

show increasing numbers of aliens waiting to be processed on the Mexican side of the border, yet they also indicate the ports were not using all available detention capacity.

For example, we observed this scenario during our visit to the San Luis port of entry in Arizona. At the San Luis port, which has the capacity to hold 48 detainees, we found at the time of our visit in October 2018 that CBP was detaining only 5 undocumented aliens while a line of at least 30 more waited along the international border.[41] Yet, we observed several empty holding cells and an empty trailer fully equipped to hold undocumented families, even though there was a line of waiting aliens. We later learned from CBP's daily Queue Management Report that 105 aliens were in the queue to enter the port that day.

When interviewed by DHS OIG, staff at the San Luis port said they could process more asylum seekers than they were processing.[42] When we asked why the San Luis port elected not to process the undocumented aliens waiting at the Queue Management line, we received a range of answers. The senior port official said the undocumented aliens waiting outside were not real asylum seekers, but rather came to seek economic opportunity. However, this assumption on the part of the official is not an appropriate basis for CBP to refuse to process the individuals, as CBP officials do not have the authority to evaluate the credibility of asylum claims and must process all claiming to seek asylum, regardless of the officials' opinions about the strength of their claims. Alternatively, two staff members at the San Luis port of entry said management "above" the port sets limits on the numbers of undocumented aliens the port should process. One of these officers told us, "I know from what came down from HQ, we are trying to process the least amount of people."

During our visit in November 2018, we observed a similar situation at the Nogales port of entry, which consists of three separate crossing points close to each other geographically: the Mariposa facility, DeConcini crossing, and Morley Gate. CBP added family unit holding cells to the Mariposa facility when it renovated the port in 2014, but CBP was not using those cells during our fieldwork. We observed at least six hold rooms and office space that were either empty or used for storage. A port official said the staff had used these hold rooms during the 2016 surge of Haitian migrants, but did not recall the last time they were used since then.

---

[41] CBP provided us with internal reports stating the port's capacity is 48 aliens. However, in an interview, a senior port official told us the port's capacity was 35 aliens.
[42] We visited the San Luis port of entry on October 30, 2018 to observe operations, including the Queue Management line, and to interview CBP employees familiar with processing undocumented aliens.

**AR01281**



According to the official, the port does not use the hold rooms because it does not have enough staff to monitor aliens in the rooms, and the facility closes at night. The official told us when his staff encounter undocumented aliens, they drive them a short distance to the DeConcini crossing. However, on the day of our visit, the DeConcini crossing's hold rooms were full. As a result, the 20 or more aliens waiting outside the DeConcini facility would not be processed until the DeConcini crossing's hold rooms became available. In the meantime, the hold rooms in the Mariposa facility, 3 miles away, were empty.

It is unclear why officials at the Nogales port assigned staff to transport undocumented aliens to other CBP facilities rather than assigning the officers to monitor these aliens at the Nogales port. Additionally, by assigning staff to operate the limit line, the port reduced its capability to process undocumented aliens.

Although CBP has been attempting to hire more officers to fill vacant positions, many ports of entry are not at full staffing. According to CBP OFO's port of entry staffing data, shown in Table 2, overall staffing rates at four field offices' ports have improved since FY 2016, when three of four CBP field offices processed more undocumented aliens than in FYs 2017 and 2018.

**Table 2. Southwest Border Land Port of Entry CBP OFO Staffing Levels and Numbers of Undocumented Aliens Processed in FYs 2016 – 2018**

| Field Office | FY 16 Staff % | Aliens Processed in FY 2016 | FY 17 Staff % | Aliens Processed in FY 2017 | FY 18 Staff % | Aliens Processed in FY 2018 |
|---|---|---|---|---|---|---|
| El Paso | 98.4% | *23,787* | 101.2% | *17,308* | 99.7% | *23,509* |
| Laredo | 90.0% | *68,957* | 94.5% | *48,524* | 99.2% | *48,059* |
| San Diego | 83.1% | *49,075* | 86.5% | *31,252* | 90.3% | *35,288* |
| Tucson | 73.9% | *12,105* | 71.9% | *13,885* | 78.7% | *17,303* |
| **All Southwest Border** | **87.1%** | ***153,924*** | **90.0%** | ***110,969*** | **93.6%** | ***124,159*** |

*Source*: CBP

## Conclusion

In 2018, as surges of undocumented aliens sought asylum in the United States, the DHS Secretary and CBP leadership urged asylum seekers to come to ports of entry to be processed. However, DHS and CBP took actions to reduce the number of asylum seekers CBP processed daily. Under the INA, the

**AR01282**



U.S. Government must process all those who are physically in the United States and express fear of persecution in their home country or an intention to seek asylum.  The law does not set limits as to the number of asylum seekers the Government can or must process.  Nevertheless, the Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public.  As a result, the numbers of asylum seekers in Queue Management lines grew.  As the lines grew and asylum seekers were redirected to other ports, some undocumented aliens attempted to enter the United States illegally, exacerbating the very problem DHS sought to solve.

## Recommendations

We recommend the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

## Management Comments and OIG Analysis

We have included a copy of CBP's Management Response in its entirety in Appendix B.  We also received technical comments from CBP and incorporated them into the report where appropriate.  CBP did not concur with Recommendation 1, but concurred with Recommendations 2 and 3.  We consider Recommendation 1 unresolved and open.  Recommendations 2 and 3 are resolved and open.  A summary of CBP's responses and our analysis follows.

In its response to our report, CBP expressed concerns that the report "demonstrates a fundamental misunderstanding of Office of Field Operations (OFO) holding capacity holding capacity [*sic*] compared to its operational capacity."  CBP said its capacity to detain individuals in its short-term facilities depends on many factors, including:
- Demographics of the individual in custody;
- Medical or other needs of individuals in custody;

**AR01283**


- Ability of ICE ERO or HHS to transfer individuals out of CBP custody;
- OFO's available resources to process and hold individuals;
- Competing priority missions; and
- Availability of staff, room, and resources.

In our report, we acknowledge the difference between holding and operational capacity, though we use the terms capacity and capability. The report explains that capacity (holding space) and capability (staffing and resources) were the reasons for CBP's stated limitations to process undocumented aliens. However, our evidence also indicates that CBP OFO used these reasons regardless of the port's actual capacity and capability, as detailed on page 10 of the report.

Moreover, throughout the report, we address the confluence of factors that affect the capability/operational capacity of a given port. For example, we explain in footnote 40,

> Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in another cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

The report also recognizes the constraints facing CBP. As described on page 12, we detail that while temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care. The report explains how and why CBP OFO leadership implemented the redirecting procedure at some ports. Finally, the report's background provides historical context for how challenging it has been for CBP to manage the surges of undocumented aliens in its facilities given CBP OFO's complex mission.

As the report describes, DHS leadership directed ports to focus resources and staff on all other OFO missions other than processing inadmissible aliens despite improved levels of staffing in every field office since 2016 and available holding capacity. The 2018 queue management reports showed that the redirecting ports rarely reported anyone in custody. Finally, the report details that staff at the ports we visited received instructions to redirect all asylum seekers, and port staff were not checking the port's capability or capacity before doing so. These findings were further corroborated by the OIG's

**AR01284**



previous review, *Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel (OSC File No. DI-18-5034).*

In its response, CBP also raised concerns about OIG's analysis and conclusions regarding 8 CFR § 100.4., stating "…it is not within OIG's mission or authority to provide legal advice to the Department." We note that the IG is duty-bound to promote efficiency and prevent and detect abuse within agency programs and operations.

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**CBP Response:** CBP did not concur with the recommendation. CBP officials said their decision to redirect the processing of undocumented aliens at the seven ports of entry to other ports depended on operational capacity and the resources available to execute its primary mission of securing the border. Additionally, CBP stated that specific dynamics at each port of entry affect the port's capacity to process and hold aliens without documents and each port director must maintain a discretionary balance between processing aliens and facilitating trade, travel, and counter-narcotics missions. CBP requested that OIG consider this recommendation resolved and closed.

**OIG Response:** We consider this recommendation unresolved and open. The intent of the recommendation is for CBP to address the "discretionary balance" of missions at the seven redirecting ports. We understand that port directors consider many factors when prioritizing port resources and missions, however, these seven ports have effectively ceased processing aliens without regard to other missions. The recommendation will remain unresolved and open until CBP can show it is processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or CBP has formally reclassified those ports consistent with long-established procedures.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**CBP Response:** CBP concurred with the recommendation. In its response, CBP said it has issued the following guidance to its employees:

1. *Processing of Expedited Removal Cases*, October 2, 2014
2. *Metering Guidance*, April 27, 2018

**AR01285**


3. *Metering Guidance*, April 30, 2020

CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:** We consider these actions responsive to the intent of the recommendation, which is resolved and open. CBP issued two of the three documents before we initiated our fieldwork, and based on our findings, those documents alone may be insufficient for training. CBP's April 30, 2020 "Metering Guidance" memorandum restates CBP policy on metering to Directors of Field Offices, however, it does not address officer training or provide any indication the guidance was disseminated to the OFO's line officers. We will close this recommendation when we receive documentation showing that CBP employees have received training on how to follow the metering guidance.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**CBP Response:** CBP concurred with the recommendation. CBP said its port directors use discretion in balancing mission requirements with respect to activities occurring at the port as well as available resources when evaluating the operational capacity to ensure the most efficient use of resources. CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:** We consider this action responsive to our recommendation, which is resolved and open. However, the intent of the recommendation is for CBP to assess the use of each port's available holding spaces to identify areas where port directors could address capacity and capability issues to enable more flexibility in balancing mission needs. CBP did not provide any documentation showing that it conducted an evaluation of available holding spaces. We will close this recommendation when we receive documentation that CBP has performed such an evaluation of more efficient use of available holding spaces to process undocumented aliens.

**AR01286**


# Appendix A
# Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107–296) by amendment to the *Inspector General Act of 1978.*

We initiated this review in response to 2 congressional requests signed by 53 members that our office received in June 2018, with the following objectives, to determine whether CBP's OFO is: (1) turning away those who present themselves for asylum at ports of entry; and (2) separating family units seeking asylum and documenting this practice appropriately. We have split discussion of our findings into two separate reports. This report addresses the first objective, whether CBP's ports of entry are turning away asylum-seeking aliens. We are issuing a second report, which addresses the second objective, separation of family units at CBP OFO ports of entry.

To answer our objectives, we conducted unannounced site visits to 12 land ports of entry across 4 field offices along the Southwest Border, listed below, where we interviewed CBP staff and observed port operations. We also interviewed officials in CBP headquarters, Washington D.C.

<u>Laredo, Texas, Field Office and ports of entry:</u>
1. Brownsville
   a. Brownsville and Matamoros Bridge
   b. Gateway International Bridge
2. Hidalgo

<u>El Paso, Texas, Field Office and ports of entry:</u>
3. Paso Del Norte Bridge

<u>Tucson, Arizona, Field Office and ports of entry:</u>
4. Nogales
   a. DeConcini crossing
   b. Mariposa facility
   c. Morley Gate
5. Douglas
6. Lukeville
7. Naco
8. San Luis

<u>San Diego, California, Field Office and ports of entry:</u>
9. Calexico

**AR01287**



10. Otay Mesa
11. San Ysidro
12. Tecate

To obtain a different perspective of the issues, we spoke with representatives of six non-governmental organizations.

We used forensic means to gather and search CBP emails because we had not received complete and accurate information from CBP during our fieldwork. Early in the review, we asked CBP for policies, procedures, and training related to CBP's asylum processing at the ports of entry, and received few, marginally related documents in response. We did not receive any policies or procedures for conducting Queue Management lines or redirecting undocumented aliens. During our interviews in the field, we heard conflicting accounts of CBP policies and procedures, and learned of policies CBP had not provided to us, despite their relevance to our work. As a result, we requested the email accounts of 49 senior OFO officials at Headquarters, Field Offices, and ports of entry from April 2018 through November 8, 2018. CBP provided the emails and because of this search, we identified the Secretary's June 5, 2018 announcement of the Prioritization-based Queue Management pilot program, preparations for it, and subsequent actions at the ports, such as Queue Management lines and redirecting procedures.

We conducted the preliminary research for this review between June and October 2018, and conducted fieldwork between November 2018 and April 2019, under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

**AR01288**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## CBP Comments to the Draft Report



1300 Pennsylvania Avenue NW
Washington, DC 20229

September 8, 2020

MEMORANDUM FOR: Joseph V. Cuffari, Ph.D.
Inspector General

FROM: Henry A. Moak, Jr.
Senior Component Accountable Official
U.S. Customs and Border Protection

X _____ 9/8/2020
Signed by: HENRY A MOAK JR

SUBJECT: Management Response to Draft Report: "CBP Has Taken Steps
to Limit Processing of Undocumented Aliens at Ports of Entry"
(Project No. 18-122-ISP-CBP)

Thank you for the opportunity to comment on this draft report. U.S. Customs and Border
Protection (CBP) appreciates the work of the Office of Inspector General (OIG) in
planning and conducting its review and issuing this report.

CBP is pleased that the OIG's draft report recognizes that CBP has taken disciplinary
action against CBP Officers (CBPO) found, in violation of asylum-processing policies, to
have returned individuals physically present in the U.S. and who expressed a fear of
return to Mexico. Integrity is one of CBP's Core Values and it is essential to the
effective functioning of the Agency. As an Agency charged with law enforcement
activities, it is imperative that all CBP employees demonstrate high standards.

CBP is concerned, however, that the draft report demonstrates a fundamental OIG
misunderstanding of the Office of Field Operations (OFO) holding capacity *holding
capacity* compared to its *operational capacity*. Title 6, United States Code (U.S.C.)
Section 211(g), assigns CBP OFO its multifaceted mission set to coordinate enforcement
activities at air, land, and sea ports of entry (POEs); safeguard the United States from
illegal entry of persons; and facilitate the flow of legitimate travelers and trade. As part
of its mission to secure the border and facilitate lawful trade and travel, CBP OFO takes
steps, as needed, to regulate the flow of travelers into the POEs. Regulating the flow
ensures that each POE has enough operational capacity to safely process all individuals,
as well as execute its priority mission sets. In recent years, CBP has seen an increasing
number of aliens presenting at POEs who do not possess appropriate travel and
identification documents required by law. Processing these aliens requires a substantial
amount of time and resources that, if not carefully managed, negatively affects the flow

**AR01289**



of trade and other travel. Thus, CBP must carefully balance its space and resources to ensure that the POEs have enough capacity to address all aspects of its mission set, including the safety of all travelers accessing the POE.

In 2016, there was a significant influx of aliens, without appropriate documents, seeking entry into the United States along the U.S.-Mexico border. The demographics of the inadmissible applicants for admission also began evolving from single adults to include families. In addition, the number of individuals who presented themselves at the border exceeded CBP OFO's operational capacity to safely process, and hold, these individuals in its short-term detention facilities. It also strained the resources of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) long-term custodial facilities. Regardless, upon completion of the inspection of an inadmissible applicant for admission, the U.S. Government is statutorily required to detain the inadmissible applicant for admission in accordance with the provisions of Sections 235(b)(1) and (2) of the Immigration and Nationality Act (INA) [8 U.S.C. 1225(b)(1)-(2)].

CBP's capacity to detain individuals in its short-term facilities depends on many factors, including:

- Demographics of the individuals in custody;
- Medical or other needs of individuals in custody;
- Ability of ICE ERO (or, if an unaccompanied alien child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and
- OFO's available resources to safely process and hold individuals.

The operational capacity of a POE also depends largely on the resources available to the POE to execute its primary mission of securing the border. CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on more than the amount of available physical holding space. It is also dependent on other activities occurring at the POE, including:

- Encounters with individuals who have terrorist, criminal, or gang ties;
- Volume of trade and trade enforcement issues;
- Detection of contraband; and
- Volume of other travelers seeking entry into the United States.

Regarding OIG's analysis and conclusions that CBP actions were inconsistent with 8 CFR § 100.4, it is important to note that it is not within OIG's mission or authority to provide legal advice to the Department. It is also inappropriate for the OIG to infer that the Department must act in accordance with OIG's conclusions. To ensure that CBP maintains a safe inspectional environment for personnel, as well as all travelers and goods processed at POEs, CBP may engage, as necessary, in steps to regulate the flow of

**AR01290**



travelers without documents sufficient for lawful entry. Queue management (also known as "metering") allows CBP to engage in all aspects of its multifaceted mission set at POEs along the U.S.-Mexico border. During queue management, CBPOs are required to stand at, or as close as operationally possible, to the international boundary, also known as the "limit line," to determine whether travelers approaching the POE have documents sufficient for lawful entry to the United States. If an alien does not have the requisite documents to apply for admission to the United States, the alien may be required to wait in Mexico until resources and capacity allows for processing.

CBP must have enough operational capacity, including personnel, space, and technology, to execute its full mission set of protecting national security, interdicting narcotics and other contraband, protecting the country's economic security and facilitating lawful trade and travel. When a POE lacks operational capacity to safely process and hold aliens without documents sufficient for lawful entry and execute its full mission set, queue management, which is consistent with principles of determining when, where, and how aliens may apply for admission to the United States may be required. This ensures CBP resources are efficiently balancing its multifaceted mission set until resources to process aliens without documents sufficient for lawful entry are operationally available.

CBP policy prohibits personnel from taking any steps to discourage travelers from waiting at the international border to be processed from claiming fear of return to another country or from seeking any other protections. On April 27, 2018, CBP's OFO issued guidance on metering, which states in part, "Once a traveler is in the United States, he or she must be fully processed …." Therefore, it is CBP policy that upon an individual's arrival at a POE that individual shall be inspected and processed. If, upon arrival in the United States, an individual (of any nationality) expresses an intention to apply for asylum, a fear of return to their home country, or a fear of persecution or torture in their home country, that individual's claim is referred to an asylum officer or an immigration judge for further consideration. CBP OFO holds its managers, supervisors, and CBPOs accountable to correctly follow the laws, regulations, and procedures in the processing of inadmissible applicants for admission, including those who express a fear of return or a desire to seek asylum. DHS and CBP have repeatedly provided CBPOs guidance to reinforce the correct laws, regulations, and help ensure procedures are adhered to in the processing of inadmissible applicants for admission. And, as recognized by the OIG, personnel that violate CBP's asylum-processing policies have been disciplined.

The draft report contained three recommendations, including two with which CBP concurs (Recommendations 2 and 3) and one with which CBP non-concurs (Recommendation 1). Attached find our detailed response to each recommendation. CBP previously submitted technical comments under a separate cover for OIG's consideration.

3

**AR01291**



Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions.

Attachment

4

**AR01292**



**Attachment: Management Response to Recommendations
Contained in 18-122-ISP-CBP**

OIG recommended that the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Response:** Non-concur. CBP will ensure public notification, as necessary, when POEs make changes to better align with operational capacity. However, CBP's decision to redirect the processing of undocumented aliens at the seven ports of entry to other posts was dependent on operational capacity, and the resources available to the POEs to execute its primary mission of securing the border. CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on many factors, not just on the amount of available holding space. It is also contingent on other POE specific dynamics, including:

- Operating hours;
- Access to medical facilities/personnel to comply with screening requirements;
- Isolation and quarantine requirements for certain individuals and those with communicable diseases;
- Encounters of individuals with terrorist, criminal, or gang ties;
- Volume of trade and other trade enforcement issues;
- Detection of contraband; and,
- Volume of other travelers seeking entry to the United States.

There is a discretionary balance by port directors assessing their mission requirements to process lawful trade and travel, to address CBP's counter-narcotics mission, and to process people arriving without documents. This balance must be maintained.

CBP requests that the OIG consider this recommendation resolved and closed.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Response:** Concur. On October 2, 2014, CBP OFO issued a memorandum "Processing of Expedited Removal Cases," which has been in effect through the period of OIG's audit and which outlines the requirement that once an alien expresses a fear of return or a

5

**AR01293**



desire to apply for asylum, the alien must be processed accordingly. Additionally, on April 27, 2018, CBP OFO issued a memorandum "Metering Guidance," which emphasizes that once a traveler is in the United States, he or she must be processed. CBP OFO reiterated these requirements on April 30, 2020, with the issuance of second memorandum titled "Metering Guidance." Copies of these memorandums were previously provided to the OIG under separate cover.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**Response:** Concur. CBP port directors evaluate operational capacity daily at the POEs to ensure the most efficient use of resources. The assessment of operational capacity is based on the activities occurring at a POE at any given time, as well as the resources necessary to balance national security, and facilitating legitimate travel and trade. There is a discretionary balance by the port director assessing their mission requirements to process lawful trade and travel, to address our counter-narcotics mission, and to process people arriving without documents.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

6

**AR01294**



**Appendix C**
**Timeline of Asylum Processing Significant Events in 2018**



**Zero-Tolerance Policy**
As implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those traveling with their children. By early May, CBP separated parents, who entered illegally, from their children.

April 6, 2018

**Initial Queue Management Guidance**
CBP issued guidance for establishing queue management lines to slow the flow of undocumented aliens arriving in Southwest border ports.

April 27, 2018

**DHS Secretary Public Statement**
Secretary Nielsen told Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry. [We] will process your claim there."

May 9, 2018

**DHS Secretary Request**
Secretary Nielsen asked CBP officials to examine the number asylum seekers CBP could turn away every day if CBP ports ran queue management lines full-time.

May 24, 2018

**DHS Secretary Memo on CBP Priorities**
Secretary Nielsen signed an internally-circulated memo emphasizing that processing undocumented aliens was not one of CBP's main priorities and encouraging Port Directors to re-assign CBP staff away from processing such aliens.

June 5, 2018

**DHS Secretary White House Press Briefing**
Secretary Nielsen told reporters, "As I said before, if you're seeking asylum, go to a port of entry. You do not need to break the law of the United States to seek asylum." When reporters told the Secretary that media reported families turned away at ports of entry, she described that reporting as 'incorrect.'

June 18, 2018

**CBP OFO EAC Statement**
Executive Assistant Commissioner Owen said during a press conference, "despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

July 9, 2018

**OIG Observations**
During our site visit to San Ysidro POE, we observed a CBPO turn away a mother and two children who had crossed the border into the U.S.

August 28, 2018

**AR01295**



**Appendix D**
**Office of Special Reviews and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Elizabeth Kingma, Team Lead
Adam Brown, Senior Inspector
Stephen Farrell, Senior Inspector
Paul Lewandowski, Senior Inspector
Jason Wahl, Senior Inspector
Jon Goodrich, Investigative Counsel
Gregory Flatow, Program Analyst
Michael Brooks, Independent Reference Reviewer

**AR01296**



**Appendix E**
**Report Distribution**

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner, CBP
CBP Component Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

**AR01297**

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

**Final or Most Current Outcomes, Total SW Border Encounters by MPP cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 |
| Repatriations | 314,855 | 364,051 | 199,873 | 10,999 | 7,066 | 991 | 303,856 | 356,985 | 198,882 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | | | 1 | 1 | 102,234 | 111,174 |
| Removals | 254,317 | 128,063 | 6,437 | 545 | 43 | - | 253,772 | 128,020 | 6,437 |
|   Expedited | 142,713 | 76,786 | 2,953 | 17 | 7 | - | 142,696 | 76,779 | 2,953 |
|   Reinstatement | 99,362 | 54,075 | 3,405 | 22 | 1 | - | 99,340 | 54,074 | 3,405 |
|   Administrative removals | 685 | 272 | 5 | 24 | - | - | 661 | 272 | 5 |
|   Other removals[1] | 11,557 | 2,930 | 76 | 482 | 35 | - | 11,075 | 2,895 | 76 |
| Returns | 39,587 | 21,090 | 4,086 | 24 | 5 | - | 39,563 | 21,087 | 4,086 |
| Re-encounters[2] | 20,950 | 112,664 | 78,175 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,185 |
| **No confirmed departure** | 662,374 | 94,015 | 16,808 | 33,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 |
| Being processed | 528,445 | 77,011 | 14,917 | 10,075 | 6,202 | 1,583 | 518,368 | 68,809 | 13,334 |
|   Being processed by DHS | 163,766 | 27,322 | 10,398 | 207 | 284 | 206 | 163,559 | 27,038 | 10,192 |
|   In EOIR proceedings[3] | 287,962 | 34,911 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,368 | 2,281 |
|   EOIR case completed – additional DOJ action[4] | 76,713 | 14,778 | 861 | 5,169 | 375 | - | 71,546 | 14,403 | 861 |
| Final order/voluntary departure | 94,780 | 9,897 | 439 | 18,047 | 4,399 | - | 76,773 | 5,498 | 439 |
|   Unexecuted removal orders | 93,265 | 9,864 | 434 | 18,047 | 4,397 | - | 75,258 | 5,467 | 434 |
|     In absentia | 73,061 | 6,655 | - | 14,006 | 4,171 | - | 59,055 | 2,484 | - |
|     Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | - | 16,203 | 2,983 | 434 |
|   Unexecuted voluntary departures | 1,515 | 33 | 5 | | 2 | - | 1,515 | 31 | 5 |
| Relief | 28,473 | 2,107 | 33 | 3,199 | 479 | - | 25,274 | 1,628 | 33 |
|   SIJ or affirmative asylum | 5,709 | 178 | - | 6 | 3 | - | 5,703 | 175 | - |
|   LPR status granted by DHS | 4,244 | 224 | 10 | 5 | - | - | 4,239 | 224 | 10 |
|   EOIR relief[5] | 6,873 | 944 | 3 | 561 | 48 | - | 6,312 | 896 | 3 |
|   EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | - | 6,707 | 290 | 7 |
|   Other[6] | 315 | 44 | 13 | 2 | 1 | - | 313 | 43 | 13 |
| Parole | 7,055 | 4,285 | 788 | - | - | - | 7,055 | 4,285 | 788 |
| No Subsequent Event[7] | 3,623 | 713 | 631 | - | - | - | 3,623 | 713 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters by MPP Cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 32.2% | 79.5% | 92.2% | 24.8% | 35.1% | 38.5% | 32.6% | 81.5% | 92.9% |
| Title 42 Expulsion | 0.0% | 22.3% | 51.3% | 0.0% | 0.0% | 0.0% | 0.0% | 23.3% | 51.9% |
| Removals | 26.0% | 28.0% | 3.0% | 1.2% | 0.2% | 0.0% | 27.2% | 29.2% | 3.0% |
|   Expedited | 14.6% | 13.3% | 1.4% | 0.0% | 0.0% | 0.0% | 15.3% | 16.2% | 1.4% |
|   Reinstatement | 10.2% | 11.8% | 1.6% | 0.0% | 0.0% | 0.0% | 10.6% | 12.3% | 1.6% |
|   Administrative removals | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% |
|   Other removals[1] | 1.2% | 0.6% | 0.0% | 1.1% | 0.2% | 0.0% | 1.2% | 0.7% | 0.0% |
| Returns | 4.1% | 4.6% | 1.9% | 0.1% | 0.0% | 0.0% | 4.2% | 4.8% | 1.9% |
| Re-encounters[2] | 2.1% | 24.6% | 36.1% | 23.6% | 34.8% | 38.5% | 1.1% | 24.1% | 36.0% |
| **No confirmed departure** | 67.8% | 20.5% | 7.8% | 75.2% | 64.9% | 61.5% | 67.4% | 18.5% | 7.1% |
| Being processed | 54.1% | 16.8% | 6.9% | 22.8% | 40.7% | 61.5% | 55.6% | 15.7% | 6.2% |
|   Being processed by DHS | 16.8% | 6.0% | 4.8% | 0.5% | 1.4% | 8.0% | 17.5% | 6.2% | 4.8% |
|   In EOIR proceedings[3] | 29.5% | 7.6% | 1.7% | 10.6% | 37.4% | 53.5% | 30.4% | 6.2% | 1.1% |
|   EOIR case completed – additional DOJ action[4] | 7.9% | 3.2% | 0.4% | 11.7% | 1.9% | 0.0% | 7.7% | 3.3% | 0.4% |
| Final order/voluntary departure | 9.7% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.2% | 1.3% | 0.2% |
|   Unexecuted removal orders | 9.5% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.1% | 1.2% | 0.2% |
|     In absentia | 7.7% | 1.5% | 0.0% | 36.1% | 20.7% | 0.0% | 6.3% | 0.6% | 0.0% |
|     Not in absentia | 1.9% | 0.7% | 0.2% | 4.5% | 1.1% | 0.0% | 1.7% | 0.7% | 0.2% |
|   Unexecuted voluntary departures | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% |
| Relief | 2.9% | 0.5% | 0.0% | 11.7% | 2.4% | 0.0% | 2.5% | 0.4% | 0.0% |
|   SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.0% | 0.0% |
|   LPR status granted by DHS | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.1% | 0.0% |
|   EOIR relief[5] | 0.7% | 0.2% | 0.0% | 1.3% | 0.2% | 0.0% | 0.7% | 0.2% | 0.0% |
|   EOIR termination | 1.2% | 0.2% | 0.0% | 10.4% | 2.1% | 0.0% | 0.7% | 0.1% | 0.0% |
|   Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.7% | 0.9% | 0.4% | 0.0% | 0.0% | 0.0% | 0.8% | 1.0% | 0.4% |
| No Subsequent Event[7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.4% | 0.2% | 0.3% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

AR01299

MOST CURRENT OUTCOMES

|  | 81,716 | 20,177 |  |  | 58,325 |  |
|---|---|---|---|---|---|---|
|  |  | **Total** |  |  |  |  |

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 448,786 | 381,055 | 829,841 | 34,205 | 11,944 | 46,149 43.7% | | | | 34,144 | 11,927 | 46,071 | 252,868 | 293,671 | 546,539 | 11% | | ER |
|  | 2019 | 2020 | 2Q2QQ | 2019 | 2020 | 2Q2QQ | 2019 | 2020 | 2Q2QQ | 2019 | 2020 | 2Q2QQ | 2019 | 2020 | 2Q2QQ | 2019 | 2020 | 2Q2QQ |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 | 753,918 | 366,296 | 211,705 | 44,209 | 20,128 | 2,574 | 709,709 | 346,168 | 209,131 |
| **Repatriations** | 314,855 | 364,051 | 199,873 | 12,999 | 7,266 | 991 | 301,856 | 356,985 | 198,882 | 166,691 | 291,727 | 196,908 | 10,972 | 7,058 | 991 | 155,719 | 284,669 | 195,917 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | 1 | 0 | 1 | 0 | 102,234 | 111,174 | 1 | 102,233 | 111,168 | 1 | 0 | 0 | 0 | 102,233 | 111,167 |
| Removals | 254,317 | 128,063 | 6,437 | 545 | 43 | 0 | 253,772 | 128,020 | 6,437 | 108,344 | 56,726 | 3,497 | 536 | 40 | 0 | 107,808 | 56,686 | 3,497 |
| Expedited | 142,713 | 70,786 | 2,953 | 17 | 7 | 0 | 142,696 | 70,779 | 2,953 | 1,375 | 411 | 20 | 12 | 4 | 0 | 1,363 | 407 | 20 |
| Reinstatement | 99,362 | 54,075 | 3,405 | 22 | 1 | 0 | 99,340 | 54,074 | 3,405 | 98,982 | 53,950 | 3,403 | 22 | 1 | 0 | 98,960 | 53,949 | 3,403 |
| Administrative removals | 685 | 272 | 3 | 24 | 0 | 0 | 661 | 272 | 3 | 587 | 219 | 2 | 24 | 0 | 0 | 563 | 219 | 2 |
| Other removals[1] | 11,557 | 2,930 | 76 | 482 | 35 | 0 | 11,075 | 2,895 | 76 | 7,400 | 2,146 | 72 | 478 | 35 | 0 | 4,157 | 784 | 4 |
| Returns | 39,587 | 21,090 | 4,086 | 24 | 3 | 0 | 39,563 | 21,087 | 4,086 | 38,176 | 20,971 | 4,086 | 24 | 3 | 0 | 38,152 | 20,968 | 4,086 | 1,411 | 119 | 0 |
| Re-encounters[2] | 20,950 | 112,664 | 78,175 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,185 | 20,170 | 111,797 | 78,157 | 10,411 | 7,015 | 990 | 9,759 | 104,782 | 77,167 | 780 | 867 | 18 |
| **No confirmed departure** | 662,374 | 94,015 | 16,808 | 31,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 | 587,227 | 74,569 | 14,797 | 33,237 | 13,070 | 1,583 | 553,990 | 61,499 | 13,214 | 75,147 | 19,446 | 2,011 |
| Being processed | 528,443 | 77,011 | 14,917 | 10,071 | 8,202 | 1,583 | 518,368 | 68,809 | 13,334 | 466,906 | 60,698 | 13,234 | 10,065 | 8,201 | 1,583 | 456,841 | 52,497 | 11,651 | 61,537 | 16,313 | 1,683 |
| Being processed by DHS | 163,766 | 27,322 | 10,398 | 307 | 284 | 206 | 163,559 | 27,038 | 10,192 | 151,076 | 20,632 | 9,151 | 207 | 284 | 206 | 150,869 | 20,348 | 8,945 | 12,690 | 6,690 | 1,247 |
| In EOIR proceedings[3] | 287,962 | 34,911 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,368 | 2,281 | 272,578 | 32,880 | 3,387 | 4,697 | 7,542 | 1,377 | 267,881 | 25,338 | 2,010 | 15,382 | 2,030 | 271 |
| EOIR case completed - additional DOJ[4] | 76,715 | 14,778 | 861 | 5,169 | 375 | 0 | 71,546 | 14,403 | 861 | 43,252 | 7,186 | 696 | 5,161 | 375 | 0 | 38,091 | 6,811 | 696 | 33,463 | 7,592 | 165 |
| Final order/voluntary departure | 94,780 | 9,897 | 439 | 18,007 | 4,399 | 0 | 76,773 | 5,498 | 439 | 88,836 | 7,534 | 219 | 17,980 | 4,390 | 0 | 70,856 | 3,144 | 219 | 5,944 | 2,363 | 220 |
| Unexecuted removal orders | 93,265 | 9,864 | 434 | 18,007 | 4,397 | 0 | 75,258 | 5,467 | 434 | 87,374 | 7,510 | 214 | 17,980 | 4,388 | 0 | 69,394 | 3,122 | 214 | 5,891 | 2,354 | 220 |
| In absentia | 75,061 | 6,655 | 0 | 16,006 | 4,171 | 0 | 59,055 | 2,484 | 0 | 71,854 | 6,612 | 0 | 15,979 | 4,162 | 0 | 55,875 | 2,450 | 0 | 3,207 | 43 | 0 |
| Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | 0 | 16,203 | 2,983 | 434 | 15,520 | 898 | 214 | 2,001 | 226 | 0 | 13,519 | 672 | 214 | 2,684 | 2,311 | 220 |
| Unexecuted voluntary departures | 1,515 | 33 | 5 | 0 | 2 | 0 | 1,515 | 31 | 5 | 1,462 | 24 | 5 | 0 | 2 | 0 | 1,462 | 22 | 5 | 53 | 9 | 0 |
| Relief | 28,473 | 2,107 | 33 | 5,199 | 479 | 0 | 23,274 | 1,628 | 33 | 21,183 | 1,534 | 32 | 5,192 | 479 | 0 | 15,991 | 1,055 | 32 | 7,290 | 573 | 1 |
| SIJ or affirmative asylum | 5,709 | 178 | 0 | 6 | 3 | 0 | 5,703 | 175 | 0 | 5,387 | 173 | 0 | 6 | 3 | 0 | 5,381 | 170 | 0 | 322 | 5 | 0 |
| LPR status granted by DHS | 4,244 | 224 | 10 | 5 | 0 | 0 | 4,239 | 224 | 10 | 2,389 | 224 | 10 | 5 | 0 | 0 | 2,384 | 224 | 10 | 1,855 | 0 | 0 |
| EOIR relief[5] | 6,873 | 944 | 3 | 561 | 48 | 0 | 6,312 | 896 | 3 | 3,448 | 407 | 3 | 560 | 48 | 0 | 2,888 | 359 | 3 | 3,425 | 537 | 0 |
| EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | 0 | 6,707 | 290 | 7 | 9,683 | 688 | 6 | 4,619 | 427 | 0 | 5,064 | 261 | 6 | 1,649 | 29 | 1 |
| Other[6] | 315 | 44 | 13 | 2 | 1 | 0 | 313 | 43 | 13 | 276 | 42 | 13 | 2 | 1 | 0 | 274 | 41 | 13 | 39 | 2 | 0 |
| Parole | 7,055 | 4,285 | 788 | 0 | 0 | 0 | 7,055 | 4,285 | 788 | 7,055 | 4,285 | 788 | 0 | 0 | 0 | 7,055 | 4,285 | 788 | 0 | 0 | 0 |
| No Subsequent Event[7] | 3,623 | 715 | 631 | 0 | 0 | 0 | 3,623 | 715 | 631 | 3,247 | 518 | 524 | 0 | 0 | 0 | 3,247 | 518 | 524 | 376 | 197 | 107 |

|  |  | 576 | 12 | 426 | 34,205 | 11,944 | 46,149 | 1.4% |  |  |  | 10,027 | 794 | 11,721 | 252,868 | 293,671 | 546,539 | 2.1% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR prosecutorial discretion, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 44,280 | 20,146 | 2,574 | 30,896 | 5,735 | - | 13,306 | 14,252 | 2,552 |
| Repatriations | 10,999 | 7,066 | 993 | 2,322 | 483 | - | 8,418 | 6,491 | 973 |
| Title 42 Expulsion | 1 | | 1 | | | | 1 | | |
| Removals | | | | | | | | | |
|    Expedited | 545 | 45 | - | 533 | 36 | - | 12 | 5 | - |
|    Expedited | 17 | 7 | - | 13 | 4 | - | 4 | 5 | - |
|    Reinstatement | 22 | 1 | - | 21 | - | - | 1 | 1 | - |
|    Administrative removals | 24 | - | - | 24 | - | - | - | - | - |
|    Other removals[1] | 482 | 35 | - | 475 | 34 | - | 7 | 1 | - |
| Returns | 24 | 3 | - | 22 | 1 | - | 2 | 2 | - |
| Re-encounters[2] | 10,429 | 7,020 | 990 | 1,966 | 444 | - | 8,404 | 6,484 | 973 |
| **No confirmed departure** | 33,281 | 13,080 | 1,583 | 28,374 | 5,252 | - | 4,888 | 7,761 | 1,579 |
| Being processed | 10,073 | 6,202 | 1,585 | 5,369 | 574 | - | 4,687 | 7,761 | 1,579 |
|    Being processed by DHS | 207 | 284 | 206 | - | - | - | 188 | 217 | 202 |
|    In EOIR proceedings[3] | 4,039 | 7,543 | 1,377 | - | - | - | 4,039 | 7,543 | 1,377 |
|    EOIR case completed - additional DOJ action[4] | 5,169 | 375 | - | 5,169 | 374 | - | - | 1 | - |
| Final order/voluntary departure | 18,007 | 4,599 | - | 18,006 | 4,599 | - | 1 | - | - |
|    Unexecuted removal orders | 18,007 | 4,397 | - | 18,006 | 4,397 | - | 1 | - | - |
|    In absentia | 16,006 | 4,371 | - | 16,006 | 4,371 | - | - | - | - |
|    Not in absentia | 2,001 | 226 | - | 2,000 | 226 | - | 1 | - | - |
|    Unexecuted voluntary departures | - | 2 | - | - | 2 | - | - | - | - |
| Relief[5] | 5,199 | 479 | - | 5,199 | 479 | - | - | - | - |
|    SIJ or affirmative asylum | 6 | 3 | - | 6 | 3 | - | - | - | - |
|    LPR status granted by DHS | 5 | - | - | 5 | - | - | - | - | - |
|    EOIR relief[6] | 563 | 48 | - | 563 | 48 | - | - | - | - |
|    EOIR termination | 4,625 | 427 | - | 4,625 | 427 | - | - | - | - |
|    Other[6] | 2 | 1 | - | 2 | 1 | - | - | - | - |
| Parole | - | - | - | - | - | - | - | - | - |
| No Subsequent Event[7] | - | - | - | - | - | - | - | - | - |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | #DIV/0! | 100.0% | 100.0% | 100.0% |
| Repatriations | 24.8% | 35.1% | 38.5% | 8.2% | 8.4% | #DIV/0! | 63.3% | 45.5% | 38.1% |
| Title 42 Expulsion | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Removals | | | | | | | | | |
|    Expedited | 1.2% | 0.2% | 0.0% | 1.7% | 0.7% | #DIV/0! | 0.1% | 0.0% | 0.0% |
|    Expedited | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Reinstatement | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Administrative removals | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Other removals[1] | 1.1% | 0.2% | 0.0% | 1.5% | 0.6% | #DIV/0! | 0.1% | 0.0% | 0.0% |
| Returns | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Re-encounters[2] | 23.6% | 34.8% | 38.5% | 6.4% | 7.7% | #DIV/0! | 63.2% | 45.5% | 38.1% |
| **No confirmed departure** | 75.2% | 64.9% | 61.5% | 91.8% | 91.6% | #DIV/0! | 36.7% | 54.5% | 61.9% |
| Being processed | 22.8% | 40.7% | 61.5% | 16.7% | 6.5% | #DIV/0! | 36.7% | 54.5% | 61.9% |
|    Being processed by DHS | 0.5% | 1.4% | 8.0% | 0.0% | 0.0% | #DIV/0! | 1.4% | 1.5% | 7.9% |
|    In EOIR proceedings[3] | 10.6% | 37.4% | 53.5% | 0.0% | 0.0% | #DIV/0! | 35.5% | 52.9% | 54.0% |
|    EOIR case completed - additional DOJ action[4] | 11.7% | 1.9% | 0.0% | 16.7% | 6.5% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Final order/voluntary departure | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Unexecuted removal orders | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    In absentia | 36.1% | 20.7% | 0.0% | 51.8% | 72.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Not in absentia | 4.5% | 1.1% | 0.0% | 6.5% | 3.9% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Unexecuted voluntary departures | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Relief[5] | 11.7% | 2.4% | 0.0% | 16.8% | 8.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    SIJ or affirmative asylum | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    LPR status granted by DHS | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    EOIR relief[6] | 1.3% | 0.2% | 0.0% | 1.8% | 0.8% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    EOIR termination | 10.4% | 2.1% | 0.0% | 15.0% | 7.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|    Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Parole | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| No Subsequent Event[7] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

AR01301

**Final or Most Current Outcomes, Total SW Border Encounters for Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 932,949 | 437,920 | 214,207 | 189,231 | 28,919 | 1,087 | 715,020 | 194,831 | 24,172 |
| Repatriations | 303,836 | 356,985 | 198,882 | 32,466 | 8,286 | 88 | 264,132 | 145,752 | 12,310 |
| Title 42 Expulsion | | 102,234 | 111,174 | | | | | 854 | 1,345 |
| Removals | 253,772 | 128,020 | 6,437 | 28,446 | 7,336 | 69 | 224,856 | 120,489 | 6,365 |
|   Expedited | 142,096 | 70,779 | 2,953 | 15,472 | 4,710 | 37 | 127,224 | 66,069 | 2,916 |
|   Reinstatement | 99,340 | 54,074 | 3,405 | 2,864 | 659 | 5 | 96,476 | 53,413 | 3,400 |
|   Administrative removals | 661 | 272 | 5 | 33 | 11 | - | 158 | 66 | |
|   Other removals[1] | 11,075 | 2,895 | 76 | 10,077 | 1,956 | 27 | 998 | 939 | 49 |
| Returns | 39,563 | 21,087 | 4,086 | 3,368 | 541 | 18 | 36,192 | 20,542 | 4,068 |
| Re-encounters[2] | 10,521 | 105,644 | 77,185 | 652 | 409 | 1 | 3,084 | 3,867 | 332 |
| No confirmed departure | 629,093 | 80,933 | 15,225 | 156,765 | 20,633 | 999 | 450,888 | 49,079 | 11,862 |
|   Being processed | 518,368 | 68,809 | 13,334 | 71,457 | 14,382 | 860 | 432,544 | 47,478 | 10,898 |
|     Being processed by DHS | 145,824 | 27,038 | 10,192 | - | - | - | 149,172 | 20,089 | 8,616 |
|     In EOIR proceedings[3] | 285,263 | 27,568 | 2,281 | 5 | - | - | 283,258 | 27,568 | 2,281 |
|     EOIR case completed - additional DOJ action[4] | 71,346 | 14,403 | 861 | 71,432 | 14,382 | 860 | 114 | 21 | 1 |
|   Final order/voluntary departure | 76,773 | 5,498 | 439 | 69,726 | 5,020 | 129 | 7,047 | 478 | 310 |
|     Unexecuted removal orders | 73,258 | 3,467 | 434 | 68,223 | 4,993 | 124 | 7,035 | 474 | 310 |
|       In absentia | 59,055 | 2,484 | - | 59,049 | 2,484 | - | 6 | - | |
|       Not in absentia | 16,203 | 2,983 | 434 | 9,174 | 2,509 | 124 | 7,029 | 474 | 310 |
|     Unexecuted voluntary departure | 1,515 | 31 | 5 | 1,503 | 27 | 5 | 12 | 4 | |
|   Relief | 23,274 | 1,628 | 33 | 15,602 | 1,231 | 10 | 7,669 | 397 | 23 |
|     SIJ or affirmative asylum | 5,703 | 175 | - | 1,373 | 44 | - | 4,330 | 131 | |
|     LPR status granted by DHS | 4,239 | 224 | 10 | 1,155 | - | - | 3,084 | 224 | 10 |
|     EOIR relief[5] | 6,312 | 896 | 5 | 6,310 | 895 | 5 | 2 | 1 | |
|     EOIR termination | 6,707 | 290 | 7 | 6,701 | 290 | 7 | 6 | - | |
|   Other[6] | 315 | 43 | 13 | 63 | 2 | - | 247 | 41 | 13 |
| Parole | 7,055 | 4,285 | 768 | - | - | - | 3,625 | 713 | 631 |
| No Subsequent Event[7] | 3,625 | 713 | 631 | - | - | - | 3,625 | 713 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 32.6% | 81.5% | 92.9% | 17.2% | 28.7% | 8.1% | 36.9% | 74.8% | 50.9% |
| Title 42 Expulsion | 0.0% | 23.3% | 51.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.4% | 5.6% |
| Removals | 27.2% | 29.2% | 3.0% | 15.0% | 25.4% | 6.3% | 31.4% | 61.8% | 26.3% |
|   Expedited | 15.3% | 16.2% | 1.4% | 8.2% | 16.3% | 3.4% | 17.8% | 33.9% | 12.1% |
|   Reinstatement | 10.6% | 12.3% | 1.6% | 1.5% | 2.3% | 0.5% | 13.5% | 27.4% | 14.1% |
|   Administrative removals | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
|   Other removals[1] | 1.2% | 0.7% | 0.0% | 5.3% | 6.8% | 2.5% | 0.1% | 0.5% | 0.2% |
| Returns | 4.2% | 4.8% | 1.9% | 1.8% | 1.9% | 1.7% | 5.1% | 10.5% | 16.8% |
| Re-encounters[2] | 1.1% | 24.1% | 36.0% | 0.3% | 1.4% | 0.1% | 0.4% | 2.0% | 2.2% |
| No confirmed departure | 67.4% | 18.5% | 7.1% | 82.8% | 71.3% | 91.9% | 63.1% | 25.2% | 49.1% |
|   Being processed | 55.6% | 15.7% | 6.2% | 37.8% | 49.7% | 79.1% | 60.5% | 24.4% | 45.1% |
|     Being processed by DHS | 17.5% | 6.2% | 4.8% | 0.0% | 0.0% | 0.0% | 20.9% | 10.3% | 35.6% |
|     In EOIR proceedings[3] | 30.6% | 6.2% | 1.1% | 0.0% | 0.0% | 0.0% | 39.6% | 14.0% | 9.4% |
|     EOIR case completed - additional DOJ action[4] | 7.7% | 3.3% | 0.4% | 37.7% | 49.7% | 79.1% | 0.0% | 0.0% | 0.0% |
|   Final order/voluntary departure | 8.2% | 1.3% | 0.2% | 36.8% | 17.4% | 11.9% | 1.0% | 0.2% | 1.3% |
|     Unexecuted removal orders | 8.1% | 1.2% | 0.2% | 36.1% | 17.3% | 11.4% | 1.0% | 0.2% | 1.3% |
|       In absentia | 6.3% | 0.6% | 0.0% | 31.2% | 8.6% | 0.0% | 0.0% | 0.0% | 0.0% |
|       Not in absentia | 1.7% | 0.7% | 0.2% | 4.8% | 8.7% | 11.4% | 1.0% | 0.2% | 1.3% |
|     Unexecuted voluntary departure | 0.2% | 0.0% | 0.0% | 0.8% | 0.1% | 0.5% | 0.0% | 0.0% | 0.0% |
|   Relief | 2.5% | 0.4% | 0.0% | 8.2% | 4.3% | 0.9% | 1.1% | 0.2% | 0.1% |
|     SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.7% | 0.2% | 0.0% | 0.6% | 0.1% | 0.0% |
|     LPR status granted by DHS | 0.5% | 0.1% | 0.0% | 0.6% | 0.0% | 0.0% | 0.4% | 0.1% | 0.0% |
|     EOIR relief[5] | 0.7% | 0.2% | 0.0% | 3.3% | 3.1% | 0.5% | 0.0% | 0.0% | 0.0% |
|     EOIR termination | 0.7% | 0.1% | 0.0% | 3.5% | 1.0% | 0.6% | 0.0% | 0.0% | 0.0% |
|   Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.8% | 1.0% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No Subsequent Event[7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.5% | 0.4% | 2.6% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

— *Central American Migration*

# The devastating toll of 'Remain in Mexico' asylum policy one year later

*Press Release*    |    *29 January 2020*

**RELATED**

CENTRAL AMERICAN MIGRATION    REFUGEES, IDPS AND PEOPLE ON THE MOVE    MEXICO    UNITED STATES OF AMERICA

- The US government's 'Remain in Mexico' policy which keeps asylum seekers in Mexico to await their proceedings, has been in place for a year.
- The policy endangers the lives of asylum seekers, who are vulnerable and trapped in an area known for violence, extortion and kidnapping.
- The US must end this degrading and inhumane policy that places people's lives at substantial risk.

**MEXICO CITY/NEW YORK**  – One year since the United States implemented its "Remain in Mexico" policy, tens of thousands of asylum seekers are trapped in danger in Mexico, facing daily violence and dealing with the mental health toll of constant risk and uncertainty, Médecins Sans Frontières (MSF) said.

"The US continues to send asylum seekers back into danger and into the hands of the cartels that control the migration routes in Mexico," said Sergio Martin, general coordinator for MSF in Mexico. "Just steps from the US border in Matamoros, there are thousands of asylum seekers now living in makeshift camps with limited access to shelter or basic health care."

| **RELATED**
| **US migration policy endangers lives of asylum seekers in Tamaulipas s...**
| PRESS RELEASE



**In Nuevo Laredo, we have patients who won't set foot outside of shelters because they know they are targeted to be kidnapped, held for ransom, or killed.**

SERGIO MARTIN, MSF GENERAL COORDINATOR IN MEXICO

Implemented in January 2019, 'Remain in Mexico' – officially called the Migrant Protection Protocols (MPP) by the US government – forces asylum seekers back to Mexico to await their asylum proceedings, making them vulnerable to kidnapping and violence.

More than 62,000 people have been returned to Mexico due to MPP. MSF works along the migration route in Mexico, and at border locations in Nuevo Laredo, Matamoros, Mexicali, and Reynosa, and witnesses the devastating humanitarian consequences of MPP and new rules that have essentially ended asylum at the US southern border.

## Alarming numbers experience violence and kidnapping

Approximately 80 per cent of the migrants treated by MSF teams in Nuevo Laredo during the first nine months of 2019 reported having suffered at least one violent incident. Another 44 per cent of patients said they had been victims of violence during the seven days prior to the consultation.

## 62,

**PEOPLE RETURNED TO MEXICO DUE TO THE MPP**

## 8%

PATIENTS TREATED B'
JAN-OCT 2019

In September 2019, 43 percent of MSF's patients who were sent to Nuevo Laredo through MPP had been kidnapped recently. Twelve percent of patients reported being victims of a failed kidnapping attempt. In October 2019, the percentage of MSF patients who were in Nuevo Laredo due to MPP who had been kidnapped, rose to 75 percent. These figures only represent MSF programmes and do not capture the massive scope of violence migrants are facing.

## Traumatised and needing mental health support

This site uses cookies to offer you a better browsing experience.  **Read our privacy policy.**

> ACCEPT ALL

> ADJUST SETTINGS


AR01303

"Our patients are living in a state of limbo and constant fear," said Martin. "They are traumatised and in need of mental health support."



An MSF psychologist speaks to a woman seeking asylum in the US, trapped in Matamoros, Mexico. November 2019.

## A catalogue of policies designed to push people back

MPP is just one in a litany of new extremely harmful asylum restrictions enacted by the US, in cooperation with governments in the region, that risk people's lives and purposefully send people back to danger.

In 2019 the US negotiated migration agreements with the governments of Guatemala, Honduras, and El Salvador that would allow them to send asylum seekers to these countries.

"Many of our patients are escaping high levels of violence in Guatemala, Honduras, and El Salvador," said Marcelo Fernandez, regional coordinator for MSF programs in Central America. "It is preposterous that the US would send people back to the very same Central American countries people are fleeing in the first place."

In addition to being unsafe, these countries do not have the necessary infrastructure, protection mechanisms, or funding in place to begin receiving asylum seekers. There is limited information about the exact terms of these deals, how they will be implemented, or what the timing will be, said MSF.

"The people we are seeing along the migration route are well aware of the dangers they will face along the way, but they are desperate to escape violence and poverty back home and they will continue to seek refuge in the United States," said Fernandez. "A year since Remain in Mexico was implemented, there's no question of the toll it has taken and the risks it creates for extremely vulnerable people."

"The United States must end this cruel and inhumane policy that forces people to risk their lives to seek asylum," Fernandez said.

In Mexico, MSF provides medical and mental health care in shelters Tapachula, Tenosique, Coatzacoalcos, Nuevo Laredo, Mexicali, Reynosa, and Matamoros. In Mexico City, MSF runs a specialized therapeutic center for migrants and asylum seekers who are victims of extreme violence.



This site uses cookies to offer you a better browsing experience.   Read our privacy policy.

> ADJUST SETTINGS          ✓ ACCEPT ALL


AR01304



# Pentagon announces nearly 4, additional troops heading to U Mexico border

BY **BRETT SAMUELS** · 02/03/19 04:06 PM EST

**14,207** SHARES                    SHARE              TW



© Getty Images

Nearly 4,000 additional U.S. troops will be deployed to the southern border to assist Customs and Border Protection, the Pentagon announced Sunday.

According to a statement released by the Defense Department, 3,750 troops will head to the border for 90 days to aid in placing razor wire along the border, as well as with mobile surveillance operations. The deployment will bring the number of active-duty forces in the area supporting Customs and Border Protection to roughly 4,350.

Acting Defense Secretary Patrick Shanahan said last week that the department would send "several thousand" additional troops to the border, but declined to be more specific.

Rep. Adam Smith (D-Wash.), the chairman of the House Armed Services Committee, chastised Shanahan last Thursday over the lack of transparency surrounding how many troops were being sent to the border.

The additional troop deployment comes amid a standoff between President Trump and congressional Democrats over funding for his desired wall along the southern border. The president has demand $5.7 billion for the structure, which Democrats have staunchly opposed. The stalemate triggered a partial government shutdown that lasted 35 days.

## Just In...

**Florida high school draws backlash after altering girls' yearbook photos to add clothing**
STATE WATCH — 9S AGO

**Michigan governor apologizes after photo shows her violating state's health order**
STATE WATCH — 1M 52S AGO

**Harris to 2021 grads: Pandemic prepared you for 'pretty much anything'**
IN THE KNOW — 1H 8M AGO

**Senate Armed Services chair throws support behind changing roles of military commanders in sexual assault prosecutions**
DEFENSE — 2H 2M AGO

**Blinken condemns 'shocking act' of Belarus forcing plane carrying opposition journalist to land**
INTERNATIONAL — 2H 19M AGO

**Three in five say more changes needed to give Black Americans equal rights: poll**
BLOG BRIEFING ROOM — 2H 37M AGO

**Cheney dodges on link between Trump election claims and GOP voting laws**

AR01305

**HOUSE** — 2H 40M AGO

---

**NSF funding choice:
Move forward or fall
behind**

**OPINION** — 3H 17M AGO

---

**VIEW ALL**

Trump signed legislation to reopen the government until Feb. 15 that did
not include money for the wall, but allowed for a bipartisan group of
lawmakers to negotiate over border security funding.

The president has expressed doubts that the final agreement will be to his
liking, raising the prospect of another government shutdown or that he
could declare a national emergency to secure money for the wall. The
latter measure would likely prompt swift legal challenges.

Trump tweeted last Thursday that more troops were being sent to the
border, but that building a wall would be "soooo much easier and less
expensive."

Trump last year ordered thousands of troops be sent to secure the
southern border in anticipation of the arrival a caravan of Central
American migrants that the president had portrayed as a horde of
criminals. Critics decried the use of the military as a political stunt.

*Updated at 5:15 p.m.*

TAGS   PATRICK SHANAHAN   DONALD TRUMP   ADAM SMITH

SHARE              TWEET



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2021 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

**AR01306**

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**PROCLAMATIONS**

# Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States

— **NATIONAL SECURITY & DEFENSE**

Issued on: **February 15, 2019**



The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency. The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate. In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and resources to the Department of Homeland Security at the southern border. Because of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border

**AR01307**

of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense in the case of the Secretaries of the Army, Navy, and Air Force. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

Section 1. The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border.

Sec. 2. The Secretary of Defense, the Secretary of the Interior, the Secretary of Homeland Security, and, subject to the discretion of the Secretary of Defense, the Secretaries of the military departments, shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

Sec. 3. This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fifteenth day of February, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

DONALD J. TRUMP

**AR01308**



The White House

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Economic Advisers

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright   Privacy Policy



# Protection Postponed: Asylum Office Backlogs Cause Suffering, Separate Families, and Undermine Integration

The Biden Administration has inherited a large and growing backlog of asylum claims. As of September 2020, more than 386,000 applications were awaiting adjudication by the Asylum Division of U.S. Citizenship and Immigration Services (USCIS). This backlog exploded under the Obama Administration, which increased the use of expedited removal and redirected asylum officers from adjudicating asylum cases to instead conduct fear screenings. Over the past four years, the backlog continued to grow as the Trump Administration diverted Asylum Division resources to block and turn back refugees seeking U.S. asylum protection – in violation of U.S. laws and treaty obligations.

As a result, refugees face catastrophic, years-long delays to receive an asylum interview. Although U.S. law requires the government to conduct asylum interviews within 45 days of filing, many asylum seekers – including those who filed applications during the Obama Administration – have waited years. They are trapped in legal limbo without permanent status and are often subjected to prolonged separation from their families, including many who are living in danger abroad. While waiting, asylum seekers are often unable to pursue educational opportunities or secure employment, all the while living in fear that they could be deported to persecution or torture.

The backlog coincides with record levels of global refugee displacement. At the end of 2020, the U.N. Refugee Agency (UNHCR) reported that more than 26 million refugees were displaced worldwide, including refugees from Cameroon, Central African Republic, China, El Salvador, Eritrea, Guatemala, Honduras, Nicaragua, Russia, Syria, South Sudan, Venezuela, and Yemen, as political repression, civil conflicts, and other violence forced people to flee their homes in search of protection. For instance, since 2014, political violence in Venezuela has led to an 8,000 percent increase in the number of Venezuelans seeking refugee protection worldwide, with over 100,000 Venezuelans seeking refuge in the United States. Since September 2016, Venezuelans have filed more affirmative asylum applications each month with USCIS than asylum seekers of any other nationality.

Despite these acute needs, U.S. policies and practices are forcing more asylum seekers to wait even longer to receive protection as Asylum Division resources are diverted to implement harsh and flawed border policies, including the expansive use of expedited removal. In fiscal years (FY) 2016 and 2019, an astounding 89 percent of asylum officers were temporarily reassigned from adjudicating affirmative asylum to other duties, including screenings for asylum seekers placed in expedited removal as well as those subjected to the Trump Administration's illegal policies to block refugees at the southern border, such as the Migrant Protection Protocols (MPP) and Asylum Cooperative Agreements (ACA).

At the same time, USCIS's decision to prioritize more recent applicants – the so-called "last in, first out" (LIFO) policy – has failed to reduce the backlog, essentially freezing those already waiting for interviews while adding new asylum seekers to the backlog each year. During the COVID-19 pandemic, the backlog has continued to expand and wait times have grown even longer.

This report, which builds on Human Rights First's prior research, examines the human impact of the backlog through interviews with our asylum clients who have been waiting years for asylum office interviews. It also

analyzes government policies and data to explain underlying causes of the backlog, challenges it poses, and opportunities to resolve it.

*Key findings:*

☑ **The affirmative asylum backlog grew under the Trump Administration, reaching a historic high of more than** <u>386,000</u> pending applications at the end of FY 2020. Among the asylum seekers stuck in the backlog are thousands from <u>Venezuela</u>, who since September 2016 have filed more affirmative asylum applications than people of any other nationality, with many seeking protection from persecution by the repressive Venezuelan government.

☑ **Asylum seekers wait for years in the backlog for their claims to be adjudicated.** Without a change in the Asylum Division's interview scheduling priorities, USCIS's <u>plan</u> to eliminate the backlog in six years would leave many asylum seekers waiting years – some waiting potentially more than a decade. Asylum seekers who filed applications during the Obama Administration – and who are now at the end of the line due to the adoption of the "last in, first out" scheduling policy in January 2018 – continue to wait for asylum officer interviews. The large majority of interviews currently scheduled are for applications submitted in the last three months; for example, only <u>four percent</u> of asylum interviews scheduled in April/May 2020 were from cases pending more than 100 days. The Bellevue Program for Survivors of Torture (PSOT) <u>reported</u> that only 18 percent of its clients whose cases were pending in the affirmative asylum backlog prior to January 2018 had received interviews as of 2020. Of the more than 300 Human Rights First clients stranded in the affirmative backlog, 80 percent have been waiting for more than two years for an interview, with average wait time of more than four years, as of April 2021. In addition, years-long, post-interview delays have become increasingly common for refugees from Iran, Iraq, Syria, Yemen and other nationalities who are eventually granted asylum, as USCIS takes extreme amounts of time to conclude security and background vetting and additional reviews.

☑ **Harsh and flawed border policies, including the expansive use of expedited removal, worsen the backlog by diverting Asylum Division resources away from resolving affirmative asylum claims.** During the Obama and Trump Administrations (FY 2016 to FY 2019), an astounding <u>89 percent</u> of the 535 asylum officers in the Asylum Division were temporarily diverted from adjudicating affirmative asylum cases to other duties, including screenings for asylum seekers placed in expedited removal as well as those subjected to illegal Trump Administration policies – MPP and ACA – to block refugees at the southern border.

☑ **Despite efforts to hire new staff, the Asylum Division continues to lack sufficient asylum officers.** USCIS was authorized to employ up to <u>1,296</u> asylum officers in FY 2020, but as of April 2020 it had only <u>866</u> on staff. In addition, low retention of experienced asylum officers is a problem. Many retired, transferred to other USCIS divisions, or <u>quit</u> to avoid implementing, or being complicit in, the Trump Administration's illegal asylum policies.

☑ **The human consequences of the backlog are devastating.** The backlog prolongs family separation, leaving many children and spouses in danger for years. Delays also undercut pro bono legal representation and harm asylum seekers' mental health, leaving them in limbo and potentially compounding their trauma from persecution and torture experienced in their home countries. Meanwhile employment and education are often placed on hold while asylum seekers are forced to wait for years without permanent legal status. Those caught in the backlog include: A father, who has been separated from his children for six years and had his request to expedite his asylum case denied despite his brother's political imprisonment in Yemen and efforts by a local militia to target his teenage son; an asylum seeker from the Central African Republic who has not seen his three daughters or wife in more than four years; and an Iranian asylum seeker, who has suffered homelessness during a more than five-year wait for an asylum interview.

☑ **Fraud and security screenings have grown unchecked and surpassed their necessary roles as fraud and security checks.** USCIS components tasked with implementing the Trump Administration's rhetoric of "extreme vetting" have drained substantial agency resources to pre-screen asylum applications that could, and should, be more effectively devoted to conducting interviews with asylum seekers. The post-interview vetting and background check process has also ballooned in a discriminatory fashion that affects some nationalities, including asylum applicants from Iran, Iraq, Syria, and Yemen, more than others.

*Human Rights First urges the Biden Administration to:*

**U.S. Citizenship and Immigration Services and its Asylum Division**

☑ Address the backlog of pending asylum applications.

    o   Prioritize applications pending the longest for interview, while the Asylum Division also schedules interviews for child applicants and other recently filed applications, and consider authorizing overtime for asylum officers who volunteer to help clear the backlog of affirmative cases.

    o   Create an effective process to advance asylum interviews for applicants with medical, humanitarian or other pressing concerns, including family members in danger abroad, and ensure access to advance parole for applicants with emergent reasons to travel abroad temporarily.

☑ Modernize and improve asylum office processes to promote efficiency.

    o   Ramp up hiring and establish initiatives to boost retention of asylum officers, including encouraging experienced asylum officers who quit or transferred out of the Asylum Division to return.

    o   Ensure cases are accurately resolved and unnecessary referrals to immigration court minimized through hiring of qualified asylum officers, appropriate and accurate training and oversight, and review of all referrals and denials while Trump administration policies and rulings remain under review.

    o   Establish a process for individuals to apply directly to USCIS for cancellation of removal, such as through a separate USCIS application and adjudication unit, so that applicants for this humanitarian relief can be referred for assessment and these cases do not add to asylum backlogs.

    o   Allow electronic filings, establish online interview scheduling and rescheduling, create a uniform short notice list, and provide longer interview notice periods to reduce rescheduling.

    o   Assess application processing and vetting efforts, such as the Asylum Vetting Center (AVC) and Fraud Detection and National Security (FDNS) Directorate, to identify ways to improve efficiency and effectiveness of USCIS resources.

☑ Revoke illegal Trump Administration policies, including unprecedented asylum application fees, new and increased fees for initial and renewed work authorization, and other rules that prevent, limit, or delay refugees from supporting themselves and their families while waiting for asylum decisions.

☑ Promote transparency by providing regular, public updates on asylum officer interview schedules, as recommended by the USCIS Ombudsman and agreed to by USCIS, reinstating quarterly national stakeholder meetings, and releasing quarterly data fully disaggregated by nationality and other characteristics.

**Department of Homeland Security (DHS)**

☑ Withdraw expansions of expedited removal to the interior of the United States and between ports of entry, and exercise DHS's discretion at and between ports of entry to reject the use of expedited removal to avoid diverting substantial asylum office staffing and resources to screen people likely to be entitled to apply for

asylum. <u>USCIS</u> has noted that high volumes of expedited removal screenings "place[] great strain on the resources of the USCIS Asylum Division."

☑ End the <u>Migrant Protection Protocols</u> and the <u>misuse</u> of Title 42 public health authority to summarily expel asylum seekers and fully rescind the <u>asylum cooperative agreements</u>, <u>entry</u> and <u>third-country transit</u> asylum bans, and other illegal policies that block refugees from requesting U.S. asylum protection, weaponize expedited removal, and divert asylum officers from adjudicating affirmative asylum claims.

**United States Attorney General**

☑ Vacate Attorney General and Board of Immigration Appeals rulings that rig asylum adjudications against refugees, including *Matter of A-B-*, *Matter of A-C-A-A-*, and *Matter of L-E-A-*, which purport to limit asylum for survivors of domestic violence, people persecuted on account of their family relationships and other particular social groups.

**United States Congress**

☑ Provide appropriations to hire additional asylum officers to clear the backlog of affirmative asylum applications and ensure that new applications are timely adjudicated.

# USCIS's Role in Asylum Adjudication

Seeking asylum in the United States is a complex process. Individuals present in the United States who are not in immigration removal proceedings can apply for asylum with the USCIS Asylum Division by voluntarily filing an "affirmative" asylum application. Generally, asylum seekers can be barred from asylum if they do not apply within one year of their arrival unless they meet certain limited exceptions – a harsh ban that denies asylum to refugees and separates refugee families. Asylum seekers who apply affirmatively are usually not detained while they wait to present their claim.

Affirmative asylum applicants receive a non-adversarial interview with an Asylum Division officer to determine whether they meet the legal definition of a "refugee"—a person unable or unwilling to return to her country of origin because of persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. Applicants must present evidence to support their case and convince the asylum officer of their credibility, a process that may be made difficult by the lingering effects of persecution, torture, or other trauma. Although <u>U.S. law</u> requires that asylum interviews generally be conducted within 45 days of filing, wait times for the scheduling of asylum interviews, as discussed below, may extend for years.

If the officer does not grant the asylum application and the applicant does not otherwise have valid immigration status, the case will be "referred" to the immigration court, where an attorney from U.S. Immigration and Customs Enforcement (ICE) will argue for the person's removal from the United States and an immigration judge will consider the asylum case or other available forms of relief from removal. Between FY 2013 and 2017, **most affirmative asylum claims referred from the asylum office and decided by immigration judges were ultimately <u>granted</u>,** according to DOJ data. Thus, referrals to court do not necessarily indicate that an asylum claim lacks merit.

In addition, the Asylum Division considers asylum applications of unaccompanied children who are subject to immigration court removal proceedings. While an unaccompanied child's asylum claim is being considered, the immigration judge may adjourn the hearing to allow time for the Asylum Division to issue a decision. The judge will consider the merits of an unaccompanied child's case only if it is not granted by the asylum officer and is "referred" to the court.

Although affirmative asylum applicants and unaccompanied children may present their cases directly to an asylum officer, asylum seekers who seek protection upon arrival at a port of entry without valid travel documents or enter without inspection are currently unable to apply for affirmative asylum if they are placed in expedited removal. DHS has discretion in many cases to parole these asylum seekers into the United States and to refer them to regular immigration court removal proceedings. However, DHS tends to place these asylum seekers in expedited removal or, for those who have a prior removal order, in reinstatement of removal proceedings.

When DHS uses expedited removal, Section 235 of the Immigration and Nationality Act (INA) requires asylum officers to conduct protection screening interviews—known as credible fear interviews (CFI) and reasonable fear interviews (RFI)—with people subject to expedited removal or reinstatement of removal, respectively. These screenings determine whether the United States can immediately deport them to their country of origin or whether they must be referred to the immigration court for a hearing. While the Trump Administration has repeatedly attempted to unlawfully raise the standards applied during these interviews, the INA requires that during a credible fear interview, an asylum officer must determine whether there is a "significant possibility" that a person could establish an asylum, withholding of removal, or torture protection claim before an immigration judge. In a reasonable fear interview the officer determines if there is a "reasonable possibility" of future persecution based on one of the five protected grounds under the refugee definition and for potential eligibility for protection under the Convention Against Torture.

## The Human Impact of the Asylum Backlog

Long wait times for adjudication of asylum claims have devastating effects on refugees and their families. Delays prolong the separation of families—by years—leaving children and spouses of many refugees stranded in danger abroad. Mental health experts warn that extended anxiety due to delays and temporary status hinders asylum seekers' ability to recover from past trauma. Limited access to employment and educational opportunities impede asylum seekers' ability to support themselves and their families and to rebuild their lives in the United States. **Of the more than 300 Human Rights First clients stranded in the affirmative backlog, 80 percent have been waiting for more than two years for an interview, with average wait time of more than four years, as of April 2021.**

### Prolonged Family Separation

Many asylum seekers stuck in the backlog are separated from spouses, children, and other family members, many of whom are stuck in danger abroad. Once individuals are granted asylum, they may petition for their children and spouse to join them in the United States. But asylum seekers awaiting adjudication cannot sponsor qualifying family members under a pending application. While it is possible to request expedited scheduling of an asylum interview based on urgent humanitarian concerns, including danger to family abroad, the process for doing so is opaque to unrepresented asylum applicants, and the Asylum Office has in recent years been unreliable in responding to such requests even when made by lawyers.

Long waits are often destructive to asylum seekers' mental health and relationships with family members left behind. As Dr. Asher Aladjem, Chief Psychiatrist at the Bellevue Program for Survivors of Torture, told Human Rights First, asylum seekers struggle with "the sense that their own lives aren't only in limbo, but the whole family and the children and the whole [familial] system that they're part of is impacted." The Center for Victims of Torture recently noted that "prolonged uncertainty" for asylum seekers in the backlog separated from family members in danger "can cause such acute feelings of hopeless[ness] and depression that it can result in suicidality." In addition, researchers find that lengthy family separations caused by asylum adjudication backlogs often leave asylum seekers in "a state of fear and guilt due to their sense of having made family members targets of persecution." Asylum seekers in the backlog whose families remain stranded abroad include:

- **Ibrahim[1], a Pakistani human rights activist, has waited for his asylum interview since 2015 while his wife and children remain in danger in Pakistan due to his work on behalf of marginalized groups.** USCIS denied his request to expedite his asylum interview despite credible threats against his family. Ibrahim's youngest daughter was just three years old when he fled Pakistan. As Ibrahim's wait continues to grow, he laments the time separated from his children as they grow up without him. "I have lost my children – even if I see them again, I will never have those years back."

- **Jean, an opposition party activist from the Central African Republic, has not seen his wife and three daughters for more than four years.** He fled in 2016 after government authorities arrested, imprisoned, and tortured him for his political views. Because Jean was unable to bring his family with him as he fled, his wife and children are stranded alone in Cameroon. "I miss my family every day. Whenever I feel hopeless or tired, I think of my children. When I think of them, it gives me the courage to continue."

- **Aaron, an Ethiopian refugee waiting in the backlog for over five years, saw his relationship with his fiancée break down due to their separation.** "I met someone who I fell in love with. I thought we would be able to get married, and she could come from Ethiopia to live with me." But without asylum Aaron lacked the immigration status to bring his fiancée to the United States. "After more than a year of waiting, she had to move on with her life and married someone else. It crushed me."

- **Ali, who fled political persecution in Yemen, has been separated from his wife and children for nearly six years as he waits for an interview**. His wife, children, and other family in Yemen are in grave danger due to Ali's former business dealings with the U.S. government. Since Ali fled Yemen, the authorities detained his brother after they discovered WhatsApp messages from Ali on his phone. "They took him because of me. No one in my family knows where he is or when he will be released, or even if he is alive. . . . If they do that to him, what could happen to me or other members of my family?"

Refugees reunited with their families after receiving asylum continue to deal with the trauma of long-term family separation caused by the asylum backlog, including:

- **Syed, a Bangladeshi journalist who received asylum in 2018, was separated from his family for three years while in the asylum backlog.** His wife and three children finally joined him in the United States in late 2019 after USCIS approved their derivative asylee petitions. "My daughter was an infant when I was imprisoned, and when I was released, she didn't remember me. I was forced to leave the country to save my life while my wife was pregnant. My two youngest children had no memories of me ever living with them in Bangladesh." Now Syed and his family are working to build relationships and recover the years they lost. "Our separation is something we are still trying to heal together."

- **Maya, a Pakistani asylum seeker, was separated from her two children for three years while waiting in the asylum backlog.** Her children recently escaped from their abusive father and rejoined their mother in the United States. "I still feel shaky and weak when I think about those years apart. It was traumatizing for all of us."

## Mental Health Consequences

Many asylum seekers have endured severe persecution and faced further trauma during dangerous journeys to the United States. After arriving in the United States, they may experience even more suffering resulting from family separation, the inability to work, discrimination, and the anxiety of waiting for the outcome of their asylum case.

---

[1] All names are pseudonyms to ensure the confidentiality and safety of asylum seekers and their families.

Case delays impede asylum seekers' ability to overcome trauma and may compound it. As Dr. Melba Sullivan, a staff psychologist at the Bellevue Program for Survivors of Torture (PSOT), explained to Human Rights First, prolonged delays in the adjudication of asylum claims is an "ongoing stressor," causing asylum seekers to experience prolonged exposure to the trauma trigger of uncertainty of future protection. These delays also increase "clinical service backlogs" for mental health providers, such as PSOT, and "diminish[ their] ability to take in new cases." Asylum seekers who have experienced significant mental health consequences as a result of their prolonged wait in the backlog include:

- **Rita, an asylum seeker from Kosovo, has been waiting more than two years to learn whether she has received asylum.** An award-winning journalist, Rita is suffering from post-traumatic stress disorder (PTSD) exacerbated by her wait for a decision in her case and the lack of support for asylum seekers. "I cannot describe the feeling of uncertainty when I came here. I had many dark moments during the first six months here when I didn't have permission to work."

- **Farah, an asylum seeker from Bahrain, has been struggling since applying for asylum in April 2015.** When Farah began experiencing depression, she was unable to receive psychological treatment because, without permanent legal status, she did not qualify for medical insurance and could not afford treatment.

- **Paul, an LGBT asylum seeker from Cameroon, suffers from depression, which he attributes to persecution he endured due to his sexual orientation and trauma he continues to experience while separated from his family.** "My last romantic partner was arrested and killed. I was so afraid that I would be next, or my family would be hurt. So, I had to flee. But now I feel sad when I am not able to speak to my children or see their faces."

- **Ali, a Yemeni asylum seeker, has felt suicidal and despondent.** "I think about killing myself. I see my kids grow up so far from me. My son only knows his father on the phone – he doesn't remember me." For Ali, the delay in receiving an asylum interview feels as difficult as leaving his family behind. "Applying for asylum means you've already lost everything. My family, security, community, country. And now you just keep waiting. Waiting, waiting, waiting. This is almost the hardest part because there is absolutely nothing you can do."

- **Yusuf, a gay man seeking asylum from Tajikistan, faced a mental health crisis when his asylum case went from the front of the line to the back in 2018.** "It was catastrophic for me. I felt overwhelmed and depressed. The hardest part was that my whole life was upended . . . I felt that I had no control over my life at all." Yusuf still finds it difficult to cope as he sees more recent applicants have their cases resolved. "I haven't even had my interview. It has been so hard."

- **Sophie, an asylum seeker from Burkina Faso who was subjected to female genital mutilation and years of domestic violence, has struggled to maintain her mental health after her asylum interview was cancelled and subsequently pushed to the back of the backlog line following the switch to "last in, first out" in 2018.** Sophie's depression, PTSD, anxiety, and insomnia have at times been so severe that she has been unable to work. "Today, I'm not sure if I am distressed because of my abuse or because I have been waiting for an answer in my case for so long. It is difficult for me to know whether my panic attacks are due to bad memories from the past or due to anxieties I have about my current situation."

- **Teresa, who fled severe domestic violence in Honduras, wants to move on with her life but remains in limbo waiting for a decision.** Unaware of the arbitrary requirement to file an asylum application within a year of her arrival in the United States and suffering the effects of the trauma she experienced in Honduras, Teresa filed her asylum application outside of the one-year-filing deadline. In the backlog for

three years before finally receiving an interview in 2020, Teresa has been experiencing severe anxiety as she has waited months for the asylum office to decide whether she qualifies for asylum protection.

## Asylum Seekers Left Vulnerable, Integration Delayed by Barriers to Economic Stability

Under U.S. law, refugees who are granted asylum are automatically authorized to work, but asylum seekers must apply for and may only receive work authorization after their case has been pending for at least 180 days. Asylum seekers may be required to renew work permits each year, at a cost of $495, while their cases are pending. Frequent delays in processing initial and renewal applications by USCIS mean that work permits often take many months to arrive, placing asylum seekers in perilous financial situations while they wait.

The Trump Administration, through a series of administrative rules, sought to increase the period asylum seekers must wait to apply for work authorization to 365 days, bar asylum seekers from authorization who apply more than one year after last arriving in the country, and charge a prohibitive $580 fee for initial employment authorization as well as similarly high fees for work authorization renewals. The rules also eliminated fee waivers for indigent asylum seekers. Federal courts have partially enjoined the changes to work authorization eligibility and preliminarily enjoined the USCIS fee changes. In June 2020, USCIS eliminated a requirement that initial work authorization for asylum seekers be processed within 30 days.

Even without these new restrictions, the inability to work for at least six months after applying for asylum leaves many asylum seekers, already vulnerable and traumatized, in precarious situations. Those without means to survive must rely on friends, family, or local communities for support. But many lack support networks and face further difficulties in informal or illicit labor markets and tenuous housing. With no support from the federal government for housing or basic necessities, many asylum seekers experience homelessness, including:

- **Leila, a 56-year-old Iranian asylum seeker, has struggled to find secure housing, at times sleeping in subway cars.** For a period, Leila was forced to live at a homeless shelter. "There was a time when I no longer felt safe at the shelter, so I went to stay with friends, then a church acquaintance, then with other people in my community." But when COVID-19 hit, Leila's friends could longer take her in. "**I was sleeping on the subway because no one could house me.** These are the moments when you realize you truly are an immigrant – you don't have family, resources, or belongings."

- **Mary, who fled Kenya to protect herself from being forcibly subjected to female circumcision, has repeatedly experienced homelessness.** Mary has resided in the United States for nearly two years and has not yet received her work authorization. She has at times had to resort to sleeping in homeless shelters. Mary is now living with a family who informally employs her as a nanny, but she is afraid that she could once again be on the streets without a job before she receives permission to work.

- **Alexander, Nadia, and their two sons, who fled race-based attacks in Russia, were evicted from their apartment and are now facing homelessness as they struggle to find support services.** The homeless shelter where the family stays is closing, and they have only weeks to find new housing. But very limited support is available to asylum seekers. As Alexander noted, some "programs require an interview date or a green card to be eligible for assistance – **but the reason I need assistance is because I don't have an interview date or a green card.** The system is set up for me to fail, and to never be able to access the basic programs I need to be able to keep my family fed, housed, and healthy on my own."

- **Yusuf was homeless for a year after applying for asylum in 2016.** He often went days without eating and sometimes slept in airport waiting areas. Harassed in homeless shelters because of his sexuality, Yusuf said that he "would sometimes sleep in the subway for safety."

Asylum seekers without work authorization or who experience delays in renewing work permits often face difficulty in obtaining or maintaining employment. Those who do secure employment can find themselves working under exploitative circumstances and dangerous conditions, such as:

- **Maria and Jorge, who fled government persecution in Venezuela in 2014, have encountered significant barriers to housing, work, and health care in the United States without permanent status.** When the couple first arrived, they depleted their savings and Jorge took dangerous informal work to survive. When Jorge was injured on the job, the family could not afford the $1,500 treatment he needed. Maria told Human Rights First: "I had to convince the doctor to teach me how to care for him at home instead of receiving care in the office." Even now, as they remain in limbo without asylum status, Maria reported, "we cannot buy a home, return to school, or get a credit card because of our status."

Asylum seekers who were professionals in their home countries can often find only lower-skilled jobs with employers who are willing to hire asylum seekers with temporary work authorization. They include:

- **Latif worked as a software engineer in Libya but has been unable to find work in his profession while he waits for his asylum interview.** Instead, he has been teaching software engineering at a nonprofit. "Many of my students come into my classes without any expertise, then they receive full-time jobs that I also have applied for. It is very frustrating." **Latif's wife, Melissa, is a doctor, but she cannot return to school to obtain U.S. medical credentials because she is ineligible for federal financial aid as an asylum seeker.** She has also been unable to find full-time work in the medical field despite multiple unpaid internships and stints as a volunteer.

- **In the Central African Republic, Jean worked as a computer programmer but is now struggling to earn enough to survive and support his wife and daughters who were forced to flee to Cameroon.** Jean now works as a rideshare driver, but COVID-19 has dramatically reduced his earnings. "I am lucky if I earn $100 each day. I have to pay my car lease, rent, electricity, internet, insurance – and I have to eat and send money to my wife. It isn't working at all."

Without permanent legal status, many asylum seekers struggle to continue their education, as do their children who are with them in the United States and included in their claims. Thirty-one states do not provide in-state tuition rates to certain categories of immigrants, including asylum seekers. As a result, few asylum seekers qualify for in-state tuition or financial aid for higher education. Indeed, some states will not offer in-state tuition rates even after a person is granted asylum, either delaying in-state consideration until one year after the asylum grant or until the person is granted permanent residence, depending on the state. The lack of permanent status also impedes access to basic services that require official identification, including opening a bank account, renting a vehicle, or establishing a credit history to rent an apartment. Asylum seekers struggling to pursue educational opportunities in the United States include:

- **Usman, a Yemeni medical student, has not been able continue his medical studies while waiting nearly five years for an interview.** He fled Yemen in his fifth year of medical school and cannot afford to continue his education because he is not eligible for loans or other financial support. "I was doing really well in school. But you do what you have to do." Usman now works as a driver for a ride-sharing service and has struggled even to open a checking account. Banks refuse to accept the temporary state ID card he was issued because its period of validity is tied to his temporary work permit.

- **Amal, an activist in Yemen, has not been able to return to school to continue her work as a community organizer and human rights activist.** "I can't go because I am working so much [and] because it is so expensive." Without permanent status, Amal does not qualify for financial aid. She was also

recently rejected from leasing a car because of her immigration status. "These small things could make our lives easier, but asylum seekers waiting for their interview can't access them. I am in limbo."

- **Amir, who applied for asylum in 2016 after fleeing Egypt, may be suspended from his dentistry program if he does not soon receive renewal of his work authorization.** The human resources office at his dental residency program notified him that if he does not receive an extension of his work authorization before April 2021, he will be placed on leave from his dental residency.

- **Maya's son, Isaac, was unable to attend the university where he was accepted because he does not qualify for financial aid.** "We could not find a scholarship to provide funding for tuition. We tried our best but couldn't afford it. I know my son will work hard and be professionally successful, but I sometimes worry that he has lost out on opportunities and experiences because of our status."

- **By the time Samer and his family, asylum seekers from Syria, were finally granted asylum in 2021, after a nearly seven-year wait, their older child had been forced to miss a year of college due to her lack of eligibility for financial aid.** After filing for asylum, the family waited three years for an asylum interview and a further three and a half years for a decision after the case disappeared into USCIS's security and background checks and centralized review peculiar to the cases of Syrians and certain other nationalities. This delay created many hardships for the family. They had to put plans of home ownership on hold due to their lack of permanent status. After the family's oldest child graduated high school, she could not qualify for financial aid to attend college. Samer has now been granted asylum, but his daughter will still have to wait an additional year to qualify for in-state tuition rates, as the state where the family resides does not consider non-citizens to be residents for tuition purposes until a year after they are granted asylum or permanent residency.

The COVID-19 pandemic has left asylum seekers, who already struggle to build economic stability while forced to wait months for work authorization and have limited access to education and training opportunities, even more vulnerable. Asylum seekers are rarely able to access state and local safety net programs and are not eligible for Medicaid in nearly all states. Because many asylum seekers work part-time or in positions where they are not treated as employees, they may not qualify for protections awarded to full-time employees. Asylum seekers in the backlog who have suffered the economic and health consequences of the pandemic include:

- **Isabelle, a Salvadoran asylum seeker, lost her job as a housekeeper and went two months without pay when she fell sick with COVID-19.** In El Salvador, Isabelle faced death threats by the MS-13 gang that controls large parts of the country as well as severe domestic violence. She has been waiting for an asylum office interview since applying in 2016. Because of her status as an asylum seeker, Isabelle was ineligible for unemployment benefits when she was fired.

- **Mahmoud, an asylum seeker from Bahrain, went without pay for weeks when he contracted COVID-19 while working for a major online retailer.** Even though Mahmoud was working full-time when he fell ill, he was not provided health insurance and could not afford to pay for a COVID-19 test. Because he could not officially confirm that he had COVID-19, his employer refused to give him paid leave. Instead, he was forced to take time off without pay. "I was sick for three weeks, twenty-four hours a day. I was terrified."

- **Luis, a Venezuelan asylum seeker, contracted COVID-19 likely while working as ride-share driver.** Hospitalized in intensive care for sixteen days, Luis convalesced at home for another three months. Luckily, Luis and his wife, Manuela, had purchased health insurance through an exchange. But Luis was out of work for nearly six months. Without permanent legal status, Luis and Manuela were ineligible for federal government relief and they are still reeling financially from Luis' time out of work. "It sometimes feels more difficult to survive in the United States than in Venezuela."

**Impaired Access to Counsel**

Legal representation can vastly improve asylum seekers' chances of receiving protection. In 2020, asylum seekers with legal representation were nearly twice as likely to receive asylum protection in immigration court compared to asylum seekers without an attorney. Access to counsel also improves system efficiency. The U.S. Commission on International Religious Freedom noted that "lack of counsel not only disadvantaged detainees but also burdens the system, since unrepresented cases are more difficult and time consuming for adjudicators to decide." Despite the undisputed importance of legal counsel, the government does not generally fund legal representation in asylum proceedings. Indigent asylum seekers must rely on the limited resources of nonprofit organizations, law school clinics, and law firm pro bono programs.

Long delays at the Asylum Division impair the ability of pro bono legal providers to accept cases for representation and create obstacles for private immigration attorneys. A survey of 24 pro bono coordinators at major law firms conducted by Human Rights First in 2016 found that over 60 percent of pro bono professionals view delays at the asylum office as a negative factor in their firm's ability to take an affirmative asylum cases. Because associates at major law firms generally do not remain at the firm for more than a few years, years-long case delays mean cases must be reassigned – sometimes repeatedly. Moreover, many attorneys who take on a pro bono case will not take on other pro bono matters until the pending case is resolved. Similarly, law school clinics, whose students generally rotate each year, waste resources and worry about putting clients through retraumatizing interviews as wait times become prolonged. For private attorneys, managing cases in the backlog often without taking concrete steps on the asylum application for many years can create both logistical and financial difficulties. Years-long delays in adjudicating the asylum application also increase the sheer volume of work required of advocates over the life of the asylum case, due to the need to update asylum applications to deal with evolving conditions in the home country or changes in applicants' personal circumstances, and the need to apply to renew work permits—several times, in many cases—for the principal applicant and all included family members, and to deal with the many challenges the lack of lasting status poses for asylum applicants.

## The Backlog Stagnates

As of September 2020, the number of asylum applications pending before the ten USCIS asylum offices was more than 386,000. According to the USCIS Ombudsman the affirmative asylum backlog has continued to grow even as the number of applications received has fallen. USCIS has noted that high volumes of expedited removal screenings "place[] great strain on the resources of the USCIS Asylum Division." The current backlog began to grow under the Obama Administration, which increased the use of expedited removal and diverted asylum officers from adjudicating full asylum claims to conducting expedited removal fear screenings. Using expedited removal against refugee populations diverts asylum office resources toward screening individuals who are overwhelmingly entitled to full assessments of their eligibility for humanitarian protection. In 2015, for instance, 88 percent of asylum-seeking families who were placed in expedited removal passed credible fear interviews, demonstrating the redundancy and wastefulness of channeling limited asylum office resources to screen

| Fiscal Year | Affirmative Asylum Applications Filed | New Reasonable Fear Requests | New Credible Fear Requests | Total Affirmative Applications Pending at End of Fiscal Year |
|---|---|---|---|---|
| 2012 | 46,659 | 5,053 | 13,880 | 20,143 |
| 2013 | 45,403 | 7,733 | 36,035 | 38,345 |
| 2014 | 57,840 | 9,084 | 51,101 | 71,152 |
| 2015 | 84,182 | 8,015 | 48,052 | 116,774 |
| 2016 | 115,926 | 9,632 | 94,048 | 209,806 |
| 2017 | 142,818 | 10,273 | 78,564 | 303,513 |
| 2018 | 107,803 | 11,048 | 99,035 | 319,563 |
| 2019 | 84,312 | 13,197 | 105,439 | 339,836 |
| 2020 | 93,134 | 8,721 | 30,839 | 386,014 |

Sources: 2018, 2019 & 2020 USCIS Ombudsman reports and USCIS statistics.

asylum seekers. Even with variations in grant rates at different times, the vast majority of asylum seekers subjected to these screenings qualify for full asylum hearings. Positive credible fear rates during the Obama and George W. Bush administrations averaged nearly 80 percent.

The backlog's rate of growth slowed after the last-in, first-out policy was implemented in January 2018, but the LIFO policy has failed to reduce the size of the backlog, and most newly filed asylum applications continue to be placed into the growing backlog. In its response to the 2020 USCIS Ombudsman report, USCIS acknowledged in December 2020 that LIFO and other restrictive Trump Administration policies aimed at limiting access to the U.S. asylum system have not reduced "the number of pending [affirmative] cases."[2] The temporary closure of asylum offices on March 18, 2020 due to the COVID-10 pandemic and resulting reductions in interview volume since offices began to re-open on June 4, 2020 has caused the backlog to expand further; nearly 50,000 cases were added to the affirmative asylum backlog in FY 2020. According to the Trump Administration's proposed USCIS budget for FY 2021, "[u]nder current assumptions . . . USCIS is aiming to eliminate the [affirmative asylum] backlog within six years." Without a change in the Asylum Division's priorities, **USCIS' six-year timeline would leave many asylum seekers waiting for substantial periods – some potentially for as many as ten years – just to receive an interview with an asylum officer**.

The volume of asylum applications received by USCIS corresponds with high levels of global refugee displacement. Targeted violence by transnational criminal organizations and human rights abuses by government forces in El Salvador, Guatemala, and Honduras has led to a significant increase in asylum requests in the United States, as well as in other countries in the region. Since 2014, political repression in Venezuela has led to an 8,000 percent increase in the number of Venezuelans seeking refugee protection worldwide, with over 100,000 Venezuelans seeking refuge in the United States. Since September 2016, Venezuelans have filed more asylum applications each month with USCIS than any other nationality and, as of March 2019, account for nearly one-third of all new USCIS asylum applications. A continuing authoritarian crackdown in Egypt and a deepening human rights crisis in Turkey have led thousands to seek asylum in the United States. In FY 2019, refugees from Egypt and Turkey were the third and fourth largest recipients of asylum by nationality at the asylum office, respectively. Widespread human rights abuses by government forces and armed groups in Cameroon have led to the displacement of nearly one million people, roughly 10,000 of whom have sought asylum at the southern U.S. border. The Chinese government's crackdown on political dissent in Hong Kong, repression of ethnic Uighurs, and other state violence has driven thousands of Chinese citizens to seek refuge abroad. Many refugees have also sought protection from violence in Yemen, where political dissidents have fled atrocities committed by U.S.-backed Saudi forces.

The Trump Administration's diversion of significant Asylum Division resources away from conducting asylum interviews and toward expedited removal was a major impediment to addressing the affirmative asylum backlog. The expansive use of expedited removal and reinstatement of removal and the corresponding increases in credible and reasonable fear interviews, which peaked in FY 2019 with nearly 120,000 fear interview requests, prevented asylum officers from addressing backlogged cases. In addition, deploying asylum officers to weaponize screening interviews to deny refugees access to U.S. asylum hearings undercuts the Asylum Division's ability to adjudicate pending claims. Asylum officers have, for instance, carried out nearly 20,000 screening interviews for individuals subject to MPP who fear being returned to Mexico and over 1,000 interviews for asylum seekers transferred to Guatemala under an asylum cooperative agreement between the United States and Guatemala.

---

[2] USCIS also acknowledged that Trump Administration policies aimed at increasing asylum fees, delaying and limiting work authorization, regulations to severely limit asylum eligibility, the third-country transit asylum ban, and the ACAs are intended to disincentivize refugees from applying for asylum in the United States with the effect of "significantly chang[ing] the inflow of affirmative applications."

Even as the number of asylum officers has increased in recent years, the diversion of resources to carry out border enforcement policies meant to block refugees from the U.S. asylum system has prevented the Asylum Division from effectively addressing the backlog of asylum seekers awaiting interviews. According to the USCIS Ombudsman's 2020 report, "between FY 2016 and FY 2019, the Asylum Division . . . temporarily assign[ed] on average 475 asylum officers each year in response to other program needs within USCIS" including "to conduct fear screenings at the border" – meaning that **an astounding 89 percent of the 535 asylum officers employed on average each year were temporarily diverted from adjudicating affirmative asylum applications**.

As the backlog continues to grow, thousands of asylum seekers have been made to wait for years to have their applications for protection adjudicated. Since January 2018, USCIS has not made public the average wait time for backlogged cases, but the 2018 USCIS Ombudsman report indicated that, **as of March 2018, the average waiting time from application to interview was well over two years at several asylum offices and nearly three years for some applications pending before the Newark asylum office.** Many asylum seekers caught in the backlog at that time are still waiting for an interview with an asylum officer. The hundreds of asylum seekers represented by Human Rights First with backlogged affirmative asylum claims have been waiting, on average, more than four years for an interview. The Bellevue Program for Survivors of Torture (PSOT) similarly reported that only 18 percent of its clients whose were pending in the affirmative asylum backlog prior to January 2018 had been scheduled for interview as of 2020.

## Asylum Backlog: Causes and Challenges

Several factors are responsible for the continued growth of the asylum backlog. Chief among these are decisions to use expedited removal expansively and the Trump Administration's illegal border policies that imposed a substantial burden on the asylum office to screen individuals under policies intended to block asylum seekers from accessing the U.S. asylum system. In addition, staffing challenges, shifting scheduling priorities, and the impacts of the COVID-19 pandemic have undercut USCIS's ability to adjudicate new cases and begin to address the still growing backlog, leaving thousands of asylum seekers waiting many years for an interview.

### Expansive Use of Expedited Removal

As the USCIS Ombudsman has noted, expedited removal and attendant fear screenings for asylum seekers placed into these proceedings "impact USCIS' available resources and inhibit the agency's ability to reduce the affirmative asylum backlog."

In its 2015 Report, the USCIS Ombudsman wrote, "[s]pikes in requests for reasonable and credible fear determinations, which have required the agency to redirect resources away from affirmative asylum adjudications, along with an uptick in new affirmative asylum filings, are largely responsible for the backlog and processing delays." This increase in the use of expedited removal originated under the Obama Administration. Through FY 2019, the number of credible and reasonable fear screenings continued to grow under the Trump Administration's use of expedited removal, as escalating violence and persecution in Cameroon, El Salvador, Guatemala, Honduras, Nicaragua, Venezuela and elsewhere led increasing numbers of refugees to seek protection at the southern border.

The Trump Administration hailed expanded expedited removal as an important tool to improve efficiency in asylum processing and "reduce the significant costs to the government associated with full removal proceeding before an immigration judge." However, it has had the opposite effect, contributing to an overwhelming backlog of asylum cases and redirecting hundreds of asylum officers to the border to conduct screening interviews of people whose cases overwhelmingly warranted a full asylum assessment.

Successive administrations have expanded the geographic and temporal implementation of expedited removal. Originally, expedited removal was applied only at ports of entry, [3] but in <u>2004</u>, DHS expanded its use to areas within a 100-mile border zone and within two weeks of an individual's entry to the United States. In July 2019, the Trump Administration <u>announced</u> a vast expansion of expedited removal to apply to non-citizens apprehended anywhere in the United States up to two years after they arrived. Although this expansion of expedited removal was temporarily <u>enjoined</u>, the preliminary injunction was <u>lifted</u> in June 2020, and expanded expedited removal remains in place as of March 2021.

In addition to the geographic and temporal expansion of expedited removal, the Trump Administration's "Humanitarian Asylum Review Process" (HARP) and "Prompt Asylum Case Review" (PACR) programs also diverted significant asylum office resources to conduct fear screenings. Under these programs, first introduced in October 2019, asylum seekers were forced to undergo credible fear screenings while detained in notoriously cold and inhumane Customs and Border Patrol (CBP) facilities at the border where they are unable to meet with <u>attorneys</u>. This "<u>streamlined</u>" process not only made it extremely difficult for asylum seekers to consult with a lawyer or prepare for their interviews, but also required additional asylum office staffing to conduct fear interviews on very short notice. Through mid-March 2020, when the Trump Administration paused the use of PACR and HARP, approximately <u>5,290</u> individuals had been placed into these removal programs. In a February 2021 <u>executive order</u>, the Biden Administration directed DHS to "cease implementing" PACR and HARP.

The Trump Administration's repeated attempts to change the credible fear screening standard established by Congress and impose additional requirements have made screening interviews increasingly complex and time consuming. The administration's <u>third-country transit asylum ban</u>, which USCIS asylum officers applied in more than 43,000[4] screening interviews between July 2019 and June 2020, required officers to determine whether asylum seekers qualified for an exception to the <u>transit ban</u> before then conducting the fear screening interview at the heightened reasonable fear standard. The policy, which was <u>vacated</u> by a federal court in June 2020 but was <u>re-issued</u> by the Trump administration as a final rule in December 2020, was subsequently enjoined again in February 2021. The Trump administration also finalized rules to apply <u>criminal</u> and <u>public health</u> bars at fear screening stage that would further <u>complicate</u> these preliminary interviews. In addition, USCIS has repeatedly attempted to <u>heighten</u> the <u>credible</u> and <u>reasonable</u> fear screening standards, including 2019 <u>alterations</u> that were <u>vacated</u> by a federal court in November 2020.

In May 2019, Border Patrol agents began <u>conducting</u> credible fear interviews after receiving a <u>two-week</u> limited training on asylum. Efforts to deputize CBP staff to <u>conduct</u> fear screenings, a task historically conducted by specialized asylum officers, have resulted in major discrepancies in the rate of positive determinations compared to interviews conducted by trained USCIS asylum officers. Analysis by the <u>Migration Policy Institute</u> of USCIS data shows that between May 2019 and May 2020, **CBP officers determined that asylum seekers had a credible fear of persecution at half the rate compared to screenings carried out by trained USCIS asylum officers – meaning that they acted to deny these asylum seekers the ability to even have a full asylum hearings**. In August 2020, a federal court blocked the use of CBP officers to conduct fear screenings, finding that the two-to-five-week training CBP officers received was "in no way comparable" to the formal training for USCIS asylum officers and that the government's contention the trainings were equivalent was "<u>poppycock</u>." The USCIS <u>Ombudsman</u> noted in June 2020 that "CBP officers' competing law enforcement duties" limited their

---

[3] Immigration officers however retain discretion to apply expedited removal or place an individual in full immigration court removal proceedings. *See Matter of E-R-M & L-R-M*, 25 I&N Dec. 520 (BIA 2011). Finding that "Congress' use of the term 'shall' in section 235(b)(1)(A)(i) of the Act does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of Government on whether to charge an individual and on what charges to bring."

[4] According to USCIS data, <u>25,096</u> people were subjected to the third-country transit ban during screenings between July and September 2019, and <u>18,124</u> between October 2019 and June 2020.

ability to conduct temporary assignments as asylum officers, but did not consider whether law enforcement officers were well-positioned to fairly and impartially protect the rights of asylum seekers.

Overall, the number of credible and reasonable fear screenings declined by 65 percent in FY 2020 compared to 2019, as new Trump Administration policies including MPP, ACA transfers to Guatemala, and expulsions under a Centers for Disease Control and Prevention (CDC) order effectively eliminated humanitarian protections at the border and blocked the vast majority of refugees from requesting U.S. protection at ports of entry. At the same time, significant asylum office resources were diverted to "screen" asylum seekers who were ultimately returned, transferred, or expelled under these new illegal policies.

## Border Policies to Block Refugees

Trump Administration border policies diverted asylum officers from conducting affirmative asylum interviews to conduct screenings not established by Congress, but instead designed to deny asylum seekers access to the U.S. asylum system. In February 2021, the Biden Administration issued an executive order instructing DHS and other agencies to promptly review several of these policies which had worsened the asylum backlog as Asylum Office resources were syphoned off to conduct screening interviews. In late January 2021, the Biden Administration suspended placing new individuals into MPP and has now begun to parole asylum seekers returned to Mexico to the United States to continue their asylum proceedings. Following the executive order, the U.S. Department of State also announced that it had "suspended and initiated the process to terminate" the asylum cooperative agreements.

- "**Migrant Protection Protocols**": Significant asylum office resources were devoted to implementing MPP, which was used by the Trump Administration beginning in January 2019 to forcibly return tens of thousands of asylum seekers and migrants to dangerous border regions of Mexico to await U.S. immigration court hearings. People placed in the MPP program who fear return to Mexico are entitled to a fear screening interview conducted by a USCIS asylum officer. Although many individuals have been blocked by CBP officers and Border Patrol agents from even requesting such interviews, nearly 20,000 MPP fear screening interviews were conducted by USCIS asylum officers, as of December 2020. DHS has imposed an impermissibly high burden on asylum seekers to establish that they fear return to Mexico. Asylum seekers must prove that it is "more likely than not" that they would face persecution or torture in Mexico. This standard is equivalent to that required to receive withholding of removal protection in immigration court, i.e. a standard higher than for asylum and far higher than the standard to establish a reasonable or credible fear of persecution, the standard asylum officers normally apply in screenings.

  As of February 2021, when the Biden Administration's wind down of MPP began, there had been at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against individuals DHS sent to Mexico under MPP. Yet very few of those placed in MPP have been determined to have a fear of Mexico. According to DHS, only 13 percent of individuals who received screenings were found to have sufficient fear of being returned to Mexico to be removed from MPP, as of October 2019. *Vox* reported that in some cases asylum officers' positive MPP fear determinations were overruled by DHS officials. Asylum officers wrote in an amicus brief in support of a case challenging the MPP policy that "MPP diverts the limited resources of asylum officers to carry out a task they did not perform before," and "exacerbates the backlog."

- **Asylum Cooperative Agreements**: Asylum officers were also diverted from adjudicating affirmative asylum applications to screen asylum seekers transferred to Guatemala under the ACA the United States signed with Guatemala in July 2019. Under the agreement, the Trump Administration sent asylum seekers from El Salvador and Honduras to Guatemala even though the country lacks the asylum infrastructure to accommodate them as a "safe third country," often resulting in the forced abandonment of asylum claims

and the return of asylum seekers who have a well-founded fear of persecution to their home countries. The rule implementing the ACA requires asylum officers to determine whether an asylum seeker is subject to transfer to Guatemala under the ACA. Officers are only required to screen for a fear of persecution in Guatemala if the asylum seeker affirmatively states a fear of being sent there. Acting CBP Commissioner Mark Morgan testified that approximately 1,000 individuals had been sent to Guatemala under the ACA, as of February 2020. In mid-March 2020, Guatemala suspended ACA transfers from the United States in order to curb the spread of COVID-19 to the country after deportees from the United States repeatedly tested positive on arrival. As noted above, the Biden Administration has suspended the ACAs.

## Staffing Challenges

The Asylum Division continues to face hiring and staff turnover challenges that contribute to the backlog. In FY 2020, USCIS was authorized to employ 1,296 asylum officers, but only 866 asylum officers were on board as of April 2020 – meaning that hundreds of authorized positions were vacant. Despite a significant increase in asylum officers from the 528 employed by the Asylum Division in early January 2017, USCIS continues to identify staffing shortages as one of the primary causes of the affirmative asylum backlog.

Retaining experienced asylum officers, which has long been an issue, became an even greater problem as the Trump Administration implemented a series of illegal policies that returned refugees to harm including the transit ban, MPP, and the ACA with Guatemala. As the union for USCIS asylum officers wrote in an amicus brief opposing MPP, that policy "places [asylum officers] at risk of participation in the widespread violation of international treaty and domestic legal obligations—something that they did not sign up to do when they decided to become asylum and refugee officers for the United States government."

The _Los Angeles Times_ reported that in response to MPP and other Trump Administration asylum policies, asylum officers were "retiring earlier than planned and quitting." One asylum officer noted that while the "stresses of the job" often lead asylum officers to leave after two to three years, working under "an agency head who routinely bashes the program and a president who bashes the program" has resulted in even higher turnover.[5] Replacing experienced staff requires substantial training resources and time. USCIS estimates that it takes "a minimum of 6 months on the job for an asylum officer to be proficient enough to adjudicate asylum applications" at the pace of an experienced officer. Trump Administration policies that completely diverged from the fear screening and affirmative asylum process enacted by Congress, such as MPP and the third-country transit asylum ban, not only diverted asylum staff but also pulled training officers preparing new asylum officers to adjudicate affirmative adjudications.

The turnover in asylum officer staff during the Trump Administration is likely to have continued consequences for asylum adjudications. For instance, a former asylum officer, who quit in protest of the MPP policy, has raised concerns about the hiring of asylum office staff "who tend to favor the [Trump] administration's policies," and whose continued tenure, "even in a new administration . . . will affect institutional norms and capacity at the Asylum Office,"[6] which already needlessly referred many cases to immigration court that should have been decided by the asylum office.

## Scheduling and Interview Policies

Modifications to asylum interview scheduling priorities have significantly impacted asylum seekers' wait times.

---

[5] Asylum officer attrition rates are difficult to quantify, since the numbers reported by USCIS do not include asylum officers who transfer from the Asylum Division to other divisions within the agency.

[6] Comments by Douglas Stevens, 17th Annual Immigration Law and Policy Conference, Migration Policy Institute, "Protection in Disarray: The Dismantling of the U.S. Asylum System" (Sept. 22, 2020).

In January 2018, USCIS began processing the most recently filed affirmative asylum applications – a reversion to an earlier policy known as "last in, first out" (LIFO). Prior to LIFO, USCIS processed asylum cases in the order in which they were filed. In instituting the LIFO policy, USCIS stated that its "aim [was] to deter individuals from using asylum backlogs solely to obtain employment authorization by filing frivolous, fraudulent or otherwise non-meritorious asylum applications" and that LIFO would "allow[] USCIS to decide qualified applications in a more efficient manner." However, the change in policy has left many refugees with bona fide asylum claims languishing in a years-long limbo waiting for an asylum interview.

When LIFO was adopted in 2018, USCIS announced that it would schedule asylum interviews under a tiered priority system. **First Priority** cases include applicants whose interview had to be rescheduled; **Second Priority** is made up of new applications pending for 21 days or less; and the catch-all **Third Priority** category covers "all other pending affirmative asylum applications . . . starting with newer filings and working back towards older filings." As a result, overnight, USCIS shifted the longest pending applications from the front of the backlog line to the very end.

The 2020 USCIS Ombudsman report indicates that, since at least April 2020, USCIS has created a **Fourth Priority** area that encompasses "[a]ll pending affirmative asylum applications that are over 100 days old." USCIS has not, however, publicly announced the creation of a fourth priority category nor included it in its description of the affirmative asylum process on its website. It is unclear whether the creation of this category has had much impact on the scheduling of backlogged cases, as "most interview slots are taken by the first and second priorities, giving little movement to the Third Priority and older cases," according to the USCIS Ombudsman report. Only four percent of asylum interviews scheduled in April/May 2020 were from the fourth priority.

USCIS' asylum scheduling creates needless rescheduling requests and slows adjudication of asylum claims. Asylum offices often provide only two or three weeks' notice when scheduling interviews. With worsening delays in mail delivery, asylum seekers and their attorneys may receive notice of an interview just days before it is scheduled. Given this lack of notice, many applicants or their attorneys will be compelled to request to reschedule the date of their interview, leaving affirmative asylum interview slots unused. In addition, the automatic USCIS scheduling system does not allow for prior coordination of interview dates with applicants' lawyers, who in many cases are forced to reschedule due to conflicts with other client matters. In the past, before the asylum office had any backlogged cases, interviews were consistently filed a set number of days following the receipt date, so legal representatives and their clients could reliably anticipate the interview date based on the date of filing. Now, even in the case of interviews that are timely scheduled, the timing is unpredictable, leading to the need to reschedule interviews. While some asylum offices have so-called "short notice" lists to fill last-minute interview openings, the Asylum Division has not, to date, adopted a more formal or uniform policy for all asylum offices. Some asylum offices previously overbooked asylum interviews to fill interview slots of applicants who missed their interviews. However, to enforce social distancing at asylum offices and in waiting rooms, USCIS reduced the number of scheduled in-person interviews, leading to longer wait times.

The Asylum Division's efforts to address pending affirmative applications filed more than 10 years after the individual's last entry to the United States have removed some cases from the backlog but also created additional inefficiencies. Currently, the only way to receive the form of humanitarian relief known as cancellation of removal is during removal proceedings before an immigration judge. However, there is no application route for individuals who may be eligible for this relief, and some individuals (or their attorneys) are believed to have filed applications for asylum anticipating that the case could then be referred into removal proceedings to seek this relief. The Asylum Division identified 50,000 cases where individuals had filed for asylum more than 10 years after arriving in the country (though of course, many of these persons may just have been late-filing asylum seekers), and began a pilot project to notify these applicants of an option to waive their asylum interviews and proceed directly to immigration court. As of May 2019, approximately 26 percent of the 6,500 individuals who

received notices for the pilot waived an asylum interview. As a result, these cases were simply forwarded into removal proceedings, without the need to waste asylum office time. However, with respect to the remaining applicants, rather than conducting full asylum interviews, the Asylum Division scheduled these asylum seekers for interviews solely to determine whether the individual qualified for an exception to the one-year-filing deadline. Those found to qualify for an exception were often required to then attend a second interview scheduled weeks later, creating additional inefficiencies in scheduling. As of May 2019, 30,000 cases in which the applicant filed an asylum application more than 10 years after arrival in United States remain in the backlog. Establishing an alternative mechanism to allow individuals to apply for cancellation affirmatively with USCIS, as recommended above, would help to avoid these cases needlessly adding to the asylum office and immigration court backlogs.

## COVID-19 Impacts on the Backlog

During the COVID-19 pandemic, both the size of backlog and the wait that asylum seekers face has continued to grow. On March 18, 2020, asylum processing came to a standstill as USCIS temporarily closed its offices. Although asylum offices began a staggered reopening on June 4, 2020, the number of daily appointments has been reduced to ensure social distancing. USCIS estimates that at least 4,000 and as many as 12,000 asylum interview slots were lost during the closure, and that affirmative asylum completions may be reduced by as much as 50 percent until offices reopen at normal capacity. Indeed, the asylum office backlog expanded by over 15,000 cases during the third quarter of FY 2020 during the asylum office closure, compared to an increase of fewer than 5,000 cases during the second quarter of FY 2020 when the asylum office received a similar number of new affirmative applications. Given the limited number of asylum interviews conducted since asylum offices began to reopen, the backlog is likely to continue to increase.

## Misuse of Limited Resources in Additional Screenings

The U.S. asylum system is rigorous, requiring detailed interviews, as well as extensive background vetting. Screening asylum applications to detect the small number of cases that raise security and fraud concerns during asylum adjudications is an important safeguard for the integrity of the U.S. asylum system. However, in recent years, the Fraud Detection and National Security (FDNS) Directorate and other USCIS components tasked with implementing the Trump Administration's rhetoric of "extreme vetting" – part of a broader effort to falsely portray immigration and asylum cases as lacking in merit – have drained substantial agency resources to pre-screen asylum applications that could, and should, be more effectively devoted to conducting interviews with asylum seekers. While some fraud issues may be identifiable on review of the application itself, DHS has long acknowledged that the credibility determination made by the interviewing asylum officer is the "determining factor" in fraud detection. The post-interview vetting and background check process has also ballooned in a discriminatory fashion that affects some nationalities, including asylum applicants from Iran, Iraq, Syria, and Yemen, more than others. It poses a major challenge to securing protection for asylum seekers and their families within a reasonable timeframe.

The expansion of pre-interview screening and vetting mechanisms predates the Trump Administration. A 2015 Government Accountability Office (GAO) report concluded that while USCIS has "mechanisms to investigate fraud in individual applications," the agency had not "assessed fraud risks across the asylum process, in accordance with leading practices of managing fraud risks" and recommended that USCIS take several targeted steps to assess fraud risks and detect fraud in individual cases, including developing and implementing additional trainings, mechanisms to collect reliable data on FDNS's efforts to combat fraud, asylum-specific guidance for FDNS officers, and pre-screening of asylum applications for indicators of fraud, to the extent that these fraud detection tools are "relevant or cost-effective." In response, USCIS began planning in 2017 for a substantial centralized pre-screening center for asylum applications through the Asylum Vetting Center (AVC), currently under construction in Atlanta, GA. While USCIS has stated that it anticipates the AVC will enhance its

ability to address "systemic" fraud concerns and, through pre-screening, free up regional asylum office resources to reduce the asylum backlog, given the agency's substantial budgetary and personnel investment, the AVC raises questions about whether it meets the GAO report's recommendation to implement only "relevant or cost-effective" fraud detection tools. It remains unclear whether the AVC is the most efficient and cost-effective method for addressing fraud, as it substantially diverts resources from asylum adjudications, which are themselves an important tool in assessing credibility and identifying potential fraud. The AVC will ultimately be staffed by some 300 personnel, including asylum officers who could otherwise be deciding backlogged asylum cases.

The data made public by USCIS on FDNS's effectiveness reveals that the vast sums spent on FDNS have resulted in very limited improvements to USCIS's fraud analysis and detection processes. In FY 2018, for instance, USCIS budgeted 67 million dollars for FDNS activities and that year used its ATLAS tool to screen 15.5 million immigration filings and biometrics enrollments, but detected fraud or security concerns in just 0.03 percent of cases. Of the 1,400 credible and reasonable fear cases referred to FDNS for review in FY 2017 and FY 2018, FDNS made a formal finding of a fraud or safety concern in less than one percent of referred cases. Despite the GAO's recommendations that USCIS collect data on and assess FDNS's progress, since the 2015 GAO report, no public reports have been released on the effectiveness of FDNS screening of affirmative asylum applications. The union for USCIS asylum officers has called for an audit of FDNS and a "re-examination" of its role, saying it "has grown beyond its original designation as a support service to adjudicators."

In addition, last year USCIS implemented other unnecessary interviews that divert asylum office resources away from adjudicating pending cases. In November 2020, USCIS announced that it would begin to systematically interview all resettled refugees and asylees (individuals granted asylum in the United States) who are applying to bring a qualifying spouse or child to the United States through an I-730 petition. These interviews are not required by law or regulation and are generally not needed to resolve I-730 petitions since the petitioning refugee/asylee has already been interviewed in connection with their resettlement case or asylum application and undergone security and fraud screenings. USCIS has acknowledged that the additional interview requirement "may lengthen the overall adjudicative process" for I-730 relative petitions. Requiring such interviews may also contribute to the affirmative asylum backlog as the agency diverts asylum officers to conduct them, which Human Rights First attorneys in Los Angeles have already reported occurring for some asylee clients. As of September 2020, nearly 26,000 I-730 petitions were pending adjudication – a steep increase from June 2016 when fewer than 9,000 were awaiting decision.  Further delays in the I-730 process are particularly devastating since USCIS was already taking close to two years to adjudicate these petitions, which are then subject to additional, often lengthy wait times before spouses and children receive appointments for interviews with U.S. consulates abroad.

## Attorney General Rulings Rig Adjudications Against Refugees

Any effort to resolve the asylum backlog must address the Trump Administration's weaponization of the U.S. asylum adjudication system, including the Asylum Division, to deny refugees protection. Asylum grant rates plummeted in the wake of Trump Administration policies and Attorney General asylum rulings that attempt to limit asylum eligibility for survivors of domestic violence and individuals persecuted because of their family relationships, including *Matter of A-B-* and *Matter of L-E-A*. As a result, the asylum office has referred increasing numbers of affirmative cases to the immigration court, where judges determine the asylum seeker's claim. The asylum referral rate grew by 35 percent from FY 2015, when about 50 percent of asylum claims were referred by asylum officers to the immigration court, compared to FY 2019, when nearly 70 percent were sent to the courts. These referrals needlessly subject asylum seekers to additional years-long delays for adjudication of their requests for protection in immigration court, where judges ultimately grant most asylum claims referred from the asylum office. The Biden Administration announced in its February executive order that it would issue

new regulations on particular social group claims within 270 days and conduct a comprehensive review to evaluate whether U.S. protections "for those fleeing domestic or gang violence" are consistent with international law.

## Hope Beyond the Interview

Despite the hardships and trauma inflicted by years in the asylum backlog, many of the asylum seekers interviewed remain hopeful that the United States will welcome and protect refugees and reunite their families.

- **Manuela, a Venezuelan asylum seeker who has been in the backlog since 2016, sought refugee protection in the United States to safeguard her family.** "We felt that our rights would be valued here. . . . If we receive asylum, our lives would change completely. We would have calm. We would be secure knowing we would not be thrown out of the United States and returned to Venezuela. It would change everything for us."

- **Mahmoud, a Bahraini journalist who has waited for his asylum interview since April 2015 is hopeful that receiving asylum will help him feel in control of his life again and build a new life.** "I know it is not going to be a magical event where everything improves in a single moment. But at least I could move forward – at least I could put all of this behind me."

- **Alexander, a Russian asylum seeker who has faith that the United States will protect him and his family, despite waiting more than five years for his asylum interview.** "I still believe the United States is a country of laws, and the laws will work for the good of the people. I hope that politicians will prioritize the needs of asylum seekers. . . . I hope no other families will have to endure what we have experienced."

- **Paul, a Cameroonian asylum seeker, expressed thanks to the organizations and individuals that have helped him survive during his wait in the backlog.** "[A]lthough I was surprised by the lack of aid from the [U.S.] government, I was impressed by the generosity of people. I was very afraid when I first came. I felt hopeless. But people made me feel welcome when I needed it most. I received free clothes and meals from churches and shelters. Those necessities allowed me to get to where I am today."

**ON HUMAN RIGHTS**, the United States must be a beacon. Activists fighting for freedom around the globe continue to look to us for inspiration and count on us for support. Upholding human rights is not only a moral obligation; it's a vital national interest. America is strongest when our policies and actions match our values.

Human Rights First is an independent advocacy and action organization that challenges America to live up to its ideals. We believe American leadership is essential in the struggle for human rights so we press the U.S. government and private companies to respect human rights and the rule of law. When they don't, we step in to demand reform, accountability, and justice. Around the world, we work where we can best harness American influence to secure core freedoms.

We know that it is not enough to expose and protest injustice, so we create the political environment and policy solutions necessary to ensure consistent respect for human rights. Whether we are protecting refugees, combating torture, or defending persecuted minorities, we focus not on making a point, but on making a difference. For over 40 years, we've built bipartisan coalitions and teamed up with frontline activists and lawyers to tackle issues that demand American leadership.

*Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.*

© 2021 Human Rights First All Rights Reserved.
This report is available online at humanrightsfirst.org

**ACKNOWLEDGEMENTS**

*This report was written and researched by Anika Ades and Kennji Kizuka. Ana Ortega assisted in the research. Eleanor Acer, Charlotte Finegold, Becky Gendelman, Anwen Hughes, David Mizner, and Jennifer Quigley contributed edits to the report. Our thanks to the many Human Rights First colleagues who assisted in referring asylum seekers for interview. We are grateful for the support of the Masiyiwa-Bernstein Fellowship. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers and asylees who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.*

**AR01331**

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/14/19 | police extortion | 1 | Mexican police detained Plaintiff Ian Doe several times and demanded his immigration documents. About a month ago, officers required him to pay a bribe of 1,500 pesos to avoid being arrested and taken to jail. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | robbery | 1 | Plaintiff Howard Doe was robbed at gunpoint by two Mexican men in Tijuana just days before he presented himself at the port of entry. The robbers said they knew that he was Honduran, and that if they saw him again, they would kill him. Plaintiff Howard Doe was kidnapped and held for more than two weeks by members of a Mexican drug cartel until he and several others were able to escape | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | armed mob threats | 1 | Plaintiff Gregory Doe was staying at a shelter in Tijuana when a mob of young men wielding sticks surrounded the shelter and threatened the residents. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | assault | 1 | Plaintiff Alex Doe was staying in the Playas neighborhood of Tijuana when he and other asylum seekers were forced to flee in the middle of the night after a group of Mexicans threw stones at them and additional attackers began to gather with sticks and other weapons. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | unlawful deportation | 1 | Plaintiff Dennis Doe first entered Mexico en route to the United States, he was apprehended by Mexican officials who deported him without asking him if he wished to apply for asylum or if he feared returning to his home country. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 3/21/19 | robbery | 2 | Gelin, a 29-year-old woman from Honduras who came with her 13-year-old son, was evaluated by an asylum officer after explaining to CBP that she had been robbed in Mexico two weeks before asking for asylum. She, too, was returned. | https://www.sandiegouniontribune.com/news/immigration/sd-me-cbp-questions-20190321-story.html |
| 3/27/19 | kidnapping | 1 | R.T., 31, who asked that his full name not be used out of concern for his safety, said through tears during an interview in Tijuana after his hearing that someone in a black van without license plates followed him one morning in the city and tried to kidnap him; he's known migrants who were taken for ransom money. But the next day, he was returned to Mexico, with a piece of paper that said in English that he "did not establish a clear probability of persecution or torture in Mexico." | https://www.nbcnews.com/news/latino/asylum-seekers-forced-wait-tijuana-fear-their-lives-n988081 |
| 4/8/19 | assault by Mexican police | 1 | Pamela (Salvadoran asylum-seeker): "Since I've been attacked and assaulted by the Mexican police in Mexico City, I wouldn't feel safe going to the police if I were attacked by people here in Tijuana | Interview by Amnesty International with Forced Returnee, in Tijuana |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/10/19 | threats | 1 | Luis Alvarado is one of about 200 immigrants who were sent to Juárez from El Paso under the Trump administration's Migrant Protection Protocols since the policy began here in mid-March. "Before the record, before the judge, they made a commitment that he won't go back to Mexico, which was ultimately our priority given that he's already faced threats in Mexico," said Nicolas Palazzo, a lawyer who took on Alvarado's case Wednesday. | https://www.elpasotimes.com/story/news/2019/04/10/el-paso-asylum-seeker-hearing-remain-in-mexico-policy/3426588002/?cid=twitter_elpasotimes |
| 4/11/19 | gang threats | 1 | One man, for example, stated that the same persecutors he was fleeing from in Honduras managed to pursue him in Mexico, and even located his whereabouts at a Tijuana migrant shelter. | Interview by Amnesty International with Forced Returnee, in San Diego |
| 4/25/19 | kidnapping | 4 | The day before, the two young fathers, Edwin Escobar from El Salvador and Ronaldo Garcia from Guatemala, said that after leaving their church shelter for food, they had been kidnapped by three men at gunpoint, held for three hours, beaten, and robbed. The men broke Garcia's finger and stole the five pesos—about 25 cents—that he had to his name. | https://www.texasmonthly.com/politics/im-in-danger-migrant-parents-face-violence-in-mexico-under-new-trump-policy/ |
| 4/25/19 | kidnapping | 2 | "Yesterday, I stepped out [from a Ciudad Juárez shelter] to buy my lunch, and a man tried to take my son," said Riccy, a 24-year-old Honduran woman who held her 4-year-old, Binsel. | https://www.texasmonthly.com/politics/im-in-danger-migrant-parents-face-violence-in-mexico-under-new-trump-policy/ |
| 5/1/19 | rape | 1 | One woman said she was the victim of an attempted rape in Juarez; | https://twitter.com/BobMooreNews/status/1123697012275384320 |
| 5/1/19 | robbery | 1 | Another said men tried to kick down the door to their shelter and threatened to kill and rape them if they didn't open the door. | https://twitter.com/BobMooreNews/status/1123697012275384320 |
| 5/9/19 | robbery, assault | 1 | Rene, a man from El Salvador, said on March 29 he was robbed and stabbed in Ciudad Juarez. He went to the police but was told they couldn't help him because he wasn't Mexican. | https://twitter.com/BobMooreNews/status/1126609660486856706 |
| 5/9/19 | robbery | 1 | Esdras, a man from Guatemala, was robbed twice at a church shelter. He went to police with suspicions he was being victimized by a neighbor of the church and police recovered his stolen cell phone. He was then threatened by the neighbor's family | https://twitter.com/BobMooreNews/status/1126610204777381888 |
| 5/9/19 | robbery | 1 | Elvia, also from Guatemala, said she was robbed at a church shelter. | https://twitter.com/BobMooreNews/status/1126611527958704128 |
| 5/16/19 | kidnapping | 1 | A 21-year-old Salvadoran woman told Judge Herbert: "I was on my way to the store when men in a car tried to take me." That's been another common theme at MPP hearings in El Paso: people facing kidnapping when they leave shelters to buy food or supplies. | https://twitter.com/BobMooreNews/status/1129094829835735040 |

AR01333

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/20/19 | kidnapping, rape | 1 | A migrant woman from Honduras was kidnapped and sexually assaulted after federal police agents in the Mexican border town of Ciudad Juárez abducted her and handed her over to a criminal group in the early morning hours of June 10, El Diario de Juárez reported. | https://www.insightcrime.org/news/brief/mexico-police-collude-criminals-kidnap-migrant/ |
| 6/26/19 | Mexican police extortion / deportation | 3 | While on the street with two other Guatemalan women in Ciudad Juárez, Mexican police approached her and attempted to extort her; when she refused to pay, the police took her and the other women to the airport. Although the woman expressed a fear of return to Guatemala and even showed the Mexican police her U.S. immigration court papers, she was nevertheless forcibly returned to Guatemala | https://www.splcenter.org/sites/default/files/documents/2019.06.26_0044_amnesty_international_amicus_brief198883.1.pdf |
| 6/26/19 | kidnapping | 1 | Juan and Marisa were kidnapped in Nuevo Laredo, Mexico by the Zetas cartel and held for over two months; Juan is in MPP while Marisa was released to the United States | https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf |
| 6/26/19 | police harrassment / sexual abuse | 2 | During their journey to the United States, they suffered harassment from Mexican federal police, who insulted them and would not let them rest. / After a short time, he began demanding to have sex with her and when she refused, he sexually abused her. | https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf |
| 7/1/19 | robbery, assault | 1 | "We are all afraid when we go out," says a Cuban migrant named Serafin Aguilera Perez. He says he was returned to Juárez last month after spending more than 40 days in U.S. custody. His sister in Miami wired him money to help him find shelter and food in Juárez, he told NPR. But when he went to a convenience store, Aguilera says, he was jumped from behind by two attackers who knocked him down and tried to take his money. | https://www.kacu.org/post/fear-confusion-and-separation-trump-administration-sends-migrants-back-mexico |
| 7/2/19 | assault, rape, robbery | 29 | Human Rights Watch documented at least 29 reports of harm to asylum seekers in Ciudad Juárez, including violent attacks, sexual assault, and kidnapping, in interviews and court observations. | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | attempted kidnapping, assault | (counted within 29 reported by HRW) | Delfina M. (pseudonym), 20, an asylum seeker who fled Guatemala with her 4-year-old son, said that after she was returned to Ciudad Juárez, two men grabbed her in the street and sexually assaulted her. They told her not to scream and threatened to kill her son. "I can still feel the dirtiness of what they did in my body," she said | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | robbery, stabbing | (counted within 29 reported by HRW) | Rodrigo S. (pseudonym), 21, who fled El Salvador, told a judge in immigration court proceedings that he was robbed at knifepoint and stabbed in the back. He said he went to the police, but the Mexican officers wouldn't help him because he wasn't a Mexican citizen. He told the judge that although he is recovering physically, he's afraid to be sent back | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/2/19 | robbery, threats | (counted within 29 reported by HRW) | Esteban G. (pseudonym), 19, said in immigration court he was robbed when he left his room to go to the store for food. He told police he suspected a neighbor of stealing his cellphone. When police investigated the neighbor, they recovered his cellphone, but after that, the neighbor's family threatened to hurt him | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | kidnapping | (counted within 29 reported by HRW) | Two families who had been forced to remain in Mexico told the immigration judge in court that family members had been "express-kidnapped," or abducted for a short period of time and extorted, prior to their preliminary hearing in El Paso, according to local lawyers and news reports | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | kidnapping | (counted within 29 total reported by HRW) | Central Americans Rafael M. (pseudonym) and Gerald H. (pseudonym), who said they planned to seek asylum in the US, reported that after they had been in Ciudad Juárez for 21 days around April, they were kidnapped at gunpoint in Parque de las Tortugas, which runs along the border just north of the Santa Fe Bridge.[74] Some cars pulled up and men got out with guns. Rafael said he tried to run, but they grabbed him, tearing his shirt. They put a jacket over Rafael's head, told the two not to scream, and forced them into cars. The kidnappers accused the two of being rival smugglers working their territory. The kidnappers interrogated them and searched Rafael's phone to confirm they were in fact asylum seekers. They let them go, but not before taking photos of their faces. They also recorded information on where they were staying. The abductors told the two that if they reported the incident, they would kill them. Rafael reported he was hit about 30 times; Gerald reported being hit in the back of the head so hard he could taste blood in his mouth | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/11/19 | kidnapping | 4 | Another family that was lured into this made up "alternative shelters" was kidnapped and they had to pay money in order to be released at the border where they were able to then turn themselves into Border Patrol custody. Due to the lack of financial resources, this family was released at different times by kidnappers. Wife and two children were released before the implementation of the MPP between borders so they were released into the United States. Father and son had to stay behind with the kidnappers. When father was able to pay the kidnapper more money, kidnappers released them. When they turned themselves in to border patrol, they were returned to Mexico under the MPP program. This family continues to be separated. Father and son are currently sleeping at construction sites where father occasionally works. Father does not have the money to pay for a hotel and the shelters are at capacity in Tijuana, their only option is to sleep at construction sites. | Email from Jewish Family Services in San Diego |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/14/19 | persecutors | 1 | The man, whom I will call Franklin to protect him from retaliation, said he was being pursued by assassins. Back in his home country months earlier, covered from head to toe to conceal his identity, he had given testimony against cartel bosses who had extorted his and his common-law wife's businesses. The extortionists were convicted and imprisoned, but the witness's disguise had fooled no one. Post-trial, two of the bosses' armed underlings pursued Franklin, first in his home country in Central America. Then, after he fled, they threatened his niece back home with death if she did not say where he had gone. "Juárez, Mexico," the terrified woman told the hit men. But Franklin's first MPP court date in El Paso was over four months away. Meanwhile, he'd seen the hit men near a monument to Benito Juárez, staring intently. They'd seen Franklin, too, even though he was on a bus, and they yelled, "Get him! Kill him!" The bus driver sped away. Franklin was certain his pursuers would not give up. CBP allowed Franklin to walk into the United States. He was soon given a non-refoulement interview. He passed, was removed from the MPP, and was sent to an ICE detention center, where he passed his credible fear interview. A Las Americas-affiliated immigration lawyer has vowed to bond Franklin out, pending resolution of his asylum claim. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping | (also discussed in HRF report - not counted here ) | In July, I learned from an immigration lawyer in California that a distraught client had called to report that her sister, a Salvadoran woman, with a 14-year-old, 10-year-old, and 3-year-old, were kidnapped in Juárez. The California family scraped together $4,000 for a ransom payment, and after several days, the family was freed near a church in downtown Juárez. The mother said that she and her children had been captured after the kidnappers had spotted them wandering into Juárez disoriented, after being dumped there following their enrollment into MPP. When I met them by the church, the family told me that during their captivity they'd had almost nothing to eat, and they barely slept. After being freed, they made it to a migrant assistance organization that operates behind locked doors. A psychologist there told me that the family was suffering from shock, including the kids.  the kidnapped and ransomed Salvadoran mother and her three psychologically traumatized children. On July 9, Rivas crossed that family into El Paso. But they did not pass their non-refoulement interviews, and on July 11 they were dumped into Juárez for a second time. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping, rape | (also discussed in HRF report - not counted here ) | Two young Cuban women, and the husband of one of them, were hailing a taxi when a van drove up and men with assault rifles forced them inside. The group was taken to a house and told they could choose to carry drugs across the border in backpacks or pay $500 a piece to be freed. The women told me, during an interview at a migrant assistance office in Juárez, that they declined both options and the husband was taken to a separate room. The women were then raped repeatedly until the victims paid their ransoms. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/14/19 | kidnapping | (also discussed in HRF report - not counted here ) | Katy describes being kidnapped by a taxi driver and his accomplices, who demanded $1,000 from her family in the U.S. They paid most of the ransom, and she was freed. But the kidnappers said they knew where she was staying, and they gave her a warning: "If you file a report, you know how people die in Juárez." Later, Katy tells Herbert that she was trying to sleep and saw a knife being inserted into the doorjamb of her room. She chokes up at the memory. Katy, for example — the woman who was kidnapped in the taxi and later saw the knife pushing through her door — described those experiences during a non-refoulement interview. She was sent back to Juárez anyway. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping | 2 | Two other women in the courtroom, who were also kidnapped, begin to wail. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/22/19 | kidnapping | 2 | In early June, "immediately upon leaving the custody of immigration officials on the Mexican side of the border," R.G.A.M. and his 17-year-old daughter were kidnapped in Ciudad Juárez, held for a month while the kidnappers demanded ransom from family members and forced them to work. After being trafficked into the United States, R.G.A.M. and his daughter again requested asylum but DHS sent them to the Berks County family detention center, according to documents filed by attorneys. | Request for TRO and habeas petition filed in E.D. Penn District Court (19-cv-03194-EGS July 22, 2019) |
| 7/25/19 | kidnapping | 1 | One woman came to court in El Paso on July 25th with her leg in a cast and said it was broken when she was kidnapped after being returned to Juarez. | https://www.refugeesinternational.org/reports/2019/8/28/remain-in-mexico-policy-is-undermining-asylum-and-endangering-asylum-seekers |
| 7/29/19 | extortion | 1 | Genesis Reyes waited three months in Mexico to see an immigration judge in San Diego. When her day in court finally arrived, extortionists posing as immigration officials asked her parents for hundreds of dollars claiming the money would release her from a detention center. As her parents frantically struggled to put the money together, they called Reyes dozens of times. Reyes wasn't in a detention center. She was sitting on the eighth floor of an office building downtown waiting for an immigration judge to call her name. Her phone was turned off. "When I turned my phone back on, I had so many messages," said Reyes, 25, from Honduras. "My mother wanted to know where I was. People called her and said, 'We have your daughter and you need to deposit the money to bail her out.'" | https://www.sandiegouniontribune.com/news/immigration/story/2019-07-27/asylum-seekers-targeted-by-kidnappers-extortionists-and-traffickers-while-waiting-in-mexico |
| 8/5/19 | attempted kidnapping | 1 | Single woman from Honduras kidnapped but escaped, after return to Ciudad Juarez under MPP (additional information provider by attorney) | https://twitter.com/cbrownimmlaw/status/1158396364037902336 |
| 8/6/19 | kidnapping, assault | 3 | Couple from Guatemala kidnapped with 12 year old child by Mexican federal police and cartel members. They saw their persecutors put plastic bags over other migrants' heads and duct tape them in place. They were abused, separated, and threatened. | https://twitter.com/cbrownimmlaw/status/1158596077995479040 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/8/19 | | 42 | Human Rights First researchers documented the cases of 42 individuals returned under MPP to Mexico who were raped, kidnapped, assaulted, and/or pursued by persecutors there. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | rape, kidnapping | (counted within 42 reported in HRF report) | A Honduran woman who DHS returned to Ciudad Juárez was reportedly kidnapped in June by a group of men in federal police uniforms and repeatedly sexually assaulted. According to her attorney, Linda Rivas of Las Americas Immigrant Advocacy Center in El Paso, the woman is part of the Afro-Caribbean Garifuna minority and was vulnerable to targeting in Mexico because of her race, gender and nationality. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | rape, sexual exploitation | (counted within 42 reported in HRF report) | When CBP officials returned Gisela*, a 28-year-old-asylum seeker from Honduras, to Ciudad Juárez from the El Paso port of entry, a trafficker kidnapped her as she left a Mexican migration office. She was raped and forced into sexual slavery for three months and escaped only when one of her captors offered to assist her to leave in exchange for sex. Now hiding at a Juárez church shelter, she is not safe. The parish priest told her that an unknown man recently came to the church looking for her. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | kidnapping, extortion | (counted within 42 reported in HRF report) | Irma*, a Salvadoran asylum seeker, was kidnapped in late June with her three children, ages 3, 10, and 14, after being returned to Ciudad Juárez by CBP. Irma and two other women who had just been returned to Mexico under MPP flagged down a passing minibus to ask for help because they had nowhere to stay. The three women and three children were instead kidnapped and held hostage for days with little to eat. Irma's 14-year-old son said one of the men shouted "that he was tired of so many migrants. He said [to us], 'why did you stay in this country?'" In early July, Irma's family in the United States was forced to make a $2800 ransom payment after the kidnappers sent threatening messages to Irma's sister. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | attempted rape, labor exploitation | (counted within 42 reported in HRF report) | After DHS returned Sarai* and her 18 year-old-daughter, Maya*, asylum seekers from Honduras, to Mexico under MPP they were coerced to work by the owner of a migrant hotel in Ciudad Juárez where they had been staying. When the owner tried to rape Maya, Sarai and her daughter fled the hotel but were penniless. They spent three nights sleeping on the streets without eating before they were able to beg for enough money to reach an NGO on the Mexican side of the El Paso port of entry in early July to ask for help. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | assault | (counted within 42 reported in HRF report) | In her first hours after DHS returned her to Ciudad Juárez under MPP, Blanca*, an LGBTQ asylum seeker from Guatemala, was walking with other asylum seekers when a group of men followed and robbed them. She sought safety at the main migrant shelter in the city, but it was at capacity, so she ended up in a rented room with other asylum seekers at a hotel catering to migrants. Later, Blanca and other asylum seekers were again attacked, and some were beaten by a group of men. "After what happened, I hardly ever go out," she said. "I'm really scared of the situation here." | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/8/19 | threats | (counted within 42 reported in HRF report) | Fredi*, a 20-year-old Salvadoran asylum seeker, and his five-year-old daughter were returned to Mexico after CBP officers refused to refer them for a fear screening and did not allow Fredi to explain that gang members had followed him from El Salvador and were threatening him in Mexico. Fredi tried to describe his fear of remaining in Mexico, but a CBP officer ignored him and instead accused Fredi and his daughter of being a "fake family" even though Fredi's name appears on his daughter's birth certificate. Fredi was only able to request a fear screening, which he passed, during his first immigration court hearing in mid-July after months of living in fear in Ciudad Juárez. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | threats | (counted within 42 reported in HRF report) | Karla*, a Honduran asylum-seeker, was returned to Mexicali despite presenting evidence that she and her three-year-old son were receiving threats in Mexico. According to Karla, CBP officers refused to accept a printout of the threatening messages, and she was unable to present this crucial evidence to the asylum officer who interviewed her by telephone. Karla does not know what to do to protect herself and her son: "No parent wants something to happen to their child." | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | assault | (counted within 42 reported in HRF report) | Javier*, a 48-year-old Salvadoran asylum seeker, failed his fear screening and was returned to Mexico by CBP under MPP even though he had twice been assaulted in Mexico and had a copy of a police report he had made about the incident. Javier also feared remaining in Ciudad Juárez because the day prior to Human Rights First's visit to the church-run shelter where he was staying, a man was shot dead outside on the street in broad daylight. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/10/19 | kidnapping | 8 | Under the Trump administration policy called the Migrant Protection Protocols, the family — Victor Esquivel, his wife, Maria, and their sons Anderson, 10, and Ryan, 4 — were sent back to the Mexican state of Tamaulipas to await their first hearing, scheduled for October. On July 24, U.S. officials dropped the family off at the international bridge that connects Laredo, Tex., to the city of Nuevo Laredo, in Tamaulipas. They were given a pile of immigration paperwork and escorted to the parking lot of the Mexican immigration office, 20 yards south of the Rio Grande. For the first three nights, they slept on the ground outside the office in the 100-degree heat. Exhausted and hungry, they arranged through a family friend to pay for a small apartment where they could wait for their October hearing. On July 27, Victor and Maria walked outside the immigration office in the early afternoon, they said, holding the hands of their two sons. They made it two blocks, toward a car that was supposed to take them to the apartment. Then a truck pulled up next to them and a group of men jumped out, screaming at them. "They yelled, 'Get into the truck!'" Victor said. "It all happened really quickly." The Esquivels say they were taken to an abandoned house where migrants from Cuba and Guatemala were also being held. They were led to a room without furniture and told to sit on the ground. The Esquivels were moved between three different houses in and around Nuevo Laredo. They were held with about 10 different migrants, including a Nicaraguan family with two small children, Victor said. That family said they, too, had been returned to Mexico to wait for their asylum hearings. The father of the Nicaraguan family wrote the telephone number of relatives back home on the front page of Victor's Bible, in case he was released first. The kidnappers took their phones and used them to send messages to Esquivel's relatives in El Salvador and Wisconsin demanding $7,500 per person. | https://www.washingtonpost.com/world/the_americas/when-they-filed-their-asylum-claim-they-were-told-to-wait-in-mexico-there-they-say-they-were-kidnapped/2019/08/09/6133c2d6-b95f-11e9-8e83-4e6687e99814_story.html |
| 8/10/19 | kidnapping | 3 | Two Venezuelan and one Cuban asylum seeker who were sent back to Nuevo Laredo by U.S. officials in July also told The Washington Post of their ordeal. They were at a bus station when two men approached them, asked where they were from and where they were going. Within minutes, and without weapons, the men physically forced the Venezuelans into a car. They were taken to a small house and told to put all their possessions on a table. Three migrants from Nicaragua and Honduras were already there, according to the Venezuelans. They said they had also been kidnapped that morning. "I just started crying," one of the Venezuelan men said. They spoke on the condition of anonymity for fear of reprisals. The Cuban man and one of the Venezuelans scraped together around $400 in cash from an ATM and were released six hours later. The other Venezuelan was held for four more days. | https://www.washingtonpost.com/world/the_americas/when-they-filed-their-asylum-claim-they-were-told-to-wait-in-mexico-there-they-say-they-were-kidnapped/2019/08/09/6133c2d6-b95f-11e9-8e83-4e6687e99814_story.html |
| 8/12/19 | assault, robbery | 1 | Jeff Mendoza "lives in a high-crime part of [Tijuana], and shows two fresh scars on his forearm — knife wounds from when a group of men stole his phone. He says he has been robbed here several times, including by the police." | https://www.pri.org/stories/2019-08-12/mexico-waiting-room-thousands-migrants-trying-get-us |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/13/19 | assault, robbery | 1 | While she waited in Ciudad Juárez, Cindis said she was robbed, assaulted and targeted with anti-immigrant slurs. | https://www.cbsnews.com/news/remain-in-mexico-asylum-seekers-forced-to-wait-in-mexico-face-danger-and-desperation/ |
| 8/13/19 | robbery, threats | 2 | On July 31, Francisco Chavez Raymundo, 43, and Gaspar Cobo Coria, 31 were placed in the Migrant Protection Protocol (MPP) program and returned to Mexico by U.S. Customs and Border Protection. On their way to the United States, the two were robbed by a Mexican policeman who allegedly hurled racial insults at them; they were later threatened with jail by other officers when they tried to file a complaint in Juarez, according to affidavits filed with the Chihuahua State Human Rights Commission. | https://www.ktsm.com/news/border-report/too-afraid-to-go-home-texas-lawyer-stands-up-for-two-mayan-migrants/ |
| 8/14/19 | kidnapping | 2 | La mujer hondureña y su hijo de 8 años ya habían sido guiados por tres coyotes y estaban a punto de cruzar el río Bravo pero terminaron secuestrados en Reynosa por el crimen organizado. Después de que su familia pagara el rescate de $12,000, pudieron llegar a EEUU, pero el gobierno los envió de vuelta a México mientras avanza su caso de asilo. | https://www.univision.com/noticias/inmigracion/decian-que-si-no-pagabamos-al-nino-le-iban-a-sacar-los-organos-la-angustia-de-una-madre-migrante-secuestrada-por-el-cartel-del-golfo |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/20/19 | kidnapping | 2 | with his girlfriend and her son. They planned to wait their turn on the list after being assigned No. 2400, but the lack of security scared them. "After a week when they didn't call anyone, a group of Venezuelans decided to cross. We did it because of fear, out of desperation. That day, about 42 people crossed. There were many who nearly drowned," he told el Nuevo Herald in an interview at a park in Matamoros, where he sleeps under the open skies. When they reached the U.S. side of the river they were separated by authorities. He was put into one of the cold holding cells known as "freezers," along with about 80 other migrants. He spent a day there, was taken that night to a detention center in McAllen, Texas, and later to Laredo. "They put me in another 'freezer.' The only food they gave us was a burrito and water. I was detained five days. They never turned off the lights. They did a roll call three times a day. It was very hard," he recalled. After the officials reviewed his documentation, he was released in Mexico, in a dangerous part of Nuevo Laredo. "They freed us in an empty terminal with other people. Afterward, no one wanted to leave there because there was talk that there were kidnappings. They had kidnapped two Cubans and a Honduran," he said. They slept on the floor. The next day, a truck took away many people, and the migrants were told that it would be the last truck to leave that week. He and a friend decided to pay a taxi to take them to a bus terminal from where they could go on to Matamoros, where they learned that their families had been taken. "We were kidnapped when we were buying the tickets. It was a bad scene, because everyone there saw what was happening and no one did anything. They took us far away, to a house where they searched us, took away everything and put us in a room with other people kidnapped that same day," the young man said. "All were immigrants." One of the kidnappers interrogated them, looking for information that could help draw a ransom payment from relatives. But neither of the Venezuelans had relatives in the United States, and the contact lists on their cellphones had been damaged when they crossed the river. When the kidnappers realized the two had no relatives who could pay a ransom, they were taken to a different room. "We spent two hours there, praying, begging God," the young man said. "When they told us we were going to be released, we could not believe it. They told us not to go back. They put us in a car, took us to a terminal, put us on a bus to Matamoros, with nothing, because they took what little we still had." This Venezuelan migrant now faces another great obstacle: He must return to Nuevo Laredo, so he can be transported to the U.S. side of the border for a September hearing before an immigration judge who is considering his asylum | https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article234175802.html |
| 8/22/19 | attempted kidnapping | 4 | Misael Palacio, 37, from San Rafael, El Salvador is determined to appear for his court date on Oct. 23. He brought his two sons, ages 3 and 12, to the U.S. border, he said, after he was threatened by gang members at home. The day after he was released back into Nuevo Laredo from the United States under the "Remain in Mexico" policy," he and his kids were nearly kidnapped by four men who tried to force them into a vehicle. Palacio escaped by holding onto his kids and running into oncoming traffic, he said. | https://www.deseret.com/2019/8/22/20828880/nuevo-loredo-mexico-border-crisis-immigration |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/19 | kidnapping | 2 | Liceth Morales -  "It's dangerous in Nuevo Laredo. Lots of things can happen," she says, her lip trembling. She says they fled out-of-control crime in Honduras, thinking they could find refuge in the United States. But when she arrived at the Nuevo Laredo bus station, she says young men with tattoos and ball caps grabbed her and her son and held them prisoner for three weeks in safe houses. Ultimately, she says, her family in San Antonio paid $8,000 for her freedom. Finally, she crossed the Rio Grande to the U.S., asked for asylum and was sent right back to Nuevo Laredo. | https://www.npr.org/2019/08/23/753660088/migrants-in-mexico-seeking-u-s-asylum-wait-amid-dangerous-conditions |
| 8/26/19 | attempted kidnapping, extortion | 1 | Even though Danilo explained to a CBP officer that he had escaped from armed men attempting to kidnap him, he was returned to Mexico through MPP without a fear screening. In late May, Danilo placed his name on the wait "list" in Reynosa to seek asylum at the U.S. port of entry. While searching for a shelter, two armed men hunted Danilo and another asylum seeker throughout Reynosa trying to kidnap them. A Good Samaritan hid the two in a car trunk and spirited them to another part of town, but the kidnappers found them. Danilo managed to escape and hid in a shelter for 40 days. Danilo had previously been abducted by Mexican police officers who demanded a $1,500 payment from his family to release him. In early July, as CBP severely reduced the number of people permitted to ask for asylum at the port of entry, Danilo crossed the border in desperation to request protection. CBP did not refer Danilo for a fear screening despite his attempts to express his fear: "I explained what had happened in Mexico, but [the CBP officer] insisted that I had to return to Mexico." | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |
| 8/26/19 | armed robbery | 1 | CBP returned Yerson*, an asylum seeker from Cuba, to Mexico where he had been robbed three times in the five days before he crossed the border to seek asylum. As Yerson arrived in Reynosa in early July, a group of armed men stopped the vehicle he and other asylum seekers were traveling in and robbed them. Days later Yerson was robbed in the street by two men who threatened to kidnap him. Yerson tried to seek asylum by crossing the bridge that links Reynosa to Hidalgo, Texas but was turned back by U.S. officials. After learning that the "list" to seek asylum in Reynosa would require him to remain there in danger for months, Yerson decided to cross the border to seek asylum. But at the Rio Grande a group of more than a dozen tattooed men robbed him before he could cross the river and turn himself in to the Border Patrol. Yerson was returned to Mexico without a fear screening: "I told [the CBP officer processing him for MPP] that I had been robbed three time in Reynosa, but he didn't pay attention to me. . . . He only told me that I was going to be brought to the bridge in Nuevo Laredo. | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/26/19 | armed robbery | 1 | Edwin*, a Cuban asylum seeker, was returned by CBP under MPP to Mexico, where he had been extorted by corrupt police officers and robbed at gun point. After being forced to pay police officers in Reynosa $300 because they threatened to deport him, Edwin tried to request asylum at the U.S. port of entry in Hidalgo, Texas, but learned that he would have to place his name on a months-long "list." While waiting in Reynosa two men, one armed with a pistol, robbed Edwin including a backpack that contained important evidence for his asylum case. Afraid to remain in Reynosa, Edwin crossed the river to seek asylum. CBP officers processing Edwin for MPP did not explain his legal rights, including the need to affirmatively request a fear screening. Returned by CBP to Nuevo Laredo, Edwin left for Monterrey in search of safer accommodation, but there two men pursued Edwin in the street late at night as he left a job washing dishes. | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |
| 8/27/19 | kidnapping, extortion | 14 | According to a witness account, several pickups full of mafiosos recently screeched to a stop in front of a government-contracted bus that had just left the central bus station. They ordered a dozen migrants off the bus, ordered them into their vehicles, and drove off, leaving the rest of the passengers shocked and frantic. "It's dangerous here. Lots of things can happen," says Liceth Morales, her lip trembling.

The 40-year-old Honduran woman fled the city of Choluteca with her 6-year-old son, Leytan, when thugs repeatedly robbed her small store. Then, as she tells it, when they arrived at the Nuevo Laredo bus station last month, young men with tattoos and ball caps grabbed her and her son and held them prisoner for three weeks in a succession of safe houses. Ultimately, she says, her family in San Antonio paid $8,000 in ransom for her freedom.

"When they released us, we immediately crossed the bridge to the U.S. to ask for asylum," she says. "But they sent me right back over here." | https://www.npr.org/2019/08/27/754489426/criminals-target-migrants-in-mexico-seeking-u-s-asylum? |
| 8/28/19 | assault, robbery | 1 | Un grupo de 17 migrantes cubanos fue asaltado por policías estatales en el hotel donde se hospedaban en Ciudad Juárez, frontera mexicana con Estados Unidos, según declaraciones y videos a los que tuvo acceso Efe. A los cubanos, que se encuentran en Ciudad Juárez para pedir asilo en Estados Unidos, y al encargado del hotel, los policías estatales de Chihuahua, estado del norte de México, les despojaron de más de 2.000 dólares, entre dinero y bienes. | https://www.radiotelevisionmarti.com/a/polic%C3%ADas-asaltan-a-migrantes-cubanos-en-hotel-de-ciudad-ju%C3%A1rez/246305.html |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/29/19 | kidnapping | 4 | Taylor Levy, a pro bono immigration attorney in El Paso, said one client and her children had been kidnapped twice in Juárez. The woman managed to pay both ransoms, and though she showed asylum officers evidences of the ransom payments, the government still sent her back, saying just because she'd been kidnapped twice in the past does not mean she's likely to be kidnapped again. Levy said she once watched a group of men snatch a family right before her eyes. When she tried to intervene, the kidnappers threatened her as well. So Levy thought of her two adopted daughters and stood, helpless and devastated, as the kidnappers dragged the family away: "I can't stop thinking about them, ever. There's just rampant, rampant amounts of kidnapping [in Juárez]. I know my life is in danger every time I go over there." | https://world.wng.org/2019/08/no_safe_haven |
| 9/2/19 | kidnapping, extortion | 8 | Three Honduran migrant families who returned to Mexico under the Migrant Protection Protocols recently recounted in interviews with the Los Angeles Times how gangsters kidnapped them, obliging relatives in the United States to pay ransoms. All three said they had alerted U.S. immigration officials that they had been abducted in Mexico — but were nonetheless sent back to Mexico. | https://www.latimes.com/world-nation/story/2019-09-01/kidnapping-of-pastor-in-mexican-border-town-dramatizes-threats-to-migrants |
| 9/3/19 | kidnapping | 2 | One woman in the United States called Cargioli on behalf of a family member under MPP in Tijuana. The woman said her family—a mother and child—had been kidnapped in Tijuana, and thus the mother probably couldn't make it to her court date. She asked how she could explain to the judge what happened, and Cargioli encouraged her to report it to Mexican authorities. "But she was too afraid," Cargioli recalled. "She said, 'How do you know the police there will actually help?' She never called back." | https://world.wng.org/2019/09/a_bad_day_in_court |
| 9/3/19 | robbery, assault | 38 | Three armed masked men burst into a Juarez shelter at night to assault and rob migrants of their documents, phones, money and even clothes and hygiene products - El asalto ocurrió aproximadamente a las 8:30 de la noche, en un albergue ubicado en el poniente de la ciudad, donde actualmente viven 52 cubanos, pero unos 14 de ellos se encontraban fuera del lugar, al igual que el pastor Rodolfo Barraza, quien había salido a comprar cena para algunos de ellos. Ocho de los migrantes fueron golpeados, tres de los cuales fueron trasladados en una ambulancia a un hospital de la ciudad para descartar que tuvieran alguna fractura, pero debido a que sólo fueron lesiones leves fueron dados de alta la misma noche del domingo. | https://diario.mx/juarez/asaltan-en-albergue-a-migrantes-cubanos-20190902-1557808.html |
| 9/5/19 | kidnapping | 2 | I have a family (clients) in CBP custody, going through a legal process (a non-refoulement interview) for which they should have access to counsel. They were kidnapped in Mexico. I know nothing about what has happened and cannot access them | https://twitter.com/cbrownimmlaw/status/1169640214421102592 |
| 9/8/19 | rape | 1 | I met a woman who was raped in (Juarez) Mexico and was so traumatized she couldn't write her name on a pad of paper. She trembled so much it was just scribbles. The woman is now pregnant. | https://twitter.com/cbrownimmlaw/status/1170554328098078721 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/9/19 | kidnapping | 2 | father and daughter were kidnapped while waiting in Reynosa - El padre y su pequeña hija fueron secuestrados mientras esperaban para solicitar asilo en Reynosa, Tamaulipas, México. Se escaparon de sus secuestradores y cruzaron a los Estados Unidos para buscar alivio. El padre y la niña fueron enviados de regreso a Tamaulipas bajo MPP. | https://www.elmanana.com/viven-en-el-limbo-entre-dos-paises-migrantes-frontera-esperanza/4913398 |
| 9/10/19 | rape | 1 | "This man had informed someone that he had picked up two people, but he didn't know we were trans," the Salvadoran woman said. "I was kidnapped in Mexico with a gun to my head. I was raped. I also knew my friend was being raped because of her screams."She said they were able to escape one night when the men got drunk. They returned home but then they tried again. That second time, they made it to the U.S. But she was deported, and so she tried again. That time she was told to wait in Mexico because the Remain in Mexico program, also known as the Migrant Protection Protocols, or MPP, was in effect. | https://www.keranews.org/post/lgbtq-migrants-face-unique-dangers-when-us-rejects-and-returns-them-mexico |
| 9/11/19 | kidnapping | 2 | One young couple was so traumatized after being kidnapped they spoke in a whisper our entire consultation. | https://twitter.com/L_Toczylowski/status/1172037061622108160?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1172037061622108160&ref_url=https%3A%2F%2Famericasvoice.org%2Fblog%2Fscotus-asylum-ban-tweets%2F |
| 9/14/19 | kidnapping | 3 | However, as they neared Reynosa, a city about an hour's drive west of Matamoros, a man apparently known to the guide pulled them off a bus and took them to a site where dozens of other people were being forcibly held, the couple said. They said they escaped, sleeping in ditches until finally crossing the Rio Grande and surrendering to U.S. authorities. | https://www.reuters.com/article/us-usa-immigration-mexico/after-us-court-ruling-honduran-newlyweds-among-migrants-clinging-to-asylum-dream-idUSKBN1VZ0N7 |
| 9/15/19 | kidnapping, extortion | 1 | Melissa fled Venezuela in late July seeking asylum in the United States. As a critic of Venezuela's disputed President Nicolas Maduro, she feared retribution from the government. Along her route, she says she was kidnapped and extorted by smugglers in Reynosa, Mexico, who forced her to cross into the U.S. between ports of entry, where she was detained. Melissa was returned to the International Bridge spanning the Rio Grande river to Nuevo Laredo, Puente 1, lacking laces in her shoes, a change of clothes, food or shelter. Her pleas to remain in the U.S. to await her Oct. 22 court hearing were denied. "I thought this would be, as they say, the American dream. But for me, it's only been an American nightmare." | https://www.irishsun.com/news/262423121/us-bound-migrants-asylum-seekers-wait-out-policy-changes |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/16/19 | kidnapping | 12 | He said when he and another dozen or so asylum seekers who had been returned that day to Mexico arrived at the bus station in Nuevo Laredo, a group of 20 men were already waiting for them. Immediately, the men forced David, his child, and the other migrants into trucks, as an immigration official looked their way but did nothing. | https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel |
| 9/16/19 | kidnapping | 4 | One woman, whom VICE News is calling Ana to protect her identity, was kidnapped with her husband and two children the day after the U.S. sent them back. She said they were at the bus terminal buying a ticket for a nearby city when a group of men surrounded them and said the family needed to go with the men. | https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel |
| 9/16/19 | kidnapping, rape | 1 | I learned last night about an 18-year-old girl separated from her little sister by CBP and forced back to Nuevo Laredo with a Feb. 2020 court date. She was kidnapped and raped. | https://twitter.com/ReichlinMelnick/status/1173559391582326787 |
| 9/16/19 | robbery | 1 | and then, in southern Mexico, bought phony immigration papers that landed her in a detention center. "The food was not fit for dogs—not even for rats," she says of the facility. "I was there eight days, and if I stayed one more, I would have died or gone crazy." In April, Dana was among 600 migrants who escaped. By the time she reached Juárez, she'd been robbed so often that she carried the remains of her cash, $20, wrapped in a condom stuffed in her crotch. | https://www.theatlantic.com/international/archive/2019/09/us-mexico-mpp-ciudad-juarez/597796/?utm_source=twitter&utm_medium=social&utm_campaign=the-atlantic&utm_content=edit-promo&utm_term=2019-09-16T10%3A00%3A09 |
| 9/16/19 | kidnapping | 1 | For the migrants who made it, the judge set another court hearing for October 16. As she was wrapping up, one father, there with his wife and young son, rose from his chair in Laredo to ask whether he had to return to Mexico. "I'm not in a position to demand anything, but I want to say, I'm with my family, and I'm very afraid of returning to Mexico," he said through the video screen. He said that he had been kidnapped. | https://www.texasobserver.org/migrants-at-laredo-tent-court-tell-stories-of-kidnappings-and-violence-while-pleading-not-to-be-returned-to-mexico/ |
| 9/16/19 | kidnapping | 2 | Before court Monday, Honduran asylum seeker Yudy Pagoaga said that days after she and her 7-year-old daughter Allison were returned to Nuevo Laredo in July, they were kidnapped with four other migrants. They escaped and met a local pastor who took them in until their hearing. Pagoaga, 30, a single mother who ran a small store in Honduras, said she fled extortion and gang threats and couldn't return home. | https://www.latimes.com/world-nation/story/2019-09-16/secretive-tent-courts-latest-hurdle-for-asylum-seekers |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/17/19 | kidnapping | 1 | Gonzalez said she would address him afterward. Then a second person asked to speak and also said he was afraid. Eventually, eight people spoke. One woman said she had to pay someone to bring her back for her hearing. Another person said she had been kidnapped and mugged. | https://www.japantimes.co.jp/news/2019/09/17/world/social-issues-world/texas-tent-courtrooms-open-process-migrants-waiting-mexico/#.XYDkqChKiUk |
| 9/17/19 | attempted kidnapping | 5 | A family with four young children from Nicaragua described how they were nearly kidnapped at the bus terminal as they were heading to court, their children almost separated from them. | https://twitter.com/charanya_k/status/1174080750943166466 |
| 9/17/19 | kidnapping | 2 | A Salvadoran father wept while his little girl slept in his lap. He was kidnapped with others while traveling to court via bus. The police cars he thought were there to help them instead kidnapped the group. He was released because he had no money. The others remain missing. | https://twitter.com/charanya_k/status/1174080751878516736 |
| 9/17/19 | kidnapping | 2 | Young Honduran mom was kidnapped after returning to Nuevo Laredo. The kidnappers realized she had no family in the United States and no money so they dumped her back on the street with her kid, took photos of her and told her to get out of town in an hour or else. Many people were being held in the house with the family. | Report to HRF by U.S. immigration attorney working with MPP returnees in Nuevo Laredo |
| 9/17/19 | extortion | 2 | A Cuban couple had been extorted in Mexico and made to pay $1500, which they had to do with the help of family at home. Several of their friends had been kidnapped. One of them told the judge: "We want to ask for your pardon for entering illegally, but please don't send us back." | https://twitter.com/charanya_k/status/1174080756882268160 |
| 9/18/19 | kidnapping | 2 | Was @ Laredo bridge 3:30 a.m. today talking to migrants in "Remain in Mexico" before tent court, about 20 from Cuba, Honduras, Venezuela and El Salvador. Nicaraguan father w/16 year-old son said they had been kidnapped on their way there for a few hours; they didn't have a lawyer | https://twitter.com/mollyhf/status/1174480795525877760?s=12 |
| 9/18/19 | robbery | 1 | Honduran client in Monterrey was robbed, needs to travel to Juarez for hearing | MPP FB group post |
| 9/19/19 | kidnapping | 1 | An asylum seeker I worked with in #Matamoros sent me a message tonight. He had been kidnapped and extorted already in Matamoros while in #MPP. He was kidnapped again, and the armed men who did it burned his body with lit cigarettes. | https://twitter.com/vwesg/status/1174837816783712262 |
| 9/20/19 | kidnapping | 1 | I do not envy at all the job of interpreting by video for 3 hours straight. But still I noticed a number of errors that caused confusion. At one point a man even said he'd been kidnapped and it was left out of translation. | https://twitter.com/bova_gus?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/21/19 | kidnapping, assault | 3 | Escuchaba cómo golpeaban a mi marido con unos bates y le daban toques eléctricos. Lo escuchaba gritar", cuenta Ángeles, una hondureña que fue secuestrada con su familia en Nuevo Laredo, Tamaulipas, en la frontera entre México y Estados Unidos. Ella, de 24 años, y su hijo, de tres, fueron liberados a los 8 días. Pero, no sabe si su esposo está vivo o muerto. Describe cómo el autobús en el que viajaban había apenas llegado a la estación cuando fue abordado por ocho criminales. Su intento de lograr el sueño americano se convirtió en una pesadilla. "Nos tuvieron encerrados en tres casas diferentes donde había más gente secuestrada. Me pedían que le llamara a mi familia para que les pagaran 11 mil dólares. Mi familia me dijo que lo sentía mucho, pero que no tenían dinero. El mundo se me iba haciendo cada vez más pequeño. Y ellos me amenazaban con matarme". La última vez que vio a su esposo fue cuando uno de los secuestradores la acompañó al baño y pasó por la habitación donde él estaba, tendido en el suelo, boca abajo. Tenía esposas y las manos amarradas hacia atrás. Sus pies estaban amarrados con cinta de aislar. Estaba muy golpeado y ensangrentado. "Me vio y me dijo: `amor, nos van a matar`. Yo solo pude asentir", dice en voz baja y tragando sus lágrimas. | https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html |
| 9/21/19 | kidnapping, extortion | 2 | "Yo le dije a un oficial de la patrulla fronteriza que por favor me encarcelaran en EU, pero que no me regresaran esperar a México, que es como la boca del lobo. Allí me secuestraron, me extorsionaron y me amenazaron de muerte", dice entre lágrimas de desesperación Daniel, un migrante de Honduras. "Para obligarme que regresara, me amenazaron con separarme de mi hijo", continua. asegura que le dijeron que en el país latinoamericano él y su hijo de 8 años iban a estar en un albergue, con protección. Sin embargo, es uno de los cientos de migrantes que ahora duermen al ras del suelo, en la calle en Matamoros. No se atreven a moverse más de algunos metros de la línea fronteriza marcada por el Río Bravo, porque tienen miedo del crimen organizado, que está al acecho. "Es muy cruel lo que nos hacen. México ni siquiera puede proteger a sus ciudadanos, ¿cómo va a proteger a los migrantes?", se pregunta Daniel, que tenía un buen trabajo en Honduras, pero migró porque las maras querían que su hijo introdujera droga en su escuela primaria. | https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html |
| 9/24/19 | kidnapping | 1 | Christina Brown, a Colorado-based immigration lawyer representing a handful of migrants forced to wait out their asylum cases in Mexico, told VICE News one of her clients was also kidnapped shortly after arriving in Juarez and had her immigration paperwork taken by her kidnapper. "She has a court date coming up, and the person who kidnapped her knows when it is," Brown said. "She's so afraid to even present at the port of entry because they have her information. She's terrified that they will be there waiting for her at the port of entry when she goes and that she won't make it to court." Christina also told us: Guatemalan woman HMR in MPP was kidnapped in Juarez on her way back from court. The kidnapper took her court documents. He got her number from the documents and has been texting her threats. She later woke up to find him standing over her bed. Nonetheless, she didn't pass her non-refoulement interview. | https://www.vice.com/en_us/article/gyzdp9/trumps-remain-in-mexico-policy-is-causing-asylum-seekers-to-miss-court-dates-and-get-deported |
| 9/26/19 | assault, robbery | 2 | My 23-year-old clients (brother and sister from Cuba) were beaten and robbed yesterday in Matamoros | https://twitter.com/Kou_Sua/status/1177206159033405441 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/26/19 | kidnapping | 2 | Y.C.F.F. (A# XXX-XXX-XXX) of Honduras is 8 months pregnant and was returned to Matamoros, Tamaulipas, Mexico on or about August 18, 2019. In April 2019, prior to entering the United States, she and her five-year-old daughter were kidnapped in Mexico but managed to escape. While detained in CBP custody, a "white, tall, blue-eyed woman," wearing a green uniform told her that she should abort her baby because "Trump didn't want there to be any more pregnant people here." She was held in overcrowded conditions for three days. She has had no prenatal care in Matamoros | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | attempted kidnapping | 3 | G.M.H.M. (A# XXX-XXX-XXX) of Honduras, age 25, is 5.5 months pregnant and was returned to Matamoros, Tamaulipas, Mexico on September 3, 2019. She along with her two young daughters, ages 5 and 2, were victims of an attempted kidnapping in Mexico prior to their entering the United States at the end of August 2019. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | kidnapping | 1 | L.E.L.P. (A# XXX-XXX-XXX) of Ecuador, age 18, is 4 months pregnant and was returned to Nuevo Laredo, Mexico on September 23, 2019 for a second time under MPP. Despite repeated attempts by U.S. advocates to intervene, Border Patrol sent her back to Mexico. Previously returned to Nuevo Laredo under MPP, the young woman was subsequently kidnapped, and her family extorted for her release. Upon re-entering the United States, she expressed her fear of return to Mexico to Border Patrol officers, who failed to refer her for a screening interview. Once back in Mexico, her and other returned women could not leave the Mexican side of the port of entry due to known cartel scouts waiting to identify returning migrants for kidnapping. After extensive efforts byU.S. 10 advocates, a local contact was able to transport the women to a local church. Despite not sharing their location with anyone, unknown individuals identifying themselves as local journalists appeared at the church the following day demanding to speak with the women. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | extortion | 4 | F.Y.C.H. (A#: XXX-XXX-XXX) of Honduras, age 28, is 2.5 months pregnant and was returned to Tijuana, Baja California, Mexico on May 25, 2019, along with her husband and two small children. Upon return to Mexico, F.Y.C.H. and her family suffered threats and extortion from smugglers in Tijuana. The family fled to Mexicali, where she experienced bleeding due to her pregnancy and received limited emergency medical care. In her past two pregnancies, F.Y.C.H. endured medical difficulties, including preeclampsia and a hernia that required surgery. She has lost weight during this pregnancy as she cannot eat regularly and suffers from high blood pressure. In early September 2019, when in CBP custody during her initial immigration court hearing, F.Y.C.H. informed CBP officers of her pregnancy but was ignored. She also requested diapers for her three-year-old child. CBP agents told her she should potty train her son and did not provide diapers. Due to ongoing threats against the family in Baja California, F.Y.C.H. and her family have fled south to another state in Mexico. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/29/19 | kidnapping | 2 | David was aware of migrant shelters at that point and was desperate to find refuge in the closest one, about five blocks away."Papi, I'm scared," Edin said as they started walking. "Just start walking. God will protect us," David told him, putting his arm around his son. "We'll be fine." They were fine for three or four blocks until a group of gang members appeared. Edin began to cry. They asked David for his password. He told them: "Pancho mini mi." "Good, he's with us," they said. And they kidnapped them anyway. After more than a week in captivity, David's family in Guatemala paid the kidnappers $15,000 to free them. | https://www.msn.com/en-us/news/world/kidnapped-and-attacked-in-mexico-migrants-are-giving-up-their-asylum-claims/ar-AAI0XAw |
| 9/29/19 | robbery, attempted kidnapping | 2 | Ten-year-old Anthony sat cross-legged on the floor eating soupy white rice while his mother recounted the day when 20 gang members stormed the migrant shelter where they stayed. She said the men, dressed in black and wearing ski masks, yelled "Get to the ground!" and pointed their guns at them. Dozens of parents and children screamed and cried as the gang took their phones and money. "We can't stay here," said Sandra, Anthony's mother, as she held him at the Good Samaritan shelter here. "It's not safe." | https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php |
| 9/29/19 | assault, robbery, attempted kidnapping | 4 | Noelia and her two daughters, migrants from Honduras, arrived at the bridge that crosses the river to Laredo for their court hearing out of breath — after running from kidnappers, Noelia said. Another woman wound her way toward the bridge wearing a jacket that hides a ripped yellow shirt and knife markings on her breasts. She said she was attacked that morning on her way to work. Men stole her purse, emptied it and then returned it to her rented room. The implied message: We know where you live. And Axel, a 40-year-old Venezuelan migrant, has scars on his upper back and arms. He said the one on his back is from a bullet shot at him during an anti-government protest in Venezuela. The scars on his arms are from gang attacks here. "In Venezuela, I was a dead man," said Axel, who has spent six months at the Barrio Para Dios shelter in Nuevo Laredo, waiting for his court hearing. "Here, I'm a dead man walking." Because the region has suffered cartel violence for years, the U.S. State Department has issued a "Do Not Travel" advisory for the state of Tamaulipas, where Nuevo Laredo is located. | https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/30/19 | assault, robbery | 1 | Mario Rodríguez, a 27-year-old from Nicaragua, was in the southern Mexican state of Chiapas in May when he was attacked the first time. According to a police report, he was knocked unconscious and robbed of $70 by an unknown assailant. He experienced a second attack in late July, when he was in Matamoros, a Mexican border city across from Brownsville, waiting his turn to request asylum legally at the bridge under the Trump policy known as "metering." One evening, Rodríguez—who, like the other migrants in this story, requested a pseudonym for his protection—walked downtown to buy some churros. Night fell, so he decided to take a taxi back to the bridge, where he lived in a migrant encampment.<br><br>By Rodríguez's account, the taxi driver recognized him as a foreigner, pulled a crescent wrench from the floorboard, and slammed him over the head three times in an attempt to knock him unconscious. The driver grabbed Rodríguez's cell phone and said he was going to turn him over to the local Gulf Cartel. Rodríguez, an ex-cop, says he fought back, wresting away the wrench and fleeing to the bridge on foot, blood pouring down his face. He reached the bridge's midpoint, where Customs and Border Protection (CBP) officials stand guard, and begged to be let through. But, he says, the agents just confiscated the bloody wrench from him and turned him away. About two weeks later, it was his turn to request asylum at the bridge. Though he told a CBP officer he was afraid of Mexico, the agent said nothing could be done, and Rodríguez was returned to Matamoros under MPP. Now he rarely leaves the area right by the bridge. "I feel a fear here," he told me in August. "I have this premonition that something's going to happen to me." Though he'd later decide against it, he told me then that he was thinking of returning to Nicaragua. His reasoning? He'd heard it costs thousands of dollars to repatriate a body.<br><br>Cheaper to die at home, he calculated, than to die in Mexico. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/30/19 | assault, kidnapping | 1 | Eduardo Águila, a 33-year-old also from Nicaragua, has had it even worse. According to police reports he filed with Mexican authorities, a man stabbed him in his right side in March in Chiapas; four months later, in Mexico City, two men kidnapped him, tied his hands with a cable, beat him, and burned him in an attempt to extort ransom. He then managed to escape the kidnappers and flee to Tijuana. There, a group of men began chasing him and one slashed his right arm with a knife. Running for his life, Águila climbed the border wall and turned himself in to Border Patrol agents, who took him to a hospital in nearby Chula Vista. Later, he tried to explain what had happened to him to the agents, but, he says, they wouldn't listen. They put him in MPP and returned him to Tijuana, with fresh stitches in his arm and medical paperwork that says he "sustained laceration to right elbow during entry." Now he lives in a shelter that he almost never leaves. He's already overstayed his allotted time there and will likely be kicked out soon. Águila, the Nicaraguan attacked three times in Mexico, has copies of police reports for every incident, but when he finally got an interview after his first court date in early September, he spoke to an officer through an interpreter by phone and was not even able to present the evidence. He was returned to Tijuana again. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |
| 9/30/19 | kidnapping | 2 | Denise Gilman, director of the University of Texas at Austin's immigration clinic, told me she also knows of at least two cases in which migrants were unable to attend their court hearings in Laredo because they were being held for ransom at the time. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |
| 9/30/19 | kidnapping | 2 | Carlos and his 17-year-old son sit in a migrant shelter run by the Mexican government here, their days tethered to ever slimming hopes that their appeals to the U.S. for asylum will somehow give them passage to a better life across the border.

On July 1, they fled what Carlos, 41, describes as an untenable life in Nicaragua, hounded by gangs who beat them and attempted to extort money. He left his job in a gold mine, and his wife and seven other children remained back home as he and Carlos Jr. struggled over the next month making their way north.

The journey became perilous in Mexico, where they were kidnapped and held for ransom, although they had no money. Carlos feels it's a miracle that they were released, and his son chokes up when his father describes the sacrifices in their quest for a fresh start in the United States.But when they arrived at a port of entry near El Paso in early August, they were quickly swept up in the Trump administration's Migration Protection Protocols program, also known as the Remain in Mexico program. Established in January, the MPP program ushered in a host of changes to U.S. immigration rules, none approved by Congress. | https://pulitzercenter.org/reporting/borderline-despair-how-us-warehousing-asylum-seekers |
| 10/1/19 | | 55 | During its most recent research, Human Rights First researchers identified an additional 54 unreported cases of individuals returned under MPP who were harmed in Mexico. | |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Two young women were abducted in Nuevo Laredo from a group of asylum seekers who had just been returned there by DHS following an immigration court hearing in late September at the Laredo tent "court." An asylum seeker in the group reported that they had been forced to sleep on the street because no transportation had been provided to return the group to Monterrey where they had previously been bussed by Mexican government officials. During the night unknown men kidnapped the young women while the others managed to escape. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Five Cuban asylum seekers returned by DHS to Nuevo Laredo were kidnapped there, as reported by an attorney representing clients in Nuevo Laredo. Even after they were released, the Cubans continue to receive threat from individuals they suspect are related to the cartels that control the area. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Four Venezuelan women and a girl were kidnapped in Nuevo Laredo in July, according to a declaration provided to Human Rights First from a Cuban asylum seeker who reported witnessing the kidnappings which occurred just outside the INM offices there. He reported that a group of men stopped a taxi an INM employee had arranged to take the four Venezuelan women and girl to a local shelter and kidnapped them. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | The men who kidnapped a Guatemalan asylum-seeking family, including children ages 4 and 6, in Nuevo Laredo specifically targeted them because they had been expelled by DHS under MPP. The family was released after several days in captivity but told they could be kidnapped again at any time and that they would be required to pay extortion calculated based on the number of days they were in Nuevo Laredo. The kidnappers reviewed the family's MPP court documents to determine the date they had been returned by DHS and the date of their upcoming court hearing. They are living in terror waiting for their next hearing, afraid they could easily be kidnapped again going to or returning from court. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | In late September, a Honduran asylum seeker was kidnapped while travelling from Monterrey to Nuevo Laredo to attend an MPP hearing at the Laredo tent "court" facility with his 16-year-old son. Another asylum-seeking family brought the boy to the port of entry where CBP processed him as an unaccompanied minor given his father's disappearance. According to attorneys familiar with the case, the man remains missing. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A 3-month-old baby and her asylum-seeking mother from Honduras were nearly kidnapped in Matamoros after being returned there by DHS. The woman told researchers from Human Rights First in September that men had attempted to force the family into a car but were prevented from abducting them by the owner of a nearby laundromat who intervened. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A Central American family with three children were abducted by men wearing Mexican police uniforms after being returned by DHS to Ciudad Juárez in August. An attorney assisting the family reported that photos sent with ransom demands to the family's relatives in the United States showed the family in what appeared to be a government office. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A Guatemalan family with two children were kidnapped for ransom by men in Mexican federal police uniforms after DHS returned them to Ciudad Juárez in July under MPP. The family told an immigration attorney that the kidnappers tortured some of the migrants held with them, duct-taping plastic bags over their heads to suffocate them. They and others managed to escape when their abductors unexpectedly left. However, the family later saw the same men who had kidnapped them near the shelter where they were hiding. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, torture | (counted within 55 reported in HRF report) | A Honduran asylum seeker, who had previously been kidnapped in Mexico with his son, was kidnapped again after DHS returned them to Matamoros. He told his attorney, Veronica Walther, that the armed men who abducted him "burned me with lit cigarettes" because he could not meet their extortion demands | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault, threats | (counted within 55 reported in HRF report) | An asylum seeker from Honduras sent by DHS to Matamoros in July was assaulted and threatened with rape for being a lesbian. In an interview recorded by the Texas Civil Rights Project and shared with Human Rights First, the woman said that a few blocks from the makeshift tent camp in Matamoros passers-by who discovered she was a lesbian hit her in the face, leaving her with a busted lip. In September, men at the camp told her they would "teach us [lesbians] to like men," a statement she understand to be a threat to rape her. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A Salvadoran asylum seeker returned by DHS to Tijuana was attacked, threatened, and abused with slurs calling Salvadorans "trash" and "leeches." The incident exacerbated the woman's already precarious mental state. A therapist evaluating the woman found her to be acutely suicidal, according to her attorney. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A Cuban woman who was seeking asylum, but turned back to Matamoros by DHS, told Human Rights First researchers that she had been threatened and assaulted during the nearly five months she had already been waiting in Matamoros. She said that other Cuban women returned to Matamoros had been raped, but women have "only two options, you are quiet, or they kill you." | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A teenage Guatemalan asylum seeker was attacked and beaten in the street in Mexicali, according to attorneys from a legal services organization that visited Mexicali in September. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

AR01355

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Three children, all under the age of ten, and their mother sought asylum in the United States but were sent by DHS to Matamoros. They were returned to Mexico even though they had previously been abducted in Villahermosa. The family was held by kidnappers for nearly a month and only managed to escape when other migrants held with them helped the family to escape when the woman's youngest daughter became gravely ill. When the mother told CBP about the kidnapping and her fears her family would be harmed if returned to Mexico, the officer told her that "we have orders from above to return all." | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A 12-year-old girl and her father, asylum seekers from Honduras, were kidnapped in southern Mexico, an experience that further traumatized the girl who had already been traumatized by a brutal attack on her family in Honduras. When her father told CBP about the kidnapping, a CBP officer said that he did not believe the man because he had not filed a police report. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, torture | (counted within 55 reported in HRF report) | A Honduran asylum seeker and his 9-year-old son were expelled to Matamoros without a fear screening even though the man explained to CBP officers that he and his son had been kidnapped and that he was subsequently tortured by Mexican law enforcement officers in Tamaulipas who burned him with lit cigarettes. The man showed Human Rights First researchers several small circular scars on his stomach that appeared consistent with his account. He said a CBP officer threatened to separate him from his son if he persisted in insisting that he feared return to Mexico. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | CBP officers returned a Nicaraguan political activist seeking asylum in the United States to Mexico even though corrupt Mexican police officers in Reynosa had handed him over to kidnappers in mid-August. He was held along with a group of about 24 other migrants – including about ten non-Spanish speaking black migrants, several other Central American migrants, and a Russian man who had been tortured by the abductors after apparently attempting to escape. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, rape | (counted within 55 reported in HRF report) | An asylum seeking woman who was kidnapped in Mexico with her son, repeatedly raped, and pursued by the kidnapper to Tijuana, did not pass an MPP fear screening. Even though the woman had a video sent to her by the kidnapper proving that he was in the same city as her and she had reported the kidnapping, rape and threats to local police, she and her son were returned to Tijuana, according to the attorneys representing the family. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | 3 | Denis was especially nervous. A few months earlier, his wife had left the city of San Pedro Sula with the couple's two other children, including the eldest, who, at seventeen, was being targeted to join a local gang; after he resisted, gang members began threatening the entire family. Denis stayed behind to earn a bit more money before following with the couple's other children. His wife arrived at a port of entry in El Paso, and immigration agents allowed her and the children to enter the U.S. while their asylum case was pending. Denis planned to use the same process. But, shortly after he and the two children reached Juárez, in mid-August, a group of local gangsters kidnapped them and held them for five days in an abandoned church on the outskirts of town. They eventually escaped and travelled directly to the U.S. border crossing. "It doesn't make sense to try to cross illegally," he told me. "The smugglers will just take your money and then abandon you." By the time they arrived in El Paso, the asylum process had changed: Denis and his children were briefly detained, given a court date in December, and then sent back to Mexico to wait, under a U.S. policy called the Migrant Protection Protocols (M.P.P.). | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |
| 10/1/19 | robbery | 2 | The other woman, Betty, was from Guatemala City. Her seventeen-year-old daughter, Marielos, followed quietly behind her. After arriving, in early August, the two of them had been given a court date for late October, but they'd been robbed immediately after returning to Juárez. Betty had kept their court documents and identification in her purse, which was now gone. | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | rape, kidnapping, assault | previously counted in tally | Earlier this summer, I spoke with a twenty-year-old woman from northern Honduras named Tania. In early April, she and her fourteen-year-old sister were separated at an El Paso port of entry. Her sister was sent to a children's shelter run by the Department of Health and Human Services and eventually placed with their mother, who lives in Boston. Tania spent six days in detention in the U.S., in a frigid holding cell known among migrants as a hielera, before Mexican immigration agents picked her up and took her back across the border, into Mexico. They dropped her off at a migrant shelter that was already full. She roamed the streets, looking for another place to stay. Her tattered clothes and accent marked her as foreign, and her race—she's black and belongs to an indigenous community called the Garifuna—led to several episodes of public abuse. "People would shout and spit at me when I was on the street," she said. "If I sat down somewhere, people would get up and move away." ...Back in Mexico, she decided that it was pointless to wait any longer. She and another woman from Honduras hired a smuggler to help them cross into the U.S. Neither of the women realized it at the time, but the smuggler was in league with a cadre of Mexican federal policemen. For two nights, she and the other woman were driven to different stash houses along the border. On the last night before they expected to cross, they were taken to yet another house, where there were four other women and a group of armed men, including policemen in uniforms, keeping watch. That night, one of the policeman held a gun to Tania's head and ordered her to perform oral sex on him. "I could hear the other women getting beat up in the background," she said. Early the following morning, Tania and another woman were transported to a separate location, where they were repeatedly raped. A week passed before local authorities found them and took them to a hospital. | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |
| 10/1/19 | sexual assault | 1 | A Nicaraguan woman I met this past weekend in Matamoros told me that she had been sexually assaulted by Mexican police and was afraid to tell CBP for fear they'd share the information with Mexican authorities and she would be retaliated against while she's in Mexico. | https://twitter.com/mariaaleote/status/1179170242058174465 |
| 10/7/19 | kidnapping | 1 | The Remain in Mexico policy is hurting people: My friend's family is being extorted after her cousin (Salvadoran) was kindapped because he was sent back to Mexico to file for asylum. Let's venmo @ Karol-Jalpay to get him back! (later correction specified the cousin is Honduran) | https://twitter.com/_danalvarenga/status/1181240055869952001 |
| 10/7/19 | assault | 1 | Dany and other LGBTQ asylum seekers said that while they waited in Mexico they had been threatened and intimidated for being gay. Melisa, a 27-year-old from Honduras, said she was hit in the face by a stranger as she stood talking to friends outside a nearby pharmacy. | https://www.latimes.com/politics/story/2019-10-07/julian-castro-helps-lgbtq-migrants-trump-remain-in-mexico-plan-cross-border |
| 10/8/19 | assault, threats | 1 | Mari, a Cuban asylum seeker, said two men had threatened her and her partner, Dany, when they went to buy cigarettes. One of the men also grabbed her during the altercation, Mari said. They also faced discrimination from fellow asylum seekers. | https://www.motherjones.com/politics/2019/10/trump-asylum-seekers-lgbtq-pregnant-women-matamoros/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/8/19 | threats | previously counted in tally | On Thursday, Mayela, the only trans women at the encampment, told me she feared for her life as she waited for her December court date across the Rio Grande in Brownsville, Texas.Mayela had similar experiences to the other LGBTQ women in Matamoros. In late September, a woman came to her tent and threatened to cut out her guts with a knife, according to a complaint Mayela submitted to the Mexican government. In the line for food at the camp, fellow migrants told her she had to wait in the men's line and sometimes used slurs. Goodwin learned the next day that the Department of Homeland Security was taking Mayela out of MPP. Mayela had passed her screening interview. It was the first and only time Goodwin has seen that happen in Brownsville. | https://www.motherjones.com/politics/2019/10/trump-asylum-seekers-lgbtq-pregnant-women-matamoros/ |
| 10/10/19 | kidnapping, rape | 3 | Also on the bridge was Jilma, a 26-year-old Honduran asylum-seeker who was sent to Nuevo Laredo after presenting herself at the US border. Along with a group of other immigrants, she was transported to a shelter at the direction of Mexican immigration agents.<br><br>Along the way, the bus was stopped by federal police, Jilma said, who ordered all of the immigrants off the vehicle. Moments later the group was boarded onto trucks at gunpoint by men who took them to a large house with about 300 kidnapped immigrants. When Jilma and two other women couldn't provide phone numbers for family members who could pay a ransom, some of the men took them to another room and took turns raping them, she said."While they raped us they told us they would do the same things to our children," Jilma told BuzzFeed News. "They let us go, but before they left they took photos of us and told us to never return to Nuevo Laredo."<br><br>Jilma has since made her way to Matamoros where she hopes she will be safe, but is fearful of returning to Nuevo Laredo in January for her court hearing on the other side of the border. | https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas |
| 10/12/19 | kidnapping | 1 | "CBS This Morning" spoke to a Honduran woman, who is part of MPP, who said that her husband was kidnapped when they got sent back to Mexico. He was eventually released because the couple couldn't afford the ransom. | https://www.cbsnews.com/news/remain-in-mexico-doctors-decry-trump-policy-of-sending-more-than-51000-migrants-back-to-mexico/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/15/19 | kidnapping | 2 | "At this point, I'm so frightened I just want to go home," said Beti Suyapa Ortega, 36, from Honduras, who crossed the border into Texas intending to seek political asylum and surrendered to the Border Patrol.<br>She, along with her son, 17, were among two dozen or so Remain in Mexico returnees waiting recently for a southbound bus in a spartan office space at the Mexican immigration agency compound in Nuevo Laredo, across the Rio Grande from Laredo, Texas.<br>Ortega and others said they were terrified of venturing onto the treacherous streets of Nuevo Laredo — where criminal gangs control not only drug trafficking but also the lucrative enterprise of abducting and extorting from migrants.<br>"We can't get out of here soon enough. It has been a nightmare," said Ortega, who explained that she and her son had been kidnapped and held for two weeks and only released when a brother in Atlanta paid $8,000 in ransom. "I can never come back to this place." | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |
| 10/15/19 | kidnapping | 2 | But some, including Flores Reyes, said they were terrified of returning to Matamoros, where they had been subjected to robbery or kidnapping. Nor did they want to return across the Rio Grande to Texas, if it required travel back through Matamoros.<br><br>Flores Reyes said kidnappers held her and her daughter for a week in Matamoros before they managed to escape with the aid of a fellow Honduran.<br><br>The pair later crossed into Texas, she said, and they surrendered to the U.S. Border Patrol. On Sept. 11, they were sent back to Matamoros with a notice to appear Dec. 16 in immigration court in Harlingen.<br><br>"When they told us they were sending us back to Matamoros I became very upset," Flores Reyes said. "I can't sleep. I'm still so scared because of what happened to us there."<br><br>Fearing a second kidnapping, she said, she quickly agreed to take the transport back to southern Mexico. | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |
| 10/15/19 | robbery | 1 | Christian Gonzalez, 23, a native of El Salvador who was also among those recently returned here, said he had been mugged in Matamoros and robbed of his cash, his ID and his documents, among them the government notice to appear in U.S. immigration court in Texas in December. | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/16/19 | kidnapping, robbery | 1 | Even after he was kidnapped and robbed outside the makeshift migrant camp where he had slept for two weeks, Luis Osorto decided his only chance for eventual asylum in the United States was to stay put along the border just inside Mexico. But the 37-year-old Honduran made a pact with himself: not to leave the enclave of tents at the end of a bridge between Matamoros and Brownsville, Texas - not even to buy a bottle of water or to collect money transfers from his family back home. After what is commonly known as an "express kidnapping" last month by men waiting in a van for him outside a convenience store where he was collecting a $100 transfer from relatives, Osorto promised himself he would only leave the camp to cross the bridge to Texas for his December court date with U.S. immigration authorities. | https://www.nytimes.com/reuters/2019/10/16/world/americas/16reuters-usa-immigration-mexico-matamoros.html |
| 10/16/19 | kidnapping | 5 | Kristin Clarens, a U.S. attorney who advises asylum-seekers at the border, said she had come across five cases of migrants in Matamoros awaiting MPP hearings who were kidnapped briefly. They were taken to an ATM to clear out their accounts or forced to phone relatives to send cash transfers to a nearby convenience store. | https://www.nytimes.com/reuters/2019/10/16/world/americas/16reuters-usa-immigration-mexico-matamoros.html |
| 10/16/19 | kidnapping, extortion | 6 | Reuters spoke to six asylum seekers at Osorto's camp who said they had been kidnapped or extorted, and several more who had brushes with suspected criminals near the border or elsewhere within Mexico. | https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat/asylum-seekers-cling-to-hope-safety-in-camp-at-us-mexico-border-idUSKBN1WV1DY |
| 10/16/19 | kidnapping | 2 | I have clients who are waiting in Juarez for the MCH hearings in December. They have been kidnapped once, family paid the ransom, they are now staying in a shelter, but their kidnappers have continued to drive by and threaten to kidnap again. They want to present at the POE to request a non-refoulement interview, but are afraid to leave the shelter by themselves. Does anyone know of any agency or organization that they could reach out to accompany them to the POE? | MPP Facebook group post: posted by Guillermo Hernández |
| 10/16/19 | kidnapping, assault | 2 | respondent asked if she would be returned to México to wait until 12/16 and explained to judge that they had been kidnapped and assaulted in Nuevo Laredo and said, "if I don't return for court on 12/16, it's because something happened to me in Nuevo Laredo." | According to reports by human rights monitors at San Antonio immigration court as shared with HRF |
| 10/16/19 | assault | 2 | she said Nuevo Laredo is dangerous and she would like to avoid going back—people harass her kids, throw rocks at them and call them "mentally retarded" | According to reports by human rights monitors at San Antonio immigration court as shared with HRF |

AR01361

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/19 | rape | 1 | Constance Wannamaker wanted to scream and cry at the same time. The Texas immigration attorney had just heard what should have been great news: Her client, a 21-year-old Guatemalan woman, was getting released from the El Paso Processing Center after weeks in detention. But that's just a sliver of the story. When the asylum seeker first tried to come to the United States in April, she was returned to Mexico to await a hearing in the U.S. She crossed the border again in May but was later sent away once more to a dangerous city far from home. While she was forced to shelter in Ciudad Juárez, a stranger broke into her hotel room and raped her, her lawyer said. After she was let back into the U.S. and detained, she discovered she was pregnant. And once immigration authorities found out, they decided to remove her from their care with almost no notice...As both a woman and a migrant, Wannamaker's client was already in jeopardy. But she is also a lesbian — a factor for which her attorney suggested the U.S. government failed to screen — and because of her sexuality, she could have been exempted from the program. | https://www.nbcbayarea.com/news/national-international/Asylum-Seeker-Migrant-Protection-Protocols-Raped-Pregnant-563171401.html |
| 10/22/19 | kidnapping | 2 | "Like most of the families she assists that day, a 23-year-old man from Honduras and his toddler have been living in the plaza next to the Brownsville & Matamoros International Bridge.The site is just an hour from the place where they were kidnapped en route to the US and held for ransom. "He was petrified at being in Matamoros, living in constant fear that his kidnappers were looking for him and could find him," Zavala says. "He was out in the open and staying at the plaza. He didn't have shelter, family, or any form of protection for him and his daughter."" | https://intercontinentalcry.org/theyre-treated-like-animals-the-us-government-is-abusing-asylum-seekers-including-indigenous-migrants-but-people-are-fighting-back/ |
| 10/26/19 | kidnapping | 3 | was in Juarez driving to a shelter when I gave this quote. Picked up a couple & little boy who had been kidnapped & released after paying thousands of $. they saw the same kidnappers circling their shelter & requested help getting to the bridge to beg to be taken out of #MPP | https://twitter.com/taylorklevy |

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/5/19 | assault, robbery | 7 | Today, the ACLU Foundation of San Diego & Imperial Counties (ACLUF-SDIC) filed a class-action lawsuit against the U.S Department of Homeland Security. The suit demands that people seeking asylum who have been subjected to the Trump administration's dangerous Remain in Mexico policy – referred to by the government as the "Migrant Protection Protocols" (MPP) – and who have expressed a fear of being returned to Mexico must be given access to their lawyers while awaiting critical interviews in U.S. Customs and Border Protection (CBP) custody…The plaintiffs in the case are a Guatemalan family who fled their home in April 2019 after they were extorted, and the couple's 17-year-old daughter was raped and threatened with death. The couple's nine-year-old son has symptoms consistent with leukemia. While traveling through Mexico, the couple and their five children were assaulted by men in government uniforms at gunpoint and forced to take off their clothes during the attack. One of the assailants choked the 17-year-old daughter while she was completely undressed.<br><br>In August 2019, the family requested asylum in the United States but under MPP they were returned to Tijuana to await their immigration proceedings. During this time, there have been shootings outside the place where the family is temporarily staying.<br><br>When the family expressed a fear of being returned to Mexico, the father was separated from the family, handcuffed and given a "non-refoulement interview" via telephone and without legal representation. The rest of the family was interviewed separately, also without representation.<br><br>After the interview, the family was returned to Tijuana without an explanation. The father has since been robbed at gunpoint while on his way to work.<br><br>The family is now being represented in their immigration case pro bono by Jewish Family Service of San Diego, which is one of only two organizations in the San Diego region providing legal representation and counsel to asylum seekers subjected to MPP. | https://www.aclusandiego.org/aclu-asylum-seekers-subject-to-trumps-remain-in-mexico-policy-must-be-given-access-to-counsel/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/6/19 | assault | 1 | A Salvadoran woman seeking asylum in the United States spends her days sequestered in her cousin's cramped house in Mexico, too scared to leave after being savagely beaten three weeks ago when strolling back from a convenience store. The attack came after she spent four months in captivity, kidnapped into prostitution on her journey through Mexico.<br><br>The woman is one of 55,000 migrants who have been returned to Mexico by the Trump administration to wait for their cases to wind through the backlogged immigration courts, and her situation offers a glimpse into some of the problems with the program...As he heard the case last week of the immigrant from El Salvador, immigration Judge Lee O'Connor made no secret of his disdain for the program.<br><br>The judge said she was ineligible for the program because, in his view, the law only allows it for people who present themselves at official border crossings, not for immigrants like her who enter illegally.<br><br>But the U.S. still sent her back to Mexico with a notice that her next court date was Dec. 16, even though her case was terminated by the judge. | https://apnews.com/0746f2a9cc5745b387d795081a9c7691 |
| 11/6/19 | kidnapping | 1 | A mother appeared in court with her eight-year-old son and tearfully told the judge her husband couldn't be there because he disappeared in Mexico and has been missing for months. DHS asked that he be ordered deported for not appearing at his hearing. | https://twitter.com/becky_gendelman/status/11922606134619586 56 |
| 11/6/19 | kidnapping | 2 | Observed Laredo MPP hearings in San Antonio Immigration Court this week. An asylum seeker who had been kidnapped in Mexico with her 2-year-old baby said it was horrible and begged the court: "If I am to be deported, I would like to be deported to my own country, not Mexico." | https://twitter.com/becky_gendelman/status/11922606113648517 14 |
| 11/6/19 | kidnapping | 3 | Heart wrenching cries for help in Laredo MPP tent courts today. 16 yo girl and 12 yo boy crying, begging judge not to return them w/dad to Mexico where they were kidnapped after the last hearing in Sept (as seen by my colleague & Yale Law fellow @becky_gendelman from San Antonio) | https://twitter.com/KennjiKizuka/status/1192200730213593088 |
| 11/7/19 | attempted kidnapping, assault | 3 | Ghazialam first noticed this in September, when three of his clients were sent back to Mexico after their cases were terminated on Sept. 17. After being returned to Mexico, the mother was stabbed in the forearm while protecting her children from an attempted kidnapping. She still has stitches from the knife wound, Ghazialam said. | https://www.sandiegouniontribune.com/news/immigration/story/2019-11-07/cbp-fraud |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/8/19 | kidnapping | 2 | "Mommy, I don't want to die!" That's what a 7-year-old child cried to her mother on hearing their kidnappers plan to murder migrants held with them at a cartel safe house in Nuevo Laredo. The cartel abducted the family after CBP returned them to Mexico following an MPP hearing. Cartel members were in the Nuevo Laredo office of Mexican migration openly abducting asylum seekers just returned by CBP from their court hearings at the US port of entry. This woman managed to hide in the bathroom w/ her daughter to call a local pastor for help. When the pastor bravely tried to drive away w/the woman & her daughter, cartel members blocked the road forcing them to stop just blocks from the port of entry. They were pulled from the car & taken to a house where other migrants were being held - some of them tied up with ropes. At one point, the family witnessed cartel members carrying away two young men, discussing that they would be killed because their families had failed to pay their ransom. They saw another person beaten by the abductors for failing to pay. | https://twitter.com/KennjiKizuka/status/1192907065955667969 |
| 11/9/19 | kidnapping | | Jonathan (no es su nombre real), joven padre de familia de Nicaragua, . . . Jonathan, su mujer y dos hijos pequeños fueron devueltos a México, concretamente a la franja fronteriza del estado de Tamaulipas, un territorio sin ley que poco tiene que envidiar a las ciudades centroamericanas en lo que se refiere a la violencia atroz. Abandonada por la policía estadounidense en un descampado al otro lado del puesto fronterizo, la familia vio acercarse un autobús que supuestamente los llevaría a un lugar seguro. Pero el conductor se dirigió directamente a la casa segura de uno de los grupos de delincuentes que se dedican a extorsionar a los migrantes. Secuestraron a la familia y amenazaron con asesinarlos si desde Nicaragua no les pagaban 3.000 dólares. Una semana después fueron puestos en libertad. | https://www.lavanguardia.com/internacional/20191109/471459892472/mexico-eeuu-migracion-extorsiones.html |
| 11/13/19 | kidnapping | 1 | One pregnant 18 y/o was sent to Nuevo Laredo via MPP, kidnapped by the Cartel Noreste, dropped back in US (presumably as a decoy as the group moved drugs elsewhere), taken to the hospital by Border Patrol, did an interview asking to leave MPP, & then was sent back to Nuevo Laredo | https://twitter.com/Sleutert/status/1194644878384349190 |
| 11/15/19 | kidnapping | 4 | Yohan, a 31-year-old Nicaraguan security guard, trudged back across the border bridge from Laredo, Texas, in July with his wife and two children in tow, clutching a plastic case full of documents including one with a court date to return and make their asylum claim to a U.S. immigration judge two months later. On their way to the bus station, two strange men stopped Yohan while another group grabbed his loved ones. At least one of them had a gun. They were hustled into a van, relieved of their belongings and told they had a choice: Pay thousands of dollars for their freedom, or for another illegal crossing. | https://madison.com/news/world/migrants-thrust-by-us-officials-into-the-arms-of-the/article_3485698f-1327-522b-8ab6-5659a0ff96a6.html |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/19 | kidnapping, robbery | 2 | Along the road in Mexico, Damian added, he and his son were robbed and kidnapped and he was tortured until the boy's mother paid a $5,000 ransom – a not unusual experience for many other migrants.<br>But when he crossed the bridge to apply for asylum, US officials returned him to Matamoros, where he said he was again robbed when he tried to withdraw money sent by friends. His son suffered another kidnapping attempt while living in the tent camp. The fear for the boy's safety drove Damian to decide to send him alone to the United States, after a US immigration judge denied his own asylum application. "I don't know what to do, because I have nothing in my country. My mother is dead, my father is dead and my two sons are in the United States," he said. "I have no options other than to send my son across the bridge. At least he can be saved." | https://www.univision.com/univision-news/immigration/at-least-he-can-be-saved-migrants-trapped-in-mexico-are-sending-their-children-alone-to-the-united-states |
| 11/18/19 | kidnapping | 2 | Xiomara* and her teenaged daughter Jenny* are from Honduras...once they entered the United States, Customs and Border Patrol officials placed them under MPP and returned them to Ciudad Juarez, Mexico, to wait for their initial master calendar hearing in January 2020. In Juarez, members of organized crime kidnapped the mother and daughter for five days and six nights. They were forced to stay in a small room in a house where people came and went, music always played loudly and drugs were strewn in plain sight. Jenny remembers seeing a man snorting white powder. She said she saw very bad things — things she never had imagined before. They were able to escape, but had nowhere to go or any idea where they were. They crawled through desert-like empty lots and hid in a ditch before reaching a public area where they sought help. They are now staying in a shelter, but rarely leave out of fear that they could be kidnapped again. Xiomara does not know what will become of them — but understands that they are easy prey and never safe. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/18/19 | kidnapping | 1 | Elizabeth,* 24, fled gang violence with her 2-year-old toddler, was placed under MPP and waited months for her hearing before immigration courts in El Paso. Days before the hearing, her child was taken from her. She did not appear for her Master Calendar Hearing in El Paso because she was searching for her child. As a result, the immigration judge entered an order of removal in absentia — or in absence — against her and her child. The very system meant to protect asylum seekers like Elizabeth, instead, put her and her daughter in harm's way. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/18/19 | kidnapping attempt | 3 | Nicole* fled Honduras with her husband Wilmer* and their young child. Her father was recently murdered and most of their family is either dead or fleeing for their lives. She is a strong woman, but when asked if she fears being in Juarez, she does her best to hold back tears. The men that have been hunting down her family have tried to find them in Mexico as well. They have tried to find a safe place to wait for their hearing, but she knows they will never be safe amongst organized crime in Mexico. They have already escaped two kidnapping attempts. In the most recent attempt against their lives, however, she fell trying to escape one of the men and suffered a miscarriage. She prays for her family to stay alive and be able to appear before a U.S. immigration court in December. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |

AR01366

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/19 | assault, sexual assault | 3 | A family of three — father, son and daughter — fled Venezuela to Panama due to political persecution, after they opposed the ruling party. Upon arrival to Panama, they applied for protection, but were harassed, abused and constantly targeted because of increased xenophobia against Venezuelan nationals. Local residents threatened the son and beat him badly. In addition, officials denied the family access to education and health care. As a result, they fled Panama, traveling through Central America and Mexico to seek asylum in the United States. Upon arrival, Mexican authorities mistreated and extorted them by unlawfully retaining their passports. Both father and son survived beatings, abuse and attempted kidnapping in Mexico. The teenaged daughter experienced an attempted sexual assault, from which she suffers continued signs of trauma and possible mental health complications. Eventually, they crossed the border to the United States, and immigration authorities placed them under MPP. Fearing more persecution and violence, they now spend all their time at a shelter in Ciudad Juarez. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/21/19 | kidnapping, rape | 2 | After Lucia and her daughter were returned to Mexico, they briefly found a shelter in which to stay but were forced to leave when the shelter demanded payment, which Lucia could not pay. A man offered to let Lucia and her daughter live with his family and do domestic work for pay. However, when Lucia and her daughter went to his house, they learned he lived alone and works for a dangerous Mexican cartel. He locked them in the house, forced Lucia to do all of his housework for no pay, and inappropriately touched Lucia's daughter sexually. After much pleading and the intervention of a third party, the man let Lucia attend her MPP hearing, but threatened to kill Lucia and her daughter if they did not return after the court hearing. As before, Lucia and her daughter were sent back under MPP even though they should have been exempt from MPP because Lucia's daughter is disabled. In direct violation of the MPP guiding principles, CBP officers sent them back to Mexico anyway. This time, the consequences were even more severe. Just a few blocks from the port of entry in Tijuana, men with knives stopped Lucia and her daughter and abducted them. Lucia describes the horrors that followed: The men drove us in a car overnight. They took us to a place that I believe was [redacted], Mexico and kept us there for thirteen days. They didn't give us food or water. They tied my daughter up in a sheet so she could not move. They beat us repeatedly. They took off all of our clothes, touched us sexually, raped us, and masturbated in front of us. They often would not let us go to the bathroom. When they did let us, they would grab us and walk us to the bathroom and we would have to go in front of them. The men told me that I did not have rights because I am [redacted], called me a dog and trash, and said they would light me on fire. | http://americanimmigrationcouncil.org/sites/default/files/general_litigation/statement_for_the_house_migrant_protection_protocols_11_21_19.pdf |
| 11/24/19 | rape | 1 | Attorney reported to immigration attorney Taylor Levy that a client had been raped in Juarez. | https://twitter.com/taylorklevy/status/1198707918197198849 |
| 11/27/19 | kidnaping | 1 | At the shelter, a woman from Guatemala who did not want her name published out of fear, explained how she had been kidnapped in Mexico. For eight days along with other migrants she was tied up with tape over her mouth. She managed to get free, climb out a window and find her way to this shelter. | https://www.hppr.org/post/migrants-nuevo-laredo-remain-mexico-means-remain-danger |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/1/19 | kidnapping | 2 | One migrant, Tere, wrote that she and her 7-year-old son were kidnapped once they reached the US border and were held for nine days without food. They were only released after her family paid a ransom, she wrote.<br><br>"I thank God for freeing me from that terrible experience," wrote Tere, who says her asylum court date in the US is next February. | https://www.cnn.com/2019/12/01/world/mexico-asylum-seekers-letters/index.html |
| 12/2/19 | kidnapping, rape | 5 | "We represented a young woman and her daughter who were victimized not once but three times in Ciudad Juarez, robbed and then kidnapped for ransom and then an attempted break-in into their hotel room," Rivas said. Rivas said most recently they represented a migrant woman who had been raped during her trek to the United States and they have medical documentation that her seven-year-old daughter was also raped. The advocate also said their organization represented a young migrant woman who denounced Mexican state police that she was raped by members of the Mexican military. She added that they have "proof of all of this." | https://www.urdupoint.com/en/world/migrants-face-extortion-in-mexico-awaiting-as-777274.html |
| 12/5/19 | kidnapping | 201 | Seven and ten year-old-girls were threatened with rape by kidnappers who also abducted their brother and father, an asylum seeker from Honduras, after DHS returned the family to Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A 12-year-old Salvadoran girl was nearly abducted from her mother in Monterrey after they were sent by DHS to Nuevo Laredo under MPP then dumped by Mexican authorities in Monterrey. Armed men chased the family and grabbed the girl, but her mother managed to wrestle her back and escape. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A seven-year-old Honduran girl returned by DHS to Nuevo Laredo told her asylum-seeking mother "Mommy, I don't want to die" after overhearing the men who kidnapped them discussing murdering migrants who could not pay ransom. In mid-September, cartel members openly kidnapped returned asylum seekers inside the INM building in Nuevo Laredo following U.S. immigration court hearings, including the seven-year-old Honduran girl and her mother mentioned above. The woman overheard a Mexican migration officer tell the kidnappers the number of migrants returned from court that day and the men counting victims to abduct. The family tried to escape in the car of local pastor, but cartel members forced the vehicle to stop a few blocks away, abducted them, and held them in a house with some 20 other kidnapped migrants. A cartel member threatened to kill the woman if she reported the kidnapping to the police and bragged "the man from migration gave you to us." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR01368

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery, threats | (counted within 201 reported in HRF report) | an LGBT Cuban woman who had been robbed and threatened in Nuevo Laredo while waiting on the metering list, and a gay asylum seeker from Cuba who was robbed and threatened in Mexico but subsequently returned to Matamoros | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A Honduran asylum seeker and his two children, a 12-year-old boy and a 16-year-old girl, were kidnapped while returning from a Laredo MPP tent court hearing in September. During another hearing in November, observed by a Human Rights First researcher, the family begged not to be sent to Mexico. The girl, sobbing, said that when they return to court "bad people" approach them. The boy said to the judge, "I hope you can help us, please. I don't want to return to Mexico. We run a lot of risk." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In late October, a Venezuelan asylum seeker was kidnapped while returning to Nuevo Laredo for an MPP hearing at the port of entry tent court in Laredo. Immediately after getting off of a bus from Monterrey five men approached him and a Guatemalan asylum seeker traveling with him. The two were taken from the bus station in separate vehicles. "I started to cry in the truck. One guy told me to calm down and shut up or he would beat me." The man was taken to two different houses where the cartel held a dozen other migrants including a Colombian man with a toddler and Nicaraguan family with a nine-month-old baby. The kidnappers punched the Nicaraguan mother in the neck, as they forced her to call family members to beg for a ransom to be paid. The kidnappers released the man after several days of captivity. He fears returning to Nuevo Laredo for his next hearing in December, as his abductors recorded his details from his passport into a notebook and took a photograph of him. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A 13-year-old boy and his mother were nearly kidnapped in Nuevo Laredo while walking from the bus station toward the port of entry to attend an MPP hearing in Laredo in late September. An armed man and woman approached the family, took photos of them and tried to force them into a waiting vehicle. They escaped on foot to the office of the Instituto Nacional de Migración (National Migration Institute – INM) but so feared leaving that they missed the hearing. A Mexican migration officer eventually ordered the family to get out, saying "it wasn't [INM's] problem." A local pastor, who happened to arrive, hid the family in the back of a passenger van and spirited them from the parking lot of INM building to a shelter. A Salvadoran asylum seeker, who had nearly been kidnapped in Nuevo Laredo, indicated that the officer conducting her 15-minute-long interview principally asked about the route she and her children took to the United States and "why they had come illegally." The aggressive questioning made her afraid to fully recount what had happened, in part, because she feared her responses might be shared with Mexican migration officials who she had seen speaking to one of the men who tried to kidnap her. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | assault | (counted within 201 reported in HRF report) | A Venezuelan refugee returned by DHS to Mexico after an immigration judge granted him withholding of removal at the Laredo MPP tent court was nearly kidnapped in November while returning to the port of entry to request to be allowed to enter the United States. At the Nuevo Laredo bus station, a group of around ten men surrounded the Venezuelan man. He managed to push his way through, jump into a waiting taxi, and immediately walk onto the international bridge to Laredo, Texas, to escape. A Venezuelan asylum seeker in MPP, who was later granted withholding of removal at the Laredo tent court facility, was beaten by a group of men with sticks in Monterrey. On another occasion armed men in a vehicle nearly kidnapped him while he was traveling in a taxi in Monterrey. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping, assault | (counted within 201 reported in HRF report) | In mid-October, a Honduran asylum seeker and her daughter told an immigration judge at the Laredo MPP tent court that they had been kidnapped and assaulted in Nuevo Laredo. According to a court monitor attending the hearing from San Antonio, the woman said that if she didn't return for her next court hearing, "[i]t's because something happened to me in Nuevo Laredo." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | A Cuban asylum seeker returned by DHS to Mexico stated that in August cartel members had robbed him inside of a church offering shelter to migrants in Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 25-year-old Honduran woman and her three young children – all under 5 – who crossed the border near Piedras Negras were kidnapped upon exiting a taxi in front of a shelter in Nuevo Laredo after DHS returned them there in mid-October. Men in white vans intercepted the family, held them captive for five days, and demanded money from family members, according to an academic researcher who spoke with the relatives. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery, assault | (counted within 201 reported in HRF report) | In September, armed, masked men attacked a church-based shelter in Ciudad Juárez housing mainly Cuban migrants, according to a Cuban asylum seeker who was sleeping in the shelter with his partner and nine-year-old daughter at the time. The men shouted: "asshole Cubans, open up," as they forced their way into the shelter. The armed men threatened to "kill one of these asshole Cubans" and fired their weapons indiscriminately, nearly hitting the Cuban man. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | At another shelter on the outskirts of Ciudad Juárez, a Honduran asylum seeker who DHS had returned under MPP was nearly abducted by four masked men in a black van who repeatedly came to the shelter where she was staying and interrogated other migrants about her whereabouts. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted sexual assault | (counted within 201 reported in HRF report) | A 12-year-old Salvadoran girl was nearly raped after she, her father, and younger brother were returned by DHS to Ciudad Juárez under MPP. After the Casa Migrante told the family that they could not extend their stay due to limited capacity at the shelter, the family rented a room in a local home. While the girl's father was out purchasing food, the husband of the house's owner tried to rape the girl. The man threatened to have the girl's father arrested and deported, if she reported him to the police. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, robbery | (counted within 201 reported in HRF report) | In early July, armed cartel members attacked a home where several Cubans were renting rooms while waiting for permission to approach the port of entry at Laredo to request asylum. The cartel members announced they were searching for "foreigners," roughed up the elderly Mexican couple renting out the home, beat several of the men and placed rifles to their heads, robbed the group, took their photos and ordered them to leave the city. DHS returned these asylum seekers to Nuevo Laredo through MPP, telling one man that his fear of the cartel was "outside their [CBP's] jurisdiction." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | An asylum-seeking Venezuelan family with 16- and 11-year-old girls and 10- and 3-year-old boys were robbed in a migrant hotel after DHS returned them to Nuevo Laredo. A hotel manager said he was powerless to stop the cartel from entering the hotel. Men had previously tried to kidnap one of the girls, as the family passed through the Nuevo Laredo bus station. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | disappearance | (counted within 201 reported in HRF report) | A 28-year-old Salvadoran asylum seeker sent to Nuevo Laredo by DHS under MPP went missing in September after leaving a shelter in Nuevo Laredo to work for the day. The man was still missing at the time his 8-year-old son and wife, who was due to give birth in mid-November, appeared at their master calendar hearing in early November at the Laredo MPP tent court. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a Salvadoran asylum seeker and her two young children, who DHS returned to Matamoros, were abducted in a taxi while trying to reach a nearby store to purchase food. The taxi driver handed the family over to kidnappers who held them for seven days while attempting to extort the woman's relatives, according to Charlene D'Cruz, an immigration attorney heading the Lawyers for Good Government project at the Matamoros tent encampment. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery, kidnapping, threats | (counted within 201 reported in HRF report) | A Cuban asylum-seeking couple were robbed and pushed to the ground while walking to a store in Mexicali, where the pair had moved after DHS returned them to Nuevo Laredo. The couple had previously been abducted, robbed, and threatened in Reynosa. Another couple seeking asylum from Cuba were abducted from the street in Mexicali in August, according to their attorney Margaret Cargioli from the Immigrant Defenders Law Center. The family is afraid to venture outside now because the kidnappers took their phones and recorded their biographical information. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | A 51-year-old member of a Cuban opposition party said that he and his adult sons, who were returned to Nuevo Laredo by DHS, have been repeatedly targeted because of their nationality. In one incident, men shouted at them on the street: "asshole Cubans, you're fucked." Then in late October, a group of men cornered the family in the street, beating the older man with a board. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | After being returned to Ciudad Juárez by DHS, a Venezuelan asylum seeker was robbed while walking in downtown Juárez. The assailant used the woman's stolen phone to threaten and extort her family members in the United States claiming he knew where the woman lived. When the woman's family stopped answering the calls, a man with a photo of the woman appeared near her home in Juárez asking about her. She reported the incident to authorities, but the police did not conduct any investigation. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Armed men cut a 33-year-old Venezuelan asylum seeker with a knife as he was searching for a migrant shelter in Nuevo Laredo when the man refused to get in their truck. DHS later returned the man under MPP despite the attack. A former police officer, the man stated that fears going outside the shelter where he is staying. "You cannot understand how bad it is," he said. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a female asylum seeker from Honduras returned by DHS to Matamoros was kidnapped near the tent camp just feet from the local INM office and the building where Lawyers for Good Government is assisting MPP returnees with asylum applications, according to attorney Charlene D'Cruz. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | In September, the 18-year-old son of a Venezuelan asylum seeker returned by DHS to Nuevo Laredo was nearly kidnapped while working at a fruit and vegetable stand where he and his mother had found work. A passerby intervened to stop five men from kidnapping the young man when they began interrogating him about whether he was a foreigner. The young man had previously received a graze wound on his neck during a shooting near the stand. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Kidnappings of asylum seekers in MPP from the bus station in Nuevo Laredo are common, including: a family seeking asylum from Venezuela with daughters ages seven and two; two Honduran asylum-seeking sisters and their three children held captive for five days and threatened with death if their family did not pay ransom; and, a Guatemalan family with two boys who were kidnapped from the station while waiting for a bus to Monterrey while on the port of entry asylum metering list. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 4-year-old Honduran boy and his 23-year-old asylum seeker mother were kidnapped in Monterrey after being bused there following their return to Nuevo Laredo by DHS. On the second night of their captivity, one of the kidnappers began to sexually assault the woman but was interrupted by another of the kidnappers who set the family free. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 3-year-old Salvadoran boy and his mother were kidnapped while attempting to reach Monterrey after DHS returned them to Nuevo Laredo. Family members were forced to pay a ransom to secure their release. The family went into hiding in the house of Good Samaritan who is providing them with food because they fear going outside. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | threats | (counted within 201 reported in HRF report) | A group of men stopped and threatened a Venezuelan asylum seeker traveling from Nuevo Laredo, where she had been returned by DHS under MPP, to Toluca. The men asked whether the woman was Venezuela or Cuban and gave a "first warning" to the minister traveling with the woman at the time. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An asylum seeker from Ecuador was abducted in September while traveling to Monterrey after being returned to Nuevo Laredo by DHS. The kidnappers removed her from a car and took her to a series of houses where they demanded money for her release. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery, assault | (counted within 201 reported in HRF report) | A group of men beat and robbed a Salvadoran asylum seeker returned by DHS to Nuevo Laredo in July when he stepped out of the migrant shelter in Monterrey to purchase food for himself and his daughter. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | assault, threats | (counted within 201 reported in HRF report) | Cartel members in Monterrey sent extortion demands and threatening messages to a Cuban asylum seeker placed in MPP by DHS and returned to Nuevo Laredo in July. The man was forced to relocate again to another part of Mexico. He had previously been assaulted three times while in Reynosa. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Another Cuban asylum seeker sent by DHS to Nuevo Laredo who had moved to Monterrey was kidnapped there and released only after he and his family paid a significant ransom. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In late July, a woman with a baby girl in her arms, who DHS had just returned to Mexico under MPP, were abducted from the parking lot behind the INM building in Nuevo Laredo. According to a Venezuelan asylum seeker returned the same day, armed men entered the parking lot, which is enclosed by a concrete wall and metal fencing, and forced the family into their vehicle. INM officials and a patrol of Mexican soldiers who passed by shortly afterwards did nothing to investigate or respond to the abduction. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | DHS returned a Salvadoran asylum seeker, her husband, and three young children to Mexico in October even though they had been kidnapped and threatened by Mexican federal police in Ciudad Juárez. The officers brought the family to what appeared to be a police station, demanded ransom from the woman's family in the United States saying that they "would never see them again," if they failed to pay, and even threatened to take away the woman's children and put them up for adoption. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, robbery | (counted within 201 reported in HRF report) | In Ciudad Juárez, Mexican police attacked a Salvadoran asylum seeker, throwing him to the ground, kicking and robbed him in front of his two children as they approached the port of entry to attend an MPP court hearing in August. The man was walking with his children in the early morning hours to report to CBP at the port of entry by 4:30 am for their hearing. When the man was able to show the police his MPP court documents, they released him but stole his money. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Mexican migration agents in Nuevo Laredo also appear to have been involved in the near kidnapping of a Honduran asylum seeker, her husband, and son in late September after DHS sent them to Nuevo Laredo. As the family and other migrants were walking from the INM building after Mexican migration told them to leave or get on a bus for the southern Mexican border, men in vans abducted more than a dozen migrants, including the Honduran woman. Her husband and son managed to run back to the INM office. Mexican immigration officers were either directly participating in or permitting the men to kidnap asylum seekers from the INM building because the kidnappers showed the woman a photo of her family crying inside the building to pressure her to convince them to come out. The family managed to escape with a pastor who spirited them to a shelter in Monterrey, according to an academic researcher who interviewed migrant families in Monterey in mid-October. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | In mid-October, a Venezuelan asylum-seeking family of five including two girls ages eight and ten were nearly kidnapped at the Nuevo Laredo airport while returning for an MPP hearing. The family had moved to another Mexican city after nearly being kidnapped outside of a shelter in Nuevo Laredo. As they passed through internal migration controls, a Mexican migration official took photos of the family and their documents with what appeared to be her personal cell phone. When the family challenged the official, they were allowed to proceed. However, upon exiting the terminal a group of men immediately approached them and tried to force the family into a waiting vehicle – indicating to the family that the migration official had sent their photos to the kidnappers. The family narrowly managed to escape abduction by pushing their way back into the terminal. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Mexican police asked for a bribe when a former judge seeking asylum from Cuba and her husband attempted to report an assault against the man in southern Mexico, according to their immigration attorney Natalie Cadwalader-Schultheis of Justice for Our Neighbors. The couple refused to pay and the police failed to investigate the attack even though it had been captured on a film by a nearby security camera. The couple were also robbed and threatened at gunpoint with other Cuban asylum seekers in Reynosa, but DHS returned them to Matamoros under MPP nonetheless. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | extortion | (counted within 201 reported in HRF report) | Mexican police have repeatedly threatened, wrongfully detained, and extorted the clients of Constance Wannamaker, an immigration attorney representing asylum seekers returned to Ciudad Juárez under MPP. Police there threatened to beat a Honduran asylum-seeking client and demanded money from him. Two Cuban asylum-seeking clients, one of whom was pregnant, were also repeatedly detained and extorted by Mexican police in Juárez and in Tapachula in southern Mexico. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Lisa Knox, an immigration attorney who represents asylum seekers in MPP said she had been alerted by her clients to multiple instances of physical assault and abuse by Mexican police in Tijuana against returned asylum seekers. One Honduran asylum seeker told her that he been attacked in Tijuana, and in another incident, Mexican police had detained him and called him a "dirty Honduran." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | A Cuban asylum-seeking client of Kenna Giffen, an immigration attorney working with asylum seekers returned to Matamoros, told Giffen that Mexican police had entered a church in Reynosa sheltering migrants and demanded money. The police detained those who refused to pay from the church. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An Ecuadoran asylum seeker kidnapped in September in Nuevo Laredo with her daughter, told her attorney Esmeralda Sosa, that she was asked only a few questions even though she had presented evidence in the form of text messages from the kidnappers during an MPP screening Sosa was not permitted to attend or monitor. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | A Cuban woman kidnapped and gang raped in Nuevo Laredo when she first arrived there to seek asylum at the port of entry did not pass an MPP fear-screening interview. The attackers said, "this is what we do to Cubans here." After DHS initially returned her to Nuevo Laredo, the women lived in hiding, only leaving to receive treatment for her trauma and to attend an MPP court hearing. During a fear-screening interview in November after that hearing, an asylum officer asked the woman for proof that "the attackers believed they were targeting [her] because [she is] Cuban" and concluded that despite the serious harm she suffered in Mexico that her fear of return to Mexico was insufficient to justify removing her from MPP. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A Guatemalan man and his nine-year-old son, who were twice nearly kidnapped in Mexico, did not pass an MPP fear screening after aggressive questioning of the boy by an asylum officer. The officer questioned the nine-year-old child about details of the kidnapping attempts, one of which occurred just a day after the family was returned to Mexico, resulting in the nine-year-old becoming confused, overwhelmed, and crying, according to an attorney who spoke with Human Rights First. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping, robbery | (counted within 201 reported in HRF report) | An asylum seeker from El Salvador and his six-year-old son who were kidnapped, robbed, and extorted multiple times, including by Mexican police, were returned by DHS to Mexico after failing to pass an MPP fear screening, according to their attorney Constance Wannamaker. Though the family's account was deemed credible, as indicated by the interview worksheet, the asylum officer found that they did not meet the standard to establish a more likely than not probability of harm in Mexico. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | rape, kidanpping | (counted within 201 reported in HRF report) | A Cuban asylum seeker, who was the victim of two kidnappings in Reynosa and who was physically abused and sexually assaulted after being returned under MPP, did not pass a fear screening in November, according to her attorney Kenna Giffen. The woman who was referred for interview following a hearing in the Brownsville tent court fainted in terror of being returned to Mexico and was put into a wheelchair. DHS did not permit the woman to be represented by counsel during the interview. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, threats | (counted within 201 reported in HRF report) | A Honduran asylum seeker who did not pass an MPP fear screening had been repeatedly stripped and searched for money by men in Mexican police uniforms who threatened to kidnap her older son and had been followed and threatened by men in Mexicali. The woman was found not credible and the family returned to Mexico. The woman reported to her attorney Troy Elder of Immigrant Defenders Law Center, who DHS did not allow to be present during the interview, that the asylum officer interviewing her and her sons questioned the boys about whether they "like" Mexico in what appeared to her to be an attempt to contradict her fear of remaining there. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | An asylum-seeking woman was not referred by CBP for an MPP fear interview before being sent to Matamoros even though she was kidnapped and raped in front of her three-year-old son. The woman was still bleeding days after the attack and in need of additional medical attention when she met with attorney Jennifer Harbury in November. Before being returned to Mexico, the woman had tried to explain that she and her son had been kidnapped in Reynosa before crossing into the United States to seek asylum, but CBP sent them back without referring them to an asylum officer for an MPP screening. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | CBP officers in Laredo failed to refer a Guatemalan family with two children for a fear-screening interview even though they explained that they had been kidnapped from the Nuevo Laredo bus station, held for days, and threatened that they would have to pay to remain in the city. The CBP officer processing the family when they were allowed to enter the port of entry after waiting on a metering list said kidnapping was immaterial to fear of Mexico unless the person was raped or seriously injured. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Immigration attorney Lisa Knox reported that CBP officers refused to refer her asylum-seeking client from Honduras for an MPP fear-screening interview after he had been attacked and robbed in Mexicali by men with machetes. The man also informed the private security guards transporting him back to Mexico from the immigration court that he feared return but was not referred for an MPP fear interview. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols", as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Similarly, a Salvadoran asylum seeker who had been kidnapped in Ciudad Juárez and escaped by climbing out of a window after DHS sent her to Juárez under MPP was not referred for a fear-screening interview even though she specifically requested one. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | CBP officers accused a 32-year-old Nicaraguan woman fleeing political persecution of lying about having been kidnapped and raped by cartel members in Nuevo Laredo after DHS returned her there in July. After a ransom was paid, the cartel had forced her to cross the river. When she attempted to express her fear of return to Mexico, a CBP officer accused her of lying and sent her to Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A Salvadoran asylum seeker abducted with her three children in Monterrey was not referred by CBP for an MPP screening despite the woman describing hear fear of being returned to Mexico. A CBP officer told the woman that, "everyone has to go back." After being returned by DHS to Tijuana in October, the woman received a death threat in November from men involved in her family's kidnapping. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted sexual assault | (counted within 201 reported in HRF report) | A teenage Venezuelan girl was returned with her father and brother to Ciudad Juárez even though she had been the victim of an attempted sexual assault in Mexico, which has left her symptoms of continued trauma, according to attorney Tania Guerrero of CLINIC. Despite explaining their fear of return to Mexico, CBP sent them to Ciudad Juárez in September. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An asylum-seeking woman from Cuba reported that CBP refused to listen when she recounted having been kidnapped with her husband in Nuevo Laredo and held with other migrants who were being beaten by cartel members. After being forced to wait on the metering wait list at the Laredo port of entry, a CBP officer told the woman in response to her fear of Mexico: "I don't want to hear it. You can tell it to the judge at your hearing." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | sexual assault | (counted within 201 reported in HRF report) | The children and mother of a Colombian asylum seeker who did not appear at the Laredo MPP court with her for their hearing in December were ordered removed in absentia. The woman explained that she could not afford to bring her family from Guadalajara because she had to hire an attorney to file charges against a man who had sexually abused her daughter and that she could not even afford to see a doctor for cancer treatment. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Two Venezuelan men – who were kidnapped as they attempted to approach the Laredo port of entry to seek asylum, beaten, ransomed, forced across the border by their abductors, and again threatened with kidnapping by the same men on the bridge just after DHS returned them to Nuevo Laredo – are so afraid for their lives that they have been forced to abandon their U.S. asylum claims. According to immigration attorney David Robledo who unsuccessfully requested that DHS provide the men a remote MPP fear screening, the men have relocated to another city in the interior of Mexico but are too afraid to return to the border region to attend MPP court. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a Honduran woman with a two-year-old boy, who DHS returned to Nuevo Laredo under MPP, told an immigration judge during a hearing monitored by a Human Rights First researcher that she had been kidnapped with her baby, and said, "If I am to be deported, I would like to be deported to my own country, not Mexico." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| **Total victims of attacks** | | **636** | | |



**DEPARTMENT OF JUSTICE**

**Immigration and Naturalization Service**

**8 CFR Parts 3, 103, 208, 235, 238, 240, 241, 253, and 507**

**[INS No. 1976–99; AG Order No. 2207–99]**

**RIN 1115–AF39**

**Regulations Concerning the Convention Against Torture**

**AGENCY:** Immigration and Naturalization Service, and Executive Office for Immigration Review, Justice.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This interim rule amends Department of Justice regulations by establishing procedures for raising a claim for protection from torture, as directed by the Foreign Affairs Reform and Restructuring Act of 1998. Section 2242 of that Act requires the heads of appropriate agencies to prescribe regulations for implementing United States obligations under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture or Convention). Under Article 3 of the Convention Against Torture (Article 3), the United States has agreed not to "expel, return ('refouler') or extradite" a person to another state where he or she would be tortured. The interim rule establishes procedures for ensuring compliance with Article 3 with respect to removal of aliens from the United States by integrating many Convention Against Torture requests into the present scheme governing asylum and withholding determinations before the Immigration Court. For persons subject to reinstatement, administrative removal, expedited removal, or other streamlined proceedings, excluding those relating to aliens inadmissible on security and related grounds, the rule establishes a screening mechanism followed by Immigration Court review that is similar to the screening procedure currently used in determining credible fear under expedited removal. The rule also establishes "deferral of removal," a new, limited form of protection that will be accorded aliens who would be tortured in the country of removal but who are barred from withholding of removal. Finally, this interim regulation serves as notice that, upon the effective date of this rule, the informal procedure currently in place for considering Convention Against Torture requests will end and those persons who have raised a claim under the

informal procedure will be given an opportunity, as prescribed by this rule, to have their cases reviewed under the new procedures.

**DATES:** *Effective date:* This interim rule is effective March 22, 1999.

*Comment date:* written comments must be submitted on or before April 20, 1999.

**ADDRESSES:** Please submit written comments in original and three copies to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW, Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS No. 1976–99 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** For matters relating to the Immigration and Naturalization Service: Dorothea Lay, 425 I Street, NW, Washington, DC 20536, telephone number (202) 514–2895. For matters relating to the Executive Office for Immigration Review: Margaret M. Philbin, General Counsel, Executive Office for Immigration Review, Suite 2400, 5107 Leesburg Pike, Falls Church, Virginia, 22041, telephone number (703) 305–0470.

**SUPPLEMENTARY INFORMATION:**

**Background**

On October 21, 1998, the President signed into law legislation which requires that "[n]ot later than 120 days after the date of enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Section 2242(b) of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub. L. 105–277, Division G, Oct. 21, 1998).

Obligations under the Convention Against Torture have been in effect for the United States since November 20, 1994. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) [hereinafter Convention or Convention Against Torture]. On October 21, 1994, President Clinton deposited the United States instrument of ratification of the Convention with the Secretary General

of the United Nations. Consistent with its terms, the Convention Against Torture entered into force for the United States 30 days later. Under Article 3, the United States had agreed not to "expel, return ('refouler') or extradite" a person to another state where he or she would be tortured. The Department of State is responsible for carrying out extradition requests and will promulgate regulations to ensure compliance with Article 3 in those cases. In other cases, the Attorney General is charged with expelling or returning aliens from the United States to other countries. This rule is published pursuant to this mandate to implement United States obligations under Article 3 in the context of the Attorney General's removal of aliens Article 3 provides as follows:

1. No State Party shall expel, return, ("refouler") or extradite a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant, or mass violations of human rights.

This Article is similar in some ways to Article 33 of the 1951 Convention relating to the Status of Refugees. The Convention relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 (hereinafter Refugee Convention). Article 33 provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of race, religion, nationality, membership of a particular social group or political opinion." The United States currently implements Article 33 of the Refugee Convention through the withholding of removal provision in section 241(b)(3) (formerly section 243(h)) of the Immigration and Nationality Act (INA or the Act). That provision, as interpreted by the courts, requires the Attorney General to withhold an alien's removal to a country where it is more likely than not that the alien's life or freedom would be threatened on account of one of the five grounds mentioned above. *See INS* v. *Stevic,* 467 U.S. 407, 429–30 (1984).

However, there are some important differences between withholding of removal under section 241(b)(3) of the Act and Article 3 of the Convention Against Torture. First, several categories of individuals, including persons who

assisted in Nazi persecution or engaged in genocide, persons who have persecuted others, persons who have been convicted of particularly serious crimes, persons who are believed to have committed serious non-political crimes before arriving in the United States, and persons who pose a danger to the security of the United States, are ineligible for withholding of removal. *See* INA section 241(b)(3)(B). Article 3 of the Convention Against Torture does not exclude such persons from its scope. Second, section 241(b)(3) applies only to aliens whose life or freedom would be threatened on account of race, religion, nationality, and membership in a particular social group or political opinion. Article 3 covers persons who fear torture that may not be motivated by one of those five grounds. Third, the definition of torture does not encompass all types of harm that might qualify as a threat to life or freedom. Thus, the coverage of Article 3 is different from that of section 241(b)(3): broader in some ways and narrower in others.

Until the October 21, 1998 legislation, there was no statutory provision to implement Article 3 of the Convention Against Torture in United States domestic law. When the United States Senate gave advice and consent to ratification of the Convention Against Torture, it made a declaration that Articles 1 through 16 were not self-executing. Recognizing, however, that ratification of the Convention represented a statement by the United States to the international community of its commitment to comply with the Convention's provisions to the extent permissible under the Constitution and existing federal statutes, the Department of Justice sought to conform its practices to the Convention by ensuring compliance with Article 3 in the case of aliens who are subject to removal from the United States.

In order to conform to the Convention before the enactment of implementing legislation, the Immigration and Naturalization Service (INS or Service) adopted a pre-regulatory administrative process to assess the applicability of Article 3 to individual cases in which an alien is subject to removal. Under this pre-regulatory administrative process, upon completion of deportation, exclusion, or removal proceedings and prior to execution of a final order of removal, the INS has considered whether removing an alien to a particular country is consistent with Article 3. If it is determined that the alien could not be removed to the country in question consistent with Article 3, the INS has used its existing discretionary authority to ensure that

the alien is not removed to that country for so long as he or she is likely to be tortured there. *See* INA § 103(a); 8 CFR 2.1.

In formulating its pre-regulatory administrative process to conform to Article 3 in the context of the removal of aliens, the INS has been careful not to expand upon the protections that Article 3 grants. Only execution of an order of removal to a country where an alien is more likely than not to be tortured would violate the Convention. Therefore, the INS has not addressed the question of whether Article 3 prohibits removal in an individual case until there is a final administrative order of removal to a place where an alien claims that he or she would be tortured, and until all appeals, requests for review, or other administrative or judicial challenges to execution of that order have been resolved. This approach has allowed the INS to address the applicability of Article 3 to a case only when actually necessary to comply with the Convention. It has also allowed an individual alien to exhaust all avenues for pursuing any other more extensive benefit or protection for which he or she may be eligible before seeking the minimal guarantee provided by Article 3 that he or she will not be returned to a specific country where it is likely that he or she would be tortured. At the same time, this approach has allowed the INS, the agency responsible for executing removal orders, to ensure that no order is executed under circumstances that would violate the Convention.

**Goals of Interim Rule**

Pursuant to statutory mandate, the Department of Justice now publishes this rule in order to implement the United States' Article 3 obligations in the context of the removal of aliens by the Attorney General. The rule is published as an interim rule, effective 30 days after the date of publication. This rule is intended to create fair and efficient provisions to implement Article 3 within the overall regulatory framework for the issuance of removal orders and decisions about the execution of such orders.

The primary goals of this rule are to establish procedures that ensure that no alien is removed from the United States under circumstances that would violate Article 3 without unduly disrupting the issuance and execution of removal orders consistent with Article 3. To this end, we have designed a system that will allow aliens subject to the various types of removal proceedings currently afforded by the immigration laws to seek, and where eligible, to be accorded

protection under Article 3. At the same time, we have created mechanisms to quickly identify and resolve frivolous claims to protection so that the new procedures cannot be used as a delaying tactic by aliens who are not in fact at risk.

In cases subject to streamlined, expedited removal processes under current law, the rule employs screening mechanisms to quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch. For example, the rule allows for the screening of aliens arriving at ports of entry to determine whether they establish a credible fear of torture. This screening will be conducted in conjunction with the existing credible fear of persecution screening process, so that it will not complicate or delay the expedited removal process established by Congress for arriving aliens. If an alien passes this threshold-screening standard, his or her claim for protection under Article 3 will be further examined by an immigration judge in the context of removal proceedings under section 240 of the Act. The screening mechanism also allows for the expeditious review by an immigration judge of a negative screening determination and the quick removal of an alien with no credible claim to protection.

Furthermore, the rule establishes a new screening process to rapidly identify and assess both claims for withholding of removal under section 241(b)(3) of the Act and for protection under the Convention by either aliens subject to administrative removal for aggravated felons under section 238(b) of the Act or to reinstatement of a previous order of removal under section 241(a)(5) of the Act. Modeled on the credible fear screening mechanism, this screening process will also allow for the fair and expeditious resolution of such claims without unduly disrupting the streamlined removal processes applicable to these aliens.

The cases of alien terrorists and other aliens subject to administrative removal under section 235(c) of the Act will be handled through the administrative process in which the INS issues and executes the removal order. Cases handled under section 235(c) are only a few each year, and typically involve highly sensitive issues and adjudication based on classified information under tight controls. Thus, by retaining the ability to assess the applicability of Article 3 through the administrative removal process, the INS will both maintain a workable process and ensure U.S. compliance with Article 3 in these unusual cases. Similarly, the regulations

provide that an alien whose removal has been ordered by the Alien Terrorist Removal Court under the special procedures set forth in Title V of the Act shall not be removed to a particular country if the Attorney General determines, in consultation with the Secretary of State, that removal to that country would violate Article 3.

For aliens subject to removal proceedings under section 240 of the Act, exclusion proceedings, or deportation proceedings, a claim to protection under the Convention Against Torture will be raised and considered, along with any other applications, during removal proceedings before an immigration judge. Both the alien and the INS will have the ability to appeal decisions of the immigration judge to the Board of Immigration Appeals (the Board). This will allow the alien to seek review of this important decision, and will also allow the INS to use the review mechanism to ensure that decisions about the applicability of Article 3 are made consistently and according to the high standards of proof required by Article 3 itself. At the same time, the availability of review will not expand the process already available to aliens in proceedings under section 240, who under current law already have the opportunity to seek Board review of decisions of the immigration judge.

Nor does this rule expand the availability of judicial review for aliens who make claims to protection under the Convention Against Torture. The statute requiring regulatory implementation of obligations under Article 3 explicitly provides that it does not authorize judicial review of these regulations. Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998. The rule restates at § 208.18(e) the statutory mandate that the only available judicial review for Convention Against Torture claims is when such claims are heard as part of the review of a final order of removal pursuant to section 242 of the Act. Such review remains subject to the requirements and limitations of section 242. Where a court has jurisdiction to consider a Convention Against Torture claim, it may not, except as authorized by section 242, consider other claims regarding the alien's removal.

**Structure of Rule**

Generally, the rule creates two separate provisions for protection under Article 3 for aliens who would be tortured in the country of removal. The first provision establishes a new form of withholding of removal under § 208.16(c). This type of protection is only available to aliens who are not barred from eligibility for withholding of removal under section 241(b)(3)(B) of the Act. The second provision, under § 208.17(a), concerns aliens who would be tortured in the country of removal but who are subject to the bars contained in section 241(b)(3)(B) of the Act. These aliens may only be granted deferral of removal, a less permanent form of protection than withholding of removal and one that is more easily and quickly terminated if it becomes possible to remove the alien consistent with Article 3. Deferral of removal will be granted based on the withholding of removal application to an alien who is likely to be tortured in the country of removal but who is barred from withholding of removal. Section 208.17(d) sets out a special, streamlined procedure through which the INS may seek to terminate deferral of removal when appropriate.

**Withholding of Removal Under the Convention Against Torture**

Revised § 208.16(c) creates a new form of withholding of removal, which will be granted to an eligible alien in removal proceedings who establishes that he or she would be tortured in the proposed country of removal. This section references new § 208.18(a), which contains the definition of torture, and provides that this definition will be applied in all determinations about eligibility for this new form of withholding, or for deferral of removal.

An alien granted withholding under new § 208.16(c) would be treated similarly to an alien granted withholding of removal under § 208.16(b), the regulatory provision implementing section 241(b)(3) of the Act. The rule provides at § 208.16(c)(2) that, in order to be eligible for withholding of removal under Article 3, an alien must establish that it is more likely than not that he or she would be tortured in the country in question. Imposition of this burden of proof on the alien gives effect to one of the Senate understandings upon which ratification was conditioned, which provides that "the United States understands that the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " The ratification history makes clear that this understanding was intended to ensure that the standard of proof for Article 3 would be the same standard as that for withholding of removal under section 241(b)(3) of the Act, then section 243(h) of the Act. *See,*

*e.g.,* Convention Against Torture, *submitted to the Senate,* May 20, 1988, S. Treaty Doc. No. 100–20, at 6 (1988) (hereinafter S. Treaty Doc. No. 100–20).

Section 208.16(c)(3) also directs that all evidence relevant to the possibility of future torture should be considered when making the determination as to whether the alien is more likely than not to be tortured. It specifically provides that evidence of past torture inflicted on the applicant should be considered, because evidence of past torture may be probative as to whether future torture is likely.

Section 208.16(c)(3) also requires that, in determining whether the applicant has met his or her burden of proof, the decision-maker may consider any evidence that the alien may be able to relocate to an area of the country of removal where he or she is not likely to be tortured. Consideration of this factor is consistent with long-established precedent in the context of the adjudication of requests for asylum and withholding of removal under section 241(b)(3) of the Act, and is relevant to the likelihood that an alien would be tortured if returned to a specific country. This section also provides that, where applicable, the adjudicator will consider evidence of gross, flagrant, or mass violations of human rights committed within the country in question. This requirement is drawn directly from clause 2 of Article 3. The words "where applicable" indicate that, in each case, the adjudicator will determine whether and to what extent evidence of human rights violations in a given country is in fact a relevant factor in the case at hand. Evidence of the gross and flagrant denial of freedom of the press, without more, for example, may not tend to show that an alien would be tortured if returned to that country. *See, e.g.,* S. Treaty Doc. No. 100–20, at 20. The rule further directs that any other relevant information about country conditions in the country of removal be considered.

Applicants for withholding under § 208.16(c) will be subject to the mandatory bars to withholding contained in section 241(b)(3)(B) of the Act. Section 241(b)(3)(B) of the Act bars from withholding of removal aliens: who have assisted in Nazi persecution or engaged in genocide; who have ordered, incited, assisted or otherwise participated in the persecution of others; and who, having been convicted of a particularly serious crime, pose a danger to the community of the United States. The section 241(b)(3)(B) bar also applies when there are serious reasons to believe that the alien has committed a serious non-political crime outside the

United States before arriving in the United States or there are reasonable grounds to believe that the alien is a danger to the security of the United States. The legislation implementing Article 3 provides that ''[t]o the maximum extent consistent with the obligations of the United States under the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, the regulations described in subsection (b) [mandating promulgation of regulations to implement Article 3] shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)(B)).'' Section 2242(c) of the Foreign Affairs Reform and Restructuring Act of 1998. Thus, consistent with the statutory directive, the advantages of a grant of withholding of removal will not be available to such aliens. Rather, their protection from return to a country where they would be tortured, as required by the Convention, will be effected through a less extensive form of protection, i.e., deferral of removal, established in § 208.17(a).

**Deferral of Removal Under the Convention Against Torture**

Although aliens who are barred from withholding of removal under § 241(b)(3)(B) of the Act are not eligible for withholding under 208.16(c), the Article 3 implementing statute directs that any exclusion of these aliens from the protection of these regulations must be consistent with United States obligations under the Convention, subject to United States reservations, understandings, declarations, and provisos conditioning ratification. Section 2242(c) of the Foreign Affairs Reform and Restructuring Act of 1998. Article 3 prohibits returning any person to a country where he or she would be tortured, and contains no exceptions to this mandate. Nor do any of the United States reservations, understandings, declarations, or provisos contained in the Senate's resolution of ratification provide that the United States may exclude any person from Article 3's prohibition on return because of criminal or other activity or for any other reason. Indeed, the ratification history of the Convention Against Torture clearly indicates that the Executive Branch presented Article 3 to the Senate with the understanding that it ''does not permit any discretion or provide for any exceptions * * *.'' Convention Against Torture: Hearing Before the Senate Comm. on Foreign Relations, 101st Cong., 18 (1990)

(statement of Mark Richard, Deputy Assistant Attorney General for the Criminal Division, DOJ).

Wherever possible, subsequent acts of Congress must be construed as consistent with treaty obligations. *See e.g., Cook* v. *United States,* 288 U.S. 102, 120 (1933) (''[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed.''). Here, Congress has not indicated an intent to modify the obligations imposed by Article 3. In fact, Congress has clearly expressed its intent that any exclusion of aliens described in section 241(b)(3)(B) of the Act from the protection of these regulations must be consistent with Article 3. The obligation not to return such an alien to a country where he or she would be tortured remains in effect. Thus, while this rule does not extend the advantages associated with a grant of withholding of removal to aliens barred under section 241(b)(3)(B) of the Act, it does ensure that they are not returned to a country where they would be tortured.

To this end, the rule creates a special provision under § 208.17(a) for deferral of removal when an alien described in section 241(b)(3)(B) of the Act has been ordered removed to a country where it has been determined that he or she would be tortured. The process is as follows: Before determining whether the bars described in section 241(b)(3)(B) of the Act apply to withholding removal of an alien under the Convention Against Torture, the immigration judge is required to find whether the alien is likely to be tortured in the country of removal. Only after this finding is made does the immigration judge decide, as required by § 208.16(d), whether the statutory bars to withholding of removal apply. If the bars do not apply, the immigration judge will grant withholding of removal to an alien who has been determined to be likely to be tortured in the country of removal. If the immigration judge finds that the bars apply, § 208.17(a) requires the immigration judge to defer removal of an alien to a country where the alien is likely to be tortured. The alien need not apply separately for deferral because this form of protection will be accorded automatically, based on the withholding application, to an alien who is barred from withholding but is likely to be tortured in the country of removal. While the order of deferral is in effect, the alien will not be returned to the country in question.

Section 208.17(a) is subject to the same standard of proof and definitional provisions as § 208.16(c). This will

ensure that compliance with Article 3 is complete and consistent in the cases of aliens who are barred from withholding as well as in the cases of aliens who are not barred from withholding. However, an order of deferral provides a much more limited form of protection than does a grant of withholding of removal. An order of deferral would not confer upon the alien any lawful or permanent immigration status in the United States and would be subject to streamlined and expeditious review and termination if it is determined that it is no longer likely that the alien would be tortured in the country to which he or she has been ordered removed. Further, like withholding, deferral of removal is effective only with respect to the particular country in question and does not alter the government's ability to remove the alien to another country where he or she would not be tortured. The rule requires the immigration judge to inform the alien of the limited nature of the deferral order at the time such order is entered.

In addition, an order deferring removal to a particular country will not alter INS authority to detain an alien who is otherwise subject to detention. Section 241(a)(6) of the Act provides a variety of grounds for INS in its discretion to detain beyond the removal period an alien under a final order who cannot be removed. These include, most importantly, the discretion to detain an alien granted deferral of removal under Article 3 who is removable based on security grounds, based on certain criminal offenses, or who has been determined to pose a risk to the community. This is consistent with the Article 3 implementing statute, which provides that ''[n]othing in this section shall be construed as limiting the authority of the Attorney General to detain any person under any provision of law, including, but not limited to, any provision of the Immigration and Nationality Act.'' Section 2242(e) of the Foreign Affairs Reform and Restructuring Act of 1998. Section 208.17(c) of the interim rule provides that decisions about the detention of detainable aliens who have been granted deferral of removal will be made according to standard procedures under 8 CFR part 241.

**Termination of Deferral of Removal**

The most important distinction between withholding of removal and deferral of removal is the mode of termination. Section 208.17(d) will provide for a streamlined termination process for deferral of removal when it is no longer likely that an alien would be tortured in the country of removal.

**AR01383**

a**8482** **Federal Register** / Vol. 64, No. 33 / Friday, February 19, 1999 / Rules and Regulations

Under existing regulations, withholding can only be terminated when the government moves to reopen the case, meets the standards for reopening, and meets its burden of proof to establish by a preponderance of the evidence that the alien is not eligible for withholding. The termination process for deferral of removal is designed to be much more accessible, so that deferral can be terminated quickly and efficiently when appropriate.

At any time while the order of deferral is in effect, the INS District Counsel for the district with jurisdiction over an alien granted deferral of removal may move the immigration court to schedule a hearing to determine whether the deferral order can be terminated. The INS motion will not be subject to the normal motion to reopen requirement that the moving party seek to offer evidence that was previously unavailable (i.e., could not have been discovered and presented at the previous hearing) and that establishes a *prima facie* case for termination. Rather, the Service's motion will be granted and a termination hearing will be scheduled on an expedited basis if the Service meets a lower threshold, which requires only that the evidence was not considered at the previous hearing and is relevant to the possibility that the alien would be tortured in the country of removal. This will allow the Service to monitor cases in which an order of deferral is in effect, and to bring such cases for termination hearings when it appears that the alien may no longer face likely torture in the country in question.

The Immigration Court will provide the alien with notice of the time, place, and date of the termination hearing, and will have the opportunity to submit evidence to supplement his or her initial application for withholding, which was the basis for the deferral order. As is the case with initial asylum and withholding applications, the original application, along with any supplemental information submitted by the alien, will be forwarded to the Department of State, which may comment on the case at its option. At the termination hearing, it will be the alien's burden to establish that it is more likely than not that he or she would be tortured in the country of removal. The immigration judge will make a *de novo* determination about the alien's likelihood of torture in the country in question. If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the alien fails to meet

the burden of proof, the deferral order will be terminated. If the alien establishes that he or she still requires protection under the Convention Against Torture, the deferral order will remain in effect. Appeal of the immigration judge's decision shall lie to the Board.

Deferral of removal may also be terminated at the alien's written request under § 208.17(e). For termination on this basis, the rule requires that the immigration judge determine whether the alien's request is knowing and voluntary. If necessary, the immigration judge may conduct a hearing to make this determination. If it is determined that the alien's request for termination is not knowing and voluntary, deferral will not be terminated on this basis.

**Implementation of the Convention Against Torture**

Section 208.18 sets out a number of provisions governing the implementation of the Convention Against Torture provisions. This section contains the definition of torture that will apply in both the withholding and deferral contexts, rules about the applicability of the new provisions, and a section clarifying that this rule does not expand the availability of judicial review to aliens who assert claims to protection under the Convention Against Torture.

**Definition of Torture**

Section 208.18(a) provides the definition of torture and of terms within that definition. Initially, consistent with the statute, it provides that the regulatory definition of torture incorporates the definition in Article 1 of the Convention, as interpreted and modified by United States reservations, understandings, declarations and provisos. The remainder of the definition section is drawn directly from the language of the Convention, the language of the reservations, understandings and declarations contained in the Senate resolution ratifying the Convention, or from ratification history.

Section 208.18(a)(1) contains the first sentence of Article 1, providing the basic contours of the definition of torture. It does not attempt to list the types of acts that would constitute torture, but rather expresses basic elements that must be present in order for an act to be torture: It must be an act causing severe pain or suffering, whether physical or mental, intentionally inflicted on a person. Article 16, which refers to "other acts of cruel, inhuman or degrading treatment or punishment, which do not amount to

torture," confirms that, as provided in § 208.18(a)(2), torture is an extreme form of cruel and inhuman treatment. *See, e.g.,* S. Treaty Doc. No. 100–20 at 23.

Section 208.18(a)(3) provides that torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." This is drawn from the second sentence of Article 1. The Senate adopted an understanding providing that "with reference to article 1 of the Convention, the United States understands that 'sanctions' includes judicially-imposed sanctions and other enforcement actions authorized by United States law or by judicial interpretation of such law. Nonetheless, the United States understands that a State Party could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture." 136 Cong. Rec. 36198 (1990). Therefore § 208.18(a)(3) also provides that "[l]awful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." This paragraph does not require that, in order to come within the exception, an action must be one that would be authorized by United States law. It must, however, be legitimate, in the sense that a State cannot defeat the purpose of the Convention to prohibit torture.

Senate understandings also provide that "the United States understands that international law does not prohibit the death penalty, and does not consider this Convention to restrict or prohibit the United States from applying the death penalty consistent with the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States, including any constitutional period of confinement prior to the imposition of the death penalty." This understanding is embodied in § 208.18(a)(3)'s inclusion of the death penalty in the description of lawful sanctions that do not constitute torture. The purpose of the Senate's understanding on the death penalty is to clarify that the Convention does not prohibit the United States from applying the death penalty consistent with United States constitutional standards. This concept will likely have limited application in the context of Article 3 implementation. It means simply that the constitutionally sufficient imposition of the death penalty in the United States is not torture. The understanding does not mean, however, that any imposition of the death penalty by a foreign state that fails to satisfy United States

**AR01384**

constitutional requirements constitutes torture. Any analysis of whether the death penalty is torture in a specific case would be subject to all requirements of the Convention's definition, the Senate's reservations, understandings, and declarations, and the regulatory definitions. Thus, even if imposition of the death penalty would be inconsistent with United States constitutional standards, it would not be torture if it were imposed in a legitimate manner to punish violations of law. Similarly, it would not be torture if it failed to meet any other element of the definition of torture.

The definition of torture can, in limited circumstances, include severe mental pain and suffering. Section 208.18(a)(4) provides a detailed and restrictive definition of the type of severe mental harm that can constitute torture. This language is drawn directly from the Senate's understandings. *See* 136 Cong. Rec. 36198.

Section 208.18(a)(5) requires that, in order to qualify as torture, an act must be specifically intended to inflict severe pain or suffering, a requirement clearly imposed by United States understandings. *Id.* Thus, an act that results in unanticipated or unintended severity of pain and suffering is not torture. *See, e.g.,* S. Treaty Doc. No. 100–20, at 19.

Section 208.18(a)(6) provides that, for an act to constitute torture, the victim of the act must be in the custody or physical control of the perpetrator. Thus, harm, even severe pain and suffering, inflicted on a person who is not within the perpetrator's custody or physical control, would not qualify as torture. Again, the language of this regulatory provision is taken directly from the Senate understandings. *See* 136 Cong. Rec. 36198.

Article 1 of the Convention Against Torture requires that torture must be inflicted ''by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'' Senate understandings provide that ''the term 'acquiescence' requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity.'' 136 Cong. Rec. 36198. Section 208.18(a)(7) mirrors this requirement. Thus the definition of torture includes only acts that occur in the context of governmental authority. *See, e.g.,* S. Treaty Doc. No. 100–20, at 19.

Section 208.18(a)(8) provides that noncompliance with applicable legal procedural standards does not *per se*

constitute torture. Again, this provision mirrors Senate understandings. 136 Cong. Rec. 36198.

**Applicability of New Provisions**

Section 208.18(b)(1) provides that aliens who are in exclusion, deportation, or removal proceedings as of the effective date of this rule may seek withholding under the Convention Against Torture, and if applicable be considered for deferral under the Convention, through the procedures established by this rule. Section 208.18(b)(2) also establishes special procedures to provide a reasonable opportunity to request consideration for protection under Article 3 for aliens who were either ordered removed prior to the effective date of this rule, or whose removal orders become final prior to the effective date of the rule. Such aliens will be given a 90-day window of time in which to file a motion to reopen before the immigration court or before the Board of Immigration Appeals, to apply for protection under this rule. Any motion filed by such an alien within 90 days of the effective date of this rule, March 22, 1999, will not be subject to the normal requirement that the motion must seek to present new evidence that was unavailable and could not have been presented at the previous hearing. Nor will such a motion be subject to the normal time and numerical limitations on motions to reopen under §§ 3.2 and 3.23. Such a motion will, however, be subject to the other requirements set out in the regulations for a motion to reopen. Therefore it will not be granted unless the evidence sought to be offered establishes a prima facie case that the alien's removal would violate Article 3 of the Convention Against Torture. Similarly, like other motions to reopen, such a motion will not automatically stay the alien's removal. Rather, the alien must request a stay of removal at the time of filing the motion to reopen.

**Aliens Who Requested Protection Under the Convention Through the INS Pre-regulatory Administrative Process To Ensure Compliance With Article 3**

As explained previously, the INS has, prior to the effective date of this rule, conducted a pre-regulatory administrative process to comply with Article 3 of the Convention Against Torture until implementing legislation was enacted and obligations under that Article could be implemented by this rule. Section 208.18(b)(3) of this rule provides that, after the effective date of this rule, the INS pre-regulatory administrative process for ensuring compliance with Article 3 will end.

After the effective date of this rule, except as otherwise provided, the INS will no longer stay an alien's removal based only on a request for protection under Article 3, nor will it consider the applicability of Article 3 to an individual case under its pre-regulatory administrative process.

Section 208.18(b)(4) provides that the new procedures established by this rule to provide for the consideration of claims to protection under the Convention Against Torture do not apply to cases in which the Service, prior to the effective date of this rule, has made a final administrative determination about the applicability of Article 3. This section provides that, if the Service has determined under its pre-regulatory administrative process that an alien cannot be removed to a particular country consistent with Article 3, the alien is considered to have been granted withholding of removal under § 208.16(c), unless the alien is subject to mandatory denial of withholding under § 208.16(d) (2) or (3). If such an alien is barred from withholding of removal, he or she will be considered to have been granted deferral of removal under § 208.17(a). Similarly, if an alien was determined under the pre-regulatory administrative process not to require protection under Article 3, that alien will be considered to have been finally denied withholding of removal under § 208.16(c) and deferral of removal under § 208.17(a). This paragraph applies only to cases in which the Service actually reached a final determination about the applicability of Article 3 to an individual case.

A different regime will apply to aliens who requested protection under the pre-regulatory administrative process but did not receive a final determination from the Service. The Service will provide notice about the end of the pre-regulatory administrative process to such aliens. This notice will inform the alien of the new regulatory process through which Article 3 claims will be processed. The notice will also explain that an alien who was ordered removed or whose removal order became final prior to the effective date of this rule may obtain consideration of a claim under Article 3 only through the procedures set out in this rule. An alien under a final removal order issued by EOIR may obtain consideration of the Article 3 claim by filing a motion to reopen with the immigration court or the Board of Immigration Appeals. In order to provide a reasonable opportunity to file such a motion, an alien who has a request for Article 3 protection pending with the Service on

the date this rule becomes effective will be granted a stay of removal effective until 30 days after the notice is served on the alien. Any motion filed by such an alien will not be subject to the normal requirements for motions to reopen. The immigration judge or the Board shall grant such a motion if it is accompanied by a copy of the notice provided by the Service or by other convincing evidence that the alien requested protection under Article 3 from the Service through the pre-regulatory administrative process and did not receive a final administrative determination prior to the effective date of this rule. The filing of such a motion shall extend the stay of removal pending the adjudication of the motion. This special provision ensures that those who requested protection under the INS pre-regulatory administrative process and did not get a ruling will have a full and fair opportunity to pursue their claims for protection under the new regulatory process.

For an alien under a removal order issued by the Service under section 238(b) of the Act or an alien under an exclusion, deportation, or removal order that has been reinstated by the Service, the Service will consider any claim to protection that is pending on the effective date of this rule through the process set out in section 208.31. For an alien ordered removed by the Service under section 235(c) of the Act, the Service will decide under section 235.8(b)(4) any Article 3 claim that is pending on the effective date of this rule. Such a claim will not be subject to the procedures set out for consideration of Article 3 claims by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

**Cases in Which Diplomatic Assurances Are Considered**

Section 208.18(c) sets out special procedures for cases in which the Secretary of State forwards to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured if returned there. In some cases, it may be possible for the United States to actually reduce the likelihood that an alien would be tortured in a particular country. The nature and reliability of such assurances, and any arrangements through which such arrangements might be verified, would require careful evaluation before any decision could be reached about whether such assurances would allow an alien's removal to that country consistent with Article 3. This paragraph sets out special procedures under which the Attorney General, in

consultation with the Secretary of State, will assume responsibility for assessing the adequacy of any such assurances in appropriate cases. Cases will be handled under this provision only if such assurances are actually forwarded to the Attorney General by the Secretary of State for consideration under this special process. It is anticipated that these cases will be rare.

In cases in which the Secretary has forwarded assurances under this provision, the procedures for administrative consideration of claims under the Convention Against Torture set out elsewhere in this rule will not apply. Further, the rule provides that the Attorney General's authority to make determinations about the applicability of Article 3 in such a case may be exercised by the Deputy Attorney General or by the Commissioner, but may not be further delegated. Thus the rule ensures that cases involving the adequacy of diplomatic assurances forwarded to the Attorney General by the Secretary of State will receive consideration at senior levels within the Department of Justice, which is appropriate to the delicate nature of a diplomatic undertaking to ensure that an alien is not tortured in another country. Under § 208.17(f), these special procedures may also be invoked in appropriate cases for considering whether deferral of removal should be terminated.

**Cases Involving Aliens Ordered Removed Under Section 235(c) of the Act**

Section 208.18(d) provides, as discussed previously in the supplementary information, that an alien ordered removed pursuant to section 235(c) of the Act will not be removed under circumstances that would violate section 241(b)(3) of the Act or Article 3 of the Convention Against Torture. Any claim by an alien for protection against removal to a country where the alien claims he or she would be tortured will be considered by the Service under the standards applicable to protection under the Convention Against Torture, in light of the special circumstances of each case.

Because these determinations will be made by the Service, the procedural provisions in Part 208 for consideration or decision of an alien's claims by an immigration judge, the Board, or an asylum officer do not apply in such cases. Thus, although this rule amends 8 CFR 253.1(f) to provide that an alien removable under section 235(c) of the Act may apply for protection under the Convention Against Torture under 8 CFR Part 208, such an alien's claim

would be considered by the Service as provided in § 208.18(d), and not by an immigration judge or asylum officer.

Similarly, although § 208.2(b)(1)(C)(v) provides that an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by an alien who has been ordered removed under section 235(c) of the Act, that provision by its express terms is only applicable ''[a]fter Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court.'' When the alien is found to be removable as provided in section 235(c)(2)(B) of the Act, the Service issues a removal order without referring the case to an immigration judge. Thus this provision relating to the authority of the immigration judge will apply to an alien who is subject to removal under section 235(c) of the Act only if the Service makes a determination to refer the case to an immigration judge for consideration as provided in sections 235.8(b)(2)(ii) and (d).

**Expedited Removal and the Credible Fear Process**

The credible fear screening provisions at § 208.30 are amended to ensure that arriving aliens who are subject to the statutory provisions for expedited removal at ports of entry will, when necessary, be considered for protection under Article 3 as well as for asylum under section 208 of the Act and withholding under section 241(b)(3)(B) of the Act. Under current procedures, an alien subject to expedited removal who expresses a fear of persecution in his or her country of origin is interviewed by an asylum officer to determine whether the alien has a credible fear of persecution. Under the amended procedures, an alien who expresses such a fear will also be examined to determine whether he or she has a credible fear of torture. An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. If the alien has a credible fear of torture, he or she will be referred to an immigration judge for removal proceedings under section 240 of the Act, just as in the current credible fear of persecution process. In these proceedings, the alien will be able to assert a claim to withholding of removal under the Convention Against Torture or under section 241(b)(3) of the Act, or to deferral of removal in the case of an alien barred from withholding, or to asylum under section 208 of the Act. Similarly, consistent with current

procedures in the expedited removal context, upon the alien's request, an asylum officer's negative credible fear of torture determination will be subject to expeditious review by an immigration judge, with no appeal of this screening review. Thus, the interim rule provides for fair resolution of claims to protection under the Convention Against Torture in the expedited removal context, without disrupting the streamlined process established by Congress to circumvent meritless claims.

## Reasonable Fear Screening Process for Aliens in Administrative Removal Proceedings for Aggravated Felons and Aliens Subject to Reinstated Orders

Section 208.31 creates a new screening process to evaluate torture claims for aliens subject to streamlined administrative removal processes for aggravated felons under section 238(b) of the Act and for aliens subject to reinstatement of a previous removal order under section 241(a)(5) of the Act. This new screening process is modeled on the credible fear screening process, but requires the alien to meet a higher screening standard. Similar to the credible fear screening process, § 208.31 is intended to provide for the fair resolution of claims both to withholding under section 241(b)(3) of the Act, and to protection under the Convention Against Torture without unduly disrupting the operation of these special administrative removal processes.

Unlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum. They may, however, be entitled to withholding of removal under either section 241(b)(3) of the Act, or under the Convention Against Torture, or to deferral of removal under § 208.17(a). Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher. In fact, the "reasonable fear" screening standard is the same standard of proof used in asylum eligibility determinations. That is, the alien must show that there is a "reasonable possibility" that he or she would be persecuted or tortured in the country of removal.

Under the new screening process, aliens in these streamlined administrative removal proceedings who express a fear of persecution or torture will be interviewed by an asylum officer to determine whether

they have a reasonable fear of persecution or torture. If they are determined to have such a fear, they will be referred to an immigration judge for a determination only as to their eligibility for withholding of removal under either section 241(b)(3) of the Act or under the Convention Against Torture, or for deferral of removal. Either the alien or the Service may appeal the immigration judge's decision about eligibility for withholding or deferral of removal to the Board of Immigration Appeals. The Board will have jurisdiction to review only the issue of eligibility for withholding or deferral of removal and may not review issues related to the administratively issued order of removal or to the reinstatement of the previous order of removal.

If the asylum officer determines that the alien does not have a reasonable fear of persecution or torture, the alien will be afforded the opportunity for an expeditious review of the negative screening determination by an immigration judge. A new form I–898, Record of Negative Reasonable Fear Finding and Request for Review by the Immigration Judge, will be created on which the alien may request review of a negative asylum officer screening determination. If the immigration judge upholds the negative screening determination, the alien may be removed without further review. If the immigration judge reverses the asylum officer's screening determination, however, the immigration judge will proceed to a determination only as to eligibility for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture, or if applicable, deferral of removal. Again, either the alien or the INS may appeal the immigration judge's decision about withholding or deferral to the Board of Immigration Appeals.

This reasonable fear screening process provides a formal mechanism, previously unavailable, to make determinations under section 241(b)(3) of the Act for aliens who are subject to administrative removal as aggravated felons under section 238(b) of the Act, but who were sentenced to an aggregate term of imprisonment of less than five years, and thus are not conclusively barred from withholding under section 241(b)(3)(B) of the Act. This same mechanism will provide for consideration of applications for withholding of removal under the Convention Against Torture, and for consideration for deferral of removal when necessary, in these cases. Thus the new screening process will unify any consideration of applications for

withholding of removal under section 241(b)(3) of the Act and under the Convention Against Torture in these cases.

Similarly, the new reasonable fear of persecution or torture screening process will ensure proper consideration of applications for withholding of removal under section 241(b)(3) of the Act and under the Convention Against Torture, and of deferral of removal when appropriate, in cases subject to reinstatement of a previous removal order. Thus it replaces current regulatory provisions at § 241.8(d) for the consideration of applications for withholding of removal under section 241(b)(3) of the Act.

Form I–589 as application form for withholding of removal under the Convention Against Torture

The Form I–589, Application for Asylum and for Withholding of Removal, will serve as an application form for withholding of removal under the Convention Against Torture, as well as for withholding of removal under section 241(b)(3) of the Act. Supplemental instructions for the Form I–598 will be issued to explain how an alien may use this form to seek withholding of removal under the Convention. Under this rule, consideration for deferral of removal must be undertaken when an alien's application for withholding has been denied because of a bar to withholding. Therefore, the Form I–589 will automatically trigger deferral of removal where appropriate.

Use of the Form I–589 will avoid confusion by allowing aliens who believe they are at risk of harm to apply for asylum, as well as these other risk-based forms of protection, at the same time, using the same form. It will also help to ensure that these claims are presented at one time, thereby allowing resolution of these issues in the normal course of proceedings.

Additionally, use of the Form I–589 will obviate the need for two separate forms that, in many cases, will elicit similar information. In many cases in which the alien applies both for asylum and withholding of removal under the Act and for withholding under the Convention Against Torture, the underlying facts supporting these claims will be the same. Thus use of the I–589 will reduce the burden on the applicant while also simplifying the adjudication process for the Service and EOIR. In all cases, the same biographical background information will be necessary. Additionally, the Form I–589 already contains questions that would elicit the facts underlying an alien's fear of torture as well as his or her fear of persecution.

For example, the form specifically asks the applicant whether he or she fears torture upon return to a country, and also asks open-ended questions designed to elicit any information about past mistreatment or fear of mistreatment in the future. Thus the existing form can easily be used for the adjudication of claims to protection under the Convention Against Torture.

## Good Cause Exception

The interim rule is effective 30 days from the date of publication in the **Federal Register**, although the Department invites public comment for 60 days from the date of publication. For the following reasons, the Department finds that good cause exists under 5 U.S.C. 553(b)(B) and (d)(3) for implementing this rule as an interim rule without the prior notice and comment period ordinarily required under that provision. First, section 2242(b) of the Foreign Affairs Reform and Restructuring Act of 1998 requires that "[n]ot later than 120 days after the date of the enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention Against Torture]." In order to comply with this statutory requirement, it was necessary to dispense with the usual period of public notice and comment; however, the Department will consider carefully all public comments submitted in the course of preparation of a final rule. Second, this rule provides a formal mechanism for requesting protection from torture, and must be implemented expeditiously in order to allow aliens who may require protection under the Convention Against Torture to seek such protection under a regulatory system. While the current informal procedure will remain in place during the next 30 days, it allows for consideration of such requests only at the end of the removal process, after all other avenues of appeal have been exhausted. The interim rule will permit most aliens to raise their claims during the course of regular removal proceedings, and thus many individuals currently in proceedings before the immigration court will have the opportunity to have their request for protection resolved more expeditiously than under the current informal procedure. Therefore, early implementation will be advantageous to those persons seeking protection under the Convention Against Torture, and it is contrary to the intent of the statute and the public interest to delay the implementation of this rule until after a notice and comment period.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities because of the following reason: This rule involves the process for adjudication of certain requests for withholding of removal. This process affects individuals and not small entities.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the Provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12866

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, Regulatory Planning and Review. Accordingly, this regulation has been submitted to the Office of Management and Budget for review.

## Executive Order 12612

The regulation adopted herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibility among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

## Executive Order 12988—Civil Justice Reform

This interim rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act

The information collection requirement contained in this rule has been approved for use by the Office of Management and Budget (OMB) under the Paperwork Reduction Act. The OMB control number for this collection is contained in 8 CFR part 299.5, Display of control numbers.

## List of Subjects

### 8 CFR Part 3

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 238

Air Carriers, Aliens, Government contracts, Maritime carriers.

### 8 CFR Part 240

Administrative practice and procedure, Immigration.

### 8 CFR Part 241

Aliens, Immigration.

### 8 CFR Part 253

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

### 8 CFR Part 507

Aliens, Terrorists.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

1. The authority citation for part 3 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100.

2. In § 3.23, revise the paragraph heading and the first sentence in paragraph (b)(4)(i) to read as follows:

**§ 3.23   Reopening or Reconsideration before the Immigration Court.**

*   *   *   *   *

(b) * * *

(4) * * *

(i) *Asylum and withholding of removal.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. * * *

3. In § 3.42, revise paragraphs (d) and (f) to read as follows:

**§ 3.42   Review of credible fear determination.**

*   *   *   *   *

(d) *Standard of review.* The immigration judge shall make a *de novo* determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding under the Convention Against Torture.

*   *   *   *   *

(f) *Decision.* If an immigration judge determines that an alien has a credible fear of persecution or torture, the immigration judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I–862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum and withholding of removal in the course of removal proceedings pursuant to section 240 of the Act. If an immigration judge determines that an alien does not have a credible fear of persecution or torture, the immigration

judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.

*   *   *   *   *

## PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS

4. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR 14874, 15557; 3 CFR, 1982 Comp., p 166; 8 CFR part 2.

5. In § 103.12, revise paragraph (a)(5) to read as follows:

**§ 103.12   Definition of the term ''lawfully present'' aliens for purposes of applying for Title II social security benefits under Public Law 104–193.**

(a) * * *

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

*   *   *   *   *

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

6. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

7. Revise § 208.1 to read as follows:

**§ 208.1   General.**

(a) *Applicability.* Unless otherwise provided in this chapter, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, or under the Convention Against Torture, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(d). Such applications are hereinafter referred to as ''asylum applications.'' The

provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer, or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where applicable.

(b) *Training of asylum officers.* The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race, religion, nationality, membership in a particular social group, or political opinion, torture of persons in other countries, and other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

8. In § 208.2, revise paragraphs (a), (b)(1)(ii), and (b)(3), to read as follows:

**§ 208.2   Jurisdiction.**

(a) *Office of International Affairs.* Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. The Office of International Affairs shall also have initial jurisdiction to consider applications for withholding of removal under § 208.31. An application that is complete within the meaning of § 208.3(c)(3) shall either be adjudicated or referred by asylum officers under this part in accordance with § 208.14. An application that is incomplete within the meaning of § 208.3(c)(3) shall be returned to the applicant.

(b) * * *

(1) * * *

(ii) An alien stowaway who has been found to have a credible fear of

persecution or torture pursuant to the procedures set forth in subpart B of this part;

*    *    *    *    *

(3) *Other aliens.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Executive Office for Immigration Review under § 208.31.

9. In § 208.4, revise paragraph (a) introductory text and paragraph (b)(2) to read as follows:

**§ 208.4   Filing the application.**

*    *    *    *    *

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under § 208.16 of this part. If an applicant submits an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer or an immigration judge shall review the application to determine if the application should be rejected or denied. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

*    *    *    *    *

(b) * * *

(2) *With the asylum office.* Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so or in the case of an alien whose case has been referred to the asylum office for purposes of conducting a reasonable

fear determination under § 208.31 of this part.

*    *    *    *    *

10. In § 208.5, revise paragraph (b)(1) introductory text to read as follows:

**§ 208.5   Special duties toward aliens in custody of the Service.**

*    *    *    *    *

(b) * * *

(1) If an alien crewmember or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, or if the alien expresses a fear of torture upon return to that country, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

*    *    *    *    *

11. In § 208.11, revise paragraph (b)(2) to read as follows:

**§ 208.11   Comments from the Department of State.**

*    *    *    *    *

(b) * * *

(2) Information about whether persons who are similarly situated to the applicant are persecuted or tortured in his or her country of nationality or habitual residence and the frequency of such persecution or torture; or

*    *    *    *    *

12. In § 208.12, revise paragraph (a) to read as follows:

**§ 208.12   Reliance on information compiled by other sources.**

(a) In deciding an asylum application, or in deciding whether the alien has a credible fear of persecution or torture pursuant to § 208.30 of this part, or a reasonable fear of persecution or torture pursuant to § 208.31, the asylum officer may rely on material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

*    *    *    *    *

13. Section 208.13 revise paragraph (c)(1) to read as follows:

**§ 208.13   Establishing asylum eligibility.**

*    *    *    *    *

(c) * * *

(1) *Applications filed on or after April 1, 1997.* For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act. The applicant shall also be considered for eligibility for withholding of removal under the Convention Against Torture if the applicant requests such consideration or if the evidence presented by the alien indicates that the alien may be tortured in the country of removal.

14. Section 208.16 is amended as follows:

A. Revise the section heading;
B. Revise paragraph (a);
C. Revise paragraph (b) introductory test;
D. Redesignate paragraphs (c) and (d), as (d) and (e) respectively;
E. Add a new paragraph (c);
F. Revise newly redesignated paragraphs (d) and (e); and
G. Add a new paragraph (f) to read as follows:

**§ 208.16   Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.**

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) *Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof.* The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden

of proof without corroboration. The evidence shall be evaluated as follows:

\* \* \* \* \*

(c) *Eligibility for withholding of removal under the Convention Against Torture.*

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub. L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 208.17(a).

(d) *Approval or denial of application.* (1) *General.* Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

(2) *Mandatory denials.* Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Pub. L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.

(e) *Reconsideration of discretionary denial of asylum.* In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

(f) *Removal to third country.* Nothing in this section or § 208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.

15. Section 208.17 is revised to read as follows:

### § 208.17 Deferral of removal under the Convention Against Torture.

(a) *Grant of deferral of removal.* An alien who: has been ordered removed; has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) *Notice to Alien.* (1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) *Detention of an alien granted deferral of removal under this section.* Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) *Termination of deferral of removal.*

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 3.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the

Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a *de novo* determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) *Termination at the request of the alien.*

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 3.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary, the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) *Termination pursuant to § 208.18(c).* At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the

Secretary of State pursuant to the procedures in § 208.18(c).

**§§ 208.18 through 208.22 [Redesignated as §§ 208.19 through 208.23]**

16. Sections 208.18 through 208.22 are redesignated as §§ 208.19 through 208.23 respectively.

17. Section 208.18 is added to read as follows:

**§ 208.18 Implementation of the Convention Against Torture.**

(a) *Definitions.* The definitions in this subsection incorporate the definition of torture contained in Article 1 of the Convention Against Torture, subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

(4) In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:

(i) The intentional infliction or threatened infliction of severe physical pain or suffering;

(ii) The administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(iii) The threat of imminent death; or

(iv) The threat that another person will imminently be subjected to death,

severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

(6) In order to constitute torture an act must be directed against a person in the offender's custody or physical control.

(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

(8) Noncompliance with applicable legal procedural standards does not *per se* constitute torture.

(b) *Applicability of §§ 208.16(c) and 208.17(a).*

(1) *Aliens in proceedings on or after March 22, 1999.* An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may apply for withholding of removal under § 208.16(c), and, if applicable, may be considered for deferral of removal under § 208.17(a).

(2) *Aliens who were ordered removed, or whose removal orders became final, before March 22, 1999.* An alien under a final order of deportation, exclusion, or removal that became final prior to March 22, 1999 may move to reopen proceedings to seek protection under § 208.16(c). Such motions shall be governed by §§ 3.23 and 3.2 of this chapter, except that the time and numerical limitations on motions to reopen shall not apply and the alien shall not be required to demonstrate that the evidence sought to be offered was unavailable and could not have been discovered or presented at the former hearing. The motion to reopen shall not be granted unless:

(i) The motion is filed within June 21, 1999; and

(ii) The evidence sought to be offered establishes a prima facie case that the applicant's removal must be withheld or deferred under §§ 208.16(c) or 208.17(a).

(3) *Aliens who, on March 22, 1999, have requests pending with the Service for protection under Article 3 of the Convention Against Torture.*

(i) Except as otherwise provided, after March 22, 1999, the Service will not:

(A) Consider, under its pre-regulatory administrative policy to ensure compliance with the Convention Against Torture, whether Article 3 of

that Convention prohibits the removal of an alien to a particular country, or

(B) Stay the removal of an alien based on a request filed with the Service for protection under Article 3 of that Convention.

(ii) For each alien who, on or before March 22, 1999, filed a request with the Service for protection under Article 3 of the Convention Against Torture, and whose request has not been finally decided by the Service, the Service shall provide written notice that, after March 22, 1999, consideration for protection under Article 3 can be obtained only through the provisions of this rule.

(A) The notice shall inform an alien who is under an order of removal issued by EOIR that, in order to seek consideration of a claim under §§ 208.16(c) or 208.17(a), such an alien must file a motion to reopen with the immigration court or the Board of Immigration Appeals. This notice shall be accompanied by a stay of removal, effective until 30 days after service of the notice on the alien. A motion to reopen filed under this paragraph for the limited purpose of asserting a claim under §§ 208.16(c) or 208.17(a) shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter. Such a motion shall be granted if it is accompanied by a copy of the notice described in paragraph (b)(3)(ii) or by other convincing evidence that the alien had a request pending with the Service for protection under Article 3 of the Convention Against Torture on March 22, 1999. The filing of such a motion shall extend the stay of removal during the pendency of the adjudication of this motion.

(B) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 238(b) of the Act or an exclusion, deportation, or removal order reinstated by the Service under section 241(a)(5) of the Act that the alien's claim to withholding of removal under § 208.16(c) or deferral of removal under § 208.17(a) will be considered under § 208.31.

(C) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 235(c) of the Act that the alien's claim to protection under the Convention Against Torture will be decided by the Service as provided in § 208.18(d) and 235.8(b)(4) and will not be considered under the provisions of this part relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(4) *Aliens whose claims to protection under the Convention Against Torture*

*were finally decided by the Service prior to March 22, 1999.* Sections 208.16(c) and 208.17 (a) and paragraphs (b)(1) through (b)(3) of this section do not apply to cases in which, prior to March 22, 1999, the Service has made a final administrative determination about the applicability of Article 3 of the Convention Against Torture to the case of an alien who filed a request with the Service for protection under Article 3. If, prior to March 22, 1999, the Service determined that an applicant cannot be removed consistent with the Convention Against Torture, the alien shall be considered to have been granted withholding of removal under § 208.16(c), unless the alien is subject to mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), in which case the alien will be considered to have been granted deferral of removal under 208.17(a). If, prior to March 22, 1999, the Service determined that an alien can be removed consistent with the Convention Against Torture, the alien will be considered to have been finally denied withholding of removal under § 208.16(c) and deferral of removal under § 208.17(a).

(c) *Diplomatic assurances against torture obtained by the Secretary of State.*

(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service, but may not be further delegated.

(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(d) *Cases involving aliens ordered removed under section 235(c) of the Act.* With respect to an alien terrorist or other alien subject to administrative

removal under section 235(c) of the Act who requests protection under Article 3 of the Convention Against Torture, the Service will assess the applicability of Article 3 through the removal process to ensure that a removal order will not be executed under circumstances that would violate the obligations of the United States under Article 3. In such cases, the provisions of Part 208 relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

(e) *Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.*

(1) Pursuant to the provisions of section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, there shall be no judicial appeal or review of any action, decision, or claim raised under the Convention or that section, except as part of the review of a final order of removal pursuant to section 242 of the Act; provided however, that any appeal or petition regarding an action, decision, or claim under the Convention or under section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 shall not be deemed to include or authorize the consideration of any administrative order or decision, or portion thereof, the appeal or review of which is restricted or prohibited by the Act.

(2) Except as otherwise expressly provided, nothing in this paragraph shall be construed to create a private right of action or to authorize the consideration or issuance of administrative or judicial relief.

18. Newly redesignated 208.19 is revised to read as follows:

**§ 208.19  Determining if an asylum application is frivolous.**

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim. For purposes of this section, a finding that an alien filed a frivolous asylum application shall not preclude the alien from seeking withholding of removal.

19. Newly redesignated § 208.21 is revised to read as follows:

**§ 208.21  Effect on exclusion, deportation, and removal proceedings.**

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.23 of this part. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation or deferral of removal may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to § 208.23 or deferral is terminated pursuant to § 208.17(d) or (e).

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this part, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings or subject to a final order of removal. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.23(e).

20. Section 208.30 is amended by:
A. Revising paragraphs (b), (d) and (e); and by
B. Revising paragraphs (f)(1), and (f)(2), and (f)(3), to read as follows:

**§ 208.30  Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

\*    \*    \*    \*    \*

(b) *Interview and procedure.* The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall verify that the alien has received Form M–444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has an understanding of the credible fear determination process. The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview

and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture. The decision shall not become final until reviewed by a supervisory asylum officer.

\*    \*    \*    \*    \*

(d) *Referral for an asylum hearing.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice to Referral to Immigration Judge, for full consideration of the asylum and withholding of removal claim in proceedings under § 208.2(b)(1).

(e) *Removal of aliens with no credible fear of persecution or torture.* If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–869, Record of Negative Credible Fear Finding and

Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review. If the alien is not a stowaway, the officer shall also order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal. If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall also refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(f) * * *

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to the Service for removal of the alien. The immigration judge's decision is final and may not be appealed.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the application for asylum or withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If and when an approval of the application for asylum or withholding of removal becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

21. In Subpart B, § 208.31 is added to read as follows:

**§ 208.31  Reasonable fear of persecution or torture determinations involving aliens ordered removed under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act.**

(a) *Jurisdiction.* This section shall apply to any alien ordered removed under section 238(b) of the Act or whose deportation, exclusion, or removal order is reinstated under section 241(a)(5) of the Act who, in the course of the administrative removal or reinstatement process, expresses a fear of returning to the country of removal. The Service has exclusive jurisdiction to make reasonable fear determinations, and EOIR has exclusive jurisdiction to review such determinations.

(b) *Initiation of reasonable fear determination process.* Upon issuance of a Final Administrative Removal Order under § 238.1 of this chapter, or notice under § 241.8(b) of this chapter that an alien is subject to removal, an alien described in paragraph (a) of this section shall be referred to an asylum officer for a reasonable fear determination. In the absence of exceptional circumstances, this determination will be conducted within 10 days of the referral.

(c) *Interview and Procedure.* The asylum officer shall conduct the interview in a non-adversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall determine that the alien has an understanding of the reasonable fear determination process. The alien may be represented by counsel or an accredited representative at the interview, at no expense to the Government, and may present evidence, if available, relevant to the possibility of persecution or torture. The alien's representative may present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and the length of the statement. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country or nationality, or if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture. The alien shall be determined to have a reasonable fear of persecution or torture if the alien establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal. For purposes of the screening determination, the bars to eligibility for withholding of removal under section 241(b)(3)(B) of the Act shall not be considered.

(d) *Authority.* Asylum officers conducting screening determinations under this section shall have the authority described in § 208.9(c).

(e) *Referral to Immigration Judge.* If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only. Such cases shall be adjudicated by the immigration judge in accordance with the provisions of § 208.16 within 10 days of the issuance of the I–863. Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals.

(f) *Removal of aliens with no reasonable fear of persecution or torture.* If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the asylum officer shall inform the alien in writing of the decision and shall inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–898, Record of Negative Reasonable Fear Finding and Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review.

(g) *Review by immigration judge.* The asylum officer's negative decision regarding reasonable fear shall be subject to review by an immigration judge upon the alien's request. If the alien requests such review, the asylum officer shall serve him or her with a Form I–863. The record of determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative reasonable fear determination:

(1) If the immigration judge concurs with the asylum officer's determination that the alien does not have a reasonable

fear of persecution or torture, the case shall be returned to the Service for removal of the alien. No appeal shall lie from the immigration judge's decision.

(2) If the immigration judge finds that the alien has a reasonable fear of persecution or torture, the alien may submit Form I–589, Application for Asylum and Withholding of Removal.

(i) The immigration judge shall consider only the alien's application for withholding of removal under § 208.16 and shall determine whether the alien's removal to the country of removal must be withheld or deferred.

(ii) Appeal of the immigration judge's decision whether removal must be withheld or deferred lies to the Board of Immigration Appeals. If the alien or the Service appeals the immigration judge's decision, the Board shall review only the immigration judge's decision regarding the alien's eligibility for withholding or deferral of removal under § 208.16.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

22. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

23. Section 235.1 is amended by revising paragraph (d)(4) to read as follows:

### § 235.1  Scope of examination.

\*     \*     \*     \*     \*

(d) \* \* \*

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum, or expresses a fear of persecution, a fear of torture, or a fear of return to the country of proposed removal shall be referred to an asylum officer for a determination of credible fear of persecution or torture in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution or torture shall have his or her asylum application adjudicated in accordance with § 208.2(b)(2) of this chapter.

\*     \*     \*     \*     \*

24. In section 235.3, revise paragraph (b)(4) introductory text and paragraph (b)(4)(i)(D) to read as follows:

### § 235.3  Inadmissible aliens and expedited removal.

\*     \*     \*     \*     \*

(b) \* \* \*

(4) *Claim of asylum or fear of persecution or torture.* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution, a fear of torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with § 208.30 of this chapter to determine if the alien has a credible fear of persecution or torture. The examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility.

(i) \* \* \*

(D) The consequences of failure to establish a credible fear of persecution or torture.

\*     \*     \*     \*     \*

25. In § 235.6, revise paragraphs (a)(1)(ii) and (iii), and paragraph (a)(2)(i) to read as follows:

### § 235.6  Referral to immigration judge.

(a) \* \* \*

(1) \* \* \*

(ii) If an asylum officer determines that an alien in expedited removal proceedings has a credible fear of persecution or torture and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution or torture and vacates the expedited removal order issued by the asylum officer.

\*     \*     \*     \*     \*

(2) \* \* \*

(i) If an asylum officer determines that an alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge; or

\*     \*     \*     \*     \*

26. In § 235.8, add a new paragraph (b)(4), to read as follows:

### § 235.8  Inadmissibility on security and related grounds.

\*     \*     \*     \*     \*

(b) \* \* \*

(4) The Service shall not execute a removal order under this section under circumstances that violate section 241(b)(3) of the Act or Article 3 of the Convention Against Torture. The

provisions of part 208 of this chapter relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

\*     \*     \*     \*     \*

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

27. The authority citation for part 238 continues to read s follows:

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

28. In § 238.1, revise paragraphs (b)(2)(i) and (c)(1), and add new paragraph (f)(3) to read as follows:

### § 238.1  Proceeding under section 238(b) of the Act.

\*     \*     \*     \*     \*

(b) \* \* \*

(2) *Notice.*

(i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intent to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. The Notice of Intent shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the government, by counsel of the alien's choosing, as long as counsel is authorized to practice in removal proceedings; may request withholding of removal to a particular country if he or she fears persecution or torture in that country; may inspect the evidence supporting the Notice of Intent; may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

\*     \*     \*     \*     \*

(c) \* \* \*

(1) *Time for response.* The alien will have 10 calendar days from service of the Notice of Intent or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or submit a statement indicating an intention to request withholding of removal under 8 CFR 208.16 of this chapter, and/or request in writing an extension of time

for response, stating the specific reasons why such an extension is necessary.

\* \* \* \* \*

(f) \* \* \*

(3) *Withholding of removal.* If the alien has requested withholding of removal under § 208.16 of this chapter, the deciding officer shall, upon issuance of a Final Administrative Removal Order, immediately refer the alien's case to an asylum officer to conduct a reasonable fear determination in accordance with § 208.31 of this chapter.

\* \* \* \* \*

## PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

29. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sec. 202, Pub. L. 105–100 (111 Stat. 2160, 2193); 8 CFR part 2.

30. In § 240.1, revise paragraph (a) to read as follows:

### § 240.1  Immigration Judges.

(a) *Authority.* (1) In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to:

(i) Determine removability pursuant to section 240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act;

(ii) To determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act and section 202 of Pub. L. 105–100;

(iii) To order withholding of removal pursuant to section 241(b)(3) of the Act and pursuant to the Convention Against Torture; and

(iv) To take any other action consistent with applicable law and regulations as may be appropriate.

(2) In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also

exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

\* \* \* \* \*

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

31. The authority citation for part 241 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.

32. In § 241.8, revise paragraph (d) to read as follows:

### § 241.8  Reinstatement of removal orders.

\* \* \* \* \*

(d) *Exception for withholding of removal.* If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 208.31 of this chapter.

\* \* \* \* \*

33. In § 241.11, revise paragraph (d)(1) to read as follows:

### § 241.11  Detention and removal of stowaways.

\* \* \* \* \*

(d) *Stowaways claiming asylum*—
(1) *Referral for credible fear determination.* A stowaway who indicates an intention to apply for asylum or a fear of persecution or torture upon return to his or her native country or country of last habitual residence (if not a national of any country) shall be removed from the vessel or aircraft of arrival in accordance with § 208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. The stowaway

shall be detained in the custody of the Service pending the credible fear determination and any review thereof. Parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. A stowaway who has established a credible fear of persecution or torture in accordance with § 208.30 of this chapter may be detained or paroled pursuant to § 212.5 of this chapter during any consideration of the asylum application. In determining whether to detain or parole the alien, the Service shall consider the likelihood that the alien will abscond or pose a security risk.

\* \* \* \* \*

## PART 253—PAROLE OF ALIEN CREWMEN

34. The authority citation in part 253 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

35. In § 253.1, revise paragraph (f) to read as follows:

### § 253.1  Parole.

\* \* \* \* \*

(f) *Crewman, stowaway, or alien removable under section 235(c) alleging persecution or torture.* Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, or because of fear of torture is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure that the provisions of § 208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

\* \* \* \* \*

36. Add a new part 507 to read as follows:

## PART 507—ALIEN TERRORIST REMOVAL PROCEDURES

**§ 507.1 Eligibility for Protection under the Convention Against Torture.**

A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105–277. Convention-based claims by aliens subject to removal under this Title shall be determined by the Attorney General, in consultation with the Secretary of State.

**Authority:** Pub. L. 105–277, 112 Stat. 2681.

Dated: February 13, 1999.

**Janet Reno,**

*Attorney General.*

[FR Doc. 99–4140 Filed 2–18–99; 8:45 am]

BILLING CODE 4410–10–P



**Homeland
Security**

November 20, 2014

MEMORANDUM FOR:    Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

Leon Rodriguez
Director
U.S. Citizenship and Immigration Services

Alan D. Bersin
Acting Assistant Secretary for Policy

FROM:    Jeh Charles Johnson
Secretary

SUBJECT:    **Policies for the Apprehension, Detention and
Removal of Undocumented Immigrants**

This memorandum reflects new policies for the apprehension, detention, and removal of aliens in this country. This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). This memorandum should inform enforcement and removal activity, detention decisions, budget requests and execution, and strategic planning.

In general, our enforcement and removal policies should continue to prioritize threats to national security, public safety, and border security. The intent of this new policy is to provide clearer and more effective guidance in the pursuit of those priorities. To promote public confidence in our enforcement activities, I am also directing herein greater transparency in the annual reporting of our removal statistics, to include data that tracks the priorities outlined below.

**AR01399**

The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.

In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.

Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens,* March 2, 2011; John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens,* June 17, 2011; Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases,* November 17, 2011; *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems,* December 21, 2012; *National Fugitive Operations Program: Priorities, Goals, and Expectations,* December 8, 2009.

AR01400

## A. Civil Immigration Enforcement Priorities

The following shall constitute the Department's civil immigration enforcement priorities:

### Priority 1 (threats to national security, border security, and public safety)

Aliens described in this priority represent the highest priority to which enforcement resources should be directed:

(a) aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

(b) aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

(c) aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

(d) aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

(e) aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

### Priority 2 (misdemeanants and new immigration violators)

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

(a) aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element

3

was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b)   aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c)   aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

(d)   aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority.

**Priority 3 (other immigration violations)**

Priority 3 aliens are those who have been issued a final order of removal[2] on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

---

[1] In evaluating whether the offense is a significant misdemeanor involving "domestic violence," careful consideration should be given to whether the convicted alien was also the <u>victim</u> of domestic violence; if so, this should be a mitigating factor. *See generally,* John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs,* June 17, 2011.

[2] For present purposes, "final order" is defined as it is in 8 C.F.R. § 1241.1.

4

**B.     Apprehension, Detention, and Removal of Other Aliens Unlawfully in the   United States**

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein. However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified. Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest.

**C.     Detention**

As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law. Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest. To detain aliens in those categories who are not subject to mandatory detention, DHS officers or special agents must obtain approval from the ICE Field Office Director. If an alien falls within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

**D.     Exercising Prosecutorial Discretion**

Section A, above, requires DHS personnel to exercise discretion based on individual circumstances. As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or <u>unless</u>, in the judgment of an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or <u>unless</u>, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, <u>unless</u>, in the judgment of an immigration officer, the alien is not a threat to the

5

AR01403

integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

In making such judgments, DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality of the circumstances.

## E.    Implementation

The revised guidance shall be effective on January 5, 2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.

## F.    Data

By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers of those apprehended, removed, returned, or otherwise repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part of the package of data released by DHS to the public annually.

## G.    No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

6

AR01404



U.S. Immigration
and Customs
Enforcement

October 24, 2005

MEMORANDUM FOR:     All OPLA Chief Counsel

FROM:                              William J. Howard
                                         Principal Legal Advisor

SUBJECT:                        Prosecutorial Discretion

As you know, when Congress abolished the Immigration and Naturalization Service
and divided its functions among U.S. Immigration and Customs Enforcement (ICE),
U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration
Services (CIS), the Office of the Principal Legal Advisor (OPLA) was given exclusive
authority to prosecute all removal proceedings. *See* Homeland Security Act of 2002,
Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002) ("the legal advisor * * *
shall represent the bureau in all exclusion, deportation, and removal proceedings before
the Executive Office for Immigration Review"). Complicating matters for OPLA is
that our cases come to us from CBP, CIS, and ICE, since all three bureaus are
authorized to issue Notices to Appear (NTAs).

OPLA is handling about 300,000 cases in the immigration courts, 42,000 appeals before
the Board of Immigration Appeals (BIA or Board), and 12,000 motions to reopen each
year. Our circumstances in litigating these cases differ in a major respect from our
predecessor, the INS's Office of General Counsel. Gone are the days when INS district
counsels, having chosen an attorney-client model that required client consultation
before INS trial attorneys could exercise prosecutorial discretion, could simply walk
down the hall to an INS district director, immigration agent, adjudicator, or border
patrol officer to obtain the client's permission to proceed with that exercise. Now
NTA-issuing clients or stakeholders might be in different agencies, in different
buildings, and in different cities from our own.

Since the NTA-issuing authorities are no longer all under the same roof, adhering to
INS OGC's attorney-client model would minimize our efficiency. This is particularly
so since we arc litigating our hundreds of thousands of cases per year with only 600 or
so attorneys; that our case preparation time is extremely limited, averaging about 20
minutes a case; that our caseload will increase since Congress is now providing more
resources for border and interior immigration enforcement; that many of the cases that
come to us from NTA-issuers lack supporting evidence like conviction documents; that
we must prioritize our cases to allow us to place greatest emphasis on our national
security and criminal alien dockets; that we have growing collateral duties such as

assisting the Department of Justice with federal court litigation; that in many instances we lack sufficient staff to adequately brief Board appeals or oppositions to motions to reopen; and that the opportunities to exercise prosecutorial discretion arise at many different points in the removal process.

To elaborate on this last point, the universe of opportunities to exercise prosecutorial discretion is large. Those opportunities arise in the pre-filing stage, when, for example, we can advise clients who consult us whether or not to file NTAs or what charges and evidence to base them on. They arise in the course of litigating the NTA in immigration court, when we may want, among other things, to move to dismiss a case as legally insufficient, to amend the NTA, to decide not to oppose a grant of relief, to join in a motion to reopen, or to stipulate to the admission of evidence. They arise after the immigration judge has entered an order, when we must decide whether to appeal all or part of the decision. Or they may arise in the context of DRO's decision to detain aliens, when we must work closely with DRO in connection with defending that decision in the administrative or federal courts. In the 50-plus immigration courtrooms across the United States in which we litigate, OPLA's trial attorneys continually face these and other prosecutorial discretion questions. Litigating with maximum efficiency requires that we exercise careful yet quick judgment on questions involving prosecutorial discretion. This will require that OPLA's trial attorneys become very familiar with the principles in this memorandum and how to apply them.

Further giving rise to the need for this guidance is the extraordinary volume of immigration cases that is now reaching the United States Courts of Appeals. Since 2001, federal court immigration cases have tripled. That year, there were 5,435 federal court cases. Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000. The lion's share of these cases consists of petitions for review in the United States Courts of Appeal. Those petitions are now overwhelming the Department of Justice's Office of Immigration Litigation, with the result that the Department of Justice has shifted responsibility to brief as many as 2,000 of these appellate cases to other Departmental components and to the U.S. Attorneys' Offices. This, as you know, has brought you into greater contact with Assistant U.S. Attorneys who are turning to you for assistance in remanding some of these cases. This memorandum is also intended to lessen the number of such remand requests, since it provides your office with guidance to assist you in eliminating cases that would later merit a remand.

Given the complexity of immigration law, a complexity that federal courts at all levels routinely acknowledge in published decisions, your expert assistance to the U.S. Attorneys is critical.[1] It is all the more important because the decision whether to

---

[1] As you know, if and when your resources permit it, I encourage you to speak with your respective United States Attorneys' Offices about having those Offices designate Special Assistant U.S. Attorneys from OPLA's ranks to handle both civil and criminal federal court immigration litigation. The U.S.

proceed with litigating a case in the federal courts must be gauged for reasonableness, lest, in losing the case, the courts award attorneys' fees against the government pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412. In the overall scheme of litigating the removal of aliens at both the administrative and federal court level, litigation that often takes years to complete, it is important that we all apply sound principles of prosecutorial discretion, uniformly throughout our offices and in all of our cases, to ensure that the cases we litigate on behalf of the United States, whether at the administrative level or in the federal courts, are truly worth litigating.

\* \* \* \* \* \* \* \* \* \*

With this background in mind, I am directing that all OPLA attorneys apply the following principles of prosecutorial discretion:

**1) Prosecutorial Discretion Prior to or in Lieu of NTA Issuance:**

In the absence of authority to cancel NTAs, we should engage in client liaison with CBP, CIS (and ICE) via, or in conjunction with, CIS/CBP attorneys on the issuance of NTAs. We should attempt to discourage issuance of NTAs where there are other options available such as administrative removal, crewman removal, expedited removal or reinstatement, clear eligibility for an immigration benefit that can be obtained outside of immigration court, or where the desired result is other than a removal order.

It is not wise or efficient to place an alien into proceedings where the intent is to allow that person to remain unless, where compelling reasons exist, a stayed removal order might yield enhanced law enforcement cooperation. See Attachment A (Memorandum from Wesley Lee, ICE Acting Director, Office of Detention and Removal, Alien Witnesses and Informants Pending Removal (May 18,2005)); see also Attachment B (Detention and Removal Officer's Field Manual, Subchapters 20.7 and 20.8, for further explanation on the criteria and procedures for stays of removal and deferred action).

> Examples:

- **Immediate Relative of Service Person-** If an alien is an immediate relative of a military service member, a favorable exercise of discretion, including not issuing an NTA, should be a prime consideration. Military service includes current or former members of the Armed Forces, including: the United States Army, Air Force, Navy, Marine Corps, Coast Guard, or National Guard, as well as service in the Philippine Scouts. OPLA counsel should analyze possible eligibility for citizenship under

---

Attorneys' Offices will benefit greatly from OPLA SAUSAs, especially given the immigration law expertise that resides in each of your Offices, the immigration law's great complexity, and the extent to which the USAOs are now overburdened by federal immigration litigation.

sections 328 and 329.  See Attachment C (Memorandum from Marcy M. Forman, Director, Office of Investigations, Issuance of Notices to Appeal, Administrative Orders of Removal, or Reinstatement of a Final Removal Order on Aliens with United States Military Service (June 21, 2004)).

- **Clearly Approvable I-130/I-485-**  Where an alien is the potential beneficiary of a clearly approvable I-130/I-485 and there are no serious adverse factors that otherwise justify expulsion, allowing the alien the opportunity to legalize his or her status through a CIS-adjudicated adjustment application can be a cost-efficient option that conserves immigration court time and benefits someone who can be expected to become a lawful permanent resident of the United States.  See Attachment D (Memorandum from William J. Howard, OPLA Principal Legal Advisor, Exercising Prosecutorial Discretion to Dismiss Adjustment Cases (October 6, 2005)).

- **Administrative Voluntary Departure-**  We may be consulted in a case where administrative voluntary departure is being considered.  Where an alien is eligible for voluntary departure and likely to depart, OPLA attorneys are encouraged to facilitate the grant of administrative voluntary departure or voluntary departure under safeguards.  This may include continuing detention if that is the likely end result even should the case go to the Immigration Court.

- **NSEERS Failed to Register-**  Where an alien subject to NSEERS registration failed to timely register but is otherwise in status and has no criminal record, he should not be placed in proceedings if he has a reasonable excuse for his failure. Reasonably excusable failure to register includes the alien's hospitalization, admission into a nursing home or extended care facility (where mobility is severely limited); or where the alien is simply unaware of the registration requirements.  See Attachment E (Memorandum from Victor Cerda, OPLA Acting Principal Legal Advisor, Changes to the National Security Entry Exit Registration System (NSEERS) (January 8, 2004)).

- **Sympathetic Humanitarian Factors-**  Deferred action should be considered when the situation involves sympathetic humanitarian circumstances that rise to such a level as to cry for an exercise of prosecutorial discretion.  Examples of this include where the alien has a citizen child with a serious medical condition or disability or where the alien or a close family member is undergoing treatment for a potentially life threatening disease.  DHS has the most prosecutorial discretion at this stage of the process.

2) **Prosecutorial Discretion after the Notice to Appear has issued, but before the Notice to Appear has been filed:**

We have an additional opportunity to appropriately resolve a case prior to expending court resources when an NTA has been issued but not yet filed with the immigration court.  This would be an appropriate action in any of the situations

identified in #1. Other situations may also arise where the reasonable and rational decision is not to prosecute the case.

Example:

- **U or T visas**- Where a "U" or "T" visa application has been submitted, it may be appropriate not to file an NTA until a decision is made on such an application. In the event that the application is denied then proceedings would be appropriate.

## 3) Prosecutorial Discretion after NTA Issuance and Filing:

The filing of an NTA with the Immigration Court does not foreclose further prosecutorial discretion by OPLA Counsel to settle a matter. There may be ample justification to move the court to terminate the case and to thereafter cancel the NTA as improvidently issued or due to a change in circumstances such that continuation is no longer in the government interest.[2] We have regulatory authority to dismiss proceedings. Dismissal is by regulation without prejudice. <u>See</u> 8 CFR §§ 239.2(c), 1239.2(c). In addition, there are numerous opportunities that OPLA attorneys have to resolve a case in the immigration court. These routinely include not opposing relief, waiving appeal or making agreements that narrow issues, or stipulations to the admissibility of evidence. There are other situations where such action should also be considered for purposes of judicial economy, efficiency of process or to promote justice.

Examples:

---

[2] Unfortunately, DHS's regulations, at 8 C.F.R. 239.1, do not include OPLA's attorneys among the 38 categories of persons given authority there to issue NTAs and thus to cancel NTAs. That being said, when an OPLA attorney encounters an NTA that lacks merit or evidence, he or she should apprise the issuing entity of the deficiency and ask that the entity cure the deficiency as a condition of OPLA's going forward with the case. If the NTA has already been filed with the immigration court, the OPLA attorney should attempt to correct it by filing a form I-261 or, if that will not correct the problem, should move to dismiss proceedings without prejudice. We must be sensitive, particularly given our need to prioritize our national security and criminal alien cases, to whether prosecuting a particular case has little law enforcement value to the cost and time required. Although we lack the authority to sua sponte cancel NTAs, we can move to dismiss proceedings for the many reasons outlined in 8 CFR § 239.2(a) and 8 CFR § 1239.2(c). Moreover, since OPLA attorneys do not have independent authority to grant deferred action status, stays of removal, parole, etc., once we have concluded that an alien should not be subjected to removal, we must still engage the client entity to "defer" the action, issue the stay or initiate administrative removal.

- **Relief Otherwise Available-** We should consider moving to dismiss proceedings without prejudice where it appears in the discretion of the OPLA attorney that relief in the form of adjustment of status appears clearly approvable based on an approvable I-130 or I-140 and appropriate for adjudication by CIS. <u>See</u> October 6, 2005 Memorandum from Principal Legal Advisor Bill Howard, <u>supra</u>. Such action may also be appropriate in the special rule cancellation NACARA context. We should also consider remanding a case to permit an alien to pursue naturalization.[3] This allows the alien to pursue the matter with CIS, the DHS entity with the principal responsibility for adjudication of immigration benefits, rather than to take time from the overburdened immigration court dockets that could be expended on removal issues.

- **Appealing Humanitarian Factors-** Some cases involve sympathetic humanitarian circumstances that rise to such a level as to cry for an exercise of prosecutorial discretion. Examples of this, as noted above, include where the alien has a citizen child with a serious medical condition or disability or where the alien or a close family member is undergoing treatment for a potentially life threatening disease. OPLA attorneys should consider these matters to determine whether an alternative disposition is possible and appropriate. Proceedings can be reinstituted when the situation changes. Of course, if the situation is expected to be of relatively short duration, the Chief Counsel Office should balance the benefit to the Government to be obtained by terminating the proceedings as opposed to administratively closing proceedings or asking DRO to stay removal after entry of an order.

- **Law Enforcement Assets/CIs-** There are often situations where federal, State or local law enforcement entities desire to have an alien remain in the United States for a period of time to assist with investigation or to testify at trial. Moving to dismiss a case to permit a grant of deferred action may be an appropriate result in these circumstances. Some offices may prefer to administratively close these cases, which gives the alien the benefit of remaining and law enforcement the option of calendaring proceedings at any time. This may result in more control by law enforcement and enhanced cooperation by the alien. A third option is a stay.

**4) Post-Hearing Actions:**

Post-hearing actions often involve a great deal of discretion. This includes a decision to file an appeal, what issues to appeal, how to respond to an alien's appeal, whether to seek a stay of a decision or whether to join a motion to reopen. OPLA

---

[3] Once in proceedings, this typically will occur only where the alien has shown prima facie eligibility for naturalization and that his or her case involves exceptionally appealing or humanitarian factors. 8 CFR § 1239.1(f). It is improper for an immigration judge to terminate proceedings absent an affirmative communication from DHS that the alien would be eligible for naturalization but for the pendency of the deportation proceeding. <u>Matter of Cruz</u>. 15 I&N Dec. 236 (BIA 1975); <u>see Nolan v. Holmes</u>, 334 F.3d 189 (2d Cir. 2003) (Second Circuit upholds BIA's reliance on <u>Matter of Cruz</u> when petitioner failed to establish prima facie eligibility.).

attorneys are also responsible for replying to motions to reopen and motions to reconsider. The interests of judicial economy and fairness should guide your actions in handling these matters.

Examples:

- **Remanding to an Immigration Judge or Withdrawing Appeals-** Where the appeal brief filed on behalf of the alien respondent is persuasive, it may be appropriate for an OPLA attorney to join in that position to the Board, to agree to remand the case back to the immigration court, or to withdraw a government appeal and allow the decision to become final.

  - **Joining in Untimely Motions to Reopen-** Where a motion to reopen for adjustment of status or cancellation of removal is filed on behalf of an alien with substantial equities, no serious criminal or immigration violations, and who is legally eligible to be granted that relief except that the motion is beyond the 90-day limitation contained in 8 C.F.R, § 1003.23, strongly consider exercising prosecutorial discretion and join in this motion to reopen to permit the alien to pursue such relief to the immigration court.

  - **Federal Court Remands to the BIA-** Cases filed in the federal courts present challenging situations. In a habeas case, be very careful to assess the reasonableness of the government's detention decision and to consult with our clients at DRO. Where there are potential litigation pitfalls or unusually sympathetic fact circumstances and where the BIA has the authority to fashion a remedy, you may want to consider remanding the case to the BIA. Attachments H and I provide broad guidance on these matters. Bring concerns to the attention of the Office of the United States Attorney or the Office of Immigration Litigation, depending upon which entity has responsibility over the litigation. <u>See generally</u> Attachment F (Memorandum from OPLA Appellate Counsel, U.S. Attorney Remand Recommendations (rev. May 10, 2005)); <u>see also</u> Attachment G (Memorandum from Thomas W. Hussey, Director, Office of Immigration Litigation, U.S. Department of Justice, Remand of Immigration Cases (Dec. 8, 2004)).

  - **In absentia orders.** Reviewing courts have been very critical of in absentia orders that, for such things as appearing late for court, deprive aliens of a full hearing and the ability to pursue relief from removal. This is especially true where court is still in session and there does not seem to be any prejudice to either holding or rescheduling the hearing for later that day. These kinds of decisions, while they may be technically correct, undermine respect for the fairness of the removal process and cause courts to find reasons to set them aside. These decisions can create adverse precedent in the federal courts as well as EAJA liability. OPLA counsel should be mindful of this and, if possible, show a measured degree of flexibility, but

only if convinced that the alien or his or her counsel is not abusing the removal court process.

**5) Final Orders-  Stays and Motions to Reopen/Reconsider:**

Attorney discretion doesn't cease after a final order.  We may be consulted on whether a stay of removal should be granted.  <u>See</u> Attachment B (Subchapter 20.7).  In addition, circumstances may develop whether the proper and just course of action would be to move to reopen the proceeding for purposes of terminating the NTA.

Examples:

- **Ineffective Assistance-**  An OPLA attorney is presented with a situation where an alien was deprived of an opportunity to pursue relief, due to incompetent counsel, where a grant of such relief could reasonably be anticipated.  It would be appropriate, assuming compliance with <u>Matter of Lozada</u>, to join in or not oppose motions to reconsider to allow the relief applications to be filed.

- **Witnesses Needed, Recommend a Stay-**  State law enforcement authorities need an alien as a witness in a major criminal case.  The alien has a final order and will be removed from the United States before trial can take place.  OPLA counsel may recommend that a stay of removal be granted and this alien be released on an order of supervision.

*  *  *  *  *  *  *  *  *  *

Prosecutorial discretion is a very significant tool that sometimes enables you to deal with the difficult, complex and contradictory provisions of the immigration laws and cases involving human suffering and hardship.  It is clearly DHS policy that national security violators, human rights abusers, spies, traffickers both in narcotics and people, sexual predators and other criminals are removal priorities.  It is wise to remember that cases that do not fall within these categories sometimes require that we balance the cost of an action versus the value of the result.  Our reasoned determination in making prosecutorial discretion decisions can be a significant benefit to the efficiency and fairness of the removal process.

**Official Use Disclaimer:**

This memorandum is protected by the Attorney/Client and Attorney Work product privileges and is for Official Use Only.  This memorandum is intended solely to provide legal advice to the Office of the Chief Counsels (OCC) and their staffs regarding the appropriate and lawful exercise of prosecutorial discretion, which will lead to the efficient management of resources. It is not intended to, does not, and may not be relied upon to create or confer any right(s) or benefit(s), substantive or procedural, enforceable at law by any individual or other party in

removal proceedings, in litigation with the United States, or in any other form or manner. Discretionary decisions of the OCC regarding the exercise of prosecutorial discretion under this memorandum are final and not subject to legal review or recourse. Finally this internal guidance does not have the force of law, or of a Department of Homeland Security Directive.



**U.S. Immigration and Customs Enforcement**

February 21, 2017

MEMORANDUM FOR:     All ERO Employees

FROM:     Matthew T. Albence
Executive Associate Director

SUBJECT:     Implementing the President's Border Security and Interior
Immigration Enforcement Policies

On February 21, 2017, Secretary Kelly issued the attached memoranda, "Implementing the
President's Border Security and Immigration Enforcement Improvements Policies," and
"Enforcement of the Immigration Laws to Serve the National Interest." These new polices
outline the role of the Department of Homeland Security (DHS) in the implementation of
Executive Order (E.O.) 13767, "Border Security and Immigration Enforcement Improvements,"
82 Fed. Reg. 8793 (Jan. 25, 2017), and E.O. 13768, "Enhancing Public Safety in the Interior of
the United States," 82 Fed. Reg. 8799 (Jan. 25, 2017). Effective immediately, Enforcement and
Removal Operations (ERO) will implement this direction from the Secretary, with particular
guidance as set forth below.

Additionally, U.S. Immigration and Customs Enforcement (ICE) is reviewing all existing
policies and guidance documents and will revise or rescind relevant policies in order to ensure
consistency with the E.O.[1]

### A. Enforcement Policy

Effective immediately, ERO officers will take enforcement action against all removable aliens
encountered in the course of their duties. As always, ERO officers must make an individualized
custody determination in every case, prioritizing detention resources on aliens subject to
expedited removal and aliens removable on any criminal ground, security or related ground, or
for grounds related to fraud or material misrepresentation. Under the terms of the E.O., DHS
will no longer exempt classes or categories of removable aliens from potential enforcement.

Additionally, regardless of the basis of removability, ERO officers should prioritize efforts to
remove aliens who:

---

[1] With the exception of the June 15, 2012 memo, "Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children," and the November 20, 2014 memo, "Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain
Individuals Who Are the Parents of U.S. Citizens or Permanent Residents."

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

      (1) Have been convicted of any criminal offense;
      (2) Have been charged with any criminal offense that has not been resolved;
      (3) Have committed acts which constitute a chargeable criminal offense;
      (4) Have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency;
      (5) Have abused any program related to receipt of public benefits;
      (6) Are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or
      (7) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Aliens listed above do not necessarily have to be placed in removal proceedings based on a criminal ground of inadmissibility or removability. Instead, ERO officers should prioritize individuals within the above priorities for removal proceedings based on any lawfully available removal grounds.

**B. Detention Policy**

The agency is currently expanding detention space to support the E.O.'s termination of "catch-and-release" policies.[2] ERO will work to detain aliens pending a final determination of whether they will be removed from the United States, including a determination regarding eligibility for immigration relief and protection. ERO officers should only release from detention an alien detained pursuant to section 235(b) of the Immigration and Nationality Act (INA) on a case-by-case basis, in accordance with applicable statues and regulations, in the following situations:

      (1) When removing the alien from the United States pursuant to statute or regulation;
      (2) When the alien obtains an order granting relief or protection from removal or DHS determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;
      (3) A Field Office Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;
      (4) When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;
      (5) A Field Office Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director as expeditiously as possible; or
      (6) When an arriving alien processed under the expedited removal provisions of section

---

[2] The implementation of this provision may be dependent upon the deployment of a surge of immigration judges and asylum officers and the acquisition of additional detention space, as determined by the Secretary.

AR01415

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

> 235(b) has been found to have established a "credible fear" of persecution or torture by
> an asylum officer or an immigration judge, provided that such an alien affirmatively
> establishes to the satisfaction of an immigration officer his or her identity, that he or she
> presents neither a security risk nor a risk of absconding, and provided that he or she
> agrees to comply with any additional conditions of release imposed to ensure public
> safety and appearance at any removal hearings.

As the agency works to expand its detention capacity, detention of all such individuals may not
be possible. Detention resources should be prioritized based upon potential danger and risk of
flight if an individual alien is not detained.

### C. Release and Parole Policy

ERO officers should process requests for parole or other release sparingly, and only in individual
cases where, after careful consideration of the circumstances, the officer believes that the release
would serve the best interests of the United States because of demonstrated urgent humanitarian
reasons or significant public benefit. Parole or other release, with all available safeguards, may
also be warranted in instances where detention capacity limits the agency's ability to detain the
alien consistent with legal requirements, including court orders and settlement agreements.

Agency policy establishing standards and procedures for the parole of certain arriving aliens
found to have a credible fear of persecution or torture will remain in full force and effect until
further evaluation is completed and additional guidance is issued.[3] ERO officers are reminded,
however, to apply ICE policy consistent with its plain language, and to ensure that the alien is
held to his or her burden of establishing identity and that his or her release will not pose a danger
or risk of flight. There is no presumption that an individual alien's release would not pose a
danger or risk of flight.

### D. Processing and Treatment of Unaccompanied Alien Minors

ERO officers will continue to comply with the requirements of the William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement
Agreement, including all implementing policies and procedures, to ensure that all children,
including unaccompanied alien children, are provided special protections to ensure that they are
properly processed and receive appropriate care and placement when they are encountered by
DHS officers and agents. Mexican and Canadian unaccompanied alien children may be
permitted to withdraw their application for admission and return to Mexico or Canada after
proper coordination with the Mexican or Canadian Consulate has been completed.

---

[3] Current agency policy is set forth in ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible
Fear of Persecution or Torture, dated December 8, 2009, which is available here. The policy is implicated by
pending litigation before the U.S. Supreme Court in *Jennings v. Rodriguez*, No. 15-1204, and as noted in the
Secretary's February 17, 2017 memorandum, "Implementing the President's Border Security and Immigration
Enforcement Improvements Policies," is subject to further review and evaluation pending ongoing implementation
of Executive Order 13767.

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

Unaccompanied alien children who are permitted to withdraw may be repatriated at the nearest port of entry to Mexican or Canadian Consulate officials at a time designated by the consulate official.

### E. No Private Right of Action

This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of ICE.

In implementing these policies, I direct all ERO employees to consult with legal counsel through proper chain of command, to ensure compliance with all applicable laws, including the Administrative Procedure Act.



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

---

Office of the Commissioner                    *425 I Street NW*
*Washington, DC 20536*


NOV 17 2000



MEMORANDUM TO REGIONAL DIRECTORS
                          DISTRICT DIRECTORS
                          CHIEF PATROL AGENTS
                          REGIONAL AND DISTRICT COUNSEL

FROM:      Doris Meissner
              Commissioner
              Immigration and Naturalization Service

SUBJECT:    <u>Exercising Prosecutorial Discretion</u>

        Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion. This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions. <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position. In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

        More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.



DEFENDANTS'
EXHIBIT

AR-003

AILA InfoNet Doc. No. 00112702. (Posted 11/27/00)

**AR01418**

AR_DHSP_00000030

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution,"[2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings.  INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

Memorandum for Regional Directors, et al.                                                    Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or
officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive
any legal requirements that apply to the action itself.  For example, an enforcement decision to
focus on certain types of immigration violators for arrest and removal does not mean that the INS
may arrest any person without probable cause to do so for an offense within its jurisdiction.
Service officers who are in doubt whether a particular action complies with applicable
constitutional, statutory, or case law requirements should consult with their supervisor and obtain
advice from the district or sector counsel or representative of the Office of General Counsel to
the extent necessary.

        Finally, exercising prosecutorial discretion does not lessen the INS' commitment to
enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore
the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our
mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

        Like all law enforcement agencies, the INS has finite resources, and it is not possible to
investigate and prosecute all immigration violations.  The INS historically has responded to this
limitation by setting priorities in order to achieve a variety of goals.  These goals include
protecting public safety, promoting the integrity of the legal immigration system, and deterring
violations of the immigration law.

        It is an appropriate exercise of prosecutorial discretion to give priority to investigating,
charging, and prosecuting those immigration violations that will have the greatest impact on
achieving these goals.  The INS has used this principle in the design and execution of its border
enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing
benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under
appropriate principles, rather than devoting resources to cases that will do less to advance these
overall interests, is a crucial element in effective law enforcement management.

        The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the
concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution
if "*no substantial Federal interest would be served by prosecution*."  This principle provides a
useful frame of reference for the INS, although applying it presents challenges that differ from
those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal
responsibility, the option of an adequate alternative remedy under state law is not available.  In
an immigration case, the interest at stake will always be Federal.  Therefore, we must place
particular emphasis on the element of substantiality.  How important is the Federal interest in the
case, as compared to other cases and priorities?  That is the overriding question, and answering it
requires examining a number of factors that may differ according to the stage of the case.

Memorandum for Regional Directors, et al.                                    Page 5
Subject:  Exercising Prosecutorial Discretion

      As a general matter, INS officers may decline to prosecute a legally sufficient
immigration case if the Federal immigration enforcement interest that would be served by
prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements
or directives, the responsibility for exercising prosecutorial discretion in this manner rests with
the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and
sound judgment.[4]  The DD or CPA should obtain legal advice from the District or Sector Counsel
to the extent that such advice may be necessary and appropriate to ensure the sound and lawful
exercise of discretion, particularly with respect to cases pending before the Executive Office for
Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent
necessary and proper, except that decisions not to place a removable alien in removal
proceedings, or decisions to move to terminate a proceeding which in the opinion of the District
or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized
under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion
will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs
remain subject to their chains of command and may be supervised as necessary in their exercise
of prosecutorial discretion.

*Investigations*

      Priorities for deploying investigative resources are discussed in other documents, such as
the interior enforcement strategy, and will not be discussed in detail in this memorandum. These
previously identified priorities include identifying and removing criminal and terrorist aliens,
deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse,
responding to community complaints about illegal immigration and building partnerships to
solve local problems, and blocking and removing employers' access to undocumented workers.
Even within these broad priority areas, however, the Service must make decisions about how
best to expend its resources.

      Managers should plan and design operations to maximize the likelihood that serious
offenders will be identified.  Supervisors should ensure that front-line investigators understand
that it is not mandatory to issue an NTA in every case where they have reason to believe that an
alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's
attention.  Operational planning for investigations should include consideration of appropriate
procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by
other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests
should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light
of the circumstances and interests involved.
[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS
personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not
report to DDs or CPAs, or to change any INS chains of command.
[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8
CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                     Page 6
Subject:  Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial
discretion.  Managers should consider not simply whether a particular effort is legally
supportable, but whether it best advances the INS' goals, compared with other possible
uses of those resources.  As a general matter, investigations that are specifically focused to
identify aliens who represent a high priority for removal should be favored over investigations
which, by their nature, will identify a broader variety of removable aliens.  Even an operation
that is designed based on high-priority criteria, however, may still identify individual aliens who
warrant a favorable exercise of prosecutorial discretion.[6]

     *Initiating and Pursuing Proceedings*

     Aliens who are subject to removal may come to the Service's attention in a variety of
ways.  For example, some aliens are identified as a result of INS investigations, while others are
identified when they apply for immigration benefits or seek admission at a port-of-entry.  While
the context in which the INS encounters an alien may, as a practical matter, affect the Service's
options, it does not change the underlying principle that the INS has discretion and should
exercise that discretion appropriately given the circumstances of the case.

     Even when an immigration officer has reason to believe that an alien is removable and
that there is sufficient evidence to obtain a final order of removal, it may be appropriate to
decline to proceed with that case.  This is true even when an alien is removable based on his or
her criminal history and when the alien–if served with an NTA–would be subject to mandatory
detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the
INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the
immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to
detain (for those aliens not subject to mandatory detention), whether to offer an alternative to
removal such as voluntary departure or withdrawal of an application for admission, and whether
to stay an order of deportation.

     The decision to exercise any of these options or other alternatives in a particular case
requires an individualized determination, based on the facts and the law.  As a general matter, it
is better to exercise favorable discretion as early in the process as possible, once the relevant
facts have been determined, in order to conserve the Service's resources and in recognition of the
alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the
Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether
the exercise of prosecutorial discretion would be appropriate in individual cases.

AR01423

AR_DHSP_00000035

Memorandum for Regional Directors, et al.                                                    Page 7
Subject:  Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

∞  Immigration status: Lawful permanent residents generally warrant greater consideration.  However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
∞  Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
∞  Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation.  It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
∞  Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
∞  Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

AR01424

AR_DHSP_00000036

Memorandum for Regional Directors, et al.                                    Page 8
Subject:  Exercising Prosecutorial Discretion

∞   Likelihood of ultimately removing the alien:  Whether a removal proceeding would have a
    reasonable likelihood of ultimately achieving its intended effect, in light of the case
    circumstances such as the alien's nationality, is a factor that should be considered.
∞   Likelihood of achieving enforcement goal by other means:  In many cases, the alien's
    departure from the United States may be achieved more expeditiously and economically by
    means other than removal, such as voluntary return, withdrawal of an application for
    admission, or voluntary departure.
∞   Whether the alien is eligible or is likely to become eligible for other relief:  Although not
    determinative on its own, it is relevant to consider whether there is a legal avenue for the
    alien to regularize his or her status if not removed from the United States.  The fact that the
    Service cannot confer complete or permanent relief, however, does not mean that discretion
    should not be exercised favorably if warranted by other factors.
∞   Effect of action on future admissibility:  The effect an action such as removal may have on
    an alien can vary–for example, a time-limited as opposed to an indefinite bar to future
    admissibility–and these effects may be considered.
∞   Current or past cooperation with law enforcement authorities:  Current or past cooperation
    with the INS or other law enforcement authorities, such as the U.S. Attorneys, the
    Department of Labor, or National Labor Relations Board, among others, weighs in favor of
    discretion.
∞   Honorable U.S. military service:  Military service with an honorable discharge should be
    considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an
    NTA against current or former member of armed forces requires advance approval of
    Regional Director).
∞   Community attention:  Expressions of opinion, in favor of or in opposition to removal, may
    be considered, particularly for relevant facts or perspectives on the case that may not have
    been known to or considered by the INS.  Public opinion or publicity (including media or
    congressional attention) should not, however, be used to justify a decision that cannot be
    supported on other grounds.  Public and professional responsibility will sometimes require
    the choice of an unpopular course.
∞   Resources available to the INS:  As in planning operations, the resources available to the INS
    to take enforcement action in the case, compared with other uses of the resources to fulfill
    national or regional priorities, are an appropriate factor to consider, but it should not be
    determinative.  For example, when prosecutorial discretion should be favorably exercised
    under these factors in a particular case, that decision should prevail even if there is detention
    space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one
factor may deserve more weight than it might in another case.  There may be other factors, not
on the list above, that are appropriate to consider.  The decision should be based on the totality of
the circumstances, not on any one factor considered in isolation.  General guidance such as this
cannot provide a "bright line" test that may easily be applied to determine the "right" answer in
every case.  In many cases, minds reasonably can differ, different factors may point in different
directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

Memorandum for Regional Directors, et al.                                                Page 9
Subject:  Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may not be considered.  Impermissible factors include:

∞  An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
∞  The officer's own personal feelings regarding the individual; or
∞  The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

AR01426

AR_DHSP_00000038

Memorandum for Regional Directors, et al.                                      Page 10
Subject:  Exercising Prosecutorial Discretion

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if
appropriate, would be more useful to the INS if done sooner rather than later.  It would be
improper for an officer to assume that someone else at some later time will always be able to
make a more informed decision, and therefore never to consider exercising discretion.

     Factors relevant to exercising prosecutorial discretion may come to the Service's
attention in various ways.  For example, aliens may make requests to the INS to exercise
prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be
cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as
cancellation of removal that may only be available in that forum).  In either case, the INS may
consider the request, but the fact that it is made should not determine the outcome, and the
prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly,
the fact that an alien has not requested prosecutorial discretion should not influence the analysis
of the case.  Whether, and to what extent, any request should be considered is also a matter of
discretion.  Although INS officers should be open to new facts and arguments, attempts to
exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have
been thoroughly considered and decided, or for other improper tactical reasons should be
rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the
close of this memorandum) this memorandum creates no right or obligation enforceable at law
by any alien or any other party.

**Process for Decisions**

     *Identification of Suitable Cases*

     No single process of exercising discretion will fit the multiple contexts in which the need
to exercise discretion may arise.  Although this guidance is designed to promote consistency in
the application of the immigration laws, it is not intended to produce rigid uniformity among INS
officers in all areas of the country at the expense of the fair administration of the law.  Different
offices face different conditions and have different requirements.  Service managers and
supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop
mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to
exercise discretion as early in process as possible once the factual record has been identified.[8]  In
particular, in cases where it is clear that no statutory relief will be available at the immigration
hearing and where detention will be mandatory, it best conserves the Service's resources to make
a decision early.

     Enforcement and benefits personnel at all levels should understand that prosecutorial
discretion exists and that it is appropriate and expected that the INS will exercise this authority in
appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either
for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                    Page 11
Subject:  Exercising Prosecutorial Discretion

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the
favorable exercise of discretion to their attention for appropriate resolution.  To assist in
exercising their authority, DDs and CPAs may wish to convene a group to provide advice on
difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their
personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial
discretion.  These cases should then be reviewed at a supervisory level where a decision can be
made as to whether to proceed in the ordinary course of business, to develop additional facts, or
to recommend a favorable exercise of discretion.  Such triggers could include the following facts
(whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly
both within and between INS offices, this list of possible trigger factors for supervisory review is
intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to
suggest that the presence or absence of "trigger" facts should itself determine whether
prosecutorial discretion should be exercised, as compared to review of all the relevant factors as
discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended
solely as a suggested means of facilitating identification of potential cases that may be suitable
for prosecutorial review as early as possible in the process.

### Documenting Decisions

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision
should be clearly documented in the alien file, including the specific decision taken and its
factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of
facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial
discretion favorably, such as not placing him or her in removal proceedings or not pursuing a
case.  This normally should be done by letter to the alien and/or his or her attorney of record,
briefly stating the decision made and its consequences.  It is not necessary to recite the facts of
the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

Memorandum for Regional Directors, et al.                                        Page 12
Subject:  Exercising Prosecutorial Discretion

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed.  For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing.  This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

*Future Impact*

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion.  An alien may come to the attention of the INS in the future through seeking admission or in other ways.  An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances.  However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account.  In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

AR01429

AR_DHSP_00000041

Memorandum for Regional Directors, et al.                                          Page 13
Subject:  Exercising Prosecutorial Discretion

**Legal Liability and Enforceability**

The question of liability may arise in the implementation of this memorandum.  Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision.  We cannot promise INS officers that they will never be sued.  However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Training and Implementation**

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level.  This training will include discussion of accountability and periodic feedback on implementation issues.  In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated.  The regions will report to the Office of Field Operations when this training has been completed.



# Report: Crimes against migrants waiting in Mexico to seek U.S. asylum continue to climb

More than 630 violent crimes against asylum seekers affected by the Migrant Protection Protocols program have been reported in Mexico, according to a new report by Human Rights First.

BY **JULIÁN AGUILAR**    DEC. 5, 2019    5 PM CENTRAL

COPY LINK



AR01431

Migrants walk across an international bridge from the United States to Nuevo Laredo, Mexico, after requesting asylum in the U.S. 📷 Miguel Gutierrez Jr./The Texas Tribune

More than 600 migrants seeking asylum in the United States have been the victims of violent crimes in Mexico after being sent there under a controversial immigration policy, according to a report by Human Rights First.

There have been at least 636 reports of crimes like rape, kidnapping and torture since January, when the Trump administration's Migrant Protection Protocols program was implemented. Some of the alleged incidents involved more than one victim.

The watchdog organization said the latest tally is an increase of nearly 300 incidents since their report in October.

The program, also known as "remain in Mexico," requires asylum seekers to stay in Mexico until their court hearings in the United States. In Texas, MPP is in effect in the border cities of El Paso, Eagle Pass, Laredo and Brownsville, whose sister cities in Mexico have all seen sustained or increased violence this year.

The group said the report's sourcing includes interviews with asylum seekers, attorneys, court monitors, researchers, Mexican officials and media reports.

"The extensive and escalating public accounts of kidnappings and attacks on asylum seekers turned back to remain in Mexico are highly alarming," said Kennji Kizuka, the group's senior researcher and policy analyst. "What's worse is that many more men, women and children have certainly suffered attacks; the numbers we have are just cases that have been reported."

The Department of Homeland Security did not respond to a request for comment about Human Rights First's findings.

About 55,000 people have been sent back to Mexico under the program, and thousands of others are in Mexico under the Trump administration's metering policy, which requires asylum seekers to wait weeks or months before even applying.

The report said 130 children have been kidnapped or victims of attempted kidnappings. It also cites instances in which Department of Homeland Security officials apparently broke the agency's own rules by returning vulnerable

**AR01432**

populations, like pregnant women, the seriously ill, LGBTQ migrants or Mexican nationals.

Officials have also said the program has helped reduce fraudulent claims and alleviated overcrowding in Border Patrol and Immigration and Customs Enforcement facilities.

"It's one of our most successful initiatives," acting DHS Secretary Chad Wolf said last month in El Paso. "It's critical to what [the agents] do to control the flow. … We are able to do in a matter of months what would take years to do."

During a press briefing in Washington, D.C., last month, acting Customs and Border Protection Commissioner Mark Morgan said that safety was "ok" in Mexico and that reports of violence were "anecdotal," according to the report and attached transcript of the commissioner's remarks. He also said that during a recent State Department-led trip to Mexico, some shelters had continuous law enforcement protection.

But in recent trips to shelters or tent camps in the border cities of Ciudad Juárez and Matamoros, Texas Tribune reporters did not see security or law enforcement near the facilities. In Ciudad Juarez, some asylum seekers were told by shelter operators to limit the time they spend outdoors.

The MPP program is under review by the 9th Circuit Court of Appeals in California and has been allowed to continue while the case is pending.

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

AR01433



Donate

Contact Us

Advertise

© 2021 The Texas Tribune

**SOCIAL MEDIA**

Facebook

Twitter

YouTube

Instagram

LinkedIn

Reddit

Join our Facebook Group, This Is Your Texas.

**INFO**

About Us

Our Staff

Jobs

Who Funds Us?

Strategic Plan

Republishing Guidelines

Code of Ethics

Terms of Service

Privacy Policy

Send us a confidential tip

Corrections

Feeds

Newsletters

Audio

Video

AR01434



MAR  16  2000

MEMORANDUM FOR Regional Counsel
          For Distribution to District and Sector Counsel

FROM:              Bo Cooper
              General Counsel

SUBJECT:          Detention and Release of Aliens with Final Orders of Removal


      This memorandum clarifies the Service interpretation of the detention and release provisions of the Immigration and Nationality Act (INA) for aliens with final orders of removal.

      <u>Non-Criminal Aliens</u>

      During immigration court proceedings, the INS's determination as to whether to detain or release a non-criminal alien is governed by INA § 236(a). During the 90-day removal period, the INS must seek to remove the alien. See INA § 241(a)(1)(A).[1]

      Once the removal period commences, the INS may – but is not required to – detain a non-criminal alien until his removal is effected. See INA § 241(a)(2) (interpreted by INS and the Office of Immigration Litigation as only mandating detention for criminals and terrorists during the removal period). If the alien delays his removal (e.g., by failing to make timely application for travel documents), the removal period is extended beyond 90 days. The INS may continue to detain or may release the alien during this extended removal period. See INA § 241(a)(1)(C).



---

[1] However, the INS must comply with any judicial stay of removal.



### Criminal and Terrorist Aliens

During immigration court proceedings, the INS is required to detain all terrorists, all aggravated felons, and almost all other criminal aliens pursuant to INA § 236(c). The only criminal aliens who are not subject to § 236(c) are those who are deportable only under § 237(a)(2)(A)(i) (if sentenced to less than one year), § 237(a)(2)(A)(iv), and/or § 237(a)(2)(E). Those few criminal aliens to whom § 236(c) does not apply are subject to detention and release under INA § 236(a) during their immigration court proceedings.

Once the alien has an administratively final order of removal (i.e., an unappealed order of removal by an immigration judge or an order of removal by the Board of Immigration Appeals), the removal period begins. See INA § 241(a)(1)(B)(i).[2] Once the removal period begins, the alien is subject to mandatory detention pursuant to INA § 241(a)(2). If the alien delays his removal (e.g., by failing to make timely application for travel documents), the removal period is extended beyond 90 days. See INA § 241(a)(1)(C). The INS must continue to detain the alien during this extended removal period pursuant to INA § 241(a)(2) (which mandates detention even though INA § 241(a)(1)(C) permits release for other aliens during the extended removal period).

If the alien seeks judicial review (whether or not barred from doing so by INA § 242(a)(2)(C)), the removal period continues to run for a period of 90 days from the date of the final administrative order. However, if the court has issued a stay of the alien's removal (or if the alien has filed a petition for a writ of habeas corpus, in which case the INS accepts a stay automatically), the court's final order on the petition, if adverse to the alien, will trigger a new 90-day removal period. See INA §§ 241(a)(1)(A), 241(a)(1)(B)(ii). During the second removal period, the alien is once again subject to mandatory detention under § 241(a)(2).

If the INS has not removed the alien during the initial removal period, it may continue to detain him, as a criminal or a terrorist, pursuant to INA § 241(a)(6), or it may

---

[2] Unless a stay is in effect, the INS should seek to remove the alien.

AR01436

release him under an order of supervision pending removal pursuant to INA § 241(a)(3).[3] INA Sections 241(a)(6) and 241(a)(3) also apply to an alien who has not been removed by the expiration of any second removal period.

Should you have any questions, please contact Deputy General Counsel David Dixon or Associate General Counsel Arthur Strathern at (202) 514-2895.

241FLDrev

---

[3] Presumably, the INS would always detain terrorist aliens and would generally detain criminal aliens pursuant to INA § 241(a)(6). However, release of a criminal under INA § 241(a)(3) may be appropriate where the alien poses no risk and is not likely to be removed.

AR01437



OCT 18 2004

MEMORANDUM TO:    Robert C. Bonner
                  Commissioner
                  U.S. Customs and Border Protection

                  Michael J. Garcia
                  Assistant Secretary
                  U.S. Immigration and Customs Enforcement

FROM:             Asa Hutchinson
                  Under Secretary for Border and Transportation Security

RE:               <u>Detention Prioritization and Notice to Appear Documentary
                  Requirements</u>


This memorandum provides priorities for the detention of aliens and outlines
documentary requirements that must be met when transferring custody of aliens to
Immigration and Customs Enforcement (ICE), Office of Detention and Removal
Operations (DRO). The guidance in this memo supercedes all outstanding guidance
regarding priorities for the detention of aliens within Border and Transportation Security
(BTS). All BTS personnel must adhere to legal authorities and the procedures set forth
below in making decisions regarding whether to detain an alien.[1]


<u>I. Detention Priorities</u>

The following guidelines provide priority categories for the detention of aliens subject to
detention. An alien being considered for detention should be placed in the highest
numbered priority within the top category possible (i.e., an alien found to have a credible
fear of persecution with an aggravated felony conviction would still meet the
requirements of Mandatory, #2). In the case of mandatory detention, the Director of ICE
DRO is to heed the guidelines strictly. In all other cases, the DRO Director retains the
discretionary authority with respect to allocation of bed space and other detention-related
resources. In all cases, the DRO Director is to heed these guidelines to the greatest
extent possible when determining detention priorities.

---

[1] This policy does not supercede any requirement to release an alien under <u>Zadvydas v. Davis</u>, 533 U.S.
678 (2001) and implementing guidance in 8 CFR §§ 241.4, 241.13 and § 241.14 nor does it apply to
unaccompanied juveniles.

AR01438

All such aliens must be detained unless they fall within one of the exceptions to mandatory detention. There are no priority designations among categories of cases subject to mandatory detention. Questions as to whether a given alien falls under one of these categories and <u>must</u> be detained should be directed to local legal counsel.

**Mandatory**

- Aliens subject to mandatory detention under INA 236A[2]
- Aliens in expedited removal (INA § 235) with limited exceptions[3]
- Aliens subject to mandatory detention in removal and deportation proceedings under INA 236(c)[4]
- Aliens who have final orders of removal subject to mandatory detention under INA 241(a)(2), whether ordered removed pursuant to INA 238 or 240 proceedings[5]

**High Priority**

1. National Security Interest aliens including aliens who are subject to an ongoing national security investigation or who, by virtue of specific information or intelligence specific to the alien in question raise a national security concern, as identified either by 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection (CBP).[6]
2. Continued detention of aliens with final administrative orders past 180 days on account of special circumstances (i.e. 8 CFR 241.14).
3. Aliens who have been issued final removal orders over 90-days old, where removal is foreseeable.
4. Aliens who present an articulable danger to the community (claimant agency must be able to articulate the danger)
5. Aliens who exhibit specific, articuable intelligence-based risk factors for terrorism or national security concern not solely based on the alien's race, ethnicity, nationality or religion (as identified by either 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection.
6. Aliens associated with ongoing significant criminal investigations;

---

[2] Prior approval of the ICE National Security Unit and the ICE Office of the Principal Legal Advisor is required before charges may be brought under either INA § 212(a)(3) or INA § 237(a)(4).

[3] Not all aliens in expedited removal proceedings are subject to mandatory detention, however. See, for example 8 CFR § § 235.3(b)(2)(iii), 235.3(b)(4)(ii), and 235.3(b)(5)(i) allowing for parole in limited circumstances of medical emergency, or where necessary for a legitimate law enforcement objective.

[4] Note that INA 236(c)(2) authorizes release to provide for protection of a witness, etc., where the alien does not pose a danger to the safety of others or to property and is likely to appear for any scheduled proceedings.

[5] This includes aliens ordered removed under INA 240 and criminal aliens ordered removed under INA 238. These aliens may not be released under any circumstances during the 90-day removal period set forth in INA 241(a)(2). Following the 90-day period, the continued detention of such aliens should be determined pursuant to criteria in <u>Zadvydas</u>, *supra* and implementing guidance in 8 CFR §§ 241.4, 241.13, and 241.14.

[6] ICE and CBP shall track all cases where the two bureaus disagree on whether a particular alien poses a national security threat. CBP and ICE shall review these cases on a quarterly basis.

AR01439

7. Remaining criminal aliens not subject to 236(c) ;
8. Aliens whose detention is essential to national border enforcement initiatives;

**Medium Priority**
1. Suspected alien and narcotics smugglers
2. Aliens who committed fraud
3. Inadmissible, non-criminal aliens (other than expedited removal cases)

**Lower Priority**
1. Worksite enforcement arrests
2. Final orders (beyond 179 days-not likely to remove)
3. Aliens placed in expedited removal found to have a credible fear and referred for full 240 proceedings.
4. Other aliens not subject to required detention

II. Documentary requirements.

Each component must ensure apprehended aliens are processed efficiently and placed in the appropriate and most expedient removal process. (e.g. stipulated, reinstatement, administrative, expedited) At a minimum, the following documents must be completed by the apprehending entity and presented to DRO to ensure each case moves swiftly through the removal process:

- Original charging documents;
- Completed Form I-213 (Record of Deportable/Inadmissible Alien) or approved equivalent;
- 2 completed Forms FD-249 (fingerprint cards);
- R-84 Form with prints and biographical information completed;
- Print out of results, including negative responses, of name search in IBIS "SQ11" function.
- IAFIS printout relating to criminal history; if IAFIS is not available, print out of results, including negative responses, based on name search in either NCIC or NLETS.
- Record of Fingerprint Identification Number (FIN) generated by the Automated Biometric Identification System (IDENT);
- 4 photographs;
- Completed Form I-217 (Information for Travel Document or Passport if required);
- Documentation of Consular Notification;
- Certified conviction records, when applicable. In the event that conviction records are not immediately available, the arresting officer must provide written notification to the file that a Certified Copy of the Conviction Document has been requested, and include in the administrative file the following information: the exact date and jurisdiction where the alien was convicted, the name and telephone number of the referring officer and the supervisor, the name and contact

3

AR01440

information of the agency official responsible for procuring the conviction record. Furthermore, the arresting agency must produce the actual conviction record within 30 days of issuance of the NTA;[7]

- Documentation reflecting that appropriate record checks (Central Index System (CIS), Non-Immigrant Information System (NIIS), National Crime Information Center (NCIC), IDENT, Interagency Border Inspection System (IBIS), etc.) have been completed;
- Completed Form I-203 or I-203A [Order to Detain or Release Alien(s)] bearing the appropriate official's signature must accompany each detainee presented for detention;
- Notice of Custody Determination (Form I-286), indicating date and time custody decision was made and probable charges against alien;
- And any other relevant documents pertaining to the detainee.

To ensure maximum efficiency in the use of the Department's finite detention bed resources, it is imperative that this documentation is prepared and presented. Custody responsibility will not be transferred to ICE/Detention and Removal Operations (DRO) until ICE/DRO verifies that all of the above required documentation has either been provided or has been waived by an ICE/DRO authorizing official at the detention site. The arresting or delivering officer will ensure that detainees turned over to the custody of ICE/DRO are accompanied by any personal items, identity documents, baggage and/or prescription medications in that detainee's possession at the time of arrest.

The requirements I issued in my memorandum of March 30, 2004, *Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Department of Justice Inspector General*, remain in effect. You are responsible for ensuring implementation of these requirements.

---

[7] CBP shall establish within 30 days of this memorandum points of contact in each field office to coordinate obtaining conviction records for cases where the conviction record is not timely produced. Contact information shall be provided to the DRO Field Office Directors and the ICE Chief Counsels.

4

AR01441



JUL 2 4 2000

MEMORANDUM FOR     Regional Counsel
                        For Distribution to District Counsel

FROM:              Bo Cooper
                        General Counsel

SUBJECT:        Clarification of March 16, 2000 Memorandum Entitled
                        "Detention and Release of Aliens with Final Orders of
                        Removal"

       This is intended to clarify two points in the HQCOU memorandum of March 16, 2000 entitled "Detention and Release of Aliens with Final Orders of Removal."

       First, the issuance of a stay of removal by a reviewing federal court will neither stop nor extend the subject alien's 90 day removal period. The removal period will continue to run for the full 90 days, even though the INS cannot remove the alien due to the court's order. At the conclusion of that removal period, the INS must consider his release pursuant to § 241(a)(3) and (a)(6) of the Immigration and Nationality Act (INA). Regardless of whether the INS releases the alien, if the reviewing court that had stayed the alien's removal later issues a final order on the petition that is adverse to the alien, the INS has the benefit of a second 90 day removal period.[1]

       Second, confusion has arisen in connection with the sentence that states: "However, if the court has issued a stay of the alien's removal **(or if the alien has filed a petition for a writ of habeas corpus, in which case the INS accepts a stay automatically)**, the court's final order on the petition, if adverse to the alien, will trigger a new 90-day removal period" (emphasis added).

---

[1]   During the second 90 day removal period, the INS may take a previously-released alien back into custody under INA § 241(a)(2). If the alien is removable as either a criminal or a terrorist, he is again subject to mandatory detention during the second removal period. INA § 241(a)(2).

**AR01442**

Some have interpreted this language to mean that it is INS policy to agree "automatically" to an indefinite stay in all habeas corpus actions. Please be advised that this was not the intent of the language used in the March 16th memorandum. The government may oppose a stay motion in any habeas litigation where opposition is deemed appropriate. It is INS policy that these decisions will be made on a case-by-case basis.

However, the INS will not remove an alien who has a pending habeas petition without first notifying the court of our intention to do so.[2] If the court indicates that it does not want the INS to remove the alien, we should either ask the court to enter a stay, or stipulate to a stay if a stay is deemed appropriate, rather than merely informing the court that the INS will agree not to remove the alien.[3] If the court enters a stay, the INS must abide by it, of course. If, however, the court declines to enter a stay, the INS is not required to postpone the alien's removal.

Should you have any questions regarding this policy, please call Deputy General Counsel David Dixon or Associate General Counsel Arthur Strathern at (202) 514-2895

---

[2] As a matter of policy, a district may elect to postpone a removal automatically for a set period of time following the filing of a petition for a writ of habeas corpus. However, in order to discourage the filing of frivolous habeas petitions designed to frustrate scheduled removals, a district may also choose not to adopt such a policy, provided that the district still provides the court reasonable notice of the scheduled date and time of removal.

[3] This step guarantees the INS the benefit of a second 90-day removal period under INA § 241(a)(1)(B)(ii) if the court eventually rules in the government's favor, as discussed in the March 16th memorandum.

**Department of Homeland Security**
**DHS Directives System**
**Instruction Number: 044-01-001**
**Revision Number: 00**
**Issue Date: 6/10/2015**

# Implementing Department of Homeland Security Immigration Enforcement Priorities

## I.   Introduction

This Instruction implements the Department of Homeland Security (DHS) policies for the apprehension, detention, and removal of aliens in the United States.  This Instruction is Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).  This Instruction informs enforcement and removal activity and detention decisions.

In general, enforcement and removal policies continue to prioritize threats to national security, public safety, and border security.  DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.  DHS exercises prosecutorial discretion in the enforcement of the law and, in the exercise of that discretion, ensures that use of its limited resources is devoted to the pursuit of its priorities.

This Instruction implements two of Secretary Johnson's November 20, 2014 memoranda (listed in Section III, References) that directly impact the activities of immigration officers engaged in civil immigration enforcement by:

   A.     Setting forth Department-wide civil immigration enforcement priorities focused on national security, border security, and public safety including guidelines for the exercise of prosecutorial discretion at all stages of the enforcement process;

   B.     Discontinuing the Secure Communities Program and implementing the Priority Enforcement Program (PEP).

## II.   Purpose and Scope

This Instruction provides guidance to Components charged with the administration and enforcement of immigration laws, while ensuring adherence to the roles and methodologies of each Component.  The following procedures apply only to civil

Instruction # 044-01-001
Revision # 00

**AR01444**

immigration enforcement activities and are inapplicable to criminal investigations and civil enforcement action taken pursuant to or in furtherance of a criminal investigation.

Nothing in this Instruction should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as DHS immigration enforcement priorities in Secretary Johnson's November 20, 2014 memorandum entitled *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.  However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth, commensurate with the level of prioritization identified.  Immigration officers and attorneys may pursue removal of an alien not identified as a priority provided, in the judgment of a designated DHS Component Field Responsible Official, removing such an alien would serve an important federal interest.

This is a law enforcement-sensitive document.  This document contains information that would disclose techniques, procedures or guidelines for investigations or prosecutions and is exempt from release under the Freedom of Information Act.

# III.  References

A.      Policy Directive 044-02, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, Signed by Secretary Janet Napolitano on June 15, 2012.

B.      Policy Directive 044-03, *Secure Communities*, signed by Secretary Jeh Charles Johnson on November 20, 2014

C.      Policy Directive 044-04, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, signed by Secretary Jeh Charles Johnson on November 20, 2014

D.      USCIS Memorandum, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, issued on November 7, 2011.

# IV.  Definitions

The following definitions apply for purposes of this Instruction only:

A.      **Alien**:  Any person who is not a citizen or national of the United States.

Instruction # 044-01-001
Revision # 00

**AR01445**

B. **Biographic identifiers**:  Credible personal information obtained from a subject or a reliable third party (e.g., name, address, Social Security number, driver's license number, or permanent resident card) that can be used to identify an individual.

C. **Biometric identifiers**:  An objective measurement of an anatomical, physiological, or behavioral characteristic of an individual that, when associated with an identity in a system of records, can be used to verify an individual's identity (e.g., fingerprints).

D. **DHS Component Field Responsible Official (FRO)**:  CBP U.S. Border Patrol (USBP) Sector Chief Patrol Agents  and Office of Field Operations (OFO) Directors of Field Operations, ICE Enforcement and Removal Operations (ERO) Field Office Directors, Homeland Security Investigations (HSI) Special Agents in Charge, and the Chief Counsel of the Office of the Principal Legal Advisor (OPLA), and USCIS District Directors, USCIS Service Center Directors, and USCIS Asylum Office Directors.

E. **Enforcement action**:  An activity taken by DHS to address criminal or administrative violations.

F. **Immigration Officers:**  Any individual designated by the Secretary of Homeland Security, individually or by regulation, to perform the functions of an immigration officer, as described in 8 C.F.R. § 287.

G. **Interview**:  A meeting or conversation, telephonic or otherwise, in which an individual is questioned by an immigration officer about his/her citizenship, nationality, and inadmissibility or deportability from the United States.

H. **Vetting**:  The process of verifying the identity or other information about an individual through biographic and/or biometric identifiers.

# V.   Responsibilities

A. **DHS Component Field Responsible Officials (FROs)** are responsible for approving the exercise of prosecutorial discretion, when appropriate, commensurate with an alien's priority level, and for ensuring that their subordinates comply with the procedures provided in this Instruction.

B.  **ICE Enforcement and Removal Operations (ERO) Field Office Directors** have additional responsibilities under section VII (D) of this Instruction.

C. **United States Border Patrol (USBP) Agents** have responsibilities under

sections VI and VII (A) of this Instruction.

D.      **United States Customs and Border Protection Officers** have responsibilities under sections VI and VII (B) of this Instruction.

E.      **ICE Homeland Security Investigation (HSI) Special Agents** have responsibilities under sections VI and VII (C) of this Instruction.

F.      **ICE ERO Deportation Officers, Immigration Enforcement Agents and 287(g) Designated Immigration Officers** have their respective responsibilities under sections VI and VII (D) of this Instruction.

G.      **United States Citizenship and Immigration Services Officers** have responsibilities under sections VI and VII (F) of this Instruction.

# VI.  Procedures

The following procedures are to be applied universally by employees of the Components charged with the administration and enforcement of immigration laws during the course of enforcement actions.

A.      **Identification.**  Determine if an individual is an alien against whom DHS may take a civil enforcement action.  Immigration officers determine alienage and legal authority to enter or remain in the United States.  The identification process may include, but is not limited to, interviews and vetting.

B.      **Investigation and Assessment.**  Assess whether the alien's apprehension, detention, and/or removal meets one of the DHS civil immigration enforcement priorities.  This assessment is based on the totality of information known to the immigration officer at the time.  As additional facts present themselves throughout the course of the processing, detention, and removal process, it may become necessary to re-determine whether the alien continues to constitute an enforcement priority.

C.      **Consultation.**  In cases where there is any question whether the alien is a DHS enforcement priority, the immigration officer should consult with the appropriate DHS Component FRO and/or that official's designee.

D.      **Consideration of Evidence.**  At the discretion of each Component, the following evidence may be taken into consideration to assess the totality of the circumstances when determining whether the alien is an enforcement priority:

    1.      the alien's statements;

-4-

2.      background and record checks;

3.      documentation and information the immigration officer believes is relevant, including federal, state, and local forms of identification and records; or

4.      if the alien cannot reasonably provide valid government-issued evidence of identity, the immigration officer may consider affidavits, sworn to or affirmed by individuals (other than the alien) who have direct personal knowledge of the events and circumstances at issue, and who provide copies of valid, government-issued photo identification documents and fully establish their own identities and addresses.

E.      **Prosecutorial Discretion.**  DHS exercises prosecutorial discretion in the enforcement of the law and, in the exercise of that discretion, ensures that use of its limited resources is devoted to the pursuit of those priorities.  Prosecutorial discretion applies to the decision to issue, serve, file, or cancel a Notice to Appear, as well as a broad range of other discretionary enforcement decisions, including deciding:  whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case.  While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases.  DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process—from the earliest investigative stage to enforcing final orders of removal—subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.  The exercise of prosecutorial discretion is conducted on a case-by-case basis and no one factor is necessarily determinative.  Decisions should be based on the totality of the circumstances.

1.      In making such determinations, when information is available, DHS personnel should consider factors, such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in, civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative.  These factors are not intended to be dispositive nor is this list exhaustive.

-5-

2.      As defined in Appendix A, Priority 1 aliens must be prioritized for removal unless, in the judgment of a designated DHS Component FRO there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  Priority 2 aliens should be removed unless, in the judgment of a designated DHS Component FRO, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  For CBP, authority to favorably exercise prosecutorial discretion in the case of a Priority 1 or 2 alien may be delegated from a USBP Sector Chief Patrol Agent to a designee ranking no lower than Patrol Agent in Charge, or from an OFO Director of Field Operations to a designee ranking no lower than Port Director.  Upon determining, based upon the above considerations, that prosecutorial discretion may be appropriate in the case of a Priority 1 or Priority 2 alien, immigration officers are to communicate this information through their chain of command as soon as practicable.  The authority for exercising prosecutorial discretion in these cases rests with the FRO, except as noted above.

3.      An immigration officer, in accordance with the Component's policies and procedures, may exercise prosecutorial discretion in the case of Priority 3 aliens if, in the judgment of the immigration officer, the individual is not a threat to the integrity of the immigration system, or there are factors suggesting that the individual should not be an enforcement priority.

4.      If an officer believes the removal of an alien who is not otherwise identified as a priority would serve an important federal interest, the officer should communicate this information through his or her chain of command for further evaluation and appropriate action.  Only an FRO may determine that the removal of such an alien would serve an important federal interest.

5.      For purposes of determining whether an individual falls within Priority 3, during the transition period between the prior and new enforcement priorities, the following categories of individuals are evaluated on a case-by-case basis to determine whether their removal would serve an important federal interest:

a.      Individuals who were removed and illegally reentered the country before January 1, 2014 but whose prior removal orders were reinstated after January 1, 2014;

-6-

b.    Individuals ordered removed by an immigration judge before January 1, 2014, but whose timely appeals were denied on or after that date; and

c.    Individuals who were granted voluntary departure by an immigration judge or the Board of Immigration Appeals before January 1, 2014, and whose voluntary departure period expired on or after that date without them having departed (thereby converting their voluntary departure into a removal order).

5.    The normal expenditure of federal resources to prosecute and otherwise adjudicate an individual's immigration case, alone, will not determine whether removal of that individual serves an important federal interest.  Instead, the immigration officer should consider, on a case-by-case basis, the conduct of the individual and its impact on the integrity of the immigration system in the exercise of discretion.

F.    **Considerations in Applying Immigration Priorities.**  In applying the immigration priorities, the following considerations apply:

1.    National Security Threats.  In evaluating the range of aliens who pose a danger to national security, immigration officers should refer to the statutory language found in sections 212(a)(3) and 237(a)(4) of the *Immigration and Nationality Act (*INA), generally captioned under "Security and Related Grounds."  These sections encompass: (1) aliens who have engaged in espionage, sabotage, the illegal export of goods, technology, or sensitive information, and (2) aliens who have engaged in terrorist activities, including material support of terrorist organizations, solicitation of goods, funds or membership for terrorist acts or terrorist groups and the commission of terrorist activities as defined under the INA, and human rights violators as described in Section 2 below.

2.    Human Rights Violations and Relationship to National Security Threats.  The "otherwise poses a danger to national security" language in Priority 1(a) also includes those who have participated in serious violations of human rights.  This is consistent with the longstanding approach of the U.S. government that equates human rights violations with national security threats.  DHS should  be guided by the statutory language found in INA sections 208(b)(2)(A)(i), 212(a)(2)(G), 212(a)(3)(E), and 212(a)(3)(G).  These individuals would include aliens described as having engaged in, committed, ordered, incited, assisted, or otherwise participated in severe violations of religious freedom, Nazi persecution,

-7-

genocide, torture, extrajudicial killings, or use or recruitment of child soldiers, and aliens described as having ordered, incited, assisted, or otherwise participated in persecution.

3.        Juvenile Delinquency. An adjudication of juvenile delinquency is not treated as a conviction and will not, on its own, serve to render an alien an enforcement priority. However, if a juvenile is tried and convicted as an adult, such conviction is treated as a conviction for purposes of priorities determinations.

4.        Expunged Convictions. Expunged convictions are assessed on a case-by-case basis to determine whether, under the particular circumstances, including consideration of public safety, the expunged conviction should make an alien a priority for removal. In considering whether an expunged conviction should be considered, immigration officers should consult with their counsel regarding any questions.

5.        Domestic Violence. Perpetrators of domestic violence, depending on state law, are prosecuted either under generally applicable criminal statutes prohibiting assault and battery or under statutes specifically addressing domestic violence. Many states do not have specific domestic violence laws, but INA section 237(a)(2)(E)(i) applies if there was a domestic relationship between the perpetrator and victim. The memorandum's definition of domestic violence applies to convictions that are crimes of violence (as defined in section 16 of title 18) for acts of domestic violence regardless of how the state law categorizes them. Likewise, INA section 237(a)(2)(E)(i) applies to crimes of violence (as defined in section 16 of title 18) against spouses or domestic partners, both current and former, regardless of how the state law categorizes the offense.

In evaluating whether an offense constitutes a significant misdemeanor involving domestic violence, careful consideration should be given to whether the alien was also the victim of domestic violence and whether there was a connection between the conviction and the alien's own victimization. In such cases, this fact should be a mitigating factor.

6.        Driving Under the Influence (DUI). When determining whether a conviction for DUI is a significant misdemeanor, the elements of the applicable state law are considered. A conviction (requiring proof beyond a reasonable doubt) for DUI is a significant misdemeanor if the state statute of conviction: (1) constitutes a misdemeanor as defined by federal law (the minimum penalty includes imprisonment for more than 5 days but not more than 1 year); (2) requires the operation of a motor vehicle; and

(3) requires, as an element of the offense, either a finding of impairment or a blood alcohol content of .08 or higher.

a.      While individuals convicted of significant misdemeanors generally fall within Priority 2 of Secretary Johnson's November 20, 2014 enforcement priorities, the Secretary's guidance makes clear that, on a case-by-case basis, a designated DHS Component FRO (or appropriate designee, in the case of CBP) can determine that such an individual is not an enforcement priority when there are factors indicating that he or she is not a threat to national security, border security, or public safety.  As with all criminal convictions, these factors could include the length of time since conviction, age at the time the offense was committed, sentence and/or fine imposed, whether the conviction has been expunged, and evidence of rehabilitation.

b.      In the specific context of DUI offenses, such factors, if known to the officer, may also include the level of intoxication; whether the individual was operating a commercial vehicle; any additional convictions for alcohol or drug-related DUI offenses; circumstances surrounding the arrest, including presence of children in the vehicle, or harm to persons or property; mitigating factors for the offense at issue, such as the conviction being for a lesser-included DUI offense under state law, and other relevant factors demonstrating that the person is or is not a threat to public safety.

7.   Significant Abuse of the Visa System.  Aliens who, in the judgment of a designated DHS Component FRO, significantly abuse the visa or visa waiver programs may be deemed to meet Priority 2(d) for removal.  An FRO should consider the totality of the circumstance in making this decision.  An FRO may find significant abuse of the visa or visa waiver programs where the alien has committed intentional violations of the immigration laws that distinguish the alien as a priority because of the noteworthy or substantial nature of the violations or their frequency.  By itself, overstay of a visa or the period of admission under the visa waiver program does not constitute significant abuse.  The length of time an individual has overstayed his or her period of admission as a nonimmigrant should not generally be a factor in the determination.  Prior or subsequent immigration violations or an adverse credibility finding are not determinative but are relevant factors to be considered.  The commission of fraud when seeking an immigration benefit, at the time of entry, or during the visa application process is a significant matter that should be considered under the totality of the circumstances.

-9-

8.      Identity Theft Convictions.  With respect to identity theft-related convictions where immigration status is not an explicit element of the offense but may be related to the offense or arrest, DHS may presumptively regard such cases as falling within Priority 1(d), Priority 2(a), or Priority 2(b), as applicable.  But an immigration officer should be sensitive to the overall circumstances of the arrest and conviction in such cases, and should discuss such cases with his or her FRO. Circumstances that may be relevant in such cases include whether DHS was the agency that presented the case for prosecution, whether there is a victim in the case, the nature of any loss or harm experienced by the victim as a result of the crime, the sentence imposed as a result of the conviction (including whether the conviction was subsequently reclassified as a misdemeanor), whether there is any indication that the conviction has been collaterally challenged based on allegations of civil rights violations, and the nature and extent of the individual's criminal history.

G.      If an alien who is not an enforcement priority indicates that the issuance of a charging document would make him or her eligible for a perceived benefit and requests issuance of the charging document, the ICE or CBP officer may explain to the alien that he or she does not meet one of the Department's priorities, and that no further action is to be taken at that time.  This guidance does not limit USCIS's ability to issue an NTA consistent with its policy referenced in Section III C.

# VII.   Component Procedures

The following requirements and procedures guide the individual Component workforces on the implementation of the Department's guidance.

**United States Customs and Border Protection**

A.  **United States Border Patrol**

In accordance with the memoranda listed in section III(A) and III(D) of this Instruction:

1.      Upon encountering individual(s), USBP Agents are to determine alienage and legal status to enter/remain/reside in the United States.

2.      For aliens subject to removal proceedings, USBP Agents are to:

a.      Field process the subject with basic identifying/ biographical information (e.g. name, DOB, nationality) per sector guidelines;

       b.     Transport to the nearest USBP facility with processing and biometric enrollment capabilities and enroll aliens' biographic and biometric information into the e3 Processing system and the IDENT/ Next Generation Identification/Automated Biometric Identification System fingerprint system; and

       c.     Complete appropriate record checks, including wants and warrants, immigration history, and criminal records checks.

3.     For aliens who have been identified as a priority for removal or return, (and a determination has been made that prosecutorial discretion is not warranted), under current authorized processes, procedures and guidelines, USBP Agents are to:

       a.     Process alien under required document process (expedited removal, warrant of arrest/notice to appear, etc.); and

       b.     Document the case in the e3 Processing system.

4.     For individuals who demonstrate that they meet the guidelines for consideration of DACA under section III (D) of this Instruction, USBP Agents are to:

       a.     Complete an A-file on the alien with a Full Voluntary Return path;

       b.     Take sworn statement from the alien in order for them to outline their claim;

       c.     Obtain first- and second-line supervisory approval and concurrence from the sector-designated approving Agent (contact the Office of Chief Counsel (OCC) if legal questions arise);

       d.     Document the case appropriately in the e3 Processing system; and

       e.     Provide the USCIS Hotline number to the alien upon release (800-375-5283).

5.     For aliens who <u>do not</u> fall within one of the Enforcement Priorities, or for aliens determined to warrant an exercise of prosecutorial discretion (and who do not demonstrate that they meet the guidelines for consideration of DACA under section III (D) of this Instruction), USBP

Agents are to:

        a.      Complete an A-file on the subject with a Full Voluntary Return path;

        b.      Obtain first- and second-line supervisory approval and concurrence from the Sector designated approving Agent (contact OCC if legal questions arise); and

        c.      Document the case appropriately in the e3 Processing system.

6.      For aliens who <u>do not</u> fall within one of the listed Enforcement Priorities, but a determination has been made that placing the individual in removal proceedings would be in the federal government's interest, USBP Agents are to:

        a.      Obtain first- and second-line supervisory approval and concurrence from the FRO (contact OCC if legal questions arise);

        b.      Process those individuals under current authorized processes, procedures, and guidelines, including properly documenting the determination via the e3 Processing system; and

        c.      Coordinate with local ICE/ERO for detention space, if necessary.

7.      For an alien in the custody of a different law enforcement agency, who is an immigration enforcement Priority 1(a), (c), (d), or (e), or Priority 2(a) or (b), USBP Agents may issue:

        a.  Form I-247N (Request for Voluntary Notification of Release of Suspected Priority Alien)  in cases involving jursidictions that do not accept immigration detainers or where USBP does not yet have probable cause that the alien is removable;

        b.  Form I-247D (Immigration Detainer- Request for Voluntary Action) in cases involving cooperative jurisdictions and where there is probable cause that the subject is a removable alien. Contact OCC if legal questions arise.  Probable cause sufficient to support the issuance of an immigration detainer may be established with:

            i.     A final order of removal against the subject;

-12-

ii. The pendency of ongoing removal proceedings against the subject;

iii. Biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; or

iv. Statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

8. USBP Agents may also issue a Form I-247D (Immigration Detainer – Request for Voluntary Action) or Form I-247N (Request for Voluntary Norification of Release of Suspected Priority Alien) when a subject is transferred to the custody of another federal, state or local law enforcement agency for a proceeding or investigation and DHS intends to resume custody of the subject to complete its processing when the proceeding or investigation is concluded.

9. In cases in which an USBP Agent intends to seek the transfer of a priority alien outside of Priority 1(a), (c), (d), or (e); Priority 2(a) or (b), from a cooperative state or local LEA, the USBP Agent must comply with CBP policies and procedures applicable to such transfers, including the form or forms developed for use in such cases.

## B. **Office of Field Operations**

In accordance with the memoranda listed in section III(A) and III(B) of this Instruction:

1. Upon encountering individual(s), CBP Officers are to determine alienage and eligibility to enter, remain, or reside in the United States.

2. Arriving Aliens – Arriving aliens at a port of entry who are found inadmissible fall within Priority 1 and are processed and documented appropriately in SIGMA in accordance with existing policies and procedures.

-13-

3.      <u>Non-Arriving Aliens</u> - When CBP Officers encounter a non-arriving alien, they are to determine whether the alien falls under an Enforcement Priority under section VI or the Prosecutorial Discretion Procedures under section VII(E) of this Instruction, and, for aliens who may be subject to an enforcement action, perform the following actions:

a.      If not encountered at a port of entry, transport the alien to the nearest CBP facility with processing and biometric enrollment capabilities and enroll the alien's biographic and biometric information into SIGMA and the IAFIS fingerprint system;

b.      Complete appropriate record checks, including wants and warrants and criminal and immigration history checks; and

c.      Process appropriately in SIGMA in accordance with existing policies and procedures.

4.      For individuals who demonstrate that they meet the guidelines for consideration for DACA under section III (D) of this Instruction, (and who are not otherwise an Enforcement Priority), CBP Officers are to document such claim in SIGMA and, with the concurrence of first- and second-line supervisory approval, release the individual.

**U.S. Immigration and Customs Enforcement**

**C.      Homeland Security Investigations**

In accordance with the memoranda listed in section III(A) and III(B) of this Instruction:

1.      HSI Special Agents (SAs) are to carry out their primary mission of investigating transnational organized crimes including drug smuggling, money laundering, counter proliferation and illegal export of controlled sensitive technology, trade fraud, human smuggling and trafficking, and cybercrimes.  In the course of such criminal investigations, SAs may encounter individuals who are aliens.  In the furtherance of their investigations, SAs are to determine if such individuals are criminally culpable and face potential arrest and criminal charges.

2.      If the aliens do not face criminal charges related to the investigation, SAs are to assess whether such aliens fall under Enforcement Priority 1, 2, or 3.  After full administrative processing, SAs are to prioritize the transfer of aliens in these categories to ERO custody

-14-

for removal.  SAs are to exercise  prosecutorial discretion as early in the investigation as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases.  SAs are to document the exercise of prosecutorial discretion during encounters with both priority and non-priority aliens.

3.    SAs are to determine whether aliens encountered during an investigation may meet the guidelines for consideration of DACA under section III (D) of this Instruction.  SAs are to refer such aliens to USCIS for case-by-case determinations.

For specific requirements related to the proper documentation in the Enforcement Integrated Database Arrest Graphic User Interface for Law Enforcement (EAGLE) of priority enforcement and prosecutorial discretion decisions made by SAs, please refer to sections VII(D) (5)-(8) of this Instruction below.

**D.    Enforcement and Removal Operations**

In adherence to the memoranda listed in section III(A) and III(B) of this Instruction:

1.    ICE Officers may seek the transfer of any priority alien when the state or locality agrees to cooperate with such transfer.  However, under PEP, ICE Officers may seek the transfer of an alien in the custody of state or local law enforcement only when ICE has determined that the alien is an immigration enforcement Priority 1(a), (c), (d), or (e), or Priority 2(a) or (b). PEP does not apply to aliens detained in federal facilities.

2.    ICE Officers are to use the following forms to request notification of release and/or request temporary detention from local and state facilities:

a.    **Form I-247N Request for Voluntary Notification of Release of Suspected Priority Alien**.  A Form I-247N may be issued in any case that falls within Priority 1(a), (c), (d), or (e); Priority 2 (a) or (b), as defined in Appendix A of this document. A Form I-247N may be particularly helpful in the following circumstances:

i.    DHS does not yet have probable cause that an individival is a removable alien;

ii.    Law enforcement agencies (LEAs) are unwilling or unable to accept detainers, or otherwise refuse to cooperate

-15-

with DHS enforcement efforts, even in cases where probable cause does exist (e.g., not permitting DHS officers entry into jails to conduct interviews);

iii.     An alien is an immigration enforcement Priority 1(a), (c), (d), or (e), or Priority 2(a) or (b),  but enough information is not known and an investigation into the alien's immigration status and criminal history is ongoing; and/or

iv.     Other circumstances that ICE deems appropriate. Form I-247N does not request or authorize an LEA to detain the suspected alien beyond the time the alien is currently scheduled for release by the LEA, but instead requests advance notice of release.

b.     After a Form I-247N is issued and probable cause is established, a Form I-247D may also be issued for the alien.

c.     **Form I-247D - Immigration Detainer - Request for Voluntary Action.**  The Form I-247D may only be issued against individuals detained in local or state custody when the officer has established:

1)  That the subject falls within Priority 1(a), (c), (d), or (e); Priority 2(a) or (b); and

2)  ***Probable cause*** that the subject is a removable alien. Probable cause sufficient to support the issuance of an immigration detainer may be established with:

i.  A final order of removal;

ii.  The pendency of ongoing removal proceedings (e.g., filing of an NTA with the Immigration Court);

iii.  Biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

iv.  Statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that

-16-

affirmatively indicate that the subject either lacks lawful immigration status or notwithstanding such status  is removable under U.S. immigration law.

d.      Form I-247D requests that the LEA maintain custody of the alien for a period not to exceed 48 hours beyond the time when the alien would otherwise have been released from the LEA's custody to allow ICE to assume custody.  The LEA is not obligated by law to maintain custody of the subject for ICE, and this request only takes effect if the alien is served a copy of the form.

e.      In cases in which an ICE Officer intends to seek the transfer of a priority alien outside of Priority 1(a), (c), (d), or (e); Priority 2(a) or (b), from a cooperative state or local LEA, the ICE Officer must comply with ICE policies and procedures applicable to such transfers, including the form or forms developed for use in such cases.

3.      Detention

a.      As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law.

b.      ERO Field Office Directors should not expend detention resources, absent extraordinary circumstances or the requirements of mandatory detention, on aliens who are:

    i.      known to have a serious physical or mental illness;

    ii.      disabled;

    iii.      elderly;

    iv.      pregnant;

    v.      nursing mothers and primary caretakers of children,when such aliens are being placed in an adult-only facility;

    vi.      primary caretakers of an infirm person; or

    vii.      persons whose detention is otherwise not in the public

-17-

interest.

If an alien falls within the above categories and is subject to mandatory detention, FODS are encouraged to contact their local Office of Chief Counsel fo guidance.

4.      ICE Officers and Agents are to document all encounters regardless of the outcome.  Alerts have been added to the following Enforcement Integrated Database (EID) modules:

   a.      EID Arrest GUI for Law Enforcement (EAGLE);

   b.      Enforcement Alien Removal Module (EARM); and

   c.      Enforcement Alien Detention Module (EADM).

5.      For priority alien encounters, including those relating to aliens whose removal would serve an important federal interest, ICE Officers and Agents are to add the appropriate alert to the Bio tab in EAGLE.

6.      For encounters that resulted in the exercise of prosecutorial discretion, ICE Officers and Agents are to:

   a.      Create an encounter in EAGLE with the processing disposition (PD) - prosecutorial discretion in the Bio tab in EAGLE; and

   b.      Complete Form G-166c in EAGLE stating November 2014 Executive Actions.

7.      If Form I-247N or Form I-247D has been lodged in connection with an encounter that results in the favorable exercise of prosecutorial discretion, ICE Officers and Agents are to issue a new form to the LEA with the appropriate box marked to notify the law enforcement agency that it should disregard the original request.  The date that the previous request was issued should be included, if known.  The lifting of the request is documented in EARM with the lift code value P – prosecutorial discretion.

8.      For pre-final order aliens who are detained in ICE custody, ICE Officers and Agents are to complete a custody redetermination Form I-286 in Risk Classification Assessment or EADM.

9.     For final order cases, ICE Officers and Agents are to select the final order action/decision in EARM and select "Yes" for "Are there reasons that prevent removal of the alien at this time?"  Select prosecutorial discretion in the "Reason Preventing Removal" drop-down list and write <u>November 2014 Executive Actions release</u> in the comments section.

10.     When booking an alien out of ICE custody due to the exercise of prosecutorial discretion, ICE Officers and Agents are to select DACA or PD (prosecutorial discretion) from the "Release Reason" drop-down list in the Bookout Details section of Detention Book Out, as appropriate.

11.     For every alien that receives an exercise of prosecutorial discretion from ICE, ICE Officers and Agents are to add an Alert Code PD - prosecutorial discretion to the Bio tab in EAGLE or the Supporting Info tab in EARM/EADM, as appropriate.  A comment is optional.

## E. Monitoring of State and Local Law Enforcement Transfers

In accordance with the memoranda listed in section III(B) and pursuant to Appendix B of this Instruction, ICE, in conjunction with DHS's Office for Civil Rights and Civil Liberties (CRCL), has a role in ensuring that transfers from state and local law enforcement agency (LEA) custody to ICE for purposes of civil immigration enforcement are not based upon improper police practices by those LEAs.

1.     Notification.  When ICE officers or agents receive an allegation of, or themselves identify, improper LEA conduct, such as profiling on the basis of race, ethnicity, or limited English proficiency, that led to an individual's arrest and subsequent transfer to ICE custody for civil immigration enforcement, they are to refer the allegation to the CRCL Compliance Branch.  The Detention Reporting and Information Line (DRIL) is to also refer any such allegations it receives to CRCL.

2.     Statistical Output and Modeling Development.  ICE and CRCL will develop a quarterly statistical package to enable CRCL statistical modeling.  The package involves customized output of data and fields regularly maintained by ICE.  Based on Fiscal Year quarters, six months from the issuance of this Instruction, ICE will provide this data on a quarterly basis.  The contents of the data package are subject to periodic reexamination.  The data may contain personally identifiable information (PII), as appropriate to the needs of the project.  ICE will provide CRCL

with technical assistance in understanding the data delivered and, where appropriate, advice on appropriate modeling and inferences.

3.      Outreach to LEAs.  ICE will assist CRCL in identifying and approaching appropriate points of contact with LEAs about whom CRCL has concerns.  While neither Component has compulsory investigative authority over LEA civil rights compliance, each will undertake reasonable and responsive best efforts to obtain information voluntarily to facilitate CRCL's inquiries.

4.      Quarterly Reports, Meetings, and Remedial Steps.  ICE will meet quarterly with CRCL to discuss CRCL's quarterly report regarding custody transfers, the status of any ongoing adaptive or remedial actions, and the need for any new adaptive or remedial actions.

5.      Public messaging.  ICE will collaborate with CRCL on messaging regarding the monitoring program and in determining the contents of any data released to the public related to CRCL statistical monitoring.

6.      System improvements.  ICE will develop a system, as a component element of the DHS immigration data integration project, for tracking all transfers of arrestees from LEA custody to ICE civil custody, including those who are transferred outside of PEP, through an enhancement to the appropriate system of record.  This system will enable more direct monitoring of jail transfers arising outside of PEP.  ICE will consult with CRCL during the development of this system to ensure that it provides CRCL with necessary and useful data to monitor such transfers, including identification of the arresting LEA, the LEA holding custody, the timing and circumstances of the transfer, the nature of the information communicated from the LEA to ICE outside of PEP, and other relevant data.

## F.  U.S. Citizenship and Immigration Services

In accordance with the memoranda listed in section III(A) and III(B) of this Instruction, and because the memorandum listed in section III(A) is not intended to modify USCIS Notice to Appear policies, which remain in force and effect, USCIS will:

1.      Issue NTAs required by statute or regulation, including:

a.      Termination of Conditional Permanent Resident Status and Denials of Form I-751 (8 Code of Federal Regulations (CFR) 216.3, 216.4, 216.5);

-20-

      b.      Termination of Conditional Permanent Resident Status and Denials of Form I-829 (8 CFR 216.6);

      c.      Termination of refugee status by the DD (8 CFR 207.9);

      d.      Denials of NACARA 202 (8 CFR 245.13(m)) and HRIFA adjustments (8 CFR 245.15(r)(2)(i)); and

      e.      Asylum (8 CFR 208.14(c)(1), 8 CFR 208.24(e)), NACARA 203 (8 CFR 240.70(d)), and Credible Fear cases (8 CFR 208.30(f))

2.      Continue to issue other NTAs in accordance with its policies to the extent they are not inconsistent with the  November 20, 2014 Enforcement Priorities.

# VIII.  Questions

Questions or concerns regarding this Instruction should be directed to the respective DHS component chain of command.

# IX.  Rights and Procedures

This is an internal procedures statement of DHS.  It is not intended to and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States; its departments, agencies, or other entities; its officers or employees, or any other person.

_____        6/10/15
Russell C. Deyo                          Date
Under Secretary for Management

# APPENDIX A
# Enforcement Priorities

As set forth in Secretary of Homeland Security Johnson's November 20, 2014 memorandum, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, the DHS immigration enforcement priorities are as follows:

**Civil Immigration Enforcement Priorities**

The following shall constitute the Department's civil immigration enforcement priorities:

**Priority 1 (threats to national security, border security, and public safety)**

Aliens described under Priority 1 represent the highest priority to which enforcement resources should be directed.

    (a) Aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

    (b) Aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

    (c) Aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

    (d) Aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

    (e) Aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* (INA) at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

AR01465

**Priority 2 (misdemeanants and new immigration violators)**

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

    (a) Aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element was the alien's immigration status, provided the offenses arise out of three separate incidents;

    (b) Aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above is one for which the individual was sentenced to time in custody of 90 days or more (the sentence involves time to be served in custody, and does not include a suspended sentence);

    (c) Aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

    (d) Aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority.

**Priority 3 (other immigration violators):**

Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly toward removal of the following:

    (a) Those who have been issued a final order of removal on or after January 1, 2014.

-23-

Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

# APPENDIX B
## Monitoring and Addressing Civil Rights Complaints and Concerns Arising from Transfers from State or Local Law Enforcement Custody

### I. Purpose

On November 20, 2014, Secretary of Homeland Security Johnson issued a memorandum entitled *Secure Communities*, in which he acknowledged the important law enforcement goal of more effectively identifying and facilitating the removal of criminal aliens in the custody of state and local law enforcement agencies. In order to address criticisms of the program, the Secretary directed ICE to discontinue the Secure Communities program and to put in its place the Priority Enforcement Program (PEP).

PEP relies on fingerprint-based biometric data, submitted during bookings by state and local law enforcement agencies (LEAs) to the Federal Bureau of Investigation, to identify priority aliens in LEA custody for potential enforcement action. PEP and the DHS enforcement priorities serve to significantly limit the potential for abuse. LEAs may cooperate in the transfer of priority aliens outside the PEP framework as well.

Recognizing the need to support community policing and maintain community trust, Secretary Johnson further directed that DHS, pursuant to a plan developed by the Office for Civil Rights and Civil Liberties (CRCL), monitor these activities, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and to establish effective remedial measures to stop any such misuses.

CRCL has authority to investigate whether federal immigration enforcement activities, including those initiated based upon criminal arrests by state and local LEAs, may serve as a conduit for improper policing activities by those LEAs. CRCL investigates, identifies, and reports on areas of concern; to develop relevant facts; and where necessary to establish effective remedial measures, with respect to aliens who are transferred to ICE custody following an arrest by an LEA.

This instruction supersedes the June 14, 2011 memorandum from then-CRCL Officer Margo Schlanger and then-ICE Executive Associate Director Gary Mead, entitled *Secure Communities Complaints Involving State or Local Law Enforcement Agencies*.

### II. Identification and Monitoring

Instruction # 044-01-001
Revision # 00

**AR01468**

Civil rights concerns regarding the use of transfers to ICE by state or local LEAs to support or engage in biased policing may come to the attention of ICE or CRCL through several channels, including:

- *Notification of individual complaints:* Allegations alleging improper LEA conduct that led to an individual's arrest and subsequent transfer to ICE custody, such as profiling on the basis of race, ethnicity, or limited English proficiency;

- *Community and public concerns:* External stakeholders, including nongovernmental organizations, advocates, or media representatives, may provide reliable information indicating improper LEA practices; and

- *Statistical monitoring:* CRCL's analysis of information routinely collected by ICE may identify patterns or trends consistent with improper police practices, warranting additional review.

Allegations by the public of this nature should be directed to CRCL's Compliance Branch. Where ICE receives an allegation of improper LEA conduct, or identifies information suggesting improper police practices, ICE refers such information to CRCL.

Not less than quarterly, CRCL monitors these transfers through statistical modeling. The information includes biometric submission and match data through PEP as well as ICE data on prioritization of aliens encountered and enforcement actions taken.

### III. Assessing Civil Rights Concerns

CRCL assesses civil rights concerns at the state, county, and individual law enforcement agency levels as appropriate.

Although this Department is neither charged with nor possesses broad legal authority to investigate the activities of state and local LEAs, CRCL will to use all available and lawful means to identify when concerns arise from allegations of biased policing, misuse of federal information systems, or any other allegation of improper LEA practices that may impact federal immigration enforcement. CRCL may review DHS records and data; interview DHS personnel and complainants; and request information from LEAs. As needed, additional DHS Components provide support in aid of these efforts.

### IV. Remedial Measures

On a quarterly basis, CRCL provides ICE and the Deputy Secretary of Homeland Security with a report of jurisdictions of concern (if any), and the basis for the concern. ICE and CRCL meets quarterly to discuss this report, the status of any ongoing

assessments, adaptive or remedial actions previously implemented, and the need for any new adaptive or remedial action.

Where CRCL has received information that alleges biased policing, and CRCL has identified significant concerns with that jurisdiction's implementation, CRCL notifies ICE and Deputy Secretary of Homeland Security in order to develop an appropriate Departmental response. ICE acts on this information as appropriate. Early reporting on significant concerns is expected, particularly when they are the result of public allegations or reports of misconduct. CRCL provides as much transparency as reasonably feasible, consistent with law and policy, and develops appropriate outreach and public engagement plans.

If CRCL assesses or develops a good-faith basis to conclude that an LEA participating in transfers to ICE may be in violation of federal civil rights law, including but not limited to 42 U.S.C. § 14141, it notifies the U.S. Department of Justice, Civil Rights Division. CRCL may also communicate similar concerns to state attorneys general or other entities with appropriate jurisdiction.

Policy Number: 10075.1
FEA Number: 306-112-0026

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



## U.S. Immigration and Customs Enforcement

June 17, 2011

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Exercising Prosecutorial Discretion Consistent with the Civil
                    Immigration Enforcement Priorities of the Agency for the
                    Apprehension, Detention, and Removal of Aliens

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) personnel
guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration
enforcement resources are focused on the agency's enforcement priorities. The memorandum
also serves to make clear which agency employees may exercise prosecutorial discretion and
what factors should be considered.

This memorandum builds on several existing memoranda related to prosecutorial discretion with
special emphasis on the following:

- Sam Bernsen, Immigration and Naturalization Service (INS) General Counsel, Legal
  Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976);
- Bo Cooper, INS General Counsel, INS Exercise of Prosecutorial Discretion (July 11,
  2000);
- Doris Meissner, INS Commissioner, Exercising Prosecutorial Discretion (November 17,
  2000);
- Bo Cooper, INS General Counsel, Motions to Reopen for Considerations of Adjustment
  of Status (May 17, 2001);
- William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (October 24,
  2005);
- Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (November 7,
  2007);
- John Morton, Director, Civil Immigration Enforcement Priorities for the Apprehension,
  Detention, and Removal of Aliens (March 2, 2011); and
- John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and
  Plaintiffs (June 17, 2011).

AR01471

The following memoranda related to prosecutorial discretion are rescinded:

- Johnny N. Williams, Executive Associate Commissioner (EAC) for Field Operations, Supplemental Guidance Regarding Discretionary Referrals for Special Registration (October 31, 2002); and
- Johnny N. Williams, EAC for Field Operations, Supplemental NSEERS Guidance for Call-In Registrants (January 8, 2003).

<u>Background</u>

One of ICE's central responsibilities is to enforce the nation's civil immigration laws in coordination with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE, however, has limited resources to remove those illegally in the United States. ICE must prioritize the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system. These priorities are outlined in the ICE Civil Immigration Enforcement Priorities memorandum of March 2, 2011, which this memorandum is intended to support.

Because the agency is confronted with more administrative violations than its resources can address, the agency must regularly exercise "prosecutorial discretion" if it is to prioritize its efforts. In basic terms, prosecutorial discretion is the authority of an agency charged with enforcing a law to decide to what degree to enforce the law against a particular individual. ICE, like any other law enforcement agency, has prosecutorial discretion and may exercise it in the ordinary course of enforcement[1]. When ICE favorably exercises prosecutorial discretion, it essentially decides not to assert the full scope of the enforcement authority available to the agency in a given case.

In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:

- deciding to issue or cancel a notice of detainer;
- deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
- focusing enforcement resources on particular administrative violations or conduct;
- deciding whom to stop, question, or arrest for an administrative violation;
- deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
- seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;

---

[1] The Meissner memorandum's standard for prosecutorial discretion in a given case turned principally on whether a substantial federal interest was present. Under this memorandum, the standard is principally one of pursuing those cases that meet the agency's priorities for federal immigration enforcement generally.

**AR01472**

- settling or dismissing a proceeding;
- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

Authorized ICE Personnel

Prosecutorial discretion in civil immigration enforcement matters is held by the Director[2] and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities:

- officers, agents, and their respective supervisors within Enforcement and Removal Operations (ERO) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- officers, special agents, and their respective supervisors within Homeland Security Investigations (HSI) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- attorneys and their respective supervisors within the Office of the Principal Legal Advisor (OPLA) who have authority to represent ICE in immigration removal proceedings before the Executive Office for Immigration Review (EOIR); and

- the Director, the Deputy Director, and their senior staff.

ICE attorneys may exercise prosecutorial discretion in any immigration removal proceeding before EOIR, on referral of the case from EOIR to the Attorney General, or during the pendency of an appeal to the federal courts, including a proceeding proposed or initiated by CBP or USCIS. If an ICE attorney decides to exercise prosecutorial discretion to dismiss, suspend, or close a particular case or matter, the attorney should notify the relevant ERO, HSI, CBP, or USCIS charging official about the decision. In the event there is a dispute between the charging official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute with the local supervisors of the charging official. If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

---

[2] Delegation of Authority to the Assistant Secretary, Immigration and Customs Enforcement, Delegation No. 7030.2 (November 13, 2004), delegating among other authorities, the authority to exercise prosecutorial discretion in immigration enforcement matters (as defined in 8 U.S.C. § 1101(a)(17)).

AR01473

Factors to Consider When Exercising Prosecutorial Discretion

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and conditions in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and
- whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

AR01474

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

- veterans and members of the U.S. armed forces;
- long-time lawful permanent residents;
- minors and elderly individuals;
- individuals present in the United States since childhood;
- pregnant or nursing women;
- victims of domestic violence, trafficking, or other serious crimes;
- individuals who suffer from a serious mental or physical disability; and
- individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

- individuals who pose a clear risk to national security;
- serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
- known gang members or other individuals who pose a clear danger to public safety; and
- individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

Timing

While ICE may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing the enforcement proceeding. As was more extensively elaborated on in the Howard Memorandum on Prosecutorial Discretion, the universe of opportunities to exercise prosecutorial discretion is large. It may be exercised at any stage of the proceedings. It is also preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion. Although affirmative requests from an alien or his or her representative may prompt an evaluation of whether a favorable exercise of discretion is appropriate in a given case, ICE officers, agents, and attorneys should examine each such case independently to determine whether a favorable exercise of discretion may be appropriate.

In cases where, based upon an officer's, agent's, or attorney's initial examination, an exercise of prosecutorial discretion may be warranted but additional information would assist in reaching a final decision, additional information may be requested from the alien or his or her representative. Such requests should be made in conformity with ethics rules governing

AR01475

communication with represented individuals[3] and should always emphasize that, while ICE may be considering whether to exercise discretion in the case, there is no guarantee that the agency will ultimately exercise discretion favorably. Responsive information from the alien or his or her representative need not take any particular form and can range from a simple letter or e-mail message to a memorandum with supporting attachments.

Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[3] For questions concerning such rules, officers or agents should consult their local Office of Chief Counsel.

AR01476



February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:    John Kelly
Secretary

SUBJECT:    **Implementing the President's Border Security and
Immigration Enforcement Improvements Policies**

    This memorandum implements the Executive Order entitled "Border Security and
Immigration Enforcement Improvements," issued by the President on January 25, 2017, which
establishes the President's policy regarding effective border security and immigration
enforcement through faithful execution of the laws of the United States. It implements new
policies designed to stem illegal immigration and facilitate the detection, apprehension, detention,
and removal of aliens who have no lawful basis to enter or remain in the United States. It
constitutes guidance to all Department personnel, and supersedes all existing conflicting policy,
directives, memoranda, and other guidance regarding this subject matter—to the extent of the
conflict—except as otherwise expressly stated in this memorandum.

**A. Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.**

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1.  When removing the alien from the United States pursuant to statute or regulation;

2.  When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (DHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3.  When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4.  When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

2

AR01478

5.     When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6.     When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

## B. Hiring More CBP Agents/Officers

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall—while ensuring consistency in training and standards—immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

3

AR01479

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

## C. Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

## D. Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

4

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

### E. Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

### F. Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise—and using materials originating in the United States to the maximum extent permitted by law—shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

### G. Expanding Expedited Removal Pursuant to Section 235(b)(1)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

5

**AR01481**

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).
[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.
[3] *Id.*

AR01482

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

## H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

## I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

7

AR01483

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

## J. Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] See INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] See INA § 235(b)(1)(B)(v).
[6] See id.
[7] Id.

AR01484

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

## K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

9

AR01485

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

### L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).
[9] *See* 8 U.S.C. § 1232(b)(3).
[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

10

AR01486

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

### M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

### N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

11

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border—including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

## O. Public Reporting of Border Apprehensions Data

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

12

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

## P. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

AR01489

**8 Immigration Law Service 2d PSD Selected DHS Document 920**

*Immigration Law Service, Second Edition* | August 2022 Update

SELECTED DHS DOCUMENTS

Asylum and Refugees

# Detention Policy Where an Immigration Judge has Granted Asylum and ICE has Appealed (Feb. 9, 2004)

| | |
|---|---|
| MEMORANDUM FOR: | Anthony Tangeman |
| | Deputy Executive Associate Commissioner |
| | Office of Detention and Removal |
| FROM: | Michael J. Garcia |
| | Assistant Secretary |
| SUBJECT: | Detention Policy Where an Immigration Judge has Granted |
| | <u>Asylum and ICE has Appealed</u> |

(*Date stamp:* Feb 9 2004)

This memorandum reiterates the U.S. Immigration and Customs Enforcement (ICE) policy where the immigration court has granted asylum (or other protection relief, such as withholding of removal or protection under the Convention Against Torture) and ICE has entered an appeal of the decision which is pending before the Board of Immigration Appeals.

In general, it is ICE policy to favor release of aliens who have been granted protection relief by an immigration judge, absent exceptional concerns such as national security issues or danger to the community and absent any requirement under law to detain.

For cases where a bond has been required but not posted, the bond should be reviewed following an immigration judge's grant of asylum so that an alien can be released in accordance with this ICE policy. Arriving aliens should be considered for parole.

In all cases, the Field Office Director must approve a decision to keep an alien granted protection relief in custody pending appeal, in consultation with the Chief Counsel. This review cannot be delegated beyond the Field Office Director or anyone acting in that capacity.

If you have any questions regarding this memorandum, please contact your local Chief Counsel.

cc: Victor **Cerda**

Acting Principal Legal Advisor

MEMORANDUM FOR CHIEF COUNSEL

| | |
|---|---|
| FROM: | Victor X. **Cerda** |
| | Acting Principal Legal Advisor |
| SUBJECT: | Policy on Appeals of CAT Grants |

(*Date stamp:* Feb 12 2004)

This memorandum clarifies the appeal policy as it relates to grants of protection under Article 3 of the United Nations Convention Against Torture ("CAT"). Chief Counsel are not required to reserve appeal on all grants of CAT protection by the Immigration Judges. Instead, Chief Counsel and Assistant Chief Counsel should exercise their judgment in determining the type of cases that warrant reserving appeal, based on the individual facts of each case, BIA precedent, and applicable case law. Chief Counsel shall abide by current appeal policy guidelines in determining whether to pursue an appeal.

Westlaw. © 2022 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.



**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

February 21, 2017

MEMORANDUM FOR:   All ERO Employees

FROM:   Matthew T. Albence
Executive Associate Director

SUBJECT:   Implementing the President's Border Security and Interior
Immigration Enforcement Policies

On February 21, 2017, Secretary Kelly issued the attached memoranda, "Implementing the
President's Border Security and Immigration Enforcement Improvements Policies," and
"Enforcement of the Immigration Laws to Serve the National Interest." These new polices
outline the role of the Department of Homeland Security (DHS) in the implementation of
Executive Order (E.O.) 13767, "Border Security and Immigration Enforcement Improvements,"
82 Fed. Reg. 8793 (Jan. 25, 2017), and E.O. 13768, "Enhancing Public Safety in the Interior of
the United States," 82 Fed. Reg. 8799 (Jan. 25, 2017). Effective immediately, Enforcement and
Removal Operations (ERO) will implement this direction from the Secretary, with particular
guidance as set forth below.

Additionally, U.S. Immigration and Customs Enforcement (ICE) is reviewing all existing
policies and guidance documents and will revise or rescind relevant policies in order to ensure
consistency with the E.O.[1]

### A. Enforcement Policy

Effective immediately, ERO officers will take enforcement action against all removable aliens
encountered in the course of their duties. As always, ERO officers must make an individualized
custody determination in every case, prioritizing detention resources on aliens subject to
expedited removal and aliens removable on any criminal ground, security or related ground, or
for grounds related to fraud or material misrepresentation. Under the terms of the E.O., DHS
will no longer exempt classes or categories of removable aliens from potential enforcement.

Additionally, regardless of the basis of removability, ERO officers should prioritize efforts to
remove aliens who:

---

[1] With the exception of the June 15, 2012 memo, "Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children," and the November 20, 2014 memo, "Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain
Individuals Who Are the Parents of U.S. Citizens or Permanent Residents."

**AR01492**

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

      (1) Have been convicted of any criminal offense;

      (2) Have been charged with any criminal offense that has not been resolved;

      (3) Have committed acts which constitute a chargeable criminal offense;

      (4) Have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency;

      (5) Have abused any program related to receipt of public benefits;

      (6) Are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or

      (7) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Aliens listed above do not necessarily have to be placed in removal proceedings based on a criminal ground of inadmissibility or removability. Instead, ERO officers should prioritize individuals within the above priorities for removal proceedings based on any lawfully available removal grounds.

## B. Detention Policy

The agency is currently expanding detention space to support the E.O.'s termination of "catch-and-release" policies.[2] ERO will work to detain aliens pending a final determination of whether they will be removed from the United States, including a determination regarding eligibility for immigration relief and protection. ERO officers should only release from detention an alien detained pursuant to section 235(b) of the Immigration and Nationality Act (INA) on a case-by-case basis, in accordance with applicable statues and regulations, in the following situations:

      (1) When removing the alien from the United States pursuant to statute or regulation;

      (2) When the alien obtains an order granting relief or protection from removal or DHS determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

      (3) A Field Office Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

      (4) When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

      (5) A Field Office Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director as expeditiously as possible; or

      (6) When an arriving alien processed under the expedited removal provisions of section

---

[2] The implementation of this provision may be dependent upon the deployment of a surge of immigration judges and asylum officers and the acquisition of additional detention space, as determined by the Secretary.

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed to ensure public safety and appearance at any removal hearings.

As the agency works to expand its detention capacity, detention of all such individuals may not be possible. Detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained.

## C. Release and Parole Policy

ERO officers should process requests for parole or other release sparingly, and only in individual cases where, after careful consideration of the circumstances, the officer believes that the release would serve the best interests of the United States because of demonstrated urgent humanitarian reasons or significant public benefit. Parole or other release, with all available safeguards, may also be warranted in instances where detention capacity limits the agency's ability to detain the alien consistent with legal requirements, including court orders and settlement agreements.

Agency policy establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or torture will remain in full force and effect until further evaluation is completed and additional guidance is issued.[3] ERO officers are reminded, however, to apply ICE policy consistent with its plain language, and to ensure that the alien is held to his or her burden of establishing identity and that his or her release will not pose a danger or risk of flight. There is no presumption that an individual alien's release would not pose a danger or risk of flight.

## D. Processing and Treatment of Unaccompanied Alien Minors

ERO officers will continue to comply with the requirements of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement Agreement, including all implementing policies and procedures, to ensure that all children, including unaccompanied alien children, are provided special protections to ensure that they are properly processed and receive appropriate care and placement when they are encountered by DHS officers and agents. Mexican and Canadian unaccompanied alien children may be permitted to withdraw their application for admission and return to Mexico or Canada after proper coordination with the Mexican or Canadian Consulate has been completed.

---

[3] Current agency policy is set forth in ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture, dated December 8, 2009, which is available here. The policy is implicated by pending litigation before the U.S. Supreme Court in *Jennings v. Rodriguez*, No. 15-1204, and as noted in the Secretary's February 17, 2017 memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies," is subject to further review and evaluation pending ongoing implementation of Executive Order 13767.

AR01494

Subject: Implementing the President's Border Security and Interior Immigration
        Enforcement Policies

Unaccompanied alien children who are permitted to withdraw may be repatriated at the nearest
port of entry to Mexican or Canadian Consulate officials at a time designated by the consulate
official.

### E.  No Private Right of Action

This document provides only internal ICE policy guidance, which may be modified, rescinded,
or superseded at any time without notice.  This guidance is not intended to, does not, and may
not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by
any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by
this guidance on the otherwise lawful enforcement or litigation prerogatives of ICE.

In implementing these policies, I direct all ERO employees to consult with legal counsel through
proper chain of command, to ensure compliance with all applicable laws, including the
Administrative Procedure Act.

AR01495

United States General Accounting Office

Report to the Chairman, Subcommittee on International Law, Immigration, and Refugees, Committee on Judiciary, House of Representatives

# GAO

June 1992

# IMMIGRATION CONTROL

## Immigration Policies Affect INS Detention Efforts





147090

RESTRICTED--Not to be released outside the General Accounting Office unless specifically approved by the Office of Congressional Relations.   554733

AR01496

AR01497

**GAO**

United States
General Accounting Office
Washington, D.C. 20548

General Government Division

B-248431

June 25, 1992

The Honorable Romano L. Mazzoli, Chairman
Subcommittee on International Law,
    Immigration, and Refugees
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

This report responds to the Subcommittee's request that we examine the Immigration and Naturalization Service's detention policy and practices.

As arranged with the Subcommittee, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days after the report date. At that time, we will send copies of this report to the Attorney General, Department of Justice; the Commissioner, Immigration and Naturalization Service; and other interested parties. Copies will also be made available to others upon request.

Major contributors to this report are listed in appendix III. Please call me on (202) 566-0026 if you have any questions.

Sincerely yours,

Harold A. Valentine
Associate Director, Administration
    of Justice Issues

AR01498

# Executive Summary

## Purpose

Immigration advocacy groups have questioned detention practices affecting illegal immigrants, implying that they violate civil and human rights and are arbitrary, capricious, and even discriminatory. For example, the decision to detain illegal immigrants from Haiti beginning in 1981 and continuing with the incarceration of certain Central Americans in 1989 has caused controversy.

The House Judiciary Subcommittee on International Law, Immigration, and Refugees, which expressed concern about these issues, asked GAO to review the Immigration and Naturalization Service's (INS) detention policies and practices. Specifically, GAO analyzed the implementation of INS criteria and priorities governing alien detention and length of detention to determine the basis on which INS detains aliens.

## Background

When Congress passed the Immigration and Nationality Act of 1952, the illegal flow of aliens into this country was not a major problem. Since then, however, the flow has become a torrent. Apprehensions of aliens illegally entering the country have risen from 45,000 in 1959 to 1.17 million in 1990.

INS apprehends aliens it wants to deport or exclude from the country. For the purposes of this report, excludable aliens are those persons to whom INS denies admission to the country. Deportable aliens are those persons who violate their condition of entry or enter illegally and are subject to deportation. Criminal aliens are those persons who were convicted of a crime (e.g., murder) for which they can be deported.

Aliens in all three groups, deportable, excludable, and criminal, are entitled to a hearing before an immigration judge to determine whether they should be deported or excluded. Pending the resolution of their cases, INS can detain the aliens, release them on bond, or release them on their own recognizance. To handle detainees, INS' detention capacity nationwide is 6,259 beds. In 1990, those detained by INS were held an average of 23 days. (See p. 12 and p. 16.)

In February 1991, INS established a flexible national detention policy and priority system. The system contains criteria to be used throughout INS in deciding which aliens to detain. Under the system, the highest priority is the detention of criminal aliens, followed by exclusion cases. The system permits INS field offices discretion in making their custody determinations. (See p. 14.)

AR01499

INS operates two programs that can result in somewhat reducing the demand on its detention capabilities.

- Under the institutional hearing program, criminal aliens are to have their deportation hearing while they are serving their sentences in state and federal facilities. If their hearings are not completed before the end of their sentences, INS detains them until the hearing process has been completed. (See p. 13.)
- Under the preflight inspection program, INS determines if the aliens should be permitted to enter the country before they depart from a foreign airport. As a result, excludable aliens are not permitted to land at domestic airports and do not have to be detained until INS can expel them. (See p. 40.)

While not explicitly a part of this INS priority system, laws and administrative policy also affect INS detention decisions regarding certain nationalities. For example, the Cuban Adjustment Act of 1966 recognized Cuban nationals as political refugees. In response to this act, INS does not detain Cubans for extended periods of time. (See p. 30.)

To make its analysis of INS detention policies and practices, GAO reviewed available records of all aliens (2,705) who were detained at the time of its visits at 13 detention facilities. (See p. 19.)

## Results in Brief

INS is faced with a complex problem of coping with the hundreds of thousands of aliens it apprehends. According to estimates, about 489,000 aliens were subject to detention for such reasons as awaiting deportation or being criminals between 1988 and 1990. INS' planned expansion from 6,259 to 8,600 beds by 1996 will not significantly alleviate the shortage of detention space.

Detaining all such aliens in current available facilities is impractical and cost prohibitive. On the other hand, detaining some but not all aliens may mean that aliens in similar circumstances are treated differently.

Given the average 23 days of detention per alien in 1990, INS can detain about 99,000 aliens a year at its current facilities. However, according to INS data, about 489,000 aliens were subject to detention between 1988 and 1990 because they were criminal, deportable, or excludable. INS has released criminal aliens and not pursued illegal aliens because it did not have the detention space to hold them.

AR01500

INS has made a good faith effort to implement its national priority system for determining which aliens to detain. However, GAO found that INS does not treat excludable aliens consistently—some were released within a few days, while others remained in detention for extended time periods. Whether INS detained an alien and for how long depended on the amount of available space where the alien was eventually detained, the location of the alien's apprehension, and laws and administration practices directed at certain nationalities.

In GAO's view, INS' need for increased detention space is symptomatic of larger enforcement issues relating to aliens that remain unresolved—how best to gain better control over the flood of aliens entering the country illegally and how to improve on efforts to remove aliens already in the country who do not have a legal basis to remain. Effective resolution of these issues will require Congress and the administration to decide whether and how to best control our borders and remove aliens who are illegally here. Until these issues are more fully resolved, it is unrealistic to expect INS to overcome its shortage of detention space.

# Principal Findings

## INS Does Not Have Sufficient Detention Capability

The increasing number of aliens who meet the criteria for removal from the country has placed a high demand on INS detention resources. INS projects that 88,800 criminal aliens will need to be detained in 1996. Large numbers of excludable and deportable aliens—as many as 400,000 according to INS estimates—will also be subject to detention. Meeting the need to detain the half million excludable, deportable, and criminal aliens annually who meet its detention criteria would impose enormous costs on INS—costs that are unlikely to be funded under current budget restrictions. (See p. 38 and p. 42.)

Limited detention space has led INS to release aliens in accordance with its priority criteria. For example, INS released 382 convicted criminal aliens on their own recognizance between October and December 1990 who had been detained in facilities in its Western Region. (See p. 41.)

## Programs to Mitigate Detention Have Minimal Effect

The institutional hearing and preflight inspection programs can mitigate the demand for detention space.

AR01501

- In 1990, INS reported that the institutional hearing program, although in place and operational in many states, was not operating at its full potential. In February 1991, INS reported that only about 6 percent of criminal aliens complete their deportation hearings before completing their sentences. (See p. 39.)
- INS operates the preflight inspection program at foreign airports in four countries. In May 1991, INS' New York District Office reported that by expanding the program to six European airports, approximately 25 percent of the exclusion cases at John F. Kennedy International Airport would be eliminated. (See p. 40.)

However, given the overwhelming number of apprehended aliens who are subject to detention, greatly expanding these programs would have only a minimal effect on INS's detention needs.

## Detention Differs Among Aliens

Of the aliens detained at the time of GAO's visit to 13 facilities, 915 were criminal aliens, 993 were deportable aliens, and 793 were excludable aliens. Their detention was generally consistent with INS' February 1991 detention policy and priority system for determining which criminal and excludable aliens to detain in available facilities. However, the results produced differences among nationalities and in the length of their detentions.

- INS detains Haitians who try to enter the country for extended periods of time. At INS' Krome detention facility, the average length of time those in GAO's sample had already spent in detention was 101 days, while Indians had been detained an average of 69 days. (See p. 27.)
- INS detains Chinese aliens as they try to enter the country in New York. Limited detention space in New York resulted in INS transferring some of the Chinese to its Denver facility. The time those in GAO's sample had spent in detention in New York was an average of 11 days compared to 86 days for those in Denver. The difference in detention time was related to the location of their detention rather than to their behavior or the factors surrounding their individual cases. (See p. 27.)
- Excludable aliens who were detained at the time of GAO's review had been detained an average of 56 days. Aliens who had illegally entered the country and were subsequently apprehended for noncriminal behavior had been detained an average of 47 days. (See p. 25.)

AR01502

## Matter for Congressional Consideration

Unless the programs designed to prevent aliens from illegally entering the country and to remove those who have no legal basis to remain here are made more effective, INS has little hope of detaining any more than a small fraction of the criminal and other aliens meeting its detention criteria. Inevitably, proposals to tighten the nation's borders and to expedite the expulsion of deportable aliens have to take into account their rights to constitutionally based protections and must deal with complex and sensitive issues, such as potential strains in relationships with Mexico and other nations, humanitarian concerns relating to equitable treatment of aliens, and difficult budgetary trade-offs. Nonetheless, until Congress comes to grips with these problems and trade-offs, little progress in resolving detention issues can be expected.

Congress may therefore wish to address border security and deportation issues in the course of future deliberations on immigration policy, specifically: How tight do we want our borders to be; how aggressively should we expel deportable aliens, and how much additional funding are we willing to invest in these efforts? (See pp. 43 to 44.)

## Agency Comments

Justice generally agreed with GAO's findings and recommendations and provided technical comments, which GAO incorporated where appropriate. (See p. 58.)

AR01503

AR01504

# Contents

| Executive Summary | | 2 |
|---|---|---|

**Chapter 1
Introduction** — 10

| Aliens Fall Into Several Categories | 10 |
|---|---|
| INS Enforcement | 12 |
| Executive Office for Immigration Review | 13 |
| INS Detention Policy | 13 |
| Increased Demand for Detention | 15 |
| Aliens' Rights | 17 |
| Objectives, Scope, and Methodology | 18 |

**Chapter 2
INS Implementation
of Detention Priorities
Affects Aliens
Differently** — 23

| Detained Aliens | 23 |
|---|---|
| Detention of Excludable Aliens | 27 |
| Detention of Selected Nationalities Was Affected by Statute or Administrative Policy | 29 |
| Conclusions | 34 |

**Chapter 3
Policy Solutions
Needed for INS to
Meet Its Detention
Demands** — 35

| INS Plans Expansion of Detention Capacity | 35 |
|---|---|
| Detention Space and Other Programs Cannot Address Influx of Aliens | 38 |
| Conclusion | 43 |
| Matter for Consideration by Congress | 44 |

**Chapter 4
Issues Affecting Alien
Representation** — 45

| Few Aliens Had Representation | 45 |
|---|---|
| Factors Contributing to Low Alien Representation | 46 |
| Impact of Representation | 49 |
| Conclusions | 52 |
| Recommendation to the Attorney General | 53 |

**Chapter 5
Excludable and
Detained Aliens
Requested Asylum** — 54

| Data on When Detained Aliens Request Asylum | 54 |
|---|---|
| Pilot Parole Program | 55 |
| Conclusion | 55 |

AR01505

# Appendixes

Appendix I: Length of Detention by Type of Alien and Site    58
Appendix II: Comments From the Department of Justice    60
Appendix III: Major Contributors to This Report    61

# Tables

Table 1.1: Detention Facilities Visited and Number of Cases Reviewed    20
Table 2.1: Criminal, Excludable, and Deportable Aliens Detained in INS Detention Facilities    25
Table 2.2: Average Days in Detention by Facility    26
Table 2.3: Average Days of Detention by Nationality and Site    27
Table 2.4: Average Length of Detention by Nationality for Aliens Detained at Krome    31
Table 3.1: Known Excludable Haitian Arrivals in Miami, Florida    36
Table 3.2: Projected Number of Criminal Aliens Detained and the Number of Beds Required to Hold Them    38
Table 3.3: Criminal Aliens Released to INS Custody in May 1990 and Processed Through the Institutional Hearing Program    39
Table 4.1: Representation Rate Among Facilities    47
Table 4.2: Legal Aid Organizations That Will Represent Criminal Aliens    48
Table 4.3: Accuracy of Legal Aid Lists    49
Table 4.4: Status of Case by Representation and Average Length of Detention    52

# Figures

Figure 1.1: Average Length of Detention    16
Figure 2.1: Site and Country of Origin for Detained Aliens    24

## Abbreviations

| | |
|---|---|
| BIA | Board of Immigration Appeals |
| EOIR | Executive Office of Immigration Review |
| INS | Immigration and Naturalization Service |
| TPS | temporary protected status |

AR01506

# Introduction

The Immigration and Nationality Act (8 U.S.C. 1101) authorizes the Attorney General to

- deport (expel) aliens who entered the country illegally, violated a condition of entry, or were convicted of certain crimes such as murder, manslaughter, or rape; and
- exclude (deny admission to) aliens who are not authorized to enter the United States.

The act further authorizes the Attorney General to detain aliens pending their deportation or exclusion hearings before an immigration judge. Pending the judge's determination of deportability, the Attorney General may continue to detain aliens without bond, release them on bond of not less than $500, or release them on their own recognizance. Most aliens are released on bond or their own recognizance. Also, aliens who are excludable are entitled to hearings and pending their hearings may be detained or temporarily admitted (paroled) into the country.

Within the Department of Justice, the Immigration and Naturalization Service (INS) is responsible for enforcing the act. The authority of the Attorney General to detain aliens has been delegated to INS district directors. INS offers most aliens whom it determines to be excludable or deportable (other than criminals and subversives) the opportunity to leave the country voluntarily. Should aliens decide not to do so, they are entitled to a hearing before they can be deported or expelled.

In fiscal year 1990, INS apprehended at borders and within the country 1.17 million aliens, most of whom had entered the country illegally (deportable). Of this total, about 1.02 million left the country voluntarily. In addition to these apprehensions, 27,213 deportable aliens were expelled; 887,923 excludable aliens who were stopped at ports of entry withdrew from the country voluntarily; and 3,700 excludable aliens, who had not agreed to withdraw voluntarily, were denied entry.

Department of Justice records show that as of September 30, 1990, between 40,000 and 50,000 aliens were either awaiting deportation or exclusion hearings and that approximately 250,000 aliens may have illegally remained in the country after being ordered to leave.

## Aliens Fall Into Several Categories

Aliens may be in the United States legally or illegally. Aliens may enter legally as either immigrants or nonimmigrants. Immigrants enter to

AR01507

become lawful permanent residents. Generally, legal entry requires aliens to first obtain visas at a U.S. consulate and appropriate travel documents, such as passports, from their own government. They then present themselves for INS inspection at a U.S. port of entry. In fiscal year 1990, a total of 1,536,483 aliens were admitted as immigrants. Of this total, about 880,000 became permanent resident aliens.

Nonimmigrants are admitted for a specified period of time for a specific purpose, such as tourism, business, or schooling. In fiscal year 1990, 17.6 million nonimmigrants arrived. Under certain conditions, nonimmigrants in the United States may apply to INS to have their status changed to that of immigrant.

Illegal aliens are aliens who enter by evading INS inspection. They might cross a U.S. border between ports of entry or enter at a port of entry and present fraudulent entry documents. Illegal entry is a criminal violation with a penalty of up to 6 months' imprisonment and/or a $500 fine upon conviction.

An alien is deemed excludable from entry if any 1 of 33 conditions set out in the act applies. If aliens are to be excluded from entry, INS needs to make the exclusion decision when the aliens present themselves for admission to the country at a port of entry. For example, aliens are excludable if INS can prove that they have a dangerous contagious disease; are narcotic addicts, convicted criminals, or members of subversive organizations; are seeking to enter to obtain unauthorized work; or lack valid visas, passports, or other required documents. INS has the authority to deny entry to those aliens who meet the exclusion conditions.

Aliens are deportable if after entering the country, either legally or illegally, they meet one of INS' 20 conditions for deportation. Under the act, aliens may be deported if, among other reasons, they

- were convicted of certain crimes (e.g., drug trafficking);
- were excludable at the time of their entry;
- entered illegally (i.e., without undergoing INS inspection);
- entered legally but violated the conditions of their entry, such as overstaying their required departure date or working without authorization;
- were smuggling other aliens into the country;
- are members of totalitarian or communist organizations or were associated with Nazi governments; or

AR01508

• advocate or engage in subversive activities.

For the purposes of this report, the term "criminal aliens" includes all aliens, legally or illegally residing in the United States, who have been convicted of a crime for which they could be deported. In contrast, the term "deportable alien" includes all noncriminal aliens whose only crime is being here illegally (e.g., entered illegally or violated their condition of entry).

# INS Enforcement

INS operates through a central office, 4 regional offices, 33 domestic district offices, 21 Border Patrol sectors, and 162 INS-staffed ports of entry.[1] INS' budget, including user fees, was about $1.1 billion for fiscal year 1991.[2] Within each district office, the structure consists of the following three major elements:

• The inspections group is responsible for facilitating the entry of qualified applicants to the country and identifies and denies admission to those who do not qualify for entry.[3]
• The detention and deportation group is responsible for detaining deportable and excludable aliens and for removing them from the United States.
• The investigations group is responsible for identifying, locating, and apprehending deportable aliens.

The Border Patrol is responsible for preventing the entry of aliens between ports of entry and apprehending aliens in border areas. In some areas, the Border Patrol also performs investigations to locate illegal aliens.

INS operates 9 detention facilities (i.e., service processing centers) capable of detaining 2,864 people. Through contracts, INS has the use of 5 facilities providing space for another 653 people. INS contracts with state and local prisons and jails to provide an additional 1,800 beds. It also uses a hospital with 110 beds and a Bureau of Prisons facility with 832 beds. Thus, INS has capacity to detain 6,259 aliens. INS' detention expenditures increased from $82 million to $149 million between fiscal years 1986 and 1990.

---

[1]Other ports of entry are not permanently staffed.

[2]INS is authorized to use the fees it collects to support its programs. For example, a $5 fee is collected from international travelers arriving at U.S. airports and seaports; this is used for inspection and related activities.

[3]In addition, inspections approves or denies applications and petitions for benefits such as visitors' requests to extend their stay in the country.

# Executive Office for Immigration Review

Within Justice, but separate from INS, the Executive Office for Immigration Review (EOIR) consists primarily of (1) immigration judges who conduct hearings to consider aliens' applications for relief from exclusion and deportation and ultimately decide whether or not to exclude or deport them, and (2) the Board of Immigration Appeals (BIA).

Immigration judges hold hearings throughout the country. As of April 1, 1992, 88 immigration judges were located in 20 cities and EOIR headquarters. In fiscal year 1991, immigration judges completed about 128,400 cases that involved alien deportability or excludability.[4]

In addition to the field offices, immigration judges also hold deportation hearings at selected federal and state prisons under the institutional hearing program. Under the program, which began in 1987, immigration judges can hold deportation hearings for criminal aliens while they are still incarcerated. If found deportable (and if any appeals are unsuccessful), aliens are deported after being released. Aliens incarcerated in a state prison that is not used for deportation hearings are transported to one that is used for hearings and returned after the hearing to their original prison. Seven federal prisons are used for deportation hearings.

BIA hears appeals from decisions of immigration judges and INS. BIA is a quasi-judicial body composed of a chairman and four members appointed by the Attorney General. It is located in Falls Church, Virginia, where it renders decisions for the entire country.

BIA relies on the record of the previous proceeding before an immigration judge to make a decision, but it may also hear oral arguments. Its decisions are binding on all INS officers and immigration judges unless modified or overruled by the Attorney General. The decisions are also subject to judicial review in the federal courts.[5] In fiscal year 1991, BIA completed about 13,700 cases that involved deportation and exclusion.

For fiscal year 1991, the total EOIR budget was about $38 million.

# INS Detention Policy

In February 1991, INS established a flexible national detention policy and priority system to enforce the immigration and nationality laws of the

---

[4]Other cases do not pertain directly to exclusion or deportation but involve issues such as aliens' requests to have bond amounts lowered.

[5]BIA decisions can be appealed through the federal district courts, the U.S. Court of Appeals, and—ultimately—the U.S. Supreme Court.

AR01510

United States and to comply with recent statutory requirements relating to criminal aliens. The system sets forth INS detention policy, in priority order, for the following six major groupings:

- The first group includes aliens who are (1) convicted for aggravated felonies, (2) convicted of other crimes, or (3) identified through the Alien Smuggler Identification and Deportation Project.[6]
- The second group includes excludable aliens who (1) have a criminal or terrorist history; (2) attempt to enter with fraudulent documents or without documents; and (3) are otherwise inadmissible (e.g., seeking to enter to obtain unauthorized work).
- The third group includes aliens who have committed fraud against INS (e.g., entered with fraudulent visas).
- The fourth group includes aliens who have failed to appear for their hearings or have been ordered deported.
- The fifth group includes aliens apprehended as they tried to enter the country illegally.
- The sixth group includes aliens who have violated the law or INS regulations (e.g., worked in the country without authorization).

Under the priority system, district directors (and chief Border Patrol agents) are allowed to exercise discretion in custody determinations. The INS central office has directed the field offices to detain criminal aliens while continuing to detain a percentage of aliens within each priority within available detention space and resources.

The act requires detention, pending final determination of deportability, for aliens who are not lawful permanent residents[7] and are convicted of aggravated felonies (e.g., murder or drug or firearm trafficking). Aliens attempting to enter the United States without proper documentation who are apprehended at the border or a port of entry are considered excludable and are subject to mandatory indefinite detention unless eligible for parole. In addition, aliens under the age of 18 (unaccompanied minors) are to be held in detention until they can be released to a parent, legal guardian, or adult relative who is not presently in INS detention or, if necessary, an adult designated by the parent or legal guardian. With regard to all other aliens, INS is authorized to detain those who pose a danger to

---

[6]The project is designed to target and prosecute alien smugglers.

[7]A lawful permanent resident is a noncitizen who resides legally in the United States and who may, after 5 years' residence, apply for citizenship.

AR01511

public safety or national security, or when INS has reason to believe that the aliens are not likely to appear at their hearings.[8]

According to INS, its detention efforts are crucial to immigration law enforcement for the reasons noted in its 1990 Detention and Deportation Plan.

"The ability to detain an alien, when an alien's freedom at large clearly represents a present danger to public safety, is paramount if the Immigration and Nationality laws of this country are to be enforced. Clearly, if the capability to detain is not available, any deterrent effect upon illegal immigration is lost and enforcement efforts become no more than an exercise for training personnel."

# Increased Demand for Detention

Even though the number of aliens apprehended by INS has remained at about 1 million per year, the type of alien being apprehended has changed. Increasingly, INS is apprehending more aliens from countries other than Mexico and more aliens with serious criminal records. Both of these types of aliens usually have longer average lengths of stay in detention facilities than aliens who are from Mexico or are noncriminals.

Although Mexican nationals historically have been and are still the largest group of people entering the United States illegally, recent upheavals in Central America and other parts of the Third World have contributed to the increasing numbers of people from these countries seeking illegal entrance. These nationals cannot be returned as easily to their native lands as Mexicans, because—unlike Mexicans—they need travel documents (e.g., airline tickets and visas) before their country will permit them to be returned. Therefore, INS is forced to detain them for longer periods of time.

INS' emphasis on apprehension and detention of aliens convicted of felonies and other serious crimes has also contributed to the increase in the average length of stay. These criminal aliens normally remain in INS custody for much longer periods of time than illegal entrants. Deporting

---

[8]The Supreme Court in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953), approved the indefinite detention of excludable aliens. By contrast, the Immigration and Nationality Act explicitly limits INS' authority to detain deportable aliens pending execution of their deportation orders. If the alien is not deported within 6 months, the alien must be released and put under supervision until deportation.

AR01512

any alien can be a lengthy process due to the numerous rights of appeal available.[9]

Figure 1.1 shows that the average length of stay of detainees has increased from 7.3 days in fiscal year 1984 to 22.9 days in fiscal year 1990. Because average stays are longer, fewer apprehended aliens can be detained in the available bedspace. In fact, the proportion of aliens detained to those apprehended has decreased from 24 percent in 1982 to 9 percent in 1990.

**Figure 1.1: Average Length of Detention**



Source: INS Six Year Detention Plan.

The deportation process for criminal aliens usually begins upon conviction and sentencing for a deportable crime. Working with law enforcement agencies, INS identifies criminal aliens within federal, state, and local criminal justice systems such as courts or prisons. Investigators compile the evidence needed to deport aliens and issue (1) detainers, which notify the law enforcement agency to turn aliens over to INS when they are

---

[9]See Immigration Control: Deporting and Excluding Aliens From the United States (GAO/GGD-90-18, Oct. 26, 1989) for more information regarding aliens' appeal rights and their effects on the length of time for the deportation process.

AR01513

released from custody and (2) orders to show cause, which inform aliens that they must appear for deportation hearings and show cause why their deportation should not proceed. INS can apprehend criminal aliens when they are released and either place them in detention or release them on bond.[10]

The Anti-Drug Abuse Act of 1986 (1) authorizes state and local law enforcement officials to notify INS when they arrest individuals on drug charges whom they suspect of being in the country illegally and (2) requests INS to determine promptly whether or not to detain them. The 1988 Anti-Drug Abuse Act requires INS to detain and deport aliens convicted of aggravated felonies.[11]

The 1988 act has significantly increased the number of criminal aliens detained by INS. Although INS did not have complete data on the number of criminal aliens apprehended, the number of criminal aliens whom INS arrested in urban areas increased from 12,500 to 30,500 between fiscal years 1986 and 1989. INS projects that it will need to detain almost 60,000 criminal aliens annually starting in fiscal year 1991. In comparison, the Bureau of Prisons housed about 60,000 inmates, as of August 1991.

## Aliens' Rights

The Immigration and Nationality Act sets out procedural requirements governing deportation hearings. The act provides the following procedural rights in deportation cases:

- The aliens will be given notice, reasonable under all the circumstances, of the nature of the charges against them and of the time and place at which the proceeding will be held.
- The aliens will have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as they shall choose.
- The aliens will have a reasonable opportunity to examine the evidence against them, to present evidence in their own behalf, and to cross-examine witnesses presented by the government.
- No decision of deportability will be valid unless it is based upon reasonable, substantial, and probative evidence.

---

[10]The Immigration and Nationality Act precludes INS from removing criminal aliens from the country until they have completed their prison terms.

[11]The Immigration Act of 1990 permits INS to release certain aggravated felons (e.g., lawful permanent residents).

AR01514

To help aliens obtain representation, INS and EOIR provide aliens with lists of organizations and individuals who may assist aliens without charge or at reduced rates. The aliens' right to examine and present evidence—the opportunity to express themselves—includes the use of an interpreter when they request one or when the judge determines one is necessary.[12]

Although the act states the rights of aliens during their deportation hearings, failure to afford these rights during the hearings may not affect the final resolution of the aliens' cases. Courts have held that in order to overturn an immigration judge's decision because of a procedural error, the error must have affected the outcome of the alien's case.

At a deportation hearing, an INS trial attorney presents the INS case before an immigration judge. Once INS' allegations of deportability are established, the hearing procedures provide that aliens may seek relief from deportation. Aliens may use numerous grounds in contesting deportation (e.g., claim that they are U.S. citizens) or seeking relief from deportation (e.g., apply for political asylum). In certain instances, aliens are not eligible for relief (e.g., aliens who entered the country illegally and were charged with crimes of moral turpitude). Aliens may appeal adverse rulings through the Department of Justice to the federal courts up to the Supreme Court.

## Objectives, Scope, and Methodology

The Chairman, Subcommittee on International Law, Immigration, and Refugees, House Committee on the Judiciary, pointed out that beginning with the long-term incarceration of Haitian asylum seekers in Florida in 1981 and continuing with the incarceration of Central American asylum seekers in South Texas in 1989, INS' detention policies and practices have become extremely controversial. Immigrant advocacy groups have denounced these policies and practices as violating civil and human rights, arbitrary and capricious, and even discriminatory. Accordingly, the Chairman requested that we review INS detention policies and practices to determine the basis on which INS detains aliens. Specifically, we agreed to analyze INS detention policy implementation at the field level. This included reviewing

[12]In El Rescate Legal Services, the court is considering the question of whether immigration proceedings for non- and limited-English-speaking individuals must be interpreted in full. El Rescate Legal Services v. EOIR, 727 F. Supp. 557 (C.D. Cal. 1989), reversed and remanded, 941 F.2d 950 (9th Cir. 1991), amended on reh'g, _ F.2d _, No. 90-55292 (Mar. 10, 1992).

AR01515

- INS' criteria and priorities governing alien detention and
- INS' delegation for detention to its district offices.

In addition, we agreed to

- determine the rights of detainees but not their ability to exercise their rights;
- compare statutory and administrative detention policies for distinct nationalities with the results of a case file review;
- determine if aliens who voluntarily present themselves to an INS officer in order to apply for asylum risk being detained;
- include data that INS used to show that detention is a deterrent to illegal immigration; and
- determine the number of aliens who had or did not have representation, compare the time those with and without representation spent in detention, and discuss the issues related to the government providing representation.

We visited 13 detention facilities that INS used and reviewed all available records for those aliens being detained at the time of our visit.[13] We also reviewed the apprehension records at 11 districts in which the detention facilities were located. Table 1.1 shows the locations we visited and the number of cases we reviewed. We spent about 1 week at each location from March 13 through June 7, 1991.

---

[13]After our review, INS started using 14 facilities.

AR01516

**Table 1.1: Detention Facilities Visited and Number of Cases Reviewed**

| Facility | Location | Capacity on 2/1/91 | Detained aliens | Cases reviewed |
|---|---|---|---|---|
| Varick Street | New York, NY | 224 | 153 | 103 |
| Krome | Miami, FL | 451 | 424 | 404 |
| Port Isabel | Los Fresnos, TX | 668 | 581 | 449 |
| El Paso | El Paso, TX | 342 | 338 | 301 |
| El Centro | El Centro, CA | 344 | 307 | 271 |
| Florence | Florence, AZ | 325 | 320 | 299 |
| Boston | Boston, MA | 50 | 34 | 33 |
| Houston | Houston, TX | 150 | 215 | 182 |
| Laredo | Laredo, TX | 175 | 146 | 133 |
| Denver | Denver, CO | 150 | 135 | 124 |
| Los Angeles | Inglewood, CA | 200 | 252 | 209 |
| Seattle | Seattle, WA | 78 | 105 | 97 |
| Wackenhut | New York, NY | 100 | 105 | 100 |
| **Totals** | | **3,257** | **3,115** | **2,705** |

Note: We were unable to review 410 files for the detained cases because the files were unavailable for our review because they were transferred to another location or were being used for deportation hearings. About one-third of the missing files were at the Port Isabel facility. We could not review 132 files in Port Isabel because heavy rains flooded the district office and many files were unavailable. At each of the locations, district officials assured us that our results would not be affected by these cases.

Source: GAO.

We cannot project our audit results to the universe of all detained aliens because we only reviewed the detention records for the population detained during our visit. We only sampled 1 month of apprehension records at the districts and cannot project the results to all apprehended aliens.

We reviewed INS detention procedures and policies and interviewed INS officials at the INS central office; 2 regions (Western and Southern) where we did most of our work; 11 districts (New York, Boston, Denver, Los Angeles, San Antonio, Harlingen, El Paso, Seattle, Phoenix, Houston, and Miami) where the detention facilities are located; and 2 Border Patrol sectors (El Paso and Miami). These units were judgmentally selected to determine (1) who decides to detain or release the aliens and the basis on which those decisions were made and (2) if these decisions are consistent with INS policies and procedures.

AR01517

We reviewed files of aliens being detained at the seven INS and six contract detention facilities to determine the basis on which INS was detaining aliens and compared the results of the case file review with INS' detention criteria.[14] For the detained aliens, the case files provided basic information, such as their (1) nationality; (2) reason for detention; (3) date of detention; (4) transfer between facilities; (5) release date (if known); (6) resolution, if any, of their cases (e.g., ordered deported, deported, released); and (7) any factors affecting their detention or release.

For each apprehended alien, INS is to maintain a copy of the alien's apprehension record, which contains data such as biographical information, arrest record, and immigration status (e.g., entered illegally). We reviewed all apprehension records for a selected month at the locations we visited to determine which aliens INS apprehended but did not detain.

Generally, INS keeps the files of detained aliens at the facility where they are located. However, once the aliens are removed from the facility, their files are returned to the district office and kept with all other aliens' files. Therefore, no practical way existed for us to identify a universe of aliens who completed their detention. As a result, we could not determine the total time aliens spent in detention but rather determined the time they had already spent in their current detention facility when we reviewed the files.

INS maintains the Deportable Alien Control System, which contains such information as the alien's name, nationality, and date of apprehension. However, it does not contain certain additional information we needed, such as whether the alien was represented or applied for asylum. Further, in our September 1990 report, we said that data contained in the system did not accurately reflect the number of illegal aliens at its Port Isabel facility.[15] Accordingly, we did not use system data for this review.

In determining the rights of detainees, we interviewed INS officials and reviewed relevant laws, regulations, and guidelines and identified court cases affecting the detention and rights of aliens. However, we did not determine if detained aliens were able to exercise their rights or review the living conditions of detained aliens.

---

[14]We did not include the El Centro contract facility because it held 11 aliens.

[15]Information Management: Immigration and Naturalization Service Lacks Ready Access to Essential Data (GAO/IMTEC-90-75, Sept. 27, 1990).

AR01518

With respect to disparate treatment, we reviewed the Justice and INS policy regarding detention by nationality. In addition, we contacted immigrant advocacy groups and reviewed published studies concerning the disparate treatment of certain nationalities to identify different detention practices based on nationality. We also analyzed the results of the case file review.

To determine if aliens were at risk of being detained after presenting themselves to INS in order to apply for asylum, we compared their dates of detention to the dates they requested asylum.

In response to the Chairman's concern about the deterrent value of detention, we did not determine if it deterred illegal immigration. However, we agreed to review available data INS used to support its contention that detention can be a deterrent.

In response to the Chairman's concern about aliens having representation, including the government providing representation during the deportation process, we interviewed INS and advocacy group officials to determine if the use of government counsel might in some instances result in speedier deportation processes and fewer days in detention. In addition, we analyzed case file review data to compare length of detention for aliens at the time of our review who requested counsel, did not request it, and had representation. We also reviewed the list of free or low-cost legal services that EOIR and INS provide to detained aliens to determine (1) the accuracy of the lists and (2) the extent that the listed organizations provide direct assistance to aliens (i.e., represent them before EOIR or help them fill out forms).

We did our field work from August 1990 through July 1991. Our work was done in accordance with generally accepted government auditing standards. In commenting on our draft report, the Department of Justice generally agreed with our findings and recommendations and provided technical comments, which GAO incorporated where appropriate (see app. II).

AR01519

# INS Implementation of Detention Priorities Affects Aliens Differently

INS has a flexible national detention policy and priority system. The system sets forth INS' detention policy in a priority order for major groupings of aliens. The highest priority is criminal aliens, followed by excludables.

Our analysis of INS detention records indicated that INS generally followed its detention criteria. However, because of limited resources and specific legal and administrative requirements for certain nationalities, the likelihood of INS detaining an alien was related to (1) the location where INS apprehended the alien—the border or interior—and (2) the alien's nationality. These two factors also affected the length of time aliens were in detention.

## Detained Aliens

We reviewed case files for 2,705 detained aliens at 13 detention facilities. Ninety-two nationalities were represented in our sample, but the predominant nationality was Mexican. Figure 2.1 shows detained aliens by their nationalities.

AR01520

**Figure 2.1: Site and Country of Origin for Detained Aliens**



- Other
- 29%
- 27% — Mexico
- 13% — El Salvador
- 11% — Haiti
- 6% Honduras
- 5% Guatemala
- 5% India
- 4% China

Note: The "Other" category includes 85 nationalities and 2 cases for which we could not determine the nationality.

Source: GAO analysis of INS data.

As shown in table 2.1, 4 of the 13 facilities housed predominately (70 percent or more) criminal aliens, while 4 other facilities had predominately noncriminal (e.g., excludable aliens). The remaining five facilities had a mix of criminal and noncriminal (deportable and excludable) aliens.

AR01521

**Table 2.1: Criminal, Excludable, and Deportable Aliens Detained in INS Detention Facilities**

| Facility | Criminal | | Excludable | | Deportable | | Total |
|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | |
| Boston | 30 | 91 | 1 | 3 | 2 | 6 | **33** |
| Varick Street | 91 | 89 | 2 | 2 | 9 | 9 | **102** |
| El Centro[a] | 201 | 74 | 23 | 8 | 47 | 17 | **271** |
| Florence | 210 | 70 | 17 | 6 | 72 | 24 | **299** |
| Houston | 103 | 57 | 39 | 21 | 40 | 22 | **182** |
| Laredo | 72 | 54 | 5 | 4 | 56 | 42 | **133** |
| Seattle | 49 | 52 | 19 | 20 | 27 | 28 | **95** |
| El Paso[a] | 103 | 34 | 13 | 4 | 185 | 61 | **301** |
| Denver | 35 | 28 | 28 | 23 | 61 | 49 | **124** |
| Los Angeles | 7 | 3 | 192 | 92 | 10 | 5 | **209** |
| Port Isabel[a] | 11 | 2 | 5 | 1 | 433 | 96 | **449** |
| Krome[a] | 3 | 1 | 349 | 87 | 51 | 13 | **403** |
| Wackenhut | 0 | 0 | 100 | 100 | 0 | 0 | **100** |
| **Total** | **915** | **34** | **793** | **29** | **993** | **37** | **2,701[b]** |

[a]Does not equal 100 percent because of rounding.

[b]The column does not total 2,705 because we could not determine the status of 4 aliens.

Source: GAO analysis of INS data.

According to INS, certain facilities are used for either criminal or noncriminal aliens, where possible, in order not to mix them. For example, INS' New York Wackenhut facility is used exclusively for detaining noncriminal aliens, while its Varick Street facility houses mainly criminal aliens.

Based on when the aliens entered the current facility to the date of our review, the average length of time criminal aliens had been in detention was 59 days; this length was about the same (56 days) for excludable aliens but longer than for noncriminal deportable aliens (47 days). Table 2.2 compares these statistics by facility. According to INS, the national average for length of detention for all detained aliens was about 23 days in 1990. As detention space becomes limited, INS releases aliens who are lower under its priority criteria in order to detain aliens who are higher (e.g., aggravated felons).

AR01522

**Table 2.2: Average Days in Detention by Facility**

| Facility | Criminal | | Deportable | | Excludable | | Overall average | |
|---|---|---|---|---|---|---|---|---|
| | **Days** | **Number** | **Days** | **Number** | **Days** | **Number** | **Days** | **Number** |
| Boston | 111 | 29 | 26[a] | 2 | 27[a] | 1 | 103 | 32 |
| Varick Street | 152 | 91 | 112[a] | 9 | 335[a] | 2 | 154 | 102 |
| El Centro | 53 | 201 | 54 | 47 | 35 | 23 | 52 | 271 |
| Florence | 26 | 208 | 21 | 72 | 65 | 17 | 27 | 297 |
| Houston | 52 | 102 | 81 | 40 | 76 | 39 | 64 | 181 |
| Laredo | 56 | 72 | 40 | 56 | 38[a] | 5 | 48 | 133 |
| Seattle | 32 | 49 | 57 | 27 | 67 | 19 | 46 | 95 |
| El Paso | 49 | 103 | 35 | 185 | 54 | 13 | 40 | 301 |
| Denver | 58 | 35 | 48 | 61 | 89 | 28 | 60 | 124 |
| Los Angeles | 21[a] | 7 | 24[a] | 10 | 14 | 192 | 14 | 209 |
| Port Isabel | 176 | 11 | 50 | 433 | 53[a] | 5 | 53 | 449 |
| Krome | 97[a] | 3 | 64 | 51 | 85 | 349 | 83 | 403 |
| Wackenhut | 0 | 0 | 0 | 0 | 15 | 100 | 15 | 100 |
| **Total** | **59** | **911** | **47** | **993** | **56** | **793** | **54** | **2,697[b]** |

Note: Length of detention was computed as the average length of time from when aliens entered their current facility to the date of our review.

[a]Averages may not be meaningful because of limited number of cases.

[b]Column does not total 2,705 because we could not determine either the number of days aliens spent in detention and/or their status.

Source: GAO analysis of INS data.

Further, the average time of those in detention at the time of our review fluctuated between nationalities (see table 2.3).

AR01523

**Table 2.3: Average Days of Detention by Nationality and Site**

| Facility | Mexicans | El Salvadorans | Haitians | Hondurans | Indians | Guatemalans | Chinese |
|---|---|---|---|---|---|---|---|
| Boston | 0 | a | a | a | 0 | 0 | a |
| Varick Street | 0 | a | 264 | a | 0 | 0 | a |
| El Centro | 36 | 70 | 0 | a | 60 | 40 | 19 |
| Florence | 17 | 23 | 0 | 34 | 49 | 18 | a |
| Houston | 24 | 69 | 0 | 56 | a | a | a |
| Laredo | 46 | 38 | a | 53 | 0 | 67 | 0 |
| Seattle | 16 | 92 | 0 | a | 49 | a | a |
| El Paso | 19 | 40 | 70 | 32 | a | 24 | 0 |
| Denver | 23 | a | 0 | a | a | a | 86 |
| Los Angeles | 29 | 21 | 0 | 0 | 13 | 4 | 16 |
| Port Isabel | 46 | 42 | a | 46 | a | 43 | a |
| Krome | 0 | a | 101 | a | 69 | 0 | a |
| Wackenhut | 0 | a | a | 0 | 13 | 0 | 11 |

Note: Length of detention was computed as the average length of time from when aliens entered their current facility to the date of our review.

aAverages are not included for those nationalities that had between one and four detainees in a facility because they would not be meaningful.

Source: GAO analysis of INS data.

Our analysis of alien detention cases showed that the average time they had spent in detention fluctuated by nationality and facility. For example, noncriminal Indians in Wackenhut had spent an average of 13 days as compared to 69 days in Krome, even though both facilities detained almost exclusively noncriminal aliens. Noncriminal Haitians had spent an average of 101 days in the Krome facility as compared to 69 days for Indians. See appendix I for more detailed information on the time aliens had spent in detention by nationality and facility.

# Detention of Excludable Aliens

For exclusion cases, in general, the location where an alien was detained determined the length of detention. Further, the point in time that INS apprehended aliens—as they tried to enter the country or after they entered—determined, to some degree, if they would be detained.

## Resources Determine Length of Detention

INS officials stated that funding and the relative demands on space were the primary factors that determined the length of detention at any given

AR01524

facility. INS' national detention criteria require the detention first of criminal aliens, then excludable aliens. However, INS district officials said that space availability affected the length of time individuals spent in detention. At the time of our review, the average time the 793 aliens in exclusion had spent in detention was 56 days—ranging from 14 days for the Los Angeles contract facility to 335 days for Varick Street (see table 2.2).

The apprehension and subsequent detention of individuals from the People's Republic of China illustrates the impact resources can have on the length of time aliens are detained. Between October and December 1990, INS experienced an increase of excludable Chinese who were entering the country through New York City. Because they were excludable, INS detained them. However, as detention space became limited in New York, it sent a number of the Chinese to its Denver facility for detention because space was available there. According to New York district officials, the selection of which Chinese to send to Denver was made on the basis that those transferred aliens would not have to return to New York for their cases. Chinese who remained in New York were generally paroled into the country within a couple of weeks because the limited space was needed to detain aliens who were more recently apprehended. Those who were sent to Denver were detained until their cases were resolved (e.g., they were granted asylum or the court determined that they were excludable).

A Denver district official stated that INS has experienced lawsuits, partly because of the disparity between the length of detention for aliens detained in other parts of the country and those detained in Denver. Seven Chinese apprehended in Anchorage, Alaska, and sent to Denver had been detained by INS for about 5 to 7 months. They initiated a lawsuit to gain their release, but the case was dismissed for three of the litigants after they had been granted asylum and released. According to an INS report, Denver had 14 similar lawsuits pending as of August 1991.

## Detention for Excludables Differs From Deportables

From 1945 to 1980, INS policy was to detain excludable aliens whom it considered to be security risks or likely to not attend their hearings. Then it changed its policy and started to detain almost all excludable aliens. This change was in response to the massive influx of over 125,000 Cubans and 15,000 Haitians in 1980. The excludable aliens who are being detained are not given the same consideration as is given the majority of deportable

AR01525

aliens—early release unless it is determined that they pose a danger to public safety or national security or are likely to abscond.

This policy follows an arbitrary classification—aliens attempting to enter without valid travel documents—and severely restricts the possibility of release for those excludable aliens. By contrast, once aliens enter the United States—even by avoiding inspection and illegally crossing the border or by misrepresenting their intentions upon arrival and remaining beyond the permitted stay—they are no longer excludable but instead deportable. Thus, if apprehended later, they are entitled to release as long as appropriate assurances are given that they will not abscond and do not pose a danger to the community. In deciding if an alien is or is not likely to abscond, INS considers such factors as whether the alien has family members in the area and whether the alien has a strong case to support remaining in the country.

The detention policy creates two classes of aliens—those who successfully managed to enter the country illegally and those who did not—and it gives each class different treatment. Those found in the interior are routinely released; those found at points of entry are routinely detained. In our view, aliens who have reached the interior in a less than forthright manner are not less likely to abscond or more deserving of release than those who are stopped at the border.

This policy also affects the use of INS' limited detention resources. In our review of 2,705 detained aliens, we identified 170 excludable aliens who had been in detention over 90 days, some up to almost 2 years. Using INS' average daily detention cost of $40 per day, INS had incurred a cost of about $612,000 to detain these 170 aliens for 90 days.

## Detention of Selected Nationalities Was Affected by Statute or Administrative Policy

In addition to the place aliens were detained, their nationality affected the length of time they spent in detention. Consistent with its detention criteria, INS does not detain aliens who are unlikely to be deported or excluded because of temporary relief provided by statute or administrative policy. As a result, aliens who likely will not be deported or expelled from the United States are generally detained, if at all, for only a short period. Nationals from Cuba, El Salvador, Guatemala, Nicaragua, and the People's Republic of China who meet eligibility criteria are affected by temporary relief provisions.[1]

---

[1]People from Kuwait, Lebanon, and Liberia are also affected by specific detention policy. However, they represent 12 detained cases of the 2,705 in our review.

## Cuban Adjustment Act of 1966

The Cuban Adjustment Act of 1966, as amended (8 U.S.C. 1255 note), recognizes Cuban nationals as political refugees and allows them to apply for permanent residence 1 year after entry. The act authorizes the Attorney General to adjust the immigration status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States after January 1, 1959. After 1 year, the alien's status may be adjusted to lawful permanent resident.

According to Miami district officials, any Cubans arriving on rafts and apprehended within the Miami district are to be released quickly from detention because they cannot be deported, therefore spending money for their detention is unwise. As a result, the Miami district does not detain Cubans for extended periods of time. According to district officials, most Cubans are only detained a few days until their identities can be determined and background investigations are completed. Subsequent to the investigation, most Cubans are paroled to family members or sponsors from the Miami community. According to Miami district officials, Cubans are given priority for release on parole because (1) most have immediate family members (e.g., parent or child) who can petition for their release, (2) it is difficult to deport them,[2] and (3) the provisions of the Cuban Adjustment Act make it inexpedient to use large amounts of resources to detain them.

As shown in table 2.4, at the time of our review of detention cases in Krome in the Miami district, we identified 16 detainees from Cuba who had been in detention an average of 16 days. In contrast, the entire sample of 404 Krome detainees had been in detention an average of 83 days.[3]

---

[2]As of December 1990, INS had in detention about 2,600 Cubans whom it would remove from the country if Cuba would permit their repatriation.

[3]As shown in table 2.1, all those detained were (noncriminal) excludable (87 percent) or (noncriminal) deportable aliens (13 percent), except for 3 of the 404 aliens. Those 3 aliens were criminals.

AR01527

Table 2.4: Average Length of Detention by Nationality for Aliens Detained at Krome

| Country of nationality | Number of cases | Average days |
|---|---|---|
| Haiti | 278 | 101 |
| Cuba | 16 | 16 |
| India | 13 | 69 |
| Colombia | 9 | 42 |
| Poland | 9 | 25 |
| Other[a] | 79 | 45 |
| **Total population** | **404** | **83** |

Note: Length of detention was computed as the average length of time from when aliens entered their current facility to the date of our review.

[a]The "Other" category includes 34 nationalities and 2 cases where the nationality could not be determined from the files.

Source: GAO analysis of INS data.

## Temporary Protected Status

Under the Immigration Act of 1990, the Attorney General is authorized to grant temporary protected status (TPS) to nationals from certain countries with social or political unrest.[4] An alien who qualifies for TPS may be granted a temporary stay of deportation and work authorization.[5] The act further provides that an alien granted TPS shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States.

The 1990 act specifically designated El Salvadoran nationals residing in the United States since September 19, 1990, as eligible for TPS, effective for an 18-month period beginning January 1, 1991. INS estimated that between 120,000 and 150,000 El Salvadorans would apply for TPS by the registration deadline of October 31, 1991.

[4]The Attorney General may designate a country for TPS classification if he finds that (1) there is an ongoing armed conflict within the country that would pose a serious threat to the personal safety of nationals of that country if they were required to return; (2) there has been an earthquake, flood, drought, or other environmental disaster in the country resulting in substantial but temporary disruption in living conditions in the area affected; (3) the country is unable to handle the return of its nationals and has officially requested TPS designation; and (4) other exceptional circumstances make return to the country unsafe, and temporary asylum in the United States is not contrary to the national interest of the United States.

[5]A national of a designated country may be granted TPS if the alien (1) has been continuously physically present in the United States since the effective date of designation; (2) has been continuously residing in the United States since a date set by the Attorney General; (3) is admissible as an immigrant; and (4) has not been convicted of a felony or two or more misdemeanors in the United States. The Attorney General has to determine that the described person has not persecuted others, committed particular serious crimes or other serious nonpolitical crimes, or poses a danger to national security.

AR01528

In our review of apprehension records, we found that 45 of 51 El Salvadoran nationals apprehended by INS were released and 6 were detained. Of the 45 aliens released, 37 were released because they were eligible for TPS benefits. We identified 365 detained El Salvadorans who, according to INS, did not qualify for TPS.

On March 27, 1991, the Attorney General also designated the nationals of Kuwait, Lebanon, and Liberia for TPS for 1 year. On September 6, 1991, the Attorney General included the nationals of Somalia for TPS for 1 year. The designation has been extended for Lebanese and Liberians but not for Kuwaitis.

## American Baptist Churches v. Thornburgh Settlement Affects El Salvadorans and Guatemalans

The American Baptist Churches v. Thornburgh, 760 F. Supp 796 (N.D. Cal. 1991), case was filed in May 1985 on behalf of over 80 religious and refugee assistance organizations that alleged that INS, EOIR, and the State Department engaged in a pattern and practice of discrimination against El Salvadoran and Guatemalan asylum seekers.

The settlement, approved on January 31, 1991, applies to El Salvadorans who were in the United States as of September 19, 1990, and Guatemalans who were in the United States as of October 1, 1990.[6] Under the settlement, those previously denied asylum by a district director, an immigration judge, or the Board of Immigration Appeals will have their asylum application reevaluated (de novo adjudication) by the newly trained corps of asylum officers hired under the regulations in effect on October 1, 1990. Further, INS may only detain class members eligible for relief who are otherwise subject to detention under the law and who (1) have been convicted of a crime involving moral turpitude for which the sentence exceeded 6 months or (2) pose a threat to national security or public safety. However, INS may detain, on the basis of events occurring after their application is denied, class members it believes are likely to abscond.

## Attorney General Directive Affects Nicaraguans

On July 2, 1987, the Attorney General directed that no Nicaraguan shall be deported who has a well-founded fear of persecution unless the Department of Justice finds that the individual has either engaged in serious criminal activity or poses a danger to the national security. He also directed INS to expedite applications for work authorization and to encourage Nicaraguans whose claims for asylum or withholding of

---

[6]We identified 126 detained Guatemalans along with the 365 detained El Salvadorans who did not qualify for relief under the case according to INS.

deportation had been denied to reapply for reopening or rehearing of such claims in accordance with the Cardoza-Fonseca decision.[7] The Attorney General's directive was intended to ensure that individuals with a well-founded fear of persecution in Nicaragua were allowed to remain in the United States for the present and allowed to support themselves by working while they remained in the country.

In response to the Attorney General's concern, a special review unit—the Asylum Policy Review Unit—for deportations of Nicaraguans was established. This unit is not part of INS. INS' Office of General Counsel does an initial review of each case. If INS recommends deportation, the Asylum Policy Review Unit reviews the case and makes recommendations to the Deputy Attorney General who makes a final decision on the case.

As a result of the Attorney General's directive, INS generally does not detain Nicaraguans. However, when they are detained, they are subject to a longer average detention stay. Under the review process, INS averages 1 to 2 months to review the cases, and the unit averages 4 to 8 months, with many cases taking considerably longer. As a result, some Nicaraguans are subject to a longer stay in detention. In our review of detention cases, we identified 52 Nicaraguans being detained in 8 of 13 facilities we visited. While 7 facilities detained from 1 to 8 Nicaraguans, 21 were detained in Port Isabel. At the time of our review, the Nicaraguans in Port Isabel had been in detention for an average of 98 days. In contrast, all aliens in Port Isabel had been in detention an average of 53 days.

## Presidential Executive Order Affects Chinese

On April 11, 1990, the president issued Executive Order 12711, directing the Attorney General to take any steps necessary to defer until January 1, 1994, the enforced departure of all nationals of the People's Republic of China and their dependents who were in the United States between June 4, 1989, and April 11, 1990. As a result, Chinese who qualify are generally not detained. The INS Commissioner stated that the president's order did not preclude district directors from detaining or denying parole to Chinese. However, he further stated that eligible deportable Chinese should not be detained and the parole of eligible excludable Chinese should be considered to be "in the public interest." If the district director determined that continued detention was appropriate, the decision was subject to

---

[7]On March 9, 1987, the Supreme Court decided the asylum case of INS v. Cardoza-Fonseca, 480 U.S. 421 (1987), changing the standard used to decide asylum cases. The Court concluded that the standard of evidence in use for the last 7 years, i.e., "a clear probability of persecution," had been too high and directed the Attorney General to establish and implement a lesser standard, i.e., "a well-founded fear of persecution."

AR01530

review by the central office. As of December 1990, about 50,000 Chinese had applied for benefits under the program. According to INS, the 104 detained Chinese in our sample were not eligible for relief under the order.[8]

## Conclusions

On the basis of our analysis of INS' detention of 2,705 aliens, we believe that INS generally followed its priorities. About two-thirds of the aliens whom it detained were in its top two priority groupings—34 percent were criminal aliens and 29 percent were excludable aliens.

The time aliens spend in detention can be affected by the amount of available detention space, laws, and administrative policies. For example, INS tends not to detain Cubans as a result of its implementation of the Cuban Adjustment Act. These factors, for the most part, are not within INS control.

---

[8] In our review, we identified 104 Chinese in detention who arrived after April 11, 1990, or had been convicted of a crime and therefore were not affected by the order.

AR01531

# Policy Solutions Needed for INS to Meet Its Detention Demands

Our review of 2,705 detention cases indicated that INS generally followed its detention criteria. However, because of variations in availability of detention facilities from location to location, the duration of detention can depend in large part on where the aliens are detained. INS plans to expand its detention capability from 6,259 beds to about 8,600 by 1996 to help meet the need to detain increasing numbers of deportable and excludable aliens. Also, INS is taking certain actions designed to reduce the need for detention space. However, INS has little or no prospect of being able to detain the overwhelming number of aliens it apprehends who should be detained under its criteria.

The detention problems are part of the larger enforcement questions relating to aliens—preventing aliens from illegally entering the country and removing those who do not have a legal basis to remain. INS has limited resources to detain those aliens who try to illegally enter or remain. Further, the prospect for significant resource increases is unlikely. As a result, INS will continue to be limited in its ability to carry out its detention responsibilities.

## INS Plans Expansion of Detention Capacity

INS believes that its detention efforts are a deterrent to illegal entry. Accordingly, INS is expanding its detention capability in attempting to respond to the increased flow of aliens illegally entering the country as well as the increased number of criminal aliens.

### Detention as a Deterrent to Illegal Entry

Contending that detention is a deterrent to uncontrolled illegal immigration, INS referred to three efforts to reduce the flow of aliens entering illegally—(1) Central Americans entering the country through South Texas, (2) Haitians entering through Miami, and (3) Chinese entering through New York City.

#### South Texas

In response to a dramatic increase in the illegal entry of Central Americans in South Texas (Rio Grande Valley), INS initiated steps, from December 1988 to June 1989, to restrict the flow. Many of these Central Americans were requesting asylum—requests that the then INS Commissioner considered to be "frivolous." INS expanded its apprehension and detention efforts and instituted a 1-day expedited review of the asylum applications for persons who filed with the district director. The 1-day expedited process was limited to aliens who entered the United States illegally, avoided apprehension, and presented themselves at the INS Asylum Office. According to the INS Commissioner, the actions INS took in South Texas

AR01532

were successful. He said that the average number of non-Mexican apprehensions declined in South Texas from 147 a day during the period from February 22 to March 15, 1989, to 72 a day for the period from March 16 to April 15, 1989.

## South Florida

In May 1981, prompted by the influx of Cubans and Haitians entering the country illegally, INS began routinely detaining excludable aliens in an effort to discourage such illegal immigration. In the 1970s, few Haitian migrants attempted to enter the country, but their number increased rapidly to 15,093 in 1980. As shown in table 3.1, monthly figures of excludable Haitian arrivals increased from 308 aliens in February 1980 to 2,280 in October 1980. However, the numbers of Haitian arrivals dropped to 306 in October 1981. INS Miami district officials attributed this drop in the number of excludable Haitian arrivals to its detention efforts. However, the most significant reduction—monthly arrivals of less than 50—occurred after the Coast Guard stationed a vessel off the coast of Haiti in October 1981 and interdicted those Haitians bound for the United States. This measure was taken with the consent of the Haitian Government.

**Table 3.1: Known Excludable Haitian Arrivals in Miami, Florida**

| Month | 1980 | 1981 | 1982 |
|-------|------|------|------|
| January | 577 | 769 | 41 |
| February | 308 | 262 | 12 |
| March | 1,401 | 530 | 14 |
| April | 1,174 | 475 | 20 |
| May | 1,266 | 803 | 2 |
| June | 1,456 | 1,507 | 6 |
| July | 1,462 | 1,717 | 4 |
| August | 1,731 | 978 | 0 |
| September | 1,874 | 629 | N/A |
| October | 2,280 | 306 | N/A |
| November | 1,021 | 47 | N/A |
| December | 543 | 46 | N/A |

N/A = not available.

Source: INS.

As of January 1991, the Coast Guard had interdicted over 23,000 aliens, mostly Haitians. The Haitians, along with returning Mexicans, are the only

AR01533

foreign nationals who the United States routinely interdicts and returns to their country.

## New York City

In October 1990, INS' New York district began efforts to detain at all costs all excludable nationals from the People's Republic of China attempting to enter the United States with fraudulent documents. Before this time, many of the Chinese were released from detention, pending their exclusion hearing, because of lack of space. Fraud cases for Chinese fell dramatically from a high of 205 in November 1990 to 38 in March 1991. INS attributed this drop to its detention efforts. However, INS reported that subsequent to the New York district's aggressive detention policy, Chinese were being smuggled through other major ports of entry—Miami, San Francisco, and Los Angeles—and were no longer concentrated exclusively at the John F. Kennedy International Airport in New York City.

In addition, because of the district's lack of detention space, many Chinese were released within 2 weeks. According to INS, these aliens did not report for their exclusion hearings and disappeared into the community. According to an INS report dated May 1991, as the word spread of the 2-week detention, the downward trend of fraud cases for Chinese started climbing to 73 and 77 cases in April and May 1991, respectively. The report concluded that, to these aliens, 2 weeks in detention was a small price to pay for employment in the United States.

## INS Plans to Increase Capacity

INS plans to increase its detention bedspace from about 6,259 beds in fiscal year 1992 to about 8,600 beds in fiscal year 1996 in an attempt to respond to the growing demand for detention bedspace. According to INS, the additional resources are needed because, as discussed in chapter 1, of the growing emphasis on the detention and deportation of criminal aliens, increasing demands placed on bedspace by detention of aliens other than Mexicans, and increasing average length of alien detention (from 11 days in 1986 to 23 days in 1990). Given the 23-day average, INS can detain about 99,000 aliens a year with its present capacity.

In February 1991, INS estimated that over the next 6 years, it will apprehend 6.8 million aliens who are illegally in the United States. INS further estimated that it will detain 900,000 aliens for lengths of stay ranging from 1 day to several months. The others will be returned to their countries voluntarily or released.

AR01534

Criminal aliens are placing—and are estimated to continue to place—a high demand on INS resources. In February 1991, INS estimated that in fiscal year 1991, over 66 percent of detainees will be criminal aliens. Further, INS projected that in the next 6 years the number of criminal aliens will continue to increase, as shown in table 3.2.

**Table 3.2: Projected Number of Criminal Aliens Detained and the Number of Beds Required to Hold Them**

| Fiscal year | Number detained | Beds needed |
|---|---|---|
| 1991 | 57,000 | 2,500 |
| 1992 | 73,200 | 3,500 |
| 1993 | 76,300 | 3,931 |
| 1994 | 79,000 | 4,141 |
| 1995 | 83,800 | 4,390 |
| 1996 | 88,800 | 4,654 |

Source: INS Six Year Detention Plan (fiscal years 1991-1996).

INS' estimates take into account its enforcement resources and apprehension statistics rather than the potential universe of deportable criminals in custody and expected to be apprehended by state and local authorities in the future. Therefore, more aliens may be subject to detention than INS estimates. For example, in 1989, we testified that over 72,000 aliens will be arrested yearly on felony drug charges who will be subject to deportation.[1] At that time, INS testified that according to Bureau of Justice statistics, as of June 30, 1988, about 20 percent of the total federal and state prison population (600,000)—about 120,000 prisoners—were deportable. Also, representatives from state and local agencies testified in November 1989 about the growing problem of illegal aliens committing crimes and overloading the court system, parole departments, and penal institutions.

# Detention Space and Other Programs Cannot Address Influx of Aliens

In addition to recent and planned facility expansion, the demand for detention space can be reduced by (1) expanding the institutional hearing program and (2) increasing the inspection at foreign airports of aliens flying into the country. However, these efforts will not significantly reduce the demand for detention space caused by aliens illegally entering and illegally remaining in the country.

[1]Criminal Aliens: INS Enforcement (GAO/T-GGD-90-6, Nov. 1, 1989).

AR01535

## Institutional Hearing Program

Expansion of the institutional hearing program can reduce the demand criminal aliens place on detention space. As discussed in chapter 1, under this program, deportation hearings are to be conducted while aliens are incarcerated at penal institutions. If ordered to be deported, aliens are removed from the country when they complete their sentences. However, if their hearings have not been started or completed when they finish their sentences, INS would have to detain them until their deportation cases are resolved. In October 1990, INS reported that while the program is in place and operating well in many states, it is not operating at its full potential. Table 3.3 shows the results of a May 1990 INS survey of criminal aliens released from penal institutions to INS custody.

Table 3.3: Criminal Aliens Released to INS Custody in May 1990 and Processed Through the Institutional Hearing Program

| Region | Criminal aliens | Processed | Percentage |
|--------|----------------:|----------:|-----------:|
| Eastern | 353 | 81 | 22.95 |
| Northern | 415 | 12 | 2.89 |
| Western | 3,495 | 89 | 2.55 |
| Southern | 1,569 | 37 | 2.36 |
| **Total** | **5,832** | **219** | **3.76** |

Source: INS May 1990 survey of criminal aliens released from penal institutions to INS custody.

In February 1991, INS reported that only about 6 percent of the criminal aliens complete their hearings before their release to INS custody. California, New York, Texas, and Florida exemplify this problem. These states have large criminal alien populations in their state penal systems. Each state reports a significant disparity between the number of criminal aliens in custody and the number of cases that EOIR is able to adjudicate.[2]

In California, for example, there were approximately 3,000 criminal aliens in state correctional facilities in 1991. Of these, approximately half were eligible for the program. Aliens with less than 6 months remaining on their prison terms were ineligible for the program.[3] The California Department of Corrections and INS agreed to use one facility for the program. Because of the limited bedspace at the facility, 16 cases a week were processed and 60 orders of deportation were issued a month, out of a possible 100 cases or more. EOIR was authorized 20 additional immigration judges for the program, but funding was not provided as of January 1992.

---

[2]According to EOIR, it had completed 88 percent of the cases that were referred to it.

[3]According to the Department of Justice, the 6-month period has been increased to 1 year and no upper limit exists.

AR01536

## Preflight Inspection

Expanding the preflight inspection program can help alleviate the exclusion problem. Some INS officials believe that INS should concentrate more on preventing unauthorized aliens from arriving in the United States. The program is currently in place at airports in Ireland, the Bahamas, Canada, and Bermuda. An INS New York district report, dated May 23, 1991, estimated that by expanding the preflight inspection program to Amsterdam, Brussels, Frankfurt, London, Paris, and Rome, INS would eliminate almost one-half of the inspections of foreign arrivals and approximately 25 percent of exclusion cases at John F. Kennedy International Airport. In such cases, aliens whom INS determines are not admissible to the country (excludable) would not be permitted to board the airplane. This measure would reduce the number of potentially excludable aliens from entering the country; had they tried to enter they would be subject to detention.

As also discussed in chapter 5, INS has released a number of exclusion cases that meet its detention criteria because of lack of space. For example, the Los Angeles district has nearly doubled its monthly exclusion cases from 745 in January 1990 to 1,363 in May 1991. Additionally, during the period November 10, 1990, through April 10, 1991, almost 4,000 excludable aliens were released from custody in Los Angeles. The conference report for the 1992 appropriations act directed that the negotiations process be initiated with the United Kingdom to include London in the preflight inspection program.

## INS Cannot Meet Detention Needs

INS' apprehensions of aliens trying to enter the country illegally have soared over the past 3 decades. In fiscal year 1959, for example, about 45,000 aliens were apprehended. By the late 1970s through fiscal year 1990, INS averaged about 1 million alien apprehensions annually. In fiscal year 1986, apprehension of aliens peaked at nearly 1.8 million. The Border Patrol estimates that two successful entries are made for every alien who is apprehended. Compounding the problem of the large influx of aliens are INS resource constraints. Given those constraints INS has not been able to effectively carry out such responsibilities as apprehending aliens here illegally, detaining those aliens it apprehends, pursuing aliens who fail to appear for hearings or abscond after being ordered to depart, and ensuring their removal when ordered to depart.

### Large Illegal Alien Population

The Census Bureau estimated the population of aliens here illegally in 1980 at 2.5 to 3.5 million. Census estimated a net addition of 200,000 immigrants per year entering illegally, some of whom enter illegally for

AR01537

temporary periods. In addition to these potentially deportable aliens, an unknown number of lawful permanent resident aliens may become deportable because they have engaged in criminal, immoral, drug-related, or other prohibited activities. This number of potentially deportable aliens has been reduced by about 2.9 million aliens who applied for legal status under the Immigration and Control Act of 1986. Thus, an estimated 1.2 to 2.2 million potentially deportable aliens reside within the country.[4]

## Limited Detention Space Results in Release of Criminal Aliens

Our analysis of apprehended aliens showed that INS did not detain all criminal aliens because of limited detention space. For example, from October 21 to December 15, 1990, districts and Border Patrol sectors in the Western Region released 382 convicted criminal aliens on their own recognizance because of limited detention space. Furthermore, from January through June 1991, the New York district released 77 criminal aliens and did not detain another 116 criminal aliens. During 1990, 201 criminal aliens were released in the Boston district. In addition, our review of INS apprehension records showed that 40 criminal aliens were not detained in the 11 districts we visited.

## Removing Aliens Is Difficult

Compounding the problem of dealing with large numbers of aliens illegally residing in the country is the difficulty of removing them. In our October 1989 report, we pointed out that the existing process to deport aliens is not working well. Aliens violate our laws by entering the country illegally; not complying with the conditions of legal entry (e.g., overstaying their visas); or not attending their deportation hearings. Our report also showed that on the basis of our sample of deportation cases in New York and Los Angeles, about 27 percent of the aliens failed to appear at their deportation hearings.

The Immigration Act of 1990 implemented our 1989 report recommendations regarding aliens who fail to appear for their deportation hearings. If the aliens have been properly notified about their deportation hearings and they fail to appear, the act requires them to be ordered deported in absentia. However, INS has to locate, apprehend, and remove aliens from the country who have been so ordered. If INS finds these aliens, it may have to detain them in order to ensure their removal.

Detaining all aliens until their cases are resolved is too costly. For example, in fiscal year 1990, the cost per detention day averaged $40

---

[4]Added to the 1980 census of 2.5 to 3.5 million illegal aliens are 2 million aliens entering illegally from 1981 to 1990 (200,000 per year) for a total of 4.5 to 5.5 million. This estimate is reduced by 2.9 million aliens who applied for legalization under the Immigration Reform and Control Act of 1986 (or 1.2 to 2.2 million).

AR01538

nationally. It ranged from $12.42 for Port Isabel to $100.33 for the Florence facility. Using INS estimates that (1) 297,000 aliens were awaiting deportation or exclusion hearings or awaiting deportation in 1990, (2) 120,000 aliens in federal and state prisons were subject to deportation in 1988, and (3) 72,000 aliens were subject to arrest on drug charges in 1989, we estimated that the cost to INS would be about $450 million dollars to detain these aliens for an average of 23 days—the current average detention stay.

The overload on INS detention facilities is inextricably related to the ease with which aliens can enter the country illegally and to difficulties in more expeditiously expelling aliens who are deportable. Consequently, successfully addressing and resolving alien detention issues can be accomplished only in the context of finding solutions to the broader problems of border control and deportation policy. Border control initiatives raise complex issues of international relations, including

- the economic disparities between the United States and other nations, such as Mexico, which give rise to illegal immigration;
- conflicts between trade facilitation objectives calling for efficient flow of goods across the border and immigration control needs calling for added documentation and closer scrutiny of cross-border traffic;
- the reliance of U.S. employers on inexpensive labor, legal and illegal, from south of the border; and
- the reliance of the Mexican economy on money earned in the United States and spent in Mexico.

Other issues are raised as well, including

- the feasibility and effectiveness of different approaches to, and technologies for, improved border control;
- humanitarian concerns, such as equitable treatment of aliens of different nationalities and divided families; and
- cost considerations and trade-offs, such as choosing between alien detention and prevention of their illegal entry, in a time of budgetary constraint.

Proposals to more effectively expel deportable aliens also raise difficult issues, which have to take into account their rights to certain constitutionally based procedural protections.

AR01539

## Conclusion

INS is faced with a complex problem of coping with the hundreds of thousands of deportable and excludable aliens it apprehends. Detaining all such aliens is cost prohibitive and impracticable. Some of the aliens, however, have committed crimes. INS believes other aliens, if not detained, would not appear for their deportation or exclusion hearings. We estimated that about $450 million in 1990 would be needed if the aliens who were awaiting hearings and criminal aliens were detained for 23 days—average detention in 1990.

Our analysis of 2,705 detention cases indicated that INS generally followed its detention criteria. However, INS apprehended but, because of lack of space, could not detain numerous criminal aliens—its highest priority under its detention criteria. INS also released criminal aliens from detention to make space for other criminal aliens of a higher priority.

In attempting to respond to the need for more detention space, INS plans to increase the number of beds from 6,259 to 8,600 by 1996. This increase, in our opinion, will not be sufficient to meet the increased need to detain criminal aliens.

INS sees detention as a deterrent to the flow of aliens illegally entering the country. It reported some success in temporarily reducing the flow of illegal entry in three specific situations. However, it does not have the resources (e.g., detention capability) to maintain such efforts or to detain those aliens whom it believes that it should. In our opinion, the institutional hearing program and preflight inspection program, along with INS' plans to expand its detention capabilities, cannot significantly offset its need to detain the increasing number of criminal aliens. For example, about 120,000 aliens in federal and state prisons were deportable aliens.

The detention problem is affected by the ability of the federal government to control our nation's borders and to remove those aliens who do not have a legal basis to remain here. A provision of the Immigration Act of 1990 made it easier to remove aliens by requiring that aliens not appearing for their deportation hearings be ordered deported in absentia. However, INS still has to find those aliens, detain them, and remove them from the country.

We do not believe that it is feasible to expand INS' detention capabilities sufficiently to solve the problems. While we agree that expanding the institutional hearing program and preflight inspection efforts can reduce the demand for detention, the impact will be slight. INS has little hope of

AR01540

coping with its detention needs unless two related programs, the one to prevent aliens from illegally entering the country and the one to remove aliens with no legal basis to remain here, are made more effective. Despite the complexity of the issues raised by proposals to strengthen these programs and despite inevitable trade-offs between the objectives of tightening border and deportation programs on the one hand and broader trade and humanitarian objectives on the other, agreement on how best to address these issues is an essential prerequisite to making significant progress in resolving detention problems.

## Matter for Consideration by Congress

Congress may wish to address border security and deportation issues in the course of future deliberations on immigration policy, specifically: How secure do we want our borders to be? How aggressive should we be in expelling deportable aliens? How much additional funding are we willing to invest in these efforts?

AR01541

# Issues Affecting Alien Representation

A related issue that may affect the length of time aliens spend in detention is their ability to obtain representation. While aliens are entitled to have representation at no cost to the government, our review showed that few aliens actually obtained such representation. This lack of representation could be attributed to the following: (1) aliens did not request representation, (2) facilities in remote areas made obtaining representation difficult, and (3) few legal aid organizations were willing to represent criminal aliens. As shown in chapter 2, criminal aliens made up 34 percent of the 2,705 cases in our review of detained aliens.[1] In addition, the legal aid lists that INS provides to detained aliens for their use in obtaining representation contained incorrect phone numbers and organizations that did not exist.

As shown by the low representation rate for aliens, they may have difficulty in exercising their right to obtain legal services. At the time of our review, our data showed that aliens with representation at various stages in the deportation hearing process had been detained longer than aliens without representation. However, the difference narrowed significantly for aliens appealing deportation decisions.

## Few Aliens Had Representation

On the basis of our analysis, at the time of our visit, 2,071 of 2,670 aliens (or about 78 percent) did not have representation.[2] However, 301 of those aliens (or about 11 percent) requested, but did not obtain, representation.

By having representation, aliens may have a better opportunity to become aware of their rights and options to remain in the country. In an earlier report, the Chief Immigration Judge advised us that when aliens were not represented, the immigration judge's statutory responsibility as a special inquiry officer had more significance.[3] We also noted in that earlier report that the immigration judges provided explanations to the aliens of their rights and of possible consequences under the law. For example, one alien, before his deportation hearing, chose not to be represented and did not contest his deportation. While the judge was explaining the deportation process to the alien, the judge noted that the alien might have been a legal resident. The judge suggested that the alien get representation because the alien might be eligible to obtain relief from deportation. The

---

[1]Criminal aliens are those who committed a crime for which they could be deported.

[2]We could not determine whether aliens obtained, requested but did not obtain, or did not request representation for 35 of the total 2,705 cases we reviewed.

[3]Criminal Aliens: Prison Deportation Hearings Include Opportunities to Contest Deportation (GAO/GGD-90-79, May 25, 1990).

AR01542

alien declined, and the hearing proceeded. We noted other cases in which the judges took steps to assist unrepresented aliens in understanding their rights.

# Factors Contributing to Low Alien Representation

Although aliens have the right to representation at no expense to the government, only 599 (or 22 percent) of the 2,670 aliens in our review had representation.[4] INS officials and representatives of alien advocacy groups attributed this low rate of representation to a number of factors. INS officials stated that, in their opinion, most aliens do not want representation in order to avoid lengthy detention. Advocacy group officials said that the remoteness of a facility discouraged free or low-cost representatives from assisting detained aliens. In addition, our discussion with legal aid organizations indicated that few organizations that provide free or low-cost legal services will represent criminal aliens. We agree that each of these factors can affect, to some degree, the rate of representation.

## Detention Facilities in Isolated Areas

Organizations that represent aliens told us that a factor causing aliens difficulty in obtaining representation is that few attorneys who provide free or low-cost services are willing or able to make the long commutes necessary to some of these facilities. We pointed out in a previous report that aliens' ability to obtain representation could be affected when they are detained away from population centers.[5] In 1990, the Chief Immigration Judge recognized this potential problem and said that, where practical, selecting central locations for deportation hearings may help aliens locate representatives.

The following facilities were cited by these organizations as isolated:

- Krome, located approximately 20 miles from Miami, Florida;
- Port Isabel, located approximately 28 miles from Harlingen, Texas, and approximately 18 miles from Brownsville, Texas;
- Florence, located 60 miles southeast of Phoenix, Arizona; and
- El Centro, located approximately 114 miles from San Diego, California.

According to INS officials, with the exception of the Florence Service Processing Center, the location of these facilities was determined years—if not decades—ago based on the illegal immigration patterns at

---

[4]We could not determine whether aliens obtained, requested but did not obtain, or did not request representation for 35 of the total 2,705 cases we reviewed.

[5]See GAO/GGD-90-79 for a discussion on remoteness of facilities.

AR01543

the time. INS selected the Florence facility—one of its newest service processing centers—in part because, as a prior Bureau of Prisons site, it provided modern detention facilities. Therefore, the surrounding community would have little opposition to it as a detention facility.[6]

As shown in table 4.1, we compared the representation rate among the facilities at the time of our review. With the exception of Krome, the isolated facilities were below the average rate of 24 percent per facility. The 4 isolated facilities accounted for 1,151 (or 56 percent) of the total 2,071 cases where representation was not obtained.

Table 4.1: Representation Rate Among Facilities

| Facility | Cases with representation | Total cases | Percentage |
|---|---|---|---|
| Isolated | | | |
| El Centro | 27 | 270 | 10 |
| Florence | 13 | 293 | 4 |
| Krome | 147 | 399 | 37 |
| Port Isabel | 68 | 444 | 15 |
| **Subtotal** | **255** | **1,406** | **18** |
| Other | | | |
| Boston | 19 | 33 | 58[a] |
| Denver | 31 | 118 | 26 |
| El Paso | 69 | 294 | 24 |
| Houston | 44 | 182 | 24 |
| Laredo | 40 | 133 | 30 |
| Los Angeles | 42 | 208 | 20 |
| Seattle | 28 | 96 | 29 |
| Varick Street | 40 | 100 | 40 |
| Wackenhut | 31 | 100 | 31 |
| **Subtotal** | **344** | **1,264** | **27** |
| **Total** | **599** | **2,670** | **22** |

Note: Cases were included in the analysis only if alien representation was known.

[a]Boston's percentage may not be meaningful because of the few cases involved.

Source: GAO analysis of INS data.

[6]The location of another recent detention facility in San Pedro, California, was selected because it was also the site of a preexisting INS facility and was located near a Bureau of Prisons facility; this location helped minimize construction costs and community objection to the facility, according to INS officials.

AR01544

## Reluctance to Assist Criminal Aliens

As shown in table 4.2, our review of 67 organizations identified on legal service lists provided by INS indicated that relatively few organizations provide direct assistance to any aliens and even fewer will represent criminal aliens. Our review included lists collected from the service processing centers of El Centro, Florence, Krome, and Port Isabel and the contract facilities of Denver, Houston, and Laredo. We selected these facilities on the basis of location and alien population.

**Table 4.2: Legal Aid Organizations That Will Represent Criminal Aliens**

| Facility | Number contacted | Total that assist aliens | Number that represent criminal aliens |
|---|---|---|---|
| El Centro | 2 | 1 | 1 |
| Florence | 16 | 9 | 2 |
| Krome | 20 | 9 | 3 |
| Port Isabel | 11 | 5 | 3 |
| Houston | 6 | 6 | 1 |
| Laredo | 12 | 8 | 1 |
| **Total** | **67** | **38** | **11** |

Note: Denver is excluded because we could not contact the two organizations on its list.

Source: Interviews with advocacy group representatives.

Although most organizations will refer aliens to other organizations or private attorneys, of the 67 organizations contacted, 38 directly provided representation to aliens or assisted aliens in filling out forms.[7] Of those, 12 said they would represent criminal aliens.

Criminal aliens were less likely to obtain representation than noncriminal aliens. Of the 2,670 aliens for whom we could determine whether they obtained, requested, or did not have a representative, 1,065 (or 40 percent) were criminal aliens. Of the criminal aliens, 176 (or 17 percent) obtained representation, compared to 27 percent of the noncriminal aliens.

## Errors in Lists of Possible Representatives

As indicated in table 4.3, INS lists of representatives contained organizations that did not exist or had incorrect telephone numbers. Four lists included either nonexistent organizations or incorrect phone numbers. Further, we identified three organizations on the Krome Service

[7]There were a total of 80 organizations listed for the 7 facilities. Four of those were nonexistent, and another three were listed twice under different names. We could not reach 6 of the remaining 73 organizations by phone because no one answered after several attempts.

AR01545

Processing Center's list that had stopped representing aliens about 2 years ago.

**Table 4.3: Accuracy of Legal Aid Lists**

| Facility | Number of organizations | Number of existent organizations | Number of organizations with correct phone numbers |
|---|---|---|---|
| El Centro | 2 | 2 | 2 |
| Florence | 16 | 16 | 16 |
| Krome | 26 | 24[a] | 14 |
| Port Isabel | 12 | 11 | 11 |
| Denver | 2 | 1 | 1 |
| Houston | 6 | 6 | 6 |
| Laredo | 16 | 16 | 15 |
| **Total** | **80** | **76** | **65** |

[a]Three of these organizations were listed twice under different names.

Source: Interviews with advocacy group representatives.

Our review of these legal aid lists showed problems similar to those we had previously identified.[8] In the earlier review, we found that four of the five lists were inaccurate.

# Impact of Representation

At the Chairman's request, we analyzed detention data to determine the impact of government-provided representation. The low representation rate of detained aliens raises the issue of whether the presence or absence of alien representation could affect the length of time aliens remain in detention. INS officials had varying views on the impact government-provided representation would have on detention. While some officials thought that representation would prolong detention, others believed that this would be minimal and provided an example of the Florence Service Processing Center, where an informational program could reduce both alien detention time and the deportation process. At the time of our review, our analysis of detention files showed aliens with representation stayed about 2.5 times longer in detention than did unrepresented aliens.

---

[8]See GAO/GGD-90-79 for a discussion of legal aid lists.

AR01546

## Different Views Regarding Government-provided Representation

INS officials had mixed views on whether the government should provide representation to detained aliens. The officials were concerned as to whether government-provided representation would expedite the deportation process. Those officials who felt that counsel would delay the process stated that attorneys would only prolong individual cases by pursuing all avenues of relief from deportation (e.g., asylum). Although two other INS officials recognized that such a situation was possible, they believed that it would be minimized if the attorneys provided aliens with a realistic assessment of their cases. An advocacy group attorney stressed that if the government provided counsel, such a position should be independent of INS in order to eliminate possible pressures from within INS to expedite all cases regardless of merit.

We do not know the consequences of aliens representing themselves. However, we earlier estimated that aliens who had applied for asylum had a 12-percent approval rate of their cases for those represented by attorneys as compared to 3.9 percent for those representing themselves.[9] In addition, none of the applicants represented by religious or social groups were approved. We do not know the specifics surrounding individual cases or the impact representation had (i.e., would unrepresented aliens have different results if they were represented). However, the difference suggested that representation could affect the disposition of their cases.

## Florence Service Processing Center Project

At the Florence Processing Center, a local alien advocacy group—the Florence Immigration and Refugee Rights Project, Inc.[10] —established an alien orientation program. Its objective is to enable aliens to make informed decisions about their deportation hearings. To do so, the project's attorneys explain to aliens their rights on the day of their hearing. These rights include eligibility requirements for various forms of relief, such as asylum. After these discussions, those aliens who do not want to discuss their cases further proceed immediately with their deportation hearings. Most aliens fall in this category, according to the project supervisory attorney. The remainder may discuss their cases individually with participating attorneys; this can result in (1) proceeding with their deportation hearings without further legal advice or (2) requesting a continuance on their hearings from the immigration judge to obtain a representative—either from the project's attorneys or another advocacy group—or by hiring a private attorney.

---

[9]Asylum: Approval Rates Selected Applicants (GAO/GGD-87-82FS, June 4, 1987).

[10]Formerly the Florence Asylum Project.

AR01547

INS officials at the Florence Service Processing Center said that the project had successful results. Although estimates of total time saved as a result of the project were not available, INS officials stated that it saved a significant amount of time during deportation hearings because the process used at the center eliminated the need to have immigration judges describe the various types of relief available to each alien during the hearings. One INS official estimated that INS saved about 15 minutes per alien, with about 40 to 50 aliens scheduled for hearings a day. In addition, the project's attorneys ensured that the quicker cases went first and that the court allocated the appropriate amount of time to the other cases, thus increasing court efficiency. However, according to the project's supervisory attorney, the success of this program relies heavily on INS cooperation and the availability of resources that this and other advocacy groups can provide.

## Aliens With Representation Spent More Time in Detention

As shown in table 4.4, 594 aliens who had representation had spent an average of 95 days in detention compared to 38 days for 1,764 aliens who were not represented and 60 days for 300 aliens who requested but did not obtain representation. Our analysis also showed that during various stages of the deportation process, aliens who had representation spent more time in detention. However, for those aliens who appealed their cases, the difference in length of detention diminished for those with representation as compared to those without—196 days compared to 186 days. While we could not determine why aliens with representation are detained longer, people who represent aliens most likely are more knowledgeable of rights that are available to aliens (e.g., asylum) and therefore may pursue such rights. Further, aliens who have or desire representation may have more complex deportation cases that require more time.

Some INS officials suggested that most aliens want to expedite their deportation as much as possible to avoid lengthy detention. According to these officials, these aliens are typically Mexicans who entered without inspection and have few, if any, avenues of relief from deportation and therefore do not want representation.

**Table 4.4: Status of Case by Representation and Average Length of Detention**

| Case status | Represented | | Not represented | | Not represented but requested | |
|---|---|---|---|---|---|---|
| | Cases | Avg. days | Cases | Avg. days | Cases | Avg. days |
| Awaiting hearing | 116 | 57 | 924 | 16 | 54 | 39 |
| In progress | 305 | 70 | 335 | 51 | 203 | 47 |
| Case appealed | 97 | 196 | 79 | 186 | 25 | 158 |
| Case closed | 76 | 121 | 426 | 47 | 18 | 96 |
| **Total** | **594** | **95** | **1,764** | **38** | **300** | **60** |

Note: Length of detention was computed as the average length of time from when aliens entered their current facility to the date of our review. The table does not include 47 cases where representation, case status, or length of detention were unknown.

Source: GAO analysis of INS data.

## Conclusions

On the basis of our analysis, 22 percent of the aliens had representation, while 11 percent requested but did not obtain representation. We could not determine the specific reasons why they did not obtain it; however, a number of factors may contribute to this lack of representation. These factors include the isolation of certain facilities, limited number of organizations and individuals who are willing to provide free or low-cost legal services to criminal aliens, and problems with INS' lists of organizations and individuals who may represent aliens.

Aliens who had representation spent more time in detention than aliens who did not have representation. This finding is not unexpected, because aliens who have representation are trying to remain in the country. Since INS may not release them while their case is in process, they remain in detention longer than those not contesting their removal from the country.

Different opinions exist within INS as to whether aliens should be provided free legal representation or some form of legal assistance when initially detained. Some officials stated that providing legal aid would expedite the deportation process and thereby reduce detention time. They referred to the Florence Service Processing Center project, which provides information to detained aliens about their rights so that they can make more informed decisions about their cases. Other INS officials expressed concern that representation would prolong an alien's case and result in longer detention times.

The 22-percent representation rate of detained aliens, along with the 11 percent who requested but did not obtain representation, raises the issue of whether aliens are able to exercise their right to obtain representation as well as to have adequate access to representation while detained in remote areas. Under the existing law, aliens are entitled to representation, but not an expense to the government.

## Recommendation to the Attorney General

Because of the low representation rate for detained aliens, we recommend that the Attorney General direct INS and EOIR to determine the reasons aliens are not exercising their right to obtain representation and take appropriate action on any problems identified.

# Excludable and Detained Aliens Requested Asylum

While not directly related to INS' detention policy and procedures, concern has been raised that aliens risk being detained when they apply to INS for asylum.[1] However, our analysis showed that this generally was not the case. In our sample of 2,705 detained aliens, 417 requested asylum. About one-fourth of the detained aliens were deportable and already in detention when they applied for asylum, and about 66 percent were excludable.

INS tested for an 18-month period a pilot program to parole certain asylum applicants into the country rather than detain them in an effort to reduce its demand for detention space. These asylum applicants had to meet certain criteria to be paroled under the pilot program.

## Data on When Detained Aliens Request Asylum

Asylum applicants under deportation or exclusion proceedings generally applied while in detention. District directors stated that with the exception of excludable aliens, their general policy is not to detain asylum applicants who voluntarily present themselves to INS. In addition, advocacy groups knew of no cases within the past 2 years of aliens INS detained who had voluntarily presented themselves to apply for asylum.[2] Our review of detention files of deportable aliens supported the idea that asylum applicants applied while in their current detention.

Of the 2,705 INS detained aliens, 417 applied for asylum. Of the 319 applicants for whom we could determine the date of their application, 81 aliens (or 25 percent) applied after INS placed them in detention and 211 (or 66 percent) applied for asylum when they tried to enter the country and were detained on the basis of INS' policy of detaining excludable aliens. The remaining 27 (or 9 percent) detained aliens had applied for asylum prior to their detention.

- Twenty had applied for asylum before they were detained and according to INS officials they either had (1) asylum granted years before but had subsequently violated conditions for remaining in the country (e.g., committed a crime) or (2) asylum denied during previous deportation proceedings;
- three were detained for reasons unrelated to their asylum application (e.g., they were criminal aliens);

---

[1]Aliens can apply for asylum after they have entered the country by presenting themselves to INS or while in detention. Once apprehended, aliens may request asylum during their deportation or exclusion hearings.

[2]These advocacy groups were the Refugee Assistance Council, Incorporated; Casa Del Projecto Libertad; and Florence Immigrant and Refugee Rights Project, Inc.

AR01551

- two were stowaways; and
- one was a juvenile held in custody until INS could locate a legal guardian to whom the alien could be released.

We could not determine the status of one alien.

## Pilot Parole Program

In May 1990, INS implemented a pilot program to test the feasibility of paroling up to 200 asylum applicants who met certain criteria, such as not presenting a threat to public safety, having means of financial support, and having a legitimate address where the alien could be contacted. Asylum applicants were to establish a prima facie case with the district director before being released on parole. The program was limited to the district offices in Los Angeles, California; Miami, Florida; New York, New York; and San Francisco, California; it was to last 18 months. However, lack of detention space forced some districts to extend parole to aliens who might not have qualified under the pilot program's criteria.

Although INS designed the pilot program for careful control of parolees, the number of excludable aliens entering the country and limited detention space forced a number of districts, including New York and Los Angeles, to release more than the intended total of 200 excludable aliens. For example, the New York district reported that, effective mid-June 1991, it would no longer detain excludable aliens with fraudulent documents who are asylum applicants because of lack of detention space. The New York district released 183 exclusion cases in June 1991. In addition, the Assistant District Director in Los Angeles reported that his district released excludable aliens before a prima facie asylum case was established because of limited detention space and hearing time.

According to INS officials, the program ended on October 31, 1991, and a report on the program was sent to the Commissioner in February 1992. They added that as of April 6, 1992, INS was analyzing the program results to determine what action to take regarding the future use of parole for asylum applicants.

## Conclusion

Our review of detained aliens who applied for asylum showed that they were detained because they were (1) excludable and therefore met INS detention criteria or (2) already in detention when applying. INS has implemented a pilot program to parole into the country aliens who are

seeking asylum. This program may help relieve the burden on detention space imposed by aliens with legitimate asylum claims.

AR01553

AR01554

# Length of Detention by Type of Alien and Site

| Facility | Number of aliens | | | |
|---|---|---|---|---|
| | 0-30 days | 31-60 days | 61-90 days | Over 90 days |
| Boston | | | | |
| Criminal | 9 | 5 | 3 | 12 |
| Noncriminal | 2 | 1 | 0 | 0 |
| Varick Street | | | | |
| Criminal | 22 | 15 | 10 | 44 |
| Noncriminal | 3 | 5 | 0 | 4 |
| El Centro | | | | |
| Criminal | 111 | 29 | 27 | 34 |
| Noncriminal | 54 | 2 | 5 | 9 |
| Florence | | | | |
| Criminal | 166 | 23 | 11 | 8 |
| Noncriminal | 68 | 10 | 6 | 5 |
| Houston | | | | |
| Criminal | 58 | 23 | 6 | 15 |
| Noncriminal | 34 | 17 | 11 | 17 |
| Laredo | | | | |
| Criminal | 38 | 11 | 8 | 15 |
| Noncriminal | 33 | 19 | 3 | 6 |
| Seattle | | | | |
| Criminal | 42 | 3 | 0 | 4 |
| Noncriminal | 26 | 8 | 4 | 9 |
| El Paso | | | | |
| Criminal | 60 | 15 | 8 | 20 |
| Noncriminal | 150 | 20 | 11 | 17 |
| Denver | | | | |
| Criminal | 23 | 1 | 3 | 8 |
| Noncriminal | 51 | 7 | 9 | 22 |
| Los Angeles | | | | |
| Criminal | 6 | 1 | 0 | 0 |
| Noncriminal | 176 | 22 | 3 | 1 |
| Port Isabel | | | | |
| Criminal | 3 | 2 | 3 | 3 |
| Noncriminal | 197 | 114 | 73 | 54 |
| Krome | | | | |
| Criminal | 1 | 0 | 1 | 1 |
| Noncriminal | 122 | 101 | 43 | 135 |

(continued)

AR01555

| Facility | Number of aliens | | | |
|---|---|---|---|---|
| | **0-30 days** | **31-60 days** | **61-90 days** | **Over 90 days** |
| Wackenhut | | | | |
| Criminal | 0 | 0 | 0 | 0 |
| Noncriminal | 97 | 0 | 0 | 3 |

Note: Length of detention was computed as the average length of time from when aliens entered their current facility to the date of our review. Noncriminal includes deportable and excludable aliens.

Source: GAO analysis of INS data.

AR01556

# Comments From the Department of Justice



**U. S. Department of Justice**

Washington, D.C. 20530

MAY 2 2 1992

Mr. Richard L. Fogel
Assistant Comptroller General
General Government Division
U.S. General Accounting Office
Washington, D.C. 20548

Dear Mr. Fogel:

See pp. 6 and 22.

The Department appreciates the opportunity to provide comments on the General Accounting Office (GAO) draft report entitled, "Immigration Control: Immigration Policies Affect INS Detention Practices." The Department generally agrees with GAO's findings and recommendations as stated in its report, and has informally provided technical comments to GAO. We understand that GAO is incorporating our comments into the final report.

Sincerely,

Harry H. Flickinger
Assistant Attorney General
for Administration

AR01557

# Major Contributors to This Report

| | |
|---|---|
| **General Government Division, Washington, D.C.** | James M. Blume, Assistant Director, Administration of Justice Issues<br>C. Jay Jennings, Assignment Manager<br>Barry J. Seltser, Technical Advisor |
| **Office of General Counsel** | Ann H. Finley, Senior Attorney |
| **Dallas Regional Office** | Vernon L. Tehas, Regional Management Representative<br>Cleofas Zapata, Evaluator-in-Charge<br>Hilary C. Sullivan, Site Senior<br>Shannon Q. Cross, Technical Advisor |
| **Los Angeles Regional Office** | Janet Fong, Site Senior<br>Yelena K. Thompson, Evaluator |

AR01558

AR01559

Ordering Information

The first copy of each GAO report is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20877

Orders may also be placed by calling (202) 275-6241.

AR01560

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

**AR01561**



United States Department of Justice
Immigration & Naturalization Services

Inspector's Field Manual

Updated Through March 2001

I. Policies and Procedures: Application for Admission.
Chapter 17: Inadmissible Aliens

17.15 EXPEDITED REMOVAL.

 (a) Inadmissibility. An alien found to be inadmissible solely under section 212(a)(6)(C) or 212(a)(7) of the Act may be ordered removed by a Service officer at the port-of-entry without a hearing before an immigration judge. Referred to as expedited removal, this procedure was added to section 235(b)(1) of the Act by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104-208. The provision itself became effective April 1, 1997. This new process gives immigration officers a great deal of authority over removal of aliens and will remain subject to serious scrutiny by the public, advocate groups, and Congress. All officers should be especially careful to exercise objectivity and professionalism when refusing admission to aliens under this provision. Because of the sensitivity of the program and the potential consequences of a summary removal, you must take special care to ensure that the basic rights of all aliens are preserved, and that aliens who fear removal from the United States are given every opportunity to express any concerns at any point during the process. Since a removal order under this process is subject to very limited review, you must be absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her.

 Arriving aliens who are inadmissible under section 212(a)(6)(C) or (7) are subject to expedited removal under section 235(b)(1) of the new Act. If 212(a)(6)(C) and 212(a)(7) are the only charges lodged, the alien must be processed under expedited removal and may not be referred for an immigration hearing under section 240. If additional charges are lodged, the alien may be referred for a section 240 hearing, but this should only occur in extraordinary circumstances. Generally speaking, if an alien is inadmissible under 212(a)(6)(C) or (7), additional charges should not be brought and the alien should be placed in expedited removal. Aliens charged with grounds other than 212(a)(6)(C) or (7) should be referred for a hearing under section 240. There will be very few instances where it will be advantageous to the Service to lodge additional charges and institute section 240 removal proceedings if a solid expedited proceeding can be concluded. Even in criminal cases, an expedited proceeding will normally be the preferred option.

 If the alien appears to be inadmissible under the provisions of section 235(c) of the Act as a terrorist or other special interest case, refer to Chapter 17.7 or, in appropriate circumstances, detain the alien for removal proceedings conducted by the Alien Terrorist Removal Court under Title V of the Act.

 The authority to formally order an alien removed from the United States, without hearing or review, carries with it the responsibility to accurately and properly apply the grounds of inadmissibility. Any immigration officer issuing an expedited removal order and any designated supervisory officer concurring on an expedited removal order must have completed Phase I of the official 96 Act Training Program prepared by the Training Division. Phase I training was also incorporated into the curriculum of all IOBTC classes which were graduated on or after June 3, 1997 (class numbers IOBTC-264 and above).

 The Service retains the discretion to permit withdrawal of application for admission in lieu of issuing an expedited removal order. Provisions for withdrawal are now contained in both statute and regulation, with specific guidance in the IFM and should be followed by all officers with authority to permit withdrawals. As an example, in cases where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a lack of proper documents is the result of inadvertent error, misinformation, or where no fraud was intended (e.g. an expired nonimmigrant visa), Service officers may consider, on a case-by-case basis and at the discretion of the Service, any appropriate waivers, withdrawal of application for admission, or deferred inspection to resolve the ground of inadmissibility rather than issuing an expedited removal order.

   All officers should be aware of precedent decisions and policies relating to the relevant grounds of inadmissibility. Section 212(a)(6)(C) is an especially difficult charge to sustain, unless the case involves obviously fraudulent or counterfeit documents. Misrepresentation is even more difficult to determine. Also keep in mind that an alien who is determined to be inadmissible for fraud or misrepresentation is barred forever from the United States, with few waivers available. Any one or several of the following points should be considered in determining if an alien has committed fraud or misrepresentation.

   • To support a charge of having procured a document by fraud or misrepresentation, the procuring must have been done from a government official, not from a counterfeiter, and any misrepresentation must have been practiced on a U.S. Government official.

   • The procurement by fraud must relate to a person who has done so to obtain his or her own admission, not someone else's.

   • The fraud or misrepresentation must be material, i.e., the alien is inadmissible on the true facts, or the misrepresentation tends to shut off a relevant line of inquiry that might have resulted in a determination of inadmissibility.

   • In general, an alien should not be charged with misrepresentation if he or she makes a timely retraction of the misrepresentation, in most cases at the first opportunity.

   • Silence or failure to volunteer information does not in itself constitute a misrepresentation.

   • Aliens who are determined to be mentally incompetent and small children judged to be incapable of independently forming an intent to defraud should not be ordered removed using section 212(a)(6)(C) as the inadmissibility charge. The preferred charge in such cases would be section 212(a)(7).

   All expedited removal orders require supervisory approval before service upon the alien. By regulation, this approval authority is not to be delegated below the level of a second line supervisor. Each district may determine at what level (second line supervisor or above) this review authority should be delegated. The expedited removal provisions are not applicable in preclearance or preinspection operations. If the Service wishes to proceed with expedited removal of an alien inspected during an en route inspection of a vessel, action on the case will be deferred until the vessel has arrived in the United States. The alien may then be processed as an expedited removal case.

   Port directors are responsible for ensuring that all U.S. Customs officers who are cross-designated to perform immigration inspections are adequately trained in the expedited removal provisions. Customs officers shall not issue expedited orders of removal, even in ports where there is only a Customs officer on duty. Such cases must be referred to an INS officer if a decision is made to pursue expedited removal.

   See Appendix 17-3 for a flow chart mapping the entire expedited removal process.

   (Paragraph (a) amended 8/21/97; IN97-05)

   (b) Preparing a Case. The steps to be taken when ordering an alien removed under the expedited removal provisions differ somewhat from those in normal removal proceedings. As when referring an alien for a removal hearing before an immigration judge, it is important that a complete, accurate record of removal be created, and that any expedited removal be justifiable and non-arbitrary. Numerous Service forms have been revised or newly created to conform with IIRIRA. The revised forms are listed in 8 CFR 299.1 and 299.5 of the interim regulations.

   A separate IIRIRA wire details the list of forms and how to obtain them. Districts may request these forms from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Service Forms Centers. In addition, the forms are being incorporated in electronic format into numerous automated forms-generation systems.

The following steps must be taken in each case in which an order of expedited removal is contemplated or entered against an alien:

(1) Clearly explain to the alien, in a language he or she understands, the serious nature and impact of the expedited removal process. Read the statement of rights and consequences contained on the first page of Form I-867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, to the alien. Explain that you will be taking a statement from him or her, and that any information given or discovered will be used in making a decision on the case and may result in his or her prompt removal. Advise the alien that if he or she is found to be inadmissible and a decision is made to order the alien removed, he or she will be immediately removed from the United States. Explain that there is no appeal to this decision and that this will be his or her only opportunity to provide any information or state any fear of return or removal that he or she may have.

(2) In every expedited removal case, you must use Form I-867A&B to take a complete sworn statement from the alien concerning all pertinent facts. The information discussed in paragraph (1) above is printed on the form and should be carefully explained to the alien. If the case did not initially appear to involve inadmissibility and removal under the expedited removal proceedings, and the sworn statement was begun using other Service forms, you must immediately advise the alien of the rights and warnings on Form I-867A once you determine that the expedited removal proceedings will apply.

The sworn statement will usually be done in question and answer format, but a narrative format may be used in simple, straightforward cases not involving potentially sensitive or contentious issues. The sworn statement should cover several general areas of inquiry:

Identity--including true name, aliases, date and place of birth and other biographical data.

Alienage--determine citizenship, nationality, residence. Cover any possible claim to U.S. citizenship through parents.

Inadmissibility--questions should cover the alien's reason for coming to the United States, information about the specific facts of the case and the specific suspected grounds of inadmissibility.

Fear of persecution or torture--if the alien indicates in any fashion that he or she has a fear of persecution, or that he or she has suffered or might suffered torture, you are required to refer the alien to an asylum officer for a credible fear determination. One of the significant differences between expedited removal proceedings and regular removal proceedings is that the inspecting officer has a responsibility to ensure that anyone who indicates a fear of persecution is referred to an asylum officer for a credible fear determination. Inspectors should consider verbal as well as non-verbal cues given by the alien. The obligatory questions on the Form I-867B are designed to help in determining whether the alien has such fear. In some cases, this area of discussion might arise during the main body of the sworn statement (i.e., before you reach the jurat page, Form I-867B) and you may have already asked these specific questions. If the exact questions have already been asked and answered, you may elect to line out the identical questions on the jurat page. Otherwise, ask the questions as they appear on the I-867B at the end of the sworn statement. If the alien indicates an intention to apply for asylum or a fear of harm or concern about returning home, the inspector should ask enough follow-up questions to ascertain the general nature of the fear or concern. Do not go into detail on the nature of the alien's fear of persecution or torture; leave that for the asylum officer. If an alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution, then the case should not be referred to an asylum officer. In determining whether to refer the alien, inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements. The inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution. Do not make any evaluation as to the merits of such fear; that is the responsibility of the asylum officer. Immigration officers processing aliens for expedited removal may contact the asylum office point(s) of contact when necessary to obtain guidance on questionable cases involving an expression of fear or a potential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

asylum claim.

 Impact of decision--once you have gathered all the facts, you will decide, usually in consultation with a supervisor, the best course of action. Depending on the circumstances, you may admit the alien, allow the alien to apply for any applicable waivers, defer the inspection or otherwise parole the alien, permit the alien to withdraw his or her application for admission, issue an expedited removal order, or refer the alien for a credible fear determination. Whatever decision is made, clearly advise the alien of the impact and consequences of the determination and record this in the statement.

 You must use Form I-867B as the final page of the sworn statement and jurat. Be sure to obtain responses from the alien regarding the closing questions contained on the form. If the alien in any way indicates a fear of removal or return, follow the procedures in paragraph (d) of this section. Collect any additional evidence relevant to the case which is discovered during the inspection process. Provide a copy of the completed statement, upon signature, to the alien. Retain a copy for the Service file and copy for the port file.

 (3) Prepare three copies of Form I-860, Notice and Order of Expedited Removal. Check the appropriate ground(s) of inadmissibility under which the alien is being charged (e.g. 212(a)(6)(C)(i)), and insert a narrative description of each charge. Read and explain the charges to the alien in the alien's native language or in a language the alien can understand. An interpreter may be required to ensure that the alien understands the allegations and the removal order. Interpreters should not be used if they are employees of the government of the alien's home country, such as an employee of a government-owned airline, except for the most routine questioning. Never use an employee of a foreign government if there is any possibility of sensitive areas (e.g., persecution or torture) being discussed. The alien should be given an opportunity to respond to the charges, and any response must be recorded either in the sworn statement or as an addendum to the statement.

 After all statements are taken and other paperwork is complete, present it through your chain of command to the appropriate supervisor (not to be delegated below the second line supervisor) or person acting in that capacity, for review and approval. If the appropriate supervisor is not present at the port, the supervisory review and approval may be obtained telephonically, by fax, or by other means. The approving authority must be properly advised of all facts in the case in order to make an informed decision. Print the name and title of the supervisor approving the order, and check the box on the form indicating that concurrence was obtained telephonically or by other means. The expedited removal order must be signed legibly by the preparing officer.

 (4) Obtain the photograph and fingerprints of the alien on FD-249 fingerprint cards (three sets--see chapter 18.9(c) for distribution). Be sure to complete the entire form and to properly code the fingerprint cards with the proper United States Code citation, since the FBI will not clear cards without such codes. Following are examples of codes that may be used:

• 18 U.S.C. 1544 Photo substitutions

• 18 U.S.C. 1546 Counterfeit immigrant visa

• 8 U.S.C. 1306 Counterfeit INS documents, such as alien registration

• 18 U.S.C. 911 False claims to U.S. citizenship (imposters, photo substitution of U.S. passport)

• 18 U.S.C. 1001 Other (fraudulent documents, false statements, imposter, etc.)

 (5) Obtain forensic analysis, if appropriate. In cases involving fraudulent documents, if the sworn statement includes an admission of the fraud, no forensic analysis may be required. Due to the expedited nature of the proceedings, actual forensic examination of the document by the Forensic Document Laboratory (FDL) may not be feasible. This does not mean that it is permissible to "rush to judgement", or that it is permissible to expeditiously remove an alien based on incomplete evidence. If forensic analysis is required to establish that the alien is inadmissible, such analysis must be obtained before the Form I-860 is executed. If necessary, the alien should be detained until the analysis is performed, and then the I-860 can be executed. (On the other hand, if the alien's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inadmissibility under section 212(a)(7) has been established, there is little or no reason to delay the expedited removal process in order to also establish the 212(a)(6)(C) charge.) Offices with photophones or other communications devices for transmitting quality images should use that technology whenever possible or necessary. [See Chapter 32 for details on using FDL services and for contributing documents or intelligence information concerning the fraud.]

  (6) Unless an "A" number already exists for an alien placed into expedited removal, an "A" number must be assigned to every expedited removal case at the port-of-entry in order to ensure proper tracking of the case from the onset.

  New codes have been created for entry of expedited removal cases into the Central Index System (CIS). Those new codes are:

  ERF--Expedited Removal case has been initiated under section 235(b)(1) INA and a final decision is pending a credible Fear determination by an asylum officer or immigration judge.

  ERP--Expedited Removal case has been initiated under section 235(b)(1) INA and a final decision is Pending for reasons other than referral for credible fear interview before an asylum officer.

  ERR--Expedited Removal case has been initiated and alien has been Removed from the United States under that program

  Entry of cases into CIS should be accomplished as quickly as possible in accordance with district policy. To ensure prompt data entry, "A" files for expedited removal cases should be separated from other files and flagged as expedited removal cases.

  New codes are also being created to designate expedited removal cases in the National Automated Immigration Lookout System (NAILS) and the Interagency Border Inspection System (IBIS). The new IBIS disposition codes have recently been posted in the IBIS Daily News. Field offices will be notified as new codes are finalized.

  Search for existing Service records in CIS and other appropriate automated systems. If an "A" file exists, create a temporary file and request the permanent file. After the file is received, update it with all relevant documents completed or collected during the expedited removal process, and forward it to the proper files control office. If no previous file exists, create a new "A" file relating to the alien.

  (7) Consult 8 CFR 236.1(e) to ensure that, if required, the appropriate consular official is immediately notified of the alien's detention, even if the alien requests that this not be done. Notify the alien that he or she may communicate with a consular official. This normally will only be necessary when removal of the alien cannot be accomplished immediately and the alien must be placed in detention for longer than 24 hours. When you contact a consular official, never mention any asylum claim which may have been filed, or give any indication that the alien has expressed a fear of persecution or torture.

  (8) If criminal prosecution of the alien is contemplated in addition to expedited removal, the criminal action must be completed before the alien is ordered removed. [See Chapter 18 for procedures for criminal prosecution]. Once the warning of rights has been given to the alien, questioning of the alien can only occur with the alien's consent. If the alien permits questioning and processing to proceed, complete the sworn statement and the Form I-860. Do not serve the I-860 on the alien, but place it in the "A" file pending the criminal processing. If the alien is to be turned over to another law enforcement agency, serve a Form I-247, Immigration Detainer--Notice of Action, on the other agency. Once the alien is returned to INS custody, the I-860 may be served and the alien removed under the expedited removal order.

  (9) Serve the original Form I-860 on the alien, unless the alien is to be deferred to an onward office, in which case the service is accomplished by the onward office. Place a copy of the I-860 in the "A" file. The third copy may be retained at the port.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(10) Serve Form I-296, Notice to Alien Ordered Removed. You must check the appropriate box to indicate the period during which the alien must obtain permission to reenter: 5 years for the first removal under section 235(b)(1); 20 years in the case of a second or subsequent removal; at any time if the alien has been convicted of an aggravated felony (even though the alien is not being charged as an aggravated felon in this proceeding). At the time of actual removal, a photograph and a pressed print of the alien's right index finger should be placed on a copy of the I-296, the alien should sign the form, and the particulars of the departure entered on the form for retention in the file.

(11) Cancel the alien's visa or border crossing card, if appropriate, and complete and distribute Form I-275 as described in Chapter 17.2. Note the passport with the file number and action taken, for example: "Ordered Removed 12/1/97 NYC/Section 212(a)(6)(C)(i)". Forward a copy of the expedited removal order with the I-275 to the Department of State.

(12) Prepare a new Form I-94. If the alien applied for admission at a land border, annotate the Form I-94 to read: "Form I-860 Removal Order issued pursuant to section 235(b)(1) of the Act. (Date), (Place), (Officer)". If the alien applied for admission at an airport or seaport, use the parole stamp and endorse the I-94 to read: "For removal from the U.S. by (carrier name). Form I-860 Removal Order issued pursuant to section 235(b)(1) of the Act. (Date), (Place), (Officer)".

(13) Detain the alien, as appropriate. Follow local procedures to obtain detention authorization and arrange for detention. Aliens placed into expedited removal proceedings must be detained until removed from the United States. Parole may be permitted only if there is a medical emergency or if it is necessary for legitimate law enforcement purposes, such as for criminal prosecution or to testify in court. Once an alien has established a credible fear of persecution or is otherwise referred (as provided by regulation) for a full removal proceeding under section 240, release of the alien may be considered under normal parole criteria.

If there is insufficient detention space to detain an alien in expedited removal who is arriving at a land port-of-entry and who claims a fear of persecution, that alien may be required to wait in Canada or Mexico pending a final determination of his or her claim. This option should be taken only as a last resort and should only be used for aliens who claim a fear of persecution that is unrelated to Canada or Mexico. Aliens who make false claims to U.S. citizenship, or false or unverified claims to lawful permanent resident, asylee, or refugee status, and aliens who claim a fear of persecution that is related to Canada or Mexico must be detained. Aliens arriving at a land border port-of-entry who do not claim lawful status in the United States or a fear of persecution should normally be processed immediately and either returned to Canada or Mexico or detained until removed. These aliens should not be required to wait in Canada or Mexico pending issuance of an expedited removal order.

Credible fear interviews will normally take place at Service or contract detention facilities. Each port-of-entry and detention facility will be provided with a point or points of contact at the asylum office having responsibility for that geographical area. It is the responsibility of the referring (Inspections) officer to provide the alien being referred for a credible fear interview with both a Form M-444, Information about Credible Fear Interview, and a list of free legal services, as provided in 8 CFR parts 3 and 292. It is the responsibility of the detention or deportation officer to notify the appropriate Asylum office point of contact when an alien subject to the expedited removal process requires a credible fear interview, and is being detained in Service custody pending this interview. That officer should also provide any additional information or requirements of the alien, such as whether the alien requires an interpreter or other special requests or considerations. When aliens are detained in non-Service facilities or at remote locations, the referring officer must notify the appropriate Asylum Office. If the alien is subsequently transferred to another detention site, the detention or deportation officer must ensure that the appropriate Asylum Office has been notified.

Normally the credible fear interview will not take place sooner than 48 hours after the alien arrives at the detention facility. If the alien requests that the interview be conducted sooner, the referring officer, or any other officer to whom the alien makes the request, should immediately convey that information to the appropriate Asylum office.

(14) Remove the alien from the United States. Most aliens removed under the expedited removal provisions will be turned over to the carrier of arrival for prompt removal; however, some aliens, such as those who claim asylum or LPR status, may be detained pending a decision on their claim. At the land border, ensure the alien's departure to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contiguous foreign territory. At air and seaports, serve the carrier with Form I-259, Notice to Detain, Remove, or Present Aliens, and check the appropriate boxes to order the carrier to remove the alien when the removal process is finished, or if the case has not yet been completed, to advise the carrier of potential liability.

 (15) Every case in which an expedited removal order is issued must be entered into the Deportable Alien Control System (DACS). Entry of data for those aliens detained by the Service will be handled by the Detention and Deportation section responsible for the detention facility. Entry of data for aliens not requiring detention who are removed directly from the port-of-entry is the responsibility of the Inspections section. A separate memorandum issued by the Office of Field Operations on March 18 details the procedures for entry of data into DACS for expedited removal cases. Cases initiated at the ports-of-entry and referred for removal proceedings under section 240 will continue to be entered into DACS by Detention and Deportation.

 The expedited removal process will be the subject of extensive inquiry and will require appropriate tracking of specific case data. A separate memorandum regarding tracking of expedited removal cases at ports-of-entry explains how this data collection will be accomplished.

 (16) The Inspections Workload Report, Form G-22.1 is being revised to include data relating to expedited removal cases, and is expected to be available October 1, 1997.

 (c) Withdrawal of Application for Admission in Lieu of Expedited Removal Order. The Service has the discretion to allow an inadmissible alien to withdraw his or her application for admission and depart the United States. See Chapter 17.2 for a full discussion of withdrawal considerations. This discretion also applies to aliens subject to expedited removal, and should be applied carefully and consistently, since your decision to allow withdrawal or issue a removal order is final. Officers should keep in mind that an order of expedited removal carries with it all the penalties of an order of removal issued by an immigration judge (including a bar to reentry of at least 5 years following removal). Follow the guidelines and considerations contained in Chapter 17.2 in determining whether granting withdrawal of application for admission is in the best interest of justice.

 (d) Fear of Persecution or Request for Asylum. Aliens who indicate an intention to apply for asylum or a fear of persecution may not be ordered removed until an asylum officer has interviewed the alien to determine whether the alien has a credible fear of persecution and warrants a full asylum hearing before an immigration judge.

 When questioning or taking a sworn statement from any alien subject to the expedited removal provisions, you need not directly solicit an asylum claim. However, to ensure that an alien who may have a genuine fear of return to his or her country is not summarily ordered removed without the opportunity to express his or her concerns, you should determine, in each case, if the alien has any concern about being returned to his or her country. Further, you should fully explore any statement or indications, verbal or non-verbal, that the alien actually may have a fear of persecution or return to his or her country. You must fully advise the alien of the process, as indicated on the Form I-867A, and of the opportunity to express any fears.

 Keep in mind that the alien need not use the specific terms "asylum" or "persecution" to qualify for referral to an asylum officer, nor does the fear of return have to relate specifically to one of the five grounds contained within the definition of refugee. The United States is bound by both the Protocol on Refugees and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and, except under extraordinary circumstances, may not return an alien to a country where he or she may face torture or persecution.

 The alien may convey fear of violence or harm, a need for protection, an indication of harm to, or disappearance of, relatives or associates, or dangerous conditions in his or her country. Even disputes of a personal nature sometimes may relate to asylum, such as domestic violence, sexual or child abuse, child custody problems, coercive marriage or family planning practices, or forced female genital mutilation. All officers should recognize that sometimes unusual cases have been found eligible for asylum that may not have initially appeared to relate to the five grounds contained in the definition of refugee, such as AIDS victims who face government persecution, land or money disputes with wealthy persons or persons in power, whistle blowers, witnesses to crimes and even organized crime connections. Do not make judgement decisions concerning any fear of persecution, torture, or return. If in doubt, refer to an asylum officer for a determination. Any alien who by any means indicates a fear of persecution or return may not be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

removed from the United States until the alien has been interviewed by an asylum officer.

If the alien indicates an intention to apply for asylum or asserts a fear of persecution or return, and is being referred for a credible fear interview with an asylum officer:

(1) Create an "A" file, if one does not already exist.

(2) Fully process the alien as an expedited removal case, if that is not already being done. Establishing inadmissibility cannot be left to the asylum officer. Record a description of the particulars of the interview and the alien's initial claim to asylum or fear of return by means of a sworn statement. Form I-867A and B must be used for all expedited removal cases. Follow the instructions in paragraph (b)(1) above to ensure that the alien understands the proceedings. Although you need not pursue the asylum claim in detail, enough information should be obtained to inform the asylum officer of the alien's initial claim to asylum or fear of persecution or return. If the alien answers the closing questions on Form I-867B in the affirmative, several other questions may be necessary to determine the nature of the fear or concern.

If the case did not initially appear to involve inadmissibility and removal under the expedited removal proceedings, and the sworn statement was begun using other Service forms, you must immediately advise the alien of the rights and warnings on Form I-867A once you determine that the expedited removal proceedings will apply and then use Form I-867B for the closing questions and jurat. The sworn statement will usually be done in question and answer format, but a narrative format may be used in simple, straightforward cases not involving potentially sensitive or contentious issues.

(3) Complete the Determination of Inadmissibility portion of the Form I-860, including sufficient information to support the charges of inadmissibility should the asylum officer find that alien does not have a credible fear of persecution. Sign only the Determination portion of the form. The removal part of the order will be signed by the asylum officer only after it is determined that the alien does not have a credible fear of persecution. Refer also to Chapter 43.3 for documenting any potential fines issues.

(4) Advise the alien of the purpose of the referral and that the alien may consult with a person or persons of his or her choosing, at no expense to the government and without delaying the process, prior to the interview. The Form M-444, Information about Credible Fear Interview, must be given to the alien and explained in a language the alien understands. The alien should sign two copies, acknowledging receipt of the information. One copy should be placed in the A file, and the other retained by the alien.

(5) Arrange for detention of the alien according to local procedures. According to local procedures, you must advise the appropriate asylum office that an alien being detained requires a credible fear interview. The asylum office should also be advised whether the alien requires an interpreter and of any other special considerations. Forward the "A" file to the location where the credible fear interview will take place. Prepare Form I-259 and serve it on the affected carrier. Complete Form I-94 for NIIS entry notated "Detained at _____ pending credible fear interview pursuant to section 235(b)(1)(B) of the Act. (Date), (Place), (Officer)".

An asylum officer will conduct an interview to determine if the alien has a credible fear of persecution, either at the detention facility or at a location arranged through the asylum office having jurisdiction over the place of apprehension, depending on location. In some cases, credible fear interviews may be conducted by other asylum-trained immigration officers. If the alien is determined to have a credible fear of persecution, the asylum officer will refer the alien for a well-founded fear hearing before an immigration judge under section 240 of the Act. If the alien is found not to have a credible fear of persecution, following review by a supervisory asylum officer, the asylum officer will order the alien removed pursuant to section 235(b)(1), unless the alien requests that the determination of no credible fear be reviewed by an immigration judge. If the alien makes such a request, the asylum officer will use Form I-863, Notice of Referral to Immigration Judge, checking box #1, to refer the alien to the immigration judge for review of the credible fear determination. If the immigration judge determines that the alien does not have a credible fear of persecution, the Service will present the alien for removal to the carrier on which he or she arrived. There may be some situations where the actual carrier of arrival and port of embarkation cannot be ascertained. Such cases may require additional processing, including detention, in order to arrange for travel documents and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transportation at government expense (User Fee).

 (e) Claim to lawful permanent resident, asylee, or refugee status, or U.S. citizenship. (1) General. Cases in which an alien who is subject to expedited removal claims to be a U.S. citizen, claims to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 207, or to have been granted asylum under section 208, should be handled very cautiously to ensure that the rights of the individual are fully protected. The expedited removal authority provided by IIRIRA is a powerful tool and there are significant interests at issue where such a claim is made. You should be extremely aware of those interests when you are using this tool. There are grave consequences (for the person involved, for the Service, and for the individual officer) involved in incorrectly processing a bona fide citizen, LPR, refugee or asylee for removal. Although the statute and regulations provide certain procedural protections to minimize the risk of such consequences, you should never process a case for expedited removal which you would not feel satisfied processing for a hearing before an immigration judge.

 If the alien falsely (or apparently falsely) claims to be a U.S. citizen, lawful permanent resident, refugee, or asylee, and is not in possession of documents to prove the claim, make every effort to verify the alien's claim prior to proceeding with the case. This can be accomplished through a thorough check of the Service data systems, manual request to the Records Division, careful questioning of the alien, or review of Service issued and other documentation presented. Use whatever means at your disposal to verify or refute a claim to U.S. citizenship, including verification of birth records with state authorities, etc.

 (2) Verifiable Claim. When inspecting an alien whose claim to lawful permanent resident status has been verified, determine whether the alien is considered to be making an application for admission within the meaning of section 101(a)(13). [See discussion in Chapter 13.4.] Although the lawful permanent resident may not be considered to be seeking admission, he or she is nonetheless required to present proper documents to establish his or her status as a lawful permanent resident. If the claim is verified and the alien appears to be admissible except for lack of the required documents, consider a waiver under section 211(b) for a lawful permanent resident, or consider accepting an application for a refugee travel document in accordance with 8 CFR 223.2(d)(2)(ii) for a refugee or asylee. Refer to Chapters 13.2 and **17.5** for a discussion of this and other options for admitting returning residents.

 If the claim is verified, but a waiver is not available or is not clearly warranted, such as when fraud was committed in obtaining status or upon entry, or in cases where the alien appears to have abandoned his or her residence, you may initiate removal proceedings under section 240 of the Act. Procedures for preparing for removal hearings and processing inadmissible LPRs are discussed in Chapters 17.6 and 17.10. Although the charging document, Form I-862, Notice to Appear, is the same for both inadmissible and deportable aliens, immigration officers performing inspections at a port-of-entry are authorized to issue a Notice to Appear only to arriving aliens, as defined in 8 CFR 1.1(q). If a lawful permanent resident is not considered to be seeking admission, he or she is not an arriving alien. If a Notice to Appear is to be issued charging the returning resident as a deportable alien, the Notice to Appear must be issued by one of the authorizing officers listed in 8 CFR 239.1, such as the ADDE or ADDI, in accordance with local policy.

 (3) No Verifiable Claim. If no record of the alien's lawful admission for permanent residence, grant of refugee status, admission as an asylee, or citizenship can be found after a reasonably diligent search, advise the alien that you are placing him or her under oath, or take a declaration as permitted in 28 U.S.C. 1746, and warn the alien of the penalties for perjury. Section 1746 of the Title 28 United States Code reads as follows:

 Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him as true under penalty of perjury, and dated, in substantially the following form:

 (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

        (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

 The penalties for perjury contained in 18 U.S.C. 1621 (Perjury generally) provide for fine and imprisonment of not more than five years, or both. The penalties for perjury contained in 18 U.S.C. 1546 (Fraud and misuse of visas, permits, and other documents) provide for fine and imprisonment of not more than 10 years, or both.

 If the alien declares under oath, pursuant to the advice above, that he or she is a citizen, lawful permanent resident, refugee, or asylee, order the alien removed under section 235(b)(1)(A) and refer to the immigration judge for review of the order. Complete Form I-860 after completing all procedures in this chapter. Serve the Form I-860 on the alien. Serve Form I-259 on the affected carrier, if appropriate. Use Form I-863, checking Box #4, to refer the removal order to the immigration judge for review. The alien should be detained pending review of the order by the immigration judge. In the event an alien who has made a verbal claim to citizenship or to LPR, refugee, or asylee status declines to make a sworn statement, conclude the expedited removal process in the same manner as any other nonimmigrant in the same situation.

 If the immigration judge determines that the individual is not a citizen or is an alien who has never been admitted as a lawful permanent resident, refugee, or asylee, the expedited removal order will be affirmed and the alien removed. There is no appeal from the decision of the immigration judge. If the judge determines that the individual is a citizen, the process is completed and the citizen is released. If the judge determines that the alien was once admitted as a lawful permanent resident, refugee, or asylee, and that status has not been terminated, the judge will vacate the expedited removal order and the Service may initiate removal proceedings under section 240.

 (f) Special Treatment of Minors.

 (1) General Policy. When an unaccompanied minor (a person under the age of eighteen) appears to be inadmissible under section 212(a)(6)(C) or (7) of the Act, officers should first try to resolve the case under existing guidelines. Existing guidelines permit granting a waiver, deferring the inspection, or employing other discretionary means, if applicable, including withdrawal of an application for admission.

 (2) Withdrawal of Application for Admission by Minors. Whenever appropriate, the INS should permit unaccompanied minors to withdraw their application for admission rather than placing them in formal removal proceedings. In deciding whether to permit an unaccompanied minor to withdraw his or her application for admission, every precaution should be taken to ensure the minor's safety and well-being. Factors to be considered include the seriousness of the offense in seeking admission, previous findings of inadmissibility against the minor, and any intent by the minor to knowingly violate the law.

 Before permitting a minor to withdraw his or her application for admission, the INS officer must be satisfied either that the minor is capable of understanding the withdrawal process, or that a responsible adult (relative, guardian, or in cases where a relative or guardian is not available, a consular officer) is aware of the actions taken and the minor's impending return. Officers must attempt to contact a relative or guardian either in the United States or in another country regarding the minor's inadmissibility whenever possible. A minor brought to the United States by a smuggler is to be considered an unaccompanied minor, unless the smuggler is an adult relative (parent, brother, sister, aunt, uncle, or grandparent) or legal guardian. If the smuggler is not a relative or guardian, he or she should not be consulted concerning the disposition of the minor's case.

 The true nationality of the minor must be ascertained before permitting the minor to withdraw. Another factor to consider is whether the port of embarkation to which the minor will be returned is the country of citizenship of the minor. A minor may not be returned to or be required to transit through a country which may not be willing or obligated to accept him or her. If the minor is being returned to a third country through a transit point, officers must ensure that an immediate and continuous transit will be permitted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

INS Insp. Field Manual 17.15

When deciding whether to permit the minor to withdraw his or her application for admission, officers must also make every effort to determine whether the minor has a fear of persecution or return to his or her country. If the minor indicates a fear of persecution or intention to apply for asylum, or if there is any doubt, especially in the case of countries with known human rights abuses or where turmoil exists, the minor should be placed in removal proceedings under section 240 of the Act. If there is no possibility of a fear of persecution or return and the INS permits the minor to withdraw his or her application for admission, the consular or diplomatic officials of the country to which the minor is being returned must be notified. Safe passage can then be arranged, and after all notifications to family members and government officials have been made, the minor may be permitted to withdraw.

(3) Minors Referred for Section 240 Proceedings. Except as noted below, if a decision is made to pursue formal removal charges against the unaccompanied minor, the minor will normally be placed in removal proceedings under section 240 of the Act rather than expedited removal. The unaccompanied minor will be charged under both section 212(a)(7)(A)(i)(I) of the Act as an alien not in possession of proper entry documents and section 212(a)(4) of the Act as an alien likely to become a public charge. This additional charge renders the minor subject to removal proceedings under section 240 of the Act. Other charges may also be lodged, as appropriate. As a general rule, minors should not be charged with section 212(a)(6)(C) of the Act, unless circumstances indicate that the alien clearly understood that he or she was committing fraud or that the minor is knowingly involved in criminal activity relating to fraud.

Minors who are placed in section 240 proceedings and who are not in expedited removal may either be released in accordance with the parole provisions, or placed in a Service-approved juvenile facility, shelter, or foster care in accordance with existing juvenile detention policies and the Flores v. Reno settlement. At all stages of the inspection and removal process, officers should take every precaution to ensure that the minor's rights are protected and that he or she is treated with respect and concern. [See Appendix 17-4, policy memorandum discussing the Flores settlement.]

(4) Expedited Removal of Minors. Under limited circumstances, an unaccompanied minor may be placed in expedited removal proceedings. The minor may be removed under the expedited removal provisions only if the minor:

• has, in the presence of an INS officer, engaged in criminal activity that would qualify as an aggravated felony if committed by an adult;

• has been convicted or adjudicated delinquent of an aggravated felony within the United States or another country, and the inspecting officer has confirmation of that order; or

• has previously been formally removed, excluded, or deported from the United States.

If an unaccompanied minor is placed in expedited removal proceedings, the removal order must be reviewed and approved by the district director or deputy district director, or person officially acting in that capacity, before the minor is removed from the United States. This is in addition to the normal supervisory approval required of all expedited removal cases.

(5) Treatment of Minors during Processing. Officers should treat all minors with dignity and sensitivity to their age and vulnerability. Processing of minors should be accomplished as quickly as possible. As with all persons being detained at ports-of-entry, officers must provide the minor access to toilets and sinks, drinking water and food, and medical assistance if needed. Minors may not be placed in short-term hold rooms, nor may they be restrained, unless they have shown or threatened violent behavior, they have a history of criminal activity, or there is a likelihood the juvenile will attempt to escape. Unaccompanied minors should not be held with unrelated adults. Any detention following processing at the port-of-entry must be in accordance with the Flores v. Reno settlement.

(6) Minors Accompanied by Relatives or Guardians. If formal proceedings are initiated against an accompanying adult relative or legal guardian, the minor should be placed in the same type of proceeding (i.e. expedited removal or 240 proceedings) as the adult. However, withdrawal of application for admission by the minor should be considered whenever appropriate, even though the relative or guardian may remain subject to formal removal proceedings.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Paragraph (f) added 8/21/97; IN97-05)

(g) United Nations High Commissioner for Refugees (UNHCR) Monitoring Guidelines.

(1) Background. The United States has signed various international agreements accepting an obligation to protect refugees and asylum-seekers from return to persecution, and to follow certain international standards in processing asylum-seekers. The organization that monitors compliance with these agreements and provides guidance on their implementation is the United Nations High Commissioner for Refugees (UNHCR). As such, the United States has a responsibility to cooperate with UNHCR's requests for access to processes involving asylum-seekers. Therefore, the Immigration and Naturalization Service (INS) believes it is appropriate for the UNHCR to observe, to the extent possible within the resources available to the UNHCR, the expedited removal process in secondary. The Congressional General Accounting Office and the UNHCR have been given full access, and can be relied on to make a fair and impartial assessment of the process.

For these reasons, full cooperation with visiting UNHCR delegations is essential. Below are general guidelines and procedures to follow regarding a visit from the UNHCR. While the guidelines concentrate on the limits of the UNHCR's access and potential problem areas, in our experience the UNHCR has approached site visits professionally and responsibly, providing us with positive comments and useful feedback, and problems are unlikely to arise during its site visits.

(2) UNHCR Requests. The UNHCR has agreed to make all requests to observe the expedited removal process, whether at ports-of-entry, detention facilities or at the credible fear interview stage, in writing to the Office of Field Operations. If any field office receives a request for access to the expedited removal process from a representative of the UNHCR, the field office should advise the representative to make the request to the Office of Field Operations.

Written requests from UNHCR to conduct a site visit must be received a minimum of two weeks in advance. The INS will consider written requests submitted less than two weeks in advance for only exceptional circumstances. The request will include the purpose and site(s) of the visit, the duration of the visit, the full names of the UNHCR staff on the delegation, the title and official responsibilities of everyone in the delegation, which person on the delegation is leading the team, and whether they will have any special needs or requests. The Office of Field Operations will evaluate the request in consultation with the field and make a decision as quickly as possible.

Should there be a need to clarify or confirm the identities of visiting team members, local INS staff will call the Office of Field Operations.

(3) Scope of UNHCR's Access to Secondary Inspection Processing. The UNHCR has agreed to maintain the confidentiality of any information to which it has access such as training materials and procedures manuals. Therefore, it can be given full access to tour the primary and secondary inspection areas, holding cells, food storage facilities, and other areas related to processing of expedited removal cases. While representatives are at the port, an INS officer should be present except if the INS has arranged for the representatives to talk confidentially to an alien. Due to safety issues, the representatives will not be allowed to participate or be used as witnesses when searching baggage and personal effects or in body pat-downs and searches. Viewing of the baggage search may be allowed unless the officer determines there to be a safety concern or threat to the UNHCR representatives. The UNHCR should not be given access to computer databases or programs due to the sensitive law enforcement nature of the information, but may be given a demonstration of certain programs in relation to the expedited removal process. The representatives may ask questions about the process, so long as their movements and the timing of their questions do not impede the processing of cases.

The port will designate a supervisor on the shift to whom the UNHCR team may direct questions about the processing. As time permits, the supervisor may arrange or representatives to talk directly to line officers. During a secondary inspection, when possible, the representatives should be allowed to view the secondary inspection from an area (seated or standing) that would enable them to hear and see all participants.

The port will designate one or more secondary and primary officers on the shift to whom the UNHCR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives may direct questions. Designation of these officers should be initially on a voluntary basis.

(4) Interactions Between UNHCR and Aliens in Secondary Inspection. If UNHCR representatives ask to sit in on interviews, either of specific aliens or a random sample of aliens in secondary, the INS officer should explain to the alien that the UNHCR representatives do not work for the United States government, but work for the United Nations High Commissioner for Refugees, and have asked to observe some interviews to understand the American process. No more than two representatives can be present during the interview, and business cards will be provided to the alien after the interview is completed. The INS officer should explain that it is the alien's decision whether the UNHCR representatives are allowed to observe the interview or not, and that the INS will ask the same questions and follow the same procedures either way. If the alien does not want the UNHCR representatives to sit in on the interview, his or her wish should be respected. If the applicant requests to talk briefly and confidentially with the UNHCR representatives, he or she may do so after the officer finishes the secondary interview and process.

If she indicates that he or she does not want the representative present, and UNHCR appears to be questioning that decision, a supervisor should be notified immediately, and should support the alien's decision to be interviewed without a UNHCR observer with no further discussion. The INS supervisor will provide an explanation to the UNHCR delegation lead official that the interview will not continue with their participation. Additionally, the INS supervisor reserves the right to terminate the entire site visit, any part of an interview, or a particular portion of the site visit. A reason must be provided to the lead UNHCR official at the time of the termination. Prior to a decision to terminate the entire site visit, the INS supervisor must immediately advise the Headquarters Field Operations point-of-contact through appropriate channels. The alien's agreement or refusal to have a UNHCR presence at the interview should not be factored into the INS officer's decision to refer a case for a credible fear interview.

If an alien agrees to be interviewed with the UNHCR representatives present, the UNHCR representatives may observe the interview, and will be given a few minutes at the end of the interview to communicate directly with the applicant. In general, the UNHCR representatives should not ask questions or make comments during the interview. The INS officer may, however, at his or her discretion, allow the representatives to make a comment or ask a question if the INS officer believes that it is facilitating the progress of the interview.

The INS is not responsible for interpreting the interview verbatim or locating an interpreter to provide a verbatim interpretation in such circumstances. If the INS officer and the alien are communicating in a language other than English without the assistance of an interpreter, and the representatives do not understand the language, the INS officer should explain what is being stated or asked.

When the interview is concluded, the UNHCR representatives should be invited to communicate briefly with the applicant. Any questions or statements asked by the representatives or the applicant, and any responses, will be recorded in the sworn statement. Additionally, any interruptions of the statement will be recorded on the sworn statement.

If the UNHCR team or the alien request a brief private discussion, the request should be accommodated within the constraints of the facility. Normally the issues aliens bring up with the UNHCR are the same that they bring up during secondary, for example: when can they call a relative, how long does the process take, and so forth. This request should be noted on the sworn statement. Generally, the meeting should take place out of hearing, but not out of sight, of the INS staff. If the UNHCR team requires translation and is not able to locate its own telephonic interpreter quickly, then it should be provided when feasible. The local asylum office will have been notified that the UNHCR is conducting a site visit and can cover the cost of interpretation using a commercial interpreter service if necessary. However, if an interpreter cannot be located quickly and there are time constraints (such as finishing in time to put an applicant on a scheduled plane), the INS officer should consult with his or her supervisor to decide if there are compelling reasons for delaying the process to provide the representatives time to obtain an interpreter.

If the UNHCR team reports back to the INS officer, after a private conference, that the alien alleged abusive treatment, either by the INS, an airline employee, or a smuggler, a supervisor should be notified immediately and the alien should be asked further questions in the representatives' presence. If the UNHCR team indicates that the alien has expressed a fear during the private conference which was not expressed during the interview with the INS officer, the INS officer should ask the alien, in the representatives' presence, if the alien is afraid or concerned about

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

INS Insp. Field Manual 17.15

return, or would like to discuss his or her situation privately with an asylum officer. The alien's answer to the above questions should be recorded on the sworn statement or in a memo to file.

If the alien either appears unwilling to discuss the alleged claim of fear with the INS officer, or states that the UNHCR representatives misunderstood, or that he or she does not want to be detained for a credible fear interview, the INS officer should call the local asylum office for guidance on whether to refer the alien for a credible fear interview. If the local supervisory asylum officer is not immediately available, the INS officer may call the INS Command Center and ask it to page another supervisory asylum officer or listed headquarters asylum staff.

(5) Follow-up. If serious problems or misunderstandings arise during the UNHCR site visit, an INS supervisor should immediately contact the Headquarters Field Operations representative who set up the meeting. After the UNHCR visit is completed, the district will provide the Office of Field Operations feedback on how the visit went and alert it to any issues which the UNHCR representative(s) might raise.

(Added IN 00-22.)

References:

INA: Sections 212, 235, 240, 241.

Regulations: 8 CFR 212, 235, 240, 241.

END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| **Subject:** | **Date:** |
|---|---|
| Expedited Removal:  Additional Policy Guidance | **December 30, 1997** |

**To:**
Regional Directors
District Directors
Asylum Office Directors

**From:**
Office of Field Operations

     The Expedited Removal Working Group,[*] which has been meeting regularly since April 1, 1997, was organized to identify and address policy questions, procedural and logistical problems and quality assurance concerns related to the expedited removal process.  Based on recommendations made by the Working Group following a series of site visits, the following guidance and instructions have been approved by the INS Policy Council and endorsed by Field Operations.  Please review and take the necessary steps for implementation. Thank you for the tremendous effort you have devoted to ensuring the success of the expedited removal process.

**Expedited Removal Experts:**  Each region and each district will appoint an expedited removal "expert."  The expedited removal expert should be carefully selected for his or her ability to work effectively with headquarters and within the region or district to ensure close coordination and exchange of information, and to ensure that policy guidance is distributed, fully understood, and implemented.  The expert must be available to attend a regional seminar during the second quarter of Fiscal Year 1998, and conduct or facilitate training of all officers involved in the expedited removal process.  Experts will be required to remain in close contact with the Expedited Removal Working Group to communicate feedback and ensure distribution and implementation of future policy guidance and memoranda, and to work with each district to ensure that monthly statistics and DACS data entry are completed quickly and accurately.  Districts should submit their lists of nominees to the regional director no later than January 16, 1998.  The regional director

---

[*]The Expedited Removal Working Group is chaired by the Director of International Affairs, and is made up of representatives from the Offices of Inspections, Detention and Deportation, Asylum, Field Operations, and General Counsel, as well as specialists on the Deportable Alien Control System (DACS), Freedom of Information Act (FOIA), juveniles, records, and the Office of Policy and Planning.

will then inform ███████, Office of Field Operations, of the designated experts for each region and district. ███████ can be reached through cc: Mail, or by calling ███████.

**Withdrawal Guidance:**  The decision to issue an expedited removal order or to permit withdrawal of application for admission in lieu of a formal removal must be carefully considered and reviewed by every officer and supervisor handling expedited removal cases.  Additional guidance on withdrawals is attached. Districts and asylum offices will ensure that all inspectors and asylum officers receive the memorandum and are properly trained in exercising this important discretionary authority.  Training should be completed no later than the end of the second quarter of Fiscal Year 1998.

**Re-Interview of Individuals Prior to Departure:**  The Office of International Affairs may, at its discretion, offer a second credible fear interview to any alien even if the alien has not established a credible fear before an asylum officer or after immigration judge review.  Deportation officers will be informed of the second interview.  Re-interviews will occur when the Office of International Affairs determines that the alien has made a reasonable claim that compelling new information concerning the case exists and should be considered.  Districts should cooperate by continuing to detain the alien until the second adjudication, and potentially also a second review by the immigration judge, is completed.  Please note that any alien who did not express fear of return at secondary inspection, but expresses a fear or requests asylum at any point before removal, should be referred for a credible fear interview.

**Monthly Reports and Database Entries:**  It is critically important that every district and region ensure that monthly statistical reports are submitted in accordance with policy memoranda which have been distributed on this subject.  See, Memorandum, "Distribution of guidance on changes to the Deportable Alien control System (DACS) that are effective April 1, 1997" (March 20, 1997); Memorandum, "Responsibilities and procedures for data entry of expedited removal cases into the Deportable Alien Control System" (March 18, 1997); Memorandum "Inspections' Responsibilities for Tracking of Expedited Removal Cases at Ports-of-Entry" (march 31, 1997); Memorandum "Monitoring Expedited Removal Reports and Quality Control" (July 18, 1997).  Adequate statistics are required to document the implementation of the expedited removal program and analyze trends; without such statistics, continuing authority to implement expedited removal could be in jeopardy.  Each district should ensure that every port-of-entry in the region is providing the required monthly reports to headquarters not later than the 10th of the month for the preceding month's statistics.  Each district should also ensure that DACS entries are completed quickly and accurately. Questions concerning the monthly reports should be referred to ███████████████████, and questions concerning DACS should be referred to ███████████████████.

**Parole Consideration for Detainees Who Meet the Credible Fear Standard:**  Parole consideration for detainees who meet the credible fear standard, and accurate statistics on parole, are critical to the success of the expedited removal program.  Below are basic guidelines on parole which should be implemented immediately:

> **The supervisory asylum officer must inform the district director (or the person designated by the district director to make parole decisions) of the outcome of all credible fear cases by faxing the completed I-870 (Record of Determination/ Credible Fear Worksheet) and interview notes as soon as the decision has been served on the applicant.**

> The district director (or the person designated by the district director to make parole decisions) should review the I-870 Record of Determination (which includes information on the detainee's identity and community ties), and any accompanying documentation, to make a parole determination.  As soon as the parole determination has been made, the "District Director Decision" page of the I-870 should be faxed back to the supervisory asylum officer.

The following factors should be considered in making the parole determination:

> Parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct; for example, the applicant is an aggravated felon or a persecutor. For the purpose of parole determinations, cases involving the firm resettlement bar should receive the same treatment as cases where no bar exists. It should be noted that asylum officers are not making a parole recommendation when they determine that an alien meets the credible fear standard: the parole decision is the sole authority of the district director

> If there is some evidence or concern that an alien who meets the credible fear standard may be a security risk or subject to a terrorist bar, or may in some other way be a danger to the community if released, the supervisory asylum officer will inform the district director and district counsel by including a short memorandum with the I-870 Record of Determination, by sending a cc: mail, and by confirming receipt of the information with a telephone call. The supervisory asylum officer will also inform the Office of International Affairs, Asylum Division which will in turn inform Headquarters Field Operations of any evidence of a security risk or terrorist bar. Field Operations will check with Headquarters Intelligence, the FBI, and other appropriate agencies for law enforcement purposes, security measures, and appropriate detention. District directors should exercise extreme caution in considering parole for such cases until they receive information from Field Operations on the outcome of their investigation. The case should be referred for a regular 240 removal hearing and not delayed for the Field Operations investigation. Other bar cases will be flagged on the I-870 and with an accompanying memorandum: if an alien subject to a possible bar (other than firm resettlement) is paroled, the I-870 should be marked to indicate that the parole was for reasons unrelated to the asylum claim, such as a medical emergency.

**Guidance on Access to Interpretation, and Written, Videotaped, and Audiotaped Translations:**
Attached is guidance on access to telephonic interpreters which should be distributed to every port-of-entry and detention facility, with follow-up to confirm that adequate access to interpretation has been secured. Districts should also ensure that every port-of-entry and detention facility has clear copies of the twelve translations of the I-867A&B and M-444, or that the translations have been ordered from the forms centers as outlined in the attached guidance. In addition, the Expedited Removal Working Group will soon complete video and audio tapes of each of the translations of the I-867A&B and M-444. Each port-of-entry and detention facility should have the capacity to play these tapes to aliens in secondary inspection and when they arrive at the detention facility. Each port-of-entry and detention facility which does not already have the necessary equipment should purchase a television/ VCR unit, or an audio-tape player for standard cassette-sized tapes.

**Contingency Planning for Space Needs:** Service Processing Centers and contract facilities should review existing space and install additional telephone lines and jacks to prepare sufficient interview space for an emergency situation (such as boat interdictions) in which a large number of expedited removal cases need to be processed simultaneously. Provisional space should be roughly double the space used currently, on average, to conduct credible fear interviews, orientations, and consultations.

Michael A. Pearson
Executive Associate Commissioner
for Field Operations

**AR01579**

**9 Immigration Law Service 2d PSD Selected DHS Document 4110**

**Immigration Law Service, Second Edition** | November 2021 Update

**SELECTED DHS DOCUMENTS**

**Parole**

# <mark>Parole</mark> <mark>Project</mark> <mark>for</mark> <mark>Asylum</mark> <mark>Seekers</mark> at Ports of Entry and INS Detention (Apr. 20, 1992)

69 INTERPRETER RELEASES      526      April 27, 1992

Appendix I, continued

15272      Federal Register / Vol. 57, No. 81 / Monday, April 27, 1992 / Proposed Rules

made separately to ensure compliance with this requirement, such allocations shall also be made to such aliens in the sequential order of their rank order numbers.

6. Section 43.17 is revised to read as follows:

§ 43.17 Eligibility to receive a visa.

The eligibility of an applicant for a visa under section 132 of Public Law 101-649 shall be determined as provided in the Immigration and Nationality Act, as amended, and Parts 40 and 42 of Subchapter E–Visas except that —

(a) Such an applicant shall be deemed to be ineligible to receive a visa under INA 212(a)(14) of the Immigration and Nationality Act, as amended, if he or she does not present to the consular officer a firm commitment for employment in the United States for a period of at least one year, as defined in section 43.12(b); and

(b) Section 212(e) of the Immigration and Nationality Act, as amended, shall not apply to such an applicant.

Dated: April 17, 1992.

John H. Adams,

*Acting Assistant Secretary for Consular Affairs.*

[FR Doc. 92-9841 Filed 4-24-92; 8:45 am]

BILLING CODE 4710-06-M

---

Appendix II

# Memorandum



| Subject | Date |
|---|---|
| Parole Project for Asylum Seekers at Ports of Entry and in INS Detention | APR 2 0 1992 |

To
All Regional Administrators
All Regional Counsels
All District Directors
All Chief Patrol Agents
All Officers in Charge
All District Counsels

From
Office of the Commissioner

The Service conducted a Pilot Parole Project beginning in May, 1990 and concluding in October, 1991. After evaluating the preliminary results of this project, the Service has decided to reimplement it and to expand it to all Service detention facilities, as well as to contract detention facilities and major ports of entry where Service personnel are available to conduct pre-screening interviews.

The Service has limited detention space. By adopting the Parole Project, the Service will be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space. This memorandum sets forth the criteria under which a person who appears to be excludable from the United States, but who has made a claim for asylum, may be paroled pending adjudication of his or her claim.

Appendix II, continued

## PRE-SCREENING INTERVIEWS

Pre-screening interviews will be conducted at two types of locations.

First, the Service will endeavor to place asylum pre-screening officers (APSOs) at certain major airports and other ports of entry. The APSOs may be (1) members of the Asylum Corps or (2) inspectors or other Service officers who have been specially trained in asylum law and in asylum interviewing techniques. The Director of Asylum and the General Counsel have been directed to develop a course of training in asylum law and interviewing standards for APSOs, and a team consisting of representatives of the Inspections and Asylum Branches is working to develop operating procedures for APSOs at ports of entry.

Second, the Service will conduct pre-screening interviews at all Service detention facilities, as well as at contract detention facilities where Service personnel are available to conduct interviews. The interviews at detention facilities will be conducted, wherever possible, by APSOs. Pending the widespread availability of trained APSOs, these interviews will be conducted by Service attorneys.

## RELEASE CRITERIA

In making the determination whether to recommend parole for a person seeking asylum, the interviewer will determine if the following criteria have been met:

1. The person's true identity has been determined with a reasonable degree of certainty.

2. The allegations in the person's asylum application --- or, in the case of a person who has requested asylum upon arrival at a port of entry, the statements made by the person in support of his or her request for asylum together with any other evidence available to the APSO --- appear to be credible and to provide substantial support for the application or request.

3. The person does not appear to fall within any of the following categories:

    a.) Any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42);

    b.) Any person who has been convicted of an aggravated felony. 8 U.S.C. § 1158(d);

    c.) Any person who has been convicted by a final court judgment of a particularly serious crime in the United States constituting a danger to the community. 8 C.F.R. § 208.14(c)(1);

Appendix II, continued

d.) Any person who has been firmly resettled within the meaning of § 208.15. 8 C.F.R. § 208.14(c)(2); or

e.) Any person who may be regarded as a danger to the security of the United States. 8 C.F.R. § 208.14(c)(3).

4.  The person has legal representation as defined under 8 C.F.R. § 292.1, and/or a place to live and employment or other means of support.

5.  The person agrees to the following:

a.) to contact the appropriate local INS office each month and to indicate any change in the person's address, employment, or representative; and

b.) to appear for all hearings before the EOIR and/or all interviews with the Service; and

c.) to appear for deportation, if the person is ultimately ordered excluded; and

d.) to report for detention if the person fails to comply with the above requirements, or if the alien is convicted of any felony or three misdemeanors.

If the interviewer has found that the person has met the above criteria, and in the absence of other factors suggesting an unusually strong risk that the person will not appear for further proceedings, the interviewer shall recommend to the district director that the person be paroled.  In cases where the person meets some but not all of the above tests, or where other factors suggest a strong risk that the person will not appear as required, the district director may require the person to post a bond. Upon review, the district director may determine that exclusion/deportation proceedings should be terminated and the district director may refer the person's case to the asylum office for processing.

The district directors may also continue to grant parole for the reasons set forth in 8 C.F.R. § 212.5.

Gene McNary
Commissioner

Westlaw. © 2021 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.



**JAN 1 1 2005**

MEMORANDUM FOR:    ALL SPECIAL AGENTS IN CHARGE
                                  ALL FIELD OFFICE DIRECTORS

FROM                           Marcy M. Forman
                                   Director
                                   Office of Investigations

                                   Victor X. Cerda
                                   Acting Director

SUBJECT:                    ICE Transportation, Detention and Processing Requirements

The attached memorandum dated October 18, 2004, from Border and Transportation Under Secretary Asa Hutchinson entitled "*Detention Prioritization and Notice to Appear Documentary Requirements*" is re-circulated with this guidance. This memorandum applies to all components within US Immigration and Customs Enforcement (ICE).

To assist the field locations in implementation of the aforementioned memorandum, the Office of Investigations (OI) and the Office of Detention and Removal Operations (DRO) are providing this joint guidance to the Special Agents in Charge (SAC) and Field Office Directors (FOD).

The following guidance will assist the SACs and FODs while conducting immigration enforcement operations:

- The arresting office is responsible to ensure all aliens in ICE custody are served with appropriate processing papers that will facilitate the most expedient removal process (i.e. stipulated removal, reinstatement, administrative, expedited, notice to appear) as soon as possible after being taken into custody, but no longer than forty-eight (48) hours in the absence of exceptional circumstances.

- OI and DRO personnel will notify their respective management when a detained alien has not been processed/served within 48 hours of being in Immigration and Customs Enforcement (ICE) custody. The SAC/FOD or designee will ensure that the aliens are processed and served immediately. **All aliens will be served in an expeditious manner.**

- DRO will continue to provide the transportation support to OI of aliens prior to processing, from jails, roadside smuggling loads, drop houses and other significant enforcement operations as conducted in past local procedures. SACs and FODs should ensure proper communication and understanding of the local level of transportation support.

- DRO does not have the legal authority to transport United States Citizens (USCs) or Lawfully Admitted Permanent Residents (LAPRs) for criminal proceedings. However, DRO will transport LAPRs and/or illegal aliens that may be presented as material witnesses, after they have been processed for a Notice To Appear (NTA). DRO will not detain an alien solely on the basis of a material witness warrant. If such is occurring, both the SAC and FOD should address this issue with the local U.S. Attorney's Office.

- Should the FOD or designee determine that an alien, categorized as a Mandatory Detention or High Priority #1-6 detention, as described on page 2 of the attached memorandum "*Detention Prioritization and Notice to Appear Documentary Requirements*", be released at the time of processing, the DRO office will provide a written denial to the SAC for inclusion in the alien's A-File. This should only occur when the national bed space population is at capacity and such situation should be reported by the FOD to HQDRO prior to such release.

- The A-file should be completed and accompany the aliens when they are turned over to DRO or with the least possible delay. If the A-file is not available or the A-file needs to be retained for prosecution purposes, the processing agent will create a temporary file (T-file), which will include the original NTA and copies of all other required documentation for DRO use and tracking. T-Files should be used in extremely limited circumstances.

- In the event that the Judgment & Conviction (J&C) documents are necessary for an alien's removal hearing and are unavailable when the A-file is transferred to DRO, the processing agent must ensure that the J&C documents have been requested by annotating the request in the A-file. The processing agent is responsible for ensuring that the J&Cs are forwarded to DRO for inclusion in the A-File in a timely manner.

OI & DRO Headquarters staffs are working together to ensure uniformity and that a spirit of cooperation exists during this transition period. It should be emphasized however that local communication and coordination between SAC and FOD offices should occur to ensure proper implementation and monitoring of these requirements.

Attachment



OCT 1 8 2004

MEMORANDUM TO:    Robert C. Bonner
Commissioner
U.S. Customs and Border Protection

Michael J. Garcia
Assistant Secretary
U.S. Immigration and Customs Enforcement

FROM:    Asa Hutchinson
Under Secretary for Border and
Transportation Security

RE:    <u>Detention Prioritization and Notice to Appear Documentary
Requirements</u>

This memorandum provides priorities for the detention of aliens and outlines
documentary requirements that must be met when transferring custody of aliens to
Immigration and Customs Enforcement (ICE), Office of Detention and Removal
Operations (DRO).  The guidance in this memo supersedes all outstanding guidance
regarding priorities for the detention of aliens within Border and Transportation Security
(BTS).  All BTS personnel must adhere to legal authorities and the procedures set forth
below in making decisions regarding whether to detain an alien.[1]

## *I.  Detention Priorities*

The following guidelines provide priority categories for the detention of aliens subject to
detention.  An alien being considered for detention should be placed in the highest
numbered priority within the top category possible (i.e., an alien found to have a credible
fear of persecution with an aggravated felony conviction would still meet the
requirements of Mandatory, #2).  In the case of mandatory detention, the Director of ICE
DRO is to heed the guidelines strictly.  In all other cases, the DRO Director retains the
discretionary authority with respect to allocation of bed space and other detention-related
resources.  In all cases, the DRO Director is to heed these guidelines to the greatest extent
possible when determining detention priorities.

---

[1] This policy does not supersede any requirement to release an alien under <u>Zadvydas v. Davis</u>, 533 U.S.
678 (2001) and implementing guidance in 8 CFR §§ 241.4, 241.13 and 241.14 nor does it apply to
unaccompanied juveniles.

All such aliens must be detained unless they fall within one of the exceptions to mandatory detention. There are no priority designations among categories of cases subject to mandatory detention. Questions as to whether a given alien falls under one of these categories and <u>must</u> be detained should be directed to local legal counsel.

**Mandatory**

- Aliens subject to mandatory detention under INA 23 6A[2]
- Aliens in expedited removal (INA § 235) with limited exceptions[3]
- Aliens subject to mandatory detention in removal and deportation proceedings under INA 236(c)[4]
- Aliens who have final orders of removal subject to mandatory detention under INA 241(a)(2), whether ordered removed pursuant to INA 238 or 240 proceedings[5]

**High Priority**

1. National Security Interest aliens including aliens who are subject to an ongoing national security investigation or who, by virtue of specific information or intelligence specific to the alien in question raise a national security concern, as identified either by 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection (CBP).[6]
2. *Continued detention of aliens with final administrative orders past 180 days on account of special circumstances (i.e. 8 CFR 241.14).*
3. Aliens who have been issued final removal orders over 90-days old, where removal is foreseeable.
4. Aliens who present an articulable danger to the community (claimant agency must be able to articulate the danger)
5. Aliens who exhibit specific, articulable intelligence-based risk factors for terrorism or national security concern not solely based on the alien's race, ethnicity, nationality or religion (as identified by either 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection.
6. Aliens associated with ongoing significant criminal investigations;

---

[2] Prior approval of the ICE National Security Unit and the ICE Office of the Principal Legal Advisor is required before charges may be brought under either INA § 212(a)(3) or INA § 237(a)(4).

[3] Not all aliens in expedited removal proceedings are subject to mandatory detention, however. See, for example 8 CFR §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii), and 235.3(b)(5)(i) allowing for parole in limited circumstances of medical emergency, or where necessary for a legitimate law enforcement objective.

[4] Note that INA 236(c)(2) authorizes release to provide for protection of a witness, etc., where the alien does not pose a danger to the safety of others or to property and is likely to appear for any scheduled proceedings.

[5] This includes aliens ordered removed under INA 240 and criminal aliens ordered removed under INA 238. These aliens may not be released under any circumstances during the 90-day removal period set forth in INA 241(a)(2). Following the 90-day period, the continued detention of such aliens should be determined pursuant to criteria in <u>Zadvydas</u>, *supra* and implementing guidance in 8 CFR §§ 241.4, 241.13, and 241.14.

[6] ICE and CBP shall track all cases where the two bureaus disagree on whether a particular alien poses a national security threat CBP and ICE shall review these cases on a quarterly basis.

AR01587

7. Remaining criminal aliens not subject to 236(c);
8. Aliens whose detention is essential to national border enforcement initiatives;

**Medium Priority**

1. Suspected alien and narcotics smugglers
2. Aliens who committed fraud
3. Inadmissible, non-criminal aliens (other than expedited removal cases)

**Lower Priority**

1. Worksite enforcement arrests
2. Final orders (beyond 179 days-not likely to remove)
3. Aliens placed in expedited removal found to have a credible fear and referred for full 240 proceedings.
4. Other aliens not subject to required detention

## II. Documentary requirements

Each component must ensure apprehended aliens are processed efficiently and placed in the appropriate and most expedient removal process, (e.g. stipulated, reinstatement, administrative, expedited). At a minimum, the following documents <u>must</u> be completed by the apprehending entity and presented to DRO to ensure each case moves swiftly through the removal process:

- Original charging documents;
- Completed Form I-213 (Record of Deportable/Inadmissible Alien) or approved equivalent;
- 2 completed Forms FD-249 (fingerprint cards);
- R-84 Form with prints and biographical information completed;
- Print out of results, including negative responses, LES ██████ LES ██.
- LES ██ printout relating to criminal history; if LES ██ is not available, print out of results, including negative responses, based on LES ██████ ████.
- Record of LES ██████████████████ generated by the LES ████
- 4 photographs;
- Completed Form I-217 (Information for Travel Document or Passport if required);
- Documentation of Consular Notification;
- Certified conviction records, when applicable. In the event that conviction records are not immediately available, the arresting officer must provide written notification to the file that a Certified Copy of the Conviction Document has been requested, and include in the administrative file the following information: the exact date and jurisdiction where the alien was convicted, the name and telephone number of the referring officer and the supervisor, the name and contact

3

AR01588

information of the agency official responsible for procuring the conviction record. Furthermore, the arresting agency must produce the actual conviction record within 30 days of issuance of the NTA;[7]

- Documentation reflecting that appropriate record checks LES ████████████████ have been completed;
- Completed Form I-203 or I-203A [Order to Detain or Release Alien(s)] bearing the appropriate official's signature must accompany each detainee presented for detention;
- Notice of Custody Determination (Form I-286), indicating date and time custody decision was made and probable charges against alien;
- And any other relevant documents pertaining to the detainee.

To ensure maximum efficiency in the use of the Department's finite detention bed resources, it is imperative that this documentation is prepared and presented. Custody responsibility will not be transferred to ICE/Detention and Removal Operations (DRO) until ICE/DRO verifies that all of the above required documentation has either been provided or has been waived by an ICE/DRO authorizing official at the detention site. The arresting or delivering officer will ensure that detainees turned over to the custody of ICE/DRO are accompanied by any personal items, identity documents, baggage and/or prescription medications in that detainee's possession at the time of arrest.

The requirements I issued in my memorandum of March 30, 2004, *Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Department of Justice Inspector General*, remain in effect. You are responsible for ensuring implementation of these requirements.

---

[7] CBP shall establish within 30 days of this memorandum points of contact in each field office to coordinate obtaining conviction records for cases where the conviction record is not timely produced. Contact information shall be provided to the DRO Field Office Directors and the ICE Chief Counsels.

AR01589


U.S. Immigration
and Customs
Enforcement

**SEP 1 4** 2004

MEMORANDUM FOR:     All Field Office Directors

FROM:     Victor X. Cerda
Acting Director

SUBJECT:     Expedited Removal Guidance

BACKGROUND

The Department of Homeland Security (DHS) Undersecretary for Border and Transportation Security recently announced plans to expand control of the United States borders through increased use of immigration laws to combat illegal entry between the ports-of-entry. This will be accomplished, in part, by immediately expanding the use of expedited removal (ER) processing from the ports-of-entry to locations along the United States border. The expanded authority was announced in the attached Federal Register Notice (FR). See 69 FR 48877-01 (August 11, 2004).

LAREDO AND TUCSON BORDER SECTORS FIRST

ER has traditionally been employed at official ports-of-entry and has not been applied on the land borders to aliens seeking to illegally enter the United States between ports-of-entry. DHS will now apply its ER authority to certain locations along both northern and southern land borders between ports-of-entry. Border Patrol agents will be trained to exercise this authority. Border Patrol plans to initially implement this expansion of ER between the ports-of-entry in the Laredo and Tucson border sectors.

PRIMARY FOCUS

As the extension of ER is meant as a border-enforcement tool, it will be limited to illegal aliens who have spent less than 14 days in the United States after evading inspection, and who are apprehended within 100 miles of a U. S. international land border. The primary focus of this expansion of ER is directed at "third country nationals" who are not citizens of Mexico or Canada, and who have nominal equities in and ties to the United States. DHS will retain operational discretion to place citizens of Mexico or Canada into ER proceedings, but only expects to apply it to those Mexican and Canadian citizen/nationals with histories of criminal or repeated immigration violations, such as recidivists, alien smugglers, guides, drivers, etc.

ER EXCEPTIONS

ER will not be applied to unaccompanied juveniles, citizens and nationals of Cuba and El Salvador, and aliens who are members of the Class Action Settlement in <u>American Baptist Churches v. Thornburg</u>, (ABC), which settled the claims of a specific class of Salvadorans and Guatemalans regarding the handling of asylum claims.

CREDIBLE FEAR REFERRALS TO CITIZENSHIP AND IMMIGRATION SERVICES

The expansion of ER does not eliminate existing protections for individuals seeking asylum.  When an alien is placed in ER, Customs and Border Protection (CBP) Border Patrol Agents must inquire whether the alien has any reason to fear harm if returned to his or her country, and will refer any alien who expresses an intention to apply for asylum, or a fear of persecution or torture, or a fear of return to his or her home country to a Citizenship and Immigration Services (CIS) Asylum Officer for a "credible fear" interview.  Before remanding those aliens who have been referred to a CIS Asylum Officer for a credible fear interview to Detention and Removal Operations (DRO), CBP Border Agents are responsible for providing local CIS Asylum Offices (either by fax or electronically) with a copy of the following paperwork:

> Form I-860, *Notice and Order of Expedited Removal*

> Form I-867A, *Record of Sworn Statement and Proceedings under § 235(b)(1) of the Immigration and Nationality Act (INA)*

> Form I-867B, *Jurat for Record of Sworn Statement and Proceedings under INA § 235(b)(1)*

> M-444, *Information About Credible Fear Interview*

> List of Free Legal; Services Providers

Detention of Border Patrol ER cases is under INA § 235; therefore, Form I-286, *Notice of Custody Determination*, and a Warrant of Arrest are not issued for these cases, even when a case is referred to an Immigration Judge (IJ) after a credible fear finding.

CUSTODY

Aliens placed in ER will be processed in the Enforcement Case Tracking System, (ENFORCE), by CBP Border Patrol Agents and will normally be detained and removed by DRO as soon as possible, consistent with the legal process.  In order to properly manage bed space, Field Office Directors are to maximize removal efforts, recommend alternate detention sites (if necessary), and continue to review non-mandatory detention cases pursuant to existing guidelines.

At the time of custody referral, Field Office Directors must ensure that all cases have been properly processed and that all requisite forms have been completed by CBP Border Patrol Agents and

included in the alien file (A-file). Pursuant to the July 20, 2004 Memorandum from Undersecretary for Border and Transportation Security relating to Costs Associated with the Care and Custody of Aliens, DRO will take physical custody of the alien after CBP has completed all of the required paperwork.

To the extent possible, CBP Border Patrol Agents will update the Deportable Alien Control System (DACS) and the Central Index System (CIS) prior to an alien being transferred to DRO custody. However, the final responsibility for this critical task lies with the Field Office Directors. Please ensure the proper updating of DACS in a timely manner.

PAROLE POLICY

Aliens placed in ER will be detained under INA § 235, not INA § 236. Any release of these aliens will be considered under parole authority of INA § 212(d)(5). Unless an alien is found to have a credible fear, parole is authorized only on a case-by-case basis if required to meet a medical emergency or a legitimate law enforcement objective. See 8 CFR 235.3(b)(2)(iii) and 8 CFR 235.3(b)(4)(ii).

If an alien is found to have a credible fear and referred for section 240 removal proceedings, detention authority will continue to be under INA § 235, and DRO policy is that parole should be granted under 8 § CFR § 212.5(b) only in exceptional cases of medical emergency or where continued detention would cause unusual hardship. Juveniles are a special class and must continue to be treated in accordance with the Flores v. Reno settlement and other special laws applicable to juveniles.

Once credible fear is found, each case must be individually reviewed under these custody criteria, and each file must be documented that the review took place. If the alien or the alien's counsel has independently submitted a parole request, the review should take into account any information submitted as part of the request.

If an alien is transferred to another field office pending conclusion, the receiving Field Office Director shall make custody and parole determinations in accordance with the above policy. As per the above, custody will be maintained absent any new medical emergency, law enforcement objective, or circumstance of unusual hardship if credible fear has been found.

If an IJ grants asylum or withholding of removal, Field Office Directors will apply existing policy in determining whether the alien will be continued in detention or released on parole.

WEEKLY/MONTHLY REPORTS

Field Office Directors will be responsible for the development of weekly and, later, monthly ER tracking reports. The Phoenix and San Antonio Field Offices will be directly impacted by the initial expansion of authority and will bear the greatest reporting burden. However, all field offices

receiving ER cases from this expanded authority will adhere to reporting requirements. Reports will contain the information listed below:

1. The number of aliens (broken down by nationality and numbers) who:

   - did not request credible fear interviews and are awaiting removal;

   - are awaiting credible fear interviews;

   - have received credible fear interviews and continue in detention awaiting proceedings; and

   - have received credible fear interviews and have been paroled based on exceptional circumstances.

2. The average length of stay for aliens (broken down by nationality and numbers) in ER. Include those having credible fear, and who are placed in regular proceedings. Include how much of the detention time is due solely to travel document requests and break down this group by nationality and numbers.

3. The number of aliens (broken down by nationality and numbers) granted relief, to include asylum and withholding of removal.

Headquarters DRO will develop a metric to measure if the number of removals is increasing due to ER.

COMMUNICATION AND FLEXIBILITY

It cannot be emphasized enough that the success of this initiative is dependent upon communication and flexibility on the part of all DRO, CBP and CIS components. Accurate and timely data collection and reporting will permit DHS to continuously evaluate the effect of this pilot. Please keep Headquarters DRO informed of any issues and of the progress related to expanded ER.

Attachments

(OMB) for review and clearance under the Paperwork Reduction Act of 1995.

**DATES:** Fax written comments on the collection of information by September 10, 2004.

**ADDRESSES:** OMB is still experiencing significant delays in the regular mail, including first class and express mail, and messenger deliveries are not being accepted. To ensure that comments on the information collection are received, OMB recommends that written comments be faxed to the Office of Information and Regulatory Affairs, OMB, Attn: Fumie Yokota, Desk Officer for FDA, FAX: 202-395-6974.

**FOR FURTHER INFORMATION CONTACT:** Karen L. Nelson, Office of Management Programs (HFA-250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301-827-1482.

**SUPPLEMENTARY INFORMATION:** In compliance with 44 U.S.C. 3507, FDA has submitted the following proposed collection of information to OMB for review and clearance.

**Draft Guidance for Industry on Pharmacogenomic Data Submissions (OMB Control Numbers 0910-0014, 0910-0001, and 0910-0338)–Extension**

The guidance provides recommendations to sponsors submitting or holding investigational new drugs (INDs), new drug applications (NDAs), or biologic licensing applications (BLAs) on what pharmacogenomic data should be submitted to the agency during the drug development process. Sponsors holding and applicants submitting INDs, NDAs, or BLAs are subject to FDA requirements in parts 312, 314, and 601 (21 CFR 312, 314, and 601) for submitting to the agency data relevant to drug safety and efficacy (§§ 312.22, 312.23, 312.31, 312.33, 314.50, 314.81, 601.2, and 601.12).

*Description of Respondents*: Sponsors submitting or holding INDs, NDAs, or BLAs for human drugs and biologies.

*Burden Estimate*: The guidance interprets FDA regulations for IND, NDA, or BLA submissions, clarifying when the regulations require pharmacogenomics data to be submitted and when the submission of such data is voluntary. The pharmacogenomic data submissions described in the guidance that are required to be submitted to an IND, NDA, BLA, or annual report are covered by the information collection requirements under parts 312, 314, and 601 and are approved by OMB under control numbers 0910–0014 (part 312—INDs; approved until January 1, 2006); 0910-0001 (part 314—NDAs and annual reports; approved until March 31, 2005); and 0910-0338 (approved until August 31, 2005).

The guidance distinguishes between pharmacogenomic tests that may be considered valid biomarkers appropriate for regulatory decision making, and other, less well developed exploratory tests. The submission of exploratory pharmacogenomic data is not required under the regulations, although the agency encourages the voluntary submission of such data.

The guidance describes the voluntary genomic data submission (VGDS) that can be used for such a voluntary submission. The guidance does not recommend a specific format for the VGDS, except that such a voluntary submission be designated as a VGDS. The data submitted in a VGDS and the level of detail should be sufficient for FDA to be able to interpret the information and independently analyze the data, verify results, and explore possible genotype-phenotype correlations across studies. FDA does not want the VGDS to be overly burdensome and time-consuming for the sponsor.

FDA has estimated the burden of preparing a voluntary submission described in the guidance that should be designated as a VGDS. Based on FDA's familiarity with sponsors' interest in submitting pharmacogenomic data during the drug development process, FDA estimates that approximately 20 sponsors will submit approximately 80 VGDSs and that, on average, each VGDS will take approximately 10 hours to prepare and submit to FDA.

In the **Federal Register** of November 4, 2003 (68 FR 62461), FDA published a 60-day notice requesting public comment on the information collection provisions. No comments were received on the information collection estimates.

TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN[1]

| | Number of Respondents | Number of Responses per Respondent | Total Annual Responses | Hours per Response | Total Hours |
|---|---|---|---|---|---|
| Voluntary genomic data submissions | 20 | 4 | 80 | 10 | 800 |

[1] There are no capital costs or operating and maintenance costs associated with this collection.

Dated: August 5, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04-18360 Filed 8-6-04; 12:04 pm]

**BILLING CODE 4160–01–S**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Bureau of Customs and Border Protection**

**Designating Aliens For Expedited Removal**

**AGENCY:** Bureau of Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice authorizes the Department of Homeland Security to place in expedited removal proceedings any or all members of the following class of aliens: Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter. DHS believes that exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.

**DATES:** This notice is effective on August 11, 2004.

**ADDRESSES:** Please submit written comments to: Regulations Branch, Office of Regulations and Rulings, Bureau of Customs and Border Protection, 1300 Pennsylvania Avenue, NW., Washington, DC 20229. *See* SUPPLEMENTARY INFORMATION section for more details on submission of comments.

**FOR FURTHER INFORMATION CONTACT:** Dana E. Graydon, Acting Associate Chief, Office of Border Patrol, U.S. Customs and Border Protection, 1300 Pennsylvania Ave., NW., Suite 6.5-E, Washington, DC 20229, *dana.graydon@dhs.gov*, 202-344-3153.

**SUPPLEMENTARY INFORMATION:** Please submit written comments, original and two copies, to the address listed above on or before after October 12, 2004. Submitted comments may be inspected at the Office of Regulations and Rulings, Bureau of Customs and Border Protection, 799 9th Street, NW., Washington, DC, during regular business hours. Arrangements to inspect submitted comments should be made in advance by calling Mr. Joseph Clark at (202) 572-8768.

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104-208, Div. C, 110 Stat. 3009-546, amended section 235(b) of the Immigration and Nationality Act ("Act"). 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, aliens arriving in the U.S. who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7). Under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), expedited removal proceedings may be applied to two categories of aliens. First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are "arriving in the United States." "Arriving aliens" are defined by regulation to mean "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international waters and brought into the United States by any means whether or not to a designated port-of-entry." (8 CFR 1.1(q)). Cuban citizens who arrive at U.S. ports-of-entry by aircraft are exempted from this first category of aliens subject to expedited removal under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). Second, section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), permits the Attorney General (now the Secretary of Homeland Security), in his or her sole and unreviewable discretion, to designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), authorizes the Secretary to apply (by designation) expedited removal proceedings to aliens who arrive in, attempt to enter, or have entered the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility.

By statute, an alien present in the U.S. who has not been admitted shall be deemed for purposes of the Act to be an applicant for admission. 8 U.S.C. 1225(a), section 235(a)(1) of the Act. Once alienage has been established, an alien applicant for admission has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of this Act. Aliens who have not been admitted or paroled and who are subject to expedited removal under this designation have the burden of proof to show affirmatively that they are not inadmissible and have maintained the required continuous physical presence in the U.S. Any absence from the U.S. shall serve to break the period of continuous physical presence. 8 CFR 235.3(b)(1)(ii).

Pursuant to 8 CFR 235.3(b)(1)(ii) (62 FR 10312, 10355, March 6, 1997), the Attorney General provided that her designation authority would be exercised by the Commissioner of the former Immigration and Naturalization Service (INS). Pursuant to sections 102(a), 441, 1512(d) and 1517 of the Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2310, 6 U.S.C. 112, 251, 552(d), 557, and 8 CFR 2.1, the authority of the Attorney General and the Commissioner of the INS in accordance with 8 U.S.C. 235(b)(1)(A)(iii) and 8 CFR 235.3(b)(1)(ii), respectively, was transferred to the Secretary of Homeland Security, and references to the Attorney General or the Commissioner in the statute and regulations are deemed to refer to the Secretary.

DHS has a pressing need to improve the security and safety of the nation's land borders, and expanding expedited removal between ports of entry will provide DHS officers with a valuable tool to meet that objective. Presently DHS officers cannot apply expedited removal procedures to the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry. It is not logistically possible for DHS to initiate formal removal proceedings against all such aliens. This is primarily a problem along the southern border, and thus the majority of such aliens are Mexican nationals, who are "voluntarily" returned to Mexico without any formal removal order. Based upon anecdotal evidence, many of those who are returned to Mexico seek to reenter the U.S. illegally, often within 24 hours of being voluntarily returned (it is not uncommon for DHS officers to apprehend the same individual many times over a span of several months). On the southern land border with Mexico, those aliens who are apprehended who are not Mexican nationals cannot be returned to Mexico. Currently, non-Mexican nationals who are inadmissible may be voluntarily returned to their country of citizenship or nationality via aircraft, or placed in formal removal proceedings under section 240 of the Act. Because DHS lacks the resources to detain all third-country nationals (aliens who are neither nationals of Mexico nor Canada) who have been apprehended after illegally crossing into the U.S. from both the northern and southern land borders, many of these aliens are released in the U.S. each year with a notice to appear for removal proceedings. Many of these aliens subsequently fail to appear for their removal proceedings, and then disappear in the U.S.

Without limiting its ability to exercise its discretion in the event of a national emergency, other unforeseen events, or a change in circumstances, DHS plans under this designation as a matter of prosecutorial discretion to apply expedited removal only to (1) third-country nationals and (2) to Mexican and Canadian nationals with histories of criminal or immigration violations, such as smugglers or aliens who have made numerous illegal entries. We recognize that certain aliens, including unaccompanied minors, members of the Class Action Settlement in *American Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (which settled the claims of a class of Salvadorans and Guatemalans regarding handling of asylum claims), and aliens who may be eligible for cancellation of removal under section 240A of the Act,

for example, may possess equities that weigh against the use of expedited removal proceedings. Accordingly, in appropriate circumstances and as an exercise of prosecutorial discretion, officers will be able to permit certain aliens described in this notice to return voluntarily, withdraw their application for admission, or to be placed into regular removal proceedings under section 240 of the Act in lieu of expedited removal proceedings.

In the interests or focusing enforcement resources upon unlawful entries that have a close spatial and temporal nexus to the border, this notice dues not implement the full nationwide expedited removal authority available to DHS pursuant to section 235 of the Act, 8 U.S.C. 1225. Nor does this notice limit DHS from implementing the full nationwide enforcement authority of the statute through publication of a subsequent **Federal Register** notice. The statute provides DHS with the authority to apply expedited removal to aliens who cannot establish that they have maintained a physical presence in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility. The statute also does not limit geographically the application of expedited removal. At this time, DHS has elected to assert and implement only that portion of the authority granted by the statute that bears close temporal and spatial proximity to illegal entries at or near the border. Accordingly, this notice applies only to aliens encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border.

It is anticipated under this designation that expedited removal will be employed against those aliens who are apprehended immediately proximate to the land border and have negligible ties or equities in the U.S. Nevertheless, this designation extends to a 100-mile operational range because many aliens will arrive in vehicles that speedily depart the border area, and because other recent arrivals will find their way to near-border locales seeking transportation to other locations within the interior of the U.S. The 100-mile range already has been established by regulation as a reasonable distance from the external boundary of the U.S. for the purpose of preventing the illegal entry of aliens into the U.S. See section 287(a)(3) of the Act: 8 CFR 287.1 (a)(2) and (c).

The use of expedited removal orders, which prohibit reentry for a period of 5 years, will deter unlawful entry, and

make it possible to pursue future criminal prosecution against those aliens who continue to enter the U.S. in violation of law. It will also accelerate the processing of inadmissible aliens because it generally does not require an appearance before an immigration judge, except in certain circumstances. Deterring future entries and accelerating removals will enhance DHS's ability to oversee the border, and to focus its resources on threats to public safety and to national security. DHS also believes that the use of expedited removal will likely interfere with human trafficking and alien smuggling operations, which are growing in sophistication, and which induce aliens from all over the world to cross the country's borders. Alien smuggling organizations have been responsible for numerous violent crimes, including homicide, hostage-taking, and crimes involving sexual exploitation. DHS expects that the expansion of expedited removal under this notice will ultimately reduce the number of aliens who risk injury or death attempting to enter the U.S. through difficult mountainous and desert terrain, as well as decrease property crimes in border areas.

All aliens placed into expedited removal as a result of this designation will have the same rights to a credible fear screening by an asylum officer, and the right to review of an adverse credible fear determination by an immigration judge, that are provided to arriving aliens who are currently placed into expedited removal after being denied admission at a port of entry. Any alien who falls within this designation, who is placed in expedited removal proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a removal proceeding under section 240 of the Act, sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4), The Forms I-867A and I-867B currently used by officers who process aliens under the expedited removal program provide to all aliens in expedited removal proceedings information concerning the credible fear interview, in accordance with the statutory requirement at section 235(b)(1)(B)(iv) of the Act, 8 U.S.C. 1225(b)(1)(B)(iv). The forms require that the officer inquire whether the alien has any reason to fear harm if returned to his

or her country. Officers authorized to administer the expedited removal program will be trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

Similarly, all aliens placed into expedited removal as a result of this designation, who claim lawful permanent resident, refugee, asylee status, or U.S. citizenship will receive the same procedures, including the right to review of any adverse expedited removal order by an immigration judge, that are provided to arriving aliens making similar status claims who are currently placed in expedited removal at ports of entry under 8 CFR 235.3(b). DHS, with limited exceptions, plans to detain aliens who are placed in expedited removal under this designation. Section 235(b)(1)(B)(iii)(IV) of the Act, 8 U.S.C. 1225(b)(1)(B)(iii)(IV), and 8 CFR 235.3(b)(2)(iii) direct that any alien who is placed in expedited removal proceedings shall be detained pending a final determination of credible fear and, if found not to have such a fear, such alien shall be detained until removed. Parole of such alien under 8 CFR 235.3(b)(2)(iii) may be permitted only when the Secretary determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), directs that if a credible fear has been established, the alien shall be detained for further consideration of the protection claim or claims. Under Department of Justice regulations, immigration judge review of custody determinations is permitted only for bond and custody determinations pursuant to section 236 of the Act, 8 U.S.C. 1226, 8 CFR 1236, and 8 CFR 1003.19(a). Aliens subject to expedited removal procedures under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond redetermination before an immigration judge. Parole of aliens determined to have a credible fear may be considered in accordance with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5), and 8 CFR 212.5.

The expedited removal authority implemented in this Notice will not be employed against Cuban citizens because removals to Cuba cannot presently be assured and for other U.S. policy reasons.

The Department has determined that good cause exists under the Administrative Procedure Act (APA), 5 U.S.C. 553(b)(3)(B) and (d)(3), to exempt this notice from the notice and comment requirements under the APA. Delaying the implementation of this notice to allow public notice and comment would be impracticable, unnecessary and contrary to the public interest.

Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). The large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries, necessitates that DHS expand the expedited removal program as provided in this designation. DHS is confident that the experience gained through implementation of the expedited removal program at ports of entry will enable DHS to expand the program in a manner that is both effective and humane.

There is an urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders, as well as the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations. The expansion of expedited removal will increase the deterrence of illegal entries by ensuring that apprehension quickly leads to removal. This is especially critical because of the environmental dangers faced by aliens illegally entering the U.S. across desert or mountainous areas. In the Arizona desert alone, since the initiation of the Arizona Border Control Initiative (ABC) in March of 2004, the Border Patrol has rescued hundreds of aliens in distress and has unfortunately discovered over 40 aliens who have died in the attempt to enter the U.S.

This designation is necessary to remove quickly from the U.S. aliens who are encountered shortly after illegally entering the U.S. across the land borders. The ability to detain aliens while admissibility and identity is determined and protection claims are adjudicated, as well as to quickly remove aliens without protection claims or claims to lawful status, is a necessity for national security

and public safety. As a critical element of a number of DHS initiatives to enhance security along the border, the expansion of expedited removal will increase national security, diminish the number of illegal entries, and impair the ability of smuggling organizations to operate. Accordingly, for the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable, unnecessary and contrary to the public interest as those terms are used under the APA.

Although the Department believes for the foregoing reasons that pre-promulgation notice and comment procedures are not statutorily mandated in this case, DHS is interested in receiving comments from the public on all aspects of the expedited removal program, but especially on the effectiveness of the program, problems envisioned by the commenters, and suggestions on how to address those problems. DHS believes that by maintaining a dialogue with interested parties, DHS can ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

The expansion of expedited removal under this notice will also support the Arizona Border Control Initiative (ABC), a program designed to secure and protect the Arizona border. Working with other Federal, State, local and tribal entities, DHS has placed significant personnel and technical assets on the border to decrease the deaths of illegal immigrants in the desert; and to lower the rate of violent crime related to illegal border traffic in Southern Arizona. The ABC began operations in March 2004. For the reasons stated above, the ABC's success will rely in part upon the ability of DHS officers to place inadmissible aliens apprehended shortly after illegal entry into expedited removal.

Every year, illegal aliens from many different countries continue to enter the U.S. illegally across the nation's land borders. It is critical for public safety and national security that these aliens are not released into the U.S. without adequate verification of their identities and backgrounds.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act ("Act") and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) Except as provided in paragraph (5), the Department of Homeland

Security, through its component bureaus, may place in expedited removal proceedings any or all members of the following class of aliens: Aliens who are inadmissible under sections 212(a)(6)(C) or (7) of the Act, who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter. Each alien subject to this notice bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the U.S. continuously for the relevant 14-day period. This notice does not apply to aliens who arrive at U.S. ports-of-entry, as these aliens are already subject to expedited removal. This notice will be given effect only with respect to apprehensions made within the CBP Border Patrol sectors of (Laredo, McAllen, Del Rio, Marfa, El Paso, Tucson, Yuma, El Centre San Diego, Blame, Spokane, Havre, Grand Forks, Detroit, Buffalo, Swanton, and Houlton).

(2) Any alien who falls within this designation who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer to determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for proceedings under section 240 of the Act, 8 U.S.C. 1229a.

(3) Any alien who is placed in expedited removal proceedings under this designation who claims lawful permanent resident, refugee, asylee status, or U.S. citizenship will be processed in accordance with the procedures provided in 8 CFR 235.3(b) and 8 CFR 1235.3(b).

(4) Any alien who is placed in expedited removal proceedings under this designation will be detained pursuant to section 235(b) of the Act, 8 U.S.C. 1225(b), with certain exceptions, until removed. However, aliens determined to have a credible fear may be considered by DHS for parole in accordance with section 212(d)(5) of the Act and 8 CFR 212.5. Aliens detained pursuant to the expedited removal provisions under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under

section 240 of the Act) are not eligible for a bond, and therefore are not eligible for a bond redetermination before an immigration judge.

(5) This notice applies to aliens described in paragraph (1) who are encountered within the U.S. beginning August 11, 2004.

(6) The expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals.

Dated: August 3, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04-18469 Filed 8-10-04; 8:45 am]

**BILLING CODE 4820-02-P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR-4903-N-63]**

**Notice of Proposed Information Collection: Comment Request; Contract and Subcontract Activity**

**AGENCY:** Office of the Chief Information Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for in view, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

This is a request for approval of a revision to the currently approved information collection, which enables HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577-0088 and 2502-0355. OMB control number 2535-pending will now be used for this collection.

**DATES:** *Comments due:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Wayne_Eddins@HUD.gov;* telephone (202) 708-2374. This is not a toll-free number. Copies of available documents may be obtained from Mr. Eddins and at HUD's Web site at

*http://www5.hud.gov:6300l/po/i/icbts/coll ectionsearch.cfm.*

**FOR FURTHER INFORMATION CONTACT:** Lillian Deitzer, Information Technology Specialist, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Lillian_L._Deitzer@HUD.gov,* telephone (202) 708-2374. This is not a toll-free number.

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

This Notice is soliciting comments from members of the public and affecting agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Contract and Subcontract Activity.

*OMB Control Number, if applicable:* 2535-pending.

*Description of the need for the information and proposed use:* Information will enable HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577-0088 and 2502-0355. OMB control number 2535-pending will now be used for this collection.

*Agency form numbers, if applicable:* HUD 2516.

*Estimation of the total number of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:* An estimation of the total numbers of hours needed to prepare the information collection is 5,000,

number of respondents is 5,000, frequency of response is "annually," and the hours per response is 1 hour.

*Status of the proposed information collection:* Revision of a currently approved collection.

**Authority:** Section 3506 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, as amended.

Dated: August 4, 2004.

**Wayne Eddins,**

*Departmental Reports Management Officer, Office of the Chief Information Officer.*

[FR Doc. 04-18301 Filed 8-10-04; 8:45 am]

**BILLING CODE 4210-72-P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR-4907-N-26]**

**Notice of Proposed Information Collection: Comment Request; Automated Clearing House (ACH) Program Application—Title I Insurance Charge Payments System**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street, SW., L'Enfant Plaza Building, Room 8001, Washington, DC 20410 or *Wayne_Eddins@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Lester J. West, Director, Financial Operations Center, Department of Housing and Urban Development, 52 Corporate Circle, Albany, NY 12203, telephone (518) 464-4200 x4206 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** The Department is submitting the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

**AR01598**

# Expedited Removal Policy
## Office of Border Patrol

**BACKGROUND:**

Authorized by section 235(b) of the Immigration and Nationality Act (INA), the Expedited Removal (ER) process authorizes immigration officers, under certain circumstances, to formally remove certain aliens from the U.S. without requiring that they be provided a hearing before an immigration judge. Aliens subject to ER must have illegally entered into the U.S. by engaging in fraud or misrepresentation (e.g., falsely claiming to be U.S. citizens or misrepresenting a material fact) or arrived with fraudulent, improper, or no documents (e.g., visas or passports).

When an immigration officer places an alien in ER proceedings, the alien is detained and returned to his or her country of origin as soon as circumstances will allow. An Expedited Removal order results in a 5-year bar to re-entry and a second or subsequent removal results in the alien being barred for 20 years. An aggravated felon is permanently barred.

**PURPOSE OF EXPANDING ER:**

The Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), has the critical task of overseeing the borders of the United States. While ER has been employed against inadmissible arriving aliens at designated ports of entry (POE) in the United States for years, it has not been applied to aliens who have illegally entered the U.S. along our land borders between the ports of entry.

Through the publication of Federal Register Notice 1651ZA01, which will be published on August 12, 2004, DHS is expanding ER authority to apply to illegal entries between the ports of entry on both northern and southern land borders. Expanding ER between ports of entry will provide CBP Border Patrol Agents with a valuable tool to help establish greater control over our borders.

ER will have a deterrent effect on unlawful entry, and make it possible to pursue future criminal prosecution against those aliens who continue to enter the U.S. in violation of law. It will also accelerate the processing of inadmissible aliens because it generally does not require an appearance before an immigration judge, except in certain circumstances (e.g., credible fear cases, Lawful Permanent Residents, parole, refugees). Deterring future entries and accelerating removals will enhance CBP's ability to oversee the border, and to focus its resources on threats to public safety and to national security.

**POLICY GUIDANCE:**

# Expedited Removal Policy
## Office of Border Patrol

## Aliens subject to ER

A Federal Register (FR) Notice that will be published on August 12, 2004, expands the provisions of ER to undocumented aliens entering the United States illegally across a land border between the POEs. The Border Patrol's authority to use ER is effective immediately upon publication of the Notice. The Notice allows placement in ER proceedings any or all members of the following class of aliens:

- Aliens determined to be inadmissible under INA Sections 212(a)(6)(C) or (7) who are present in the U.S. without having been admitted or paroled by an CBP Officer at a designated POE;

- Aliens who are encountered by a Border Patrol Agent within 100 air miles of the U.S. international land border;

- Aliens who have not established to the satisfaction of the Agent that they have been physically present in the United States continuously for the 14-day period immediately prior to the date of encounter.

ER will be primarily directed to nationals of countries other than Mexico and Canada (third country nationals) and to certain Mexican and Canadian nationals with criminal histories or repeated immigration violations, such as recidivists, alien smugglers, guides, drivers, etc. CBP will retain operational discretion to place citizens of Mexico or Canada into ER proceedings.

Other provisions for processing illegal aliens apprehended in the United States, such as removal proceedings under INA Section 240, reinstatement of removal orders under INA Section 241(a)(5), administrative removal of aggravated felons under INA Section 238, and stipulated removal procedures, will continue to apply where applicable per existing law and policy.

## Aliens not subject to ER

ER will **not** be applied to unaccompanied juveniles, citizens and nationals of Cuba and El Salvador, and aliens who are members of the Class Action Settlement in *American Baptist Churches v. Thornburgh, (ABC)*, which settled the claims of a specific class of Salvadorans and Guatemalans regarding handling of asylum claims.

- **Unaccompanied juveniles:** Unaccompanied juveniles will not be processed for ER. An accompanied juvenile can only be processed for ER if the accompanying adult is also processed for ER. However, nothing precludes an accompanied juvenile from being granted a voluntary return even if the adult is processed for an ER. Maintaining family unity is critical.

# Expedited Removal Policy
## Office of Border Patrol

- **Citizens and nationals of Cuba:** ER proceedings will not be initiated against Cuban citizens or nationals, as removals to Cuba cannot presently be assured.

- **Citizens and nationals of El Salvador:** Due to court rulings issued in *Orantes-Hernandez v. Meese*, 685 F. Supp 1488 (CD. Cal 1988), ER proceedings will not be initiated against citizens or nationals of El Salvador. *Orantes* grants Salvadorans the right to counsel, the right to apply for asylum, a hearing before an immigration judge and written instructions that they are not to be moved from the jurisdiction where they were apprehended for a period of 7-days.

- **Certain citizens and nationals of El Salvador and Guatemala:** ER proceedings will not be applied to certain citizens and nationals of El Salvador and Guatemala, including unaccompanied minors, who are members of the Class Action Settlement in *American Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (*ABC*), which settled the claims of a class of El Salvadorians and Guatemalans regarding handling of asylum claims, and aliens who may be eligible for cancellation of removal under section 240A of the Act.
  - ABC-eligible class members may not be removed until they have had an opportunity to obtain the benefits of the *ABC* settlement. Potential eligibility for *ABC* membership should be determined at initial processing.
  - *ABC* class members can be identified solely on the basis of nationality and first date of entry; therefore agents who apprehend these aliens should determine their first date of entry.
  - Guatemalans who first entered the United States on or before October 1, 1990, and Salvadorans who first entered the United States on or before September 19, 1990, are eligible for ABC class membership.
  - Any El Salvadorian or Guatemalan apprehended "at entry" on or after December 19, 1990 (which was the date of the settlement agreement) is ineligible for *ABC* class membership.
  - When agents apprehend Guatemalans and Salvadorans who have entered the United States before these dates, they should contact their local U.S. Citizenship and Immigration Services (CIS) Asylum Offices for further direction.
    - If the aliens are apprehended "upon entry" (at the international border), the Asylum Officer will need the details (included in the I-213) to determine whether to issue ineligibility letters.

In all cases, the use of ER is discretionary. If an Agent encounters an alien who appears to be eligible both for ER but may also be eligible for some other form of relief from removal (such as cancellation of removal under section 240A of the INA), the Agent shall give preference to allowing the alien to pursue the alternative form of relief (i.e. by placing the alien in regular 240 proceedings

rather than ER) absent exigent circumstances.  Additionally, there may be other cases where the use of ER may not be appropriate and Agents should exercise their discretion when deciding whether to place an individual into ER, such as where persons appear to have mental health issues or diminished mental capacity.

## TRAINING REQUIREMENTS:

No Border Patrol Agent will be authorized to process an alien for ER, until the agent and approving supervisors have attended a comprehensive 8-hour course of instruction on ER.  The training curriculum uses the Train-the-Trainer (TTT) concept.  After completing the TTT session, trainers will return to their respective stations to train other agents and supervisors on ER.  Agents authorized to process aliens for ER program will be trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

## EXPEDITED REMOVAL PROCESS:

Completing an ER case requires consistency, thoroughness, and attention to detail.  Agents must create accurate and complete records of all ER cases, and most of all, exercise extreme caution to ensure a proper decision in every instance in order to minimize attempts at litigation and possibly even further legislation curtailing the Border Patrol's authority in such cases.  By regulation, the review of the ER processing paperwork must be completed by the processing Agent's second line supervisor

### Credible Fear Interview

When a person is placed in ER, Border Patrol Agents will determine whether the person has a fear of persecution if returned home.  If an alien indicates a fear of persecution or an intention to apply for asylum, the Agent must refer the alien to a CIS Asylum Officer for a "credible fear" interview.  If the alien is found to have a credible fear, they are referred to an immigration judge for regular removal proceedings under section 240 of the INA where the alien may apply for asylum or protection.

### Fear of Persecution or Torture

Any alien who is placed in ER proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear as defined in INA Section 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a removal proceeding under INA Sections 240, 235(b)(1)(A)(ii) and (B), 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4).

One of the significant differences between ER proceedings and 240 removal proceedings is that the processing Agent has the responsibility to ensure that any alien who indicates a fear of persecution or torture is referred to an asylum

officer.  Agents should consider verbal as well as non-verbal cues given by the alien.  The Agent/supervisor processing the alien for ER may be the only official that will interview the alien and therefore the only one able to discover the existence of a potential credible fear or claim.  Because of this, exceptional diligence must be made to determine if a potential fear or asylum claim exists.

For example, Agents processing aliens for ER should not make asylum eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.  The Agent should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including any cases that might raise a question about whether the alien faces persecution.

<u>Other Claims to Current or Previous Status</u>

If the alien claims to be a U.S. citizen, lawfully admitted for permanent residence, admitted as a refugee under SNA Section 207, or to have been granted asylum under INA Section 208, and is not in possession of documents to prove the claim, the alien should be handled very cautiously to ensure that their rights are fully protected.  Border Patrol Agents should make every effort to verify the alien's claim prior to proceeding with the case.  This can be accomplished through a thorough check of data systems, careful questioning of the alien, or review of government-issued and other documentation presented.  Agents should use all means at their disposal to verify or refute a claim to U.S. citizenship, including verification of birth records with state authorities, etc.  Border Patrol Agents processing aliens for ER should contact their servicing Asylum Office point(s) of contact when necessary to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim.

<u>Credible Fear Forms</u>

The forms used by Agents who process aliens under ER provide to all aliens information concerning the credible fear interview, in accordance with the statutory requirement at INA Section 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).  The forms require that the agent inquire whether the alien has any reason to fear harm if returned to his or her country.  The mandatory closing questions contained on Form I-867B are designed to help in determining whether the alien has such a fear.  If an alien asserts a fear or concern that appears unrelated to an intention to seek asylum or a fear of persecution, the Agent should normally consult with an Asylum Officer to determine whether to refer the alien.

Before remanding any alien who has been processed for ER over to the custody of U.S. Immigration and Customs Enforcement, Office of Detention and Removal (ICE/DRO), Border Patrol Agents are responsible for providing (either by fax or sent electronically) their local CIS Asylum Offices with a copy of the following processing paperwork:

- Form I-860, Notice and Order of Expedited Removal

- Form I-867A, Record of Sworn Statement and Proceedings under Section 235(b)(1) of the Act

- Form I-867B, Jurat for Record of Sworn Statement and Proceedings under Section 235(b)(1) of the Act

- M-444, Information About Credible Fear Interview

- List of Free Legal Services Providers

ENFORCE – Case Processing

In order to ensure complete records are maintained and available, all processing of ERs will be accomplished in ENFORCE per current policy and ongoing training. Border Patrol Agents should ensure that all forms are produced from ENFORCE per service standards and training in conjunction with ER processing for inclusion in the alien's permanent A-File.

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT Parole of Arriving Aliens Found to Have a "Credible Fear" of Persecution or Torture**

| | |
|---|---|
| **DISTRIBUTION:** | **ICE** |
| **DIRECTIVE NO.:** | **7-1.0** |
| **ISSUE DATE:** | **November 6, 2007** |
| **EFFECTIVE DATE:** | **November 6, 2007** |
| **REVIEW DATE:** | **November 6, 2009** |
| **SUPERSEDES:** | **See Section 3.** |

1. **PURPOSE.** The purpose of this ICE policy directive is to ensure transparency, consistency and quality assurance in ICE decisions on the parole requests of arriving aliens seeking asylum in the United States. This Directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider parole requests by arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge (IJ) of the Executive Office for Immigration Review. While preserving DRO's discretion to make case-by-case parole determinations, this Directive seeks to promote consistently high-quality parole decision-making and, accordingly, establishes a quality assurance process and includes record-keeping requirements to ensure accountability and compliance with the procedures set forth in this guidance.

1.1 This Directive does not apply to aliens in DRO custody under INA Section 236(a). This Directive applies only to arriving aliens who have been found by USCIS or an IJ to have a "credible fear" of persecution or torture.

2. **AUTHORITIES/REFERENCES.**

2.1. INA §§ 208, 212(d)(5), 235(b), and 241(b)(3), 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ l.l(q), 208.30(e)-(f), 212.5 and 235.3.

2.2. Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Customs Enforcement" (Nov. 13, 2004).

2.3. ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3. **SUPERSEDED POLICIES AND GUIDANCE.** All other ICE or former Immigration and Naturalization Service (INS) directives, memoranda, bulletins, manuals, handbooks, and other guidelines and procedures, including those

AR01605

specifically listed below, no longer apply to DRO parole determinations under INA § 212(d)(5) for arriving aliens who have been determined to have a credible fear of persecution or torture.

3.1.     Memorandum from Victor X. Cerda, DRO Acting Director, <u>Expedited Removal Guidance 3</u> (Sept. 14, 2004);

3.2.     Memorandum from Michael J. Garcia, ICE Assistant Secretary, <u>Detention Policy Where an Immigration Judge has Granted Asylum and ICE has appealed</u> (Feb. 9, 2004);

3.3.     Memorandum from Michael A. Pearson, INS Executive Associate Commissioner for Field Operations, <u>Detention Guidelines Effective October 9. 1998</u> (Oct. 7, 1998); and

3.4.     Memorandum from Michael A. Pearson, INS Executive Associate Commissioner for Field Operations, <u>Expedited Removal: Additional Policy Guidance</u> (Dec. 30, 1997).

4.     **BACKGROUND.** Arriving aliens processed under the INA's expedited removal provisions may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an IJ a "credible fear" of persecution or torture. Aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(l)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b); <u>see also</u> 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

The applicable regulations describe five categories of aliens who, on a case-by-case basis and depending upon whether the alien presents a flight or security risk, may meet the parole standards: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest. 8 C.F.R. § 212.5(b).

Given that the expedited removal statute is generally oriented towards detention, the regulations governing parole determinations make clear that aliens are only to be paroled in limited circumstances and only on a case-by-case basis. Accordingly, this Directive clarifies the applicable parole standards under 8 C.F.R. § 212.5(b) as they relate to arriving aliens determined to have a credible

fear of persecution or torture. The Directive also provides standardized procedures and analytical guidance for DRO Field Offices' parole decisions for arriving aliens and mandating uniform recordkeeping and review requirements for such decisions. Parole remains an inherently discretionary determination entrusted to the agency, but this Directive will serve to guide the exercise of that discretion.

## 5.  DEFINITIONS.

**5.1.**  **Arriving alien.** For purposes of this Directive, "arriving alien" has the same definition as provided for in 8 C.F.R. §§ 1.1 (q) and 1001.1(q).

**5.2.**  **Credible fear.** Consistent with INA § 235(b)(l)(B)(v), and for purposes of this Directive, with respect to an alien processed under INA § 235(b) "expedited removal" process, "credible fear" of persecution or torture is a finding by USCIS or an IJ that indicates a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the interviewing USCIS officer, that the alien may be able to establish eligibility for asylum under INA § 208 or entitlement to withholding or removal under INA § 241(b)(3) or protection under the Convention Against Torture.

**5.3.**  **Parole.** For purposes of this Directive, "parole" is an administrative measure used by ICE to temporarily authorize (without lawfully admitting) the release of an inadmissible arriving alien found to have a "credible fear" of persecution or torture from DRO custody. Parole does not constitute a lawful admission or a determination of admissibility, see INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, see 8 C.F.R. § 212.5(d). Parole may only be used, in the discretion of ICE and under such conditions as ICE may prescribe, in individually compelling cases for urgent humanitarian reasons or for significant public benefit.

**5.4.**  **Urgent humanitarian reasons and significant public benefit.** For purposes of this Directive, the terms "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth at 8 C.F.R. § 212.5(b), as those five categories are further explained in paragraphs 8.3.1 through 8.3.5 of this Directive.

## 6.  POLICY.

**6.1.**    Generally, subject to any applicable legal restrictions on removal, it is ICE policy to remove all aliens with final orders of removal irrespective of any type of immigration relief or protection that an alien may elect or may have elected to pursue during the course of the alien's immigration proceedings.

Parole of Arriving Aliens Found to Have a "Credible Fear" of Persecution or Torture

AR01607

6.2.　Continued custody of aliens who pose a risk of flight throughout the course of their immigration proceedings is the most effective way of ensuring their appearance at all immigration hearings and appointments.

6.3.　Parole decisions under INA § 212(d)(5) are to be made only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit." Arriving aliens found by USCIS to have a "credible fear" of persecution or torture may be individually considered for parole by DRO if they fall within one of the categories set forth at 8 C.F.R. § 212.5(b), subject to the terms of this Directive.

6.4.　While each alien's parole request will be unique and should be analyzed individually, DRO Field Offices shall uniformly document their parole decision-making processes using the *Record of Determination/Parole Determination Worksheet.* Field Office personnel are authorized to exercise their judgment and to document additional factors appropriate for consideration based on the facts of each particular case.

6.5.　Consistent with the terms of this Directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in section 8 of this Directive.

6.6.　In conducting parole determinations for arriving aliens in custody after they are found to have a "credible fear" of persecution or torture, DRO shall follow the procedures set forth in section 8 of this Directive.

6.7.　DRO shall provide any such alien who submits a written request for INA § 212(d)(5) parole with a written response if the decision is to deny parole.

6.8.　Generally, a decision to grant or deny parole shall be initially prepared by a DRO officer assigned such duties within his or her respective DRO Field Office. The decision shall pass through at least one level of supervisory review and concurrence must be finally approved by the Field Office Director (FOD) or Deputy FOD, where authorized by the FOD.

7.　**RESPONSIBILITIES.**

7.1.　The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a "credible fear" of persecution or torture.

7.2.　The **DRO Assistant Director for Operations** is responsible for:

7.2.1.　Ensuring high nationwide quality and consistency of DRO parole decision-making and recordkeeping in cases of arriving aliens found to have a "credible fear" of persecution or torture;

AR01608

7.2.2.  Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

7.2.3.  Overseeing an effective national quality assurance program that monitors the Field Offices to ensure consistent compliance with this Directive.

7.3.  **DRO Field Office Directors** are responsible for:

7.3.1.  Implementing this policy and quality assurance processes;

7.3.2   Maintaining a log of parole adjudications for "credible fear" cases within their respective geographic areas of responsibility (AORs), including copies of the ICE *Record of Determination/Parole Determination Worksheet;*

7.3.3.  Providing monthly statistical reports on parole requests received from arriving aliens found to have a "credible fear;"

7.3.4.  Making the final decision to grant or deny parole requests made by arriving aliens found to have a "credible fear" of persecution or torture within their respective AOR's or, alternatively, delegating such responsibility to their Deputy FODs (DFODs) (in which case, the FOD nevertheless retains overall responsibility for his or her office's respective compliance with this Directive) regardless of delegating signatory responsibility to the DFOD; and

7.3.5.  Ensuring that DRO field personnel within their respective AORs who will be assigned to receive and prepare responses to parole requests are familiar with this Directive and corresponding legal authorities.

7.4.  **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, proposed parole decisions prepared by their subordinates in the cases of arriving aliens found to have a "credible fear" or persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3.4 of this Directive are responsible for discharging final decision-making authority over parole requests in such cases within their respective AORs.

7.5.  As applicable, **DRO field personnel** assigned parole-related duties by their local chains-of-command are responsible for fully and accurately completing the ICE *Record of Determination/Parole Determination Worksheet,* in accordance with this Directive and corresponding legal authorities.

8.  **PROCEDURES.**

8.1.   Upon receipt of a written INA § 212(d)(5) parole request by an arriving alien found to have a "credible fear" of persecution or torture, the receiving DRO Field Office shall assign the request to a DRO officer familiar with the requirements of this Directive and corresponding legal authorities, who will complete the ICE

**AR01609**

*Record of Determination/Parole Determination Worksheet,* which sets forth the correct two-part analysis applicable to parole requests in such cases.

8.2. **Step One.** Step one of the parole analysis is a threshold assessment of whether the alien's parole request and any supporting documents establish: (1) the alien's identity; (2) that he or she does not pose a risk of flight; and (3) that he or she is not a danger to the community.

8.2.1. Identity. Identity is a critical element in qualifying for parole. Asylum applicants who arrive in the United States without any identifying documents or who present fraudulent documents or claims raise significant security concerns. Field Office personnel must review all relevant documentation offered by an alien, as well as other information available about the alien to determine whether the alien is who he or she claims to be. If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should request that the alien provide government-issued documentation of identity. If the alien cannot reasonably provide valid government-issued evidence of identity, the alien can provide for consideration affidavits from third parties, if the affiants include copies of valid, government issued photo-identification document, and fully establish their identity and address. Without such additional documentation, affidavits from third parties may not suffice for establishing identity for parole purposes, particularly if the alien attempted to enter the U.S. through fraud.

8.2.2. Flight Risk. An alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required. Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to: community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings, prior immigration history, ability to post bond, property ownership, and possible relief from removal available to the alien. An alien must be able to post bond in an amount deemed sufficient for reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so, and to ensure that the alien will comply with all periodic reporting conditions.

8.2.3. Danger to the Community. An alien must demonstrate that he or she will not pose a risk to the security of the community. Evidence to the contrary may include, but is not limited to, past criminal history in the United States and abroad, national security interests, concerns of public safety or danger to the community, prior immoral acts or participation in subversive activities, and any detention history that shows that he or she has harmed himself or herself or others.

8.3. **Step Two.** Step two of the parole analysis is an assessment of whether the alien has established that he or she falls within one or more of the five categories enumerated in 8 C.F.R. § 212.5(b) and it is determined on a case-by-case basis

that parole is justified for "urgent humanitarian reasons" or "significant public benefit," provided the alien presents neither a security risk nor a risk of absconding. The five categories are aliens in 8 C.F.R. § 212.5(b): (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest. While Step One and Step Two of the parole analysis should be individually documented during the decision-making process, officers must take care to consider whether any interrelationship exists between them, such as where an alien's pregnancy or serious medical condition might reduce his or her risk of flight, or where a juvenile's young age would suggest that he or she poses little danger to the community."

8.3.1. <u>Serious Medical Condition</u>. Based on a finding of urgent humanitarian need or significant public benefit, a favorable exercise of discretion maybe considered on a case-by-case basis whenever a medical or psychological evaluation, diagnosis, treatment plan, or other documentation provided by a qualified medical or psychological professional indicates the existence of a serious medical condition or an impairment that makes detention problematic or inappropriate. DRO may consult with medical professionals to determine the severity of any alien's medical condition.

8.3.2. <u>Women Medically Certified as Pregnant</u>. Parole for a woman medically certified as pregnant should be considered on a case-by-case basis.

8.3.3. <u>Juveniles</u>. ICE detains a small number of accompanied alien minors under the age of 18. When adjudicating parole requests from juvenile aliens, FODs shall consult with the Juvenile and Family Residential Management Unit (JFRMU) at Headquarters about these parole requests.

8.3.4. <u>Witnesses</u>. Parole under this category should require a substantial showing from the alien as to why serving as a witness for some limited purpose justifies release from custody. Factors to consider in this discretionary determination may include: whether the law enforcement agency, prosecutor, judicial, administrative, or legislative body before which the alien is to serve as a witness has presented a formal request; whether some other law enforcement agency will take custody of the alien (usually referred to as a Bench Warrant or Writ); and whether the alien's potential testimony could endanger him or her and why the alien would be safer in the community-at-large than in a secure detention setting.

8.3.5. <u>Public Interest</u>. Parole on public interest grounds requires careful consideration of whether, consistent with ICE's mission to protect the United States, uphold public safety, and enforce the immigration laws, a specific alien's case is appropriate for

Parole of Arriving Aliens Found to Have a "Credible Fear" of Persecution or Torture

AR01611

parole because of some public interest. Because the term "public interest" is not amenable to a single, standard definition, the decision to grant parole on this basis must be documented by a well-reasoned justification.

8.4.    Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The ICE *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5.    After conducting this two-part analysis, preparing and signing the ICE *Record of Determination/Parole Determination Worksheet,* and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence. If the DRO officer believes parole is warranted in the public interest under 8 C.F.R. § 212.5(b)(5) and paragraph 8.3.5 of this Directive, the officer shall draft a full written justification for supervisory review.

8.6.    Upon his or her concurrence, the first-line supervisor shall sign the ICE *Record of Determination/Parole Determination Worksheet,* and forward this form and other documentation to the FOD (or, where applicable, the DFOD) for final approval.

8.7.    The FOD (or, where applicable, the DFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and either grant or deny parole by completing the ICE *Record of Determination/Parole Determination Worksheet,* and in the case of a denial, signing the written response to the alien. If the FOD (or, where applicable, the DFOD) believes that parole is warranted in the public interest under 8 C.F.R. § 212.5(b)(5) and paragraph 8.3.5 of this Directive, he or she shall document the well-reasoned justification for parole.

8.8.    Following a final decision by the FOD to deny parole (or, where applicable, the DFOD), the Field Office shall provide a standardized written response to the alien or, if represented, to the alien's legal representative, indicating that the parole request was denied. If parole is granted, the Field Office shall provide the alien with a stamped 1-94 Form that authorizes parole under INA Section 212 (d) (3) (5)(A) in accordance with DRO guidelines.

8.9.    The parole request, supporting documents, a copy of the decision sent to the alien (if applicable), the ICE *Record of Determination/Parole Determination Worksheet,* and any other documents related to the parole request or adjudication should be placed in the alien's A-file in a record of proceeding format. In addition, a copy of the ICE *Record of Determination/Parole Determination Worksheet,* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

AR01612

8.10.  The FOD shall submit monthly parole reports to the Assistant Director for Operations as directed by DRO Headquarters.

8.11.  At least once every six months, the Assistant Director for Operations shall conduct a thorough and objective quality assurance review of the Field Offices' parole decision-making as directed by DRO Headquarters. The quality assurance review will become part of the Deportation Officer's Field Operations Manual.

**9.**  **ATTACHMENT.**  ICE *Record of Determination/Parole Determination Worksheet.*

**10.**  **NO PRIVATE RIGHT STATEMENT.** This Directive is an internal policy statement of ICE. It is not intended to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:**  *Julie Myers*

Julie L. Myers
Assistant Secretary
U.S. Immigration and Customs Enforcement

**CBP Directive No.** 3340-043          **Date:** September 3, 2008

> **ORIGINATING OFFICE**: OFO: APP
> **SUPERSEDES:**
> **REVIEW DATE:** September 2011

**SUBJECT:     THE EXERCISE OF DISCRETIONARY AUTHORITY**

**1. Purpose.** To provide guidance and direction to promote the fair, objective and consistent application of U.S. Customs and Border Protection (CBP) discretionary authority in the enforcement of immigration laws nationwide.

**2. Policy.**

2.1     It is the policy of CBP to protect the United States of America from threats posed by terrorist organizations and to prevent terrorists as well as suspected terrorists, terrorist funding, weapons, and instruments, including Weapons of Mass Effects (WME), and their precursors from entering the United States.

2.2     It is the policy of CBP, consistent with the Immigration and Nationality Act (INA) to verify the identity, citizenship and admissibility of persons seeking entry into the United States. Where there is a belief, based on an evaluation of available information, that an alien may have ties to or presents a threat related to terrorism, has criminality rendering him or her inadmissible, or is likely to add to the illegal population of the United States, the alien will be denied admission where there is a legal basis to do so.

2.3     It is the policy of CBP that, through the use of all authorities and sanctions provided by law and procedure, enforcement actions will be vigorously pursued against any individual where there exists any reasonable suspicion of association with terrorism, criminality, illegal migration, smuggling or any other activity contrary to national interests or in violation of U.S. statutes.

2.4     It is the policy of CBP to consider the exercise of discretionary measures in favor of aliens who are inadmissible due to a minor or technical violation of the INA. This includes the use of the waiver and parole processes to allow such aliens into the United States, where appropriate and permissible by law. In keeping with the CBP strategy of risk management, CBP will focus resources on those cases that pose the greatest risk.

2.5     It is the policy of CBP that in individual cases involving technical inadmissibility, minor violations, and apparent bona fide travel, where refusal of admission or withdrawal of application for admission would involve detention or undue hardship, it is appropriate to expansively consider the exercise of discretionary authority. This principle must be applied on a case-by-case basis and may not be interpreted to provide relief from the visa requirement in any systemic manner to any particular class of aliens.

2.6     It is the policy of CBP that supervisors and managers will responsibly assess every case involving a prospective adverse action. This will ensure that CBP's legal and discretionary authority is being exercised judiciously and in a manner consistent with the facts of the case.

**3. Authority/References.** Immigration and Nationality Act (INA); Title 8 United States Code (USC); Title 19 USC; Title 8 Code of Federal Regulations (CFR); Inspector's Field Manual (IFM) Chapters 16.1 (Parole); 17.1 (Deferred Inspection); 17.2 (Withdrawal of Application for Admission); and 17.5 (Waivers).

**4. Definitions.**

4.1    "Admission," means, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by a CBP officer.

4.2    "Brief overstay," generally means an overstay of approved nonimmigrant status, unintentional in nature or beyond the control of the alien, covering a period of ███████ or less.

4.3    "Hardship," must be determined based on the factors presented.  Applicants must be encouraged to describe and document all applicable factors, since there is no guarantee that any particular reason will result in a finding that an adverse action would cause extreme or undue hardship.

4.4    "Minor or technical violation," means a single infraction of a CBP statute that does not rise to a level of such a serious nature that would preclude the offering of a form of discretion.

4.5    "Significant public benefit," means that the inadmissibility of an alien is outweighed by the public interest in allowing the alien to enter the United States.

4.6    "Unforeseen emergency," as used in 8 CFR § 212.1(g) generally means:

4.6.1    An alien arriving for a medical emergency (an injury or illness that requires immediate medical attention to prevent life-threatening or disabling conditions);

4.6.2    An emergency or rescue worker arriving in response to a community disaster or catastrophe in the United States;

4.6.3    An alien accompanying or following to join a person arriving for a medical emergency;

4.6.4    An alien arriving to visit a spouse, child, parent, or sibling who within the past 5 days has unexpectedly become critically ill or who within the past 5 days has died; or,

4.6.5    An alien whose passport or visa was lost or stolen within 48 hours of departing the last port of embarkation for the United States.

**5. Responsibilities.**

5.1    The Assistant Commissioner, Office of Field Operations, is responsible for policy oversight, which includes the formulation and implementation of guidelines and procedures.

5.2     The Executive Director, Admissibility and Passenger Programs (APP), is responsible for the formulation and implementation of the guidelines set forth by the Assistant Commissioner. In addition, the Executive Director, APP, will be responsible for conducting national reviews to ensure compliance with implemented guidelines outlined in this directive.

5.3     Directors, Field Operations (DFOs) are responsible for the overall management and implementation of this program. DFOs will also be responsible for the overall monitoring of the exercise of discretionary authority within their areas of responsibility.

5.4     Port Directors (PDs) are responsible for performing periodic reviews of cases to ensure that the exercise of discretionary authority is being applied in accordance with this directive. PDs are also responsible to ensure that any exercise of discretionary authority is fully warranted.

5.5     Field managers and supervisors are responsible for ensuring that the Discretionary Checklist is utilized in every case involving a prospective adverse action.  They are further responsible for assessing every case involving a prospective adverse action to ensure that any exercise of discretionary authority is done judiciously and in a manner consistent with the facts of the case.

5.6     Supervisors are responsible for ensuring that the Discretionary Checklist is completed during case processing.  Supervisors are further responsible for ensuring that CBP officers under their supervision are familiar with the policies and procedures established by this directive.

5.7     CBP officers are responsible for knowing, understanding and adhering to the contents of this directive.  CBP officers are further responsible for accurately presenting all facts and circumstances resulting from an inspection that may involve a prospective adverse action to the appropriate level of management, through the chain of command.

5.8     CBP officers are responsible for immediately forwarding information to the appropriate level of management, through the chain of command, regarding time-critical situations, including medical emergencies.

**6.  Port of Entry Environments.**

6.1     Land Border and Preclearance Ports of Entry

6.1.1   In these environments, an inadmissible alien can normally be returned to a contiguous country immediately or without the need to arrange for additional transportation or to be taken into federal custody.  Ports may need to consider additional factors where refused aliens must be transported to a designated return location.

6.1.2   In these environments, it is generally reasonable to refuse admission, or accept a withdrawal of application, as it would not create an undue hardship on an alien.  If necessary, an alien can access a United States Embassy or Consulate in an attempt to correct any documentary deficiencies, or can secure additional evidence to support a subsequent application for admission.

6.1.3 Despite the ease with which aliens may be refused admission in these environments, CBP supervisors and officers must continue to evaluate each case to adequately determine if the exercise of discretionary authority is warranted.

6.2 Air and Sea Ports of Entry

6.2.1 In these environments, there is less flexibility due to external circumstances that must be considered, such as transportation schedules and carrier liabilities.

6.2.2 When a violation is technical or minor in nature, and the purpose for travel is determined to be bona fide, discretionary guidelines shall be applied expansively to minimize hardship on an alien [redacted]. This does not preclude the use of restraints or detention where there is an articulable concern for officer safety.

**7. Discretionary Checklist**

7.1 The attached Discretionary Checklist serves as an aid to frontline personnel and managers in exercising discretionary authority. It also ensures that the INA is consistently applied and that each applicant's admissibility is viewed as a unique, individual case.

7.2 The Discretionary Checklist should be completed by the inspecting CBP officer and reviewed by a first and/or second line supervisor.

7.3 The Discretionary Checklist should be maintained as a part of the alien's port file or A-file (if one exists), regardless of whether discretionary authority is exercised or denied. The checklist should explain why discretion was approved or denied.

7.4 Discretionary authority should generally not be exercised if the alien is unable to establish his or her identity or citizenship.

7.5 Discretionary authority should generally not be exercised if the alien has terrorist ties or affiliations, significant criminal history, or is likely to contribute to the illegal population of the United States. [redacted]

7.6 The factors outlined below should be considered when deciding whether to exercise discretion. Not every factor will apply in every case.

7.6.1 The nature of the inadmissibility should be reviewed to determine if it is a minor or technical concern as opposed to more serious fraud, criminal or security grounds.

7.6.2 All potential grounds of inadmissibility should be reviewed. Generally, if there are multiple grounds of inadmissibility, it is not merely a minor or technical concern.

7.6.3   Previous violations or determinations of inadmissibility should be reviewed ████ ████

7.6.4   Previous grants of parole or waiver should be reviewed ████████

7.6.5   An alien's stated purpose of entry should be reviewed ████████

7.6.6   An alien's stated family or business ties in the United States should be reviewed and verified to the extent possible.  Such ties must be carefully considered as they may support a legitimate reason for entry, or provide evidence indicating intentions to contribute to the illegal population of the United States.

7.6.7   An alien's current and previous immigration status and length of residence in the United States (if applicable) should be reviewed to assess compliance with previous admissions.

7.6.8   An alien's good faith efforts to obtain correct information or documents prior to arrival should be reviewed and verified to the extent possible.

7.6.9   An alien's knowledge or ignorance of correct procedures or admissibility requirements should be reviewed to determine if a violation is inadvertent, or caused by unfamiliarity with the laws and/or language of the United States.

7.6.10  Advance opportunity to obtain travel documents should be reviewed to determine if the situation provided sufficient time for an alien to comply.  In some cases, an alien may have been aware of the documentary requirements, but may have a plausible reason for not complying.

7.6.11  Any suspected intentions to circumvent admissibility requirements should be reviewed to determine the underlying reason for inadmissibility, and the extent to which the alien was aware of any inability or unlikelihood of being granted a visa or admission to the United States.

7.6.12  Misrepresentations[1] made during the inspection process should be reviewed and treated with the seriousness they deserve.  While certain misrepresentations may subject an alien to Expedited Removal provisions, other misrepresentations may be less severe, and may be made due to fear or distrust of authority, or for cultural reasons.  Where inconsistencies in critical information exist due to misrepresentation, the exercise of discretionary authority is less likely to be appropriate.



7.6.13  An alien may not be aware that a previous brief overstay has resulted in either the voidance of a visa, or future ineligibility to enter the United States under the Visa Waiver Program (VWP).  In such cases, the alien should be informed of the consequences of his or her previous overstay but discretion may still be considered.

7.6.14  An alien's claim of official misinformation, especially from government officials, should be reviewed to determine the credibility, and verified to the extent possible.

7.6.15  An alien's willingness to cooperate with CBP processing should be reviewed ▮

7.6.16  An alien's age and health should be reviewed to determine if he or she requires assistance, as an infant, child, or elderly person, or if he or she is experiencing a life-threatening or long-term illness.  Such conditions may impact an alien's ability to travel, be detained or be restrained, and may also affect his or her ability to understand or comply with entry requirements.

7.6.17  Any political or media sensitivities should be reviewed to determine if the alien presents high-profile or sensitive issues.  Discretionary authority should not be exercised solely to avoid adverse publicity.

7.6.18  An alien's potential to pose a threat of future terrorist, criminal or violent acts in the United States should be considered.

7.6.19  Any other humanitarian or public interest considerations should be reviewed by the appropriate supervisor to determine if an officer should allow withdrawal of application for admission, or pursue Expedited Removal or removal proceedings before an Immigration Judge.

## 8.  Forms of Discretion.

### 8.1  Waivers.

8.1.1  Generally, waivers approved at ports of entry will be for documentary deficiencies and will be documented using Form I-193, *Application for Waiver of Passport and/or Visa*.  If an alien is inadmissible for reasons other than documentary deficiencies, such a waiver is not appropriate and cannot be approved at the port of entry.  In such cases, parole may be considered as a discretionary means to allow the alien into to the United States.

8.1.2  The authority to approve such waivers under INA § 211(b) and INA § 212(d)(4)(A) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.1.3    The Form I-193 application fee may be waived for aliens granted a waiver for the first time under INA § 211(b) or INA § 212(d)(4).  Such determination shall be made by port management at the GS-13 level and above, or a port director at the GS-12 level.  Previous beneficiaries of a fee-exempt waiver may be considered for subsequent fee-exempt waivers on a case-by-case basis.

8.1.4    Ports of entry encountering returning lawful permanent residents lacking evidence of alien registration, and thus inadmissible under INA § 212(a)(7)(A)(i), may offer a visa waiver pursuant to INA § 211(b), if otherwise admissible.

8.1.4.1 If a lawful permanent resident claims his or her evidence of registration has been lost or stolen, the port may accept Form I-90, with fee.

8.1.5    Ports of entry encountering nonimmigrant aliens seeking admission to the United States determined to be inadmissible under INA § 212(a)(7)(B), may offer a waiver pursuant to INA § 212(d)(4).

8.1.5.1 Waivers approved pursuant to INA § 212(d)(4) should generally be for unforeseen emergency situations.  Such waivers may also be approved for aliens who fall outside the scope of an unforeseen emergency on a case-by-case basis where it is determined that humanitarian factors support the decision.  The following scenarios are a few examples of situations in which a waiver may be appropriate.

8.1.5.2 An alien is not in possession of a proper visa due to governmental error (e.g., the consulate issued an L-2 instead of an L-1 nonimmigrant visa).

8.1.5.3 An alien is not in possession of a proper visa, but has the requisite documentation for an employment based nonimmigrant visa (e.g., presents an I-797 confirming that a petition has been approved; however, the nonimmigrant visa presented has expired).  Note: CBP cannot waive the underlying documentary requirement for another agency (such as a Department of Labor (DOL) labor certification or petition).

8.1.5.4 An alien with a brief overstay that rendered his or her visa invalid pursuant to INA § 222(g).

8.1.5.5 An alien issued a valid and appropriate visa, but who is unable to present the visa at the time of his or her application for admission.  This often occurs when the visa is contained in a previously issued passport that is not in the alien's possession.

8.1.5.6 Representatives of foreign information media without appropriate visas.

8.2    **Parole.**

8.2.1    Generally, cases requiring parole authorization will present more complex circumstances than those in which a waiver would be considered.  Parole authority is normally exercised when

an alien is inadmissible for reasons other than simple documentary deficiencies. Parole is not regarded as an "admission;" therefore, paroled aliens remain subject to proceedings as inadmissible (under INA § 212), rather than removable (under INA § 237), aliens.

8.2.2    The authority to approve a parole under INA § 212(d)(5) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.2.3    If a parole is provided as a benefit to an alien, the prescribed fee should generally be collected. However, if a parole is provided in the interest of the government, the fee should be waived.

8.2.4    Since there is no application form for a parole, CBP officers must document all approved port of entry paroles in █████████████████████

8.2.4.1 Aliens presenting a valid, approved Form I-512, *Authorization for Parole of an Alien into the United States*, need not be documented ████████████

8.2.4.2 Port of entry paroles involving emergency or other time-critical situations should be documented █████████████████████████████████████

8.2.4.3 In time-critical situations, an alien may be allowed to enter the United States ███████ █████████████████████████████████████

8.2.5    Ports of entry may grant paroles for deferred inspection, referral for removal proceedings, to facilitate an alien's departure, and in other situations deemed to be in the public interest.

8.2.6    The following situations are a few examples in which parole may be appropriate.

8.2.6.1 An inadmissible alien in need of emergency medical treatment.

8.2.6.2 Emergency workers responding to a natural disaster or other emergency situation.

8.2.6.3 **Medical evacuation** — often termed **MEDEVAC** or **medivac** (land and air ambulance) crew and/or patients.

8.2.6.4 A minor accompanying a detained parent.

8.2.6.5 A missing or abducted minor located and paroled to another agency.

8.2.6.6 Sick or injured crewmembers, including shipwreck or plane crash survivors.

8.2.6.7 An unaccompanied minor who is being released pursuant to an order of preference found in 8 CFR § 212.5(b)(3) or 8 CFR § 236.3(b)(1).

8.2.6.8 Significant Public Benefit Parole, including silent parole, requested by other law enforcement agencies. ███████████████████████████████████████████

8.2.6.9    In situations involving minor or inadvertent violations and apparent bona fide travel with no other violations, such as a brief overstay of a VWP admission that rendered an alien statutorily ineligible to apply for admission under the VWP, ████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████

8.2.6.10  Foreign students on field trips, aliens attending cultural events, and aliens coming for non-emergency medical treatment determined to be inadmissible for reasons other than documentary deficiencies may also be issued a port of entry parole.  When a documentary deficiency is the only apparent ground of inadmissibility, a waiver should be pursued prior to parole consideration.

8.2.7    Aliens placed into expedited removal proceedings must normally be detained until removed from the United States.  However, parole may be permitted if there is a medical emergency, or if it is necessary for legitimate law enforcement purposes, such as for criminal prosecution, or to testify in court.

8.3    **Deferred Inspection**.

8.3.1    A deferred inspection may be used when an immediate decision concerning admissibility cannot be made at a port of entry and when it appears likely that the issues surrounding admissibility can be resolved favorably at the onward port of entry.  Deferred inspections may be necessary to review an existing file, or some other documentary evidence essential to clarifying admissibility.

8.3.2    As a form of parole, the authority to approve a deferred inspection is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level. ███
████████████████████████████████████████████████████████████

8.3.3  ████████████████████████████████████████████████
████████████████████████████████

8.3.4  ████████████████████████████████████████████████
████████████████████████████████████████████████████

8.3.5    CBP processing shall be deferred for a specific purpose, and not as a way to transfer a difficult case to another office.

8.3.6   CBP processing shall be deferred to the office having jurisdiction over the area where the alien will be staying while in the United States.

8.3.7   CBP processing shall not be deferred where the alien is not expected to establish his or her admissibility. █████████████████████████████████████████████████████████
█████████████████████████████████

8.3.8   An inspection shall not be deferred if, based on the totality of circumstances and the presence of articulable facts, there are concerns that the alien may abscond or fail to report for CBP processing as directed.

8.3.9   An inspection may be deferred on behalf of an alien who is the beneficiary of an immediate relative petition, and who has an adjustment of status application pending with U.S. Citizenship and Immigration Services (USCIS), if the only reason for inadmissibility is the alien's failure to have a valid advance parole, and there is a likelihood that USCIS will exercise discretion and allow the alien's adjustment of status application to continue to a final decision.

8.3.10   The deferred inspection provision contained in 8 CFR § 235.2(a) shall not apply to an applicant for admission under INA § 217, except that the removal of a VWP applicant may only be deferred if the alien is paroled for criminal prosecution or punishment.  This is the only provision for deferred removal under the Visa Waiver Program.

8.4   **Withdrawal of Application for Admission**.

8.4.1   A nonimmigrant applicant for admission who does not appear to be admissible may be offered the opportunity to withdraw his or her application for admission pursuant to INA § 235(a)(4), rather than being placed in proceedings pursuant to INA § 240 or removed under INA § 235(b)(1).

8.4.2   An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued.  All withdrawals of application for admission ███████████████
███████████████████████████████ should be approved by a first-line supervisor.

8.4.2.1 At land border ports of entry, aliens who refuse to pay the fee required for issuance of an entry document (I-94 or I-94W), and aliens who seek immediate return to the country of departure with documented intentions of obtaining or extending status in that country, but who are otherwise admissible, █████████████████████████████████████████████████
███████████████████████████████████████████████████████

8.4.3   Prior to permitting an alien to withdraw his or her application for admission, the alien must demonstrate both the intent and the means to depart immediately from the United States.

8.4.4   Withdrawal is strictly voluntary and may not be coerced in any way.  If withdrawal is offered, but not voluntarily accepted, appropriate removal proceedings should be initiated.

8.4.5   In exercising discretion to permit a withdrawal of application for admission, carefully consider all the facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, if justice would be ill-served if an order of removal were issued.

8.4.6   In light of the serious consequences of an expedited removal order, including a minimum 5-year bar on re-entry to the United States, the decision to permit withdrawal should be based on a careful consideration of relevant mitigating and aggravating factors in order to reach a reasonable decision.

8.4.7   Withdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant, or when especially egregious CBP violations are uncovered (e.g., long-term or repeated overstays, unauthorized employment).

8.5   **Voluntary Return.**

8.5.1   Voluntary Return (VR) is an act of discretion that can be applied to non-arriving aliens in circumstances analogous to those where withdrawal of application for admission is allowed, and should be approved by a first-line supervisor.

8.5.2   Usually, when an alien has demonstrated his or her intent to depart the United States, it serves no purpose to issue a Notice to Appear, because the alien is already executing the ultimate objective, which is removal from the United States.  There is generally no reason to burden the immigration court with these cases.

8.5.3   When feasible, Voluntary Return cases should be documented ███████████████, facts should be articulated documenting the unlawful presence, and an A-file ██████████████████.  Without these actions, it may be difficult to sustain a future ground of inadmissibility regarding the alien's unlawful stay.

8.5.4   In circumstances where CBP officers encounter outbound illegal aliens and there is insufficient time before the departure flight to collect biometrics, CBP officers may use available biographic data alone to create ████████████████████.

8.6   **Detention.**

8.6.1   When an alien does not pose a potential risk to the United States and transfer to a detention facility may cause undue hardship, parole and/or continued detention at the port of entry should be considered, when feasible.  When an alien is permitted to withdraw an application for admission, or is being refused admission under INA § 217, it is particularly important to carefully consider the consequences of transfer to a detention facility in each case.

8.7   **Fee Collection**.

8.7.1    When a form of discretion under consideration requires the payment of an associated fee (such as waiver applications and certain paroles), CBP should determine if the action taken is solely for the benefit of the alien.  If the discretionary action is taken for reasons of significant public benefit, CBP should not charge a fee.

8.7.2    Situations resulting from an action at the port of entry in which it would not be appropriate to charge a fee include the following:

8.7.2.1 Parole for criminal prosecution;

8.7.2.2 Parole for incarceration after conviction for a crime;

8.7.2.3 Parole into the custody of another agency;

8.7.2.4 Parole for INA § 240 proceedings, if detention is not appropriate or feasible;

8.7.2.5 Parole of a stowaway for a medical emergency or legitimate law enforcement objective;

8.7.2.6 Parole of a witness in a judicial, administrative or legislative proceeding being conducted, or to be conducted in the United States;

8.7.2.7 Parole for deferred inspection; and,

8.7.2.8 Parole for deportation from another country through the United States.

8.7.3    Nothing in this directive is intended to diminish the authority of port management to waive fees under other circumstances, where appropriate, in accordance with 8 CFR § 103.7(c).

**9.  No Private Right Created.**  The procedures set forth in this Directive are for CBP internal use only and create no private rights, benefits, or privileges for any private person or party.


/s/
Assistant Commissioner
Office of Field Operations

## Discretionary Authority Checklist for Alien Applicants

**Applicant's Name:** [                    ]   **Port #:** [          ]

**Date of Birth:** [              ]   **Date of Action:** [          ]

**Citizenship:** [              ]   **Passport / A-#:** [          ]

**1) Identity / Citizenship:**

Identity sufficiently determined: Yes ☐ No ☐
Citizenship sufficiently determined: Yes ☐ No ☐

**2) Age, Health and Notoriety of Applicant:**

Are age or health relevant factors? Yes ☐ No ☐
Is the applicant a public figure? Yes ☐ No ☐
Congressional or media interest? Yes ☐ No ☐

*\*\*NOTE: Discretionary authority should generally not be exercised if identity or citizenship can not be established.*
**REMARKS (to include origin, destination and intended length of stay):**

[                                                                    ]

**3) Intended Purpose of Entry:**

Emergency: Yes ☐ No ☐
Medical: Yes ☐ No ☐
Pleasure: Yes ☐ No ☐
Business/Official: Yes ☐ No ☐
Other: Yes ☐ No ☐

**4) Database queries:**

[ ██████████████████ ]

[ ██████████████████ ]

[                                                                    ]

**5) Previous Immigration Violations or Inadmissibility:**

Previous Immigration Violation(s): Yes ☐ No ☐
Previous Inadmissibility: Yes ☐ No ☐
Previous Beneficiary of Discretion: Yes ☐ No ☐

**6) Nature of Inadmissibility:**

[ ██████████████████ ]

**REMARKS:**

[                                                                    ]

**7) Threat posed to the United States:**

[ ██████████████████ ]

*\*\*NOTE: Discretionary authority should generally not be exercised if a threat is posed to the United States.*
**REMARKS:**

[                                        ]

Law Enforcement Sensitive / For Official Use Only

**AR01626**

**8) Other Factors to Consider:**

| | |
|---|---|
| Legitimate reason for entering the United States: | Yes ☐ No ☐ |
| Documentary (Passport / Visa) deficiency only: | Yes ☐ No ☐ |
| Credible claim of official misinformation: | Yes ☐ No ☐ |
| Relationship to a U.S. employer or resident: | Yes ☐ No ☐ |
| Intent to circumvent admissibility requirements: | Yes ☐ No ☐ |
| Misrepresentations made during processing: | Yes ☐ No ☐ |
| Minor children accompanying or already in the United States: | Yes ☐ No ☐ |
| Unaware of visa voidance or consequences of VWP overstay: | Yes ☐ No ☐ |
| Relief available through the parole or waiver process: | Yes ☐ No ☐ |

**REMARKS:**

**Examining CBP Officer:**

**Applicable Ground(s) of Inadmissibility:**

**Applicable Discretionary Action(s):**

| | | |
|---|---|---|
| Withdrawal of Application for Admission: | Yes ☐ No ☐ | |
| Parole to Depart Foreign / Voluntary Return: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Humanitarian Parole: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Waiver of Passport Requirement: | Yes ☐ No ☐ | Period of admission sought: _____ |
| Waiver of Non-Immigrant Visa Requirement: | Yes ☐ No ☐ | |
|     Classification: _____ | | Period of admission sought: _____ |
| Waiver of Immigrant Visa Requirement: | Yes ☐ No ☐ | |
| Waiver of processing fee (if applicable): | Yes ☐ No ☐ | |
| Deferred Inspection: | Yes ☐ No ☐ | Deferral Period and Location: _____ |

**Supervisory CBP Officer:**

**Recommendation:**
Approve:       Yes ☐ No ☐
Disapprove:   Yes ☐ No ☐

**Justification for recommendation (to include alternatives, if disapproval is recommended):**

**Reviewing 2nd Line Manager:**
(GS13 or Above)

**Decision:**
Approved: ☐          Disapproved: ☐

**Justification for decision (to include final disposition, if disapproved):**



**Supplemental Policy Guidance for Additional Improvement of the Migrant Protection Protocols (December 7, 2020)**

**Background**:  Since its inception in January 2019, the Migrant Protection Protocols (MPP) remain a critical tool in managing irregular migrant flows at the U.S-Mexico border.  Building on former Acting Secretary McAleenan's direction to ensure that MPP is the most effective and efficient program possible, Acting Secretary Wolf requested that the Department of Homeland Security (DHS) Components continue to refine processes and implement best practices related to MPP.

**Purpose:**  As a continuation of efforts to improve MPP, several principles have been identified that either enshrine developments implemented after MPP's inception or provide further enhancement and clarity for the MPP process.

Therefore, having secured Acting Secretary Wolf's approval, and without prejudice to previous policy guidance, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Office of Operations Coordination (OPS), with support from other offices as needed, should take necessary action to ensure that MPP operations reflect these principles:

<div align="center">

**Access to Information About MPP**

</div>

**Actions to Provide Program Information**
DHS should continue to make every reasonable effort to ensure that aliens in MPP have access to information about the program.  This includes, but is not limited to, a plain-language indication by CBP personnel of pertinent information in an alien's service packet in the alien's preferred language (using interpretation resources, as needed) and maintaining the MPP landing page on DHS.gov in English and Spanish which consolidates MPP-related information and resources. Additionally, as local infrastructure, resources, and processing allow this could also include "Know Your Rights" presentations and videos, etc.

**Information Regarding Access to Counsel**
Components should continue to ensure the ability to have retained counsel participate telephonically in USCIS's MPP *non-refoulement* assessments -- where it does not delay the

AR01628

interview, or as required by court order.[1]  Aliens subject to MPP continue to have a right to be represented by counsel in removal proceedings before an immigration judge at no cost to the government.

**Regular Release of Statistics**
Next, DHS should make every reasonable effort to regularly release DHS's MPP-related statistics.  To that end, DHS and/or its Components should continue to provide publicly-available information regarding MPP.

## Appeals

As is currently the practice, where an immigration judge grants an MPP alien relief or protection from removal, but ICE has reserved appeal to the Board of Immigration Appeals, ICE will take custody of the alien and will determine whether to detain or release the alien into the United States pending the administrative appeal[2].

## Family Units

**Definition of Family Unit**
For the purposes of MPP, DHS defines a family unit as a group of two or more aliens consisting of a minor or minors accompanied by his/her/their adult parent(s) or legal guardian(s).  Every effort should continue to be made to maintain the integrity of family units pending completion of removal proceedings, consistent with applicable law and policy.

**Consolidation of Individual Cases of Family Unit Members**
If, for any reason, the individual cases of family unit members processed pursuant to MPP have not already been consolidated, DHS entities should work with DOJ, to the extent possible, to identify and link cases of these individuals.  DHS and DOJ may also consider case consolidations in other reasonable instances, such as domestic partnerships, on a case-by-case basis.

**Adjudication of Expressions of Fear of Return to Mexico**
If any member of a family unit in MPP expresses a fear of returning to Mexico, then the entire family unit will await the adjudication of that claim before any return to Mexico can proceed, so long as there is not an independent basis to separate members of a family unit.  If any member of a family unit establishes that he/she is more likely than not to suffer persecution on account of a protected ground or torture in Mexico, the entire family unit must not be processed for MPP or, if currently in MPP and in the United States together, must be removed from MPP and reprocessed as appropriate.

---

[1] This policy both updates and supersedes in part section *A. Interview* of USCIS' January 28, 2019 Policy Memorandum PM-602-0169 which notes, "DHS is currently unable to provide access to counsel during the assessments."

[2] If an immigration judge grants an MPP alien's application for relief or protection from removal or orders the alien removed from the United States, and appeal is not reserved by either party, the alien should be processed in accordance with standard procedures applicable to final order cases.

**Grants of Relief or Protection from Removal**

If any member(s) of a family unit processed under MPP is/are granted relief or protection from removal, the family member(s) (regardless of nationality) not granted relief or protection should be taken into ICE custody. A determination will be made regarding whether to detain or release the alien(s) into the United States pending completion of removal proceedings (including an administrative appeal) of all members of the family unit.

## Mixed-Nationality Family Units

Non-Mexican national or citizen members of mixed-nationality family units may be considered for processing through MPP if doing so maintains family unity. This applies even if one or more member(s) of the family unit might be of a nationality that is otherwise not generally amenable to MPP.

**Mexican Citizen/National Family Member**

In the case of a family member who is a Mexican citizen or national, in order to maintain family unity, the Mexican citizen/national would be allowed to voluntarily withdraw his/her application for admission through a Form I-275 or be voluntarily returned to Mexico with the rest of the non-Mexican citizen/national family unit.

**Mexican Citizen/National Family Member Expressing Fear of Return to Mexico**

If the Mexican citizen/national (or a parent or legal guardian on behalf of a Mexican citizen/national child) expresses fear of return to Mexico, that individual must no longer be voluntarily returned to Mexico with the rest of the family unit. Any withdrawal or return of such an individual to Mexico would not be voluntary given that the individual expressed a fear of return to Mexico. In that instance, and because the family unit cannot be separated pursuant to MPP, the entire family unit must not be processed for MPP or, if previously processed for MPP, the family unit must be removed from MPP and reprocessed as appropriate.

## Unaccompanied Alien Children (UACs)

**CBP Processing of UACs**

Any child who arrives at the border and is determined to be a UAC will be processed as such by CBP in accordance with existing UAC processing procedures, including transfer to the Department of Health and Human Services (HHS) and generally processed for removal proceedings pursuant to Section 240 of the Immigration and National Act (INA). UACs are not amenable to MPP.

**CBP Providing of UAC Information to HHS**

When CBP encounters a UAC who it can confirm was, in fact, previously processed as part of a family unit and returned to Mexico under MPP, CBP should provide HHS's Office of Refugee Resettlement (ORR) with all relevant identifying information for the UAC and those previously processed into MPP with him/her (e.g. full name(s), alien number(s), and processing location) when ORR assumes custody of the UAC. Providing this information will ensure that ORR has all options available when considering UAC placement and appearances at hearings.

## Known Physical and Mental Health Issues

In an instance where there is any doubt as to whether an alien should be included in MPP owing to a known physical or mental health issue, CBP should err on the side of exclusion.

**Aliens Determined Not Fit to Travel**
Generally, aliens who are determined not to be fit to travel by medical personnel should be excluded from MPP. Exemptions from MPP for aliens with known physical or mental health issues are decided on a case-by-case basis. DHS officials should carefully evaluate and provide appropriate responses for those in special circumstances, which could include exclusion from MPP.

**Expressions of Need for Medical Attention**
If at any time an alien expresses a need for medical attention, or if a CBP agent or officer observes that medical attention is warranted, that alien will be referred to on-site medical staff. The on-site medical staff will both screen the alien and make the determination about his/her immediate medical needs and whether emergent care is required. In this situation, CBP is to follow the guidance issued in its "Enhanced Medical Support Directive."[3]

**Case-by-Case Determination of Exemption from MPP**
Following CBP's medical evaluation process -- which should consider potential physical and/or mental health issues related to an alien's disclosure of personal history -- determinations as to whether an alien is exempt from MPP due to known physical or mental health issues are generally to be made on a case-by-case basis at the local level with supervisory review. The Port Director or Chief Patrol Agent of each location should use his/her discretion to determine amenability on a case-by-case basis considering the totality of the circumstances. Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, are amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determines otherwise.

## Use of Restraints

Aliens subject to MPP are not a detained population, including during transportation to and from immigration court hearings.

To the extent CBP is required to use restraints during MPP processing, CBP should continue to follow the National Standards on Transport, Escort, Detention and Search (TEDS). To the extent ICE or contract staff is required to use restraints during MPP processing or transportation, ICE or contract staff should continue to follow the Performance-Based National Detention Standards (PBNDS) 2011 and relevant supplemental guidance, including the ICE Enforcement and Removal Operations (ERO) Memorandum on Use of Restraints (ERO 11155.1).

---

[3] https://www.cbp.gov/document/directives/cbp-enhanced-medical-efforts

## Interagency Collaboration

**Collaboration with DOS**
Recognizing that DHS does not have the statutory authority to provide foreign assistance and deferring to DOS's internal regulations and procedures, DHS should, to the greatest extent possible, regularly collaborate with DOS to identify programs or other efforts that support MPP aliens' options to access safe shelters and MPP-related information during their time in Mexico.

**Collaboration with DOJ and HHS**
Further, DHS should also regularly collaborate with DOJ and HHS to exchange appropriate case-related and statistical information tied to the implementation of MPP and related processes.

## Ongoing Improvement

Notwithstanding the above-mentioned items, DHS should continue to evaluate MPP operations and effectiveness and make continued adjustments, as needed, to improve the integrity and operation of the MPP program including in areas not specifically articulated in this memorandum.

As further potential improvements are identified by CBP, ICE, USCIS, the Office of Strategy, Policy and Plans (PLCY), the Office of Operations Coordination (OPS), the Office of the General Counsel (OGC), the Office of Civil Rights and Civil Liberties (CRCL), etc., all interested parties, including interagency partners, should collaborate to find the most appropriate outcome to reinforce the integrity of MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

## Supplemental Migrant Protection Protocols Guidance

**Date:**                           December 7, 2020

**Topic:**                          Initial Document Service

**HQ POC/Office:**             Enforcement Programs Division

- Effective immediately, in accordance with the January 28, 2019 Commissioner's Memorandum, and consistent with existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act, when placing an amenable alien into the Migrant Protection Protocols (MPP), U.S. Customs and Border Protection (CBP) Office of Field Operations Officers or U.S. Border Patrol Agents must also take the following actions, in addition to previously issued guidance, regarding service packet issuance:

  1. **Completing, Serving and Explaining the Documents to the Alien.** If the officer/agent is not fluent in the alien's preferred language, he/she should utilize in-person or telephonic interpretation to complete and serve the documents to the alien, including any explanation of the documents.

  2. **Completing the Form I-862 Notice to Appear (NTA).** When filling out the NTA for aliens being placed into MPP, officers/agents should affirmatively inquire as to whether the alien has an address in Mexico. DHS is obligated to record the alien's answer to this question on the NTA filed with the immigration court. If the alien cannot provide an address in Mexico, the officer/agent should notate on the NTA that the alien "failed to provide address" and advise the alien of the need to update this information with the court by filling out and mailing in or bringing to court the EOIR-33 form* once an address is secured.

  3. **Completing the CBP Form 838 and Form 839 Tear Sheets.** There is no need to read the tear sheet to the alien, as each alien should be presented a copy for his/her records. However, pertinent information in the service packet should be verbally identified for the alien in plain language.

- The following documents should be served to the alien before transferring them to Mexico through the applicable port of entry to the National Migration Institute:
  - Form I-862 Notice to Appear
  - CBP Form 838 or Form 839 Initial Processing Information
  - EOIR List of Pro Bono Legal Service Providers*
  - EOIR-33 Change of Address*

*The version of each of these forms provided to the MPP aliens should correspond to the immigration court where the NTA is issued.

# Supplemental Migrant Protection Protocols Guidance

Date:                                December 7, 2020

Topic:                               MPP Amenability

HQ POC/Office:                Enforcement Programs Division

- In accordance with the Commissioner's Memorandum of January 28, 2019 and the *Supplemental Policy Guidance for Additional Improvement of the Migrant Protection Protocols (December 7, 2020)*, and consistent with existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), this guidance intends to clarify how U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Officers and U.S. Border Patrol (USBP) Agents may exercise their discretion in determining whether individuals are amenable to be returned to Mexico under INA Section 235(b)(2)(C) and to standardize CBP's application of the Migrant Protection Protocols (MPP) to amenable aliens.

- The categories of individuals identified in the Guiding Principles for Migrant Protection Protocols issued on January 28, 2019 by the OFO Enforcement Program Division as not amenable to MPP remain unchanged. CBP should continue to follow the existing practice of referring to U.S. Citizenship and Immigration Services (USCIS) any alien, whether before or after they are processed under MPP, who expresses a fear of persecution, torture, or return to Mexico.

- Though a particular situation may not in and of itself be considered a physical or mental health issue, conditions related to an alien's disclosed personal history (e.g. pregnancy, prior illness, or any other disclosed medical condition) should be taken into account during the medical assessment process, and may, on a case-by-case basis, constitute grounds for an alien to be excluded from MPP.

## *Mental and Physical Health Issues*

- For the purposes of MPP, an "emergent medical condition" is defined as a medical issue such as injury, illness, or infection posing an immediate threat to life, limb, or eyesight requiring immediate medical attention. Any aliens with an emergent medical condition will be transported to receive appropriate care, consistent with current practice. Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

- For the purposes of MPP, a "pre-existing medical condition" is defined as a current medical issue such as injury, illness, or infection not requiring immediate, significant medical attention. Aliens with pre-existing medical conditions determined not to require ongoing, emergent medical care, and who are fit for travel, as determined by medical personnel,

AR01634

remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

- For the purposes of MPP, a "significant disability" is defined as a physical or mental impairment that substantially limits the alien from meaningfully participating in removal proceedings. Individual aliens with a significant disability, not traveling as a part of a family unit with a caregiver, are to be excluded from MPP. Aliens with a significant disability who are traveling with a caregiver as a part of a family unit, and who are fit for travel, as determined by medical personnel, remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

*Other Situations*

- Pregnant females are generally amenable under the MPP Guiding Principles. Pregnancy in and of itself does not preclude an alien from remaining amenable under MPP guidelines.

- In cases where an alien self-identifies as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming, CBP documents this self-identification on the Detainee Assessment for National Standards on Transport, Escort, Detention, and Search (TEDS). Sexual orientation in and of itself does not preclude an alien from remaining amenable under MPP guidelines. Officers and agents are reminded that if an alien expresses a fear of return to Mexico for any reason, including based on sexual orientation, they are to refer the individual to USCIS.

*Additional Case Review*

- Officers and agents make determinations based on the facts and circumstances known to the officer or agent at the time. Local offices should use their judgement to determine which cases should be referred to OFO and USBP Headquarters for further consideration.

- In all cases, when considering amenability, the Chief Patrol Agent or Port Director of each individual location maintains their discretion to review each case on an individualized basis.

🚩 KeyCite Red Flag - Severe Negative Treatment

Vacated as Moot by Innovation Law Lab v. Mayorkas, 9th Cir., August 6, 2021

951 F.3d 1073
United States Court of Appeals, Ninth Circuit.

INNOVATION LAW LAB; Central American Resource Center of Northern California; Centro Legal De La Raza; University of San Francisco School of Law Immigration and Deportation Defense Clinic; Al Otro Lado; Tahirih Justice Center, Plaintiffs-Appellees,
v.
Chad WOLF, Acting Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Kenneth T. Cuccinelli, Acting Director, U.S. Citizenship and Immigration Services, in his official capacity; Andrew Davidson, Acting Chief of Asylum Division, U.S. Citizenship and Immigration Services, in his official capacity; United States Citizenship and Immigration Services; Todd C. Owen, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; U.S. Immigration and Customs Enforcement, Defendants-Appellants.

No. 19-15716
|
Argued and Submitted October 1, 2019 San Francisco, California
|
Filed February 28, 2020

**Synopsis**
**Background:** Non-Mexican asylum seekers and advocacy organizations brought action under Administrative Procedure Act (APA) to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications. The United States District Court for the Northern District of California, Richard Seeborg, J., 🚩 366 F.Supp.3d 1110, granted a preliminary injunction. Officials appealed and filed motion for emergency

stay pending appeal. The Court of Appeals, 🗁 924 F.3d 503, granted the motion.

**Holdings:** The Court of Appeals, William A. Fletcher, Circuit Judge, held that:

[1] plaintiffs were likely to succeed on merits of claim that MPP were inconsistent with Immigration and Nationality Act (INA) because INA's contiguous territory return provision did not apply to bona fide asylum seekers;

[2] plaintiffs were likely to succeed on merits of claim that MPP did not comply with treaty-based non-refoulement obligations codified in INA; and

[3] geographic scope for preliminary injunction, which in practical effect would operate in only four States, was warranted.

Affirmed.

Fernandez, Senior Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (14)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

Non-Mexican asylum seekers, because they had been returned to Mexico, satisfied in the injury-in-fact element for Article III standing to bring action to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications. U.S. Const. art. 3, § 2, cl. 1.

3 Cases that cite this headnote

**[2]** **Associations** 🔑 Aliens, immigration, and citizenship

Organizations that provided representation to aliens seeking admission to United States, including asylum seekers, satisfied injury-in-fact element for Article III standing to bring action to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications; organization alleged that MPP decreased their ability to carry out their core missions and diverted their resources. U.S. Const. art. 3, § 2, cl. 1.

2 Cases that cite this headnote

**[3]    Injunction** 🔑 Grounds in general; multiple factors

When deciding whether to issue a preliminary injunction, a district court considers whether the requesting party has shown that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

2 Cases that cite this headnote

**[4]    Injunction** 🔑 Likelihood of success on merits

Likelihood of success on the merits is a threshold inquiry and the most important factor when deciding whether to issue a preliminary injunction.

1 Cases that cite this headnote

**[5]    Federal Courts** 🔑 Preliminary injunction; temporary restraining order

The Court of Appeals reviews a grant of a preliminary injunction for abuse of discretion.

**[6]    Federal Courts** 🔑 Preliminary injunction; temporary restraining order

When the Court of Appeals reviews a grant of a preliminary injunction, a district court's interpretation of the underlying legal principles is subject to de novo review, and a district court

abuses its discretion when it makes an error of law.

**[7]    Federal Courts** 🔑 Former decision as law of the case

The legal analysis of a motions panel of the Court of Appeals, performed during the course of deciding an emergency motion for a stay pending appeal, is not binding on later merits panels.

2 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Non-Mexican asylum seekers were likely to succeed on merits, as factor for issuance of preliminary injunction against implementation by Department of Homeland Security (DHS), of claim that Migrant Protection Protocols (MPP), generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications, were inconsistent with INA because non-Mexican asylum seekers were bona fide asylum applicants with fraudulent documents or no documents at all, who were not subject to INA's contiguous territory return provision, which applied to asylum applicants who were inadmissible on grounds other than fraudulent documents or lack of documentation. Immigration and Nationality Act § 235(b)(1, 2), 🚩 8 U.S.C.A. § 1225(b)(1, 2).

2 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Non-Mexican asylum seekers were likely to succeed on merits, as factor for issuance of preliminary injunction against implementation by Department of Homeland Security (DHS), of claim that Migrant Protection Protocols (MPP), generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications, did not comply with treaty-based non-refoulement obligations codified in INA,

because MPP used, for screening interviews, a more-likely-than-not standard of proof that asylum seeker would be persecuted in Mexico if not allowed to stay in United States during removal proceeding, and because MPP did not instruct asylum officers to ask asylum seekers whether they feared returning to Mexico, and instead, MPP provided only for review of potential refoulement concerns when an alien affirmatively raised the point. Immigration and Nationality Act §§ 235(b)(1)(A)(ii), (b)(1)(B)(ii, v), 241(b)(3)(A), 🚩 8 U.S.C.A. § 1225(b)(1)(A)(ii), 🚩 (b)(1)(B)(ii, v), 🏳️ 1231(b)(3)(A); 🏳️ 8 C.F.R. § 208.30(d).

2 Cases that cite this headnote

[10] **Injunction** 🔑 Injunctions Sought by Government in General

**Injunction** 🔑 Injunctions against government entities in general

When the government is a party, the balance of the equities, and the public interest, as factors for determining whether to issue a preliminary injunction, merge.

2 Cases that cite this headnote

[11] **Aliens, Immigration, and Citizenship** 🔑 Injunction

Likelihood of irreparable harm was a factor supporting issuance of preliminary injunction, in action to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications; plaintiff non-Mexican asylum seekers risked substantial harm, and even death, if they were returned to Mexico while awaiting adjudication of their asylum applications.

2 Cases that cite this headnote

[12] **Aliens, Immigration, and Citizenship** 🔑 Injunction

Balance of equities, and public interest, as factors for issuance of preliminary injunction, favored plaintiff non-Mexican asylum seekers, in action to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications; plaintiffs risked substantial harm, and even death, if they were returned to Mexico while awaiting adjudication of their asylum applications, strength of government's interest in continuing to follow directives of MPP were diminished by likelihood that MPP were inconsistent with INA, and public had interest in ensuring that statutes enacted by their representatives were not imperiled by executive fiat. Immigration and Nationality Act §§ 235(b), 241(b), 🚩 8 U.S.C.A. §§ 1225(b), 🏳️ 1231(b).

3 Cases that cite this headnote

[13] **Aliens, Immigration, and Citizenship** 🔑 Injunction

Geographic scope for preliminary injunction, which in practical effect would not operate nationwide, was warranted, in action by non-Mexican asylum seekers to enjoin Department of Homeland Security (DHS) from implementing Migrant Protection Protocols (MPP) generally requiring non-Mexican asylum seekers arriving at southern border to return to Mexico during adjudication of their asylum applications; MPP operated only at southern border and it directed the actions of government officials only in the four States along that border, MPP was challenged under Administrative Procedure Act (APA) as not being in accordance with law and the APA presumed that offending agency action should be set aside in its entirety rather than only in limited geographical areas, and cases implicating immigration policy had a particularly strong claim for uniform relief. 🏳️ 5 U.S.C.A. § 706(2)(A).

5 Cases that cite this headnote

[14]  **Administrative Law and Procedure** 🔑 Determination and Disposition

**Administrative Law and Procedure** 🔑 Rules and regulations

When a reviewing court determines that agency regulations are unlawful, the ordinary result, in an action under the Administrative Procedure Act (APA), is that rules are vacated, not that their application to the individual challengers is proscribed. 🚩 5 U.S.C.A. § 706(2)(A).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1076** Scott G. Stewart (argued), Deputy Assistant Attorney General; Archith Ramkumar, Trial Attorney; Erez Reuveni, Assistant Director; William C. Peachey, Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, United States Department of Justice, Washington, D.C., Washington, D.C.; for Defendants-Appellants.

Judy Rabinovitz (argued), Michael Tan, Omar Jadwat, Lee Gelernt, Anand Balakrishnan, and Daniel Galindo, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York; Jennifer Chang Newell, Katrina Eiland, Cody Wofsy, and Julie Veroff, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Mary Bauer, Southern Poverty Law Center, Charlottesville, Virginia; Gracie Willis, Southern Poverty Law Center, Decatur, Georgia; Michelle P. Gonzalez, Southern Poverty Law Center, Miami, Florida; Sean Riordan and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; Blaine Bookey, Karen Musalo, Eunice Lee, Kathryn Jastram, and Sayoni Maitra, Center for Gender and Refugee Studies, San Francisco, California; Steven Watt, ACLU Foundation Human Rights Program, New York, New York; for Plaintiffs-Appellees.

Adeel A. Mangi, Muhammad U. Faridi, Elizabeth Riordan Hurley, W. Robert Fair, and A. Robert Quirk, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amicus Curiae Local 1924.

Alan E. Schoenfeld and Olga Musayev, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Julia Prochazka, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, Connecticut; for Amici Curiae Former U.S. Government Officials.

Xiao Wang, Rakesh Kilaru, Aleshadye Getachew, and Sophia Cooper, Wilkinson Walsh & Eskovitz LLP, Washington, D.C.; Chanakya A. Sethi, Wilkinson Walsh & Eskovitz LLP, New York, New York; for Amici Curiae Amnesty International USA, The Washington Office on Latin America, The Latin America Working Group, & Imumi.

Eleni Bakst, Human Rights First, New York, New York; W. Hardy Callcott, Naomi A. Igra, and Tom Magaña, Sidley Austin LLP, San Francisco, California; for Amicus Curiae Human Rights First.

Ana C. Reyes, Williams & Connolly LLP, Washington, D.C.; Alice Farmer, United Nations High Commissioner for Refugees, Washington, D.C.; for Amicus Curiae United Nations High Commissioner.

Appeal from the United States District Court for the Northern District of California, Richard Seeborg, District Judge, Presiding, D.C. No. 3:19-cv-00807-RS

Before: Ferdinand F. Fernandez, William A. Fletcher, and Richard A. Paez, Circuit Judges.

Dissent by Judge Fernandez

**OPINION**

W. FLETCHER, Circuit Judge:

**\*1077** Plaintiffs brought suit in district court seeking an injunction against the Government's recently promulgated Migrant Protection Protocols ("MPP"), under which non-Mexican asylum seekers who present themselves at our southern border are required to wait in Mexico while their asylum applications are adjudicated. The district court entered a preliminary injunction setting aside the MPP, and the Government appealed. We affirm.

I. Background

In January 2019, the Department of Homeland Security ("DHS") promulgated the MPP without going through notice-and-comment rulemaking. The MPP provides that non-Mexican asylum seekers arriving at our southern border be "returned to Mexico for the duration of their immigration proceedings, rather than either being detained for expedited or regular removal proceedings or issued notices to appear for regular removal proceedings." *Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1114 (N.D. Cal. 2019) (quotation marks omitted). The MPP does not apply to certain groups, including "unaccompanied alien children," "aliens processed for expedited removal," "aliens with known physical [or] mental health issues," "returning [Legal Permanent Residents] seeking admission," and "aliens with an advance parole document or in parole status."

DHS issued guidance documents to implement the MPP. Under this guidance, asylum seekers who cross the border and **\*1078** are subject to the MPP are given a Notice to Appear in immigration court and returned to Mexico to await their court date. Asylum seekers may re-enter the United States to appear for their court dates. The guidance instructs officials not to return any alien who will more likely than not suffer persecution if returned to Mexico. However, this instruction applies only to an alien "who affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico." Officers are not instructed to ask aliens whether they fear returning to Mexico. If an asylum officer determines, based on an alien's volunteered statement, that he or she will more likely than not suffer persecution in Mexico, the alien is not subject to return to Mexico under the MPP.

The MPP went into effect on January 28, 2019. It was first implemented at the San Ysidro, California, port of entry and was later expanded across the entire southern border.

The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports. *See, e.g.*, Zolan Kanno-Youngs & Maya Averbuch, *Waiting for Asylum in the United States, Migrants Live in Fear in Mexico*, N.Y. TIMES (Apr. 5, 2019), https://www.nytimes.com/2019/04/05/us/politics/asylum-united-states-migrants-mexico.html; Alicia A. Caldwell, *Trump's Return-to-Mexico Policy Overwhelms Immigration Courts*, WALL STREET J. (Sept. 5, 2019), https://www.wsj.com/articles/trumps-return-to-mexico-policy-overwhelms-immigration-courts-11567684800; Mica Rosenberg, et al., *Hasty Rollout of Trump Immigration Policy Has 'Broken' Border Courts*, REUTERS (Sept. 10, 2019), https://www.reuters.com/article/us-usa-immigration-courts-insight/hasty-rollout-of-trump-immigration-policy-has-broken-border-courts-idUSKCN1VV115; Mireya Villareal, *An Inside Look at Trump's "Remain in Mexico" Policy*, CBS NEWS (Oct. 8, 2019), https://www.cbsnews.com/news/ remain-in-mexico-donald-trump-immigration-policy-nuevo-laredo-mexico-streets-danger-migrants-2019-10-08/.

The organizational plaintiffs have also suffered serious adverse consequences. The MPP has substantially hindered the organizations' "ability to carry out their core mission of providing representation to aliens seeking admission, including asylum seekers," *Innovation Law Lab*, 366 F. Supp. 3d at 1129, and has forced them to divert resources because of increased costs imposed by the MPP.

**[1]** **[2]** The Government has not argued in this court that either the individual or organizational plaintiffs lack standing under Article III, but we have an independent obligation to determine our jurisdiction under Article III. The individual plaintiffs, all of whom have been returned to Mexico under the MPP, obviously have Article III standing. The organizational plaintiffs also have Article III standing. The Government conceded in the district court that the organizational plaintiffs have Article III standing based on *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765–67 (9th Cir. 2018), given their decreased ability to carry out their core missions as well as the diversion of their resources, both caused by the MPP. *See Innovation Law Lab*, 366 F. Supp. at 1120–22. Because *East Bay Sanctuary Covenant* was a decision by a motions **\*1079** panel on an emergency stay motion, we are not obligated to follow it as binding precedent. *See* discussion, *infra*, Part V.A. However, we are persuaded by its reasoning and hold that the organizational plaintiffs have Article III standing.

## II. Proceedings in the District Court

Plaintiffs filed suit in district court seeking an injunction, alleging, *inter alia*, that the MPP is inconsistent with the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. §§ 1225(b) and 1231(b), and that they have a right to a remedy under 5 U.S.C. § 706(2)(A). Section 706(2)(A) provides, "The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (Internal numbering omitted.)

The district court held that plaintiffs had shown a likelihood of success on the merits of their claim that the MPP is inconsistent with § 1225(b). *Id.* at 1123. The Government contended that the MPP is authorized by § 1225(b)(2). Plaintiffs argued, however, that they are arriving aliens under § 1225(b)(1) rather than under § 1225(b)(2). They pointed out that there is a contiguous territory return provision in § (b)(2) but no such provision in § (b)(1). The district court agreed with plaintiffs:

> On its face, ... the contiguous territory return provision may be applied to aliens described in subparagraph (b)(2)(A). Pursuant to subparagraph (b)(2)(B), however, that *expressly* excludes any alien "to whom paragraph [(b)](1) applies."

*Id.* (emphasis in original). The court concluded, "Applying the plain language of the statute, [the individual plaintiffs] simply are not subject to the contiguous territory return provision." *Id.*

The district court also held that plaintiffs had shown a likelihood of success on the merits of their claim that the MPP violates § 1231(b)(3), the statutory implementation of the United States' treaty-based non-refoulement obligations. The district court held that "plaintiffs have shown they are more likely than not to prevail on the merits of their contention that defendants adopted the MPP without sufficient regard

to refoulement issues." *Id.* at 1127. In so holding, the district court noted that the MPP does not instruct asylum officers to ask asylum seekers whether they fear returning to Mexico. Rather, "the MPP provides only for review of potential refoulement concerns when an alien 'affirmatively' raises the point." *Id.* The court further held that it was more likely than not that the MPP should have been adopted through notice-and-comment rulemaking with respect to the non-refoulement aspects of the MPP. *Id.* at 1128.

With respect to the individual plaintiffs, the district court found that "[w]hile the precise degree of risk and specific harms that plaintiffs might suffer in this case may be debatable, there is no real question that it includes the possibility of irreparable injury, sufficient to support interim relief in light of the showing on the merits." *Id.* at 1129. With respect to the organizational plaintiffs, the court found that they had "shown a likelihood of harm in terms of impairment of their ability to carry out their core mission of providing representation to aliens seeking admission, including asylum seekers." *Id.* Finally, the court held that the balance of equities and the public interest support the issuance of a preliminary injunction. *Id.*

Relying on a decision of our court, the district court issued a preliminary injunction setting aside the MPP. The court noted:

> [D]efendants have not shown the injunction in this case can be limited geographically. This is not a case implicating **\*1080** local concerns or values. There is no apparent reason that any of the places to which the MPP might ultimately be extended have interests that materially differ from those presented in San Ysidro.

*Id.* at 1130.

## III. Proceedings Before the Motions Panel

The district court issued its preliminary injunction on April 8, 2019. The Government filed an appeal on April 10 and

the next day requested an emergency stay pending appeal. In accordance with our regular procedures, our April motions panel heard the Government's request for an emergency stay. The motions panel held oral argument on the stay on April 24. In three written opinions, the panel unanimously granted the emergency stay on May 7. *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019).

In a per curiam opinion, the motions panel disagreed, by a vote of two to one, with the district court's holding that plaintiffs were likely to succeed in their statutory argument that the MPP is inconsistent with 8 U.S.C. § 1225(b). *Id.* at 508–09. The panel majority stated its legal conclusion in tentative terms, writing that it was "*doubtful* that subsection (b)(1) [of § 1225] 'applies' to [plaintiffs.]" *Id.* at 509 (emphasis added).

Judge Watford concurred in the per curiam opinion but wrote separately to express concern that the MPP is arbitrary and capricious because it lacks sufficient non-refoulement protections. *Id.* at 511 (Watford, J., concurring). Judge Watford expressed concern that asylum officers do not ask asylum applicants whether they have a fear of returning to Mexico: "One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer." *Id.* Judge Watford concluded, "DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' non-refoulement obligations." *Id.*

Judge Fletcher concurred only in the result. He wrote separately, arguing that the MPP was inconsistent with 8 U.S.C. § 1225(b). *Id.* at 512 (W. Fletcher, J., concurring in the result). In his view, asylum seekers subject to the MPP are properly characterized as applicants under § 1225(b)(1) rather than § 1225(b)(2), and are thus protected against being returned to Mexico pending adjudication of their applications. Judge Fletcher emphasized the preliminary nature of the emergency stay proceedings before the motions panel, writing, "I am hopeful that the regular argument panel that will ultimately hear the appeal, with the benefit of full briefing and regularly scheduled argument, will be able to

see the Government's arguments for what they are—baseless arguments in support of an illegal policy[.]" *Id.* at 518.

## IV. Standard of Review

**[3]** **[4]** When deciding whether to issue a preliminary injunction, a district court considers whether the requesting party has shown "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Likelihood of success on the merits is a threshold inquiry and the most important factor. *See, e.g., Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

**[5]** **[6]** We review a grant of a preliminary injunction for abuse of discretion. *See, e.g., United States v. California*, 921 F.3d 865, 877 (9th Cir. 2019). "The district **\*1081** court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

## V. Likelihood of Success on the Merits

### A. Effect of the Motions Panel's Decision

**[7]** A preliminary question is whether a merits panel is bound by the analysis of a motions panel on a question of law, performed in the course of deciding an emergency request for a stay pending appeal. On that question, we follow *East Bay Sanctuary Covenant v. Trump*, Nos. 18-17274 and 18-17436, 950 F.3d 1242, 2020 WL 962336 (9th Cir. 2020), argued on the same day as this case, in which we held that a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later merits panels. Such a decision by a motions panel is a "probabilistic endeavor," "doctrinally distinct" from the question considered by the later merits panel, and "issued without oral argument, on limited timelines, and in reliance on limited briefing." *Id.* at 1263 at \*7–8. "Such a predictive analysis should not, and does not, forever bind the merits of

the parties' claims." *Id. at 1264, at \*8.* At oral argument in this case, the Government acknowledged "that law of the circuit treatment does not apply to [the motion's panel's decision]." The Government later reiterated that it was "not advocating for law of the circuit treatment." The Government "agree[d] that that is inappropriate in the context of a motions panel decision."

Even if, acting as a merits panel, we may be bound in some circumstances by a decision by a motions panel on a legal question, we would in any event not be bound in the case now before us. Two of the three judges on the motions panel disagreed in part with the Government's legal arguments in support of the MPP. Further, the motions panel's per curiam opinion did not purport to decide definitively the legal questions presented to it in the emergency stay motion. The per curiam spoke in terms of doubt and likelihood, rather than in terms of definitive holdings. *Innovation Law Lab, 924 F.3d at 509; see also supra* Part III. Indeed, Judge Fletcher, who concurred in granting the emergency stay, specifically addressed the effect of the legal analysis of the motions panel and expressed the hope that the merits panel, with the benefit of full briefing and argument, would decide the legal questions differently.

### B. Questions on the Merits

Plaintiffs challenge two aspects of the MPP. First, they challenge the requirement that asylum seekers return to Mexico and wait there while their applications for asylum are adjudicated. They contend that this requirement is inconsistent with the INA, as amended in 1996 by the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Second, in the alternative, they challenge the failure of asylum officers to ask asylum seekers whether they fear being returned to Mexico. They contend that this failure is inconsistent with our treaty-based non-refoulement obligations. They contend, further, that with respect to non-refoulement, the MPP should have been adopted only after notice-and-comment rulemaking.

We address these challenges in turn. We conclude that plaintiffs have shown a likelihood of success on their claim that the return-to-Mexico requirement of the MPP is inconsistent with 8 U.S.C. § 1225(b). We further conclude that plaintiffs have shown a likelihood of success on their claim that the MPP does not comply with our treaty-based

non-refoulement obligations codified **\*1082** at 8 U.S.C. § 1231(b). We do not reach the question whether they have shown a likelihood of success on their claim that the anti-refoulement aspect of the MPP should have been adopted through notice-and-comment rulemaking.

### 1. Return to Mexico

**[8]** The essential feature of the MPP is that non-Mexican asylum seekers who arrive at a port of entry along the United States' southern border must be returned to Mexico to wait while their asylum applications are adjudicated. Plaintiffs contend that the requirement that they wait in Mexico is inconsistent with 8 U.S.C. § 1225(b). The government contends, to the contrary, that the MPP is consistent with § 1225(b).

The relevant text of § 1225 is as follows:

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted ... shall be deemed for purposes of this chapter an applicant for admission.

...

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien ... who is arriving in the United States ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien ... is inadmissible under section 1182(a)(6)(C)or1182(a)(7)of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

...

**(B) Asylum interviews**

...

**(ii) Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution ... , the alien shall be detained for further consideration of the application for asylum.

...

**(2) Inspection of other aliens**

    **(A) In general**

    Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

    **(B) Exception**

    Subparagraph (A) shall not apply to an alien —

    **(i)** who is a crewman

    **(ii)** to whom paragraph (1) applies, or

    **\*1083** **(iii)** who is a stowaway.

    **(C) Treatment of aliens arriving from contiguous territory**

    In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

There are two categories of "applicants for admission" under § 1225. § 1225(a). First, there are applicants described in § 1225(b)(1). Second, there are applicants described in § 1225(b)(2).

Applicants described in § 1225(b)(1) are inadmissible based on either of two grounds, both of which relate to their documents or lack thereof. Applicants described in § 1225(b)(2) are in an entirely separate category. In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Put differently, again in the words of the statute, § (b)(2) applicants are applicants "to whom paragraph [(b)](1)" does not apply. § 1225(b)(2)(B)(ii). That is, § (b)(1) applicants are those who are inadmissible on either of the two grounds specified in that subsection. Section (b)(2) applicants are all other inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that § (b)(2) applicants are inadmissible on more grounds than § (b)(1) applicants. Inadmissable applicants under § (b)(1) are aliens traveling with fraudulent documents (§ 1182(a)(6)(C)) or no documents (§ 1182(a)(7)). By contrast, inadmissable applicants under § (b)(2) include, *inter alia*, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed ... a crime involving moral turpitude" or who have "violat[ed] ... any law or regulation ... relating to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States ... to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely ... to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

The Supreme Court recently distinguished § (b)(1) and § (b)(2) applicants, stating unambiguously that they fall into two separate categories:

> [A]pplicants for admission fall into one of two categories, those covered

by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. ... Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1).

*Jennings v. Rodriguez*, — U.S. —, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) (emphasis added) (citations omitted).

Even more recently, the Attorney General of the United States, through the Board of Immigration Appeals, drew the same distinction and briefly described the procedures applicable to the two categories:

Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and **1084** beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M-S-*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are outlined in their respective subsections. To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview, he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular removal proceedings under § 1229a at the discretion of the Government. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522 (BIA 2011). A § (b)(2) applicant who is "not clearly and beyond a doubt entitled to be admitted" is automatically placed in regular removal proceedings under § 1229a. *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal proceedings under § 1229a, though by different routes. But the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a.

However, the statutory procedures for the two categories are not identical. Some of the procedures are exclusive to one category or the other. For example, if a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be removed in an expedited proceeding without a regular removal proceeding under § 1229a. *See* § 1225(b)(1)(A), (B). There is no comparable procedure specified in § (b)(2) for expedited removal of a § (b)(2) applicant. Further, in some circumstances a § (b)(2) applicant may be "returned" to a "territory contiguous to the United States" pending his or her regular removal proceeding under § 1229a. *See* § 1225(b)(2)(C). There is no comparable "return" procedure specified in § 1225(b)(1) for a § (b)(1) applicant.

The statutory question posed by the MPP is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C). That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant? A plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent practice up until now—tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed ... without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview. The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer— either expedited **\*1085** removal or detention pending further consideration. § 1225(b)(1)(B)(ii)–(iii). There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows. Subparagraph (A) tells us that unless a § (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a. § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)." *Id.* Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]." § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land ... from a foreign territory contiguous to the United States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under § 1229a, may be "returned" to that contiguous territory pending that proceeding. § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in § 1225(b)(2), in subparagraph (B)(ii). That subparagraph specifies that subparagraph (A) —which automatically entitles § (b)(2) applicants to regular removal proceedings under § 1229a—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of § 1225(b)(2)(C) is thus available only for § (b)(2) applicants.

There is no plausible way to read the statute otherwise. Under a plain-meaning reading of the text, as well as the Government's longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

The Government nonetheless contends that § (b)(2)(C) authorizes the return to Mexico not only of § (b)(2) applicants, but also of § (b)(1) applicants. The Government makes essentially three arguments in support of this contention. None is persuasive.

First, the Government argues that § (b)(1) applicants are a subset of § (b)(2) applicants. Blue Brief at 35. Under the Government's argument, there are § (b)(1) applicants, defined in § (b)(1), and there are § (b)(2) applicants, defined as all applicants, including § (b)(2) and § (b)(1) applicants. The Government argues that DHS, in its discretion, can therefore apply the procedures specified in § (b)(2) to a § (b)(1) applicant. That is, as stated in its brief, the Government has "discretion to make the initial 'determin[ation]' whether to apply section 1225(b)(1) or section 1225(b)(2) to a given alien." Blue Brief at 30.

The Government's argument ignores the statutory text, the Supreme Court's opinion in *Jennings*, and the opinion of its own Attorney General in *Matter of M-S-*. The text of § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. In *Jennings*, the Supreme Court told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. In *Matter of M-S-*, the Attorney General wrote that applicants are subject to different procedures depending on whether they are § (b)(1) or § (b)(2) applicants.

Second, the Government argues that § (b)(2)(B)(ii) allows DHS, in its discretion, to "apply" to a § (b)(1) applicant either procedures described in § (b)(1) or those described in § (b)(2). The Government's second argument is necessitated by its first. To understand the Government's second argument, one must keep in mind that a § (b)(2)(A) automatically entitles a § (b)(2) applicant to a regular removal hearing under § 1229a. But we know from § (b)(1) **\*1086** that not all § (b)(1) applicants are entitled to a removal hearing under § 1229a. Having argued that § (b)(2) applicants include not only § (b)(2) but also § (b)(1) applicants, the Government needs some way to avoid giving regular removal proceedings to all

§ (b)(1) applicants. The best the Government can do is to rely on § (b)(2)(B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien ... to whom paragraph [(b)](1) *applies*." § 1225(b)(2)(B)(ii) (emphasis added). The Government thus argues that § (b)(2)(B)(ii) allows DHS, in its discretion, to "apply," or not apply, § (b)(2)(A) to a § (b)(1) applicant.

The Government misreads § (b)(2)(B)(ii). Subparagraph (B) tells us, "Subparagraph (A) shall not apply to an alien — (i) who is a crewman, (ii) to whom paragraph [(b)](1) applies, or (iii) who is a stowaway." The function of § (b)(2)(B)(ii) is to make sure that we understand that the automatic entitlement to a regular removal hearing under § 1229a, specified in § (b)(2)(A) for a § (b)(2) applicant, does not apply to a § (b)(1) applicant. However, the Government argues that § (b)(2)(B)(ii) authorizes the Government to perform an act. That act is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants.

There is a fatal syntactical problem with the Government's argument. "Apply" is used twice in the same sentence in § (b)(2)(B)(ii). The first time the word is used, in the lead-in to the section, it refers to the application of a statutory section ("Subparagraph (A) shall not apply"). The second time the word is used, it is used in the same manner, again referring to the application of a statutory section ("to whom paragraph [(b)](1) applies"). When the word is used the first time, it tells us that subparagraph (A) shall not apply. When the word is used the second time, it tells us to whom subparagraph (A) shall not apply: it does not apply to applicants to whom § (b)(1) applies. The word is used in the same manner both times to refer to the application of subparagraph (A). The word is not used the first time to refer to the application of a subparagraph (A), and the second time to an action by DHS.

The Government's third argument is based on the supposed culpability of § (b)(1) applicants. We know from § (b)(2)(A) that § (b)(2) applicants are automatically entitled to full removal proceedings under § 1229a. However, § (b)(2) applicants may be returned to Mexico under § (b)(2)(C) to await the outcome of their removal hearing under § 1229a. It makes sense for the Government, in its discretion, to require some § (b)(2) applicants to remain in Mexico while their asylum applications are adjudicated, for some § (b)(2) applicants are extremely undesirable applicants. As discussed above, § (b)(2) applicants include spies, terrorists, alien smugglers, and drug traffickers.

When the Government was before the motions panel in this case, it argued that § (b)(1) applicants are more culpable than § (b)(2) applicants and therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. In its argument to the motions panel, the Government compared § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." The Government argued that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud ... over aliens who follow our laws."

The Government had it exactly backwards. Section (b)(1) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. **\*1087** These two sections describe applicants who are inadmissible because they lack required documents rather than because they have a criminal history or otherwise pose a danger to the United States. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, *inter alia*, aliens using fraudulent documents. That is, it covers aliens who travel under false documents and who, once they arrive at the border or enter the country, apply for asylum. Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents. In short, § (b)(1) applies to bona fide asylum applicants, who commonly have fraudulent documents or no documents at all. Indeed, for many such applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries. The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

In its argument to our merits panel, the Government made a version of the same argument it had made earlier to the motions panel. After referring to (but not describing) § (b)(2) applicants, the Government now argues in its opening brief:

> Section 1225(b)(1), meanwhile, reaches, among other classes of aliens, those who engage in fraud or willful misrepresentations *in an attempt to deceive the United States* into granting an immigration benefit. *See* 8

U.S.C. § 1182(a)(6)(C). Plaintiffs have not explained why Congress would have wanted that class of aliens to be exempt from temporary return to Mexico while their full removal proceedings are ongoing.

Blue Brief at 37–38 (emphasis in original).

We need not look far to discern Congress's motivation in authorizing return of § (b)(2) applicants but not § (b)(1) applicants. Section (b)(2)(C) was added to IIRIRA late in the drafting process, in the wake of *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996). Sanchez-Avila was a Mexican national who applied for entry as a "resident alien commuter" but who was charged with being inadmissible due to his "involvement with controlled substances." *Id.* at 445; *see* 8 U.S.C. § 1182(a)(2)(A)(i) (§ (b)(2) applicants include aliens who have "violat[ed] ... any law or regulation ... relating to a controlled substance"). In order to prevent aliens like Sanchez-Avila from staying in the United States during the pendency of their guaranteed regular removal proceeding under § 1229a, as they would otherwise have a right to do under § (b)(2)(A), Congress added § 1225(b)(2)(C). Congress had specifically in mind undesirable § (b)(2) applicants like Sanchez-Avila. It did not have in mind bona fide asylum seekers under § (b)(1).

We therefore conclude that plaintiffs have shown a likelihood of success on the merits of their claim that the MPP is inconsistent with 8 U.S.C. § 1225(b).

### 2. Refoulement

[9] Plaintiffs claim that the MPP is invalid in part, either because it violates the United States' treaty-based anti-refoulement obligations, codified at 8 U.S.C. § 1231(b)(3)(A), or because, with respect to refoulement, the MPP was improperly adopted without notice-and-comment rulemaking. Our holding that plaintiffs are likely to succeed on their claim that the MPP is invalid in its entirety because it is inconsistent with § 1225(b) makes it unnecessary to decide plaintiffs' second claim. We nonetheless address it as

an alternative ground, under which we hold the MPP invalid in part.

Refoulement occurs when a government returns aliens to a country where their **\*1088** lives or liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion. The United States is obliged by treaty and implementing statute, as described below, to protect against refoulement of aliens arriving at our borders.

Paragraph one of Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees, entitled, "Prohibition of expulsion or return ('refoulement')," provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

The United States is not a party to the 1951 Convention, but in 1968 we acceded to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967. *INS v. Stevic*, 467 U.S. 407, 416, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). "The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *Id.* Twelve years later, Congress passed the Refugee Act of 1980, implementing our obligations under the 1967 Protocol. "If one thing is clear from the legislative history of the ... entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The 1980 Act included, among other things, a provision designed to implement Article 33 of the 1951 Convention. After recounting the history behind 8 U.S.C. § 1253(h)(1), part of the 1980 Act, the Supreme Court characterized that section as "parallel[ing] Article 33," the anti-refoulement provision

of the 1951 Convention. 🔖 *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

🔖 Section 1253(h)(1) provided, in relevant part, "The Attorney General *shall not deport or return* any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership of a particular social group, or political opinion." 🔖 *Id.* at 419, 119 S.Ct. 1439 (emphasis added). The current version is 🔖 § 1231(b)(3)(A): "[T]he Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." (Emphasis added.) The words "deport or return" in the 1980 version of the section were replaced in 1996 by "remove" as part of a general statutory revision under IIRIRA. Throughout IIRIRA, "removal" became the new all-purpose word, encompassing "deportation," "exclusion," and "return" in the earlier statute.

*See, e.g.,* 🔖 *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1162 (9th Cir. 2005) ("IIRIRA eliminated the distinction between deportation and exclusion proceedings, replacing them with a new, consolidated category—'removal.' ").

Plaintiffs point out several features of the MPP that, in their view, provide insufficient protection against refoulement.

First, under the MPP, to stay in the United States during the pendency of removal proceedings under 🔖 § 1229a, the asylum seeker must show that it is "more likely than not" that he or she will be persecuted in Mexico. More-likely-than-not is a high standard, ordinarily applied only after an alien has had a regular removal   **\*1089** hearing under 🔖 § 1229a. By contrast, the standard ordinarily applied in screening interviews with asylum officers at the border is much lower. Aliens subject to expedited removal need only establish a "credible fear" in order to remain in the United States pending a hearing under 🔖 § 1229a. 🔖 §§ 1225(b)(1)(A)(ii), 🚩 1225(b)(1)(B)(ii). Credible fear requires only that the alien show a "significant possibility" of persecution. 🚩 § 1225(b)(1)(B)(v).

Second, under the MPP, an asylum seeker is not entitled to advance notice of, and time to prepare for, the hearing

with the asylum officer; to advance notice of the criteria the asylum officer will use; to the assistance of a lawyer during the hearing; or to any review of the asylum officer's determination. By contrast, an asylum seeker in a removal proceeding under 🔖 § 1229a is entitled to advance notice of the hearing with sufficient time to prepare; to advance notice of the precise charge or charges on which removal is sought; to the assistance of a lawyer; to an appeal to the Board of Immigration Appeals; and to a subsequent petition for review to the court of appeals.

Third, an asylum officer acting under the MPP does not ask an asylum seeker whether he or she fears returning to Mexico. Instead, asylum seekers must volunteer, without any prompting, that they fear returning. By contrast, under existing regulations, an asylum officer conducting a credible fear interview is directed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 🔖 8 C.F.R. § 208.30(d). The asylum officer is specifically directed to "determine that the alien has an understanding of the credible fear determination process." 🔖 § 208.30(d)(2).

The Government disagrees with plaintiffs based on two arguments. The Government first argues briefly that 🔖 § 1231(b)(3)(A) does not encompass a general anti-refoulement obligation. It argues that the protection provided by 🔖 § 1231(b)(3)(A) applies to aliens only after they have been ordered removed to their home country at the conclusion of a regular removal proceeding under 🔖 § 1229a. It writes:

> 🔖 Section 1231(b)(3) codifies a form of protection from *removal* that is available only *after* an alien is adjudged removable. See 🔖 8 U.S.C. § 1231(b)(3); 🔖 8 C.F.R. 1208.16(a). Aliens subject to MPP do not receive a final order of removal to their home country when they are returned (temporarily) to Mexico, and so there is no reason why the same procedures would apply ....

Blue Brief at 41 (emphasis in original).

The Government reads 🚩 § 1231(b)(3)(A) too narrowly. 🚩 Section 1231(b)(3)(A) does indeed apply to regular removal proceedings under 🚩 § 1229a, as evidenced, for example, by 🚩 8 C.F.R. § 1208.16(a) (discussing, *inter alia*, the role of the Immigration Judge). But its application is not limited to such proceedings. As described above, and as recognized by the Supreme Court, Congress intended 🚩 § 1253(h)(1), and 🚩 § 1231(b)(3)(A) as its recodified successor, to "parallel" Article 33 of the 1951 Convention. 🚩 *Aguirre-Aguirre*, 526 U.S. at 427, 119 S.Ct. 1439. Article 33 is a general anti-refoulement provision, applicable whenever an alien might be returned to a country where his or her life or freedom might be threatened on account of a protected ground. It is not limited to instances in which an alien has had a full removal hearing with significant procedural protections, as would be the case under 🚩 § 1229a.

The Government's second argument is that the MPP satisfies our anti-refoulement obligations by providing a sufficiently effective method of determining whether aliens fear, or have reason to fear, returning to Mexico. In its brief, the Government **\*1090** contends that asylum seekers who genuinely fear returning to Mexico have "every incentive" affirmatively to raise that fear during their interviews with asylum officers, and that Mexico is not a dangerous place for non-Mexican asylum seekers. The Government writes:

> [N]one of the aliens subject to MPP are Mexican nationals fleeing Mexico, and all of them voluntarily chose to enter and spend time in Mexico en route to the United States. Mexico, moreover, has committed to adhering to its domestic and international obligations regarding refugees. Those considerations together strongly suggest that the great majority of aliens subject to MPP are not more likely than not to face persecution on a protected ground or torture, in Mexico. In the rare case where an MPP-eligible

> alien does have a substantial and well-grounded basis for claiming that he is likely to be persecuted in Mexico, that alien will have every incentive to raise that fear at the moment he is told that he will be returned.

Blue Brief at 45. However, the Government points to no evidence supporting its speculations either that aliens, unprompted and untutored in the law of refoulement, will volunteer that they fear returning to Mexico, or that there is little danger to non-Mexican aliens in Mexico.

The Government further asserts, again without supporting evidence, that any violence that returned aliens face in Mexico is unlikely to be violence on account of a protected ground—that is, violence that constitutes persecution. The Government writes:

> [T]he basic logic of the contiguous-territory-return statute is that aliens generally do not face *persecution* on account of a protected status, or torture, in the country from which they happen to arrive by land, as opposed to the home country from which they may have fled. (International law guards against torture and persecution on account of a protected ground, not random acts of crime or generalized violence.)

Blue Brief at 40–41 (emphasis in original).

Plaintiffs, who are aliens returned to Mexico under the MPP, presented sworn declarations to the district court directly contradicting the unsupported speculations of the Government.

Several declarants described violence and threats of violence in Mexico. Much of the violence was directed at the declarants because they were non-Mexican—that is, because of their nationality, a protected ground under asylum law. Gregory Doe wrote in his declaration:

I did not feel safe at Benito Juarez [a migrant shelter] because the neighbors kept trying to attack the migrant community. The people who lived near the shelter tried to hurt us because they did not want us in their country. ...

At El Barretal [another migrant shelter], I felt a little more secure because we had a high wall surrounding us. Even so, one night someone threw a tear gas bomb into the shelter. When I tried to leave the shelter, people in passing cars would often yell insults at me like "get out of here, you *pinches* Hondurans," and other bad words that I do not want to repeat.

Alex Doe wrote:

> I know from personal experience and from the news that migrants have a bad name here and that many Mexicans are unhappy that so many of us are here. I have frequently been insulted by Mexicans on the street. ... [O]ther asylum seekers and I had to flee Playas [a neighborhood in Tijuana] in the middle of the night because a group of Mexicans threw stones at us and more people **\*1091** were gathering with sticks and other weapons to try to hurt us.

Christopher Doe wrote:

> The Mexican police and many Mexican citizens believe that Central Americans are all criminals. They see my dark skin and hear my Honduran accent, and they automatically look down on me and label me as a criminal. I have been stopped and questioned by the Mexican police around five or six times, just for being a Honduran migrant. During my most recent stop, the police threatened to arrest me if they saw me on the street again.
>
> ...
>
> I have also been robbed and assaulted by Mexican citizens. On two occasions, a group of Mexicans yelled insults, threw stones, and tried to attack me and a group of other Caravan members.

Howard Doe wrote:

I was afraid to leave the house [where I was staying] because I had seen in the news that migrants like myself had been targeted. While I was in Tijuana, two young Honduran men were abducted, tortured and killed.

...

On Wednesday, January 30, 2019, I was attacked and robbed by two young Mexican men. They pulled a gun on me from behind and told me not to turn around. They took my phone and told me that they knew I was Honduran and that if they saw me again, they would kill me. Migrants in Tijuana are always in danger[.]

Some of the violence in Mexico was threatened by persecutors from the aliens' home countries, and much of that violence was on account of protected grounds—political opinion, religion, and social group. Gregory Doe wrote:

> I am also afraid the Honduran government will find me in Mexico and harm me. Even outside the country, the Honduran government often works with gangs and criminal networks to punish those who oppose their policies. I am afraid that they might track me down.

Dennis Doe, who had fled the gang "MS-13" in Honduras, wrote:

> In Tijuana, I have seen people who I believe are MS-13 gang members on the street and on the beach. They have tattoos that look like MS-13 tattoos ... and they dress like MS-13 members with short sleeved button up shirts. I know that MS-13 were searching for people who tried to escape them with at least one of the caravans. This makes me afraid that the people who were trying to kill me in Honduras will find me here.

Alex Doe, who had fled Honduras to escape the gang "Mara 18" because of his work as a youth pastor and organizer, wrote:

> I am also afraid that the Mara 18 will find me here in Mexico. I am afraid that the Mara 18 might send someone to find me or get information from someone in the caravan. The Mara 18 has networks throughout Central America, and I have heard that their power and connections in Mexico are growing.

Kevin Doe, who fled MS-13 because of his work as an Evangelical Christian minister, wrote:

> [When I was returned to Mexico from the United States], I was met by a large group of reporters with cameras. I was afraid that my face might show up in the news. ... I was afraid that the MS-13 might see my face in the news. They are a powerful, ruthless gang and have members in Tijuana too.

Ian Doe wrote:

> I am not safe in Mexico. I am afraid that the people who want to harm me in Honduras will find me here. I have learned from the news that there are **\*1092** members of Central American gangs and narcotraffickers that are present here in Mexico that could find and kill me. Honduran migrants like me are very visible because of our accents and the way that we look, and it would not be hard for them to find me here.

Several declarants described interviews by asylum officers in which they were not asked whether they feared returning to Mexico. Gregory Doe wrote, "The officer never asked me if I was afraid of being in Mexico or if anything bad had happened to me here [in Mexico]." Christopher Doe wrote:

> I don't remember [the officer] asking if I was afraid to live in Mexico while waiting for my asylum hearing. If she had asked, I would have told her about being stopped by the Mexican police and attacked by Mexican citizens. I would also have told her I am afraid that the people who threatened me in Honduras could find me in Mexico ....

Kevin Doe wrote:

> The officer who was doing the talking couldn't understand me, and I could not understand him very well because he was rushing me through the interview and I didn't fully understand his Spanish. The interview lasted about 4 or 5 minutes. ... He never asked me if I was afraid of returning to Mexico.

Two declarants wrote that asylum officers actively prevented them from stating that they feared returning to Mexico. Alex Doe wrote:

> When I tried to respond and explain [why I had left Honduras] the officer told me something like, "you are only going to respond to the questions that I ask you, nothing more." This prevented me from providing additional information in the interview apart from the answers to the questions posed by the officer.

Dennis Doe wrote:

> I was not allowed to provide any information other than the answers to the questions I was asked. I expected to be asked more questions and to have the opportunity to provide more details. But the interview was fairly short, and lasted only about 30 minutes. ...

No one asked me if I was afraid to return to Mexico, if I had received threats in Mexico, or if I had felt safe in Mexico.

Two declarants did succeed in telling an asylum officer that they feared returning to Mexico, but to no avail. Frank Doe wrote:

> He never asked me if I was afraid of returning to Mexico. At one point, I had to interrupt him to explain that I didn't feel safe in Mexico. He told me that it was too bad. He said that Honduras wasn't safe, Mexico wasn't safe, and the U.S. isn't safe either.

Howard Doe wrote:

> I told the asylum officer that I was afraid [of returning to Mexico]. I explained that I'd been kidnapped for fifteen days by Los Zetas in Tuxtla Gutierrez, Chiapas, [Mexico], and that I'd managed to escape. ... Migrants in Tijuana are always in danger, and I am especially afraid because the Zetas torture people who escape them.

Despite having told their asylum officers that they feared returning, Frank Doe and Howard Doe were returned to Mexico.

This evidence in the record is enough—indeed, far more than enough—to establish that the Government's speculations have no factual basis. Amici in this case have filed briefs bolstering this already more-than-sufficient evidence. For example, Amnesty International USA, the Washington **\*1093** Office on Latin America, the Latin America Working Group, and the Institute for Women in Migration submitted an amicus brief referencing many reliable news reports corroborating the stories told by the declarants. We referenced several of those reports earlier in our opinion.

Local 1924 of the American Federation of Government Employees, a labor organization representing "men and women who operate USCIS Asylum Pre-Screening Operation, which has been responsible for a large part of USCIS's 'credible fear' and 'reasonable fear' screenings, and for implementing [the MPP]," also submitted an amicus brief. Local 1924 Amicus Brief at 1. Local 1924 writes in its brief:

> Asylum officers are duty bound to protect vulnerable asylum seekers from persecution. However, under the MPP, they face a conflict between the directives of their departmental leaders to follow the MPP and adherence to our Nation's legal commitment to not returning the persecuted to a territory where they will face persecution. They should not be forced to honor departmental directives that are fundamentally contrary to the moral fabric of our Nation and our international and domestic legal obligations.

*Id.* at 24.

Based on the Supreme Court's conclusion that Congress intended in § 1253(h)(1) (the predecessor to § 1231(b)(3)(B)) to "parallel" the anti-refoulement provision of Article 33 of the 1951 Convention, and based on the record in the district court, we conclude that plaintiffs have shown a likelihood of success on the merits of their claim that the MPP does not comply with the United States' anti-refoulement obligations under § 1231(b). We need not, and do not, reach the question whether the part of the MPP challenged as inconsistent with our anti-refoulement obligations should have been adopted through notice-and-comment rulemaking.

## VI. Other Preliminary Injunction Factors

**[10]** In addition to likelihood of success on the merits, a court must consider the likelihood that the requesting party will suffer irreparable harm, the balance of the equities, and the public interest in determining whether a preliminary injunction is justified. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. "When the government is a party, these last two factors

merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

**[11]** There is a significant likelihood that the individual plaintiffs will suffer irreparable harm if the MPP is not enjoined. Uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum.

**[12]** The balance of equities favors plaintiffs. On one side is the interest of the Government in continuing to follow the directives of the MPP. However, the strength of that interest is diminished by the likelihood, established above, that the MPP is inconsistent with 8 U.S.C. §§ 1225(b) and 1231(b). On the other side is the interest of the plaintiffs. The individual plaintiffs risk substantial harm, even death, so long as the directives of the MPP are followed, and the organizational plaintiffs are hindered in their ability to carry out their missions.

The public interest similarly favors the plaintiffs. We agree with *East Bay Sanctuary Covenant*:

> On the one hand, the public has a "weighty" interest "in efficient administration of the immigration laws at the **\*1094** border." *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). But the public also has an interest in ensuring that "statutes enacted by [their] representatives" are not imperiled by executive fiat. *Maryland v. King*, 567 U.S. 1301, 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers).

932 F.3d at 779 (alteration in original).

## VII. Scope of the Injunction

**[13]** The district court issued a preliminary injunction setting aside the MPP—that is, enjoining the Government "from continuing to implement or expand the 'Migrant Protection Protocols' as announced in the January 25, 2018 DHS policy memorandum and as explicated in further agency memoranda." *Innovation Law Lab*, 366 F. Supp. 3d at 1130. Accepting for purposes of argument that some injunction should issue, the Government objects to its scope.

We recognize that nationwide injunctions have become increasingly controversial, but we begin by noting that it is something of a misnomer to call the district court's order in this case a "nationwide injunction." The MPP operates only at our southern border and directs the actions of government officials only in the four States along that border. Two of those states (California and Arizona) are in the Ninth Circuit. One of those states (New Mexico) is in the Tenth Circuit. One of those states (Texas) is in the Fifth Circuit. In practical effect, the district court's injunction, while setting aside the MPP in its entirety, does not operate nationwide.

For two mutually reinforcing reasons, we conclude that the district court did not abuse its discretion in setting aside the MPP.

First, plaintiffs have challenged the MPP under the Administrative Procedure Act ("APA"). Section 706(2)(A) of the APA provides that a "reviewing court shall ... hold unlawful and set aside agency action ... not in accordance with law." 5 U.S.C. § 706(2)(A). We held, above, that the MPP is "not in accordance with" 8 U.S.C. § 1225(b). Section 706(2)(A) directs that in a case where, as here, a reviewing court has found the agency action "unlawful," the court "shall ... set aside [the] agency action." That is, in a case where § 706(2)(A) applies, there is a statutory directive—above and beyond the underlying statutory obligation asserted in the litigation—telling a reviewing court that its obligation is to "set aside" any unlawful agency action.

**[14]** There is a presumption (often unstated) in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographical areas. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (internal quotation marks omitted). "When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action." *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *see also* *United Steel v. Mine Safety*

*& Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' ....").

Second, cases implicating immigration policy have a particularly strong claim for **\*1095** uniform relief. Federal law contemplates a "comprehensive and unified" immigration policy. *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant*, 932 F.3d at 779. We wrote in *Regents of the University of California*, 908 F.3d at 511, "A final principle is also relevant: the need for uniformity in immigration policy. ... Allowing uneven application of nationwide immigration policy flies in the face of these requirements." We wrote to the same effect in *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, —— U.S. ——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018): "Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights." The Fifth Circuit, one of only two other federal circuits with states along our southern border, has held that nationwide injunctions are appropriate in immigration cases. In sustaining a nationwide injunction in an immigration case, the Fifth Circuit wrote, "[T]he Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.' " *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (emphasis in original; citations omitted). In *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), we relied on the Fifth Circuit's decision in *Texas* to sustain the nationwide scope of a temporary restraining order in an immigration case. We wrote, "[W]e decline to limit the geographic scope of the TRO. The Fifth Circuit has held that such a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Id.* at 1166–67.

Conclusion

We conclude that the MPP is inconsistent with 8 U.S.C. § 1225(b), and that it is inconsistent in part with 8 U.S.C. § 1231(b). Because the MPP is invalid in its entirety due to its inconsistency with § 1225(b), it should be enjoined in its entirety. Because plaintiffs have successfully challenged the MPP under § 706(2)(A) of the APA, and because the MPP directly affects immigration into this country along our southern border, the issuance of a temporary injunction setting aside the MPP was not an abuse of discretion.

We lift the emergency stay imposed by the motions panel, and we affirm the decision of the district court.

**AFFIRMED.**

FERNANDEZ, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion because I believe that we are bound by the published decision in *Innovation Law Lab v. McAleenan* (*Innovation I*), 924 F.3d 503 (9th Cir. 2019) (per curiam).

More specifically, we are bound by both the law of the circuit and the law of the case. Of course, the rules that animate the former doctrine are not the same as those that animate the latter. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).

As we have said: "Circuit law ... binds all courts within a particular circuit, including the court of appeals itself. Thus, the first panel to consider an issue sets the law not only for all the inferior courts in the circuit, but also future panels of the court of appeals." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). Moreover: "Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, **\*1096** unless overruled by the court itself sitting en banc, or by the Supreme Court." *Id.* (footnote omitted). Published opinions are precedential. *See id.* at 1177; *see also Gonzalez*, 677 F.3d at 389 n.4. That remains true, even if some later panel is satisfied that "arguments have been characterized differently or more persuasively by a new litigant,"[1] or even if a later panel is convinced that

the earlier decision was "incorrectly decided" and "needs reexamination."[2] And those rules are not mere formalities to be nodded to and avoided. Rather, "[i]nsofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis." *Hart*, 266 F.3d at 1172. In this case, there are no material differences — in fact, the situation before this panel is in every material way the same as that before the motions panel. Furthermore, there is no doubt that motions panels can publish their opinions,[3] even though they do not generally do so.[4] Once published, there is no difference between motions panel opinions and other opinions; all are entitled to be considered with the same principles of deference by ensuing panels. Thus, any hesitation about whether they should be precedential must necessarily come before the panel decides to publish, not after. As we held in *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015):

> Lair contended at oral argument that a motions panel's decision cannot bind a merits panel, and as a result we are not bound by the motions panel's analysis in this case. Not so. We have held that motions panels can issue published decisions. ... [W]e are bound by a prior three-judge panel's published opinions, and a motions panel's published opinion binds future panels the same as does a merits panel's published opinion.

*Id.* at 747 (citations omitted). Therefore, the legal determinations in *Innovation I* are the law of the circuit.

We have explained the law of the case doctrine as "a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal." *Jeffries v. Wood*, 114 F.3d 1484, 1488–89 (9th Cir. 1997) (en banc), *overruled on other grounds by Gonzalez*, 677 F.3d at 389 n.4. While we do have discretion to decline application of the doctrine, "[t]he prior decision should be followed unless: (1) the decision is clearly erroneous and its

enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* at 1489 (internal quotation marks and footnote omitted).[5] We have also indicated that, in general, "our decisions at the preliminary injunction phase do not constitute the law of the case,"[6] but that is principally because **\*1097** the matter is at the preliminary injunction stage and a further development of the factual record as the case progresses to its conclusion may well require a change in the result.[7] Even so, decisions "on pure issues of law ... are binding." *Ranchers Cattlemen*, 499 F.3d at 1114. Of course, the case at hand has not progressed beyond the preliminary injunction stage. It is still at that stage, and the factual record has not significantly changed between the record at the time of the decision regarding the stay motion and the current record. Therefore, as I see it, absent one of the listed exceptions, which I do not perceive to be involved here, the law of the case doctrine would also direct that we are bound by much of the motions panel's decision in *Innovation I*.

Applying those doctrines:

(1) The individuals and the organizational plaintiffs are not likely to succeed on the substantive claim that the Migrant Protection Protocols directive (the MPP) was not authorized by 8 U.S.C. § 1225(b)(2)(C). *Innovation I*, 924 F.3d at 506–09.

(2) The individuals and organizational plaintiffs are not likely to succeed on their procedural claim that the MPP's adoption violated the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553(b), (c); *Innovation I*, 924 F.3d at 509–10.

(3) As the motions panel determined, due to the errors in deciding the issues set forth in (1) and (2), the preliminary injunction lacks essential support and cannot stand. Thus, we should vacate and remand.

(4) I express no opinion on whether the district court could issue a narrower injunction targeting the problem identified by Judge Watford, that is, the dearth of support for the government's unique rule[8] that an alien processed under the MPP must spontaneously proclaim his fear of persecution or

torture in Mexico. *See* 🚩*Innovation I*, *924 F.3d at 511–12* (Watford, J., concurring)

Thus, I respectfully dissent.

**All Citations**

951 F.3d 1073, 20 Cal. Daily Op. Serv. 1635, 2020 Daily Journal D.A.R. 1670

---

## Footnotes

1    ⚠️*United States v. Ramos-Medina*, *706 F.3d 932, 939 (9th Cir. 2013)*.

2    🚩*Naruto v. Slater*, *888 F.3d 418, 425 n.7 (9th Cir. 2018)*.

3    *See* 9th Cir. Gen. Order 6.3(g)(3)(ii); *see also id.* at 6.4(b).

4    *See* 🚩*Haggard v. Curry*, *631 F.3d 931, 933 n.1 (9th Cir. 2010)* (per curiam).

5    The majority seems to add a fourth exception, that is, motions panel decisions never constitute the law of the case. That would be strange if they can constitute the law of the circuit, which they can.

6    🚩*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, *499 F.3d 1108, 1114 (9th Cir. 2007)*; *see also* 🚩*Stormans, Inc. v. Wiesman*, *794 F.3d 1064, 1074, 1076 n.5 (9th Cir. 2015)*; 🚩*Ctr. for Biological Diversity v. Salazar*, *706 F.3d 1085, 1090 (9th Cir. 2013)*.

7    *See* 🚩*Ctr. for Biological Diversity*, *706 F.3d at 1090*.

8    *Cf.* 8 C.F.R. § 235.3(b)(2)(i). That regulation describes information which must be provided to an alien facing expedited removal, including a Form I-867AB; the A portion of the pair of forms explains that the United States provides protection for those who face persecution or torture upon being sent home, and the B portion requires asking specific questions about whether the alien fears that kind of harm. *See* U.S. Immigration & Naturalization Serv., Forms I-867A & I-867B, *reprinted in* 9 Charles Gordon et al., Immigration Law & Procedure app. B, at 102–05 (2019).

---

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Extend by  Emami v. Nielsen,  N.D.Cal.,  June 5, 2020

924 F.3d 503
United States Court of Appeals, Ninth Circuit.

INNOVATION LAW LAB; Central American Resource
Center of Northern California; Centro Legal De La
Raza; University of San Francisco School of Law
Immigration and Deportation Defense Clinic; Al Otro
Lado; Tahirih Justice Center, Plaintiffs-Appellees,

v.

Kevin K. MCALEENAN, Acting Secretary of Homeland
Security, in his official capacity; U.S. Department
of Homeland Security; Lee Francis Cissna, Director,
U.S. Citizenship and Immigration Services, in his
official capacity; John L. Lafferty, Chief of Asylum
Division, U.S. Citizenship and Immigration Services,
in his official capacity; United States Citizenship
and Immigration Services; Todd C. Owen, Executive
Assistant Commissioner, Office of Field Operations,
U.S. Customs and Border Protection, in his official
capacity; U.S. Customs and Border Protection; Ronald D.
Vitiello, Acting Director, U.S. Immigration and Customs
Enforcement, in his official capacity; U.S. Immigration
and Customs Enforcement, Defendants-Appellants.

No. 19-15716
|
Argued and Submitted April 24,
2019 San Francisco, California
|
MAY 7, 2019

**Synopsis**
**Background:** Aliens, as non-Mexican asylum seekers
who arrived in United States from Mexico without valid
admission documents, and organizations that advocated
on behalf of asylum seekers, brought action against
government officials under Administrative Procedure Act
(APA), challenging Department of Homeland Security's
(DHS) migrant protection protocols (MPP) calling for return
of non-Mexican asylum seekers to Mexico for duration
of their immigration proceedings, rather than detention for
expedited or regular removal proceedings, or issuance of
notices to appear for regular removal proceedings. The United
States District Court for the Northern District of California,

No. 3:19-cv-00807-RS, Richard Seeborg, J., 366 F.Supp.3d
1110, granted nationwide preliminary injunction. Officials
filed motion for stay pending appeal.

**Holdings:** The Court of Appeals held that:

[1] DHS was likely to prevail on merits of its statutory
interpretation argument concerning applicability of statutory
procedures for expedited removal;

[2] DHS was likely to prevail on merits of its argument
that MPP was not subject to notice-and-comment rulemaking
under APA; and

[3] DHS would suffer irreparable harm in absence of stay.

Motion granted.

Watford, Circuit Judge, filed a concurring opinion.

W. Fletcher, Circuit Judge, filed an opinion concurring only
in the result.

**Procedural Posture(s):** Motion for Stay; Motion for
Preliminary Injunction.

West Headnotes (7)

**[1]** **Federal Courts** 👈 Supersedeas or Stay of
Proceedings

The equitable discretion of the Court of Appeals
in ruling on a motion to stay the enforcement
of a judgment pending appeal is guided by four
factors: (1) whether the stay applicant has made
a strong showing that he is likely to succeed
on the merits; (2) whether the applicant will be
irreparably injured absent a stay; (3) whether
issuance of the stay will substantially injure the
other parties interested in the proceeding; and (4)
where the public interest lies.

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** 👈 Administrative Procedure

Aliens "described in" first statutory provision, under which applicants for admission who are not processed for expedited removal are placed in regular removal proceedings, within meaning of second statutory provision giving Attorney General discretion, in the case of aliens described in first provision who arrive on land from a foreign territory contiguous to United States to return the alien to that territory pending a hearing before an immigration judge in a regular removal proceeding, is an alien with the salient identifying features of the individuals subject to the first provision. Immigration and Nationality Act §§ 235(b)(2)(A, C), 240, 8 U.S.C.A. §§ 1225(b)(2)(A, C), 1229a.

4 Cases that cite this headnote

[3]    Aliens, Immigration, and
       Citizenship ⚷ Stay pending review

Department of Homeland Security (DHS) was likely to prevail on merits of its contention, as element for granting to DHS a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings, that only if an alien was actually processed for expedited removal during inspection at border, and not if alien was merely eligible for expedited removal because of fraud, misrepresentation, or lack of documentation, would the statutory procedures for expedited removal be applicable to alien, as statutory exception to regular removal proceedings for aliens seeking admission who were determined by examining immigration officer to not be clearly and beyond a doubt entitled to be admitted, so that Attorney General would not be able to exercise statutory discretion, with respect to aliens who arrived on land from foreign territory contiguous to United States, to return the alien to that territory pending a hearing before immigration judge in regular removal proceeding. Immigration and Nationality Act §§ 212(a)(6)(C), (a)(7), 235(b)(1), (b)(2)(A), (b)(2)(B)(ii), (b)(2)(C), 240, 8 U.S.C.A. §§ 1182(a)(6)(C), (a)(7), 1225(b)(1), (b)(2)(A), (b)(2)(B)(ii), (b)(2)(C), 1229a.

6 Cases that cite this headnote

[4]    Aliens, Immigration, and
       Citizenship ⚷ Stay pending review

Department of Homeland Security (DHS) was likely to prevail on merits of its contention, as element for granting to DHS a stay pending its appeal of preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings, that MPP was a general statement of policy that was exempted from Administrative Procedure Act's (APA) notice-and-comment requirement because immigration officers designated asylum applicants for return on discretionary case-by-case basis. 5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 8 U.S.C.A. § 1225(b)(2)(C).

4 Cases that cite this headnote

[5]    Aliens, Immigration, and
       Citizenship ⚷ Stay pending review

Irreparable harm to Department of Homeland Security (DHS) in absence of stay was factor weighing in favor of granting to DHS a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings; preliminary injunction took off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who were currently arriving at nation's southern border on daily basis. 5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 8 U.S.C.A. § 1225(b)(2)(C).

2 Cases that cite this headnote

[6]    Aliens, Immigration, and
       Citizenship ⚷ Stay pending review

Consideration of substantial injury to other interested parties if stay was granted was factor weighing in favor of granting to Department of Homeland Security (DHS) a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings; while plaintiff aliens, as non-Mexican asylum seekers who arrived in United States from Mexico without valid admission documents, feared substantial injury upon return to Mexico, likelihood of harm was reduced somewhat by Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under MPP, and the Court of Appeals was hesitant to disturb that compromise amid ongoing diplomatic negotiations between United States and Mexico. 5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 8 U.S.C.A. § 1225(b)(2)(C).

2 Cases that cite this headnote

[7] **Aliens, Immigration, and Citizenship** 👉 Stay pending review

Public interest, which favored efficient administration of immigration laws at the border, was a factor weighing in favor of granting to Department of Homeland Security (DHS) a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings. 5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 8 U.S.C.A. § 1225(b)(2)(C).

7 Cases that cite this headnote

**\*506** Appeal from the United States District Court for the Northern District of California, Richard Seeborg, District Judge, Presiding, D.C. No. 3:19-cv-00807-RS

Before: O'SCANNLAIN, W. FLETCHER, and WATFORD, Circuit Judges.

OPINION

PER CURIAM:

In January 2019, the Department of Homeland Security (DHS) issued the Migrant Protection Protocols (MPP), which initiated a new inspection policy along the southern border. Before the MPP, immigration officers would typically process asylum applicants who lack valid entry documentation for expedited removal. If the applicant passed a credible fear screening, DHS would either detain or parole the individual until her asylum claim could be heard before an immigration judge. The MPP now directs the "return" of asylum applicants who arrive from Mexico as a substitute to the traditional options of detention and parole. Under the MPP, these applicants are processed for standard removal proceedings, instead of expedited removal. They are then made to wait in Mexico until an immigration judge resolves their asylum claims. Immigration officers exercise discretion in returning the applicants they inspect, but the MPP is categorically inapplicable to unaccompanied minors, Mexican nationals, applicants who are processed for expedited removal, and any applicant "who is more likely than not to face persecution or torture in Mexico."

Eleven Central American asylum applicants who were returned to Tijuana, Mexico, and six organizations that provide asylum-related legal services challenged the MPP on several grounds in the district court. After concluding that the MPP lacks a statutory basis and violates the Administrative Procedure Act (APA), the district court enjoined DHS on a nationwide basis "from continuing to implement or expand the [MPP]."

[1] DHS has moved for a stay of the preliminary injunction pending its appeal to this court. Our equitable discretion in ruling on a stay motion is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (internal quotation marks omitted). We begin with a discussion of the first factor, which turns largely on the

plaintiffs' likelihood of success on **\*507** their claim that the MPP lacks statutory authorization.

I

Some background is in order before addressing the merits of the plaintiffs' statutory claim. Congress has established an exhaustive inspection regime for all non-citizens who seek admission into the United States. *See* 8 U.S.C. § 1225(a) (3). Applicants for admission are processed either through expedited removal proceedings or through regular removal proceedings. Section 1225(b)(1) outlines the procedures for expedited removal and specifies the class of non-citizens who are eligible for expedited removal:

> If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a) (7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

§ 1225(b)(1)(A)(i). Simply put, an applicant is eligible for expedited removal only if the immigration officer determines that the individual is inadmissible on one of two grounds: fraud or misrepresentation (§ 1182(a)(6)(C)) or lack of documentation (§ 1182(a)(7)).

All applicants for admission who are not processed for expedited removal are placed in regular removal proceedings under § 1225(b)(2)(A). That process generally entails a hearing before an immigration judge pursuant to § 1229a. Section 1225(b)(2)(B) provides exceptions to § 1225(b)(2) (A), while § 1225(b)(2)(C) permits applicants processed under § 1225(b)(2)(A) to be returned to the contiguous territory from which they arrived for the duration of their removal proceedings. Section 1225(b)(2) provides in full:

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien—

> **(i)** who is a crewman,

> **(ii)** to whom paragraph (1) applies, or

> **(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

**[2]** DHS relies on the contiguous-territory provision in subsection (b)(2)(C) as the statutory basis for the MPP. That provision authorizes DHS to return "alien[s] described in subparagraph (A)" to Mexico or Canada. § 1225(b)(2)(C). The phrase "described in" refers to the "salient identifying features" of the individuals subject to this provision. *Nielsen v. Preap*, —— U.S. ——, 139 S. Ct. 954, 965, —— L.Ed.2d —— (2019) (emphasis and internal quotation marks omitted). Because the plaintiffs in this case are not "clearly and beyond a **\*508** doubt entitled to be admitted," they fit the description in § 1225(b)(2)(A) and thus seem to fall within the sweep of § 1225(b)(2)(C).

As the district court interpreted the statute, however, the contiguous-territory provision may not be applied to applicants for admission who could have been placed in expedited removal under § 1225(b)(1), even if they were placed in regular removal proceedings. The crux of this argument is § 1225(b)(2)(B)(ii), which provides that "[s]ubparagraph (A) shall not apply to an alien ... to whom paragraph (1) applies." So long as the applicant is eligible for expedited removal, the district court reasoned, § 1225(b)(1) "applies" to that individual. On this account, it is immaterial

that the plaintiffs were not in fact processed for expedited removal during their inspection at the border.

The primary interpretive question presented by this stay motion is straightforward: Does § 1225(b)(1) "apply" to everyone who is *eligible* for expedited removal, or only to those *actually processed* for expedited removal? The interpretive difficulty arises mainly because the inadmissibility grounds contained in subsections (b)(1) and (b)(2) overlap. A subset of applicants for admission—those inadmissible due to fraud or misrepresentation, § 1182(a)(6)(C), and those who do not possess a valid entry document, § 1182(a)(7)—may be placed in expedited removal. § 1225(b)(1)(A)(i). But as we read the statute, anyone who is "not clearly and beyond a doubt entitled to be admitted" can be processed under § 1225(b)(2)(A). Section 1225(b)(2)(A) is thus a "catchall" provision in the literal sense, and Congress' creation of expedited removal did not impliedly preclude the use of § 1229a removal proceedings for those who could otherwise have been placed in the more streamlined expedited removal process. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522–24 (BIA 2011).

Because the eligibility criteria for subsections (b)(1) and (b)(2) overlap, we can tell which subsection "applies" to an applicant only by virtue of the processing decision made during the inspection process. Take first the procedures for designating an applicant for expedited removal. When the immigration officer "determines" that the applicant "is inadmissible" under § 1182(a)(6)(C) or (a)(7), he "shall order the alien removed from the United States without further hearing" unless the applicant requests asylum or expresses a fear of persecution, in which case the officer "shall refer the alien for an interview by an asylum officer under subparagraph (B)." 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). In other words, the officer decides inadmissibility on the spot without sending the matter to an immigration judge. DHS's regulations further explain that a § 1225(b)(1) determination entails either the issuance of a Notice and Order of Expedited Removal or the referral of the applicant for a credible fear screening. 8 C.F.R. § 235.3(b)(2)(i), (4); *see also id.* § 208.30. And to "remove any doubt" on the issue, § 1225(b)(2)(B) clarifies that applicants processed in this manner are not entitled to a proceeding under § 1229a. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008).

In contrast, § 1225(b)(2) is triggered "if the examining immigration officer determines that an alien seeking

admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Following this determination, the officer will issue a Notice to Appear, which is the first step in a § 1229a proceeding. 8 C.F.R. § 235.6(a)(1)(i); *see also id.* § 208.2(b). A Notice to Appear can charge inadmissibility on *any* ground, including the two that render an individual eligible **\*509** for expedited removal. 8 U.S.C. § 1229a(a)(2). The officer then sets a date for a hearing on the issue before an immigration judge. *See Pereira v. Sessions*, ––– U.S. ––––, 138 S. Ct. 2105, 2111, 201 L.Ed.2d 433 (2018).

The plaintiffs were not processed under § 1225(b)(1). We are doubtful that subsection (b)(1) "applies" to them merely because subsection (b)(1) *could have been* applied. And we think that Congress' purpose was to make return to a contiguous territory available during the pendency of § 1229a removal proceedings, as opposed to being contingent on any particular inadmissibility ground. Indeed, Congress likely believed that the contiguous-territory provision would be altogether unnecessary if an applicant had already been processed for expedited removal. The plaintiffs are properly subject to the contiguous-territory provision because they were processed in accordance with § 1225(b)(2)(A).

Though the plaintiffs contend otherwise, our approach is consistent with the subsections' headings. Section 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and § 1225(b)(2) is labeled "Inspection of other aliens." The plaintiffs interpret § 1225(b) to create two mutually exclusive *pre-inspection* categories of applicants for admission; as explained above, we read the statute to create two mutually exclusive *post-inspection* categories. In our view, those who are not processed for expedited removal under § 1225(b)(1) are the "other aliens" subject to the general rule of § 1225(b)(2).

Our interpretation is also consistent with *Jennings v. Rodriguez*, ––– U.S. ––––, 138 S. Ct. 830, 200 L.Ed.2d 122 (2018), the principal authority on which the plaintiffs rely. There, the Supreme Court explained that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* at 837. As the Court noted, "Section 1225(b)(1) applies to aliens *initially determined* to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id.* (emphasis added). "Section 1225(b)(2) is broader," since it "serves as a catchall provision that applies to all

applicants for admission not covered by § 1225(b)(1)." *Id.* We think our interpretation more closely matches the Court's understanding of the mechanics of § 1225(b), as it is attentive to the role of the immigration officer's initial determination under § 1225(b)(1) and to § 1225(b)(2)'s function as a catchall.

 **[3]** For the foregoing reasons, we conclude that DHS is likely to prevail on its contention that § 1225(b)(1) "applies" only to applicants for admission who are processed under its provisions. Under that reading of the statute, § 1225(b)(1) does not apply to an applicant who is processed under § 1225(b)(2)(A), even if that individual is rendered inadmissible by § 1182(a)(6)(C) or (a)(7). As a result, applicants for admission who are placed in regular removal proceedings under § 1225(b)(2)(A) may be returned to the contiguous territory from which they arrived under § 1225(b)(2)(C).

 **[4]** The plaintiffs have advanced only one other claim that could justify a nationwide injunction halting the implementation of the MPP on a wholesale basis: that the MPP should have gone through the APA's notice-and-comment process. DHS is likely to prevail on this claim as well, since "general statements of policy" are exempted from the notice-and-comment requirement. 5 U.S.C. § 553(b)(A). The MPP qualifies as a general statement of policy because immigration officers designate applicants for return on a discretionary case-by-case basis. *See* **\*510** *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 507 (9th Cir. 2018); *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987).

## II

 **[5]** The remaining factors governing issuance of a stay pending appeal weigh in the government's favor. As to the second factor, DHS is likely to suffer irreparable harm absent a stay because the preliminary injunction takes off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who are currently arriving at the Nation's southern border on a daily basis. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250–51 (9th Cir. 2018). DHS has therefore made a strong showing on both the first and second factors, which are the "most critical." *Nken*, 556 U.S. at 434, 129 S.Ct. 1749.

 **[6]** **[7]** The other two factors support the issuance of a stay as well. The plaintiffs fear substantial injury upon return to Mexico, but the likelihood of harm is reduced somewhat by the Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under the MPP. We are hesitant to disturb this compromise amid ongoing diplomatic negotiations between the United States and Mexico because, as we have explained, the preliminary injunction (at least in its present form) is unlikely to be sustained on appeal. Finally, the public interest favors the "efficient administration of the immigration laws at the border." *East Bay Sanctuary Covenant*, 909 F.3d at 1255 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)).

The motion for a stay pending appeal is **GRANTED**.

WATFORD, Circuit Judge, concurring:

I agree that the Department of Homeland Security (DHS) is likely to prevail on the plaintiffs' primary claim, as 8 U.S.C. § 1225(b) appears to authorize DHS's new policy of returning applicants for admission to Mexico while they await the outcome of their removal proceedings. But congressional authorization alone does not ensure that the Migrant Protection Protocols (MPP) are being implemented in a legal manner. As then-Secretary of Homeland Security Kirstjen Nielsen recognized, the MPP must also comply with "applicable domestic and international legal obligations." One of those legal obligations is imposed by Article 33 of the 1951 Convention Relating to the Status of Refugees, which provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Protocol Relating to the Status of Refugees art. I, Jan. 31, 1967, 19 U.S.T. 6223, 6225, 6276 (binding the United States to comply with Article 33). Article 3 of the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment similarly provides:

> No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988).

DHS's stated goal is to ensure that the MPP is implemented in a manner that **\*511** complies with the *non-refoulement* principles embodied in these treaty provisions. Specifically, Secretary Nielsen's policy guidance on implementation of the MPP declares that "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion ..., or would more likely than not be tortured, if so returned pending removal proceedings."

In my view, DHS has adopted procedures so ill-suited to achieving that stated goal as to render them arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Under DHS's current procedures, immigration officers do not ask applicants being returned to Mexico whether they fear persecution or torture in that country. Immigration officers make inquiries into the risk of *refoulement* only if an applicant affirmatively states that he or she fears being returned to Mexico.

DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations. It seems fair to assume that at least some asylum seekers subjected to the MPP will have a legitimate fear of persecution in Mexico. Some belong to protected groups that face persecution both in their home countries and in Mexico, and many will be vulnerable to persecution in Mexico because they are Central American migrants. It seems equally fair to assume that many of these individuals will be unaware that their fear of persecution in Mexico is a relevant factor in determining

whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. If both of those assumptions are accurate, DHS will end up violating the United States' treaty obligations by returning some number of asylum seekers to Mexico who should have been allowed to remain in the United States.

There is, of course, a simple way for DHS to help ensure that the United States lives up to its *non-refoulement* obligations: DHS can ask asylum seekers whether they fear persecution or torture in Mexico. I'm at a loss to understand how an agency whose professed goal is to comply with *non-refoulement* principles could rationally decide *not* to ask that question, particularly when immigration officers are already conducting one-on-one interviews with each applicant. This policy of refusing to ask seems particularly irrational when contrasted with how DHS attempts to uphold the United States' *non-refoulement* obligations in expedited removal proceedings. In that context, immigration officers are required to ask applicants whether they fear being removed from the United States and returned to their home countries. *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867B). Since the same *non-refoulement* principles apply to removal and return alike, DHS must explain why it affirmatively asks about fear of persecution in the removal context but refrains from asking that question when applying the MPP.

DHS has not, thus far, offered any rational explanation for this glaring deficiency in its procedures. (One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer.) As the record stands now, then, it seems likely that the plaintiffs will succeed in establishing that DHS's procedures for implementing the MPP are arbitrary and capricious, at least in the respect discussed above.

**\*512** Success on this claim, however, cannot support issuance of the preliminary injunction granted by the district court. We explained recently that the "scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Here, the plaintiffs' injury can be fully remedied without enjoining the MPP in its entirety, as the district court's preliminary injunction currently does. I expect that appropriate relief for this arbitrary and capricious aspect of the MPP's implementation will involve (at the very least) an injunction directing DHS to ask applicants for admission whether they fear being returned to Mexico. The

precise scope of such relief would need to be fashioned after further proceedings in the district court. In the meantime, the government is entitled to have the much broader preliminary injunction currently in place stayed pending appeal.

W. FLETCHER, Circuit Judge, concurring only in the result: I strongly disagree with my colleagues.

The question of law in this case can be stated simply: The Government relies on 8 U.S.C. § 1225(b)(2)(C) for authority to promulgate its new Migrant Protection Protocols ("MPP"). If § 1225(b)(2)(C) provides such authority, the MPP is valid. If it does not, the MPP is invalid. The question is thus whether § 1225(b)(2)(C) provides authority for promulgation of the MPP. The answer can also be stated simply: The Government is wrong. Not just arguably wrong, but clearly and flagrantly wrong. Section 1225(b)(2)(C) does not provide authority for the MPP.

\* \* \*

I begin with a short summary of established law. Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), arriving aliens applying for admission into the United States fall into two separate and non-overlapping categories.

First, there are aliens described in 8 U.S.C. § 1225(b)(1). These are alien applicants for admission who are traveling with fraudulent documents or no documents. Immigration officers are required by regulation to ask whether these applicants fear persecution in their home country. If so, they are referred for a "credible fear" interview with an asylum officer. If they are found to have a credible fear of persecution in their home country, and are therefore potentially eligible for asylum, they are placed in a regular removal proceeding under 8 U.S.C. § 1229a. In that proceeding, an Immigration Judge ("IJ") can find them either eligible or ineligible for asylum. Applicants who are referred to regular removal proceedings are entitled to remain in the United States while their eligibility for asylum is determined. Applicants found not to have a credible fear are subject to expedited removal without any formal proceeding.

Second, there are aliens described in 8 U.S.C. § 1225(b)(2). These are all alien applicants for admission not described in § 1225(b)(1). In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Section (b)(2) applicants include aliens who are suspected of being, inter alia, drug

addicts, convicted criminals, terrorists, or alien smugglers, and who would therefore be inadmissible. *See* 8 U.S.C. § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Unlike § (b)(1) applicants, § (b)(2) applicants are automatically referred to regular removal proceedings under § 1229a. In those proceedings, an IJ can determine whether the applicants are, in fact, inadmissible on a ground specified in § 1182(a). Also unlike § (b)(1) applicants, § (b)(2) applicants are not entitled **\*513** to remain in the United States while their admissibility is determined. At the discretion of the Government, they may be "returned" to a "contiguous territory" pending determination of their admissibility. § 1225(b)(2)(C).

This statutory structure has been well understood ever since the passage of IIRIRA in 1996, and until now the Government has consistently acted on the basis of this understanding. The Government today argues for an entirely new understanding of the statute, based on arguments never before made or even suggested.

\* \* \*

It is undisputed that plaintiffs are bona fide asylum applicants under § (b)(1). Although it has long been established that § (b)(1) applicants are entitled to stay in the United States while their eligibility for asylum is determined, the Government is now sending § (b)(1) applicants back to Mexico. The Government refuses to treat them as § (b)(1) applicants. Instead, the Government improperly treats them under the MPP as § (b)(2) applicants who can be "returned" to Mexico under § 1225(b)(2)(C). The Government's arguments in support of the MPP are not only unprecedented. They are based on an unnatural and forced—indeed, impossible—reading of the statutory text.

The relevant text of 8 U.S.C. § 1225 is as follows:

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted ... shall be deemed for purposes of this chapter an applicant for admission.

...

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien ... who is arriving in the United States ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

...

**(B) Asylum interviews**

...

**(ii) Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for further consideration of the application for asylum.

...

**(2) Inspection of other aliens**

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining **\*514** immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be

detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien —

**(i)** who is a crewman

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

The statutory text is unambiguous. There are two categories of "applicants for admission." § 1225(a). First, there are applicants described in § 1225(b)(1). Second, there are applicants described in § 1225(b)(2).

Applicants described in § 1225(b)(1) are those who may be inadmissible under § 1182(a)(6)(C) (applicants traveling with fraudulent documents) or under § 1182(a)(7) (applicants with no valid documents).

Applicants described in § 1225(b)(2) are distinct. In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Put differently, again in the words of the statute, § (b)(2) applicants are applicants "to whom paragraph [b](1)" does not apply. § 1225(b)(2)(B)(ii). That is, § (b)(1) applicants are those who may be inadmissible on either of the two grounds specified in that subsection. Section (b)(2) applicants are all other potentially inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that applicants under § (b)(2) are inadmissible on more grounds than applicants under § (b)(1). Applicants inadmissible under § (b)(2) include, for example, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed ... a crime involving moral turpitude" or who have "violat[ed] ... any law or regulation ... relating

to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States ... to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely ... to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

Just last year, the Supreme Court distinguished between § (b)(1) and § (b)(2) applicants, stating clearly that they fall into two separate categories:

> [*A*]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. ... Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all *applicants for admission not covered by § 1225(b)(1)*.

*Jennings v. Rodriguez*, ––– U.S. ––––, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) (emphasis added).

**\*515** Less than a month ago, the Attorney General of the United States drew the same distinction and briefly described the procedures applicable to the two categories:

> Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* §

235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M-S-*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are given in their respective subsections.

To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular removal proceedings under § 1229a at the discretion of the Government. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011). A § (b)(2) applicant who is "not clearly and beyond a doubt entitled to be admitted" will also be placed in removal proceedings under § 1229a. *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal proceedings under § 1229a, though by different routes. But the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a. A homely analogy may help make the point. Dogs and cats can both be placed in the pound. But they still retain their separate identities. Dogs do not become cats, or vice versa.

However, the statutory procedures for the two categories are not identical. Some of the procedures are exclusive to one category or the other. For example, if a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be removed in an expedited proceeding without a removal proceeding under § 1229a. *See* § 1225(b)(1)(A), (B). There is no comparable procedure for expedited removal of a § (b)(2) applicant. Further, in some circumstances a § (b)(2) applicant may be "returned" to a "territory contiguous to the United States" pending his or her removal proceeding under § 1229a. *See* § 1225(b)(2)(C). There is no comparable procedure for a § (b)(1) applicant.

The precise question in this case is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C). That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant? A plain-meaning reading of § 1225(b)—as well as the Government's

longstanding and consistent **\*516** practice—tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed ... without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview. The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer—either expedited removal or detention pending further consideration. § 1225(b)(1)(B)(ii)-(iii). There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows. Subparagraph (A) tells us that unless a § (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a. § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)." *Id.* Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]." § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land ... from a foreign territory contiguous to the United States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under § 1229a, may be "returned" to that contiguous territory pending that proceeding. § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in § 1225(b)(2), in subparagraph (B)(ii). That subparagraph specifies that subparagraph (A)—which tells us what happens to § (b)(2) applicants—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of § 1225(b)(2)(C) is available only for § (b)(2) applicants. There is no way to read the statute otherwise. Under a plain-meaning reading of the text, as well as the Government's longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

\* \* \*

In support of its motion to stay the order of the district court pending appeal, the Government makes several arguments. None is persuasive.

The Government first argues that § (b)(1) applicants are included within the category of § (b)(2) applicants. *See* Govt. Brief at 10. Under the Government's argument, there are two categories of applicants, but the categories are overlapping. There are § (b)(1) applicants, who are defined in § (b)(1), and there are § (b)(2) applicants, who are defined as all applicants, including, but not limited to, § (b)(1) applicants.

For this argument, the Government relies on the phrase "an alien seeking admission" in § 1225(b)(2)(A). The Government argues that because § (b)(1) and § (b)(2) applicants are both "aliens seeking admission," subparagraph (A) of § (b)(2) refers to both categories of applicants. Then, because subparagraph (A) is, by its terms, "[s]ubject to subparagraphs (B) and (C)," the Government argues that a § (b)(1) applicant may be "return[ed]" to a "foreign **\*517** territory contiguous to the United States" under subparagraph (C).

The Government's argument ignores the statutory text, the Supreme Court's opinion in *Jennings* last year, and the opinion of its own Attorney General in *Matter of M-S-* less than a month ago.

The text of § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. Section 1225(b) specifies that § (b)(1) applicants are aliens who are inadmissible either under § 1182(a)(6)(C) or under § 1182(a)(7). Section (b)(2) aliens are *other* aliens." *See* § 1225(b)(2) (heading) ("Inspection of *other* aliens") (emphasis added). That is, § (b)(2) covers applicants "other" than § (b)(1) applicants. In case a reader has missed the significance of the heading of § (b)(2), the statute makes the point again, this time in the body of § (b)(2). Section (b)(2)(B)(ii) specifically provides that subparagraph (A) of § (b)(2) "shall not apply to an alien ... to whom paragraph [b](1) applies."

In *Jennings*, the Supreme Court last year told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. It wrote, "[A]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2).... Section 1225(b)(2) ... applies to all applicants for admission *not* covered by §

1225(b)(1)." *Jennings*, 138 S. Ct. at 837 (emphasis added). Finally, in *Matter of M-S-*, the Attorney General wrote on April 16 of this year that an applicant is subject to different procedures depending on whether he or she is a § (b)(1) or § (b)(2) applicant. *Matter of M-S-*, 27 I. & N. Dec. at 510.

The Government's second argument follows from its first. *See* Govt. Brief at 10–13. For its second argument, the Government relies on subparagraph (B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien ... to whom paragraph [b](1) *applies*." § 1225(b)(2)(B)(ii) (emphasis added). The Government argues that subparagraph (B)(ii) allows a government official to perform an act. The act supposedly authorized is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants. (The Government needs to make this argument in order to avoid the consequence of treating all § (b)(1) applicants as § (b)(2) applicants, who are automatically entitled to regular removal proceedings.)

There is a fundamental textual problem with the Government's argument. "Apply" is used twice in the same sentence in § (b)(2)(B)(ii). The first time the word is used, it refers to the application of a statutory section ("Subparagraph (A) shall not apply"). The second time the word is used, it is used in the same manner, again referring to the application of a statutory section ("to whom paragraph [b](1) applies"). When the word is used the first time, it tells us that subparagraph (A) shall not apply. When the word is used the second time, it tells us to whom subparagraph (A) shall not apply: It does not apply to applicants to whom § (b)(1) applies. Neither time does the word "apply" refer to an act performed by a government official.

The Government's third argument is disingenuous. The Government argues that § (b)(1) applicants are more "culpable" than § (b)(2) applicants, and that they therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. The Government argues that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud ... over aliens who follow our laws." Govt. Brief at 14. In its **\*518** Reply Brief, the Government compares § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." Govt. Reply Brief at 5. The Government has it exactly backwards.

Section (b)(2) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, inter alia, aliens using fraudulent documents. That is, it covers aliens who travel under false documents and who, once they arrive at the border or have entered the country, apply for asylum. Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents. In other words, § (b)(1) applies to bona fide asylum applicants, who commonly have fraudulent documents or no documents. Indeed, for many applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries. The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

The history of § 1225(b)(2)(C) confirms that Congress did not have § (b)(1) applicants in mind. Section 1225(b)(2)(C) was added to IIRIRA late in the drafting process, in the wake of *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996). The petitioner in *Sanchez-Avila* was a Mexican national who applied for entry as a "resident alien commuter" but who was charged as inadmissible due to his "involvement with controlled substances." *Id.* at 445. In adding § 1225(b)(2)(C) to what was to become IIRIRA, Congress had in mind § (b)(2) applicants like the petitioner in *Sanchez-Avila*. It did not have in mind bona fide asylum seekers who arrive with fraudulent documents or no documents at all.

Contrary to the Government's argument, § (b)(1) applicants are not more "culpable" than § (b)(2) applicants. Quite the opposite. The § (b)(1) applicants targeted by the MPP are innocent victims fleeing violence, often deadly violence, in Central America. In stark contrast, § (b)(2) applicants include suspected drug addicts, convicted criminals, terrorists, and alien smugglers. *See* § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Section (b)(2) applicants are precisely those applicants who should be "returned" to a "contiguous territory," just as § 1225(b)(2)(C) provides.

\* \* \*

Acting as a motions panel, we are deciding the Government's emergency motion to stay the order of the district court pending appeal. Because it is an emergency motion, plaintiffs and the Government were severely limited in how many

words they were allowed. Our panel heard oral argument on an expedited basis, a week after the motion was filed.

I regret that my colleagues on the motions panel have uncritically accepted the Government's arguments. I am hopeful that the regular argument panel that will ultimately hear the appeal, with the benefit of full briefing and regularly scheduled argument, will be able to see the Government's arguments for what they are—baseless arguments in support of an illegal policy that will, if sustained, require bona fide asylum applicants to wait in Mexico for years while their applications are adjudicated.

**All Citations**

924 F.3d 503, 19 Cal. Daily Op. Serv. 4239, 2019 Daily Journal D.A.R. 3864

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

520 F.Supp.3d 94
United States District Court, D. Massachusetts.

Andrés Oswaldo BOLLAT VASQUEZ, et al., Plaintiffs,
v.
Alejandro MAYORKAS, Secretary of
Homeland Security, [1] et al., Defendants.

[1]      Pursuant to Fed. R. Civ. P. 25(d), Secretary of the U.S. Department of Homeland Security Alejandro Mayorkas has been substituted for former Acting Secretary of the U.S. Department of Homeland Security Chad Wolf.

Civil Action No. 1:20-cv-10566-IT
|
Signed 02/13/2021

**Synopsis**
**Background:** Noncitizens, who were returned to Mexico by the Department of Homeland Security (DHS) pursuant to Immigration and Nationality Act's (INA) contiguous removal provision to await adjudication of immigration removal proceedings, filed complaint against DHS Secretary, alleging, inter alia, that application of contiguous removal provision to noncitizens violated INA, and seeking declaration and preliminary injunction ordering noncitizens to be paroled into United States or, in the alternative, providing noncitizens with assessment of their fear of remaining in Mexico.

**Holdings:** The District Court, Indira Talwani, J., held that:

[1] noncitizens were applicants for admission under INA, and thus were not subject to contiguous removal;

[2] noncitizens were likely to suffer irreparable harm absent preliminary injunction; and

[3] District Court would issue preliminary injunction ordering DHS to rescind orders returning noncitizens to Mexico.

Motion granted in part.

**Procedural Posture(s):** Motion for Preliminary Injunction; Petition for Declaratory Judgment.

West Headnotes (9)

**[1]**    **Injunction** 🔑 Extraordinary or unusual nature of remedy

      **Injunction** 🔑 Grounds in general; multiple factors

Preliminary injunction, which is extraordinary remedy never awarded as of right, is appropriate where plaintiff demonstrates that he is likely to succeed on merits, that he is likely to suffer irreparable harm in absence of preliminary relief, that balance of equities tips in his favor, and that injunction is in public interest.

**[2]**    **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

Under law of the case doctrine, unless corrected by appellate tribunal, legal decision made at one stage of civil or criminal case constitutes law of the case throughout pendency of litigation.

**[3]**    **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

Court ordinarily ought to respect and follow its own rulings that were made earlier in same case.

**[4]**    **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

      **Courts** 🔑 Interim relief, rulings relating to

Court's reconsideration of earlier ruling that was made in same case may be appropriate if initial ruling was designed to be preliminary or if there has been material change in controlling law.

**[5]**    **Injunction** 🔑 Likelihood of success on merits

Likelihood of success on the merits is the "main bearing wall" of the four-factor framework for preliminary injunction.

**[6]**   **Administrative Law and Procedure**  🔑  Theory or grounds not provided or relied upon by agency

Agency's action must be upheld, if at all, on basis articulated by agency itself.

**[7]**   **Aliens, Immigration, and Citizenship**  🔑  Application or Petition

Noncitizens who were returned to Mexico pursuant to Immigration and Nationality Act's (INA) contiguous removal provision, after they crossed border into United States and were apprehended, deemed inadmissible, and placed into standard removal proceedings, were "applicants" for admission under INA, and thus were not subject to contiguous removal, where noncitizens were deemed inadmissible to United States because they lacked valid entry documents. Immigration and Nationality Act §§ 212, 235, 8 U.S.C.A. §§ 1182(a)(7), 1225(b)(1), 1225(b)(2)(C).

**[8]**   **Aliens, Immigration, and Citizenship**  🔑  Injunction

Noncitizens who were returned to Mexico under Immigration and Nationality Act's (INA) contiguous removal provision, after they crossed border into United States and were apprehended, deemed inadmissible, and placed into removal proceedings, were likely to suffer irreparable harm in absence of preliminary injunction ordering Department of Homeland Security (DHS) to rescind orders returning noncitizens to Mexico; noncitizens, who included children, were returned to violent, unsafe area that lacked sufficient food and heat, U.S. State Department had even assigned area a "Level 4: Do Not Travel" warning due to violence and kidnappings, and noncitizens' immigration cases were unlikely to proceed, given indefinite postponement of proceedings due to COVID-19 pandemic. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C).

**[9]**   **Aliens, Immigration, and Citizenship**  🔑  Injunction

District Court would issue preliminary injunction ordering Department of Homeland Security (DHS) to rescind orders returning noncitizens to Mexico pursuant to Immigration and Nationality Act's contiguous return provision; noncitizens were likely to succeed on merits of their claim against DHS challenging application of contiguous return provision, as noncitizens were "applicants" for admission under INA and therefore were not subject to contiguous removal, noncitizens demonstrated likelihood of irreparable harm absent injunction, as area to which they were returned was extremely unsafe, and equitable consideration of moving noncitizens out of dangerous area outweighed government's and public's interest in keeping them in Mexico. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C).

**Attorneys and Law Firms**

 *96  Adriana Lafaille, Matthew Segal, Krista Oehlke, Kristin M. Mulvey, Rebecca R. Krumholz, American Civil Liberties Union, Adam J. Kessel, Eda Stark, Kenton W. Freeman, Proshanto Mukherji, Fish & Richardson, P.C., Boston, MA, Bobby Gene Hampton, Fish & Richardson, P.C., Washington, DC, for Plaintiffs Andres O. Bollat Vasquez, A.B., Luisa M. Vasquez Perez de Bollat, Jose M. Urias Martinez, Rosa M. Martinez de Urias, Salome Olmos Lopez, Evila F. Colaj Olmos.

Adriana Lafaille, Matthew Segal, Krista Oehlke, Kristin M. Mulvey, Rebecca R. Krumholz, American Civil Liberties Union, Adam J. Kessel, Kenton W. Freeman, Proshanto Mukherji, Fish & Richardson, P.C., Boston, MA, Bobby Gene Hampton, Fish & Richardson, P.C., Washington, DC, for Plaintiff J.C.

Adam J. Kessel, Fish & Richardson, P.C., Krista Oehlke, ACLU of Massachusetts, Boston, MA, for Plaintiffs Jorge A. Guevara Diaz, Nora Indalia Alvarado Reyes, Mateo Lopez, T.L., D.L., A.L., Hermes Arnulfo Lopez Merino, Maria De La

Cruz Abarca de Lopez, Rosi Lisbeth Zuniga Posadas, Miriam Yanett Zuniga Posadas.

Erin E. Brizius, Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Defendants.

MEMORANDUM AND ORDER

TALWANI, District Judge

I. Introduction

Pending before the court is Plaintiffs' Second Motion for Preliminary Injunction [#77]. As with Plaintiffs' first Motion for Preliminary Injunction [#27], the motion seeks an order that seven Plaintiffs currently in Mexico pursuant to the government's Migrant Protection Protocol be paroled in to the United States for the pendency of their immigration removal proceedings or, in the alternative, that they be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31. For the reasons that follow, Plaintiffs' Motion [#77] is GRANTED in part. The Department of Homeland Security shall rescind the orders returning these seven Plaintiffs to Mexico. The court leaves to the Department in the first instance the determination of whether parole or detention in the United States is appropriate once the orders returning the seven Plaintiffs to Mexico are rescinded.

II. Procedural Background

On March 20, 2020, five asylum seekers who were placed in the Migrant Protection Protocol and "returned" to Mexico for the duration of their immigration proceedings filed a Complaint [#1] seeking, *inter alia*, declaratory and injunctive relief that applying the Migrant Protection Protocol to the Plaintiffs was contrary to the Immigration and Nationality Act and its regulations, violated the Administrative Procedures Act, violated Defendants' Non-Refoulement Obligations, violated the Equal Protection Clause of the United States Constitution, and violated the substantive requirements of the Due Process Clause of the United States Constitution. Id. at 28-35.

Plaintiffs filed the first Motion for Preliminary Injunction [#27] on April 13, **\*97** 2020. Plaintiffs sought an order that the five Plaintiffs in Mexico ("the Returned Plaintiffs") be paroled to the United States for the pendency of their immigration removal proceedings or, in the alternative,

that they be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31. Defendants opposed the Motion for Preliminary Injunction [#27]. Opposition re Motion for Preliminary Injunction [#35].

On May 14, 2020, the court granted the Motion [#27] in part. See Memorandum and Order ("Mem. & Order") [#45]. The court found that Plaintiffs demonstrated a likelihood of success on the merits as to their contentions that the Returned Plaintiffs do not belong to the subgroup of applicants subject to the contiguous return provision in § 1225(b)(2)(C) because, at the time of their apprehension by Customs and Border Patrol ("CBP"), they were not "arriving on land." Id. at 18-17. The court also found that plaintiffs were likely to succeed on the merits of their claim that because Returned Plaintiffs are applicants for admission described in 8 U.S.C. § 1225(b)(1), they are not subject to the contiguous return provision at 8 U.S.C. § 1225(b)(2)(C).

The Defendants appealed. Notice of Appeal [#49]. After the Supreme Court granted certiorari in Wolf v. Innovation Law Lab, Inc., 951 F.3d 1073, 1084 (9th Cir. 2020), cert. granted, —— U.S. ——, 141 S.Ct. 617, 208 L.Ed.2d 227 (2020), the First Circuit held the appeal in abeyance pending a decision in that case. [2]

[2]  The Supreme Court has recently granted a motion to hold further briefing in abeyance and to remove the case from the February 2021 argument calendar. Innovation Lab, —— U.S. ——, 141 S.Ct. 1289, 209 L.Ed.2d 22 (2021).

Meanwhile, Plaintiffs filed an Amended Complaint [#73] on December 22, 2020 which added seven new Plaintiffs. The Amended Complaint [#73] includes all counts from the Complaint [#1] except for the Due Process claim. Amended Complaint 35-40 [#73]. On December 25, 2020, Plaintiffs filed their Second Motion for Preliminary Injunction [#77], seeking an order that the seven new Plaintiffs be paroled to the United States for the pendency of their immigration removal proceedings or, in the alternative, that they be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31. Defendants oppose the Second Motion for Preliminary Injunction [#77]. Opposition to Plaintiffs' Second Motion for a Preliminary Injunction [#88].

## III. Factual Background

### A. The Migrant Protection Protocol [3]

[3] The court begins with the background provided in its Memorandum and Order [#45].

In December 2018, the Department of Homeland Security ("DHS") announced the imminent implementation of the Migrant Protection Protocols ("MPP"). Press Release, Kirstjen M. Nielsen, Sec'y, DHS, Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration: Announces Migration Protection Protocols (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration. Under the MPP, noncitizens "arriving in or entering the U.S. from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." Id. DHS grounds its authority for **98** this policy in the contiguous return provision at § 235 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1225(b)(2)(C). See Memorandum from DHS, Policy Guidance for Implementation of the Migrant Protection Protocols 1 [#36-1]. Under MPP, a noncitizen is placed in standard removal proceedings under 8 U.S.C. § 1229a [4] "rather than another applicable proceeding pursuant to the INA." Id. at 3. [5]

[4] These are commonly referred to as "Section 240" proceedings after the relevant INA provision.

[5] A January 28, 2019, document drafted by Customs and Border Protection entitled "MPP Guiding Principles" lists the following categories of noncitizens as "not amenable to MPP":
• Unaccompanied alien children,
• Citizens or nationals of Mexico,
• Aliens processed for expedited removal,
• Aliens in special circumstances:
• Returning LPRs seeking admission (subject to INA section 212)
• Aliens with an advance parole document or in parole status
• Known physical/mental health issues
• Criminals/history of violence
• Government of Mexico or USG interest,
• Any alien who is more likely than not to face persecution or torture in Mexico, or

• Other aliens at the discretion of the Port Director
Customs and Border Protection, "MPP Guiding Principles" 1-2 [#36-2].

Noncitizens who affirmatively assert a "concern that [they] may face a risk of persecution on account of a protected ground or torture upon return to Mexico" are referred to a U.S. Citizenship and Immigration Services ("USCIS") asylum officer for "an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico." Memorandum from USCIS, Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols ("USCIS Guidance for Implementing MPP") 4 [#36-3]. There is no right to have counsel present, and, "provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." Id. The result of the assessment "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." Id. at 5.

On February 2, 2021, the President of the United States signed an executive order instructing DHS to " ' promptly review and determine whether to terminate or modify' " the MPP, and, "in coordination with the Secretary of State, the Attorney General, and the Director of the CDC, to 'promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.' " Second Motion for Extension of Time to Respond to First Amended Complaint [#93] (quoting Exec. Order No. 14010, 86 FR 8267 (Feb. 2, 2021)).

### B. The Plaintiffs

#### 1. Massachusetts Plaintiffs

Plaintiffs Jorge Alberto Guevara Diaz, Mateo López, and Rosi Lisbeth Zuniga Posadas live in Massachusetts. Amended Complaint 5-6 [#73]. Mr. Guevara Diaz brings suit individually and as next friend to his wife Nora Idalia Alvarado Reyes and their children, J.G., S.G., and M.G.

**\*99** Id. at 5. Mr. López brings suit individually and as next friend to his brother and sister-in-law, Hermes Arnulfo López Merino and María de la Cruz Abarca de López and their children T.L., D.L., and A.L. Id. at 5. Ms. Zuniga Posadas brings suit individually and as next friend to her sister, Miriam Yanett Zuniga Posadas, her niece, G.Z., and her nephews, D.Z. and K.Z. Id. at 6. [6]

[6] Although J.G., S.G., M.G., D.Z., and K.Z. were initially placed in the MPP, these five children are now residing in Massachusetts. Declaration of Nora Idalia Alvarado Reyes ("Reyes Dec.") ¶¶ 4-12; 33; 41 [#79-2]; Declaration of Miriam Yanett Zuniga Posadas ("Zuniga Dec.") ¶¶ 4; 12-21; 48-50 [#79-6].

### 2. The New Returned Plaintiffs [7]

[7] The court referred collectively to the original Plaintiffs who had been returned to Mexico under the MPP as the "Returned Plaintiffs." Mem. & Order [#45]. The court refers to Ms. Reyes, Mr. López Merino, Ms. Abarca, A.L., T.L., D.L., and Ms. Zuniga, collectively as "the New Returned Plaintiffs."

As with the Returned Plaintiffs, each of the New Returned Plaintiffs crossed the border from Mexico into the United States between border checkpoints and was subsequently apprehended and detained by U.S. officials. Reyes Dec. ¶¶ 4-5 [#79-2]; Declaration of María de la Cruz Abarca de López ("Abarca Dec.") ¶¶ 2-3 [#79-4]; "Zuniga Dec." ¶ 4 [#79-6]. DHS determined that the New Returned Plaintiffs were inadmissible due to a lack of valid entry documents pursuant to 8 U.S.C. § 1182(a)(7). [8] Immigration Charging Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7]. DHS initiated removal proceedings against each of the seven Plaintiffs under 8 U.S.C. § 1229a, [9] and, pursuant to the MPP, brought them to bridges at the U.S.-Mexico border and handed them over to Mexican officials, who walked them over the bridges to Matamoros, Tamaulipas, Mexico, Reyes Dec. ¶¶ 7-15 [#79-2]; Abarca Dec. ¶ 9 [#79-4], and to Nuevo Laredo, Tamaulipas, Mexico, Zuniga Dec. ¶¶ 6-11 [#79-6], to await the adjudication of their cases. Immigration Charging Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7].

[8] Section 212 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1182.

[9] Section 240 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1229a.

Both Matamoros and Nuevo Laredo are located in the state of Tamaulipas, which the U.S. State Department has assigned a "Level 4: Do Not Travel" warning "due to crime and kidnapping." See U.S. Dep't of State—Bureau of Consular Affairs, Mexico Travel Advisory ("State Dep't Advisory"), travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html ("Organized crime activity—including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault—is common along the northern border.") (last visited February 8, 2021). U.S. government employees are prohibited from being outside in Matamoros and Nuevo Laredo between midnight and 6 a.m. and cannot travel between cities in Tamaulipas on interior highways. Id. [10]

[10] Plaintiffs have filed the Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico ("Martin Supp. Dec.") [#79-12] and the Supplemental Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First ("Kizuka Supp. Dec.") [#79-11] as additional evidence of the conditions in Matamoros and Nuevo Laredo for returned migrants. Mr. Kizuka explains that "[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP" and that "the security situation in Mexico, including in the state of Tamaulipas has worsened" with one of Mexico's "most powerful and violent cartels" reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted. Kizuka Supp. Dec. ¶¶ 4, 11-15 [#79-11A]. Mr. Kizuka also reports that conditions have only worsened from when he wrote his first Declaration [#79-11B] in which he reported that during his "first visit to the Matamoros encampment in September 2019, food and potable water remained scarce, some individuals were defecating in an open field because the site lacked latrines, and ...

[he] witnessed a decomposing corpse wash up along the Mexican side of the Rio Grande where children were bathing and adults were washing clothing." Kizuka Supp. Dec. ¶ 44 [#79-11B]. On his return in January 2020, "the encampment had expanded onto the muddy banks of the Rio Grande to accommodate a growing population, while conditions improved little." Id. at ¶ 45. Moreover, "[a]s a result of overcrowding and poor sanitary conditions, disease is rampant" and "[a]ccess to food remains a problem, with doctors having treated pediatric patients suffering from severe-acute malnutrition, which increases the likelihood that an underfed child will die from flu, gastrointestinal infection, or other normally treatable conditions." Id. at ¶¶ 46-47 (internal citations omitted). Mr. Martin reports that in Matamoros, "the local authorities have failed to meet basic humanitarian standards for the population" and that these camps are a "high risk for becoming COVID-19 hotspots." Martin Supp. Dec. ¶¶ 11-12 [#79-12A]; see also First Martin Dec. ¶ 8 [#79-12B] ("Tamaulipas is among the most dangerous and violent regions in Mexico and migrants are particular targets. The criminal groups that control the state view migrants as a commodity and source of income and profit from each individual who passes through their territory. They deliberately pursue asylum seekers for kidnapping, extortion, and other forms of violence.").

**\*100**  The New Returned Plaintiffs provide the following individual accounts through their declarations.

### a. Nora Idalia Alvarado Reyes

Nora Idalia Alvarado Reyes ("Ms. Reyes") is a national of El Salvador. See Reyes Dec. ¶ 2 [#79-2]. She had never been to Matamoros before August 2019, when she was "returned" there with her two youngest children, and paperwork from the U.S. and Mexican governments. Id. at ¶¶ 10-11. Because they did not have shelter, Ms. Reyes and her two children slept on the sidewalk for the first three days and when it rained on the second night, they "huddled" under a "temporary canopy" and were still "soaked through." Id. at ¶¶ 12-13. They had to rely on help to get food. Id. at ¶ 14.

After a few days, Ms. Reyes, concerned by the "dangerous and difficult conditions," decided to travel three days by bus to Chiapas to stay with her sister. Id. at ¶ 16. Ms. Reyes and her children returned to Matamoros for their November 2019 hearing and camped out in front of the immigration building. Id. at ¶ 18. After the hearing, Ms. Reyes decided against returning to Chiapas because the trip was long and dangerous, and their next hearing was scheduled for January 2020. Id. at ¶ 19.

At the camp, Ms. Reyes and her children lived in a tent another migrant gave them. Id. at ¶ 20. Conditions in Matamoros had worsened; it was cold and wet, Ms. Reyes did not have much money to buy food, and her children complained that they were hungry and cold. Id. Sometimes people passed by Ms. Reyes' tent and called the migrants names, told them to go back to their country, and complained that they were "dirty and ... a plague for the city." Id. at ¶ 21.

After a few weeks living in the tent, Ms. Reyes, her children, and another woman left the camp and found a house to rent in a different neighborhood. Id. at ¶ 22. One day, a dead body was found near their house, and a few days after that, neighbors saw a woman running through the street covered in blood. Id. Ms. Reyes thought that the woman was a migrant and heard that she had escaped after having been kidnapped. Id. A neighbor told Ms. Reyes that she should lock herself and her children inside their house and not come out; **\*101** they were terrified and decided to leave that neighborhood. Id. at ¶¶ 22-23. They went to a shelter, but it was full, so they began living outside in the camp once more. Id. at ¶ 23.

There is a lot of violence at the camp; Ms. Reyes and her children have seen men beating migrants with wooden planks. Id. at ¶ 24. She also knows of migrants who have been killed and women who have been raped in the camp. Id. Ms. Reyes has seen bodies in the river multiple times. Id. Because of the violence, Ms. Reyes feels unsafe using the bathroom at night and put her children in diapers so they would not have to go to the bathroom at night. Id. at ¶ 26. Ms. Reyes' children developed skin infections that lasted for months and caused bumps on her son's arms and legs and a lesion to develop on her daughter's scalp. Id. at ¶ 29.

Ms. Reyes' third court date was set for March 2020 but was postponed due to the spread of the novel coronavirus. Id. at ¶ 31. Ms. Reyes' hearings continued to be postponed as the court closure continued; each time she traveled to the bridge she was told by U.S. officials that she could call a number on

a piece of paper they handed to her to figure out when her next hearing would be. Id. In July 2020, there was a hurricane and the camp flooded. Id. at ¶ 28. Ms. Reyes feared that the river would crest and that the camp would be under water. Id.

Ms. Reyes crossed the border again in November 2020 and was apprehended by U.S. officials. Id. at ¶ 34. She was interviewed by a U.S. official about her fear of returning to Mexico and recounted her experiences living in the camp. Id. at ¶ 37. The immigration officials took her clothing and sent her back to the camp in "prison clothes." Id. at ¶ 38. Ms. Reyes remains in the camp. Id. at ¶ 40. [11]

[11]     The court has not taken into account additional information provided by Ms. Reyes under seal as that information is not necessary for purposes of this motion.

### b. María de la Cruz Abarca de López, her minor children, A.L., T.L., D.L., and her husband Hermes Arnulfo López Merino.

María de la Cruz Abarca de López ("Ms. Abarca"), her husband Hermes Arnulfo López Merino ("Mr. López"), and their three children, A.L., T.L., and D.L., ages 13, 10, and 7, are Salvadoran nationals. Abarca Dec. ¶ 1 [#79-4]. In September 2019, after spending time in two detention centers, they were "returned" to Matamoros, Mexico, a city they had never been to and in which they knew no one. Id. at ¶¶ 5-7; 9-10. While they were detained, U.S. officials threw away nearly all of their belongings, including their clothing. Id. at ¶¶ 3, 12. They spent their first night in Matamoros sleeping outside the tent of a woman who was worried for their safety. Id. at ¶¶ 11-12. Ms. Abarca was "terrified." Id. at ¶ 12. Ms. Abarca's daughters' health suffered in the camp; they were vomiting and feverish, and her eldest daughter, who had bronchitis, stopped eating. Id. at ¶ 13. A man hit Ms. Abarca's eldest daughter "for no apparent reason," and when Mr. López reported it to a Mexican official, he was told it would be better not to complain. Id. at ¶ 14.

The family left the encampment and lived in a hotel for about a month, but when that became too expensive, they rented a small house in Matamoros. Id. at ¶¶ 15-16. All five family members sleep on wooden bedframes in the same room. Id. at ¶ 16. The weather has turned cold and because the roof has caved in one of their rooms, the family is exposed

to the elements. Id. at ¶¶ 16-17. They often hear gunshots throughout the day. Id. at ¶ 18.

**\*102** Mr. López worked in a carpentry shop for about a year. Id. at ¶ 19. Because he was a foreigner, he was expected to perform the most strenuous tasks and was only paid about ten dollars a day. Id. Even with Mr. López's job and some money from his family, they did not have enough money for food. Id. at ¶¶ 20-21. Mr. López was fired from his job in December 2020 and without his wages, the family is unable to cover expenses and struggles to buy food. Id. at ¶¶ 27-28. Ms. Abarca and her daughters do not leave the house because it is not safe outside. Id. at ¶¶ 22-24.

The family has had two court dates. Id. at ¶ 25. At their first, after they told the judge they were afraid of returning to Mexico, they were referred to a separate phone interview where they explained why they were afraid to return. Id. They were returned. Id. During their second hearing, in March 2020, Mr. López asked the judge to permit his family to wait in the United States until there was a decision, but the judge denied his request. Id. at ¶ 26. Ms. Abarca worries about her family's safety every day; she struggles to sleep, and her hair has started to fall out. Id. at ¶ 29. Her daughters are getting thinner and have barely left the house for a year. Id.

### c. Miriam Yanett Zuniga Posadas

Miriam Yanett Zuniga Posadas ("Ms. Zuniga") is a national of Honduras. See Zuniga Dec. ¶ 2 [#79-6]. After she and her children crossed the border, they were detained and placed in Immigration and Customs Enforcement custody for about four days. Id. at ¶ 6. During that time, Ms. Zuniga tried to explain to immigration authorities that she fled Honduras because she feared for her life, but immigration officials did not listen to her and berated her for entering the United States illegally. Id. at ¶ 5. She was told she would have a hearing before a judge who would determine whether they would remain in the United States or be sent back to Mexico, but she never had the hearing and when she asked an official about it she was told to "shut up." Id. Later, she, her five-year-old twin boys, and her sixteen-year-old daughter were "returned" to Nuevo Laredo, a city in which they had never been and did not know anyone. Id. at ¶¶ 2, 6, 8, 10. When Ms. Zuniga asked Mexican officials at the border where she should go, she was told it was her "problem" to figure out. Id. at ¶ 11.

Almost immediately after they left the Mexican immigration building, Ms. Zuniga and her children were approached by a group of men armed with large guns. Id. at ¶ 13. The men took Ms. Zuniga's money and her children's clothing and pulled the tennis shoes from her sons' feet. Id. at ¶ 14. They demanded that Ms. Zuniga tell them where she and her children were from. Id. After the armed men took their things and threatened them, a pastor intervened, and the armed men left. Id. at ¶ 15. The pastor told Ms. Zuniga that the men were from a cartel and that it was not safe for Ms. Zuniga and her family to be out in the open near the immigration building. Id. ¶ 17. Ms. Zuniga and her children went to a shelter where they were advised they should never go outside because if they did, "[b]ad people would take" them. Id. at ¶¶ 18-19. Members of the cartel have invaded the shelter twice. Id. at ¶ 43.

Since they were "returned" to Nuevo Laredo, members of the cartel have tried to kidnap her children twice. Id. at ¶ 21. The first attempt happened while they were on their way to their first court appearance in early February 2020. Id. at ¶ 23. Ms. Zuniga was holding one of her son's hands and her daughter was holding her other son's hand and a group of men approached her daughter and tried to pull her son away. Id. Her daughter screamed, **103 and Ms. Zuniga turned around and reached for her daughter and son. Id. at ¶¶ 23-24. She shouted at the men and told her daughter to take both of her sons and run towards the immigration building. Id. at ¶ 24. Ms. Zuniga tried to run, but the men grabbed her backpack and she could not get away. Id. at ¶ 25. The men dispersed when several Mexican officials came towards Ms. Zuniga and she was escorted by the officials to the Mexican immigration building. Id.

During the hearing that followed, Ms. Zuniga tried to explain to the judge all that had happened since her family was "returned" to Nuevo Laredo, but they judge asked her only "yes" or "no" questions. Id. at ¶¶ 26-27. After the hearing, Ms. Zuniga had a phone interview and was told that this interview would decide whether she and her family would return to Mexico or stay in the United States. Id. at ¶ 28. Ms. Zuniga tried to explain that she was afraid of returning to Mexico and was afraid of what the cartels would do to her and her children if they had to go back. Id. at ¶ 29. She was told they would have to return to Mexico. Id. at ¶ 30. They spent the night in a detention center and were not given food. Id.

The next morning, Mexican immigration officials told Ms. Zuniga that they needed to leave the facility. Id. at ¶ 32. The officials tried to get all of the migrants in the building outside,

but Ms. Zuniga tried to stay inside as long as possible. Id. While they were inside, Ms. Zuniga and her family watched as the cartel kidnapped families who had just exited the Mexican immigration building. Id. at ¶ 33. Ms. Zuniga protested being forced out of the building and, eventually, the Mexican immigration officials allowed them to stay in a different office building overnight. Id. at ¶ 35. They left the building the next morning with a pastor and a group of other migrants. Id. at ¶ 36. As they were driving, the car was stopped by cartel members and the cartel took some people from the car. Id. at ¶¶ 36-38.

In September 2020, as Ms. Zuniga and her children were returning from renewing their permits at the Mexican immigration building, they were again "surrounded" by members of the cartel. Id. at ¶ 44. The men asked them where they were from and what they were doing in Nuevo Laredo and touched Ms. Zuniga's daughter's face and told her she was beautiful. Id. Her daughter was "crying and shaking." Id. While this was happening, a man and woman approached in a car and the men left. Id. at ¶ 46. The man from the car told Ms. Zuniga to get her children out of Mexico because the cartel had taken over and if they stayed, they would be killed. Id. at ¶¶ 46-47. Ms. Zuniga is still in the shelter and is terrified that men from the cartel will break in again and kidnap her. Id. at ¶ 50. [12]

[12]   The court has not taken into account additional information provided by Ms. Zuniga under seal as that information is not necessary for purposes of this motion.

IV. Legal Standard

 **[1]**  A preliminary injunction is an "extraordinary remedy never awarded as of right," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), appropriate where a plaintiff demonstrates that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20, 129 S.Ct. 365.

V. Analysis

A. The First Preliminary Injunction
Plaintiffs argue that the court's Memorandum and Order [#45] granting Plaintiffs' **104 first Motion for Preliminary Injunction [#27] is law of the case, Memorandum in

Support of Second Preliminary Injunction ("Mem. in Supp. of Sec. PI") 14-15 [#78], while Defendants argue that "intervening changes in controlling law have undermined" Plaintiffs arguments and the court "should reconsider its prior conclusion." Opposition to Plaintiffs' Second Motion for a Preliminary Injunction ("Opp'n to Sec. PI") 5-6 [#88].

**[2]** **[3]** **[4]** "Under the law of the case doctrine, 'unless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation.' " Latin Am. Music Co. Inc. v. Media Power Grp., Inc., 705 F.3d 34, 40 (1st Cir. 2013) (quoting Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997)). "This means that a court ordinarily ought to respect and follow its own rulings, made earlier in the same case." Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002). Reconsideration may be appropriate "if the initial ruling ... was designed to be preliminary" or "if there has been a material change in controlling law." Id. at 647-48.

Here, the First Circuit has not ruled on Defendants' appeal and the Supreme Court is holding Innovation Law Lab in abeyance. Accordingly, the court's decision is law of the case, and much of the court's prior analysis is repeated herein. See Latin Am. Music, 705 F.3d at 40. At the same time, the decision on a motion for a preliminary injunction is by definition preliminary, and accordingly, the court considers carefully the decisions cited by Defendants to determine whether they amount to a "material change in controlling law." Ellis, 313 F.3d at 648. The court provides analysis of Plaintiffs' Second Motion for Preliminary Injunction [#77] below.

### B. Likelihood of Success on the Merits

**[5]** The court turns to Plaintiffs' likelihood of success on the merits, which "is the main bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). The Plaintiffs raise several claims, but the court finds it unnecessary to proceed beyond the statutory arguments.

### 1. The Statutory and Regulatory Scheme Applicable to "Applicants for Admission"

The Immigration and Nationality Act ("INA"), as amended, lays out the main statutory scheme for our nation's immigration laws. See 8 U.S.C. § 1101 *et seq.* Section 235 of

the INA, codified at 8 U.S.C. § 1225, addresses the processing of certain noncitizens considered "applicants for admission." An "applicant for admission" is an "alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." 8 U.S.C. § 1225(a)(1). "The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." Id. § 1101(13)(C). The term "arriving alien" refers "to an individual who (1) attempted entry at a port of entry but was not admitted, (2) was interdicted at sea, or (3) was paroled into the United States. 8 C.F.R. § 1.2.

8 U.S.C. § 1225(b) is entitled "Inspection of applicants for admission." Its first paragraph, § 1225(b)(1), is entitled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and provides in relevant part:

**\*105 (A) Screening**

**(i) In general**

If an immigration officer determines that an alien ... who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) [ 13 ] or 1182(a)(7) [ 14 ] of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien ... who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, [ 15 ] the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

**(iii) Application to certain other aliens**

**(I) In general**

The Attorney General [ 16 ] may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**

An alien described in this clause is an alien who ... has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

**(B) Asylum Interviews**

**(i) Conduct by asylum officers**

An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

***106 (ii) Referral of certain aliens**

If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), [ 17 ] the alien shall be detained for further consideration of the application for asylum.

**(iii) Removal without further review if no credible fear of persecution**

**(I) In general**

Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

...

**(v) "Credible fear of persecution" defined**

For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's

claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

...

**(E) "Asylum officer" defined**

As used in this paragraph, the term "asylum officer" means an immigration officer who--

(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title, and

(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

...

8 U.S.C. § 1225(b)(1).

13   8 U.S.C. § 1182(a)(6)(C) makes inadmissible an alien who by fraud misrepresents a material fact to obtain admission into the United States.

14   8 U.S.C. § 1182(a)(7) makes inadmissible an alien not in possession of a valid visa, reentry permit, or other valid entry document.

15   Under 8 U.S.C. § 1158(b)(1)(B)(i), asylum applicants must establish that they are "refugees" within the meaning of 8 U.S.C. § 1101(a)(42)(A) by establishing "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant[s]." This definition draws upon the 1967 Protocol Relating to the Status of Refugees, to which the United States is a party, and which incorporates Article 33 of the 1951 Convention Relating to the Status of Refugees, which states that: "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

16   Although the statute allocates this authority to the Attorney General, Congress has transferred this

authority to the Secretary of Homeland Security. See 6 U.S.C. §§ 251, 552(d); Clark v. Suarez Martinez, 543 U.S. 371, 374 n.1, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). The court reads the text of the statute accordingly.

17     Under the implementing regulations at 8 C.F.R. § 208.30(d), "[t]he purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." The inclusion of "torture" keeps the United States in line with its duty under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), to which it is a party, and which provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." See Matter of G-A-, 23 I. & N. Dec. 366, 367 (BIA 2002) ("Article 3 of the Convention Against Torture prohibits refoulement of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official"). The regulations provide that "an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17." 8 C.F.R. § 208.30(e)(3).

Subsection (b)'s second paragraph, "Inspection of other aliens," in turn, provides in relevant part:

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien--

  **\*107** **(i)** who is a crewman,

  **(ii)** to whom paragraph (1) applies, or

  **(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2). [18]

18     The third paragraph, entitled "Challenge of Decision," see 8 U.S.C. § 1225(b)(3), is not relevant here.

2. Whether the New Returned Plaintiffs Were "Arriving" When They Were Apprehended

Plaintiffs argue that, under the MPP, the contiguous return provision found at 8 U.S.C. § 1225(b)(2)(C) was improperly applied to Ms. Reyes, Ms. Abarca, Mr. López, A.L., T.L., D.L., and Ms. Zuniga as they are "similarly situated" to the Returned Plaintiffs who were the subject of the first motion for a preliminary injunction. Mem. in Supp. of Sec. PI 14 [#78]; see also Mem. & Order [#45]. Defendants do not dispute that the New Returned Plaintiffs were apprehended after they crossed the border but contend that the New Returned Plaintiffs were nonetheless "arriving" as the term is used in § 1225. Opp'n to Sec. PI 4-6 [#88]. [19]

19     Plaintiffs' Immigration Charging Documents [#79-7] do not indicate whether the Plaintiffs are "arriving alien[s]," "alien[s] present in the United States who has not been admitted or paroled," or "admitted to the United States, but [ ] removable for reasons stated below." Id. 2, 4, 6, 8, 10, 12, 14, 17.

In its Memorandum and Order [#45] granting Plaintiffs' Motion for Preliminary Injunction [#27], the court explained that the statutory provisions reflected a longstanding distinction in our immigration law between noncitizens who have entered the United States, even if unlawfully, and those who remain at the threshold. Mem. & Order 14-18 [#45], (citing Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("The distinction between

an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (distinguishing between "aliens who have once passed through our gates, even illegally" and "an alien on the threshold of initial entry")).

In DHS v. Thuraissigiam, the Supreme Court affirmed this longstanding distinction, but explained that an alien who had crossed into the United States and was apprehended 25 yards from the border was still on the threshold and had not yet entered the United States. ── U.S. ──, 140 S. Ct. 1959, 1965, 1982-83, 207 L.Ed.2d 427 (2020). The Court determined that this minimal border-crossing did not amount to "effect[ing] an entry." Id. at 1982 (citing Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491). Accordingly, aliens like Thuraissigiam, who are apprehended shortly after crossing, may be treated "as if stopped at the border." Id. (citing Mezei, 345 U.S. at 215, 73 S.Ct. 625). At the same time, although some passage of time or distance may thus be needed to effect a border crossing, Thuraissigiam does not undermine the overall distinction in immigration law between noncitizens who have entered the interior of the United States, even if unlawfully, and those who remain at or near the threshold.

**\*108** The Defendants also argue that a recent Board of Immigration Appeals ("the Board") decision reinforces that the government's action was reasonable and lawful." Opp'n to Sec. PI 9 [#88] (citing Matter of M-D-C-V-, 28 I. & N. Dec. 18 (BIA 2020)). In Matter of M-D-C-V-, the Board upheld the application of the MPP to a particular alien deciding "only ... whether the respondent, who was apprehended just inside the border ... was properly considered to be 'arriving.' " 28 I. & N. Dec. at 23. The applicant for admission in Matter of M-D-C-V- was served with Form I-261 which stated she was "an arriving alien." Id. at 19. The Board determined that CBP's initial determination that the migrant was "arriving" was correct. Id. at 23. Although the decision stands for the proposition that "just inside the border" is still arriving, it does not undermine the notion that the statutory scheme distinguishes between those who are arriving, and those, a bit further away from the border, who are no longer arriving, and have entered the United States, albeit unlawfully.

**[6]** The New Returned Plaintiffs may well be able to establish that they had entered the United States before they were apprehended. Notably, CBP left the immigration documents blank and did not mark the New

Returned Plaintiffs as "arriving." See Immigration Charging Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7]. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207); Dugan v. Ramsay, 727 F.2d 192, 196 (1st Cir. 1984) (same); cf. Natural Resources Defense Council, Inc. v. U.S. E.P.A., 824 F.2d 1258, 1286 n.19 (1st Cir. 1987) ("Reviewing courts will not rely on appellate counsel's post hoc rationalizations in lieu of adequate findings or explanations from the agency itself."). Nonetheless, the record is not clear, and accordingly, the court turns to the next statutory argument.

### 3. Whether the New Returned Plaintiffs Are Applicants for Admission as Specified in 8 U.S.C. § 1225(b)(1) to Whom 8 U.S.C. § 1225(b)(2) Does Not Apply

**[7]** Plaintiffs contend that the New Returned Plaintiffs are not noncitizens "described in subparagraph (A)," that is, § 1225(b)(2)(A), to whom the contiguous return authority may be applied, see 8 U.S.C. § 1225(b)(2)(C), but, rather, are explicitly excluded from the group of "other aliens" described in § 1225(b)(2)(A) because they are applicants "to whom paragraph (1) applies." Mem. in Supp. of Sec. PI 15-17 [#78] (citing 8 U.S.C. § 1225(b)(2)(B)(ii)). Defendants argue that "Section 1225 does not set up immutable, fixed categories of aliens" and that, instead, DHS has "inherent prosecutorial discretion" to choose "whether to apply § 1225(b)(1)'s expedited removal procedure to a particular 'applicant for admission,' or whether instead ... to afford him or her a full removal proceeding under § 1225(b)(2)(A)." Opp'n to Sec. PI 16 [#88]. It remains Defendants' view that DHS's discretion to put applicants for admission in "full removal proceedings under § 1555(b)(2)" allows DHS to apply the contiguous return provision to the New Returned Plaintiffs because they have the "salient identifying features" of § 1225(b)(2). Id. at 15-16.

Section 1225(b) differentiates between the "inspection" of applicants for admission described in (b)(1) and those described in (b)(2). See **\*109** Jennings v. Rodriguez, ── U.S. ──, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) ("applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)"). A section (b)(1) applicant is one who

is "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. Id. (citing § 1225(b)(1)(A)(i) and 8 U.S.C. §§ 1182(a)(6)(C) and 1182(a)(7)). When such applicants are "arriving in the United States," § 1225(b)(1), they are placed into what are known as "expedited removal" proceedings unless they express a fear of persecution or an intention to claim asylum, 8 U.S.C. §§ 1225(b)(1)(A)(i) and 1225(b)(1)(A)(ii), or the Secretary of Homeland Security exercises prosecutorial discretion and places them into "standard" removal proceedings under 8 U.S.C. § 1229a. See Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. 520, 523-24 (BIA 2011); see also Matter of M-S-, 27 I. & N. Dec. 509, 510 (BIA 2019); Innovation Law Lab, 951 F.3d at 1084. The Secretary of Homeland Security may also elect to process through "expedited removal" any (b)(1) noncitizens who are present in the United States without having been admitted or paroled and who cannot affirmatively demonstrate that they have been continuously present in the country for two years. 8 U.S.C. §§ 1225(b)(1)(A)(i) and (iii).

A section (b)(2) applicant is, as the statute puts it, an "other alien [ ]." 8 U.S.C. § 1225(b)(2). Section (b)(2) "serves as a catchall provision" and "applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." Jennings, 138 S. Ct. at 837; see also 8 U.S.C. § 1225(b)(2)(B)(ii). "Other aliens" includes aliens present in the United States who have not been admitted or paroled and who are inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation, or who can demonstrate that they have been present in the United States for more than 2 years, and arriving aliens who are inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation. [20] 8 U.S.C. § 1225(b)(1)(A). Any section (b)(2) applicants who are "not clearly and beyond a doubt entitled to be admitted" are processed not through "expedited removal" proceedings, but through standard removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(2)(A).

[20]    Other grounds include having a significant communicable disease, 8 U.S.C. § 1182(a)(1)(A)(i), having been determined to be a drug addict, 8 U.S.C. § 1182(a)(1)(A)(iv), having been convicted of a felony involving moral turpitude or controlled substances, 8 U.S.C. § 1182(a)(2)(A)(i), having been convicted of crimes with aggregate sentences of confinement of 5 years or more, 8 U.S.C. § 1182(a)(2)(B), having engaged in human trafficking, 8 U.S.C. § 1182(b)(2)(H),

having engaged in money laundering, 8 U.S.C. § 1182(b)(2)(I), having engaged in terrorist activity, 8 U.S.C. § 1182(b)(3)(B), having participated in genocide, 8 U.S.C. § 1182(b)(3)(E), and so on.

Defendants argue that because none of the New Returned Plaintiffs were placed in expedited removal proceedings, § 1225(b)(1) does not apply to them. Opp'n to Sec. PI 16 [#88]. In other words, because the government placed the New Returned Plaintiffs in § 1229a removal proceedings, they are subject to contiguous return under § 1225(b)(2)(C) regardless of the text of § 1225(b)(2)(b)(ii). Id. Defendants misstate the issue; Section (b)(1) applicants are not defined by the proceedings to which they are ultimately subject to, but rather, by their status as noncitizens arriving or present in the United States for less than two years whom "an immigration officer determines ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)." See Jennings, 138 S. Ct. at 837 ("Section 1225(b)(1) applies to aliens initially determined **110 to be inadmissible due to fraud, misrepresentation, or lack of valid documentation"). The Defendants provide no statutory language authorizing the government to re-categorize an applicant for admission between (b)(1) and (b)(2) and the court to decline to read in such an authorization. DHS has the authority to, by an exercise of discretion, place arriving aliens who are not authorized to be in expedited or full removal proceedings, § 1225(b)(1)(A)(iii), but (b)(1) and (b)(2) are different groups. The New Returned Plaintiffs, who were determined to be inadmissible under 8 U.S.C. § 1182(a)(7) because they lacked valid entry documents, are § (b)(1) applicants. [21] See Mem. in Supp. of Sec. PI 16 [#78].

[21]    The New Returned Plaintiffs are (b)(1) applicants whether they are considered to have been "arriving" or "present" for less than two years without having been admitted or paroled at the time of their apprehension. See 8 U.S.C. § 1225(b)(1)(A)(i) (including a noncitizen who is "arriving in the United States or is described in clause (iii)"); 8 U.S.C. § 1225(b)(1)(A)(iii)(II) ("An alien described in this clause is an alien ... who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph").

Moreover, while the DHS does, indeed, have the discretion to place § (b)(1) applicants into standard § 1229a removal proceedings, see Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. at 523-24; see also Matter of M-S-, 27 I. & N. Dec. at 510; Innovation, 951 F.3d at 1084, it does not do so "under" or "pursuant to" § 1225(b)(2). In Matter of E-R-M- and L-R-M-, the Board held only that the DHS has the discretion to place § (b)(1) noncitizens into standard § 1229a removal proceedings, not that such placement is pursuant to § 1225(b)(2). The Board interprets the § 1225(b)(2)(B) "exception" to the group of noncitizens to whom § 1225(b)(2)(A) applies to mean that the "three classes of aliens" excepted, "including those subject to expedited removal under section [1225](b)(1)(A)(i), are not *entitled* to a section [1229a] proceeding, *not* that these classes of aliens may not be placed in such proceedings," and that "aliens like the respondents who are subject to section [1225](b)(1)(A)(i) ... may nevertheless be placed in section [1229a] proceedings at the election of the DHS." Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. at 523-24 (emphasis in original). As the 9th Circuit affirmed, "the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a." Innovation, 951 F.3d at 1084.

Because the New Returned Plaintiffs are applicants for admission described in § (b)(1), they are not subject to the contiguous return provision at 8 U.S.C. § 1225(b)(2)(C), which applies only to applicants for admission described in § (b)(2)(A).[22] They are, thus, likely to succeed on the merits of their claim that their inclusion in the MPP is in violation of the INA for this reason.[23]

[22] Put another way, because the New Returned Plaintiffs are applicants "to whom paragraph (1) applies" such that "[s]ubparagraph (A) shall not apply" to them, see 8 U.S.C. § 1225(b)(2)(B)(ii), the provision addressing the return to a contiguous territory of "an alien described in subparagraph (A)" does not apply to them. See 8 U.S.C. § 1225(b)(2)(C).

[23] Plaintiffs also argue that extant regulations limit the contiguous return authority to (b)(2) noncitizens arriving at ports-of-entry, Mem. in Supp. of Sec. PI 17-19 [#79], that implementing the MPP without notice-and-comment rulemaking violated the Administrative Procedure Act, Id. at 20-21, that

the MPP is arbitrary and capricious in violation of the Administrative Procedure Act, Id. at 21-24, that the MPP is motivated by animus in violation of the Constitution's equal protection guarantee, Id. at 25-26, and that requiring the New Returned Plaintiffs to remain in Mexico for the pendency of their removal proceedings violates the duty of non-refoulement. Id. at 26-28. The court does not reach these arguments. Whether implementing the MPP without notice-and-comment rulemaking violated the Administrative Procedure Act and whether requiring migrants to remain in Mexico for the pendency of their removal proceedings violates the duty of non-refoulement is before the Supreme Court in Innovation Law Lab, 141 S.Ct. 617 and the court declines to address this issue here.

**\*111** C. Irreparable Harm, Equities, and the Public Interest

[8] [9] Having found that Plaintiffs are likely to succeed on the merits, the court turns to the three other factors relevant to the issuance of a preliminary injunction. See Winter, 555 U.S. at 20, 129 S.Ct. 365.

First, the New Returned Plaintiffs are likely to suffer irreparable harm if Defendants are not enjoined from maintaining their "return" to Mexico under the MPP. Ms. Reyes, Ms. Abarca, and Ms. Zuniga have all submitted sworn declarations attesting to the ongoing hardships and extreme dangers they face, and, in the case of Ms. Abarca, her three young children face, as they struggle to survive in Matamoros and Nuevo Laredo, Tamaulipas, Mexico. See Reyes Dec. [#79-2]; Abarca Dec. [#79-4]; Zuniga Dec. [#79-6]. While she waits for her removal proceedings to progress, Ms. Reyes is in a state of constant fear due to the violence in and around the camp, feels unsafe using the bathrooms at night, and lacks adequate heat and sufficient food. Reyes Dec. at ¶¶ 25-27 [#79-2]. Ms. Abarca reports that she and her young daughters never leave the house because they fear they are in danger outside. Abarca Dec. ¶¶ 22, 29, 30. [#79-4]. Her daughters are getting thinner and she is worried about their health. Id. at ¶ 29. Also, the home that Ms. Abarca and her family have been living in is being sold on February 20, 2021 and they do not know whether they will have a place to live after that date. Letter re Preliminary Injunction n.1 [#94]. Temperatures in Matamoros, where Ms. Reyes and the Abarca family are, are forecasted to drop to a low of 26 degrees on February 16, 2021. Id. This is colder than the lowest recorded temperature in Matamoros

since the beginning of the MPP. Id. (citing Past Weather in Matamoros, Tamaulipas, Mexico, timeanddate.com/weather/Mexico/matamoros/historic). In Nuevo Laredo, Ms. Zuniga is living in a shelter where she fears she will be kidnapped by cartel members because she has seen such kidnappings happen and fears that if she stays in Mexico, her "children will no longer have their mother." Zuniga Dec. ¶¶ 43, 50 [#79-6]. Their personal accounts are unrebutted [24] and are supported by affidavits from employees of two nongovernmental organizations [25] and the U.S. State Department's **112 assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping." See "State Dep't Advisory." U.S. government employees are prohibited from being outside in Matamoros and Nuevo Laredo between midnight and 6 a.m. Id. Furthermore, since March 2020, MPP proceedings have been indefinitely postponed due to the COVID-19 pandemic and New Returned Plaintiffs are unlikely to proceed with their immigration proceedings. See, e.g., Supplemental Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First 2-3 [#79-11A]; Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico 2-3 [#79-12A].

[24] Defendants note that Plaintiffs were "not found to be more likely that not to face persecution on account of a protected ground or tortured if returned to Mexico." Opp'n to Sec. PI 27 [#88]; see also Assessment Notice [#79-9] (provided to Ms. Reyes after her November 9, 2020 "nonrefoulement interview," on which a box is marked next to the statement "You did not establish a clear probability of persecution or torture in Mexico"). The court can accord the interviewer's determination little weight here where Defendants have not stated what information was considered by the interviewer in reaching those conclusions and have offered no written or other record of the interview for the court to review.

[25] The observations about the vulnerability of migrants like the New Returned Plaintiffs in Tamaulipas, and in Matamoros and Nuevo Laredo in particular, contained in the Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico [#79-12A] and the Supplemental Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First [#79-11] corroborate the

New Returned Plaintiffs' accounts of their own experiences. For example, Mr. Kizuka describes the "escalating dangers and unconscionable conditions" in the migrant encampment in Matamoros and Nuevo Laredo which have "grown even more dire" than in reported in his previous Declaration. Kizuka Supp. Dec. 4-6 [#79-11A]; see also Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First ("First Kizuka Dec") [#79-11B]. Mr. Martin reports that in Matamoros, the "population of the camp has endured constant fear from organized crime" and that Doctors Without Borders has "recorded 13 victims of sexual violence" and that the "vulnerability of asylum seekers and migrants has not changed" since the date of his first declaration. Martin Supp. Dec. ¶¶ 1, 8 [#79-12A]; see also Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico ("First Martin Dec.") ¶ 43 [#79-12B] (Staff has received direct reports of numerous violent incidents involving migrants and asylum seekers. These include cases of sexual violence, robbery, verbal harassment of migrants by the local community, attempted kidnapping, disappearance and murder of migrants after leaving the camp, and violent aggression with weapons. [They] have also witnessed cartel watchmen observing migrants."). Defendants have filed nothing that contradicts these accounts.

Defendants contend that Plaintiffs' "delay in seeking relief severely undermines their claims of irreparable harm." Opp'n to Sec. PI 30 [#88]. The court finds no such delay. [26]

[26] New Returned Plaintiffs filed joined the Amended Complaint [#73] on December 22, 2020 and the Second Motion for Preliminary Injunction was filed on December 25, 2020. The court finds no evidence of delay between Plaintiffs' filing of their Amended Complaint [#73] and their Motion for Preliminary Injunction [#77].

The court notes recent news reports describing DHS's plan to begin a new asylum process to allow about 300 asylum seekers a day into the United States. Alana Wise, Biden Team Unveils New Asylum System to Replace Trump's 'Remain in Mexico', Nat'l Pub. Radio (February 12, 2021), https://www.npr.org/2021/02/12/967201293/biden-team-unveils-new-asylum-system-to-replace-trumps-

remain-in-mexico. While this development may result in the New Returned Plaintiffs' admission into the United States, it is unclear when that may occur. The New Returned Plaintiffs have demonstrated that they face daily peril such that there is a high likelihood they will suffer irreparable harm should the preliminary injunction not issue.

The court further finds that the balance of equities tips in favor of granting Plaintiffs' request for a preliminary injunction and that such a grant is in the public interest. Moving the New Returned Plaintiffs out of the constant danger they face outweighs the government's or the public's interest in the keeping these seven noncitizens in Mexico, in light of the likelihood of success of Plaintiffs' claim that the MPP is inconsistent with 8 U.S.C. § 1225 as it applies to the New Returned Plaintiffs.

**\*113** VI. Conclusion

Accordingly, Plaintiffs' Second Motion for Preliminary Injunction [#77] is GRANTED in part. The Department of Homeland Security shall promptly rescind the orders returning Ms. Reyes, Ms. Abarca, Mr. López, A.L., T.L., D.L., and Ms. Zuniga to Mexico and shall permit their re-entry into the United States for the pendency of their immigration removal proceedings. The court leaves to the Department in the first instance the determination whether parole or detention is appropriate once the New Returned Plaintiffs are inside the United States and expresses no opinion as to the authority under which the New Returned Plaintiffs might be detained. The court does not reach Plaintiffs' other arguments or alternative request that the New Returned Plaintiffs be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." Mem. in Supp. of Sec. PI 36 [#78].[27]

[27]   The court notes, however, that a cursory review highlights why MPP's "nonrefoulement interviews" described above may be inadequate and in any event, differ substantially from the "reasonable fear" interview process set forth under the regulations, where noncitizens subject to the "reinstatement" of a previous removal order or "administrative removal" as the result of certain criminal convictions, see 8 C.F.R. § 208.31(a), are evaluated to determine whether they should be referred to an immigration judge "for full consideration of the request for withholding of

removal [under section 241 of the Immigration and Nationality Act or the Convention Against Torture] only." 8 C.F.R. § 208.31(e). First, to be referred to an immigration judge, a noncitizen must establish only a "reasonable possibility" of persecution or torture, see 8 C.F.R. § 208.31(c), while MPP's interviews require a "more likely than not" showing. USCIS Guidance for Implementing MPP 4 [#36-3]. Under the "reasonable fear" procedures, noncitizens "may be represented by counsel ... and the alien's representative may present a statement at the end of the interview," 8 C.F.R. § 208.31(c), while DHS "is currently unable to provide access to counsel" during primary or secondary inspection under MPP "given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." USCIS Guidance for Implementing MPP 4 [#36-3]. The "reasonable fear" regulations require that a record of the interview be created and reviewed with the noncitizen. 8 C.F.R. § 208.31(c) ("The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture."). No record is required for the MPP interviews. Under the "reasonable fear" procedure, asylum officers' negative fear determinations are reviewable by immigration judges, 8 C.F.R. § 208.31(g), while the assessment under MPP "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." USCIS Guidance for Implementing MPP 5 [#36-3].

IT IS SO ORDERED.

**All Citations**

520 F.Supp.3d 94

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Remanded by  Doe v. Mayorkas,  9th Cir.(Cal.),  July 19, 2021

432 F.Supp.3d 1200
United States District Court, S.D. California.

Cristian DOE, Diana Doe, Petitioners-Plaintiffs,

v.

Chad F. WOLF, Acting Secretary of Homeland
Security; et al., Respondents-Defendants.

Case No.: 19-cv-2119-DMS (AGS)
|
Signed January 14, 2020

**Synopsis**

**Background:** Asylum seekers who entered from Mexico and
who expressed a fear of persecution if returned to Mexico
brought putative class action challenging government's
refusal, in alleged violation of the Administrative Procedure
Act (APA), to allow asylum seekers access to their retained
counsel prior to and during their non-refoulement interviews.
After a class was certified, asylum seekers moved for
classwide preliminary injunction.

**Holdings:** The District Court, Dana M. Sabraw, J., held that:

[1] the Court had jurisdiction;

[2] asylum seekers were likely to succeed on merits;

[3] asylum seekers demonstrated the likelihood of irreparable
harm;

[4] balance of equities weighed in favor of granting
preliminary injunction;

[5] public interest favored granting preliminary injunction;
and

[6] asylum seekers would be entitled to in-person access, as
opposed to telephonic access, to retained counsel.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (15)

**[1]** **Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and venue

District court had jurisdiction over class action
challenging government's refusal, in alleged
violation of the Administrative Procedure Act
(APA), to allow asylum seekers access to their
retained counsel prior to and during their non-
refoulement interviews; despite argument that
the Immigration and Nationality Act (INA)
prohibited judicial review of a decision or action
that was in the discretion of the Attorney General
or the Secretary of Homeland Security, asylum
seekers who had initiated the class action, who
were asylum seekers who had entered from
Mexico and who expressed a fear of persecution
if returned to Mexico, were challenging an
issue that was collateral to the outcome of
the non-refoulement interviews. 5 U.S.C.A. §
555(b); Immigration and Nationality Act § 242,
8 U.S.C.A. § 1252(a)(2)(B)(ii).

**[2]** **Injunction** 🔑 Extraordinary or unusual nature
of remedy

**Injunction** 🔑 Grounds in general; multiple
factors

**Injunction** 🔑 Clear showing or proof

Injunctive relief is an extraordinary remedy that
may only be awarded upon a clear showing that
the petitioner is entitled to such relief, and to
meet that showing, petitioners must demonstrate
that they are likely to suffer irreparable harm
in the absence of preliminary relief, that the
balance of equities tips in their favor, and that an
injunction is in the public interest.

**[3]** **Injunction** 🔑 Likelihood of success on merits

Likely success on the merits is the most
important factor among those considered when
determining whether preliminary injunctive
relief is warranted.

**[4]**    **Injunction** 🔑 Likelihood of success on merits

**Injunction** 🔑 Standard of proof in general

While petitioners seeking injunctive relief carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek.

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Asylum seekers who entered from Mexico and who expressed a fear of persecution if returned to Mexico were likely to succeed on merits in their class action challenging government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow asylum seekers access to retained counsel prior to and during non-refoulement interviews, as was relevant to whether injunctive relief was warranted; Immigration and Nationality Act (INA) did not foreclose asylum seekers the right to access retained counsel prior to and during such interviews, APA provided that persons compelled to appear in person before an agency were entitled to be accompanied, represented, and advised by counsel, and asylum seekers were compelled, for purposes of the APA, to attend non-refoulement interviews. 5 U.S.C.A. §§ 555(b), 559; Immigration and Nationality Act §§ 235, 240, 8 U.S.C.A. §§ 1225, 1229a.

1 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Asylum seekers who entered from Mexico and who expressed a fear of persecution if returned to Mexico were "compelled," for purposes of the Administrative Procedure Act (APA), to attend non-refoulement interviews, as was relevant to determining their likelihood to succeed on the merits, and thus whether injunctive relief was warranted, in their class action challenging government's refusal, in alleged violation of the APA, to allow asylum seekers

access to retained counsel prior to and during non-refoulement interviews; prior to the non-refoulement interviews, asylum seekers were detained in custody of Customs and Border Protection (CBP), and although asylum seekers had to articulate a fear of return to Mexico before interviews commenced, they were not electing to appear at the interviews. 5 U.S.C.A. § 555(b).

1 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Asylum seekers challenging government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow them access to their retained counsel prior to and during their non-refoulement interviews demonstrated the likelihood of irreparable harm, as was relevant to determining if a preliminary injunction was warranted in their class action; asylum seekers' first non-refoulement interview, in which counsel was not present, resulted in a negative assessment of fear, asylum seekers' second interview, in which counsel was present, resulted in a positive assessment of fear, and presence of counsel at a second interview for one of the seekers in question was clearly helpful to that seeker in presenting his fear of return to Mexico. 5 U.S.C.A. § 555(b).

**[8]**    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Petitioners seeking injunctive relief arising out of the denial of counsel at a refoulement hearing in asylum proceedings premised on fear of torture in the home country need not further show that the action sought to be enjoined is the exclusive cause of the injury; it is enough to find that injunctive relief will prevent additional suffering, persecution, and torture.

**[9]**    **Injunction** 🔑 Equitable considerations in general

To obtain a preliminary injunction, a plaintiff must demonstrate that the balance of equities tips in his favor.

**[10]**　**Aliens, Immigration, and Citizenship**　⬦　Injunction

Balance of equities weighed in favor of granting preliminary injunction as requested by asylum seekers challenging, in a class action, government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow them access to their retained counsel prior to and during their non-refoulement interviews; although government would be required to comply with additional procedural requirements prior to and during non-refoulement interviews, those procedural requirements were required by federal law, specifically the APA, and if injunctive relief were not granted, asylum seekers faced possibility of being forced to return to Mexico to suffer persecution, torture, and potentially death. 5 U.S.C.A. § 555(b).

**[11]**　**Injunction**　⬦　Public interest considerations

Under the public-interest factor considered when determining whether injunctive relief is warranted, petitioners must demonstrate that the public interest favors granting the injunction in light of its likely consequences, i.e., consequences that are not too remote, insubstantial, or speculative and are supported by evidence.

**[12]**　**Aliens, Immigration, and Citizenship**　⬦　Injunction

Public interest favored granting preliminary injunction as requested by asylum seekers challenging, in a class action, government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow them access to their retained counsel prior to and during their non-refoulement interviews; federal law, specifically the APA, required asylum seekers to have access to retained counsel prior to and during non-refoulement interviews,

and government failed to demonstrate how complying with that legal requirement would impede the efficient administration of immigration laws at the border. 5 U.S.C.A. § 555(b).

**[13]**　**Federal Civil Procedure**　⬦　Amendments by briefs or motion papers

The complaint may not be amended by the briefs.

3 Cases that cite this headnote

**[14]**　**Aliens, Immigration, and Citizenship**　⬦　Injunction

Asylum seekers seeking preliminary injunction in their class action challenging government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow them access to retained counsel prior to and during non-refoulement interviews adequately raised in their complaint the issue of in-person, as opposed to telephonic, access to counsel, where asylum seekers alleged that Customs and Border Protection (CBP) had a policy and practice of denying requests for in-person visits or confidential telephonic communication with counsel at its holding facilities, and asylum seekers' prayer for relief included a request that the court enjoin government from preventing confidential legal visits. 5 U.S.C.A. § 555(b).

**[15]**　**Aliens, Immigration, and Citizenship**　⬦　Assistance of counsel

**Aliens, Immigration, and Citizenship**　⬦　Injunction

Asylum seekers, as a result of granting of their motion for a preliminary injunction in their class action challenging government's refusal, in alleged violation of the Administrative Procedure Act (APA), to allow them access to retained counsel prior to and during non-refoulement interviews, would be entitled to in-person access, as opposed to telephonic access, to retained counsel prior to their non-refoulement interviews; APA provided that a person compelled to appear in person before

an agency was entitled to be accompanied, represented, and advised by counsel, asylum seekers were compelled, for APA purposes, to attend the interviews, and APA's provision in question suggested that it envisioned the right to in-person access to counsel. 5 U.S.C.A. § 555(b).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1203** Monika Yvette Langarica, Bardis Vakili, John David Loy, ACLU Foundation of San Diego & Imperial Counties, Jonathan Paul Markovitz, San Diego, CA, for Petitioners-Plaintiffs.

U.S. Attorney CV, Rebecca Grace Church, United States Attorney's Office, San Diego, CA, Archith Ramkumar, Department of Justice Office of Immigration L, Washington, DC, for Respondents-Defendants.

**ORDER GRANTING MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

Hon. Dana M. Sabraw, United States District Judge

On November 5, 2019, Petitioners filed a motion for class certification and a motion **\*1204** for temporary restraining order ("TRO") to allow Petitioners access to their retained counsel prior to and during Petitioners' non-*refoulement* interviews under the Government's Migrant Protection Protocols Program ("MPP" or "Remain in Mexico"). Pursuant to the MPP, asylum seekers arriving at the United States Border by land from Mexico are returned to Mexico to await the outcome of their immigration proceedings. Bound by the duty of non-*refoulement*, however, Respondents may not return an asylum seeker to Mexico if the individual can show he or she faces persecution or torture in Mexico. Instead, the asylum seeker is taken out of the MPP and paroled or detained in the United States to await their removal proceedings.

On November 12, 2019, the Court granted Petitioners' motion for TRO and ordered Respondents to allow Petitioners access to their retained counsel prior to and during their non-*refoulement* interviews. *Doe v. McAleenan*, 415 F. Supp. 3d 971, 979-80 (S.D. Cal. 2019). Petitioner Cristian Doe

was interviewed two days later by an U.S. Citizenship and Immigration Services ("USCIS") Asylum Officer. Three attorneys for Doe were present telephonically. The Asylum Officer found it is more likely than not that Petitioners will be persecuted or tortured if they are returned to Mexico. Consequently, the Doe family was taken out of the MPP and released from Customs and Border Patrol ("CBP") custody. They are still awaiting the remainder of their immigration case.

The Court has certified a class action to include similarly situated asylum seekers. Petitioners now request classwide injunctive relief to allow for access to retained counsel prior to and during their non-*refoulement* interviews. The matter has been fully briefed and argued. For the reasons set forth below, the Court reaffirms its conclusion that Petitioners have met their burden and that the Administrative Procedures Act ("APA"), specifically 5 U.S.C. § 555(b), provides a right to retained counsel in these circumstances.

**I.**

**BACKGROUND**

Petitioners' and Respondents' declarations provide the following background facts. Petitioners are the parents of a family of five children that fled their home country of Guatemala after suffering extortion, death threats, and rape. (Mot. for TRO, Declaration of Cristian Doe ("Cristian Doe Decl."), at ¶¶ 2, 4). Like many families, Petitioners traveled through Mexico to seek asylum in the United States. (*Id.* at ¶ 7). While in Mexico, Petitioners and their children were threatened at gun point, assaulted, robbed, and stripped of their clothing. (Mot. for TRO at 14). Their attackers, masked men clothed in what appeared to be Mexican government uniforms, threatened to kill Petitioners if they reported the incident. (*Id.*). Petitioners and their children were left terrified. (*Id.*). Upon reaching the United States, Petitioners immediately requested asylum. (*Id.*).

Prior to the MPP, asylum seekers arriving at the Southern border were usually placed in expedited removal proceedings. 8 U.S.C. § 1225(b)(1). If they expressed a fear of persecution or torture upon removal to their country of origin, the asylum seekers were given a credible fear interview ("CFI") to determine whether there was a significant possibility they would establish eligibility for asylum. 8 U.S.C. § 1225(b)(1)(A)(i). Before such interviews, asylum seekers had a right to

consult with counsel. 8 C.F.R. §§ 208.30(d), 208.31(c). If the asylum seekers passed their CFIs, they were placed in full removal proceedings before an Immigration Judge ("IJ") to present their asylum claims. 8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(B)(ii); **\*1205** 8 C.F.R. §§ 208.30, 235.3. While awaiting their removal proceedings, the asylum seekers were often paroled into the United States.

The process changed in January of 2019 when the Department of Homeland Security ("DHS") instituted the MPP: "an unprecedented action" meant to "address the urgent humanitarian and security crisis at the Southern border." (Resp. in Opp'n to TRO, Ex. 2 at 4). Pursuant to the MPP, "individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." (*Id.*, Ex. 1 at 1). Asylum seekers within the MPP are given "Notice[s] to Appear" for their immigration court hearings and await such hearings in Mexico. (*Id.* at 2). In effect, the MPP replaces expedited removal proceedings and CFIs for certain asylum seekers. (*Id.*, Ex. 2 at 7). The MPP is authorized by the Immigration and Nationality Act ("INA"), which provides that asylum seekers "arriving on land ... from a foreign territory contiguous to the United States" may be returned "to that territory pending [their immigration] proceeding[s.]" 8 U.S.C. § 1225(b)(2)(C).

In implementing the MPP, DHS officials must act consistent with the principle of non-*refoulement*. (Resp. in Opp'n to TRO, Ex. 3 at 11). This principle, contained in both Article 33 of the 1951 Convention Relating to the Status of Refugees [1] and Article 3 of the Convention Against Torture, [2] prohibits the return of an individual to a country in which he or she would more likely than not be persecuted or tortured. (*Id.* at 10–11). As applied to the MPP, asylum seekers must first express a fear of returning to Mexico, and those that do are then detained by CBP pending a non-*refoulement* interview with USCIS Asylum Officers. (*Id.* at 11 n.4). During this interview, the Asylum Officer "elicit[s] all relevant and useful information" regarding the likelihood the asylum seeker will face persecution and torture upon his or her return to Mexico. (*Id.*, Ex. 4 at 15). The interview "can last up to several hours, during which time the [asylum seeker] is often handcuffed." (Mot. for TRO at 16; Cristian Doe Decl. at ¶¶ 25–26). If the asylum seeker passes the non-*refoulement* interview, he or she is removed from the MPP and is either released on parole or detained in the United States pending removal proceedings. (Mot. for TRO at 17). If the asylum

seeker does not pass, he or she must await the outcome of their removal proceedings in Mexico. (*Id.*).

[1]     July 28, 1951, 189 U.N.T.S. 150.

[2]     Dec. 10, 1984, 1465 U.N.T.S. 85.

Pursuant to DHS policy, asylum seekers cannot communicate with retained counsel prior to or during non-*refoulement* interviews. [3]   In practice, asylum seekers are given sporadic access to counsel—prior to their interviews, asylum seekers may have monitored calls with their attorneys if the phones are working, and during their interviews, asylum seekers are "sometimes" given access to counsel "on an ad hoc basis." (*Id.* at 18; Resp. in Opp'n to Prelim. Inj., Declaration of Ashley B. Caudill-Mirillo ("Caudill-Mirillo Decl."), at ¶ 3). DHS maintains, however, that providing asylum seekers with access to retained counsel is  **\*1206** not required by law. (Resp. in Opp'n to Prelim. Inj. at 18–19).

[3]     USCIS states in its *Policy Memorandum* concerning the implementation of the MPP, "[P]rovided the [non-*refoulement* interviews] are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the [interviews] given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for orderly and efficient processing of individuals." (Resp. in Opp'n to TRO, Ex. 4 at 15). USCIS does not state in writing whether there is a right to access retained counsel if the interview occurs outside of primary or secondary inspection.

In accordance with the MPP, Petitioners and their children were returned to Mexico to await their immigration proceedings. (Mot. for TRO at 14). At their first immigration court hearing, Petitioners articulated a fear of return to Mexico and were given separate non-*refoulement* interviews. They did not have counsel present. (Caudill-Mirillo Decl. at ¶ 5; Cristian Doe Decl. at ¶ 26; Rep. in Supp. of Mot. for Prelim. Inj. at 9). Petitioners did not pass their interviews and were returned to Mexico. (Caudill-Mirillo Decl. at ¶ 5). Petitioners again articulated their fear of returning to Mexico at their third immigration court hearing, in which retained counsel was present. (Mot. for TRO at 19). The family was then detained by CBP to await a second non-*refoulement* interview. (*Id.*). Petitioners were not given confidential access to retained counsel. (*Id.*)

Petitioners filed suit the same day on which they expressed a fear of returning to Mexico in immigration court. Petitioners sought a temporary restraining order to enjoin Respondents from prohibiting access to retained counsel and moved for class certification. The Court granted Petitioners' motion for a temporary restraining order and thereafter certified the class. The Court now determines whether Petitioners are entitled to a classwide preliminary injunction that requires Respondents to provide asylum seekers access to retained counsel prior to and during non-*refoulement* interviews.

## II.

## DISCUSSION

 [1] Before addressing the merits of injunctive relief, the Court considers Respondents' jurisdictional arguments, including that the INA forecloses judicial review of Petitioners' claims and that the rule of non-inquiry bars judicial review of non-*refoulement* procedures. The INA prohibits judicial review of a "decision or action" that is "in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). Respondents assert this jurisdictional bar extends not only to decisions to return asylum seekers to Mexico pending removal proceedings—which this case does not concern—but also extends to "the procedures used to arrive at those decisions." (Resp. in Opp'n to Prelim. Inj. at 13). In support, Respondents cite *Gebhardt v. Nielsen*, in which the Ninth Circuit held it did not have jurisdiction to review the plaintiff's statutory claim attacking the USCIS's denial of his I-130 petition because of the INA's jurisdictional bar. *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018). In that case, the Ninth Circuit noted that it did not matter whether the plaintiff "characterize[d] his claims as challenges to the substantive standards that the Secretary [of DHS] use[d]" or as challenges to the Secretary's ultimate decision. *Id.* Either way, the Court lacked jurisdiction to review the claim because "[t]he standards by which the Secretary reaches a decision within his or her 'sole and unreviewable discretion'—and the methods by which the Secretary adopts those standards— are just as unreviewable as the Secretary's ultimate decisions themselves." *Id.* (citing *Ortiz v. Meissner*, 179 F.3d 718, 722 (9th Cir. 1999)). Respondents argue the same logic applies here: Petitioners' claims attack "the procedures used to arrive at the ultimate decisions to return [asylum seekers] to Mexico" and those procedures are not subject to judicial review. (Resp. in Opp'n to Prelim. Inj. at 14).

Respondents' argument distorts Petitioners' claim. Petitioners are not challenging Respondents' decisions to return asylum seekers to Mexico or the substantive standards used to determine whether an asylum seeker will face persecution or torture **\*1207** upon return to Mexico. Petitioners' claim is narrow in its attack on Respondents' policy prohibiting access to retained counsel prior to and during non-*refoulement* interviews—an issue that is collateral to the outcome of the interview, and therefore within the Court's jurisdiction. *See Gebhardt*, 879 F.3d at 987 ("[W]e can review a claim in this context only if it challenges a genuinely *collateral* action") (emphasis in original); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) ("[Section] 1252(a)(2)(B)(ii) restricts jurisdiction *only* with respect to the executive's exercise of discretion."); *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 31 (D.D.C. 2019) ("[S]ection 1252(a)(2)(B)(ii) relates to judicial review of 'denials of discretionary relief[,]' ... and nothing about Plaintiffs' claims challenges *relief* at all, much less discretionary relief or denials thereof.") (internal citations omitted). To hold otherwise, as Petitioners argue, would be to grant Respondents the unreviewable freedom to determine the results of non-*refoulement* interviews with a "Ouija board" or "prevent persons from speaking" or "bind and gag" asylum seekers during the interview. (Rep. in Supp. of Mot. for Prelim. Inj. at 3). The Court, therefore, has jurisdiction over Petitioners' claim.

As to Respondents' argument that the rule of non-inquiry bars judicial review of Petitioners' claim, the Court reaffirms its conclusion that the rule of non-inquiry does not apply because Petitioners are not challenging extradition or return decisions. (Order Granting TRO at 5–6 n.2). Petitioners seek to vindicate rights provided to them under federal law, specifically the APA, and do not seek relief under the Convention Against Torture or any extradition statute.

 [2] With these findings, the Court considers whether Petitioners are entitled to a classwide preliminary injunction. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). To meet that showing, Petitioners must demonstrate " '[they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.' " *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)

(quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365). Petitioners have met each factor.

### A. Likelihood of Success

**[3]** **[4]** "The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Petitioners carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

**[5]** As explained in the Order granting Petitioners' motion for TRO, Petitioners contend they are likely to succeed on the merits because 5 U.S.C. § 555(b) provides asylum seekers the right to access counsel of their choice prior to and during non-*refoulement* interviews. Petitioners argue that because the INA does not contain any statutory provision concerning access to retained counsel and non-*refoulement* interviews, the APA provision providing such access remains in effect. *See* 5 U.S.C. § 559 ("Subsequent statute may not be held to supersede or modify [the APA's protection of the right to access of retained counsel], except to the extent that it does so expressly."). Respondents argue **\*1208** § 555(b) of the APA does not apply in *any* immigration proceeding, the INA provides no right to access retained counsel prior to or during non-*refoulement* interviews, non-*refoulement* interviews occur during primary and secondary inspections, and finally, even if the INA did not supplant the APA here, § 555(b) does not apply. The Court addresses these arguments in turn.

In opposition to the preliminary injunction, Respondents revive their argument that two Supreme Court cases, *Ardestani v. Immigration and Naturalization Service* and *Marcello v. Bonds*, hold the INA displaces the APA in all "immigration proceedings"— immigration being broadly defined. *Ardestani v. INS*, 502 U.S. 129, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991); *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955). The Court reaffirms its previous decision: neither case stands for the proposition Respondents proffer. The Supreme Court held in *Marcello* that § 242(b) of the INA, the precursor to the modern removal proceeding statute, 8 U.S.C. § 1229a, supplants the APA as the "sole and exclusive procedure for deportation proceedings." *Marcello*, 349 U.S. at 310, 75 S.Ct. 757. Relying on its decision in *Marcello*, the Supreme Court

held in *Ardestani* that deportation proceedings are not within the scope of the Equal Access to Justice Act ("EAJA") because "deportation proceeding[s] [are] not subject to the APA." *Ardestani*, 502 U.S. at 134, 112 S.Ct. 515. Both cases emphasize the INA's "laborious adaptation of the [APA] to the deportation process" and the INA's language asserting that it "shall be the *sole* and *exclusive* procedure for deportation proceedings." *Id.* at 134, 112 S.Ct. 515 (quoting *Marcello*, 349 U.S. at 310, 75 S.Ct. 757). Distilled to their core holdings, both cases concern solely deportation proceedings, not *all* immigration proceedings.

The problem is the Supreme Court's language in *Ardestani* is not specific. In stating the question before the Court, the Court writes: "We now consider whether the EAJA authorizes the award of attorney's fees and costs for administrative *deportation proceedings* before the INS." *Id.* at 131, 112 S.Ct. 515 (emphasis added). The Court later replaces the phrase 'deportation proceedings' with 'immigration proceedings' and states: "Although immigration proceedings are required by statute to be determined on the record after a hearing ..., we previously have decided that they are not governed by the APA." *Id.* at 132, 112 S.Ct. 515 (citing *Marcello*, 349 U.S. 302, 75 S.Ct. 757). We know, however, that not *all* immigration proceedings 'are required by statute to be determined on the record after a hearing.' The immigration proceeding at issue here, a non-*refoulement* interview, is undeniably not determined on the record after a hearing. (Resp. in Opp'n to TRO, Ex. 4 at 15–16). Do we take the Supreme Court's language to mean that *all* immigration proceedings must be determined on the record after a hearing? Or, do we understand the Supreme Court's language to concern the narrower category of deportation proceedings? The Court finds the latter, most importantly because the Supreme Court's decision in *Marcello* requires such an interpretation. In comparison, there is no Supreme Court precedent holding the INA supplants the APA in *all* immigration proceedings.

Respondents argue the Court's reading of these two cases is not correct, for if it was, then § 555(b) of the APA would necessarily extend to expedited removal proceedings. (*Id.* at 17). Respondents contend this cannot be right because "courts have repeatedly and unequivocally concluded the APA right-to-counsel provision does not govern expedited removal proceedings." (*Id.* at 17 (citing *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011); **\*1209** *United States v. Quinteros Guzman*, No. 3:18-cr-00031-001, 2019 WL 3220576, at \*10 (W.D. Va. July

17, 2019)))). Respondents' argument is a non sequitur because expedited removal proceedings and non-*refoulement* interviews are not comparable immigration proceedings. The INA provision concerning expedited removal proceedings is complex, specialized, and specific to expedited removal proceedings. *See* 8 U.S.C. § 1225. The INA contains no provision concerning non-*refoulement* interviews. This difference is crucial in this context: the INA's expedited removal proceeding provision supersedes the APA, whereas the INA's lack of mention of non-*refoulement* interview does not. *See* 5 U.S.C. § 559 ("Subsequent statute may not be held to supersede or modify [the APA's protection of the right to access of retained counsel], except to the extent that it does so expressly."); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires") (internal quotation omitted); *Barajas-Alvarado,* 655 F.3d at 1088 ("The cases cited by [the plaintiff] involve aliens in the more formal removal proceedings, where the regulations provide a right of counsel, as compared to expedited removal proceedings, where they do not."); *Kim v. Ashcroft,* 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004) ("[A]lthough there is no statutory or regulatory deadline by which [Citizenship and Immigration Services] *must* adjudicate an application, at some point, defendants' failure to take any action runs afoul of section 555(b) [of the APA]"). Holding the INA fails to supplant the APA for non-*refoulement* interview procedures says nothing about whether the INA supplants the APA for expedited removal proceedings.

Next, Respondents argue the INA does not provide a right to access retained counsel prior to and during non-*refoulement* interviews. Although Respondents agree there is "no statutory or regulatory provision" addressing the issue, Respondents contend that this silence buttresses their conclusion that the INA does not provide for a right to access retained counsel. (Resp. in Opp'n to Prelim. Inj. at 18). Respondents cite the Ninth Circuit's decision in *Barajas-Alvarado* in support of their argument. In that case, the court held that aliens do not have a right to counsel in expedited removal proceedings because the expedited removal proceeding provision of the INA does not provide for one, unlike the formal removal proceeding provision, which does. *Barajas-Alvarado,* 655 F.3d at 1088. Respondents argue the same logic applies here. The INA is silent on whether asylum seekers may access retained counsel prior to and during non-*refoulement* interviews, whereas the INA provides access

to retained counsel prior to CFIs and during formal removal proceedings. Therefore, Respondents argue, the INA does not provide asylum seekers access to retained counsel in the non-*refoulement* interview context.

Respondents' argument is not persuasive. It is impossible to evince from the INA whether there is a right to counsel in non-*refoulement* interviews because the INA does not mention non-*refoulement* interviews at all.[4] In *Barajas-Alvarado,* the **\*1210** court's reasoning necessarily depends on Congressional consideration of both expedited removal proceedings and formal removal proceedings. *Barajas-Alvarado,* 655 F.3d at 1088 ("The cases cited by [the plaintiff] involve aliens in the more formal removal proceedings, where the regulations provide a right of counsel, as compared to expedited removal proceedings, where they do not."); *see also* 8 C.F.R. § 287.3 ("Except in the case of an alien subject to the expedited removal provisions of section 235(b) (1)(A) of the Act, an alien arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of ... the right to be represented at no expense of the Government."). Here, there is no such Congressional consideration. Therefore, the Court stands by its prior conclusion that the INA does not foreclose asylum seekers the right to access retained counsel prior to and during non-*refoulement* interviews.

4    At oral argument, counsel for Respondents argued the INA's provision concerning the return of asylum seekers to contiguous territories pending their immigration proceedings constitutes a statutory provision concerning non-*refoulement* interviews. (Rep. Tr. (Draft) at 19–20, Dec. 20, 2019); *See* 8 U.S.C. § 1225(b)(2)(c). Respondents asked the Court to compare § 1225(b)(2)(c) to § 1225(b)(1)(B)(iv), which provides for the right to consult with counsel prior to a CFI. Respondents argued that the INA's mention of a right to consult counsel prior to CFIs and its lack of mention of a right to access counsel in non-*refoulement* interviews indicates there is no right to counsel in the latter immigration proceeding. There is one major problem with this argument: § 1225(b)(2)(c) says nothing about the duty of non-*refoulement* or the mechanisms by which Respondents comply with this obligation. It is textually inappropriate to consider § 1225(b) (2)(c) a provision that concerns non-*refoulement* interviews whatsoever. If Respondents' argument

were true and § 1225(b)(2)(c) concerned the procedures of a non-*refoulement* interview, then, by extension, the lack of mention of non-*refoulement* interviews in comparison to the detailed procedures of a CFI could be used to argue Congress did not intend for there to be a duty of non-*refoulement* altogether. Yet, we know this not to be true. *See* Article 33 of the 1951 Convention Relating to the Status of Refugees; Article 3 of the Convention Against Torture. Respondents' argument is not textually sound.

Respondents also argue the regulation prohibiting individuals from accessing retained counsel during primary and secondary inspection precludes the Court's conclusion that § 555(b) of the APA applies to non-*refoulement* interviews. (Resp. in Opp'n to Prelim. Inj. at 19). Respondents cite the USCIS's *Policy Memorandum* concerning the implementation of the MPP, which states: "[P]rovided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at the ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." (Resp. in Opp'n to TRO, Ex. 4, at 15). Respondents argue that, at the very least, the regulation forecloses a right to access retained counsel if the non-*refoulement* interview occurs during primary or secondary inspection.

There are two problems with this argument. First, there is no evidence that a non-*refoulement* interview has *ever* occurred during primary or secondary inspection. Respondents' declarations provide information concerning the number of individuals in the MPP and the number of individuals crossing the United States-Mexico border. (Resp. in Opp'n to Prelim. Inj., Declaration of Scott Garrett ("Garrett Decl."), at ¶ 8 ("Since [implementation of the MPP] San Diego Sector has processed approximately 6,200 cases through the program.... El Centro Sector has also processed approximately 6,800 cases which includes aliens apprehended by Tucson Sector.... On November 21, 2019, there were approximately 190 individuals processed by Border Patrol who were scheduled to appear in immigration court."), Declaration of Mariza Marin ("Marin Decl."), at ¶ 27 ("For fiscal year 2019, through the end of August, the San Ysidro POE processed more than 11 million northbound pedestrians, more than 13 million northbound vehicles, and more than 34 million northbound travelers altogether **\*1211** .... San Diego OFO has processed approximately 1,110

aliens pursuant to the MPP.... While daily numbers vary, there were 224 individuals scheduled for their immigration court appearance, of which 116 showed up for transport to court."). None of Respondents' declarations, however, state that non-*refoulement* interviews are, or ever have been, conducted during primary or secondary inspection.

In fact, Respondents' declarations lend themselves to conclude the opposite. "Generally, the MPP respondents are returned to Mexico within a day or two after encounter." (Marin Decl. at ¶ 17). If an asylum seeker were to articulate a fear of returning to Mexico before he or she is processed for MPP, the asylum seeker is referred to a USCIS Asylum Officer. (Resp. in Opp'n to TRO, Ex. 5 at 18–19 ("If an alien who is potentially amendable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening....")). It is clear that non-*refoulement* interviews do not occur within primary or secondary inspection. They are conducted in separate areas by an officer of a different agency at a later time. (*Id.*, Ex. 4 at 15) ("[T]he USCIS officer should conduct the MPP Assessment interview in a non-adversarial manner, separate and apart from the general public."); Cristian Doe Decl. at ¶ 17 ("After the court hearing we were returned to the [POE] before being transferred to another nearby cold holding cell. We were there for two or three days...."). Respondents have provided no information stating otherwise. [5]

[5]     At oral argument, counsel for Respondents pointed to paragraphs 12 and 24 of the Marin Declaration in support of their argument that non-*refoulement* interviews occur during primary and secondary inspection. Paragraph 12 of the Marin Declaration states: "Amenable aliens arriving at the San Ysidro POE or Calexico POE are initially processed for MPP at the POE at which they attempted to enter the U.S." (Marin Decl. at ¶ 12). Paragraph 24 states: "Nor do the ports have the manpower to supervise MPP respondent visits, as most officers are at the inspection booths in primary and secondary inspection ensuring and facilitating lawful trade and travel, and preventing the introduction of contraband into the United States." (*Id.* at 24). Neither paragraph substantiates Respondents' claim.

The second problem with Respondents' argument is that primary and secondary inspection and non-*refoulement* interviews are separate immigration proceedings with different purposes. In primary and secondary inspection, CBP officers "at the inspections booths ... ensur[e] and facilitiat[e] lawful trade and travel, and prevent[ ] the introduction of contraband into the United States. (Marin Decl. at ¶ 24); *see also Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 42 (D.D.C. 1998) ("During the primary inspection stage, the immigration officer literally has only a few seconds to examine documents, run basic lookout queries, and ask pertinent questions to determine admissibility and issue relevant entry documents."). During non-*refoulement* interviews, the USCIS Asylum Officer's purpose is to "elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico...." (Resp. in Opp'n to TRO, Ex. 4, at 15). The Asylum Officer takes into account (1) the credibility of the asylum seeker's statements, (2) commitments from the Government of Mexico regarding treatment and protection of asylum seekers, and (3) whether the alien has engaged in criminal, persecutory, or terrorist activity. (*Id.* at 15–16). This fact intensive interview can last up to several hours. (Cristian Decl. at ¶¶ 25, 26). Although a non-*refoulement* **\*1212** interview may be conducted close in time and space to inspection, the two immigration proceedings are separate and different—the procedures of one do not extend to the procedures of another. Therefore, the regulation prohibiting right to counsel during primary and secondary inspection is irrelevant to the issue of whether there is such a right prior to and during non-*refoulement* interviews.

 [6]   Finally, Respondents argue that even if the INA fails to supersede the APA, § 555(b) of the APA does not apply to non-*refoulement* interviews. (Resp. in Opp'n to Prelim. Inj. at 19–21). Section 555(b) contains two distinct provisions on access to retained counsel. The first provision states: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." 5 U.S.C. § 555(b). The second provision states: "A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." *Id.* Respondents argue Petitioners are not " 'compelled to appear' at non-*refoulement* interviews" and non-*refoulement* interviews are not "agency proceedings." (Resp. in Opp'n to Prelim. Inj. at 20). Because the Court finds the first provision

of § 555(b) applies, it will not address the applicability of the second provision.

Prior to non-*refoulement* interviews, asylum seekers are detained in CBP custody. (Cristian Decl. at ¶¶ 2, 22). During the interview, asylum seekers may be handcuffed. (Mot. for TRO, Declaration of A.V.D. ("AVD Decl."), at ¶ 27). Although asylum seekers must articulate a fear of return to Mexico before non-*refoulement* interviews commence, they are not "elect[ing] to appear at their non-*refoulement* interviews." (Res. in Opp'n to Prelim. Inj. at 20). A non-*refoulement* interview is merely the next step in a long, multi-stage immigration process, and it is irrelevant to the applicability of § 555(b) whether or not Petitioners triggered that process. (*See* Resp. In Opp'n to TRO, Ex. 4 at 16). To hold otherwise would suggest § 555(b) does not apply in workers' compensation hearings— hearings that are initiated by the same individuals claiming a right to counsel under § 555(b). The Ninth Circuit has, however, held otherwise. *See Smiley v. Dir. Office of Workers Comp. Programs*, 984 F.2d 278, 282 (9th Cir. 1993) ("[The plaintiff] had a statutory right to be advised and represented by counsel. 5 U.S.C.A. § 555(b)."). Given the circumstances in which the non-*refoulement* interview takes place, Petitioners are "compelled" to appear for the purposes of § 555(b).

The Court's conclusion that asylum seekers have a right to access retained counsel prior to and during non-*refoulement* interviews is required by the text of § 555(b) and § 559 of the APA. Petitioners have established a likelihood of success on their statutory claim under the APA, 5 U.S.C. § 555(b). [6]

6          In light of Petitioners' likelihood of success on their first claim for relief under the APA, the Court declines to address the balance of Petitioners' statutory and constitutional claims under the INA and the First and Fifth Amendments to the United States Constitution. (*See* Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 23–26).

### B. Irreparable Injury

 [7]   Turning to the next factor, Plaintiffs must show they are " 'likely to suffer irreparable harm in the absence of preliminary relief.' " *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365). Respondents argue Petitioners have not demonstrated **\*1213** an immediate threatened injury, but only a speculative injury. (Resp. in Opp'n to Prelim.

Inj. at 30). Specifically, Respondents argue that Petitioners' showing is lacking because (1) they have not identified "any named class members who would suffer irreparable harm in the absence of injunctive relief, and (2) even if the unnamed, unidentified class members obtained the relief sought and were able to have [an] attorney present during their interview they could very well still nonetheless be returned to Mexico." (*Id.*). Petitioners allege that without access to counsel, class members risk the irreparable harm of a non-reviewable, erroneous decision that forces them to return to Mexico to face persecution and torture. (Mot. for TRO at 32–33).

Petitioners' declarations provide sufficient evidence to establish a likelihood of irreparable injury. Petitioners' first non-*refoulement* interview, in which counsel was not present, resulted in a negative assessment of fear. (Caudill-Mirillo Decl. at ¶ 5). Petitioners' second interview, in which counsel was present, resulted in a positive assessment of fear. (*Id.* at ¶ 7). Respondents suggest Petitioners provided the USCIS Asylum Officer with information concerning "additional threats" that occurred "between the first and second interview." (*Id.*). Petitioners' counsel, however, notes that during the interview, she "identif[ied] discrepancies with the interpretation and add[ed] to the record by eliciting important testimony from [Petitioner] Cristian Doe." (Rep. in Supp. of Prelim. Inj., Declaration of Stephanie Blumberg ("Blumberg Decl."), at ¶ 5). The presence of counsel was clearly helpful to Petitioner Cristian Doe in presenting his fear of return to Mexico. Given the stakes of a non-*refoulement* interview—the return to a country in which one may face persecution and torture—and the interview's fact-intensive nature, it is undeniable that access to counsel is important.

 [8]  The fact that some class members may still be returned to Mexico, despite having an attorney present during their non-*refoulement* interview, does not preclude a finding of irreparable injury. Petitioners "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012). It is enough to find that injunctive relief will prevent additional suffering, persecution, and torture. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding the plaintiff satisfied the irreparable injury element because the injunctive relief prevented "exacerbation of the current ... situation and additional suffering"). In addition, deprivation of the right to retained counsel for an interview of this magnitude is an injury itself. Accordingly, the Court finds Petitioners have shown a likelihood of irreparable injury.

## C. Balance of Equities

 [9]   [10]  "To obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.' " *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365). Respondents argue the balance of equities weighs against granting injunctive relief because "the Government will be required to comply with additional procedural prerequisites in numerous non-*refoulement* interviews in California going forward." (Resp. in Opp'n to Prelim. Inj. at 31). Respondents further contend that an injunction would threaten national security and hinder immigration officers from addressing "the flow of illegal immigration." (*Id.*). Respondents' declarations note the heightened security at border patrol stations, the border patrol's limited staff and space, and the likelihood of asylum seekers' counsel overhearing sensitive information. (*See* Garrett Decl. at ¶¶ 14–17; Marin Decl. at ¶¶ 21–24).

 **\*1214** The balance of equities weighs in favor of granting the preliminary injunction, despite Respondents' allegations. Although Respondents will be required to comply with additional procedural requirements prior to and during non-*refoulement* interviews, those procedural requirements are required by federal law, specifically the APA. Respondents "cannot reasonably assert that [they are] harmed in any legally cognizable sense" by being compelled to the follow the law. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). Furthermore, if injunctive relief is not granted, class members face the possibility of being forced to return to Mexico to suffer persecution, torture, and potentially death. The balance of equities, therefore, favors preventing the violation of "requirements of federal law." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

## D. Public Interest

 [11]   [12]  The final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("When, as here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.' ")) To obtain the requested relief, "[Petitioners] must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' *i.e.*, 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.' " *Id.* (quoting *Stormans*, 586 F.3d at 1139).

Respondents contend that the "public interest favors the efficient administration of immigration laws at the border" and thus, favors the Government. (Resp. in Opp'n to Prelim. Inj. at 31) (citing *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019)).

As explained in the Court's Order granting Petitioners' motion for TRO, the public interest is served by allowing class members access to retained counsel prior to and during non-*refoulement* interviews. It would not be "in the public's interest to allow [Respondents] ... to violate the requirements of federal law, especially when there are not adequate remedies available." *Ariz. Dream Act Coal.*, 757 F.3d at 1069 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Federal law, specifically the APA, requires class members to have access to retained counsel prior to and during non-*refoulement* interviews. Respondents have failed to demonstrate how complying with this legal requirement will impede the efficient administration of immigration laws at the border. Furthermore, Respondents' argument that it lacks the staff and space required to comply with the APA is not persuasive, for Respondents elected to implement the MPP and detain asylum seekers in CBP custody pending non-*refoulement* interviews. As Petitioners note, Respondents "cannot bootstrap [their] choices into justifications for those choices." (Rep. in Supp. of Prelim. Inj. at 8). Therefore, the public's interest weighs in favor of granting injunctive relief.

**E. In-Person Access**

In its Order granting Petitioners' motion for TRO, the Court asked the parties to address whether the APA's right to access retained counsel provided for in-person access or only telephonic access. Respondents contend (1) Petitioners did not demand in-person access in their Complaint, (2) courts have upheld restrictions on defendants' communication with counsel within the Sixth Amendment context, and (3) § 555(b)'s right to be 'accompanied' does not extend to being represented in 'an agency proceeding.' (Resp. in Opp'n of Prelim. Inj. at 22). Petitioners argue they **\*1215** expressly sought to enjoin Respondents from "preventing confidential visits" with class members in their Complaint, and therefore, demanded the appropriate relief from the outset. (Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 27). Petitioners further argue it is assumed that § 555(b)'s right to counsel includes in-person access given the importance of face-to-face communication. Neither party has provided case law concerning in-person, as opposed to telephonic, access to counsel within the context of § 555(b) of the APA.

**[13]** **[14]** Before considering the text of § 555(b), the Court must address whether Petitioners adequately raised the issue of in-person access to counsel in their Complaint. It "is axiomatic that the complaint may not be amended by the briefs." *Candor v. United States*, 1 F. Supp. 3d 1076, 1082 (S.D. Cal. 2014) (internal quotation omitted). Petitioners' Complaint includes the word 'visit' nine times. Petitioners allege that CBP does not "allow attorneys representing persons in its custody to visit such persons for the purpose of confidential legal advice," and CBP has "a policy and practice of denying requests for in-person visits or confidential telephonic communication with counsel at its holding facilities." (Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 9, 15). Petitioners allege that as a result of CBP's policy, "lawyers are unable to locate, visit or make confidential phone calls with their clients." (*Id.* at 16). Petitioners also note that the common questions of law and fact as to all class members include "whether they are denied confidential visitation or communication with retained counsel." (*Id.* at 21). Finally, Petitioners' prayer for relief includes a request that the Court enjoin Defendants from "preventing confidential legal visits." (*Id.* at 27). Given Petitioners' allegations and requests of the Court in their Complaint, the Court finds the question of whether access to retained counsel includes in-person access is properly before the Court.

**[15]** As noted above, § 555(b) of the APA contains two provisions providing access to retained counsel. The Court has already found that the first provision applies to non-*refoulement* interviews. This provision reads: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." 5 U.S.C. § 555(b). The pertinent word is "accompanied." *Black's Law Dictionary* defines 'accompany' as "[t]o go along with" or "to attend." *Black's Law Dictionary* (11th ed. 2019). This definition suggests § 555(b) envisioned in-person access to counsel. *See also United States v. McPhaul*, 617 F. Supp. 58, 59 (W.D.N.C. 1985) ("Under 5 U.S.C. § 555(b), there is a right to have counsel present whenever a person is compelled to appear."). Although Petitioners have conceded telephonic access to counsel during the non-*refoulement* interviews is sufficient, Petitioners have maintained the need for in-person access prior to non-*refoulement* interviews. (Rep. in Supp. of TRO at 3 n.2). Therefore, given the text of § 555(b), class

members are entitled to in-person access to retained counsel prior to their non-*refoulement* interviews.

### III.

### CONCLUSION AND ORDER

For these reasons, Petitioners' motion for classwide preliminary injunction is granted. Respondents may not conduct class members' non-*refoulement* interviews without first affording the interviewees access **\*1216** to their retained counsel both before and during any such interview.

**IT IS SO ORDERED.**

**All Citations**

432 F.Supp.3d 1200

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

1    ROBERT S. SHWARTS (SBN 196803)     TIMOTHY P. FOX (SBN 157750)
    rshwarts@orrick.com                 tfox@creeclaw.org
2    ORRICK, HERRINGTON & SUTCLIFFE LLP    CIVIL RIGHTS EDUCATION AND
    The Orrick Building                   ENFORCEMENT CENTER
3    405 Howard Street                     1245 E. Colfax Avenue, Suite 400
    San Francisco, CA  94105-2669          Denver, CO 80218
4    Telephone:  (415) 773-5700            Telephone:  (303) 757-7901
    Facsimile:  (415) 773-5759             Facsimile: (303) 872-9072
5
    LILLIAN J. MAO (SBN 267410)         MARIA DEL PILAR GONZALEZ
6    lmao@orrick.com                      MORALES (SBN308550)
    ORRICK, HERRINGTON & SUTCLIFFE LLP    pgonzalez@creeclaw.org
7    1000 Marsh Road                     CIVIL RIGHTS EDUCATION AND
    Menlo Park, CA  94025-1015           ENFORCEMENT CENTER
8    Telephone:  (650) 614-7400           1825 N. Vermont Avenue, #27916
    Facsimile:  (650) 614-7401            Los Angeles, CA 90027
9                                   Telephone:  (805) 813-8896
                                   Facsimile:  (303) 872-9072
10    *Attorneys for Plaintiffs*

11

12              IN UNITED STATES DISTRICT COURT

13          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14    E.A.R.R.; G.S.E.R, A MINOR CHILD,    Case No.    **'20 CV2146 TWR BGS**
    by and through his mother and NEXT
15    FRIEND, E.A.R.R; B.A.E.R., A        **CLASS ACTION COMPLAINT**
    MINOR CHILD, by and through his      **FOR DECLARATORY AND**
16    mother and NEXT FRIEND, E.A.R.R;    **INJUNCTIVE RELIEF**
    L.Y.G.; H.A.H.G.; J.A.E.M; Y.J.C.E, A
17    MINOR CHILD, by and through his
    mother and NEXT FRIEND, J.A.E.M.;
18    S.F.L.; C.J.M.L., A MINOR CHILD, by
    and through his mother and NEXT
19    FRIEND, S.F.L.; Y.M.M.; J.C.M.M., A
    MINOR CHILD, by and through her
20    mother and NEXT FRIEND, Y.M.M.;
    G.F.F.; M.Y.J.L.; M.M.G., A MINOR
21    CHILD, by and through his mother and
    NEXT FRIEND, V.A.G.; D.Y.S., A
22    MINOR CHILD, by and through his
    mother and NEXT FRIEND, M.S.S.;
23    S.M.A., A MINOR CHILD, by and
    through her mother and NEXT
24    FRIEND, K.A.M.; D.G.M.; N.R.R.;
    H.H.M.; E.H.M.; C.J.V.C., A MINOR
25    CHILD, by and through his mother and
    NEXT FRIEND, M.C.; La.V.S.O., A
26    MINOR CHILD, by and through her
    mother and NEXT FRIEND, A.A.F.S.O;
27    and, AL OTRO LADO, an organization,

28            Plaintiffs,

AR01701

1        v.

2 U.S. DEPARTMENT OF HOMELAND
    SECURITY ("DHS"); CHAD WOLF,
3 Acting Secretary of The Department of
    Homeland Security, in his official
4 capacity; U.S. CUSTOMS AND
    BORDER PROTECTION ("CBP"); and
5 MARK A. MORGAN, Acting
    Commissioner of U.S. Customs and
6 Border Protection, in his official
    capacity,
7
              Defendants.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AR01702

1.    Named Plaintiffs[1] are men, women, and children who represent putative classes of migrants with disabilities and health conditions and their family members whom the Department of Homeland Security ("DHS") and its sub-component Customs and Border Protection ("CBP") have forcibly returned to Mexico under the so-called Migrant Protection Protocols (the "MPP"). Defendants' own policies categorically prohibit placing people with "mental or physical health issues in the MPP." This is far from accidental. Instead, the brutal practice of ignoring this policy, refusing disability accommodations, and sending people with disabilities to survive in makeshift refugee camps and shelters in Mexico is widespread. The risk of harm to people with disabilities in this program is imminent, substantial, and irreparable. Countless individuals have tried and failed to overcome the everyday deprivations of water, sanitation, medicine, and reasonable aids in order to prepare and present their cases in inaccessible courts without basic accommodations.

2.    Prior to being placed in the MPP, CBP takes a recently arrived immigrant into custody and detains them in a CBP processing center. As a result of this process, Defendants knew or should have known during Plaintiffs' time in CBP custody that Plaintiffs or their family member had physical or mental health

---

[1] A motion to proceed under anonymity is forthcoming. In this case, Plaintiffs assert multiple facts that support proceeding with anonymity. They (1) face imminent threats from anti-immigrant groups in Northern Mexico; (2) disclose information of the utmost intimacy about the physical abuse and discrimination that could subject them to being ostracized; and (3) face potential retaliation from port officials, who have threatened to label as "terrorists" other migrants who peacefully raised public awareness of their plight, an action that would bar that person from receiving asylum. These factors counsel in favor of proceeding anonymously. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000) (party may preserve anonymity in judicial proceedings when "special circumstances justify" this treatment – *i.e.*, when the plaintiff's need for anonymity outweighs prejudice to the [Defendants] and the public's interest in knowing [Plaintiff's] identity"); *see also Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2017 WL 6541446, at *1 (S.D. Cal. Dec. 20, 2017) (granting anonymity to asylum seekers who brought suit against the government for denying them access to the U.S. asylum system through unlawful policies and practices). Moreover, ten of the plaintiffs are minor children and the Federal Rules of Civil Procedure require redaction of the names of minor children. Fed. R. Civ. Proc. 5.2(a) ("In an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . the filing may include only . . . the minor's initials"). Plaintiffs will disclose their identities to the representatives of Defendants.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01703

1   conditions, including disabilities. Plaintiffs' conditions are open and obvious, well

2   documented, and/or were repeatedly reported to CBP agents. Further, Defendants are

3   obligated to put in place screening procedures to identify people with disabilities.

4       3.    Defendants have utterly failed to establish mechanisms to ensure that its

5   agents follow Defendants' policies, including exempting migrants with physical or

6   mental health conditions from the MPP. As a result, Defendants' employees or agents

7   subjected Plaintiffs to the MPP, forcing them to return to Mexico pending their

8   immigration proceedings and any appeals.

9       4.    As a result of Defendants' actions, Plaintiffs and putative class members

10  in Mexico do not have sufficient shelter, are denied essential medical equipment and

11  care, and/or face barriers such as inaccessible buildings and facilities, a lack of sign

12  language interpreters, and a lack of effective communication, all of which

13  substantially affect their ability to prepare for and adequately aid in their defense in

14  removal proceedings.

15      5.    Further, Defendants send Plaintiffs and members of the class—

16  sometimes completely without warning—to areas in Mexico for which the

17  Department of State has given the highest travel warning due to rampant murder,

18  armed robbery, carjacking, kidnapping, extortion, and sexual assault, and to some

19  areas where the Department of State warns U.S. citizens that local law enforcement

20  is not capable of protecting them. This is particularly harmful to Plaintiffs and

21  members of the putative class, who are especially vulnerable to persecution, torture,

22  and human trafficking in Mexico.

23      6.    As a result of these conditions, Plaintiffs and putative class members

24  cannot meaningfully prepare for or participate in removal proceedings, including

25  asserting any defenses to removal to another country claims. For example, Plaintiffs

26  are forced to divert their time, energy, and resources to attempt to obtain—sometimes

27  unsuccessfully—basic medical equipment and care, making it virtually impossible

28  for them to meaningfully assert defenses to removal or otherwise prepare for removal

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01704

1    proceedings.

2        7.    Despite repeated pleas from Plaintiffs and advocates, and despite clear

3    evidence of harm, Defendants continue to refuse to exempt Plaintiffs and members

4    of the class from the MPP notwithstanding that their own policies and applicable laws

5    require them to do so.

6        8.    Plaintiffs seek a declaration that Defendants' actions violate the

7    Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and Section 504 of

8    the Rehabilitation Act of 1973, 29 U.S.C. § 794, and seek an order enjoining

9    Defendants from continuing to subject Plaintiffs and putative class members to the

10   MPP, and requiring Defendants to put in place practices and procedures to satisfy

11   their obligations under Section 504.

12                    **I.    PARTIES**

13   **A.    The Plaintiffs**

14       9.    Plaintiff E.A.R.R. is a thirty-four-year old woman and is a qualified

15   individual with a disability. Doctors diagnosed her with a pituitary tumor that presses

16   against her brain. Since on or about May 22, 2019, Defendants have forced her to

17   remain in Mexico under the MPP with her two children, including G.S.E.R.

18       10.   Plaintiff G.S.E.R. is a thirteen-year-old child and is a qualified

19   individual with a disability. G.S.E.R. has only one functioning lung. Since on or

20   about May 22, 2019, Defendants have forced him to remain in Mexico under the

21   MPP.

22       11.   Plaintiff B.A.E.R. is twelve-year-old child and is the child and sibling

23   of people with disabilities (E.A.R.R. and G.S.E.R.). Since on or about May 22, 2019,

24   Defendants have forced him to remain in Mexico under the MPP.

25       12.   Plaintiff L.Y.G. is a thirty-six-year-old woman and is a qualified

26   individual with a disability. Doctors diagnosed her with scoliosis and kidney stones.

27   She has Post-Traumatic Stress Disorder, high blood pressure, and high glucose

28   levels. Since on or about February 5, 2020, Defendants have forced her and her two

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
AR01705

children to remain in Mexico under the MPP.

13.     Plaintiff H.A.H.G. is a forty-five-year-old man and is a qualified individual with a disability. H.A.H.G. has an inguinal hernia, a kidney cyst, a dislocated spinal disc, and hearing loss. Since on or about June 22, 2019, Defendants have forced him and his sons to remain in Mexico under the MPP.

14.     Plaintiff Y.J.C.E is a seven-year-old child and is a qualified individual with disabilities. He has been diagnosed with a heart murmur. Since on or about October 29, 2019, Defendants have forced him and his family, including his mother J.A.E.M., to stay in Mexico under the MPP.

15.     Plaintiff J.A.E.M. is a thirty-eight-year-old woman and is the mother of a person with disabilities (Y.J.C.E.). Since on or about October 29, 2019, Defendants have forced her and her family to stay in Mexico under the MPP.

16.     Plaintiff S.F.L. is a forty-seven-year-old woman and is a qualified individual with disabilities. She has diabetes, vision loss, and depression. Since on or about July 16, 2019, Defendants have forced her and her son, C.J.M.L., to remain in Mexico under the MPP.

17.     Plaintiff C.J.M.L. is an eight-year-old boy and is a qualified individual with disabilities. He has a urethral malformation that requires surgery. Since on or about July 16, 2019, Defendants have forced him and his mother, S.F.L., to remain in Mexico under the MPP.

18.      Plaintiff Y.M.M. is a thirty-nine-year-old woman and is mother of a person with disabilities (J.C.M.M.). Y.M.M. is being assessed for mental health issues. Since on or about March 27, 2020, Defendants have forced Y.M.M. and her child to remain in Mexico under the MPP.

19.     Plaintiff J.C.M.M. is a seven-year-old child and is a qualified individual with disabilities. She has urinary tract problems, experiences seizures, and has a mild intellectual disability. Since on or about March 27, 2020, Defendants have forced her and her mother, Y.M.M., to remain in Mexico under the MPP.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
AR01706

20.    Plaintiff G.F.F. is a thirty-eight-year-old man, and is a qualified individual with a disability. He has depression and insomnia. Since around July 2019, Defendants have forced him to remain in Mexico under the MPP.

21.    Plaintiff M.Y.J.L. is a thirty-four-year-old woman and is a qualified individual with disabilities. She has debilitating uterine fibroids, also known as myomas and endometriosis. These conditions cause her to experience intense pain and bleeding. Since on or about March 13, 2020, Defendants have forced her and her husband to remain in Mexico under the MPP.

22.    Plaintiff M.M.G. is a sixteen-year-old boy and is a qualified individual with a disability. He has a brain injury arising from surgery to reconstruct a brain blood vessel, and he experiences painful headaches, impaired memory, and confusion. Since on or about September 26, 2019, Defendants have forced him and his family, including his mother, V.A.G., to stay in Mexico.

23.    Plaintiff D.Y.S. is a nine-year-old child and is a qualified individual with a disability. Doctors have diagnosed him with autism, hyperactivity, and epilepsy. Since on or about November 22, 2019, Defendants have forced him and his mother, M.S.S., to remain in Mexico under the MPP.

24.    Plaintiff S.M.A. is a seven-year-old child and is a qualified individual with a disability. Doctors diagnosed her with lissencephaly, a disorder characterized by developmental delay and seizures. Since on or about August 23, 2019, Defendants have forced her and her mother, K.A.M., to remain in Mexico under the MPP.

25.    Plaintiff D.G.M. is a fifty-two-year-old man and is a qualified individual with a disability. He has hypertension and a growth in his heart that requires a pacemaker. Since on or about July 28, 2019, Defendants have forced him and his family to remain in Mexico under the MPP.

26.    Plaintiff N.R.R. is a forty-four-year-old woman and the wife of a person with disabilities (D.G.M.). Since on or about July 28, 2019, Defendants have forced her and her family to remain in Mexico under the MPP.

AR01707

27.     Plaintiff H.H.M. is a twenty-year-old man and is a qualified individual with a disability. He is deaf and does not communicate through any standardized sign language. He relies on his sister, E.H.M., almost exclusively for communication. Since on or about March 21, 2020, Defendants have forced him and his family to remain in Mexico under the MPP.

28.     Plaintiff E.H.M. is a twenty-two-year-old woman and is the sister of person with disabilities (H.H.M.). Since on or about March 21, 2020, Defendants have forced her, her child, and her brother to remain in Mexico under the MPP.

29.     Plaintiff C.J.V.C. is a fourteen-year-old child and is a qualified individual with a disability. He has an amputated leg. Since on or about September 24, 2019, Defendants have forced him and his mother, M.C., to remain in Mexico under the MPP.

30.     Plaintiff La.V.S.O. is a one-year-old baby and is a qualified individual with a disability. She was born with congenital hydrocephalus, which causes a buildup of fluid around her brain and spinal cord and requires specialized medical treatment. Since on or about February 27, 2020, Defendants have forced her and her family, including her mother A.A.F.S.O., to remain in Mexico under the MPP.

31.     Al Otro Lado is a non-profit, binational legal services organization incorporated in California. Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles, California and Tijuana, Mexico. In both locations, the populations that Al Otro Lado serves includes many individuals with disabilities or who are seriously ill, as well as their families. The volume of individuals with disabilities or medical conditions subjected to the MPP requiring Al Otro Lado's assistance has forced Al Otro Lado to expend significant additional time and effort, affecting the organization's activities and staffing, frustrating its mission, and requiring it to divert its resources.

**B.     The Defendants**

32.     Defendant U.S. Department of Homeland Security ("DHS") is a

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01708

1    Department within the Executive Branch tasked with enforcing the immigration laws
2    of the United States.

3        33.    Defendant Chad Wolf is or was the purported Acting Secretary of DHS
4    at all times relevant to this suit and is sued in his official capacity. Defendant Wolf
5    is responsible for the administration, implementation, and enforcement of U.S.
6    immigration laws and policies pursuant to 8 U.S.C. § 1103(a), including policies
7    related to the forcible return of asylum-seekers to Mexico at the U.S. southern border.

8        34.    Defendant U.S. Customs and Border Protection ("CBP") is the sub-
9    agency of DHS that is responsible for enforcement operations along the borders of
10   the United States, including the U.S. southern border.

11       35.    Defendant Mark A. Morgan is the Acting Commissioner of CBP and is
12   sued in his official capacity. Defendant Morgan oversees the apprehension and
13   detention of individuals, including asylum seekers, who enter the United States at or
14   near the U.S. border.

15              **II.    JURISDICTION AND VENUE**

16       36.    This case arises under the Administrative Procedure Act ("APA"), 5
17   U.S.C. § 701 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.
18   § 794.

19       37.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1346,
20   2201-2202; 29 U.S.C. § 794a; and 5 U.S.C. § 702.

21       38.    Venue is proper under 28 U.S.C. § 1391(e) because a substantial part of
22   the acts or omissions occurred in the Southern District of California.

23              **III.   LEGAL FRAMEWORK**
24   **A.    Section 240 Proceedings**

25       39.    The Immigration and Naturalization Act ("INA") provides different
26   proceedings for different categories of individuals to determine their admissibility to
27   the United States.

28       40.    The proceedings relevant to this case are set forth in section 240 of the

7

INA, as well as any appeals as of right therefrom including petitions for review, collectively referred to herein as "Section 240 proceedings." Section 240 is codified at 8 U.S.C. § 1229a. Appeals as of right from those proceedings are discussed in 8 C.F.R. § 1003.1. Petitions for review to Circuit Court of Appeals (included in the term "appeals as of right" for the purposes of this complaint) are discussed in 8 U.S.C. § 1252.

41.   Section 240 proceedings are evidentiary hearings presided over by an immigration judge.

42.   Through this, individuals, who are respondents in these proceedings, are given the opportunity to examine evidence brought against them, to present evidence, and to cross-examine witnesses. 8 U.S.C. § 1229a(b)(4).

43.   The respondent has the burden of proof on most issues, and in determining whether that burden has been met, an immigration judge focuses on whether the respondent has submitted credible, persuasive, specific facts. 8 U.S.C. § 1229a(c)(2). Any evidence submitted by the noncitizen must comply with applicable requirements. 8 U.S.C. § 1229a(c)(3).

44.   A respondent who does not appear for a scheduled Section 240 proceeding faces a significant risk that the immigration judge will order their removal. 8 U.S.C. § 1229a(b)(5).

45.   Appeals as of right, which include appeals to the Board of Immigration Appeals and petitions for review for the purposes of this complaint as indicated above, involve review of the factual and legal findings of the agency through briefs, occasionally including oral argument. A respondent who does not file briefs on appeal faces a significant risk of having an appeal as of right dismissed.

**B.   The Migrant Protection Protocols**

46.   The MPP, introduced in December 2018, is a policy of the Trump administration that purports to grant CBP officers the authority to return to Mexico people seeking admission to the United States, pending their Section 240

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01710

1  proceedings.[2]

2      47.   As of March 2020, Defendants had forcibly returned more than 60,000

3  people to Mexico pursuant to the MPP. Approximately 25,000 of these individuals

4  live in makeshift camps and shelters in Mexican border towns.

5      48.   Individuals placed in the MPP are in Section 240 proceedings. The

6  process of pursuing Section 240 proceedings under the MPP is itself a grueling

7  exercise. Immigration court respondents who are set for morning proceedings must

8  travel through extremely dangerous, sometimes cartel-controlled areas, to present

9  themselves to CBP agents at the Port of Entry before sunrise. Those set for the

10 afternoon docket often are not released back into Mexico until late in the evening,

11 often after sunset. Section 240 proceedings usually entail a series of court

12 appearances, culminating in a final merits hearing. As a result, prior to receiving an

13 immigration judge's determination on the merits of their cases, Plaintiffs and others

14 in the MPP must often present themselves for court many times.

15     49.   Respondents in MPP proceedings must first pass a medical inspection

16 before being permitted to enter immigration court. Some individuals have been

17 turned away and rescheduled because, for example, abysmal living conditions have

18 caused them to have lice. After their belongings are inspected, individuals often wait

19 hours in holding areas before being called for their proceedings.

20     50.   At San Diego and El Paso, MPP court proceedings are held in the San

21 Diego and El Paso immigration courts in person, where asylum-seekers interact with

22 court staff or officials and, when possible, submit documents in person. Once an

23 asylum seeker is permitted to enter the court, that person is prohibited from exercising

24 any freedom of movement.

25     51.   At Brownsville and Laredo, Texas, MPP court proceedings are

26

27 [2] Plaintiffs, including members of the putative class, who entered the United States
   without inspection and were apprehended by CBP agents thereafter, do not
28 concede that the INA permits CBP to return them to a contiguous country
   pending removal proceedings by filing this suit.

CLASS ACTION COMPLAINT FOR
                                      DECLARATORY AND INJUNCTIVE RELIEF
                                      AR01711

conducted in temporary "tent" facilities erected on federal property near the ports of entry. These facilities are not easily accessible for individuals with mobility disabilities, such as C.V.J.C. Those who attend courts at these facilities do not come face-to-face with any court staff or officials; instead, asylum-seekers interact with the immigration judge and government attorneys entirely over televideo. Individuals who have documents to submit to the court must hand the documents to a security guard to scan. While waiting for others to finish proceedings with the judge, immigrants are not given any freedom of movement and must ask for and be granted permission to use restroom facilities. When appearing for the merits portion of their immigration proceeding, individuals are placed into a repurposed shipping container that is barely big enough to hold three people. Interpreters are not physically present for the interviews. Instead, if interpretation is needed, respondents speak through an interpreter over the phone.

52.     After proceedings are concluded, depending on several factors, including whether someone has been granted a *non-refoulement* interview, people can wait another several hours, incommunicado, before being returned to Mexico.

53.     The heightened risk of abuse or crimes and the conditions that people with disabilities face in Mexico—including lack of medical care, medical equipment, accessible housing and buildings, sign language interpreters, and other necessary supports—are appalling.

54.     As a result, people with disabilities that Defendants force to return to Mexico often must focus all their efforts on simply surviving. They have no meaningful opportunity to prepare for their Section 240 proceedings. In fact, people with disabilities run the risk of not even being able to appear at their 240 proceedings because of their disabilities.

55.     DHS, apparently recognizing that the MPP should not be applied to people with disabilities, has expressly excluded people with known physical or mental health issues from the MPP in its policies (the "Physical/Mental Health

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Exclusion").

56.    Among other places, the Physical/Mental Health Exclusion is set forth on a DHS webpage entitled "Migrant Protection Protocols," last published on August 10, 2020. In a section of this webpage entitled "Are there any exclusions to who is subject to MPP?" DHS explicitly states that people with "[k]nown physical/mental health issues" are excluded from the MPP.[3]

57.    On several other occasions—including in a brief to the Ninth Circuit[4] and a statement of "Guiding Principles" applicable to the MPP at all ports of entry[5]— DHS and CBP have made it clear that the MPP should not be applied to people with known physical or mental health issues.

58.    Notwithstanding DHS and CBP's stated policy that the MPP should not apply to people with known physical or mental health issues, CBP continues to apply the MPP to such people, returning Plaintiffs and numerous other people with physical or mental health conditions, including people with disabilities, to Mexico.

59.    On information and belief, DHS has not put in place effective mechanisms to ensure that CBP employees implement its policy exempting people with known physical or mental health conditions from the MPP, and has failed to put in place mechanisms to identify or assess, for purposes of accommodations, immigrants with disabilities.

---

[3] *Migrant Protection Protocols*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/migrant-protection-protocols (last visited Nov. 2, 2020).

[4] *See* Br. for Appellants at 13, *Innovation Law Lab v. McAleenan*, 2019 WL 2290420 (9th Cir. May 22, 2019).

[5] [MPP Guiding Principles], CBP Enforcement Programs Division, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (stating that the MPP should not be applied to people with known physical or mental health issues); Executive Director Todd A. Hoffman, Office of Field Operations, Guidance on Migrant Protection Protocols, CBP (Jan. 28, 2019) https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20OFO%20Memo%201-28-19.pdf (stating that "[t]he Guiding Principles outline which aliens may be amenable to MPP" and instructs recipients to "ensure that this memorandum is disseminated to all ports of entry.").

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

AR01713

60.     Defendants similarly refuse to allow Plaintiffs' family members to accompany them into the United States or to assist Plaintiffs in preparing for and participating in their 240 Proceedings. Defendants have a policy of maintaining family unity "to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that require separation" (the "Family Unit Policy").[6] Defendants have been enjoined from separating parents from their minor children when in detention or upon release from detention, for example, through continuing to detain the minor children while releasing the parents, or vice versa. *Ms. L. v. U.S. Immigr. & Customs Enf't,* No. 18-CV-0428-DMS-MDD (S.D. Cal. June 26, 2018), Docket Nos. 82-83.[7]

## IV.   FACTUAL ALLEGATIONS

### A.   Conditions that People with Disabilities Face When Placed in the MPP and Returned to Mexico

*Defendants place persons with known physical or mental health issues and/or disabilities in the MPP*

61.     Defendants routinely place persons with known physical or mental health issues, including qualified individuals with disabilities, in the MPP.  Yet, Defendants have no mechanism to properly screen individuals with disabilities and exempt them from the program.

62.     Defendants' practice has been widely reported.[8] For example, six people with physical and/or mental health disabilities, including four children, were placed in the MPP and sent to Ciudad Juárez. One of those persons, a fourteen-year-old child

---

[6] National Standards on Transport, Escort, Detention, and Search, CBP, https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (last updated February 28, 2020)

[7] Compare class certification order, Docket No.82, to preliminary injunction, docket no. 83, both issued on the same day.

[8] *See, e.g., US Move Puts More Asylum Seekers at Risk*, HUM. RTS. WATCH (Sept. 25, 2019), https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk; Jessica Eller et al., *Migrant Protection Protocols: Implementation and Consequences for Asylum Seekers in Mexico*, 218 U. TEX. AUSTIN STRAUSS CTR. INT'L SEC. & L. 26 (May 2020), https://repositories.lib.utexas.edu/handle/2152/81991.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01714

with intellectual disabilities, appeared to be confused and distraught by his situation.[9]

63.    In Matamoros, Mexico, across the border from Brownsville, Texas, attorneys with the organization Lawyers for Good Government have confirmed that children with disabilities were being placed in the MPP, which included at least two children with Down Syndrome.[10]

64.    A 2019 article by *The Guardian* details the story of José, an asylum seeker with a severe cognitive disability who sought asylum. When José and his family arrived at the U.S. border, they provided officials with a written statement from his doctor affirming that he had the cognitive age of a four-year-old child. Nevertheless, Defendants separated him from his caretaker, detained him in an El Paso detention facility for two weeks, and then bused him to Ciudad Juárez, Chihuahua, Mexico, and placed him in the MPP.[11]

65.    José was unable to provide basic information such as his date of birth or age, and immigration advocates informed government officials of his condition. Nevertheless, he was sent back to Ciudad Juárez, where he stayed without any support for nearly three months.[12]

66.    Immigration advocates arranged for José to undergo another cognitive assessment, which confirmed the earlier diagnosis, including the fact that Jose had no concept of time or space, and no real idea of where he was. Despite this evidence, CBP insisted on retesting him and held him in a detention center for three days. CBP then inexplicably sent Jose back to Mexico, where he remained at the time of the article.[13]

67.    Other outlets have confirmed that individuals with disabilities who

---

[9] *Id.*

[10] *Id.*

[11] Adam Gabbatt, *'Like a Child': The Disabled Migrant Stranded and Alone in Mexico*, GUARDIAN (July 18, 2019), https://www.theguardian.com/us-news/2019/jul/27/mexico-disabled-migrant-stranded-trump.

[12] *Id.*

[13] *Id.*

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01715

should be exempt from the MPP continue to be held in the program, despite their inability to access their immigration proceedings or the necessary medical treatments in Mexico.[14]

*Living conditions in Mexico for people with disabilities housed in shelters and migrant "camps"*

68.     The living environment for those returned to Mexico, including in overcrowded shelters or makeshift tent encampments, exacerbates any existing health conditions and puts these individuals at risk for developing infectious diseases.[15] There is heightened inaccessibility to health care due to the violence in northern Mexico border cities and a lack of basic services, including medical supplies. Basic care is in general provided by over-burdened and under-funded non-governmental organizations.[16]

69.     Most of the shelters and facilities available to those returned to Mexico are inaccessible to persons with disabilities and lack the necessary resources for persons with physical and mental disabilities. Many individuals are fearful of leaving to seek care.[17]

70.     Apart from these shelters and facilities, those who must live in tent encampments face even more inaccessibility issues. For example, at the tent encampment in Matamoros, Tamaulipas, Mexico, which at its height held 2,500 people, there are only a handful of outdoor showers. There is also a limited number of portable toilets, which at times have overflowed with human waste. Insufficient

---

[14] Reynaldo Leaños Jr., *Border Officials Keep Sending Asylum Seekers With Disabilities, Illnesses Back To Mexico*, TEX. PUB. RADIO (Feb. 21, 2020), https://www.tpr.org/border-immigration/2020-02-21/border-officials-keep-sending-asylum-seekers-with-disabilities-illnesses-back-to-mexico.

[15] Megan Diamond, et al., *A Population in Peril: A Health Crisis Among Asylum Seekers on the Northern Border of Mexico*, HARV. GLOB. HEALTH INST. & B.C. SCH. SOC. WORK 1 (2020), https://globalhealth.harvard.edu/wp-content/uploads/2020/07/A_Population_in_Peril.pdf.

[16] *Id*. at 4.

[17] *Id*. at 5.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01716

access to potable water frequently leads to chronic dehydration and heat stroke.[18]

71.     Existing disabilities and chronic health conditions are exacerbated by the routine confiscation of medications by CBP agents.[19] It can take weeks to secure new prescriptions in Mexico. Those held in CBP custody also commonly report chronic conditions being undiagnosed and left untreated, as well as inconsistent initial medical screening protocols performed by the Mexican government. In particular, the Mexican government has provided insufficient information to people with disabilities and chronic health conditions regarding how they could access healthcare.[20]

72.     Being returned to Mexico can be a "catastrophic stressor on health" for these individuals due to the stress from waiting in a dangerous living environment and trauma from their experiences in migration.[21]

73.     Minors are especially vulnerable to exacerbated mental health issues. Due to the high need for mental health and psychosocial services for those placed in the MPP, those with psychiatric disabilities face a lack of care.[22]

74.     Generally, Mexico does not have enough health care resources, particularly in the border cities where Defendants have forcibly sent Plaintiffs. In three Mexican border states, the physician to population ratio is approximately 0.6 to 1,000, and compared to other nations, Mexico exhibits poor performance on quality of care indicators, including amputations on diabetic patients and avoidable hospital admission. As a result, under-funded and over-burdened faith-based and nonprofit organizations attempt to fill the gaps in health care services and supplies for those

---

[18] *Id.*

[19] *Id.* at 6.

[20] *Id; see also*, Human Rights Watch, *Mexico: Risks at Border for Those with Disabilities*, HUM. RTS. WATCH (Oct. 29, 2019), https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities.

[21] Diamond, et al., *supra* note 15, at 7.

[22] *Id.*

AR01717

1    sent to Mexico whose disabilities Defendants refuse to accommodate.[23]

2    75.    Researchers in December 2018 in Tijuana identified many barriers that

3    those migrating through Mexico face—and since the MPP began to be administered

4    in January 2019, conditions have not improved. Due to the number of migrants

5    arriving in Tijuana in 2018, Mexican officials used a sports stadium as a shelter. After

6    the stadium flooded during a storm, many migrants were forced to move into the

7    streets.[24]

8    76.    The sports stadium used as a shelter does not have any bathrooms,

9    forcing migrants to walk outside and pay for the use of a public restroom. Moreover,

10   those with disabilities are unable to access the available restrooms outside of the

11   stadium and, for example, some have required someone to push their wheelchair in

12   order to access the restroom.[25]

13   77.    While other shelters do have bathrooms on site, these facilities are filthy

14   and have puddles of water on the floor. For instance, at the "El Barretal" shelter,

15   beyond basic hygiene concerns, the slippery floor makes it impossible for wheelchair

16   users to even enter and dangerous for people with physical disabilities to use, as was

17   the case for a migrant named Rafael who uses crutches. To avoid the inaccessible El

18   Barretal bathrooms, Rafael relieves himself in a plastic can and sometimes goes five

19   days without bathing. When he does finally bathe, he pays to use a private bathroom

20   outside of El Barretal.[26]

21   78.    Migrants have reported being turned away from local clinics and

22   hospitals, which can be deadly for those with serious chronic health conditions.[27]

23   79.    In Ciudad Juárez, Chihuahua, Mexico, migrants with disabilities and

24   ───────────────
     [23] *Id.* at 7-8.

25   [24] Carlos Ríos Espinosa, *Life with a Disability in the Migrant Caravan*, HUM. RTS.
         WATCH (Dec. 20, 2018), https://www.hrw.org/news/2018/12/20/life-disability-
26       migrant-caravan.

27   [25] *Id.*

     [26] *Id.*
28
     [27] Eller et al., *supra* note 8, at 29.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01718

chronic health conditions face obstacles in obtaining basic services and health care. The Mexican government fails in supporting migrants with disabilities and chronic health conditions returned from the United States by Defendants in a variety of ways. For example, the Mexican government has an inadequate system for identifying people with disabilities and health conditions nor and for providing information about and access to health care.[28]

80.    None of the four shelters in Ciudad Juárez, even the newly built ones, are fully accessible to persons with disabilities returned to Mexico by Defendants. The government-run Leona Vicario National Integration Center, which has a capacity for 3,000 people, originally had no beds, leaving people to sleep on the floor, including persons with disabilities. The shelter also has no accessible bathrooms for persons with physical disabilities and no accessible transportation nearby.[29]

81.    Some individuals with disabilities reported that neither American nor Mexican government officials provide them sufficient information or otherwise facilitate access to health care. Although a state health insurance program exists for low-income migrants, many were not told of its existence. For example, a woman with high blood pressure and a man with a prosthetic eye were deprived of critical health care because they were not informed of the state health insurance.[30]

82.    Limited food options at many shelters results in an inability to provide appropriate dietary accommodations for persons with certain disabilities and chronic illnesses, which can lead to a deterioration in their health.[31]

83.    The COVID-19 pandemic has also exacerbated access to shelters for individuals with disabilities returned from the United States. In Matamoros and

---

[28] *Mexico: Risks at Border for Those with Disabilities*, HUM. RTS. WATCH (Oct. 29, 2019), https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities.

[29] *Id*.

[30] *Id*.

[31] *Id*.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01719

1    Tijuana, migrant shelters have announced that they will be closing or no longer

2    accepting new residents.[32]

3    *Deafness*

4        84.    Numerous sources point to Mexico as being unsafe and unsupportive to

5    deaf or hard-of-hearing persons.

6        85.    There is a lack of sign language interpreters for the most basic services,

7    especially in health care. In a survey regarding accessibility, a mother in the MPP

8    with a deaf child stated that there are no sign interpreters in Mexican hospitals and

9    that sometimes hospitals would not allow her to accompany her deaf child to

10   appointments.[33]

11       86.    Advocates for individuals who are deaf or hard-of-hearing in Mexico

12   often speak to the constant discrimination and societal and institutional barriers that

13   deaf persons face in Mexico.[34]

14   *Blindness*

15       87.    People who are visually impaired face architectural barriers as a major

16   obstacle to accessing rehabilitation services in Mexico.[35]

17       88.    Blind people also face discrimination and accessibility challenges in

18   Mexico. For example, many blind people are prevented from entering public places

19   and using public transportation with their guide dogs. Once inside, navigating public

20   places can be particularly difficult, for barriers such as many elevators do not have

21

22

23   _____

     [32] *Id*. at 30.

24   [33] Amanda Admire & Blanca Ramirez, *Violence and Disability: Experiences and
     Perceptions of Victimization Among Deaf People*, JOURNAL OF INTERPERSONAL
     VIOLENCE  13-14 (Sept. 14, 2017),

25   https://journals.sagepub.com/doi/10.1177/0886260517730564.
     [34] Paola Cortés Pérez, *Sordos Enfrentan Discriminación Social e Institucional:
     DIES*, UNIVERSO (Nov. 3, 2018), https://www.uv.mx/prensa/general/sordos-

26   enfrentan-discriminacion-social-e-institucional-dies/.

27   [35] Guillermo Rivera, *Como es Ser Invidente en México*, VICE (en español) (July 7,
     2016), https://www.vice.com/es/article/pp5qvm/los-ciegos-la-tenemos-

28   complicada-como-es-ser-invidente-en-mexico.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01720

1    braille signage.[36]

2    89.    In its 2019 Country Reports on Human Rights Practices, the State

3    Department stated that public buildings and facilities were often not accessible to

4    those with disabilities. Furthermore, the State Department documented systemic

5    problems of abuse and unhygienic conditions within mental health institutions and

6    care facilities meant for people with disabilities in Mexico.[37] The report found that

7    "[p]ublic buildings and facilities often did not comply with the law requiring access

8    for persons with disabilities."[38]

9    **B.    Heightened Risks to People with Disabilities of Kidnapping, Abuse, and**

10   **Hospitalization in the Informal Refugee Camps**

11   90.    By placing individuals with disabilities and medical conditions and their

12   families in the MPP, Defendants force them to live in Mexico where they are

13   particularly vulnerable to criminal activity. Plaintiffs and putative class members

14   stand out within their Mexican surroundings because they live in the camps, speak

15   with non-Mexican accents (or do not speak Spanish at all), or because of their

16   disability. Criminals often assume people in the MPP have U.S. relatives who can be

17   extorted for large sums of money.

18   91.    From November 2019 to January 2020, criminal organizations in the

19   Mexican state of Tamaulipas kidnapped at least 80 migrants and attempted to kidnap

20   an additional 19 people who were in the MPP.[39] The organization Doctors Without

21   Borders reported that between June 2018 and July 2019, 45% of the 2,315 people

22   (migrant, asylum seekers, refugees, or returnees) treated by their mental health teams

23

---

24   [36] Mario Mora Legaspi, *Lamentan que Haya Discriminación Hacia Personas
      Invidentes*, FUNDACIÓN ONCE AMÉRICA LATINA (Oct. 7, 2014),

25   https://www.foal.es/es/noticias/lamentan-que-haya-discriminaci%C3%B3n-
      hacia-personas-invidentes.

26   [37] U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2019:
      MEXICO 25 (2019), https://www.state.gov/reports/2019-country-reports-on-human-

27   rights-practices/mexico/.
      [38] *Id.*

28   [39] *US: Investigate 'Remain in Mexico' Program*, HUM. RTS. WATCH (June 2, 2020),
      https://www.hrw.org/news/2020/06/02/us-investigate-remain-in-mexico-program.

CLASS ACTION COMPLAINT FOR
                                          DECLARATORY AND INJUNCTIVE RELIEF

AR01721

in the Tamaulipas cities of Reynosa and Matamoros reported being victims of violence while in Mexico.[40]

92.    In line with these larger trends, Plaintiffs have suffered under the poor health conditions, disability discrimination, and crime they experience in Mexico. Many have ended up being hospitalized in Mexico or have had their conditions deteriorate, resulting from lack of access to the medical care that would have kept Plaintiffs healthy. For example, in January 2020, while Plaintiff D.Y.S. and his mother were staying in a shelter in Matamoros as a result of Defendants actions, he was sexually assaulted. D.Y.S.'s health deteriorated in the weeks following the sexual assault: He began having seizures and was eventually hospitalized. Similarly, Plaintiff S.M.A. and her mother ran out of medicine for S.M.A.'s brain disorder, lissencephaly, after being sent to a makeshift migrant camp in Matamoros, Mexico. Her mother had no way of replacing the medicine, resulting in S.M.A's hospitalization.

93.    Apart from issues of crime and health, conditions in the camp lack the basic safeguards to make life stable and secure for Plaintiffs and class members.

94.    In addition to the above-mentioned risks, the COVID-19 pandemic has made the situation for individuals with disabilities and medical conditions in the MPP more dire. On July 17, 2020, DHS and DOJ postponed Section 240 proceedings for people in the MPP until the completion of certain public health criteria, which caused additional backlog in court proceedings.

95.    Nonetheless, Defendants are still issuing new hearing dates for people in the MPP. Plaintiffs who have been given updated court hearing dates have attempted to prepare for their claims despite the limitations and lack of access noted above, only to have the court dates postponed yet again each time.  Each successive

---

[40] *US 'Remain in Mexico' Policy Endangers Lives of Asylum Seekers in Tamaulipas State*, DOCTORS WITHOUT BORDERS (Sept. 5, 2019), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/us-remain-mexico-policy-endangers-lives-asylum-seekers-tamaulipas.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

AR01722

postponement of Plaintiffs' hearings does nothing to provide them with appropriate accommodations to pursue their claim: Plaintiffs are forced to remain in the abysmal conditions described in detail above in order to access even basic medical care and humanitarian aid. If they leave and are forced to give up their space in a shelter or a refugee camp, where access is restricted, some people risk losing access to even these minimal protections of the tent camp or shelter.

96.     In addition to the crime and poor health conditions that Plaintiffs have experienced in Mexico, they now face another layer of threat due to COVID-19 exposure. The informal refugee camps force people to live within arm's reach of other tents. These overcrowded conditions are ripe for the spread of COVID-19.[41] Named Plaintiffs and other similarly situated individuals have medical conditions and/or disabilities that put them at high risk of serious, potentially life-threatening outcomes from COVID-19.

## C.    The Named Plaintiffs' Experiences

## 1., 2., & 3.  E.A.R.R., G.S.E.R., and B.A.E.R.

97.     Defendants forcibly sent E.A.R.R. and her two sons, G.S.E.R. and B.A.E.R., to Mexicali, Mexico pursuant to the MPP.

98.     E.A.R.R. is a person with disabilities: She has a pituitary tumor that presses against her brain and causes severe headaches, dizziness, and fainting spells. Doctors diagnosed the tumor about three years ago, but E.A.R.R. was unable to undergo the necessary procedures to manage her condition. Her condition substantially limits her ability to care for herself, think, concentrate, and work, and impairs her neurological and brain functions.

99.     E.A.R.R.'s son, G.S.E.R., is also a person with a disability: he has only one functioning lung. This substantially impairs his respiratory and immune functions. For example, when exposed to cold temperatures, he suffers from a severe

---

[41] Ashoka Mukpo, *Asylum Seekers Stranded in Mexico Face a New Danger: COVID-19*, ACLU (Mar. 26, 2020), https://www.aclu.org/news/immigrants-rights/asylum-seekers-stranded-in-mexico-face-a-new-danger-covid-19/.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01723

1    cough.

2        100.   On or around May 17, 2019, Defendants apprehended E.A.R.R. and her

3    children and took them into custody. Defendants detained E.A.R.R. and her sons for

4    five days, including time in a *hielera* (a Spanish-language term immigrants use to

5    refer to certain border detention facilities).

6        101.   Defendants knew about E.A.R.R.'s and G.S.E.R.'s physical health

7    conditions because these conditions worsened in the *hielera*. At the *hielera,* G.S.E.R.

8    developed a severe cough due to the cold temperature's impact on his lung condition.

9    E.A.R.R. battled an incapacitating headache caused by her tumor. After making her

10   wait for several hours, Defendants' guards gave her medication that alleviated some

11   of the pain.

12       102.   On information and belief, sometime during the family's detention,

13   Defendants placed E.A.R.R., G.S.E.R., and B.A.E.R. in the MPP. They did not

14   receive interviews or an opportunity to discuss their medical concerns about being

15   returned to Mexico. The family was never given a chance to understand the

16   determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly

17   sent them to Mexico.

18       103.   Since being sent to Mexicali, E.A.R.R. and her sons have struggled.

19   E.A.R.R. is very worried about not being able to afford treatment if she or her sons

20   get ill. She has been unable to work as she has no-one to care for her sons and is

21   afraid for her and her sons' safety.

22       104.   Because of this stress and instability, E.A.R.R.'s headaches have

23   worsened: The pain now spreads down her arms and hands and she is barely able to

24   sleep due to the pain. She has dizzy spells that impair her ability to function.

25       105.   Within the past couple of months, E.A.R.R. went to get medicine for her

26   headaches at a pharmacy. The medical personnel referred her to a specialist for

27   several tests. Based on her blood test, the specialist told her that, due to her pituitary

28   tumor, she had extremely high levels of the hormone prolactin in her blood—the

22

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01724

1    healthy level being around 20 nanograms per milliliter (ng/mL) and hers being

2    around 150 ng/mL. She had a follow-up appointment, but despite receiving medicine,

3    E.A.R.R.'s condition has not improved and suffers from severe headaches, pain in

4    both arms, and dizziness. She was told that she now needs surgery.

5        106.   E.A.R.R. struggles to perform everyday tasks because of her severe

6    headaches and she is worried her family is even more vulnerable in Mexico because

7    of her medical condition. As she struggles due to her medical condition, she will be

8    unable to meaningfully participate in her and her sons' removal proceedings. Her

9    severe headaches and difficulty sleeping impact her ability, on behalf of herself and

10   her children, to (i) focus on and understand what is asked of her to participate in

11   immigration proceedings on behalf of herself and her children; (ii) provide accurate,

12   relevant, helpful responses to questions in court or on necessary forms; and (iii)

13   collect and provide required information and documents.

14       107.   E.A.R.R. is very worried that her son, G.S.E.R., will contract COVID-

15   19. She knows that he is more vulnerable due to his lung disorder.

16       108.   As G.S.E.R. is thirteen years old and B.A.E.R. is twelve years old,

17   E.A.R.R. prepares their cases and presents their claims in conjunction with her own.

18   Because of this, E.A.R.R.'s disability significantly impedes her participation in her

19   immigration court proceedings, and E.A.R.R. must spend significant resources in

20   caring for G.S.E.R. due to his medical condition. As a result, although he does not

21   have a disability or medical condition, B.A.E.R. cannot receive proper assistance

22   from his mother in the preparation of his case.

23       109.   When she appeared for a hearing, E.A.R.R. tried to tell the judge that

24   she and her son experience severe health issues and that they felt unsafe returning to

25   Mexico. The judge suggested E.A.R.R. talk with immigration officers about this, but

26   Defendants' employees never gave her the chance to do so before forcibly sending

27   her back to Mexico.

28       110.   E.A.R.R. and her children were denied relief in immigration court

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01725

proceedings and her case is now on petition for review before the Ninth Circuit Court of Appeals. She and her children face obstacles along the appeal process as well.

**4.    L.Y.G.**

111.   Defendants forcibly sent L.Y.G. and her two children to Tijuana, Mexico pursuant to the MPP.

112.   L.Y.G. has multiple physical and mental disabilities and disorders: She has hypertension (high blood pressure), hyperglycemia (high glucose levels), scoliosis, kidney stones so severe that she needs surgery, Post-Traumatic Stress Disorder (PTSD), and panic attacks. Four years ago, doctors diagnosed her with scoliosis. On a daily basis, L.Y.G.'s scoliosis substantially impairs her ability to walk, stand, lift, bend, and care for herself. Additionally, her chronic conditions— hyperglycemia and hypertension—impairs her immune and circulatory function. Her PTSD and panic attacks impair her ability to think, concentrate, and communicate.

113.   Defendants detained L.Y.G. and her children in the in the *hielera* for four days. Defendants were aware of L.Y.G.'s physical disabilities because they performed a medical examination on her. In addition to her disabilities, Defendants' medical staff diagnosed L.Y.G. with an additional physical health condition: influenza. Every day, the officers brought L.Y.G. medicine, but she did not know what type of medicine they were bringing her. L.Y.G. remembers having a fever and her daughter telling her that her skin was hot to the touch.

114.   Upon information and belief, Defendants decided to place L.Y.G. and her family into the MPP. They did not receive interviews or an opportunity to discuss their medical concerns about being returned to Mexico. The family was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants' employees forcibly sent them to Mexico. Indeed, Defendants sent L.Y.G. to Mexico even when she had not recovered fully from the flu. L.Y.G. was not able to explain why she could not return to Mexico.

115.   L.Y.G. has experienced numerous barriers to medical treatment. Since

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01726

March 2020, L.Y.G. has not been able to get free medications for her panic attacks; therefore, she cannot manage her conditions. L.Y.G. is afraid to have surgery because she has heard that her operation is serious and she is concerned about what will happen to her children if she were to die.

116.   Given L.Y.G.'s ongoing weakness and her mental health deterioration, L.Y.G. struggles to participate fully in the family's removal proceedings. Due to her physical and mental health limitations, L.Y.G. is struggling for the survival of herself and her children. She does not have the mental or physical ability to complete all tasks necessary in between court hearings: preparing documents, compiling evidence, and communicating with attorneys. Furthermore, the limitations posed by her disabilities will prevent L.Y.G. from fully understanding and communicating at long and exhausting removal proceedings.

**5.    H.A.H.G.**

117.   Defendants forcibly sent H.A.H.G. and his family to Tijuana, Mexico pursuant to the MPP.

118.    Due to a brutal physical attack, H.A.H.G. has permanent hearing loss, an inguinal hernia, kidney cyst, and physical impairments. H.A.H.G. has severe, chronic pain in his back, neck, head, and left eye. As a result, this pain causes headaches, burning sensations around his eye, and inability to breathe well through his nose, substantially impairing his respiratory functions and limiting his ability to think, concentrate, and care for himself. H.A.H.G. has a dislocated disc in his spine and struggles to move his left arm and leg, which impairs his ability to walk, lift, bend, stand, and perform manual tasks. His disabilities are easily observable.

119.   On or about on June 18, 2019, H.A.H.G. and his two sons were apprehended. His wife entered the day before them on June 17, 2019, with their other children. His wife and three of their children are currently in the United States, while he and their two sons remain in Mexico.

120.   Defendants detained H.A.H.G. and his sons in a *hielera* for four days.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01727

Defendants were aware of H.A.H.G.'s disabilities. Upon arrival at the *hielera*, H.A.H.G. asked to speak with a doctor and for medicine because he was experiencing severe pain. H.A.H.G. repeatedly requested medical attention for his pain, but Defendants repeatedly denied or ignored his requests. At one point, Defendants told H.A.H.G. that only children were entitled to medical attention. H.A.H.G. struggled to sleep because of the pain.

121. During his detention, H.A.H.G. was interviewed by Defendants' employees. H.A.H.G. explained the attack and his resulting limitations, pointing to places on his body where he had been injured.

122. Upon information and belief, Defendants decided to place H.A.H.G. into the MPP. He was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly sent him and his sons to Mexico.

123. H.A.H.G. continues to endure severe pain from his disabilities. In Mexico, there are many days where H.A.H.G. is unable to walk or do anything because of the pain he is experiencing. Sometimes, he is unable to even put his foot on the floor to get out of bed because he is in so much pain. H.A.H.G. has been taking over-the-counter painkillers like ibuprofen for over two years, but the medication is insufficient to address the resulting limitations. Doctors have told H.A.H.G. that he needs a neurologist, a pain management specialist, a kidney specialist, and a spinal column specialist to address his physical limitations—medical treatment unavailable in Mexico.

124. Because H.A.H.G. is not a Mexican citizen, he faces barriers to access health care in Mexico that prevent him from receiving such specialized medical treatment. This makes it very hard for him to take care of his children and himself, let alone work on their asylum case. He and his sons therefore face obstacles preparing for and participating in their immigration proceedings because of H.A.H.G.'s disability. His sons help him as much as they can, but they are too young

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01728

to prepare court filings, compile evidence, consult with attorneys, and represent the family in removal proceedings.

125.   H.A.H.G. struggles to complete ordinary, day-to-day tasks. Due to the physical limitations, his lack of hearing aid, his headaches, and his chronic pain, he believes his conditions will interfere with his ability to travel to court, sit through hours of proceedings, understand the judge, and adequately present his family's asylum case. Furthermore, he finds it challenging to go to court, especially due to the long wait involved in waiting for transportation to court hearings in MPP.

**6. & 7. Y.J.C.E. and J.A.E.M.**

126.   Defendants forcibly sent a child with disabilities, Y.J.C.E., his mother J.A.E.M., and the rest of his family to Mexicali, Mexico pursuant to the MPP.

127.   Y.J.C.E. has a physical health condition: a heart murmur that causes chest pain. This congenital heart defect substantially limits his respiratory function, causing him to struggle to breathe at times. Y.J.C.E.'s heart veins are smaller than normal, so doctors recommend that he needs to be under medical surveillance at all times and cannot do any strenuous activities. Additionally, Y.J.C.E.'s immune system is substantially impaired, meaning that he may not survive medical events such as a fever, a cold, or COVID-19.

128.   On or around October 26, 2019, Defendants took Y.J.C.E. and his family into custody. The agents separated Y.J.C.E. and his father from J.A.E.M. and sister.

129.   Defendants detained Y.J.C.E. and his family for three days. Defendants were aware of Y.J.C.E.'s medical condition. While detained, Y.J.C.E. was examined by a doctor who told his mother, J.A.E.M., that her son had a heart murmur and that his condition could worsen in the future. J.A.E.M. immediately grew concerned that the *hielera*'s cold temperatures would worsen her son's condition.

130.   Defendants placed Y.J.C.E. into the MPP with his mother J.A.E.M, his sister and his father. His parents were never given a chance to understand the

1   determination, appeal the decision, or contact a lawyer. Instead, Defendants'
2   employees forcibly sent them to Mexicali, Mexico in a small bus. Given the doctor's
3   recent prognosis, his mother, J.A.E.M., was terrified for her son's health.

4       131.   J.A.E.M. and her husband struggle to care for him in Mexico. Their
5   housing will soon end, placing them at risk of becoming homeless. Y.J.C.E.'s
6   medical insurance has ended, so his mother worries that he will not be able to receive
7   adequate medical care for his condition. In particular, J.A.E.M. is worried that
8   Y.J.C.E. will be exposed to COVID-19 and she will not be able to afford a doctor
9   visit or the necessary medicine.

10      132.   Y.J.C.E. and his family have had three immigration court hearings.
11  Their individual court proceeding was set for April 2020, but because of COVID-19,
12  it has been delayed and they have stayed much longer in Mexico.

13      133.   Given their circumstances in Mexico and Y.J.C.E.'s need for constant
14  supervision, J.A.E.M. uses a substantial amount of time, energy, and focus to
15  concentrate on overcoming daily obstacles, such as ensuring Y.J.C.E. remains
16  healthy. Thus, it is difficult for J.A.E.M. to concentrate on preparing for their asylum
17  claim. This affects Y.J.C.E. who is a minor and relies on his parents to represent his
18  interests in court.

19  **8. & 9. S.F.L. and C.J.M.L.**

20      134.   Defendants forcibly sent S.F.L. and her eight-year old son, C.J.M.L., to
21  Tijuana, Mexico pursuant to the MPP.

22      135.   S.F.L. has multiple medical conditions: diabetes, cataracts, and severe
23  depression. Doctors diagnosed her diabetes fourteen years ago. This condition
24  substantially limits her ability to care for herself and sleep. For example, she wakes
25  up regularly at night when her blood sugar level drops dangerously low. When this
26  happens, S.F.L. is unable to help herself; instead, she relies on C.J.M.L. to bring her
27  food or something to drink to increase her blood sugar levels. S.F.L.'s cataracts are
28  a result of her diabetes. The cataracts impair her ability to see and cause pain in her

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01750

head, which limits her ability to read and think. She has had surgery but still has vision problems. Lastly, her depression interferes with her ability to focus and care for herself, causing her to have suicidal thoughts.

136.   S.F.L.'s eight-year-old son, C.J.M.L., was born with a closed urethra, which required surgery when he was just three months old. Although he needs another surgery, he must first see an endocrinologist because he is also prone to low blood sugar. S.F.L. already struggles due to her own health, and at times must rely on her son. As a result, having to care for C.J.M.L.  further aggravates S.F.L.'s circumstances.

137.   Defendants detained S.F.L. and her son. Defendants were aware of S.F.L.'s disabilities because, on the third day in the *hielera*, S.F.L. told Defendants' agents that she and her son were ill and informed the agents that she was diabetic and that her son's symptoms are likely indicative of low blood sugar. S.F.L. also informed the agents that she had been told that C.J.M.L. needs to see a specialist related to his blood sugar issues.

138.   The agents took S.F.L. and her son to the hospital for a check-up. During the check-up, S.F.L. told the doctor about her cataracts. The doctor then gave S.F.L. diabetes medicine and sent her and C.J.M.L. back to the *hielera*.

139.   On information and belief, around that time, Defendants placed S.F.L and C.J.M.L. into the MPP. She was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly sent them to Mexico.

140.   In Mexico, S.F.L. cannot access the food and medical care necessary to manage her disabilities. S.F.L. is unable to afford to see the specialists she and C.J.M.L. so desperately need in order to improve their health. The conditions have worsened her depression. S.F.L. often struggles to find enough food to sustain them, further exacerbating their low blood sugar issues.

141.   At S.F.L.'s first court hearing in the United States, she informed the

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01751

judge that she needed emergency surgery for her eyes because her cataracts made it increasingly difficult to see. The judge told S.F.L. that she needed to find an attorney and to inform immigration officers. S.F.L. informed the officers but was still sent back to Mexico.

142.    S.F.L.'s limitations have already almost forced her and C.J.M.L. to lose their immigration proceedings. In Mexico, S.F.L.'s eyesight rapidly degraded. After she was nearly run over by a car, she became fearful for her life and for what would happen to C.J.M.L. if she died. S.F.L. underwent emergency surgery. Because of complications from this surgery, S.F.L. was forced to miss her last court date. She was informed that the court terminated their case due to her absence. Their case was appealed and remanded to the immigration court. However, due to her limitations, S.F.L. still faces challenges to prepare for and attend her hearings with C.J.M.L. Her cataracts, for example, may severely impede her ability to read, review, and present documents in hearings that rely on written documents. Her depression can affect her motivation and focus on preparation and participation.

**10. & 11. Y.M.M. and J.C.M.M.**

143.    On or around March 27, 2020, Defendants forcibly sent Y.M.M. and her daughter J.C.M.M. to Matamoros, Mexico under the MPP. They were then taken to Tijuana, Baja California by the Mexican government.

144.    Y.M.M. suffers from a trauma-related disorder consistent with PTSD. Her condition substantially interferes with her ability to think, communicate, and care for herself and for J.C.M.M. While trauma-related disorders are not visible to the eye, Y.M.M. had an interview with an official, and her cognitive issues would become apparent upon an interview with her. At the time of her detention in CBP custody, Y.M.M. also had a severely infected foot that limited her ability to walk, of which Defendants were also aware.

145.    J.C.M.M. has epilepsy, a mild intellectual disability, severe asthma, frequent urinary tract infections, and a bleeding condition for which she has

AR01752

undergone testing due to the possibility that it is tumor-related. J.C.M.M.'s medical conditions substantially interfere with her cognitive abilities and her awareness and physical safety, as well as her bladder and immune functions. As she suffered a seizure in detention, her epilepsy was or should have been open and obvious to Defendants. J.C.M.M.'s uncontrolled asthma was or should have been also open and obvious to Defendants, as the asthma attack she suffered in their custody caused her to appear purple all over at times when she was in detention.

146.   Defendants detained Y.M.M. and J.C.M.M. Defendants knew about their medical conditions. While detained, Y.M.M. asked Defendants' for medical help for J.C.M.M.

147.   Defendants decided to place Y.M.M. and J.C.M.M. into the MPP. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants' employees forcibly sent them to Mexico.

148.   The conditions in Mexico have exacerbated the limitations arising from both Y.M.M.'s and J.C.M.M.'s medical conditions. J.C.M.M. requires significant medical care, chiefly for her epilepsy and intellectual impairment, as well as for her urinary condition. Due to the strain of trying to find the medical care that J.C.M.M. needs and the stress of the conditions in which they are living, Y.M.M.'s mental health condition has deteriorated, affecting her ability to think, concentrate, focus, and communicate. Y.M.M. has a traumatic disorder that is being diagnosed, which causes her to experience scattered thinking. These limitations mean that Y.M.M. is struggling to understand and prepare for her immigration case.

149.   Furthermore, as Defendants placed them into separate removal proceedings, J.C.M.M., as a six-year old with uncontrolled epilepsy and asthma, will likely be forced to attend any hearing alone, without the support of Y.M.M. J.C.M.M.'s seizure condition is currently poorly controlled, creating a risk that she will have a seizure while waiting for a hearing, on the way to a hearing, or during a hearing. This would preclude meaningful participation in their case and puts

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01753

1    J.C.M.M.'s health in grave danger.

2    **12.    G.F.F.**

3       150.   Since around July 2019, Defendants have forcibly kept G.F.F., a thirty-

4    eight-year-old man, in Tijuana, Mexico under the MPP.

5       151.   G.F.F. is a victim of torture, which occurred while in his home country.

6    He has been diagnosed with depression and suffers from insomnia and traumatic

7    nightmares. These conditions significantly impair his ability to think, concentrate,

8    and sleep.

9       152.   In or around July 2019, Defendants detained G.F.F. His initial detention

10   by Defendants resurfaced the trauma of his past torture.

11      153.   Defendants placed G.F.F. into the MPP. He was never given a chance

12   to understand the determination, appeal the decision, or contact a lawyer.

13      154.   G.F.F. attended one court hearing for his immigration case.  For his

14   following hearing, he was not given special transport instructions needed to be

15   transported to his hearing, so he was not allowed to enter the United States to attend

16   court. In his absence, he was ordered removed. This led to his detention by Mexican

17   authorities.

18      155.   On or around February 25, 2020, G.F.F. was re-detained by Mexican

19   officials and held for about twenty-five days.  Because he had been tortured in

20   detention by his home country's government, this experience again traumatized him.

21   He asked to see a physician and tried to show his documentation for his prescriptions

22   and diagnoses unsuccessfully. G.F.F. was seen by a physician only towards the end

23   of his detention, around the twenty-third or twenty-fourth day of detention. The

24   physician referred him to a psychiatrist, but G.F.F. was released before he could see

25   a psychiatrist in detention.

26      156.   G.F.F.'s disability, known to the Defendants, prevents him from

27   meaningfully participating in his immigration proceedings because the trauma of his

28   torture in detention by government officials is aggravated by the repeated detention

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01754

1    and interaction with CBP officers that the MPP court involves.

2    **13.   M.Y.J.L.**

3    157.   Since on or around March 13, 2020, Defendants have forcibly kept
4    M.Y.J.L., a thirty-four-year-old woman, in Tijuana, Mexico, with her husband under
5    the MPP.

6    158.   She suffers from fibroids and endometriosis. Her fibroids and
7    endometriosis cause her debilitating pain and protracted menstrual bleeding. Her
8    condition is worsening and, in transit to the border with the United States, Mexican
9    agency workers referred her to specialist care.  However, she has not been able to
10   pursue this or obtain the care that she needs.

11   159.   On or around March 13, 2020, M.Y.J.L. and her husband were detained
12   by the Defendants.  M.Y.J.L., who is only fluent in Spanish, tried to make Defendants
13   aware of her disability but Defendant did not provide a Spanish-fluent agent nor an
14   interpreter.  Defendants did not otherwise seek to engage meaningfully with M.Y.J.L.
15   in discussing her disability.

16   160.   Defendants placed M.Y.J.L. into the MPP. She was never given a
17   chance to understand the determination, appeal the decision, or contact a lawyer.
18   Nevertheless, Defendants forcibly returned M.Y.J.L. and her husband to Mexico.

19   161.   M.Y.J.L. has been unable to obtain the care she needs since she was
20   placed in MPP and her condition is getting worse. The protracted bleeding makes her
21   feel weak and her pain is debilitating and worsening. This pain is such that it would
22   prevent her from being able to prepare for her hearings or participate in them while
23   she is suffering such pain. Her weakness from her bleeding prevents her from being
24   able to take the steps she needs to prepare for her hearings or proceedings or take
25   steps in her case at times that she is not feeling pain.

26   **14. M.M.G.**

27   162.   Since on or about September 26, 2019, Defendants have forced M.M.G.
28   and his mother, father, and sister, to remain in Mexico under the MPP.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01755

163.   Plaintiff M.M.G. is a 16-year-old boy, suffering from a brain injury following surgery to reconstruct a brain blood vessel. He experiences painful headaches, impaired memory, and confusion. M.M.G.'s brain injury significantly impairs his ability to think, communicate, and focus as well as his brain functions.

164.   On or around September 19, 2019, Defendants took him and his family, his mother, father, and sister, into detention. While in detention, his mother, V.A.G., notified Defendants of M.M.G.'s brain condition and his need for medical care.

165.   Defendants placed M.M.G. and his family into the MPP. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Defendants forcibly returned the family to Mexico.

166.   M.M.G. may be sixteen-years old, but his family has to watch him closely due to his condition: he is easily confused, experiences headaches, and has memory problems. Caring for M.M.G. in MPP takes up much of the family's time and attention, making it difficult to concentrate on his, and their own, claims before the immigration court.

**15.   D.Y.S.**

167.   Since November 2019, Defendants have forcibly kept D.Y.S., a nine-year-old indigenous child, and his mother, M.S.S., in the MPP in Matamoros, Mexico.

168.   D.Y.S. has three long-diagnosed disabilities: epilepsy, autism spectrum disorder, and hyperactivity. D.Y.S.'s disabilities substantially impair his ability to learn, and he depends heavily on his mother even for daily life tasks. D.Y.S. needs M.S.S.'s support to care for himself and eat. These disabilities also severely affect D.Y.S.'s immune system. His disabilities are documented and easily observable.

169.   Defendants took M.S.S. and D.Y.S. into custody sometime in August 2019. Defendants were aware of D.Y.S.'s disability. While in CBP custody, M.S.S. told CBP agents that D.Y.S. had a medical condition and that he needed medicine. She provided medical documentation that explained D.Y.S.'s diagnosed disabilities

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    and resulting medical needs.

2        170.   Instead of providing medical assistance, CBP agents said that D.Y.S.

3    was "special" and instructed other people not to touch him. While detained in the

4    *hielera* and without adequate care, D.Y.S.'s health rapidly deteriorated so that D.Y.S.

5    had a severe seizure and had to be hospitalized. Nevertheless, agents returned D.Y.S.

6    to the same conditions that caused his hospitalization and failed to provide

7    medication as directed by doctors.

8        171.   Prior to returning them to Mexico, an officer interviewed M.S.S. over

9    the telephone. She discussed her fear of returning to Mexico and D.Y.S.'s medical

10   conditions. Despite medical documentation, the officer refused to believe that D.Y.S.

11   had medical conditions. On or around the time of this interview, officials decided to

12   place M.S.S. and D.Y.S. in the MPP and return them to Mexico. M.S.S. was never

13   given a chance to understand the determination, appeal the decision, or contact a

14   lawyer.

15       172.   Upon seeing the bridge, M.S.S. frantically begged the officers not to

16   return her, saying that she was afraid to go to Mexico, especially due to the violence

17   and D.Y.S.'s recent hospitalization and poor health. Despite this, agents forcibly sent

18   M.S.S. and D.Y.S. to Mexico pursuant to the MPP.

19       173.   On the day after their first immigration court hearing, D.Y.S. was again

20   hospitalized. The doctors gave D.Y.S. some medicine and released him. Soon after

21   his release, M.S.S. approached the international bridge and asked CBP to re-assess

22   their placement in the MPP. D.Y.S. was weak from his hospitalization and needed

23   help walking. Without providing paperwork or a reason for the decision, the agent

24   told M.S.S. that D.Y.S. was fine, implying that the agent was refusing the request for

25   redetermination. The agent never informed M.S.S. or D.Y.S. about any right to

26   appeal the determination.

27       174.   M.S.S. and D.Y.S., along with an attorney, made two additional

28   attempts to request parole but were denied in the same manner: without a record of

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01757

the denial or any information about the reason for the denial or appeals process.

175.   D.Y.S.'s limitations affect M.S.S.'s ability to prepare for their immigration hearing. The medical support that D.Y.S. needs for any type of stability is completely out of reach while M.S.S. and D.Y.S. are in the MPP. Without stability, M.S.S. must constantly attend to D.Y.S.'s health and safety; she has no time or resources to work on their asylum case. Despite M.S.S.'s best efforts, every day poses risks to D.Y.S.'s health.

176.   D.Y.S.'s limitations impact M.S.S.'s ability to participate in their immigration hearings. At the tent court, Defendants employees or subcontractors refuse to take care of D.Y.S. due to his disability, telling M.S.S. that she had best keep him. Defendants' employees do not make accommodations for food appropriate for D.Y.S.'s dietary needs, causing D.Y.S. to further struggle. During court hearings, M.S.S. must pay attention to managing D.Y.S. while trying to answer the judge, which can cause her to struggle to speak with the judge and makes her feel flustered.

**16.   S.M.A.**

177.   Defendants forcibly returned a child with disabilities, S.M.A., and her mother to Matamoros, Mexico pursuant to the MPP.

178.   S.M.A. has lissencephaly, a condition caused by the brain's failing to develop normal deep grooves and ridges, which means that she will likely live to be only ten years old. As a result, S.M.A. has seizures and is severely developmentally impaired. This disability substantially impairs major life activities, such as caring for herself, eating, speaking, learning, concentrating, and communicating. Her disability affects major bodily functions such as bowel and bladder functions, as well as neurological, brain, and respiratory functions. S.M.A.'s mother, K.A.M., provides S.M.A. with constant assistance and care.

179.   On or about August 2019, S.M.A. and her mother K.A.M. were apprehended by Defendants, who sent them to a *hielera*.

180.   Defendants are aware of S.M.A.'s disability. Immediately after being

apprehended, K.A.M. told CBP agents about S.M.A.'s disability and need for medication, showing them her medical documentation and medication. At that time, CBP refused to provide S.M.A. with the necessary medical care or treatment.

181.   While at the *hielera*, K.A.M. repeatedly told Defendants about S.M.A.'s condition and need for medication. Although Defendants finally brought medicine, K.A.M. later discovered that agents were providing medication to S.M.A. were not in accordance with the medical documentation and inappropriate for S.M.A.'s condition. In these conditions, S.M.A.'s health deteriorated.

182.   Although aware of S.M.A.'s disability, Defendants placed K.A.M. and her daughter to the MPP. On information and belief, Defendants never asked, or in any way investigated, if K.A.M. or her daughter were afraid to be sent to Mexico.

183.   Defendants provided no notice of decision, opportunity to appeal the decision, or chance to speak with a lawyer. Indeed, K.A.M. did not realize she and her daughter were being sent to Mexico until the bus arrived at the Brownsville-Matamoros bridge. K.A.M. repeatedly explained to CBP officers about S.M.A.'s conditions and the need for proper medication and their fear of Mexico. Instead of providing any process for appeal, or re-determination, the CBP officers answered that they did not care and that K.A.M. and S.M.A. were not welcome in the United States.

184.   While living in Mexico under the MPP, S.M.A.'s health has further deteriorated, causing her be hospitalized. K.A.M. often cannot obtain S.M.A.'s necessary medications on time or, sometimes, at all. Due to S.M.A.'s medical conditions, K.A.M. does not believe her daughter would survive contracting COVID-19.

185.   CBP agents refused to re-evaluate S.M.A.'s placement in the MPP. K.A.M. and S.M.A. have gone twice to the Brownsville-Matamoros Bridge with documentation of S.M.A.'s medical condition. Although they waited hours each time for a decision, Defendants' employees returned them without providing notice or a rationale for the decision or an opportunity to appeal the decision.

AR01759

186.   Due to S.M.A.'s need for care in the conditions of Matamoros, K.A.M. has struggled to prepare for their immigration proceedings. She cannot leave S.M.A. alone and must continuously worry about S.M.A.'s medication. This interferes with K.A.M.'s time and focus to work on their immigration case, like focusing on tasks such as compiling evidence, completing paperwork, and consulting with her attorney.

187.   S.M.A.'s disability has severely impacted K.A.M.'s ability to participate in their immigration proceedings. As K.A.M. cannot find anyone who can properly care for S.M.A. due to her disabilities, K.A.M. has had to take S.M.A. to their immigration court hearing all three times. When K.A.M. tries to speak with the judge, S.M.A. yells, tries to get up, or talks about random things, including to the judge, distracting K.A.M. and the judge. During the most recent hearing, S.M.A. had a seizure as they waited for the court. Right after S.M.A. regained consciousness, K.A.M. was forced to enter the room for her immigration hearing. She was so worried about S.M.A. that she could not answer the judge's questions.

**17 & 18. D.G.M. and N.R.R.**

188.   Defendants forcibly sent D.G.M. and his family, including wife N.R.R., to Matamoros, Mexico pursuant to the MPP.

189.   D.G.M. has two heart conditions, including hypertension and a growth on his heart. D.G.M.'s medical conditions cause extreme spikes in his blood pressure that sometimes require hospitalization. These conditions substantially limit major life activities, such as breathing, performing manual tasks, and working, and major bodily functions, such as respiratory and circulatory functions.

190.   On July 26, 2019, Defendants took D.G.M. and his family into custody.

191.   Defendants knew of D.G.M.'s disability because he was hospitalized in custody when his blood pressure spiked dangerously high on July 27, 2019.

192.   Despite D.G.M.'s disability, Defendants subjected D.G.M. and his family in the MPP. When he came back from the hospital, Defendants' employees handed D.G.M. and his family documents in English, even though no one in

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01740

D.G.M.'s family is able to read or speak English. Defendants did not read or explain the paperwork or the family's rights. Instead, without explanation, they demanded that the family sign the documents.

193.   D.G.M. pleaded with the agents that he could not go back to Mexico due to his health issues. Instead of providing a process for appeal, or re-determination, the agents returned D.G.M. and his family to Mexico.

194.   In the MPP, D.G.M.'s health continues to worsen. He now regularly has dangerously elevated blood pressure and difficulty breathing. D.G.M. has needed medical attention multiple times. On one occasion, the entire left side of his body went numb and he fainted; nevertheless, the hospital refused to treat him. Given his current heart issues, his doctor has informed D.G.M. that his health is at greater risk of severe complications and possible death from COVID-19.

195.   D.G.M.'s heart conditions interfere with his ability to prepare for his immigration case. Due to the severity of his impairments and limits of treatment, he must monitor and care for his health. Therefore, he cannot devote sufficient efforts to such matters such as gathering information, compiling evidence, filling out documents, and consulting with attorneys.

196.   D.G.M.'s heart conditions interfere with his ability to participate in his immigration case. While in the MPP, D.G.M. and his family have attended five immigration hearings. Each time they attend court, a doctor checks the blood pressure of each family member. D.G.M. often has chest pains on days he has a hearing. The doctor informs D.G.M. each time that, if his blood pressure is too high, he will not be permitted to attend the hearing, and his court hearing will be rescheduled for a later date. As D.G.M.'s health worsens, the chances increase that he will have high blood pressure on a court date and be forced to wait for months longer for the next stage in his proceedings.

197.   N.R.R. is impacted by her husband's disability. She must devote time and energy to caring for D.G.M.'s deteriorating health, leaving her with little time or

AR01741

energy to prepare the entire family's immigration claims. Furthermore, every time they attend court, N.R.R. worries both about her husband's health and that the family's hearing will be re-set due to D.G.M.'s conditions. This distracts her from meaningfully participating in the proceedings.

**19 & 20. H.H.M. and E.H.M.**

198.   Defendants forcibly sent H.H.M., his older sister E.H.M., and his niece to Matamoros, Mexico pursuant to the MPP.

199.   H.H.M. is a twenty-year-old individual who is Deaf. H.H.M. does not know standard sign language, but communicates in "home sign," meaning a sign language that he and E.H.M. have developed together. As a result, H.H.M. relies entirely on his sister to translate what other people say to him and to relay his thoughts to other hearing people. H.H.M. is therefore substantially limited in his ability to communicate. H.H.M.'s Deafness is apparent to anyone who interacts with him.

200.   On or around March 17, 2020, H.H.M., his sister and niece were taken into custody by Defendants.

201.   Defendants knew of H.H.M.'s disability. As they were being taken into custody, one of the agents asked E.H.M. why H.H.M. came to the United States if he could not communicate with anyone.

202.   At the *hielera*, agents separated H.H.M. from E.H.M—the only person with whom he could communicate. E.H.M. explained three times to officers that H.H.M. could not hear or speak and that she was the only person that could communicate with him. One agent responded that, if that was the case, H.H.M. should not have come to the United States, effectively denying E.H.M.'s request for an accommodation. Instead, federal officials kept H.H.M. separated from the sole person with whom he could communicate for days. E.H.M. was extremely worried about her brother the entire time that she was detained.

203.   After about two days, agents decided to place E.H.M. and her daughter, H.H.M.'s niece in the MPP and return them to Mexico. They never permitted H.H.M.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01742

1  to see his sister or communicate about what was happening prior to forcibly returning
2  E.H.M. to Mexico. E.H.M. was never given an interview or a notification that she
3  had been placed in MPP, let alone a chance to appeal.

4      204.   Although Defendants knew H.H.M. was deaf, they never provided an
5  interpreter and did not inquire if he had any needs that he could not verbally
6  communicate to them. They never even permitted E.H.M. to be present or translate
7  in any interview.

8      205.   On information and belief, without using an interpreter to determine
9  H.H.M.'s fears about return to his home country or Mexico, Defendants decided to
10  place H.H.M. in the MPP and forcibly returned him to Mexico. Defendants never
11  provided chance to understand the determination, appeal the decision, or contact a
12  lawyer.

13     206.   E.H.M. was also forcibly returned to MPP, and was able to find and
14  reunite with H.H.M. because she repeatedly spoke with Mexican immigration
15  officers to see if he had been returned. She found out that H.H.M. had initially been
16  bused to southern Mexico, hours by bus from where E.H.M. was forced to stay. Only
17  after the intervention of private Mexican citizens, the two were able to reunite.

18     207.   H.H.M. cannot effectively prepare for his immigration proceedings in
19  Matamoros, Mexico. H.H.M. is overwhelmed, stressed, and worried about the
20  dangers and difficulties posed by his disability in Matamoros, ranging from difficulty
21  communicating with aid providers to high risk of being kidnapped. H.H.M. worries
22  that, if anything were to happen to E.H.M., he would be unable to communicate with
23  the world. If H.H.M. were kidnapped—a common occurrence for those Defendant
24  has returned to Mexico—he would not be able to provide even basic information to
25  possible kidnappers for his ransom. Especially with the risks of COVID-19, without
26  E.H.M., H.H.M. will struggle to communicate if he has any medical issues. As his
27  time and energy is focused on survival, he is not able to adequately focus on tasks
28  such as collecting information and preparing documents.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01743

208.   After seven months, H.H.M. has not yet had a first immigration court hearing. However, his case is separate from that of his sister. There is no indication that Defendants will provide an interpreter or other effective form of communication as part of that hearing, at the bridge, or in any interactions while he is present in the United States for court. Absent such assistance, H.H.M. will not be able to meaningfully participate in his court hearings and will be denied the opportunity to communicate his fears of returning to his home country or remaining in Mexico.

209.   E.H.M. is constantly worried about her brother. She must constantly stay close to H.H.M. to ensure that he is not attacked or otherwise harmed. In order for him to communicate with anyone, even the humanitarian organizations, she must be present to translate for him. E.H.M. has spent most of her time and energy ensuring that H.H.M. and her child are safe and cared for. She has tried to help with her brother's immigration case, but she is unsure whether she will be able to attend his hearing to translate. Due to the energy that she spends on her brother's care and case, E.H.M. does not have sufficient time or energy to prepare for her own case.

**21. C.J.V.C.**

210.   Defendants forcibly sent a child with disabilities, C.J.V.C, and his mother, to Matamoros, Mexico pursuant to the MPP.

211.   At thirteen-years old, C.J.V.C. was in a major accident and doctors had to amputate his left leg above the knee. As a result, C.J.V.C.'s mobility impairment substantially limits his ability to perform major life activities, including caring for himself, performing manual tasks, walking, standing, lifting, and bending.

212.   In September 2019, Defendants took C.J.V.C. and his mother. M.C., into custody.

213.   Defendants detained them in a *hielera* for about a week. Defendants knew about C.J.V.C.'S disability because M.C. made multiple requests that agents provide C.J.V.C. with medical attention due to pain associated with his amputation. However, agents refused to provide him with any assistance.

214.   Despite C.J.V.C.'s disability, Defendants placed C.J.V.C. and M.C. in the MPP. Neither received interviews. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Indeed, neither knew that they would be returned to Mexico until Defendants' employees walked them up to the bridge to Mexico.

215.   Since CBP agents sent them to Mexico, C.J.V.C. and M.C. are forced to live in a crowded shelter with limited access to sufficient food and resources.

216.   C.J.V.C.'s mobility impairments also impact he and his mother's ability to prepare for immigration hearings. For example, C.V.J.C. and M.C. depend on a volunteer lawyer to prepare their case. However, the only lawyer they can find does not have accessible facilities. Therefore, it is difficult for C.V.J.C. to be in a private space to privately consult with the attorney.

217.   C.J.V.C.'s mobility impairments also impact their ability to participate in immigration hearings. It is difficult for C.J.V.C. to travel to hearings. As his only set of crutches are currently broken, M.C. is unsure how they will even make it to court hearings. They have attended court hearings twice in a makeshift tent court. It is dangerous for C.J.V.C. to maneuver the court in his crutches due to uneven floors and inclines. Therefore, M.C. arrives at the hearing only after spending the entire trip worrying about whether her son will be hurt because the trip to and the hearing rooms themselves are inaccessible for him. In one hearing, after expressing her concern for her son, M.C. has broken down crying when trying to discuss her son's disability with the judge, which interferes with her ability to discuss her case.

**22. La.V.S.O.**

218.   Defendants forcibly sent La.V.S.O., a child with disabilities, and her family to Ciudad Juarez, Mexico pursuant to the MPP.

219.   La.V.S.O. has congenital hydrocephalus, which causes a build-up of fluid around her brain and spinal cord and requires continuous, specialized medical treatment. This condition causes her to have to seizures, developmental delay, and

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01745

brain damage. These impairments substantially limit major life functions, such as caring for herself and thinking, and major bodily functions, including neurological and brain functions.

220. In February 2020, Defendants took La.V.S.O., her mother, and her siblings into custody.

221. Defendants were aware of La.V.S.O.'s disabilities, as her mother, A.A.F.S.O. repeatedly attempted to show La.V.S.O.'s medical documentation to Defendants. Defendants' medical personnel also diagnosed La.V.S.O.'s condition. A doctor placed a bracelet on her showing that she had a special condition. Defendants' agents saw the bracelet and made A.A.F.S.O. remove the medical bracelet. CBP agents knew La.V.S.O. needed medication but threw away both the prescriptions and the medications.

222. On information or belief, around this time, Defendants decided to place La.V.S.O. and her family in the MPP. They did not receive interviews. The family was never given a chance to understand the determination, appeal the decision, or contact a lawyer.

223. Instead, after a few weeks in the *hielera*, agents placed the family on a bus. Once boarded, agents told the family that they were going to be sent back to Mexico. They were not given an opportunity to explain why they could not return to Mexico.

224. La.V.S.O. and her family have twice approached the international bridge in Juarez to try to explain to agents that they cannot be in Mexico. On one occasion, a doctor at the bridge examined La.V.S.O. and determined that she required special medical treatment. Officers still sent the family back to Mexico. Due to their treatment, the children have become so scared of the immigration officers, causing them to beg A.A.F.S.O. not to go to the bridge.

225. A.A.F.S.O. is forced to live with her children in a crowded shelter with little in the way of precautionary measures to prevent the spread of coronavirus,

AR01746

1   including to La.V.S.O., who could face dire consequences if infected. Without a

2   support system in Mexico, and due to La.V.S.O.'s medical condition, A.A.F.S.O.

3   must spend a significant amount of time watching over La.V.S.O. and her siblings.

4   A.A.F.S.O. reports that she must keep constant watch over La.V.S.O. for fear that

5   she will fall due to issues with her coordination caused by her brain condition.

6   A.A.F.S.O. is left with little time or energy to focus on activities such as reviewing

7   documents or consulting with her attorney, making her unable to properly prepare for

8   the entire family's immigration case.

9   **23. *Plaintiff Al Otro Lado***

10      226.   Al Otro Lado is a binational immigrants' rights advocacy nonprofit

11   organization. Al Otro Lado provides legal orientation and other services to large

12   numbers of migrants at the border between the United States and Mexico, including

13   individuals with disabilities subjected to the MPP. Al Otro Lado advocates for such

14   disabled individuals by giving them legal orientation and, in certain cases, direct

15   representation, as well as by making parole requests on their behalf or otherwise

16   advocating for them to be taken out of the MPP and paroled into the United States.

17   Al Otro Lado was incorporated at 4843 Slauson Ave., Maywood, California 90270-

18   3018, and has offices in Los Angeles, San Diego, and Tijuana.

19      227.   The Defendants' actions in failing to follow the law and their own

20   internal guidelines to exempt the Plaintiffs and their families from MPP has diverted

21   the organization's time and resources. Al Otro Lado has needed to engage workers

22   to assist with social care and provide special assistance for particularly vulnerable

23   individuals who often face more problems in their immigration proceedings because

24   of their vulnerability, whether it is due to inability to obtain or prepare documents, or

25   a higher likelihood of being kidnapped or missing court hearings. This means that Al

26   Otro Lado's ability to carry out its organizational mission to provide assistance to

27   indigent individuals on both sides of the border between Mexico and the United

28   States is undermined by Defendants' placing avoidable obstacles in their path,

1   limiting the amount of time and resources that could otherwise go to serving a wider
2   population better and with more services.

3   ## V.   CLASS ALLEGATIONS

4   228.   The named Plaintiffs seek certification pursuant to Rule 23(b)(2) of the
5   Federal Rules of Civil Procedure of the following three classes:

6   The "*Accardi* class," consisting of all people (1) who have been or will be
7   placed in the Migrant Protection Protocols program, and (2) who have known
    physical or mental health issues for purposes of the Physical/Mental Health
8   Exclusion;

9   The "Section 504 class," consisting of all qualified people with a disability
    under the Rehabilitation Act who have been, or will be, denied meaningful
10  participation in Section 240 proceedings, properly initiated or not, because
    they are placed in the MPP; and

11  The "Family Member class," consisting of the members of the family unit of
    each Section 504 class member, who are also seeking admission from CBP
12  and who are placed in Section 240 proceedings, properly initiated or not.

13  229.   All three putative classes seek certification of claims for declaratory
14  relief and injunctive relief.

15  230.   Named Plaintiffs E.A.R.R., G.S.E.R., L.Y.G., H.A.H.G., Y.J.C.E.,
16  S.F.L., C.J.M.L., Y.M.M., J.C.M.M., G.F.F., M.Y.J.L., M.M.G., D.Y.S., S.M.A.,
17  D.G.M., H.H.M., C.J.V.C., La.V.S.O. are representatives of the *Accardi* and Section
18  504 classes (the "*Accardi*/Section 504 class representatives") and Named Plaintiffs
19  B.A.E.R., J.A.E.M., N.R.R., and E.H.M. are representatives of the Family Member
20  class (the "Family Member class representatives").

21  231.   The *Accardi* class, the Section 504 class, and the Family Member class
22  are each so numerous that joinder of all members is impracticable. The exact number
23  of people with disabilities or physical and mental health issues who have, or will be,
24  returned to Mexico pursuant to the MPP is unknown because Defendants do not
25  adequately screen and track such individuals with disabilities. Based on estimates
26  from service organizations that assist asylum-seekers along the U.S.-Mexico border,
27  Plaintiffs reasonably believe there are at least hundreds of individuals in the classes.
28  Plaintiff Al Otro Lado alone currently serves more than forty individuals who are

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01748

1   themselves disabled or seriously ill, approximately, and more than twenty individuals

2   who are family members or care for disabled or seriously ill individuals.

3       232.   Other factors establish the numerosity requirement, including that the

4   classes consist of numerous individuals who are geographically diverse and who are

5   unlikely to be able to bring individual suits, and that the classes include future,

6   unknowable class members.

7       233.   There are questions of law and fact common to the members of the

8   *Accardi* Class. Such questions include, but are not limited to:

9           a.  Whether Defendants have a policy the Physical/Mental Health

10              Exclusion pursuant to which people with known physical or mental

11              health issues are supposed to be excluded from the MPP and not

12              returned to Mexico;

13          b.  What mechanisms, if any, Defendants have in place to ensure that the

14              Physical/Mental Health Exclusion is carried out on the ground;

15          c.  Whether people with known physical or mental health issues have been

16              returned to Mexico pursuant to the MPP notwithstanding the

17              Physical/Mental Health Exclusion;

18          d.  If so, whether this violates the *Accardi* doctrine; and

19          e.  Whether, if members of the *Accardi* class prevail on their claim, the

20              relief should include requiring Defendants to admit members of the

21              family unit of each class member pursuant to the Family Unit Policy and

22              relevant injunctions.

23      234.   There are questions of law and fact common to the members of the

24   Section 504 class. These questions include, but are not limited to:

25          a.  Whether Section 240 proceedings constitute a program or activity of the

26              federal government;

27          b.  Whether Section 504 obligates Defendants to put in place practices and

28              procedures to identify members of the Section 504 class, and to assess

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01749

1    those people as to the need for accommodations in order to meaningfully

2    participate in Section 240 proceedings;

3    c.   Whether placing members of the Section 504 class in the MPP, and

4         returning them to Mexico, violates DHS regulations by affording such

5         class members an opportunity to participate in or benefit from Section

6         240 proceedings that is not equal to that afforded to others;

7    d.   Whether placing members of the Section 504 class in the MPP, and

8         returning them to Mexico, violates DHS regulations by providing those

9         class members with a benefit or service that is not as effective in

10        affording equal opportunity to obtain the same result as that provided to

11        others;

12   e.   Whether Defendants violate DHS regulations by utilizing criteria or

13        methods of administration the purpose or effect of which is to subject

14        members of the Section 504 class to discrimination, or that defeat or

15        substantially impair accomplishment of the objectives of Section 240

16        proceedings;

17   f.   Whether placing members of the Section 504 class in the MPP and

18        returning them to Mexico denies them meaningful participation in

19        Section 240 proceedings; and

20   g.   Whether excluding people with disabilities from the MPP, which would

21        be in keeping with Defendants' Physical/Mental Health Exclusion,

22        constitutes a reasonable accommodation.

23   235.   There are questions of law and fact common to the members of the

24   Family Member Class. Such questions include, but are not limited to:

25   a.   Whether people with an association to a person with a disability, and

26        who are injured based on discrimination against that person with a

27        disability, have a claim under the Rehabilitation Act;

28   b.   Whether family members have been injured based on their association

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01750

1        with members of the Section 504 class; and

2            c.  If so, what is the appropriate relief.

3        236.   Defendants are expected to raise common defenses to the claims of each

4    class, including denying that their actions violate the law.

5        237.   The claims of the *Accardi*/Section 504 class representatives are typical

6    of those of the *Accardi* Class, as each *Accardi*/Section 504 class representative, like

7    each member of the proposed *Accardi* class, has a known physical or mental health

8    issue; each *Accardi*/Section 504 class representative's claim arises from the same

9    policies, practices, or courses of conduct as those of the class; and their claims are

10    based on the same theory of law as the class's claims.

11        238.   The claims of the *Accardi*/Section 504 are typical of those of the Section

12    504 class, as each *Accardi*/Section 504 class representative has a disability for

13    purposes of the Rehabilitation Act; each *Accardi*/Section 504 class representative's

14    claim arises from the same policies, practices, or courses of conduct as those of the

15    class; and their claims are based on the same theory of law as the Section 504 class's

16    claims.

17        239.   The claims of the Family Member class representatives are typical of

18    those of the Family Member class, as each Family Member class representative has

19    an association with a person with a disability; each Family Member class

20    representative's claim arises from the same policies, practices, or courses of conduct

21    as those of the class; and their claims are based on the same theory of law as the

22    Family Member class's claims.

23        240.   The representative Plaintiffs for each putative class are capable of fairly

24    and adequately protecting the interests of the members of each class because the

25    representative Plaintiffs do not have any interests antagonistic to the classes.

26    Plaintiffs, as well as the members of the classes, seek to enjoin the unlawful acts and

27    omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced

28    in civil rights litigation, litigation regarding the rights of detained individuals and

individuals with disabilities, working with individuals placed in the MPP, and complex class action litigation.

241.   This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of each putative class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the respective class(es). Defendants' MPP policies are centrally promulgated, disseminated, and enforced. The injunctive and declaratory relief sought is appropriate and will apply to all members of the respective class(es).

## VI.   CAUSES OF ACTION

### COUNT I
**(Violation of the Administrative Procedure Act/*Accardi* Doctrine on behalf of the *Accardi* class)**

242.   All of the foregoing allegations are repeated and realleged as though fully set forth herein.

243.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id*. § 706(2)(D). The *Accardi* doctrine requires that agencies follow their own regulations, policies, and procedures. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

244.   Defendants' Physical/Mental Health Exclusion policy exempts people with known physical or mental health issues from the MPP.

245.   In spite of this, Defendants placed, and continue to place, individuals with known physical or mental health issues in the MPP.

246.   Defendants placed the *Accardi*/Section 504 class representatives in the MPP even though Defendants knew of those representatives' medical issues. For example, Defendants were aware of D.Y.S. and D.G.M.'s medical issues because

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01752

each of these individuals was hospitalized due to these known medical issues while in Defendants' custody. Regardless, Defendants placed each individual in the MPP shortly after their release from the hospital.

247. Similarly, Defendants were also aware of other *Accardi*/Section 504 class representatives' various medical issues because each provided Defendants with proof of these medical issues. Plaintiffs presented medical records and prescribed medications, explained their disabilities, and asked for medical attention for their deteriorating condition while in Defendants' custody. Defendants' own medical team corroborated many of Plaintiffs' medical issues and required Defendants to allow the Plaintiffs access to prescribed medications. Despite this, Defendants placed Plaintiffs in the MPP.

248. By placing the *Accardi*/Section 504 class representatives and members of the *Accardi* class in the MPP, Defendants have violated their own policy, and thus run afoul of the *Accardi* doctrine, by not following their own policy.

249. As a result, *Accardi*/Section 504 class representatives and members of the *Accardi* class have been injured, and in the absence of judicial relief, this injury is ongoing and will continue.

## COUNT II
### (Violation of the Rehabilitation Act on behalf of the Section 504 class)

250. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

251. Section 504 of the Rehabilitation Act ("Section 504") provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

252. Section 504 requires covered entities to provide reasonable accommodations to qualified disabled individuals so that they can have meaningful access to programs and benefits provided by executive agencies.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01753

253.   DHS has promulgated regulations implementing the requirements of Section 504. These regulations prohibit, among other things, DHS and CBP from: affording a qualified individual with a disability an opportunity to participate in or benefit from a benefit or service "that is not equal to that afforded to others;" providing a qualified individual with a disability with a benefit or service "that is not as effective in affording equal opportunity to obtain the same result as that provided to others"; or utilizing criteria or methods of administration the purpose or effect of which would subject qualified individuals with disabilities to discrimination or defeat or substantially impair accomplishment of the objectives of a program or activity." 6 C.F.R. § 15.30.

254.   Section 240 proceedings, and determinations by DHS/CBP as to who will be returned to Mexico pending those proceedings, constitute a program, activity or benefit of the federal government.

255.   Each of the *Accardi*/Section 504 class representatives is a qualified person with a disability for purposes of Section 504.

256.   Defendants have violated Section 504 by returning people with disabilities to Mexico pending or after the conclusion of their Section 240 proceedings, whether or not properly initiated, because doing so: (i) denies people with disabilities meaningful access to those proceedings; (ii) does not afford them with an opportunity to participate in Section 240 proceedings that is equal to that afforded others; (iii) does not provide them with an opportunity to achieve the same result as others; and (iv) utilizes criteria or methods of administration the purpose or effect of which subject qualified individuals with disabilities to discrimination and, thus, defeat or substantially impair accomplishment of the objectives of Section 240 proceedings.

257.   Defendants' actions are also contrary to Defendants' own Physical/Mental Health Exclusion policy.

258.   As a result of Defendants' actions as described herein, members of the

52

AR01754

Section 504 class have been, and in the absence of judicial relief will continue to be, injured.

259. Putting in place mechanisms to ensure that Defendants follows their own Physical/Mental Health Exclusion policy and admit members of the Section 504 class into the United States who are currently in Mexico pursuant to the MPP, and in the future to not return Section 504 class members to Mexico, would constitute a reasonable accommodation, and is otherwise required by Section 504.

260. Similarly, exempting people with disabilities from the MPP and allowing those currently in Mexico to pursue their Section 240 proceedings from the United States would constitute a reasonable accommodation, and is otherwise required by Section 504.

261. Further, in accordance with CBP's Family Unit policy, admitting members of the Family Member class, who provide support to Section 504 class members and allow such class members to meaningfully participate in Section 240 proceedings, is also a reasonable accommodation, and is otherwise required by Section 504.

## COUNT III
**(Violation of Rehabilitation Act on behalf of the Family Member class)**

262. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

263. Each member of the Family Member class has an association with a person with a disability who has suffered discrimination in violation of the Rehabilitation Act, as described above.

264. As a result of the discrimination suffered by their disabled family member, each member of the Family Member class has been injured because, for example and without limitation, rather than being able to prepare for their own Section 240 proceedings, they have had to focus on assisting and supporting their disabled family member and thus have not been able to meaningfully participate in

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01755

1    Section 240 proceedings.

2        265.   If members of the Section 504 class are allowed to pursue their Section

3    240 proceedings from the United States pursuant either to the Rehabilitation Act or

4    in compliance with Defendants' Physical/Mental Health Exclusion policy, any

5    Family Member class member who is forced to remain in Mexico will be unable to

6    assist and support their disabled family member. Furthermore, a disabled family

7    member may be essential to the proper development of a family member's claim,

8    leaving them unable to fully develop their claim if forced to remain in the MPP.   As

9    a result, they will continue to suffer mental trauma and will be unable to meaningfully

10   participate in Section 240 proceedings.

11       266.   In the absence of judicial relief, this injury to Family Member class

12   members is ongoing and will continue.

13   **V.      APPLICATION FOR TEMPORARY RESTRAINING ORDER**
     **AND INJUNCTIVE RELIEF**

14

15       267.   Plaintiffs intend to file an Application for Temporary Restraining Order

16   and Injunctive Relief and Brief in Support, requesting that the court provide relief

17   consistent with the claims set forth above.

18                        **PRAYER FOR RELIEF**

19       Plaintiffs respectfully request that the Court enter a judgment against

20   Defendants and award the following relief:

21   1.   Issue a temporary restraining order, pending a hearing on the request for a

22       preliminary injunction, that provides relief that will be identified in Plaintiffs'

23       briefing and will be consistent with the claims set forth above;

24   2.   Declare that the suit is maintainable as a class action pursuant to Federal Rule

25       of Civil Procedure 23(a) and 23(b)(2);

26   3.   Adjudge and declare that the acts, omissions, policies, and practices of

27       Defendants, and their agents, employees and officials, described herein, are in

28       violation of the rights of Plaintiffs and the class members they seek to represent

54

AR01756

1    under the Rehabilitation Act, and the Administrative Procedure Act/*Accardi*

2    doctrine;

3    4.    Preliminarily and permanently enjoin Defendants, their agents, employees,

4          and officials from subjecting Plaintiffs and the class members they seek to

5          represent to the illegal and unconstitutional conditions, acts, omissions,

6          policies, and practices set forth above;

7    5.    Issue an injunction requiring Defendants, without limitation, to: stop

8          subjecting members of the *Accardi* class to the MPP, and to put in place

9          mechanisms to ensure that their Physical/Mental Health Exclusion policy is

10         carried out on the ground; to admit family members of *Accardi* class members

11         pursuant to the Family Unit Policy; put in place practices and policies to

12         identify immigrants with disabilities, and to assess those immigrants for

13         accommodations necessary to meaningfully prepare for and participate in

14         Section 240 proceedings from the United States; as part of this

15         accommodations assessment process, determine whether the immigrant with a

16         disability and their families should be admitted into the United States to pursue

17         their Section 240 proceedings, either as an accommodation or in compliance

18         with Defendants' Physical/Mental Health Exclusion policy;

19   6.    Require Defendants to pay Plaintiff's reasonable attorneys' fees and costs,

20         pursuant to 29 U.S.C. § 794(a)(b) and 28 U.S.C. § 2412(d); and

21   7.    Grant all other relief that is just and proper.

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

AR01757

1   Date:  November 2, 2020              Respectfully Submitted,

2
                                        /s/ Robert S. Shwarts
3                                       ROBERT S. SHWARTS (SBN 196803)
                                        rshwarts@orrick.com
4                                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                        The Orrick Building
5                                       405 Howard Street
                                        San Francisco, CA 94105-2669
6                                       Telephone:  (415) 773-5700
                                        Facsimile:  (415) 773-5759
7
                                        LILLIAN J. MAO (SBN 267410)
8                                       lmao@orrick.com
                                        ORRICK, HERRINGTON & SUTCLIFFE LLP
9                                       1000 Marsh Road
                                        Menlo Park, California 94025-1015
10                                      Telephone:  (650) 614-7400
                                        Facsimile:  (650) 614-7401
11
                                        TIMOTHY P. FOX (SBN 157750)
12                                      tfox@creeclaw.org
                                        CIVIL RIGHTS EDUCATION AND
13                                      ENFORCEMENT CENTER
                                        1245 E. Colfax Avenue, Suite 400
14                                      Denver, CO 80218
                                        Telephone:  (303) 757-7901
15                                      Facsimile: (303) 872-9072

16                                      MARIA DEL PILAR GONZALEZ MORALES
                                        (SBN 308550)
17                                      pgonzalez@creeclaw.org
                                        CIVIL RIGHTS EDUCATION AND
18                                      ENFORCEMENT CENTER
                                        1825 N. Vermont Avenue, #27916
19                                      Los Angeles, CA 90027
                                        Telephone:  (805) 813-8896
20                                      Facsimile: (303) 872-9072

21                                      *Counsel for Plaintiffs*

22  *Of Counsel:*

23  ERIN D. THORN* (TX SBN 24093261)
    erin@texascivilrightsproject.org
24  EFREN C. OLIVARES* (TX SBN 24065844)
    efren@texascivilrightsproject.org
25  KARLA M. VARGAS* (TX SBN 24076748)
    kvargas@texascivilrightsproject.org
26  MIMI MARZIANI* (TX SBN 24091906)
    mimi@texascivilrightsproject.org
27  CAROLYN O'CONNOR* (CT SBN 441082)
    carrie@texascivilrightsproject.org
28  TEXAS CIVIL RIGHTS PROJECT

                                56          CLASS ACTION COMPLAINT FOR
                                            DECLARATORY AND INJUNCTIVE RELIEF

AR01756

1    1017 W. Hackberry Ave.
     Alamo, Texas 78516
2    Telephone: 956-787-8171, ext. 127
     Facsimile: 956-787-6348
3
     *Pro hac vice application forthcoming
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

57                                CLASS ACTION COMPLAINT FOR
                          DECLARATORY AND INJUNCTIVE RELIEF

AR01759

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

E.A.R.R., et al.

**(b)** County of Residence of First Listed Plaintiff   Mexicali, Mexico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert S. Shwarts; Orrick, Herrington & Sutcliffe LLP;
405 Howard Street, San Francisco, CA 94105-266;
(415) 773-5700

## DEFENDANTS

U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"), et al.

County of Residence of First Listed Defendant   Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'20 CV 2146 TWR BGS**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
       Plaintiff
- ☐ 3   Federal Question
       *(U.S. Government Not a Party)*
- ☒ 2   U.S. Government
       Defendant
- ☐ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☒ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. sec. 706; 29 U.S.C. sec. 794
Brief description of cause:
Improper placement of persons with disabilities into the Migrant Protection Protocols program.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Judge Dana S. Sabraw

DOCKET NUMBER   19-cv-2119

DATE
11/02/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert S. Shwarts

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE **AR01760**

505 F.Supp.3d 164
United States District Court, E.D. New York.

Amin Naim Salim ADRIANZA, individually and as next
friend to Leimariana del Valle Petit Romero, Leimariana
del Valle Petit Romero, Blanca Danelia Funes Castellano,
individually and as next friend to Emma Obando Funes,
A.Y.B.O., and J.L.B.O., Emma Obando Funes, Teodila
Sambula Ramos, individually and as next friend to
Cinthya Vanessa Castillo Sambula and A.E.C.S., Cinthya
Vanessa Castillo Sambula, and Jane Doe, Plaintiffs,
v.
Donald J. TRUMP, in his official capacity as President of
the United States, Chad F. Wolf, in his official capacity
as Acting Secretary of Homeland Security, and United
States Department of Homeland Security, Defendants.

20-cv-3919 (RPK)
|
Signed 12/07/2020

**Synopsis**
**Background:** Migrants and families brought action against
President, Department of Homeland Security (DHS), and
Acting Secretary of DHS, alleging migrants were not
statutorily eligible to be returned to Mexico because they were
not "arriving on land" when apprehended, pursuant to DHS
protocol that stated that certain migrants who arrived into
United States on land without proper documentation may be
returned to Mexico for duration of immigration proceedings,
and that federal regulations barred their returns because
they did not cross into United States at designated ports of
entry. Defendants filed motion to stay action pending case
in which other plaintiffs challenged protocols and migrants
and families filed motion for preliminary injunction to permit
migrants to re-enter United States for duration of removal
proceedings.

**Holdings:** The District Court, Rachel P. Kovner, J., held that:

[1] migrants had standing;

[2] husband of migrant adequately established independent
standing as required to establish proper venue;

[3] issue as to whether protocol was substantive rule
requiring notice-and-comment procedures was intertwined
with pending Supreme Court case;

[4] migrants and families failed to demonstrated likelihood of
success on claim that migrants were not "arriving on land"
when apprehended;

[5] migrants and families failed to demonstrated likelihood of
success on claim that regulatory definition of "arriving alien"
applied to INA section authorizing only return of foreign
citizens who arrived on land from foreign territory contiguous
to United States;

[6] migrants failed to demonstrated likelihood of success on
claim that regulation implicitly provided that immigration
officials may have not returned migrants who did not pass
through land border ports-of-entry;

[7] regulations did not impose a port-of-entry limitation; and

[8] migrant failed to demonstrate likelihood of success on
claim that return violated substantive due process rights.

Motion for stay granted in part, and motion for preliminary
injunction denied.

**Procedural Posture(s):** Motion for Stay; Motion for
Preliminary Injunction.

West Headnotes (32)

**[1]** **Aliens, Immigration, and
Citizenship** 🔑 Judicial Review or
Intervention

Migrants returned to Mexico under Department
of Homeland Security (DHS) protocol, which
stated that certain migrants who arrived
into United States on land without proper
documentation may be returned to Mexico
for duration of immigration proceedings, had
standing to seek preliminary injunction to permit
migrants to re-enter United States for duration of
removal proceedings; migrants' return to Mexico
subjected them to ongoing actual, concrete, and
particularized harms, harms were fairly traceable
to immigration officials' decisions to return those

migrants, and harms would be redressed through remedy that migrants sought. U.S. Const. art. 3, § 2, cl. 1.

**[2]** **Injunction** Persons entitled to apply; standing

A court has jurisdiction to adjudicate a preliminary injunction motion if there is standing for each claim and form of relief sought. U.S. Const. art. 3, § 2, cl. 1.

2 Cases that cite this headnote

**[3]** **Federal Civil Procedure** In general; injury or interest

If multiple parties seek the same relief, a court ordinarily has jurisdiction so long as one of the plaintiffs has standing. U.S. Const. art. 3, § 2, cl. 1.

3 Cases that cite this headnote

**[4]** **Federal Civil Procedure** In general; injury or interest

**Federal Civil Procedure** Causation; redressability

A plaintiff has standing if she demonstrates an injury that is: (1) concrete, particularized, and actual or imminent, (2) fairly traceable to the challenged action, and (3) redressable by a favorable ruling.

**[5]** **Aliens, Immigration, and Citizenship** Judicial Review or Intervention

Husband, a New York resident, of migrant returned to Mexico pursuant to Department of Homeland Security (DHS) protocol, which stated that certain migrants who arrived into United States on land without proper documentation may be returned to Mexico for duration of immigration proceedings, adequately established independent standing, as required to establish proper venue in Eastern District of New York for migrants and families to seek

preliminary injunction to permit migrants to re-enter United States for duration of removal proceedings; husband was in United States and not likely to be removed, there was non-speculative likelihood that husband's separation from wife would be remedied by requested relief, and goals of family unity was interest implicated in INA. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C); 28 U.S.C.A. § 1391(e)(1).

**[6]** **Injunction** Scope of inquiry and matters considered

When defendants object to venue, a district court must address venue before it can decide the merits of a motion for a preliminary injunction. U.S. Const. art. 3, § 2, cl. 1.

**[7]** **Federal Civil Procedure** In general; injury or interest

A plaintiff falls outside the zone of interests for a provision only if his interests are so marginally related to or inconsistent with the purposes implicit in the provision that it cannot reasonably be assumed that Congress intended to permit the suit.

**[8]** **Action** Stay of Proceedings

The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.

**[9]** **Action** Stay of Proceedings

In deciding whether to enter a stay, district courts commonly consider the interests of the courts, the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed, the private interests of and burden on the defendants, the interests of persons not parties to the civil litigation, and the public interest.

**[10]** **Action** 🔑 Stay of Proceedings

The decision to stay proceedings ultimately requires and must rest upon a particularized inquiry into the circumstances of, and the competing interests in, the case.

**[11]** **Action** 🔑 Stay of Proceedings

When balancing considerations as to whether to stay proceedings, district courts often stay litigation over questions that mirror or are intertwined with questions that are pending before a higher court.

**[12]** **Action** 🔑 Identity of parties, subject matter, and relief

Issue as to whether Department of Homeland Security (DHS) protocol, which stated that certain migrants who arrived into United States on land without proper documentation may be returned to Mexico for duration of immigration proceedings, was substantive rule requiring notice-and-comment procedures was intertwined with pending Supreme Court case, as required to stay migrants' claims alleging that protocol was substantive rule and that DHS officials impermissibly deviated from procedures set out in agency guidance regarding migrant returns; Supreme Court granted review of whether protocol was exempt from Administrative Procedure Act (APA) requirement of notice-and-comment rulemaking as general statement of policy, and DHS did not need not adhere to mere general statements of policy. 5 U.S.C.A. § 553.

**[13]** **Administrative Law and Procedure** 🔑 Legislative rules; substantive rules

**Administrative Law and Procedure** 🔑 Policy statements; ad hoc rules

The primary distinction between a substantive rule and a general statement of policy under the

Administrative Procedure Act (APA) turns on whether an agency intends to bind itself to a particular legal position. 5 U.S.C.A. § 553.

**[14]** **Injunction** 🔑 Extraordinary or unusual nature of remedy

A preliminary injunction is an extraordinary and drastic remedy.

**[15]** **Injunction** 🔑 Extraordinary or unusual nature of remedy

Preliminary injunctions are never awarded as of right.

**[16]** **Injunction** 🔑 Grounds in general; multiple factors

To obtain a preliminary injunction, as a general matter, a litigant must establish: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest.

**[17]** **Injunction** 🔑 Actual success on merits

A clear or substantial likelihood of success on merits is generally needed when a litigant seeks a mandatory injunction to command some positive act that will alter the status quo.

**[18]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

Migrants and families failed to demonstrated likelihood of success on claim that migrants were not "arriving on land" when apprehended and, thus, that immigration officials who returned migrants to Mexico violated INA section authorizing only return of foreign citizens who arrived on land from foreign territory contiguous to United States, as required for preliminary injunction to permit migrants to re-enter United States for duration of removal proceedings,

where migrants made only limited declarations that they were apprehended only after walking or crossing over border. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C).

**[19]** **Aliens, Immigration, and Citizenship** 🔑 Detention Pending Removal Proceeding

For purposes of INA section authorizing return of foreign citizens who are "arriving on land" from foreign territory contiguous to United States to that territory pending an immigration proceeding, migrants are not arriving on land only at the moment of crossing the border. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C).

**[20]** **Aliens, Immigration, and Citizenship** 🔑 Detention Pending Removal Proceeding

For purposes of INA section authorizing return of foreign citizens who are "arriving on land" from foreign territory contiguous to United States to that territory pending an immigration proceeding, migrants who have recently crossed the boundary line and are walking toward the interior of the country are still in the process of "arriving on land" from a foreign territory. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C).

**[21]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

Migrants returned to Mexico failed to demonstrated likelihood of success on claim that INA regulatory definition of "arriving alien," for which migrants did not qualify because they were apprehended on land outside of designated ports-of-entry, applied to INA section authorizing only return of foreign citizens who arrived on land from foreign territory contiguous to United States, as required for preliminary injunction to permit migrants to re-enter United States for duration of removal proceedings;

although "arriving alien" was used in various places in INA, it was not used in section at issue, and section instead reached certain migrants arriving on land whether or not at a designated port of arrival. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C); 8 C.F.R. § 1001.1(q).

**[22]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

Migrants who did not cross into United States at designated ports of entry and were returned to Mexico failed to demonstrated likelihood of success on claim that Department of Homeland Security (DHS) regulation, by stating that Immigration and Naturalization Service may have returned migrants who arrived at land border port-of-entry, implicitly provided that officials may have not returned migrants who did not pass through those ports-of-entry, as required for preliminary injunction to permit migrants to re-enter United States for duration of removal proceedings; regulation implemented statute that conferred return authority outside of ports of entry, and regulation was designed to approve existing practice of returning migrants at land border ports and not to foreclose practices. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C); 8 C.F.R. § 235.3(d).

**[23]** **Administrative Law and Procedure** 🔑 Presumptions and burden of proof

A permissive statement in a regulation can sometimes prohibit acts it does not mention, by negative implication, but whether such an implication should be drawn depends on context.

**[24]** **Administrative Law and Procedure** 🔑 Presumptions and burden of proof

A court will not read the enumeration of one case in a regulation to exclude another unless it is fair to suppose that the enacting body considered the unnamed possibility and meant to say no to it.

**[25]** **Aliens, Immigration, and Citizenship** 🔑 Detention Pending Removal Proceeding

Department of Homeland Security (DHS) and INA regulations, which defined "arriving alien" and stated that Immigration and Naturalization Service may return migrants who arrived at land border port-of-entry pending immigration proceedings, did not impose a port-of-entry limitation. Immigration and Nationality Act § 235, 8 U.S.C.A. § 1225(b)(2)(C); 8 C.F.R. §§ 235.3(d), 1001.1(q).

**[26]** **Constitutional Law** 🔑 Custody or restraint; special relationship

The Due Process Clause, in certain circumstances, obligates state actors to protect a person with whom they have a special relationship. U.S. Const. Amend. 5.

**[27]** **Constitutional Law** 🔑 Creation of danger or risk

State actors, in some circumstances, have an obligation under the Due Process Clause to protect a person if they have assisted in creating or increasing the danger to that person. U.S. Const. Amend. 5.

**[28]** **Civil Rights** 🔑 Preliminary Injunction

Migrant who did not cross into United States at designated ports of entry and was returned to Mexico failed to demonstrate likelihood of success on claim that return violated substantive due process rights, as required for preliminary injunction to permit migrant to re-enter United States for duration of removal proceedings; a foreign citizen had no constitutional substantive due process right not to be removed from the United States, nor a right not to be removed from the United States to a particular place, and migrant failed to show that officials willfully disregarded obvious risks of severe consequences and extreme danger in returning

migrant. U.S. Const. Amend. 5; Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(B)(ii).

**[29]** **Constitutional Law** 🔑 Admission and exclusion; deportation

A foreign citizen has no constitutional substantive due process right not to be removed from the United States, nor a right not to be removed from the United States to a particular place. U.S. Const. Amend. 5.

**[30]** **Constitutional Law** 🔑 Creation of danger or risk

In contexts in which the state-created danger doctrine, which requires state actors to protect against invasion by private actors under substantive due process clause, applies, it proscribes only conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience; this standard screens out all but the most significant constitutional violations, lest the Constitution be demoted to a font of tort law. U.S. Const. Amend. 5.

**[31]** **Constitutional Law** 🔑 Creation of danger or risk

To show conscience-shocking conduct, as required to apply state-created danger doctrine, which requires state actors to protect against invasion by private actors under substantive due process clause, a plaintiff must demonstrate more than mere negligence on the part of the defendants. U.S. Const. Amend. 5.

**[32]** **Constitutional Law** 🔑 Creation of danger or risk

To show conscience-shocking conduct, as required to apply state-created danger doctrine, which requires state actors to protect against invasion by private actors under substantive due process clause, a plaintiff must show that defendants were at least deliberately indifferent

to an obvious risk of severe consequences and extreme danger. U.S. Const. Amend. 5.

**Attorneys and Law Firms**

**\*168** Christopher Thomas Dunn, Megan Sallomi, Pro Hac Vice, Amy Belsher, New York Civil Liberties Union, New York, NY, for Plaintiffs.

James R. Cho, Layaliza K. Soloveichik, United States Attorneys Office, Brooklyn, NY, for Defendants.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*169** In December 2018, the Department of Homeland Security ("DHS") announced the Migrant Protection Protocols ("MPP"). The MPP states that certain migrants who arrive into the United States on land without proper documentation may be returned to Mexico for the duration of their immigration proceedings. In this action, four sets of migrants and their family members in New York City sue to have such return orders rescinded. Plaintiffs contend that they were not statutorily eligible to be returned to Mexico because they were not "arriving on land" when apprehended. *See* 8 U.S.C. § 1225(b)(2)(C). They also contend that federal regulations barred their returns, because they did not cross into the United States at designated ports of entry. In addition, plaintiffs bring claims under the Administrative Procedures Act ("APA"), Rehabilitation Act, and Due Process Clause of the Fifth Amendment.

Defendants have moved to stay this action until the Supreme Court decides a pending case in which other plaintiffs are challenging the MPP under the APA. *See Wolf v. Innovation Law Lab, cert. granted.*, No. 19-1212, –––– U.S. ––––, 141 S.Ct. 617, 208 L.Ed.2d 227 (2020). I stay proceedings regarding the claims that are squarely implicated by *Innovation Law Lab*. But I decline to stay litigation over plaintiffs' other claims.

Plaintiffs have moved for a preliminary injunction that would permit the migrants to re-enter the United States for the duration of their removal proceedings. I conclude that plaintiffs are not entitled to a preliminary injunction on their un-stayed claims, because they have not demonstrated that those claims are likely to succeed on the merits.

**BACKGROUND**

**A. Legal Background**

When a migrant is apprehended after unlawful entry, he is ordinarily detained for the duration of his removal proceedings in the United States, *see* DHS, *Assessment of the Migrant Protection Protocols (MPP)* at 1 (Oct. 28, 2019) (Dkt. #19-1 Ex. 6) ("MPP Assessment"); 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(B)(ii), 1225(b)(2)(A); *Jennings v. Rodriguez*, ––– U.S. ––––, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018), or released on bond or parole into the United States, *see* 8 U.S.C. §§ 1182(d)(5)(A), 1226(a)(2); *Jennings*, 138 S. Ct. at 837. But immigration officials have long returned some migrants to Canada or Mexico to await proceedings instead. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 445 (Jan. 3, 1997).

Congress statutorily authorized such returns in 1996 as part of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), which amended the Immigration and Nationality Act ("INA"). *See* IIRIRA, Pub. L. 104-208, § 302, 110 Stat. 3009 (1996). As relevant here, that statute provides:

> In the case of an alien ... who is arriving on land (whether or not at a designated **\*170** port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(C). Soon after, the Immigration and Naturalization Service ("INS") authorized agents to "require any alien who appears inadmissible and who arrives at a land-border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing." 8 C.F.R. § 235.3(d). That authority was later transferred to DHS. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). The INS issued regulations defining

various terms appearing in the INA but did not enact a regulation defining the term "alien ... who is arriving on land." *See* 8 C.F.R § 1001.1.

In December 2018, DHS announced the MPP. *See DHS, Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec. 20, 2018) (Dkt. #14-8 Ex. A) ("MPP Press Release"). To address a "migration crisis along [the] southern border," these protocols declare that certain migrants who arrive by land from Mexico "illegally or without proper documentation ... may be returned to Mexico ... for the duration of their ... removal proceedings." Kirstjen M. Nielsen, DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Dkt. #14-8 Ex. B.) ("Nielsen Memo"). The protocols apply to migrants who arrive at a port of entry as well as migrants apprehended between ports of entry. *See* Customs and Border Patrol, *MPP Guiding Principles* (Jan. 28, 2019) (Dkt. #14-8 Ex. D) ("MPP Guiding Principles"); Customs and Border Patrol, *Muster Guiding Principles for Migrant Protection Protocols (MPP)* (Dkt. #14-8 Ex. E) ("Muster Memo").

Alongside the protocols, the Government of Mexico announced that it would "authorize the temporary entrance of certain foreign individuals coming from the United States who ... have received a notice to appear before an immigration judge." Nielsen Memo at 2. These individuals could "remain in [Mexico]," and they "would be able to enter and leave [Mexico] multiple times." *Id.* at 3. Further, the Government of Mexico committed to "ensur[ing] that foreigners who have received their notice to appear have all the rights and freedoms recognized" by Mexican law, and declared that these foreigners would "be entitled to equal treatment with no discrimination whatsoever and due respect [would] be paid to their human rights." *Ibid.*

Under the protocols, agents generally "retain discretion to process aliens for MPP ... on a case-by-case basis." MPP Guiding Principles at 1. But only "aliens arriving from Mexico who are amenable to the process" are to be "transferred to await proceedings in Mexico." *Ibid.* Aliens who "are not amenable to MPP" include, for example, "[u]naccompanied alien children"; "[c]itizens or nationals of Mexico"; "[a]liens processed for expedited removal"; "[a]ny alien who is more likely than not to face persecution or torture in Mexico"; and "[a]liens in special circumstances," including aliens with "[k]nown physical/mental health issues." *Ibid.*; *see* Muster Memo at 1. The protocols direct agents to make

determinations about these categories "based on the facts and circumstances presented by a particular case." Muster Memo at 1.

A migrant who is returned to Mexico may still pursue a claim for asylum in the United States, but he must do so from across the border. *See* MPP Press Release at 2. The migrant is issued a notice to appear for immigration proceedings at a port of entry on a later date. *See* MPP **\*171** Guiding Principles at 1. The migrant is transported from the port of entry to the hearing site and then returned to Mexico after the hearing. *See id.* at 2. This continues for as many hearings as necessary to conclude the migrant's removal proceedings. *See ibid.*

### B. Factual Background

This lawsuit concerns four sets of migrants who crossed into the United States between ports of entry, requested asylum, and were returned to Mexico to await further immigration proceedings. Leimariana del Valle Petit Romero fled Venezuela to seek asylum in the United States. *See* Decl. of Leimariana del Valle Petit Romero ¶¶ 1-4 (Dkt. #14-2) ("Romero Decl."). She crossed the U.S.-Mexico border on foot in September 2019. *Id.* ¶ 4. She was apprehended "several hours" after crossing and then returned to Mexico to await her immigration hearing. *Id.* ¶¶ 4, 10. Emma Obando Funes and her children A.Y.B.O. and J.L.B.O. fled Honduras to seek asylum here. *See* Decl. of Emma Obando Funes ¶ 1 (Dkt. #14-3) ("Funes Decl."). They crossed the Rio Grande river into the United States. in September 2019. *See id.* ¶¶ 2, 5. Immigration authorities apprehended them "[s]ome time after" crossing, *id.* ¶ 5, and then returned them to Mexico to await their immigration hearings, *see id.* ¶¶ 9-10. Cinthya Vanessa Castillo Sambula fled Honduras to seek asylum in the United States. *See* Decl. of Cinthya Vanessa Castillo Sambula ¶¶ 2-4 (Dkt. #14-4) ("Sambula Decl."). When she crossed the U.S.-Mexico border in November 2019, she was pregnant with her child A.E.C.S. *See id.* ¶ 3. Immigration authorities "later located [her]" and returned her to Mexico to await her immigration hearing. *Id.* ¶¶ 4, 6. She gave birth to A.E.C.S. three months later. *Id.* ¶ 13. The final migrant, Jane Doe, also fled Honduras. *See* Decl. of Jane Doe ¶¶ 1-2 (Dkt. #9-2) ("Doe Decl."). She crossed the Rio Grande river into the United States in October 2019. *See id.* ¶¶ 3, 5. She was apprehended after walking "for a long time after that," *id.* ¶ 5, and then was returned to Mexico to await her immigration hearings, *see id.* ¶ 9.

### C. Procedural History

This lawsuit challenging the migrants' returns was filed on August 25, 2020. *See* Compl. ¶ 32 (Dkt. #1). The plaintiffs are (i) Leimariana del Valle Petit Romero, as well as her husband Amin Naim Salim Adrianza, who appears individually and as next friend to Ms. Petit Romero; (ii) Emma Obando Funes, as well as her sister Blanco Danelia Funes Castellano, who appears individually and as next friend to Ms. Obando Funes, A.Y.B.O. and J.L.B.O.; (iii) Cinthya Vanessa Castillo Sambula, as well as Teodila Sambula Ramos, individually and as next friend to Ms. Sambula and A.E.C.S.; and (iv) Jane Doe, who appears without a next-friend representative. *See id.* ¶¶ 7-15. Mr. Adrianza, Ms. Funes Castellano, and Ms. Sambula Ramos (the "New York plaintiffs") all reside in the Eastern District of New York. *See id.* ¶¶ 7, 9, 13, 21.

Plaintiffs principally allege that defendants' actions in returning the migrant plaintiffs to Mexico violated the INA and its implementing regulations, the APA, the Rehabilitation Act, and the Fifth Amendment's Due Process Clause. *See id.* ¶¶ 116-125.

On September 5, 2020, plaintiffs moved for a preliminary injunction "requiring the defendants to rescind the orders returning Ms. Petit Romero, Ms. Obando Funes, A.Y.B.O., J.L.B.O., Ms. Castillo Sambula, A.E.C.S., and Ms. Doe to Mexico and permitting their re-entry into the United States for the duration of their removal **\*172** proceedings and any appeals." Pls.' Notice of Mot. at 1 (Dkt. #14). Alternatively, plaintiffs seek an order directing "the defendants to make an independent determination of whether the plaintiffs in Mexico should be excluded from the Migrant Protection Protocols." *Ibid.* In seeking that relief, plaintiffs argue that they are likely to succeed on their claims that plaintiffs' returns (i) violated Section 1225(b)(2)(C) of the INA; (ii) violated 8 C.F.R. §§ 1001.1(q) and 235.3(d); (iii) were arbitrary and capricious in violation of the APA; (iv) ran afoul of the APA's notice-and-comment requirements; and (v) failed to comply with agency procedures, in violation of *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Plaintiffs also contend that Ms. Doe and A.Y.B.O. are likely to prevail on claims that their returns violated the Rehabilitation Act, and that Ms. Doe is likely to prevail on a challenge under the Fifth Amendment's Due Process Clause.

During oral argument on plaintiffs' motion, the Supreme Court granted certiorari in a different lawsuit challenging the MPP. *See Wolf v. Innovation Law Lab, cert. granted.,* No. 19-1212, –– U.S. ––, 141 S.Ct. 617, 208 L.Ed.2d 227 (2020). In that case, the Supreme Court has agreed to review

whether the MPP "is exempt from the APA requirements of notice-and-comment rulemaking," among other questions. *See* Pet. at i, *Innovation Law Lab,* No. 19-1212, 2020 WL 1877955 at \*i. The Court has stayed a lower-court injunction against the MPP pending the resolution of *Innovation Law Lab. See Wolf v. Innovation Law Lab,* –– U.S. ––, 140 S. Ct. 1564, 206 L.Ed.2d 389 (mem.) (2020).

After the Supreme Court granted certiorari in *Innovation Law Lab,* defendants move to stay this action until the Supreme Court resolves that case. Plaintiffs have opposed a stay.

## DISCUSSION

This opinion proceeds in three parts. First, I address threshold questions of standing and venue. I conclude that at least some plaintiffs have established standing and that venue is proper. Second, I stay proceedings on two claims that are intertwined with the issues on which the Supreme Court has granted review in *Innovation Law Lab.* Specifically, I stay proceedings on plaintiffs' claim that DHS was required to promulgate the MPP using notice-and-comment procedures and their claim that DHS failed to comply with procedures in the MPP guidance documents. I deny defendants' request to stay consideration of plaintiffs' remaining four arguments. Finally, I conclude that plaintiffs are not entitled to a preliminary injunction on the claims that have not been stayed, because they have not demonstrated a likelihood of success on the merits of those claims.

## I. Standing and Venue

Before turning to the substance of plaintiffs' motion, I consider whether I have the authority to adjudicate it.

### A. Standing

**[1]  [2]  [3]  [4]**  Plaintiffs have set out evidence of standing that is adequate to seek a preliminary injunction. A court has jurisdiction to adjudicate a preliminary injunction motion if there is standing "for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman,* 352 F.3d 625, 642 n.15 (2d. Cir. 2003)). If multiple parties seek the same relief, a court ordinarily has jurisdiction so long as one of the plaintiffs has standing. *See* **\*173** *Town of Chester, N.Y. v. Laroe Estates, Inc.,* –– U.S. ––, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,* 868 F.3d 104, 109 (2d Cir. 2017). In turn,

a plaintiff has standing if she demonstrates an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable to the challenged action"; and (iii) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (citations omitted).

There is no dispute here that the migrant plaintiffs returned to Mexico under the MPP have standing to seek the relief requested on each claim in the preliminary injunction motion. Their return to the Tamaulipas region of Mexico subjected them to actual, concrete, and particularized harms, which are ongoing. They are fairly traceable to immigration officials' decisions to return those plaintiffs. And they would be redressed through the remedy that plaintiffs seek: permission to leave Tamaulipas and re-enter the United States for the duration of their immigration proceedings.

**B. Venue**

[5]  [6]  Plaintiffs have also adequately established venue. When defendants object to venue, a district court must address venue before it can decide the merits of a motion for a preliminary injunction. *See Hendricks v. Bank of America, N.A.,* 408 F.3d 1127, 1134-35 (9th Cir. 2005); *see also Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir. 1963)* (Friendly, J.) (stating that venue should be addressed "prior to consideration of the merits"). Plaintiffs invoke the venue provision that allows lawsuits against the United States to be brought in a judicial district where any plaintiff resides. 28 U.S.C. § 1391(e)(1) (specifying that action against the United States may be brought in a district in which "the plaintiff resides if no real property is involved in the action"); *see* 14D Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 3815 (4th ed.) ("In cases involving multiple plaintiffs, venue is proper where any one of them resides."); *Sidney Coal Co. v. Soc. Sec. Admin.,* 427 F.3d 336, 344 (6th Cir. 2005) ("Each court faced with the same issue has interpreted 'the plaintiff' to mean 'any plaintiff.' "). Here, the only plaintiffs who reside in this judicial district are the relatives of the migrant plaintiffs. Venue accordingly turns on whether at least one of those New York plaintiffs can anchor venue.

Defendants argue that none of the New York plaintiffs can anchor venue because each lack standing under Article III. But at minimum, Amin Naim Salim Adrianza has adequately established independent standing and, therefore, venue. *See California v. Trump,* 379 F. Supp. 3d 928, 941 (N.D. Cal. 2019) (concluding that venue was proper under Section

1391(e)(1) even if some plaintiffs lacked standing because California had "independent Article III standing" to bring action in Northern District of California), *aff'd,* 963 F.3d 926 (9th Cir. 2020), *cert. granted sub nom. Trump v. Sierra Club,* No. 20-138, ––– U.S. ––––, 141 S.Ct. 618, 208 L.Ed.2d 227 (2020). Mr. Adrianza seeks an injunction that would permit his spouse to enter the country. In *Trump v. Hawaii,* ––– U.S. ––––, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), the Supreme Court held that relatives of individuals excluded from the country under an executive order had standing to challenge the order, because "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact." *Id.* at 2416. The Court noted that conclusion was consistent with prior decisions on the "merits of claims asserted by United States citizens regarding **\*174** violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals," *ibid.* (citing *Kerry v. Din,* 576 U.S. 86, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) (plurality opinion); *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972)), as well as with an earlier stay order that "recognized that an American individual who has 'a bona fide relationship with a particular person seeking to enter the country ... can legitimately claim concrete hardship if that person is excluded,' " *ibid.* (quoting *Trump v. Int'l Refugee Assistance Project,* ––– U.S. ––––, 137 S. Ct. 2080, 2089, 198 L.Ed.2d 643 (2017)).

Defendants do not persuasively distinguish that authority. Defendants emphasize that the migrant plaintiffs will be permanently reunited with their relatives in the United States only if they ultimately prevail on their asylum applications. *See* Hr'g Tr. 84:19-87:24 (Oct. 16, 2020). But they fail to explain why Mr. Adrianza lacks a concrete interest in being reunited with his wife while her asylum application is being considered—a period that may last for years. *See id.* at 87:1-2; MPP Assessment at 3, 6.

Nor have defendants convincingly explained why a favorable decision would not bring these spouses together. Defendants speculate that family reunification could be thwarted if Mr. Adrianza were himself deported. *See* Hr'g Tr. 86: 10-17 (Oct. 16, 2020). But Mr. Adrianza is in the United States now, and nothing in the record suggests that he is likely to be removed from the country soon. As for his wife, Ms. Petit Romero, the government's filings establish that aliens apprehended while unlawfully entering the United States between ports of entry are often released in the United States pending the determination of their asylum

applications because "resource constraints" and "other court-ordered limitations" make "many releases inevitable." MPP Assessment at 1; *see* MPP Press Release at 1. There is therefore "a non-speculative likelihood" that Mr. Adrianza's separation from his wife would be "remedied by the requested relief." *Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013)). In any event, "[t]he Supreme Court has held that a plaintiff has standing where 'the challenged action of the [government] stands as an absolute barrier' that will be removed 'if [the plaintiff] secures the ... relief it seeks.' " *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). An injunction rescinding the return order would remove the absolute barrier that keeps Mr. Adrianza and Ms. Petit Romero from living together in the United States. Under these circumstances, at minimum, Mr. Adrianza has a present interest in family reunification that is adequate to establish standing.

 [7]  The defendants argue that even if Mr. Adrianza and the other New York plaintiffs have standing under Article III, they fall outside the "zone of interests" for the provisions on which they rely. But a plaintiff falls outside the zone of interests for a provision only if his "interests are so marginally related to or inconsistent with the purposes implicit in [the provision] that it cannot reasonably be assumed that Congress intended to permit the suit." *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 131-32 (2d Cir. 2020) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)). That cannot be said of Mr. Adrianza's claims under Section 1225(b)(2)(C). The Second Circuit has previously **\*175** determined when assessing the "broader context of the INA" that "goals of family unity" are among the "interests implicated in the statute." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 62-63 (2d Cir. 2020). Mr. Adrianza's independent standing makes venue proper in this district.

## II. Motion for Stay

Having found that I have the authority to consider plaintiffs' motion for a preliminary injunction, I next turn to the government's motion for a stay. I grant the government's motion to stay consideration of two claims that are squarely implicated by the certiorari grant in *Innovation Law Lab* but deny the government's motion to stay plaintiffs' remaining four claims.

 [8]   [9]   [10]  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). In deciding whether to enter a stay, district courts commonly consider "the interests of the courts"; "the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed"; "the private interests of and burden on the defendants"; "the interests of persons not parties to the civil litigation"; and "the public interest." *Id.* at 99 n.13. But the decision "ultimately requires and must rest upon 'a particularized inquiry into the circumstances of, and the competing interests in, the case.' " *Id.* at 99 (quoting *Banks v. Yokemick*, 144 F. Supp. 2d 272, 275 (S.D.N.Y. 2001)).

 [11]  When balancing those considerations, district courts often stay litigation over questions that mirror or are intertwined with questions that are pending before a higher court. *See, e.g.*, *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) ("[A] court may ... properly exercise its staying power when a higher court is close to settling an important issue of law bearing on the action"); *Carter v. United States*, No. 06-CV-225, 2007 WL 2439500, at \*3 (D. Vt. Aug. 23, 2007) ("[I]t is common practice in this Circuit to postpone the final disposition of a case pending an upcoming decision in the United States Supreme Court."); *Jugmohan v. Zola*, No. 98-CV-1509, 2000 WL 222186, at \*5 (S.D.N.Y. Feb. 25, 2000) ("Postponing the final disposition of a case pending an upcoming decision by the United States Supreme Court is a practice exercised by the Second Circuit in the interest of judicial economy."); *see also Gonzalez de Fuente v. Preferred Home Care of New York LLC*, No. 18-CV-6749, 2020 WL 738150, at \*2-\*4 (E.D.N.Y. Feb. 13, 2020) (granting stay pending Supreme Court decision in parallel case); *In re MPM Silicones, L.L.C.*, No. 15-CV-2280, 2017 WL 4386378, at \*2 (S.D.N.Y. Oct. 2, 2017) (granting stay pending Second Circuit decision in similar case).

 [12]  Under these principles, a stay is warranted on two of plaintiffs' claims. First, litigation is stayed over plaintiffs' claim that the MPP is a substantive rule requiring notice-and-comment procedures. The Supreme Court has agreed to consider essentially the same question, by granting review of whether the "MPP is exempt from the APA requirement of notice-and-comment rulemaking" in *Innovation Law Lab*. *See* Pet. at i, *Innovation Law Lab*, No. 19-1212, 2020 WL

1877955 at *i. Plaintiffs note that *Innovation Law Lab* raises that question in the context of a challenge to the MPP's non-refoulement procedures, while plaintiffs here are focused on the **\*176** portion of the MPP that sets out eligibility criteria. *See* Pls.' Stay Letter at 2 (Oct. 21, 2020) (Dkt. #25). But defendants' argument in *Innovation Law Lab* is not limited to a portion of the MPP. Rather, defendants argue that the MPP "qualifies as a 'general statement[ ] of policy' that is exempt from the APA's notice-and-comment requirement," because it "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *See* Pet. at 29, *Innovation Law Lab*, No. 19-1212, 2020 WL 1877955 at *29 (alterations in original). At minimum, the disposition of the claim in *Innovation Law Lab* would shed significant light on the notice-and-comment challenge here. *See Sikhs for Justice*, 893 F. Supp. 2d at 622 (noting that a court may "properly exercise its staying power" to await a high court decision "bearing on the action," even when "the issues in [a higher court's] proceedings are [not] necessarily controlling on the action" in the lower court and "may not settle every question of fact and law"); *Gonzalez de Fuente*, 2020 WL 738150 at *3 (same); *In re Literary Works in Elec. Databases Copyright Litig.*, No. 00-CV-6049, 2001 WL 204212, at *3 (S.D.N.Y. Mar. 1, 2001) (same). Under these circumstances, a stay will appropriately allocate resources and promote legal clarity. *See Trikona Advisors Ltd. v. Kai-Lin Chuang*, No. 12-CV-3886, 2013 WL 1182960, at *1 (E.D.N.Y. Mar. 20, 2013) (noting the "strong public interest in avoiding time-consuming and unnecessary duplicative litigation"); *see also* Defs.' Stay Letter (Oct. 21, 2020) (Dkt. #24) (noting defendants' interest in avoiding the "need to defend ... once now, and once again after the resolution of *Innovation*").

The interests in appropriately allocating resources, avoiding duplicative litigation, and promoting legal clarity also justify staying litigation over plaintiffs' claim that defendants violated *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Plaintiffs' *Accardi* claim is that agency officials impermissibly deviated from procedures set out in agency guidance regarding migrant returns. *See* Compl. at ¶¶ 57, 75, 89-90; Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj. at 16-19 (Dkt. #14-1) ("Pls.' Mem."). But an *Accardi* claim is viable only if an agency "denie[d] [it]self the right to sidestep" the procedures on which the claim rests. *Accardi*, 347 U.S. at 267, 74 S.Ct. 499; *see Mantena v. Johnson*, 809 F.3d 721, 729-30 (2d Cir. 2015).

[13] The Supreme Court's decision on whether the MPP is a substantive rule requiring notice-and-comment procedures,

or is instead a "general statement[ ] of policy," *see* 5 U.S.C. § 553, will inform the *Accardi* determination. That is because "[t]he primary distinction between a substantive rule ... and a general statement of policy ... turns on whether an agency intends to bind itself to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *see Gonnella v. United States Sec. & Exch. Comm'n*, 954 F.3d 536, 547 (2d Cir. 2020) (finding directive to be "policy statement" rather than "legislative rule" in part because it was "highly discretionary, non-binding, and d[id] not impose any legal requirements"); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019) ("The critical question in distinguishing between legislative rules and general statements of policy is whether the statement 'is of present binding effect.' "); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) ("The primary distinction between a substantive rule ... and a general statement of policy ... turns on whether an agency intends to bind *itself* to a particular legal position."). Because "[i]t is axiomatic that an agency ... need not adhere to mere 'general statement[s] of policy,' " **\*177** *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.), *Innovation Law Lab* may well settle plaintiffs' *Accardi* claim.

In deciding to stay proceedings on these two claims, I have considered plaintiffs' countervailing interest in avoiding delay. That interest should not be minimized, particularly when plaintiffs have argued that they will suffer irreparable harm in the absence of injunctive relief. But the duration of a stay will be limited, because the Supreme Court will almost certainly decide *Innovation Law Lab* in the current Term. And I take into account that plaintiffs waited for a considerable period before challenging their returns to Mexico. Although plaintiffs were returned to Mexico in late 2019, *see* Romero Decl. ¶ 4; Funes Decl. ¶¶ 2, 5; Sambula Decl. ¶ 3; Doe Decl. ¶¶ 3, 5, they filed this lawsuit only in late August 2020, *see* Compl. ¶ 32, and first sought a preliminary injunction in early September 2020, *see* Pls.' Notice of Mot. at 1. On balance, under these circumstances, I find appropriate the "common practice in this Circuit [of] postpon[ing] the final disposition" of questions closely related to those on which certiorari has been granted, *Carter*, 2007 WL 2439500, at *3.

That approach is comparable to the one that the Supreme Court and D.C. Circuit have taken in addressing related MPP challenges. The plaintiffs in *Innovation Law Lab* also asserted they would face irreparable harm if forced to await adjudication of their asylum claims in Mexico, and the district court there awarded a preliminary injunction on those

grounds. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1130 (N.D. Cal. 2019), *aff'd sub. nom. Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *cert. granted*, No. 19-1212, ––– U.S. ––––, 141 S.Ct. 617, 208 L.Ed.2d 227 (2020). But the Supreme Court nevertheless issued a stay, deciding that any injunctive relief in that case should await the Court's decision on the merits. *See Wolf v. Innovation Law Lab*, ––– U.S. ––––, 140 S. Ct. 1564, 206 L.Ed.2d 389 (mem.) (2020). Plaintiffs suggest that "the equities and merits of *Innovation* are materially different" because the injunction that the Supreme Court stayed had "immediately halted all operation of the MPP within the Ninth Circuit," whereas plaintiffs here seek injunctive relief only as to themselves. *See* Pls.' Stay Letter at 3. But that case is not so readily distinguished. The defendants in *Innovation Law Lab* asked the Court to either stay the Ninth Circuit's broad injunction or, in the alternative, to stay those portions that afforded relief to individuals other than the plaintiffs. *See* Gov't's Appl. for a Stay, No. 19A960, at 38, 40, *Wolf v. Innovation Law Lab*, ––– U.S. ––––, 140 S. Ct. 1564, 206 L.Ed.2d 389 (mem.) (2020). The Court chose to stay the injunction in its entirety. Similarly, after the grant of certiorari in *Innovation Law Lab*, the D.C. Circuit stayed an appeal from the denial of a motion for a preliminary injunction because the lawsuit included claims paralleling some of those in *Innovation Law Lab*—even though the plaintiff had alleged he would suffer irreparable harm if required to await the completion of his immigration proceedings in Mexico. *See Cruz v. U.S. Dep't of Homeland Sec.*, No. 19-5359 (D.C. Cir. Oct. 20, 2020) (per curiam).

I decline the government's invitation to stay adjudication of plaintiffs' remaining claims. *Innovation Law Lab* is not likely to significantly inform the disposition of plaintiffs' remaining arguments. And while there would be some efficiency benefits to having all of plaintiffs' claim litigated on the same calendar, plaintiffs' countervailing interest in speedy disposition of their remaining claims outweighs that interest. I therefore turn to whether plaintiffs' remaining arguments entitle them to a preliminary injunction.

**\*178 III. Motion for Preliminary Injunction**

 **[14]** **[15]** **[16]** **[17]** A preliminary injunction is an "extraordinary and drastic remedy." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (citation omitted). Such injunctions are "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). To obtain such an injunction, as a general matter, a litigant must establish

(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter*, 555 U.S. at 20, 129 S.Ct. 365); *see Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019) (citing *Winter*, 555 U.S. at 20, 129 S.Ct. 365). [1] As explained below, I conclude that the plaintiffs have not demonstrated the requisite likelihood of success on the merits of their un-stayed claims. I therefore do not determine whether they have made the other showings needed to obtain a preliminary injunction.

1    An even stronger showing on the merits is generally needed when a litigant seeks a "mandatory" injunction to command some positive act that will alter the status quo. *See D.D. ex rel. V.D. v. N.Y.C. Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018). In such cases, the movant must demonstrate a "clear or substantial likelihood of success on merits." *N. Am. Soccer League,* 883 F.3d at 37 (citations omitted). The parties dispute whether the injunction that plaintiffs seek would "alter" the status quo or merely "restore" it. I need not resolve that dispute, because the plaintiffs' claims are not likely to succeed even under the more permissive standard.

**A. Plaintiffs have not demonstrated a likelihood of success on their argument that immigration officials violated 8 U.S.C. § 1225(b)(2)(C) by returning them to Mexico.**

 **[18]** Plaintiffs first argue that immigration authorities lacked the power under 8 U.S.C. § 1225(b)(2)(C) to return them to Mexico while they were awaiting removal proceedings. *See* Pls.' Mem. at 11. Section 1225(b)(2)(C) authorizes only the return of "an alien *... who is arriving on land* (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States." 8 U.S.C. § 1225(b)(2)(C) (emphasis added).

 **[19]** **[20]** Plaintiffs' argument turns on the definition of "arriving" in Section 1225(b)(2)(C). To arrive is to "come to the end of a journey." 1 *Oxford English Dictionary* 651 (2d ed. 1989); *see Webster's Third New International Dictionary* 121 (2002) ("to reach a destination; come to the end of a journey"). Congress's "use of the present progressive tense 'arriving,'

rather than the past tense 'arrived,' implies [a] geographic or temporal limit." *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020). But that present progressive formulation—"is arriving on land," 8 U.S.C. § 1225(b)(2)(C)—also suggests " 'an ongoing process,' " rather than an instantaneous event, *M-D-C-V-*, 28 I. & N. Dec. at 22 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020)). Taking the term and tense together, I conclude that aliens are not "arriving on land" only at the moment of crossing the border—a conclusion that plaintiffs appear to accept. *See* Hr'g Tr. 9:11-21 (Oct. 16, 2020) (stating that plaintiffs are "not contesting" that an alien apprehended "20 yards from the border ... could still be considered arriving"). **\*179** Migrants are not naturally said to have "come to the end of [their] journey" as they continue making an arduous journey on foot through a border zone. Instead, aliens who have recently crossed the boundary line and are walking toward the interior of the country are still in the process of "arriving on land" from a foreign territory. *Cf. Dep't of Homeland Sec. v. Thuraissigiam*, ––– U.S. ––––, 140 S. Ct. 1959, 1982, 207 L.Ed.2d 427 (2020) ("[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry' ").

Applying that understanding to the limited record before me, I cannot conclude that plaintiffs have shown a likelihood of success on their claim that they were not "arriving on land" when apprehended. Plaintiff Leimariana del Valle Petit Romero states that she was apprehended after crossing the U.S.-Mexico border and "walk[ing] for several hours." *See* Romero Decl. ¶ 4. Plaintiff Emma Obando Funes says only that she and her sons walked across the U.S.-Mexico border and were apprehended "[s]ome time after that." *See* Funes Decl. ¶ 5. Plaintiff Cinthya Vanessa Castillo Sambula simply states that she crossed the U.S.-Mexico border and was "later" apprehended by immigration officials. *See* Sambula Decl. ¶ 4. And plaintiff Jane Doe declares only that she "walked for a long time" after she crossed into the United States. *See* Doe Decl. ¶ 5. I cannot conclude from these limited declarations that plaintiffs are likely to show that they were not "arriving on land" from a contiguous foreign territory when apprehended.

In their reply brief and at oral argument, plaintiffs seek to shift focus from their own apprehensions toward the outer bounds of those permitted under the MPP. They argue that aliens are no longer "arriving" 96 hours after they cross the border—the outer bound suggested by the Muster memo. *See* Pls.' Reply Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 7-8 (Dkt. #23) ("Pls.' Reply Mem."); Hr'g Tr. 4:23-25 (Oct.

16, 2020). Of course, litigants cannot generally challenge the application of a statute to themselves on the basis that the statute cannot properly be applied to someone else. To avoid that problem, plaintiffs in reply and at oral argument seek to restyle their Section 1225(b)(2)(C) argument as a claim under the APA that their own removals are prohibited as the product of an invalid 96-hour agency rule. *See* Pls.' Reply Mem. at 7-8; Hr'g Tr. 5:16-6:22 (Oct. 16, 2020); Hr'g Tr. 11:4-20 (Oct. 19, 2020).

That restyling is not properly before me. In their motion for a preliminary injunction, plaintiffs' argument concerning the "arriving on land" portion of Section 1225(b)(2)(C) was that they themselves could not be described as "arriving on land" under that provision. *See* Pls.' Mem. at 10-12. They stated, for example, that that their motion "presents [the] question ... whether the MPP can be applied to these plaintiffs, who were not apprehended while 'arriving' in the United States, but after they had entered." *Id.* at 11 n.4. They did not invoke any purported 96-hour rule, and their sole reference to the APA as part of their "arriving" argument was in contending that "[a]pplying Section 1225(b)(2)(C) to the MPP Plaintiffs, who were apprehended after entering the United States, violates the INA, and therefore, the APA." *Id.* at 12. Plaintiffs cannot recast their statutory claim as an APA challenge to a purported 96-hour rule in a reply brief, more than halfway through the preliminary injunction litigation. *See, e.g., In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 118 n.15 (S.D.N.Y. 2020) (citing *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)); *Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (citation omitted).

**\*180** Further, I would be unlikely to conclude that plaintiffs could demonstrate a substantial likelihood of success on that argument. MPP guidance documents do not mandate the return of aliens apprehended within 96 hours of crossing the border. Instead, the actual decisions to return these plaintiffs to Mexico under Section 1225(b)(2)(C) appear to rest on individual determinations. The "guiding principles" for the program emphasize that the determination whether to return a particular alien to Mexico under Section 1225(b)(2)(C) turns on "an exercise of discretion" by immigration officers, who are to determine whether individuals should be returned to Mexico "'on a case-by-case basis." *See* MPP Guiding Principles at 1; *see also* Muster Memo at 1 (explaining that MPP return procedures may be applied only to an alien "who in an exercise of discretion the [immigration] agent determines should be subject to the process"). The Muster memo on which plaintiffs rely indicates that immigration

officials must make individual judgments about whether aliens qualify as "arriving on land," rather than applying a hard-and-fast 96-hour rule. *See* Muster Memo at 1 ("*In general, and on an individualized basis*, USBP agents *may* consider an alien to be arriving on land for purposes of the MPP if the alien is encountered within 96 hours of the alien's crossing the land border") (emphasis added). Indeed, that guidance indicates that not every alien apprehended within 96 hours of crossing the border should be treated as "arriving on land." *See id.* at 1 n.2 (stating that while "approximately 90% of aliens apprehended by the U.S. Border Patrol along the southwest border have been apprehended within 96 hours of crossing the land border," agents "should consider unique circumstances in which an alien apprehended in that period has credibly demonstrated that he or she has reached his intended destination in the United States"). Under these circumstances, it is enough to assess whether plaintiffs' individual determinations were proper. *Cf. M-D-C-V-, 28 I. & N. Dec. at 23* (upholding application of the MPP to a particular alien, after determining that the Board "need only decide in this case whether the respondent, who was apprehended just inside the border upon crossing into the United States" was "properly considered to be 'arriving'").

Even if plaintiffs could challenge their own removal by attacking the Muster memo's 96-hour reference, I would be hard-pressed to conclude that the memo impermissibly construes the term "arriving on land" by indicating that some aliens may be returned if apprehended within 96 hours of entry. Plaintiffs do not dispute that "arriving on land" from a contiguous territory is a process that extends beyond the moment in which an alien crosses a boundary line. *See* Hr'g Tr. 9:11-21 (Oct. 16, 2020). Once that point is recognized, determining the duration of that process requires line-drawing. Plaintiffs have offered no temporal or geographic line of their own. Nor do they offer specific linguistic or practical arguments to challenge a 96-hour construction, such as an argument that no migrant could take 96 hours to end his journey from the border into the interior. And the Muster memo's 96-hour line is tempered by the memo's indication that not all aliens apprehended within 96 hours are subject to return. Instead, the memo directs that agents deciding whether to return an alien apprehended within 96 hours of entry must consider whether "an alien apprehended in that period has credibly demonstrated that he or she has reached his intended destination in the United States." *See* Muster Memo at 1 n.2. Under these circumstances, were plaintiffs' APA argument properly presented and the MPP more categorical, I would be unlikely **\*181** to conclude at the preliminary injunction

stage that plaintiffs have established a substantial likelihood that they will show their returns to be invalid on the grounds that a 96-hour line is impermissible.

### B. Plaintiffs have not demonstrated a likelihood of success on their argument that their returns violated federal regulations.

Plaintiffs next challenge their returns on the ground that they did not cross into the United States at designated ports of arrival. Yet Section 1225(b)(2)(C) itself expressly permits immigration officers to return arriving aliens who do not come through such ports. It specifies, after all, that the return authority extends to covered aliens "arriving on land (*whether or not at a designated port of arrival*) from a foreign territory contiguous to the United States." 8 U.S.C. § 1225(b)(2)(C) (emphasis added). Plaintiffs nevertheless contend that a pair of regulations forbid the return of aliens who do not arrive at designated ports. Plaintiffs have not demonstrated a likelihood of success on these arguments. Accordingly, they have also failed to show that the agency acted arbitrarily and capriciously by departing from the agency's own regulations.

#### 1. 8 C.F.R. § 1001.1(q)

**[21]** Plaintiffs contend that their returns are prohibited by 8 C.F.R. § 1001.1(q). That provision defines "[t]he term arriving alien" to mean only certain aliens who are (i) "coming or attempting to come into the United States at a port-of-entry," (ii) "seeking transit through the United States at a port-of-entry," or (iii) apprehended on water. *See* 8 C.F.R. § 1001.1(q). Plaintiffs do not qualify as "arriving aliens" under this definition, because they were apprehended on land outside of the designated ports-of-entry.

The problem for plaintiffs is that while "arriving alien" appears in various places in the INA, it is not used in Section 1225(b)(2)(C). Instead, Section 1225(b)(2)(C) authorizes the return of an "alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival)." 8 U.S.C. § 1225(b)(2)(C). It is implausible that the definition of "arriving alien" in 8 C.F.R. § 1001.1(q) was meant to define this different phrase in the statutory return provision, because the phrase there is surrounded by statutory text that conflicts with the regulatory language. As noted above, the statute reaches certain aliens arriving on land "whether or not at a designated port of arrival." 8 U.S.C. § 1225(b)(2)(C). But plaintiffs would read the regulation to

effectively negate that statutory language, by defining an "alien ... who is arriving on land" to include only aliens who "present[ ] at a port-of-entry." *See* Pls. Mem. at 13.

Plaintiffs' application of 8 C.F.R. § 1001.1(q) to the statutory provision at issue here is also implausible because the regulatory definition of "arriving alien" is much broader than the statutory text. While Section 1225(b)(2)(C) limits return authority to certain aliens "arriving on land," plaintiffs would import into the statute a definition of "arriving alien" that expressly includes aliens apprehended on water. *See* 8 U.S.C. § 1001.1(q) (defining "arriving alien" to include "an alien interdicted in international or United States waters and brought into the United States by any means"). These conflicts are strong evidence that the definition of "[t]he term arriving alien" contained at 8 C.F.R. § 1001.1(q) was not meant to be cross-applied to the separate phrase "alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival)" in Section 1225(b)(2)(C). *See, e.g.,* **\*182** *Joaquin-Porras v. Gonzales*, 435 F.3d 172, 179 (2d Cir. 2006) (indicating that immigration regulation should be read in the context of underlying statutes); *cf. Singh v. Mukasey*, 536 F.3d 149, 154 (2d Cir. 2008). Plaintiffs therefore appear unlikely to succeed on their argument from 8 C.F.R. § 1001.1(q).

Plaintiffs suggest that this understanding is undermined by "regulatory history" in which "the agency expressly rejected a proposal to define" the term arriving alien "to include individuals who crossed between ports of entry." *See* Pls.' Reply Mem. at 11; Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. at 10312-13 (Mar. 6, 1997). That history is unilluminating. The agency's choice not to give "arriving alien" a broader scope does not suggest that the agency meant its definition of "arriving alien" to cover the different terms used in Section 1225(b)(2)(C). Nor does such evidence solve the fundamental problem with plaintiffs' construction: that on plaintiffs' interpretation, 8 C.F.R. 1001.1(q) construes language in Section 1225(b)(2)(C) in a manner fundamentally incompatible with other portions of the statutory text.

My conclusion regarding the best reading of 8 C.F.R. § 1001.1(q) parallels the agency's most recent interpretation of its regulation. *See M-D-C-V-*, 28 I. & N. Dec. at 24 & n.9 (concluding that the definition of "arriving alien" in Section 1001.1(q) does not define the terms in Section 1225(b)(2)(C)). In *Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019), the Supreme Court affirmed that judicial deference is appropriate "to agencies' reasonable readings of genuinely ambiguous regulations." *Id.* at 2408. *Kisor* makes clear, however, that "the possibility of deference can arise only if a regulation is genuinely ambiguous ... even after a court has resorted to all the standard tools of interpretation." *Id.* at 2414. Because I conclude that the statutory context renders plaintiffs' interpretation of the regulation here implausible, I do not rely on deference principles in concluding that plaintiffs have failed to show a likelihood of success on their argument under 8 C.F.R. § 1001.1(q).

### 2. 8 C.F.R. § 235.3(d)

**[22]** Plaintiffs next invoke 8 C.F.R. § 235.3(d). That regulation provides:

> The [Immigration and Naturalization] Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, *the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing.* Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

8 C.F.R. § 235.3(d) (emphasis added). Plaintiffs argue that by stating that the Service *may* return aliens who arrive "at a land border port-of-entry from Canada or Mexico," the regulation implicitly provides that immigration officials *may not* return aliens who do not pass through those land border ports-of-entry. *See* Pls.' Reply Mem. at 10.

**[23]** **[24]** Plaintiffs have not demonstrated they are likely to prevail on this argument. By its terms, the regulation in question is "permissive, not proscriptive." *M-D-C-V-*, 28 I. & N. Dec. at 25. A permissive statement can sometimes

prohibit acts it does not mention, by negative implication. But whether such an implication should be drawn "depends on context." **183 *NLRB v. SW General, Inc.*, ––– U.S. ––––, 137 S. Ct. 929, 940, 197 L.Ed.2d 263 (2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013)). A court will "not read the enumeration of one case to exclude another unless it is fair to suppose that" the enacting body "considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003); *see Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("Virtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context.").

Context does not favor drawing a negative implication from the permissive text of Section 235.3(d). First, the regulation is not freestanding: It implements a statute that confers return authority outside of ports of entry, using the clearest possible terms. I hesitate to infer that a regulation that does not speak directly to returns outside of ports-of-entry implicitly forbids a practice that the underlying statute so expressly authorizes.

Second, the historical backdrop suggests that Section 235.3(d) was designed to approve an existing practice, not to foreclose a new one. Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), immigration officials had asserted the power to return aliens "only ... at land border ports." *Matter of Sanchez*, 21 I. & N. Dec. 444, 463 (B.I.A. 1996). By enacting Section 1225(b)(2)(C) as part of the IIRIRA, Congress not only sanctioned that practice but also provided discretion to return aliens who arrive on land outside ports-of-entry. *See* 8 U.S.C. § 1225(b)(2)(C). But Congress did not *require* immigration authorities to use that discretion, and the parties appear to agree that after IIRIRA's enactment, immigration officials simply continued their prior practice of returning some aliens apprehended at ports of entry. *See* Hr'g Tr. 19:20-22 (Oct. 16, 2020) (plaintiffs); *id.* at 58:19-25 (defendants). Neither party has pointed to evidence that immigration authorities in that period contemplated exercising their discretion elsewhere. Under these circumstances, I cannot infer that the agency was "consider[ing]" removals beyond ports of entry "and meant to say no to [them]" when it enacted Section 235.3(d). *Barnhart*, 537 U.S. at 168, 123 S.Ct. 748. The agency appears to have simply spoken to the type of returns that were relevant to its

activities at the time, without opining on a return-authority issue that had not come up in either pre- or post-IIRIRA practice. On balance, given this statutory context, plaintiffs are unlikely to prevail on their argument that Section 235.3(d) prohibits a class of statutorily authorized removals that the regulation does not discuss.

In arguing to the contrary, plaintiffs place heavy reliance on a three-sentence abstract on DHS's regulatory agenda dating to spring 2017. The abstract indicates that DHS officials took the view that the MPP would require amending Section 235.3(d)—before evidently reconsidering and adopting the MPP without such changes. *See* Off. of Info. and Reg. Affs., *DHS/USCBP Return to Territory*, RIN 1651-AB13 (Spring 2017) (Dkt. #14-8 Ex. G) (stating that the agency intends "to ensure that aliens describe in Section 235(b)(2)(C) of the Immigration and National[ity] Act are returned to the territory from which they came pending a formal removal proceeding" and will "amend 8 C.F.R. 235.3(d) so that it is consistent with this requirement"). That statement deserves little, if any, weight in interpreting 8 C.F.R. § 235.3(d). Decisions of the Board **184 of Immigration Appeals, rather than abstracts like these, are the agency constructions that generally receive high levels of judicial solicitude—including deference in the case of genuine ambiguity concerning the regulation's meaning. *See, e.g., Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2d Cir. 2008) (discussing BIA constructions of regulations); *Yuen Jin v. Mukasey*, 538 F.3d 143, 150 (2d Cir. 2008) (same); *see also Kisor*, 139 S. Ct. at 2414-18 (explaining circumstances in which agencies' interpretations of their regulations may receive judicial deference). Here, the Board of Immigration Appeals has rejected plaintiffs' reading of Section 235.3(d) in a published decision—concluding, in line with the analysis above, that Section 235.3(d) does not limit the agency's authority to return aliens apprehended outside ports-of-entry. *See M-D-C-V-*, 28 I. & N. Dec. at 25-27. That decision contains detailed analysis of the text of the statute and regulation, as well as the agency's past practices, *ibid.*, while the abstract on which plaintiffs rely contains none of those things.

Plaintiffs suggest that the withdrawn regulatory-agenda item nevertheless deserves weight because it evidences the agency's longstanding construction of 8 C.F.R. § 235.3(d). *See* Pls.' Reply Mem. at 10. The record does not support that conclusion. The abstract dates only to 2017. *See DHS/ USCBP Return to Territory*, RIN 1651-AB13 (Spring 2017). And it does not indicate that it reflects a longstanding view or is derived from historical practice. *See ibid.* Plaintiffs

place weight on the fact that in the years after the adoption of 8 C.F.R. § 235.3(d), as in the years before, immigration officials only exercised return authority at ports of entry. But as explained above, that history is entirely compatible with the defendants' understanding of the regulations, under which the agency had broad return power but limited its use as an exercise of discretion. *See* pp. 26-27, *supra.* Plaintiffs have not shown a likelihood of success on their argument that 8 C.F.R. § 235.3(d), which nowhere mentions returns of aliens apprehended outside ports of entry, bars immigration officials from exercising the discretion to conduct such returns that the statute expressly confers.

### 3. APA Violation Based on Regulatory Departure

[25] The deficiencies in plaintiffs' regulatory arguments mean that plaintiffs have also not demonstrated a likelihood of success on their claim that defendants have acted arbitrarily and capriciously by "depart[ing] from their regulations without a reasoned explanation." *See* Pls.' Mem. at 9. The only "departure" from regulations alleged in the briefs is the agency's "disregard" of the purported "port-of-entry limitation." *See id.* at 14. But as explained above, DHS regulations do not impose a port-of-entry limitation. There was therefore no departure, and thus no "[u]nexplained inconsistency" in agency policy. *Encino Motorcars, LLC v. Navarro*, ––– U.S. ––––, 136 S. Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005)).

### C. A.Y.B.O. and Ms. Doe have not demonstrated a likelihood of success on their argument that their returns violated the Rehabilitation Act.

Ms. Doe and A.Y.B.O. have failed to show a likelihood of success on their Rehabilitation Act claims. Plaintiffs' complaint includes a standalone claim that "defendants' actions violate the Rehabilitation Act and its implementing regulations." *See* Compl. ¶ 125. Plaintiffs sought a preliminary **\*185** injunction on the grounds that this claim was likely to succeed. Their theory was that "defendants violated the Rehabilitation Act" under 29 U.S.C. § 794(a) because two plaintiffs—A.Y.B.O. and Ms. Doe—now lack meaningful access to a federal program solely by reason of their disabilities. *See* Pls.' Mem. at 21-23. They sought a court order "exempting A.Y.B.O. and Ms. Doe from placement in the MPP," *id.* at 22, or directing "defendants to make an

independent determination of whether the plaintiffs in Mexico should be excluded from the Migrant Protection Protocols under ... the Rehabilitation Act," Pls.' Notice of Mot. at 1.

Plaintiffs have not shown a likelihood of success on that standalone Rehabilitation Act claim because they have abandoned it. After the government argued that the Rehabilitation Act lacks an express or implied private cause of action, *see* Defs.' Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. at 30-33 (Dkt. #18) ("Defs.' Mem."), plaintiffs conceded that point. They responded only that it is not "of consequence that the Act does not provide a private right of action" because agency action that violates the Rehabilitation Act would be arbitrary and capricious under the APA. Pls.' Reply Mem. at 14. Similarly, plaintiffs took no issue with the statement at oral argument that was now "undisputed ... that the Rehabilitation Act itself doesn't provide a cause of action." *Compare* Hr'g Tr. 77:14-18 (Oct. 16, 2020) (court's statement that "plaintiffs can correct me if I'm wrong" in that understanding), *with* Hr'g Tr. 15:4-16:3 (Oct. 19, 2020) (plaintiffs' closing remarks that do not dispute that understanding).

Plaintiffs have belatedly suggested that the APA supplies the private right of action that they concede the Rehabilitation Act does not. In reply and at oral argument, they argued that their Rehabilitation Act claim could be framed as a claim that immigration officials violated the APA because they did not comply with the Rehabilitation Act. And they argued that the APA provides an express private right of action to bring that claim. *See* Pls.' Reply Mem. at 14; Hr'g Tr. 15:7-22, 16:13-21 (Oct. 19, 2020). But these arguments come too late to support the current motion for a preliminary injunction. *See Zirogiannis*, 221 F. Supp. 3d at 298 (declining to consider "[n]ew arguments first raised in reply papers in support of a motion"). The complaint treated the Rehabilitation Act claim as distinct from the APA claims raised in later counts. *See* Compl. ¶ 125. It did not give the government "fair notice" that plaintiffs were pursuing a theory that immigration officials violated the APA by virtue of Rehabilitation Act failings. *Cf. Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (explaining that a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"). Nor did plaintiffs' memorandum in support of their preliminary injunction motion contain any suggestion that plaintiffs were relying on the APA to provide a vehicle for their Rehabilitation Act claims. *See* Pls.' Mem. at 19-22. Indeed, plaintiffs' Rehabilitation Act argument does not even mention the APA.

*Ibid.* Accordingly, defendants' briefing was premised on the understanding that plaintiffs brought only a standalone claim.

Addressing plaintiffs' belatedly raised APA reframing on the present adversarial record would be unwise. There has been no adversarial briefing on whether the APA provides a vehicle for plaintiffs to pursue their Rehabilitation Act challenge. Moreover, the contours of plaintiffs' APA theory are imprecise. For instance, plaintiffs have not identified the final agency action they seek to have reviewed. And because the Rehabilitation Act concerns exclusion from government **\*186** programs based on a disability, *see* 29 U.S.C. § 794(a), as well as the assurance of meaningful access to government programs, *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003), it is not immediately clear that the relevant agency action would be the return of plaintiffs to Mexico. Under these circumstances, I decline to address, as part of plaintiffs' motion for a preliminary injunction, plaintiffs' belated suggestion that the APA provides a cause of action for their Rehabilitation Act claim.

### D. Ms. Doe has not demonstrated a likelihood of success on her argument that her return violated her substantive due process rights.

**[26]** **[27]** Lastly, Ms. Doe is not likely to succeed on her argument that immigration officials violated substantive due process guarantees by returning her to Mexico on the ground that doing so exposed her to dangerous conditions. *See* Pls.' Mem. at 22-24. In *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that the Fifth Amendment's Due Process Clause does not generally require the government to protect life, liberty, or property "against invasion by private actors." *Id.* at 195, 109 S.Ct. 998. Nevertheless, courts of appeals have "recognized two exceptions to this general principle, rooted in the Supreme Court's analysis in *DeShaney*," under what is often called the "state-created danger" doctrine. *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). First, in some circumstances, the Due Process Clause obligates state actors to protect a person with whom they have a "special relationship." *Ibid.* Second, in some circumstances, state actors have an obligation to protect a person if they have "assisted in creating or increasing the danger to" that person. *Ibid.*

**[28]** Ms. Doe is unlikely to prevail under these principles, assuming I have jurisdiction over the substantive due process claim she presents. *See* Defs.' Mem. at 23-25 (arguing that 8 U.S.C. § 1252(a)(2)(B)(ii) bars jurisdiction over Ms. Doe's

substantive due process claim); *Butcher v. Wendt*, 975 F.3d 236, 242-244 (2d Cir. 2020) (permitting court to assume "hypothetical jurisdiction" to resolve a straightforward merits question when a complex jurisdictional dispute was "statutory in nature"); *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 123 (2d Cir. 2020) (assuming hypothetical jurisdiction when the question whether a provision presented a jurisdictional bar was "complex" and a "claim fail[ed] on other more obvious grounds").

**[29]** First, whatever constitutional protections the state-created danger doctrine confers in domestic settings, the weight of circuit authority holds that "an alien has no constitutional substantive due process right not to be removed from the United States, nor a right not to be removed from the United States to a particular place." *Enwonwu v. Gonzales*, 438 F.3d 22, 29 (1st Cir. 2006); *Beibei Zhang v. Holder*, 358 Fed. App'x 216, 218 (2d Cir. 2009) ("[T]he state-created danger doctrine does not apply in immigration proceedings."); *Kamara v. Att'y Gen.*, 420 F.3d 202, 217 (3d Cir. 2005) ("[T]he state-created danger exception has no place in our immigration jurisprudence."); *Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1095 (10th Cir. 2008) (refusing to "judicially engraft a new form of relief from removal"); *but see Wang v. Reno*, 81 F.3d 808, 818-19 (9th Cir. 1996) (affirming injunction against deportation because government had a constitutional duty to protect testifying witness against torture and possible execution). Those holdings reflect separation-of-powers limitations, including the principle that "the Constitution **\*187** gives 'the political department of the government' plenary authority to decide which aliens to admit." *Thuraissigiam*, 140 S. Ct. at 1982 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 35 L.Ed. 1146 (1892)); *see Enwonwu*, 438 F.3d at 30 (explaining that the application of state-created danger doctrine to removals would impermissibly "shift to the judiciary the power to expel or retain aliens" that "the Constitution has assigned to the political branches"). That authority forecloses Ms. Doe's substantive due process claim here. *Cf. Nora v. Wolf*, No. 20-CV-0993, 2020 WL 3469670, at \*13 (D.D.C. June 25, 2020) (concluding that plaintiffs' constitutional challenge to the MPP was unlikely to succeed for the same reasons).

**[30]** Second, even if the state-created danger doctrine were available in the immigration context, Ms. Doe has not demonstrated that she could prevail under it. In contexts in which the state-created danger doctrine applies, it proscribes only conduct that is "so egregious, so outrageous, that it

may fairly be said to shock the contemporary conscience." *Matican,* 524 F.3d at 155 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 848 n.8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). That standard "screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to ... a font of tort law.' " *Ibid.* (citation omitted).

**[31]** **[32]** Ms. Doe is not likely to clear that high bar. Conduct does not generally shock the conscience when government officials are "subject[ ] to the pull of competing obligations," *Lombardi v. Whitman,* 485 F.3d 73, 85 (2d Cir. 2007) (quoting *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708); *see Robischung-Walsh v. Nassau Cnty. Police Dep't,* 421 F. App'x 38, 41 (2d Cir. 2011), as are the immigration officers who must assess whether individual migrants are amenable to return to Mexico under the MPP. Moreover, to show conscience-shocking conduct, a plaintiff must demonstrate more than mere negligence on the part of the defendants. *See Lewis,* 523 U.S. at 849, 118 S.Ct. 1708. She must show that they were at least deliberately indifferent, *see id.* at 850, 118 S.Ct. 1708, to an "obvious risk of severe consequences and extreme danger," *Pena v. DePrisco,* 432 F.3d 98, 114 (2d Cir. 2005); *see Okin v. Vill. of Cornwall-On-Hudson Police Dep't,* 577 F.3d 415, 432 (2d Cir. 2009); *cf. Charles v. Orange County.,* 925 F.3d 73, 87 (2d Cir. 2019). In the context of a preliminary injunction record reflecting that agents returned Ms. Doe to Mexico only after two interviews to assess whether doing so would be appropriate, *see* Doe Decl. ¶¶ 7-8, and with scant other evidence of defendants' state of mind, Ms. Doe has not shown that officials willfully disregarded obvious risks of severe consequences and extreme danger in Ms. Doe's case.

## CONCLUSION

Defendants' motion to stay proceedings is granted in part and denied in part. As to the claims that have not been stayed, plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

**All Citations**

505 F.Supp.3d 164

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3469670

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.

NORA and Her Minor Son, Jose (by
and through his mother) c/o American
Civil Liberties Union, et al., Plaintiffs,

v.

Chad F. WOLF, Acting Secretary of the
Department of Homeland Security in
his official capacity, et al., Defendants.

Civil Action No. 20-0993 (ABJ)
|
Signed 06/25/2020

**Attorneys and Law Firms**

Arthur B. Spitzer, Scott Michelman, American Civil Liberties Union of the District of Columbia, Rebecca H. Smullin, Public Citizen Litigation Group, Washington, DC, Celso Perez, Anand Balakrishnan, Pro Hac Vice, Daniel Antonio Galindo, Pro Hac Vice, Judy Rabinovitz, Pro Hac Vice, American Civil Liberties Union Foundation, New York, NY, Anne Elizabeth Peterson, Pro Hac Vice, Blaine Bookey, Pro Hac Vice, Karen Musalo, Pro Hac Vice, My Khanh Ngo, Pro Hac Vice, Center for Gender and Refugee Studies, San Francisco, CA, for Plaintiffs Nora, Jose, Jonathan, Steven, Emilia, Gabriela, Jane, Fabiola, Ernesto, Laura, Joseph, Anna, Carlos, Diana, Wanda, Diego, Jessica, Edgar, Damian, Henry, Carolina, Armando, Salvador, Carmen, Lola, Esteban.

Anand Balakrishnan, Judy Rabinovitz, Pro Hac Vice, Celso Perez, Daniel Antonio Galindo, Pro Hac Vice, American Civil Liberties Union Foundation, New York, NY, Arthur B. Spitzer, Scott Michelman, American Civil Liberties Union of the District of Columbia, Rebecca H. Smullin, Public Citizen Litigation Group, Washington, DC, Anne Elizabeth Peterson, Pro Hac Vice, Blaine Bookey, Pro Hac Vice, Karen Musalo, Pro Hac Vice, My Khanh Ngo, Pro Hac Vice, Center for Gender and Refugee Studies, San Francisco, CA, for Plaintiff All Plaintiffs.

Diana Viggiano Valdivia, U.S. Attorney's Office for the District of Columbia, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

AMY BERMAN JACKSON, United States District Judge

**\*1** Plaintiffs are twenty-six asylum seekers – twelve adults and their fourteen minor children – who are awaiting the completion of asylum proceedings in the Mexican state of Tamaulipas. Compl. [Dkt. # 3] ¶ 1. They all fled violence and persecution in their home countries and sought refuge in the United States. Compl. ¶ 1. Once they reached the border, the Department of Homeland Security returned plaintiffs to Mexico pursuant to the Migrant Protection Protocols, which require that asylum seekers be returned to the territory from which they came from pending adjudication of their requests. Compl. ¶¶ 3–4. The complaint alleges that the decision to expand the implementation of this policy to include the entry points bordering Tamaulipas was unreasonable and unlawful; plaintiffs allege that they have endured – and continue to endure – extreme physical violence there. Compl. ¶ 2. They aver that have been assaulted, kidnapped, raped, extorted, and threatened by members of organized groups that control the area. Pls.' Declarations, Ex. 1 to Compl. [Dkt. # 3-2] (SEALED) ("Pls.' Decls."). Plaintiffs contend that the federal government is well-aware of the violence that migrants face in Tamaulipas, Compl. ¶ 5; they point out that the region has been assigned the U.S. State Department's highest level "Do Not Travel" advisory "due to crime and kidnapping." Compl. ¶¶ 39–40.

On April 16, 2020, plaintiffs filed this lawsuit, claiming that the Department of Homeland Security and its Acting Secretary, Chad F. Wolf, violated the Administrative Procedure Act ("APA"), 🚩 5 U.S.C. § 706(2), in expanding the Migrant Protection Protocols to include Tamaulipas; that the policy and the government's decision to return these plaintiffs violates their substantive due process rights; and that the return decisions were not adjudicated appropriately. Compl. ¶¶ 105–21. On May 2, 2020, plaintiffs filed a motion for a preliminary injunction, requesting that they be returned to the United States during the pendency of this litigation. Pls.' Mot. for Prelim. Inj. [Dkt. # 18] ("Pls.' Mot."); Pls.' Redacted Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. [Dkt. # 18-2] ("Pls.' Mem.") at 1, 4. Defendants opposed the motion on May 8, 2020. Defs.' Mem. of P. & A. in Opp. to Pls.' Mot. [Dkt. # 23-2] (SEALED); Defs.' Redacted Mem. of P. & A. in Opp. to Pls.' Mot. [Dkt. # 34] ("Defs.' Mem."). In opposition to the motion, defendants argued, among other things, that plaintiffs could not demonstrate a likelihood of success on the merits since the Court lacked jurisdiction to hear their claims. Defs.' Mem. at 22–30, 35–37.

For the reasons set forth in more detail below, the motion for preliminary injunctive relief will be granted in part and denied in part. Defendants have pointed to a statutory provision that precludes judicial review of individual, discretionary deportation decisions, Defs.' Mem. at 29–30; *see* 8 U.S.C. § 1252(a)(2)(B)(ii), and the portions of the complaint that seek such relief must be dismissed pursuant to Federal Rule of Civil Procedure 12(h)(3). But there are some claims in the complaint that will go forward. Claim One alleges that the defendants' broadly applicable decision to expand the Migrant Protection Protocols to Tamaulipas was arbitrary and capricious, Compl. ¶¶ 105–08, and the Court has jurisdiction to hear it under the APA notwithstanding section 1252 of the Illegal Immigration Reform and Immigrant Responsibility Act. The Court has jurisdiction to consider Claim Two to the extent it challenges the constitutionality of the expansion of MPP to Tamaulipas, as opposed to the MPP generally. *See* Compl. ¶¶ 109–14. Claim Three directly challenges the merits of the decisions to return each of the plaintiffs to Mexico notwithstanding their expressions of fear in *nonrefoulement* interviews, Compl. ¶¶ 115–21, and it falls under the statutory prohibition except to the extent that it alleges that some plaintiffs received no *nonrefoulement* interview at all.

 *2  Assuming that plaintiffs have demonstrated that they risk irreparable harm if they remain in Tamaulipas, the Court must consider whether they have carried their burden to show that they are likely to succeed on the merits of the claims over which it has jurisdiction. Based on the complaint and the evidence adduced so far, the Court cannot determine whether plaintiffs are likely to succeed on the merits of Claim One since it has not been provided with records that memorialize the agency's decision or any administrative record underlying the alleged decision. Therefore, the Court will consolidate consideration of the motion for preliminary injunction with expedited consideration of Claim One on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The Court finds that plaintiffs have not shown that they are likely to succeed on the merits of Claim Two given the lack of authority to support the extension of the state-created danger doctrine to the immigration context. But the Court will order that any plaintiffs who were returned to Mexico without *nonrefoulement* interviews as alleged in the surviving portion of Claim Three must receive an interview by July 2, 2020.

**BACKGROUND**

## I. The Migrant Protection Protocols

On December 20, 2018, the Department of Homeland Security ("DHS") introduced the Migrant Protection Protocols ("MPP"), which require that certain noncitizens who enter the United States directly from, or by travelling through Mexico, "illegally or without proper documentation," must be "returned to Mexico for the duration of their immigration proceedings." Compl. ¶ 29; Dec. 20, 2018 Migrant Protection Protocols Announcement, Ex. 1 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-14] ("MPP Announcement"). The protocols were issued pursuant to a provision in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225(b)(2)(C) (hereinafter, "contiguous territory provision"), which states:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

*See* Jan. 25, 2019 Policy Guidance for Implementation of the Migrant Protection Protocols, Ex. 3 to Defs.' Mem. [Dkt. # 34-3] ("Jan. 25 MPP Policy Guidance").

The announcement that accompanied the adoption of the protocols asserts that they were issued because the United States "has an overwhelming asylum backlog of more than 786,000 pending cases," and "[m]ost of these claims are not meritorious." MPP Announcement at 2. Therefore, DHS proclaimed, to prevent "aliens ... [from] exploit[ing] asylum loopholes" and from "disappear[ing] into the United States," asylum seekers must await the processing of their applications in Mexico, and if they are granted asylum, they will then be allowed to enter the country. *Id.*

The same day the United States announced the MPP, the government of Mexico also issued a statement declaring that it would allow "temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry" and "ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international

treaties to which Mexico is a party, and its Migration Law." Jan. 25 MPP Policy Guidance at 1–2.

Individuals subject to the MPP undergo removal proceedings under 8 U.S.C. § 1229(a), and they are ordered to appear at immigration hearings at a U.S. port of entry on a future date. Compl. ¶ 30. Then, they are physically returned to Mexico, and on the date of their hearing, they must report to their designated port of entry to be processed by Customs and Border Patrol ("CBP") and transported to the hearing site. *Id.* ¶¶ 30–31. After the hearing, they are transported back to the port of entry and returned to Mexico. This process continues for as many hearings as are necessary to conclude the individual's immigration proceedings. *See* Jan. 28, 2019 MPP Guiding Principles, Ex. 2 to Defs.' Mem. [Dkt. # 34-2] ("Jan. 28 MPP Guiding Principles") at 2.

**\*3** Consistent with the principle of *nonrefoulement*, which precludes a State from expelling or returning a refugee "to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion," [1] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150, the MPP are not supposed to apply to any individual who is "more likely than not to face persecution or torture in Mexico." Jan. 28 MPP Guiding Principles at 2. Thus, "where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico," U.S. Citizenship and Immigration Services ("USCIS") "will conduct an assessment" to determine whether application of the MPP is appropriate. Jan. 28, 2019 MPP Guidance for Implementing Section 235(b)(2)(C) of the INA, Ex. 2 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-15] ("Jan. 28 Policy Memo.") at 3.

That assessment is referred to by plaintiffs as a "*nonrefoulement* interview." *See, e.g.*, Compl. ¶ 9. These interviews are meant to be conducted in a "non-adversarial manner, separate and apart from the general public." Jan. 28 Policy Memo at 3. "The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's [asylum] proceedings." *Id.* The officer conducting the interview takes into account "[t]he credibility of any statements made by the alien," whether "residing in another region of Mexico to which the

alien would have reasonable access could mitigate against the alleged harm," "[c]ommitments from the Government of Mexico regarding the treatment and protection of aliens," and "[w]hether the alien has engaged in criminal, persecutory, or terrorist activity." *Id.* at 4.

On January 28, 2019, the government began implementing section 235(b)(2)(C) of the INA through the MPP at the San Ysidro port of entry, located in San Diego, California, with the understanding that implementation would be expanded in the near future. Compl. ¶ 34; Jan. 28, 2019 Memorandum from Kevin K. McAleenan, Commissioner of CBP to Todd C. Owen, Executive Assistant Commissioner of CBP, Implementation of the MPP, Ex. 3 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-16] ("Jan. 28 MPP Implementation Memo") ("MPP expansion beyond ... San Ysidro is coordinated closely with my office."); *see also* Jan. 28 MPP Guiding Principles. [2]

**\*4** The complaint alleges that in March 2019, DHS "expanded MPP" to the Calexico, California and El Paso, Texas ports of entry. Compl. ¶ 35.

On June 7, 2019, the United States issued a U.S.-Mexico Joint Declaration, stating that "[t]he United States will immediately expand the implementation of the existing Migrant Protection Protocols across its entire Southern Border." June 7, 2019 U.S.-Mexico Joint Declaration Media Note, Ex. 1 to Defs.' Mem. [Dkt. # 34-1] at 2. Plaintiffs allege that in July of 2019, DHS expanded the MPP to the Mexican border state of Tamaulipas. Compl. ¶¶ 5, 36. Individuals entering the United States through the ports of entry in Laredo, McAllen, or Brownsville, Texas are returned through these ports to Tamaulipas. *Id.* ¶ 36.

## II. Factual Background

Plaintiffs are migrants from Central and South American countries with pending asylum applications who were returned to Tamaulipas under the MPP. While awaiting the outcome of their asylum proceedings in Tamaulipas, plaintiffs have been kidnapped, raped, assaulted, threatened, sexually assaulted, extorted, imprisoned, robbed, and attacked. Compl. ¶¶ 15–25; *see generally* Pls.' Decls. Plaintiffs have been unable to seek protection from the Mexican police, Compl. ¶ 73, and they allege that they live in constant fear of additional similar attacks. Compl. ¶ 2.

Several plaintiffs expressed fears of returning to Mexico when they were first processed at the border. Compl. ¶ 88. CBP did not refer them to USCIS for *nonrefoulement* interviews, as it was required to do, and it returned them to Tamaulipas instead. Compl. ¶ 88. Eventually, all of the plaintiffs except for one received interviews when they returned to the port of entry for a hearing. Compl. ¶¶ 78–79. Not one plaintiff who was interviewed was found to have satisfied the "more likely than not" standard; in each case, a finding was made that the individual had not made a sufficient showing. Compl. ¶ 91. Plaintiffs allege that the hearings were not conducted in accordance with the applicable procedures, and that the migrants were prevented from fully sharing their experiences or submitting evidence. Compl. ¶¶ 94–104.

In their complaint, plaintiffs highlight the government's own statements about the dangers of Tamaulipas. Since at least 2018, the U.S. Department of State has assigned the Mexican state a "Level 4: Do Not Travel" advisory. Compl. ¶ 39. This is the Department's highest level of warning, typically assigned to active-combat zones such as Afghanistan, Iraq, and Syria. *Id.* Until coronavirus-related travel advisories were issued, plaintiffs assert that Tamaulipas was the only Mexican border state with a Level 4 advisory. Compl. ¶ 41. It warns:

> Do not travel due to crime and kidnapping.
>
> Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Armed criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Federal and state security forces have limited capability to respond to violence in many parts of the state.

**\*5** U.S. Dep't of State, Mexico Travel Advisory, *available at* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (Apr. 9, 2019) ("April 2019 Mexico Travel Advisory"). Indeed, the State Department advises that anyone traveling to such a high-risk area should create a will, designate a family member to negotiate with kidnappers, and establish secret questions and answers to verify that the traveler is still alive when kidnappers reach out to family. U.S. Dep't of State, High-Risk Area Travelers, *available at* https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/high-risk-travelers.html (last updated Nov. 6, 2019).

The Mexican government has similarly recognized the dangers associated with this region. For example, according to the complaint, the Mexican ambassador to the United States acknowledged that her government had not been prepared for the expansion of MPP to Tamaulipas, given challenges associated with security. Compl. ¶ 46, citing CQ Newsmaker Transcripts, *CQ Roll Call and the Meridian International Center Holds Discussion on Trade, Immigration and Foreign Affairs,* (Jul. 18, 2019), Ex. 21 to Pls.' Mot. [Dkt. # 18-34], quoting Ambassador Martha Bárcena Coqui ("[W]e recognize there are certain areas of Mexico in which the challenges of security are higher. So, that is why we have been very careful of not opening up, for example, the return in Tamaulipas...."); *see also* Kevin Sieff, *When They Filed Their Asylum Claim, They Were Told To Wait in Mexico. There, They Say, They Were Kidnapped,* Wash. Post., (June 9, 2017), Ex. 26 to Declaration of Darlene Barballianiz Boggs [Dkt. # 18-39] (reporting a statement from a Mexican legislator stating that the lives of migrants were in danger and that the State does not have the capacity to protect them).

Plaintiffs contend that asylum seekers who are sent to Tamaulipas to wait out their immigration proceedings have no choice but to be exposed to the violence in the region. Individuals who are processed under the MPP are dropped off at bridges connecting ports in Texas to cities in Tamaulipas. Compl. ¶ 53. Individuals with proceedings underway must report to these bridges, where they are then picked up by DHS agents for their hearings. *See* Compl. ¶ 54. These locations are well-known, and plaintiffs assert that many asylum applicants are kidnapped within moments of their return to Mexico. Compl. ¶ 53. In addition, migrants can be ordered to present themselves at the pick-up locations very early in the morning, sometimes as early as 4:30 AM. Compl. ¶ 54. Plaintiffs allege that reporting "essentially in the middle of the night" is especially dangerous, Compl. ¶ 54: the State Department imposes a curfew on U.S. government employees in these areas between midnight and 6:00 am because of the risks. April 2019 Mexico Travel Advisory. And, "[b]ecause immigration proceedings require multiple hearings over a period of many months, individuals are repeatedly subjected to the danger of being dropped off at the bridges." Compl. ¶ 56.

Plaintiffs further allege that the dangerous nature of the region hinders individual asylum applications: lawyers are afraid to travel to Tamaulipas to meet with asylum seekers, and many applicants receive removal orders *in absentia* because they are too afraid to attend their hearings. Compl. ¶ 57.

### III. Procedural Background

On April 16, 2020, twenty-six plaintiffs proceeding under pseudonyms filed a complaint against the DHS and Chad F. Wolf, Acting Secretary of DHS, that included three claims:

**\*6** 1) Defendants' decision to expand the MPP to Tamaulipas was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2), because DHS knew that migrants would face extreme levels of violence there. Compl. ¶¶ 105–08. Plaintiffs also allege that defendants failed to engage in reasoned decision-making because they have not supplied any explanation for their action. Compl.¶ 108.

2) Defendants violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution by knowingly placing plaintiffs in danger so serious and egregious that it shocks the conscience. Compl. ¶¶ 109–14.

3) Defendants violated the APA, 5 U.S.C. § 706(2) and the *Accardi* doctrine because they failed to follow their own regulations when conducting the *nonrefoulement* interviews for individuals returned to Tamaulipas under the expanded MPP. Compl. ¶¶ 115–21. Plaintiffs also alleged that one of them did not receive an interview at all. Compl. ¶¶ 117–18.

On May 2, 2020, plaintiffs filed a motion for a preliminary injunction, requesting an order that they be permitted to return to the United States for the pendency of the litigation, or at least an order that they be promptly provided with *nonrefoulement* interviews to be adjudicated under the proper standard. Pls.' Mem. at 45 n.24. The government opposed the motion on May 8, 2020. Defs.' Mem.

### STANDARD OF REVIEW

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.' " *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The decision to issue a preliminary injunction turns on four factors: whether (1) plaintiffs are likely to succeed on the merits of the action; (2) plaintiffs will suffer irreparable harm absent an injunction; (3) the balance of the equities tips in the plaintiffs' favor; and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). The last two factors merge when the government is the opposing party. *Guedes*, 920 F.3d at 10. Preliminary injunctive relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The manner in which courts should weigh the four factors "remains an open question" in this Circuit. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). The Court of Appeals has long adhered to the "sliding scale" approach, where "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 392. But its more recent decisions call that into question.

The Supreme Court has not addressed the precise question of whether a particularly strong showing of harm would suffice in the face of a weaker showing on the merits. But because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," the Court of Appeals has "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.' " *Id.* at 392–93, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring). And although the Court of Appeals has not specifically clarified whether the " 'sliding scale' approach remains valid after *Winter*," *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016), it has ruled that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction. *See Ark. Dairy Co-op. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006).

**\*7** Regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been "the basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959) (internal edits

omitted). A failure to show irreparable harm is grounds for the Court to refuse to issue a preliminary injunction, "even if the other three factors entering the calculus merit such relief."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ANALYSIS

### I. Jurisdiction

Defendants argue that section 1252(a)(2)(B)(ii) of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") prohibits the Court from reviewing plaintiffs' claims. Defs.' Mem. at 22. The provision states:

> (B) **Denials of discretionary relief** - Notwithstanding any other provision of law (statutory or nonstatutory), ... no court shall have jurisdiction to review—
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).

Defendants argue that the ban on judicial review applies in this case because the statute specifically accords the Secretary the discretion to return an alien to the territory from which he or she arrived pending a section 1229a proceeding. Defs.' Mem. at 22–23. 8 U.S.C. § 1225(b)(2)(C) states:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(C). In other words, since a return decision is left to the discretion of the Secretary, a court cannot

review it. Defs.' Mem. at 22–23; *see Zhu v. Gonzales*, 411 F.3d 292, 294–96 (D.C. Cir. 2005) (finding that a statute using the word "may" conferred discretion to the attorney general, and thus the decisions made under that statute were unreviewable pursuant to section 1252(a)(2)(B)(ii)).

Claim One alleges that defendants' decision to expand the MPP to Tamaulipas was arbitrary and capricious given the known dangers in the region. Compl. ¶ 106. Defendants maintain that the claim is precluded because, in essence, it challenges the agency's exercise of its discretion to return the individual plaintiffs. Defs.' Mem. at 22–27.

But Claim One does not take on the individual decisions made to return each plaintiff to Mexico; it is directed at an agency decision – the decision to "expand" MPP implementation to Tamaulipas – that applies to migrants arriving from Mexico at three Texas points of entry. *See Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (differentiating between a discrete agency action and the broader ongoing policy underlying that action). Defendants do not point to any specific provision in the INA specifying that a decision to expand protocols implementing section 1225(b)(2)(C) is discretionary. Thus, the claim does not fall within section 1252(a)(2)(B)(ii), and the Court may consider Claim One. [3]

**\*8** Claim Two alleges that defendants engaged in affirmative conduct they knew or should have known would expose asylum seekers to the risk of grave danger. Compl. ¶ 110. This general allegation is followed by a more particularized one: that defendants have forced each of the plaintiffs to remain in Tamaulipas "despite [d]efendants' knowledge of the severe harms that plaintiffs have experienced and the continuing serious and obvious risk...." Compl. ¶ 111. Paragraph 114 of the complaint concludes, "[d]efendants have violated [p]laintiffs' due process rights both by adopting and applying MPP-Tamaulipas, and additionally by subjecting and continuing to subject [p]laintiffs to MPP-Tamaulipas." Compl. ¶ 114. This claim is something of a hybrid; to the extent it claims, as in paragraph 111, that the defendants were aware that these particular plaintiffs had already suffered harm in the Mexican state but returned them anyway, it asks the Court to review individual discretionary decisions made in the application of the MPP, and the Court lacks jurisdiction to do so. But to the extent Claim Two challenges the allegedly unconscionable nature of the decision to implement the MPP in Tamaulipas at all, that is not a decision committed to the

discretion of the Attorney General by statute, and the Court has the power to consider the constitutional question.[4]

Finally, Claim Three states that defendants failed to properly adjudicate the plaintiffs' *nonrefoulement* interviews in violation of the APA. Compl. ¶¶ 115, 117–18. They also allege that one plaintiff did not receive the required interview at all, even though she too expressed a fear of returning to Mexico. Compl. ¶ 117.

The allegation that the defendants failed to properly "adjudicate," that is, to make an official decision about, plaintiffs' *nonrefoulement* requests is a clear attack on the merits of the return decisions. Plaintiffs make clear that they are attacking the legitimacy of the individual, discretionary determinations in their motion for a preliminary injunction; they complain that "despite [their] credible accounts of being raped, assaulted, and subjected to repeated death threats in Tamaulipas, [d]efendants did not find that *any* of them had established the requisite fear to remove them from MPP." Pls.' Mem. at 32. The declarations submitted to the Court in support of the motion include individual accounts of "past persecution in Tamaulipas on account of a protected ground," and plaintiffs argue that "they should have been presumed to face a future threat of persecution." *Id.* at 32–33. In other words, plaintiffs are contesting the outcome of their *nonrefoulement* interviews. While the allegation that the interview has become a hollow exercise that offers asylum seekers little protection is deeply troubling, the Court is required by law to conclude that Claim Three questions discretionary decisions that it lacks the jurisdiction to review.

**\*9** Plaintiffs argue, though, that even if the Court construes Claim Three to be challenging the return decisions themselves, section 1252(a)(2)(B)(ii) does not preclude judicial review. They submit that the provision "only restricts review of discretionary denials of relief concerning admission or removal," Pls.' Reply in Supp. of Pls.' Mot. (REDACTED) [Dkt. # 36] ("Pls.' Reply") at 5, and that "an individual decision to 'return' an individual to Mexico during the course of immigration proceedings is not a decision about whether that person can legally be admitted to the country or should be removed." *Id.* at 6.

Plaintiffs' argument is that the operative subparagraph – section 1252(a)(2)(B)**(ii)** – cannot be understood unless it is read within the context of paragraph (B) in its entirety. The IIRIRA provision in question states:

(B) **Denials of discretionary relief** - Notwithstanding any other provision of law (statutory or nonstatutory), ... no court shall have jurisdiction to review—

> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, **or**

> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(B).

According to the plaintiffs, paragraph (B)(ii) is a "catchall or residual clause that should be interpreted as limited by the enumerated categories ... which are recited just before it."[5] Pls.' Reply at 5. Applying that principle, they reason that because all of the statutes listed in (B)(i) involve substantive decisions regarding whether an individual may stay in the country, the catchall provision should be construed to refer only to similar decisions, and, they say, returning an asylum seeker under the MPP is not one of these types of decisions. *Id.* at 5–6.

Plaintiffs point to the Supreme Court's opinion in *Kucana v. Holder*, 558 U.S. 233 (2010), which examined the relationship between the two subsections. In that case, the "discretionary decision" at issue was one made by the Board of Immigration Appeals ("BIA") to deny a motion to reopen removal proceedings. The discretion to deny such a motion was derived from a federal regulation, not a statute, and the Court found that (B)(ii) did not contemplate discretionary decisions set forth in federal regulations. It relied, in part, on a consideration of subsection (B)(i); the Court stated that it was instructive in determining the meaning of (B)(ii) that Congress had in mind "decisions of the same genre, i.e., those made discretionary by legislation." *Id.* at 246–47. The Court also found "significant the character of the decisions Congress enumerated in section 1252(a)(2)(B)(i)" which were "substantive decisions ... made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not." *Id.* at 247. Because a motion to reopen a case "does not direct

the Executive to afford the alien substantive relief" and is merely a "procedural device" that "concerns only the question whether the alien's claims have been accorded a reasonable hearing," the Court was not precluded from reviewing the BIA's decision to deny the motion to reopen by (B)(ii). *Id.* at 248.

**\*10** Plaintiffs argue that the decision to remove an individual from the United States under the MPP is an "adjunct" decision, similar to a decision denying a motion to reopen proceedings, and it does not afford the alien substantive relief. Pls.' Reply at 6. But the Court concludes, as others have, that while the return determination under the MPP may be a merely interim decision regarding the status of an alien, the ruling is not simply a "procedural" decision like the one in *Kucana*. Rather, it is a decision that entails the substantive evaluation of the non-citizen's fear of return, and it plainly "involve[s] whether aliens can stay in the country or not." *Kucana*, 588 U.S. at 247. Moreover, the main focus of the *Kucana* decision was whether (B)(ii) precluded judicial review when discretion was conferred by regulation as opposed to by statute. Here, discretion is conferred by statute, and therefore, the decision to return an alien to Mexico pending further proceedings falls within the scope of 🚩 section 1252(a)(2)(B)(ii). *See Cruz*, 2019 WL 8139805, at \*4 (finding individual return decisions unreviewable under 🚩 section 1252(a)(2)(B)(ii)); *see also* 📙 *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 191 (3d Cir. 2020) (finding that 🚩 section 1252(a)(2)(B)(ii) did not preclude judicial review over plaintiffs' claims because they did not seek review of the Attorney General's exercise of discretion, rather, they challenged the extent of the Attorney General's authority under the statute); 🚩 *Innovation Law Lab*, 366 F. Supp. 3d at 1118, *aff'd sub nom.* 🚩 *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020) (recognizing that DHS's "decisions to review or not return any particular alien ... might not be subject to review," but finding that plaintiffs' claims were justiciable because plaintiffs were challenging the applicability of the contiguous territory provision to them, not the return decisions themselves).

Thus, the Court finds that it does not have jurisdiction over Claim Three to the extent that it challenges the adjudication of the *nonrefoulement* interviews. However, the Court finds that it can review the decision not to grant plaintiff Diana a *nonrefoulement* interview at all, since that was not a choice the Attorney General was accorded the discretion to make.

The MPP Guiding Principles issued by DHS in January of 2019 state:

- "If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien *will be* referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico." Jan. 28 MPP Guiding Principles at 1–2.

- "If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien *may not* be processed for MPP. Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole." *Id.* at 2.

The government is bound to follow its own procedures, and a failure to follow those procedures is not immune from judicial review because it is not a discretionary decision. *See* 📙 *Damus v. Nielsen*, 313 F. Supp. 3d 317, 327 (D.D.C. 2018) (finding that 🚩 section 1252(a)(2)(B)(ii) did not apply because the plaintiffs were not challenging the outcome of the agency's decision making, but the method by which the policy was being applied). Here, plaintiff Diana was subject to the MPP without being afforded the proper procedures. Thus, the Court may review her claim.

Because the Court has jurisdiction to review at least some parts of all three claims, the Court will go on to assess the likelihood of success on the merits and the other preliminary injunction factors.

## II. The Court will consolidate the motion for preliminary injunctive relief with expedited consideration of the merits of Claim One.

Plaintiffs allege that the decision to expand implementation of the MPP to Tamaulipas was arbitrary and capricious because they exposed asylum seekers to a known risk of serious harm. Compl. ¶¶ 36, 47, 106; *see also* Pls.' Mem. at 21–24 (defendants did not offer any plausible explanation for the

choice, and they failed to consider the risk of danger to the migrants). Defendants respond that the "relevant inquiry" to evaluate this claim "is not whether DHS acted arbitrarily or capriciously '[i]n expanding MPP to Tamaulipas, but rather ... whether the individual asylum officers' determinations in question were rational" in light of the contiguous territory provision, which gives DHS the authority to return aliens "arriving on land ... from a foreign territory contiguous to the United States ... to *that* territory." Defs.' Mem. at 27, citing 🚩8 U.S.C. § 1225(b)(2)(C). Defendants emphasize that DHS was implementing a statute that permits the return of aliens who come from a foreign contiguous country to that country. They point out that the plaintiffs came to the United States through Tamaulipas, and they submit that therefore, it could not have been unreasonable to carry out the statutory scheme by sending them back.

 **\*11** But plaintiffs are not challenging the government's decision to return them to *Mexico*; this lawsuit takes on the agency's decision to expand its implementation of the statute to the state of Tamaulipas. The defense points to selected interviews in which at least some of the plaintiffs failed to identify another place it would be safer to go, and it maintains that the decision to return *them* isn't arbitrary and capricious. Defs.' Mem. at 27–28. This is simply the jurisdictional argument restated. The Court has already concluded that defendants have mischaracterized the complaint, and that complaint is indeed asking it to assess the reasonableness of a broad policy decision and not the individual asylum officers' determinations.

Since plaintiffs focused their evidentiary presentation on the question of irreparable harm and the deficiencies of the *nonrefoulement* interviews, and defendants declined to address the alleged expansion directly at all, the Court has little before it that would enable it to determine, based on this record, whether plaintiffs have carried their burden to demonstrate the likelihood that they will succeed on the merits of the APA claim. So, the Court will defer ruling on the motion until it has had the benefit of the necessary materials. The complaint details what was known to – and announced by – some agencies within U.S. government about Tamaulipas, and it gives rise to serious questions about whether it would be reasonable for DHS to require asylum seekers to stay there for an indefinite period of time, even if their route to the United States took them through that territory. But the Court has not yet been provided with records memorializing the actual decision or the reasons behind it; nor has it seen any material comprising an administrative record that could reveal what

facts were known to or considered by the decision makers, and what risks were evaluated or ignored. [6] Therefore, the parties will be ordered to meet and confer and propose a schedule for the expedited creation of an administrative record and the briefing of dispositive motions.

## III. Plaintiffs have not shown that they are likely to succeed on Claim Two.

Plaintiffs allege that when defendants expanded the MPP to Tamaulipas, they violated plaintiffs' Fifth Amendment substantive due process rights. The concept of substantive due process embodies the recognition that the Constitution "forbids the government to infringe certain 'fundamental' liberty interests ... no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." 🚩*Reno v. Flores*, 507 U.S. 292, 301–02 (1993). "To succeed on a substantive due process claim, a plaintiff must prove 'egregious government misconduct' that deprives him of a liberty or property interest." *Bellinger v. Bowser*, 288 F. Supp. 3d 71, 85 (D.D.C. 2017), citing 🚩*George Washington Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (holding that substantive due process imposes no burden on the government "in the absence of a liberty or property interest"). "[T]he plaintiff must also show that the ... conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " 🚩*Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001), quoting 🚩*County of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8 (1998). The "[s]ubstantive due process analysis must begin with a careful description of the asserted right, for [t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." 🚩*Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992).

 **\*12** Defendants argue that plaintiffs have not alleged a deprivation of a liberty or property interest, and they rely on authority that states, "an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States." 🚩*Rafeedie v. INS,* 880 F.2d 506, 520 (D.C. Cir. 1989); *see also* 🚩*Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215 (1953) ("Aliens seeking entry from contiguous lands obviously can be turned back at the border without more."). Plaintiffs

do not dispute that legal principle. But plaintiffs point out that the second claim expressly alleges that they have been deprived of something else: their liberty interest in bodily security. *See* Compl. ¶¶ 109–112. According to the plaintiffs, the constitutional right at issue is protection from third-party violence, and that claim can be recognized under the state-created danger doctrine. *See* Pls.' Mem. at 25, quoting *Butera*, 235 F.3d at 654; *see also* Pls.' Reply at 15 ("Plaintiffs' substantive due process claim is that the state cannot, in a conscience-shocking way, increase their risk to deadly harm.").

In *Butera*, the D.C. Circuit explained that "[a]s a general matter, a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.' " *Butera*, 235 F.3d at 647, quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). But the Court of Appeals has also recognized that in "certain limited circumstances, the Constitution may impose affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198 (where state authorities knew that a child's father was abusive, but did not take steps to remove the child from his father's custody, the Court found that the state's failure to provide the child with adequate protection against his father's violence did not violate the substantive due process clause).

One such circumstance is "where the state creates a dangerous situation or renders citizens more vulnerable to danger."[7] *Butera*, 235 F.3d at 648–49, quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993). The state-created danger doctrine applies where "the State knowingly created or increased the risk that an individual would be exposed to danger." *Butera*, 235 F.3d at 654. In *Butera*, the plaintiff brought several claims under 42 U.S.C. § 1983, alleging violations of a number of constitutional rights when her son was killed while serving as an undercover operative for the Metropolitan Police Department ("MPD"). *Id.* at 640–41. The plaintiff presented evidence that the police officers failed to advise her son of the risks of serving as an undercover operative and failed to put in place measures to ensure his safety. *Id.* at 643–44. The Court examined whether the District of Columbia and MPD officers could be held liable for failing to protect an individual who was not in custody

from harm inflicted by a third party. *Id.* at 641. The Court held that they could under the state-created danger doctrine, but because this case was the first in the D.C. Circuit to deal with this issue, it held that the right was not clearly established when Eric was murdered, and the officers were entitled to qualified immunity. *Id.* at 654. Other circuits have also recognized this right in the section 1983 context. *See* *Munger v. City of Glasgow*, 227 F.3d 1082, 1084–85 (9th Cir. 2000) (where the police ejected an intoxicated man wearing only a t-shirt and jeans from a bar on a very cold night and forced him to walk home, and he later died of hypothermia, the court found the district court erred when it granted the officers qualified immunity); *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989) (police officer who stopped a car in which plaintiff was a passenger, arrested and removed the driver, impounded the car, and left the plaintiff in a high crime area could be liable for a substantive due process violation when she was raped on her way home).

**\*13** Plaintiffs contend that defendants have created a dangerous situation and increased their vulnerability to danger by: returning them to Tamaulipas; requiring them to appear at known kidnapping sites as early as 4:30 AM; returning them to the dangerous locations at the end of the day; and forcing them to repeat this process again and again for months while their cases are adjudicated. Compl. ¶¶ 53–56; Pls.' Reply at 13, 16.

Plaintiffs have not pointed the Court to any opinion in which this circuit applied the state-created danger doctrine to a non-citizen in immigration proceedings. The doctrine arose in proceedings under 42 U.S.C. § 1983 seeking to hold state actors liable for constitutional violations, and several circuits have expressly rejected the notion that it could be applied in the immigration context. For example, in *Enwonwu v. Gonzales*, 438 F.3d 22, 29 (1st Cir. 2006), the First Circuit held:

> [T]here can be no *substantive* due process objection to the order removing [plaintiff]. The state-created danger theory argument fails because an alien has no constitutional substantive due process right not to be removed from the United States, nor

a right not to be removed from the United States to a particular place.

The First Circuit relied on separation of powers principles, finding that "entertaining the state-created danger theory as means for relief from a removal order, a court, whether sitting in habeas or in judicial review, steps outside its defined constitutional role and intrudes into a realm reserved to the Executive and the Legislative Branches." *Id.* at 30.

The Third Circuit came to a similar conclusion, stating that "[w]e are aware of no court of appeals which has recognized the constitutional validity of the state-created danger theory in the context of an immigration case. We decline to do so here, and hold that the state-created danger exception has no place in our immigration jurisprudence." *Kamara v. Attorney Gen. of U.S.*, 420 F.3d 202, 217 (3d Cir. 2005). The *Kamara* court reasoned that "[e]xtending the state-created danger exception to final orders of removal would impermissibly tread upon Congress' virtually exclusive domain over immigration, and would unduly expand the contours of our immigration statutes and regulations." *Id.* at 217–18; *see Paulino v. Attorney Gen. of U.S.*, 445 Fed. Appx. 558, 561 (3d Cir. 2011) (reaffirming the holding in *Kamara*); *see also Beibei Zhang v. Holder*, 358 Fed. Appx. 216, 218 (2d Cir. 2009) (citing to *Kamara* in "holding that the state-created danger doctrine does not apply in immigration proceedings."). The Tenth Circuit adopted the same reasoning, finding that the state-created danger doctrine should not be extended to the context of immigration review because that would effectively "judicially engraft a new form of relief from removal onto the statutory scheme established by Congress." *Vincent-Elias v. Mukasey*, 532 F.3d 1086, 1095 (10th Cir. 2008).

In the absence of clear direction from the D.C. Circuit on the issue, and in light of the persuasive reasoning of the three other circuits cited above, the Court cannot find that plaintiffs have shown that they are likely to be successful on the merits of their constitutional claim. [8] Therefore, the Court will deny plaintiffs' motion for preliminary injunction as to Claim Two. [9]

**IV. Plaintiffs have established that plaintiff Diana is likely to succeed on the surviving portion of Claim Three, and that the requested relief should be granted as to her.**

**\*14** Guidance issued by DHS provides that an individual who "affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico," will be referred for a *nonrefoulement* screening. *See* Jan. 28 MPP Guiding Principles at 1. One plaintiff, Diana, never received a *nonrefoulement* interview, although she told immigration officials that she feared returning to Mexico. Declaration of Diana, Ex. 1 to Compl. [Dkt. # 3-2] ("Diana Decl.") (SEALED) at 70, ¶ 34.

Government agencies must follow their own rules, including agency procedures "[w]here the rights of individuals are affected." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954); *accord Damus*, 313 F. Supp. 3d at 337. This obligation extends even to unpublished measures intended to be binding. *See Aracely v. Nielsen*, 319 F. Supp. 3d 110, 150 (D.D.C. 2018).

Defendants argue that Diana has not shown that she is entitled to a *nonrefoulement* interview because she claims only that she intended to express a fear and ask for help, but does not state that she affirmatively articulated the fear. Defs.' Mem. at 36–37. But, Diana avers that her family was subjected to an armed assault in Mexico, *see* Diana Decl. ¶¶ 21–27, and that when immigration officials asked her to sign documents written in English, and stated that she would be agreeing to leave for Mexico, "[t]hat is when I told them I was afraid of being in Mexico, which I knew is as or more dangerous than my home country." Diana Decl. ¶ 34. She added, "I refused to sign these documents because I did not understand them and I did not want to go back to Mexico." Diana Decl. ¶ 36.

Because Diana articulated a fear of returning to Mexico and was not given a *nonrefoulement* interview, in violation of the agency's procedures, she has demonstrated a substantial likelihood of success on the merits.

Diana has also demonstrated that she would be likely to suffer irreparable injury if she and her children were to remain in Mexico without being properly evaluated for a fear of persecution. Diana has already been attacked and robbed, and her daughter has been kidnapped and raped multiple times. Compl. ¶ 21. Others around them in the camp have had similar experiences, and it is likely that they will continue to be

targets of violence. Thus, plaintiff Diana has shown that she is entitled to a preliminary injunction.

However, "[i]njunctive relief granted to a party in a lawsuit must be framed to remedy the harm claimed by the party." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976). The injunction should be "no broader than necessary to achieve its desired goals." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("We have long held that an injunction must be narrowly tailored to remedy the specific harm shown.") (internal quotation marks omitted). For that reason, the Court is constrained to order that plaintiff Diana be afforded the *nonrefoulement* interview to which she is entitled, rather than that she be returned to the United States for the pendency of the litigation.

## CONCLUSION

For all these reasons, plaintiffs' motion for preliminary injunction will be granted in part and denied in part.

A separate order will issue.

## All Citations

Slip Copy, 2020 WL 3469670

## Footnotes

1    While the United States is not a party to the 1951 Convention Relating to the Status of Refugees, it is a party to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, which incorporates the 1951 convention's prohibition on *refoulement*. In addition, the United States is a signatory of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), which states: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* at art. 3, ¶ 1. CAT was implemented in U.S. law by the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (codified at 8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

2    On April 8, 2019, the Northern District of California issued a nationwide preliminary injunction enjoining the continued implementation of the MPP. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1130–31 (N.D. Cal. 2019). The court found that plaintiffs were likely to succeed on their claim that the MPP, as applied to a particular class of plaintiffs, were in violation of the APA and the INA. *Id.* at 1121–28. The Ninth Circuit affirmed the injunction, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020), petition for cert. filed, 88 U.S.L.W. 3339 (U.S. Apr. 10, 2020) 88 U.S.L.W. 3339 (U.S. Apr. 10, 2020), but it has since been stayed by the Supreme Court pending petition for certiorari. *Wolf v. Innovation Law Lab*, No. 19A960, 2020 WL 1161432, at *1 (U.S. Mar. 11, 2020).

3    Defendants cite *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) in support of their argument, but *Cruz* actually supports jurisdiction for Claim One. That court found that it could not review a specific challenge to the Attorney General's discretionary choice to remove the plaintiff

back to Mexico. But, the court found that ⚑ section 1252(a)(2)(B) did not preclude review of the plaintiff's APA claims challenging the procedures employed in promulgating the MPP. *Id.* at *4.

4    Defendants note in their opposition that other circuit courts have held that constitutional claims are unreviewable under this statute. Defs.' Mem. at 29–30. But the cases they cite are not so broad; those opinions held that the particular constitutional claims before them could not be reviewed because they were specifically aimed at discretionary decisions. *See* ⚑ *Polfliet v. Cuccinelli*, 955 F.3d 377, 384 (4th Cir. 2020) ("⚑ 8 U.S.C. § 1252(a)(2)(B)(ii) strips courts of jurisdiction to review" "constitutional claims" challenging discretionary "decisions"); ⚑ *Privett v. Sec'y of Dep't of Homeland Sec.*, 865 F.3d 375, 381 (6th Cir. 2017) ("The Secretary's decision not to make an exception for Privett is an element of these constitutional and statutory claims. In fact, it is the very thing challenged as causing the constitutional harm or applying the statute improperly. Accordingly, in order to adjudicate these claims, we would be required to give the Secretary's decision not to grant his petition a central role in our review. Because such review is proscribed by ⚑ § 1252(a)(2)(B)(ii), we do not have jurisdiction over the constitutional and retroactivity claims."); ⚑ *Jilin Pharmacy USA v. Chertoff*, 447 F.3d 196, 206 (3d Cir. 2006) ("Because evaluating these constitutional claims requires us to revisit and review the Attorney General's exercise of discretion ... we lack the jurisdiction to consider them."); ⚑ *Dave v. Ashcroft*, 363 F.3d 649, 653 (7th Cir. 2004) ("[T]he decision when to commence deportation proceedings is within the discretion of the Attorney General and does not, therefore, involve a protected property or liberty interest."). Here, the Court need not review the decision to return any particular plaintiff to assess the lawfulness of the expansion of the MPP to Tamaulipas. Plaintiffs are challenging the policy itself, and courts have held that those claims are reviewable under the INA. *See* ⚑ *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015) (holding that the statute "does not strip jurisdiction over procedural challenges," but it "strips jurisdiction over a substantive discretionary decision"); ⚑ *Kwai Fun Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004) (finding that the plaintiff's constitutional claims did not challenge any discretionary decision, and so the Court could review the claims under ⚑ section 1252(a)(2)(B)).

5    Plaintiffs are invoking the statutory canon of *ejusdem generis*, which provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those enumerated by the preceding specific words." ⚑ *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (where the statute stated that "nothing herein shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," the residual clause at the end of that list was informed by the two preceding categories of workers).

6    For example, the Court notes that in the Memorandum referred to in paragraph 34 of the complaint, the Commissioner of CPB stated: "MPP implementation will begin at the San Ysidro port of entry on January 28, 2019, and it is anticipated that it will be expanded in the near future. Please ensure that each stage of MPP expansion beyond OFO implementation at San Ysidro is coordinated closely with my office." Jan. 28, 2019 MPP Implementation Memo. at 1. This suggests that there may be a record of decision making related to the expansion to Tamaulipas.

7    Another circumstance arises when the State "takes a person into its custody and holds him there against his will," hence depriving him of liberty. *Id.* at 199–200.

8    Even if the state-created danger doctrine applied in this context, plaintiffs face difficulties meeting the legal test for whether the government's conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." ⚑ *Lewis*, 523 U.S. at 847 n.8. There are two methods or proving the claim:

a plaintiff must show that the defendant acted with "intent to harm" or "deliberate indifference." *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145–46 (D.C. Cir. 2004).

The Court cannot find that plaintiffs have shown at this time that a claim under "intent to harm" standard will succeed because the complaint does not allege any facts that would support an inference that the government intended to harm plaintiffs when it expanded the MPP to Tamaulipas.

The "deliberate indifference" standard "applies only in circumstances where the State has a heightened obligation toward the individual." *Id.* at 1145–46, citing *Butera*, 235 F.3d at 652. Because the government has required plaintiffs to remain in Tamaulipas or travel to Tamaulipas to attend their asylum hearings and assumed the role of transporting them from the border to their hearings, one could argue that it has undertaken a heightened obligation to ensure plaintiffs' safety. But the guiding principles implementing the MPP show that the government contemplated that migrants may fear remaining in Mexico, and it adopted procedures requiring a *nonrefoulement* interview for any person that expresses such a fear. Jan. 28 MPP Guiding Principles at 1–2. If the Asylum Officer determines that these fears are founded, they will not be processed under the MPP. *Id.* at 2. Such procedures run counter to the necessary finding that the agency has been indifferent to the risks, and it will be difficult for plaintiff to establish that they are likely to succeed on the merits on the record before it.

9     Where plaintiffs have not demonstrated a likelihood of success on the merits, the Court need not analyze the other preliminary relief factors. *Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

---

**End of Document**                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 10788713
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

Wilmer Ramiro Enriquez TURCIOS, individually,
and on behalf of Elba Guerrero Alvarado,
Josue Enriquez, and Jose Enriquez, Plaintiffs,
v.
Chad WOLF, Acting Secretary of the Department
of Homeland Security, et al., Defendants.

Civil Action No. 1:20-cv-00093
|
Signed 10/16/2020

**Attorneys and Law Firms**

Raed Gonzalez, Gonzalez Olivieri, LLC, Houston, TX, for Plaintiffs Wilmer Ramiro Enriquez Turcios, Elba Guerrero Alvarado, Josue Enriquez, Jose Enriquez.

Annalisa L. Cravens, United States Attorney's Office, Houston, TX, Christopher D. Pineda, United States Attorneys Office, Brownsville, TX, for Defendants Chad F. Wolf, Mark A. Morgan, William P. Barr, Donald Trump.

**ORDER**

Rolando Olvera, United States District Judge

**\*1** The following pleadings are before the Court: "Plaintiffs' Emergency Motion for Preliminary Injunction" ("MPI") (Docket No. 6), "Defendants' Response to Plaintiffs' Motion for a Mandatory Preliminary Injunction (Docket No. 13), "Defendants' Supplemental Brief" (Docket No. 31) and "Defendants' Surreply" (Docket No. 37). For the following reasons, Plaintiffs' MPI (Docket No. 6) is **GRANTED.**

**I. FACTUAL BACKGROUND**

Wilmer Ramiro Enriquez Turcios [1] ("Wilmer") sues individually and on behalf of his spouse, Elba Guerrero Alvarado ("Elba"), and their two minor children, Josue Enriquez, and Jose Enriquez ("children") (collectively "Plaintiffs"). Elba and the children departed Honduras to seek asylum in the U.S. Docket No.1, Exhibit 1. Elba and the children entered the U.S. without inspection near

McAllen, Texas. Docket No. 13. After being apprehended by U.S. Customs and Border Patrol agents ("CBP agents"), Elba and the children were placed in removal proceedings under 8 U.S.C. § 1229(a) and processed for return to Mexico under the Migrant Protection Protocol ("MPP"). [2] *Id.* Elba told CBP agents she feared being sent to Matamoros, Mexico ("Matamoros"), because of its high level of crime and requested to remain in the U.S. *Id.* Elba's request was denied, and she and the children were sent to Matamoros to await their next court hearing. *Id.*

Plaintiffs filed a motion for a preliminary injunction seeking to enjoin Elba and the children's placement in the MPP. Docket No. 6. Plaintiffs request to await the adjudication of their asylum claims in the U.S. *Id.*

**II. LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must clearly show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *See Planned Parenthood of Gulf Coast, Inc. v. Gee,* 862 F.3d 445, 457 (5th Cir. 2017).

**III. DISCUSSION**

A. Plaintiffs are likely to succeed on the merits.
Plaintiffs challenge the MPP on several grounds. Plaintiffs argue the MPP does not apply to them, because it is inconsistent with Section 235(b) of the Immigration and Nationality Act ("INA") ("8 U.S.C. § 1225(b)"), and for that reason, they should be allowed to await the adjudication of their asylum claims in the U.S. [3] Docket No. 6. The Court agrees.

**\*2** The essential feature of the MPP is that non-Mexican asylum seekers who arrive at a port of entry along the U.S.'s southern border must be returned to Mexico to await the adjudication of their asylum application. *Innovation Law Lab v. Wolf,* 951 F.3d 1073, 1082 (9th Cir. 2020). Asylum seekers (or "applicants") fall into one of two statutory categories, 8 U.S.C. § 1225(b)(1) ("(b)(1)") or § 1225(b)(2) ("(b)(2)"). Section (b)(2) allows applicants to be

removed to Mexico while they await their asylum hearing, but (b)(1) does not provide for removal of applicants to Mexico.  § 1225(b)(1) *et seq.* That said, the MPP subjects both (b)(1) and (b)(2) applicants to removal to Mexico. In summary, because section (b)(1) does not provide for removal to Mexico, and Plaintiffs are (b)(1) applicants, they were improperly removed to Mexico.

The relevant text of 🚩 § 1225 states:

**🚩 8 U.S.C. § 1225 (b)(1)**

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(ii) Claims for asylum**

If an immigration officer determines that an alien ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

...

**(B) Asylum interviews**

...

**(ii) Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for further consideration of the application for asylum.

**🚩 8 U.S.C. § 1225 (b)(2)**

**(2) Inspection of other aliens**

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be

admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien —

**(i)** who is a crewman

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

i. The Supreme Court found sections (b)(1) and (b)(2) distinct.

The Supreme Court distinguished (b)(1) and (b)(2) applicants, finding they fall into two separate categories:

> [A]pplicants for admission fall into one of two categories, those covered by 🚩 § 1225(b)(1) and those covered by 🚩 § 1225(b)(2). 🚩 Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation .... 🚩 Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission **not covered by** 🚩 § 1225(b)(1).

📙 *Jennings v. Rodriguez*, ⸻ U.S. ⸻, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) (emphasis added) (citations omitted). Defendants ("Government") maintain DHS, in its discretion, may apply the procedures specified in (b)(2) to a (b)(1) applicant. Relying on the Supreme Court's language

in 🚩 *Jennings*, this Court holds the relevant statutes are not ambiguous, and further that the Government's position contradicts the statute's text.[4]

ii. Sections (b)(1) and (b)(2) describe two distinct categories of applicants and two distinct procedures for removal.

**\*3** Under 🚩 8 U.S.C. § 1225, there are two distinct categories of alien applicants for admission, (b)(1) applicants and (b)(2) applicants. 🚩 § 1225(a). Applicants described in (b)(1) can be inadmissible to the U.S. for presenting fraudulent travel documents (§ 1182(a)(6)(C)) or not having travel documents (§ 1182(a)(7)). Applicants described in (b)(2) are in a separate category; they are "other aliens" (🚩 § 1225(b)(2) (heading) "to whom paragraph [(b)](1)" does not apply. 🚩 § 1225(b)(2)(B)(ii). Applicants under (b)(2) include aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed ... a crime involving moral turpitude" or who have "violat[ed] ... any law or regulation ... relating to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States ... to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely ... to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

Both (b)(1) and (b)(2) applicants are subject to distinct removal proceedings under 🚩 8 U.S.C. § 1229a. *See* 🚩 8 C.F.R. § 208.30(f). A (b)(2) applicant may be "return[ed]" to a "territory contiguous to the United States" pending their regular removal proceeding. *See* 🚩 § 1225(b)(2)(C). The Court notes there is no comparable "return" procedure specified in (b)(1). The statutory question posed by the MPP is whether a (b)(1) applicant may be "returned" to a contiguous territory under (b)(2)(C). 🚩 *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1084 (9th Cir. 2020). A plain reading of the statute confirms a (b)(1) applicant should not be "returned" outside the U.S.

Section (b)(1) contains no language that a (b)(1) applicant is subject to the "return" procedure set forth in (b)(2)(C). Likewise, Section (b)(2) contains no language addressing

a (b)(1) applicant's "return" under 🚩 § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in (b) (2), in subparagraph (B)(ii); that subparagraph specifies that subparagraph (A)—which automatically entitles (b)(2) applicants to removal proceedings—does not apply to (b)(1) applicants. The return-to-a-contiguous-territory provision of (b)(2)(C) is thus available for only (b)(2) applicants. Being an applicant in removal proceedings *does not change the applicant's underlying category.* 🚩 *Innovation Law Lab*, 951 F.3d 1073, 1084 (emphasis added). The statute's language does not explicitly provide for nor does its construction suggest a (b)(1) applicant becomes a (b)(2) applicant, or vice versa, by being placed in removal proceedings. 🚩 *Id.*

iii. Plaintiffs' claims are not barred by the Administrative Procedure Act ("APA").

The Government also contends Plaintiffs' claims are barred by the APA because Plaintiffs are challenging a discretionary decision by DHS (to return Plaintiffs to Mexico for the rest of their removal proceedings), and therefore the challenge is not reviewable. *See* Docket No. 31 at 7-9. The Government relies on 🚩 8 U.S.C. § 1252(a)(2)(B)(ii), which provides a reviewing court cannot review any discretionary decision taken by an agency. *Id.* at 8-9.

That said, an APA claim challenging the expansion and implementation of the MPP to individuals is reviewable by the district courts. *See Nora v. Wolf*, 2020 WL 3469670, at *7 (D.D.C., 2020) (citing to 🚩 *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (differentiating between a discrete agency action and the broader ongoing policy underlying that action); *Cruz v. Dep't of Homeland Sec.*, 2019 WL 8139805, at *3 (D.D.C., 2019) (finding that "the Court has jurisdiction to consider this claim because it concerns the legality of the [MPP] program itself rather than the substance of the Attorney General's discretionary choices," and the Court also has jurisdiction over plaintiffs' due process and equal protection claims); 🚩 *Innovation Law Lab v. Nielsen*, 366 F.Supp.3d 1110, 1118 (N.D. Cal., 2019) (finding that the threshold question of whether applying the MPP violates the APA is justiciable and 🚩 8 U.S.C. § 1252(a) does not bar judicial review). For these reasons, the Government's claim that 🚩 § 1252(a)(2)(B)(ii) precludes judicial review is erroneous. Thus, Plaintiffs have satisfied the first element required for an injunction.

B. Plaintiffs will be irreparably harmed if an injunction is not granted.

**\*4** Plaintiffs will be irreparably harmed if an injunction is not granted. The family is separated. Wilmer, the father, awaits adjudication in the U.S. Elba and the children are in Matamoros, Tamaulipas, Mexico. The U.S. Department of State ("DOS") issued a Level 4 travel warning for the state of Tamaulipas. [5] DOS warns armed criminal groups patrol Tamaulipas, often acting illegally without repercussions from law enforcement. *Id.* The criminal activity includes gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault. [6] U.S. government employees are instructed to travel to Tamaulipas only in the limited areas between the U.S. consulates and ports of entry. [7] In addition, U.S. government employees are forbidden from using freeways to travel between cities in Tamaulipas.

Plaintiffs allege the following: Elba and the children are living in a shelter in Matamoros. Docket No. 6. Drug cartel members fired weapons near the shelter, which prompted Mexican national police to intervene, causing a shootout. *Id.* Elba and her children also live in unsanitary conditions hazardous to their health. The shelter houses 150 adults and children. *Id.* There is one restroom, which males and females share, and the facility is crowded, making it impossible to practice safe social distancing during the ongoing coronavirus ("COVID-19") pandemic. *Id.* There are no tests for COVID-19 available, and no one at the shelter is being provided with gloves or masks to prevent spreading the disease. *Id.* The shelter is infested with rats. *Id.* Besides being separated from Wilmer, Elba and the children are at risk of becoming seriously ill or being injured by Cartel violence. Plaintiffs have satisfied the second element required for an injunction.

C. The balance of equities weighs in favor of Plaintiffs.

Balancing equities involves determining whether the "substantial injury [to Plaintiffs] outweighs the threatened harm to the party whom [the Plaintiffs] seek to enjoin..." *See Tex. Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 574 (5th Cir. 2012)* (brackets and citations omitted).

The Government will not be harmed by allowing Elba and the children to join Wilmer and enter the U.S. for the pendency of their asylum claim adjudications. Plaintiffs are not a threat to national security. Because, the equities weigh in favor of Plaintiffs, they have satisfied the third element required for an injunction.

D. The public interest weighs in favor of granting an injunction.

The public interest is served when the U.S. immigration law is applied properly (as explained above) and when families await their asylum adjudication together. There is no consistent rationale why Elba and the children cannot join Wilmer in the U.S. Plaintiffs thus meet the fourth and final prong for injunctive relief.

### IV. CONCLUSION

**\*5** Because all four elements of the preliminary injunction were met, Plaintiffs' MPI (Docket No. 6) is **GRANTED.** The Court holds Plaintiffs are (b)(1) applicants and not subject to the MPP. Thus, Plaintiffs may await the adjudication of their asylum claims in the U.S.

### All Citations

Slip Copy, 2020 WL 10788713

## Footnotes

1  Wilmer fled Honduras before Elba and the children. Docket No. 1. He applied for asylum prior to the existence of MPP; he currently resides in the U.S.

2  In January 2019, the U.S. Department of Homeland Security ("DHS") promulgated the MPP without the standard notice-and-comment rulemaking period. The MPP provides that non-Mexican asylum seekers arriving at the U.S. southern border be "returned to Mexico for the duration of their immigration proceedings,

rather than either being detained for expedited or regular removal proceedings or issued notices to appear for regular removal proceedings." 🚩 *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077 (9th Cir. 2020) (quoting 🚩 *Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1114 (N.D. Cal. 2019) (quotation marks omitted)).

3    Because the Court finds the MPP does not apply to Plaintiffs under their INA claims, the Court declines to consider Plaintiffs' other claims. Plaintiffs also allege: (1) their removal to Mexico violates the Government's non-refoulment duties under Art. III of the U.N.H.C.R.; 🚩 8 U.S.C. § 1231(b)(3); 🚩 8 C.F.R. § 208.16; (2) the MPP was implemented in violation of the Administrative Procedure Act's notice and comment period; (3) the MPP is arbitrary, capricious, and unlawful; (4) the MPP violates Plaintiffs' Fifth Amendment due process rights; and (5) the MPP violates Plaintiffs' Fifth Amendment rights to equal protection under the law. Docket Nos. 1 and 6.

4    The Government also relies on a recent decision where the BIA found, "for aliens who are eligible for expedited removal under 🚩 § 1225(b)(1), DHS retains discretion to place them in expedited removal or full removal proceedings." 🚩 *Matter of M-D-C-V-*, 28 I. & N. Dec. at 22. n.6 (citing 🚩 *Matter of E-R-M-& L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011)). The Government alleges this Court is bound by the BIA's decision through *Chevron* deference. Docket No. 31. Yet in the Fifth Circuit, BIA decisions are entitled to *Chevron* deference only when the decision is interpreting an ambiguous statute. 🚩 *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 449 (5th Cir. 2015). This Court will not afford *Chevron* deference to a statute that is not ambiguous.

5    U.S. Department of State – Department of Consular Affairs, https://travel.state.gov/content/travel7en/ traveladvisories/traveladvisories/mexico-travel-advisory.html#:~:text=Tamaulipas%20state %20%E2%80%93%20Do%20Not%20Travel&text=Organized%20crim                e%20activity %20%E2%80%93%20including%20gun,border%20and%20in%20Ciudad%20Victoria.    The    Level    4 designation has been given to countries such as Syria and Afghanistan. (*See* https://travel.state.gov/content/ travel/en/traveladvisories/traveladvisories/afghanistanadvisory. html).

6    OSAC, *Mexico 2019 Crime and Safety Report: Matamoros* (Apr. 2, 2019), https://www.osac.gov/Content/ Report/03b3ba8-0cd3-4772-bc97-15f4aebfc985.

7    Department of State, *Mexico Travel Advisory* (Dec. 17, 2019), travel.state.gov/content/travel/en/ traveladvisories/traveladvisories/mexico-travel-advisory.html.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 **World** **Business** **Markets** **Breakingviews** **Video** **More**  

**AMERICAS-TEST-2**

MARCH 7, 2021 / 10:46 AM / UPDATED 3 MONTHS AGO

# Mexican camp that was symbol of migrant misery empties out under Biden

By Laura Gottesdiener



MATAMOROS, Mexico (Reuters) - A sprawling camp in the Mexican city of Matamoros, within sight of the Texan border, has since 2019 been one of the most powerful reminders of the human toll of former President Donald Trump's efforts to keep migrants out of the United States.

Migrant camp, once a symbol of misery, empties out

01:57

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

finally allowed to cross the border to press their claim to stay in the United States.

**AR01799**

President Joe Biden last month rolled back the program - known as the Migrant Protection Protocols (MPP) - that had forced asylum seekers to wait in Mexico.

Biden's wife, Jill, visited the camp during last year's presidential campaign to witness the difficult conditions first hand.

"If it hadn't been for this camp, I don't think they would have ever ended MPP," said Honduran asylum seeker Oscar Borjas, one of the few remaining residents who has not yet been permitted to cross.

The last few people remaining in the camp were relocated to more secure locations identified by international aid groups where they could complete required paperwork, a U.S. official told Reuters late on Saturday.

Like hundreds of asylum seekers expelled from the United States to this crime-ridden town, Borjas began sleeping near the foot of the international bridge across the Rio Grande out of fear and necessity.

But the migrants also intended to make a statement, he said: a visible reminder of the human toll of the MPP program. "We were there so that people would see us; see it wasn't fair what they were doing to us."

As of Friday, some 1,127 people in the MPP program across Mexico have been permitted to enter the United States since Biden rescinded the policy last month. More than half of those were from the Matamoros camp, according to the U.N. refugee agency. More than 700 enrolled in the program have been processed across the border in Brownsville, Texas, according to officials.

Once home to more than 3,000 people, the camp now stands deserted, as nearly all remaining residents left voluntarily for shelters over the weekend after receiving assurances from the United Nation's refugee agency that their asylum cases would still be considered

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial …

**AR01800**

On Saturday, agents from Mexican migration agents began dismantling the camp's ramshackle structures.

"I don't know what I'll do now. I can't go back," said Borjas, who said he faces the threat of murder in Honduras for supporting an opposition party.

"LET'S UNITE"

Slideshow ( 7 images )

The Trump administration touted the MPP program as part of its successful efforts to reduce immigration and cut down on what it called fraudulent asylum claims.

Since 2019, the policy pushed more than 65,000 migrants back into Mexico as their asylum cases wound through U.S. courts. The majority gave up waiting and left Mexico. Thousands

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial …

**AR01801**

But in Matamoros, which had scant resources for migrants, families opted to sleep in the plaza at the foot of the bridge.

"We said 'Let's unite' and that's how the camp in Matamoros began," said Honduran asylum seeker Josue Cornejo, who was returned to Matamoros along with his wife and their children in August 2019.

Parents scavenged cardboard to stop the summer heat radiating off the pavement from burning their children's skin. The men formed a guard watch.

Aid workers arrived. So did Matamoros' criminal groups, which doled out beatings and siphoned off donations, migrants say.

As the camp population ballooned, the tents sprawled from the plaza to the wooded banks of the Rio Grande, where residents braved contamination and undercurrents to bathe and wash their clothes.

The migrants resisted federal government efforts to house them in a makeshift shelter miles from the border.

Life took root in a way migrants say they had never expected, making the lengthy wait in Mexico slightly more bearable.

They formed church groups, supply distribution tents and kitchens with handmade earthen ovens and stoves improvised from old washing machines.

Nicaraguan asylum seeker Perla Vargas and other migrants launched a tent school that provided music, dance, English and Spanish classes to dozens of children each day, including her two grandchildren.

There were quinceaneras, romances, and at least one wedding.

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

Consuelo Tomas, an indigenous Q'anjob'al Guatemalan asylum seeker, gave birth inside the

**AR01802**

Slideshow（7 images）

camp and named her newborn Andrea in honor of the child's grandmother, who died years
earlier trying to cross the Sonoran desert to reach the United States.

Insecurity and hardship reigned.

The weather whiplashed between scorching heat and freezing cold. Human rights groups
documented kidnappings and rape of asylum seekers in Matamoros. Occasionally, migrants'
bodies washed up along the river bank.

Some mothers, including Salvadoran asylum seeker Sandra Andrade, sent their children to
cross the U.S. border alone illegally out of concern for their safety.

"

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial …

**AR01803**

## MATAMOROS TO WASHINGTON

At times, the camp served as the launch pad for protests: from a blockade of the international bridge that halted traffic for hours to demonstrations and all-night vigils opposing Trump's re-election.

Aaron Reichlin-Melnick, policy counsel at the American Immigration Council, said that MPP program might have succeeded in obscuring the plight of these migrants from the American public if it were not for the Matamoros camp.

"It was the one place where you couldn't deny that what we were doing was inflicting harm on people," he said.

Last month, the Biden administration said it would allow about 25,000 migrants in MPP to enter the United States to pursue their cases. Matamoros camp residents were to be among the first in line, it added.

Buoyed by the news, migrants had prepared for their departure in late February: snapping farewell photographs and snipping haircuts for fellow migrants. The sound of bachata music rang out as children hopped about, rehearsing for their final dance recital. Andrade packed up her remaining protest signs and distributed donated pairs of tiny sneakers.

"It's so the kids can cross into the United States in brand new shoes," she said.

Reporting by Laura Gottesdiener in Matamoros, Mexico; Editing by Daniel Flynn and Alistair Bell

*Our Standards: The Thomson Reuters Trust Principles.*

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...



**AR01804**

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial …

**AR01805**

 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

# Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border

**Release Date:** March 16, 2021

There is understandably a great deal of attention currently focused on the southwest border. I want to share the facts, the work that we in the Department of Homeland Security (DHS) and across the government are doing, and our plan of action. Our personnel remain steadfast in devotion of their talent and efforts in the service of our nation.

The situation at the southwest border is difficult. We are working around the clock to manage it and we will continue to do so. That is our job. We are making progress and we are executing on our plan. It will take time and we will not waver in our commitment to succeed.

We will also not waver in our values and our principles as a Nation. Our goal is a safe, legal, and orderly immigration system that is based on our bedrock priorities: to keep our borders secure, address the plight of children as the law requires, and enable families to be together. As noted by the President in his Executive Order, "securing our borders does not require us to ignore the humanity of those who seek to cross them." We are both a nation of laws and a nation of immigrants. That is one of our proudest traditions.

## The Facts

We are on pace to encounter more individuals on the southwest border than we have in the last 20 years. We are expelling most single adults and families. We are not expelling unaccompanied children. We are securing our border, executing the Centers for Disease

**AR01806**

Control and Prevention's (CDC) public health authority to safeguard the American public and the migrants themselves, and protecting the children.  We have more work to do.

This is not new. We have experienced migration surges before – in 2019, 2014, and before then as well. Since April 2020, the number of encounters at the southwest border has been steadily increasing. Border Patrol Agents are working around the clock to process the flow at the border and I have great respect for their tireless efforts. To understand the situation, it is important to identify who is arriving at our southwest border and how we are following the law to manage different types of border encounters.

## Single Adults

The majority of those apprehended at the southwest border are single adults who are currently being expelled under the CDC's authority to manage the public health crisis of the COVID-19 pandemic.  Pursuant to that authority under Title 42 of the United States Code, single adults from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras are swiftly expelled to Mexico.  Single adults from other countries are expelled by plane to their countries of origin if Mexico does not accept them.  There are limited exceptions to our use of the CDC's expulsion authority.  For example, we do not expel individuals with certain acute vulnerabilities.

The expulsion of single adults does not pose an operational challenge for the Border Patrol because of the speed and minimal processing burden of their expulsion.

## Families

Families apprehended at the southwest border are also currently being expelled under the CDC's Title 42 authority.  Families from Mexico and the Northern Triangle countries are expelled to Mexico unless Mexico does not have the capacity to receive the families.  Families from countries other than Mexico or the Northern Triangle are expelled by plane to their countries of origin.  Exceptions can be made when a family member has an acute vulnerability.

Mexico's limited capacity has strained our resources, including in the Rio Grande Valley area of Texas.  When Mexico's capacity is reached, we process the families and place them in immigration proceedings here in the United States.  We have partnered with community-based organizations to test the family members and quarantine them as needed under COVID-19 protocols.  In some locations, the processing of individuals who are part of a family unit has strained our border resources.  I explain below additional challenges we have encountered and the steps we have taken to solve this problem.

**AR01807**

## Unaccompanied Children

We are encountering many unaccompanied children at our southwest border every day.  A child who is under the age of 18 and not accompanied by their parent or legal guardian is considered under the law to be an unaccompanied child.  We are encountering six- and seven-year-old children, for example, arriving at our border without an adult.  They are vulnerable children and we have ended the prior administration's practice of expelling them.

An unaccompanied child is brought to a Border Patrol facility and processed for transfer to the Department of Health and Human Services (HHS).  Customs and Border Protection is a pass-through and is required to transfer the child to HHS within 72 hours of apprehension.  HHS holds the child for testing and quarantine, and shelters the child until the child is placed with a sponsor here in the United States. In more than 80 percent of cases, the child has a family member in the United States. In more than 40 percent of cases, that family member is a parent or legal guardian.  These are children being reunited with their families who will care for them.

The children then go through immigration proceedings where they are able to present a claim for relief under the law.

The Border Patrol facilities have become crowded with children and the 72-hour timeframe for the transfer of children from the Border Patrol to HHS is not always met.  HHS has not had the capacity to intake the number of unaccompanied children we have been encountering.  I describe below the actions we have taken and the plans we are executing to handle this difficult situation successfully.

## Why the Challenge is Especially Difficult Now

Poverty, high levels of violence, and corruption in Mexico and the Northern Triangle countries have propelled migration to our southwest border for years.  The adverse conditions have continued to deteriorate.  Two damaging hurricanes that hit Honduras and swept through the region made the living conditions there even worse, causing more children and families to flee.

The COVID-19 pandemic has made the situation more complicated.  There are restrictions and protocols that need to be followed.  The physical distancing protocol, for example, imposes space and other limitations on our facilities and operations.

The prior administration completely dismantled the asylum system.  The system was gutted, facilities were closed, and they cruelly expelled young children into the hands of traffickers.

**AR01808**

We have had to rebuild the entire system, including the policies and procedures required to administer the asylum laws that Congress passed long ago.

The prior administration tore down the lawful pathways that had been developed for children to come to the United States in a safe, efficient, and orderly way.  It tore down, for example, the Central American Minors program that avoided the need for children to take the dangerous journey to our southwest border.

The previous administration also cut foreign aid funding to the Northern Triangle.  No longer did we resource efforts in El Salvador, Guatemala, and Honduras to tackle the root causes of people fleeing their homes.

And, there were no plans to protect our front-line personnel against the COVID-19 pandemic.  There was no appropriate planning for the pandemic at all.

As difficult as the border situation is now, we are addressing it.  We have acted and we have made progress.  We have no illusions about how hard it is, and we know it will take time.  We will get it done.  We will do so adhering to the law and our fundamental values.  We have an incredibly dedicated and talented workforce.

## Actions We Have Taken

In less than two months, Customs and Border Protection stood-up an additional facility in Donna, Texas to process unaccompanied children and families.  We deployed additional personnel to provide oversight, care, and transportation assistance for unaccompanied minors pending transfer to HHS custody.

We are standing up additional facilities in Texas and Arizona to shelter unaccompanied children and families.  We are working with Mexico to increase its capacity to receive expelled families.  We partnered with community-based organizations to test and quarantine families that Mexico has not had the capacity to receive.  We have developed a framework for partnering with local mayors and public health officials to pay for 100% of the expense for testing, isolation, and quarantine for migrants.  ICE has also developed additional facilities to provide testing, local transportation, immigration document assistance, orientation, travel coordination in the interior, and mechanisms to support oversight of the migrant families who are not expelled.

Working with Mexico and international organizations, we built a system in which migrants who were forced to remain in Mexico and denied a chance to seek protection under the previous administration can now use a virtual platform – using their phones – to register.

**AR01809**

They do not need to take the dangerous journey to the border.  The individuals are tested, processed, and transported to a port of entry safely and out of the hands of traffickers.  We succeeded in processing the individuals who were in the Matamoros camp in Mexico.  This is the roadmap going forward for a system that is safe, orderly, and fair.

To protect our own workforce, we launched Operation Vaccinate Our Workforce (VOW) in late January.   At the beginning of this administration, less than 2 percent of our frontline personnel were vaccinated.  Now more than 25 percent of our frontline personnel have been vaccinated.

We directed the Federal Emergency Management Agency (FEMA) to assist HHS in developing the capacity to meet the surge of unaccompanied children.  FEMA already established one new facility for HHS to shelter 700 children.  They have identified and are currently adding additional facilities.  We are working with HHS to more efficiently identify and screen sponsors for children.  In two days, we recruited more than 560 DHS volunteers to support HHS in our collective efforts to address the needs of the unaccompanied children.

We are restarting and expanding the Central American Minors program.  It creates a lawful pathway for children to come to the United States without having to take the dangerous journey. Under this expansion, children will be processed in their home countries and brought to the United States in a safe and orderly way.

In addition, DHS and HHS terminated a 2018 agreement that had a chilling effect on potential sponsors – typically a parent or close relative – from coming forward to care for an unaccompanied child placed in an HHS shelter. In its place, DHS and HHS signed a new Memorandum of Agreement that promotes the safe and timely transfer of children. It keeps safeguards designed to ensure children are unified with properly vetted sponsors who can safely care for them while they await immigration proceedings.


## The Path Forward

We are creating joint processing centers so that children can be placed in HHS care immediately after Border Patrol encounters them.  We are also identifying and equipping additional facilities for HHS to shelter unaccompanied children until they are placed with family or sponsors.  These are short-term solutions to address the surge of unaccompanied children.

Longer term, we are working with Mexico and international organizations to expand our new virtual platform so that unaccompanied children can access it without having to take the

**AR01810**

dangerous journey to our border.  As mentioned, we are expanding the Central American Minors program to permit more children to be processed in their home countries and if eligible, brought to the United States in a safe and orderly way.

We are developing additional legal and safe pathways for children and others to reach the United States.  While we are building a formal refugee program throughout the region, we are working with Mexico, the Northern Triangle countries, and international organizations to establish processing centers in those countries so that individuals can be screened through them and brought to the United States if they qualify for relief under our humanitarian laws and other authorities.

For years, the asylum system has been badly in need of reengineering.  In addition to improving the process by which unaccompanied children are placed with family or sponsors, we will be issuing a new regulation shortly and taking other measures to implement the long-needed systemic reforms.  We will shorten from years to months the time it takes to adjudicate an asylum claim while ensuring procedural safeguards and enhancing access to counsel.

President Biden laid out a vision of a "multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values." To that end, we are working with the Departments of Health and Human Services, Justice, and State in an all-of-government effort to not only address the current situation at our southwest border, but to institute longer-term solutions to irregular migration from countries in our hemisphere that are suffering worsening conditions.  This is powerfully exemplified by the President's goal to invest $4 billion in the Northern Triangle countries to address the root causes of migration.

## Conclusion

The situation we are currently facing at the southwest border is a difficult one.  We are tackling it.  We are keeping our borders secure, enforcing our laws, and staying true to our values and principles. We can do so because of the incredible talent and unwavering dedication of our workforce.

I came to this country as an infant, brought by parents who understood the hope and promise of America.  Today, young children are arriving at our border with that same hope.  We can do this.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Secretary of Homeland Security

**AR01811**

(/topics/secretary-homeland-security)

Keywords: Family (/keywords/family) , Immigration (/keywords/immigration) , Immigration Reform (/keywords/immigration-reform) , Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas) , Southwest Border (/keywords/southwest-border) , Unaccompanied Children (UC) (/keywords/unaccompanied-children)

Last Published Date: March 16, 2021

AR01812

 

FACTCHECK POSTS > FEATURED POSTS

# The Facts on the Increase in Illegal Immigration

*By Lori Robertson*

*Posted on March 23, 2021 | Updated on March 23, 2021*

   

Democrats and Republicans are pointing fingers over an increase in illegal immigration at the southern border, and notably an increase in children traveling alone.

While Democrats argue the surge began before President Joe Biden took office, Republicans argue Biden's welcoming policies are to blame. A rise in border apprehensions did begin prior to the election under then-President Donald Trump. But the increase in unaccompanied children has spiked significantly in the first full month of the Biden administration.

The unaccompanied children are being held in custody in large numbers while the administration tries to catch up with a backlog in housing and processing them.

We'll take a look at the immigration statistics and facts behind the recent increase.

**How many people are trying to cross the border illegally?**

Let's start with a look at the big picture: Apprehensions on the southwest border peaked in 2000 at 1.64 million and have generally declined since, with some fluctuations. In 2017, apprehensions hit the lowest level since 1972, but they spiked in fiscal year 2019 at 851,508 and fell back down to 400,651 in fiscal 2020.

## Total Southwest Border Apprehensions



Data by fiscal year.
Source: U.S. Customs and Border Protection



On a monthly basis over the past year, apprehensions plummeted to 16,182 in April 2020, as the coronavirus pandemic and economic shutdowns gripped both the U.S. and Mexico. But then, apprehensions started ticking up again, increasing noticeably in late summer and fall. By October, 69,022 people were apprehended on the southwest border, up 79% from July. In February, the figure was 96,974.

While the bulk of the increase comes from single adults, the number of children arriving at the border without an adult has gone up as well. Here's a breakdown of the type of apprehensions by month — for single adults, unaccompanied children and those traveling in a family unit — dating back to 2013, the earliest point of data for family units.

AR01814

## Monthly Southwest Border Apprehensions

### January 2013 - January 2021



Unaccompanied children          Family units          Single adults

Source: U.S. Customs and Border Protection



[Tony Payan](#), director of the Center for the United States and Mexico at Rice University's Baker Institute for Public Policy, [wrote](#) in a March 15 blog post that "the current situation at the border is neither a unique crisis nor the result (yet) of Biden's policy changes."

In a phone interview, he told us that while the apprehension numbers are spiking now, "this is not a new crisis." Instead, it has been going on since 2014, "when we first saw unaccompanied minors and family units arriving at the border and turning themselves in," and the problem has plagued each administration since.

As the chart above shows, apprehension spikes under the past two presidents in 2014 and 2019 similarly included sizable increases in family units and unaccompanied children arriving at the border.

Other immigration experts, writing in the *Washington Post*, [agree](#) that "the current increase in apprehensions fits a predictable pattern of seasonal changes in undocumented immigration combined with a backlog of demand because of 2020's coronavirus border closure." It's "not a surge," they said.

Overall, Payan said, "The patterns of migration do not seem to correlate to any specific U.S. immigration policy. The numbers seem to go up and down on a logic of their own." People leave their home countries for reasons other than U.S. policy, such as deteriorating economic, political or public safety conditions.

**How does this increase in unaccompanied children crossing the border compare with past increases?**

The recent numbers are on track to rival or surpass the spike of unaccompanied children apprehended in 2019.

A [report](#) from the nonpartisan Congressional Research Service sums up the trends in what the government calls UAC — "unaccompanied alien children" — this way: "In FY2014, the Department of Homeland Security (DHS), Customs and Border Protection (CBP) apprehended 68,541 UAC, a record at that time. Since FY2014, UAC apprehensions have fluctuated considerably, declining to 39,970 in FY2015, increasing to 59,692 in FY2016, declining to 41,435 in FY2017, and increasing to 50,036 in FY2018."

In fiscal year 2019, the number of unaccompanied children who were apprehended — [76,020](#) — surpassed 2014's total, a new yearly record. And in fiscal 2020, which ended on Sept. 30, the total dropped considerably to 30,557.

At just five months into this fiscal year, the number is already at [29,010](#). The number of unaccompanied children being apprehended at the southern border did start trending up in October, but also jumped 63% from January to February, when the total was 9,297.

AR01815

As Payan said, the issue started in 2014, and it has been a problem for each administration.

[Theresa Cardinal Brown](#), managing director of immigration and cross-border policy at the Bipartisan Policy Center, told us that 2014 was not only the first time there was a dramatic increase in unaccompanied children, but migrants also came from Central America, not Mexico.



*Immigrants walk along the U.S.-Mexico border on March 17 after crossing the shallow Rio Grande between El Paso and Ciudad Juarez, Mexico. Photo by John Moore/Getty Images.*

"The border facilities and the system of processing unaccompanied minors under law were designed for the time when the vast majority of encounters at the border were single adult Mexican males who were processed and returned across the border very quickly, often within a day," Brown said in an email. "But Central Americans could not be sent back across to Mexico and if they applied for asylum, or were UACs would have to be taken into custody and provided an opportunity to make their case in immigration court."

[Sarah Pierce](#), a policy analyst with the Migration Policy Institute, said the increases of families and unaccompanied children in 2014 and 2019 "overwhelmed U.S. resources." In both of those years, the flow of immigrants "were driven primarily by longstanding push and pull factors."

Those "push and pull factors" include poverty and violence in migrants' home countries, and economic opportunity in the U.S., family ties and border policies on children and families, as the Migration Policy Institute outlined in a [2019 report](#).

In 2019, another factor was a "chaotic implementation of restrictive southern border policies" under Trump, Pierce told us.

The difference this year is that the increase overwhelming U.S. resources "has been entirely driven by unaccompanied child migrants," Pierce said. The flow is also due to push and pull factors, as well as the coronavirus pandemic-caused economic crisis and recent hurricanes.

All three experts we spoke with told us there may be a perception that the Biden administration is more welcoming to migrants, but "Biden has not significantly changed operations at the border since Trump as of yet," as Brown said.

In mid-February, the administration [announced](#) it would [begin processing](#) non-Mexican asylum seekers who have been waiting in Mexico for their U.S. court dates under a Trump-era program to keep those individuals on the other side of the border. But that policy doesn't concern new arrivals or those without pending asylum cases, the administration said.

One notable change for unaccompanied children, however, is that they are "the only population that is officially exempt from the CDC's Title 42 order," Pierce said.

**What is Title 42 and how has it affected immigration flows?**

[Title 42](#) is a public health law the Trump administration [began invoking](#) in March 2020 to immediately expel, due to the coronavirus pandemic, those apprehended on the southern border. In November, a federal judge [ordered](#) a halt to such deportations of minors. While the Biden administration has continued to use the law to expel adults and some families, it has stopped expelling children.

"We are expelling most single adults and families," Department of Homeland Security Secretary Alejandro Mayorkas [said in a March 16 statement](#). "We are not expelling unaccompanied children."

While that's certainly the case for single adults, CBP [data show](#), the administration expelled 41% of family units in February, down from 62% who were expelled in January. The *Washington Post* [wrote about](#) the discrepancy.

Brown noted that migration started to increase in April 2020 and "continued to rise through the Biden inauguration. So it is not true that the increase started under Biden." But the decision not to expel unaccompanied children "sped up the increase."

"A somewhat new phenomenon, being reported by attorneys for migrants in the region, is that it seems that some unaccompanied children actually arrived in Northern Mexico with family members who sent them into the US alone since the U.S. was letting them in, and then the adults would try to come in later," she said.

At the same time, Title 42 may have artificially inflated the problem of single adults being apprehended, because some are trying to cross repeatedly in short time frames.

AR01816

"We know that single adults have driven the majority of the total increase in encounters at the border," Brown said in an email. "But we also have been told by CBP that as many as 1/3 of those are repeat encounters with the same person. We believe that because Title 42 results in rapid expulsion of migrants back to Mexico within a very short period of time, and no immigration process (and therefore no immigration bars being applied), the opportunity cost of migrants to repeatedly try to cross the border is low."

Brown said there are reports that smuggling operations "are charging rates for 'up to 3 attempts.'"

The increase in single adults also could be due to people sending children ahead of them and attempting to follow separately. "But there are not detailed statistics on that," she told us.

**What's the process for these unaccompanied kids? How many unaccompanied children are being held in Customs and Border Protection custody?**

Unaccompanied children are generally referred to the Department of Health and Human Services' Office of Refugee Resettlement. Some from Mexico can be returned home, a Congressional Research Service report explains, but the vast majority of these kids in recent years are from Guatemala, Honduras and El Salvador. While that referral process is taking place, they are held in Customs and Border Protection custody.

A backlog, due to the increase in unaccompanied children arriving at the border and policies in place due to the coronavirus pandemic, has led to a crush of kids being held in border facilities. One lawmaker released images of kids sleeping on cots on the floor.

A CBP spokesperson wouldn't tell us how many children are now in custody, saying that it doesn't provide daily numbers "as they are considered operationally sensitive because CBP's in-custody numbers fluctuate on a constant basis. The number it shares one morning may be different by the afternoon and the next day."

CNN reported on March 20 that more than 5,000 unaccompanied children were in CBP custody, "according to documents obtained by CNN, up from 4,500 children days earlier."

The children are only supposed to be in CBP custody for up to 72 hours, before being transferred to the Office of Refugee Resettlement. CNN reported that the children were being held an average of five days and that more than 600 of them had been held in CBP custody for more than 10 days.

"Unfortunately HHS waited until March 5 to start bringing beds back that were taken offline during the pandemic," Pierce told us of the problem. "While HHS is making efforts to expand their capacity by bringing these beds back online and acquire new influx facilities, their lack of bed space has led to the current back up of children in CBP custody."

The CBP spokesperson told us the agency's "ability to move children out of its care is directly tied to available space at HHS ORR" and that "everybody's focus is on moving UACs through as quickly as we can."

Past administrations have also struggled to get unaccompanied minors out of CBP custody.

In a November 2019 report, for instance, the Department of Homeland Security wrote: "One of the most visible and troubling aspects of this humanitarian crisis, one that manifested itself in April, May and early June 2019, was young children (sometimes for a week or more) being held by CBP's Border Patrol, not because it wanted to hold them, but because HHS had run out of funds to house them."

A July 2019 DHS Office of Inspector General report warned of "dangerous overcrowding" of kids held in five border facilities. It said CBP data showed 2,669 children, some who arrived at the border alone and some with families, had been held for more than 72 hours, with some children younger than 7 years old held for more than two weeks.

Once with the Office of Refugee Resettlement, children stay in shelters while awaiting immigration proceedings, including asylum, before being placed with a sponsor, who could be a parent, another relative or a non-family member. In fiscal year 2019, 69,488 children were referred to the Office of Refugee Resettlement, which has cared for 409,550 children since 2003. The HHS press office told us there are currently about 11,350 children in ORR care.

Data from HHS from fiscal year 2012 through 2020 show that at least 66% of referred children each year have been male. They are primarily from Guatemala, Honduras and El Salvador, and most are age 15 and older.

The Biden administration has tasked the Federal Emergency Management Agency with assisting HHS in housing the children.

*Update, March 23: We updated this story with the number of children now in the care of the Office of Refugee Resettlement.*

AR01817

*Editor's note: FactCheck.org does not accept advertising. We rely on grants and individual donations from people like you. Please consider a donation. Credit card donations may be made through our "Donate" page. If you prefer to give by check, send to: FactCheck.org, Annenberg Public Policy Center, 202 S. 36th St., Philadelphia, PA 19104.*

**Categories**   FactCheck Posts    Featured Posts

**Issue**   Illegal Immigration    Immigration

---

PREVIOUS STORY

Posts Misrepresent Columbia's Multicultural Graduation Ceremonies

NEXT STORY

Three False Claims About the Federal Voting Rights Bill

ARCHIVES        PRIVACY        COPYRIGHT POLICY        CONTACT US

REPORT ACCESSIBILITY ISSUES AND GET HELP

© Copyright 2021 FactCheck.org ®

A Project of The Annenberg Public Policy Center of the University of Pennsylvania

**AR01818**


## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service and Executive Office for Immigration Review**

**8 CFR Parts 1, 3, 103, 204, 207, 208, 209, 211, 212, 213, 214, 216, 217, 221, 223, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 251, 252, 253, 274a, 286, 287, 299, 316, 318, and 329**

**[INS No. 1788–96; AG Order No. 2065–96]**

**RIN 1115–AE47**

**Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures**

**AGENCY:** Immigration and Naturalization Service, Justice, and Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to amend the regulations of the Immigration and Naturalization Service (Service) and the Executive Office for Immigration Review (EOIR) governing the conduct of both expedited and regular removal proceedings, and handling of asylum claims. The regulation addresses other activities involving the apprehension, detention, hearing of claims and ultimately the removal of inadmissible and deportable aliens. In addition, this rule incorporates a number of changes which are a part of the Administration's reinvention initiative, mandated in a directive signed by the President on March 4, 1995, requiring all heads of departments and agencies to conduct a page-by-page review of all regulations and to eliminate or revise those that are outdated or otherwise in need of reform. This rule is necessary to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

**DATES:** Written comments must be submitted on or before February 3, 1997.

**ADDRESSES:** Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please refer INS number 1788–96 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:**

For matters relating to the Executive Office for Immigration Review—Peggy Philbin, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2400, Falls Church, VA 22041, telephone number (703) 305–0470; for asylum issues—Michael Shaul, Field Manual Project Office, Immigration and Naturalization Service, 425 I Street NW., ULLB–4th Floor, Washington, DC 20536, telephone number (202) 616–7439; for inspections issues—Linda Loveless, Office of Inspections, Immigration and Naturalization Service, 425 I Street NW., Room 4064, Washington, DC 20536, telephone number (202) 616–7489; for detention and removal issues—Len Loveless, Office of Detention and Deportation, Immigration and Naturalization Service, 425 I Street NW., Room 3008, Washington, DC 20536, telephone number (202) 616–7799.

**SUPPLEMENTARY INFORMATION:** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, enacted on September 30, 1996, amends the Immigration and Nationality Act (Act) in several ways. This rule proposes to implement the IIRIRA by creating a new, expedited removal process for aliens attempting to enter the United States through fraud or misrepresentation or without proper documents while providing a mechanism for the determination and review of applicants who demonstrate a credible fear of persecution if returned to their own country. It consolidates exclusion and deportation proceedings into one unified removal proceeding. It revises the asylum process.

It provides that persons who are present in the United States without inspection are considered applicants for admission and indicates that such persons will not be subject to expedited removal unless and until the INS Commissioner invokes the provisions in the statute and this rule allowing her to expand the use of the expedited removal process to include such individuals. Also, various sections of IIRIRA have revised and expanded the grounds of inadmissibility (formerly exclusion grounds).

The effective date of the changes implementing the expedited removal process is April 1, 1997. The Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, was enacted April 24, 1996. Many of its major provisions were superseded by IIRIRA before they became effective. Several of the remaining provisions will be implemented with this rulemaking.

Taken together, the provisions of IIRIRA have made pervasive changes in

the laws governing admission, inspection, removal, and detention of aliens—eliminating or revising old standards, creating new ones, and reorganizing and revising numerous provisions of existing law. In some respects, even after the effective date of the new provisions, existing legal standards will still be applied with respect to legal matters initiated prior to that date. The length of this rulemaking document alone—only one of the regulatory actions necessary to implement IIRIRA— demonstrates the breadth and complexity of these changes.

Congress directed that the provisions of Title III–A of IIRIRA take effect on April 1, 1997, and also directed that the Attorney General publish implementing regulations by March 1, 1997. A five-month period is an extremely short time frame for completing the regulatory process for a rule of this magnitude, given the time needed to draft the rule, coordinate with interested agencies, complete the regulatory review process by OMB pursuant to Executive Order 12866, and allow time for public comment. In particular, it means that there is not adequate time for the usual rulemaking model of 60 days public notice.

Because of these exigencies, the Department has limited the public comment period on this proposed rule to 30 days. However, in order to provide a fuller opportunity for public input on the numerous issues addressed in this rulemaking, the Department will allow a 120-day comment period on the Interim Rule when that is published by the beginning of March, prior to the development of a Final Rule.

As of the date this document was submitted for publication, Public Law 104–208 had not been printed. The conference report accompanying the House version of the bill, however, contains the provisions of IIRIRA. *See* H.R. Conf. Rep. No. 863, 104th Cong. 2d Sess., at 561. The Act should be printed in its entirety in the next few weeks.

**Applicants for Admission and Arriving Aliens**

Section 302 of IIRIRA amends section 235(a) of the Act to describe as applicants for admission both aliens who are arriving in the United States (whether or not they arrive at a designated port-of-entry) and aliens present in the United States who have not been admitted. This section also includes aliens brought to the United States after having been interdicted in international or United States waters. Prior to the enactment of the IIRIRA, aliens apprehended after entering the

United States without inspection were subject to deportation proceedings under section 242 of the Act. By considering such aliens to be applicants for admission, this amendment significantly changes the manner in which aliens who have entered the United States without inspection are considered under the Act.

In some instances, IIRIRA distinguishes between the broader term "applicants for admission" and a narrower group, "arriving aliens." For clarity, "arriving alien" has now been specifically defined in 8 CFR part 1. The proposed definition of "arriving alien" in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry. The Department would value commentary on the proper scope of the regulatory definition.

**Parole of Aliens**

The proposed rule amends § 212.5 to permit chief patrol agents to authorize parole from Service custody of aliens who have not been admitted to the United States. The regulations previously allowed the district director to exercise this authority for emergent reasons or when strictly in the public interest. Because many of the aliens apprehended and processed under the jurisdiction of a chief patrol agent will now be considered applicants for admission, this change is necessary to allow discretionary release of those aliens in the particular circumstances enumerated in § 212.5.

**Custody of Aliens Applying at Land Border Ports-of-entry**

The proposed regulation implements a new provision added to section 235(b)(2) of the Act to state that an applicant for admission arriving at a land border port-of-entry and subject to a removal hearing under section 240 of the Act may be required to await the hearing in Canada or Mexico. This simply adds to statute and regulation a long-standing practice of the Service. If the alien fails to appear for the hearing, the immigration judge may order the alien removed *in absentia.*

**Withdrawal of Application for Admission**

Section 302(a) of IIRIRA incorporates into section 235(a)(4) of the Act the longstanding practice used by the Service to permit applicants for admission to voluntarily withdraw their applications for admission to the United

States, in lieu of removal proceedings, and to depart immediately. Permitting an alien to withdraw his or her application for admission allows the Service to better manage its resources by removing inadmissible aliens quickly at little or no expense to the Government, and may be considered instead of expedited or regular removal when the circumstances of the inadmissibility may not warrant a formal removal. The option to permit withdrawal is solely at the discretion of the Government, and is not a right of the alien. An immigration judge may allow only arriving aliens to withdraw an application for admission. Such a grant should ordinarily require the Service's concurrence once the issue of inadmissibility or deportability has been resolved. During the pendency of an appeal from an order of removal, permission to withdraw must be obtained from the immigration judge or the Board of Immigration Appeals (Board).

**Expedited Removal of Certain Applicants for Admission**

Pursuant to section 302(a) of IIRIRA, aliens who attempt to enter the United States by fraud or misrepresentation or who arrive without valid entry documents may be removed under an expedited process without further hearing or review. An exception is provided for Cuban nationals arriving by aircraft at a port-of-entry. Aliens who are inadmissible on other grounds will be referred for proceedings before an immigration judge under the new removal provisions of section 240 of the Act. Although not required by statute, the proposed regulation provides for review and approval of the expedited removal order by a supervisory immigration officer prior to removal of the alien. The expedited removal order bars reentry for 5 years following the removal, or 20 years in the case of a second or subsequent removal, unless the alien obtains advance permission to reenter the Untied States.

The Department requests public comment regarding the appropriate use of the authority conferred by the statute upon the Attorney General to expand the class of aliens subject to expedited removal. Section 235(b)(1)(A)(iii) of the Act permits the Attorney General, in her sole and unreviewable discretion, to apply expedited removal to aliens not admitted or paroled (and not described in section 235(b)(1)(H)) who cannot establish continuous physical presence in the United States for the previous two years.

Under the proposed rule, expedited removal will generally apply only to "arriving aliens," as defined in section

1.1(q), i.e., aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The Commissioner may, however, elect to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute, if, in the Commissioner's discretion, such action is operationally warranted. The Commissioner's designation may be localized, in response to specific needs within a particular region, or nationwide, as appropriate. The designation would become effective upon publication in the **Federal Register,** except where circumstances require immediate implementation. The Department would value commentary on two alternative approaches as well: (1) application of expedited removal only to "arriving aliens"; and (2) application of expedited removal to all aliens not admitted or paroled (and not described in section 235(b)(1)(F)) who cannot demonstrate continuous physical presence for the previous two years.

Finally, commentary on the proper scope of the term "arriving alien" would be helpful to the Department in implementing section 235(b)(1). The proposed regulatory definition in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry.

**Review of Claim to Lawful Permanent Resident, Refugee, or Asylee Status in Expedited Removal**

An expedited removal order entered against an alien by an immigration officer at the time of arrival or by an asylum officer following a determination that the alien does not have a credible fear of persecution is not subject to administrative appeal, but may be reviewed by an immigration judge upon request of the alien. An exception is provided in section 235(b)(1)(C) of the act for an alien who claims under oath or under penalty or perjury to be a lawful permanent resident, to have been admitted as a refugee under section 207 of the Act, or to have been granted asylum under section 208 of the Act.

Before entering an expedited removal order against these aliens, the Service will attempt to verify the alien's claim to lawful permanent resident, refugee, or asylee status. If a claim to lawful permanent resident status is verified, the examining officer will determine whether the alien is considered an applicant for admission within the

meaning of section 101(a)(13) of the Act. Section 301(a) of IIRIRA amended section 101(a)(13) of the Act to provide that an alien lawfully admitted for permanent residence is not seeking admission unless the alien has abandoned or relinquished that status, has been absent for a continuous period in excess of 180 days, has engaged in illegal activity after having departed the United States, has departed while under legal process seeking removal, has committed certain criminal offenses, or is attempting to enter at a time or place other than as designated or has not been inspected and admitted to the United States. If the verified lawful permanent resident is determined to be an applicant for admission, the officer may consider appropriate discretionary waivers, if applicable, such as a waiver of documents under section 211(b) or other administrative options.

Current regulations do not provide for a waiver of documents or similar options for refugees and asylees who seek to reenter the United States without a refugee travel document. The regulations at § 223.2(b)(2) require that an application for a refugee travel document be filed before a refugee or asylee departs from the United States. The regulations also require at § 223.1(b) that a refugee or asylee must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document. The combination of these two provisions has resulted in a few refugees and asylees (who had no intention of abandoning their status in the United States at the time of their departure) not being able to be readmitted in such status. With the advent of the expedited removal provisions, including the procedure for a review by an immigration judge of a claim to refugee or asylee status, the need for a formal process for dealing with such individuals has become more critical. The Service proposes to address the problem by giving district directors the discretionary authority to accept an application for a refugee travel document from an alien who is outside the United States, provided that alien: (1) held bonafide refugee or asylee status in the United States at the time of his or her departure from the United States, (2) did not intend to abandon such refugee or asylee status, (3) did nothing while outside the United States which would be inconsistent with refugee or asylee status, (4) has been outside the United States for less than one year (the maximum period of time for which the refugee travel document

can be issued), and (5) files the requisite Form I–131, Application for a Travel Document, with the appropriate fee. Upon the filing and approval of such application, the alien may be readmitted to the United States as if he or she were in possession of a valid refugee travel document, provided the alien is otherwise admissible.

If the immigration officer determines that an alien verified to have once held the status of a lawful permanent resident, refugee, or asylee does not merit a waiver, the officer will not issue an expedited removal order; rather, the officer may place the alien in removal proceedings under section 240 of the Act, Section 235(b)(1)(C) of the Act does not specify what should occur if an alien actually establishes to the satisfaction of an inspecting officer or an immigration judge that he or she is a lawful permanent resident, refugee, or asylee. However, section 242(e)(4) of the amended Act provides that if an alien appealing an expedited removal order to Federal district court establishes by a preponderance of the evidence that he or she is a lawful permanent resident, has been admitted as a refugee, or has been granted asylum, then the district court may order that the alien be provided a hearing under section 240 of the Act. In light of these judicial review provisions that would result in such aliens receiving a regular removal proceeding under section 240 of the Act, the Department considers a referral into section 240 removal proceedings upon verification of such status by an immigration officer or demonstration of such status to an immigration judge to be the most practical and efficient implementation of these provisions.

In cases where the alien's claim to lawful permanent resident, refugee, or asylee status cannot be verified, the immigration officer or the asylum officer will order the alien removal under section 235(b)(1)(A)(i) of the Act or for a credible fear determination under section 235(b)(1)(B)(iii), and then refer the alien to an immigration judge for review of the order. If the judge determines that the alien is not a lawful permanent resident, has not been admitted as a refugee, or has not been granted asylum under section 208 of the Act, the order issued by the examining immigration officer or asylum officer will be effected and the alien will be removed from the United States under that order. No further review is available. If the judge determines that the alien was once admitted and/or currently is a lawful permanent resident, refugee, or asylee, the order will be canceled and proceedings under section 235(b)(1) of the Act will be

terminated. The Service may then admit the alien or pursue any other grounds of inadmissibility or deportability under section 212 or 237 of the Act in a removal proceeding pursuant to section 240 of the Act, if appropriate.

**Revision of Asylum Procedures**

The regulation proposes to amend 8 CFR part 208 to create new procedures for the consideration of asylum applications as mandated by section 604 of IIRIRA, to make certain other changes which are not mandated by IIRIRA, but that will significantly improve the asylum process, and to streamline the existing regulations in accordance with the principles discussed elsewhere in the supplementary information.

Of special significance are the provisions in the regulation providing the immigration judges with exclusive jurisdiction over certain categories of asylum applications, including those filed by alien crewmen, stowaways who establish a credible fear of persecution, aliens covered by the Visa Waiver Pilot Program, aliens subject to removal under section 235(c) of the Act, and aliens who have applied for or received an "S" visa. Under the current regulations, some of these classes of aliens (stowaways, crewmen, and aliens removable under section 235(c) of the Act) receive only an interview with an asylum officer which is reviewed directly by the Board. However, some problems have arisen with these procedures, most significantly, the difficulty of generating a reliable and complete record and the absence of a government-provided interpreter in asylum officer interviews. The Department believes that giving the immigration judges exclusive jurisdiction over such determinations will certify these problems while still maintaining the high quality and consistency of the interview and decision-making process which the public has come to expect.

The proposed rule's treatment of section 208(a)(2) of the Act, which establishes a number of new grounds barring an alien from applying for asylum, is equally important. Regarding section 208(a)(2)(C) of the Act, which bars an alien from applying for asylum if the alien had a previous asylum application denied, the rule makes clear that this provision applies only to asylum applications that have been denied by an immigration judge or the Board. This ensures that aliens who received a denial of their application from an asylum officer because they applied for asylum while in valid status or under procedures in place prior to January 1995 receive consideration of

their application by an immigration judge. The rule also interprets the terms "changed circumstances" and "extraordinary circumstances" in section 208(a)(2)(D) of the Act as those terms apply to the 1-year bar in section 208(a)(2)(B) of the Act. The regulation provides minimal guidance on the meaning of the term "changed circumstances." Nevertheless, because of the novelty of the "extraordinary circumstances" exception to the 1-year bar, the rule offers a regulatory interpretation of this term. While the Department considered having the regulation identify specific examples of extraordinary circumstances that would justify a waiver of the one-year filing requirement, the proposed rule opts in favor of a provision that generally defines the term as events or factors beyond the alien's control that caused the failure to meet the one-year deadline. The regulation also provides that the alien file the application as soon as practicable under those circumstances. Thus, an event or factor of relatively brief duration would be insufficient to excuse the filing of an application long after the deadline. In our view, such a general definition provides guidance to decision makers while offering more flexibility than a definition by example would. Nevertheless, we can imagine several examples that would likely satisfy this definition: the applicant suffered a physical or mental disability that prevented a timely filing; the applicant was under a legal disability (e.g., an unaccompanied minor) during the one-year period; or the applicant received ineffective assistance of counsel, as that concept has been interpreted by the Board of Immigration Appeals, resulting in a failure to file a timely application. Nevertheless, because of both the novelty and importance of these new provisions, the Department welcomes suggestions from the public on how best to implement them.

The proposed rulemaking also offers guidance on how to apply section 208(d)(6) of the Act, which provides that an alien who knowingly makes a frivolous asylum application shall be permanently ineligible for any benefits under the Act. At § 208.18, the rule first provides that such determinations may only be made in a final order by an immigration judge or the Board of Immigration Appeals. The rule also defines an application as "frivolous" if it is fabricated or brought for an improper purpose. In doing so, the Department is carrying out one of the central principles of the asylum reform process begun in 1993; to discourage

applicants from making patently false claims.

It should be noted that the proposed rule does not discuss § 208.19 dealing with the admission of the spouse and children of an alien granted asylum status. This topic was the subject of a separate proposed rule published July 9, 1996. *See* 61 FR 35,984 (1996). That separate rulemaking will be incorporated into the overall asylum regulations once it is finalized.

**Credible Fear Determination and Claims of Asylum or Fear of Persecution by Alien Subject to Expedited Removal**

Under the new section 235(b)(1)(A)(ii) of the Act, an alien subject to expedited removal who indicates an intention to apply for asylum or who expresses a fear of persecution will be referred to an asylum officer to determine if the alien has a credible fear of persecution. Credible fear of persecution is defined in section 302(a) of IIRIRA to mean that "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208."

Interviews to determine whether an alien has a credible fear of persecution will be conducted by an asylum officer, either at the port-of-entry or at designated locations such as detention centers. For purposes of this credible fear interview, an asylum officer is defined in the Act as an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and is supervised by an officer who meets the same criteria and who has had substantial experience adjudicating asylum applications. This definition may include officers other than full-time asylum officers, provided they have undergone the necessary training and have the requisite supervision, but the Service will generally attempt to assign full-time asylum officers to the task of determining credible fear. Prior to the interview, the alien may consult with a person or persons of his or her own choosing at no cost to the Government, provided it does not unreasonably delay the process.

The asylum officer will make a determination whether the alien has a credible fear of persecution. Service procedures will require that the determination be reviewed by a supervisory asylum officer. The

supervisory asylum officer may direct the asylum officer to interview the applicant further, or to research country conditions or other matters relevant to the decision. If the supervisory asylum officer agrees that the alien has not demonstrated a credible fear of persecution, the alien will be ordered removed under the provisions of section 235(b)(1)(B)(iii)(I) of the Act. If the alien requests review of the determination that he or she has not demonstrated a credible fear of persecution, the credible fear determination will be promptly reviewed by an immigration judge. The alien will have the opportunity to be heard and questioned by the immigration judge. This review will be limited solely to the issue of credible fear, and may be conducted either in person or by telephonic or video connection. By statute, the review should be conducted as soon as possible following the credible fear determination, preferably within 24 hours, and no later than seven days after the date of determination. The alien will be detained during this review period, and if found by the immigration judge not to have a credible fear, will be promptly removed.

Section 235(b)(1)(B)(ii) of the Act provides that aliens who are determined by an asylum officer to have a credible fear of persecution will be detained for further consideration of the asylum claim. While the statute does not specify how or by whom this further consideration should be conducted, the proposed rule provides for such consideration by an immigration judge in removal proceedings conducted pursuant to section 240 of the Act. In the removal hearing, the immigration judge will make a determination whether alien is eligible for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. The removal order will be subject to administrative review by the Board in accordance with section 240 of the Act and § 3.1(b)(3).

Credible fear determinations are also made in the case of stowaways. Although not entitled to removal proceedings under section 240 of the Act, a stowaway who has been determined by an asylum officer (or by an immigration judge upon review of a negative determination by an asylum officer) to have a credible fear of persecution may file an asylum application to be adjudicated by an immigration judge in asylum-only proceedings. There is no appeal from the decision of an immigration judge as to whether the stowaway has a credible fear of persecution. A stowaway who is found not to have a credible fear will be

**AR01822**

expeditiously removed. However, a stowaway who meets the credible fear threshold and is allowed to present an asylum or withholding of removal application in a proceeding before an immigration judge may appeal the resulting decision to the BIA.

**Proposed Changes Not Mandated by IIRIRA**

The rulemaking also proposes to remove §§ 208.13(b)(2)(ii) and 208.16(b)(4) which require that adjudicators give ''due consideration to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country.'' The regulations accomplish little and are potentially misleading in their current form. The term ''due consideration'' provides little guidance. Moreover, the question of whether punishment for a migration-related offense is ''persecution'' hinges on an evaluation of the circumstances of each case. Under current law, prosecution for migration-related offenses does not ordinarily amount to persecution. Since the provision does not offer any assistance in adjudicating claims involving prosecution for unauthorized departure, we propose removing it from the regulations.

The rule provides a special regulation to govern the application of section 243(h)(3) of the Act, a provision added by section 413(f) of AEDPA that was eliminated by section 307 of IIRIRA. That section provided that, notwithstanding any other provision of law, the Attorney General could grant an alien withholding of deportation if she determined that it was necessary to do so to ensure compliance with the 1967 Protocol Relating to the Status of Refugees. In new section 241(b)(3)(B) of the Act, the only change Congress made to the existing bars to withholding of deportation was to require, in the case of an alien convicted of an aggravated felony (or felonies), that the alien receive an aggregate term of imprisonment of at least 5 years before such crime or crimes are automatically considered to be particularly serious. We understand this change to reflect Congress' conclusion that the bars to withholding of deportation or removal are consistent with the United States' obligations under the 1967 Protocol Relating to the Status of Refugees, except potentially in the case of an aggravated felon who receives less than a 5-year aggregate sentence. The Department proposes a regulatory interpretation of section 243(h)(3) that is

consistent with this most recently expressed view of the Congress. Thus, the rule provides that an alien may attempt to obtain relief under section 243(h)(3) of the Act only if he or she is an aggravated felon who received an aggregate sentence of less than 5 years and can establish that the crime or crimes of which he or she has been convicted are not particularly serious. This will require a case-by-case determination whether the crime or crimes committed by the alien are particularly serious. Only if the crime is determined not to be particularly serious will the alien be entitled to have his or her withholding of deportation claim considered. Because section 243(h)(3) of the Act was eliminated by IIRIRA, this rule applies only to applications for withholding made in proceedings commenced prior to April 1, 1997, so long as a final action on any such withholding request was not taken prior to April 24, 1996, the date of AEDPA's passage.

**Establishment of a Fee for Filing an Application for Asylum**

This rulemaking does not propose to establish a fee for filing an application for asylum or to expand the situations under which fees may be charged for asylum-based applications for work authorization, despite the statutory permission to do so contained in section 208(d)(3) of the Act. Should the Department decide to do so at a later date, that action would be part of a separate rulemaking.

**Employment Authorization for Asylum Applicants**

The proposed regulations will continue to allow asylum applicants to apply for an employment authorization document (EAD) once the asylum application has been pending for 150 days, which is 30 days before the new statutorily-mandated time for granting such authorization contained in section 208(d)(2) of the Act.

**Rules of Procedure for Executive Office for Immigration Review**

Implementation of IIRIRA will impact the rules of procedure for proceedings before the Executive Office for Immigration Review. These proposed rules amend the regulations to expand the scope of the rules of procedure to include new removal proceedings in provisions regarding motions to reopen and reconsider, jurisdiction and commencement of proceedings, stipulated requests for orders, in absentia hearings, public access to hearings, and additional charges. The proposed rules also add provisions

regarding the scheduling of removal cases, custody and bond in removal proceedings, and contents of the Notice of Appear form.

**Subpoenas by Immigration Judges**

Section 304 of IIRIRA bestows upon immigration judges the statutory authority to issue subpoenas for the attendance of witnesses and presentation of evidence in removal proceedings. This subpoena power had previously been granted to immigration judges by regulation only and the immigration judges had to enlist the district director to invoke the aid of the district court for failure to comply with the subpoena. The proposed rule amends the subpoena provisions to provide that an immigration judge directly invokes the aid of the district court for an order requiring the compliance with a subpoena instead of requiring the district director to take such action.

**New Removal Proceedings**

Section 240 of the Act as amended by section 304(a) of IIRIRA merges the separate proceedings of exclusion and deportation into one removal proceeding. In this single proceeding, the immigration judge will determine whether an alien is inadmissible under section 212 of the Act or deportable under section 237 (formerly section 241) of the Act. In light of these statutory changes, individuals in removal proceedings are referred to in the proposed rule as determined to be removable or ordered removed after being found to be either inadmissible or deportable (but no longer will be referred to as excludable or excluded). Removal proceedings will in nearly all respects resemble present day deportation or exclusion proceedings, with some minor differences outlined below and implemented by this proposed rule.

Although not as a result of any provision of IIRIRA, the Department is soliciting public comments on whether these regulations should include a provision for appointment of a guardian ad litem in a case where a minor or incompetent respondent in removal proceedings is otherwise unrepresented.

**Applicability of New Removal Provisions**

The IIRIRA provides that the newly created removal procedures and the new amended forms of relief available in removal proceedings which appear in title III–A of IIRIRA will apply to all individuals placed into removal proceedings on or after April 1, 1997, and will not affect individuals who

were in deportation or exclusion proceedings prior to April 1, 1997. *See* Section 309(a) of IIRIRA. For this reason, the proposed rule preserves the former regulations relating to deportation and exclusion proceedings for those individuals who will continue on in such proceedings after April 1, 1997. The proposed rule preserves such provisions by retaining current regulatory provisions previously contained in 8 CFR parts 236, 242, and 244 within separate new subparts of part 240. In addition, sections formerly contained in parts 237 and 243 have been retained in new subparts of part 241. A more detailed description of the entire reorganization of effected parts of title 8 is contained later in this supplementary information.

**The Notice to Appear (Form I–862)**

The charging document which commences removal proceedings under section 240 of the Act will be referred to as the Notice to Appear, Form I–862, replacing the Order to Show Cause, Form I–221, that was used to commence deportation proceedings and the Notice to Detained Applicant of Hearing Before an Immigration Judge, Form I–110. The Notice to Appear must contain nearly all of the information that was required to be in the Form I–221. The regulations reflect the fact that section 304 of IIRIRA did not retain the requirement that the Notice to Appear be provided in Spanish; that the mandatory period between service of a Notice to Appear and the date of an individual's first hearing is 10 days rather than the 14 days required for the Order to Show Cause; that service of the Notice to Appear by ordinary mail, rather than certified mail, is sufficient if there is proof of attempted delivery to the last address provided by the alien and noted in the Central Address File; and that no written notice need be provided if the alien has failed to provide his or her address as required under the amended Act.

In addition, the proposed rule implements the language of the amended Act indicating that the time and place of the hearing must be on the Notice to Appear. The Department will attempt to implement this requirement as fully as possible by April 1, 1997. Language has been used in this part of the proposed rule recognizing that such automated scheduling will not be possible in every situation (e.g., power outages, computer crashes/downtime.)

**Burdens of Proof in Removal Proceedings**

The proposed regulation restates the burden of proof language in section

240(c) of the Act as revised by section 304(a) of IIRIRA. In removal proceedings in which an alien is charged with deportability, the Service must establish deportability by clear and convincing evidence. This replaces the clear, convincing, and unequivocal standard set forth in *Woodby* v. *INS*, 385 U.S. 276 (1966). An applicant for admission to the United States must establish that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible. In the case of an alien present in the United States without being admitted or paroled, once the Service establishes alienage, the alien must prove that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible, unless the alien proves by clear and convincing evidence that he or she is lawfully present pursuant to a prior admission.

**Cancellation of Removal**

The proposed rule provides for the application by qualified individuals in removal proceedings for the new form of relief created by section 304(a) of IIRIRA: cancellation of removal. Cancellation of removal comes in two forms. The first form, available to lawful permanent residents, is similar to relief under section 212(c) of the pre-IIRIRA Act, except that only 5 years of the required 7 years of residence to statutorily qualify for this form of cancellation of removal need be fulfilled as a lawful permanent resident. This means that up to 2 years of the 7 years can be satisfied with temporary residence. This provision codifies the interpretation by a number of Federal circuit courts that a period of temporary residence counts toward the 7-year residency requirement for relief under section 212(c) of the pre-IIRIRA Act.

The second form of cancellation of removal resembles suspension of deportation under section 244 of the pre-IIRIRA Act, except that an applicant for the second form of cancellation of removal must demonstrate continuous physical presence for 10 years instead of 7 years, and must show "exceptional and extremely unusual hardship" instead of "extreme hardship." Further, unlike suspension of deportation, this form of cancellation of removal is not available for aliens who can only show hardship to themselves. The proposed rule also implements the availability of this second form of cancellation of removal to a battered spouse or child who can demonstrate 3 years of continuous physical presence in the United States and who shows that removal would result in "extreme hardship" to the battered spouse, his or her child, or the battered child's parent.

**Administrative Motions To Reopen and Reconsider Removal Proceedings**

Section 304(a) of IIRIRA added a number of motions procedures to the Act regarding the reopening or reconsideration of a final order of removal. For the most part, these new statutory provisions encompass the new procedures implemented by EOIR's new motions and appeals regulation, which took effect on July 1, 1996. However, the statute does place the time and number restrictions for motions specifically on the alien. The proposed rule implements this change by adding a provision to indicate that in removal proceedings, the restrictions only apply to the alien and not to the Service. In addition, unlike the pre-IIRIRA regulations excepting motions to reopen exclusion or deportation orders rendered in absentia from both the 90-day and 1-motion restrictions, the statute only excepts motions to reopen removal orders rendered in absentia from the 90-day time period and not the numerical restriction. The proposed rule implements this change as well.

**Proceedings To Review Asylum Claims by Certain Aliens Not Eligible for Section 240 Proceedings**

This rule established a new Notice of Referral to Immigration Judge, Form I–863, to be used to institute limited proceedings before an immigration judge. This referral form will be used by immigration officers to initiate review by an immigration judge for asylum or withholding of removal claims by Visa Waiver Pilot Program (VWPP) refusal cases and VWPP status violators, crew members, aliens ordered removed pursuant to section 235(c) of the Act, aliens present pursuant to section 101(a)(15)(S) of the Act, and alien stowaways found to have a credible fear of persecution. This proceeding is limited solely to the asylum or withholding claim and no other forms of relief may be presented by the alien or considered by the immigration judge.

Asylum officers will also use the Notice of Referral for expedited removal cases where the alien seeks review of a "no credible fear" finding by the asylum officer in section 235(b)(1) proceedings or for stowaways, prior to the execution of the expedited removal order or removal of the stowaway.

In addition, the Notice of Referral will be used to institute an immigration judge review of expedited removal orders issued against aliens claiming to be lawful permanent residents, refugees or asylees. In such cases, the immigration judge will review the

expedited removal order, which may either be affirmed or canceled.

Existing regulations regarding deportable VWPP aliens who claim asylum state that the alien will be referred for a determination of deportability. The current regulations for VWPP applicants arriving at ports-of-entry are vague, stating only that the alien will be referred to an immigration judge for further inquiry. The proposed change will clarify that VWPP applicants and status violators are to be provided a hearing and appeal on the asylum and withholding claim only.

Existing regulations provide that a crewman, stowaway, or alien temporarily excluded under section 235(c) of the Act file an application for asylum with the district director and that the district director forward it to an asylum officer for adjudication. The Attorney General has determined that these claims should be adjudicated by an immigration judge. This determination to adjudicate the asylum claims for these classes of aliens in a proceeding before an immigration judge is in response to recent case law holding that stowaway asylum applicants must be afforded the same asylum procedures deemed necessary for other aliens. In *Marincas* v. *Lewis*, 92 F.3d 195, 200–201 (3rd Cir. 1996), the court held that the plain language of the Refugee Act left no room to construe the statue to permit differing asylum procedures for stowaways. Although the Department with that holding, the Attorney General has found that providing a proceeding before an immigration judge to hear the asylum claim will address the concerns raised in *Mirancas*, while remaining consistent with the statutory directives to limit due process for these classes of aliens. As required by IIRIRA, a stowaway will receive a credible fear determination by an asylum officer prior to the referral to an immigration judge.

**Reorganization of Certain Regulatory Sections**

The IIRIRA substantially revised sections of the Act relating to the arrest of aliens suspected of inadmissibility to or unlawful presence in the United States, detention of such aliens prior to and during removal proceedings, the conduct of removal proceedings, and ancillary issues such as voluntary departure and available forms of relief. The Service and EOIR have jointly undertaken a complete revision of the affected parts of title 8, to bring the relevant regulatory parts into alignment with the new sections of the Act. The newly revised sections are organized in the following manner: 8 CFR part 236, Subpart A—Detention of aliens prior to

order of removal, Subpart B—Family Unity Program; 8 CFR part 238—Expeditious removal of aggravated felons; 8 CFR part 239—Initiation of removal proceedings; 8 CFR part 240, Subpart A—Removal proceedings, Subpart B—Cancellation of removal, Subpart C—Voluntary departure, Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997); Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (commenced prior to April 1, 1997); Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997); Subpart G—Civil penalties for failure to depart; 8 CFR part 241, Subpart A—Post-hearing detention and removal, Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997), Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997); 8 CFR parts 237, 242, and 243 have been removed and reserved; 8 CFR part 244 will now contain regulations pertaining to the Temporary Protected Status program.

Sections of the old regulations which are still applicable to proceedings commenced prior to April 1, 1997, have been retained, but moved to new parts of the regulations as separate subparts according to topic. For example, the regulations relating to the conduct of proceedings, formerly contained in 8 CFR part 242, have been moved to 8 CFR part 240, which contains regulations for the conduct of removal proceedings.

Most sections of the regulations have not been retained in this manner. They have been totally revised, in conformity with the new statute. In some instances, these regulations distinguish between situations involving aliens ''grandfathered'' under former statutory authority and those encompassed by the provisions of IIRIRA. For example, new § 252.2(b) contains separate provisions for alien crewmen who arrived prior to April 1, 1997, and those who arrive after that date.

Because the Service and EOIR have concerns about the serious restructuring of these regulations, the public is invited to comment on the approach taken by this rulemaking. In particular, the Service wishes to solicit comments concerning any possible unintended consequences of the restructuring, such as the inclusion of new sections which encompass aliens entitled to consideration under ''old'' provisions.

**Apprehension, Custody, and Detention of Aliens**

This rule incorporates the changes made to section 242 of the Act by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104–132 as well as section 303(a) of the IIRIRA. By enactment of AEDPA, Congress altered the provisions created by section 504 of the Immigration Act of 1990 (IMMACT), Public Law 101–649, enacted November 29, 1990, relating to release of lawfully admitted aliens who had been convicted of aggravated felonies. The AEDPA directed the Attorney General to detain aliens convicted of aggravated felonies without bond and extended the mandatory detention provisions to aliens deportable for conviction of certain other felonies. The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The INS exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. The Act is very clear as to which aliens may be released. This rule proposes to amend the Service's regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Otherwise, the proposed rule essentially preserves the status quo for bond determination by the Service and bond redetermination proceedings before immigration judges. Despite being applicants for admission, aliens who are present without having been admitted (formerly referred to as aliens entering without inspection) will be eligible for bond and bond redetermination.

**Expedited Deportation Procedures for Aliens Convicted of Aggravated Felonies Who Are Not Lawful Permanent Residents**

This rule incorporates the changes made to section 242A(b) of the Act by section 442 of the AEDPA and section 304(c) of the IIRIRA. By enactment of the AEDPA, Congress made several changes to the expedited administrative deportation procedure authorized under section 130004 of the Violent Crime Control and Law Enforcement Act of

1994, Public Law 103–322. Some of these changes were modified by the IIRIRA and one was eliminated. This rule proposes to amend the Service's regulations to comply with the amended Act as follows: aliens who have lawful permanent residence on a conditional basis under section 216 of the Act are subject to expedited administrative deportation procedures and have been included in the regulation. Since section 238(b)(5) of the Act states that an alien subject to these proceedings is ineligible for any relief from removal, all references to prima facie eligibility for relief and to relief from deportation have been removed. This revision also eliminates references to release from custody, since aliens subject to these proceedings are now statutorily ineligible for release as a result of changes to other sections of the Act.

**Voluntary Departure**

The proposed rule outlines how voluntary departure will be handled at various stages of proceedings. Prior to the initiation of proceedings, the Service has sole jurisdiction to grant voluntary departure for a period not to exceed 120 days. The Service may impose any conditions it deems necessary to ensure the alien's timely departure from the Untied States, including the posting of a bond, continued detention pending departure and removal under safeguards. After proceedings have been commenced and at any time up to 30 days subsequent to the master calendar, the immigration judge may grant voluntary departure for a period not to exceed 120 days. In each instance, the alien will be required to present to the Service travel documents sufficient to assure lawful entry into the country to which the alien is departing, unless such document is not necessary for the alien's return.

An alien may be granted voluntary departure at the conclusion of proceedings if the immigration judge finds that the alien meets the conditions of section 240B(b) of the Act. The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, but in all cases, the alien shall be required, within 5 days of the order, to post a voluntary departure bond of no less than $500. In order for the bond to be canceled, the alien must provide proof of departure to the district director. If the alien fails to depart, or to meet any of the conditions attached to the grant of voluntary departure, such order will vacate and the alternate order of deportation will stand.

Section 304(a) of IIRIRA makes significant changes to both the nature

and duration of voluntary departure. Under the new law, voluntary departure is clearly meant to be granted to aliens illegally in the United States who are able and willing to depart in a relatively short period of time. It will no longer be available to those who are seeking to significantly extend their time in the United States for other reasons. If fact, the time periods which will be allowed for voluntary departure are such that they meet or exceed the normal processing time for applications for employment authorization. In light of these changes, the Department is eliminating the provisions currently contained in 8 CFR parts 242 and 274a which permit the granting of work authorization to aliens who have been given voluntary departure.

New section 240B of the Act and the corresponding regulations represent a significant departure from the predecessor provisions for voluntary departure. Public comments regarding the Department's approach to implementation of this provision will be particularly welcome.

**Reinstatement of Removal Orders Against Aliens Illegally Reentering**

Section 241(b)(5) of the Act requires the Attorney General to reinstate the removal order for an alien who illegally reenters the United States after having been removed or after having departed voluntarily under a removal order. Removal would be accomplished under the proposed rule without referral to an Immigration Court. Although the Act previously contained a provision for reinstatement of a final order of deportation, the accompanying regulation required the issuance of an order to show cause and a hearing before an immigration judge. This resulted in limited use of the provision. The proposed rule provides a procedure for a district director to reinstate a final order upon establishing identity and unlawful reentry of a previously deported or removed alien found in the United States. Once identity is affirmed, the original order will be executed.

**Detention and Removal of Aliens Ordered Removed**

This rule incorporates the changes made to section 241 of the Act by section 305(a) of IIRIRA. Section 241 of the Act now relates to the period for removal of aliens, post-order detention and removal of aliens, reinstatement of final orders, and detention and removal of stowaways.

This rule provides for the assumption of custody during the removal period, allows detention beyond the period, and provides condition for discretionary

release and supervision of aliens who cannot be removed during the period. A district director may issue a warrant of removal based on a final administrative order of removal. The warrant of removal will authorize the Service to take an alien in the United States into custody during the removal period. The Service is required to assume custody of any alien within the United States once the 90-day removal period begins, as defined in section 241 of the Act, and detain the alien until removal or expiration of the removal period. At the expiration of the removal period, the Service has the discretion to release an alien. If the alien shows to the satisfaction of the district director that the alien is not a threat to the community and is likely to report for removal, the district director may release the alien on an order of supervision. As a condition or release, an authorized officer may require the posting of a bond, impose restrictions on conduct, and require periodic reporting to a designated officer. The district director may grant employment authorization as specified in the Act. The district director retains the authority to grant humanitarian stays of removal.

This rule restates the principle, previously found at § 243.5, that an alien who departs the United States while a final order is outstanding has executed the order.

**Detention and Removal of Stowaways**

The arrival of stowaways in the United States, particularly aboard cargo vessels, has long been a problem for both the transportation companies and the Service. Section 308(e) of IIRIRA has stricken former section 273(d) of the Act, which governed stowaways and section 305 of IIRIRA has clearly defined the responsibilities for stowaways and costs of detention in the new section 241 of the Act. All stowaways are deemed to be inadmissible under the Act and are not entitled to a hearing on admissibility. Those with a credible fear of persecution may seek asylum in accordance with 8 CFR part 208 in proceedings before an immigration judge.

Under the provisions of section 241 of the Act, the carrier (which includes the owner, agent, master, commanding officer, person in charge, purser, or consignee) is responsible for detaining the stowaways on board the vessel or aircraft (or at another approved location) until completion of the inspection, and may not permit the alien to leave the vessel or aircraft, unless authorized by the Service for either medical treatment,

detention by the Service, or removal of the stowaways. The Service may order that the stowaway be removed on the vessel or aircraft of arrival when that is the most practical manner of removal. With the mutual goal of removing stowaways by the most expeditious and secure means, the Service will generally favor any reasonable request to remove the stowaway on other than the vessel or aircraft of arrival. The carrier must make all travel arrangements, including obtaining any necessary travel documents.

Since asylum-seeking stowaways may not be removed pending a final decision on their asylum claim, which may sometimes extend for a lengthy period, the statute limits the detention liability of the owner of the vessel or aircraft. The owner is now responsible for a period of time needed to determine whether the stowaway has a credible fear of persecution, and a reasonable period, beginning when a credible fear is found to exist, during which the asylum application may be considered. The statute and regulations allow for up to 72 hours to arrange and conduct the credible fear interview, although the Service anticipates that this will occur as expeditiously as possible, depending on the location and circumstances of the stowaway's arrival. If the stowaway is allowed to pursue his or her asylum application, the statute provides 15 working days, excluding Saturdays, Sundays, and holidays, for the asylum claim to be heard, at the expense of the owner of the vessel or aircraft. Any detention required beyond that time period will be at the expense of the Service. The carrier remains liable for removal, including removal expenses, if the alien is denied asylum.

### Adjustment of Status

Adjustment of status is granted in the discretion of the Attorney General. Consistent with Congress' intent that arriving aliens, as that term is defined in § 1.1(g), be removed in an expedited manner through the procedures provided in section 235(b)(1) of the Act, the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act. Of course, any such alien who has been persecuted or has a reasonable fear of persecution may request asylum in expedited removal. Arriving aliens who are granted asylum may then adjust their status outside of the removal proceeding context. In all other instances, those apprehended after

arriving illegally in the United States should have no other benefit available to them, and should not be permitted to delay their removal through an application for adjustment of status. Any other arriving alien who is eligible to receive an immigrant visa will be required to return to his or her country of residence and request it through the consular process available to all aliens outside of the United States. If the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director.

### Disposition of Cases of Aliens Arrested in the United States

The regulation proposes to amend § 287.3 to differentiate the actions that must be taken when an alien is apprehended entering or attempting to enter the United States in violation of the immigration laws, or is otherwise found in the United States in violation of those laws. Disposition of the case will vary depending on the circumstances of entry or attempted entry, or the specific violation with which the alien is charged. This section is amended to include those cases that may now be processed under the expedited removal provisions of section 235(b)(1) of the Act, if such provisions are invoked by the Commissioner.

### Elimination of Mexican Border Visitor's Permit

The Mexican Border Visitor's Permit, Form I–444, is a record of entry issued by the Service at land border ports-of-entry along the United States/Mexico border to holders of Nonresident Alien Border Crossing Cards, Forms I–186 and I–586. The Nonresident Alien Border Crossing Card is issued in place of a nonimmigrant visa. Currently, Form I–444 is issued when the requested visit to the United States will be for more than 72 hours but less than 30 days in duration or when requested travel is more than 25 miles from the United States/Mexico border but within the five states of Arizona, California, Nevada, New Mexico, or Texas. The Service also issues Form I–444 to Mexican nationals who are in possession of valid Mexican passports and multiple-entry nonimmigrant visas requesting admission to the United States under the limitations described above.

The current Form I–444 has been in use since 1983 and the Service now issues over 200,000 of these forms per month. Due largely to its lack of security features and the absence of standardization between ports, Form I–

444 is widely counterfeited. The Service has been unable to demonstrate that there is a connection between the limits on travel by persons issued Forms I–444 and immigration violations. These restrictions should be lifted and applicants for admission should be admitted as any other person in possession of a B–1 or B–2 visa is admitted.

This regulation proposes to remove references to the issuance of the form and the section requiring a fee for issuance of Form I–444. A provision is added requiring the issuance of Form I–94, and collection of the fee, for Mexican nationals seeking to enter for more than 72 hours and/or to travel further than 25 miles from the United States/Mexico border. The Form I–94 issued to a B–2 visitor for pleasure is normally valid for 6 months. The proposed rule provides in § 235.1(f) that a Form I–94 issued at a land border port-of-entry is valid for multiple entries unless otherwise indicated.

### Streamlining and Updating of Regulations

The President has directed each agency to undertake a review of its regulations for the purpose of reducing the regulations or, when possible, rendering them more readable and comprehensible. See E.O. 12866, 58 FR 51,735 (1993). The Service is engaging in a thorough line-by-line review of all regulations in Title 8 of the Code of Federal Regulations.

### Updated Sections

References to the former section 212(a)(17) of the Act dealing with the Attorney General's consent to apply for readmission have been removed from § 217.2(b) and replaced with the current citation. References throughout 8 CFR part 235 to special inquiry officers have been replaced with the title "immigration judge." References to regional commissioners have been replaced with references to regional directors. The regulatory language contained in §§ 238.1, 238.2, 238.3, and 238.5 has been moved to 8 CFR part 233, to conform with redesignation of those statutory sections by the IIRIRA. Lists of carriers signatory to agreements with the Service for carriage to transit passengers and preinspection have been removed form the regulations and will be maintained by the Headquarters Office of Inspections.

### Terminated Programs

References to initial (not replacement) application procedures in § 235.12 for Form I–777, Northern Mariana Card, have been removed as the application

period for that form expired in July 1990. Section 235.9, dealing with refugee admissions, has been removed as that procedure is no longer followed and its subject is now governed by section 207 of the Act. Provisions in § 211.2 dealing with waivers of passport requirements for third-preference immigrants have been removed as that category of immigrant no longer exists. Terms which were appropriate in referring to exclusion and deportation procedures have been changed to reflect the single removal process.

## Removal of Purely Procedural Matters Involving Only Internal Service Processes

The discussion of internal Service procedures regarding the admission of immigrant children formerly found in § 211.4 has been removed. Language in § 211.5 relating to admission procedures for alien commuters has been removed in favor of placing such information into Service Field Manuals. Examples dealing with alien crewmen, as well as Canadian nationals, have been removed from § 235.1. Part 232 of 8 CFR dealing with the procedures for notification of the master or agent of an arriving vessel when arriving aliens were placed in detention for mental or physical examination has been removed since it is addressed in Service manuals. Language dealing with procedures for completion of entry documents for nonimmigrant aliens, Mexican border crossers, bearers of Mexican diplomatic passports, and paroled aliens in 8 CFR part 235 has been removed. Language in § 235.2 relating to deferred inspection procedures for incapacitated or incompetent aliens has also been removed. Section 235.4 dealing solely with Service procedures for endorsing documents evidencing admission has been revised to address the withdrawal of an application for admission. The former § 251.1(d), dealing with the notations to be made on Service forms when inspecting crewmen, has been incorporated into Service manuals.

## Elimination of Duplication

Duplicative references have been removed. Language in § 217.2, relating to eligibility for the Visa Waiver Pilot Program, has been removed as it merely restates the eligibility requirements contained in the Act. Language in § 217.3 and throughout relating to Visa Waiver Pilot Program participants' eligibility for other immigration benefits and readmission after departure to contiguous territory has been removed as it merely restates the Act and is covered by other regulations in this part.

## Streamlining

Section 211.1. has been restructured in its entirety to make it easier to comprehend. The provisions relating to admission of children of lawful permanent residents formerly contained in § 211.2 have been consolidated into the general waiver provisions of section § 211.1. Language formerly in § 211.2(b) which referred to other code sections by description has been replaced by a simple citation. Sections 211.3, 211.4, and 235.9 have been removed and reserved as their contents are addressed in other sections of this part. The 8 CFR part 251, relating to alien crewmen, longshore work, and vessels has been restructured and clarified.

Unnecessary recitals of the law have been removed in the following: § 211.5(b), relating to forfeiture of an I–551 upon loss of resident status by a commuter alien; and § 217.1, which merely restates statutory language regarding eligibility for admission under the Visa Waiver Pilot Program. The 8 CFR part 217 has been streamlined by consolidating various definitions throughout that part into one section. Confusing language in § 217.3 has been streamlined with regard to readmission under the Visa Waiver Pilot Program of an alien who has departed to contiguous territory or an adjacent island has been streamlined.

## Other Changes

In addition, conforming and purely editorial or grammatical revisions have been made, as appropriate.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant adverse economic impact on a substantial number of small entities because of the following factors. This rule affects only Federal government operations by codifying statutory amendments to the Immigration and Nationality Act primarily regarding the examination, detention, and removal of aliens from the United States. It affects only individuals and does not impose any reporting or compliance requirements on small entities.

## Executive Order 12866

This rule is considered by the Department of Justice to be a ''significant regulatory action'' under Executive Order 12866, section 3(f), because it will have a significant economic impact on the Federal government in excess of $100,000,000. No economic impact is anticipated for state and local governments. The Service projects significant increases in detention-related costs due to the provisions of IIRIRA which mandate the custody of criminal aliens who have committed two or more crimes involving moral turpitude, aliens convicted of firearms offenses, and aliens who have been convicted of an aggravated felony. The type of crime that will qualify as an ''aggravated felony'' has been greatly expanded under IIRIRA. In addition, all aliens, even non-criminal aliens, who are subject to a final administrative order of removal must be held in custody until the alien can be removed from the United States. If the person is not removed within 90 days he or she may be released from custody.

The Commissioner has notified Congress pursuant to section 303(b) of IIRIRA that the Service lacks sufficient space to immediately implement the mandatory custody provisions. This notification will delay for 1 year full implementation of the new mandatory custody provisions. Section 303(b) also provides for an additional 1-year delay in implementation of the mandatory custody provisions upon a second certification that space and personnel are inadequate to comply with the requirement. The Service estimates that the cost to enforce the requirement to detain all criminal aliens will be at least $205,000,000. Of that total, personnel costs account for $65,284,000 which include detention and deportation officers ($32,873,000), investigators ($25,501,000), legal proceedings personnel ($4,968,000), and administrative support ($1,942,000). Non-personnel requirements are projected to be at least $139,732,000 which includes increases in bedspace and related alien custody requirements ($82,782,000—funds 3,600 beds @ $63.00 per day), increases in alien travel expenses ($36,000,000–3,600 removals @ $1,000 each), and detention vehicle expenses ($20,950,000). The Service is currently in the process of projecting the cost of the IIRIRA requirements that we detain all aliens with administratively final orders of deportation pending their removal.

In addition to these detention related costs, the Service estimates that the expenses for training employees on the provisions of the new law and the regulations will be $2,977,500. The cost to the Service related to additional forms or changes needed to current forms is estimated to be $2,000,000 (until the final list of form requirements is completed it is not possible to more accurately assess this cost). Finally, the Department believes there may be some

increases needed for immigration judges to review credible fear determinations made under section 235(b) of the INA.

The EOIR estimates increases in its costs related to IIRIRA-mandated immigration judge review of credible fear determinations (which must be made under stringent time frames) and the prompt immigration judge review which IIRIRA requires of certain expedited removal orders entered against aliens claiming to be lawful permanent residents, asylees or refugees. Further, EOIR projects costs associated with the need for an Immigration Court presence in nearly ever port-of-entry, which will result from the above-mentioned credible fear review and expedited removal review process. Also, there will be costs related to the overall need for an increased Immigration Court presence at existing Service detention centers to support the processing of the additional detainees that will result from the implementation of this rule. Similarly, EOIR anticipates a need for construction of new Immigration Courts at new detention facilities the Service may open as a result of this rule's implementation.

Although there are still a number of unknown variables which could affect the total costs to EOIR to implement its part of the new expedited removal process and to respond to the increased number of detained individuals in proceedings under this rule, EOIR estimates that the total annual cost for EOIR could be as high as $25,000,000. Of that total, the cost for hiring new immigration judges and legal support staff is projected to be $21,300,000. The cost for new video and audio teleconfering equipment is estimated at $3,000,000. Training costs are expected to be approximately $400,000. Finally, forms and other support requirements are estimated to cost $300,000.

## Small Business Regulatory Enforcement Act of 1996

At this time the Department considers this rule a ''major rule'' as defined in 5 U.S.C. § 804(2).

## Executive Order 12612

The regulations proposed herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

## Executive Order 12988

This proposed rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act

The information collection requirements contained in this rule have been forwarded to the Office of Management and Budget under the Paper Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

## List of Subjects

### 8 CFR Part 1

Administrative practice and procedure, Immigration.

### 8 CFR Part 3

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Reporting and recordkeeping requirements.

### 8 CFR Part 204

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 207

Administrative practice and procedure, Refugees, Reporting and recordkeeping requirements.

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 209

Aliens, Immigration, Refugees.

### 8 CFR Part 211

Immigration, Passports and visas, Reporting and recordkeeping requirements.

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

### 8 CFR Part 213

Immigration, Surety bonds.

### 8 CFR Part 214

Administrative practice and procedure, Aliens.

### 8 CFR Part 216

Administrative practice and procedure, Aliens.

### 8 CFR Part 217

Air carriers, Aliens, Maritime carriers, Passports and visas.

### 8 CFR Part 221

Aliens, Surety bonds.

### 8 CFR Part 223

Aliens, Reporting and recordkeeping requirements.

### 8 CFR Part 232

Aliens, Public health.

### 8 CFR Part 233

Administrative practice and procedure, Air carriers, Government contracts, Travel.

### 8 CFR Part 234

Air carriers, Aircraft, Airports, Aliens.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 236

Administrative practice and procedure, Aliens, Immigration.

### 8 CFR Part 237

Aliens.

### 8 CFR Part 238

Administrative practice and procedure, Aliens.

### 8 CFR Part 239

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 240

Administrative practice and procedure, Aliens, Immigration.

### 8 CFR Part 241

Administrative practice and procedure, Aliens, Immigration.

### 8 CFR Part 242

Administrative practice and procedure, Aliens, Immigration.

### 8 CFR Part 243

Administrative practice and procedure, Aliens.

### 8 CFR Part 244

Administrative practice and procedure, Aliens.

**8 CFR Part 245**

Aliens, Immigration, Reporting and recordkeeping requirements.

**8 CFR Part 246**

Administrative practice and procedure, Aliens, Immigration.

**8 CFR Part 248**

Aliens, Immigration, Reporting and recordkeeping requirements.

**8 CFR Part 249**

Aliens, Immigration, Reporting and recordkeeping requirements.

**8 CFR Part 251**

Air carriers, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

**8 CFR Part 252**

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

**8 CFR Part 253**

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

**8 CFR Part 274a**

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

**8 CFR Part 286**

Air carriers, Immigration, Reporting and recordkeeping requirements.

**8 CFR Part 287**

Immigration, Law enforcement officers.

**8 CFR Part 299**

Immigration, Reporting and recordkeeping requirements.

**8 CFR Part 316**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 318**

Citizenship and naturalization.

**8 CFR Part 329**

Citizenship and naturalization, Military personnel, Veterans.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 1—DEFINITIONS**

1. The authority citation for part 1 is revised to read as follows:

**Authority:** 8 U.S.C. 1101.

2. Section 1.1 is amended by revising paragraph (l), and by adding new paragraphs (q) and (r) to read as follows:

**§ 1.1   Definitions.**

\*   \*   \*   \*   \*

(l) The term *immigration judge* means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

\*   \*   \*   \*   \*

(q) The term *arriving alien* means an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.

(r) the term *respondent* means a person named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with § 242.1 of this chapter as it existed prior to April 1, 1997.

**PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

3. The authority citation for part 3 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002.

4. Section 3.1 is amended by revising paragraphs (b)(1), (b)(2), (b)(3), (b)(7), (b)(9), and (b)(10) to read as follows:

**§ 3.1   General authorities.**

\*   \*   \*   \*   \*

(b) \* \* \*

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 236, Subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 240, Subpart E, except that no appeal shall lie from an order of an Immigration Judge under 8 CFR part 240, Subpart F, granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that

a greater period of departure time should have been fixed.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 240.

\*   \*   \*   \*   \*

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 236, Subpart A and 8 CFR part 240, Subpart E.

\*   \*   \*   \*   \*

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 244.

\*   \*   \*   \*   \*

5. Section 3.2 is amended by:

a. Revising the section heading;

b. Revising paragraph (b)(2);

c. Revising paragraph (c)(2) and (c)(3), and by

d. Revising paragraphs (d) through (f), to read as follows:

**§ 3.2   Reopening or reconsideration before the Board of Immigration Appeals.**

\*   \*   \*   \*   \*

(b) \* \* \*

(2) A motion to reconsider a decision must be filed with the Board within 30 days after the mailing of the Board decision or on or before July 31, 1996, whichever is later. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. In removal proceedings pursuant to section 240 of the Act, an alien may file only one motion to reconsider a decision that the alien is removable from the United States.

(c) \* \* \*

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened. Except as provided in paragraph (c)(3) of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the

provisions of § 3.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of § 3.23(b)(4)(iii)(A)(*1*) or § 3.23(b)(4)(iii)(A)(*2*);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

* * * * *

(d) *Departure, deportation, or removal.* A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States.

(e) *Judicial proceedings.* Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of the proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) *Stay of deportation.* Except where a motion is filed pursuant to the provisions of §§ 3.23(b)(4)(ii) and 3.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision

made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

* * * * *

## Subpart B—Immigration Court

b. In Part 3, the heading of Subpart B is revised as set forth above.

7. Section 3.9 is revised to read as follows:

### § 3.9 Chief Immigration Judge.

The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them. The Chief Immigration Judge shall be assisted by Deputy Chief Immigration Judges and Assistant Chief Immigration Judges in the performance of his or her duties. These shall include, but are not limited to:

(a) Establishment of operational policies; and

(b) Evaluation of the performance of Immigration Courts, making appropriate reports and inspections, and taking corrective action where indicated.

8. Section 3.10 is revised to read as follows:

### § 3.10 Immigration Judges.

Immigration Judges, as defined in 8 CFR part 1, shall exercise the powers and duties in this chapter regarding the conduct of exclusion, deportation, removal, and asylum proceedings and such other proceedings which the Attorney General may assign them to conduct.

9. Section 3.11 is revised to read as follows:

### § 3.11 Administrative control Immigration Courts.

An administrative control Immigration Court is one that creates and maintains Records of Proceedings for Immigration Courts within an assigned geographical area. All documents and correspondence pertaining to a Record of Proceeding shall be filed with the Immigration Court having administrative control over that Record of Proceeding and shall not be filed with any other Immigration Court. A list of the administrative control Immigration Courts with their assigned geographical areas will be made available to the public at any Immigration Court.

## Subpart C—Immigration Court—Rules of Procedure

10. In part 3, the heading of Subpart C is revised as set forth above.

11. Section 3.12 is amended by revising the last sentence, and adding a new sentence at the end of the section, to read as follows:

### § 3.12 Scope of rules.

* * * Except where specifically stated, these rules apply to matters before Immigration Judges, including, but not limited to, deportation, exclusion, removal, bond, rescission, departure control, and asylum proceedings. The sole procedures for review of credible fear determinations by Immigration Judges are provided for in § 3.42.

12. Section 3.13 is revised to read as follows:

### § 3.13 Definitions.

As used in this subpart:

*Administrative control* means custodial responsibility for the Record of Proceeding as specified in § 3.11.

*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

*Filing* means the actual receipt of a document by the appropriate Immigration Court.

*Service* means physically presenting or mailing a document to the appropriate party or parties; except that an Order to Show Cause or Notice of Deportation Hearing shall be served in person to the alien, or by certified mail to the alien or the alien's attorney and a Notice to Appear or Notice of Removal Hearing shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.

13. Section § 3.14 is amended by:
a. Revising paragraph (a), and by
b. Adding a new paragraph (c) to read as follows:

### § 3.14 Jurisdiction and commencement of proceedings.

(a) Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the

opposing party pursuant to § 3.32 which indicates the Immigration Court in which the charging document is filed. However, no charging document is required to be filed with the Immigration Court to commence bond proceedings pursuant to §§ 3.19, 236.1(d) and 240.2(b) of this chapter or credible fear determinations pursuant to § 208.30 of this chapter.

\*    \*    \*    \*    \*

(c) Immigration Judges have jurisdiction to administer the oath of allegiance in administrative naturalization ceremonies conducted by the Service in accordance with § 337.2(b) of this chapter.

14. Section 3.15 is amended by:
a. Revising the section heading;
b. Amending paragraph (b) introductory text and paragraph (b)(6), by adding the phrase ''and Notice to Appear'' immediately after the phrase ''Order to Show Cause'';
c. Redesignating paragraph (c) as (d);
d. Adding a new paragraph (c); and by
e. Revising newly redesignated paragraph (d), to read as follows:

**§ 3.15  Contents of the order to show cause and notice to appear and notification of change of address.**

\*    \*    \*    \*    \*

(c) *Contents of the Notice to Appear for Removal Proceedings.* In the Notice to Appear for removal proceedings, the Service shall provide the following administrative information to the Immigration Court. Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;

(2) The alien's address;

(3) The alien's registration number, with any lead alien registration number with which the alien is associated;

(4) The alien's alleged nationality and citizenship; and

(5) The language that the alien understands.

(d) *Address and telephone number.* (1) If the alien's address is not provided on the Order to Show Cause or Notice to Appear, or if the address on the Order to Show Cause or Notice to Appear is incorrect, the alien must provide to the Immigration Court where the charging document has been filed, within five days of service of that document, a written notice of an address and telephone number at which the alien can be contacted. The alien may satisfy this requirement by completing and filing Form EOIR–33.

(2) Within five days of any change of address, the alien must provide written notice of the change of address on Form

EOIR–33 to the Immigration Court where the charging document has been filed, or if venue has been changed, to the Immigration Court to which venue has been changed.

**§ 3.16  [Amended]**

15. Section 3.16(b) is amended by revising the term ''respondent/ applicant'' to read ''alien''.

**§ 3.17  [Amended]**

16. Section 3.17(a) is amended in the first sentence by revising the term ''respondent/applicant'' to read ''alien'', and by revising the phrase ''the appropriate EOIR form'' to read ''Form EOIR–28''.

17. Section 3.18 is revised to read as follows:

**§ 3.18  Scheduling of cases.**

(a) The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.

(b) In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing. In the case of any change or postponement in the time and place of such proceeding, the Immigration Court shall provide written notice to the alien specifying the new time and place of the proceeding and the consequences under section 240(b)(5) of the Act of failing, except under exceptional circumstances as defined in section 240(e)(1) of the Act, to attend such proceeding. No such notice shall be required for an alien not in detention if the alien has failed to provide the address required in section 239(a)(1)(F) of the Act.

**§ 3.19  [Amended]**

18. Section 3.19(a) is amended by revising the reference to ''part 242 of this chapter'' to read ''8 CFR part 236'' wherever it appears in the paragraph.

19. Section 3.19(d) is amended in the first sentence by adding the term ''or removal'' immediately after the word ''deportation''.

20. Section 3.19 is amended by removing paragraph (h).

21. In § 3.20, paragraph (a) is revised to read as follows:

**§ 3.20  Change of venue.**

(a) Venue shall lie at the Immigration Court where jurisdiction vests pursuant to § 3.14.

\*    \*    \*    \*    \*

22. Section 3.23 is amended by revising the section heading and paragraph (b) to read as follows:

**§ 3.23  Reopening or Reconsideration before the Immigration Court.**

\*    \*    \*    \*    \*

(b) *Before the Immigration Court.* (1) *In general.* An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4) of this section, a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act, or to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

(i) *Form and contents of the motion.* The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject

of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) *Filing.* Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party, other than the Service, is represented, a Form EOIR–28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) *Assignment to an Immigration Judge.* If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) *Replies to motions; decision.* The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) *Stays.* Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) *Motion to reconsider.* A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) *Motion to reopen.* A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A

motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice top appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) *Exceptions to filing deadlines.*

(i) *Asylum.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for relief under section 208 or 241(b)(3) of the Act and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien many request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) *Order entered in absentia in removal proceedings.* An order of removal entered in absentia pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien demonstrates that the failure to appear was because of "exceptional circumstances" as defined in section

240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a) (1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding small be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion to reopen under this section shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) *Order entered in absentia in deportation or exclusion proceedings.* (A) An order entered in absentia in deportation proceedings may be rescinded only upon a motion to reopen filed:

(*1*) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of "exceptional circumstances" beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(*2*) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraphs (b)(4)(iii)(A)(*1*) of this section.

(iv) *Jointly filed motions.* The time and numerical limitations set forth in subsection (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

23. Section 3.25 is revised to read as follows:

**§ 3.25    Form of the proceeding.**

(a) *Waiver of presence of the parties.* The Immigration Judge may, for good cause, and consistent with section 240(b) of the Act, waive the presence of the alien at a hearing when the alien is represented or when the alien is a minor child at least one of whose parents or whose legal guardian is present. When it is impracticable by reason of an alien's mental incompetency for the alien to be present, the presence of the alien may be waived provided that the alien is represented at the hearing by an attorney or legal representative, a near relative, legal guardian, or friend.

(b) *Stipulated request for order, waiver of hearing.* An Immigration Judge may enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representative) and the Service. The Immigration Judge may enter such an order without a hearing and in the absence of the parties based on a review of the charging document, the written stipulation, and supporting documents, if any. If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any. The attorney or representative shall file a Notice of Appearance in accordance with § 3.16(b). A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States. The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as written;

(2) A concession of deportability or inadmissibility as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and

(8) A waiver of appeal of the written order of deportation or removal.

(c) *Telephonic or video hearings.* An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person. An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference, except that credible fear determinations may be reviewed by the Immigration Judge through a telephone conference without the consent of the alien.

24. Section 3.26 is amended by revising paragraph (c) and adding a new paragraph (d) to read as follows:

**§ 3.26    In absentia hearings.**

\*    \*    \*    \*    \*

(c) In any removal proceeding before an Immigration Judge in which the alien fails to appear, the Immigration Judge shall order the alien removed *in absentia* if:

(1) The Service establishes by clear, unequivocal, and convincing evidence that the alien is removable; and

(2) The Service establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien.

(d) Written notice to the alien shall be considered sufficient for purposes of this section if it was provided at the most recent address provided by the alien. If the respondent fails to provide his or her address as required under § 3.15(d), no written notice shall be required for an Immigration Judge to proceed with an *in absentia* hearing. This paragraph shall not apply in the event that the Immigration Judge waives the appearance of an alien under § 3.25.

25. Section 3.27 is amended by revising paragraph (c) to read as follows:

**§ 3.27    Public access to hearings.**

\*    \*    \*    \*    \*

(c) In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

26. Section 3.30 is revised to read as follows:

**§ 3.30    Additional charges in deportation or removal hearings.**

At any time during deportation or removal proceedings, additional or substituted charges of deportability and/or factual allegations may be lodged by the Service in writing. The alien shall be served with a copy of these additional charges and/or allegations and the Immigration Judge shall read them to the alien. The Immigration Judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented. The alien may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.10(b) of this chapter relating to pleading shall apply to the additional factual allegations and charges.

27. Section 3.35 is revised to read as follows:

**§ 3.35    Depositions and Subpoenas.**

(a) *Depositions.* If an Immigration Judge is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence is essential, the Immigration Judge may order the taking of deposition either at his or her own instance or upon application of a party. Such order shall designate the official by whom the deposition shall be taken, may prescribe and limit the content, scope, or manner of taking the deposition, and may direct the production of documentary evidence.

(b) *Subpoenas issued subsequent to commencement of proceedings.* (1) *General.* In any proceeding before an Immigration Judge, other than under 8 CFR part 335, the Immigration Judge shall have exclusive jurisdiction to issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. An Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien.

(2) *Application for subpoena.* A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

(3) *Issuance of subpoena.* Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence

is essential, the Immigration Judge shall issue a subpoena. The subpoena shall state the title of the proceeding and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. The subpoena may also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena.

(4) *Appearance of witness.* If the witness is at a distance of more than 100 miles from the place of the proceeding, the subpoena shall provide for the witness' appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless there is no objection by any party to the witness' appearance at the proceeding.

(5) *Service.* A subpoena issued under this section may be served by any person over 18 years of age not a party to the case.

(6) *Invoking aid of court.* If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the Immigration Judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers or documents designated in the subpoena.

28. In Subpart C, a new § 3.42 is added to read as follows:

**§ 3.42 Review of credible fear determination.**

(a) *Referral.* Jurisdiction for an Immigration Judge to review an adverse credible fear finding by an asylum officer pursuant to section 235(b)(1)(B) of the Act shall commence with the filing by the Service to Form I–863, Notice of Referral to Immigration Judge. The Service shall also file with the notice of referral a copy of the written record of determination as defined in section 235(b)(1)(B)(iii)(II) of the Act, including a copy of the alien's written request for review, if any.

(b) *Record of proceeding.* The Immigration Court shall create a Record of Proceeding for a review of an adverse credible fear determination. This record shall be merged with any later proceeding pursuant to section 240 of the Act involving the same alien.

(c) *Procedures and evidence.* The Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review. The testimony of the alien shall be under oath or affirmation administered by the Immigration Judge. If an interpreter is necessary, one will be provided by the Immigration Court. The Immigration Judge shall determine whether the review shall be in person, or through telephonic or video connection (where available). The alien may consult with a person or persons of the alien's choosing prior to the review.

(d) *Standard of review.* The Immigration Judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the Immigration Judge, that the alien could establish eligibility for asylum under section 208 of the Act.

(e) *Timing.* The Immigration Judge shall conclude the review to the maximum extent practicable within 24 hours, but in no case later than 7 days after the determination of the asylum officer.

(f) *Decision.* If an Immigration Judge determines that an alien has a credible fear of persecution, the Immigration Judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I–862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum in the course of removal proceedings pursuant to section 240 of the Act. If an Immigration Judge determines that an alien does not have a credible fear of persecution, the Immigration Judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an Immigration Judge.

(g) *Custody.* An Immigration Judge shall have no authority to review an alien's custody status in the course of a review of an adverse credible fear determination made by the Service.

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**

29. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR. 14874, 15557; 3 CFR, 1982 Comp. p. 166; 8 CFR part 2.

30. In § 1301, paragraph (g)(3)(ii) is revised to read as follows:

**§ 103.1 Delegations of authority.**

\* \* \* \* \*

(g) \* \* \*

(3) \* \* \*

(ii) *Asylum Officers.* Asylum officers constitute a professional corps of officers who serve under the supervision and direction of the Director of International Affairs and shall be specially trained as required in § 208.1(b) of this chapter. Asylum officers are delegated the authority to hear and adjudicate credible fear of persecution determinations under section 235(b)(1)(B) of the Act and applications for asylum and for withholding of removal, as provided under 8 CFR part 208.

\* \* \* \* \*

**§ 103.5 [Amended]**

31. Section 103.5 is amended by:
a. Removing paragraphs (a)(1)(iii)(B);
b. Redesignating paragraphs (a)(1)(iii) (C) through (F) as paragraphs (a)(1)(iii) (B) through (E), respectively; and
c. Removing paragraph (a)(5)(iii).

32. In § 103.5a, paragraph (c)(1) is revised to read as follows:

**§ 103.5a Service of notification, decisions, and other papers by the Service.**

\* \* \* \* \*

(c) \* \* \*

(1) *Generally.* In any proceeding which is initiated by the Service, with proposed adverse effect, service of the initiating notice and of notice of any decision by a Service officer shall be accomplished by personal service, except as provided in section 239 of the Act.

\* \* \* \* \*

33. In § 103.6, paragraph (a) is revised to read as follows:

**§ 103.6 Surety bonds.**

(a) *Posting of surety bonds.*—(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases shall be executed on Form I–352, Immigration Bond, a copy of which, and any rider attached thereto, shall be furnished the obligor. A district director is authorized to approve a bond, a formal agreement to extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on Form I–312, Designation of Attorney in Fact. All other matters relating to bonds, including a power of attorney not

executed on Form I–312 and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, shall be forwarded to the regional director for approval.

(2) *Bond riders.*—(i) *General.* Bond riders shall be prepared on Form I–351, Bond Riders, and attached to Form I–352. If a condition to be included in a bond is not on Form I–351, a rider containing the condition shall be executed.

\* \* \* \* \*

### § 103.7 [Amended]

34. Section 103.7(b)(1) is amended by removing the entry to "Form I–444".

## PART 204—IMMIGRANT PETITIONS

35. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255; 8 CFR part 2.

36. Section 204.2 is amended by:

a. Revising paragraph (a)(1)(iii) introductory text;

b. Removing paragraphs (a)(1)(iii) (A) through (C); and

c. Redesignating paragraphs (a)(1)(iii) (D) through (I) as paragraphs (a)(1)(iii) (A) through (F) respectively, to read as follows:

### § 204.2 Petitions for relatives, widows, and widowers, and abused spouses and children.

\* \* \* \* \*

(a) \* \* \*

(1) \* \* \*

(iii) *Marriage during proceedings— general prohibition against approval of visa petition.* A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(8) of this chapter.

\* \* \* \* \*

## PART 207—ADMISSION OF REFUGEES

37. The authority citation for part 207 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

38. Section 207.1 is amended by removing paragraph (e), and by revising paragraph (a) to read as follows:

### § 207.1 Eligibility.

(a) *Filing jurisdiction.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by filing an application in accordance with § 207.2 with the Service office having jurisdiction over the area where the applicant is located. In those areas too distant from a Service office, the application may be filed at a designated United States consular office.

\* \* \* \* \*

39. Section 207.3 is revised to read as follows:

### § 207.3 Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved. Officers in charge of overseas offices are delegated authority to initiate the necessary investigations to establish the facts in each waiver application pending before them and to approve or deny such waivers.

(b) *Filing requirements.* The applicant for a waiver must submit Form I–602, Application by Refugee for Waiver of Grounds of Inadmissibility, with the Service office processing his or her case. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial, if the application is denied. There is no appeal from such decision.

### § 207.8 [Amended]

40. Section 207.8 is amended in the last sentence by revising the reference to "sections 235, 236, and 237" to read "sections 235, 240, and 241".

41. Part 208 is revised to read as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

Subpart A—Asylum and Withholding of Removal

Sec.
208.1   General.
208.2   Jurisdiction.
208.3   Form of application.
208.4   Filing the application.
208.5   Special duties toward aliens in custody of the Service.
208.6   Disclosure to third parties.
208.7   Employment authorization.
208.8   Limitations on travel outside the United States.
208.9   Procedure for interview before an asylum officer.
208.10   Failure to appear at an interview before an asylum officer.
208.11   Comments from the Department of State.
208.12   Reliance on information compiled by other sources.
208.13   Establishing asylum eligibility.
208.14   Approval, denial, or referral of application.
208.15   Definition of "firm resettlement."
208.16   Withholding of removal.
208.17   Decisions.
208.18   Determining if an asylum application is frivolous.
208.19   [Reserved]
208.20   Effect on exclusion, deportation, and removal proceedings.
208.21   Restoration of status.
208.22   Termination of asylum or withholding or removal or deportation.
208.23–29   [Reserved]

Subpart B—Credible Fear of Persecution

208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

## Subpart A—Asylum and Withholding of Removal

### § 208.1 General.

(a) *Applicability.* Unless otherwise provided herein, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(c) of this chapter. Such applications are hereinafter referred to generically as asylum applications. The provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where

applicable. The provisions of this part relating to a person convicted of an aggravated felony, as defined in section 101(a)(43) of the Act, shall apply to asylum applications that are filed on or after November 29, 1990.

(b) *Training of asylum officers.* The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race, religion, nationality, membership in a particular social group, or political opinion, as well as other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

### § 208.2 Jurisdiction.

(a) *Office of International Affairs.* Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. An application that is complete within the meaning of § 208.3(c)(3) shall be either adjudicated or referred by asylum officers under this part in accordance with § 208.14. An application that is incomplete within the meaning of § 208.3(c)(3) shall be returned to the applicant. Except as provided in § 208.16(a), an asylum officer shall not decide whether an alien is entitled to withholding of removal under section 241(b)(3) of the Act.

(b) *Immigration Court.* (1) *Certain aliens not entitled to proceedings under section 240 of the Act.* After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewman who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) Has been granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution pursuant to the procedure set forth in Subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under section 235(c) of the Act; or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act.

(2) *Rules of procedure.* Proceeding falling under the jurisdiction of the immigration judge pursuant to paragraph (b)(1) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, except the scope of review shall be limited to a determination of whether the alien is eligible for asylum or withholding of removal and whether asylum shall be granted in the exercise of discretion. During such proceeding all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, removability, eligibility for waivers, and eligibility for any form of relief other than asylum or withholding of removal.

(3) *other aliens.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crew members who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program.

### § 208.3 Form of application.

(a) An asylum applicant must file, in triplicate, Form I–589 together with any additional supporting material. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One

additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application. An application shall be accompanied by one completed fingerprint card, Form FD–258, for every individual included in the application who is 14 years of age or older. The application also shall be accompanied by two photographs of the applicant and of each dependent included in the application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to its amendment by Pub. L. 104–208.

(c) Form I–589 shall be filed under the following conditions and shall have the following consequences:

(1) Information provided on the application may be used as a basis for the institution of or as evidence in removal proceedings, and in deportation and exclusion proceedings where the application has been filed on or after January 4, 1995, as well as to satisfy the Service's burden of proof in such proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature is evidence that the applicant is a aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I–589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filling of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with § 208.7. An application that is incomplete shall be retuned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete;

(4) Knowing placement of false information on the application may

subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil penalties under section 274C of the Act; and

(5) Knowing filing of a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 208.18.

### § 208.4 Filing the application.

Except as prohibited in paragraph (a) of this section, asylum applications shall be filed in accordance with paragraph (b) of this section.

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate that the exceptions in section 208(a)(2)(D) of the Act apply. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) For the purpose of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals;

(2) The term ''changed circumstances'' in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum that have arisen:

(i) For the purpose of section 208(a)(2)(C) of the Act, since the denial of the last asylum application by the alien. Changed circumstances arising after the denial of the application but before the alien's departure or removal from the United States shall only be considered as part of a motion to reopen under section 240(c)(6) of the Act and §§ 3.2, 3.23 and 103.5 of this chapter; or

(ii) For the purpose of section 208(a)(2)(B) of the Act, since the 1-year period has expired; and

(3) The term ''extraordinary circumstances'' in section 208(a)(2)(D) of the Act shall refer to events or factors beyond the alien's control that caused the failure to meet the 1-year deadline. Such circumstances shall excuse the failure to file within the 1-year period so long as the alien filed the application as soon after the deadline as practicable given those circumstances.

(b) *Filing location.* (1) *With the service center by mail.* Except as provided in paragraphs (b)(2), (b)(3), (b)(4) and (b)(5) of this section, asylum applications shall be filed directly by mail with the service center servicing the asylum office with jurisdiction over the place of the applicant's residence or, in the case of an alien without a United States residence, the applicant's current lodging or the land border port-of-entry through which the alien seeks admission to the United States.

(2) *With the asylum office.* Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so.

(3) *With the immigration judge.* Aslyum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings

(iii) In asylum proceedings pursuant to § 208.2(b)(1) and after the Notice of Referral to Immigration Judge has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) *With the Board of Immigration Appeals.* In conjunction with a motion to remand or reopen pursuant to §§ 3.2 and 3.8 of this chapter where applicable, an initial asylum application shall be filed with the Board of Immigration Appeals if jurisdiction over the proceedings is vested in the Board of Immigration Appeals under 8 CFR part 3. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(5) *With the district director.* In the case of any alien described in § 208.2(b)(1) and prior to the service on the alien of Form I–863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. The district director shall forward such asylum application to the appropriate Immigration Court with the Form I–863 being filed with that Immigration Court.

(c) *Amending an application after filing.* Upon request of the alien and as a matter of discretion, the asylum officer or immigration judge having jurisdiction may permit an asylum applicant to amend or supplement the application, but any delay caused by such request shall extend the period within which the application may not apply for employment authorization in accordance with § 208.7(a).

### § 208.5 Special duties toward aliens in custody of the Service.

(a) *General.* When an alien in the custody of the Service requests asylum or withholding of removal or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear of persecution determination under section 235(b)(1)(B) of the Act. Where possible, expedited consideration shall be given to applications of detained aliens. Except as provided in paragraph (c) of this section, such alien shall not be excluded, deported, or removed before a decision is rendered on his or her asylum application.

(b) *Certain aliens aboard vessels.* (1) If an alien crewman or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

(i) An alien stowaway will be referred to an asylum officer for a credible fear determination under § 208.30.

(ii) An alien crewman shall be provided the appropriate applications forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port of entry. The district director, pursuant to § 208.4(b), shall serve Form I–863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I–863 being filed with that court.

(2) Pending adjudication of the application, and, in the case of a

stowaway the credible fear determination and any review thereof, the alien may be detained by the Service or otherwise paroled in accordance with § 212.5 of this chapter. However, pending the credible fear determination, parole of an alien stowaway may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(c) *Exception to prohibition on removal.* A motion to reopen or an order to remand accompanied by an asylum application pursuant to § 208.4(b)(3)(iii) shall not stay execution of a final exclusion, deportation, or removal order unless such stay is specifically granted by the Board of Immigration Appeals or the immigration judge having jurisdiction over the motion.

### § 208.6 Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service that indicate that a specific alien has applied for asylum shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentially of these records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The defense of any legal action arising from the adjudication of or failure to adjudicate the asylum application;

(iii) The defense of any legal action of which the asylum application is a part; or

(iv) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, state, or local court in the United States considering any legal action:

(i) Arising from the adjudication of or failure to adjudicate the asylum application; or

(ii) Arising from the proceedings of which the asylum application is a part.

### § 208.7 Employment authorization.

(a) *Application and approval.* (1) Subject to the restrictions contained in sections 236(a) and 208(d) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§ 274a.12(c)(8) and 274a.13(a) of this chapter to submit a Form I–765, Application for Employment Authorization. The application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§ 208.3 and 208.4 has been received. If an asylum application has been returned as incomplete in accordance with § 208.3(c)(3), the 150-day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150-day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I–765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

(2) Employment authorization pursuant to § 274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(3) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§ 208.3 and 208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods. Such time periods also shall be extended by the equivalent of the time between issuance of a request for evidence under § 103.2(b)(8) of this chapter and the receipt of the applicant's response to such request.

(4) The provisions of paragraphs (a) (1) through (3) of this section apply to applications for asylum filed on or after January 4, 1995.

(b) *Renewal and termination.* Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I–765, the required fee (unless waived in accordance with § 103.7(c) of this chapter), and (if applicable) proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus

pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

## § 208.8 Limitations on travel outside the United States.

(a) An applicant who leaves the United States without first obtaining advance parole under § 212.5(e) of this chapter shall be presumed to have abandoned his or her application under this section.

(b) An applicant who leaves the United States pursuant to advance parole under § 212.5(e) of this chapter and returns to the country of claimed persecution shall be presumed to have abandoned his or her application, unless the applicant is able to establish compelling reasons for such return.

## § 208.9 Procedure for interview before an asylum officer.

(a) The Service shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of § 208.3(c)(3) and is within the jurisdiction of the Service.

(b) The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity electronically or through any other means designated by the Attorney General. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

(d) Upon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented. The asylum officer may, in his or her discretion, limit the length of such statement or comment and may require their submission in

writing. Upon completion of the interview, the applicant shall be informed that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision shall be treated as delay caused by the applicant for purposes of § 208.7(a)(3) and shall extend the period within which the applicant may not apply for employment authorization by the number of days until the applicant does appear to receive and acknowledge receipt of the decision or until the applicant appears before an immigration judge in response to the issuance of a charging document under § 208.14(b).

(e) The asylum officer shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview. As a matter of discretion, the asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by § 208.7 for the filing and adjudication of any employment authorization application.

(f) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by the Service, and any other information specific to the applicant's case and considered by the asylum officer shall comprise the record.

(g) An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure without good cause to appear for the interview for purposes of § 208.10.

## § 208.10 Failure to appear at an interview before an asylum officer.

Failure to appear for a scheduled interview without prior authorization may result in dismissal of the

application, waiver of the right to an interview, or denial of any application for an employment authorization document. Failure to appear shall be excused if the notice of the interview was not mailed to the applicant's current address and such address had been provided to the Office of International Affairs by the applicant prior to the date of mailing in accordance with section 265 of the Act and regulations promulgated thereunder, unless the asylum officer determines that the applicant received reasonable notice of the interview. Failure to appear will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances.

## § 208.11 Comments from the Department of State.

(a) The Service shall forward to the Department of State a copy of each completed application it receives. At its option, the Department of State may provide detailed country conditions information relevant to eligibility for asylum or withholding of removal.

(b) At its option, the Department of State may also provide:

(1) An assessment of the accuracy of the applicant's assertions about conditions in his or her country of nationality or habitual residence and his or her particular situation;

(2) Information about whether persons who are similarly situated to the applicant are persecuted in his or her country of nationality or habitual residence and the frequency of such persecution; or

(3) Such other information as it deems relevant.

(c) Asylum officers and immigration judges may request specific comments from the Department of State regarding individual cases or types of claims under consideration, or such other information as they deem appropriate.

(d) Any such comments received pursuant to paragraphs (b) and (c) of this section shall be made part of the record. Unless the comments are classified under the applicable Executive Order, the applicant shall be provided an opportunity to review and respond to such comments prior to the issuance of any decision to deny the application.

## § 208.12 Reliance on information compiled by other sources.

(a) In deciding an asylum application, or whether the alien has a credible fear of persecution pursuant to section 235(b)(1)(B) of the Act, the asylum officer may rely on material provided by the Department of State, the Office of

International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State.

**§ 208.13   Establishing asylum eligibility.**

(a) *Burden of proof.* The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien from the additional burden of establishing eligibility for asylum.

(b) *Persecution.* The applicant may qualify as a refugee either because he or she has suffered actual past persecution or because he or she has a well-founded fear of future persecution.

(1) *Past persecution.* An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past

persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section.

(2) *Well-founded fear of persecution.* An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of actually suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear. In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

(c) *Mandatory denials.* (1) *Applications filed on or after April 1, 1997.* For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the evidence indicates that the applicant may be ineligible under section 208(a)(2) of the Act to apply for asylum, or under section 208(b)(2) of the Act to be granted asylum, the applicant shall have the burden of proving by a preponderance of the evidence, or in the case of an alien described in section 208(a)(2)(B) of the Act by clear and convincing evidence, that he or she is eligible.

(2) *Applications filed before April 1, 1997.* An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(i) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(ii) Has been firmly resettled within the meaning of § 208.15;

(iii) Can reasonably be regarded as a danger to the security of the United States;

(iv) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(v) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(d) *Discretionary denial.* An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

**§ 208.14   Approval, denial, or referral of application.**

(a) *By an immigration judge.* Unless otherwise prohibited in § 208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) *By an asylum officer.* Unless otherwise prohibited in § 208.13(c):

(1) An asylum officer may grant asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(2) If the alien appears to be deportable, excludable or removable under section 240 of the Act, the asylum officer shall either grant asylum or refer the application to an immigration judge for adjudication in deportation, exclusion, or removal proceedings. An asylum officer may refer such an application after an interview conducted in accordance with § 208.9 or if, in accordance with § 208.10, the applicant is deemed to have waived his or her right to an interview.

(3) If the applicant is maintaining valid nonimmigrant status at the time the application is decided, the asylum officer may grant or deny asylum, except in the case of an applicant described in § 208.2(b)(1).

(c) *Applicability of § 103.2(b) of this chapter.* No application for asylum or withholding of deportation shall be subject to denial pursuant to § 103.2(b) of this chapter.

(d) *Duration.* If the alien's asylum application is granted, the grant will be effective for an indefinite period, subject to termination as provided in § 208.22.

**§ 208.15  Definition of "firm resettlement."**

An alien is considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he establishes:

(a) That his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation; or

(b) That the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he was not in fact resettled. In making his determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

**§ 208.16  Withholding of removal.**

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) *Eligibility for withholding of removal; burden of proof.* The burden of proof is on the applicant for withholding of removal to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) The applicant's life or freedom shall be found to be threatened if it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) If the applicant is determined to have suffered persecution in the past such that his or her life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that his or her life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

(3) In evaluating whether the applicant has sustained the burden of proving that his or her life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that there is a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return.

(c) *Approval or denial of application.* (1) *General.* Subject to paragraphs (c)(2) and (c)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraph (b) of this section.

(2) *Mandatory denials.* Except as provided in paragraph (c)(3) of this section, an application for withholding of removal shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of

the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Pub. L. 104–132, shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(d) *Reconsideration of discretionary denial of asylum.* In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

**§ 208.17  Decisions.**

The decision of an asylum officer to grant or to deny asylum or withholding of removal, or to refer an asylum application in accordance with § 208.14(b), shall be communicated in writing to the applicant. Notices of decisions to grant or deny asylum by asylum officers shall generally be served in person unless, in the discretion of the asylum office director, routine service by mail is appropriate. A letter communicating denial of the

**AR01842**

application shall state the basis for denial of the asylum application. The letter also shall contain an assessment of the applicant's credibility, unless the denial is the result of the applicant's conviction of an aggravated felony. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision.

### § 208.18 Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. An asylum application is frivolous if it is fabricated or is brought for an improper purpose. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

### § 208.19 [Reserved]

### § 208.20 Effect on exclusion, deportation and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.22. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation may not be deported or removed to the country to which his or her deportation or removal is ordered withheld unless the withholding order is terminated pursuant to § 208.22.

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this chapter, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.22(e).

### § 208.21 Restoration of status.

An alien who was maintaining his or her nonimmigrant status at the time of filing an asylum application and has such application denied may continue in or be restored to that status, if it has not expired.

### § 208.22 Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by the Service.* Except as provided in

paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

(1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;

(2) As to the applications filed on or after April 1, 1997, one or more of the conditions described in section 208(c)(2) of the Act exist; or

(3) As to applications filed before April 1, 1997, the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence or the alien has committed any act that would have been grounds for denial of asylum under § 208.14(e)(2).

(b) *Termination of withholding of deportation or removal by the Service.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of an asylum officer or a district director if the asylum officer determines, following an interview, that:

(1) The alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld;

(2) There is a showing of fraud in the alien's application such that the alien was not eligible for withholding of removal at the time it was granted;

(3) The alien has committed any other act that would have been grounds for denial of withholding of removal under section 241(b)(3)(B) of the Act had it occurred prior to the grant of withholding of removal; or

(4) For applications filed in proceedings commenced before April 1, 1997, the alien has committed any act that would have been grounds for denial of withholding of deportation under section 243(h)(2) of the Act.

(c) *Procedure.* Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice

that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

(d) *Termination of derivative status.* The termination of asylum status for a person who was the principal applicant shall result in termination of the asylum status of a spouse or child whose status was based on the asylum application of the principal. Such termination shall not preclude the spouse or child of such alien from separately asserting an asylum or withholding of deportation or removal claim.

(e) *Termination of asylum or withholding of deportation or removal by the Executive Office for Immigration Review.* An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to § 3.2 or § 3.23 of this chapter for the purpose of terminating a grant of asylum or withholding of deportation or removal made under the jurisdiction of an immigration judge. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum or withholding of deportation or removal made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation or removal proceeding.

(f) *Termination of asylum for arriving aliens.* If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in section 208(c)(2) of the Act and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

### §§ 208.23–208.29 [Reserved]

### Subpart B—Credible Fear of Persecution

### § 208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive

Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (e) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and review under section 235(b)(1)(B) of the Act.

(b) *Interview and procedure.* The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner and separate and apart from the general public. At the time of the interview, the alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence when available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a brief statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence.

(c) *Authority.* Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

(d) *Referral for an asylum hearing.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–862, Notice to Appear, for full consideration of the asylum claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–863, Notice to Referral to

Immigration Judge, for full consideration of the asylum claim in proceedings under § 208.2(b)(1).

(e) *Removal of aliens with no credible fear of persecution.* If an alien, other than an alien stowaway, is found not to have a credible fear of persecution, the asylum officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal. If an alien stowaway is found not to have a credible fear of persecution, the asylum officer shall order the alien removed from the United States in accordance with section 235(a)(2) of the Act. The asylum officer shall also advise the alien of his or her right to request that an immigration judge review the negative decision.

(f) *Review by immigration judge.* The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's verbal or written request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. If the alien requests such review, the asylum officer shall arrange for the detention of the alien and serve him or her with a Form I–863, Notice of Referral to Immigration Judge. Copies of the Form I–863, the asylum officer's notes, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative credible fear determination:

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution, the case shall be returned to the Service for removal of the alien.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an asylum application in accordance with § 208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution, the alien shall be allowed to file an asylum application before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the asylum application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the asylum application becomes final, the alien shall be removed from the United States

in accordance with section 235(a)(2) of the Act. If and when an approval of the asylum application becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

# PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

42. The authority citation for part 209 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; 8 CFR part 2.

### § 209.1 [Amended]

43. In § 209.1, paragraph (a)(1) is amended in the first sentence by revising the reference to '', 236, and 237'' to read ''and 240''.

44. In § 209.2, the last sentence of paragraph (c) is revised to read as follows:

### § 209.2 Adjustment of status of alien granted asylum.

\* \* \* \* \*

(c) *Application.* \* \* \* If an alien has been placed in deportation, exclusion, or removal proceedings under any section of this Act (as effective on the date such proceedings commenced), the application can be filed and considered only in those proceedings.

\* \* \* \* \*

# PART 211—DOCUMENTARY REQUIREMENTS; IMMIGRANTS; WAIVERS

45. The authority citation for part 211 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

46. Part 211 is revised to read as follows:
Sec.
211.1  Visas.
211.2  Passports.
211.3  Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I–551.
211.4  Waiver of documents for returning residents.
211.5  Alien commuters.

### § 211.1  Visas.

(a) *General.* Except as provided in paragraph (b) of this section, each arriving alien applying for admission (or boarding the vessel or aircraft on which he or she arrives) into the United States for lawful permanent residence, or as a returning lawful permanent resident, shall present one of the following:

(1) A valid, unexpired immigrant visa;

(2) A valid, unexpired Form I–551, Alien Registration Receipt Card, if seeking readmission after a temporary

absence of less than one year, or in the case of a crewmember regularly serving on board a vessel or aircraft of United States registry seeking readmission after any job-connected absence;

(3) A valid, unexpired Form I–327, Permit to Reenter the United States;

(4) A valid, unexpired Form I–571, Refugee Travel Document, properly endorsed to reflect admission as a lawful permanent resident;

(5) An expired Form I–551, Alien Registration Receipt Card, accompanied by a filing receipt issued within the previous six months for either a Form I–751, Petition to Remove the Conditions on Residence, or Form I–829, Petition by Entrepreneur to Remove Conditions, if seeking admission or readmission after a temporary absence of less than one year;

(6) A Form I–551, whether or not expired, presented by a civilian or military employee of the United States Government, who was outside the United States pursuant to official orders, or the spouse or child of such employee who is preceding, accompanying or following to join within four months the employee, returning to the United States; or

(7) Form I–551, whether or not expired, or a transportation letter issued by an American consular officer, presented by an employee of the American University of Beirut, returning temporarily to the United States before resuming employment with the American University of Beirut, or resuming permanent residence in the United States.

(b) *Waivers.* (1) A waiver of the visa required in paragraph (a) of this section shall be granted without fee by the district director, upon presentation of the child's birth certificate, to a child born subsequent to the issuance of an immigrant visa to his or her accompanying parent who applies for admission during the validity of such a visa; or a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within two years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States.

(2) For an alien described in paragraph (b)(1) of this section, recordation of the child's entry shall be on Form I–181, Memorandum of Creation of Record of Admission for Lawful Permanent Residence. The carrier of such alien shall not be liable for a fine pursuant to section 273 of the Act.

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an immigrant visa, Form I–551, or reentry permit, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter, *except* that if the alien's Form I–551 was lost or stolen, the alien shall instead file Form I–90, Application to Replace Alien Registration Receipt Card, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of an immigrant visa, Form I–551, or reentry permit and admit the alien as a returning resident, if the district director is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, Form I–551, or reentry permit.

(c) *Immigrants having occupational status defined in section 101(a)(15) (A), (E), or (G) of the Act.* An immigrant visa, reentry permit, or Form I–551 shall be invalid when presented by an alien who has an occupational status under section 101(a)(15) (A), (E), or (G) of the Act, unless he or she has previously submitted, or submits at the time he or she applies for admission to the United States, the written waiver required by section 247(b) of the Act and 8 CFR part 247.

(d) *Returning temporary residents.* (1) Form I–688, Temporary Resident Card, may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 210.1 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within one year after a temporary absence abroad.

(2) Form I–688 may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 245a.2 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within 30 days after a temporary absence abroad, provided that the aggregate of all such absences abroad during the temporary residence period has not exceeded 90 days.

### § 211.2 Passports.

(a) A passport valid for the bearer's entry into a foreign country at least 60 days beyond the expiration date of his or her immigrant visa shall be presented by each immigrant except an immigrant who:

(1) Is the parent, spouse, or unmarried son or daughter of a United States citizen or of an alien lawful permanent resident of the United States,

(2) Is entering under the provisions of § 211.1(a)(2) through (a)(7), or § 211.1(b)(1),

(3) Is a stateless person or a person who because of his or her opposition to Communism is unwilling or unable to obtain a passport from the country of his or her nationality, or is the accompanying spouse or unmarried son or daughter of such immigrant,

(4) Is a member of the Armed Forces of the United States,

(b) If an alien seeking admission as an immigrant with an immigrant visa believes that good cause exists for his or her failure to present a passport, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of passport and admit the alien as an immigrant, if the district director is satisfied that the alien has established good cause for the alien's failure to present a passport.

### § 211.3 Expiration of immigrant visas, reentry permits, refugee travel document, and Form I–551.

An immigrant visa, reentry permit, refugee travel document, or Form I–551 shall be regarded as unexpired if the rightful holder embarked or enplaned before the expiration of his immigrant visa, reentry permit, or refugee travel document, or, with respect to Form I–551, before the first anniversary of the date on which he departed from the United States: provided, that the vessel or aircraft on which he so embarked or enplaned arrives in the United States or foreign contiguous territory on a continuous voyage. The continuity of the voyage shall not be deemed to have been interrupted by scheduled or emergency stops of the vessel or aircraft en route to the United States or foreign contiguous territory, or by a layover in foreign contiguous territory necessitated solely for the purpose of effecting a transportation connection to the United States.

**§ 211.4  Waiver of documents for returning residents.**

(a) Pursuant to the authority contained in section 211(b) of the Act, an alien previously lawfully admitted to the United States for permanent residence who, upon return from a temporary absence was inadmissible because of failure to have or to present a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director if the district director determines that such alien:

(1) Was not otherwise inadmissible at the time of entry, or

(2) Having been otherwise inadmissible at the time of entry is with respect thereto qualified for an exemption from deportability under section 237(a)(1)(H) of the Act, and

(3) Is not otherwise subject to removal.

(b) Denial of a waiver by the district director is not appealable but shall be without prejudice to renewal of an application and reconsideration in proceedings before the immigration judge.

**§ 211.5  Alien commuters.**

(a) *General.* An alien lawfully admitted for permanent residence or a special agricultural worker lawfully admitted for temporary residence under section 210 of the Act may commence or continue to reside in foreign contiguous territory and commute as a special immigrant defined in section 101(a)(27)(A) of the Act to his or her place of employment in the United States. An alien commuter engaged in seasonal work will be presumed to have taken up residence in the United States if he or she is present in this country for more than six months, in the aggregate, during any continuous 12-month period. An alien commuter's address report under section 265 of the Act must show his or her actual residence address even though it is not in the United States.

(b) *Loss of residence status.* An alien commuter who has been out of regular employment in the United States for a continuous period of six months shall be deemed to have lost residence status, notwithstanding temporary entries in the interim for other than employment purposes. An exception applies when employment in the United States was interrupted for reasons beyond the individual's control other than lack of a job opportunity or the commuter can demonstrate that he or she has worked 90 days in the United States in the aggregate during the 12-month period

preceding the application for admission into the United States.

(c) *Eligibility for benefits under the immigration and nationality laws.* Until he or she has taken up residence in the United States, an alien commuter cannot satisfy the residence requirements of the naturalization laws and cannot qualify for any benefits under the immigration laws on his or her own behalf or on behalf of his or her relatives other than as specified in paragraph (a) of this section. When an alien commuter takes up residence in the United States, he or she shall no longer be regarded as a commuter. He or she may facilitate proof of having taken up such residence by notifying the Service as soon as possible, preferably at the time of his or her first reentry for that purpose. Application for issuance of a new alien registration receipt card to show that he or she has taken up residence in the United States shall be made on Form I–90.

**PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE**

47. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

48. Section 212.5 is amended by:
a. Revising paragraph (a) and (b);
b. Revising introductory text in paragraph (c);
c. Revising paragraph (c)(1); and by
d. Revising paragraph (d)(2)(i), to read as follows:

**§ 212.5  Parole of aliens into the United States.**

(a) The parole of aliens within the following groups who have been or are detained in accordance with § 235.3 (b) or (c) of this chapter would generally be justified for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as juveniles in § 236.3(a) of this chapter. The district director or chief patrol agent shall follow the guidelines set forth in § 236.3(a) of this chapter in determining under what conditions a juvenile should be paroled from detention;

(i) Juveniles may be released to a relative (brother, sister, aunt, uncle) not

in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that the juvenile has a relative who is in detention.

(ii) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompany relative who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a nonrelative in detention who accompanied him on arrival, the question of releasing the minor and the accompanying nonrelative adult shall be addressed on a case-by-case basis.

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by the district director or chief patrol agent.

(b) In the case of all other arriving aliens, except those detained under § 235.3 (b) or (c) of this chapter and paragraph (a) of this section, the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (c) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (e) of this section shall be denied parole and detained for removal in accordance with the provisions of § 235.3 (b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under § 235.3 (b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(c) *Conditions.* In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director or chief patrol agent may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director or chief patrol agent should apply reasonable discretion. The

consideration of all relevant factors includes:

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I–352 in such amount as the district director or chief patrol agent may deem appropriate;

\*  \*  \*  \*  \*

(d) \* \* \*

(2)(i) *On notice.* In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 250 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed by removal within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director or the chief patrol agent the public interest requires that the alien be continued in custody.

\*  \*  \*  \*  \*

49. In § 212.6 paragraph (a)(2) is revised to read as follows:

### § 212.6  Nonresident alien border crossing cards.

(a) \* \* \*

(2) *Mexican border crossing card, Form I–186 or I–586.* The rightful holder of a nonresident alien Mexican border crossing card, Form I–186 or I–586, may be admitted under § 235.1(f) of this chapter if found otherwise admissible. However, any alien seeking entry as a visitor for business or pleasure must also present a valid passport and shall be issued Form I–94 if the alien is applying for admission from:

(i) A country other than Mexico or Canada, or

(ii) Canada if the alien has been in a country other than the United States or Canada since leaving Mexico.

\*  \*  \*  \*  \*

## PART 213—ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT

50. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

### § 213.1  [Amended]

51. Section 213.1 is amended in the last sentence by revising the term ''part 103'' to read ''§ 103.6''.

## PART 214—NONIMMIGRANT CLASSES

52. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.

53. Section 214.1 is amended by revising paragraph (c)(4)(iv) to read as follows:

### § 214.1  Requirements for admission, extension, and maintenance of status.

\*  \*  \*  \*  \*

(c) \* \* \*

(4) \* \* \*

(iv) The alien is not the subject of deportation proceedings under section 242 of the Act (prior to April 1, 1997) or removal proceedings under section 240 of the Act.

\*  \*  \*  \*  \*

## PART 215—[REMOVED]

54. Part 215 is removed.

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

55. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

Section 216.3 is revised to read as follows:

### § 216.3  Termination of conditional resident status.

(a) *During the two-year conditional period.* The director shall send a formal written notice to the conditional permanent resident of the termination of the alien's conditional permanent resident status if the director determines that any of the conditions set forth in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or it becomes known to the government that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs). If the Service issues a notice of intent to terminate an alien's conditional resident status, the director shall not adjudicate Form I–751 or Form I–829 until it has been determined that the alien's status will not be terminated. During this time, the alien shall continue to be a lawful conditional permanent resident with all the rights, privileges, and responsibilities provided to persons possessing such status. Prior to issuing the notice of termination, the director shall provide the alien with an opportunity to review and rebut the evidence upon which the decision is to be based, in accordance with § 103.2(b)(2) of this chapter. The termination of status, and all of the rights and privileges concomitant thereto (including authorization to accept or continue in employment in this country), shall take effect as of the date of such determination by the director, although the alien may request a review of such determination in removal proceedings. In addition to the notice of termination, the director shall issue a notice to appear in accordance with 8 CFR part 239. During the ensuing removal proceedings, the alien may submit evidence to rebut the determination of the director. The burden of proof shall be on the Service to establish, by a preponderance of the evidence, that one or more of the conditions in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs).

(b) *Determination of fraud after two years.* If, subsequent to the removal of the conditional basis of an alien's permanent resident status, the director determines that an alien spouse obtained permanent resident status through a marriage which was entered into for the purpose of evading the immigration laws or an alien entrepreneur obtained permanent resident status through a commercial enterprise which was improper under section 216A(b)(1) of the Act, the director may institute rescission proceedings pursuant to section 246 of the Act (if otherwise appropriate) or removal proceedings under section 240 of the Act.

57. Section 216.4 is amended by:

a. Revising paragraphs (a)(6) and (b)(3);

b. Revising paragraph (c)(4);

c. Removing the unnumbered paragraph immediately after paragraph (c)(4); and by

d. Revising paragraph (d)(2) to read as follows:

**§ 216.4　Joint petition to remove conditional basis of lawful permanent resident status for alien spouse.**

(a) \* \* \*

(6) *Termination of status for failure to file petition.* Failure to properly file Form I–751 within the 90-day period immediately preceding the second anniversary of the date on which the alien obtained lawful permanent residence on a conditional basis shall result in the automatic termination of the alien's permanent residence status and the initiation of proceedings to remove the alien from the United States. In such proceedings the burden shall be on the alien to establish that he or she complied with the requirement to file the joint petition within the designated period. Form I–751 may be filed after the expiration of the 90-day period only if the alien establishes to the satisfaction of the director, in writing, that there was good cause for the failure to file Form I–751 within the required time period. If the joint petition is filed prior to the jurisdiction vesting with the immigration judge in removal proceedings and the director excuses the late filing and approves the petition, he or she shall restore the alien's permanent residence status, remove the conditional basis of such status and cancel any outstanding notice to appear in accordance with § 239.2 of this chapter. If the joint petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the alien and the service.

(b) \* \* \*

(3) *Termination of status for failure to appear for interview.* If the conditional resident alien and/or the petitioning spouse fail to appear for an interview in connection with the joint petition required by section 216(c) of the Act, the alien's permanent residence status will be automatically terminated as of the second anniversary of the date on which the alien obtained permanent residence. The alien shall be provided with written notification of the termination and the reasons therefor, and a notice to appear shall be issued placing the alien under removal proceedings. The alien may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the alien to establish compliance with the interview requirements. If the alien submits a written request that the interview be rescheduled or that the interview be waived, and the director determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate.

If the interview is rescheduled at the request of the petitioners, the Service shall not be required to conduct the interview within the 90-day period following the filing of the petition.

(c) \* \* \*

(4) A fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) in connection with the filing of the petition through which the alien obtained conditional permanent residence. If derogatory information is determined regarding any of these issues, the director shall offer the petitioners the opportunity to rebut such information. If the petitioners fail to overcome such derogatory information the director may deny the joint petition, terminate the alien's permanent residence, and issue a notice to appear to initiate removal proceedings. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the alien's permanent residence status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) \* \* \*

(2) *Denial.* If the director denies the joint petition, he or she shall provide written notice to the alien of the decision and the reason(s) therefor and shall issue a notice to appear under section 239 of the Act and 8 CFR part 239. The alien's lawful permanent residence status shall be terminated as of the date of the director's written decision. The alien shall also be instructed to surrender any Alien Registration Receipt Card previously issued by the Service. No appeal shall lie from the decision of the director; however, the alien may seek review of the decision in removal proceedings. In such proceedings the burden of proof shall be on the Service to establish, by a preponderance of the evidence, that the facts and information set forth by the petitioners are not true or that the petition was properly denied.

58. Section 216.5 is amended by revising paragraphs (a)(1), (d), (e)(1), (e)(3)(ii), and (f) to read as follows:

**§ 216.5　Waiver of requirement to file joint petition to remove conditions by alien spouse.**

(a) \* \* \*

(1) Removal from the United States would result in extreme hardship;

\* \* \* \* \*

(d) *Interview.* The service center director may refer the application to the appropriate local office and require that the alien appear for an interview in connection with the application for a waiver. The director shall deny the application and initiate removal proceedings if the alien fails to appear for the interview as required, unless the alien establishes good cause for such failure and the interview is rescheduled.

(e) *Adjudication of waiver application.* (1) *Application based on claim of hardship.* In considering an application for a waiver based upon an alien's claim that extreme hardship would result from the alien's removal from the United States, the director shall take into account only those factors that arose subsequent to the alien's entry as a conditional permanent resident. The director shall bear in mind that any removal from the United States is likely to result in a certain degree of hardship, and that only in those cases where the hardship is extreme should the application for a waiver be granted. The burden of establishing that extreme hardship exists rests solely with the applicant.

\* \* \* \* \*

(3) \* \* \*

(ii) A conditional resident or former conditional resident who has not departed the United States after termination of resident status may apply for the waiver. A conditional resident who is in exclusion, deportation, or removal proceedings may apply for the waiver only until such time as there is a final order of deportation or removal. The conditional resident may apply for the waiver regardless of his or her present marital status. The conditional resident may still be residing with the citizen or permanent resident spouse, or may be divorced or separated.

\* \* \* \* \*

(f) *Decision.* The director shall provide the alien with written notice of the decision on the application for waiver. If the decision is adverse, the director shall advise the alien of the reasons therefore, notify the alien of the termination of his or her permanent residence status, instruct the alien to surrender any Alien Registration Receipt Card issued by the Service and issue a notice to appear placing the alien in removal proceedings. No appeal shall lie from the decision of the director, however, the alien may seek review of such decision in removal proceedings.

## PART 217—VISA WAIVER PILOT PROGRAM

59. The authority citation for part 217 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1187; 8 CFR part 2.

60. Section 217.1 is revised to read as follows:

### § 217.1  Scope.

The Visa Waiver Pilot Program (VWPP) described in this section is established pursuant to the provisions of section 217 of the Act.

61. Section 217.2 is revised to read as follows:

### § 217.2  Eligibility.

(a) *Definitions.* As used in this part, the term:

*Carrier* refers to the owner, charterer, lessee, or authorized agent of any commercial vessel or commercial aircraft engaged in transporting passengers to the United States from a foreign place.

*Designated country* refers to Andorra, Argentina, Australia, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, San Marino, Spain, Sweden, Switzerland, and the United Kingdom. The United Kingdom refers only to British citizens who have the unrestricted right of permanent abode in the United Kingdom (England, Scotland, Wales, Northern Ireland, the Channel Islands, and the Isle of Man); it does not refer to British overseas citizens, British dependent territories' citizens, or citizens of British Commonwealth countries. Effective April 1, 1995, until September 30, 1998, or the expiration of the Visa Waiver Pilot Program, whichever comes first, Ireland has been designated as a Visa Waiver Pilot Program country with Probationary Status in accordance with section 217(g) of the Act.

*Return trip ticket* means any return trip transportation ticket presented by an arriving Visa Waiver Pilot Program applicant on a participating carrier valid for at least 1 year, airline employee passes indicating return passage, individual vouchers for return passage, group vouchers for return passage for charter flights, and military travel orders which include military dependents for return to duty stations outside the United States on U.S. military flights. A period of validity of 1 year need not be reflected on the ticket itself, provided that the carrier agrees that it will honor the return portion of the ticket at any time, as provided in § 217.6(b)(2)(v).

(b) *Special program requirements.* (1) *General.* In addition to meeting all of the requirements for the Visa Waiver Pilot Program specified in section 217 of the Act, each applicant must posses a valid, unexpired passport issued by a designated country and present a completed, signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form.

(2) *Persons previously removed.* Aliens who have been deported or removed from the United States, after having been determined deportable, require the consent of the Attorney General to apply for admission to the United States pursuant to section 212(a)(9)(A)(ii) of the Act. Such persons may not be admitted to the United States under the provisions of this part notwithstanding the fact that the required consent of the Attorney General may have been secured. Such aliens must secure a visa in order to be admitted to the United States as nonimmigrants, unless otherwise exempt.

(c) *Restrictions on manner of arrival.* (1) *Applicants arriving by air and sea.* Applicants must arrive on a carrier signatory to an agreement specified in § 217.6 and at the time of arrival must be in possession of a return trip ticket that will transport the traveler out of the United States to any other foreign port or place as long as the trip does not terminate in contiguous territory or an adjacent island; except that the return trip ticket may transport the traveler to contiguous territory or an adjacent island, if the traveler is a resident of the country of destination.

(2) *Applicants arriving at land border ports-of-entry.* Any Visa Waiver Pilot Program applicant arriving at a land border port-of-entry must provide evidence to the immigration officer of financial solvency and a domicile abroad to which the applicant intends to return. An applicant arriving at a land-border port-of-entry will be charged a fee as prescribed in § 103.7(b)(1) of this chapter for issuance of Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form. A round-trip transportation ticket is not required of applicants at land border ports-of-entry.

(d) *Aliens in transit.* An alien who is in transit through the United States is eligible to apply for admission under the Visa Waiver Pilot Program, provided the applicant meets all other program requirements.

62. Section 217.3 is revised to read as follows:

### § 217.3  Maintenance of status.

(a) *Satisfactory departure.* If an emergency prevents an alien admitted

under this part from departing from the United States within his or her period of authorized stay, the district director having jurisdiction over the place of the alien's temporary stay may, in his or her discretion, grant a period of satisfactory departure not to exceed 30 days. If departure is accomplished during that period, the alien is to be regarded as having satisfactorily accomplished the visit without overstaying the allotted time.

(b) *Readmission after departure to contiguous territory or adjacent island.* An alien admitted to the United States under this part may be readmitted to the United States for the balance of his or her Visa Waiver Pilot Program admission period if he or she is otherwise admissible.

63. Section 217.4 is amended by:
a. Revising the section heading;
b. Removing paragraph (a);
c. Redesignating paragraphs (b), (c), and (d) as paragraphs (a), (b), and (c) respectively;
d. Revising newly redesignated paragraph (a)(1);
e. Adding a new paragraph (a)(3);
f. Revising newly redesignated paragraph (b); and by
g. Revising newly redesignated paragraph (c) to read as follows:

### § 217.4  Inadmissibility and deportability.

(a) *Determinations of inadmissibility.* (1) An alien who applies for admission under the provisions of section 217 of the Act, who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa), or who is in possession of and presents fraudulent or counterfeit travel documents, will be refused admission into the United States and removed. Such refusal and removal shall be made at the level of the port director or officer-in-charge, or an officer acting in that capacity, and shall be effected without referral of the alien to an immigration judge for further inquiry, examination, or hearing, except that an alien who presents himself or herself as an applicant for admission under section 217 of the Act, who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with § 208.2(b)(1) of this chapter.

*        *        *        *        *

(3) Refusal under paragraph (a)(1) of this section shall not constitute removal for purposes of section 212(a)(9)(A) of the Act.

**AR01849**

(b) *Determination of deportability.* (1) An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the Act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as a Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with § 208.2(b)(1) of this chapter.

(2) Removal under paragraph (b)(1) is equivalent in all respects and has the same consequences as removal after proceedings conducted under section 240 of the Act.

(c)(1) *Removal of inadmissible aliens who arrived by air or sea.* Removal of an alien from the United States under this section may be effected using the return portion of the round trip passage presented by the alien at the time of entry to the United States as required by section 217(a)(7) of the Act. Such removal shall be on the first available means of transportation to the alien's point of embarkation to the United States. Nothing in this part absolves the carrier of the responsibility to remove any inadmissible or deportable alien at carrier expense, as provided in § 217.6(b).

(2) *Removal of inadmissible and deportable aliens who arrived at land border ports-of-entry.* Removal under this section will be by the first available means of transportation deemed appropriate by the district director.

**§ 217.5    [Removed and reserved]**

64. Section 217.5 is removed and reserved.

65. Section 217.6 is revised to read as follows:

**§ 217.6    Carrier agreements.**

(a) *General.* The carrier agreements referred to in section 217(e) of the Act shall be made by the Commissioner on behalf of the Attorney General and shall be on Form I–775, Visa Waiver Pilot Program Agreement.

(b) *Agreement provisions.* (1) To be authorized to transport an alien to the United States pursuant to section 217 of the Act and this part, a carrier must

enter into an agreement on Form I–775 to transport as an applicant for admission under section 217 of the Act and this chapter, only an alien who:

(i) Is a national of and in possession of a valid passport issued by a country listed in § 217.2;

(ii) Is in possession of a completed and signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form, prior to inspection;

(iii) Seeks admission into the United States for 90 days or less;

(iv) Is in possession of a round trip ticket; and

(v) Appears otherwise admissible.

(2) The carrier further agrees to:

(i) Submit to the Immigration and Naturalization Service the Form I–94 was required by 8 CFR part 231 and section 217(e)(1)(B) of the Act;

(ii) Remove from the United States any alien transported by the carrier to the United States for admission under the Visa Waiver Pilot Program, in the event that the alien is determined by an immigration officer at the port-of-entry to be inadmissible or is determined to have remained unlawfully beyond the 90-day period of admission under the program;

(iii) Reimburse within 30 days of notice (not pay as a penalty) the Service for any and all expenses incurred in the transportation (from the point of arrival in the United States to the place of removal) of any alien found inadmissible or deportable under this program;

(iv) Retain the responsibilities and obligations enumerated in this part should the alien under the Visa Waiver Pilot Program depart temporarily for a visit to foreign contiguous territory during the period of authorized stay in the United States and be readmitted pursuant to § 217.3(b);

(v) Transport an alien found inadmissible to the United States or deportable from the United States after admission under the Visa Waiver Pilot Program, by accepting as full payment for return passage the return portion of the transportation ticket as required in paragraph (b)(1)(iv) of this section from the original port of arrival in the United States to point of embarkation or to the country of nationality or last residence.

(c) *Termination of agreements.* The Commissioner, on behalf of the Attorney General, may terminate any carrier agreement under this part, with 5 days notice to a carrier, for the carrier's failure to meet the terms of such agreement. As a matter of discretion, the Commissioner may notify a carrier of the existence of a basis for termination of a carrier agreement under this part and allow the carrier a period not to

exceed 15 days within which the carrier may bring itself into compliance with the terms of the carrier agreement. The agreement shall be subject to cancellation by either party for any reason upon 15 days' written notice to the other party.

**PART 221—ADMISSION OF VISITORS OR STUDENTS**

66. The authority citation for part 221 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1201; 8 CFR part 2.

**§ 221.1    [Amended]**

67. Section 221.1 is amended in the last sentence by revising the term ''part 103'' to read ''§ 103.6''.

**PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS**

68. The authority citation for part 223 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

69. In § 223.1, paragraph (b) is revised to read as follows:

**§ 223.1    Purpose of documents.**

\*    \*    \*    \*    \*

(b) *Refugee travel document.* A refugee travel document is issued pursuant to this part and article 28 of the United Nations Convention of July 29, 1951, for the purpose of travel. Except as provided in § 223.3(d)(2)(i), a person who holds refugee status pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document.

70. In § 223.2, paragraph (b)(2) is revised to read as follows:

**§ 223.2    Processing.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(2) *Refugee travel document.* (i) *General.* Except as otherwise provided in this section, an application may be approved if filed by a person who is in the United States at the time of application, and either holds valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act, or is a permanent resident and received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept an application from an alien not within the United States.* As a matter of discretion, a district having jurisdiction over a port-of-entry or a preinspection station where an alien is an applicant for admission, or an overseas district director having jurisdiction over the place where an alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who had departed from the United States without having applied for such refugee travel document, provided:

(A) The alien submits a Form I–131, Application for Travel Document, with the fee required under § 103.7(b)(1) of this chapter.

(B) The district director is satisfied that the alien did not intend to abandon his or her refugee status at the time of departure from the United States;

(C) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(D) The alien has been outside the United States for less than 1 year since his or her last departure.

*     *     *     *     *

71. In § 223.3, paragraph (d)(2) is revised to read as follows:

**§ 223.3   Validity and effect on admissibility.**

*     *     *     *     *

(d) * * *

(2) *Refugee travel document.* (i) *Inspection and immigration status.* Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in § 223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(ii)) which will be endorsed in such document, unless he or she is no longer eligible therefor, or he or she applies for and is found eligible for some other immigration status.

(ii) *Inadmissibility.* If an alien who presents a valid unexpired refugee travel document appears to be inadmissible, he or she shall be referred for proceedings under section 240 of the Act. Section 235(c) of the Act shall not be applicable.

## PART 232—DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION

72. The heading for part 232 is revised to read as set forth above.

73. The authority citation for part 232 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1222, 1224, 1252; 8 CFR part 2.

**§ 232.1   Redesignated as 232.3 and revised]**

74. Section 232.1 is redesignated as §232.3, and is revised to read as follows:

**§ 232.3   Arriving aliens.**

When a district director has reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act, he or she shall, after consultation with the United States Public Health Service at the port-of-entry, notify the master or agent of the arriving vessel or aircraft of his or her intention to effect such detention by serving on the master or agent Form I–259 in accordance with § 235.3(a) of this chapter.

**§ 234.1 and § 234.2   [Redesignated as §§ 232.1 and 232.2 respectively]**

75. Sections 234.1 and 234.2 are redesignated as §§ 232.1 and 232.2 respectively.

## PART 234—[REMOVED]

76. Part 234 is removed.

77. The following parts are redesignated as set forth in the table below:

| Old part | New part |
|---|---|
| Part 238 .................... | Part 233. |
| Part 239 .................... | Part 234. |

## PART 233—CONTRACTS WITH TRANSPORTATION LINES

78. The authority citation for newly redesignated part 233 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1228; 8 CFR part 2.

79. Newly redesignated § 233.1 is revised to read as follows:

**§ 233.1   Contracts.**

The contracts with transportation lines referred to in section 233(c) of the Act may be entered into by the Executive Associate Commissioner for Programs, or by an immigration officer designated by the Executive Associate Commissioner for Programs on behalf of the government and shall be documented on Form I–420. The contracts with transportation lines referred to in section 233(a) of the Act shall be made by the Commissioner on behalf of the government and shall be documented on Form I–426. The contracts with transportation lines desiring their passengers to be preinspected at places outside the United States shall be made by the Commissioner on behalf of the government and shall be documented on Form I–425; except that contracts for irregularly operated charter flights may be entered into by the Associate Commissioner for Examinations or an immigration officer designated by the Executive Associate Commissioner for Programs and having jurisdiction over the location where the inspection will take place.

80. In newly redesignated § 233.3, paragraph (b) is revised to read as follows:

**§ 233.3   Aliens in immediate and continuous transit.**

*     *     *     *     *

(b) *Signatory lines.* A list of currently effective Form I–426 agreements is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

81. Newly redesignated § 233.4 is revised to read as follows:

**§ 233.4   Preinspection outside the United States.**

(a) *Form I–425 agreements.* A transportation line bringing applicants for admission to the United States through preinspection sites outside the United States shall enter into an agreement on Form I–425. Such an agreement shall be negotiated directly by the Service's Headquarters Office of Inspections and the head office of the transportation line.

(b) *Signatory lines.* A list of transportation lines with currently valid transportation agreements on Form I–425 is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

82. Newly redesignated § 233.5 is revised to read as follows:

**§ 233.5   Aliens entering Guam pursuant to section 14 of Public Law 99–396, "Omnibus Territories Act."**

A transportation line bringing aliens to Guam under the visa waiver provisions of § 212.1(e) of this chapter shall enter into an agreement on Form I–760. Such agreements shall be negotiated directly by the Service's Headquarters and head offices of the transportation lines.

## PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT

83. The heading for newly redesignated part 234 is revised as set forth above.

84. The authority citation for newly redesignated part 234 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

### § 234.3 [Amended]

85. Newly redesignated § 234.3 is amended by removing the last sentence.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

86. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

87. Section 235.1 is revised to read as follows:

### § 235.1  Scope of examination.

(a) *General.* Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section.

(b) *U.S. citizens.* A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR part 53. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

(c) *Alien members of United States Armed Forces and members of a force of a NATO country.* Any alien member of the United States Armed Forces who is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces is not subject to the removal provisions of the Act. A member of the force of a NATO country signatory to Article III of the Status of Forces Agreement seeking to enter the United States under official orders is exempt from the control provision of the Act. Any alien who is a member of either of the foregoing classes may, upon request, be inspected and his or her entry as an alien may be recorded. If the alien does not appear to the examining immigration officer to be clearly and beyond a doubt entitled to enter the United States under the provisions of the Act, the alien shall be so informed and his or her entry shall not be recorded.

(d) *Alien applicants for admission.* (1) Each alien seeking admission at a United States port-of-entry shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations and is entitled under all of the applicable provisions of the immigration laws and this chapter to enter the United States. A person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting immigration officer and must present proper documents in accordance with § 211.1 of this chapter.

(2) An alien present in the United States who has not been admitted or paroled or an alien who seeks entry at other than an open, designated port-of-entry, except as otherwise permitted in this section, is subject to the provisions of section 212(a) of the Act and to removal under section 235(b) or 240 of the Act.

(3) An alien who is brought to the United States, whether or not to a designated port-of-entry and regardless of the means of transportation, after having been interdicted in international or United States waters, is considered an applicant for admission and shall be examined under section 235(b) of the Act.

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum shall be referred to an asylum officer for a determination of credible fear of persecution in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution shall have his or her asylum application adjudicated in accordance with § 208.2(b)(2) of this chapter. Nothing in this section shall be construed to require expedited removal proceedings in accordance with section 235(b)(1) of the Act. A stowaway who absconds either prior to inspection by an immigration officer or after being ordered removed as a stowaway pursuant to section 235(a)(2) of the Act is not entitled to removal proceedings under section 240 of the Act and shall be removed under section 235(a)(2) of the Act as if encountered upon arrival. A stowaway who has been removed pursuant to section 235(a)(2) of the Act and this section shall be considered to have been formally removed from the United States for all purposes under the Act.

(e) *U.S. citizens, lawful permanent residents of the United States, Canadian nationals, and other residents of Canada having a common nationality with Canadians, entering the United States by small craft.* Upon being inspected by an immigration officer and found eligible for admission as a citizen of the United States, or found eligible for admission as a lawful permanent resident of the United States, or in the case of a Canadian national or other resident of Canada having a common nationality with Canadians being found eligible for admission as a temporary visitor for pleasure, a person who desires to enter the United States from Canada in a small pleasure craft of less than 5 net tons without merchandise may be issued, upon application and payment of a fee prescribed under § 103.7(b)(1) of this chapter, Form I–68, Canadian Border Boat Landing Card, and may thereafter enter the United States along with the immediate shore area of the United States on the body of water designated on the Form I–68 from time to time for the duration of that navigation season without further inspection. In the case of a Canadian national or other resident of Canada having a common nationality with Canadians, the Form I–68 shall be valid only for the purpose of visits not to exceed 72 hours and only if the alien will remain in nearby shopping areas, nearby residential neighborhoods, or other similar areas adjacent to the immediate shore area of the United States. If the bearer of Form I–68 seeks to enter the United States by means other than small craft of less than 5 net tons without merchandise, or if he or she seeks to enter the United States for other purposes, or if he or she is an alien, other than a lawful permanent resident alien of the United States, and intends to proceed beyond an area adjacent to the immediate shore area of the United States, or remains in the United States longer than 72 hours, he or she must apply for admission at a United States port of entry.

(f) *Form I–94, Arrival Departure Record.* (1) Unless otherwise exempted, each arriving nonimmigrant who is admitted to the United States shall be issued, upon payment of a fee prescribed in § 103.7(b)(1) of this chapter for land border admissions, a Form I–94 as evidence of the terms of

**AR01852**

admission. A Form I–94 issued at a land border port-of-entry shall be considered issued for multiple entries unless specifically annotated for a limited number of entries. A Form I–94 issued at other than a land border port-of-entry, unless issued for multiple entries, must be surrendered upon departure from the United States in accordance with the instructions on the form. Form I–94 is not required by:

(i) Any nonimmigrant alien described in § 212.1(a) of this chapter and 22 CFR 41.33 who is admitted as a visitor for business or pleasure or admitted to proceed in direct transit through the United States;

(ii) Any nonimmigrant alien residing in the British Virgin Islands who was admitted only to the U.S. Virgin Islands as a visitor for business or pleasure under § 212.1(b) of this chapter;

(iii) Any Mexican national in possession of a valid nonresident alien Mexican border crossing card, or a valid Mexican passport and a multiple-entry nonimmigrant visa issued under section 101(a)(15)(B) of the Act, who is admitted as a nonimmigrant visitor at a Mexican border port of entry for a period not to exceed 72 hours to visit within 25 miles of the border;

(iv) Bearers of Mexican diplomatic or official passports described in § 212.1(c–1) of this chapter.

(2) *Paroled aliens.* Any alien paroled into the United States under section 212(d)(5) of the Act, including any alien crewmember, shall be issued a completely executed Form I–94, endorsed with the parole stamp.

88. Section 235.2 is revised to read as follows:

**§ 235.2   Deferred inspection.**

(a) A district director may, in his or her discretion, defer the inspection of any vessel or aircraft, or of any alien, to another Service office or port-of-entry. Any alien coming to a United States port from a foreign port, from an outlying possession of the United States, from Guam, Puerto Rico, or the Virgin Islands of the United States, or from another port of the United States at which examination under this part was deferred, shall be regarded as an applicant for admission at that onward port.

(b) An examining immigration officer may defer further examination and refer the alien's case to the district director having jurisdiction over the place where the alien is seeking admission, or over the place of the alien's residence or destination in the United States, if the examining immigration officer has reason to believe that the alien can

overcome a finding of inadmissibility by:

(1) Posting a bond under section 213 of the Act;

(2) Seeking and obtaining a waiver under section 211 or 212(d)(3) or (4) of the Act; or

(3) Presenting additional evidence of admissibility not available at the time and place of the initial examination.

(c) Such deferral shall be accomplished pursuant to the provisions of section 212(d)(5) of the Act for the period of time necessary to complete the deferred inspection.

(d) Refusal of a district director to authorize admission under section 213 of the Act, or to grant an application for the benefits of section 211 or section 212(d)(3) or (4) of the Act, shall be without prejudice to the renewal of such application or the authorizing of such admission by the immigration judge without additional fee.

(e) Whenever an alien on arrival is found or believed to be suffering from a disability that renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his or her family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

89. Section 235.3 is revised to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

(a) *Detention prior to inspection.* All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b) *Expedited removal.* (1) *Determination of inadmissibility.* An alien who is arriving in the United States or other alien as designated pursuant to paragraph (b)(2)(ii) of this section who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. The examining immigration officer shall serve the alien with Form I–860, Notice and Order of Expedited Removal. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order by the Board of Immigration appeals. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(2) *Applicability.* The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i) Arriving aliens, as defined in § 1.1(q) of this chapter, except for citizens of Cuba arriving at a United States port-of-entry by aircraft;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the **Federal Register.** However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of

**AR01853**

the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(3) *Additional charges of inadmissibility.* In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. if an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

(4) *Claim of asylum or fear of persecution.* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country, the inspecting officer shall, before proceeding further with the case, detain the alien and refer him or her for an interview by an asylum officer in accordance with § 208.30 of this chapter to determine if the alien has a credible fear of persecution. The referring officer shall provide information to the alien concerning the nature and purpose of the credible fear interview and shall advise the alien that he or she may, prior to the interview, consult with a person or person of his

or her choosing, at no expense to the Government and without unreasonably delaying the process. Pending the credible fear determination, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(5) *Claim to lawful permanent resident, refugee, or asylee status.* (i) *Verification of status.* If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, or granted asylum under section 208 of the Act, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, or asylee status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of the Act, or grant of asylum status under section 208 of the Act. Whenever practicable, a written statement shall be taken from the alien. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and § 235.6(a)(2)(ii).

(ii) *Claimed lawful permanent residents.* If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and § 211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the

required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iii) *Claimed refugees and asylees.* If a check of Service records or other means indicates that the alien has been granted refugee status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with § 223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with § 223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of this Act.

(iv) *Review of order for claimed lawful permanent residents, refugees, or asylees.* When an alien whose status has not been verified but who is claiming under oath or under penalty or perjury to be a lawful permanent resident, refugee, or asylee is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and § 235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, or granted asylum status, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

(6) *Opportunity for the alien to establish that he or she was admitted or paroled into the United States.* If the Commissioner determines that the

expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

(7) *Review of expedited removal orders.* Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

(8) *Removal procedures relating to expedited removal.* An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed from the United States in accordance with section 241(c) of the Act and 8 CFR part 241.

(9) *Waivers of documentary requirements.* Nothing in this section limits the discretionary authority of the Attorney General, including authority

under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

(10) *Applicant for admission under section 217 of the Act.* The provisions of § 235.3(b) do not apply to an applicant for admission under section 217 of the Act.

(c) *Other inadmissible aliens.* Any alien applicant for admission, as included in sections 101(a)(13) and 235(a)(1) of the Act and § 235.1(d) of this chapter, who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b) of this section, may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not an alien shall be detained, paroled, or paroled for deferred inspection, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

(d) *Service custody.* The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

(e) *Detention in non-Service facility.* Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

(1) 24-Hour supervision,
(2) Conformance with safety and emergency codes,
(3) Food Service, and
(4) Availability of emergency medical care.

(f) *Privilege of communication.* The mandatory notification requirements of consular and diplomatic officers pursuant to § 236.1(e) of this chapter

apply when an inadmissible alien is detained for removal proceedings.

90. Section 235.4 is revised to read as follows:

### § 235.4  Withdrawal of application for admission.

(a) The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission. Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately. An alien permitted to withdraw his or her application for admission shall normally remain in carrier or Service custody pending departure, unless the district director determines that parole of the alien is warranted in accordance with § 212.5(a) of this chapter.

(b) An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility or deportability has been resolved, permission to withdraw an application for admission should ordinarily be granted only with the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. In addition, during the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

91. Section 235.5 is revised to read as follows:

### § 235.5  Preinspection.

(a) *In United States territories and possessions.* In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act

may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

(b) *In foreign territory.* In the case of any aircraft, vessel, or train proceeding directly, without stopping, from a port or place in foreign territory to a port-of-entry in the United States, the examination and inspection of passengers and crew required by the Act and final determination of admissibility may be made prior to such departure at the port or place in the foreign territory and shall have the same effect under the Act as though made at the destined port-of-entry in the United States.

92. Section 235.6 is revised to read as follows:

### §235.6  Referral to immigration judge.

(a) *Notice.* (1) *Referral by Form I–862, Notice to Appear.* An immigration officer or asylum officer will sign and deliver a Form I–862 to an alien in the following cases:

(i) If, in accordance with the provisions of section 235(b)(2)(A) of the Act, the examining immigration officer detains an alien for a proceeding before an immigration judge under section 240 of the Act; or

(ii) If, in accordance with section 235(b)(1)(B)(ii) of the Act, an asylum officer determines that an alien is in expedited removal proceedings has a credible fear of persecution and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution and

vacates the expedited removal order issued by the asylum officer pursuant to section 235(b)(1)(B)(iii) of the Act.

(iv) If an immigration officer verifies that an alien subject to expedited removal under section 235(b)(1) of the Act has been admitted as a lawful permanent resident refugee, or asylee, or upon review pursuant to §235.3(b)(5)(iv) an immigration judge determines that the alien was once so admitted, provided that such status has not been terminated by final administrative action, and the Service initiates removal proceedings against the alien under section 240 of the Act.

(2) *Referral by Form I–863, Notice of Referral to Immigration Judge.* An immigration officer will sign and deliver a Form I–863 to an alien in the following cases:

(i) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, an asylum officer determines that an alien does not have a credible fear of persecution, and the alien requests a review of that determination by an immigration judge; or

(ii) If, in accordance with section 235(b)(1)(C) of the Act, an immigration officer refers an expedited removal order entered on an alien claiming to be a lawful permanent resident, refugee, or asylee for whom the officer could not verify such status to an immigration judge for review of the order.

(iii) If an immigration officer refers an applicant described in §208.2(b)(1) of this chapter to an immigration judge for an asylum hearing under §208.2(b)(2) of this chapter.

(b) *Certification for mental condition; medical appeal.* An alien certified under sections 212(a)(1) and 232(b) of the Act shall be advised by the examining immigration officer that he or she may appeal to a board of medical examiners of the United States Public Health Service pursuant to section 232 of the Act. If such appeal is taken, the district director shall arrange for the convening of the medical board.

### §235.7  [Removed]

93. Section 235.7 is removed.

### §235.13  [Redesignated as §235.7]

94. Section 235.13 is redesignated as §235.7.

95. Section 235.8 is revised to read as follows:

### §235.8  Inadmissibility on security and related grounds.

(a) *Report.* When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii), (B), or (C) of the

Act, the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I–147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

(b) *Action by regional director.* (1) In accordance with section 235(c)(2)(B) of the Act, the regional director may deny any further inquiry or hearing by an immigration judge and order the alien removed by personal service of Form I–148, Notice of Permanent Inadmissibility, or issue any other order disposing of the case that the regional director considers appropriate.

(2) If the regional director concludes that the case does not meet the criteria contained in section 235(c)(2)(B) of the Act, the regional director may direct that:

(i) An immigration officer shall conduct a further examination of the alien, concerning the alien's admissibility; or,

(ii) The alien's case be referred to an immigration judge for a hearing, or for the continuation of any prior hearing.

(3) The regional director's decision shall be in writing and shall be signed by the regional director. Unless the written decision contains confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security of the United States, the written decision shall be served on the alien. If the written decision contains such confidential information, the alien shall be served with a separate written order showing the disposition of the case, but with the confidential information deleted.

(c) *Finality of decision.* The regional director's decision under this section is final when it is served upon the alien in accordance with paragraph (b)(3) of this section. There is no administrative appeal from the regional director's decision.

(d) *Hearing by immigration judge.* If the regional director directs that an alien subject to removal under this section be given a hearing or further hearing before an immigration judge, the hearing and all further proceedings in

**AR01856**

the matter shall be conducted in accordance with the provisions of section 240 of the Act and other applicable sections of the Act to the same extent as though the alien had been referred to an immigration judge by the examining immigration officer. In a case where the immigration judge ordered the alien removed pursuant to paragraph (a) of this section, the Service shall refer the case back to the immigration judge and proceedings shall be automatically reopened upon receipt of the notice of referral. If confidential information, not previously considered in the matter, is presented supporting the inadmissibility of the alien under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again order the alien removed under the authority of section 235(c) of the Act and further action shall be taken as provided in this section.

(e) *Nonapplicability.* The provisions of this section shall apply only to arriving aliens, as defined in § 1.1(q) of this chapter. Aliens present in the United States who have not been admitted or paroled may be subject to proceedings under Title V of the Act.

§ 235.9 [Removed]

96. Section 235.9 is removed.

§ 235.12 [Redesignated as § 235.9 and revised]

97. Section 235.12 is redesignated as § 235.9 and is revised to read as follows:

§ 235.9 Northern Marianas identification card.

During the two-year period that ended July 1, 1990, the Service issued Northern Marianas Identification Cards to aliens who acquired United States citizenship when the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States entered into force on November 3, 1986. These cards remain valid as evidence of United States citizenship. Although the Service no longer issues these cards, a United States citizen to whom a card was issued may file Form I–777, Application for Issuance or Replacement of Northern Marianas Card, to obtain replacement of a lost, stolen, or mutilated Northern Marianas Identification Card.

98. Section 235.10 is revised to read as follows:

§ 235.10 U.S. Citizen Identification Card.

(a) *General.* Form I–197, U.S. Citizen Identification Card, is no longer issued by the Service but valid existing cards will continue to be acceptable documentation of U.S. citizenship. Possession of the identification card is not mandatory for any purpose. A U.S. Citizen Identification Card remains the property of the United States. Because the identification card is no longer issued, there are no provisions for replacements cards.

(b) *Surrender and voidance.* (1) *Institution of proceeding under section 240 or 342 of the Act.* A U.S. Citizen Identification Card must be surrendered provisionally to a Service office upon notification by the district director that a proceeding under section 240 or 342 of the Act is being instituted against the person to whom the card was issued. The card shall be returned to the person if the final order in the proceeding does not result in voiding the card under this paragraph. A U.S. Citizen Identification Card is automatically void if the person to whom it was issued is determined to be an alien in a proceeding conducted under section 240 of the Act, or if a certificate, document, or record relating to that person is canceled under section 342 of the Act.

(2) *Investigation of validity of identification card.* A U.S. Citizen Identification Card must be surrendered provisionally upon notification by a district director that the validity of the card is being investigated. The card shall be returned to the person who surrendered it if the investigation does not result in a determination adverse to his or her claim to be a United States citizen. When an investigation results in a tentative determination adverse to the applicant's claim to be a United States citizen, the applicant shall be notified by certified mail directed to his or her last known address. The notification shall inform the applicant of the basis for the determination and of the intention of the district director to declare the card void unless within 30 days the applicant objects and demands an opportunity to see and rebut the adverse evidence. Any rebuttal, explanation, or evidence presented by the applicant must be included in the record of proceeding. The determination whether the applicant is a United States citizen must be based on the entire record and the applicant shall be notified of the determination. If it is determined that the applicant is not a United States citizen, the applicant shall be notified of the reasons, and the card deemed void. There is no appeal from the district director's decision.

(3) *Admission of alienage.* A U.S. Citizen Identification Card is void if the person to whom it was issued admits in a statement signed before an immigration officer that he or she is an alien and consents to the voidance of the card. Upon signing the statement the card must be surrendered to the immigration officer.

(4) *Surrender of void card.* A void U.S. Citizen Identification Card which has not been returned to the Service must be surrendered without delay to an immigration officer or to the issuing office of the Service.

(c) *U.S. Citizen Identification Card previously issued on Form I–179.* A valid Form I–179, U.S. Citizen Identification Card, continues to be valid subject to the provisions of this section.

99. Section 235.11 is revised to read as follows:

§ 235.11 Admission of conditional permanent residents.

(a) *General.* (1) *Conditional residence based on family relationship.* An alien seeking admission to the United States with an immigrant visa as the spouse or son or daughter of a United States citizen or lawful permanent resident shall be examined to determine whether the conditions of section 216 of the Act apply. If so, the alien shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the alien and his or her petitioning spouse must file a Form I–751, Petition to Remove the Conditions on Residence, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(2) *Conditional residence based on entrepreneurship.* An alien seeking admission to the United States with an immigrant visa as an alien entrepreneur (as defined in section 216A(f)(1) of the Act) or the spouse or unmarried minor child of an alien entrepreneur shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the principal alien (entrepreneur) must file a Form I–829, Petition by Entrepreneur to Remove Conditions, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(b) *Correction of endorsement on immigrant visa.* If the alien is subject to the provisions of section 216 of the Act, but the classification endorsed on the immigrant visa does not so indicate, the endorsement shall be corrected and the alien shall be admitted as a lawful permanent resident on a conditional basis, if otherwise admissible. Conversely, if the alien is not subject to the provisions of section 216 of the Act, but the visa classification endorsed on the immigrant visa indicates that the

alien is subject thereto (e.g., if the second anniversary of the marriage upon which the immigrant visa is based occurred after the issuance of the visa and prior to the alien's application for admission) the endorsement on the visa shall be corrected and the alien shall be admitted as a lawful permanent resident without conditions, if otherwise admissible.

(c) *Expired conditional permanent resident status.* The lawful permanent resident alien status of a conditional resident automatically terminates if the conditional basis of such status is not removed by the Service through approval of a Form I–751, Petition to Remove the Conditions on Residence or, in the case of an alien entrepreneur (as defined in section 216A(f)(1) of the Act), Form I–829, Petition by Entrepreneur to Remove Conditions. Therefore, an alien who is seeking admission as a returning resident subsequent to the second anniversary of the date on which conditional residence was obtained (except as provided in § 211.1(b)(1) of this chapter) and whose conditional basis of such residence has not been removed pursuant to section 216(c) or 216A(c) of the Act, whichever is applicable, shall be placed under removal proceedings. However, in a case where conditional residence was based on a marriage, removal proceedings may be terminated and the alien may be admitted as a returning resident if the required Form I–751 is filed jointly, or by the alien alone (if appropriate), and approved by the Service. In the case of an alien entrepreneur, removal proceedings may be terminated and the alien admitted as a returning resident if the required Form I–829 is filed by the alien entrepreneur and approved by the Service.

100–101. Part 236 is revised to read as follows:

# PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

**Subpart A—Detention of Aliens Prior to Order of Removal**

Sec.
236.1   Apprehension, custody, and detention.
236.2   Confined aliens, incompetents, and minors.
236.3   Detention and release of juveniles.
236.4   Removal of S–5, S–6, and S–7 nonimmigrants.
236.5   Fingerprints and photographs.

**Subpart B—Family Unity Program**

236.10   Description of program.
236.11   Definitions.
236.12   Eligibility.
236.13   Ineligible aliens.
236.14   Filing.
236.15   Voluntary departure and eligibility for employment.
236.16   Travel outside the United States.
236.17   Eligibility for Federal financial assistance programs.
236.18   Termination of Family Unity Program benefits.

**Authority:** 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; 8 CFR part 2.

## Subpart A—Detention of Aliens Prior to Order of Removal

### § 236.1   Apprehension, custody, and detention.

(a) *Detainers.* The issuance of a detainer under this section shall be governed by the provisions of § 287.7 of this chapter.

(b) *Warrant of arrest.* (1) *In general.* At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of this chapter and may be served only by those immigration officers listed in § 287.5(e)(3) of this chapter.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

(c) *Custody issues and release procedures.* (1) After the expiration of the Transition Period Custody Rules under Pub. L. 104–208, no alien described in section 236(c)(1) of the Act shall be released from custody during removal proceedings except pursuant to section 236(c)(2) of the Act.

(2) Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236 (a)(2) and (3) of the Act; *provided* that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

(3) When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If

detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.

(4) The provisions of § 103.6 of this chapter shall apply to any bonds authorized by this section. Subject to the provisions of this section, the provisions of § 3.19 of this chapter shall govern availability to the respondent of recourse to other administrative authority for release from custody.

(5) An immigration judge may not exercise authority provided in this section and the review process described in paragraph (d) of this section shall not apply with respect to:

(i) Inadmissible aliens in removal proceedings,

(ii) Arriving aliens, as described in § 1.1(q) of this chapter, including aliens paroled pursuant to section 212(d)(5) of the Act, in removal proceedings,

(iii) Aliens described in section 237(a)(4) of the Act, or

(iv) After the expiration of section 303(b)(3) of Pub. L. 104–208, aliens described in section 236(c)(1) of the Act.

(d) *Appeals from custody decisions.* (1) *Application to immigration judge.* After an initial custody determination by the district director, including the setting of a bond, the respondent may at any time before an order under 8 CFR part 240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in § 3.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release. Once a removal order becomes administratively final, determinations regarding custody and bond are made by the district director.

(2) *Application to the district director.* (i) After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.

(ii) After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

(3) *Appeal to the Board of Immigration Appeals.* An appeal relating to bond and custody determinations may be filed within 10 days of the decision, to the Board of

Immigration Appeals in the following circumstances:

(i) In accordance with § 3.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section.

(ii) The alien may appeal from the district director's decision under paragraph (d)(2)(i) of this section.

(iii) The alien may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of deportation and takes the alien into custody for that purpose.

(4) *Effect of filing an appeal.* The filing of an appeal from a determination of an immigration judge or district director under this paragraph shall not operate to delay compliance with the order, nor stay the administrative proceedings or removal.

(e) *Privilege of communication.* Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the countries listed below require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania[1]
Antigua
Armenia
Azerbaijan
Bahamas
Barbados
Belarus
Belize
Brunei
Bulgaria
China (People's Republic of)[2]
Costa Rica
Cyprus
Czech Republic

Dominica
Fiji
Gambia, The
Georgia
Ghana
Grenada
Guyana
Hungary
Jamaica
Kazakhstan
Kiribati
Kuwait
Kyrgyzstan
Malaysia
Malta
Mauritius
Moldova
Mongolia
Nigeria
Philippines
Poland
Romania
Russian Federation
St. Kitts/Nevis
St. Lucia
St. Vincent/Grenadines
Seychelles
Sierra Leone
Singapore
Slovak Republic
South Korea
Tajikistan
Tanzania
Tonga
Trinidad/Tobago
Turkmenistan
Tuvalu
Ukraine
United Kingdom[3]
U.S.S.R.[4]
Uzbekistan
Zambia

(f) *Notification to Executive Office for Immigration Review of change in custody status.* The Service shall notify the Immigration Court having administrative control over the Record of Proceeding of any change in custody location or of release from, or subsequent taking into, Service custody of a respondent/applicant pursuant to § 3.19(g) of this chapter.

### § 236.2 Confined aliens, incompetents, and minors.

(a) *Service.* If the respondent is confined, or if he or she is an incompetent, or a minor under the age of 14, the notice to appear, and the warrant of arrest, if issued, shall be served in the manner prescribed in § 239.1 of this chapter upon the person or persons specified by § 103.5a(c) of this chapter.

(b) *Service custody and cost of maintenance.* An alien confined because of physical or mental disability in an institution or hospital shall not be accepted into physical custody by the Service until an order of removal has been entered and the Service is ready to remove the alien. When such an alien is an inmate of a public or private institution at the time of the commencement of the removal proceedings, expenses for the maintenance of the alien shall not be incurred by the Government until he or she is taken into physical custody by the Service.

### § 236.3 Detention and release of juveniles.

(a) *Juveniles.* A juvenile is defined as an alien under the age of 18 years.

(b) *Release.* Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

(1) Juveniles shall be released, in order of preference, to:

(i) A parent;

(ii) Legal guardian; or

(iii) An adult relative (brother, sister, aunt, uncle, grandparent) who is not presently in Service detention, unless a determination is made that the detention of such juvenile is required to secure his or her timely appearance before the Service or the Immigration Court or to ensure the juvenile's safety or that of others. In cases where the parent, legal guardian, or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at a Service office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraphs (b)(1) (i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement

---

[1] Arrangements with these countries provide that U.S. authorities shall notify responsible representatives within 72 hours of the arrest or detention of one of their nationals.

[2] When Taiwan nationals (who carry ''Republic of China'' passports) are detained, notification should be made to the nearest office of the Taiwan Economic and Cultural Representative's Office, the unofficial entity representing Taiwan's interests in the United States.

[3] British dependencies are also covered by this agreement. They are: Anguilla, British Virgin Islands, Hong Kong, Bermuda, Montserrat, and the Turks and Caicos Islands. Their residents carry British passports.

[4] All U.S.S.R. successor states are covered by this agreement. They are: Armenia, Azerbaijan, Belarus, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan.

to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraphs (b)(1) (i) through (iii) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(c) *Juvenile coordinator.* The case of a juvenile for whom detention is determined to be necessary should be referred to the "Juvenile Coordinator," whose responsibilities should include, but not be limited to, finding suitable placement of the juvenile in a facility designated for the occupancy of juveniles. These may include juvenile facilities contracted by the Service, state or local juvenile facilities, or other appropriate agencies authorized to accommodate juveniles by the laws of the state or locality.

(d) *Detention.* In the case of a juvenile for whom detention is determined to be necessary, for such interim period of time as is required to locate suitable placement for the juvenile, whether such placement is under paragraph (b) or (c) of this section, the juvenile may be temporarily held by Service authorities or placed in any Service detention facility having separate accommodations for juveniles.

(e) *Refusal of release.* If a parent of a juvenile detained by the Service can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and shall be afforded an opportunity to present their views to the district director, chief patrol agent, or immigration judge before a custody determination is made.

(f) *Notice to parent of application for relief.* If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director or

immigration judge before a determination is made as to the merits of the request for relief.

(g) *Voluntary departure.* Each juvenile, apprehended in the immediate vicinity of the border, who resides permanently in Mexico or Canada, shall be informed, prior to presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or to an organization found on the free legal services list. A juvenile who does not reside in Mexico or Canada who is apprehended shall be provided access to a telephone and must in fact communicate either with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. If such juvenile, of his or her own volition, asks to contact a consular officer, and does in fact make such contact, the requirements of this section are satisfied.

(h) *Notice and request for disposition.* When a juvenile alien is apprehended, he or she must be given a Form I–770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands. In the event a juvenile who has requested a hearing pursuant to the notice subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I–770 shall be given to, and signed by the juvenile.

§ 236.4   Removal of S–5, S–6, and S–7 nonimmigrants.

(a) *Condition of classification.* As a condition of classification and continued stay in classification pursuant to section 101(a)(15)(S) of the Act, nonimmigrants in S classification must have executed Form I–854, Part B, Inter-agency Alien Witness and Informant Record, certifying that they have knowingly waived their right to a removal hearing and right to contest, other than on the basis of an application for withholding of deportation or removal, any removal action, including detention pending deportation or removal, instituted before lawful permanent resident status is obtained.

(b) *Determination of deportability.* (1) A determination to remove a deportable alien classified pursuant to section 101(a)(15)(S) of the Act shall be made by the district director having jurisdiction over the place where the alien is located.

(2) A determination to remove such a deportable alien shall be based on one or more of the grounds of deportability listed in section 237 of the Act based on conduct committed after, or conduct or a condition not disclosed to the Service prior to, the alien's classification as an S nonimmigrant under section 101(a)(15)(S) of the Act, or for a violation of, or failure to adhere to, the particular terms and conditions of status in S nonimmigrant classification.

(c) *Removal procedures.* (1) A district director who determines to remove an alien witness or informant in S nonimmigrant classification shall notify the Commissioner, the Assistant Attorney General, Criminal Division, and the relevant law enforcement agency in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant law enforcement agency have a right of appeal from any decision to remove.

(2) A district director who has provided notice as set forth in paragraph (c)(1) of this section and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall issue a Warrant of Removal. The alien shall immediately be arrested and taken into custody by the district director initiating the removal. An alien classified under the provisions of section 101(a)(15)(S) of the Act who is determined, pursuant to a warrant issued by a district director, to be deportable from the United States shall be removed from the United States to his or her country of nationality or last residence. The agency that requested the alien's presence in the United States shall ensure departure from the United States and so inform the district director in whose jurisdiction the alien has last resided. The district director, if necessary, shall oversee the alien's departure from the United States and, in any event, shall notify the Commissioner of the alien's departure.

(d) *Withholding of removal.* An alien classified pursuant to section 101(a)(15)(S) of the Act who applies for withholding of removal shall have 10 days from the date the Warrant of Removal is served upon the alien to file an application for such relief with the

district director initiating the removal order. The procedures contained in §§ 208.2 and 208.16 of this chapter shall apply to such an alien who applies for withholding of removal.

(e) *Inadmissibility.* An alien who applies for admission under the provisions of section 101(a)(15)(S) of the Act who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act and which has not been previously waived by the Commissioner will be taken into custody. The district director having jurisdiction over the port-of-entry shall follow the notification procedures specified in paragraph (c)(1) of this section. A district director who has provided such notice and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall remove the alien without further hearing. An alien may not contest such removal, other than by applying for withholding of removal.

### § 236.5 Fingerprints and photographs.

Every alien 14 years of age or older against whom proceedings based on deportability under section 237 of the Act are commenced under this part by service of a notice to appear shall be fingerprinted and photographed. Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies upon request to the district director or chief patrol agent having jurisdiction over the alien's record. Any such alien, regardless of his or her age, shall be photographed and/or fingerprinted if required by any immigration officer authorized to issue a notice to appear. Every alien 14 years of age or older who is found to be inadmissible to the United States and ordered removed by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

### §§ 236.6–236.9 [Reserved]

### Subpart B—Family Unity Program

### § 236.10 Description of program.

The family unity program implements the provisions of section 301 of the Immigration Act of 1990, Pub. L. 101–649. This Act is referred to in this section as ''IMMACT 90''.

### § 236.11 Definitions.

In this subpart, the term:

*Eligible immigrant* means a qualified immigrant who is the spouse or unmarried child of a legalized alien.

*Legalized alien* means an alien who:

(1) Is a temporary or permanent resident under section 210 or 245A of the Act; or

(2) Is a permanent resident under section 202 of the Immigration Reform and Control Act of 1986 (Cuban/Haitian Adjustment).

### § 236.12 Eligibility.

(a) *General.* An alien who is not a lawful permanent resident is eligible to apply for benefits under the Family Unity Program if he or she establishes:

(1) That he or she entered the United States before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), and has been continuously residing in the United States since that date; and

(2) That on May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), he or she was the spouse or unmarried child of a legalized alien, and that he or she has been eligible continuously since that time for family-sponsored second preference immigrant status under section 203(a)(2) of the Act based on the same relationship.

(b) *Legalization application pending as of May 5, 1988 or December 1, 1988.* An alien whose legalization application was filed on or before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), but not approved until after that date will be treated as having been a legalized alien as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), for purposes of the Family Unity Program.

### § 236.13 Ineligible aliens.

The following categories of aliens are ineligible for benefits under the Family Unity Program:

(a) An alien who is deportable under any paragraph in section 237(a) of the Act, except paragraphs (1)(A), (1)(B), (1)(C), and (3)(A); provided that an alien who is deportable under section 237(a)(1)(A) of such Act is also ineligible for benefits under the Family Unity Program if deportability is based upon a ground of inadmissibility described in section 212(a) (2) or (3) of the Act;

(b) An alien who has been convicted of a felony or three or more misdemeanors in the United States; or

(c) An alien described in section 241(b)(3)(B) of the Act.

### § 236.14 Filing.

(a) *General.* An application for voluntary departure under the Family Unity Program must be filed at the service center having jurisdiction over the alien's place of residence. A Form I–817, Application for Voluntary Departure under the Family Unity Program, must be filed with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. A separate application with appropriate fee and documentation must be filed for each person claiming eligibility.

(b) *Decision.* The service center director has sole jurisdiction to adjudicate an application for benefits under the Family Unity Program. The director will provide the applicant with specific reasons for any decision to deny an application. Denial of an application may not be appealed. An applicant who believes that the grounds for denial have been overcome may submit another application with the appropriate fee and documentation.

(c) *Referral of denied cases for consideration of issuance of notice to appear.* If an application is denied, the case will be referred to the district director with jurisdiction over the alien's place of residence for consideration of whether to issue a notice to appear. After an initial denial, an applicant's case will not be referred for issuance of a notice to appear until 90 days from the date of the initial denial, to allow the alien the opportunity to file a new Form I–817 application in order to attempt to overcome the basis of the denial. However, if the applicant is found not to be eligible for benefits under § 236.13(b), the Service reserves the right to issue a notice to appear at any time after the initial denial.

**AR01861**

**§ 236.15 Voluntary departure and eligibility for employment.**

(a) *Authority.* Voluntary departure under this section implements the provisions of section 301 of IMMACT 90, and authority to grant voluntary departure under the family unity program derives solely from that section. Voluntary departure under the family unity program shall be governed solely by this section, notwithstanding the provisions of section 240B of the Act and 8 CFR part 240.

(b) *Children of legalized aliens.* Children of legalized aliens residing in the United States, who were born during an authorized absence from the United States of mothers who are currently residing in the United States under voluntary departure pursuant to the Family Unity Program, may be granted voluntary departure under section 301 of IMMACT 90 for a period of 2 years.

(c) *Duration of voluntary departure.* An alien whose application for benefits under the Family Unity Program is approved will receive voluntary departure for 2 years, commencing with the date of approval of the application. Voluntary departure under this section shall be considered effective from the date on which the application was properly filed.

(d) *Employment authorization.* An alien granted benefits under the Family Unity Program is authorized to be employed in the United States and may apply for an employment authorization document on Form I–765, Application for Employment Authorization. The application may be filed concurrently with Form I–817. The application must be accompanied by the correct fee required by § 103.7(b)(1) of this chapter. The validity period of the employment authorization will coincide with the period of voluntary departure.

(e) *Extension of voluntary departure.* An application for an extension of voluntary departure under the Family Unity Program must be filed by the alien on Form I–817 along with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. The submission of a copy of the previous approval notice will assist in shortening the processing time. An extension may be granted if the alien continues to be eligible for benefits under the Family Unity Program. However, an extension may not be approved if the legalized alien is a lawful permanent resident, and a petition for family-sponsored immigrant status has not been filed in behalf of the applicant. In such case the Service will notify the alien of the reason for the denial and afford him or her the opportunity to file another Form I–817

once the petition, Form I–130, has been filed in behalf of him or her. No charging document will be issued for a period of 90 days.

(f) *Supporting documentation for extension application.* Supporting documentation need not include documentation provided with the previous application(s). The extension application need only include changes to previous applications and evidence of continuing eligibility since the date of the prior approval.

**§ 236.16 Travel outside the United States.**

An alien granted Family Unity Program benefits who intends to travel outside the United States temporarily must apply for advance authorization using Form I–131, Application for Travel Document. The authority to grant an application for advance authorization for an alien granted Family Unity Program benefits rests soley with the district director. An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be inadmissible under section 212(a) (2) or (3) of the Act, shall be inspected and admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program.

**§ 236.17 Eligibility for Federal financial assistance programs.**

An alien granted Family Unity Program benefits based on a relationship to a legalized alien as defined in § 236.11 is ineligible for public welfare assistance in the same manner and for the same period as the legalized alien who is ineligible for such assistance under section 245A(h) or 210(f) of the Act, respectively.

**§ 236.18 Termination of Family Unity Program benefits.**

(a) *Grounds of termination.* The Service may terminate benefits under the Family Unity Program whenever the necessity for the termination comes to the attention of the Service. Such grounds will exist in situations including, but not limited to, those in which:

(1) A determination is made that Family Unity Program benefits were acquired as the result of fraud or willful misrepresentation of a material fact;

(2) The beneficiary commits an act or acts which render him or her inadmissible as an immigrant or who are ineligible for benefits under the Family Unity Program;

(3) The legalized alien upon whose status benefits under the Family Unity Program were based loses his or her legalized status;

(4) The beneficiary is the subject of a final order of exclusion, deportation, or removal issued subsequent to the grant of Family Unity Program benefits unless such final order is based on entry without inspection; violation of status; or failure to comply with section 265 of the Act; or inadmissibility at the time of entry other than inadmissibility pursuant to section 212(a)(2) or 212(a)(3) of the Act, regardless of whether the facts giving rise to such ground occurred before or after the benefits were granted; or

(5) A qualifying relationship to a legalized alien no longer exists.

(b) *Notice procedure.* Notice of intent to terminate and of the grounds thereof shall be served pursuant to the provisions of § 103.5a of this chapter. The alien shall be given 30 days to respond to the notice and may submit to the Service additional evidence in rebuttal. Any final decision of termination shall also be served pursuant to the provisions of § 103.5a of this chapter. Nothing in this section shall preclude the Service from commencing exclusion or deportation proceedings prior to termination of Family Unity Program benefits.

(c) *Effect of termination.* Termination of benefits under the Family Unity Program, other than as a result of a final order of removal, shall render the alien amenable to removal proceedings under section 240 of the Act. If benefits are terminated, the period of voluntary departure under this section is also terminated.

**PART 237—[REMOVED AND RESERVED]**

102. Part 237 is removed and reserved.

103. Part 238 is added to read as follows:

**PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS**

**§ 238.1 Proceedings under section 238(b) of the Act.**

(a) *Definitions.* As used in this part:

*Deciding Service officer* means a district director, chief patrol agent, or another immigration officer designated by a district director or chief patrol agent, who is not the same person as the issuing Service officer.

*Issuing Service officer* means any Service officer listed in § 239.1 of this chapter as authorized to issue notices to appear.

(b) *Preliminary consideration and Notice of Intent to Issue a Final*

AR01862

*Administrative Deportation Order; commencement of proceedings.* (1) *Basis of Service charge.* An issuing Service officer shall cause to be served upon an alien a Form I–851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual:

(i) Is an alien;

(ii) Has not been lawfully admitted for permanent residence, or has conditional permanent resident status under section 216 of the Act;

(iii) Has been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 3.41 of this chapter) of an aggravated felony and such conviction has become final; and

(iv) Is deportable under section 237(a)(2)(A)(iii) of the Act, including an alien who has neither been admitted nor paroled, but who is conclusively presumed deportable under section 237(a)(2)(A)(iii) by operation of section 238(c) of the Act (''Presumption of Deportability'').

(2) *Notice.* (i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intention to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. This Notice shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing, as long as counsel is authorized to practice in deportation proceedings; may inspect the evidence supporting the Notice of Intent; and may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

(ii) The Notice of Intent also shall advise the alien that he or she may designate in writing, within the rebuttal period, the country to which he or she chooses to be deported in accordance with section 241 of the Act, in the event that a Final Administrative Removal Order is issued, and that the Service will honor such designation only to the extent permitted under the terms,

limitations, and conditions of section 241 of the Act.

(iii) The Service must determine that the person served with the Notice of Intent is the person named on the Notice.

(iv) The Service shall provide the alien with a list of available free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to 8 CFR part 292, located within the district or sector where the Notice of Intent is issued.

(v) The Service must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands.

(c) *Alien's response.* (1) *Time for response.* The alien will have 10 calendar days from service of the Notice of Intent, or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or request in writing an extension of time for response, stating the specific reasons why such an extension is necessary. Alternatively, the alien may, in writing, choose to accept immediate issuance of a Final Administrative Removal Order. The deciding Service officer may extend the time for response for good cause shown. A request for extension of time for response will not automatically extend the period for the response. The alien will be permitted to file a response outside the prescribed period only if the deciding Service officer permits it. The alien must send the response to the deciding Service officer at the address provided in the Notice of Intent.

(2) *Nature of rebuttal or request to review evidence.* (i) If an alien chooses to rebut the allegations contained in the Notice of Intent, the alien's written response must indicate which finding(s) are being challenged and should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(ii) If an alien's written response requests the opportunity to review the Government's evidence, the Service shall serve the alien with a copy of the evidence in the record of proceeding upon which the Service is relying to support the charge. The alien may, within 10 calendar days following service of the Government's evidence (13 calendar days if service is by mail), furnish a final response in accordance

with paragraph (c)(1) of this section. If the alien's final response is a rebuttal of the allegations, such a final response should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(d) *Determination by deciding Service officer.* (1) *No response submitted or concession of deportability.* If the deciding Service officer does not receive a timely response and the evidence in the record of processing establishes deportability by clear, convincing, and unequivocal evidence, or if the alien concedes deportability, then the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the deportation decision. The alien may, in writing, knowingly and voluntarily waive the 14-day waiting period before execution of the final order of removal provided in a paragraph (f) of this section.

(2) *Response submitted.* (i) *Insufficient rebuttal; no genuine issue of material fact.* If the alien timely submits a rebuttal to the allegations, but the deciding Service officer finds that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(ii) *Additional evidence required.* (A) If the deciding Service officer finds that the record of proceeding, including the alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings, the deciding Service officer may either obtain additional evidence from any source, including the alien, or cause to be issued a notice to appear to initiate removal proceedings under section 240 of the Act. The deciding Service officer may also obtain additional evidence from any source, including the alien, if the deciding Service officer deems that such additional evidence may aid the officer in the rendering of a decision.

(B) If the deciding Service officer considers additional evidence from a source other than the alien, that evidence shall be made a part of the record of proceeding, and shall be provided to the alien. If the alien elects to submit a response to such additional evidence, such response must be filed with the Service within 10 calendar days of service of the additional evidence (or 13 calendar days if service is by mail). If the deciding Service officer finds, after considering all

**AR01863**

additional evidence, that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Deportation Order that states the reasons for the decision of deportability.

(iii) *Conversion to proceedings under section 240 of the Act.* If the deciding Service officer finds that the alien is not amenable to removal under section 238 of the Act, the deciding Service officer shall terminate the expedited proceedings under section 238 of the Act and shall, where appropriate, cause to be issued a notice to appear for the purpose of initiating removal proceedings before an immigration judge under section 240 of the Act.

(3) *Termination of proceedings by deciding Service officer.* Only the deciding Service officer may terminate proceedings under section 238 of the Act, in accordance with this section.

(e) *Proceedings commenced under section 240 of the Act.* In any proceeding commenced under section 240 of the Act which is based on deportability under section 237 of the Act, if it appears that the respondent alien is subject to removal pursuant to section 238 of the Act, the immigration judge may, upon the Service's request, terminate the case and, upon such termination, the Service may commence administrative proceedings under section 238 of the Act. However, in the absence of any such request, the immigration judge shall complete the proceeding commenced under section 240 of the Act.

(f) *Executing final removal order of deciding Service officer.* (1) *Time of execution.* Upon the issuance of a Final Administrative Removal Order, the Service shall issue a Warrant of Removal in accordance with § 241.2 of this chapter; such warrant shall be executed no sooner than 14 calendar days after the date the Final Administrative Removal Order is issued, unless the alien knowingly, voluntarily, and in writing waives the 14-day period.

(2) *Country to which alien is to be removed.* The deciding Service officer shall designate the country of removal in the manner prescribed by section 241 of the Act.

(g) *Arrest and detention.* At the time of issuance of a Notice of Intent or at any time thereafter and up to the time the alien becomes the subject of a Warrant of Removal, the alien may be arrested and taken into custody under the authority of a Warrant of Arrest issued by an officer listed in § 287.5(e)(2) of this chapter. The

decision of the Service concerning custody or bond shall not be administratively appealable during proceedings initiated under section 238 of the Act and this part.

(h) *Record of proceeding.* The Service shall maintain a record of proceeding for judicial review of the Final Administrative Removal Order sought by any petition for review. The record of proceeding shall include, but not necessarily be limited to: the charging document (Notice of Intent); the Final Administrative Removal Order (including any supplemental memorandum of decision); the alien's response, if any; all evidence in support of the charge; and any admissible evidence, briefs, or documents submitted by either party respecting deportability. The executed duplicate of the Notice of Intent in the record of proceedings shall be retained as evidence that the individual upon whom the notice for the proceeding was served was, in fact, the alien named in the notice.

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

104. Part 239 is added to read as follows:

**PART 239—INITIATION OF REMOVAL PROCEEDINGS**

Sec.
239.1    Notice to appear.
239.2    Cancellation of notice to appear.
239.3    Effect of filing notice to appear.

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

**§ 239.1    Notice to appear.**

(a) *Commencement.* Every removal proceeding conducted under section 240 of the Act to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court. Any immigration officer performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such an alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);
(2) Deputy district directors (except foreign);
(3) Assistant district directors for investigations;
(4) Deputy assistant district directors for investigations;
(5) Assistant district directors for deportation;
(6) Deputy assistant district directors for deportation;
(7) Assistant district directors for examinations;

(8) Deputy assistant district directors for examinations;
(9) Officers in charge (except foreign);
(10) Assistant officers in charge (except foreign);
(11) Chief patrol agents;
(12) Deputy chief patrol agents;
(13) Associate chief patrol agents;
(14) Assistant chief patrol agents;
(15) Patrol agents in charge;
(16) The Assistant Commissioner, Investigations;
(17) Service center directors;
(18) Deputy center directors;
(19) Assistant center directors for examinations;
(20) Supervisory asylum officers; or
(21) Institutional Hearing Program directors.

(b) *Service of notice to appear.* Service of the notice to appear shall be in accordance with section 239 of the Act.

**§ 239.2    Cancellation of notice to appear.**

(a) Any officer authorized by § 239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to § 3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;
(2) The respondent is not deportable or inadmissable under immigration laws;
(3) The respondent is deceased;
(4) The respondent is not in the United States;
(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act; or
(6) The notice to appear was improvidently issued.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) *Motion to dismiss.* After commencement of proceedings pursuant to § 3.14 of this chapter, any officer enumerated in paragraph (a) of this section may move for dismissal of the matter on the grounds set out under paragraph (a) of this section. Dismissal of the matter shall be without prejudice to the alien or the Service.

(d) *Motion for remand.* After commencement of the hearing, any officer enumerated in paragraph (a) of this section may move for remand of the

matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Service.

(e) *Warrant of arrest.* When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) *Termination of removal proceedings by immigration judge.* An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completely as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

**§ 239.3 Effect of filing notice to appear.**

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

**§§ 240.1–240.20 Redesignated as §§ 244.3–244.22]**

105. Sections 240.1 through 240.20 are redesignated as §§ 244.3 through 244.22.

106. Part 240 is revised to read as follows:

# PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

## Subpart A—Removal Proceedings

Sec.
240.1    Immigration judges.
240.2    Attorney for the Service.
240.3    Representation by counsel.
240.4    Incompetent respondents.
240.5    Interpreter.
240.6    Postponement and adjournment of hearing.
240.7    Evidence in removal proceedings under section 240 of the Act.
240.8    Burdens of proof in removal proceedings.
240.9    Contents of record.
240.10   Hearing.
240.11   Ancillary matters, applications.
240.12   Decision of the immigration judge.
240.13   Notice of decision.
240.14   Finality of order.
240.15   Appeals.
240.16   Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

## Subpart B—Cancellation of Removal

240.20   Cancellation of removal and adjustment of status under section 240A(a) and 240A(b) of the Act

## Subpart C—Voluntary Depature

240.25   Voluntary departure—authority of the Service.
240.26   Voluntary departure—authority of the Executive Office for Immigration Review.

## Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997)

240.30   Proceedings prior to April 1, 1997.
240.31   Authority of immigration judges.
240.32   Hearing.
240.33   Applications for asylum or withholding of deportation.
240.34   Renewal of application for adjustment of status under section 245 of the Act.
240.35   Decision of the immigration judge; notice of the applicant.
240.36   Finality of order.
240.37   Appeals.
240.38   Fingerprinting of excluded aliens.
240.39   Reopening or reconsideration.

## Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)

240.40   Proceedings commenced prior to April 1, 1997.
240.41   Immigration judges.
240.42   Representation by counsel.
240.43   Incompetent respondents.
240.44   Interpreter.
240.45   Postponement and adjournment of hearing.
240.46   Evidence.
240.47   Contents of record.
240.48   Hearing.
240.49   Ancillary matters, applications.
240.50   Decision of the immigration judge.
240.51   Notice of decision.
240.52   Finality of order.
240.53   Appeals.
240.54   Proceedings under section 242(f) of the Act.

## Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997)

240.55   Proceedings commenced prior to April 1, 1997.
240.56   Application.
240.57   Extension of time to depart.

## Subpart G—Civil penalties for failure to depart [Reserved]

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; 8 CFR part 2.

## Subpart A—Removal Proceedings

### § 240.1 Immigration judges.

(a) *Authority:* In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to: determine removability pursuant to section 240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act; to determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act; to order withholding of removal pursuant to section 241(b)(3) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

(c) *Conduct of hearing.* The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

### § 240.2 Attorney for the Service.

(a) *Authority.* The attorney for the Service shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part. The Service

attorney is authorized to appeal from a decision of the immigration judge pursuant to § 3.38 of this chapter and to move for reopening or reconsideration pursuant to § 3.23 of this chapter.

(b) *Assignment.* In a removal proceeding, the Service shall assign an attorney to each case within the provisions of § 240.10(d), and to each case in which an unrepresented respondent is incompetent or is under 18 years of age, and is not accompanied by a guardian, relative, or friend. In a case in which the removal proceeding would result in an order of removal, the Service shall assign an attorney to each case in which a respondent's nationality is in issue. A Service attorney shall be assigned in every case in which the Commissioner approves the submission of non-record information under § 240.11(a)(3). In his or her discretion, whenever he or she deems such assignment necessary or advantageous, the General Counsel may assign a Service attorney to any other case at any stage of the proceeding.

### § 240.3   Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

### § 240.4   Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

### § 240.5   Interpreter.

Any person acting as an interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

### § 240.6   Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

### § 240.7   Evidence in removal proceedings under section 240 of the Act.

(a) *Use of prior statements.*

The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(b) *Testimony.* Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(c) *Depositions.* The immigration judge may order the taking of depositions pursuant to § 3.35 of this chapter.

### § 240.8   Burdens of proof in removal proceedings.

(a) *Deportable aliens.* A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable.

(b) *Arriving aliens.* In proceedings commenced upon a respondent's arrival in the United States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) *Aliens present in the United States without being admitted or paroled.* In the case of a respondent in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) *Relief from removal.* The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

### § 240.9   Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be

recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her decision, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

### § 240.10   Hearing.

(a) *Opening.* In a removal proceeding, the immigration judge shall:

(1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation;

(2) Advise the respondent of the availability of free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the removal hearing is being held;

(3) Ascertain that the respondent has received a list of such programs, and a copy of appeal rights;

(4) Advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government (but respondent shall not be entitled to examine such national security information as the government may proffer in opposition to the respondent's admission to the United States or to an application by the respondent for discretionary relief);

(5) Place the respondent under oath;

(6) Read the factual allegations and the charges in the notice to appear to the respondent and explain them in non-technical language; and

(7) Enter the notice to appear as an exhibit in the Record of Proceeding.

(b) *Public access to hearings.* Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 3.27 of this chapter.

(c) *Pleading by respondent.* The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no

issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

(d) *Issues of removability.* When removability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of an assistant district counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The alien shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the alien. No JRAD is effective against a charge of deportability under former section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(e) *Additional charges in removal hearings.* At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing. The alien in removal proceedings shall be served with a copy of these additional charges and allegations. The immigration judge shall read the additional factual allegations and charges to the and explain them to him or her. The immigration judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented, and that he or she may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.6(b) relating to pleading shall apply to the additional factual allegations and charges.

(f) *Country of removal.*The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the first instance be directed pursuant to section 241(b) of the Act to the country designated by the alien, unless section

241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country.

(g) In the event that the Service is unable to remove the alien to the specified or alternative country or countries, the Service may remove the alien to any other country as permitted by section 241(b) of the Act.

**§ 240.11  Ancillary matters, applications.**

(a) *Creation of the status of an alien lawfully admitted for permanent residence.* (1) In a removal proceeding, an alien may apply to the immigration judge for cancellation of removal under section 240A of the Act, adjustment of status under section 245 of the Act, adjustment of status under section 1 of the Act of November 2, 1996 (as modified by section 606 of Pub. L 104–132) or under section 101 or 104 of the Act of October 28, 1977, or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of § 240.20, and 8 CFR parts 245 and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act) shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act, or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216.

(2) In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the alien is inadmissible under any provision of section 212(a) of the Act, and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of

the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.

(3) In exercising discretionary power when considering an application for status as a permanent resident under this chapter, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the alien, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the alien of the general nature of the information in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The alien may apply to the immigration judge for voluntary departure in lieu of removal pursuant to section 240B of the Act and subpart C of this part.

(c) *Applications for asylum and withholding of removal.* (1) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be removed pursuant to § 240.10(f), and the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with § 208.14 of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of removal of those countries;

(ii) Make available the appropriate application forms; and

(iii) Advise the alien of the privilege of being represented by counsel at no expense to the government and of the consequences, pursuant to section 208(d)(6) of the Act, of knowingly, filing a frivolous application for asylum. The immigration judge shall provide to the alien a list of persons who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(2) An application for asylum or withholding of removal must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy

to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the alien and to the assistant district counsel representing the government.

(3) Applications for asylum and withholding of removal so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 of this chapter after an evidentiary hearing to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.14 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of removal will be open to the public unless the alien expressly requests that the hearings be closed pursuant to § 3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.

(ii) Nothing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing.

(iii) During the removal hearing, the alien shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The alien has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standards set forth in § 208.13 of this chapter.

(iv) The assistant district counsel may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information, he or she shall inform the alien. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources. The summary should be as detailed as possible, in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(4) The decision of an immigration judge to grant or deny asylum or withholding of removal shall be communicated to the alien and to the assistant district counsel. An adverse decision shall state why asylum or withholding of removal was denied.

(d) *Application for relief under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from removal under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his or her alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation or removal submitted to the Service on or after January 4, 1995, as the basis for issuance of a charging document or to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The alien shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege that he or she believes himself or herself eligible to receive in proceedings under this part. Nothing in this section is intended to limit the Attorney General's authority to remove an alien to any country permitted by section 241(b) of the Act.

(f) *Fees.* The alien shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee.

### § 240.12   Decision of the immigration judge.

(a) *Contents.* The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to § 240.10(b) and the respondent does not make an application under § 240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

### § 240.13   Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the service counsel, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the service counsel, if any, at the conclusion of the hearing. A copy of the summary written order shall be furnished at the request of the respondent or the service counsel.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.12(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing.

(d) *Decision to remove.* If the immigration judge decides that the respondent is removable and orders the respondent to be removed, the immigration judge shall advise the respondent of such decision, and of the consequences for failure to depart under the order of removal, including civil and criminal penalties described at sections 274D and 243 of the Act. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.15.

## § 240.14 Finality of order.

The order of the immigration judge shall become final in accordance with § 3.39 of this chapter.

## § 240.15 Appeals.

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals, except that no appeal shall lie from an order of removal entered in absentia. The procedures regarding the filing of a Form EOIR 26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board of Immigration Appeals. The reasons for the appeal shall be stated in the Notice of Appeal in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

## § 240.16 Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

The Attorney General shall have the sole discretion to apply the provisions of section 309(c) of Pub. L. 104–208, which provides for the application of new removal procedures to certain cases in exclusion or deportation proceedings and for the termination of certain cases in exclusion or deportation proceedings and initiation of new removal proceedings. The Attorney General's application of the provisions of section 309(c) shall become effective upon publication of a notice in the **Federal Register**. However, if the Attorney General determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Attorney General's application shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter.

## §§ 240.17–240.19 [Reserved]

## Subpart B—Cancellation of Removal

## § 240.20 Cancellation of removal and adjustment of status under section 240A of the Act.

(a) *Jurisdiction.* An application for the exercise of discretion under section 240A of the Act shall be submitted on Form EOIR–42, Application for Cancellation of Removal, to the Immigration Court having administrative control over the Record of Proceeding of the underlying removal proceeding under section 240 of the Act.

(b) *Filing the application.* The application may be filed only with the immigration Court after jurisdiction has vested pursuant to § 3.14 of this chapter.

## §§ 240.21–240.24 [Reserved]

## Subpart C—Voluntary Departure

## § 240.25 Voluntary departure—authority of the Service.

(a) *Authorized officers.* The authority contained in section 240B(a) of the Act to permit aliens to depart voluntarily from the United States may be exercised in lieu of being subject to proceedings under section 240 of the Act or prior to the completion of such proceedings by district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors, and assistant center directors for examinations.

(b) *Conditions.* The Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service may hold the passport or documentation for sufficient time to investigate its authenticity.

(c) *Periods of time.* The authorized officer, in his or her discretion, shall specify the period of time permitted for voluntary departure, and may grant extensions thereof, except that the total period allowed, including any extensions, shall not exceed 120 days.

(d) *Application.* Any alien who believes himself or herself to be eligible for voluntary departure under this section may apply therefor at any office of the Service. After the commencement of removal proceedings, the application may be communicated through the Service attorney. If the Service agrees to voluntary departure after proceedings have commenced, it may either:

(1) Join in a motion to terminate the proceedings, and if the proceedings are terminated, grant voluntary departure; or

(2) Join in a motion asking the immigration judge to permit voluntary departure in accordance with § 240.26.

(e) *Appeals.* An appeal shall not lie from a denial of an application for voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply to the immigration judge for voluntary departure in accordance with § 240.26 or for relief from removal under any provision of law.

(f) *Revocation.* If, subsequent to the granting of an application for voluntary departure under this section, it is ascertained that the application should not have been granted, that grant may be revoked without notice by any officer authorized to grant voluntary departure under § 240.25(a).

## § 240.26 Voluntary departure—authority of the Executive Office for Immigration Review.

(a) *Eligibility; general.* An alien previously granted voluntary departure under section 240B of the Act, including by the Service under § 240.25, and who fails to depart voluntarily within the time specified, shall thereafter be ineligible, for a period of ten years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act.

(b) *Prior to completion of removal proceedings.* (1) *Grant by the immigration judge.* (i) An alien may be granted voluntary departure by an immigration judge pursuant to section 240B(a) of the Act only if the alien:

(A) Makes such request prior to or at a master calendar hearing;

(B) Makes no additional request for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability; and

(D) Waives appeal of all issues.

(ii) The judge may not grant voluntary departure under section 240B(a) of the Act beyond 30 days after the case has been calendared for a merits hearing, except pursuant to a stipulation under paragraph (b)(2) of this section.

(2) *Stipulation.* At any time prior to the completion of removal proceedings, the Service attorney may stipulate to a grant of voluntary departure under section 240B(a) of the Act.

(3) *Conditions.* (i) The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. The alien shall be required to present to

**AR01869**

the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing, unless:

(A) A travel document is not necessary to return to his or her native country or to which country the alien is departing; or

(B) The document is already in the possession of the Service.

(ii) The Service may hold the passport or documentation for sufficient time to investigate its authenticity. If such documentation is not immediately available to the alien, but the immigration judge is satisfied that the alien is making diligent efforts to secure it, voluntary departure may be granted for a period not to exceed 120 days, subject to the condition that the alien within 60 days must secure such documentation and present it to the Service. The Service in its discretion may extend the period within which the alien must provide such documentation. If the documentation is not presented within the 60-day period or any extension thereof, the voluntary departure order shall vacate automatically and the alternate order of deportation will take effect, as if in effect on the date of issuance of the immigration judge order.

(c) *At the conclusion of the removal proceedings.* (1) *Required findings.* An immigration judge may grant voluntary departure at the conclusion of the removal proceedings under section 240B(b) of the Act, if he or she finds that:

(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was served under section 239(a) of the Act;

(ii) the alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) the alien is not deportable under section 237(a)(2)(A)(iii) or 237(a)(4) of the Act; and

(iv) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so.

(2) *Travel documentation.* Except as otherwise provided in paragraph (b)(3) of this section, the clear and convincing evidence of the means to depart shall include in all cases presentation by the alien of a passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service shall have full opportunity to inspect and photocopy the documentation, and to

challenge its authenticity or sufficiency before voluntary departure is granted.

(3) *Conditions.* The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States. In all cases under section 240B(b) of the Act, the alien shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien departs within the time specified, but in no case less than $500. The voluntary departure bond shall be posted with the district director within 5 business days of the immigration judge's order granting voluntary departure, and the district director may, at his or her discretion, hold the alien in custody until the bond is posted. If the bond is not posted within 5 business days, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect on the following day. In order for the bond to be canceled, the alien must provide proof of departure to the district director.

(d) *Alternate order of removal.* Upon granting a request made for voluntary departure either prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate order of removal.

(e) *Periods of time.* If voluntary departure is granted prior to the completion of removal proceedings, the immigration judge may grant a period not to exceed 120 days. If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period not to exceed 60 days.

(f) *Extension of time to depart.* Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

(g) *Administrative Appeals.* (1) *Grants of requests made prior to the completion of the section 240 removal proceeding.* A Service appeal of a grant of voluntary departure prior to the completion of section 240 removal proceedings shall be limited to the issue of whether the alien merits the grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the

number of days of voluntary departure granted.

(2) *At the conclusion of the section 240 removal proceeding.* An appeal of a grant or denial of voluntary departure at the conclusion of the section 240 removal proceeding shall be limited to the issues of whether the alien is eligible for a grant of voluntary departure under the Act and this chapter and whether the alien merits a grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the number of days of voluntary departure granted.

(h) *Reinstatement of voluntary departure.* An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act and paragraph (a) of this section.

**§§ 240.27–240.29  [Reserved]**

**Subpart D—Exclusion of Aliens (for Hearings Commenced Prior to April 1, 1997)**

**§ 240.30  Proceedings prior to April 1, 1997.**

Subpart D of 8 CFR part 240 applies to exclusion proceedings commenced prior to April 1, 1997, pursuant to the former section 236 of the Act. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

**§ 240.31  Authority of immigration judges.**

In determining cases referred for further inquiry as provided in section 235 of the Act, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases.

**§ 240.32  Hearing.**

(a) *Opening.* Exclusion hearings shall be closed to the public, unless the alien at his or her own instance requests that the public, including the press, be permitted to attend; in that event, the hearing shall be open, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public.

When the hearing is to be open, depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public. The immigration judge shall ascertain whether the applicant for admission is the person to whom Form I–122 was previously delivered by the examining immigration officer as provided in 8 CFR part 235; enter a copy of such form in evidence as an exhibit in the case; inform the applicant of the nature and purpose of the hearing; advise him or her of the privilege of being represented by an attorney of his or her own choice at no expense to the Government, and of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter located in the district where his or her exclusion hearing is to be held; and shall ascertain that the applicant has received a list of such programs; and request him or her to ascertain then and there whether he or she desires representation; advise him or her that he or she will have a reasonable opportunity to present evidence in his or her own behalf, to examine and object to evidence against him or her, and to cross-examine witnesses presented by the Government; and place the applicant under oath.

(b) *Procedure.* The immigration judge shall receive and adduce material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(c) *Attorney for the Service.* The Service shall assign an attorney to each case in which an applicant's nationality is in issue and may assign an attorney to any case in which such assignment is deemed necessary or advantageous. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the applicant and other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part.

(d) *Depositions.* The procedures specified in § 240.48(e) shall apply.

(e) *Record.* The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge.

## § 240.33 Applications for asylum or withholding of deportation.

(a) If the alien expresses fear of persecution or harm upon return to his or her country of origin or to a country to which the alien may be deported after a determination of excludability from the United States pursuant to this subpart, and the alien has not been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(1) Advise the alien that he may apply for asylum in the United States or withholding of deportation to that other country; and

(2) Make available the appropriate application forms.

(b) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(c) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve material factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13(c) of this chapter is not necessary once the immigration judge has determined that such denial is required.

(1) Evidentiary hearings on applications for asylum or withholding of deportation will be closed to the public unless the applicant expressly requests that it be open pursuant to § 236.3 of this chapter.

(2) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(3) During the exclusion hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses on his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(4) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. The applicant shall be informed when the immigration judge receives such classified information. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that such information is material to the decision.

(d) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

## § 240.34 Renewal of application for adjustment of status under section 245 of the Act.

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act (as in effect prior to April 1, 1997) before an immigration judge under the following two conditions: first, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

## § 240.35 Decision of the immigration judge; notice to the applicant.

(a) *Decision.* The immigration judge shall inform the applicant of his or her decision in accordance with § 3.37 of this chapter.

(b) *Advice to alien ordered excluded.* An alien ordered excluded shall be furnished with Form I–296, Notice to Alien Ordered Excluded by Immigration Judge, at the time of an oral decision by

the immigration judge or upon service of a written decision.

(c) *Holders of refugee travel documents.* Aliens who are holders of valid unexpired refugee travel documents shall be ordered excluded only if they are found to be inadmissible under section 212(a)(2), 212(a)(3), or 212(a)(6)(E) of the Act, and it is determined that on the basis of the acts for which they are inadmissible there are compelling reasons of national security or public order for their exclusion. If the immigration judge finds that the alien is inadmissible but determines that there are no compelling reasons of national security or public order for exclusion, the immigration judge shall remand the case to the district director for parole.

**§ 240.36 Finality of order.**

The decision of the immigration judge shall become final in accordance with § 3.37 of this chapter.

**§ 240.37 Appeals.**

Except for temporary exclusions under section 235(c) of the Act, an appeal from a decision of an Immigration Judge under this part may be taken by either party pursuant to § 3.38 of this chapter.

**§ 240.38 Fingerprinting of excluded aliens.**

Every alien 14 years of age or older who is excluded from admission to the United States by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

**§ 240.39 Reopening or reconsideration.**

Except as otherwise provided in this section, a motion to reopen or reconsider shall be subject to the requirements of § 103.5 of this chapter. The immigration judge may upon his or her own motion, or upon motion of the trial attorney or the respondent, reopen or reconsider any case in which he or she had made a decision, unless jurisdiction in the case is vested in the Board of Immigration Appeals under 8 CFR part 3. An order by the immigration judge granting a motion to reopen may be made on Form I–328. A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing; nor will any motion to reopen for the purpose of providing the respondent with an opportunity to make an application under § 242.17 of this chapter be granted if respondent's right to make such application were fully

explained to him or her by the immigration judge and he or she was afforded an opportunity to do so at the hearing, unless circumstances have arisen thereafter on the basis of which the request is being made. The filing of a motion under this section with an immigration judge shall not serve to stay the execution of an outstanding decision; execution shall proceed unless the immigration judge who has jurisdiction over the motion specifically grants a stay of deportation. The immigration judge may stay deportation pending his or her determination of the motion and also pending the taking and disposition of an appeal from such determination.

**Subpart E—Proceedings To Determine Deportability of Aliens in the United States: Hearing and Appeal (for Proceedings Commenced Prior to April 1, 1997)**

**§ 240.40 Proceedings commenced prior to April 1, 1997.**

Subpart E of 8 CFR part 240 applies only to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart pertain to the Act as in effect prior to April 1, 1997.

**§ 240.41 Immigration Judges.**

(a) *Authority.* In any proceeding conducted under this part the immigration judge shall have the authority to determine deportability and to make decisions, including orders of deportation, as provided by section 242(b) and 242B of the Act; to reinstate orders of deportation as provided by section 242(f) of the Act; to determine applications under sections 208, 212(k), 241(a)(1)(E)(iii), 241(a)(1)(H), 244, 245, and 249 of the Act; to determine the country to which an alien's deportation will be directed in accordance with section 243(a) of the Act; to order temporary withholding of deportation pursuant to section 243(h) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. An immigration judge may certify his or her decision in any case to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under section 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he deems himself disqualified. If an immigration judge becomes unavailable to complete

his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he has done so.

**§ 240.42 Representation by counsel.**

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

**§ 240.43 Incompetent respondents.**

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the guardian, near relative, or friend who was served with a copy of the order to show cause shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

**§ 240.44 Interpreter.**

Any person acting as interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

**§ 240.45 Postponement and adjournment of hearing.**

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

**§ 240.46 Evidence.**

(a) *Sufficiency.* A determination of deportability shall not be valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.

(b) *Use of prior statements.* The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(c) *Testimony.* Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(d) *Depositions.* The immigration judge may order the taking of depositions pursuant to § 3.35 of this chapter.

**AR01872**

## § 240.47  Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

## § 240.48  Hearing.

(a) *Opening.* The immigration judge shall advise the respondent of his or her right to representation, at no expense to the Government, by counsel of his or her own choice authorized to practice in the proceedings and require him or her to state then and there whether he desires representations; advise the respondent of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the deportation hearing is being held; ascertain that the respondent has received a list of such programs, and a copy of Form I–618, Written Notice of Appeal Rights; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him, to present evidence in his or her own behalf and to cross-examine witnesses presented by the Government; place the respondent under oath; read the factual allegations and the charges in the order to show cause to the respondent and explain them in nontechnical language, and enter the order to show cause as an exhibit in the record. Deportation hearings shall be open to the public, except that the immigration judge may, in his or her discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.

(b) *Pleading by respondent.* The immigration judge shall require the respondent to plead to the order to show cause by stating whether he or she admits or denies the factual allegations and his or her reportability under the charges contained therein. If the respondent admits the factual allegations and admits his or her deportability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that deportability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge may not accept an admission of deportability, he or she shall direct a hearing on the issues.

(c) *Issues of deportability.* When deportability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of a trial attorney, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The respondent shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the special inquiry officer when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the respondent. No JRAD is effective against a charge of deportability under section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(d) *Additional charges.* The Service may at any time during a hearing lodge additional charges of deportability, including factual allegations, against the respondent. Copies of the additional factual allegations and charges shall be submitted in writing for service on the respondent and entry as an exhibit in the record. The immigration judge shall read the additional factual allegations and charges to the respondent and explain them to him or her. The immigration judge shall advise the respondent if he or she is not represented by counsel that he or she may be so represented and also that he or she may have a reasonable time within which to meet the additional factual allegations and charges. The respondent shall be required to state then and there whether he or she desires a continuance for either of these reasons. Thereafter, the provisions of paragraph (b) of this section shall apply to the additional factual allegations and lodged charges.

## § 240.49  Ancillary matters, applications.

(a) *Creation of the status of an alien lawfully admitted for permanent residence.* The respondent may apply to the immigration judge for suspension of deportation under section 244(a) of the Act; for adjustment of status under section 245 of the Act, or under section 1 of the Act of November 2, 1966, or under section 101 or 104 of the Act of October 28, 1977; or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of 8 CFR parts 240, 245, and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act), shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216. In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the respondent is inadmissible under any provision of section 212(a) of the Act and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing. In exercising discretionary power when considering an application under this paragraph, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the respondent of the general nature of the information in

order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The respondent may apply to the immigration judge for voluntary departure in lieu of deportation pursuant to section 244(e) of the Act and § 240.56.

(c) *Applications for asylum or withholding of deportation.* (1) The immigration judge shall notify the respondent that if he or she is finally ordered deported, his or her deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by the respondent and shall afford him an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the respondent declines to designate a country.

(2) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported pursuant to paragraph (c)(1) of this section, and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(i) Advise the alien that he may apply for asylum in the United States or withholding of deportation to those countries; and

(ii) Make available the appropriate application forms.

(3) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(b) of this chapter. Upon receipt of an application that has not been referred to an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, of the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(4) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of deportation will be open to the public unless the applicant expressly requests that it be closed.

(ii) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(iii) During the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(iv) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information he or she shall inform the applicant. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(5) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

(d) *Application for relief under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from deportation under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation submitted to an asylum officer pursuant to § 208.2 of this chapter on or after January 4, 1995, as the basis for issuance of an order to show cause or a notice to appear to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The respondent shall have the burden of establishing that he or she is eligible for any request benefit or privilege and that it should be granted in the exercise of discretion. The respondent shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege which he or she believes himself or herself eligible to receive in proceedings under this part.

**§ 240.50 Decision of the immigration judge.**

(a) *Contents.* The decision of the immigration judge may be oral or written. Except when deportability is determined on the pleadings pursuant to § 240.48(b), the decision of the immigration judge shall include a finding as to deportability. The formal enumeration of findings is not required. The decision shall also contain the reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where deportability is determined on the pleadings pursuant to § 240.48(b) and the respondent does not make an application under § 240.49, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision on Form EOIR–7, Summary Order of Deportation, if deportation is

AR01874

ordered, or on Form EOIR–6, Summary Order of Voluntary Departure, if voluntary departure is granted with an alternate order of deportation.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's deportation, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When deportation is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's deportation shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

§ 240.51   Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the trial attorney, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the trail attorney, if any, at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.53. A typewritten copy of the oral decision shall be furnished at the request of the respondent or the trial attorney.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.51(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.54.

§ 240.52   Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.39 of this chapter.

§ 240.53   Appeals.

(a) Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board, except that no appeal shall lie from an order of deportation entered in absentia. The procedures regarding the filing of a Form EOIR–26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the

Notice of Appeal by the Board. The reasons for the appeal shall be stated in the Form EOIR–26, Notice of Appeal, in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

(b) *Prohibited appeals; legalization or applications.* An alien respondent defined in § 245a.2(c)(6) or (7) of this chapter who fails to file an application for adjustment of status to that of a temporary resident within the prescribed period(s), and who is thereafter found to be deportable by decision of an immigration judge, shall not be permitted to appeal the finding of deportability based solely on refusal by the immigration judge to entertain such an application in deportation proceedings.

§ 240.54   Proceedings under section 242(f) of the Act.

(a) *Order to show cause.* In the case of an alien within the provisions of section 242(f) of the Act, the order to show cause shall charge him or her with deportability under section 242(f) of the Act. The prior order of deportation and evidence of the execution thereof, properly identified, shall constitute prima facie cause for deportability under this section.

(b) *Applicable procedure.* Except as otherwise provided in this section, proceedings under section 242(f) of the Act shall be conducted in general accordance with the rules prescribed in this part.

(c) *Deportability.* In determining the deportability of an alien alleged to be within the purview of paragraph (a) of this section, the issues shall be limited to solely to a determination of the identity of the respondent, i.e., whether the respondent is in fact an alien who was previously deported, or who departed while an order of deportation was outstanding; whether the respondent was previously deported as a member of any of the classes described in section 241(a)(2),(3) or (4) of the Act; and whether respondent has unlawfully reentered the United States.

(d) *Order.* If deportability as charged in the order to show cause is established, the Immigration Judge shall order that the respondent be deported under the previous order of deportation in accordance with section 242(f) of the Act.

(e) *Service counsel; additional charges.* When Service counsel is assigned to a proceeding under this section and additional charges are lodged against the respondent, the

provisions of paragraphs (c) and (d) of this section shall cease to apply.

## Subpart F—Suspension of Deportation and Voluntary Departure (for Proceedings Commenced Prior to April 1, 1997)

§ 240.55   Proceedings commenced prior to April 1, 1997.

Subpart F of 8 CFR part 240 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

§ 240.56   Application.

Notwithstanding any other provision of this chapter, an alien who is deportable because of a conviction on or after November 18, 1988, for an aggravated felony as defined in section 101(a)(43) of the Act, shall not be eligible for voluntary departure as prescribed in 8 CFR part 240 and section 244 of the Act. Pursuant to subpart F of this part and section 244 of the Act, an immigration judge may authorized the suspension of an alien's deportation; or, if the alien established that he or she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorized the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure, and under such conditions as the district director shall direct. An application for suspension of deportation shall be made on Form EOIR–40.

§ 240.57   Extension of time to depart.

Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director, except that an immigration judge or the Board may reinstate voluntary departure in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure. A request by an alien for reinstatement or an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision shall be served upon the alien and no appeal may be taken therefrom.

**Subpart G—Civil Penalties for Failure To Depart [Reserved]**

107. Part 241 is revised to read as follows:

# PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

**Subpart A—Post-Hearing Detention and Removal**

Sec.
241.1   Final order of removal.
241.2   Warrant of removal.
241.3   Detention of aliens during removal period.
241.4   Continued detention beyond the removal period.
241.5   Conditions of release after removal period.
241.6   Administrative stay of removal.
241.7   Self-removal.
241.8   Reinstatement of removal orders.
241.9   Notice to transportation line of inadmissible alien's removal.
241.10  Special care and attention of removable aliens.
241.11  Detention and removal of stowaways.
241.12  Nonapplication of costs of detention and maintenance.

**Subpart B—Deportation of Excluded Aliens (for Hearings Commenced Prior to April 1, 1997).**

241.20  Proceedings commenced prior to April 1, 1997.
241.21  Stay of deportation of excluded alien.
241.22  Notice to surrender for deportation.
241.23  Cost of maintenance not assessed.
241.24  Notice to transportation line of alien's exclusion.
241.25  Deportation.

**Subpart C—Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)**

241.30  Proceedings commenced prior to April 1, 1997.
241.31  Final order of deportation.
241.32  Warrant of deportation.
241.33  Expulsion.
   **Authority:** 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.

## Subpart A—Post-hearing Detention and Removal

### § 241.1   Final order of removal.

An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the Board of Immigration Appeals;

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the respondent has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.

### § 241.2   Warrant of removal.

(a) *Issuance of a warrant of removal.* A Form I–205, Warrant of Removal, based upon the final administrative removal order in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 241 of the Act to determine at whose expense the alien shall be removed and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

(b) *Execution of the warrant of removal.* Any officer authorized by § 287.5(e) of this chapter to execute administrative warrants of arrest may execute a warrant of removal.

### § 241.3   Detention of aliens during removal period.

(a) *Assumption of custody.* Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.

(b) *Cancellation of bond.* Any bond previously posted will be canceled unless it has been breached or is subject to being breached.

(c) *Judicial stays.* The filing of (or intention of file) a petition or action in a Federal court seeking review of the issuance or execution of an order of removal shall not delay execution of the Warrant of Removal except upon an affirmative order of the court.

### § 241.4   Continued detention beyond the removal period.

(a) *Continuation of custody for inadmissible or criminal aliens.* The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;

(2) Other criminal history;

(3) Sentence(s) imposed and time actually served;

(4) History of failures to appear for court (defaults);

(5) Probation history;

(6) Disciplinary problems while incarcerated;

(7) Evidence of rehabilitative effort or recidivism;

(8) Equities in the United States; and

(9) Prior immigration violations and history.

(b) *Continuation of custody for other aliens.* Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the remvoal order and is not a risk to the community.

### § 241.5   Conditions of release after removal period.

(a) *Order of supervision.* An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision. A district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge may issue an order of supervision on Form I–220B. The order shall specify conditions of supervision including, but not limited to, the following:

(1) A requirement that the alien report to a specified officer periodically and provide relevant information under oath as directed;

(2) A requirement that the alien continue efforts to obtain a travel document and assist the Service in obtaining a travel document;

(3) A requirement that the alien report as directed for a mental or physical examinations as directed by the Service;

(4) A requirement that the alien obtain advance approval of travel beyond previously specified times and distances; and

(5) A requirement that the alien provide the Service with written notice of any change of address within five days of the change.

(b) *Posting of bond.* An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.

(c) *Employment authorization.* An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that:

(1) The alien cannot be removed because no country will accept the alien; or

(2) The removal of the alien is impracticable or contrary to public interest.

### § 241.6  Administrative stay of removal.

Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed on Form I–246, Stay of Removal, with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his or her discretion and in consideration of factors such as are listed in § 212.5 of this chapter and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate. Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal. Denial by the district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a motion to reopen or a motion to reconsider as provided in 8 CFR part 3. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed.

### § 241.7  Self-removal.

A district director may permit an alien ordered removed (including an

alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to have been so deported or removed.

### § 241.8  Reinstatement of removal orders.

(a) *Applicability.* An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) *Notice.* If an officer determines that an alien is subject to removal under this section, he or shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the

determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) *Order.* If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) *Exception for withholding of removal.* If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer to determine whether the alien's removal to that country must be withheld under section 241(b)(3) of the Act. The alien's claim will be granted or denied by an asylum officer in accordance with § 208.16 of this chapter. If the alien has previously had a claim to withholding of deportation or removal denied, then that decision shall prevail unless the alien can establish the existence of changed circumstances that materially affect the alien's eligibility for withholding. The alien's case shall not be referred to an immigration judge, and there is no appeal from the decision of the asylum officer. If the alien is found to merit withholding of removal, the Service shall not enforce the reinstated order.

(e) *Execution of reinstated order.* Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

### § 241.9  Notice to transportation line of alien's removal.

(a) An alien who has been ordered removed shall, immediately or as promptly as the circumstances permit, be offered for removal to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien is to be removed, as determined by the district director, with a written notice specifying the cause of inadmissibility or deportability, the class of travel in which such alien arrived and is to be removed, and with the return of any documentation that will assist in effecting his or her removal. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered removed shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal, including the cost of any transportation

**AR01877**

as required under section 241(e) of the
Act. The User Fee Account shall not be
assessed for expenses incurred because
of the carrier's violation of the
provisions of section 241 of the Act
and this paragraph. The Service will, at
the carrier's option, retain custody of the
alien for an additional 7 days beyond
the date of the removal order. If, after
the third day of this additional 7-day
period, the carrier has not made all the
necessary transportation arrangements
for the alien to be returned to his or her
point of embarkation by the end of the
additional 7-day period, the Service will
make the arrangements and bill the
carrier for its costs.

**241.10  Special care and attention of
removable aliens.**

When, in accordance with section
241(c)(3) of the Act, a transportation
line is responsible for the expenses of an
inadmissible or deportable alien's
removal, and the alien requires special
care and attention, the alien shall be
delivered to the owner, agent, master,
commanding officer, person in charge,
purser, or consignee of the vessel or
aircraft on which the alien will be
removed, who shall be given Forms I–
287, I–287A, and I–287B. The reverse of
Form I–287A shall be signed by the
officer of the vessel or aircraft to whom
the alien has been delivered and
immediately returned to the
immigration officer effecting delivery.
Form I–287B shall be retained by the
receiving officer and subsequently filled
out by the agents or persons therein
designated and returned by mail to the
district director named on the form. The
transportation line shall at its own
expense forward the alien from the
foreign port of disembarkation to the
final destination specified on Form I–
287. The special care and attention shall
be continued to such final destination,
except when the foreign public officers
decline to allow such attendant to
proceed and they take charge of the
alien, in which case this fact shall be
recorded by the transportation line on
the reverse of Form I–287B. If the
transportation line fails, refuses, or
neglects to provide the necessary special
care and attention or comply with the
directions of Form I–287, the district
director shall thereafter and without
notice employ suitable persons, at the
expense of the transportation line, and
effect such removal.

**§ 241.11  Detention and removal of
stowaways.**

(a) *Presentation of stowaways.* The
owner, agent, master, commanding
officer, charterer, or consignee of a
vessel or aircraft (referred to in this

section as the carrier) bringing any alien
stowaway to the United States is
required to detain the stowaway on
board the vessel or aircraft, at the
expense of the owner of the vessel or
aircraft, until completion of the
inspection of the alien by an
immigration officer. If detention on
board the vessel or aircraft pending
inspection is not possible, the carrier
shall advise the Service of this fact
without delay, and the Service may
authorize that the carrier detain the
stowaway at another designated
location, at the expense of the owner,
until the immigration officer arrives. No
notice to detain the alien shall be
required. Failure to detain an alien
stowaway pending inspection shall
result in a civil penalty under section
243(c)(1)(A) of the Act. The owner,
agent, master, commanding officer,
charterer, or consignee of a vessel or
aircraft must present the stowaway for
inspection, along with any documents
or evidence of identity or nationality in
the possession of the alien or obtained
by the carrier relating to the alien
stowaway, and must provide any
available information concerning the
alien's boarding or apprehension.

(b) *Removal of stowaways from vessel
or aircraft for medical treatment.* The
district director may parole an alien
stowaway into the United States for
medical treatment, but the costs of
detention and treatment of the alien
stowaway shall be at the expense of the
owner of the vessel or aircraft, and such
removal of the stowaway from the vessel
or aircraft does not relieve the carrier of
the requirement to remove the
stowaway from the United States once
such medical treatment has been
completed.

(c) *Repatriation of stowaways.* (1)
*Requirements of carrier.* Following
inspection, an immigration officer may
order the owner, agent, master,
commanding officer, charterer, or
consignee of a vessel or aircraft bringing
any alien stowaway to the United States
to remove the stowaway on the vessel or
aircraft of arrival. If the owner, agent,
master, commanding officer, cahrterer,
or consignee requests that he or she be
allowed to remove the stowaway by
other means, the Service shall consider
any such request, provided the carrier
has obtained, or will obtain in a timely
manner, any necessary travel documents
and has made or will make all
transportation arrangements. The
owner, agent, master, commanding
officer, charterer, or consignee shall
transport the stowaway or arrange for
secure escort of the stowaway to the
vessel or aircraft of departure to ensure
that the stowaway departs the United

States. All expenses relating to removal
shall be borne by the owner. Other than
requiring compliance with the detention
and removal requirements contained in
section 241(d)(2) of the Act, the Service
shall not impose additional conditions
on the carrier regarding security
arrangements. Failure to comply with an
order to remove an alien stowaway shall
result in a civil penalty under section
243(c)(1)(A) of the Act.

(2) *Detention of stowaways ordered
removed.* If detention of the stowaway is
required pending removal on other than
the vessel or aircraft of arrival, or if the
stowaway is to be removed on the vessel
or aircraft of arrival but departure of the
vessel or aircraft is not imminent and
circumstances preclude keeping the
stowaway on board the vessel or
aircraft, the Service shall take the
stowaway into Service custody. The
owner is responsible for all costs of
maintaining and detaining the
stowaway pending removal, including
costs for stowaways seeking asylum as
described in paragraph (d) of this
section. Such costs will be limited to
those normally incurred in the
detention of an alien by the Service,
including, but not limited to, housing,
food, transportation, medical expenses,
and other reasonable costs incident to
the detention of the stowaway. The
Service may require the posting of a
bond or other surety to ensure payment
of costs of detention.

(d) *Stowaways claiming asylum.* (1)
*Referral for credible fear determination.*
A stowaway who indicates an intention
to apply for asylum or a fear of
persecution shall be removed from the
vessel or aircraft of arrival in accordance
with § 208.5(b) of this chapter. The
immigration officer shall refer the alien
to an asylum officer for a determination
of credible fear in accordance with
section 235(b)(1)(B) of the Act and
§ 208.18 of this chapter. The stowaway
shall be detained in the custody of the
Service pending the credible fear
determination and during any
consideration of the asylum application.

(2) *Costs of detention of asylum-
seeking stowaways.* The owner of the
vessel or aircraft that brought the
stowaway to the United States shall
reimburse the Service for the costs of
maintaining and detaining the
stowaway pending a determination of
credible fear under section 235(b)(1)(B)
of the Act, up to a maximum period of
72 hours. The owner is also responsible
for the costs of maintaining and
detaining the stowaway during the
period in which the stowaway is
pursuing his or her asylum application,
for a maximum period of 15 working
days, excluding Saturdays, Sundays,

**AR01878**

and holidays. The 15-day period shall begin on the day following the day in which the alien is determined to have a credible fear of persecution by the asylum officer, or by the immigration judge if such review was requested by the alien pursuant to section 235(b)(1)(B)(iii)(III), but not later than 72 hours after the stowaway was initially presented to the Service for inspection. Following the determination of credible fear, if the stowaway's application for asylum is not adjudicated within 15 working days, the Service shall pay the costs of detention beyond this time period. If the stowaway is determined not to have a credible fear of persecution, or if the stowaway's application for asylum is denied, including any appeals, the carrier shall be notified and shall arrange for repatriation of the stowaway at the expense of the owner of the vessel or aircraft on which the stowaway arrived.

### § 241.12 Nonapplication of costs of detention and maintenance.

The owner of a vessel or aircraft bringing an alien to the United States who claims to be exempt from payment of the costs of detention and maintenance of the alien pursuant to section 241(c)(3)(B) of the Act shall establish to the satisfaction of the district director in charge of the port of arrival that such costs should not be applied. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim. There is no appeal from the decision of the district director.

### §§ 241.13–241.19 [Reserved]

## Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)

### § 241.20 Proceedings commenced prior to April 1, 1997.

Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.21 Stay of deportation of excluded alien.

The district director in charge of the port of arrival may stay the immediate deportation of an excluded alien pursuant to section 237 (a) and (d) of the Act under such conditions as he or she may prescribe.

### § 241.22 Notice to surrender for deportation.

An alien who has been finally excluded pursuant to 8 CFR part 240,

subpart D may at any time surrender himself or herself to the custody of the Service and shall surrender to such custody upon notice in writing of the time and place for his or her surrender. The Service may take the alien into custody at any time. An alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent thereto filed in writing with the district director in charge of the place of his or her detention. An alien in foreign contiguous territory shall be informed that he or she may remain there in lieu of surrendering to the Service, but that he or she will be deemed to have acknowledged the execution of the order of exclusion and deportation in his or her case upon his or her failure to surrender at the time and place prescribed.

### § 241.23 Cost of maintenance not assessed.

A claim pursuant to section 237(a)(1) of the Act shall be established to the satisfaction of the district director in charge of the port of arrival, from whose adverse decision no appeal shall lie. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim.

### § 241.24 Notice to transportation line of alien's exclusion.

(a) An excluded alien shall, immediately or as promptly as the circumstances permit, be offered for deportation to the master, commanding officer, purser, person in charge, agent, owner, or consignee of the vessel or aircraft on which the alien is to be deported, as determined by the district director, with a written notice specifying the cause of exclusion, the class of travel in which such alien arrived and is to be deported, and with the return of any documentation that will assist in effecting his or her deportation. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered excluded and deported shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal including the cost of any transportation. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 237 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the excluded alien for an additional 7 days

beyond the date of the deportation/exclusion order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the excluded alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

### § 241.25 Deportation.

(a) *Definitions of terms.* For the purposes of this section, the following terms mean:

(1) Adjacent island—as defined in section 101(b)(5) of the Act.

(2) Foreign contiguous territory—any country sharing a common boundary with the United States.

(3) Residence in foreign contiguous territory or adjacent island—any physical presence, regardless of intent, in a foreign contiguous territory or an adjacent island if the government of such territory or island agrees to accept the alien.

(4) Aircraft or vessel—any conveyance and other mode of travel by which arrival is affected.

(5) Next available flight—the carrier's next regularly scheduled departure to the excluded alien's point of embarkation regardless of seat availability. If the carrier's next regulatory scheduled departure of the excluded aliens point of embarkation is full, the carrier has the option of arranging for return transportation on other carrier which service the excluded aliens point of embarkation.

(b) *Place to which deported.* Any alien (other than an alien crew member or an alien who boarded an aircraft or vessel in foreign contiguous territory or an adjacent island) who is ordered excluded shall be deported to the country where the alien boarded the vessel or aircraft on which the alien arrived in the United States. If that country refuses to accept the alien, the alien shall be deported to:

(1) The country of which the alien is a subject, citizen, or national;

(2) The country where the alien was born;

(3) The country where the alien has a residence; or

(4) Any country willing to accept the alien.

(c) *Contiguous territory and adjacent islands.* Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island is the alien is a native, citizen, subject or national of such foreign contiguous territory or adjacent

**AR01879**

island, or if the alien has a residence in such foreign contiguous territory or adjacent island. Otherwise, the alien shall be deported, in the first instance, to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island.

(d) *Land border pedestrian arrivals.* Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory.

### §§ 241.26–241.29  [Reserved]

### Subpart C—Deportation of Aliens in the United States (For Hearings Commenced Prior to April 1, 1997)

### § 241.30  Proceedings commenced prior to April 1, 1997.

Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.31  Final order of deportation.

Except as otherwise required by section 242(c) of the Act for the specific purposes of that section, an order of deportation, including an alternate order of deportation coupled with an order of voluntary departure, made by the immigration judge in proceedings under 8 CFR part 240 shall become final upon dismissal of an appeal by the Board of Immigration Appeals, upon waiver of appeal, or upon expiration of the time allotted for an appeal when no appeal is taken; of, if such an order is issued by the Board or approved by the Board upon certification, it shall be final as of the date of the Board's decision.

### § 241.32  Warrant of deportation.

A Form I–205, Warrant of Deportation, based upon the final administrative order of deportation in the alien's case shall be issued by a district director. The director shall exercise the authority contained in such 243 of the Act to determine at whose expense the alien shall be deported and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

### § 241.33  Expulsion.

(a) *Execution of order.* Except in the exercise of discretion by the district director, and for such reasons as are set forth in § 212.5(a) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. For the

purposes of this part, and order of deportation is final and subject to execution upon the date when any of the following occurs:

(1) A grant of voluntary departure expires;

(2) An immigration judge enters an order of deportation without granting voluntary departure or other relief, and the alien respondent waives his or order right to appeal;

(3) The Board of Immigration Appeals enters and order of deportation on appeals, without granting voluntary departure or other relief; or

(4) A Federal district or appellate court affirms an administrative order of deportation in a petition for review or habeas corpus action.

(b) *Service of decision.* In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

### PART 242—[REMOVED AND RESERVED]

108. Part 242 is removed and reserved.

### PART 243—[REMOVED AND RESERVED]

109. Part 243 is removed and reserved.

### PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

110. The heading for part 244 is revised as set forth above.

111. The authority citation for part 244 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note.

### §§ 244.1 and 244.2  [Removed]

112. Sections 244.1 and 244.2 are removed.

### §§ 244.3 through 244.22  [Redesignated as §§ 244.1 through 244.20]

113. Newly redesignated §§ 244.3 through 244.22 are further redesignated as §§ 244.1 through 244.20, respectively.

### PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

114. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

115. Section 245.1 is amended by:

a. Removing the word ''and'' at the end of the paragraph (c)(3);

b. Removing the ''.'' at the end of paragraphs (c)(4) through (c)(7), and replacing it with a '';'';

c. Redesignating paragraph (c)(8) as paragraph (c)(9);

d. Adding a new paragraph (c)(8);

e. Revising newly redesignated paragraph (c)(9) introductory text,

f. Revising newly redesignated paragraphs (c)(9)(i) through (c)(9)(iii); and by

g. Revising paragraph (f), to read as follows:

### § 245.1  Eligibility.

\*     \*     \*     \*     \*

(c) \* \* \*

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act; and

(9) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto.

(i) *Commencement of proceedings.* The period during which the alien is in deportation, exclusion, or removal proceedings or judicial proceedings relating thereto, commences:

(A) With the issuance of the Form I–221, Order to Show Cause and Notice of Hearing prior to June 20, 1991;

(B) With the filing of a Form I–221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the Immigration Court;

(C) With the issuance of Form I–122, Notice to Applicant for Admission Detained for Hearing before Immigration Judge, prior to April 1, 1997,

(D) With the filing of a Form I–862, Notice to Appear, with the Immigration Court, or

(E) With the issuance and service of Form I–860, Notice and Order of Expedited Removal.

(ii) *Termination of proceedings.* The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:

(A) When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

(B) When the alien is found not to be inadmissible or deportable from the United States;

(C) When the Form I–122, I–221, I–860, or I–862 is canceled;

(D) When proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

(E) When a petition for review or an action for habeas corpus is granted by a Federal court on judicial review.

(iii) *Exemptions.* This prohibition shall no longer apply if:

(A) The alien is found not to be inadmissible or deportable from the United States;

(B) Form I–122, I–221, I–860, or I–862, is canceled;

(C) Proceedings are terminated by the immigration judge or the Board of Immigration Appeals;

(D) A petition for review or an action for habeas corpus is granted by a Federal court on judicial review;

(E) The alien has resided outside the United States for 2 or more years following the marriage; or

(F) The alien establishes the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

\* \* \* \* \*

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212 (g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

\* \* \* \* \*

116. Section 245.2 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (a)(4)(ii);

c. Revising paragraph (a)(5) (ii) and (iii); and by

d. Revising paragraph (c), to read as follows:

**§ 245.2  Application.**

(a) *General.* (1) *Jurisdiction.* An alien who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall

apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act or section 1 of the Act of November 2, 1966 shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall apply to the director having jurisdiction over his or her place of arrival. An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the Director, may be renewed in removal proceedings under 8 CFR part 240 only if:

(i) The denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and

(ii) The applicant's later absence from and return to the United States was under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

\* \* \* \* \*

(4) \* \* \*

(ii) *Under section 245 of the Act.* The departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of the proceeding by reason of the departure. The departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absence, and was inspected upon returning to the United States. If the application of an individual granted advance parole is subsequently denied, the applicant will be treated as an applicant for admission, and subject to the provisions of sections 212 and 235 of the Act.

\* \* \* \* \*

(5) \* \* \*

(ii) *Under section 245 of the Act.* If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status. An application for adjustment of status, as a preference

alien, shall not be approved until an immigrant visa number has been allocated by the Department of State, except when the applicant has established eligibility for the benefits of Public Law 101–238. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility. At the time of renewal of application, an applicant does not need to meet the statutory requirement of section 245(c) of the Act, or § 245.1(g), if, in fact, those requirements were met at the time the renewed application was initially filed with the director. Nothing in this section shall entitle an alien to proceedings under section 240 of the Act who is not otherwise so entitled.

(iii) *Under the Act of November 2, 1966.* If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility.

\* \* \* \* \*

(c) *Application under section 214(d) of the Act.* An application for permanent resident status pursuant to section 214(d) of the Act shall be filed on Form I–485 with the director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each applicant. If the application is approved, the director shall record the lawful admission of the applicant as of the date of approval. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the director but such denial shall be without prejudice to the alien's right to renew his or her application in proceedings under 8 CFR part 240.

117. Section 245.5 is amended by revising the first sentence to read as follows:

**§ 245.5  Medical examination.**

Pursuant to section 232(b) of the Act, an applicant for adjustment of status

shall be required to have a medical examination by a designated civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant, including compliance with section 212(a)(1)(A)(ii) of the Act, shall be incorporated into the record.* * *

118. Section 245.8 is amended by revising paragraph (e), to read as follows:

**§ 245.8  Adjustment of status as a special immigrant under section 101(a)(27)(K) of the Act.**

*  *  *  *  *

(e) *Removal provisions of section 237 of the Act.* If the Service is made aware by notification from the appropriate executive department or by any other means that a section 101(a)(27)(K) special immigrant who has already been granted permanent residence fails to complete his or her total active duty service obligation for reasons other than an honorable discharge, the alien may become subject to the removal provisions of section 237 of the Act, provided the alien is in one or more of the classes of deportable aliens specified in section 237 of the Act. The Service shall obtain current Form DD–214, Certificate of Release or Discharge from Active Duty, from the appropriate executive department for verification of the alien's failure to maintain eligibility.

*  *  *  *  *

119. Section 245.9 is amended by revising paragraphs (d) and (m), to read as follows:

**§ 245.9  Adjustment of Status of Certain Nationals of the People's Republic of China under Public Law 102–404.**

*  *  *  *  *

(d) *Waivers of inadmissibility under section 212(a) of the Act.* An applicant for the benefits of the adjustment of status provisions of Pub. L. 102–404 is automatically exempted from compliance with the requirements of sections 212(a)(5) and 212(a)(7)(A) of the Act. A Pub. L. 102–404 applicant may also apply for one or more waivers of inadmissibility under section 212(a) of the Act, except for inadmissibility under section 212(a)(2)(C), 212(a)(3)(A), 212(a)(3)(B), 212(a)(3)(C) or 212(a)(3)(E) of the Act.

*  *  *  *  *

(m) *Effect of enactment on family members other than qualified family members.* The adjustment of status benefits and waivers provided by Pub. L. 102–404 do not apply to a spouse or child who is not a qualified family member as defined in paragraph (c) of this section. However, a spouse or child whose relationship to the principal

alien was established prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien, in accordance with the provisions of section 203(d) of the Act. The spouse or child may use the priority date and category when it becomes current, in accordance with the limitations set forth in sections 201 and 202 of the Act. Persons who are unable to maintain lawful nonimmigrant status in the United States and are not immediately eligible to apply for adjustment of status may request voluntary departure pursuant to 8 CFR part 240.

120. Section 245.10 is amended by:
a. Revising paragraphs (a)(3) and (6); and by
b. Revising introductory text in paragraph (b), to read as follows:

**§ 245.10  Adjustment of status upon payment of additional sum under Public Law 103–317.**

(a) * * *
(3) Is not inadmissible from the United States under any provision of section 212 of the Act, or all grounds for inadmissibility have been waived;
*  *  *  *  *
(6) Remits the sum specified in section 245(i) of the Act, unless payment of the sum is waived under section 245(i) of the Act; and
*  *  *  *  *
(b) *Payment of additional sum.* An applicant filing under the provisions of section 245(i) of the Act must pay the standard adjustment of status filing fee, as shown on Form I–485 and contained in § 103.7(b)(1) of this chapter. The applicant must also pay the additional sum specified in section 245(i) of the Act, unless at the time the application for adjustment of status is filed, the alien is:
*  *  *  *  *

121. Section 245.11 is amended by:
a. Revising paragraph (a)(4)(ii)(B);
b. Revising paragraph (b)(1)(iii);
c. Revising the introductory text in paragraph (c); and by
d. Revising paragraphs (h) and (i), to read as follows:

**§ 245.11  Adjustment of aliens in S nonimmigrant classification.**

(a) * * *
(4) * * *
(ii) * * *
(B) Be admissible to the United States as an immigrant, unless the ground of inadmissibility has been waived;
*  *  *  *  *
(b) * * *
(1) * * *
(iii) The family member is not inadmissible from the United States as

a participant in Nazi persecution or genocide as described in section 212(a)(3)(E) of the Act;
*  *  *  *  *
(c) *Waivers of inadmissibility.* An alien seeking to adjust status pursuant to the provisions of section 101(a)(15)(S) of the Act may not be denied adjustment of status for conduct or a condition that:
*  *  *  *  *
(h) *Removal under section 237 of the Act.* Nothing in this section shall prevent an alien adjusted pursuant to the terms of these provisions from being removed for conviction of a crime of moral turpitude committed within 10 years after being provided lawful permanent residence under this section or for any other ground under section 237 of the Act.

(i) *Denial of application.* In the event the district decides to deny an application on Form I–485 and an approved Form I–854 to allow an S nonimmigrant to adjust status, the Assistant Attorney General, Criminal Division, and the relevant LEA shall be notified in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant LEA have a right of appeal from any decision to deny. A denial of an adjustment application under this paragraph may not be renewed in subsequent removal proceedings.

**PART 246—RESCISSION OF ADJUSTMENT OF STATUS**

122. The authority citation for part 246 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1255, 1256, 1259; 8 CFR part 2.

**§ 246.8  [Removed]**

123. Section 246.8 is removed.

**PART 248—CHANGE OF NONIMMGRANT CLASSIFICATION**

124. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1187, 1258; 8 CFR part 2.

125. Section 248.1 is amended by revising paragraph (b)(4) to read as follows:

**§ 248.1  Eligibility.**

\*  \*  \*  \*  \*

(b) \* \* \*

(4) The alien is not the subject of removal proceedings under 8 CFR part 240.

\*  \*  \*  \*  \*

## PART 249—CREATION OF RECORDS OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE

126. The authority citation for part 249 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1259; 8 CFR part 2.

127. Section 249.2 is amended by revising the first sentence in paragraph (a) and by revising paragraph (b), to read as follows:

**§ 249.2  Application.**

(a) *Jurisdiction.* An application by an alien, other than an arriving alien, who has been served with a notice to appear or warrant of arrest shall be considered only in proceedings under 8 CFR part 240. \* \* \*

(b) *Decision.* The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. If the application is granted, a Form I–551, showing that the applicant has acquired the status of an alien lawfully admitted for permanent residence, shall not be issued until the applicant surrenders any other document in his or her possession evidencing compliance with the alien registration requirements of former or existing law. No appeal shall lie from the denial of an application by the district director. However, an alien, other than an arriving alien, may renew the denied application in proceedings under 8 CFR part 240.

## PART 251—ARRIVAL MANIFESTS AND LISTS: SUPPORTING DOCUMENTS

128. The authority citation for part 251 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1221, 1281, 1282, 8 CFR part 2.

129. Section 251.1 is revised to read as follows:

**§ 251.1  Arrival manifests and lists.**

(a) *Vessels.* (1) *General.* The master or agent of every vessel arriving in the United States from a foreign place or an outlying possession of the United States shall present to the immigration officer at the port where the immigration inspection is performed a manifest of all crewmen on board on Form I–418, Passenger List and Crew List, in accordance with the instructions contained thereon.

(2) *Longshore work notations.* The master or agent of the vessel shall indicate in writing immediately below the name of the alien listed on the Form I–418 whether or not crewmen aboard the vessel will be used to perform longshore work at any United States port before the vessel departs the United States.

(i) If no longshore work will be performed, no further notation regarding longshore work is required.

(ii) If longshore work will be performed, the master or agent shall note which exception listed in section 258 of the Act permits the work. The exceptions are:

(A) The hazardous cargo exception;

(B) The prevailing practice exception in accordance with a port's collective bargaining agreements;

(C) The prevailing practice exception in a port where there is no collective bargaining agreement, but for which the vessel files an attestation;

(D) The prevailing practice exception for automated vessels; and

(E) The reciprocity exception.

(iii) If longshore work will be performed under the hazardous cargo exception, the vessel must either be a tanker or be transporting dry bulk cargo that qualifies as hazardous. All tankers qualify for the hazardous cargo exception, except for a tanker that has been gas-freed to load non-hazardous dry bulk commodities.

(A) To invoke the exception for tankers, the master or agent shall note on the manifest that the vessel is a qualifying tanker.

(B) If the vessel is transporting dry bulk hazardous cargo, the master or agent shall note on the manifest that the vessel's dry bulk cargo is hazardous and shall show the immigration officer the dangerous cargo manifest that is signed by the master or an authorized representative of the owner, and that under 46 CFR 148.02 must be kept in a conspicuous place near the bridge house.

(iv) If longshore work will be performed under the prevailing practice exception, the master or agent shall note on the manifest each port at which longshore work will be performed under this exception. Additionally, for each port the master or agent shall note either that:

(A) The practice of nonimmigrant crewmen doing longshore work is in accordance with all collective bargaining agreements covering 30 percent or more of the longshore workers in the port;

(B) The port has no collective bargaining agreement covering 30 percent or more of the longshore

workers in the port and an attestation has been filed with the Secretary of Labor;

(C) An attestation that was previously filed is still valid and the continues to comply with the conditions stated in that attestation; or

(D) The longshore work consists of operating an automated, self-unloading conveyor belt or a vacuum-actuated system.

(v) If longshore work will be performed under the reciprocity exception, the master or agent shall note on the manifest that the work will be done under the reciprocity exception, and will note the nationality of the vessel's registry and the nationality or nationalities of the holders of a majority of the ownership interest in the vessel.

(3) *Exception for certain Great Lakes vessels.* (i) A manifest shall not be required for a vessel of United States, Canadian, or British registry engaged solely in traffic on the Great Lakes or the St. Lawrence River and connecting waterways, herein designated as a Great Lakes vessel, unless:

(A) The vessel employs nonimmigrant crewmen who will do longshore work at a port in the United States; or

(B) The vessel employs crewmen of other than United States, Canadian, or British citizenship.

(ii) In either situation, the master shall note the manifest in the manner prescribed in paragraph (a)(2) of this section.

(iii) After submission of a manifest on the first voyage of a calendar year, a manifest shall not be required on subsequent arrivals unless a nonimmigrant crewman of other than Canadian or British citizenship is employed on the vessel who was not aboard and listed on the last prior manifest, or a change has occurred regarding the performance of longshore work in the United States by nonimmigrant crewmen, or a change has occurred in the exception that the master or agent of the vessel wishes to invoke which was not noted on the last prior manifest.

(4) The master or agent of a vessel that only bunkers at a United States port en route to another United States port shall annotate Form I–418 presented at the onward port to indicate the time, date, and place of bunkering.

(5) If documentation is required to support an exception, as described in § 258.2 of this chapter, it must accompany the manifest.

(b) *Aircraft.* The captain or agent of every aircraft arriving in the United States from a foreign place or from an outlying possession of the United States, except an aircraft arriving in the United

States directly from Canada on a flight originating in that country, shall present to the immigration officer at the port where the inspection is performed a manifest on United States Customs Service Form 7507 or on the International Civil Aviation Organization's General Declaration of all the alien crewmembers on board, including alien crewmembers who are returning to the United States after taking an aircraft of the same line from the United States to a foreign place or alien crewmembers who are entering the United States as passengers solely for the purpose of taking an aircraft of the same line from the United States to a foreign port. The captain or agent of an aircraft that only refuels at the United States en route to another United States port must annotate the manifest presented at the onward port to indicate the time, date, and place of refueling. The surname, given name, and middle initial of each alien crewman listed also shall be shown on the manifest. In addition, the captain or agent of the aircraft shall indicate the total number of United States citizen crewmembers and total number of alien crewmembers.

(c) *Additional documents.* The master, captain, or agent shall prepare as a part of the manifest, when one is required for presentation to an immigration officer, a completely executed set of Forms I–95, Conditional Landing Permit, for each nonimmigrant alien crewman on board, except:

(1) A Canadian or British citizen crewman serving on a vessel plying solely between Canada and the United States; or

(2) A nonimmigrant crewman who is in possession of an unmutilated Form I–184, Alien Crewman Landing Permit and Identification Card, or an unmutilated Form I–95 with space for additional endorsements previously issued to him or her as a member of the crew of the same vessel or an aircraft of the same line on his or her last prior arrival in the United States, following which he or she departed from the United States as a member of the crew of the same vessel or an aircraft of the same line.

130. Section 251.2 is revised to read as follows:

### § 251.2  Notification of illegal landings.

As soon as discovered, the master or agent of any vessel from which an alien crewman has illegally landed or deserted in the United States shall inform the immigration officer in charge of the port where the illegal landing or desertion occurred, in writing, or the name, nationality, passport number and, if known, the personal description,

circumstances and time of such illegal landing or desertion of such alien crewman, and furnish any other information and documents that might aid in his or her apprehension, including any passport surrendered pursuant to § 252.1(d) of this chapter. Failure to file notice of illegal landing or desertion and to furnish any surrendered passport within 24 hours of the time of such landing or desertion becomes known shall be regarded as lack of compliance with section 251(d) of the Act.

131. Section 251.3 is revised to read as follows:

### § 251.3  Departure manifests and lists for vessels.

(a) *Form I–418, Passenger List-Crew List.* The master or agent of every vessel departing from the United States shall submit to the immigration officer at the post from which such vessel is to depart directly to some foreign place or outlying possession of the United States, except when a manifest is not required pursuant to § 251.1(a), a single Form I–418 completed in accordance with the instructions on the form. Submission of a Form I–418 that lacks any required endorsement shall be regarded as lack of compliance with section 251(c) of the Act.

(b) *Exception for certain Great Lakes vessels.* The required list need not be submitted for Canadian or British crewmembers of Great Lakes vessels described in § 251.1(a)(3).

132. Section 251.4 is revised to read as follows:

### § 251.4  Departure manifests and lists for aircraft.

(a) *United States Customs Service Form 7507 or International Civil Aviation Organization's General Declaration.* The captain or agent of every aircraft departing from the United States for a foreign place or an outlying possession of the United States, except on a flight departing for and terminating in Canada, shall submit to the immigration officer at the port from which such aircraft is to depart a completed United States Customs Service Form 7507 or the International Civil Aviation Organization's General Declaration. The form shall contain a list of all alien crewmen on board, including alien crewmen who arrived in the United States as crewmen on an aircraft of the same line and who are departing as passengers. The surname, given name, and middle initial of each such alien crewman listed shall be shown. In addition, the captain or agent of the craft shall indicate the total number of alien crewmembers and the

total number of United States citizen crewmembers.

(b) *Notification of changes in employment for aircraft.* The agent of the air transportation line shall immediately notify in writing the nearest immigration office of the termination of employment in the United States of each alien employee of the line furnishing the name, birth date, birthplace, nationality, passport number, and other available information concerning such alien. The procedure to follow in obtaining permission to pay off or discharge an alien crewman in the United States after initial immigration inspection, other than an alien lawfully admitted for permanent residence, is set forth in § 252.1(f) of this chapter.

133. Section 251.5 is revised to read as follows:

### § 251.5  Exemptions for private vessels and aircraft.

The provisions of this part relating to submission of arrival and departure manifests and lists shall not apply to a private vessel or a private aircraft not engaged directly or indirectly in the carriage of persons or cargo for hire.

## PART 252—LANDING OF ALIEN CREWMEN

134. The authority citation for part 252 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1184, 1258, 1281, 1282; 8 CFR part 2.

135. Section 252.1 is amended by revising paragraphs (a) through (c) to read as follows:

### § 252.1  Examination of crewmen.

(a) *Detention prior to examination.* All persons employed in any capacity on board any vessel or aircraft arriving in the United States shall be detained on board the vessel or at the airport of arrival by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service.

(b) *Classes of aliens subject to examination under this part.* The examination of every nonimmigrant alien crewman arriving in the United States shall be in accordance with this part except that the following classes of persons employed on vessels or aircraft shall be examined in accordance with the provisions of 8 CFR parts 235 and 240:

(1) Canadian or British citizen crewmen serving on vessels plying solely between Canada and the United States; or

(2) Canadian or British citizen crewmen of aircraft arriving in a State of the United States directly from

Canada on flights originating in that country. The crew of a vessel arriving at a United States port that may not require inspection by or clearance from the United States Customs Service is, nevertheless, subject to examination under this part; however, the master of such a vessel is not required to present Form I–95 for any crewman who is not an applicant for a conditional landing permit.

(c) *Requirements for landing permits.* Every alien crewman applying for landing privileges in the United States must make his or her application in person before an immigration officer, present whatever documents are required, be photographed and fingerprinted as the district director may require, and establish to the satisfaction of the immigration officer that he or she is not inadmissible under any provision of the law and is entitled clearly and beyond doubt to landing privileges in the United States.

136. Section 252.2 is revised to read as follows:

### § 252.2 Revocation of conditional landing permits; removal.

(a) *Revocation and removal while vessel is in the United States.* A crewman whose landing permit is subject to revocation pursuant to section 252(b) of the Act may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival, if the vessel is in any port in the United States and has not departed foreign since the crewman was issued his or her conditional landing permit. Detention and removal of the crewman shall be at the expense of the transportation line on which the crewman arrived. Removal may be effected on the vessel of arrival or, if the master of the vessel has requested in writing, by alternate means if removal on the vessel of arrival is impractical.

(b) *Revocation and removal after vessel has departed the United States.* A crewman who was granted landing privileges prior to April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to § 252.1(f), is subject to removal proceedings under section 240 of the Act as an alien deportable pursuant to section 237(a)(1)(C)(i) of the Act. A crewman who was granted landing privileges on or after April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to § 252.1(f), shall be removed from the United States without a hearing. In either case, if the alien is

removed within 5 years of the date of landing, removal of the crewman shall be at the expense of the owner of the vessel. In the case of a crewman ordered removed more than 5 years after the date of landing, removal shall be at the expense of the appropriation for the enforcement of the Act.

137. Section 252.3 is revised to read as follows:

### § 252.3 Great Lakes vessels and tugboats arriving in the United States from Canada; special procedures.

(a) *United States vessels and tugboats.* An immigration examination shall not be required of any crewman aboard a Great Lakes vessel of United States registry or a tugboat of United States registry arriving from Canada at a port of the United States who has been examined and admitted by an immigration officer as a member of the crew of the same vessel or tugboat or of any other vessel or tugboat of the same company during the current calendar year.

(b) *Canadian or British vessels or tugboats.* An alien crewman need not be presented for inspection if the alien crewman:

(1) Serves aboard a Great Lakes vessel of Canadian or British registry or aboard a tugboat of Canadian or British registry arriving at a United States port-of-entry from Canada;

(2) Seeks admission for a period of less than 29 days;

(3) Has, during the current calendar year, been inspected and admitted by an immigration officer as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(4) Is either a British or Canadian citizen or is in possession of a valid Form I–95 previously issued to him or her as a member of the crew of the same vessel or tugboat, or of any vessel or tugboat of the same company;

(5) Does not request or require landing privileges in the United States beyond the time the vessel or tugboat will be in port; and,

(6) Will depart to Canada with the vessel or tugboat.

138. Section 252.4 is revised to read as follows:

### § 252.4 Permanent landing permit and identification card.

A Form I–184 is valid until revoked. It shall be revoked when an immigration officer finds that the crewman is in the United States in willful violation of the terms and conditions of his or her permission to land, or that he or she is inadmissible to the United States. On revocation, the Form I–184 shall be

surrendered to an immigration officer. No appeal shall lie from the revocation of Form I–184.

139. Section 252.5 is revised to read as follows:

### § 252.5 Special procedures for deserters from Spanish or Greek ships of war.

(a) *General.* Under E.O. 11267 of January 19, 1966 (31 FR 807) and 28 CFR 0.109, and E.O. 11300 of August 17, 1966 (31 FR 11009), and 28 CFR 0.110, the Commissioner and immigration officers (as defined in § 103.1(j) of this chapter) are designated as "competent national authorities" on the part of the United States within the meaning of Article XXIV of the 1903 Treaty of Friendship and General Relations between the United States and Spain (33 Stat. 2105, 2117), and "local authorities" and "competent officers" on the part of the United States within the meaning of Article XIII of the Convention between the United States and Greece (33 Stat. 2122, 2131).

(b) *Application for restoration.* On application of a Consul General, Consul, Vice-Consul, or Consular-Agent of the Spanish or Greek Government, made in writing pursuant to Article XXIV of the treaty, or Article XIII of the Convention, respectively, stipulating for the restoration of crewmen deserting, stating that the person named therein has deserted from a ship of war of that government, while in any port of the United States, and on proof by the exhibition of the register, crew list, or official documents of the vessel, or a copy or extract therefrom, duly certified, that the person named belonged, at the time of desertion, to the crew of such vessel, such person shall be taken into custody by any immigration officer without a warrant of arrest. Written notification of charges shall be served on the alien when he or she is taken into custody or as soon as practical thereafter.

(c) *Examination.* Within a reasonable period of time after the arrest, the alien shall be accorded an examination by the district director, acting district director, or the deputy district director having jurisdiction over the place of arrest. The alien shall be informed that he or she may have the assistance of or be represented by a counsel or representative of his or her choice qualified under 8 CFR part 292 without expense to the Government, and that he or she may present such evidence in his or her behalf as may be relevant to this proceeding. If, upon the completion of such examination, it is determined that:

(1) The individual sought by the Spanish or Greek authorities had

deserted from a Spanish or Greek ship of war in a United States port;

(2) The individual actually arrested and detained is the person sought;

(3) The individual is not a citizen of the United States; and

(4) The individual had not previously been arrested for the same cause and set at liberty because he or she had been detained for more than 3 months, or more than 2 months in the case of a deserter from a Greek ship of war, from the day of his or her arrest without the Spanish or Greek authorities having found an opportunity to send him or her home, the individual shall be served with a copy of the findings, from which no appeal shall lie, and be surrendered forthwith to the Spanish or Greek authorities if they are prepared to remove him or her from the United States. On written request of the Spanish or Greek authorities, the individual shall be detained, at their expense, for a period not exceeding 3 months or 2 months, respectively, from the day of arrest to afford opportunity to arrange for his or her departure from the United States.

(d) *Timely departure not effected.* If the Spanish authorities delay in sending the individual home for more than 3 months, or if the Greek authorities delay in sending the individual home for more than 2 months, from the day of his or her arrest, the individual shall be dealt with as any other alien unlawfully in the United States under the removal provisions of the Act, as amended.

(e) *Commission of crime.* If the individual has committed any crime or offense in the United States, he or she shall not be placed at the disposal of the consul until after the proper tribunal having jurisdiction in his or her case shall have pronounced sentence, and such sentence shall have been executed.

## PART 253—PAROLE OF ALIEN CREWMEN

140. The authority citation for part 253 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

141. In § 253.1, paragraph (f) is revised to read as follows:

### § 253.1　Parole.

\* \* \* \* \*

(f) *Crewman, stowaway, or alien removable under section 235(c) alleging persecution.* Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution

in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure the provisions of § 208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

\* \* \* \* \*

## PART 274A—CONTROL OF EMPLOYMENT OF ALIENS

142. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

143. Section 274a.12 is amended by:
a. Revising paragraphs (a)(10) and (12);

b. Revising paragraphs (c)(8) and (10);
c. Removing and reserving paragraph (c)(12); and by
d. Revising paragraph (c)(18), to read as follows:

### § 274a.12　Classes of aliens authorized to accept employment.

(a) \* \* \*

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

\* \* \* \* \*

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or

\* \* \* \* \*

(c) \* \* \*

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date;

\* \* \* \* \*

(10) An alien who has filed an application for suspension of deportation under section 243 of the Act or cancellation of removal pursuant to section 240A of the Act. Employment authorization shall be granted in increments not exceeding one year during the period the application is

pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

\* \* \* \* \*

(12) [Reserved]

\* \* \* \* \*

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

## PART 286—IMMIGRATION USER FEE

144. The authority citation for part 286 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1356; 8 CFR part 2.

145. In § 286.9, paragraph (b)(3) is revised to read as follows:

### § 286.9　Fee for processing applications and issuing documentation at land border Ports-of-Entry.

\* \* \* \* \*

(b) \* \* \*

(3) A Mexican national in possession of a valid nonresident alien border crossing card or nonimmigrant B–1/B–2 visa who is required to be issued Form I–94, Arrival/Departure Record, pursuant to § 235.1(f) of this chapter, must remit the required fee for issuance of Form I–94 upon determination of admissibility.

\* \* \* \* \*

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

146. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; 8 CFR part 2.

147. Section 287.3 is revised to read as follows:

**§ 287.3 Disposition of cases of aliens arrested without warrant.**

(a) *Examination.* An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Act will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

(b) *Determination of proceedings.* If the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry in accordance with 8 CFR parts 235, 239, or 240, order the alien removed as provided for in section 235(b)(1) of the Act and § 235.3(b) of this chapter, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

(c) *Notifications and information.* Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, all aliens arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien with a list of the available free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized under § 292.2 of this chapter that are located in the district where the hearing will be held. The examining officer shall note on Form I–862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

(d) *Custody procedures.* Unless voluntary departure has been granted pursuant to subpart C of 8 CFR part 240, a determination will be made within 24 hours of the arrest whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.

148. In § 287.4, paragraph (d) is revised to read as follows:

**§ 287.4 Subpoena.**

\* \* \* \* \*

(d) *Invoking aid of court.* If a witness neglects to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the officer or immigration judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers, or documents designated in the subpoena.

149. In § 287.5, paragraphs (b) through (f) are revised to read as follows:

**§ 287.5 Exercise of power by immigration officers.**

\* \* \* \* \*

(b) *Power and authority to patrol the border.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:

(1) border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Immigration inspectors (seaport operations only);

(4) Adjustments officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);

(5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commission.

(c) *Power and authority to arrest.* (1) *Arrests of aliens under section 287(a)(2) of the Act for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(2) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest aliens under section 287(a)(2) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(2) *Arrests of persons under section 287(a)(4) of the Act for felonies regulating the admission or removal of aliens.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(4) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(4) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(3) *Arrests of persons under section 287(a)(5)(A) of the Act for any offense against the United States.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(A) of the Act in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors (permanent full-time immigration inspectors only);

(v) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under

section 287(a)(5)(A) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(4) *Arrests of persons under section 287(a)(5)(B) of the Act for any felony.* (i) Section 287(a)(5)(B) of the Act authorizes designated immigration officers, as listed in paragraph (c)(4)(iii) of this section, to arrest persons, without warrant, for any felony cognizable under the laws of the United States if:

(A) The immigration officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony;

(B) The immigration officer is performing duties relating to the enforcement of the immigration laws at the time of the arrest;

(C) There is a likelihood of the person escaping before a warrant can be obtained of his or her arrest; and

(D) The immigration officer has been certified as successfully completing a training program that covers such arrests and the standards with respect to the enforcement activities of the Service as defined in § 287.8.

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(B) of the Act and in accordance with § 287.8(c):

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors (permanent full-time immigration inspectors only);

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 287(a)(5)(B) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(iii) Notwithstanding the authorization and designation set forth in paragraph (c)(4)(ii) of this section, no immigration officer is authorized to make an arrest for any felony under the authority of section 287(a)(5)(B) of the

Act until such time as he or she has been certified by the Director of Training as successfully completing a training course encompassing such arrests and the standards for enforcement activities as defined in § 287.8. Such certification shall be valid for the duration of the immigration officer's continuous employment, unless it is suspended or revoked by the Commissioner or the Commissioner's designee for just cause.

(5) *Arrests of persons under section 274(a) of the Act who bring in, transport, or harbor certain aliens, or induce them to enter.*

(i) Section 274(a) of the Act authorizes designated immigration officers, as listed in paragraph (c)(5)(ii) of this section, to arrest persons who bring in, transport, or harbor aliens, or induce them to enter the United States in violation of law. When making an arrest, the designated immigration officer shall adhere to the provisions of the enforcement standard governing the conduct of arrests in § 287.8(c).

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are authorized and designated to exercise the arrest power conferred by section 274(a) of the Act:

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors;

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 274(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(6) *Custody and transportation of previously arrested persons.* In addition to the authority to arrest pursuant to a warrant of arrest in paragraph (e)(2)(i) of this section, detention enforcement officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to take and maintain custody of and transport any person who has been arrested by an immigration officer pursuant to paragraphs (c)(1) through (c)(5) of this section.

(d) *Power and authority to conduct searches.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to conduct searches conferred by section 287(c) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to conduct searches under section 287(c) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(e) *Power and authority to execute warrants.* (1) *Search warrants.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to execute a search warrant:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(iv) Immigration officers who need the authority to execute search warrants under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(2) *Issuance of arrest warrants for immigration violations.* A warrant of arrest may be issued only by the following immigration officers:

(i) District directors (except foreign);

(ii) Deputy district directors (except foreign);

(iii) Assistant district directors for investigations;

(iv) Deputy assistant district directors for investigations;

(v) Assistant district directors for deportation;

(vi) Deputy assistant district directors for deportation;

(vii) Assistant district directors for examinations;

(viii) Deputy assistant district directors for examinations;

(ix) Officers in charge (except foreign);

**AR01888**

(x) Assistant officers in charge (except foreign);

(xi) Chief patrol agents;

(xii) Deputy chief patrol agents;

(xiii) Associate chief patrol agents;

(xiv) Assistant chief patrol agents;

(xv) Patrol agents in charge;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Institutional Hearing Program Directors;

(xviii) Area Port Directors;

(xix) Port Directors; or

(xx) Deputy Port Directors.

(3) *Service of warrant of arrests for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power pursuant to section 287(a) of the Act to execute warrants of arrest for administrative immigration violations issued under section 236 of the Act or to execute warrants of criminal arrest issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Detention enforcement officers (warrants of arrest for administrative immigration violations only);

(v) Immigration inspectors;

(vi) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(viii) Immigration officers who need the authority to execute arrest warrants for immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner, for warrants of arrest for administrative immigration violations, and with the approval of the Deputy Attorney General, for warrants of criminal arrest.

(4) *Service of warrant of arrests for non-immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to execute warrants of criminal arrest for non-immigration violations issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(v) Immigration officers who need the authority to execute warrants of arrest for non-immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(f) *Power and authority to carry firearms.* The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in § 287.8(a):

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Detention enforcement officers;

(5) Immigration inspectors;

(6) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(7) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(8) Immigration officers who need the authority to carry firearms under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

150. Section 287.7 is revised to read as follows:

### § 287.7 Detainer provisions under section 287(b)(3) of the Act.

(a) *Detainers in general.* Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter. Any authorized Service official may at any time issue a Form I–247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Service seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Service, prior to release of the alien, in order for the Service to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

(b) *Authority to issue detainers.* The following officers are authorized to issue detainers:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to issue detainers under section 287(d)(3) of the Act in order to effectively accomplish their individual missions and who are designated individually or as a class, by the Commissioner.

(c) *Availability of records.* In order for the Service to accurately determine the propriety of issuing a detainer, serving a notice to appear, or taking custody of an alien in accordance with this section, the criminal justice agency requesting such action or informing the Service of a conviction or act that renders an alien inadmissible or removable under any provision of law shall provide the Service with all documentary records and information available from the agency that reasonably relates to the alien's status in the United States, or that may have an impact on conditions of release.

(d) *Temporary detention at Service request.* Upon a determination by the Service to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Service.

(e) *Financial responsibility for detention.* No detainer issue as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Service, until actual assumption of custody by the Service, except as provided in paragraph (d) of this section.

### PART 299—IMMIGRATION FORMS

151. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103; 8 CFR part 2.

152. Section 299.1 is amended by:

a. Revising the entries for Forms ''I–147'', ''I–205'', ''I–246'', ''I–247'', ''I–259'', ''I–284'', ''I–286'', ''I–291'', ''I–296'', ''I–310'', ''I–408'', ''I–426'', ''I–541'', ''I–589'', ''I–775'', ''I–851'', and ''I–851A'';

b. Removing the entries for Forms ''I–122'', ''I–221'', ''I–259C'', ''I–290A'', and ''I–444'', and by

c. Adding the entries for Forms ''I–94T'', ''I–99'', ''I–148'', ''I–160'', ''I–210'', ''I–213'', ''I–217'', ''I–220A'', ''I–220B'', ''I–241'', ''I–261'', ''I–270'', ''I–275'', ''I–294'', ''I–407'', ''I–546'', ''I–701'', ''I–770'', ''I–771'', ''I–826'', ''I–827A'', ''I–827B'', ''I–860'', ''I–862'', and ''I–863'', in proper numerical sequence, to the listing of forms, to read as follows:

**§ 299.1   Prescribed forms.**

\*     \*     \*     \*     \*

| Form No. | Edition date | Title |
|---|---|---|
| \* | \* | \*          \*          \*          \*          \* |
| I–94T | 09–22–87 | Arrival-Departure Record (Transit without visa). |
| \* | \* | \*          \*          \*          \*          \* |
| I–99 | 04–01–97 | Notice of Revocation and Penalty. |
| \* | \* | \*          \*          \*          \*          \* |
| I–147 | 04–01–97 | Notice of Temporary Inadmissibility to U.S. |
| I–148 | 04–01–97 | Notice of Permanent Inadmissibility. |
| \* | \* | \*          \*          \*          \*          \* |
| I–160 | 04–01–97 | Notice of Parole/Lookout Intercept. |
| \* | \* | \*          \*          \*          \*          \* |
| I–205 | 04–01–97 | Warrant of Removal. |
| I–210 | 04–01–97 | Voluntary Departure Notice. |
| \* | \* | \*          \*          \*          \*          \* |
| I–213 | 04–01–97 | Record of Deportable/Inadmissible Alien. |
| I–217 | 04–01–97 | Information for Travel Document or Passport. |
| I–220A | 04–01–97 | Order of Release on Recognizance. |
| I–220B | 04–01–97 | Order of Supervision. |
| \* | \* | \*          \*          \*          \*          \* |
| I–241 | 04–01–97 | Request for Travel Document to Country Designated by Alien. |
| \* | \* | \*          \*          \*          \*          \* |
| I–246 | 04–01–97 | Application for Stay of Removal. |
| I–247 | 04–01–97 | Immigration Detainer—Notice of Action. |
| I–259 | 04–01–97 | Notice to Detain, Deport, Remove, or Present Aliens. |
| \* | \* | \*          \*          \*          \*          \* |
| I–261 | 04–01–97 | Additional Charges of Removability. |
| \* | \* | \*          \*          \*          \*          \* |
| I–270 | 04–01–97 | Request for Consent to Return Person to Canada. |
| I–275 | 04–01–97 | Withdrawal of Application/Consular Notification. |
| I–284 | 04–01–97 | Notice to Transportation Line Regarding Deportation and Detention Expenses of Detained Alien. |
| I–286 | 04–01–97 | Notification to Alien of Conditions of Release or Detention. |
| \* | \* | \*          \*          \*          \*          \* |
| I–291 | 04–01–97 | Decision on Application for Status as Permanent Resident. |
| \* | \* | \*          \*          \*          \*          \* |
| I–294 | 04–01–97 | Notice of Country to Which Deportation has been Directed and Penalty for Reentry without Permission. |
| I–296 | 04–01–97 | Notice to Alien Ordered Removed. |
| \* | \* | \*          \*          \*          \*          \* |
| I–310 | 04–01–97 | Bond for Payment of Sums and Fines Imposed under Immigration and Nationality Act (Term or Single Entry). |
| \* | \* | \*          \*          \*          \*          \* |
| I–407 | 04–01–97 | Abandonment by Alien of Status as Lawful Permanent Resident. |
| I–408 | 04–01–97 | Application to Pay Off or Discharge Alien Crewman. |
| \* | \* | \*          \*          \*          \*          \* |
| I–426 | 04–01–97 | Immediate and Continuous Transit Agreement Between a Transportation Line and United States of America (special direct transit procedure). |
| \* | \* | \*          \*          \*          \*          \* |
| I–541 | 04–01–97 | Order of Denial of Application for Extension of Stay or Student Employment or Student Transfer. |

| Form No. | Edition date | Title |
|---|---|---|
| * | * | * | * | * | * | * |
| I–546 ............................................... | 04–01–97 | Order to Appear—Deferred Inspection. |
| * | * | * | * | * | * | * |
| I–589 ............................................... | 04–01–97 | Application for Asylum and Withholding of Removal. |
| * | * | * | * | * | * | * |
| I–701 ............................................... | 04–01–97 | Detainee Transfer Worksheet. |
| * | * | * | * | * | * | * |
| I–770 ............................................... | 04–01–97 | Notice of Rights and Request for Disposition. |
| I–771 ............................................... | 04–01–97 | Bond Computation Worksheet. |
| I–775 ............................................... | 04–01–97 | Visa Waiver Pilot Program Agreement. |
| * | * | * | * | * | * | * |
| I–826 ............................................... | 04–01–97 | Notice of Rights. |
| I–827A ............................................. | 04–01–97 | Request for Disposition. |
| * | * | * | * | * | * | * |
| I–827B ............................................. | 04–01–97 | Request for Disposition. |
| I–851 ............................................... | 04–01–97 | Notice of Intent to Issue Final Administrative Removal Order. |
| I–851A ............................................. | 04–01–97 | Final Administrative Removal Order. |
| * | * | * | * | * | * | * |
| I–860 ............................................... | 04–01–97 | Notice and Order of Expedited Removal. |
| I–862 ............................................... | 04–01–97 | Notice to Appear. |
| I–863 ............................................... | 04–01–97 | Notice of Referral to Immigration Judge. |
| * | * | * | * | * | * | * |

153. Section 299.5 is amended by:

a. Removing the entry for Form ''I–259C''; and by

b. Revising the entries for Forms ''I–246'' and ''I–589'', and to read as follows:

**§ 299.5  Display of control numbers.**

* * * * *

| INS form No. | INS form title | Currently assigned OMB control no. |
|---|---|---|
| * | * | * | * | * | * | * |
| I–246 ............................................... | Application for Stay of Removal ............................................................... | 1115–0055 |
| * | * | * | * | * | * | * |
| I–589 ............................................... | Application for Asylum and Withholding of Removal ................................. | 1115–0086 |
| * | * | * | * | * | * | * |

## PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

154. The authority citation for part 316 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1443, 1447; 8 CFR part 2.

155. Section 316.5 is amended by revising paragraph (c)(3) to read as follows:

**§ 316.5  Residence in the United States.**

* * * * *

(c) * * *

(3) *Removal and return.* Any departure from the United States while under an order of removal (including previously issued orders of exclusion or deportation) terminates the applicant's status as a lawful permanent resident and, therefore, disrupts the continuity of residence for purposes of this part.

* * * * *

## PART 318—PENDING REMOVAL PROCEEDINGS

156. The heading for part 318 is revised as set forth above.

157. The authority citation for part 318 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1252, 1429, 1443; 8 CFR part 2.

158. Section 318.1 is revised to read as follows:

**§ 318.1  Warrant of arrest.**

For the purposes of section 318 of the Act, a notice to appear issued under 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) shall be regarded as a warrant of arrest.

## PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATURALIZATION BASED ON ACTIVE DUTY SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES.

159. The authority citation for part 329 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

160. Section 329.2 is amended by revising paragraph (e)(3) to read as follows:

**§ 329.2  Eligibility.**

\*     \*     \*     \*     \*

(e) \* \* \*

(3) The applicant may be naturalized even if an outstanding notice to appear pursuant to 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) exists.

Dated: December 24, 1996.

**Janet Reno,**

*Attorney General.*

[FR Doc. 96–33166 Filed 12–27–96; 12:10 pm]

**BILLING CODE 4410–10–M**

**AR01892**

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges. Projected total: 1,575,324
Projection 2: May through September is based on the monthly rate of change observed FY16. Projected total: 1,624,867



U.S. Customs and
Border Protection



CBP STAT Division
Operations Support

AR01893

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



**USBP Total Unaccompanied Children Enforcement Encounter FY21 Planning Profile**
*based on data through May 8, 2021*

Legend: FY21 Actual — Based on Hybrid — Based on FY16

Data through April is actual and reconciled for the FYTD.

Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges. Projected total: 141,497

Projection 2: May through September is based on the monthly rate of change observed FY16. Projected total: 152,673



U.S. Customs and Border Protection



CBP STAT Division
Operations Support

AR01894



### USBP Total Individuals in a Family Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 405,961
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 483,776





AR01895



### USBP Total Single Adult Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Legend: ■ FY21 Actual ■ Based on Hybrid ■ Based on FY16

Data through April is actual and reconciled for the FYTD.
<u>Projection 1</u>: May through September trends are a hybrid based on current trends from this FY influenced by previous surges. Projected total: 1,027,865
<u>Projection 2</u>: May through September is based on the monthly rate of change observed FY16. Projected total: 988,418



U.S. Customs and
Border Protection

**UNCLASSIFIED // FOR OFFICIAL USE ONLY**



CBP STAT Division
Operations Support

AR01896


© UNHCR/Daniel Dreifuss

# RAPID PROTECTION

# ASSESSMENT

## MPP RETURNEES AT THE NORTHERN BORDER OF MEXICO

CONFIDENTIAL

DECEMBER 2019



AR01897