

© UNHCR/Daniel Dreifuss

# UNHCR
## The UN Refugee Agency

This report was produced by UNHCR and represents the findings of a protection assessment carried out by UNHCR staff in Northern Mexico.

This version is strictly confidential with limited circulation.

**December 2019**

# TABLE OF CONTENTS

Background ---------------------------------------------- 04

Exercise Scope and Methodology --------------------------- 04

Summary of Key Findings --------------------------------- 06

Demographic Profile ------------------------------------- 08

Referrals for Assistance and Intervention ------------------ 08

Reasons for Departure from Country of Origin -------------- 09

Fear of Return to Country of Origin --------------------- 10

Future Intentions --------------------------------------- 12

Access to U.S. Asylum ----------------------------------- 13

Asylum in Mexico and Legal Status ---------------------- 14

Security Situation in Mexico and Fear of Return ----------- 15

Humanitarian Needs ------------------------------------- 18

AR01899



4

# BACKGROUND

In August 2019, UNHCR Mexico carried out a **rapid protection assessment** at various sites along the northern border of Mexico to better understand the **situation of individuals returned to Mexico under the Migrant Protection Protocols** (MPP). More specifically, the rapid assessment aimed to help UNHCR develop a deeper understanding of the **humanitarian needs and particular vulnerabilities** of individuals returned to Mexico under the MPP.

Key findings of the rapid assessment are being shared by UNHCR on a **confidential basis** with **Mexican and U.S. Government counterparts** and select UN agencies. However, certain findings, including those specifically addressing access to the U.S. asylum system, are shared solely and confidentially with the U.S. Government.



# EXERCISE SCOPE AND METHODOLOGY

The rapid protection assessment was carried out over a two-month period during August and September 2019. During that period, approximately 37,000 individuals had been returned to Mexico under the MPP.

In total, the UNHCR Mexico team interviewed **409 heads of household** in diverse locations along Mexico's northern border. As part of each interview, additional data was collected on family members, especially as relates to their particular needs and vulnerabilities. UNHCR Mexico interviewed a total of 943 individuals. Interviews were conducted in Tijuana, Mexicali, Ciudad Juárez, and Monterrey.

Data collection was undertaken by a mobile team of UNHCR and NGO partner staff totaling five enumerators. UNHCR designed the household survey using Kobo (a field data collection tool).The survey consisted of 175 questions, of which 60 questions were mandatory). The form was designed in line with data collection and protection survey standards of UNHCR in the Americas region.

The survey was piloted and tested prior to implementation, and enumerators were trained on the use of the survey and communicating with the respondents prior to their deployment to the field. The team adapted a convenience/purposive random sampling approach, given the timing and resources constraints. Such an approach limits the ability to extrapolate the findings of the exercise to the wider population.

Interviews were conducted in the following Mexican border cities:
- **34%** in Tijuana
- **33%** in Ciudad Juárez
- **25%** in Mexicali
- **8%** in Monterrey

Acquisition of Assets and Returns of the Northern Border of Mexico

5

## MAP 1: EXERCISE LOCATIONS



6

 # SUMMARY OF KEY FINDINGS

The main findings of the assessment can be described as follows:

### 1. Demographics

☑ **Family Composition:** The most dominant household/family composition was **single parent with one or more children**.

### 2. Reasons for Departure

☑ **Reasons for fleeing Country of Origin:** Over **86%** of respondents interviewed indicated one or more **violence-related reasons** for fleeing their country of origin, including: threats, intimidation, insecurity, generalized violence, or having been a victim of violent crime (extortion, abduction, or assault).

☑ **Fear of Return to Country of Origin: 91%** of respondents indicated a fear of return due to at least **one or more violence-related reasons**, including: **fear for their life or the life** of a family member, risk of being **victimized by crime** and widespread violence, and forced recruitment by armed groups.

### 3. Future Intentions

☑ **Asylum in the United States:** Approximately **93%** of respondents expressed an intention to seek asylum in the United States, while **77%** of respondents indicated that they did **not have any access to orientation** on U.S. asylum procedures.

☑ **Asylum in Mexico: 7%** of respondents had filed for asylum in Mexico.

☑ **Family Links in the U.S.: 88%** of families interviewed had one or more **relatives in the United States**, out of which **25%** had either a spouse, partner, parent or at least one child living in the United States.

### 4. Situation in Mexico

☑ **Security Incidents: 81%** of the respondents indicated that they **do not feel safe in Mexico**, and over **40%** indicated that they had been **a victim of an incident** of violence in Mexico.

☑ Of all violent incidents reported, **robbery** was the most common, with approximately **30%** of total respondents reporting have been a victim or witness of a robbery. **Kidnapping** was ranked second most common (**18%** of total respondents reporting), followed by physical violence (**13%**), intimidation or threat (**11%**) and extortion (**10%**).

☑ Accounts of experiencing or witnessing **kidnapping** constituted about **27%** of the total violent incidents reported, with about **48%** of all victims being **children**.

☑ **Physical violence** was reported as the third most frequent type of incident, with children comprising roughly **48%** of the total victims or witnesses. Additionally, **threats or intimidation** constituted 14% of the total incidents reported.

☑ **60%** of **sexual assault victims** were women and **girls** between the ages of **5 and 29 years** old.

## 5. Referral

☑ **12%** of all respondents required UNHCR **referral for intervention and assistance** following the administration of the survey.

☑ **70%** of the total individuals referred for assistance (74 individuals) required medical intervention for either **physical or mental health concerns**.

☑ **19%** of those referred were persons with specific needs (20 individuals), including with mental health issues (2 individuals), physical mobility needs (8 individuals), visual impairment (8 individuals), hearing disability (1 individual) or speech disability (1 individual).

8



# DEMOGRAPHIC PROFILE


**409** Household Interviews


**943** Total Individuals interviewed


**453** (47%) Children under the age of 18

Nationalites of respondents can be summarized as follows:
- **42%** Honduras
- **41%** Guatemala
- **11%** El Salvador
- **5%** Nicaragua
- **1%** Cuba


male 48.9%

female 51.1%

Approximately, **51%** of respondents were female, **49%** male. Of those, **30%** of all females interviewed were between the ages of 18-59, while only **23%** were males in that age range. **47%** of all respondents were children.

**Age and gender breakdown** | All individuals



| | | |
|---|---|---|
| 6% | 0-4 yrs | 6% |
| 10% | 5-11 yrs | 11% |
| 5% | 12-17 yrs | 9% |
| 30% | 18-59 yrs | 23% |

The most dominant household/family composition was **"single parent with one or more children "** ( **over 80%**).

# REFERRALS FOR ASSISTANCE AND INTERVENTION

About **12%** of respondents required referral for intervention and assistance.

■ **70%** of the total individuals identified for referral (74 individual) required medical intervention for either physical or mental health.

■ **19%** of the total referrals are persons with specific needs (20 individuals) with either **mental disability** (2 individuals), **mobility and physical disability** (8 individuals), **visual disability** (8 individuals), **hearing disability** (1 individual) and **speech disability** (1 individual).

■ In addition, **2%** of the total women and girls interviewed were pregnant and **6%** were lactating.



9



# REASONS FOR DEPARTURE

## Fleeing Country of Origin

Respondents were asked about reasons or motivations for fleeing their country of origin. Respondents were presented with a set of twelve potential responses, consistent with the current country conditions in the three countries of the North of Central America (NCA) region, standardized by UNHCR across all countries hosting NCA nationals to enhance cross-regional analysis and interoperability. In total, five of twelve reasons linked to violence-related motives for flight while the remainder were linked to hardships associated with difficult living conditions, economic conditions, and lack of accessibility to basic services and rights.

The questions were presented in a multiple-choice, select-all-that-apply format. Accordingly, in the analysis, responses were categorized into two broad categories to consolidate findings:

■ **Violence-related reasons:** Fear of suffering threats or intimidation, generalized violence and crime, fear of being a victim of extortion or violence, fear of being persecuted or assaulted, fear of forced recruitment of children or adolescents.

■ **Reasons related to difficult living conditions:** Lack of access to employment or livelihoods, lack of access to food, healthcare, education, etc.



Reasons for Departure from Country of Origin

10

■ **Over 86%** of the respondents interviewed indicated one or more **violence-related reason** for fleeing their country of origin[1].  Of these families and individuals, **92%** are nationals of NCA countries (Guatemala, Honduras, or El Salvador).

■ Nicaraguans and Cubans indicated both violence-related reasons and difficult living conditions as motivating departure from their home country.

■ Of all the respondents, **14%** indicated one or more reasons related to **difficult living conditions** but did not indicate any violence-related issues. (Of the sub-set who indicated only difficult living conditions, **47%** were from Honduras, **43%** from Guatemala and **4%** from El Salvador.)

# FEAR OF RETURN TO COUNTRY OF ORIGIN

**Return to Country of Origin**

Respondents were also asked to indicate risks they might face upon return to their country of origin. Respondents were presented with six potential risks, standardized by UNHCR across the NCA response and consistent with NCA country conditions.

The most cited risk was **"fear for my life or the life of a family member"**, followed by widespread violence and risk of being a victim of violent crime.

Answers were again categorized into:

■ **Violence-related reasons**

■ **Reasons related to difficult living conditions**

---

**1.** The 86% represent the summation of respondents who selected one or more violence related reason and (53%)the ones who selected both violence and difficult living condition reasons (33%).

Assessment of the Protection Returnees of Women and Mexico

11

In total:

■    **91%** of respondents indicated a fear of return due to at least **one or more reason related to violence².**

■    Only **9%** indicated **risks related to difficult living conditions** and access to basic needs or services such as food, health, employment, etc.

■    **15%** of respondents cited multiple reasons related both to **violence** and to **difficult living conditions**.



**Fear of Return to Country of Origin**

**Violence**

**Difficult living conditions**

**9%**

**15%**

**76%**

---

**2.** The 91% represent the summation of respondents who selected one or more violence related fear (76%) and the ones who selected both violence and difficult living condition (15%) related fear of return.

# 12



## FUTURE INTENTIONS

### Intention at Departure from Country of Origin

■  In total **92%** of respondents indicated that their destination at the time of departure from their country of origin was the United States (**5%** indicated Canada, **3%** indicated Mexico).

■   Fewer than **1%** indicated a destination in Europe.

**Intention at Departure | Planned Final Destination**



### Family Links in the United States

■  Roughly **88%** of families interviewed had one or more relatives in the United States, of which **25%** had either a parent, a spouse/partner, or at least one child living in the United States.

■  The enumerators did not inquire about the U.S.-based family members' immigration status; however, the prevalence of family links demonstrates the existence of family/community support in the United States for many of the respondents who sought asylum in the United States.





## Family in the US

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 12 of 256   PageID 6420
Humanitarian Assessment on the Return of Women to Mexico

13

 # ACCESS TO U.S. ASYLUM

■ **93%** of respondents expressed an intention to seek asylum in the United States.

■ **77%** indicated that they **did not have any access to legal orientation** or other information on the U.S. asylum system. Respondents who had received orientation or information were not asked about the quality of that orientation, or whether they understood the process moving forward.

■ Of the **23%** who indicated receiving some type of orientation or information on asylum, respondents indicated their source as:

   ■ **68%** NGOs

   ■ **16%** family member or a friend

   ■ **13%** private attorney

   ■ **3%** U.S. official.

When asked about the date of their next hearing before a U.S. immigration court, respondents indicated dates between **August 2019 and February 2020**.

   ■ 77% indicated hearings between August and December 2019.

   ■ 22% had their next hearing in the beginning of 2020.



# ASYLUM IN MEXICO

- Only **7%** of respondents indicated that they had filed for asylum in Mexico. Of those:
  - **93%** indicated doing so before crossing into the United States
  - **7%** reported doing so after being returned to Mexico under the MPP.

Of those reporting having filed for asylum in Mexico:

- Over **64%** indicated abandoning their asylum claims
- **10%** had been recognized as refugees in Mexico
- **7%** had their claim pending.

- Of those who did not file for asylum in Mexico, **77%** were **not aware of the Mexican asylum procedure** nor had access to legal representation.




Regarding legal status in Mexico:

- **92%** indicated holding the **"forma migratoria multiple"** (a temporary, multi-purpose migratory visa)
- **3%** indicated holding a humanitarian visa
- **3%** indicated that they do not have an official legal status provided by the Government of Mexico. (Responses to this effect may be understood as reflecting some respondents' lack of understanding of the nature of the documentation they may possess).

Migration Assessment of Mexico's Returned and Foreign Women Migrants in Mexico

15



# SECURITY SITUATION IN MEXICO

## Security Incidents in Mexico

When asked about the security situation in Mexico:

- **81%** of respondents indicated that they did not feel safe in Mexico

- **48%** indicated being a victim or witness to an incident of violence in Mexico.



Respondents were presented types of violence-related incidents to indicate those they had experienced.

**Robbery** was the most common, with approximately **30%** of all respondents indicating having been a **victim or witness** of robbery. Victims of robbery constituted approximately **43%** of all respondents who reported experiencing one or more incident. **49%** of respondents who cited robbery were in Mexicali, while **25%** were in Ciudad Juárez, **20%** in Tijuana and only **6%** were in Monterrey.

**Kidnapping** was the second most common incident, with **18%** of the total respondents reporting either experiencing or witnessing kidnapping incidents. Overall, kidnapping constituted **27 %** of the total violent incidents reported.





*Impact of Migrant Protection Protocols on the Northern Border of Mexico*

# 16

Below is some demographic breakdown of the victims of **kidnapping:**

- **73%** of kidnapping victims were NCA nationals, while **27%** were Nicaraguans, Cubans or other nationalities.

- **48%** of kidnapping victims were children between 1 and 18 years old.

- **43%** of kidnapping incidents were believed to be perpetrated by organized criminal enterprises.

- **37%** of kidnapping victims were interviewed in Ciudad Juárez, **27%** in Tijuana, **22%** in Monterrey and **16%** in Mexicali.

**Physical violence** was reported as the third most common incident with **13%** of all survey respondents reporting either being a victim or a witness to such incident.  Physical violence constituted **17%** of the total incidents cited. Below is a demographic breakdown of the victims of physical violence:

- **48%** of targets were **children**.

- **62%** of targets were **men and boys**.

- **38%** of targets were **women and girls**.



The bubbles represent the count of each incident type as reported by respondents. Bubble size is proportionate to the incident count.

Documented Assessment of Returned to Northern Mexico

17

**Intimidation or threat** was ranked as the fourth most common incident, with **11%** of the overall respondents citing being either a victim or a witness of threats or intimidation. Of all the incidents reported, intimidation or threat constituted **14%** of the total incidents reported. Respondents cited that they faced intimidation or threats by organized criminal groups, or federal or municipal police.

- **52%** of targets were male (**43%** of which were children)

- **48%** of targets were female (**38%** of which were children)

About **4%** of total respondents cited **sexual assault,** of which:

- **60%** were women and girls between the ages of 5-29. Of these, **38%** were **girls under the age of 18.**

- **40%** were men and boys. Of these, **43%** were **boys under the age of 18**.

In total four respondents cited **rape** with three being a witness and one respondent being a **victim of rape**. The rape victim was **a 37-year old Guatemalan mother** accompanied by a **6-year-old child**.

Respondents were asked to indicate other types of incidents experienced that were not presented in the list of responses. Two families cited incidents related to **risks of trafficking of their children**. One Honduran family,  with young children between the **ages of 1-4,** reported that traffickers had offered money to traffic one of their children. Another family from **El Salvador** with a 10-year-old child cited a similar experience.

One 36-year-old man from El Salvador cited that **federal police confiscated and destroyed his documentation**. A 24-year-old **Guatemalan woman** indicated being a **victim of forced labor.** Three respondents indicated witnessing homicide incidents.

**Length of Stay in Mexico**

When respondents were asked about the length of stay in Mexico upon their return under the MPP:

- **51%** cited that they had been in Mexico less than one month.

- **42%** had been in Mexico for 1-3 months.

- **6%** had been in Mexico for 4-6 months.



# 18

## Fear of Return to Mexico

**80%** indicated having been fearful to return to Mexico. *(It is important to note that respondents were not asked whether or not they indicated such a fear to immigration officials during processing in the U.S.).* Of those who indicated that they had been fearful of returning to Mexico, **39%** cited safety concerns due to **violence and crime along the northern border of Mexico**. **17%** indicated fear for their lives. **7%** cited lack of access of employment. **1%** cited specialized **medical needs**.

Of the **37%** who articulated 'other' reasons for fear of returning to Mexico, the majority specified **fear of discrimination** and **racism** against North Central American (NCA) nationals, **fear for the lives of their children**, **fear of kidnapping**, and labor exploitation in Mexico. **Low pay** was also a reason cited in the 'other' category.

**Reasons for Fear of Return to Mexico**



## ☒ HUMANITARIAN NEEDS

When respondents were asked to indicate their greatest concerns and needs (other than safety), the most common response related to **access to employment**. **Access to livelihoods** was the second most common response, followed by access to **health care**, **access to documentation**, and the ability to provide **financial support to family members** in country of origin.

19





© UNHCR/Daniel Dreifuss

This report was produced by UNHCR and represents the findings of a protection assessment carried out by UNHCR staff in Northern Mexico.

This version is strictly confidential with limited circulation.

December 2019

AR01916

**Final or Most Current Outcomes, Total SW Border Encounters by MPP cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 |
| Repatriations | 314,855 | 364,051 | 199,873 | 10,999 | 7,066 | 991 | 303,856 | 356,985 | 198,882 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | 1 | - | 1 | - | 102,234 | 111,174 |
| Removals | 254,317 | 126,063 | 6,437 | 545 | 43 | - | 253,772 | 126,020 | 6,437 |
| Expedited | 142,713 | 70,786 | 2,953 | 17 | 7 | - | 142,696 | 70,779 | 2,953 |
| Reinstatement | 99,362 | 54,075 | 3,405 | 22 | 1 | - | 99,340 | 54,074 | 3,405 |
| Administrative removals | 685 | 272 | 5 | 24 | - | - | 661 | 272 | 5 |
| Other removals [1] | 11,557 | 2,930 | 76 | 482 | 35 | - | 11,075 | 2,895 | 76 |
| Returns | 39,587 | 21,090 | 4,086 | 24 | 3 | - | 39,563 | 21,087 | 4,086 |
| Re-encounters [2] | 20,950 | 112,664 | 78,375 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,385 |
| **No confirmed departure** | 662,374 | 94,015 | 16,808 | 33,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 |
| Being processed | 528,445 | 77,011 | 14,917 | 10,075 | 6,202 | 1,583 | 518,368 | 68,809 | 13,334 |
| Being processed by DHS | 163,766 | 27,322 | 10,398 | 207 | 284 | 206 | 163,559 | 27,038 | 10,192 |
| In EOIR proceedings [3] | 287,962 | 34,911 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,368 | 2,281 |
| EOIR case completed - additional DOI action [4] | 76,715 | 14,778 | 861 | 5,169 | 375 | - | 71,546 | 14,403 | 861 |
| Final order/voluntary departure | 94,780 | 9,897 | 430 | 18,007 | 4,399 | - | 76,773 | 5,498 | 430 |
| Unexecuted removal orders | 53,263 | 9,864 | 434 | 18,007 | 4,397 | - | 75,258 | 5,467 | 434 |
| In absentia | 73,063 | 6,655 | - | 16,006 | 4,171 | - | 59,055 | 2,484 | - |
| Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | - | 16,203 | 2,983 | 434 |
| Unexecuted voluntary departures | 1,515 | 33 | 5 | - | 2 | - | 1,515 | 31 | 5 |
| Relief [5] | 28,473 | 2,107 | 33 | 3,199 | 479 | - | 25,274 | 1,628 | 33 |
| SIJ or affirmative asylum | 5,709 | 178 | - | 6 | 3 | - | 5,703 | 175 | - |
| LPR status granted by DHS | 4,244 | 224 | 10 | 5 | - | - | 4,239 | 224 | 10 |
| EOIR relief [6] | 6,875 | 944 | 3 | 561 | 48 | - | 6,312 | 896 | 3 |
| EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | - | 6,707 | 290 | 7 |
| Other [6] | 315 | 44 | 13 | 2 | 1 | - | 313 | 43 | 13 |
| Parole | 7,055 | 4,285 | 708 | - | - | - | 7,055 | 4,285 | 708 |
| No Subsequent Event [7] | 3,623 | 715 | 631 | - | - | - | 3,623 | 715 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters by MPP Cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 32.2% | 79.5% | 92.2% | 24.8% | 35.1% | 38.5% | 32.6% | 81.5% | 92.9% |
| Title 42 Expulsion | 0.0% | 22.3% | 51.3% | 0.0% | 0.0% | 0.0% | 0.0% | 23.3% | 51.9% |
| Removals | 26.0% | 28.0% | 3.0% | 1.2% | 0.2% | 0.0% | 27.2% | 29.2% | 3.0% |
| Expedited | 14.6% | 15.5% | 1.4% | 0.0% | 0.0% | 0.0% | 15.3% | 16.2% | 1.4% |
| Reinstatement | 10.2% | 11.8% | 1.6% | 0.0% | 0.0% | 0.0% | 10.6% | 12.3% | 1.6% |
| Administrative removals | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% |
| Other removals [1] | 1.2% | 0.6% | 0.0% | 1.1% | 0.2% | 0.0% | 1.2% | 0.7% | 0.0% |
| Returns | 4.1% | 4.6% | 1.9% | 0.1% | 0.0% | 0.0% | 4.2% | 4.8% | 1.9% |
| Re-encounters [2] | 2.1% | 24.6% | 36.1% | 23.6% | 34.8% | 38.5% | 1.1% | 24.1% | 36.1% |
| **No confirmed departure** | 67.8% | 20.5% | 7.8% | 75.2% | 64.9% | 61.5% | 67.4% | 18.5% | 7.1% |
| Being processed | 54.1% | 16.8% | 6.9% | 22.8% | 40.7% | 61.5% | 55.6% | 15.7% | 6.2% |
| Being processed by DHS | 16.8% | 6.0% | 4.8% | 0.5% | 1.4% | 8.0% | 17.5% | 6.2% | 4.8% |
| In EOIR proceedings [3] | 29.5% | 7.6% | 1.7% | 10.6% | 37.4% | 53.5% | 30.4% | 6.2% | 1.1% |
| EOIR case completed - additional DOI action [4] | 7.9% | 3.2% | 0.4% | 11.7% | 1.9% | 0.0% | 7.7% | 3.3% | 0.4% |
| Final order/voluntary departure | 9.7% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.2% | 1.3% | 0.2% |
| Unexecuted removal orders | 9.5% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.1% | 1.2% | 0.2% |
| In absentia | 7.7% | 1.5% | 0.0% | 36.1% | 20.7% | 0.0% | 6.3% | 0.6% | 0.0% |
| Not in absentia | 1.9% | 0.7% | 0.2% | 4.5% | 1.1% | 0.0% | 1.7% | 0.7% | 0.2% |
| Unexecuted voluntary departures | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% |
| Relief [5] | 2.9% | 0.5% | 0.0% | 11.7% | 2.4% | 0.0% | 2.5% | 0.4% | 0.0% |
| SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.0% | 0.0% |
| LPR status granted by DHS | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.1% | 0.0% |
| EOIR relief [6] | 0.7% | 0.2% | 0.0% | 1.3% | 0.2% | 0.0% | 0.7% | 0.2% | 0.0% |
| EOIR termination | 1.2% | 0.2% | 0.0% | 10.4% | 2.1% | 0.0% | 0.7% | 0.1% | 0.0% |
| Other [6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.7% | 0.9% | 0.4% | 0.0% | 0.0% | 0.0% | 0.8% | 1.0% | 0.4% |
| No Subsequent Event [7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.4% | 0.2% | 0.3% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

|  | 81,716 |  | 20,177 |  |  |  |  | 34,144 | 11,927 | 46,071 | 252,868 | 293,671 | 546,539 | 58,325 | 11% |
|--|--------|--|--------|--|--|--|--|--------|--------|--------|---------|---------|---------|--------|------|
| 448,786 | 381,055 | 829,841 | 34,205 | 11,944 | 46,149 | 43.7% | | | Non ER | | | | | | ER |
| | | | Total | | | | | | | | | | | | |

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 | 753,918 | 366,296 | 211,705 | 44,209 | 20,128 | 2,574 | 709,709 | 346,168 | 209,131 |
| **Repatriations** | 314,855 | 364,051 | 199,873 | 10,399 | 7,066 | 991 | 303,856 | 356,985 | 198,882 | 166,691 | 291,727 | 196,908 | 10,972 | 7,058 | 991 | 155,719 | 284,669 | 195,917 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | 1 | 0 | 0 | 1 | 102,234 | 111,174 | 1 | 102,233 | 111,168 | 1 | 0 | 0 | 0 | 102,233 | 111,167 |
| Removals | 254,317 | 128,063 | 6,437 | 545 | 43 | 0 | 253,772 | 128,020 | 6,437 | 108,344 | 56,726 | 3,497 | 536 | 40 | 0 | 107,808 | 56,686 | 3,497 |
| Expedited | 142,713 | 70,786 | 2,953 | 17 | 7 | 0 | 142,696 | 70,779 | 2,953 | 1,375 | 411 | 20 | 12 | 4 | 0 | 1,363 | 407 | 20 |
| Reinstatement | 99,362 | 54,075 | 3,405 | 22 | 1 | 0 | 99,340 | 54,074 | 3,405 | 98,982 | 53,950 | 3,403 | 22 | 1 | 0 | 98,960 | 53,949 | 3,403 |
| Administrative removals | 685 | 272 | 3 | 24 | 0 | 0 | 661 | 272 | 3 | 587 | 219 | 2 | 24 | 0 | 0 | 563 | 219 | 2 |
| Other removals[1] | 11,557 | 2,930 | 76 | 482 | 35 | 0 | 11,075 | 2,895 | 76 | 7,400 | 2,146 | 72 | 478 | 35 | 0 | 6,922 | 2,111 | 72 |
| Returns | 39,587 | 21,090 | 4,086 | 24 | 3 | 0 | 39,563 | 21,087 | 4,086 | 38,176 | 20,971 | 4,086 | 24 | 3 | 0 | 38,152 | 20,968 | 4,086 |
| Re-execution[2] | 20,950 | 112,664 | 78,175 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,185 | 20,170 | 111,797 | 78,157 | 10,411 | 7,015 | 990 | 9,759 | 104,782 | 77,167 |
| No confirmed departure | 662,374 | 94,015 | 16,808 | 33,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 | 587,227 | 74,569 | 14,797 | 33,237 | 13,070 | 1,583 | 553,990 | 61,499 | 13,214 |
| Being processed | 528,441 | 77,011 | 14,917 | 10,075 | 8,202 | 1,583 | 466,906 | 60,698 | 13,234 | 466,906 | 60,698 | 13,234 | 10,065 | 8,201 | 1,583 | 456,841 | 52,497 | 11,651 |
| Being processed by DHS | 163,766 | 27,322 | 10,398 | 207 | 284 | 206 | 163,559 | 27,038 | 10,192 | 151,076 | 20,632 | 9,151 | 207 | 284 | 206 | 150,869 | 20,348 | 8,945 |
| In EOIR proceedings[3] | 287,962 | 34,911 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,368 | 2,281 | 272,578 | 32,880 | 3,387 | 4,697 | 7,542 | 1,377 | 267,881 | 25,338 | 2,010 |
| EOIR case completed - additional DOJ[4] | 76,715 | 14,778 | 861 | 5,169 | 375 | 0 | 71,546 | 14,403 | 861 | 43,252 | 7,186 | 696 | 5,161 | 375 | 0 | 38,091 | 6,811 | 696 |
| Final order/voluntary departure | 94,780 | 9,897 | 439 | 18,007 | 4,399 | 0 | 76,773 | 5,498 | 439 | 88,836 | 7,534 | 219 | 17,980 | 4,390 | 0 | 70,856 | 3,144 | 219 |
| Unexecuted removal orders | 93,265 | 9,864 | 434 | 18,007 | 4,397 | 0 | 75,258 | 5,467 | 434 | 87,374 | 7,510 | 214 | 17,980 | 4,388 | 0 | 69,394 | 3,122 | 214 |
| In absentia | 75,061 | 6,855 | 0 | 16,006 | 4,171 | 0 | 59,055 | 2,684 | 0 | 71,854 | 6,612 | 0 | 15,979 | 4,162 | 0 | 55,875 | 2,450 | 0 |
| Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | 0 | 16,203 | 2,983 | 434 | 15,520 | 898 | 214 | 2,001 | 226 | 0 | 13,519 | 672 | 214 |
| Unexecuted voluntary departures | 1,515 | 33 | 5 | 0 | 2 | 0 | 1,515 | 31 | 5 | 1,462 | 24 | 5 | 0 | 2 | 0 | 53 | 9 | 0 |
| Relief | 28,473 | 2,107 | 33 | 5,199 | 479 | 0 | 23,274 | 1,628 | 33 | 21,183 | 1,534 | 32 | 5,192 | 479 | 0 | 15,991 | 1,055 | 32 |
| SIJ or affirmative asylum | 5,709 | 178 | 0 | 6 | 3 | 0 | 5,703 | 175 | 0 | 5,387 | 173 | 0 | 6 | 3 | 0 | 5,381 | 170 | 0 |
| LPR status granted by DHS | 4,244 | 224 | 10 | 5 | 0 | 0 | 4,239 | 224 | 10 | 2,389 | 224 | 10 | 5 | 0 | 0 | 2,384 | 224 | 10 |
| EOIR relief[5] | 6,873 | 944 | 3 | 561 | 48 | 0 | 6,312 | 896 | 3 | 3,648 | 407 | 3 | 560 | 48 | 0 | 3,425 | 537 | 0 |
| EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | 0 | 6,707 | 290 | 7 | 9,683 | 688 | 6 | 4,619 | 427 | 0 | 5,064 | 261 | 6 |
| Other[6] | 315 | 44 | 13 | 2 | 1 | 0 | 313 | 43 | 13 | 276 | 42 | 13 | 2 | 1 | 0 | 39 | 2 | 0 |
| Parole | 7,055 | 4,285 | 788 | 0 | 0 | 0 | 7,055 | 4,285 | 788 | 7,055 | 4,285 | 788 | 0 | 0 | 0 | 0 | 0 | 0 |
| No Subsequent Event[7] | 3,623 | 715 | 631 | 0 | 0 | 0 | 3,623 | 715 | 631 | 3,247 | 518 | 524 | 0 | 0 | 0 | 376 | 197 | 107 |
| | | | | 374 | 12 | 626 | 34,205 | 11,944 | 46,149 | 1.4% | | | 10,037 | 794 | 11,721 | 252,868 | 293,671 | 546,539 | 2.1% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

AR01918

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 44,280 | 20,146 | 2,574 | 30,896 | 5,735 | - | 13,306 | 14,252 | 2,552 |
| Repatriations | 10,999 | 7,066 | 991 | 2,522 | 483 | - | 8,418 | 6,491 | 973 |
| Title 42 Expulsion | 1 | | 1 | 1 | | | | | |
| Removals | 545 | 45 | - | 533 | 36 | - | 12 | 5 | - |
|   Expedited | 17 | 7 | - | 13 | 4 | - | 4 | 3 | - |
|   Reinstatement | 22 | 1 | - | 21 | - | - | 1 | 1 | - |
|   Administrative removals | 24 | - | - | 24 | - | - | - | - | - |
|   Other removals[1] | 482 | 35 | - | 475 | 34 | - | 7 | 1 | - |
| Returns | 24 | 5 | - | 22 | 1 | - | 2 | 2 | - |
| Re-encounters[2] | 10,429 | 7,020 | 990 | 1,966 | 444 | - | 8,404 | 6,484 | 973 |
| **No confirmed departure** | 33,281 | 13,080 | 1,583 | 28,374 | 5,252 | - | 4,888 | 7,761 | 1,579 |
| Being processed | 10,073 | 6,202 | 1,583 | 5,169 | 574 | - | 4,887 | 7,761 | 1,579 |
|   Being processed by DHS | 207 | 284 | 206 | - | - | - | 188 | 217 | 202 |
|   In EOIR proceedings[3] | 4,699 | 7,543 | 1,377 | - | - | - | 4,699 | 7,543 | 1,377 |
|   EOIR case completed - additional DOJ action[4] | 5,169 | 375 | - | 5,169 | 374 | - | - | 1 | - |
| Final order/voluntary departure | 18,007 | 4,399 | - | 18,006 | 4,399 | - | 1 | - | - |
|   Unexecuted removal orders | 18,007 | 4,397 | - | 18,006 | 4,397 | - | 1 | - | - |
|     In absentia | 16,006 | 4,171 | - | 16,006 | 4,171 | - | - | - | - |
|     Not in absentia | 2,001 | 226 | - | 2,000 | 226 | - | 1 | - | - |
|   Unexecuted voluntary departures | - | 2 | - | - | 2 | - | - | - | - |
| Relief | 5,199 | 479 | - | 5,199 | 479 | - | - | - | - |
|   SIJ or affirmative asylum | 6 | 3 | - | 6 | 3 | - | - | - | - |
|   LPR status granted by DHS | 3 | - | - | 3 | - | - | - | - | - |
|   EOIR relief[5] | 563 | 48 | - | 563 | 48 | - | - | - | - |
|   EOIR termination | 4,625 | 427 | - | 4,625 | 427 | - | - | - | - |
|   Other[6] | 2 | 1 | - | 2 | 1 | - | - | - | - |
| Parole | | | | | | | | | |
| No Subsequent Event[7] | - | - | - | - | - | - | - | - | - |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so...
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | #DIV/0! | 100.0% | 100.0% | 100.0% |
| **Repatriations** | 24.8% | 35.1% | 38.5% | 8.2% | 8.4% | #DIV/0! | 63.3% | 45.5% | 38.1% |
| Title 42 Expulsion | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Removals | 1.2% | 0.2% | 0.0% | 1.7% | 0.7% | #DIV/0! | 0.1% | 0.0% | 0.0% |
|   Expedited | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Reinstatement | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Administrative removals | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Other removals[1] | 1.1% | 0.2% | 0.0% | 1.5% | 0.6% | #DIV/0! | 0.1% | 0.0% | 0.0% |
| Returns | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Re-encounters[2] | 23.6% | 34.8% | 38.5% | 6.4% | 7.7% | #DIV/0! | 63.2% | 45.5% | 38.1% |
| **No confirmed departure** | 75.2% | 64.9% | 61.5% | 91.8% | 91.6% | #DIV/0! | 36.7% | 54.5% | 61.9% |
| Being processed | 22.8% | 40.7% | 61.5% | 16.7% | 6.5% | #DIV/0! | 36.7% | 54.5% | 61.9% |
|   Being processed by DHS | 0.5% | 1.4% | 8.0% | 0.0% | 0.0% | #DIV/0! | 1.4% | 1.5% | 7.9% |
|   In EOIR proceedings[3] | 10.6% | 37.4% | 53.5% | 0.0% | 0.0% | #DIV/0! | 35.3% | 52.9% | 54.0% |
|   EOIR case completed - additional DOJ action[4] | 11.7% | 1.9% | 0.0% | 16.7% | 6.5% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Final order/voluntary departure | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Unexecuted removal orders | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|     In absentia | 36.1% | 20.7% | 0.0% | 51.8% | 72.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|     Not in absentia | 4.5% | 1.1% | 0.0% | 6.5% | 3.9% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Unexecuted voluntary departures | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Relief | 11.7% | 2.4% | 0.0% | 16.8% | 8.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   SIJ or affirmative asylum | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   LPR status granted by DHS | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   EOIR relief[5] | 1.3% | 0.2% | 0.0% | 1.8% | 0.8% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   EOIR termination | 10.4% | 2.1% | 0.0% | 15.0% | 7.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
|   Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Parole | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| No Subsequent Event[7] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters for Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 932,949 | 437,920 | 214,207 | 189,231 | 28,919 | 1,087 | 715,020 | 194,831 | 24,172 |
| Repatriations | 303,836 | 556,985 | 198,882 | 32,466 | 8,286 | 88 | 264,132 | 145,752 | 12,310 |
| Title 42 Expulsion | | 102,234 | 111,174 | | | | | 854 | 1,345 |
| Removals | 253,772 | 128,020 | 6,437 | 28,446 | 7,336 | 69 | 224,856 | 120,469 | 6,365 |
| Expedited | 142,696 | 70,779 | 2,953 | 15,472 | 4,710 | 37 | 127,224 | 66,069 | 2,916 |
| Reinstatement | 99,340 | 54,074 | 3,405 | 2,864 | 659 | 5 | 96,476 | 53,415 | 3,400 |
| Administrative removals | 661 | 272 | 5 | 33 | 11 | | 158 | 66 | |
| Other removals[1] | 11,075 | 2,895 | 76 | 10,077 | 1,956 | 27 | 998 | 939 | 49 |
| Returns | 39,563 | 21,087 | 4,086 | 3,368 | 541 | 18 | 36,192 | 20,542 | 4,068 |
| Re-encounters[2] | 10,521 | 105,644 | 77,185 | 632 | 409 | 1 | 3,084 | 3,867 | 332 |
| **No confirmed departure** | 629,093 | 80,935 | 15,225 | 156,765 | 20,633 | 999 | 450,888 | 49,079 | 11,862 |
| Being processed | 518,368 | 68,809 | 13,334 | 73,437 | 14,382 | 860 | 432,344 | 47,478 | 10,898 |
| Being processed by DHS | 163,559 | 27,038 | 10,192 | | | | 149,172 | 20,089 | 8,616 |
| In EOIR proceedings[3] | 283,263 | 27,568 | 2,281 | 5 | | | 283,258 | 27,568 | 2,281 |
| EOIR case completed - additional DOJ action[4] | 71,546 | 14,403 | 861 | 71,432 | 14,382 | 860 | 114 | 21 | 1 |
| Final order/voluntary departure | 76,775 | 5,498 | 439 | 69,726 | 5,020 | 129 | 7,047 | 478 | 310 |
| Unexecuted removal orders | 75,256 | 5,467 | 434 | 68,223 | 4,993 | 124 | 7,033 | 474 | 310 |
| In absentia | 59,055 | 2,484 | | 59,049 | 2,484 | | 6 | | |
| Not in absentia | 16,201 | 2,983 | 434 | 9,174 | 2,509 | 124 | 7,029 | 474 | 310 |
| Unexecuted voluntary departures | 1,515 | 31 | 5 | 1,505 | 27 | 5 | 12 | 4 | |
| Relief | 23,274 | 1,628 | 33 | 15,602 | 1,231 | 10 | 7,669 | 397 | 23 |
| SIJ or affirmative asylum | 5,703 | 175 | | 1,373 | 44 | | 4,330 | 131 | |
| LPR status granted by DHS | 4,239 | 224 | 10 | 1,155 | | | 3,084 | 224 | 10 |
| EOIR relief[5] | 6,312 | 896 | 5 | 6,310 | 895 | 5 | 2 | 1 | |
| EOIR termination | 6,707 | 290 | 7 | 6,701 | 290 | 7 | 6 | | |
| Other[6] | 313 | 43 | 13 | 63 | 2 | | 247 | 41 | 13 |
| Parole | 7,055 | 4,285 | 788 | | | | 5 | 11 | |
| No Subsequent Event[7] | 3,623 | 715 | 631 | | | | 3,623 | 715 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 32.6% | 81.5% | 92.9% | 17.2% | 28.7% | 8.1% | 36.9% | 74.8% | 50.9% |
| Title 42 Expulsion | 0.0% | 23.3% | 51.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.4% | 5.6% |
| Removals | 27.2% | 29.2% | 3.0% | 15.0% | 25.4% | 6.3% | 31.4% | 61.8% | 26.3% |
| Expedited | 15.3% | 16.2% | 1.4% | 8.2% | 16.3% | 3.4% | 17.8% | 33.9% | 12.1% |
| Reinstatement | 10.6% | 12.3% | 1.6% | 1.5% | 2.3% | 0.5% | 13.5% | 27.4% | 14.1% |
| Administrative removals | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other removals[1] | 1.2% | 0.7% | 0.0% | 5.3% | 6.8% | 2.5% | 0.1% | 0.5% | 0.2% |
| Returns | 4.2% | 4.8% | 1.9% | 1.8% | 1.9% | 1.7% | 5.1% | 10.5% | 16.8% |
| Re-encounters[2] | 1.1% | 24.1% | 36.0% | 0.3% | 1.4% | 0.1% | 0.4% | 2.0% | 2.2% |
| **No confirmed departure** | 67.4% | 18.5% | 7.1% | 82.8% | 71.3% | 91.9% | 63.1% | 25.2% | 49.1% |
| Being processed | 55.6% | 15.7% | 6.2% | 37.8% | 49.7% | 79.1% | 60.5% | 24.4% | 45.1% |
| Being processed by DHS | 17.5% | 6.2% | 4.8% | 0.0% | 0.0% | 0.0% | 20.9% | 10.3% | 35.6% |
| In EOIR proceedings[3] | 30.4% | 6.2% | 1.1% | 0.0% | 0.0% | 0.0% | 39.6% | 14.0% | 9.4% |
| EOIR case completed - additional DOJ action[4] | 7.7% | 3.3% | 0.4% | 37.7% | 49.7% | 79.1% | 0.0% | 0.0% | 0.0% |
| Final order/voluntary departure | 8.2% | 1.3% | 0.2% | 36.8% | 17.4% | 11.9% | 1.0% | 0.2% | 1.3% |
| Unexecuted removal orders | 8.1% | 1.2% | 0.2% | 36.1% | 17.3% | 11.4% | 1.0% | 0.2% | 1.3% |
| In absentia | 6.3% | 0.6% | 0.0% | 31.2% | 8.6% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not in absentia | 1.7% | 0.7% | 0.2% | 4.8% | 8.7% | 11.4% | 1.0% | 0.2% | 1.3% |
| Unexecuted voluntary departures | 0.2% | 0.0% | 0.0% | 0.8% | 0.1% | 0.5% | 0.0% | 0.0% | 0.0% |
| Relief | 2.5% | 0.4% | 0.0% | 8.2% | 4.3% | 0.9% | 1.1% | 0.2% | 0.1% |
| SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.7% | 0.2% | 0.0% | 0.6% | 0.1% | 0.0% |
| LPR status granted by DHS | 0.5% | 0.1% | 0.0% | 0.6% | 0.0% | 0.0% | 0.4% | 0.1% | 0.0% |
| EOIR relief[5] | 0.7% | 0.2% | 0.0% | 3.3% | 3.1% | 0.5% | 0.0% | 0.0% | 0.0% |
| EOIR termination | 0.7% | 0.1% | 0.0% | 3.5% | 1.0% | 0.6% | 0.0% | 0.0% | 0.0% |
| Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.8% | 1.0% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No Subsequent Event[7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.5% | 0.4% | 2.6% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 235**

[CIS No. 2692–21; DHS Docket No. USCIS–2021–0012]

**RIN 1615–AC67**

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1003, 1208, and 1235**

[A.G. Order No. 5116–2021]

**RIN 1125–AB20**

### Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") are proposing to amend the regulations governing the determination of certain protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture. Under the proposed rule, such individuals could have their claims for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA" or "the Act") ("statutory withholding of removal"), or protection under the regulations issued pursuant to the legislation implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") initially adjudicated by an asylum officer within U.S. Citizenship and Immigration Services ("USCIS"). Such individuals who are granted relief by the asylum officer would be entitled to asylum, withholding of removal, or protection under CAT, as appropriate. Such individuals who are denied protection would be able to seek prompt, de novo review with an immigration judge ("IJ") in the DOJ Executive Office for Immigration Review ("EOIR"), with appeal available to the Board of Immigration Appeals ("BIA"). These changes are intended to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while ensuring fundamental fairness. In addition, among other changes to the asylum process, the Departments are proposing to return to the regulatory framework governing the credible fear screening process in place before various regulatory changes made from the end of 2018 through the end of 2020, so as to apply once more the longstanding "significant possibility" screening standard to all protection claims, but not to apply the mandatory bars to asylum and withholding of removal (with limited exception) at this initial screening stage.

**DATES:** *Submission of public comments:* Written comments and related material must be submitted on or October 19, 2021. The electronic Federal Docket Management System will accept comments prior to midnight Eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments on the entirety of this rulemaking package, identified by DHS Docket No. USCIS–2021–0012, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS, USCIS, DOJ, or EOIR officials, will not be considered comments on the proposed rule and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments also are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For USCIS:* Andria Strano, Acting Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009; telephone (240) 721–3000 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Background
  A. Improving the Expedited Removal Process
  B. DOJ and DHS Authority To Propose This Rule
  C. The Current Asylum and Expedited Removal Process
III. Discussion of the Proposed Rule
  A. Parole—Proposed 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii)
  B. Credible Fear Screening Process—Proposed 8 CFR 208.30
  C. Applications for Asylum—Proposed 8 CFR 208.3(a) and 208.9(a)
  D. Proceedings for Further Consideration of the Application for Asylum by USCIS Asylum Officer in Asylum and Withholding Merits Hearing for Noncitizens With Credible Fear—Proposed 8 CFR 208.2(a) and (c); 208.9(a), (f), and (g); 208.14(c)(5); 208.30(e) and (f); 235.6(a)(1); 1003.42; and 1208.30(g)
  E. Application Review Proceedings Before the IJ—Proposed 8 CFR 1208.2(c), 1003.48
  F. Severability
  G. Discretion/Phased Implementation
Statutory and Regulatory Requirements
  H. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)
  I. Regulatory Flexibility Act
  J. Unfunded Mandates Reform Act of 1995
  K. Congressional Review Act
  L. Executive Order 13132 (Federalism)
  M. Executive Order 12988 (Civil Justice Reform)
  N. Family Assessment
  O. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  P. National Environmental Policy Act
  Q. Paperwork Reduction Act

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this rule by the deadline stated above. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this rule. All comments must be submitted in English or accompanied by an English translation. Comments that will provide the most assistance to the Departments in developing these changes will reference a specific portion of the rule; explain the reason for any

recommended change; and include data, information, or authority that support such recommended change. Comments submitted in a manner other than the one listed above, including emails or letters sent to departmental officials, will not be considered comments on the proposed rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the agency name (U.S. Citizenship and Immigration Services) and the DHS Docket No. USCIS–2021–0012 for this rulemaking. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold from public viewing information provided in comments that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2021–0012. You also may sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

## II. Background

There is wide agreement that the system for dealing with asylum and related protection claims at the southwest border has long been "overwhelmed" and in desperate need of repair.[1] As the number of such claims

has skyrocketed over the years, the system has proven unable to keep pace, resulting in large backlogs and lengthy adjudication delays. A system that takes years to reach a result is simply not a functional one. It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit. The aim of this rule is to begin replacing the current system, within the confines of the law, with a better and more efficient one that will adjudicate protection claims fairly and expeditiously. The proposed rule would accomplish this goal by transferring the initial responsibility for adjudicating asylum and related protection claims[2] made by noncitizens encountered at or near the border from IJs in EOIR to asylum officers in USCIS. The proposed rule would also provide for the prompt filing of asylum applications by such individuals, while also providing ample procedural safeguards designed to ensure due process, respect human dignity, and promote equity.

The current U.S. protection system at the border was initially designed in the mid-1990s.[3] Congress established an expedited removal process for noncitizens who present themselves at a port of entry for inspection or are encountered at or near the border and who are found to be inadmissible because they lack valid entry documents or because they sought to enter the United States by fraud or misrepresentation. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); INA 212(a)(6)(C), (7), 8 U.S.C. 1182(a)(6)(C), (7). Congress authorized DHS to extend the expedited removal process to certain noncitizens apprehended shortly after crossing the border unlawfully, and DHS has exercised that authority. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii).[4]

A DHS immigration officer who encounters a noncitizen subject to expedited removal may order the noncitizen to be "removed from the United States without further hearing or review" unless the noncitizen indicates either "an intention to apply for asylum" or "a fear of persecution." INA 235 (b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). If the noncitizen indicates such an intention or fear, the immigration officer must refer the noncitizen for an interview by an asylum officer to determine whether the noncitizen has a "credible fear of persecution." INA 235(b)(1)(A)(ii), (B)(ii), 8 U.S.C. 1225(b)(1)(A)(ii), (B)(ii). A credible fear is defined by statute as a "significant possibility" that the noncitizen could establish eligibility for asylum. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Before various regulatory changes published between 2018 and 2020, explained in greater detail below, the "significant possibility" standard also was applied to screening for eligibility for statutory withholding of removal and CAT protection.[5] Because those recent regulatory changes have been vacated or enjoined, the "significant possibility" standard presently applies to all three forms of protection claims.[6] If the asylum officer determines that the noncitizen lacks a credible fear, that determination is subject to expedited review by an IJ, but not by the BIA or an Article III court. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); *see* INA

---

[1] *See* DHS, Homeland Security Advisory Council, *Final Emergency Interim Report: CBP Families and Children Care Panel,* at 1 (Apr. 16, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf;* Randy Capps et al., *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* 7, Migration Policy Institute (MPI) (Aug. 2019), *https://www.migrationpolicy.org/sites/default/files/publications/BorderSecurity-ControltoCrisis-Report-Final.pdf* ("as arrivals have surged to levels unseen in years, border enforcement and asylum systems have been overwhelmed"); Lora Ries, *Securing the Border and Fixing Our Broken Immigration System,* Heritage Foundation (Sept. 21, 2020), *https://www.heritage.org/immigration/commentary/securing-the-border-and-fixing-our-broken-immigration-system* ("our immigration court system is so overwhelmed, [asylum] cases of merit are combined with meritless cases, each of which can take years to resolve"); Greg Chen & Peter

Markowitz, *Recommendations for DOJ and EOIR Leadership To Systematically Remove Non-Priority Cases from the Immigration Court Backlog* 1, Am. Immigr. Law. Ass'n (Feb. 11, 2021), *https://www.aila.org/infonet/remove-non-priority-cases* ("The bottleneck for the entire removal system caused by the court backlog, if not addressed quickly, presents a serious obstacle to the Biden administration's goal of ensuring the fair and efficient processing of all removal cases.").

[2] The generic term "protection claims" is used here to refer to all three forms of protection addressed in this proposed rule (asylum, statutory withholding of removal, and protection from removal under the regulations implementing U.S. obligations under Article 3 of the CAT).

[3] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, 110 Stat. 3009, 3009–546 (1996) ("IIRIRA").

[4] The former Immigration and Naturalization Service ("INS") initially implemented expedited removal only against noncitizens arriving at ports of entry. In 2002, DHS expanded the application of

expedited removal to noncitizens who (1) entered the United States by sea, either by boat or other means, (2) were not admitted or paroled into the United States, and (3) have not been continuously present in the United States for at least 2 years. Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 FR 68924 (Nov. 13, 2002). In 2004, DHS published an immediately effective notice in the **Federal Register** to expand the application of expedited removal to noncitizens encountered within 100 miles of the border and to noncitizens who entered the United States without inspection fewer than 14 days before they were encountered. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004). In 2019, DHS expanded the process to the full extent authorized by statute to reach noncitizens who entered the country without inspection less than 2 years before being apprehended and who were encountered anywhere in the United States. Designating Aliens for Expedited Removal, 84 FR 35409 (July 23, 2019). President Biden has directed DHS to consider whether to modify, revoke, or rescind that 2019 expansion. E.O. 14010, *Ensuring a Timely and Fair Expedited Removal Process,* 86 FR 8267, 8270–71 (Feb. 2, 2021).

[5] *See generally* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

[6] *See infra* note 24.

242(a)(2)(A)(iii), (e)(2), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(2).

Noncitizens placed into expedited removal and determined to have a credible fear of persecution or torture by an asylum officer or an IJ must be referred for ''further consideration of the application for asylum.'' INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). The INA is silent as to the procedures by which this ''further consideration'' should occur. Under regulations in place before December 2020,[7] such individuals are currently referred to IJs for removal proceedings under section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and its implementing regulations, 8 CFR 208.30(f), 235.6(a)(1)(ii)–(iii), 1208.30(g)(2)(iv)(B). In those proceedings, IJs conduct adversarial hearings to determine removability and adjudicate applications for asylum, withholding or deferral of removal, and any other forms of relief or protection.

The process put into place in 1997, under which noncitizens who establish credible fear generally must have their asylum claims decided through an adversarial removal proceeding before an IJ, is no longer fit for its intended purpose. It does not adequately address the need to adjudicate in a timely manner the rapidly increasing number of asylum claims raised by individuals arriving in the United States.

This system was designed at a time when the vast majority of southwest border encounters involved single adults from Mexico and relatively few asylum claims were filed. This system has proven unable to manage the increasing numbers and changing demographics of noncitizens[8] with asylum claims arriving at the southwest border. Since the mid-2010s, the demographic characteristics of noncitizens encountered at the border with Mexico have been utterly transformed from being dominated by Mexican nationals to consisting mainly of nationals from the Northern Triangle countries of Central America (El Salvador, Guatemala, and Honduras) along with other Western Hemisphere states; from consisting almost entirely of

adults traveling without children to including large numbers of families and unaccompanied children; and from including very few asylum seekers to asylum seekers making up a large share of southwest border encounters.[9] As a result, even as overall encounters at the southwest border have been lower in recent years than in the 1990s and 2000s, the demands on the U.S. asylum system have increased sharply.

Recent demographic changes in southwest border encounters have been dramatic. As recently as 2009, Mexican nationals accounted for 92 percent of southwest border apprehensions.[10] Their share fell below 50 percent for the first time ever in 2014, remained below 50 percent between 2016 and 2019, and fell to an all-time low of 20 percent in 2019, the last full year before the COVID–19 pandemic disrupted ongoing migration trends.[11] Single adults accounted for about 89 percent of southwest border encounters in 2013—a number that was likely near an all-time low at the time—and fell to just 38 percent in 2019.[12] Over much of this period, U.S. Border Patrol (''USBP'') agents have apprehended an increasing number of families and children from Northern Triangle countries. Individuals from Northern Triangle countries accounted for 71 percent of USBP apprehensions in 2019, a record high, and families from all countries accounted for 56 percent of the total, also an all-time high.[13]

These demographic changes have coincided with—and contributed to the reversal of—what had been a long-term trend in declining border encounters. Moreover, as the population of individuals encountered at or near the southwest border has changed, the number of people making fear claims after being placed in expedited removal has increased sharply. Southwest border apprehensions by the U.S. Border Patrol fell from over 1.6 million in 2000 to under 330,000 in 2011 before rising back to over 850,000 in 2019.[14] During the same period, however, credible fear referrals to USCIS initially decreased from just over 10,000 in 2000, to just under 5000 in 2008, before increasing back over 11,000 in 2011, to over 105,000 in 2019.[15] Thus, even as overall border encounters fell 48 percent between 2000 and 2019, the number of individuals making fear claims increased over 900 percent. These changing demographics have had an equally dramatic impact on the immigration courts responsible for determining removability. EOIR now faces a pending caseload of approximately 1.3 million cases,[16] with approximately 610,000 pending asylum applications.[17] While the corps of IJs has more than doubled since 2014, going from 249 at the end of FY 2014 to 539 as of April 2021,[18] the number of pending cases has more than tripled in that same period, growing by nearly 500,000 cases since the end of Fiscal Year (''FY'') 2018.[19] This surge in

---

[7] See *infra* note 24 discussing recent regulations governing the current status. The final rule entitled Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274, 80276 (Dec. 11, 2020) (''Global Asylum'' rule), revised the process used to hear the asylum claim, placing noncitizens into asylum/withholding-only proceedings instead of removal proceedings under section 240 of the INA.

[8] For purposes of this discussion, the Departments use the term ''noncitizen'' synonymously with the term ''alien'' in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3).

[9] Office of Immigration Statistics, *Fiscal Year 2020 Enforcement Lifecycle Report* 1, Dep't of Homeland Security (Dec. 2020) (''OIS FY 2020 Lifecycle Report''), *https://www.dhs.gov/sites/default/files/publications/immigration-statistics/Special_Reports/Enforcement_Lifecycle/2020_enforcement_lifecycle_report.pdf*.

[10] Dep't of Homeland Security, *Fiscal Year 2019 Border Security Metrics Report* 52 (Aug. 5, 2020), *https://www.dhs.gov/sites/default/files/publications/immigration-statistics/BSMR/ndaa_border_security_metrics_report_fy_2019_0.pdf*.

[11] U.S. Customs and Border Protection, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Aug. 4, 2021); *see also* OIS FY 2020 Lifecycle Report, *supra* note 9, at 7. Mexico's share of southwest border encounters returned to 65 percent during the first year of the COVID–19 pandemic, but preliminary data indicate that Mexican nationals accounted for fewer than half of southwest border encounters during the first eight months of Fiscal Year 2021 and only about one-third of unique individuals when controlling for higher than usual repeat encounters due to border COVID–19 protocols.

[12] *Id.* The phenomenon of families being encountered at the border was sufficiently rare that U.S. Border Patrol only began recording data on family unit apprehensions in 2013, and the Office of Field Operations did so beginning in 2016.

[13] Mike Guo, *Immigration Enforcement Actions: 2019* at 4, Dep't of Homeland Security (Sept. 2020), *https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2019/enforcement_actions_2019.pdf*.

[14] United States Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions by Fiscal Year, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Fiscal%20Year%20Southwest%20Border%20Sector%20Apprehensions%20%28FY%201960%20-%20FY%202019%29_0.pdf* (last visited Aug. 4, 2021).

[15] Bruno, Andorra, *Immigration: U.S. Asylum Policy* (CRS Report No. R45539), at 37 (Feb. 19, 2019) (data through 2018), *https://crsreports.congress.gov/product/pdf/R/R45539; see also* U.S. Citizenship and Immigration Services, *Credible Fear Workload Report Summary—FY2019 Total Caseload* (2019 data), *https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf* (last visited Aug. 4, 2021).

[16] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2021), *https://www.justice.gov/eoir/page/file/1242166/download*.

[17] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Total Asylum Applications* (Apr. 19, 2021), *https://www.justice.gov/eoir/page/file/1106366/download*.

[18] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Immigration Judge (IJ) Hiring* (Apr. 2021), *https://www.justice.gov/eoir/page/file/1242156/download*.

[19] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2021), *https://www.justice.gov/eoir/page/file/1242166/download*.

pending and new cases, along with the temporary, partial closure of the immigration courts to in-person hearings in 2020 and 2021 because of the COVID–19 pandemic, has resulted in significantly increased adjudication times. While the median completion time for cases involving individuals who are detained through the 2nd quarter of FY 2021 was 43 days, for non-detained individuals in removal proceedings, including arriving asylum seekers initially screened into expedited removal who establish a credible fear of persecution, the recent average case completion time in immigration court has been 3.75 years.[20] Most asylum seekers arriving at the southwest border in recent years must therefore often wait several years to have their claims adjudicated in removal proceedings under section 240 of the Act, 8 U.S.C. 1229a. Absent changes to the current system, the continuing arrival of large numbers of noncitizens at the southwest border with protection claims is likely to lengthen adjudication times further.

In 2020 and 2021, the situation at the southwest border was complicated further by the COVID–19 pandemic. Pursuant to sections 362 and 365 of the Public Health Service Act, Public Law 78–410, 58 Stat. 682 (1944), 42 U.S.C. 265 and 268 ("Title 42"), the Centers for Disease Control and Prevention ("CDC") determined in March 2020 that it was necessary to prohibit the introduction of certain persons from Mexico and Canada to protect the public health by preventing the further introduction of the virus that causes COVID–19 into the United States.[21] To mitigate the risks presented by COVID–19, the CDC Order requires returning all covered noncitizens as rapidly as possible—and with the least amount of time spent in congregate settings as feasible—to the country from which they entered the United States, to their country of origin, or to another location as practicable and appropriate.[22] Covered noncitizens are those persons traveling from Canada or Mexico (regardless of their country of origin) who otherwise would be introduced into a congregate setting in

a land (and, as amended, coastal) port of entry or USBP station at or near the U.S. borders with Canada and Mexico. The CDC Order does not apply to, among others, U.S. citizens, lawful permanent residents, and those who arrive at a port of entry with valid travel documents.[23]

Border encounters in FY 2021 remain high. To date, the data does suggest that single adults make up a greater percentage of apprehensions than in FY 2019 and, controlling for repeat encounters, the actual number of unique encounters (the number of unique individuals encountered irrespective of potential repeated attempts to enter) has been lower to date in FY 2021 than in FY 2019 (given the continuing use of Title 42 authority to expel many adults and families soon after they are apprehended). But *total* encounters at or near the southwest border through April for FY 2021 has surpassed the FY 2019 highs over the same period. The high number of southwest border apprehensions is presenting serious challenges for an already overwhelmed U.S. asylum system at the border.

## A. Improving the Expedited Removal Process

The principal purpose of this proposed rule is to simultaneously increase both the efficiency and the procedural fairness of the expedited removal process for individuals who have been found to have a credible fear of persecution or torture. When individuals who have been placed into the expedited removal process make a fear claim, they are referred to a USCIS asylum officer, who interviews them to determine whether they have a credible fear of persecution or torture. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). Under current procedures, individuals who receive a positive credible fear determination are referred to an immigration court for removal proceedings, in the course of which they have the opportunity to apply for asylum and other forms of relief or protection from removal. *See* 8 CFR 208.30(f) (2018) (providing that if a noncitizen, other than a stowaway, "is found to have a credible fear of persecution or torture, the asylum officer will so inform the [noncitizen] and issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act"). As explained above, it may take years before the individual's protection claim is first adjudicated by an IJ. The ability to stay in the United

States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim. This delay creates additional stress for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed and unable to petition for qualified family members, some of whom may still be at risk of harm.

To respond to this problem, this rule proposes at 8 CFR 208.2(a)(1)(ii) and 208.9 to provide USCIS asylum officers the authority to adjudicate in the first instance the protection claims of individuals who receive a positive credible fear determination, and that they do so in a nonadversarial hearing. The rule also proposes at 8 CFR 208.3(a)(2) that the record of a credible fear interview may serve as an asylum application for those noncitizens whose cases are retained by or referred to USCIS for adjudication after a positive credible fear determination, thereby helping to ensure that asylum seekers meet the statutory requirement to apply for asylum within one year of arrival. These steps are meant to ensure greater efficiency in the system, which was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border. The proposed rule will also stem the rapid growth of the EOIR caseload, described in greater detail above.

As noted earlier, the current system for processing protection claims made by individuals encountered at or near the border and who establish credible fear was originally adopted in 1997. Within the last 3 years, however, several attempts have been made to issue new rules to change the credible fear screening process. Many of these attempts have been vacated or enjoined, and the implementation of others has been delayed pending consideration of whether they should be revised or rescinded.[24]

---

[20] According to a review of data collected as part of the FY 2020 Lifecycle Report by DHS OIS, 39% of cases of noncitizens encountered at the southwest border in 2013 through 2019 who made fear claims remain in EOIR proceedings as of this date. As those cases are eventually completed, the median and average completion time for cases could be further impacted.

[21] *See Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 85 FR 65806, 65807 (Oct. 16, 2020) ("CDC Order" or "Title 42 order") (extending March 20, 2020 order, 85 FR 16559).

[22] *Id.* at 65812.

[23] *Id.* at 65808.

[24] On November 9, 2018, the Departments issued an interim final rule ("IFR") that barred noncitizens who entered the United States in contravention of a covered Presidential proclamation or order from eligibility for asylum, required that they receive a negative credible fear finding on their asylum claims, and required that their statutory withholding and CAT claims be considered under the higher reasonable fear screening standard. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 FR 55934, 55939, 55943 (Nov. 9, 2018). A month later, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the rule, *E. Bay Sanctuary Covenant* v. *Trump*, 354 F.

Continued

This proposed rule offers another approach. It would establish a streamlined and simplified adjudication process for individuals encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of deciding protection claims in a more timely fashion while ensuring procedural protections against erroneous denials of relief.[25] The proposed rule would

authorize USCIS asylum officers to adjudicate in the first instance the protection claims of individuals who receive positive credible fear determinations under the expedited removal framework in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). The procedures that USCIS asylum officers would use to adjudicate these claims would be nonadversarial, and the decisions would be made within timeframes more in line with those established by Congress in section 208(d)(5) of the INA.[26]

To ensure effective implementation of the expedited removal system, this rule also proposes to revise the parole considerations prior to a positive credible fear determination in 8 CFR 235.3. The current rule limits parole consideration before the credible fear determination to situations in which parole "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). Under this proposed rule, DHS would also be able to consider whether parole is required "because detention is unavailable or impracticable." The current narrower parole standards effectively prevent DHS from placing into expedited removal many noncitizens who would otherwise be eligible for this process, especially families, given the requirements of the Flores Settlement Agreement ("FSA").[27] These restrictions

on DHS's ability to detain families, coupled with capacity constraints imposed by the COVID–19 pandemic, have effectively prevented the Government from using the third option to detain families subject to expedited removal for more than a very limited number of families and for more than a very limited period of time. This proposed rule would, when finalized, eliminate that barrier to placing families into expedited removal. The proposed parole provision would allow more noncitizens arriving at the U.S. border without proper documents for entry into the country to be placed into expedited removal and allow for them to have their fear claims heard and considered outside the detention setting where space is unavailable or impracticable to use.

This proposed rule would apply prospectively and only to adults and families who are placed into expedited removal.[28] The proposed rule would not apply to unaccompanied children, see 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child"), as they are statutorily exempt from expedited removal proceedings. 8 U.S.C. 1232(a)(5)(D)(i) (providing that "any unaccompanied alien child" "shall be— (i) placed in removal proceedings under section 240" of the INA).[29] The

---

Supp. 3d 1094, 1121 (N.D. Cal. 2018), and the Ninth Circuit affirmed, *E. Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640, 680 (9th Cir. 2021).

On July 16, 2019, the Departments published another IFR, entitled Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019), which generally barred noncitizens from asylum eligibility if they entered or attempted to enter the United States across the southwest border after failing to apply for protection from persecution or torture while in any one of the third countries through which they transited, required a negative credible fear finding for such noncitizens' asylum claims, and required their withholding and CAT claims to be considered under the higher reasonable fear screening standard. *Id.* at 33837–38. The U.S. District Court for the District of Columbia vacated that IFR after concluding that the Departments violated the Administrative Procedure Act by forgoing notice-and-comment rulemaking. *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25, 45–57 (D.D.C. 2020). The Departments issued a final rule on December 17, 2020, entitled Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020), which again attempted to bar from asylum eligibility those noncitizens who transited a third country before arriving at the border. The U.S. District Court for the Northern District of California subsequently issued a preliminary injunction against implementation of that rule, which remains in place as of this writing. *E. Bay Sanctuary Covenant* v. *Barr,* No. 19–cv– 04073–JST, 2021 WL 607869, at *5 (N.D. Cal. Feb. 16, 2021).

Around the same time, the Departments also issued the final rule entitled Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (Dec. 11, 2020) ("Global Asylum" rule). That rule revised the credible fear screening process to require that all the mandatory bars to asylum and withholding be considered during the credible fear screening process and established a new screening standard for withholding of removal and CAT protection. On January 8, 2021, the U.S. District Court for the Northern District of California preliminarily enjoined the Departments from implementing the rule. *Pangea Legal Servs.* v. *DHS,* No. 20–cv–09253 JD, 2021 WL 75756, at *7 (N.D. Cal. Jan. 8, 2021). That preliminary injunction remains in place.

Finally, the Departments also published a final rule entitled Security Bars and Processing, 85 FR 84160 (Dec. 23, 2020) ("Security Bars" rule), which added an additional bar to asylum and withholding that would be applied to the credible fear screening process. The Departments have delayed the rule's effective date to December 31, 2021, *see* Security Bars and Processing; Delay of Effective Date, 86 FR 15069 (Mar. 22, 2021), as the Departments consider possible action to rescind or revise the rule.

[25] Section 4(b)(i) of E.O. 14010 instructed the Secretary of Homeland Security to review the procedures for individuals placed into expedited removal at or near the border and issue a report with recommendations "for creating a more efficient and orderly process that facilitates timely adjudications [of asylum/protection claims] and adherence to standards of fairness and due process." 86 FR at 8270.

[26] *See* INA 208(d)(5), 8 U.S.C. 1158(d)(5) (specifying that an initial hearing on an asylum application should generally occur within 45 days after the filing of the application and that an initial administrative decision should generally be made within 180 days).

[27] In 1985, a class-action suit challenged the policies of the former INS relating to the detention, processing, and release of alien children; the case eventually reached the U.S. Supreme Court. The Court upheld the constitutionality of the challenged INS regulations on their face and remanded the case for further proceedings consistent with its opinion. *See Reno* v. *Flores,* 507 U.S. 292, 315 (1993). In January 1997, the parties reached a comprehensive settlement agreement, referred to as the Flores Settlement Agreement. *See Flores* v. *Rosen,* 984 F.3d 720, 727 (9th Cir. 2020) (describing litigation history). The FSA was to terminate 5 years after the date of final court approval; however, the termination provisions were modified in 2001, such that the FSA does not terminate until 45 days after publication of regulations implementing the agreement. *Id.* In August 2019, DHS and HHS jointly issued a final rule entitled Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 FR 44392 (Aug. 23, 2019). In September 2019, about a month before the Final Rule was to take effect, a Federal district court granted the plaintiff class's motion to enforce the FSA and denied the government's motion to terminate it, because the final rule was inconsistent with the FSA and thus did not "implement[ ]" it as required by the FSA's termination provisions. *See Flores* v. *Barr,* 407 F. Supp. 3d 909, 914 (C.D. Cal. 2019). The Ninth Circuit affirmed in part, and the provisions of the FSA that are relevant here thus generally remain in effect. *See Flores* v. *Rosen,* 984

F.3d at 737, 744. Under the requirements of the FSA, when DHS apprehends an alien parent or legal guardian with their child(ren) either illegally entering the United States between the ports of entry or found inadmissible at a port of entry, it has, following initiation of removal proceedings, three primary options for purposes of immigration custody: (1) Parole all family members into the United States; (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or transfer them to HHS to be treated as an unaccompanied child; or (3) detain family members together by placing them at an appropriate DHS Family Residential Center ("FRC") during their immigration proceedings. *See, e.g., id.* at 737–38 (discussing "transfer of unaccompanied minors from DHS to HHS," "DHS custodial care immediately following apprehension," and parole).

[28] According to EOIR data, as of April 2021, over 220,000 of EOIR's pending removal cases originated with a credible fear claim. EOIR, *Executive Office for Immigration Review Adjudication Statistics:* Pending I–862 Proceedings Originating With a Credible Fear Claim and All Pending I–862s (Apr. 19, 2021), *https://www.justice.gov/eoir/page/file/ 1112996/download.* These cases are in various stages of the removal process, and hearings may have already been scheduled or held. Moving these cases to a new process at this stage would risk further delaying adjudication of their protection claims and create an immediate backlog of tens of thousands of cases for USCIS as it prepares to implement this proposed process for future border arrivals.

[29] The statute provides that any unaccompanied child whom DHS seeks to remove shall be placed with a credible fear claim. In lieu of being placed in removal proceedings, unaccompanied children from contiguous countries who meet special criteria may be permitted to withdraw their applications for

proposed rule also would not apply to individuals already residing in the United States who are not designated by the Secretary as subject to expedited removal.[30] Such individuals would continue to have their asylum claims heard in removal proceedings under section 240 of the INA, or through an affirmative asylum application under section 208 of the INA if they have not yet been placed into removal proceedings. The proposed rule also would not apply to (1) stowaways or (2) noncitizens who are present in or arriving in the Commonwealth of the Northern Mariana Islands who are determined to have a credible fear. Such individuals would continue to be referred to asylum/withholding-only proceedings before an IJ under 8 CFR 208.2(c).

Finally, the Departments clarify that nothing in this proposed rule, if finalized, is intended to displace DHS's (and, in particular, USCIS's) prosecutorial discretion to place a covered noncitizen in, or to withdraw a covered noncitizen from, expedited removal proceedings and issue a Notice to Appear ("NTA") to place the noncitizen in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 523 (BIA 2011).

The credible fear screening regulations proposed under this rule generally would recodify the current screening process, returning the regulatory language, in large part, to what was in place prior to the various regulatory changes made from the end of 2018 through the end of 2020. Noncitizens encountered at or near the border or ports of entry can be placed into expedited removal and provided a credible fear screening if they indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home countries. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); 8 CFR 235.3(b)(4), 1235.3(b)(4)(i). Individuals claiming a fear or an intention to apply for protection are referred to USCIS asylum officers for an interview and consideration of their fear claims under the credible fear screening standard, which applies to all relevant protection claims. If an asylum officer determines that an individual does not have a

---

admission and be voluntarily returned to their country of nationality or country of last habitual residence. Actual removal proceedings for unaccompanied children, whether from contiguous countries or not, however, must be under section 240 of the INA.

[30] *See supra* note 4.

credible fear of persecution or torture, the individual can request that an IJ review the asylum officer's negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g). If the IJ concurs with the asylum officer's negative credible fear determination, no administrative appeal is available, 8 CFR 1208.30(g)(2)(iv)(A), and DHS can execute the individual's expedited removal order, promptly removing the individual from the United States.

If the noncitizen is found to have a credible fear, however, the proposed rule would change the procedures in place prior to this rulemaking that are described above. Under this proposed rule, rather than referring the individual to an IJ for an adversarial removal proceeding under section 240 of the INA, or, as provided for in a presently-enjoined regulation, an asylum/withholding-only hearing, the individual's asylum application instead could be retained by USCIS for a nonadversarial hearing before an asylum officer. *See* 8 CFR 208.30(f) (proposed). Similarly, if, upon review of an asylum officer's negative credible fear determination, an IJ finds that an individual does have a credible fear of persecution or torture, the individual also could be referred back to an asylum officer for proceedings on the individual's protection claims. *Id.* §§ 1003.42, 1208.30(g). The Departments plan to implement these procedures by having asylum hearings conducted for those individuals who are referred to or retained by USCIS after the positive credible fear determination would be adjudicated in a separate queue, apart from adjudications made with respect to affirmative asylum applications filed directly with USCIS. The individual would have the right to representation during this proceeding. *Id.* § 208.9(b). If, at the conclusion of an asylum hearing described in this proposed rule, the asylum officer grants asylum, the individual would be allowed to remain in the United States indefinitely with the status of "asylee" and eventually may apply for lawful permanent residence. *Id.; see also* INA 208(c)(1), 209(b), 8 U.S.C. 1158(c)(1), 1159(b). If the asylum officer denies asylum and orders the individual removed based on the immigration officer's initial inadmissibility determination under section 235(b)(1)(A)(i) of the INA, 8 U.S.C. 1225(b)(1)(A)(i), the asylum officer will also issue a decision regarding withholding or deferral of removal. 8 CFR 208.14(c)(5) (proposed). An individual who is denied asylum

may request review by an IJ of the asylum decision, as well as any denial of withholding or deferral of removal. *Id.* §§ 208.14(c)(5)(i), 1003.48(a).

In cases in which a noncitizen seeks review of an asylum officer's adverse decision, the Departments propose that the IJ would make an independent de novo determination based on the record of the hearing before the Asylum Office plus any additional, non-duplicative evidence presented to the court that is necessary to reach a reasoned decision. *Id.* § 1003.48(e) (proposed). The individual would also have the right, consistent with the INA, to representation during this review. *See* 8 CFR 1003.12 (proposed) (providing that the rules in this subpart apply to the proposed proceedings under 8 CFR 1003.48); 8 CFR 1003.16(b) (providing that a noncitizen "may be represented in proceedings before an Immigration Judge by an attorney or other representative"). The IJ also would be authorized to vacate proceedings when the judge finds the individual is prima facie eligible for other forms of relief from removal, so that DHS, in the exercise of DHS's discretion, could place the noncitizen into removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. *See* 8 CFR 1003.48(d) (proposed).

Finally, the rule proposes that both parties would be able to appeal the IJ's decision to the BIA under procedures similar to those used in section 240 removal proceedings and asylum/withholding-only proceedings under 8 CFR 208.2(c), 1208.2(c). *See* 8 CFR 1003.1(b)(15) (proposed). In addition, the individual would be able to petition for review of the BIA decision with the Federal courts. *See infra* note 59.

*B. DOJ and DHS Authority To Propose This Rule*

The Attorney General and the Secretary jointly propose this rule pursuant to their respective authorities concerning asylum determinations. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. The HSA charged the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and granted the power to take all actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary's authority also includes the authority to

publish regulatory amendments governing the apprehension, inspection and admission, detention and removal, withholding of removal, and release of noncitizens encountered in the interior of the United States or at or between the U.S. ports of entry. INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA thus transferred to DHS authority to adjudicate asylum applications, as well as the authority to conduct credible fear interviews and make credible fear determinations in the context of expedited removal. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* HSA 451(b), 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). By operation of the HSA, the reference to "Attorney General" in the INA is understood also to encompass the Secretary in matters with respect to immigration proceedings before DHS. That authority has been delegated within DHS to the Director of USCIS. *See* 8 CFR 208.2(a), 208.30.

In addition, under the HSA, the Attorney General retained authority over individual immigration adjudications (including section 240 removal proceedings and certain adjudications related to asylum applications) conducted within EOIR. *See* HSA 1101(a), 6 U.S.C. 521(a); INA 103(g), 8 U.S.C. 1103(g). IJs within DOJ continue to adjudicate all asylum applications filed by noncitizens during the pendency of removal proceedings, and they also may review asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); 8 CFR 1208.2(b), 1240.1(a).

Section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), provides that if a noncitizen in expedited removal proceedings is determined to have a credible fear of persecution by an asylum officer, the noncitizen is entitled to "further consideration of the application for asylum." This proposed rule addresses how that further consideration will occur. Section 208(d)(1) of the INA, 8 U.S.C. 1158(d)(1), provides the Attorney General with the authority to establish procedures for the consideration of asylum applications, including those filed in accordance with section 235(b) of the INA, 8 U.S.C. 1225(b). *See* INA 208(a), 8 U.S.C. 1158(a).

Section 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), authorizes the Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole to applicants for admission on a case-by-case basis.

*C. The Current Asylum and Expedited Removal Process*

1. Asylum

The Refugee Act of 1980, Public Law 96–212, 94 Stat. 102, was the first comprehensive legislation to establish the modern refugee and asylum system in the United States. Asylum is a discretionary benefit that can be granted by the Attorney General or the Secretary if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1), 8 U.S.C. 1158(b)(1) (providing that the Attorney General "may" grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining "refugee"). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or last habitual residence, (2) receive employment authorization incident to their status, and (3) may be permitted to apply for readmission after travel outside of the United States with prior consent from the Secretary. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez,* 141 S. Ct. 2271, 2286 (2021) ("[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]" (internal quotation marks and citation omitted) (emphases omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); *id.* § 223.1(b) (readmission after travel for a "person who holds . . . asylum status pursuant to section 208 of the Act").

Asylum applications are presently classified based on the agency with jurisdiction over the noncitizen's case. If a noncitizen is physically present in the United States, not detained, and not in removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are known as "affirmative" filings. If the noncitizen is in removal proceedings before an IJ, the noncitizen instead may file an application for asylum with the IJ as a defense to removal. Such "defensive" filings are currently the only route by which noncitizens referred to an IJ by a USCIS asylum officer after receiving a positive credible fear determination can obtain an adjudication of the merits of their asylum claims.

Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, nonetheless may qualify for other forms of protection. An application for asylum submitted by a noncitizen in removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for withholding and deferral of removal under regulations issued pursuant to the implementing legislation regarding U.S. obligations under Article 3 of the CAT. Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note (1999)); 8 CFR 1208.3(b), 1208.13(c)(1); *see also id.* §§ 1208.16(c), 1208.17.

Withholding and deferral of removal bar a noncitizen's removal to any country where the noncitizen would "more likely than not" face persecution or torture, meaning that the noncitizen would face a clear probability that their life or freedom would be threatened because of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen proves that it is more likely than not that the noncitizen's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason— for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that he or she more likely than not will face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a). In contrast to the more generous benefits available through asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman*

*Chavez,* 141 S. Ct. at 2286 ("distinguish[ing] withholding-only relief from asylum" on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that "the Act does not permit derivative withholding of removal under any circumstances"); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

## 2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), regarding material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), regarding documentation requirements for admission. Under expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

The former INS and, later, DHS implemented a screening process, known as the "credible fear" screening, to identify potentially valid claims for asylum, statutory withholding of removal, and CAT protection, or, more specifically, to prevent noncitizens placed in expedited removal from being removed to a country in which they would face persecution or torture. Currently, with regulatory changes made from 2018 through 2020 either vacated, enjoined, or delayed, any noncitizen who expresses a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process is referred to a USCIS asylum officer for an interview to determine whether the noncitizen has a credible fear of persecution or torture in the country of return. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4), 1235.3(b)(4)(i). If the asylum officer determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g).

Under the regulatory framework prior to November 2018 and currently in effect,[31] if the asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution or torture, DHS refers the noncitizen to an immigration court for adjudication of the noncitizen's claims by initiating section 240 removal proceedings through service of an NTA on the noncitizen and with the court. *See* 8 CFR 208.30(f), 235.6(a)(1)(ii), 1235.6(a)(1)(ii) (2018). Similarly, if an IJ, upon review of the asylum officer's negative credible fear determination, finds that the noncitizen possesses a credible fear of persecution or torture, the IJ vacates the expedited removal order and DHS initiates section 240 removal proceedings. *See id.* 1208.30(g)(2)(iv)(B). If the noncitizen subsequently decides to file for asylum, the asylum application is filed with the court during the section 240 removal proceedings, is considered a "defensively filed" application, and is subject to the one-year filing deadline. *See* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B). There is no requirement that the noncitizen file an asylum application, however, once placed into section 240 removal proceedings.

## III. Discussion of the Proposed Rule

As noted in the summary above, this proposed rule would make several changes to the adjudication process of protection claims presented by noncitizens in expedited removal who both make fear claims and are determined to have a credible fear of persecution or torture. A more detailed explanation of the proposed changes, the reasons for these changes, and their alignment with the relevant statutes, as well as a brief outline of certain other changes proposed by this rule, follows.

## A. Parole—Proposed 8 CFR 235.3(b)(2)(iii) and (b)(4)(ii)

The expedited removal statute provides for detention throughout the expedited removal process, including

during the credible fear screening process and during the process for further consideration of the protection claims on their merits. The statute does not, however, limit DHS's general parole authority under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), and 8 CFR 212.5(b), and the Departments have not understood the language providing for detention in expedited removal to limit this parole authority. Instead, parole authority in the context of expedited removal has been specifically provided for in the relevant regulations covering expedited removal and the credible fear screening process since they were first implemented in 1997. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312, 10356 (Mar. 6, 1997) (interim final rule). And the U.S. Supreme Court recently acknowledged in *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 837 (2018), that DHS may exercise its authority to temporarily parole persons subject to expedited removal, while also acknowledging that the relevant statutory language in section 235(b)(1) and (b)(2) of the INA, 8 U.S.C. 1225(b)(1), (b)(2), "unequivocally mandate that aliens falling within their scope 'shall' be detained," *id.* at 844.

Since expedited removal's implementation regulations were first promulgated, parole consideration has been limited to a narrow category of circumstances for individuals awaiting a credible fear determination—when necessary "to meet a medical emergency or . . . for a legitimate law enforcement objective." *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (current). This proposed rule change would add to those grounds, allowing parole when "detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities)." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (proposed). This change would allow DHS to prioritize use of its limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety, while avoiding unnecessary operational limitations on DHS's authority to place noncitizens into expedited removal. Under the proposed rule, when detention space is unavailable or its use is otherwise impracticable, DHS would have the option of using parole rather than placing nearly all families arriving at the border directly into section 240 removal proceedings. The proposed rule also makes clear that a grant of parole only

---

[31] *See supra* note 24 (discussing the status of more recent regulatory changes).

authorizes release from custody and cannot serve as an independent basis for employment authorization under 8 CFR 274a.12(c)(11).[32] *See* 8 CFR 235.3(b)(4)(ii) (proposed). The Departments are seeking public comment on this change in the circumstances under which parole may be considered in the expedited removal context, as well as the use of (c)(11) employment authorization documents ("EADs") for those in expedited removal who have been paroled from custody.

*B. Credible Fear Screening Process— Proposed 8 CFR 208.30*

As noted earlier, there were several rules published by the Departments from the end of 2018 through the end of 2020 that attempted to change the credible fear screening process that had been in place for approximately 20 years, but these rules are not in effect.[33] The Global Asylum rule, which, as explained above, has been enjoined, attempted to eliminate the pre-2018 practice of not applying the mandatory bars to asylum and statutory withholding in the credible fear screening process, instead requiring a final determination on the applicability of a significantly expanded list of mandatory bars during credible fear screenings and mandating a negative credible fear finding should any of the bars be determined to apply to the noncitizen at that initial stage. 85 FR at 80278. In addition, the Global Asylum rule attempted to alter the longstanding practice for screening claims for statutory withholding of removal and CAT protection. Prior to the rule, the statutory standard for screening asylum claims (*i.e.,* a "significant possibility" of establishing eligibility for asylum) was also used to screen withholding of removal and CAT claims. The Global

Asylum rule attempted to create a more complicated two-step, two-standard screening by requiring a higher screening standard for such claims (*i.e.,* a "reasonable possibility" of persecution or torture). *Id.* The Security Bars rule, issued less than 2 weeks after the Global Asylum rule, further expanded the list of mandatory bars to asylum that would apply in the credible fear screening process, 85 FR at 84160, but its implementation has been delayed until the end of 2021, 86 FR at 15069.

With this proposed rule, the Departments generally seek to return the credible fear screening process regulations to the simpler screening process that was in place for expedited removal's first two decades of implementation. Given the injunctions, delays, and vacaturs referenced above, this rule proposes to recodify in the Code of Federal Regulations the standard of "significant possibility" that has remained in effect since the rule changing that standard has been enjoined. *Pangea Legal Servs.* v. *DHS,* No. 20–cv–09253, 2021 WL 75756, at *7 (N.D. Cal. Jan. 8, 2021) (preliminarily enjoining the Global Asylum rule). The Departments believe that this change will make for a more efficient and effective credible fear screening process and is also necessary to make that screening process consistent with congressional intent.

The 104th Congress chose a screening standard "intended to be a low screening standard for admission into the usual full asylum process."[34] Originally, the Senate bill had proposed a "determination of whether the asylum claim was 'manifestly unfounded,'" while the House bill applied a 'significant possibility' standard coupled with an inquiry into whether there was a substantial likelihood that the alien's statements were true."[35] In IIRIRA, Congress then "struck a

compromise by rejecting the higher standard of credibility included in the House bill."[36] This proposed regulation would now return the screening standard to the "low screening standard" intended by the compromise reflected in the text that Congress ultimately passed. Rather than creating a complicated screening process that requires full evidence gathering and determinations to be made on possible bars to eligibility, this proposed rule aims to return to allowing protection claims with a "significant possibility" of success to be fully heard and adjudicated, but in a process that more quickly reaches a final decision on the merits than the current process.

To accomplish this, the proposed rule would replace all the references throughout 8 CFR 208.30 to a "credible fear of persecution, reasonable possibility of persecution, or a reasonable possibility of torture" with "credible fear," acknowledging that the statutory "significant possibility" standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), would be applied in considering all three types of protection claims—asylum, statutory withholding, and protection under the CAT.[37] Consistent with that change, the proposed rule would revise 8 CFR 208.30 to return the definition of the "credible fear" standard to the "significant possibility" definition provided in the statute (paragraph (e)(2)), replace the "reasonable possibility" standard with the same "significant possibility" screening standard for statutory withholding of removal and CAT claims or deferral of removal (paragraphs (e)(2) and (3)), return the language in the regulation to reflect the existing and two-decade long practice of not applying the mandatory bars to the credible fear screening determination (paragraph (e)(5)),[38] maintain the

[32] As noted elsewhere in this preamble, this proposed rule is not intended to rescind previously enjoined or vacated rules. Accordingly, the Departments are proposing that those in the credible fear process who have been paroled from custody would be ineligible for a (c)(11) employment authorization document ("EAD"), similar to what was implemented with the final rule entitled Asylum Application, Interview, and Employment Authorization for Applicants, 85 FR 38532, 38582 (June 26, 2020). A Federal district court preliminarily enjoined certain provisions of the rule but only as applied to the plaintiffs in that case, and the EAD-parole provision similar to the one proposed here was not challenged in that litigation. *See Casa de Maryland, Inc.* v. *Wolf,* 486 F. Supp. 3d 928, 935 (D. Md. 2020) ("preliminarily enjoin[ing] Defendants from enforcing a subset of the rule changes as applied to the individual members of Plaintiffs Casa de Maryland, Inc. ('CASA') and Asylum Seeker Advocacy Project ('ASAP')"). The Departments are seeking public comment on the use of (c)(11) EADs for those in expedited removal who have been paroled from custody.

[33] *See supra* note 24.

[34] 142 Cong. Rec. S11491 (daily ed. Sept. 27, 1996) (statement of Senate Judiciary Committee Chairman Orrin Hatch).

[35] *Id.* The chairman of the conference committee assigned to reconcile the two bills, Rep. Henry Hyde, stated that "[t]he credible fear standard is redrafted in the conference document to address fully concerns that the 'more probable than not' language in the original House version was too restrictive." 142 Cong. Rec. H11081 (daily ed. Sept. 25, 1996) (statement of House Judiciary Committee Chairman Henry Hyde). The exact language in section 302 of the House bill, H.R. 2202, 104th Cong. (1995), was as follows: "the term 'credible fear of persecution' means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208." The conference committee compromise stuck subsection (I) from the definition of credible fear.

[36] 142 Cong. Rec. S11491 (statement of Sen. Hatch).

[37] These proposed changes would not alter reasonable fear of persecution or torture determinations involving noncitizens ordered removed under section 238(b) of the INA, 8 U.S.C. 1228(b), and noncitizens whose removal is reinstated under section 241(a)(5) of the INA, 8 U.S.C. 1251(a)(5), pursuant to 8 CFR 208.31.

[38] This proposed rule does not, and is not intended to, rescind prior rulemakings, including Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018); and Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020). To that end, the Departments have proposed to change 8 CFR 208.30 only to the extent necessary to implement the changes proposed in this rule and left the remaining provisions of the aforementioned rules to be

threshold screening under the safe third country agreement with Canada (paragraph (e)(6)), and continue to require supervisory review of all credible fear determinations before they can become final (paragraph (e)(8)). The Departments seek comment on these changes and also request comment on whether any additional changes to the provisions of the Global Asylum and Security Bar rules are necessary or appropriate to accomplish the objectives outlined in this section.

As part of the proposed restructuring of the credible fear determination framework, the proposed rule would also remove the current language at 8 CFR 208.30(g)(2)(i) providing that DHS may reconsider a negative credible fear finding that has been reviewed and upheld by an IJ.[39] Section 208.30(g)(1)(i) would be revised to provide that once the asylum officer has made a negative credible fear determination, the individual either requests IJ review or declines to request review and that declination is treated as a request for review and the individual is served with a Form I–863. At that point, under the proposed rule, the IJ has sole jurisdiction to review whether the individual has established a credible fear of persecution or torture, and an asylum officer may not reconsider or reopen the determination.

These proposed changes reflect an intention to return to the statutory scheme of INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), under which it is the IJ review of the credible fear determination that serves as the check to ensure that individuals who have a credible fear are not returned based on an erroneous screening determination by USCIS. Section 208.30(g)(1)(i) is amended to provide that, when DHS inquires whether an individual wishes to have an IJ review a negative credible

fear determination, DHS will inform the individual that the IJ review will include an opportunity for the individual to be heard and questioned by the IJ. *See* 8 CFR 208.30(g)(1) (proposed). This opportunity will allow such individuals to present any additional evidence or arguments they may wish to make to the IJ, who will consider them in making a de novo determination about whether the individual has a credible fear of persecution or torture.

The clarification that the IJ has sole jurisdiction to review the individual's negative credible fear determination and that asylum officers may not reconsider or reopen a determination that already has passed to the jurisdiction of the IJ is necessary to ensure that requests for reconsideration to USCIS do not obstruct the streamlined process that Congress intended in creating expedited removal. Further, this clarification ensures that the necessary efficiencies implemented in this proposed rule are not undermined.

The expedited removal statute and its implementing regulations generally prohibit any further administrative review or appeal of an IJ's decision made after review of a negative credible fear determination. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C); 8 CFR 1003.42(f)(2), 1208.30(g)(2)(iv)(A). Congress similarly has made clear its intent that expedited removal should remain a streamlined, efficient process by limiting judicial review of many determinations in expedited removal. *See* INA 242(a)(2)(A), (e), 8 U.S.C. 1252(a)(2)(A), (e). These provisions limiting administrative and judicial review and directing expeditious determinations reflect clear congressional intent that expedited removal be a truly expedited process. Removal of the current language at 8 CFR 208.30(g)(2)(i) allowing DHS to reconsider negative credible fear determinations after the IJ concurs is consistent with that congressional intent and with the purpose of the current regulation.

In recent years, USCIS has received growing numbers of meritless reconsideration requests, which have strained agency resources and resulted in significant delays to the expedited removal process. The total time to review a reconsideration request varies widely, but if an office recommends a follow-up interview, then the complete review process could take more than 5 hours per request. The Departments believe that these resources could be far better spent, including in training and supervisory efforts, to ensure the high

quality of USCIS initial screening determinations. In many cases, reconsideration requests that previously were considered are resubmitted numerous times without additional information, resulting in additional delays in removal processes that Congress explicitly intended to be conducted through streamlined, efficient procedures.

These developments have highlighted the need to ensure that the IJ review process, rather than reconsideration by USCIS, serves as the safeguard against erroneous negative screening determinations by an asylum officer. These changes will ensure that DOJ and DHS implementation of the expedited removal provisions is consistent with statutory intent. The Departments believe these changes will help accomplish the purpose of the present rule to make the framework of the screening process, including the process following USCIS's fear determination, more efficient and streamlined, while ensuring due process is accorded to all individuals in expedited removal. The Departments seek comments on these proposed changes, including on other options short of eliminating reconsideration entirely—such as imposing restrictions on, or modifications to, reconsideration requests made to USCIS—to address the problems outlined above, while also ensuring efficiency and the opportunity to have one's protection claim properly screened.

### C. Applications for Asylum—Proposed 8 CFR 208.3(a) and 208.9(a)

The expedited removal statute specifically provides for an exception to the mandate that a noncitizen be "removed from the United States without further hearing or review" when the noncitizen expresses an intention to apply for asylum, a fear of persecution or torture, or a fear of return to the country of removal. Such person instead is referred to USCIS for a credible fear screening. INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). If the noncitizen is found to have a credible fear of removal, the noncitizen's claim is referred for "further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). This statutory language, however, does not specify the nature of such "further consideration."

Under current regulations, an individual who establishes a credible fear is placed into removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. Under this process, the individual is not required to officially request asylum or file the Form I–589,

---

modified or rescinded by the Departments at a later date. *See, e.g.,* OMB, *Agenda Rule List—Spring 2021: Department of Homeland Security, https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=1600.* The Departments, however, do seek comment on whether the changes proposed in this rule would require any other rescissions or modifications of the provisions adopted in recent prior rulemakings.

[39] The proposed versions of the Global Asylum rule and the Security Bars rule both dropped the regulatory provision previously in 8 CFR 1208.30(g)(2) that acknowledged USCIS's ability to reconsider a negative credible fear finding that had already received IJ concurrence, but the Departments responded to comments received about this change by reinserting the provision into 8 CFR 208.30(g) in the final rules, stating that the provision had been omitted from the proposed rule inadvertently. 85 FR at 80275, 84181. This proposed rule again proposes this change but does so for the reasons provided herein.

Application for Asylum and for Withholding of Removal ("Form I–589"), until *after* being placed into removal proceedings. In many cases, the application may be filed many months after removal proceedings are initiated, thus potentially delaying adjudication. In many other cases, an application is never filed. EOIR reported that, for individuals who were referred to USCIS for the credible fear screening process and then placed into proceedings before EOIR between FY 2008 and the third quarter of FY 2020, only 62 percent have filed an asylum application with EOIR as of July 2020.[40]

Under this proposed rule, an individual who passes the initial credible fear screening would have his claim reviewed by an asylum officer in USCIS in the first instance, rather than by an IJ in a removal hearing under section 240 of the INA. As part of this new procedure for "further consideration," and to eliminate delays between a positive credible fear determination and the filing of an application for asylum, the Departments propose that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, would be treated as an "application for asylum," with the date of service on the individual considered the date of filing. 8 CFR 208.3(a)(2) (proposed). Every individual who receives a positive credible fear determination would be considered to have filed an application for asylum at the time the determination is served on him or her. The application would be considered filed or received as of the service date for purposes of the 1-year filing deadline for asylum, *see* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the clock for eligibility to file for work authorization on the basis of a pending asylum application, 8 CFR 208.3(c)(3) (current). The Departments propose that this application for asylum would not be subject to the completeness requirement of 8 CFR 208.3(c) and 208.9(a) in order to qualify for hearing and adjudication, but it would be subject to the other conditions and consequences provided for in 8 CFR 208.3(c) once the noncitizen signs the documentation under penalty of perjury and with notice of the consequences of the filing

of a frivolous asylum application at the time of the asylum officer hearing.[41]

The Departments plan to implement these changes to the credible fear process by having the trained USCIS asylum officer conducting the credible fear interview advise the noncitizen of the consequences of filing a frivolous asylum application and capture the noncitizen's relevant information through testimony provided under oath. During this process, the asylum officer would "elicit all relevant and useful information" for the credible fear determination, *id.* § 208.30(d), create a summary of the material facts presented by the noncitizen during the interview, read the summary back to the noncitizen, and allow the noncitizen to correct any errors, *id.* § 208.30(d)(6). The record created would contain the necessary biographical information and sufficient information related to the noncitizen's fear claim to be considered an application. The information captured by the asylum officer during the credible fear interview will contain information about the noncitizen's spouse and children, including those who were not part of the credible fear determination—but under this proposed rule only a spouse or children who were included in the credible fear determination issued pursuant to proposed 8 CFR 208.30(c) or have a pending asylum application with USCIS pursuant to § 208.2(a)(1)(ii) can be included on the request for asylum.[42] *See id.* § 208.3(a)(2). A copy of

this application for asylum, including the officer's notes from the interview and basis for the determination, would be provided to the noncitizen at the time that the credible fear determination is served. *See id.* § 208.30(f), (g)(1). As proposed in this rule, the noncitizen would be allowed to supplement or request modifications or corrections to this application up until 7 days prior to the scheduled asylum hearing before a USCIS asylum officer, or for documents submitted by mail, postmarked no later than 10 days before the scheduled asylum hearing. *Id.* § 208.3(a)(2).

The information required to be gathered during the credible fear screening process is based on the noncitizen's own testimony under oath in response to questions from a trained USCIS asylum officer. Thus, the Departments believe that the screening would provide sufficient information upon which to conduct a full asylum interview. Under this proposed rule, all noncitizens who receive a positive credible fear determination would have an asylum application on file with the Government within days of their credible fear screenings, thereby meeting the one-year asylum filing deadline, avoiding the risk of filing delays, and immediately beginning the waiting period for work authorization eligibility. Understanding that noncitizens may want to modify, correct, or supplement the initial presentation of their protection claims, this proposed rule would allow the noncitizen to do so in advance of the hearing before the asylum officer. The Departments seek comments on all aspects of this proposed change.

### D. Proceedings for Further Consideration of the Application for Asylum by USCIS Asylum Officer in Asylum and Withholding Merits Hearing for Noncitizens With Credible Fear— Proposed 8 CFR 208.2(a) and (c); 208.9(a), (f), and (g); 208.14(c)(5); 208.30(e) and (f); 235.6(a)(1); 1003.42; and 1208.30(g)

As noted earlier in the preamble, under the current regulatory framework, if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution or

---

[40] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Rates of Asylum Filings in Cases Originating with a Credible Fear Claim* (July 2020), *https://www.justice.gov/eoir/page/file/1062971/download.*

[41] In addition, the Departments are proposing to amend 8 CFR 1208.3 and 1208.4 to account for changes made by this proposed rule, including the proposed provisions that would treat the credible fear interviews as an application for asylum in the circumstances addressed by the proposed rule. The amendment at 8 CFR 1208.3(c)(3) affects language that was enacted by DOJ in 2020. *See* Procedures for Asylum and Withholding of Removal, 85 FR 81698 (Dec. 16, 2020). The December 16, 2020 rulemaking made various changes to DOJ regulations, including 8 CFR 1208.3(c)(3). *Id.* Those changes remain enjoined. *See National Immigrant Justice Center, et. al.,* v. *Exec. Office for Immigration Review, et. al.,* No. 21–CV–00056 (D.D.C.). As noted above, the proposed rule would make changes to the regulations only as necessary to effectuate its goals. The Departments anticipate that additional changes to the relevant regulations, including rescission of or revision to the language added by the enjoined regulation, will be made through later rulemakings.

[42] While only a spouse or dependent included on the credible fear determination or who presently has an asylum application pending with USCIS after a positive credible fear determination can be included on the subsequent asylum application under this proposed process, the noncitizen granted asylum remains eligible to apply for accompanying or follow-to-join benefits for any qualified spouse or child not included on the asylum application, as provided for in 8 CFR 208.21. The Departments believe that it is procedurally impractical to attempt to include a spouse or child on the application when the spouse or child has not previously been

placed into expedited removal and subsequently referred to USCIS after a positive credible fear determination. This is similar to the inability to include a spouse or child not in removal proceedings under section 240 of the INA on the asylum application of a principal asylum application who is in such removal proceedings. Under such circumstances, there is no clear basis for issuing a final order of removal against such an individual spouse or child should the asylum application be denied. The Departments seek comments on this proposed approach.

torture, DHS places the noncitizen before an immigration court for adjudication of the noncitizen's claims by initiating section 240 removal proceedings.[43] Similarly, if an IJ, upon review of the asylum officer's negative credible fear determination, finds that the noncitizen possesses a credible fear of persecution or torture, the IJ vacates the expedited removal order, and DHS initiates section 240 removal proceedings. 8 CFR 1208.30(g)(2)(iv)(B). Section 240 removal proceedings, which are used to determine removability as well as eligibility for any relief or protection from removal, currently provide additional procedural protections, including greater administrative and judicial review, than expedited removal proceedings under section 235 of the Act. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a.

As noted previously, however, the expedited removal statute provides only that a noncitizen who is found to have a credible fear "shall be detained for further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). The statute mandates neither that the noncitizen be placed in removal proceedings generally nor placed in section 240 removal proceedings specifically. *Id.*

The regulations regarding the credible fear process, and the interplay between expedited removal and section 240 removal proceedings, were first adopted in 1997.[44] At the time, the former INS explicitly recognized that "the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution." [45] Faced with this ambiguity, the INS opted at the time to have the further consideration take place in pre-existing section 240 removal proceedings rather than create new proceedings for this purpose.[46] But the INS's contemporaneous analysis was very limited.

The Departments believe that section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), authorizes a procedure for "further consideration of [an] application for

asylum" that is separate from section 240 removal proceedings. By its terms, the phrase "further consideration" is open-ended and does not mandate any particular procedure. It is thus naturally read as giving DHS flexibility to determine the appropriate procedure for consideration of noncitizens' asylum claims after establishing a credible fear in the expedited removal process. Moreover, while section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), mandates that a noncitizen with a positive credible fear determination receive "further consideration of [the noncitizen's] application for asylum," section 235(b)(2) of the INA, 8 U.S.C. 1225(b)(2), mandates that other classes of noncitizens receive "a proceeding under section 1229a of this title," *i.e.,* section 240 of the INA. *Compare* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), *with* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A). The difference in language suggests that section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), does not require use of section 240 removal proceedings, in contrast to section 235(b)(2), 8 U.S.C. 1225(b)(2), which does. The Supreme Court has observed that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States,* 464 U.S. 16, 23 (1983) (internal quotation marks and citation omitted). More recently, the D.C. Circuit stated that it has "consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion." *Catawba Cty., N.C.* v. *EPA,* 571 F.3d 20, 36 (D.C. Cir. 2009) (emphasis in original) (internal quotation marks and citation omitted).[47] The inference that Congress's silence intentionally permits agency discretion is reinforced by the fact that the noncitizens whom DHS has elected to process into the United States using the expedited removal procedure are expressly excluded from the class of noncitizens who are statutorily guaranteed section 240 removal proceedings under section 235(b)(2)(A) of the INA, 8 U.S.C. 1225(b)(2)(A). *See* INA 235(b)(2)(B)(ii), 8 U.S.C. 1225(b)(2)(B)(ii).

Second, a noncitizen with a positive credible fear determination is entitled only to a further proceeding related to their "application for asylum," or for withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1251(b)(3), or withholding or deferral of removal under the regulations implementing U.S. obligations under Article 3 of the CAT. INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii); 8 CFR 208.30(e). An asylum application's purpose is to determine whether the noncitizen is entitled to relief or protection from removal, not whether the noncitizen should be admitted or granted other immigration benefits. *See Sanchez* v. *Mayorkas,* 141 S. Ct. 1809, 1813 (2021) ("[A] foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum."); *Matter of V–X–,* 26 I&N Dec. 147, 150 (BIA 2013) (holding that, "although [a noncitizen's] grant of asylum confer[s] a lawful status upon him, it [does] not entail an 'admission' "). By contrast, the purpose of a section 240 removal proceeding is to "determin[e] whether [a noncitizen] may be admitted to the United States." INA 240(a)(3), 8 U.S.C. 1229a(a)(3). In section 240 removal proceedings, both removability and entitlement to various forms of relief or protection are determined. *Compare* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), *with* INA 240(c)(2)–(4), 8 U.S.C. 1229a(c)(2)–(4).[48] Moreover, the Departments believe that it is better policy to place noncitizens with a positive credible fear determination initially in nonadversarial proceedings in which their asylum claims can be adjudicated by asylum officers.

The idea of allowing USCIS asylum officers to fully adjudicate the

---

[43] *See* 8 CFR 208.30(f) (2018); *supra* note 24 (explaining that various changes to these procedures have been enjoined).

[44] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 10312 (Mar. 6, 1997) *(interim final rule).*

[45] *Id.* at 10320; *see* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 FR 444, 447 (Jan. 3, 1997) (proposed rule) (noting that although the statute calls for further consideration of the noncitizen's asylum application, it "does not specify how or by whom this further consideration should be conducted").

[46] 62 FR at 10320.

[47] *See also Henson* v. *Santander Consumer USA, Inc.,* 137 S. Ct. 1718, 1723 (2017) ("[U]sually at least, . . . we presume differences in language . . . convey differences in meaning.").

[48] The Departments acknowledge that there is some legislative history suggesting that some Members of Congress believed that individuals found to have a credible fear would be referred to section 240 removal proceedings. *See, e.g.,* H.R. Rep. No. 104–828, at 209 (1996) (suggesting that noncitizens who received positive credible fear determinations would be placed in "normal non-expedited removal proceedings"). But the Departments are not convinced that the legislative history is sufficiently clear to foreclose an option the text itself does not "unambiguously forbid." *Barnhart* v. *Walton,* 535 U.S. 212, 218 (2002). Indeed, other Members of Congress took a different view. *See* Letter for Richard A. Sloan, Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, from Lamar Smith, Chairman, Subcommittee on Immigration and Claims, *Re: INS 1788–96, RIN 1115–AE47* (Feb. 3, 1997), *in Implementation to Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary,* 105th Cong. 21–22 (1997) ("Section 235(b)(1)(B)(ii) [was] drafted deliberately to leave flexibility regarding how the asylum adjudication would take place.").

protection claims made by noncitizens who receive a positive credible fear determination is not new. In its congressionally mandated 2005 report on the expedited removal process, the U.S. Commission on International Religious Freedom ("USCIRF") recommended that asylum officers be allowed to grant asylum to ease "the burden on the detention system, the immigration courts, and bona fide asylum seekers in Expedited Removal." [49] The USCIRF repeated this recommendation when it conducted a follow-up study and issued an updated report in 2016, stating as follows:

One solution to reduce the immigration courts' caseload and backlog is to allow asylum officers to adjudicate defensive asylum claims, as USCIRF recommended in the 2005 Study. Asylum officers have the legal background and training to adjudicate asylum claims, and do so for affirmative asylum cases. Further, having an asylum officer review a credible fear claim and then having an immigration judge review an asylum claim creates significant redundancy without necessarily adding value.[50]

In 2012, the Administrative Conference of the United States studied the removal process and also issued recommendations that regulations be changed to allow for asylum officers to adjudicate protection claims for noncitizens determined to have a credible fear as part of a package of proposals to improve the operations of the immigration courts.[51] More recently, experts from the Migration Policy Institute ("MPI") reached a similar conclusion in a 2018 report on the state of the U.S. asylum system. MPI concluded as follows:

Allowing cases with positive credible-fear findings to instead remain with the Asylum Division for the full asylum merits adjudication would capitalize on the investment of time and expertise the division has already made. It would also enable meritorious cases to be resolved more quickly, reducing the overall asylum system backlogs and using limited asylum officer and IJ resources more efficiently.[52]

In reaching this conclusion, these experts noted that moving the cases to the USCIS Asylum Division for adjudication plays to its strengths, including its experience in handling asylum and asylum-related adjudications; its regular trainings on asylum-related country conditions and legal issues, as well as nonadversarial interviewing techniques; and its ready access to country conditions experts. Additionally, the MPI experts concluded that nonadversarial proceedings are well suited for this process because they are "considerably less resource-intensive than immigration court proceedings" and "lend themselves to a fuller understanding of the strengths and weaknesses of an applicant's case." [53] The DHS Homeland Security Advisory Council's ("HSAC") bipartisan CBP Families and Children Care Panel also included this recommendation in its final report to the Secretary.[54] This panel of the HSAC was created at the request of the Secretary in October 2018 to study "the burgeoning humanitarian crisis resulting from a surge in migration of families, primarily from Guatemala and Honduras, overwhelming the DHS resources at the border to address the crisis." [55]

The Departments acknowledge that the above recommendations assumed that individuals denied asylum by a USCIS asylum officer would be issued an NTA and placed into section 240 removal proceedings before an IJ, where the noncitizen would have a second, full evidentiary hearing on the asylum application with a different decision-maker. This proposed rule would not adopt that approach, as the Departments determined it was unnecessary, duplicative, and inefficient. Instead, as noted in the previous section, this proposed rule would establish a new process that would require the IJ to conduct a de novo review of a denied application for protection when such review is requested, but it would not provide the noncitizen with a second full evidentiary hearing to present the claim. The Departments believe that an approach requiring a full evidentiary hearing before an IJ after an asylum officer's denial would lead to inefficiencies without adding additional value or procedural protections. Under this proposal, the asylum officer will have developed and considered the

noncitizen's claim fully, including by taking testimony and accepting evidence, during the nonadversarial proceeding. If a noncitizen seeks review of an asylum officer's denial, the IJ would have a complete record for review developed by the asylum officer (including a transcript of the hearing and any evidence offered by the applicant or otherwise considered by the officer) and the written decision of the asylum officer. The noncitizen would have a full opportunity to challenge the asylum officer's denial during this review process and would not need to present their claim at a second full hearing. Instead, to the extent that a noncitizen seeks to introduce additional non-duplicative testimony or evidence, a provision of the proposed rule would allow them to do so if certain requirements are met. *See* 8 CFR 1003.48(e) (proposed). Accordingly, the Departments believe that a second full evidentiary hearing before an IJ is unnecessary and inefficient. A further description of the proposed review process follows in the next section.

This proposed rule would change current procedures to allow a noncitizen who is found to have a credible fear to have a full adjudication of the noncitizen's protection claims by an asylum officer. 8 CFR 208.2(a) (proposed) (revising jurisdiction over asylum applications in order to provide USCIS jurisdiction to hear asylum claims after a positive credible fear determination), *id.* § 208.30(f) (retention of a positive credible fear determination with USCIS for an asylum hearing); *id.* §§ 1003.42, 1208.30(g) (referral of negative credible fear determinations vacated by an IJ to USCIS for an asylum hearing). This proposed rule would supplant the process in place prior to this proposed rule whereby DHS referred such an individual directly to an IJ for an adversarial hearing in a section 240 removal proceeding. Proposed 8 CFR 1003.42 and 1208.30(g) of the EOIR regulations reflect similar changes, enabling an IJ who vacates an asylum officer's negative credible fear determination to refer the case back to USCIS for an asylum hearing.

The Departments propose to make corresponding amendments to 8 CFR 208.2(c), 8 CFR 208.30(e)(5) and (f), and 8 CFR 235.6(a)(1) to provide that the cases of individuals who receive a positive credible fear determination may be retained by USCIS for a nonadversarial hearing before a USCIS asylum officer under the jurisdiction of 8 CFR 208.2(a)(1)(ii) to determine eligibility for asylum, statutory withholding of removal, and

[49] USCIRF, *Report on Asylum Seekers in Expedited Removal, Volume I: Findings & Recommendations* 66 (Feb. 2005), *https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf.*

[50] USCIRF, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 54 (Aug. 2016), *https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.*

[51] Administrative Conference of the United States, *Administrative Conference Recommendation 2012–3: Immigration Removal Adjudication* 15 (June 15, 2012), *https://www.acus.gov/sites/default/files/documents/2012-3.pdf.*

[52] Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward* 3, Migration Policy Institute (Sept. 2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf.*

[53] *Id.* at 26.
[54] HSAC, *CBP Families and Children Care Panel Final Report* 24 (Nov. 14, 2019), *https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.*
[55] *Id.* at 4.

withholding of deferral or removal under CAT. The Departments also propose to amend 8 CFR 1003.1, 8 CFR 1003.12, 8 CFR 1208.2, and 8 CFR 1208.30 of the EOIR regulations, and to add a new section 8 CFR 1003.48, to make corresponding changes regarding how and when cases involving individuals found to have a credible fear would be referred by DHS to EOIR.

The proposed nonadversarial proceedings for further consideration of asylum applications by asylum officers would provide protections similar to those provided in section 240 removal proceedings. The asylum officer's consideration under this proposal, however, would be limited solely to claims for asylum, statutory withholding of removal, and withholding or deferral of removal under the CAT regulations. 8 CFR 208.2(a)(2) (proposed). Under this proposed rule, if the asylum officer denies the noncitizen asylum, statutory withholding of removal, and protection under the CAT regulations, the noncitizen would be ordered removed based upon the immigration officer's earlier inadmissibility determination under section 235(b)(1)(A)(i) of the INA, 8 U.S.C. 1225(b)(1)(A)(i). The noncitizen, may, however appeal an adverse decision to an IJ, and if necessary, to the BIA. 8 CFR 208.14(c)(5), 1003.1(b)(15), 1208.2(b).

To allow asylum officers to carry out this new responsibility fully, additional changes to the regulations have been proposed. First, the Departments propose that under 8 CFR 208.9(f), asylum officers would be required to record the asylum hearing and that a transcript of that recording would be made part of the record whenever a noncitizen denied protection seeks review of a denial. USCIS would transcribe the asylum hearing recording and a copy of the transcript and the record developed at the hearing would be served on the applicant and filed with the immigration court. The hearing would be transcribed prior to the record being referred for review. Second, the Departments propose that USCIS be required to provide an interpreter for any hearing, just as EOIR is required to do for a removal hearing. 8 CFR 208.9(g) (proposed). Third, as in section 240 removal proceedings, the Departments propose that the noncitizen would be entitled to be represented, at no expense to the Government, by counsel of the noncitizen's choosing who is authorized to practice in such proceedings. *See id.* § 1003.12 (proposed), 1003.16 (current); *cf.* 8 U.S.C. 1229a(b)(4).

The Departments propose that the "failure to appear" rule at 8 CFR 208.10

be revised to allow for an order of removal to be issued when the noncitizen fails to appear for the scheduled hearing with the asylum officer. Changes to 8 CFR 208.16 through 208.19 also are proposed in order to provide asylum officers authority to adjudicate claims for withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and withholding and deferral of removal under the regulations implementing the CAT. Existing 8 CFR 208.14(b) already provides USCIS the authority to grant an asylum application properly within USCIS's jurisdiction, including the jurisdiction given USCIS by this proposed rule over asylum applications from noncitizens determined to have a credible fear. Similar authority is provided for immigration judges in existing 8 CFR 1208.14. Finally, the Departments propose that 8 CFR 208.14(c)(5) be added to provide the process for USCIS to deny an application for asylum, including the issuance of a decision on withholding and deferral of removal if asylum is denied; the issuance of an order of removal by the asylum officer after the merits hearing; and the process for the applicant to seek review of an asylum denial before an IJ. Review of these decisions would be governed by proposed 8 CFR 1003.48. The Departments also propose technical edits to 8 CFR 208.22 to include references to corresponding sections of both 8 CFR part 208 and 8 CFR part 1208. The Departments seek comments on all aspects of these proposed changes, including whether different or additional decision and review procedures should apply to applications considered under this proposed process.

The authority of asylum officers to enter an order of removal after denying a noncitizen's asylum claim follows from the relevant provisions of the INA. By definition, noncitizens who are placed into expedited removal already have been determined to be inadmissible and are protected from immediate removal only because their credible fear of persecution entitled them to further consideration of their asylum claim. *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1). If, after that further consideration, an asylum officer concludes that a noncitizen is not entitled to asylum, that determination removes the only remaining legal barrier to removal. That determination qualifies as an order of removal under the relevant statutory definition, which provides that an "order of deportation" includes not only an order "ordering deportation," but also an order

"concluding that [a noncitizen] is deportable." INA 101(a)(47)(A), 8 U.S.C. 1101(47)(A). The Seventh Circuit reached the same conclusion in addressing another class of noncitizens whose only defense to removal is a potential asylum claim: Those who entered under the visa-waiver program, INA 217(b)(2), 8 U.S.C. 1187(b)(2). The court explained that an order denying such a noncitizen's asylum claim is an order of removal because "an order that is proper only if the [noncitizen] is remov*able* implies an order of removal." *Mitondo* v. *Mukasey,* 523 F.3d 784, 787 (7th Cir. 2008). This proposed rule therefore would provide that if the noncitizen is not granted asylum at the conclusion of the asylum hearing, the asylum officer is authorized to issue an order of removal.

*E. Application Review Proceedings Before the Immigration Judge— Proposed 8 CFR 1208.2(c), 1003.48*

The Departments propose to amend 8 CFR 1208.2(c) and add 8 CFR 1003.48 to establish new IJ review proceedings for those noncitizens who establish a credible fear of persecution or torture but (1) were found by USCIS not to merit asylum, statutory withholding of removal, or protection under the CAT and its implementing regulations; and (2) affirmatively request further review of their applications by an IJ. The Departments propose that upon a referral of the case from USCIS, the IJ would conduct a de novo review of USCIS's denial of the claims.

Under these proposed limited review proceedings, unlike under section 240 of the INA, 8 U.S.C. 1229a, the IJ would not have authority to consider issues related to a noncitizen's removability or a noncitizen's eligibility for any other relief from removal. Moreover, an IJ ordinarily would not conduct an evidentiary hearing on the noncitizen's asylum application. Rather, the IJ would determine, after de novo review of the full record of proceedings created during asylum officer hearings and consideration of any additional testimony or evidence permitted under the proposed process described below, whether a noncitizen is eligible for asylum or withholding of removal under the Act or withholding or deferral of removal under the CAT. Although the Departments intend these proceedings to be more streamlined than section 240 removal proceedings, asylum officer and IJ review, together, would provide significant protections to ensure that these noncitizens continue to receive full and fair adjudication of their applications.

For noncitizens who affirmatively request further review by an IJ, the Departments propose that DHS would initiate the review proceedings through the service of a Form I–863, Notice of Referral to Immigration Judge, on the noncitizen. As proposed in 8 CFR 1003.48(b), DHS would file the following items with the immigration court: (1) A copy of the Notice of Referral; (2) a copy of the record of proceedings before the asylum officer, as outlined in 8 CFR 208.9(f); (3) the asylum officer's written decision, including the removal order issued under 8 CFR 208.14(c)(5) by the asylum officer; and (4) proof that DHS served the Notice of Referral, the record of proceedings, and the asylum officer's written decision, including the removal order, on the noncitizen. Unlike in credible fear determination reviews, where the IJ is provided only asylum officers' notes from the interview, the summary of the material facts, and other limited records, *see, e.g.,* 8 CFR 208.30(e)(4), the proposed requirements in 8 CFR 1003.48(b) would ensure that cases would only be referred to the immigration courts following asylum officers' full nonadversarial adjudication of the noncitizens' applications, and that IJs and noncitizens would have asylum officers' decisions and complete records of the hearings in advance of the IJ review. This would allow the noncitizen to have notice of the reasons for the asylum officer's denial in advance of the immigration court review process, and it would allow the IJ to conduct a thorough review of the asylum officer's decision based on the application and complete record developed before the asylum officer. Accordingly, because the IJ would be provided the complete record of proceedings from the asylum officer hearing, the Departments expect that the IJ generally would be able to complete the de novo review solely on the basis of the record before the asylum officer, taking into consideration any arguments raised by the noncitizen, or the noncitizen's counsel, and DHS.

That said, the proposed rule recognizes that the factual record as elicited by the asylum officer sometimes will need to be further developed before the IJ. The rule proposes at 8 CFR 1003.48(e) that an IJ does not have the authority to remand a case to an asylum officer because the Departments believe that this would be unnecessary and inefficient. Instead, the rule proposes that a party may seek to introduce additional testimony or documentation so long as the party demonstrates to the IJ that the testimony or documentation

is not duplicative of the testimony or documentation considered by the asylum officer and that it is necessary to develop the factual record to allow the IJ to issue a reasoned decision in the case. The Departments expect that an IJ may, in appropriate cases, require parties to submit prehearing statements or briefs concerning whether they will seek to introduce additional testimony or documentation and, if so, explaining why this testimony or documentation meets the standard at 8 CFR 1003.48(e). The Departments further expect that, where necessary, for example in cases involving pro se applicants, IJs will, before proceeding with the case, explain in court the standards for submitting additional testimony and documentation. This proposed provision would ensure a full and fair evaluation of the applicant's application for asylum, withholding of removal under the Act, or withholding or deferral of removal under the CAT.

The Departments believe that this proposed regulatory scheme—under which IJs typically would rely on the record created at the asylum officer hearing but could allow additional testimony and evidence if a party establishes that doing so is necessary— is the best way to balance efficiency and fairness considerations appropriately.[56] The Departments believe that these proceedings, as proposed, will be more streamlined than removal proceedings but will still provide the parties with a fair opportunity to present their cases. Nevertheless, the Departments understand that there are alternative threshold standards for the introduction of evidence or the reopening of proceedings.[57] Accordingly, the Departments request the public's comments on the proposed evidentiary threshold requirements, including any suggestions for alternatives that balance efficiency and fairness considerations, particularly taking into account challenges pro se applicants for asylum and related protection sometimes face in developing their claims.

To ensure that noncitizens have a full and fair opportunity to prepare for and receive review of their claims, the Departments propose that many of the procedural safeguards that apply in

section 240 removal proceedings would apply to the IJ review proceedings as well. Unless specifically indicated in 8 CFR 1003.48 of the EOIR proposed rules, the general rules of procedure that apply in removal proceedings before the immigration courts also would apply to these proceedings. This would include a noncitizen's rights (1) to obtain representation by an attorney or other representative authorized to appear before the immigration court, at no cost to the Government, *see* 8 CFR 1003.16(b); (2) to seek a change of venue, *see id.* § 1003.20(b); and (3) to seek a continuance for good cause shown, *see id.* § 1003.29. Moreover, the provisions of 8 CFR 1003.2 and 1003.23 governing motions to reopen and reconsider generally would be applicable to decisions rendered by IJs or the BIA in these proceedings. The Departments also propose to add a cross-reference in 8 CFR 1003.12 to the new proceedings under 8 CFR 1003.48 to codify these procedural protections.

The rule further proposes at 8 CFR 1003.48(d) that the IJ would have the discretion, pursuant to a motion filed by an applicant, to vacate the asylum officer's order of removal. For the motion to be granted, the applicant would have to show that he or she is prima facie eligible for a form of relief that cannot be granted in proceedings under 8 CFR 1003.48. With the motion granted, DHS would have the discretion to place the applicant in removal proceedings. An applicant would be permitted to file only one such motion, the motion would have to be filed before the IJ issues a decision on the applications for asylum and related protection, and motions to apply for voluntary departure would not be granted. The Departments believe these limitations are appropriate given the goal of meaningfully streamlining these proceedings as compared with removal proceedings. That said, the Departments seek the public's comments on whether the provisions relating to motions to vacate removal orders appropriately balance fairness and efficiency considerations.

In these proposed proceedings, the IJ would have the authority to review all decisions issued by the asylum officer, upon request by the applicant. *See* 8 CFR 1003.48(a) (proposed). For example, if the asylum officer denies an applicant's application for asylum but grants the applicant's application for withholding of removal under the Act, and the applicant requests review by an IJ, the IJ would have the authority to review not only the denial of asylum but also the grant of withholding of removal as well. In these mixed cases, the

---

[56] *See, e.g., INS* v. *Abudu,* 485 U.S. 94, 107 (1988) ("There is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases.").

[57] *See, e.g., Matter of Coelho,* 20 I&N Dec. 464, 473 (BIA 1992) (providing that the moving party generally must demonstrate that "new evidence offered would likely change the result in the case" in order for the BIA to consider granting a discretionary motion to remand).

AR01935

Departments believe it is appropriate, where the applicant has requested review of an asylum officer's decision, to permit IJs to review not only the denial but also the grant, because DHS could present documentation or testimony before the IJ that is admissible under 8 CFR 1003.48(e) and that indicates that the applicant does not qualify for any of the relief or protection at issue. The Departments seek comment on whether the IJ should have the authority to review all decisions of the asylum officer in this manner.

As proposed at 8 CFR 1003.48(e), if the IJ determines that the noncitizen is eligible for and merits asylum as a matter of discretion, the IJ would issue a decision vacating the order of removal issued by the asylum officer based upon the immigration officer's initial inadmissibility determination under section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), and granting the noncitizen asylum. If the IJ determines that the noncitizen is eligible for withholding of removal under the Act or withholding or deferral of removal under the CAT, the IJ would issue a decision granting the appropriate protection, but the IJ would not vacate the removal order issued by the asylum officer.[58]

The Departments propose that either party may appeal the IJ's decision rendered in the new proceedings under 8 CFR 1003.48 to the BIA in accordance with the standard EOIR appeal procedures that currently apply to removal proceedings, including the submission of a Form EOIR–26, Notice of Appeal from a Decision of an Immigration Judge. *See generally* 8 CFR 1003.3, 1003.38. The Departments also propose to amend 8 CFR 1003.1(b) to make clear that a noncitizen may appeal the IJ's decision to the BIA and that the review of these decisions is within the BIA's jurisdiction. And, as with BIA decisions in removal proceedings, the noncitizen may seek judicial review before the appropriate circuit court of appeals. *See* INA 242, 8 U.S.C. 1252(a)(1).[59] Accordingly, noncitizens

under the proposed regulations would have opportunities at four levels to have their claims for asylum, withholding of removal, or deferral of removal considered: First during a nonadversarial hearing before an asylum officer and then, if necessary, on review by an IJ, the BIA, and the appropriate circuit court of appeals.

*F. Severability*

Upon the completion of the notice and comment period provided for herein and subsequent issuance of a final rule, to the extent that any portion of the resulting final rule is stayed, enjoined, not implemented, or otherwise held invalid by a court, the Departments intend for all other parts of the final rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect. Thus, even if a judicial decision invalidating a portion of the final rule results in a partial reversion to the current regulations or to the statutory language itself, the Departments intend that the rest of the final rule continue to operate in tandem with the reverted provisions, if at all possible. The Departments seek comment on whether (and which of) the regulatory provisions proposed herein should be severable from one another.

*G. Discretion/Phased Implementation*

The Departments believe that the proposed changes in this rule are necessary to establish a more

streamlined and timely adjudication process for individuals who establish a credible fear of persecution or torture, while simultaneously ensuring fundamental fairness. The Departments emphasize, however, that this proposed rule would provide DHS the discretion to continue placing such individuals directly into section 240 removal proceedings before an IJ. This discretion may be exercised, for example, when a noncitizen with a positive credible fear determination may have committed significant criminal activity, have engaged in past acts of harm to others, or pose a public safety or national security threat. In some cases, DHS may determine that it is more appropriate for such noncitizens' protection claims to be heard and considered in the adversarial process before an IJ.

Additionally, if the Departments decide to issue a final rule implementing this new process during FY 2022, DHS would also need to continue to place many noncitizens receiving a positive credible fear determination into section 240 removal proceedings, while USCIS takes the steps needed to allow it to fully implement this new process for all cases. As discussed below in greater detail in the costs and benefits analysis of this proposal and its impacts on USCIS, as required under Executive Orders 12866 and 13563, USCIS has estimated that it will need to hire approximately 800 new employees and spend approximately $180 million to fully implement the proposed asylum officer hearing and adjudication process to handle approximately 75,000 cases annually. If the number of noncitizens placed into expedited removal and making successful fear claims increases significantly above that estimate, the cost to implement this proposed rule with staffing levels sufficient to handle the additional cases in a timely fashion would be substantially higher.[60] Until USCIS is able to support full implementation, USCIS would need to continue to place a large percentage of individuals receiving a positive credible fear determination into section 240 removal proceedings. This exercise of discretion is similar to and in line with DHS's recognized prosecutorial discretion to issue an NTA to a covered

---

[58] A grant of withholding of removal "does not afford [a noncitizen] any permanent right to remain in the United States" and "does not prevent the DHS from removing [a noncitizen] to a country other than the one to which removal has been withheld." *Guzman Chavez*, 141 S. Ct. at 2286 (quoting *Matter of I-S- & C-S-*, 24 I&N Dec. 432, 434 (BIA 2008)). That presupposes the issuance of a removal order to preserve DHS's discretion to remove the noncitizen to a third country. *See id.* at 2287–88 (noting that "it is axiomatic that in order to withhold removal there must first be an order of removal that can be withheld" (internal quotation marks and citation omitted)).

[59] The courts of appeals have jurisdiction to review "a final order of removal." INA 242(a)(1), 8 U.S.C. 1252(a)(1). As several courts of appeals have

held, that grant of jurisdiction includes the authority to review a conclusion that an otherwise-removable noncitizen is ineligible for asylum, even where—unlike under the present rule—"no formal order of removal has been entered." *Mitondo*, 523 F.3d at 787; *see Shehu* v. *Att'y Gen.*, 482 F.3d 652, 656 (3d Cir. 2007); *Kanacevic* v. *INS*, 448 F.3d 129, 134–35 (2d Cir. 2006); *Nreka* v. *Att'y Gen.*, 408 F.3d 1361, 1366–67 (11th Cir. 2005). The courts of appeals do not have jurisdiction to review "an order of removal without a hearing pursuant to [8 U.S.C.] 1225(b)(1)." INA 242(a)(1), 8 U.S.C. 1252(a)(1); *see* INA 242(a)(2)(A), 8 U.S.C. 1252(a)(2)(A) (additional limits on review of matters related to removal orders issued pursuant to INA 235(b)(1), 8 U.S.C. 1225(b)(1)). That limitation does not apply here. An order of removal entered after an asylum officer conducts a full hearing on a noncitizen's asylum application is not "an order or removal without a hearing." And, in the context of INA 242's limits on judicial review, the references to an order of removal issued "pursuant to" INA 242(b)(1), 8 U.S.C. 1225(b)(1), most naturally is read to encompass only the orders expressly described in that provision: An order issued when a noncitizen subject to expedited removal does not indicate an intention to apply for asylum or a fear of persecution, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(i), or an order issued when a noncitizen is found not to have a credible fear of persecution, INA 235(b)(1)(B)(iii)(I),8 U.S.C. 1225(b)(1)(B)(iii)(I). *Cf. Guerrero-Lasprilla* v. *Barr*, 140 S. Ct. 1062, 1069 (2020) (applying "the presumption favoring judicial review of administrative action" in construing another limit on judicial review in INA 242, 8 U.S.C. 1252).

[60] USCIS presently has over 400,000 pending affirmative asylum applications awaiting interview or adjudication. In proposing this rule, the Departments seek to avoid simply shifting work from a resource-challenged EOIR to a similarly resource-challenged USCIS Asylum Division. DHS seeks to fully resource the USCIS Asylum Division to handle their present workloads and this new workload prior to the USCIS full takeover of the adjudication of protection claims that follow a positive credible fear determination.

noncitizen in expedited removal proceedings at any time after the covered citizen is referred to USCIS for a credible fear determination. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. at 523.

USCIS is primarily funded by immigration and naturalization benefit request fees charged to applicants and petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account ("IEFA"). These fee collections fund the costs of adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants. The authority for establishing fees is found in section 286(m) of the INA, 8 U.S.C. 1356(m), which authorizes DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."

The Chief Financial Officers Act of 1990 ("CFO Act"), 31 U.S.C. 901–03, requires each agency's chief financial officer to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." 31 U.S.C. 902(a)(8). USCIS conducted a FY 2019 and 2020 IEFA fee review, as required under the CFO Act, and, as a result of that review, DHS published an updated final fee rule on August 3, 2020, with an effective date of October 2, 2020. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 FR 46788 (Aug. 3, 2020). Implementation of that new fee rule was enjoined before its effective date, and USCIS has notified the public that it intends to continue to comply with the court injunctions.[61] DHS intends to rescind and replace the changes made by the August 3, 2020 fee

rule and establish new USCIS fees to recover USCIS operating costs.[62]

Current resource constraints would prevent the Departments from immediately achieving their ultimate goal of having the protection claims of nearly all individuals who receive a positive credible fear determination adjudicated by an asylum officer. The Departments believe that to fully implement the proposed rule, additional resources would be required. The Departments therefore propose that the new process be implemented in phases, as the necessary staffing and resources are put into place.

A phased implementation would allow the Departments to begin employing the proposed process in an orderly and controlled manner and for a limited number of cases, giving USCIS the opportunity to work through operational challenges and ensure that each noncitizen placed into the process is given a full and fair opportunity to have any protection claim presented, heard, and properly adjudicated in full conformance with the law. Phased implementation would also have an immediately positive impact in reducing the number of individuals arriving at the southwest border who are placed into backlogged immigration court dockets, thus allowing the Departments to more quickly adjudicate some cases.

Given limited agency resources, the Departments anticipate first implementing this new process for certain non-detained family units. The Departments believe this is necessary as USCIS capacity is currently insufficient to handle all family unit referrals under this new proposed process. The Departments also anticipate limiting referrals under the initial implementation of this proposed rule to families apprehended in certain southwest border sectors or stations, as well as based on the family unit's final intended destination (*e.g.*, if the family unit is within a predetermined distance from the potential interview location). As the USCIS Asylum Division gains resources and builds capacity, the Departments anticipate that additional family unit cases and then single adult cases could be considered for processing pursuant to this phased implementation. Under this approach, it is likely that single adult cases would not be handled under the new process

until a later phase of implementation. The Departments are seeking comments on what might be the appropriate factors for DHS to consider when determining which individuals to place into the new process during this period prior to full implementation.

**Statutory and Regulatory Requirements**

*H. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives. If a regulation is necessary, these Executive orders direct that, to the extent permitted by law, agencies ensure that the benefits of a regulation justify its costs and select the regulatory approach that maximizes net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. It explicitly draws attention to "equity, human dignity, fairness, and distributive impacts," values that are difficult or impossible to quantify. All of these considerations are relevant here. This proposed rule has been designated as a "significant regulatory action," and it is economically significant since it meets the $100 million threshold under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget ("OMB") has reviewed this regulation.

1. Summary

This proposed rule would change and streamline the overall adjudicatory process for asylum applications arising out of the expedited removal process. By reducing undue delays in the system, and by providing a variety of procedural safeguards, the rule protects equity, human dignity, and fairness.

A central feature of the regulation changes the respective roles of an IJ and an asylum officer during proceedings for consideration of asylum applications after a positive credible fear determination. Notably, IJs will retain their existing authority to review de novo the negative determinations made by asylum officers in a credible fear proceeding. In making credible fear determinations, asylum officers will return to evaluating whether there is a significant possibility that the noncitizen could establish eligibility for asylum, withholding of removal, or CAT

---

[61] *See Immigrant Legal Res. Ctr.* v. *Wolf*, 491 F. Supp. 3d 520, 526 (N.D. Cal. 2020) (enjoining the rule); *Nw. Immigrant Rts. Project* v. *U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 41 (D.D.C. 2020) (same). On January 29, 2021, USCIS published a **Federal Register** notice indicating that the agency was continuing to comply with these court orders. U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 86 FR 7493, 7493 (Jan. 29, 2021).

[62] DHS lists a notice of proposed rulemaking for new fees on the Spring 2021 Unified Regulatory Agenda with a proposed publication date of November 2021. Office of Management and Budget, *Spring 2021 Unified Regulatory Agenda* (June 11, 2021), *https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=202104&RIN=1615-AC68.*

protection for possible referral to a full hearing of the claim and the noncitizen will still be able to seek review of that negative credible fear determination before the IJ.

Asylum officers will take on a new role of fully adjudicating all protection claims made by some noncitizens who have received a positive credible fear determination, a role previously carried out only by IJs as part of a proceeding under section 240 of the INA. Under the rule, IJs will take on a new authority to review de novo an asylum officer's denial of these claims.

The population of individuals likely to be affected by this proposed rule's provisions are individuals for whom USCIS completes a credible fear screening. The average annual number of credible fear screenings for FY 2016 through 2020 completed by USCIS is broken out as 59,280 positive credible fear determinations and 12,083 negative credible fear determinations, for a total of 71,363 individuals with credible fear determinations. DHS expects that this population will be affected by the rule in a number of ways, which may vary from person to person depending on (1) whether the individual receives a positive credible fear determination, and (2) whether the individual's asylum claim is granted or denied by the asylum officer. In addition, because of data constraints and conceptual and empirical challenges, we can provide only a partial monetization of the impacts to individuals. For example, asylum seekers who establish credible fear may benefit from having their asylum claims adjudicated potentially much sooner than they otherwise

would. Those who are granted asylum sooner may have a possible path to citizenship in the United States. This is obviously a benefit in terms of human dignity and equity, but it is a benefit that is not readily monetized. Asylum seekers who establish credible fear may also benefit from filing cost savings and earlier labor force entry. DHS has estimated this impact on a per-person workday basis.

As it relates to the Government and USCIS costs, the planned human resource and information-related expenditures required to implement this proposed rule are monetized as real resource costs. These estimates are developed along three population bounds, ranging from 75,000 to 300,000 credible fear screenings to account for possible variations in future years. Furthermore, the possibility of parole for more individuals—applied on a case-by-case basis—could lower the cost to the Government per person processed. DHS has also estimated potential employment tax impacts germane to earlier labor force entry, likewise on a per-person workday basis. Such estimates made on a per-person basis reflect a range of wages that the impacted individuals could earn. The per-person, per-work day estimates are not extended to broader monetized impacts due to data constraints.

An important caveat to the possible benefits to asylum applicants who establish a credible fear introduced above and discussed more thoroughly in the analysis is that it is expected to take time to implement this rule. Foremost, DHS expects the resourcing of this proposed rule to be implemented in a

phased approach. Further, while up-front expenditures to support the changes from this proposed rule based on planning models are high, the logistical and operational requirements of this proposed rule may take time to fully implement. For instance, once USCIS meets its staffing requirements, time will be required for the new asylum staff to be trained for their positions, which may occur over several months. As a result, the benefits to applicants and the Government may not be realized immediately.

To develop the monetized costs of the proposed rule, DHS relied on a low, midrange, and high population bound to reflect future uncertainty in the population. In addition, resources are partially phased in over FYs 2022 and 2023, as a full phasing in of resources, potentially up to 2026, is not possible at this time. The average annualized cost of this proposed rule ranges from $180.4 million to $1.0 billion, at a 3 percent discount rate, and from $179.5 million to $995.8 million, at a 7 percent discount rate. At a 3 percent discount rate the total 10-year costs could range from $1.5 billion to $8.6 billion, with a midpoint of $3.9 billion. At a 7 percent discount rate, the total 10-year costs could range from $1.3 billion to $7.0 billion, with a midpoint of $3.2 billion.

A summary of the potential impacts of this proposed rule are presented in Table 1 and are detailed more in the ensuing analysis. Where quantitative estimates are provided, they apply to the midpoint figure (applicable to the wage range or the population range).

TABLE 1—SUMMARY OF THE POTENTIAL IMPACTS OF THIS PROPOSED RULE

| Entities impacted | Annual population estimate | Potential impacts |
|---|---|---|
| Individuals who receive a positive credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (*see* Table 3), approximately 83.1% of individuals screened have received a positive credible fear determination. | • Maximum potential cost-savings to applicants of Form I–589 of $364.86 per person. |
| | | • Potential cost-savings to applicants of Form I–765 of $370.28 per person. |
| | | • Potential early labor earnings to asylum applicants who obtain an employment authorization document ("EAD") of $225.44 per person per workday; this impact could potentially constitute a transfer from workers in the U.S. labor force to certain asylum applicants. We identified three factors that could drive this impact of early entry to the labor force: (i) More expeditious grants of asylum, thereby authorizing work incident to status; and (ii) a change in timing appropos to the "start" time for filing for work authorization—the "EAD-clock" duration is not impacted, but it "shifts" to an earlier starting point. On the other hand, some individuals who would have reached the "EAD-clock" duration for a pending asylum application and obtained work authorization under the current regulations may not obtain work authorization if their asylum claim is promptly denied. |
| | | • Individuals could not have to wait lengthy times for a decision on their protection claims. This is a benefit in terms of equity, human dignity, and fairness. |
| | | • Some individuals could benefit from de novo review by an IJ of the asylum officer's denial of their asylum claim. |

AR01938

TABLE 1—SUMMARY OF THE POTENTIAL IMPACTS OF THIS PROPOSED RULE—Continued

| Entities impacted | Annual population estimate | Potential impacts |
|---|---|---|
| Individuals who receive a negative credible fear determination. | USCIS provides a range from 75,000 to 300,000 total individuals who receive credible fear determinations. In recent years (see Table 3), approximately 16.9% of individuals screened have received a negative credible fear determination. | • Beneficiaries of the new process may benefit in terms of human dignity if paroled from detention while awaiting their credible fear interview and determination. |
| DHS–USCIS | N/A | • Parole may result in more individuals failing to appear for hearings.<br>• At a 7 percent discount rate, the resource costs could be $451.2 million annually, based on up-front and continuing components.<br>• It is reasonable to assume that there could be a reduction in Form I–765 filings due to more expeditious adjudication of asylum claims, but there could also be countervailing influences; hence, the volume of Form I–765 filings (writ large or for specific classes related to asylum) could decrease, remain the same, or increase—these reasons are elucidated in the analysis.<br>• A net change in Form I–765 volumes overall could impact the incumbent volume of biometrics and biometrics services fees collected; however, based on the structure of the USCIS Application Support Center ("ASC") biometrics processing contract, it would take a significant change in such volumes for a particular service district to generate marginal cost increases or savings per biometrics submission. |
| EOIR | 555 current IJs as well as support staff and other personnel. | • EOIR only reviews on appeal and will no longer adjudicate asylum claims raised in expedited removal in the first instance.<br>• Allows EOIR to focus efforts on other priority work and reduce its substantial current backlog.<br>• There could be non-budget related cost-savings if the actual time worked on a credible fear case decreases in the transfer of credible fear cases to USCIS. |
| Support networks for asylum applicants who receive a positive credible fear determination. | Unknown | • To the extent that some applicants may be able to earn income earlier than they otherwise could currently, burdens to the support network of the applicant may be lessened. This network could include public and private entities and family and personal friends, legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and non-governmental organizations ("NGOs"). |
| Other | Unknown | • There could be familiarization costs associated with this proposed rule; for example, if attorneys representing the asylum client reviewed the rule, the cost would be about $69.05 per hour.<br>• There may be some labor market impacts as some asylum seekers that currently enter the labor market with a pending asylum application would no longer be entering the labor market under this proposed rule if they get a negative decision on their asylum claim sooner. Applicants with a positive credible fear determination may enter the labor market sooner under this proposed rule than they would currently.<br>• Tax impacts could accrue to the earlier entry of some individuals into the labor market; we estimate employment tax impacts could be $34.49 per person on a workday basis. |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 2 presents the prepared accounting statement showing the costs and benefits associated with this regulation.[63]

TABLE 2—OMB A–4 ACCOUNTING STATEMENT

[$ millions, 2020]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| Time Period: 2022–2031 | | | | |
| **Benefits** | | | | |
| Monetized benefits | Not estimated | Not estimated | Not estimated | |
| Annualized quantified, but un-monetized, benefits | N/A | N/A | N/A | |
| Unquantified benefits | Some individuals may benefit from filing cost-savings related to Forms I–589 and I–765. Early labor market entry would be beneficial in terms of labor earnings to the applicant, but also because it could reduce burdens on the applicants' support networks.<br>Benefits driven by increased efficiency would enable some asylum-seeking individuals to move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly, thus promoting both human dignity and equity. Adjudicative efficiency gains and expanded parole could lead to individuals spending less time in detention, which would benefit the Government and the affected individuals. | | | Regulatory Impact Analysis ("RIA"). |

---

[63] OMB, *Circular A–4* (2003), *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf* (last viewed June 1, 2021).

**Federal Register** / Vol. 86, No. 159 / Friday, August 20, 2021 / Proposed Rules    **46925**

TABLE 2—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, 2020]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| *Time Period: 2022–2031* | | | | |
| | Another benefit is that EOIR would not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent reduction in their overall credible fear workload. This stands to mitigate the backlog of cases pending in immigration courts. Additionally, this benefit would extend to individuals granted or denied asylum faster than if they were to go through the current process with EOIR.<br><br>Depending on the individual case circumstances, this proposed rule would mean that such noncitizens would likely not remain in the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum would be granted asylum several years earlier than they are under the present process.<br><br>The anticipated operational efficiencies from this proposed rule may provide for prompt grant of relief or protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection are removed more efficiently than they are under current rules. | | | |
| **Costs** | | | | |
| Annualized monetized costs for 10-year period between 2021 and 2030 (discount rate in parenthesis). | (3%)<br>$453.8 | $180.4 | $1,002.4 | RIA. |
| | (7%)<br>$451.2 | 179.5 | 995.8 | RIA. |
| Annualized quantified, but un-monetized, costs ...................................... | • Potential cost-savings applicable to Form I–589 of $338.86 per person.<br>• Potential cost-savings applicable to Form I–765 of $377.32 per person.<br>• Potential early labor earnings of $225.44 per person per workday.<br>• The transfer of cases from EOIR to USCIS would allow resources at EOIR to be directed to other work, and there is a potential for cost-savings to be realized as it relates to credible fear processing specifically, if the average cost of work-time spent on cases by USCIS asylum officers would be lower than at EOIR currently. These would not be budgetary cost-savings, and USCIS has not made a one-to-one time- and cost-specific comparison between worktime actually spent on a case at EOIR and USCIS. | | | RIA. |
| Qualitative (unquantified) costs ...................................... | N/A | | | |
| **Transfers** | | | | |
| Annualized transfers: ...................................... | Potential labor earnings that would accrue to credible fear asylum applicants that enter the labor market earlier than they would currently. | | | |
| From whom to whom? ...................................... | Potentially a distributional economic impact in the form of a transfer to asylum applicants who enter earlier than they would currently from others in the U.S. workforce. | | | |
| Miscellaneous analyses/category ...................................... | N/A | | | RIA. |
| Effects on State, local, or Tribal governments ...................................... | N/A | | | |
| Effects on small businesses ...................................... | This proposed rule does not directly regulate small entities, but rather individuals. | | | RFA. |
| Effects on wages ...................................... | None | | | |
| Effects on growth ...................................... | None | | | |

## 2. Background and Purpose of the Rule

The purpose of this proposed rule is to address the rising number of apprehensions at or near the southwest border and the ability of the U.S. asylum system to fairly and efficiently handle protection claims made by those encountered. The proposed rule streamlines and simplifies the adjudication process for certain individuals who are encountered at or near the border, placed into expedited

removal, and determined to have a credible fear of persecution or torture, with the aim of adjudicating applications for asylum, statutory withholding of removal, and CAT protection in a timelier fashion and in conformity with procedural protections against erroneous denial of relief or protection. The principal facet of the rule is to transfer the initial responsibility for adjudicating asylum, statutory withholding of removal, and CAT protection applications from IJs to USCIS asylum officers for individuals within expedited removal proceedings who receive a positive credible fear determination.

The proposed rule also would broaden the circumstances in which individuals making a fear claim during the expedited removal process could be considered for parole on a case-by-case basis prior to a positive credible fear determination being made. For such individuals, parole could be granted as an exercise of discretion not only where

required to meet a medical emergency or for a legitimate law enforcement objective, but also where detention is unavailable or impracticable.

DHS intends to apply this proposed rule only to recently-arrived individuals who are subject to expedited removal—*i.e.*, adults and families. The proposed rule does not apply to unaccompanied children, as they are statutorily exempt from being placed into expedited removal. It also does not apply to individuals already residing in the United States and whose presence in the United States is outside the coverage of noncitizens designated by the Secretary as subject to expedited removal. The proposed rule also does not apply to (1) stowaways or (2) noncitizens who are present in or arriving in the Commonwealth of the Northern Mariana Islands who are determined to have a credible fear. They will continue to be referred to asylum/withholding-only hearings before an IJ under 8 CFR 208.2(c). Finally, it is not legally

required that a noncitizen amenable to expedited removal after the effective date of the rule be placed in the non-adversarial review process described in this proposed rule. Rather, DHS generally, and USCIS in particular, retains discretion to issue an NTA to a covered noncitizen in expedited removal proceedings to instead place them in section 240 removal proceedings at any time after they are referred to USCIS for a credible fear determination. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. at 523; *see also* 8 CFR 1208.2(c).

In this section we provide some data and information relevant to the ensuing discussion and analysis of the potential impacts of the rule. We first present USCIS data followed by EOIR data. Table 3 shows USCIS data for the Form I–589 and credible fear cases for the five-year span from FY 2016 through FY 2020.

TABLE 3—USCIS FORM I–589, APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL, AND CREDIBLE FEAR DATA

[FY 2016–2020][64]

| FY | Form I–589 receipts | | Credible fear completions | | | Total credible fear cases[65] |
|---|---|---|---|---|---|---|
| | Initial receipts | Pending receipts | Positive screen | Negative screen | All completions | |
| 2016 | 115,888 | 194,986 | 73,081 | 9,697 | 82,778 | 94,048 |
| 2017 | 142,760 | 289,835 | 60,566 | 8,245 | 68,811 | 79,842 |
| 2018 | 106,041 | 319,202 | 74,677 | 9,659 | 84,336 | 99,035 |
| 2019 | 96,861 | 349,158 | 75,252 | 16,679 | 91,931 | 102,204 |
| 2020 | 93,134 | 386,014 | 12,824 | 16,134 | 28,958 | 30,839 |
| Total | 554,684 | N/A | 296,400 | 60,414 | 356,814 | 405,968 |
| 5-year Average | 110,937 | 307,839 | 59,280 | 12,083 | 71,363 | 81,194 |

Source: USCIS Office of Performance and Quality (OPQ), and USCIS Refugee, Asylum, and International Operations (RAIO) Directorate, CLAIMS 3 database, Global received May 11, 2021.

[64] In FY 2020, the credible fear filings are captured in the Form I–870, "Record of Determination/Credible Fear Worksheet." As part of the credible fear screening adjudication, USCIS Asylum Officers prepare Form I–870, Record of Determination/Credible Fear Worksheet. This worksheet includes biographical information about the applicant, including the applicant's name, date of birth, gender, country of birth, nationality, ethnicity, religion, language, and information about the applicant's entry into the United States and place of detention. Additionally, Form I–870 collects sufficient information about the applicant's marital status, spouse, and children to determine whether they may be included in the determination. Form I–870 also documents the interpreter identification number of the interpreter used during the credible fear interview and collects information about a relative or sponsor in the United States, including their relationship to the applicant and contact information. In previous years credible fear filings included the Form I–867, "Credible Fear Referral." Prior to FY 2020, the USCIS Asylum Division electronically received information about credible fear determinations through referral documentation provided by U.S. Customs and Border Protection. The referral documentation includes a form containing information about the applicant: Form I–867, Credible Fear Referral.

[65] The credible fear total receipts are larger than the sum of positive and negative determinations because the latter apply to "completions," referring to cases forwarded to EOIR, and thus exclude cases that were administratively closed.

As can be seen from Table 3, the Form I–589 pending case number has grown steadily since 2016, and as of May 11, 2021, was 400,200, which is well above the five-year average of 307,839. Over that same period, the majority, 83.1 percent, of completed credible fear screenings were positive, while 16.9 percent were negative.[66]

In addition to the credible fear case data presented in Table 3, USCIS data and analysis can provide some insight concerning how long it has taken for the credible fear screening process to be completed. As detailed in this preamble, while this proposed rule's primary

concern is the length of time before incoming asylum claims are expected to be adjudicated by EOIR, changes to USCIS processes enabled by this proposed rule (including, for example, improved systems for conducting credible fear interviews for individuals who are not in detention facilities) are also expected to reduce processing times for credible fear cases. Table 4

[66] Calculation: Positive completions total 296,400/total completions (296,400 + 60,414) =

296,400/356,814 = 0.831 × 100 = 83.1 percent (rounded); negative completions total 60,414/total completions (356,814) = 0.169 × 100 = 16.9 percent (rounded).

provides credible fear processing durations at USCIS.

### TABLE 4—CREDIBLE FEAR TIME DURATIONS FOR DETAINED AND NON-DETAINED CASES

[In average and median days, FY 2016–2021]

| FY | Screen | Detained | | Non-detained | |
|---|---|---|---|---|---|
| | | Average | Median | Average | Median |
| 2016 | Positive | 23.3 | 13 | 290.6 | 163.0 |
| | Negative | 34 | 26 | 197.1 | 80.5 |
| 2017 | Positive | 23.3 | 13 | 570.1 | 407.0 |
| | Negative | 34.2 | 25 | 496.1 | 354.0 |
| 2018 | Positive | 22.6 | 16 | 816.2 | 671.0 |
| | Negative | 32.3 | 25 | 811.7 | 668.0 |
| 2019 | Positive | 35.6 | 24 | 1230.9 | 1082.0 |
| | Negative | 44.7 | 33 | 1067.3 | 959.0 |
| 2020 | Positive | 37.2 | 20 | 1252.7 | 1065.0 |
| | Negative | 30.3 | 16 | 1311.2 | 1247.0 |
| 2021 | Positive | 25.6 | 15 | 955.3 | 919.0 |
| | Negative | 29.8 | 17 | 1174.0 | 1109.0 |

Source: Data and analysis provided by USCIS, RAIO Directorate, SAS PME and data-bricks databases, received May 11, 2021.
* FY 2021 includes partial fiscal year data as of May 2021.

Table 4 reports the "durations," defined as the elapsed days from date of apprehension to forwarding of the credible fear screening process at USCIS, in both averages and medians. USCIS has included the most recent figure, which is applicable to May 11, 2021. The total time for cases from apprehension to adjudication by EOIR can be found by summing the times in Table 4 with the times in Table 6, below.

The data in Table 4 are not utilized to develop quantitative impacts, but rather are intended to build context and situational awareness. There are several key observations from the information presented. Foremost, there is a substantial difference between durations for the detained and the non-detained populations. The existence of a gap is expected because USCIS can interface with detained individuals rapidly. However, the gap has grown over time;

in 2016 the duration for positive-screened processing was 12.5 times greater, but by 2021 it had grown to a factor of nearly 40.[67] Second, and relatedly, there was a substantial duration rise through 2019 for both detained and non-detained screenings, although there has been a recent pullback. Furthermore, the duration for negative screenings is lower across the board than for positive screenings—as of the most recent data point the duration was about 19 percent lower for negative screened cases.[68] It is also seen that the 2021 average durations for detained cases are relatively close to 2016–2018 levels, with this series witnessing a spike in 2019.

Since some of the EOIR data are presented in medians, we note that the median durations are lower than the means for both screened types. This indicates that a small number of cases take an exceptionally long time to

resolve, resulting in large outlier data points that skew the mean upwards. It is noted that for non-detained cases, the gap between median and mean duration is relatively consistent up to 2021, but the mean and median converge toward the end of the period; this feature of the data could indicate that fewer outlier durations were represented in the data.

It is possible that the proposed rule may impact employment authorization applications and approvals in terms of volume and timing. While we cannot predict the net change in filings for the Form I–765 categories, we present data on initial filings and approvals for three asylum-related categories (Table 5). As a result of the rule, there could be substitutions in Form I–765 categories from the (c)(8), Applicant for Asylum/Pending Asylum, into the (a)(5), Granted Asylum Under Section 208, and (a)(10) Granted Withholding of Removal/243 (H) categories, in Table 5.

### TABLE 5—USCIS FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION INITIAL RECEIPTS AND APPROVALS RELATED TO ASYLEE CATEGORIES

[FY 2016–2020]

| FY | EAD category (a)(5) Granted Asylum Under Section 208 | | EAD category (c)(8) Applicant for Asylum/Pending Asylum | | EAD category (a)(10) Granted Withholding of Removal/243 (H) | |
|---|---|---|---|---|---|---|
| | Initial receipts | Approvals | Initial receipts | Approvals | Initial receipts | Approvals |
| 2016 | 29,887 | 27,139 | 169,970 | 152,269 | 2,008 | 1,621 |
| 2017 | 32,673 | 29,648 | 261,782 | 234,053 | 1,936 | 1,076 |
| 2018 | 38,743 | 39,598 | 262,965 | 246,525 | 1,733 | 1,556 |
| 2019 | 47,761 | 41,288 | 216,038 | 177,520 | 2,402 | 2,101 |

---

[67] Calculations: For 2016, 290.6 average days/23.3 average days = 12.5; for 2021, 1174.0 average days/25.6 average days = 39.4.

[68] Calculation: [1 − (955.3 days/1174.0 days)] = .186, rounded to .19.

TABLE 5—USCIS FORM I–765 APPLICATION FOR EMPLOYMENT AUTHORIZATION INITIAL RECEIPTS AND APPROVALS RELATED TO ASYLEE CATEGORIES—Continued

[FY 2016–2020]

| FY | EAD category (a)(5) Granted Asylum Under Section 208 | | EAD category (c)(8) Applicant for Asylum/Pending Asylum | | EAD category (a)(10) Granted Withholding of Removal/243 (H) | |
|---|---|---|---|---|---|---|
| | Initial receipts | Approvals | Initial receipts | Approvals | Initial receipts | Approvals |
| 2020 ............................................... | 31,931 | 36,334 | 233,864 | 183,820 | 3,318 | 2,554 |
| 5-year total ................................ | 180,995 | 174,007 | 1,144,619 | 994,187 | 11,397 | 8,908 |
| Average ....................................... | 36,199 | 34,801 | 228,924 | 198,837 | 2,279 | 1,782 |

Source: USCIS, Office of Performance and Quality (OPQ), CLAIMS 3, data obtained May 11, 2021, *https://www.uscis.gov/sites/default/files/document/reports/I-765_Application_for_Employment_FY03-20.pdf* (last visited August 9, 2021).

Across the three relevant employment authorization categories, the total of the averages is 267,402 initial EADs, with a total of 235,420 approved EADs.

Having presented information and data applicable to USCIS specifically, we now turn to EOIR data and information. Table 6 presents average and median processing times for EOIR to complete credible fear cases originating from the credible fear screening process, positive and negative, and detained and non-detained (the processing time represents that time between when a case is lodged in EOIR systems and a final decision). Note that the ''initial case completions'' are not directly comparable to USCIS completions (Table 3) in terms of annual volumes for two primary reasons. First, there can be timing differences in terms of when a credible fear case is sent to EOIR and when it is lodged in their processing systems. Second, not all individuals determined to have a credible fear follow up with their case with EOIR, and some cases filed are administratively closed. Therefore, as a general rule, case completions by EOIR would be necessarily lower than ''completions'' at USCIS.

TABLE 6—EOIR TIME DURATION METRICS, DAYS, AND COMPLETIONS FOR CASES WITH A CREDIBLE FEAR ORIGIN

| FY | Average processing time | Median processing time | Initial case completions |
|---|---|---|---|
| **6A. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions With a Credible Fear Origin** | | | |
| 2016 ............................................................................................................. | 413 | 214 | 16,794 |
| 2017 ............................................................................................................. | 447 | 252 | 26,531 |
| 2018 ............................................................................................................. | 648 | 512 | 33,634 |
| 2019 ............................................................................................................. | 669 | 455 | 55,404 |
| 2020 ............................................................................................................. | 712 | 502 | 33,517 |
| 2021–March 31, 2021 (years) * ............................................................... | 1,078 (2.95) | 857 (2.35) | 6,646 |
| **6B. Average and Median Processing Times (in Days) for Form I–862 Initial Case Completions With a Credible Fear Origin and Only an Application for Asylum, Statutory Withholding of Removal, and Withholding and Deferral of Removal Under the CAT** | | | |
| 2016 ............................................................................................................. | 514 | 300 | 7,519 |
| 2017 ............................................................................................................. | 551 | 378 | 13,463 |
| 2018 ............................................................................................................. | 787 | 690 | 19,293 |
| 2019 ............................................................................................................. | 822 | 792 | 30,052 |
| 2020 ............................................................................................................. | 828 | 678 | 21,058 |
| 2021–March 31, 2021 (years) * ............................................................... | 1,283 (3.52) | 1,316 (3.61) | 3,730 |

Source: EOIR, Planning, Analysis, and Statistics Division (''PASD''), data obtained April 19, 2021.
* Current through March 31, 2021.

The FY 2021 data point reflects data through the start of FY 2021 to March 31, 2021, and we have included the current processing times in years for situational awareness. As Table 6 shows, there was an across-the-board jump in processing times in 2018, followed by a leveling off until 2021, when the processing times surged again.

3. Population

The population expected to be affected by this rule is the total number of credible fear completions processed annually by USCIS (71,363, *see* Table 3), split between an average of 59,280 positive-screen cases and 12,083 negative-screen cases. This can be considered the maximum, ''encompassing,'' population that could be impacted. However, we take into consideration larger populations to account for variations and uncertainty in the future population.

4. Impacts of the Rule

This section is divided into three modules. The first (A) focuses on impacts to asylum seekers, presented on a per-person basis. The second (B) discusses costs to the Federal Government, and the third (C) discusses other, possible impacts, including benefits.

i. Impacts to the Credible Fear Asylum Population

Under the change in procedures of this proposed rule, asylum applicants who have established a credible fear of persecution or torture would not be required to file Form I–589 with USCIS. Individuals in this population could accrue cost-savings relevant to this change. There is no filing fee for Form I–589, and the time burden is currently estimated at 12.0 hours per response, including the time for reviewing instructions, and completing and submitting the form.[69] With regard to cost-savings, DHS believes the minimum wage is appropriate to rely on as a lower bound, as the applicants would be new to the U.S. labor market. The Federal minimum wage is $7.25 per hour; however, in this proposed rule, we rely on the "effective" minimum wage of $11.80. As *The New York Times* reported, "[t]wenty-nine states and the District of Columbia have state-level minimum hourly wages higher than the federal [minimum wage]," as do many city and county governments. This *New York Times* report estimates that "the effective minimum wage in the United States [was] $11.80 an hour in 2019."[70] Therefore, USCIS uses the "effective" minimum hourly wage rate of $11.80 to estimate a lower bound. USCIS uses a national average wage rate across occupations of $27.07[71] to take into consideration the variance in average wages across States as an upper bound.

DHS accounts for worker benefits by calculating a benefits-to-wage multiplier using the most recent Bureau of Labor Statistics ("BLS") report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS relies on a benefits-to-wage multiplier of 1.45 and, therefore, is able to estimate the full opportunity cost per applicant, including employee wages and salaries and the full cost of

benefits such as paid leave, insurance, retirement, and other benefits.[72] The total rate of compensation for the effective minimum hourly wage is $17.11 ($11.80 × benefits burden of 1.45), which is 62.8 percent higher than the Federal minimum wage.[73] The total rate of compensation for the average wage is $39.25 ($27.07 × benefits burden of 1.45).

For applicants who have established a credible fear, the opportunity cost of 12 hours to file Form I–589 at the lower and upper bound wage rates is $205.32 (12 hours × $17.11) and $471.00 (12 hours × $39.25), respectively, with a midrange average of $338.16. In addition, form instructions require a passport-style photograph for each family member associated with the Form I–589 filing. The Departments obtain an estimate of the number of additional family members applicable via data on biometrics collections for the Form I–589. Biometrics information is collected on every individual associated with a Form I–589 filing, and the tracking of collections is captured in the USCIS Customer Profile Management System ("CPMS") database. A query of this system reveals that for the five-year period of FY 2016 through FY 2020, an average of 296,072 biometrics collections accrued for the Form I–589 annually. Dividing this figure by the same five-year period average of 110,937 initial filings (Table 3) yields a multiplier of 2.67 (rounded).[74] Under the supposition that each photo incurs costs to applicants of $10,[75] there could be $26.70 in additional cost-savings at either wage

bound.[76] The resulting cost savings per applicant from no longer having to file Form I–589 could range from $232.02 to $497.70, with a midrange of $364.86.[77]

Though these applicants would no longer be required to file Form I–589, DHS recognizes that applicants would likely expend some time and effort to prepare for their asylum interviews and provide documentation for their asylum claim under this rule as well. DHS does not know exactly how long, on average, an individual may spend preparing for their credible fear interviews under the proposed rule, and how that amount of time and effort would compare to the time individuals currently spend preparing for the credible fear interview. If the increased time were substantial— *i.e.,* above and beyond that currently earmarked for the asylum application process—lower cost-savings could result.

Additionally, asylum applicants with a positive credible fear determination would still submit biometrics to USCIS. Hence, for applicants that file a Form I–589, photos would be collected via this biometrics process for the credible fear determination as well as for the Form I–589 application. Under this proposed rule, there would be a change in process such that applicants would submit biometrics at an asylum office as opposed to an USCIS Application Support Center ("ASC"). As a result, there could be time- and travel-associated impacts driven by this change, but because the requirements remain largely the same, we do not attempt to quantify them. Specifically, the average distance and travel time is likely to differ between asylum offices and ASCs, thereby possibly impacting the direct travel (mileage) cost as well as the travel-time related opportunity costs. However, the Departments assume these differences would be negligible, and therefore we do not quantify them.

Under the proposed rule, asylum applicants who established a credible fear would be able to file for work authorization via the Form I–765, Application for Employment Authorization ("EAD"), while their asylum application is being adjudicated. We cannot say, however, whether the volume of Form I–765 EADs filed would increase or decrease in upcoming years due to this proposed rule. Currently, asylum applicants can file for an EAD under the asylum (c)(8) category while

---

[69] *See* Instructions for Form I–589, Application for Asylum and for Withholding of Removal, OMB No.1615–0067 (expires July 31, 2022), *https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf* (last visited May 12, 2021).

[70] Ernie Tedeschi, *Americans Are Seeing Highest Minimum Wage in History (Without Federal Help),* The New York Times (Apr. 24, 2019), *https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html.* We note that with the wage level dated to 2019, we do not make an inflationary adjustment because the Federal minimum wage has not changed since then.

[71] For the average wage for all occupations, the Departments rely on statistics of the U.S. Department of Labor. *See* U.S. Dep't of Labor, Bureau of Labor Statistics ("BLS"), May 2020 National Occupational Employment and Wage Estimates, *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* (last visited May 13, 2021).

[72] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/ (Wages and Salaries per hour) ($38.60 Total Employee Compensation per hour)/($26.53 Wages and Salaries per hour) = 1.454957 = 1.45 (rounded). *See* U.S. Department of Labor, BLS, Economic News Release, *Employer Cost for Employee Compensation (December 2020), Table 1. Employer Costs for Employee Compensation by Ownership* (Dec. 2020), *https://www.bls.gov/news.release/archives/ecec_03182021.pdf.* (last visited Mar. 31, 2021).

[73] The Federal minimum wage is $7.25 hourly, which burdened at 1.45 yields $10.51. It follows that: (($17.11 wage − $10.51 wage)/$10.51)) wage = 0.628, which rounded and multiplied by 100 = 62.8 percent.

[74] Calculation: Average I–589 biometrics collections 296,072/110,937 average initial I–589 filings = 2.67 (rounded). Data were obtained from the USCIS Immigration Records and Identity Services ("IRIS") Directorate, via the CPMS database (data obtained May 7, 2021).

[75] The U.S. Department of State estimates an average cost of $10 per passport photo in their supporting statement for their Paperwork Reduction Act (PRA) submission for the *Application for a U.S. Passport,* OMB #1405–0004 (DS–11) (Feb. 8, 2011), *http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201102-1405-001* (see question #13 of the Supporting Statement).

[76] Calculation: $10 per photo cost × 2.67 photos per I–589 application = $26.70.

[77] Calculation: $205.32 + $26.70 = $232.02; $338.16 + $26.70 = $364.86; $471.00 + $26.70 = $497.70.

their asylum application is pending. Such applications are subject to a 365-day waiting period that commences when their completed Form I–589 is filed. Asylum applicants who establish a credible fear would still be subject to the 365-day waiting period.[78] Applicants would still be able to file for their EADs under the (c)(8) category. We analyze the impacts regarding the EAD filing in two steps, explaining first why filing volumes might decline and related impacts, and then why countervailing factors might mitigate such a decline.

A result of this proposed rule is that asylum applications for some individuals pursuant to this proposed rule could be granted asylum earlier than they would be under current conditions. Since an asylum approval grants work authorization incident to status and USCIS automatically provides an asylum-granted EAD ((a)(5)) after a grant of asylum by USCIS, some applicants may choose not to file for an EAD based on the pending asylum application under the expectation that asylum would be granted earlier than the EAD approval. This could result in cost savings to some applicants.

There is currently no filing fee for the initial (c)(8) EAD Form I–765 application, and the time burden is currently estimated at 4.75 hours, which includes the time associated with submitting two passport-style photos along with the application.[79] As stated earlier, the Department of State estimates that each passport photo costs about $10 each. Submitting two passport photos resulting in an estimated cost of $20 per Form I–765 application.

Because the (c)(8) EAD does not include or require, at the initial or renewal stage, any data on employment, and since it does not involve an associated labor condition application, we have no information on wages, occupations, industries, or businesses that may employ such workers. Hence, we continue to rely on the wage bounds (effective minimum and national average) developed earlier. At the wage bounds relied upon, the opportunity cost-savings are $81.27 (4.75 hours × $17.11 per hour), and $186.44 (4.75 hours × $39.25). When the $20 photo cost is included, the cost-savings would

be $101.27 and $206.44 per applicant, respectively. However, some might choose to file for an EAD after being granted asylum, or even if they expect asylum to be granted earlier than the EAD approval, they may want to have documentation that reflects that they are employment authorized.

In the discussion of the possible file volume decline for the Form I–589, above, we noted that applicants and family members would continue to submit biometrics as part of their asylum claim, and that, as a result, there would not be costs or cost-savings changes germane to biometrics. For the Form I–765(c)(8) category, USCIS started collecting biometrics, and the associated $85 biometrics service fee, in October 2020.[80]

The submission of biometrics involves travel to an ASC for the biometric services appointment. In past rulemakings, DHS estimated that the average round-trip distance to an ASC is 50 miles, and that the average travel time for the trip is 2.5 hours.[81] The cost of travel also includes a mileage charge based on the estimated 50-mile round trip at the 2021 General Services Administration ("GSA") rate of $0.56 per mile.[82] Because an individual would spend an average of 1 hour and 10 minutes (1.17 hours) at an ASC to submit biometrics,[83] summing the ASC time and travel time yields 3.67 hours. At the low- and high-wage bounds, the opportunity costs of time are $62.79 and $144.05.[84] The travel cost is $28, which is the per mileage reimbursement rate of 0.56 multiplied by 50-mile travel distance. Summing the time-related and travel costs generates a per-person biometrics submission cost of $90.79, at the low-wage bound and $172.05 at the high-wage bound.[85] While the

biometrics collection includes the $85 service fee, fee waivers and exemptions are granted on a case-by-case basis (across all forms) that are immaterial to this proposed rule. Accordingly, not all individuals pay the fee. When the opportunity costs of time for filing Form I–765 ($101.27 and $206.44, respectively) are added to the opportunity costs of time and travel for biometrics submissions ($90.79 and 172.05), the total opportunity cost of time to file Form I–765 and submitting biometrics are $192.07 and $378.49, respectively. For those who pay the biometrics service fee, the total costs are $277.07 and $463.49, respectively, with a midpoint of $370.28.[86] These figures represent the maximum per-person cost savings for those who choose not to file for an EAD.[87]

Having developed the cost-savings for applicants who do not file for an EAD, we now turn to countervailing factors against the potential decline in Form I–765 volumes. First, applicants will benefit from a timing change relevant to the EAD waiting period as it relates to the "filing date" of their asylum application that will allow an EAD to be filed earlier than it could be currently. USCIS allows for an EAD to be filed under 8 CFR 208.7 when an asylum application is pending and certain other conditions are met. Here, an asylum application would be pending when the credible fear determination is served on the individual as opposed to current practice under which the asylum application is lodged in immigration court. This change in timing could allow some EADs to be approved earlier for those who file for an EAD with a pending asylum application. In this

---

[78] A preliminary injunction in *Casa de Maryland, Inc.* v. *Wolf,* 486 F. Supp. 3d 928, 935 (D. Md. 2020), currently exempts members of certain organizations from this 365-day waiting period. Such members are subject to the 180-day Asylum EAD Clock.

[79] *See* Instructions for Form I–765, Application for Employment Authorization, OMB No. 1615– 0040 (expires July 31, 2022), *https://www.uscis.gov/ i-765* (last visited May 12, 2021).

[80] USCIS collects biometrics for Form I–765 (c)(8) submissions, but a preliminary injunction in *Casa de Maryland, Inc.* v. *Wolf,* 486 F. Supp. 3d 928, 935 (D. Md. 2020), currently exempts members of certain organizations from this biometrics collection.

[81] *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 535 (Jan. 3, 2013).

[82] GSA mileage rate of $0.56. *See* GSA, *Privately Owned Vehicle Mileage Reimbursement Rates* (effective January 1, 2021), *https://www.gsa.gov/ travel/plan-book/transportation-airfare-rates-pov- rates/privately-owned-vehicle-pov-mileage- reimbursement-rates* (last visited Aug. 4, 2021).

[83] *See* Instructions for Form I–765, Application for Employment Authorization, OMB No. 1615– 0040 (expires July 31, 2022), *https://www.uscis.gov/ i-765* (last visited May 12, 2021).

[84] Calculations: Total time burden 3.67 hours × total rate of compensation for the effective wage $17.11 = $62.79; total time burden 3.67 hours × total rate of compensation for the average wage $39.25 = $144.05.

[85] Calculations: Opportunity cost of time, effective wage $62.79 + travel cost $28 = $90.79;

Opportunity cost of time, average wage $144.05 + travel cost $28 = $172.05.

[86] Calculations: $192.07 + biometrics services fee $85 = $277.07; $378.49 + biometrics services fee $85 = $463.49. While we have the overall count for biometrics for the period from October 1, 2020 through May 1, 2021, we do not know how many biometrics service fees were collected with these biometrics submissions; the fee data are retained by the USCIS Office of the Chief Financial Officer ("OCFO"), but the Form I–765 fee payments are not captured by eligibility class.

[87] There is a scenario that the Departments account for, though it is not likely to occur often. Currently, an asylum applicant might file for an EAD and have the EAD approved prior to the grant of asylum. It is possible that, under this proposed rule, asylum may be approved more expeditiously. At the time of the asylum grant, the individual will automatically receive a category (a)(5) EAD based on the grant of asylum; if they did file for an EAD, technically the filing costs associated with the EAD would be accounted for as sunk costs, since the (c)(8) EAD does not actually provide any benefit over the (a)(5) EAD. This would only apply if the proposed rule itself was responsible for the more expeditious asylum grant, and again, we only account for this possibility since it cannot be ruled out.

sense, the EAD remains the same in duration, but the starting point shifts to an earlier position for asylum applicants who will file for an initial EAD under the (c)(8) category.

DHS would begin to consider for parole on a case-by-case basis all noncitizens who have been referred to USCIS for a credible fear screening under the slightly expanded set of factors provided for in the proposed rule during the relatively short period between being referred to USCIS for a credible fear screening interview and the issuance of a credible fear determination. A parole grant does not constitute work authorization, however, and currently there are two Form I–765 classes, (a)(5), "Granted Asylum Sec. 208," and (a)(10), "Granted Withholding of Removal/243 (H)," that could apply to applicants filing for asylum pursuant to the parole process under this proposed rule. In the past, some parolees under these categories have been able to obtain EADs sooner than they would if they were explicitly subject to the filing clock that applies to a pending Form I–589 application.

Given the two changes discussed above related to the EAD filings—(i) the change in timing under when an EAD can be filed; and (ii) the somewhat expanded set of circumstances under which certain credible fear cases may be considered for parole—some applicants may file for an EAD, even under the expectation that their asylum could be granted earlier, if they expect to receive an (a)(5) asylum granted EAD even sooner. In this sense, the potential for more rapid approvals of an EAD claim may be expected to provide a net pecuniary benefit even in light of a more expeditious asylum claim. Coupled with the expectation that some individuals may seek an EAD for the non-pecuniary benefit associated with its documentary value, we cannot determine if these countervailing influences might limit, or even completely absorb, any reductions in EAD filing for credible fear asylum applicants.

Regardless of whether, under the proposed rule, it is the more expeditious asylum or EAD approval that is binding for purposes of work authorization, individuals who enter the labor force earlier are able to earn income earlier. The assessments of possible impacts rely on the implicit assumption that credible fear asylum seekers who receive employment authorization will enter and be embedded in the U.S. labor force at the time of the proposed rule being effective. This assumption is justifiable for those whose labor force entry was effectuated by the EAD approval, as opposed to the grant of

asylum. We believe this assumption is justifiable because applicants would generally not have expended the direct and opportunity costs of applying for an EAD if they did not expect to recoup an economic benefit. We also take the extra step of assuming these entrants to the labor force are employed. It is possible that some applicants who are eventually denied asylum are currently able to obtain work authorizations—approved while their asylum application was pending. We do not know what the annual or current scale of this population is, but it is an expected consequence of this proposed rule that such individuals would not obtain work authorizations in the future.

The impact is attributable to the difference in days between when asylum would be granted under the proposed rule and the current baseline. USCIS describes this distributional impact in more detail. Since a typical workweek is 5 days, the total day difference ("D") can be scaled by 0.714 (5 days/7 days) and then multiplied by the average wage ("W") and the number of hours in a typical work day (8) to obtain the impact, as in the formula: $D \times 0.714 \times W \times 8$. In terms of each actual workday, the daily distributional impact at the wage bounds are $136.88 ($17.11 × 8 hours) and $314.00 ($39.25 × 8 hours), respectively, on a per-person basis, with a midrange average of $225.44.

USCIS cannot expand the per-person per-day quantified impacts to a broader monetized estimate. Foremost, while Table 5 provides filing volumes for the asylum relevant EADs, we cannot determine how many individuals within this population would be affected. In addition, we cannot determine what the average day difference would be for any individual that could be impacted. To quantify the day difference, the Departments would need to simultaneously analyze the current and future interaction between the asylum grant and EAD approvals. Doing so for the current system is conceptually possible with a significant devotion of time and resources, but it is not possible to conduct a similar analysis for future cases without relying on a number of assumptions that may not be tractable. As a result, we cannot extend the per-person cost (in terms of earnings) basis to an aggregate monetized cost, even if USCIS knew either the population impacted or the day-difference average because an estimate of the costs would require both data points. The impact accruing to labor earnings developed above has the potential to include both distributional effects (which are transfers) and indirect benefits to

employers.[88] The distributional impacts would accrue to asylum applicants who enter the U.S. labor force earlier than under current regulations, in the form of increased compensation (wages and benefits). A portion of this compensation gain might be transferred to asylum applicants from others that are currently in the U.S. labor force or eligible to work lawfully. Alternatively, employers that need workers in the U.S. labor market may benefit from those asylum applicants that receive employment authorization earlier as a result of the proposed rule, gaining productivity and potential profits that the asylum applicant's earlier start would provide. Companies may also benefit by not incurring opportunity costs associated with the next-best alternative to the immediate labor the asylum applicant would provide, such as having to pay existing workers to work overtime hours, if in fact it was necessary or they were requested to work overtime.

We do not know what this next-best alternative may be for those companies. As a result, the Departments do not know the portion of overall impacts of this proposed rule that are transfers or benefits, but the Departments estimate the maximum monetized impact of this proposed rule in terms of a daily, per-person basis compensation. The extent to which the portion of impacts would accrue to benefits or transfers is difficult to discern and would depend on multiple labor market factors. However, we think it is reasonable to posit that the portion of impacts attributable to transfers would mainly be benefits, for the following reason: If there are both workers who obtain employment authorization under this rule and other workers who are available for a specific position, an employer would be expected to consider any two candidates to be substitutable to a high degree. There is an important caveat, however. There could be costs involved in hiring asylum seekers that are not captured in this discussion. As the U.S. economy recovers from the effects of the COVID–19 pandemic, there may be structural changes to the general labor market and to specific job positions that could impact the next-best alternatives that employers face. The Departments cannot speculate on how such changes in relation to the earlier labor market entry of some asylum applicants could

---

[88] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. *See* OMB, Circular A–4 at 14, 38 (Sept. 17, 2003), *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf* (further discussion of transfer payments and distributional effects).

mitigate the beneficial impacts to employers.

The early possible entry into the labor force of some positive-screened credible fear asylum applicants is not expected to change the composition of the labor market, as it would affect only the timing, not the scale of the labor force. However, there may be some labor market impacts from asylum seekers who currently enter the labor market with a pending asylum application and who may no longer be entering the labor market under this proposed rule if they get a decision sooner on their asylum claim. As we cannot predict how many people would be impacted in such a way, we are not able to quantify this impact.

Furthermore, there may be tax impacts for the Government. It is difficult to quantify income tax impacts of earlier employment in the tight labor market scenario because individual tax situations vary widely, but the Departments estimate the potential contributory effects on employment taxes, namely Medicare and Social Security, which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[89] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated accretion in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent.[90] The Departments will rely on this total tax rate where applicable. The Departments are unable to quantify other tax transfer payments, such as for Federal income taxes and State and local taxes. As noted above, the Departments do not know how many individuals with a positive credible fear determination will be affected, and what the average day-difference would be, and therefore the Departments cannot make an informed monetized estimate of the potential impact. It therefore follows that the Departments cannot monetize the potential tax impacts of the proposed rule. However, the Departments can provide partial quantitative information by focusing on the workday earnings presented earlier. At the wage bounds, the workday

earnings, at $136.88 and $314.00, are multiplied by 0.153 to obtain $20.94 and $48.04, respectively, with a midpoint of $34.49, which are the daily employment tax impacts per individual. The tax impacts per person would accrue to the total day-difference in earnings scaled by 0.714, to reflect a five-day workweek.

Having developed partial (based on an individual basis) monetized impacts of this proposed rule, there are two important caveats applicable to the population of asylum applicants who have received a positive credible fear determination. Foremost, as we detail extensively in the following module, there will be resource requirements and associated costs needed to make this proposed rule operational and effective. These changes will not occur instantaneously and may require months or even a year or more to fully implement. While existing USCIS resources will be able to effectuate changes for some individuals rather quickly, others (and thus the entire population from an average perspective) will face a time horizon in realizing the impacts—generally the impacts are beneficial as they include earlier asylum determinations, income gains, and possible filing cost-savings. While the time horizon would not be accounted as a cost to applicants, some may face a delay in realizing such benefits. Second, despite the possibility that some baseline EAD filers may choose not to file in the future, there could be mitigating effects to concomitant volume declines for Form I–765(c)(8) submissions.

In closing, we have noted that the impacts developed in this section apply to the population that receives a positive credible fear determination. Additionally, for the subset of this population that receives a negative asylum determination from USCIS, the possibility of de novo review of their claim by an IJ may benefit some applicants by affording another opportunity for review and approval of their asylum claims.

## ii. Impacts to USCIS

### a. Total Quantified Estimated Costs of Regulatory Changes

In this section, DHS discusses impacts to the Federal Government. Where possible, cost estimates have been quantified, otherwise they are discussed qualitatively. The total annual costs are provided only for those quantified costs that can be applied to a population.

## Costs of Staffing to USCIS

USCIS will need additional staffing to implement the provisions presented in this proposed rule. The staffing requirement will largely depend on the anticipated volume of credible fear referrals. In addition to asylum officers, USCIS will require additional supervisory staff, operational personnel, and organizational structures commensurate with the number of asylum officers needed. USCIS anticipates an increased need for higher-graded field adjudicators and supervisors to implement the provisions of this proposed rule. Approximately 92 percent of the field asylum officers are currently employed at the GS–12 pay level or lower.[91] Under this model, USCIS will be assuming work normally performed by an IJ. EOIR data indicate the weighted average salary of $155,089 in FY 2021 for IJs, $71,925 for Judicial Law Clerks (''JLC''s), $58,394 for Legal Assistants, $132,132 for DHS Attorneys, and $98.51 per hour for interpreters.[92] Notably, entry-level IJs are required to adjudicate a wider array of immigration applications than asylum officers, and their decisions are not subject to 100 percent supervisory review, unlike current USCIS asylum officers. As such, under this proposed rule, USCIS asylum officers making final decisions on statutory withholding of removal and CAT protection cases would be at a GS–13 minimum, considering they will be conducting adjudications traditionally performed only by IJs.[93] In addition, first-line Supervisory Asylum Officers (''SAO''s) reviewing these decisions would be graded at a GS–14.[94] Currently, not all SAOs are at a grade GS–14. However, aligning all first-line SAOs to a GS–14 ensures operational flexibility and makes this position consistent with the similar work processes and functions performed by the first-line Supervisory Refugee Officer position.

Currently, USCIS refers all credible fear determinations to IJs at EOIR. This

[89] See Internal Revenue Service Publication 15, Circular E, Employer's Tax Guide for Specific Information on Employment Tax Rates (Feb. 4, 2021), https://www.irs.gov/pub/irs-pdf/p15.pdf; see also Market Watch, More Than 44 Percent of Americans Pay No Federal Income Tax (Sept. 16, 2018), https://www.marketwatch.com/story/81-million-americans-wont-pay-any-federal-income-taxes-this-year-heres-why-2018-04-16.

[90] Calculation: (6.2 percent Social Security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent total estimated tax loss to Government.

[91] In 2021, the base salary for a GS–12 ranges from $66,829, at step 1, up to $86,881, at step 10. See Office of Personnel Mgmt., Salary Table 2021–GS Incorporating the 1% General Schedule Increase Effective January 2021, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2021/GS.pdf (last visited May 17, 2021).

[92] Weighted average base salaries across position, FY, and location are drawn from DOJ EOIR PASD analysis. Interpreter wages are presented hourly here, as these positions are paid differently and not always on an annual basis. In 2021, the base salary for a GS–15 step 3 is $117,824 and step 4 is $121,506. See id.

[93] In 2021, the base salary for a GS–13 step 1 is $79,468. See id.

[94] In 2021, the base salary for a GS–14 step 1 is $93,907. See id.

proposed rule continues to provide for the possibility that individuals who receive a negative credible fear determination may request review of the negative determination by an IJ at EOIR. Reviewing historical EOIR data on the amount of time required to complete a typical hearing with a credible fear origin and only an application for asylum, the median duration for credible fear merit plus master hearings from FY 2016 through FY 2020 is about 97 minutes, or 1.6 hours. Factoring in the EOIR weighted average salaries for the IJs, JLCs, DHS Attorneys, and interpreters required for EOIR to complete these hearings, we estimate the median cost to be $470.62 [95] per hearing over the same time period.

USCIS analyzes a range of credible fear cases to estimate staffing requirement costs. At a lower bound volume of 75,000 credible fear cases, USCIS assumes it would receive fewer credible fear cases compared to prior years (with the exception of FY 2020, which had a lower number of credible fear cases due to the COVID–19 pandemic and resulting border closures). A volume of 300,000 credible fear cases is an upper bound, based on the assumption that nearly all individuals apprehended will be placed into expedited removal for USCIS to process. As shown in Table 3, the lowest number of credible fear cases received within the last five years was 79,842 in FY 2017, while the highest was 102,204 in FY 2019. DHS recognizes that the estimated volume of 300,000 is nearly three times the highest annual number of credible fear cases received, but DHS presents this as an upper bound estimate to reflect the uncertainty concerning an operational

limit to how many credible fear cases could be handled by the agency in the future. Inclusion of this unlikely upper bound scenario is intended only to present information concerning the potential costs should the agency consider an intervention at the highest end of the range. USCIS expects volumes to fall within the lower and upper bounds and therefore we also provide a primary estimate of 150,000 credible fear cases.[96]

USCIS has estimated the staffing resources it will need to implement this proposed rule. At the three volume levels of credible fear cases, USCIS plans to hire between 794 and 4,647 total new positions, with a primary estimate of 2,035 total new positions.[97] The estimated costs associated with payroll, non-payroll, and other general expenses including interpreter services, transcription services, facilities, physical security, information technology ("IT") case management, and other contract, supplies, and equipment are anticipated to begin in FY 2022.

In developing the quantified costs of this proposed rule, there are likely to be initial costs associated with the hiring and training of staff, and those payroll and other costs associated with the additional personnel would continue in future years. Additionally, as was explained in Section G of this preamble, DHS expects a phased approach to implementation due to budgetary and logistical factors. The cost estimates developed below focus on three volume bands and are based on initial data and staffing models that captured initial implementation costs accruing to FY 2022 and FY 2023. It therefore partially captures the likely phasing of resourcing and costs, but not the full phasing that

could extend into further years. As of the final drafting of this proposed rule, DHS does not have the appropriate data to integrate a full phasing of the implementation in terms of quantified resource costs. However, we do not believe a partial implementation significantly skews the expected costs of this proposed rule. We offer some additional comments concerning this phasing of implementation as it relates to costs at the conclusion of this analysis.

The Departments recognize that initial costs are likely to spill into future years depending on the pace of hiring, employee retention, obtaining and signing contracts (for interpreters, transcription, facilities), training, etc. For the remainder of FY 2021, DHS will finalize job descriptions, post new positions, and begin the hiring process to onboard some new Federal employees, and DHS will work to procure new contracts for interpreters, transcription, facilities, and security staff as its current fiscal situation allows. In FY 2022, the implementation costs are expected to range between $179.8 million and $952.4 million with a primary cost estimate of $438.2 million, assuming all staff is hired and corresponding equipment needs are purchased in the fiscal year. DHS recognizes that, operationally, it may take more time to attain the staffing postures described. However, we are not able to reliably predict those timelines due to the uncertain nature of the recruitment and onboarding processes. Any delay in hiring would reduce the first-year costs of implementation, as explained further below. The itemized planned resources are presented in Table 7.

TABLE 7—ESTIMATED USCIS FY 2022 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

|  | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $140,507 | $355,175 | $806,697 |
| Payroll | 113,602 | 285,983 | 648,257 |
| Non-Payroll | 26,905 | 69,192 | 158,440 |
| (B) General Expenses | 39,313 | 83,025 | 145,682 |
| Interpreter Services | 6,615 | 19,136 | 44,179 |
| Transcription Services | 9,366 | 26,697 | 37,362 |

[95] Estimate based on analysis provided by EOIR on May 19, 2021, of median digital audio recording ("DAR") length data from all merit and master asylum hearings between FY 2016 and FY 2020. The five-year average estimated cost of hearings is based on 2,087 assumed hours per year for the IJ, JLC, and DHS attorneys' at the annual salaries shown, plus the hourly cost per interpreter. These annual values were multiplied by the respective sums of the annual median lengths of master and merit hearings for corresponding years to produce the five-year average cost per hearing of $470.62.

[96] Note that the primary estimate of 150,000 is not equal to the average of the lower volume of 75,000 credible fear cases and the upper volume of 300,000 credible fear cases. Rather, this primary estimate, based on OCFO modeling, represents the number of cases that the agency may reasonably expect. The OCFO volume levels were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. The actual volume levels could be above or below these levels.

[97] Note that the primary estimate of 2,035 total new positions is not equal to the average of the

lower 794 and upper bound 4,647 estimates. Rather, this primary estimate, based on a staffing allocation model, represents the number of staff in a mix of occupations at a mix of grade levels that the agency may need to hire to handle the volume of credible fear cases. The staffing is commensurate with OCFO model volume levels, which were developed as a guide for several possible ranges that could be realized in the future, taking into account variations in the populations. The actual volume levels and hence staffing could be above or below these levels.

TABLE 7—ESTIMATED USCIS FY 2022 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS—Continued

[$ in thousands]

| | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| Facilities | 6,635 | 17,606 | 40,865 |
| Physical Security | 623 | 1,654 | 3,839 |
| IT Case Management | 12,500 | 12,500 | 12,500 |
| Other Contract/Supplies/Equipment | 3,574 | 5,432 | 6,937 |
| Total | 179,820 | 438,200 | 952,379 |

Source: USCIS Analysis from RAIO and OCFO, May 19, 2021.

In FY 2023, USCIS estimates costs between $164.7 million and $907.4 million, with a primary estimate of $413.6 million, as shown in Table 8. The reductions are mostly attributable to non-recurring, one-time costs for new staff and upgrades to IT case management systems, although a decline in costs pertaining to other contracts/supplies/equipment is also expected. The largest expected cost decrease is for IT case management, which is estimated to decline from $12.5 million in FY 2022 down to $4.375 million in FY 2023. Meanwhile, costs for interpreter and transcription services, facilities, and physical security are expected to rise in FY 2023 to factor in resource cost increases. For FY 2024 through FY 2031 of implementation, DHS expects resource costs to stabilize.

TABLE 8—ESTIMATED USCIS FY 2023 FUNDING REQUIREMENTS BY VOLUME OF CREDIBLE FEAR REFERRALS

[$ in thousands]

| | 75k cases | 150k cases | 300k cases |
|---|---|---|---|
| (A) Staffing | $133,427 | $337,047 | $766,159 |
| Payroll | 122,753 | 309,758 | 703,852 |
| Non-Payroll | 10,674 | 27,289 | 62,307 |
| (B) General Expenses | 31,267 | 76,554 | 141,249 |
| Interpreter Services | 6,813 | 19,710 | 45,504 |
| Transcription Services | 9,647 | 27,498 | 38,483 |
| Facilities | 6,834 | 18,134 | 42,091 |
| Physical Security | 642 | 1,704 | 3,954 |
| IT Case Management | 4,375 | 4,375 | 4,375 |
| Other Contract/Supplies/Equipment | 2,956 | 5,133 | 6,842 |
| Total | 164,694 | 413,601 | 907,408 |

Source: USCIS Analysis from RAIO and OCFO, May 19, 2021.

To estimate the costs for each category itemized in Tables 7 and 8, USCIS considered the inputs for each. On average, USCIS expects to hire the majority of new staff at the GS–13, step 1 level, and most of those hired will serve as asylum officers. As stated, these officers will be adjudicating statutory withholding of removal and withholding and deferral of removal under the CAT, so their pay will be higher than the current asylum officer pay, which is at a GS–12 level. Additionally, USCIS assumes step 1 because these employees are expected to be new to the position. Payroll costs also include Government contributions to non-pay benefits, such as healthcare and retirement. While payroll is the greatest estimated cost to hiring staff, non-payroll costs include training, equipping, and setting staff up with resources such as laptops, cell phones, office supplies, etc. For example, asylum officers are required to attend and successfully complete a multi-week residential training at a Federal Law Enforcement Training Center ("FLETC") as a condition of their continued employment. The estimated cost per student (including FLETC enrollment costs, travel, etc.) is approximately $7,000. The cost of training would apply to any new asylum staff with "officer" in their title. To fully furnish and equip new employees, USCIS estimates a cost of $3,319 per asylum employee. Costs for new equipment would be largely commensurate with the increase in staffing levels.

In addition to costs associated with hiring new staff, DHS anticipates that it will need to both increase funding on existing contracts and procure new ones. As a result of this proposed rule, the need for interpretation services will increase as the number of asylum interviews USCIS performs rises. Current interpreter contracts cannot absorb this expected increase. Using current contracts, USCIS applied the current cost model to the estimated increase in case volumes in order to estimate costs. The facilities and physical security estimates were similarly based on current cost models that were expanded to account for additional employees. Additional contract support will also be needed for transcription services to create a written record of the asylum hearing, which staff are not currently employed by USCIS. To create transcription service estimates, USCIS applied EOIR's current cost model to the estimated increase in case volumes. DHS also anticipates costs associated with general expenses associated with miscellaneous contract, supplies, equipment, etc. commensurate with the increase in staff.

The timing of these costs will depend on the hiring timeline but are expected to commence in the first year. DHS recognizes that if it takes more than one year to hire and equip asylum employees, costs may instead be experienced in later years.

**AR01949**

Costs to Information Technology Typology to USCIS

DHS is planning upgrades to internal management systems and databases as a requirement to implement this proposed rule. The estimated cost of these upgrades in FY 2022 is a one-time cost of $12.5 million that will impact virtually all processing and record-keeping systems at USCIS. The cost embodies funds for enhancements and refurbishment to the USCIS Global case management system that would support features such as: Ensuring transition of positive credible fear screening cases to the hearing process currently provided for affirmative asylum cases, support for withholding of removal and CAT adjudication features, non-detained scheduling enhancements, and capabilities to accept and provide review for electronic documents. The one-time cost also includes funds earmarked for teams that support integrations with other internal and external-facing systems, such as record-keeping, identity management and matching, reporting and analytics, applicant-facing interfaces, and other key USCIS systems, as well as external systems at Immigration and Customs Enforcement ("ICE"), CBP, or DOJ.[98]

Included in these $12.5 million costs are the costs to pay staff to make these upgrades. DHS estimates between 30 and 40 individuals, with a little over half contract personnel and the rest being Federal employees, would be involved (either part- or full-time) in the implementation of these enhancements through FY 2022. The Federal personnel would mainly comprise GS–14 and GS–15 level personnel and supervisory and management staff.

IT costs are expected to decline in FY 2023 and remain flat into the future at $4.375 million, which accounts for ongoing operations and maintenance costs. New features or upgrades are not expected at this time, but if they were to be needed in the future, those enhancements would result in additional costs not included here.

At present, DHS does not envision new facilities or additional structures being required from an IT perspective to implement this rule.

Importantly, this effort is expected to coincide with the first electronic processing of the Form I–589. Since this will be a significant change for processing asylum applications, unexpected errors or system changes could have impacts on this project as well. Additional dependencies rely on the availability of ICE, CBP, and DOJ systems to integrate with USCIS systems to provide for streamlined implementation. However, since this trajectory was enabled outside the scope of this rule, we do not attribute costs to it.

As described earlier in this analysis, we expect no net change regarding biometrics collection germane to asylum applications for individuals with a positive credible fear determination. We also detailed how factors concomitant to more expeditious EAD approvals make it impossible to estimate the magnitude or even direction in the net change in Form I–765 filing volumes (related to asylum or withholding of removal), and hence, commensurate biometrics collections (and fee payments).

However, given the parameters of this proposed rule, any net change in biometrics would not impose new costs to the Federal Government. The

maximum monthly volume of biometrics submissions allowed by the current ASC contract is 1,633,968 and the maximum annual volume is 19,607,616.[99] The average number of individuals that submitted biometrics annually across all USCIS forms for the period FY 2016 through FY 2020 was 3,911,857.[100] Given that the average positive-screened credible fear population is 59,280 (Table 3), which is 1.52 percent of the biometrics volume, a volume change would not encroach on these bounds.

One scenario that we do account for relates to costs for a particular USCIS–ASC district. The DHS–ASC contract was designed to be flexible to reflect variations in benefit request volumes. The pricing mechanism within this contract embodies such flexibility. Specifically, the ASC contract is aggregated by USCIS district, and each district has five volume bands with its pricing mechanism. The incumbent pricing strategy takes advantage of economies of scale because larger biometrics processing volumes have smaller corresponding biometrics processing prices.[101] For example, Table 9 provides an example of the pricing mechanism for a particular USCIS district. This district incurs a monthly fixed cost of $25,477.79, which will cover all biometrics submissions under a volume of 8,564. However, the price per biometrics submission decreases from an average cost of $6.66 for volumes between a range of 8,565 and 20,524 to an average of $5.19 once the total monthly volume exceeds 63,503. In other words, the average cost decreases when the biometrics submissions volume increases (jumps to a higher volume band).

TABLE 9—EXAMPLE OF PRICING MECHANISM FOR A USCIS DISTRICT PROCESSING BIOMETRICS APPOINTMENTS, FY 2021

| District X | Volume band | Minimum volume | Maximum volume | Costs |
|---|---|---|---|---|
| Baseline: Fixed price per month | AA | 0 | 8,564 | $25,477.79 |
| Fixed price per person processed | AB | 8,565 | 20,524 | 6.66 |
| Fixed price per person processed | AC | 20,525 | 31,752 | 5.94 |
| Fixed price per person processed | AD | 31,753 | 63,504 | 5.53 |
| Fixed price per person processed | AE | 63,505 | 95,256 | 5.19 |

Source: USCIS, IRIS Directorate, received May 10, 2021.

At the district level, since there are small marginal changes to costs in terms

of volumes, it would take a substantial change in volumes for a particular

district to mount a significant change in costs for that district. If biometrics

---

[98] While this plan tracks the FY 2022 time frame, variations in the pace of Federal and contractor hiring and retention during the performance period, unforeseen legal or other policy challenges to any electronic process, and the ability of relevant offices to truly operationalize minimal functionality give their own staffing constraints to handle manually

any additional process automations, could delay some implementation into FY 2023.

[99] Data and information provided by the USCIS IRIS Directorate. The average annual biometrics volumes were obtained through the CPMS database. The cost contract reflects the most recent contract update, dated June 18, 2020.

[100] Data and information provided by USCIS IRIS Directorate, utilizing the CPMS database.

[101] Economies of scale is a technical term that is used to describe the process whereby the greater the quantity of output produced (in this case more biometric service appointments), the lower the per-unit fixed cost or per-unit variable costs to produce that output.

volumes increase on net, there could be small marginal, and hence, average, cost declines; in contrast, if volumes decline, some of those marginal costs could not be realized.

Having developed the costs to USCIS to implement the proposed rule, this section brings the total costs together as annual inputs that are discounted over a 10-year horizon. At the three

population bounds, the inputs are captured in Table 10. The FY 2022 and FY 2023 costs are from Tables 7 and 8. For FY 2024 through FY 2031, human resources cost increases. As stated earlier, USCIS expects positions to be filled at step 1 for each GS level, so in years where employees remain at the same step for more than one year, these estimates account only for human

resource cost increases (FYs 2026, 2028 and 2030). The general non-IT cost increases account for expected contract pricing increases. Finally, IT costs are expected to remain flat at $4.375 million into the future, which accounts for ongoing operations and maintenance costs.

TABLE 10—MONETIZED COSTS OF THE PROPOSED RULE TO USCIS

[In undiscounted 2020 dollars]

| FY | Human resources | General (non-IT) cost | IT expenditure | Annual total |
|---|---|---|---|---|
| Time Period: FYs 2022–2031 | | | | |
| **10A. Lower Population Bound (75k Annual Cases)** | | | | |
| 2022 | $140,507,000 | $26,813,000 | $12,500,000 | $179,820,000 |
| 2023 | 133,427,000 | 26,892,000 | 4,375,000 | 164,694,000 |
| 2024 | 137,429,810 | 27,698,760 | 4,375,000 | 169,503,570 |
| 2025 | 141,552,704 | 28,529,723 | 4,375,000 | 174,457,427 |
| 2026 | 142,968,231 | 29,385,614 | 4,375,000 | 176,728,846 |
| 2027 | 147,257,278 | 30,267,183 | 4,375,000 | 181,899,461 |
| 2028 | 148,729,851 | 31,175,198 | 4,375,000 | 184,280,049 |
| 2029 | 153,191,747 | 32,110,454 | 4,375,000 | 189,677,201 |
| 2030 | 154,723,664 | 33,073,768 | 4,375,000 | 192,172,432 |
| 2031 | 159,365,374 | 34,065,981 | 4,375,000 | 197,806,355 |
| 10-year total | 1,459,152,660 | 300,011,682 | 51,875,000 | 1,811,039,342 |
| **10B. Primary Population Bound (150k Annual Cases)** | | | | |
| 2022 | 355,175,000 | 70,525,000 | 12,500,000 | 438,200,000 |
| 2023 | 337,047,000 | 72,179,000 | 4,375,000 | 413,601,000 |
| 2024 | 347,832,504 | 74,344,370 | 4,375,000 | 426,551,874 |
| 2025 | 358,963,144 | 76,574,701 | 4,375,000 | 439,912,845 |
| 2026 | 362,552,776 | 78,871,942 | 4,375,000 | 445,799,718 |
| 2027 | 374,154,464 | 81,238,100 | 4,375,000 | 459,767,565 |
| 2028 | 377,896,009 | 83,675,243 | 4,375,000 | 465,946,252 |
| 2029 | 389,988,681 | 86,185,501 | 4,375,000 | 480,549,182 |
| 2030 | 393,888,568 | 88,771,066 | 4,375,000 | 487,034,634 |
| 2031 | 406,493,002 | 91,434,198 | 4,375,000 | 502,302,200 |
| 10-year total | 3,703,991,149 | 803,799,121 | 51,875,000 | 4,559,665,270 |
| **10C. High Population Bound (300k Annual Cases)** | | | | |
| 2022 | 806,697,000 | 133,182,000 | 12,500,000 | 952,379,000 |
| 2023 | 766,159,000 | 136,874,000 | 4,375,000 | 907,408,000 |
| 2024 | 793,740,724 | 140,980,220 | 4,375,000 | 939,095,944 |
| 2025 | 822,315,390 | 145,209,627 | 4,375,000 | 971,900,017 |
| 2026 | 830,538,544 | 149,565,915 | 4,375,000 | 984,479,459 |
| 2027 | 860,437,932 | 154,052,893 | 4,375,000 | 1,018,865,824 |
| 2028 | 869,042,311 | 158,674,480 | 4,375,000 | 1,032,091,791 |
| 2029 | 900,327,834 | 163,434,714 | 4,375,000 | 1,068,137,548 |
| 2030 | 909,331,112 | 168,337,755 | 4,375,000 | 1,082,043,868 |
| 2031 | 942,067,032 | 173,387,888 | 4,375,000 | 1,119,829,921 |
| 10-year total | 8,500,656,879 | 1,523,699,492 | 51,875,000 | 10,076,231,371 |

The totals reported in Table 10 are collated in Table 11, with the 10-year discounted present values, each at a 3

percent and 7 percent discount rate. It is noted that since the cost inputs differ yearly, the average annualized

equivalence costs are not uniform across discount rates.

TABLE 11—MONETIZED COSTS OF THE PROPOSED RULE

[In millions, 2020 dollars]

| Population Level | Undiscounted | 3-Percent | | 7-Percent | |
|---|---|---|---|---|---|
| | 10-Year cost | 10-Year cost | Annualized cost | 10-Year cost | Annualized cost |
| Low ............................................................ | $1,811.0 | $1,538.8 | $180.4 | $1,260.8 | $179.5 |
| Primary ...................................................... | 4,559.7 | 3,871.3 | 453.8 | 3,168.9 | 451.2 |
| High ........................................................... | 10,076.2 | 8,550.3 | 1,002.4 | 6,993.7 | 995.8 |

As discussed in Section G of this preamble, and alluded to above, DHS expects this proposed rule to be implemented in phases. Our quantitative cost estimates are based on the assumption that the funding for the proposed rule is essentially available when the proposed rule takes effect, and that implementation costs are spread out over several years due to timing effects related to operational and hiring impacts. In reality, the effect of budgeting constraints and variations is expected to play a prominent role in the phasing in of the program. Our estimates thus account partially but not fully for such phasing. Incorporating additional phasing into resource allocation models is complex because of the interaction between initial and recurring costs, and DHS is not prepared at this time to attempt to fully phase in the costs quantitatively. Despite this limitation, we do not believe that the true costs would be significantly different than those presented above. A phased implementation would not skew the actual costs, but rather allocate them to different timing sequences. In fact, from a discounting perspective the present value of the costs would actually be lower if they were allocated to future years. DHS will continue to evaluate all pertinent data and information related to the phasing approach, and if tractable, may include refined estimates of the resource-related costs in the final rule.

DHS welcomes public comment on the phasing of costs and provides some additional, preliminary information here to supplement the cost data presented above. As of the final drafting of this proposed rule, DHS believes that through FY 2022 new staff positions can be funded with existing resources, which would support a minimum processing level of 50,000 annual family-unit cases. For the medium and high-volume bands of 150,000 and 300,000 annual cases, respectfully, DHS does not believe it can meet the full staffing requirements with current funding. Based on preliminary modelling, it could take up to three years to fully staff the medium-volume

band and up to five years to staff the high-volume band.

If the medium- and high-volume bands of 150,000 and 300,000 were to be funded through a future fee rule, it would increase fees by an estimated weighted average of 13 percent and 26 percent respectively. This estimated increase would be attributable to the implementation of the asylum officer portions of the proposed rule only, and it is provided to show the magnitude of the impact that implementation of this proposed rule would have in addition to other increases in a future fee rule. The 13 percent or 26 percent estimated weighted average increase would be in addition to any changes in the IEFA non-premium budget.

b. Intra-Federal Government Sector Impacts

This proposed rule is expected to shift the initial case processing of some asylum and protection claims from EOIR to USCIS. We present this shift in case processing as new resource costs to USCIS since new staff would be employed, new IT expenditures acquired, etc. There will be new resource costs to the economy. The IJs at EOIR will continue to remain at DOJ and work on other priority matters not related to the high volume of asylum and protection claims processed through expedited removal. Some IJs are expected to continue to work on these claims through the do novo review process for appeals from the denial of asylum claims. Cases in which USCIS grants all relief under the proposed rule, however, would not receive further administrative review. Accordingly, every case granted relief or protection by USCIS would constitute a direct reduction in new cases that EOIR would have to adjudicate. Given EOIR's significant pending caseload of approximately 1.3 million cases, reducing the number of cases referred to EOIR by 11,250 to 45,000 will enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. A reduction in the pending case load may reduce the overall time required for adjudications

since dockets would not have to be set as far into the future. This in turn will better enable EOIR to meet its mission of fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws, including granting relief or protection to noncitizens who qualify.

iii. Familiarization Costs, Benefits, and Transfers of Possible Early Labor Market Entry

It is likely that there will be familiarization costs associated with this proposed rule. It is expected that applicants and their support network will incur costs to read and develop an understanding of this proposed rule and the associated changes in process. If, for example, attorneys are utilized, the cost could be $101.07 [102] per hour, which is the average hourly wage for lawyers including the full cost of benefits.

The proposed rule offers other benefits to asylum applicants and the Government. Although we cannot parse out the transfer and costs portions explicitly, we believe that most of the distributional effects will comprise transfers that are beneficial to the asylum seekers (which we calculated on a per-person, workday basis), as opposed to costs. These transfers may impact the support network of the applicants. This network could include public and private entities, and it may comprise family and personal friends, legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and non-governmental organizations. To the extent that some applicants may be able to earn income earlier, burdens to this support network may be lessened. However, as described above, it will take time for USCIS to make the requisite resourcing and staffing changes needed to fully effectuate the changes under which the impacts could

[102] The average wage for lawyers is provided by the Department of Labor. *See* U.S. Dep't of Labor BLS, May 2021 National Occupational Employment and Wage Estimates, *https://www.bls.gov/oes/2020/may/oes_nat.htm#00-0000* (last visited May 13, 2021). Calculation: Average hourly wage for lawyers $69.70 × benefits burden of 1.45 = $101.07 (rounded).

be realized. In other words, there is likely to be a time horizon ranging from several months to more than a year for a sizeable portion of the impacts to begin to be realized. As a result, resources and efforts related to the applicants' support network can be expected to be maintained in the short to medium term.

In addition to the likely pecuniary benefits associated with early labor force entry, there could be other benefits as well. As a result of this proposed rule, DHS will begin to consider parole on a case-by-case basis for noncitizens who have been referred to USCIS for a credible fear screening under an expanded set of factors. Allowing for parole to be considered for more individuals in government custody could also provide resource redistribution to DHS in terms of shifting resources otherwise dedicated to the transportation and detention of these individuals and families. This will allow DHS to prioritize the use of its limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety, while facilitating the expanded use of the expedited removal process to order the removal of those who make no fear claim or who express a fear but subsequently fail to meet the credible fear screening standard after interview by an asylum officer (or, if applicable, by an IJ). However, DHS does not know how many future referrals for a credible fear screening will be eligible for parole; therefore, DHS cannot make an informed monetized estimate of the potential impact.

This proposed rule presents substantial costs for USCIS, especially as costs are expended to upgrade IT systems and begin hiring and training new staff. However, there are several expected qualitative benefits associated with the increased efficiency that would enable some asylum-seeking individuals claiming credible fear to move through the asylum process more expeditiously than through the current process. Under current timelines, it takes anywhere from eight months to five years for individuals claiming credible fear to reach a final asylum determination, whereas this proposed rule is expected to take 90 days in most cases for the initial determination, assuming no further review is sought. Greater efficiencies in the adjudicative process could lead to individuals spending less time in detention, which is a benefit to both the individuals and the Federal Government. Another benefit is that EOIR will not see the cases in which USCIS grants asylum, which we estimate as at least a 15 percent

reduction in their overall credible fear workload.[103] DHS anticipates this will help to mitigate the number of cases pending in immigration court. Additionally, this benefit will extend to individuals granted or denied asylum faster than if they were to go through the current process with EOIR. For those credible fear cases that receive a positive screen but a denial of their asylum claim, USCIS recognizes that only certain cases seeking further review will reach EOIR. Therefore, the benefit to EOIR through this process could be greater than we are able to currently quantify.

Given EOIR's significant pending caseload, the reduction of credible fear cases it would process would enable EOIR to focus its resources on addressing existing pending cases and reducing the growth of the overall pending caseload. It would also allow EOIR to shift some resources to other work. We cannot currently make a one-to-one comparison between the work-time actually spent on a credible fear case between EOIR judges and USCIS asylum officers, but if there is a reduction in average work-times spent on cases, there could be cost savings to EOIR, though it is emphasized that these cost-savings would not be budgetary. The Departments welcome public comment on this topic and will integrate additional information into the final rule, as appropriate.

Further, this proposed rule may stop adding to the existing volumes for Form I–765 for pending asylum applicants. As explained above, if some individuals are granted asylum earlier than they would under current conditions, some applicants in this process may choose not to file for an EAD. This could result in cost savings to applicants, as discussed, and it would also reduce USCIS's adjudication burden.

Assuming DHS places those noncitizens into expedited removal proceedings, the Departments assess that it will be more likely that they would receive a more prompt adjudication of their claims for asylum, withholding of removal, or CAT protection than they would under the existing regulations. Depending on the individual circumstances of each case, this proposed rule could mean that such noncitizens would likely not remain in

the United States—for years, potentially—pending resolution of their claims, and those who qualify for asylum will be granted asylum several years earlier than they are under the present process.

Overall, the anticipated operational efficiencies from this proposed rule may provide for a more prompt grant of protection to qualifying noncitizens and ensure that those who do not qualify for relief or protection are removed more efficiently than they are under current rules. Considering both quantifiable and unquantifiable benefits and costs, the Departments believe that the aggregate benefits of the rule would amply justify the aggregate costs.

*I. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (''RFA''), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

The proposed rule does not directly regulate small entities and is not expected to have a direct effect on small entities. Rather, this proposed rule regulates individuals, and individuals are not defined as ''small entities'' by the RFA.[104] While some employers could experience costs or transfer effects, these impacts would be indirect. Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities. DHS nonetheless welcomes comments regarding potential impacts on small entities, which DHS may consider as appropriate in a final rule.

*J. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (''UMRA'') is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal

---

[103] Based on the five-year (FY 2016 through FY 2020) average, an estimated 15 percent of EOIR asylum claims were granted asylum in cases originating with a credible fear claim. *See EOIR Adjudications Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim* (Apr. 19, 2021), *https://www.justice.gov/eoir/page/file/1062976/download* (last visited Aug. 4, 2021).

[104] *See* Public Law 104–121, tit. II, 110 Stat. 847 (5 U.S.C. 601 note). A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act. *See* 15 U.S.C. 632(a)(1).

agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.

While this proposed rule is expected to exceed the $100 million expenditure in any 1 year when adjusted for inflation ($169.8 million in 2020 dollars based on the Consumer Price Index for All Urban Consumers ("CPI–U")),[105] the Departments do not believe this proposed rule would impose any unfunded Federal mandates on State, local, and Tribal governments, in the aggregate, or on the private sector. The impacts are likely to apply to individuals, potentially in the form of beneficial distributional effects and cost savings. There could be tax impacts related to the distributional effects. However, these do not constitute mandates. Further, the real resource costs quantified in this analysis apply to the Federal Government and also are not mandates. Therefore, the Departments have not prepared a written statement.

### K. Congressional Review Act

The Administrator of the Office of Information and Regulatory Affairs has determined that this proposed rule is a "major rule" within the meaning of Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act), 5 U.S.C. 804(2). Accordingly, it is expected that this rule, if enacted as a final rule, would be effective 60 days after the final rule's publication.

### L. Executive Order 13132 (Federalism)

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or

---

on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### M. Executive Order 12988 (Civil Justice Reform)

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### N. Family Assessment

The Departments have assessed this proposed action in accordance with section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. With respect to the criteria specified in section 654(c), the Departments determined that the proposed rule would not have any adverse impacts on family safety or stability. The proposed rule would allow families seeking asylum the possibility of parole from custody, thereby helping preserve family unity and safety given the COVID–19 pandemic. Additionally, this proposed rule would result in greater efficiencies in the expedited removal and asylum processes, providing speedier resolution of meritorious cases, and reducing the overall asylum system backlogs.

### O. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This proposed rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### P. National Environmental Policy Act

The Departments analyze actions to determine whether the National Environmental Policy Act, Public Law 91–190, 42 U.S.C. 4321 through 4347 ("NEPA"), applies to them and, if so, what degree of analysis is required. *See* DHS, *Implementing the National Environmental Policy Act* (Directive 023–01, issued Oct. 31, 2014, and Instruction Manual, issued Nov. 6, 2014), *https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex*. Both the DHS Directive 023–01

---

and the Instruction Manual establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii). The DHS categorical exclusions are listed in Appendix A of the Instruction Manual. For an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[106]

As discussed in more detail throughout this proposed rule, the Departments are proposing to modify the expedited removal process, specifically for those who are found to have a positive credible fear. The proposed rule could result in an increase in the number of noncitizens in expedited removal paroled out of custody, thereby possibly allowing for efficient processing or prioritizing use of DHS's limited detention bed space to detain those noncitizens who pose the greatest threats to national security and public safety.

Generally, the Departments believe NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative. This proposed rule would not alter any eligibility criteria, but rather would change certain procedures, specifically, which Federal agency adjudicates certain asylum claims. The proposed rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence and to attempt to calculate how many noncitizens would be paroled—a highly discretionary benefit—and how many would proceed to the detention centers would be near impossible to determine. The Departments have no reason to believe that these amendments would change

---

[105] *See* BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf* (last visited May 5, 2021).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2020 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383)/152.383] * 100 = (106.428/152.383) *100 = 0.6984 * 100 = 69.84 percent = 69.84 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

---

[106] Instruction Manual section V.B(2)(a)–(c).

the environmental effect, if any, of the existing regulations.

Therefore, the Departments have determined that, even if NEPA applied to this action, this proposed rule clearly fits within categorical exclusion A3(d) in the Instruction Manual, which provides an exclusion for ''promulgation of rules . . . that amend an existing regulation without changing its environmental effect.'' Furthermore, the Departments have determined that this proposed rule clearly fits within the categorical exclusion A3(a) in the Instruction Manual because the proposed rule is of a strictly administrative or procedural nature. This proposed rule is not a part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this proposed rule is categorically excluded and no further NEPA analysis is required.

*Q. Paperwork Reduction Act*

USCIS Form I–765

Under the Paperwork Reduction Act (''PRA''), Public Law 104–13, 109 Stat. 163 (1995), all agencies are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule.

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0040 in the body of the letter and the agency name. To avoid duplicate submissions, please use only *one* of the methods under the **ADDRESSES** and I. Public Participation section of this rule to submit comments. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of IT (*e.g.,* permitting electronic submission of responses).

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization. USCIS is proposing to revise the form instructions to correspond with revisions related to information about the asylum application and USCIS grants of withholding of removal.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–765 paper filing is 2,179,494, and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the information collection I–765 online filing is 106,506, and the estimated hour burden per response is 4 hours; the estimated total number of respondents for the information collection I–765WS is 302,000, and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection biometrics submission is 302,535, and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection passport photos is 2,286,000, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual

hour burden associated with this collection of information is 11,881,713 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

## List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## Regulatory Amendments

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security proposes to amend 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.2 by:
■ a. Revising paragraphs (a) and (b);
■ b. Removing the word ''or'' at the end of paragraph (c)(1)(vii);
■ c. Removing the period at the end of paragraph (c)(1)(viii) and adding ''; or'' in its place;
■ d. Removing and reserving paragraph (c)(1)(ix);
■ e. Adding paragraph (c)(1)(x); and

■ f. In paragraph (c)(3)(i):
■ i. Adding the words "and in 8 CFR 1003.48" after the words "Except as provided in this section"; and
■ ii. Removing "paragraph (c)(1) or (c)(2)" and adding "paragraph (c)(1) or (2)" in its place.

The revisions and addition read as follows:

### § 208.2   Jurisdiction.

(a) *Jurisdiction of U.S. Citizenship and Immigration Services (USCIS).* (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Hearings provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway, found to have a credible fear of persecution or torture in accordance with § 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to 8 CFR 1003.42 and 1208.30 after the immigration judge has vacated a negative credible fear determination. Hearings to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for under § 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

(b) *Jurisdiction of Immigration Court in general.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by aliens who have been served a Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review credible fear determinations referred to the Immigration Court under § 208.30, reasonable fear determinations referred to the Immigration Court under § 208.31, and asylum officers' denials of applications, under § 208.14(c)(5), referred to the Immigration Court for review under 8 CFR 1003.48.

(c) * * *
(1) * * *
(x) An alien referred for proceedings under 8 CFR 1003.48 on or after [effective date of final rule].

*       *       *       *       *

■ 3. Amend § 208.3 by revising paragraphs (a) and (c)(3) to read as follows:

### § 208.3   Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) For asylum applicants, other than stowaways, who are awaiting further consideration of an asylum application pursuant to section 235(b)(1)(B)(ii) of the Act following a positive credible fear determination, the written record of a positive credible fear finding issued in accordance with § 208.30(f) or 8 CFR 1003.42 or 1208.30 satisfies the application filing requirements in paragraph (a)(1) of this section and § 208.4(b) for purposes of consideration by USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of §§ 208.4(a), 208.7, and 208.9(a); shall not be subject to the requirements of 8 CFR 103.2; and shall be subject to the conditions and consequences in paragraph (c) of this section upon signature at the asylum hearing. The date that the positive credible fear determination is served on the alien shall be considered the date of filing and receipt. Application information collected electronically will be preserved in its native format. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to § 208.30(c), or also presently have an application for asylum pending adjudication with USCIS pursuant to § 208.2(a)(1)(ii). The asylum applicant may subsequently amend, correct, or supplement the information collected during the expedited removal process, including the process that concluded with a positive credible fear determination, provided the information is submitted directly to the asylum office no later than 7 calendar days prior to the scheduled asylum hearing, or for documents submitted by mail, postmarked no later than 10 days prior to the scheduled asylum hearing. As a matter of discretion, the asylum officer may consider amendments or supplements submitted after the 7- or 10-day (depending on the method of submission) deadline or may grant the applicant a brief extension of time during which the applicant may submit additional evidence. The biometrics captured during expedited removal for the principal applicant and any dependents may be used to verify identity and for criminal and other background checks for purposes of an asylum application under the jurisdiction of USCIS pursuant to § 208.2(a)(1) and any subsequent immigration benefit.

*       *       *       *       *

(c) * * *

(3) An asylum application under paragraph (a)(1) of this section must be properly filed in accordance with 8 CFR part 103 and the filing instructions. Receipt of a properly filed asylum application under paragraph (a) of this section will commence the period after which the applicant may file an application for employment authorization in accordance with § 208.7 and 8 CFR 274a.12 and 274a.13.

*       *       *       *       *

■ 4. Amend § 208.4 by revising paragraph (c) to read as follows:

### § 208.4   Filing the application.

*       *       *       *       *

(c) *Amending an application after filing.* Upon the request of the alien, and as a matter of discretion, the asylum officer or immigration judge with jurisdiction may permit an asylum applicant to amend or supplement the application filed under § 208.3(a)(1). Any delay in adjudication or in proceedings caused by a request to amend or supplement the application will be treated as a delay caused by the applicant for purposes of § 208.7 and 8 CFR 274a.12(c)(8).

■ 5. Amend § 208.9 by revising and republishing the section heading and paragraphs (a) through (g) to read as follows:

## §208.9  Procedure for interview or hearing before an asylum officer.

(a) *Claims adjudicated.* USCIS shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of § 208.3(a)(2) or (c)(3), when applicable, and is within the jurisdiction of USCIS pursuant to § 208.2(a).

(b) *Conduct and purpose of interview or hearing.* The asylum officer shall conduct the interview or hearing in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview or hearing shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview or hearing, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) *Authority of asylum officer.* The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present evidence, receive evidence, and question the applicant and any witnesses.

(d) *Completion of the interview or hearing.* Upon completion of the interview or hearing before an asylum officer:

(1) The applicant or the applicant's representative will have an opportunity to make a statement or comment on the evidence presented. The representative will also have the opportunity to ask follow-up questions.

(2) USCIS will inform the applicant that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision will be treated as delay caused by the applicant for purposes of § 208.7.

(e) *Extensions.* The asylum officer will consider evidence submitted by the applicant together with his or her asylum application. For applications being considered under § 208.2(a)(1)(i), the applicant must submit any documentary evidence at least 14 calendar days in advance of the interview date. As a matter of discretion, the asylum officer may consider evidence submitted within the 14-day period prior to the interview date or may grant the applicant a brief extension of time during which the applicant may submit additional evidence. Any such extension will be treated as a delay caused by the applicant for purposes of § 208.7.

(f) *Record.* (1) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by DHS, and any other information considered by the asylum officer in the written decision shall comprise the record.

(2) For hearings on asylum applications within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the record shall also include a verbatim audio or video recording of the hearing, except for statements made off the record with the permission of the asylum officer. A transcript of the interview will be included in the referral package to the immigration judge as described in § 208.14(c)(5).

(g) *Interpreters.* (1) Except as provided in paragraph (g)(2) of this section, an applicant unable to proceed with the interview in English must provide, at no expense to USCIS, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of § 208.10.

(2) Notwithstanding paragraph (h) of this section, for asylum applications retained by USCIS for further consideration pursuant to § 208.30*(f)* or 8 CFR 1003.42 or 1208.30, if the applicant is unable to proceed effectively in English, the asylum officer shall arrange for the assistance of an interpreter in conducting the hearing. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter.

\*    \*    \*    \*    \*

■ 6. Revise § 208.10 to read as follows:

## §208.10  Failure to appear for an interview or hearing before an asylum officer or for a biometrics services appointment for the asylum application.

(a) *Failure to appear for an asylum interview or hearing, or for a biometrics services appointment.* (1) The failure to appear for an asylum interview or hearing, or for a biometrics services appointment, may result in one or more of the following actions:

(i) Waiver of the right to an interview or adjudication by an asylum officer;

(ii) Dismissal of the application for asylum;

(iii) Referral of the applicant to the Immigration Court;

(iv) Denial of employment authorization; or

(v) For individuals whose case is retained by USCIS for consideration of their application for asylum after a positive credible fear determination pursuant to § 208.30(f) or 8 CFR 1003.42 or 1208.30, issuance of an order of removal based on the inadmissibility determination of the immigration officer under section 235(b)(1)(A)(i) of the Act.

(2) There is no requirement for USCIS to send a notice to an applicant that he or she failed to appear for his or her asylum interview or hearing, or for a biometrics services appointment prior to issuing a decision on the application. Any rescheduling request for the asylum interview or hearing that has not yet been fulfilled on the date the application for employment authorization is filed under 8 CFR 274a.12(c)(8) will be treated as an applicant-caused delay for purposes of § 208.7.

(b) *Rescheduling missed appointments.* USCIS, in its sole discretion, may excuse the failure to appear for an asylum interview or hearing, or biometrics services appointment and reschedule the missed appointment as follows:

(1) *Asylum interview or hearing.* If the applicant demonstrates that he or she was unable to make the appointment due to exceptional circumstances.

(2) *Biometrics services appointment.* USCIS may reschedule the biometrics services appointment as provided in 8 CFR part 103.

■ 7. Amend § 208.14 by:

■ a. Removing ''RAIO'' and adding in its place ''USCIS'' in paragraph (b);

■ b. Revising paragraphs (c) introductory text and (c)(1); and

■ c. Adding paragraph (c)(5).

The revisions and addition read as follows:

## §208.14  Approval, denial, referral, or dismissal of application.

\*    \*    \*    \*    \*

AR01957

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer does not grant asylum to an applicant after an interview or hearing conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived his or her right to an interview, a hearing, or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application as follows:

(1) *Inadmissible or deportable aliens.* Except as provided in paragraph (c)(4) or (5) of this section, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

*       *       *       *       *

(5) *Alien referred for consideration of asylum application in a hearing before an asylum officer after positive credible fear finding.* In the case of an application within the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer shall deny the application for asylum. The applicant will be provided a written notice of the decision. The decision will also include an order of removal based on the immigration officer's inadmissibility determination under section 235(b)(1)(A)(i) of the Act and a decision on any request for withholding of removal under § 208.16(d) and deferral of removal under § 208.17, where applicable. The notice shall explain that the alien may seek to have an immigration judge review the decision, in accordance with 8 CFR 1003.48. The alien shall have 30 days to affirmatively request such review as directed on the decision notice. The failure to timely request further review will be processed as the alien's decision not to request review.

(i) If the alien requests that immigration judge review, USCIS will serve the alien with a notice of referral to an immigration judge for review of the asylum application. USCIS shall provide the record of the proceedings before the asylum officer, as outlined in § 208.9(f), to the immigration judge and the alien, along with the written notice of decision, including the order of removal issued by the asylum officer, and the alien's request for review.

(ii) If the alien does not request a review by an immigration judge, the decision and order of removal will be final and the alien shall be subject to removal from the United States.

(iii) Once USCIS has commenced proceedings under 8 CFR 1003.48 by filing the notice of referral, the immigration judge has sole jurisdiction to review the application and an asylum officer may not reopen or reconsider the application once it has been referred to the immigration judge.

*       *       *       *       *

8. Amend § 208.16 by revising paragraphs (a) and (c)(4) to read as follows:

### § 208.16   Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is determined to be an applicant for admission under section 235(b)(1) of the Act, is found to have a credible fear of persecution or torture, and whose case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii) to consider the application for asylum, and that application for asylum is denied.

*       *       *       *       *

(c) *       *       *

(4) In considering an application for withholding of removal under the Convention Against Torture, the asylum officer shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the asylum officer determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section, the alien's removal shall be deferred under § 208.17(a).

*       *       *       *       *

■ 9. Amend § 208.17 by revising paragraph (b), (d), and (e) to read as follows:

### § 208.17   Deferral of removal under the Convention Against Torture.

*       *       *       *       *

(b) *Notice to alien.* (1) After an asylum officer orders an alien described in paragraph (a) of this section removed, the asylum officer shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section or under 8 CFR 1208.17. The asylum officer shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of DHS if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination pursuant to this section or 8 CFR 1208.17 if the asylum officer determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The asylum officer shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

*       *       *       *       *

(d) *Termination of deferral of removal.* (1) At any time while deferral of removal is in effect, the Asylum Office with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may schedule a hearing to consider whether deferral of removal should be terminated.

(2) The Asylum Office shall provide notice to the alien of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail).

(3) The asylum officer shall conduct a hearing and make a de novo determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been

deferred. This determination shall be made under the standards for eligibility set out in § 208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the asylum officer determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the asylum officer determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the asylum officer's decision shall lie to the immigration judge under the process provided for at § 208.14(c)(5) and 8 CFR 1003.48.

(e) *Termination at the request of the alien.* (1) At any time while deferral of removal is in effect, the alien may make a written request to the Asylum Office with jurisdiction over the initial determination to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the asylum officer shall terminate the order of deferral and the alien may be removed.

(2) If necessary, the Asylum Office may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the asylum officer determines that the alien's request is knowing and voluntary, the order of deferral shall be terminated. If the asylum officer determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

\* \* \* \* \*

■ 10. Amend § 208.18 by revising paragraph (b)(1) to read as follows:

### § 208.18   Implementation of the Convention Against Torture.

\* \* \* \* \*

(b) \* \* \*

(1) *Aliens in proceedings on or after March 22, 1999.* (i) An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999, may apply for withholding of removal under 8 CFR 1208.16(c), and, if applicable, may be considered for deferral of removal under 8 CFR 1208.17(a).

(ii) In addition, an alien may apply for withholding of removal under § 208.16(c), and, if applicable, may be considered for deferral of removal under

§ 208.17(a), in the following situation: the alien is determined to be an applicant for admission under section 235(b)(1) of the Act, the alien is found to have a credible fear of persecution or torture and the alien's case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii) for consideration of the application for asylum, and that application is denied.

\* \* \* \* \*

■ 11. Revise § 208.19 to read as follows:

### § 208.19   Decisions.

The decision of an asylum officer issued in accordance with § 208.14(b) or (c) shall be communicated in writing to the applicant in-person, by mail, or electronically. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision unless, in the discretion of the asylum office director, service by mail or electronic service is appropriate. A letter communicating denial or referral of the application shall state the basis for denial or referral and include an assessment of the applicant's credibility.

■ 12. Revise § 208.22 to read as follows:

### § 208.22   Effect on exclusion, deportation, and removal proceedings.

An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.24 or 8 CFR 1208.24. An alien who is granted withholding of removal or deportation, or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to § 208.24 or 8 CFR 1208.24, or deferral is terminated pursuant to § 208.17(d) or (e) or 8 CFR 1208.17.

■ 13. Amend § 208.30 by:

■ a. Revising the section heading and paragraphs (b), (c), and (d) introductory text;

■ b. Adding a heading for paragraph (e);

■ c. Removing the introductory text of paragraph (e); and

■ d. Revising paragraphs (e)(1) through (4), (e)(5)(i)(A), (e)(6) introductory text, (e)(6)(ii), (f), and (g).

The revisions and addition read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\* \* \* \* \*

(b) *Process and authority.* If an alien subject to section 235(a)(2) or 235(b)(1) of the Act indicates an intention to

apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by a USCIS asylum officer in accordance with this section. A USCIS asylum officer shall then screen the alien for a credible fear of persecution or torture. An asylum officer, as defined in section 235(b)(1)(E) of the Act, has the authorities described in § 208.9(c). If the asylum officer in his or her discretion determines that circumstances so warrant, the asylum officer, after supervisory concurrence, may refer the alien for proceedings under section 240 of the Act without making a credible fear determination.

(c) *Treatment of family units.* (1) A spouse or child of a principal alien who arrived in the United States concurrently with the principal alien shall be included in that alien's positive fear evaluation and determination, unless the principal alien declines such inclusion. However, any alien may have his or her evaluation and determination made separately, if he or she expresses such a desire.

(2) The asylum officer in his or her discretion may also include other accompanying family members who arrived in the United States concurrently with a principal alien in that alien's positive fear evaluation and determination for purposes of family unity.

(3) For purposes of family units in credible fear determinations, the definition of "child" means an unmarried person under 21 years of age.

(d) *Interview.* A USCIS asylum officer will conduct the credible fear interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the alien can establish a credible fear of persecution or torture. The information provided during the interview may form the basis of an asylum application pursuant to paragraph (f) of this section and § 208.3(a)(2). The asylum officer shall conduct the interview as follows:

\* \* \* \* \*

(e) *Determination.* (1) The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) An alien will be found to have a credible fear of persecution if there is a

significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. However, prior to January 1, 2030, in the case of an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, the officer may only find a credible fear of persecution if there is a significant possibility that the alien can establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit a positive credible fear finding pursuant to paragraph (f) of this section in order to receive further consideration of the application for asylum and withholding of removal.

(5)(i)(A) Except as provided in paragraphs (e)(5)(ii) through (iv) or paragraph (e)(6) or (7) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and (b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless retain or refer the alien for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

*    *    *    *    *

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the United States during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section

208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph (e)(6). The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

*    *    *    *    *

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

*    *    *    *    *

(f) *Procedures for a positive credible fear finding.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue the alien a record of the positive credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The documents may be served in-person, by mail, or electronically. USCIS will retain jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in a hearing pursuant to § 208.9 or refer for consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and 8 CFR 212.5.

(g) *Procedures for a negative credible fear finding.* (1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of

decision and issue the alien a record of the credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. The documents may be served in-person, by mail, or electronically. The asylum officer shall inquire whether the alien wishes to have an immigration judge review the negative decision, which shall include an opportunity for the alien to be heard and questioned by the immigration judge as provided for under section 235(b)(1)(B)(iii)(III) of the Act, using Form I–869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether he or she desires such review on Form I–869. A refusal by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses to either request or decline such review, the asylum officer shall serve him or her with a Form I–863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (g)(2) of this section. Once the asylum officer has served the alien with Form I–863, the immigration judge shall have sole jurisdiction to review whether the alien has established a credible fear of persecution or torture, and an asylum officer may not reconsider or reopen the determination.

(ii) If the alien is not a stowaway and does not request a review by an immigration judge, the officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2)(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1003.42 and 1208.30(g).

(ii) The record of the negative credible fear determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 14. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (Title VII of Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458, 118 Stat. 3638 and Pub. L. 112–54, 125 Stat. 550).

■ 15. Amend § 235.3 by revising paragraphs (b)(2)(iii) and (b)(4)(ii) to read as follows:

### § 235.3   Inadmissible aliens and expedited removal.

*      *      *      *      *

(b) * * *

(2) * * *

(iii) *Detention and parole of alien in expedited removal.* An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal. Parole of such alien, in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter, may be permitted only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities).

*      *      *      *      *

(4) * * *

(ii) *Detention pending credible fear interview.* Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien, in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter, may be permitted only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities). A grant of parole would be for the limited purpose of parole out of custody and cannot serve as an independent basis for employment authorization under § 274a.12(c)(11) of this chapter. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing. If the alien is detained, such consultation shall be made available in accordance with the

policies and procedures of the detention facility where the alien is detained, shall be at no expense to the Government, and shall not unreasonably delay the process.

*      *      *      *      *

■ 16. Amend § 235.6 by:
■ a. Removing and reserving paragraphs (a)(1)(iii) and (iv); and
■ b. Revising paragraph (a)(2)(i);
■ c. Removing the period at the end of paragraph (c)(2)(ii) and adding ''; or'' in its place; and
■ d. Revising paragraph (a)(2)(iii).
The revisions read as follows:

### § 235.6   Referral to immigration judge.

(a) * * *

(2) * * *

(i) If an asylum officer determines that the alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

*      *      *      *      *

(iii) If an immigration officer refers an applicant in accordance with the provisions of § 208.2(c)(1) or (2) of this chapter to an immigration judge for an asylum- or withholding-only hearing.

*      *      *      *      *

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General proposes to amend 8 CFR parts 1003, 1208, and 1235 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 17. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 18. Amend § 1003.1 by adding paragraph (b)(15) to read as follows:

### § 1003.1   Organization, jurisdiction, and powers of the Board of Immigration Appeals.

*      *      *      *      *

(b) * * *

(15) Decisions of immigration judges in proceedings pursuant to § 1003.48, including immigration judges' decisions on motions under § 1003.48(d) to vacate removal orders. Immigration judges' decisions denying applications because the applicant failed to appear cannot be appealed, but immigration judges'

decisions on motions to reopen and motions to reconsider can be appealed.

*      *      *      *      *

■ 19. Amend § 1003.12 by revising the second sentence to read as follows:

### § 1003.   12 Scope of rules.

* * * Except where specifically stated, the rules in this subpart apply to matters before immigration judges, including, but not limited to: Deportation, exclusion, removal, bond, rescission, departure control, asylum proceedings (including application review proceedings under § 1003.48), and disciplinary proceedings. * * *

■ 20. Add § 1003.48 to read as follows:

### § 1003.48   Review of applications denied after a positive credible fear determination.

(a) *Scope.* In proceedings conducted under this section, immigration judges shall have the authority, upon the request of an applicant under 8 CFR 208.14(c)(5), to review asylum officers' decisions on applications for asylum under section 208 of the Act, withholding of removal under section 241(b)(3) of the Act, and withholding or deferral of removal under the Convention Against Torture. Where an asylum officer grants one application but denies another, the immigration judge has the authority to review both the denial and the grant. An immigration judge shall not have the authority in these proceedings to consider an application for a form of relief and protection other than those listed in the first sentence of this paragraph (a), or to review an asylum officer's inadmissibility determination under section 235(b)(1)(A)(i) of the Act. However, an applicant can file a motion to vacate a removal order as specified in paragraph (d) of this section.

(b) *Commencement of proceedings.* Proceedings under this section shall commence when DHS files with the Immigration Court the documents identified in paragraphs (b)(1) through (4) of this section:

(1) A Notice of Referral to the immigration judge;

(2) A copy of the record of proceedings before the asylum officer, as outlined in 8 CFR 208.9(f);

(3) The asylum officer's written decision, including the removal order issued under 8 CFR 208.14(c)(5) by the asylum officer; and

(4) Proof that the Notice of Referral, the record of proceedings, and the written decision, including the removal order, have been served on the applicant, which may consist of service via mail.

(c) *Proceedings before the immigration judge.* After a Notice of

Referral is filed with the immigration court, the case shall be scheduled for a hearing, and a hearing notice shall be served on the parties.

(d) *Motion to vacate removal order.* The applicant may file a motion with the immigration judge to vacate the asylum officer's order of removal. For the motion to be granted, the applicant must show that he or she is prima facie eligible for a form of relief or protection under the Act that cannot be considered in proceedings under this section. If the applicant makes such a showing, the immigration judge may, in the exercise of his or her discretion, grant the motion. If the immigration judge grants the motion, DHS may, in the exercise of its discretion, place the applicant in removal proceedings, by issuing a Notice to Appear and filing it with the immigration court. An applicant may file only one such a motion, and the motion must be filed before the immigration judge issues a decision under paragraph (e) of this section. A motion to vacate to apply for voluntary departure under section 240B of the Act shall be denied.

(e) *Immigration judge review.* (1) The immigration judge shall determine, de novo, whether the applicant qualifies for the relief or protection at issue and, if applicable, whether the applicant merits relief in the exercise of discretion. In reaching a decision in proceedings under this section, the immigration judge shall review the record created before the asylum officer, as well as the asylum officer's decision. Either party may provide additional testimony and documentation, but the party must establish that the testimony or documentation is not duplicative of testimony or documentation already presented to the asylum officer, and that the testimony or documentation is necessary to ensure a sufficient factual record upon which to base a reasoned decision on the application or applications. The immigration judge shall not have the authority to remand the case to the asylum officer.

(2) If the immigration judge grants the applicant asylum under section 208 of the Act, the immigration judge shall issue orders granting the application and vacating the removal order issued by an asylum officer under 8 CFR 208.14(c)(5). If the immigration judge grants the application for withholding of removal under section 241(b)(3) of the Act, or withholding or deferral of removal under the Convention Against Torture, the immigration judge shall issue an order granting the application at issue, but shall not vacate the removal order issued by the asylum officer under 8 CFR 208.14(c)(5).

(f) *Failure to appear.* (1) If the applicant fails to appear at a hearing in proceedings conducted under this section, and DHS establishes by clear, unequivocal, and convincing evidence that written notice of the hearing was served on the applicant, the immigration judge shall deny the application or applications under review. There is no appeal from an immigration judge's decision denying an application or applications for failure to appear. However, following such a decision, the applicant may file a motion to reopen with the immigration judge. In the motion, the applicant must establish that:

(i) The failure to appear was because of exceptional circumstances (such as battery or extreme cruelty to the applicant or any child or parent of the applicant, serious illness of the applicant, or serious illness or death of the spouse, child, or parent of the applicant, but not including less compelling circumstances) beyond the control of the applicant;

(ii) The applicant did not receive notice of the hearing; or

(iii) The applicant was in Federal or State custody at the time of the hearing, and the failure to appear was through no fault of the applicant.

(2) A motion filed under paragraph (f)(1)(i) of this section must be filed within 180 days of the hearing. A motion filed under paragraph (f)(1)(ii) or (iii) of this section may be filed at any time. When a motion under this paragraph (f) is granted, the applicant's proceedings under this section are reopened. The granting of such a motion does not entitle the applicant to be placed in removal proceedings.

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 21. The authority section for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 22. Amend § 1208.2 by:
■ a. Revising paragraph (a);
■ b. Revising the last sentence of paragraph (b);
■ c. Removing the word "or" at the end of paragraph (c)(1)(vii);
■ d. Removing the period at the end of paragraph (c)(1)(viii) and adding "; or" in its place;
■ e. Removing and reserving paragraph (c)(1)(ix);
■ f. Adding paragraph (c)(1)(x); and
■ g. In paragraph (c)(3)(i):

■ i. Adding the words "and in 8 CFR 1003.48" after the words "Except as provided in this section"; and
■ ii. Removing "paragraph (c)(1) or (c)(2)" and adding "paragraph (c)(1) or (2)" in its place.

The revisions and addition read as follows:

### § 1208.2  Jurisdiction.

(a) *U.S. Citizenship and Immigration Services (USCIS).* (1) Except as provided in paragraph (b) or (c) of this section, USCIS shall have initial jurisdiction over:

(i) An asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry; and

(ii) Hearings provided in accordance with section 235(b)(1)(B)(ii) of the Act to further consider the application for asylum of an alien, other than a stowaway, found to have a credible fear of persecution or torture in accordance with 8 CFR 208.30(f) and retained by USCIS, or referred to USCIS by an immigration judge pursuant to §§ 1003.42 of this chapter and 1208.30 after the immigration judge has vacated a negative credible fear determination. Hearings to further consider applications for asylum under this paragraph (a)(1)(ii) are governed by the procedures provided for under 8 CFR 208.9. Further consideration of an asylum application filed by a stowaway who has received a positive credible fear determination will be under the jurisdiction of an immigration judge pursuant to paragraph (c) of this section.

(2) USCIS shall also have initial jurisdiction over credible fear determinations under 8 CFR 208.30 and reasonable fear determinations under 8 CFR 208.31.

(b) * * * Immigration judges shall also have the authority to review credible fear determinations referred to the Immigration Court under § 1208.30, reasonable fear determinations referred to the Immigration Court under § 1208.31, and asylum officers' decisions on applications, under 8 CFR 208.14(c)(5), referred to the Immigration Court for review under § 1003.48 of this chapter.

(c) * * *

(1) * * *

(x) An alien referred for proceedings under § 1003.48 of this chapter on or after [effective date of the final rule].

*       *       *       *       *

■ 23. Amend § 1208.3 by revising paragraphs (a) and (c)(3) to read as follows:

## § 1208.3   Form of application.

(a)(1) Except for applicants described in paragraph (a)(2) of this section, an asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(2) In proceedings under § 1003.48 of this chapter, the written record of a positive credible fear finding issued in accordance with 8 CFR 208.30(f), § 1003.42 of this chapter, or § 1208.30 shall be construed as the asylum application and satisfies the application filing requirements in paragraph (a)(1) of this section and § 1208.4(b). The written record of the positive credible fear determination shall be considered a complete asylum application for purposes of § 1208.4(a), with the date of service of the positive credible fear determination on the alien considered the date of filing and receipt, and shall be subject to the conditions and consequences provided for in paragraph (c) of this section following the applicant's signature at the asylum hearing before the USCIS asylum officer. The applicant's spouse and children may be included in the request for asylum only if they were included in the credible fear determination pursuant to 8 CFR 208.30(c). The asylum applicant may subsequently seek to amend, correct, or supplement the record of proceedings created before the asylum officer or during the credible fear review process, but must otherwise meet the requirements of § 1003.48(e) of this chapter concerning new documentation or testimony.

\*     \*     \*     \*     \*

(c) \* \* \*

(3) An asylum application under paragraph (a)(1) of this section must be properly filed in accordance with the form instructions and with §§ 1003.24, 1003.31(b), and 1103.7(a)(3) of this chapter, including payment of a fee, if any, as explained in the instructions to the application. For purposes of filing with an immigration court, an asylum application is incomplete if it does not include a response to each of the required questions contained in the form, is unsigned, is unaccompanied by the required materials specified in paragraph (a) of this section, is not completed and submitted in accordance

with the form instructions, or is unaccompanied by any required fee receipt or other proof of payment as provided in § 1208.4(d)(3). The filing of an incomplete application shall not commence the period after which the applicant may file an application for employment authorization. An application that is incomplete shall be rejected by the Immigration Court. If an applicant wishes to have his or her application for asylum considered, he or she shall correct the deficiencies in the incomplete application and refile it within 30 days of rejection. Failure to correct the deficiencies in an incomplete application or failure to timely refile the application with the deficiencies corrected, absent exceptional circumstances as defined in § 1003.10(b) of this chapter, shall result in a finding that the alien has abandoned that application and waived the opportunity to file such an application;

\*     \*     \*     \*     \*

## § 1208.4   [Amended]

■ 24. Amend § 1208.4 by adding the words '', except that an alien in a review proceeding under § 1003.48 of this chapter is not required to file the Form I–589'' after the word ''case'' in paragraph (b)(3)(iii).

## § 1208.5   [Amended]

■ 25. Amend § 1208.5(b)(2) by removing the reference ''§ 1212.5 of this chapter'' and adding ''8 CFR 212.5'' in its place.
■ 26. Amend § 1208.14 by:
■ a. Removing ''the Office of International Affairs'' and adding in its place ''USCIS'' in paragraph (b);
■ b. Revising paragraphs (c) introductory text and (c)(1); and
■ c. Adding paragraph (c)(5).
   The revisions and addition read as follows:

## § 1208.14   Approval, denial, referral, or dismissal of application.

\*     \*     \*     \*     \*

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer does not grant asylum to an applicant after an interview or hearing conducted in accordance with 8 CFR 208.9, or if, as provided in 8 CFR 208.10, the applicant is deemed to have waived his or her right to an interview, a hearing, or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) *Inadmissible or deportable aliens.* Except as provided in paragraph (c)(4) or (5) of this section, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the

asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

\*     \*     \*     \*     \*

(5) *Alien referred for consideration of asylum application in a hearing before an asylum officer after positive credible fear finding.* In the case of an application within the jurisdiction of USCIS pursuant to 8 CFR 208.2(a)(1)(ii), the asylum officer shall deny the application for asylum. The applicant will be provided a written notice of the decision. The decision will also include an order of removal based on the immigration officer's inadmissibility determination under section 235(b)(1)(A)(i) of the Act and a decision on any request for withholding of removal under 8 CFR 208.16(d) and deferral of removal under 8 CFR 208.17, where applicable. The notice shall explain that the alien may seek to have an immigration judge review the decision, in accordance with § 1003.48 of this chapter. The alien shall have 30 days to affirmatively request such review as directed on the decision notice. The failure to timely request further review will be processed as the alien's decision not to request review.

(i) If the alien requests such immigration judge review, USCIS will serve the alien with a notice of referral to an immigration judge for review of the asylum application. USCIS shall provide the record of the proceedings before the asylum officer, as outlined in 8 CFR 208.9(f), to the immigration judge and the alien, along with the written notice of decision, including the order of removal issued by the asylum officer, and the alien's request for review.

(ii) If the alien does not request a review by an immigration judge, the decision and order of removal will be final and the alien shall be subject to removal from the United States.

(iii) Once USCIS has commenced proceedings under § 1003.48 of this chapter by filing the notice of referral on the alien, the immigration judge has sole jurisdiction to review the application, and an asylum officer may not reopen or reconsider the application once it has been referred to the immigration judge.

\*     \*     \*     \*     \*

■ 27. Amend § 1208.16 by revising paragraph (a) to read as follows:

## § 1208.16   Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.

(a) *Consideration of application for withholding of removal.* An asylum

officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is determined to be an applicant for admission under section 235(b)(1) of the Act, is found to have a credible fear of persecution or torture, and whose case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at 8 CFR 208.2(a)(1)(ii) to consider the application for asylum, and that application for asylum is denied. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal, whether or not asylum is granted.

\*      \*      \*      \*      \*

■ 28. Amend § 1208.18 by revising paragraph (b)(1) to read as follows:

### § 1208.18   Implementation of the Convention Against Torture.

\*      \*      \*      \*      \*

(b) \* \* \*

(1) *Aliens in proceedings on or after March 22, 1999.* (i) An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999, may apply for withholding of removal under § 1208.16(c), and, if applicable, may be considered for deferral of removal under § 1208.17(a).

(ii) In addition, an alien may apply for withholding of removal under 8 CFR 208.16(c), and, if applicable, may be considered for deferral of removal under 8 CFR 208.17(a), in the following situation: the alien is determined to be an applicant for admission under section 235(b)(1) of the Act, the alien is found to have a credible fear of persecution or torture, and the alien's case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at 8 CFR 208.2(a)(1)(ii) to consider the application for asylum, and that application for asylum is denied.

\*      \*      \*      \*      \*

### § 1208.19   [Removed and Reserved]

■ 29. Remove and reserve § 1208.19.
■ 30. Revise § 1208.22 to read as follows:

### § 1208.22   Effect on exclusion, deportation, and removal proceedings.

An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to 8 CFR 208.24 or § 1208.24. An alien who is granted withholding of removal or deportation, or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal

is ordered withheld or deferred unless the withholding order is terminated pursuant to 8 CFR 208.24 or § 1208.24 or deferral is terminated pursuant to 8 CFR 208.17 or § 1208.17(d) or (e).

■ 31. Amend § 1208.30 by revising the section heading and paragraphs (a), (e), and (g)(2) to read as follows:

### § 1208.30   Credible fear of persecution or torture determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, DHS has exclusive jurisdiction to make the determinations described in this subpart. Except as otherwise provided in this subpart, paragraphs (b) through (g) of this section are the exclusive procedures applicable to stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act and who receive fear interviews, determinations, and reviews under section 235(b)(1)(B) of the Act. Prior to January 1, 2030, an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands is ineligible to apply for asylum and may only establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act or withholding or deferral of removal under the regulations in §§ 1208.16(c) through (f), 1208.17, and 1208.18 issued pursuant to the Convention Against Torture's implementing legislation.

\*      \*      \*      \*      \*

(e) *Determination.* For the standards and procedures for asylum officers in conducting credible fear interviews and hearings, and in making positive and negative credible fear determinations, see 8 CFR 208.30. The immigration judges will review such determinations as provided in paragraph (g) of this section and 8 CFR 1003.42 and 1003.48.

\*      \*      \*      \*      \*

(g) \* \* \*

(2) *Review by immigration judge of a negative credible fear finding.* (i) The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, or upon the applicant's refusal either to request or to decline the review after being given such opportunity, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. The immigration judge shall not have the authority to remand the case to the asylum officer.

(ii) The record of the negative credible fear determination, including copies of

the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

(iii) A credible fear hearing shall be closed to the public unless the alien states for the record or submits a written statement that the alien is waiving that requirement; in that event the hearing shall be open to the public, subject to the immigration judge's discretion as provided in 8 CFR 1003.27.

(iv) Upon review of the asylum officer's negative credible fear determination:

(A) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to DHS for removal of the alien. The immigration judge's decision is final and may not be appealed.

(B) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with § 1208.2(a)(1)(ii). Alternatively, DHS may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 1208.4(b)(3)(i).

(C) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 1208.4(b)(3)(iii). The immigration judge shall decide the application as provided in that section. Such decision may be appealed by either the stowaway or DHS to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, DHS shall terminate removal proceedings under section 235(a)(2) of the Act.

## PART 1235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 32. The authority citation for part 1235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR

241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Title VII of Pub. L. 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Public Law 115–218.

■ 33. Amend § 1235.6 by:
■ a. Revising paragraph (a)(2)(i);
■ b. Removing the period at the end of paragraph (a)(2)(ii) and adding ''; or'' in its place; and
■ c. Revising paragraph (a)(2)(iii).

The revisions read as follows:

**§ 1235.6   Referral to immigration judge.**

(a) * * *

(2) * * *

(i) If an asylum officer determines that the alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge;

*       *       *       *       *

(iii) If an immigration officer refers an applicant in accordance with the provisions of 8 CFR 208.2(b) to an immigration judge.

*       *       *       *       *

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*

Dated: August 13, 2021.

**Merrick B. Garland,**
*Attorney General.*

[FR Doc. 2021–17779 Filed 8–18–21; 8:45 am]

**BILLING CODE 9111–97–P**

**AR01965**

Federal Register

Vol. 86, No. 97

Friday, May 21, 2021

# Presidential Documents

Title 3—

The President

Memorandum of May 18, 2021

## Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable

### Memorandum for the Heads of Executive Departments and Agencies

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to increase meaningful access to our legal system and an array of Federal programs, it is hereby ordered as follows:

**Section 1**. *Policy*. This Nation was founded on the ideal of equal justice under the law. Everyone in this country should be able to vindicate their rights and avail themselves of the protections that our laws afford on equal footing. Whether we realize this ideal hinges on the extent to which everyone in the United States has meaningful access to our legal system. Legal services are crucial to the fair and effective administration of our laws and public programs, and the stability of our society.

Recognizing the importance of access to justice and the power of legal aid, the Department of Justice (DOJ) in 2010 launched an access-to-justice initiative. In 2016, DOJ formally established the Office for Access to Justice. This office worked in partnership with other DOJ components to coordinate policy initiatives on topics including criminal indigent defense, enforcement of fines and fees, language barriers in access to the courts, and civil legal aid. The DOJ and the White House Domestic Policy Council also launched the Legal Aid Interagency Roundtable (LAIR) in 2012 to work with civil legal aid partners to advance Federal programs; create and disseminate tools to provide information about civil legal aid and Federal funding opportunities; and generate research to inform policy that improves access to justice.

The LAIR's successes prompted President Obama to issue the memorandum of September 24, 2015 (Establishment of the White House Legal Aid Interagency Roundtable), which formally established LAIR as a White House initiative. Using the White House's convening power, LAIR examined innovative and evidence-based solutions for access to justice, from medical-legal partnerships to improve health outcomes and decrease health costs to better procedures in court hearings for individuals representing themselves.

But there is much more for the Federal Government to do. According to a 2017 study by the Legal Services Corporation, low-income Americans receive inadequate or no professional legal assistance with regard to over 80 percent of the civil legal problems they face in a given year. All too often, unaddressed legal issues push people into poverty. At the same time, in the criminal legal system, those who cannot afford private counsel often receive a lower-quality defense because public defender caseloads are overburdened.

The coronavirus disease 2019 (COVID–19) pandemic has further exposed and exacerbated inequities in our justice system, as courts and legal service providers have been forced to curtail in-person operations, often without the resources or technology to offer remote-access or other safe alternatives. These access limitations have compounded the effects of other harms wrought by the pandemic. These problems have touched the lives of many persons in this country, particularly low-income people and people of color.

With these immense and urgent challenges comes the opportunity to strengthen access to justice in the 21st century. Through funding, interagency collaboration, and strategic partnerships, the Federal Government can drive development of new approaches and best practices that provide meaningful access to justice today, and into the future, consistent with our foundational ideal of equal justice under the law.

**Sec. 2.** *The Department of Justice's Access-to-Justice Function.* (a) My Administration is committed to promoting equal access to justice and addressing access limitations throughout the criminal and civil legal systems. The DOJ has a critical role to play in improving the justice delivery systems that serve people who cannot afford lawyers, and I am committed to reinvigorating that work.

(b) The Attorney General shall consider expanding DOJ's planning, development, and coordination of access-to-justice policy initiatives, including in the areas of criminal indigent defense, civil legal aid, and pro bono legal services. As soon as practicable, and no later than 120 days from the date of this memorandum, the Attorney General shall—in coordination with the Director of the Office of Management and Budget—submit a report to the President describing the Department's plan to expand its access-to-justice function, including the organizational placement of this function within the Department, expected staffing and budget, and, if necessary, the timeline for notifying the Congress of any reorganization.

**Sec. 3.** *Reinvigorating the White House Legal Aid Interagency Roundtable.* My Administration is committed to ensuring that all persons in this country enjoy the protections and benefits of our legal system. Reinvigorating LAIR as a White House initiative is a key step in this direction.

Accordingly, I direct as follows:

(a) The LAIR is hereby reconvened as a White House initiative in furtherance of the vision set forth in the memorandum of September 24, 2015, by which it was established and in light of today's most pressing challenges. The September 2015 memorandum is superseded to the extent that it is inconsistent with this memorandum.

(b) The LAIR shall work across executive departments, agencies, and offices to fulfill its mission, including to:

(i) improve coordination among Federal programs, so that programs are more efficient and produce better outcomes by including, where appropriate, legal services among the range of supportive services provided;

(ii) increase the availability of meaningful access to justice for individuals and families, regardless of wealth or status;

(iii) develop policy recommendations that improve access to justice in Federal, State, local, Tribal, and international jurisdictions;

(iv) assist the United States with implementation of Goal 16 of the United Nation's 2030 Agenda for Sustainable Development to promote peaceful and inclusive societies for sustainable development, provide access to justice for all, and build effective, accountable, and inclusive institutions at all levels; and

(v) advance relevant evidence-based research, data collection, and analysis of civil legal aid and indigent defense, and promulgate best practices.

(c) The Attorney General and the Counsel to the President, or their designees, shall serve as the Co-Chairs of LAIR, which shall also include a representative or designee from each of the following executive departments, agencies, and offices:

(i) the Department of State;

(ii) the Department of the Treasury;

(iii) the Department of Defense;

(iv) the Department of Justice;

(v) the Department of the Interior;

(vi) the Department of Agriculture;

(vii) the Department of Labor;

(viii) the Department of Health and Human Services;

(ix) the Department of Housing and Urban Development;

(x) the Department of Transportation;

(xi) the Department of Education;

(xii) the Department of Veterans Affairs;

(xiii) the Department of Homeland Security;

(xiv) the Environmental Protection Agency;

(xv) the Equal Employment Opportunity Commission;

(xvi) the Corporation for National and Community Service;

(xvii) the Office of Management and Budget;

(xviii) the United States Agency for International Development;

(xix) the Administrative Conference of the United States;

(xx) the National Science Foundation;

(xxi) the United States Digital Service;

(xxii) the Domestic Policy Council;

(xxiii) the Office of the Vice President; and

(xxiv) such other executive departments, agencies, and offices as the Co-Chairs may, from time to time, invite to participate.

(d) The Co-Chairs shall invite the participation of the Bureau of Consumer Financial Protection, the Federal Communications Commission, the Federal Trade Commission, the Legal Services Corporation, and the Social Security Administration, to the extent consistent with their respective statutory authorities and legal obligations.

(e) The LAIR shall report annually to the President on its progress in fulfilling its mission. The report shall include data from participating members on the deployment of Federal resources to foster this mission. The LAIR's 2021 report shall be due no later than 120 days from the date of this memorandum.

(f) In light of the mission and function set forth in section 3(b) of this memorandum, LAIR shall focus its first annual report on the impact of the COVID–19 pandemic on access to justice in both the criminal and civil legal systems. Moreover, the first convening of LAIR shall, at a minimum, address access-to-justice challenges the pandemic has raised and work towards identifying technological and other solutions that both meet these challenges and fortify the justice system's capacity to serve the public and be inclusive of all communities.

(g) The Attorney General shall designate an Executive Director of LAIR who shall, as directed by the Co-Chairs, convene regular meetings of LAIR and supervise its work. The DOJ staff designated to support the Department's access-to-justice function under section 2 of this memorandum shall serve as the staff of LAIR.

(h) The DOJ shall, to the extent permitted by law and subject to the availability of appropriations, provide administrative services, funds, facilities, staff, equipment, and other support services as may be necessary for LAIR to carry out its mission.

(i) The LAIR shall hold meetings at least three times per year. In the course of its work, LAIR should conduct outreach to Federal, State, local, Tribal, and international officials, technical advisors, and nongovernmental organizations, among others, as necessary to carry out its mission (including public defender organizations and offices and legal aid organizations and providers).

AR01968

(j) The LAIR members are encouraged to provide support, including by detailing personnel, to LAIR. Members of LAIR shall serve without any additional compensation for their work.

**Sec. 4**. *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) Independent agencies are strongly encouraged to comply with the provisions in this memorandum.

(d) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(e) The Attorney General is authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, May 18, 2021*

[FR Doc. 2021–10973
Filed 5–20–21; 11:15 am]
Billing code 4410–19–P

AR01969

**Information About Credible Fear Interview**

You have been placed in expedited removal proceedings because the U.S. Department of Homeland Security (DHS) believes that you may not have the right to stay in the United States. You have also indicated that you intend to apply for asylum, you fear persecution or torture, or you fear returning to your country. This notice explains what will happen while the U.S. Government is considering your case, what rights you have, and what may happen to you as a result of statements you make. **PLEASE READ THIS NOTICE CAREFULLY**.

**What is a Credible Fear Interview?**

Before DHS can remove you, DHS must interview you to determine if you have a fear of persecution or torture that the U.S. Government needs to consider further. A specially trained asylum officer will interview you. The credible fear interview is not your formal asylum or withholding of removal hearing. The interview is a screening to determine if you are eligible for a hearing before an immigration judge.

You may be detained both before and after the interview if DHS determines that it is appropriate. The interview will usually occur at least 48 hours after you arrive at the detention facility.

**What Happens At Your Credible Fear Interview**

At your interview, you will have an opportunity to discuss your background and experiences in your country and any other country where you fear harm and explain to the asylum officer the reasons you are pursuing an asylum claim. The officer will take written notes. This may be your only opportunity to provide information about your claim, so it is very important that you tell the asylum officer about any harm you may have suffered in the past and any harm you fear in the future. You also may be asked about conditions in your country. **To demonstrate a credible fear of persecution or torture, you must show the officer that you have a credible fear of being persecuted because of your race, religion, nationality, membership in a particular social group or political opinion, or a credible fear of being tortured in your country.**

You may request a female or male officer, if this would make it easier for you to speak about information that is very personal or difficult to discuss. You also have the right to speak with the asylum officer separately from your family.

It is very important that you:

- **Tell the truth during your credible fear interview**. If you do not tell the truth, your statements may be used against you in this or in any future immigration case.

- **Tell the officer any reasons why you fear returning to your home country**. U.S. law has strict rules to prevent the government from telling others about what you say in your credible fear interview. For example, the U.S. Government will not disclose to your government any information that you provide, except in exceptional circumstances.

**Whom You May Consult**

While you wait for your interview, you may use this time to prepare and consult with a consultant of your choice as long as it does not unreasonably delay the interview process. The U.S. Government does not provide you with an attorney or representative, but you may choose to hire an attorney or representative, at your expense. You can have a consultant of your choice with you at your interview or participate by telephone.

If you need additional time before your interview to contact someone, inform a DHS officer about your circumstances and explain the reason you need more time. DHS will decide whether your circumstances merit providing you with additional time. You may also request to have the interview earlier if you are prepared to discuss your case immediately.

A list of representatives who may be able to speak to you for free is attached to this notice. Representatives of the United Nations High Commissioner for Refugees (UNHCR) also may be able to assist you with information regarding the credible fear process:

United Nations High Commissioner for Refugees
1800 Massachusetts Avenue N.W., Suite 500, Washington, D.C. 20036
*Telephone*: 202-296-5191     *Email*: usawa@unhcr.org     *Web site*: www.unhcr.org

You may call UNHCR toll-free by dialing #566 or 1-888-272-1913 on Monday, Wednesday, and Friday, 2 p.m. - 5 p.m. (Eastern Time).

If you want to call someone, ask a DHS officer for assistance. You may also use the telephone while you are in detention to call a representative, friend, or family member in the United States. You or the person you call must pay for the phone call, if charges apply.

Form M-444 (Rev. 5-17-19)

AR01970

**Interpreters**

If you do not speak English well or if you want to be interviewed in a language of your choosing, DHS will provide an interpreter for the interview. The interpreter has been told to keep the information you discuss confidential.  You may:

- Request another interpreter if the interpreter is not interpreting correctly or you do not feel comfortable with the interpreter.

- Request a female or male interpreter, if this would make it easier for you to speak about information that is very personal or difficult to discuss. DHS will provide them if they are available.

**After Your Credible Fear Interview**

After your interview, the asylum officer will make a determination on your case.  If the asylum officer determines that you have a credible fear of persecution or torture, you will receive a charging document for a hearing in immigration court.  At the immigration court hearing, the immigration judge will determine your removability and whether you should be granted protection or relief from removal.  You will receive information about the date and time of this hearing.  If the asylum officer determines that you do <u>not</u> have a credible fear of persecution or torture, you may ask to have an immigration judge review the asylum officer's negative determination.  If you decline this review, you may be removed from the United States.

**Immigration Judge Review of a Negative Determination**

If you request that an immigration judge review the asylum officer's negative determination, the immigration judge's review will usually happen within 24 hours and no later than 7 days from the date that the supervisory asylum officer concurs with the asylum officer's negative determination. The review will be in person, by telephone, or by video connection.  You may consult with a consultant of your choice before the review as long as it does not cause unreasonable delay.  You will receive a copy of the asylum officer's determination before the immigration judge review.  If any of the information is incorrect, tell the immigration judge.

At the review, the immigration judge will decide that:

- You do not have a credible fear of persecution or torture.  You may then be removed from the United States.
OR
- You have a credible fear of persecution or torture and you are eligible for a full hearing in immigration court where you can apply for asylum or other protection from removal.  At the full hearing in immigration court, the immigration judge will determine your removability and whether you should be granted protection or relief from removal.  If you are ordered removed, you may not be allowed to reenter the United States for 5 years or longer.

**After a Positive Credible Fear Determination by an Asylum Officer or Immigration Judge**

If you receive a charging document for proceedings in immigration court and wish to apply for asylum, you must file Form I-589 Application for Asylum and for Withholding of Removal.  The Form I-589 and instructions on where to file the Form can be found at www.uscis.gov/i-589.  Failure to file Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to INA § 208(a)(2)(B).

---

**Interpreter Certification**

I, _____ , certify that I am fluent in both the _____ and English languages, and that I have read to this applicant in every question and instruction on this form.  The applicant informed me that he or she understands every instruction on this form.


Interpreter Signature/Interpreter ID (if telephonic)          Date of Signature (mm/dd/yyyy)

---

**Applicant Acknowledgment of Receipt**

I acknowledge that I have been given notice concerning my credible fear interview.  I understand that I may consult with anyone I choose before the interview as long as it does not unreasonably delay the process and is at no expense to the U.S. Government.


Applicant Signature               Date of Signature (mm/dd/yyyy)

AR01971

Form M-444 (Rev. 5-17-19)

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

| FY | Component | Demographic |
|---|---|---|
| All | All | All |

| Citizenship Grouping | Title of Authority | |
|---|---|---|
| All | All | Reset Filters |

FY    ◻ 2018    ◻ 2019    ◻ 2020    ◻ 2021 (FYTD)



## FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 71,951 | 72,111 | 74,018 | 78,443 | 101,120 | 173,348 | 178,622 | | | | | | 749,613 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |
| 2018 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |



## FY Comparison by Demographic

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 5/4/2021.

Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/)    (https://www.instagram.com/cbpgov/)    (https://www.flickr.com/photos/cbpphotos/)

(https://twitter.com/cbp)    (https://www.linkedin.com/company/2997?trk=tyah)    (https://www.youtube.com/user/customsborderprotect)

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

U.S. Customs and
Border Protection
(/)

# Southwest Land Border Encounters

Demographics for U.S. Border Patrol (USBP) and Office of Field Operations (OFO) include:

- Accompanied Minors
- Family Unit Apprehensions (FMUA)
- Single Adults
- Unaccompanied Children (UC)

For a breakdown of encounters by USBP Sector and OFO Field Office, visit **Southwest Land Border Encounters (By Component) (/newsroom/stats/southwest-land-border-encounters-by-component)**.

*Note: Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

**AR01973**

**Source:** USBP and OFO official...

AR01974



U.S. Border Patrol and Office of Field Operations Encounters[1] FY2021

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 79 of 256   PageID 6187

APR FY21

OFO

All; **Title of Authority:** All

PERCENT CHANGE

4,135

5,162

▲24.8%

AR01976

l
Rede

[1] Beginning in March FY2020, USBP and OFO Encounter statistics include both Title 8 Apprehensions, Title 8 Inadmissibles, and Title 42 Expulsions. To learn more, visit: **Title 8 and Title 42 Statistics (/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics)**

**Last modified:** May 11, 2021

**Tags:**   **Statistics**

 Share This Page.

**AR01977**

5/23/2021　　　Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 81 of 256   PageID 6189

Official website of the Department of Homeland Security



U.S. Department of
Homeland Security

# Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border

**Release Date:** March 16, 2021

There is understandably a great deal of attention currently focused on the southwest border. I want to share the facts, the work that we in the Department of Homeland Security (DHS) and across the government are doing, and our plan of action. Our personnel remain steadfast in devotion of their talent and efforts in the service of our nation.

The situation at the southwest border is difficult. We are working around the clock to manage it and we will continue to do so. That is our job. We are making progress and we are executing on our plan. It will take time and we will not waver in our commitment to succeed.

We will also not waver in our values and our principles as a Nation. Our goal is a safe, legal, and orderly immigration system that is based on our bedrock priorities: to keep our borders secure, address the plight of children as the law requires, and enable families to be together. As noted by the President in his Executive Order, "securing our borders does not require us to ignore the humanity of those who seek to cross them." We are both a nation of laws and a nation of immigrants. That is one of our proudest traditions.

## The Facts

We are on pace to encounter more individuals on the southwest border than we have in the last 20 years. We are expelling most single adults and families. We are not expelling unaccompanied children. We are securing our border, executing the Centers for Disease

**AR01978**

Control and Prevention's (CDC) public health authority to safeguard the American public and the migrants themselves, and protecting the children.  We have more work to do.

This is not new. We have experienced migration surges before – in 2019, 2014, and before then as well. Since April 2020, the number of encounters at the southwest border has been steadily increasing. Border Patrol Agents are working around the clock to process the flow at the border and I have great respect for their tireless efforts. To understand the situation, it is important to identify who is arriving at our southwest border and how we are following the law to manage different types of border encounters.

## Single Adults

The majority of those apprehended at the southwest border are single adults who are currently being expelled under the CDC's authority to manage the public health crisis of the COVID-19 pandemic.  Pursuant to that authority under Title 42 of the United States Code, single adults from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras are swiftly expelled to Mexico.  Single adults from other countries are expelled by plane to their countries of origin if Mexico does not accept them.  There are limited exceptions to our use of the CDC's expulsion authority.  For example, we do not expel individuals with certain acute vulnerabilities.

The expulsion of single adults does not pose an operational challenge for the Border Patrol because of the speed and minimal processing burden of their expulsion.

## Families

Families apprehended at the southwest border are also currently being expelled under the CDC's Title 42 authority.  Families from Mexico and the Northern Triangle countries are expelled to Mexico unless Mexico does not have the capacity to receive the families.  Families from countries other than Mexico or the Northern Triangle are expelled by plane to their countries of origin.  Exceptions can be made when a family member has an acute vulnerability.

Mexico's limited capacity has strained our resources, including in the Rio Grande Valley area of Texas.  When Mexico's capacity is reached, we process the families and place them in immigration proceedings here in the United States.  We have partnered with community-based organizations to test the family members and quarantine them as needed under COVID-19 protocols.  In some locations, the processing of individuals who are part of a family unit has strained our border resources.  I explain below additional challenges we have encountered and the steps we have taken to solve this problem.

**AR01979**

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 83 of 256   PageID 6191

## Unaccompanied Children

We are encountering many unaccompanied children at our southwest border every day.  A child who is under the age of 18 and not accompanied by their parent or legal guardian is considered under the law to be an unaccompanied child.  We are encountering six- and seven-year-old children, for example, arriving at our border without an adult.  They are vulnerable children and we have ended the prior administration's practice of expelling them.

An unaccompanied child is brought to a Border Patrol facility and processed for transfer to the Department of Health and Human Services (HHS).  Customs and Border Protection is a pass-through and is required to transfer the child to HHS within 72 hours of apprehension.  HHS holds the child for testing and quarantine, and shelters the child until the child is placed with a sponsor here in the United States. In more than 80 percent of cases, the child has a family member in the United States. In more than 40 percent of cases, that family member is a parent or legal guardian.  These are children being reunited with their families who will care for them.

The children then go through immigration proceedings where they are able to present a claim for relief under the law.

The Border Patrol facilities have become crowded with children and the 72-hour timeframe for the transfer of children from the Border Patrol to HHS is not always met.  HHS has not had the capacity to intake the number of unaccompanied children we have been encountering.  I describe below the actions we have taken and the plans we are executing to handle this difficult situation successfully.


### Why the Challenge is Especially Difficult Now

Poverty, high levels of violence, and corruption in Mexico and the Northern Triangle countries have propelled migration to our southwest border for years.  The adverse conditions have continued to deteriorate.  Two damaging hurricanes that hit Honduras and swept through the region made the living conditions there even worse, causing more children and families to flee.

The COVID-19 pandemic has made the situation more complicated.  There are restrictions and protocols that need to be followed.  The physical distancing protocol, for example, imposes space and other limitations on our facilities and operations.

The prior administration completely dismantled the asylum system.  The system was gutted, facilities were closed, and they cruelly expelled young children into the hands of traffickers.

**AR01980**

We have had to rebuild the entire system, including the policies and procedures required to administer the asylum laws that Congress passed long ago.

The prior administration tore down the lawful pathways that had been developed for children to come to the United States in a safe, efficient, and orderly way.  It tore down, for example, the Central American Minors program that avoided the need for children to take the dangerous journey to our southwest border.

The previous administration also cut foreign aid funding to the Northern Triangle.  No longer did we resource efforts in El Salvador, Guatemala, and Honduras to tackle the root causes of people fleeing their homes.

And, there were no plans to protect our front-line personnel against the COVID-19 pandemic. There was no appropriate planning for the pandemic at all.

As difficult as the border situation is now, we are addressing it.  We have acted and we have made progress.  We have no illusions about how hard it is, and we know it will take time.  We will get it done.  We will do so adhering to the law and our fundamental values.  We have an incredibly dedicated and talented workforce.

## Actions We Have Taken

In less than two months, Customs and Border Protection stood-up an additional facility in Donna, Texas to process unaccompanied children and families.  We deployed additional personnel to provide oversight, care, and transportation assistance for unaccompanied minors pending transfer to HHS custody.

We are standing up additional facilities in Texas and Arizona to shelter unaccompanied children and families.  We are working with Mexico to increase its capacity to receive expelled families.  We partnered with community-based organizations to test and quarantine families that Mexico has not had the capacity to receive.  We have developed a framework for partnering with local mayors and public health officials to pay for 100% of the expense for testing, isolation, and quarantine for migrants.  ICE has also developed additional facilities to provide testing, local transportation, immigration document assistance, orientation, travel coordination in the interior, and mechanisms to support oversight of the migrant families who are not expelled.

Working with Mexico and international organizations, we built a system in which migrants who were forced to remain in Mexico and denied a chance to seek protection under the previous administration can now use a virtual platform – using their phones – to register.

AR01981

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 85 of 256   PageID 6193

They do not need to take the dangerous journey to the border.  The individuals are tested, processed, and transported to a port of entry safely and out of the hands of traffickers.  We succeeded in processing the individuals who were in the Matamoros camp in Mexico.  This is the roadmap going forward for a system that is safe, orderly, and fair.

To protect our own workforce, we launched Operation Vaccinate Our Workforce (VOW) in late January.   At the beginning of this administration, less than 2 percent of our frontline personnel were vaccinated.  Now more than 25 percent of our frontline personnel have been vaccinated.

We directed the Federal Emergency Management Agency (FEMA) to assist HHS in developing the capacity to meet the surge of unaccompanied children.  FEMA already established one new facility for HHS to shelter 700 children.  They have identified and are currently adding additional facilities.  We are working with HHS to more efficiently identify and screen sponsors for children.  In two days, we recruited more than 560 DHS volunteers to support HHS in our collective efforts to address the needs of the unaccompanied children.

We are restarting and expanding the Central American Minors program.  It creates a lawful pathway for children to come to the United States without having to take the dangerous journey. Under this expansion, children will be processed in their home countries and brought to the United States in a safe and orderly way.

In addition, DHS and HHS terminated a 2018 agreement that had a chilling effect on potential sponsors – typically a parent or close relative – from coming forward to care for an unaccompanied child placed in an HHS shelter. In its place, DHS and HHS signed a new Memorandum of Agreement that promotes the safe and timely transfer of children. It keeps safeguards designed to ensure children are unified with properly vetted sponsors who can safely care for them while they await immigration proceedings.

## The Path Forward

We are creating joint processing centers so that children can be placed in HHS care immediately after Border Patrol encounters them.  We are also identifying and equipping additional facilities for HHS to shelter unaccompanied children until they are placed with family or sponsors.  These are short-term solutions to address the surge of unaccompanied children.

Longer term, we are working with Mexico and international organizations to expand our new virtual platform so that unaccompanied children can access it without having to take the

**AR01982**

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 86 of 256   PageID 6194

dangerous journey to our border.  As mentioned, we are expanding the Central American Minors program to permit more children to be processed in their home countries and if eligible, brought to the United States in a safe and orderly way.

We are developing additional legal and safe pathways for children and others to reach the United States.  While we are building a formal refugee program throughout the region, we are working with Mexico, the Northern Triangle countries, and international organizations to establish processing centers in those countries so that individuals can be screened through them and brought to the United States if they qualify for relief under our humanitarian laws and other authorities.

For years, the asylum system has been badly in need of reengineering.  In addition to improving the process by which unaccompanied children are placed with family or sponsors, we will be issuing a new regulation shortly and taking other measures to implement the long-needed systemic reforms.  We will shorten from years to months the time it takes to adjudicate an asylum claim while ensuring procedural safeguards and enhancing access to counsel.

President Biden laid out a vision of a "multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values." To that end, we are working with the Departments of Health and Human Services, Justice, and State in an all-of-government effort to not only address the current situation at our southwest border, but to institute longer-term solutions to irregular migration from countries in our hemisphere that are suffering worsening conditions.  This is powerfully exemplified by the President's goal to invest $4 billion in the Northern Triangle countries to address the root causes of migration.


## Conclusion

The situation we are currently facing at the southwest border is a difficult one.  We are tackling it.  We are keeping our borders secure, enforcing our laws, and staying true to our values and principles. We can do so because of the incredible talent and unwavering dedication of our workforce.

I came to this country as an infant, brought by parents who understood the hope and promise of America.  Today, young children are arriving at our border with that same hope.  We can do this.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Secretary of Homeland Security

**AR01983**

5/23/2021      Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z    Document 162-4    Filed 09/02/22    Page 87 of 256    PageID 6195

(/topics/secretary-homeland-security)

Keywords: Family (/keywords/family) , Immigration (/keywords/immigration) , Immigration Reform (/keywords/immigration-reform) , Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas) , Southwest Border (/keywords/southwest-border) , Unaccompanied Children (UC) (/keywords/unaccompanied-children)

Last Published Date: March 16, 2021

AR01984

## as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 10,722 |
| **ELP - Total** | | **10722** |
| HLG | MPB | 7,844 |
| **HLG - Total** | | **7844** |
| SNA | MPL | 8,069 |
| **SNA - Total** | | **8069** |
| SND | CIX | 1,167 |
| | SYP | 1,167 |
| **SND - Total** | | **1167** |
| **Overall - Total** | | **27802** |

## as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 287 |
| **ELP - Total** | | **287** |
| HLG | MPB | 1,780 |
| **HLG - Total** | | **1780** |
| SNA | MPL | 1,451 |
| **SNA - Total** | | **1451** |
| SND | CIX | 1,004 |
| | SYP | 1,004 |
| **SND - Total** | | **1004** |
| **Overall - Total** | | **4522** |

**AR01986**

## as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 11,009 |
| **ELP - Total** | | **11009** |
| HLG | MPB | 9,624 |
| **HLG - Total** | | **9624** |
| SNA | MPL | 9,520 |
| **SNA - Total** | | **9520** |
| SND | CIX | 2,171 |
| | SYP | 2,171 |
| **SND - Total** | | **2171** |
| **Overall - Total** | | **32324** |

**AR01987**

## as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 374 |
| **ELP - Total** | | **374** |
| HLG | MPB | 437 |
| **HLG - Total** | | **437** |
| SNA | MPL | 506 |
| **SNA - Total** | | **506** |
| SND | CIX | 8,605 |
| | SYP | 8,605 |
| **SND - Total** | | **8605** |
| **Overall - Total** | | **9922** |

**AR01988**

 **REUTERS**    World    Business    Markets    Breakingviews    Video    More        🔍

U.S. LEGAL NEWS

APRIL 16, 2019 / 10:15 PM / UPDATED 2 YEARS AGO

# Trump attorney general's ruling expands indefinite detention for asylum seekers

By Mica Rosenberg, Kristina Cooke



NEW YORK/SAN FRANCISCO (Reuters) - The U.S. Attorney General on Tuesday struck down a decision that had allowed some asylum seekers to ask for bond in front of an immigration judge, in a ruling that expands indefinite detention for some migrants who must wait months or years for their cases to be heard.



down on the flow of migrants at the u.s. Southern borde

The͏                  Minutes to touchdown: the moment a Belarusian dissident knew his time was up                  y
General William Barr is in keeping with the administration's moves to clamp down on the

**AR01989**

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 93 of 256   PageID 6201

asylum process as tens of thousands of mostly Central Americans cross into the United States asking for refuge. U.S. immigration courts are overseen by the Justice Department and the Attorney General can rule in cases to set legal precedent.

Barr's ruling is the latest instance of the Trump administration taking a hard line on immigration. This year the administration implemented a policy to return some asylum seekers to Mexico while their cases work their way through backlogged courts, a policy which has been challenged with a lawsuit.

Several top officials at the Department of Homeland Security were forced out this month over Trump's frustrations with an influx of migrants seeking refuge at the U.S. southern border.

Barr's decision applies to migrants who crossed illegally into the United States.

Typically, those migrants are placed in "expedited removal" proceedings - a faster form of deportation reserved for people who illegally entered the country within the last two weeks and are detained within 100 miles (160 km) of a land border. Migrants who present themselves at ports of entry and ask for asylum are not eligible for bond.

But before Barr's ruling, those who had crossed the border between official entry points and asked for asylum were eligible for bond, once they had proven to asylum officers they had a credible fear of persecution.

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

**AR01990**

Slideshow（3 images）

"I conclude that such aliens remain ineligible for bond, whether they are arriving at the border or are apprehended in the United States," Barr wrote.

Barr said such people can be held in immigration detention until their cases conclude, or if the Department of Homeland Security（DHS）decides to release them by granting them "parole." DHS has the discretion to parole people who are not eligible for bond and frequently does so due to insufficient detention space or other humanitarian reasons.

Barr said he was delaying the effective date by 90 days "so that DHS may conduct the necessary operational planning for additional detention and parole decisions."

The decision's full impact is not yet clear, because it will in large part depend on DHS' ability to ex ...

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

**AR01991**

"The number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and not whether the individual circumstances of individual cases warrant release or detention," Vladeck said.

DHS officials did not immediately respond to a request for comment on the decision. The agency had written in a brief in the case arguing that eliminating bond hearings for the asylum seekers would have "an immediate and significant impact on...detention operations."

Slideshow ( 3 images )

In early March, Immigration and Customs Enforcement (ICE), the DHS agency responsible for detaining and deporting immigrants in the country illegally, said the average daily population of immigrants in detention topped 46,000 for the 2019 fiscal year, the highest level since ...

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

or released on bond, making the process more restrictive.

**AR01992**

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 96 of 256   PageID 6204

The decision will have no impact on unaccompanied migrant children, who are exempt from expedited removal. Most families are also paroled because of a lack of facilities to hold parents and children together.

Michael Tan, from the American Civil Liberties Union, said the rights group intended to sue the Trump administration over the decision, and immigrant advocates decried the decision.

Barr's decision came after former Attorney General Jeff Sessions decided to review the case in October. Sessions resigned from his position in November, leaving the case to Barr to decide.

Reporting by Mica Rosenberg in New York and Kristina Cooke in San Francisco; additional reporting by Yeganeh Torbati in Washington; Editing by Lisa Shumaker

*Our Standards:* <u>*The Thomson Reuters Trust Principles.*</u>

---

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy

Do Not Sell My Personal Information



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

AR01993



# Trump declares national emerg
# at border

BY **JORDAN FABIAN** - 02/15/19 10:50 AM EST

**4,485** SHARES

SHARE    TW

## Just In...

**Florida high school draws backlash after altering girls' yearbook photos to add clothing**
STATE WATCH — 5M 10S AGO

**Michigan governor apologizes after photo shows her violating state's health order**
STATE WATCH — 6M 53S AGO

**Harris to 2021 grads: Pandemic prepared you for 'pretty much anything'**
IN THE KNOW — 1H 13M AGO

**Senate Armed Services chair throws support behind changing roles of military commanders in sexual assault prosecutions**
DEFENSE — 2H 7M AGO

**Blinken condemns 'shocking act' of Belarus forcing plane carrying opposition journalist to land**
INTERNATIONAL — 2H 24M AGO

**Three in five say more changes needed to give Black Americans equal rights: poll**
BLOG BRIEFING ROOM — 2H 42M AGO

**Cheney dodges on link between Trump election claims and GOP voting laws**

This video file cannot be played.
(Error Code: 232011)

**President Trump** on Friday declared a national emergency to bypass Congress and spend roughly $8 billion on barriers along the southern border, a big step toward building his long-promised wall that also comes with significant political and legal risk.

Trump's move, announced in a rambling, improvised address from the Rose Garden shortly after signing the declaration, will launch a fierce constitutional battle in the courts with lawmakers and outside groups who say the president overstepped his authority.

"I am going to be signing a national emergency," Trump said after a long introduction that touched on trade, China, Syria and the caravans of immigrants that Trump made a political issue of ahead of last fall's midterm elections.

**Kayleigh McEnany 45 Archived** ✔
@PressSec45

President @realDonaldTrump signs the Declaration for a National Emergency to address the national security and humanitarian crisis at the Southern Border.

**AR01994**

HOUSE — 3H 4M AGO

**NSF funding choice:
Move forward or fall
behind**
OPINION — 3H 22M AGO

VIEW ALL

11:02 AM · Feb 15, 2019                                ⓘ

♡ 35.6K        💬 8K      ⬆ Share this Tweet

"It's a great thing to do because we have an invasion of drugs, invasion of
gangs, invasion of people," the president said in seeking to justify the
need for an emergency declaration.

Trump predicted the move will be challenged in federal court, but said he
would eventually prevail.

"I could do the wall over a long period of time. I didn't need to do this, but
I'd rather do it much faster," Trump said, a concession his critics seized
upon to argue an emergency does not exist on the southern border.

Speaker Nancy Pelosi (Calif.) and Senate Minority Leader Charles Schumer
(N.Y.), the top two Democrats in Congress, said they would use "every
available remedy" to overturn the emergency declaration.

"The president's unlawful declaration over a crisis that does not exist does
great violence to our Constitution and makes America less safe," they said
in a joint statement. "The president is not above the law. The Congress
cannot let the president shred the Constitution."

Trump is separately set to sign legislation approved by Congress that
funds the government and prevents a new shutdown set to begin on
Saturday.

But that legislation fell far short of his demands for $5.7 billion in wall
funding, with Trump saying he tried his best to work with lawmakers to
secure additional border security but "on the wall, they skimped."

Trump also claimed "I've already done a lot of wall for the election —
2020," even existing construction has repaired and replaced existing
barriers instead of building new ones.

Trump plans to redirect $3.6 billion in military construction funding
toward the border project, according to White House officials. Trump will
also take separate executive action repurposing about $2.5 billion from
the Defense Department's drug-interdiction program and $600 million
from the Treasury Department's asset-forfeiture fund.

Officials said the goal is to ultimately build roughly 234 miles of barriers
along the border, including bollard-style wall.

An administration official did not identify which military construction
projects would be affected but said funding would be taken from "lower-
priority construction projects," such as funding to fix or repair existing
structures, and not from flood-mitigation efforts or projects that would
affect military readiness. Disaster-relief funds will also not be touched.

**AR01995**

Lawmakers in both parties have criticized Trump's decision to declare an emergency, though Senate Majority Leader Mitch McConnell (R-Ky.) did offer his support.

McConnell on Friday called Trump's decision "the predictable and understandable consequence of Democrats' decision to put partisan obstruction ahead of the national interest" and called on lawmakers to approve more border funding.

But House Democrats instead plan to introduce legislation that would block the declaration, which could pass both chambers and reach the president's desk if Republicans who have criticized Trump's decision vote for it.

That would force Trump to potentially veto the first piece of legislation as president, a move that could further divide his own party in the lead-up to the 2020 elections.

Democrats and liberal advocacy groups have said they also plan to file lawsuits to stop the move in federal court.

Pelosi, speaking Thursday on the anniversary of the Parkland, Fla., school shootings, said it could lead a new president to declare a national emergency on guns. Such a scenario is exactly what some GOP lawmakers have feared.

"A Democratic president can declare emergencies, as well," Pelosi told reporters in the Capitol. "So the precedent that the president is setting here is something that should be met with great unease and dismay by the Republicans."

Sen. Marco Rubio (R-Fla.) made a similar argument, warning on Thursday that "a future president may use this exact same tactic to impose the Green New Deal."

"I will wait to see what statutory or constitutional power the president relies on to justify such a declaration before making any definitive statement. But I am skeptical it will be something I can support," he said.

In a call to reporters preceding Trump's announcement, acting White House chief of staff Mick Mulvaney pushed back against Democrats' claims Trump's move would allow a president from their party to declare an emergency over an issue like climate change and gun violence, saying it "actually creates zero precedent" and calling the claim "completely false."

"This is authority given to the president in law already," he said. "It's not as if he just didn't get what he wanted so he's waving a magic wand and taking a bunch of money."

Trump's decision to sign the spending bill ends three weeks of uncertainty over whether he would trigger another shutdown over his demand for wall money.

The president reopened closed government agencies on Jan. 25 after a 35-day shutdown that resulted in a major blow to his approval ratings and no financing for a wall.

A bipartisan group of lawmakers on Capitol Hill spent the ensuing weeks hammering out a proposal that includes $1.375 billion in wall funding, only a fraction of the $5.7 billion Trump demanded.

**AR01996**

Case 2:21-cv-00067-Z   Document 162-4   Filed 09/02/22   Page 100 of 256   PageID 6208

Trump's acceptance of the compromise marks a defeat for a president
who touted his negotiating skills during the 2016 campaign, and it showed
Democrats' increased leverage under divided government.

*The story was updated at 12:50 p.m.*

TAGS   MITCH MCCONNELL   CHARLES SCHUMER   MICK MULVANEY   NANCY PELOSI   DONALD TRUMP
MARCO RUBIO   IMMIGRATION   BORDER WALL   SHUTDOWN

SHARE              TWEET



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2021 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

AR01997

# The Washington Post

*Democracy Dies in Darkness*

# Supreme Court says Trump administration may continue 'Remain in Mexico' policy for asylum seekers

By Robert Barnes

March 11, 2020 at 4:59 p.m. EDT

 2023

The Supreme Court on Wednesday said the Trump administration may continue its "Remain in Mexico" policy for asylum seekers while lower-court challenges continue, after the federal government warned that tens of thousands of immigrants amassed at the southern border could overwhelm the immigration system.

The justices reversed a decision of a panel of the U.S. Court of Appeals for the 9th Circuit that had ordered the policy be suspended Thursday along parts of the border. As is usual in emergency rulings, the court's unsigned, one-paragraph order did not provide the majority's reasoning. Only Justice Sonia Sotomayor noted her dissent.

The Trump administration had warned the justices of a dire situation without their intervention.

"Substantial numbers of up to 25,000 returned aliens who are awaiting proceedings in Mexico will rush immediately to enter the United States," Solicitor General Noel Francisco wrote in a brief. "A surge of that magnitude would impose extraordinary burdens on the United States and damage our diplomatic relations with the government of Mexico."

The program — officially known as the Migrant Protection Protocols, or MPP — is among the tools the Trump administration has used to curb mass migration from Central America and elsewhere across the southern U.S. border.

**wp NEWSLETTER** | EVERY WEEKDAY

A 5-minute breakdown to track a new president **Sign Up** →

AR01998

massive immigration court backlog, the administration implemented MPP to stop that practice.

The American Civil Liberties Union, representing immigration groups and individuals, called it an "unprecedented policy that fundamentally changed the nation's asylum system, contrary to Congress's design and the United States' treaty obligations."

After the ruling, ACLU lawyer Judy Rabinovitz said in a statement: "The Court of Appeals unequivocally declared this policy to be illegal. The Supreme Court should as well. Asylum seekers face grave danger and irreversible harm every day this depraved policy remains in effect."

A spokeswoman for the Justice Department said the administration was "gratified" by the court's action.

"The Migrant Protection Protocols, implemented pursuant to express authority granted by Congress decades ago, have been critical to restoring the government's ability to manage the Southwest border and to work cooperatively with the Mexican government to address illegal immigration," the department's statement said.

The 9th Circuit panel last month said implementation of the policy should be halted in California and Arizona, states within the court's authority. The order would not have affected the other border states, New Mexico and Texas.

Judges William A. Fletcher and Richard A. Paez, both appointed by President Bill Clinton, agreed with a lower-court judge in California that MPP probably violated federal immigration law by ousting undocumented asylum seekers who should be allowed to apply for protection in the United States.

The judges also said the program probably violated the administration's "non-refoulement" obligations under international and domestic law, which prohibit the government from sending people to countries where they face danger. The 57-page ruling cited asylum seekers who feared kidnapping, threats and violence in Mexico.

"There is a significant likelihood that the individual plaintiffs will suffer irreparable harm if the MPP is not enjoined," Fletcher wrote in the opinion. "Uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."

Judge Ferdinand F. Fernandez, a President George H.W. Bush appointee, dissented, arguing that the panel should have adhered to a prior appeals court decision that allowed MPP to take effect.

The MPP issue could return to the Supreme Court for a decision on whether it violates federal statutes.

The court's action marks another case in which the Trump administration has asked the high court to immediately intervene after an adverse ruling from a regional appeals court.

NEWSLETTER   EVERY WEEKDAY

A 5-minute breakdown to track a new president   Sign Up →

AR01999

the high court.

"Claiming one emergency after another, the Government has recently sought stays in an unprecedented number of cases, demanding immediate attention and consuming limited court resources in each" she wrote in a solo opinion. "And with each successive application, of course, its cries of urgency ring increasingly hollow."

*Maria Sacchetti contributed to this report.*

---

NEWSLETTER | EVERY WEEKDAY

A 5-minute breakdown to track a new president   **Sign Up** →

# Exhibit C

AR02001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:21-cv-00067-Z |

## DECLARATION OF RICARDO ZÚNIGA

I, Ricardo Zúniga, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am currently the Senior Bureau Official in the Bureau of Western Hemisphere Affairs at the U.S. Department of State and have held this position since August 3, 2021. Prior to this appointment, I was appointed Special Envoy for the Northern Triangle in the Bureau of Western Hemisphere Affairs on March 22, 2021 and retained that role in addition to my new duties. In my capacity as Special Envoy, I serve as the senior Department of State official responsible for our relationship with the northern Central American Countries, particularly regarding irregular migration from those countries to the southern

1

border of the United States. In that capacity I have also engaged on the effects of irregular migration through and from Mexico. I travelled with senior White House and State Department officials to Mexico on August 10, 2021, to discuss the challenge of irregular migration with senior Mexican officials, and joined Vice President Harris during her June 6-8 visit to Central America for meetings regarding the administration's Root Causes Strategy and Collaborative Migration Management Strategy. I am a Senior Foreign Service officer with the rank of Minister Counselor with 28 years of experience most of that related to the U.S. relationship with Latin America. I have served in multiple assignments in Washington and throughout the Western Hemisphere. As the Senior Bureau Official in the Bureau of Western Hemisphere Affairs, I oversee the Department's work on Western Hemisphere Affairs, including bilateral engagement with the Government of Mexico. I engage regularly with interlocutors throughout the Department and interagency to advance the U.S. government's regional migration policy.

2. I am familiar with the lawsuit that the States of Texas and Missouri filed in the United States District Court in the Northern District of Texas seeking to enjoin the U.S. government from enforcing or implementing the discontinuance of the Migrant Protection Protocols (MPP) either through the Acting Secretary of Homeland Security's January 20, 2021 Memorandum suspending enrollment in the MPP, or the Secretary of Homeland Security's June 1, 2021 Memorandum formally terminating MPP, and the District Court decision granting the injunction. If this injunction remains in place, it could have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala and Honduras (the "northern Central American countries") and Mexico.

2

3. Addressing regional irregular migration and its root causes is a top U.S. foreign policy priority. To sustainably reduce irregular migration in, from, and through North and Central America, the United States must establish long-term strategic partnerships with the governments in the region to catalyze structural change to root out corruption and impunity, improve security and the rule of law, and increase economic opportunity. These efforts must be coordinated in a comprehensive policy framework to address regional migration that includes adequate protection, expanded legal pathways, and regional solutions.

4. President Biden introduced such a framework on February 2, 2021, through Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. Among other things, Executive Order 14010 outlines a new and comprehensive, multi-pronged policy approach toward collaboratively managing migration throughout North and Central America. The two main prongs are the Root Causes Strategy and the Collaborative Migration Management Strategy.

5. The Root Causes Strategy focuses on the three main challenges that drive irregular migration: governance and anticorruption, economic opportunity, and security. Through this strategy, the United States seeks to partner with Mexico and the northern Central American countries to rebuild hope in the region, promote accountability, and advance a safe, democratic and prosperous region where people can advance economically, live in safety, and create futures for themselves and their families instead of embarking on dangerous and often futile journeys to the United States.

3

**AR02004**

6.  The Collaborative Migration Management Strategy is devoted to fostering the
    international cooperation and partnership with Mexico and Central American countries
    necessary to focus resources and energy on collective action that will mobilize
    humanitarian assistance, enhance access to international protection and other protection
    options for those forcibly displaced from their homes, strengthen legal pathways for those
    who choose to or must migrate, and reduce irregular migration. As Secretary of State
    Blinken stated on February 2, 2021, "The United States remains committed to working
    with governments in the region to address irregular migration and ensure safe, orderly,
    and humane migration. We are working to establish and expand a cooperative, mutually
    respectful approach to managing migration across the region that aligns with our national
    values and respects the rights and dignity of every person."

7.  Mexico is an essential partner for the United States in the implementation of both the
    Root Causes Strategy and the Collaborative Migration Management Strategy. On March
    1, 2021, Presidents Biden and López Obrador issued the U.S.-Mexico Joint Declaration,
    in which they committed to immigration policies that recognize the dignity of migrants
    and the imperative of orderly, safe and regular migration. They further committed to
    collaborate on a joint effort to address the root causes of regional migration, improve
    migration management, and develop legal pathways for migration. They also directed the
    Department of State and the Secretariat of Foreign Relations, respectively, to engage with
    the governments of the northern Central American countries, as well as with civil society
    and private sectors, through policies that promote equitable and sustainable economic
    development, combat corruption, and improve law enforcement cooperation against
    transnational criminal smuggling networks.

4

8.  As then-Acting Assistant Secretary of State Chung stated in her remarks before the U.S. House Foreign Affairs Subcommittee on Western Hemisphere, Civilian Security, Migration and International Economic Policy on April 28, 2021, Mexico has already begun taking actions to advance these commitments. It has reinforced its efforts to reduce irregular northbound movements through its territory, launching a major enforcement action in southern Mexico in March with over 10,000 personnel. It has further committed to increasing its enforcement personnel strength to 12,000. The Mexican government continues to look for ways to invest in and develop its own communities, contribute to stronger Central American economies, and engage with regional and international partners to share the burden. In addition, Mexico continues to be a leader in the region in offering international protection for those fleeing persecution.

9.  On June 8, 2021, Vice President Harris met with President López Obrador during her first foreign trip as Vice President, reflecting the priority the Administration is placing on addressing irregular migration. Together they announced a new partnership to work jointly in Central America to address the root causes of irregular migration to Mexico and the United States, as well as efforts to disable human trafficking and human smuggling organizations. During this visit, the U.S. and Mexican governments signed a memorandum of understanding to establish a strategic partnership to address the lack of economic opportunities in the northern Central American countries, which will include fostering agricultural development and youth empowerment programs and co-creating and managing a partnership program enabling them to better deliver, measure, and communicate about assistance to the region.

5

**AR02006**

10. The United States has likewise worked to secure key commitments from the governments of the northern Central American countries to advance both the Root Causes Strategy and the Collaborative Migration Management Strategy. Both Secretary Blinken and Vice President Harris have been engaged on these issues throughout the region during my tenure as Special Envoy for the Northern Triangle.

11. For example, on June 1, 2021, Secretary Blinken met with foreign ministers from Costa Rica, Guatemala, Honduras, El Salvador, Nicaragua, Panama and Mexico in San José, Costa Rica at a meeting of the Central America Integration System (SICA) – the economic and political organization of the region's states. The leaders discussed the U.S. strategy to address the root causes of migration, including generating economic opportunities for Central Americans, advancing the essential work of reducing violence and addressing the COVID-19 pandemic and climate change. Secretary Blinken emphasized that Central America can be a stronger region if the people and countries cooperate to jointly tackle these challenges.

12. Vice President Harris has had several conversations with President Giammattei of Guatemala about migration issues, and met with him on June 7, 2021, in Guatemala City. Both leaders acknowledged the need to work as partners to address irregular migration from Central America. A high-level delegation led by the National Security Council's (NSC) then-Senior Advisor to the President, Amy Pope, were in Costa Rica from June 9-11, 2021, to attend the Comprehensive Regional Protection and Solutions Framework Solidarity Event (Spanish acronym "MIRPS"), which focused on how the international community can support solutions for forced displacement in Mexico and Central America. The delegation also held a series of bilateral meetings to underscore the United

6

States' commitment to finding solutions to the challenges of irregular migration and forced displacement in the region, including with officials from northern Central America. Additionally, Uzra Zeya, the State Department's Undersecretary for Civilian Security, Democracy, and Human Rights, participated in the High Level Dialogue on Irregular Migration hosted by the Government of Panama on August 11, 2021, and attended by foreign ministers from the region, including the foreign minister of Mexico. The group agreed on the need for a shared regional approach to address irregular migration in the Western Hemisphere and is moving forward to establish and implement joint solutions and actions.

13. As a result of these and other U.S. diplomatic efforts, the northern Central American countries have engaged in migration management, and the governments make decisions about humane enforcement in ways that are appropriate for each country. We have seen the results in increased access to protection, apprehensions of irregular migrants, and greater numbers of checkpoints.

14. For example, the United States and Guatemala are collaborating to deepen bilateral law enforcement cooperation to combat migrant smugglers, human traffickers, and narcotics traffickers including through the reconstitution of a Mobile Tactical Interdiction Unit focused on dismantling transnational criminal activities in Guatemala, by providing U.S. law enforcement personnel to train and advise Guatemalan border security and law enforcement, and by the Guatemalan government identifying and seizing the illicit assets of those criminal organizations. The Guatemalan government has also committed to collaborate with the United States to establish Migration Resource Centers in Guatemala that will provide protection screening and referrals to services for people in need of

7

protection and others seeking lawful pathways to migrate, as well as for returning migrants in need of reintegration support in Guatemala. The first Migration Resource Center became operational on June 10, 2021, and has provided protection screenings for hundreds of returning migrants. The U.S. government, in collaboration with international organization partners and the Guatemalan government, is in the process of establishing several other Migration Resource Centers in Guatemala.

15. For its part, in addition to the joint efforts described above, the United States has already taken several other actions to advance the administration's efforts to enact a comprehensive approach to regional migration. One of the first such actions was to commence a process for safe and orderly re-processing of persons who had previously been returned to Mexico under MPP. While MPP was operational, tens of thousands of migrants, primarily individuals from Central America who were returned to Mexico under MPP, lived in very poor conditions along the U.S.-Mexico border, including in an informal camp that had formed in Matamoros, Tamaulipas, for extended periods while many awaited the commencement or completion of their U.S. immigration proceedings. The governments of the northern Central American countries expressed concern for the safety of their nationals residing in the camp as well as elsewhere along the U.S.-Mexico Border. The Government of Mexico shared these concerns.

16. The U.S. government announced the plan for safe and orderly re-processing of noncitizens in MPP on February 11, 2021. Since the announcement of the MPP re-processing, the Mexican and U.S. governments have worked together to implement this process, including determining the prioritization of the intake. Through the MPP re-processing the informal migrant camp in Matamoros was closed in early March 2021.

8

AR02009

17. Mandatory and immediate implementation of MPP until the federal government has sufficient detention capacity to detain all noncitizens subject to Section 1225 would undermine current U.S. foreign policy. An immediate imposition on Mexico to care for and protect irregular migrants would be extremely problematic for Mexico. The Mexican government's partnership was essential for implementing MPP when it was operational, and Mexico has been an essential partner in the re-processing since February. An MPP process without the support and material collaboration of Mexico is impossible. Implementation of contiguous-territory-return authority depends on the issuance by Mexico of immigration documents, coordination for individuals being returned and then re-entering the United States for court dates, supplemental shelter provided by Mexico in some locations, and additional law-enforcement measures to meaningfully curb activities and presence of gangs, cartels, and other criminals seeking to prey on returned migrants. Attempting to hastily and unilaterally re-implement MPP without explicit Mexican support along with appropriate humanitarian safeguards would nullify more than six months of diplomatic and programmatic engagement with the Government of Mexico to restore safe and orderly processing at the U.S. southern border. It would also require the U.S. government to divert attention and limited resources away from its current U.S. foreign policy goals mentioned above towards negotiating with the Government of Mexico issues related to the re-implementation of MPP. Further, it would divert humanitarian resources from ongoing strategic efforts elsewhere in Mexico to reinforce capacity in northern Mexico, including in locations where security conditions severely limit humanitarian actors' ability to operate, or otherwise would necessitate drawing from already-limited resources for other humanitarian emergencies globally.

9

18. In addition, rapidly re-implementing MPP without appropriate humanitarian safeguards at this stage, and without active collaboration with the Government of Mexico, would be harmful to our bilateral relationships with the northern Central American countries, with our international organization partners, and with other refugee host countries and donor countries throughout the Western Hemisphere and beyond. As a result, regional partners and international organizations could be less inclined to cooperate with the United States in implementing its broader, long-term foreign policy goals, including the Root Causes Strategy and the Collaborative Migration Management Strategy, and this, in turn, could adversely impact the U.S. government's efforts to stem the flow of irregular migration in the region. It would also undermine U.S. credibility and global leadership on humanitarian issues.

19. Additionally, the Mexican government and international organizations lack sufficient funding and capacity to respond to an order directing the United States government to immediately re-implement MPP nationwide. In recent days, the U.S. government has been interdicting approximately 7,500 individuals a day at the U.S. southwestern border. If the U.S. government were to attempt to return that number to Mexico absent appropriate procedural arrangements with Mexico and sufficient Mexican absorption capacity, the result would create a humanitarian and diplomatic emergency.

20. Mandatory and immediate re-implementation of MPP on a wide-scale basis would undermine the U.S. government's flexibility and discretion, negatively impact U.S.-Mexico bilateral relations, and subject already-vulnerable individuals to increased risks. When operational, MPP frequently stressed Mexican social services beyond capacity and created challenges to meeting the needs of such large numbers of vulnerable individuals

10

on the Mexican side of the U.S. border. Moreover, the diplomatic tensions caused by this

humanitarian crisis became an ongoing obstacle to achieving our broader security,

economic, and trade goals with Mexico.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed on this 16th day of August, 2021

Ricardo Zúñiga
Senior Bureau Official
Bureau of Western Hemisphere Affairs
U.S. Department of State

11

AR02012

AR02013

# EXHIBIT A

AR02014

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.,*<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 2:21-cv-00067-Z<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me from official records

and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Chief Operating Officer at U.S. Customs and Border Protection (CBP), within the

Department of Homeland Security (DHS), and have been in this role since March 5, 2021. Since

August 24, 2021, I have been serving as the Vice Chair for the Secretary of Homeland Security's

Southwest Border Taskforce. I also previously served at DHS as an Advisor to CBP

Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

2. Pursuant to this Court's August 13, 2021, order, DHS has taken a number of steps to

reimplement the Migrant Protection Protocols (MPP). These steps include (1) engaging with the

Government of Mexico (GOM); (2) creating an interagency task force; (3) initiating the

**AR02015**

processes required to rebuild needed infrastructure and reorganize resources; and (4) reviewing and updating MPP related policies in light of Title 42 and COVID-19.

3. Most importantly, DHS and the Department of State (DOS) are holding diplomatic engagements with the Government of Mexico (GOM) and have already held several high-level meetings to advance negotiations related to restarting MPP. Because the U.S. Government cannot implement MPP without GOM's concurrence, these negotiations—which are ongoing—are critical.

4. Though the specific details of ongoing diplomatic engagements are sensitive, at this point GOM has not yet agreed to accept individuals returned to Mexico under the court-ordered restart of MPP. Prior to implementation, our two governments must reach agreement on a number of foundational matters, to include: the demographic make-up of individuals who can be returned to Mexico pursuant to MPP; in what circumstances and locations returns and reentry for court-related matters can occur; how many individuals can be enrolled in given locations; and what kind of support these individuals will receive while in Mexico. All of these topics, and others, are being actively discussed with the GOM.

5. DHS is not waiting for these negotiations to conclude, however, before taking steps to reimplement MPP. DHS has created an interagency task force comprised of the various DHS components involved in MPP as well as the Executive Office for Immigration Review (EOIR) at the Department of Justice (DOJ) and DOS. The task force is meeting regularly to quickly and efficiently rebuild the infrastructure and reapportion the staffing required to reimplement MPP.

6. The task force is, among other things, coordinating with EOIR regarding dockets and management of removal proceedings. Before individuals can be placed into MPP, they must be placed into removal proceedings, which is done by issuing the charging document (the notice to

2

appear) that ideally sets a hearing date. EOIR is, as a result, working to make space available on immigration court dockets to schedule hearings for individuals in MPP. These ongoing efforts will allow the government to be able to rapidly implement MPP once an agreement is reached with GOM.

7. Restarting MPP requires operational adjustments. DHS is taking steps to rebuild the infrastructure needed for MPP and redeploy resources as needed. Importantly, MPP requires space near the border to hold immigration court proceedings. Although there are some immigration courts near the border, under the previous iteration of MPP these were not sufficient to meet the program's needs. To supplement the existing courts, DHS utilized soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas. These IHFs, however, were largely dismantled and repurposed to facilitate processing at the ports of entry (POEs) when MPP was terminated. These IHFs now need to be restructured and rebuilt built to accommodate court proceedings, and these new facilities must be designed and constructed with robust mitigation measures for COVID-19. In addition, the POEs will need to find another space to process the migrants currently being processed in the repurposed facilities in order to not adversely impact POE operations.

8. DHS has identified funds to contract for the IHFs, which will cost approximately $14.1 million to construct and $10.5 million per month to operate. In line with the actions taken by the previous Administration, DHS plans to execute the contract for the IHFs as soon as an agreement is reached with GOM.[1] DHS estimates that once the contracting process has been completed the

---

[1] During the previous administration, the IHFs were not built until after the June 7, 2019 joint declaration between the U.S. Government and the Government Of Mexico. The June 7th agreement permitted further expansion of MPP.

AR02017

building of the IHFs and the installation of necessary information technology will take approximately 30 days.

9.  Among other efforts, the Task Force is reviewing MPP-related policies and procedures in light of two developments that were not at issue when MPP was initiated: first, the ongoing risk posed by COVID-19, and second, the continued role that DHS plays in enforcing the Center of Disease Control's (CDC's) Title 42 Order, which temporarily prohibits the entry of certain noncitizens traveling from Canada or Mexico into the United States.  Both of these developments require updates to past protocols and practices, as well as updated guidance to the workforce.

10. The current COVID-19 pandemic greatly affects how MPP is reimplemented.  In March 2020, immigration court proceedings were paused indefinitely because of COVID-19.  DHS is currently reviewing the necessary and critical measures to be taken at each step of MPP processing to protect our officers, communities, and the migrants from the spread of COVID-19 (e.g., face coverings, social distancing, disinfecting, testing, vaccines, etc.). Given these protocols, DHS is evaluating how many people can safely be processed for court hearings on a daily basis, which will in turn affect the setting of court dates and issuance of the requisite Notices to Appear.  These changed circumstances require updating of internal guidance and procedures, developing necessary health protocols, and putting plans in place to provide this updated information to third parties, including the noncitizens who will be placed into MPP. Lastly, as noted above, the IHF facilities must include COVID mitigation measures in their redesign.

11. In addition, when MPP was first implemented, DHS was not implementing the CDC's Title 42 public health order, which restricts the entry of non-citizens into the United States for public health reasons and takes precedence over the use of Title 8 authorities (such as expedited

4

AR02018

removal or MPP returns) at the land border.  DHS is actively assessing the interplay of this authority with the reimplementation of MPP and developing appropriate guidance to the field to clarify this interplay.  Importantly, individuals who are subject to Title 42 will continue to be expelled when MPP is reimplemented. However, the Title 42 order has always included exceptions for humanitarian reasons, and DHS has been working with non-governmental partners to identify individuals who meet specified vulnerability criteria that merit such exceptions from Title 42.  In other cases, individuals who are covered by Title 42 cannot be expelled because of the GOM does not accept the return of certain nationalities or demographics at certain parts of the border.  There is no guarantee that the GOM will accept via MPP those whom it has refused to allow to be expelled pursuant to Title 42.

12. Those individuals who are not covered by, are exempted from, or cannot be expelled pursuant to Title 42 are put into Title 8 removal proceedings..  DHS also has the discretion to place certain inadmissible noncitizens into expedited removal.  DHS intends to continue the exercise of its pre-existing policies and practices as it continues to work in good faith to re-implement MPP.

13. These actions demonstrate that DHS has been working, and will continue to work, in good faith to reimplement the MPP, as required by the court's injunction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed on this 15th day of September, 2021

Blas Nuñez-Neto
Vice Chair, Southwest Border Taskforce
Department of Homeland Security
Chief Operating Officer
U.S. Customs and Border Protection

5

# EXHIBIT 1

AR02020

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, ) | |
| STATE OF MISSOURI, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civil Action No. 2:21-cv-00067-Z |
| ) | |
| JOSEPH R. BIDEN, JR., ) | |
| in his official capacity as ) | |
| President of the United States, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me from official records

and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Acting Assistant Secretary for Border and Immigration Policy as of

October 1, 2021. My permanent role is Chief Operating Officer at U.S. Customs and Border

Protection (CBP), within the Department of Homeland Security (DHS), which I began on March

5, 2021. Since August 24, 2021, I have been concurrently serving as the Vice Chair for the

Secretary of Homeland Security's Southwest Border Taskforce. I also previously served at DHS

as an Advisor to CBP Commissioner Gil Kerlikowske from January 12, 2015 to January 16,

2017.

1

AR02021

2.     I have read and am familiar with the declaration of Mark Morgan, the former

Acting CBP Commissioner.  I also read and am familiar with the *Plaintiffs' Motion to Enforce*

*Permanent Injunction and for Expedited Discovery*, filed Sept. 23, 2021.


*I. Continued Compliance with Court Order*

3.     Over the past month, DHS has continued to make substantial progress as it works

in good faith to reimplement the Migrant Protection Protocols (MPP).  The Department has,

among other things: engaged in a number of high-level and ongoing virtual and in-person

discussions with the Government of Mexico (GOM); continued to finalize the operational plans

that will be required to quickly reimplement MPP; worked closely with the Department of

Justice and other interagency partners to ensure that the immigration courts are prepared to hear

the cases of those subject to MPP on a timely basis; and issued the contracts required to rebuild

soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas.  As a result

of this progress, and dependent on the independent decisions made by the sovereign GOM, DHS

anticipates being in a position to reimplement MPP in mid-November.

*A. Discussions with Mexico*

4.     DHS, along with the Department of State (DOS), has, since August 2021, been

engaged in high-level discussions to coordinate a wide range of border management and

migration issues as part of a bilateral U.S.- Mexico working group.  In conjunction with those

efforts, DHS has had multiple virtual and in-person high-level discussions with the GOM about

DHS's planned reimplementation of MPP.

5.     Critically, and as described in my prior declaration on September 15, 2021, the

U.S. Government cannot unilaterally implement MPP without an independent decision by the

AR02022

GOM to accept individuals that the United States wishes to send to Mexico.  As a sovereign nation, Mexico decides who it allows to cross its borders.  In the prior implementation of MPP, for example, the GOM only accepted the return of individuals from Spanish-speaking countries and Brazil; it did not generally accept the return of Haitians, or other nationals from other non-Spanish-speaking countries, unless they were family members of an individual that the GOM accepted.

6.      Therefore, before DHS can begin sending individuals back to Mexico, the United States needs Mexico's concurrence, as well as a shared understanding about key details of how MPP will be reimplemented, including, for example: where and what time such entries into Mexico will be permitted; how many individuals and what demographics will be permitted per day at each location; and what nationalities will be accepted for return to Mexico.

7.  Mexico's decision to accept individuals returned pursuant to MPP was needed before the program was initiated in 2019, and, because the previous program was terminated, it is needed again now. This is true whether the U.S. seeks to re-implement border-wide, as DHS prefers in order to avoid pushing migratory flows from one part of the border to another, or whether it seeks to adopt a phased approach to reimplementation.  Both require a unilateral decision by Mexico to accept those individuals the United States seeks to return to return to Mexico—that decision by the GOM has yet to be made.

8.      In the context of the ongoing discussions, the GOM has made clear that it expects to see substantial improvements in how MPP is reimplemented before it can make its decision. The GOM has stated it would not decide to accept MPP enrollees unless and until its concerns about how MPP was previously implemented are addressed.  The GOM has identified a number of improvements that it deems critical, including the following key areas of concern:

AR02023

(i) *Length of time for Case Adjudication / Clarity about Timing of Hearings*

9.      The  GOM expressed significant concerns about the lengthy delays in the adjudication of immigration proceedings under the previous implementation of MPP and has made clear that, in order to accept returns under the program, it needs assurances that proceedings will generally be concluded within six months of an individual's return to Mexico and the initiation of the individual's case.  The GOM similarly made clear that it is critical that any individuals awaiting court hearings in Mexico receive timely and accurate information about hearing dates and times and other information about their cases.

(ii) *Access to Counsel*

10.      The GOM made clear that enhancing opportunities for MPP enrollees to secure adequate access to counsel is a critical issue that needs to be addressed before it could decide to accept MPP enrollees into Mexico.

(iii) *Accounting for Vulnerability:*

11.      The GOM expressed concern that, under the previous MPP, DHS returned particularly vulnerable individuals to Mexico, and that this placed an undue burden on the services provided by local communities in Mexico.  In particular, the GOM raised concerns about certain populations being enrolled in MPP, including particularly elderly or sick individuals, as well as other populations, such as LGBTQI individuals.  GOM made clear that it expects the reimplementation of MPP to address these concerns.

(iv)  *Times and Locations of Returns.*

4

12.     The GOM also expressed concern that under the previous implementation of MPP, individuals were returned to Mexico at locations and times of the day that made it difficult for the GOM officials to adequately receive them in a safe and orderly manner.  It expects that, if the GOM decides to accept such returns, DHS will better coordinate the locations and times of day that individuals are returned to Mexico.

13.     Based on these discussions, DHS is finalizing a plan for the reimplementation of MPP that takes into account these concerns, which it will be communicating to the GOM in the coming days.  The GOM — which has repeatedly emphasized that, as a sovereign nation, Mexico is not subject to the Court's jurisdiction — will need to independently assess the plan to ensure it adequately addresses their concerns.  The GOM will then make an independent decision as to whether it is prepared to accept for entry into Mexico the individuals that the USG seeks to return under MPP.

*B. The U.S. Government's Ongoing Efforts*

14.     However, consistent with its obligation to comply in good faith with the Court's Order, DHS is not waiting for the GOM's decision to put in place what is needed to restart MPP. To the contrary, DHS has made significant progress since we last reported to the Court, including taking the following key steps to begin reimplementing MPP around the middle of November, subject to GOM's response to the reimplementation plan and a decision to accept returns.

15.     First, DHS issued a task order on October 13, 2021, under an existing contract, to rebuild the soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas. These facilities will take about 30 days to reconstruct at a cost of approximately $14.1 million to

5

rebuild and $10.5 million per month to operate. In my prior declaration, I indicated that DHS did not intend to initiate these contracts until the GOM decided to accept returns. However, after reviewing the substantial progress that has been made in the discussions with the GOM over the past month, DHS believes that it makes sense to proceed with contracting now despite the lack of a final decision by GOM. This will ensure that DHS is ready to begin implementing the program across the entire border in a timely fashion, even as we await the GOM's unilateral decision about if, when, and where it will accept returns.

16. Second, as noted in my previous declaration, the USG stood up an interagency task force, comprising DHS, the Department of Justice (DOJ), the Department of Health and Human Services (HHS), and DOS, to manage and oversee the reimplementation of MPP. This interagency taskforce draws on the expertise of a number of career officials who were previously involved in standing up and implementing MPP, includes a large number of working groups that are addressing specific components of the reimplementation, and is working daily to ensure that the policies and processes are in place to be ready to begin reimplementation in mid-November.

17. Among other things, the task force is working with DOJ's Executive Office for Immigration Review (EOIR) to ensure that there is sufficient space available on immigration court dockets so that hearings for individuals in MPP can be done in a timely manner subsequent to enrollment. This is to address a key concern identified by the GOM, which, as noted above, has expressed its expectation that cases would generally be adjudicated within six months after the case is initiated.

18. Third, as noted in my previous declaration, the current COVID-19 pandemic greatly affects how MPP can be reimplemented. In response to the unprecedented effects of the global pandemic, the government began postponing immigration court proceedings for MPP

AR02026

enrollees in March 2020, and ultimately paused them indefinitely in July 2020—significantly before the termination at issue in this case.   Although the government developed guidelines for restarting court hearings during the pandemic, those plans were never implemented.  Moreover, the unexpected emergence of the highly contagious Delta variant this past year is a significant complicating factor that requires updates to these guidelines.  DHS, as a result, is continuing to review the measures needed to ensure that these hearings can take place in a manner that protects government personnel, our communities, and the migrants themselves from the spread of COVID-19.  As part of this process, DHS is working with interagency partners, including EOIR and the Centers for Disease Control and Prevention (CDC) at HHS, to evaluate how many people can safely be processed for court hearings on a daily basis, which will in turn affect the setting of court dates and issuance of the requisite Notices to Appear.  DHS is also working to update guidance, protocols, and communication plans to ensure that these protections are implemented effectively.  All of this work is currently being finalized in order to ensure a timely reimplementation of the program.

7

*II. Conclusion*

19.     In sum, we have made great progress and are, as a result, ready to begin

reimplementing MPP in mid-November, subject to the GOM's independent decision to accept

those that the USG seeks to return. Critically, DHS and DOS have sufficiently advanced

discussions with the GOM to the point that we will shortly finalize and communicate to GOM a

plan for reimplementation that addresses the concerns they have identified.  DHS has also taken

all the necessary steps to reimplement MPP—including contracting for the IHFs, working to

establish robust COVID-19 protocols, and updating policies and guidelines.  These actions

demonstrate that DHS has been working diligently, and will continue to work as expeditiously as

possible, to reimplement MPP in good faith, as required by the Court's injunction.

I declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge, information and belief.  Executed on this 14th day of October

2021

_____
Blas Nuñez-Neto
Acting Assistant Secretary
Border and Immigration Policy
Department of Homeland Security
Chief Operating Officer
U.S. Customs and Border Protection

AR02028

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Texas v. United States,    5th Cir.(Tex.),   September 15, 2021

10 F.4th 538
United States Court of Appeals, Fifth Circuit.

STATE of Texas; State of
Missouri, Plaintiffs—Appellees,

v.

Joseph R. BIDEN, Jr., in his official capacity as
President of the United States of America; United
States of America; Alejandro Mayorkas, Secretary,
U.S. Department of Homeland Security; United States
Department of Homeland Security; Troy Miller, Acting
Commissioner, U.S. Customs and Border Protection;
United States Customs and Border Protection; Tae D.
Johnson, Acting Director, U.S. Immigration and Customs
Enforcement; United States Immigration and Customs
Enforcement; Tracy Renaud, in her official capacity
as Acting Director of the United States Citizenship
and Immigration Services; United States Citizenship
and Immigration Services, Defendants—Appellants.

No. 21-10806
|
August 19, 2021

**Synopsis**

**Background:** States brought action alleging that challenging
Department of Homeland Security's (DHS) purported
suspension of its Migrant Protection Protocols (MPP)
violated Administrative Procedure Act (APA). Following
bench trial, the United States District Court for the Northern
District of Texas, Matthew J. Kacsmaryk, J., 2021
WL 3603341, entered judgment in states' favor, and DHS
appealed. DHS moved for stay pending appeal.

**Holdings:** The Court of Appeals held that:

[1] Texas satisfied injury element for standing;

[2] Texas satisfied redressability element for standing;

[3] DHS memorandum purporting to rescind MPP was "final
agency action";

[4] Immigration and Nationality Act (INA) did not confer
discretion on DHS to choose among various detention and
non-detention options;

[5] decision to rescind MPP was not committed to agency
discretion by law;

[6] DHS's decision was not unreviewable non-enforcement
decision;

[7] DHS failed to demonstrate strong chance of success on its
appeal;

[8] DHS failed to demonstrate that it would be irreparably
injured absent stay; and

[9] balance of equities and public interest did not favor stay.

Motion denied.

**Procedural Posture(s):** Motion for Stay.

West Headnotes (28)

**[1]**    **Federal Courts** 🗝️   Supersedeas or Stay of
Proceedings

In considering motion for emergency stay
pending appeal, Court of Appeals must consider:
(1) whether government makes strong showing
that it is likely to succeed on merits; (2)
whether government will be irreparably injured
in absence of stay; (3) whether other interested
parties will be irreparably injured by stay; and (4)
where public interest lies. Fed. R. App. P. 8.

3 Cases that cite this headnote

**[2]**    **Federal Civil Procedure** 🗝️   In general;
injury or interest

**Federal Civil Procedure** 🗝️   Causation;
redressability

To establish standing, plaintiffs must show injury
that is concrete, particularized, and actual or

imminent, fairly traceable to challenged action, and redressable by favorable ruling.

1 Cases that cite this headnote

**[3]    Federal Civil Procedure** 🔑 In general; injury or interest

Only one plaintiff needs to have standing to permit court to consider complaint.

**[4]    Federal Courts** 🔑 "Clearly erroneous" standard of review in general

After bench trial, Court of Appeals reviews district court's factual determinations for clear error.

**[5]    Federal Courts** 🔑 Waiver of Error in Appellate Court

Any argument not raised on appeal, including challenge to district court's factual finding, is forfeited.

**[6]    Injunction** 🔑 Persons entitled to apply; standing

State of Texas satisfied injury element for Article III standing to seek injunction barring Department of Homeland Security (DHS) from suspending its Migrant Protection Protocols (MPP); MPP's suspension resulted in increase in immigration into Texas, state required issuance of driver's license to any qualified person—including noncitizens, and Texas incurred cost every time it inquired into whether immigrant satisfied requirements for license. U.S. Const. art. 3, § 2, cl. 1; Tex. Transp. Code Ann. § 521.142(a).

**[7]    Aliens, Immigration, and Citizenship** 🔑 Injunction

State of Texas satisfied redressability element for Article III standing to seek injunction barring Department of Homeland Security (DHS) from suspending its Migrant Protection Protocols

(MPP), even though MPP gave immigration officers discretion as to whether to return third-country nationals arriving in United States to Mexico or Canada for duration of their removal proceedings; immigration agents did order over 50,000 noncitizens back to Mexico from Texas border while MPP was in effect, and there was no indication that renewed MPP would have any different impact or that Mexico had retracted its consent to admit noncitizens excluded from United States under MPP. U.S. Const. art. 3, § 2, cl. 1.

**[8]    States** 🔑 Capacity of state to sue in general

States are entitled to special solicitude in standing analysis, so long as they have procedural right to challenge action in question, and challenged action affects one of states' quasi-sovereign interests.

3 Cases that cite this headnote

**[9]    Injunction** 🔑 Persons entitled to apply; standing

State of Texas was entitled to special solicitude when determining whether it had Article III standing to seek injunction barring Department of Homeland Security (DHS) from suspending its Migrant Protection Protocols (MPP); Texas was asserting procedural right under Administrative Procedure Act (APA), and suspension placed pressure on Texas to change its law by increasing class of people to whom existing state law would entitle subsidized driver's license. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 702.

1 Cases that cite this headnote

**[10]   Administrative Law and Procedure** 🔑 What constitutes finality in general

For agency action to qualify as "final" under Administrative Procedure Act (APA), so as to allow for judicial review, the action must (1) mark consummation of agency's decisionmaking process, and (2) either determine rights or

obligations or produce legal consequences. 5
U.S.C.A. § 704.

1 Cases that cite this headnote

**[11]    Administrative Law and
          Procedure** 🔑 What constitutes finality in
          general

Where agency action withdraws entity's
previously held discretion, that action alters
legal regime and binds entity and thus qualifies
as "final agency action" under Administrative
Procedure Act (APA), so as to allow judicial
review. 5 U.S.C.A. § 704.

**[12]    Aliens, Immigration, and
          Citizenship** 🔑 Decisions reviewable

Secretary of Department of Homeland Security's
(DHS) memorandum purporting to rescind
DHS's Migrant Protection Protocols (MPP)
was "final agency action" under Administrative
Procedure Act (APA), even if memorandum
was general policy statement; memorandum
was consummation of decisionmaking process,
and memorandum withdrew DHS officers'
previously existing discretion when it directed
them to take all appropriate actions to terminate
MPP, including taking all steps necessary
to rescind implementing guidance and other
directives issued to carry out MPP. 5 U.S.C.A. §
704.

**[13]    Administrative Law and
          Procedure** 🔑 Presumptions as to
          Reviewability

Administrative Procedure Act (APA) creates
basic presumption of judicial review. 🚩5
U.S.C.A. § 701(a).

**[14]    Aliens, Immigration, and
          Citizenship** 🔑 Decisions reviewable

Immigration and Nationality Act (INA)
provision permitting Attorney General to return
noncitizen arriving on land from Canada

or Mexico to that country pending removal
proceeding did not confer discretion to
choose among various detention and non-
detention options, and thus did not preclude
judicial review of Department of Homeland
Security's (DHS) purported suspension of its
Migrant Protection Protocols (MPP) under
Administrative Procedure Act (APA); MPP was
government program that created rules and
procedures for entire classes of aliens, and—with
or without MPP—DHS retained discretion to
make individualized detention and non-detention
decisions in accordance with INA. 🚩5 U.S.C.A.
§ 701(a)(1); Immigration and Nationality Act §
235, 🚩8 U.S.C.A. § 1225(b)(2)(C).

**[15]    Aliens, Immigration, and
          Citizenship** 🔑 Decisions reviewable

Secretary of Department of Homeland
Security's (DHS) decision to rescind DHS's
Migrant Protection Protocols (MPP) was not
committed to agency discretion by law,
and thus was subject to judicial review
under Administrative Procedure Act (APA),
notwithstanding Immigration and Nationality
Act (INA) provision permitting Attorney
General to return noncitizen arriving on land
from Canada or Mexico to that country pending
removal proceeding; there was no reason to think
that DHS's discretion extended beyond bounds
of individualized, case-by-case determinations,
and INA included provisions that meaningfully
restrained DHS's discretion. 🚩5 U.S.C.A. §
701(a)(2); Immigration and Nationality Act §
235, 🚩8 U.S.C.A. § 1225(b)(2)(C).

2 Cases that cite this headnote

**[16]    Administrative Law and
          Procedure** 🔑 Meaningful standard for review

Decision is committed to agency discretion
by law, and thus is not reviewable under
Administrative Procedure Act (APA), where
statute is drawn so that it furnishes no meaningful

standard by which to judge agency's action. 🚩5
U.S.C.A. § 701(a)(2).

1 Cases that cite this headnote

**[17]    Aliens, Immigration, and
Citizenship** 🔑 Decisions reviewable

Secretary of Department of Homeland
Security's (DHS) decision to rescind DHS's
Migrant Protection Protocols (MPP) was
not unreviewable non-enforcement decision;
termination of MPP would necessarily lead to
release and parole of aliens into United States,
which would create affirmative benefits for
aliens such as work authorization, and MPP
was government program—replete with rules
procedures and dedicated infrastructure.

1 Cases that cite this headnote

**[18]    Administrative Law and
Procedure** 🔑 Review for arbitrary,
capricious, unreasonable, or illegal actions in
general

Administrative Procedure Act's (APA) arbitrary
and capricious standard requires that agency
action be reasonable and reasonably explained.
🚩5 U.S.C.A. § 706(2).

**[19]    Administrative Law and
Procedure** 🔑 Review for arbitrary,
capricious, unreasonable, or illegal actions in
general

**Administrative Law and
Procedure** 🔑 Wisdom, judgment, or opinion
in general

While applying Administrative Procedure Act's
(APA) arbitrary and capricious standard, court
must not substitute its own policy judgment
for that of agency but must ensure that agency
has acted within zone of reasonableness and,
in particular, has reasonably considered relevant
issues and reasonably explained decision. 🚩5
U.S.C.A. § 706(2).

**[20]    Administrative Law and
Procedure** 🔑 Review for arbitrary,
capricious, unreasonable, or illegal actions in
general

**Administrative Law and
Procedure** 🔑 Review for correctness or error

Under Administrative Procedure Act's (APA)
arbitrary and capricious standard, court must set
aside any action premised on reasoning that fails
to account for relevant factors or evinces clear
error of judgment. 🚩5 U.S.C.A. § 706(2).

**[21]    Administrative Law and
Procedure** 🔑 Theory or grounds not provided
or relied upon by agency

**Administrative Law and
Procedure** 🔑 Timing of theory and grounds
asserted

In reviewing agency action, court can consider
only reasoning articulated by agency itself; it
cannot consider post hoc rationalizations.

2 Cases that cite this headnote

**[22]    Federal Courts** 🔑 Other particular cases

Department of Homeland Security (DHS)
failed to demonstrate strong chance of
success on its appeal of district court order
concluding that DHS Secretary's suspension
of its Migrant Protection Protocols (MPP)
violated Administrative Procedure Act (APA),
for purposes of determining its entitlement
to stay pending appeal; Secretary failed to
consider states' legitimate reliance interests,
including DHS's agreement with Texas to
consult with it before changing its rules and
policies, DHS's prior factual findings on MPP's
benefits, potential alternatives to MPP, or
whether suspension complied with Immigration
and Nationality Act (INA). 🚩5 U.S.C.A. §
706(2); Immigration and Nationality Act § 235,
🚩8 U.S.C.A. § 1225.

2 Cases that cite this headnote

[23]  **Administrative Law and**
**Procedure** 👈 Change of policy; reason or
explanation

Agency must provide more detailed justification
when new policy rests upon factual findings that
contradict those that underlay its prior policy.

1 Cases that cite this headnote

[24]  **Administrative Law and**
**Procedure** 👈 Requirements in General

When agency rescinds prior policy, its reasoned
analysis must consider alternatives that are
within ambit of existing policy.

1 Cases that cite this headnote

[25]  **Administrative Law and**
**Procedure** 👈 Procedure in General

Statement by agency that factor was considered
is not substitute for considering it.

1 Cases that cite this headnote

[26]  **Federal Courts** 👈 Other particular cases

Department of Homeland Security (DHS) failed
to demonstrate that it would be irreparably
injured absent stay pending appeal of district
court order concluding that DHS Secretary's
suspension of its Migrant Protection Protocols
(MPP) violated Administrative Procedure Act
(APA), despite DHS's contentions that it was
incapable of reinstating MPP in matter of days,
and that it lacked sufficient detention capacity to
comply with order; district court did not order
DHS to restore MPP's infrastructure overnight,
only that it enforce and implement MPP in good
faith, and DHS had options other than detention,
including returning migrants to Mexico, paroling
them into United States on case-by-case basis,
and releasing them on bond or conditional parole.

Immigration and Nationality Act § 235, 🚩8
U.S.C.A. § 1225.

2 Cases that cite this headnote

[27]  **Administrative Law and**
**Procedure** 👈 Timing of theory and grounds
asserted

Administrative agency cannot make decision
first and explain it later on judicial review.

1 Cases that cite this headnote

[28]  **Federal Courts** 👈 Other particular cases

Balance of equities and public interest did not
favor stay pending Department of Homeland
Security's (DHS) appeal of district court order
concluding that DHS Secretary improperly
suspended its Migrant Protection Protocols
(MPP); MPP's termination increased number of
noncitizens being released into United States,
stay would enable noncitizens to apply for
driver's licenses and other benefits and it would
be difficult for states to retract those benefits or
recoup their costs even if they won on merits,
and Texas would have no remedy for DHS's
repudiation of its agreement with state to consult
with it before changing policy.

1 Cases that cite this headnote

**\*542** Appeal from the United States District Court for the
Northern District of Texas, USDC No. 2:21-cv-67, Matthew
Joseph Kacsmaryk, U.S. District Judge

**Attorneys and Law Firms**

Judd Edward Stone, II, Lanora Christine Pettit, William
Thomas Thompson, Assistant General Counsel, Office of the
Attorney General, Office of the Solicitor General, Austin, TX,
for Plaintiff - Appellee State of Texas.

Jesus Armando Osete, Dean John Sauer, Office of the
Attorney General for the State of Missouri, Jefferson City,
MO, for Plaintiff - Appellee State of Missouri.

Brian Christopher Ward, Trial Attorney, U.S. Department
of Justice, Office of Immigration Litigation - District Court
Section, Washington, DC, Joseph Anton Darrow, Esq., U.S.
Department of Justice, Civil Division, Washington, DC, Erez
Reuveni, Assistant Director, U.S. Department of Justice,
Office of Immigration Litigation, Civil Division, Washington,

DC, Brian Walters Stoltz, U.S. Attorney's Office, Northern District of Texas, Dallas, TX, for Defendants - Appellants.

Cody Wofsy, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, CA, for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Texas.

Blaine Bookey, UC Hastings College of the Law, Center for Gender & Refugee Studies, San Francisco, CA, for Amici Curiae American Immigration Council, American Immigration Lawyers Association, Catholic Legal Immigration Network, Incorporated, Center for Gender & Refugee Studies, Human Rights First, Justice Action Center, National Immigration Law Center, Round Table of Former Immigration Judges, and Southern Poverty Law Center.

Thomas Molnar Fisher, Solicitor General, Office of the Attorney General for the State of Indiana, Indianapolis, IN, for Amici Curiae State of Indiana, State of Alabama, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Montana, State of Ohio, State of Oklahoma, State of South Carolina, and State of West Virginia.

Before Elrod, Oldham, and Wilson, Circuit Judges.

**Opinion**

Per Curiam:

 **\*543**  This case concerns the Migrant Protection Protocols ("MPP") created by the Secretary of the Department of Homeland Security on December 20, 2018, and purportedly rescinded by DHS in a memorandum on June 1, 2021 ("June 1 Memorandum"). [1]  After a full bench trial and 53 pages of findings of fact and conclusions of law, the district court concluded that DHS's purported rescission of MPP violated, *inter alia*, the Administrative Procedure Act ("APA"). DHS seeks a stay pending appeal. After carefully considering full briefing from the parties, we hold DHS failed to satisfy the four stay factors. *See*  Nken v. Holder, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). The motion is denied.

I.

A.

On December 20, 2018, the Trump Administration implemented MPP in response to an immigration surge at the southern border. D. Ct. Op. at 7. The statutory authority for MPP is found in  8 U.S.C. § 1225(b)(2)(C), which authorizes the Government to return certain third-country nationals arriving in the United States to Mexico or Canada for the duration of their removal proceedings under  8 U.S.C. § 1229a. *Id.* at 8. Also on December 20, 2018, the United States obtained Mexico's agreement to permit entry of MPP enrollees. *Id.* The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation ... will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." *Id.* (quotation omitted).

In January 2019, "DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide." *Id.* (citing AR.155–56, AR.684). In February 2019, U.S. Immigration and Customs Enforcement issued guidance on MPP to its field offices, anticipating the expansion of MPP across the border. *Id.* at 9 (citing AR.165–70). By December 31, 2020, DHS had enrolled 68,039 aliens in MPP. *Id.* at 12 (citing AR.555).

DHS and Texas entered into a Memorandum of Understanding (the "Agreement"), which the parties finalized on January 8, 2021. *Id.* at 13 (citing Compl., Ex. B at 8). The Agreement required Texas to provide information and assist DHS to "perform its border security, legal immigration,  **\*544**  immigration enforcement, and national security missions." *Id.* (quoting Compl., Ex. B at 2). In return, DHS agreed to consult Texas and consider its views before taking actions that could modify immigration enforcement. *See id.* at 13–14 (citing Compl., Ex. B at 2). DHS also agreed to " ' [p]rovide Texas with 180 days' written notice ... of any proposed action' subject to the consultation requirement," *id.* at 14 (quoting Compl., Ex. B at 3), so that Texas would have an opportunity to comment on the proposal. The Agreement further required DHS to consider Texas's input "in good faith" and, if it decided to reject Texas's input, "provide a detailed written explanation" of its reasons for doing so. *Id.* (emphasis omitted) (quoting Compl., Ex. B at 3).

On Inauguration Day, the Biden Administration announced that it would suspend further enrollments in MPP. The Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant

Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Id.* at 15 (quoting AR.581).

On February 2, 2021, DHS sent a letter to Texas purporting to terminate the Agreement "effective immediately." *Id.* at 14. Because it believed that the letter did not comply with the Agreement's required procedures, Texas interpreted the letter "as a notice of intent to terminate" the Agreement. *Id.* (citing ECF No. 53 at 21).

On April 13, 2021, Texas and Missouri (the "States") sued, challenging the temporary suspension of MPP. *Id.* at 1 (citing ECF No. 1). The States alleged that DHS's January 20 Memorandum violated the APA, the Immigration and Nationality Act ("INA"), the Constitution, and the Agreement. *See id.* at 2 (citing ECF No. 1 at 4; ECF No. 45). On May 14, the States moved for a preliminary injunction that would enjoin the Government from enforcing and implementing the January 20 Memorandum. Prelim. Inj. Mot., ECF No. 30.

On June 1, before briefing on the preliminary injunction had concluded, DHS issued a new memorandum permanently terminating MPP. D. Ct. Op. at 2. The district court concluded that the June 1 Memorandum mooted the States' complaint, and the court allowed the States to amend their complaint and file a new preliminary injunction motion. *Id.* The parties agreed to consolidate the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *Id.* at 3.

### B.

Following the bench trial, the district court issued a 53-page memorandum opinion and order, concluding that the States were entitled to relief on their APA and statutory claims. *See* D. Ct. Op. at 1. The district court made many findings of fact that are relevant here. Among other things, the district court found that MPP had significant benefits before DHS purported to rescind it. For example, DHS's October 2019 Assessment of MPP concluded that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." D. Ct. Op. at 10. And the court noted that DHS also found MPP effective in addressing the prior "perverse incentives" created by allowing "those with

non-meritorious claims ... [to] remain in the country for lengthy periods of time." *Id.* The court found that this caused a significant decrease in immigration-enforcement encounters along the southern border. *Id.* And more directly, the court found that **\*545** caused a decrease in "the number of aliens released into the interior of the United States for the duration of their U.S. removal proceedings." *Id.* at 11 (citing AR.554). These benefits, DHS emphasized, were a "cornerstone" of the agency's prior immigration policy. D. Ct. Op. at 12.

The court made specific (and largely uncontested) factual findings that "[t]he termination of MPP has [increased] and will continue to increase the number of aliens being released into the United States," and that this increase "has [imposed] and will continue to impose harms on Plaintiff States Texas and Missouri." *Id.* at 17. On the basis of its factual findings, the district court determined that the States had Article III standing, that the court had jurisdiction to review the agency action, and that the States were within the zone of interests of the INA. *Id.* at 21–34. The court then concluded that DHS's termination of MPP was unlawful under the APA because the action was arbitrary and capricious and contrary to the INA. *Id.* at 34–44. Based on those conclusions, the district court "permanently enjoined and restrained [DHS] from implementing or enforcing the June 1 Memorandum" and ordered DHS "to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens because of a lack of detention resources." *Id.* at 52–53 (emphases omitted).

 **[1]** DHS noticed an appeal. On August 17, 2021, the Government requested an emergency stay under Federal Rule of Appellate Procedure 8. The States opposed that request on August 18. On August 19, the Government filed a reply. The Government requested that we rule the same day, August 19. In considering the Government's request, we must consider four factors: (1) whether the Government makes a strong showing that it is likely to succeed on the merits; (2) whether the Government will be irreparably injured in the absence of a stay; (3) whether other interested parties will be irreparably injured by a stay; and (4) where the public interest lies. *See*
*Nken*, 556 U.S. at 426, 129 S.Ct. 1749.

### II.

We begin with whether the Government has made a strong showing that it is likely to succeed on the merits. The Government makes two merits arguments: (A) the case is not justiciable, and (B) DHS's rescission of MPP did not violate federal law. The Government is likely wrong on both.

## A.

The Government first argues that it is likely to succeed on the merits because two justiciability doctrines—standing and non-reviewability—operate as insuperable obstacles to the States' suit. We consider and reject each argument in turn.

### 1.

**[2]** **[3]** First, the States' standing. To establish standing, the States "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.' " *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)). "Only one of the [appellants] needs to have standing to permit us to consider the [complaint]." [2] **\*546** *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007); *accord Nat'l Rifle Ass'n Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013). Because the Government is seeking a stay, we must ask whether it has made a strong showing that the States lack standing. *See Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

**[4]** **[5]** After a bench trial, we review the district court's factual determinations for clear error. *See, e.g., Texas, 809 F.3d at 171–72* (reviewing a factual finding for clear error); *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence. A factual finding that a plaintiff met that burden is reviewed for clear error." (citation omitted)). And any argument not raised on appeal (including a challenge to a district court's factual finding) is forfeited. *See, e.g., United States v. Edwards*, 303 F.3d 606, 647 (5th Cir. 2002) ("Many of the 'errors' cited by the defendants

are unbriefed. These issues have been [forfeited]."); *cf.* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain ... appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.").

We begin with (a) the district court's uncontested factual findings. Then we hold that the Government fails to make a strong showing that it is likely to succeed on appeal because it has not shown that the States lack (b) an injury-in-fact that is (c) traceable and (d) redressable. Finally, any doubt about the States' standing is resolved by (e) the special solicitude guaranteed to sovereign States in our federal system.

### a.

The district court found eight facts central to the standing issue. These include:

1. The court found that because of MPP's termination, the Government has been "forced to release and parole aliens into the United States because [the Government] simply [does] not have the resources to detain aliens as mandated by statute." D. Ct. Op. at 17; *see also id.* at 18 (finding that Texas's "border state" status means some of those aliens have ended up in Texas).

2. The court found that DHS previously acknowledged that "MPP implementation contributed to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." *Id.* at 17 (quotation and alteration omitted).

3. The court found that "the termination of MPP has contributed to the current border surge." *Id.*

4. The court found that "[s]ince MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed." *Id.*; *see also id.* at 18 n.7 (noting "the sworn statement of David Shahoulian, Assistant Secretary for Border and Immigration Policy at DHS," including Shahoulian's statement that "[b]ased on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded" (emphasis omitted)).

5. The court found that many "aliens present in Texas because of MPP's termination would apply for driver's

**\*547** licenses," the granting of which would impose a cost on Texas. *Id.* at 19.

6. The court found that "[s]ome school-age child aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States," and that (according to state estimates) Texas will expend an average of $9,216 per additional student in the 2021 school year. *Id.* at 19.

7. The court found that "[s]ome aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will use state-funded healthcare services or benefits in Texas," imposing a cost on the state. D. Ct. Op. at 19–20 (citing AR.555, AR.587–88).

8. Finally, the court found that "[s]ome aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and [some] will commit crimes in Texas," imposing costs on the state's correctional apparatus. *Id.* at 20.

The Government does not challenge *any* of these findings.[3] But even if it did, we would not find any of them clearly erroneous in the light of the record as a whole. *See, e.g.,* ⚑⚠ *United States v. Ismoila,* 100 F.3d 380, 396 (5th Cir. 1996) ("[A]s long as the determination is plausible in light of the record as a whole, clear error does not exist.").

b.

 **[6]** Texas's injuries are actual and imminent. As just described, MPP's termination has caused an increase in immigration into Texas. And as discussed at length in ⚑ *Texas v. United States,* Texas law requires the issuance of a license to any qualified person—including noncitizens who "present ... documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." ⚑ 809 F.3d at 155–56 (alteration in original) (quoting Tex. Transp. Code § 521.142(a)); *see also* ⚑ *id.* (discussing other Texas requirements for a driver's license). Of course, unlike in the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program, the challenged action here does not *ipso facto* guarantee that a given alien will satisfy that requirement. Yet the district court's uncontested findings of fact likely

compel the conclusion that MPP's termination has led to an increase in the number of aliens in Texas, many of whom will apply for driver's licenses. And the district court found that Texas incurs a cost every time it *inquires* into whether an alien satisfies the requirements for a license—even if the person does not in fact qualify for a license. D. Ct. Op. at 19 ("Each additional customer seeking a Texas driver's license imposes a cost on Texas."); *see also* Decl. of Sheri Gipson, Chief of the Texas Department of Public Safety Driver License Division, ¶ 8 ("DPS estimates that for an additional 10,000 driver['s] license customers *seeking* a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80." (emphasis added)). So Texas has shown imminent injury in this case. *See* ⚑ *Texas,* 809 F.3d at 156 (reaching the same conclusion on similar facts). Driver's licenses aside, the district court's unchallenged factual findings regarding educational, healthcare, and correctional costs **\*548** provide equally strong bases for finding cognizable, imminent injury.

The Government's counterargument (limited to the driver's-license theory) is that the district court's analysis was "primarily based on speculation about an increase in the number of aliens released and paroled who will seek driver's licenses." Stay Mot. at 7 (quotation omitted). But the Government has done nothing to show that district court's findings of fact about the increased number of aliens were clearly erroneous. And it is grounded in our precedent. ⚑ *Texas,* 809 F.3d at 156 ("[T]here is little doubt that many [DAPA beneficiaries] would [apply for driver's licenses] because driving is a practical necessity in most of the state.").

c.

Texas's injury is also traceable to the Government's termination of MPP. The district court's uncontested factual findings establish as much: MPP's termination has caused an increase in unlawful immigration into Texas. Many new immigrants are certain to apply for driver's licenses—and evaluating each application will impose costs on Texas. *Cf.* ⚑ *Texas,* 809 F.3d at 160 (noting that new immigrants— in that case, DAPA recipients—"have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible."). Likewise, at least some MPP-caused immigrants will certainly seek educational and healthcare services from the state. And the States have incurred and will continue to incur costs associated with the

border crisis, at least part of which the district court found is traceable to rescinding MPP. The causal chain is easy to see, and the Government does not meaningfully contest this point. *See also* 🔖 *Massachusetts v. EPA,* 549 U.S. at 523, 127 S.Ct. 1438 (finding traceability where the EPA's challenged action may have caused people to drive less fuel-efficient cars, which may in turn contribute to a prospective rise in sea levels, which may in turn cause the erosion of Massachusetts's shoreline).

d.

**[7]**   An injunction would remedy Texas's injury by requiring reinstatement of MPP. And with MPP back in place, immigration officers would once again have discretion to return (some) aliens to Mexico. The Government gives two arguments that it says undercut redressability. First, the Government contends, an injunction would provide no redress because immigration officers under MPP would have discretion about whether to return any given immigrant to Mexico. Stay Mot. at 8. This argument ignores the fact that, during MPP's operative period, immigration agents did in fact order over 50,000 aliens back to Mexico from the Texas border. ECF 11 at 2. The Government offers no basis to conclude that a renewed MPP would have any different impact.

Second, the Government argues there is no redressability because aliens cannot be returned to Mexico without Mexico's consent. Stay Mot. at 8. This argument fails because for at least some aliens, MPP would permit DHS to simply refuse admission at ports of entry in the first place. *See* 🚩 8 U.S.C. § 1225(b)(2)(C) (allowing the Attorney General to "return [an] alien" "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States ... to that territory pending a" removal proceeding). Further, Mexico issued a statement in 2018 consenting to admit aliens excluded from the United States under MPP—and nothing in the record suggests Mexico has since retracted that consent. *See* AR.153 (Secretaría do Relaciones Exteriores, *Position of Mexico on* **\*549** *the Decision of the U.S. Government to Invoke Section 235(b)(2) (C) of its Immigration and Nationality Act* (Dec. 20, 2018)).

e.

**[8]**   To eliminate any doubt as to standing, we emphasize that the States are entitled to "special solicitude" in the standing analysis. 🔖 *Massachusetts v. EPA,* 549 U.S. at 520, 127 S.Ct. 1438; *see also* 🔖 *Texas,* 809 F.3d at 151 (beginning with the special-solicitude question). Such special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests. 🔖 *Texas,* 809 F.3d at 151–52 (citing 🔖 *Massachusetts,* 549 U.S. at 516–20, 127 S.Ct. 1438). In both 🔖 *Massachusetts* and 🔖 *Texas,* the first prong was satisfied where a State challenged an agency action as invalid under a statute. 🔖 549 U.S. at 516–17, 127 S.Ct. 1438 (Clean Air Act); 🔖 809 F.3d at 152–53 (APA). And in both cases, the second prong was satisfied where a State's challenge involved an agency's alleged failure to protect certain formerly "sovereign prerogatives [that] are now lodged in the Federal Government." 🔖 *Massachusetts,* 549 U.S. at 520, 127 S.Ct. 1438; *see* 🔖 *Texas,* 809 F.3d at 152–54. Particularly relevant here is 🔖 *Texas,* where this Court held that DAPA, by authorizing the presence of many previously unlawful aliens in the United States, affected "quasi-sovereign interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses." 🔖 809 F.3d at 153 (quotation omitted).

**[9]**   Texas is indeed entitled to special solicitude. First, just as in the DAPA suit, Texas is asserting a procedural right under the APA to challenge an agency action. *See* 🔖 *id.* at 152 ("In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." (quoting 🔖 5 U.S.C. § 702)). And second, Texas asserts precisely the same driver's-license-based injury here that it did there. *See* 🔖 *id.* at 153–54 (explaining that DAPA, by greatly increasing the class of people to whom existing Texas law would entitle a subsidized driver's license, pressured Texas to change its own law—thus affecting a quasi-sovereign interest). Thus, Texas is entitled to special solicitude in the standing inquiry.

That solicitude means redressability is easier to establish for certain state litigants than for other litigants—and

this should remove any lingering doubt as to that prong. *See* Massachusetts, 549 U.S. at 517–18, 127 S.Ct. 1438 (holding a State "can assert [its] right[s] without meeting all the normal standards for redressability and immediacy" (quotations and citations omitted)). Texas would be able to establish redressability without this special solicitude—but it reinforces our conclusion that the States have standing and that the Government has failed to make a strong showing to the contrary.

### 2.

The Government next argues this suit is non-justiciable under the APA. The Government makes three arguments on this score. None is persuasive.

#### a.

**[10]**  First, the Government argues that its termination of MPP is not a "final agency action" under the APA. The APA allows judicial review for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And for an agency action to qualify as final, the action must (1) mark[ ] the consummation  *\*550*  of the agency's decisionmaking process," and (2) either determine "rights or obligations" or produce "legal consequences." Texas v. EEOC, 933 F.3d 433, 441 (5th Cir. 2019) (quoting Bennett v. Spear, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).

**[11]    [12]**  The Government does not contest that the June 1 Memorandum was the consummation of the decisionmaking process. As for the second prong, the Government simply asserts the Memorandum is a general policy statement— and therefore can neither determine rights nor produce obligations or legal consequences. Stay Mot. at 10–11. This argument ignores Circuit precedent establishing that a "policy statement" can nonetheless be "final agency action" under the APA. *See* Merchs. Fast Motor Lines, Inc. v. ICC, 5 F.3d 911, 919–20 (5th Cir. 1993). It also ignores the principle that "where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action" under the APA. EEOC, 933 F.3d at 442 (quotation omitted). As the district court ably explained, the Memorandum

withdrew DHS officers' previously existing discretion when it directed "DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." D. Ct. Op. at 27 (emphasis omitted) (quoting AR.7).

#### b.

**[13]**  Second, the Government argues that the decision to terminate MPP is unreviewable under 5 U.S.C. § 701(a). Stay Mot. at 8. The APA creates a "basic presumption of judicial review." DHS v. Regents of the Univ. of Cal., —— U.S. ——, 140 S. Ct. 1891, 1905, 207 L.Ed.2d 353 (2020) (quotation omitted). And to vindicate that presumption, the Supreme Court has read § 701(a)(2) "quite narrowly." Id. (quotation omitted). The presumption can be overcome "by a showing that the relevant statute precludes review, § 701(a)(1), or that the agency action is committed to agency discretion by law, § 701(a)(2)." Id. (quotations and alterations omitted). Here, the Government has tried but failed to make both showings.

**[14]**  The Government argues that 8 U.S.C. § 1225(b)(2)(C) is a "statute[ ] [that] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Section 1225(b)(2)(C) provides:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

That provision does confer the discretion to choose among various detention and non-detention options for aliens placed in § 1229a removal proceedings. But the question presented in the States' complaint is *not* whether a particular alien is subject to detention in any particular set of

circumstances. The States are instead challenging DHS's June 1 decision to rescind MPP—which is a government program that creates rules and procedures for *entire classes* of aliens. It remains true—with or without MPP—that DHS has discretion to make individualized detention and non-detention decisions in accordance with the strictures of § 1225. What DHS cannot do, the States allege, is rescind the MPP program in a way that is arbitrary, capricious, and contrary to law. DHS cites nothing to suggest that latter decision is committed to agency discretion. In fact, cases like *Regents* prove it is not. *See* 140 S. Ct. at 1905–06 (decision to rescind DACA not **\*551** committed to agency discretion); *Texas,* 809 F.3d at 168–69 (decision to implement DAPA not committed to agency discretion).

**[15]** **[16]** The Government's argument that the decision to rescind MPP is "committed to agency discretion by law" fails for similar reasons. 5 U.S.C. § 701(a)(2); *see Regents,* 140 S. Ct. at 1905. This form of non-reviewability occurs where a statute is "drawn so that it furnishes no meaningful standard by which to judge the [agency's] action." *Dep't of Commerce v. New York,* ––– U.S. ––––, 139 S. Ct. 2551, 2568, 204 L.Ed.2d 978 (2019); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (holding a decision is committed to agency discretion when there is "no law to apply" (quotation omitted)). The Government argues that § 1225 provides no standard by which to evaluate DHS's action in this case. Stay Mot. at 8–9.

Once again, Supreme Court precedent undercuts the Government's argument. Even a statute that "leave[s] much to [an agency's] discretion" does not necessarily "leave [that] discretion unbounded." *Dep't of Commerce,* 139 S. Ct. at 2567–68 (holding a statute granting the Secretary of Commerce broad discretion to take the census "in such form and content as he may determine" did not commit the decision to reinstate a citizenship question to the Secretary's discretion (quotation omitted)). So too here. Section 1225(b)(2)(C) certainly confers discretion, but there is no reason to think that discretion is infinite—just as there is no reason to think the discretion extends beyond the bounds of individualized, case-by-case determinations to begin with. And like the statute in *Department of Commerce,* which included provisions that meaningfully restrained the Secretary of Commerce, *see* 139 S. Ct. at 2568–69, § 1225 includes provisions restraining the DHS in this case. *See* § 1225(b)(1)(B)(iii)(IV) (an alien subject to expedited removal, but without a credible fear of persecution, "shall be detained pending a final determination of credible fear of persecution"); § 1225(b)(1)(B)(ii) (an alien with a credible fear of persecution "shall be detained for further consideration of the application for asylum"); § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); § 1225(b)(2)(C) (Attorney General "may return" an alien not subject to expedited removal as an alternative to detention). We conclude that this is not a "case in which there is no law to apply." *Dep't of Commerce,* 139 S. Ct. at 2569 (quotation omitted).

c.

**[17]** The Government's final justiciability argument is that the MPP-termination decision is nothing more than a non-enforcement decision, unreviewable under *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). This argument fails for two reasons. The first is that the termination of MPP is more than a non-enforcement policy, just like the DACA program at issue in *Regents* and the DAPA program at issue in *Texas.* As the district court explained, the termination of MPP will necessarily lead to the release and parole of aliens into the United States. And that will "create affirmative benefits for aliens such as work authorization." D. Ct. Op. at 31; *see also Texas,* 809 F.3d at 167 ("Likewise, to be reviewable agency action, DAPA need not directly confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial **\*552** review.' " (quoting *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649)).

Second and independently, the termination of MPP was simply not a non-enforcement decision. MPP was a government program—replete with rules procedures and dedicated infrastructure. It is precisely because MPP was a government program—and *much more* than a non-

enforcement decision—that the Government now claims that it will be difficult to resume it. *See infra* Part III. And the Government cites nothing to suggest that the elimination of a such a program can be dismissed as mere "non-enforcement." The Government therefore has failed to make a strong showing that the States' claims are non-justiciable.

### B.

The Government next argues that it is likely to succeed on appeal because the June 1 Memorandum accords with federal law. The district court held otherwise on two independent grounds. First, the district court determined that the termination of MPP violated the APA because the June 1 Memorandum was arbitrary and capricious. D. Ct. Op. at 34–42. Second, the district court concluded that in "these particular circumstances," the termination violated 8 U.S.C. § 1225. *Id.* at 42–44 (emphasis removed). We hold the Government has not come close to showing that it is likely to succeed in challenging either conclusion, let alone both.

### 1.

**[18]  [19]  [20]  [21]**  First, the APA. The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, — U.S. —, 141 S. Ct. 1150, 1158, 209 L.Ed.2d 287 (2021). While applying this "deferential" standard, we must not "substitute" our "own policy judgment for that of the agency." *Id.* But we must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made' " (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct.

239, 9 L.Ed.2d 207 (1962))). "Put simply, we must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.' " *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). This review "is not toothless." *Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019). And in all events, we can consider only the reasoning "articulated by the agency itself"; we cannot consider *post hoc* rationalizations. *State Farm*, 463 U.S. at 50, 103 S.Ct. 2856; *see also Regents*, 140 S. Ct. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

**[22]**  The Government has not shown a strong chance of success on appeal. That is because when terminating MPP in the June 1 Memorandum, the Secretary failed to consider several "relevant factors" and " 'important aspect[s] of the problem.' " **\*553** *Michigan v. E.P.A.*, 576 U.S. 743, 750, 752, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015) (quotations omitted); *see also Regents*, 140 S. Ct. at 1910. These include (a) the States' legitimate reliance interests, (b) MPP's benefits, (c) potential alternatives to MPP, and (d) § 1225's implications. These four omissions likely doom the Government's appeal. The Governments counterarguments (e) are unpersuasive.

#### a.

DHS "failed to address whether there was 'legitimate reliance' on" MPP. *Regents*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996)). In its seven-page June 1 Memorandum, DHS does not directly mention any reliance interests, especially those of the States. The closest the June 1 Memorandum gets is a reference to "the impact [terminating MPP] could have on border management and border communities." AR5. But the Memorandum makes clear that "border communities" do not include border states. *See id.* ("referring only to "nongovernmental organizations and local officials"). And the vague reference to "border management" is insufficient to show specific, meaningful consideration of the States' reliance interests.

In response, the Government concedes that it failed to consider the States' reliance interests. But it argues that is irrelevant because "the States have no cognizable reliance interest in a *discretionary* program." Stay Mot. at 18. We reject that argument for several reasons.

Most importantly, the Government's contention is squarely foreclosed by 🚩 *Regents*. There, the Supreme Court acknowledged that the Deferred Action for Childhood Arrivals ("DACA") program was a discretionary program. 🚩 140 S. Ct. at 1910. Still, the Court faulted DHS for not considering reliance interests, including in particular those of the states. As the Supreme Court explained, "[w]hen an agency changes course, ... it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." 🚩 *Id.* at 1913 (quotation omitted). Those reliance interests included states' interests. *See* 🚩 *id.* at 1914 (highlighting assertions that "[s]tates and local governments could lose $1.25 billion in tax revenue each year"). So if the termination of DACA—a discretionary, immigration program—must consider states' "potential reliance interests," then so does termination of MPP. 🚩 *Id.* at 1913. That is particularly true here because the district court found as a matter of fact—and the Government does not contest—that states like Texas face fiscal harm from the termination of MPP. *See* D. Ct. Op. at 18–20.

The district court also found that the "termination of MPP has and will continue to increase the number of aliens being released into the United States." *Id.* at 17. The Supreme Court has recognized that border states "bear[ ] many of the consequences of unlawful immigration." 🚩 *Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). It therefore follows that a "potential reliance interest" that DHS must consider includes Texas.

The DHS-Texas Agreement reinforces the Government's awareness of the State's reliance interests. In that Agreement, DHS stipulated:

- "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Compl., Ex. B at 1.

- "The harm to Texas is particularly acute where its budget has been set months or years in advance and it has **\*554** no time to adjust its budget to respond to DHS policy changes." *Id.*

- "[A]n aggrieved party will be irreparably damaged." *Id.* at 5.

The Agreement further states that it "establishes a binding and enforceable commitment between DHS and Texas." *Id.* at 2. Texas therefore could reasonably rely on the Agreement. And Texas did in fact rely on the Agreement by including DHS's breach as a cause of action in its complaint—filed months before the June 1 Memorandum. And then—despite these reliance interests and despite being on notice of the Agreement from the States' complaint—the June 1 Memorandum said not one word about the Agreement. A "reasonable and reasonably explained" decision would have said *something.* 🚩 *Prometheus*, 141 S. Ct. at 1158. That is why this "omission alone [likely] renders [the Secretary's] decision arbitrary and capricious." 🚩 *Regents*, 140 S. Ct. at 1913. [4]

b.

The June 1 Memorandum also failed to consider DHS's prior factual findings on MPP's benefits. In its October 2019 Assessment of MPP, DHS found that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." D. Ct. Op. at 10. DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims ... [to] remain in the country for lengthy periods of time." *Id.* These benefits, DHS emphasized, were a "core component" or "cornerstone" of the agency's prior immigration policy. *Id.* at 12.

**[23]** Nonetheless, the June 1 Memorandum did not expressly mention, let alone meaningfully discuss, DHS's prior factual findings. Instead, the Secretary changed policies based on his own findings that contradict DHS's October 2019 findings. But an agency must provide "a more detailed justification" when a "new policy rests upon factual findings that contradict those which underlay its prior policy." 🚩 *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). The Secretary did not provide the

required "more detailed justification." *Id.* This further indicates that the termination of MPP was arbitrary and capricious.

c.

**[24]**   The June 1 Memorandum also insufficiently addressed alternatives to terminating MPP. "[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotation omitted). While considering alternatives, DHS "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. **\*555** As explained above, DHS did not adequately assess reliance interests. So it would be impossible for the June 1 Memorandum to properly weigh the relevant interests against competing policy concerns while considering alternatives.

The June 1 Memorandum offers a single conclusory sentence addressing potential modifications to MPP: "I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources." AR.5. But "belief" that a "total redesign" was required, *id.*, is no substitute for a "reasonable and reasonably explained" decision. *Prometheus*, 141 S. Ct. at 1158.

Of course, "DHS was not required ... to consider *all* policy alternatives in reaching [its] decision," and the agency has "considerable flexibility" to "wind-down" a program. *Regents*, 140 S. Ct. at 1914 (emphasis added) (quotation omitted). But the problem is that the Secretary failed to mention *any* modification to MPP as a possible alternative, even though "the alternatives ... are within the ambit of the existing policy." *Id.* at 1913 (quotations omitted). And merely stating that an alternative was considered is not enough to show reasoned analysis. *Cf.* *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("We do not defer to the agency's conclusory or unsupported suppositions." (quotation omitted)).

The Government's principal counterargument is that DHS considered an alternative *outside* "the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913. Specifically, the June 1 Memorandum pointed to a "Dedicated Docket" program designed to provide counsel to aliens in removal proceedings. AR.4–5 & n.6; *see* Stay Mot. at 16; Reply at 7. This argument is unpersuasive for at least two reasons. First, by the Government's own admission, the "Dedicated Docket" is outside the ambit of MPP—and hence it does not count as a reasoned consideration of alternatives "*within* the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (emphasis added). And second, neither the June 1 Memorandum nor the Government in its stay motion explains why MPP and the "Dedicated Docket" are mutually exclusive.

d.

The June 1 Memorandum also failed to consider the legal implications of terminating the policy. After the Government suspended MPP—but before it rescinded the program—Texas filed this lawsuit. In its original complaint, and in its initial motion for preliminary injunction, Texas argued that the suspension of MPP violated § 1225. *See* Compl. at 36–38; Prelim. Inj. Mot., ECF No. 30. About a month and a half later, the Secretary issued the memorandum terminating MPP. So the government was on notice of the legal implications. Yet in the memorandum, the Secretary does not mention the lawfulness concerns involving § 1225—even though, the "natural response" to this "newly identified problem" would be to consider the problem. *Regents*, 140 S. Ct. at 1916. This further indicates that "the process by which the Secretary reached that result was neither "logical" nor "rational." *Michigan*, 576 U.S. at 750, 135 S.Ct. 2699.

e.

The Government offers a hodgepodge of counterarguments to justify the June 1 Memorandum's omissions. None is persuasive.

**[25]**   The Government repeatedly argues that DHS's statement that it considered this or that factor is enough to avoid any arbitrary-and-capricious problems. *See* **\*556** Stay Mot. at 16. The law says otherwise. "Stating that a

factor was considered ... is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements ...."); *United Techs.*, 601 F.3d at 562 ("We do not defer to the agency's conclusory or unsupported suppositions." (quotation omitted)); *cf. Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("And stating that a factor was considered— or found—is not a substitute for considering or finding it." (quotation omitted)); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). This well-established principle makes sense. After all:

> [A]n agency's "experience and expertise" presumably enable the agency to provide the required explanation, but they do not substitute for the explanation, any more than an expert witness's credentials substitute for the substantive requirements applicable to the expert's testimony under Fed. R. Evid. 702. The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter.

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (citations omitted).

The Government also points to the June 1 Memorandum's observations on MPP's shortcomings. *See* Stay Mot. at 16–17. Even if creditable, these observations cannot justify the other omissions discussed above. But in any event, many of those observations are neither "logical" nor "rational." *Michigan*, 576 U.S. at 750, 135 S.Ct. 2699. Take DHS's termination justification based on *in absentia* removal orders. DHS observed that "the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) *raises*

*questions* for me about the design and operation of the program." AR.4 (emphasis added). The district court found that "[t]he federal government's data shows similarly high rates of *in absentia* removals *prior* to implementation of MPP." D. Ct. Op. at 40. The Government has not said one word to suggest the district court's factual finding was clearly erroneous.[5] We therefore cannot conclude that the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation" with "a rational connection between the facts found and the choice" to terminate MPP. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quotation omitted). And even on the Government's own terms—considering *only* half the statistics and ignoring the district court's factual finding— the June 1 Memorandum only said that *in absentia* statistics "raise[d] questions for [DHS] about the design and operation of the program." AR.4. But the process required by the APA requires agencies to *seek answers* and reasonably explain the **\*557** outcome of that effort, including its conclusions.

The June 1 Memorandum places much weight on COVID-19. According to the Memorandum, the pandemic "compounded" "challenges faced by MPP" when "immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021." AR.4. But DHS issued its memorandum terminating MPP at least one month *after* courts reopened. As the district court explained: "*Past* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021. This is especially true when the Secretary admits DHS had maintained the facilities during the pandemic." D. Ct. Op. at 41. The Government challenges this conclusion on the ground that "infrastructure used for MPP remains shuttered." Stay Mot. at 19 n.4. But the Government provides no indication that the facilities are not maintained or are shuttered because of the pandemic—as opposed to the choice the Government itself made when it suspended MPP in January 2021.

### 2.

In addition to the APA, the district court also relied on 8 U.S.C. § 1225. The Government claims that the district court determined that "the Secretary is *required* to return any noncitizen he fails to detain" and that the district court's "core legal analysis" is that DHS has "a binary choice between detention or return to Mexico for noncitizens arriving from Mexico." Stay Mot. at 11–13. In essence, the Government characterizes the district court's decision and injunction as

removing the Government's ability to use its discretion under 8 U.S.C. §§ 1182(d)(5)(A) and 1226. But as we explain in Part III, *infra*, the Government has mischaracterized the district court's order. This matters because all of the Government's § 1225 arguments hinge on an incorrect premise.

Therefore, we cannot conclude that the Government is likely to succeed on either its APA arguments or its § 1225 arguments—let alone that the Government is likely to succeed on both. The Government therefore has not come close to a "strong showing" that it is likely to succeed on the merits. *Nken*, 556 U.S. at 426, 129 S.Ct. 1749.

### III.

**[26]** The Government also has not shown that it will be irreparably injured absent a stay pending appeal. The Government's arguments are largely built on two strawmen. We consider and reject those before turning to the Government's other arguments.

First, the Government complains that it will be irreparably harmed absent a stay because DHS is incapable of reinstating MPP "in a matter of days." Stay Mot. at 21; *see also* Decl. of David Shahoulian ¶ 16 (Aug. 16, 2021) (arguing DHS cannot immediately "reestablish the entire infrastructure upon which [MPP] was built"). This is a strawman. The district court did not order the Government to restore MPP's infrastructure overnight. It ordered that, once the injunction takes effect on August 21, DHS must "enforce and implement MPP *in good faith*." D. Ct. Op. at 52. DHS does not argue that good faith is an unreasonably high standard to meet.

Second, the Government asserts it will be irreparably injured because the injunction obligates DHS to detain "every single person described in 8 U.S.C. § 1225," which DHS cannot do because it lacks "sufficient detention capacity." Decl. of David Shahoulian ¶ 5 (Aug. 16, 2021). This is a second strawman. The injunction does not require the Government to detain every **\*558** alien subject to § 1225. Nor does it order the Government to "build or obtain" additional detention facilities. Stay Mot. at 21. Instead, it requires the Government to "enforce and implement MPP *in good faith ... until such a time* as the federal government has sufficient

detention capacity to detain all aliens subject to mandatory detention." D. Ct. Op. at 52 (second emphasis added).

And far from ordering the Government to detain "every single person described in 8 U.S.C. § 1225," Decl. of David Shahoulian ¶ 5 (Aug. 16, 2021), the district court specifically acknowledged that the Government has other options. Under § 1225(b)(2)(A), which provides the statutory authority for MPP, an alien arriving on land from a contiguous foreign territory can be returned to that territory. *See* D. Ct. Op. at 43 & n.11 (noting this discretion). Under 8 U.S.C. § 1182(d)(5)(A), DHS can parole an alien into the United States "on a *case-by-case* basis for urgent humanitarian reasons or significant public benefit." (Emphasis added); *see* D. Ct. Op. at 43 & n.11 (noting this discretion). Under 8 U.S.C. § 1226, DHS can release on "bond" or "conditional parole" an alien arrested on a warrant and detained "pending a decision on whether the alien is to be removed." *See also* Stay Mot. at 12; D. Ct. Op. at 51 (noting this discretion). Last but not least, of course, the Government can choose to detain an alien in accordance with § 1225. *See* D. Ct. Op. at 43 (noting this discretion).

What the Government cannot do, the district court held, is simply release every alien described in § 1225 *en masse* into the United States. The Government has not pointed to a single word anywhere in the INA that suggests it can do that. And the Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take.

Third and finally, we turn to the Government's non-strawmen arguments for its irreparable injuries. Most of these are self-inflicted and therefore do not count. *See* 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2021) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"). For example, the Government notes that "DHS has been in the process of unwinding MPP and its infrastructure for months," such that restarting the program now would be difficult. Stay Mot. at 21. But as the district court noted, "Texas filed suit challenging the suspension of enrollments in MPP ... nearly two months *before* DHS purported to terminate the program entirely in the June 1 Memorandum." D. Ct. Op. at 47. Therefore, DHS could have avoided this problem by waiting to unwind MPP until this litigation was resolved. The self-inflicted nature of the

government's asserted harm " 'severely undermines' its claim for equitable relief." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Hirschfeld v. Bd. of Elections in City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993)); *accord Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

 **[27]**  Before the district court, the Government also suggested that it began unwinding MPP four or more months *before* the June 1 Memorandum. *See* D. Ct. Op. at 48. That understandably would make it harder for DHS to restart MPP on Saturday. But it also makes DHS's legal position dramatically weaker. It is a fundamental precept of administrative law that an **\*559** administrative agency cannot make its decision first and explain it later. *See, e.g.*, *Regents*, 140 S. Ct. at 1908–10. Insofar as DHS concedes that its June 1 Memorandum is a *post hoc* rationalization for a decision that it made many months earlier, it has conceded that the June 1 Memorandum is arbitrary, capricious, and not a good faith explanation for its decision. Such inequitable conduct is "sufficient to deny" DHS's request for an equitable stay pending appeal. *See In re GGW Brands, LLC*, No. 2:13-bk-15130, 2013 WL 6906375, at *26–*27 (Bankr. C.D. Cal. Nov. 15, 2013).

The Government also asserts that reinstating MPP will cause harm because "DHS cannot restart MPP without significant cooperation with Mexico," and the injunction implicates "delicate and ongoing discussions with Mexico." Stay Mot. at 21. There are at least four problems with that. First, as the district court noted, DHS created MPP unilaterally and without any previous agreement with Mexico. *See* D. Ct. Op. at 49 & n.15. DHS does not explain why it cannot likewise restart MPP unilaterally. Second, the Government does not point to any evidence that Mexico has withdrawn its support for MPP. *See* AR.152–53 (Mexico's December 20, 2018 statement of support). Third, the Government " 'could have avoided' any disruptions by simply informing Mexico that termination of MPP would be subject to judicial review." D. Ct. Op. at 47 (quoting *Texas*, 809 F.3d at 187). Insofar as the Government failed to do that, again, its injury is self-inflicted. Fourth, even assuming Mexico's support is required, assuming Mexico has withdrawn its support, and assuming

Mexico will not support a new MPP, the injunction *still* does not irreparably harm the Government. The injunction only requires good faith on the part of the United States—if the Government's good-faith efforts to implement MPP are thwarted by Mexico, it nonetheless will be in compliance with the district court's order, so long as it also adheres to the rest of the statutory requirements.

Finally, because the Government has requested a stay pending completion of appellate proceedings, the relevant question is whether the Government will be irreparably harmed *during the pendency of the appeal*. Even if the Government were correct that long-term compliance with the district court's injunction would cause irreparable harm, it presents no reason to think that it cannot comply with the district court's requirement of good faith while the appeal proceeds. Therefore, the Government has failed to demonstrate that it will be irreparably injured absent a stay pending appeal.

### IV.

 **[28]**  The final two *Nken* factors also do not warrant a stay. *See Nken*, 556 U.S. at 434, 129 S.Ct. 1749.

The district court concluded that the States have suffered, and will continue to suffer, harms as a result of the termination of MPP. *See* D. Ct. Op. at 17 ("The termination of MPP has [increased] and will continue to increase the number of aliens being released into the United States and has [imposed] and will continue to impose harms on Plaintiff States Texas and Missouri."). We agree. *See supra* Part II.A.1 (standing). A stay "would enable" aliens released into the interior "to apply for driver's licenses and other benefits, and it would be difficult for the states to retract those benefits or recoup their costs even if they won on the merits." *Texas v. U.S.*, 787 F.3d 733, 768 (5th Cir. 2015).

Likewise, the "public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations." **\*560** *Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994). Here, the Government has failed to carry its burden to show that its conduct comports with federal law. And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The Government is also wrong to say that a stay would promote the public interest by preserving the separation of powers. All the district court's injunction requires of the Government is that it act in accordance with the INA. And in all events, "it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect" principles of "separation of powers and federalism." *Texas*, 787 F.3d at 768.

The DHS-Texas Agreement also suggests the public interest counsels against issuing a stay. That Agreement expressly acknowledged that if DHS failed to comply with the Agreement's terms, Texas would "be irreparably damaged" and would "not have an adequate remedy at law." Compl., Ex. B at 4. The Agreement remained binding until August 1, 2021, and the parties agree DHS violated its terms. *See* D. Ct. Op. at 14 ("The parties agree DHS did not follow the[ ] procedures" required by the Agreement). The district court concluded that the expiration of the Agreement mooted Texas's claim under it. *See id.* at 44. As noted in Part II above, however, the States' likelihood of success on the merits of their APA claims means that DHS will have to consider all relevant factors before attempting to rescind MPP—including its effects on the States. The public interest plainly lies in not allowing DHS to circumvent those federalism concerns.

### V.

Finally, the Government argues a stay is warranted because the district court should have remanded without vacating the June 1 Memorandum or issuing an injunction. Stay Mot. at 22; *see also* Reply at 12. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389

(5th Cir. 2021). But it is unclear how DHS can substantiate its decision on remand. Neither in its opening stay motion nor in its reply does the Government suggest how it can. *See generally* Stay Mot. at 22–23; Reply at 12. And Supreme Court precedent suggests that any later memorandum on remand elaborating on the June 1 Memorandum would be irrelevant to an arbitrary-and-capricious analysis because it is a *post hoc* rationalization. *See* *Regents*, 140 S. Ct. at 1907–09. So at this stage, without any argument whatsoever to the contrary, it appears that DHS would have to issue "a *new* rule implementing a *new* policy" that "compl[ies] with the procedural requirements for new agency action." *Id.* at 1908 (emphases added).

Vacatur, by contrast, would not cause "disruptive consequences". *See* *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (also considering "the disruptive consequences of vacatur" (internal quotation marks omitted)). The Government makes no argument materially different from its irreparable-injury argument. So we reject the Government's arguments here for the same reasons we rejected them in Part III, *supra*.

* * *

The Government has failed to make the requisite showing for all four *Nken* factors. The Government's motion for a stay pending appeal is therefore DENIED. The Government's appeal is hereby EXPEDITED **\*561** for consideration before the next available oral argument panel.

**All Citations**

10 F.4th 538

### Footnotes

1    We refer to the Secretary's actions as those of "DHS" unless otherwise stated.

2    For this reason, we focus on Texas's standing. We note, however, that Missouri brings largely similar arguments with respect to driver's-license, educational, healthcare, and other costs.

3    On one reading of the Government's brief, it does contest the fifth finding. *See* Stay Mot. at 7 (discussing "speculation about an increase in the number of aliens released and paroled who will seek driver's licenses" (quotation omitted)). But in any case, neither our precedent nor the district court's record allows us to conclude the Government is likely to show the finding is clearly erroneous. *See* ⚑ *Texas,* 809 F.3d at 156 (making a similar inference about driver's license applications).

4    As the D.C. Circuit has emphasized in a different APA context, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." ⚑ *Sherley v. Sebelius,* 689 F.3d 776, 784 (D.C. Cir. 2012) (Sentelle, C.J.) (quotation omitted). We do not suggest that DHS needed notice-and-comment rulemaking to rescind MPP. But it did need to consider "relevant factors" to that rescission decision. ⚑ *Id.* And you might reasonably think that one "relevant factor[ ]" to that decision was DHS's pledge "to consult Texas and consider its views before taking any action, adopting or modify[ing] a policy or procedure, or making any decision that" affects MPP. Compl., Ex. B at 2. Perhaps DHS has a good reason for its action. But it is likely arbitrary and capricious for DHS not even to acknowledge its agreement—let alone do anything to consult Texas or consider its views.

5    In its reply brief, the Government argues that it need not have commissioned an "in-depth empirical analysis" of the *in absentia* statistics before rescinding MPP. Reply at 9. Of course that is true. But it is equally true that the Government cannot cherry-pick only the statistics it likes in the administrative record. Nor can the Government fail to address statistics that already exist in that record. *See* ⚑ *Encino Motorcars, LLC v. Navarro,* —— U.S. ——, 136 S. Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) (holding "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (quotation omitted)).

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** and | Case No. 2:21-CV-22 |
| **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security | (Judge Kleeh) |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff, STATE OF WEST VIRGINIA, files this lawsuit seeking judicial review of the decision of the United States Department of Homeland Security ("DHS") and Secretary Alejandro Mayorkas, in his official capacity (the "Secretary") to terminate a critical border security program without considering the consequences for the ongoing devastating deadly flood of fentanyl across the Southwest border into this country.

## NATURE OF ACTION

1. The United States today is suffering from an unprecedented and increasing surge of drug overdose deaths resulting from fentanyl trafficked into this country across the Southwest border from Mexico, both at and between ports of entry.

2. Despite this pressing emergency, DHS suspended and then terminated a critical border security program without considering the impact that this decision would have on fentanyl trafficking across the Southwest border and into the rest of the Country and the ensuing addiction, death, and related consequences, in direct violation of the requirements of the Administrative

AR02049

Procedure Act (the "APA").

3. The DHS established the Migrant Protection Protocols ("MPP") on December 20, 2018, in order to deter individuals without legal authorization or valid asylum claims from seeking to enter the United States by crossing the Southwest border.

4. Under the MPP program, asylum applicants attempting to cross the Southwest border were returned to Mexico for expedited processing of their claims, as authorized by Section 235(b)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(2)(C), rather than held in detention or, as was most common, released into the United States under the guise of a statutory "parole."

5. By dramatically reducing the number of individuals without valid asylum claims released into the United States pending adjudications taking years and often resulting in individuals not appearing or in absentia removal, DHS—via the MPP—aimed at "reduc[ing] illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place."[1]

6. One of the stated purposes of this deterrence program was to increase DHS's ability to focus resources and personnel on securing the border against threats such as drug trafficking.

**The Biden Administration Impermissibly Revoked the MPP**

7. The MPP was first suspended on January 20, 2021 (the "Suspension Decision"), and then formally terminated by the Secretary on June 1, 2021 (the "Termination Decision"), without any consideration of how the termination would impact drug trafficking and the flow of fentanyl across the Southwest border into this country, despite this precise issue being raised to the Secretary prior to the termination.

8. A seven page memorandum was issued explaining the Termination Decision on June 1,

---

[1] DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

AR02050

2021, as well.  *See* DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021) (the "June Termination Memorandum").[2]

9. After the Suspension Decision, Texas and Missouri sued President Biden and other federal official in their official capacities, as well as related agencies, on April 13, 2021, to enjoin the suspension of the MPP.  *See Texas v. Biden*, No. 2:21-cv-00067 (N.D. Tex. Aug. 13, 2021) (the "Texas Case").  That action was later modified to focus on the Termination Decision, which superseded the Suspension Decision.

10. On June 7, 2021, West Virginia Attorney General Patrick Morrisey objected by letter to the dereliction of duty and violation of the Administrative Procedure Act embodied in the Termination Decision, and requested that DHS respond by June 20, 2021.  *See* Letter from Patrick Morrisey to Alejandro Mayorkas (June 7, 2021) ("Morrisey Letter").  Attorney General Morrisey admonished that "[t]here should be no need for a lawsuit to make ending the fentanyl flood one of your priorities."  DHS never responded to this letter.

11. On August 13, 2021, the court in the Texas Case determined that the Termination Decision was, among other things, arbitrary and capricious and issued an injunction against the enforcement of the decision to terminate the MPP (the "Texas Court Order").  DHS then appealed that ruling.

12. Having received no response to the Morrisey Letter, the State of West Virginia consequently filed its original Complaint on August 19, 2021.  *See* Complaint, ECF No. 1.

13. On September 29, 2021, DHS issued a press release stating it was going to terminate MPP.[3]

14. On October 15, 2021, DHS' announced, via Twitter, that "DHS will be issuing a memo terminating MPP…"

---

[2] DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.
[3] DHS, *DHS Announces Intention to Issue New Memo Terminating MPP* (Sept. 29, 2021), *available at* https://www.dhs.gov/news/2021/09/29/dhs-announces-intention-issue-new-memo-terminating-mpp

AR02051

15. On October 29, 2021, DHS issued a memorandum with the subject "Termination of the Migrant Protection Protocols" (the "October Termination Memorandum") which stated that Secretary Mayorkas "once more assessed whether MPP should be maintained, terminated, or modified" and concluded that he is "hereby terminating MPP."[4]

16. On October 29, 2021, Secretary Mayorkas also issued a 39-page memorandum titled "Explanation of the Decision to Terminate the Migrant Protection Protocol" (the "Explanation Memorandum").[5]

17. The Defendants did not file a responsive pleading to the original Complaint, in November seeking additional time based on the publication of the October 29, 2021, memoranda.

18. In light of these filings and after conferring with the Defendants per the Court's direction, the State was granted leave to amend its Complaint.

19. On December 2, 2021, DHS issued "Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols" (the "Reimplementation Guidance") that purported to reinstate the MPP program.[6]

20. DHS' termination of MPP—through the Termination Decision and the various memoranda issued addressing termination of MPP—does not properly consider the impact of the MPP termination on trafficking of fentanyl into our country and is arbitrary, capricious, and an abuse of discretion.

21. DHS' attempted rehabilitation of this failing and maneuver to moot this action—namely

---

[4] DHS, *Memorandum on Termination of the Migrant Protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-memo.pdf.

[5] DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.

[6] DHS, *Memorandum on Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols* (Dec. 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1202_plcy_mpp-policy-guidance_508.pdf.

AR02052

the issuance of the October memoranda—is inherently flawed.  Its October documents demonstrate its belief in "the power to implement a massive policy reversal—affecting billions of dollars and countless people—simply by typing out a new Word document and posting it on the internet." *Texas v. Biden*, No. 21-10806, 2021 WL 5882670, at *1 (5th Cir. Dec. 13, 2021).  This is something that a federal agency cannot do.  *Id.*

22. Furthermore, the Reimplementation Guidance contains loopholes and exceptions that go beyond the statutory authority of DHS and drastically undermine the reimplementation of the MPP program.

23. This Court should invalidate the termination of the MPP program and require DHS to reestablish and continue the MPP program properly and not pursuant to the Reimplementation Guidance.

## JURISDICTION AND VENUE

24. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities, the State of West Virginia is a resident of this judicial district, and no real property is involved in the action.

## PARTIES

26. The State of West Virginia is a sovereign State of the United States of America. Attorney General Morrisey has state constitutional and statutory authority to represent the State in federal court. W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also* Syl. Pt. 4, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002).

27. The Department of Homeland Security is an agency of the United States.

AR02053

28. Alejandro Mayorkas is Secretary of the Department of Homeland Security and is named as a party in his official capacity.

29. The Secretary is responsible for securing and managing our nation's borders and is empowered to issue regulations necessary to do so.

## STANDING

30. West Virginia has standing to seek judicial review of DHS's arbitrary and capricious termination of the MPP without considering the impact of the decision on fentanyl trafficking into the country. *Cf. Department of Commerce v. New York*, 139 S. Ct. 2551, 2565-2566 (2019).

31. West Virginia further has standing under the special solicitude doctrine.

### West Virginia Has Been Injured By Increased Fentanyl Crossing The Border And Flowing To West Virginia.

32. Fentanyl is produced in Mexico and, trafficked across the border into the United States.[7]

33. While much of the fentanyl is manufactured in China, it still reaches the U.S. through the Mexican border. *Id*. at 9.

34. Once in the US, a typical distribution path is to Chicago, and then to "Toledo, Columbus, Cincinnati and south to West Virginia." *Id.* at 31-32.

35. Upon information and belief, increased fentanyl smuggling across the border in turn increases the amount of fentanyl consumed in West Virginia and in turn the number of West Virginians killed or otherwise harmed by this lethal poison.

36. As a result, West Virginia has suffered financial damages by virtue of (i) increased medical care costs of the State to take care of those who overdose on fentanyl (such as EMS response, hospital care, drug treatment centers and naloxone/narcan treatments); (ii) increased foster care

---

[7] Wilson Center Mexico Institute, *Mexico's Role in the Deadly Rise of Fentanyl* 12 (February 2019), https://www.wilsoncenter.org/sites/default/files/media/documents/publication/fentanyl_insight_crime_final_19-02-11.pdf.

6

costs resulting from parental deaths from overdoses; (iii) increased law enforcement costs to track down, arrest, prosecute and incarcerate fentanyl dealers; and (iv) costs to care for babies born with addictions.

37. Fentanyl from Mexico kills West Virginians every single day. In 2020 alone, 992 West Virginian's died from fentanyl overdoses.[8] This was approximately 75% of the 1,336 total drug overdose deaths in West Virginia during 2020. Nationally, in 2020, there were approximately 57,550 fentanyl related deaths.[9] In other words, in one year, Mexican fentanyl killed nearly as many Americans as died in the 20 years of the Vietnam War.

38. In addition to the 992 fentanyl overdose deaths in West Virginia, there were untold additional non-lethal fentanyl overdoses.

39. In 2020, EMS responded to 7,561 suspected drug overdoses (and 3,775 in 2021 through August). Moreover there were 7,233 emergency room visits related to drug overdoses in 2020 and 6,188 in 2021 through September 2021.[10] Based on the data above showing fentanyl related overdose deaths of 75% of all overdose deaths, it is also likely that about 75% of the EMS and ER responses are in response to fentanyl usage.

40. The typical costs for each EMS response is about $1,211[11] and the typical emergency room visit cost, without admission or treatment, related to drug overdoses is at least $504. If admitted,

---

[8] WV DHHR, *Fatal Overdoses in West Virginia – Overview*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited Dec. 20, 2021).
[9] Jesse C. Baumgartner and David C. Radley, *The Drug Overdose Mortality Toll in 2020 and Near-Term Actions for Addressing It*, Commonwealth Fund: To the Point (Aug. 16, 2021), https://www.commonwealthfund.org/blog/2021/drug-overdose-toll-2020-and-near-term-actions-addressing-it.
[10] WV DHHR, *Emergency Room (ER) Visits Related to Overdoses*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited Dec. 20, 2021).
[11] Andrew Hurst, *Ambulance Rides Have Cost $1,189 on Average Since 2010 – Totaling More Than $46 Billion*, ValuePenguin (Sept. 13, 2021), https://www.valuepenguin.com/cost-ambulance-services.

AR02055

the cost can be between \$11,731 and \$20,500.[12]

41. Based on those figures, the immediate costs from these 2 categories are massive. EMS costs from fentanyl for 2020 were likely about \$6,867,278. Costs for fentanyl ER visits were likely between \$2,734,074 and \$111,207,375. It is likely that the State would bear much of these costs because drug users often have no insurance to cover these costs.

42. In 2020, over 7,100 West Virginia children were in foster care during an average month,[13] at least 85% of which resulted from drug use.[14] As of 2020, nearly 75% of drug overdose deaths resulted from fentanyl or fentanyl analogs.[15] While explicit percentage statistics on fentanyl usage resulting in placement in foster care are not available, a conservative estimate of even 50% would suggest that about 3,000 foster care placements result from fentanyl usage. Because of the large number of placements, some of these are out-of-state placements, which cost the State between \$300 and \$1,500 per day per child.[16] In-state placements are less expensive and the total daily expenditure is harder to calculate, but the cost of payments to the foster care families alone (excluding medical care, therapy and administrative costs) is at least \$26 per day per child.[17]

43. In addition, the approximate cost to care for babies born with opioid addiction (as of 2017)

---

[12] *Opioid Overdoses Costing U.S. Hospitals an Estimated \$11 Billion Annually*, Premier Inc. (Jan. 3, 2019), https://www.premierinc.com/newsroom/press-releases/opioid-overdoses-costing-u-s-hospitals-an-estimated-11-billion-annually.

[13] WV DHHR, *Foster Care Placements Report*, https://dhhr.wv.gov/bcf/Reports/Documents/2021%20January%20Legislative%20Foster%20Care%20Placements%20Report.pdf (last visited Dec. 20, 2021).

[14] WV DHHR, *West Virginia 2021 Annual Progress and Services Review* 241, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/West%20Virginia%20APSR%202021.pdf (last visited Dec. 20, 2021).

[15] National Institute on Drug Abuse, *West Virginia: Opioid-Involved Deaths and Related Harms*, https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/west-virginia-opioid-involved-deaths-related-harms (last visited Dec. 20, 2021).

[16] Amelia Ferrell Knisely et al., *West Virginia's Reliance On Out-Of-State Group Homes Leaves Some Foster Kids In Unsafe, Abusive Situations*, WV Public Broadcasting (Sept. 21, 2021, 12:54 PM), https://www.wvpublic.org/government/2021-09-21/west-virginias-reliance-on-out-of-state-group-homes-leaves-some-foster-kids-in-unsafe-abusive-situations

[17] Erin Beck, *WV Senate Restores Funding, Rights To Foster Care Bill*, The Register-Herald (Mar. 6, 2020), https://www.register-herald.com/wv-senate-restores-funding-rights-to-foster-care-bill/article_d62045d8-6012-11ea-8c6c-6f1fbed99f3a.html.

AR02056

was $66,000 per year[18], most of which is paid by the State of West Virginia.  In 2019, there were 761[19] such addicted babies, many of which (probably 75% based on the above cited statistics) suffered addiction from fentanyl-related maternal addictions, resulting in a cost to the State of as much as $54,120,000.

44. Law enforcement time, resource use, and other costs from increased fentanyl entering the State are difficult to quantify, but are real.

45. As an example, the West Virginia state-wide average cost per inmate for FY 2018 was $70.90 per day.[20]   The specific number of inmates whose incarceration stems from fentanyl-related activity is unspecified at present, but it is certainly a number that is significant.

46. The cost and impact on families affected by each fentanyl illegal usage, overdose, or death, while not a cost to the State, is immeasurable.

### The  MPP Program Decreased Irregular Border Crossings And Drug Smuggling

47. DHS has "presumed" that the MPP program "resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims."  *See* October Termination Memorandum at 3.

48.  More pointedly, though, "DHS has previously acknowledged that 'MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico.' AR 555. MPP removed the 'perverse incentives' which enticed aliens with 'a free

---

[18] *The Opioid Crisis: Impact on Child. and Fams.: Hearing Before the S. Comm. On Health, Educ., Labor, and Pensions*, 135th Cong. (2018) (statement by Senator Lamar Alexander), *available at* https://www.govinfo.gov/content/pkg/CHRG-115shrg28659/html/CHRG-115shrg28659.htm (last visited Dec. 10, 2021).
[19] U.S. Dep't of Health and Hum. Servs. – Agency for Healthcare Rsch. And Quality, *Neonatal Abstinence Syndrome (NAS) Among Newborn Hospitalizations*, https://www.hcup-us.ahrq.gov/faststats/NASServlet?radio-2=on&location1=WV&characteristic1=05C11&location2=US&characteristic2=01C11&expansionInfoState=hide& dataTablesState=hide&definitionsState=hide&exportState=hide (last visited Dec. 20, 2021).
[20]   WV   Div.   of   Corr.,   *Annual   Report:   FY2018*   42   (Dec.   2018), https://dcr.wv.gov/resources/Documents/annual_reports/WVDOC%2018%20Annual%20Report.pdf.   These costs might be assessed against the defendant, but realistically, many defendants will never pay those costs.

AR02057

ticket into the United States.' AR 684, 687; Trial Tr. 147:23–25" *Texas v. Biden*, 2021 WL 3603341, at *9 (N.D. Tex. Aug. 13, 2021), *enforcement granted in part*, No. 2:21-CV-067-Z, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and *aff'd*, No. 21-10806, 2021 WL 5882670 (5th Cir. Dec. 13, 2021).

49. Indeed, there has been a drastic uptick in illegal immigration across the Mexican border in 2021, which coincides with the cancellation of the MPP as measured by U.S. Customs and Border Patrol (CPB) encounters.  The encounters jumped from in 78,414 in January 2021 to 213,593 in July 2021, staying over 200,000 per month until September 2021 when encounters ebbed slightly to 192,001.[21]  Notably, in 2021, about 65% of these illegal entrants were single adults, not families or children.  *Id.*

50. By contrast, in September 2020, the total encounters was only 57,674.  *Id.*

51. Federal agents have "seen a staggering 4,000 percent increase in fentanyl seizures over the last three years" and "[t]hose busts are not at ports of entry, where most smuggled drugs are typically found."[22]

52. The suspension of the MPP program in January 2021 coincides with the drastic increase in fentanyl seizures at the border.  "A record setting 1,300 pounds of fentanyl has been seized at the Texas-Mexico border. This is compared to only 200 pounds seized in 2020."[23]

## This Court Can Redress This Problem

53. The Court can order DHS to reinstitute the MPP program, which will help alleviate the

---

[21] *Stats and Summaries: Southwest Land Border Encounters*, CBP, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified Dec. 17, 2021)
[22] Gabe Gutierrez and Al Henkel, *Fentanyl Seizures At U.S. Southern Border Rise Dramatically*, NBC News (June 29, 2021, 7:59 PM), https://www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676.
[23] *1.3K Lbs. Of Fentanyl Seized At Texas Border This Year*, One America News Network (Dec. 10, 2021, 10:12 AM), https://www.oann.com/1-3k-lbs-of-fentanyl-seized-at-texas-border-this-year/?utm_source=rss&utm_medium=rss&utm_campaign=1-3k-lbs-of-fentanyl-seized-at-texas-border-this-year.

AR02058

fentanyl smuggling across the Mexico-U.S. border and thereby help to alleviate the harm to West Virginia.

## West Virginia Has Standing Based On Its Special Solicitude

54. West Virginia, like other States, is not a "normal litigant[] for purposes of invoking federal jurisdiction," *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007), but is instead entitled to "special solicitude" in the standing analysis.

55. States, including West Virginia, cannot legislate or regulate immigration.  *See Arizona v. United States*, 567 U.S. 387, 401 (2012).

56.  Because of the federal government's monopoly on legislating and regulating policy and law regarding immigration, West Virginia does not have the ability to control illegal immigration into the State or the control the consequences thereof.

57. Large quantities of fentanyl are smuggled into the country from Mexico, via illegal immigration.

58. This illegal fentanyl injures West Virginia financially, as well as health and wellbeing of West Virginia's residents.

59. The federal government has the statutory obligation to control immigration.

60. The federal government also has the statutory obligation to follow proper regulatory processes, especially the APA.

61. The State has a quasi-sovereign interest in controlling and protecting its state finances and its citizens' health and safety.  "The police power of a state is an attribute of sovereignty, co-extensive therewith" and [w]ithin constitutional limits, the police power may be exercised to promote the safety, health, morals, and general welfare of society."  *Hinebaugh v. James*, 119 W. Va. 162, 192 S.E. 177, 178 (1937).

AR02059

62. The federal government's failure to properly control immigration and properly follow the APA damages the State's interest in protecting its own residents, its obligation to protect them, and its interest in its own financial wellbeing.

63. West Virginia is entitled to the same 'special solicitude' as was Massachusetts and therefore is entitled to standing to pursue the federal government's violation of the APA. *See also Texas v. Biden*, 2021 WL 5882670 at *25.

## FACTUAL ALLEGATIONS

### The Purpose of DHS and ICE

64. The statutory authority and mission of DHS, as set forth in 6 U.S.C.A. §111, focuses almost exclusively on protecting the homeland. That statute further provides that DHS will "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking." 6 U.S.C. §111(b)(1)(H).

65. The mission statement of the U.S. Immigration and Customs Enforcement ("ICE") (part of DHS) "is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety. This mission is executed through the enforcement of more than 400 federal statutes and focuses on immigration enforcement and combating transnational crime." ICE's Mission, https://www.ice.gov/mission (last visited Dec. 20, 2021).

### The Migrant Protection Protocols Effectively Implemented These Purposes

66. The purpose of MPP was to confront the border crisis of illegal migration and reduce the rate of illegal crossings which in turn would reduce the amount of drug smuggling across the border.

67. On December 20, 2018, DHS announced MPP with the goal of freeing up "[p]recious

AR02060

border security personnel and resources . . . to focus on protecting our territory[.]"[24]

68. The DHS elaborated on the purpose of MPP on Jan 25, 2019. In a section titled "Why is the DHS Instituting MPP?," the DHS stated "[h]uman smugglers and traffickers exploit migrants and seek to turn human misery into profit.  Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities."  The DHS went on to state one of the anticipated benefits of MPP was "migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey" to the U.S. [25]

**<u>Mexican Fentanyl is Killing West Virginians</u>**

69. West Virginia has battled an opioid epidemic within the state for many years.

70. The CDC determined West Virginia had the highest rate of drug overdose deaths in the nation in 2014.[26]  West Virginia continued to have the highest drug overdose death rate from 2015 to 2019.[27]

71. In recent years, fentanyl has become the deadliest drug in the State of West Virginia.  In 2020, 74.5% of all drug-related deaths in West Virginia were connected with fentanyl. Further, fentanyl-related deaths in 2020 had increased by 700% over fentanyl-related deaths in 2015.[28]

72. Fentanyl is about 100 times more potent than morphine.  A lethal dose of fentanyl can be as small as two milligrams depending on the person's body size, tolerance, and past usage.  That means one kilogram (equivalent to 2.2 pounds) of fentanyl contains up to 500,000 potentially lethal

---

[24] *See supra* note 1.
[25] DHS, *Migrant Protection Protocols* (Jan 25, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols#.
[26] Rose Rudd et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, (Jan. 1, 2016), www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.
[27] CDC, *Drug Overdose Mortality Rate by State*, (Feb. 12, 2021), www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.
[28] *See supra* note 8.

AR02061

doses.[29]

73. Drug trafficking organizations have a tremendous motivation to produce and traffic fentanyl.  Due to the potency of fentanyl, drug traffickers can bring in massive profits from relatively small amounts.

74. According to the DEA's 2017 Drug Threat Assessment, one kilogram of pure fentanyl can result in revenues of $1.28 million to $1.92 million, as compared to only $80,000 in revenue for one kilogram of heroin.[30]

75. This results from the potency of pure fentanyl, as one kilogram of pure fentanyl can be diluted to generate 16 to 24 kilograms of product, each of which is equivalent in value to one kilogram of heroin.  *Id.*

76. Upon information and belief, fentanyl smuggled in vehicles at ports of entry into this country are typically already diluted bricks or pressed into pills, given low concern over space and weight.

77. However, a new and pressing threat comes in the form of pure fentanyl carried by individuals, typically in backpacks, across the Southwest border *between* points of entry.

78. A single backpack can easily contain 10 kilograms or more of pure fentanyl, with a street value of nearly $20 million and enough potentially lethal doses to kill 5,000,000 Americans.

79. With industrial-scale illegal fentanyl production now occurring in Mexico, these backpack loads can cost less than $50,000 for drug cartels to produce.[31]

80. Seizure statistics show dramatic increases in fentanyl seizures both at and between points

---

[29] DEA, *Facts about Fentanyl,* www.dea.gov/resources/facts-about-fentanyl (last visited Dec. 20, 2021)
[30] DEA, 2017 National Drug Threat Assessment 62 (Oct. 2017), *available at* https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf.
[31] DHS, *U.S. Customs and Border Protection Budget Overview Fiscal Year 2022 Congressional Justification* CBP-3, https://www.dhs.gov/sites/default/files/publications/u.s._customs_and_border_protection_0.pdf (last visited Dec. 20, 2021).

AR02062

of entry.

81. Importantly, CBP statistics do not adjust for purity of the seized substance, so one pound reported seized between ports of entry of pure fentanyl can be equivalent to nearly 25 pounds of diluted fentanyl bricks or fentanyl pills reported as seized at a port of entry.

82. The threat of fentanyl backpacked between ports of entry is not hypothetical.

83. For example, on December 19, 2020, CBP's Integrated Fixed Tower system detected "three subjects traveling northbound from a drainage gate along the International Boundary Fence . . . between the United States and Mexico."  Criminal Complaint, *U.S. v. Morales Rodriguez*, No. 21-941 (D. Ariz. Dec. 21, 2020).

84. A Border Patrol Agent was dispatched to intercept them.  *Id.*  As he approached within a half mile of their coordinates, the Integrated Fixed Tower system camera operator observed the three individuals stop walking.  *Id.*

85. The camera operator guided the agent to the location where the three individuals had last been seen.  *Id.*

86. When he arrived, the agent found "three individuals dressed in camouflage clothing," "wearing carpet booties" (used to disguise footprints in the desert) and "attempting to conceal themselves under some brush."  *Id.*

87. The three subjects "then got up and ran in different locations."  *Id.* The agent apprehended one of the individuals and the backpack he was carrying, which contained 14.32 kilograms of methamphetamine.  *Id.*

88. The agent also seized a second backpack that likely had been carried by one of the two individuals that escaped.[32]

---

[32] CBP, *Border Patrol Seizes $3M in Narcotics* (Dec. 21, 2020), *available at* cbp.gov/newsroom/local-media-release/border-patrol-seizes-3m-narcotics.

15

89. The second backpack contained over 6 kilograms of fentanyl wrapped in cellophane and brown packing tape, along with a large quantity of methamphetamine as well. *Id.* The fentanyl alone was worth potentially $1.1 **billion** and is enough to potentially kill as many as 3,000,000 people.

These are the two backpacks seized by the agent that day:[33]



90. It is unknown whether there was a third backpack that got away with the two individuals who were not apprehended.

91. From 2016 to today, DHS and CBP have *targeted* an apprehension rate of "detected illegal entrants" "along the Southwest border between ports of entry" of 81%.  In practice, DHS actually

---

[33] *See supra* note 32.

AR02064

apprehended 82.7%, 78.9%, 79.7%, 86.3%, and 79.4% of *detected* illegal entrants from Fiscal Year 2016 through Fiscal Year 2020.[34]

92. The 81% target, and these actual apprehension rates achieved in practice, reflect previous experience that hard narcotics trafficking occurred primarily through bulk vehicle shipments at points of entry, as opposed to *between* points of entry.

93. But industrial-scale fentanyl production by Mexican drug cartels and the current dynamics of between-the-ports-of-entry smuggling changes everything.

### The Biden Administration Improperly and Without Analysis Terminated the MPP

94. During his 2020 presidential campaign, then-candidate Joe Biden "vowed to end Trump's restrictive asylum policies, beginning with a program known as 'remain in Mexico.'"[35]  Once elected, the Biden administration had already predetermined that it would terminate the MPP.

95. Indeed, on January 20, 2021, the first day of the Biden administration, without any time for any internal review or analysis of the MPP program, the Acting Secretary of DHS fulfilled President Biden's campaign promise.  He immediately, *that very day,* suspended MPP.[36]

96. Many months after this immediate suspension, DHS subsequently stated on multiple occasions that "[t]he U.S. Government . . . cannot reimplement MPP without the Government of Mexico ("GOM") making an independent decision to accept the return of individuals enrolled in the program."  Reimplementation Guidance at 2;[37] *see also* Explanation Memorandum at 29.

---

[34] *See supra* note 31.

[35] Ted Hesson, *Factbox: Here Are Six Things Joe Biden Will Likely Do On Immigration*, Thomson Reuters, https://www.reuters.com/article/us-usa-immigration-biden-factbox/factbox-here-are-six-things-joe-biden-will-likely-do-on-immigration-idUSKBN27O00R (last visited Dec. 20, 2021).

[36] DHS, *DHS Statement on the Suspension of New Enrollment in the Migrant Protection Protocols Program* (Jan. 21, 2021), *available at* https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

[37] Memorandum from Robert Silvers, Under Secretary, DHS Off. of Strategy, Pol'y, and Plans, to CBP, ICE, CIS, and Off. of Operations Coordination (Dec. 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1202_plcy_mpp-policy-guidance_508.pdf.

AR02065

97. Upon information and belief, at the time of the action on January 20, 2021, DHS' Acting Secretary knew of the foregoing issue and, as a logical consequence of this, knew that his "suspension" would effectively terminate the MPP program because the suspension functionally ceased operations consistent with the agreement with the GOM facilitating MPP. Consequently—and as now repeatedly mentioned by DHS—restarting MPP would require the administration to negotiate a new agreement with the GOM.

98. On February 2, 2021, President Biden issued an Executive Order directing the Secretary of DHS "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." Executive Order 14010 of February 2, 2021, § 4(ii)(B), 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021). The President instructed the Secretary to review MPP and take appropriate actions "consistent with public health and safety." *Id.* at § 4(i).

99. Upon information and belief, DHS had improperly predetermined that it would terminate the MPP, regardless of any such review.

100. While the Secretary's review of MPP was underway, the concern of fentanyl coming across the Southwest border was brought directly to the attention of the Secretary by Senator Rick Scott of Florida at the Senate Hearing on Unaccompanied Minors at US-Mexico Border on May 13, 2021.[38]

101. At another hearing on May 26, 2021, after stating that the Secretary was responsible for "opioid and drug interdiction," Senator Shelly Moore Capito of West Virginia, ranking member of the Homeland Security Appropriations Subcommittee, again brought the issue of fentanyl to the attention of the Secretary. Senator Capito informed Secretary Mayorkas "[t]his is a big issue for me. Drugs continue to pour across our border, including record amounts of fentanyl, which are

---

[38] *DHS Actions to Address Unaccompanied Minors at the Southern Border: Hearing Before the Comm. on Homeland Sec. & Gov. Affairs*, 117th Cong. (2021) (statement of Senator Rick Scott).

AR02066

devastating states like West Virginia and killing a lot of our people."[39]

102. On June 1, 2021, DHS Secretary Alejandro Mayorkas terminated the Migrant Protection Protocols Program, providing some discussion and explanation of the Termination Decision in the June Termination Memorandum.[40]

103. DHS's termination of the MPP was a major change that increased the "pull factor" attracting individuals without a lawful right to enter the United States or a legitimate asylum claim to nonetheless travel to and across the Southern border into this country, requiring the attention and limited resources of the Border Patrol.

104. By thusly burdening and distracting the Border Patrol, the termination of the MPP decreased the security of the border against fentanyl trafficking between ports of entry, leading directly to both increased numbers of smuggling attempts and increased rates of success in evading Border Patrol.

105. The June Termination Memorandum did not acknowledge or discuss how terminating MPP would affect drug trafficking across the border.

106. In an analogous, high-profile case decided just one year before DHS terminated MPP, the Supreme Court held DHS acted arbitrarily and capriciously in terminating the Deferred Action for Childhood Arrivals Program because DHS failed to consider an important aspect of the problem. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).

107. Despite the alarms raised by Senator Scott and Senator Capito, the prominence of the *Regents* decision, and the President's instructions in his Executive Order to consider public health and safety (the "EO Health and Safety Directive"), DHS failed to consider fentanyl drug trafficking

---

[39] *Hearing on The FY 2022 Dept. of Homeland Sec. Budget Before the Subcomm. On Homeland Sec.* 117th Cong. (2021) (statement by Senator Shelley Moore Capito).
[40] *See supra* note 2.

AR02067

in the Termination Decision and the June Termination Memorandum.

108. West Virginia Attorney General Patrick Morrisey objected to this failure in a letter to the Secretary on June 7, 2020. *See* Morrisey Letter. Attorney General Morrisey's letter informed the Secretary that his "action and accompanying justification memorandum entirely overlook[ed] a critical aspect of a major problem facing our country, the issue of illegal drug trafficking and fentanyl." *Id.*

109. Meanwhile, the concerns of Attorney General Morrisey and others that the formal termination of MPP would aggravate the fentanyl trafficking problem began to be borne out almost immediately. Not long after Attorney General Morrisey's letter, Gloria Chavez, Chief Border Patrol Agent for the El Paso Sector, emphasized that "[f]or the first time, we're starting to see these tactics where fentanyl is being smuggled *between* ports of entry" at that portion of the border.[41]

110. As emphasized in Attorney General Morrisey's letter, "[t]his is a pressing and urgent matter impacting West Virginia and every State suffering from fentanyl abuse and illegal drug trafficking," "[l]ives are being lost every day," and "[t]here is no time for delay." *See* Morrisey Letter.

111. On August 13, 2021, the Texas court issued an injunction against the enforcement of the decision to terminate the MPP (the "Texas Court Order"), finding it to be, among other things, arbitrary and capricious.[42]

112. After issuance of the Texas Court Order on August 13, 2021, DHS had to either abandon its termination of the MPP or it had to take one of two actions:

    a. Give a fuller explanation of the Agency's reasoning at the time of the original

---

[41] *See supra* note 22 (emphasis added).
[42] Memorandum Opinion and Order, Texas v. Biden, No. 2:21-CV-067-Z (N.D. Texas Aug. 13, 2021), ECF No. 94, 2021 WL 3603341.

AR02068

agency action; or

b.   Take new agency action, which means full compliance with relevant sections of the APA and engaging in *new* reasoned decision making without a pre-determined outcome.   The agency is "bound to deal with the problem afresh, performing the function delegated to it by Congress." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 201, 67 S. Ct. 1575, 1579, 91 L. Ed. 1995 (1947); *see also Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env't Prot.*, 482 F.3d 79, 105 (2d Cir. 2006) ("Any effort by the [agency] to pursue a "strategy" to justify a foreordained [conclusion] would be incompatible with a reviewing agency's mandate to use its expertise to come to a reasoned decision supported by substantial evidence. . . .  To the extent some evidence indicates a greater concern with mounting a public relations campaign . . . than with neutrally evaluating the record evidence, that evidence further supports the conclusion that the Denial was arbitrary and capricious.")

113. DHS purported to follow the second option in its October Termination Memorandum, stating that "the Secretary has *considered anew* whether MPP should be maintained, terminated or modified…"  October Termination Memorandum at 2, 4 (emphasis added).

114. However, in what appears to have been a reflection of a predetermined outcome, DHS announced its decision to terminate MPP well before it published new memoranda on October 29, 2021, or could have fully completed the analysis purportedly reflected in those documents.

115. Specifically, on September 29, 2021—a full month in advance of its October memoranda—DHS very clearly stated that it *was* going to terminate MPP.[43]

---

[43] *See supra* note 3.

AR02069

116. This plan and decision was repeated on October 15, 2021, when DHS' twitter feed announced that "DHS will be issuing a memo terminating MPP…"

117. Media reported on this, as well.  For example, on October 19, 2021, Catholic news services reported DHS' predetermined intention to terminate MPP: "On Twitter, DHS said that "separately, as announced previously, DHS also will be issuing a memo terminating MPP[.]"[44]

118. However, DHS could not have completed its "new" analysis by October 15, 2021—let alone September 29, 2021, when its decision was disclosed online—because DHS did not at that time have the data relied upon in the October Termination Memorandum. *See, e.g.,* Explanation Memorandum at 25 ns. 103-106 (referencing data obtained on Oct. 28, 2021).

119. DHS did not consider the impact on U.S. citizens or DHS' core statutory mission cited above to "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking," or even the EO Health and Safety Directive.

120. In the October Termination Memorandum, DHS spent only one page out of 39 pages addressing the core mission of DHS and ICE (i.e. protecting the homeland) and dismissed all concerns with a wave of the hand and very little hard data.  And the data provided is either misleading or insufficient as it addresses fentanyl and other drug problems.

121. Further, only two sentences in the entire document even mention the deadly fentanyl epidemic:  "Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for hard drugs at ports of entry have been mixed, with

---

[44] Rhina Guidos, *After Court Order, DHS Officials Aim To Resume 'Remain In Mexico' Policy*, National Catholic Reporter (Oct. 19, 2021), https://www.ncronline.org/news/justice/after-court-order-dhs-officials-aim-resume-remain-mexico-policy.

AR02070

fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20."  October Termination Memorandum at 25-26.

122. However, that data as to fentanyl is inaccurate, out of date, or otherwise false.  Fentanyl is now smuggled largely between ports of entry.  *See* ¶¶ 45, 46, 75 and 109.  Further, as alleged in Paragraphs 66-84, even very small amounts of fentanyl smuggled between ports of entry are vastly stronger, more lethal, and much more valuable than copious amounts of marijuana or other narcotics that have typically been smuggled between ports of entry.  The October Termination Memorandum virtually ignores this and the resulting harm to Americans generally and West Virginians specifically.

123. The October Termination Memorandum also dismisses the State's reliance concerns without any discussion or analysis.

124. The States must rely on DHS to protect them from the dangers that DHS and ICE are charged with confronting per their respective mission statements, in particular to enforce immigration law and protect the States from the harmful consequences of illegal immigration.  *See Arizona*, 567 U.S. at 394-400.  With the power to regulate immigration, comes the responsibility to enforce it.  *Id.* at 416.

125. By virtue of the federal government's role and responsibilities vis-à-vis border security and immigration, West Virginia has no option but to rely on the federal government to actually enforce the law.  DHS's mission includes the obligation to "contribute to efforts to interdict illegal drug trafficking," and it failed to do so here to the detriment of West Virginia.

126. Indeed, Attorney General Morrisey explained West Virginia's reliance interest in his June 7 Letter, writing, "[a]s a State, West Virginia must rely on the federal government to secure the

23

border against this deadly scourge [of fentanyl]."

127. The October Termination Memorandum dismissed this most fundamental reliance interest, even though the illegal drug trafficking across the Southwest border and its obvious real consequences to lives and resources have not slackened but seemingly increased.

128. The October Termination Memorandum justifies its conclusion to terminate MPP not based on the values of DHS' and ICE's missions or harm to the American public and the States, but rather on the MPP program as being difficult to administer, taking away resources from other border control efforts, and presenting an unacceptable risk of harm to anyone remaining in Mexico while their asylum claims were being processed and evaluated.

129. In the event that DHS now claims that the October Termination Memorandum is nothing more than a fuller explanation of its reasoning at the time of the Termination Decision, it is still invalid.

130. As a fuller explanation, DHS is limited to the original rationale and cannot add *post hoc* rationalizations.  "If the October 29 Memoranda are post hoc rationalizations, they are powerless to cure the June 1 Termination Decision's problems." *Texas v. Biden*, No. 21-10806, 2021 WL 5882670, at *17 (5th Cir. Dec. 13, 2021).

## CAUSES OF ACTION

## COUNT I – TERMINATION OF MPP VIOLATED THE APA

131. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

132. The APA requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2).

133. Defendants' Termination Decision, as explained by the June Termination Memorandum,

AR02072

and/or the October 29, 2021, memoranda was arbitrary, capricious, an abuse of discretion. It failed to consider a critical aspect of discontinuing the MPP: the impact of such a decision on deadly fentanyl trafficking, the consequences and costs of that impact on trafficking, and the ability of DHS to secure the border against that trafficking.

## COUNT II - THE REIMPLEMENTATION MEMORANDUM IS INVALID

134. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

135. DHS was to reinstate or re-implement the MPP program per the Texas Court Order. Over three months later, in December 2021, DHS issued its Reimplementation Guidance.

136. The Reimplementation Guidance purports to comply with the Texas Court Order and to follow U.S. law. It does neither. Rather, it seems designed more as an effort to *appear* to restore MPP, while in actuality it does nothing of the sort.

137. The Reimplementation Guidance asserts that DHS will "begin to enroll certain non-citizens into MPP and processing them for return to Mexico." *See* Reimplementation Guidance at 2.

138. The Reimplementation Guidance adds multiple exceptions that are inconsistent with the law, including broad, undefined and vague exceptions for the following categories that will not be returned to Mexico:

    a.   Those with a known mental or physical health issue, including a disability or a medical condition related to pregnancy;

    b.   Those with particular vulnerabilities given their advanced age; and

    c.   Those at increased risk of harm in Mexico due their sexual orientation or gender identity.

AR02073

*See Id.* at 5.

139. While these exemptions are compassionate, the Reimplementation Guidance does not cite any provisions of the U.S. immigration law that would support these exemptions.

140. The Reimplementation Guidance appears to rely heavily on various international conventions and protocols.

141. The Reimplementation Guidance states that the United States will follow Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), which states "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are *substantial grounds* for believing that he would be in danger of being subjected to torture." *See Id.* at 2 (emphasis added).

142. However, the Reimplementation Guidance unlawfully changes this standard.

143. The Reimplementation Guidance requires CBP officials to "proactively ask questions upon initial enrollment to determine whether an individual being considered for enrollment in MPP possesses a fear of return to Mexico." *Id.* at 5.

144. A person answering in the affirmative will be given an interview within 24 hours and "[i]ndividuals who establish that there is a 'reasonable possibility'" "that they will be tortured in Mexico are not subject to MPP and will not be returned to Mexico." The standard of "*reasonable possibility*" is a much lower standard than the more objective CAT standard of "there are *substantial grounds* for believing." The former may only require an individual to assert "I believe it is a reasonable possibility that I will be tortured if I return to Mexico" whereas "substantial grounds for believing" requires that the CBP—not the immigrant—actually believes this based on "substantial grounds."

145. The Reimplementation Guidance also requires CBP to provide "legal resource packets"

26

to MPP enrollees, which, upon information and belief, will provide enrollees with clear direction on how to avoid being returned to Mexico—effectively avoiding the focus of MPP—simply by communicating "I believe there is a reasonable possibility that I will be tortured if I return to Mexico."[45]

146. Similarly, the Reimplementation Guidance misstates and misapplies Article 33 of the 1951 Convention Relating to the Status of Refugees (the "1951 Convention"), which states that: "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Reimplementation Guidance at 2 n.1.

147. This requires a *determination* that the refugee's *life or freedom* would be threatened based on one of *five* categories.

148. The Reimplementation Guidance greatly expands this exception arising from the 1951 Convention.  The Reimplementation Guidance would prevent an individual's return to Mexico (a) not if there is a "determination" of the threat to his "life or freedom," but rather if the individual can just establish "a reasonable possibility," (b) not if there is a "threat" to his life or freedom, but rather if there is a reasonable possibility of "persecution," and finally, (c) not based on just the *five* enumerated grounds, but rather on account of any "*statutorily protected ground*."   These expansions are beyond the authority of DHS.

149. The Reimplementation Guidance fails to address the provisions of the 1951 Convention, Article 32(1) which allows the United States to expel a refugee "on grounds of national security or public order," such as a positive COVID test, mass migration undermining public order,

---

[45] See supra note 6.

27

trespassing on private property, or other crimes harming others' property or persons.

150. The Reimplementation Guidance fails to provide for informing the refugee of the *duty* that "he conform to [the country's] laws and regulations as well as to measures taken for the maintenance of public order." *See* 1951 Convention, Article 2.

151. The Reimplementation Guidance fails to account for the provisional measures in the 1951 Convention providing for provisional measures "essential to the national security in the case of a particular person, pending a determination by the Contracting State that that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security," such as the increased influx of lethal dosages of fentanyl. *See* 1951 Convention, Article 9.

152. Keeping all refugees outside the boundaries of the United States pending confirmation that they do not pose a threat at this time of COVID and fatal fentanyl smuggling is a reasonable provisional measure that the Reimplementation Guidance does not consider.

153. The Reimplementation Guidance fails to address the limitation of the number of refugees allowed into the United States as required by 8 U.S.C. § 1157.

154. The Reimplementation Guidance appears to bind the Agency and also notifies third parties—illegal immigrants—of their newly-created rights enunciated in the Reimplementation Guidance.

155. Further, nothing in the Reimplementation Guidance genuinely leaves the agency and its [employees] free to exercise discretion.

156. The Reimplementation Guidance is invalid because it exceeds DHS' authority and otherwise violates 5 U.S.C § 706 and the APA.

AR02076

## COUNT III – VIOLATION OF 8 U.S.C. SECTION 1225

157. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

158. APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) and (C).

159. Federal law directs the government to detain virtually all aliens applying for admission into the United States.  The government "shall ... detain[]" any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings.  8 U.S.C. § 1225(b)(2)(A).  For aliens "arriving on land ... from a foreign territory contiguous to the United States," the government may opt to "return the alien to that territory pending" removal proceedings.  8 U.S.C. § 1225(b)(2)(C).  These provisions give the government an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous to the United States": either detain the alien pending removal proceedings, or otherwise return the alien to the country from which he or she arrived pending removal proceedings.

160. Indeed, "Congress expressly authorized the MPP program by [this] statute." *Texas v. Biden*, 2021 WL 5882670, at *3.

161. The government claims that it lacks the capacity to detain the vast majority of the tens of thousands of aliens now arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States.

162. Through MPP, the government was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.  By discontinuing the MPP, DHS has created its own problem, causing it to fail to

AR02077

meet its statutory obligations to detain or otherwise return aliens pending removal proceedings.

163. Because the government cannot detain many of these aliens, tens of thousands will instead be released into the United States and fail to show up for statutorily required removal proceedings. 83 Fed. Reg. 55,946.

164. This likelihood or near certainty of release incentivizes illegal immigration by allowing aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and, in many instances, never appear for court dates, simply disappearing into the United States—notwithstanding that these aliens have not shown that they are "clearly and beyond a doubt" entitled to enter the country, much less remain in it.

165. The June Termination Memorandum, the October Termination Memorandum, and the Reinstatement Guidance confirm that Defendants will unlawfully fail to detain illegal aliens and unlawfully release illegal aliens into the interior of the United States, notwithstanding Section 1225's directives and the ability to avoid these statutory violations through full reimplementation of MPP.

166. Federal statute allows for the Attorney General to temporarily parole certain aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). DHS cannot use that power to parole aliens *en masse*; that is entirely contrary to the "case-by-case" requirement that Congress embedded in the statute. DHS cannot use this code provision as an exception to its enforcement of Section 1225.

167. Terminating MPP therefore violates 8 U.S.C. § 1225.

## COUNT IV – FAILURE TO TAKE CARE TO ENFORCE THE LAW

168. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

AR02078

169. The Constitution requires the President to "take Care that the Laws be faithfully executed," (the "Take Care Clause"). U.S. CONST. art. II, § 3.

170. DHS and its officers are bound by this directive. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

171. DHS' suspension, discontinuation, or evasion of the MPP violates the Take Care Clause. It does this by (a) violating a statutory framework obligating DHS to detain or otherwise return aliens, and (b) predictably allowing (and encouraging) more aliens to illegally enter into the United States. This then results in more aliens violating immigration law requirements once released into the interior without first going through the statutory methodology for qualifying refugees before such release.

172. "The duty to execute the laws faithfully means that the President may not—whether by revocation, suspension, dispensation, inaction, or otherwise—fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative*, 21 Hastings Const. L.Q. 865, 873-74 (1994).

173. U.S. immigration law requires that the government detain any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings, 8 U.S.C. § 1225(b)(2)(A), or, alternatively for aliens "arriving on land ... from a foreign territory contiguous to the United States," optionally "return the alien to that territory pending" removal proceedings, 8 U.S.C. § 1225(b)(2)(C).

174. The October Termination Memorandum and the Reimplementation Guidance confirm that Defendants will unlawfully prioritize alternatives to detention, unlawfully fail to detain illegal immigrants, and unlawfully release illegal aliens into the interior of the United States,

AR02079

notwithstanding the directives in Section 1225(b)(2)(C) and the ability to avoid these statutory violations through MPP.

175. Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

176. This constitutional violation is also actionable independent of the APA.  Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## PRAYER FOR RELIEF

**WHEREFORE**, the State of West Virginia respectfully requests that the Court:

A.  Declare that the termination of MPP violates 5 U.S.C. § 706, because, among other things, it is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225;

B.  Declare that the Reimplementation Guidance violates 5 U.S.C. § 706 because, among other things, it  is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225;

C.  Issue preliminary and permanent injunctive relief against the Termination Decision and all related or consequent memoranda, including but not limited to the June Termination Memorandum and October Termination Memorandum;

D.  Issue preliminary and permanent injunctive relief requiring the Defendants to fully and in good faith implement the MPP, including the removal from its Reimplementation Guidance and

AR02080

any future guidance those exceptions that are unsupported by U.S. immigration law;

E.  Order the Defendants to take care to follow the law, specifically 8 U.S.C. § 1225.

F.  Award Plaintiff costs and attorneys' fees; and

G.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R.A. Capehart*

Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: Curtis.R.A.Capehart@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: December 22, 2021

AR02081

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** and | Case No. 2:21-CV-22 |
| **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security, | (Judge Kleeh) |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of December 2021, I electronically filed the foregoing "*Amended Complaint*" with the Clerk of Court and all parties using the CM/ECF System.

/s/ Curtis R. A. Capehart
Douglas P. Buffington II (WV Bar # 8157)
*Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
*Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
*Deputy Attorney General*
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Email: Curtis.R.A.Capehart@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

34

AR02082

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

## APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

AR02083

**DOCUMENT**                                                                    **PAGE**

1.  Declaration of David Shahoulian…………………………………………………1

2.  Declaration of Emily Mendrala……………………………………………...11

Dated: June 25, 2021                          Respectfully submitted,

PRERAK SHAH                                   BRIAN M. BOYNTON
*Acting United States Attorney*               *Acting Assistant Attorney General*

BRIAN W. STOLZ                                WILLIAM C. PEACHEY
*Assistant United States Attorney*            *Director*
                                              Office of Immigration Litigation
                                              District Court Section

                                              EREZ REUVENI
                                              *Assistant Director*

                                              FRANCESCA GENOVA
                                              JOSEPH A. DARROW
                                              *Trial Attorneys*

                                              /s/ *Brian C. Ward*
                                              BRIAN C. WARD
                                              *Senior Litigation Counsel*
                                              U.S. Department of Justice
                                              Civil Division
                                              Office of Immigration Litigation
                                              District Court Section
                                              P.O. Box 868, Ben Franklin Station
                                              Washington, DC 20044
                                              Tel.: (202) 616-9121
                                              brian.c.ward@usdoj.gov


                                              *Counsel for Defendants*

**AR02084**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|   |   |   |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**DECLARATION OF DAVID SHAHOULIAN**

I, David Shahoulian, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me from official records

and reasonably relied upon in the course of my employment, hereby declare as follows:

*Introduction*

1.  I am the Assistant Secretary for Border Security and Immigration at the Department of

    Homeland Security (DHS) and have been in this role since January 20, 2021.  I previously

    served at DHS as Deputy General Counsel from June 29, 2014 to January 19, 2017.

2.  In Mexico, as in the United States, migration is a politically and emotionally charged issue,

    in part because of the profound impact that migration-related policies and operations have

    on individuals and communities.  As a result, discussions between the U.S. and Mexican

    governments regarding migration management in the region and at our shared border are

AR02085

fluid, sensitive, and iterative.  The United States and Mexico have maintained a close, delicate, and dynamic conversation on this issue for many years.

3.      Critical to these conversations is the ability of each country to (1) alter policies or operations as circumstances change, and (2) trust that the other country will follow through with its commitments.  Over the course of the past five months, in response to changing circumstances and given the change in administration, the U.S. Government has undertaken a review of various migration-related policies as it pursues a series of new strategies, both unilaterally and in partnership with foreign partners and international organizations.  The decisions to first suspend new enrollments into the Migrant Protection Protocols (MPP) program, and then to terminate MPP following close review of the program, are part of the Department's new strategies in response to changing circumstances.

4.      As discussed further below, an injunction interfering with the U.S. Government's ability to proceed with the termination of MPP would undermine the Administration's overall strategy for managing migration in the region, complicate the U.S. Government's bilateral relationship with Mexico, divert limited government resources and detract from important DHS missions, and hinder the Department's ongoing efforts to build its capacity to process individuals at ports of entry and adjudicate asylum claims in a safe, orderly, and humane manner consistent with our laws.

*Governments need the ability to change policies and operations in response to changing circumstances*

5.      As regional migration trends evolve, governments need the ability to react and adjust their policy and operational responses as necessary, consistent with their overall strategic visions for migration management and humanitarian protection.  In December 2018, DHS announced plans to utilize its authority under Section 235(b)(2)(C) of the Immigration and

AR02086

Nationality Act (INA) to create a new program—the Migrant Protection Protocols

(MPP)—aimed at returning certain non-Mexican applicants for admission to Mexico for

the duration of their U.S. removal proceedings.[1]  Because MPP required such individuals to

temporarily reside in Mexico, implementation of MPP required close collaboration and

negotiation with the Government of Mexico.  Shortly after the DHS announcement,

Mexico reaffirmed its sovereign right to manage migration in its territory—including

whether to admit or deny entry to foreign nationals—and committed to a number of steps

that were important to the functioning of MPP.  Such steps included utilizing federal

resources (personnel and infrastructure) to receive individuals returned to Mexico under

MPP; granting temporary, humanitarian status to persons enrolled in MPP; ensuring that

such individuals received equal treatment and protection from discrimination, as well as the

right to request work authorization; and providing MPP enrollees with the ability to access

selected social services.[2]

6.     After MPP was initiated, the United States and Mexico coordinated closely in response to

changing conditions, including substantial operational challenges that surfaced during the

program's implementation.  One such challenge—the onset of the COVID-19 pandemic—

required significant coordination and flexibility to protect public health and address other

changes in the border environment.  In March 2020, for example, the Department of Justice

suspended removal hearings for MPP enrollees due to the pandemic.  This suspension

fundamentally altered the situation at the border given that one of MPP's principal

---

[1] *See Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration,* Dec. 20, 2018 *available at* https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (last visited June 23, 2021).

[2] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act,* Dec. 20, 2018 *available at* https://www.gob.mx/sre/en/articulos/position-of-mexico-on-the-decision-of-the-u-s-government-to-invoke-section-235-b-2-c-of-its-immigration-and-nationality-act-185795?idiom=en  (last visited June 23, 2021)

AR02087

objectives was to promptly process the claims of MPP enrollees returned to Mexico. Without court hearings, the MPP program was unable to deliver on this objective, leaving MPP enrollees with no way to have their claims considered. And as the months passed, more and more MPP enrollees found themselves in challenging circumstances in Mexico for a prolonged—and frankly indefinite—length of time with no avenue for relief.

7.  Moreover, the fact that tens of thousands of individuals remained in Mexico for long periods with no movement in their immigration cases placed a strain on community resources along Mexico's northern border. This contributed to instability and insecurity in some communities, which complicated US-Mexico bilateral relations and undermined the ability of some MPP enrollees to wait for adjudications to resume.

8.  Additionally, and just as important, the lack of court hearings violated the premise under which the Government of Mexico agreed to provide temporary status in Mexico to MPP enrollees in the first place: namely, that the United States would have a functioning, rapid immigration court process in which MPP enrollees could participate. Mexican officials made clear that providing temporary status (and relatedly, the ability to access select social services in Mexico) was to be provided only to those "involved in immigration proceedings."[3] But with the closure of the non-detained immigration courts due to COVID-19, there were no such proceedings. Even now, after more than a year, it is still unclear when many of those enrolled in MPP would have had their cases heard. This challenge required a new solution and a change in policy and operations.

---

[3] *See Press Conference with Legal Counsel Alejandro Alday on the Bilateral Relationship with the United States*, Dec. 20, 2018 *available at* https://www.gob.mx/sre/prensa/press-conference-with-legal-counsel-alejandro-alday-on-the-bilateral-relationship-with-the-united-states (last visited June 23, 2021).

AR02088

9.    On February 2, 2021, President Biden issued Executive Order (EO) 14010, 86 Fed. Reg.

8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration,*

*to Manage Migration Throughout North and Central America, and to Provide Safe and*

*Orderly Processing of Asylum Seekers at the United States Border.*[4]  In this EO, President

Biden directed the Secretary of Homeland Security to review and determine whether to

modify or terminate MPP.  Furthermore, the President directed the Secretary to consider a

phased strategy for the safe and orderly entry into the United States of those individuals

who were placed in MPP.

10.   Upon the completion of the required review, the Secretary announced his decision to

terminate MPP.[5]  Among the reasons provided, the Secretary noted that MPP required a

significant amount of diplomatic engagement with the Government of Mexico that the

Department would like to now devote to other strategic initiatives that will allow for better

and more consistent border management.  From DHS's perspective, it is simply not a wise

use of taxpayer resources to continue to focus bilateral energy on a program that cannot

operate as intended in the current border environment, and that, even if continued, would

involve significant and complicated burdens on border security personnel and resources

that would detract from important DHS mission sets.  As the internal review of MPP

showed, significant modifications to the current operational and policy structure of MPP

---

[4] *See* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* 86 Fed. Reg. 8267 (Feb. 2, 2021), *available at* https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration (last visited June 23, 2021)

[5] *See* Secretary Alejandro N. Mayorkas, "Termination of The Migrant Protection Protocols Program," June 1, 2021 *available at* https://www.dhs.gov/publication/dhs-terminates-mpp-and-continues-process-individuals-mpp-united-states-complete-their (last visited June 23, 2021).

AR02089

would have been required to restart the program and to ensure that participants can remain in Mexico pending their immigration proceedings.

11. For instance, restarting the MPP program would have required the United States, in partnership with Mexico, to provide information about updated hearing times and locations to up to 26,000 individuals in Mexico with active cases. Before the pandemic, MPP relied on in-person document service during initial encounter, or follow-up in-person interactions, with MPP enrollees. However, now that all previously scheduled hearings have lapsed due to court closures, the United States would need to devise a new way to contact the 26,000 MPP enrollees with active cases. The United States would also likely need to process each of these individuals at a port of entry, reschedule each of their hearings, service required court documents, and then return them to Mexico once again. The United States would also need to reestablish the process for bringing these individuals into and out of the United States to attend their future hearings.

12. Additionally, even before COVID-19 forced the suspension of immigration hearings for MPP enrollees—and throughout the time that immigration courts have been shuttered—some program participants experienced inadequate and unstable access to housing, income, and safety, which made it challenging for some to remain in Mexico for the time required to complete their proceedings. In order to address these matters, including security-related concerns along the border, the United States would need to devote significant foreign assistance to counterparts operating in Mexico. The level of financial and diplomatic engagement that would be required to address these concerns would detract from this Administration's broader goal of establishing a comprehensive regional strategy for managing migration.

13.    Rather than devote efforts to reestablishing and overhauling the MPP program, DHS seeks to refocus efforts to address the root causes of migration from Central America, improve regional migration management, enhance protection and asylum systems throughout North and Central America, expand cooperative efforts to combat smuggling and trafficking networks, and pursue other initiatives. These efforts are part of a broader strategy to address irregular migration in a more sustainable and effective way. Many of those efforts will require engagement with Mexico and, as is the President's prerogative, DHS can choose to focus on these efforts with Mexico rather than negotiations over MPP. This kind of evolution in response to new dynamics at the border should not be impeded.

*Governments need the ability to trust that each country will uphold the actions to which it commits*

14.    Policy and operational decisions on migration matters are often the subject of intense scrutiny and criticism. In the case of U.S.-Mexico negotiations on these matters, both governments have been willing to endure domestic criticism for policies or operational decisions taken jointly, because each has believed these actions were ultimately in their country's best interests. However, if either party is prevented from upholding commitments made in the course of negotiations, the foundation of trust upon which these negotiations are premised erodes. In fact, as noted above, it is partly because of the necessary closure of immigration courts, which impeded the U.S. commitment to provide MPP enrollees with meaningful access to immigration court proceedings, that DHS has been required to develop *new* policy and operational options. To maintain a trusted relationship with Mexico, DHS must have the ability to negotiate a new approach to address migration-related issues, including when that means moving away from MPP.

15. Just as DHS worked closely with and made a series of commitments to the Government of Mexico to initiate MPP, DHS has similarly negotiated closely with Mexico on the recent steps the Department has taken, including the ongoing phased approach to processing certain MPP enrollees into the United States and the decision to terminate MPP. The U.S. and Mexican governments continue to work together to look for more robust regional solutions to manage migration. If Mexico cannot trust the United States to keep its commitments in these negotiations, the result would be the inability to negotiate in good faith or make hard decisions. This is especially important when it comes to issues of migration management, which are inherently multinational in nature.

16. An order interfering with DHS's termination of MPP, or otherwise requiring DHS to re-institute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution. Such an order would require the United States to renege on the reasoned—and I believe more effective—strategy being developed with Mexico. Moreover, restarting MPP operations would require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19.

17. An order to delay termination of MPP or to restart the program would also draw resources from other efforts aimed at more effectively and sustainably addressing irregular migration in the region, such as the creation of a dedicated court docket to hear cases in a more timely fashion, other efforts to streamline the adjudication of asylum cases coming from the border, the expansion of alternative lawful migration pathways in the region, and regional

AR02092

efforts to address the underlying causes of migration.[6]  Instead of focusing on these efforts, the Department would be forced to implement a discretionary program that the Department's recent review concluded would require a total redesign involving significant additional investments in personnel and resources.  This redesign would come at tremendous opportunity cost and would detract from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.[7]  In sum, such an order would undermine the Executive's ability to operationalize its considered policy vision with respect to an issue that is central to both domestic and foreign policy interests.

---

[6] *Id.*
[7] *Id.*

AR02093

18. To be successful, migration management requires collective and coordinated policy and operational actions among regional governments. Undermining the ability of the Federal Government to make commitments will create doubt about the reliability of the United States as a negotiating partner. This doubt will hamstring the Federal Government's ability to conduct the foreign policy discussions that are part and parcel of migration-related negotiations. Without the ability to secure regional action, in part by making and keeping our own commitments, the United States will be forced to go-it-alone, which will have significant resource implications and be damaging to our national and economic security.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 24 day of June, 2021

*David Shahoulian*
_____
David Shahoulian
Assistant Secretary for Border Security and Immigration
Department of Homeland Security

AR02094

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS,
STATE OF MISSOURI,

    *Plaintiffs,*

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as
President of the United States, *et al.*,

    *Defendants.*

Civil Action No. 2:21-cv-00067-Z

## DECLARATION OF EMILY MENDRALA

I, Emily Mendrala, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am currently Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs at the U.S. Department of State and have held this position since January 20, 2021. Prior to this appointment, I was a member of President-Elect Biden's transition, serving on the Agency Review Team for the Department of State with a focus on the Bureau of Western Hemisphere Affairs. From 2017 to 2021, I was Executive Director of the Center for Democracy in Americas, promoting U.S. policies of engagement toward the Americas. During my tenure with the Center, I became very familiar with the issues we are confronting at the U.S. southern border and led educational travel delegations to the

1

**AR02095**

border for policy leaders and other stakeholders. In addition, I have served as Director for Legislative Affairs in the National Security Council and as a Special Adviser to the Coordinator for Cuban Affairs and in the Office of Central American Affairs in the State Department. I was also a Professional Staff Member on the Senate Foreign Relations Committee, where I worked on Western Hemisphere policy matters for the Committee.

2. As Deputy Assistant Secretary, I oversee the Department's work on regional migration and Cuban affairs. I engage regularly with interlocutors throughout the Department and interagency to advance the U.S. government's regional migration policy.

3. I am familiar with the lawsuit that the States of Texas and Missouri have filed in the United States District Court in the Northern District of Texas seeking to enjoin the U.S. government from enforcing or implementing the discontinuance of the Migrant Protection Protocols (MPP) either through the Acting Secretary of Homeland Security's January 20, 2021 memorandum suspending enrollment in the MPP,[1] or the Secretary of Homeland Security's June 1, 2021 memorandum formally terminating MPP.[2] Granting this injunction will have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala and Honduras (the "northern Central American countries") and Mexico.

4. Addressing regional irregular migration and its root causes is a top U.S. foreign policy priority. To sustainably reduce irregular migration in, from, and through North and Central America, the United States must establish long-term strategic partnerships with the governments in the region to catalyze structural change to root out corruption and

---

[1] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

[2] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols Program* (Jun. 1, 2021).

2

**AR02096**

impunity, improve security and the rule of law, and increase economic opportunity. These efforts must be coordinated in a comprehensive foreign policy framework to address regional migration that includes adequate protection, expanded legal pathways and regional solutions.

5. President Biden introduced such a framework on February 2, 2021 through Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. Among other things, Executive Order 14010 outlines a new comprehensive, multi-pronged foreign policy approach toward collaboratively managing migration throughout North and Central America. The two main prongs are the Root Causes Strategy and the Collaborative Migration Management Strategy.

6. The Root Causes Strategy focuses on the three main challenges that drive irregular migration: governance and anticorruption, economic opportunity, and security, to rebuild hope in the region. Through this strategy, the United States seeks to partner with Mexico and the northern Central American countries to promote accountability and advance a safe, democratic and prosperous region, where people can advance economically, live in safety, and create futures for themselves and their families instead of embarking on dangerous and often futile journeys to the United States.

7. The Collaborative Migration Management Strategy is devoted to fostering the international cooperation and partnership with Mexico and Central American countries necessary to focus resources and energy on collective action that will enhance safety and economic opportunity, strengthen legal pathways for those who choose to migrate or are

3

AR02097

forcibly displaced from their homes, and reduce irregular migration. As Secretary of State Blinken stated on February 2, 2021, "The United States remains committed to working with governments in the region to address irregular migration and ensure safe, orderly, and humane migration. We are working to establish and expand a cooperative, mutually respectful approach to managing migration across the region that aligns with our national values and respects the rights and dignity of every person."

8.  Mexico is an essential partner for the United States in the implementation of both the Root Causes Strategy and the Collaborative Migration Management Strategy. On March 1, 2021, Presidents Biden and López Obrador issued the U.S.-Mexico Joint Declaration, in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe and regular migration. They further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration. They also directed the Secretariat of Foreign Relations and the Department of State, respectively, to engage with the governments of the northern Central American countries, as well as with civil society and private sectors, through policies that promote equitable and sustainable economic development, combat corruption, and improve law enforcement cooperation against transnational criminal smuggling networks.

9.  As Acting Assistant Secretary of State Chung stated in her remarks before the U.S. House Foreign Affairs Subcommittee on Western Hemisphere, Civilian Security, Migration and International Economic Policy on April 28, 2021, Mexico has already begun taking actions to advance these commitments. It has reinforced its efforts to reduce irregular northbound movements through its territory – launching a major enforcement action in

4

AR02098

southern Mexico in March with over 10,000 personnel. It has further committed to increasing its enforcement personnel strength to 12,000. The Mexican government continues to look for ways to invest in and develop its own communities as well as contribute to stronger Central American economies and engage with regional and international partners to share the burden. In addition, Mexico continues to be a leader in the region in offering international protection for those fleeing persecution.

10. On June 8, Vice President Harris met with President López Obrador during her first foreign trip as Vice President, reflecting the priority the Administration is placing on addressing irregular migration. Together they announced a new partnership to work jointly in Central America to address the root causes of irregular migration to Mexico and the United States, as well as efforts to disable human trafficking and human smuggling organizations. During this visit, the U.S. and Mexican governments signed a memorandum of understanding to establish a strategic partnership between the two countries to address the lack of economic opportunities in the northern Central American countries, which will include fostering agricultural development and youth empowerment programs, and co-creating and managing a partnership program enabling them to better deliver, measure and communicate about assistance to the region.

11. The United States has likewise worked to secure key commitments from the governments of the northern Central American countries to advance both the Root Causes Strategy and the Collaborative Migration Management Strategy. Both Secretary Blinken and Vice President Harris have been engaged on these issues throughout the region, as has Special Envoy for the Northern Triangle Zúñiga.

AR02099

12. For example, on June 1, 2021, Secretary Blinken met with foreign ministers from Costa Rica, Guatemala, Honduras, El Salvador, Nicaragua, Panama and Mexico in San José, Costa Rica at a meeting of the Central America Integration System (SICA) – the economic and political organization of the region's states. The leaders discussed the U.S. strategy to address the root causes of migration, including generating economic opportunities for Central Americans and advancing the essential work of reducing violence and addressing the COVID-19 pandemic and climate change. Secretary Blinken emphasized that Central America can be a stronger region if the people and countries cooperate to jointly tackle these challenges. Vice President Harris has had several conversations with the president of Guatemala about migration issues, and on June 7, 2021, she met with President Giammattei in Guatemala City. Both leaders acknowledged the need to work as partners to address irregular migration from Central America.

13. As a result of these and other U.S. diplomatic efforts, the northern Central American countries have engaged in migration management, and the governments make decisions about humane enforcement in ways that are appropriate for each country. We have seen the result in increased access to protection, apprehensions of irregular migrants, and greater numbers of checkpoints.

14. For example, the United States and Guatemala are collaborating to deepen bilateral law enforcement cooperation to combat migrant smugglers, human traffickers, and narcotics traffickers including through the reconstitution of a Mobile Tactical Interdiction Unit focused on dismantling transnational criminal activities in Guatemala, by providing U.S. law enforcement personnel to train and advise Guatemalan border security and law enforcement, and by the Guatemalan government identifying and seizing the illicit assets

**AR02100**

of those criminal organizations. The Guatemalan government has also committed to collaborate with the United States to establish Migration Resource Centers in Guatemala that will provide protection screening and referrals for people in need of protection, others seeking lawful pathways to migrate, as well as returning migrants in need of reintegration support in Guatemala. The first Migration Resource Center has already become operational.

15. For its part, the United States has already taken several actions to advance the administration's efforts to enact a comprehensive approach to regional migration. One of the first was to commence the wind-down of the MPP policy. From a foreign policy perspective, the MPP wind-down was a crucial initial step in implementing the new policy. As a result of the U.S. "Remain in Mexico" policy, an informal camp had formed in Matamoros, Tamaulipas along the U.S.-Mexico border consisting of thousands of migrants primarily from Central America living in squalid conditions for extended periods while, for some, they were awaiting the commencement or completion of their U.S. immigration proceedings. This camp was located in a dangerous area where the migrants faced the risk of murder, sexual and gender-based violence, kidnaping or extortion on a daily basis. The governments of the northern Central American countries expressed concern for the safety of their nationals residing in the camp as well as elsewhere along the U.S.-Mexico border where migrants faced similar conditions while awaiting their immigration proceedings. The Government of Mexico shared these concerns.

16. After the U.S. government announced the wind-down of the MPP policy on February 11, 2021, President López Obrador applauded this move and welcomed the United States'

7

**AR02101**

commitment to "regularize the situation of migrants." Since the announcement of the MPP wind-down process, the Mexican and U.S. governments have worked together to implement this process, including determining the prioritization of the intake. Through the MPP wind-down process, the informal migrant camp in Matamoros was closed in early March 2021, and Mexican officials welcomed its closure. On May 7, 2021, during a telephone conversation with Vice President Harris, President López Obrador stated, "We agree with the migration policies you are developing and we are going to help, you can count on us." International Organization partners, such as the United Nations High Commissioner for Refugees (UNHCR), International Organization for Migration (IOM), and others, responded positively to the decision to wind down and terminate MPP, and some acted as partners in the wind-down effort.

17. Reversing the MPP wind-down and termination process would undercut current U.S. foreign policy. The Mexican government and our international organization partners have been essential partners in the wind-down process since February. Re-implementing MPP would nullify more than four months of diplomatic and programmatic engagement with them to restore safe and orderly processing at the U.S. southern border. It would also require the U.S. government to divert attention and limited resources away from its current U.S. foreign policy goals mentioned above towards negotiating with Mexico the re-implementation of MPP.

18. In addition, reversing the wind-down and termination of MPP at this stage would be harmful to our bilateral relationships with Mexico and the northern Central American countries, as well as with our partner international organizations, as it would diminish their trust that the United States follows through on its commitments. As a result, these

8

APP 18

**AR02102**

countries and international organizations will be less inclined to cooperate with the
United States in implementing its broader, long-term foreign policy goals, including the
Root Causes Strategy and the Collaborative Migration Management Strategy, and this in
turn would adversely impact the U.S. government's efforts to stem the flow of irregular
migration in the region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge, information and belief.

Executed on this 25th day of June, 2021

Emily Mendrala
Deputy Assistant Secretary
Bureau of Western Hemisphere Affairs
U.S. Department of State

9

AR02103

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2021, I electronically filed this appendix with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice

AR02104

# Exhibit B

AR02105

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF MISSOURI, | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF PRINCIPAL DEPUTY** |
| | ) | **CHIEF IMMIGRATION JUDGE DANIEL H.** |
| v. | ) | **WEISS** |
| | ) | |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| PRESIDENT OF THE UNITED STATES, ET | ) | |
| AL., | ) | |
| | | |
| Defendants. | | |

_____

I, **DANIEL H. WEISS**, do hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief:

1. I am the Principal Deputy Chief Immigration Judge ("PDCIJ") for the Executive Office for Immigration Review ("EOIR") for all immigration courts nationwide. I work for EOIR's Office of the Chief Immigration Judge ("OCIJ") which provides overall program direction and articulates policies and procedures for the immigration courts nationwide. As PDCIJ, my responsibilities include supervising and managing the dockets and daily activity in the immigration courts.

2. I was appointed as PDCIJ in January 2021. Prior to my appointment as PDCIJ, I served as an Assistant Chief Immigration Judge from September 2017-January 2021, Acting Chief of Staff, from April 2019-July 2019, and as an immigration judge at the Dallas Immigration Court from January 2016-September 2017.

3. As PDCIJ, I have knowledge of the policies and practices relating to immigration court

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

1

operations, including operations of all detained and non-detained immigration courts and immigration adjudication centers[1] nationwide. I am familiar with the lawsuit that the States of Texas and Missouri have filed in the United States District Court in the Northern District of Texas, and the court's Memorandum Opinion and Order granting the Plaintiffs' request for a preliminary injunction and vacating the Defendant Department of Homeland Security's ("DHS") June 1 Memorandum terminating the Migrant Protection Protocols (MPP) program, *Texas, et al., v. Biden, et al.*, No. 2:21-cv-00067-Z (N.D. Texas Aug. 13, 2021) ("Court's Order").

4. I am aware that when the Court's Order becomes effective, it requires that Defendant's DHS enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the Administrative Procedures Act ("APA") and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 of the Immigration and Nationality Act ("INA") without releasing any non-citizen because of a lack of detention resources. A consequence of the Court's Order would be to resume enrollment of new individuals in MPP, who are placed in removal proceedings. Those cases would then require processing, in addition to the 26,000 individuals in Mexico with active cases.[2]

5. I have prepared this declaration to explain the burden this Court's Order places on EOIR's immigration courts. From my role as PDCIJ, I have personal knowledge of the facts stated in this declaration.

A. **Overview of the Immigration Courts' Dockets**

6. There are currently 66 Immigration Courts nationwide, and three Immigration Adjudication Centers. When MPP was in operation, EOIR heard cases for MPP enrollees at four Immigration Courts: El Paso, Harlingen, San Antonio and San Diego. Hearings for MPP enrollees were conducted in-person before an immigration judge within the United States in El Paso and San Diego, with DHS transporting individuals to their hearings by bus, and virtually from Immigration Hearing Facilities (IHFs), temporary

---

[1] An immigration adjudication center is a facility where immigration judges preside over immigration proceedings via video teleconference.
[2] Dkt. 64, Declaration of David Shahoulian, APP 6 (indicating that restarting MPP would require providing information about updated hearing times and locations to up to 26,000 individuals in Mexico with active cases.").

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

2

AR02107

structures constructed and operated by DHS at the southern border in Brownsville and Laredo, Texas, with immigration judges appearing by video from San Antonio and San Diego. Cases involving MPP enrollees were given priority scheduling – similar to the treatment of cases for persons who are detained – and were scheduled to avoid disrupting existing dockets.

7. In March 2020, EOIR paused hearing cases, including MPP matters, at the non-detained immigration courts due to the COVID-19 pandemic. Beginning in June of 2020, the non-detained courts resumed hearing cases and by July 6, 2021, all non-detained immigration courts have resumed hearing cases, although the operational levels vary at each court due to the ongoing pandemic. As of August 13, 2021, only four immigration courts nationwide are operating at 100 percent staffing capacity.[3] The remaining courts and IACs continue to operate at a reduced capacity, with twenty-six (26) locations operating at less than sixty percent (60%) capacity – that is more than 36% of locations operating with significant staffing shortages.

8. The court closures on account of the COVID-19 pandemic have significantly impacted EOIR's adjudicatory functions. As a result of the long-term closures, hundreds of thousands of cases have been postponed and most have still have not had a hearing since the non-detained dockets have resumed. As of August 6, 2021, only 17 locations have docket availability in 2021 for merits hearings. Twelve have availability in 2022, but 35 locations do not have availability until 2023, two of which do not have availability until 2025. As such, most new cases will not receive a hearing on the merits and subsequent decision for several years. As of August 13, 2021, the Office of the Chief Immigration Judge had 1,348,787 pending matters.

9. In cases where an individual remains in Department of Homeland Security ("DHS") custody during the pendency of immigration proceedings, EOIR seeks to minimize detention (and the costs associated with detention) by prioritizing detained cases over non-detained cases. In 20 of those courts, Immigration Judges preside over detained cases only; in 38 of those courts, Immigration Judges preside over both detained and non-detained cases; and in 10 of those courts, Immigration Judges preside over

---

[3] The four locations are the detained court at Batavia, NY; the hybrid courts (that maintain both a non-detained and detained dockets) at Tucson, AZ and Saipan; and the newly opened Immigration Adjudication Center in Richmond, VA.

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

3

AR02108

non-detained cases only. The three IAC locations hear both detained and non-detained cases. Therefore, the majority of EOIR's immigration courts and the Immigration Judges assigned to them have dockets that conduct hearings for detained cases only or at least some detained cases. As such, EOIR is limited in the resources it can divert to non-detained cases, including MPP cases.

10. Assuming DHS resumes the use of Immigration Hearing Facilities (IHFs), along the southwest border, there are only a limited number of such facilities where Immigration Judges can conduct hearings. In-person cases are also limited to those locations that are nearest to the border where DHS can transport individuals for their proceedings. DHS is responsible for physically bringing an MPP enrollee to their immigration court hearings, or facilitating their appearance from the IHF by video-teleconference ("VTC"). It is my understanding that DHS also has a finite number of VTC units and secure space for use for immigration court hearings. While the VTC units are able to connect to any immigration courtroom across the country, consideration must be given to allow counsel for the parties, any witnesses, and often an interpreter to be able to also appear before the immigration court for a given hearing when selecting a hearing location.

11. Due to space and resource constraints, EOIR could not immediately dedicate additional Immigration Judges to MPP dockets without great disruption to existing dockets and the expenditure of already reduced resources. Even if the government could construct and bring online additional IHFs and VTC units to facilitate the docketing of additional MPP cases, to do so would likely require the realignment of dockets at courts across the country for the 1,348,787 pending matters (excluding the detained cases), to make room for new MPP cases, further pushing out pending cases to 2025 and beyond.[4] As such, implementing these changes on a nationwide or widespread basis is not immediately possible. EOIR also has a policy in place to ensure that all courtrooms across the country are used at all times and because of this policy, there are generally no courtrooms sitting vacant that could be utilized for these hearings. *See* Executive Office for Immigration Review, Office of the Director, Policy Memorandum 19-11, "No Dark Courtrooms," (May 1, 2019), *available at* https://www.justice.gov/eoir/office-of-policy.

---

[4] Currently, nineteen courts have dockets out to 2024 and two courts have dockets out to 2025.

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

4

AR02109

Even when a courtroom is not in use because the adjudicator and the parties are able to appear remotely, the immigration court has to flex that space to use it for social distancing on account of the pandemic where a hearing is taking place in-person, resulting in fewer courtrooms available for other hearings.

12. Beyond the space and judicial resource limitations, EOIR lacks sufficient administrative support staff to promptly create, docket, assign and schedule new MPP cases to be heard nationwide within a very short time frame.[5] The immigration courts are experiencing significant staffing shortages in most courts across the county, and as such the agency does not have additional resources at other locations to immediately reassign to these tasks so as to be able to immediately re-implement MPP nationwide. Because the MPP program was discontinued, EOIR decreased the number of contract administrative staff employed to manage MPP cases. As a result, new staff would need to be recruited and trained to resume hearing MPP dockets. Immigration Judges are generally supported by court staff and a court administrator. As indicated above, only four locations are currently at full administrative staffing levels for the number of Immigration Judges presiding over cases, and many are without a permanent Court Administrator. For example, as of August 13, 2021, Harlingen was at 50% of its operational capacity; San Antonio was at 60%; San Diego was at 52%; and El Paso was at 90%, but without the contract administrative staff previously dedicated to MPP.

**B. Impact of the Court's Order**

13. The COVID-19 pandemic creates unique burdens on the immigration court to implement MPP. Prior to the pandemic, MPP enrollees could be transported in substantial numbers to the San Diego and El Paso courts by van and awaited their hearings in crowded waiting areas or courtrooms. Because of the pandemic, current social distancing protocols prohibit such close contact and enforcing those necessary measures would necessarily require fewer individuals to appear in person at the court, limiting the efficiency of hearing time and ultimately resulting in delays in scheduling MPP cases, and further delays in scheduling preexisting non-MPP matters. Re-implementing MPP cases at this time during the pandemic would require court administrative staff to schedule and generate thousands of hearing notices for

---

[5] Administrative staff are responsible for creating an alien's electronic and paper record of proceedings, scheduling initial master calendar and bond hearings, and ensuring that there is sufficient docket space for required hearings.

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

5

AR02110

individuals, some of whom DHS would be unable to transport to their hearings because they exhibit COVID symptoms. This would require re-scheduling and reissuance of new hearing notices, which places an additional administrative burden on the immigration courts. As indicated above, the significant judicial and administrative resource shortages would make it severely difficult for the government to immediately re-implement MPP nationwide on an orderly basis. Social distancing protocols would also limit the number of MPP enrollees who can appear at the courts and IHFs. Overall, the reduced numbers of MPP matters that can be heard due to social distancing protocols may result in significantly delayed hearings for MPP enrollees and, as a consequence, cause further delays of displaced non-MPP cases.

14. Given the large number of cases already on the Immigration Court's dockets and the limited space and resources available, it will be difficult and disruptive to resume dedicated dockets for MPP cases. As noted, there is restricted space to hold VTC hearings along the southwest border and more than half of the courts have calendars set into 2023. Requiring additional Immigration Judges to assist is not feasible due to space restrictions and would result in continuances and further delays of cases on the judges' dockets, who would be required to assist with these hearings. More importantly, cases currently docketed during this time would need to be rescheduled to accommodate these cases. As stated above in paragraph 11, EOIR has instituted a policy that requires that all courtrooms be utilized for immigration hearings at all times. Therefore, in order to hold space open for these cases, EOIR would necessarily need to reschedule already-scheduled hearings.

15. Rescheduling cases will have an adverse impact on all cases because other hearings would be deferred to later dates, resulting in the further delay of those individuals who have been waiting for several years for their day in court. Many noncitizens would therefore face longer overall removal proceedings due to delays in order to make room to conduct hearings for MPP enrollees.

16. Further, rescheduling currently docketed cases will create a ripple effect on the dockets. Rescheduling requires re-serving notices of hearings to the parties and their attorneys and the rescheduled dates, in turn, may result in new scheduling conflicts that would require still further rescheduling. The resulting delays would likely contribute to the number of cases pending at the courts. Such delays would

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

6

1   also substantially interfere with EOIR's goal of expediting other priority dockets, including the detained

2   docket, if there are less resources available to assist overall with fluctuating detention numbers and surges

3   in new arrivals who are not eligible for MPP enrollment.

4       17. Beginning in May 2021, EOIR and DHS implemented "Dedicated Dockets" in 11 cities,

5   including El Paso and San Diego. The dedicated docket process is intended to allow the agency to more

6   expeditiously and fairly make decisions in immigration cases of families who arrive between ports of entry

7   at the Southwest Border. [6]  This new process is intended to significantly decrease the amount of time it

8   takes for migrants to have their cases adjudicated while still providing fair hearings for families seeking

9   asylum at the border. Under the Dedicated Docket, IJ's are expected to generally issue a decision within

10  300 days of the initial master calendar hearing. To facilitate such timeliness while providing due process,

11  these cases are only scheduled before immigration judges who generally have docket time available to

12  manage a case on that timeline, recognizing that unique circumstances of each case may impact the ability

13  to issue a decision within that period. [7]  These dockets are anticipated to grow to 80,000 individuals and

14  are priority matters for adjudication. Given the limited judicial resources, the resumption of MPP matters

15  as an additional priority, particularly in cities that are designated for the Dedicated Docket, will likely

16  result in delays of existing cases and any new non-priority cases.

17      18. It is difficult to estimate how much time the Immigration Courts would need to docket and

18  schedule new hearings for MPP cases because the size is relatively unknown and constantly changing.

19  DHS opines that as of June 2021, there were 26,000 individuals in Mexico with active cases, and the

20  Court's Order provides that for "May and June 2021, for example, CBP recorded over 180,000 and

21  188,000 encounters, respectively, at the southwest border." Court's Order at footnote 7. In my opinion, if

22  the government were required by court order to re-implement MPP immediately as it existed prior to

23  January 20, 2021, and to utilize MPP for all applicants for admission who are not detained, the requirement

24  to manage an influx of 100,000 new MPP cases or more each month would likely push out all non-priority

---

[6] *See* DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings, May 28, 2021 available at https://www.justice.gov/opa/pr/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings

[7] *See* EOIR Policy Memorandum, PM 21-23, Dedicated Docket, available at https://www.justice.gov/eoir/book/file/1399361/download

DECLARATION OF DANIEL H. WEISS
No. 2:21-cv-00067-Z

7

AR02113

1    dockets for at least another calendar year or more, and continue to push the cases out as needed based on

2    the number of new receipts. Alternatively, if MPP cases are not prioritized, individuals could wait years

3    for their merit hearings to take place.

4

5    I affirm, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and

6    belief. Executed in Dallas, Texas.

7

     Dated: August 16, 2021

8                                              DANIEL WEISS   Digitally signed by DANIEL
                                                              WEISS
                                                              Date: 2021.08.16 15:29:55
                                                              -05'00'

9                                              Daniel H. Weiss
                                               Principal Deputy Chief Immigration Judge
10                                             Executive Office for Immigration Review

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   DECLARATION OF DANIEL H. WEISS
     No. 2:21-cv-00067-Z
28                                             8

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**VOLUME I OF II**

AR02114

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
|  | § | |
| THE STATE OF MISSOURI, | § | |
|  | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
|  | § | |
| v. | § | |
|  | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
|  | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

THE STATE OF TEXAS and      )
                )
THE STATE OF MISSOURI,      )
                )
    *Plaintiffs*,       )
                )
v.                )  Case No. 2:21-CV-00067-Z
                )
JOSEPH R. BIDEN, JR.,       )
in his official capacity as      )
President of the United States of    )
America;            )
                )
ALEJANDRO MAYORKAS,      )
in his official capacity as      )
Secretary of the United States     )
Department of Homeland Security;   )
                )
UNITED STATES DEPARTMENT OF   )
HOMELAND SECURITY;       )
                )
TROY MILLER,         )
in his official capacity as      )
Acting Commissioner of the     )
United States Customs and Border   )
Protection;           )
                )
UNITED STATES CUSTOMS AND BORDER )
PROTECTION;          )
                )
TAE JOHNSON,         )
in his official capacity as      )
Acting Director of the       )
United States Immigration and    )
Customs Enforcement;       )
                )
UNITED STATES IMMIGRATION AND   )
CUSTOMS ENFORCEMENT;      )
                )
TRACY RENAUD,        )
in her official capacity as      )
Acting Director of the United States   )

Citizenship and Immigration Services; and )
                                           )
UNITED STATES CITIZENSHIP AND )
IMMIGRATION SERVICES, )
                                           )
               *Defendants.*       )

## DECLARATION OF WYATT SULING

1. My name is Wyatt Suling. I am a professional researcher and data analyst for the Missouri Attorney General's Office. I am over 21 years of age and competent to testify to the matters asserted herein.

2. Attached hereto as Exhibit 1 is a true and correct copy of the Department of Homeland Security's publication, *Assessment of the Migrant Protection Protocols (MPP)*, dated October 28, 2019, which is publicly available on DHS's website at https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protecti on_protocols_mpp.pdf.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Department of Homeland Security's press release dated Dec. 20, 2018, and entitled *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration*, which is publicly available on DHS's website at https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

4. Attached hereto as Exhibit 3 is a true and correct copy of the Memorandum of Secretary Kirstjen M. Nielsen entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," dated Jan. 25, 2019, which is publicly available on DHS's website at https://www.dhs.gov/publication/policy-guidance-implementation-migrant-protection-protocols.

5. Attached hereto as Exhibit 4 is a true and correct copy of the Jan. 28, 2019 memorandum entitled "MPP Guiding Principles," which is publicly available at https://www.dhs.gov/publication/policy-guidance-implementation-migrant-protection-protocols.

6. Attached hereto as Exhibit 5 is a true and correct copy of the Jan. 20, 2021 memorandum from Acting Secretary David Pekoske entitled "Suspension of Enrollment in the Migrant Protection Protocols Program," which is publicly filed on the U.S. Supreme Court's docket at https://www.supremecourt.gov/DocketPDF/19/19-1212/167806/20210201143843402_19-1212%20Innovation%20Law%20Lab%20-%20Motion%20to%20Hold%20in%20Abeyance%20-%20FINAL.pdf.

7. Attached hereto as Exhibit 6 is a true and correct copy of the March 16, 2021 Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border, which is publicly available on DHS's website at

https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation.

8. Attached hereto as Exhibit 7 is a true and correct copy of the March 31, 2021 news article entitled "Border Patrol official expects more than 1 million migrant encounters this year," which is publicly available on Fox News's website at https://www.foxnews.com/politics/more-than-1-million-migrants-expected-us-border-2021.

9. In May 2021, the U.S. Customs and Border Protection reported 173,348 southwest border land encounters during March 2021 and 178,622 in April, a month-over-month increase of 3.04%. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. These included 18,960 encounters with unaccompanied children for March and another 17,171 in April 2021. *See id.* The overall number of border encounters in April 2021 exceeds the April 2019 influx by 63.25% and appears to be the highest recorded number of April encounters since at least 2000. *See id.* A true and correct copy of this report is attached hereto as Exhibit 8.

10. Attached hereto as Exhibit 9 is a true and correct copy of the April 1, 2021 news article entitled "Migrants freed without court notice – sometimes no paperwork," which is publicly available on the Associated Press's website at https://apnews.com/article/migrants-freed-without-court-notice-paperwork-9ace3e41e0acadac7cece17c83a8f7ff.

11. Attached hereto as Exhibit 10 is a true and correct copy of the March 23, 2021 news article entitled "Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies," which is publicly available on National Public Radio's website at https://www.npr.org/2021/03/23/980272165/ex-dhs-chief-says-biden-was-warned-about-dismantling-trumps-border-policies.

12. Attached hereto as Exhibit 11 is a true and correct copy of the April 1, 2021 opinion entitled "The Real Reason for the Border Crisis," which is publicly available on the New York Times's website at https://www.nytimes.com/2021/04/01/opinion/us-migrants-jobs.html.

13. Attached hereto as Exhibit 12 is a true and correct copy of the March 3, 2019 news article entitled " 'You Have to Pay With Your Body,' " which is publicly available on the New York Times's website at https://www.nytimes.com/2019/03/03/us/border-rapes-migrant-women.html.

14. Attached hereto as Exhibit 13 is a true and correct copy of the December 2016 report entitled "Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas," which is publicly available on the University of Texas's website at https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

15. Attached hereto as Exhibit 14 is a true and correct copy of the Department of Homeland Security's publication, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, dated February 11, 2021, which is publicly available on DHS's website at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

16. Attached hereto as Exhibit 15 is a true and correct copy of Polaris Project's publication, *The Latino Face of Human Trafficking and Exploitation in the United States*, which is publicly available on Polaris Project's website at https://polarisproject.org/wp-content/uploads/2020/04/EXECUTIVE-SUMMARY-The-Latino-Face-of-Human-Trafficking-and-Exploitation-in-the-United-States.pdf.

17. Before MPP was implemented, U.S. officials encountered an average of approximately 2,000 inadmissible aliens at the Southern border each day, and the rate at which those aliens claimed asylum surged exponentially. *See, e.g.*, 83 Fed. Reg. 55,934, 55,935 (Nov. 9, 2018). A true and correct copy of the *Federal Register* is attached hereto as Exhibit 16, and is publicly available at https://www.govinfo.gov/content/pkg/FR-2018-11-09/pdf/2018-24594.pdf.

18. In Fiscal Year 2006, only 5% of the 104,440 aliens subject to expedited removal claimed a credible fear of return to their home country and were entered into the asylum process. In Fiscal Year 2018, that rate had grown to 42% of over 234,000 aliens under expedited removal making a credible fear claim, an increase of 740% in the rate of claims. *See* Ex. 1.

19. Of the credible fear claimants referred for asylum proceedings with the Executive Office for Immigration Review (EOIR) between Fiscal Year 2008 and Fiscal Year 2019, approximately 45% did not actually file asylum claims. Executive Office for Immigration Review Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019* (Oct. 23, 2019), https://www.justice.gov/eoir/file/1216991/download. A true and correct copy of this report is attached hereto as Exhibit 17.

20. Between Fiscal Year 2008 and Fiscal Year 2019, 32 percent of aliens referred to EOIR absconded into the United States and were ordered removed in absentia. *See* Ex. 17.

21. The EOIR reported that between Fiscal Year 2008 and FY 2019, only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum. *See* Ex. 17.

22. Immigration courts were faced with a backlog of 768,257 cases at the end of Fiscal Year 2018—a number that since has grown 69.1% to 1,299,239 as of February 2021. TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/. A true and correct copy of this publication is attached hereto as Exhibit 18.

23. As of February 2021, the immigration court backlog has led to cases having an average wait time of over 900 days, providing unauthorized aliens released into the United States nearly two and half years in country. *See* Ex. 18.

24. In February 2020, the number of aliens either apprehended or deemed inadmissible at the Southern border was down roughly 40,000 from February 2019. *See* Ex. 8.

25. Missouri spent an average of $10,654 per student in school year 2019-2020 regardless of immigration status. Missouri Department of Elementary and Secondary Education, *State Report Card – 2020 Data*, https://apps.dese.mo.gov/MCDS/Reports/SSRS_Print.aspx?Reportid=84d85ca8-c722-4f9b-9935-70d36a53cf54. A true and correct copy of this publication is attached hereto as Exhibit 19.

26. A 2018 study shows that an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools. Migration Policy Institute, *Profile of the Unauthorized Population: Missouri*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/MO. A true and correct copy of this publication is attached hereto as Exhibit 20.

27. Statistically, for every 1,000 unlawful aliens who remain in the United States, 56 reside in Missouri. Pew Research Center, *U.S. unauthorized immigrant population estimates by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/. A true and correct copy of this publication is attached hereto as Exhibit 21.

28. According to records of Missouri's Department of Social Services, Missouri expended $5,427,715 in health-care costs for treatment of ineligible aliens during Fiscal Year 2020.

29. Missouri's Department of Revenue (DOR) uses the Systemic Alien Verification of Entitlements (SAVE) system to verify individuals' lawful immigration status at a cost of $0.80 for the initial inquiry and $0.50 for any additional inquiries. In state fiscal year 2020, DOR paid $30,114.11 for SAVE inquiries.

30. While applicants for drivers' licenses are charged a fee, no part of that fee is specifically designated for SAVE costs and DOR must annually request appropriations from the state legislature to cover the costs of SAVE inquiries.

31. At the end of March 2021, a little more than two months after the Biden administration took office, 3,911 individuals with immigration cases subject to the Migrant Protection Protocols (MPP) program had been allowed into the United States. At the end of April 2021, only a month later, that number more than doubled to 8,387, signifying an increased pace in admissions. Of the cases admitted into the United States thus far, 56 were transferred to the immigration court in Kansas City, MO. Attached hereto as Exhibit 22 is a true and correct copy of the Transactional Access Records Clearinghouse (TRAC) publication, *Now Over 8,000 MPP Cases Transferred Into United States Under Biden*,

which is publicly available on TRAC's website at
https://trac.syr.edu/immigration/reports/647/.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: 05/13/2021

Wyatt Suling

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Assessment of the Migrant Protection Protocols (MPP)

# EXHIBIT A-1

**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

I.    **Overview and Legal Basis**

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.    MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

AR02024

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  o The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings. Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  o The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  o After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  o Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  o A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  o Individuals not processed under MPP generally must wait years for adjudication of their claims. There are approximately one million pending cases in DOJ immigration courts. Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  o According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States. This number—along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

3

**III.    Both Governments Endeavor to Provide Safety and Security for Migrants**

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

4

northern border cities. As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration. Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.

### IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS). Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

  - MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

  - As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP. As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

  - That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

  - Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

  - Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there. This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

## V. Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge. Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019. At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners. In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months. MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

AR02028

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R.§ 235.3(b)(2).

7

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase. Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process. And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018. Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| **Total Encounters** | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 _11.7%_ | 4,192 _11.4%_ | 3,956 _11.2%_ | 4,775 _6.3%_ | 2,377 _4.3%_ | 2,168 _2.9%_ | 21,155 _6.8%_ |
| Removal Orders[4] | 9,980 _31.7%_ | 11,064 _30.2%_ | 9,466 _26.7%_ | 17,700 _23.3%_ | 12,130 _22.0%_ | 11,673 _15.4%_ | 72,013 _23.2%_ |
| Asylum Cases Pending | 17,554 _55.8%_ | 21,104 _57.6%_ | 21,737 _61.4%_ | 53,023 _69.8%_ | 40,586 _73.5%_ | 61,918 _81.6%_ | 215,922 _69.5%_ |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
[1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
[2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
[3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
[4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

8

Implementing MPP assessments currently imposes a significant resource burden to DHS. As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment. The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide. In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**. Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do. As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico. Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico. Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context. For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard. "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP. Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8] The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9] In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

9

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

10

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Department of Homeland Security's Press Release dated December 20, 2018

# EXHIBIT A-2



## Homeland Security

## News Archive

Search

Blog Archive  Events & Media Advisories Archive

Fact Sheets Archive  Press Release Archive

Speeches Archive

### Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration



**Release Date:** December 20, 2018

Announces Migration Protection Protocols

">

WASHINGTON – Today, Secretary of Homeland Security Kirstjen M. Nielsen announced historic action to confront the illegal immigration crisis facing the United States. Effective immediately, the United States will begin the process of invoking Section 235(b)(2)(C) of the Immigration and Nationality Act. Under the Migration Protection Protocols (MPP), individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings.

"Today we are announcing historic measures to bring the illegal immigration crisis under control," said Secretary Nielsen. "We will confront this crisis head on, uphold the rule of law, and strengthen our humanitarian commitments. Aliens trying to game the system to get into our country illegally will no longer be able to disappear into the United States, where many skip their court dates. Instead, they will wait for an immigration court decision while they are in Mexico. 'Catch and release' will be replaced with 'catch and return.' In doing so, we will reduce illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place. This will also allow us to focus more attention on those who are actually fleeing persecution.

"Let me be clear: we will undertake these steps consistent with all domestic and international legal obligations, including our humanitarian commitments. We have notified the Mexican government of our

AR02134

Case 3:21-cv-00067-Z   Document 152-4   Filed 09/08/22   Page 238 of 256   PageID 6846

intended actions. In response, Mexico has made an independent determination that they will commit to implement essential measures on their side of the border.  We expect affected migrants will receive humanitarian visas to stay on Mexican soil, the ability to apply for work, and other protections while they await a U.S. legal determination."

## Background

Illegal aliens have exploited asylum loopholes at an alarming rate.  Over the last five years, DHS has seen a 2000 percent increase in aliens claiming credible fear (the first step to asylum), as many know it will give them an opportunity to stay in our country, even if they do not actually have a valid claim to asylum.  As a result, the United States has an overwhelming asylum backlog of more than 786,000 pending cases.  Last year alone the number of asylum claims soared 67 percent compared to the previous year.  Most of these claims are not meritorious—in fact *nine out of ten asylum claims are not granted by a federal immigration judge*.  However, by the time a judge has ordered them removed from the United States, many have vanished.

## Process

- Aliens trying to enter the U.S. to claim asylum will no longer be released into our country, where they often disappear before a court can determine their claim's merits.
- Instead, those aliens will be processed by DHS and given a "Notice to Appear" for their immigration court hearing.
- While they wait in Mexico, the Mexican government has made its own determination to provide such individuals humanitarian visas, work authorization, and other protections. Aliens will have access to immigration attorneys and to the U.S. for their court hearings.
- Aliens whose claims are upheld by U.S. judges will be allowed in. Those without valid claims will be deported to their home countries.

## Anticipated Benefits

- As we implement, illegal immigration and false asylum claims are expected to decline.
- Aliens will not be able to disappear into U.S. before court decision.
- More attention can be focused on more quickly assisting legitimate asylum-seekers, as fraudsters are disincentivized from making the journey.
- Precious border security personnel and resources will be freed up to focus on protecting our territory and clearing the massive asylum backlog.
- Vulnerable populations will get the protection they need while they await a determination in Mexico.

Topics: Border Security, Immigration and Customs Enforcement, Secretary of Homeland Security
Keywords: Border Security, Immigration Enforcement, Southwest Border

Last Published Date: December 20, 2018

>   Archive   >   News Archive   >   Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration

**AR02035**

Official website of the Department of Homeland Security

Site Links     Privacy     FOIA     Accessibility     Plug-ins

AR02136

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Memorandum of Secretary Kirstjen M. Nielsen dated January 25, 2019

# EXHIBIT A-3



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

January 25, 2019

**ACTION**

MEMORANDUM FOR:  L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:  Kirstjen M. Nielsen
Secretary

SUBJECT:  Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS),
consistent with the Migrant Protection Protocols (MPP), will begin implementation of
Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to
address the migration crisis along our southern border. In 1996, Congress added Section
235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to
return certain applicants for admission to the contiguous country from which they are arriving on
land (whether or not at a designated port of entry) pending removal proceedings under Section
240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico
("third-country nationals") arriving in the United States by land from Mexico—illegally or
without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for
the duration of their Section 240 removal proceedings.

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.
>
> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.
>
> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.
>
> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return (*'refouler'*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return (*'refouler'*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF WYATT SULING

MPP Guiding Principles

# EXHIBIT A-4

## MPP Guiding Principles

**Date:**                       January 28, 2019

**Topic:**                     Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**      Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
  - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
  - Unaccompanied alien children,
  - Citizens or nationals of Mexico,
  - Aliens processed for expedited removal,
  - Aliens in special circumstances:
    - Returning LPRs seeking admission (subject to INA section 212)
    - Aliens with an advance parole document or in parole status
    - Known physical/mental health issues
    - Criminals/history of violence
    - Government of Mexico or USG interest,
  - Any alien who is more likely than not to face persecution or torture in Mexico, or
  - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP.  Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time.  Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico.  If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*
- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Memorandum of Acting Secretary David Pekoske dated January 20, 2021

# EXHIBIT A-5

Secretary
U.S. Department of Homeland Security
Washington, DC 20528

 **Homeland Security**

January 20, 2021

**MEMORANDUM FOR:**   Troy Miller
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Tae Johnson
Acting Director
U.S. Immigration and Customs Enforcement

**FROM:**   David Pekoske
Acting Secretary

**SUBJECT:**   **Suspension of Enrollment in the Migrant Protection Protocols Program**

Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF WYATT SULING

Department of Homeland Security's Press Release dated March 16, 2021

# EXHIBIT A-6

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z Document 152-4 Filed 09/02/22 Page 251 of 256 PageID 6359

# Homeland Security

## News

Search

Blog  Data  Events  Fact Sheets  Homeland Security LIVE

In Focus  Media Contacts  Multimedia

National Terrorism Advisory System  Podcasts

Press Releases  Publications Library  Social Hub

Social Media  Speeches  Testimony  News Archive

Comunicados de Prensa

# Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border



**Release Date:** March 16, 2021

There is understandably a great deal of attention currently focused on the southwest border.  I want to share the facts, the work that we in the Department of Homeland Security (DHS) and across the government are doing, and our plan of action.  Our personnel remain steadfast in devotion of their talent and efforts in the service of our nation.

The situation at the southwest border is difficult.  We are working around the clock to manage it and we will continue to do so.  That is our job.  We are making progress and we are executing on our plan.  It will take time and we will not waver in our commitment to succeed.

We will also not waver in our values and our principles as a Nation.  Our goal is a safe, legal, and orderly immigration system that is based on our bedrock priorities: to keep our borders secure, address the plight of children as the law requires, and enable families to be together. As noted by the President in his Executive Order, "securing our borders does not require us to ignore the humanity of those who seek to cross them." We are both a nation of laws and a nation of immigrants.  That is one of our proudest traditions.

## The Facts

We are on pace to encounter more individuals on the southwest border than we have in the last 20 years. We are expelling most single adults and families.  We are not expelling unaccompanied children.  We are securing our border, executing the Centers for Disease Control and Prevention's (CDC) public health authority to safeguard the American public and the migrants themselves, and protecting the children.  We

AR02148

have more work to do.

This is not new. We have experienced migration surges before – in 2019, 2014, and before then as well. Since April 2020, the number of encounters at the southwest border has been steadily increasing. Border Patrol Agents are working around the clock to process the flow at the border and I have great respect for their tireless efforts. To understand the situation, it is important to identify who is arriving at our southwest border and how we are following the law to manage different types of border encounters.

## Single Adults

The majority of those apprehended at the southwest border are single adults who are currently being expelled under the CDC's authority to manage the public health crisis of the COVID-19 pandemic. Pursuant to that authority under Title 42 of the United States Code, single adults from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras are swiftly expelled to Mexico. Single adults from other countries are expelled by plane to their countries of origin if Mexico does not accept them. There are limited exceptions to our use of the CDC's expulsion authority. For example, we do not expel individuals with certain acute vulnerabilities.

The expulsion of single adults does not pose an operational challenge for the Border Patrol because of the speed and minimal processing burden of their expulsion.

## Families

Families apprehended at the southwest border are also currently being expelled under the CDC's Title 42 authority. Families from Mexico and the Northern Triangle countries are expelled to Mexico unless Mexico does not have the capacity to receive the families. Families from countries other than Mexico or the Northern Triangle are expelled by plane to their countries of origin. Exceptions can be made when a family member has an acute vulnerability.

Mexico's limited capacity has strained our resources, including in the Rio Grande Valley area of Texas. When Mexico's capacity is reached, we process the families and place them in immigration proceedings here in the United States. We have partnered with community-based organizations to test the family members and quarantine them as needed under COVID-19 protocols. In some locations, the processing of individuals who are part of a family unit has strained our border resources. I explain below additional challenges we have encountered and the steps we have taken to solve this problem.

## Unaccompanied Children

We are encountering many unaccompanied children at our southwest border every day. A child who is under the age of 18 and not accompanied by their parent or legal guardian is considered under the law to be an unaccompanied child. We are encountering six- and seven-year-old children, for example, arriving at our border without an adult. They are vulnerable children and we have ended the prior administration's practice of expelling them.

An unaccompanied child is brought to a Border Patrol facility and processed for transfer to the Department of Health and Human Services (HHS). Customs and Border Protection is a pass-through and is required to transfer the child to HHS within 72 hours of apprehension. HHS holds the child for testing and quarantine, and shelters the child until the child is placed with a sponsor here in the United States. In more than 80 percent of cases, the child has a family member in the United States. In more than 40 percent of cases, that family member is a parent or legal guardian. These are children being reunited with their families who will

AR02049

care for them.

The children then go through immigration proceedings where they are able to present a claim for relief under the law.

The Border Patrol facilities have become crowded with children and the 72-hour timeframe for the transfer of children from the Border Patrol to HHS is not always met. HHS has not had the capacity to intake the number of unaccompanied children we have been encountering. I describe below the actions we have taken and the plans we are executing to handle this difficult situation successfully.

## Why the Challenge is Especially Difficult Now

Poverty, high levels of violence, and corruption in Mexico and the Northern Triangle countries have propelled migration to our southwest border for years. The adverse conditions have continued to deteriorate. Two damaging hurricanes that hit Honduras and swept through the region made the living conditions there even worse, causing more children and families to flee.

The COVID-19 pandemic has made the situation more complicated. There are restrictions and protocols that need to be followed. The physical distancing protocol, for example, imposes space and other limitations on our facilities and operations.

The prior administration completely dismantled the asylum system. The system was gutted, facilities were closed, and they cruelly expelled young children into the hands of traffickers. We have had to rebuild the entire system, including the policies and procedures required to administer the asylum laws that Congress passed long ago.

The prior administration tore down the lawful pathways that had been developed for children to come to the United States in a safe, efficient, and orderly way. It tore down, for example, the Central American Minors program that avoided the need for children to take the dangerous journey to our southwest border.

The previous administration also cut foreign aid funding to the Northern Triangle. No longer did we resource efforts in El Salvador, Guatemala, and Honduras to tackle the root causes of people fleeing their homes.

And, there were no plans to protect our front-line personnel against the COVID-19 pandemic. There was no appropriate planning for the pandemic at all.

As difficult as the border situation is now, we are addressing it. We have acted and we have made progress. We have no illusions about how hard it is, and we know it will take time. We will get it done. We will do so adhering to the law and our fundamental values. We have an incredibly dedicated and talented workforce.

## Actions We Have Taken

In less than two months, Customs and Border Protection stood-up an additional facility in Donna, Texas to process unaccompanied children and families. We deployed additional personnel to provide oversight, care, and transportation assistance for unaccompanied minors pending transfer to HHS custody.

Case 2:21-cv-00067-Z Document 62-1 Filed 06/08/23 Page 336 of 256 PageID 6362

We are standing up additional facilities in Texas and Arizona to shelter unaccompanied children and families. We are working with Mexico to increase its capacity to receive expelled families. We partnered with community-based organizations to test and quarantine families that Mexico has not had the capacity to receive. We have developed a framework for partnering with local mayors and public health officials to pay for 100% of the expense for testing, isolation, and quarantine for migrants. ICE has also developed additional facilities to provide testing, local transportation, immigration document assistance, orientation, travel coordination in the interior, and mechanisms to support oversight of the migrant families who are not expelled.

Working with Mexico and international organizations, we built a system in which migrants who were forced to remain in Mexico and denied a chance to seek protection under the previous administration can now use a virtual platform – using their phones – to register. They do not need to take the dangerous journey to the border. The individuals are tested, processed, and transported to a port of entry safely and out of the hands of traffickers. We succeeded in processing the individuals who were in the Matamoros camp in Mexico. This is the roadmap going forward for a system that is safe, orderly, and fair.

To protect our own workforce, we launched Operation Vaccinate Our Workforce (VOW) in late January. At the beginning of this administration, less than 2 percent of our frontline personnel were vaccinated. Now more than 25 percent of our frontline personnel have been vaccinated.

We directed the Federal Emergency Management Agency (FEMA) to assist HHS in developing the capacity to meet the surge of unaccompanied children. FEMA already established one new facility for HHS to shelter 700 children. They have identified and are currently adding additional facilities. We are working with HHS to more efficiently identify and screen sponsors for children. In two days, we recruited more than 560 DHS volunteers to support HHS in our collective efforts to address the needs of the unaccompanied children.

We are restarting and expanding the Central American Minors program. It creates a lawful pathway for children to come to the United States without having to take the dangerous journey. Under this expansion, children will be processed in their home countries and brought to the United States in a safe and orderly way.

In addition, DHS and HHS terminated a 2018 agreement that had a chilling effect on potential sponsors – typically a parent or close relative – from coming forward to care for an unaccompanied child placed in an HHS shelter. In its place, DHS and HHS signed a new Memorandum of Agreement that promotes the safe and timely transfer of children. It keeps safeguards designed to ensure children are unified with properly vetted sponsors who can safely care for them while they await immigration proceedings.

**The Path Forward**

We are creating joint processing centers so that children can be placed in HHS care immediately after Border Patrol encounters them. We are also identifying and equipping additional facilities for HHS to shelter unaccompanied children until they are placed with family or sponsors. These are short-term solutions to address the surge of unaccompanied children.

Longer term, we are working with Mexico and international organizations to expand our new virtual platform so that unaccompanied children can access it without having to take the dangerous journey to our border. As mentioned, we are expanding the Central American Minors program to permit more children to be processed in their home countries and if eligible, brought to the United States in a safe and orderly way.

AR02057

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z Document 152-4 Filed 09/08/22 Page 255 of 256 PageID 6383

We are developing additional legal and safe pathways for children and others to reach the United States. While we are building a formal refugee program throughout the region, we are working with Mexico, the Northern Triangle countries, and international organizations to establish processing centers in those countries so that individuals can be screened through them and brought to the United States if they qualify for relief under our humanitarian laws and other authorities.

For years, the asylum system has been badly in need of reengineering. In addition to improving the process by which unaccompanied children are placed with family or sponsors, we will be issuing a new regulation shortly and taking other measures to implement the long-needed systemic reforms. We will shorten from years to months the time it takes to adjudicate an asylum claim while ensuring procedural safeguards and enhancing access to counsel.

President Biden laid out a vision of a "multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values." To that end, we are working with the Departments of Health and Human Services, Justice, and State in an all-of-government effort to not only address the current situation at our southwest border, but to institute longer-term solutions to irregular migration from countries in our hemisphere that are suffering worsening conditions. This is powerfully exemplified by the President's goal to invest $4 billion in the Northern Triangle countries to address the root causes of migration.

## Conclusion

The situation we are currently facing at the southwest border is a difficult one. We are tackling it. We are keeping our borders secure, enforcing our laws, and staying true to our values and principles. We can do so because of the incredible talent and unwavering dedication of our workforce.

I came to this country as an infant, brought by parents who understood the hope and promise of America. Today, young children are arriving at our border with that same hope. We can do this.

Topics:
Border Security, Citizenship and Immigration Services, Homeland Security Enterprise, Secretary of Homeland Security
Keywords:
Family, Immigration, Immigration Reform, Secretary Alejandro Mayorkas, Southwest Border, Unaccompanied Children (UC)

Last Published Date: March 16, 2021

> News > Press Releases > Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border



Official website of the Department of Homeland Security

AR02152

Site Links    Privacy    FOIA    Accessibility    Plug-ins

AR02059