UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF WYATT SULING

Fox News Article dated March 31, 2021
"Border Patrol official expects more than 1 million migrant encounters this year"

# EXHIBIT A-7

By using this site, you agree to our Privacy Policy and our Terms of Use. Close

Fox News
12:17 PM

- U.S.
- Politics
- Media
- Opinion
- Business
- Entertainment
- Sports
- Lifestyle
- TV
- Fox Nation
- Listen
- More

Expand / Collapse search
Login
Watch TV
Menu
Hot Topics

- LIVE UPDATES: Chauvin trial continues Thursday

| Search foxnews.com | | Search |

**Coronavirus**

**U.S.**

- Crime
- Military
- Education
- Terror
- Immigration
- Economy
- Personal Freedoms
- Fox News Investigates

**World**

- U.N.
- Conflicts
- Terrorism
- Disasters
- Global Economy
- Environment
- Religion
- Scandals

**Opinion**

AR02155

Politics

- Executive
- Senate
- House
- Judiciary
- Foreign Policy
- Polls
- Elections

Entertainment

- Celebrity News
- Movies
- TV News
- Music News
- Style News
- Entertainment Video

Business

- Personal Finance
- Economy
- Markets
- Watchlist
- Lifestyle
- Real Estate
- Tech

Lifestyle

- Food + Drink
- Cars + Trucks
- Travel + Outdoors
- House + Home
- Fitness + Well-being
- Style + Beauty
- Family
- Faith

Science

- Archaeology
- Air & Space
- Planet Earth
- Wild Nature
- Natural Science
- Dinosaurs

Tech

- Security
- Innovation
- Drones

AR_02056

- Computers
- Video Games
- Military Tech

Health

- Coronavirus
- Healthy Living
- Medical Research
- Mental Health
- Cancer
- Heart Health
- Children's Health

TV

- Shows
- Personalities
- Watch Live
- Full Episodes
- Show Clips
- News Clips

**About**

- Contact Us
- Careers
- Fox Around the World
- Advertise With Us
- Media Relations
- Corporate Information
- Compliance
- Supplier Diversity

**Other**

- Fox Nation
- Fox News Shop
- Fox News Go
- Fox News Radio
- Newsletters
- Alerts
- Podcasts
- Apps & Products

Fox News

- New Terms of Use
- Updated Privacy Policy
- Do Not Sell my Personal Information
- Closed Captioning Policy
- Help
- Contact Us

This material may not be published, broadcast, rewritten, or redistributed. ©2021 FOX News Network, LLC. All rights

Case 2:21-cv-00067-Z   Document 132-5   Filed 09/02/22   Page 5 of 140   PageID 6368

reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

- Facebook
- Twitter
- Google+
- Instagram
- RSS
- Email

IMMIGRATION
**Published** 20 hours ago

# Border Patrol official expects more than 1 million migrant encounters this year

## Officials encountered more than 100,000 migrants in February

By Adam Shaw | Fox News

- Facebook
- Twitter
- Flipboard
- Comments
- Print
- Email

close

AR02058

**Biden has posted 'open for business' sign at border: Texas Congressman**

U.S. Rep. Michael Burgess, who just visited the region, with a firsthand account of the crisis.

A border official on Tuesday told reporters that he expects Border Patrol to have more than a million migrant encounters in 2021 -- the latest indication of the scale of the escalating crisis at the southern border that the Biden administration faces.

Texas Deputy Border Chief Raul Ortiz told pool reporters that he "fully expects" Border Patrol to encounter more than a million migrants this year.

**INSIDE THE BORDER CRISIS: PRESS TOUR PACKED TEXAS FACILITY WITH 4,000+ MIGRANTS**

AR02059

In February, there were more than 100,000 migrant encounters in February, and there is little sign that that rate is slowing down -- with peak migration season coming before June.

While the administration has noted that many of those encountered are single adults, and therefore able to be swiftly returned under Title 42 health protections, those that arrive as part of a family unit or who are unaccompanied children are not so easily returned.

Some migrant families can be returned under Title 42, but Mexico has been refusing to take back families with tender-age children, meaning families are being held in the U.S. or released into the interior.

There are currently more than 5,000 unaccompanied children in Customs and Border Protection custody and more than 11,000 in Health and Human Services custody.

## GOP SENATORS REVEAL SHOCKING IMAGES OF MIGRANTS, BABIES PACKED IN BORDER FACILITIES

Some of those minors were seen by reporters on Tuesday, when press was allowed in to view a migrant facility in Donna, Texas, which is at 1700 percent capacity -- with more than 3,400 children in custody.

Eight "pods" were seen -- each containing 500-600 migrants. Guidelines say there should only be 32 migrants in each pod. Donna's temporary facility is 140,000 square feet.

Video

The images, as well as indications that the border crisis will not abate any time soon, is continuing to increase pressure on the Biden administration to act. The administration has claimed it is not facing a "crisis" but calling it a "challenge" instead -- a claim rejected by Republicans.

## MIGRANT CHILDREN IN BIDEN'S PACKED BORDER FACILITIES NOT BEING COVID TESTED, CAN'T SOCIAL DISTANCE

"It is a humanitarian disaster and crisis," Sen. Ted Cruz, R-Texas, who led a delegation to Donna last week, said on "Fox & Friends" on Wednesday. "And it's man-made. Joe Biden caused this by political decisions made in the opening weeks of his administration."

Critics have blamed the ending of Trump-era policies like the Migrant Protection Protocols (MPP) -- which kept migrants in Mexico -- and the halting of border wall construction for giving a green light to migrants to make the journey north. The administration has blamed the prior administration for dismantling legal pathways for asylum.

## CLICK HERE TO GET THE FOX NEWS APP

"What we're working to do is put in place steps and actions to help address the situation at the border, including...expediting processing and opening up additional shelters, but also reinstituting policies like the Central American Minors Program to encourage young people to apply in their country and not make that treacherous journey,"

AR02060

White House Press Secretary Jen Psaki said on Monday.

"We are also in a circumstance where we are digging out of a broken system over the past four years -- not just the inhumane policies, but the fact that there were never efforts put in place to look for and seek shelters where these children could be safely and humanely housed," she said.

Adam Shaw is a reporter covering U.S. and European politics for Fox News. He can be reached at adam.shaw@foxnews.com.

## Sponsored Stories You May Like

Ads by Verizon Media



**13 Moments At Airports That People Stared At**

Sponsored | MoneyPail Travel




**Celebrity Prom Photos Before They Were Famous**

Sponsored | CultureHook



**Things That Were Actually Acceptable In The '60s**

Sponsored | History A2Z



**Grossly Uncool Things Boomers Still Think Are Cool**

Sponsored | Autooverload



**When She Was Younger She Was Beyond Hot**

Sponsored | forwhatitsearth.com



**Fake Reality Shows That People Believed Were Real**

Sponsored | Definition


## Sponsored Stories

### More from Fox News

- **McDonald's Sandwiches, Ranked From Worst to First**

  Sponsored | Thrillist

- **Olivia Jade Giannulli is all 'smiles for a sunny day' in teeny tiny bikini**

  Fox News

- **The 2021 Jeep Grand Cherokee Is Stunning And Cheap**

  Sponsored | CarsGenius

- **'Desperate Housewives' star James Denton reveals why he moved his family away from Hollywood**

  Fox News

AR02062

- US Surgeon Drops Over 70 LBS: "I Quit 3 Foods"

  Sponsored | TotalRestore

  - Kentucky teen, 14, killed in Florida while jumping in front of gun aimed at stepbrother, family says

    Fox News

- Tom Bradys New Missouri Mansion As Big As A City

  Sponsored | Bonvoyaged

  - Wendy's customer asks for extra mayo, gets way more than she expected

    Fox News

- He Left Pregnant Wife. Weeks Later, She Opens Oven

  Sponsored | World Life Style

  - Matt Gaetz case gets more bizarre as extortion claim involves search for missing ex-FBI agent Robert Levinson

    Fox News

- At 92, He's The Last Living TV Western Star

  Sponsored | Definition

  - Sarah Palin discloses COVID-19 diagnosis, urges Americans to wear masks

    Fox News

Ads by Verizon Media



AR02069



Get all the stories you need-to-know from the most powerful name in news delivered first thing every morning to your inbox

Arrives Weekdays
Subscribe

Subscribed

Type your email
Subscribe

You've successfully subscribed to this newsletter!

## More from Fox News



**Olivia Jade Giannulli is all 'smiles for a sunny day' in teeny tiny bikini**



**'Desperate Housewives' star James Denton reveals why he moved his family away from Hollywood**

AR02164

Case 2:21-cv-00067-Z   Document 162-5   Filed 09/02/22   Page 12 of 140   PageID 16376



**Kentucky teen, 14, killed in Florida while jumping in front of gun aimed at stepbrother, family says**

**Wendy's customer asks for extra mayo, gets way more than she expected**

**Netflix purchases 'Knives Out' sequel rights in massive two-movie deal**

**Matt Gaetz case gets more bizarre as extortion claim involves search for missing ex-FBI agent Robert Levinson**

## More from Politics

17 mins ago

**How China gains leverage over developing countries through secret debt contracts**

21 mins ago

**Bipartisan bill would demand DHS establish plan to counter border surges, create $1B fund**

57 mins ago

**Intelligence, national security agencies warn of US supply chain threats**

1 hour ago

**Texas sheriff warns border crisis stretching police resources: 'We can't serve our citizens' the way we need**

## Sponsored Stories

AR02065

Verizon Media



**13 Moments At Airports That People Stared At**

Sponsored | MoneyPail Travel

**Coronavirus**

U.S.

- Crime
- Military
- Education
- Terror
- Immigration
- Economy
- Personal Freedoms
- Fox News Investigates

**AR02066**

World

- U.N.
- Conflicts
- Terrorism
- Disasters
- Global Economy
- Environment
- Religion
- Scandals

Opinion

Politics

- Executive
- Senate
- House
- Judiciary
- Foreign Policy
- Polls
- Elections

Entertainment

- Celebrity News
- Movies
- TV News
- Music News
- Style News
- Entertainment Video

Business

- Personal Finance
- Economy
- Markets
- Watchlist
- Lifestyle
- Real Estate
- Tech

Lifestyle

- Food + Drink
- Cars + Trucks
- Travel + Outdoors
- House + Home
- Fitness + Well-being
- Style + Beauty
- Family
- Faith

Science

AR02067

- Archaeology
- Air & Space
- Planet Earth
- Wild Nature
- Natural Science
- Dinosaurs

Tech

- Security
- Innovation
- Drones
- Computers
- Video Games
- Military Tech

Health

- Coronavirus
- Healthy Living
- Medical Research
- Mental Health
- Cancer
- Heart Health
- Children's Health

TV

- Shows
- Personalities
- Watch Live
- Full Episodes
- Show Clips
- News Clips

About

- Contact Us
- Careers
- Fox Around the World
- Advertise With Us
- Media Relations
- Corporate Information
- Compliance
- Supplier Diversity

Other

- Fox Nation
- Fox News Shop
- Fox News Go
- Fox News Radio
- Newsletters

AR02068

- Alerts
- Podcasts
- Apps & Products

- Facebook
- Twitter
- Instagram
- Youtube
- Flipboard
- LinkedIn
- Slack
- RSS
- Newsletters
- Spotify
- iHeartRadio

Fox News

- New Terms of Use
- Updated Privacy Policy
- Do Not Sell my Personal Information
- Closed Captioning Policy
- Help
- Contact Us
- Accessibility Statement

This material may not be published, broadcast, rewritten, or redistributed. ©2021 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

AR02069

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

U.S. Customs and Border Protection Encounters
Southwest Land Border Encounters for Fiscal Year 2021

# EXHIBIT A-8



**U.S. Customs and Border Protection (CBP) Encounters**
Southwest Land Border Encounters for Fiscal Year (FY) 2021

U.S. Customs and Border Protection

| Demographic | Citizenship Grouping | Title of Authority | |
|---|---|---|---|
| All | All | All | **Reset Filters** |

| | OFO | USBP | All CBP |
|---|---|---|---|
| MAR FY21 | **4,135** | **169,213** | **173,348** |
| APR FY21 | **5,162** | **173,460** | **178,622** |
| PERCENT CHANGE | ▲24.8% | ▲2.5% | ▲3.% |

Demographic: All; **Citizenship:** All; **Title of Authority:** All

| FYTD Southwest Land Border Demographic by Month | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | OCT | NOV | DEC | JAN | FEB | MAR | APR | **FYTD Total** |
| Office of Field Operations | Accompanied Minors | 112 | 89 | 87 | 105 | 145 | 159 | 134 | **831** |
| | FMUA | 113 | 130 | 156 | 230 | 301 | 719 | 1,790 | **3,439** |
| | Single Adults | 2,544 | 2,606 | 2,493 | 2,631 | 2,872 | 3,030 | 3,000 | **19,176** |
| | UC / Single Minors | 131 | 124 | 140 | 163 | 160 | 227 | 238 | **1,183** |
| | Total | 2,900 | 2,949 | 2,876 | 3,129 | 3,478 | 4,135 | 5,162 | **24,629** |
| U.S. Border Patrol | FMUA | 4,634 | 4,170 | 4,248 | 7,066 | 19,287 | 53,406 | 48,226 | **141,037** |
| | Single Adults | 59,727 | 60,516 | 62,042 | 62,560 | 69,085 | 97,074 | 108,301 | **519,305** |
| | UC / Single Minors | 4,690 | 4,476 | 4,852 | 5,688 | 9,270 | 18,733 | 16,933 | **64,642** |
| | Total | 69,051 | 69,162 | 71,142 | 75,314 | 97,642 | 169,213 | 173,460 | **724,984** |
| | **FYTD Total** | **71,951** | **72,111** | **74,018** | **78,443** | **101,120** | **173,348** | **178,622** | **749,613** |

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 5/4/2021.



## U.S. Customs and Border Protection (CBP) Encounters
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY
All

Component
All

Demographic
All

Citizenship Grouping
All

Title of Authority
All

Reset Filters

FY    2018    2019    2020    2021 (FYTD)

### FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 71,951 | 72,111 | 74,018 | 78,443 | 101,120 | 173,348 | 178,622 | | | | | | 749,613 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,548 | 977,509 |
| 2018 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |

### FY Comparison by Demographic

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporing for FY21 to date. Data is current as of 5/4/2021.



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2000

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 716 | 523 | 514 | 527 | 525 | 588 | 496 | 529 | 449 | 395 | 517 | 426 | 6,205 |
| Miami | 401 | 342 | 493 | 375 | 562 | 614 | 461 | 613 | 483 | 639 | 543 | 711 | 6,237 |
| New Orleans | 559 | 626 | 333 | 596 | 684 | 1,000 | 581 | 507 | 375 | 262 | 392 | 563 | 6,478 |
| Ramey | 221 | 102 | 115 | 142 | 28 | 71 | 63 | 202 | 124 | 99 | 284 | 280 | 1,731 |
| Blaine | 246 | 184 | 177 | 228 | 204 | 226 | 200 | 311 | 229 | 196 | 197 | 183 | 2,581 |
| Buffalo | 168 | 106 | 61 | 80 | 65 | 117 | 117 | 110 | 109 | 185 | 219 | 233 | 1,570 |
| Detroit | 213 | 145 | 191 | 190 | 183 | 227 | 169 | 146 | 138 | 165 | 130 | 160 | 2,057 |
| Grand Forks | 68 | 30 | 20 | 33 | 33 | 71 | 44 | 57 | 57 | 36 | 48 | 65 | 562 |
| Havre | 73 | 82 | 80 | 122 | 78 | 100 | 190 | 246 | 129 | 120 | 178 | 170 | 1,568 |
| Houlton | 51 | 37 | 32 | 25 | 42 | 25 | 30 | 30 | 25 | 45 | 105 | 42 | 489 |
| Spokane | 112 | 103 | 65 | 92 | 100 | 95 | 80 | 102 | 118 | 156 | 154 | 147 | 1,324 |
| Swanton | 153 | 111 | 125 | 97 | 87 | 108 | 132 | 118 | 140 | 370 | 374 | 142 | 1,957 |
| Big Bend (formerly Marfa) | 891 | 1,111 | 1,192 | 1,093 | 1,675 | 1,597 | 1,272 | 1,154 | 885 | 921 | 998 | 900 | 13,689 |
| Del Rio | 8,161 | 6,812 | 5,118 | 20,354 | 24,706 | 24,416 | 18,145 | 13,443 | 7,820 | 9,373 | 10,132 | 8,698 | 157,178 |
| El Centro | 13,761 | 11,035 | 8,882 | 21,924 | 31,072 | 33,301 | 26,534 | 27,460 | 20,071 | 15,820 | 15,018 | 13,248 | 238,126 |
| El Paso | 6,386 | 5,203 | 4,651 | 14,914 | 15,049 | 16,018 | 12,883 | 10,645 | 7,637 | 7,533 | 8,106 | 6,671 | 115,696 |
| Laredo | 6,962 | 6,058 | 4,477 | 13,794 | 14,745 | 15,549 | 11,174 | 9,707 | 6,436 | 6,760 | 6,971 | 6,340 | 108,973 |
| Rio Grande Valley (formerly McAllen) | 8,416 | 7,371 | 5,808 | 15,443 | 16,814 | 17,995 | 15,005 | 12,390 | 7,764 | 9,842 | 9,073 | 7,322 | 133,243 |
| San Diego | 9,046 | 7,620 | 5,978 | 15,363 | 20,204 | 18,279 | 16,751 | 16,615 | 13,186 | 10,630 | 9,356 | 8,653 | 151,681 |
| Tucson | 32,384 | 25,767 | 30,182 | 70,632 | 73,506 | 76,245 | 65,213 | 62,555 | 44,341 | 46,849 | 47,905 | 40,767 | 616,346 |
| Yuma | 5,403 | 5,219 | 4,964 | 12,462 | 13,557 | 16,663 | 13,073 | 12,327 | 6,953 | 6,228 | 6,753 | 5,145 | 108,747 |
| Coastal Border | 1,897 | 1,593 | 1,455 | 1,640 | 1,799 | 2,273 | 1,601 | 1,851 | 1,431 | 1,395 | 1,736 | 1,980 | 20,651 |
| Northern Border | 1,084 | 798 | 751 | 867 | 792 | 969 | 962 | 1,120 | 945 | 1,273 | 1,405 | 1,142 | 12,108 |
| Southwest Border | 91,410 | 76,196 | 71,252 | 185,979 | 211,328 | 220,063 | 180,050 | 166,296 | 115,093 | 113,956 | 114,312 | 97,744 | 1,643,679 |
| Monthly Total | 94,391 | 78,587 | 73,458 | 188,486 | 213,919 | 223,305 | 182,613 | 169,267 | 117,469 | 116,624 | 117,453 | 100,866 | 1,676,438 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2001

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 532 | 449 | 360 | 403 | 407 | 463 | 443 | 482 | 463 | 436 | 406 | 367 | 5,211 |
| Miami | 338 | 590 | 481 | 483 | 452 | 392 | 399 | 503 | 607 | 735 | 532 | 450 | 5,962 |
| New Orleans | 315 | 306 | 396 | 358 | 634 | 446 | 740 | 377 | 346 | 402 | 354 | 359 | 5,033 |
| Ramey | 399 | 285 | 187 | 418 | 79 | 73 | 19 | 117 | 94 | 107 | 101 | 73 | 1,952 |
| Blaine | 179 | 168 | 151 | 141 | 159 | 175 | 145 | 194 | 231 | 192 | 186 | 168 | 2,089 |
| Buffalo | 203 | 85 | 74 | 87 | 81 | 116 | 89 | 137 | 134 | 165 | 156 | 107 | 1,434 |
| Detroit | 132 | 139 | 107 | 195 | 182 | 167 | 157 | 156 | 177 | 195 | 349 | 150 | 2,106 |
| Grand Forks | 48 | 23 | 45 | 44 | 66 | 73 | 96 | 85 | 112 | 100 | 144 | 85 | 921 |
| Havre | 108 | 67 | 58 | 77 | 136 | 108 | 104 | 97 | 93 | 169 | 175 | 113 | 1,305 |
| Houlton | 40 | 37 | 30 | 54 | 27 | 30 | 24 | 31 | 33 | 153 | 182 | 44 | 685 |
| Spokane | 158 | 114 | 126 | 99 | 100 | 131 | 87 | 95 | 117 | 132 | 109 | 67 | 1,335 |
| Swanton | 126 | 120 | 75 | 101 | 73 | 95 | 109 | 139 | 168 | 543 | 715 | 199 | 2,463 |
| Big Bend (formerly Marfa) | 844 | 874 | 776 | 846 | 1,046 | 1,427 | 1,249 | 1,123 | 1,058 | 1,107 | 906 | 831 | 12,087 |
| Del Rio | 7,648 | 5,344 | 3,756 | 11,218 | 16,447 | 16,833 | 11,444 | 9,005 | 7,048 | 6,069 | 6,038 | 4,025 | 104,875 |
| El Centro | 13,712 | 9,979 | 8,299 | 18,672 | 21,412 | 21,815 | 20,699 | 17,203 | 11,385 | 11,175 | 10,965 | 7,536 | 172,852 |
| El Paso | 6,095 | 5,401 | 4,683 | 10,862 | 12,369 | 15,311 | 12,738 | 11,343 | 8,035 | 8,607 | 9,945 | 7,468 | 112,857 |
| Laredo | 5,154 | 3,652 | 2,762 | 8,228 | 10,656 | 12,604 | 9,928 | 9,216 | 6,586 | 6,475 | 7,338 | 4,469 | 87,068 |
| Rio Grande Valley (formerly McAllen) | 6,634 | 5,975 | 4,280 | 10,102 | 12,298 | 12,890 | 11,366 | 11,204 | 8,152 | 9,191 | 9,426 | 6,326 | 107,844 |
| San Diego | 8,002 | 5,556 | 5,270 | 11,558 | 12,085 | 13,510 | 12,597 | 11,270 | 8,467 | 7,580 | 8,297 | 5,883 | 110,075 |
| Tucson | 30,009 | 25,889 | 20,907 | 43,972 | 54,913 | 64,779 | 52,949 | 44,573 | 33,602 | 29,550 | 28,028 | 20,504 | 449,675 |
| Yuma | 4,534 | 5,039 | 4,348 | 9,632 | 11,003 | 11,411 | 9,843 | 7,990 | 4,798 | 3,848 | 3,705 | 2,234 | 78,385 |
| Coastal Border | 1,584 | 1,630 | 1,424 | 1,662 | 1,572 | 1,374 | 1,601 | 1,479 | 1,510 | 1,680 | 1,393 | 1,249 | 18,158 |
| Northern Border | 994 | 753 | 666 | 798 | 824 | 895 | 811 | 934 | 1,065 | 1,649 | 2,016 | 933 | 12,338 |
| Southwest Border | 82,632 | 67,709 | 55,081 | 125,090 | 152,229 | 170,580 | 142,813 | 122,927 | 89,131 | 83,602 | 84,648 | 59,276 | 1,235,718 |
| Monthly Total | 85,210 | 70,092 | 57,171 | 127,550 | 154,625 | 172,849 | 145,225 | 125,340 | 91,706 | 86,931 | 88,057 | 61,458 | 1,266,214 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2002

