**Figure 6:**     Foreign-Born Migrants to Texas by Region of Origin, 2005-2013



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013

of Latin-American born persons moving to Texas were international migrants, resulting in nearly 31,000 fewer international Latin-American origin migrants to Texas.

*BETWEEN 2005 AND 2013, DECLINES IN LATIN AMERICAN ORIGIN MIGRATION TO TEXAS WERE LARGELY OFFSET BY INCREASES IN ASIAN ORIGIN MIGRATION.*

In 2005, 56.0 percent of Asian-born persons moving to Texas were international migrants while 44.0 percent came from other U.S. states. By 2013, Texas was experiencing an unprecedented growth in the Asian-born population. The peak year for Asian migration to Texas was 2013 and 62.4 percent of Asian-origin migrants to Texas moved from abroad while 37.6 percent moved from other states.

Figure 6 shows a time-series for foreign-born migration to Texas. In this figure, international and domestic migration are combined, and we see a trend where migration to Texas from Latin-American origin persons is declining while that for Asian origin persons is increasing. Between 2005 and 2013, Latin American migration declined by almost 25 percent while migration for Asian origin persons doubled.

**Figure 7:**     Numerical Difference in the Size of the 2005 and 2013 Foreign-Born Migrant Streams to Texas by World Area of Birth and Migration Type



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013

AR02299

The shift from Latin-American born to Asian born migration to Texas is further illustrated in Figure 7. This figure shows differences in the 2005 and 2013 migration streams for international and domestic migration to Texas. We find that the international migration of Latin-American origin persons declined by more than 30,000 while that for Asian origin persons increased by almost 30,000. With domestic migration, the Latin-American origin migrants increased by less than 2,000 while Asian origin migration increased by more than 13,000. Thus, between 2005 and 2013, the declining Latin American origin migration to Texas was largely offset by increases in Asian origin migration.

The primary states of origin for domestic migration to Texas are examined in Figure 8. Taken together, the 10 states in this figure contributed to more than half of the total domestic migration to Texas in 2013.

*IN 2013, ONE OF EVERY FIVE FOREIGN-BORN DOMESTIC MIGRANTS MOVED TO TEXAS FROM CALIFORNIA.*

Figure 8 shows that California, the nation's most populous state, is the primary source of domestic migration to Texas. In 2013, California sent a total of 62,386 migrants to Texas. This was almost twice as many as the 33,321 from Florida, the second largest sender.

California also dominates as the primary sender of foreign-born domestic migrants to Texas. In 2013, 16,412 foreign-born persons migrated from

**Figure 8:** Nativity of Domestic Migrants to Texas from the Top Ten Origin States, 2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

California to Texas. This represented 26.3 percent of the 62,386 total migrants from California. The 16,412 foreign-born migrants from California comprise 20 percent of the 82,174 total 2013 domestic foreign-born migrants from all states to Texas. That is, one of every five foreign-born domestic migrants to Texas in 2013 originated from California.

We have seen that Texas's foreign-born migrants are predominantly of Asian and Latin American origin. We also found that California is a primary source for foreign-born domestic migrants to Texas. The next section describes the destinations of these migrants within Texas.

## Destinations of Foreign-Born Migrants to Texas

Figure 8 indicated that most of the state's domestic in-migrants originate in large population states such as California and geographically proximate states such as Oklahoma. Figures 9-11

**Figure 9:**     Top Ten Receiving Counties in Texas for Foreign-Born International Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

**Figure 10:**     Top Ten Receiving Counties in Texas for Foreign-Born Domestic Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

show there also is a degree of selectivity in where these in-migrants locate within Texas.

*IN 2013, THE MAJORITY OF FOREIGN-BORN MIGRANTS TO TEXAS SETTLED IN THE STATE'S FOUR MOST POPULOUS COUNTIES.*

Figures 9 and 10 respectively show the top destination counties for foreign-born international and domestic in-migrants to Texas. Not surprisingly, these migrants tend to settle in the state's more populous counties. However, these migrants also tend to be highly concentrated. For example, four counties, Harris, Dallas, Bexar, and Tarrant, received 52.4 percent of the state's foreign-born migrants in 2013. For comparison, these four counties contained only 39.8 percent of the state's total population.

Figure 11 shows the five counties that received 60 percent of the foreign-born migration to Texas in 2013. This figure indicates there are some differences in the types of migrants to the destination counties. For Harris, Dallas, and Travis counties, there is roughly a 60-40 split between international and domestic foreign-born migrants. In Tarrant County, the split is close to 50-50. For Bexar County, the foreign-born migrant stream is about 70 percent international versus 30 percent domestic.

We have shown that foreign-born migrants to Texas tend to settle in the state's largest metropolitan areas. Next we examine how current trends in foreign-born migration are shaping population growth in Texas.

## Current Trends in Texas Nativity

The foreign-born population of Texas is growing because of international and domestic migration. Table 4 indicates that between 2010 and 2013, Texas received an average of 182,593 international migrants per year (the left panel in Table 4). This made Texas second only to California

**Figure 11:** Number and Percentage of Foreign-Born In-migrants by Migration Type to the Top Five Receiving Counties in Texas, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

Table 4: Comparison of International Migration and Foreign-Born Population Growth 2010-2013

| Average Annual International Migration | | Numerical Change Foreign-Born | |
|---|---|---|---|
| **State** | **Migration** | **State** | **Foreign-Born** |
| Illinois | 67,106 | New Jersey | 81,192 |
| New York | 151,412 | New York | 85,699 |
| Florida | 164,710 | Florida | 140,019 |
| Texas | 182,593 | California | 160,771 |
| California | 268,868 | Texas | 227,240 |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2010-2013*

which received an annual average of 268,868 international in-migrants during the 2010-2013 time period.

*WHILE CALIFORNIA CONSISTENTLY RECEIVES THE LARGEST NUMBER OF INTERNATIONAL MIGRANTS, TEXAS LEADS THE NATION IN THE GROWTH OF THE FOREIGN-BORN POPULATION.*

Even though California is the leading destination for international migrants, recent data indicate that Texas leads the nation in the growth of the foreign-born population. Between 2010 and 2013, Texas added 227,240 foreign-born persons (the right panel in Table 4). California was second to Texas, adding 160,771 foreign-born persons during the same time period.

Thus, while California consistently receives the largest number of international migrants, Texas leads the nation in the growth of the foreign-born population. The explanation for this apparent paradox is the domestic migration of the foreign-born population to Texas.

Earlier, we saw that California is a major source of foreign-born domestic migrants to Texas. In 2013, around one-in-five foreign-born domestic migrants to Texas moved from California. The data suggest that California is not only a gateway for international migrants but also a 'staging area' for their subsequent relocation. It appears that many of the international migrants who initially settle in California subsequently relocate in Texas as domestic migrants.

**Figure 12:** Net Population Gain from Domestic and International Migration to Texas by Migrant Nativity, 2013[3]



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

AR02298

When net migration is examined in Figure 12, the importance of foreign-born migration to the recent growth of the Texas population is immediately apparent. Using net migration, Figure 12 shows that slightly more than half of Texas' 2013 growth from migration can be attributed to foreign-born persons moving to Texas.

For contemporary Texas, about half of its population growth is from natural increase (i.e., the excess of births over deaths) while the other half is from net migration. Figure 12 shows about half of this net migration was by the foreign-born. Consequently, this means that about one of every four new Texans in 2013 was born abroad.

The migration of foreign-born persons to Texas is not only adding to the size of the state's population but also leading to greater diversity in the state's population composition. Recent migrants to Texas represent an increasing variety of countries, yielding greater racial/ethnic heterogeneity in the state's population (White et al 2015).

## Summary and Conclusions

In recent decades, the international and domestic migration of foreign-born persons have made Texas more international than at any time since its statehood in 1845. In 2013, about one of every four new Texans was born abroad. These foreign-born Texans came to the state from other countries as well as other states. International migration accounts for the majority of these foreign-born Texans. Nonetheless, between 2005 and 2013, Texas added a little over 1.1 million persons through net domestic migration and 254,181, or 22.5 percent, of these domestic migrants were foreign-born.

For both international and domestic migration, persons from Latin America and Asia dominate the migration of the foreign-born to Texas. Historically, people of Latin-American origin have comprised the vast majority of Texas' foreign-born population. Recently, however, this trend has moderated as the migration of Latin-American origin persons to Texas has declined while that for Asian origin persons has increased. Between 2005 and 2013, Latin-American origin migration to Texas declined by almost 25 percent while the migration of

Asian origin persons to the state doubled. With this shift in the traditional migration patterns of the foreign-born, Texas now has an unprecedented number of Asian origin residents.

The data show selectivity in both the origins and destinations of foreign-born migrants to Texas. For example, in 2013, one of every five foreign-born domestic migrants to Texas originated in California. As for destinations, in 2013, the majority of the state's foreign-born in-migrants (52.4 percent) settled in just four counties: Bexar, Dallas, Harris, and Tarrant.

Whether these recent patterns will sustain into the future is impossible to know. But, should there be continued growth in the state's foreign-born population, Texas can expect an increasingly diverse and more international population in its future. The continuing growth of the foreign-born population could lead to a future Texas that is different in several important ways:

• First, a continuing shift toward more Asian origin migrants which would make the state's population more racially and culturally diverse.

• Second, while the state as a whole will become more international, the foreign-born will not be distributed evenly across Texas' geography. Because of geographic selectivity, the population of cities such as Houston and Dallas will become more similar to the traditional foreign-born gateways of New York, Miami, and Los Angeles.

• Lastly, the continued domestic migration of the foreign-born to the state would mean that even in the absence of international migration to Texas the state's foreign-born population would continue to grow.

This report has examined the sources of growth for the foreign-born population in Texas. The focus has been on domestic and international migration because these are the only processes by which the foreign-born population of the state can grow. By definition, these migrants either lived abroad or in another U.S. state one year ago. As such, the report described only the newly arrived foreign-born Texans. The majority of the state's foreign-born residents have been in Texas for more than a year. Future reports will examine the entire

foreign-born population of Texas. Topics to be covered include:

◊ Education and Labor Force Characteristics;
◊ Income Levels, Poverty, and Income Distribution;
◊ Family, Household, and Fertility Patterns;
◊ Age, Sex, and Race/Ethnicity;
◊ Housing and Suburbanization Patterns; and,
◊ Language Acquisition and Citizenship Patterns.

## Notes

[1]  Please be aware that the U.S. Census Bureau has several programs that estimate migration. These include the American Community Survey (ACS), the Current Population Survey (CPS), Population Estimate (Components of Population Change), and the Survey of Income and Program Participation. Each of these estimation programs uses specific data sources, time frames, and sampling techniques. For example migration estimates in the ACS are based on the respondents' answer to where they lived one year ago. By contrast, migration in the Population Estimates is based on a wide range of administrative data including IRS filings, Medicare enrollment, Social Security information, and Defense Manpower data. Consequently, the estimates of migration by the different Census programs are not equivalent. As such, data users should not compare estimates from one Census source to another without a thorough understanding of their differing methodologies.

[2]  The U.S. Census (2014) uses the following countries to designate the world area of birth for Asia and Latin America:

• Asia:   Afghanistan, Armenia, Azerbaijan, Bahrain, Bangladesh, Bhutan, Brunei, Burma (Myanmar), Cambodia, China, Cyprus, East Timor, Georgia, Hong Kong, India, Indonesia, Iran, Iraq, Israel, Japan, Jordan, Kazakhstan, Korea, Kuwait, Kyrgyzstan, Laos, Lebanon, Macau, Malaysia, Maldives, Mongolia, Nepal, North Korea, Oman, Pakistan, Paracel Islands, Philippines, Qatar, Saudi Arabia, Singapore, South Korea, Spratly Islands, Sri Lanka, Syria, Taiwan, Tajikistan, Thailand, Turkey, Turkmenistan, United Arab Emirates, Uzbekistan, Vietnam, and Yemen.

• Latin America:   Anguilla, Antigua & Barbuda, Argentina, Aruba, Bahamas, Barbados, Belize, Bolivia, Bonaire, Brazil, British Virgin Islands, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, Falkland Islands, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, Saba, Sint Eustatius, Sint Maarten, St. Barthelemy, St. Kitts -Nevis, St. Lucia, St. Vincent & the Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos Islands, Uruguay, Venezuela, and West Indies

[3]  Please note that international migrants are persons who were living abroad one year ago. The Census Bureau includes the following as native-born migrants who were living abroad one year ago: persons from Puerto Rico, the U.S. Virgin Islands, Guam, and other outlying parts of the United States who are U.S. citizens at birth; overseas military personnel and their dependents who are returning to the U.S.; and, any other U.S. citizens who return from abroad (Faber 2000).

## References

Faber, Carol S. 2000. "Geographical Mobility – March 1997 to March 1998." Current Population Reports, Series P20-520, U.S. Census Bureau (Available: https://www.census.gov/prod/2000pubs/p20-520.pdf 09/02/2015).

Gibson, Campbell and Kay Jung. 2006. "Historical Census Statistics on the Foreign-Born Population of the United States: 1850 to 2000." U.S. Census Bureau, Population Division, Working Paper No. 81 (Available: https://www.census.gov/population/www/documentation/twps0081/twps0081.pdf 07/31/2015).

Grieco, Elizabeth, Yesensia Acosta, G. Patricia de la Cruz, Christine Gambino, Thomas Gryn, Luke Larsen, Edward Trevelyan, and Nathan Walters. 2012. "The Foreign-Born Population in the United States: 2010." American Community Survey Reports, ACS-19, U.S. Census Bureau (Available: https://www.census.gov/prod/2012pubs/acs-19.pdf 07/28/2015)

Perry, Mark. 2006. "Domestic Net Migration in the United States: 2000 to 2004." Current Population Reports, Series P25-1135, U.S. Census Bureau (Available: https://www.census.gov/prod/2006pubs/p25-1135.pdf 07/28/2015)

Schmidley, A. Dianne and Campbell Gibson. 1999. "Profile of the Foreign-Born Population in the United States: 1997." Current Population Reports, Series P23-195, U.S. Census Bureau (Available: https://www.census.gov/prod/99pubs/p23-195.pdf 01/26/2015)

U.S. Census Bureau. 1992. "Part B. Glossary, 1990 Census of Population and Housing." (Available: http://www.census.gov/prod/cen1990/cph-r/cph-r-1b.pdf 07/29/2015)

_____. 2014. "American Community Survey and Puerto Rico Community Survey: 2013 Code List." (Available: http://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2013_ACS_Code_Lists.pdf 08/10/2015)

_____. (various years). American Community Survey (ACS): One-Year Public Use Microdata Sample (PUMS). (Available: http://www.census.gov/programs-surveys/acs/data/pums.html 09/03/2015).

_____. (various years). One-Year American Community Survey. (Available: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml 09/03/2015).

White, Steve, Lloyd B. Potter, Helen You, Lila Valencia, Jeffrey A. Jordan, and Beverly Pecotte. 2015. "Origins of Immigrants to Texas." Office of the State Demographer. (Available: http://osd.state.tx.us/Publications/2015_05_Origins.pdf 06/25/2015).



OFFICE OF
THE STATE
DEMOGRAPHER

P.O. Box 13455
Austin, TX 78701
http://osd.state.tx.us
Ph: 512-463-8390
Fx: 512-463-7632
Email: state.demographer@state.tx.us



UTSA.
The University of Texas at San Antonio™



TEXAS
STATE DATA CENTER

501 West Cesar E. Chavez Blvd.
San Antonio, TX 78207-4415
http://txsdc.utsa.edu
Ph: 210-458-6543
Fx: 210-458-6541
Email: txsdc@utsa.edu

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

Gone to Texas

# EXHIBIT B-10

# GONE TO TEXAS

The latest state-to-state migration flows data from the U.S. Census Bureau reveal over half a million people moved to Texas from other states in 2019, among the highest in-migration flows of all U.S. states, second only to Florida. Texas net migration (in-migrants minus out-migrants) during this time was over 106,000, with California contributing over 42% to this net migration. The next two highest sending states to Texas were Florida and Illinois. During this same period, over 37,000 Texans moved to California, but the greatest net migrant loss from Texas went to Colorado.





Source: U.S. Census Bureau, 2019 State-to-State Migration Flows Data

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF MARK MORGAN

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS AND | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DECLARATION OF MARK MORGAN

I, Mark Morgan, am over the age of 18 and fully competent in all respects to make this declaration.

Pursuant to 28 U.S.C. § 1746, testify that:

1.     I make this declaration on the basis of my own personal and professional knowledge. I have almost 30 years of combine law enforcement experience at the local, county, and federal levels, as well as, more than ten years of service with the United States Marine Corps.

2.     Since February 2021, I have been a Senior Fellow for the Federation for American Immigration Reform, a non-partisan public interest organization evaluating immigration policies and seeking solutions to reduce the negative impact of uncontrolled immigration on the Nation's security, economy, workforce, education, healthcare, and environment.

3.     From July 5, 2019 to January 20, 2021, I was Acting Commissioner of U.S. Customs and Border Protection ("CBP"). In this position, I oversaw 60,000 employees at the largest law enforcement agency and the second-largest revenue-collecting source in the federal

government. I managed a budget of over $13 billion and ensured the effective operations of CBP's mission to protect national security while promoting economic prosperity. I directed CBP's five core missions of counterterrorism, combatting transnational crime, border security, facilitation of lawful trade and travel, and revenue enforcement, including $4 trillion in trade and the travel of over 410 million people through ports of entry.

4.      From March 28, 2019 to July 5, 2019, I was Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). During my leadership of ICE, I was responsible for overseeing an organization of approximately 19,000 employees with a budget of more than $7.5 billion. ICE is the lead federal agency responsible for enforcing federal laws related to immigration, border control, customs, and trade. In addition to enforcing our immigration laws, ICE's law enforcement responsibilities include investigating financial and cybercrimes as well as intellectual property and commercial fraud; human rights violations; weapons, narcotics, and human smuggling; transnational gang activity; and enforcing our export laws.

5.      From January 2017 to January 2018, I served as the Executive Director of the FBI's National Academy Associates, a non-profit, international organization of more than 16,500 senior law enforcement professionals dedicated to providing communities and profession with the highest degree of law enforcement expertise, training, and education.

6.      From October 12, 2016 to January 26, 2017, I was Chief of U.S. Border Patrol, a component of CBP within the Department of Homeland Security ("DHS"), after having begun to serve in that position in an acting capacity in July 2016. In this position, I had oversight of nearly 21,000 Border Patrol Agents. The mission of Border Patrol is preventing the illegal trafficking of people and contraband and is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land borders and over 2,000 miles of coastal waters surrounding the

Florida Peninsula, as well as the island of Puerto Rico.

7.      From August of 1996 to August of 2016, I served as a Special Agent with Federal Bureau of Investigation.  Over the span of 20 years, I served in a variety of positions including supervisor of an MS-13 Gang Task Force; Assistant Special Agent In-Charge of the New Haven Division; Deputy On-Scene Commander in Baghdad, Iraq; Special Agent In-Charge of the El Paso Division; and Assistant Director of the FBI's Training Division, Quantico.  I was a member of the Special Weapons and Tactics Team, certified Firearms Instructor, and Tactical Medic.

8.      From 1995 to 1996 I served as a Police Officer with the Los Angeles Police Department where I was assigned to the 77th Division as a patrol officer.

9.      From 1992 to 1995 I attended the University of Missouri – Kansas City, School of Law.  I earned a Juris Doctor degree in 1995 and passed the Missouri Bar.  While attending law school I served as a Reserve Deputy Sheriff in Platte County, Missouri.

10.      I served in the United States Marine Corps, active duty and reserves, from August of 1984 until my Honorable Discharge in September of 1996.

**The 2018-2019 Border Crisis**

11.      In Fiscal Year ("FY") 2018, CBP experienced a steady increase in total apprehensions along the Southwest Border ("SWB"). Starting the FY with just under 35,000 apprehensions for the month of October and ending the FY with just over 50,000 apprehensions in the month of September.  The total apprehensions in FY 2018 were approximately 521,000, an increase of more than 100,000 from FY 2017.  The apprehensions were continuing to rise and already over-burdening agencies involved in the immigration process due to the increase in families and unaccompanied minor apprehensions.

12.      As FY 2019 began, apprehensions spiked. At the end of FY 2018, CBP

AR02307

apprehended over 50,000 aliens in a single month (September). That number increased by 10,000 for the first month of FY 2019 (October) and had more than doubled to over 100,000 only a few months later (March). The apprehension numbers continued to climb and by May of FY 2019 CBP apprehended more than 144,000 aliens along the SWB – more than double the monthly highwater mark of the previous 6 years. At the time it was acknowledged by the White House and the DHS as a full-blown crisis.

13.    In addition to the skyrocketing number of apprehensions, the major element exacerbating the crisis was the demographic composition of those being apprehended. Historically, the majority of migrants illegally entering our SWB were adult single males, primarily from Mexico. The U.S. immigration system, laws, and agency's capability and capacity were designed around the single adult male demographic. By contrast, dealing with families and unaccompanied minors consumes an exhaustive amount time and resources to support the humanitarian efforts required.

14.    By the end of FY 2019 CBP's enforcement actions totaled more than 979,000 – a staggering 88% higher than FY 2018 and 72% higher than FY 2014's highwater mark. The U.S. Border Patrol alone reported more than 850,000 apprehensions – 115% higher than FY 2018. Family units consisted of more than 473,000, the highest year on record and 342% higher than FY 2018. Unaccompanied minors consisted of more than 76,000, 26% higher than FY 2018.

15.    These are numbers no immigration system in the world is designed to handle – including the U.S. Arrivals of families at our SWB in FY 2019 more than tripled any previous FY on record. CBP's facilities are not designed for long-term hold for families and unaccompanied minors. The dual front crisis, both volume and demographics, quickly strained CBP resources along the SWB and forced the diversion of many of our essential front-line personnel securing our

border to address the humanitarian crisis – negatively impacting CBP's ability to carry-out its national security mission. In some sectors along the SWB, 40% of front-line personnel were pulled to provide humanitarian assistance.

**The Migrant Protection Protocols**

16.     As CBP was navigating the crisis, including the unprecedented volume of families and unaccompanied minors, the Trump Administration was developing strategies and introducing policies and initiatives in an effort to restore the rule of law; remove the incentives driving illegal immigration; and close the loopholes undermining the integrity of our immigration system. Although FY 2019 began with skyrocketing apprehensions and ended with record setting number of families and unaccompanied minors, had there not been intervention with a network of tools, polices, and initiatives, the crisis would have been catastrophic.  Increased interior enforcement; Asylum Cooperative Agreement ("ACA") with Guatemala; and Mexico's support of the Migrant Protection Protocols ("MPP") laid the foundation to dramatically reduce the flow of illegal immigration – especially by families and unaccompanied minors.

17.     In FY 2019, DHS announced the MPP as part of its network of polices to assist with addressing the crisis at the border. The MPP declared migrants who illegally enter our borders or otherwise were deemed inadmissible, may be removed to Mexico while the illegal alien continues to participate in  immigration proceedings conducted in the U.S. Illegal aliens enrolled in MPP and removed to Mexico are not barred from claiming asylum or fully participating in the U.S. immigration proceedings but rather are required to do so while remaining in Mexico.

18.     There was extensive coordination and planning between the U.S. and the Government of Mexico concerning the effective implementation of MPP.  I personally oversaw CBP's "phased-in" implementation strategy area by area along the SWB over several months

during FY 2019, to ensure a smooth and safe approach. We constantly coordinated with partners in the Mexican Government–both with my counterparts at the agency-head level, as well as, field leadership at the ground level. By the beginning of FY 2020 MPP had been initiated along the entire SWB.

19.     Pursuant to the Flores Settlement Agreement ("FSA") court order, unaccompanied minors arriving at the border who have been determined not to have been trafficked and are from non-contiguous countries, can only be detained by U.S. authorities 20 days before being released into the United States. This 20-day detention rule was later reinterpreted to apply to families as well.

20.     Historically, especially when the immigration system is inundated with the volume experienced in FY 2019, immigration proceedings generally cannot be completed within 20 days. Thus, the FSA resulted in the mandatory release of any family and unaccompanied minor who illegally crosses our borders. The inability to detain a migrant while immigration proceedings progress is what directly resulted in the process commonly referred to as "catch and release". Meaning illegally alien families and unaccompanied minors could no longer be detained while awaiting their proceedings due to the 20-day restriction order, but rather were mandated to be released into the U.S. Whereas single adults could still be detained.

21.     By FY 2019, the human smuggling organizations were using this judicially created loophole in our immigration system as an incentive to convince families to illegally enter the U.S. That's exactly what CBP experienced. In FY 2019, Border Patrol apprehended the highest number of illegal alien families on record. The human smugglers were so successful because they, along with the migrants, understood if they came to our borders with a minor child, they would be released into the interior of the U.S. in just a few days. The result of the FSA, regardless of its

noble premise, had the opposite impact. It resulted in the ruthless and dangerous exploitation of minors. Children were being used as human passports. They were being sold or rented to non-family members, being forced to make the dangerous overland journey, with some being flown or driven back to their home country to repeat the journey all over again.

22.     Additionally, not only did the FSA create an unmitigated loophole to be exploited, it enhanced the human smuggler's ability to take advantage of those seeking a better life. If the cartels smuggle 300,000 migrants per year at an average "fee" of $5,000 per person, it's estimated the cartels can make more than $1.5 billion. And the migrants are often abused, locked in overcrowded, unsanitary stash house or tractor trailers during their journey. Fear is part of the smuggler's business model, often subjecting the migrants to extortion, sexual assault, and even forced labor to pay off their debts. The smugglers often use the families as distraction techniques to pull Border Patrol agents off the line allowing the smugglers to bring in dangerous drugs and criminal illegal aliens across the border.

23.     DHS implemented MPP, as part of the network of policies and tools, to manage this crisis at the border. By allowing CBP to directly remove illegal aliens to Mexico it not only ended "catch and release," but it simultaneously sent a powerful message to the smugglers and immigrants themselves that we had closed a significant loophole. Bringing a child with you to the border was no longer your passport into the U.S. Not only did the MPP enable DHS to stop releasing illegal aliens into the U.S. but just as important, it acted to deter aliens from paying smugglers, risking their lives, and attempting to illegally cross the southern border. This policy created a powerful disincentive for aliens to arrive at the southern border to seek entry with meritless claims of asylum.

24.     The MPP played a critical role in addressing the border crisis. By removing

migrants to Mexico to await their asylum proceedings, MPP reduced the ability of illegal aliens to remain in the U.S. in defiance of their court ordered removals; deterred aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States; and shut down the driving force behind the FY 2019 illegal migration crisis by closing the FSA generated loophole.   An additional benefit to MPP is it's allowed the government to better focus its resources on individuals who have legitimate asylum claims.   To illustrate MPP's effectiveness, the underlying demographic driving the crisis–families from Central America was significantly mitigated by February of FY 2020 when CBP saw a decline of families from the previous year of 66%. And families decreased from the height of May FY 2019 by 92%.  In FY 2019, because of the FSA and other loopholes, CBP alone had released more than 230,000 illegal aliens and inadmissible migrants into the U.S. In FY 2020, in large part directly related to MPP, CBP released fewer than 1,000.

**The Biden Presidential Transition**

25.     I have served in a variety of federal law enforcement positions during my 25 years of federal service, including more than a decade in the Senior Executive Service ranks, and as such I am familiar with the Presidential Transition processes.

26.     The process to transition-in a new administration is an extremely formal and a time-tested process.  The incoming administration selects its own transition members and drives not only the briefing schedule but the areas of focus for the briefings.  The transition teams often ask for specific briefers by name – as did the Biden transition team.  Each Cabinet-level Department selects a senior executive to act the Department's "lead" coordinator.   Each agency within its respective Department also selects a lead "coordinator." The incoming transition team coordinates directly with Department coordinators, as well as agency coordinators after consultation with the

department coordinator, to set all briefings – including dates, times, and topics. Included in most transition briefings there will be an "Agency 101" covering the general mission, statistics, and accomplishments, as well as a series of more detailed topics addressing areas of critical importance.

27.     The transition process following the 2020 election was consistent with previous transitions that I participated in.

28.     For the transition following the 2020 election, Deputy Director of the U.S. Citizenship and immigration Services ("USCIS") Mark Koumans, a career official, led the DHS transition team and each agency within DHS appointed a transition official to assist the Biden transition team.

29.     Assistant Commissioner, Chief Acquisition Officer ("CAO") of CBP Mark Borkowski, a career official, was the lead coordinator for the CBP transition. As such CAO Borkowski provided regular updates to the CBP executive team, including myself, regarding all aspects on the transition. He provided detailed briefing materials which outlined the transition progress, issues and concerns, topics, and over all timetable of briefings. CAO Borkowski coordinated with the senior leadership of each of the six program offices within CBP to ensure timely and effective materials were provided in advance and addressed the transition teams inquires.

30.     As Acting Commissioner of CBP, it was my duty to ensure that CBP was providing any and all materials requested by the transition team members; that CBP provided timely and complete responses; and that CBP made the transition team aware of issues and concerns requiring their awareness and attention. I not only received regular status updates from CAO Borkowski regarding the transition process but also from senior executives who participated in the briefings.

31.     Based on the "back briefs" I received, I was confident the Biden Transition Team members were fully and completely briefed on a series of critical issues facing CBP's five mission priorities, especially border security and the progress we made addressing the illegal immigration crisis we faced in FY 2019.  I recall one such back-brief detailing the transition team briefing concerning implementation of MPP, its effectiveness, and the consequences if the policy were suspended.  One of the reasons I recall the back brief was the significance of MPP.  CPB career employees informed me that they had fully briefed the Biden transition officials on the importance of MPP and the consequences that would follow a suspension of MPP.

32.     During the transition, DHS provided approximately 200 hundred briefings to the Biden transition team, most of them concerning border security and immigration related topics, including the effectiveness of the MPP program and the border crisis that would occur if it were to be suspended.

33.     The Biden transition personnel were specifically warned that the suspension of the MPP, along with other polices, would lead to a resurgence of illegal aliens attempting to illegally enter our SWB.  They were warned the smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open. They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities.

**The Biden Administration's Suspension of the MPP Program**

34.     I have reviewed the memorandum issued by then-Acting Secretary of DHS titled "Suspension of Enrollment in the Migrant Protection Protocols Program" dated January 20, 2021 (the "Pekoske Memorandum").  The body of that memorandum consists entirely of the following: "Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already

enrolled in MPP should be processed under other existing legal authorities."

35.     The Pekoske Memorandum does not reflect any understanding regarding the consequence of rescinding MPP to the CBP briefers, nor does it heed the warning of border security experts who predicted the very crisis we are now experiencing at our SWB as a result of the suspension of MPP.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of May 2021.

MARK MORGAN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF ALISON PHILLIPS

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

THE STATE OF TEXAS; and )
)
THE STATE OF MISSOURI, )
)
                 *Plaintiffs*, )
)
v. )      Case No. 2:21-CV-00067-Z
)
JOSEPH R. BIDEN, JR., )
in his official capacity as )
President of the United States of )
America; )
)
ALEJANDRO MAYORKAS, )
in his official capacity as )
Secretary of the United States )
Department of Homeland Security; )
)
UNITED STATES DEPARTMENT OF )
HOMELAND SECURITY; )
)
TROY MILLER, )
in his official capacity as )
Acting Commissioner of the )
United States Customs and Border )
Protection; )
)
UNITED STATES CUSTOMS AND BORDER )
PROTECTION; )
)
TAE JOHNSON, )
in his official capacity as )
Acting Director of the )
United States Immigration and )
Customs Enforcement; )
)
UNITED STATES IMMIGRATION AND )
CUSTOMS ENFORCEMENT; )
)
TRACY RENAUD, )
in her official capacity as )
Acting Director of the United States )

Citizenship and Immigration Services; and )
)
UNITED STATES CITIZENSHIP AND )
IMMIGRATION SERVICES, )
)
                    *Defendants*. )

## DECLARATION OF ALISON PHILLIPS

**Background**

1.      My name is Alison Phillips and I am the Director for the Anti-Human Trafficking Task Force (HTTF) for the Missouri Attorney General's Office. My job entails facilitating and implementing a multi-disciplinary, comprehensive approach to addressing human trafficking in the state of Missouri. Toward that end, I work with federal, state, county and local law enforcement, as well as regulatory, and social service agencies. I train hundreds of professionals every year about how to identify and respond to human trafficking and have extensive public speaking experience, including my own Tedx Talk. Under my leadership, our HTTF launched a first of its kind in the nation, strategy to address human trafficking in illicit massage businesses; named The Hope Initiative. This initiative is achieving unprecedented success in closing IMB's within our state. It has been featured in multiple national forums and to date, nine other states are looking to replicate the Hope Initiative.

2.      Prior to my employment with the Attorney General's Office, I worked as an Adjunct Professor at the University of Missouri, Kansas City and Mid-America Nazarene University teaching courses on human trafficking to undergraduate criminal justice majors. I have worked as a consultant to churches and other community groups, helping them to plan effective and strategic efforts to combat human trafficking. In 2017, I obtained a Master's Degree in Criminal Justice and Criminology from the University of Missouri, Kansas City.  I have almost a decade of experience in the anti-trafficking field.

3.      As part of my work, I have interviewed, worked with, advocated for and mentored dozens of survivors of human trafficking. Many of them have shared with me personal details about the inhumane and horrific things that they have experienced; things that I will never forget. These stories and the resilience of those that have survived and carry on to build a new life for themselves motivate and inspire me to continue to fight.

4.      Part of my background in human trafficking work also originates from my experiences as a foster parent. Additionally, I am the proud mother of a daughter that my husband and I adopted internationally at the age four. Our adoption is the result of an intensive, three year process that we underwent before we could bring our daughter home. This was followed by another year before we were permitted to legally finalize her adoption. When we traveled to our daughter's birth country of India to bring her home, we were allowed to do so because an Indian court had granted us legal guardianship and we had obtained a Visa so that she could enter the United States. In order to finalize the adoption and for our daughter to become a U.S. citizen, we first submitted to a year's worth of social work visits and progress reports which were forwarded to

India for their review and approval. We understood that all of this was to ensure that children brought into the U.S. for the purpose of adoption are protected from abuse and exploitation.

**Human Trafficking on a Global Level**

5.      Recent estimates state that human trafficking is a $150 billion dollar annual industry in which 40 million people around the world are currently victimized (International Labor Organization, 2014). Victims are trafficked for the purpose of forced labor, commercial sexual exploitation, using children as soldiers, begging, surrogacy, adoption and even organ harvesting. In financial terms, human trafficking is the second largest criminal enterprise on earth, following the illegal trade in drugs. Traffickers all around the world are increasingly recognizing the lucrative nature of human trafficking as it is relatively low risk when compared to the trade in illegal drugs, which requires extensive time and investment to manufacture, and high risk to transport and sell. Victims of human trafficking, on the other hand, can be easily obtained for little or no investment and can be sold repeatedly.

6.      On a global scale, human trafficking victims are recruited and sold domestically within their own native country, but they are also moved via trans-regional flows that are influenced by "push and pull" factors. In so-called "origin countries," government corruption, war, persecution, natural disasters, poverty, and organized crime create environments that in effect *push* victims out of their native country. Traffickers use financial rewards, opportunities to make money and the provision of basic needs to lure potential victims. Individuals from backgrounds of poverty and desperation are especially vulnerable to these offers. Traffickers capitalize on these circumstances of desperation and further exploit their victims' vulnerabilities by creating situations of debt bondage and dependency. The affluence of "destination countries," and the presence of demand for commercial sex and forced labor present a powerful economic *pull* that influence the flow of victims from one country to another.



**Main destinations of transregional flows and their significant origins, 2012-2014**

→ Transregional flows: detected victims in destination countries
→ Transregional flows: victims repatriated from destination countries
Countries and territories not covered

7.      Policy makers in destination countries who are interested in protecting vulnerable people groups from exploitation within their country, should understand trans-regional flow and global patterns of human trafficking. Yury Fedotov, former Executive Director of the United Nations Office of Drugs and Crime, was quoted in the 2020 Annual Trafficking in Persons Report (TIPS) as saying, "[Human Trafficking] thrives in situations where the rule of law is weak and people lack opportunities. Humanitarian crises and conflicts create an environment in which traffickers easily prey upon the vulnerable." (Trafficking In Persons Report, 2020 p. 23) Destination countries with weak border security and lax immigration policies in effect create an open door for traffickers to enter and do business. It creates more opportunity for them to make money and in turn motivates traffickers to recruit more victims from origin countries. Put simply, traffickers would not invest the time and resources to groom, recruit and transport large numbers of potential victims to the U.S. border if they had reason to believe a crossing would not be possible. There's no money in that.

**Human Trafficking in the United States**

8.      According to years of data collected by Polaris Project, the nation's largest anti-human trafficking non-governmental organization and the operator of the National Human Trafficking Hotline, the majority of human trafficking victims in the United States are U.S. citizens. The affluence of the U.S., however, also makes it a destination country for victims from other countries. International criminal organizations look for weaknesses in U.S. borders and

immigration policy in order to bring their victims into the country. Russian mafia, Asian organized crime, and Mexican cartels smuggle people into the United States for the purpose of human trafficking. Much of this occurs across the U.S.-Mexico border.

9.      The most common origin countries for human-trafficking victims documented in 2020 were from Mexico followed by Honduras and Guatemala (*US Department of State (2020) Trafficking in Persons Report. pgs. 515-523. Retrieved from: https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf)*. In the years 2015-2018, 2,552 victims of human trafficking were identified by Polaris Project that related to cross US-Mexico border human trafficking activities. Of those victims, 1,535 originated from Mexico, 151 from the USA, 82 from Honduras, 76 from Guatemala, 33 from India, and 33 from El Salvador. In the same years, Polaris identified 1,782 traffickers committing cross US-Mexico border human trafficking. 380 of those traffickers originated from Mexico, 132 from the USA, 29 from Honduras, 20 from Guatemala, and 13 from India.

10.     Not all victims entering the U.S. via the southern border are Hispanic. Victims from Eastern Europe have also been smuggled into the United States via the U.S.-Mexico border by Russian mafia and other Eastern European criminal organizations. Their tactic is to disguise their victims as American students by purchasing a nice car and western clothing for their Caucasian victims as a means to ensure passage across the border. Asian organized crime also has a history of using the southern border as a means to bring in women they intend to traffic through illicit massage businesses.

11.     It is important to understand that human trafficking and human smuggling, while interconnected, are two different things. Smuggling is a crime against a nation and is something that an individual can consent to. Human trafficking, however, is a crime against an individual. As defined by law, a person cannot consent to being trafficked. Smuggling can make an individual vulnerable to traffickers in a number of ways. For example, many smuggling operations are conducted for the purpose of creating debt bondage situations or circumstances in which children are separated from their families. Many traffickers employ smugglers to transport the victims recruited in origin countries.

12.     To be clear, the United States is a desirable location for human traffickers to be doing business. There is money to be made here. International organized crime groups seek to exploit loopholes in our visa system, policies about asylum, and find areas of our borders that can be physically crossed with relative ease. For example, many of the workers in the estimated 9,000 illicit massage businesses across the United States entered the U.S. in one of two ways: they were smuggled across the U.S.-Mexico border via coyotes or took advantage of loopholes in immigration policy enacted in 2012 under the Obama Administration that allowed them to claim asylum for persecution. No verification of the basis for seeking asylum is required and follow up is not provided. Thus, the victims disappeared into the United States. Many of these women are under the control of Asian organized crime groups and are being sex trafficked in illicit massage parlors across the United States (Polaris, 2018, Human Trafficking in Illicit Massage Businesses.)

13.     Foreign national victims of human trafficking are found in both labor and sex trafficking across the United States. Foreign nationals who don't speak English and are undocumented can easily be marginalized and isolated. Fear of deportation can keep victims from reporting to law enforcement. Often these victims have been told to fear law enforcement and are unaware of their rights. Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look. In the eyes of a trafficker, children in these circumstances make ideal victims.

14.     The following graphic represents top venues for human trafficking reported to the National Human Trafficking Hotline during the year of 2019 (the latest year those statistics are available):





Source: Polaris Project (2019), Retrieved from: https://humantraffickinghotline.org/states

15.     Unskilled labor pools are common places to find labor trafficking victims in states all across the U.S. Undocumented, marginalized immigrants are ideal candidates for these situations. Female labor trafficking victims are also often subjected to harassment and sexual abuse including sex trafficking.

- According to the International Journal of Rural Criminology (2014), 39% of North Carolina's farm workers report being trafficked or otherwise abused.
- In 2008, approximately 1,200 undocumented migrant workers were freed from slave-like conditions on tomato farms in central Florida. Victims had wages withheld, were beaten, threatened and forced to work long hours in extreme conditions. They were locked up and confined. Some of the women reported sexual abuse.
- In 2015, a Justice Department press release announced the unsealing of a 15-count superseding indictment "charging three defendants with luring Guatemalan minors and adults into the United States on false pretenses, then using threats of physical harm to compel their labor at egg farms in Ohio."
- Other cases have involved tomato pickers locked in box trucks under armed guard and children around the age of 7 laboring in Michigan blueberry groves.

Retrieved from: https://www.csmonitor.com/World/2015/1116/Trafficking-In-Florida-s-tomato-fields-a-fight-for-ethical-farm-labor-grows)

16.      Farley, Ugarte & Zarate (2004) document reports of residential brothels and camps that extend from San Diego all the way up to Canada where undocumented immigrant young girls and women are sold for sex. These victims entered the United States via the southern border with the assistance of coyotes who initially promised them a better life (Farley, M., Ugarte, MB., Zarate, L. 2004. Prostitution and trafficking of women and children from Mexico to the United States. Journal of Trauma Practice, Taylor & Francis.) One of these camps is described in a 2003 report by a physician working with migrant workers, "'The first time I went to the camps I didn't vomit only because I had nothing in my stomach. It was truly grotesque and unimaginable.' Many of the girls were 9 to 10 years old. On one occasion the physician counted 35 men raping a girl for money during a single hour." (Hernandez, A. 2003. The Sex Trafficking of Children in San Diego: Minors are prostituted in farm labor camps in San Diego. El Universal, Mexico City. Jan 11, 2003).

# Number of Trafficking Cases by State of Exploitation



17.      Humanitarian considerations are primary in our border policy. Nevertheless, there are fiscal costs to consider as well. Expenses are incurred by our federal government, but also by states for things like law enforcement; and other criminal justice system resources, social service costs, the public health system as well as opportunity costs should be considered. Labor trafficking results in lost wages and tax revenue and puts downward pressure on wages in general, especially in unskilled labor pools. This further exacerbates the economic challenges for individuals working in those areas of the economy which often impacts increased demand for

assistance with housing and food. The money made through human trafficking by international organized criminal organizations operating in the United States further empowers these entities and contributes to an increase in crime in general. All of this has a very real price tag to it. In 2016, the University of Texas and published a report estimating the prevalence of child sex trafficking and labor trafficking in Texas and the associated financial cost to the state. Key findings of this report estimate that approximately 79,000 minors were being sex-trafficked in Texas at any given time during that year. The lifetime social service costs incurred by the state and the victims themselves through mental and physical health costs, strains to the public health system, and law enforcement expenses is estimated to be $6.6 billion dollars. The study additionally estimates the annual value of lost wages for labor trafficking victims to be approximately $600 million dollars. (Source retrieved from: https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf)

18.     In conclusion, the data presented indicates there is a relationship between the prevalence of human trafficking in the United States and activity on the US-Mexico border. Immigration policies as they relate to the management of the southern border of the United States are a contributing factor to overall rates of human trafficking in the United States. Cross border trafficking is not the largest cause of overall human trafficking in the United States, as the majority of human trafficking cases within the United States originate domestically. Nevertheless, cross border human trafficking activity has implications for the overall prevalence of human trafficking in all fifty states, not just the states along the U.S. Mexico border.


**Missouri**

19.     For the three years 2017 through 2019, between 9% and 12% of calls made to the National Human Trafficking Hotline for the state of Missouri involved foreign nationals. It is my professional opinion, based on my study of relevant research and my work in the field, that what is reported to the National Human Trafficking Hotline are just the proverbial "tip of the iceberg." The vast majority of cases of human trafficking are not identified or reported at all, this is especially true for cases in which the victims are foreign nationals. Most of these victims are very isolated and marginalized by physical, geographical, cultural and linguistic factors. They, like many human trafficking victims, do not self-identify as victims, do not know their rights, and do not know who or how to ask for help.

20.     Several recent sample cases of human trafficking involving foreign nationals who were able to gain entry into the United States due to weaknesses in immigration policy and then were exploited in or through Missouri are provided in the following section. They detail the ways in which lax immigration policy and open borders create opportunities for traffickers. Once victims arrive in the United States, they do not just stay in the bordering states of California, Arizona, New Mexico and Texas. Cases involving human trafficking of foreign nationals are documented in all fifty states.

21.     In 2014, an 80% increase in unaccompanied minors at the U.S. Mexico border was reported. This increase is attributed to several factors, including a change in policy regarding the

potential deportation for undocumented immigrants who were minors. Accompanying that change in policy was a marked increase in smugglers' recruitment in origin countries. ( Robertson, Lori (2018-06-28). *"Illegal Immigration Statistics")*. As Director of our state HTTF, I have the opportunity to work with numerous social service and law enforcement agencies across the state. A veteran state Trooper with over two decades of experience on Missouri highways recounted for me how in 2014, he saw a marked increase in activity on our highways involving foreign nationals. Some of that activity he suspects involved human trafficking.

22.    Missouri can be a destination or transit state for many human traffickers. This is mainly due to the state's substantial transportation infrastructure, major population centers and various aspects of our economy that are reliant on unskilled labor such as agriculture. Missouri has the 7th largest highway system in the nation with six major interstates. Coupled with its geographical middle location in the country, this ensures that a significant portion of transnational movement passes through Missouri.



Source: Missouri Department of Economic Development (2021). Retrieved from:
https://ded.mo.gov/transportation-and-logistics/why-missouri/centrally-located-with-excellent-infrastructure

**Case Examples**

**An Unaccompanied Three Year Old Girl**

23.     On December 22, 2020, a Kansas Highway Patrol Technical Trooper conducted a traffic stop on U-54 Hwy in SW Kansas.  The vehicle was full of illegal immigrants.  The trooper observed 9 males and 1 female and wanted to check the welfare of the female to make sure that she was not being trafficked.  During the traffic stop, it came to light that there was a small female child in the vehicle.  The trooper re-approached and eventually discovered that the 3 year old female from Ecuador was concealed under the rear bench seat and covered with a blanket.  Further investigation revealed that the child was not related to anyone in the vehicle.  Further, her parents had her smuggled across the U.S.-Mexico border in one fashion and they were going to attempt to cross utilizing a different method.  The parents didn't make it across.  However, they had sent the girl with a phone and some phone numbers to contact if this scenario happened.  The driver stated he picked the child up in Albuquerque, NM at a gas station from a different vehicle.  He admitted he was taking the child to Chicago [via Missouri].  The parents had planned to arrive in New York to live with family.  The driver didn't know why the girl was going to Chicago or whether she would end up in New York or not.  He was being paid to transport these immigrants.

24.     The girl was removed from the situation and family in New York was contacted.  No one had heard from this girl in the six days since she crossed the border.  Two days later, the family members from New York arrived to take custody of the girl.

25.     This traffic stop came five days after some human trafficking/sex offender training that the Missouri State Highway Patrol provided to this trooper and other members of the Kansas Highway Patrol.

(Source: Personal Communication (April 2, 2021). Kansas Highway Patrol)

26.     As task force director, I am aware of children in situations like this, especially very young ones, being sexually exploited in residential brothels and through websites that specialize in producing child sexual abuse material (CSAM) (also referred to as child pornography). There is a very specific niche market for CSAM featuring very young children with subscribers who are willing to pay high dollar to access. Some of these websites require subscriptions where a viewer can pay for customized sessions where they can request specific acts to be done to the child while the viewer watches live. The website platforms that participate in this horrible practice often use children from developing countries with unstable governments where they have reasonable assurance that there will be no law enforcement involvement. Children who are unaccompanied and undocumented in the United States are ideal potential victims for this form of horrific abuse as well.

**Labor Trafficking in the Kansas City Area**

27.     In 2016, the owners and crew leaders of a company named Century Roofing were found to be involved in labor trafficking of undocumented immigrants. The federal indictment alleges that the workers were threatened, intimidated, and coerced into paying kickbacks to the company and its managers. Workers were housed in over-crowded apartments, and threatened with deportation if they did not work long hours and pay money back to supervisors. Further investigation indicated that Century Roofing helped facilitate the recruitment and transportation of their victims for the purpose of providing below market wages.  Three arrests were made.

Retrieved from: https://fox4kc.com/news/3-arrested-in-kck-on-criminal-charges-following-homeland-security-investigation/

**Labor Trafficking in the Branson Area**

28.     In 2009, a labor leasing company named Santa Cruz Management, was found to be hiring foreign nationals who had been trafficked into the United States utilizing loopholes in the U.S. H-2B Visa system. The company sent recruiters to countries like Belize and the Phillipines to find workers to fill their positions knowing there were weaknesses in the H-2B Visa system that could be used to facilitate their entry into the U.S. Workers agreed to incur a debt that they believed could later be paid off once they started working. The labor company would help facilitate travel, and provided assistance with circumventing the immigration process by telling them how to lie to immigration officials. Victims were then forced violate the terms of their visas, housed in overcrowded apartments and hotel rooms, and threatened with deportation. The victims were employed as landscapers, housekeepers and worked in restaurants in the Branson Area.

29.     This case is a classic example of how the tactic of utilizing debt bondage is a common means to control labor trafficking victims and exploit them for their wages. Many victims make substandard wages, but even those who make minimum wage can then be forced, coerced or tricked into paying all or most of that back to the company as a means to pay of that debt. Traffickers will continue to find ways to add to this contrived debt as a means to continue control and make money. An important aspect of this story to keep in mind is that were it not for weaknesses in our immigration system, be it loopholes in our Visa system or a physical opening in a border where crossing is permissible, traffickers would not invest in recruiting, transporting and harboring of victims in the first place.

Retrieved from: https://www.hoppocklawfirm.com/a-branson-human-trafficking-scheme-and-its-hopeful-aftermath/

**Multi State Labor Trafficking Case**

30.     In 2009, eight individuals from Uzebekistan were charged with racketeering, forced labor trafficking, immigration violations. They owned and operated three labor leasing companies that primarily was looking to hire house cleaners for hotels across 14 states including Missouri, specifically in the Kansas City and Branson areas.  The workers were largely undocumented immigrants who entered via the southern U.S.-Mexico border or had overstayed their visas. They were controlled by debt bondage tactics in which sometimes worker would receive paychecks with negative earnings and threats of physical violence and abuse and threat of deportation. The indictment also included violations related to identity theft, harboring illegal aliens, mail fraud, conspiracy to commit money laundering, transporting illegal aliens, visa fraud, extortion, interstate travel in aid of racketeering, wire fraud and inducing the illegal entry of foreign nationals.

Retrieved from: https://www.justice.gov/opa/pr/eight-uzbekistan-nationals-among-12-charged-racketeering-human-trafficking-immigration

I swear or affirm under penalty of perjury that the foregoing is true and correct.


Dated:  April 28, 2021

Alison Phillips

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF CARA PIERCE**

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS AND THE STATE OF MISSOURI, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Case No. 2:21-cv-00067-Z ) |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, et al., | ) ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF CARA PIERCE

My name is Cara Foos Pierce, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

**Background**

1.    I am the Chief of the Texas Attorney General's Human Trafficking and Transnational Organized Crime Section ("HTTOC"), and I also serve, as designee of Texas Attorney General Ken Paxton, as the chair of the Texas Human Trafficking Prevention Taskforce and the Texas Human Trafficking Coordinating Council.  In these roles, I am charged with developing and implementing a comprehensive plan to eradicate human trafficking in Texas. I work with federal, state and local partners, including prosecutors, law enforcement, social service providers, and non-government organizations to combat human trafficking. I also supervise seven prosecutors that support District Attorneys throughout Texas on human trafficking prosecutions. I have trained thousands of law enforcement officers, prosecutors and community members about

human trafficking. I also consult and serve as a Resource Witness to the Texas Legislature on human trafficking. In my role as Chief of HTTOC, I was asked to write this Declaration summarizing the scope of human trafficking in Texas.

2.    Prior to joining the Attorney General's Office in June of 2020, I was an Assistant United States Attorney in the Northern District of Texas for twelve years. I served as the Human Trafficking Coordinator for the District for nine years, and I prosecuted over 80 human trafficking cases, involving over 200 victims. I have seen first-hand the horrific trauma traffickers inflict on victims, and the long-term impact it has on their lives. Traffickers frequently target the most vulnerable people – children, people with substance abuse problems, people without legal status in the United States, people with mental or physical disabilities and those experiencing homelessness. They are master manipulators that prey on people's vulnerabilities, and they profit greatly from exploiting others.

**Human Trafficking in the United States**

3.    Human trafficking is the fastest growing crime impacting every continent and economic structure in the world.[1] Affecting every ethnicity, gender, age and socioeconomic background, human trafficking knows no boundaries. And the true magnitude of this hidden crime is largely unconfirmed as human trafficking data is often difficult to collect.[2] The majority of existing data focuses primarily on identified victims, highlighting only a fraction of the problem. Because many survivors do not report their exploitation for a variety of reasons, including fear of harm or retaliation, language barriers, mistrust of government and trauma, the data will never fully

---

[1] https://www.a21.org/content/human-trafficking/gqe0rc (last visited Apr 29, 2021).
[2] Noël L. Busch-Armendariz et al., Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas (December 2016), https://ic2.utexas.edu/pubs/human-trafficking-by-the-numbers-the-initial-benchmark-of-prevalence-and- economic-impact-for-texas/.

reflect the gravity of human trafficking cases. However, data can provide useful insight into human trafficking trends.

4.      For example, the Counter Trafficking Data Collaborative collects data on human trafficking from organizations across the world.  By collaborating data from several different organizations, it determined that 10.9% of trafficking victims in the United States came from Mexico.  The second highest nationality of non-American trafficking victims was the 3.7% who came from China.[3]



5.      Federal agencies provide additional insight into the number of foreign nationals in trafficking situations in the United States.  In 2019, the United States Department of Health and Human Services served 1573 individuals, including 968 trafficking victims and 605 family members who were foreign national victims.[4]  The State Department's Trafficking in Persons Report also tracks Certification Letters, which allow foreign national adult victims of severe trafficking to receive continued presence, and Eligibility Letters, which does the same for children. In 2019, HHS issued 331 Certification Letters, which was approximately 75% of the number

---

[3] https://www.ctdatacollaborative.org/.
[4] 2020 Trafficking in Persons Report, p.525, found at https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf.

issued in 2018.[5] The number of Eligibility Letters, in contrast, increased from 466 in 2018 to 892 in 2019.[6] DHS also reported on the issuance of T visas, which allow for Continued Presence in the United States. It requires that the applicant show that they are (1) a victim of severe trafficking in persons, (2) are physically present in the United States, (3) have complied with law enforcement, and (4) would suffer hardship if they were removed from the United States. In 2019, DHS granted T status to 500 individuals and 491 family members, which was a significant decrease from 576 victims and 703 family members in 2018.[7] DHS also issued Continued Presence in 2019 to 125 trafficking victims.[8]

6. Many immigrants come to the United States in hopes of finding a legitimate job, and they end up being exploited, in places such as illicit massage businesses ("IMBs"). IMBs frequently traffic women from Asian countries, including China and South Korea.[9] Women who come to the United States and end up working in an IMB are frequently smuggled into the United States, or they enter on a tourist visa, and overstay that visa. These girls and women are frequently indebted to their smuggler, and they end up being trafficked to repay that debt.[10] Once here, they are unable to leave because they are controlled by their traffickers due to their immigrant status and through threats and coercion.[11]

**Human Trafficking in Texas**

7. Texas consistently has the second highest number of reported human trafficking cases in the United States. Texas' size, diverse economy, and geographic location as a border state

---

[5] *Id.* at 526.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Polaris: *Human Trafficking in Illicit Massage Businesses* p. 19.
[10] *Id.*
[11] *Id.*

leads to a wide range of human trafficking related crimes and issues. According to *Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas*, a prevalence data report published in 2016, minor and youth sex trafficking is estimated to cost Texas approximately $6.6 billion, and traffickers are estimated to exploit approximately $600 million from victims of labor trafficking.[12] Migrants are frequently targeted by traffickers and exploited for their labor because of their lack of community and family ties in the United States, their uncertain immigration status and language barriers.

8.      Currently, Texas has over 1,000 active illicit massage businesses, as identified by Heyrick Research. These storefront brothels frequently employ women without legal status in the United States. This makes them particularly susceptible to traffickers, who exploit them through sex trafficking and debt bondage arising from being smuggled into the United States. In 2020, there were over 37,000 online commercial advertisements for illicit massage businesses in Texas.

9.      In 2019, the National Human Trafficking Hotline identified 2,455 victims, 515 traffickers, and 240 trafficking businesses located in Texas.[13] It also identified 1,080 trafficking cases in Texas.[14] Of those, 16% involved foreign nationals, with unreported citizenship.[15] While this is not a complete picture of the scope of the human trafficking problem in Texas for the reasons stated in paragraph 3 above, it indicates that non-citizens are particularly susceptible to being trafficked  Also, non-citizens may not report their trafficking through the Hotline because of language barriers and fear of deportation.

---

[12] *Id.* Net present value (NPV) of estimated lifetime cost of minor and youth sex trafficking victims.
[13] https://humantraffickinghotline.org/sites/default/files/2019%20Texas%20State%20Report.pdf
[14] *Id.*
[15] https://humantraffickinghotline.org/state/texas

## LOCATIONS OF REPORTED HUMAN TRAFFICKING IN TEXAS



16

This image represents locations in Texas where trafficking was reported to the Hotline. While these figures are shocking, they represent only a small glimpse of the whole picture as these statistics indicate only reported cases. Many cases are not reported either because of fear, or victims may not even know that they are victims of a crime.

10.    Since 2008, when Texas issued its first report on human trafficking in the state, there are five times the number of trafficking arrests and four times the number of human trafficking convictions in Texas courts. Likewise, according to the Texas Department of Public Safety, when many industries in Texas slowed down because of COVID-19, human trafficking flourished. In 2020, there were 1,817,605 online commercial sex advertisements posted in Texas. Of those ads, 323,900 are believed to advertise children for commercial sex. Even more startling, most of the more than 1.8 million commercial sex ads were likely reused on several occasions, making the actual number of commercial sex transaction substantially higher.

---

[16] *Id.*

11.     The Texas Attorney General's Human Trafficking and Transnational/Organized Crime Section (HTTOC) was established in 2016 to assist human trafficking prosecutions across the State.  HTTOC is currently comprised of a team of seven criminal attorneys, two civil attorneys, one policy attorney, three legal assistants, a victim advocate, a policy specialist, and a criminal analyst. The OAG- HTTOC section assists law enforcement and prosecutors on human trafficking cases, pursues civil litigation against traffickers and businesses, assists victims with resources, engages the public through training, develops initiatives to enhance the state's support and coordination of human trafficking efforts, and facilitates collaboration between federal, state, and local law enforcement and prosecutors.  Since its inception, HTTOC has resolved 51 cases, resulting in 734 years in prison and one life sentence for human traffickers.  HTTOC is currently involved in 42 ongoing human trafficking cases and investigations across the state.

12.     The charts below provide data on the number of arrests and convictions for human trafficking and related offenses in state courts in Texas, including compelling prostitution, promotion of prostitution, and aggravated promotion of prostitution. [17] It should be noted that arrests and cases from recent years, may be ongoing and delayed in the court process because of COVID-19, thus producing a relatively low number of convictions compared to prior years as of the date of this Declaration.

| HUMAN TRAFFICKING | | | | | |
|---|---|---|---|---|---|
| FY | ARRESTS | DISPOSED BY PROSECUTOR | CONVICTIONS | DEFERRED | DISMISSAL |
| 2007 | 39 | 11 | 9 | 7 | 3 |
| 2008 | 24 | 5 | 10 | 10 | 5 |
| 2009 | 12 | 2 | 4 | 0 | 10 |
| 2010 | 16 | 7 | 3 | 2 | 3 |
| 2011 | 24 | 8 | 5 | 1 | 2 |

[17] Source: Texas Department of Public Safety. All data by fiscal years. 2007 from January 1-August 31.

| | | | | | |
|---|---|---|---|---|---|
| 2012 | 68 | 10 | 5 | 5 | 3 |
| 2013 | 109 | 20 | 11 | 1 | 20 |
| 2014 | 110 | 26 | 19 | 1 | 14 |
| 2015 | 120 | 19 | 32 | 6 | 40 |
| 2016 | 142 | 26 | 53 | 6 | 34 |
| 2017 | 128 | 18 | 41 | 6 | 46 |
| 2018 | 184 | 20 | 62 | 3 | 39 |
| 2019 | 165 | 27 | 46 | 7 | 53 |
| 2020 | 185 | 21 | 28 | 5 | 39 |
| 2021 | 45 | 2 | 2 | 2 | 5 |

| COMPELLING PROSTITUTION | | | | | |
|---|---|---|---|---|---|
| FY | ARRESTS | DISPOSED BY PROSECUTOR | CONVICTIONS | DEFERRED | DISMISSAL |
| 2007 | 45 | 0 | 13 | 3 | 5 |
| 2008 | 45 | 4 | 22 | 0 | 16 |
| 2009 | 51 | 2 | 13 | 6 | 14 |
| 2010 | 48 | 6 | 13 | 3 | 4 |
| 2011 | 65 | 4 | 10 | 2 | 16 |
| 2012 | 70 | 4 | 21 | 3 | 14 |
| 2013 | 85 | 7 | 19 | 2 | 22 |
| 2014 | 113 | 16 | 25 | 5 | 34 |
| 2015 | 105 | 19 | 38 | 6 | 49 |
| 2016 | 142 | 6 | 35 | 12 | 37 |
| 2017 | 141 | 7 | 31 | 15 | 81 |
| 2018 | 106 | 7 | 43 | 7 | 35 |
| 2019 | 105 | 5 | 26 | 6 | 53 |
| 2020 | 97 | 5 | 18 | 3 | 28 |
| 2021 | 21 | 1 | 4 | 0 | 4 |

13.     In 2019, Texas had the highest number of active human trafficking cases pending in federal courts in the United States.[18]  Forty-eight federal human trafficking defendants were convicted in Texas in 2019, which was also the highest in the nation.  The 2019 Federal Human Trafficking Report also noted that 19.6% of victims in new trafficking cases across the country

---

[18] *Federal Human Trafficking Report*, The Human Trafficking Institute (2019).

lacked regular immigration status in the United States.[19]   Victims hailed from 24 different countries, including Guatemala, Honduras, Mexico, Columbia, the Dominican Republic and Venezuela. It also noted that traffickers exploited communication barriers to isolate these victims, along with their fear of deportation, as a means of control. [20]

14.    Based on my knowledge and experience, I anticipate that any increase in non-citizens present in the United States, including those claiming asylum, is likely to increase human trafficking because traffickers often target non-citizens for exploitation. Traffickers may use any method available to get their victims into the United States, including instructing them to claim asylum at the border; many victims feel compelled to comply with their trafficker's demands. Also, even legitimate asylum seekers, especially children, face the risk of being trafficked once they are within the United States. They are especially vulnerable because of cultural and language barriers and the lack of a stable home and system of support in this country.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⁴ᵗʰ day of May 2021.

Cara Foos Pierce
Cara Foos Pierce

---

[19] *Id.* at 30.
[20] *Id.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF SHERI GIPSON**

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF SHERI GIPSON

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1. I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2. I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020. I have worked for the Driver License Division of DPS for 38 years.

3. Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section

521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.  Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.  If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence. In fiscal year 2019 (September 2018 through August 2019), DPS issued 386,898 limited term licenses and identification certificates. In fiscal year 2020 (September 2019 through August 2020), DPS issued 304,031 limited term licenses and identification certificates. Driver license and identification card transactions for FY 2020 were impacted by office closures and reduced

---

[1] DPS maintains a list documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf. A copy is attached to this declaration as Exhibit 1.

customer capacity in offices due to the pandemic.

6.      For each non-citizen resident of Texas who seeks a limited term driver license or personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per transaction.

7.      For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.      Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS. DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.      The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on this _6th__ day of May 2021.

_____

SHERI GIPSON

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF SHERI GIPSON**

Verifying Lawful Presence

# EXHIBIT F-1

# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US. The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence. All documentation must show the applicant's name and date of birth. The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program. Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days. If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification. Each stage may require additional documentation from the applicant. After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction. To avoid further delay, the applicant should comply with the instructions fully and as soon as possible. If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|-------|-------------------------------|---------------------------|
| First | Within a few seconds | If verified, card issued |
| Second | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| Third | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

## Temporary Visitor/Limited Term Issuance

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

## Commercial Driver Licenses

This guide does not apply to commercial driver licenses. A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license. All others may apply for a nonresident commercial driver license, if eligible. Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

**(Rev. 7-13)**

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.<br>❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad<br>❖ Certificate of U.S. Citizenship<br>❖ Certificate of Naturalization<br>❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)<br>❖ Northern Mariana Card (I-873)<br>❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"<br>❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents. Issuance cannot occur without approval of the documents by Austin headquarters. DLD Personnel: make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551)<br>❖ Resident Alien Card (I-551) – card issued without expiration date<br>❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport<br>❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ Re-entry Permit I-327<br><br>Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry"<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

AR02348

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD. Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

4

| Category | Acceptable Documents |
|---|---|
| Persons granted **withholding of deportation or removal** | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in **removal or deportation proceedings** | Immigration documentation with an alien number or I-94 number |
| Persons granted a **stay of deportation** | Immigration documentation with an alien number or I-94 number |
| Persons granted **voluntary departure** | Immigration documentation with an alien number or I-94 number |
| A-1, A-2, and A-3 | Unexpired foreign passport or I-94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card. |
| B1/B2 Visa/BCC with I-94<br><br>(Border Crosser Card , DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ I -94<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| B-1, B-2, C-1, C-3, D-1, and D-2 | Unexpired foreign passport or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| C-2<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements. |
| E-1, E-2, and E-3 | Unexpired foreign passport or I -94 |
| E-2 CNMI<br><br>Treaty-investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| F-1<br><br>Foreign academic student | Unexpired foreign passport or I -94 or I-20 |

5

| Category | Acceptable Documents |
|---|---|
| **F-2**<br><br>Dependent on F-1 | Unexpired foreign passport or I-94 |
| **F-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **G-1, G-2, G-3, G-4, and G-5** | Unexpired foreign passport or I-94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| **H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I** | Unexpired foreign passport or I-94 |
| **J-1**<br><br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I-94 or DS-2019 |
| **J-2**<br><br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I-94 |
| **K-1, K-2, K-3, K-4, L-1, L-1A, L-1B, and L-2,** | Unexpired foreign passport or I-94 |
| **M-1**<br><br>Non-academic student | Unexpired foreign passport or I-94 or I-20 |
| **M-2**<br><br>Dependents of non-academic students | Unexpired foreign passport or I-94 |
| **M-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **N-1 through N-7 (NATO)**<br><br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I-94 |
| **N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3** | Unexpired foreign passport or I-94 |

6

| Category | Acceptable Documents |
|---|---|
| **WB\***<br><br>Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I –94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **WT\***<br><br>Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I –94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |

\*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

AR02352

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LEONARDO R. LOPEZ**

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS AND | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DECLARATION OF LEONARDO R. LOPEZ

My name is Leonardo R. Lopez, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.     I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2016, having previously served as the Executive Director of Finance for the Austin Independent School District ("AISD") for four years. Prior to my time at AISD, I served for ten years in a variety of roles for TEA, including six years as the Foundation School Program Operations Manager for the TEA's State Funding Division.

2.     In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data.

My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.      TEA estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. If a student qualifies for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $11,432 to educate each student in attendance for the entire school year. Assuming additional Bilingual and Compensatory Education weighted funding, comparable student costs for fiscal year 2022 would be $11,532.

4.      TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on April 29, 2021 at 4 p.m. CST at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit 1), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; and 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021

would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, and $11,432, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, and $26.71 million, respectively.

5.      Additionally, if the same number of UAC are released to sponsors during the 12-month period covering October 2020 through September 2021 as were released during the 12-month period covering October 2019 through September 2020, and if each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal year 2022 would be roughly $11,532), the State's annual cost to educate this group of children for fiscal year 2022 would be approximately $26.94 million. Currently, all the costs of educating these students would be borne by the State.

6       In fact, the number of UAC released to sponsors in Texas may end up being higher than this, as 2,389 UAC were released to sponsors in Texas during the 6-month period covering October 2020 through March 2021.  (Exhibit 1).  If the rate of this 6-month period is maintained for the rest of the 12-month period through September 2021, 4,778 UAC would be released to sponsors in Texas for that period.  This would be an increase of nearly 105% over the previous 12-month period number of 2,336.

7.      School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 36,000 students in enrollment growth across Texas each year.

8.      The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

9.      Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

10.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of April 2021.

_____

LEONARDO R. LOPEZ

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LEONARDO R. LOPEZ**


U.S. Health and Human Services Office of Refugee Resettlement


# EXHIBIT G-1

# Unaccompanied Children Released to Sponsors by State

Publication Date: April 29, 2021

The data in the table below shows **state-by-state** data of unaccompanied children released to sponsors as of March 31, 2021. ACF will update this data each month. View unaccompanied children released to sponsors by county.

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. The FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

## Unaccompanied Children Release Data

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 333 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 0 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 96 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 116 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 1,696 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 168 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 249 |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 86 |
| DC | 201 | 432 | 294 | 138 | 322 | 48 | 38 |
| Florida | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 1,779 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 708 |
| Hawaii | 2 | 4 | 4 | 1 | 16 | 6 | 3 |
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 13 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 255 |

AR02359

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 234 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 115 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 100 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 177 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 478 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 17 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 838 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 410 |
| Michigan | 132 | 227 | 160 | 136 | 248 | 74 | 67 |
| Minnesota | 243 | 318 | 320 | 294 | 624 | 151 | 176 |
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 128 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 112 |
| Montana | 2 | 0 | 2 | 3 | 0 | 2 | 2 |
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 158 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 41 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 8 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 955 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 22 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 1,545 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 674 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 0 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 251 |
| Oklahoma | 225 | 301 | 267 | 286 | 581 | 120 | 150 |

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Oregon | 122 | 188 | 170 | 200 | 318 | 71 | 89 |
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 295 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 |
| Rhode Island | 185 | 269 | 234 | 235 | 453 | 92 | 62 |
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 245 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 36 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 717 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 2,389 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 39 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 2 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 792 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 210 |
| West Virginia | 12 | 26 | 23 | 23 | 41 | 4 | 12 |
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 63 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 5 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| **TOTAL** | **27,840** | **52,147** | **42,497** | **34,953** | **72,837** | **16,837** | **17,154** |

*The FY2015 numbers have been reconciled.

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read ORR's reunification policy.

Topics:

AR002361

Unaccompanied Children (UC)

**Types:**
Grant & Funding

**Audiences:**
Unaccompanied Alien Children (UAC)

Last Reviewed Date: April 29, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF LISA KALAKANIS

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS AND | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>DECLARATION OF LISA KALAKANIS</u>

My name is Lisa Kalakanis, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I serve as the Interim Director of the Texas Health and Human Services Commission's Center for Analytics and Decision Support (CADS). The Texas Health and Human Services Commission (HHSC) is the state agency responsible for ensuring the appropriate delivery of health and human services in Texas. As such, HHSC has operational responsibility for certain health and human services programs and oversight authority over the state health and human services (HHS) agencies.

2.       As a part of my employment with HHSC, I am responsible for analytic and quantitative research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs, including Medicaid. I am also responsible for program evaluation activities and analytic support across all of the HHS agencies and programs.

3.      I have served as Interim CADS Director since September 1, 2020. I also serve as the Director for the Data Dissemination Unit within CADS.

4.      This declaration was first prepared by Monica Smoot, then Chief Data and Analytics Officer for the Texas Health and Human Services Commission's Center for Analytics and Decision Support (CADS). Ms. Smoot retired from the agency in August 2020. The data contained in this declaration is true and correct.

5.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014 and 2017. The Rider 59 Report completed in 2017 covered state fiscal year (SFY) 2015.

6.      HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology

HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, $73 million in SFY 2015, and $85 million in SFY 2017; the estimate in SFY 2019 was $80 million.

8.    The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, $1.0 million in SFY 2015, and $1.2 million in SFY 2017; the estimate for SFY 2019 is $1.0 million.

9.    Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the

AR_002366

Rider 59 report. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, $38 million in SFY 2013, $30 million in SFY 2015, and $30 million in SFY 2017; the estimate for SFY 2019 is $6 million.

10.     In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

11.     Although all of these numbers are estimated costs for the respective programs, it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants.

12.     Based on my knowledge, expertise, and research regarding the provision of services and benefits to undocumented immigrants by HHSC, I believe that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year.

13.     CADS can produce an updated report on the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. Because of other CADS workload,

including ongoing reporting on the impacts of COVID on Texas' vulnerable populations and demands associated with other litigation, as well as the ongoing legislative session, we estimate that the report will be ready by May 15.

14.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of April, 2021.

Lisa Kalakanis
_____

LISA KALAKANIS

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LISA KALAKANIS**

Estimating the Percent of Undocumented Clients

# EXHIBIT H-1

# Appendix B:  Estimating the Percent of Undocumented Clients

<u>Previous Undocumented Immigrant Estimates</u>

Previously, HHSC relied on different methods to estimate the percent of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

More recently HHSC relied on a method that uses two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Method for Current Estimates

Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

<u>Data Analysis and Estimate</u>

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs for the purposes of the analysis in this report.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF REBECCA WALTZ

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS AND<br>THE STATE OF MISSOURI,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States of<br>America, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2:21-cv-00067-Z |

## <u>DECLARATION OF REBECCA WALTZ</u>

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.     I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.     I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.     The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating

undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures ( correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the eligible inmates - (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1, 2017 through June 30, 2018), TDCJ reported data for 8,951 eligible inmates and total of 2,439,110 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2018 ($62.34) as reported by the Texas Legislative Budget Board by the number of days.  For example ($62.34 x 2,439,110 days = $152,054,117).

7.      Of this estimated amount, TDCJ was reimbursed $14,657,739 by SCAAP.

8.      It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

9.      All of the facts and information contained within this declaration are within my

personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on this 30th day of April 2021.

_____

REBECCA WALTZ

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**SECOND DECLARATION OF RYAN D. WALTERS**

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

THE STATE OF TEXAS and §
§
THE STATE OF MISSOURI, §
§
    Plaintiffs, §
§    Case No. 2:21-cv-00067-Z
v. §
§
JOSEPH R. BIDEN, JR., in his official §
capacity as President of the United States §
of America, *et al.*, §
§
    Defendants. §
§

## SECOND DECLARATION OF RYAN D. WALTERS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
## INJUNCTION

I, Ryan D. Walters, hereby declare as follows:

    1.    I am over 18 years of age and am fully competent to make this declaration. I am Special Counsel in the Special Litigation Unit at the Texas Office of Attorney General, and I am admitted to practice law in this Court, and I represent the State of Texas in the above-captioned matter. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the facts stated herein.

    2.    Appended to the Plaintiffs' Motion for Preliminary Injunction is the following exhibit:

| Ex. No. | Title |
|---------|-------|
| 1 | Memorandum of Secretary Alejandro N. Mayorkas dated June 1, 2021; https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf |

    3.    The exhibit listed above is a true and correct copy of what it purports to be.

I declare under the penalty of perjury that the foregoing is true and correct.

<div align="center">

Executed on June 8, 2021

*/s/ Ryan D. Walters*
Ryan D. Walters

</div>

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that on June 8, 2021, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

<div align="center">

*/s/ Ryan D. Walters*
Ryan D. Walters

</div>

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**SECOND DECLARATION OF RYAN D. WALTERS**

Memorandum of Secretary Alejandro N. Mayorkas dated June 1, 2021

# EXHIBIT J-1

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

June 1, 2021

MEMORANDUM FOR:    Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Tracy L. Renaud
                   Acting Director
                   U.S. Citizenship and Immigration Services

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Termination of the Migrant Protection Protocols Program**

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." Over the course of the Migrant Protection Protocols (MPP) program, the Department of Homeland Security and its components issued further policy guidance relating to its implementation. In total, approximately 68,000 individuals were returned to Mexico following their enrollment in MPP.[1]

On January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum suspending new enrollments in MPP, effective the following day.[2] On February 2, 2021, President Biden issued Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed me, in coordination with the Secretary of State, the Attorney General, and the Director of the Centers for Disease Control and Prevention, to "promptly

---

[1] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, available at
https://www.dhs.gov/publication/metrics-and-measures.
[2] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[3]

On February 11, the Department announced that it would begin the first phase of a program to restore safe and orderly processing at the Southwest Border of certain individuals enrolled in MPP whose immigration proceedings remained pending before the Department of Justice's Executive Office for Immigration Review (EOIR).[4]  According to Department of State data, between February 19 and May 25, 2021, through this program's first phase approximately 11,200 individuals were processed into the United States.  The Department is continuing to work with interagency partners to carry out this phased effort and to consider expansion to additional populations enrolled in MPP.

Having now completed the further review undertaken pursuant to Executive Order 14010 to determine whether to terminate or modify MPP, and for the reasons outlined below, I am by this memorandum terminating the MPP program.  I direct DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program.

## Background

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), authorizes DHS to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service primarily used this authority on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry, though the provision was occasionally used for third country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.

On December 20, 2018, the Department announced the initiation of a novel program, the Migrant Protection Protocols, to implement the contiguous-territory-return authority under Section 235(b)(2)(C) on a wide-scale basis along the Southwest Border.  On January 25, 2019, DHS issued policy guidance for implementing MPP, which was subsequently augmented a few days later by guidance from U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.  During the course of MPP, DHS and its components continued to update and supplement the policy, including through the "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols" issued on December 7,

---

[3] Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021), available at https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

[4] U.S. Department of Homeland Security, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, Feb. 11, 2021, available at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

Case 2:21-cv-00067-Z   Document 56-26   Filed 09/09/22   Page 90 of 366   PageID 6594
Subject: Termination of the Migrant Protection Protocols Program
Page 3

2020 by the Senior Official Performing the Duties of the Under Secretary for Strategy, Policy, and Plans.

Under MPP, it was DHS policy that certain non-Mexican applicants for admission who arrived on land at the Southwest Border could be returned to Mexico to await their removal proceedings under INA Section 240.  To attend removal proceedings, which were prioritized by EOIR on the non-detained docket, DHS facilitated program participants' entry into and exit from the United States. Due to public health measures necessitated by the ongoing COVID-19 pandemic, however, DHS and EOIR stopped being able to facilitate and conduct immigration court hearings for individuals enrolled in MPP beginning in March 2020.[5]

Following the Department's suspension of new enrollments in MPP, and in accordance with the President's direction in Executive Order 14010, DHS has worked with interagency partners and facilitating organizations to implement a phased process for the safe and orderly entry into the United States of certain individuals who had been enrolled in MPP.

## Determination

In conducting my review of MPP, I have carefully evaluated the program's implementation guidance and programmatic elements; prior DHS assessments of the program, including a top-down review conducted in 2019 by senior leaders across the Department, and the effectiveness of related efforts by DHS to address identified challenges; the personnel and resource investments required of DHS to implement the program; and MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program.  I have additionally considered the Department's experience to date carrying out its phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP.  In weighing whether to terminate or modify the program, I considered whether and to what extent MPP is consistent with the Administration's broader strategy and policy objectives for creating a comprehensive regional framework to address the root causes of migration, managing migration throughout North and Central America, providing alternative protection solutions in the region, enhancing lawful pathways for migration to the United States, and—importantly—processing asylum seekers at the United States border in a safe and orderly manner consistent with the Nation's highest values.

As an initial matter, my review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges.

- I have determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls. Over the course of the program, border encounters increased during certain periods and decreased during others.  Moreover, in making my assessment, I share the belief that we can only manage migration in an effective, responsible, and durable manner if we approach the issue comprehensively, looking well beyond our own borders.

---

[5] *See* "Joint DHS/EOIR Statement on MPP Rescheduling," Mar. 23, 2020, available at https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

Case 2:21-cv-00067-Z Document 56-26 Filed 09/09/22 Page 91 of 366 PageID 6595
Subject: Termination of the Migrant Protection Protocols Program
Page 4

- Based on Department policy documents, DHS originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs. It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims. I am also mindful of the fact that, rather than helping to clear asylum backlogs, over the course of the program backlogs increased before both the USCIS Asylum Offices and EOIR.

- MPP was also intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets. The Department devoted resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities to support EOIR; facilitating the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings; and providing transportation to and from ports of entry in certain locations related to such hearings. Additionally, as more than one-quarter of individuals enrolled in MPP were subsequently re-encountered attempting to enter the United States between ports of entry, substantial border security resources were still devoted to these encounters.

A number of the challenges faced by MPP have been compounded by the COVID-19 pandemic. As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

In deciding whether to maintain, modify, or terminate MPP, I have reflected on my own deeply held belief, which is shared throughout this Administration, that the United States is both a nation of laws and a nation of immigrants, committed to increasing access to justice and offering protection to people fleeing persecution and torture through an asylum system that reaches decisions in a fair and timely manner. To that end, the Department is currently considering ways to implement long-needed reforms to our asylum system that are designed to shorten the amount of time it takes for migrants, including those seeking asylum, to have their cases adjudicated, while still ensuring adequate procedural safeguards and increasing access to counsel. One such initiative that DHS recently announced together with the Department of Justice is the creation of a Dedicated Docket to

Case 2:21-cv-00067-Z   Document 5626  Filed 09/09/22   Page 92 of 366   PageID 6596
Subject: Termination of the Migrant Protection Protocols Program
Page 5

process the cases of certain families arriving between ports of entry at the Southwest Border.[6]  This process, which will take place in ten cities that have well-established communities of legal service providers, will aim to complete removal proceedings within 300 days—a marked improvement over the current case completion rate for non-detained cases.  To ensure that fairness is not compromised, noncitizens placed on the Dedicated Docket will receive access to legal orientation and other supports, including potential referrals for pro bono legal services. By enrolling individuals placed on the Dedicated Docket in Alternatives to Detention programs, this initiative is designed to promote compliance and increase appearances throughout proceedings.  I believe these reforms will improve border management and reduce migration surges more effectively and more sustainably than MPP, while better ensuring procedural safeguards and enhancing migrants' access to counsel.  We will closely monitor the outcomes of these reforms, and make adjustments, as needed, to ensure they deliver justice as intended: fairly and expeditiously.

In arriving at my decision to now terminate MPP, I also considered various alternatives, including maintaining the status quo or resuming new enrollments in the program.  For the reasons articulated in this memorandum, however, preserving MPP in this manner would not be consistent with this Administration's vision and values and would be a poor use of the Department's resources.  I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources.  Perhaps more importantly, that approach would come at tremendous opportunity cost, detracting from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.

Moreover, I carefully considered and weighed the possible impacts of my decision to terminate MPP as well as steps that are underway to mitigate any potential negative consequences.

- In considering the impact such a decision could have on border management and border communities, among other potential stakeholders, I considered the Department's experience designing and operating a phased process, together with interagency and nongovernmental partners, to facilitate the safe and orderly entry into the United States of certain individuals who had been placed in MPP.  Throughout this effort, the Department has innovated and achieved greater efficiencies that will enhance port processing operations in other contexts. The Department has also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border.  The Department's partnership with the Government of Mexico has been an integral part of the phased process's success.  To maintain the integrity of this safe and orderly entry process for individuals enrolled in MPP and to encourage its use, the Department has communicated the terms of the process clearly to all stakeholders and has continued to use, on occasion and where appropriate, the return-to-contiguous-territory authority in INA Section 235(b)(2)(C) for MPP enrollees who nevertheless attempt to enter between ports of entry instead of through the government's process.

---

[6] See U.S. Department of Homeland Security, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2011, available at https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

Case 2:21-cv-00067-Z   Document 55-26   Filed 09/02/22   Page 96 of 366   PageID 6597
Subject: Termination of the Migrant Protection Protocols Program
Page 6

- In the absence of MPP, I have additionally considered other tools the Department may utilize to address future migration flows in a manner that is consistent with the Administration's values and goals. I have further considered the potential impact to DHS operations in the event that current entry restrictions imposed pursuant to the Centers for Disease Control and Prevention's Title 42 Order are no longer required as a public health measure. At the outset, the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced. The Department has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services. Many of these detention alternatives have been shown to be successful in promoting compliance with immigration requirements. This Administration's broader strategy for managing border processing and adjudicating claims for immigration relief—which includes the Dedicated Docket and additional anticipated regulatory and policy changes—will further address multifaceted border dynamics by facilitating both timely and fair final determinations.

- I additionally considered the Administration's important bilateral relationship with the Government of Mexico, our neighbor to the south and a key foreign policy partner. Over the past two-and-a-half years, MPP played an outsized role in the Department's engagement with the Government of Mexico. Given the mixed results produced by the program, it is my belief that MPP cannot deliver adequate return for the significant attention that it draws away from other elements that necessarily must be more central to the bilateral relationship. During my tenure, for instance, a significant amount of DHS and U.S. diplomatic engagement with the Government of Mexico has focused on port processing programs and plans, including MPP. The Government of Mexico was a critically important partner in the first phase of our efforts to permit certain MPP participants to enter the United States in a safe and orderly fashion and will be an important partner in any future conversations regarding such efforts. But the Department is eager to expand the focus of the relationship with the Government of Mexico to address broader issues related to migration to and through Mexico. This would include collaboratively addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more. Terminating MPP will, over time, help to broaden our engagement with the Government of Mexico, which we expect will improve collaborative efforts that produce more effective and sustainable results than what we achieved through MPP.

Given the analysis set forth in this memorandum, and having reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether, I have determined that, on balance, any benefits of maintaining or now modifying MPP are far outweighed by the benefits of terminating the program. Furthermore, termination is most consistent with the Administration's broader policy objectives and the Department's operational needs. Alternative options would not sufficiently address either consideration.

Therefore, in accordance with the strategy and direction in Executive Order 14010, following my review, and informed by the current phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP, I have concluded that, on balance, MPP is no longer a

Case 2:21-cv-00067-Z Document 56-26 Filed 08/09/22 Page 94 of 366   PageID 6598
**Subject: Termination of the Migrant Protection Protocols Program**
**Page 7**

necessary or viable tool for the Department.  Because my decision is informed by my assessment that MPP is not the best strategy for implementing the goals and objectives of the Biden-Harris Administration, I have no intention to resume MPP in any manner similar to the program as outlined in the January 25, 2019 Memorandum and supplemental guidance.

Accordingly, for the reasons outlined above, I hereby rescind, effective immediately, the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled "Suspension of Enrollment in the Migrant Protection Protocols Program."  I further direct DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP.  Furthermore, DHS personnel should continue to participate in the ongoing phased strategy for the safe and orderly entry into the United States of individuals enrolled in MPP.

The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before EOIR or the phased entry process describe above.

<div align="center">*     *     *     *     *</div>

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CC:     Kelli Ann Burriesci
       Acting Under Secretary
       Office of Strategy, Policy, and Plans

🚩 KeyCite Red Flag - Severe Negative Treatment
Reversed and Remanded by  Biden v. Texas,   U.S.,   June 30, 2022

554 F.Supp.3d 818
United States District Court, N.D. Texas, Amarillo Division.

The State of TEXAS, the State of Missouri, Plaintiffs,

v.

Joseph R. BIDEN, Jr. et al., Defendants.

2:21-CV-067-Z
|
Signed 08/13/2021

**Synopsis**

**Background:** States brought action against the government, the President, Department of Homeland Security (DHS), DHS Secretary, Customs and Border Protection (CBP), CBP Acting Commissioner, Immigration and Customs Enforcement (ICE), Acting ICE Director, Citizenship and Immigration Services (CIS), and Acting CIS Director, alleging suspension of Migrant Protection Protocols (MPP) permitting DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings violated Administrative Procedure Act (APA), Immigration and Nationality Act (INA), the Constitution, and a binding agreement between Texas and the federal government. Defendants filed motion to transfer to another district court and to strike portions of plaintiffs motion for preliminary injunction, both of which the trial court denied. Thereafter, trial court ordered consolidation of preliminary injunction hearing with trial on the merits. Plaintiffs moved to strike defendants' addendum to administrative record to add DHS assessment of MPP, which the trial court denied.

**Holdings:** The District Court, Matthew J. Kacsmaryk, J., held that:

[1] States had standing;

[2] judicial review of States' action was not statutorily precluded;

[3] States' interests fell within zone of interests of INA, as required for standing under APA;

[4] termination of MPP was arbitrary and capricious under APA;

[5] termination of MPP violated INA;

[6] vacatur without remand to DHS was warranted; and

[7] injunction was warranted.

Judgment for plaintiffs.

**Procedural Posture(s):** Motion to Transfer or Change Venue; Motion for Preliminary Injunction; Motion to Strike.

West Headnotes (54)

**[1]   Federal Courts**  🔑  Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal courts are courts of limited jurisdiction which possess only that power authorized by Constitution and statute.

**[2]   Federal Courts**  🔑  Necessity of Objection; Power and Duty of Court

The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception. U.S. Const. art. 3, § 2, cl. 1.

**[3]   Federal Civil Procedure**  🔑  In general; injury or interest

**Federal Civil Procedure**  🔑  Causation; redressability

To establishing standing, the plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[4]** **Federal Civil Procedure** 🔑 In general; injury or interest

Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation. U.S. Const. art. 3, § 2, cl. 1.

**[5]** **Federal Civil Procedure** 🔑 In general; injury or interest

At the final stage of litigation, those facts establishing the elements of standing, if controverted, must be supported adequately by the evidence adduced at trial. U.S. Const. art. 3, § 2, cl. 1.

**[6]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

States established that they suffered and would continue to suffer concrete and particularized injuries attributable to termination of Migrant Protection Protocols (MPP), which permitted Department of Homeland Security (DHS) to return to Mexico certain third-country nationals during the pendency of their removal proceedings, as element required to support standing to bring action for preliminary injunction challenging termination under Administrative Procedure Act (APA); States showed that the termination of MPP would increase the cost of providing driver's licenses to noncitizens released and paroled into the United States, inflicting on States an actual and imminent injury. U.S. Const. art. 3, § 2, cl. 1.

**[7]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

Injuries due to increased cost of issuing drivers licenses in Texas and Missouri were fairly traceable to suspension and termination of Migrant Protection Protocols (MPP), which authorized Department of Homeland Security (DHS) to return to Mexico certain third-country nationals during the pendency of their removal proceedings, as element required to support standing to bring action for preliminary injunction challenging suspension and termination of MPP; termination of MPP necessarily increased the number of noncitizens released and paroled into the United States and the plaintiff States specifically, as noncitizens who would have otherwise been enrolled in MPP were paroled into the United States. U.S. Const. art. 3, § 2, cl. 1.

**[8]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

District court had power to redress States' increased cost of issuing drivers licenses which were attributable to termination of Migrant Protection Protocols (MPP), which authorized Department of Homeland Security (DHS) to return to Mexico certain third-country nationals during pendency of their removal proceedings, as element supporting States' standing to bring action for preliminary injunction challenging termination of MPP under Administrative Procedure Act (APA); APA allowed court to set aside agency action that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and injunction implementing MPP would decrease number of noncitizens paroled and released into States, decreasing their fiscal injuries. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 706.

**[9]** **Aliens, Immigration, and Citizenship** 🔑 Injunction

States failed to establish by a preponderance of the evidence that termination of Migrant Protection Protocols (MPP), which authorized Department of Homeland Security (DHS) to return to Mexico certain third-country nationals during pendency of their removal proceedings, caused or would cause a distorted labor market making it more difficult for their citizens to obtain a job, as "quasi-sovereign" interest required to support parens patriae standing to bring action for preliminary injunction

challenging termination of MPP; plaintiffs did not provide citations to studies, articles, or analyses concluding that termination of MPP had distorted States' labor markets. U.S. Const. art. 3, § 2, cl. 1.

**[10]**    **States**  ☞  Capacity of state to sue in general

Parens patriae is a type of standing that allows a state to sue defendant to protect the interests of its citizens. U.S. Const. art. 3, § 2, cl. 1.

**[11]**    **States**  ☞  Capacity of state to sue in general

To have parens patriae standing, a state must assert an injury to a "quasi-sovereign" interest. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[12]**    **Aliens, Immigration, and Citizenship**  ☞  Injunction

States were entitled to special solicitude when determining whether they had Article III standing to seek injunctive relief challenging termination of Migrant Protection Protocols (MPP), which authorized Department of Homeland Security (DHS) to return to Mexico certain third-country nationals during the pendency of their removal proceedings, in action brought under the Administrative Procedure Act (APA); APA provided States procedural rights needed for special solicitude, and States relied on the federal government to protect their interests, as they surrendered their power over immigration when they joined the Union, and termination of MPP affected States' "quasi-sovereign" interests by imposing substantial pressure on them to change their laws for issuing driver's licenses noncitizens. U.S. Const. art. 3, § 2, cl. 1; ⚑ 5 U.S.C.A. § 551 et seq.

**[13]**    **Administrative Law and Procedure**  ☞  Finality in General

Whether an agency action is final, for purposes of permitting judicial review under

the Administrative Procedure Act (APA), is a jurisdictional issue, not a merits question. 5 U.S.C.A. § 704.

**[14]**    **Administrative Law and Procedure**  ☞  What constitutes finality in general

An administrative agency action is "final," for purposes of permitting judicial review under the Administrative Procedure Act (APA), only if it both (1) consummates the agency's decisionmaking process and (2) determines the rights or obligations or produces legal consequences. 5 U.S.C.A. § 704.

**[15]**    **Aliens, Immigration, and Citizenship**  ☞  Decisions reviewable

Department of Homeland Security (DHS) Secretary's memorandum terminating Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, produced legal consequences and determined rights and obligations, and, thus, constituted a "final agency action" subject to judicial review under Administrative Procedure Act (APA); termination memorandum had the immediate legal consequence of rescinding previous DHS Secretary's memorandum implementing MPP and previous Acting DHS Secretary's memorandum suspending MPP, and termination memorandum prevented DHS line officers from using MPP, which was previously available to them. ⚑ 5 U.S.C.A. § 551 et seq.; 5 U.S.C.A. § 704.

**[16]**    **Administrative Law and Procedure**  ☞  What constitutes finality in general

Where agency action withdraws an entity's previously held discretion, that action alters the legal regime and binds the entity and thus qualifies as final agency action, for purposes of permitting judicial review under

the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

**[17]    Administrative Law and Procedure** 🔑 Requirements for Reviewability in General

Whether and to what extent a particular statute precludes judicial review under the Administrative Procedure Act (APA) is determined not only from its express language but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.

🚩 5 U.S.C.A. § 701(a)(1).

**[18]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Provision of Immigration and Nationality Act (INA) precluding jurisdiction over claims by or on behalf of "aliens" arising from action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders did not preclude judicial review of States' action under Administrative Procedure Act (APA) for preliminary injunction challenging Department of Homeland Security's (DHS) termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, where States did not bring any action on behalf of an "alien."

🚩 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(g).

**[19]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Provision of Immigration and Nationality Act (INA) limiting jurisdiction over claims arising from any action taken or proceeding brought to remove an "alien" from the United States did not preclude judicial review of States' action under Administrative Procedure Act (APA) for preliminary injunction challenging Department of Homeland Security's (DHS) termination of

Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, where States were not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined, and did not challenging any removal proceedings.

🚩 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)(9).

**[20]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Provision of Immigration and Nationality Act (INA) limiting jurisdiction to enjoin or restrain the operation of provisions governing removal of noncitizens did not preclude judicial review of States' action under Administrative Procedure Act (APA) for preliminary injunction challenging Department of Homeland Security's (DHS) termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, where States did not seek to restrain government from enforcing removal provisions, but rather were attempting to government comply with removal provisions. 🚩 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(f)(1).

1 Cases that cite this headnote

**[21]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Provision of Immigration and Nationality Act (INA) precluding jurisdiction to review decisions of the Attorney General or the Secretary of Homeland Security rendered under authority specified in INA did not preclude judicial review of States' action under Administrative Procedure Act (APA) for preliminary injunction challenging Department of Homeland Security's (DHS) termination of Migrant Protection Protocols (MPP), which

authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, where States did not challenge the substantive exercise of the Attorney General's discretion, but rather, whether the government complied with its legal obligations under the APA in terminating MPP.

🚩 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(a)(2)(B)(ii).

[22] **Aliens, Immigration, and Citizenship** 🔑 Injunction

Department of Homeland Security (DHS) Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, was not an agency action committed to agency discretion by law, and, thus, States' action under Administrative Procedure Act (APA) for injunctive relief challenging termination of MPP was not precluded by APA provision precluding judicial review of administrative decisions committed to agency discretion; termination was not simply a non-enforcement policy, but rather created affirmative benefits for noncitizens such as work authorization, as termination necessarily meant more noncitizens would be released and paroled into the plaintiff States. 🚩 5 U.S.C.A. § 701(a)(2).

[23] **Administrative Law and Procedure** 🔑 Interest in general

States suing under the Administrative Procedure Act (APA) must satisfy not only Article III's standing requirements but an additional test: the interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated. U.S. Const. art. 3, § 2, cl. 1; 🚩 5 U.S.C.A. § 551 et seq.

[24] **Administrative Law and Procedure** 🔑 Interest in general

Zone of interest test forecloses suits under the Administrative Procedure Act (APA) only when the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit suit. 🚩 5 U.S.C.A. § 551 et seq.

[25] **Administrative Law and Procedure** 🔑 Interest in general

In determining whether a plaintiff's interest are within the zone of interests to be protected or regulated by the statute that they say was violated, for purposes of establishing standing to sue under the Administrative Procedure Act (APA), the district court is not limited to considering the statute under which the plaintiff's sued but may consider any provision that helps it to understand Congress' overall purposes. 🚩 5 U.S.C.A. § 551 et seq.

[26] **Aliens, Immigration, and Citizenship** 🔑 Injunction

The interests that States sought to protect fell within zone of interests of Immigration and Nationality Act (INA) provision mandating the detention or return to Mexico of "aliens" who would otherwise impose costs on the states, as required for States' suit for judicial review under Administrative Procedure Act (APA) for preliminary injunction challenging Department of Homeland Security (DHS) Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings; States sought to require Secretary to engage in reasoned decisionmaking under APA before termination, which forced States to choose between subsidizing driver's licenses for noncitizens or changing their statutes. 🚩

U.S.C.A. § 551 et seq.; Immigration and Nationality Act § 235, 🚩8 U.S.C.A. § 1225.

**[27]    Administrative Law and Procedure** 👈 Report or opinion; reasons for decision

Provision of Administrative Procedure Act (APA) prohibiting agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law means federal administrative agencies are required to engage in reasoned decisionmaking; to do so, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. 🚩5 U.S.C.A. § 706(2)(A).

**[28]    Administrative Law and Procedure** 👈 Arbitrariness and capriciousness; reasonableness

An agency rule would be arbitrary and capricious under the Administrative Procedure Act (APA) if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. 🚩5 U.S.C.A. § 706(2)(A).

**[29]    Administrative Law and Procedure** 👈 Deference given to agency in general

**Administrative Law and Procedure** 👈 Wisdom, judgment, or opinion in general

**Administrative Law and Procedure** 👈 Procedural matters in general

Review under Administrative Procedure Act's (APA) arbitrary and capricious standard is highly deferential; district courts must accord

the agency's decision a presumption of regularity and are prohibited from substituting the court's judgment for that of the agency. 🚩5 U.S.C.A. § 706(2)(A).

**[30]    Administrative Law and Procedure** 👈 Theory or grounds not provided or relied upon by agency

Because the central focus of the arbitrary and capricious standard under the Administrative Procedure Act (APA) is on the rationality of the administrative agency's decisionmaking, rather than its actual decision, an agency's action must be upheld, if at all, on the basis articulated by the agency itself; this "record rule" normally dictates that the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. 🚩5 U.S.C.A. § 706(2)(A).

**[31]    Administrative Law and Procedure** 👈 Consideration of new or additional evidence

District courts allow extra-record evidence in a review of an administrative agency's decision under the Administrative Procedure Act (APA) when it is necessary to determine whether the agency considered all the relevant factors. 🚩5 U.S.C.A. § 706(2)(A).

**[32]    Administrative Law and Procedure** 👈 Procedure in General

Agency action is lawful only if it rests on consideration of relevant factors. 🚩5 U.S.C.A. § 551 et seq.

**[33]    Administrative Law and Procedure** 👈 Procedure in General

An administrative agency merely stating that a relevant factor was considered is not a substitute for considering it. 🚩5 U.S.C.A. § 551 et seq.

**[34]**   **Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

In reviewing whether an administrative agency considered all of relevant factors, the district court does not defer to the agency's conclusory or unsupported suppositions; rather, the court must make a searching and careful inquiry to determine if the agency actually did consider the relevant factors. 🚩5 U.S.C.A. § 706(2)(A).

**[35]**   **Aliens, Immigration, and Citizenship** 🔑 Injunction

Secretary of Department of Homeland Security (DHS) failed to consider the benefits of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, and, thus, Secretary's act of terminating MPP was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination of MPP; memorandum terminating MPP did not address the problems created by noncitizens' false claims of asylum or how MPP addressed those problems, even though DHS had previously found that noncitizens without meritorious claims were beginning to voluntarily return home due to MPP. 🚩5 U.S.C.A. § 706(2)(A).

**[36]**   **Aliens, Immigration, and Citizenship** 🔑 Injunction

Secretary of Department of Homeland Security (DHS) failed to consider warnings by career DHS personnel that the suspension of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, would lead to a resurgence of illegal crossings into the United States, and, thus, Secretary's act of terminating MPP was arbitrary

and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination; memorandum terminating MPP did not discuss the rise in border encounters during period in which MPP was suspended to when it was terminated in its entirety, and memorandum did not discuss why the warnings were misguided or incorrect. 🚩5 U.S.C.A. § 706(2)(A).

**[37]**   **Aliens, Immigration, and Citizenship** 🔑 Injunction

Secretary of Department of Homeland Security (DHS) failed to consider the costs to States and States' reliance interests in the proper enforcement of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, and, thus, Secretary's act of terminating MPP was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination; Secretary's memorandum terminating MPP did not discuss the costs to States or whether the States had any reliance interests in the ongoing implementation of MPP. 🚩5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[38]**   **Administrative Law and Procedure** 🔑 Change of policy; reason or explanation

When an agency changes course, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account; it would be arbitrary and capricious to ignore such matters. 🚩5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[39]**   **Aliens, Immigration, and Citizenship** 🔑 Injunction

Secretary of Department of Homeland Security (DHS) failed to meaningfully consider more limited policies than the total termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during the pendency of their removal proceedings, and, thus, Secretary's act of terminating MPP was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination of MPP; Secretary's memorandum terminating MPP did not identify a single example of what a modified MPP would look like or what kind of investment would be needed to modify or scale back MPP. 5 U.S.C.A. § 706(2)(A).

[40]    **Administrative Law and Procedure** 🔑 Change of policy; reason or explanation

When an administrative agency rescinds a prior policy, its reasoned analysis must consider alternatives that are within the ambit of existing policy. 5 U.S.C.A. § 551 et seq.

1 Cases that cite this headnote

[41]    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Department of Homeland Security (DHS) Secretary's reason for terminating Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, based on concerns about in absentia removal orders for non-detained cases was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination of MPP; memorandum terminating MPP did not provide a reason why DHS determined that in absentia removals resulted from noncitizens abandoning meritorious asylum claims when DHS previously concluded that in absentia removals were a result of noncitizens abandoning meritless claims, and did not indicate

that in absentia removals were unusually high under MPP. 5 U.S.C.A. § 706(2)(A).

[42]    **Administrative Law and Procedure** 🔑 Procedure in General

The Administrative Procedure Act (APA) imposes no general obligation on administrative agencies to conduct or commission their own empirical or statistical studies, but an agency must actually reach some sort of conclusion. 5 U.S.C.A. § 551 et seq.

[43]    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Department of Homeland Security (DHS) Secretary's reason for terminating Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, based on concerns over immigration court closures caused by COVID-19 pandemic was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination of MPP; concerns about court closures were irrelevant, as courts were only closed for two month period, and were reopened approximately two months before Secretary issued memorandum terminating MPP. 5 U.S.C.A. § 706(2)(A).

[44]    **Aliens, Immigration, and Citizenship** 🔑 Injunction

Department of Homeland Security (DHS) Secretary's memorandum terminating Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, failed to consider effect terminating MPP would have on DHS's ability to detain noncitizens subject to mandatory detention under INA, and, thus, termination was arbitrary and capricious under Administrative Procedure Act (APA), in States' action for

injunctive relief challenging termination; DHS previously recognized that, before MPP, resource constraints and court-ordered limitations on the ability to detain individuals made many releases of noncitizens inevitable, but termination memorandum did not discuss DHS's detention capacity or mandatory-detention obligation.

🚩 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 235, 🚩 8 U.S.C.A. § 1225.

1 Cases that cite this headnote

**[45]    Aliens, Immigration, and Citizenship** 🖝 Injunction

Department of Homeland Security (DHS) Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, violated provisions of Immigration and Nationality Act (INA) requiring that noncitizens not subject to expedited removal and who arrived on land from a foreign territory contiguous to the United States be detained or returned to the contiguous territory pending asylum proceedings, in States' action for injunctive relief challenging termination; DHS admitted that it did not have the capacity to meet its detention obligations under INA because of resource constraints.

Immigration and Nationality Act § 235, 🚩 8 U.S.C.A. §§ 1225(b)(1)(B)(ii), 🚩 1225(b)(1)(B)(iii)(IV), 🚩 1225(b)(2)(A), 🚩 1225(b)(2)(C).

1 Cases that cite this headnote

**[46]    Constitutional Law** 🖝 Resolution of non-constitutional questions before constitutional questions

Where the district court has made a full disposition of a case without addressing a constitutional claim, it will not address the constitutional issue.

1 Cases that cite this headnote

**[47]    Aliens, Immigration, and Citizenship** 🖝 Injunction

District court's finding that Department of Homeland Security (DHS) Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA) rendered moot States' claims for injunctive relief challenging termination based on a binding and enforceable commitment between DHS and Texas, in which Texas agreed to help DHS perform its border security and immigration enforcement missions, and DHS agreed to consult Texas before modifying its procedures in a way that could negatively impact Texas, where any further agency action responsive to court's opinion would take place after agreement expired. 🚩 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 235, 🚩 8 U.S.C.A. §§ 1225(b)(1)(B)(ii), 🚩 1225(b)(1)(B)(iii)(IV), 🚩 1225(b)(2)(A), 🚩 1225(b)(2)(C).

**[48]    Administrative Law and Procedure** 🖝 Annulment, Vacatur, or Setting Aside of Administrative Decision

**Administrative Law and Procedure** 🖝 Remand

Remand without vacatur is only generally appropriate in an action for violation of the Administrative Procedure Act (APA) when there is at least a serious possibility that the administrative agency will be able to substantiate its decision given an opportunity to do so. 🚩 5 U.S.C.A. § 706(2)(A).

**[49]    Administrative Law and Procedure** 🖝 Annulment, Vacatur, or Setting Aside of Administrative Decision

**Administrative Law and Procedure** 🖝 Remand

The district court considers two factors when deciding whether to remand without vacatur as a remedy in an action for violation of the Administrative Procedure Act (APA): (1) the seriousness of the deficiencies of the action, that is, how likely it is the administrative agency will be able to justify its decision on remand, and (2) the disruptive consequences of vacatur. 🏳5 U.S.C.A. § 706(2)(A).

[50]  **Aliens, Immigration, and Citizenship** 🔑 Determination

Deficiencies in Department of Homeland Security (DHS) Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases, were serious and were unlikely to be resolved on a simple remand, as factor supporting vacatur without remand in States' action for preliminary injunction alleging termination violated Administrative Procedure Act (APA); DHS failed to consider the main benefits of MPP, DHS knew of the failings of terminating MPP, and termination of MPP caused DHS to violate INA provisions mandating removal or detention of noncitizens not subject to expedited removal and who arrived on land from a foreign territory contiguous to the United States. 🏳5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 235, 🚩8 U.S.C.A. §§ 1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 🚩1225(b)(2)(A), 🚩1225(b)(2)(C).

1 Cases that cite this headnote

[51]  **Aliens, Immigration, and Citizenship** 🔑 Determination

Vacatur without remand to Department of Homeland Security (DHS) would not be unduly disruptive, as factor supporting vacatur as remedy for DHS Secretary's termination of Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their

removal cases, in violation of Administrative Procedure Act (APA), in States' action for injunctive relief challenging termination; alleged disruptions to DHS's approach to managing migration were self-inflicted, as State filed suit challenging DHS's suspension of MPP nearly two months before DHS terminated MPP in its entirety, and DHS could have avoided any disruptions by informing Mexico that termination of MPP would be subject to judicial review. 🏳5 U.S.C.A. § 706(2)(A).

[52]  **Injunction** 🔑 Grounds in general; multiple factors

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief: (1) that plaintiffs have suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and (4) that the public interest would not be disserved by a permanent injunction.

[53]  **Aliens, Immigration, and Citizenship** 🔑 Injunction

Injunction was warranted enjoining Department of Homeland Security (DHS) from terminating Migrant Protection Protocols (MPP), which authorized DHS to return to Mexico certain third-country nationals during pendency of their removal cases; termination caused States injuries by requiring them to expend more funds issuing driver's licenses to noncitizens, States were unable to recover the additional expenditures from the federal government, States' injuries outweighed any harms to DHS, as DHS had no interest in the perpetuation of unlawful agency action, public interest favored injunction, as public had an interest in addressing illegal immigration, injunction was needed to prevent systemic violation of INA, and DHS indicated it would not comply with MPP if termination was deemed invalid. Immigration and Nationality Act § 235, 🚩8 U.S.C.A. §§ 1225(b)(1)

(B)(ii), 🚩 1225(b)(1)(B)(iii)(IV), 🚩 1225(b)(2)
(A), 🚩 1225(b)(2)(C).

**[54]**    **Injunction** 🔑 Public interest considerations
**Injunction** 🔑 Balancing or weighing
hardship or harm

Federal courts may consider together the
balance of hardships and public interest factors
for a permanent injunction, as they overlap
considerably.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*827** William Thomas Thompson, Patrick K. Sweeten, Ryan
Daniel Walters, Office of the Attorney General, Austin, TX,
for Plaintiff State of Texas.

Dean John Sauer, Pro Hac Vice, Jesus A. Osete, Pro Hac Vice,
Missouri Attorney General, Jefferson City, MO, for Plaintiff
State of Missouri.

Erez Reuveni, Brian C. Ward, Francesca Marie Genova,
Joseph Anton Darrow, US Department of Justice,
Washington, DC, Brian Walters Stoltz, U.S. Attorney's
Office, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

MATTHEW J. KACSMARYK, UNITED STATES
DISTRICT JUDGE

**\*\*1   \*828** The Court enters the below-listed findings of fact
and conclusions of law pursuant to Rule 52(a) of the Federal
Rules of Civil Procedure after a consolidated hearing and trial
on the merits on Plaintiff States Texas and Missouri's various
claims against the federal Defendants. [1] For the reasons that
follow, the Court **FINDS** and **CONCLUDES** that Plaintiffs
are entitled to relief on their APA and statutory claims against
Defendants. The Court will therefore enter judgment in favor
of Plaintiffs. The Court also crafts injunctive relief to ensure
Plaintiffs receive a full remedy.

**I. PROCEDURAL BACKGROUND**

Only four months old, this case already has a complicated
procedural history. Thus, the Court will quickly summarize
the record before entering its findings of fact and conclusions
of law.

On April 13, 2021, Plaintiffs filed this suit challenging the
temporary suspension of the Migrant Protection Protocols
("MPP"). ECF No. 1. MPP was a program implemented
by the Department of Homeland Security that returned
some aliens temporarily to Mexico during the pendency of
their removal proceedings. Specifically, Plaintiffs alleged
that DHS's "two-sentence, three-line memorandum" that
suspended enrollments in the Migrant Protection Protocols
pending review of the program was a violation of the APA,
🚩 8 U.S.C § 1225, the Constitution, and a binding agreement
between Texas and the federal government. *See* ECF No. 1
at 4; ECF No. 45 (showing the original administrative record
to consist solely of the Secretary's January 20 Memorandum
without any supporting documentation).

On May 3, Defendants made a motion to transfer this case
to the Southern District of Texas. ECF No. 11. On June 3,
the Court denied this motion in a written order. *See* ECF No.
47 at 9 ("Defendants' evidence, taken as a whole, does not
establish that the convenience of the parties and witnesses will
be enhanced by transferring this case.").

On May 14, Plaintiffs moved for a preliminary injunction.
ECF No. 30. But before briefing was concluded, DHS
completed its review of MPP and issued a new memorandum
(the "June 1 Memorandum") that *permanently* terminated
MPP. ECF No. 46. The Court concluded the June 1
Memorandum mooted Plaintiffs' original complaint but
allowed Plaintiffs to amend their complaint and file a new
motion seeking to enjoin the June 1 Memorandum. *See* **\*829**
ECF No. 52 at 3 ("[T]he January 20 Memorandum expired
upon the completion of DHS's review of the program.").

Accordingly, Plaintiffs amended their complaint and renewed
their motion for a preliminary injunction. *See* ECF Nos. 48,
53. On June 22, Defendants filed the administrative record.
ECF No. 61. Three days later, Defendants filed their response
to Plaintiffs' motion. ECF No. 63. Plaintiffs filed their reply
on June 30.

**\*\*2** But in addition to opposing Plaintiffs' Motion,
Defendants also moved to strike the entire appendix attached

to Plaintiffs' Motion because it arguably ran afoul of the "record rule." The Court expedited briefing on this motion and denied the motion by written order for the reasons stated in ECF No. 76.

Next, the parties agreed with the Court that this case involved mainly questions of law. Accordingly, the parties favored consolidating the preliminary injunction hearing with the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). ECF No. 68. The Court ordered the consolidation, provided notice to the parties, and allowed each party to file a supplemental brief before the hearing. *Id.*

Lastly, on July 20, two days before the hearing, Defendants filed a notice of a "corrected administrative record." ECF No. 78. By this notice, Defendants added the 2019 DHS assessment of MPP to the administrative record — even though Defendants knew for at least three weeks that the document was *not* included in the certified administrative record. ECF No. 85 at 2. Plaintiffs moved to strike this last-minute addendum to the administrative record. The Court denied that motion by written order on July 21. ECF No. 85 ("The delay between the government's acquiring knowledge of the missing document and its filing of notice with the Court comes perilously close to undermining the presumption of administrative regularity. But the Court finds the presumption is not overcome in this case.").

On July 22, the Court held a consolidated hearing and bench trial on the merits. The parties filed their proposed findings of fact and conclusions of law on July 27. ECF Nos. 91, 92. The parties also filed supplemental briefs on the scope of relief available to Plaintiffs. ECF Nos. 90, 93. Pursuant to Fed. R. Civ. P. 52(a), the Court may now enter its findings of facts and conclusions of law.

## II. EVIDENTIARY OBJECTIONS [2]

**1.** At the bench trial, Defendants made several objections to Plaintiffs' exhibits which the Court deferred ruling upon. Trial Tr. 8–30. The Court now overrules Defendants' objections under Fed. R. Evid. 401 as the exhibits are relevant to Plaintiffs' claims and overrules Defendants' objections under Fed. R. Evid. 403. "Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision."

⚑ *Gulf States Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A 1981).

**2.** The Court overrules Defendants' privilege objections as to Exhibits A10 and C. The content Defendants seek to protect has been in the public record for months. Even if Defendants were unaware of Exhibit A10 and C at the time the exhibits were published, Defendants have been on **\*830** notice since June 8, 2021, when Plaintiffs filed their Appendix in Support. ECF No. 54. The Court finds Defendants' privilege objections to be untimely and moot.

**3.** The Court sustains Defendants' hearsay objections under Fed. R. Evid. 802 as to Plaintiffs' Exhibits A-7, A-9, A-11, A-12, A-13, and A-15 to the extent the information within the exhibits is offered for the truth of the matters asserted.

**\*\*3** **4.** The Court overrules Defendants' objections under Fed. R. Evid. 702 as to Plaintiffs' Exhibits D, E, F, F-1, G, G-1, H, H-1, and I. Defendants object to these exhibits, generally arguing Plaintiffs impermissibly offered expert testimony. *See* ECF No. 92 at 28. Defendants' objections fail to identify with specificity which declarants and which parts of each exhibit were impermissibly offered. Further, Defendants fail to state with specificity why each declarant is unqualified.

**5.** Even so, the Court reviewed each declaration and finds Defendants' objections unpersuasive. For example, in reviewing Plaintiffs' Exhibit D, Declaration of Mark Morgan, the Court noted Mark Morgan served as the Acting Commissioner of the United States Customs and Border Patrol from 2019-2021. App. 390. Prior to that service, Mr. Morgan served as the Acting Chief of the United States Immigration and Customs Enforcement. *Id.* Prior to that assignment, Mr. Morgan served twenty years as an FBI agent. *Id.* The Court finds Mr. Morgan more than sufficiently qualified to opine and present testimony in the form of a declaration regarding immigration laws, policies, procedures, and practices.

**6.** Any objections not previously discussed are overruled.

## III. FINDINGS OF FACT [3]

**1.** Because the Court consolidated the hearing on the motion with a trial on the merits, the proper standard for factual findings is the preponderance of the evidence.

AR02399 12

### A. Overview of the relevant statutory framework

**2.** Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully.

🚩 8 U.S.C. § 1225(a)(1).

**3.** An immigration officer must first inspect the alien to determine whether he is entitled to be admitted. 🚩 § 1225(a)(3). 🚩 Section 1225(b)(2)(A) provides that, if an immigration officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under Section 1229a of this title" to determine whether he will be removed from the United States.

***831 4.** Alternatively, if an alien lacks valid entry documentation or misrepresents his identity, he shall be "removed from the United States without further hearing or review unless" he "indicates either an intention to apply for asylum ... or a fear of persecution." 🚩 § 1225(b)(1)(A)(i). If the alien makes such a showing, then he "shall be detained for further consideration of the application for asylum." 🚩 § 1225(b)(1)(B)(ii). Such an alien then would also be placed in a Section 1229a full removal proceeding. See 🏳 8 C.F.R. § 208.30(f).

****4 5.** Under either route, Section 1229a proceedings involve a hearing before an immigration judge with potential review by the Board of Immigration Appeals. 🏳 8 U.S.C. § 1229a; 🏳 8 C.F.R. § 1003.1. In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien may seek asylum or any other form of relief or protection from removal to his home country. 🏳 8 U.S.C. § 1229a(a)(2), 🏳 (c)(4).

**6.** Most importantly for this case, when DHS places an applicant for admission into a full removal proceeding under 🏳 Section 1229a, the alien is subject to *mandatory* detention during that proceeding. 🚩 § 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding

under 🏳 Section 1229a of this title.") (emphasis added). DHS does retain the discretion to parole certain aliens "for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A).

**7.** But Congress allows DHS an alternative to mandatory detention in the United States: "In the case of an alien described in [🚩 Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under 🏳 Section 1229a of this title." 🚩 § 1225(b)(2)(C). This contiguous-territory-return authority enables DHS to avoid having to detain aliens arriving on land from Mexico (or Canada), and instead allows DHS to temporarily return those aliens to the foreign territory from which they just arrived pending their immigration proceedings.

### B. MPP was created to combat an influx of illegal aliens during the Trump administration

**8.** In 2018, the southern border of the United States experienced an immigration surge and a resulting "humanitarian and border security crisis." AR 186; App. 005. Federal officials encountered an approximately 2,000 inadmissible aliens each day in 2018. App. 005. By May 2019, that number had increased to 4,800 aliens crossing the border daily. AR 682.

**9.** The resulting influx of immigrants had "severe impacts on U.S. border security and immigration operations." App. 302. But most aliens lacked meritorious claims for asylum — "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." App. 005. With so many "fraudulent asylum claims," "[t]he dramatic increase in illegal migration" was "making it harder for the U.S. to devote appropriate resources to individuals who [were] legitimately fleeing persecution." App. 302–03.

**10.** The influx did not just divert resources from legitimate asylum seekers, but illegal aliens with *meritless* asylum claims were being released into the United States. "[M]any of these individuals ... disappeared into the country before a judge denie[d] their claim and simply bec[a]me fugitives." App. 303. "Between ***832** Fiscal Year 2008 and Fiscal Year 2019, 32 percent of aliens referred to [the Executive Office for

Immigration Review] absconded into the United States and were ordered removed *in absentia.*" App. 005.

**\*\*5 11.** In response, the Trump Administration implemented a program known as the Migrant Protection Protocols. On December 20, 2018, the Secretary of Homeland Security announced the MPP program, under which DHS would begin the process of invoking the authority provided at ⚑ § 1225(b)(2)(C).[4] This statutory authority allows DHS to return to Mexico certain third-country nationals — *i.e.*, aliens who are not nationals or citizens of Mexico — arriving in the United States from Mexico for the duration of their removal proceedings under ⚑ 8 U.S.C. § 1229a. AR 151.

**12.** The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." App. 303–04.

**13.** The same day, the United States obtained the Government of Mexico's agreement to temporarily permit "entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interviewed by the authorities of migration authorities of that country, and have received a notice to attend a hearing before a judge." AR 149.

**14.** On January 25, 2019, DHS issued guidance for implementation of MPP. Three days later, DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide. AR 155, 156, 684.

**15.** Under the issued guidance, DHS officers determined whether aliens were amenable to the MPP process. If they were, the DHS officer could issue a Notice to Appear (NTA), place the alien into a removal proceeding under ⚑ Section 1229a, and then return the alien to Mexico to await removal proceedings *unless* the alien affirmatively demonstrated a fear of persecution or torture in Mexico. AR 161.

**16.** Certain categories of noncitizens were not amenable to MPP: unaccompanied alien children — as defined in ⚑ 6 U.S.C. § 279(g); citizens or nationals of Mexico; noncitizens processed for expedited removal under ⚑ 8 U.S.C. § 1225(b)(1); noncitizens "in special circumstances"; returning lawful permanent residents seeking admission; noncitizens with an advance parole document or in parole status; noncitizens with known physical or mental health issues; noncitizens with a criminal history or a history of violence; noncitizens of interest to the Government of Mexico or the United States; any noncitizen who demonstrated that they are more likely than not to face persecution or torture in Mexico; and other noncitizens at the discretion of the Port Director or Border Patrol counterpart. AR 161.

**17.** On February 12, 2019, U.S. Immigration and Customs Enforcement issued guidance on MPP to its field offices, in anticipation of expansion of MPP across the border. AR 165–70. After June 7, 2019, DHS began constructing temporary structures at the southern border in Brownsville and Laredo, Texas, to hold immigration hearings for noncitizens subject to MPP, and notified Congress of their completion in August 2019. These temporary facilities functioned as virtual courtrooms, with immigration judges appearing by video connection from their courthouses within the United States. AR 208, 684.

**\*833 C. The Department of Homeland Security found MPP to be effective**

**18.** Upon review, DHS found MPP to be effective. In its October 28, 2019, Assessment of the Migrant Protection Protocols, DHS stated that "MPP has demonstrated operational effectiveness." AR 683. DHS noted that it had "returned more than 55,000 aliens to Mexico under MPP" and that "MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system." *Id.*

**19.** Specifically, DHS found "[s]ince a recent peak of more than 144,000 in May 2019, total enforcement actions ... have decreased by 64% through September 2019." *Id.* Moreover, DHS found "[b]order encounters with Central American[5] families — who were the main driver of the crisis and comprise a majority of MPP-amenable aliens — have decreased by approximately 80%." *Id.*

**20.** Additionally, DHS stated "although MPP is one among many tools that DHS employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border — including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens

have been processed and returned to Mexico pursuant to MPP." *Id.*

**21.** In addition to finding MPP effective at deterring border encounters and decreasing the number of illegal aliens present in the United States, DHS also found that "MPP is restoring integrity to the [immigration] system." *Id.* As examples of this restoration, DHS found that "MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States." *Id.* at 684. And "MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States — are beginning to voluntarily return home." *Id.*

**22.** DHS did recognize that there were some flaws in the original implementation of MPP. On October 25, 2019 — just three days before releasing its assessment of MPP — DHS released the Migrant Protection Protocols Red Team Report. AR 192. This report found several issues and recommended improvements — but not termination — of MPP. Some of these improvements included standardizing documents and protocols to ensure aliens received a fair process and hearing on their claims. AR 192–201.

**23.** MPP also faced legal challenges. In 🚩*Innovation Law Lab v. Nielsen,* a district court enjoined the implementation of MPP. 🚩*366 F. Supp. 3d 1110 (N.D. Cal. 2019).* The Ninth Circuit stayed that injunction, but a separate panel affirmed the injunction on the merits. 🚩*951 F.3d 1073 (9th Cir. 2020).* The Ninth Circuit then granted a stay as far as the district court's injunction applied outside the territorial limits of the Ninth Circuit but otherwise denied the government's request for a stay. *951 F.3d 986 (9th Cir. 2020).*

**24.** But the Supreme Court stayed the injunction in full granting the Trump Administration a legal victory. *Innovation Law Lab v. Wolf,* —— U.S. ——, 140 S. Ct. 1564, 206 L.Ed.2d 389 (2020). The Supreme Court also granted certiorari. —— U.S. ——, 141 S. Ct. 617, 208 L.Ed.2d 227 (2020). The case was later dismissed from the merits docket as moot. 🏳
**\*834** *Wolf v. Innovation Law Lab,* —— U.S. ——, 141 S.Ct. 2842, ——, 210 L.Ed.2d 955 (2021) (citing 🏳*United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)).

**25.** But throughout the legal challenges, DHS found MPP was meeting its intended goals. AR 554. First, DHS found "MPP provides a streamlined pathway for aliens to defensively apply for protection or relief from removal, while upholding *non-refoulement* obligations through screenings of fear in Mexico." *Id.* Second, DHS found "MPP provides a pathway for aliens to proceed efficiently through the U.S. immigration court processes, as compared to non-detained dockets." *Id.* at 555. Third, DHS found "MPP decreases the number of aliens released into the interior of United States for the duration of their U.S. removal proceedings." *Id.* And fourth, DHS found "MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico — including those apprehended between the [ports of entry]." *Id.*

**26.** By December 31, 2020, DHS had enrolled 68,039 aliens in the MPP program. *Id.*[6] DHS concluded its review of MPP and found it to be a "cornerstone" of DHS's efforts to restore integrity to the immigration system:

   **\*\*6** These unprecedented [immigration] backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners. In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months. MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system — and of the United States' agreement with Mexico to address the crisis at our shared border.

AR 687.

**D. During the transition period, the outgoing Trump Administration entered into an Agreement with Texas and warned the incoming Biden Administration of the dangers of ending MPP**

*1. DHS and Texas enter into an Agreement*

**27.** Shortly before leaving office, the Trump Administration entered into a **\*835** Memorandum of Understanding (the "Agreement") between Texas and DHS. App. 317–26. The Agreement was finalized on January 8, 2021. *Id.* at 325.

**28.** The Agreement purportedly established "a binding and enforceable commitment between DHS and Texas," in which Texas agreed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions." *Id.* at 319. In return, DHS agreed "to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1) reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2) decrease the number of ICE agents performing immigration enforcement duties;

(3) pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4) increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

**\*\*7** (5) increase or decline to decrease the number of releases from detention;

(6) relax the standards for granting relief from return or removal, such as asylum;

(7) relax the standards for granting release from detention;

(8) relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9) increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10) otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas." *Id.* at 319.

**29.** To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice ... of any proposed action" subject to the consultation requirement. *Id.* at 320. That would give Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submitted its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the Agreement. *Id.*

**30.** The parties agree DHS did not follow these procedures when it issued the June 1 Memorandum. But DHS did send a letter that purported to terminate the Agreement "effective immediately" on February 2, 2021. *Id.* at 347–48. Texas avers that the termination letter also did not comply with the Agreement and chose to interpret a letter as a notice of intent to terminate. ECF No. 53 at 21. Accordingly, even under Texas's view, the Agreement is only "binding until August 1, 2021." *Id.*

*2. The Biden Administration was warned of the consequences of terminating MPP*

**31.** During the latter half of 2020, the Biden transition team met with career staff from DHS. According to Mark Morgan — who is former Acting Commissioner of CBP, former Acting Director of ICE, and Marine — CBP "career employees ... fully briefed the Biden transition officials on the importance of MPP and the consequences that would follow a suspension of MPP." App. 399. Morgan stated: "transition **\*836** personnel were specifically warned that the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally enter our [southwest border]." *Id.* And officials were also "warned smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open. They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities." *Id.*

**E. The Biden Administration first suspended, then terminated MPP.**

**32.** The incoming Biden Administration (1) knew MPP had been found effective by DHS as a matter of policy, (2) knew MPP had been successfully defended in court, and (3) had received warnings about the consequences that would attend the repealing of MPP. But the Biden Administration suspended new enrollments in MPP on its first day in office. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." AR 581.

 **\*\*8  33.** Since that day, DHS has not offered a single justification for suspending new enrollments in the program during the period of review. Indeed, when the original administrative record was filed prior to the June 1 Memorandum's issuance, it contained only a single document — the January 20 Memorandum. *See* ECF No. 45. There was no cost-benefit analysis or any sort of reasoned decisionmaking for a court to review.

**34.** But the flaws of the January 20 Memorandum were mooted when DHS completed its review and issued the June 1 Memorandum that terminated the MPP program. AR 1–7; ECF No. 52 at 3 ("[T]he January 20 Memorandum expired upon the completion of DHS's review of the program.").

**35.** In the June 1 Memorandum, DHS Secretary Mayorkas found that his "review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." AR 3.

**36.** In particular, Secretary Mayorkas made several conclusions. First, the Secretary "determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." *Id.*

**37.** Second, the Secretary was concerned that MPP did not ensure that aliens waiting in Mexico were able to attend their immigration proceedings. "The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings." *Id.* at 4. The Secretary noted that "[i]n particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises

questions for me about the design and operation of the program." *Id.*

**38.** Third, the Secretary found that MPP was "intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets." *Id.* The Secretary also added that "[a] number of the challenges faced by MPP have been compounded by the COVID-19 pandemic." *Id.* The Secretary concluded by stating "as a result, any benefits the program may have offered are now far  **\*837**  outweighed by the challenges, risks, and costs that it presents." *Id.*

**39.** The June 1 Memorandum contained no discussion or analysis of DHS's previous assessment that MPP removed "perverse incentives" and decreased the number of aliens attempting to illegally cross the border.

**40.** The June 1 Memorandum contained no discussion or analysis regarding DHS's ability to fulfill its statutory obligation to detain certain classes of aliens in the absence of MPP.

**F. The termination of MPP has and will continue to increase the number of aliens being released into the United States and has and will continue to impose harms on Plaintiff States Texas and Missouri**

*1. The termination of MPP increases the number of aliens present in the United States*

**41.** First, Defendants' termination of MPP necessarily increases the number of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute. App. 307 ("[R]esource constraints during the [May 2019] crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable."); App. 330 n.7 ("Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation.").

 **\*\*9  42.** Second, the termination of MPP has contributed to the current border surge. DHS previously acknowledged

that "MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." AR 555. MPP removed the "perverse incentives" which enticed aliens with "a free ticket into the United States." AR 684, 687; Trial Tr. 147:23–25 (Defense counsel: "I think it's fair to say that [MPP] probably deterred some individuals from coming to the United States.").

**43.** Since MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed. Defendants' data shows encounters jumping from 75,000 in January 2021, when MPP was suspended, to about 173,000 in April 2021, when this case was filed. AR 670. Since then, encounters have continued to increase: CBP data shows nearly 189,000 encounters occurred in June 2021. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters; FRE 201. [7]

**\*838 44.** Even if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity.

**45.** Texas is a border state. But Missouri also faces an increased number of aliens due to the termination of MPP. Statistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri. App. 006.

*2. Texas and Missouri have suffered injuries because of the increased numbers of aliens present in their states*

### a. Driver's Licenses

**46.** As a result of the termination of MPP, some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will obtain Texas driver's licenses. AR555; AR587–588. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. App. 426. Each additional customer seeking a Texas driver's license imposes a cost on Texas. App. 427.

**\*\*10 47.** Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because of MPP's termination would apply for driver's licenses. *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015). The Chief of the Texas Department of Public Safety's Driver License Division gave estimates of the costs of providing additional driver's licenses. App. 428.

**48.** Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license. App. 006.

### b. Education

**49.** Some school-age child aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States. AR423; AR431; AR496; AR547; AR617. Texas estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. App. 440. For students qualifying for bilingual education services, it would cost Texas $11,432 for education per child for attendance for an entire school year. *Id.* The total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases. App. 442.

### c. Healthcare

**50.** Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will use state-funded healthcare services or benefits in Texas and Missouri. AR555; AR587–588; App. 006. Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, **\*839** the Family Violence Program, and the Texas Children's Health Insurance Program. App. 450. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. App. 452. The total costs to the State will increase as the number of aliens within the state increases. *Id.*

**51.** Missouri is similarly situated. App. 006.

#### d. Law enforcement and correctional costs

**52.** Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will commit crimes in Texas and Missouri. AR555; AR587–588; App. 006; App. 362–63; App. 372; App. 388. In one year alone, the Texas Department of Criminal Justice housed 8,951 illegal alien criminals for a total of 2,439,110 days at a cost of over $150 million, with less than $15 million reimbursed by the federal government. App. 460. "[T]o the extent the number of aliens in [Texas Department of Criminal Justice] custody increases, TDCJ's unreimbursed expenses will increase as well." App. 460.

**53.** Some aliens who would have otherwise been enrolled in MPP are victimized by human traffickers in Texas. App. 406; App. 418. Aliens "are particularly susceptible to being trafficked." App. 419. Increasing the number of aliens "present in the United States, including those claiming asylum, is likely to increase human trafficking." App. 423; App. 409. Missouri is likewise a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally. App. 409–410.

**54.** Human trafficking causes fiscal harm to Texas and Missouri. App. 418–19.

#### e. *Parens patriae*

**\*\*11 55.** Aliens who would have otherwise been enrolled in MPP are being paroled into the United States. App. 307; App.330 n.7; AR 183–84. Aliens paroled into the United States are eligible for work authorization thereby increasing the supply of workers by some amount. App. 337; App. 555. Some aliens who would have otherwise been enrolled in MPP will work for employers in Texas or Missouri. AR 555; AR 587–88; App. 362–63; App. 372; App. 388.

#### IV. CONCLUSIONS OF LAW

The Court's opinion proceeds in the following order: (1) the Court finds that it has jurisdiction and Plaintiffs have established standing; (2) the Court concludes there are no other jurisdictional or procedural hurdles to judicial review of Plaintiffs' claims; (3) the Court proceeds to the merits of Plaintiffs' APA and statutory claims; (4) and then the Court

declines to address the merits of Plaintiffs' constitutional and Agreement-based claims.

#### A. Plaintiffs have standing

**[1]  [2]  1.** Federal courts are courts of limited jurisdiction which possess only that power authorized by Constitution and statute. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

**[3]  [4]  2.** "[T]he states have the burden of establishing standing," *Texas*, 809 F.3d at 150, by showing "(1) an 'injury in fact,' (2) **\*840** a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.' "

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014).

**[4]  [5]  3.** "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation"

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.' " *Id.* (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

**4.** Here, the Court consolidated the preliminary injunction hearing with trial on the merits, so the preponderance of evidence standard applies. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

> *1. Texas and Missouri have suffered harms that are concrete, non-speculative, and are traceable to Defendants' conduct — and are redressable.*

**[6]  5.** First, Texas and Missouri have both shown that they have suffered and will continue to suffer "concrete and

particularized" injuries attributable to Defendants' actions.

🚩 *Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).

**6.** Plaintiffs have established that the termination of MPP will increase the cost of providing driver's licenses to aliens released and paroled into the United States, inflicting on the States an actual and imminent injury. *See* 🚩 *Texas*, 809 F.3d at 155 ("[L]icenses issued to beneficiaries would necessarily be at a financial loss.").

 **[7]** **7.** Second, Plaintiffs' injuries are fairly traceable to the actions of Defendants. As stated above, the termination of MPP necessarily increases the number of aliens released and paroled into the United States and the Plaintiff States specifically.

**8.** Paroled and released aliens seeking to obtain driver's licenses is the "the predictable effect of Government action on the decisions of third parties." 🚩 *Dep't of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2566, 204 L.Ed.2d 978 (2019); 🚩 *Texas,* 809 F.3d at 156 ("[T]here is little doubt that many [aliens] would [apply for driver's licenses] because driving is a practical necessity in most of the state.").

 **\*\*12** **[8]** **9.** Third, the Court has the power to redress Plaintiffs' injuries. The APA allows the Court to "set aside agency action ... [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 🚩 5 U.S.C. § 706. Additionally, injunctive relief authorizing DHS officers to return aliens to Mexico via the MPP program pending the resolution of their asylum claims would decrease the number of aliens paroled and released into the United States and into Plaintiff States specifically. Consequently, the amount of fiscal injury suffered by Plaintiffs would decrease.

**10.** Accordingly, the Court finds Plaintiffs have more likely than not established Article III standing under the driver's license theory of injury approved by applicable Fifth Circuit precedent.[8]

 **\*841** **11.** The same line of reasoning applies to the increased healthcare costs, education costs, and enforcement and correctional costs that Plaintiffs will suffer because of the termination of MPP.

 *2. Plaintiffs have not established parens patriae standing*

 **[9]** **12.** Texas and Missouri have not established by a preponderance of the evidence that they are entitled to *parens patriae* standing.

 **[10]** **13.** *Parens patriae* is a type of standing that allows a state to sue a defendant to protect the interests of its citizens.

🚩 *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).

**14.** Preliminarily, in 🚩 *Alfred L. Snapp*, the Supreme Court stated "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." 🚩 *Id.* at 610 n. 16, 102 S.Ct. 3260 (citing 🚩 *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)). This so-called 🚩 *Mellon* bar does not sweep as widely as it may seem. In 🚩 *Massachusetts v. EPA*, the Supreme Court crafted a distinction: "There is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what 🚩 *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 🚩 549 U.S. at 520 n. 17, 127 S.Ct. 1438 (citing 🚩 *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 447, 65 S.Ct. 716, 89 L.Ed. 1051 (1945)).

**15.** Here, Texas is asserting rights *under* the INA rather than attempting to protect its citizens from the *operation* of the INA. Accordingly, the 🚩 *Mellon* bar does not apply. *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 694–98 (S.D. Tex. 2018).

 **[11]** **16.** "To have [*parens patriae*], standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." 🚩 *Alfred L. Snapp*, 458 U.S. at 601, 102 S.Ct. 3260. The Supreme Court then articulated two general categories of "quasi-sovereign" interests: a state has an interest "in the health and well-being — both physical and economic — of its residents in general" and a state has an "interest in not being discriminatorily denied its rightful status within the federal system." 🚩 *Id.* at 607, 102 S.Ct. 3260.

**17.** Plaintiffs aver that they have standing under the first category because they allege the termination of MPP forces their citizens to compete in distorted labor markets in which it is more difficult to obtain a job. ECF No. 53 at 27–28. The Court finds this is a valid "quasi-sovereign" interest. *Texas,* 328 F. Supp. 3d at 698.

**18.** Plaintiffs fail, however, to prove by a preponderance of the evidence that the termination of MPP caused or will cause a distorted labor market. Plaintiffs' entire argument rests on the proposition that "the basic economic law of supply and demand applies to the labor market, so an increase in the supply of illegal aliens authorized to work will harm the employment prospects of Texans and Missourians competing with them." ECF No. 53 at 28. There are no citations to studies, articles, analyses, or anything else that would allow the Court to conclude that the termination of MPP has distorted Texas's or Missouri's labor markets. *See, e.g.,* **\*842** *Texas v. United States,* No. 1:18-CV-068, 549 F.Supp.3d 572, 592 (S.D. Tex. July 16, 2021) (discussing the addition of 114,000 work-eligible individuals who "Texas employers are financially incentivized under the [Affordable Care Act] to hire.").

**\*\*13 19.** Plaintiffs' simple invocation of the law of supply and demand is not enough for the Court to conclude that Plaintiffs carried their burden at the *merits* stage.

### *3. Plaintiffs are entitled to special solicitude*

**[12] 20.** Texas and Missouri are entitled to special solicitude because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA,* 549 at 518, 127 S.Ct. 1438.

**21.** The Fifth Circuit has identified two additional factors that must be present in a case for States to be entitled to special solicitude: the presence of a procedural right to challenge agency action and the invasion of a "quasi-sovereign" interest. *Texas,* 809 F.3d at 152–53.

**22.** First, the Fifth Circuit has already held that the APA provides Texas the procedural right needed for special solicitude. *Id.* at 152 ("The Clean Air Act's review

provision is more specific than the APA's, but the latter is easily adequate to justify 'special solicitude' here.").

**23.** Second, the termination of MPP "affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses." *Id.* at 153. As the Supreme Court noted: "When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. EPA,* 549 U.S. at 519, 127 S.Ct. 1438. Like Massachusetts, Texas and Missouri surrendered their power over immigration when they joined the Union. *See Arizona v. United States,* 567 U.S. 387, 394–400, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Plaintiffs States, like Massachusetts, "now rely on the federal government to protect their interests." *Texas,* 809 F.3d at 154.

**24.** Accordingly, "[t]hese parallels confirm that [the termination of MPP] affects the states 'quasi-sovereign' interests." *Id.*

**25.** As a result, although unnecessary to the Court's finding of standing, the Court finds Texas and Missouri are entitled to special solicitude in its standing analysis.

### **B. There are no jurisdiction or procedural hurdles to judicial review**

#### *1. The termination of MPP is final agency action*

**[13] 26.** The APA states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. In the Fifth Circuit, "whether an agency action is final is a jurisdictional issue, not a merits question." *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.,* 362 F.3d 333, 336 (5th Cir. 2004). "The Supreme Court has long taken a pragmatic approach to finality." *Texas v. EEOC,* 933 F.3d 433, 441 (5th Cir. 2019) (internal marks omitted).

**[14] 27.** Agency action is "final" only if it both (1) "consummate[es] the agency's decisionmaking process" and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

[15]  **28.** The June 1 Memorandum meets both 🚩 *Bennett* standards and is thus an action amenable to judicial review.

**29.** First, the parties do not contest that the June 1 Memorandum marks the consummation of the decisionmaking process. AR 002 (The June 1 Memorandum was published after the Secretary "completed **\*843** the further review undertaken pursuant to Executive Order 14010.").

**\*\*14  30.** Second, the June 1 Memorandum produces legal consequences and determines rights and obligations. 🚩 *EEOC, 933 F.3d at 445* ("[W]hether the agency action binds the *agency* indicates whether legal consequences flow from that action.").

**31.** The June 1 Memorandum had the immediate legal consequence of "terminating the MPP program." AR 002.

**32.** The June 1 Memorandum had the immediate legal consequence of rescinding "the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled 'Policy Guidance for Implementation of the Migrant Protection Protocols,' and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled 'Suspension of Enrollment in the Migrant Protection Protocols Program.' " AR 007.

**33.** The June 1 Memorandum directed "DHS personnel, *effective immediately*, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." *Id.* (emphasis added).

[16]  **34.** Moreover, the June 1 Memorandum determined rights and obligations. The June 1 Memorandum prevents DHS line officers from using MPP, a tool that was previously available to them. "Where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." 🚩 *EEOC*, 933 F.3d at 442 (quoting 🚩 *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016)).

**35.** Accordingly, the June 1 Memorandum constitutes final agency action.

*2. No statute precludes judicial review*

**36.** Judicial review is presumptively available under the APA "except to the extent that statutes preclude judicial review." 🚩 5 U.S.C 701(a)(1); 🚩 *Texas*, 809 F.3d at 163 ("[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.' ") (quoting 🚩 *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 63–64, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)).

[17]  **37.** "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." 🚩 *Id.* at 164 (quoting 🚩 *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)).

[18]  **38.** First, 🚩 8 U.S.C. § 1252(g) does not preclude judicial review.

**39.** 🚩 Section 1252(g) states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

**40.** Texas and Missouri are not bringing this case on "behalf of any alien." 🚩 *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, ── U.S. ───, 140 S. Ct. 1891, 1907, 207 L.Ed.2d 353 (2020) ("We have previously rejected as 'implausible' the Government's suggestion that 🚩 § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.' ") (quoting 🚩 *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999)). This is further confirmed by the fact that the remedy ordered by the Court in this case does not affect the status of any alien or immigration proceeding.

**\*\*15  [19]  41.** Second, 🚩 8 U.S.C. § 1252(b)(9) does not preclude judicial review.

**42.** Section 1252(b)(9) states: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from *any action taken or proceeding* brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this Section." (emphasis added). This Section functions as a limit on where aliens can seek judicial review of their immigration proceedings.

**43.** But the Supreme Court has recently stated: "As we have said before, § 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Regents*, 140 S. Ct. at 1907 (quoting *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 841, 875–76, 200 L.Ed.2d 122 (2018) (plurality opinion) (internal marks omitted)). "And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Id.*

 **[20]  44.** Third, 8 U.S.C. § 1252(f)(1) does not preclude judicial review.

**45.** Section 1252(f)(1) states: "No court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."

**46.** But this section does not apply because Plaintiffs are not seeking to *restrain* Defendants from enforcing Section 1225. Plaintiffs are attempting to make Defendants *comply* with Section 1225.

 **[21]  47.** Fourth, 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude judicial review.

**48.** Section 1252(a)(2)(B)(ii) states: "no court shall have jurisdiction to review ... any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under Section 1158(a) of this title."

**49.** But Plaintiffs are not challenging the substantive exercise of the Attorney General's discretion. Instead, they are challenging whether the government complied with its legal obligations under the APA in terminating MPP. *See e.g.*, *Nora v. Wolf*, No. 20-0993, 2020 WL 3469670, at *7 (D.D.C. June 25, 2020) ("But Claim One does not take on the individual decisions made to return each plaintiff to Mexico; it is directed at an agency decision – the decision to "expand" MPP implementation to Tamaulipas."); *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 191 (3d Cir. 2020) (same); *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *4 (D.D.C. Nov. 21, 2019) (same).

**50.** This reading of the statute is further confirmed by Section 1252(a)(2)(B)(ii)'s title: "**Denials of discretionary relief**." This title indicates the objective of the statute is to prevent aliens from challenging the federal government's refusal to grant discretionary relief. *Texas*, 809 F.3d at 164.

**51.** Lastly, the overall structure of the INA does not evidence a clear intent by Congress to preclude judicial review. *Texas*, 809 F.3d at 163. Congress's choice to expressly preclude certain types of claims **\*845** does not show by "clear and convincing evidence" that Congress also meant to implicitly preclude all *other* types of claims. *Id.*; *see Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 844, 200 L.Ed.2d 122 (2018) (An "express exception ... implies that there are no other[s]"); ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law* 107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").

 **\*\*16  52.** Accordingly, no statute or statutory scheme precludes judicial review of Plaintiffs' APA claim.

*3. The termination of MPP is not an agency action committed to agency discretion by law*

 **[22]  53.** The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.' " *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182,

191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993)); 5 U.S.C. § 701(a)(2).

**54.** Section 1225(b)(2)(c) states: "In the case of an alien described in subparagraph (A) who is arriving on land ... from a foreign territory contiguous to the United States, [DHS] *may* return the alien to that territory pending a proceeding under Section 1229a of this title." (emphasis added). But the mere presence of the word "may" does not place the agency's actions outside of the ambit of judicial review. *Regents,* 140 S. Ct. at 1905 ("The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.").

**55.** Rather, "[t]o honor the presumption of review, [courts] read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Id.* (internal citations omitted).

**56.** First, this limited category of unreviewable actions includes an agency's decision to not institute enforcement proceedings. *Id.* (citing *Heckler v. Chaney,* 470 U.S. 821, 831–32, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). But the decision to terminate MPP "is more than a non-enforcement policy." *Regents,* 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization. App. 337; *Texas,* 809 F.3d at 167 ("Likewise, to be reviewable agency action, DAPA *need not directly confer* public benefits.") (emphasis added).

**57.** Moreover, the MPP program is not about enforcement proceedings *at all.* Any alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a. The only question MPP answers is *where* the alien will *be* while the federal government pursues removal — in the United States or in Mexico.

**58.** Second, under Fifth Circuit precedent, agency decisions are "completely unreviewable under the committed to 'agency discretion by law' exception" if "the statutory

scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas,* 809 F.3d at 168.

**59.** The INA provides guidance as to how DHS should exercise its discretion "according to the general requirements of reasoned agency decisionmaking." *New York,* 139 S. Ct. at 2569. Section 1225 imposes mandatory-detention obligations on Defendants. § 1225(b)(2)(A) ("[T]he alien shall be detained"); AR 682 ("The law ***846** provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings."). To avoid violating Section 1225's obligations, DHS must use its authority to return aliens to Mexico when an influx of aliens exceeds DHS's detention capacity. These statutory obligations provide courts guidance on how DHS's contiguous-territory-return authority should be exercised.

***17 60.** DHS does not *have* to use this authority; it could always detain every alien required by Section 1225. But if it is incapable of detaining such a large number, then the statute implicitly demands, or, at the very least, directs DHS use its authority to return certain aliens to Mexico.

**61.** Accordingly, the decision to terminate MPP is "not one of those areas traditionally committed to agency discretion." *New York,* 139 S. Ct. at 2568.

### *4. Plaintiffs are within the zone of interests of the INA*

**[23] 62.** "Because the states are suing under the APA, they 'must satisfy not only Article III's standing requirements, but an additional test: The interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated.' " *Texas,* 809 F.3d at 162 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 132 S. Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (internal marks omitted)).

**[24] 63.** "That 'test ... is not meant to be especially demanding' and is applied 'in keeping with Congress's 'evident intent' when enacting the APA 'to make agency

action presumptively reviewable.' " *Id.* "The Supreme Court 'has always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.' " *Id.* "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " *Id.*

**[25] 64.** First, the Court concludes that the proper scope of the zone-of-interest inquiry is the entirety of the INA. *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 401, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("In considering whether the "zone of interest" test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act."). The Court is "not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes." *Id.* And, historically, the Fifth Circuit's "treatment of APA claims in the immigration context [ ] considers the INA as a whole." *Texas v. United States,* No. 6:21-CV-003, 524 F.Supp.3d 598, 632 (S.D. Tex. Feb. 23, 2021); *Texas,* 809 F.3d at 193 n. 80.

**[26] 65.** Here, Plaintiffs are seeking to require the Secretary to engage in reasoned decisionmaking under the APA before the Secretary terminates MPP requiring the state to choose between "spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.*

**66.** The INA and Section 1225 in particular protect the states' interest by mandating the detention or return to Mexico of aliens who would otherwise impose costs on the states.

**67.** Accordingly, "[t]he interests the states seek to protect fall within the zone of interests of the INA." *Texas,* 809 F.3d at 193.

***847 C. The termination of MPP violated the APA**

**[27] [28] 68.** The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means

"[f]ederal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA,* 576 U.S. 743, 750, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015) (internal marks omitted). To do so, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43, 103 S.Ct. 2856.

***18 [29] 69.** Review under the APA's arbitrary and capricious standard is "highly deferential." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir. 1983). District courts must "accord the agency's decision a presumption of regularity" and "are prohibited from substituting [the court's] judgment for that of the agency." *United States v. Garner,* 767 F.2d 104, 116 (5th Cir. 1985).

**[30] 70.** "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' " *Garner,* 767 F.2d at 116 (quoting *State Farm,* 463 U.S. at 50, 103 S.Ct. 2856). This "record rule" normally dictates that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

**[31] 71.** But courts allow extra-record evidence when it is necessary to determine whether the agency "considered all the relevant factors." *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 285 (D.C. Cir. 1981). [9]

**72.** If a court finds that an administrative agency failed to engage in reasoned decisionmaking, the reviewing court "shall hold unlawful and set aside" such "agency action, findings, and conclusions" as arbitrary and capricious. 🚩5 U.S.C. § 706(2)(A).

### 1. DHS ignored critical factors

**[32]   [33]   [34]   73.** "Agency action is lawful only if it rests on a consideration of the relevant factors." 🚩*Michigan*, 576 U.S. at 750, 135 S.Ct. 2699 (internal marks omitted). Although the June 1 Memorandum claims that Defendants "reviewed all relevant evidence and weighed the costs and benefits of" their decision, AR 006, an agency merely "[s]tating that a factor was considered, however, is not a substitute for considering it." 🚩*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Courts "do not defer to the agency's conclusory or unsupported suppositions." 🚩⚠ *848 *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010). Rather, the Court "must make a "searching and careful" inquiry to determine if [DHS] actually *did* consider [the relevant factors]." 🚩*Getty*, 805 F.2d at 1055 (quoting 🚩*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)) (emphasis in original).

**[35]   74.** Defendants failed to consider several critical factors.

**75.** First, the Secretary failed to consider several of the main benefits of MPP. As the Court stated above in the findings of fact, DHS had previously found that "aliens without meritorious claims — which no longer constitute[d] a free ticket into the United States — [were] beginning to voluntarily return home." AR 684. DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims ... [to] remain in the country for lengthy periods of time." AR 687.

**76.** The June 1 Memorandum never once mentions these benefits. At the very least, the Secretary was required to show a reasoned decision for discounting the benefits of MPP. Instead, the June 1 Memorandum does not address the problems created by false claims of asylum or how MPP addressed those problems. Likewise, it does not address the fact that DHS previously found that "approximately 9 out of 10 asylum claims from Northern Triangle countries

are ultimately found non-meritorious by federal immigration judges," App. 303, and that MPP discouraged such aliens from traveling and attempting to cross the border in the first place. AR 687.

**\*\*19  77.** To be sure, DHS could have determined, "in the particular context before it, that other interests and policy concerns outweigh[ed] any [benefits MPP had]. Making that difficult decision was the agency's job, but the agency failed to do it." 🚩*Regents*, 140 S. Ct. at 1914.

**78.** By ignoring its own previous assessment on the importance of deterring meritless asylum applications without "a reasoned analysis for the change," Defendants acted arbitrarily and capriciously. 🚩*State Farm*, 463 U.S. at 42, 103 S.Ct. 2856.

**[36]   79.** Second, the Secretary also failed to consider the warnings by career DHS personnel that "the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally" cross the border. App. 399.[10] This is all the more important because the Secretary had the opportunity to see if the warnings were predictive because the Secretary suspended enrollments in MPP on January 20, 2021. From that date until June 1, 2021 when MPP was permanently terminated, the Secretary had the opportunity to observe the ever-increasing number of border encounters. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. But the Secretary never discussed the rise in border encounters in the June 1 Memorandum or discussed why the warnings by career DHS personnel were misguided or incorrect even as the data appeared to show that the career officials were, in fact, prescient.

**[37]   80.** Third, the Secretary failed to consider the costs to Plaintiffs and Plaintiffs' reliance interests in the proper enforcement of federal immigration law. The Court has already found that the states face fiscal harm from the termination of  **\*849** MPP. But the fact that Plaintiffs suffer fiscal injuries does not indicate the June 1 Memorandum is arbitrary and capricious. Rather, it is the fact that the agency did *not* consider the costs to the States *at all*.

**81.** Fiscal burdens on states are "one factor to consider" — even if the agency could conclude that "other interests and policy concerns outweigh" those costs. 🚩*Regents*, 140 S.

Ct. at 1914 (listing possible valid reliance interests, including damage to a state's coffers; "State and local governments could lose $1.25 billion."). But once again, even though "[m]aking that difficult decision was the agency's job, [ ] the agency failed to do it." *Id.*

**[38]  82.** Moreover, the Secretary failed to address whether the States had any "reliance interests" in the ongoing implementation of MPP. "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.' " *Id.* at 1913 (*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2126, 195 L.Ed.2d 382 (2016)). "It would be arbitrary and capricious to ignore such matters." *Id.* (quoting *Fox*, 129 S. Ct. at 1800).

**[39]  [40]  83.** Fourth, the Secretary also failed to meaningfully consider more limited policies than the total termination of MPP. "When an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51, 103 S.Ct. 2856) (internal marks omitted). The entirety of the Secretary's reasoning in not modifying MPP is contained in a single sentence: "I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources." AR 005. The Secretary does not identify a single example of what a modified MPP would look like or what kind of investment would be needed to modify or scale back MPP. Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp.*, 601 F.3d at 562.

### 2. DHS's given reasons were arbitrary

**\*\*20  [41]  84.** On the other hand, one of the key reasons the Secretary gave for terminating for MPP is arbitrary. In discounting the expeditious pace at which MPP completed removal proceedings, the Secretary stated:

> It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but

this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) *raises questions for me* about the design and operation of the program.

AR 004 (emphasis added).

**85.** Certainly, the June 1 Memorandum was concerned about the rate of *in absentia* removals, which were around 44 percent under MPP. And that concern was a key factor in the Secretary's decision to terminate MPP.

**86.** But the June 1 Memorandum never provides any reason why DHS determined that *in absentia* removals resulted from aliens abandoning *meritorious* asylum claims when DHS previously concluded **\*850** that *in absentia* removals were a result of aliens abandoning *meritless* claims. AR 684 ("Moreover, aliens without meritorious claims ... are beginning to voluntarily return home."). Instead, the June 1 Memorandum states only that this data "raises questions." AR 004. But it is the Secretary's job to answer such questions. *Regents*, 140 S. Ct. at 1914.

**[42]  87.** It is true that "the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, —— U.S. ——, 141 S. Ct. 1150, 1160, 209 L.Ed.2d 287 (2021). But it is also true that the agency must *actually reach* some sort of conclusion." *State Farm*, 463 U.S. at 52, 103 S.Ct. 2856 ("Rescission of [agency action] would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's *conclusion* ... the agency must then exercise its judgment in moving from the facts and probabilities on the record *to a policy conclusion*.") (emphasis added).

**88.** Merely noting the presence of "questions" provides no "justification for rescinding [MPP] or engaging in a search for further evidence" that could answer those questions. *Id.*; *see also Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 44 (D.D.C. Cir. 2020) (finding agency action arbitrary when the agency "took no position

whatsoever on the actual effects that a [policy change] would have").

**89.** Besides assuming without evidence that the 44% *in absentia* rate was attributable to MPP, the Secretary never explained why 44% is itself an unacceptably high number. The June 1 Memorandum does not consider any relevant comparator for determining whether the rate of in absentia removal orders under MPP was unusually high. *See* State Farm*, 463 U.S. at 43, 103 S.Ct. 2856* ("[T]he agency must examine the relevant data.").

**\*\*21 90.** The federal government's data shows similarly high rates of *in absentia* removals *prior to* implementation of MPP. Executive Office for Immigration Review, Adjudication Statistics: *Comparison of* In Absentia *Rates*, https://www.justice.gov/eoir/page/file/1153866/download. For example, the *in absentia* rate was 42% in 2015 and 43% in 2017. *Id.* Failing to exam the relevant data is arbitrary and capricious. Again, "the agency must examine the relevant data." *State Farm, 463 U.S. at 43, 103 S.Ct. 2856.*

**91.** In their briefing, Defendants posit a new theory not mentioned in the June 1 Memorandum. ECF No. 63 at 32–33; *but see Sw. Elec. Power Co. v. EPA, 920 F.3d 999, 1014 (5th Cir. 2019)* (A court "may uphold agency action only on the grounds that the agency invoked when it took the action."). Defendants argue that 44 percent of MPP cases resulted in *in absentia* removal orders, while only 11 percent of non-MPP cases resulted in *in absentia* orders during the same time period. *Id.* at 33. And the disparity between MPP and non-MPP *in absentia* removal orders is evidence of the ineffectiveness of the program in deterring fraudulent claims. *Id.*

**92.** But even if the Court considered this argument, it is not persuasive. A higher rate of *in absentia* removal is consistent with DHS's findings that MPP reduced the "perverse incentives" to pursue meritless asylum applications. There is nothing in the record that provides any analysis or reasoning explaining how higher *in absentia* removals resulted from aliens abandoning meritorious, rather than unmeritorious, asylum claims as DHS had previously found. AR 684 ("Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States — are beginning to voluntarily return **\*851** home."); *FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515–16, 129 S.Ct.*

*1800, 173 L.Ed.2d 738 (2009)* ("If the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must offer "a reasoned explanation ... for disregarding facts and circumstances that underlay ... the prior policy.").

**[43] 93.** Another of the Secretary's stated conclusions is arbitrary. In the June 1 Memorandum, the Secretary justified, in part, terminating MPP because of the court closures caused by the COVID-19 pandemic:

> As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

**94.** The Secretary's reasoning is without any merit. Even according to the June 1 Memorandum, immigration courts were reopened by the end of April 2021. *Past* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021. This is especially true when the Secretary admits DHS had maintained the facilities during the pandemic.

> *3. DHS failed to consider or acknowledge the effect terminating MPP would have on its compliance with Section 1225*

**[44] 95.** As detailed more below, the June 1 Memorandum failed to consider the effect terminating MPP would have on DHS's ability to detain aliens subject to *mandatory* detention under Section 1225.

**96.** DHS had previously recognized that "[t]he law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings." AR 682. But "resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable." *Id.*

**\*\*22  97.** MPP addressed the resource problem by reducing the number of aliens DHS would have to detain by returning certain aliens to Mexico. *Id.*; AR 687. In terminating MPP, the Secretary was required to consider whether DHS could meet its statutory obligation to detain aliens seeking asylum without MPP as a tool. This the Secretary did not do.

**98.** Not once did the June 1 Memorandum discuss DHS's mandatory-detention obligation. In fact, a perusal of the *entire* administrative record shows *zero* evidence of DHS's detention capacity. Trial Tr. 114 (DHS counsel: "the [administrative] record doesn't contain *any* information about detention capacity.") (emphasis added). By "fail[ing] to consider an important aspect of the problem," the Secretary acted arbitrarily and capriciously. *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

**99.** For the above stated reasons, Defendants' termination of MPP was arbitrary and capricious and in violation of the APA. Accordingly, the Court concludes that Plaintiffs' APA claim is meritorious.

### D. The termination of MPP causes Defendants to violate Section 1225

**100.** The Court begins by quickly re-summarizing the relevant statutory framework.

**\*852  101.** Section 1225 provides that if an immigration officer determines that an alien subject to expedited removal *does not* have a credible fear of persecution, the alien "*shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added).

**102.** An alien subject to expedited removal and determined by an immigration officer to have a credible fear of persecution

"*shall be detained* for further consideration of the application for asylum." § 1225(b)(1)(B)(ii) (emphasis added).

**103.** An alien seeking admission and not subject to expedited removal, whom an examining immigration officer determines is not clearly and beyond a doubt entitled to be admitted, "*shall be detained*" for removal proceedings. § 1225(b)(2)(A) (emphasis added).

**104.** Aliens who are not subject to expedited removal and arrive on land from a foreign territory contiguous to the United States may be returned by the government to that territory pending asylum proceedings as an alternative to detention. § 1225(b)(2)(C); AR 682.

**105.** MPP used this statutory authority to return aliens to Mexico pending their removal proceedings. AR 682.

**106.** Accordingly, Section 1225 provides the government two options vis-à-vis aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory. Failing to detain or return aliens pending their immigration proceedings violates Section 1225. [11]

**\*\*23  [45]  107.** Without MPP, Defendants only remaining option under Section 1225 is mandatory detention. But DHS admits it does not have the capacity to meet its detention obligations under Section 1225 because of "resource constraints." AR 682; App. 330 n. 7 ("Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice.").

**108.** Under *these particular* circumstances, where Defendants cannot meet their detention obligations, terminating MPP necessarily leads to the systemic violation of Section 1225 as aliens are released into the United States because Defendants are unable to detain them.

**109.** Accordingly, the Court concludes that Plaintiffs' statutory claim is meritorious as well.

### E. The Court does not need to decide Plaintiffs' Take Care Clause claim

**110.** Because the Court will grant Plaintiffs full relief on their APA and statutory **\*853** claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

**[46] 111.** Where the Court has made a full disposition of the case without addressing a constitutional claim, it will not address the issue. *See Matal v. Tam*, —— U.S. ——, 137 S. Ct. 1744, 1755, 198 L.Ed.2d 366 (2017) ("We have often stressed that it is important to avoid the premature adjudication of constitutional questions and that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable.") (internal marks and citations omitted).

### F. The Agreement with Texas has expired and is therefore moot.

**[47] 112.** Because the Court will grant Plaintiffs full relief on their APA and statutory claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

**113.** Any further agency action responsive to this opinion shall take place after August 1, 2021, which is when Texas agrees the Agreement is terminated. Therefore, the Agreement will not apply to any new agency action either.

**114.** The Court accordingly dismisses this claim as moot.

### V. REMEDIES

**115.** Having found Plaintiffs' APA and statutory claims are meritorious, it is the Court's remaining task to craft to proper relief.

### A. Vacatur and Remand

**116.** The APA provides that "[t]he reviewing court *shall* ... hold unlawful and *set aside* agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).

**[48] 117.** As a textual matter, [12] the mandatory language of the APA has led courts to make remand and vacatur the default remedy for agency action that violates the APA. *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) ("[D]istrict courts have a duty to

vacate unlawful agency actions."). Remand, without vacatur, is only "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Assoc. of Mfrs. v. US Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021).

**\*\*24 \*854 [49] 118.** The D.C. Circuit considers two factors when deciding whether to remand without vacatur: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*, 925 F.3d at 1287; *accord Cent. & S. W. Servs., Inc. v. E.P.A.*, 220 F.3d 683, 692 n.6 (5th Cir. 2000) ("EPA gave ample reasons for its application of the Rule to the members of the regulated community in general. It simply failed to explain why it refused to grant the national variance to the electric utilities. We conclude that it would be disruptive to vacate application of the Rule to other segments of the industry.").

**[50] 119.** Under the first prong, the Court finds that the deficiencies in the June 1 Memorandum are serious and are unlikely to be resolved on a simple remand. As the Court has found, Defendants failed to consider the main benefits of MPP: (1) MPP deterred aliens, especially from the Northern Triangle, from attempting to illegally cross the border, (2) MPP allowed DHS to avoid systemic violation of Section 1225's detention requirements, and (3) MPP reduced the burden on states caused by tens of thousands of aliens being released.

**120.** Moreover, DHS *knew* of these failings when it issued the June 1 Memorandum because Plaintiffs first brought suit on April 13, 2021 — nearly two months earlier. DHS had the opportunity to consider Plaintiffs' suit and engage in reasoned decisionmaking to avoid the flaws the Court has identified in this opinion.

**121.** Additionally, the June 1 Memorandum is not only arbitrary and capricious for a lack of reasoned decisionmaking, but it is also substantively unlawful because, in these circumstances, termination of MPP causes Defendants to systemically violate Section 1225. It will continue to be unlawful to terminate MPP until DHS has the capacity and willingness to detain immigrants claiming asylum under Section 1225.

[51] **122.** Under the second prong, the Court finds vacatur will not be unduly disruptive. In their supplemental briefs addressing remedies, Defendants emphasizes the "chaos" and "disruptive consequences" that would follow vacatur of the June 1 Memorandum. ECF Nos. 70, 93 at 4–7 ("An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution."). The government further states "restarting MPP would 'come at tremendous opportunity cost,' 'draw resources from other efforts,' 'create doubt about the reliability of the United States as a negotiating partner,' 'hamstring the Federal Government's ability to conduct the foreign policy discussions' necessary to manage migration, and 'have significant resource implications and be damaging to our national and economic security.' " *Id.*

**123.** But these problems are entirely self-inflicted. "Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved." 🔖 *Texas, 809 F.3d at 187.* Here, Texas filed suit challenging the suspension of enrollments in MPP on April 13, 2021, which is nearly two months *before* DHS purported to terminate the program entirely in the June 1 Memorandum. DHS "could have avoided" any disruptions by simply informing Mexico that termination of MPP would be subject **\*855** to judicial review "until the litigation was resolved." 🔖 *Id.* [13] Mexico is capable of understanding that DHS is required to follow the laws of the United States which includes the APA and INA.

**\*\*25 124.** And, as evidenced by Defendants' briefs, DHS seemingly relies on the premise that it *actually terminated* MPP back in January 2021 and has been dismantling the program ever since then, even though the January 20 Memorandum only purported to suspend the enrollment of aliens in MPP. [14]

**125.** DHS argues, in a brief dated July 7, 2021, that it began acting "to unwind MPP and its infrastructure," *before* the June 1 Memorandum terminating MPP, which is only two months old. ECF No. 70 at 8 ("[N]ew initiatives" to replace MPP have been "in place for nearly *six months*."). Similarly, in the same brief, Defendants stated that re-implementing MPP would be

difficult because MPP "had been terminated for *some* time." *Id.* at 9 (emphasis added)

**126.** Again, in the same brief, Defendants argues that "Mexico had already begun taking action to redeploy resources." *Id.* at 9. But Defendants' citation shows that Mexico was redeploying resources already by April 28, a month *before* DHS issued the June 1 Memorandum. ECF No. 64 at 14. In another portion, Defendants state MPP began being wound down on "February 11, 2021." *Id.* at 17–18. Defendants also state that vacatur would nullify "more than four months of diplomatic and programmatic engagement," ECF No. 70 at 11, even though MPP had only been terminated for one month when that brief was submitted.

**127.** In other words, DHS's apparent argument is that MPP has been in the process of termination for *months*, far preceeding the actual issuance of the June 1 Memorandum, and it is simply *too late* for a court to vacate their actions. But if the decision to terminate MPP was made far in advance of the June 1 Memorandum, that reduces the entire June 1 Memorandum into *post hoc* arguments for a decision that was already made. *Compare* ECF No. 64 at 5 ("Upon completion of the required review, the Secretary announced his decision to terminate MPP [on June 1, 2021].") *with id.* at 17 ("[T]he U.S. government announced the wind-down of the MPP policy on February 11, 2021.").

**128.** Additionally, DHS's arguments also only relate to the effect vacatur would have on its diplomatic engagements with foreign countries. [15] ECF No. 70 at 7–11.

**129.** DHS's reliance on the effects of foreign affairs is unpersuasive. DHS's first **\*856** duty is to uphold *American* law. It cannot just point at diplomatic efforts as an excuse to not follow the APA or fulfill its statutory obligations.

**\*\*26 130.** Accordingly, Plaintiffs are entitled to vacatur and remand because the June 1 Memorandum violates the APA and is in substantive violation of 🔖 Section 1225.

### B. Injunctive Relief is warranted

[52] **131.** "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." 🔖 *eBay Inc. v. MercExchange, LLC.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The four factors are: "(1)

that [Plaintiffs have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 📙 *Id.*

**[53] 132.** Regarding the first factor, as discussed in the Section on standing, *supra* § IV.A.1, Plaintiffs have shown that they are suffering ongoing and future injuries as a result of the termination of MPP.

**133.** Regarding the second factor, Texas and Missouri are unable to recover the additional expenditures from the federal government. *Texas*, 524 F.Supp.3d at 663 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *see also Texas*, 328 F. Supp. 3d at 737 (deeming an injury irreparable because "there [was] no source of recompense").

**[54] 134.** Regarding the third and fourth factors, [16] the ongoing and future injuries sustained by Plaintiffs outweigh any harms to Defendants as Defendants have no "interest in the perpetuation of unlawful agency action." 📙 *League of Women Voters of United States, v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, there is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." 📙 *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

**135.** Moreover, the public interest favors Plaintiffs because the public has an "interest in stemming the flow of illegal immigration." *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620 at *2 (S.D. Tex. Nov. 28, 2017) (citing 📙 *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–58, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). And the public has interest in the enforcement of immigration laws, including 🚩 Section 1225. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat 3359, 3384 (1986) ("[T]he immigration laws of the United States should be enforced vigorously and uniformly.")

**136.** Lastly, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not

issue an injunction unless an injunction would "have [a] meaningful practical effect **\*857** independent of its vacatur." 📙 *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010).

**\*\*27 137.** Here, an injunction is warranted for two reasons. First, an injunction is needed to prevent the continued systemic violation of 🚩 Section 1225. Second, Defendants have indicated that, *even if* the June 1 Memorandum were declared invalid, they would not necessarily return any aliens to Mexico. ECF No. 63 at 9 ("Reinstating MPP would not *require* DHS to return anyone to Mexico.") (emphasis in original). ECF No. 92 at 47 ("DHS retains discretion to ... release *all* noncitizens inspected for admission under 🚩 Section 1225(b)(2)(A) or arrested while present in the United States under Section 1226.") (emphasis added).

**138.** Defendants are correct in stating that this Court does not have the power to tell a DHS line officer which individual aliens are amenable to MPP and must be enrolled. But Defendants are *incorrect* in arguing this Court has no power to enjoin a "blanket policy" that removes all discretion from line officers to utilize MPP. *Texas*, 524 F.Supp.3d at 667 ("But this injunction does not enjoin *individual* removal decisions. As described above, it enjoins a *blanket* policy that is contrary to law. The Government makes much of its discretion in individual matters .... But nothing in this preliminary injunction changes that."); ECF No. 63 at 9 ("Reinstating MPP ... would merely authorize line-level officers to [return aliens to Mexico] in their discretion.").

**139.** Lastly, Fifth Circuit precedent dictates that, in immigration related cases, proper relief includes nationwide injunctions. A geographically limited injunction would be improper because federal *immigration* law must be uniform. 📙 *Texas*, 809 F.3d at 187–88; *see also Texas*, 524 F.Supp.3d at 667–68; *Texas v. United States*, 515 F.Supp.3d 627, 638 (S.D.Tex. 2021). Furthermore, a geographically limited injunction would likely "be ineffective because [aliens] would be free to move among states." 📙 *Id.* at 188.

**140.** Accordingly, the Court will grant the narrowest injunction possible that afford Plaintiffs full relief on their claims.

## VI. CONCLUSION

For the reason stated above, the Court finds that Plaintiffs have proven their APA and statutory claims by the preponderance of the evidence. Accordingly, it is **ORDERED**:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **PERMANENTLY ENJOINED** and **RESTRAINED** from implementing or enforcing the June 1 Memorandum.

2. The June 1 Memorandum is **VACATED** in its entirety and **REMANDED** to DHS for further consideration.

3. Defendants are **ORDERED** to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources.

4. To ensure compliance with this order, starting September 15th, 2021, the Government must file with the Court on the 15th of each month, a report stating (1) the total monthly number of encounters at the southwest border; (2) the total monthly number of aliens **\*858** expelled under Title 42, Section 1225, or under any other statute; (3) Defendants' total detention capacity as well as current usage rate; (4)

the total monthly number of "applicants for admission" under Section 1225; (5) the total monthly number of "applicants for admission" under Section 1225 *paroled* into the United States; and (6) the total monthly number of "applicants for admission" under Section 1225 released into the United States, *paroled or otherwise.*

**\*\*28** 5. This injunction is granted on a nationwide basis.

6. Nothing in this injunction requires DHS to take any immigration or removal action nor withhold its statutory discretion towards any individual that it would not otherwise take.

7. The Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this permanent injunction.

8. The Court **STAYS** the applicability of this opinion and order for **7 days** to allow the federal government time to seek emergency relief at the appellate level.

**SO ORDERED.**

**All Citations**

554 F.Supp.3d 818, 2021 WL 3603341

---

### Footnotes

1   Defendants are the United States of America; President Biden in his official capacity; the Department of Homeland Security ("DHS") and DHS Secretary Mayorkas in his official capacity; the United States Customs and Border Protection ("CBP") and Acting Commissioner of CBP Troy Miller in his official capacity; the United States Immigration and Customs Enforcement "ICE" and Acting ICE Director Tae Johnson; and the United States Citizenship and Immigration Services ("CIS") and Acting CIS Director Tracy Renaud in her official capacity.

2   Citations to Plaintiffs' Appendix in Support, found at ECF No. 54, are labeled App. ###. Citations to the administrative record, found at ECF No. 61, are labeled AR ###.

3   In preparing this memorandum opinion and order, the Court carefully considered the trial arguments, the record, and the admitted exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the Court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis."

🚩 *Id.* The Court instead has limited its discussion to those legal and factual issues that form the basis for its decision. 🚩 *Id.*

Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

4     Section 235(b)(2)(C) of the Immigration and Nationality Act (INA)

5     These countries are also sometimes referred to as the "Northern Triangle." The Northern Triangle countries are Guatemala, Honduras, and El Salvador.

6     The COVID-19 pandemic accounted for the markedly fewer aliens enrolled in MPP in 2020. Due to the pandemic, MPP removal proceedings began to be postponed on April 22, 2020. AR 466. Additionally, beginning in March 2020, DHS assisted in the enforcement of Title 42 — a statutory provision not relevant to this suit — to expel certain amenable noncitizens from Mexico and the Northern Triangle countries back to Mexico, and certain amenable noncitizens from other countries to their countries of origin if Mexico will not accept them, with limited exceptions. AR 621–22, 631. Title 42 expulsions accounted for 102,234 and 111,175 repatriations in 2020 and the first quarter of 2021. AR 660.

7     Moreover, the Court takes judicial notice of the sworn statement of David Shahoulian, Assistant Secretary for Border and Immigration Policy at DHS — filed in the District Court of the District of Columbia in Title 42 related litigation. ECF No. 113-1 at 7–9, No. 1:21-CV-100-EGS (D.D.C. Aug. 2, 2021) (emphasis added). The Court finds David Shahoulian is a "source[ ] whose accuracy cannot reasonably be questioned." FRE 201.

> In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border ... These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations. As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type.

> Based on preliminary data, the number of border encounters continued to increase in July 2021. Over the first 29 days of July, CBP encountered an average of **6,779** individuals per day, including 616 unaccompanied children and 2,583 individuals in family units. Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000. July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.

> ...

> Based on current trends, the Department expects that total encounters this fiscal year are likely to be **the highest ever recorded**.

8     Even if Missouri has failed to establish standing, it does not prevent the Court from proceedings to the merits because Texas has standing. *See, e.g.,* 🚩 *Texas v. United States,* No. 1:18-CV-00068, 549 F.Supp.3d 572, 596 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff."); 🚩 *Massachusetts,* 549 U.S. at 518, 127 S.Ct. 1438.

9    See ECF No. 76 at 11–12. There, the Court discussed the applicable exceptions to the "record rule" and found that Plaintiffs may submit extra-record evidence on its APA claims.

10   The briefing materials from the career officials were not part of the administrative record.

11   DHS does have the discretion to parole some aliens. But parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Nor is parole intended "to replace established refugee processing channels." App. 336. By enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole ... was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Any class-wide parole scheme that paroled aliens into the United States simply because DHS does not have the detention capacity would be a violation of the narrowly prescribed parole scheme in section 1182 which allows parole "only on a *case-by-case* basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). *See also* AR 184 ("The number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and *not whether the individual circumstances* of individual cases warrant release or detention,' [according to UT law professor Steve] Vladeck.") (emphasis added).

12   Defendants aver that "nothing in section 706(2)'s text specifies whether a rule, if found invalid, should be set side on its *face* or *as applied* to the challenger." ECF No. 93 at 11. And Defendants further argue the Court should adopt the narrower "as-applied" reading of the statute and only set aside agency action as to the named Plaintiffs. But that argument is in error. "The APA empowers courts to determine *rule validity*, not just whether the *application* of the rule is valid." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. R. 1120, 1133 (2019); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012 (2018) ("[T]he APA and these organic statutes go further by empowering the judiciary to act directly against the challenged agency action. This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy. It is a veto-like power that enables the judiciary to formally revoke an agency's rules, orders, findings, or conclusions — in the same way that an appellate court formally revokes an erroneous trial-court judgment."). The question of whether courts should extend relief beyond the named litigants *in the APA context* is a question of *severability*, not a question of whether the APA authorizes such relief — it does. Mitchell, *supra*, at 1013.

13   The Court notes that only slightly more than two months has passed between the issuance of the June 1 Memorandum and the Court's *final* disposition of this case on the merits.

14   There is no question that the January 20, 2021 Memorandum would have been found to be arbitrary and capricious as there is *no* administrative record or any stated basis for agency action for the Court to review. *See* ECF No. 45.

15   At various points, Defendants argue that the Court is unable to redress Plaintiffs' injuries because any relief would be dependent on Mexico's cooperation. *See, e.g.*, ECF No. 913 at 10–11. This is not correct. The United States initiated MPP unilaterally pursuant to U.S. law, not pursuant to bilateral agreement or treaty with Mexico. App. 307. The program was then "implemented and expanded ... through ongoing discussions with Mexico." *Id.* In other words, MPP was adopted and launched unilaterally, just as it was later terminated unilaterally. App.307; *see also* App.303. And even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place — before they ever enter the United States.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

16    Federal courts may consider the third and fourth together as they overlap considerably. 🚩*Texas,* 809 F.3d at 187; 🚩*Nken v. Holder,* 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) ("Once an applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

---

**End of Document**                                               © 2022 Thomson Reuters. No claim to original U.S. Government Works.

8/26/22, 10:21 AM    Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act | …

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 131 of 366   PageID 6635



🏠 (http://www.gob.mx) › Secretaría de Relaciones Exteriores (/sre) › **Blog**

Publicaciones Recientes  he International Summit on the Habitat of Latin America and

# Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act

Mexico reaffirms its sovereign right to implement its immigration policy and admit or deny entry into its territory to foreign citizens

Secretaría de Relaciones Exteriores | December 20, 2018

AR02424

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 132 of 366   PageID 6636



Press conference by SRE Legal Counsel Alejandro Alday

At 8 a.m. this morning, the Government of the United States informed the Mexican Government that the U.S. Department of Homeland Security (DHS) intends to invoke a section of its immigration law that would enable it to return non-Mexican individuals to our country for the duration of their immigration proceedings in the United States.

Mexico reaffirms its sovereign right to implement its immigration policy and admit or deny entry into its territory to foreign citizens. Therefore, the Government of Mexico has decided to take the following steps on behalf of migrants, especially minors, whether accompanied or not, and to protect the right of those who wish to begin and continue the process of applying for asylum in United States territory:

1.      For humanitarian reasons, it will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the

AR02425

8/26/22, 10:21 AM          Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act | …

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 133 of 366   PageID 6637

nternational commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

2.      It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3.      It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law.  They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4.      It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.

The actions taken by the governments of Mexico and the United States do not constitute a Safe Third Country arrangement, in which migrants in transit would be required to apply for asylum in Mexico. They are aimed at facilitating the follow-up to applications for asylum in the United States. This does not imply that foreign individuals face any obstacles to applying for asylum in Mexico.

The Government of Mexico reiterates that all foreign individuals must comply with the law while they are in national territory.

**AR02426**

8/26/22, 10:21 AM                Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act | …

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 134 of 366   PageID 6638

**Press conference with Legal Counsel Alejandro Alday on the bilateral relationship with the United States (https://www.gob.mx/sre/prensa/press-conference-with-legal-counsel-alejandro-alday-on-the-bilateral-relationship-with-the-united-states)**

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 135 of 366   PageID 6639



AR02428

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 136 of 366   PageID 6640



Suscríbete al newsletter de gob.mx

Twittear

**Compartir** 0

🖨 Imprime la página completa

**AR02429**

Case 2:21-cv-00067-Z    Document 162-6    Filed 09/02/22    Page 137 of 366    PageID 6641

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades normativas.

AR02430

Homeland Security

U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration

**Release Date:** December 20, 2018

### Announces Migration Protection Protocols

">

WASHINGTON – Today, Secretary of Homeland Security Kirstjen M. Nielsen announced historic action to confront the illegal immigration crisis facing the United States.  Effective immediately, the United States will begin the process of invoking Section 235(b)(2)(C) of the Immigration and Nationality Act.  Under the Migration Protection Protocols (MPP), individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings.

“Today we are announcing historic measures to bring the illegal immigration crisis under control,” said Secretary Nielsen.  “We will confront this crisis head on, uphold the rule of law, and strengthen our humanitarian commitments.  Aliens trying to game the system to get into our country illegally will no longer be able to disappear into the United States, where many skip their court dates.  Instead, they will wait for an immigration court decision while they are in Mexico.  ‘Catch and release’ will be replaced with ‘catch and return.’  In doing so, we will reduce illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place.  This will also allow us to focus more attention on those who are actually fleeing persecution.

“Let me be clear:  we will undertake these steps consistent with all domestic and international legal obligations, including our humanitarian commitments.  We have notified the Mexican government of our intended actions.  In response, Mexico has made an independent determination that they will commit to implement essential measures on their side of the border.  We expect affected migrants will receive humanitarian visas to stay on Mexican soil, the ability to apply for work, and other protections while they await a U.S. legal determination.”

## Background

Illegal aliens have exploited asylum loopholes at an alarming rate.  Over the last five years, DHS has seen a 2000 percent increase in aliens claiming credible fear (the first step to asylum), as many know it will give them an opportunity to stay in our country, even if they do not actually have a valid claim to asylum.  As a result, the United States has an overwhelming asylum backlog of more than 786,000 pending cases.  Last year alone the number of asylum claims soared 67 percent compared to the previous year.  Most of these claims are not meritorious—in fact *nine out of ten asylum claims are not granted by a federal immigration judge*.  However, by the time a judge has ordered them removed from the United States, many have vanished.

## Process

- Aliens trying to enter the U.S. to claim asylum will no longer be released into our country, where they often disappear before a court can determine their claim’s merits.
- Instead, those aliens will be processed by DHS and given a “Notice to Appear” for their immigration court hearing.
- While they wait in Mexico, the Mexican government has made its own determination to provide such individuals humanitarian visas, work authorization, and other protections. Aliens will have access to immigration attorneys and to the U.S. for their court hearings.
- Aliens whose claims are upheld by U.S. judges will be allowed in. Those without valid claims will be deported to their home countries.

## Anticipated Benefits

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 139 of 366   PageID 6643

- As we implement, illegal immigration and false asylum claims are expected to decline.
- Aliens will not be able to disappear into U.S. before court decision.
- More attention can be focused on more quickly assisting legitimate asylum-seekers, as fraudsters are disincentivized from making the journey.
- Precious border security personnel and resources will be freed up to focus on protecting our territory and clearing the massive asylum backlog.
- Vulnerable populations will get the protection they need while they await a determination in Mexico.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)      IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)      IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)

SOUTHWEST BORDER (/KEYWORDS/SOUTHWEST-BORDER)

Last Updated: 01/20/2021

**AR02432**

 **AP NEWS**



U.S. News    World New

Trending News    Student loans    U.S. Open Tennis    Russia-Ukraine war    Midterm elections

We use cookies to personalize content and ads, to provide social media features and to
e our traffic. We also share information about your use of our site with our
media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

**AR02433**

# AP NEWS

walk from the U.S.-Mexico border, rising from ever-burning fires and piles of human waste. Parents and children live in a sea of tents and tarps, some patched together with garbage bags. Others sleep outside in temperatures that recently dropped to freezing.

**Full Coverage:** Immigration

Justina, an asylum seeker who fled political persecution in Nicaragua, is struggling to keep her 8-month-old daughter healthy inside the damaged tent they share. The baby, Samantha, was diagnosed with pneumonia and recently released from a hospital with a dwindling supply of antibiotics.

ADVERTISEMENT

"I face cold, hunger and everything because I don't have resources, and my daughter doesn't either," said Justina, who didn't want her last name used out of fear for her safety.

The camp is an outgrowth of the Trump administration's "Remain in Mexico" policy, which has sent more than 55,000 migrants, including Justina and Samantha, south of the border to wait and pursue their asylum cases.

We use cookies to personalize content and ads, to provide social media features and to
▢re our traffic. We also share information about your use of our site with our
▢media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

AR02434

**AP NEWS**

or they pull fish from the river and fry them over wood fires.

U.S. News    World New
Trending News    Student loans    U.S. Open Tennis    Russia-Ukraine war    Midterm elections

of toilets.

The conditions show the health risks associated with the Remain in Mexico policy — which many have criticized for sending migrants to dangerous border towns — and how nonprofit groups are struggling to provide health care and other basic services without more support from the U.S. or Mexican governments.

Doctors Without Borders says that in three weeks in October, it did 178 consultations at the camp in Matamoros for conditions that included diarrhea, hypertension, diabetes, psychiatric conditions and asthma. More than half the patients were younger than 15.

Remain in Mexico has helped the U.S. government push down migration numbers at the southern border, a key priority of President Donald Trump. His administration said Thursday that migrant apprehensions at the U.S.-Mexico border had fallen for a fifth straight month.

ADVERTISEMENT

Mark Morgan, acting commissioner of U.S. Customs and Border Protection, credited

We use cookies to personalize content and ads, to provide social media features and to
        e our traffic. We also share information about your use of our site with our
        media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

AR02435

**AP NEWS**

migrants" are provided access to humanitarian care and assistance, food and housing,

U.S. News    World New
Trending News    Student loans    U.S. Open Tennis    Russia-Ukraine war    Midterm elections

But there is dire need in Matamoros, where more than 11,000 people had been sent back through Oct. 1, according to official numbers obtained by The Associated Press.

Many migrants receive medical care at a sidewalk clinic run by Global Response Management, a small nonprofit that works in combat and disaster zones. Asylum seekers help at the clinic, including two fluent English speakers who help translate — one from Cuba, the other from Venezuela.

Helen Perry, a nurse practitioner and Global Response Management's operations director, saw a dozen patients one recent weekday as people lined up under a tarp shielding them from the sun.

A woman from southern Mexico says she had lingering neck pain from being attacked. A 3-year-old child from El Salvador had a fever and sore throat. A dehydrated 4-year-old drank Pedialyte as Perry examined his father's toothache, using the light from her iPhone to look at the back of his mouth.

Perry then turned to a man from Cuba who was complaining of sharp pains in his chest that spread to his jaw and left elbow. She listened to his chest with a stethoscope, then used an ultrasound wand attached to her phone to observe the chambers of his heart. It appeared he was having a mild heart attack.

She sent the man off with volunteers to find a cab to take him to the hospital. A Red

We use cookies to personalize content and ads, to provide social media features and to
  e our traffic. We also share information about your use of our site with our
   media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

**AR02436**

**AP NEWS**

to as the "hielera," or icebox.

U.S. News    World New
Trending News    Student loans    U.S. Open Tennis    Russia-Ukraine war    Midterm elections

Justina said agents took them to a hospital, where Samantha was treated and given antibiotics. When her health stabilized, they were returned to Mexico.

"They treated me very well inside there," she said. "But when she came here, sincerely — when they deported me here — that's when she got worse."

Eventually, a few people in the camp helped the two take the bus to a Matamoros hospital, where the baby was again diagnosed with a respiratory infection. Samantha was hospitalized for about a week before being released with antibiotics again.

Their next court hearing is not until January.

"I don't want anything to happen to my daughter," Justina said last week as she held Samantha. "The truth is we face a lot of danger here."

The camp is in Matamoros, a city of 450,000 people in the state of Tamaulipas, which faces endemic violence and corruption driven by cartels. The U.S. State Department warns Americans not to go to Tamaulipas, assigning the state the same warning level as Syria.

Morgan, the acting CBP commissioner, said widespread stories of migrants being kidnapped or attacked in Mexican border cities were "anecdotal."

We use cookies to personalize content and ads, to provide social media features and to
...re our traffic. We also share information about your use of our site with our
...media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

**AR02437**

**AP NEWS**

more medicine and new tents as winter approaches. Authorities also are watching for any

U.S. News      World New
Trending News      Student loans      U.S. Open Tennis      Russia-Ukraine war      Midterm elections

The Tamaulipas government has tried to move migrants to a new shelter it recently
opened with room for several hundred people.

But migrants have largely refused to go. From the camp, they can see a tent courtroom
built by the Trump administration on the U.S. side where they go to make their cases by
video to judges.

Several people said they are afraid of missing out on their U.S. court dates or worry that
Mexican authorities will try to deport them. Mexican officials have bused hundreds of
migrants to cities far away from the border, with no offer of returning them for their
hearings.

A widely shared video taken by a migrant shows a Mexican official appearing to imply
that if families don't leave the camp in Matamoros, authorities might take their children
because of the hazards there — evoking the Trump administration's family separations.
Mexican officials later said families would not be separated.

Global Response Management plans to bring in a trailer soon to expand its capacity to
treat migrants.

"The important thing is it's not my job to fix the politics of it, it's not my job to fix the
immigration system," Perry said. "My job is to go out there and give them medicine and
give them mercy and give them hope."

On the other side of the Rio Grande, there are signs that Remain in Mexico has worked as

We use cookies to personalize content and ads, to provide social media features and to
      e our traffic. We also share information about your use of our site with our
      media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

AP NEWS

Patrol agents to pick them up.

Now, routes near the river where agents would sometimes spot families several times a day are usually empty. The Border Patrol's central processing center and its smaller stations are holding far fewer migrants.

Hundreds of agents pulled in to work at the processing center or monitor migrants are back to their regular duties.

"What we look forward to doing is our job and not what we were doing before," one agent, Hermann Rivera, said during a recent tour.

Families requesting asylum now are detained quickly, then taken back to the border and released with future court dates, sometimes several hours away from where they originally crossed.

Agents are not supposed to send back children traveling alone and can exempt "vulnerable populations," though there have been several cases of pregnant women and ill people returned to Mexico.

Rodolfo Karisch, the Border Patrol's Rio Grande Valley chief, testified in a September court hearing that the agency was sending as many as 1,200 people back to Mexico from the region weekly.

"Who protects them, do you know?" asked Efrén Olivares, a lawyer for the Texas Civil

We use cookies to personalize content and ads, to provide social media features and to
___re our traffic. We also share information about your use of our site with our
___media, advertising and analytics partners. **Privacy Policy**

**Cookies Settings**

Accept All Cookies

**AR02439**

**AP NEWS**

**charity foundation**

HARTFORD, Conn. (AP) — A new lawsuit has
exposed a deep rift between two of Paul ...

August 24, 2022

# Ad Content

## Congress Passes Billions for Camp Lejeune Families

Promoted: UnitedClaimsBureau

## Hands Down! The World's Healthiest Breakfast

Promoted: Kachava

## How Interchange Price Caps Hurt Small Businesses

Promoted: Credit Union Times

## A Game Where Everything Is Allowed!

Promoted: BuzzDaily Winners

## Sylvester Stallone's wife files for divorce

We use cookies to personalize content and ads, to provide social media features and to
analyze our traffic. We also share information about your use of our site with our
social media, advertising and analytics partners. Privacy Policy

**Cookies Settings**

Accept All Cookies

AR02440

# AP NEWS

Top Stories

Video

U.S. News    World New
Trending News    Student loans    U.S. Open Tennis    Russia-Ukraine war    Midterm elections

Accessibility Statement

Cookie Settings

## DOWNLOAD AP NEWS

Connect with the definitive source for global and local news

## MORE FROM AP

ap.org

AP Insights

AP Definitive Source Blog

AP Images Spotlight

AP Explore

AP Books

AP Stylebook

## FOLLOW AP

THE ASSOCIATED PRESS

About    Contact    Customer Support    Careers    Terms & Conditions    Privacy

All contents © copyright 2022 The Associated Press. All rights reserved.

We use cookies to personalize content and ads, to provide social media features and to
re our traffic. We also share information about your use of our site with our
media, advertising and analytics partners. Privacy Policy

Cookies Settings

Accept All Cookies

AR02441

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | Civil Action No. 2:21-cv-00067-Z |

## DEFENDANTS' FIRST SUPPLEMENTAL NOTICE OF COMPLIANCE WITH INJUNCTION

AR02442

On August 13, 2021, the Court entered an injunction requiring Defendants to, *inter alia*, "enforce and implement [the Migrant Protection Protocols] *in good faith*." ECF No. 94 at 52; *see also State v. Biden*, No. 21-10806, 2021 WL 3674780 at *13 (5th Cir. Aug. 19, 2021). Defendants submit this supplemental notice to update the Court on the steps Defendants have taken to comply with the injunction since Defendants' initial Notice of Compliance on September 15, 2021, ECF No. 105.

In that initial Notice, Defendants explained that they were rebuilding the administrative, physical, personnel and policy structures necessary to operate the program, but that MPP could not be implemented unless and until Mexico independently decides to accept individuals that the U.S. seeks to return to Mexico. The initial Notice described that conversations with Mexico were ongoing. *See id.*; ECF No. 105-1.

Defendants can now further report that, since the September 15 Notice, the Department of Homeland Security (DHS) has made substantial progress toward the re-implementation of MPP. Declaration of Blas Nuñez-Neto at ¶ 3, ECF No. 110-1; *see generally* ECF No. 110. DHS has, among other things, engaged in a number of high-level and ongoing virtual and in person discussions with the Government of Mexico (GOM); continued to finalize the operational plans that will be required to quickly re-implement MPP; worked closely with the Department of Justice and other interagency partners to ensure that the immigration courts are prepared to hear the cases of those subject to MPP on a timely basis; and issued the contracts required to rebuild the soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas. *Id.* As a result of this progress, DHS anticipates being in a position to re-implement MPP by mid-November—dependent on decisions made by Mexico. *Id.*

Notably, DHS cannot implement MPP without Mexico's independent decision to accept

AR02443

individuals that the United States seeks to send to Mexico. *Id.* ¶ 5. As a sovereign nation, Mexico can deny the entry of all individuals who do not have status in Mexico. *Id.; cf.* Administrative Record (AR) 149-50, ECF No. 61 (Mexico's statement of cooperation with initial implementation of MPP and assertion of authority to accept or reject migrants into its territory). Thus, before the U.S. can begin sending individuals back to Mexico, the U.S. needs Mexico's concurrence, as well as a shared understanding about key details of how MPP will be re-implemented including, for example: where and what time such entries will be permitted; how many individuals and what demographic groups will be permitted per day at each location; and what nationalities will be accepted for return. *Id.* ¶ 6.

In addition, in the ongoing discussions with Mexico regarding re-implementation of MPP, Mexico has made clear that it has concerns about aspects of how MPP was previously implemented, and that without certain improvements to the program, it will not decide to accept MPP enrollees. *Id.* ¶ 8; *see id.* ¶ 7 ("Mexico's decision to accept individuals returned pursuant to MPP was needed before the program was initiated in 2019, and, because the previous program was terminated, it is needed again now."). Specifically, Mexico has identified a number of changes that it would like to see in MPP before deciding to accept MPP returns, including: an assurance that cases are generally adjudicated within six months of enrollment and that individuals awaiting court hearings in Mexico receive timely and accurate information about hearing dates and times; improved access to counsel; protections against the return of particularly vulnerable populations to Mexico; and better coordination with Mexico concerning the locations and times of day that individuals are returned to Mexico. *Id.* ¶¶ 8-12. DHS is developing an MPP reimplementation plan that takes into account these concerns, which it will be discussing with Mexico in the coming days; reimplementation remains contingent on Mexico's decision to accept returns under MPP. *Id.* ¶ 13.

AR02444

DHS has simultaneously begun taking other steps within its control to be in a position to begin implementing MPP on or around the middle of November 2021, subject to Mexico's decision to accept MPP returns. *Id.* ¶ 14. First, on October 13, 2021, DHS issued a task order under an existing contract to rebuild the soft-sided IHFs in Laredo and Brownsville, Texas, at a cost of approximately $14.1 million to build and $10.5 million per month to operate, to assist with adjudication of the MPP immigration-court docket. *Id.* ¶ 15. Second, the MPP interagency task force is working with DOJ's Executive Office for Immigration Review (EOIR) to ensure that there is sufficient space available on immigration court dockets so that hearings for individuals in MPP can be conducted in a timely manner after enrollment. *Id.* ¶¶ 16, 17. Third, DHS is finalizing operational guidance and planning documents that will be needed to operationalize MPP. *Id.* ¶¶ 16, 18, 19. Fourth, DHS is putting into place measures to ensure that MPP hearings can take place in a manner that protects government personnel, United States communities, and the migrants themselves from the spread of COVID-19. *Id.* ¶ 18.

In conclusion, as a result of these efforts, Defendants report that DHS is ready to begin re-implementing MPP in mid-November, assuming Mexico's decision to accept returns under MPP at that time. *Id.* ¶ 19.

Defendants will provide a further report to the Court once MPP is operational.

 

Dated: October 14, 2021      Respectfully submitted,

CHAD E. MEACHAM      BRIAN M. BOYNTON
*Acting United States Attorney*    *Acting Assistant Attorney General*

BRIAN W. STOLZ       WILLIAM C. PEACHEY
*Assistant United States Attorney*   *Director*
              Office of Immigration Litigation
              District Court Section

AR02445

EREZ REUVENI
*Assistant Director*

BRIAN C. WARD
*Senior Litigation Counsel*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

4

AR02446

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 14, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice

AR02447

1    **MARK BRNOVICH**
     **ATTORNEY GENERAL**
2    (Firm State Bar No. 14000)

3    Joseph A. Kanefield (No. 15838)
4    Brunn (Beau) W. Roysden III (No. 28698)
     Drew C. Ensign (No. 25463)
5    Robert J. Makar (No. 33579)
     2005 N. Central Ave
6    Phoenix, AZ 85004-1592
7    Phone: (602) 542-8958
8    Joseph.Kanefield@azag.gov
     Beau.Roysden@azag.gov
9    Drew.Ensign@azag.gov
     Robert.Makar@azag.gov
10   *Attorneys for Plaintiff State of Arizona*

11              **UNITED STATES DISTRICT COURT**
12                   **DISTRICT OF ARIZONA**

13   State of Arizona,                      No. 2:21-cv-00617-DWL

14              Plaintiff,
                                            **FIRST AMENDED COMPLAINT**
          v.                                **FOR DECLARATORY AND**
15                                          **INJUNCTIVE RELIEF**
     Alejandro   Mayorkas  in   his  official
16   capacity  as  Secretary  of  Homeland
     Security;  United  States  Department  of
17   Homeland  Security;  Troy  Miller  in  his
     official  capacity  as  serves  as  Senior
18   Official  Performing  the  Duties  of  the
     Commissioner  of  U.S.  Customs  and
19   Border  Protection;  Tae  Johnson  in  his
     official  capacity  as  Senior  Official
20   Performing the Duties of Director of U.S.
     Immigration  and  Customs  Enforcement;
21   United  States  Department  of  Defense;
     Lloyd  Austin  in  his  official  capacity  as
22   Secretary of Defense.

23              Defendants.

24

25

26

27

28

AR02448

**INTRODUCTION**

1.      This is an action challenging Defendants' pervasive violations of law related to immigration policy.

2.      Defendants, driven by the President's campaign promises to enact lax immigration enforcement and loosen border security, have found themselves with a crisis at the southern border. Undeterred, they have moved ahead with a policy of loosening migration restrictions and enforcement, causing the number of migrants to surge. This surge has strained the resources and damaged the environment of Plaintiff, the State of Arizona (the "State").

3.      This complaint focuses on the Defendant's entire program causing increased migration, while also identifying two policies which have played a major role in causing this sudden influx of migrants: Defendant's decisions to terminate construction of border barriers and cancel contracts regarding same ("Border Wall Construction Termination"); and the defendant's decision to terminate, with minimal explanation, the Migrant Protection Protocols ("MPP").

4.      On January 20, 2021, President Biden, in one of his first official actions, issued a proclamation directing Defendants to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]"[1] Following this proclamation, Defendants stopped all work on any border fencing or associated structures, leaving over 100 miles of planned and funded—but unfinished—wall in Arizona, in an arbitrary and haphazard manner.

---

[1] *Proclamation on the Termination Of Emergency With Respect To The Southern Border Of The United States And Redirection Of Funds Diverted To Border Wall Construction*, Office of the White House (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/proclamation-termination-of-emergency-with-respect-to-southern-border-of-united-states-and-redirection-of-funds-diverted-to-border-wall-construction/

AR02449

5.      Subsequently, on April 30, the Deputy Secretary of Defense directed the Secretary of the Army to "cancel all section 284 construction projects" and to use funds transferred for construction to "pay contract termination costs" including costs associated with activities necessary for contractor demobilization."[2] Finally, the Deputy Secretary of Defense issued a memorandum to the Secretary of Homeland Security reflecting that the Department of Homeland Security "will accept custody of border barrier infrastructure constructed pursuant to section 284, account for such infrastructure in its real property records, and operate and maintain the infrastructure."[3]

6.      Defendants' termination of any building connected to the wall has also meant the end of all wall-related construction by DHS, notwithstanding the fact that there remain unspent funds which were allocated for wall construction by Congress.

7.      On the same day the President announced he would not build any more border fencing, Defendants suspended new entrants into the MPP.[4] Previously, the MPP had ensured that individuals who lacked a legal basis to be in the United States, and who had passed through Mexico *en route* to the United States, had to remain in Mexico for the duration of their immigration proceedings (particularly as Mexico was also a country that they could have applied for asylum in during their travels, but they refused to do so preferring the United States).

---

[2]  Letter from Elizabeth Prelogar, Acting Solicitor General, to Clerk of the Supreme Court (Apr. 30, 2021), *available at* https://www.supremecourt.gov/DocketPDF/20/20-138/177066/20210430165630859_letter%2020-138%20%204-30-20.pdf.

[3]  *Id.*

[4]  Memorandum from David Pekoske, Department of Homeland Security, *Review of and Interim Revision of Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf; Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain In Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy.

2

8.      Defendants then announced they would process into the United States individuals who had previously been returned to Mexico under the MPP.[5] Beginning on February 19, 2021, DHS started to execute this policy and bring those individuals into to the United States. DHS has also continued processing new migrants arriving across the Mexican border who would previously have been covered by the MPP. The result is the admission of tens of thousands of aliens that otherwise would have been excluded from the U.S. pending resolution of their asylum claims (the vast majority of which fail).

9.      These decisions were formalized on June 1, 2021, when the Administration ended the MPP with a seven-page memorandum.[6]

10.     At no point in the process of terminating border wall construction and the MPP did Defendants ever consider any environmental impacts of those actions.

11.     Defendants also failed to consider the degree to which the State relied on both previous policies, and failed adequately to explain its abrupt reversal in course.

12.     Furthermore, these decisions are both pieces of Defendant's overarching program of encouraging migration and augmenting the U.S. population. This *de facto* program has enormous impacts on the people and environment of Arizona.

13.     The impacts of population growth are by no means uniformly, or even on balance, negative. Population growth, for example, has contributed substantially to Arizona's remarkable economic growth over the last century. Immigrants have contributed to every facet of American society in a manner that has benefited the United States's economic, cultural, military, and societal strengths. This suit does not (and could

---

[5]   *See Press Release, Department of Homeland Security, DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*(Feb. 11, 2021), *available at* https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[6]   *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, *Termination of the Migrant Protection Protocols*, (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

3

AR02451

not) challenge population growth *per se*. Instead, this action challenges Defendants' persistent failures to analyze, as federal law mandates, the entirely predictable and foreseeable environmental impacts of population growth caused by Defendants' policies of increasing the population of the United States through immigration.

14.     Defendant's decisions are both arbitrary and capricious and have been enacted in violation of numerous federal laws. In particular, although these policies undeniably have significant effects on the environment, Defendants have not even attempted to comply with the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq*. Defendants' policies also have unstudied impact on endangered species in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*.

15.     As Justice Holmes explained in 1907: "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Arizona has a strong interest in ensuring that policies that affect the environment of the State are enacted consistent with federal law governing environmental protection.

16.     Furthermore, the Supreme Court has recognized "the importance of immigration policy to the States" and that the States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The additional costs of housing, educating, providing healthcare, and other social services places burdens on the State of Arizona as a consequence of Defendants' actions.

17.     Defendant's policies encouraging migration and downgrading enforcement have subverted federal law, damaged the environment in Arizona, and have not been subject to any required public process or participation. Accordingly, they should be declared unlawful, vacated, and/or enjoined.

4

**PARTIES**

18.     Plaintiff State of Arizona is a sovereign state of the United States of America, and is represented by its Attorney General Mark Brnovich. The Attorney General is the chief legal officer of the State of Arizona, and has the authority to represent the State in federal court.

19.     Arizona is one of four states on the United States-Mexico border. As a border state, it suffers disproportionately from immigration-related burdens.

20.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security. Defendant Mayorkas is sued in his official capacity.

21.     Defendant United States Department of Homeland Security is a federal agency.

22.     Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection ("CBP"). Defendant Miller is sued in his official capacity.

23.     Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

24.     Defendant Lloyd Austin is the Secretary of Defense. Defendant Austin is sued in his official capacity.

25.     Defendant Department of Defense is a federal agency.

**JURISDICTION AND VENUE**

26.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

27.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

AR02453

28.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiff resides in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

<div align="center">

**LEGAL BACKGROUND**

</div>

**A.     The National Environmental Policy Act**

29.     NEPA establishes "a national policy [to] encourage productive and enjoyable harmony between man and his environment[.]" 42 U.S.C. § 4321.

30.     "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (*citing Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)) (cleaned up); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

31.     NEPA thus ensures that important environmental effects will not be "overlooked or underestimated[.]" *Robertson*, 490 U.S. at 349. The requirement to evaluate environmental impacts also provides the public with information about environmental impacts, assuring the public that the agency is considering the environment and providing a "springboard for public comment[.]" *Id.* Public participation under NEPA serves to improve the agency's processes by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (cleaned up).

32.     NEPA is "particularly" concerned with "the profound influences of population growth" on the environment. 42 U.S.C. § 4331(a). Human population is among the biggest factors in environmental change. It is "plain common sense" that the number of people in an area has a significant impact on the environment, through factors such as

<div align="center">

6

</div>

AR02454

urbanization, infrastructure development, pollution, and stress on natural resources. *See City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir. 1975).

33.     This action challenges, among other things, a collection of policies of Defendants that have the direct effect of causing growth in the population of the United States generally, and Arizona specifically, through immigration (collectively, "Population Augmentation Policies"). These policies have a direct and substantial impact on the environment in the United States, with particularly acute effects in Arizona.

34.     Population growth can have significant benefits. For example, Arizona's economy has benefited substantially from population growth over the last century. That growth, effectuated by both domestic migration and international immigration, has strengthened Arizona in innumerable ways. But at the same time, population growth can have environmental impacts, both positive and negative. Those impacts can be particularly acute when they result (as here) from haphazard policy-making that is allowed to escalate into a crisis, whose existence is then repeatedly denied (punctuated by occasional accidental admissions that it is, indeed, a "crisis"). NEPA mandates that federal agencies analyze these environmental impacts *before* they take action. Defendants have failed to do so here.

35.     NEPA declares that "it is the continuing responsibility of the Federal Government to … improve and coordinate" federal programs in order to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;" "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;" and, significantly, to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b).

36.     To accomplish its goals, NEPA creates a set of procedures which force federal agencies to take account of environmental concerns. Accordingly, the statute

7

AR02455

provides, in relevant part, that "all agencies of the Federal Government shall" consider the environmental impacts of all "proposals . . . and other major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332.

37.　Under NEPA, agencies must make a "detailed statement" on those impacts, addressing, among other things, alternatives to the proposed action. *Id.* This detailed statement is generally known as an environmental impact statement ("EIS").

38.　Alongside these provisions, NEPA established the Council on Environmental Quality ("CEQ") with authority to issue regulations to assist federal agencies in administering the statute's requirements. The CEQ regulations define important terms such as the "[m]ajor Federal action" and "[e]ffects or impacts[,]" 40 C.F.R. § 1508.1, and set up procedures for public participation in the EIS process. *See, e.g.*, 40 C.F.R. § 1503 *et seq.* CEQ regulations also set forth the process for agencies to use in determining whether NEPA applies or is otherwise fulfilled. *See* 40 C.F.R. § 1501 *et seq.*

39.　Under existing CEQ regulations, environmental impacts should be "considered early in the process in order to ensure informed decision making by Federal agencies." 40 C.F.R. § 1500.1(b). NEPA should be integrated with other planning "at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions[.]" 40 C.F.R. § 1501.2(a).

40.　Agencies may identify "categories of actions" which "normally do not have a significant effect on the human environment" and which therefore do not require the preparation of an EIS. 40 C.F.R. § 1501.4(a) ("categorical exclusions"). Such actions are exempt from environmental review, absent unusual circumstances.

41.　CEQ regulations provide that agencies should prepare an Environmental Assessment ("EA") for proposed actions that are not categorically excluded if those actions are "not likely to have significant effects or when the significance of the effects is

8

AR02456

unknown[.]" 40 C.F.R. § 1501.5(a). The EA may assist the agency in determining whether to prepare a full-fledged EIS or whether to issue a finding of no significant impact. 40 C.F.R. § 1501.5(b).

42.     The regulations also state that agencies "shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). As the Supreme Court has recognized, programmatic environmental analysis is required where a program is "a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976). When considering such programmatic action, agencies should consider factors such as whether the relevant actions are "occurring in the same general location," and whether they "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(b)(1).

43.     CEQ regulations define the "[e]ffects or impacts" that agencies must consider to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." 40 C.F.R. § 1508.1(g)(1).

44.     NEPA requires that all environmental impacts of major federal actions—the good, the bad, and the ambiguous—be studied prior to the government taking action. *See, e.g.*, 40 C.F.R. § 1501.3 (requiring federal agencies to consider "[b]oth beneficial and adverse effects" under NEPA); 40 C.F.R. § 1508.1 (agencies must consider effects "resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial"). But Defendants here are

9

simply ignoring NEPA entirely while engaging in actions that are certain to have dramatic impacts on the environment.

45.     This suit seeks to end these pervasive violations and require that Defendants discharge their duties under NEPA. It further seeks to compel Defendants to allow public participation in these processes, which is a central requirement of NEPA.

46.     NEPA's requirements "are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act." *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (cleaned up).

47.     "NEPA protects the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action *before* the government launches any major federal action." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (cleaned up) (emphasis added).

48.     "[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).

**B.     The Endangered Species Act**

49.     The ESA, passed in 1973, was enacted in order "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). *See also* 16 U.S.C. § 1531. "As it was finally passed, the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Hill*, 437 U.S. at 180.

50.     The ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1).

AR02458

51.     To implement this policy, Section 7 of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2).

52.     An agency violates this section when it fails to consult with an applicable agency about an action which could be potentially harmful to endangered species. *See, e.g.*, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005).

53.     The applicable regulations define key terms for purposes of when consultations under the ESA are required. For example, "action" is defined broadly, as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02. "Effects of the Action" are defined as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* Moreover, as the Ninth Circuit has made clear, there is "agency action" for purposes of the ESA whenever an agency "makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1011 (9th Cir. 2012) (en banc).

54.     An agency can avoid ESA Section 7 consultation only if it makes a "no effect determination." The threshold for requiring consultation is thus "relatively low": "'*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character,' " triggers the requirement" of informal consultation. *Id.* at 1027 (quoting *California ex rel. Lockyer v. USDA*, 575 F.3d 999, 1018–19 (9th Cir. 2009) (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)) (emphasis in *Lockyer*). An agency thus cannot avoid ESA Section

11

AR02459

7 consultation even if it believes that the effect of its action on endangered species will be beneficial. Instead, it must engage in ESA consultation to confirm that belief.

55.     There is no indication that Defendants have considered effects on threatened and endangered species from their challenged actions whatsoever, let alone reached a formal no-effect finding commanding any deference (even under the "relatively low" no-effect threshold).

56.     The ESA has a citizen suit provision, allowing individuals to bring suit to "enjoin any person, including the United States and any other governmental instrumentality or agency…who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." 16 U.S.C. § 1540(g)(1). *See also Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("§ 1540(g)(1)(A) is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies").

**C.     The Administrative Procedure Act**

57.     The Administrative Procedure Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 701 *et seq.* Under the APA, a federal court reviewing agency action "shall" "hold unlawful and set aside agency action, findings, and conclusions" that the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706.

58.     When an agency undertakes final agency action that fails to comply with NEPA, such action is unlawful and set must be set aside under the APA. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.2 (9th Cir. 2001) ("Although NEPA does not provide a private right of action for violations of its provisions, private parties may enforce the requirements of NEPA by bringing an action against the federal agency under § 10(a) of the Administrative Procedure Act.").

12

AR02460

59.     Furthermore, federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (cleaned up). In other words, "agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up).

60.     In reviewing an agency's failure to act, the APA states that the Court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

### A.     Program to Increase Migration

61.     Since his presidential campaign, President Biden and his administration have prioritized migration and population growth. From the earliest days of his administration, Defendants have sought to further these policy priorities by enacting a program of lax border enforcement and encouraging increased immigration through administrative action.

62.     Defendants knew early on that their program would cause a surge in migration, and only sought to manage the pace of this swell.[7] For example, Defendant Secretary Mayorkas recently pleaded with migrants merely to *delay* coming—not to stay in their home countries: telling would-be migrants on March 1: "[w]e [DHS] are not saying, 'Don't come' … We are saying, 'Don't come now.'"[8] In effect, the Secretary Mayorkas inadvertently said the quiet part loudly: Defendants do not wish to avoid radically increased immigration; they merely wish to manage the swiftness of the increase.

---

[7]  *See* Steven Nelson, *Joe Biden says fast immigration changes could cause '2 million people on our border'*, New York Post (Dec. 22, 2020), https://nypost.com/2020/12/22/biden-says-fast-immigration-changes-could-cause-rush-at-border/. This understanding continued as the Defendants actually enacted the program.

[8]  *See* Nick Miroff, *At the border, a widely predicted crisis that caught Biden off guard*, Washington Post (Apr. 26, 2021), https://www.washingtonpost.com/national/biden-border-timeline/2021/04/26/a5550aa4-a2a8-11eb-8a6d-f1b55f463112_story.html

13

AR02461

63.     There are many aspects to this program, and they all work in tandem. For example, immediately after taking office, Defendants directed ICE to stop issuing any fines to individuals that had been ordered to leave the country but had failed to comply.[9] This policy reduces deterrence for the conduct in question—which is the very purpose of the fines. Accordingly, this program intentionally boosts migration by eliminating this deterrence effect.

64.     In another agency action, which is part of the Population Augmentation Program and designed to encourage migration, Defendants have determined to reduce a key component of this country's pandemic response, by exempting 250 migrants per day from Title 42, a public health order barring the entry of migrants without valid travel documents.[10]

65.     In another policy, which is also part of the Population Augmentation Program and designed to encourage migration, recent disclosures from the federal government reveal that defendants are detaining fewer migrants than ever, including migrants with serious felony convictions.[11]

66.     In a late-night email on February 4, 2021, Defendant Tae Johnson emailed DHS personnel and told them ""Effective immediately … *only those who meet the*

---

[9]  *See* Press Release, Department of Homeland Security, *DHS Announces Rescission of Civil Penalties for Failure-to-Depart* (Apr. 23, 2021), *available at* https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart.

[10]  *See* Alyssa Aquino, *US To Exempt 250 Asylum-Seekers Daily From Pandemic Rule*, Law360 (May 18, 2021), *available at* https://www.law360.com/articles/1385840/print?section=immigration.

[11]  *See, e.g.*, Press Release, Arizona Attorney General's Office, *AG Brnovich Obtains Records Detailing Dangerous Shift in Immigration Polices* (Apr. 28, 2021), *available at* https://www.azag.gov/press-release/ag-brnovich-obtains-records-detailing-dangerous-shift-immigration-polices. *See also* Adam Shaw, *ICE predicted 50% drop in illegal immigrant arrests under new DHS guidance, email shows*, Fox News (Apr. 28, 2021), *available at* https://www.foxnews.com/politics/ice-50-drop-illegal-immigrant-arrests-new-dhs-guidance-email.

14

AR02462

*[Department] priorities will be removed*." (emphasis added). Those categories were largely limited to terrorism-related activities.

67.     At a hearing on May 27, 2021, this Court explained that "[W]hat the evidence … shows is … that *Immigration and Customs Enforcement lifted detainers that were previously in place, has not placed detainers on individuals* that … they know or can know with ease are in detention or incarceration that have final orders of removal and, most significantly, that *they have only removed some incredibly small number* -- seven or ten – nonpriority [cases]." 5/27/21 Tr. at 14-15 (emphasis added). This Court further explained that "So, of 325 individuals *who, before February 18th, would have been put into immigration detention and removed, only seven have*. Doesn't that sound like a prohibition on removal of anybody other than in the first three categories?" *Id.* at 19-20 (emphasis added).

68.     Migrants and human smugglers understand that Defendants have enacted a program to encourage migration. As the New York Times recently explained: "While most of the migrants do not necessarily understand the intricacies of U.S. border policy, many said in interviews that they perceived a limited-time offer to enter the United States. Friends and family members already in the country, along with smugglers eager to cash in, have assured them that they will not be turned away—and this is proving to be true."[12]

69.     In addition to the elements discussed above, two key aspects of this program are the Defendants' Border Wall Construction Termination and MPP Termination. These decisions have enormous direct impacts on population flows, as well as indirect impacts by encouraging migration. Cumulatively, the Population Augmentation Programs will likely increase the population of the United States by hundreds of thousands—if not

---

[12]  Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.

AR02463

millions—of people, with a disproportionate share of the increased burdens occurring in Arizona.

**B.      Promised Termination of Border Wall Construction**

70.      On August 5, 2020, Joe Biden declared in an NPR interview that "[t]here will not be another foot of wall constructed in my administration, number one."[13]

71.      He further stated, "Number 2, … I'm gonna make sure that we have border protection, but it's going to be based on making sure that we use high-tech capacity to deal with it *and at the ports of entry, that's where all the bad stuff happens*."[14]

72.      He also responded when asked about land confiscations, he responded "End. Stop. Done. Over. Not gonna do it. *Withdraw the lawsuits. We're out.* We're not gonna confiscate the land."[15]

73.      These statements by Mr. Biden, individually and collectively, show that he promised to, and intended to, stop all new wall construction.

74.      On January 20, 2021, President Biden, in one of his first official actions, put his promises into action. He issued a proclamation directing DHS to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]"[16]

---

[13]      *See* Lulu Garcia-Navarro August 5, 2020, interview of Joe Biden, https://twitter.com/i/status/1291000306915057669; *see also* Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Additions*, NPR, (August 5, 2020), *available at* https://www.npr.org/2020/08/05/899266045/biden-would-end-border-wall-construction-but-wont-tear-down-trump-s-additions (last visited April 11, 2021).

[14]      *See* https://twitter.com/i/status/1291000306915057669 (emphasis added)

[15]      *See* https://twitter.com/i/status/1291000306915057669 (emphasis added).

[16]      *Proclamation on the Termination Of Emergency With Respect To The Southern Border Of The United States And Redirection Of Funds Diverted To Border Wall Construction*, Office of the White House (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/proclamation-termination-of-emergency-with-respect-to-southern-border-of-united-states-and-redirection-of-funds-diverted-to-border-wall-construction/.

16

AR02464

75.     This proclamation was issued without any notice and comment or interagency review.

76.     The proclamation directs Defendant Secretary Mayorkas to, in consultation with various other members of the cabinet and other appropriate agency and department heads, "shall develop a plan for the redirection of funds concerning the southern border wall[.]" *Id.* Since then, the Administration has canceled border wall projects paid for with funds diverted from Defense Department accounts.[17]

77.     The President's Proclamation justifies its policy change by stating that "building a massive wall … is not a serious policy solution," and the wall is "a waste of money that diverts attention from genuine threats to our homeland security." *Id.*

78.     DHS has implemented this proclamation by suspending all border wall projects, on information and belief leaving hundreds of miles of fencing unfinished compared to what DHS had studied and planned. The termination of border wall construction has left huge holes in the border fencing, including substantial gaps of over 100 miles along the Arizona-Mexico border.

79.     Subsequently, on April 30, the Deputy Secretary of Defense directed the Secretary of the Army to "cancel all section 284 construction projects" and to use funds transferred for construction to "pay contract termination costs" including costs associated with activities necessary for contractor demobilization."[18] Finally, the Deputy Secretary of Defense issued a memorandum to the Secretary of Homeland Security reflecting that the Department of Homeland Security "will accept custody of border barrier infrastructure

---

[17] *See* Nick Miroff, *Biden cancels border wall projects Trump paid for with diverted military funds*, Washington Post (Apr. 30, 2021), *available at* https://www.washingtonpost.com/national/border-wall-cancelled/2021/04/30/98575af0-a9ec-11eb-b166-174b63ea6007_story.html.

[18] Letter from Elizabeth Prelogar, Acting Solicitor General, to Clerk of the Supreme Court Apr. 30, 2021), *available at* https://www.supremecourt.gov/DocketPDF/20/20-138/177066/20210430165630859_letter%2020-138%20%204-30-20.pdf.

AR02465

1  constructed pursuant to section 284, account for such infrastructure in its real property

2  records, and operate and maintain the infrastructure."[19] Accordingly, neither DOD nor

3  DHS has constructed or intends to construct any additional barriers.

4        80.    Since January 20, machinery has been literally standing idle in some areas of

5  Arizona's wilderness, with awkward-seeming and incomplete work in numerous places.[20]

6        81.    Concurrently with these events, on March 17, 2021, a number of U.S.

7  Senators sent a letter to Gene L. Dodaro, the Comptroller General at the Government

8  Accountability Office (GAO).[21] This letter also highlighted the January 20th suspension

9  of border wall construction, and asserted that the President's actions froze funds that were

10 appropriated by Congress for wall construction.

11       82.    As explained in that letter, in appropriations bills for fiscal years 2020 and

12 2021 Congress appropriated nearly three billion dollars for "the construction of a barrier

13 system along the southwest border." *Id.* (*citing* Consolidated Appropriations Act, 2020,

14 Pub. L. No. 116-93, 133 Stat. 2511; Consolidated Appropriations Act, 2021, Pub L. No.

15 115-141, 132 Stat. 348). Although these laws place the obligation on Defendants to

16 execute those funds for the stated purposes, on information and belief, this

17 Administration is withholding substantial portions of those funds and has suspended all

18 construction.

19

20

---

21 [19] *Id.*

22 [20] *See* Mia Jankowicz, *Biden's order to pause construction on Trump's border wall expires
23 on March 20. Nobody knows what happens next.*, Business Insider (Mar. 16, 2021, 6:47
   AM), *available at* https://www.businessinsider.com/what-happen-end-biden-60-day-
24 pause-border-wall-work-2021-3. *See also Work has stopped on Trump's border wall. See
   how it looks now*, CNN (May 3, 2021), *available at*
25 https://www.youtube.com/watch?v=q1fT_dEgoqg.

26 [21] *See* Letter from Shelly M. Capito, et al., *to Hon. Gene L. Dodaro* (Mar. 17, 2021),
   https://www.appropriations.senate.gov/imo/media/doc/Capito%20GAO%20Border%20L
   etter.pdf.

18

83.     On information and belief, the order to halt construction on the wall in Arizona involved the sudden termination of several large contracts. Contractors who were ready to work received a stand-down order from the Army Corps of Engineers on January 21. These contractors remain ready to return to work, but the Administration and Defendants have given no indication that this is going to be forthcoming.

84.     As a result of this termination of wall construction, countless employers and workers in the State of Arizona have been put out of work, directly harming them, and costing the State valuable tax revenue.

85.     One major purpose of the Defendants' actions in affirmatively halting this construction was to signal the relative openness of the United States-Mexico border and to encourage migration.

86.     None of the gaps in the border wall was the product of planning or reasoned decision-making. The current state of the border is entirely arbitrary, and none of the impacts flowing from Defendants' actions were studied before taking the decision to affirmatively halt construction.

87.     Despite this, DHS, following the policy prescriptions in the President's proclamation, has finally decided that the United States-Mexico border is adequately secured without the wall, in its current condition.

88.     Furthermore, contrary to the unsupported claims that the wall was "not a serious policy solution" in the Proclamation, many individuals are constantly seeking to cross the United States-Mexico border, for whom the wall has served both as a meaningful physical barrier and a powerful signal of the federal government's commitment to enforcing immigration law. And while DHS has reportedly "consider[ed]" making changes to address gaps in particular areas or implementing technology in places where the wall is

19

AR02467

unfinished, DHS has no intent to deviate from the fundamental policy announced in the Presidential Proclamation.[22]

89.     As a direct and foreseeable consequence of the gaps in the nation's border wall and the signal intentionally transmitted by the President and the Defendants, migrants have been crossing the border in Arizona in greater numbers than ever before. CBP reported it "encountered 171,700 migrants in March, including a record number of unaccompanied minors, far exceeding the prior month's totals."[23] Indeed, "[t]he US is on track to encounter more than 2 million migrants at the US-Mexico border by the end of the fiscal year, according to internal government estimates[,] marking a record high."[24]

90.     One border county sheriff stated that, at a particular gap in the fencing, "'five or six groups'" of migrants are able to cross a day.[25] One news outlet reported that "[s]mugglers send groups of asylum seekers through the gaps [in the fencing] to overwhelm the agents. When agents leave to intercept or apprehend one group, another group scampers across."[26]

---

[22]  *See* Ryan Saavedra, *Biden Admin Considers Restarting Border Wall Construction To 'Plug Gaps' Amid Biden's Border Crisis: Report*, Daily Wire (Apr. 6, 2021), *available at* https://www.dailywire.com/news/biden-admin-considers-restarting-border-wall-construction-to-plug-gaps-amid-bidens-border-crisis-report.

[23]  *See* Priscilla Alvarez, *Border apprehensions spiked in March, including a record number of unaccompanied migrant minors*, CNN (April 2, 2021), https://www.cnn.com/2021/04/02/politics/us-mexico-border-immigration-apprehended/index.html .

[24]  *See* Priscilla Alvarez, *US on* track *to encounter record 2 million migrants on the southern border, government estimates show*, CNN (Apr. 11, 2021), https://www.cnn.com/2021/03/31/politics/migrants-us-southern-border/index.html.

[25]  *See* Roman Chiarello, *Arizona sheriff says Biden halting border wall construction left area wide open for cartels*, Fox News (Mar. 5, 2021), https://www.foxnews.com/us/arizona-sheriff-biden-border-wall-construction-cartels.

[26]  *See* William La Jeunesse, *Migrants stream through gaps in border wall following Biden's order to halt construction*, Fox News (Mar. 31, 2021), *available at* https://www.foxnews.com/politics/migrants-stream-through-gaps-in-border-wall-following-bidens-order-to-halt-construction.

AR02468

91.     One source estimates that approximately 1,000 individuals are able to evade detention and enter the United States illegally every single day, many of whom are able to do so because of these glaring holes in the border barriers.[27] Inevitably, many of these migrants settle in Arizona, increasing the population of the state.

92.     This border control policy has been—correctly—understood worldwide as an invitation. From as far as India and elsewhere in Asia, migrants have traveled to Mexico and seek to enter the United States through wide gaps in the border wall around Yuma, Arizona.[28]

93.     As the New York Times explains, these migrants are here to stay: "Most migrants are being released to await immigration hearings that could take years, and if they fail to win asylum, many may wind up staying anyway, adding to the millions of immigrants living in the United States without permission."[29]

94.     On information and belief, the gaps in the wall may also have significant effects on Arizona wildlife, including endangered species. Many commentators have noted how the construction of the wall itself may have risked endangered species.[30] However, the state of affairs created by the Defendant's sudden halt of construction has led to an environment for these species which is unstudied and unknown. For example, the current gaps have created a "bottleneck for species" which may affect predator patterns and harm

---

[27]   *See Heritage Experts Release New Biden Border Crisis Fact Check*, Heritage Foundation (March 25, 2021), *available at* https://www.heritage.org/press/heritage-experts-release-new-biden-border-crisis-fact-check.

[28]   *See* Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.

[29]   *Id.*

[30]   *See, e.g.*, Garet Bleir, *Endangered Species Are Casualties of Trump's Border Wall*, Sierra (Feb. 18, 2020), *available at* https://www.sierraclub.org/sierra/endangered-species-are-casualties-trump-s-border-wall (discussing how the border wall construction puts "nearly 100 endangered species" at risk).

21

endangered species.[31] This "could lead to a variety of unknown consequences, from migration and mating patterns, to throwing predator-prey relationships out of whack. It could also potentially eliminate endangered species who might not be able to survive the change—around 90 endangered and threatened species call the area home."[32]

95.     The combined effect of (1) partially constructing a barrier (2) followed by intentional refusal to complete portions of the barrier, leaving enormous "gaps," also has significant environmental impacts by itself. In particular, the barrier—with its new gaps—fragments the habitat of wildlife that lives in the U.S.-Mexico border region. And it does so in a manner that is completely arbitrary, unplanned, and unstudied under NEPA or the ESA.

**C.     Ending the "Remain in Mexico" Policy**

96.     In 2018, the United States faced a massive surge of migrants, many from Central American countries, attempting to cross through Mexico to enter the United States despite having no lawful basis for admission. *See, e.g.*, 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018). This surge created a humanitarian, public safety, and security crisis on the United States-Mexico border.

97.     In response to this crisis, in January 2019, DHS enacted the "Migrant Protection Protocols," (the "MPP") commonly known as the "Remain in Mexico" policy. Under this policy, "certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation" were "returned to Mexico [to] wait outside of the U.S. for the duration of their immigration proceedings[.]"[33]

---

[31] *See, e.g.*, Nathaniel Janowitz, *Trump's Border Wall Is Threatening Endangered Species*, Vice (Feb. 2, 2021) https://www.vice.com/en/article/y3gekk/trumps-border-wall-is-threatening-endangered-species. ("Border wall construction in eastern and western Arizona has created a bottleneck for species."),

[32] *Id.*

[33] *See Migrant Protection Protocols*, Department of Homeland Security (Jan. 24, 2019), *available at* https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

22

AR02470

98.    The purpose of this program, among other things, was to alleviate crushing burdens on the U.S. immigration detention system and to eliminate a "key incentive" for illegal immigration—the ability of aliens to stay in the United States during lengthy immigration proceedings, regardless of the validity of their asylum claims. Moreover, many, if not most, will skip their court dates and instead attempt to stay in the country for as long as possible: either attempting to remain undetected or, if found, avoid enforcement/deportation under the policies of the current administration.

99.    Under this program, approximately 65,000 non-Mexican migrants who were detained attempting to enter the United States illegally or without proper documentation across the Mexican border were sent back to Mexico to await the completion of their immigration processes.[34]

100.    The MPP functionally came to an end on January 20, 2021, when it was rescinded by Defendants with little-to-no-explanation. On February 2, 2021, President Biden issued "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border."[35] This order, among other things, ordered DHS and HHS to "reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public

[34] *See* Ted Hesson & Mimi Dwyer, *Biden to bring in asylum seekers forced to wait in Mexico under Trump program*, Reuters (Feb. 12, 2021, 4:10 AM), *available at* https://www.reuters.com/article/us-usa-biden-immigration-asylum/biden-to-bring-in-asylum-seekers-forced-to-wait-in-mexico-under-trump-program-idUSKBN2AC113.

[35] *See Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Office of the White House (Feb. 2, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

23

AR02471

health and safety and capacity constraints" and commanded DHS to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols[.]" *Id.*

101.   On February 11, 2021, DHS announced it would process into the United States individuals who had been returned to Mexico under the MPP.[36] Beginning on February 19, 2021, DHS started to execute this policy and bring those individuals into to the United States.

102.   Finally, on June 1, 2021, the Administration formally ended the MPP with a cursory seven-page memorandum.[37] This memorandum provides several insufficient explanations, including that it allegedly failed to reduce resource usage at DHS and failed to reduce Executive Office of Immigration Review case backlogs. *Id.* However, this memorandum makes no mention of a major justification for the MPP in the first place: *i.e.*, the ability of asylum applicants to file non-meritorious claims in order to stay in the country, with the ultimate intent of absconding and remaining illegally.[38]

103.   The Biden Administration's termination of MPP has continued and furthered their program of expanding the population of the United States by pro-migration policies and has greatly exacerbated the crisis at the southern border. This "catch and release"

---

[36]   *See Press Release, Department of Homeland Security, DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, (Feb. 11, 2021), *available at* https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[37]   *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, *Termination of the Migrant Protection Protocols*, (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_progr am.pdf.

[38]   *See* 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018). *See also* Executive Office for Immigration Review Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019 (Oct. 23, 2019), *available at* https://www.justice.gov/eoir/file/1216991/download (illustrating that only 14% of aliens claiming credible fear are granted asylum, and 32% abscond into the United States and are ordered removed in absentia).

24

1  program has bolstered cartels and other criminal operations and greatly increased the

2  sophistication and frequency of human smuggling operations.[39]

3       104.    Today, tens of thousands of migrants are crossing the border in Arizona with

4  the expectation they will be released in the United States to await their immigration

5  hearing.[40] They can then skip out on the hearing and disappear into the country.

6  Defendant's action here encourages precisely the sort of meritless asylum claims that the

7  MPP program was designed to avoid.

8       105.    On information and belief, thousands of individuals have been released and

9  are being released into Arizona as a result of the termination of this program that otherwise

10  would never have entered the country. Many, if not most, will be able to remain and reside

11  in the State, regardless of the formal outcomes of their immigration proceedings. Despite

12  the intent to cause this outcome, as well as its ready foreseeability, at no time did

13  Defendants undertake any analysis of the environmental impacts on the human

14  environment, in Arizona specifically and the United States generally, of this additional

15  population and the additional migration.

16  **D.    Prior Programmatic Environmental Impact Statements**

17       106.    The federal government has previously recognized the need to address the

18  environmental impacts of its interlocking border programs in a programmatic EIS. In 1994,

19  the Department of Justice ("DOJ") issued a draft programmatic environmental impact

20  statement ("DPEIS") addressing border enforcement efforts, addressing collaborative

21  efforts between the then-DOJ entities the Immigration and Naturalization Service ("INS"),

22

23  [39]  *See* Dave Graham, *Exclusive: 'Migrant president' Biden Stirs Mexican Angst Over*
24  *Boom Time for Gangs*, Reuters (Mar. 10, 2021), https://www.reuters.com/article/us-usa-
   immigration-mexico-exclusive/exclusive-migrant-president-biden-stirs-mexican-angst-
25  over-boom-time-for-gangs-idUSKBN2B21D8.

26  [40]  *See* Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*,
   New York Times (May 16, 2021), https://www.nytimes.com/2021/05/16/us/migrants-
   border-coronavirus-pandemic.html

25

AR02473

and the Border Patrol and DOD entity Joint Task Force Six ("JTF-6") (now "JTF-N"). *See Draft Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six*, 59 FR 26322-02 (May 19, 1994). The Notice indicates that "INS elected to act as lead agency for the preparation of this DPEIS" because the border patrol—now a part of CBP in the DHS—was the primary "beneficiary" of most JTF-6 engineering. *Id.*

107.   The purpose of the DPEIS was "to address cumulative environmental impacts of previous actions as well as those actions which may be developed within the reasonably foreseeable future." *Id.* The final programmatic EIS was issued in October 1994. *See Notice of Availability of the Final Programmatic Environmental Impact Statement (DPEIS): Final Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six*, 59 FR 50773 (Oct. 5, 1994).

108.   In 1999, DOJ began supplementing the 1994 programmatic EIS. *See* 64 FR 15969 (April 2, 1999) (weekly EPA notice of EIS availability). A revised draft of the supplemental programmatic EIS was issued in September 2000. *See* 65 FR 58527 (Sept. 29, 2000) (weekly EPA notice of EIS availability); 65 FR 63076 (Oct. 20, 2000) (corrected weekly EPA notice of EIS availability).

109.   On May 24, 2019, DHS withdrew both the 1994 programmatic EIS and the 2000 supplemental programmatic EIS. *See Notice of the withdrawal of a 1994 programmatic environmental impact statement and a 2001 supplemental programmatic environmental impact statement regarding certain activities along the U.S. Southwest border*, 84 Fed. Reg. 25067-01 (May 24, 2019). DHS's explanation stated that CBP "believe[s] their decision-makers are well-served by site-specific or project-specific NEPA analyses. Unlike a sprawling programmatic NEPA analysis, a site specific or project-

26

specific NEPA analysis gives decision-makers concrete and tangible information regarding the potential impacts of a proposed action. In addition, because every site-specific or project-specific analysis includes an analysis of cumulative impacts, they also present decision-makers with a larger frame of reference in which to understand those impacts."

110.   DHS has also completed a programmatic PEIS for the Northern U.S.-Canada border. *See Notice of Intent To Prepare One Programmatic Environmental Impact Statement for the Northern Border Between the United States and Canada* 75 FR 68810-01 (Nov. 9, 2010). In the Notice announcing the intent to prepare the programmatic EIS, CBP explained why it was providing a single PEIS for the entire border: "(1) CBP's need to identify a single unified proposal and alternatives for maintaining or enhancing security along the Northern Border, and (2) Certain resources of concern for this PEIS extend or move across the PEIS regions previously identified (e.g. habitat of various wildlife)." *Id.*

111.   Accordingly, Defendants have recognized that, in actions involving the border and immigration enforcement, their interlocking and related actions often have environmental impacts that must be analyzed comprehensively in a programmatic EIS under NEPA. DHS's conclusory explanation in the 2019 withdrawal that project- and site-specific analysis give more "concrete and tangible" information simply runs contrary to their legal obligation to ensure that actions which "will have cumulative or synergistic environmental impact upon a region … must be considered together." *Kleppe*, 427 U.S. at 410.

**E.    Environmental Consequences of Defendants' Actions**

112.   Defendants' actions are likely to have significant environmental impacts. However, Defendants have flouted compliance with NEPA and have not even engaged in the pretense of performing any environmental analysis before taking environmentally transformative actions.

27

113.    On information and belief, thousands of additional individuals have settled and continue to settle in Arizona than otherwise would have as the intentional, anticipated, and direct result of Defendants' actions. This additional population, and the thousands of individuals traveling across Arizona's lands and wilderness, has significant negative impacts on the human environment in Arizona.

114.    Arizona has not attempted (and need not attempt) to "conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 972 (9th Cir. 2003).

115.    Those environmental effects are classified below into a few main categories.

     **a.  *Migration Impacts***

116.    The first main category of environmental impacts includes all effects from migrants crossing in the particular areas left open by Defendants' actions. In particular, this category includes the proliferation of garbage and refuse as a result of the transit of hundreds of thousands of migrants through the passageways in the border fencing created by Defendants' actions, particularly their actions in affirmatively halting wall construction.

117.    Thousands of migrants are crossing and will continue to cross across the Arizona-Mexico border, concentrated at areas where there are gaps in the fencing. As the New York Times has explained: "Many [migrants] are entering the United States through wide openings in the border wall near Yuma, sparing them from the risky routes through remote desert regions, where migrants frequently lose their bearings, or across the Rio Grande in Texas."[41] This is the entirely foreseeable effect of Defendants' actions in choosing to leave gaps in the border wall—migrants seek out and cross at those gaps, and in greater numbers than ever before.

---

[41]  Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.

28

AR02476

118.    Because of Defendants' actions, migrants are crossing wilderness areas and other parts of the state not intended for human migration in huge numbers. Accordingly, migrants necessarily leave behind considerable refuse and can damage wildlife by their passing. As the Arizona Department of Environmental Quality ("ADEQ") has explained, border trash typically includes "plastic containers, clothing, backpacks, foodstuffs, vehicles, bicycles and paper. Human waste and medical products have also been found in border trash."[42]

119.    ADEQ estimates that each border-crosser leaves an average of six to eight pounds of trash behind.[43]

120.    The proliferation in border trash as a result of increased unauthorized crossings has numerous negative consequences for the human environment. Some are articulated by the ADEQ, including: "Strewn trash and piles, Illegal trails and paths, Erosion and watershed degradation, Damaged infrastructure and property, Loss of vegetation and wildlife, Campfires and escaped fires, Abandoned vehicles and bicycles, Vandalism, graffiti and site damage (historical and archaeological), Occurrence of bio-hazardous waste."[44]

121.    These impacts are the direct result of Defendants' actions. By encouraging migrants to come with a host of policies which encourage migration and advertise the relative openness of the border, combined with actively reducing physical security measures in certain areas of the Arizona desert, Defendants certainly caused migrants to cross, and with their crossing, bring huge quantities of trash and litter. These impacts must be addressed pursuant to the process provided by NEPA.

---

[42] *About Arizona Border Trash*, Arizona Department of Environmental Quality, *available at* https://www.azbordertrash.gov/about.html.

[43] *Id.*

[44] *Id.*

29

AR02477

**b.  *Increased Air Emissions***

122.    Another predictable environmental impact of Defendants' actions are increased air emissions, including emissions of greenhouse gases (GHGs), the most common of which is carbon dioxide. *Id.*

123.    The United States has disproportionately high ratios of carbon emissions and energy consumption to population; the U.S. represents approximately 5 percent of the global population but consumes about 25 percent of the world's energy and generates 5 times the world average of CO2 emissions. *Id.* On a per capita basis, U.S. residents generate five times as much carbon as the average individual outside of the country.

124.    These greater per-capita emissions substantially reflect the economic strength of the United States. GHG emissions predictably increase with income, and the United States is one of the wealthiest countries in the world on a per-capita basis. GHG emissions have notably declined recently, with EPA reporting that they dropped 1.7% from 2018 to 2019, for example.[45]

125.    This discrepancy in per-capita emissions is even more pronounced with individuals arriving from the countries that mostly make up the migration occasioned by Defendants' actions. According to one report, "Around four-in-ten (42%) of those apprehended at the southwestern border in February were people of Mexican origin, up from 13% in May 2019, the most recent peak month for monthly apprehensions. People from El Salvador, Guatemala and Honduras accounted for 46% of apprehensions in February, down from 78% in May 2019."[46] The United States population produces considerably more GHG emissions per capita by comparison: compared to Mexico, 5.4

[45]    *See* EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*, *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks

[46]    *See* John Gramlich, *Migrant apprehensions at U.S.-Mexico border are surging again*, Pew Research Center (Mar. 15, 2021), *available at* https://www.pewresearch.org/fact-tank/2021/03/15/migrant-apprehensions-at-u-s-mexico-border-are-surging-again/.

30

AR02478

times; El Salvador, 21.9 times; Guatemala, 22.4 times, and Honduras, 20.3 times. *See* Flood Report at 7.

126.    Furthermore, migrants driven to come across the border by Defendants' actions are largely coming for economic opportunity. While enhanced economic opportunity in the United States undoubtedly makes migrants better off individually, collectively, this can have a significant impact on GHG output. *Id.*

127.    The increased emissions resulting from immigrants reflects migrants' understandable—and laudable—desires to improve their economic conditions. Many migrants, for example, could not afford in their origin countries to purchase automobiles or gasoline, or to heat or cool their residences, or to purchase many products (such as meat). But their improved economic circumstances in the United States frequently permits immigrants to undertake many activities previously unavailable to them. That commendable desire for—and realization of—economic improvement is one of the fundamental components of American history and the American Dream. But it also predictably leads to increased air emissions—potentially resulting in increased smog, acid raid, unhealthy levels of particulate matter and ozone, and GHG emissions—which NEPA requires analysis of. But Defendants have completely failed to conduct that analysis that NEPA requires.

128.    These impacts on air emissions were a direct and foreseeable consequence of Defendants' actions. Because individuals generate substantially more air/GHG emissions in the United States than they would in their countries-of-origin, policies which admit more individuals into the country—like the termination of the MPP—or policies which permit or encourage more individuals to come to this country—like the affirmative halt to the construction of the border wall—have significant environmental impacts which must be addressed under NEPA.

31

129.     Defendants' refusal to consider GHG emissions from additional immigration is particularly baffling in light of the Administration's otherwise-ubiquitous fixation with GHG emissions. For example, as one of his first actions in office, President Biden issued Executive Order 13,990 on January 20, 2021. That order explains, for example, that "It *is essential that agencies capture the full costs of greenhouse gas emissions* as accurately as possible, including by taking global damages into account." Exec. Order 13,990 § 5(a) (Jan. 20, 2021) (emphasis added).

130.     That Executive Order also called for the creation of an Interagency Working Group to promulgate values for "'social cost of carbon' (SCC), 'social cost of nitrous oxide' (SCN), and 'social cost of methane' (SCM), to "publish an interim SCC, SCN, and SCM within 30 days of the date of this order," and "publish a final SCC, SCN, and SCM by no later than January 2022." *Id.* § 5.

131.     The Working Group published interim values for SCC, SCN, and SCM on February 26, 2021.

132.     Defendants have made no attempt to analyze the putative social costs—or any environmental impacts whatsoever—from increased air emissions that directly result from their challenged conduct. In doing so, Defendants have not only violated the Biden Administration's own policies (a violation not directly challenged here), but violated NEPA as well (which is challenged).

133.     Defendants' violations of their own Administration policies thus further demonstrate Defendants' apparent—and glaring—ideological blind spot to GHG emissions resulting from their immigration policies. Defendants are apparently fixated on reducing GHG emissions in all other contexts, but are completely oblivious or willfully ignorant of them in this one particular setting. These apparent ideological blinders violate NEPA.

32

### c. *Growth Impacts*

134.    Since at least 1975, the Ninth Circuit has held that population growth can be an environmental impact that agencies must consider under NEPA. *See City of Davis*, 521 F.2d at 671. In that case, the court held that the Federal Highway Administration violated NEPA by failing to prepare an EIS prior to the construction of a freeway interchange near an agricultural area. *Id.* at 666. As the Ninth Circuit explained, "plain common sense" indicated that the highway interchange was likely to cause growth in the area: "The growth-inducing effects of the … project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities." *Id.* at 675. *See also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011) (holding that, with respect to project adding a new runway to an airport, "even if the stated purpose of the project is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects"); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) ("Consideration of the growth-inducing effects furthers the National Environmental Policy Act's information and public awareness goals.").

135.    To be sure, population growth also frequently provides significant benefits, economic and otherwise. In particular, Arizona has benefited substantially from population growth, both from internal migration and international immigration. This suit does not challenge population growth, only Defendants' failure to analyze that growth properly—or, indeed, *at all*—under NEPA.

136.    Each of the Defendant's policies focused on below individually involves environmental consequences that are far greater than construction of a single highway interchange or runway. But Defendants have not prepared an EIS to consider any of them. Indeed, Defendants have not even prepared EAs.

AR02481

137.   As stated above, NEPA expressly states that one of its purposes is to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b). As the drafters of NEPA recognized, population growth has significant environmental impacts. Migrants (like everyone else) need housing, infrastructure, hospitals, and schools. They drive cars, purchase goods, and use public parks and other facilities. Their actions also directly result in the release of pollutants, carbon dioxide, and other greenhouse gases into the atmosphere, which directly affects air quality. All of these activities have significant environment impact which, as discussed above, courts have recognized as cognizable impacts under NEPA.

138.   Population and growth effects must be considered as long as such effects are "'reasonably foreseeable[.]'" *Center for Biological Diversity*, 982 F.3d at 737. This includes indirect effects and such effects as may be "'later in time'" or "'farther removed in distance'" from the agency action in question. *Id.* For example, "[a]n increased risk of an oil spill caused by an increase in crude oil tanker traffic … is a reasonably foreseeable indirect effect of a proposed dock extension." *Id.* (citing *Ocean Advocates v. U.S. Army Corps. of Eng'rs*, 402 F.3d 846, 867–70 (9th Cir. 2005)).

### d. *Impacts To Wildlife*

139.   Another major impact is to wildlife and endangered species from migration and wildlife being concentrated in particular corridors. *See* Flood Report at 5-6.

140.   In particular, threatened and endangered species such as Mexican gray wolf, jaguar, ocelot, and Sonoran pronghorn, are located in Arizona-Mexico border region.

141.   The de facto creation of gaps in the Border Wall may affect these species by concentrating their migration activities to those corridors—where they will be exposed to concentrated human activity and potential predators.

34

AR02482

142.    Indeed, the Border Wall Construction Termination may create *de facto* predator corridors where prey species (including the Sonoran pronghorn) will be forced to "run the gauntlet" of predators that may simply park themselves at the gaps in the Border Wall and feast upon the resulting abundance of prey that passes through.

e.  *Summary Of Impacts*

143.    Where there is a question as to whether a major federal action will affect the environment, "[t]he appropriate inquiry" is whether the effect at issue is so "'remote and highly speculative'" that NEPA does not warrant its consideration. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030 (9th Cir. 2006) (finding that Nuclear Regulatory Commission had violated NEPA by failing to consider the possibility of terrorist attacks on Diablo Canyon nuclear facility). At the very least, "[i]ndirect impacts need only to be 'reasonably foreseeable' to require an assessment of the environmental impact." *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30, 41 (D.D.C. 2000).

144.    Furthermore, "NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). *See also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("In a cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment.") (quoting *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)) (cleaned up).

145.    Defendants—in both the context of past actions relating to the Southern Border and actions relating to the Northern Border—have conducted programmatic analyses of their actions. No such programmatic analysis was conducted here, despite the

35

1    bevy of actions relating to immigration, all of which are closely related and have similar

2    environmental impacts.

3        146.    All of the impacts from the actions detailed above should have been

4    considered together, along with other parts of the administration's policy which serve to

5    encourage migration. In addition, whether considered separately or collectively, the impact

6    of those policies, there can be little doubt, will foreseeably and directly impact the

7    population and environments of border-states like Arizona.

8        147.    Notwithstanding this governing law, in formulating the policies discussed

9    above, the Defendants never took any of the specific procedures required by NEPA and the

10   CEQ regulations. Defendants at no time have ever accounted for any environmental

11   impacts of those policies or the cumulative impact of those actions in combination with

12   each other.

### FIRST CLAIM FOR RELIEF

### Failure To Prepare A Programmatic EIS

### (Asserted Under NEPA/APA)

16       148.    The allegations in the preceding paragraphs are reincorporated herein.

17       149.    Defendants' Population Augmentation Program constitutes "a coherent plan

18   of national scope, [whose] adoption surely has significant environmental consequences."

19   *Kleppe*, 427 U.S. at 400.

20       150.    Defendants were therefore required to prepare a programmatic EIS to

21   evaluate the Population Augmentation Program.

22       151.    Alternatively, each of the components of the Population Augmentation

23   Program: *e.g.*, eliminating fines, exempting individuals from Title 42, and drastically

24   decreasing deportation of individuals with final orders of removal, all individually have

25   significant environmental impacts requiring preparation of an EIS.

26

36

AR02484

152.   Defendants have not attempted to comply with NEPA for any of these actions. Defendants have therefore violated NEPA both by failing to prepare a programmatic EIS for their Population Augmentation Program, and by alternatively failing to prepare EISs (or even EAs) for the individual components.

153.   Defendants cannot rely on the 1994 programmatic EIS or the 2001 supplemental programmatic EIS, since both of those EISs were vacated. But even if they could, the situation has so radically changed in the ensuing two decades that Defendants' failure to prepare a supplemental EIS violates NEPA.

**SECOND CLAIM FOR RELIEF**

**Failure To Prepare An EIS For Border Wall Construction Termination**

**(Asserted Under NEPA/APA)**

154.   The allegations in the preceding paragraphs are reincorporated herein

155.   The termination of border wall construction has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA. In particular, Defendants have not prepared either an EIS or EA to study the pertinent environmental effects.

156.   In taking the above-referenced major federal actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.*

**THIRD CLAIM FOR RELIEF**

**Failure To Prepare An EIS For Terminating The MPP**

**(Asserted Under NEPA/APA)**

157.   The allegations in the preceding paragraphs are reincorporated herein

37

AR02485

158.     Plaintiffs' cancellation of the MPP has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA. In particular, Defendants have not prepared either an EIS or EA to study the pertinent environmental effects.

159.     In taking the above-referenced major federal actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.*

## FOURTH (CONTINGENT) CLAIM FOR RELIEF

### Violation of ESA – Border Wall Construction Termination

160.     The allegations in the preceding paragraphs are reincorporated herein.

161.     Defendants' Border Wall Construction Termination will have effects on endangered species without engaging in the required consultation under Section 7 of the ESA.

162.     At no point have Defendants engaged in any consultation under ESA Section 7 regarding potential impacts to threatened and species from the Border Wall Construction Termination.

163.     On July 9, 2021, the State sent a 60-day letter to Defendants under 16 U.S.C. § 1540(g) alerting them to their violations of ESA Section 7 concerning their Border Wall Construction Termination. Defendants will receive notice from those letters on July 12.

164.     If Defendants have not remedied its ESA violations within 60 days, the State intends to assert a claim under the ESA challenging Defendants' Border Wall Construction Termination.

165.     This claim for relief is intended to become operative automatically on September 10, 2021—*i.e.*, 60 days after receipt of the State's July 9, 2021 60-day letter. If necessary, the State will formally amend this First Amended Complaint to do so.

38

**FIFTH CLAIM FOR RELIEF**

**Arbitrary and Capricious Agency Action – Lack of Reasoned Decision-Making**

**Border Wall Construction Termination**

**(Asserted Under APA)**

166.    The allegations in the preceding paragraphs are reincorporated herein.

167.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

168.    Defendants' Border Wall Construction Termination was not the product of reasoned decision-making. In particular, that halt has left gaps in border barriers that are entirely unstudied and arbitrary.

169.    The timing of the Border Wall Construction Termination—being issued on the first day of the new administration—precludes any thoughtful analysis by Defendants. Instead, Defendants only had time to follow the President's January 20 Proclamation without engaging in meaningful thought.

170.    The January 20 Proclamation does not supply any meaningful analysis, and instead merely announces that "building a massive wall … is not a serious policy solution" and the wall is "a waste of money that diverts attention from genuine threats to our homeland security." These *ipse dixit* assertions do not supply reasoned analysis upon which Defendants could rely.

171.    Defendants' Border Wall Construction Termination is accordingly arbitrary and capricious, and should be set aside. 5 U.S.C. § 706(2)

**SIXTH CLAIM FOR RELIEF**

**Arbitrary and Capricious Agency Action – Lack of Reasoned Decision-Making**

**MPP Termination**

**(Asserted Under APA)**

172.    The allegations in the preceding paragraphs are reincorporated herein.

39

173.   The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

174.   Defendants previously provided a robust justification for the MPP. Current DHS policy represents an abrupt departure from this policy without sufficient justification.

175.   Defendants have also failed to consider Arizona's reliance interest on the MPP.

176.   Neither the January 20 suspension of the MPP nor the June 1 memorandum adequately explains the Defendants departure from the previous policy.

177.   As such, Defendants' actions should be held arbitrary and capricious and set aside. 5 U.S.C. § 706(2).

## SEVENTH CLAIM FOR RELIEF

### Violation of the Constitution And The Impoundment Control Act Of 1974

178.   The allegations in the preceding paragraphs are reincorporated herein.

179.   Under Article II, Section 3 of the Constitution, the President "shall take Care that the Laws be faithfully executed." Consistent with this obligation, and Articles I and II generally, when Congress allocates funds for a particular program, the President generally cannot refuse to administer that program or spend those funds for purely policy or political reasons. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 261–66 (D.C. Cir. 2013) (Kavanaugh, J., concurring). *See also* 2 U.S.C. §§ 682-88.

180.   Congress allocated to DHS considerable funds to spend on border construction, with specific instructions detailing what those funds may be used for. Defendants, in violation of their obligation to take care that those laws are faithfully executed, are withholding the funds and refusing to proceed with the statutorily mandated program.

40

181.   Accordingly, Defendants have violated the Constitution and their actions are unlawful. Defendants' actions violated the APA and are actionable independent of the APA.

182.   Defendants' actions similarly violate the Impoundment Control Act of 1974, 2 U.S.C. §§ 681-88. That statute broadly prohibits the President from refusing to expend moneys that Congress has appropriated. Defendants' actions here violate this prohibition.

183.   Nor has the President invoked his authority to pause expenditures pending Congress's consideration of a rescission bill. *See id.*

184.   Although the General Accounting Office ("GAO") determined on June 15 that the Biden Administration's non-expenditure of funds appropriated for border wall construction did not yet violate the Impoundment Control Act of 1974, that determination was in error. In particular, the GAO relied upon the Biden Administration's statement that the expenditures of funds was merely "delayed in order to perform environmental reviews" "such as the National Environmental Policy Act of 1969 (NEPA)." *See* https://www.gao.gov/assets/b-333110.pdf. But NEPA required Defendants to undertake NEPA analysis *before* taking irreversible action such as terminating contracts.

185.   Moreover, it does not appear that Defendants have published any draft EAs or EIS in the Federal Register, or notified the public of their intent to do so. Defendants' response to GAO is thus pretextual and cannot withstand scrutiny.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment:

A. Declaring that Defendants have violated NEPA and the APA by their Border Wall Construction and MPP Terminations without preparing EISs or EAs, and by failing to prepare a programmatic EIS to study their Population Augmentation Program;

41

B. Declaring that Defendants' refusal to expend moneys appropriated by Congress for construction of the border wall for actual border wall construction violates both the Constitution and the Impoundment Control Act of 1974;

C. Enjoining Defendants from continuing to take actions, including diverting and impounding appropriated funds, to prevent the continuation of construction of border wall under contracts already entered into by the United States until such time as Defendants comply with NEPA;

D. Enjoining Defendants from processing any further migrants into the United States, who were and who would have been covered by the MPP until such time as Defendants comply with NEPA;

E. Enjoining Defendants to secure the border in Arizona to the satisfaction of this Court to prevent additional unlawful migration until such time as Defendants comply with NEPA;

F. Vacating Defendants' actions that violate the APA and the Constitution;

G. Awarding Plaintiff costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H. Granting any and all other such relief as the Court finds appropriate.


RESPECTFULLY SUBMITTED this 12th of July, 2021.


**MARK BRNOVICH**
**ATTORNEY GENERAL**


By: /s/ Drew C. Ensign
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Robert J. Makar (No. 33579)

*Attorneys for Plaintiff State of Arizona*

42

AR02490

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| *Plaintiffs*, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## FIRST AMENDED COMPLAINT[1]

1.      In the first several hours following President Biden's inauguration, the incoming Administration discontinued implementing the successful Migrant Protection Protocols ("MPP").  These regulations required individuals who both lacked a legal basis to be present in the United States and who had passed through Mexico en route to the United States to remain in Mexico pending adjudication of their immigration claims.  Prior to the MPP, individuals passing through Mexico could enter the United States, raise asylum claims, expect to be released into the United States in violation of statutory requirements mandating their detention, and stay in the U.S. for years pending the resolution of their claims—even though most were ultimately rejected in court.  MPP changed the incentives for economic migrants

---

[1] On June 3, 2021, Defendants advised through written correspondence that they "do not oppose amendment" of Plaintiffs' Complaint. *See* FRCP 15(a)(2).

with weak asylum claims, and therefore reduced the flow of aliens—including aliens who are victims of human trafficking—to the southern border.

2.    This lawsuit challenges the Administration's unexplained and inexplicable two-sentence statement suspending the MPP, as well as its latest memorandum permanently terminating MPP.  The result of these arbitrary and capricious actions has been a huge surge of Central American migrants, including thousands of unaccompanied minors, passing through Mexico in order to advance meritless asylum claims at the U.S. border.

3.    This migrant surge has inflicted serious costs on Texas as organized crime and drug cartels prey on migrant communities and children through human trafficking, violence, extortion, sexual assault, and exploitation.  These crimes directly affect Texas and its border communities, especially given Texas's strong focus on combating human trafficking both at the border and throughout the State.  The additional costs of housing, educating, and providing healthcare and other social services for trafficking victims or illegal aliens further burden Texas and its taxpayers.

4.    The effects of unlawful immigration do not stop at the southern border. Indeed, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States[,]" which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).  With its intersection of major interstate highway routes, Missouri is a major destination and hub for human trafficking.  Missouri's ongoing fight against human trafficking—

2

AR02492

including the exploitation and trafficking of vulnerable migrants—likewise provides it with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy. Indeed, irresponsible border-security policies that invite and encourage human traffickers to exploit vulnerable border-crossing victims irreparably injure Missouri and other States.

5.    Recently, Texas's and Missouri's interests in combating human trafficking have become more urgent. By dismantling the MPP, the Administration has directly caused a massive uptick in illegal immigration through Central America, Mexico, and to the U.S. southern border.

6.    MPP is an exercise of DHS's express authority under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, to return those aliens temporarily to Mexico during the pendency of their removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(C). The Secretary of Homeland Security implemented MPP to manage the large influx of aliens arriving on the southern border with no lawful basis for admission. MPP proved to be enormously effective: it enabled DHS to avoid detaining or releasing into the United States more than 71,000 migrants during removal proceedings, and curtailed the number of aliens approaching or attempting to cross the southern border.[2] The program served as an indispensable tool in the United States' efforts, working cooperatively with the governments of Mexico and other countries, to address the migration crisis by diminishing incentives for illegal

---

[2] *See, e.g.*, TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings*, https://trac.syr.edu/phptools/immigration/mpp/.

AR02493

immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims.

7.     Nonetheless, the Biden Administration cast aside congressionally enacted immigration laws and discontinued MPP on its first day in office.  In a peremptory two-sentence, three-line memorandum, the Acting Secretary of Homeland Security issued a directive, effective January 21, 2021, that DHS would "suspend new enrollments in [MPP], pending further review of the program."  Exhibit A ("January 20 Memorandum").  This memorandum provided no analysis or reasoned justification for this abrupt suspension.  In doing so, the Biden Administration ignored the governing legal authority and basic requirements set forth in the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, 5 U.S.C. § 701 *et seq.*

8.     The Biden Administration's suspension "takes off the table one of the few congressionally authorized measures available to process" the vast numbers of migrants arriving at the southern border on a daily basis.  *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (per curiam).  Before MPP, U.S. officials encountered an average of approximately 2,000 inadmissible aliens at the southern border each day, and the rate at which those aliens claimed fear of return to their home countries surged exponentially.

9.     That huge influx imposes enormous, avoidable burdens on the United States' immigration system.  Most asylum claims are meritless.  For example, the Executive Office for Immigration Review ("EOIR") reported that between FY 2008 and FY 2019, only 14 percent of aliens who claimed credible fear were granted

4

asylum.[3]  Alongside the fact that immigration courts were faced with a backlog of over 768,000 cases at the end of FY 2018—a number that since has grown—it is clear the asylum system was and continues to be manipulated by aliens presenting at the border.[4]  Further, though federal law mandates that aliens awaiting asylum hearings "shall" be detained, in fact DHS does not detain the vast majority of such asylum applicants, but releases them into the United States, where many simply abscond.

10.    MPP played a critical role in addressing this crisis.  By returning migrants to Mexico to await their asylum proceedings—in cooperation with the Mexican Government, which has permitted these aliens to remain in Mexico—MPP eased the strain on the United States' immigration-detention system and reduced the ability of inadmissible aliens to abscond into the United States.  Between FY 2008 and FY 2019, 32 percent of aliens referred to EOIR absconded into the United States and were ordered removed in absentia.[5]

11.    MPP also discouraged aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States, thereby permitting the government to better focus its resources on individuals who legitimately qualify for relief or protection from removal.  In February 2020, for example, the number of aliens either apprehended or deemed inadmissible at the

---

[3] *See* Executive Office for Immigration Review Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019* (Oct. 23, 2019), https://www.justice.gov/eoir/file/1216991/download.

[4] *See* TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/.

[5] *See Credible Fear and Asylum Process*, *supra*, at n.2.

AR02495

southern border was down roughly 40,000 from February 2019.[6]  The Biden Administration's termination of the MPP has imposed severe and ongoing burdens on Texas and Missouri because the government will not process into the MPP the tens of thousands of aliens who are resuming attempts to cross the southern border with no legal basis for admission, and the government will process the tens of thousands of aliens already admitted into the MPP into the United States.

12.     Additionally, the Biden Administration's suspension threatens damage to the bilateral relationship between the United States and Mexico.  Migration has been the subject of substantial discussion between the two countries and is a key topic of ongoing concern in their relationship.[7]  The unchecked flow of third-country migrants through Mexico to the United States strains both countries' resources and produces significant public safety risks—not only to the citizens of Mexico and the United States, but also to the migrants themselves, who are often targeted by criminals for human trafficking, violence, and extortion.  MPP played a key role in joint efforts to address the crisis, but the suspension of MPP upsets those efforts and undermines Mexican confidence in U.S. foreign policy commitments.  And like Texas and Missouri, the Mexican government intends to "crack down on migrant

---

[6] U.S. Customs & Border Protection, *Southwest Border Migration FY 2020*, https://go.usa.gov/xdhSh (last visited Apr. 9, 2020).

[7] *See, e.g.*, U.S. Department of Homeland Security, *Assessment of the Migrant Protection Protocols (MPP)* (Oct. 28, 2019), https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_pro tection_protocols_mpp.pdf; Declaration of Ambassador Christopher Landau, No. 19-15716, Doc. 92-3, ¶ 3 (9th Cir.).

AR02496

trafficking."[8]    But the suspension of MPP can only significantly delay those enforcement efforts given the constant flow of migrants.

13.    Texas contains more than half of the border between the United States and Mexico, and a large share of individuals crossing into the United States to claim asylum arrive through the Texas-Mexico border.  Likewise, human traffickers and their victims frequently arrive in Texas and either settle there, travel to one of Texas's major cities, or travel along Texas's state highways to proceed further into the United States.

14.    Missouri is a destination and transit state for many human traffickers, including human traffickers of migrants from Central American countries who have crossed the border illegally.  This is mainly due to the state's substantial transportation infrastructure and major population centers.  Indeed, St. Louis and Kansas City are major human-trafficking hubs connected by Interstate 70.

15.    As a direct result of the discontinuance of the MPP, and the corresponding increase in human-trafficking incidents involving vulnerable Central American migrants, both Texas and Missouri will be forced to spend significantly more resources in combating human trafficking.  Thus, the Biden Administration's unlawful suspension of the MPP will cause both States immediate and irreparable harm if it is not enjoined.

16.    Moreover, the influx of unlawful immigrants with meritless claims of

---

[8] Mark Stevenson et al., *Biden tries to reset relationship with Mexican president*, ASSOCIATED PRESS (Mar. 1, 2021), https://apnews.com/article/biden-obrador-us-mexico-migration-issues-edb25cf298b7c9a83d15ff4f6c7ea95f.

AR02497

asylum will result in additional unlawful migrants entering and remaining in Texas and Missouri, thus forcing both States to expend more taxpayer resources on health care, education, social services, and similar services for such migrants. There is no monetary remedy for these increased costs and thus they constitute irreparable injury to the State of Texas, the State of Missouri, and their taxpayers.

17.     Because suspension of the MPP is invalid, it must be enjoined in its entirety. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]' "). Indeed, federal law contemplates a "comprehensive and unified" immigration policy. *Arizona*, 567 U.S. at 401. As the Fifth Circuit has held, "[t]he Constitution requires an uniform Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and uniformly; and the Supreme Court has described immigration policy as a comprehensive and unified system." *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (per curiam). Thus, "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (per curiam); *see also Texas v. United States*, No. 6:21-CV-00003,

8

AR02498

2021 WL 247877, at *8 (S.D. Tex. Jan. 26, 2021) (enjoining government from executing 100-day moratorium on the removal of aliens everywhere in the United States).

18.     Following the Biden Administration's suspension of new enrollments into the MPP—and, therefore, discontinued implementation of the program—in the January 20 Memorandum, Texas and Missouri ("Plaintiff States") filed this lawsuit on April 13, 2021, challenging the suspension as: (1) arbitrary and capricious agency action for a lack of reasoned decisionmaking, for a failure to consider state reliance interests, for a failure to consider alternative approaches to suspension, and for not stating a basis for the suspension; (2) a violation of notice-and-consultation requirements contained in an Agreement between DHS and Texas; (3) a violation of 8 U.S.C. § 1225, including DHS's obligation to detain migrants awaiting asylum hearings in the United States; and (4) a violation of the Take Care Clause of the United States Constitution.  *See* ECF 1 at 31-39.

19.     The Original Complaint requested, in relevant part, that the January 20 Memorandum suspending new enrollments into the MPP be declared unlawful and set aside and that Defendants be enjoined "nationwide from enforcing or implementing the January 20 Memorandum suspending new enrollments into the MPP[.]" ECF 1 at 39.

20.     Exactly one month after filing the Original Complaint, Plaintiff States moved for a preliminary injunction demonstrating that they were likely to succeed on the merits of their claims, that they would suffer irreparable harm absent an

9

AR02499

injunction due to significant, unrecoverable financial costs that would increase following the suspension of the MPP, and that the equities and public interest overwhelmingly favored an injunction due to the ongoing humanitarian crisis at the Southern border. *See* ECF 30 at 15-37.

21.   After Plaintiff States filed their motion for a preliminary injunction, this Court entered a Scheduling Order: (1) requiring Defendants to produce the administrative record by May 31, 2021; (2) requiring Defendants to file their response to Plaintiff States' motion for a preliminary injunction by June 4, 2021; (3) requiring the parties to file, by June 9, 2021, a joint statement regarding whether expedited discovery and consolidation of trial under Fed. R. Civ. P. 65(a)(2) were appropriate; and (4) requiring Plaintiff States to file their reply brief by Friday June 18, 2021. *See* ECF 37 at 1-2.

22.   On May 31, 2021, Defendants filed the administrative record, which consisted only of the two-sentence January 20 Memorandum. *See* ECF 45 at 4.

23.   Less than 24 hours later, on June 1, 2021, DHS published a memorandum purportedly terminating the MPP and rescinding the January 20 Memorandum. *See* Exhibit C ("June 1 Memorandum").

24.   In essence, DHS simply reaffirmed in the June 1 Memorandum what it previously did in the January 20 Memorandum:   it completely discontinued implementing MPP.

25.   The June 1 Memorandum cannot and does not cure the defects in the January 20 Memorandum. DHS's new justification is woefully insufficient to justify

10

DHS's agency action under the APA, as it overlooks numerous important aspects of the problem, fails to consider important State reliance interests, disregards DHS's statutory obligations, and continues to violate the Take Care Clause, among other reasons.  And this belated justification only comes after Plaintiff States filed suit against Defendants and moved for a preliminary injunction, and after Defendants filed a thin administrative record that merely consists of the January 20 Memorandum.

26.     While the June 1 Memorandum does not announce or adopt any new policy, it broadcasts (yet again) to human traffickers, smugglers, and organized crime that the Southern border is open for business.  It threatens immediately to exacerbate the ongoing irreparable injury experienced by Plaintiff States from the discontinuation of MPP.

### PARTIES

27.     Plaintiffs incorporate by reference all preceding paragraphs.

28.     Plaintiff State of Texas is a sovereign State of the United States of America.

29.     Defendants' unlawful discontinuance of MPP injures Texas. MPP reduced both the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. Discontinuing MPP has increased and will increase the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. That harms Texas in multiple ways.

11

30.     Discontinuing MPP will cause Texas to "incur significant costs in issuing driver's licenses." *Texas*, 809 F.3d at 155. Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States, rather than enrolled in MPP, will be eligible for subsidized driver's licenses.[9] By enabling more aliens to secure subsidized licenses, discontinuing MPP will impose significant financial harm on the State of Texas. *See Texas*, 809 F.3d at 155.

31.     Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Discontinuing MPP will injure Texas by increasing the number of illegal aliens receiving such services at Texas's expense.

32.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

33.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to

---

[9] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifying lawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

12

AR02502

include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

34. The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

35. The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

36. Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

37. Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

38. DHS itself has previously recognized "that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Exhibit B § II (Agreement between Department of Homeland Security and the State of Texas). DHS agrees that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" "result in concrete

AR02503

injuries to Texas." *Id.*

39.　　Plaintiff State of Missouri is a sovereign State of the United States of

America.

40.　　There is a well-documented and tragic connection between human

trafficking in the Midwest and unlawful immigration from the southern border.

Indeed, data makes it readily apparent that trafficking on the southern border is a

contributing factor to overall rates of human trafficking in the United States—and

such cross-border human trafficking activity directly affects the overall prevalence of

human trafficking within Missouri.[10]　The prevalence of human trafficking in

Missouri directly affects Missouri financially.

41.　　Because "[h]uman trafficking is a form of modern slavery that occurs in

every state, including Missouri[,]"[11] the Attorney General of Missouri has created a

---

[10] *See generally* U.S. Department of State, *Trafficking in Persons Report* (20th ed., June 2020), https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf; *U.S.-Mexico Bilateral Human Trafficking Enforcement Initiative*, U.S. DEPARTMENT OF JUSTICE, https://www.justice.gov/humantrafficking/special-initiatives#bilateral (last visited Mar. 30, 2021) ("Mexico is the country of origin of the largest number of foreign-born human trafficking victims identified in the United States."); Polaris Project, *Fighting Human Trafficking Across the U.S. – Mexico Border* (2018), https://polarisproject.org/wp-content/uploads/2016/10/Consejo-NHTH-Statistics-2018.pdf ("Every day, powerful criminal networks and individual traffickers on both sides of the border recruit people for labor or sexual exploitation."); U.S. Customs and Border Protection, *CBP Releases Fiscal Year 2020 Southwest Border Migration and Enforcement Statistics* (Oct. 14, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2020-southwest-border-migration-and; United Nations Office on Drugs and Crime, *Global Report on Trafficking in Persons* (2018), https://www.unodc.org/documents/data-and-analysis/glotip/2018/GLOTiP_2018_BOOK_web_small.pdf.

[11]　　*Missouri*, NATIONAL HUMAN TRAFFICKING HOTLINE, https://humantraffickinghotline.org/state/missouri (last visited Apr. 11, 2021).

AR02504

Human Trafficking Task Force that is designed and structured to identify, respond to, investigate, and ultimately eradicate human trafficking in Missouri.[12]

42.     While one case of human trafficking in Missouri is tragic enough, Missouri has seen higher numbers just in the last few years.  For example, of the 233 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2019, 21 were foreign nationals.[13]  Of the 179 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2018, 18 were foreign nationals.[14]  And of the 146 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2017, 17 were foreign nationals.[15]

43.     Missouri annually expends funds on the Human Trafficking Task Force and Human Trafficking Hotline to combat human trafficking.  Those amounts will increase should DHS be allowed to discontinue implementation of the MPP.

44.     When DHS fails to implement the MPP and comply with federal law, Missouri faces other significant costs.  Aside from the higher costs associated with fighting human trafficking, the Administration's decision to end MPP—and therefore allow more unlawfully present aliens to enter and remain in Missouri—requires Missouri to increase taxpayer expenditures for social and educational services for such aliens, resulting in irreparable injury.

---

[12] *Human Trafficking Task Force*, OFFICE OF THE MISSOURI ATTORNEY GENERAL, https://ago.mo.gov/home/human-trafficking/task-force (last visited Mar. 29, 2021).
[13] *Missouri*, *supra*, at n.10.
[14] *Id.*
[15] *Id.*

15

45.    The Biden Administration's unlawful discontinuance of the MPP will require Missouri to increase funding for its Human Trafficking Task Force, which will have to expend substantially more resources in order to combat a substantial increase in human trafficking efforts that arise out of the mass-migration surge.

46.    While the costs of combating human trafficking will vary from state to state, Texas and Missouri will inevitably face these costs.  For example, a report from 2016 concluded that Texas spends approximately $6.6 billion in lifetime expenditures on minor and youth sex trafficking victims, and that traffickers exploit approximately $600 million annually from victims of labor trafficking in Texas (i.e., lost wages), which necessarily results in corresponding lost tax revenue to the State.[16]  Missouri faces comparable costs.  Other States likewise suffer these costs proportional to their sizes and populations of trafficking victims.

47.    Defendants are officials of the United States government and United States governmental agencies responsible for the issuance and implementation of the challenged discontinuance of the MPP.

48.    Defendant Joseph R. Biden, Jr., is the President of the United States of America.  He is sued in his official capacity.

49.    Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-

---

[16] The University of Texas at Austin, School of Social Work: Institute on Domestic Violence and Sexual Assault, *Human Trafficking by the Numbers* (2016), https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

AR02506

related statutes, policies, and directives, including the discontinuance of MPP. DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 551(1). DHS oversees Defendants' Office of Strategy, Policy, and Plans, United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

50. Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS. He authored the June 1 Memorandum. He is sued in his official capacity.

51. Defendant Kelli Ann Burriesci is the Acting Under Secretary for the Office of Strategy, Policy, and Plans. She received the June 1 Memorandum. She is sued in her official capacity.

52. Defendant Troy A. Miller is the Acting Commissioner of the United States Customs and Border Protection. He received the January 20 Memorandum and the June 1 Memorandum. He is sued in an official capacity.

53. Defendant Tae D. Johnson is the Acting Director of the United States Immigration and Customs Enforcement. He received the January 20 Memorandum and the June 1 Memorandum. He is sued in his official capacity.

54. Defendant Tracy L. Renaud is the Acting Director of the United States Citizenship and Immigration Services. She received the June 1 Memorandum. She is sued in her official capacity.

17

AR02507

## JURISDICTION AND VENUE

55.     Plaintiffs incorporate by reference all preceding paragraphs.

56.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a).  This action arises under the Constitution (art. II, §§ 1, 3), 5 U.S.C. §§ 702-703, and other federal statutes.

57.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e).  Defendants are United States agencies or officers sued in their official capacities.  The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Northern District of Texas.

58.     Texas and Missouri bring this action to redress harms to their sovereign interests, quasi-sovereign interests, proprietary interests, and interests as *parens patriae*; and to vindicate their interests under 5 U.S.C. § 702.  Plaintiffs' ongoing fight against human trafficking—including the exploitation and trafficking of vulnerable migrants—provides them with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy.  The injury to Texas's and Missouri's fiscal interests from the increase in unlawful migrants entering and remaining in Texas and Missouri provides them with redressable injuries in this case as well.

59.     This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

18

## BACKGROUND

60.     Plaintiffs incorporate by reference all preceding paragraphs.

### Legal Framework

61.     Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully. 8 U.S.C. § 1225(a)(1).[17]

62.     An immigration officer must first inspect the alien to determine whether he is entitled to be admitted.  8 U.S.C. § 1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836-37 (2018).

63.     Section 1225(b)(2)(A) provides that, if an immigration officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under section 1229a of this title" to determine whether he will be removed from the United States.  8 U.S.C. § 1225(b)(2)(A); *see also id.* § 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV); *In re M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019).  Section 1229a, in turn, sets out the procedures for a "full" removal proceeding, which involves a hearing before an immigration judge with potential review by the Board of Immigration Appeals.  *See* 8 U.S.C. § 1229a; 8 C.F.R. § 1003.1.  In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien

---

[17] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security.  *See Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

19

may seek asylum or any other form of relief or protection from removal to his home country.  *See* 8 U.S.C. § 1229a(a)(2), (c)(4).

64.    As an alternative to a full removal proceeding, an immigration officer may also determine whether an applicant for admission is eligible for, and should be placed in, the expedited removal process described in Section 1225(b)(1), which is designed to remove certain aliens quickly using specialized procedures.  *See Jennings*, 138 S. Ct. at 837; *M-S-*, 27 I. & N. Dec. at 510.  An alien is generally eligible for expedited removal when an officer "determines" that he engaged in fraud, made a willful misrepresentation in an attempt to gain admission or another immigration benefit, or lacks any valid entry documents.    8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

65.    An alien subject to expedited removal will be "removed from the United States without further hearing or review," unless he expresses an intention to apply for asylum or a fear of persecution or torture.   8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4).   An alien who does so is referred to an asylum officer to determine whether he has a "credible fear of persecution" or torture; if so, he "*shall* be detained for further consideration of the application for asylum.*"* 8 U.S.C. § 1225(b)(1)(B)(ii)  (emphasis added);  *see*  8  U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(4); *see also Jennings*, 138 S. Ct. at 842 (observing that aliens in expedited removal are subject to mandatory detention).  By regulation, the government has provided that an alien found to have a credible fear will be placed in a Section 1229a full removal proceeding.  *See* 8 C.F.R. § 208.30(f); *M-S-*, 27 I. & N.

20

AR02510

Dec. at 512.

66.     When DHS places an applicant for admission into a full removal proceeding under Section 1229a, the alien is subject to mandatory detention during that proceeding, *see* 8 U.S.C. § 1225(b)(2)(A), except that certain aliens may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A).  *See Jennings*, 138 S. Ct. at 837.

67.     But Congress has also provided in the alternative that, "[i]n the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).  This contiguous-territory-return authority enables DHS to avoid keeping aliens arriving on land from Mexico or Canada in the United States during their full removal proceedings, and instead to temporarily return those aliens to the foreign territory from which they just arrived pending those proceedings.

**Factual Background**

68.     Plaintiffs incorporate by reference all preceding paragraphs.

69.     In 2018, the United States faced a surge of hundreds of thousands of migrants, many from the Northern Triangle countries of Central America (Honduras, El Salvador, and Guatemala), attempting to cross through Mexico to enter the United States despite having no lawful basis for admission.  *See, e.g.*, 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018).  By the fall of 2018, U.S. officials encountered an

21

average of approximately 2,000 inadmissible aliens per day at the border. *Id.* at 55,935. This surge created a humanitarian, public safety, and security crisis on the southern border.

70. Many of these inadmissible aliens were enticed to make the dangerous journey north by smugglers and human traffickers, who promoted the belief that, if the migrants simply claimed fear of return to their home country once they reached the United States (especially when traveling with children), they could gain release into the United States, even though their asylum claims overwhelmingly lacked merit.

71. In fiscal year 2018, approximately 97,192 aliens in expedited removal were referred for a credible-fear interview because they expressed a fear of persecution or torture in their home country or else an intention to apply for relief or protection from removal (as compared to approximately 5,000 aliens referred in fiscal year 2008), and 65% of those were from Northern Triangle countries. 83 Fed. Reg. at 55,945.

72. Yet among Northern Triangle aliens who claimed fear and were referred for a Section 1229a proceeding, and whose cases were completed in fiscal year 2018, they filed an asylum application only about 54 percent of the time, and they were granted asylum in only about nine percent of cases. *Id.* at 55,946. In 38 percent of cases, those aliens did not even appear for immigration proceedings. *Id.* Before MPP, detention-capacity constraints or court orders forced DHS to release tens of thousands of aliens into the United States, where many disappeared. *See id.* at

22

55,935, 55,946.

73.      Amid this crisis, the Secretary of Homeland Security announced MPP in December 2018.[18]  The Secretary explained that DHS would exercise its statutory authority in 8 U.S.C. § 1225(b)(2)(C) to "return[] to Mexico" certain aliens "arriving in or entering the United States from Mexico" "illegally or without proper documentation," "for the duration of their immigration proceedings."[19]  MPP aimed "to bring the illegal immigration crisis under control" by, among other things,

_____

[18] *See, e.g.*, U.S. Department of Homeland Security, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration; *see also* 84 Fed. Reg. 6811 (Feb. 28, 2019); U.S. Immigration and Customs Enforcement, *Implementation of the Migrant Protection Protocols*       (Feb.       12,       2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ICE-Policy-Memorandum-11088-1.pdf; U.S. Immigration and Customs Enforcement, *Migrant Protection       Protocols       Guidance*       (Feb.       12,       2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ERO-MPP-Implementation-Memo.pdf; U.S. Customs and Border Protection, *MPP Guiding Principles*       (Jan.       28,       2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf;  U.S.  Customs  and  Border Protection, *Implementation of the Migrant Protection Protocols* (Jan. 28, 2019); U.S. Customs and Border Protection, *Guidance on Migrant Protection Protocols* (Jan. 28, 2019); U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection       Protocols*       (Jan.       28,       2019), https://www.uscis.gov/sites/default/files/document/memos/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf; U.S. Department of Homeland Security, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019),     https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf;     *Migrant     Protection     Protocols*,     U.S. Department     of     Homeland     Security, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols (last visited Mar. 29, 2021).
[19] *Nielsen Announces Historic Action to Confront Illegal Immigration*, *supra*, at n.17.

AR02513

alleviating crushing burdens on the U.S. immigration detention system and reducing "one of the key incentives" for illegal immigration: the ability of aliens to "stay in our country" during immigration proceedings "even if they do not actually have a valid claim to asylum," and in many cases to "skip their court dates" and simply "disappear into the United States."[20]

74.     MPP excluded several categories of aliens: "[u]naccompanied alien children"; "[c]itizens or nationals of Mexico"; "[a]liens processed for expedited removal"; "[a]liens in special circumstances" (such as returning lawful permanent residents or aliens with known physical or mental health issues); and "[o]ther aliens at the discretion of the Port Director."[21]  Even when an alien was eligible for MPP, the policy did not mandate return: "[o]fficers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis."[22]

75.     The Secretary also directed that MPP would be implemented consistent with non-refoulement principles—*i.e.*, DHS would avoid sending an alien to a country where he will more likely than not be persecuted on account of a protected ground (race, religion, nationality, membership in a particular social group, or political opinion) or tortured.[23]  "If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return

---

[20] *Id.*
[21] *MPP Guiding Principles*, *supra*, at n.17.
[22] *Id.*
[23] *Policy Guidance for Implementation of the Migrant Protection Protocols*, *supra*, at n.17.

AR02514

to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a [U.S. Citizenship and Immigration Services] asylum officer for screening ... [to] assess whether it is more likely than not that the alien will face" persecution on account of a protected ground, or torture, in Mexico.[24]  If so, then "the alien may not be" returned to Mexico.[25]  The screening interview is "non-adversarial" and is conducted "separate and apart from the general public," and officers are required to ensure that the alien "understand[s]" both "the interview process" and "that he or she may be subject to return to Mexico."[26]

76.     If an alien is eligible for MPP and an immigration officer "determines" that MPP should be applied, the alien "will be issued a[] Notice to Appear (NTA) and placed into Section [1229a full] removal proceedings," and then "transferred to await proceedings in Mexico."[27]  The alien is directed to return to a port of entry on the appointed date for immigration proceedings.[28]

77.     The Secretary further explained that the Government of Mexico has committed to "authorize the temporary entrance" of third-country nationals who are returned pending U.S. immigration proceedings; to "ensure" that returned migrants "have all the rights and freedoms recognized in the Constitution [of Mexico], the international treaties to which Mexico is a party, and its Migration Law"; to accord

---

[24] *MPP Guiding Principles*, *supra*, at n.17.
[25] *Id.*
[26] *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, *supra*, at n.17.
[27] *MPP Guiding Principles*, *supra*, at n.17.
[28] *Id.*

25

AR02515

the migrants "equal treatment with no discrimination whatsoever and due respect …
paid to their human rights"; to permit the migrants "to apply for a work permit for
paid employment"; and to coordinate "access without interference to information and
legal services" for them.[29]

78.    DHS began processing aliens under MPP on January 28, 2019, first at a
single port of entry and gradually expanding across the southern border.  MPP proved
to be extremely effective at reducing the strain on the United States' immigration-
detention capacity and improving the efficient resolution of asylum applications.[30]
DHS reported that it had applied MPP to more than 60,000 aliens who would
otherwise have needed to be detained in the United States or else released into the
interior, and the EOIR reported that immigration judges had issued more than
32,000 orders of removal.  The program had also become a crucial component of the
United States' diplomatic efforts in coordination with the governments of Mexico and
other countries to deter illegal immigration.[31]

79.    The MPP, however, functionally came to an end on January 20, 2021,
when the Biden Administration immediately suspended new enrollments into the
program through a two-sentence memorandum.  The Biden Administration stated
that it intends to "rebuild fair and effective asylum procedures that respect human

---

[29] *Policy Guidance for Implementation of the Migrant Protection Protocols*,
*supra*, at n.17.
[30] *Assessment of the Migrant Protection Protocols (MPP)*, *supra*, at n.6.
[31] *Id.*

26

AR02516

rights,"[32] yet the sudden shift in immigration-related policy and enforcement has led to a crisis on the southern border—as acknowledged by the White House Press Secretary.[33]

80.    For example, "[t]housands more migrants from Latin America have pushed their way toward Mexico[,]" many of whom "have told journalists that they are making their way north because they expect it to be easier to enter the U.S. under the Biden administration."[34]  Earlier this year, Border Patrol reported that "the number of migrants apprehended at the border in the month of January reached nearly 78,000, up from 36,679 in January 2020.  Single adult Mexican citizens accounted for more than 37,000 CBP encounters, a 119 percent increase from this time last year, according to the agency."[35]  "The Biden administration's undoing of Trump's border policies has prompted a flood of Central American and Mexican illegal migrants at the US border, including thousands of unescorted children.

---

[32] U.S. Department of Homeland Security, *Review of and Interim Revision of Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

[33] Sarah Kolinovsky, *White House Press Secretary Slips Up, Calls Border Migrant Surge a 'Crisis'*, ABC NEWS (Mar. 18, 2021), https://abcnews.go.com/Politics/white-house-press-secretary-slips-calls-border-migrant/story?id=76540202.

[34] Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain In Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy.

[35] Emily Jacobs, *Biden administration opens another tent city to detain surge of illegal migrants*, NEW YORK POST (Feb. 11, 2021), https://nypost.com/2021/02/11/biden-admini-opens-tent-city-to-detain-illegal-migrants/.

27

AR02517

Central Americans looking for refuge from the Northern Triangle countries—El Salvador, Honduras and Guatemala—have taken these policy moves, as well as the overwhelmingly more welcoming tone from Democrats, as a sign that this president is inviting them to cross the border."[36] More recently, the President of Mexico blamed President Biden for the migrant surge.[37]

81.    Like Texas and Missouri, the Mexican government intends to "crack down on migrant trafficking."[38]  But discontinuing MPP can only impede those enforcement efforts given the constant flow of migrants.  During the Trump Administration, "[t]he hardening of U.S. and Mexican immigration policies ... 'complicated' the business" of "handling the income from smuggling migrants across a 375-mile stretch of the U.S.-Mexico border."[39]  Just one territory "nets an average of $1 million per month.  But that's just a tiny piece of a multi-billion-dollar business that the United Nations Office on Drugs and Crime estimates involves $4 billion annually.  The Mexican government has calculated it could be as high as $6 billion."[40] Indeed, "[a] migrant rarely crosses the U.S. border without paying someone."[41]

82.    The Biden Administration's discontinuance of the MPP has greatly

---

[36] Emily Jacobs, *Mexican President Andrés Manuel López Obrador Blames Migrant Crisis on Biden*, NEW YORK POST (Mar. 24, 2021), https://nypost.com/2021/03/24/mexican-president-obrador-blames-migrant-crisis-on-biden/.

[37] *See id.*

[38] Stevenson et al., *supra*, at n.7.

[39] Maria Verza & Christopher Sherman, *What crackdown? Migrant smuggling business adapts, thrives*, ASSOCIATED PRESS (Dec. 19, 2019), https://apnews.com/article/202a751ac3873a802b5da8c04c69f2fd.

[40] *Id.*

[41] *Id.*

AR02518

exacerbated the crisis at the southern border. Indeed, "Mexico's government is worried the new U.S. administration's asylum policies are stoking illegal immigration and creating business for organized crime[.]"[42] Moreover, "[p]reviously unreported details in the internal assessments, based on testimonies and intelligence gathering, state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.' "[43] "One Mexican official familiar with migration developments, who spoke on condition of anonymity, said organized crime began changing its modus operandi 'from the day Biden took office' and now exhibited 'unprecedented' levels of sophistication. 'Migrants have become a commodity,' the official said, arguing they were now as valuable as drugs for the gangs."[44]

83.    "[A]s in previous years, migrants are being told to bring along children to make it easier to apply for asylum."[45]  Tragically, drug cartels in Mexico "are using helpless children as decoys to smuggle their members into the US" and "making a killing off the border crisis, jacking up their fees to smuggle the growing flood of people into the country—and now 'making more money on humans than they are on

---

[42] Dave Graham, *Exclusive: 'Migrant president' Biden Stirs Mexican Angst Over Boom Time for Gangs*, REUTERS (Mar. 10, 2021), https://www.reuters.com/article/us-usa-immigration-mexico-exclusive/exclusive-migrant-president-biden-stirs-mexican-angst-over-boom-time-for-gangs-idUSKBN2B21D8.
[43] *Id.*
[44] *Id.*
[45] *Id.*

29

AR02519

the drug side[.]' "[46] "[T]he cartels also are further exploiting the disastrous situation by splitting up kids from their wannabe immigrant parents, then having members pose as the children's relatives to cross the border[.]"[47] As a former U.S. marshal in El Paso explained, "Mexican drug cartels are taking advantage of the recent influx of migrants, using it as an opportunity to 'make money'" because "it's more cost effective to be involved in human smuggling that it is to be in drug trafficking."[48] And "human smuggling often also turns into human trafficking[.]"[49]

84.     Recently sources advised that "notorious drug gangs . . . are seizing upon [the Biden Administration's] reforms to ratchet up human trafficking operations."[50] Indeed, the "mass-migration surge along the U.S. southern border has so overwhelmed Mexican cartel-associated smugglers that they are requiring their customers to wear numbered, colored, and labeled wristbands to denote payment and

---

[46] Gabrielle Fonrouge, *Mexican drug cartels using kids as decoys in to smuggle its members into US: sheriff*, NEW YORK POST (Mar. 22, 2021), https://nypost.com/2021/03/22/mexican-drug-cartels-use-kids-as-decoys-to-smuggle-members-into-us/.

[47] *Id.*

[48] Briana Chavez, *El Paso's former U.S. Marshal says Mexican cartels 'make money' from migrant influx*, KVIA (Mar. 18, 2021), https://kvia.com/news/border/2021/03/18/el-pasos-former-u-s-marshal-says-mexican-cartels-make-money-from-migrant-influx/.

[49] *Id.*

[50] Ben Ashford, *EXCLUSIVE: 'People are the new dope.' Mexican cartels are seizing on Biden's lax border policies to run multimillion-dollar human trafficking scheme and are using families as DECOYS to smuggle single adults and drugs from elsewhere*, DAILY MAIL (Mar. 22, 2021), https://www.dailymail.co.uk/news/article-9367713/Mexican-cartels-ratchet-human-trafficking-operations-amid-Bidens-relaxed-immigration-policy.html.

30

help them manage their swelling human inventory."[51]  However, if migrants " 'don't pay their debt then the cartel has the information about where they're going, but more importantly, they have the information on their families in home countries. ... 'From there, they can start the threats and hold them accountable through debt bondage, a form of human trafficking.  Either pay or we're going to come after your family.' "[52]

85.    Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law—including in preventing human trafficking and the surge of violent crimes associated with cartel smuggling.

86.    To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement. *See* Ex. B (hereinafter, the "Agreement"). The Agreement establishes a binding and enforceable commitment between DHS and Texas. *Id.* § II.

87.    The Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. B § II.

---

[51] Todd Bensman, *Overwhelmed Mexican Alien-Smuggling Cartels Use Wristband System to Bring Order to Business*, CENTER FOR IMMIGRATION STUDIES (Mar. 2, 2021), https://cis.org/Bensman/Overwhelmed-Mexican-AlienSmuggling-Cartels-Use-Wristband-System-Bring-Order-Business.
[52] *Id.*

31

88.     For example, DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. B § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect":

- "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement";

- "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country"; or

- "increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States."

Ex. B § III.A.2.a, c, f.

89.     The termination of MPP is an administrative action and decision that reduces immigration enforcement.  It likewise increases the number of removable or inadmissible aliens in the United States.

90.     The termination of MPP does so by removing a lawful means by which the Executive may prevent aliens without a clear basis for admission into the United States from absconding into the country pending appropriate removal proceedings. As noted above, 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), entitled "Mandatory Detention," states that aliens awaiting asylum hearings "shall be detained pending a final determination of credible fear of persecution," but Defendants routinely fail to detain them.  *See also id.* § 1225(b)(1)(B)(ii), (b)(2)(A).

91.     To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice of any proposed action" subject to the

32

consultation requirement. Ex. B § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id*. After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id*.

92.     The Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." Ex. B § VIII.

93.     To the extent DHS fails to comply with its obligations, the Agreement expressly provides for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. Ex. B § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id*. "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id*.

94.     The Agreement provides mechanisms by which it can be modified or terminated.   *See* Ex. B §§ XIV-XV. DHS purported to terminate the Agreement "effective immediately" by letter on February 2, 2021, but it did not provide the requisite 180 days' notice required for termination under the terms of the Agreement. Texas therefore treats DHS's letter as notice of intent to terminate, which will become

AR02523

effective after 180 days (*i.e.*, on August 1, 2021). The Texas Agreement remains binding until then.

## CLAIMS

### COUNT I
### (Arbitrary and Capricious Agency Action—Lack of Reasoned Decision-Making)

95.    Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

96.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.    The discontinuance of the MPP constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 701. Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of Defendants' discontinuance of the MPP. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

98.    Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

34

99.     DHS has previously recognized the importance of the MPP.  The discontinuance of the MPP represents a sharp departure from DHS's previous policy. In a two-sentence memorandum published on January 20, DHS suspended the carefully crafted and assessed MPP program created during the prior Administration. DHS provided no reasoning, much less sufficient reasoning, for the immediate suspension of new enrollments into the program.  The current Administration failed to consider the benefits of the MPP program (and the costs of not having it), as detailed by the prior Administration.  Failing to consider important costs of a new policy renders that policy arbitrary and capricious.  *See Michigan*, 135 S. Ct. at 2706 ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.' ").

100.     Then, in the June 1 Memorandum, DHS attempted to shore up its earlier decision. DHS's belated justification in the June 1 Memorandum was made only after Plaintiff States filed suit against Defendants and moved for a preliminary injunction, and after Defendants filed a thin administrative record that merely consists of the January 20 Memorandum.

101.     The June 1 Memorandum is still arbitrary and capricious, and woefully insufficient to justify DHS's action. As the June 1 Memorandum itself reveals, DHS still failed to consider many important aspects of the problem before it.  For example, DHS routinely fails to detain illegal immigrants in the interior, notwithstanding its statutory obligation to do so under 8 U.S.C. § 1225, and this is not mentioned at all in the June 1 Memorandum.  While DHS stated in the June 1 Memorandum that the United States is a "nation of laws" where its "immigration laws … will be enforced,"

35

that statement is contradicted by the fact that discontinuing MPP will result in systematic violation of the detention requirements in Section 1225. Nowhere in the June 1 Memorandum does DHS address that aspect of the problem, or acknowledge that, before MPP, detention-capacity constraints or court orders forced DHS to release tens of thousands of aliens into the United States, where many disappeared. Nor does the June 1 Memorandum acknowledge the role of MPP in permitting DHS to avoid violating its statutory detention obligations under Section 1225.

102.    As an additional example, although the June 1 Memorandum refers to the impact of COVID-19 on the cost of maintaining MPP facilities, it fails to consider the public health risks and impact of admitting tens of thousands of potentially COVID-19 positive migrants into the United States, another important part of the problem left unaddressed by DHS. While the June 1 Memorandum states that DHS has considered "the potential impact to DHS operations" if CDC's Title 42 restrictions are lifted, it does not state that DHS has given any consideration to the public health risks in border states and the United States' interior from releasing new waves of potentially COVID-19 positive migrants into communities.

103.    In addition, while the June 1 Memorandum discusses the impact of the closure of immigration courts due to COVID-19—i.e., from March 2020 to April 2021—it does not state that they remain closed, so this cannot be a relevant consideration to discontinue the MPP prospectively. Immigration courts were not the only places that experienced delays and costs because of COVID-19 shutdowns during that period, so this consideration does not (and cannot) reflect poorly on the success

36

of MPP, particularly when it was successfully implemented well before the COVID-19 pandemic.

104.    Furthermore, one of the most important points in favor of MPP was that it discouraged Northern Triangle migrants from making the dangerous trek across Mexico in the first place.  The prior Administration touted MPP's success on this critical point.  But the June 1 Memorandum does not consider or discuss this point, and it certainly provides no data to dispute the prior Administration's assessment the MPP deterred and discouraged Northern Triangle migrants from making the dangerous trek in the first place (and thus making themselves vulnerable to cartels and human traffickers).

105.    Even more, while the June 1 Memorandum discusses how the MPP failed to expeditiously process applicants for asylum waiting in Mexico, it merely talks about how this "raises questions," not any policy conclusions.  And DHS fails to consider more limited alternatives, such as accelerating the process for processing migrants.  In fact, the June 1 Memorandum talks about planning to accelerate consideration of asylum applications, including the "Dedicated Docket," but DHS fails to consider that as a more limited alternative to discontinuing MPP outright.  Although the June 1 Memorandum lists the alternatives DHS considered—"maintaining the status quo" and "resuming new enrollments in the program"—nothing else was considered according to that Memorandum.

106.    The June 1 Memorandum is also arbitrary and capricious for failure to consider additional important aspects of the problem, failure to engage in reasoned

37

decision-making, and failure to provide an adequate explanation for agency action, on other grounds as well.

## COUNT II
### (Arbitrary and Capricious Agency Action—Failure to Consider State Reliance Interests)

107.   Even had DHS considered the costs and benefits to the United States from the MPP, DHS was also obligated to consider the costs of ending the MPP to the States.  It transparently failed to do so, having made its decision without seeking input from Texas and Missouri and without inquiring about the costs Texas and Missouri bear from illegal immigration.  DHS ignored the harms that discontinuing the MPP will cause, such as increased costs to states, which "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.  Certainly, the January 20 Memorandum did not analyze those costs.  This, too, was arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706.

108.   DHS particularly failed to consider whether "there was 'legitimate reliance' on the" prior administration's method of using the MPP as an indispensable tool in bilateral efforts to address the migration crisis by diminishing incentives for illegal immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  That was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered

38

serious reliance interest that must be taken into account.' " *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

109.    The June 1 Memorandum's belated justification is still arbitrary and capricious.

110.    Indeed, DHS still failed to consider State reliance interests, as there is no mention of such interests in the June 1 Memorandum.  On information and belief, DHS did not seek any input from States—including Plaintiff States—before adopting the June 1 Memorandum, and gave them no opportunity for comment or input.  Instead, Plaintiff States found out about the June 1 Memorandum from DHS's litigation counsel after the memorandum was issued.

111.    The June 1 Memorandum discusses the impact on "border communities," but it cites only "interagency and nongovernmental partners," "nongovernmental organizations," and "local communities," and not States like Plaintiff States.  This strongly indicates that DHS did not consider the States' reliance interests.

112.    Because the June 1 Memorandum reflects no consideration of the States' interests in enforcement of immigration policy, it is arbitrary and capricious.

## COUNT III
### (Arbitrary and Capricious Agency Action—Failure to Consider Alternative Approaches)

113.    But even had the Administration considered the States' costs as well—and it did not—it failed to consider whether it could achieve its (unstated) goals through a less-burdensome or less-sweeping means.  This too rendered its resulting

39

decision arbitrary and capricious.

114. The January 20 Memorandum failed to consider alternative approaches that would allow at least some additional enrollments to continue, and that would have accordingly imposed less-significant burdens on the States. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued " 'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51). The January 20 Memorandum categorically suspends *all* new enrollments into the MPP.

115. By omitting any analysis of continuing at least some enrollments into the MPP, DHS "failed to consider important aspects of the problem" before it. *Id.* at 1910 (alterations and citation omitted).

116. The June 1 Memorandum, likewise, fails to meaningfully consider more limited policies than complete discontinuation of MPP.

117. In fact, the June 1 Memorandum makes clear that DHS did not give meaningful consideration to more limited policies than complete termination of MPP. Though the Memorandum recites that the Secretary "considered various alternatives," the only alternatives actually identified are "maintaining the status quo [*i.e.*, no enrollments at all] or resuming new enrollments into the program." Ex. C at 5. No other more limited policy is identified as considered in the June 1 Memorandum.

118. On information and belief, Defendants did not give any meaningful

40

consideration to more limited policies before terminating the program. Indeed, the June 1 Memorandum states that "termination is most consistent with the Administration's broader policy objectives," *id.* at 6, indicating that no more limited policies were given serious consideration.

## COUNT IV
### (Arbitrary and Capricious Agency Action—No Stated Basis for Agency Action)

119. Even if there were some way to explain or justify DHS's decision, it would be irrelevant because DHS did not provide any such explanation or justification in the January 20 Memorandum. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Because DHS failed to provide *any* grounds for its decision, it is precluded from asserting new grounds before this Court—and therefore its termination of the MPP is necessarily arbitrary.

120. Further, by suspending new enrollees into the MPP program, DHS is precluded from complying with the congressionally-enacted statutory framework detailed above and provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States.

121. Because DHS does not sufficiently explain its sudden departure from implementing the MPP program, the January 20 Memorandum suspending new

AR02531

enrollees into the MPP is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

122.    Each of these numerous flaws renders DHS's decision legally invalid. Yet that invalid suspension will cause Texas and Missouri irreparable injury that cannot be remedied adequately at law.  Texas and Missouri are therefore entitled to injunctive relief to enforce DHS's obligations under the applicable law.

123.    And DHS's explanation for discontinuing the MPP in the June 1 Memorandum cannot justify the January 20 Memorandum because it constitutes impermissible post hoc rationalization that should be given no consideration.  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1908-10.  Thus, it fails to cure the inadequacy of explanation in the January 20 Memorandum.

## COUNT V
### (Failure to Provide Notice to, and Consult with, Texas)

124.    DHS discontinued MPP without following the notice-and-consultation requirements contained in the Agreement.

125.    The Agreement is currently in effect and remains so until August 1, 2021.

126.    Discontinuing MPP is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).

127.    Discontinuing MPP exceeds the authority DHS can delegate to Acting Secretary Pekoske, Secretary Mayorkas, and anyone charged with discontinuing implementation of the MPP and is therefore *ultra vires*.

42

128.   As a result of the discontinuance of the MPP, Texas "will be irreparably damaged and will not have an adequate remedy at law."  Ex. A § VI.  Texas is therefore "entitled ... to injunctive relief ... to enforce [DHS's] obligations" under the Agreement.  *Id*. § VI.

## COUNT VI
### (Violation of Section 1225)

129.   The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."   5 U.S.C. § 706(2)(A), (C).

130.   Federal law directs the Executive to detain virtually all aliens applying for admission into the United States.  The Executive "shall ... detain[]" any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings. 8 U.S.C. § 1225(b)(2)(A).  In lieu of detention, a second subparagraph of the same section permits the Executive, for aliens "arriving on land ... from a foreign territory contiguous to the United States," to optionally "return the alien to that territory pending" removal proceedings.  8 U.S.C. § 1225(b)(2)(C).  These provisions give the Executive an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous to the United States:" either detain the alien pending removal proceedings, or otherwise return him to the country from which he arrived pending removal proceedings.

131.   Though it could create such capacity if it chose to do so, the Executive

43

presently lacks the capacity to detain the vast majority of the tens of thousands of aliens arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States. Through MPP, the Executive was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.

132.    Discontinuing the MPP will necessarily cause the Executive to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings. Because the Executive cannot detain many of these aliens, tens of thousands will instead abscond into the United States and fail to show up for statutorily required removal proceedings. 83 Fed. Reg. 55,946.

133.    This release provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States—notwithstanding that these aliens have no legal entitlement to enter the country, much less remain in it.

134.    The June 1 Memorandum confirms that Defendants will unlawfully prioritize alternatives to detention, unlawfully fail to detain illegal aliens, and unlawfully release illegal aliens into the interior of the United States, notwithstanding section 1225's directives and the ability to avoid these statutory violations through MPP.

135.    Discontinuing MPP therefore violates 8 U.S.C. § 1225.

AR02534

## COUNT VII
**(Failure to Take Care that the Laws be Faithfully Executed)**

136.   The Constitution requires the President to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.

137.   This constitutional limitation is binding on agencies and officers exercising executive power.  *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

138.   Discontinuing MPP violates the Executive's Take Care Clause obligations in two ways:  first, by placing the Executive in a position where it will necessarily violate a statutory framework obligating it to detain or otherwise return aliens, and second, by predictably allowing (and encouraging) more aliens to illegally enter into the United States and violate immigration-law requirements once released into the interior.

139.   The June 1 Memorandum confirms that Defendants will unlawfully prioritize alternatives to detention, and unlawfully fail to detain illegal immigrants, and unlawfully release illegal aliens into the interior of the United States, notwithstanding section 1225's directives and the ability to avoid these statutory violations through MPP.

140.   Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

141.   This constitutional violation is also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers.  *See Armstrong v.*

45

*Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Hold unlawful and set aside Defendants' discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both;

b.      Declare that Defendants' discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both—is unlawful;

c.      Issue preliminary and permanent injunctive relief enjoining Defendants nationwide from enforcing or implementing the discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both;

d.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to continue implementing the MPP, including, without limitation, resuming enrollments into the program;

e.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to enforce or implement the MPP;

f.      Award Texas and Missouri the costs of this action and reasonable attorney's fees; and

g.      Award such other and further relief as the Court deems equitable and just.

AR02536

Dated: June 3, 2021

Respectfully submitted.

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ D. John Sauer
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ William T. Thompson
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Attorney-in-Charge
Texas Bar No. 24088531

Counsel for Plaintiff State of Missouri

*Admitted pro hac vice

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

Counsel for Plaintiff State of Texas

AR02537

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 3, 2021, which automatically serves all counsel of record who are registered to receive notices in this case.

/s/ *William T. Thompson*
WILLIAM T. THOMPSON

AR02538

# THE 1951 CONVENTION
## RELATING TO THE STATUS OF REFUGEES
# AND ITS 1967 PROTOCOL



AR02539

UNHCR
The UN Refugee Agency

Cover:
**Kenya: Somali refugee women.**

UNHCR / B. BANNON / KEN-2011



For more information about:

**UNHCR and its work on refugees**

Visit UNHCR's website at www.unhcr.org

You can also consult relevant *Conclusions on International Protection of UNHCR's Executive Committee* at http://www.unhcr.org/pages/49e6e6dd6.html

**Information relating to the Commemorations:**

Visit UNHCR's website at www.unhcr.org/commemorations

**International law relating to the protection of refugees and other persons of concern:**

Visit UNHCR's Refworld at www.refworld.org/, containing a vast collection of documents relating to situations in countries of origin, protection policy and legal positions, international instruments, case law, and national legislation.

## A PERSONAL APPEAL FROM THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES

Refugees are among the most vulnerable people in the world. The 1951 Refugee Convention and its 1967 Protocol help protect them. They clarify the rights of refugees and the obligations of the 148 States that are party to one or both of these instruments. Universal accession to the Refugee Convention is a valid and achievable goal. In this anniversary year of the Convention, I appeal to all non-signatory States to accede to it and pledge the full support of my Office to governments to help implement its provisions.

António Guterres
UN High Commissioner for Refugees



Published by:

UNHCR
P.O. Box 2500
1211 Geneva 2
Switzerland

UNHCR, September 2011

**AR02540**

UNHCR / DIP•1951 CONV. / Q&A A.8 / ENG1

# THE LEGAL FRAMEWORK
# FOR PROTECTING REFUGEES

I N  T H E  A F T E R M A T H  O F  W O R L D  W A R  I  (1914-1918), millions of people fled their homelands in search of refuge. Governments responded by drawing up a set of international agreements to provide travel documents for these people who were, effectively, the first refugees of the 20th century. Their numbers increased dramatically during and after World War II (1939-1945), as millions more were forcibly displaced, deported and/or resettled.

Throughout the 20th century, the international community steadily assembled a set of guidelines, laws and conventions to ensure the adequate treatment of refugees and protect their human rights. The process began under the League of Nations in 1921. In July 1951, a diplomatic conference in Geneva adopted the Convention relating to the Status of Refugees ('1951 Convention'), which was later amended by the 1967 Protocol. These documents clearly spell out who is a refugee and the kind of legal protection, other assistance and social rights a refugee is entitled to receive. It also defines a refugee's obligations to host countries and specifies certain categories of people, such as war criminals, who do not qualify for refugee status. Initially, the 1951 Convention was more or less limited to protecting European refugees in the aftermath of World War II, but the 1967 Protocol expanded its scope as the problem of displacement spread around the world.

These instruments have also helped inspire important regional instruments such as the 1969 OAU Refugee Convention in Africa, the 1984 Cartagena Declaration in Latin America and the development of a common asylum system in the European Union. Today, the 1951 Convention and 1967 Protocol together remain the cornerstone of refugee protection, and their provisions are as relevant now as when they were drafted.

**AR02541**

# WHY DO REFUGEES NEED PROTECTION?

**S**tates are responsible for protecting the fundamental human rights of their citizens. When they are unable or unwilling to do so – often for political reasons or based on discrimination – individuals may suffer such serious violations of their human rights that they have to leave their homes, their families and their communities to find sanctuary in another country. Since, by definition, refugees are not protected by their own governments, the international community steps in to ensure they are safe and protected.

# IS THE 1951 CONVENTION STILL RELEVANT IN TODAY'S WORLD?

**T**he realities of conflict, violence and persecution continue to cause displacement. Refugee protection remains urgently needed by those forced to leave their countries. The 1951 Convention and its 1967 Protocol are the only global legal instruments explicitly covering the most important aspects of a refugee's life. According to their provisions, refugees deserve, as a minimum, the same standards of treatment enjoyed by other foreign nationals in a given country and, in many cases, the same treatment as nationals. The 1951 Convention also recognizes the international scope of the refugee problem and the importance of international solidarity and cooperation in trying to resolve them.

The 1951 Convention has shown remarkable resilience over the last 60 years as the nature of conflict as well as patterns of migration have changed. The international system of refugee protection has helped to protect millions of people in a wide variety of situations. As long as people continue to be persecuted, there will be a need for the 1951 Convention and its 1967 Protocol.

**AR02542**

# PROTECTING REFUGEES
# WITH THE 1951 CONVENTION

## WHO DOES THE 1951 CONVENTION PROTECT?

The 1951 Convention protects refugees. It defines a refugee as a person who is outside his or her country of nationality or habitual residence; has a well-founded fear of being persecuted because of his or her race, religion, nationality, membership of a particular social group or political opinion; and is unable or unwilling to avail him— or herself of the protection of that country, or to return there, for fear of persecution (*see Article 1A(2)*).

People who fulfill this definition are entitled to the rights and bound by the duties contained in the 1951 Convention.

## WHAT IS THE DIFFERENCE BETWEEN A REFUGEE AND A MIGRANT?

Refugees are forced to flee because of a threat of persecution and because they lack the protection of their own country.

A migrant, in comparison, may leave his or her country for many reasons that are not related to persecution, such as for the purposes of employment, family reunification or study. A migrant continues to enjoy the protection of his or her own government, even when abroad.

## IS REFUGEE PROTECTION PERMANENT?

The protection provided under the 1951 Convention is not automatically permanent.

A person may no longer be a refugee when the basis for his or her refugee status ceases to exist. This may occur when, for example, refugees voluntary repatriate to their home countries once the situation there permits such return. It may also occur when refugees integrate or become naturalized in their host countries and stay permanently.

## CAN SOMEONE BE EXCLUDED FROM REFUGEE PROTECTION?

Yes. The 1951 Convention only protects persons who meet the criteria for refugee status. Certain categories of people are considered not to deserve refugee protection and should be excluded from such protection.

This includes persons for whom there are serious reasons to suspect that:

● they have committed a crime against peace, a war crime, a crime against humanity or a serious non-political crime outside their country of refuge; or

● they are guilty of acts contrary to the purposes and principles of the United Nations.

**AR02543**

## WHAT RIGHTS DO REFUGEES HAVE UNDER THE 1951 CONVENTION?

The 1951 Convention contains a number of rights and also highlights the obligations of refugees towards their host country. The cornerstone of the 1951 Convention is the principle of *non-refoulement* contained in Article 33. According to this principle, a refugee should not be returned to a country where he or she faces serious threats to his or her life or freedom. This protection may not be claimed by refugees who are reasonably regarded as a danger to the security of the country, or having been convicted of a particularly serious crime, are considered a danger to the community.

Other rights contained in the 1951 Convention include:

- The right not to be expelled, except under certain, strictly defined conditions (Article 32);

- The right not to be punished for illegal entry into the territory of a contracting State (Article 31);

- The right to work (Articles 17 to 19);

- The right to housing (Article 21);

- The right to education (Article 22);

- The right to public relief and assistance (Article 23);

- The right to freedom of religion (Article 4);

- The right to access the courts (Article 16);

- The right to freedom of movement within the territory (Article 26); and

- The right to be issued identity and travel documents (Articles 27 and 28).

Some basic rights, including the right to be protected from *refoulement*, apply to all refugees. A refugee becomes entitled to other rights the longer they remain in the host country, which is based on the recognition that the longer they remain as refugees, the more rights they need.

## WHAT RIGHTS DOES THE 1967 PROTOCOL CONTAIN?

The 1967 Protocol broadens the applicability of the 1951 Convention. The 1967 Protocol removes the geographical and time limits that were part of the 1951 Convention. These limits initially restricted the Convention to persons who became refugees due to events occurring in Europe before 1 January 1951.

## DOES A REFUGEE ALSO HAVE OBLIGATIONS?

Refugees are required to abide by the laws and regulations of their country of asylum and respect measures taken for the maintenance of public order.

**AR02544**

## WHO DETERMINES WHETHER A PERSON IS A REFUGEE? HOW IS THIS DONE?

Protecting refugees is primarily the responsibility of States. This may be done by an individual or group assessment as to whether they meet the definition in the Convention. Although the 1951 Convention does not prescribe a particular procedure for the determination of whether a person is a refugee, where an individual assessment is the preferred approach, any procedures must be fair and efficient. This would require that States designate a central authority with the relevant knowledge and expertise to assess applications, ensure procedural safeguards are available at all stages of the process and permit appeals or reviews of initial decisions. UNHCR has been tasked to assist States to establish such procedures.

## IS THE 1951 CONVENTION THE ONLY INSTRUMENT RELEVANT TO THE RIGHTS OF REFUGEES?

No. The 1951 Convention is the only global legal instrument dealing with the status and rights of refugees. In addition to the 1951 Convention, there are several conventions and declarations that are of particular relevance in specific regions. For example, there are legal instruments on refugees that apply in Africa, Latin America and the European Union. There is also a substantial body of international human rights law that complements the rights of refugees in the 1951 Convention. States are already committed to protecting the human rights of refugees through their human rights obligations, not least the right to live in security and with dignity.

## CAN A COUNTRY THAT HAS NOT SIGNED THE 1951 CONVENTION REFUSE TO ADMIT A PERSON SEEKING PROTECTION?

The principle of *non-refoulement*, which prohibits the return of a refugee to a territory where his or her life or freedom is threatened, is considered a rule of customary international law. As such it is binding an all States, regardless of whether they have acceded to the 1951 Convention or 1967 Protocol. A refugee seeking protection must not be prevented from entering a country as this would amount to refoulement.

**AR02545**

# HOW DOES UNHCR ASSIST STATES TO PROTECT REFUGEES?

**U**NHCR is mandated by the United Nations General Assembly to seek international protection and permanent solutions for refugees. It also has the responsibility to supervise the implementation of the 1951 Convention by States Parties. States Parties are required to cooperate with UNHCR, and provide relevant information and statistical data. UNHCR's role complements that of States, contributing to the protection of refugees by:

- Promoting accession to, and implementation of, refugee conventions and laws;
- Ensuring that refugees are treated in accordance with internationally recognized legal standards;
- Ensuring that refugees are granted asylum and are not forcibly returned to the countries from which they have fled;
- Promoting appropriate procedures to determine whether or not a person is a refugee according to the 1951 Convention definition and/or to other definitions found in regional conventions; and
- Seeking durable solutions for refugees.

### WHAT IS THE LINK BETWEEN UNHCR AND THE 1951 CONVENTION?

UNHCR serves as the 'guardian' of the 1951 Convention and its 1967 Protocol. The 1951 Convention expressly provides that States are expected to cooperate with UNHCR in ensuring that the rights of refugees are respected and protected.

**AR02546**

# THE IMPORTANCE OF ACCESSION TO THE 1951 CONVENTION

**WHY IS IT IMPORTANT FOR STATES TO ACCEDE TO THE 1951 CONVENTION AND ITS PROTOCOL?**

The refugee phenomenon is one of truly global proportions, affecting not only millions of marginalized people directly but also the policies and practices of virtually every government in the world. To help tackle this problem UNHCR believes that it is necessary to broaden the base of State support for these refugee instruments, ensuring that the protection provided to refugees is more universal in scope and the burdens and responsibilities of governments are more equitably distributed and consistently applied.

When a State accedes to the 1951 Convention:

- it demonstrates its commitment to treating refugees in accordance with internationally recognized legal and humanitarian standards;
- it gives refugees a possibility to find safety;
- it helps to avoid friction between States over refugee questions. Granting asylum is a peaceful, humanitarian and legal act rather than a hostile gesture, and should be understood by the refugee's country of origin as such;
- it demonstrates its willingness to share the responsibility for protecting refugees; and
- it helps UNHCR to mobilize international support for the protection of refugees.

**AR02547**

**?**
**Q**UESTIONS
**&**ANSWERS

# FREQUENTLY ASKED QUES

## ■ How to accede to the 1951 Convention?

A State can accede to the 1951 Convention at any time by depositing a so-called "instrument of accession" with the United Nations Secretary-General. The instrument of accession must be signed by the Head of State or Government or the Foreign Minister, and is then usually transmitted through the Representative of the acceding country accredited to the United Nations Headquarters in New York. A model instrument for accession to the 1951 Convention can be found in Annex I.

When acceding to the 1951 Convention, States must make a declaration as to whether they choose alternative (a) or (b) of Article 1B(1) of the 1951 Convention.[1] Nearly all States Parties to the 1951 Convention have accepted the wider alternative and acknowledge events "occurring in Europe and elsewhere"; and almost all States that originally introduced the geographical limitation as per alternative (a) have since withdrawn it.

---

[1]*Article 1B(1) states: "For the purpose of this Convention, the words 'events occurring before 1 January 1951' in Article 1, Section A, shall be understood to mean either:*

*(a) 'events occurring in Europe before 1 January 1951' or*

*(b) 'events occurring in Europe and elsewhere before 1 January 1951',*

*and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention."*

## ■ How to accede to the 1967 Protocol?

States wishing to accede to the 1967 Protocol must follow a similar procedure as for accession to the 1951 Convention. Accession to the 1967 Protocol obliges the acceding State to apply the provisions of the 1951 Convention without any temporal or geographical limitations, unless in relation to the latter they maintain a declaration under paragraph (a) of Article 1B(1) of the 1951 Convention. A model instrument for accession to the Protocol can be found in Annex II.

## ■ Can a State accede simultaneously to both the 1951 Convention and the 1967 Protocol?

Yes. In fact, most States have done so. When acceding simultaneously to both instruments, States must still make a formal declaration regarding the geographical application under 1B(1) of the 1951 Convention.

**AR02548**



# TIONS ABOUT ACCESSION

## ■ What happens in situations of State succession?

In cases where States have been disintegrated or divided in parts, the new States are in principle bound by treaties to which the predecessor State was a State Party. These new States should notify the Secretary-General as the depository of the 1951 Convention and the 1967 Protocol accordingly of their succession to these treaties. Model instruments for succession to the Convention and Protocol can be found in Annexes III and IV.

## ■ Can a State adopt reservations to the provisions of the 1951 Convention and the 1967 Protocol?

In principle, reservations are permitted at the time of ratification or accession to the 1951 Convention. In accordance with Article 42 of the 1951 Convention, however, reservations may not be made to several of its fundamental provisions, namely:

- Article 1 (definition of the term "refugee");
- Article 3 (non-discrimination);
- Article 4 (freedom of religion);
- Article 16(1) (access to courts);
- Article 33 (non-refoulement); and
- Articles 36–46 (final clauses).

Upon accession to the 1967 Protocol, reservations may be made to any article(s) of the 1951 Convention, except those mentioned above. No reservations may be made to Article II of the 1967 Protocol, concerning cooperation with UNHCR.

Reservations must be compatible with the object and purpose of the 1951 Convention and 1967 Protocol and should not be expressed so broadly that it is impossible for other States Parties to determine their scope. Instead of a reservation, States can also make an "interpretative declaration". Such declarations do not modify the legal effects of a provision, but express a State's understanding of certain aspects of the 1951 Convention or 1967 Protocol.

## ■ Can reservations, once made, be withdrawn?

Yes. Over time, and in response to changes in circumstances, many States have withdrawn reservations made at the time of accession.

**AR02549**

**Annex I**

# MODEL INSTRUMENT OF ACCESSION TO THE CONVENTION RELATING TO THE STATUS OF REFUGEES OF 1951

WHEREAS a Convention Relating to the Status of Refugees was adopted by the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons on the 25th day of July, one thousand, nine hundred and fifty-one, and is open for accession pursuant to Article 39 thereof;

AND WHEREAS it is provided in section 3 of the said Article 39 that accession thereto shall be effected by deposit of an instrument with the Secretary-General of the United Nations;

NOW THEREFORE, the undersigned, [Title of Head of State or Government, or of Foreign Minister], hereby notifies the accession of [State concerned] to the said Convention, and declares that [State concerned] considers itself bound by alternative (b) of Article 1B(1) thereof, that is to say "events occurring in Europe or elsewhere before 1 January 1951".

GIVEN under my hand in _____ this _____ day of _____ two thousand and _____.

[Public Seal and
Signature of Custodian,
if appropriate]

[Signature of Head of State,
Head of Government or
Foreign Minister]

**AR02550**

# MODEL INSTRUMENT OF ACCESSION TO THE PROTOCOL RELATING TO THE STATUS OF REFUGEES OF 1967

Annex II

WHEREAS the Protocol Relating to the Status of Refugees was adopted by the General Assembly of the United Nations on the 16th day of December, one thousand, nine hundred and sixty six, and is open for accession pursuant to Article V thereof;

AND WHEREAS it is provided in Article V that accession thereto shall be effected by deposit of an instrument with the Secretary-General of the United Nations;

NOW THEREFORE, the undersigned, [Title of Head of State or Government, or of Foreign Minister], hereby notifies the accession of [State concerned] to the said Protocol.

GIVEN under my hand in _____ this _____ day of _____ two thousand and _____.

[Public Seal and
Signature of Custodian,
if appropriate]

[Signature of Head of State,
Head of Government or
Foreign Minister]

**AR02551**

# MODEL INSTRUMENT OF SUCCESSION TO THE CONVENTION RELATING TO THE STATUS OF REFUGEES OF 1951

WHEREAS the Convention Relating to the Status of Refugees, done at Geneva on 25 July 1951, was ratified by [Former State Party];

AND WHEREAS the Government of [Successor State] has examined the said Convention;

THE GOVERNMENT of [Successor State] declares that it regards the said Convention as continuing in force for [Successor State] and hereby succeeds to the same;

NOW THEREFORE, the undersigned, [Title of Head of State or Government, or of Foreign Minister], hereby notifies the succession of [Successor State] to the said Convention, and declares that [Successor State] considers itself bound by alternative (b) of Article 1B(1) thereof, that is to say "events occurring in Europe or elsewhere before 1 January 1951".

GIVEN under my hand in _____ this _____ day of _____ two thousand and _____.

[Public Seal and Signature of Custodian, if appropriate]

[Signature of Head of State, Head of Government or Foreign Minister]

**AR02552**

# MODEL INSTRUMENT OF SUCCESSION TO THE PROTOCOL RELATING TO THE STATUS OF REFUGEES OF 1967

WHEREAS the Protocol Relating to the Status of Refugees was adopted by the General Assembly of the United Nations on the 16th day of December, one thousand, nine hundred and sixty six, and was ratified by [Former State Party];

AND WHEREAS the Government of [Successor State] has examined the said Protocol;

THE GOVERNMENT of [Successor State] declares that it regards the said Protocol as continuing in force for [Successor State] and hereby succeeds to the same;

NOW THEREFORE, the undersigned, [Title of Head of State or Government, or of Foreign Minister], hereby notifies the succession of [Successor State] to the said Protocol.

GIVEN under my hand in _____ this _____ day of _____ two thousand and _____.

[Public Seal and
Signature of Custodian,
if appropriate]

[Signature of Head of State,
Head of Government or
Foreign Minister]

**AR02553**



**AR02554**

KeyCite Yellow Flag - Negative Treatment
Superseded by Statute as Stated in   Hamid v. Gonzales,   7th Cir.,   August 2, 2005

395 F.3d 123
United States Court of Appeals,
Third Circuit.

Napoleon Bonaparte AUGUSTE, Appellant

v.

Thomas RIDGE, Secretary, United States Department of Homeland Security; John Ashcroft, Attorney General of the United States; Michael Garcia, Assistant Secretary, Bureau of Immigration and Customs Enforcement (BICE); Anthony S. Tangeman, Director of Detention and Removal, BICE; John Carbone, Detention and Removal Field Office Director— New Jersey, BICE; Michael T. Abode, Warden, Middlesex County Adult Corrections Center.

No. 04–1739.
|
Argued Nov. 1, 2004.
|
Jan. 20, 2005.

**Synopsis**
**Background:** Haitian national who was removable based on his conviction of narcotics offense filed habeas petition for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). The United States District Court for the District of New Jersey, Joel A. Pisano, J., entered order denying petition, and alien appealed.

**Holdings:** The Court of Appeals, Fuentes, Circuit Judge, held that:

[1] regardless of whether term "torture," as used in the CAT, was intended to include specific intent requirement, and regardless of whether the shared understanding of President and the United States Senate, as part of ratification process, that term required a specific intent was consistent with understanding of that term in international community, this shared understanding, as codified in the Foreign

Affairs Reform and Restructuring Act (FARRA), governed interpretation of term in domestic context;

[2] Board of Immigration Appeals' (BIA's) interpretation of "specific intent" requirement, to impose same limitations as are ordinarily imposed by "specific intent" requirement under American criminal law, was not unreasonable;

[3] for alien to establish that there are "substantial grounds" for believing that he will be subjected to torture if removed, as required for grant of relief under the CAT, alien must establish that it is more likely than not that he will be subjected to torture if removed;

[4] fact that Haitian national, if removed to Haiti, would be detained indefinitely in Haitian prison did not rise to level of "torture," nor did deplorable conditions in Haitian prisons; and

[5] while isolated reports of physical beatings of prisoners by Haitian guards might constitute evidence of torture, alien failed to establish that such beatings were so pervasive that it was more likely than not that he would be subjected to such beatings if removed.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (25)

[1] **International Law**  🔑 Self-executing agreements;  implementing legislation

Treaties that are not self-executing do not create judicially-enforceable rights, unless they are first given effect by implementing legislation.

12 Cases that cite this headnote

[2] **International Law**  🔑 Self-executing agreements;  implementing legislation

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) is not self-executing, and does not create judicially-enforceable rights, except as given effect by implementing legislation.

16 Cases that cite this headnote

**[3]    Habeas Corpus**    🔑 Aliens

Although alien against whom removal order was entered based on his conviction of aggravated felony/drug trafficking crime was statutorily barred from filing petition for direct review in the Court of Appeals from decision of the Board of Immigration Appeals (BIA) that he was ineligible for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), he retained right to seek relief under habeas statute for alleged violations of the CAT, as implemented by the Foreign Affairs Reform and Restructuring Act (FARRA). Immigration and Nationality Act, § 242, 8 U.S.C.A. § 1252; Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242, 8 U.S.C.A. § 1231 note; 28 U.S.C.A. § 2241.

4 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship**    🔑 Substantial evidence in general

On direct petition for review in immigration case, Court of Appeals reviews factual findings made by immigration judge, or by the Board of Immigration Appeals (BIA), under "substantial evidence" standard.

**[5]    Habeas Corpus**    🔑 Aliens

On habeas review in immigration case, Court of Appeals' review is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion. 28 U.S.C.A. § 2241.

2 Cases that cite this headnote

**[6]    Habeas Corpus**    🔑 Aliens

Regulation-specific    jurisdiction-stripping provision of the Foreign Affairs Reform and

Restructuring Act (FARRA) did not deprive court of jurisdiction to review alien's habeas corpus petition, alleging that his removal would violate the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), where FARRA, which implemented the CAT, neither stated explicitly that court could not exercise jurisdiction over habeas corpus claims alleging violations of the CAT nor indicated, in unmistakably clear terms, Congress' intent to eliminate habeas jurisdiction over such claims. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(d), 8 U.S.C.A. § 1231 note; 28 U.S.C.A. § 2241; 8 C.F.R. § 208.16(c)(2).

2 Cases that cite this headnote

**[7]    International Law**    🔑 Legislative or executive construction

Interpretive views of government agencies that have been charged with negotiation and enforcement of treaty are entitled to great weight.

**[8]    International Law**    🔑 Punishment, torture, and genocide

Regardless of whether the term "torture," as used in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), was intended to include specific intent requirement, and regardless of whether the shared understanding of President and the United States Senate, as part of ratification process, that term required a specific intent to inflict severe pain and suffering was consistent with understanding of that term in international community, this shared understanding, as codified in the Foreign Affairs Reform and Restructuring Act (FARRA), governed interpretation of term in domestic context. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a)(5).

5 Cases that cite this headnote

**[9]**   **International Law**  ☞  **Purpose and intent**

Generally, courts should interpret treaties so as to give a meaning consistent with shared expectations of contracting parties.

1 Cases that cite this headnote

**[10]**   **International Law**  ☞  **Purpose and intent**

Though treaties should generally be interpreted in manner consistent with shared expectations of contracting parties, where President and the United States Senate express a shared consensus on meaning of treaty as part of the ratification process, that meaning is to govern in domestic context.

3 Cases that cite this headnote

**[11]**   **Aliens, Immigration, and Citizenship**  ☞  **Acts constituting torture**

Board of Immigration Appeals' (BIA's) interpretation of "specific intent" requirement incorporated in definition of "torture," as used in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), to impose same limitations as are ordinarily imposed by "specific intent" requirement under American criminal law, was not unreasonable, though the CAT is not concerned with criminal prosecution; "specific intent" standard is term of art well-known in American jurisprudence, and the BIA could rely on this jurisprudence to conclude that, in order for act to constitute "torture" under the CAT as implemented by the FARRA, there must be showing that actor had both intent to commit the act and intent to achieve the consequences of that act, i.e., infliction of severe pain and suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a)(5).

16 Cases that cite this headnote

**[12]**   **Aliens, Immigration, and Citizenship**  ☞  **Law questions**

Board of Immigration Appeals' (BIA's) interpretation and application of immigration law are subject to *Chevron* deference.

1 Cases that cite this headnote

**[13]**   **Aliens, Immigration, and Citizenship**  ☞  **Law questions**

Court of Appeals must defer to the Board of Immigration Appeals' (BIA's) interpretation of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), to extent that the CAT involves issues of immigration law which may implicate questions of foreign relations.

2 Cases that cite this headnote

**[14]**   **Aliens, Immigration, and Citizenship**  ☞  **Standard for relief**

For alien to establish that there are "substantial grounds" for believing that he will be subjected to torture if removed to proposed country of removal, as required for grant of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), alien must establish that it is more likely than not that he will be subjected to torture if removed. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.16(c)(2).

8 Cases that cite this headnote

**[15]**   **Habeas Corpus**  ☞  **Review de novo**

Court of Appeals would review de novo district court's denial of alien's petition for habeas relief on theory that his removal to Haiti would violate rights that he possessed under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA). Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note.

**[16]     Aliens, Immigration, and Citizenship**  🔑  Law questions

Board of Immigration Appeals' (BIA's) interpretation and application of its own regulations is entitled to great deference.

3 Cases that cite this headnote

**[17]     Aliens, Immigration, and Citizenship**  🔑  Standard and Scope of Review

Deference to the Executive Branch is especially appropriate in immigration context, where officials exercise especially sensitive political functions that implicate questions of foreign relations.

**[18]     Aliens, Immigration, and Citizenship**  🔑  Standard for relief

**Aliens, Immigration, and Citizenship**  🔑  Presumptions and Burden of Proof

Alien applying for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), bears burden of establishing that it is more likely than not that he will be tortured if removed to proposed country of removal. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.16(c)(2).

15 Cases that cite this headnote

**[19]     Aliens, Immigration, and Citizenship**  🔑  Standard for relief

Standard for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) has no subjective component, but instead requires alien to establish, by objective evidence, that he is entitled to relief.

2 Cases that cite this headnote

**[20]     Aliens, Immigration, and Citizenship**  🔑  Relief Under Treaties Against Torture

For an act to constitute "torture" under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for some illicit or proscribed purpose; (4) by or at instigation of, or with consent or acquiescence of, public official who has custody or physical control of alien; and (5) not arising from lawful sanctions. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a).

42 Cases that cite this headnote

**[21]     Aliens, Immigration, and Citizenship**  🔑  Weight and Sufficiency

Alien's uncorroborated testimony, if credible, may be sufficient to sustain his burden of proof on claim for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).

8 Cases that cite this headnote

**[22]     Aliens, Immigration, and Citizenship**  🔑  Relief Under Treaties Against Torture

**International Law**  🔑  Private parties; privately enforceable rights

If alien satisfies burden of establishing right to relief under the United Nations Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), then withholding of removal is mandatory.

6 Cases that cite this headnote

**[23]** **Aliens, Immigration, and Citizenship** 🔑 Acts constituting torture

Fact that Haitian national, if removed to Haiti, would be detained indefinitely in Haitian prison due to combined effect of Haitian government's policy of preventively detaining criminal deportees and of his own prior United States conviction of narcotics offense did not rise to level of "torture," such as would provide basis for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), given complete lack of evidence that Haitian authorities were detaining criminal deportees with specific intent to inflict severe physical or mental pain or suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a).

25 Cases that cite this headnote

**[24]** **Aliens, Immigration, and Citizenship** 🔑 Acts constituting torture

Deplorable nature of conditions inside prison where Haitian national would be detained if he were removed to Haiti, which were so crowded that inmates allegedly had to sleep sitting or standing up, and in which lack of sanitation facilities allegedly meant that prison floors were covered with urine and feces, did not rise to level of "torture," such as would provide basis for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), where prison conditions appeared to be result of budgetary and management problems, not of any specific intent to inflict severe physical or

mental pain or suffering; mere fact that Haitian authorities had knowledge of severe pain and suffering that might result from incarcerating detainees in such conditions did not support finding that they intended to inflict severe pain and suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a).

35 Cases that cite this headnote

**[25]** **Aliens, Immigration, and Citizenship** 🔑 Standard for relief

While isolated reports of physical beatings of prisoners by Haitian guards might constitute evidence of torture, Haitian national failed to establish that such beatings were so pervasive within prisons in Haiti that it was more likely than not that he would be subjected to such beatings if returned to Haiti and imprisoned pursuant to Haiti's policy of detaining criminal deportees; alien did not claim that he had been tortured in past and failed to make requisite showing for grant of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA). Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.16(c)(2).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*128** Robert W. Brundige, Renee C. Redman (Argued), Sarah Loomis Cave, Laurence Burger, Hughes Hubbard & Reed LLP, New York, The Legal Aid Society, Janet Sabel, Supervising Attorney, Immigration Law Unit, Bryan Lonegan, New York, for Appellant, of counsel.

Christopher J. Christie, United States Attorney, District of New Jersey, Stuart A. Minkowitz (Argued), Assistant United States Attorney, District of New Jersey, Newark, Robert D.

McCallum, Jr., Assistant Attorney General, Margaret Perry, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, Civil Division, Washington, for Appellees.

Before ALITO, FUENTES, and BECKER, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

Napoleon Bonaparte Auguste appeals from the District Court's denial of his petition for writ of habeas corpus seeking relief under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT" or "Convention"). Auguste, who is facing removal to Haiti, claims that he will be indefinitely detained upon his arrival in Haiti in prisons that are notorious for their brutal and deplorable conditions that have been compared to those existing on slave ships. There is no doubt that the prison conditions that Auguste and others like him may face upon their removal to Haiti are indeed miserable and inhuman. However, because we hold that in order to constitute torture, an act must be inflicted with the specific intent to cause severe physical or mental pain and suffering, the standard the President and Senate understood as applying when the United States ratified the CAT, we find that Auguste is not entitled to relief. Accordingly, we will affirm the decision of the District Court.

## I. Background

Auguste, a twenty-seven year old male, is a native and citizen of Haiti who was admitted to the United States as a lawful permanent resident on December 8, 1987. His entire family lives in the United States. On April 4, 2003, Auguste was convicted of Attempted Criminal Sale of a Controlled Substance (cocaine) in the third degree in Queens County, New York, and sentenced to ten months imprisonment.

On July 3, 2003, the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, issued a notice to appear charging Auguste with removal on two grounds: (1) as an alien who has been convicted of a controlled substance violation pursuant to § 237(a)(2)(B)(i) of the Immigration and Nationality Act (the "INA" or "Act"), 8 U.S.C. § 1227(a)(2)(B)(i), and (2) as an alien who has been convicted of an aggravated felony/attempted drug trafficking crime pursuant to § 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii).

**\*129**  Auguste did not contest his eligibility for deportation as charged and instead, as his defense, applied for deferral of removal under the CAT and its implementing regulations. With regards to his claim for relief under the CAT, Auguste argued that he was entitled to a deferral of removal on the grounds that he faces torture in Haiti because, as a deported drug offender, he will be detained by Haitian authorities for an indeterminate amount of time in harsh and intolerable prison conditions.

### A. Conditions in Haitian Prisons

Since at least 2000, it has been the policy of the Haitian government to detain deported Haitians, who have incurred a criminal record while residing in the United States and who have already served their sentences, in preventive detention. The policy appears to have been motivated by the belief that criminal deportees pose a threat of recidivist criminal behavior after their return to Haiti. The length of the detention can vary, lasting in many instances upwards of several months. Auguste contends that release often depends on the family members of the deportees petitioning the Haitian Ministry of Interior for release and their ability to pay anywhere between $1,000 to $20,000.

Documentary evidence submitted by Auguste in support of his CAT claim describes the brutal and harsh conditions that exist in the Haitian prison system. We recount briefly some of these conditions. The prison population is held in cells that are so tiny and overcrowded that prisoners must sleep sitting or standing up, and in which temperatures can reach as high as 105 degrees Fahrenheit during the day. Many of the cells lack basic furniture, such as chairs, mattresses, washbasins or toilets, and are full of vermin, including roaches, rats, mice and lizards. Prisoners are occasionally permitted out of their cells for a duration of about five minutes every two to three days. Because cells lack basic sanitation facilities, prisoners are provided with buckets or plastic bags in which to urinate and defecate; the bags are often not collected for days and spill onto the floor, leaving the floors covered with urine and feces. There are also indications that prison authorities provide little or no food or water, and malnutrition and starvation is a continuous problem. Nor is medical treatment provided to prisoners, who suffer from a host of diseases including tuberculosis, HIV/AIDS, and Beri–Beri, a life-threatening disease caused by malnutrition. At least one source provided

by Auguste likened the conditions in Haiti's prisons to a "scene reminiscent of a slave ship."

There are also reports of beatings of prisoners by guards. State Department reports on conditions in Haiti in 2001 and 2002 discussed police mistreatment of prisoners and noted that there were isolated allegations of torture by electric shock, as well as instances in which inmates were burned with cigarettes, choked, or were severely boxed on the ears, causing ear damage. The authorities' record of disciplining police misconduct was, however, inconsistent.

The Department of State reported that Haiti remains a "very poor" country, and that the prison system operates at or near the same budget level as in 1995. Despite attempts at increasing the budgetary allocation for prisons, political instability in Haiti was expected to cause a continuation of budgetary freezes.

### B. The Convention Against Torture

Auguste seeks protection under Article 3 of the Convention. *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, **\*130** art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987). Because the history of ratification of the Convention by the United States will prove relevant to resolving Auguste's habeas claim, we recount that history in some detail.

The CAT was adopted by the United Nations General Assembly on December 10, 1984, with the stated purpose to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." *See* Preamble to Convention, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85. The CAT represented a continuing process in the codification of an international legal norm condemning the practice of torture by public officials, a norm first recognized in several prior multilateral agreements. [1] As the preamble to the CAT recognizes, it is the obligation of nations under the United Nations Charter to "promote universal respect for, and observance of, human rights and fundamental freedoms." *See* Preamble to Convention, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85. Since opening for signature in December 1984, over 130 countries have signed and/or become parties to the Convention. [2]

[1] *See, e.g.,* U.N. Charter, chap. IX, art. 55, para. c (directing United Nations member countries to promote "universal respect for, and observance of, human rights and fundamental freedoms for all"); Universal Declaration of Human Rights, art. 5, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"); International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 7, 999 U.N.T.S. 171, 6 I.L.M. 368 (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"). *See generally* J Herman Burgers & Hans Danelius, The United Nations Convention against Torture: A Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 5–30 (1988).

[2] *See* Status of the Ratification of the Convention against Torture (visited Nov. 24, 2004) (http://www.ohchr.org/english/law/cat-ratify.htm).

Article 1 of the CAT defines torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, whether such pain or suffering is inflicting by or at the instigation of or within the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incident to lawful sanctions.

Art. 1(1), S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85. In turn, Article 3 of the CAT states: "No State Party shall expel, return (*"refouler"* ) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.

President Reagan signed the Convention on April 18, 1988, with the following reservation: "The Government of the United States of America reserves the right to communicate, upon ratification, such reservations, interpretive understandings, or declarations as are deemed necessary." *See Ogbudimkpa v. Ashcroft,* 342 F.3d 207, 211 (3d Cir.2003); *see also* Declarations **\*131** and Reservations (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/englishinternetbible/ partI/chapterIV/treaty14.asp). Approximately one month later, on May 20, 1988, the President transmitted the CAT to the Senate for its advice and consent with seventeen proposed conditions (four reservations, nine understandings, and four declarations). *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101–30, at 2, 7 (1990).

In response to congressional and public concern regarding several of the proposed conditions, in January 1990 President George H.W. Bush submitted a revised and reduced list of proposed conditions. *See id.* at 2, 7–8; *see also Ogbudimkpa,* 342 F.3d at 212 n. 11. Of the proposed conditions, President Bush submitted several understandings, two of which are directly relevant to this case. First, with respect to Article 1 of the CAT, the President proposed the understanding that the "United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *See* S. Exec. Rep. 101–30, at 9, 36. [3] This first understanding closely tracked a similar understanding initially submitted by President Reagan in 1988, which stated that the United States "understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering." *See* S. Exec. Rep. 101–30, at 15. [4] Second, with respect to Article 3 of the CAT, President Bush submitted an understanding, previously submitted by President Reagan, that the United States "understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if

it is more likely than not that he would be tortured.' " *See* S. Exec. Rep. 101–30, at 16, 36. [5]

[3]     In a cover letter from Janet G. Mullins, Assistant Secretary, Legislative Affairs, Department of State, to Senator Claiborne Pell, Chairman of the Senate Committee on Foreign Relations, transmitting President Bush's revised reservations, understandings, and declarations to the CAT, it was stated that the revised understanding "maintains our position that specific intent is required for torture." *See* S. Exec. Rep. 101–30, at 35 (App.A).

[4]     A summary and technical analysis of the Convention submitted by President Reagan to the Senate further stated: "[T]he requirement of intent to cause severe pain and suffering is of particular importance in the case of alleged mental pain and suffering, as well as in cases where unexpectedly severe physical suffering is caused. Because specific intent is required, an act that results in unanticipated and unintended severity of pain and suffering is not torture for purposes of this Convention." *See* S. Exec. Rep. 101–30, at 13–14.

[5]     The Senate Report explains why this understanding was added:

> Article 3 forbids a State Party from forcibly returning a person to a country where there are "substantial grounds for believing that he would be in danger of being subjected to torture."
>
> Under U.S. immigration law, the United States can not deport an individual if "it is more likely than not that the alien would be subject to persecution." *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). U.S. immigration law also provides that asylum may be granted to an alien who is unwilling to return to his home country "because of persecution or a well-founded fear of persecution." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).
>
> The administration's proposed understanding adopts the more stringent *Stevic* standard because the administration regards the *nonrefoulement* prohibition of article 3 as analogous to mandatory withholding of

deportation. Therefore, article 3 would apply when it is "more likely than not" that the individual would be tortured upon return. *See* S. Exec. Rep. 101–30, at 10.

**\*132** The Senate adopted a resolution of advice and consent to ratification of the CAT on October 27, 1990, subject to several reservations, understandings, and declarations. *See* 136 Cong. Rec. S17,486, S17491–92 (daily ed. 1990) ("Senate Resolution"). Importantly, the Senate adopted the two understandings proposed by President Bush with respect to Articles 1 and 3 of the Convention. Thus, the Senate explained that with reference to the definition of torture contained in Article 1 of the CAT, the "United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *See* Senate Resolution, *supra,* II.1(a). Moreover, the Senate explained that with reference to the standard of proof required in Article 3 of the CAT, the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *See* Senate Resolution, *supra,* II.2.

Finally, pursuant to Article 26 of the Convention, President Clinton deposited the instrument of ratification with the United Nations on October 21, 1994.[6] *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478, 8478 (Feb. 19, 1999); *see also* Status of the [Convention] (visited Nov. 24, 2004) (http://www.un.org/documents/ga/docs/53/plenary/a53–253.htm). Notably, the President included the Senate understandings in the instrument of ratification. *See* 1830 U.N.T.S. 320, 321, 322 (1994); Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp).

[6]     Article 26 of the Convention states in pertinent part: "Accession shall be effected by the deposit of an instrument of accession with the Secretary–General of the United Nations." *See* art. 26, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.

**[1]    [2]**    Because the resolution of advice and consent specified that the CAT was not self-executing, Congress proceeded to pass legislation in order to implement the United States' obligations under the Convention in 1998 with the Foreign Affairs Reform and Restructuring Act ("FARRA").

*See* Pub.L. No. 105–227, Div. G., Title XXII, § 2242, 112 Stat. 2681, 2681–822, codified as note to 8 U.S.C. § 1231.[7]

**\*133**    The first section of FARRA, § 2242(a), contained a general statement of congressional policy, providing that: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." In turn, § 2242(b), which substantively implements the CAT, directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *See* 8 U.S.C. § 1231 note.

[7]     Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation. *See* Ogbudimkpa, 342 F.3d at 218 (citing Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir.1979)). Several circuits have already determined that the CAT is not self-executing. *See, e.g.,* Reyes–Sanchez v. United States Attorney Gen., 369 F.3d 1239, 1240 n. 1 (11th Cir.2004); Saint Fort v. Ashcroft, 329 F.3d 191, 202 (1st Cir.2003); Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir.2003); Castellano–Chacon v. INS, 341 F.3d 533, 551 (6th Cir.2003). This Court, however, has not previously addressed whether the CAT is self-executing. *See* Ogbudimkpa, 342 F.3d at 218 n. 22 (noting that because Congress passed FARRA to implement the United States' obligations under the CAT, "we need not consider whether CAT is self-executing"). As noted later, we decide that the Convention is not self-executing.

On a side note, in *Ogbudimkpa,* we briefly considered whether a claim seeking relief from removal on the grounds of alleged future torture should be called a "CAT claim" or a "FARRA claim." 342 F.3d at 221 n. 24. We noted that, if it were true that the Convention was not self-executing, then strictly speaking an alien would seek relief under FARRA, and not the Convention. *Id.* Ultimately, however, given that the language of FARRA is virtually identical to the language of Article 3 of the Convention, we concluded that the difference between the terminology of a "CAT claim" versus a "FARRA claim" was

inconsequential. *Id.* Accordingly, we used there, and we continue to use here, the colloquial reference to a "CAT claim" rather than a "FARRA claim" in discussing Auguste's requested relief. *Id.*

In accordance with § 2242(b) of FARRA, the Department of Justice, of which the Immigration and Naturalization Service ("INS") at that time was a division, promulgated regulations setting forth the procedures by which individuals could seek relief pursuant to the CAT. *See* 64 Fed.Reg. 8478 (Feb. 19, 1999), codified at 8 C.F.R. §§ 208.16(c), .17, & .18(a) (2004). Section 208.18(a) sets out the definitions under the CAT and states: "The definitions in this subsection incorporate the definition of torture contained in Article 1 of the [Convention], subject to the reservations, understandings, declarations, and provisos contained in the [Senate] resolution of ratification of the Convention." 8 C.F.R. § 208.18(a). Section 208.18(a)(1) proceeds then to adopt a basic definition of torture, mirroring the definition of torture in Article 1 of the CAT, which is then clarified by six additional provisions, several of which are relevant in this matter:

(a)(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(a)(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

(a)(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions....

(a)(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

In addition to clarifying the definition of torture that is to apply in the domestic context, the Department of Justice also promulgated regulations specifying the elements and burden

of proof for a CAT claim. Section 208.16(c)(2), which tracks the understanding proposed by the President and adopted by the Senate in its **134** resolution of ratification, states that "[t]he burden of proof is on the applicant for withholding of removal to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[8] If an applicant establishes that he "more likely than not would be tortured" upon return to his home country, withholding of removal or deferral of removal is mandatory. *See* 8 C.F.R. §§ 208.16(c)(3) and (4). The objective evidence to be considered in evaluating a CAT claim includes "[e]vidence of past torture inflicted upon the applicant;" "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal;" and "[o]ther relevant information regarding conditions in the country of removal." *See* 8 C.F.R. § 208.16(c)(3); *see also* 8 C.F.R. § 208.17(a).[9]

8   Auguste seeks deferral of removal, not withholding of removal. Regulations for withholding of removal are set out at 8 C.F.R. § 208.16, while regulations for deferral of removal are set out at 8 C.F.R. § 208.17. However, the general standards of eligibility for each are identical, i.e., a requirement that an alien establish that future "torture" is "more likely than not." *See* 8 C.F.R. § 208.16(c), .17(a); *see also* 64 Fed.Reg. 8478, 8481 (noting that " § 208.17(a) is subject to the same standard of proof and definitional provisions as § 208.16(c)").

9   Applications for relief under the CAT are not the only instance in which courts address torture-related claims. For instance, pursuant to Articles 4 and 5 of the Convention, the United States enacted §§ 2340–2340A of the U.S. Criminal Code, which criminalize torture in the United States and defines torture as any "act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. §§ 2340–2340A. In addition, the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), provides a civil tort remedy for victims of torture. Torture is defined under the TVPA as:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other

than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

### C. The Immigration Judge's Decision

On November 12, 2003, an immigration judge ("IJ") issued an oral decision finding Auguste ineligible for deferral of removal under the CAT. The IJ began by noting that Auguste had conceded that he had never been tortured in the past in Haiti, and that his application was based on the likelihood that he would be detained upon arrival and subject to harsh prison conditions. (J.A. 43.) In denying Auguste's claim for CAT relief, the IJ found that the matter was governed by the Board of Immigration Appeals' ("BIA") decision in *Matter of J–E–, 23 I. & N. Dec. 291 (BIA 2002)*, a 13–5 decision interpreting the elements of a claim for relief under the CAT.

In *Matter of J–E–* the BIA considered the same issue raised by Auguste: whether Haiti's indefinite detention of criminal deportees, the deplorable prison conditions in Haiti, and the physical abuse of prisoners constitute "torture" as that term is defined under the Convention and the implementing regulations. *Id.* at 292. The BIA emphasized that the Convention itself expressly differentiates between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment." **\*135** *Id.* at 295. [10] Only those acts that constitute torture under Article 1 trigger the requirement that an individual's return to the removal country be suspended. *Id.* In exploring the difference between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment," the BIA noted that "the act [of torture] must cause severe pain or suffering, physical or mental. It must be an extreme form of cruel and inhuman treatment, not lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." *Id.* at 297 (citing 8 C.F.R. §§ 208.18(a)(1),(2)).

[10]   "Torture" is prohibited by Article 1 of the CAT, while "other acts of cruel, inhuman or degrading

treatment or punishment" are prohibited by Article 16 of the CAT. *Id.* at 295–96.

With reference to the regulations implementing the CAT, the BIA summarized a five-part test for determining whether an act rises to the level of torture:

> For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

*Matter of J–E–, 23 I. & N. Dec. at 297.* As to the second element, that of intent, the BIA explained that the "act must be specifically intended to inflict severe physical or mental pain or suffering. This specific intent requirement is taken directly from the understanding contained in the Senate ratification resolution.... Thus, an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture." *Id.* at 298 (citation omitted). The BIA went on to define "specific intent" with reference to its common legal definition: "specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness." *Id.* at 301 (quoting Black's Law Dictionary 813–14 (7th ed.1999)).

In light of the requirements of 8 C.F.R. § 208.18(a), the BIA in *Matter of J–E–* considered whether any of the alleged state actions by Haiti—indefinite detention, inhuman prison conditions, and police mistreatment—constituted torture. First, with regards to the policy of indefinite detention, the BIA concluded that it appeared to be a "lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." *Id.* at 300. Accordingly, the BIA concluded that the detention policy was a lawful sanction and, standing alone, did not constitute torture by virtue of 8 C.F.R. § 208.18(a)(3). *See id.* In addition, the BIA noted that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or

mental pain or suffering" within the meaning of 8 C.F.R. § 208.18(a)(1). *See id.*

Second, with regards to the inhuman prison conditions in Haiti, even when coupled with the possibility of indefinite detention, the BIA again concluded that this did not constitute torture. In particular, the BIA noted that there was "no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." *Id.* at 301 (citing 8 C.F.R. §§ 208.18(a)(1), (5)). The BIA noted that this specific intent **136** requirement was drawn from the Senate's understanding, which accompanied the resolution of advice and consent, and was distinct from a general intent requirement. *See id.* To the contrary, the BIA concluded that the prison conditions were not the result of any specific intent to inflict severe physical or mental pain or suffering, but rather were the "result of budgetary and management problems as well as the country's severe economic difficulties." *Id.*

Finally, the BIA considered whether police mistreatment of prisoners constituted torture. The BIA noted that there had been reports of isolated instances of police mistreatment, some of which could rise to the level of torture. *See id.* at 302. In particular, the BIA noted that while certain "[i]nstances of police brutality do not necessarily rise to the level of torture ... deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa [severe boxing of the ears, which can result in eardrum damage], and electric shock may constitute acts of torture." *Id.* Although the alien in *Matter of J–E–* had shown that acts of torture have occurred in Haitian prisons, the BIA concluded that he had failed to satisfy the requisite burden of proof, *i.e.,* that it was more likely than not that he would be tortured if returned to Haiti. *See id.* at 304. [11] The alien had made no claim of past torture, and the basis of his CAT claim was premised on the possibility that he would be subject to police mistreatment when detained in a Haitian prison. Accordingly, the BIA concluded that the alien had failed to establish that the severe yet isolated instances of mistreatment were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment." *Id.* at 304. In other words, the alien's evidence had failed to show that he as an individual in a Haitian prison was more likely than not to suffer "torture," as defined by the CAT, as opposed to "other acts of cruel, inhuman or degrading punishment or treatment." *Id.* [12]

[11] In considering whether an alien has satisfied his burden of proof, the BIA stated that:

> all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal.

*Matter of J–E–,* 23 I. & N. Dec. at 303 (citing 8 C.F.R. § 208.16(c)(3)).

[12] It does not appear that the aggrieved alien in *Matter of J–E–* appealed the adverse decision of the BIA or otherwise filed a habeas petition.

Returning to the present matter, the IJ found Auguste's CAT claim to be virtually indistinguishable from the matter presented in *Matter of J–E–*, noting that counsel "for [Auguste] is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the [alien] in [*Matter of J–E–*]." (J.A. 46.) Accordingly, the IJ denied Auguste's request for deferral of removal. Auguste appealed the IJ's decision to the BIA, which, on February 27, 2004, affirmed the IJ's decision without an opinion. Accordingly, the IJ's decision is the final agency determination for purposes of our review. *See Dia v. Ashcroft,* 353 F.3d 228 (3d Cir.2003) (*en banc* ).

### D. Auguste's Habeas Petition

On March 9, 2004, in the District of New Jersey, Auguste filed a Verified Petition **137** for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, as well as a request for a stay of removal, on the grounds that the decision of the IJ, as affirmed by the BIA, erroneously denied him relief under the Convention for deferral of removal to Haiti. Count One of Auguste's petition alleged that his CAT claim was denied improperly based on *Matter of J–E–*'s interpretation of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) to require a showing of "specific intent" as that term is used in U.S. criminal law. In addition, Auguste contended that the BIA in *Matter of J–E–* erroneously concluded that the detention of criminal deportees in harsh and deplorable prison conditions did not constitute torture.

Count Two of Auguste's petition alleged that his CAT claim was improperly denied because the Department of Justice had adopted regulations at 8 C.F.R. § 208.16(c)(2) that set the burden of proof for CAT relief higher than what was required by Article 3 of the Convention and FARRA.

The District Court began by noting that the conditions which Auguste would be subjected to in Haiti "can objectively be described as horrifying prison conditions which are inflicted upon anyone unfortunate enough to find themselves in custody in Haiti." (J.A. 14.) Nonetheless, the District Court denied Auguste's habeas petition on the merits, finding that the BIA in *Matter of J–E–* properly interpreted the intent requirement of 8 C.F.R. § 208.18(a)(5). The District Court noted that "we have circumstances here where we have simply the allegation of general prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.) The District Court concluded that "there must be some sort of underlying intentional direction of pain and suffering against a particular petitioner, more so than simply complaining of the general state of affairs that constitute conditions of confinement in a place, even as unpleasant as Haiti." (J.A. 18.) The District Court, however, did not appear to reach the issue of whether the BIA's application of the burden of proof in 8 C.F.R. § 208.16(c)(2) was inconsistent with Article 3 of the CAT or FARRA.

This timely appeal followed.

## II. JURISDICTION AND SCOPE OF REVIEW

**[3]**    As an alien convicted of an aggravated felony/drug trafficking crime and removable on such grounds, Auguste is statutorily barred from filing a petition for direct review from the BIA's decision to a court of appeals challenging his ineligibility for relief under the CAT. *See* 8 U.S.C. § 1252; *see also Bakhtriger v. Elwood,* 360 F.3d 414, 420 (3d Cir.2004). Several of the circuits, including this one, however, have concluded that aliens convicted of crimes retain the right to seek relief under the traditional habeas statute for alleged violations of the Convention. *See Ogbudimkpa,* 342 F.3d at 215–22; *see also Cadet v. Bulger,* 377 F.3d 1173, 1182 (11th Cir.2004); *Saint Fort v. Ashcroft,* 329 F.3d 191, 200–02 (1st Cir.2003); *Wang v. Ashcroft,* 320 F.3d 130, 140–43 (2d Cir.2003); *Singh v. Ashcroft,* 351 F.3d 435, 441–42 (9th Cir.2003). We have jurisdiction over appeals involving habeas petitions filed in the District Court pursuant to 28 U.S.C. §§ 1291, 2241, and 2253.

**[4]    [5]    [6]**    The scope of review of an alien's habeas petition is far narrower than that typically available to an alien who has filed a direct petition for review to a court of appeals. On direct petitions for review, we review factual findings made by an immigration judge or the BIA under the **\*138** familiar substantial evidence standard. *See Mulanga v. Ashcroft,* 349 F.3d 123, 131 (3d Cir.2003); *see also Dia,* 353 F.3d at 247–48. However, on a habeas petition, our review does not extend so far. It is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion. *See Bakhtriger,* 360 F.3d at 425 ("In the wake of [*INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ] we are not aware of any cases that have upheld habeas review of factual findings or discretionary determinations in criminal alien removal cases."); *Ogbudimkpa,* 342 F.3d at 222; *see also Cadet,* 377 F.3d at 1184; *Bravo v. Ashcroft,* 341 F.3d 590, 592 (5th Cir.2003); *Gutierrez–Chavez v. INS,* 298 F.3d 824, 829–30 (9th Cir.2002), *amended by* 337 F.3d 1023; *Carranza v. INS,* 277 F.3d 65, 71–73 (1st Cir.2002); *Sol v. INS,* 274 F.3d 648, 651 (2d Cir.2001); *Bowrin v. INS,* 194 F.3d 483, 489–90 (4th Cir.1999).[13]

13    We note that neither party has addressed whether the regulation-specific jurisdiction-stripping provision of § 2242(d) of FARRA affects our jurisdiction in this matter. *See* § 2242(d) ("[N]o court shall have jurisdiction to review the regulations adopted to implement this section."). In *Ogbudimkpa,* we held that a different aspect of § 2242(d), stating that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention ... except as part of a review of a final order of removal," does not affect habeas review. *See Ogbudimkpa,* 342 F.3d at 215–16 (noting that "Ogbudimkpa does not challenge the regulations themselves, but the IJ's application of the regulations to his case, and thus [the regulation-specific jurisdiction-stripping] provision is not implicated"). The regulation-specific jurisdiction-stripping provision may be relevant insofar as any of Auguste's arguments may be construed as challenging the regulations themselves, instead of their application to his case.

We believe the rationale behind *Ogbudimkpa* applies here with the same force. In *St. Cyr,* the Supreme Court held that "at the absolute minimum, the Suspension Clause protects the writ [of *habeas corpus* ] as it existed in 1789." 533 U.S. at 301, 121 S.Ct. 2271 (internal quotation omitted). The Court found that, at that time, "the issuance of the writ was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." *Id.* at 302, 121 S.Ct. 2271. Thus, just as the wholesale jurisdiction-stripping provision of FARRA cannot eliminate habeas jurisdiction without what has been termed a "superclear statement" or "magic words," *id.* at 327, 121 S.Ct. 2271 (Scalia, J., dissenting) (characterizing the requirement set forth by the majority), the regulation-specific jurisdiction-stripping provision may not restrict that jurisdiction beyond its 1789 form without such an unmistakably clear statement, which is lacking in either provision of § 2242(d).

Keeping in mind the narrow scope of our habeas review, we now turn to consider Auguste's appeal.

### III. ANALYSIS

In his appeal from the denial of his habeas petition, Auguste raises three arguments. First, Auguste contends that the BIA erred as a matter of law in *Matter of J–E–,* upon which the IJ relied in denying Auguste's application, in construing the definition of torture at 8 C.F.R. § 208.18(a)(1) and (a)(5) to require a showing of "specific intent" to inflict severe pain and suffering. Auguste contends that such a specific intent requirement is inconsistent with the Convention's commonly understood international interpretation as well as the Third Circuit's prior decision in *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003). Second, Auguste contends that the Department of Justice promulgated regulations at 8 C.F.R. § 208.16(c)(2), which require that an alien show "more likely than not that he or she would be tortured," that are inconsistent with Article 3 of the **\*139** Convention, which only requires that an alien show that there are "substantial grounds for believing the person would be in danger of being subjected to torture." Finally, Auguste contends that even if the specific intent standard is the correct standard in defining torture, and even if the correct burden of proof is the "more likely than not" standard, he is nonetheless entitled to relief under

the Convention because Haitian authorities knowingly and purposefully detain criminal deportees, such as him, in prison conditions that he contends are torturous.

We address each argument in turn.

### A. The Standard of Intent Required for CAT Relief

#### 1.

8 C.F.R. § 208.18(a)(5) states that in order for an act to constitute torture, "[it] must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture." In *Matter of J–E–,* the BIA stated that the "ratification [history of the CAT] make it clear that this is a 'specific intent' requirement not a 'general intent' requirement." 23 I. & N. Dec. at 300–01. Thereafter, the BIA defined the term "specific intent" by its ordinary usage in American law as the "intent to accomplish the precise criminal act that one is later charged with." *Id.* at 301 (internal quotations omitted). Auguste, however, contends that the specific intent standard is at odds with the prevailing and commonly understood meaning of Article 1 of the Convention. Auguste argues that the infliction of severe pain and suffering, so long as the pain and suffering is not unanticipated or unintended, would satisfy the definition of torture under Article 1 of the Convention, and that the BIA's specific intent standard is in conflict with the more liberal standard he proposes. Auguste in effect suggests that a general intent standard would satisfy the requirements of Article 1 of the Convention, arguing that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering." Appellant's Br. at 25. Because this involves a pure question of law, we have habeas jurisdiction over the issue. *See Bakhtriger,* 360 F.3d at 425. [14]

[14]    This, of course, is not the first instance in which this Court has applied the standards for relief under the CAT and its regulations. *See, e.g., Sevoian v. Ashcroft,* 290 F.3d 166, 174–78 (3d Cir.2002) (denying alien facing deportation to Republic of Georgia relief under the CAT). However, we are not aware of a prior decision by this Court, or any other court, that has analyzed whether the Department of Justice or the BIA thereunder have faithfully

implemented the United States' obligations under the Convention.

The issue that we must resolve then is what the controlling standard for relief under the Convention is in the domestic context. Is it, as Auguste contends, the standard of intent that he believes is the prevailing requirement under international legal interpretations of the Convention? Or is it, as the Government contends, the specific intent standard which the Department of Justice adopted in the Convention's implementing regulations issued pursuant to FARRA, and interpreted by the BIA in *Matter of J–E–?* We approach this matter mindful of the sensitive considerations that are raised in Auguste's habeas petition. Auguste is asking this Court in effect to declare the administrative regulations implementing the United States' obligations under the Convention, and implicitly the understandings which accompanied the United States' ratification, to be inconsistent with the Convention.

**\*140** **[7]** **[8]**  In so doing, Auguste invites this Court to inquire into the meaning of Article 1 of the Convention, its drafting history, and the interpretation of Article 1 by various international tribunals. Should we do so, we would of course not be interpreting the treaty from scratch, and the Government's interpretation would be accorded some deference. "[A]lthough not conclusive," the interpretive views of the government agencies that have been charged with the negotiation and enforcement of a treaty are "entitled to great weight." *See United States v. Stuart,* 489 U.S. 353, 369, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (internal citations omitted); *see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due to reasonable views of the Executive Branch concerning the meaning of an international treaty.") (internal citations omitted); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). We, however, see no reason to be drawn into a debate about the appropriate interpretation of Article 1 of the Convention, or what the prevailing international understanding of the intent standard required under Article 1 of the Convention is. As will be discussed below, we believe that we must apply the standard clearly stated in the ratification record of the United States.

**2.**

In FARRA, Congress directed the appropriate agencies to implement the United States' obligations under the CAT "subject to any reservations, understandings, declarations,

and provisos contained in the United States Senate resolution of ratification of the [CAT]." § 2242(b), codified at 8 U.S.C. § 1231 note. Congress passed FARRA because the Senate had explicitly included a declaration in its resolution of ratification that the Convention was not self-executing. *See Ogbudimkpa,* 342 F.3d at 212 (citing 136 Cong. Rec. 36,198 (1990)). Because the CAT was not self-executing, FARRA, at least in the domestic context, represented a clear statement on the part of Congress to incorporate into domestic law the understandings submitted by the President and adopted by the Senate in its resolution of ratification, including the understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." The Department of Justice, in promulgating the relevant regulations, adopted verbatim the understanding in defining the intent standard at 8 C.F.R. § 208.18(a)(5). Thus, in our opinion, FARRA codified the Senate's understandings into domestic law.

Auguste, however, contends that the United States' understanding regarding specific intent was without effect and could not be enacted into domestic law as part of FARRA. In particular, Auguste argues that because the understanding regarding specific intent was in conflict with the accepted international interpretation of the Convention as he believes it to be, it could not modify the United States' obligations under the Convention. Auguste appears to rely in part on Article 19 of the Vienna Convention on the Law of the Treaties, which states that reservations to a treaty ratification are prohibited where they are "incompatible with the object and purpose of the treaty." *See* Vienna Convention on the Law of Treaties, May 23, 1969, art. 19, 1155 U.N.T.S. 331.[15] Auguste **\*141**  also contends more generally that an understanding "that conflicts with those of other signatory states [is] of little weight," suggesting at one point that the fact that the Netherlands objected to the United States' understanding as overly restrictive should weigh in this Court's analysis. Appellant's Reply Br. at 11, 14. Thus, according to Auguste, FARRA could not modify or abrogate the United States' obligations under the Convention merely by incorporating the understanding accompanying the United States' ratification of the Convention because that understanding was void under international norms governing treaty interpretation.[16]

[15]       The United States has not ratified the Vienna Convention on the Law of Treaties. Nonetheless, several courts have stated that they look to it "as an authoritative guide to the customary international

law of treaties." *See, e.g., Ehrlich v. Am. Airlines, Inc.,* 360 F.3d 366, 373 n. 5 (2d Cir.2004).

16    Auguste makes a related argument: because the understandings were without effect, and thus the interpretation of the Convention he advocates was in effect upon ratification in the United States, a clear statement was required by Congress to modify or abrogate the treaty in FARRA to enact the specific intent standard. Auguste relies on the well-known rule that a "treaty will not be deemed to be abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." *See Trans World Airlines v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (quotations omitted). In Auguste's view, Congress' statement in § 2242(b) of FARRA directing the appropriate agencies to implement the United States' obligations under the CAT "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the [CAT]," 8 U.S.C. § 1231 note, was not a clear enough statement to modify or abrogate the Convention as it was ratified by the United States. Because we ultimately conclude that the understandings must be given domestic legal effect, we need not address this argument.

The issue of whether and in what circumstances courts should give effect to reservations, declarations and understandings to treaties is a hotly contested area of academic debate. *See* Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent,* 149 U. Pa. L.Rev. 399, 401–02 (2000). To date, several courts have enforced reservations, understandings, or declarations, but we are not aware of any court that has considered their validity in any detail. [17] However, we believe that resolution of this issue in this case is fairly straightforward.

17    *See, e.g., Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1st Cir.1994) (enforcing declaration that the International Covenant on Civil and Political Rights was not self-executing); *Ralk v. Lincoln County,* 81 F.Supp.2d 1372, 1380 (S.D.Ga.2000) (same); *Sandhu v. Burke,* No. 97 Civ. 4608(JGK), 2000 WL 191707 (S.D.N.Y. Feb.10, 2000) (enforcing declaration that the CAT was not self-executing); *Calderon v. Reno,* 39

F.Supp.2d 943, 956 (N.D.Ill.1998) (same); *White v. Paulsen,* 997 F.Supp. 1380, 1387 (E.D.Wash.1998) (same).

We begin by noting that the Constitution vests the President and the U.S. Senate with the responsibility of making treaties, stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *See* U.S. Const. art. II, sec. 2, cl. 2. [18] As part of its role in the advice and **\*142** consent process, the U.S. Senate has routinely attached conditions to ratification known as reservations, understandings, and declarations. [19]

18    In practice, the treaty-making process operates as follows. After the executive branch negotiates the terms of a treaty with foreign nations, and a completed draft is signed, the President thereafter transmits the treaty to the Senate for its advice and consent. If the treaty receives the required two-thirds vote, the Senate sends a resolution to the President approving the treaty. The President has the discretion at this point to ratify or not ratify the treaty. Should the President decide to ratify the treaty, he will sign the instrument of ratification and deposit it in a place typically specified by the treaty. *See* Bradley & Goldsmith, *supra,* (citing Congressional Research Service, Treaties and Other International Agreements: The Role of the United States Senate, 103rd Congress, 1st Sess., at 75–120 (1993)).

19    Although we are aware of no cases construing the limits of the Senate's prerogative to attach reservations, understandings, and declarations as part of its advice and consent function to ratification, we note in passing that the Supreme Court has previously held that the Senate's ability to put forward its understanding of a treaty does not extend beyond the ratification process. *See Fourteen Diamond Rings v. United States,* 183 U.S. 176, 180, 22 S.Ct. 59, 46 L.Ed. 138 (1901) ("The meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it.").

As we recounted at some length above in Part I.B, the specific intent standard was the standard accepted by both the President and the Senate during the ratification process. Both Presidents Reagan and Bush submitted nearly identical

understandings containing the language stating that for an act to constitute torture, it must be specifically intended to inflict severe pain and suffering. *See* S. Exec. Rep. 101–30, at 9, 15. The Senate adopted the language of President Bush's understanding in its resolution of ratification. *See* Senate Resolution, *supra,* II.1(a). Moreover, when the President deposited the instrument of ratification with the United Nations, he did so with the relevant understanding relating to the specific intent requirement. *See* 1830 U.N.T.S. 320, 321; Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp).

Thus, we are presented with a situation where both the President and the Senate, the two institutions of the federal government with constitutional roles in the treaty-making process, agreed during the ratification stage that their understanding of the definition of torture contained in Article 1 of the Convention included a specific intent requirement. In our view, this is enough to require that the understanding accompanying the United States' ratification of the Convention be given domestic legal effect, regardless of any contention that the understanding may be invalid under international norms governing the formation of treaties or the terms of the Convention itself. We think it so plain a proposition that the United States may attach an understanding interpreting the meaning of a treaty provision as part of the ratification process that, where as here there is clear consensus among the President and Senate on that meaning, a court is obliged to give that understanding effect.

We find support for this position in the Restatement (Third) of the Foreign Relations Law of the United States, a persuasive authority. Section 314(2) of the Restatement states: "When the Senate gives its advice and consent to a treaty on the basis of a particular understanding of its meaning, the President, if he makes the treaty, must do so on the basis of the Senate's understanding." *See* Restatement (Third) of the Foreign Relations Law of the United States § 314 (2004). Comment d to § 314 further states: "A treaty that is ratified or acceded to by the United States with a statement of understanding becomes effective in domestic law subject to that understanding." § 314 cmt. d. Thus, we hold that, for purposes of domestic law, the understanding proposed by the President and adopted by the Senate in its resolution of ratification are the binding standard to be applied in domestic law.

In so holding, we should be clear what this case is not about. We are not presented with a situation where the President and the Senate took contradictory positions on the meaning of a treaty provision during the ratification process. Nor **\*143** are we required to resolve the situation where the President is contending that a Senate conditionality of ratification is improper, infringes on executive authority, or is without domestic or international legal effect. Undoubtedly, these situations, and others like them, would present more difficult constitutional issues. Instead, we are presented with a situation where both the President and Senate shared an understanding as to the meaning of a treaty provision during the ratification process.

**[9]**  **[10]**  Thus, because we find that the governing standards to be applied in the domestic context are those in the understanding that accompanied the United States' ratification of the treaty, and which were later incorporated in FARRA's implementing legislation, we believe that Auguste's claim that a specific intent standard is in conflict with what he perceives to be the prevailing international consensus misses the point. Generally, it is true that courts should interpret treaties so as to give a "meaning consistent with the shared expectations of the contracting parties." *See Air France v. Saks,* 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985); *see also MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1143 (3d Cir.1988) (noting that "our role in treaty interpretation is limited to ascertaining and enforcing the intent of the treaty parties"). Moreover, it is well-established that when construing international agreements, courts will often look to the drafting history of the agreement, as well as the intent of the other signatory parties, as Auguste now proposes. *See Stuart,* 489 U.S. at 366–69, 109 S.Ct. 1183; *see also El Al Israel Airlines, Ltd.,* 525 U.S. at 167, 119 S.Ct. 662 ("Because a treaty ratified by the United States is not only the law of this land ... but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux preparatoires* ) and the postratification understanding of the contracting parties.") (citations omitted). However, we believe that where the President and the Senate express a shared consensus on the meaning of a treaty as part of the ratification process, that meaning is to govern in the domestic context. [20]

[20]  In passing, we express some skepticism as to whether it is so obvious, as Auguste contends, that the United States' understanding of Article 1 of the Convention as requiring "specific intent" is

inconsistent with the Convention, as he contends it is generally understood internationally.

Auguste relies on several sources in support of his contention that a specific intent standard would be inconsistent with the common understanding of Article 1 of the Convention. For instance, he notes that during the negotiations of the treaty, a U.S. proposal for Article 1 that read "the offence of torture includes any act by which extremely severe pain and suffering, whether physical or mental, is deliberately and maliciously inflicted" was rejected. *See* Burgers and Danelius, *supra,* at 41–42. However, in our view, it does not follow necessarily that the final language of Article 1 was a repudiation of a specific intent standard.

We also believe it to be telling that both Presidents Reagan and Bush submitted the condition interpreting Article 1 with the "specifically intended" language as an understanding, and not as a reservation or declaration. This suggests to us that the commonly understood meaning at the time of ratification was that, at least to the United States, the specific intent standard was consistent with a reasonable interpretation of the language in Article 1.

In any event, we need not resolve this issue. Whether specific intent is or is not commonly understood to be part of Article 1's definition of torture is not relevant to our holding. But, as the CAT gains increased attention in light of recent events abroad, we are confident that the debate on this question will continue.

### 3.

 **[11]**   Based on the ratification record, there is no doubt that the applicable standard to be applied for CAT claims in the  **\*144**  domestic context is the specific intent standard, which was adopted verbatim by the Department of Justice in 8 C.F.R. § 208.18(a)(5) from the understanding accompanying ratification. We now consider whether the BIA's interpretation of the specific intent standard in *Matter of J–E–,* which defined the term by reference to its ordinary meaning in American law, was appropriate. [21]

[21]   We note that this issue was itself a source of division within the BIA. In *Matter of J–E–,* one Board member, in dissent, wrote:

Contrary to what the majority suggests, the regulatory requirement that the torture be "specifically intended" does not mean that proof of specific intent, as that term is used in American criminal prosecutions, is required.... The majority's reading of the regulations functionally converts the Senate understanding that torture must be "specifically intended" into a "specific intent" requirement. I disagree. I can find no basis to conclude that the Senate understanding was intended to require proof of an intent to accomplish a precise criminal act, as the majority contends is required. Rather, the plain language of the text of 8 C.F.R. § 208.18(a)(5) reflects only that something more than an accidental consequence is necessary to establish the probability of torture.

Nowhere does the regulation state that the respondent must prove that the prospective torture he may face will result from the torturer's specific intent to torture him. Indeed, it would be difficult, if not impossible, to prove specific intent in a prospective context. 23 I. & N. Dec. at 315–16 (Rosenberg, Comm'r, dissenting).

Another Board member in dissent wrote: "We are in the early stages of the very difficult and thankless task of construing the Convention. Only time will tell whether the majority's narrow reading of the torture definition and its highly technical approach to the standard of proof will be the long-term benchmark for our country's implementation of this international treaty.... I do not believe the majority adequately carries out the language or the purposes of the Convention and the implementing regulations." *Id.* at 309 (Schmidt, Comm'r, dissenting).

 **[12]**     **[13]**   Our resolution of whether the BIA's interpretation of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was appropriate implicates two well-known principles of deference. First, the BIA's interpretation and application of immigration law are subject to *Chevron* deference. *See Tineo v. Ashcroft,* 350 F.3d 382, 396 (3d Cir.2003) ("There is no longer any question that the BIA should be accorded *Chevron* deference for its interpretations of the immigration laws.") (citing *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)). [22]

Second, this Court owes deference to the **\*145** agency's interpretation to the extent that the CAT involves issues of immigration law which may implicate questions of foreign relations. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (noting that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (citations omitted).

22      Under the Chevron analysis, in determining whether an agency's interpretation of the statute which it administers is reasonable, the initial question is whether the statute is silent or ambiguous with respect to the specific issue. If the statutory language is clear, the court need not look any further, and the agency's interpretation fails if it is inconsistent with the plain language. If, however, the statute is silent or ambiguous, the question for the court is whether the agency's interpretation is based on a permissible construction of the statute. *See Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Auguste contends that *Chevron* deference to the BIA's interpretation of the Convention is not appropriate because the BIA does not have any particular expertise in interpreting treaties. Whether agencies are to be given *Chevron* deference when interpreting and implementing treaties is an unsettled topic. *See generally* Curtis A. Bradley, *Chevron Deference and Foreign Affairs,* 86 Va. L.Rev. 649 (2000). We note that some courts have applied or suggested applying *Chevron* deference to agency interpretation and implementation of United States' treaty obligations. *See, e.g., Hill v. Norton,* 275 F.3d 98, 104 (D.C.Cir.2001) (applying *Chevron* framework to agency's interpretation of a treaty and an implementing statute); *see also Collins v. Nat'l Transp. Safety Bd.,* 351 F.3d 1246, 1251 (D.C.Cir.2003) (applying some standard of deference to an agency construction of a treaty). However, in this matter, because we view the issue as one of the BIA interpreting and applying FARRA and its implementing regulations, and not the Convention per se, we do not believe that resolution of the issue is necessary. This is particularly so because we believe there is

no ambiguity in the Convention for which we would need to afford the BIA any deference in the first place. Accordingly, unless there be any misunderstanding, we afford *Chevron* deference to the BIA's interpretation of FARRA and the implementing regulations in *Matter of J–E–* and no more.

In light of these principles, we cannot say that the BIA erred in its interpretation of the "specific intent" requirement in *Matter of J–E–* by defining that term as it is ordinarily used in American criminal law. In other contexts, we have noted that "congressional intent is presumed to be expressed through the ordinary meaning of the statute's plain language." *United States v. Whited,* 311 F.3d 259, 263 (3d Cir.2002). We think that the same principle applies when interpreting an understanding proposed by the President and adopted by the Senate in its resolution of ratification. Thus, in light of the use of the phrase "specifically intended" in the understanding to ratification, the BIA acted reasonably in interpreting that language as mandating the use of a specific intent requirement and defining that term in accord with its ordinary meaning in American law. *Matter of J–E–,* 23 I. & N. Dec. at 301 ("specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness") (internal quotations omitted).

Auguste's contention that the introduction of criminal law concepts into the standard for relief under the Convention was in error because the Convention is not about criminal prosecution, but rather about protecting the victims of torture, is besides the point. The specific intent standard is a term of art that is well-known in American jurisprudence. The Supreme Court has explained that in order for an individual to have acted with specific intent, he must expressly intend to achieve the forbidden act. *See Carter v. United States,* 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In contrast, the more relaxed general intent standard typically only requires that a defendant "possessed knowledge with respect to the *actus reus* of the crime." *Carter,* 530 U.S at 268, 120 S.Ct. 2159. [23]

23      In explaining the difference between specific and general intent, the Supreme Court used the following example to distinguish the two mental states:

        [A] person entered a bank and took money from a teller at gunpoint, but deliberately

failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter,* 530 U.S. at 268, 120 S.Ct. 2159 (citing *United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980)).

Thus, in the context of the Convention, for an act to constitute torture, there must be a showing that the actor had the intent **\*146** to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act, *i.e.,* the infliction of the severe pain and suffering, although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied. Auguste's suggestion that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering," Appellant's Br. at 25, is inconsistent with the meaning of specific intent.

Nonetheless, despite what we think is the clear import of the use of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) and the understanding attached to ratification, the Government inserted a curious footnote in its Brief to this Court, stating that:

> There has been some confusion about the [BIA's] reading of the specific-intent requirement. At one point in [*Matter of J–E–*] the majority stated that, "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." 23 I. & N. Dec. at 301. However, when read in light of the majority's other statements describing the intent requirement quoted above, it is clear that this was not a heightened strict-intent standard.
>
> Nonetheless, one of the dissenting Board members [in *Matter of J–E–*] accused the [BIA] of imposing a requirement that an alien "pro[ve] ... an intent to accomplish a precise criminal act" and "the torture's

[sic] specific intent to torture [the victim]." *See Matter of J–E–* at 315 (Rosenberg, L., dissenting). This is not what the majority concluded, given a full reading of its decision and the excerpts quoted above.

Appellee's Br. at 40. Not surprisingly, Auguste seizes on this statement, and argues that it merits reversal in this matter, stating that he finds "it difficult to believe that the [BIA] did not require a heightened specific-intent requirement" in *Matter of J–E–*. Appellant's Reply Br. at 15.

We see the source of the Government's concern. Standing alone, the problematic statement in *Matter of J–E–*, which the Government now disavows, could be read to impose a "heightened strict intent" or a "specific intent plus" standard. The statement can be broken down as follows: the Haitian authorities (1) intend the act of detaining deportees ("Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard") but (2) lack an intent to inflict severe pain and suffering ("there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions") and (3) lack an intent to inflict torture ("in order to inflict torture"). As the Government suggests, we think this last element goes too far and is not required under the specific intent standard. Section 208.18(a)(5) only requires that the act be specifically intended to inflict severe pain and suffering, not that the actor intended to commit torture. The two are distinct and separate inquiries.

However, we disagree with Auguste that this single troubling statement in *Matter of J–E–* renders the entire decision of the BIA in error. The statement should not be read out of context, and the rest of the opinion clearly indicates that the BIA appropriately understood 8 C.F.R. § 208.18(a)(5) to require only specific intent **\*147** to inflict severe pain or suffering, not anything more. *See Matter of J–E–,* 23 I. & N. Dec. at 297 (stating that "for an act to constitute 'torture' ... the act must cause severe physical or mental pain or suffering [and] ... be intentionally inflicted"); *id.* at 298 (quoting 8 C.F.R. § 208.18(a)(5) as requiring that "the act must be specifically intended to inflict severe physical or mental pain or suffering"); *id.* (noting that "the specific intent requirement is taken directly from the understanding contained in the Senate's ratification resolution"); *id.* (stating that "an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture"); *id.* at 300 (determining that no conduct constituting "torture" took place based in part on the lack of evidence that "Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering" (citing 8

C.F.R. § 208.18(a)(5)). Thus, we reject Auguste's contention that the BIA applied in *Matter of J–E–* a "heightened strict intent" or a "specific intent plus" standard.

**4.**

We must resolve one final issue before turning to the appropriate burden of proof. Auguste contends that this Court previously held in *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003), that a showing of specific intent is not required under the Convention or its implementing regulations. In *Zubeda,* an alien successfully obtained relief from an order of removal under the Convention on the grounds that she would likely be subject to rape upon her return to the Democratic Republic of Congo ("DRC"). Zubeda introduced evidence tending to show that her family had been persecuted in the DRC, that members of her family had been brutally murdered, and that she had been gang-raped by soldiers. However, the BIA reversed, finding that the record did not support the immigration judge's finding that Zubeda would likely be detained if returned to the DRC, or that she would be targeted for harm by the soldiers of the Congolese government. In addition, the BIA likened the case to *Matter of J–E–*, noting that reported isolated instances of mistreatment that may rise to the level of torture do not establish that the alien herself was more likely than not to be tortured.

Zubeda filed a petition for review to this Court, and we reversed. In particular, we were troubled by the cursory nature of the BIA's opinion and noted that the BIA "completely ignore[d] the basis of the Immigration Judge's decision." 333 F.3d at 475. For instance, we took issue with the BIA's assertion that the record did not support a finding that Zubeda would be likely detained upon her return to the DRC when the record clearly supported a contrary conclusion, a fact which the IJ had taken administrative notice of. *Id.* In addition, we held that the BIA erred when it relied on the IJ's adverse credibility finding, made in the context of Zubeda's asylum and withholding of deportation claims, to discredit her application for relief under the Convention. *Id.* at 476. We noted that because Zubeda's CAT claim was analytically separate from her other claims for relief, the BIA was required to provide a further explanation before relying on the IJ's adverse credibility finding. *Id.* Finally, we found that the BIA's application of *Matter of J–E–* to Zubeda's CAT claim to be wholly unconvincing, noting that "[r]educing Zubeda's claim to an attack on the kind of inhumane prison conditions that formed the basis of the [BIA's] decision in *Matter of*

*J–E–*–totally ignores the fact that the record is replete with reports ... that detail what appear to be systematic incidents of gang rape, mutilation, and mass murder." *Id.* at 477.

**\*148** In addition to our criticisms of the BIA's opinion in *Zubeda,* we discussed at length whether "rape can constitute torture" when it is inflicted with the requisite intent, imposed for one of the purposes specified under the Convention, and inflicted with the knowledge or acquiescence of a public official with custody or control over the victim. *Id.* at 473. With regards to the intent element, we considered the applicable regulations and stated:

> Although the regulations [8 C.F.R. § 208.18] require that severe pain or suffering be 'intentionally inflicted, *we do not interpret this as a specific intent requirement* .... The intent requirement [under § 208.18(a)(5) ] therefore distinguishes between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the foreseeable consequence of deliberate conduct. However, *this is not the same as requiring a specific intent to inflict suffering.'*

*Id.* at 473 (emphasis added). We proceeded to note that "requiring an alien to establish the specific intent of his/ her persecutors could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the [Convention]." *Id.* at 474 (citation omitted).

We recognize that this portion of *Zubeda* is in tension with our holding in this case, that based on the ratification record of the CAT, the appropriate standard to be applied in the domestic context is the specific intent standard. However, we believe that the quoted passage of *Zubeda,* upon which Auguste relies, is dicta. The basis of our holding in *Zubeda* was limited to the defects in the BIA's reversal of the IJ's ruling that Zubeda was entitled to relief under the CAT. In fact, the INS agreed that, in light of these defects, "the most appropriate resolution [was] to remand to the Immigration Judge for clarification and additional evidence." *Id.* at 465. Our discussion of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was not necessary to our finding of the defects in the BIA's opinion. Moreover, it does not appear that the meaning of the specific intent standard was challenged in that case, as there is no discussion of the United States' ratification history of the Convention, nor a discussion of the understandings submitted by the President and agreed to by the Senate. Thus, we decline to follow that portion of the *Zubeda* opinion that is dicta. *See Ponnapula v. Ashcroft,*

373 F.3d 480, 488 n. 5 (3d Cir.2004); *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 397 (3d Cir.2003).

## B. The Burden of Proof Required to Prove a Claim for Relief under the CAT

**[14]**    Auguste argues that the BIA erroneously set the burden of proof in 8 C.F.R. § 208.16(c)(2) to require an alien seeking relief under the Convention to show that it is "more likely than not" that he would be tortured upon removal, rather than the standard Auguste contends is required under Article 3 of the Convention, which requires a showing of "substantial grounds for believing that he would be in danger of being subjected to torture." In particular, Auguste points to the drafting history of the Convention, which he argues shows that negotiators rejected a similar increased burden of proof on individuals seeking protection from torture. Moreover, Auguste points to several decisions of the Committee against Torture, an advisory body created by the Convention to monitor compliance with the terms of the treaty, that have used the "substantial grounds" standard of Article 3 in rendering opinions under the Convention. Because this involves a pure question of law,  **\*149**  we have habeas jurisdiction over the issue. *See Bakhtriger,* 360 F.3d at 425.

We begin by noting that on several prior occasions, we have applied the "more likely than not" standard in evaluating claims for relief under the Convention. *See, e.g., Berishaj v. Ashcroft,* 378 F.3d 314, 332 (3d Cir.2004); *Wang v. Ashcroft,* 368 F.3d 347, 348 (3d Cir.2004); *Mulanga,* 349 F.3d at 132 (quotations omitted). Our prior uses of the "more likely than not" standard constitute precedent in this matter, and we are bound to apply the standard contained in 8 C.F.R. § 208.16(c)(2) to resolve Auguste's claim. *See* Third Circuit Internal Operating Procedure 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

Nor do we see any error in our prior decisions in this regard because it is plain that the "more likely than not" standard is the correct standard to be applied for CAT claims. The "more likely than not" standard has its origins in identical understandings submitted by Presidents Reagan and Bush with regards to Article 3 of the Convention, and adopted by the Senate in its resolution of ratification, stating that the "United States understands the phrase 'where there

are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *See* Senate Resolution, *supra,* II.2. This standard was then codified into domestic law through § 2242(b) of FARRA, which directed the relevant agencies to adopt regulations implementing the United States' obligations under the Convention "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *See* 8 U.S.C. § 1231 note. Accordingly, in evaluating Auguste's claim that he is entitled to relief under the Convention, we must apply the "more likely than not" standard contained in 8 C.F.R. § 208.16(c)(2).[24]

24        Because we find that the applicable burden of proof to be applied for CAT claims is the "more likely than not" standard, we do not reach Auguste's arguments that the Department of Justice improperly incorporated the burden of proof used in claims arising under Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6223, 189 U.N.T.S. 150, or whether we should resort to the rule of lenity as an aid in interpreting the Convention.

## C. Whether Auguste is Entitled to Relief on his Habeas Petition

### 1.

Auguste argues that, even if the BIA adopted the correct intent and burden of proof standards in the implementing regulations, he is nonetheless entitled to relief under the CAT. Auguste contends that he will be subject to indefinite detention upon his return to Haiti, that the conditions in Haitian prisons are deplorable, and that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but purposely place deportees in the deplorable conditions in order to punish and intimidate them.

**[15]    [16]    [17]**   We review de novo the District Court's denial of Auguste's habeas petition. *See De Leon–Reynoso v. Ashcroft,* 293 F.3d 633, 635 (3d Cir.2002). However, because our evaluation of the merits of Auguste's habeas claim involves a review of the IJ's decision, which in turn relied on  **\*150**  the BIA's decision in *Matter of J–E–,*

our standard of review is far narrower because the BIA's interpretation and application of its own regulations is entitled to "great deference." *See Abdille v. Ashcroft,* 242 F.3d 477, 484 (3d Cir.2001). This deference "to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *Tineo,* 350 F.3d at 396 (quoting *Aguirre–Aguirre,* 526 U.S. at 424, 119 S.Ct. 1439).

### 2.

Before considering the merits of Auguste's habeas petition, we address an issue related to the scope of our habeas review. As we noted above, our review is limited to errors of law, such as the application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings. Thus, as an initial matter, we must identify what the undisputed facts are in this matter, and what administrative fact findings were made by the IJ.

The IJ found the factual situation presented by Auguste's application for deferral of removal to be indistinguishable from the matter presented in *Matter of J–E–*. The IJ's oral decision states:

> Counsel for the respondent is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the respondent in [*Matter of J–E–*] and that the Board had to consider in *Matter of J–E–*. So, we are dealing with essentially the same fact pattern, the respondent like the respondent in [*Matter of J–E–*] is a person from Haiti on the brink of deportation back to that country for criminal reasons, and the prison conditions are fundamentally the same today as they were just a year ago in Haiti, and so the claim is in this Court's view virtually the identical claim that was before the Board in *Matter of J–E–* both as a

legal issue and in terms of the facts of the case.

(J.A. 46–47.) Thus, on habeas review, we are limited to the administrative factual findings of the IJ, which are essentially those that the BIA addressed in *Matter of J– E–*. In addition, the IJ found that, with regards to Auguste's predicament in particular, there was no evidence (nor was there any submitted) that Auguste's situation differed in any way from the alien in *Matter of J–E–*, or that he had faced torture in Haiti in the past. The District Court, in considering Auguste's habeas petition, does not appear to have made any independent findings of fact in this matter and instead relied on the facts presented in *Matter of J–E–*. Thus, at a minimum, the administrative facts in this matter are the same as those in the factual record the BIA considered in *Matter of J–E–*.[25]

[25] The Government explains that the record before this Court is incomplete and does not include a copy of Auguste's pleadings before the IJ or the BIA. This is because the complete administrative record of the removal proceedings was not yet in evidence at the time the District Court denied the habeas petition on the merits. The only record we have is contained in the Joint Appendix, which contains the petition for writ of habeas corpus and attached exhibits, as well as an affidavit executed by counsel for Auguste with attached exhibits.

The Government, however, contends that Auguste has introduced evidence in his habeas petition that conflicts with the factual findings made by the BIA in *Matter of J–E–*, and that this constitutes an attack on fact findings inappropriate on habeas review. The specific facts in dispute include a statement by a Haitian government official that acknowledges that **\*151** the conditions in the prisons are "tough," as well as a statement that the purpose of Haiti's imprisonment policy is to intimidate and punish deportees, and to teach them a lesson about the true conditions in Haiti's prisons. Even assuming that we agree with the Government that these statements somehow are in conflict with the findings of the BIA in *Matter of J–E–*, we nonetheless see no reason to decide the question of whether the foregoing statements offered by Auguste may be considered on habeas review because they do not, in our opinion, strengthen Auguste's CAT claim or change our ultimate disposition of his petition. Accordingly, although we will discuss these facts below, nothing in this

opinion should be construed as a holding that the disputed facts are properly before this Court. [26]

[26]    As an additional matter, in his Brief to this Court, Auguste relies in part on the 2003 State Department Country Report on Human Rights Practices for Haiti ("2003 Report") which was released on February 25, 2004. Because the IJ decided this case on November 12, 2003, the 2003 Report was not part of the administrative record on which the IJ based his finding that Auguste was not eligible for CAT relief. In contrast, it appears that the 2001 and 2002 State Department Country Reports were before the IJ. The Government contends that the 2003 Report is not properly before this Court. However, after reviewing the 2003 Report submitted as part of Auguste's habeas petition, we believe that it contains no new evidence that strengthens Auguste's claim or which would change our ultimate disposition of his habeas petition. Accordingly, we need not decide whether the 2003 Report is properly before this Court.

### 3.

[18]   [19]   "An applicant for relief on the merits under [Article 3] of the [Convention] bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " *See Sevoian v. Ashcroft,* 290 F.3d 166, 174–75 (3d Cir.2002) (quoting 8 C.F.R. § 208.16(c)(2)). The standard for relief under the Convention "has no subjective component, but instead requires the alien to establish, by objective evidence, that he is entitled to relief." *See id.* (internal citations and quotations omitted); *see also Elien v. Ashcroft,* 364 F.3d 392, 398 (1st Cir.2004); *Cadet,* 377 F.3d at 1180.

[20]   [21]   [22]   For an act to constitute torture under the Convention and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions. *See Matter of J–E–,* 23 I. & N. Dec. at 297 (citing 8 C.F.R. § 208.18(a)); *see also Cadet,* 377 F.3d at 1192 (outlining the same requirements); *Elien,* 364 F.3d at 398 (same). An "alien's testimony, if credible, may be sufficient to

sustain the burden of proof without corroboration." *Zubeda,* 333 F.3d at 471–72 (citing *Mansour v. INS,* 230 F.3d 902, 907 (7th Cir.2000)). "If an alien meets his/her burden of proof, withholding of removal under the Convention is mandatory just as it is for withholding of deportation under § 243(h)." *Zubeda,* 333 F.3d at 472 (citing INA § 241(b)(3) and 8 C.F.R. §§ 208.16—208.18).

We can discern at least three separate circumstances which Auguste contends constitute torture within the meaning of the Convention. First, Auguste contends that the indefinite detention of criminal deportees constitutes torture. Second, Auguste contends that the detention, coupled with the harsh and deplorable prison conditions, constitutes torture. Finally, **\*152** Auguste contends that the fact that he may be subject to physical abuse and beatings by prison guards constitutes torture. We consider each in turn.

### a. Indefinite Detention

[23]   As we discussed above in Part I.A, the government of Haiti uses a preventive detention policy for criminal deportees. The State Department's 2000 Country Report on Human Rights Practices in Haiti, which was submitted to the District Court as an exhibit to Auguste's habeas petition, states:

> In the past, when the authorities received Haitian citizens deported from other countries for having committed crimes, they were generally processed in 1 week and then released. Since March 2000, criminal deportees who already have served sentences outside the country are kept in "preventive detention," with no fixed timetable for their eventual release. According to police officials, the deportees are held in order to prevent an increase in insecurity and to convince them that they would not want to risk committing crime because of prison conditions. The average period of preventive detention for these persons has decreased to approximately 1 month, compared to several months in 2000.

2000 Country Report.

The BIA found in *Matter of J–E–* as a factual matter that the Haitian government uses the detention procedure "to prevent the bandits from increasing the level of insecurity and crime in the country" and as a "warning and deterrent not to commit crimes in Haiti." *Matter of J–E–,* 23 I. & N. Dec. at 300 (internal citations and quotations omitted). The BIA also

found that the detention policy "in itself appears to be a lawful sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." *Id.* Accordingly, the BIA concluded that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), and was not otherwise intended to defeat the purpose of the Convention, and thus was not torture. *Matter of J–E–,* 23 I. & N. Dec. at 300.

Auguste, however, contends that the detention policy, whatever its deterrent purposes, is unlawful under Haiti's Constitution and criminal code and violates the international human rights law prohibition against indefinite and arbitrary imprisonment. Auguste, in effect, contends that whether a state policy is a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3) hinges on the legality of that policy under the removal country's applicable law. This is undoubtedly an interesting but difficult issue. [27]

[27]    The District Court in this matter, relying on the BIA's finding in *Matter of J–E–* that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), apparently found no violation or challenge to Haitian law by the use of the detention policy.

However, we note that in *Matter of J–E–,* the BIA made an alternative ruling why the policy of indefinite detention does not constitute torture, specifically that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." 23 I. & N. Dec. at 300. As will be shown in the next section, we agree with that conclusion. Thus, even if we were to find that the detention policy was not a lawful sanction, we would conclude that the Haitian authorities lacked the requisite intent for a finding **\*153** of torture. Thus, we see no need to address the lawful sanction issue arising under 8 C.F.R. § 208.18(a)(3) or be drawn into an inquiry as to the particularities of Haitian or international law on this matter.

### b. Prison Conditions

[24]    Auguste contends that his detention in harsh and brutal prison conditions constitutes torture. We briefly described these conditions above in Part I.A, and there is no doubt that these conditions are objectively deplorable. In *Matter of J–E–,* the BIA found from the record

that the Haitian prison conditions were "the result of budgetary and management problems as well as the country's severe economic difficulties." *Matter of J–E–,* 23 I. & N. Dec. at 301. In addition, the BIA found that "although lacking in resources and effective management, the Haitian Government is attempting to improve its prison systems," and that the Haitian Government "freely permitted the ICRC [International Committee of the Red Cross], the Haitian Red Cross, MICAH [International Civilian Mission for Support in Haiti], and other human rights groups to enter prisons and police stations, monitor conditions, and assist prisoners with medical care, food, and legal aid." *Id.* (citations omitted). However, the BIA found that placing detainees in these prison conditions did not constitute torture because there was no evidence that the Haitian authorities had the specific intent to create or maintain these conditions so as to inflict severe pain or suffering on the detainees. *Id.* The District Court, relying on *Matter of J–E–,* agreed, concluding that "we have circumstances here where we have simply the allegation of general prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.)

Auguste, however, challenges the conclusion of the District Court and the BIA in *Matter of J–E–* that the Haitian authorities do not have the requisite specific intent under 8 C.F.R. § 208.18(a)(5). He contends that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but purposely place deportees in the brutal prison conditions in order to punish and intimidate them. The BIA's finding that the prison conditions are the result of budgetary and management problems is a factual finding that falls outside the scope of our habeas review. However, Auguste's contention that the BIA misapplied 8 C.F.R. § 208.18(a)(5) involves the application of law to facts and thus is appropriate on habeas review.

Keeping in mind the appropriate deference we must give to the BIA in the interpretation of its own regulations, we do not think the BIA acted outside of its authority or contrary to law in *Matter of J–E–* in concluding that the Haitian authorities lack the requisite specific intent to inflict severe pain and suffering on Auguste, or others like him, within the meaning of 8 C.F.R. § 208.18(a)(5). As we noted above, for an act to constitute torture, the actor must not only intend to commit the act but also intend to achieve the consequences of the act. In this case, the latter is lacking. As the BIA found in *Matter of J–E–,* the prison conditions, which are

the cause of the pain and suffering of the detainees, result from Haiti's economic and social ills, not from any intent to inflict severe pain and suffering on detainees by, for instance, creating or maintaining the deplorable prison conditions. The mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities **\*154** intend to inflict severe pain and suffering. The difference goes to the heart of the distinction between general and specific intent.

In effect, Auguste is complaining about the general state of affairs that exists in Haitian prisons. The brutal conditions are faced by all prisoners and are not suffered in a unique way by any particular detainee or inmate. We think it goes without saying that detainees and other prisoners face a brutal existence, experiencing pain and suffering on a daily basis. The conditions that we have described are among the worst we have ever addressed. But, the pain and suffering that the prisoners experience in Haiti cannot be said to be inflicted with a specific intent by the Haitian government within the meaning of 8 C.F.R. § 208.18(a)(5). [28]

[28]   Although we do not think that the following list, contained in the record of the ratification of the Convention by the Senate, was intended to be exhaustive, we think the illustrative list of the acts which could constitute torture supports our analysis of the specific intent requirement of 8 C.F.R. § 208.18(a)(5):

> The term 'torture,' in United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.

> *See* S. Exec. Rep. 101–30, at 14 (citations omitted).

In so holding, we caution that we are not adopting a per se rule that brutal and deplorable prison conditions can never constitute torture. To the contrary, if there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture should the other requirements of the Convention be met. Perhaps, as evidence is further developed on conditions in Haiti, the BIA may arrive at a different conclusion in the future. But, the situation that we are presented with, and the evidence that we must consider, do not support a finding that Auguste will face torture under the only definition that is relevant for our purposes—the definition contained in the Convention and the implementing regulations.

### c. Physical Abuse

[25]   Finally, Auguste points to reports of physical beatings of prisoners by prison guards as evidence that he faces torture upon his removal to Haiti. In *Matter of J–E–*, the BIA noted that the reports of prisoner abuse have ranged from the beating with fists, sticks and belts to burning with cigarettes, choking, hooding, and kalot marassa. 23 I. & N. Dec. at 302. In *Matter of J–E–*, the BIA concluded that, although such acts may rise to the level of torture, the alien there had failed to meet his burden of proof that he would be more likely than not subject to torture. *Id.* at 302–03. In particular, the BIA noted that there were no claims by the alien of past torture. *Id.* at 303. Moreover, although there were reported instances of beatings of prisoners, the alien had failed to show that the beatings were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture." *Id.* at 304. The situation here is no different. Auguste has not alleged any past torture, nor has he offered any evidence tending to show that he faces an increased likelihood of torture anymore than the alien in *Matter of J–E–*.

### IV. CONCLUSION

The conditions that Auguste will likely face in Haiti's prisons, like those awaiting many other criminal deportees, are harsh and deplorable. However, in ratifying the **\*155** Convention against Torture, the United States undertook its obligations subject to certain understandings on the proper intent and burden of proof standards. The Department of Justice thereafter adopted regulations that properly implemented those standards in the regulations governing CAT claims. Auguste has not satisfied those standards. Accordingly, we will affirm the order of the District Court.

### All Citations

395 F.3d 123

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Vissuet v. Bank of America, N.A.,   Cal.App. 4 Dist.,
June 19, 2014

584 F.3d 773
United States Court of Appeals,
Ninth Circuit.

Anjam Parvez KHAN, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 07–72586.
|
Argued and Submitted Feb. 11, 2009.
|
Filed Sept. 9, 2009.

**Synopsis**

**Background:** Alien, a citizen of India, sought judicial review
of an order of the Board of Immigration Appeals (BIA)
affirming the immigration judge's (IJ) denial of asylum and
withholding of removal due to alien's involvement with
terrorist organization.

**Holdings:** The Court of Appeals, William A. Fletcher, Circuit
Judge, held that:

[1] IJ did not violate alien's due process rights by not holding
second hearing after enactment of REAL ID Act;

[2] Court of Appeals had jurisdiction to hear alien's asylum
claims;

[3] substantial evidence supported IJ's determination that
organization was "terrorist organization";

[4] substantial evidence supported IJ's determination that
alien knew or should have known that organization was
involved in terrorism; and

[5] definition of "terrorist activity" was not unconstitutionally
vague.

Petition denied.

D.W. Nelson, Circuit Judge, filed concurring opinion.

**West Headnotes (16)**

**[1]** **Aliens, Immigration, and
Citizenship** 🔑 Review of initial decision or
administrative review

When the Board of Immigration Appeals (BIA)
affirms and adopts an immigration judge's (IJ)
decision, the Court of Appeals reviews the
decision of the IJ.

9 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** 🔑 Constitutional questions

**Aliens, Immigration, and
Citizenship** 🔑 Law questions

In reviewing a decision of an immigration judge
(IJ), the Court of Appeals reviews constitutional
and other questions of law de novo.

41 Cases that cite this headnote

**[3]** **Aliens, Immigration, and
Citizenship** 🔑 Law questions

**Statutes** 🔑 Attorney General

Court of Appeals applies *Chevron* deference
to the Attorney General's interpretations of
ambiguous immigration statutes, but need not
defer if the statute is unambiguous.

**[4]** **Administrative Law and
Procedure** 🔑 Substantial evidence

Court of Appeals reviews agency factual
findings and determinations of mixed questions
of law and fact for substantial evidence.

11 Cases that cite this headnote

**[5]** **Aliens, Immigration, and
Citizenship** 🔑 Right to hearing

**Aliens, Immigration, and
Citizenship** 🔑 Weight and Sufficiency

**Constitutional Law** 🔑 Asylum, refugees, and withholding of removal

Because alien failed to show, by a "preponderance of the evidence", that he did not know, and should not reasonably have known, that his solicitation of funds for a political organization would further the organization's terrorist activity, he necessarily failed to meet the more stringent "clear and convincing evidence" standard set forth by the REAL ID Act, which was enacted following the alien's asylum and withholding of removal hearing, and thus IJ did not violate alien's due process rights by failing to afford alien a new hearing following enactment of REAL ID Act. U.S.C.A. Const.Amend. 5; REAL ID Act of 2005, §§ 103(b), 101(c), 8 U.S.C.A. §§ 1182(a)(3)(B)(iv), 1231(b)(3)(B)(iv).

1 Cases that cite this headnote

**[6]** **Federal Courts** 🔑 Determination of question of jurisdiction

Court of Appeals has jurisdiction to determine whether jurisdiction exists.

**[7]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

For purposes of appellate review under the REAL ID Act, "mixed questions of law and fact" are those in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard. REAL ID Act of 2005, § 106(a)(1)(A), 8 U.S.C.A. § 1252(a)(2)(D).

1 Cases that cite this headnote

**[8]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Court of Appeals, on judicial review of an order of the Board of Immigration Appeals (BIA) affirming the immigration judge's (IJ) denial of asylum and withholding of removal due to alien's involvement with terrorist organization, had jurisdiction to determine the scope and

meaning of the statutory terrorism bar to asylum, including the definition of "terrorist organization" and "terrorist activity," as these presented purely legal questions. REAL ID Act of 2005, § 103(b), 8 U.S.C.A. § 1182(a)(3)(B)(iv).

30 Cases that cite this headnote

**[9]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Court of Appeals, on judicial review of an order of the Board of Immigration Appeals (BIA) affirming the immigration judge's (IJ) denial of asylum and withholding of removal due to alien's involvement with terrorist organization, had jurisdiction to determine whether the organization for which alien sought monetary contributions was a "terrorist organization" under statute barring asylum for aliens involved in such organizations, where such issue was a mixed question of law and fact. REAL ID Act of 2005, § 103(b), 8 U.S.C.A. § 1182(a)(3)(B)(iv).

16 Cases that cite this headnote

**[10]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Because immigration judge (IJ) found alien's testimony credible, whether alien reasonably should have known of the terrorist activity of organization to which he belonged and solicited money presented a mixed question of law and fact over which Court of Appeals on judicial review of an order of the Board of Immigration Appeals (BIA) affirming the immigration judge's (IJ) denial of asylum and withholding of removal due to alien's involvement with terrorist organization had jurisdiction. REAL ID Act of 2005, § 103(b), 8 U.S.C.A. § 1182(a)(3)(B)(iv).

27 Cases that cite this headnote

**[11]** **Aliens, Immigration, and Citizenship** 🔑 Participants in persecution

Immigration judge's (IJ) finding, in denying alien asylum and withholding of removal, that organization to which alien belonged, and for

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 291 of 366   PageID 6795

which he solicited funds, was a "terrorist organization," rendering alien ineligible for asylum and withholding of removal, was supported by substantial evidence showing that members of the organization killed politicians, kidnapped the daughter of the Indian Home Minister, and attacked Indian Army convoys, and such actions were unlawful under Indian law. REAL ID Act of 2005, § 103(b), 8 U.S.C.A. §§ 1182(a)(3)(B)(iii), (a)(3)(B)(iv).

2 Cases that cite this headnote

[12]  **International Law**  Self-executing agreements; implementing legislation

United Nations protocol relating to status of refugees is not self-executing. Protocol Relating to the Status of Refugees, Art. 1 et seq., 1968 WL 89568.

13 Cases that cite this headnote

[13]  **International Law**  Self-executing agreements; implementing legislation

A "self-executing" treaty has automatic domestic effect as federal law upon ratification; conversely, a "non-self-executing" treaty does not by itself give rise to domestically enforceable federal law.

11 Cases that cite this headnote

[14]  **International Law**  Domestic statutes and regulations

An act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.

2 Cases that cite this headnote

[15]  **Aliens, Immigration, and Citizenship**  Participants in persecution

Immigration judge's (IJ) finding, in denying alien asylum and withholding of removal, that alien knew or should have known that organization with which he was involved was a terrorist organization was supported by substantial evidence showing that alien knew

that a wing of the organization was dedicated to armed struggle against the Indian government and that he knew that this wing was fighting the Indian Army, that many newspaper reports of terrorist attacks attributed to the organization at the time of the attacks. REAL ID Act of 2005, § 103(b), 101(c), 8 U.S.C.A. §§ 1182(a)(3)(B)(iv), 1231(b)(3).

5 Cases that cite this headnote

[16]  **Aliens, Immigration, and Citizenship**  Validity

**Constitutional Law**  Terrorism

**Constitutional Law**  Aliens, immigration, and citizenship

While statutory definition of what constitutes "terrorist activity" for purposes of determining whether an alien is ineligible for asylum or withholding of removal was broad, it was not unconstitutionally vague, where statute elaborated in great detail would constitute "terrorist activity". REAL ID Act of 2005, § 104, 8 U.S.C.A. § 1182(d)(3)(B)(i).

8 Cases that cite this headnote

**Attorneys and Law Firms**

*775  Robert Bradford Jobe, Law Offices of Robert B. Jobe, San Francisco, CA, for the petitioner.

Jeffrey Lawrence Menkin, U.S. Department of Justice, Washington, DC, for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX1–013.

Before: D.W. NELSON, W. FLETCHER and RICHARD C. TALLMAN, Circuit Judges.

**Opinion**

WILLIAM A. FLETCHER, Circuit Judge:

Anjam Parvez Khan petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for

asylum and withholding of removal. The BIA adopted the IJ's finding that Khan was ineligible for both forms of relief because he had engaged in terrorist activity. Because we hold that the IJ properly applied the terrorism bar in the Immigration and Nationality Act ("INA"), we deny the petition for review.

## I. Background

According to his credible testimony, Khan was born in Kashmir and is a citizen of India. He has been involved in the Kashmir independence movement since about 1967. Beginning in the early 1970s, Khan worked with the Jammu Kashmir Liberation Front ("JKLF"), a group dedicated to the establishment of an independent Kashmir, though he was never officially a member of the JKLF.

The JKLF had both militant and political factions that, until approximately 1994, were part of the same organization. According to Khan, the two factions operated separately but were "wings of the same organization." In about 1994, the two factions split into different organizations when half of the JKLF renounced violence. Before the split, the political wing of the organization advocated nonviolently for an independent Kashmir, while the militant **776** wing operated an armed insurgency against the Indian government in Kashmir. The militant wing took part in killings of politicians, the kidnapping of the daughter of the Indian Home Minister, and repeated attacks on the Indian Army, including attacks on military convoys.

Khan testified that he was affiliated with only the political wing of the JKLF, that his work with the JKLF was entirely nonviolent in nature, and that he had no knowledge of the activities of the military wing. However, Khan admitted to knowing that he was "part of that movement, a part of which was an arms struggle" and that the militant wing of the JKLF was carrying out a "war" against the Indian military. But he claimed to be unaware of any kidnappings, bombings, or activity targeting civilians by the militant wing of the group. Khan's work with the JKLF consisted of planning political activities for the JKLF, working to distribute aid through a "central committee" funded by the JKLF, and raising funds for the political wing of the JKLF. However, Khan testified that he turned the money he raised over to the JKLF, not merely to its political wing. He further testified that he was one of the primary organizers of the political wing of the

JKLF, and that he advised the political wing on how to spend its funds.

In October 1997, Khan fled India and entered the United States on a nonimmigrant visitor visa. In March 1998, he applied for asylum and was referred to an IJ. Before the IJ, he asserted requests for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

In June 2005, the IJ issued a written decision denying Khan's request for asylum and withholding of removal but granting Khan's request for relief under CAT. The IJ found Khan's testimony to be credible, but held that Khan was statutorily ineligible for asylum or withholding of removal under 8 U.S.C. § 1182(a)(3)(B)(iv)(IV) because he had engaged in terrorist activity. In July 2005, the IJ issued a supplemental decision to account for changes made to the INA by the REAL ID Act, which applied retroactively to cases pending at the time of its enactment. *Rafaelano v. Wilson,* 471 F.3d 1091, 1092 (9th Cir.2006). The IJ held that the REAL ID Act increased the burden on Khan to show that he had not engaged in terrorist activity. The IJ held that because Khan had failed to meet his burden under the old statute, he necessarily failed under the REAL ID Act.

Both the government and Khan appealed to the BIA. The BIA adopted and affirmed the IJ's decision on January 17, 2007. Khan timely petitioned for review.

## II. Standard of Review

**[1]  [2]  [3]  [4]**   When the BIA affirms and adopts an IJ's decision, this court reviews the decision of the IJ. *Tapia v. Gonzales,* 430 F.3d 997, 999 (9th Cir.2005). In reviewing the decision of the IJ, we review constitutional and other questions of law de novo. *Id.; Cerezo v. Mukasey,* 512 F.3d 1163, 1166(9th Cir.2008). We apply *Chevron* deference to the Attorney General's interpretations of ambiguous immigration statutes, but need not defer if the statute is unambiguous. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). We review agency factual findings and determinations of mixed questions of law and fact for substantial evidence. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Dhital v. Mukasey,* 532 F.3d 1044, 1050 (9th Cir.2008) (applying substantial evidence standard to mixed question).

**\*777**  III. Discussion

The INA precludes aliens who have engaged in terrorist activity from seeking some forms of relief. In particular, 8 U.S.C. § 1182(a)(3)(B)(i) renders inadmissible certain aliens who have engaged in terrorist activity, have been members or representatives of terrorist organizations, or have encouraged others to engage in terrorist activity. This provision applies to aliens seeking both asylum and withholding of removal through other parts of the statute. Section 1158(b)(2)(A)(v) provides that any alien described in § 1182(a)(3)(B)(i)(I)— i.e., "any alien" who "has engaged in a terrorist activity"— is ineligible for asylum Additionally, § 1231(b)(3)(B)(iv) provides that withholding of removal is unavailable when "there are reasonable grounds to believe that the alien is a danger to the security of the United States." "Reasonable grounds exist to believe that an alien is a danger to security if the alien 'has engaged, is engaged, or at any time after admission engages in any terrorist activity (as defined in section 1182(a)(3)(B)(iv) ...).' " *Bellout v. Ashcroft,* 363 F.3d 975, 978 (9th Cir.2004) (quoting § 1231(b)(3)(B)(iv) and a former version of § 1227(a)(4)(B)). Thus, if an alien "has engaged in a terrorist activity" under § 1182(a)(3)(B)(iv) at any time, he is ineligible for both asylum and withholding of removal. It does not matter that the alien ceased participation in terrorist activity at some point before seeking admission to or relief in the United States.

The statute defines "engag[ing] in terrorist activity" broadly. Section 1182(a)(3)(B)(iv)(IV)(cc) defines "engag[ing] in terrorist activity" to include "solicit[ing] funds or other things of value for ... a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." An alien's intention in soliciting funds only for nonviolent activity is irrelevant to this definition, even when an organization has separate political and militant wings, because money donated to an organization's political wing is considered to be support for the militant wing as well. *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1136 (9th Cir.2000) ("[M]oney is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.").

The statute also defines "terrorist organization" broadly. The definition includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup

which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Subclauses (I) through (VI) of clause (iv) list ways in which an individual or an organization can "engage in terrorist activity." These include committing, planning, soliciting funds for, soliciting individuals for, or providing material support for a terrorist activity. *Id.* § 1182(a)(3)(B)(iv).

The statute defines a "terrorist activity" as

any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a **\*778** governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any—

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).

Under these provisions, an alien is ineligible for asylum or withholding of removal if he solicited funds or things of value for an organization that committed, planned, solicited funds

for, solicited individuals for, or provided material support for a "terrorist activity," unless the alien can "demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." The IJ found Khan ineligible for relief under these provisions because he solicited funds for the JKLF.

The IJ focused on subsections (I), (II), and (III) of § 1182(a)(3)(B)(iii) in considering whether the JKLF had "engaged in terrorist activity." The IJ found that the JKLF had conducted attacks against the Indian military, including killings, bombings, and attacks on convoys, as well as the kidnapping of the daughter of the Indian Home Minister. The IJ then found that Khan had not met his burden in establishing that he had not known nor reasonably should have known about these terrorist activities.

Khan makes several arguments challenging the IJ's findings. First, Khan argues that his due process rights were violated when the IJ did not conduct a new hearing to allow him to present evidence challenging his ineligibility under the modified standards in the REAL ID Act.

Second, Khan challenges the IJ's determination on the merits, arguing that the JKLF was not a "terrorist organization," that he did not know and reasonably should not have known about the JKLF's terrorist activities, and that he is not presently a threat to national security and thus may not be subjected to refoulement. The core of these arguments is that the activities of an organization such as the JKLF that is engaged in armed resistance against an illegitimate government are permitted under international law, and that the definition of "terrorist activity" in the INA does not extend to violent activities in furtherance of such armed resistance so long as those activities comply with international law.

Third, Khan argues that the statute is unconstitutionally vague.

We consider each of these arguments below.

### A. Due Process Claim

After the IJ's initial ruling, the IJ issued a supplemental decision to account for changes made to the INA by the REAL ID Act. Khan claims that his due process rights were violated because he was not afforded an opportunity to present evidence relevant to his admissibility under the new standards imposed by the REAL ID Act.

**\*779** Under the previously applicable standard, an alien was required to show, by a preponderance of the evidence, that "he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity." As we explained above, under the REAL ID Act, an alien must "demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(IV)(cc).

[5] Khan's due process claim fails because the REAL ID Act served only to increase Khan's burden. Because Khan failed to meet the "preponderance of the evidence" standard, he necessarily failed to meet the more stringent "clear and convincing evidence" standard. Further, because Khan failed to show that he should not reasonably have known that his fundraising would further the JKLF's terrorist activity, he necessarily failed to show that he should not reasonably have known the JKLF was a terrorist organization. As explained above, the definition of "terrorist organization" encompasses any group engaged in "terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). If Khan should have known that his fundraising for the JKLF would further its terrorist activities, he also should have known that the JKLF was engaged in terrorist activities and was thus a "terrorist organization."

Because Khan had already presented evidence that failed to meet the lower standard pre-REAL ID Act, there was no due process violation in denying him the opportunity to present evidence to meet the higher standard post-REAL ID Act.

### B. Asylum and Withholding of Removal Claims

Khan challenges the IJ's holding that he is ineligible for asylum and withholding of removal because of his work for the JKLF. The government argues that we lack jurisdiction to review the IJ's determination on the asylum claim. It is uncontested that we have jurisdiction to review whether Khan is ineligible for withholding of removal because he engaged in terrorist activity.

### 1. Jurisdiction over the Asylum Claim

[6]   The government argues that this court lacks jurisdiction to review the BIA's determination that Khan is statutorily ineligible for asylum because he engaged in terrorist activity. We have jurisdiction to determine whether jurisdiction exists. *Flores–Miramontes v. INS,* 212 F.3d 1133, 1135(9th Cir.2000).

Section 1158(b)(2)(D) provides, "There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v)." Section 1158(b)(2)(A)(v), described above, bars aliens who engage in a terrorist activity from eligibility for asylum. In *Bellout v. Ashcroft,* 363 F.3d 975 (9th Cir.2004), we held that this provision stripped the court of jurisdiction to review the IJ or the BIA's determination that a petitioner was ineligible for asylum because he engaged in terrorist activity. *Id.* at 977.

However, after we decided *Bellout,* Congress passed the REAL ID Act, which revised this jurisdictional bar. Section 1252(a)(2)(D) provides that "[n]othing ... in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." The chapter referred to in § 1252(a)(2)(D) includes § 1158(b)(2)(D), the jurisdiction-stripping provision upon which we relied in *Bellout.*

**\*780**   [7]   In *Fernandez–Ruiz v. Gonzales,* 410 F.3d 585(9th Cir.2005), we held that the REAL ID Act restored appellate review over all "constitutional claims or questions of law." [1] *Id.* at 587. In *Ramadan v. Gonzales,* 479 F.3d 646(9th Cir.2007), we held that this principle extended to mixed questions of law and fact. *Id.* at 648. Mixed questions of law and fact are those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." *Id.* at 656–57(quotation omitted). We held in *Ramadan* that whether undisputed facts constituted "changed circumstances" in a country, as defined by the immigration laws, is a mixed question of law and fact over which we have jurisdiction. *Id.*

[1]   We heard *Fernandez–Ruiz* en banc and vacated the panel opinion. *Fernandez–Ruiz v. Gonzales,* 466 F.3d 1121 (9th Cir.2006). In our en banc opinion, we adopted the portion of the panel

opinion addressing jurisdiction over questions of law. *Id.* at 1124.

Where the facts are undisputed, we have extended *Ramadan* to other jurisdiction-stripping provisions. *See, e.g., Ramos Barrios v. Holder,* 2009 WL 1813469, at \*4 (9th Cir. June 26, 2009) (holding that question of whether petitioner had satisfied threshold requirements to qualify for special rule cancellation was mixed question over which we have jurisdiction); *Husyev v. Mukasey,* 528 F.3d 1172, 1178–79 (9th Cir.2008) (holding that question of whether "extraordinary circumstances" exist to justify a delay in the filing of an application for asylum is a mixed question over which we have jurisdiction); *Ghahremani v. Gonzales,* 498 F.3d 993, 998–99 (9th Cir.2007) (holding that question of whether petitioner established "due diligence" in discovering deception, fraud, or error in motion to reopen context is a mixed question over which we have jurisdiction). Additionally, we have held that even when facts are in dispute we have jurisdiction to review a mixed question so long as under any view of the factual record the petitioner has satisfied the relevant legal standard. *Khunaverdiants v. Mukasey,* 548 F.3d 760, 765 (9th Cir.2008). Therefore, § 1158(b)(2)(D) does not completely deprive this court of jurisdiction to review the IJ's holding that Khan is ineligible for asylum on account of his engaging in terrorist activities.

[8]   [9]   [10]   We have jurisdiction to determine the scope and meaning of the statutory terrorism bar, including the definition of "terrorist organization" and "terrorist activity," as these present purely legal questions. We also have jurisdiction to determine whether the JKLF meets this standard. This is a mixed question, because the nature of JKLF's activities is undisputed by the parties, and the question is whether these undisputed facts as found by the IJ meet the legal standard of "terrorist organization." Finally, because the IJ found Khan's testimony credible, whether Khan reasonably should have known of the JKLF's terrorist activity presents a mixed question of law and fact over which we have jurisdiction. *See, e.g., Kingman Reef Atoll Invs., L.L.C. v. United States,* 541 F.3d 1189, 1195 (9th Cir.2008) (stating that "what a reasonable person should have known" presents mixed question); *Colleen v. United States,* 843 F.2d 329, 331 (9th Cir.1987) (same).

2. Merits of the Asylum and Withholding Claims

Both the asylum and withholding of removal claim turn on whether the JKLF is a terrorist organization, and on whether

Khan knew or should have known that it was a terrorist organization. We discuss these questions in turn.

**\*781**  i. JKLF's Status as a "Terrorist Organization"

As we noted above, the JKLF is a "terrorist organization" under the INA if it committed, planned, solicited funds for, solicited individuals for, or provided material support for "a terrorist activity." Khan seeks to limit the definition of "terrorist activity" in a manner that might exclude the JKLF from the definition of a "terrorist organization."

[11]   Khan argues that the definition of "terrorist activity" under § 1182(a)(3)(B)(iii) incorporates international law, and thus excludes legitimate armed resistance against military targets from the definition of "terrorist activity." Under Khan's proposed definition, actions that are illegal under the laws of the regime in power in the alien's country of origin are "unlawful" within the meaning of § 1108(a)(3)(B)(iii) only if these actions violate the international law of armed conflict. We hold that this is not a permissible reading of the statute.

a. Statutory Text

We begin with the text of the statute. As noted above, § 1182(a)(3)(B)(iii) defines "terrorist activity" to include various violent acts that are "unlawful under the laws of the place where [they are] committed (or which, if [they] had been committed in the United States, would be unlawful under the laws of the United States or any State)." The words "under the laws of the place where it is committed" directly modify the word "unlawful," such that "unlawful" does not just mean generically unlawful, but rather "unlawful" in this specific sense. This text is unambiguous, specifying that "unlawful" actions include actions that are unlawful in the place where they were committed.

Khan argues that the BIA's reading of the statute is so broad that it includes within the definition of "terrorist activity" many actions that we generally do not consider to be terrorist in nature. For example, Khan argues that under the BIA's reading, it would include armed resistance by Jews against the government of Nazi Germany. This may be true, but the text does not make an exception for actions that are lawful under international law. An action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that

the conduct in question is no longer "unlawful" under the country's domestic law, but Khan has made no argument that that is the case here.

We note that the statute includes a discretionary waiver of the terrorism bar for relief from removal that can be exercised by the Secretary of State or the Secretary of Homeland Security. Section 1182(d)(3)(B)(i) provides

> The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) of this section shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) of this section shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II) of this section, no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has **\*782** voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi) of this section, and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians.

Khan v. Holder, 584 F.3d 773 (2009)
09 Cal. Daily Op. Serv. 11,621, 2009 Daily Journal D.A.R. 13,525

This waiver weakens Khan's argument that the BIA's reading of the statutory language is overly broad, because the broad statutory definition is combined with a discretionary waiver by executive branch officials. These officials are in a position to judge the characteristics of particular groups engaging in armed resistance in their home countries, as well as the implications for our foreign relations in determining whether the actions of these groups are terrorist activities.

### b. Refugee Protocol and Convention

Khan also argues that the international law obligations of the United States under the 1967 United Nations Protocol Relating to the Status of Refugees ("the Protocol") compel a narrower definition of "terrorist activity." 19 U.S.T. 6223, 606 U.N.T.S. 268 (Jan. 31, 1967). "The Protocol[binds] parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees [ ("Refugee Convention") ] ... with respect to 'refugees' defined in Article 1.2 of the Protocol." *INS v. Stevic,* 467 U.S. 407, 416, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). Article 1.2 of the Protocol defines "refugee" as an individual who

> owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

UN Protocol, Article 1.2(relying on Refugee Convention, Article 1A(2)). The Refugee Convention excepts from coverage

> any person with respect to whom there are serious reasons for considering that:
>
> (a) He has committed a crime against peace, a war crime, or a crime against humanity, as defined in the

> international instruments drawn up to make provision in respect of such crimes;
>
> (b) He has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>
> (c) He has been guilty of acts contrary to the purposes and principles of the United Nations.

Refugee Convention, Article 1F, 189 U.N.T.S. 150 (Jul. 28, 1951) (adopted in the Protocol, Article 1.2). The Refugee Convention includes the duty of non-refoulement in Article 33.1, providing that

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Refugee Convention, Article 33.1. Article 33.2 of the Refugee Convention provides an exception from this duty:

> The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for **\*783** regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country.

Refugee Convention, Article 33.2.

Khan argues that Article 33.2 and Article 1F provide the only permissible grounds on which a country can refoul a refugee. Therefore, he contends that the INA's terrorism bar to relief from removal can only apply to individuals who (1) have been implicated in a crime against peace, a war crime, or a crime

against humanity; (2) have committed a serious non-political crime; (3) have been guilty of acts contrary to the purposes or principles of the United Nations; (4) may constitute a danger to the security of this country; or (5) having been convicted by a final judgment of a particularly serious crime, constitute a danger to the community. He argues that the IJ's interpretation of "terrorist activity" covers actions that do not satisfy any of these five criteria, and that such a broad bar to relief from removal therefore violates the United States' international obligations under the Protocol.

[12] [13] The United States acceded to the Protocol in 1968, though it did not sign the Convention itself. *Stevic,* 467 U.S. at 416 & n. 9, 104 S.Ct. 2489. However, the Protocol is not self-executing. *Barapind v. Reno,* 225 F.3d 1100, 1107 (9th Cir.2000) (citing *Stevic,* 467 U.S. at 428 n. 22, 104 S.Ct. 2489). A "self-executing" treaty has "automatic domestic effect as federal law upon ratification. Conversely, a 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law." *Medellin v. Texas,* 552 U.S. 491 n. 2, 128 S.Ct. 1346, 1356 n. 2, 170 L.Ed.2d 190 (2008). Therefore, the Protocol does not have the force of law in American courts. Instead, the Supreme Court and our court have both stated that the Protocol "serves only as a useful guide in determining congressional intent in enacting the Refugee Act" of 1980, which sought to bring United States refugee law into conformity with the Protocol. *Barapind,* 225 F.3d at 1106–07; *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 436–37, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Stevic,* 467 U.S. at 428 n. 22, 104 S.Ct. 2489; *United States v. Aguilar,* 883 F.2d 662, 680 (9th Cir.1989), *superseded by statute on other grounds,* P.L. No. 99–603, 100 Stat. 3359, *as stated in United States v. Gonzalez–Torres,* 309 F.3d 594 (9th Cir.2002).

[14] These cases do not discuss whether the Protocol is also a "useful guide" in interpreting provisions of the INA that were not enacted with the Protocol in mind, such as the terrorism bars to relief from removal. However, we follow the general rule of the *Charming Betsy* canon that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. The Charming Betsy,* 2 Cranch 64, 6 U.S. 64, 118, 2 L.Ed. 208 (1804). Under *Charming Betsy,* we should interpret the INA in such a way as to avoid any conflict with the Protocol, if possible. Khan's argument that the terrorism bar violates the obligations of the United States in the Protocol fails because the Protocol does not conflict with the INA's definition of "terrorist activity."

The Protocol, through Refugee Convention Article 33.2, allows the United States to refoul an individual "whom there are reasonable grounds for regarding as a danger to the security" of the United States. Neither the Refugee Convention nor the Protocol defines "danger to the security" of the United States. Relying on law review articles, publications of the Office of the High Commissioner for Refugees, and a Canadian Supreme Court opinion, **\*784** Khan argues that the meaning of "danger to the security" must be limited in three ways. He contends that (1) "danger to the security" can only apply to individuals who pose a present danger to the United States; (2) the danger must be a serious threat to national security; and (3) the danger must be proved, not simply assumed. He further argues, using similar sources, that refoulement is an act of last resort that the United States can employ only after attempting to contain an individual's danger to the country's security through criminal prosecution or removal to a third country.

We disagree. We have already stated that "the determination of refugee status ... is incumbent upon the Contracting State in whose territory the refugee finds himself." *Aguilar,* 883 F.2d at 680(quoting the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979), which "provides significant guidance in construing the Protocol" (internal quotations omitted)); *see also Maximov v. United States,* 373 U.S. 49, 53, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). The INA provides that "an alien who [has engaged in a terrorist activity] shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(indirectly referencing 8 U.S.C. § 1182(a)(3)(B)). This definition, not that expressed in legal commentary or by the courts of other nations, controls in this court. Therefore, the INA's definition of "terrorist activity" not only does not violate the Protocol, but adheres to its specific non-refoulement exception.

Even if it did conflict, the administrative discretion in the INA, § 1182(a)(3)(B)(i)(II), might resolve the conflict. In *Stevic,* the Supreme Court held that, to the extent there were differences between American statutory refugee law and the Protocol, it was acceptable that such differences be accommodated by administrative discretion. *Stevic,* 467 U.S. at 428 n. 22, 104 S.Ct. 2489.

#### c. Summary

Given both the text of the statute and Khan's failure to point to any binding international law which would alter our understanding of that text, we hold that the definition of "terrorist activity" under the INA does not provide an exception for armed resistance against military targets that is permitted under the international law of armed conflict. Our reading of the statute accords with the interpretation of both the BIA and the Third Circuit, which have both considered similar questions. In *In re S–K–*, 23 I & N Dec. 936 (BIA 2006), the petitioner had been a member of the Chin National Front ("CNF"), which was involved in armed struggle against the Burmese government and undisputedly had committed violent acts that were unlawful within Burma. *Id.* at 937–38. The petitioner argued, as Khan does here, that the definition of unlawful action as applied to certain regimes and in certain conflicts should not be based solely on the domestic laws of the country where the acts were committed, but should account for whether the regime is in fact "legitimate" under international law or norms. *Id.* at 938. The BIA rejected this argument, holding that the language in the statute was clear:

> As noted by the DHS during oral argument, the fact that Congress included exceptions elsewhere in the Act for serious nonpolitical offenses and aliens who have persecuted others, even where persecuted themselves, and that it has not done so in section 212(a)(3)(B), indicates that the omission of an exception for justifiable force was intentional. In fact, having reviewed the statutory sections, **\*785** we find that Congress intentionally drafted the terrorist bars to relief very broadly, to include even those people described as "freedom fighters," and it did not intend to give us discretion to create exceptions for members of organizations to which our Government might be sympathetic. Rather, Congress attempted to balance the harsh provisions set forth in the Act with a waiver, but it only granted the power to make exemptions to the Attorney General and the Secretaries

> of State and Homeland Security, who have not delegated such power to the Immigration Judges or the Board of Immigration Appeals.... [T]here is no exception in the Act to the bar to relief in cases involving the use of justifiable force to repel attacks by forces of an illegitimate regime.

*Id.* at 941. We need not defer under *Chevron* because the text of the statute itself is unambiguous. Based on that fact, we agree with the BIA.

In the only published applicable circuit opinion on this question, *McAllister v. Attorney General*, 444 F.3d 178 (3d Cir.2006), the Third Circuit has also agreed, holding that the definition of "terrorist activity" under the INA does not contemplate international laws that distinguish between types of conflicts, purposes of resistance groups, and whether citizens were targeted. *Id.* at 187–88.

Under our reading of the statute, the IJ's holding that the JKLF meets the definition of a "terrorist organization" is supported by substantial evidence. There is documentary evidence in the record, at least some of which is corroborated by Khan's testimony, that members of the JKLF killed politicians, kidnapped the daughter of the Indian Home Minister, and attacked Indian Army convoys. Each of these activities constitutes "terrorist activity" under § 1182(a)(3)(B)(iii). Therefore, substantial evidence supports the IJ's finding that the JKLF, during Khan's affiliation with the organization, constituted a "terrorist organization" under the statute.

#### ii. "Know or Reasonably Should Have Known"

Khan argues that, even if the JKLF was a terrorist organization, he did not know and should not have reasonably known this fact.

**[15]** Khan admitted that he knew that a wing of the JKLF was dedicated to armed struggle against the Indian government and that he knew that this wing was fighting the Indian Army. Attacks by dissidents on the military of a country constitute terrorist activity under § 1182(a)(3)(B)(iii). Additionally, the record contains many newspaper reports of terrorist attacks attributed to the JKLF. The IJ found these reports credible and that, given these reports, Khan had not

demonstrated that he did not know and reasonably should not have known about the JKLF's terrorist activities. For these reasons, the IJ's finding is supported by substantial evidence.


iii. Summary

The IJ's findings that the JKLF was a terrorist organization, that Khan solicited funds for the JKLF, and that Khan knew or reasonably should have known that the JKLF was a terrorist organization are supported by substantial evidence. We therefore decline to upset the BIA's holding that Khan is ineligible for asylum or withholding of removal.


C. Vagueness Claim

[16]   Khan argues that if the definition of "terrorist activity" as written in the INA is not limited in some way, the statute is unconstitutionally vague. This argument **\*786** fails. The statute elaborates in great detail what constitutes "terrorist activity." This definition is broad, but it is not unconstitutionally vague. *See McAllister,* 444 F.3d at 186–87. We recognize that the statute includes a discretionary waiver at § 1182(d)(3)(B)(i), and that the statute does not guide the execution of this discretion. However, the issue is whether the terrorist activity bar is unconstitutionally vague, not whether the criteria for a discretionary waiver of that bar are vague. Such discretion is routinely found throughout the immigration statutes and has been upheld repeatedly. *See, e.g., INS v. Stevic,* 467 U.S. 407, 428 n. 22, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).


Conclusion

The IJ applied the terrorism bars in the INA properly and the IJ's factual findings are supported by substantial evidence. Khan's due process and vagueness challenges also fail. Therefore, we **DENY** the petition for review.


D.W. NELSON, Circuit Judge, concurring:
I agree with the majority that the petition should be denied: Khan solicited funds for the JKLF, an organization he reasonably should have known was a terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(iv). I write separately, however, because I believe that Khan has sufficiently raised the issue of international law and deem it worthy of consideration.

1. Statutory Framework

Because it has not been specifically designated as such, the JKLF can only qualify as a terrorist organization under § 1182(a)(3)(B)(vi)(III). Such a "Tier III" terrorist organization is defined as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, ... [terrorist] activities." *Id.* § 1182(a)(3)(B)(vi)(III). "Terrorist activity," in turn, is "any activity which is unlawful under the laws of the place where it is committed" and which involves conduct proscribed by subsections (I)-(VI). *Id.* § 1182(a)(3)(B)(iii).


2. The Relevance of International Law

In my view, whether conduct is "unlawful under the laws of the place where it is committed" will, under certain circumstances, depend on whether and to what extent the foreign nation at issue has incorporated tenets of international law into its domestic legal regime, for example by acceding to an international agreement with binding obligations.[1] The Geneva Conventions, to which nearly every country in the world is a party, are a prime example. The protections and obligations of the Geneva Conventions are triggered whenever there is an armed conflict, either international or non-international in character, involving a state party. *See* Geneva Convention Relative to the Treatment of Prisoners of War arts. 2, 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. In such a situation, the Geneva Conventions are part of "the laws of the place" where the conflict is occurring. *See* 8 U.S.C. § 1182(a)(3)(B)(iii).

[1]   The majority appears to recognize this possibility when it notes that "[a]n action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law." Maj. op. at 781.

Thus, while a group is not automatically a terrorist organization simply by virtue of engaging in an armed conflict, neither would its participation in such a conflict shield it from the terrorist label. The answer would depend on whether the **\*787** group had engaged in unlawful conduct. Deliberately targeting noncombatants, for example,

is unlawful under the Geneva Conventions and would constitute terrorist activity.

It is worth emphasizing that my view is not premised on carving out an "exception" to the terrorist activity definition for groups engaged in legitimate armed conflict. *See* Maj. op. at 784 ("[W]e hold that the definition of 'terrorist activity' under the INA does not provide an exception for armed resistance against military targets that is permitted under the international law of armed conflict."). My analysis, like that of the majority, turns on whether the conduct in question is unlawful.

The majority recognizes the possibility that an interpretation of "terrorist activity" that ignores international law could lead to some bizarre outcomes, including classifying as terrorists Jews engaged in armed resistance against the Nazis. Maj. op. at 781. But such anomalous results are not merely hypothetical: the United States military, whose invasions of Afghanistan and Iraq were indisputably "unlawful" under the domestic laws of those countries, would qualify as a Tier III terrorist organization. Accordingly, any individual or group who assisted the U.S. military in those efforts would be ineligible for asylum or withholding of removal. *See* 8 U.S.C. § 1182(a)(3)(B)(iv). This could discourage sympathetic groups from lending support to the U.S. military, knowing it would preclude them from seeking refuge in the U.S. in the future.

The majority contends that such concerns are overblown, pointing to a provision in the statute allowing the Secretaries of State and Homeland Security, in consultation with each other and the Attorney General, to waive the terrorism bar. *See* Maj. op. at 781–82; *see also* 8 U.S.C. § 1182(d)(3)(B)(i). I hope my colleagues are correct. I, however, am less sanguine than they are about the efficacy of this waiver provision. First, the waiver is entirely discretionary and unreviewable. *See* 8 U.S.C. § 1182(d)(3)(B)(i). Second, the waiver requires the assent of three separate agencies, posing a daunting bureaucratic obstacle to implementation. Third, even without this high administrative hurdle, a waiver seems to me a haphazard and inefficient means of avoiding outcomes—such

as classifying the U.S. military as a terrorist organization—that Congress clearly never intended. Finally, because India is a democracy, the waiver provision is not even available in this case. *See id.* ("[N]o ... waiver may be extended to a group that has engaged [in] terrorist activity against ... another democratic country.").

In sum, it is foreseeable that interpreting the statute without reference to international law occasionally will lead to anomalous, and unintended, results, and the availability of individual waivers is, at best, an inadequate piecemeal solution. Consequently, I agree with Khan that international law will sometimes be relevant in determining whether to apply the terrorist bar.

### 3. Application to Khan's Case

Recourse to international law, however, does not help Khan in this case. Although India has ratified the Geneva Conventions, and the JKLF is arguably engaged in a qualifying conflict, substantial evidence supports the conclusion that the JKLF has exceeded the bounds of permissible conduct under the international law of armed conflict. The record indicates that the JKLF has killed moderate politicians, detonated bombs in public places, and claimed responsibility for high-profile kidnappings. Such activities violate the Geneva Conventions, which prohibit the targeting of noncombatants or the taking of hostages. *See* **\*788** Geneva Conventions art. 3. Accordingly, this conduct is "unlawful" for purposes of § 1182(a)(3)(B)(iii) and constitutes terrorist activity. The JKLF, therefore, qualifies as a Tier III terrorist organization. Because Khan has failed to demonstrate by clear and convincing evidence that he should not reasonably have known that the JKLF is a terrorist organization, I agree with the majority that he is ineligible for asylum or withholding of removal.

### All Citations

584 F.3d 773, 09 Cal. Daily Op. Serv. 11,621, 2009 Daily Journal D.A.R. 13,525

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

404 F.3d 733
United States Court of Appeals,
Third Circuit.

Said Husni AL–FARA; Bahya Safi, Petitioners

v.

Alberto GONZALES, Attorney General

of the United States [*] Respondent

[*]     Caption amended pursuant to Rule 43(c), Fed.
R.App. P.

No. 02–4580.
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) May 27, 2004.
|
Filed: April 14, 2005.

**Synopsis**
**Background:** Applicant, who was born in the Gaza Strip, petitioned for review of order of Board of Immigration Appeals (BIA) denying asylum.


**Holdings:** The Court of Appeals, Cowen, Circuit Judge, held that:

[1] substantial evidence supported determination that incident involving Israeli soldiers, along with ensuing encounters between Israeli forces and applicant's family, did not constitute persecution;

[2] applicant failed to establish that any persecution of his family members was because of their familial relationship;

[3] finding that applicant's fear of retaliation was not objectively reasonable was supported by substantial evidence; and

[4] applicant failed to establish well-founded fear of persecution based on his Palestinian nationality.


Petition denied.

West Headnotes (21)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Summary affirmance; single or multiple member review

**Constitutional Law** 🔑 Asylum, refugees, and withholding of removal

Affirmance-without-opinion procedures employed by Board of Immigration Appeals (BIA) in asylum action did not violate due process. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1); 8 C.F.R. § 1003.1(e)(4).

1 Cases that cite this headnote


**[2]** **Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

Under the substantial evidence standard, the Court of Appeals must uphold an Immigration Judge's (IJ) factual findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole.


**[3]** **Aliens, Immigration, and Citizenship** 🔑 Fact Questions

Findings of past and future persecution in an asylum proceeding are factual determinations and are accordingly subject to deferential review. Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1).

2 Cases that cite this headnote


**[4]** **Aliens, Immigration, and Citizenship** 🔑 Threats, Harassment, and Acts of Violence

Determination of Immigration Judge (IJ), that incident in which Israeli soldiers entered asylum applicant's home in Gaza Strip in 1967, and shot at him as he fled, along with ensuing encounters between Israeli forces and applicant's family, did not constitute "persecution" for purposes of

asylum, was supported by substantial evidence, where neither applicant nor his parents were arrested, detained, abused, or physically harmed, and where war had broken out, such that threat of injury or harm affected entire population in Gaza. Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1).

3 Cases that cite this headnote

[5]    **Aliens, Immigration, and Citizenship** 🔑 Acts Constituting Persecution

"Persecution" for purposes of asylum is not a limitless concept; while it includes threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom, it does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

5 Cases that cite this headnote

[6]    **Aliens, Immigration, and Citizenship** 🔑 Acts Constituting Persecution

Persecution must be extreme conduct to qualify for asylum protection. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** 🔑 Grounds for Persecution; Protected Groups

Harm resulting from country-wide civil strife is not persecution on account of a factor enumerated in the asylum statute. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

4 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** 🔑 Humanitarian grant

Because asylum applicant failed to establish past persecution, he was not eligible for discretionary

grant of asylum for humanitarian reasons. Immigration and Nationality Act, §§ 101(a)(42)(A), 208(b)(1), as amended, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158(b)(1).

8 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship** 🔑 Well Founded Fear of Future Persecution

In the absence of past persecution, an applicant for asylum can establish that he or she has a well-founded fear of persecution. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

6 Cases that cite this headnote

[10]   **Aliens, Immigration, and Citizenship** 🔑 Subjective and Objective Tests

An asylum applicant's demonstration of a well-founded fear of persecution carries both a subjective and objective component; the applicant must show a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

[11]   **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

Testimony alone may be sufficient to satisfy the burden of demonstrating a well-founded fear of persecution, so long as it is found credible. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

[12]   **Aliens, Immigration, and Citizenship** 🔑 Membership in social group

To qualify for asylum on account of membership in a particular social group requires that an applicant: (1) identify a group that constitutes a particular social group; (2) establish that he or

she is a member of that group; and (3) show persecution or a well-founded fear of persecution based on that membership. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

[13]   **Aliens, Immigration, and Citizenship** ⚷ Weight and Sufficiency

Evidence that asylum applicant's cousin was arrested and tortured in Intifada in 1987, that another cousin who served as judge in Gaza was killed because he refused to unlawfully apply laws to Palestinians before him, and that applicant's parents' house was among the thousands destroyed in 1976 pursuant to Israeli policy, was insufficient to establish that any persecution of his family members was because of their familial relationship, and thus was insufficient to establish applicant's membership in a particular social group. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

[14]   **Aliens, Immigration, and Citizenship** ⚷ Acts Constituting Persecution

Violence against a family member may support an asylum applicant's claim of persecution, and in some instances is sufficient to establish a well-founded fear of persecution. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

3 Cases that cite this headnote

[15]   **Aliens, Immigration, and Citizenship** ⚷ Weight and Sufficiency

Substantial evidence supported finding of Immigration Judge (IJ), that asylum applicant's fear of retaliation from Israeli forces as result of his attack on Israeli soldier in Gaza in 1967 was not objectively reasonable, given passage of 38 years since such incident, and 30 years since Israelis last inquired of applicant's whereabouts.

Immigration and Nationality Act, § 101(a)(42) (A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

[16]   **Aliens, Immigration, and Citizenship** ⚷ Nationality

Asylum applicant, who was born in Gaza Strip, failed to establish well-founded fear of persecution based on his Palestinian nationality, even if harsh conditions confronted those residing in Gaza, where applicant personally suffered isolated harm or little cumulative harm. Immigration and Nationality Act, § 101(a)(42) (A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

[17]   **Aliens, Immigration, and Citizenship** ⚷ Acts Constituting Persecution
**Aliens, Immigration, and Citizenship** ⚷ Grounds for Persecution; Protected Groups

Although an individual who resides in a country where the lives and freedoms of a significant number of persons of a protected group are targeted for persecution may make less of the individual showing required to qualify for asylum, the applicant must do more than rely on a general threat of danger arising from a state of civil strife; some specific showing is required. Immigration and Nationality Act, § 101(a)(42) (A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

3 Cases that cite this headnote

[18]   **Aliens, Immigration, and Citizenship** ⚷ Acts Constituting Persecution

Statelessness alone was not sufficient to warrant asylum on part of Palestinian who was born in, but fled, Gaza. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[19]    Aliens, Immigration, and Citizenship** 🔑 Asylum, Refugees, and Withholding of Removal

**International Law** 🔑 Self-executing agreements;  implementing legislation

Alien could not assert claims under 1967 United Nations Protocol Relating to the Status of Refugees beyond those contained in INA, since Protocol was not self-executing, and did not confer any rights beyond those granted by implementing domestic legislation. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

4 Cases that cite this headnote

**[20]    Aliens, Immigration, and Citizenship** 🔑 Exhaustion of remedies in general

Asylum applicant failed to exhaust his available administrative remedies as to claim that he qualified as refugee pursuant to legal opinion of Immigration and Naturalization Service (INS) General Counsel's Office, and judicial review thus was precluded by Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), where he failed to raise it before Immigration Judge (IJ) or on direct appeal to Board of Immigration Appeals (BIA). Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A); Immigration and Nationality Act, § 106(c), as amended, 8 U.S.C.(1994 Ed.) § 1105a(c).

3 Cases that cite this headnote

**[21]    Aliens, Immigration, and Citizenship** 🔑 Record

The general rule, applicable across the board to judicial review of administrative action and merely codified for immigration appeals, is that the court may not go outside the administrative record. Immigration and Nationality Act, § 106(a)(4), as amended, 8 U.S.C.(1994 Ed.) § 1105a(a)(4).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*735**  Tahani Salama, Philadelphia, PA, Counsel for Petitioners.

Anthony W. Norwood, Earle B. Wilson, Linda S. Wernery, Terri J. Scadron, John M. McAdams, Jr., United States Department of Justice, Office of Immigration Litigation, **\*736** Ben Franklin Station, Washington, DC, Counsel for Respondent.

Before: RENDELL and COWEN, Circuit Judges and SCHWARZER [*], District Judge.

[*]     Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

**Opinion**

COWEN, Circuit Judge.

Said Al–Fara ("Petitioner" or "Al–Fara") and Bahya Safi [1] petition for review of an order of the Board of Immigration Appeals ("BIA"), which summarily affirmed an Immigration Judge's ("IJ") decision to deny Al–Fara's applications for asylum and withholding of deportation under the Immigration and Nationality Act ("INA" or "Act"). Al–Fara challenges the propriety of the BIA's summary affirmance in his case. For the following reasons, we will deny the petition for review.

[1]     Petitioner Bahya Safi is Al–Fara's wife and a derivative applicant on his applications for asylum and withholding of deportation. *See* 8 C.F.R. § 208.3(a) (2004). While our opinion refers to the primary applicant, it is understood to include the derivative applicant as well.

I.

A.

The IJ found Al–Fara to be credible regarding his subjective narrative. The facts below are accordingly taken largely from his testimony.

Petitioner was born on June 24, 1947, in Khan Younis, a town located in the area known as the Gaza Strip of what was then Palestine. During the War of 1967, Israeli forces occupied the Gaza Strip, and entered Petitioner's house by force. In response, Petitioner attacked one of the Israeli soldiers with a stick. Recalling a fearful memory from the 1956 Sinai War where he had witnessed Israeli soldiers lining up and shooting a group of Palestinian youths, Al–Fara fled as the Israeli soldiers shot at him. Petitioner believed that the Israeli soldiers had come to destroy his home, and that if he remained in Gaza they would arrest and kill him in retaliation for his attack on the Israeli soldier. He escaped to Jordan.

From 1967 through 1976, Israeli soldiers approached Petitioner's parents and other family members demanding his whereabouts. Specifically in 1976, Israeli soldiers forced Al–Fara's parents from their home and demolished it. As a result of this ordeal, Al–Fara's mother became mentally ill and was admitted to a psychiatric hospital, where she passed away in 1991. Other relatives were killed by Israeli authorities. Petitioner's cousin, a judge in the Gaza Strip, was tortured and killed by Israeli authorities for refusing to impose unlawful judgments against Palestinian youths. According to Petitioner's testimony and an affidavit from the office of the Palestinian National Liberation Movement, Petitioner's cousin Essam Al–Fara was arrested during the Great Intifada in 1987 but managed to escape. Petitioner testified that Essam was tortured.

Petitioner remained in Jordan until October 1968, when Jordan agreed to issue travel documents to any Palestinian refugee willing to leave. He traveled to Kuwait, where he succeeded in receiving a sponsorship from a Kuwaiti citizen. His residence permit, however, expired in 1983 and the sponsor refused renewal. He next lived in Iraq until December 1985, but returned to Jordan to establish an importing business. Petitioner operated his business from July 1986 until December 1989. During this period he entered the United States on several occasions for business purposes. After his business in Jordan came to a close, Al–Fara traveled to Syria, Turkey, Greece, Bulgaria, Cyprus, and Yugoslavia. He spent five and one-half **737** months in Egypt, where he married his present wife in 1990.

Petitioner testified that Israeli authorities will not permit him to return, and that the Palestinian Authority is powerless. As corroborated by a letter dated March 15, 1997, from the Palestinian National Liberation Movement, the Palestinian National Authority denied his application for reunification

with his family in Gaza, because they were not processing applications at the time. He does not possess a Palestinian passport, but has a traveling document from Jordan. His wife, who was also born in Khan Younis but raised in Egypt, has a traveling document from Egypt. Although he may enter Jordan, his wife cannot, and he will be asked to surrender his passport to Jordan authorities. His children, who are all United States citizens, may only enter Jordan on tourist visas. Petitioner believes that neither he nor his wife will be accepted by any other country.

B.

Petitioners entered the United States on or about April 7, 1991, on a non-immigrant visitor's visa issued with authorization to remain until October 7, 1991. On June 28, 1996, the former Immigration and Naturalization Service ("INS")[2] issued an Order to Show Cause in which it charged Petitioners with remaining in the United States beyond the authorized period. On October 18, 1996, Petitioners admitted the allegations, and the IJ thus concluded that they are subject to deportation pursuant to section 241(a)(1)(B) of the INA. Seeking relief, Petitioners applied for asylum and withholding of deportation.

[2]   On March 1, 2003, the INS ceased to exist as an agency within the Department of Justice and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (2002).

The IJ found Said Al–Fara to be credible but denied his application for asylum. After identifying Petitioner as a stateless Palestinian, the IJ observed that it was the conditions of unrest and battle brought about by the 1967 war, and not any individualized persecution of Petitioner, that prompted Petitioner's flight from Gaza in 1967. In addition, the IJ recognized that the 1967 war involved attacks and abuses by both Israelis and Palestinians. The IJ reasoned that harm resulting from such violence in a situation of civil strife is not necessarily persecution "on account of" a statutory factor, and thus Petitioner is not a "refugee" by virtue of past persecution. With respect to Petitioner's well-founded fear of future persecution claim, the IJ found that the substantial amount of time that passed between Petitioner's flight and the present renders his subjective fear of retaliation objectively unfounded. Addressing Petitioner's status as stateless, the IJ concluded that statelessness alone does not warrant a grant

of asylum, and noted as an additional matter the lack of any evidence, other than Al–Fara's testimony, that the Palestinian Authority would deny him admission into the area it controls. In light of Petitioner's inability to qualify for asylum, the IJ rejected his request for withholding of deportation, but granted the application for voluntary departure. On December 2, 2002, the BIA affirmed without opinion the IJ's decision pursuant to 8 C.F.R. § 1001.3(e)(4). [3]

[3]    At the time the BIA acted on Al–Fara's appeal, the streamlining regulations were located at 8 C.F.R. § 3.1(a)(7) (2002). The language of the current streamlining regulation does not significantly differ from that of the former provision, and it is thus to the current regulation that we refer to and cite. 8 C.F.R. § 1003.1(e)(4) provides in pertinent part:

(i) The Board member to whom a case is assigned shall affirm the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

(A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or

(B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

**\*738**  II.

Because Petitioners were placed in deportation proceedings before April 1, 1997, and the final order of deportation was issued by the BIA after October 30, 1996, our jurisdiction arises under 8 U.S.C. § 1105a (1996), as amended by the transitional rules for judicial review in section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009– 546 (Sept. 30, 1996). The BIA's jurisdiction arose under 8 C.F.R. §§ 1003.1(b) and 1240.53 (2003). [4]

[4]    At the time the BIA acted on Al–Fara's appeal, these regulations were found at 8 C.F.R. § 3.1(b) (2) and 240.53 (2002).

[1]  [2]  [3]    The IJ denied Al-Fara's applications for relief, but granted voluntary departure. The BIA affirmed without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4). [5] "[W]hen the BIA issues an [affirmance without opinion] under the streamlining regulations, we review the IJ's opinion and scrutinize its reasoning." *Dia v. Ashcroft,* 353 F.3d 228, 245 (3d Cir.2003) (en banc). Under the substantial evidence standard, we must uphold the IJ's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias– Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Findings of past and future persecution are factual determinations and are accordingly subject to this deferential review. *Lukwago v. Ashcroft,* 329 F.3d 157, 167 (3d Cir.2003).

[5]    In his brief, Al-Fara argues that the BIA's affirmance-without-opinion procedures violate due process. This argument is foreclosed by our decision in *Dia v. Ashcroft,* 353 F.3d 228, 238–45 (3d Cir.2003) (en banc).

III.

Al–Fara asserts that the BIA erred in its decision to apply the streamlining regulations to his case because the criteria set forth in 8 C.F.R. § 1003.1(e)(4) were not met. [6] Specifically, he contends that (1) the IJ's decision is not correct; (2) the IJ failed to review critical evidence; (3) the BIA failed to address changed circumstances; and (4) new arguments were presented by Petitioner to the BIA. We conclude that the BIA's decision to streamline was not arbitrary and capricious.

[6]    In *Smriko v. Ashcroft,* 387 F.3d 279 (3d Cir.2004), this Court held that it has jurisdiction to review the BIA's decision to issue an affirmance-without-opinion in a particular case. We concluded that 8 C.F.R. § 1003.1 provides a "meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 292 (internal quotation marks omitted). We will uphold the BIA's decision to streamline if we find that it was not arbitrary and capricious in light of the requirements of 8 C.F.R. § 1003.1(e)(4).

A.

Substantial evidence supports the IJ's determination that Petitioner does not qualify for asylum. Pursuant to 8 U.S.C. § 1158(b)(1), the Attorney General may grant asylum to an otherwise removable alien who demonstrates that he or she meets the definition of "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A):

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is **\*739** outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Petitioner mounts four specific challenges to the merits of the IJ's decision: (1) the IJ's finding that Petitioner does not qualify as a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A) by virtue of past persecution is not supported by substantial evidence; (2) the IJ's finding that Petitioner does not qualify as a "refugee" by virtue of a well-founded fear of future persecution on account of membership in a particular social group is not supported by substantial evidence; (3) the IJ's denial of asylum is incorrect because Petitioner qualifies for a discretionary grant of asylum based on humanitarian grounds; and (4) the IJ's denial of asylum is incorrect because Petitioner's status as a stateless Palestinian renders him eligible for asylum.

Turning first to Petitioner's claim of past persecution, "[t]o establish eligibility for asylum on the basis of past persecution, an applicant must show (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Abdulrahman v. Ashcroft,* 330 F.3d 587, 592 (3d Cir.2003) (internal citation and quotation marks omitted).

**[4]**   **[5]**   **[6]**   Substantial evidence supports the IJ's determination that the incident that occurred between Petitioner and the Israeli soldier in 1967 along with the ensuing encounters between the Israeli forces and Petitioner's family do not rise to the level of "persecution" as contemplated by the Act. Persecution is not a limitless concept. While it includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom," we have explained that it "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result." *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993). Persecution must be "extreme conduct" to qualify for asylum protection. *Id.* at 1240 n. 10. In this case, Israeli soldiers entered Petitioner's home by force. Petitioner responded by attacking an Israeli soldier with a stick and fleeing the country. The Israeli forces continued to harass Petitioner's family and demand his whereabouts until 1976, when they expelled Petitioner's parents from their home and demolished the house. Neither Petitioner nor his parents were arrested, detained, abused, or physically harmed as a result of this incident. In addition, the context in which these encounters occurred is extremely significant. At the time of this event in 1967, war had broken out between Israel and what was then Palestine. The record reflects that the threat of injury or harm in Gaza affected the entire population in that region and was a function of the Israeli takeover, occupation, and claim to the lands of Gaza and the West Bank. According to Petitioner's affidavit, his parents' house was among thousands destroyed in 1976 pursuant to an Israeli policy designed to force families to leave and make room for Jewish settlements.

**\*740**   **[7]**   Petitioner's burden in showing persecution is high, and we have held that " 'generally harsh conditions shared by many other persons' do not amount to persecution." *Fatin,* 12 F.3d at 1240 (quoting *Matter of Acosta,* 19 I. & N. Dec. 211, 222 (BIA 1985)); *see Ambartsoumian v. Ashcroft,* 388 F.3d 85, 93 (3d Cir.2004); *Matter of Sanchez and Escobar,* 19 I. & N. Dec. 276, 284 (BIA 1985), *aff'd sub nom Sanchez–Trujillo v. INS,* 801 F.2d 1571 (9th Cir.1986). While troubling, Petitioner's allegations do not arise to the level of persecution required by *Fatin.* Indeed, the IJ noted that Congress had specifically rejected a definition of "refugee" that would have encompassed "displaced persons," i.e., "individuals who flee widespread conditions of indiscriminative violence resulting

from civil war or military strife in a country." *Sanchez and Escobar,* 19 I. & N. Dec. at 284. Furthermore, as the IJ properly noted, harm resulting from country-wide civil strife is not persecution "on account of" an enumerated statutory factor. *See Matter of Maldonado–Cruz,* 19 I. & N. Dec. 509, 513 (BIA 1988), *rev'd on other grounds,* 883 F.2d 788 (9th Cir.1989); *Sanchez and Escobar,* 19 I. & N. Dec. at 282. Petitioner has furnished no evidence, short of speculation, that these past incidents were perpetrated on account of anything other than ongoing civil controversy. This record does not compel a finding that Petitioner suffered past persecution.

 **[8]**   This finding extinguishes Al–Fara's claim that the IJ erroneously failed to grant him a discretionary grant of asylum for humanitarian reasons. In *Matter of Chen,* 20 I. & N. Dec. 16 (BIA 1989), the Board acknowledged that in limited circumstances past persecution alone may warrant a grant of asylum, even in the absence of a future threat of persecution. The Board stated:

> If an alien establishes that he has been persecuted in the past for one of the five reasons listed in the statute, he is eligible for a grant of asylum. The likelihood of present or future persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is a little likelihood of present persecution....

> However, there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution....

> "It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate.... Thus, while the likelihood of future persecution is a factor to consider in exercising discretion in cases where any asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution."

*Id.* at 18–19 (quoting the Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979)).

In this case, however, we affirm the IJ's finding that Petitioner did not suffer past persecution. Therefore, he is not eligible for a grant of asylum pursuant to this rationale.

 **[9]**   **[10]**   **[11]**   In the absence of past persecution, an applicant for asylum can establish that he or she has a well-founded fear of persecution. *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002). Demonstration of a well-founded fear of persecution carries both a subjective and objective component. The applicant must show "a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable **\*741** possibility." *Chang v. INS,* 119 F.3d 1055, 1066 (3d Cir.1997). Testimony alone may be sufficient to satisfy this burden, so long as it is found credible. *Gao,* 299 F.3d at 272.

Taken in conjunction with the documentary evidence of conditions in Israel and the occupied territories, Al–Fara's testimony, while credible, does not establish that a reasonable person in his circumstances would fear persecution on account of social group or nationality.

 **[12]**   **[13]**   **[14]**   To qualify for asylum on account of membership in a "particular social group" requires that an applicant (1) identify a group that constitutes a "particular social group," (2) establish that he or she is a member of that group, and (3) show persecution or a well-founded fear of persecution based on that membership. *Lukwago v. Ashcroft,* 329 F.3d 157, 170 (3d Cir.2003). Petitioner argues that the IJ erred in failing to find that he has a well-founded fear of persecution based on membership in the social group of his family. It is not clear whether this argument was raised before the IJ, but any error he may have committed in failing to entertain or address it is harmless in light of the failure of the record to substantiate it. While violence against a family member may "support ... a claim of persecution and in some instances is sufficient to establish [a well-founded fear of] persecution," *Baballah v. Ashcroft,* 335 F.3d 981, 988 (9th Cir.2003), Petitioner has not sufficiently established that his family members suffered persecution *because* of their familial relationship. The record reflects that one of Petitioner's cousins was arrested and tortured in the Intifada in 1987, and that another cousin who served as a judge in Gaza was killed because he refused to unlawfully apply laws to the Palestinians before him. According to Petitioner, his parents' house was among the thousands destroyed in 1976 pursuant to an Israeli policy aimed at emptying Gaza to make room for Jewish settlements.

 **[15]**   Substantial evidence supports the IJ's finding that Petitioner's fear of retaliation from Israeli forces as a result of his attack on an Israeli soldier in 1967 is not objectively reasonable. Putting aside that such fear is not "on account

of" an acceptable statutory factor, *see Maldonado–Cruz, 19 I. & N. Dec. at 512* ("[A]liens fearing retribution over purely personal matters or those fleeing general conditions of violence and upheaval in their native countries would not qualify for asylum. Such persons may have well-founded fears of harm but such harm would not be on account of [any statutory factor]."), this fear is objectively unreasonable given that approximately thirty-eight years have passed since the incident, and approximately thirty years have passed since the Israelis last inquired of Petitioner's whereabouts. Petitioner has put forth no evidence that the Israeli authorities possess a present interest in him.

 **[16]**    **[17]**    Al–Fara's contention that he possesses a well-founded fear of persecution based on his nationality as a Palestinian is also unpersuasive. This claim is exclusively premised on the harsh conditions confronted by those who reside in Gaza. Although an individual who resides in a country where the lives and freedoms of a significant number of persons of a protected group are targeted for persecution may make less of the individual showing required to qualify for asylum, the applicant must do more than rely on a general threat of danger arising from a state of civil strife; *some* specific showing is required. A Palestinian who has suffered isolated harm, or little cumulative harm, cannot prevail merely because many Palestinians face oppressive conditions.

We certainly cannot say that "a reasonable factfinder would have to conclude,"  **\*742**  based on the record, that the Petitioner, if returned to Gaza, would face treatment amounting to "persecution" simply because he is a Palestinian. The general political upheaval that has been an unfortunate reality in Gaza is obviously threatening for those who live there, but such conditions in and of themselves do not merit asylum.

Related to this latter claim is Petitioner's contention that the IJ committed reversible error in failing to consider critical evidence regarding the conditions experienced by Palestinians in Israel and the occupied territories. In support of this charge, Petitioner refers to a portion of the IJ's oral statement: "Because as I have explained, the fundamental problem in this case is we have too much background evidence about conditions of Palestinians in occupied territories, but very little from this respondent about what exactly happened to him. And, he has to have both." (R. at 429.) Petitioner asserts that this statement proves that the IJ did not consider all of the background evidence submitted in

the case. This claim is without merit and directly belied by the IJ's other statements and written opinion, which discusses the general conditions of the areas controlled by the Palestinian Authority, citing to specific evidence submitted by both Petitioner and the INS. Significantly, Al-Fara does not point to any specific evidence that he contends the IJ ignored.

Petitioner's fear derives not from his nationality or membership in a social group, but from the general instability of the region. Accordingly, substantial evidence supports the IJ's conclusion that Petitioner does not possess a well-founded fear of persecution as defined by the Act.

 **[18]**    Petitioner's challenge to the IJ's failure to grant asylum on the basis of statelessness is without merit. Courts have repeatedly held that "statelessness alone does not warrant asylum." *See, e.g., Ahmed v. Ashcroft, 341 F.3d 214, 218 (3d Cir.2003).*

B.

Petitioner's argument that streamlining is inappropriate when new arguments are pressed on appeal to the BIA is correct only if the BIA acted arbitrarily in concluding that either "[t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation" or "[t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 1003.1(e)(4). As explained below, the BIA did not act arbitrarily in applying these standards and streamlining Al–Fara's case.

We have discussed above Al–Fara's contentions, raised on direct appeal to the BIA, that he qualifies for asylum based on humanitarian grounds and that the IJ erroneously failed to review critical evidence of country conditions. In addition to these points, his brief submitted to the BIA on appeal argued that he qualifies as a refugee pursuant to the 1951 Convention Relating to the Status of Refugees ("1951 Convention"). On appeal to this Court, Petitioner argues that he qualifies as a refugee pursuant to the legal opinion of the INS General Counsel's Office, Genco Op. No. 95–14, 1995 WL 1796321 (INS Oct. 27, 1995).

 **[19]**    Petitioner's claim that he qualifies as a refugee pursuant to the 1951 Convention and the 2002 interpretations of the United Nations High Commissioner for Refugees made

thereto is without merit. The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), which incorporated the 1951 Convention. The Attorney General implemented regulations **\*743** to comply with its terms. *INS v. Stevic,* 467 U.S. 407, 428–30, n. 22, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). In 1980, Congress amended the INA through passing the Refugee Act, which brought the domestic laws of the United States into conformity with its treaty obligations under the 1967 Protocol. *Id.* at 421, 427, 104 S.Ct. 2489. The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation. *See id.* at 428 n. 22, 104 S.Ct. 2489; *Cuban American Bar Ass'n, Inc. v. Christopher,* 43 F.3d 1412, 1426 n. 13 (11th Cir.), *cert. denied sub nom., Haitian Refugee Center, Inc. v. Christopher,* 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995); *Ming v. Marks,* 505 F.2d 1170, 1171 n. 1 (2d Cir.1974) (per curiam), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1564, 43 L.Ed.2d 776 (1975) (clarifying that 1967 Protocol does not alter or enlarge the effect of existing immigration laws already embracing its principles). Accordingly, Petitioner cannot assert rights beyond those contained in the INA and its amendments.

 **[20]**   Petitioner's claim that he qualifies as a refugee pursuant to the legal opinion of the INS General Counsel's Office, Genco Op. No. 95–14, 1995 WL 1796321 (INS Oct. 27, 1995), was not raised before the IJ or on direct appeal to the BIA. Under 8 U.S.C. § 1105a(c) (repealed), which applies to transitional aliens through incorporation, *see* IIRIRA § 309(c), there shall be no judicial review of a claim "if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c). Because Al–Fara did not advance this particular claim in his asylum hearing before the IJ or on appeal to the BIA, he has not exhausted his available administrative remedies. Consequently, we do not have jurisdiction to entertain it. [7]

[7]    We note, however, that had we jurisdiction to review this claim, we would deny it. Petitioner's claim that Jordan, the country he deems his "last

habitual residence" would deny him reentry is purely speculative, contradicts his administrative hearing testimony, and is not linked to an allegation of persecution on account of any protected ground, as required by the opinion on which he relies.

We recognize that pursuant to our recent decision in *Smriko v. Ashcroft,* 387 F.3d 279 (3d Cir.2004), we have jurisdiction to remand this case to the BIA for a written disposition. Unlike the situation presented in *Smriko,* however, this is not a case where the BIA's institutional knowledge and expertise would be of value to us.

### C.

 **[21]**   Al–Fara rightly asserts that conditions in Israel and the occupied territories have changed since 1998. He has submitted a number of articles and reports documenting these changes. Nonetheless, it is axiomatic that we may not foray outside the administrative record in considering this appeal. Indeed, the "general rule, applicable across the board to judicial review of administrative action and merely codified for immigration appeals in section 1105a(a)(4) [ (repealed) ] [8], is that the court may not go outside the administrative record." *Osaghae v. INS,* 942 F.2d 1160, 1162 (7th Cir.1991). The appropriate recourse, already taken by Petitioner, is to file a motion to reopen with the BIA on account of new evidence. If the BIA denies Petitioner's motion to reopen, he may appeal that decision to this Court.

[8]     The IIRIRA repealed this old rule, but it is still applicable to transitional aliens through incorporation. *See* IIRIRA §§ 309(c)(1) and (4).

 **\*744**  For the foregoing reasons, the petition for review will be denied.

### All Citations

404 F.3d 733

No. 20-71506

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**Jorge Alberto HERNANDEZ ORTIZ,**
A 201-749-913
**Ana Leticia OLIVA VALLE**,
A 201-749-914
**Diana Jackeline HERNANDEZ OLIVA**,
A 201-749-915
(DETAINED – IN MPP),

*Petitioners*,

v.

**Merrick GARLAND,**
Attorney General of the United States,

*Respondent.*

Petition for Review of an Order of the Board of Immigration Appeals

---

## OPENING BRIEF FOR PETITIONERS

---

Priya Arvind Patel
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, CA 94601
Tel: (650) 762-8990
Fax: (510) 437-9164
ppatel@centrolegal.org

Judah Lakin
LAKIN & WILLE LLP
1939 Harrison Street #420
Oakland, CA 94612
Tel: (510) 379-9216
Fax: (510) 379-9219
judah@lakinwille.com

*Pro Bono Counsel for Petitioners*

AR02605

No. 20-60900

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

## YUSEN MUZA DEL TORO,

### Petitioner,

### v.

## WILLIAM P. BARR,
### U.S. Attorney General,

### Respondent.

_____

## PETITION FOR REVIEW OF AN ORDER
## OF THE BOARD OF IMMIGRATION APPEALS
_____

## <u>PETITIONER'S BRIEF</u>

**James Feroli, Esquire**
**Catholic Charities Washington D.C.**
**924 G Street, NW**
**Washington, D.C.  20001**
**Attorney for Petitioner**
**(202) 772-4356**
**December 14, 2020**

AR02606

Bashir Ghazialam, Esq., CASBN 212724
LAW OFFICES OF BASHIR GHAZIALAM
P.O. Box 928167
San Diego, California 92192
Phone: (619) 795-3370
Facsimile: (866) 685-4543

Bridget Cambria, Esq. (PA Bar No. )
Amy Maldonado, Esq. (Of Counsel) (IL Bar No. 6256961)
Aldea – The People's Justice Center
532 Walnut Street, Reading, PA 19601
Phone: (484) 877-8002
Facsimile: (484) 772-8003

*Attorneys for Petitioner*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### MARITZA DEL CARMEN VALLE

PETITIONER,

V.

### WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

RESPONDENT

CASE NO. <u>20-72071</u>

DHS/EOIR NO.: A203 601 133

**DETAINED**

---

## PETITIONER'S OPENING BRIEF

8/26/22, 11:09 AM
DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States | Homela…

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 315 of 366   PageID 6819

U.S. Department of Homeland Security

# DHS Announces Expanded Criteria for MPP–Enrolled Individuals Who Are Eligible for Processing into the United States

**Release Date:** June 23, 2021

As part of our continued effort to restore safe, orderly, and humane processing at the Southwest Border, DHS will expand the pool of MPP-enrolled individuals who are eligible for processing into the United States. Beginning June 23, 2021, DHS will include MPP enrollees who had their cases terminated or were ordered removed in absentia (i.e., individuals ordered removed while not present at their hearings). DHS will continue to process for entry into the United States MPP enrollees with pending proceedings. Individuals who may be eligible for processing should stay where they are currently located and register online through https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org%2F&back_url=https%3A%2F%2Fwww.dhs.gov%2Fnews%2F2021%2F06%2F23%2Fdhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing) .

**Background:**

On June 01, 2021, following careful review of the program as directed by President Biden in Executive Order 14010, the Secretary of Homeland Security terminated the Migrant Protection Protocols (MPP) program. The termination does not impact the processing of eligible individuals into the United States. For more information, visit www.dhs.gov/migrant-protection-protocols (/migrant-protection-protocols) .

## Keywords

MIGRANT PROTECTION PROTOCOLS (MPP) (/KEYWORDS/MIGRANT-PROTECTION-PROTOCOLS-MPP)

Last Updated: 06/29/2022

AR02608



CORONAVIRUS / COVID-19 RESOURCE PAGE





# EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS OF DHS' 'REMAIN IN MEXICO' POLICY

**DATE:** *Tuesday, November 19, 2019*
**TIME:** *10:00 AM*
**LOCATION:** *310 Cannon House Office Building, Washington, DC 20515*
**SUBCOMMITTEE:** *Border Security, Facilitation, & Operations (116th Congress)*
**ISSUE:** *Border Security & Immigration*

## Witenesses

- **Ms. Laura Peña**, Pro Bono Counsel, American Bar Association Commission on Immigration
- **Ms. Erin Thorn Vela**, Staff Attorney, Racial and Economic Justice Program, Texas Civil Rights Project
- **Todd Schneberk**, MD, Assistant Professor of Emergency Medicine, Co-Director, Human Rights Collaborative, Keck School of Medicine of the University of Southern California, Asylum Network Clinician, Physicians for Human Rights
- **Mr. Michael Knowles**, President, AFGE Local 1924, Special Representative, AFGE National CIS Council 119
- **Mr. Thomas Homan**, Former Acting Director, U.S. Immigration and Customs Enforcement, Department of Homeland Security (minority witness)

## Documents

- **Chairwoman Rice Opening Statement**
- **Chairman Thompson Opening Statement**

## Video

Hearing: Examining the Human Rights and Legal Implications of DHS' 'R...

OPEN IN NEW WINDOW

AR02610



**FOR IMMEDIATE RELEASE**

## Hearing Statement of Border Security, Facilitation, and Operations Subcommittee Chairwoman Kathleen Rice (D-NY)

### *Examining the Human Rights and Legal Implications of DHS' 'Remain in Mexico' Policy*

#### November 19, 2019

Today the Subcommittee on Border Security, Facilitation, and Operations will examine the implementation of the Migrant Protection Protocols (MPP), more commonly known as the "Remain in Mexico" program. This morning we will hear the perspective of practitioners who witness the program's impact on the ground. Since this program went into effect on January 18, 2019, the Remain in Mexico policy has forced tens of thousands of asylum seekers to wait in Mexico while their claims are processed. However, this brief summary does not even begin to touch on the devastating and destructive impact that this policy has had on countless lives. Prior to this program's implementation, asylum seekers were permitted to stay in the United States while their cases moved through the courts, a policy based on the humane and common-sense premise that refugees should be given temporary safe haven while it is decided whether or not they may remain in our country.

Under Remain in Mexico however, when migrants who arrive at our Southern border inform a U.S. official that they are seeking asylum, they are provided a court date and sent back into Mexico until their initial hearing. These migrants are mostly from Central and South America, having fled their homes to escape gang violence and government oppression. They are almost always strangers to Mexico, with no friends or family to rely on as they wait on a decision from the United States. The cities in which they are forced to wait are some of the most dangerous in Mexico. Cartels are active, jobs are hard to come by, and even local government officials have been known to engage in violence and exploitation. As a result, these migrants – who were fleeing violence and oppression – are now being forced to wait in conditions that are just dangerous as the ones they fled. If not more so. Families waiting in Mexico under this policy face kidnapping, sexual assault, and extortion. In addition to provoking yet another humanitarian crisis, Remain in Mexico presents a serious threat to our national security. The program has created a newly vulnerable population left completely exposed to exploitation by drug cartels, allowing these criminal organizations to remain active along our border and even expand their reach.

The Administration assured lawmakers and the public that the program would be carefully applied, making exceptions for Mexican nationals, non-Spanish-speakers, pregnant women, the LGBTQ community, and people with disabilities.. However, investigations and reporting have revealed that individuals from every protected category are frequently turned away and left to fend for themselves in Mexican cities that the U.S. State Department has marked as too dangerous for travel. Meanwhile, in August of 2019, DHS notified Congress that it would build large temporary immigration hearing facilities to conduct Remain in Mexico-related proceedings. Located in Brownsville and Laredo, these temporary facilities are functioning as virtual immigration courtrooms, with judges appearing via video conference from brick-and-mortar courtrooms across the country.

These facilities have become a significant cause for alarm. Lack of public information about the proceedings, limited access to translators and attorneys, and a complete disregard for migrant legal rights are just some of the many problems emerging from this court system Reports have described "secretive, assembly-line" proceedings in the facilities to conduct hundreds of hearings per day. CBP, ICE, and DHS have provided little information on the functioning of these "Port Courts" despite numerous inquiries from news outlets and Congressional staff. The lack of available information on their operations is exacerbated by the severe restrictions on who can even access the facilities. With

barbed wire fences and security managed by private companies, they are closed to the public, news outlets, and legal advocacy organizations. Despite the clear legal standard that all immigration proceedings are to be open to the public, CBP has rejected request after request for access. These facilities dramatically worsen the chaotic nature of the program by removing any ability for migrants to access legal aid.

Furthermore, the prohibitions on oversight expose migrants to violations of the due process rights established for asylum seekers in U.S. law.We have invited our witnesses here to shed light on this disgraceful and untenable situation. And I thank them for joining us today. Our Asylum laws emerged after the Second World War, as our nation faced the shameful truth that we failed to provide safe haven to refugees fleeing the Nazis. Since then, we have granted asylum to desperate communities fleeing danger all over the world and in doing so saved an untold number of lives. The Remain in Mexico policy is a reprehensible step backwards, and a continuation of this Administration's abandonment of our nation's longstanding—and  bipartisan—tradition of protecting asylum seekers and refugees.

We hope today to build public awareness of this policy and improve our own understanding so that we can find a way towards stopping this needless harm inflicted on the men, women, and children seeking safety in our great country.

# # #

Media contact: Adam Comis at (202) 225-9978



FOR IMMEDIATE RELEASE

## Hearing Statement of Chairman Bennie G. Thompson (D-MS)

### *Examining the Human Rights and Legal Implications of DHS' 'Remain in Mexico' Policy*

### November 19, 2019

Today, the Subcommittee will hear about how the Trump Administration's "Remain in Mexico" policy has distorted our immigration system by effectively closing the door to people seeking safety in this country. I share Chairwoman Rice's concerns about the legal and humanitarian implications of this misguided policy and thank her for calling this hearing. While Department of Homeland Security officials have argued "Remain in Mexico" has allowed U.S. Customs and Border Protection to regain operational control of our border with Mexico, we know better. In fact, the policy has raised serious legal questions and created a new humanitarian crisis along our southern border.  Moreover, it runs contrary to our American values.

Returning migrants with known physical, mental, and developmental disabilities to Mexico is unacceptable. Sending pregnant women in to Mexico, where there is no safe housing or basic medical care for them is unacceptable. Establishing secretive courts that DHS uses to process asylum seekers forced to return to Mexico runs contrary to our values. Indeed, immigration court proceedings are generally open to the public for the sake of transparency. American Immigration Lawyers Association, ACLU, and Amnesty International, among others regularly observe proceedings. However, these organizations have been repeatedly denied access to the new temporary port courts in Brownsville and Laredo.

For those of you who are familiar with the Rio Grande Valley, you know about the work Sister Norma of Catholic Charities carries out to assist migrants in that region. Sister Norma has also been denied entry to the port courts multiple times with no real explanation as to why. These observers are desperately needed. Attorneys who have been able to get in to the port courts uniformly talk about "court" operations that run roughshod over basic due process rights. Paperwork is filled out with wrong information or certain sections are purposely left blank, for example. Every step that can be taken to limit the amount of time an attorney can meet with their clients is taken. CBP has even allegedly fabricated future hearing dates for migrants who were granted asylum in order to return them to Mexico. The Administration appears intent on cutting off access to the lawful asylum process, even if their actions are legally questionable or force vulnerable adults and children into danger.

I look forward to hearing from our panelists about their firsthand observations and experience with the Remain in Mexico policy and the temporary port courts. Their testimony will help inform the committee's future oversight work. Efficient and effective border security has long been a bipartisan priority of this Committee. But blocking the asylum process for vulnerable people and risking their lives by putting them in harm's way does not make us any safer. It just makes us less than the America we have held ourselves out to be.

# # #

Media contact: Adam Comis at (202) 225-9978

**AR02613**

KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or Preempted  Held Unconstitutional by  United States v. Gonzalez-Fierro,  10th Cir.(N.M.),  Feb. 04, 2020

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
 Title 8. Aliens and Nationality (Refs & Annos)
  Chapter 12. Immigration and Nationality (Refs & Annos)
   Subchapter II. Immigration
    Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1225

§ 1225. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

Effective: June 1, 2009
Currentness

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

**(2) Stowaways**

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.

**(3) Inspection**

All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

**(4) Withdrawal of application for admission**

An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

**(5) Statements**

An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

**(iii) Application to certain other aliens**

**(I) In general**

The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**

An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

**(B) Asylum interviews**

**(i) Conduct by asylum officers**

An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

**(ii) Referral of certain aliens**

If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

**(iii) Removal without further review if no credible fear of persecution**

**(I) In general**

Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

**(II) Record of determination**

The officer shall prepare a written record of a determination under subclause (I). Such record shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. A copy of the officer's interview notes shall be attached to the written summary.

**(III) Review of determination**

The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I).

**(IV) Mandatory detention**

Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

**(iv) Information about interviews**

The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's

choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.

**(v) "Credible fear of persecution" defined**

For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

**(C) Limitation on administrative review**

Except as provided in subparagraph (B)(iii)(III), a removal order entered in accordance with subparagraph (A)(i) or (B) (iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of Title 28, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 1157 of this title, or to have been granted asylum under section 1158 of this title.

**(D) Limit on collateral attacks**

In any action brought against an alien under section 1325(a) of this title or section 1326 of this title, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii).

**(E) "Asylum officer" defined**

As used in this paragraph, the term "asylum officer" means an immigration officer who--

**(i)** has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title, and

**(ii)** is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

**(F) Exception**

Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry.

**(G) Commonwealth of the Northern Mariana Islands**

Nothing in this subsection shall be construed to authorize or require any person described in section 1158(e) of this title to be permitted to apply for asylum under section 1158 of this title at any time before January 1, 2014.

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 325 of 366   PageID 6829

**(2) Inspection of other aliens**

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien--

**(i)** who is a crewman,

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

**(3) Challenge of decision**

The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 1229a of this title.

**(c) Removal of aliens inadmissible on security and related grounds**

**(1) Removal without further hearing**

If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 1182(a)(3) of this title, the officer or judge shall--

**(A)** order the alien removed, subject to review under paragraph (2);

**(B)** report the order of removal to the Attorney General; and

**(C)** not conduct any further inquiry or hearing until ordered by the Attorney General.

**(2) Review of order**

**(A)** The Attorney General shall review orders issued under paragraph (1).

**(B)** If the Attorney General--

**(i)** is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 1182(a)(3) of this title, and

**(ii)** after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

**(C)** If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

**(3) Submission of statement and information**

The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

**(d) Authority relating to inspections**

**(1) Authority to search conveyances**

Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

**(2) Authority to order detention and delivery of arriving aliens**

Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States--

**(A)** to detain the alien on the vessel or at the airport of arrival, and

**(B)** to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

**(3) Administration of oath and consideration of evidence**

The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service.

**(4) Subpoena authority**

**(A)** The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States.

**(B)** Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 4, § 235, 66 Stat. 198; Pub.L. 101-649, Title VI, § 603(a)(11), Nov. 29, 1990, 104 Stat. 5083; Pub.L. 104-132, Title IV, §§ 422(a), 423(b), Apr. 24, 1996, 110 Stat. 1270, 1272; Pub.L. 104-208, Div. C, Title III, §§ 302(a), 308(d)(5), 371(b)(4), Sept. 30, 1996, 110 Stat. 3009-579, 3009-619, 3009-645; Pub.L. 110-229, Title VII, § 702(j)(5), May 8, 2008, 122 Stat. 867.)

Notes of Decisions (304)

8 U.S.C.A. § 1225, 8 USCA § 1225
Current through P.L. 117-166. Some statute sections may be more current, see credits for details.

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## *8 CFR 235.3*

This document is current through October 28, 2020 issue of the Federal Register, with the exception of the amendments appearing at 85 FR 67613.

*Code of Federal Regulations > Title 8 Aliens and Nationality > Chapter I — Department of Homeland Security (Immigration and Naturalization) > Subchapter B — Immigration Regulations > Part 235 — Inspection of Persons Applying for Admission*

# § 235.3 Inadmissible aliens and expedited removal.

(a)Detention prior to inspection. All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b)Expedited removal —

(1)Applicability. The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i)Arriving aliens, as defined in *8 CFR 1.2*;

(ii)As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of

determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the Federal Register. However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(2) **Determination of inadmissibility —**

(i)Record of proceeding. An alien who is arriving in the United States, or other alien as designated pursuant to paragraph (b)(1)(ii) of this section, who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the

examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

**(ii)**No entitlement to hearings and appeals. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order to the Board of Immigration Appeals.

**(iii)**Detention and parole of alien in expedited removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required

to meet a medical emergency or is necessary for a legitimate law enforcement objective.

**(3)**Additional charges of inadmissibility. In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. If an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

**(4)**Claim of asylum or fear of persecution or torture. If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with *8 CFR 208.30*. The examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility.

**(i)**Referral. The referring officer shall provide the alien with a written disclosure on Form M-444, Information About Credible Fear Interview, describing:

**(A)**The purpose of the referral and description of the credible fear interview process;

**(B)**The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;

**(C)** The right to request a review by an immigration judge of the asylum officer's credible fear determination; and

**(D)** The consequences of failure to establish a credible fear of persecution or torture.

**(ii)** Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing. Such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process.

**(5)** Claim to lawful permanent resident, refugee, or asylee status or U.S. citizenship —

**(i)** Verification of status. If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claims to be a U.S. citizen, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, asylee status, or U.S. citizen status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under _28 U.S.C. 1746_, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of

the Act, grant of asylum status under section 208 of the Act, or claim to U.S. citizenship. A written statement shall be taken from the alien in the alien's own language and handwriting, stating that he or she declares, certifies, verifies, or states that the claim is true and correct. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and § 235.6(a)(2)(ii). The person shall be detained pending review of the expedited removal order under this section. Parole of such person, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

**(ii)** Verified lawful permanent residents. If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and § 211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

**(iii)** Verified refugees and asylees. If a check of Service records or other means indicates that the alien has been granted refugee

8 CFR 235.3

status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with § 223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with § 223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

**(iv)**Review of order for claimed lawful permanent residents, refugees, asylees, or U.S. citizens. A person whose claim to U.S. citizenship has been verified may not be ordered removed. When an alien whose status has not been verified but who is claiming under oath or under penalty of perjury to be a lawful permanent resident, refugee, asylee, or U.S. citizen is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and § 235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, granted asylum status, or is not a U.S. citizen, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, or is a U.S. citizen, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien, but not against a person determined to be a

U.S. citizen, in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

**(6)**Opportunity for alien to establish that he or she was admitted or paroled into the United States. If the Commissioner determines that the expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

**(7)**Review of expedited removal orders. Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review shall include a review of the sworn statement and any answers and statements made by the alien regarding a fear of removal or return. The

supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

**(8)**Removal procedures relating to expedited removal. An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed from the United States in accordance with section 241(c) of the Act and 8 CFR part 241.

**(9)**Waivers of documentary requirements. Nothing in this section limits the discretionary authority of the Attorney General, including authority under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

**(10)**Applicant for admission under section 217 of the Act. The provisions of § 235.3(b) do not apply to an applicant for admission under section 217 of the Act.

**(c)**Arriving aliens placed in proceedings under section 240 of the Act. Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with § 212.5(b) of this chapter. This paragraph shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.

**(d)**Service custody. The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

**(e)**Detention in non-Service facility. Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have

been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

> **(1)**24-Hour supervision,

> **(2)**Conformance with safety and emergency codes,

> **(3)**Food service, and

> **(4)**Availability of emergency medical care.

**(f)**Privilege of communication. The mandatory notification requirements of consular and diplomatic officers pursuant to § 236.1(e) of this chapter apply when an inadmissible alien is detained for removal proceedings, including for purpose of conducting the credible fear determination.

## Statutory Authority

*Authority Note Applicable to Title 8, Ch. I, Subch. B, Pt. 235*

## History

[47 FR 30046, July 9, 1982, as amended at *47 FR 46494*, Oct. 19, 1982; *54 FR 101, Jan. 4, 1989*.; *54 FR 6365*, Feb. 9, 1989; *60 FR 16043*, Mar. 29, 1995; *62 FR 10312*, 10355, Mar. 6, 1997; *64 FR 8478*, 8494, Feb. 19, 1999; *65 FR 82254*, 82256, Dec. 28, 2000; *66 FR 7863*, Jan. 26, 2001; *69 FR 69480*, 69490, Nov. 29, 2004; *76 FR 53764*, 53790, Aug. 29, 2011; *82 FR 4769*, 4771, Jan. 17, 2017]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2020 All rights reserved.

**End of Document**

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or Preempted  Prior Version's Validity Called into Doubt by   Pangea Legal Services v. U.S. Department of Homeland Security,   N.D.Cal., Jan. 08, 2021

Code of Federal Regulations
   Title 8. Aliens and Nationality
      Chapter I. Department of Homeland Security (Refs & Annos)
         Subchapter B. Immigration Regulations
            Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
            Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.16

§ 208.16 Withholding of removal under section 241(b)(3)(B) of the
Act and withholding of removal under the Convention Against Torture.

Effective: May 31, 2022
Currentness

<In Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., No. 20-09253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021), the court listed those "preliminarily enjoined from implementing, enforcing, or applying the rule titled Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (Dec. 11, 2020), or any related policies or procedures, including the Policy Memorandum entitled, Guidance Regarding New Regulations Governing Procedures For Asylum and Withholding of Removal and Credible Fear Reviews, issued by the Department of Justice on December 11, 2020". See, 86 FR 6847-01 footnote 2 (Jan. 25, 2021). See, also, KeyCite citing references for this section on Westlaw for additional judicial decisions and other materials regarding this rule. >

(a) Consideration of application for withholding of removal. An asylum officer shall not determine whether an alien is eligible for withholding of the exclusion, deportation, or removal of the alien to a country where the alien's life or freedom would be threatened, except in the case of an alien who is determined to be an applicant for admission under section 235(b)(1) of the Act, who is found to have a credible fear of persecution or torture, whose case is subsequently retained by or referred to USCIS pursuant to the jurisdiction provided at § 208.2(a)(1)(ii) to consider the application for asylum, and whose application for asylum is not granted; or in the case of the spouse or child of such an alien who is included in the alien's asylum application and who files a separate application for asylum with USCIS that is not granted. In such cases, the asylum officer will determine, based on the record before USCIS, whether the applicant is eligible for statutory withholding of removal under paragraph (b) of this section or withholding or deferral of removal pursuant to the Convention Against Torture under paragraph (c) of this section. Even if the asylum officer determines that the applicant has established eligibility for withholding of removal under paragraph (b) or (c) of this section, the asylum officer shall proceed with referring the application to the immigration judge for a hearing pursuant to § 208.14(c)(1). In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof. The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) Past threat to life or freedom.

(i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) Future threat to life or freedom. An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1) and (2) of this section, adjudicators should consider the totality of the relevant circumstances regarding an applicant's prospects for relocation, including the size of the country of nationality or last habitual residence, the geographic locus of the alleged persecution,

the size, reach, or numerosity of the alleged persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for withholding of removal.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, it shall be presumed that internal relocation would not be reasonable, unless DHS establishes by a preponderance of the evidence that, under the totality of the circumstances, it would be reasonable for the applicant to relocate.

(iii) Regardless of whether an applicant has established persecution in the past, in cases in which the persecutor is not the government or a government-sponsored actor, or otherwise is a private actor, there shall be a presumption that internal relocation would be reasonable unless the applicant establishes, by a preponderance of the evidence, that it would be unreasonable to relocate.

(iv) For purposes of determinations under paragraphs (b)(3)(ii) and (iii) of this section, persecutors who are private actors, including but not limited to persecutors who are gang members, public officials who are not acting under color of law, or family members who are not themselves government officials or neighbors who are not themselves government officials, shall not be considered to be persecutors who are the government or government-sponsored absent evidence that the government sponsored the persecution.

(c) Eligibility for withholding of removal under the Convention Against Torture.

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub.L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the adjudicator shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the adjudicator determines that the alien is more likely than not to be tortured in the country of removal, the alien is eligible for protection under the Convention Against Torture, and the adjudicator shall determine whether protection under the Convention Against Torture should be granted either in the form of withholding of removal or in the form of deferral of removal. The adjudicator shall state that an alien eligible for such protection is eligible for withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section. If an alien eligible for such protection is subject to mandatory denial of withholding of removal under paragraph (d)(2) or (3) of this section, the adjudicator shall state that the alien is eligible for deferral of removal under § 208.17(a). For cases under the jurisdiction of USCIS pursuant to § 208.2(a)(1)(ii), the asylum officer may make such a determination based on the application and the record before USCIS; however, the asylum officer shall not issue an order granting either withholding of removal or deferral of removal because that is referred to the immigration judge pursuant to § 208.14(c)(1) and 8 CFR 1240.17.

(d) Approval or denial of application—

(1) General. Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

<Text of subsection (d)(2) effective until Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(2) Mandatory denials. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

<Text of subsection (d)(2) effective Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(2) Mandatory denials—

(i) In general. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the regulations issued pursuant to the legislation implementing the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it

appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(ii) Public health emergencies. If a communicable disease has triggered an ongoing declaration of a public health emergency under Federal law, such as under section 319 of the Public Health Service Act, 42 U.S.C. 247d, or section 564 of the Food, Drug, and Cosmetic Act, 21 U.S.C. 360bbb–3, then an alien is ineligible for withholding of removal under section 241(b)(3) of the Act and under the regulations issued pursuant to the legislation implementing the Convention Against Torture on the basis of there being reasonable grounds for regarding the alien as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act if the alien

(A) Exhibits symptoms indicating that he or she is afflicted with the disease, per guidance issued by the Secretary or the Attorney General, as appropriate, or

(B) Has come into contact with the disease within the number of days equivalent to the longest known incubation and contagion period for the disease, per guidance issued by the Secretary or the Attorney General, as appropriate.

(iii) Danger to the Public Health Caused by an Epidemic Outside of the United States. If, regarding a communicable disease of public health significance as defined at 42 CFR 34.2(b), the Secretary and the Attorney General, in consultation with the Secretary of Health and Human Services, have jointly

(A) Determined that the physical presence in the United States of aliens who are coming from a country or countries (or one or more subdivisions or regions thereof), or have embarked at a place or places, where such disease is prevalent or epidemic (or had come from that country or countries (or one or more subdivisions or regions thereof), or had embarked at that place or places, during a period in which the disease was prevalent or epidemic there) would cause a danger to the public health in the United States, and

(B) Designated the foreign country or countries (or one or more subdivisions or regions thereof), or place or places, and the period of time or circumstances under which they jointly deem it necessary for the public health that aliens or classes of aliens described in paragraph (d)(2)(ii)(A) of this section who are still within the number of days equivalent to the longest known incubation and contagion period for the disease be regarded as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act, including any relevant exceptions as appropriate, then—

(C) An alien or class of aliens are ineligible for withholding of removal under section 241(b)(3) of the Act and under the regulations issued pursuant to the legislation implementing the Convention Against Torture on the basis of there being reasonable grounds for regarding the alien or class of aliens as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act if the alien or class of aliens are described in paragraph (d)(2)(ii)(A) of this section and are regarded as a danger to the security of the United States as provided for in paragraph (d)(2)(ii)(B) of this section.

(iv) The grounds for mandatory denial described in paragraphs (d)(2)(ii) and (iii) of this section shall not apply to an alien who is applying for asylum or withholding of removal in the United States upon return from Canada to the United

States and pursuant to the Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries.

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Pub.L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.

(e) [Reserved by 85 FR 67259]

<Text of subsection (f) effective until Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(f) Removal to third country. Nothing in this section or § 208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.

<Text of subsection (f) effective Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(f) Removal to third country.

(1) Nothing in this section or § 208.17 shall prevent the Department from removing an alien requesting protection to a third country other than a country to which removal is currently withheld or deferred.

(2) If an alien requests withholding or deferral of removal to his or her home country or another specific country, nothing in this section or § 208.17 precludes the Department from removing the alien to a third country prior to a determination or adjudication of the alien's initial request for withholding or deferral of removal if, after being notified of the identity of the prospective third country of removal and provided an opportunity to demonstrate that he or she is more likely than not to be tortured in that third country, the alien fails to establish that they are more likely than not to be tortured there. However, such a removal shall be executed only if the alien was:

(i) Advised at the time of requesting withholding or deferral of removal of the possibility of being removed to a third country prior to a determination or adjudication of the same under the conditions set forth in this paragraph; and

(ii) Provided, but did not accept, an opportunity to withdraw the request for withholding or deferral of removal in order to prevent such removal and, instead, proceed to removal pursuant to section 241(b) of the Act, as appropriate.

**Credits**

[64 FR 8488, Feb. 19, 1999; 65 FR 76135, Dec. 6, 2000; 85 FR 67259, Oct. 21, 2020; 85 FR 80388, Dec. 11, 2020; 85 FR 84193, Dec. 23, 2020; 86 FR 6847, Jan. 25, 2021; 86 FR 15069, March 22, 2021; 86 FR 73615, Dec. 28, 2021; 87 FR 18218, March 29, 2022]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (636)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 8. Aliens and Nationality
        Chapter I. Department of Homeland Security (Refs & Annos)
            Subchapter B. Immigration Regulations
                Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
                    Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.17

§ 208.17 Deferral of removal under the Convention Against Torture.

Currentness

(a) Grant of deferral of removal. An alien who: has been ordered removed; has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) Notice to alien.

(1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) Detention of an alien granted deferral of removal under this section. Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) Termination of deferral of removal.

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 3.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a de novo determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) Termination at the request of the alien.

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 3.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary,

Case 2:21-cv-00067-Z Document 162-6 Filed 09/02/22 Page 342 of 366 PageID 6846

the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) Termination pursuant to § 208.18(c). At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 208.18(c).

**Credits**

[64 FR 8489, Feb. 19, 1999]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (62)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by   Pangea Legal Services v. U.S. Department of Homeland Security,   N.D.Cal.,   Jan. 08, 2021

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart B. Credible Fear of Persecution

8 C.F.R. § 208.31

§ 208.31 Reasonable fear of persecution or torture determinations involving aliens ordered removed
under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act.

Effective: January 11, 2021
Currentness

<In Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., No. 20-09253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021),
the court listed those "preliminarily enjoined from implementing, enforcing, or applying the rule titled Procedures
for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (Dec. 11,
2020), or any related policies or procedures, including the Policy Memorandum entitled, Guidance Regarding New
Regulations Governing Procedures For Asylum and Withholding of Removal and Credible Fear Reviews, issued by
the Department of Justice on December 11, 2020". See, 86 FR 6847-01 footnote 2 (Jan. 25, 2021). See, also, KeyCite
citing references for this section on Westlaw for additional judicial decisions and other materials regarding this rule. >

(a) Jurisdiction. This section shall apply to any alien ordered removed under section 238(b) of the Act or whose deportation,
exclusion, or removal order is reinstated under section 241(a)(5) of the Act who, in the course of the administrative removal
or reinstatement process, expresses a fear of returning to the country of removal. USCIS has exclusive jurisdiction to make
reasonable fear determinations, and EOIR has exclusive jurisdiction to review such determinations.

(b) Initiation of reasonable fear determination process. Upon issuance of a Final Administrative Removal Order under § 238.1
of this chapter, or notice under § 241.8(b) of this chapter that an alien is subject to removal, an alien described in paragraph
(a) of this section shall be referred to an asylum officer for a reasonable fear determination. In the absence of exceptional
circumstances, this determination will be conducted within 10 days of the referral.

(c) Interview and procedure. The asylum officer shall conduct the interview in a non-adversarial manner, separate and apart
from the general public. At the time of the interview, the asylum officer shall determine that the alien has an understanding of the
reasonable fear determination process. The alien may be represented by counsel or an accredited representative at the interview,
at no expense to the Government, and may present evidence, if available, relevant to the possibility of persecution or torture.
The alien's representative may present a statement at the end of the interview. The asylum officer, in his or her discretion, may
place reasonable limits on the number of persons who may be present at the interview and the length of the statement. If the
alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen
by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter
may not be a representative or employee of the applicant's country or nationality, or if the applicant is stateless, the applicant's

country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture. The alien shall be determined to have a reasonable fear of persecution or torture if the alien establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal. For purposes of the screening determination, the bars to eligibility for withholding of removal under section 241(b)(3)(B) of the Act shall not be considered.

(d) Authority. Asylum officers conducting screening determinations under this section shall have the authority described in § 208.9(c).

(e) Referral to Immigration Judge. If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only. Such cases shall be adjudicated by the immigration judge in accordance with the provisions of § 208.16. Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals.

(f) Removal of aliens with no reasonable fear of persecution or torture. If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the asylum officer shall inform the alien in writing of the decision and shall inquire whether the alien wishes to have an immigration judge review the negative decision, using the Record of Negative Reasonable Fear Finding and Request for Review by Immigration Judge, on which the alien must indicate whether he or she desires such review. If the alien refuses to make an indication, DHS shall consider such a response as a decision to decline review.

(g) Review by immigration judge. The asylum officer's negative decision regarding reasonable fear shall be subject to review by an immigration judge upon the alien's request. If the alien requests such review, the asylum officer shall serve him or her with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. In the absence of exceptional circumstances, such review shall be conducted by the immigration judge within 10 days of the filing of the Notice of Referral to Immigration Judge with the immigration court. Upon review of the asylum officer's negative reasonable fear determination:

(1) If the immigration judge concurs with the asylum officer's determination that the alien does not have a reasonable fear of persecution or torture, the case shall be returned to DHS for removal of the alien. No appeal shall lie from the immigration judge's decision.

(2) If the immigration judge finds that the alien has a reasonable fear of persecution or torture, the alien may submit an Application for Asylum and for Withholding of Removal.

(i) The immigration judge shall consider only the alien's application for withholding of removal under 8 CFR 1208.16 and shall determine whether the alien's removal to the country of removal must be withheld or deferred.

(ii) Appeal of the immigration judge's decision whether removal must be withheld or deferred lies with the Board of Immigration Appeals. If the alien or DHS appeals the immigration judge's decision, the Board shall review only the immigration judge's decision regarding the alien's eligibility for withholding or deferral of removal under 8 CFR 1208.16.

**Credits**

[64 FR 8493, Feb. 19, 1999; 64 FR 13881, March 23, 1999; 76 FR 53785, Aug. 29, 2011; 85 FR 80392, Dec. 11, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (25)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

End of Document                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or Preempted Prior Version's Validity Called into Doubt by Pangea Legal Services v. U.S. Department of Homeland Security, N.D.Cal., Jan. 08, 2021

Code of Federal Regulations
Title 8. Aliens and Nationality
Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
Subchapter B. Immigration Regulations (Refs & Annos)
Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.16

§ 1208.16 Withholding of removal under section 241(b)(3)(B) of the
Act and withholding of removal under the Convention Against Torture.

Effective: May 31, 2022
Currentness

<In Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., No. 20-09253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021), the court listed those "preliminarily enjoined from implementing, enforcing, or applying the rule titled Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (Dec. 11, 2020), or any related policies or procedures, including the Policy Memorandum entitled, Guidance Regarding New Regulations Governing Procedures For Asylum and Withholding of Removal and Credible Fear Reviews, issued by the Department of Justice on December 11, 2020". See, 86 FR 6847-01 footnote 2 (Jan. 25, 2021). See, also, KeyCite citing references for this section on Westlaw for additional judicial decisions and other materials regarding this rule.>

(a) Consideration of application for withholding of removal. Consideration of eligibility for statutory withholding of removal and protection under the Convention Against Torture by a DHS officer is as provided at 8 CFR 208.16. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof. The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) Past threat to life or freedom.

(i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) Future threat to life or freedom. An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1) and (2) of this section, adjudicators should consider the totality of the relevant circumstances regarding an applicant's prospects for relocation, including the size of the country of nationality or last habitual residence, the geographic locus of the alleged persecution, the size, reach, or numerosity of the alleged persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for withholding of removal.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 348 of 366   PageID 6852

(ii) In cases in which the persecutor is a government or is government-sponsored, it shall be presumed that internal relocation would not be reasonable, unless the DHS establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

(iii) Regardless of whether an applicant has established persecution in the past, in cases in which the persecutor is not the government or a government-sponsored actor, or otherwise is a private actor, there shall be a presumption that internal relocation would be reasonable unless the applicant establishes, by a preponderance of the evidence, that it would be unreasonable to relocate.

(iv) For purposes of determinations under paragraphs (b)(3)(ii) and (iii) of this section, persecutors who are private actors, including persecutors who are gang members, public official who are not acting under color of law, or family members who are not themselves government officials or neighbors who are not themselves government officials, shall not be considered to be persecutors who are the government or government-sponsored absent evidence that the government sponsored the persecution.

(c) Eligibility for withholding of removal under the Convention Against Torture.

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub.L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 1208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration

judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 1208.17(a).

(d) Approval or denial of application—

(1) General. Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

<Text of subsection (d)(2) effective until Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(2) Mandatory denials. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3) (B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

<Text of subsection (d)(2) effective Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>

(2) Mandatory denials—

(i) In general. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the regulations issued pursuant to the legislation implementing the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(ii) Public health emergencies. If a communicable disease has triggered an ongoing declaration of a public health emergency under Federal law, such as under section 319 of the Public Health Service Act, 42 U.S.C. 247d, or section 564 of the Food, Drug, and Cosmetic Act, 21 U.S.C. 360bbb–3, then an alien is ineligible for withholding of removal under section 241(b) (3) of the Act and under the regulations issued pursuant to the legislation implementing the Convention Against Torture on the basis of there being reasonable grounds for regarding the alien as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act if the alien—

(A) Exhibits symptoms indicating that he or she is afflicted with the disease, per guidance issued by the Secretary or the Attorney General, as appropriate; or

(B) Has come into contact with the disease within the number of days equivalent to the longest known incubation and contagion period for the disease, per guidance issued by the Secretary or the Attorney General, as appropriate.

(iii) Danger to the public health caused by an epidemic outside of the United States. If, regarding a communicable disease of public health significance as defined at 42 CFR 34.2(b), the Secretary and the Attorney General, in consultation with the Secretary of Health and Human Services, have jointly—

(A) Determined that the physical presence in the United States of aliens who are coming from a country or countries (or one or more subdivisions or regions thereof), or have embarked at a place or places, where such disease is prevalent or epidemic (or had come from that country or countries (or one or more subdivisions or regions thereof), or had embarked at that place or places, during a period in which the disease was prevalent or epidemic there) would cause a danger to the public health in the United States; and

(B) Designated the foreign country or countries (or one or more subdivisions or regions thereof), or place or places, and the period of time or circumstances under which they jointly deem it necessary for the public health that aliens or classes of aliens described in paragraph (d)(2)(iii)(A) of this section who are still within the number of days equivalent to the longest known incubation and contagion period for the disease be regarded as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act, including any relevant exceptions as appropriate, then—

(C) An alien or class of aliens are ineligible for withholding of removal under section 241(b)(3) of the Act and under the regulations issued pursuant to the legislation implementing the Convention Against Torture on the basis of there being reasonable grounds for regarding the alien or class of aliens as a danger to the security of the United States under section 241(b)(3)(B)(iv) of the Act if the alien or class of aliens are described in paragraph (d)(2)(iii)(A) of this section and are regarded as a danger to the security of the United States as provided for in paragraph (d)(2)(iii) (B) of this section.

(iv) The grounds for mandatory denial described in paragraphs (d)(2)(ii) and (iii) of this section shall not apply to an alien who is applying for asylum or withholding of removal in the United States upon return from Canada to the United States and pursuant to the Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries)

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Pub.L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for

denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.


(e) [Reserved by 85 FR 67260]


<Text of subsection (f) effective until Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>


(f) Removal to third country. Nothing in this section or § 1208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.


<Text of subsection (f) effective Dec. 31, 2022, as delayed by 86 FR 6847; 86 FR 15069; 86 FR 73615.>


(f) Removal to third country.


(1) Nothing in this section or § 1208.17 shall prevent the Department of Homeland Security from removing an alien requesting protection to a third country other than a country to which removal is currently withheld or deferred.


(2) If an alien requests withholding or deferral of removal to the applicable home country or another specific country, nothing in this section or § 1208.17 precludes the Department of Homeland Security from removing the alien to a third country prior to a determination or adjudication of the alien's initial request for withholding or deferral of removal if, after being notified of the identity of the prospective third country of removal and provided an opportunity to demonstrate that he or she is more likely than not to be tortured in that third country, the alien fails to establish that they are more likely than not to be tortured there. However, such a removal shall be executed only if the alien was:


(i) Advised at the time of requesting withholding or deferral of removal of the possibility of being removed to a third country prior to a determination or adjudication of the same under the conditions set forth in this paragraph, and


(ii) Provided, but did not accept, an opportunity to withdraw the request for withholding or deferral of removal in order to prevent such removal and, instead, proceed to removal pursuant to section 241(b) of the Act, as appropriate.


**Credits**
[64 FR 8488, Feb. 19, 1999; 65 FR 76135, Dec. 6, 2000; 85 FR 67260, Oct. 21, 2020; 85 FR 80398, Dec. 11, 2020; 85 FR 84197, Dec. 23, 2020; 86 FR 6847, Jan. 25, 2021; 86 FR 15069, March 22, 2021; 86 FR 73615, Dec. 28, 2021; 87 FR 18222, March 29, 2022]


SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.


AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 352 of 366   PageID 6856

Notes of Decisions (574)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z Document 162-6 Filed 09/02/22 Page 353 of 366 PageID 6857

Code of Federal Regulations
   Title 8. Aliens and Nationality
      Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
         Subchapter B. Immigration Regulations (Refs & Annos)
            Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
               Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.17

§ 1208.17 Deferral of removal under the Convention Against Torture.

Currentness

(a) Grant of deferral of removal. An alien who: has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) Notice to alien.

(1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) Detention of an alien granted deferral of removal under this section. Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) Termination of deferral of removal.

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 1003.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 1208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a de novo determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 1208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) Termination at the request of the alien.

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 1003.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary,

the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) Termination pursuant to § 1208.18(c). At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 1208.18(c).

**Credits**
[64 FR 8489, Feb. 19, 1999; 68 FR 10352, March 5, 2003]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (55)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

   
July 2, 2019

# "We Can't Help You Here"
## US Returns of Asylum Seekers to Mexico



Immigrants attempt to enter the US between Ciudad Juarez, Mexico and El Paso, Texas, on April 29, 2019. Family apprehensions in El Paso area have topped about 60,000 individuals, an increase of 1,670%, up from about 3,000 last year, according to officials.  © 2019 Paul Ratje/AFP/Getty Images

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept        **Other options**

"We Can't Help You Here"

  

DONATE NOW

number of people processed daily at ports of entry, prolonging detention, and narrowing the grounds of eligibility for asylum. In January 2019, the administration expanded its crackdown on asylum with a wholly new practice: returning primarily Central American asylum seekers to several border towns in Mexico where they are expected to wait until their US asylum court proceedings conclude, which could take months and even years. Under a recent deal with Mexico, this practice may expand across the entire border.

Human Rights Watch found that the program, named the "Migrant Protection Protocols" (MPP) by the US government but known colloquially as "Remain in Mexico," has thus far had serious rights consequences for returned asylum seekers. We found that the returns program is expelling asylum seekers to ill-prepared, dangerous Mexican border cities where they face high if not insurmountable barriers to receiving due process on their asylum claims.

Asylum seekers already returned to Mexico under the MPP have been facing an extremely precarious situation. There, they encounter a severe shortage of shelter space, leaving those who can't afford to pay for a hotel room or private residence to sleep on the streets or stay in churches or abandoned homes. Most asylum seekers fleeing Central America have extremely limited means and often cannot pay for shelter, food, water, or other necessities. They are also at risk of serious crime, including kidnapping, sexual assault, and violence.

As of June 24, 2019, the Mexican government reported that 15,079 people, mostly from Honduras, Guatemala and El Salvador, had been returned to Ciudad Juárez, Tijuana and Mexicali under the MPP program, with instructions to appear months later in US immigration court across the border. This number includes at least 4,780 children with their parents, at least 13 pregnant women, and dozens of others who may be especially vulnerable due to their medical condition, age, gender identity or other factor.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept        Other options

AR02650

   

"We Can't Help You Here"                                      DONATE NOW



A sign in front of a migrant shelter in Ciudad Juárez, Mexico, informs asylum seekers that they have no space, May 2019. This shelter is located in a particularly dangerous neighborhood, and asylum seekers there said they were afraid to leave, even to go to the store just blocks away. © 2019 Clara Long/Human Rights Watch

In February, the American Civil Liberties Union, the Southern Poverty Law Center, and the Center for Gender & Refugee Studies challenged the return program in federal district court in California, arguing that the MPP violates the US Immigration and Nationality Act, the Administrative Procedure Act, and US obligations under international human rights law not to return people to places where they face grave danger.

The plaintiffs won a preliminary injunction, successfully arguing that the program would pose immediate harms to asylum seekers as well as to the advocacy organizations serving them. The government appealed and in May, the US Court of Appeals for the Ninth Circuit stayed the district court's injunction pending the appeal. The appeals court held that the return program could continue while the case was being argued, in part based on the premise that returned asylum seekers would have access to humanitarian support and work authorization in Mexico. Human Rights Watch found, however, that despite the Mexican government's earlier promises, which were later echoed by the US Department of Homeland Security, Mexico has not provided work authorization to asylum seekers in the MPP program, leaving tens of thousands stranded for prolonged periods, many with no way to support themselves. As of June, the number of asylum seekers marooned in Ciudad Juárez already outnumbered the spaces available in free humanitarian shelters by 11 to 1.

On June 26, the union representing federal asylum officers – those tasked with implementing the MPP program – filed an amicus brief in federal court condemning the program as "fundamentally contrary to the moral fabric of our Nation and our international and domestic legal obligations."

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

HUMAN
RIGHTS
WATCH

"We Can't Help You Here"

  

DONATE NOW

assaults, sexual violence, and kidnapping. A US government screening process to remove people from the MPP program who face harm in Mexico is allowing less than 1 percent of returned asylum seekers to exit the program and pursue their claims within the United States.

Meanwhile, asylum seekers forced to remain in Mexico have no meaningful access to due process. Immigration attorneys and advocates in El Paso, Texas, told Human Rights Watch the need for legal services for returned asylum seekers in Mexico is overwhelming and that attorneys working to provide low-cost or free representation face serious barriers to providing that representation, including returned asylum seekers' lack of fixed addresses and telephone numbers.

Human Rights Watch also confirmed reports that US Border Patrol agents have routinely refused or failed to return asylum seekers' personal identification documents. Without identification, asylum seekers face difficulties proving the custody of their children or receiving money wired by family members. They may also be barred from travel, meaning they cannot freely seek asylum elsewhere or return home in cases of extenuating circumstances.

The Migrant Protection Protocols program is separating families, including people who are the primary caretakers of children, siblings, and parents. The separations can wreak severe psychological harm and split shared claims for protection across US jurisdictions, adding to the already hefty immigration court backlog.

The US should immediately cease returning asylum seekers to Mexico and instead ensure them access to humanitarian support, safety, and due process in asylum proceedings. Congress should urgently act to prohibit using government funds to continue this program. The US should manage asylum-seeker arrivals through a genuine humanitarian response that includes fair determinations of an asylum seeker's eligibility to remain or not in the US. The US should simultaneously pursue longer-term efforts to address the root causes of forced displacement in Central America.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02652

Case 2:21-cv-00067-Z   Document 162-6   Filed 09/02/22   Page 360 of 366   PageID 6864

   

"We Can't Help You Here"

DONATE NOW



December 21, 2018  |  News Release

## US: Don't Return Asylum Seekers to Mexico

Policy Change Unnecessary, Potentially Dangerous



June 27, 2019  |  Dispatches

## US Border Prosecutions and the Devastating Cost to Families

Government Should Repeal Laws Criminalizing Illegal Entry and Reentry



# Recommendations

## To the US Department of Homeland Security

- Immediately end the Migrant Protection Protocols (MPP) program and cease returning asylum

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

Reduce barriers to due process as well as the backlog in the immigration court system, including by restoring the ability of immigration judges to close cases administratively.

## To the US Congress

- Provide sufficient resources to the Executive Office of Immigration Review of the Department of Justice for additional immigration judges and to US Citizenship and Immigration Services for additional asylum officers.

- Do not provide additional funding to the Department of Homeland Security (DHS) for immigration enforcement without specific measures to ensure appropriate and effective oversight and to stop and prevent abusive policies.

- Prohibit funds from being used to implement the Migrant Protection Protocols or any subsequent revisions to those protocols.

## To the Mexican Government

- Do not accept asylum seekers sent by the US to Mexico under the MPP program unless the US government can ensure they have adequate means to safely stay in Mexico, and so long as the US government can ensure they receive due process in their immigration proceedings.

- Clearly articulate, while the MPP program is in effect, the total number of MPP asylum seekers Mexico can receive in each sector based on existing shelter capacity, rather than processing capacity at the border. Do not accept anyone DHS attempts to transfer outside of those parameters.

- Provide, while the MPP program is in effect, humanitarian visas and work authorization to

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     Other options

AR02654

"We Can't Help You Here"           DONATE NOW

from May 6 to 13, 2019, as well as in San Diego, California, May 22, 2019.

Human Rights Watch visited shelters and nonprofits in Mexico, where we conducted in-depth interviews with 19 Central American asylum seekers. Sixteen of those interviewed were recently sent to Ciudad Juárez from the United States to remain for the duration of their asylum proceedings; two additional interviews included asylum seekers waiting in Mexico to pursue their claims. Researchers interviewed one additional asylum seeker in the US who had been separated from her mother after she was sent to remain in Ciudad Juárez. Staff with a partner organization, the Hope Border Institute, conducted another four interviews during the same visit to Ciudad Juárez. Findings from those interviews were shared with Human Rights Watch and are included in this report. We also observed immigration court proceedings for 54 asylum seekers in El Paso and 15 returned asylum seekers in San Diego, all of whom had been placed in the MPP program.

Some of the Central American asylum seekers interviewed were identified with the assistance of immigration advocates working in Ciudad Juárez, Mexico, and El Paso, Texas.

Human Rights Watch also interviewed 13 migrant services providers, lawyers, academics, and government officials in Mexico and in the United States. Most of these interviews took place in person, but some took place by voice or video calls.

Human Rights Watch carried out interviews in English or in Spanish, depending on the preference of the interviewee, without interpreters. We informed the interviewees of the purpose of our research and they consented to be interviewed for that purpose. They did not receive money or other compensation to speak with us.

The names of asylum seekers have been replaced with pseudonyms to mitigate security concerns, and the names of some government officials have been withheld at their request because of concerns of political retaliation, as indicated in relevant citations.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     Other options

AR02655

"We Can't Help You Here"

   

DONATE NOW

# Background

On January 25, 2019, the Donald Trump administration announced it would begin returns to Mexico under the Migrant Protection Protocols (MPP), otherwise known as "Remain in Mexico," on the grounds that such measures were needed to address a growing number of migrants, including adults traveling with children, coming to the US-Mexico border to apply for asylum.[1] The US Department of Homeland Security (DHS) asserted that a recent rise in numbers of such migrants, particularly families who were turning themselves in to US Border Patrol, was caused by people who were "trying to game the system" and applying for asylum only to cross the border and disappear into the US, rather than show up for immigration court hearings.[2]

However, the claims made by DHS were not supported by available data.

According to the US Department of Justice, Executive Office of Immigration Review (EOIR), which adjudicates immigration court cases, among those who filed an asylum application in immigration court – a complicated and lengthy form that must be completed in English – 81 percent showed up to all of their court hearings through case completion in fiscal year 2017.[3]

The Transactional Records Access Clearinghouse at Syracuse University (TRAC), a research center that analyzes government data, obtained Immigration Court records via the Freedom of Information Act of nearly 47,000 newly arrived families seeking asylum and found that nearly 86 percent of asylum seekers released from custody attended initial hearings as of the end of May 2019.[4] Of those who were represented by an attorney, more than 99 percent attended hearings.[5]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

**AR02656**

  
EOIR data suggests among all immigrants released from detention, a lower percentage attend all their hearings to court completion. EOIR reported that in fiscal year 2017, 41 percent received *in absentia* orders of removal – that is, they did not attend the hearing in which a court ordered their removal.[9] Other analysts, however, have disputed EOIR's methodology in calculating *in absentia* rates. TRAC has calculated lower *in absentia* rates using EOIR's own data, obtained via the Freedom of Information Act, but using different methodology.[10] For example, in fiscal year 2015, EOIR reported that 38 percent of people released were ordered removed *in absentia*. Under TRAC's calculations, 23 percent were ordered removed *in absentia*.[11] The *in absentia* rate of removal may also reflect the significant systemic barriers asylum seekers face to pursuing asylum in the US.[12] The large backlog and lack of government-appointed counsel in immigration court likely affects the rate of overall no-shows to court hearings as it forces migrants to navigate a complicated court system alone over many years.

EOIR's calculation also does not account for people who were ordered removed *in absentia* and who subsequently managed to get the order overturned, having demonstrated that they did not attend their hearing because the government failed to properly serve them with a notice to appear or other extenuating circumstances.[13]

Northern Triangle countries – El Salvador, Guatemala and Honduras – have been experiencing extremely high levels of violence from which their governments have proven unwilling or unable to protect the population. Several United Nations (UN) agencies working in Central America have noted that violence has forced hundreds of thousands of people into internal displacement or to flee their countries in search of protection abroad.[14] El Salvador has one of the highest homicide rates in the world, and many homicides are gang related and targeted.[15] Honduras also has one of the world's highest homicide rates.[16] Violence and extortion by gangs remain serious problems in Guatemala as well.[17]

Northern Triangle countries also have extremely high rates of sexual and gender-based violence. El

AR02657

   

DONATE NOW

from Guatemala, Honduras, and El Salvador among new arrivals for at least five years. In 2014, Border Patrol documented for the first time more Central Americans than Mexicans attempting to cross the US-Mexico border as violence in Central America was one important factor spawning a humanitarian crisis of families and unaccompanied children fleeing north. A few years later, the share of families and children among apprehended migrants rose to 39 percent, compared to under 10 percent a decade ago. [21] By February 2019, that portion had risen to 61 percent.[22]

DHS first began returning certain asylum seekers in the US to Mexico under the MPP at the San Ysidro port of entry near San Diego in southern California and Tijuana, Mexico, on January 29, 2019.[23] In mid-March, DHS expanded the MPP to Calexico, California, which borders Mexicali, Mexico, and in late March, implemented the program in El Paso, across the border from Ciudad Juárez.[24] Since then, Ciudad Juárez has surpassed both Tijuana and Mexicali as hosting the highest number of asylum seekers placed in the MPP program.[25]

When launching the MPP, then-Secretary of Homeland Security Kirstjen Nielsen said the US government would implement the program in a manner consistent with domestic and international law, including US humanitarian commitments, relying in part on the government's expectation that "affected migrants will receive humanitarian visas to stay on Mexican soil, the ability to apply for work, and other protections while they await a US legal determination."[26] She also said asylum seekers in the MPP would have access to attorneys.[27] After a federal district court issued a preliminary injunction, ruling that the program was illegal on several grounds, the US Court of Appeals for the Ninth Circuit stayed the injunction on May 8, 2019, although two of the three judges expressed serious reservations about the legality of the program.[28] The court based its decision in part on the Mexican government's commitments to grant humanitarian status and work authorization.[29]

As described below, Human Rights Watch findings contradict the Ninth Circuit's assumption. Asylum seekers forced to return to Mexico are not being granted humanitarian visas, the ability to apply for work, or other protections.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     Other options

Case 2:21-cv-00067-Z    Document 162-6    Filed 09/02/22    Page 366 of 366    PageID 6870

HUMAN
RIGHTS
WATCH

"We Can't Help You Here"

f    🐦    🟢    ✉    ⤴    DONATE NOW

June 23 Reuters report.[33] The situation is likely to become more dire as the number of asylum seekers returned to Mexico increases in the coming months.

## Harms to Asylum Seekers Returned to Mexico

## Asylum Seekers Stranded with No Means to Survive

Asylum seekers who spoke to Human Rights Watch expressed fear and confusion at the prospect of being made to wait in a city where they did not have social ties, access to shelter or legal authorization to work, and where the number of asylum seekers in the city already far exceeded available free shelter space. Mexican officials and attorneys told Human Rights Watch that there was no program under current regulations to issue work visas to those seeking asylum in the US and returned to wait in Mexico.

If these asylum seekers were pursuing their cases in the US, they would more likely be able to access financial support through personal networks. Although asylum seekers are not legally eligible to apply for work in the US until their cases have been won or 150 days have passed, nearly 84 percent of the asylum seekers in the MPP program reported having relatives in the US, according to the Mexican government.[34]

Migrant shelters in Ciudad Juárez have the capacity to hold about 1,000 people, according to Enrique Valenzuela, who heads the Chihuahua State Population Council (COESPO) branch and has been

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept    **Other options**