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 437 | 439 | 373 | 362 | 247 | 314 | 359 | 340 | 360 | 358 | 457 | 325 | 4,371 |
| Miami | 391 | 352 | 251 | 445 | 415 | 494 | 422 | 475 | 440 | 532 | 564 | 362 | 5,143 |
| New Orleans | 352 | 220 | 299 | 357 | 373 | 459 | 492 | 307 | 460 | 427 | 424 | 495 | 4,665 |
| Ramey | 3 | 47 | 11 | 37 | 36 | 98 | 32 | 94 | 29 | 90 | 222 | 136 | 835 |
| Blaine | 127 | 152 | 172 | 106 | 147 | 132 | 156 | 175 | 124 | 148 | 157 | 136 | 1,732 |
| Buffalo | 50 | 73 | 36 | 74 | 101 | 112 | 155 | 121 | 85 | 64 | 142 | 89 | 1,102 |
| Detroit | 135 | 106 | 98 | 99 | 135 | 107 | 137 | 132 | 106 | 173 | 133 | 150 | 1,511 |
| Grand Forks | 85 | 80 | 87 | 93 | 87 | 113 | 131 | 159 | 153 | 138 | 108 | 135 | 1,369 |
| Havre | 114 | 119 | 92 | 89 | 107 | 144 | 123 | 138 | 113 | 139 | 163 | 122 | 1,463 |
| Houlton | 27 | 31 | 24 | 43 | 40 | 35 | 31 | 36 | 28 | 42 | 59 | 36 | 432 |
| Spokane | 62 | 53 | 60 | 98 | 91 | 100 | 90 | 104 | 99 | 135 | 121 | 129 | 1,142 |
| Swanton | 82 | 73 | 76 | 71 | 58 | 104 | 100 | 125 | 210 | 293 | 387 | 157 | 1,736 |
| Big Bend (formerly Marfa) | 913 | 810 | 876 | 826 | 1,040 | 1,184 | 1,312 | 1,163 | 702 | 748 | 940 | 878 | 11,392 |
| Del Rio | 2,938 | 2,367 | 2,104 | 8,384 | 10,087 | 12,068 | 8,540 | 5,404 | 3,787 | 3,301 | 4,297 | 3,708 | 66,985 |
| El Centro | 4,069 | 3,318 | 3,720 | 9,670 | 11,118 | 15,673 | 14,274 | 11,415 | 8,870 | 7,897 | 9,557 | 8,692 | 108,273 |
| El Paso | 4,441 | 3,483 | 3,784 | 8,185 | 9,393 | 11,309 | 11,783 | 9,972 | 6,931 | 8,044 | 9,018 | 7,811 | 94,154 |
| Laredo | 3,431 | 2,949 | 2,608 | 7,711 | 10,628 | 12,270 | 10,709 | 7,861 | 6,545 | 5,830 | 6,376 | 5,177 | 82,095 |
| Rio Grande Valley (formerly McAllen) | 4,784 | 3,744 | 3,843 | 8,035 | 8,438 | 10,153 | 10,310 | 9,473 | 8,109 | 7,523 | 8,762 | 6,753 | 89,927 |
| San Diego | 4,530 | 3,178 | 3,183 | 7,716 | 9,172 | 12,832 | 11,712 | 11,222 | 9,251 | 9,340 | 10,115 | 8,430 | 100,681 |
| Tucson | 11,124 | 10,523 | 9,208 | 25,182 | 32,264 | 46,094 | 47,712 | 36,333 | 30,898 | 30,212 | 30,078 | 24,020 | 333,648 |
| Yuma | 1,582 | 2,134 | 2,175 | 4,084 | 3,584 | 5,409 | 5,569 | 4,581 | 3,562 | 3,766 | 3,414 | 2,794 | 42,654 |
| Coastal Border | 1,183 | 1,058 | 934 | 1,201 | 1,071 | 1,365 | 1,305 | 1,216 | 1,289 | 1,407 | 1,667 | 1,318 | 15,014 |
| Northern Border | 682 | 687 | 645 | 673 | 766 | 847 | 923 | 990 | 918 | 1,132 | 1,270 | 954 | 10,487 |
| Southwest Border | 37,812 | 32,506 | 31,501 | 79,793 | 95,724 | 126,992 | 121,921 | 97,424 | 78,655 | 76,661 | 82,557 | 68,263 | 929,809 |
| Monthly Total | 39,677 | 34,251 | 33,080 | 81,667 | 97,561 | 129,204 | 124,149 | 99,630 | 80,862 | 79,200 | 85,494 | 70,535 | 955,310 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2003

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 371 | 292 | 288 | 309 | 253 | 315 | 336 | 330 | 267 | 247 | 211 | 346 | 3,565 |
| Miami | 686 | 398 | 287 | 493 | 542 | 461 | 623 | 434 | 408 | 491 | 481 | 627 | 5,931 |
| New Orleans | 462 | 430 | 349 | 535 | 506 | 504 | 576 | 516 | 399 | 378 | 252 | 244 | 5,151 |
| Ramey | 198 | 316 | 121 | 201 | 32 | 36 | 46 | 231 | 81 | 21 | 172 | 233 | 1,688 |
| Blaine | 107 | 107 | 89 | 92 | 116 | 125 | 93 | 121 | 69 | 152 | 140 | 169 | 1,380 |
| Buffalo | 112 | 79 | 55 | 35 | 30 | 34 | 26 | 22 | 33 | 28 | 30 | 80 | 564 |
| Detroit | 151 | 195 | 153 | 178 | 188 | 170 | 220 | 195 | 196 | 235 | 232 | 232 | 2,345 |
| Grand Forks | 102 | 81 | 88 | 78 | 110 | 119 | 113 | 90 | 99 | 123 | 131 | 89 | 1,223 |
| Havre | 151 | 105 | 86 | 92 | 98 | 97 | 156 | 135 | 132 | 128 | 110 | 116 | 1,406 |
| Houlton | 53 | 22 | 12 | 19 | 17 | 16 | 19 | 30 | 21 | 38 | 29 | 16 | 292 |
| Spokane | 126 | 88 | 72 | 79 | 69 | 54 | 42 | 60 | 68 | 137 | 87 | 110 | 992 |
| Swanton | 107 | 80 | 80 | 101 | 113 | 121 | 101 | 156 | 337 | 352 | 235 | 172 | 1,955 |
| Big Bend (formerly Marfa) | 754 | 722 | 872 | 862 | 974 | 1,097 | 860 | 1,099 | 678 | 773 | 867 | 761 | 10,319 |
| Del Rio | 3,037 | 1,942 | 2,083 | 6,546 | 7,127 | 6,579 | 5,020 | 4,973 | 2,857 | 2,993 | 3,700 | 3,288 | 50,145 |
| El Centro | 8,399 | 6,107 | 4,572 | 12,369 | 13,293 | 11,632 | 6,116 | 6,528 | 5,791 | 6,128 | 6,076 | 5,088 | 92,099 |
| El Paso | 6,545 | 5,303 | 4,008 | 9,255 | 10,000 | 8,883 | 7,359 | 8,120 | 6,998 | 7,618 | 7,538 | 7,189 | 88,816 |
| Laredo | 4,644 | 4,157 | 3,991 | 7,444 | 7,603 | 7,803 | 5,990 | 6,683 | 5,165 | 5,570 | 6,371 | 5,100 | 70,521 |
| Rio Grande Valley (formerly McAllen) | 6,024 | 4,218 | 3,814 | 7,630 | 7,905 | 7,498 | 6,560 | 7,095 | 6,153 | 7,042 | 7,737 | 6,083 | 77,749 |
| San Diego | 7,339 | 5,379 | 4,280 | 10,177 | 10,958 | 11,158 | 9,082 | 10,680 | 9,271 | 10,207 | 11,217 | 11,767 | 111,515 |
| Tucson | 21,352 | 17,206 | 11,481 | 26,826 | 33,854 | 37,055 | 29,099 | 37,847 | 32,532 | 34,201 | 36,639 | 29,171 | 347,263 |
| Yuma | 3,698 | 2,697 | 2,723 | 5,816 | 5,155 | 6,694 | 5,273 | 5,665 | 6,085 | 4,752 | 4,341 | 3,739 | 56,638 |
| Coastal Border | 1,717 | 1,436 | 1,045 | 1,538 | 1,333 | 1,316 | 1,581 | 1,511 | 1,155 | 1,137 | 1,116 | 1,450 | 16,335 |
| Northern Border | 909 | 757 | 635 | 674 | 741 | 736 | 770 | 809 | 955 | 1,193 | 994 | 984 | 10,157 |
| Southwest Border | 61,792 | 47,731 | 37,824 | 86,925 | 96,869 | 98,399 | 75,359 | 88,690 | 75,530 | 79,284 | 84,486 | 72,176 | 905,065 |
| Monthly Total | 64,418 | 49,924 | 39,504 | 89,137 | 98,943 | 100,451 | 77,710 | 91,010 | 77,640 | 81,614 | 86,596 | 74,610 | 931,557 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2004

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 296 | 225 | 220 | 172 | 184 | 183 | 185 | 214 | 171 | 0 | 0 | 0 | 1,850 |
| Miami | 437 | 321 | 367 | 522 | 418 | 346 | 371 | 252 | 415 | 344 | 494 | 315 | 4,602 |
| New Orleans | 284 | 244 | 184 | 293 | 226 | 376 | 282 | 286 | 296 | 98 | 158 | 162 | 2,889 |
| Ramey | 213 | 247 | 332 | 166 | 188 | 31 | 178 | 87 | 99 | 74 | 165 | 33 | 1,813 |
| Blaine | 135 | 100 | 101 | 76 | 118 | 145 | 132 | 136 | 106 | 85 | 117 | 103 | 1,354 |
| Buffalo | 25 | 17 | 30 | 28 | 28 | 84 | 60 | 84 | 85 | 86 | 95 | 49 | 671 |
| Detroit | 154 | 157 | 111 | 114 | 108 | 202 | 149 | 173 | 148 | 184 | 212 | 200 | 1,912 |
| Grand Forks | 92 | 89 | 85 | 105 | 70 | 106 | 84 | 134 | 136 | 122 | 105 | 97 | 1,225 |
| Havre | 81 | 48 | 90 | 84 | 62 | 84 | 69 | 92 | 83 | 108 | 106 | 79 | 986 |
| Houlton | 27 | 19 | 17 | 38 | 17 | 15 | 17 | 22 | 17 | 32 | 24 | 18 | 263 |
| Spokane | 83 | 79 | 51 | 69 | 103 | 101 | 52 | 58 | 84 | 54 | 49 | 64 | 847 |
| Swanton | 177 | 82 | 107 | 224 | 182 | 195 | 141 | 179 | 270 | 526 | 374 | 244 | 2,701 |
| Big Bend (formerly Marfa) | 707 | 710 | 824 | 696 | 907 | 1,104 | 993 | 923 | 885 | 1,068 | 930 | 783 | 10,530 |
| Del Rio | 2,913 | 2,372 | 2,307 | 5,044 | 6,561 | 7,983 | 4,960 | 5,177 | 3,709 | 4,242 | 4,573 | 3,953 | 53,794 |
| El Centro | 5,438 | 3,799 | 2,802 | 7,826 | 8,417 | 10,761 | 8,327 | 7,616 | 5,611 | 4,581 | 5,086 | 4,203 | 74,467 |
| El Paso | 6,451 | 5,244 | 4,030 | 8,768 | 10,584 | 13,483 | 12,632 | 10,343 | 8,432 | 8,654 | 8,321 | 7,457 | 104,399 |
| Laredo | 4,479 | 4,670 | 3,571 | 6,540 | 8,057 | 9,686 | 7,069 | 7,421 | 6,149 | 5,376 | 6,570 | 5,118 | 74,706 |
| Rio Grande Valley (formerly McAllen) | 5,414 | 5,053 | 4,636 | 8,102 | 8,732 | 10,149 | 9,618 | 8,916 | 7,423 | 8,826 | 8,542 | 7,536 | 92,947 |
| San Diego | 10,426 | 7,996 | 5,849 | 13,405 | 13,252 | 17,532 | 15,962 | 14,976 | 11,548 | 9,530 | 9,716 | 8,416 | 138,608 |
| Tucson | 26,530 | 24,890 | 17,349 | 34,913 | 45,312 | 72,095 | 64,563 | 53,132 | 42,013 | 39,114 | 38,740 | 33,120 | 491,771 |
| Yuma | 3,033 | 3,160 | 2,246 | 7,227 | 8,847 | 12,188 | 11,344 | 10,222 | 8,820 | 10,774 | 10,768 | 9,431 | 98,060 |
| Coastal Border | 1,230 | 1,037 | 1,103 | 1,153 | 1,016 | 936 | 1,016 | 839 | 981 | 516 | 817 | 510 | 11,154 |
| Northern Border | 774 | 591 | 592 | 738 | 688 | 932 | 704 | 878 | 929 | 1,197 | 1,082 | 854 | 9,959 |
| Southwest Border | 65,391 | 57,894 | 43,614 | 92,521 | 110,669 | 154,981 | 135,468 | 118,726 | 94,590 | 92,165 | 93,246 | 80,017 | 1,139,282 |
| Monthly Total | 67,395 | 59,522 | 45,309 | 94,412 | 112,373 | 156,849 | 137,188 | 120,443 | 96,500 | 93,878 | 95,145 | 81,381 | 1,160,395 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2005

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 51 | 26 | 6 | 3 | 0 | 7 | 5 | 3 | 7 | 1 | 0 | 5 | 114 |
| Miami | 541 | 460 | 489 | 641 | 487 | 574 | 536 | 717 | 676 | 648 | 586 | 890 | 7,245 |
| New Orleans | 140 | 129 | 135 | 155 | 73 | 100 | 96 | 170 | 69 | 83 | 186 | 22 | 1,358 |
| Ramey | 188 | 112 | 205 | 33 | 106 | 63 | 163 | 67 | 103 | 101 | 156 | 322 | 1,619 |
| Blaine | 89 | 92 | 75 | 69 | 93 | 96 | 68 | 88 | 93 | 85 | 72 | 81 | 1,001 |
| Buffalo | 26 | 27 | 21 | 28 | 29 | 37 | 40 | 53 | 19 | 34 | 45 | 41 | 400 |
| Detroit | 200 | 176 | 133 | 164 | 205 | 193 | 132 | 113 | 122 | 107 | 132 | 116 | 1,793 |
| Grand Forks | 109 | 72 | 73 | 98 | 90 | 61 | 35 | 24 | 41 | 28 | 56 | 67 | 754 |
| Havre | 83 | 106 | 57 | 73 | 70 | 85 | 105 | 89 | 88 | 70 | 74 | 48 | 948 |
| Houlton | 17 | 47 | 31 | 27 | 26 | 6 | 19 | 10 | 11 | 18 | 8 | 13 | 233 |
| Spokane | 26 | 26 | 30 | 26 | 7 | 22 | 33 | 30 | 41 | 18 | 14 | 6 | 279 |
| Swanton | 193 | 186 | 141 | 95 | 105 | 152 | 105 | 123 | 241 | 274 | 214 | 106 | 1,935 |
| Big Bend (formerly Marfa) | 844 | 713 | 722 | 802 | 1,113 | 1,364 | 1,276 | 866 | 620 | 761 | 777 | 678 | 10,536 |
| Del Rio | 3,856 | 2,795 | 2,768 | 6,120 | 7,248 | 7,935 | 7,584 | 6,270 | 4,947 | 5,873 | 6,498 | 6,612 | 68,506 |
| El Centro | 3,723 | 2,798 | 1,772 | 4,963 | 5,926 | 6,632 | 6,010 | 5,352 | 3,829 | 3,712 | 5,047 | 5,958 | 55,722 |
| El Paso | 7,472 | 5,801 | 4,464 | 9,898 | 13,033 | 13,249 | 15,274 | 11,041 | 8,445 | 11,568 | 12,099 | 10,335 | 122,679 |
| Laredo | 4,691 | 3,997 | 3,367 | 6,331 | 7,530 | 8,112 | 9,043 | 7,569 | 5,699 | 6,623 | 6,635 | 5,749 | 75,346 |
| Rio Grande Valley (formerly McAllen) | 7,813 | 7,512 | 7,214 | 9,136 | 10,147 | 13,176 | 14,635 | 14,796 | 13,109 | 12,208 | 12,713 | 11,727 | 134,186 |
| San Diego | 6,702 | 5,428 | 4,632 | 9,390 | 10,864 | 12,750 | 16,534 | 15,114 | 10,921 | 10,010 | 11,798 | 12,761 | 126,904 |
| Tucson | 31,940 | 27,673 | 17,631 | 35,873 | 45,875 | 64,096 | 52,644 | 40,764 | 31,694 | 32,390 | 29,178 | 29,321 | 439,079 |
| Yuma | 8,872 | 8,418 | 5,836 | 10,507 | 12,039 | 15,734 | 17,062 | 14,051 | 11,522 | 11,809 | 11,988 | 10,600 | 138,438 |
| Coastal Border | 920 | 727 | 835 | 832 | 666 | 744 | 800 | 957 | 855 | 833 | 928 | 1,239 | 10,336 |
| Northern Border | 743 | 732 | 561 | 580 | 625 | 652 | 537 | 530 | 656 | 634 | 615 | 478 | 7,343 |
| Southwest Border | 75,913 | 65,135 | 48,406 | 93,020 | 113,775 | 143,048 | 140,062 | 115,823 | 90,786 | 94,954 | 96,733 | 93,741 | 1,171,396 |
| Monthly Total | 77,576 | 66,594 | 49,802 | 94,432 | 115,066 | 144,444 | 141,399 | 117,310 | 92,297 | 96,421 | 98,276 | 95,458 | 1,189,075 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2006

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 438 | 543 | 693 | 506 | 452 | 450 | 592 | 725 | 523 | 358 | 295 | 457 | 6,032 |
| **New Orleans** | 48 | 176 | 214 | 372 | 300 | 230 | 136 | 402 | 238 | 289 | 325 | 323 | 3,053 |
| **Ramey** | 184 | 119 | 174 | 60 | 208 | 136 | 127 | 149 | 112 | 46 | 85 | 36 | 1,436 |
| **Blaine** | 71 | 103 | 49 | 54 | 54 | 50 | 83 | 85 | 64 | 66 | 64 | 68 | 811 |
| **Buffalo** | 120 | 107 | 71 | 85 | 96 | 101 | 111 | 178 | 154 | 174 | 148 | 172 | 1,517 |
| **Detroit** | 120 | 134 | 130 | 138 | 92 | 149 | 83 | 108 | 78 | 76 | 97 | 76 | 1,281 |
| **Grand Forks** | 59 | 48 | 41 | 56 | 36 | 18 | 66 | 49 | 26 | 31 | 48 | 40 | 518 |
| **Havre** | 26 | 58 | 28 | 40 | 62 | 32 | 43 | 63 | 56 | 47 | 52 | 61 | 568 |
| **Houlton** | 17 | 21 | 15 | 28 | 10 | 12 | 11 | 5 | 22 | 12 | 16 | 6 | 175 |
| **Spokane** | 8 | 23 | 8 | 10 | 3 | 12 | 26 | 6 | 19 | 6 | 19 | 45 | 185 |
| **Swanton** | 107 | 98 | 89 | 96 | 75 | 87 | 83 | 121 | 155 | 352 | 201 | 80 | 1,544 |
| **Big Bend** (formerly Marfa) | 655 | 590 | 563 | 739 | 908 | 910 | 746 | 711 | 478 | 392 | 403 | 425 | 7,520 |
| **Del Rio** | 4,840 | 4,016 | 2,910 | 4,839 | 5,854 | 5,636 | 4,555 | 2,633 | 2,106 | 1,947 | 1,683 | 1,617 | 42,636 |
| **El Centro** | 5,072 | 3,831 | 2,998 | 5,797 | 6,399 | 9,048 | 6,847 | 6,187 | 4,112 | 3,240 | 3,705 | 4,229 | 61,465 |
| **El Paso** | 11,027 | 8,191 | 5,668 | 11,941 | 14,457 | 18,668 | 15,238 | 12,239 | 7,664 | 6,970 | 5,027 | 5,166 | 122,256 |
| **Laredo** | 5,014 | 4,323 | 3,544 | 7,415 | 9,554 | 10,179 | 8,530 | 6,866 | 4,815 | 4,667 | 5,525 | 4,408 | 74,840 |
| **Rio Grande Valley** (formerly McAllen) | 10,060 | 9,111 | 7,128 | 9,533 | 10,444 | 11,264 | 11,264 | 11,649 | 7,516 | 7,109 | 7,020 | 6,614 | 110,528 |
| **San Diego** | 10,145 | 7,730 | 6,531 | 13,959 | 17,160 | 18,361 | 14,736 | 13,888 | 10,597 | 8,683 | 10,009 | 10,305 | 142,104 |
| **Tucson** | 27,316 | 24,270 | 16,447 | 33,229 | 43,153 | 63,583 | 51,588 | 40,190 | 25,049 | 21,187 | 23,256 | 22,806 | 392,074 |
| **Yuma** | 9,428 | 8,913 | 6,884 | 13,743 | 17,117 | 21,231 | 13,034 | 11,087 | 6,029 | 5,446 | 3,123 | 2,514 | 118,549 |
| **Coastal Border** | 670 | 838 | 1,081 | 938 | 960 | 816 | 855 | 1,276 | 873 | 693 | 705 | 816 | 10,521 |
| **Northern Border** | 528 | 592 | 431 | 507 | 428 | 461 | 506 | 615 | 574 | 764 | 645 | 548 | 6,599 |
| **Southwest Border** | 83,557 | 70,975 | 52,673 | 101,195 | 125,046 | 160,696 | 126,538 | 105,450 | 68,366 | 59,641 | 59,751 | 58,084 | 1,071,972 |
| **Monthly Total** | 84,755 | 72,405 | 54,185 | 102,640 | 126,434 | 161,973 | 127,899 | 107,341 | 69,813 | 61,098 | 61,101 | 59,448 | 1,089,092 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2007

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 669 | 429 | 405 | 751 | 531 | 475 | 477 | 573 | 905 | 648 | 651 | 606 | 7,120 |
| **New Orleans** | 379 | 379 | 222 | 327 | 398 | 492 | 336 | 336 | 340 | 354 | 155 | 300 | 4,018 |
| **Ramey** | 41 | 61 | 117 | 39 | 71 | 37 | 51 | 48 | 32 | 13 | 28 | 10 | 548 |
| **Blaine** | 61 | 36 | 62 | 61 | 59 | 87 | 50 | 67 | 82 | 67 | 60 | 57 | 749 |
| **Buffalo** | 141 | 155 | 104 | 123 | 125 | 170 | 167 | 178 | 219 | 223 | 233 | 353 | 2,191 |
| **Detroit** | 106 | 99 | 83 | 77 | 56 | 83 | 85 | 76 | 51 | 52 | 66 | 68 | 902 |
| **Grand Forks** | 56 | 32 | 45 | 25 | 40 | 48 | 49 | 33 | 33 | 40 | 54 | 40 | 497 |
| **Havre** | 68 | 56 | 53 | 41 | 60 | 40 | 27 | 27 | 31 | 17 | 31 | 35 | 486 |
| **Houlton** | 7 | 7 | 4 | 6 | 12 | 2 | 3 | 6 | 5 | 22 | 6 | 15 | 95 |
| **Spokane** | 30 | 18 | 23 | 30 | 22 | 37 | 24 | 29 | 42 | 47 | 27 | 12 | 341 |
| **Swanton** | 73 | 78 | 80 | 75 | 68 | 75 | 91 | 105 | 74 | 101 | 183 | 116 | 1,119 |
| **Big Bend** *(formerly Marfa)* | 368 | 442 | 383 | 556 | 532 | 677 | 602 | 407 | 362 | 439 | 403 | 365 | 5,536 |
| **Del Rio** | 1,618 | 1,701 | 1,051 | 2,044 | 2,421 | 3,314 | 2,699 | 1,858 | 1,579 | 1,862 | 1,440 | 1,333 | 22,920 |
| **El Centro** | 4,379 | 3,667 | 3,037 | 4,983 | 5,187 | 7,198 | 6,983 | 5,747 | 3,842 | 3,835 | 3,789 | 3,236 | 55,883 |
| **El Paso** | 6,183 | 5,098 | 4,189 | 6,570 | 7,482 | 10,537 | 8,957 | 6,741 | 5,632 | 5,109 | 4,969 | 3,997 | 75,464 |
| **Laredo** | 4,286 | 3,810 | 2,890 | 4,678 | 5,855 | 7,673 | 6,428 | 4,928 | 4,595 | 4,338 | 3,858 | 3,375 | 56,714 |
| **Rio Grande Valley** *(formerly McAllen)* | 5,772 | 4,549 | 3,649 | 5,798 | 6,172 | 8,431 | 7,645 | 7,736 | 5,791 | 6,225 | 6,331 | 5,331 | 73,430 |
| **San Diego** | 9,494 | 7,764 | 6,591 | 12,489 | 12,997 | 18,044 | 17,999 | 16,136 | 13,283 | 12,941 | 13,312 | 11,410 | 152,460 |
| **Tucson** | 25,135 | 21,323 | 16,136 | 29,459 | 34,148 | 52,692 | 49,044 | 41,789 | 34,103 | 30,373 | 24,388 | 19,649 | 378,239 |
| **Yuma** | 3,478 | 3,240 | 2,601 | 5,357 | 4,474 | 5,571 | 4,108 | 3,162 | 2,151 | 1,660 | 1,305 | 885 | 37,992 |
| **Coastal Border** | 1,089 | 869 | 744 | 1,117 | 1,000 | 1,004 | 864 | 957 | 1,277 | 1,015 | 834 | 916 | 11,686 |
| **Northern Border** | 542 | 481 | 454 | 438 | 442 | 542 | 496 | 521 | 539 | 569 | 660 | 696 | 6,380 |
| **Southwest Border** | 60,713 | 51,594 | 40,527 | 71,934 | 79,268 | 114,137 | 104,465 | 88,504 | 71,338 | 66,782 | 59,795 | 49,581 | 858,638 |
| **Monthly Total** | 62,344 | 52,944 | 41,725 | 73,489 | 80,710 | 115,683 | 105,825 | 89,982 | 73,154 | 68,366 | 61,289 | 51,193 | 876,704 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2008

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 553 | 496 | 685 | 456 | 539 | 699 | 634 | 433 | 519 | 277 | 335 | 394 | 6,020 |
| New Orleans | 382 | 429 | 329 | 650 | 305 | 365 | 462 | 318 | 439 | 296 | 251 | 77 | 4,303 |
| Ramey | 90 | 40 | 20 | 52 | 12 | 55 | 48 | 33 | 53 | 28 | 50 | 91 | 572 |
| Blaine | 52 | 75 | 40 | 91 | 69 | 108 | 101 | 67 | 75 | 88 | 82 | 106 | 954 |
| Buffalo | 382 | 290 | 295 | 228 | 260 | 304 | 233 | 222 | 260 | 259 | 291 | 315 | 3,339 |
| Detroit | 100 | 63 | 68 | 79 | 71 | 95 | 64 | 113 | 83 | 73 | 84 | 68 | 961 |
| Grand Forks | 67 | 91 | 41 | 24 | 38 | 22 | 41 | 30 | 52 | 41 | 38 | 56 | 541 |
| Havre | 63 | 121 | 13 | 33 | 19 | 3 | 23 | 28 | 33 | 21 | 38 | 32 | 427 |
| Houlton | 15 | 5 | 2 | 17 | 2 | 0 | 5 | 3 | 1 | 7 | 14 | 10 | 81 |
| Spokane | 30 | 40 | 17 | 18 | 27 | 15 | 20 | 10 | 34 | 38 | 34 | 57 | 340 |
| Swanton | 106 | 126 | 64 | 74 | 85 | 87 | 72 | 92 | 148 | 195 | 159 | 74 | 1,282 |
| Big Bend (formerly Marfa) | 386 | 388 | 451 | 350 | 612 | 613 | 527 | 586 | 369 | 416 | 415 | 278 | 5,391 |
| Del Rio | 1,679 | 1,059 | 945 | 1,961 | 2,462 | 2,667 | 2,286 | 1,745 | 1,708 | 1,482 | 1,618 | 1,149 | 20,761 |
| El Centro | 3,230 | 2,412 | 2,000 | 3,839 | 4,095 | 4,604 | 5,090 | 3,860 | 3,161 | 2,726 | 2,995 | 2,949 | 40,961 |
| El Paso | 3,605 | 2,648 | 2,015 | 3,470 | 3,944 | 3,129 | 2,808 | 2,035 | 1,811 | 1,634 | 1,615 | 1,598 | 30,312 |
| Laredo | 3,825 | 2,658 | 1,969 | 3,907 | 5,001 | 5,355 | 4,904 | 3,733 | 3,432 | 3,066 | 3,310 | 2,498 | 43,658 |
| Rio Grande Valley (formerly McAllen) | 5,989 | 4,695 | 3,974 | 5,216 | 6,880 | 8,543 | 9,417 | 7,967 | 6,308 | 5,562 | 6,103 | 4,819 | 75,473 |
| San Diego | 9,801 | 9,163 | 7,773 | 12,877 | 15,091 | 18,869 | 20,569 | 16,015 | 12,395 | 13,127 | 13,734 | 12,976 | 162,390 |
| Tucson | 21,730 | 18,231 | 11,721 | 26,347 | 34,309 | 45,239 | 45,442 | 32,845 | 24,289 | 21,093 | 18,406 | 18,044 | 317,696 |
| Yuma | 1,094 | 955 | 954 | 1,061 | 1,089 | 751 | 523 | 447 | 381 | 366 | 345 | 397 | 8,363 |
| Coastal Border | 1,025 | 965 | 1,034 | 1,158 | 856 | 1,119 | 1,144 | 784 | 1,011 | 601 | 636 | 562 | 10,895 |
| Northern Border | 815 | 811 | 540 | 564 | 571 | 634 | 559 | 565 | 686 | 722 | 740 | 718 | 7,925 |
| Southwest Border | 51,339 | 42,209 | 31,802 | 59,028 | 73,483 | 89,770 | 91,566 | 69,233 | 53,854 | 49,472 | 48,541 | 44,708 | 705,005 |
| Monthly Total | 53,179 | 43,985 | 33,376 | 60,750 | 74,910 | 91,523 | 93,269 | 70,582 | 55,551 | 50,795 | 49,917 | 45,988 | 723,825 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2009

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 342 | 302 | 317 | 401 | 383 | 382 | 407 | 314 | 343 | 413 | 358 | 463 | 4,425 |
| **New Orleans** | 386 | 267 | 309 | 259 | 282 | 429 | 317 | 257 | 264 | 253 | 271 | 233 | 3,527 |
| **Ramey** | 114 | 34 | 27 | 27 | 21 | 42 | 26 | 11 | 50 | 5 | 58 | 3 | 418 |
| **Blaine** | 103 | 93 | 68 | 96 | 68 | 85 | 61 | 65 | 39 | 49 | 67 | 49 | 843 |
| **Buffalo** | 254 | 210 | 201 | 176 | 194 | 220 | 225 | 263 | 250 | 198 | 240 | 241 | 2,672 |
| **Detroit** | 120 | 62 | 63 | 78 | 118 | 99 | 97 | 91 | 80 | 117 | 122 | 110 | 1,157 |
| **Grand Forks** | 52 | 53 | 37 | 29 | 26 | 29 | 22 | 41 | 35 | 50 | 49 | 49 | 472 |
| **Havre** | 31 | 21 | 11 | 29 | 30 | 23 | 30 | 21 | 31 | 22 | 18 | 16 | 283 |
| **Houlton** | 1 | 8 | 13 | 3 | 0 | 4 | 4 | 4 | 2 | 8 | 4 | 8 | 59 |
| **Spokane** | 32 | 44 | 22 | 20 | 18 | 14 | 15 | 16 | 17 | 19 | 38 | 22 | 277 |
| **Swanton** | 65 | 80 | 106 | 36 | 77 | 71 | 74 | 111 | 99 | 125 | 104 | 95 | 1,043 |
| **Big Bend** (formerly Marfa) | 539 | 459 | 472 | 533 | 689 | 590 | 458 | 511 | 569 | 484 | 575 | 481 | 6,360 |
| **Del Rio** | 1,321 | 1,064 | 872 | 1,604 | 1,908 | 2,231 | 1,619 | 1,426 | 1,304 | 1,383 | 1,321 | 1,029 | 17,082 |
| **El Centro** | 2,619 | 2,176 | 1,691 | 2,969 | 2,904 | 4,141 | 3,314 | 2,955 | 2,811 | 2,449 | 2,767 | 2,725 | 33,521 |
| **El Paso** | 1,469 | 1,153 | 866 | 1,344 | 1,435 | 1,508 | 1,344 | 1,238 | 1,208 | 1,160 | 1,181 | 1,093 | 14,999 |
| **Laredo** | 2,709 | 2,465 | 1,932 | 3,970 | 3,718 | 4,538 | 4,168 | 3,722 | 3,283 | 3,512 | 3,671 | 2,881 | 40,569 |
| **Rio Grande Valley** (formerly McAllen) | 5,092 | 4,259 | 3,341 | 4,575 | 5,207 | 5,479 | 6,107 | 5,293 | 5,094 | 5,509 | 6,025 | 5,008 | 60,989 |
| **San Diego** | 10,036 | 7,954 | 6,552 | 10,246 | 11,678 | 16,472 | 12,618 | 11,000 | 10,278 | 8,655 | 6,743 | 6,489 | 118,721 |
| **Tucson** | 18,814 | 12,844 | 9,862 | 18,649 | 20,941 | 31,432 | 28,072 | 24,083 | 20,842 | 20,146 | 20,810 | 15,178 | 241,673 |
| **Yuma** | 339 | 406 | 359 | 612 | 731 | 951 | 793 | 656 | 655 | 545 | 429 | 475 | 6,951 |
| **Coastal Border** | 842 | 603 | 653 | 687 | 686 | 853 | 750 | 582 | 657 | 671 | 687 | 699 | 8,370 |
| **Northern Border** | 658 | 571 | 521 | 467 | 531 | 545 | 528 | 612 | 553 | 588 | 642 | 590 | 6,806 |
| **Southwest Border** | 42,938 | 32,780 | 25,947 | 44,502 | 49,211 | 67,342 | 58,493 | 50,884 | 46,044 | 43,843 | 43,522 | 35,359 | 540,865 |
| **Monthly Total** | 44,438 | 33,954 | 27,121 | 45,656 | 50,428 | 68,740 | 59,771 | 52,078 | 47,254 | 45,102 | 44,851 | 36,648 | 556,041 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2010

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 463 | 478 | 416 | 265 | 335 | 326 | 370 | 427 | 442 | 367 | 427 | 335 | 4,651 |
| **New Orleans** | 247 | 179 | 173 | 303 | 303 | 394 | 404 | 218 | 223 | 204 | 244 | 279 | 3,171 |
| **Ramey** | 41 | 20 | 10 | 8 | 23 | 32 | 40 | 44 | 25 | 4 | 94 | 57 | 398 |
| **Blaine** | 50 | 69 | 52 | 59 | 57 | 58 | 54 | 44 | 53 | 65 | 70 | 42 | 673 |
| **Buffalo** | 241 | 214 | 207 | 168 | 216 | 252 | 207 | 231 | 189 | 135 | 180 | 182 | 2,422 |
| **Detroit** | 168 | 154 | 157 | 129 | 126 | 122 | 110 | 98 | 128 | 113 | 165 | 199 | 1,669 |
| **Grand Forks** | 55 | 47 | 36 | 26 | 37 | 45 | 39 | 80 | 23 | 34 | 74 | 47 | 543 |
| **Havre** | 31 | 23 | 17 | 11 | 18 | 54 | 30 | 32 | 20 | 12 | 20 | 22 | 290 |
| **Houlton** | 3 | 2 | 0 | 0 | 0 | 12 | 5 | 10 | 6 | 12 | 6 | 0 | 56 |
| **Spokane** | 35 | 21 | 14 | 19 | 15 | 27 | 25 | 34 | 33 | 42 | 51 | 40 | 356 |
| **Swanton** | 71 | 101 | 68 | 58 | 128 | 132 | 97 | 136 | 124 | 233 | 197 | 77 | 1,422 |
| **Big Bend** *(formerly Marfa)* | 530 | 421 | 373 | 433 | 484 | 660 | 575 | 493 | 415 | 280 | 295 | 329 | 5,288 |
| **Del Rio** | 1,119 | 897 | 697 | 1,234 | 1,245 | 1,874 | 1,791 | 1,718 | 1,326 | 767 | 1,095 | 931 | 14,694 |
| **El Centro** | 2,589 | 2,412 | 2,196 | 2,688 | 2,836 | 4,408 | 3,419 | 3,126 | 2,440 | 2,331 | 2,075 | 2,042 | 32,562 |
| **El Paso** | 1,007 | 894 | 725 | 1,124 | 1,140 | 1,528 | 1,359 | 1,380 | 1,005 | 725 | 732 | 632 | 12,251 |
| **Laredo** | 2,613 | 2,130 | 1,802 | 2,526 | 3,173 | 4,433 | 4,528 | 3,813 | 3,475 | 1,857 | 2,819 | 2,118 | 35,287 |
| **Rio Grande Valley** *(formerly McAllen)* | 4,236 | 3,688 | 2,987 | 3,658 | 4,845 | 7,141 | 7,139 | 7,477 | 5,595 | 3,832 | 5,329 | 3,839 | 59,766 |
| **San Diego** | 5,017 | 4,738 | 4,636 | 6,413 | 6,982 | 9,061 | 7,115 | 5,858 | 5,092 | 5,113 | 4,528 | 4,012 | 68,565 |
| **Tucson** | 23,197 | 16,986 | 10,907 | 16,122 | 21,266 | 31,197 | 28,579 | 22,572 | 13,160 | 10,303 | 9,280 | 8,633 | 212,202 |
| **Yuma** | 582 | 649 | 711 | 586 | 819 | 1,059 | 732 | 608 | 447 | 401 | 262 | 260 | 7,116 |
| **Coastal Border** | 751 | 677 | 599 | 576 | 661 | 752 | 814 | 689 | 690 | 575 | 765 | 671 | 8,220 |
| **Northern Border** | 654 | 631 | 551 | 470 | 597 | 702 | 567 | 665 | 576 | 646 | 763 | 609 | 7,431 |
| **Southwest Border** | 40,890 | 32,815 | 25,034 | 34,784 | 42,790 | 61,361 | 55,237 | 47,045 | 32,955 | 25,609 | 26,415 | 22,796 | 447,731 |
| **Monthly Total** | 42,295 | 34,123 | 26,184 | 35,830 | 44,048 | 62,815 | 56,618 | 48,399 | 34,221 | 26,830 | 27,943 | 24,076 | 463,382 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2011

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 401 | 441 | 349 | 447 | 364 | 466 | 324 | 325 | 309 | 330 | 340 | 305 | 4,401 |
| **New Orleans** | 231 | 144 | 121 | 156 | 132 | 105 | 109 | 124 | 111 | 63 | 114 | 99 | 1,509 |
| **Ramey** | 55 | 25 | 59 | 47 | 44 | 54 | 46 | 82 | 42 | 90 | 38 | 60 | 642 |
| **Blaine** | 68 | 42 | 37 | 54 | 31 | 69 | 35 | 53 | 46 | 48 | 64 | 44 | 591 |
| **Buffalo** | 231 | 190 | 139 | 161 | 148 | 203 | 174 | 158 | 176 | 157 | 188 | 189 | 2,114 |
| **Detroit** | 177 | 143 | 110 | 133 | 121 | 175 | 118 | 103 | 110 | 96 | 126 | 119 | 1,531 |
| **Grand Forks** | 47 | 34 | 32 | 24 | 37 | 56 | 20 | 24 | 49 | 52 | 44 | 49 | 468 |
| **Havre** | 46 | 23 | 16 | 24 | 21 | 17 | 32 | 25 | 4 | 9 | 31 | 22 | 270 |
| **Houlton** | 4 | 4 | 0 | 1 | 1 | 9 | 1 | 1 | 10 | 5 | 2 | 3 | 41 |
| **Spokane** | 32 | 28 | 20 | 5 | 26 | 28 | 20 | 23 | 24 | 21 | 41 | 25 | 293 |
| **Swanton** | 78 | 74 | 37 | 67 | 67 | 50 | 53 | 53 | 50 | 121 | 110 | 55 | 815 |
| **Big Bend** (formerly Marfa) | 375 | 290 | 282 | 332 | 300 | 457 | 512 | 350 | 296 | 235 | 311 | 296 | 4,036 |
| **Del Rio** | 1,043 | 837 | 704 | 899 | 1,399 | 2,132 | 1,977 | 1,499 | 1,525 | 1,386 | 1,356 | 1,387 | 16,144 |
| **El Centro** | 2,201 | 1,851 | 1,734 | 2,135 | 2,569 | 3,772 | 3,563 | 3,278 | 2,904 | 2,225 | 2,074 | 1,885 | 30,191 |
| **El Paso** | 732 | 660 | 622 | 779 | 911 | 1,354 | 1,380 | 904 | 816 | 794 | 711 | 682 | 10,345 |
| **Laredo** | 2,286 | 2,174 | 1,797 | 2,285 | 2,943 | 4,686 | 3,891 | 3,168 | 3,205 | 2,913 | 3,262 | 3,443 | 36,053 |
| **Rio Grande Valley** (formerly McAllen) | 3,628 | 3,625 | 3,349 | 3,485 | 4,233 | 6,806 | 6,502 | 5,953 | 5,409 | 5,276 | 5,973 | 5,004 | 59,243 |
| **San Diego** | 4,344 | 3,480 | 3,233 | 3,379 | 3,977 | 4,811 | 4,031 | 3,474 | 3,109 | 3,016 | 2,863 | 2,730 | 42,447 |
| **Tucson** | 11,165 | 9,097 | 7,354 | 10,131 | 11,790 | 17,056 | 13,816 | 12,088 | 9,585 | 6,923 | 7,270 | 7,010 | 123,285 |
| **Yuma** | 391 | 391 | 354 | 501 | 664 | 940 | 579 | 522 | 317 | 402 | 346 | 426 | 5,833 |
| **Coastal Border** | 687 | 610 | 529 | 650 | 540 | 625 | 479 | 531 | 462 | 483 | 492 | 464 | 6,552 |
| **Northern Border** | 683 | 538 | 391 | 469 | 452 | 607 | 453 | 440 | 469 | 509 | 606 | 506 | 6,123 |
| **Southwest Border** | 26,165 | 22,405 | 19,429 | 23,926 | 28,786 | 42,014 | 36,251 | 31,236 | 27,166 | 23,170 | 24,166 | 22,863 | 327,577 |
| **Monthly Total** | 27,535 | 23,553 | 20,349 | 25,045 | 29,778 | 43,246 | 37,183 | 32,207 | 28,097 | 24,162 | 25,264 | 23,833 | 340,252 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2012

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore\*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 216 | 293 | 195 | 249 | 180 | 156 | 159 | 226 | 137 | 249 | 207 | 242 | 2,509 |
| **New Orleans** | 49 | 48 | 39 | 40 | 42 | 24 | 22 | 58 | 22 | 12 | 21 | 97 | 474 |
| **Ramey** | 72 | 100 | 41 | 51 | 50 | 68 | 41 | 39 | 123 | 41 | 33 | 43 | 702 |
| **Blaine** | 50 | 58 | 47 | 41 | 53 | 51 | 42 | 28 | 40 | 41 | 41 | 45 | 537 |
| **Buffalo** | 118 | 87 | 56 | 78 | 90 | 100 | 89 | 106 | 61 | 126 | 104 | 128 | 1,143 |
| **Detroit** | 127 | 109 | 57 | 62 | 67 | 95 | 111 | 67 | 82 | 67 | 55 | 51 | 950 |
| **Grand Forks** | 58 | 46 | 16 | 29 | 13 | 30 | 33 | 26 | 36 | 43 | 32 | 56 | 418 |
| **Havre** | 21 | 9 | 18 | 4 | 9 | 11 | 9 | 5 | 5 | 3 | 4 | 4 | 102 |
| **Houlton** | 0 | 3 | 2 | 1 | 0 | 1 | 2 | 1 | 7 | 4 | 9 | 11 | 41 |
| **Spokane** | 34 | 18 | 23 | 24 | 18 | 21 | 35 | 22 | 25 | 40 | 34 | 23 | 317 |
| **Swanton** | 40 | 43 | 43 | 26 | 51 | 48 | 47 | 52 | 103 | 120 | 69 | 60 | 702 |
| **Big Bend** (formerly Marfa) | 284 | 317 | 288 | 323 | 423 | 450 | 393 | 304 | 300 | 303 | 333 | 246 | 3,964 |
| **Del Rio** | 1,364 | 1,289 | 871 | 1,204 | 1,788 | 2,375 | 2,791 | 2,480 | 2,123 | 1,942 | 1,770 | 1,723 | 21,720 |
| **El Centro** | 1,946 | 1,698 | 1,401 | 1,655 | 2,041 | 2,857 | 2,805 | 2,622 | 2,107 | 1,896 | 1,411 | 1,477 | 23,916 |
| **El Paso** | 647 | 662 | 534 | 625 | 812 | 1,151 | 888 | 823 | 840 | 793 | 984 | 919 | 9,678 |
| **Laredo** | 2,835 | 2,846 | 1,853 | 3,180 | 3,855 | 5,154 | 5,100 | 4,478 | 4,019 | 3,670 | 4,306 | 3,576 | 44,872 |
| **Rio Grande Valley** (formerly McAllen) | 6,201 | 5,513 | 4,285 | 5,514 | 6,709 | 9,622 | 11,160 | 11,583 | 10,112 | 9,023 | 9,295 | 8,745 | 97,762 |
| **San Diego** | 2,439 | 2,185 | 2,136 | 2,185 | 2,439 | 3,064 | 2,879 | 2,787 | 2,170 | 2,165 | 2,020 | 1,992 | 28,461 |
| **Tucson** | 9,306 | 8,361 | 7,100 | 10,209 | 12,836 | 16,559 | 14,095 | 11,343 | 8,636 | 6,856 | 7,116 | 7,583 | 120,000 |
| **Yuma** | 590 | 497 | 515 | 819 | 676 | 986 | 517 | 546 | 362 | 330 | 332 | 330 | 6,500 |
| **Coastal Border** | 337 | 441 | 275 | 340 | 272 | 248 | 222 | 323 | 282 | 302 | 261 | 382 | 3,685 |
| **Northern Border** | 448 | 373 | 262 | 265 | 301 | 357 | 368 | 307 | 359 | 444 | 348 | 378 | 4,210 |
| **Southwest Border** | 25,612 | 23,368 | 18,983 | 25,714 | 31,579 | 42,218 | 40,628 | 36,966 | 30,669 | 26,978 | 27,567 | 26,591 | 356,873 |
| **Monthly Total** | 26,397 | 24,182 | 19,520 | 26,319 | 32,152 | 42,823 | 41,218 | 37,596 | 31,310 | 27,724 | 28,176 | 27,351 | 364,768 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2013

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 248 | 134 | 130 | 135 | 89 | 92 | 157 | 92 | 113 | 212 | 171 | 165 | 1,738 |
| **New Orleans** | 49 | 74 | 47 | 32 | 49 | 27 | 46 | 28 | 15 | 30 | 47 | 56 | 500 |
| **Ramey** | 24 | 56 | 45 | 39 | 107 | 194 | 11 | 27 | 99 | 43 | 164 | 115 | 924 |
| **Blaine** | 37 | 34 | 33 | 21 | 32 | 31 | 24 | 26 | 34 | 32 | 25 | 31 | 360 |
| **Buffalo** | 106 | 54 | 60 | 53 | 47 | 47 | 73 | 54 | 78 | 83 | 58 | 83 | 796 |
| **Detroit** | 65 | 58 | 64 | 58 | 44 | 50 | 49 | 43 | 42 | 67 | 59 | 51 | 650 |
| **Grand Forks** | 32 | 27 | 12 | 19 | 36 | 31 | 39 | 36 | 52 | 73 | 55 | 57 | 469 |
| **Havre** | 4 | 2 | 0 | 3 | 3 | 2 | 3 | 9 | 9 | 8 | 21 | 24 | 88 |
| **Houlton** | 15 | 1 | 0 | 0 | 1 | 2 | 2 | 0 | 7 | 1 | 3 | 5 | 37 |
| **Spokane** | 33 | 36 | 17 | 19 | 13 | 19 | 28 | 20 | 26 | 33 | 34 | 21 | 299 |
| **Swanton** | 35 | 21 | 29 | 17 | 41 | 50 | 53 | 57 | 42 | 72 | 48 | 66 | 531 |
| **Big Bend** (formerly Marfa) | 356 | 238 | 213 | 340 | 400 | 416 | 473 | 341 | 232 | 219 | 218 | 238 | 3,684 |
| **Del Rio** | 1,792 | 1,715 | 1,135 | 1,617 | 2,223 | 2,771 | 2,778 | 2,332 | 1,695 | 2,039 | 1,817 | 1,596 | 23,510 |
| **El Centro** | 1,527 | 1,408 | 1,101 | 1,103 | 1,340 | 2,098 | 1,972 | 1,513 | 1,222 | 1,035 | 1,056 | 931 | 16,306 |
| **El Paso** | 977 | 860 | 629 | 776 | 1,030 | 1,176 | 1,217 | 1,163 | 857 | 852 | 852 | 765 | 11,154 |
| **Laredo** | 3,829 | 3,537 | 2,835 | 3,280 | 4,628 | 5,903 | 5,621 | 5,338 | 4,029 | 4,212 | 3,944 | 3,593 | 50,749 |
| **Rio Grande Valley** (formerly McAllen) | 8,869 | 8,352 | 6,587 | 7,190 | 10,828 | 16,115 | 18,455 | 17,522 | 14,275 | 15,217 | 16,253 | 14,790 | 154,453 |
| **San Diego** | 1,922 | 1,924 | 1,795 | 2,150 | 2,227 | 3,062 | 2,833 | 2,854 | 2,324 | 2,313 | 2,069 | 2,023 | 27,496 |
| **Tucson** | 9,224 | 9,185 | 8,481 | 9,871 | 11,831 | 14,990 | 14,051 | 12,119 | 9,357 | 7,014 | 7,278 | 7,538 | 120,939 |
| **Yuma** | 433 | 417 | 467 | 594 | 535 | 762 | 812 | 674 | 445 | 329 | 310 | 328 | 6,106 |
| **Coastal Border** | 321 | 264 | 222 | 206 | 245 | 313 | 214 | 147 | 227 | 285 | 382 | 336 | 3,162 |
| **Northern Border** | 327 | 233 | 215 | 190 | 217 | 232 | 271 | 245 | 290 | 369 | 303 | 338 | 3,230 |
| **Southwest Border** | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 |
| **Monthly Total** | 29,577 | 28,133 | 23,680 | 27,317 | 35,504 | 47,838 | 48,697 | 44,248 | 34,953 | 33,884 | 34,482 | 32,476 | 420,789 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2014

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 131 | 146 | 125 | 228 | 178 | 113 | 151 | 199 | 213 | 134 | 217 | 199 | 2,034 |
| **New Orleans** | 58 | 48 | 57 | 55 | 90 | 103 | 114 | 88 | 86 | 82 | 72 | 97 | 950 |
| **Ramey** | 133 | 120 | 48 | 79 | 39 | 79 | 38 | 86 | 133 | 77 | 73 | 53 | 958 |
| **Blaine** | 16 | 22 | 18 | 29 | 26 | 19 | 36 | 27 | 19 | 28 | 14 | 18 | 272 |
| **Buffalo** | 58 | 39 | 52 | 36 | 47 | 87 | 64 | 81 | 54 | 79 | 97 | 47 | 741 |
| **Detroit** | 48 | 53 | 51 | 34 | 55 | 35 | 40 | 49 | 86 | 66 | 70 | 60 | 647 |
| **Grand Forks** | 59 | 45 | 36 | 42 | 49 | 85 | 65 | 63 | 71 | 81 | 73 | 98 | 767 |
| **Havre** | 18 | 10 | 2 | 5 | 6 | 2 | 1 | 13 | 12 | 3 | 7 | 12 | 91 |
| **Houlton** | 3 | 4 | 2 | 3 | 3 | 1 | 2 | 13 | 1 | 4 | 8 | 1 | 45 |
| **Spokane** | 35 | 24 | 15 | 24 | 16 | 31 | 17 | 22 | 19 | 19 | 16 | 31 | 269 |
| **Swanton** | 44 | 25 | 45 | 30 | 21 | 17 | 31 | 33 | 57 | 69 | 64 | 70 | 506 |
| **Big Bend** *(formerly Marfa)* | 316 | 260 | 241 | 278 | 522 | 445 | 403 | 374 | 414 | 341 | 302 | 200 | 4,096 |
| **Del Rio** | 1,587 | 1,586 | 1,360 | 1,514 | 2,133 | 2,823 | 2,616 | 3,432 | 2,857 | 1,830 | 1,279 | 1,238 | 24,255 |
| **El Centro** | 1,193 | 1,077 | 987 | 1,126 | 1,365 | 1,502 | 1,441 | 1,353 | 1,203 | 1,250 | 1,095 | 919 | 14,511 |
| **El Paso** | 885 | 845 | 738 | 813 | 1,060 | 1,278 | 1,244 | 1,371 | 1,221 | 939 | 948 | 997 | 12,339 |
| **Laredo** | 3,638 | 3,026 | 2,567 | 2,756 | 3,838 | 5,087 | 5,117 | 4,737 | 3,946 | 3,546 | 2,960 | 2,831 | 44,049 |
| **Rio Grande Valley** *(formerly McAllen)* | 15,192 | 14,170 | 13,540 | 12,255 | 16,808 | 25,398 | 28,624 | 37,510 | 38,446 | 24,938 | 17,273 | 12,239 | 256,393 |
| **San Diego** | 2,218 | 2,153 | 2,091 | 2,548 | 2,469 | 3,378 | 3,035 | 2,863 | 2,438 | 2,497 | 2,132 | 2,089 | 29,911 |
| **Tucson** | 9,785 | 8,334 | 7,629 | 6,825 | 7,566 | 8,925 | 8,473 | 8,407 | 6,867 | 5,019 | 5,105 | 4,980 | 87,915 |
| **Yuma** | 498 | 445 | 375 | 553 | 642 | 760 | 549 | 636 | 470 | 348 | 294 | 332 | 5,902 |
| **Coastal Border** | 322 | 314 | 230 | 362 | 307 | 295 | 303 | 373 | 432 | 293 | 362 | 349 | 3,942 |
| **Northern Border** | 281 | 222 | 221 | 203 | 223 | 277 | 256 | 301 | 319 | 349 | 349 | 337 | 3,338 |
| **Southwest Border** | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,862 | 40,708 | 31,388 | 25,825 | 479,371 |
| **Monthly Total** | 35,915 | 32,432 | 29,979 | 29,233 | 36,933 | 50,168 | 52,061 | 61,357 | 58,613 | 41,350 | 32,099 | 26,511 | 486,651 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2015

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 90 | 50 | 143 | 121 | 79 | 116 | 101 | 110 | 203 | 168 | 346 | 225 | 1,752 |
| **New Orleans** | 115 | 98 | 100 | 79 | 78 | 35 | 39 | 75 | 71 | 72 | 32 | 55 | 849 |
| **Ramey** | 55 | 76 | 32 | 71 | 12 | 60 | 44 | 25 | 39 | 74 | 9 | 60 | 557 |
| **Blaine** | 37 | 47 | 29 | 25 | 20 | 16 | 14 | 19 | 17 | 23 | 23 | 12 | 282 |
| **Buffalo** | 28 | 34 | 35 | 21 | 19 | 20 | 15 | 16 | 18 | 40 | 27 | 18 | 291 |
| **Detroit** | 75 | 68 | 109 | 42 | 35 | 30 | 44 | 36 | 72 | 32 | 54 | 40 | 637 |
| **Grand Forks** | 87 | 78 | 72 | 53 | 74 | 65 | 73 | 40 | 40 | 76 | 69 | 62 | 789 |
| **Havre** | 5 | 3 | 3 | 3 | 10 | 6 | 5 | 3 | 2 | 2 | 18 | 4 | 64 |
| **Houlton** | 1 | 2 | 8 | 4 | 6 | 0 | 3 | 0 | 0 | 4 | 2 | 2 | 32 |
| **Spokane** | 24 | 15 | 10 | 15 | 23 | 12 | 15 | 14 | 7 | 18 | 13 | 24 | 190 |
| **Swanton** | 26 | 23 | 25 | 6 | 19 | 27 | 14 | 16 | 35 | 39 | 68 | 43 | 341 |
| **Big Bend** (formerly Marfa) | 302 | 232 | 336 | 233 | 330 | 453 | 438 | 567 | 373 | 428 | 600 | 739 | 5,031 |
| **Del Rio** | 1,246 | 985 | 1,051 | 985 | 1,291 | 1,718 | 2,100 | 2,083 | 1,928 | 1,752 | 1,918 | 1,956 | 19,013 |
| **El Centro** | 894 | 842 | 980 | 902 | 991 | 1,355 | 1,244 | 1,295 | 1,063 | 1,072 | 1,058 | 1,124 | 12,820 |
| **El Paso** | 904 | 924 | 921 | 874 | 859 | 1,455 | 1,516 | 1,335 | 1,410 | 1,417 | 1,436 | 1,444 | 14,495 |
| **Laredo** | 3,276 | 2,540 | 2,367 | 2,776 | 2,864 | 3,093 | 3,497 | 3,127 | 2,958 | 3,110 | 3,072 | 3,208 | 35,888 |
| **Rio Grande Valley** (formerly McAllen) | 12,031 | 11,466 | 11,035 | 8,425 | 9,557 | 11,817 | 12,602 | 14,103 | 13,750 | 13,719 | 14,750 | 14,002 | 147,257 |
| **San Diego** | 2,133 | 1,924 | 2,280 | 2,111 | 2,466 | 2,876 | 2,284 | 2,308 | 2,081 | 1,985 | 1,883 | 1,959 | 26,290 |
| **Tucson** | 5,261 | 5,303 | 5,610 | 4,869 | 5,553 | 6,256 | 5,543 | 6,105 | 5,081 | 4,071 | 4,733 | 5,012 | 63,397 |
| **Yuma** | 403 | 425 | 439 | 339 | 465 | 768 | 526 | 653 | 659 | 834 | 789 | 842 | 7,142 |
| **Coastal Border** | 260 | 224 | 275 | 271 | 169 | 211 | 184 | 210 | 313 | 314 | 387 | 340 | 3,158 |
| **Northern Border** | 283 | 270 | 291 | 169 | 206 | 176 | 183 | 144 | 191 | 234 | 274 | 205 | 2,626 |
| **Southwest Border** | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 |
| **Monthly Total** | 26,993 | 25,135 | 25,585 | 21,954 | 24,751 | 30,178 | 30,117 | 31,930 | 29,807 | 28,936 | 30,900 | 30,831 | 337,117 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2016

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 271 | 206 | 337 | 207 | 181 | 310 | 331 | 266 | 232 | 286 | 274 | 304 | 3,205 |
| New Orleans | 74 | 59 | 48 | 40 | 53 | 50 | 76 | 57 | 56 | 96 | 72 | 83 | 764 |
| Ramey | 21 | 57 | 64 | 28 | 68 | 63 | 61 | 78 | 72 | 66 | 43 | 73 | 694 |
| Blaine | 27 | 28 | 13 | 13 | 21 | 33 | 19 | 20 | 17 | 28 | 30 | 22 | 271 |
| Buffalo | 15 | 4 | 7 | 22 | 14 | 17 | 29 | 21 | 15 | 37 | 27 | 18 | 226 |
| Detroit | 55 | 38 | 58 | 35 | 54 | 61 | 51 | 78 | 67 | 64 | 89 | 66 | 716 |
| Grand Forks | 40 | 40 | 25 | 48 | 26 | 49 | 35 | 34 | 34 | 66 | 62 | 46 | 505 |
| Havre | 4 | 5 | 1 | 4 | 1 | 2 | 9 | 4 | 2 | 2 | 7 | 2 | 43 |
| Houlton | 6 | 0 | 1 | 1 | 2 | 2 | 2 | 7 | 1 | 2 | 1 | 0 | 25 |
| Spokane | 4 | 16 | 9 | 4 | 6 | 11 | 18 | 56 | 20 | 19 | 20 | 23 | 206 |
| Swanton | 25 | 13 | 25 | 10 | 14 | 26 | 18 | 14 | 34 | 35 | 30 | 47 | 291 |
| Big Bend (formerly Marfa) | 735 | 637 | 690 | 388 | 458 | 616 | 739 | 491 | 292 | 344 | 326 | 650 | 6,366 |
| Del Rio | 1,873 | 1,798 | 2,185 | 1,531 | 1,780 | 2,022 | 2,224 | 2,588 | 1,918 | 1,833 | 1,445 | 1,881 | 23,078 |
| El Centro | 1,214 | 1,239 | 1,253 | 1,061 | 1,342 | 1,775 | 2,097 | 2,000 | 1,719 | 1,669 | 2,047 | 2,032 | 19,448 |
| El Paso | 1,639 | 1,679 | 2,187 | 1,148 | 1,399 | 2,158 | 2,408 | 2,481 | 2,369 | 2,503 | 2,708 | 2,955 | 25,634 |
| Laredo | 3,146 | 3,249 | 2,995 | 2,454 | 2,895 | 3,196 | 3,654 | 3,403 | 2,906 | 2,647 | 2,888 | 3,129 | 36,562 |
| Rio Grande Valley (formerly McAllen) | 15,036 | 15,297 | 17,736 | 9,398 | 9,660 | 13,325 | 16,688 | 18,291 | 15,972 | 16,519 | 19,155 | 19,753 | 186,830 |
| San Diego | 2,081 | 2,022 | 2,196 | 2,525 | 2,504 | 3,108 | 3,329 | 3,118 | 2,522 | 2,555 | 2,748 | 3,183 | 31,891 |
| Tucson | 5,899 | 5,791 | 6,263 | 4,572 | 5,245 | 6,142 | 5,784 | 6,574 | 5,427 | 4,364 | 4,303 | 4,527 | 64,891 |
| Yuma | 1,101 | 1,126 | 1,509 | 681 | 789 | 974 | 1,166 | 1,391 | 1,325 | 1,289 | 1,428 | 1,391 | 14,170 |
| Coastal Border | 366 | 322 | 449 | 275 | 302 | 423 | 468 | 401 | 360 | 448 | 389 | 460 | 4,663 |
| Northern Border | 176 | 144 | 139 | 137 | 138 | 201 | 181 | 234 | 190 | 253 | 266 | 224 | 2,283 |
| Southwest Border | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 | 408,870 |
| Monthly Total | 33,266 | 33,304 | 37,602 | 24,170 | 26,512 | 33,940 | 38,738 | 40,972 | 35,000 | 34,424 | 37,703 | 40,185 | 415,816 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2017

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 178 | 186 | 329 | 161 | 194 | 150 | 193 | 221 | 173 | 195 | 196 | 104 | 2,280 |
| **New Orleans** | 76 | 98 | 81 | 121 | 94 | 88 | 50 | 105 | 57 | 52 | 74 | 24 | 920 |
| **Ramey** | 77 | 41 | 62 | 99 | 15 | 15 | 39 | 17 | 0 | 8 | 15 | 0 | 388 |
| **Blaine** | 45 | 36 | 28 | 20 | 23 | 21 | 16 | 12 | 23 | 27 | 27 | 10 | 288 |
| **Buffalo** | 9 | 19 | 12 | 24 | 66 | 16 | 33 | 76 | 48 | 55 | 37 | 52 | 447 |
| **Detroit** | 64 | 30 | 34 | 43 | 71 | 143 | 119 | 112 | 118 | 113 | 132 | 91 | 1,070 |
| **Grand Forks** | 19 | 25 | 23 | 40 | 48 | 56 | 57 | 44 | 42 | 51 | 58 | 33 | 496 |
| **Havre** | 1 | 3 | 2 | 0 | 4 | 0 | 4 | 6 | 4 | 7 | 7 | 1 | 39 |
| **Houlton** | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 5 | 1 | 5 | 8 | 4 | 30 |
| **Spokane** | 16 | 10 | 7 | 5 | 18 | 22 | 14 | 14 | 50 | 19 | 17 | 16 | 208 |
| **Swanton** | 10 | 22 | 25 | 19 | 43 | 43 | 25 | 41 | 51 | 63 | 73 | 34 | 449 |
| **Big Bend** (formerly Marfa) | 697 | 603 | 477 | 473 | 383 | 357 | 413 | 552 | 378 | 492 | 563 | 614 | 6,002 |
| **Del Rio** | 2,106 | 1,880 | 1,817 | 1,243 | 1,104 | 746 | 589 | 740 | 761 | 760 | 798 | 932 | 13,476 |
| **El Centro** | 2,441 | 1,850 | 1,870 | 1,796 | 1,196 | 871 | 849 | 1,134 | 1,280 | 1,478 | 1,880 | 1,988 | 18,633 |
| **El Paso** | 3,973 | 4,105 | 3,948 | 2,779 | 1,575 | 978 | 906 | 1,032 | 1,180 | 1,395 | 1,782 | 1,540 | 25,193 |
| **Laredo** | 3,350 | 3,194 | 2,460 | 2,265 | 1,710 | 1,256 | 1,304 | 1,722 | 1,839 | 2,120 | 2,143 | 2,097 | 25,460 |
| **Rio Grande Valley** (formerly McAllen) | 22,642 | 24,686 | 23,418 | 15,580 | 7,855 | 4,147 | 3,942 | 4,882 | 5,817 | 7,107 | 8,650 | 8,836 | 137,562 |
| **San Diego** | 2,934 | 2,947 | 3,099 | 2,927 | 1,808 | 1,356 | 1,392 | 1,724 | 1,652 | 1,764 | 2,241 | 2,242 | 26,086 |
| **Tucson** | 5,924 | 5,912 | 4,303 | 3,357 | 2,589 | 2,148 | 1,487 | 2,199 | 2,632 | 2,177 | 2,913 | 3,016 | 38,657 |
| **Yuma** | 2,117 | 2,034 | 1,859 | 1,156 | 534 | 336 | 245 | 534 | 548 | 894 | 1,318 | 1,272 | 12,847 |
| **Coastal Border** | 331 | 325 | 472 | 381 | 303 | 253 | 282 | 343 | 230 | 255 | 285 | 128 | 3,588 |
| **Northern Border** | 169 | 145 | 131 | 152 | 273 | 302 | 268 | 310 | 337 | 340 | 359 | 241 | 3,027 |
| **Southwest Border** | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 | 303,916 |
| **Monthly Total** | 46,684 | 47,681 | 43,854 | 32,109 | 19,330 | 12,750 | 11,677 | 15,172 | 16,654 | 18,782 | 22,932 | 22,906 | 310,531 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2018

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Livermore*** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miami** | 196 | 168 | 164 | 189 | 189 | 202 | 205 | 172 | 130 | 244 | 173 | 137 | 2,169 |
| **New Orleans** | 46 | 62 | 27 | 86 | 63 | 54 | 63 | 35 | 115 | 43 | 102 | 102 | 798 |
| **Ramey** | 7 | 17 | 14 | 77 | 18 | 21 | 9 | 36 | 5 | 20 | 53 | 3 | 280 |
| **Blaine** | 19 | 22 | 22 | 15 | 10 | 54 | 40 | 35 | 27 | 22 | 43 | 50 | 359 |
| **Buffalo** | 48 | 23 | 17 | 25 | 16 | 29 | 32 | 46 | 55 | 33 | 28 | 32 | 384 |
| **Detroit** | 119 | 150 | 86 | 193 | 159 | 175 | 166 | 158 | 280 | 168 | 127 | 149 | 1,930 |
| **Grand Forks** | 48 | 40 | 38 | 21 | 30 | 41 | 31 | 41 | 38 | 41 | 55 | 37 | 461 |
| **Havre** | 10 | 13 | 2 | 0 | 2 | 1 | 1 | 0 | 6 | 4 | 6 | 2 | 47 |
| **Houlton** | 0 | 2 | 5 | 3 | 3 | 6 | 9 | 3 | 4 | 6 | 3 | 8 | 52 |
| **Spokane** | 30 | 16 | 17 | 22 | 19 | 36 | 27 | 32 | 29 | 39 | 52 | 28 | 347 |
| **Swanton** | 28 | 29 | 32 | 30 | 47 | 66 | 36 | 66 | 105 | 92 | 67 | 138 | 736 |
| **Big Bend** *(formerly Marfa)* | 819 | 828 | 802 | 543 | 838 | 703 | 808 | 743 | 375 | 456 | 585 | 545 | 8,045 |
| **Del Rio** | 1,046 | 1,186 | 1,113 | 1,083 | 1,306 | 1,466 | 1,451 | 1,486 | 1,462 | 1,365 | 1,506 | 1,363 | 15,833 |
| **El Centro** | 2,194 | 2,123 | 2,110 | 2,052 | 1,954 | 2,697 | 2,790 | 2,683 | 2,327 | 2,531 | 2,821 | 2,948 | 29,230 |
| **El Paso** | 1,489 | 1,647 | 1,713 | 1,607 | 1,737 | 2,782 | 2,671 | 3,510 | 3,560 | 2,890 | 3,585 | 4,370 | 31,561 |
| **Laredo** | 2,451 | 2,283 | 1,982 | 2,296 | 2,671 | 3,652 | 3,370 | 3,210 | 2,586 | 2,600 | 2,785 | 2,755 | 32,641 |
| **Rio Grande Valley** *(formerly McAllen)* | 9,722 | 11,726 | 11,668 | 9,484 | 9,611 | 14,140 | 15,993 | 17,491 | 14,703 | 13,238 | 16,744 | 17,742 | 162,262 |
| **San Diego** | 2,377 | 2,760 | 2,764 | 3,171 | 3,107 | 4,101 | 3,644 | 3,418 | 3,014 | 3,098 | 3,507 | 3,630 | 38,591 |
| **Tucson** | 3,854 | 4,562 | 4,400 | 3,925 | 3,824 | 5,785 | 5,012 | 4,760 | 4,146 | 3,241 | 3,627 | 5,036 | 52,172 |
| **Yuma** | 1,536 | 1,970 | 2,443 | 1,814 | 1,618 | 2,064 | 2,504 | 3,038 | 1,916 | 1,880 | 2,364 | 3,097 | 26,244 |
| **Coastal Border** | 249 | 247 | 205 | 352 | 270 | 277 | 277 | 243 | 250 | 307 | 328 | 242 | 3,247 |
| **Northern Border** | 302 | 295 | 219 | 309 | 286 | 408 | 342 | 381 | 544 | 405 | 381 | 444 | 4,316 |
| **Southwest Border** | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 |
| **Monthly Total** | 26,039 | 29,627 | 29,419 | 26,636 | 27,222 | 38,075 | 38,862 | 40,963 | 34,883 | 32,011 | 38,233 | 42,172 | 404,142 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2019

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 201 | 136 | 149 | 172 | 111 | 184 | 191 | 163 | 140 | 165 | 179 | 100 | 1,891 |
| New Orleans | 74 | 82 | 60 | 100 | 101 | 94 | 132 | 105 | 100 | 87 | 105 | 92 | 1132 |
| Ramey | 21 | 26 | 36 | 32 | 20 | 61 | 15 | 64 | 78 | 27 | 106 | 76 | 562 |
| Blaine | 53 | 35 | 48 | 41 | 41 | 54 | 35 | 27 | 53 | 49 | 38 | 50 | 524 |
| Buffalo | 40 | 29 | 19 | 26 | 27 | 43 | 33 | 18 | 55 | 93 | 123 | 31 | 537 |
| Detroit | 188 | 107 | 119 | 107 | 115 | 118 | 102 | 114 | 95 | 79 | 80 | 98 | 1,322 |
| Grand Forks | 24 | 28 | 29 | 20 | 24 | 36 | 48 | 41 | 43 | 31 | 41 | 47 | 412 |
| Havre | 7 | 7 | 5 | 8 | 0 | 5 | 7 | 3 | 8 | 14 | 5 | 8 | 77 |
| Houlton | 2 | 3 | 2 | 0 | 0 | 4 | 1 | 0 | 4 | 19 | 8 | 9 | 52 |
| Spokane | 38 | 41 | 23 | 57 | 42 | 52 | 37 | 46 | 11 | 19 | 30 | 32 | 428 |
| Swanton | 148 | 68 | 79 | 40 | 58 | 109 | 73 | 104 | 87 | 91 | 80 | 119 | 1056 |
| Big Bend | 555 | 448 | 621 | 588 | 845 | 942 | 941 | 1557 | 628 | 799 | 922 | 791 | 9,637 |
| Del Rio | 2,002 | 2,088 | 2,024 | 2,524 | 4,013 | 5,563 | 5,848 | 8,563 | 8,085 | 6,686 | 5,297 | 4,576 | 57,269 |
| El Centro | 3,242 | 3,189 | 2,718 | 2,461 | 3,319 | 3,561 | 3,386 | 3,482 | 2,885 | 2,214 | 2,327 | 2,354 | 35,138 |
| El Paso | 7,334 | 8,867 | 9,450 | 9,137 | 14,171 | 22,224 | 27,073 | 38,637 | 18,882 | 11,594 | 8,078 | 6,696 | 182,143 |
| Laredo | 3,448 | 2,669 | 2,059 | 2,632 | 3,123 | 4,192 | 3,975 | 4,115 | 3,819 | 2,686 | 2,421 | 3,239 | 38,378 |
| Rio Grande Valley | 20,755 | 20,713 | 18,372 | 17,713 | 25,366 | 33,763 | 36,727 | 49,821 | 43,207 | 36,854 | 22,355 | 13,489 | 339,135 |
| San Diego | 4,227 | 4,577 | 5,816 | 4,122 | 5,448 | 6,881 | 6,197 | 5,882 | 4,684 | 3,458 | 3,321 | 3,436 | 58,049 |
| Tucson | 5,828 | 5,062 | 4,912 | 4,096 | 4,911 | 7,257 | 5,921 | 6,875 | 5,517 | 5,517 | 4,080 | 4,902 | 63,490 |
| Yuma | 3,614 | 4,244 | 4,779 | 4,706 | 5,687 | 8,450 | 9,205 | 13,924 | 7,195 | 3,558 | 1,883 | 1,024 | 68,269 |
| Coastal Border | 296 | 244 | 245 | 304 | 232 | 339 | 338 | 332 | 318 | 279 | 390 | 268 | 3,585 |
| Northern Border | 500 | 318 | 324 | 299 | 307 | 421 | 336 | 353 | 356 | 395 | 405 | 394 | 4,408 |
| Southwest Border | 51,005 | 51,857 | 50,751 | 47,979 | 66,883 | 92,833 | 99,273 | 132,856 | 94,902 | 71,978 | 50,684 | 40,507 | 851,508 |
| Monthly Total | 51,801 | 52,419 | 51,320 | 48,582 | 67,422 | 93,593 | 99,947 | 133,541 | 95,576 | 72,652 | 51,479 | 41,169 | 859,501 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Associated Press Article dated April 1, 2021
"Migrants freed without court notice – sometimes no paperwork"

# EXHIBIT A-9

Migrants freed without court notice — sometimes no paperwork

ADVERTISEMENT

# AP NEWS

Top Stories
Topics

AP Top Ne

Coronaviru

Politics

Sports

Entertainm

Lifestyle

Oddities

Photograph

Travel

Technology

AP Fact Ch

Business

U.S. News

Health

Science

World New

Religion

Podcasts

Press Rele

Click to copy

Click to copy

**RELATED TOPICS**

Religion

U.S. News

AP Top News

Coronavirus pandemic

Latin America

Immigration

Border patrols

Texas

United States

**AR02094**

Case 2:21-cv-00067-Z    Document 162-5    Filed 09/02/22    Page 42 of 140    PageID 16406

# Migrants freed without court notice — sometimes no paperwork

By ELLIOT SPAGAT    2 hours ago



MISSION, Texas (AP) — Overwhelmed and underprepared, U.S. authorities are releasing migrant families on the Mexican border without notices to appear in immigration court or sometimes without any paperwork at all — time-saving moves that have left some migrants confused.

The rapid releases ease pressure on the Border Patrol and its badly overcrowded holding facilities but shifts work to Immigration and Customs and Enforcement, the agency that enforces immigration laws within the United States. Families are released with booking

AR02095

Case 2:21-cv-00067-Z   Document 162-5   Filed 09/03/22   Page 343 of 340   PageID 16407

records; only parents are photographed and fingerprinted.

ADVERTISEMENT

The Border Patrol began the unusual practice last week in Texas' Rio Grande Valley, which has seen the biggest increase in the number of migrant families and unaccompanied minors crossing the border. Last week, the agency added instructions to report to an ICE office within 60 days to adults' booking documents.

But some got no documents at all, including dozens at Our Lady of Guadalupe Catholic Church in the Texas border city of Mission, where about 100 migrants released by U.S. authorities had been arriving each night to sleep on mats in classrooms in a shuttered elementary school.

AR02098

Carlos Enrique Linga, 27, waited at the shelter for a week without documents along with his 5-year-old daughter, hoping to join a friend in Tennessee. His wife is still in Guatemala with their 2-year-old twin daughters and a 3-month-old.

Linga was unwilling to leave the shelter until he got documents and was asking Catholic Charities of Rio Grande Valley for help.

"We hope they can help with our papers so that we can move on, work and send (money) to my family," said Linga, whose home in Guatemala was destroyed by storms in November. "The church has told us that there are mistakes sometimes. Because there are so many people, they forget."

Customs and Border Protection, which oversees the Border Patrol, said it stopped issuing court notices in some cases because preparing even one of the documents often takes hours. Migrants undergo background checks and are tested for COVID-19.

AR02097

ADVERTISEMENT

The agency didn't answer questions about how many migrants have been released without court notices or without documents at all.

Sister Norma Pimentel, executive director of Catholic Charities of Rio Grande Valley, knows of 10 to 15 families released without any paperwork since last week, an issue that has cropped up before when there are large increases in new arrivals.

"It's a problem, it's a situation we need to resolve, to make sure we follow up," she said.

Migrants will be issued notices to appear in court at their 60-day check-ins with ICE, according to a U.S. official with direct knowledge of the plans who spoke on condition of anonymity because the plans have not been made public. It is unclear how widespread the practice has been, but it is very common in Rio Grande Valley, the busiest corridor for illegal crossings.

Preparing a court appearance notice can take an hour to 90 minutes, said Chris Cabrera, spokesman for the National Border Patrol Council, a union that represents agents. He welcomed the change.

"Honestly, from my end, I think it's good because it's less paperwork for our guys," said Cabrera, who works in the Rio Grande Valley.

An uptick in the number of people crossing the border, especially children traveling alone and families, has filled up federal holding facilities. The U.S. has been releasing families with children 6 and under and expelling families with older children under pandemic-related powers that deny an opportunity to seek asylum.

Immigration attorneys had mixed reactions to people being released without court notices or

AR02098

paperwork, particularly the requirement to check in with ICE. They advise migrants to apply for a different route to asylum — one that's only for people already in the country. In that option, they meet a Citizenship and Immigration Services asylum officer in a less adversarial environment and if denied, can appeal to an immigration judge, advocates say.

"It's a whole different tone," said Charlene D'Cruz, director of Lawyers for Good Government's Project Corazon legal aid program. And if they fail, they get "a second bite at the apple" before a judge.

Initially, U.S. authorities didn't even require the ICE check-in when it began releasing families without court notices over the past two weeks. But they shifted course. D'Cruz said ICE could potentially issue a notice to appear in court, expel people from the country or do nothing.

"There are so many different options, and I don't know what's going to happen," D'Cruz said.

The immigration courts, with a backlog of 1.3 million cases, is ill-prepared for a large increase in new asylum claims.

At the shelter in Mission, a city of about 85,000 people bordering Mexico with a large park known for birdlife, migrants who have booking records closely guarded them. Along with their proof of a COVID-19 test, the documents are kept in large yellow envelopes that say, "Please help me. I do not speak English."

Information on the booking form is sparse: name, nationality, gender, date of birth. Some forms say they are eligible for "prosecutorial discretion," a designation that signals they are not a priority for deportation.

Jose Sansario waited at the shelter for a week after coming from Guatemala with his wife, Kimberly, and their 3-year-old daughter, Genesee. They had difficulty finding flights to Richmond, Virginia, their final destination.

They left their homeland in early March because a gang threatened to kill him if he didn't hand over money from his auto repair business. He said he heard the Biden administration was friendly to immigrants, despite repeated statements from the president and top aides that the border is not open.

"We didn't know what was true, but we had faith — faith that God would help us and that faith would allow us in," Sansario said.

Alba Urquia of El Salvador waited for a week at the shelter because she was released without any documents after crossing the Rio Grande with a large group of migrants, including her 4-

year-old daughter. She plans to help her father with his car repair shop in Los Angeles.

"I can't leave," she said, sitting on a bench in the shuttered school's playground. The shelter has since closed. "Our fear is that they return us to Mexico or to our country."

"That would be a nightmare," said Alexi Sarmiento of Honduras, who came to the U.S. with her 6- and 9-year-old daughters and was released without documents.

ADVERTISEMENT

**Trending on AP News**



AR02200



Case 2:21-cv-00067-Z   Document 152-5   Filed 08/03/21   Page 48 of 140   PageID 6412

Guatemala declares emergency measures as new caravan rumored



Man charged with smuggling after California crash kills 13



Migrants freed without court notice — sometimes no paperwork



Germany drops probe of former Nazi guard deported from US

by Taboola

ADVERTISEMENT

AR02202

Migrants freed without court notice — sometimes no paperwork



## Guatemala declares emergency measures as new caravan rumored

GUATEMALA CITY (AP) — Guatemalan President Alejandro Giammattei decreed a "stat...



 March 29, 2021

## Ad Content

First-Timer's Guide to the…

Promoted: Visit Arizona



Forget the 30yr mortgage if you owe less than $356K….

Promoted: LowerMyBills
NMLS#167283; 3306



2020 BMW M850 |

Forget Bitcoin – "ID

https://apnews.com/article/us-news-im-border-patrols-texas-9ace3e41e0acadac7cece1

Mileage: 2, Pro...

Promoted: CarMax



Coin 'Potential
Market Is Bigger

Promoted: Stansberry
Research



## Germany drops probe of former Nazi guard deported from US

BERLIN (AP) — German prosecutors said
Wednesday that they have dropped an ...



AP   yesterday

## AP sources: SolarWinds hack got emails of top DHS officials

Suspected Russian hackers gained access to email
accounts belonging to the Trump administratio...



AP   March 29, 2021

# Ad Content



### 2012 Kia Soul | Mileage: 99,725 miles
Promoted: CarMax



### L.O.C.K. System Predicts Crash Before May
Promoted: Altimetry



### 30 Pictures of What Harry Potter Characters Should Have Looked Like in the…
Promoted: World Lifestyle

## AP PHOTOS: For migrants at border, both opportunity and risk

For many Americans, the scenes unfolding at the U.S.-Mexico border are visceral and jarring. A 7...


March 29, 2021



## Man charged with smuggling after California crash kills 13

LOS ANGELES (AP) — A Mexican man was charged Tuesday with coordinating a smuggling...


yesterday



ADVERTISEMENT

**AP NEWS**

Top Stories

Video

Contact Us

Cookie Settings

**DOWNLOAD AP NEWS**

Connect with the definitive source for global and local news

**MORE FROM AP**

ap.org

AP Insights

AP Definitive Source

AP Images Spotlight

AP Explore

Migrants freed without court notice — sometimes no paperwork

AP Books

**FOLLOW AP**

**THE ASSOCIATED PRESS**
About
Contact
Customer Support
Careers
Terms & Conditions
Privacy
All contents © copyright 2021 The Associated Press. All rights reserved.

**AR02006**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

NPR Article dated March 23, 2021
"Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies"

# EXHIBIT A-10

Accessibility links

- Skip to main content
- Keyboard shortcuts for audio player

- 
- 
- 

- Open Navigation Menu
- 🔲
- 

  🔲

  KSMU

  - 
  - donate
  - Change

  Sign in or register to see your station everywhere you enjoy NPR.

- Sign In
- NPR Shop
- Donate

Close

- Home
- News        Expand/collapse submenu for News
  - National
  - World
  - Politics
  - Business
  - Health
  - Science
  - Technology
  - Race & Culture
- Arts & Life        Expand/collapse submenu for Arts & Life
  - Books
  - Movies
  - Television
  - Pop Culture
  - Food
  - Art & Design
  - Performing Arts
- Music        Expand/collapse submenu for Music
  - Tiny Desk
  - All Songs Considered

AR02208

- Best Music Of 2020
  - Music News
  - New Music
  - Music Features
  - Live Sessions
- Shows & Podcasts        Expand/collapse submenu for Shows & Podcasts

Daily

  -  Morning Edition
  -  Weekend Edition Saturday
  -  Weekend Edition Sunday
  -  All Things Considered
  -  Fresh Air
  -  Up First

Featured

  -  Consider This from NPR
  -  Embedded
  -  How I Built This with Guy Raz
  -  TED Radio Hour
  - More Shows & Podcasts
- Search
- Sign In
- NPR Shop

- 
- Tiny Desk
- All Songs Considered
- Best Music Of 2020
- Music News
- New Music
- Music Features
- Live Sessions

- About NPR
- Diversity
- Organization
- Support
- Careers
- Connect
- Press
- Ethics

**Chad Wolf: Biden Was Warned About Revoking Trump Border Policy Former acting Homeland Security Secretary Chad Wolf says the Biden administration did not heed advice from the former administration about preventing an influx of migrants at the southern border.**

### Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies

5-Minute Listen

AR02209

Case 2:21-cv-00067-Z  Document 162-5  Filed 09/02/22  Page 57 of 140  PageID 16451

- **Download**
-

  Embed <iframe src="https://www.npr.org/player/embed/980272165/980305643" width="100%" height="290" frameborder="0" scrolling="no" title="NPR embedded audio player">

**Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies** 5:30

NPR

- subscribe
  - NPR One
  - Apple Podcasts
  - Google Podcasts
  - Pocket Casts
  - Spotify
  - RSS link

## Politics

# Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies

-
-
-
-

March 23, 2021 10:06 AM ET

Franco Ordoñez

Twitter Instagram

**Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies**

5-Minute Listen

- **Download**
-

  Embed <iframe src="https://www.npr.org/player/embed/980272165/980305643" width="100%" height="290" frameborder="0" scrolling="no" title="NPR embedded audio player">

Enlarge this image

AR02290

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## VOLUME II OF II

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS and | § |
| | § |
| THE STATE OF MISSOURI, | § |
| | § |
| Plaintiffs, | § |
| | §     Case No. 2:21-cv-00067-Z |
| v. | § |
| | § |
| JOSEPH R. BIDEN, JR., in his official | § |
| capacity as President of the United States | § |
| of America, *et al.*, | § |
| | § |
| Defendants. | § |
| | § |

## DECLARATION OF RYAN D. WALTERS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Ryan D. Walters, hereby declare as follows:

1.      I am over 18 years of age and am fully competent to make this declaration. I am

Special Counsel in the Special Litigation Unit at the Texas Office of Attorney General, and I am

admitted to practice law in this Court, and I represent the State of Texas in the above-captioned

matter. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have

personal knowledge of the facts stated herein.

2.      Appended to the Plaintiffs' Motion for Preliminary Injunction are the following

exhibits:

| Ex. No. | Title |
|---|---|
| 1 | U.S. Dept. of Homeland Security Migrant Protection Protocols Website, which is publicly available at Dep't of Homeland Sec., *Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.gov/news/2019/ 01/24/migrant-protection-protocols |
| 2 | Assessment of the Migrant Protection Protocols (Oct. 28, 2019), which is publicly available at Dep't of Homeland Sec., *Assessment of the Migrant Protection Protocols* |

| | | |
|---|---|---|
| | *(MPP)*, https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf | |
| 3 | Memorandum of Understanding between the U.S. Department of Homeland Security and the State of Texas | |
| 4 | U.S. Customs and Border Protection Custody and Transfer Statistics FY2021, which is publicly available at U.S. Customs and Border Protection, *Custody and Transfer Statistics FY2021*, Office of Field Operations - Dispositions and Transfers, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics | |
| 5 | U.S. Customs and Immigration Services Description of Parole, which is publicly available at USCIS, *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, "What is Parole?" (Mar. 31, 2021), https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-individuals-outside-the-united-states. | |
| 6 | U.S. Department of Homeland Security's Letter to Texas Attorney General Ken Paxton | |
| 7 | Texas Department of Public Safety Texas Criminal Illegal Alien Data | |
| 8 | U.S. Census Bureau Table – Geographic Mobility by Citizenship Status | |
| 9 | Foreign-Born Population in Texas: Sources of Growth | |
| 10 | Gone to Texas | |

3. The exhibits listed above are true and correct copies of what they purport to be.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2021

*/s/ Ryan D. Walters*
Ryan D. Walters

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2021, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Ryan D. Walters*
Ryan D. Walters

2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

U.S. Dept. of Homeland Security Migrant Protection Protocols Website

# EXHIBIT B-1



Official website of the Department of Homeland Security

**U.S. Department of**
**Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Migrant Protection Protocols

**Release Date:** January 24, 2019

*"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border." – Secretary of Homeland Security Kirstjen M. Nielsen*

## What Are the Migrant Protection Protocols?

The Migrant Protection Protocols (MPP) are a U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

## Why is DHS Instituting MPP?

The U.S. is facing a security and humanitarian crisis on the Southern border. The Department of Homeland Security (DHS) is using all appropriate resources and authorities to address the crisis and execute our missions to secure the borders, enforce immigration and customs laws,

facilitate legal trade and travel, counter traffickers, smugglers and transnational criminal organizations, and interdict drugs and illegal contraband.

MPP will help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

Historically, illegal aliens to the U.S. were predominantly single adult males from Mexico who were generally removed within 48 hours if they had no legal right to stay; now over 60% are family units and unaccompanied children and 60% are non-Mexican. In FY17, CBP apprehended 94,285 family units from Honduras, Guatemala, and El Salvador (Northern Triangle) at the Southern border. Of those, 99% remain in the country today.

Misguided court decisions and outdated laws have made it easier for illegal aliens to enter and remain in the U.S. if they are adults who arrive with children, unaccompanied alien children, or individuals who fraudulently claim asylum. As a result, DHS continues to see huge numbers of illegal migrants and a dramatic shift in the demographics of aliens traveling to the border, both in terms of nationality and type of aliens- from a demographic who could be quickly removed when they had no legal right to stay to one that cannot be detained and timely removed.

In October, November, and December of 2018, DHS encountered an average of 2,000 illegal and inadmissible aliens a day at the Southern border. While not an all-time high in terms of overall numbers, record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove (when our courts and laws even allow that), have overwhelmed the U.S. immigration system, leading to a "system" that enables smugglers and traffickers to flourish and often leaves aliens in limbo for years. This has been a prime  cause of our near-800,000 case backlog in immigration courts and delivers no consequences to aliens who have entered illegally.

Smugglers and traffickers are also using outdated laws to entice migrants to undertake the dangerous journey north where on the route migrants report high rates of abuse, violence, and sexual assault. Human smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities. The activities of these smugglers, traffickers, gangs and criminals endanger the security of the U.S., as well as partner nations in the region.

The situation has had severe impacts on U.S. border security and immigration operations. The dramatic increase in illegal migration, including unprecedented number of families and

fraudulent asylum claims is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution. In fact, approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges. Because of the court backlog and the impact of outdated laws and misguided court decisions, many of these individuals have disappeared into the country before a judge denies their claim and simply become fugitives.

The MPP will provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum.

# What Gives DHS the Authority to Implement MPP?

Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum.  Section 235(b)(2)(C) provides that "in the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA.  The U.S. has notified the Government of Mexico that it is implementing these procedures under U.S. law.

# Who is Subject to MPP?

With certain exceptions, MPP applies to aliens arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly admissible and who are placed in removal proceedings under INA § 240.  This includes aliens who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico. Unaccompanied alien children and aliens in expedited removal proceedings will not be subject to MPP.  Other individuals from vulnerable populations may be excluded on a case-by-case basis.

# How Will MPP Work Operationally?

Certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an

asylum application and/or disappear before an immigration judge can determine the merits of any claim.  Instead, these aliens will be given a "Notice to Appear" for their immigration court hearing and will be returned to Mexico until their hearing date.

While aliens await their hearings in Mexico, the Mexican government has made its own determination to provide such individuals the ability to stay in Mexico, under applicable protection based on the type of status given to them.

Aliens who need to return to the U.S. to attend their immigration court hearings will be allowed to enter and attend those hearings.  Aliens whose claims are found meritorious by an immigration judge will be allowed to remain in the U.S.  Those determined to be without valid claims will be removed from the U.S. to their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's Executive Office for Immigration Review to streamline the process and conclude removal proceedings as expeditiously as possible.

# Will Migrants in MPP Have Access to Counsel?

Consistent with the law, aliens in removal proceedings can use counsel of their choosing at no expense to the U.S. Government.  Aliens subject to MPP will be afforded the same right and provided with a list of legal services providers in the area which offer services at little or no expense to the migrant.

# What Are the Anticipated Benefits of MPP?

Every month, tens of thousands of individuals arrive unlawfully at the Southern Border.  MPP will reduce the number of aliens taking advantage of U.S. law and discourage false asylum claims.  Aliens will not be permitted to disappear into the U.S. before a court issues a final decision on whether they will be admitted and provided protection under U.S. law.  Instead, they will await a determination in Mexico and receive appropriate humanitarian protections there.  This will allow DHS to more effectively assist legitimate asylum-seekers and individuals fleeing persecution, as migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey.  Moreover, MPP will reduce the extraordinary strain on our border security and immigration system, freeing up personnel and resources to better protect our sovereignty and the rule of law by restoring integrity to the American immigration system.

# Additional Information

- Secretary Nielsen Implementation Memo (/publication/policy-guidance-implementation-migrant-protection-protocols) (January 25, 2019, PDF)

Topics: Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: Border Security (/keywords/border-security) , Immigration Enforcement (/keywords/immigration-enforcement) ,

Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp) , Southwest Border (/keywords/southwest-border)

Last Published Date: January 24, 2019

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

Assessment of the Migrant Protection Protocols (Oct. 28, 2019)

# EXHIBIT B-2

**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

## I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

AR02202

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.    MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

AR02203

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  - The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings. Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  - The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  - After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  - Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  - A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  - Individuals not processed under MPP generally must wait years for adjudication of their claims. There are approximately one million pending cases in DOJ immigration courts. Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  - According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States. This number—along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

**III.    Both Governments Endeavor to Provide Safety and Security for Migrants**

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

AR02226

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.


**IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture**

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

  - MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

  - As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

  - That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

  - Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

  - Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

5

## V.    Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

AR02227

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R.§ 235.3(b)(2).

7

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase. Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process. And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018. Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 | 4,192 | 3,956 | 4,775 | 2,377 | 2,168 | 21,155 |
|  | 11.7% | 11.4% | 11.2% | 6.3% | 4.3% | 2.9% | 6.8% |
| Removal Orders[4] | 9,980 | 11,064 | 9,466 | 17,700 | 12,130 | 11,673 | 72,013 |
|  | 31.7% | 30.2% | 26.7% | 23.3% | 22.0% | 15.4% | 23.2% |
| Asylum Cases Pending | 17,554 | 21,104 | 21,737 | 53,023 | 40,586 | 61,918 | 215,922 |
|  | 55.8% | 57.6% | 61.4% | 69.8% | 73.5% | 81.6% | 69.5% |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
[1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
[2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
[3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
[4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

8

Implementing MPP assessments currently imposes a significant resource burden to DHS. As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment. The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide. In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**. Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do. As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico. Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico. Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context. For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard. "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP. Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8] The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9] In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

AR02239

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

10

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

Memorandum of Understanding Between Texas and DHS

# EXHIBIT B-3

# AGREEMENT BETWEEN DEPARTMENT OF HOMELAND SECURITY AND THE STATE OF TEXAS

The parties to this Agreement are on the one hand:

    (1)       the Department of Homeland Security,
    (2)       U.S. Customs and Border Protection (CBP),
    (3)       U.S. Immigration and Customs Enforcement (ICE), and
    (4)       U.S. Citizenship and Immigration Services (USCIS);[1]

and on the other hand:

    (5)       the State of Texas, by and through the Office of the Governor (Texas).

## I.    AUTHORITY

The authorities governing this Agreement include, but are not limited to:

    (1)       the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended;
    (2)       the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended;
    (3)       the Privacy Act, 5 U.S.C. Section 552a, as amended;
    (4)       the Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended;
    (5)       the Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended; and
    (6)       the Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II.    PURPOSE AND COMMITMENT

DHS recognizes that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets. The harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in concrete injuries to Texas:

    (1)       a decrease of any immigration enforcement priorities;
    (2)       a reduction in the number of DHS agents performing immigration enforcement functions;

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) does not terminate this Agreement as to any other parties.

(3)     a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)     a decrease or pause on apprehensions or administrative arrests;

(5)     relaxation of the standards for granting relief from return or removal, such as asylum;

(6)     an increase in releases from detention;

(7)     a relaxation of the standards for granting release from detention;

(8)     changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)     rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Texas recognizes that DHS relies on cooperation with Texas and information shared by Texas to carry out DHS's immigration enforcement functions. Any decrease in a State's cooperation or information sharing with DHS may result in a decrease in immigration enforcement.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Texas, in which Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)     decrease the number of ICE agents performing immigration enforcement duties;

(3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)     increase or decline to decrease the number of releases from detention;

(6)     relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

AR02239

a.   enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

b.   enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

c.   enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

d.   eliminating incentives and so-called "pull factors" for illegal immigration;

e.   limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

f.   refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)   Consult with Texas before taking any action or making any decision that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens.  This includes policies, practices, or procedures which have as their purpose or effect:

a.   reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

b.   decreasing the number of ICE agents within Texas's territorial jurisdiction performing immigration enforcement duties;

c.   pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

d.   decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

e.   decreasing or pausing apprehensions or administrative arrests;

f.   increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

g.   increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

h.   otherwise negatively impacting Texas.

(3)   Provide Texas with 180 days' written notice (in the manner provided for in Section IV of this Agreement) of any proposed action listed in Section III.A.2 and an opportunity to consult and comment on the proposed action. DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action listed in Section III.A.2.  In case of doubt as to whether DHS's action is implicated by this provision,

AR02235

DHS will err on the side of consulting with Texas before taking any such action listed above.

**B.    Texas agrees to:**

Support DHS's immigration enforcement by honoring "detainer requests" or "requests to hold" issued to Texas by ICE or CBP, and honoring DHS requests for records or information from the Texas Department of Motor Vehicles.

## IV.    NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below, or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

Department of Homeland Security
Secretary of Homeland Security
Washington, D.C. 20528

U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746

Texas
c/o Greg Abbott, Governor of Texas          c/o Ken Paxton, Attorney General
1100 San Jacinto Boulevard, 4th Floor       300 West 15th Street
Austin, Texas 78701                         Austin, Texas 78711

## V.    PENALTIES

Texas acknowledges that the information it receives from DHS is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement may be subject to civil or criminal penalties.

AR02236

## VI. INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII. THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII. DISPUTE RESOLUTION

DHS and Texas will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated in a United States District Court located in Texas.

## IX. CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Texas. Any inconsistency or conflict between or among the provisions of this Agreement, will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement. Provided, however, that this Agreement shall not void, abrogate, or modify any other agreement between DHS and Texas unless and to such extent as such agreement conflicts with this Agreement.

## X.  SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.  ASSIGNMENT

Texas may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Texas without restriction.

## XII.  WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.  EFFECTIVE DATE

This Agreement shall be effective immediately when all parties have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.  MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change point-of-contact information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

AR002238

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate this Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Texas.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.   KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.   FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Texas, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Texas, respectively.

[Signatures on the following pages]

AR02239

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____     1/8/2021
Kenneth T. Cuccinelli II                       Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.  Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

AR02249

**Signature for the Office of the Governor of Texas**

OFFICE OF THE GOVERNOR OF TEXAS

_____          December 31, 2020
Greg Abbott                                              Date
Governor


**Signature for the Office of the Attorney General of Texas**

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

_____          12/31/2020
Ken Paxton                                              Date
Attorney General

AR02246

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  | § |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

U.S. Customs and Border Protection Custody and Transfer Statistics FY2021

# EXHIBIT B-4

Published on *U.S. Customs and Border Protection* (https://www.cbp.gov (https://www.cbp.gov))

# Custody and Transfer Statistics FY2021

Fiscal Year 2021 runs from October 1, 2020 to September 30, 2021

❯Collapse All

❯Office of Field Operations - Dispositions and Transfers

## OFO Monthly Southwest Border Credible Fear Inadmissibles by Disposition

| Disposition | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Expedited Removal - Credible Fear (ERCF)[1] | 63 | 94 | 111 | 133 | 117 | 56 | 77 |
| Notice to Appear (NTA)[2,7] | 22 | 36 | 74 | 93 | 200 | 795 | 2,027 |
| Notice to Appear (NTA) - Person Released | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Notice to Appear (NTA) - Person Detained | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Visa Waiver Program (VWP)-Removal - Limited Review[3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Visa Waiver Program (VWP)-Refusal - Limited Review[3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stowaway - Limited Review[3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Credible Fear Inadmissibles | 85 | 130 | 185 | 226 | 317 | 851 | 2,104 |

## Title 8 Inadmissibles

| Field Office | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| El Paso | 163 | 196 | 229 | 229 | 257 | 283 | 521 |
| Laredo | 417 | 369 | 347 | 351 | 360 | 561 | 659 |
| San Diego | 325 | 373 | 490 | 695 | 827 | 1,148 | 1,972 |
| Tucson | 97 | 70 | 66 | 83 | 92 | 143 | 261 |
| Total | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |

## OFO Monthly Southwest Border Credible Fear Inadmissibles by Program

|  | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Migrant Protection Protocols (MPP) [4] - Initial returns | 3 | 9 | 8 | 9 | 0 | 0 | 0 |
| Asylum Cooperative Agreement (ACA) [5] Program - Expedited Removal - Credible Fear (ERCF) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ACA - Notice to Appear (NTA) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Humanitarian Asylum Review Process (HARP) [6] Program -Expedited Removal - Credible Fear (ERCF) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HARP - Notice to Appear | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## OFO Monthly Southwest Border Credible Fear by Transfer Destination

| Destination | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Federal/State/Local Facility | 10 | 11 | 18 | 20 | 15 | 23 | 54 |
| ICE/ERO | 62 | 105 | 130 | 187 | 235 | 455 | 1,491 |
| ICE/HSI | 3 | 0 | 0 | 0 | 0 | 0 | 6 |
| OFO | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Return to Foreign | 2 | 7 | 12 | 11 | 0 | 0 | 0 |
| USBP | 5 | 5 | 0 | 0 | 7 | 16 | 32 |
| Total | 82 | 128 | 160 | 218 | 257 | 494 | 1,583 |

[1] Includes subjects who claimed credible fear in Office of Field Operations (OFO) custody at a port of entry. OFO refers all such claims to USCIS. Credible fear may be claimed at any time prior to removal.

[2] Office of Field Operations has the discretion to process arriving noncitizens for expedited removal or notice to appear in removal proceedings or other disposition.  In the event of NTA disposition, applicants for admission have up to one year to seek asylum and while proceeding before the immigration judge.

[3] The term "limited review" refers to the process of an immigration judge considering prior administrative adjudicated claims of US citizenship, Lawful Permanent Residence, Asylum or Refugee status.  The immigration judge considers only the claim to such benefit and not the underlying inadmissibility or removal ground that may apply in the noncitizen's case.

[4] Migrant Protection Protocols (MPP) - An exercise of the Department of Homeland Security's (DHS) express statutory authority under the Immigration and Nationality Act (INA) to return certain applicants for admission, or those who enter illegally between the ports of entry, who are subject to removal proceedings under INA Section 240 Removal Proceedings to Mexico pending removal proceedings.  Individuals processed for MPP are released from detained immigration docket while awaiting their removal proceedings and like all asylum seekers have up to one year after initiation of removal proceedings to claim fear and file form I589 to have their claims heard by an Asylum Officer or Immigration Judge.

[5] Asylum Cooperative Agreement (ACA) - CBP, in coordination with ICE Enforcement Removal Operations (ERO), and USCIS, have executed ACAs to facilitate the transfer of noncitizens to a third country where they will have access to full and fair procedures for determining their protection claims, based on the ACAs. Currently, Guatemala is the only ACA participant.

[6]

*Humanitarian Asylum Review Process (HARP) - Developed by Customs and Border Protection (CBP), in coordination with ICE, USCIS, and EOIR to promptly address credible fear claims of amenable Mexican nationals.*

[7] *Initial disposition of Expedited Removal is converted to a Notice to Appear in full removal proceedings after a preliminary finding by Asylum Officer, Supervisor or Immigration Judge of credible fear; Custody status is most likely released on recognizance or "Order of Recognizance" pending discretion of an asylum grant.*
*Legal status while out of custody is parole until asylum is granted. Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice.*

---

❤ Office of Field Operations - In Custody

# Field Operations - Southwest Border In Custody [1]

| Detention Capacity | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| 1005 | 39 (3.88%) | 49 (4.88%) | 53 (5.27%) | 55 (5.47%) | 64 (6.37%) | 107 (10.6%) | 195 (19.4%) |

[1] *Represents an estimate of each cell's code occupancy limit, as outlined in technical design standards when constructed, multiplied by the total number of cells for all ports of entry within each field office. This number does not account for the unique circumstances that may limit the occupancy of a given cell (e.g., high risk, nursing/pregnant, transgender, unaccompanied minor, etc.) nor does it reflect operational limitations that affect a port's capacity to detain. CBP's capacity to detain individuals in its short-term facilities depends on many factors, including: demographics of the individual in custody; medical or other needs of individuals in custody; ability of ICE ERO (or, if an unaccompanied child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and OFO's available resources to safely process and hold individuals.*

[2] *Represents the average number of travelers in custody on a daily basis averaged over the 30 day period, at all Southwest Border Field Office locations. Travelers include inadmissible individuals, lawful permanent residents, asylees, refugees, and United States Citizens who are being detained to verify wants, warrants, criminal, administrative or other judicial process.*

---

❤ Office of Field Operations - Title 8, 19 and 42

# OFO Southwest Border T8, T19, T42

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Title 8 | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |
| Title 19 | 7,198 | 6,937 | 6,917 | 5,447 | 5,251 | 6,826 | 9,332 |
| Title 42 | 1,899 | 1,942 | 1,748 | 1,775 | 1,947 | 2,003 | 1,751 |

# OFO Southwest Border T8, T19, T42

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Title 8 | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| **Title 19** | 7,198 | 6,937 | 6,917 | 5,447 | 5,251 | 6,826 | 9,332 |
| **Title 42** | 1,899 | 1,942 | 1,748 | 1,775 | 1,947 | 2,003 | 1,751 |

❤ U.S. Border Patrol - Dispositions and Transfers

# USBP Monthly Southwest Border Apprehensions by Processing Disposition

*The processing disposition decision related to each apprehension is made on a case-by-case basis. The processing dispositions below are representative of the time data was aggregated. As dispositions are subject to change throughout the immigration process, the data does not necessarily reflect final dispositions or removals.*

| Processing Disposition | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| **Expedited Removal (ER)** | 1,248 | 1,449 | 1,642 | 2,286 | 3,637 | 6,416 | 10,669 |
| **PACR, HARP, ACA** [1] | 0 | 2 | 0 | 6 | 2 | 13 | 25 |
| **Notice To Appear/Order of Recognizance, I-385 – Released** [2] | 20 | 9 | 18 | 1,317 | 8,797 | 26,282 | 26,233 |
| **Reinstatement of Prior Removal** | 1,533 | 1,418 | 1,430 | 1,274 | 1,126 | 1,488 | 1,697 |
| **Voluntary Return** | 169 | 964 | 1,736 | 1,815 | 1,857 | 2,387 | 2,268 |
| **Warrant/Notice To Appear (NTA) - Detained** | 2,092 | 2,766 | 4,184 | 5,151 | 9,639 | 24,610 | 20,762 |
| **MPP** [1] | 796 | 1,106 | 1,347 | 717 | 30 | 0 | 0 |
| **Other** [3] | 186 | 172 | 189 | 217 | 232 | 919 | 1,843 |
| **Total Title 8 Apprehensions** | 6,044 | 7,886 | 10,546 | 12,783 | 25,320 | 62,115 | 63,497 |

[1] *Subjects enrolled in multiple programs are only counted once based on the following order: PACR, ACA, HARP, MPP.*
[2] *Includes individuals released with a Notice to Appear/Order of Recognizance (NTA/OR) with an order to appear for immigration proceedings and individuals who are processed, not admitted, and released without an NTA as a matter of discretion.*
[3] *Processing dispositions may include subjects that do not yet have a final disposition at the time the data was collected or subjects processed under the visa waiver program, turned over to, paroled, etc.*

# USBP Monthly Southwest Border Apprehensions by Transfer Destination

*Following processing, U.S. Border Patrol arranges transfer of individuals to the appropriate entity based on disposition and other factors such as criminal charges. The transfer destinations below are representative of the time data was aggregated. The data does not reflect subsequent transfer destinations after subjects leave Border Patrol custody and are subject to change if an individual returns to U.S. Border Patrol custody during the same event.*

| Transfer Destination | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Humanitarian Release | 19 | 9 | 18 | 1,321 | 8,798 | 26,103 | 26,098 |
| Federal[1] | 3,491 | 4,077 | 5,746 | 7,443 | 13,518 | 30,993 | 30,747 |
| Federal - Northern Triangle Repatriation Flights | 20 | 7 | 0 | 26 | 11 | 8 | 1 |
| Federal - Mexican Repatriation Flights | 499 | 894 | 566 | 528 | 187 | 205 | 164 |
| Port of Entry (Non-MPP) | 920 | 1,377 | 2,411 | 2,150 | 2,100 | 2,825 | 3,042 |
| Port of Entry (MPP) | 796 | 1,106 | 1,347 | 717 | 30 | 0 | 0 |
| State and Local Law Enforcement Agencies | 184 | 229 | 315 | 443 | 525 | 1,166 | 727 |
| Other[2] | 114 | 186 | 143 | 151 | 151 | 475 | 1,485 |
| Total Title 8 Transfers | 6,043 | 7,885 | 10,546 | 12,779 | 25,320 | 61,775 | 62,264 |

[1] Manifested as turned over to other Federal agencies, to include Immigration and Customs Enforcement, Health and Human Services, U.S. Marshals, etc.
[2] Includes subjects that have not been transferred out of USBP custody at the time the data was collected or subjects manifested as transferred to hospital, paroled, etc.

⌄U.S. Border Patrol - In Custody

# USBP Average Daily Subjects In Custody by Southwest Border Sector

*U.S. Border Patrol facilities, such as stations and central processing centers, provide short-term holding capacity for the processing and transfer of individuals encountered by agents. Maximum facility capacity along the Southwest border is approximately 11,200, which assumes a homogenous population and full operating status at all facilities. Actual capacity fluctuates constantly based on characteristics of in-custody population, to include demographics, gender, criminality, etc.*

| Sector | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Big Bend | 10 | 16 | 19 | 22 | 43 | 68 | 40 |
| Del Rio | 379 | 78 | 91 | 174 | 367 | 625 | 816 |
| El Centro | 34 | 35 | 35 | 36 | 53 | 204 | 424 |
| El Paso | 72 | 74 | 123 | 107 | 231 | 913 | 476 |
| Laredo | 113 | 113 | 73 | 72 | 95 | 263 | 334 |
| Rio Grande | 178 | 176 | 120 | 158 | 878 | 3,779 | 2,883 |
| San Diego | 55 | 62 | 57 | 107 | 153 | 503 | 1,139 |
| Tucson | 70 | 72 | 98 | 87 | 186 | 490 | 305 |
| Yuma | 8 | 11 | 17 | 28 | 160 | 488 | 785 |
| Total | 919 | 637 | 633 | 791 | 2,164 | 7,331 | 7,202 |

⌄Pathways and Programs Definitions

# Migrant Protection Protocols (MPP)

The Migrant Protection Protocols (MPP) is an exercise of the Department of Homeland Security's express statutory authority under the Immigration and Nationality Act (INA) to return certain applicants for admission, or those who enter illegally between the ports of entry, who are subject to removal proceedings under INA Section 240 Removal Proceedings to Mexico pending removal proceedings.

# Prompt Asylum Claim Review (PACR)

The Prompt Asylum Claim Review (PACR) pathway was developed by U.S. Border Patrol (USBP), in coordination with U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Executive Office for Immigration Review (EOIR) to promptly address credible fear claims of amenable individuals.

# Asylum Cooperative Agreement (ACA)

U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO), and U.S. Citizenship and Immigration Services (USCIS), have executed Asylum Cooperative Agreements (ACAs) to facilitate the transfer of individuals to a third country where they will have access to full and fair procedures for determining their protection claims, based on the ACAs.

# Humanitarian Asylum Review Process (HARP)

The Humanitarian Asylum Review Process (HARP), was developed by U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Executive Office for Immigration Review (EOIR) to promptly address credible fear claims of amenable Mexican nationals.

# Electronic Nationality Verification

Under the Electronic Nationality Verification (ENV) program U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO), remove eligible noncitizens with a final order of removal to their native countries.

# Interior Repatriation Initiative (IRI)

Under the Interior Repatriation Initiative (IRI), U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO) and the Mexican Ministry of the Interior, remove eligible noncitizens from Mexico to the interior of Mexico.

**Tags:**
Statistics (https://www.cbp.gov/tags/statistics) [1]

**Source URL:** https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics
**Links**
[1] https://www.cbp.gov/tags/statistics

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

U.S. Citizenship and Immigration Services Description of Parole

# EXHIBIT B-5



**U.S. Citizenship and Immigration Services**

Home > Humanitarian > Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States

# Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States

> ⓘ Both the special parole policy for arriving Cuban nationals, commonly known as the "wet foot/dry foot" policy, and the Cuban Medical Professional Parole Program expired on January 12, 2017. Read the announcement on the DHS website. The Cuban Family Reunification Parole Program remains in effect.

Individuals who are outside of the United States may be able to request parole into the United States based on humanitarian or significant public benefit reasons.

**For information on the types of documents and evidence you should submit** in support of a request for parole, please see Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests.

This webpage does **not** cover the following types of parole requests:

- *Requests for individuals who are already in the United States and seek "advance parole" to leave and return.* For information on how an individual already in the United States may be considered for advance parole to return to the United States after departure, please see Form I-131 instructions (PDF, 284.74 KB).

- *Requests for individuals who are in the United States and seek parole in place.* For more information, please contact the local USCIS office through my.uscis.gov/appointment.

- *Requests for parole that are under the jurisdiction of Immigration and Customs Enforcement (ICE).* ICE has primary jurisdiction over a person seeking parole who is in removal proceedings in the United States or who has previously been removed or deported. Requests to ICE for parole should be submitted to ICE via the USCIS address under Humanitarian parole applicants. Please see the Memorandum of Agreement between USCIS, ICE and CBP (PDF) for more information about each agency's jurisdiction over parole requests.

- *Requests for individuals who apply under special parole programs such as:*

  ○ The Haitian Family Reunification Parole Program

  ○ The Cuban Family Reunification Parole Program

- The Central American Minor Refugee/Parole Program
- The Filipino World War II Veterans Parole Program
- International Entrepreneur Parole

↗ Close All    ↗ Open All

## Terminology    ^

The following terms are used on this page:

- **Petitioner**: The person completing the Form I-131, Application for Travel Document, on behalf of an individual outside the United States who is seeking parole (or re-parole as explained below). The term "self-petitioner" refers to an individual who files Form I-131, Application for Travel Document for him or herself.
- **Beneficiary**: A beneficiary is an individual, residing outside the United States (or a person seeking re-parole as explained below) who receives parole.
- **Sponsor**: A sponsor is an individual who agrees to provide financial support for the beneficiary of a parole application by filing Form I-134, Affidavit of Support (PDF, 463.53 KB).
- **Parolee**: A parolee is an individual who is paroled into the United States.

## What is Parole?    ^

USCIS uses its discretion to authorize parole. Parole allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period. The Immigration and Nationality Act (INA) allows the secretary of Homeland Security to use their discretion to parole any alien applying for admission into the United States temporarily for urgent humanitarian reasons or significant public benefit. (See INA section 212(d)(5)).

An individual who is paroled into the U.S. has not been formally admitted into the United States for purposes of immigration law.

Parole is not intended to be used solely to avoid normal visa processing procedures and timelines, to bypass inadmissibility waiver processing, or to replace established refugee processing channels.

**Length of Parole**

If authorized, we will specify the duration of parole for a temporary period of time to accomplish the purpose of the parole, as indicated in Part 3 of Form I-131, Application for Travel Document. For example, if parole is requested to attend a civil court proceeding between private parties, we may authorize parole for the period of time necessary to attend the proceedings. Parole is typically granted for no more than a year.

Parole ends on the date the parole period expires or when the beneficiary departs the United States or acquires an immigration status, whichever occurs first. In some cases, we may place conditions on

parole, such as reporting requirements. We may revoke parole at any time and without notice if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions of parole.

**Work Permits**

If not inconsistent with the purpose and duration of parole, we may, in our discretion, grant a parolee temporary employment authorization. The parolee may request employment authorization after being paroled into the United States by filing Form I-765, Application for Employment Authorization.

## Who Can Apply for Parole?   ⌃

Anyone may request parole for himself or herself, or on behalf of another individual, by filing Form I-131, Application for Travel Document. The petitioner is an individual or entity who is filing the Form I-131, Application for Travel Document, on behalf of an individual outside of the United States. The petitioner may also self-petition for parole. The petitioner does not have to be a resident of the United States or related to the beneficiary.

## The Need for a Sponsor   ⌃

One important factor we consider in determining whether to exercise discretion to authorize parole is whether the beneficiary will have a means of support while in the United States. We require evidence of a sponsor to provide financial support to the parolee in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole. We will take into account the Health and Human Services Federal poverty guidelines along with any special circumstances related to the beneficiary's need for care in assessing whether there are sufficient funds in place to adequately support the beneficiary once in the United States.

**Requirements for Sponsors**

The sponsor is the individual who agrees to provide financial support to the beneficiary while they are in the United States for the duration of the parole authorization period. The financial sponsor may or may not be the same person or entity as the petitioner. The sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB) for each parole request to establish whether they have enough financial resources to support the parolee during their stay in the United States, and if the funds are overseas, access to those funds for the parolee's stay in the United States.

Though there is no requirement regarding the sponsor's immigration status in the United States, a sponsor who has a more permanent status in the United States, such as lawful permanent residence or is a U.S. citizen, may more readily be able to establish the ability to support the parolee in the United States. Evidence of the sponsor's immigration status or citizenship in the United States may be relevant to the sponsor's ability to support the beneficiary. Therefore, the petitioner should generally include evidence of the sponsor's immigration status or citizenship in the United States, such as the sponsor's permanent residence card, naturalization certificate, birth certificate or passport with the parole request.

**It is important to read the** Form I-134 Instructions (PDF, 222.2 KB) **carefully for information about what kind of evidence is required to demonstrate sufficient income and financial resources.** Some examples of evidence that is helpful in demonstrating financial resources include pay stubs, last filed tax return or a letter from a sponsor's employer.

*Multiple Sponsors*

When determining a sponsor, the petitioner must take into account the Health and Human Services Federal poverty guidelines, and any special needs of the beneficiary. If the petitioner is unable to identify a sponsor who alone has sufficient means to support the beneficiary in the United States, the petitioner may indicate more than one sponsor if they have the means and agree to support the beneficiary while paroled in the United States. In this situation, the petitioner must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB), along with the proper supporting documentation, from each sponsor.

*Self-Sponsor*

A beneficiary may also demonstrate that he or she is financially self-sufficient by submitting a Form I-134, Affidavit of Support (PDF, 463.53 KB), with supporting financial documentation.

*Organization as a Sponsor*

Occasionally, a non-profit organization or medical institution may serve as a sponsor on a parole application. In those instances, if an employee of the organization cannot complete a Form I-134, Affidavit of Support (PDF, 463.53 KB), the petitioner should include with the parole application, a letter from the organization committing to support the beneficiary.

## Eligibility for Parole ⌄

A USCIS officer considers each request and the evidence provided on a case-by-case basis, taking into account all of the circumstances. (See Section 212(d)(5) of the INA.) The burden of proof is on the petitioner to establish that parole should be authorized. Parole will be authorized only if we conclude, based on all the evidence the petitioner submits and any other relevant evidence available to us, that

- There are urgent humanitarian or significant public benefit reasons for the beneficiary to be in the United States; and
- The beneficiary merits a favorable exercise of discretion.

**Urgent Humanitarian Reasons**

There is no statutory or regulatory definition of "urgent humanitarian reasons." USCIS officers look at all of the circumstances, taking into account factors such as (but not limited to):

- Whether or not the circumstances are pressing;
- The effect of the circumstances on the individual's welfare and wellbeing; and
- The degree of suffering that may result if parole is not authorized.

An applicant may demonstrate urgency by establishing a reason to be in the United States that calls for immediate or other time-sensitive action, including (but not limited to) critical medical treatment, or the need to visit, assist or support a family member who is at an end of life stage of an illness or disease.

The factors considered in determining urgent humanitarian reasons are dependent on the type of parole request. See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for more information on factors often considered in some of the more common types of requests.

**Significant Public Benefit**

There is no statutory or regulatory definition of "significant public benefit." Parole based on significant public benefit includes, but is not limited to, law enforcement and national security reasons or foreign or domestic policy considerations. USCIS officers look at all of the circumstances presented in the case.

While the beneficiary may personally benefit from the authorization of parole, the statutory standard focuses on the public benefit in extending parole. For example, a beneficiary's participation in legal proceedings may constitute a significant public benefit, because the opportunity for all relevant parties to participate in legal proceedings may be required for justice to be served.

There may be circumstances where a request is based on both urgent humanitarian reasons and significant public benefit reasons. For example, a person may be paroled if they have a request for medical care that involves experimental treatment or medical trials from which a larger community in the United States may benefit.

**Determining Who is Authorized Parole**

We exercise our discretion on a case-by-case basis, by evaluating positive factors in the record against any negative factors. Having an urgent humanitarian reason or a significant public benefit is a positive determining factor and it is evaluated against any negative factors present in a case. We evaluate the complete record.

Some common discretionary factors that we evaluate include (but are not limited to):

- Whether the purpose of the parole request may be accomplished within a specific, temporary period of time;
- Whether the beneficiary intends to leave the United States once their parole expires or has means to obtain lawful immigration status during the parole authorization period or any re-parole period that is envisioned (where applicable);
- Whether there is evidence of any national security concerns;
- Whether there is evidence of any criminal history or previous immigration violations;
- Whether there is evidence of any previous participation in fraud;
- Whether the beneficiary's presence would benefit a U.S. citizen or lawful permanent resident or community in the United States;
- Whether the beneficiary will have sufficient financial support while in the United States;
- Evidence of the beneficiary's character;

- The effect of the beneficiary's presence on a community in the United States; and
- Whether there are other means, other than parole, that are available to the beneficiary so they can travel to and remain in the United States for the stated parole purpose, such as the ability or inability to obtain a visa.

No one factor determines the outcome of the case. Each decision is based on all of the circumstances present in a case.

We may revoke parole at any time if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions on the parole.

## Parole Process ∧

**An overview of the parole process steps is as follows:**

*Step 1: Filing of Parole Request*

The petitioner files the following at the USCIS Lockbox in Dallas:

- Form I-131, Application for Travel Document
- Form I-134, Affidavit of Support (PDF, 463.53 KB)
- Supporting documentation
- The filing fee (or Form I-912, Request for Fee Waiver)

(See the **Requesting Parole** section below for more specific information)

The Lockbox sends the parole request to USCIS International and Refugee Affairs Division (USCIS-IRAD) in Washington, D.C.

*Step 2: USCIS Reviews the Request for Urgency (Triage)*

Within 2 business days of receiving the request, (usually two weeks after Lockbox filing), USCIS-IO reviews each request to confirm jurisdiction and determine whether it warrants expedited processing because of an urgent or time-sensitive reason. All requests are reviewed initially to determine urgency, regardless of whether the petitioner specifically requests expedited consideration.

*Step 3: USCIS Officer Makes a Decision*

A USCIS officer considers the request. This includes:

- Reviewing the request and all supporting documents;
- Conducting all mandatory security checks and vetting;
- Issuing a Request for Evidence (RFE) or Notice of Intent to Deny, if necessary;
- Documenting the basis for the decision; and
- Preparing the decision notice(s).

***Step 4: Supervisor Reviews the Decision***

A supervisor reviews all parole decisions before any decision is finalized.

***Step 5: USCIS Provides Notification of the Decision***

**If authorized:** We will mail an approval letter to the petitioner, the beneficiary and any representative of record. The letter provides notice of the decision and next steps for obtaining travel documents. We will also notify the U.S. Embassy or U.S. Consulate closest to the beneficiary's residence.

**If denied:** We will mail a denial letter to the petitioner, beneficiary, and any representative of record.

***Step 6: Issuance of Travel Documents and Parole into the United States (Approvals Only)***

If a request is authorized, the approval notice will inform the beneficiary that he or she must complete a Form DS-160, Application for a Nonimmigrant Visa, and appear for an appointment with the Department of State consular section to verify their identity and collect biometrics for additional security vetting. All beneficiaries 14 years and older must provide biometrics. If no derogatory information or new identity information is identified during vetting, the U. S. Consulate issues a document referred to as a boarding foil that allows the beneficiary to travel to the United States within 30 days of it being issued.  Issuance of a boarding foil does not guarantee parole but allows the beneficiary to proceed to Step 7 below.

***Step 7: Customs and Border Protection (CBP) Paroles into the United States (Approvals Only)***

A CBP officer inspects the beneficiary at the port of entry. If CBP paroles the beneficiary, CBP will issue the parolee an I-94, Arrival/Departure Record, documenting the length of their parole period. The parole period begins when CBP paroles the beneficiary at the port of entry. After arriving in the United States, the parolee may request employment Form I-765, Application for Employment Authorization.

**Requesting Parole**

To request parole you must:

- Complete a Form I-131, Application for Travel Document, and, for each parole beneficiary, include the filing fee or Form I-912, Request for Fee Waiver.

- Complete a Form I-134, Affidavit of Support (PDF, 463.53 KB), for each beneficiary to show how each beneficiary will be financially supported in the United States.

  - If there is more than one sponsor, each sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB).

- Include a detailed explanation, as well as supporting documentation, of the reasons parole is being requested for the beneficiary. (See the **Submitting Evidence** section below for more specific information.)

- If you are represented, you must include a completed Form G-28, Notice of Entry of Appearance as Attorney or Representative, for USCIS to communicate with your attorney or representative.

**Submitting Evidence**

The petitioner must show, through the parole request and supporting evidence, that the beneficiary qualifies for parole and merits a favorable exercise of discretion. Submitting all relevant supporting evidence will avoid delays. A USCIS officer may issue a Request for Evidence (RFE) to seek additional information. In addition to the Form I-131, Application for Travel Document, Form I-134, Affidavit of Support (PDF, 463.53 KB), and the filing fee or request for fee waiver, the petitioner should submit the following evidence to support their parole request:

- Detailed explanation of the reasons why the petitioner is requesting parole;

- Detailed explanation of the length of time for which the beneficiary needs parole;

- Detailed explanation of why the beneficiary cannot obtain a U.S. nonimmigrant or immigrant visa from the U.S. Department of State including:

  - When and where the beneficiary attempted to obtain visas, if applicable;

  - If a visa application was denied, include a copy of the denial letter; and

  - If applicable, a detailed explanation of the reasons why the beneficiary cannot obtain any required waiver of inadmissibility and a copy of any denial letter received.

- Copies of any previously filed immigrant petitions (Forms I-130, I-140, I-360, etc.) or nonimmigrant petitions filed by or for the beneficiary, if available;

- Copies of any documents that support the request, including a clear and legible copy of a government-issued identification that indicates the beneficiary's citizenship.

  - If a birth certificate is provided, please submit a copy of the front and back of the original birth certificate.

- Copies of a U.S. passport, lawful permanent resident card, birth certificate or other evidence of valid U.S. immigration status or citizenship for the petitioner and sponsor, where applicable.

- See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for information on what additional evidence may support specific types of parole requests.

**Requesting Parole for Children**

Depending on the circumstances, when parole is requested for a minor child (a child under the age of 18), we will require proof of parentage, and in addition may require the following types of evidence in the interest of protecting the child:

| Circumstance: | Type of evidence that may be requested: |
| --- | --- |
| Where the minor beneficiary is traveling with one parent and the other parent will remain outside the United States | Written authorization from the non-traveling parent for the minor to travel, to include:<br><br>- Permission from the non-traveling parent for the child to accompany the traveling parent;<br>- The duration of authorized travel; and<br>- If the parents of the child are divorced or separated, proof showing that the traveling parent has been awarded legal custody of the minor. |

| Circumstance: | Type of evidence that may be requested: |
|---|---|
| Where neither parent is traveling | Written authorization from both parents for the child to leave the country with an appointed guardian, to include:<br><br>• The duration of travel and<br>• Proof of legal guardianship issued by a government authority. |
| Where the parent or parents' consent cannot be obtained | • Written explanation from the petitioner or beneficiary explaining efforts to locate the parent; or<br><br>• The circumstances surrounding their unavailability; and<br><br>• Evidence of guardianship for the person who is accompanying the child on travel or receiving the child once he or she arrives. |

**Submitting a Request for Parole**

USCIS Dallas Lockbox
For U.S. Postal Service (USPS) Deliveries:
USCIS
P.O. Box 660865
Dallas, TX 75266

For Express Mail and courier deliveries:
USCIS
Attn: HP
2501 S. State Hwy 121, Business
Suite 400
Lewisville, TX 75067

Please see the I-131, Application for Travel Document website for instructions on submitting requests.

**Length of Parole Consideration Process**

While processing time varies according to case complexity and how thorough the supporting documentation is in the initial filing, we strive to complete requests for parole for applicants outside the United States (or seeking re-parole as explained below) within 3 months. Please see our processing times website for current processing times. To avoid delays in processing, **it is critical that applicants include all relevant supporting evidence at the time of application and in response to any request for evidence (RFE)**.

**Expedited Processing**

To request expedited processing, the petitioner should:

- Follow the guidance on the Form I-131 instructions (PDF, 284.74 KB).

- Write the word EXPEDITE in the top right corner of the application in black ink.

- Provide an email address, phone number, and fax number for the petitioner or representative with any expedite request.

- Include a detailed explanation of the reason for the expedite request along with any available supporting evidence.

  - Generally, all requests for parole are based on urgent needs; therefore, the petitioner must demonstrate significant reasons for expediting the request, such as a life threatening or other extremely urgent situation.

**If Parole is Denied**

The petitioner cannot appeal the denial of parole, as the grant of parole confers no substantive right or immigration status. However, if there are significant new facts that are relevant to the application for parole, the petitioner may file a new Form I-131, Application for Travel Document, packet with fee or request for fee waiver. There is no limit to the number of Forms I-131, Application for Travel Document a person may file.

## Travel for Parolees ⌃

### Leaving the United States

A parole document provided to an individual outside the United States is valid to be presented only once for parole at the port of entry. If the petitioner leaves the United States, their parole will end once the petitioner departs. If the petitioner wishes to travel abroad and then return to the United States as a parolee, they may file a separate application on a new Form I-131 for advance parole before traveling abroad. For information on how to apply for advance parole while in the United States, please see Form I-131 instructions (PDF, 284.74 KB). The petitioner may also apply for a visa or again request parole from outside of the United States in order to return.

## Re-Parole ⌃

Parole ends on the date the parole period expires, is revoked, or when the parolee departs the United States or obtains an immigration status, whichever happens first. Although parole is temporary in nature, in some instances, a beneficiary may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States.

The petitioner may request re-parole by:

- Filing a new Form I-131, Application for Travel Document;



- Checking box 1.e or 1.f in Part 2 of the form; and
- Writing "re-parole" across the top of the application.

In addition to required fees or request for fee waiver, the submission should include materials and evidence to support re-parole, including explaining and providing supporting documents on the need for an additional authorized parole period.

The request should be filed at least 90 days in advance of the expiration of the authorized parole period to allow for sufficient processing time and to avoid the potential for accruing time in unlawful status.

---

## Related Links ∧

- [Memorandum Of Agreement between CBP, ICE and USCIS regarding Parole Authority (PDF)](#)

**Forms**

- [I-134, Affidavit of Support](#)
- [I-765, Application for Employment Authorization](#)
- [I-131, Application for Travel Document](#)

---

⤢ Close All   ⤢ Open All

Last Reviewed/Updated: 03/31/2021

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § § § | |
| THE STATE OF MISSOURI, | § § | |
| Plaintiffs, | § § | Case No. 2:21-cv-00067-Z |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

2.2.2021 DHS letter to Texas

# EXHIBIT B-6

Secretary



**U.S. Department of Homeland Security**
Washington, DC 20528

February 2, 2021

Ken Paxton
Attorney General
State of Texas
300 West 15th Street
Austin, Texas  78711

Dear Attorney General Paxton:

I am writing in response to your letter to me of January 21, 2021 alleging that the
Department of Homeland Security (DHS) has violated a purported "Agreement" (Document)
with the State of Texas.

As you are fully aware, the State of Texas has initiated a lawsuit against DHS seeking to
enjoin, on the basis of that Document, the Department's lawful exercise of its authority.  *Texas v.
United States*, No. 6:21-cv-00003, Complaint, ECF No. 1 (S.D. Tex. filed Jan. 22, 2021).  The
Document that you reference in your letter is void, not binding, and unenforceable, as explained
in the Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs'
Application for a Temporary Restraining Order, ECF No. 8 (filed Jan. 24, 2021).

Notwithstanding that the Document is void, not binding, and unenforceable—and
preserving all rights, authorities, remedies, and defenses under the law—this letter also provides
notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and
Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS), that
DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective
immediately.  DHS will continue to comply with applicable executive orders, statutes,
regulations, and court orders.

Please direct any further correspondence concerning the Document to the
Department of Justice.

Sincerely,

David P. Pekoske
Acting Secretary

**COPIES OF NOTICE TO:**

Brian M. Boynton
Acting Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Greg Abbott, Governor of Texas
1100 San Jacinto Boulevard, 4th Floor
Austin, TX  78701

Department of Homeland Security
c/o Joseph B. Maher, Acting General Counsel
Washington, D.C. 20528

U.S. Customs and Border Protection
c/o Troy Miller, Acting Commissioner
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
c/o Tae Johnson, Acting Director
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
c/o Tracy Renaud, Acting Director
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746

AR02263

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

DPS Texas Criminal Illegal Alien Data

# EXHIBIT B-7

Home   >   Crime Records Service   >   Texas Criminal Illegal Alien Data

# Texas Criminal Illegal Alien Data

The Department of Public Safety and local law enforcement agencies in Texas participate in the Department of Homeland Security's (DHS) Priority Enforcement Program (PEP). Participation in PEP enables DHS to work with state and local law enforcement to take custody of individuals who pose a danger to public safety before those individuals are released into our communities. In Texas, PEP begins at the local level when an individual is arrested and booked by a Texas law enforcement officer for a criminal violation of Texas law. The arrested individual's fingerprints are submitted to the Texas DPS and subsequently to the FBI for criminal history and warrant checks. This same biometric data is also sent to DHS' IDENT database so that ICE can determine the person's immigration status and whether the individual is a priority for removal, consistent with the DHS enforcement priorities. The immigration status information is returned to DPS by DHS. The following report is based upon the status indicators provided to the DPS. For the purposes of this report, the term "criminal alien" refers to an individual who has been identified as an alien by DHS and who has been arrested for a state criminal offense, typically a Misdemeanor B or higher, committed in Texas.

## Lawful Presence Determined Through PEP

According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS.

Between June 1, 2011 and January 31, 2021, these 228,000 illegal aliens were charged with more than 368,000 criminal offenses which included arrests for 681 homicide charges; 42,698 assault charges; 6,950 burglary charges; 45,557 drug charges; 590 kidnapping charges; 18,662 theft charges; 28,892 obstructing police charges; 2,050 robbery charges; 4,505 sexual assault charges; 5,651 sexual offense charges; and 3,871 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 143,000 convictions including 300 homicide convictions; 16,864 assault convictions; 3,707 burglary convictions; 20,763 drug convictions; 223 kidnapping convictions; 8,000 theft convictions; 13,012 obstructing police convictions; 1,217 robbery convictions; 2,146 sexual assault convictions; 2,749 sexual offense convictions; and 1,527 weapon convictions.



Enlarge chart

These figures only count individuals who previously had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database. Foreign nationals who enter the country illegally and avoid detection by DHS, but are later arrested by local or state law enforcement for a state offense will not have a DHS response in regard to their lawful status and do not appear in these counts. However, in addition to the PEP program, DHS actively adjudicates the immigration status of individuals incarcerated in the Texas prison system. From 2011 to date, the Department of Criminal Justice (TDCJ) has provided DPS with information on more than 29,000 individuals who were identified by DHS as in the country illegally while they were

## Crime Records Service Menu

CRS Home

Overview

FAQs

Criminal History Reporting

Fingerprinting Services

Texas Data Exchange (TDEx)

Texas Transnational Intelligence Center (TTIC)

CRS Related Links

Misuse of Identity

Uniform Crime Reporting Program (UCR)

ViCAP - Violent Criminal Apprehension Program

Contact Crime Records Service

Criminal History Search

Sex Offender Search

Back to Crime Records Home >

incarcerated at TDCJ. 10,450 of these individuals were not identified through the PEP program at the time of their arrest. DPS does not know the current incarceration status of the individuals identified while they were incarcerated nor when their alien status was initially determined.

### Lawful Presence Determined While Incarcerated at TDCJ

Between June 1, 2011 and January 31, 2021, these 10,450 individual identified as illegal aliens while in prison, but who were not previously identified through PEP, were charged with more than 7,000 criminal offenses which included arrests for 100 homicide charges; 979 assault charges; 529 burglary charges; 1,455 drug charges; 36 kidnapping charges; 364 theft charges; 741 obstructing police charges; 301 robbery charges; 632 sexual assault charges; 282 sexual offense charges; and 173 weapon charges.  DPS criminal history records reflect those criminal charges have thus far resulted in over 4,000 convictions including 76 homicide convictions; 589 assault convictions; 344 burglary convictions; 847 drug convictions; 21 kidnapping convictions; 200 theft convictions; 323 obstructing police convictions; 231 robbery convictions; 448 sexual assault convictions; 210 sexual offense convictions; and 79 weapon convictions.



Enlarge chart

Because DPS does not know the date these individuals were identified as illegal while in prison, the count of charges for which this population was arrested between June 1, 2011 and January 31, 2021 does not necessarily align with the size of the population of illegal aliens identified while in prison. A more accurate assessment can be seen when examining this population's entire Texas criminal history and not just for offenses committed during this time period (see the Historical Data section of this report). However, for this report, in order to be consistent with the timeframe utilized to provide counts of arrest and conviction for the population identified through PEP, we have limited the arrest and conviction counts for prison identified illegal aliens to the same June 1, 2011 to January 31, 2020 time frame used for individuals identified through PEP.

### Report Notes

These figures do not attempt to allege that foreign nationals in the country illegally commit more crimes than other groups. It simply identifies thousands of crimes that should not have occurred and thousands of victims that should not have been victimized because the perpetrator should not be here. It is also important to note that these figures represent the minimum number of crimes associated with criminal illegal aliens:

- These figures only count arrests in Texas for state offenses.  These individuals may have criminal records in other states.
- These figures only represent offenses and convictions that are associated with arrest events that occurred between June 1, 2011 and January 31, 2021.
- The criminal activity for individuals identified as illegal while in prison is under represented for this time period because they may have been incarcerated during the time frame used in this report.
- These figures do not count federal criminal charges.
- These figures do not include similar data for foreign nationals who are lawfully in the country and commit state criminal offenses.
- Individuals whose lawful presence was determined while in prison may or may not be currently incarcerated.

AR02266

# Historical Data

Because individuals identified as being illegally present in the country may have had a Texas criminal history prior to their immigration status being known to law enforcement, DPS has traditionally published criminal history data for an alien's entire criminal history.

**Lawful Presence Determined Through PEP**

According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS.

Over the course of their entire Texas criminal careers, these 228,000 illegal aliens were charged with more than 555,000 criminal offenses which included arrests for 1,210 homicide charges; 64,323 assault charges; 17,037 burglary charges; 70,506 drug charges; 912 kidnapping charges; 32,700 theft charges; 47,931 obstructing police charges; 4,070 robbery charges; 6,804 sexual assault charges; 8,051 sexual offense charges; and 7,995 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 247,000 convictions including 556 homicide convictions; 26,896 assault convictions; 8,723 burglary convictions; 35,242 drug convictions; 343 kidnapping convictions; 15,130 theft convictions; 23,282 obstructing police convictions; 2,235 robbery convictions; 3,484 sexual assault convictions; 4,223 sexual offense convictions; and 3,441 weapon convictions.



Enlarge chart

**Lawful Presence Determined While Incarcerated at TDCJ**

From 2011 to date, the Department of Criminal Justice (TDCJ) has provided DPS with information on more than 29,000 individuals who were identified by DHS as in the country illegally while they were incarcerated at TDCJ. 10,450 of these individuals were not identified through the PEP program at the time of their arrest. DPS does not know the current incarceration status of the individuals identified while they were incarcerated nor when their alien status was initially determined. Over the course of their entire Texas criminal careers, these 10,450 individual identified as illegal aliens while in prison, were charged with more than 47,000 criminal offenses which included arrests for 1,930 homicide charges; 5,643 assault charges; 3,588 burglary charges; 6,763 drug charges; 341 kidnapping charges; 2,695 theft charges; 3,697 obstructing police charges; 2,424 robbery charges; 2,985 sexual assault charges; 1,151 sexual offense charges; and 1,563 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 25,000 convictions including 1,150 homicide convictions; 2,870 assault convictions; 1,961 burglary convictions; 3,964 drug convictions; 152 kidnapping convictions; 1,275 theft convictions; 1,664 obstructing police convictions; 1,636 robbery convictions; 1,923 sexual assault convictions; 718 sexual offense convictions; and 616 weapon convictions.

AR02267



Enlarge chart

---

## Follow DPS

## Keep Texas Safe

Report Suspicious Activity

## Policies

Site Policies

Accessibility

The Governor's Committee on
People with Disabilities

Statement on Telemarketing

Texas Fusion Center Privacy
Policy

Public Information Act

## Texas Sites

Texas Homeland Security

Texas Veterans Portal

Texas State Library & Archives

Public Safety Commission

texas.gov

## Feedback

Customer Feedback

Report Fraud, Waste, or Abuse

Complaints & Compliments

## Helpful Links

Outlook Web Access

CAPPS Login

ERR Entry

Compact with Texans

© 2021 Texas Department of Public Safety. PDF files require Adobe Reader or compatible.



**Arrest and Conviction Data for Select Offenses Associated with Illegal Criminal Aliens**

Identified by DHS through Texas arrests from 6/1/2011 through 01/31/2021

| Offense | Arrests | Convictions |
|---|---|---|
| Weapons | 3,871 | 1,527 |
| Sexual Offense | 5,651 | 2,749 |
| Sexual Assault | 4,505 | 2,146 |
| Robbery | 2,050 | 1,217 |
| Obstructing Police | 28,892 | 13,012 |
| Theft | 18,662 | 8,000 |
| Kidnapping | 590 | 223 |
| Drugs | 45,557 | 20,763 |
| Burglary | 6,950 | 3,707 |
| Assault | 42,698 | 16,864 |
| Homicide | 681 | 300 |
| All Other Offenses | 208,528 | 73,223 |

AR02269



Arrest and Conviction Data for Select Offenses Associated with Incarcerated Illegal Criminal Aliens
Identified by DHS through Texas arrests from 6/1/2011 through 01/31/2021

| Offense | Arrests | Convictions |
|---|---|---|
| Weapons | 173 | 79 |
| Sexual Offense | 282 | 210 |
| Sexual Assault | 632 | 447 |
| Robbery | 301 | 232 |
| Obstructing Police | 741 | 324 |
| Theft | 364 | 199 |
| Kidnapping | 36 | 21 |
| Drugs | 1,455 | 843 |
| Burglary | 529 | 345 |
| Assault | 979 | 585 |
| Homicide | 100 | 76 |
| All Other Offenses | 2,170 | 1,088 |



**Historical Arrest and Conviction Data for Select Offenses Associated with Illegal Criminal Aliens**

Identified by DHS through Texas arrests

| Offense | Arrests | Convictions |
|---|---|---|
| Weapons | 7,995 | 3,441 |
| Sexual Offense | 8,051 | 4,223 |
| Sexual Assault | 6,804 | 3,484 |
| Robbery | 4,070 | 2,235 |
| Obstructing Police | 47,931 | 23,282 |
| Theft | 32,700 | 15,130 |
| Kidnapping | 912 | 343 |
| Drugs | 70,506 | 35,242 |
| Burglary | 17,037 | 8,723 |
| Assault | 64,323 | 26,896 |
| Homicide | 1,210 | 556 |
| All Other Offenses | 294,295 | 123,867 |



### Historical Arrest and Conviction Data for Select Offenses Associated with Incarcerated Illegal Criminal Aliens

#### Identified by DHS through Texas arrests

| Offense | Arrests | Convictions |
| --- | --- | --- |
| Weapons | 1,563 | 616 |
| Sexual Offense | 1,151 | 718 |
| Sexual Assault | 2,985 | 1,923 |
| Robbery | 2,424 | 1,636 |
| Obstructing Police | 3,697 | 1,664 |
| Theft | 2,695 | 1,275 |
| Kidnapping | 341 | 152 |
| Drugs | 6,763 | 3,964 |
| Burglary | 3,588 | 1,961 |
| Assault | 5,643 | 2,870 |
| Homicide | 1,930 | 1,150 |
| All Other Offenses | 14,570 | 7,905 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

U.S. Census Bureau Table – Geographic Mobility by Citizenship Status

# EXHIBIT B-8

| Label | Texas | | Moved; within same county | |
| | Total | | | |
| | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| Population 1 year and over | 28,642,658 | ±11,223 | 8.5% | ±0.2 |
| AGE | | | | |
| 1 to 4 years | 1,628,532 | ±13,105 | 11.6% | ±0.7 |
| 5 to 17 years | 5,414,876 | ±7,620 | 8.3% | ±0.3 |
| 18 to 24 years | 2,826,700 | ±9,587 | 12.9% | ±0.5 |
| 25 to 34 years | 4,242,661 | ±12,557 | 13.9% | ±0.4 |
| 35 to 44 years | 3,959,419 | ±12,322 | 8.4% | ±0.3 |
| 45 to 54 years | 3,556,845 | ±10,636 | 6.0% | ±0.3 |
| 55 to 64 years | 3,274,898 | ±6,891 | 4.6% | ±0.2 |
| 65 to 74 years | 2,259,341 | ±7,279 | 3.3% | ±0.3 |
| 75 years and over | 1,479,386 | ±5,575 | 3.9% | ±0.3 |
| Median age (years) | 35.5 | ±0.1 | 28.0 | ±0.3 |
| SEX | | | | |
| Male | 14,205,551 | ±12,331 | 8.4% | ±0.2 |
| Female | 14,437,107 | ±12,058 | 8.5% | ±0.2 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 27,831,753 | ±29,803 | 8.4% | ±0.2 |
| White | 21,031,553 | ±47,146 | 7.9% | ±0.2 |
| Black or African American | 3,506,078 | ±23,226 | 11.1% | ±0.5 |
| American Indian and Alaska Native | 144,038 | ±8,743 | 9.3% | ±1.9 |
| Asian | 1,431,296 | ±11,251 | 7.1% | ±0.6 |
| Native Hawaiian and Other Pacific Islander | 26,595 | ±3,972 | 11.7% | ±7.3 |
| Some other race | 1,692,193 | ±44,598 | 9.4% | ±0.9 |
| Two or more races | 810,905 | ±27,487 | 10.7% | ±1.1 |

| Label | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error |
| Population 1 year and over | 3.8% | ±0.1 | 2.0% | ±0.1 |
| AGE | | | | |
| 1 to 4 years | 4.0% | ±0.4 | 2.3% | ±0.3 |
| 5 to 17 years | 2.6% | ±0.2 | 1.5% | ±0.1 |
| 18 to 24 years | 8.3% | ±0.4 | 3.5% | ±0.2 |
| 25 to 34 years | 6.5% | ±0.3 | 3.3% | ±0.2 |
| 35 to 44 years | 3.6% | ±0.2 | 2.0% | ±0.2 |
| 45 to 54 years | 2.9% | ±0.2 | 1.4% | ±0.1 |
| 55 to 64 years | 2.2% | ±0.2 | 1.1% | ±0.1 |
| 65 to 74 years | 1.7% | ±0.2 | 1.0% | ±0.1 |
| 75 years and over | 1.7% | ±0.2 | 0.8% | ±0.1 |
| Median age (years) | 28.1 | ±0.4 | 28.8 | ±0.5 |
| SEX | | | | |
| Male | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Female | 3.7% | ±0.1 | 1.9% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 3.8% | ±0.1 | 1.9% | ±0.1 |
| White | 3.7% | ±0.1 | 1.7% | ±0.1 |
| Black or African American | 4.5% | ±0.3 | 2.4% | ±0.3 |
| American Indian and Alaska Native | 4.9% | ±1.7 | 2.7% | ±0.8 |
| Asian | 3.6% | ±0.5 | 3.7% | ±0.5 |
| Native Hawaiian and Other Pacific Islander | 3.2% | ±2.0 | 9.4% | ±8.3 |
| Some other race | 3.0% | ±0.4 | 0.9% | ±0.2 |
| Two or more races | 5.1% | ±0.6 | 3.9% | ±0.7 |

| | Moved; from abroad | |
|---|---|---|
| Label | Estimate | Margin of Error |
| Population 1 year and over | 0.8% | ±0.1 |
| AGE | | |
| 1 to 4 years | 1.0% | ±0.2 |
| 5 to 17 years | 0.7% | ±0.1 |
| 18 to 24 years | 1.2% | ±0.1 |
| 25 to 34 years | 1.3% | ±0.1 |
| 35 to 44 years | 0.8% | ±0.1 |
| 45 to 54 years | 0.5% | ±0.1 |
| 55 to 64 years | 0.4% | ±0.1 |
| 65 to 74 years | 0.4% | ±0.1 |
| 75 years and over | 0.3% | ±0.1 |
| Median age (years) | 27.9 | ±1.1 |
| SEX | | |
| Male | 0.8% | ±0.1 |
| Female | 0.7% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | |
| One race | 0.8% | ±0.1 |
| White | 0.6% | ±0.1 |
| Black or African American | 0.4% | ±0.1 |
| American Indian and Alaska Native | 1.1% | ±0.6 |
| Asian | 2.9% | ±0.4 |
| Native Hawaiian and Other Pacific Islander | 1.0% | ±1.4 |
| Some other race | 1.8% | ±0.4 |
| Two or more races | 0.7% | ±0.2 |

| Label | Texas | | | |
| | Total | | Moved; within same county | |
| | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| Hispanic or Latino origin (of any race) | 11,363,374 | ±7,932 | 8.8% | ±0.3 |
| White alone, not Hispanic or Latino | 11,816,132 | ±8,528 | 7.5% | ±0.2 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 23,694,288 | ±55,093 | 8.6% | ±0.2 |
| Foreign born | 4,948,370 | ±52,930 | 7.7% | ±0.4 |
| Naturalized U.S. citizen | 1,958,749 | ±30,459 | 5.2% | ±0.5 |
| Not a U.S. citizen | 2,989,621 | ±47,047 | 9.4% | ±0.5 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| Never married | 7,715,686 | ±41,287 | 11.1% | ±0.3 |
| Now married, except separated | 11,041,301 | ±50,997 | 6.0% | ±0.2 |
| Divorced or separated | 2,938,935 | ±31,574 | 10.0% | ±0.4 |
| Widowed | 1,138,032 | ±21,081 | 5.4% | ±0.4 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 18,772,550 | ±10,843 | 7.5% | ±0.2 |
| Less than high school graduate | 2,882,388 | ±33,539 | 7.3% | ±0.4 |
| High school graduate (includes equivalency) | 4,734,422 | ±47,856 | 7.6% | ±0.3 |
| Some college or associate's degree | 5,379,207 | ±41,497 | 7.8% | ±0.3 |
| Bachelor's degree | 3,750,797 | ±35,494 | 7.6% | ±0.3 |
| Graduate or professional degree | 2,025,736 | ±29,709 | 7.1% | ±0.4 |

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 2.9% | ±0.1 | 1.0% | ±0.1 |
| White alone, not Hispanic or Latino | 4.6% | ±0.2 | 2.4% | ±0.1 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 4.1% | ±0.1 | 2.0% | ±0.1 |
| Foreign born | 2.4% | ±0.2 | 1.8% | ±0.2 |
| Naturalized U.S. citizen | 2.4% | ±0.2 | 1.6% | ±0.2 |
| Not a U.S. citizen | 2.5% | ±0.3 | 1.8% | ±0.2 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Never married | 5.7% | ±0.2 | 2.5% | ±0.1 |
| Now married, except separated | 2.8% | ±0.1 | 1.8% | ±0.1 |
| Divorced or separated | 4.6% | ±0.2 | 1.7% | ±0.2 |
| Widowed | 2.4% | ±0.3 | 1.1% | ±0.2 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 3.5% | ±0.1 | 1.8% | ±0.1 |
| Less than high school graduate | 2.6% | ±0.2 | 0.7% | ±0.1 |
| High school graduate (includes equivalency) | 3.4% | ±0.2 | 1.2% | ±0.1 |
| Some college or associate's degree | 3.9% | ±0.2 | 1.9% | ±0.1 |
| Bachelor's degree | 3.7% | ±0.2 | 2.7% | ±0.2 |
| Graduate or professional degree | 3.6% | ±0.3 | 3.0% | ±0.3 |

| | Moved; from abroad | |
|---|---|---|
| Label | Estimate | Margin of Error |
|    Hispanic or Latino origin (of any race) | 1.0% | ±0.1 |
|    White alone, not Hispanic or Latino | 0.4% | ±0.1 |
|  NATIVITY AND CITIZENSHIP STATUS | | |
|    Native | 0.3% | ±0.1 |
|    Foreign born | 3.1% | ±0.3 |
|     Naturalized U.S. citizen | 0.6% | ±0.2 |
|     Not a U.S. citizen | 4.7% | ±0.4 |
| MARITAL STATUS | | |
|  Population 15 years and over | 0.8% | ±0.1 |
|   Never married | 1.0% | ±0.1 |
|   Now married, except separated | 0.7% | ±0.1 |
|   Divorced or separated | 0.4% | ±0.1 |
|   Widowed | 0.4% | ±0.1 |
| EDUCATIONAL ATTAINMENT | | |
|  Population 25 years and over | 0.7% | ±0.1 |
|   Less than high school graduate | 1.1% | ±0.2 |
|   High school graduate (includes equivalency) | 0.5% | ±0.1 |
|   Some college or associate's degree | 0.4% | ±0.1 |
|   Bachelor's degree | 0.9% | ±0.1 |
|   Graduate or professional degree | 1.0% | ±0.2 |

| | Texas | | | |
| --- | --- | --- | --- | --- |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| $1 to $9,999 or loss | 3,203,558 | ±32,025 | 8.7% | ±0.3 |
| $10,00 to $14,999 | 1,713,105 | ±26,543 | 8.7% | ±0.5 |
| $15,000 to $24,999 | 2,959,404 | ±29,675 | 9.3% | ±0.4 |
| $25,000 to $34,999 | 2,407,403 | ±28,262 | 9.4% | ±0.4 |
| $35,000 to $49,999 | 2,631,883 | ±32,926 | 8.5% | ±0.3 |
| $50,000 to $64,999 | 2,041,160 | ±33,830 | 8.6% | ±0.4 |
| $65,000 to $74,999 | 861,911 | ±18,513 | 7.5% | ±0.6 |
| $75,000 or more | 3,355,247 | ±36,009 | 6.4% | ±0.3 |
| Median income (dollars) | 31,505 | ±139 | 29,297 | ±918 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 28,016,731 | ±12,536 | 8.3% | ±0.2 |
| Below 100 percent of the poverty level | 3,790,948 | ±67,495 | 12.6% | ±0.6 |
| 100 to 149 percent of the poverty level | 2,623,138 | ±67,036 | 9.9% | ±0.8 |
| At or above 150 percent of the poverty level | 21,602,645 | ±94,258 | 7.4% | ±0.2 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 28,041,965 | ±11,223 | 8.3% | ±0.2 |

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| $1 to $9,999 or loss | 5.3% | ±0.3 | 2.1% | ±0.2 |
| $10,000 to $14,999 | 3.8% | ±0.3 | 1.9% | ±0.2 |
| $15,000 to $24,999 | 3.6% | ±0.2 | 2.1% | ±0.2 |
| $25,000 to $34,999 | 3.7% | ±0.2 | 1.8% | ±0.2 |
| $35,000 to $49,999 | 3.7% | ±0.2 | 2.0% | ±0.2 |
| $50,000 to $64,999 | 4.1% | ±0.3 | 1.9% | ±0.2 |
| $65,000 to $74,999 | 3.8% | ±0.5 | 2.2% | ±0.4 |
| $75,000 or more | 3.1% | ±0.2 | 2.2% | ±0.2 |
| Median income (dollars) | 28,266 | ±1,439 | 31,784 | ±946 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 3.4% | ±0.1 | 1.9% | ±0.1 |
| Below 100 percent of the poverty level | 4.4% | ±0.3 | 1.8% | ±0.2 |
| 100 to 149 percent of the poverty level | 3.1% | ±0.4 | 1.7% | ±0.3 |
| At or above 150 percent of the poverty level | 3.3% | ±0.1 | 1.9% | ±0.1 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 3.4% | ±0.1 | 1.9% | ±0.1 |

|  |  Moved; from abroad | |
| --- | --- | --- |
| Label | Estimate | Margin of Error |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) |  |  |
| Population 15 years and over | 0.8% | ±0.1 |
| $1 to $9,999 or loss | 1.2% | ±0.2 |
| $10,000 to $14,999 | 0.5% | ±0.1 |
| $15,000 to $24,999 | 0.7% | ±0.2 |
| $25,000 to $34,999 | 0.4% | ±0.1 |
| $35,000 to $49,999 | 0.4% | ±0.1 |
| $50,000 to $64,999 | 0.3% | ±0.1 |
| $65,000 to $74,999 | 0.3% | ±0.1 |
| $75,000 or more | 0.4% | ±0.1 |
| Median income (dollars) | 19,924 | ±2,317 |
| POVERTY STATUS IN THE PAST 12 MONTHS |  |  |
| Population 1 year and over for whom poverty status is determined | 0.7% | ±0.1 |
| Below 100 percent of the poverty level | 1.6% | ±0.3 |
| 100 to 149 percent of the poverty level | 0.7% | ±0.2 |
| At or above 150 percent of the poverty level | 0.6% | ±0.1 |
| HOUSING TENURE |  |  |
| Population 1 year and over in housing units | 0.7% | ±0.1 |

| | Texas | | | |
| --- | --- | --- | --- | --- |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 18,304,178 | ±101,137 | 4.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 9,737,787 | ±101,070 | 16.3% | ±0.4 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | 7.8% | (X) | (X) | (X) |

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 2.1% | ±0.1 | 1.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 5.8% | ±0.2 | 3.2% | ±0.2 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | (X) | (X) | (X) | (X) |

| | Moved; from abroad | |
|---|---|---|
| Label | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 0.3% | ±0.1 |
| Householder lived in renter-occupied housing units | 1.5% | ±0.1 |
| PERCENT ALLOCATED | | |
| Residence 1 year ago | (X) | (X) |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

Foreign-Born Population in Texas

# EXHIBIT B-9



# THE FOREIGN-BORN POPULATION IN TEXAS: SOURCES OF GROWTH

Based on the size and composition of its foreign-born population, Texas is more international than at any time since its statehood in 1845. By 2013, more than one of every 10 foreign-born persons in the United States resided in Texas. Presently, about one out of six Texas residents was born in a foreign country. In this brief, we examine the sources of growth for the foreign-born population in Texas and discuss the implications of this trend for the State. Using U.S. Census Bureau data, we show that slightly more than half of the 2012-2013 net migration to Texas was by foreign-born persons and that domestic migration accounts for almost 40 percent of the growth in the State's foreign-born population[1].

## Background

International in-migrants are persons who move to the United States from abroad. The American Community Survey (ACS) asks respondents where they lived one year ago. If they lived abroad one year ago, they are considered to be recent international in-migrants. In this context, international in-migrants represent the annual inflow of persons from other countries into the United States.

**Included in this Brief:**

- Texas is experiencing strong growth in its foreign-born population.

- Both international and domestic migration are fueling the growth of the foreign-born population in Texas.

- The growth of the foreign-born population is making the Texas population more international than at any time since it became a state.

Authors :

Steve White

Lloyd B. Potter, Ph.D.

Helen You, Ph.D.

Lila Valencia, Ph.D.

Jeffrey A. Jordan , Ph.D.

Beverly Pecotte

The Office of the State Demographer is responsible for interpreting and communicating information on demographic and socioeconomic issues for the State of Texas to the public and the legislature.

**October 2015**

### Census Terminology

*Foreign-Born*
The foreign-born population includes anyone who is not a U.S. citizen at birth.

*In-Migrant*
A person entering a specified area by crossing its boundary from some point outside the area.

*Native-Born*
Anyone born in the United States, Puerto Rico, or a U.S. Island Area, or those born abroad of at least one U.S. citizen parent.

*Immigrant*
Admitted for lawful permanent residence in the United States.

*International Migrant*
A person who changes his or her usual place of residence from one country to another.

*Domestic Migration*
Domestic migration is the movement of people within the United States.

*Net Migration*
Net migration for a given geographic area is the difference between in-migration and out-migration during a specified time frame.

*Sources: Schmidley and Gibson 1999; Grieco et al 2012; Perry 2006; U.S. Census 1992*

By contrast, the foreign-born population includes all persons who were not U.S. citizens at birth. As such, the foreign-born population in the United States represents all non-native international migrants regardless of when they arrived in the United States or their immigration status. Consequently, while international in-migrants represent a flow phenomenon, the foreign-born population is a stock or resident phenomenon that results from this flow.

**Historical Trends in Texas Nativity**

Both the size and the share of the foreign-born population in Texas are greater than at any time since statehood in 1845. In Table 1, we find that 8.3 percent of Texas residents were foreign-born in 1850. After declining to 2.8 percent in 1970, the share of the foreign-born population in Texas increased to 16.4 percent in 2010.

Table 1: Number and Percent of Texas Residents by Nativity, Selected Years

| Year | Native-Born Residents | | Foreign-Born Residents | | Total Residents | |
|------|--------|---------|--------|---------|--------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 1850 | 194,911 | 91.7% | 17,681 | 8.3% | 212,592 | 100.0% |
| 1900 | 2,869,353 | 94.1% | 179,357 | 5.9% | 3,048,710 | 100.0% |
| 1960 | 9,282,717 | 96.9% | 298,791 | 3.1% | 9,581,508 | 100.0% |
| 1970 | 10,885,644 | 97.2% | 309,772 | 2.8% | 11,195,416 | 100.0% |
| 1980 | 13,372,978 | 94.0% | 856,213 | 6.0% | 14,229,191 | 100.0% |
| 1990 | 15,462,074 | 91.0% | 1,524,436 | 9.0% | 16,986,510 | 100.0% |
| 2000 | 17,952,178 | 86.1% | 2,899,642 | 13.9% | 20,851,820 | 100.0% |
| 2010 | 21,115,083 | 83.6% | 4,142,031 | 16.4% | 25,257,114 | 100.0% |

*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

**Figure 1:** Texas Population Size by Nativity, 1850-2010



*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

Table 1 and Figure 1 show that as recently as the last decades of the twentieth century, the growth of the foreign-born population in Texas was slight and gradual. For example, from 1900 to 1970, the state's foreign-born population increased by 130,415 or by less than 2,000 persons per year. From 1970 to 2010, the number of foreign-born Texans increased by 3,832,259 which is almost 96,000 persons per year.

In Figure 2, we see the Texas share of the U.S. population has increased every decade since 1850. Until 1990, the state's share of the U.S. native

-born population was greater than its share of the U.S. foreign-born population. Beginning in 1990, Texas' share of the U.S. foreign-born population has exceeded its share of the U.S. native-born population.

*SINCE 1990, TEXAS FOREIGN-BORN POPULATION HAS GROWN MORE RAPIDLY THAN THE NATIVE-BORN POPULATION.*

From 1990 until the present, the Texas share of the U.S. foreign-born population has increased so that by 2010, Texas had 7.8 percent of the U.S. native-born population and 10.4 percent of

**Figure 2:** Texas Percentage of the U.S. Population by Nativity, 1850-2010



■ Texas Foreign-Born Population as a Percent of U.S. Foreign-Born Population
■ Texas Native-Born Population as a Percent of U.S. Native-Born Population

*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

AR02289

the U.S. foreign-born population. Thus, in recent decades, the state's foreign-born population has grown more rapidly than its native-born population.

In contrast with the native-born population, migration is the sole source of growth for the foreign-born population. The following section describes the migration patterns of foreign-born persons in Texas.

## Historical Trends in Foreign-Born Migration to Texas

Table 1 and Figures 1 and 2 presented the 'migrant stock' or resident population which is the total number of foreign-born persons living in Texas at a given point in time. With these data, we saw that the state's foreign-born population has experienced tremendous growth in recent decades. In this section, we describe the sources of this growth.

Growth in the foreign-born population is the result of migration flows - the number of foreign-born persons moving to Texas during a given time period. These migration flows have two sources: international migration (originating in another country) and domestic migration (originating in another state).

Figure 3 shows the 2005 through 2013 'migrant flow' data for the foreign-born population moving to Texas. In this figure, migrants are persons who lived in another country or state in the prior year.

Between 2005 and 2013, the greatest annual migration of foreign-born people to Texas occurred in 2006, at 216,605. The least annual migration was 174,741 in 2010 following the end of the 'great recession' of 2007-2009. By 2013, the number of foreign-born migrants to Texas had increased to 213,504, the second highest level during the nine year time series.

Figure 3 shows that international migration has been the major source of growth for the foreign-born population in Texas, constituting around 60 percent of the annual foreign-born in-migration. However, growth in the domestic migration of the foreign-born also has been strong.

The domestic migration of foreign-born persons has grown from about 64,000 in 2005 to over 82,000 in 2013. This increase of almost 18,000 represents an average annual growth of more than 3 percent. By contrast, the international migration of

**Figure 3:** Number and Percent of Foreign-Born Migrants to Texas by Migration Type, 2005-2013



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013

foreign-born persons to Texas grew from around 126,000 in 2005 to 131,000 in 2013, an increase of around 5,000 which reflects an average annual growth rate of less than 1 percent.

*RECENTLY, FOR EVERY 10 FOREIGN-BORN PERSONS ENTERING TEXAS, ROUGHLY 4 MOVED FROM ANOTHER STATE IN THE U.S.*

Even though international migration remains the largest source of growth for foreign-born Texans, domestic migrants represented close to 40 percent of the foreign-born migration to Texas between 2005 and 2013. Thus, in recent years, about four of every ten foreign-born persons moving to Texas migrated from another U.S. state.

Figure 3 showed migration flow data for total in-migrants – the number of persons moving into an area. Though in-migration is an important migration measure, it does not account for out-migration – the number of people moving out of an area. For example, in 2013, 82,174 foreign-born persons migrated to Texas from other states. However, in that same year, 50,789 foreign-born persons moved out of Texas into other states. To capture the total population gain from migration, we employ net migration. Net migration is the numerical difference between in-migration and out-migration. Using net migration, Texas gained an estimated total of 31,385 foreign-born persons from domestic migration in 2013 (i.e., 82,174 – 50,789 = 31,385).

Table 2 shows the 10 U.S. states with the largest average net domestic migration for the 2005-2013 time period. These data include both native-born and foreign-born persons. Net migration for international migrants is not presented because the ACS (American Community Survey) does not track international out-migration.

In Table 2 we see that Texas led the nation in net domestic migration between 2005 and 2013. The state's average of 125,778 net domestic migrants is 1.8 times larger than that for Florida which had the second largest number of net domestic migrants for 2005-2013.

*HIGH DOMESTIC IN-MIGRATION TO TEXAS HAS FUELED THE GROWTH OF FOREIGN-BORN POPULATION INCREASES; ABOUT ONE IN FIVE DOMESTIC MIGRANTS WAS FOREIGN-BORN.*

The rapid growth in Texas' foreign-born population has occurred alongside this pattern of high net domestic in-migration. The state's substantial net domestic migration helped fuel the growth of the foreign-born population because around one in every five of these domestic migrants was foreign-born.

Table 3 and Figure 4 have the net domestic migration to Texas for native- and foreign-born persons from 2005 through 2013. During these nine years, Texas added a little over 1.1 million persons through domestic migration. Of these, 254,181, or 22.5 percent, were foreign-born.

In the 2005-2013 series, 2006 had the largest total net migration, at 169,404, while 2010 had the smallest at 81,277. After the 2006 peak, net migration declined until 2011. As noted above, this cycle of peak and decline reflects the effects of the 2007-2009 recession. By 2013, net domestic migration had risen to 133,749, the fourth highest number during the 2005-2013 annual series.

These data suggest that the native-born and foreign-born migrants have somewhat different migration patterns. For example, the peak number of native-born migrants occurred in 2006 while the peak number of foreign-born migrants happened in 2007. The smallest net migration for the native-born happened in 2010 at 21,237. For the foreign-born, the smallest net migration was in 2005 at 10,046. As for shares of net migration, native-born in-migrants range from a high of 91.3 percent in 2005 to a low of

| Table 2 | |
|---|---|
| States Ranked by Average Annual Net Domestic Migration 2005-2013 | |
| **State** | **Net Migration** |
| Tennessee | 24,684 |
| Oregon | 25,422 |
| Washington | 27,763 |
| Colorado | 33,504 |
| South Carolina | 38,189 |
| Georgia | 48,050 |
| Arizona | 53,863 |
| North Carolina | 67,501 |
| Florida | 69,801 |
| Texas | 125,778 |
| *Source: U.S. Census Bureau ACS 1-Year PUMs, 2005-2013* | |

Table 3: Number and Percent of Net Domestic Migrants to Texas by Nativity, 2005-2013

| Year | Native-Born Migrants | | Foreign-Born Migrants | | Total Migrants | |
|------|--------|---------|--------|---------|--------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 2005 | 105,041 | 91.3% | 10,046 | 8.7% | 115,087 | 100.0% |
| 2006 | 146,422 | 86.4% | 22,982 | 13.6% | 169,404 | 100.0% |
| 2007 | 103,034 | 70.7% | 42,638 | 29.3% | 145,672 | 100.0% |
| 2008 | 103,372 | 77.3% | 30,388 | 22.7% | 133,760 | 100.0% |
| 2009 | 89,647 | 72.2% | 34,524 | 27.8% | 124,171 | 100.0% |
| 2010 | 59,950 | 73.8% | 21,327 | 26.2% | 81,277 | 100.0% |
| 2011 | 92,693 | 78.2% | 25,831 | 21.8% | 118,524 | 100.0% |
| 2012 | 75,295 | 68.2% | 35,060 | 31.8% | 110,355 | 100.0% |
| 2013 | 102,364 | 76.5% | 31,385 | 23.5% | 133,749 | 100.0% |
| **All Years** | 877,818 | 77.5% | 254,181 | 22.5% | 1,131,999 | 100.0% |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2005-2013*

**Figure 4:**   Net Domestic Migration to Texas by Nativity, 2005-2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013*

68.2 percent in 2012. Conversely for the foreign-born, their highest share was in 2012 at 31.8 percent and the lowest was 2005 at 8.7 percent. Also, for the recession years, 2007-2009, the foreign-born share of net migration was 26.6 percent, higher than its overall average share of 22.5 percent. By contrast, the native-born share fell to 73.4 percent in this period, below its overall 77.5 percent average share.

We have demonstrated that the stock of foreign-born persons in Texas has had strong growth in recent years. We have also shown that migration - both international and domestic — is the source of this growth. In the next section we will describe the origins of these foreign-born migrants to Texas.

## Origins of Foreign-Born Migrants to Texas

Figures 5, 6, and 7 are based on the world area of birth for foreign-born migrants to Texas. In Figure 5, we find that, for both international and domestic migration, persons from Latin America and Asia[2] predominate foreign-born migration to Texas (for more details on the origins of international migrants to Texas, please see White et al 2015).

Between 2005 and 2013, 2005 was a peak year for the international migration of Latin-American born persons to Texas. During 2005, over 70 percent of the Latin-American origin migrants were international migrants. By 2013, less than 60 percent

**Figure 5:** Comparison of 2005 and 2013 Foreign-Born Migrants to Texas by World Area of Birth and Migration Type



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013*