Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 1 of 1021    PageID 6871

"We Can't Help You Here"

    

DONATE NOW



"Carmen S." holds her son, 3, at a shelter where they were staying in Ciudad Juárez, Mexico, May 2019, after being returned to Mexico under the Trump administration's "Migrant Protection Protocols." Carmen told Human Rights Watch that she was thinking of trying to cross illegally but was afraid of losing her children. © 2019 Clara Long/Human Rights Watch

On June 12, less than a week after the US and Mexico made a joint declaration announcing an agreement that included the expansion of the MPP program,[39] US returns to Ciudad Juárez doubled to about 200 asylum seekers. That number rose as high as 500 in late June and continued to surpass the previously negotiated level of 100 returns per day.[40]

Valenzuela said that US authorities accept an average of 30 asylum seekers per day for processing at the El Paso port of entry. This practice of "metering," or of limiting the number of people who can apply for asylum each day, has led to asylum seekers in border towns having to sign up on a "list" and wait for their number to be called. Since there are many more asylum seekers waiting to apply than are being processed, the number of people waiting in Mexican border towns for their turn to present themselves at the border continues to grow. As of June 4, the Mexican government said there were about 18,778 metered asylum seekers waiting in Mexican border cities to apply for the first time.[41]

In June, the director of the Mexican government office in charge of refugee aid, the Comisión Mexicana de Ayuda a Refugiados, estimated that Mexico will host some 60,000 asylum seekers returned under the MPP by August.[42]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

AR02660

"We Can't Help You Here"         DONATE NOW

Although the Mexican government initially promised to grant asylum seekers work visas, that promise was never realized.[46] Instead, asylum seekers forced to wait in Mexico are given temporary "multi-entry" visas contingent on their status in the MPP program – permission to be in Mexico expires on the day asylum seekers must travel to the US to attend a hearing in their case and is renewed each time Border Patrol sends them back to Mexico to wait for the next hearing.

Human Rights Watch examined the Mexican immigration paperwork of at least seven of the returned asylum seekers with whom we spoke. All carried a standard "visa multiple" form, which a Mexican immigration official confirmed did not confer the right to work.[47]

Although Human Rights Watch did not find evidence that anyone had tried to work and been penalized, many of the asylum seekers we interviewed expressed frustration that they could not legally get a job.

Returned asylum seekers have both immediate and long-term needs to access food, water, shelter, communication with family and lawyers, and other necessities, but have been left with no legal means to earn the income required to do so.

- Luisa A. (pseudonym), 20, who fled Honduras with her 3-year-old son, was staying in a local shelter in Ciudad Juárez, but when she left to appear at her preliminary hearing in El Paso, the shelter told her she'd lost her space and could not return. Mother and son were forced to stay in the street. "These are things I thought I would never live," she said. She eventually pooled her money with a group of other women, some of whom also have small children, to rent a low-cost room in a hotel. "There are times when we either eat or pay for the hotel room," Luisa said. "I prefer to have a roof over our heads than to wander the streets looking for shelter." But she said money was running out.[48]

- Galena L. (pseudonym), 22, also fled Honduras with her 1-year-old daughter and said she was on

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

AR02661

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 3 of 1021   PageID 6873

HUMAN RIGHTS WATCH

"We Can't Help You Here"

   

DONATE NOW

"We've thought about working, but we're afraid to go out." They spoke with Human Rights Watch the day before going to their first immigration court hearing and hoped to convince US authorities to let them proceed with their cases from within the US. If they were to be returned again to Ciudad Juárez, Nina said, "I don't want to think about that because I don't know."[50]

- Asylum seekers reported that when they could not find space, they were forced to sleep on the street or squat in abandoned houses located in some of the most dangerous neighborhoods.

- Silvia M. (pseudonym), 23, from Honduras, said her family had been sending her some money for food, but because she could not work legally, she was unable to pay for more permanent housing in Ciudad Juárez. "What if they give me [a court date] in October?" she said. "How am I going to handle it?" Since the shelter she is staying in has a limit on the duration asylum seekers can stay there, usually one week, she was in need of finding somewhere else to stay very soon.[51]

- Carmen S. (pseudonym), an asylum seeker traveling with her 6-year-old and 3-year old sons from Honduras, was told the day Human Rights Watch interviewed her that she and her children could not stay at the shelter anymore. She showed Human Rights Watch documents saying that her preliminary court date in the US was not until October, five months later. "Why did they make the court hearing so long from now knowing that I have nothing?" she said. Carmen said her husband and 10-year-old son traveled first and were already in Texas, where they were in asylum proceedings. In preparation for their arrival, Carmen's husband rented a larger apartment and told their older son the family would soon be reunited. When their 10-year-old found out his mother and little brothers were sent to wait in Mexico, Carmen said the boy stopped eating. "I'm thinking about going across, because I have no other option. But I'm very afraid they will take my kids," she said. "If they take my kids, it's better that they just kill me."[52]

- Lazaro P. said that he was staying in an abandoned house and felt he is at risk of being targeted in Ciudad Juárez as a migrant. A brother in the US who had been sending him some money recently died. He said he asked for permission from US authorities to enter the US to go to the funeral

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

AR02662

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 4 of 1021   PageID 6874

HUMAN RIGHTS WATCH      "We Can't Help You Here"             DONATE NOW

Human Rights Watch documented at least 29 reports of harm to asylum seekers in Ciudad Juárez, including violent attacks, sexual assault, and kidnapping, in interviews and court observations.

According to the Mexican government, the country is currently facing an "emergency of violence and insecurity," and the national security plan of Mexican President Andrés Manuel López Obrador states in its opening sentence that Mexico is "among the most unsafe countries in the world."[55] Mexico recorded over 33,500 intentional homicides in 2018, the highest since the country began keeping records in 1997.[56] Two of the northern states to which asylum seekers are being returned under the MPP, Baja California and Chihuahua, are among the most violent in the country.[57] While El Paso and San Diego are relatively safe cities, with 23 and 86 homicides in 2018 respectively, there were 1,247 homicides in Ciudad Juárez and 2,529 homicides in Tijuana.[58] Meanwhile, Mexico suffers from "widespread and persistent impunity," where approximately 98 percent of crimes go unsolved, according to the United Nations High Commissioner for Human Rights, meaning there are often no meaningful legal consequences for committing crimes there.[59]

 Expanding the MPP would mean returning migrants to Tamaulipas, one of two Mexican Gulf states where human rights officials have discovered more than 1,300 mass graves since 2007, including those of murdered migrants and where there have been multiple reports this year alone of bus kidnappings of migrants attempting to reach the border.[60]

In January, a series of attacks on Ciudad Juárez police officers prompted the US to issue a security alert for US citizens in the city, one of 17 priority areas to which the Mexican government is deploying national guard troops.[61]

Within Ciudad Juárez itself, Human Rights Watch observed at least three shelters located in "hot spot" areas where the reported number of homicides was above the city's mean between 2009 and 2010, according to peer reviewed study by Carlos Vilalta and Robert Muggah of violent homicides there from April 2014, the most recently available.[62]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      Other options

"We Can't Help You Here"

DONATE NOW

One Honduran asylum seeker who had been returned to Ciudad Juárez under the MPP was kidnapped and raped in mid-June, according to news reports.[66] In a Mexican court hearing on June 17, the asylum seeker testified that Mexican federal police officers stormed into a house where migrants were staying and abducted her and two others, turning them over to a criminal group.[67]

US federal asylum officers have said that "Mexico is simply not safe for Central American asylum seekers," and that "the risk of persecution in Mexico is even higher for the most vulnerable segments of asylum seekers," including ethnic minorities from indigenous cultures, migrant women at large, and LGBTI migrants.[68]

## Accounts of Violence

Human Rights Watch received accounts of harm to asylum seekers in the course of individual interviews with asylum seekers, shelter operators, and immigration attorneys, as well as while observing immigration court proceedings in El Paso and San Diego.

- Delfina M. (pseudonym), 20, an asylum seeker who fled Guatemala with her 4-year-old son, said that after she was returned to Ciudad Juárez, two men grabbed her in the street and sexually assaulted her. They told her not to scream and threatened to kill her son. "I can still feel the dirtiness of what they did in my body," she said.[69]

- Rodrigo S. (pseudonym), 21, who fled El Salvador, told a judge in immigration court proceedings that he was robbed at knifepoint and stabbed in the back. He said he went to the police, but the Mexican officers wouldn't help him because he wasn't a Mexican citizen. He told the judge that although he is recovering physically, he's afraid to be sent back.[70]

- Esteban G. (pseudonym), 19, said in immigration court he was robbed when he left his room to go to the store for food. He told police he suspected a neighbor of stealing his cellphone. When

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 6 of 1021   PageID 6876

**HUMAN RIGHTS WATCH**

"We Can't Help You Here"

DONATE NOW

their preliminary hearing in El Paso, according to local lawyers and news reports.[73]

Violence also affects asylum seekers who are waiting to cross into the US.

Central Americans Rafael M. (pseudonym) and Gerald H. (pseudonym), who said they planned to seek asylum in the US, reported that after they had been in Ciudad Juárez for 21 days around April, they were kidnapped at gunpoint in Parque de las Tortugas, which runs along the border just north of the Santa Fe Bridge.[74] Some cars pulled up and men got out with guns. Rafael said he tried to run, but they grabbed him, tearing his shirt. They put a jacket over Rafael's head, told the two not to scream, and forced them into cars. The kidnappers accused the two of being rival smugglers working their territory. The kidnappers interrogated them and searched Rafael's phone to confirm they were in fact asylum seekers. They let them go, but not before taking photos of their faces. They also recorded information on where they were staying. The abductors told the two that if they reported the incident, they would kill them. Rafael reported he was hit about 30 times; Gerald reported being hit in the back of the head so hard he could taste blood in his mouth.[75]

Organizations providing asylum seekers with humanitarian aid may also be at risk. The Ciudad Juárez-based human rights group, Derechos Humanos Integrales en Acción, showed Human Rights Watch a declaration they collected from two women operating a migrant shelter in the Anapra neighborhood. [76] According to their account, on April 16, they were kidnapped, beaten, and interrogated to determine whether they were involved in smuggling.

Several returned asylum seekers who had not suffered physical harm told us they were terrified of being forced to remain in Ciudad Juárez.

- Gloria O. (pseudonym), a 20-year-old asylum seeker from Honduras, said she fled because a local gang member wanted her to be his girlfriend and threatened to kill her if she refused. She said she was afraid to leave the shelter where she was staying because Ciudad Juárez was too

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     Other options

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 7 of 1021    PageID 6877

"We Can't Help You Here"

DONATE NOW

Shelter operators at Casa del Migrante and El Buen Pastor, two of the oldest shelters with the greatest capacity in Ciudad Juárez, said criminal syndicates as well as petty criminals target asylum seekers.

Cristina Coronado, who works at Casa del Migrante, said local criminals or smugglers have infiltrated the shelter, preying on vulnerable asylum seekers.[79] She said local Mexican journalists are too afraid of organized crime in the area, making it difficult for the public to understand the dangers they face.

As the result of these security concerns, Coronado said Casa del Migrante requires asylum seekers to turn over their phones to shelter workers to stay there and does not permit shelter residents to come and go as they please. She said she recognizes such rules limit asylum seekers' ability to communicate with attorneys and aren't sustainable since the MPP has created long-term shelter needs.

Pastor Juan Fierro, who operates El Buen Pastor, said the shelter had to install cameras after suspicious people were lurking outside of the gates. He said asylum seekers have been robbed or kidnapped and that local criminals are aware that some asylum seekers are sent money from relatives in the US and know where asylum seekers frequently go to collect that money.[80]

According to Fierro, one asylum seeker who was express-kidnapped was told that to stay in Ciudad Juárez, he had to "pay the plaza," or the criminal organization controlling that area or drug-smuggling corridor.[81]

The Mexican government officials who spoke to Human Rights Watch acknowledged that Ciudad Juárez is not a safe place for asylum seekers to remain. [82]

Valenzuela, the Mexican official managing the metering list in Ciudad Juárez, called the situation "a pressure cooker," explaining that though the city has had problems with violence, crime, and impunity in the past, the people who live there have begun blaming migrants.[83]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02666

"We Can't Help You Here"      f   t   ⓦ   ✉   ⤴    DONATE NOW

Many of the migrants that Human Rights Watch interviewed expressed fear at the prospect of talking to Mexican authorities, refusing to report to police any of the crimes they either witnessed or were victim to, and even Mexican officials acknowledged that corruption among Ciudad Juárez police officers was commonplace.[86]

## Nearly Impossible Standard for Exemption from the MPP Program

Typically, when Border Patrol agents apprehend someone at the border, they must ask whether that person is afraid to return to their country of origin to ensure they are complying with laws that say a person cannot be returned to a place where they are in danger of persecution or torture – known as non-refoulement.[87] If that person indicates they are afraid to return, they are supposed to be referred to a trained asylum officer – someone independent of Border Patrol – who will then determine if the asylum seeker's claim of fear meets certain standards of credibility or not, and has a "credible fear" of return. If so, the asylum seeker will then be scheduled for an asylum hearing before a judge.

That policy has changed under the MPP.

Under the MPP guidance from DHS, Border Patrol agents are not required to ask asylum seekers if they are afraid to be returned to Mexico.[88]

According to program guidelines, asylum seekers subject to them must voluntarily express fear of harm in Mexico, and only then are they entitled to an interview with an asylum officer to assess whether they are "more likely than not" to face persecution or torture or else can be safely returned to Mexico. Asylum seekers who are not from Mexico may not expect to be sent to Mexico and may not be aware of potential harms there, nor be aware that voluntarily expressing fear of return to Mexico is required to trigger an interview that would assess whether they can be returned to Mexico.[89]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

"We Can't Help You Here"



DONATE NOW

likely than not" standard will be applied.[91] In such cases, asylum seekers have access to attorneys, notice of rights, time to prepare their case, and the right to administrative and judicial review.

The MPP program has none of those same protections. Asylum seekers are not provided access to attorneys, and the asylum officer's decision is not reviewable by a judge.[92]

Outside of the MPP, where the lower "well-founded fear" standard is applied in asylum officer interviews, asylum seekers are informed of their rights, which include the right to consult with an attorney, to request that the officer's decision be reviewed by an immigration judge, and to rest for 48 hours before the interview.[93] The MPP process does not provide any of these same rights or protections, even though "it imposes a significantly higher evidentiary standard."[94]

Attorney Linda Rivas, who has represented some returned asylum seekers in these interviews, said the standard for approval appears to be whether the person has already suffered harm in Ciudad Juárez. She represented two families whose claims were approved after the fathers of each were kidnapped for several hours there.[95] If so, that standard is applied inconsistently. Kimberlyn, whose account of being kidnapped with her 5-year-old daughter is referenced above, did not prevail in her non-refoulement interview and was returned to Ciudad Juárez, according to a reporter who observed their second hearing.[96]

The Hope Border Institute, a faith-based research and policy group, has monitored nearly all the MPP court proceedings in El Paso and found that although 84 percent of asylum seekers placed in the program expressed in court a fear of persecution in Mexico, only 5 percent were subsequently exempted from the MPP and allowed to stay.[97]

An asylum officer who had been administering these interviews told *Vox*, an online news source, that decisions to let an asylum seeker in the MPP stay in the US are often reviewed — and blocked or overturned — by asylum headquarters, and that in practice the standard for prevailing on claims of fear

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

   

"We Can't Help You Here"                                                    DONATE NOW

US immigration advocates have argued certain populations would face particular challenges supporting themselves in Mexico[100] and accessing the US asylum process and should be excluded from the MPP. Without identity documents, money, and family members and the support they can provide, both financial and otherwise, asylum seekers with certain characteristics -- families with children, migrants with mental health conditions or physical disabilities, pregnant women, and transgender women, for example – are likely to face greater challenges supporting themselves and accessing the US asylum process. Transgender women seeking asylum from Central America in particular have reported violence and harassment in Mexico.[101]

Although they would also likely face difficulties supporting themselves in the US, according to data from the Mexican government, nearly 84 percent of asylum seekers placed in the MPP program reported they have relatives in the US.

Human Rights Watch interviews and court observations indicate CBP's decisions to include or exclude such populations have been inconsistent.



In Ciudad Juárez, the Mexican government took note of at least 62 asylum seekers up until May 13 with a vulnerability (as defined by the Mexican government) who were returned under the MPP, including senior adults, LGBT people, at least one person with a physical disability, and 46 people with symptoms of respiratory illness.[102] Over 4,780 children have been returned to

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

AR02669

HUMAN
RIGHTS
WATCH

"We Can't Help You Here"        f    ✗    ◯    ✉    ◁     DONATE NOW

reviewed by the judge. Human Rights Watch asked Border Patrol why these people had been included in the MPP. Border Patrol referred us to their guidelines posted online that state such persons may be excluded from the program.[104]

During court proceedings on May 22 in San Diego, the immigration judge asked repeatedly whether a mother and daughter whose primary language was Achi, an indigenous Mayan language, and who understand very little Spanish, were "appropriate" for the MPP.[105]

According to Linda Rivas, executive director and lead attorney at Las Americas Immigrant Advocacy Center, a woman with two daughters, one of whom is a person with a disability that has high support requirements; a transgender woman; and seven pregnant women, one of whom gave birth shortly after being sent back to Mexico, and another who was separated from her husband and 10-month-old baby with special needs, were placed into the MPP and later removed from the program.

At the same time, attorneys arguing for other pregnant women to be excluded from the MPP have seen them returned to Mexico.[106]

## Severely Limited Access to Attorneys, Chaotic Court Hearings

Preliminary court proceedings and interviews with local attorneys as well as asylum seekers returned to Mexico show the MPP program mired in confusion with little to no meaningful access to due process.

Though everyone in the MPP has the right to an attorney at no cost to the US government, for asylum seekers forced to remain in Mexico, getting legal representation has been nearly impossible. Additionally, DHS is not allowing attorneys to participate in fear interviews.[107] For the few who do

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02670

"We Can't Help You Here"

   

Asylum seekers located in the US are not bound to attend immigration court proceedings in US border towns. Instead, they spread out across the US to other immigration court districts, whether because they are detained elsewhere or are residing in cities where they have friends or family. But under the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.

While private attorneys may have more availability to represent clients, they also have concerns about traveling to Mexico and must charge for their services. Most asylum seekers cannot afford to pay for food, let alone tens of thousands of dollars needed to pay for private representation for the duration of their cases.

At the two preliminary hearings Human Rights Watch observed in El Paso where everyone appeared for the first time, Immigration Judge Nathan Herbert gave more time to everyone who wanted it for the purpose of finding an attorney. Those who appeared in his courtroom on May 10 for their second MPP hearings, mostly women with very small children, still had not found one. Immigration Judge Scott Simpson in San Diego explicitly acknowledged it might be more difficult for asylum seekers to find attorneys in Mexico and gave more time to everyone who wanted time to find an attorney.

Before granting more time to those at their second hearings, Judge Herbert asked each asylum seeker to describe the efforts they had made. One woman, Sol O. (pseudonym), fled Guatemala with her two daughters, one of whom was suffering from a phlegmy cough throughout proceedings. "I have called several and they tell me they can't help me because they have too many cases," Sol said. She also said she can't afford the ones that charge. "Why have they been so unfair with us?" she asked the judge. "We've been waiting for months. Other people have gone through just like that."[109]

According to immigration attorneys, most of the funding available for pro bono legal representation for immigrants in deportation proceedings limits eligibility to clients who are residents of certain

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept        Other options

AR02671

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 13 of 1021    PageID 6883

"We Can't Help You Here"

DONATE NOW

have their own offices in Mexico where they could meet privately with clients.[110]

Additionally, asylum seekers do not have regular access to phones and rarely have access to computers, meaning there are limited opportunities for the communication required to prepare asylum seekers' cases, according to attorneys and shelter operators.[111]

In a letter to DHS regarding the MPP program, the American Immigration Lawyers Association, the largest national association of immigration attorneys, stated that, "representing an asylum seeker in immigration court conservatively takes between 40-60 hours of work, with an estimated 35 hours of face-to-face communication with the client," especially since many asylum seekers have experienced physical and psychological trauma and will need time to build trust with attorneys.[112] Yet the MPP only guarantees asylum seekers one hour at immigration court just before proceedings, meaning lawyers have mere moments of face-to-face contact with clients.[113]

In one hearing, Human Rights Watch witnessed an asylum seeker cite the difficulty in accessing an attorney as one of the factors pushing her to give up her asylum claim. Karmele G. (pseudonym), who fled Guatemala with her two sons, ages 10 months and 9 years, was the only asylum seeker in the May 10 proceedings in El Paso who did not want more time to find an attorney. She said she had tried calling attorneys, but they were too expensive and that she just wanted to get on with her case. Where a lawyer would have been equipped to navigate the proceedings, Karmele repeatedly asked the judge to define the important legal terms used, and though the judge expressed concern that she was afraid to return to her country, he ultimately ordered her removed. Karmele insisted that she was afraid to return to Guatemala but said she was even more afraid of being sent back to Ciudad Juárez again, stating that, "they sent me to Mexico, and there I have no job and no family." She said that at least in Guatemala, her family could care for her children if anything happened to her.[114]

Just as the concentration of thousands of asylum seekers forced to wait in Mexico has overwhelmed attorneys, so too has the program overwhelmed courtrooms. Only a few immigration judges – one in El

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02672

"We Can't Help You Here"

 

DONATE NOW

US immigration law in the context of the MPP program and attorneys and asylum seekers scrambled to deal with the unintended consequences of choices that would typically have predictable outcomes.

Court documents, which were only provided in English, were full of errors with regard to people's names, and addresses were unusable. Because shelter space in Ciudad Juárez is limited and often temporary, many asylum seekers do not have stable addresses, meaning the court has no way to notify them of changes or decisions in their cases, an important component of due process. When asylum seekers leave Mexico to attend immigration court hearings in the US, they can lose their spots in Mexican shelters, meaning whichever address the court has on file may no longer be correct. In many cases, Border Patrol have recorded simply "address known" or the name of the city or state in Mexico to which Border Patrol agents were sending the asylum seeker.[118]

In San Diego, Immigration Judge Simpson repeatedly questioned how asylum seekers in MPP who had not yet appeared in court would receive adequate notice of their next hearing date and asked the DHS attorney to file a brief showing that it was appropriate to move forward in these cases. Several asylum seekers whose hearings were scheduled did not appear in court. The only person ordered removed *in absentia* in proceedings that day was a man who had appeared at his first hearing. Those who had never appeared in court were not ordered removed. The judge noted that usually, if a person fails to appear, that person is in the US, but that these migrants were in Mexico, had been given a hearing date in another country, which "creates an impediment to come to court." The judge further noted his concern about the ability of asylum seekers to understand the process and referred to two persons in court that day who spoke an indigenous language and understood very little Spanish.[119]

In El Paso, Immigration Judge Herbert has ordered over 150 people removed *in absentia*, according to the Hope Border Institute.[120] Asylum seekers ordered deported *in absentia* are barred from returning to the United States for at least 10 years.

Human Rights Watch witnessed the El Paso judge telling attorneys that errors to names and unusable

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

AR02673

   
One asylum seeker's good faith effort to withdraw his asylum petition, the first known attempt to do so, quickly became twisted and confused under the MPP. Emilio G. (pseudonym) told the judge in El Paso he needed to return to El Salvador to care of his sick infant. Although Emilio was afraid to return to El Salvador, he "will have to take the risk," he said. He needed to work and make money as soon as possible to pay for his baby's medical care, but with no work visa in Mexico and with his asylum case likely to drag on for months or years, returning to El Salvador was the surest possible way to provide his family with immediate support.[122]

Typically, withdrawing an asylum claim means the applicant must go home immediately but reserves the right to apply again later. In this case, the DHS attorney told the judge he'd been ordered by headquarters to object and appeal. The DHS attorney said that because Emilio only had permission to be in Mexico based on his status as an asylum seeker in the MPP program, as soon as the judge granted the petition to withdraw, Emilio may not necessarily have permission to reenter Mexico, and would therefore have no means to travel home. To complicate matters further, Emilio would have trouble taking a direct flight to El Salvador or even traveling by land since Border Patrol had taken his national identification documents.[123]

Emilio was likely going to be detained by US Immigration and Customs Enforcement for the weeks or months it would take the court to reach a decision, and the consequences for his family back home would be devastating. But at the last minute, an attorney present in the courtroom serving as "friend of the court" agreed to represent Emilio, stepping in to make a deal with the DHS attorney.[124]

The attorney was able to negotiate with the DHS attorney so that Border Patrol would return Emilio to Ciudad Juárez along with his identification document, at which point he would immediately travel to El Salvador and send proof to the US government that he was there. Only then would the judge grant his request to withdraw the asylum application. If his application to withdraw had not been granted, Emilio could have been ordered deported *in absentia*.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02674

"We Can't Help You Here"      f   🐦   📱   ✉   🔗    DONATE NOW

referring to the metering system. But the judge and the DHS attorney failed to understand what he was saying. The judge stated the man seemed to be denying the charge of lacking valid documentation and set another hearing to address this issue. With no attorney to explain the situation to the judge, the asylum seeker found himself delayed at least another two weeks in pursuing his asylum application.

## US Failure to Return Asylum Seekers' Documents and Possessions

In several of the interviews Human Rights Watch conducted, as well as in court proceedings we observed, asylum seekers reported that Border Patrol agents took some or all of their documents and personal possessions, refusing to return them. DHS attorneys acknowledged the practice and Mexican officials stated they commonly encountered migrants returned without their documents.[126]

According to a Reuters report, a DHS official said it has been federal policy since 2013 to return possessions to migrants no longer in their custody, except for those documents believed to be fraudulent or altered.[127]

Asylum seekers consistently reported that when they were initially detained by Border Patrol, agents took their documents, including government-issued forms of identification, photos, memorabilia and other possessions. A report by the DHS Office of the Inspector General found that agents routinely threw away asylum seekers' personal property, including backpacks, handbags and suitcases.[128]

Asylum seekers who were placed into the MPP program and sent to Ciudad Juárez said that their documents were not returned to them.

Without identification, asylum seekers, who are often destitute, may have difficulty receiving financial support from family or friends abroad. For example, with no government-issued ID, asylum seekers

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

AR02675

8/26/22, 11:42 AM
"We Can't Help You Here": US Returns of Asylum Seekers to Mexico | HRW
Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 17 of 1021    PageID 6887

HUMAN RIGHTS WATCH  |  "We Can't Help You Here"

     DONATE NOW

- Delia E. (pseudonym), a 43-year-old asylum seeker from Guatemala who was traveling with her 18-year-old daughter, said Border Patrol agents took all of her documents, mementos, photos, and other possessions. She said she asked agents to give her documents back to her, but they accused of using a false name and refused. "It infuriates me, the way they took all of my mementos and everything from me," Delia said.[130]

- Bernardo P. (pseudonym), a 28-year-old asylum seeker from Honduras, said Border Patrol agents took his ID and cell phone. When he tried to get his possessions back, he said they refused, telling him that the law prevents them from returning such items. Though Human Rights Watch could not verify Bernardo's exchange with agents, returning asylum seekers' documents is not illegal. As a result, Bernardo said he has had no access to his money and no way to receive financial support from anyone else. Because the shelter he was staying in has a limit on the number of days asylum seekers can stay, he would soon have to search for somewhere else to stay.[131]

Asylum seekers may also have difficulty traveling, meaning they are not free to seek asylum elsewhere or return home.

As noted above, CBP refused to return a government-issued identification to Emilio, the asylum seeker who needed his ID to make an urgent trip home to care for his 6-month-old baby who had become gravely ill.[132]

Emilio appeared at his preliminary court proceeding in El Paso on May 9, where the judge agreed to allow Emilio to withdraw his application for asylum, a process that means he could seek asylum in the future without hurting his case. In order to return to El Salvador, Emilio would need his ID, which Border Patrol had taken.[133]

Yet when CBP officers sent Emilio to Ciudad Juárez, they did not return his ID. The next day, when

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept    Other options

AR02676

"We Can't Help You Here"         f   ✦   ◉   ✉   ⋖    DONATE NOW

the following day for El Salvador.[135]

## Separation of Families within the MPP Program

Human Rights Watch documented several reports of family separation, where agents split apart families who'd been traveling together at the border. Children, including some with mental health conditions, were separated from non-parental guardians by Border Patrol, classified as "unaccompanied alien children," and placed into the custody of a US Department of Health and Human Services (HHS)-funded shelter in the United States.[136] Meanwhile, the adult family member was sent to Mexico for the duration of their lengthy asylum case.

Staying in touch is especially difficult for families separated under the MPP, since those forced to wait in Mexico may not have access to a cell phone or landline.

- Wilfredo S. (pseudonym), a 19-year-old Central American asylum seeker, said he had been separated from his 17-year-old sister who has a mental health condition and has not seen her in five weeks. Wilfredo showed the court he carried a power of attorney document that he said gives him power to make decisions about his sister in their parents' absence. DHS attorneys said their records show the girl had already been released from HHS custody to a family friend, but Wilfredo said he had learned the previous day from their mother that his sister remained in custody. He said he had not been able to contact his sister.[137]

- Elias S. (pseudonym), a 19-year-old Central American asylum seeker, said in immigration court that he had been separated from his three minor siblings, ages 9, 13 and 17, one of whom had been raped. DHS attorneys said they had no record that Elias was traveling with younger siblings, let alone that they had been separated. Elias said their mother lives in the US and that while his 13-year-old brother had been released to their mother, his two little sisters remained in HHS custody. Though his mother was in touch with the two girls, he said he had not been able to talk

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

AR02677

"We Can't Help You Here"         

country, an agent told her, "We can't help you here." She said she was separated her from her little sister, who was ultimately released to their brother in the US. Meanwhile, Amanda was returned to Mexico, where she said she is too afraid to leave the hotel room she shares with some other girls. Sometimes, they don't eat so that they can pay for shelter, Amanda said.

- Josefa C. is a 53-year-old grandmother who raised her three granddaughters after their mother moved to Texas. When she fled from Honduras, she took her granddaughters, then ages 7, 12 and 15, with her. She said Border Patrol took the girls away, forcibly removing the children as the 7-year-old clung to Josefa's pants and all four cried. She was returned to Mexico alone, while the three girls were eventually released to their mother in Texas.[140]

The MPP is applied selectively, and not everyone seeking asylum in the US is placed in the MPP program. According to Mexican officials, and verified by local attorneys and advocates, nearly all of those placed into the MPP are Central Americans from Northern Triangle countries, the vast majority of whom told Mexican officials they had family in the US.[141] Recently, under the expansion of the MPP, Cubans and some others have also been included in the program.[142]

Human Rights Watch also documented non-custodial family separations that occurred when asylum seekers were returned to Mexico while their family members were released in the US to pursue their asylum cases from within the country.

- Christopher E. (pseudonym) fled Honduras with his pregnant wife. He told a research analyst with the Hope Border Institute who interviewed him that as they were traveling through Mexico, they were kidnapped in Nuevo Laredo, Tamaulipas, for two months. When their kidnappers couldn't get ahold of a family member, they were eventually released. By the time they turned themselves in to Border Patrol, Christopher's wife was six-months pregnant. Border Patrol separated them, sending Christopher back to Ciudad Juárez and releasing his wife to his brother in Tennessee who has epilepsy. He said he was worried about them both. He also said he was too

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept      **Other options**

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 20 of 1021    PageID 6890



DONATE NOW

# US Law and International Refugee Law

The United States in 1968 committed to the central guarantees of the 1951 Convention relating to the Status of Refugees (the Refugee Convention) by its accession to the Refugee Convention's 1967 Protocol.[145] The US government then enacted the Refugee Act of 1980 to bring US law into compliance with the Refugee Convention and Protocol. The Refugee Act incorporated into US law the convention's definition of a refugee and adopted the principle of nonrefoulement, which prohibits the return of refugees to countries where they would face persecution.[146]

The US, as a party to the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, is also obligated not to return anyone to a country "where there are substantial grounds for believing that [they] would be in danger of being subjected to torture."[147] The UN Human Rights Committee, in its general comment on the prohibition against torture and other ill-treatment, stated that governments "must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[148]

As described above, Human Rights Watch's findings indicate that under the Migrant Protection Protocols program, the US fails to comply with its international legal obligations to ensure that asylum seekers can fairly exercise their right to seek asylum and are protected from refoulement. The MPP defeats mechanisms already in place in US law (specifically the asylum process in US immigration

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept          Other options

AR02679

HUMAN
RIGHTS
WATCH

"We Can't Help You Here"           DONATE NOW

Ninth Circuit considered the government's appeal of the preliminary injunction.[149]

Two main questions were being argued:

1. Whether the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to carry out the MPP;

2. If DHS does have the authority to carry out the MPP, whether the program is in compliance with US laws that prohibit migrants from being returned to a territory where they would be subjected to persecution or torture (nonrefoulement).

At issue are provisions of INA section 235. Section 235 deals with procedures for inspecting foreign nationals entering the US and the treatment of those who do not have the legal authorization to do so, which includes people who apply for asylum at the US border.[150]

Section 235(b)(2)(C) states that "in the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding" under INA section 240.[151]

The district judge, in issuing the preliminary injunction initially blocking the MPP, said the statute could not be read to apply to asylum seekers being forced to wait in Mexico.[152]

The district judge's opinion states that Congress defines two categories of aliens. Asylum seekers are among those described under the first paragraph. The second paragraph describes "other aliens." The decision finds the contiguous territory return provision "shall not apply to an alien to whom paragraph one (1) applies" and can only be applied to the second category of migrants described in paragraph two, which includes those "suspected of being, inter alia, drug addicts, convicted criminals, terrorists, or alien smugglers, and who would therefore be inadmissible."[153]

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept        Other options

AR02680

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 22 of 1021    PageID 6892

MPP."[154] Nonetheless, two of the three judges on the panel that issued the decision wrote separate opinions expressing reservations about the program's legality.[155]

With respect to the question of nonrefoulement under the MPP, DHS acknowledged in its internal MPP policy guidance that it has a responsibility to ensure migrants are not returned to conditions where they are likely to face persecution or torture.[156]

As the findings in this report make clear, the Ninth Circuit relied on assurances by the Mexican government that have not been borne out in reality – asylum seekers placed into the MPP program do not have meaningful access to the US asylum process and are at risk of return to dangerous conditions.

# Acknowledgments

This report was researched and written by Clara Long, US Program senior researcher at Human Rights Watch and Ariana Sawyer, US Program assistant researcher.

Grace Meng, US Program acting deputy director, edited and contributed to research and writing of the report. The report was also edited by Bill Frelick, refugee rights director; Daniel Wilkinson, Americas managing director; and Michael Bochenek, senior counsel in the Children's Rights Division. Dreisen Heath, coordinator in the US Program, also contributed to editing. James Ross, legal and policy director, provided legal review. Danielle Haas, senior editor in the Program Office, provided program review.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

Accept          **Other options**

AR02681

"We Can't Help You Here"              

## Protecting Rights, Saving Lives

**Human Rights Watch defends the rights of people in 90 countries worldwide, spotlighting abuses and bringing perpetrators to justice**

### DONATE NOW



## Get Updates On Rights Issues From Around The Globe

Enter an email address      Sign Up

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Blackbaud Security Incident | Site Map |

Child Safeguarding

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.      Accept      **Other options**

AR02682

"We Can't Help You Here"

   

DONATE NOW

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept

Other options

NO. 20-60978

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

ROSA MARIA TABERA COLUMBIE,

*Petitioner*,

v.

ROBERT M. WILKINSON, ACTING U.S. ATTORNEY GENERAL,

*Respondent*.

---

ON PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION APPEALS

---

**BRIEF OF PETITIONER**

---

Respectfully submitted:

**SEMINO LAW, P.A.**


Veronica Semino, Esq.
Florida Bar No.: 70592
P.O. Box 9267
Spring, Texas 77387
Telephone: (786) 505-6186
Facsimile: (855) 510-6764
Email: Veronica@SeminoLaw.com
**PRO BONO ATTORNEY FOR PETITIONER**

# Case Query

### 20-61204 Quinones Rodriguez v. Garland

| Associated Case | Short Title | Type | Start | End | Status |
|---|---|---|---|---|---|
| | | | | | |

| Originating Case | Lead Case | Filed | Execution Date | Judgment | NOA | Originating Judge | Court Reporter |
|---|---|---|---|---|---|---|---|
| A213 444 739 | | | | | | | |

| Party | Party Type | Terminated from Case | Attorney |
|---|---|---|---|
| Quinones Rodriguez, Lazaro Enrique | (null)-Petitioner | | Rodriguez,Lilia I |
| Barr, U.S. Attorney General, William P. | (null)-Respondent | 01/05/2021 | Office of Immigration Litigation, Browning,Rachel Louise |
| Rosen, Acting U.S. Attorney General, Jeffrey A. | (null)-Respondent | 01/22/2021 | Browning,Rachel Louise Office of Immigration Litigation, |
| Wilkinson, Acting U.S. Attorney General, Robert M. | (null)-Respondent | 03/10/2021 | Browning,Rachel Louise Office of Immigration Litigation, |
| Garland, U.S. Attorney General, Merrick | (null)-Respondent | | Browning,Rachel Louise Office of Immigration Litigation, Durant,Edward C. |

| Attorney | Party Type(s) Represented | Representation End |
|---|---|---|
| Durant, Edward C. | (null)-Respondent | |
| Browning, Rachel Louise | (null)-Respondent | 01/05/2021 |
| Browning, Rachel Louise | (null)-Respondent | 01/22/2021 |
| Browning, Rachel Louise | (null)-Respondent | 03/10/2021 |
| Browning, Rachel Louise | (null)-Respondent | 03/29/2021 |
| Office of Immigration Litigation | (null)-Respondent | |
| Office of Immigration Litigation | (null)-Respondent | 01/05/2021 |
| Office of Immigration Litigation | (null)-Respondent | 01/22/2021 |
| Office of Immigration Litigation | (null)-Respondent | 03/10/2021 |
| Rodriguez, Lilia I | (null)-Petitioner | |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 5th Circuit - Appellate - 08/26/2022 16:25:10 | | |
| **PACER Login:** | DHSHQOGC | **Client Code:** | DHS |
| **Description:** | Case Query | **Search Criteria:** | 20-61204 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**AR02685**

# Case Query

### 21-60065 Miranda-Cruz v. Garland

| Associated Case | Short Title | Type | Start | End | Status |
|---|---|---|---|---|---|
| | | | | | |

| Originating Case | Lead Case | Filed | Execution Date | Judgment | NOA | Originating Judge | Court Reporter |
|---|---|---|---|---|---|---|---|
| A213 292 536 | | | | | | | |
| A213 292 537 | | | | | | | |
| A213 292 538 | | | | | | | |

| Party | Party Type | Terminated from Case | Attorney |
|---|---|---|---|
| Miranda-Cruz, Harold Eduardo | (null)-Petitioner | | Schaeffer,Brian Vincent<br>Schaeffer,Brian Vincent |
| Castro-Amador, Damny Ayalila | (null)-Petitioner | | Schaeffer,Brian Vincent<br>Schaeffer,Brian Vincent |
| Miranda-Castro, Boris Carlo | (null)-Petitioner | | Schaeffer,Brian Vincent<br>Schaeffer,Brian Vincent |
| Wilkinson, Acting U.S. Attorney General, Robert M. | (null)-Respondent | 03/11/2021 | Office of Immigration Litigation,<br>Burdge,Kimberly Ann |
| Garland, U.S. Attorney General, Merrick | (null)-Respondent | | Burdge,Kimberly Ann<br>Office of Immigration Litigation,<br>O'Connell,Joseph Anthony |

| Attorney | Party Type(s) Represented | Representation End |
|---|---|---|
| O'Connell, Joseph Anthony | (null)-Respondent | |
| Office of Immigration Litigation | (null)-Respondent | |
| Office of Immigration Litigation | (null)-Respondent | 03/11/2021 |
| Burdge, Kimberly Ann | (null)-Respondent | |
| Burdge, Kimberly Ann | (null)-Respondent | 03/11/2021 |
| Schaeffer, Brian Vincent | (null)-Petitioner | |
| Schaeffer, Brian Vincent | (null)-Petitioner | 02/23/2021 |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 5th Circuit - Appellate - 08/26/2022 16:25:59 | | |
| **PACER Login:** | DHSHQOGC | **Client Code:** | DHS |
| **Description:** | Case Query | **Search Criteria:** | 21-60065 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**AR02686**

to $44.00 per ton of assessable olives. The Committee unanimously recommended 2019 expenditures of $1,628,923 and an assessment rate of $44.00 per ton of assessable olives. The recommended assessment rate of $44.00 is $20.00 higher than the 2018 rate. The quantity of assessable olives for the 2019 Fiscal year is 17,953 tons. The $44.00 rate should provide $789,932 in assessment revenue. The higher assessment rate is needed because annual receipts for the 2018 crop year are 17,953 tons compared to 90,188 tons for the 2017 crop year. Olives are an alternate-bearing crop, with a small crop followed by a large crop. Income derived from the $44.00 per ton assessment rate, along with funds from the authorized reserve and interest income, should be adequate to meet this fiscal year's expenses.

The major expenditures recommended by the Committee for the 2019 fiscal year include $713,900 for program administration, $513,500 for marketing activities, $343,523 for research, and $58,000 for inspection equipment. Budgeted expenses for these items during the 2018 fiscal year were $401,200 for program administration, $973,500 for marketing activities, $297,777 for research, and $77,000 for inspection equipment. The Committee deliberated on many of the expenses, weighed the relative value of various programs or projects, and increased their expenses for marketing and research activities.

Prior to arriving at this budget and assessment rate, the Committee considered information from various sources including the Committee's executive, marketing, inspection, and research subcommittees. Alternate expenditure levels were discussed by these groups, based upon the relative value of various projects to the olive industry. The assessment rate of $44.00 per ton of assessable olives was derived by considering anticipated expenses, the low volume of assessable olives, and a late season freeze.

A review of NASS information indicates that the average producer price for the 2017 crop year was $974.00 per ton. Therefore, utilizing the assessment rate of $44.00 per ton, the assessment revenue for the 2019 fiscal year as a percentage of total producer revenue would be approximately 4.52 percent.

This action increases the assessment obligation imposed on handlers which are minimal and uniform on all handlers. Some of the additional costs may be passed on to producers. However, these costs would be offset by the benefits derived by the operation of

the marketing order. In addition, the Committee's December 11, 2018 meeting was widely publicized throughout the production area and all interested persons were invited to attend the meeting and participate in Committee deliberations on all issues.

In accordance with the Paperwork Reduction Act of 1995, (44 U.S.C. chapter 35), the marketing order's information collection requirements have been previously approved by OMB and assigned OMB No. 0581–0178 Vegetable and Specialty Crops. No changes in those requirements because of this action are necessary. Should any changes become necessary, they would be submitted to OMB for approval.

This final rule imposes no additional reporting or recordkeeping requirements on either small or large California olive handlers. As with all Federal marketing order programs, reports and forms are periodically reviewed to reduce information requirements and duplication by industry and public sector agencies. USDA has not identified any relevant Federal rules that duplicate, overlap, or conflict with this final rule.

AMS is committed to complying with the E-Government Act, to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

A proposed rule concerning this action was published in the **Federal Register** on April 24, 2019 (84 FR 17089). Copies of the proposed rule were provided to all California olive handlers. The proposal was also made available through the internet by USDA and the Office of the Federal Register. A 30-day comment period ending May 24, 2019, was provided for interested persons to respond to the proposal. No comments were received. Accordingly, no changes will be made to the rule as proposed.

A small business guide on complying with fruit, vegetable, and specialty crop marketing agreements and orders may be viewed at: *http://www.ams.usda.gov/ rules-regulations/moa/small-businesses.* Any questions about the compliance guide should be sent to Richard Lower at the previously-mentioned address in the **FOR FURTHER INFORMATION CONTACT** section.

After consideration of all relevant material presented, including the information and recommendation submitted by the Committee and other available information, it is hereby found that this rule will tend to effectuate the declared policy of the Act.

**List of Subjects in 7 CFR Part 932**

Olives, Marketing agreements, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, 7 CFR part 932 is amended as follows:

**PART 932—OLIVES GROWN IN CALIFORNIA**

■ 1. The authority citation for 7 CFR part 932 continues to read as follows:

**Authority:** 7 U.S.C. 601–674.

■ 2. Section 932.230 is revised to read as follows:

**§ 932.230 Assessment rate.**

On and after January 1, 2019, an assessment rate of $44.00 per ton is established for California olives.

Dated: July 11, 2019.

**Bruce Summers,**

*Administrator, Agricultural Marketing Service.*

[FR Doc. 2019–15061 Filed 7–15–19; 8:45 am]

**BILLING CODE 3410-02-P**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC44**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

[EOIR Docket No. 19–0504; A.G. Order No. 4488–2019]

**RIN 1125–AA91**

**Asylum Eligibility and Procedural Modifications**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or collectively, "the Departments") are adopting an interim final rule ("interim rule" or "rule") governing asylum claims in the context of aliens who enter or attempt to enter the United States across the southern land border after failing to apply for protection from persecution or torture while in a third country through which

**AR02687**

they transited en route to the United States. Pursuant to statutory authority, the Departments are amending their respective regulations to provide that, with limited exceptions, an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum. This basis for asylum ineligibility applies only prospectively to aliens who enter or arrive in the United States on or after the effective date of this rule. In addition to establishing a new mandatory bar for asylum eligibility for aliens who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States, this rule would also require asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible-fear screening process applicable to stowaways and aliens who are subject to expedited removal under section 235(b)(1) of the Immigration and Nationality Act. The new bar established by this regulation does not modify withholding or deferral of removal proceedings. Aliens who fail to apply for protection in a third country of transit may continue to apply for withholding of removal under the Immigration and Nationality Act ("INA") and deferral of removal under regulations issued pursuant to the legislation implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

**DATES:**

*Effective date:* This rule is effective July 16, 2019.

*Submission of public comments:* Written or electronic comments must be submitted on or before August 15, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 19–0504, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive

Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 19– 0504 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 19–0504. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS

INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office for Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

## II. Purpose of This Interim Rule

As discussed further below, asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the INA, 8 U.S.C. 1158. Congress, however, has provided that certain categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This interim rule will limit aliens' eligibility for this discretionary benefit if they enter or attempt to enter the United States across the southern land border after failing to apply for protection in at least one third country through which they transited en route to the United States, subject to limited exceptions.

The United States has experienced a dramatic increase in the number of aliens encountered along or near the southern land border with Mexico. This increase corresponds with a sharp increase in the number, and percentage, of aliens claiming fear of persecution or torture when apprehended or encountered by DHS. For example, over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview on claims of a fear of return has jumped from approximately 5

percent to above 40 percent. The number of cases referred to DOJ for proceedings before an immigration judge has also risen sharply, more than tripling between 2013 and 2018. These numbers are projected to continue to increase throughout the remainder of Fiscal Year ("FY") 2019 and beyond. Only a small minority of these individuals, however, are ultimately granted asylum.

The large number of meritless asylum claims places an extraordinary strain on the nation's immigration system, undermines many of the humanitarian purposes of asylum, has exacerbated the humanitarian crisis of human smuggling, and affects the United States' ongoing diplomatic negotiations with foreign countries. This rule mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture. Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category.

Apprehending the great number of aliens crossing illegally into the United States and processing their credible-fear and asylum claims consumes an inordinate amount of resources of the Departments. DHS must surveil, apprehend, screen, and process the aliens who enter the country. DHS must also devote significant resources to detain many aliens pending further proceedings and to represent the United States in immigration court proceedings. The large influx of aliens also consumes substantial resources of DOJ, whose immigration judges adjudicate aliens' claims and whose officials are responsible for prosecuting and maintaining custody over those who violate Federal criminal law. Despite DOJ deploying close to double the number of immigration judges as in 2010 and completing historic numbers of cases, currently more than 900,000 cases are pending before the immigration courts. This represents an increase of more than 100,000 cases (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019. And this increase is on top of an already sizeable jump over the previous five years in the number of cases pending before immigration judges. From the end of FY 2013 to the close of FY 2018, the number of pending cases more than doubled, increasing nearly 125 percent.

That increase is owing, in part, to the continued influx of aliens and record numbers of asylum applications being filed: More than 436,000 of the currently pending immigration cases include an asylum application. But a large majority of the asylum claims raised by those apprehended at the southern border are ultimately determined to be without merit. The strain on the immigration system from those meritless cases has been extreme and extends to the judicial system. The INA provides many asylum-seekers with rights of appeal to the Article III courts of the United States. Final disposition of asylum claims, even those that lack merit, can take years and significant government resources to resolve, particularly where Federal courts of appeals grant stays of removal when appeals are filed. *See De Leon* v. *INS,* 115 F.3d 643 (9th Cir. 1997).

The rule's bar on asylum eligibility for aliens who fail to apply for protection in at least one third country through which they transit en route to the United States also aims to further the humanitarian purposes of asylum. It prioritizes individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11, many of whom do not volitionally transit through a third country to reach the United States. By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have obtained protection in another country, the Departments seek to ensure that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly.

Additionally, the rule seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, the rule aims to aid the United States in its negotiations with foreign nations on migration issues. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States after failing to seek protection in at least one third country through which they transited en route to the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) regarding migration issues in general, related measures employed to control the flow of aliens into the United States (such as the recently implemented Migrant Protection Protocols [1]), and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, this rule provides that, with limited exceptions, an alien who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States. The alien would, however, remain eligible to apply for statutory withholding of removal and for deferral of removal under the CAT.

In order to alleviate the strain on the U.S. immigration system and more effectively provide relief to those most in need of asylum—victims of a severe form of trafficking and refugees who have no other option—this rule incorporates the eligibility bar on asylum into the credible-fear screening process applicable to stowaways and aliens placed in expedited removal proceedings.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charged the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and granted the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* at 1103(a)(3). The HSA also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). That authority has been delegated within DHS to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers

---

[1] *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 FR 6811 (Feb. 28, 2019).

determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.4(b), 208.9.

But the HSA retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) for DOJ, under EOIR and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (Board), also within DOJ, hears appeals from certain decisions by immigration judges. 8 CFR 1003.1(b)–(d). Asylum-seekers may appeal certain Board decisions to the Article III courts of the United States. *See* INA 242(a), 8 U.S.C. 1252(a).

The HSA also provided "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

## B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that generally, if granted, keeps an alien from being subject to removal, creates a path to lawful permanent resident status and U.S. citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R– S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed subject to certain exceptions and can travel abroad with prior consent); INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2) (asylees shall be given work authorization; asylum applicants may be granted work authorization 180 days after the filing of their applications); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for an asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); 8 CFR 209.2; 8 U.S.C. 1612(a)(2)(A) (asylees are eligible

for certain Federal means-tested benefits on a preferential basis compared to most legal permanent residents); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for the naturalization of lawful permanent residents).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 8 U.S.C. 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *see Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriving" in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to obtain asylum, the alien must demonstrate that he or she meets the statutory definition of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi), an alien must show not only that he or she does not fit within one of the statutory bars to granting asylum but also that he or she is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for

asylum" established by a regulation that is "consistent with" section 208 of the INA, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The asylum applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, those aliens who are statutorily eligible for asylum (*i.e.,* those who meet the definition of "refugee" and are not subject to a mandatory bar) are not entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "[i]s a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.'" *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis.

## C. Establishing Bars to Asylum

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum statute, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the INA. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–

29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the then-existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See* 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who (1) persecuted others on account of a protected ground; (2) were convicted of a particularly serious crime in the United States; (3) firmly resettled in another country; or (4) presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar), *abrogated on other grounds, Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In the Immigration Act of 1990, Congress added an additional mandatory bar to applying for or being granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515 (1990).

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended section 208

of the INA, 8 U.S.C. 1158, to include the asylum provisions in effect today: Among other things, Congress designated three categories of aliens who, with limited exceptions, are ineligible to apply for asylum: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). Congress also adopted six mandatory bars to granting asylum, which largely tracked the pre-existing asylum regulations. These bars prohibited asylum for (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific bars to asylum eligibility, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," the perpetrator of which "constitutes a danger to the community of the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to identify additional particularly serious

crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) (finding that Congress's decisions over time to amend the particularly serious crime bar by statute did not call into question the Board's additional authority to name serious crimes via case-by-case adjudication); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006) (relying on the absence of an explicit statutory mandate that the Attorney General designate "particular serious crimes" *only* via regulation). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[2]

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General and the Secretary to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the creation by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General has previously invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). More recently, the Attorney General and Secretary invoked section 208(b)(2)(C) to limit eligibility for asylum for aliens subject to a bar on entry under certain presidential proclamations. *See* Aliens Subject to a Bar on Entry Under Certain Presidential

---

[2] These provisions continue to refer only to the Attorney General, but the Departments interpret the provisions to also apply to the Secretary by operation of the HSA, Public Law 107–296. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018).[3] The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the HSA, also the Secretary) significant discretion to adopt additional bars to asylum eligibility. As noted above, when creating mandatory bars to asylum eligibility in the IIRIRA, Congress simultaneously delegated the authority to create additional bars in section 1158(b)(2)(C). Public Law 104–208, sec. 604 (codified at 8 U.S.C. 1158(b)(2)). Pursuant to this broad delegation of authority, the Attorney General and the Secretary have in the past acted to protect the integrity of the asylum system by limiting eligibility for those who do not truly require this country's protection, and do so again here. *See, e.g.,* 83 FR at 55944; 65 FR at 76126.

In promulgating this rule, the Departments rely on the broad authority granted by 8 U.S.C. 1158(b)(2)(C) to protect the "core regulatory purpose" of asylum law by prioritizing applicants "with nowhere else to turn." *Matter of B–R–,* 26 I&N Dec. 119, 122 (BIA 2013) (internal quotation marks omitted) (explaining that, in light of asylum law's "core regulatory purpose," several provisions of the U.S. Code "limit an alien's ability to claim asylum in the United States when other safe options are available"). Such prioritization is consistent with the purpose of the statutory firm-resettlement bar (8 U.S.C. 1158(b)(2)(A)(vi)), which likewise was implemented to limit the availability of asylum for those who are seeking to choose among a number of safe

countries. *See Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006); *Matter of A–G–G–,* 25 I&N Dec. 486, 503 (BIA 2011); *see also* 8 U.S.C. 1158(a)(2)(A) (providing that aliens who may be removed, pursuant to a bilateral or multilateral agreement, to a safe third country may not apply for asylum, and further demonstrating the intention of Congress to afford asylum protection only to those applicants who cannot seek effective protection in third countries). The concern with avoiding such forum-shopping has only been heightened by the dramatic increase in aliens entering or arriving in the United States along the southern border after transiting through one or more third countries where they could have sought protection, but did not. *See infra* at 33–41; *Kalubi* v. *Ashcroft,* 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country"). While under the current regulatory regime the firm-resettlement bar applies only in circumstances in which offers of permanent status have been extended by third countries, *see* 8 CFR 208.15, 1208.15, the additional bar created by this rule also seeks—like the firm-resettlement bar—to deny asylum protection to those persons effectively choosing among several countries where avenues to protection are available by waiting until they reach the United States to apply for protection. *See Sall,* 437 F.3d at 233. Thus, the rule is well within the authority conferred by section 208(b)(2)(C).

### D. Other Forms of Protection

Aliens who are not eligible to apply for or receive a grant of asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4); 8 CFR 1208.16(a). And an immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the implementing legislation regarding U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b)

(1998); 8 CFR 1208.13(c); 8 CFR 1208.3(b), *see also* 8 CFR 1208.16(c) and 1208.17.

Those forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a). In contrast to the more generous benefits available through asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as derivative protection for family members) and access to Federal means-tested public benefits. *See R–S–C,* 869 F.3d at 1180.

### E. Implementation of International Treaty Obligations

The framework described above is consistent with certain U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v.

---

[3] This rule is currently subject to a preliminary injunction against its enforcement. *See East Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1115, 1121 (N.D. Cal. 2018), *on remand from* 909 F.3d 1219 (9th Cir. 2018).

*Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ("[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of their obligations have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, rather than through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b); 8 CFR 208.16(b)–(c), 208.17–208.18; 1208.16(b)–(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R–S–C,* 869 F.3d at 1188 & n. 11; *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Courts have rejected arguments that the Refugee Convention, as implemented, requires that every qualified refugee receive asylum. For example, the Supreme Court has made clear that Article 34, which concerns the assimilation and naturalization of refugees, is precatory and not mandatory, and, accordingly, does not mandate that all refugees be granted asylum. *See Cardoza-Fonseca,* 480 U.S. at 441. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See id.; see also R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun,* 856 F.3d at 257 & n. 16; *Garcia,* 856 F.3d at 42; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has also recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. For example, courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under

Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 & n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

## IV. Regulatory Changes

*A. Limitation on Eligibility for Asylum for Aliens Who Enter or Attempt To Enter the United States Across the Southern Land Border After Failing To Apply for Protection in at Least One Country Through Which They Transited En Route to the United States*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar to eligibility for asylum for an alien who enters or attempts to enter the United States across the southern border, but who did not apply for protection from persecution or torture where it was available in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, such as in Mexico via that country's robust protection regime. The bar would be subject to several limited exceptions, for (1) an alien who demonstrates that he or she applied for protection from persecution or torture in at least one of the countries through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country; (2) an alien who demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or (3) an alien who has transited en route to the United States through only a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT.

In all cases the burden would remain with the alien to establish eligibility for asylum consistent with current law, including—if the evidence indicates that a ground for mandatory denial applies—the burden to prove that a ground for mandatory denial of the asylum application does not apply. 8 CFR 1240.8(d).

In addition to establishing a new mandatory bar for asylum eligibility for

an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, this rule would also modify certain aspects of the process for screening fear claims asserted by such aliens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Under current procedures, aliens subject to expedited removal may avoid being removed by making a threshold showing of a credible fear of persecution or torture at an initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in removal proceedings under section 240 of the INA, especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to a third-country-transit asylum eligibility bar would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening the new mandatory third-country-transit asylum eligibility bar imposed by the present rule.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens— apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under section 212(a)(6)(C) or (a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an

alien encountered in the interior of the United States who entered the country after the publication of this rule imposing the third-country-transit bar and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, the House Judiciary Committee expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104–469, pt. 1, at 107 (1996). The Committee accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House

report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the Federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b) (requiring implementation of the CAT); IIRIRA at sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately meeting the statutory standards for asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B), *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for

asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum," not the CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process and screening standard for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT regulations, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the former Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have had were referred as well. This was done on the assumption that it would not "disrupt[] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not mandate that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same manner.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protection. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent

resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he or she is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a ''reasonable fear'' of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e).

To establish a reasonable fear of persecution or torture, an alien must establish a ''reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal.'' *Id.* § 208.31(c). ''This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard.'' Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing ''fair and efficient procedures'' in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, ''[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum,'' and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. ''Because the standard for showing entitlement to these forms of protection (a clear probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'' *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of falling subject to this rule's third-country-transit eligibility bar, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103(a)(3), 8 U.S.C. 1103(a)(3), and to regulate ''conditions or limitations on the consideration of an application for asylum,'' *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in his ''sole and unreviewable discretion,'' the exercise of which may be ''modified at any time''—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to the third-country-transit bar and nonetheless has entered the United States along the southern land border after the effective date of this rule creating the bar would be ineligible for asylum and would thus not be able to establish a ''significant possibility . . . [of] eligibility for asylum under section 1158.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation or suspension on entry imposed by the third-country-transit bar. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of falling subject to the third-country-transit bar, however, would still be screened, but in a manner that reflects that their only viable claims could be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16. After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with DOJ's longstanding rationale that ''aliens ineligible for asylum,'' who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 (''Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum[,] . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'').

3. The screening process established by the interim rule accordingly will proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All such aliens will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the third-country-transit bar, then the asylum officer will make a negative credible-fear finding.

The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the third-country-transit asylum eligibility bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the third-country-transit ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the third-country-transit bar, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the Board and then seek review from a Federal court of appeals.

Conversely, an alien who is found to be subject to the third-country-transit asylum eligibility bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the third-country-transit asylum eligibility bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the third-country-transit asylum eligibility bar will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.

4. The above process will not affect the process in 8 CFR 208.30(e)(5) (to be redesignated as 8 CFR 208.30(e)(5)(i) under this rule) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings and have their asylum claim adjudicated by an immigration judge, if they establish a credible fear of persecution, followed by further review of any denial of their asylum application before the Board and the courts of appeals.

*B. Anticipated Effects of the Rule*

When the expedited procedures were first implemented approximately two decades ago, very few aliens within those proceedings claimed a fear of persecution. Since then, the numbers have dramatically increased. In FY 2018, USCIS received 99,035 credible-fear claims, a 175 percent increase from five years earlier and a 1,883 percent increase from ten years earlier. FY 2019 is on track to see an even greater increase in claims, with more than 35,000 credible-fear claims received in the first four months of the fiscal year. This unsustainable, increased burden on the U.S. immigration system also extends to DOJ: Immigration courts received over 162,000 asylum applications in FY 2018, a 270 percent increase from five years earlier.

This dramatic increase in credible-fear claims has been complicated by a demographic shift in the alien population crossing the southern border from Mexican single adult males to predominantly Central American family units and unaccompanied alien minors. Historically, aliens coming unlawfully to the United States along the southern land border were predominantly Mexican single adult males who generally were removed or who voluntarily departed within 48 hours if they had no legal right to stay in the United States. As of January 2019, more than 60 percent are family units and unaccompanied alien children; 60 percent are non-Mexican. In FY 2017, CBP apprehended 94,285 family units from the Northern Triangle countries at the southern land border. Of those family units, 99 percent remained in the country (as of January 2019). And, while Mexican single adults who are not legally eligible to remain in the United States may be immediately repatriated to Mexico, it is more difficult to expeditiously repatriate family units and unaccompanied alien children not from Mexico or Canada. And the long and arduous journey of children to the United States brings with it a great risk of harm that could be relieved if individuals were to more readily avail themselves of legal protection from persecution in a third country closer to the child's country of origin.

Even though the overall number of apprehensions of illegal aliens was relatively higher two decades ago than it is today (around 1.6 million in 2000), given the demographic of aliens arriving to the United States at that time, they could be processed and removed more quickly, often without requiring detention or lengthy court proceedings. Moreover, apprehension numbers in past years often reflected individuals being apprehended multiple times over the course of a given year.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who claim a fear of persecution or torture and are subsequently placed into removal proceedings before an immigration judge. This is particularly true for non-Mexican aliens, who now constitute the overwhelming majority of aliens encountered along the southern border with Mexico, and the overwhelming majority of aliens who assert claims of fear. But while the number of non-Mexican aliens encountered at the southern border has dramatically increased, a substantial number of such aliens failed to apply for asylum or refugee status in Mexico—despite the availability of a functioning asylum system.

In May of FY 2017, DHS recorded 7,108 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 36 percent of all enforcement actions along the southern border that month. In May of FY 2018, DHS recorded 32,477 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 63 percent of that month's enforcement actions along the southern border. And in May of FY 2019, DHS recorded 121,151 enforcement actions with non-Mexican aliens along the southern border—which accounted for approximately 84 percent of enforcement actions along the southern border that month. Accordingly, the number of enforcement actions involving non-Mexican aliens increased by more than 1,600 percent from May FY 2017 to May FY 2019, and the percentage of enforcement actions at the southern land border involving non-Mexican aliens increased from 36 percent to 84 percent. Overall, southern border non-Mexican enforcement actions in FY 2017 totaled 233,411; they increased to 298,503 in FY 2018; and, in the first eight months of FY 2019 (through May) they already total 524,446.

This increase corresponds to a growing trend over the past decade, in which the overall percentage of all aliens subject to expedited removal who are referred for a credible-fear interview by DHS jumped from approximately 5 percent to above 40 percent. The total number of aliens referred by DHS for credible-fear screening increased from

**AR02696**

fewer than 5,000 in FY 2008 to more than 99,000 in FY 2018. The percentage of aliens who receive asylum remains small. In FY 2018, DHS asylum officers found over 75 percent of interviewed aliens to have a credible fear of persecution or torture and referred them for proceedings before an immigration judge within EOIR under section 240 of the INA. In addition, EOIR immigration judges overturn about 20 percent of the negative credible-fear determinations made by asylum officers, finding those aliens also to have a credible fear. Such aliens are referred to immigration judges for full hearings on their asylum claims.

But many aliens who receive a positive credible-fear determination never file an application for asylum. From FY 2016 through FY 2018, approximately 40 percent of aliens who received a positive credible-fear determination failed to file an asylum application. And of those who did proceed to file asylum applications, relatively few established that they should be granted such relief. From FY 2016 through FY 2018, among aliens who received a positive credible-fear determination, only 12,062 aliens[4]—an average of 4,021 per year—were granted asylum (14 percent of all completed asylum cases, and about 36 percent of asylum cases decided on the merits).[5] The many cases that lack merit occupy a large portion of limited docket time and absorb scarce government resources, exacerbating the backlog and diverting attention from other meritorious cases. Indeed, despite DOJ deploying the largest number of immigration judges in history and completing historic numbers of cases, a significant backlog remains. There are more than 900,000 pending cases in immigration courts, at least 436,000 of which include an asylum application.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures consumes an ever-increasing amount of resources of DHS, which must surveil, apprehend, screen, and process the aliens who enter the country and must represent the U.S. Government in cases before immigration judges, the Board, and the U.S. Courts of Appeals. The interim rule seeks to ameliorate these strains on the immigration system.

The rule also aims to further the humanitarian purposes of asylum by prioritizing individuals who are unable to obtain protection from persecution elsewhere and individuals who have been victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11,[6] many of whom do not volitionally transit through a third country to reach the United States.[7] By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have sought protection in another country before reaching the United States, the Departments seek to ensure that those asylees who need relief most urgently are better able to obtain it.

The interim rule would further this objective by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity. An alien's decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful.[8] By barring such

claims, the interim final rule would encourage those fleeing genuine persecution to seek protection as soon as possible and dissuade those with non-viable claims, including aliens merely seeking employment, from further overburdening the Nation's immigration system.

Many of the aliens who wait to seek asylum until they arrive in the United States transit through not just one country, but multiple countries in which they may seek humanitarian protection. Yet they do not avail themselves of that option despite their claims of fear of persecution or torture in their home country. Under these circumstances, it is reasonable to question whether the aliens genuinely fear persecution or torture, or are simply economic migrants seeking to exploit our overburdened immigration system by filing a meritless asylum claim as a way of entering, remaining, and legally obtaining employment in the United States.[9]

All seven countries in Central America plus Mexico are parties to both the Refugee Convention and the Refugee Protocol. Moreover, Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased. In 2016, the Mexican government received 8,789 asylum applications. In 2017, it received 14,596. In 2018, it received 29,623 applications. And in just the first three months of 2019, Mexico received 12,716 asylum

---

[4] These numbers are based on data generated by EOIR on April 12, 2019.

[5] Completed cases include both those in which an asylum application was filed and those in which an application was not filed. Cases decided on the merits include only those completed cases in which an asylum application was filed and the immigration judge granted or denied that application.

[6] "Severe form of trafficking in persons means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 8 CFR 214.11. Determinations made with respect to this exception will not be binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

[7] This rule does not provide for a categorical exception for unaccompanied alien children ("UAC"), as defined in 6 U.S.C. 279(g)(2). The Departments recognize that UAC are exempt from two of three statutory bars to applying for asylum: The "safe third country" bar and the one-year filing deadline, *see* INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E). Congress, however, did not exempt UAC from the bar on filing successive applications for asylum, *see* INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C), the various bars to asylum eligibility in INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), or the bars, like this one, established pursuant to the Departments' authorities under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). But UAC, like others subject to this rule, will be able to apply for withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or the CAT regulations. UAC will not be returned to the transit country for consideration of these protection claims.

[8] Indeed, the Board has previously held that this is a relevant consideration in asylum applications. In *Matter of Pula*, 19 I&N Dec. 467, 473–74 (BIA 1987), the Board stated that "in determining whether a favorable exercise of discretion is warranted" for an applicant under the asylum statute, INA 208(a), 8 U.S.C. 1158(2)(a), "[a]mong those factors which should be considered are whether the alien passed through any other

countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." Consistent with the reasoning in *Pula*, this rule establishes that an alien who failed to request asylum in a country where it was available is not eligible for asylum in the United States. Even though the Board in *Pula* indicated that a range of factors is relevant to evaluating discretionary asylum relief under the general *statutory* asylum provision, the INA also authorizes the establishment of additional limitations to asylum eligibility by *regulation*—beyond those embedded in the statute. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). This rule uses that authority to establish one of the factors specified as relevant in *Pula* as the foundation of a new categorical asylum bar. This rule's prioritization of the third-country-transit factor, considered as just one of many factors in *Pula*, is justified, as explained above, by the increased numbers and changed nature of asylum claims in recent years.

[9] Economic migrants are not eligible for asylum. *See, e.g., In re: Brenda Leticia Sonday-Chavez*, No. A–7–969, 2017 WL 4946947, at *1 (BIA Sept. 7, 2017) ("[E]conomic reasons for coming to the United States . . . would generally not render an alien eligible for relief from removal."); *see also Sale* v. *Haitian Centers Council Inc.*, 509 U.S. 155, 161–62 & n.11 (1993); *Hui Zhuang* v. *Gonzales*, 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

applications, putting Mexico on track to receive more than 50,000 asylum applications by the end of 2019 if that quarterly pace continues. Instead of availing themselves of these available protections, many aliens transiting through Central America and Mexico decide not to seek protection, likely based upon a preference for residing in the United States. The United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum. This overwhelming surge and its accompanying burden on the United States has eroded the integrity of our borders, and it is inconsistent with the national interest to provide a discretionary benefit to those who choose not to seek protection at the first available opportunity.

The interim final rule also is in keeping with the efforts of other liberal democracies to prevent forum-shopping by directing asylum-seekers to present their claims in the first safe country in which they arrive. In 1990, European states adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commission for Refugees praised the Dublin Regulation's ''commendable efforts to share and allocate the burden of review of refugee and asylum claims.'' *See* UN High Comm'r for Refugees, *UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions),* 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union (''EU''). It instructs that asylum claims ''shall be examined by a single Member State.'' Regulation (EU) No 604/ 2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37. Typically, for irregular migrants seeking asylum, the member state by which the asylum applicant first entered the EU ''shall be responsible for examining the application for international protection.'' *Id.* at 40. Generally, when

a third-country national seeks asylum in a member state other than the state of first entry into the EU, that state may transfer the asylum-seeker back to the state of first safe entry. *Id.* at 2.

This rule also seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, as discussed further below, this rule will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle countries regarding general migration issues, related measures employed to control the flow of aliens (such as the Migrant Protection Protocols), and the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, the rule would bar asylum for any alien who has entered or attempted to enter the United States across the southern border and who has failed to apply for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, unless the alien demonstrates that the alien only transited through countries that were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the CAT, or the alien was a victim of ''a severe form of trafficking in persons'' as defined by 8 CFR 214.11.

Such a rule would ensure that the ever-growing influx of meritless asylum claims do not further overwhelm the country's immigration system, would promote the humanitarian purposes of asylum by speeding relief to those who need it most (*i.e.,* individuals who have no alternative country where they can escape persecution or torture or who are victims of a severe form of trafficking and thus did not volitionally travel through a third country to reach the United States), would help curtail the humanitarian crisis created by human smugglers, and would aid U.S. negotiations on migration issues with foreign countries.

## V. Regulatory Requirements

### A. Administrative Procedure Act

#### 1. Good Cause Exception

While the Administrative Procedure Act (''APA'') generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception ''when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.'' 5 U.S.C. 553(b)(B). That exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where ''the delay created by the notice and comment requirements would result in serious damage to important interests.'' *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010); *Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982). Agencies have previously relied on that exception in promulgating immigration-related interim rules.[10] Furthermore, DHS has relied on that exception as additional legal justification when issuing orders related to expedited removal—a context in which Congress explicitly recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to ''modify at any time'' the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[11]

---

[10] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid ''an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule''); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because ''without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews'' over a six-month period).

[11] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017) (identifying the APA good cause factors as additional justification for issuing an immediately effective expedited removal order because the ability to detain certain Cuban nationals ''while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status,

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid a surge of aliens who would have strong incentives to seek to cross the border during pre-promulgation notice and comment or during the 30-day delay in the effective date under 5 U.S.C. 553(d). As courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and in fact "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay Sanctuary Covenant* v. *Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018). If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms," and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553. *See id.*

This determination is consistent with the historical view of the agencies regulating in this area. DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to

travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the November 2018 joint interim final rule that limited eligibility for asylum for aliens, subject to a bar on entry under certain presidential proclamations. *See* 83 FR at 55950. These same concerns would apply to an even greater extent to this rule. Pre-promulgation notice and comment, or a delay in the effective date, would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect. The Departments' experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border. *See East Bay Sanctuary Covenant,* 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Thus, there continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 69 FR at 48878.

Furthermore, an additional surge of aliens who sought to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. The massive increase in aliens arriving at the southern border who assert a fear of persecution is overwhelming our

immigration system as a result of a variety of factors, including the significant proportion of aliens who are initially found to have a credible fear and therefore are referred to full hearings on their asylum claims; the huge volume of claims; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible-fear determination, many of whom then abscond without pursuing their asylum claims. Recent initiatives to track family unit cases revealed that close to 82 percent of completed cases have resulted in an *in absentia* order of removal. A large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. This interim final rule is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx. An extended notice-and-comment rulemaking process would be impracticable and self-defeating for the public.

## 2. Foreign Affairs Exemption

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1), and proceeding through notice and comment may "provoke definitely undesirable international consequences," *City of New York* v. *Permanent Mission of India to United Nations,* 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exception in H.R. Rep. No. 79–1980, 69th Cong., 2d Sess. 257 (1946)). The flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017) (discussing the important national security and foreign affairs-related interests associated with securing the border); Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ("This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty."); *see also, e.g., Malek-Marzban* v. *INS,* 653 F.2d 113, 115–16 (4th Cir. 1981) (finding that a regulation

is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004) (identifying the APA good cause factors as additional justification for issuing an immediately effective order to expand expedited removal due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

requiring the expedited departure of Iranians from the United States in light of the international hostage crisis clearly related to foreign affairs and fell within the notice-and-comment exception).

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States (such as the Migrant Protection Protocols), and the urgent need to address the current humanitarian and security crisis along the southern land border between the United States and Mexico. *See City of New York,* 618 F.3d at 201 (finding that rules related to diplomacy with a potential impact on U.S. relations with other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for how these other countries could increase efforts to help reduce the flow of illegal aliens north to the United States and encourage aliens to seek protection at the safest and earliest point of transit possible.

Those negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule—provoking a disturbance in domestic politics in Mexico and the Northern Triangle countries, and eroding the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rulemaking provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). During a notice-and-comment process, public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries— actors with whom the United States must partner to ensure that refugees can more effectively find refuge and safety in third countries. *Cf. Rajah* v. *Mukasey,* 544 F.3d 427, 437–38 (2d Cir. 2008) ("[R]elations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security.").

In addition, the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass through third countries where they may have

otherwise received refuge and reach the U.S. border, which has little present capacity to provide assistance. *Cf. East Bay Sanctuary Covenant* v. *Trump,* 909 F.3d 1219, 1252 (9th Cir. 2018) ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception."). Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place to help address the enormous flow of aliens through these countries to the southern U.S. border. *Cf. Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."); *Rajah,* 544 F.3d at 438 (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively impact efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption); *East Bay Sanctuary Covenant,* 909 F.3d at 1252–53 (9th Cir. 2018) (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts).

The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. This interim final rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations. This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 (noting that the foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the

foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was consistent with the foreign affairs exception for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

### C. Unfunded Mandates Reform Act of 1995

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### D. Congressional Review Act

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-

based companies in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This rule is not subject to Executive Order 12866 as it implicates a foreign affairs function of the United States related to ongoing discussions with potential impact on a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

*F. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Regulatory Amendments

DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(4) and (5) to read as follows:

§ 208.13   Establishing asylum eligibility.

*    *    *    *    *

(c) * * *

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the INA or for benefits or services

under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 3. In § 208.30, revise the section heading, the first sentence of paragraph (e)(2), and paragraphs (e)(3) and (5) to read as follows:

§ 208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

*    *    *    *    *

(e) * * *

(2) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. * * *

(3) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

*    *    *    *    *

(5)(i) Except as provided in this paragraph (e)(5)(i) or paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(ii) If the alien is found to be an alien described in § 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's

claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(iii) If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. The scope of review shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal, accordingly. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

\* \* \* \* \*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231,

1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, revise paragraph (d) to read as follows:

### § 1003.42   Review of credible fear determination.

\* \* \* \* \*

(d) *Standard of review.* (1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding or deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(2) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(ii), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

(3) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(iii), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) prior to any further review of the asylum officer's negative determination.

\* \* \* \* \*

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraphs (c)(4) and (5) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\* \* \* \* \*

(c) \* \* \*

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the

provisions of 8 CFR 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 8. In § 1208.30, revise the section heading and paragraph (g)(1) to read as follows:

### § 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

\* \* \* \* \*

(g) \* \* \*

(1) *Review by immigration judge of a mandatory bar finding.* (i) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge

finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

(ii) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4). If the immigration judge finds that the alien is not described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), then the immigration judge shall vacate the order of the asylum officer and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\*    \*    \*    \*    \*

Approved:

Dated: July 12, 2019.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

Approved:

Dated: July 12, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–15246 Filed 7–15–19; 8:45 am]

**BILLING CODE 4410–30–P; 9111–97–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 73

[Docket No. FAA–2018–0984; Airspace Docket No. 18–ASW–8]

RIN 2120–AA66

## Expansion of R–3803 Restricted Area Complex; Fort Polk, LA

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action expands the R–3803 restricted area complex in central Louisiana by establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and makes minor technical amendments to the existing R–3803A and R–3803B legal descriptions for improved operational efficiency and administrative standardization. The restricted area establishments and amendments support U.S. Army Joint Readiness Training Center training requirements at Fort Polk for military units preparing for overseas deployment.

**DATES:** *Effective date:* 0901 UTC, September 13, 2019.

**FOR FURTHER INFORMATION CONTACT:** Colby Abbott, Airspace Policy Group, Office of Airspace Services, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

## Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes restricted area airspace at Fort Polk, LA, to enhance aviation safety and accommodate essential U.S. Army hazardous force-on-force and force-on-target training activities.

## History

The FAA published a notice of proposed rulemaking for Docket No.

FAA–2018–0984 in the **Federal Register** (83 FR 60382; November 26, 2018) establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and making minor technical amendments to the R–3803A and R–3803B descriptions for improved operational efficiency and administrative standardization in support of hazardous U.S. Army force-on-force and force-on-target training activities. Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal. Two comments were received.

## Discussion of Comments

While supportive of the U.S. Army's need to train as they fight, the first commenter noted that modern general aviation aircraft have longer flight endurance today, making timely NOTAM publication of restricted area activations necessary for effective flight planning. To overcome the possibility of the restricted areas being activated with no advance notification, the commenter recommended adding "at least 4 hours in advance" to the "By NOTAM" time of designation proposed for the R–3803A, R–3803C, and R–3803D restricted areas. Additionally, the commenter requested the effective date of the proposed restricted areas, if approved, coincide with the next update of the Houston Sectional Aeronautical Chart.

It is FAA policy that when NOTAMs are issued to activate special use airspace, the NOTAMs should be issued as far in advance as feasible to ensure the widest dissemination of the information to airspace users. The FAA acknowledges that the addition of the "at least 4 hours in advance" provision to the proposed "By NOTAM" time of designation, as recommended by the commenter, would contribute to ensuring the widest dissemination of the restricted areas being activated to effected airspace users. As such, the FAA adopts the commenter's recommendation to amend the time of designation for R–3803A, R–3803C, and R–3803D to reflect "By NOTAM issued at least 4 hours in advance."

Additionally, the establishment of R–3803C, R–3803D, R–3803E, and R–3803F, and the minor technical amendments to the existing R–3803A and R–3803B legal descriptions are being made effective to coincide with the upcoming Houston Sectional Aeronautical Chart date.

The second commenter raised aerial access concerns of the area in which the new restricted areas were proposed to be established. The commenter stated

**AR02703**

KeyCite Red Flag - Severe Negative Treatment
Vacated by  Matter of L-E-A-,   U.S.Atty.Gen.,   June 16, 2021

27 I. & N. Dec. 581 (U.S.Atty.Gen.), Interim Decision 3959, 2019 WL 3492202

U.S. Department of Justice

Office of the Attorney General

MATTER OF L-E-A-, RESPONDENT

Decided by Attorney General July 29, 2019

**\*\*1   \*581**  (1) In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board of Immigration Appeals improperly recognized the respondent's father's immediate family as a "particular social group" for purposes of qualifying for asylum under the Immigration and Nationality Act.

(2) All asylum applicants seeking to establish membership in a "particular social group," including groups defined by family or kinship ties, must establish that the group is (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question.

(3) While the Board has recognized certain clans and subclans as "particular social groups," most nuclear families are not inherently socially distinct and therefore do not qualify as "particular social groups."

(4) The portion of the Board's decision recognizing the respondent's proposed particular social group is overruled. *See Matter of L-E-A-*, 27 I&N Dec. at 42-43 (Part II.A). The rest of the Board's decision, including its analysis of the required nexus between alleged persecution and the alleged protected ground, is affirmed. *See id.* at 43-47 (Part II.B).

BEFORE THE ATTORNEY GENERAL

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum, in his discretion, if an alien establishes that he is unable or unwilling to return to his country of origin because he has suffered past persecution or has a well-founded fear of future persecution on account of """race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), (B)(i). This case once again requires interpretation of what it means to suffer persecution on account of "membership in a particular social group," an ambiguous term that has required repeated construction by the Board of Immigration Appeals (the "Board"), the Attorney General, and the U.S. Courts of Appeals.

The respondent contends that he was persecuted by a criminal gang on account of his membership in the "particular social group" defined as the "immediate family of his father," who owned a store targeted by a local drug cartel. Under existing Board precedent, a particular social group must share "a common immutable characteristic" that is defined with particularity and **\*582**  "set apart, or distinct, from other persons within the society in some significant way." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 238 (BIA 2014); *see also Matter of W-G-R-*, 26 I&N Dec. 208, 217 (BIA 2014). The alien bears the burden of showing that his proposed group meets these criteria, *see* 8 U.S.C. § 1158(b)(1)(B)(i), and he will not satisfy that burden solely by showing that his social group has been the target of private criminal activity. The fact that a criminal group--such as a drug cartel, gang, or guerrilla force--targets a group of people does not, standing alone, transform those people into a particular social group. *See, e.g., Matter of S-E-G-*, 24 I&N Dec. 579, 586-87 (BIA 2008) (concluding that respondents who feared harm from their refusal to join MS-13 were not a "particular social group"; they were "not in a substantially different situation from anyone [else] who has crossed the gang, or who is perceived to be a threat to the gang's interests"); *Matter of Acosta*, 19 I&N Dec. 211, 234 (BIA

1985) (working as a taxi driver and "refusing to participate in guerrilla-sponsored work stoppages" at risk to personal safety did not create "particular social group" status).

**2  At the same time, the Board has recognized that a clan or similar group bound together by common ancestry, cultural ties, or language *may* constitute a ""''particular social group." *Matter of H-*, 21 I&N Dec. 337, 343 (BIA 1996) (describing the relevant "distinct and recognizable clans and subclans in Somalia"); *Acosta*, 19 I&N Dec. at 233 (calling for a case-by-case determination of whether innate characteristics like "sex, color, or kinship ties" qualify as "particular social group" characteristics). But what qualifies certain clans or kinship groups as particular social groups is not merely the genetic ties among the members. Rather, it is that those ties or other salient factors establish the kinship group, on its own terms, as a "recognized component of the society in question." *W-G-R-*, 26 I&N Dec. at 217. In that respect, the large and prominent kinship and clan groups that have been recognized by the Board as cognizable particular social groups stand on a very different footing from an alien's immediate family, which generally will not be distinct on a societal scale, whether or not it attracts the attention of criminals who seek to exploit that family relationship in the service of their crimes.

Consistent with these prior decisions, I conclude that an alien's family-based group will not constitute a particular social group unless it has been shown to be socially distinct in the eyes of its society, not just those of its alleged persecutor. *See M-E-V-G-*, 26 I&N Dec. at 237; *W-G-R-*, 26 I&N Dec. at 215-18. Because the record does not support the determination in this case that the immediate family of the respondent's father constituted a particular social group, I reverse the Board's conclusion to the contrary.

**\*583  I.**

In 1998, the respondent, a Mexican citizen, illegally entered the United States. After a criminal conviction for driving under the influence, the Department of Homeland Security ("DHS") initiated removal proceedings. The respondent accepted voluntary departure and returned to Mexico in May 2011. But he did not stay there long. By August 2011, the respondent had again illegally returned to the United States. DHS apprehended him and commenced removal proceedings. The respondent conceded removability, but this time sought asylum based upon a claim of persecution allegedly suffered during his brief return to Mexico.

According to the respondent, upon returning to Mexico, he had gone to live with his parents in Mexico City. His father operated a neighborhood general store there, but he had run afoul of La Familia Michoacana, a Mexican drug cartel. Because his father refused to sell the cartel's drugs out of his store, the drug dealers evidently decided to retaliate against the respondent upon his return. About a week after returning to Mexico City, the respondent was walking a few blocks from his home when he heard gunshots coming out of a black sport-utility vehicle. He dropped down to the ground and was unharmed. Although the respondent did not initially believe that he was the target of the shooting, he later concluded that he was, based upon the cartel's subsequent actions.

**3  About a week later, four armed cartel members, driving the same black sport-utility vehicle, approached the respondent and asked him to agree to sell the cartel's drugs at his father's store. When the respondent declined, the cartel members threatened him and advised him to reconsider. Shortly thereafter, four masked men, in the same sport-utility vehicle, attempted to kidnap the respondent, but he managed to escape. After that incident, the respondent left Mexico City for Tijuana, where two months later, he illegally crossed back into the United States and was thereafter apprehended.

In his removal proceeding, the respondent claimed persecution in Mexico based on his membership in the particular social group comprising his father's immediate family. The immigration judge denied relief on the ground that the respondent had not shown he was the victim of anything more than criminal activity.

On appeal, the Board found that the respondent's relationship with his father established membership in a particular social group, namely "his father's immediate family." *Matter of L-E-A-*, 27 I&N Dec. 40, 43 (BIA 2017). In reaching that conclusion, the Board relied upon DHS's concession "that the immediate family unit of the respondent's father qualifies as a cognizable social group." *Id.* at 42; *see also* DHS Supplemental Brief at 20  **\*584  ("In this case, the Department stipulates that the immediate

family unit of the respondent's father qualifies as a cognizable particular social group."). The Board recognized that, under the relevant precedents, a family-related group must satisfy the requirements of particularity and social distinction to qualify as a "particular social group" under the INA. *L-E-A-*, 27 I&N Dec. at 42. And the Board noted that such a determination requires "a fact-based inquiry made on a case-by-case basis," and will not be satisfied by "all social groups that involve family members." *Id.* at 42-43. But the Board did not perform such an inquiry; instead, it summarily concluded that "[i]n consideration of the facts of this case *and the agreement of the parties*, we have no difficulty identifying the respondent, a son residing in his father's home, as being a member of the particular social group comprised of his father's immediate family." *Id.* (emphasis added).

Although it approved the claimed social group, the Board denied the respondent's asylum application because of the absence of the necessary nexus between his membership in the group and the persecution. *Id.* at 43-47. The Board explained that "[a] persecution claim cannot be established if there is no proof that the applicant or other members of the family were targeted because of the family relationship." *Id.* at 43. Here, the Board concluded, the respondent was approached by the cartel "because he was in a position to provide access to the store, not because of his family membership." *Id.* at 46. He "was targeted only as a means to achieve the cartel's objective to increase its profits by selling drugs in the store owned by his father," and "'"[a]ny motive to harm the respondent because he was a member of his family was, at most, incidental." *Id.* As the Board noted, "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Id.* at 45.

**\*\*4** The Board remanded the matter to the immigration judge for consideration of the respondent's additional claim for protection under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *Id.* at 47.

On December 3, 2018, Acting Attorney General Whitaker directed the Board to refer its decision for review, *see* 8 C.F.R. § 1003.1(h)(1)(i), staying the proceedings and inviting briefing on whether, and under what circumstances, an alien may establish persecution on account of membership in a "particular social group" based on the alien's membership in a family unit. *Matter of L-E-A-*, 27 I&N Dec. 494, 494 (A.G. 2018).

## *585  II.

Before turning to the merits, I address several threshold arguments raised by the respondent about my authority to review this case. First, the respondent argues that the Acting Attorney General could not certify this matter for review because the Board had remanded the case to the immigration judge for further proceedings. As *Matter of A-B-* recognized, "[n]othing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge." 27 I&N Dec. 316, 323-24 (A.G. 2018). I therefore reject this argument for the reasons stated in that opinion.

Second, the respondent argues that the Acting Attorney General had no authority to refer this case because he was not properly appointed to his position. But the President's designation of Mr. Whitaker as Acting Attorney General was expressly authorized by the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345-3349d, and was consistent with the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2. *See Designating an Acting Attorney General*, 42 Op. O.L.C. __ (Nov. 14, 2018). In any event, that question is now moot, because the respondent has not argued, and cannot argue, that my appointment as Attorney General is subject to such a challenge. As Attorney General, I have the authority to ratify the initial certification (which I hereby do), and I have decided this case based upon my own independent review of the record. *See Wilkes-Barre Hosp. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) ("[R]atification can remedy a defect arising from the decision of 'an improperly appointed official . . . when . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so.'DD' (quoting *Intercollegiate Broad. Sys., Inc. v Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015))). Therefore, the validity of the Acting Attorney General's appointment is not relevant to my disposition of this case.

**\*\*5**  Third, the respondent contends that my prior statements regarding asylum and immigration issues prevent me from acting as an unbiased adjudicator. But I "have made no public statements regarding the facts of respondent's case, and I have no 'personal interest in the outcome of the proceedings.'"DD" *A-B-*, 27 I&N Dec. at 325 (quoting *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995)); *see also Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979) (finding that policymakers do not have to retreat from "interchange and discussion about important issues").

Finally, the respondent argues that I do not have jurisdiction to render a decision because the immigration judge never properly acquired jurisdiction.  **\*586**  The respondent contends that jurisdiction never vested because the charging document lacked all of the information required by the INA and 8 C.F.R. § 1003.15--namely, the notice to appear did not include the time and place of the first hearing in this matter. But the Board has previously ruled that similar notices are adequate to establish jurisdiction, so long as subsequent notices provide that information. *Matter of Bermudez-Cota*, 27 I&N Dec. 441 (BIA 2018); *see also Karingithi v. Whitaker*, 913 F.3d 1158, 1161 (9th Cir. 2019) (holding that *Bermudez-Cota* permissibly interpreted the relevant regulations). Further, neither the INA nor 8 C.F.R. § 1003.15 specifies that the notice to appear must contain such details about the first hearing. *See id.* § 1003.15(b). And the relevant jurisdictional regulation, 8 C.F.R. § 1003.14(a), "does not specify what information must be contained in a 'charging document' at the time it is filed with an Immigration Court, nor does it mandate that the document specify the time and date of the initial hearing before jurisdiction will vest." *Bermudez-Cota*, 27 I&N Dec. at 445. Although that information was not contained in the initial notice to appear, the immigration court subsequently issued a notice of hearing with all the required information. *See Matter of L-E-A-*, Notice of Hearing (Immig. Ct. Aug. 17, 2011). Therefore, this jurisdictional challenge does not block my review.

### III.

Turning now to the merits, I conclude that the Board erred in finding that the respondent's purported social group--the members of his father's immediate family--qualified as a "particular social group" under the INA. All particular social groups must satisfy the criteria set forth in *Matter of M-E-V-G-* and *Matter of W-G-R-*, and a proposed family-based group is no different. An applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society. In the ordinary case, a family group will not meet that standard, because it will not have the kind of identifying characteristics that render the family socially distinct within the society in question. The Board here did not perform the required fact-based inquiry to determine whether the respondent had satisfied his burden of establishing the existence of a particular social group within the legal requirements of the statute. The Board's summary conclusions, based on DHS's stipulation rather than its own legal analysis, must therefore be reversed.

### \*587 A.

**\*\*6**  An applicant for asylum bears the burden of establishing that he "is a refugee, within the meaning of section 1101(a) (42)(A)" of the INA. 8 U.S.C. §§ 1158(b)(1)(A), (B)(i). To meet that definition, the applicant must demonstrate that he is an alien outside his country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). No statute or regulation defines what constitutes a "particular social group."

The Board first interpreted "persecution on account of membership in a particular social group" in *Acosta*, 19 I&N Dec. at 232-34. Noting that this provision "was added as an afterthought" to the CAT and that "Congress [similarly] did not indicate what it understood this ground of persecution to mean," *id.* at 232, the Board turned to the language itself:

A purely linguistic analysis of this ground of persecution suggests that it may encompass persecution seeking to punish either people in a certain relation, or having a certain degree of similarity, to one another or people of like class or kindred interests, such as shared ethnic, cultural, or linguistic origins, education, family background, or perhaps economic activity.

*Id.* at 232-33. Applying the doctrine of *ejusdem generis*, the Board read """"particular social group" in a manner consistent with the other statutory grounds for persecution: race, religion, nationality, and political opinion. *Id.* at 233. Because each of these terms describes "a characteristic that either is beyond the power of an individual to change or is so fundamental to an individual's identity or conscience that it ought not be required to be changed," the Board concluded that "membership in a particular social group" must similarly involve the sharing of a "common, immutable characteristic." *Id.* According to the Board, "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties," and immigration judges should engage in a case-by-case analysis to determine whether a particular innate characteristic would qualify. *Id.* The Board did not clarify whether the sharing of a "common, immutable characteristic" was a sufficient, as opposed to just a necessary, condition for qualifying as a particular social group under the statutory definition of "refugee." *See id.*

**\*\*7** In *Matter of H-*, 21 I&N Dec. 337, 342-43 (BIA 1996), the Board addressed the kind of kinship ties that might constitute membership in a **\*588** particular social group. There, the Board found that the record established credible evidence that the Somali Marehan subclan constituted a """"particular social group," because the subclan was "distinct and recognizable" in Somali society with distinguishing "linguistic commonalities." *Id.* at 343. The Board relied on a legal opinion by the General Counsel of the Immigration and Naturalization Service, who stated that Somali "[c]lan membership is a highly recognizable, immutable characteristic;" that Somali clans are "defined by discrete criteria"; and that "membership in a clan is at the essence of a Somali's identity in determining his or her relations to others in and outside of the clan," *Whether Somali Clan Membership May Meet the Definition of Membership in a Particular Social Group under the INA,* Genco Op. No. 93-91 (INS), 1993 WL 1504038, at *1-*2 (Dec. 9, 1993). *See H-*, 21 I&N Dec. at 342. The Board also recognized that annual reports issued by the Department of State spoke specifically to the "presence of distinct and recognizable clans and subclans in Somalia and the once-preferred position of the applicant's Marehan subclan," due to its association with former Somali President Siad Barre. *Id.* at 342-43.

Over the decades since, the Board has refined the standard for identifying social groups that qualify for protection under the asylum statute. *See M-E-V-G-*, 26 I&N Dec. at 236-49; *W-G-R-*, 26 I&N Dec. 209-21; *see also Reyes v. Lynch*, 842 F.3d 1125, 1134-35 (9th Cir. 2016) (recognizing the Board's refinement of its "particular social group" framework); *Orellana-Monson v. Holder*, 685 F.3d 511, 521 (5th Cir. 2012) ("The [Board] may make adjustments to its definition of 'particular social group' and often does so in response to the changing claims of applicants. Deference to published [Board] decisions is warranted as [the Board] gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." (internal quotation marks and citations omitted)). Specifically, in two complementary opinions issued in 2014, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is: (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 237; *see W-G-R-*, 26 I&N Dec. at 212. The Board explained that this definition was a continuation of its earlier interpretations of "particular social group," *see, e.g., Acosta*, 19 I&N Dec. 211, clarifying how the definition of "particular social group" had been refined through the process of case-by-case adjudication. *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244-47.

**\*\*8** In *Matter of A-B-*, Attorney General Sessions reaffirmed this approach and emphasized the importance of a rigorous application of that legal **\*589** standard. 27 I&N Dec. at 333-36. [1] Respondents must present facts to establish each of the required elements for asylum status, and the asylum officer, immigration judge, or Board must determine whether those facts satisfy the required elements. *See id.* at 340 (citing 8 C.F.R. § 208.13(a)). *Matter of A-B-* reiterated that, "[t]o be cognizable, a particular social group *must* 'exist independently' of the harm asserted." *Id.* at 334 (citing, *inter-alia*, *M-E-V-G-*, 26 I&N Dec. at 237 n.11, 243). Based upon these immigration decisions, in the ordinary case, a nuclear family will not, without more, constitute a "particular social group" because most nuclear families are not inherently socially distinct.

I recognize that a number of courts of appeals have issued opinions that recognize a family-based social group as a "particular social group" under the asylum statute. In some of these cases, the courts may have been willing (as the Board was in this case) to accept, or assume with little analysis, the existence of a particular social group because the court went on to deny asylum on other grounds. *See, e.g., Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019); *Rivas v. Sessions*, 899 F.3d 537, 542 (8th

Cir. 2018); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005). In other cases, the parties stipulated to the validity of the applicant's particular social group definition and the applicant's membership therein. *See, e.g.*, *K.H. v. Barr*, 920 F.3d 470, 474 (6th Cir. 2019). Consequently, these cases do not reflect the thorough, case-specific analysis of the three *Matter of M-E-V-G-* factors that the Board's precedents generally require. And I do not believe that a cursory analysis of a question that was either uncontested, or not dispositive to the outcome, should be taken to undermine the Board requirement that asylum applicants claiming "membership in a particular social group" must establish that their group shares a common immutable characteristic, is defined with particularity, and is socially distinct. *See M-E-V-G-*, 26 I&N Dec. at 237-38; *see W-G-R-*, 26 I&N Dec. at 212.

I also recognize that certain courts of appeals have considered the requisite elements of a "particular social group" and, despite the requirements set forth in *M-E-V-G-* and *W-G-R-*, have nonetheless suggested that shared family ties alone are sufficient to satisfy the INA's definition of "refugee"--regardless of whether the applicant's specific family is defined with particularity or is socially distinct in his society. For instance, in *Rios v. Lynch*, the Ninth Circuit expressly observed that under the "refined **\*590** framework" of *Matter of M-E-V-G-*, "the family . . . [is] the quintessential particular social group." 807 F.3d 1123, 1128 (9th Cir. 2015). In addition, three other circuits have expressed the same view, but without explicitly evaluating whether that position is consistent with *Matter of M-E-V-G-* and *Matter of W-G-R-*. *See, e.g.*, *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017) ("We have recognized that an individual's membership in her nuclear family is a particular social group."); *Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . . ."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group . . . .").

**\*\*9** These decisions do not purport to contradict the Board's "particular social group" framework and, in my view, they have relied upon outdated dicta from the Board's early cases. For example, the First Circuit has long relied on precedent that derives from *Matter of Acosta*'s vague statement that kinship ties "might" be the kind of innate characteristic that could form the basis of a particular social group. *See, e.g.*, *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) (citing *Acosta* to support broad recognition of particular social groups based on the nuclear family). But the reference to "kinship ties" in *Matter of Acosta* provides no justification for a broad assumption that an applicant's nuclear family will constitute a valid particular social group in his society. The Board there did not define what it meant by "kinship ties," since the respondent had described his relevant social group instead as persons "engaged in the transportation industry" in his country. *See 19 I&N Dec. at 232, 233*.

Similarly, the Seventh Circuit has declined to apply the particularity and social distinction requirements, requiring only that members of particular social groups share a common, immutable characteristic, as recognized in *Matter of Acosta*, 19 I&N Dec. at 233. *See, e.g.*, *Melnik v. Sessions*, 891 F.3d 278, 286 n.22 (7th Cir. 2018) (noting the circuit's rejection of the Board's initial articulations of the particularity and social distinction requirements). The Seventh Circuit's refusal to reconsider its position in light of *Matter of M-E-V-G-* and *Matter of W-G-R-* has left in place circuit precedent dating from the 1990s positing, without analysis, that every family would constitute a cognizable social group under the INA. *See Torres*, 551 F.3d at 629 (citing *Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997) (noting that "[o]ur case law has *suggested*, with *some* certainty, that a family constitutes a cognizable 'particular social group' within the meaning of the law," but citing only cases in which the court determined that the alien had failed to establish persecution on account of family ties (emphases added))).

**\*591** Finally, the Fourth Circuit based its conclusion that nuclear families could be particular social groups on a passing suggestion by the Board that "'[s]ocial groups based on innate characteristics such as . . . family relationship are generally easily recognizable and understood by others to constitute social groups.'"DD' *Crespin-Valladares v. Holder*, 632 F.3d 117, 126-27 (4th Cir. 2011) (quoting *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006)). But *Matter of C-A-* did not concern a family-based social group, and in fact expressly cautioned against broad recognition of family-based social groups, noting that a particular social group must be recognizable as a separate, distinct group within the alien's home country. 23 I&N Dec. at 959. Therefore, the Board's passing suggestion that nuclear families always constitute "particular social group[s]" was subsequently qualified within the text of the opinion itself.

**10   To the extent, however, that any court of appeals decision is best interpreted as adopting a categorical rule that any nuclear family could constitute a cognizable "particular social group," I believe that such a holding is inconsistent with both the asylum laws and the long-standing precedents of the Board. Since *Matter of Acosta*, the Board has emphasized that a "particular social group" must be particular and socially distinct in the society at question, which itself requires a fact-specific inquiry based on the evidence in a particular case. *Compare Acosta*, 19 I&N Dec. at 233, *and C-A-*, 23 I&N Dec. at 955, *with M-E-V-G-*, 26 I&N Dec. at 231, *and W-G-R-*, 26 I&N Dec at 210; *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("To determine whether a group is a particular social group for the purposes of an asylum claim, the agency must make a case-by-case determination as to whether the group is recognized by the particular society in question."); *Miranda v. Sessions*, 892 F.3d 940, 943 (8th Cir. 2018) (applicant "did not present evidence that he shared [the defining] characteristic with others or that the characteristic was commonly recognized as defining a particular social group"). The application of contradictory rules by the courts of appeals is inappropriate because whether a specific family group constitutes a "particular social group" should be determined by the immigration courts in the first instance, as an exercise of the Attorney General's delegated authority to interpret the INA. *See Gonzales v. Thomas*, 547 U.S. 183, 185-87 (2006).

The Attorney General has primary responsibility for construing and applying provisions in the immigration laws. *See M-E-V-G-*, 26 I&N Dec. at 230. The INA provides that, within the Executive Branch, the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). Plainly, the term "particular social group" is ambiguous, and every court of appeals to *592 address the proper application of the phrase "particular social group" has deferred to decisions of the Board in the phrase's application. *See A-B-*, 27 I&N Dec. at 327 & n.6 (collecting cases). Congress thus delegated to the Attorney General the discretion to reasonably interpret the meaning of "membership in a particular social group," and such reasonable interpretations are entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). As the Supreme Court has recognized, "'ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.'"DD' *Negusie v. Holder*, 555 U.S. 511, 523 (2009) (quoting *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)). This principle holds even in cases where the courts of appeals might have interpreted the phrase differently in the first instance. *See Brand X Internet Servs.*, 545 U.S. at 980. I therefore interpret the ambiguous term "particular social group" in the manner that I believe to be the most faithful to the text, purpose, and policies underlying the asylum statute.

## B.

**11   The Board has recognized that "kinship ties" may be one of the kinds of common, immutable characteristics that might form the basis for a """"particular social group" under the INA. *Acosta*, 19 I&N Dec. at 233. But the Board has never held that *every* type of family grouping would be cognizable as a particular social group. *Cf. C-A-*, 23 I&N Dec. at 959 ("In considering clan membership in [a prior decision] we did not rule categorically that membership in any clan would suffice."). Here, the respondent argues that the immediate family of his father constitutes a particular social group because a local drug cartel had a dispute with his father, and the cartel chose to take that dispute out upon his family members. But the respondent did not show that anyone, other than perhaps the cartel, viewed the respondent's family to be distinct in Mexican society. If cartels or other criminals created a cognizable family social group every time they victimized someone, then the social-distinction requirement would be effectively eliminated.

Under the *ejusdem generis* canon, the term "particular social group" must be read in conjunction with the terms preceding it, which cabin its reach, *see Acosta*, 19 I&N Dec. at 233, rather than as an "omnibus catch-all" for everyone who does not qualify under one of the other grounds for asylum, *see Velasquez*, 866 F.3d at 198 (Wilkinson, J., concurring). The INA *593 expressly grants asylum to spouses and children of aliens who receive asylum if those family members are accompanying or following the original applicant to the United States. 8 U.S.C. § 1158(b)(3)(A). By contrast, the INA does not specify family ties alone as an independent basis for qualifying for asylum relief. *Cf. In re A-K-*, 24 I&N Dec. 275, 278 (BIA 2007) ("Automatically treating harm to a family member as being persecution to others within the family is inconsistent with the derivative asylum provisions, as it would obviate the need for these provisions in many respects.").

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 52 of 1021 PageID 6922

Further, as almost every alien is a member of a family of some kind, categorically recognizing families as particular social groups would render virtually every alien a member of a particular social group. There is no evidence that Congress intended the term "particular social group" to cast so wide a net. Moreover, 8 U.S.C. § 1101, within which the definition of """"refugee" appears, uses the term family (or families) ten times in the definitions of other terms. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(A), (G) (including members of "immediate famil[ies]" within eight separate classes of nonimmigrant aliens); *id.* § 1101(a)(27)(I)(iv) (referencing members of an immigrant's "immediate family" within a category of "special immigrant"); *id.* § 1101(b)(1)(E)(i) (referencing "family member[s]" within a definition of the term "child"). If Congress intended for refugee status to turn on one's suffering of persecution "on account of" family membership, Congress would have included family identity as one of the expressly enumerated covered grounds for persecution.

**\*\*12** Thus, by the terms of the statutory definition of "refugee," as well as according to long-standing principles set forth in BIA precedent, to qualify as a "particular social group," an applicant must demonstrate that his family group meets each of the immutability, particularity, and social distinction requirements. While many family relationships will be immutable, some family-based group definitions may be too vague or amorphous to meet the particularity requirement--i.e., where an applicant cannot show discernible boundaries to the group. *See, e.g.*, *S-E-G-*, 24 I&N Dec. at 585 (noting that the "proposed group of 'family members,' which could include fathers, mothers, siblings, uncles, aunts, nieces, nephews, grandparents, cousins, and others, is . . . too amorphous a category" to satisfy the particularity requirement). Further, many family-based social groups will have trouble qualifying as "socially distinct," a requirement that contemplates that the applicant's proposed group be "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238 ("In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it."). """"To have the 'social **\*594** distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *W-G-R-*, 26 I&N Dec. at 217.

Asylum applicants generally seek to establish family-based groups as """"particular social groups" by raising one of two principal arguments. First, many applicants assert a specific family unit as their "particular social group." *See, e.g.*, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949-50 (4th Cir. 2015) (social group defined as appellant's nuclear family); *Rios*, 807 F.3d at 1126 (social group defined as appellant's "family"); *Perecki v. U.S. Att'y Gen.*, 446 F. App'x 236, 239 (11th Cir. 2011) (social group defined as """"Perkeci family, as targets of a blood feud"). But to qualify under the statute and Board precedent, when an applicant proposes a group composed of a specific family unit, he must show that his proposed group has some greater meaning in society. It is not enough that the family be set apart in the eye of the persecutor, because it is the perception of the relevant society-- rather than the perception of the alien's actual or potential persecutors--that matters. *W-G-R-*, 26 I&N Dec. at 217.

**\*\*13** In analyzing these claims, adjudicators must be careful to focus on the particular social group *as it is defined* by the applicant and ask whether *that group* is distinct in the society in question. If an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether *that* specific family is "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238. It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family. If this were the case, virtually everyone in that society would be a member of a cognizable particular social group. The fact that "nuclear families" or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be """"recognizable by society at large." *A-B-*, 27 I&N Dec. at 336; *see also Castellano-Chacon v. INS*, 341 F.3d 533, 548 (6th Cir. 2003) (noting that a country or society's reaction to a group is a factor in establishing whether it is a cognizable particular social group). The average family--even if it would otherwise satisfy the immutability and particularity requirements--is unlikely to be so recognized.

Second, other applicants define the relevant "particular social group" as a collection of familial relatives of persons who have certain shared characteristics. *See, e.g.*, *S.E.R.L. v. Att'y Gen. U.S.A.*, 894 F.3d 535, 541 (3d Cir. 2018) (social group defined as "immediate family members of Honduran women unable to leave a domestic relationship"); *Cordova v.* **\*595** *Holder*, 759 F.3d

332, 336 (4th Cir. 2014) (social group defined as """family members of persons who have been killed by rival gang members"); *Vumi v. Gonzales*, 502 F.3d 150, 152 (2d Cir. 2007) (social group defined as """relatives of assassination suspects"). This is a common approach in asylum cases concerning gang violence. *See, e.g.*, *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (social group defined to include families of Salvadoran young adults who were subjected to, and rejected, gang recruitment); *Crespin-Valladares*, 632 F.3d at 120-21 (social group defined as "consisting of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses"); *Poroj-Mejia v. Holder*, 397 F. App'x 234, 236 (7th Cir. 2010) (social group defined as "members of families who sought police assistance against the Mara 18"). Often, this category of family classifications fails the social distinction requirement because there is little evidence to indicate that families sharing these characteristics are seen in society as cohesive and identifiable groups. *See, e.g.*, *S-E-G-*, 24 I&N Dec. at 585-88 (holding that there was little to distinguish purported social group comprising "family members of Salvadoran youth . . . who have rejected or resisted membership in [MS-13]" from members of Salvadoran society at large, who were also threatened by gang violence). Furthermore, when proposing these kinds of groups, applicants risk impermissibly defining their purported social group in terms of the persecution it has suffered or that it fears. *See M-E-V-G-*, 26 I&N Dec. at 236 n.11 (particular social groups must exist independently of the harm asserted); *see also, e.g.*, *Poroj-Mejia*, 397 F. App'x at 237 (denying asylum claim of applicant whose proposed social group "has no existence independent of" the alleged persecutors); *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (concluding that the defining attribute of applicant's proposed family member group was its persecution by the drug-trafficking organization, and the risk of persecution alone can never create a particular social group).

**\*\*14** This opinion does not bar all family-based social groups from qualifying for asylum. To the contrary, in some societies, an applicant may present specific kinship groups or clans that, based on the evidence in the applicant's case, are particular and socially distinct. *See, e.g.*, *Ali v. Ashcroft*, 394 F.3d 780, 785 (9th Cir. 2005) (holding that the "persecution Ali suffered was clearly on account of . . . her membership in a particular social group, her clan"); *H-*, 21 I&N Dec. at 343 (recognizing a Somali subclan as a "particular social group"). But unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be """distinct" in the way required by the INA for purposes of asylum. Moreover, adjudicators should be skeptical of social groups that appear to be "defined principally, if **\*596** not exclusively, for the purposes of [litigation] . . . without regard to the question of whether anyone in [a given country] perceives [those] group[s] to exist in any form whatsoever." *In re R-A-*, 22 I&N Dec. 906, 918 (BIA 1999; A.G. 2001), *remanded for recons. in Matter of R-A-*, 24 I&N Dec. 629 (A.G. 2008). [2]

Here, the Board's particular social group analysis merely cited past Board and federal court precedents recognizing family-based groups and then agreed with the parties' stipulations. The Board summarily concluded that "the facts of this case present a valid particular social group," without explaining how the facts supported this finding or satisfied the particularity and social visibility requirements. *L-E-A-*, 27 I&N Dec. at 42-43. This cursory treatment could not, and did not, satisfy the Board's duty to ensure that the respondent satisfied the statutory requirements to qualify for asylum. The Board's conclusion that the respondent's proposed group presents a valid """particular social group" under the INA must be reversed.

### IV.

As Attorney General Sessions previously explained, "[a]n alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet, the asylum statute does not provide redress for all misfortune." *A-B-*, 27 I&N Dec. at 318. The term "particular social group" may not receive such an elastic and unbound meaning that it includes all immediate-family units, regardless of whether the applicant's proposed family is particular and socially distinct in his society.

For the reasons stated above, I overru **\*597** le the portion of *Matter of L-E-A-* discussing whether the proposed particular social group is cognizable. 27 I&N Dec. at 42-43 (Part II.A). Furthermore, I abrogate all cases inconsistent with this opinion.

**\*\*15** Although the Board relied on the parties' concessions to find the existence of a particular social group in this case, it ultimately concluded that the respondent failed to establish a nexus between his purported particular social group and the

persecution that he alleged and feared. I leave the Board's analysis of the nexus requirement undisturbed and remand this matter to the immigration judge for further proceedings consistent with this opinion and the remaining portions of the Board's decision below.

## Footnotes

1    The U.S. District Court for the District of Columbia has called into question some aspects of *Matter of A-B-* that are not relevant here. *See Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018). The Department of Justice has appealed that decision, which is the subject of ongoing litigation. *See* Notice of Appeal, *Grace v. Whitaker*, No. 19-5013 (D.C. Cir. Jan. 30, 2019).

2    Some proposed group definitions appear, on their face, to be convoluted and to lack any greater importance in society. *See, e.g.*, *Franco-Reyes v. Sessions*, 740 F. App'x 420, 421 (5th Cir. 2018) (proposed group comprising Salvadoran "nuclear fami[ies] headed by a woman with a partner who is perceived as being absent and who is perceived as having expatriated himself"); *Solomon-Membreno v. Holder*, 578 F. App'x 300, 301 (4th Cir. 2014) (proposed group comprising "young female students who are related to an individual who opposes gang practices and values"); *Rodriguez*, 735 F.3d at 1306-07 (proposed group comprising "Mexican farmers in the State of Michoacán, owning . . . farmland suitable for producing high yields of illegal drug crops (cannabis), who are subject to Drug Trafficking Organizations' (DTOs') extortion tactics on account of their ownership of said farmland and unwillingness to collaborate with the DTOs by refusing to grow and produce illegal drug crops or participate in illegal drug trafficking" (ellipses in original)); *Zavala v. Holder*, 353 F. App'x 631, 633 (2d Cir. 2009) (proposed group comprising "all persons who the Maras have targeted for revenge or recruitment as a form of repayment for that person's family's failure to support the guerrillas during the civil war").

27 I. & N. Dec. 581 (U.S.Atty.Gen.), Interim Decision 3959, 2019 WL 3492202

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment

Vacated by  Matter of A-B-,   U.S.Atty.Gen.,   June 16, 2021

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

U.S. Department of Justice

Office of the Attorney General

MATTER OF A-B-, RESPONDENT

Decided by Attorney General June 11, 2018

**1   *316  (1) *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014) is overruled. That decision was wrongly decided and should not have been issued as a precedential decision.

(2) An applicant seeking to establish persecution on account of membership in a "particular social group" must demonstrate: (1) membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; and (2) that membership in the group is a central reason for her persecution. When the alleged persecutor is someone unaffiliated with the government, the applicant must also show that her home government is unwilling or unable to protect her.

(3) An asylum applicant has the burden of showing her eligibility for asylum. The applicant must present facts that establish each element of the standard, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of those elements.

(4) If an asylum application is fatally flawed in one respect, an immigration judge or the Board need not examine the remaining elements of the asylum claim.

(5) The mere fact that a country may have problems effectively policing certain crimes or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

(6) To be cognizable, a particular social group must exist independently of the harm asserted in an application for asylum.

(7) An applicant seeking to establish persecution based on violent conduct of a private actor must show more than the government's difficulty controlling private behavior. The applicant must show that the government condoned the private actions or demonstrated an inability to protect the victims.

(8) An applicant seeking asylum based on membership in a particular social group must clearly indicate on the record the exact delineation of any proposed particular social group.

(9) The Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum.

*317  BEFORE THE ATTORNEY GENERAL

On March 7, 2018, I directed the Board of Immigration Appeals ("Board") to refer for my review its decision in this matter, see 8 C.F.R. § 1003.1(h)(1)(i), and I invited the parties and any interested amici to submit briefs addressing questions relevant

to that certification. *Matter of A-B-, 27 I&N Dec. 227 (A.G. 2018).* Specifically, I sought briefing on whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

 **\*\*2**  For the reasons set forth in the accompanying opinion, I vacate the Board's December 6, 2016 decision and remand this case to the immigration judge for further proceedings. Consistent with the test developed by the Board over the past several decades, an applicant seeking to establish persecution on account of membership in a "particular social group" must satisfy two requirements. First, the applicant must demonstrate membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question. And second, the applicant's membership in that group must be a central reason for her persecution. When, as here, the alleged persecutor is someone unaffiliated with the government, the applicant must show that flight from her country is necessary because her home government is unwilling or unable to protect her.

Although there may be exceptional circumstances when victims of private criminal activity could meet these requirements, they must satisfy established standards when seeking asylum. Such applicants must establish membership in a particular and socially distinct group that exists independently of the alleged underlying harm, demonstrate that their persecutors harmed them on account of their membership in that group rather than for personal reasons, and establish that the government protection from such harm in their home country is so lacking that their persecutors' actions can be attributed to the government. Because *Matter of A-R-C-G-, 26 I&N Dec. 388 (BIA 2014),* recognized a new particular social group without correctly applying these standards, I overrule that case and any other Board precedent to the extent those other decisions are inconsistent with the legal conclusions set forth in this opinion.

<div align="center">OPINION</div>

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum if an alien is unable or unwilling to return to her country of origin because she has suffered past persecution or has a well- **\*318** founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a) (42)(A), 1158(b)(1)(a), (b)(i). A recurring question in asylum law is determining whether alleged persecution was based on their membership in a """"particular social group." Over the past thirty years, this question has recurred frequently before the Board and the courts of appeals, and the standard has evolved over time.

The prototypical refugee flees her home country because the government has persecuted her--either directly through its own actions or indirectly by being unwilling or unable to prevent the misconduct of non-government actors--based upon a statutorily protected ground. Where the persecutor is not part of the government, the immigration judge must consider both the reason for the harm inflicted on the asylum applicant and the government's role in sponsoring or enabling such actions. An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet the asylum statute does not provide redress for all misfortune. It applies when persecution arises on account of membership in a protected group and the victim may not find protection except by taking refuge in another country.

 **\*\*3**  The INA does not define "persecution on account of . . . membership in a particular social group." The Board first addressed the term in *Matter of Acosta,* 19 I&N Dec. 211, 233 (BIA 1985), where it interpreted a "particular social group" in a manner consistent with the other four grounds of persecution identified in section 1101(a)(42)(A)--race, religion, nationality, or political opinion. *Id.* The Board concluded that a "particular social group" required a "group of persons all of whom share a common, immutable characteristic" that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* The Board noted that the "shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances, it might be a shared past experience such as former military leadership or land ownership." *Id.*

In *Matter of R-A-*, 22 I&N Dec. 906, 917-23 (BIA 1999) (en banc), the Board considered whether a victim of domestic violence could establish refugee status as a member of a particular social group consisting of similarly situated women. The Board held that the mere existence of shared circumstances would not turn those possessing such characteristics into a particular social group. *Id.* at 919. Rather, the members of a particular social group must not merely share an immutable characteristic, but must also be recognized as a distinct group in the alien's society, *id.* at 918-19, and the persecution must be motivated by membership in that social group, *id.* at 919-22. Attorney General Reno vacated that decision for reconsideration in **\*319** light of a proposed regulation, *see* 22 I&N Dec. 906, 906 (A.G. 2001), but no final rule ever issued, and the case was eventually resolved in 2009 without further consideration by the Board. Despite the vacatur of *R-A-*, both the Board and the federal courts have continued to treat its analysis as persuasive.

In the years after *Matter of R-A-*, the Board refined the legal standard for particular social groups. By 2014, the Board had clarified that applicants for asylum seeking relief based on "membership in a particular social group" must establish that their purported social group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G,* 26 I&N Dec. 227, 237 (BIA 2014). Applicants must also show that their membership in the particular social group was a central reason for their persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Matter of W-G-R-,* 26 I&N Dec. 208, 224 (BIA 2014). Where an asylum applicant claims that the persecution was inflicted by private conduct, she must also establish that the government was unable or unwilling to protect her. *See, e.g., Acosta,* 19 I&N Dec. at 222.

**\*\*4** Later that year, the Board decided *A-R-C-G-*, which recognized "married women in Guatemala who are unable to leave their relationship" as a particular social group--without performing the rigorous analysis required by the Board's precedents. 26 I&N Dec. at 389; *see id.* at 390-95. Instead, the Board accepted the concessions by the Department of Homeland Security ("DHS") that the respondent suffered harm rising to the level of past persecution, that she was a member of a qualifying particular social group, and that her membership in that group was a central reason for her persecution. *Id.* at 395.

I do not believe *A-R-C-G-* correctly applied the Board's precedents, and I now overrule it. The opinion has caused confusion because it recognized an expansive new category of particular social groups based on private violence. Since that decision, the Board, immigration judges, and asylum officers have relied upon it as an affirmative statement of law, even though the decision assumed its conclusion and did not perform the necessary legal and factual analysis. When confronted with asylum cases based on purported membership in a particular social group, the Board, immigration judges, and asylum officers must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements set forth in *M-E-V-G* and *W-G-R-*.

In this matter, the immigration judge initially denied the respondent's asylum claim, which arises out of allegations of domestic abuse suffered in El Salvador. In reversing the immigration judge's decision, the Board did little more than cite *A-R-C-G-* in finding that she met her burden of **\*320** establishing that she was a member of a particular social group. In addition to failing meaningfully to consider that question or whether the respondent's persecution was on account of her membership in that group, the Board gave insufficient deference to the factual findings of the immigration judge.

For these and other reasons, I vacate the Board's decision and remand for further proceedings before the immigration judge consistent with this opinion. In so doing, I reiterate that an applicant for asylum on account of her membership in a purported particular social group must demonstrate: (1) membership in a particular group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; (2) that her membership in that group is a central reason for her persecution; and (3) that the alleged harm is inflicted by the government of her home country or by persons that the government is unwilling or unable to control. *See M-E-V-G-,* 26 I&N Dec. at 234-44; *W-G-R-,* 26 I&N Dec. at 209-18, 223-24 & n.8. Furthermore, when the applicant is the victim of private criminal activity, the analysis must also """""consider whether government protection is available, internal relocation is possible, and persecution exists countrywide." *M-E-V-G-,* 26 I&N Dec. at 243.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**\*\*5**  Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. [1]  While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address. The mere fact that a country may have problems effectively policing certain crimes--such as domestic violence or gang violence--or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

I.

The respondent, a native and citizen of El Salvador, entered the United States illegally and was apprehended by U.S. Customs and Border Protection agents in July 2014. After being placed in removal proceedings, the respondent filed an application for asylum and withholding of removal under  **\*321**  the INA, 8 U.S.C. §§ 1158, 1231(b)(3), and for withholding of removal under the regulations implementing the United Nations Convention Against Torture.

The respondent claimed that she was eligible for asylum because she was persecuted on account of her membership in the purported particular social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners. *Matter of A-B-*, Decision Denying Asylum Application at \*8, (Immig. Ct. Dec. 1, 2015). The respondent asserted that her ex-husband, with whom she shares three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage. *Id*. at \*2-3).

In December 2015, the immigration judge denied all relief and ordered the respondent removed to El Salvador. The immigration judge denied the respondent's asylum claim for four independent reasons: (1) the respondent was not credible; (2) the group in which she claimed membership did not qualify as a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A); (3) even if it did, the respondent failed to establish that her membership in a social group was a central reason for her persecution; and (4) she failed to show that the El Salvadoran government was unable or unwilling to help her. *Id*. at \*4-15. The respondent appealed the immigration judge's decision to the Board.

In December 2016, the Board reversed and remanded with an order to grant the respondent asylum after the completion of background checks. *Matter of A-B-*, (BIA Dec. 8, 2016). The Board found the immigration judge's adverse credibility determinations clearly erroneous. *Id*. at \*1-2. The Board further concluded that the respondent's particular social group was substantially similar to "married women in Guatemala who are unable to leave their relationship," which the Board had recognized in *Matter of A-R-C-G-*, 26 I&N Dec. at 390. *A-B-* at \*2. Moreover, the Board held that the immigration judge clearly erred in finding that the respondent could leave her ex-husband, and that the respondent established that her ex-husband persecuted her because of her status as a Salvadoran woman unable to leave her domestic relationship. *Id*. at \*2-3. Finally, the Board determined that the El Salvadoran government was unwilling or unable to protect the respondent. *Id*. at \*3-4.

**\*\*6**  In August 2017, the immigration judge issued an order purporting to certify and administratively return the matter to the Board in light of intervening developments in the law. [2]  *Matter of A-B-*, Decision and Order  **\*322**  of Certification, (Immig. Ct. Aug. 18, 2017). The immigration judge observed that several courts of appeals had recently held that domestic-violence victims failed to prove their entitlement to asylum based on membership in particular social groups. *See id*. at \*2-3 (citing *Fuentes-Erazo v. Sessions*, 848 F.3d 847, 853 (8th Cir. 2017); *Cardona v. Sessions*, 848 F.3d 519, 523 (1st Cir. 2017); *Marikasi v. Lynch*, 840 F.3d 281, 291 (6th Cir. 2016); *Vega-Ayala v. Lynch*, 833 F.3d 34, 40 (1st Cir. 2016)). The immigration judge thus believed that the precedents relied upon by the Board in its December 2016 decision were no longer good law. *A-B-* at \*3-4 (Immig. Ct. Aug. 18, 2017).

In particular, the immigration judge cited the Fourth Circuit's opinion in *Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017), which denied the petition for review on the ground that the alien had not established that her alleged persecution was on account of her membership in a particular social group. *A-B-* at \*3-4 (Immig. Ct. Aug. 18, 2017) (citing *Velasquez*, 866 F.3d at 197). Distinguishing *A-R-C-G-* because of DHS's concessions there, 866 F.3d at 195 n.5, the court in *Velasquez* reiterated that

"'[e]vidence consistent with acts of private violence or that merely shows that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground."DDD' *Id.* at 194 (quoting *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)). The court further noted, "'the asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships."DDD' *Id.* at 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)).

In a concurrence, Judge Wilkinson reiterated that the particular social groups protected from persecution under the asylum statute must be understood in the context of the other grounds for protection, which concern specific segments of the population who are marginalized or subjected to social stigma and prejudice. *Id.* at 198 (Wilkinson, J., concurring). Noting that victims of private violence were "seizing upon the 'particular social group' criterion in asylum applications," Judge Wilkinson considered the example of applicants who claim to be the victims of gang violence. Aliens seeking asylum on that basis "are often not 'exposed to more violence or human rights violations than other segments of society,' and 'not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests."DDD' *Id.* at 199 (quoting *Matter of S-E-G-*, 24 I&N Dec. 579, 587 (BIA 2008)). He recognized that the Board "has previously explained that 'victims of gang violence come from all segments of society, and it is difficult to conclude that any "group," **\*323** as actually perceived by the criminal gangs, is much narrower than the general population."DDD' *Id.* (quoting *M-E-V-G-*, 26 I&N Dec. at 250). The pervasive nature of this violent criminality, in Judge Wilkinson's view, suggested that membership in a purported particular social group "is often not a central reason for the threats received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies." *Id.*

**\*\*7**  On March 7, 2018, pursuant to 8 C.F.R. § 1003.1(h)(1)(i), I directed the Board to refer this matter to me for my review. I invited the parties and any interested amici to submit briefs on the following question:
Whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

*A-B-*, 27 I&N Dec. at 227. After certifying this case, I received party submissions from the respondent and DHS and twelve amicus briefs.

II.

As a threshold matter, I address the respondent's procedural objections concerning my authority to review this case and the certification procedure.

A.

The respondent argues that I lack the authority to certify the Board's decision because it did not reacquire jurisdiction following its remand to the immigration judge. In the respondent's view, the Attorney General's authority to certify and review immigration cases is restricted to cases over which the Board expressly retains jurisdiction, excluding any cases that have been remanded for further proceedings. This restrictive interpretation of my jurisdiction finds no support in the law.

Under the INA, "[t]he Attorney General enjoys broad powers with respect to ""the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens."DDD' *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004) (quoting 8 U.S.C. § 1103(a)(1)); *see also Henderson v. INS*, 157 F.3d 106, 126 (2d Cir. 1998) ("[T]he extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique."); *Matter of D-J-*, 23 I&N Dec. 572, 573-74 & n.3 (A.G. 2003) (describing Attorney General's review authority under 8 U.S.C. § 1226(a)). The INA grants the Attorney General the authority to """review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the **\*324** Attorney General determines to be necessary for carrying out" his duties related to the immigration and naturalization of aliens. 8 U.S.C. § 1103(g)(2). This authority includes the power to refer cases for my review, *see* 8 C.F.R. § 1003.1(h)(1), which the First Circuit has called an "unfettered grant of authority,"

*Xian Tong Dong v. Holder*, 696 F.3d 121, 124 (1st Cir. 2012). Nothing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge.

 **\*\*8**  It is likewise irrelevant that there has not been a final decision from the Board either granting or denying relief. The relevant federal regulation states: "The Board shall refer to the Attorney General for review of its decision all cases that . . . the Attorney General directs the Board to refer to him." 8 C.F.R § 1003.1(h)(1). Nothing in section 1003.1(h) requires, or even suggests, that the only Board "decisions" the Attorney General can review are *final* decisions that definitively grant or deny relief to a respondent. Nor do the applicable regulations or the INA define "decision" as a "final" decision. *See id*. § 1001.1 (defining terms in the relevant chapter); 8 U.S.C. § 1101 (defining terms under the Act).

<div align="center">B.</div>

Both the respondent and certain amici also raise due process concerns with my certification of this matter. They argue principally that my certification improperly bypassed the Board and deprived it of the opportunity to consider the certified question in the first instance. The Board exercises "only the authority provided by statute or delegated by the Attorney General," *Matter of Castro-Tum*, 27 I&N Dec. 271, 282 (A.G. 2018), and the regulations allow the Attorney General to certify any case that is before the Board or where it has rendered a decision, 8 C.F.R § 1003.1(h). In any event, the respondent has already received full and fair opportunities to present her asylum claim before both the immigration judge and the Board. After those proceedings, both the immigration judge and the Board issued written decisions that analyzed the validity of the respondent's proposed particular social group and whether the respondent qualified for asylum on that ground.

The respondent also argues that the certification violated her due process rights because alleged "irregularities" in the certification "reflect prejudgment of her claim and lack of impartiality, in contravention of her right to a full and fair hearing by a neutral adjudicator." [3]  There is no basis  **\*325**  to this claim. The respondent and some amici complain that I have advanced policy views on immigration matters as a U.S. Senator or as Attorney General, but the statements they identify have no bearing upon my ability to faithfully discharge my legal responsibilities in this case. I have made no public statements regarding the facts of respondent's case, and I have no "personal interest in the outcome of the proceedings." *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

Nor is there any requirement that an administrator with significant policymaking responsibilities withdraw from "interchange and discussion about important issues." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979). As the Supreme Court has held, a decision maker need not be "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'DDD' *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (*quoting United States v. Morgan*, 313 U.S. 409, 421 (1941)). If policy statements about immigration-related issues were a basis for disqualification, then no Attorney General could fulfill his or her statutory obligations to review the decisions of the Board.

<div align="center">III.</div>

 **\*\*9**  I turn now to the question of whether, and under what circumstances, being a victim of private criminal activity constitutes persecution on account of membership in a particular social group. [4]

<div align="center">A.</div>

An applicant for asylum bears the burden of establishing that she "is a refugee within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. § 1158(b)(1)(A), (B)(i). Under that definition, the applicant must demonstrate that she is an alien outside her country of nationality "who is  **\*326**  unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion,

nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). Here, the respondent claims that she is eligible for asylum because of persecution she suffered on account of her purported membership in a particular social group--"El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners.

As the Board and the federal courts have repeatedly recognized, the phrase """"""membership in a particular social group" is ambiguous. *Matter of Acosta,* 19 I&N Dec. at 232-33; *Matter of M-E-V-G-,* 26 I&N Dec. at 230; *Matter of W-G-R-,* 26 I&N at 209; *see also, e.g., Ngugi v. Lynch,* 826 F.3d 1132, 1138 (8th Cir. 2016); *Gonzalez v. U.S. Att'y Gen.,* 820 F.3d 399, 404 (11th Cir. 2016); *Henriquez-Rivas v. Holder,* 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc); *Mayorga-Vidal v. Holder,* 675 F.3d 9, 17 (1st Cir. 2012); *Valdiviezo-Galdamez v. U.S. Att'y Gen.,* 663 F.3d 582, 612 (3d Cir. 2011). Neither the INA nor the implementing regulations define "particular social group." [5] "The concept is even more elusive because there is no clear evidence of legislative intent." *Valdiviezo-Galdamez,* 663 F.3d at 594. As then-Judge Alito noted for the court, "[r]ead in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.' Thus, the statutory language standing alone is not very instructive." *Fatin v. INS,* 12 F.3d 1233, 1238 (3d Cir. 1993) (Alito, J.).

 **10**  The Attorney General has primary responsibility for construing ambiguous provisions in the immigration laws. *M-E-V-G-,* 26 I&N Dec. at 230; *see also* 8 C.F.R. § 1003.1(g). The INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). The Attorney General's reasonable construction of an ambiguous term in the Act, such as "membership in a particular social group," is entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984); *see also Negusie v. Holder,* 555 U.S. 511, 516 (2009) **327**  ("""""Consistent with the rule in *Chevron* . . ., the BIA is entitled to deference in interpreting ambiguous provisions of the INA."); *id.* at 525 (Scalia, J., concurring) (citing *Chevron* and agreeing that "the agency is entitled to answer" whether the alien is statutorily barred from receiving asylum); *Aguirre-Aguirre,* 526 U.S. at 425 ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations" (quotations omitted)). Thus, every court of appeals to have considered the issue has recognized that the INA's reference to the term ""particular social group" is inherently ambiguous and has deferred to decisions of the Board interpreting that phrase. [6]

The Supreme Court has "also made clear that administrative agencies are not bound by prior judicial interpretations of ambiguous statutory interpretations, because there is 'a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."DDD' *Matter of R-A-,* 24 I&N Dec. 629, 631 (A.G. 2008) (quoting *Brand X,* 545 U.S. at 982 (internal quotation and citations omitted)). "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X,* 545 U.S. at 982.

B.

 **11**  In a number of opinions spanning several decades, the Board has articulated and refined the standard for persecution on account of membership in a "particular social group" so that this category is not boundless. The Board first interpreted the term in *Matter of Acosta,* 19 I&N Dec. at 233. Applying the canon of *ejusdem generis,* the Board concluded that the phrase """"""particular social group" should be construed in a manner consistent with the other grounds for persecution in the statute's definition of refugee: race, religion, nationality, and political opinion. *Id.* Noting that each of these terms describes "a characteristic that either is beyond the power **328** of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed," the Board concluded that persecution on account of membership in a particular social group must similarly mean "persecution that is directed toward an individual who is a member of a group

of persons all of whom share a common, immutable characteristic." *Id.* The Board stated that this definition "preserve[d] the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Id.* at 234.

In 1999, the Board, sitting *en banc*, considered for the first time "whether the repeated spouse abuse inflicted on the respondent makes her eligible for asylum as an alien who has been persecuted on account of her membership in a particular social group." *R-A-*, 22 I&N Dec. at 907. In a thorough, well-reasoned opinion, the Board first looked to the plain language of the INA to determine whether Congress intended the Act to provide asylum to battered spouses who are leaving marriages to aliens having no ties to the United States. *Id.* at 913-14. Finding no definitive answer in the language of the statute, the Board "look[ed] to the way in which the other grounds in the statute's 'on account of' clause operate." *Id.* at 914. Following that "'''''significant guidance," the Board concluded that R-A- was not eligible for asylum for two reasons. First, her claimed social group--"Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination"--did not qualify as a "particular social group" under the INA. *Id.* at 917-18. And second, even if it did qualify, she failed to show a sufficient nexus between her husband's abuse and her membership in that social group. *Id.* at 923.

 **\*12**  The Board first observed that the purported social group appeared "to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever." *Id.* at 918. The Board found "little or no relation [of the purported social group] to the way in which Guatemalans might identify subdivisions within their own society or otherwise might perceive individuals either to possess or to lack an important characteristic or trait." *Id.* The Board reasoned that for a social group to be viable for asylum purposes, there must be some showing of how the immutable characteristic shared by the group is understood in the alien's home country so that the Board can "understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm." *Id.*

The Board held that a "particular social group" should be recognized and understood to be a societal faction or a recognized segment of the population  **\*329**  in the alien's society. *R-A-*, 22 I&N Dec. at 918. The Board found that R-A- had "shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group." *Id.* Without such a showing, the Board concluded that "if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

In addition to holding that R-A-*'s* proposed group did not qualify as a "'''''particular social group," the Board also held that she had not shown the persecution was "on account of" her membership in the group. *Id.* at 920; *see* 8 U.S.C. § 1101(a)(42)(A). Even if the Board were to accept the respondent's proposed social group, she "has not established that her husband has targeted and harmed [R-A-] because he perceived her to be a member of this particular social group." *R-A-*, 22 I&N Dec. at 920. R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." *Id.*

 **\*13**  On January 19, 2001, Attorney General Reno summarily vacated *R-A-* and directed the Board to stay consideration of the case pending final publication of a proposed rule offering guidance on the definitions of "persecution" and "'''''membership in a particular social group" and what it means to be "on account of" a protected characteristic. *R-A-*, 22 I&N Dec. at 906; *see also* 65 Fed. Reg. 76,588, 76,588 (Dec. 7, 2000). No final rule ever issued, however. In September 2008, Attorney General Mukasey lifted the stay and directed the Board to reconsider the case in light of intervening Board and judicial decisions. *Matter of R-A-*, 24 I&N Dec. 629, 630 (A.G. 2008). In December 2009, before the Board issued an opinion, R-A- and DHS jointly stipulated that she was eligible for asylum, resolving the case. *See* *A-R-C-G-*, 26 I&N Dec. at 391-92 n.12.

Despite its vacatur, both the Board and federal courts have continued to rely upon *R-A-*. In 2014, the Board stated that the 1999 opinion's "role in the progression of particular social group claims remains relevant." *M-E-V-G-*, 26 I&N Dec. at 231 n.7. In

2013, the Ninth Circuit recognized that although "*R-A-* was later vacated[,] . . . litigants and other courts have relied heavily upon its analysis." *Henriquez-Rivas*, 707 F.3d at 1090 n.11. And in 2011, the Third Circuit quoted *R-A-* at length because "*R-A-* is so important to the claim before us here." *Valdiviezo-Galdamez*, 663 F.3d at 596-97 & n.8.

In the years since *R-A-*, the Board has refined its interpretation of """"particular social group" on a case-by-case basis. In *Matter of C-A-*, 23 I&N. Dec. 951, 959 (BIA 2006), *aff'd sub nom.*   **330**   *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), the Board held that a cognizable """"particular social group" should generally be "easily recognizable and understood by others to constitute social groups." In *S-E-G-*, 24 I&N. Dec. at 584, the Board defined the "particularity" requirement as "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." In *Matter of E-A-G-*, 24 I&N. Dec. 591, 594 (BIA 2008), the Board further explained that "the extent to which members of a society perceive those with the characteristic in question as members of a social group--is of particular importance in determining whether an alien is a member of a claimed particular social group."

 **\*\*14**  In 2014, the Board issued a pair of complementary precedential opinions, *M-E-V-G-* and *W-G-R-*, clarifying what is necessary to establish a particular social group. In those cases, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N. Dec. at 234, 237; *see also W-G-R-*, 26 I&N. Dec. at 212. The Board explained that those applicants also bear the burden of showing that their membership was a central reason for their persecution, and that their home government was "unable or unwilling to control" the persecutors. *W-G-R-*, 26 I&N. Dec. at 224 & n.8.

Again echoing *R-A-*, the Board explained that the requirement that a group be socially distinct "considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *M-E-V-G-*, 26 I&N. Dec. at 238. Members of a particular social group will generally understand their own affiliation with that group, as will other people in their country. *Id.* To be socially distinct, a particular social group "must be perceived as a group by society." *Id.* at 240.

*M-E-V-G-* also clarified that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Id.* at 242. The Board explained that to do otherwise would create two significant problems. First, it would conflate the inquiry into whether a "particular social group" is cognizable under the INA with the separate and distinct requirement that the persecution be "on account of" membership. *Id.* Second, defining a particular social group from the perspective of the persecutor would contradict the Board's prior holding that a social group may not be defined exclusively by the fact that its members  **\*331**  have been subjected to harm. *Id.* (citing *Matter of A-M-E- & J-G-U-*, 24 I&N. Dec. 69, 74 (BIA 2007)).

Finally, the Board explained that this definition did not abrogate or depart from *Acosta*, 19 I&N. Dec. 211, or the Board's other decisions, but rather clarified how the definition of "particular social group" had developed through case-by-case adjudication. *See W-G-R-*, 26 I&N. Dec. at 212; *M-E-V-G-*, 26 I&N. Dec. at 244-47.

C.

 **\*\*15**  Although the Board has articulated a consistent understanding of the term "particular social group," not all of its opinions have properly applied that framework. Shortly after *M-E-V-G-* and *W-G-R-*, the Board decided *A-R-C-G-*, 26 I&N. Dec. 388, which held that "married women in Guatemala who are unable to leave their relationship" could constitute a particular social group, *id.* at 392. Importantly, the Board based its decision on DHS's concessions that: (1) A-R-C-G- suffered harm rising to the level of past persecution; (2) A-R-C-G-'s persecution was on account of her membership in a particular social group; and (3) A-R-C-G-'s particular social group was cognizable under the INA. *Id.* at 392-95. In fact, the only legal question not conceded by DHS was whether, under applicable Eighth Circuit law, the Guatemalan government was unwilling or unable to control her

husband. *Id.* at 395; *see also Gutierrez-Vidal v. Holder*, 709 F.3d 728, 732 (8th Cir. 2013) (asylum applicant must show that assaults were either condoned by the government or were committed by private actors that the government was unwilling or unable to control). The Board declined to answer that question, electing instead to remand for further proceedings.

Because of DHS's multiple concessions, the Board performed only a cursory analysis of the three factors required to establish a particular social group. The Board concluded that A-R-C-G-'s purported particular social group was "'''''composed of members who share the common immutable characteristic of gender,'' and that "marital status can be an immutable characteristic where the individual is unable to leave the relationship.'' *A-R-C-G-*, 26 I&N Dec. at 392-93. With respect to particularity, the Board observed that the terms defining the group--"married,'' "women,'' and "unable to leave the relationship''--had commonly accepted definitions within Guatemalan society. *Id.* at 393. And finally, with respect to social distinction, the Board cited evidence that Guatemala has a "culture of machismo and family violence,'' and that although Guatemala's criminal laws that prohibit domestic violence, "'''''enforcement can be problematic because the National Civilian Police often failed to respond to requests for **\*332** assistance related to domestic violence.'' *Id.* at 394 (quotation marks omitted).

Subsequent Board decisions, including the decision certified here, have read *A-R-C-G-* as categorically extending the definition of a "particular social group'' to encompass most Central American domestic violence victims. Like *A-R-C-G-*, these ensuing decisions have not performed the detailed analysis required. For instance, the Board's decision in this case offered only the conclusory statement that the respondent's proposed group was "substantially similar to that which we addressed in *Matter of A-R-C-G-*,'' and that the "'''''totality of the evidence, including the 2014 El Salvador Human Rights Report, establishes that the group is sufficiently particular and socially distinct in El Salvadoran Society.'' *A-B-* at \*2. The Board's entire analysis of the respondent's proposed particular social group consisted of only two sentences. *Id*. Other Board opinions have similarly treated *A-R-C-G-* as establishing a broad new category of cognizable particular social groups. *See, e.g.*, *Matter of D-M-R-* (BIA June 9, 2015); *Matter of E-M-* (BIA Feb. 18, 2015).

**\*\*16**  By contrast, several courts of appeals have expressed skepticism about *A-R-C-G-*. In *Velasquez v. Sessions*, the Fourth Circuit concluded that the petitioner's asylum claim concerned personal, private conflict rather than persecution on a protected ground. 866 F.3d at 197. The court distinguished *A-R-C-G-* "because, there, the Government conceded that the mistreatment suffered by the alien was, at least for one central reason, on account of her membership in a cognizable particular social group.'' 866 F.3d at 195 n.5 (quotation marks and alterations omitted). In *Fuentes-Erazo*, the Eighth Circuit declined to approve a particular social group of "Honduran women in domestic relationships who are unable to leave their relationships'' after distinguishing *A-R-C-G-* because there "the petitioner's actual membership in the proposed particular social group was undisputed.'' 848 F.3d at 853. And in *Jeronimo v. U.S. Attorney General*, 678 F. App'x 796 (11th Cir. 2017), the Eleventh Circuit denied the asylum application of a woman who claimed membership in a group of "indigenous women who live with a domestic partner and who suffer abuse and cannot leave safely from that domestic partner relationship.'' *Id.* at 802-03. The court recognized that in *A-R-C-G-*, "DHS had conceded the petitioner had suffered past persecution and the persecution was because of membership in a particular social group.'' *Id.* at 802. [7]

**\*333**  IV.

*A-R-C-G-* was wrongly decided and should not have been issued as a precedential decision. DHS conceded almost all of the legal requirements necessary for a victim of private crime to qualify for asylum based on persecution on account of membership in a particular social group. [8]  To the extent that the Board examined the legal questions, its analysis lacked rigor and broke with the Board's own precedents.

A.

The Board should not have issued *A-R-C-G-* as a precedential opinion because DHS conceded most of the relevant legal questions. Precedential opinions of the Board are binding on immigration judges and guide the resolution of future cases. *See* 8 C.F.R. § 1003.1(d)(1) ("[T]he Board, through precedent decisions, shall provide clear and uniform guidance to the Service, the

immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations."). Yet the parties in *A-R-C-G-* decided significant legal issues on consent, and such concessions should not set precedential rules. Many of the issues that DHS conceded--such as the "existence of [the proposed] particular social group in Guatemala"--effectively stipulated key legal questions.

**17  *334  But "[p]arties may not stipulate to the legal conclusions to be reached by the court." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995)* (internal quotation marks and alterations omitted); *see also Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917)* ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."). The same principle has long applied before the Board. *Matter of A-*, 4 I&N Dec. 378, 384 (BIA 1951); *see also Sagastume v. Holder*, 490 F. App'x 712, 715-16 (6th Cir. 2012)* (holding that immigration judge did not err in denying voluntary departure even though the parties had stipulated that the petitioner would qualify for such relief because "[p]arties cannot stipulate around a statutory requirement"). Given the decision's significant limitations in guiding future decisionmakers, the Board should not have designated *A-R-C-G-* as a precedential decision.

B.

Had the Board properly analyzed the issues, then it would have been clear that the particular social group was not cognizable. The Board's approach in *A-R-C-G-* was contrary to the appropriate way that the Board has in the past, and must in the future, approach such asylum claims. By accepting DHS's concessions as conclusive, the Board in *A-R-C-G-* created a misleading impression concerning the cognizability of similar social groups, and the viability of asylum claims premised upon persecution on account of membership in such groups.

1.

In *A-R-C-G-*, DHS conceded that A-R-C-G- was a member of a "cognizable" social group that was both particular and socially distinct. *Id.* at 392-95. The Board thus avoided considering whether A-R-C-G- could establish the existence of a cognizable particular social group without defining the group by the fact of persecution. *M-E-V-G-*, 26 I&N Dec. at 232; *W-G-R-*, 26 I&N Dec. at 215; *see also Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005); *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1198 (11th Cir. 2006); *Moreno v. Lynch*, 628 Fed. Appx. 862, 865 (4th Cir. 2015).

**18  To be cognizable, a particular social group *must* "exist independently" of the harm asserted in an application for asylum or statutory withholding of removal. *M-E-V-G-*, 26 I&N Dec. at 236 n.11, 243; *335  *W-G-R-*, 26 I&N Dec. at 215; *Perez-Rabanales*, 881 F.3d at 67; *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003). If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja*, 420 F.3d at 556 ("If the group with which Rreshpja is associated is defined noncircularly--i.e., simply as young attractive Albanian women-- then any young Albanian woman who possesses the subjective criterion of being "'attractive' would be eligible for asylum in the United States."). *A-R-C-G-*never considered that "married women in Guatemala who are unable to leave their relationship" was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability "to leave" was created by harm or threatened harm.

In accepting DHS's concession that this proposed particular social group was defined with particularity, the Board limited its analysis to concluding that the terms used to describe the group--"married," "women," and "unable to leave the relationship"-- have commonly accepted definitions within Guatemalan society. *A-R-C-G-*, 26 I&N Dec. at 393. But that misses the point. To say that each term has a commonly understood definition, standing alone, does not establish that these terms have the requisite particularity in identifying a distinct social group as such, or that people who meet all of those criteria constitute a discrete social group. A particular social group must not be "'"'"amorphous, overbroad, diffuse, or subjective," and "not every 'immutable

characteristic' is sufficiently precise to define a particular social group." *M-E-V-G-*, 26 I&N Dec. at 239. The Board's scant analysis did not engage with these requirements or show that A-R-C-G-'s proposed group was "defined by characteristics that provide a clear benchmark for determining who falls within the group." *M-E-V-G-*, 26 I&N Dec. at 239.

Social groups defined by their vulnerability to private criminal activity likely lack the particularity required under *M-E-V-G-*, given that broad swaths of society may be susceptible to victimization. For example, groups comprising persons who are "resistant to gang violence" and susceptible to violence from gang members on that basis "are too diffuse to be recognized as a particular social group." *Constanza v. Holder*, 647 F.3d 749, 754 (8th Cir. 2011); *see also*, *e.g.*, *S-E-G-*, 24 I&N Dec. at 588; *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011); *Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010); *Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010); *Barrios v. Holder*, 581 F.3d 849, 855 (9th Cir. 2009). Victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group.

 **19   *336  Particular social group definitions that seek to avoid particularity issues by defining a narrow class--such as "Guatemalan women who are unable to leave their domestic relationships where they have children in common"--will often lack sufficient social distinction to be cognizable as a distinct social group, rather than a description of individuals sharing certain traits or experiences. *See R-A-*, 22 I&N Dec. at 918 (holding that R-A-failed to show that her claimed social group "is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Guatemala"). A particular social group must avoid, consistent with the evidence, being too broad to have definable boundaries and too narrow to have larger significance in society.

DHS similarly admitted that *A-R-C-G-'s* proposed particular social group was socially distinct by conceding that it was cognizable. *A-R-C-G-*, 26 I&N Dec. at 392. In support of that concession, the Board cited evidence that Guatemala has a "culture of machismo and family violence" and that, although Guatemala has laws in place to prosecute domestic violence crimes, "enforcement can be problematic because the National Civilian Police often failed to respond to requests for assistance related to domestic violence." *Id.* at 394 (quotation marks omitted). [9]  The Board provided no explanation for why it believed that that evidence established that Guatemalan society perceives, considers, or recognizes "married women in Guatemala who are unable to leave their relationship" to be a distinct social group. But the key thread running through the particular social group framework is that social groups must be classes recognizable by society at large. *See W-G-R-*, 26 I&N Dec. at 217 ("To have the 'social distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group."). Membership in a particular tribe or clan within a society is an instructive example: those distinctions often constitute a "particular social group" because that is a "highly recognizable, immutable characteristic" that makes members recognized in society as a group. *In re H-*, 21 I&N Dec. 337, 342-43 (BIA 1996). By contrast, there is significant room for doubt that Guatemalan society views these women, as horrible as their personal circumstances may be, as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances.

*337  2.

 **20  In *A-R-C-G-*, DHS also conceded that the respondent established that she had suffered past persecution. 26 I&N Dec. at 392. It can be especially difficult, however, for victims of private violence to prove persecution because "[p]ersecution is something a *government* does," either directly or indirectly by being unwilling or unable to prevent private misconduct. *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) (emphasis in original). Persecution under the asylum statute "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240.

Board precedents have defined "persecution" as having three specific elements. First, "persecution" involves an intent to target a belief or characteristic. *See Matter of L-E-A-*, 27 I&N Dec. 40, 44 n.2 (BIA 2017) (citing *Acosta*, 19 I&N Dec. at 222). Yet private criminals are motivated more often by greed or vendettas than by an intent to "overcome [the protected] characteristic of the victim." *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996). For example, in *R-A-*, R-A-'s husband targeted her "because

she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." 22 I&N Dec. at 920.

Second, the level of harm must be "severe." *Matter of T-Z-*, 24 I&N Dec. 163, 172-73 (BIA 2007). Private violence may well satisfy this standard, and I do not question that A-R-C-G-'s claims of repugnant abuse by her ex-husband were sufficiently severe.

Third, the harm or suffering must be "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Acosta*, 19 I&N Dec. at 222. The Board declined to address this prong of the analysis, instead remanding to the immigration judge for further proceedings to determine whether the Guatemalan government was unwilling or unable to control A-R-C-G-'s ex-husband.

An applicant seeking to establish persecution based on violent conduct of a private actor "must show more than 'difficulty . . . controlling' private behavior." *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005) (quoting *Matter of McMullen*, 17 I&N Dec. 542, 546 (BIA 1980)). The applicant must show that the government condoned the private actions "or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Hor*, 400 F.3d at 485. The fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States. There may be many reasons why a particular crime is not successfully investigated and **\*338** prosecuted. Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it.

3.

**\*\*21** Finally, DHS conceded the nexus requirement by agreeing that persecution suffered by A-R-C-G- "was, for at least one central reason, on account of her membership in a cognizable particular social group." *A-R-C-G-*, 26 I&N Dec. at 392, 395. This conclusion simply does not follow from the facts of that case or similar cases. Establishing the required nexus between past persecution and membership in a particular social group is a critical step for victims of private crime who seek asylum. *See R-A-*, 22 I&N Dec. at 920-23. Yet the Board did not evaluate the conclusion that A-R-C-G- was persecuted ""'"on account of" her status as a married woman in Guatemala who was unable to leave her relationship.

Normally, an alien seeking asylum bears the burden of establishing a nexus between the alleged persecution and one of the five statutory grounds for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 349 (5th Cir. 2006). "If the ill-treatment was motivated by something other than one of these five circumstances, then the applicant cannot be considered a refugee for purpose of asylum." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). "In analyzing 'particular social group' claims" the Board's decisions "require that the persecution or well-founded fear of persecution be on account of, or, in other words, because of, the alien's membership in that particular social group." *R-A-*, 22 I&N Dec. at 920. The focus in determining whether an alien was persecuted "on account of" her group membership is on "the persecutors' motives"--why the persecutors sought to inflict harm. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Reasons incidental, tangential, or subordinate to the persecutor's motivation will not suffice. *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007).

The nexus requirement is critically important in determining whether an alien established an asylum claim. That requirement is "where the rubber meets the road" because the "importance of the 'on account of' language must not be overlooked." *Cece*, 733 F.3d at 673. "Although the category of protected persons [within a particular group] may be large, the number of those who can demonstrate the required nexus likely is not." *Id.* Indeed, a "safeguard against potentially innumerable asylum claims" may be found "in the stringent statutory requirements for all asylum seekers." *Id.* at 675.

**\*\*22** When private actors inflict violence based on a personal relationship with a victim, then the victim's membership in a larger group may well not be **\*339** "one central reason" for the abuse. [10] *See, e.g., Zoarab*, 524 F.3d at 781 ("Courts have routinely rejected asylum applications grounded in personal disputes."). A criminal gang may target people because they have money or property within the area where the gang operates, or simply because the gang inflicts violence on those who are nearby.

*See, e.g., Constanza*, 647 F.3d at 754. That does not make the gang's victims persons who have been targeted "on account of" their membership in any social group.

Similarly, in domestic violence cases, like *A-R-C-G-*, the Board cited no evidence that her ex-husband attacked her because he was aware of, and hostile to, "married women in Guatemala who are unable to leave their relationship." Rather, he attacked her because of his preexisting personal relationship with the victim. *See R-A-*, 22 I&N Dec. at 921 ("the record does not reflect that [R-A-'s] husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala"). When """"the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

<div align="center">4.</div>

In *A-R-C-G-*, the Board recognized that it had a duty to evaluate "any claim regarding the existence of a particular social group in a country . . . in the context of the evidence presented regarding the particular circumstances in the country in question," 26 I&N Dec. at 392, but it did not adequately observe that duty. Although the immigration judge had previously denied A-R-C-G-'s applications, the Board accepted, with little or no analysis, DHS's concessions to the contrary on nearly every legal issue. By doing so, the Board recognized a new category of asylum claims that did not satisfy the requirements set forth by the Board's precedent.

**\*340**  Future social group cases must be governed by the analysis set forth in this opinion.

<div align="center">V.</div>

Having overruled *A-R-C-G-*, I must vacate the Board's December 2016 decision in this case as well. The Board's cursory analysis of the respondent's social group consisted of a general citation to *A-R-C-G-* and country condition reports. Neither immigration judges nor the Board may avoid the rigorous analysis required in determining asylum claims, especially where victims of private violence claim persecution based on membership in a particular social group. Such claims must be carefully analyzed under the standards articulated in this opinion and in past Board decisions, such as *M-E-V-G-* and *W-G-R-*.

**\*\*23**  An asylum applicant has the burden of showing her eligibility for asylum, 8 C.F.R. § 208.13(a), which includes identifying a cognizable social group and establishing group membership, persecution based on that membership, and that the government was unwilling or unable to protect the respondent. The respondent must present facts that undergird *each* of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of the legal requirements for asylum.

Of course, if an alien's asylum application is fatally flawed in one respect--for example, for failure to show membership in a proposed social group, *see Guzman-Alvarez v. Sessions*, 701 F. App'x 54, 56-57 (2d Cir. 2017)--an immigration judge or the Board need not examine the remaining elements of the asylum claim. *See, e.g., Perez-Rabanale*s, 881 F.3d at 67 ("That ends this aspect of the matter. The petitioner's failure to satisfy both the particularity and the social distinctiveness requirements defeats her attempt to qualify as a refugee through membership in a particular social group.").

Having subjected the Board's decision to plenary review, I also address several additional errors and outline other general requirements relevant to all asylum applications to provide guidance to the Board and immigration judge on remand.

<div align="center">A.</div>

First, the Board erred in finding several of the immigration judge's factual and credibility determinations to be "clearly erroneous."

Under Department regulations, the Board may not engage in fact-finding on appeals (except for taking administrative notice of commonly known facts). 8 C.F.R. § 1003.1(d)(3)(iv). Furthermore, the Board may "not engage **341** in *de novo* review of findings of fact determined by an immigration judge," and the immigration judge's factual findings, "including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." *Id.* § 1003.1(d)(3)(i); *see also Turkson v. Holder*, 667 F.3d 523, 527 (4th Cir. 2012) (noting that "[t]his rule stems from a sensible understanding of the roles and abilities of the two bodies"). Notably, "where credibility determinations are at issue, . . . 'even greater deference' must be afforded to the [immigration judge]'s factual findings." *Rodriguez v. Holder*, 683 F.3d 1164, 1171 (9th Cir. 2012) (quoting *Anderson, v. Bessemer City*, 470 U.S. 564, 575 (1985)). The Board may find an immigration judge's factual findings to be clearly erroneous only if they are "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." *Id.* at 1170 (quoting *Anderson*, 470 U.S. at 577).

**\*\*24** Furthermore, the Board "cannot, under a clear error standard of review, override or disregard evidence in the record" or rely "simply on its own interpretation of the facts." *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012). If the Board disagrees with an immigration judge's factual findings, a "conclusory pronouncement" that the findings were erroneous "does not constitute clear error review." *Id.* While the Board purported to apply the "clear error" standard in this case, I cannot simply "rely on the Board's invocation of the clear error standard." *Rodriguez*, 683 F.3d at 1170. My task is to determine whether the Board "faithfully employed the clear error standard or engaged in improper de novo review" of the immigration judge's factual findings. *Id.*

<div align="center">1.</div>

Here, the Board admitted that the immigration judge identified discrepancies and omissions in the respondent's testimony, but discounted the adverse credibility determination on various grounds including that the supportive affidavits were due greater weight, that the respondent sufficiently explained some discrepancies, and that the discrepancies did not ultimately undermine the respondent's account. In so doing, the Board failed to give adequate deference to the credibility determinations and improperly substituted its own assessment of the evidence.

When an asylum applicant makes inconsistent statements, the immigration judge is uniquely advantaged to determine the applicant's credibility, and the Board may not substitute its own view of the evidence on appeal. *See Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 334 (2d Cir. 2006) ("[W]here the [immigration judge]'s adverse credibility finding is based on specific examples in the record of inconsistent statements by the **342** asylum applicant about matters material to his claim of persecution, or on contradictory or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." (quotation omitted)). Under the REAL ID Act, "[t]here is no presumption of credibility" in favor of an asylum applicant. Pub. L. No. 109-13, div. B, §§ 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). Furthermore, the identified inconsistencies do not have to be related to an applicant's core asylum claim to support an adverse credibility determination: "Considering the totality of circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's or witness's written and oral statements . . ., the internal consistency of each such statement, [and] the consistency of such statements with other evidence of record . . ., *without regard* to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other factor." *Id.* (emphasis added). "'''''"[O]missions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination," and the existence of "only a few" such issues can be sufficient to make an adverse credibility determination as to the applicant's entire testimony regarding past persecution. *Djadjou v. Holder*, 662 F.3d 265, 273-74 (4th Cir. 2011).

<div align="center">2.</div>

**\*\*25** The Board further erred in concluding that the immigration judge's factual findings concerning the respondent's ability to leave her relationship and El Salvador's ability to protect her were clearly erroneous. *A-B-* at \*3. In support of his findings, the

immigration judge cited evidence that the respondent was able to divorce and move away from her ex-husband, and that she was able to obtain from the El Salvadoran government multiple protective orders against him. [11] Although the Board questioned the significance of these facts in light of other evidence, it did not establish that the immigration judge's conclusions were "illogical or implausible," or without support from the record. *See Rodriguez*, 683 F.3d at 1170.

Instead, the Board substituted its view of the evidence for that of the immigration judge, again violating the standard of review applicable to the factual determinations of immigration judges.

**\*343** B.

The Board also erred when it found that the respondent established the required nexus between the harm she suffered and her group membership. Whether a purported persecutor was motivated by an alien's group affiliation "is a classic factual question," *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247-48 (4th Cir. 2017) (internal quotation marks omitted), which the Board may overturn only if "clearly erroneous."

The Board stated that "the record indicates that the ex-husband abused [the respondent] from his position of perceived authority, as her ex-husband and the father of her children." *A-B-* at \*3. From this, the Board held, in a conclusory fashion, that the "record as a whole supports a finding that the respondent's membership in the particular social group of 'El Salvadoran women who are unable to leave their domestic relationship where they have children in common' is at least one central reason that he ex-husband abused her." *Id.* While citing the standard of review, the Board did not apply it in summarily dismissing the immigration judge's findings. Moreover, the Board's legal analysis was deficient. The Board, required to find "clear error" of a factual finding, pointed to no record evidence that respondent's husband mistreated her in any part "on account of" her membership in the particular social group of "'''''El Salvadoran women who are unable to leave their domestic relationship where they have children in common" The Board cited no evidence that her husband knew any such social group existed, or that he persecuted wife for reasons unrelated to their relationship. There was simply no basis in the Board's summary reasoning for overturning the immigration judge's factual findings, much less finding them clearly erroneous.

C.

**\*\*26** The Board also erred when it overruled the immigration judge's finding that the respondent failed to demonstrate that the government of El Salvador was unable or unwilling to protect her from her ex-husband. This inquiry too involved factual findings to which the Board did not give proper deference. No country provides its citizens with complete security from private criminal activity, and perfect protection is not required. In this case, the respondent not only reached out to police, but received various restraining orders and had him arrested on at least one occasion. *See A-B-* at \*14-15 (Immig. Ct. Dec. 1, 2015).

For many reasons, domestic violence is a particularly difficult crime to prevent and prosecute, even in the United States, which dedicates significant **\*344** resources to combating domestic violence. *See, e.g.*, Office of Justice Programs, U.S. Dep't of Justice, Extent, Nature, and Consequences of Intimate Partner Violence (2000). The persistence of domestic violence in El Salvador, however, does not establish that El Salvador was unable or unwilling to protect A-B- from her husband, any more than the persistence of domestic violence in the United States means that our government is unwilling or unable to protect victims of domestic violence. In short, the Board erred in finding, contrary to the record and the immigration judge's findings, that El Salvador was unable or unwilling to protect A-B- and that she thus had no choice but to flee the country.

D.

The Board, immigration judges, and all asylum officers should consider the following points when evaluating an application for asylum. First, an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group. *See Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190-91 (BIA 2018); *Matter of A-T-*, 25 I&N Dec. 4, 10 (BIA 2009). The

immigration judge has a responsibility to "ensure that the specific social group being analyzed is included in his or her decision," as it critical to the Board's "appellate review that the proposed social group is clear and that the record is fully developed." *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. at 191. The Board must also remember that it cannot sustain an asylum applicant's appeal based on a newly articulated social group not presented before or analyzed by the immigration judge. *Id.* at 192; *see also, e.g., Baltti v. Sessions*, 878 F.3d 240, 244-45 (8th Cir. 2017) (finding no jurisdiction to review a newly defined social group because the claim based on "membership in that narrowed social group" had not been raised below); *Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014) (declining to address a particular social group raised for the first time on appeal).

**\*\*27** Furthermore, the Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum. Asylum applicants who have "not established past persecution . . . bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or government-sponsored." 8 C.F.R. § 1208.13(b)(3)(i). An immigration judge, "in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution" if it is "found by a preponderance of the evidence" that "the applicant could avoid future **\*345** persecution by relocating to another part of the applicant's country of nationality, . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(1)(i). Beyond the standards that victims of private violence must meet in proving refugee status in the first instance, they face the additional challenge of showing that internal relocation is not an option (or in answering DHS's evidence that relocation is possible). When the applicant has suffered personal harm at the hands of only a few specific individuals, internal relocation would seem more reasonable than if the applicant were persecuted, broadly, by her country's government.

Finally, there are alternative proper and legal channels for seeking admission to the United States other than entering the country illegally and applying for asylum in a removal proceeding. The asylum statute "is but one provision in a larger web of immigration laws designed to address individuals in many different circumstances," and "[t]o expand that statute beyond its obviously intended focus is to distort the entire immigration framework." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). Aliens seeking a better life in America are welcome to take advantage of existing channels to obtain legal status before entering the country. In this case, A-B- entered the country illegally, and when initially apprehended by Border Patrol agents, she stated that her reason for entering the country was "to find work and reside" in the United States. Aliens seeking an improved quality of life should seek legal work authorization and residency status, instead of illegally entering the United States and claiming asylum. [12]

VI.

**\*346** In reaching these conclusions, I do not minimize the vile abuse that the respondent reported she suffered at the hands of her ex-husband or the harrowing experiences of many other victims of domestic violence around the world. I understand that many victims of domestic violence may seek to flee from their home countries to extricate themselves from a dire situation or to give themselves the opportunity for a better life. But the "asylum statute is not a general hardship statute." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). As Judge Wilkinson correctly recognized, the Board's recent treatment of the term "particular social group" is "at risk of lacking rigor." *Id.* at 198. Nothing in the text of the INA supports the suggestion that Congress intended "membership in a particular social group" to be "some omnibus catch-all" for solving every "heart-rending situation." *Id.*

**\*\*28** I therefore overrule *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) and all other opinions inconsistent with the analysis in this opinion, vacate the Board's decision, and remand to the immigration judge for further proceedings consistent with this opinion.

## Footnotes

1    Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (requiring a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title [8 U.S.C. § 1158]").

2    As explained in my order of March 30, *Matter of A-B-*, 27 I&N Dec. 247, 248-49 (A.G. 2018), the immigration judge's *sua sponte* order purporting to certify the matter back to the Board was procedurally defective because the immigration judge had not issued any decision for the Board to review. Neither the immigration judge nor the Board has taken any other actions in this matter since the Board issued its December 2016 decision.

3    The only alleged "irregularity" cited by respondent is the notion that "[g]iven that Respondent's case was not under active consideration by Judge Couch or the Board at the time of the Attorney General's referral order, it is not clear how the Attorney General became aware of Respondent's case." Respondent's Opening Br. at 18 n.5. The Attorney General has the express authority under the INA to review "administrative determinations in immigration proceedings." 8 U.S.C. § 1103(g)(2). The suggestion that there is something "'"'"'irregular" about my exercise of that authority is meritless.

4    The respondent in this case also applied for withholding of removal under 8 U.S.C § 1231(b)(3) and for protection under the United Nations Convention Against Torture ("CAT"), *see* 8 C.F.R. § 1208.16(c). Because the Board sustained the respondent's appeal as to her asylum claim, the Board did not address the immigration judge's denial of her applications for withholding of removal or for CAT protection. *See A-B-* at *4 (BIA). My opinion addresses only respondent's asylum claim. On remand, the immigration judge may consider any other issues remaining in the case.

5    One of Congress's primary purposes in passing the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, was to implement the principles agreed to in the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968), as well as the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954)). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987). The Protocol offers little insight into the definition of "particular social group," which was added to the Protocol "as an afterthought." *Acosta*, 19 I&N Dec. at 232.

6    *See*, e.g., *Reyes v. Lynch*, 842 F.3d 1125, 1135 (9th Cir. 2016); *Gonzalez*, 820 F.3d at 404; *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498 (6th Cir. 2015); *Cantarero v. Holder*, 734 F.3d 82, 85 (1st Cir. 2013); *Cece v. Holder*, 733 F.3d 662, 668-69 (7th Cir. 2013) (en banc); *Orellana-Monson v. Holder*, 685 F.3d 511, 520 (5th Cir. 2012); *Lizama v. Holder*, 629 F.3d 440, 446 (4th Cir. 2011); *Ngengwe v. Mukasey*, 543 F.3d 1029, 1033 (8th Cir. 2008); *Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 72 (2d Cir. 2007); *Fatin*, 12 F.3d at 1238-39 (3d Cir. 1993).

7    Other appellate courts have resisted attempts to expand *A-R-C-G-*'s reach. *See*, e.g., *Menjivar-Sibrian v. U.S. Att'y Gen.*, ___ F. App'x. ___, 2018 WL 1415126, at *1 (11th Cir. Mar. 22, 2018) ("women abused by her partner she cannot control" is not a cognizable social group where defining attribute of proposed group is having suffered persecution); *Solorzano-De Maldonado v. Sessions*, ___ F. App'x ___, 2018 WL 1192988, at *1 (5th Cir. Mar. 7, 2018) ("single women living alone targeted by gangs for sexual abuse" does not constitute a socially distinct group in Salvadoran society); *Perez-Rabanales v. Sessions*, 881 F.3d 61, 66 (1st Cir. 2018) (finding that purported social group of "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection" lacked particularity and social distinction); *Vega-Ayala*, 833 F.3d at 39 ("Being in an intimate relationship with a partner who views you as property is not an immutable characteristic.").

8    In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board similarly used key concessions by DHS to recognize a particular social group that might not have withstood the rigorous legal analysis required by Board precedent. The respondent and DHS "agree[d] that the immediate family unit of the respondent's father qualifies as a particular social group" and "that if family membership is a central reason for persecuting an asylum applicant, nexus may be established." *Id.* at 42. There is reason to doubt that a nuclear family can comprise a particular social group under the statute. *See, e.g.*, *Thomas v. Gonzales*, 409 F.3d 1177, 1192 (9th Cir.) (en banc) (Rymer, J., dissenting), *rev'd*, 547 U.S. 183 (2005). Although the validity of the particular social group analysis in *Matter of L-E-A-* is beyond the scope of this opinion, the case reflects another instance where the Board purported to decide significant legal questions based upon concessions by the parties, rather than the appropriate legal analysis.

9    On this point, I note that conclusory assertions of countrywide negative cultural stereotypes, such as *A-R-C-G-*'s broad charge that Guatemala has a "culture of machismo and family violence" based on an unsourced partial quotation from a news article eight years earlier, neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations.

10   Even if mistreatment is suffered at the hands of a government official, there is no nexus between the purported persecution and one of the grounds for asylum if the dispute is a "purely personal matter." *Matter of Y-G-*, 20 I&N Dec. 794, 799 (BIA 1994); *see also, e.g.*, *Marquez v. INS*, 105 F.3d 374, 380-81 (7th Cir. 1997) (concluding that a commercial dispute with a Philippine military officer was "apolitical"); *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997) (holding that a dispute with a Bulgarian secret service agent over employment was "personal, not political"). The Board has recognized this principle for decades, including in cases involving threats of domestic violence. *See Matter of Pierre*, 15 I&N Dec. 461, 463 (BIA 1975) (holding that a husband's threats against his wife were "strictly personal," even though he was a Haitian government official, and, thus, she did not establish persecution).

11   The immigration judge's findings that the respondent was able to leave her relationship on the basis of her divorce and her ability to move from the home she shared with her ex-husband, and that she was able to obtain some measure of government protection, are supported by case law considering other particular social group claims. *See, e.g.*, *Menjivar-Sibrian*, 2018 WL 1415126, at *1; *Vega-Ayala*, 833 F.3d at 39.

12   Asylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that she also merits asylum as a matter of discretion. 8 U.S.C. §§ 1158(b)(1), 1229a(c)(4)(A)(ii); *see also Romulus v. Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004). Neither the immigration judge nor the Board addressed the issue of discretion regarding the respondent's asylum application, and I decline to do so in the first instance. Nevertheless, I remind all asylum adjudicators that a favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA. Relevant discretionary factors include, *inter alia*, the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether she made any attempts to seek asylum before coming to the United States; the length of time the alien remained in a third country; and her living conditions, safety, and potential for long-term residency there. *See Matter of Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987).

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.


An official website of the United States government
Here's how you know

U.S. Customs and
Border Protection

MENU

Home » Newsroom » Stats and Summaries » Southwest Border Migration FY 2020

Newsroom

Accountability and Transparency

Legal Notices

Advisories

Media Releases

Photo Gallery

Video Gallery

Press Officers

Publications

Social Media Directory

Speeches/Statements

Spotlights

Stats and Summaries

On a Typical Day

CBP Enforcement Statistics

Southwest Land Border Encounters

Nationwide Encounters

Trade Statistics

Travel Statistics

Web Performance Metrics

CBP Public Data Portal

COVID-19

**Newsroom**

# Southwest Border Migration FY 2020



## U.S. Border Patrol Southwest Border Encounters[1] FY 2020

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | Unaccompanied Alien Child | 2,841 | 3,308 | 3,223 | 2,680 | 3,070 | 2,974 | 712 | 966 | 1,603 | 2,426 | 2,998 | 3,75 |
| | Family Units* | 9,721 | 9,006 | 8,595 | 5,161 | 4,610 | 3,455 | 716 | 979 | 1,581 | 1,989 | 2,609 | 3,80 |
| | Single Adult | 22,840 | 21,210 | 21,035 | 21,364 | 22,397 | 23,960 | 14,754 | 19,648 | 27,652 | 34,121 | 41,676 | 47,2 |
| **Southwest Border Total Apprehensions** | | 35,402 | 33,524 | 32,853 | 29,205 | 30,077 | 30,389 | 16,182 | 21,593 | 30,836 | 38,536 | 47,283 | 54,7 |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol.

**In Fiscal Year (FY) 2020, during the month of September, a total of 54,771 individuals were apprehended between ports of entry on our Southwest Border, compared to 47,283 in August and 38,536 in July.** In FY19, a total of 851,508 individuals were apprehended between ports of entry on our Southwest Border.

[1] Beginning in March FY20, USBP Encounters statistics include both Title 8 Apprehensions and Title 42 Expulsions. To learn more, visit: **Title-8-and-Title-42-Statistics**

For breakdown by Sector, visit **USBP Southwest Border Apprehensions by Sector**

## Office of Field Operations Southwest Border Encounters[1] FY 2020

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | Unaccompanied Alien Child | 360 | 369 | 416 | 396 | 420 | 247 | 29 | 42 | 88 | 83 | 105 | 127 | **2,682** |
| | Family Units* | 3,998 | 4,138 | 3,458 | 3,037 | 2,507 | 1,180 | 22 | 73 | 98 | 61 | 106 | 86 | **18,764** |
| | Single Adults | 5,277 | 4,559 | 3,777 | 3,914 | 3,645 | 2,604 | 855 | 1,499 | 1,971 | 2,181 | 2,419 | 2,603 | **35,304** |
| | Accompanied Minor Child** | 102 | 53 | 61 | 33 | 38 | 40 | 18 | 30 | 56 | 68 | 101 | 87 | **687** |
| **Southwest Border Total Inadmissibles** | | 9,737 | 9,119 | 7,712 | 7,380 | 6,610 | 4,071 | 924 | 1,644 | 2,213 | 2,393 | 2,731 | 2,903 | **57,437** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.

**Accompanied Minor Child represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful

**In Fiscal Year (FY) 2020, during the month of September, a total of 2,903 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible compared to 2,731 in August and 2,393 in July.** In FY 2019, 126,001 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible.

[1] Beginning in March FY20, OFO Encounters statistics include both Title 8 Inadmissibles and Title 42 Expulsions. To learn more, visit: **Title-8-and-Title-42-Statistics**

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

For breakdown by Field Office, visit **Southwest Border Inadmissibles by Field Office**

**AR02734**

Permanent Resident, or admissible alien, and the child is determined to be inadmissible.

**Tags:** Statistics

**Last Modified: November 19, 2020**

Click 'Share This Page' button to display social media links.


⏎  **Share This Page.**

## Related Content

**Claims of Fear**

## Previous Year Statistics

**Southwest Border Migration FY 2019**

**Southwest Border Migration FY2018**

**Southwest Border Migration FY2017**

Return to top

Travel      Trade      Border Security      Newsroom      About CBP      Careers      Employee Resources



Contact CBP



CBP.gov
**An official website of the U.S. Department of Homeland Security**

Accessibility

Accountability

DHS Components

FOIA

Forms

Inspector General

No FEAR Act

Privacy

Site Policies

The White House

USA.gov

# National Terrorism Advisory System

**AR02735**

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 77 of 1021   PageID 6947

 An official website of the United States government

Here's how you know

U.S. Customs and
Border Protection

MENU

**Home** »   **Newsroom** »   **Stats and Summaries** »   Southwest Border Migration FY 2019

Newsroom

Accountability and Transparency

Legal Notices

Advisories

Media Releases

Photo Gallery

Video Gallery

Press Officers

Publications

Social Media Directory

Speeches/Statements

Spotlights

Stats and Summaries

On a Typical Day

CBP Enforcement Statistics

Southwest Land Border Encounters

Nationwide Encounters

Trade Statistics

Travel Statistics

Web Performance Metrics

CBP Public Data Portal

COVID-19

**Newsroom**

# Southwest Border Migration FY 2019

AR02736

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 78 of 1021   PageID 6948



**CBP Southwest Border Total Apprehensions / Inadmissibles**

|   | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY19 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |
| FY18 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |
| FY17 | 66,842 | 63,218 | 58,379 | 42,359 | 23,557 | 16,954 | 15,798 | 19,966 | 21,673 | 25,069 | 30,582 | 31,280 | 415,517 |
| FY16 | 45,516 | 45,755 | 48,742 | 33,657 | 38,311 | 46,118 | 46,115 | 55,386 | 45,570 | 44,869 | 46,909 | 51,893 | 553,378 |
| FY15 | 35,903 | 33,032 | 34,243 | 30,180 | 32,550 | 39,162 | 38,296 | 40,683 | 38,619 | 38,611 | 42,415 | 41,165 | 444,859 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 | 569,237 |

**U.S. Border Patrol Southwest Border Apprehensions FY 2019**

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | Unaccompanied Alien Child | 4,964 | 5,257 | 4,753 | 5,105 | 6,817 | 8,956 | 8,880 | 11,475 | 7,372 | 5,554 | 3,722 | 3, |
|  | Family Units* | 23,116 | 25,164 | 27,507 | 24,188 | 36,530 | 53,204 | 58,713 | 84,486 | 57,358 | 42,543 | 25,049 | 15, |
|  | Single Adult | 22,925 | 21,436 | 18,491 | 18,686 | 23,536 | 30,673 | 31,680 | 36,895 | 30,172 | 23,881 | 21,913 | 21, |
| **Southwest Border Total Apprehensions** |  | **51,005** | **51,857** | **50,751** | **47,979** | **66,883** | **92,833** | **99,273** | **132,856** | **94,902** | **71,978** | **50,684** | **40,** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol.

In Fiscal Year (FY) 2019, a total of 851,508 individuals were apprehended between ports of entry on our Southwest Border. In FY18, a total of 396,579 individuals were apprehended between ports of entry on our Southwest Border.

For breakdown by Sector, visit **USBP Southwest Border Apprehensions by Sector**

## Office of Field Operations Southwest Border Inadmissibles FY 2019

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Southwest Border** | Unaccompanied Alien Child | 454 | 405 | 351 | 410 | 426 | 424 | 385 | 386 | 306 | 292 | 397 | 378 |
|  | Family Units* | 4,178 | 4,989 | 4,390 | 4,229 | 4,210 | 4,215 | 3,600 | 4,101 | 3,604 | 4,248 | 5,480 | 6,186 |
|  | Single Adults | 5,058 | 5,148 | 5,221 | 5,629 | 4,950 | 6,168 | 6,065 | 6,703 | 5,431 | 5,172 | 6,060 | 5,401 |
|  | Accompanied Minor Child** | 86 | 70 | 81 | 70 | 76 | 91 | 92 | 70 | 68 | 87 | 86 | 74 |
| **Southwest Border Total Inadmissibles** |  | **9,776** | **10,612** | **10,043** | **10,338** | **9,662** | **10,898** | **10,142** | **11,260** | **9,409** | **9,799** | **12,023** | **12,039** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.

**Accompanied Minor Child represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful Permanent Resident, or admissible alien, and the child is determined to be inadmissible.

In Fiscal Year (FY) 2019, 126,001 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible. In FY18, 124,511 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

For breakdown by Field Office, visit **Southwest Border Inadmissibles by Field Office**.

**Last Modified: November 14, 2019**

Click 'Share This Page' button to display social media links.

**AR02737**

 Share This Page.

**Related Content:**
**Claims of Fear**

**Previous Year Statistics:**
**Southwest Border Migration FY2018**

**Southwest Border Migration FY2017**

Return to top

**Travel**      **Trade**      **Border Security**      **Newsroom**      **About CBP**      **Careers**      **Employee Resources**



Contact CBP



CBP.gov
**An official website of the U.S. Department of Homeland Security**

    Accessibility

    Accountability

    DHS Components

    FOIA

    Forms

    Inspector General

    No FEAR Act

    Privacy

    Site Policies

    The White House

    USA.gov

# National Terrorism Advisory System

AR02738

An official website of the United States government
Here's how you know


U.S. Customs and
Border Protection

MENU

Home » Newsroom » Stats and Summaries » Southwest Border Migration FY2018

Newsroom

Accountability and Transparency

Legal Notices

Advisories

Media Releases

Photo Gallery

Video Gallery

Press Officers

Publications

Social Media Directory

Speeches/Statements

Spotlights

Stats and Summaries

On a Typical Day

CBP Enforcement Statistics

Southwest Land Border Encounters

Nationwide Encounters

Trade Statistics

Travel Statistics

Web Performance Metrics

CBP Public Data Portal

COVID-19

Newsroom

# Southwest Border Migration FY2018

AR02739



CBP Southwest Border Total Apprehensions / Inadmissibles

|      | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| FY18 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |
| FY17 | 66,842 | 63,218 | 58,879 | 42,359 | 23,557 | 16,794 | 15,798 | 19,966 | 21,673 | 25,069 | 30,582 | 31,280 | 415,517 |
| FY16 | 45,516 | 45,755 | 48,742 | 33,657 | 38,311 | 46,118 | 48,511 | 55,386 | 45,671 | 46,909 | 46,909 | 51,893 | 553,378 |
| FY15 | 35,903 | 33,032 | 34,243 | 30,180 | 32,510 | 39,162 | 38,296 | 40,683 | 38,619 | 38,611 | 42,415 | 41,165 | 444,859 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 | 569,237 |
| FY13 | 34,836 | 33,153 | 29,075 | 32,481 | 40,632 | 54,009 | 54,761 | 50,481 | 40,785 | 39,993 | 41,110 | 38,182 | 489,498 |

## U.S. Border Patrol Apprehensions FY2018

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Southwest Border | UAC | 3,155 | 3,972 | 4,061 | 3,202 | 3,111 | 4,140 | 4,284 | 6,367 | 5,080 | 3,911 | 4,393 | 4,360 | 50,036 |
| | Family Units | 4,836 | 7,016 | 8,120 | 5,653 | 5,475 | 8,875 | 9,646 | 9,485 | 9,435 | 9,253 | 12,760 | 16,658 | 107,212 |
| Southwest Border Total Apprehensions | | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.)

In Fiscal Year (FY) 2018, a total of 396,579 individuals were apprehended between ports of entry on our Southwest Border. In FY 2017, USBP apprehended 303,916 individuals along our Southwest Border.

For breakdown by Sector, visit **USBP Southwest Border Apprehensions by Sector**

## Office of Field Operations Inadmissibles FY2018

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|------------------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Southwest Border | UAC | 653 | 726 | 934 | 720 | 648 | 1,104 | 1,047 | 825 | 526 | 495 | 487 | 459 | 8,624 |
| | Family Units | 3,631 | 4,269 | 5,423 | 4,107 | 4,504 | 5,867 | 6,302 | 5,323 | 3,639 | 3,651 | 3,723 | 3,462 | 53,901 |
| Southwest Border Total Inadmissibles | | 9,383 | 9,966 | 11,524 | 9,930 | 10,085 | 12,957 | 12,925 | 11,523 | 9,091 | 8,850 | 9,195 | 9,082 | 124,511 |

**\*Note:** (Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.)

In FY 2018, 124,511 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible. In FY 2017 111,601 individuals were deemed inadmissible.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws; and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

For breakdown by Field Office, visit **Southwest Border Inadmissibles by Field Office**.

Tags: **Statistics**, **Unaccompanied Children (UC)**

**Last Modified: November 9, 2018**

Click 'Share This Page' button to display social media links.


Share This Page.

**AR02740**

**Travel      Trade      Border Security      Newsroom      About CBP      Careers      Employee Resources**



**Contact CBP**



CBP.gov
An official website of the **U.S. Department of Homeland Security**

**National Terrorism Advisory System**

Accessibility

Accountability

DHS Components

FOIA

Forms

Inspector General

No FEAR Act

Privacy

Site Policies

The White House

USA.gov

**AR02741**



# CBP Enforcement Statistics Fiscal Year 2020

U.S. Customs and Border Protection is the nation's largest federal law enforcement agency charged with securing the nation's borders and facilitating international travel and trade. Our top priority is to keep terrorists and their weapons from entering the United States.

At the nation's more than 300 ports of entry, CBP officers have a complex mission with broad law enforcement authorities tied to screening all foreign visitors, returning American citizens and imported cargo that enters the U.S. Along the nation's borders, the United States Border Patrol and Air and Marine Operations are the uniformed law enforcement arms of CBP responsible for securing U.S. borders between ports of entry.

The following is a summary of CBP enforcement actions related to inadmissibles, apprehensions, arrests of individuals with criminal convictions and individuals who have been apprehended multiple times crossing the border illegally.

Visit CBP's Southwest Border Migration page for demographic information regarding apprehensions and inadmissibles on the southwest border and the Use of Force page for use-of-force statistics and case summaries.

## Total CBP Enforcement Actions

Numbers below reflect Fiscal Year (FY) 2017 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

| | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|
| **Office of Field Operations (OFO)** | | | | |
| **Total Encounters[1]** | 216,370 | 281,881 | 288,523 | 241,786 |
| **U.S. Border Patrol** | | | | |
| **Total Encounters[2]** | 310,531 | 404,142 | 859,501 | 405,036 |
| **Total Enforcement Actions** | **526,901** | **683,178** | **1,148,024** | **646,822** |

[1] Beginning in March FY20,  OFO Encounters statistics include both Title 8  Inadmissibles and Title 42 Expulsions. To learn more, visit: Title-8-and-Title-42-Statistics

Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

**AR02742**

[2] Beginning in March FY20,  USBP Encounters statistics include both Title 8  Apprehensions and Title 42 Expulsions. To learn more, visit: Title-8-and-Title-42-Statistics

Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

# Search and Rescue Efforts[3]

Numbers below reflect Fiscal Year 2019 and Fiscal Year 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|  | **FY19** | **FY20** |
|---|---|---|
| **U.S. Border Patrol - Southwest Border Only** | 4,920 | 5,071 |

|  | **FY19** | **FY20** |
|---|---|---|
| **Air and Marine Operations - Nationwide** | 377 | 184 |

[3]CBP agents frequently conduct life-saving efforts, while carrying out their respective missions.

Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement

**Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement**

Numbers below reflect FY 2017 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|  | **FY17** | **FY18** | **FY19** | **FY20** |
|---|---|---|---|---|
| **Office of Field Operations** |  |  |  |  |
| **Criminal Aliens[3] Encountered** | 10,596 | 11,623 | 12,705 | 7,009 |
| **NCIC[4] Arrests** | 7,656 | 5,929 | 8,546 | 7,108 |
| **U.S. Border Patrol** |  |  |  |  |
| **Criminal Aliens[3] Encountered** | 8,531 | 6,698 | 4,269 | 2,438 |
| **Criminal Aliens with Outstanding Wants or Warrants** | 2,675 | 1,550 | 4,153 | 2,054 |

[3]Criminal Aliens refers to aliens who have been convicted of crime, whether in the United States or abroad, so long as the conviction is for conduct which is deemed criminal by the United States. Criminal aliens encountered at ports of entry are inadmissible, absent extenuating circumstances, and represent a subset of total OFO inadmissibles. U.S. Border Patrol arrests of criminal aliens are a subset of total apprehensions. **See U.S. Border Patrol Criminal Alien Statistics for a breakdown of criminal alien stats by type of conviction.**

[4]NCIC (National Crime Information Center) arrests refers to the number of CBP arrests of individuals, including U.S. citizens, who are wanted by other law enforcement agencies.

**AR02743**

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 85 of 1021   PageID 6955

Currency Seizures

## Office of Field Operations Nationwide Currency Seizures

Numbers below reflect FY 2015 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|  | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|---|
| Amount (USD) | $75,964,824 | $62,101,328 | $65,002,856 | $63,691,464 | $68,879,080 | $93,302,645 |

## Nationwide Monthly Office of Field Operations Currency Seizures

Numbers below reflect FY 2018 - FY19 and FY20 To Date (TD).

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|  | FY18 | FY19 | FY20 |
|---|---|---|---|
| October | $6,198,201 | $4,190,389 | $4,782,909 |
| November | $4,303,600 | $4,360,441 | $5,426,672 |
| December | $4,907,494 | $4,415,486 | $7,143,022 |
| January | $5,194,829 | $7,836,948 | $4,209,230 |
| February | $4,604,973 | $5,574,578 | $4,058,508 |
| March | $4,894,285 | $5,581,107 | $5,615,991 |
| April | $13,424,674 | $13,733,814 | $8,097,239 |
| May | $4,024,325 | $4,739,178 | $3,920,587 |
| June | $3,168,422 | $4,607,755 | $3,248,196 |
| July | $4,503,412 | $4,439,385 | $6,195,526 |
| August | $4,249,027 | $5,442,547 | $36,355,753 |
| September | $4,218,223 | $3,957,451 | $7,372,288 |
| **Total** | **$63,691,464** | **$68,879,080** | **$96,425,920** |

## U.S. Border Patrol Nationwide Currency Seizures

Numbers below reflect FY 2015 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|  | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|---|
| Amount (USD) | $4,741,288 | $7,924,537 | $5,869,004 | $7,176,142 | $6,805,695 | $8,933,512 |

## Monthly U.S. Border Patrol Nationwide Checkpoint Currency Seizures

**AR02744**

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 86 of 1021   PageID 6956

Numbers below reflect FY 2018 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|           | FY18       | FY19      | FY20 TD    |
|-----------|-----------|-----------|-----------|
| October   | $35,829   | $49,247   | $33,558   |
| November  | $26,285   | $51,269   | $114,297  |
| December  | $2,822    | $63,697   | $156,961  |
| January   | $203,213  | $59,857   | $52,649   |
| February  | $117,933  | $103,982  | $84,475   |
| March     | $157,669  | $110,924  | $36,301   |
| April     | $17,913   | $15,016   | $49,559   |
| May       | $256,033  | $129,766  | $691,640  |
| June      | $31,494   | $119,732  | $511,781  |
| July      | $14,339   | $86,696   | $159,504  |
| August    | $169,592  | $141,475  | $275,751  |
| September | $80,358   | $33,487   | $124,274  |
| **Total** | **$1,113,480** | **$965,148** | $2,290,750 |

[ Drug Seizures ]

## Office of Field Operations Nationwide Drug Seizures

Numbers below reflect FY 2014 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

|                  | FY 14   | FY 15   | FY 16   | FY 17   | FY 18   | FY 19    | FY20     |
|------------------|---------|---------|---------|---------|---------|----------|----------|
| Cocaine          | 45,323  | 38,346  | 52,838  | 62,415  | 51,592  | 89,485   | 42,645   |
| Heroin           | 4,356   | 6,023   | 4,224   | 3,398   | 5,205   | 5,417    | 5,222    |
| Marijuana        | 438,146 | 602,821 | 516,122 | 366,627 | 299.419 | 289,517  | 324,973  |
| Methamphetamine[5] | 19,613 | 25,495  | 33,086  | 46,247  | 57,440  | 127,497  | 156,901  |
| Fentanyl         | n/a     | 70      | 596     | 1,875   | 1,895   | 2,575    | 3,967    |

*weights are in pounds (lb)

[5]As of 01 October 2019, category includes both Methamphetamine and Crystal Methamphetamine.

## Monthly Office of Field Operations Nationwide Drug Seizures

AR02745

Numbers below reflect FY20.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

| Monthly | Marijuana | Cocaine | Heroin | Methamphetamine[5] | Fentanyl | Other |
|---|---|---|---|---|---|---|
| October | 17,037 | 6,249 | 422 | 13,618 | 248 | 5,013 |
| November | 37,943 | 2,682 | 526 | 10,665 | 189 | 6,714 |
| December | 31,129 | 3,610 | 383 | 16,658 | 103 | 8,691 |
| January | 18,912 | 1,562 | 241 | 9,169 | 94 | 7,283 |
| February | 8,790 | 5,754 | 361 | 12,542 | 228 | 9,790 |
| March | 23,075 | 1,252 | 307 | 8,907 | 216 | 85,543 |
| April | 17,221 | 1,248 | 306 | 7,816 | 239 | 5,438 |
| May | 32,475 | 2,601 | 350 | 13,497 | 220 | 8,215 |
| June | 69,926 | 4,368 | 517 | 11,051 | 604 | 11,992 |
| July | 16,288 | 4,417 | 636 | 14,289 | 712 | 15,710 |
| August | 41,096 | 3,642 | 598 | 23,590 | 453 | 22,184 |
| September | 11,080 | 5,261 | 575 | 15,097 | 662 | 42,911 |

*weights are in pounds (lb)

[5]As of 01 October 2019, category includes both Methamphetamine and Crystal Methamphetamine.

## U.S. Border Patrol Nationwide Drug Seizures

Numbers below reflect FY 2014 - FY 2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY20 |
|---|---|---|---|---|---|---|---|
| Cocaine | 4,554 | 11,220 | 5,473 | 9,346 | 6,550 | 11,682 | 15,360 |
| Heroin | 606 | 518 | 566 | 953 | 568 | 808 | 546 |
| Marijuana | 1,922,545 | 1,538,307 | 1,294,052 | 861,231 | 461,030 | 266,882 | 257,440 |
| Methamphetamine | 3,930 | 6,443 | 8,224 | 10,328 | 11,314 | 14,434 | 20,795 |
| Fentanyl | n/a | n/a | 105 | 181 | 388 | 226 | 809 |

*weights are in pounds (lb)

## Monthly U.S. Border Patrol Nationwide Checkpoint Drug Seizures

Numbers below reflect FY2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

AR02746

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 88 of 1021 PageID 6958

| | Marijuana | Cocaine | Heroin | Methamphetamine | Fentanyl | Other |
|---|---|---|---|---|---|---|
| October | 2,431 | 462 | 22 | 2,313 | 35 | 109 |
| November | 3,662 | 311 | 69 | 493 | 36 | 100 |
| December | 3,066 | 177 | 21 | 383 | 6 | 2 |
| January | 925 | 126 | 87 | 963 | 9 | 63 |
| February | 3,351 | 156 | 11 | 815 | 14 | 2 |
| March | 2,323 | 229 | 9 | 367 | 35 | 9 |
| April | 2,057 | 119 | 3 | 756 | 32 | 264 |
| May | 2,785 | 193 | 10 | 759 | 18 | 20 |
| June | 1,172 | 380 | 27 | 655 | 61 | 12 |
| July | 4,997 | 172 | 20 | 876 | 35 | 16 |
| August | 1,808 | 313 | 33 | 2,438 | 22 | 16 |
| September | 2,251 | 291 | 45 | 1,197 | 102 | 51 |

*weights are in pounds (lb)

**See Air and Marine Operations Statistics Fiscal Year 2020 for a breakdown of enforcement actions with non-CBP agencies.**

Gang Affiliated Enforcement

## U.S. Border Patrol Nationwide Apprehensions by Gang Affiliation

Numbers below reflect FY 2015 - FY2020.

*Fiscal Year 2020 runs October 01, 2019 - September 30, 2020.*

| Gang Affiliation | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|---|
| 107th St | 0 | 0 | 0 | 1 | 0 | 0 |
| 18th Street | 84 | 47 | 61 | 145 | 168 | 36 |
| Angelino Heights Sureno 13 | 0 | 0 | 1 | 0 | 0 | 0 |
| Bandidos | 0 | 4 | 0 | 0 | 0 | 0 |
| Barrio Azteca | 6 | 0 | 3 | 4 | 0 | 1 |
| Barrio Van Nuys | 0 | 0 | 0 | 0 | 1 | 0 |
| Border Brothers | 0 | 0 | 0 | 1 | 1 | 0 |
| Brown Pride | 0 | 0 | 0 | 0 | 0 | 0 |
| Chirizos | 0 | 0 | 0 | 1 | 0 | 0 |

**AR02747**

| | | | | | | |
|---|---|---|---|---|---|---|
| Folk Nation | 0 | 1 | 0 | 0 | 0 | 0 |
| Hard Times 13 | 0 | 1 | 0 | 0 | 0 | 0 |
| Hells Angels | 0 | 0 | 0 | 0 | 1 | 0 |
| Hermanos Pistoleros Latinos (HPL) | 2 | 18 | 3 | 2 | 2 | 2 |
| Latin Kings | 16 | 0 | 6 | 7 | 24 | 4 |
| Locos Surenos Trece | 0 | 1 | 0 | 1 | 0 | 0 |
| Los Traviosos | 0 | 0 | 0 | 0 | 1 | 0 |
| Los Zetas | 0 | 1 | 0 | 0 | 0 | 0 |
| MS-13 | 335 | 253 | 228 | 413 | 464 | 72 |
| Mara 18 | 0 | 0 | 0 | 1 | 2 | 1 |
| Mara-R | 0 | 0 | 1 | 1 | 0 | 0 |
| Maravilla Salva Trucha | 0 | 1 | 0 | 2 | 0 | 1 |
| Market Street | 0 | 0 | 0 | 0 | 1 | 0 |
| Mexican Mafia | 4 | 6 | 4 | 3 | 7 | 2 |
| Mexicles | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexikanemi | 2 | 0 | 3 | 0 | 0 | 0 |
| Nortenos | 14 | 5 | 6 | 5 | 6 | 1 |
| Other | 154 | 136 | 90 | 82 | 110 | 75 |
| Outlaws | 0 | 0 | 0 | 0 | 0 | 0 |
| Paisas | 73 | 119 | 53 | 62 | 90 | 93 |
| Partido Revolucionario Mexican (PRM) | 0 | 0 | 0 | 0 | 1 | 0 |
| Playboys | 0 | 1 | 0 | 0 | 0 | 1 |
| San Fernando Valley Gang | 0 | 0 | 0 | 0 | 1 | 0 |
| South Los Angeles | 0 | 0 | 0 | 1 | 0 | 0 |
| Southwest Cholos | 0 | 0 | 0 | 0 | 1 | 0 |
| Surenos (sur-13) | 140 | 90 | 66 | 66 | 70 | 66 |
| Tango Blast | 14 | 16 | 8 | 8 | 20 | 7 |
| Texas Syndicate | 0 | 3 | 1 | 1 | 3 | 0 |
| Tortilla Flats | 0 | 0 | 0 | 0 | 0 | 1 |
| Vallucos | 0 | 0 | 0 | 0 | 1 | 0 |
| Vilanos-13 | 0 | 0 | 0 | 1 | 0 | 0 |
| West Park | 0 | 0 | 1 | 0 | 0 | 0 |

AR02748

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 90 of 1021   PageID 6960

| | | | | | | |
|---|---|---|---|---|---|---|
| **Westside** | | | | | 1 | 0 |
| **Zetas** | 0 | 0 | 1 | 1 | 0 | 0 |
| **Total** | 844 | 702 | 536 | 808 | 976 | 363 |

U.S. Border Patrol Recidivism Rates

Recidivism percentages are updated at the end of each fiscal year.

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 |
|---|---|---|---|---|---|---|
| Recidivism[5] | 14% | 14% | 12% | 10% | 11% | 7% |

[5]Recidivism refers to percentage of individuals apprehended more than one time by the Border Patrol within a fiscal year.

Tags:
Statistics

**Source URL:** *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2020*

AR02749



**U.S. Customs and Border Protection**

# CBP Enforcement Statistics FY 2019

U.S. Customs and Border Protection is the nation's largest federal law enforcement agency charged with securing the nation's borders and facilitating international travel and trade. Our top priority is to keep terrorists and their weapons from entering the United States.

At the nation's more than 300 ports of entry, CBP officers have a complex mission with broad law enforcement authorities tied to screening all foreign visitors, returning American citizens and imported cargo that enters the U.S. Along the nation's borders, the United States Border Patrol and Air and Marine Operations are the uniformed law enforcement arms of CBP responsible for securing U.S. borders between ports of entry.

The following is a summary of CBP enforcement actions related to inadmissibles, apprehensions, arrests of individuals with criminal convictions and individuals who have been apprehended multiple times crossing the border illegally.

Visit CBP's Southwest Border Migration page for demographic information regarding apprehensions and inadmissibles on the southwest border and the Use of Force page for use-of-force statistics and case summaries.

## Total CBP Enforcement Actions

Numbers below reflect Fiscal Year (FY) 2017 - FY 2019.

|  | FY17 | FY18 | FY19 |
|---|---|---|---|
| **Office of Field Operations (OFO)** |  |  |  |
| **Total Inadmissibles[1]** | 216,370 | 281,881 | 288,523 |
| **U.S. Border Patrol** |  |  |  |
| **Total Apprehensions[2]** | 310,531 | 404,142 | 859,501 |
| **Total Enforcement Actions** | **526,901** | **683,178** | **1,148,024** |

[1]Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

[2]Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement

**AR02750**

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 92 of 1021   PageID 6962

**Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement**

Numbers below reflect FY 2017 - FY 2019

|  | FY17 | FY18 | FY19 |
|---|---|---|---|
| **OFFICE OF FIELD OPERATIONS** |  |  |  |
| **Criminal Aliens[3] Encountered** | 10,596 | 11,623 | **12,705** |
| **NCIC[4] Arrests** | 7,656 | 5,929 | **8,546** |
| **U.S. BORDER PATROL** |  |  |  |
| **Criminal Aliens[3] Encountered** | 8,531 | 6,698 | **4,269** |
| **Criminal Aliens with Outstanding Wants or Warrants** | 2,675 | 1,550 | **4,153** |

[3]Criminal Aliens refers to aliens who have been convicted of crime, whether in the United States or abroad, so long as the conviction is for conduct which is deemed criminal by the United States. Criminal aliens encountered at ports of entry are inadmissible, absent extenuating circumstances, and represent a subset of total OFO inadmissibles. U.S. Border Patrol arrests of criminal aliens are a subset of total apprehensions. **See U.S. Border Patrol Criminal Alien Statistics for a breakdown of criminal alien stats by type of conviction.**

[4]NCIC (National Crime Information Center) arrests refers to the number of CBP arrests of individuals, including U.S. citizens, who are wanted by other law enforcement agencies.

Currency Seizures

**Office of Field Operations Nationwide Currency Seizures**

Numbers below reflect FY 2015 - FY 2019

|  | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|
| Amount (USD) | $75,964,824 | $62,101,328 | $65,002,856 | $63,691,464 | $68,879,080 |

**Nationwide Monthly Office of Field Operations Currency Seizures**

Numbers below reflect FY 2018 and FY 2019

|  | FY18 | FY19 |
|---|---|---|
| October | $6,198,201 | $4,190,389 |
| November | $4,303,600 | $4,360,441 |
| December | $4,907,494 | $4,415,486 |
| January | $5,194,829 | $7,836,948 |
| February | $4,604,973 | $5,574,578 |
| March | $4,894,285 | $5,581,107 |
| April | $13,424,674 | $13,733,814 |

**AR02751**

| | FY18 | FY19 |
|---|---|---|
| May | $4,024,325 | $4,739,178 |
| June | $3,168,422 | $4,607,755 |
| July | $4,503,412 | $4,439,385 |
| August | $4,249,027 | $5,442,547 |
| September | $4,218,223 | $3,957,451 |
| **Total** | **$63,691,464** | **$68,879,080** |

## U.S. Border Patrol Nationwide Currency Seizures FY 2015 - FY 2019

| | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 |
|---|---|---|---|---|---|
| Amount (USD) | $4,741,288 | $7,924,537 | $5,869,004 | $7,176,142 | **$6,805,695** |

## Monthly U.S. Border Patrol Nationwide Checkpoint Currency Seizures

Numbers below reflect FY 2018 - FY 2019

| | FY 18 | FY 19 |
|---|---|---|
| October | $35,829 | $49,247 |
| November | $26,285 | $51,269 |
| December | $2,822 | $63,697 |
| January | $203,213 | $59,857 |
| February | $117,933 | $103,982 |
| March | $157,669 | $110,924 |
| April | $17,913 | $15,016 |
| May | $256,033 | $129,766 |
| June | $31,494 | $119,732 |
| July | $14,339 | $86,696 |
| August | $169,592 | $141,475 |
| September | $80,358 | $33,487 |
| **Total** | **$1,113,480** | **$965,148** |

Drug Seizures

## Office of Field Operations Nationwide Drug Seizures

Numbers below reflect FY 2014 - FY 2019

**AR02752**

Case 2:21-cv-00067-Z Document 102-7 Filed 09/02/22 Page 94 of 1021 PageID 6964

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 |
|---|---|---|---|---|---|---|
| Cocaine | 45,323 | 38,346 | 52,838 | 62,415 | 51,592 | **89,207** |
| Heroin | 4,356 | 6,023 | 4,224 | 3,398 | 5,205 | **5,427** |
| Marijuana | 438,146 | 602,821 | 516,122 | 366,627 | 299.419 | **289,529** |
| Methamphetamine | 19,613 | 25,495 | 33,086 | 46,247 | 57,440 | **68,585** |
| Fentanyl | n/a | 70 | 596 | 1,875 | 1,895 | **2,545** |

*weights are in pounds (lb)

## Monthly Office of Field Operations Nationwide Drug Seizures FY 2019

| | Marijuana | Cocaine | Heroin | Methamphetamine | Fentanyl | Other |
|---|---|---|---|---|---|---|
| October | 8,808 | 3,156 | 469 | 3,958 | 139 | 16,761 |
| November | 29,893 | 4,129 | 326 | 3,696 | 122 | 8,986 |
| December | 24,474 | 6,703 | 321 | 3,585 | 76 | 8,298 |
| January | 11,324 | 2,440 | 273 | 4,743 | 343 | 12,803 |
| February | 21,636 | 9,215 | 322 | 5,820 | 172 | 15,088 |
| March | 25,514 | 5,872 | 504 | 5,515 | 245 | 8,561 |
| April | 17,062 | 1,413 | 503 | 5,935 | 224 | 14,806 |
| May | 21,352 | 5,287 | 418 | 6,172 | 380 | 12,731 |
| June | 48,159 | 41,419 | 447 | 7,991 | 265 | 11,095 |
| July | 18,714 | 2,266 | 349 | 7,282 | 133 | 13,940 |
| August | 47,748 | 4,076 | 625 | 6,892 | 251 | 12,028 |
| September | 14,845 | 3,229 | 869 | 6,696 | 195 | 13,085 |

*weights are in pounds (lb)

## U.S. Border Patrol Nationwide Drug Seizures FY 2014 - FY 2019

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 |
|---|---|---|---|---|---|---|
| Cocaine | 4,554 | 11,220 | 5,473 | 9,346 | 6,550 | **11,682** |
| Heroin | 606 | 518 | 566 | 953 | 568 | **808** |
| Marijuana | 1,922,545 | 1,538,307 | 1,294,052 | 861,231 | 461,030 | **266,882** |
| Methamphetamine | 3,930 | 6,443 | 8,224 | 10,328 | 11,314 | **14,434** |
| Fentanyl | n/a | n/a | 105 | 181 | 388 | **226** |

*weights are in pounds (lb)

AR02753

**Monthly U.S. Border Patrol Nationwide Checkpoint Drug Seizures FY 2019**

|           | Cocaine | Heroin | Marijuana | Methamphetamine | Fentanyl | Other |
|-----------|---------|--------|-----------|-----------------|----------|-------|
| October   | 121     | 1      | 1,546     | 600             | 0        | 4     |
| November  | 48      | 15     | 1,180     | 473             | 15       | 5     |
| December  | 140     | 5      | 2,507     | 258             | 0        | 422   |
| January   | 259     | 3      | 2,802     | 542             | 16       | 5     |
| February  | 197     | 44     | 3,929     | 646             | 20       | 52    |
| March     | 87      | 2      | 2,197     | 324             | 1        | 16    |
| April     | 368     | 116    | 1,758     | 349             | 31       | 4     |
| May       | 133     | 25     | 980       | 2,079           | 0        | 7     |
| June      | 82      | 48     | 4,202     | 724             | 18       | 9     |
| July      | 175     | 130    | 980       | 1,283           | 11       | 6     |
| August    | 432     | 37     | 4,451     | 1,232           | 13       | 13    |
| September | 294     | 92     | 3,128     | 658             | 4        | 210   |

*weights are in pounds (lb)

Gang Affiliated Enforcement

## U.S. Border Patrol Nationwide Apprehensions by Gang Affiliation

Numbers below reflect FY 2015 - FY 2019

| Gang Affiliation              | FY15 | FY16 | FY17 | FY18 | FY19 |
|-------------------------------|------|------|------|------|------|
| 107th St                      | 0    | 0    | 0    | 1    | 0    |
| 18th Street                   | 84   | 47   | 61   | 145  | 168  |
| Angelino Heights Sureno 13    | 0    | 0    | 1    | 0    | 0    |
| Bandidos                      | 0    | 4    | 0    | 0    | 0    |
| Barrio Azteca                 | 6    | 0    | 3    | 4    | 0    |
| Barrio Van Nuys               | 0    | 0    | 0    | 0    | 1    |
| Border Brothers               | 0    | 0    | 0    | 1    | 1    |
| Brown Pride                   | 0    | 0    | 0    | 0    | 0    |
| Chirizos                      | 0    | 0    | 0    | 1    | 0    |
| Folk Nation                   | 0    | 1    | 0    | 0    | 0    |
| Hard Times 13                 | 0    | 1    | 0    | 0    | 0    |

AR02754

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 96 of 1021 PageID 6966

| | | | | | |
|---|---|---|---|---|---|
| Hells Angels | 0 | 0 | 0 | 0 | 1 |
| Hermanos Pistoleros Latinos (HPL) | 2 | 18 | 3 | 2 | 2 |
| Latin Kings | 16 | 0 | 6 | 7 | 24 |
| Locos Surenos Trece | 0 | 1 | 0 | 1 | 0 |
| Los Traviosos | 0 | 0 | 0 | 0 | 1 |
| Los Zetas | 0 | 1 | 0 | 0 | 0 |
| MS-13 | 335 | 253 | 228 | 413 | 464 |
| Mara 18 | 0 | 0 | 0 | 1 | 2 |
| Mara-R | 0 | 0 | 1 | 1 | 0 |
| Maravilla Salva Trucha | 0 | 1 | 0 | 2 | 0 |
| Market Street | 0 | 0 | 0 | 0 | 1 |
| Mexican Mafia | 4 | 6 | 4 | 3 | 7 |
| Mexicles | 0 | 0 | 0 | 0 | 0 |
| Mexikanemi | 2 | 0 | 3 | 0 | 0 |
| Nortenos | 14 | 5 | 6 | 5 | 6 |
| Other | 154 | 136 | 90 | 82 | 110 |
| Outlaws | 0 | 0 | 0 | 0 | 0 |
| Paisas | 73 | 119 | 53 | 62 | 90 |
| Partido Revolucionario Mexican (PRM) | 0 | 0 | 0 | 0 | 1 |
| Playboys | 0 | 1 | 0 | 0 | 0 |
| San Fernando Valley Gang | 0 | 0 | 0 | 0 | 1 |
| South Los Angeles | 0 | 0 | 0 | 1 | 0 |
| Southwest Cholos | 0 | 0 | 0 | 0 | 1 |
| Surenos (sur-13) | 140 | 90 | 66 | 66 | 70 |
| Tango Blast | 14 | 16 | 8 | 8 | 20 |
| Texas Syndicate | 0 | 3 | 1 | 1 | 3 |
| Vallucos | 0 | 0 | 0 | 0 | 1 |
| Vilanos-13 | 0 | 0 | 0 | 1 | 0 |
| West Park | 0 | 0 | 1 | 0 | 0 |
| Westside | | | | | 1 |
| Zetas | 0 | 0 | 1 | 1 | 0 |
| Total | 844 | 702 | 536 | 808 | 976 |

AR02755

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 97 of 1021   PageID 6967

U.S. Border Patrol Recidivism Rates

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 |
|---|---|---|---|---|---|---|
| Recidivism[5] | 14% | 14% | 12% | 10% | 11% | 7% |

[5]Recidivism refers to percentage of individuals apprehended more than one time by the Border Patrol within a fiscal year.

Tags:
Statistics

**Source URL:** *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2019*

AR02756

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 98 of 1021   PageID 6968



# CBP Enforcement Statistics FY2018

U.S. Customs and Border Protection is the nation's largest federal law enforcement agency charged with securing the nation's borders and facilitating international travel and trade. Our top priority is to keep terrorists and their weapons from entering the United States.

At the nation's more than 300 ports of entry, CBP officers have a complex mission with broad law enforcement authorities tied to screening all foreign visitors, returning American citizens and imported cargo that enters the U.S. Along the nation's borders, the United States Border Patrol and Air and Marine Operations are the uniformed law enforcement arms of CBP responsible for securing U.S. borders between ports of entry.

The following is a summary of CBP enforcement actions related to inadmissibles, apprehensions, arrests of individuals with criminal convictions and individuals who have been apprehended multiple times crossing the border illegally.

Visit CBP's Southwest Border Migration page for demographic information regarding apprehensions and inadmissibles on the southwest border and the Use of Force page for use-of-force statistics and case summaries.

## TOTAL CBP ENFORCEMENT ACTIONS

Numbers below reflect FY2016 - FY2018

|  | FY2016 | FY2017 | FY2018 |
|---|---|---|---|
| **OFFICE OF FIELD OPERATIONS (OFO)** |  |  |  |
| **Total Inadmissibles**[1] | 274,821 | 216,370 | 279,036 |
| **U.S. BORDER PATROL** |  |  |  |
| **Total Apprehensions**[2] | 415,816 | 310,531 | 404,142 |
| **Total Enforcement Actions** | 690,637 | 526,901 | 683,178 |

[1]Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.
[2]Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

ARRESTS OF INDIVIDUALS WITH CRIMINAL CONVICTIONS OR THOSE WANTED BY LAW ENFORCEMENT

## ARRESTS OF INDIVIDUALS WITH CRIMINAL CONVICTIONS OR THOSE WANTED BY LAW ENFORCEMENT

Numbers below reflect FY2016-2018 totals

|  | FY2016 | FY2017 | FY2018 |
|---|---|---|---|
| **OFFICE OF FIELD OPERATIONS** |  |  |  |
| **Criminal Aliens**[3] **Encountered** | 14,090 | 10,596 | 13,788 |
| **NCIC**[4] **Arrests** | 8,129 | 7,656 | 5,889 |
| **U.S. BORDER PATROL** |  |  |  |
| **Criminal Aliens**[3] **Encountered** | 12,842 | 8,531 | 6,698 |
| **Criminal Aliens with Outstanding Wants or Warrants** | 3,697 | 2,675 | 1,550 |

[3]Criminal Aliens refers to aliens who have been convicted of crime, whether in the United States or abroad, so long as the conviction is for conduct which is deemed criminal by the United States. Criminal aliens encountered at ports of entry are inadmissible, absent extenuating circumstances, and represent a subset of total OFO inadmissibles. U.S. Border Patrol arrests of criminal aliens are a subset of total apprehensions. **See U.S. Border Patrol Criminal Alien Statistics for a breakdown of criminal alien stats by type of conviction.**
[4]NCIC (National Crime Information Center) arrests refers to the number of CBP arrests of individuals, including U.S. citizens, who are wanted by other law enforcement agencies.

**AR02757**

CURRENCY SEIZURES

## Office of Field Operations Currency Seizures FY2018

| | FY 12 | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|---|---|
| Amount (USD) | $64,780,287 | $74,911,436 | $81,205,691 | $75,964,824 | $62,101,328 | $65,002,856 | $64,741,939 |

## U.S. Border Patrol Currency Seizures FY2018

| | FY 12 | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|---|---|
| Amount (USD) | $7,575,360 | $6,003,336 | $7,991,385 | $4,741,288 | $7,924,537 | $5,869,004 | $7,176,142 |

## Monthly U.S. Border Patrol Nationwide Checkpoint Currency Seizures FY2018

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount (USD) | $35,829 | $26,285 | $2,822 | $203,213 | $117,933 | $157,669 | $17,913 | $256,033 | $31,494 | $14,339 | $169,592 | $80,358 | $1,113,480 |

DRUG SEIZURES

## Office of Field Operations Drug Seizures FY2018

| | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|---|---|
| Cocaine | 45,260 | 39,075 | 41,312 | 38,145 | 52,803 | 62,331 | 51,731 |
| Heroin | 3,780 | 3,990 | 4,314 | 5,530 | 4,224 | 3,925 | 5,208 |
| Marijuana | 522,614 | 469,995 | 437,950 | 602,795 | 515,381 | 361,564 | 300,102 |
| Methamphetamine | 14,131 | 20,739 | 23,234 | 29,001 | 37,703 | 50,569 | 56,373 |
| Fentanyl | n/a | n/a | n/a | n/a | 440 | 1,196 | 1,747 |

*weights are in pounds (lb)

## U.S. Border Patrol Drug Seizures FY2018

| | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|---|---|
| Cocaine | 12,161 | 4,696 | 4,554 | 11,220 | 5,473 | 9,346 | 6,550 |
| Heroin | 430 | 576 | 606 | 518 | 566 | 953 | 568 |
| Marijuana | 2,299,864 | 2,430,123 | 1,922,545 | 1,538,307 | 1,294,052 | 861,231 | 461,030 |
| Methamphetamine | 3,715 | 3,580 | 3,930 | 6,443 | 8,224 | 10,328 | 11,314 |
| Fentanyl | n/a | n/a | n/a | n/a | n/a | 181 | 388 |

*weights are in pounds (lb)

See the U.S. Border Patrol Nationwide Checkpoint Drug Seizures in Pounds webpage for a monthly breakdown of drug seizures at U.S. Border Patrol checkpoints.

GANG AFFILIATED ENFORCEMENT

## USBP Nationwide Apprehensions by Gang Affiliation FY2018

FY2014 - FY2018

| Gang Affiliation | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|
| 107th St | | | | | 1 |
| 18th Street | 96 | 84 | 47 | 61 | 145 |

**AR02758**

| Gang Affiliation | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|
| Angelino Heights Sureno 13 | 0 | 0 | 0 | 1 | 0 |
| Bandidos | 1 | 0 | 0 | 0 | 0 |
| Barrio Azteca | 7 | 6 | 4 | 3 | 4 |
| Border Brothers | 0 | 0 | 0 | 0 | 1 |
| Brown Pride | 0 | 0 | 0 | 0 | 0 |
| Chirizos | 0 | 0 | 0 | 0 | 1 |
| Folk Nation | 0 | 0 | 0 | 0 | 0 |
| Hard Times 13 | 0 | 0 | 1 | 0 | 0 |
| Hells Angels | 0 | 0 | 1 | 0 | 0 |
| Hermanos Pistoleros Latinos (HPL) | 2 | 2 | 0 | 3 | 2 |
| Latin Kings | 17 | 16 | 18 | 6 | 7 |
| Locos Surenos Trece | | | | | 1 |
| Los Zetas | 0 | 0 | 1 | 0 | 0 |
| MS-13 | 437 | 335 | 253 | 228 | 413 |
| Mara-R | 0 | 0 | 0 | 1 | 1 |
| Maravilla Salva Trucha | 0 | 0 | 1 | 0 | 2 |
| Mexican Mafia | 3 | 4 | 6 | 4 | 3 |
| Mexicles | 0 | 0 | 0 | 0 | 0 |
| Mexikanemi | 7 | 2 | 0 | 3 | 0 |
| Nortenos | 13 | 14 | 5 | 6 | 5 |
| Other | 183 | 154 | 136 | 90 | 82 |
| Outlaws | 1 | 0 | 0 | 0 | 0 |
| Paisas | 86 | 73 | 119 | 53 | 62 |
| Partido Revolucionario Mexican (PRM) | 0 | 0 | 0 | 0 | 0 |
| Playboys | 0 | 0 | 1 | 0 | 0 |
| South Los | 1 | 0 | 0 | 0 | 1 |
| Surenos (sur-13) | 160 | 140 | 90 | 66 | 66 |
| Tango Blast | 18 | 14 | 16 | 8 | 8 |
| Texas Syndicate | 2 | 0 | 3 | 1 | 1 |
| Vilanos-13 | 0 | 0 | 0 | 0 | 1 |
| West Park | 0 | 0 | 0 | 1 | 0 |
| Zetas | 0 | 0 | 0 | 1 | 1 |
| Total | 1,034 | 844 | 702 | 536 | 808 |

U.S. BORDER PATROL RECIDIVISM RATES

## U.S. Border Patrol Recidivism Rates

| | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 |
|---|---|---|---|---|---|---|
| Recidivism[5] | 16% | 14% | 14% | 12% | 10% | |

[5]Recidivism refers to percentage of individuals apprehended more than one time by the Border Patrol within a fiscal year.

Tags:
Statistics

**Source URL:** *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2018*

**AR02759**

27 I. & N. Dec. 509 (U.S.Atty.Gen.), Interim Decision 3950, 2019 WL 1724249

U.S. Department of Justice

Office of the Attorney General

MATTER OF M-S-, RESPONDENT

Decided by Attorney General April 16, 2019

**1   *509   (1) Matter of X-K-, 23 I&N Dec. 731 (BIA 2005), was wrongly decided and is overruled.

(2) An alien who is transferred from expedited removal proceedings to full removal proceedings after establishing a credible fear of persecution or torture is ineligible for release on bond. Such an alien must be detained until his removal proceedings conclude, unless he is granted parole.

BEFORE THE ATTORNEY GENERAL

The Immigration and Nationality Act ("INA" or "Act") provides for several types of removal proceedings, including "full" proceedings conducted by immigration judges and "expedited" proceedings conducted by the front-line immigration enforcement officers of the Department of Homeland Security ("DHS"). *Lara-Aguilar v. Sessions*, 889 F.3d 134, 137-38 (4th Cir. 2018); INA §§ 235(b)(1), 240, 8 U.S.C. §§ 1225(b)(1), 1229a. Generally, aliens placed in expedited proceedings must be detained until removed. INA § 235(b)(1)(B)(iii)(IV). But some aliens who start in expedited proceedings-- namely, those who establish a credible fear of persecution or torture--are transferred to full proceedings. *Id.* § 235(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

The question here is whether, under the Act, aliens transferred after establishing a credible fear are eligible for release on bond. [1]

In *Matter of X-K-*, the Board of Immigration Appeals ("Board") held that only some aliens transferred after establishing a credible fear are subject to mandatory detention. 23 I&N Dec. 731, 736 (BIA 2005). Specifically, the *510 Board concluded that "arriving" aliens--such as those "attempting to come into the United States at a port-of-entry," *see* 8 C.F.R. § 1001.1(q)-- must be detained, but all other transferred aliens are eligible for bond. 23 I&N Dec. at 736.

*Matter of X-K-* was wrongly decided. The Act provides that, if an alien in expedited proceedings establishes a credible fear, he "shall be detained for further consideration of the application for asylum." INA § 235(b)(1)(B)(ii). The Act further provides that such an alien may be "parole[d] into the United States . . . for urgent humanitarian reasons or significant public benefit." *Id.* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). There is no way to apply those provisions except as they were written--unless paroled, an alien must be detained until his asylum claim is adjudicated. The Supreme Court recently held exactly that, concluding that section 235(b)(1) "mandate[s] detention throughout the completion of [removal] proceedings" unless the alien is paroled. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844-45 (2018). The Act's implementing regulations support that interpretation.

**2   The respondent here was transferred from expedited to full proceedings after establishing a credible fear, and an immigration judge ordered his release on bond. Because the respondent is ineligible for bond under the Act, I reverse the immigration judge's decision. I order that, unless DHS paroles the respondent under section 212(d)(5)(A) of the Act, he must be detained until his removal proceedings conclude.

I.

A.

Under section 235 of the Act, all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240" of the Act--that is, full removal proceedings. *Id.* Third, if the alien is inadmissible in one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i); *see Matter of E-R-M- & L-R-M-, 25 I&N Dec. 520, 524 (BIA 2011).*

**\*511** This case concerns aliens subject to expedited removal. To qualify for expedited removal, an alien must either lack entry documentation or seek admission through fraud or misrepresentation. INA § 235(b)(1)(A)(i) (referring to *id.* § 212(a)(6)(C), (a)(7)). [2] In addition, the alien must either be "'''arriving in the United States" or within a class that the Secretary of Homeland Security ("Secretary") has designated for expedited removal. *Id.* [3] The Secretary may designate "any or all aliens" who have "not been admitted or paroled into the United States" and also have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Id.* § 235(b)(1)(A)(iii). To date, the Secretary (and previously the Attorney General) have designated only subsets of that class. *See Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924 (Nov. 13, 2002); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004)* ("2004 Designation"). The designated group at issue here encompasses aliens who (i) "'''are physically present in the U.S. without having been admitted or paroled," (ii) "are encountered by an immigration officer within 100 air miles of any U.S. international land border," and (iii) cannot establish "that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." 2004 Designation, 69 Fed. Reg. at 48,880.

**\*\*3** For an alien originally placed in expedited proceedings, the removal process varies depending upon whether the alien indicates either "an intention to apply for asylum" or "a fear of persecution or torture." 8 C.F.R. §§ 235.3(b)(4), 1235.3(b)(4) (1); *see* INA § 235(b)(1)(A)(ii). If the alien does not so indicate, the inspecting officer "shall order the alien removed from the United States without further hearing or review." INA § 235(b)(1)(A)(i). If the alien does so indicate, however, the officer "shall refer the alien for an interview by an asylum officer." *Id.* § 235(b)(1)(A)(ii). That officer assesses **\*512** whether the alien has a "credible fear of persecution or torture," 8 C.F.R. § 208.30(d)--in other words, whether there is a "significant possibility" that the alien is eligible for "asylum under section 208 of the Act," "withholding of removal under section 241(b)(3) of the Act," or withholding or deferral of removal under the Convention Against Torture ("CAT"), [4] 8 C.F.R. § 208.30(e)(2)-(3). If the alien does not establish a credible fear, the asylum officer "shall order the alien removed from the United States without further hearing or review." INA § 235(b)(1)(B)(iii)(I). But if the alien does establish such a fear, he is entitled to "further consideration of the application for asylum." *Id.* § 235(b)(1)(B)(ii). [5] By regulation, that "further consideration" takes the form of full removal proceedings under section 240 of the Act. 8 C.F.R. §§ 208.30(f), 1208.30(g)(2)(iv)(B). Thus, if an alien originally placed in expedited removal establishes a credible fear, he receives a full hearing before an immigration judge.

Section 235 of the Act expressly provides for the detention of aliens originally placed in expedited removal. Such aliens "shall be detained pending a final determination of credible fear." INA § 235(b)(1)(B)(iii)(IV). Aliens found not to have a credible fear "shall be detained . . . until removed." *Id.* Aliens found to have such a fear, however, "shall be detained for further consideration of the application for asylum." *Id.* § 235(b)(1)(B)(ii). Like all aliens applying for admission, however, aliens detained for further consideration of an asylum claim may generally be "parole[d] into the United States . . . for urgent humanitarian reasons or significant public benefit." *Id.* § 212(d)(5)(A). Accordingly, the Act's implementing regulations assume that aliens in expedited proceedings will be detained, but provide that, if an alien establishes a credible fear, "[p]arole . . . may be considered . . . in accordance with section 212(d)(5) of the Act and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f).

**\*\*4** Section 236 of the Act addresses, more generally, the detention of aliens in removal proceedings. Once an alien has been arrested pursuant to an immigration warrant, DHS "may continue to detain the arrested alien" or "may release the alien on"

"bond of at least $1,500" or "conditional parole." INA § 236(a)(1)-(2), 8 U.S.C. § 1226(a)(1)-(2). DHS and Department of **\*513** Justice regulations provide that, when reviewing an "initial custody determination" made by DHS, an "immigration judge is authorized to exercise the authority in section 236 of the Act . . . to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in [8 C.F.R.] § 1003.19." 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1). Section 1003.19, in turn, expressly limits the availability of bond for certain enumerated classes of aliens. *Id.* § 1003.19(h)(2)(i). One of those classes is "[a]rriving aliens," *id.* § 1003.19(h)(2)(i)(B), which includes aliens "attempting to come into the United States at a port-of-entry," *id.* § 1001.1(q). But section 1003.19 does not mention the classes of aliens that have been designated for expedited removal.

<div align="center">B.</div>

Against that statutory and regulatory backdrop, the Board held in *Matter of X-K-* that, except for arriving aliens, all aliens transferred from expedited to full proceedings after establishing a credible fear are eligible for bond. 23 I&N at 736. The Board assumed that the respondent there was covered by the Secretary's 2004 Designation and had been placed in expedited removal. *Id.* at 733 & n.3. After the respondent established a credible fear, DHS had transferred him to full proceedings for further consideration of his asylum claim, and determined that the respondent would be detained for the duration of those proceedings. The respondent appealed that custody determination to an immigration judge, who ordered that the respondent be released on bond. On appeal, DHS argued that aliens originally placed in expedited proceedings were not eligible for bond, even if they were later transferred to full proceedings.

The Board rejected DHS's argument. The Board observed that, with respect to aliens in expedited removal, "[t]he Act provides for . . . mandatory detention . . . '*pending* a final determination of credible fear.'"DD' *Id.* at 734 (quoting INA § 235(b)(1)(B)(iii)(IV)) (emphasis in original). But with respect to detention *after* a credible-fear finding, the Board concluded that ""'"[t]he Act is silent" and "provide[s] no specific guidance." *Id.* In reaching that conclusion, the Board did not mention section 235(b)(1)(B)(ii) of the Act, which expressly provides that an alien found to have a credible fear ""'shall be detained for further consideration of the application for asylum."

**\*\*5** The Board then turned to the Act's implementing regulations. Those regulations, the Board noted, impose a "requirement that aliens who had initially been screened for expedited removal" and then had a "positive credible fear determination" be "placed in full section 240 removal **\*514** proceedings." 23 I&N Dec. at 734 (citing, *inter alia*, 8 C.F.R. § 1208.30(f) (2004)). The Board reasoned that immigration judges may "exercise the general custody authority of section 236 of the Act," including the authority to grant bond, "over aliens in section 240 removal proceedings." *Id.* (citing, *inter alia*, 8 C.F.R. § 1236.1(c) (11), (d)). The only exceptions are for "specified classes of aliens . . . specifically excluded from the custody jurisdiction of Immigration Judges by 8 C.F.R. § 1003.19(h)(2)(i)(B)." *Id.* at 735. That regulation expressly excludes ""'"arriving aliens," but does not mention aliens who have been designated for expedited removal. *Id.* Drawing a negative inference from the regulation, the Board concluded that arriving aliens transferred from expedited to full proceedings after establishing a credible fear are ineligible for bond, but that all other aliens so transferred are eligible. *Id.*

<div align="center">C.</div>

The respondent here is a citizen of India. He traveled to Mexico and crossed illegally into the United States. He was apprehended within hours about 50 miles north of the border. DHS placed him in expedited removal proceedings.

After the respondent claimed a fear of persecution in India, DHS referred him for an asylum interview. The asylum officer determined that the respondent lacked a credible fear, but, at the respondent's request, DHS reconsidered and reversed its determination. DHS then transferred the respondent to full proceedings. Upon his transfer, DHS issued the respondent a Notice to Appear (DHS Form I-862) and a Notice of Custody Determination (DHS Form I-286), the latter of which informed the respondent that, "pending a final administrative determination in your case, you will be . . . [d]etained by the Department of Homeland Security."

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

The respondent requested that an immigration judge review that custody determination. Without mentioning section 235(b)(1)(B)(ii), the immigration judge held that the respondent "is not subject to mandatory detention." *Matter of M-S-*, Order on Motion for Custody Redetermination at 2 (Immig. Ct. July 18, 2018). The immigration judge ordered that the respondent be released if he could produce a valid Indian passport and post a bond of $17,500. *Id.* at 3. The respondent appealed to the Board, arguing that his bond should be reduced.

 **\*\*6**  While that appeal was pending, the respondent again requested immigration-judge review of his custody, as permitted by regulation. *See* 8 C.F.R. § 1003.19(e). The respondent argued that, because the Indian consulate had denied his request for a replacement passport, he should not be required to produce one. A different immigration judge agreed, but increased **\*515** the respondent's bond to $27,000. *Matter of M-S-*, Order on Motion for Custody Redetermination at 2 (Immig. Ct. Sept. 17, 2018). The respondent posted that amount and was released on September 27, 2018. The Board, apparently unaware of that development, decided the respondent's appeal the next day, affirming the first immigration judge's bond order. *Matter of M-S-*, slip. op. at 1 (BIA Sept. 28, 2018). Neither the respondent nor DHS appealed the second immigration judge's order. [6] The respondent's case remains pending.

II.

The question presented is whether aliens who are originally placed in expedited proceedings and then transferred to full proceedings after establishing a credible fear become eligible for bond upon transfer. I conclude that such aliens remain ineligible for bond, whether they are arriving at the border or are apprehended in the United States.

The text of the Act mandates that conclusion. Section 235(b)(1)(B)(ii) provides that, if an alien in expedited proceedings establishes a credible fear, he "shall be detained for further consideration of the application for asylum." "The word 'shall' generally imposes a nondiscretionary duty." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018). And the word "for" often means "with the object or purpose of" or "throughout." 6 Oxford English Dictionary 23, 26 (2d ed. 1989). Granted, "for" can also mean "in preparation for or anticipation of." *Id.* at 24. But that latter definition makes little sense in light of surrounding provisions of the Act. *See, e.g., Rodriguez*, 138 S. Ct. at 844-45 (recognizing that defining "for" to mean "until the start of" "makes [no] sense in the context of the statutory scheme as a whole" (emphasis in original)). If section 235(b)(1)(B)(ii) governed detention only ""'in preparation for'"--that is, until the beginning of--full proceedings, then another provision, section 236, would govern detention during those proceedings. Section 236, however, permits detention only on an arrest warrant issued by the Secretary. INA § 236(a). The result would be that, if an alien were placed in expedited proceedings, DHS could detain him  **\*516**  without a warrant, but, if the alien were then transferred to full proceedings, DHS would need to issue an arrest warrant to continue detention. That simply cannot be what the Act requires. Instead, I read section 235(b)(1)(B)(ii) to mandate detention (i) for the purpose of ensuring additional review of an asylum claim, and (ii) for so long as that review is ongoing. In other words, section 235(b)(1)(B)(ii) requires detention until removal proceedings conclude.

 **\*\*7**  Several amici would read section 236 of the Act to render transferred aliens eligible for bond. That section provides that, once an alien is arrested pursuant to an immigration warrant, DHS "may continue to detain the arrested alien" or "may release [him] on" "bond of at least $1,500" or "conditional parole," unless he has committed certain crimes. INA § 236(a)(1)-(2), (c). The amici therefore read section 236 to render all non-criminal aliens eligible for bond. Yet section 235 (under which detention is mandatory) and section 236(a) (under which detention is permissive) can be reconciled only if they apply to different classes of aliens. *See Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1081 (9th Cir. 2015) (concluding that ""'permissive and mandatory [provisions] are in harmony, as they apply to different situations'"). For purposes of the respondent's case, I need not identify the full universe of aliens covered by section 236(a). It suffices to say that section 236(a) provides an independent ground for detention that does not limit DHS's separate authority to detain aliens originally placed in expedited removal, who, after the credible-fear stage, "shall be detained" either for further adjudication of their asylum claims or for removal. *See* INA § 235(b)(1)(B)(ii) (an alien placed in expedited removal who demonstrates a credible fear "shall be detained for further consideration of the application for asylum"); *id.* § 235(b)(1)(B)(iii)(IV) (an alien placed in expedited

removal who does not demonstrate a credible fear "shall be detained . . . until removed"). I do not read section 236(a) to authorize granting bond to aliens originally placed in expedited proceedings, even if they are later transferred to full proceedings after establishing a credible fear.

The conclusion that section 235 requires detention does not mean that every transferred alien must be detained from the moment of apprehension until the completion of removal proceedings. Section 212(d)(5)(A) of the Act separately provides that "any alien applying for admission" may be "parole[d] into the United States . . . for urgent humanitarian reasons or significant public benefit." Aliens with "serious medical conditions," for example, are generally eligible for parole. 8 C.F.R. § 212.5(b)(1). An alien's term of parole expires "when the purposes of such parole . . . have been served," at which point the alien must "return or be returned to . . . custody." **\*517** INA § 212(d)(5)(A). This provision grants the Secretary the discretion to parole aliens under its terms.

In light of that express exception to mandatory detention, the Act cannot be read to contain an implicit exception for bond. Under the negative-implication canon, "expressing one item of [an] associated group or series excludes another left unmentioned." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (alteration in original). Section 212(d)(5)(A) expressly states that aliens applying for admission--which includes aliens originally placed in expedited proceedings--may be released on parole. That suggests that those aliens may not be released on bond. And that suggestion is particularly strong here given that the Act expressly provides that aliens in the separate class covered by section 236(a) are eligible for both "bond of at least $1,500" *and* """"conditional parole." INA § 236(a)(2)(A)-(B). *See, e.g., Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when Congress includes particular language in one section of a statute but omits it in another--let alone in the very next provision--this Court presume[s] that Congress intended a difference in meaning." (alteration in original) (internal quotation marks omitted)).

**\*\*8** The Supreme Court recently interpreted the Act in the exact same way. In *Jennings v. Rodriguez*, a class of aliens in removal proceedings-- including aliens transferred from expedited to full proceedings after establishing a credible fear--argued that the Act did not permit their """"prolonged detention in the absence of . . . individualized bond hearing[s]." 138 S. Ct. at 839 (internal quotation marks omitted). The class acknowledged that section 235(b)(1)(B)(ii) provides that a transferred alien "shall be detained for further consideration of the application for asylum." The class argued, however, that "the term 'for' . . . mandates detention only until the *start* of [full] proceedings." *Id.* at 844 (emphasis in original). Once those proceedings begin, the class continued, section 236 applies, under which transferred aliens are generally eligible for bond and thus entitled to bond hearings. *Id.* at 845. The Court rejected that argument as "incompatible with the rest of the statute." *Id.* If the class were right about when sections 235 and 236 apply, "then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the [Secretary] would have to issue an arrest warrant in order to continue detaining the alien." *Id.* But "that makes little sense." *Id.* In evaluating whether transferred aliens are eligible for bond, the Court also considered section 212(d)(5)(A)'s parole exception. "That express exception to detention," the Court reasoned, "implies that there are no *other* circumstances under which aliens detained under [section 235(b)] may be released." *Id.* at 844 (emphasis in original). For those reasons, the *Rodriguez* Court held, as I do here, that **\*518** the Act renders aliens transferred from expedited to full proceedings after establishing a credible fear ineligible for bond.

Although *Rodriguez* did not address the Act's implementing regulations, those regulations support the conclusion that transferred aliens are ineligible for bond. First, 8 C.F.R. § 208.30(f) provides that, if an alien is either a "stowaway" or in expedited proceedings, and he establishes a credible fear, he must be transferred to, respectively, "proceedings under [8 C.F.R.] § 208.2(c)" or full removal proceedings. In either case, after the transfer, """"[p]arole of the alien may be considered only in accordance with section 212(d)(5) of the Act and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f). The regulation makes no mention of bond.

**\*\*9** In *Matter of X-K-*, the Board drew a negative inference based upon 8 C.F.R. § 1003.19's expressly rendering "arriving aliens" ineligible for bond but not addressing other categories of aliens who are subject to expedited removal. 23 I&N Dec. at 734-35. But as explained above, the Board did not discuss section 235's detention requirement at all and therefore overlooked the implications that provision has upon the appropriate interpretation of section 236. Section 1003.19(h)(2)(i) thus does not

provide an exhaustive catalogue of the classes of aliens who are ineligible for bond. The Secretary recognized that very point in designating the class at issue here. The Secretary explained that, "[u]nder Department of Justice regulations, immigration judge review . . . is permitted only for bond and custody determinations pursuant to section 236." 69 Fed. Reg. at 48,879. And "[a]liens subject to expedited removal procedures . . . (including those aliens who are referred after a positive credible fear determination . . . for proceedings under section 240 of the Act)" are covered by section 235, not section 236. *Id.* Thus, the Secretary concluded, even without adding the designated aliens to section 1003.19's list of bond-ineligible classes, the designated aliens "are not eligible for bond [or] for a bond redetermination hearing before an immigration judge." *Id.* I agree with that interpretation, which ensures that the regulation remains consistent with the statute. [7]

In conclusion, the statutory text, the implementing regulations, and the Supreme Court's decision in *Rodriguez* all lead to the same conclusion: that **\*519** all aliens transferred from expedited to full proceedings after establishing a credible fear are ineligible for bond. *Matter of X-K-* is therefore overruled. [8]

III.

Here, despite the respondent being bond ineligible, the second immigration judge ordered DHS to release him on a bond of $27,000. The respondent posted that bond in September 2018, and was released from custody. I reverse the order granting bond to the respondent. I order that, unless DHS paroles the respondent under section 212(d)(5)(A) of the Act, he must be detained until his removal proceedings conclude.

**Footnotes**

1    This opinion does not address whether detaining transferred aliens for the duration of their removal proceedings poses a constitutional problem, a question that Attorney General Sessions did not certify and that is the subject of ongoing litigation. *See Rodriguez v. Hayes*, No. 2:07-cv-3239 (C.D. Cal.). For the reasons stated in the Department of Justice's briefs in that case, aliens who have never been admitted into the United States do not have a presumptive constitutional entitlement to be released into the country. *See* Resp'ts-Appellants' Suppl. Br. 28-40, *Rodriguez v. Marin*, Nos. 13-56706 and 13-56755 (9th Cir. Aug. 10, 2018); Resp'ts-Appellants' Suppl. Reply Br. 20-26, *Rodriguez v. Marin*, Nos. 13-56706 and 13-56755 (9th Cir. Aug. 30, 2018).

2    Section 235(b)(1)(F) of the Act excepts from expedited removal any """"native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." For many years, that provision applied to Cuban nationals, but that is no longer the case. *See Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4902, 4904 (Jan. 17, 2017) ("[T]he statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations.").

3    Although the Act refers to the "Attorney General," Congress has since authorized the Secretary to exercise that power. *See* 6 U.S.C. § 202(3); 8 C.F.R. § 235.3(b)(1)(ii) (2002).

4    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

5    Under DHS and Department of Justice regulations, "[a]n asylum application shall be deemed to constitute at the same time an application for [statutory] withholding of removal" and CAT relief. 8 C.F.R. §§ 208.3(b), 1208.3(b); *see also id.*

§§ 208.16, 1208.16. This opinion employs the regulations' definition of "application for asylum." Relatedly, as used in this opinion, the term "asylum claim" encompasses a claim for asylum, statutory withholding of removal, or CAT relief.

6    All three decisions below--both bond orders and the Board's decision--pose the same threshold, legal question: whether the respondent became eligible for bond after establishing a credible fear and being transferred to full proceedings. I certified this case to answer that question, and I have authority to answer it by reviewing either the Board's decision or the second bond order. *See* 8 U.S.C. § 1103(g)(2) (authorizing the Attorney General to "review such administrative determinations in immigration proceedings . . . as [he] determines to be necessary for carrying out" the Act). My decision therefore has the effect of reversing the second bond order.

7    In *Matter of X-K-*, the Board never suggested that, if an alien designated for expedited removal established a credible fear, then DHS could terminate his expedited proceedings and initiate full ones, thereby rendering him eligible for bond. And for good reason: DHS's authority under *Matter of E-R-M- & L-R-M-* expires once an asylum officer (or immigration judge) makes a final credible-fear determination, at which point the alien "shall be detained" either for further adjudication of his asylum claim or for removal. INA § 235(b)(1)(B)(ii), (b)(1)(B)(iii)(IV).

8    Because *Matter of X-K-* declared a sizable population of aliens to be eligible for bond, DHS indicates that my overruling that decision will have """"an immediate and significant impact on [its] detention operations." DHS Br. 23 n.16. DHS accordingly requests that I delay the effective date of this decision "so that DHS may conduct necessary operational planning." *Id.* Federal circuit courts have discretion to delay the effective dates of their decisions, *see* Fed. R. App. P. 41(b), and I conclude that I have similar discretion. I will delay the effective date of this decision for 90 days so that DHS may conduct the necessary operational planning for additional detention and parole decisions.

<div align="center">27 I. & N. Dec. 509 (U.S.Atty.Gen.), Interim Decision 3950, 2019 WL 1724249</div>

---

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 108 of 1021   PageID 6978

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Reid v. Donelan,   1st Cir.(Mass.),   October 26, 2021

138 S.Ct. 830
Supreme Court of the United States

David JENNINGS et al., Petitioners

v.

Alejandro RODRIGUEZ et al., individually
and on behalf of all others similarly situated.

No. 15–1204.
|
Argued Nov. 30, 2016.
|
Reargued Oct. 3, 2017.
|
Decided Feb. 27, 2018.

**Synopsis**
**Background:** Plaintiff, a Mexican citizen and lawful permanent resident, sought writ of habeas corpus, as well as declaratory and injunctive relief on behalf of himself and class of aliens detained during immigration proceedings for more than six months without bond hearing, asserting constitutional and statutory claims for individualized bond hearings. The United States District Court for the Central District of California, Terry J. Hatter, Jr., Senior District Judge, denied class certification. Plaintiff appealed. The United States Court of Appeals for the Ninth Circuit, Betty B. Fletcher, Senior Circuit Judge, 591 F.3d 1105, reversed and remanded. The District Court, Terry J. Hatter, Jr., Senior District Judge, entered preliminary injunction. Government appealed. The Court of Appeals, 715 F.3d 1127, affirmed. The District Court, Terry J. Hatter, Jr., Senior District Judge, 2013 WL 5229795, granted summary judgment to class and entered permanent injunction. Cross-appeals were taken.

The Court of Appeals, Wardlaw, Circuit Judge, 804 F.3d 1060, affirmed in part and reversed in part. Government's petition for certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

[1] Immigration and Nationality Act (INA) provisions applicable primarily to detention of aliens seeking entry to United States could not be plausibly interpreted as implicitly placing six-month limit on detention or requiring periodic bond hearings, and

[2] INA provision, carving out narrow conditions under which Attorney General may release on bond aliens detained pending their removal based on criminal offenses or terrorist activities, could not be plausibly interpreted as implicitly placing six-month limit on detention or requiring periodic bond hearings.

Reversed and remanded.

Justices Thomas and Gorsuch joined as to all but Part II.

Justice Sotomayor joined as to Part III-C.

Justice Thomas filed an opinion concurring in part and concurring in the judgment, in which Justice Gorsuch joined except for footnote 6.

Justice Breyer filed a dissenting opinion, in which Justices Ginsburg and Sotomayor joined.

Justice Kagan took no part in the decision of the case.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Certify Class; Motion for Declaratory Judgment; Motion for Permanent Injunction.

West Headnotes (12)

**[1]**  **Constitutional Law** ⚖ Avoidance of doubt
**Constitutional Law** ⚖ Judicial rewriting or revision

Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems, but a court relying on that canon still must interpret the statute, not rewrite it.

59 Cases that cite this headnote

**[2]    Aliens, Immigration, and
Citizenship 🔑 Judicial Review or
Intervention**

Assuming that actions taken with respect to all
aliens in certified class constituted actions taken
to remove them from United States, the question
of law regarding whether, contrary to decision
of Court of Appeals, certain provisions of
Immigration and Nationality Act (INA) required
detention with a bond hearing did not arise
from those actions, as would present statutory
bar under INA to Supreme Court's jurisdiction
to entertain aliens' claims in absence of final
order; aliens were not asking for review of an
order of removal, they were not challenging the
decision to detain them or to seek their removal,
and they were not challenging any part of the
process by which their removability would be
determined. (Per Justice Alito for a majority of
the court.) Immigration and Nationality Act, §§
235(b)(1, 2), 236(a, c), 242(b)(9), 🚩 8 U.S.C.A.
§§ 1225(b)(1, 2), 🚩1226(a, c), 🚩1252(b)(9).

162 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship 🔑 Judicial Review or
Intervention**

Extent of Government's authority to detain
aliens was not a matter of discretionary
judgment, action, or decision by Attorney
General regarding detention or release, as would
present statutory bar under Immigration and
Nationality Act (INA) to Supreme Court's
jurisdiction to entertain aliens' claims that
certain INA provisions required detention with a
bond hearing; aliens were challenging statutory
framework permitting their detention without
bail, and if that challenge failed, they were
contesting constitutionality of entire statutory
scheme under Due Process Clause. (Per Justice
Alito for a majority of the court.) U.S.C.A.
Const.Amend. 5; Immigration and Nationality

Act, §§ 235(b)(1, 2), 236(a, b, e), 🚩8 U.S.C.A.
§§ 1225(b)(1, 2), 🚩1226(a, b, e).

384 Cases that cite this headnote

**[4]    Constitutional Law 🔑 Avoidance of doubt**

Under the canon of constitutional avoidance,
when a serious doubt is raised about the
constitutionality of an act of Congress, it is
a cardinal principle that the court will first
ascertain whether a construction of the statute
is fairly possible by which the question may be
avoided.

61 Cases that cite this headnote

**[5]    Constitutional Law 🔑 Avoidance of
constitutional questions**

The canon of constitutional avoidance comes
into play only when, after the application
of ordinary textual analysis, the statute is
found to be susceptible of more than one
construction, and in the absence of more than one
plausible construction, the canon simply has no
application.

51 Cases that cite this headnote

**[6]    Aliens, Immigration, and
Citizenship 🔑 Time limitations**

**Aliens, Immigration, and
Citizenship 🔑 Bond or bail**

Immigration and Nationality Act (INA)
provisions applicable primarily to aliens seeking
entry to United States, stating that certain aliens
claiming credible fear of persecution "shall
be detained for further consideration of the
application for asylum" and that all other aliens
seeking entry, with specific exceptions, "shall
be detained for a [removal] proceeding," could
not be plausibly interpreted as implicitly placing
a six-month limit on detention or requiring
periodic bond hearings; provisions mandated
detention until a certain point and authorized
release prior to that point only under limited
circumstances. Immigration and Nationality Act,

§ 235(b)(1)(B)(ii), (b)(2)(A, B), 🚩8 U.S.C.A. §
1225(b)(1)(B)(ii), 🚩(b)(2)(A, B).

136 Cases that cite this headnote

**[7]**   **Statutes** 🔑 Mandatory or directory statutes

Unlike the word "may," which implies
discretion, the word "shall" in a statute usually
connotes a requirement.

5 Cases that cite this headnote

**[8]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Detention Pending Removal
Proceeding

Immigration and Nationality Act (INA)
provisions applicable primarily to aliens seeking
entry to United States, stating that certain
aliens claiming credible fear of persecution shall
be detained "for" further consideration of the
application for asylum, and that all other aliens
seeking entry, with specific exceptions, shall be
detained "for" a removal proceeding, authorizes
detention throughout the completion of those
asylum or removal proceedings, as opposed to
ending the detention authority when the asylum
or removal proceedings begin. Immigration and
Nationality Act, § 235(b)(1)(B)(ii), (b)(2)(A, B),
🚩8 U.S.C.A. § 1225(b)(1)(B)(ii), 🚩(b)(2)(A,
B).

271 Cases that cite this headnote

**[9]**   **Statutes** 🔑 Similarity or difference

There is no canon of interpretation that forbids
interpreting different words used in different
parts of the same statute to mean roughly the
same thing.

4 Cases that cite this headnote

**[10]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Time limitations

**Aliens, Immigration, and**
**Citizenship** 🔑 Bond or bail

Immigration and Nationality Act (INA)
provision, carving out narrow conditions under
which Attorney General may release on bond
aliens detained pending their removal based
on several enumerated categories involving
criminal offenses and terrorist activities, could
not be plausibly interpreted as implicitly
placing a six-month limit on detention or
requiring periodic bond hearings. Immigration
and Nationality Act, § 236(a, c), 🚩8 U.S.C.A.
§ 1226(a, c).

262 Cases that cite this headnote

**[11]**   **Federal Courts** 🔑 Presentation of Questions
Below or on Review;  Record;  Waiver

The Supreme Court's role is as a court of review,
not of first view.

5 Cases that cite this headnote

**[12]**   **Constitutional Law** 🔑 Factors considered;
flexibility and balancing

Due process is flexible, and it calls for such
procedural protections as the particular situation
demands. U.S.C.A. Const.Amend. 5.

20 Cases that cite this headnote

**West Codenotes**

**Negative Treatment Reconsidered**

🚩8 U.S.C.A. §§ 1225(b), 🚩1226(a, c)

***833** Syllabus* *

Immigration officials are authorized to detain certain aliens
in the course of immigration proceedings while they
determine whether those aliens may be lawfully present
in the country. For example, § 1225(b) of Title 8 of
the U.S.Code authorizes the detention of certain aliens
seeking to enter the country. 🚩Section 1225(b)(1) applies
to aliens initially determined to be inadmissible due to fraud,
misrepresentation, or lack of valid documentation, and to
certain other aliens designated by the Attorney General in his

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 111 of 1021   PageID 6981

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

discretion. Section 1225(b)(2) is a catchall provision that applies to most other applicants for admission not covered by § 1225(b)(1). Under § 1225(b)(1), aliens are normally ordered removed "without further hearing or review," § 1225(b)(1)(A)(i), but an alien indicating either an intention to apply for asylum or a credible fear of persecution, § 1225(b)(1)(A)(ii), "shall be detained" while that alien's asylum application is pending, § 1225(b)(1)(B)(ii). Aliens covered by § 1225(b)(2) in turn "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled" to admission. § 1225(b)(2)(A).

The Government is also authorized to detain certain aliens already in the country. Section 1226(a)'s default rule permits the Attorney General to issue warrants for the arrest and detention of these aliens pending the outcome of their removal proceedings. The Attorney General "may release" these aliens on bond, "[e]xcept as provided in subsection (c) of this section." Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities, § 1226(c)(1), and specifies that the Attorney General "may release" one of those aliens "only if the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk, § 1226(c)(2).

After a 2004 conviction, respondent Alejandro Rodriguez, a Mexican citizen and a lawful permanent resident of the United States, was detained pursuant to § 1226 while the Government sought to remove him. In May 2007, while still litigating his removal, Rodriguez filed a habeas petition, claiming that he was entitled to a bond hearing to determine whether his continued detention was justified. As relevant here, he and the class of aliens he represents allege that §§ 1225(b), 1226(a), and 1226(c) do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that detention remains justified. The District Court entered a permanent injunction, and the Ninth Circuit affirmed. Relying on the canon of constitutional avoidance, the Ninth Circuit construed §§ 1225(b) and 1226(c) as imposing an implicit 6–month time limit on an alien's detention under those sections. After that point, the court held, the Government may continue to detain the alien only under the authority of 1226(a). The court then construed 1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6–month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified.

**\*834** *Held* : The judgment is reversed, and the case is remanded.

804 F.3d 1060, reversed and remanded.

Justice ALITO delivered the opinion of the Court, except as to Part II, concluding that §§ 1225(b), 1226(a), and 1226(c) do not give detained aliens the right to periodic bond hearings during the course of their detention. The Ninth Circuit misapplied the canon of constitutional avoidance in holding otherwise. Pp. 841 – 852.

(a) The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one [plausible] construction." *Clark v. Martinez,* 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734. The Ninth Circuit's interpretations of the provisions at issue, however, are implausible. Pp. 841 – 852.

(b) Read most naturally, §§ 1225(b)(1) and (b)(2) mandate detention of applicants for admission until certain proceedings have concluded. Until that point, nothing in the statutory text imposes a limit on the length of detention, and neither provision says anything about bond hearings. Pp. 842 – 846.

(1) Nothing in the text of § 1225(b)(1) or § 1225(b)(2) hints that those provisions have an implicit 6–month time limit on the length of detention. Respondents must show that this is a plausible reading in order to prevail under the canon of constitutional avoidance, but they simply invoke the canon without making any attempt to defend their reading.

The Ninth Circuit also all but ignored the statutory text, relying instead on *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, as authority for grafting a time limit onto § 1225(b)'s text. There, this Court invoked the constitutional-avoidance canon, construing § 1231(a)(6)—which provides than an alien subject to a removal order "may be detained" beyond the section's 90–day removal period —to mean that the alien may not be detained beyond "a period reasonably necessary to secure removal," *id.,* at 699, 121 S.Ct. 2491 presumptively six months, *id.,* at 701, 121 S.Ct. 2491. The Court detected ambiguity in the statutory phrase "may be detained" and noted the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal.

Several material differences distinguish the provisions at issue in this case from *Zadvydas* 's interpretation of § 1231(a)(6). To start, the provisions here, unlike § 1231(a)(6), mandate detention for a specified period of time: until immigration officers have finished "consider[ing]" the asylum application, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A). Section 1231(a)(6) also uses the ambiguous "may," while §§ 1225(b)(1) and (b)(2) use the unequivocal mandate "shall be detained." There is also a specific provision authorizing temporary parole from § 1225(b) detention "for urgent humanitarian reasons or significant public benefit," § 1182(d)(5)(A), but no similar release provision applies to § 1231(a)(6). That express exception implies that there are no other circumstances under which aliens detained under § 1225(b) may be released. Pp. 842 – 845.

(2) Respondents also claim that the term "for" in §§ 1225(b)(1) and (b)(2) mandates detention only until the *start* of applicable proceedings. That is inconsistent with the meanings of "for"—"[d]uring [or] throughout," 6 Oxford English Dictionary 26, and "with the object or purpose of," *id.,* at 23—that make sense in the context of the statutory scheme as a whole. Nor does respondents' reading align with the **\*835** historical use of "for" in § 1225. Pp. 845 – 846.

(c) Section 1226(c)'s language is even clearer. By allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, that provision reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. Together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision" on removal. Section 1226(c) is thus not silent as to the length of detention. See *Demore v. Kim,* 538 U.S. 510, 529, 123 S.Ct. 1708, 155 L.Ed.2d 724. The provision, by expressly stating that covered aliens may be released "only if" certain conditions are met, also unequivocally imposes an affirmative *prohibition* on releasing them under any other conditions. Finally, because § 1226(c) and the PATRIOT Act apply to different categories of aliens in different ways, adopting § 1226(c)'s plain meaning will not make any part of the PATRIOT Act, see § 1226a(a)(3), superfluous. Pp. 845 – 847.

(d) Nothing in § 1226(a), which authorizes the Attorney General to arrest and detain an alien "pending a decision" on removal and which permits the Attorney General to release the alien on bond, supports the imposition of periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that continued detention is necessary. Nor does it hint that the length of detention prior to the bond hearing must be considered in determining whether an alien should be released. Pp. 847 – 848.

(e) The Ninth Circuit should consider the merits of respondents' constitutional arguments in the first instance. But before doing so, it should also reexamine whether respondents can continue litigating their claims as a class. Pp. 851 – 852.

ALITO, J., delivered the opinion of the Court, except as to Part II. ROBERTS, C.J., and KENNEDY, J., joined that opinion in full; THOMAS and GORSUCH, JJ., joined as to all but Part II; and SOTOMAYOR, J., joined as to Part III–C. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined except for footnote 6. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. KAGAN, J., took no part in the decision of the case.

**Attorneys and Law Firms**

Ian H. Gershengorn, Acting Solicitor General, Washington, DC, for Petitioners.

Ahilan T. Arulanantham, Los Angeles, CA, for Respondents.

Ian Heath Gershengorn, Acting Solicitor General, Benjamin C. Mizer, Principal Deputy Assistant, Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Leon Fresco, Deputy Assistant Attorney General, Zachary D. Tripp, Assistant to the Solicitor General, Sarah S. Wilson, Erez R. Reuveni, Attorneys, Joyce R. Branda, Deputy Assistant Attorney General, August E. Flentje, Special Counsel to the Assistant Attorney General, Department of Justice, Washington, DC, for Petitioners.

Mark H. Haddad, Sean A. Commons, Wen W. Shen, Sidley Austin LLP, Los Angeles, CA, Judy Rabinovitz, Michael K.T. Tan, Cecillia D. Wang, Steven R. Shapiro, ACLU Immigrants' Rights Project, New York, NY, Ahilan T. Arulanantham, Counsel of Record, Michael Kaufman, ACLU Foundation of Southern California, Los Angeles, CA, Jayashri Srikantiah, Stanford Law School, Immigrants' **\*836** Rights Clinic, Stanford, CA, David D. Cole, American Civil Liberties Foundation, Washington, DC, for Respondents.

**Opinion**

Justice ALITO delivered the opinion of the Court, except as to Part II. [*]

Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official "port of entry" (*e.g.,* an international airport or border crossing) or who have been apprehended trying to enter the country at an unauthorized location. Immigration officials must also determine on a daily basis whether there are grounds for removing any of the aliens who are already present inside the country. The vast majority of these determinations are quickly made, but in some cases deciding whether an alien should be admitted or removed is not as easy. As a result, Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings. Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.

In this case we are asked to interpret three provisions of U.S. immigration law that authorize the Government to detain aliens in the course of immigration proceedings. All parties appear to agree that the text of these provisions, when read most naturally, does not give detained aliens the right to periodic bond hearings during the course of their detention. But by relying on the constitutional-avoidance canon of statutory interpretation, the Court of Appeals for the Ninth Circuit held that detained aliens have a statutory right to periodic bond hearings under the provisions at issue.

**[1]**    Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not rewrite it. Because the Court of Appeals in this case adopted implausible constructions of the three immigration provisions at issue, we reverse its judgment and remand for further proceedings.

I

A

To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering.

1

That process of decision generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible. Under 122 Stat. 867, 🚩8 U.S.C. § 1225, an alien who "arrives in the United States," or "is present" in this country but "has not been admitted," is treated as "an applicant for admission." 🚩§ 1225(a)(1). Applicants for admission must "be inspected by immigration officers" to ensure that they may be admitted **\*837** into the country consistent with U.S. immigration law. 🚩§ 1225(a)(3).

As relevant here, applicants for admission fall into one of two categories, those covered by 🚩§ 1225(b)(1) and those

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 114 of 1021   PageID 6984

covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See § 1225(b)(1)(A)(i) (citing §§ 1182(a)(6)(C), (a)(7)). Section 1225(b)(1) also applies to certain other aliens designated by the Attorney General in his discretion. See § 1225(b)(1)(A)(iii). Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here). See §§ 1225(b)(2)(A), (B).

Both § 1225(b)(1) and § 1225(b)(2) authorize the detention of certain aliens. Aliens covered by § 1225(b)(1) are normally ordered removed "without further hearing or review" pursuant to an expedited removal process. § 1225(b)(1)(A)(i). But if a § 1225(b)(1) alien "indicates either an intention to apply for asylum ... or a fear of persecution," then that alien is referred for an asylum interview. § 1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Aliens who are instead covered by § 1225(b)(2) are detained pursuant to a different process. Those aliens "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country. § 1225(b)(2)(A).

Regardless of which of those two sections authorizes their detention, applicants for admission may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A); see also 8 C.F.R §§ 212.5(b), 235.3 (2017). Such parole, however, "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Instead, when the purpose of the parole has been served, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Ibid.*

2

Even once inside the United States, aliens do not have an absolute right to remain here. For example, an alien present in the country may still be removed if he or she falls "within one or more ... classes of deportable aliens." § 1227(a). That includes aliens who were inadmissible at the time of entry or who have been convicted of certain criminal offenses since admission. See §§ 1227(a)(1), (2).

Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal. As relevant here, § 1226 distinguishes between two different categories of aliens. Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States." § 1226(a). "Except as provided in subsection (c) of this section," the Attorney General "may release" an alien detained under § 1226(a) "on bond ... or conditional parole." *Ibid.*

Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under § 1226(a). Under § 1226(c), the "Attorney General shall take into custody any alien" who falls into one of several enumerated categories involving criminal offenses and terrorist activities. **\*838** § 1226(c)(1). The Attorney General may release aliens in those categories "only if the Attorney General decides ... that release of the alien from custody is necessary" for witness-protection purposes and "the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." § 1226(c)(2). Any release under those narrow conditions "shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." *Ibid.* [1]

In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under

§§ 1226(a) and (c). The primary issue is the proper interpretation of §§ 1225(b), 1226(a), and 1226(c).

B

Respondent Alejandro Rodriguez is a Mexican citizen. Since 1987, he has also been a lawful permanent resident of the United States. In April 2004, after Rodriguez was convicted of a drug offense and theft of a vehicle, the Government detained him under § 1226 and sought to remove him from the country. At his removal hearing, Rodriguez argued both that he was not removable and, in the alternative, that he was eligible for relief from removal. In July 2004, an Immigration Judge ordered Rodriguez deported to Mexico. Rodriguez chose to appeal that decision to the Board of Immigration Appeals, but five months later the Board agreed that Rodriguez was subject to mandatory removal. Once again, Rodriguez chose to seek further review, this time petitioning the Court of Appeals for the Ninth Circuit for review of the Board's decision.

In May 2007, while Rodriguez was still litigating his removal in the Court of Appeals, he filed a habeas petition in the District Court for the Central District of California, alleging that he was entitled to a bond hearing to determine whether his continued detention was justified. Rodriguez's case was consolidated with another, similar case brought by Alejandro Garcia, and together they moved for class certification. The District Court denied their motion, but the Court of Appeals for the Ninth Circuit reversed. See *Rodriguez v. Hayes, 591 F.3d 1105, 1111 (2010).* It concluded that the proposed class met the certification requirements of Rule 23 of the Federal Rules of Civil Procedure, and it remanded the case to the District Court. *Id., at 1111, 1126.*

On remand, the District Court certified the following class:

"[A]ll non-citizens within the Central District of California who: (1) are or were detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, (2) are not and have not been detained pursuant to a national security detention statute, and (3) have not been afforded a hearing to determine whether their detention is **839** justified."

Class Certification Order in *Rodriguez v. Hayes,* CV 07–03239 (CD Cal., Apr. 5, 2010).

The District Court named Rodriguez as class representative of the newly certified class, *ibid.,* and then organized the class into four subclasses based on the four "general immigration detention statutes" under which it understood the class members to be detained: Sections 1225(b), 1226(a), 1226(c), and 1231(a). See Order Granting Plaintiff's Motion for Class Certification in *Rodriguez v. Holder,* CV 07–03239 (CD Cal., Mar. 8, 2011) (2011 Order); *Rodriguez v. Robbins, 715 F.3d 1127, 1130–1131 (C.A.9 2013).* Each of the four subclasses was certified to pursue declaratory and injunctive relief. 2011 Order. On appeal, the Court of Appeals held that the § 1231(a) subclass had been improperly certified, but it affirmed the certification of the other three subclasses. See *Rodriguez v. Robbins, 804 F.3d 1060, 1074, 1085–1086 (C.A.9 2015).*

In their complaint, Rodriguez and the other respondents argued that the relevant statutory provisions—§§ 1225(b), 1226(a), and 1226(c)—do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that the class member's detention remains justified. Absent such a bond-hearing requirement, respondents continued, those three provisions would violate the Due Process Clause of the Fifth Amendment. In their prayer for relief, respondents thus asked the District Court to require the Government "to provide, after giving notice, individual hearings before an immigration judge for ... each member of the class, at which [the Government] will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from serious danger, despite the prolonged length of detention at issue." Third Amended Complaint in *Rodriguez v. Holder,* CV 07–03239, p. 31 (CD Cal., Oct. 20, 2010). Respondents also sought declaratory relief. *Ibid.*

As relevant here, the District Court entered a permanent injunction in line with the relief sought by respondents, and the Court of Appeals affirmed. See *804 F.3d, at 1065.* Relying heavily on the canon of constitutional avoidance, the Court of Appeals construed §§ 1225(b) and 1226(c) as imposing an implicit 6–month time limit on an alien's

detention under these sections. 🚩 *Id., at 1079, 1082.* After that point, the Court of Appeals held, the Government may continue to detain the alien only under the authority of 🚩 § 1226(a). *Ibid.* The Court of Appeals then construed 🚩 § 1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6–month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified. 🚩 *Id., at 1085, 1087.*

The Government petitioned this Court for review of that decision, and we granted certiorari. 579 U.S. ——, 136 S.Ct. 2489, 195 L.Ed.2d 821 (2016).

II

Before reaching the merits of the lower court's interpretation, we briefly address whether we have jurisdiction to entertain respondents' claims. We discuss two potential obstacles, 🚩 8 U.S.C. §§ 1252(b)(9) and 🚩 1226(e).

A

Under 🚩 § 1252(b)(9):

> "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action **\*840** taken or proceeding brought to remove an alien from the United States under this subchapter [including 🚩 §§ 1225 and 🚩 1226] shall be available only in judicial review of a final order under this section."

**[2]**  This provision does not deprive us of jurisdiction. We are required in this case to decide "questions of law," specifically, whether, contrary to the decision of the Court of Appeals, certain statutory provisions require detention without a bond

hearing. We assume for the sake of argument that the actions taken with respect to all the aliens in the certified class constitute "action[s] taken ... to remove [them] from the United States." [2] On that assumption, the applicability of 🚩 § 1252(b)(9) turns on whether the legal questions that we must decide "aris[e] from" the actions taken to remove these aliens.

It may be argued that this is so in the sense that if those actions had never been taken, the aliens would not be in custody at all. But this expansive interpretation of 🚩 § 1252(b)(9) would lead to staggering results. Suppose, for example, that a detained alien wishes to assert a claim under 🟨 *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), based on allegedly inhumane conditions of confinement. See, *e.g.,* 🟨 *Ziglar v. Abbasi,* 582 U.S. ——, —— – ——, 137 S.Ct. 1843, 1863–1867, 198 L.Ed.2d 290 (2017). Or suppose that a detained alien brings a state-law claim for assault against a guard or fellow detainee. Or suppose that an alien is injured when a truck hits the bus transporting aliens to a detention facility, and the alien sues the driver or owner of the truck. The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

Interpreting "arising from" in this extreme way would also make claims of prolonged detention effectively unreviewable. By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place. And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.

In past cases, when confronted with capacious phrases like " 'arising from,' " we have eschewed " 'uncritical literalism' " leading to results that " 'no sensible person could have intended.' " 🟨 *Gobeille v. Liberty Mut. Ins. Co.,* 577 U.S. ——, ——, 136 S.Ct. 936, 943, 194 L.Ed.2d 20 (2016) (interpreting phrase "relate to" in the Employee Retirement Income Security Act of 1974's pre-emption provision). See also, *e.g.,* 🟨 *FERC v. Electric Power Supply Assn.,* 577 U.S. ——, ——, 136 S.Ct. 760, 773–775, 193 L.Ed.2d 661 (2016) (interpreting term "affecting" in Federal Power Act); 🟨 *Maracich v. Spears,* 570 U.S. 48, 59–61, 133 S.Ct. 2191,

186 L.Ed.2d 275 (2013) (interpreting phrase "in connection with" in Driver's Privacy Protection Act); *Dan's City Used Cars, Inc. v. Pelkey,* 569 U.S. 251, 260–261, 133 S.Ct. 1769, 185 L.Ed.2d 909 (2013) (interpreting phrase "related to" in Federal Aviation Administration Authorization Act); *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (interpreting phrase "related to" in Bankruptcy Act). In *Reno v. American–Arab Anti– Discrimination Comm.,* 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), we took **\*841** this approach in construing the very phrase that appears in § 1252(b)(9). A neighboring provision of the Immigration and Nationality Act refers to "any cause or claim by or on behalf of any alien *arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added). We did not interpret this language to sweep in any claim that can technically be said to "arise from" the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves. *American–Arab Anti–Discrimination Comm., supra,* at 482–483, 119 S.Ct. 936.

The parties in this case have not addressed the scope of § 1252(b)(9), and it is not necessary for us to attempt to provide a comprehensive interpretation. For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar. [3]

### B

[3]   We likewise hold that § 1226(e) does not bar us from considering respondents' claims.

That provision states:

"The Attorney General's discretionary judgment regarding the application of [ § 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention

or release of any alien or the grant, revocation, or denial of bond or parole." § 1226(e).

As we have previously explained, § 1226(e) precludes an alien from "challeng[ing] a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Demore v. Kim,* 538 U.S. 510, 516, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). But § 1226(e) does not preclude "challenges [to] the statutory framework that permits [the alien's] detention without bail." *Id.,* at 517, 123 S.Ct. 1708.

Respondents mount that second type of challenge here. First and foremost, they are challenging the extent of the Government's detention authority under the "statutory framework" as a whole. If that challenge fails, they are then contesting the constitutionality of the entire statutory scheme under the Fifth Amendment. Because the extent of the Government's detention authority is not a matter of "discretionary judgment," "action," or "decision," respondents' challenge to "the statutory framework that permits [their] detention without bail," *ibid.,* falls outside of the scope of § 1226(e). We may therefore consider the merits of their claims.

### **\*842** III

[4]   When "a serious doubt" is raised about the constitutionality of an act of Congress, "it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Relying on this canon of constitutional avoidance, the Court of Appeals construed §§ 1225(b), 1226(a), and 1226(c) to limit the permissible length of an alien's detention without a bond hearing. Without such a construction, the Court of Appeals believed, the " 'prolonged detention without adequate procedural protections' " authorized by the provisions " 'would raise serious constitutional concerns.' " 804 F.3d, at 1077 (quoting *Casas–Castrillon v. DHS,* 535 F.3d 942, 950 (C.A.9 2008)).

**[5]**  The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez,* 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). In the absence of more than one plausible construction, the canon simply " 'has no application.' " *Warger v. Shauers,* 574 U.S. ——, ——, 135 S.Ct. 521, 529, 190 L.Ed.2d 422 (2014) (quoting *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001)).

The Court of Appeals misapplied the canon in this case because its interpretations of the three provisions at issue here are implausible. In Parts III–A and III–B, we hold that, subject only to express exceptions, §§ 1225(b) and 1226(c) authorize detention until the end of applicable proceedings. And in Part III–C, we hold that there is no justification for any of the procedural requirements that the Court of Appeals layered onto § 1226(a) without any arguable statutory foundation.

### A

**[6]**  As noted, § 1225(b) applies primarily to aliens seeking entry into the United States ("applicants for admission" in the language of the statute). Section 1225(b) divides these applicants into two categories. First, certain aliens claiming a credible fear of persecution under § 1225(b)(1) "shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Second, aliens falling within the scope of § 1225(b)(2) "shall be detained for a [removal] proceeding." § 1225(b)(2)(A).

Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded. Section 1225(b)(1) aliens are detained for "further consideration of the application for asylum," and § 1225(b)(2) aliens are in turn detained for "[removal] proceeding[s]." Once those proceedings end, detention under § 1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any limit on the length of detention. And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.

Despite the clear language of §§ 1225(b)(1) and (b)(2), respondents argue—and the Court of Appeals held—that those provisions nevertheless can be construed to contain implicit limitations on the length of detention. But neither of the two limiting interpretations offered by respondents is plausible.

### 1

First, respondents argue that §§ 1225(b)(1) and (b)(2) contain an implicit 6–month limit on the length of detention. Once that 6–month period elapses, respondents contend, aliens previously detained **\*843** under those provisions must instead be detained under the authority of § 1226(a), which allows for bond hearings in certain circumstances.

There are many problems with this interpretation. Nothing in the text of § 1225(b)(1) or § 1225(b)(2) even hints that those provisions restrict detention after six months, but respondents do not engage in any analysis of the text. Instead, they simply cite the canon of constitutional avoidance and urge this Court to use that canon to read a "six-month reasonableness limitation" into § 1225(b). Brief for Respondents 48.

That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to "choos[e] between competing *plausible* interpretations of a statutory text." *Clark, supra,* at 381, 125 S.Ct. 716 (emphasis added). To prevail, respondents must thus show that § 1225(b)'s detention provisions may plausibly be read to contain an implicit 6–month limit. And they do not even attempt to defend that reading of the text.

In much the same manner, the Court of Appeals all but ignored the statutory text. Instead, it read *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), as essentially granting a license to graft a time limit onto the

text of § 1225(b). *Zadvydas,* however, provides no such authority.

*Zadvydas* concerned § 1231(a)(6), which authorizes the detention of aliens who have already been ordered removed from the country. Under this section, when an alien is ordered removed, the Attorney General is directed to complete removal within a period of 90 days, 8 U.S.C. § 1231(a)(1)(A), and the alien must be detained during that period, § 1231(a)(2). After that time elapses, however, § 1231(a)(6) provides only that certain aliens "*may* be detained" while efforts to complete removal continue. (Emphasis added.)

In *Zadvydas,* the Court construed § 1231(a)(6) to mean that an alien who has been ordered removed may not be detained beyond "a period reasonably necessary to secure removal," 533 U.S., at 699, 121 S.Ct. 2491 and it further held that six months is a presumptively reasonable period, *id.,* at 701, 121 S.Ct. 2491. After that, the Court concluded, if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the alien. *Ibid.*

The *Zadvydas* Court justified this interpretation by invoking the constitutional-avoidance canon, and the Court defended its resort to that canon on the ground that § 1231(a)(6) is ambiguous. Specifically, the Court detected ambiguity in the statutory phrase "*may* be detained." " ' [M]ay,' " the Court said, "suggests discretion" but not necessarily "unlimited discretion. In that respect the word 'may' is ambiguous." *Id.,* at 697, 121 S.Ct. 2491. The Court also pointed to the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal. *Ibid.*

*Zadvydas* represents a notably generous application of the constitutional-avoidance canon, but the Court of Appeals in this case went much further. It failed to address whether *Zadvydas* 's reasoning may fairly be applied in this case despite the many ways in which the provision in question in *Zadvydas,* § 1231(a)(6), differs materially from those at issue here, §§ 1225(b)(1) and (b)(2). Those differences **\*844** preclude the reading adopted by the Court of Appeals.

To start, §§ 1225(b)(1) and (b)(2), unlike § 1231(a)(6), provide for detention for a specified period of time. Section 1225(b)(1) mandates detention "for further consideration of the application for asylum," § 1225(b)(1)(B)(ii), and § 1225(b)(2) requires detention "for a [removal] proceeding," § 1225(b)(2)(A). The plain meaning of those phrases is that detention must continue until immigration officers have finished "consider [ing]" the application for asylum, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A). By contrast, Congress left the permissible length of detention under § 1231(a)(6) unclear.

[7] Moreover, in *Zadvydas,* the Court saw ambiguity in § 1231(a)(6)'s use of the word "may." Here, by contrast, §§ 1225(b)(1) and (b)(2) do not use the word "may." Instead, they unequivocally mandate that aliens falling within their scope "shall" be detained. "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Technologies, Inc. v. United States,* 579 U.S. ——, ——, 136 S.Ct. 1969, 1977, 195 L.Ed.2d 334 (2016). That requirement of detention precludes a court from finding ambiguity here in the way that *Zadvydas* found ambiguity in § 1231(a)(6).

*Zadvydas* 's reasoning is particularly inapt here because there is a specific provision authorizing release from § 1225(b) detention whereas no similar release provision applies to § 1231(a)(6). With a few exceptions not relevant here, the Attorney General may "for urgent humanitarian reasons or significant public benefit" temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2). 8 U.S.C. § 1182(d)(5)(A). That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released. See A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius* )"). That negative implication precludes the sort of implicit time limit on detention that we found in *Zadvydas.* [4]

In short, a series of textual signals distinguishes the provisions at issue in this case from *Zadvydas* 's interpretation of § 1231(a)(6). While *Zadvydas* found § 1231(a)(6) to be ambiguous, the same cannot be said of §§ 1225(b)(1) and (b)(2): Both provisions mandate detention until a certain point and authorize release prior to that point only under limited circumstances. As a result, neither provision can reasonably be read to limit detention to six months.

### 2

**[8]**  In this Court, respondents advance an interpretation of the language of §§ 1225(b)(1) and (b)(2) that was never made below, namely, that the term "for," which appears in both provisions, mandates detention only until the *start* of applicable proceedings rather than all the way through to their conclusion. Respondents contrast the language of §§ 1225(b)(1) and (b)(2) authorizing detention "for" further proceedings with another **\*845** provision's authorization of detention "pending" further proceedings. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien ... shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). According to respondents, that distinction between "for" and "pending" makes an enormous difference. As they see things, the word "pending" authorizes detention throughout subsequent proceedings, but the term "for" means that detention authority ends once subsequent proceedings begin. As a result, respondents argue, once the applicable proceedings commence, §§ 1225(b)(1) and (b)(2) no longer authorize detention, and the Government must instead look to § 1226(a) for continued detention authority.

That interpretation is inconsistent with ordinary English usage and is incompatible with the rest of the statute. To be sure, "for" can sometimes mean "in preparation for or anticipation of." 6 Oxford English Dictionary 24 (2d ed. 1989). But "for" can also mean "[d]uring [or] throughout," *id.,* at 26, as well as "with the object or purpose of," *id.,* at 23; see also American Heritage Dictionary 709 (3d ed. 1992) ("Used to indicate the object, aim, or purpose of an action or activity"; "Used to indicate amount, extent, or duration"); Random House Dictionary of the English Language 747 (2d ed. 1987) ("with the object or purpose of"; "during the continuance of"); Webster's Third New International

Dictionary 886 (1993) ("with the purpose or object of"; "to the ... duration of"). And here, only that second set of definitions makes sense in the context of the statutory scheme as a whole.

For example, respondents argue that, once detention authority ends under §§ 1225(b)(1) and (b)(2), aliens can be detained only under § 1226(a). But that section authorizes detention only "[o]n a warrant issued" by the Attorney General leading to the alien's arrest. § 1226(a). If respondents' interpretation of § 1225(b) were correct, then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense.

Nor does respondents' interpretation of the word "for" align with the way Congress has historically used that word in § 1225. Consider that section's text prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546. Under the older version of § 1225(b), "[e]very alien" within its scope "who may not appear ... to be clearly and beyond a doubt entitled to [entry] shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U.S.C. § 1225(b) (1994 ed.). It would make no sense to read "for further inquiry" as authorizing detention of the alien only until the start of the inquiry; Congress obviously did not mean to allow aliens to feel free to leave once immigration officers asked their first question.

**[9]**  In sum, §§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin. Of course, other provisions of the immigration statutes do authorize detention "pending" other proceedings or "until" a certain point. See *post,* at 870 – 871 (BREYER, J., dissenting) (quoting § 1225(b)(1)(B)(iii)(IV)). But there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." **\*846** *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 540, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013). We decline to invent and apply such a canon here.

B

**[10]** While the language of §§ 1225(b)(1) and (b)(2) is quite clear, § 1226(c) is even clearer. As noted, § 1226 applies to aliens already present in the United States. Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings. Section 1226(a) also permits the Attorney General to release those aliens on bond, "[e]xcept as provided in subsection (c) of this section." Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities. 8 U.S.C. § 1226(c)(1). Section 1226(c) then goes on to specify that the Attorney General "may release" one of those aliens "*only if* the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk. § 1226(c)(2) (emphasis added).

Like § 1225(b), § 1226(c) does not on its face limit the length of the detention it authorizes. In fact, by allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, § 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision on whether the alien is to be removed from the United States." § 1226(a).

In a reprise of their interpretation of § 1225(b), respondents argue, and the Court of Appeals held, that § 1226(c) should be interpreted to include an implicit 6–month time limit on the length of mandatory detention. Once again, that interpretation falls far short of a "plausible statutory construction."

In defense of their statutory reading, respondents first argue that § 1226(c)'s "silence" as to the length of detention "cannot be construed to authorize prolonged mandatory detention, because Congress must use 'clearer terms' to authorize 'long-term detention.' " Brief for Respondents 34 (quoting *Zadvydas,* 533 U.S., at 697, 121 S.Ct. 2491). But § 1226(c) is *not* "silent" as to the length of detention. It mandates detention "pending a decision on whether the alien is to be removed from the United States," § 1226(a), and it expressly prohibits release from that detention except for narrow, witness-protection purposes. Even if courts were permitted to fashion 6–month time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite. The constitutional-avoidance canon does not countenance such textual alchemy.

Indeed, we have held as much in connection with § 1226(c) itself. In *Demore v. Kim,* 538 U.S., at 529, 123 S.Ct. 1708 we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has "a definite termination point": the conclusion of removal proceedings. As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c).

Respondents next contend that § 1226(c)'s limited authorization for release for witness-protection purposes does not imply that other forms of release are forbidden, but this argument defies the **\*847** statutory text. By expressly stating that the covered aliens may be released "only if" certain conditions are met, 8 U.S.C. § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions.

Finally, respondents point to a provision enacted as part of the PATRIOT Act[5] and contend that their reading of § 1226(c) is needed to prevent that provision from being superfluous. That argument, however, misreads both statutory provisions. Although the two provisions overlap in part, they are by no means congruent.

Two differences stand out. First, § 1226(c) and the PATRIOT Act cover different categories of aliens. Both apply to certain terrorist suspects, but only § 1226(c)

reaches aliens convicted of other more common criminal offenses. See 🚩 §§ 1226(c)(1)(A)-(C) (aliens inadmissible or deportable under 🏳 § 1182(a)(2); §§ 1227(a)(2)(A)(ii), (A)(iii), (B), (C), and (D); and § 1227(a)(2)(A)(i) under certain conditions). For its part, the PATRIOT Act casts a wider net than 🚩 § 1226(c) insofar as it encompasses certain threats to national security not covered by 🚩 § 1226(c). See § 1226a(a)(3) (aliens described in 🏳 §§ 1182(a)(3)(A)(i), (iii), and 🏳 1227(a)(4)(A)(i), (iii), as well as aliens "engaged in any other activity that endangers the national security of the United States"). In addition, the Government's detention authority under 🚩 § 1226(c) and the PATRIOT Act is not the same. Under 🚩 § 1226(c), the Government must detain an alien until "a decision on *whether* the alien is to be removed" is made. 🚩 § 1226(a) (emphasis added). But, subject to exceptions not relevant here, the PATRIOT Act authorizes the Government to detain an alien "until the alien *is removed*." § 1226a(a)(2) (emphasis added).

Far from being redundant, then, 🚩 § 1226(c) and the PATRIOT Act apply to different categories of aliens in different ways. There is thus no reason to depart from the plain meaning of 🚩 § 1226(c) in order to avoid making the provision superfluous.

We hold that 🚩 § 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings "only if" the alien is released for witness-protection purposes.

C

Finally, as noted, 🚩 § 1226(a) authorizes the Attorney General to arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States." 🚩 § 1226(a). As long as the detained alien is not covered by 🚩 § 1226(c), the Attorney General "may release" the alien on "bond ... or conditional parole." 🚩 § 1226(a). Federal regulations provide that aliens detained under 🚩 § 1226(a)

receive bond hearings at the outset of detention. See 🚩 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1).

The Court of Appeals ordered the Government to provide procedural protections that go well beyond the initial bond hearing established by existing regulations—namely, periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary. Nothing in 🚩 § 1226(a)'s text—which says only that the Attorney General "may release" the alien "on ... bond"—even remotely supports the imposition of either of those requirements.

**\*848** Nor does 🚩 § 1226(a)'s text even hint that the length of detention prior to a bond hearing must specifically be considered in determining whether the alien should be released.

IV

For these reasons, the meaning of the relevant statutory provisions is clear—and clearly contrary to the decision of the Court of Appeals. But the dissent is undeterred. It begins by ignoring the statutory language for as long as possible, devoting the first two-thirds of its opinion to a disquisition on the Constitution. Only after a 19–page prologue does the dissent acknowledge the relevant statutory provisions.

The dissent frames the question of interpretation as follows: Can 🚩 §§ 1225(b), 🚩 1226(c), and 🚩 1226(a) be read to require bond hearings every six months "without doing violence to the statutory language," *post,* at 869 – 870 (opinion of BREYER, J.)? According to the dissent, the answer is "yes," but the dissent evidently has a strong stomach when it comes to inflicting linguistic trauma. Thus, when Congress mandated that an "alien shall be detained," 🚩 § 1225(b)(1)(B)(ii), what Congress really meant, the dissent insists, is that the alien may be released from custody provided only that his freedom of movement is restricted in some way, such as by "the imposition of a curfew," *post,* at 870. And when Congress stressed that "[t]he Attorney General may release an alien ... *only if* ... release ... from custody is necessary" to protect the safety of a witness, 🚩 § 1226(c)(2) (emphasis added), what Congress meant, the dissent tells us, is that the Attorney General must release an alien even when no witness is in need of protection—so long as the alien is neither a flight risk nor a danger to the community, see *post,* at

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 123 of 1021   PageID 6993

872 – 874. The contortions needed to reach these remarkable conclusions are a sight to behold.

Let us start with the simple term "detain." According to the dissent, "detain" means the absence of "unrestrained freedom." *Post,* at 870. An alien who is subject to any one of "numerous restraints"—including "a requirement to obtain medical treatment," "to report at regular intervals," or even simply to comply with "a curfew"—is "detained" in the dissent's eyes, even if that alien is otherwise free to roam the streets. *Ibid.*

This interpretation defies ordinary English usage. The dictionary cited by the dissent, the Oxford English Dictionary (OED), defines "detain" as follows: "[t]o keep in confinement or under restraint; *to keep prisoner.*" 4 OED 543 (2d ed. 1989) (emphasis added); see also OED (3d ed. 2012), http://www.oed.com/view/Entry/51176 (same). Other general-purpose dictionaries provide similar definitions. See, *e.g.,* Webster's Third New International Dictionary 616 (1961) ("to hold or keep in or as if in custody {*ed* by the police for questioning}"); Webster's New International Dictionary 710 (2d ed. 1934) ("[t]o hold or keep as in custody"); American Heritage Dictionary 508 (def.2) (3d ed. 1992) ("To keep in custody or temporary confinement"); Webster's New World College Dictionary 375 (3d ed. 1997) ("to keep in custody; confine"). And legal dictionaries define "detain" the same way. See, *e.g.,* Ballentine's Law Dictionary 343 (3d ed. 1969) ("To hold; to keep in custody; to keep"); Black's Law Dictionary 459 (7th ed. 1999) ("The act or fact of holding a person in custody; confinement or compulsory delay").

How does the dissent attempt to evade the clear meaning of "detain"? It resorts to the legal equivalent of a sleight-of-hand trick. First, the dissent cites a passage in Blackstone stating that arrestees could always **\*849** seek release on bail. *Post,* at 863 – 864. Then, having established the obvious point that a person who is initially detained may later be released from detention, the dissent reasons that this means that a person may still be regarded as detained even after he is released from custody. *Post,* at 870. That, of course, is a nonsequitur. Just because a person who is initially detained may later be released, it does not follow that the person is still "detained" after his period of detention comes to an end.

If there were any doubt about the meaning of the term "detain" in the relevant statutory provisions, the context in which they appear would put that doubt to rest. Title 8 of the United States Code, the title dealing with immigration,

is replete with references that distinguish between "detained" aliens and aliens who are free to walk the streets in the way the dissent imagines. Section 1226(a), for instance, distinguishes between the power to "continue to detain the arrested alien" and the power to "release the alien on ... bond." But if the dissent were right, that distinction would make no sense: An "alien released on bond" would *also* be a "detained alien." Here is another example: In § 1226(b), Congress gave the Attorney General the power to "revoke" at any time "a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien." It beggars belief that Congress would have given the Attorney General the power to detain a class of aliens who, under the dissent's reading, are *already* "detained" because they are free on bond. But that is what the dissent would have us believe. Consider, finally, the example of § 1226(c). As noted, that provision obligates the Attorney General to "take into custody" certain aliens whenever they are "released, without regard to whether the alien is released on parole, supervised release, or probation." On the dissent's view, however, even aliens "released on parole, supervised release, or probation" are "in custody"—and so there would be no need for the Attorney General to take them into custody again. [6]

Struggling to prop up its implausible interpretation, the dissent looks to our prior decisions for aid, but that too fails.

The best case it can find is *Tod v. Waldman,* 266 U.S. 547, 45 S.Ct. 193, 69 L.Ed. 195 (1925), a grant of a petition for rehearing in which the Court clarified that "[n]othing in [its original] order ... shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Id.,* at 548, 45 S.Ct. 193. According to the dissent, that two-page decision from almost a century ago supports its reading because the underlying **\*850** immigration statute in that case—like some of the provisions at issue here—mandated that the relevant class of aliens " 'shall be detained' " pending the outcome of an inspection process. See *post,* at 870 – 871 (quoting Act of Feb. 5, 1917, § 16, 39 Stat. 886).

That reads far too much into *Waldman*. To start, the Court did not state that the aliens at issue here were entitled to bail or even that bail was available to them. Instead, the Court merely noted that its decision should not "prejudice" any application the aliens might choose to file. That is notable, for in their petition for rehearing the aliens had asked the

Court to affirmatively *authorize* [them] to give bail." Petition for Rehearing in *Tod v. Waldman*, O.T. 1924, No. 95, p. 17 (emphasis added). By refusing to do so, the Court may have been signaling its skepticism about their request. But it is impossible to tell. That is precisely why we, unlike the dissent, choose not to go beyond what the sentence actually says. And *Waldman* says nothing about how the word "detain" should be read in the context of 🚩§§ 1225(b), 🚩1226(c), and 🚩1226(a). [7]

Neither does *Zadvydas*. It is true, as the dissent points out, that *Zadvydas* found "that the words ' "may be detained" ' [are] consistent with requiring release from long-term detention," *post,* at 871 (quoting 📙533 U.S., at 682, 121 S.Ct. 2491), but that is not because there is any ambiguity in the term "detain." As we have explained, the key statutory provision in *Zadvydas* said that the aliens in question "may," not "shall," be detained, and that provision also failed to specify how long detention was to last. Here, the statutory provisions at issue state either that the covered aliens "shall" be detained until specified events take place, see 📙8 U.S.C. § 1225(b)(1)(B)(ii) ("further consideration of the application for asylum"); 🚩§ 1225(b)(2)(A) ("a [removal] proceeding"), or provide that the covered aliens may be released "only if" specified conditions are met, 🚩§ 1226(c)(2). The term that the *Zadvydas* Court found to be ambiguous was "may," not "detain." See 📙533 U.S., at 697, 121 S.Ct. 2491. And the opinion in that case consistently used the words "detain" and "custody" to refer exclusively to physical confinement and restraint. See 📙*id.,* at 690, 121 S.Ct. 2491 (referring to "[f]reedom from imprisonment—from government custody, *detention, or other forms of physical restraint* " (emphasis added)); 📙*id.,* at 683, 121 S.Ct. 2491 (contrasting aliens "released on bond" with those "held in custody"). [8]

The dissent offers no plausible interpretation of the 🚩§§ 1225(b), 🚩1226(c), and 🚩1226(a). But even if we were to accept the dissent's interpretation and hold that "detained" aliens in the "custody" of the Government include aliens released on bond, that would *still* not justify the dissent's proposed resolution of this case. The Court of Appeals held that aliens detained under the provisions **\*851** at issue must be given *periodic* bond hearings, and the dissent agrees. See *post,* at 859 ("I would interpret the statute as requiring bail

hearings, presumptively after six months of confinement"). But the dissent draws that 6–month limitation out of thin air. However broad its interpretation of the words "detain" and "custody," nothing in *any* of the relevant provisions imposes a 6–month time limit on detention without the possibility of bail. So if the dissent's interpretation is right, then aliens detained under 🚩§§ 1225(b), 🚩1226(c), and 🚩1226(a) are entitled to bail hearings as soon as their detention begins rather than six months later. "Detained" does not mean "released on bond," and it *certainly* does not mean "released on bond but only after six months of mandatory physical confinement."

The dissent's utterly implausible interpretation of the statutory language cannot support the decision of the court below.

## V

[11] Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents' constitutional arguments on their merits. Consistent with our role as "a court of review, not of first view," 📙*Cutter v. Wilkinson,* 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), we do not reach those arguments. Instead, we remand the case to the Court of Appeals to consider them in the first instance.

Before the Court of Appeals addresses those claims, however, it should reexamine whether respondents can continue litigating their claims as a class. When the District Court certified the class under 📙Rule 23(b)(2) of the Federal Rules of Civil Procedure, it had their statutory challenge primarily in mind. Now that we have resolved that challenge, however, new questions emerge.

Specifically, the Court of Appeals should first decide whether it continues to have jurisdiction despite 🚩8 U.S.C. § 1252(f)(1). Under that provision, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§ 1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 🚩Section 1252(f)(1) thus "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2]." 📙*American–Arab Anti–Discrimination*

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 125 of 1021 PageID 6995

*Comm.,* 525 U.S., at 481, 119 S.Ct. 936. The Court of Appeals held that this provision did not affect its jurisdiction over respondents' *statutory* claims because those claims did not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct ... not authorized by the statutes." 591 F.3d, at 1120. This reasoning does not seem to apply to an order granting relief on constitutional grounds, and therefore the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims. If not, and if the Court of Appeals concludes that it may issue only declaratory relief, then the Court of Appeals should decide whether that remedy can sustain the class on its own. See, *e.g.,* Rule 23(b)(2) (requiring "that final injunctive relief or *corresponding* declaratory relief [be] appropriate respecting the class as a whole" (emphasis added)).

The Court of Appeals should also consider whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims in light of *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). We **\*852** held in *Dukes* that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id., at* 360, 131 S.Ct. 2541. That holding may be relevant on remand because the Court of Appeals has already acknowledged that some members of the certified class may not be entitled to bond hearings as a constitutional matter. See, *e.g.,* 804 F.3d, at 1082, 715 F.3d, at 1139–1141 (citing, *e.g.,* *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Assuming that is correct, then it may no longer be true that the complained-of " 'conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' " *Dukes, supra,* at 360, 131 S.Ct. 2541 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)).

**[12]**  Similarly, the Court of Appeals should also consider on remand whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve respondents' Due Process Clause claims. "[D]ue process is flexible," we have stressed repeatedly, and it "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593,

33 L.Ed.2d 484 (1972); see also *Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

VI

We reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings.

*It is so ordered.*

Justice KAGAN took no part in the decision of this case.

Justice THOMAS, with whom Justice GORSUCH joins except for footnote 6, concurring in Part I and Parts III–VI and concurring in the judgment.

In my view, no court has jurisdiction over this case. Congress has prohibited courts from reviewing aliens' claims related to their removal, except in a petition for review from a final removal order or in other circumstances not present here. See 8 U.S.C. § 1252(b)(9). Respondents have not brought their claims in that posture, so § 1252(b)(9) removes jurisdiction over their challenge to their detention. I would therefore vacate the judgment below with instructions to dismiss for lack of jurisdiction. But because a majority of the Court believes we have jurisdiction, and I agree with the Court's resolution of the merits, I join Part I and Parts III–VI of the Court's opinion.

I

Respondents are a class of aliens whose removal proceedings are ongoing. Respondents allege that the statutes that authorize their detention during removal proceedings do not authorize "prolonged" detention unless they are given an individualized bond hearing at which the Government "prove[s] by clear and convincing evidence" that their detention remains justified. Third Amended Complaint in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Oct.22, 2010), pp. 30–31 (Third Amended Complaint). If the statutes do authorize "prolonged" detention, respondents claim that the statutes violate the Due Process Clause of the Fifth Amendment. *Ibid.* In their complaint, respondents sought declaratory and injunctive relief from detention during their

removal proceedings. *Id.,* at 31–32. The District Court certified a class of aliens under 🟡 Federal Rule of Civil Procedure 23(b)(2) who, among other things, "are or were detained **\*853** for longer than six months pursuant to one of the general immigration detention statutes." Class Certification Order in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Apr.5, 2010), p. 2; 🔴 *Rodriguez v. Hayes,* 591 F.3d 1105, 1122–1126 (C.A.9 2010). After the parties moved for summary judgment, the District Court entered a permanent injunction in favor of the class, which requires the named Government officials [1] to take steps to "timely identify all current and future class members," to update class member lists with the District Court every 90 days, and to provide class members with bond hearings that comply with particular substantive and procedural requirements. Order, Judgment, and Permanent Injunction in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Aug.6, 2013), pp. 5–6 (Order, Judgment, and Permanent Injunction).

## II

### A

Although neither party raises 🔴 § 1252(b)(9), this Court has an "independent obligation" to assess whether it deprives us and the lower courts of jurisdiction. 🔴 *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). This Court has described 🔴 § 1252(b)(9) as a "'zipper' clause." See 🟡 *Reno v. American–Arab Anti– Discrimination Comm.,* 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC* ); 🔴 *INS v. St. Cyr,* 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). That description is apt because, when an alien raises a claim related to his removal, 🔴 § 1252(b)(9) closes all but two avenues for judicial review:

"**Consolidation of questions for judicial review**

"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under [ 🔵 8 U.S.C. §§ 1151–1382] shall be available *only in judicial review of a final order under this section.*

Except *as otherwise provided in this section,* no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact." (Emphasis added.)

The text of this provision is clear. Courts generally lack jurisdiction over "all questions of law and fact," both "constitutional" and "statutory," that "aris[e] from" an "action taken or proceeding brought to remove an alien." If an alien raises a claim arising from such an action or proceeding, courts cannot review it unless they are reviewing "a final order" under 🔴 § 1252(a)(1) or exercising jurisdiction "otherwise provided" in 🔴 § 1252. [2] Neither "habeas **\*854** corpus" nor "any other provision of law" can be used to avoid 🔴 § 1252(b)(9)'s jurisdictional bar. In short, if a claim arises from an action taken to remove an alien, 🔴 § 1252(b) (9) permits judicial review in only two circumstances: in connection with review of a final removal order and via a specific grant of jurisdiction in 🔴 § 1252.

Respondents do not argue that any specific grant of jurisdiction applies here, and they do not seek review of a final removal order under 🔴 § 1252(a)(1). Thus, a court may review respondents' claims only if they can show that 🔴 § 1252(b)(9)'s jurisdictional bar does not apply in the first place because their claims do not "aris[e] from any action taken or proceeding brought to remove an alien."

Respondents cannot make that showing. 🔵 Section 1252(b) (9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and the "many ... decisions or actions that may be part of the deportation process." *AADC,* 🔴 *supra,* at 482–483, 119 S.Ct. 936. Detaining an alien falls within this definition— indeed, this Court has described detention during removal proceedings as an "aspect of the deportation process." 🟡 *Demore v. Kim,* 538 U.S. 510, 523, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); see also 🟡 *Carlson v. Landon,* 342 U.S. 524, 538, 72 S.Ct. 525, 96 L.Ed. 547 (1952) ("Detention is necessarily a part of [the] deportation procedure"). As the Court explains today, Congress either mandates or permits the detention of aliens for the entire duration of their removal proceedings. See *ante,* at 841 – 848. This detention, the Court

further explains, is meant to ensure that the Government can ultimately remove them. See *ante,* at 836; accord, *Demore, supra,* at 528, 123 S.Ct. 1708 (explaining that detention during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed"). The phrase "any action taken ... to remove an alien from the United States" must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal. Claims challenging detention during removal proceedings thus fall within the heartland of § 1252(b)(9).

## B

The plurality, the dissent, and respondents each offer reasons why § 1252(b)(9) does not apply to this case. The plurality reasons that applying § 1252(b)(9) to detention claims requires an overly expansive reading of "arising from." See *ante,* at 840 – 841. The dissent contends that § 1252(b)(9) applies only to challenges to the removal order itself. *Post,* at 875. And respondents argue that, if § 1252(b)(9) applies to their claims, they will have no meaningful way to challenge their detention during their removal proceedings.[3] Tr. of Oral Arg. 36. None of these arguments persuades me.

### 1

The plurality asserts that § 1252(b)(9) covers respondents' claims only if the **\*855** words "arising from" are given an "expansive interpretation." *Ante,* at 840. I am of a different view. Even if "arising from" is read narrowly, § 1252(b)(9) still covers the claims at issue in this case. That is because detention *is* an "action taken ... to remove" an alien. And even the narrowest reading of "arising from" must cover claims that directly challenge such actions. See *AADC,* 525 U.S., at 482–483, 119 S.Ct. 936.

The main precedent that the plurality cites to support its narrow reading of "arising from" demonstrates that § 1252(b)(9) applies here. See *ante,* at 840 – 841 (citing *AADC,*

525 U.S., at 482–483, 119 S.Ct. 936). In *AADC,* the Court explained that § 1252(b)(9) covers "all claims arising from deportation proceedings" and the "many ... decisions or actions that may be part of the deportation process." *Ibid.* The Court even listed examples of the type of claims that would be covered, including challenges to the decision "to open an investigation" and the decision "to surveil the suspected [immigration-law] violator." *Id.,* at 482, 119 S.Ct. 936. If surveilling a suspected violator falls under the statute, then the detention of a known violator certainly does as well.

The plurality dismisses my "expansive interpretation" because it would lead to "staggering results," supposedly barring claims that are far afield from removal. See *ante,* at 840 (describing lawsuits challenging inhumane conditions of confinement, assaults, and negligent driving). But that is not the case. Unlike detention during removal proceedings, those actions are neither congressionally authorized nor meant to ensure that an alien can be removed. Thus, my conclusion that § 1252(b)(9) covers an alien's challenge to the *fact* of his detention (an action taken in pursuit of the lawful objective of removal) says nothing about whether it also covers claims about inhumane treatment, assaults, or negligently inflicted injuries suffered *during* detention (actions that go beyond the Government's lawful pursuit of its removal objective). Cf. *Bell v. Wolfish,* 441 U.S. 520, 536–539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (drawing a similar distinction).

### 2

The dissent takes a different approach. Relying on the prefatory clause to § 1252(b), it asserts that § 1252(b)(9) "by its terms applies only '[w]ith respect to review of an order of removal under [ § 1252(a)(1) ].' " *Post,* at 876 (quoting 8 U.S.C. § 1252(b)). The dissent reads the prefatory clause to mean that § 1252(b)(9) applies only to a "challenge [to] an order of removal." *Post,* at 876. That reading is incorrect.

Section 1252(b)(9) is not restricted to challenges to removal orders. The text refers to review of "*all* questions of law and fact" arising from removal, not just removal orders. (Emphasis added.) And it specifies that § 1252(a)

(1) provides the only means for reviewing "such an order *or* such questions of law or fact." *Ibid.* (emphasis added). The term "or" is " 'almost always disjunctive, that is, the words it connects are to be given separate meanings.' " *Loughrin v. United States,* 573 U.S. ——, ——, 134 S.Ct. 2384, 2390, 189 L.Ed.2d 411 (2014) (quoting *United States v. Woods,* 571 U.S. 31, 45–46, 134 S.Ct. 557, 187 L.Ed.2d 472 (2013)). By interpreting § 1252(b)(9) as governing only removal orders, the dissent reads "or such questions of law or fact" out of the statute. It also renders superfluous § 1252(a)(5), which already specifies that the review made available under § 1252(a)(1) "shall be the sole and exclusive means for judicial review of *an order of removal.*" This Court typically disfavors such interpretations. **\*856** See *AADC, supra,* at 483, 119 S.Ct. 936.

The prefatory clause of § 1252(b) does not change the meaning of § 1252(b)(9). The prefatory clause states that the subparagraphs of § 1252(b), including § 1252(b)(9), impose requirements "[w]ith respect to review of an order of removal under subsection (a)(1)." The phrase "with respect to" means "referring to," "concerning," or "relating to." Oxford American Dictionary and Language Guide 853 (1999 ed.); accord, Webster's New Universal Unabridged Dictionary 1640 (2003 ed.); American Heritage Dictionary 1485 (4th ed. 2000). Read together, the prefatory clause and § 1252(b)(9) mean that review of all questions arising from removal must occur in connection with review of a final removal order under § 1252(a)(1), which makes sense given that § 1252(b)(9) is meant to "[c]onsolidat[e] ... questions for judicial review." Tellingly, on the two previous occasions when this Court interpreted § 1252(b)(9), it did not understand § 1252(b)(9) as limited to challenges to removal orders. See *AADC, supra,* at 482–483, 119 S.Ct. 936 (stating that § 1252(b)(9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and "the many ... decisions or actions that may be part of the deportation process"); *St. Cyr,* 533 U.S., at 313, n. 37, 121 S.Ct. 2271 (clarifying that § 1252(b)(9) requires "claims that were viewed as being outside of a 'final order' " to be "consolidated in a petition for review and considered by the courts of appeals" in their review of

the final removal order under § 1252(a)(1)). Thus, despite the dissent's assertion to the contrary, the prefatory clause plainly does not change the scope of § 1252(b)(9), which covers "all questions of law or fact" arising from the removal process.

3

At oral argument, respondents asserted that, if § 1252(b)(9) bars their lawsuit, then the only review available would be "a petition for review of [a] final removal order" under § 1252(a)(1), which takes place "after all the detention has already happened."[4] Tr. of Oral Arg. 36. I interpret respondents' argument as a claim that § 1252(b)(9) would be unconstitutional if it precluded meaningful review of their detention. This argument is unpersuasive and foreclosed by precedent.

The Constitution does not guarantee litigants the most effective means of judicial review for every type of claim they want to raise. See *AADC,* 525 U.S., at 487–492, 119 S.Ct. 936 (rejecting a similar argument); *Heikkila v. Barber,* 345 U.S. 229, 237, 73 S.Ct. 603, 97 L.Ed. 972 (1953) (explaining that limitations on judicial review of deportation must be followed "despite [their] apparent inconvenience to the alien"). This is especially true in the context of deportation, where limits on the courts' jurisdiction have existed for almost as long as federal immigration laws, and where this Court has repeatedly affirmed the constitutionality of those limits.[5]

**\*857** Indeed, this Court has already rejected essentially the same argument that respondents raise here. In *AADC,* the Court held that § 1252(g), a provision similar to § 1252(b)(9), barred the aliens' claim that the Government was violating the First Amendment by selectively enforcing the immigration laws against them. 525 U.S., at 487–492, 119 S.Ct. 936. The aliens argued that constitutional avoidance required the Court to interpret § 1252(g) as not applying to their claims because the only remaining avenue for review —a petition for review of a final removal order under § 1252(a)(1)—would be "unavailing" and would "come too late to prevent the 'chilling effect' upon their First Amendment

rights." *Id.,* at 487–488, 119 S.Ct. 936. The Court rejected this argument because "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *Id.,* at 488, 119 S.Ct. 936. The Court further explained that it had a duty to enforce Congress' limitations on judicial review, except perhaps in "a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations [justifying limited review could] be overcome." *Id.,* at 491, 119 S.Ct. 936.

Like in *AADC,* respondents' lack-of-meaningful-review argument does not allow us to ignore the jurisdictional limitations that Congress has imposed. This Court has never held that detention during removal proceedings is unconstitutional. To the contrary, this Court has repeatedly recognized the constitutionality of that practice. See *Demore,* 538 U.S., at 523, 123 S.Ct. 1708 (explaining that detention is "a constitutionally valid aspect of the deportation process"); accord, *Reno v. Flores,* 507 U.S. 292, 305–306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Carlson,* 342 U.S., at 538, 542, 72 S.Ct. 525. Nor does this lawsuit qualify as the "rare case in which the alleged [executive action] is so outrageous" that it could thwart the jurisdictional limitations in § 1252(b)(9). *AADC, supra,* at 491, 119 S.Ct. 936. The Government's detention of respondents is entirely routine and indistinguishable from the detention that we have repeatedly upheld in the past. Thus, regardless of the inconvenience that § 1252(b)(9) might pose for respondents, this Court must enforce it as written. Respondents must raise their claims in petitions for review of their final removal orders. [6]

## *858 III

Because I conclude that § 1252(b)(9) bars jurisdiction to hear respondents' claims, I will also address whether its application to this case violates the Suspension Clause, see Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"). It does not. Even assuming the Suspension Clause bars Congress from

stripping habeas jurisdiction over respondents' claims, but see *St. Cyr,* 533 U.S., at 337–346, 121 S.Ct. 2271 (Scalia, J., dissenting), this case does not involve a habeas petition.

Respondents do not seek habeas relief, as understood by our precedents. Although their complaint references the general habeas statute, see Third Amended Complaint, at 1, it is not a habeas petition. The complaint does not request that the District Court issue any writ. See *id.,* at 31–32. Rather, it seeks a declaration and an injunction that would provide relief for both present and future class members, including future class members not yet detained. *Ibid.* Indeed, respondents obtained class certification under Federal Rule of Civil Procedure 23(b)(2), which applies only when the class seeks "final injunctive relief or corresponding declaratory relief." [7]

Nor did respondents obtain habeas relief. When their case concluded, respondents obtained a classwide permanent injunction. See Order, Judgment, and Permanent Injunction, at 5–6. That classwide injunction looks nothing like a typical writ. It is not styled in the form of a conditional or unconditional release order. Cf. *United States v. Jung Ah Lung,* 124 U.S. 621, 622, 8 S.Ct. 663, 31 L.Ed. 591 (1888) (describing habeas relief as "order[ing] the discharge from custody of the person in whose behalf the writ was sued out"); *Chin Yow v. United States,* 208 U.S. 8, 13, 28 S.Ct. 201, 52 L.Ed. 369 (1908) (awarding habeas relief by ordering the release of the alien if certain conditions were not satisfied). It applies to future class members, including individuals who were not in custody when the injunction was issued. Cf. 28 U.S.C. § 2241(c) (generally precluding issuance of the writ unless the petitioner is "in custody"). And it is directed to at least one individual, the Director for the Executive Office for Immigration Review, who is not a custodian. Cf. *Rumsfeld v. Padilla,* 542 U.S. 426, 434, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) (explaining that "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner]' " (quoting 28 U.S.C. § 2242)).

Immigration law has long drawn a distinction between the declaratory and injunctive relief that respondents sought here and habeas relief. In *Heikkila,* for instance, this Court distinguished habeas relief from "injunctions, declaratory judgments and other types of relief" that "courts ha [d] consistently rejected" in immigration cases. 345 U.S., at 230, 73 S.Ct. 603. The Court rejected the alien's request

for "injunctive and declaratory relief" because Congress had authorized courts to grant relief only in habeas proceedings.

*Id.,* at 230, 237, 73 S.Ct. 603. We reaffirmed this distinction in *St. Cyr,* where we noted that the 1961 Immigration and Nationality Act, 75 Stat. 650, withdrew the district courts' "authority to grant declaratory and injunctive relief," but not **\*859** habeas relief. 533 U.S., at 309–310, 121 S.Ct. 2271; see also *Shaughnessy v. Pedreiro,* 349 U.S. 48, 49, 52–53, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (holding that the Administrative Procedure Act, which authorizes courts to grant declaratory and injunctive relief, authorized "judicial review of deportation orders *other than by habeas corpus* " (emphasis added)). And Congress has confirmed this distinction in its immigration statutes by allowing one form of relief, but not the other, in particular circumstances. Compare, *e.g.,* § 1252(e)(1) (prohibiting courts from granting "declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)") with § 1252(e)(2) (allowing "judicial review ... in habeas corpus proceedings" of particular "determination [s] made under section 1225(b)(1)").

Respondents' suit for declaratory and injunctive relief, in sum, is not a habeas petition. The Suspension Clause protects "[t]he Privilege of the Writ of Habeas Corpus," not requests for injunctive relief. Because respondents have not sought a writ of habeas corpus, applying § 1252(b)(9) to bar their suit does not implicate the Suspension Clause.

\* \* \*

Because § 1252(b)(9) deprives courts of jurisdiction over respondents' claims, we should have vacated the judgment below and remanded with instructions to dismiss this case for lack of jurisdiction. But a majority of the Court has decided to exercise jurisdiction. Because I agree with the Court's disposition of the merits, I concur in Part I and Parts III–VI of its opinion.

Justice BREYER, with whom Justice GINSBURG and Justice SOTOMAYOR join, dissenting.
This case focuses upon three groups of noncitizens held in confinement. Each of these individuals believes he or she

has the right to enter or to remain within the United States. The question is whether several statutory provisions of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* forbid granting them bail?

The noncitizens at issue are asylum seekers, persons who have finished serving a sentence of confinement (for a crime), or individuals who, while lacking a clear entitlement to enter the United States, claim to meet the criteria for admission, see *infra,* at 869, 872 – 873, 874 – 875. The Government has held all the members of the groups before us in confinement for many months, sometimes for years, while it looks into or contests their claims. But ultimately many members of these groups win their claims and the Government allows them to enter or to remain in the United States. Does the statute require members of these groups to receive a bail hearing, after, say, six months of confinement, with the possibility of release on bail into the community *provided* that they do not pose a risk of flight or a threat to the community's safety?

The Court reads the statute as forbidding bail, hence forbidding a bail hearing, for these individuals. In my view, the majority's interpretation of the statute would likely render the statute unconstitutional. Thus, I would follow this Court's longstanding practice of construing a statute "so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916). And I would interpret the statute as requiring bail hearings, presumptively after six months of confinement. Cf. *Zadvydas v. Davis,* 533 U.S. 678, 701, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

**\*860** I

*The Respondents*

Because of their importance to my conclusion, I shall repeat, with references to record support, the key characteristics of the groups of noncitizens who appear before us.

*First,* as I have said, the respondents in this case are members of three special classes of noncitizens, the most important of whom (1) arrive at our borders seeking asylum or (2) have committed crimes but have finished serving their sentences of imprisonment. We also consider those who (3) arrive at

our borders believing they are entitled to enter the United States for reasons other than asylum seeking, but lack a clear entitlement to enter.

*Second, all* members of the first group, the asylum seekers, have been found (by an immigration official) to have a "credible fear of persecution" in their home country should the United States deny them admittance. 8 U.S.C. § 1225(b)(1)(B)(ii). *All* members of the second group have, as I have said, finished serving their criminal sentences of confinement. § 1226(c)(1). *All* members of the third group may have (or may simply believe they have) a strong claim for admittance, but they are neither "clearly and beyond a doubt entitled to be admitted" nor conclusively determined to be inadmissible by an immigration officer on grounds of fraud or lack of required documentation. § 1225(b)(2)(A); see §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), (a)(7).

*Third,* members of the first two classes number in the thousands. See Brief for 46 Social Science Researchers and Professors as *Amici Curiae* 6, 8 (identifying, in 2015, 7,500 asylum seekers and 12,220 noncitizens who have finished serving sentences of criminal confinement, a portion of whom are class members detained for more than six months).

*Fourth,* detention is often lengthy. The classes before us consist of people who were detained for at least six months and on average one year. App. 92, 97. The record shows that the Government detained some asylum seekers for 831 days (nearly 2 & half; years), 512 days, 456 days, 421 days, 354 days, 319 days, 318 days, and 274 days—before they won their cases and received asylum. *Id.,* at 97, 228–236. It also shows that the Government detained one noncitizen for nearly four years *after* he had finished serving a criminal sentence, and the Government detained other members of this class for 608 days, 561 days, 446 days, 438 days, 387 days, and 305 days—all before they won their cases and received relief from removal. *Id.,* at 92, 213–220.

*Fifth,* many of those whom the Government detains eventually obtain the relief they seek. Two-thirds of the asylum seekers eventually receive asylum. *Id.,* at 98 (Table 28); *id.,* at 135 (Table 38); App. to Pet. for Cert. 40a. Nearly 40% of those who have served criminal sentences receive relief from removal, because, for example, their earlier conviction involved only a short sentence. See App. 95 (Table 23); *id.,* at 135 (Table 38). See also App. to Pet. for Cert. 34a; App. 210, 216–217, 312–313 (between one-

half and two-thirds of the class served sentences less than six months, *e.g.,* a 2–month sentence for being under the influence of a controlled substance, or an 8–day jail term for a minor firearms offense).

*Sixth,* these very asylum seekers would have received bail hearings had they first been taken into custody within the United States rather than at the border. See *In re X–K–,* 23 I. & N. Dec. 731, 734–735 (BIA 2005); 8 U.S.C. § 1226(a).

*Seventh,* as for those who have finished serving their sentences (for crimes), some **\*861** of those who are less dangerous would (on the majority's view) be held without bail the longest, because their claims will take longer to adjudicate. Moreover, those noncitizens would have no opportunity to obtain bail *while they pursue their claims,* but if they *lose* their claims, the Government must release them, typically within six months, if the Government can find no other country willing to take them. See *Zadvydas, supra,* at 701, 121 S.Ct. 2491.

*Eighth,* all the respondents are held in detention within the geographical boundaries of the United States, either in facilities controlled by United States Immigration and Customs Enforcement (ICE) or in state or local jails that hold them on ICE's behalf. App. 302–304; see ICE, Detention Facility Locator, online at http://www.ice.gov/detention-facilities (all Internet materials as last visited Feb. 21, 2018).

*Ninth,* the circumstances of their detention are similar, so far as we can tell, to those in many prisons and jails. And in some cases the conditions of their confinement are inappropriately poor. See Dept. of Homeland Security (DHS), Office of Inspector General (OIG), DHS OIG Inspection Cites Concerns With Detainee Treatment and Care at ICE Detention Facilities (2017) (reporting instances of invasive procedures, substandard care, and mistreatment, *e.g.,* indiscriminate strip searches, long waits for medical care and hygiene products, and, in the case of one detainee, a multiday lock down for sharing a cup of coffee with another detainee).

These record-based facts make evident what I said at the outset: The case concerns persons whom immigration authorities believe are not citizens and may not have a right to enter into, or remain within, the United States. Nonetheless they likely have a reasonable claim that they do have such a right. The Government detains them, often for many months while it determines the merits of, or contests, their claims.

To repeat the question before us: Does the statute entitle an individual member of one of these classes to obtain, say, after six months of detention, a bail hearing to decide whether he or she poses a risk of flight or danger to the community and, if not, to receive bail?

## II

### The Constitutional Question

The majority reads the relevant statute as prohibiting bail and hence prohibiting a bail hearing. In my view, the relevant constitutional language, purposes, history, tradition, and case law all make clear that the majority's interpretation at the very least would raise "grave doubts" about the statute's constitutionality. See *Jin Fuey Moy,* 241 U.S., at 401, 36 S.Ct. 658.

### A

Consider the relevant constitutional language and the values that language protects. The Fifth Amendment says that "[n]o person shall be ... deprived of life, liberty, or property without due process of law." An alien is a "person." See *Wong Wing v. United States,* 163 U.S. 228, 237–238, 16 S.Ct. 977, 41 L.Ed. 140 (1896). To hold him without bail is to deprive him of bodily "liberty." See *United States v. Salerno,* 481 U.S. 739, 748–751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). And, where there is no bail proceeding, there has been no bail-related "process" at all. The Due Process Clause—itself reflecting the language of the Magna Carta—prevents arbitrary detention. Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); see also **\*862** *Demore v. Kim,* 538 U.S. 510, 532, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (KENNEDY, J., concurring); *Zadvydas,* 533 U.S., at 718, 121 S.Ct. 2491 (KENNEDY, J., dissenting).

The Due Process Clause foresees eligibility for bail as part of "due process." See *Salerno, supra,* at 748–751, 107 S.Ct. 2095; *Schilb v. Kuebel,* 404 U.S. 357, 365, 92 S.Ct.

479, 30 L.Ed.2d 502 (1971); *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951). Bail is "basic to our system of law." *Schilb, supra,* at 365, 92 S.Ct. 479. It not only "permits the unhampered preparation of a defense," but also "prevent[s] the infliction of punishment prior to conviction." *Stack, supra,* at 4, 72 S.Ct. 1. It consequently limits the Government's ability to deprive a person of his physical liberty where doing so is not needed to protect the public, see *Salerno, supra,* at 750–751, 107 S.Ct. 2095 or to assure his appearance at, say, a trial or the equivalent, see *Stack, supra,* at 4–5, 72 S.Ct. 1. Why would this constitutional language and its bail-related purposes not apply to members of the classes of detained persons at issue here?

The Eighth Amendment reinforces the view that the Fifth Amendment's Due Process Clause does apply. The Eighth Amendment forbids "[e]xcessive bail." It does so in order to prevent bail being set so high that the level itself (rather than the reasons that might properly forbid release on bail) prevents provisional release. See *Carlson v. Landon,* 342 U.S. 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (explaining that the English clause from which the Eighth Amendment was copied was understood "to provide that bail shall not be excessive in those cases where it is proper to grant bail"). That rationale applies *a fortiori* to a refusal to hold any bail hearing at all. Thus, it is not surprising that this Court has held that both the Fifth Amendment's Due Process Clause and the Eighth Amendment's Excessive Bail Clause apply in cases challenging bail procedures. See, *e.g.,* *Salerno, supra,* at 746–755, 107 S.Ct. 2095; *Carlson, supra,* at 537–546, 72 S.Ct. 525.

It is clear that the Fifth Amendment's protections extend to "all persons within the territory of the United States." *Wong Wing, supra,* at 238, 16 S.Ct. 977. But the Government suggests that those protections do not apply to asylum seekers or other arriving aliens because the law treats arriving aliens as if they had never entered the United States; hence they are not held within its territory.

This last-mentioned statement is, of course, false. All of these noncitizens are held within the territory of the United States at an immigration detention facility. Those who enter at JFK airport are held in immigration detention facilities in, *e.g.,* New York; those who arrive in El Paso are held in, *e.g.,* Texas.

At most one might say that they are "constructively" held outside the United States: the word "constructive" signaling that we indulge in a "legal fiction," shutting our eyes to the truth. But once we admit to uttering a legal fiction, we highlight, we do not answer, the relevant question: *Why* should we engage in this legal fiction here?

The legal answer to this question is clear. We cannot here engage in this legal fiction. No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries? If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United States? The answer is that the Constitution does not authorize arbitrary **\*863** detention. And the reason that is so is simple: Freedom from arbitrary detention is as ancient and important a right as any found within the Constitution's boundaries. See *Zadvydas, supra,* at 720–721, 121 S.Ct. 2491 (KENNEDY, J., dissenting) ("inadmissible aliens" who are "stopped at the border" are "entitled to be free from detention that is arbitrary or capricious").

### B

The Due Process Clause, among other things, protects "those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors," and which were brought by them to this country. *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 277, 15 L.Ed. 372 (1856). A brief look at Blackstone makes clear that at the time of the American Revolution the right to bail was "settled"—in both civil and criminal cases.

Blackstone tells us that every prisoner (except for a convict serving his sentence) was entitled to seek release on bail. 4 Commentaries on the Laws of England 296–297 (1769). This right applied in every criminal case. *Ibid.* A noncapital defendant could seek bail from a local magistrate; a capital defendant could seek bail at a hearing before the Court of King's Bench. See *ibid.* Although a capital defendant had no right to *obtain* bail, he could always *seek* it, because "the court of king's bench ... may bail for any crime whatsoever,

be it treason, murder, or any other offense, according to the circumstances of the case." *Id.,* at 296. And although King Charles I initially claimed the right to hold a prisoner without bail on secret national security grounds, see *Darnel's Case,* 3 How. St. Tr. 1 (K.B.1627), Parliament responded by extracting from the King (via the 1628 Petition of Right) a promise to cease such detention. See 2 W. Hawkins, A Treatise of the Pleas of the Crown 107–110 (4th ed. 1771). From then on, bail was available even when a prisoner was held on the personal command of the King. *Ibid.* That is why Blackstone says that the King's Bench or its judges "may bail in any Case whatsoever," 4 Analysis of the Laws of England 148 (6th ed. 1771), indeed, in civil cases too, for in Blackstone's time some private civil cases might have begun with an arrest. See 3 Blackstone, Commentaries 290 (1768). And bail was likewise an alternative to detention where a judgment debtor was unable to pay a civil judgment in the era of debtor's prison. See, *e.g., Beers v. Haughton,* 9 Pet. 329, 356, 9 L.Ed. 145 (1835) (explaining that under Ohio law, "if a defendant, upon a [writ of] capias, does not give sufficient appearance bail, he shall be committed to prison"); *Hamilton v. Dunklee,* 1 N.H. 172 (1818).

American history makes clear that the settlers brought this practice with them to America. The Judiciary Act of 1789 conferred rights to bail proceedings in all federal criminal cases. § 33, 1 Stat. 91. It said that for a noncapital defendant "bail shall be admitted" and for a capital defendant bail may be admitted in the discretion of a district judge, a circuit judge, or a Justice of the Supreme Court, taking account of "the offence, and of the evidence, and the usages of law." *Ibid.* Congress enacted this law during its debate over the Bill of Rights, which it subsequently sent to the States for ratification. See 1 Annals of Cong. 90 (1789); see also *Martin v. Hunter's Lessee,* 1 Wheat. 304, 351, 4 L.Ed. 97 (1816) (Members of the First Congress were "men of great learning and ability, ... who had acted a principal part in framing, supporting, or opposing" the Constitution itself). Colonial law had been similarly, or in some instances even more, protective. See Foote, **\*864** The Coming Constitutional Crisis in Bail: I, 113 U. Pa. L. Rev. 959, 974–977 (1965).

Similar laws have consistently remained part of our legal tradition. In all federal criminal cases federal Acts have provided for bail proceedings. Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*; Bail Reform Act of 1966, 18 U.S.C. §

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 134 of 1021   PageID 7004

3146 *et seq.* (1964 ed., Supp. II). Every State has similar or more generous laws. See Appendix B, *infra.*

Standards for granting bail have changed somewhat over time. Initially the sole factor determining the outcome of a bail proceeding was risk of flight. See ⚑ *Stack,* 342 U.S., at 4–5, 72 S.Ct. 1 (interpreting the 1789 bail law, applied to a noncapital defendant and in light of the Eighth Amendment, to require bail no higher than required to provide "adequate assurance" that the defendant "will stand trial and submit to sentence if found guilty," "based upon standards relevant to the purpose of assuring the presence of that defendant").

Congress gradually added community safety as a bail factor. In 1966, Congress provided that for capital defendants and convicted defendants pursuing appeals, bail would be granted unless the appeal was frivolous or a court had "reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community." Bail Reform Act of 1966 § 3148. In 1984, Congress modified the bail standard for noncapital defendants by adding concern for community safety. § 3142(e)(1). This Court, applying the Due Process Clause and the Excessive Bail Clause to these changes, found that the 1984 Act passed constitutional muster. See ⚑ *Salerno,* 481 U.S., at 746–755, 107 S.Ct. 2095. Again, the States typically apply roughly similar or more generous standards. See Appendix B, *infra.*

The cases before us, however, are not criminal cases. Does that fact make a difference? The problem is that there are not many instances of civil confinement (aside from immigration detention, which I address below). Mental illness does sometimes provide an example. Individuals dangerous to themselves or to others may be confined involuntarily to a mental hospital. See, *e.g.,* ⚑ *United States v. Comstock,* 560 U.S. 126, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010); ⚑ *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Those persons normally do not have what we would call "a right to a bail hearing." But they do possess equivalent rights: They have the right to a hearing prior to confinement and the right to review of the circumstances at least annually. See ⚑ *Comstock, supra,* at 130–131, 130 S.Ct. 1949 (initial hearing followed by review every six months); ⚑ *Hendricks, supra,* at 353, 117 S.Ct. 2072 (initial hearing followed by yearly review). And the mentally ill persons detained under these schemes are being detained *because* they are dangerous.

That being so, there would be no point in providing a bail hearing as well. See ⚑ *Salerno, supra,* at 748–749, 107 S.Ct. 2095 (analogizing denial of bail to dangerous individuals to the civil commitment of the mentally ill). But there is every reason for providing a bail proceeding to the noncitizens at issue here, because they have received no individualized determination that they pose a risk of flight or present a danger to others, nor is there any evidence that most or all of them do.

This Court has also protected the right to a bail hearing during extradition proceedings. ⚑ *Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903), concerned the arrest and confinement of **\*865** Whitaker Wright, an American citizen, pending extradition for a crime that Wright was accused of having committed in Great Britain. Wright sought bail. ⚑ *Id.,* at 43, 23 S.Ct. 781. Since the federal bail laws applied only to those charged with committing crimes against the United States, they did not cover Wright's confinement. ⚑ *Id.,* at 61–62, 23 S.Ct. 781. The relevant extradition statute said nothing about bail. ⚑ *Id.,* at 62, 23 S.Ct. 781. Its language (stronger than the language at issue here) said that the individual was "to remain" in "the proper jail" until the "surrender shall be made" to the nation seeking extradition; and it added that he was "to remain" in custody "until delivered up"—though after two months he could seek release. Rev. Stat. §§ 5270, 5273.

In an opinion by Chief Justice Fuller, this Court unanimously wrote that, despite the lack of express statutory authorization and the risk of "embarrassment" to the United States if Wright fled, Wright could seek release on bail prior to the expiration of the 2–month period. See ⚑ *Wright,* 190 U.S., at 62–63, 23 S.Ct. 781. Given the universal entitlement to bail under English law, the Court was "unwilling to hold that ... courts may not in any case, and whatever the special circumstances, extend that relief" to prisoners awaiting extradition. ⚑ *Id.,* at 63, 23 S.Ct. 781. It consequently read a *silent* statute as authorizing bail proceedings (though the Court went on to hold that, under applicable standards, Wright's request for bail should be denied). *Ibid.*

The strongest basis for reading the Constitution's bail requirements as extending to these civil, as well as criminal, cases, however, lies in the simple fact that the law treats like cases alike. And reason tells us that the civil confinement at issue here and the pretrial criminal confinement that calls for bail are in every relevant sense identical. There is no

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 135 of 1021 PageID 7005

difference in respect to the fact of confinement itself. And I can find no relevant difference in respect to bail-related purposes.

Which class of persons—criminal defendants or asylum seekers—seems more likely to have acted in a manner that typically warrants confinement? A person charged with a crime cannot be confined at all without a finding of probable cause that he or she committed the crime. And the majority of criminal defendants lose their cases. See Dept. of Justice, Bureau of Justice Statistics, B. Reaves, Felony Defendants in Large Urban Counties, 2009–Statistical Tables, p. 24 (Dec. 2013) (reporting that 66% of felony defendants were convicted). A high percentage of the noncitizens before us, however, ultimately win the right they seek, the right to be in the United States.

Nor am I aware of any evidence indicating that the noncitizens seeking to enter, or to remain within, the United States are more likely than criminal defendants to threaten the safety of the community if released. In any event, this is a matter to be determined, case by case, at bail hearings.

Which group is more likely to present a risk of flight? Again, I can find no evidence suggesting that asylum seekers or other noncitizens generally present a greater risk of flight than persons imprisoned for trial where there is probable cause to believe that the confined person has committed a crime. In any event, this matter too is to be determined, case by case, at bail hearings.

If there is no reasonable basis for treating these confined noncitizens worse than ordinary defendants charged with crimes, 18 U.S.C. § 3142; worse than convicted criminals appealing their convictions, § 3143(b); worse than civilly committed citizens, *supra,* at 864 – 865; worse than identical noncitizens found elsewhere within **\*866** the United States, *supra,* at 860 –861; and worse than noncitizens who have committed crimes, served their sentences, and been definitively ordered removed (but lack a country willing to take them), *supra,* at 860 –861, their detention without bail is arbitrary. Thus, the constitutional language, purposes, and tradition that require bail in instances of criminal confinement also very likely require bail in these instances of civil confinement. That perhaps is why Blackstone wrote that the law provides for the possibility of "bail in any case whatsoever." 4 Analysis of the Laws of England, at 148.

C

My examination of the cases from this Court that considered detention of noncitizens and bail suggests that this Court, while sometimes denying bail to individuals, generally has not held that bail proceedings are unnecessary. Indeed, it almost always has suggested the contrary.

1. In 1882 Congress enacted two laws that restricted immigration: The first prohibited the entry of "Chinese laborers." The Chinese Exclusion Act, ch. 126, 22 Stat. 58. The second prohibited the entry of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, 22 Stat. 214. Neither said a word about bail. But in one instance, an excluded Chinese woman was detained in jail in San Francisco pending her return to China. She sought bail. *In re Ah Moy,* 21 F. 808 (C.C.D.Cal.1884). Justice Field, sitting as a Circuit Judge, wrote that the court lacked the authority to order bail because doing so would allow her to enter the United States—just what the statute forbade. *Id.,* at 809. The other sitting Circuit Judge (Judge Sawyer) disagreed. *Id.,* at 810 (dissenting opinion). He pointed out that the alien would remain "in the custody and control of the law while lawfully on bail." *Ibid.* He added that it "would be a great hardship, not to say a gross violation of her personal rights," to refuse bail for 15 days before her ship arrived as long as she could provide "security satisfactory to the court" that she would indeed depart when it did. *Id.,* at 809–810. Two other Circuit Judges noted their agreement with Judge Sawyer. *Id.,* at 809, n. 1. But they did not participate in the case, *ibid.,* the two participating judges split 1 to 1, and so the views of presiding Justice Field prevailed. The alien appealed to this Court, *Cheong Ah Moy v. United States,* 113 U.S. 216, 5 S.Ct. 431, 28 L.Ed. 983 (1885), but before this Court could decide, the ship departed with Cheong Ah Moy aboard.

2. In *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the Court struck down as unconstitutional a statute that said alien Chinese laborers should be "imprisoned at hard labor" for up to a year before being deported. *Id.,* at 235, 16 S.Ct. 977. In doing so, the Court wrote that although a sentence to hard labor was unlawful, "detention, or temporary confinement," was constitutional, because "[d]etention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused." *Ibid.* But an analogy

to criminal detention is an analogy to instances in which bail hearings are required.

3. In *Tod v. Waldman,* 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195 (1924), the Waldman family, like many of the respondents here, challenged their exclusion. They had arrived at Ellis Island fleeing religious persecution in Ukraine. They were detained because the immigration inspector believed the mother illiterate, one of the daughters disabled, and the whole family likely to become public charges. They appealed to the Labor Department, which ordered **\*867** Mrs. Waldman retested for literacy, requiring her to read both Yiddish and Hebrew. She could not. She then petitioned for a writ of habeas corpus on the grounds that (1) as a religious refugee she was exempt from the literacy requirement; (2) in any event, she need read only one language, not two; (3) her daughter was not disabled; and (4) the Department of Labor should have allowed her to appeal administratively. *Id.,* at 114–115, 45 S.Ct. 85.

The relevant statutory provisions, just like the present statute, see *infra,* at 869, 874, said that an arriving person, unless "clearly and beyond a doubt entitled" to land, "*shall be detained* for examination ... by a board of special inquiry." Act of Feb. 5, 1917, § 16, 39 Stat. 886 (emphasis added). By the time the case reached this Court, however, the family had been allowed bail. See *Waldman,* 266 U.S., at 117, 45 S.Ct. 85. This Court ordered the Department of Labor to provide the family with an administrative appeal. Then, after initially "remand[ing] the petitioners to the custody of immigration authorities" pending the outcome of the appeal, *id.,* at 120, 45 S.Ct. 85 the Court clarified in a rehearing order that "[n]othing in the order of this Court shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Tod v. Waldman,* 266 U.S. 547, 548, 45 S.Ct. 193, 69 L.Ed. 195 (1925). This statement is inconsistent with the earlier opinion of Justice Field, sitting as a Circuit Judge, because it shows that even an alien challenging her exclusion could be released on bail. *Supra,* at 866.

4. In *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), this Court upheld the denial of bail to noncitizen Communists being held pending deportation, despite a statute that permitted bail proceedings. *Id.,* at 541–546, 72 S.Ct. 525. It did so because it considered the

individuals to be a risk to security. It said nothing to suggest that bail proceedings were unnecessary.

5. In *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), the Attorney General had ordered a noncitizen permanently excluded from the United States on the ground that his "entry would be prejudicial to the public interest for security reasons." *Id.,* at 208, 73 S.Ct. 625; see Subversive Activities Control Act of 1950, §§ 22–23, 64 Stat. 1006–1012. He "sat on Ellis Island because this country shut him out and others were unwilling to take him in." 345 U.S., at 209, 73 S.Ct. 625. After 21 months in confinement he filed a petition for a writ of habeas corpus seeking judicial review of the exclusion decision or release on bail until he could be removed to another country. *Id.,* at 207, 209, 73 S.Ct. 625. This Court refused to review the exclusion decision on the ground that the security matter fell totally within the President's authority, pursuant to an express congressional delegation of power. *Id.,* at 210, 73 S.Ct. 625. The Court also denied Mezei a bail proceeding because in an "exclusion proceeding grounded on danger to the national security ... neither the rationale nor the statutory authority for" release on bail exists. *Id.,* at 216, 73 S.Ct. 625. It denied bail, however, *after* the Attorney General had already found, on an individualized basis, not only that Mezei was a security risk and consequently not entitled to either admission or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security. *Id.,* at 208–209, 73 S.Ct. 625. The respondents in this case have been the subject of no such individualized findings. And unlike Mezei, who was requesting bail after his exclusion proceedings had ended (while the Attorney General searched for a country that would take him—a matter **\*868** that we again confronted in *Zadvydas* ), the respondents here continue to litigate the lawfulness of their exclusion itself. Thus, Mezei, but not the respondents here, was in a sense in the position of a convicted criminal who had lost his appeal, not a criminal awaiting trial (or the results of an appeal).

6. *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), concerned a noncitizen who had lawfully resided in this country, committed a serious crime, completed his prison sentence, and was then ordered deported. *Id.,* at 684, 121 S.Ct. 2491. Zadvydas sought release on bail during

the time the Government searched for a country that would take him. *Id.,* at 684–685, 121 S.Ct. 2491. The governing statute said an alien such as Zadvydas "may be detained" pending his removal to another country. 8 U.S.C. § 1231(a)(6). We interpreted those words as requiring release from detention once it became clear that there was "no significant likelihood of removal in the reasonably foreseeable future"—presumptively after a period of confinement of six months. 533 U.S., at 701, 121 S.Ct. 2491. We read the statute as requiring this release because a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.,* at 690, 121 S.Ct. 2491.

From a constitutional perspective, this case follows *a fortiori* from *Zadvydas*. Here only a bail hearing is at issue, not release on bail, much less permanent release. And here there has been no final determination that any of the respondents lacks a legal right to stay in the United States—the bail hearing at issue concerns conditional release pending that final determination. It is immaterial that detention here is not literally indefinite, because while the respondents' removal proceedings must end eventually, they last an indeterminate period of at least six months and a year on average, thereby implicating the same constitutional right against prolonged arbitrary detention that we recognized in *Zadvydas*.

7. In *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), we held that the Government could constitutionally hold without bail noncitizens who had committed certain crimes, had completed their sentences, and were in removal proceedings. See § 1226(c). But we based our holding on the short-term nature of the confinement necessary to complete proceedings. See *id.,* at 529–530, 123 S.Ct. 1708. The Court wrote that the "detention at stake ... lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.,* at 530, 123 S.Ct. 1708. We added:

> "[I]n 85% of the cases in which aliens are detained [ pursuant to the relevant statute], removal proceedings are completed in an average time of 47 days and a median of 30 days. In the remaining 15% of cases, in which the alien appeals the decision of the immigration judge to the Board of Immigration Appeals, appeal takes an average of four

months, with a median time that is slightly shorter." *Id.,* at 529, 123 S.Ct. 1708 (citation omitted).

Demore himself, an outlier, was detained for six months. *Id.,* at 530–531, 123 S.Ct. 1708.

The Court then found detention constitutional "during the limited period" necessary to arrange for removal, and we contrasted that period of detention with the detention at issue in *Zadvydas,* referring to the detention in *Demore* as being "of a much shorter duration." 538 U.S., at 526, 528, 123 S.Ct. 1708. Justice KENNEDY stated in a concurrence that the Due Process Clause might require bail hearings "if **\*869** the continued detention became unreasonable or unjustified." *Id.,* at 532, 123 S.Ct. 1708. Dissenting, I wrote that, had I believed that Demore "had conceded that he [was] deportable," then, despite *Zadvydas,* "I would conclude that the Government could detain him without bail for the few weeks ordinarily necessary for formal entry of a removal order." 538 U.S., at 576, 123 S.Ct. 1708 (opinion concurring in part and dissenting in part).

The Government now tells us that the statistics it gave to the Court in *Demore* were wrong. Detention normally lasts twice as long as the Government then said it did. And, as I have pointed out, thousands of people here are held for considerably longer than six months without an opportunity to seek bail. See *supra,* at 860. We deal here with prolonged detention, not the short-term detention at issue in *Demore*. Hence *Demore,* itself a deviation from the history and tradition of bail and alien detention, cannot help the Government.

The upshot is the following: The Constitution's language, its basic purposes, the relevant history, our tradition, and many of the relevant cases point in the same interpretive direction. They tell us that an interpretation of the statute before us that would deny bail proceedings where detention is prolonged would likely mean that the statute violates the Constitution. The interpretive principle that flows from this conclusion is clear and longstanding: " ' [A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.' " *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (quoting *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (opinion

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 138 of 1021 PageID 7008

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

of Holmes, J.)). Moreover, a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *Jin Fuey Moy,* 241 U.S., at 401, 36 S.Ct. 658. These legal principles reflect a realistic assumption, namely, that Congress—particularly a Congress that did not consider a constitutional matter—would normally have preferred a constitutional interpretation to an interpretation that may render a statute an unconstitutional nullity. And that is so even where the constitutional interpretation departs from the most natural reading of the statute's language. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); see also *National Federation of Independent Business v. Sebelius,* 567 U.S. 519, 563, 574–576, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (majority opinion and opinion of ROBERTS, C.J.).

### III

### *The Statutory Provisions*

The question remains whether it is possible to read the statute as authorizing bail. As desirable as a constitutional interpretation of a statute may be, we cannot read it to say the opposite of what its language states. The word "animal" does not include minerals, no matter how strongly one might wish that it did. Indeed, where " 'Congress has made its intent in the statute clear, we must give effect to that intent,' " even if doing so requires us to consider the constitutional question, and even if doing so means that we hold the statute unconstitutional. *Zadvydas,* 533 U.S., at 696, 121 S.Ct. 2491 (quoting *Miller v. French,* 530 U.S. 327, 336, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000)). In my view, however, we can, and should, read the relevant statutory provisions to require bail proceedings in instances of prolonged detention without doing **\*870** violence to the statutory language or to the provisions' basic purposes.

### A

### *Asylum Seekers*

The relevant provision governing the first class of noncitizens, the asylum seekers, is § 1225(b)(1)(B)(ii). It says that, if an immigration "officer determines at the time" of an initial interview with an alien seeking to enter the United States "that [the] alien has a credible fear of persecution ..., the alien *shall be detained* for further consideration of the application for asylum." See Appendix A–1, *infra.* I have emphasized the three key words, namely, "shall be detained." Do those words mean that the asylum seeker *must be detained without bail* ?

They do not. *First,* in ordinary English and in light of the history of bail, the word "detain" is ambiguous in respect to the relevant point. The Oxford English Dictionary (OED), surveying the history of the word, notes that Edward Hall, a famous 16th-century legal scholar and author of Hall's Chronicle, wrote: "A traytor ... is apprehended and deteigned in prisone for his offence," a use of the word, as we know from Blackstone, that is consistent with bail. See *supra,* at 863 – 864 OED (3d ed., Dec. 2012), http://www.oed.com/view/Entry/51176 (annot. to def. 1). David Hume, the famous 18th-century historian and philosopher, writes of being "detained in strict confinement," thereby implying the existence of detention without strict confinement. *Ibid.* A 19th-century novelist writes, " 'Beg your pardon, sir,' said the constable, ... 'I shall be obliged to detain you till this business is settled' "—again a use of "detain" that we know (from Blackstone) is consistent with bail. *Ibid.* And the OED concludes that the primary meaning of "detain" is "[t]o keep in confinement *or under restraint* ; to keep prisoner." *Ibid.* (emphasis added). To grant bail, we know, is not to grant unrestrained freedom. Rather, where the Act elsewhere expressly permits bail, it requires "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General." 8 U.S.C. § 1226(a)(2)(A). Similarly in the criminal context, bail imposes numerous restraints, ranging from the provision of a bond, to restrictions on residences and travel, to the imposition of a curfew, to a requirement to obtain medical treatment, to report at regular intervals, or even to return to custody at specified hours. See 18 U.S.C. § 3142(c)(1)(B) (listing possible conditions for the pretrial release of federal criminal defendants).

At the very least, because the word "detain" in this context refers to a comparatively long period of time, it can readily coexist with a word such as "bail" that refers to a shorter period of conditional release. For instance, there is nothing inconsistent in saying: During his exile, he was permitted to

pay short visits to his home country; during the period of active hostilities, the soldiers would lay down their arms and fraternize on Christmas Day; during his overseas detention, he was allowed home to see his sick mother; or during his detention pending proceedings, he was permitted bail.

*Second,* our precedent treats the statutory word "detain" as consistent with bail. In *Waldman,* 266 U.S. 547, 45 S.Ct. 193, 69 L.Ed. 195, we considered an immigration statute that stated (in respect of *arriving* aliens) that "[e]very alien who may not appear to the examining inspector at the port of arrival to be clearly and beyond a doubt entitled to land *shall be detained* for examination in relation thereto by a board of special inquiry." Act of Feb. 5, 1917, § 16, 39 Stat. 886 (emphasis added). The Court indicated that bail was available, **\*871** stating that "[n]othing in the order of this court shall prejudice an application for release on bail." 266 U.S., at 548, 45 S.Ct. 193. In so stating, the Court was simply following precedent, such as *Wright v. Henkel,* where the Court wrote that bail is available even where not "specifically vested by statute." 190 U.S., at 63, 23 S.Ct. 781; see *supra,* at 864 – 865. When Congress passed the relevant provisions of the Act in 1996, it legislated against this historical backdrop, at a time when the precise language that it adopted had been interpreted by this Court to permit bail. See *Monessen Southwestern R. Co. v. Morgan,* 486 U.S. 330, 338, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) ("Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and apparently affirms, that [interpretation]' " (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979))).

*Third,* the Board of Immigration Appeals reads the word "detain" as consistent with bail, for it has held that its regulations, implementing the same statutory provision as is before us, allow bail for asylum seekers who are apprehended inside the United States within 100 miles of the border, rather than at a border crossing. See *In re X–K–,* 23 I. & N. Dec., at 732, 734–735 (discussing 8 C.F.R. § 1003.19(h)(2)(i) (2004)). The same statute, same language applies to the detention of those asylum seekers and the ones before us, so the statute must be consistent with bail in the Board of Immigration Appeals' view.

*Fourth,* in *Zadvydas* we found (to avoid similar constitutional questions) that the words " 'may be detained' " were consistent with requiring release from long-term detention. 533 U.S., at 682, 121 S.Ct. 2491 (quoting 8 U.S.C. § 1231(a)(6)). The majority correctly notes that here the language substitutes the word "shall" for the word "may." *Ante,* at 866 – 868. But the majority is wrong to distinguish *Zadvydas* on this basis. There the Court did not emphasize the word "detain," for the question at issue was release from detention. And the key word was consequently "may," suggesting discretion. Here the question concerns the right to a bail hearing during detention. And the key linguistic ambiguity concerns the word "detention." Is that word consistent with bail proceedings? The answer, for the reasons I have stated, is "yes."

*Fifth,* the statute does not even mention long-term detention without bail. Whether the statute speaks in terms of discretion ("may," as in *Zadvydas* ) or mandatory action ("shall," as in this case), the Government's argument is wrong for the same reason: Congress does not unambiguously authorize long-term detention without bail by failing to say when detention must end. As we recognized in *Zadvydas,* Congress anticipated long-term detention elsewhere in the Act, providing for review every six months of terrorist aliens detained under 8 U.S.C. § 1537(b)(2)(C), but it did not do so here. See 533 U.S., at 697, 121 S.Ct. 2491.

*Sixth,* the Act provides that an asylum applicant whose proceedings last longer than six months may be given work authorization. § 1158(d)(2). The majority would apply this provision to some asylum applicants but not the ones before us. *Ante,* at 849, n. 6. Of course, the statute does not contain that limitation. Read most naturally, the provision offers some indication that Congress, in the same statute, did not require asylum seekers to remain confined without bail at the 6–month mark.

*Seventh,* there is a separate statutory provision that purports to do precisely what the majority says this one does, providing **\*872** that certain aliens "shall be detained ... *until removed.*" § 1225(b)(1)(B)(iii)(IV) (emphasis added); *ante,* at 844 (detention must continue until proceedings "have finished"). The problem for the majority is that this other provision applies only to those who, unlike the respondents, have no credible fear of persecution. The provision that applies here lacks similar language.

Linguistic ambiguity, while necessary, is not sufficient. I would also ask whether the statute's purposes suggest a congressional refusal to permit bail where confinement is prolonged. The answer is "no." There is nothing in the statute or in the legislative history that reveals any such congressional intent. The most likely reason for its absence is that Congress, like the Government when it appeared before us in *Demore,* believed there were no such instances, or at least that there were very few. Indeed, the Act suggests that asylum proceedings ordinarily finish quickly. See § 1158(d)(5)(A) (providing that absent "exceptional circumstances," final administrative adjudication (not including appeal) must be completed "within 180 days," and any appeal must be filed "within 30 days" of the decision). And for those proceedings that last longer than six months, we know that two-thirds of asylum seekers win their cases. Thus, legislative silence suggests not disapproval of bail, but a lack of consideration of the matter. For present purposes that is sufficient. It means that Congress did not intend to forbid bail. An interpretation that permits bail—based upon history, tradition, statutory context, and precedent—is consistent, not inconsistent, with what Congress intended the statutory provision to do.

The majority apparently finds a contrary purpose in the fact that other provisions of the statute permit the Attorney General to release an alien on parole " 'for urgent humanitarian reasons or significant public benefit' " and impose bail-like conditions. *Ante,* at 844 – 845 (discussing 8 U.S.C. § 1182(d)(5)(A)). Yet under the majority's interpretation of "detain," the same argument could have been made in *Zadvydas.* We held that noncitizens presumptively are entitled to release after six months of detention, notwithstanding an available alternative avenue for relief, namely, bail. 533 U.S., at 683, 121 S.Ct. 2491. There is no reason to reach a different result here. While the Government historically used this provision to take account of traditional bail factors (flight risk, safety risk), the President since issued an Executive Order directing parole to be granted "in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit." Exec. Order No. 13767, 82 Fed. Reg. 8793 (2017). And besides, Congress' provision of parole to permit, for example, release for the purpose of medical care or to testify in a court proceeding—which *adds to* the circumstances under which a noncitizen can be released from confinement—says nothing about whether Congress intended to *cut back on* those

circumstances in respect to the meaning of "detain" and the historical understanding that detention permits bail.

B

*Criminals Who Have Served Their Sentences*

The relevant statutory provision, § 1226(c), says in paragraph (1) that the "Attorney General shall *take into custody* any alien who ... is deportable [or inadmissible] by reason of having committed [certain crimes] when the alien is released," presumably (or ordinarily) after having served his sentence. It then goes on to say, in paragraph (2), that the "Attorney General *may release [that] alien* **\*873** ... *only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness [or to certain related others]." See Appendix A–2, *infra.*

I have emphasized the relevant phrases: "take into custody" in the first paragraph, and "may release [that] alien ... only if" in the second paragraph. We have long interpreted "in custody" as "not requir[ing] that a prisoner be physically confined." *Maleng v. Cook,* 490 U.S. 488, 491, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (*per curiam* ). In the habeas context, we have held that "a person released on bail or on his own recognizance" is " 'in custody' within the meaning of the statute." *Hensley v. Municipal Court, San Jose–Milpitas Judicial Dist., Santa Clara Cty.,* 411 U.S. 345, 349, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 300–301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (same). The reason is simple, as I already have explained, *supra,* at 870: A person who is released on bail "is subject to restraints 'not shared by the public generally.' " *Hensley, supra,* at 351, 93 S.Ct. 1571 (quoting *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)); see also *Maleng, supra,* at 491, 109 S.Ct. 1923 ("[A] prisoner who had been placed on parole was still 'in custody' " because his "release from physical confinement ... was not unconditional; instead, it was explicitly conditioned on his reporting regularly to his parole officer, remaining in a particular community, residence, and job, and refraining from certain activities" (citing *Jones, supra,* at 242, 83 S.Ct. 373)).

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 141 of 1021   PageID 7011

Moreover, there is no reason to interpret "custody" differently than "detain." The OED defines "custody" as "[t]he state of being detained," http://www.oed.com/view/Entry/46305 (def. 5). "Detained," as I have previously pointed out, can be read consistently with bail. See *supra,* at 869 – 871. The OED also defines the statutory phrase, "take (a person) into custody," as "to arrest and imprison (a person)," http://www.oed.com/view/Entry/46305 (def. 5). And we know from the history, tradition, case law, and other sources earlier discussed, including Blackstone, that arresting and imprisoning a person is consistent with a bail hearing and a subsequent grant of bail, even where a statute contains words such as "commitment" or "detain." See *supra,* at 861 – 869 (citing, *e.g.,* 🚩 *Wright,* 190 U.S., at 62, 23 S.Ct. 781 (reading as consistent with a bail proceeding the statutory language " 'shall issue [a] warrant for the commitment ... to the proper jail, there to remain' " until " ' surrender' " for extradition)).

But what about the second phrase, stating that the Attorney General "may release [that] alien ... *only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness"? Does the presence of the words "only if" show that the statute automatically denies bail for any other reason?

It does not. That is because the phrase has nothing to do with bail. It has to do with a special program, the Witness Protection Program, set forth in 18 U.S.C. § 3521. That program allows the Attorney General to relocate the witness, to give him an entirely new identity, to help his family similarly, and to pay him a stipend, among other things. §§ 3521(a)(1), (b)(1). The Attorney General may "take such action as [he] determines to be necessary to protect the person," presumably even free the witness from whatever obligations might require him to report to an immigration or judicial authority. § 3521(b)(1). Accordingly, when the Attorney General **\*874** "release[s]" an alien under 🚩 8 U.S.C. § 1226(c)(2), he does not grant bail; he may well do far more, freeing the witness from a host of obligations and restraints, including those many obligations and restraints that accompany bail. See *supra,* at 870.

This understanding of "release" in § 1226(c) is consistent with the OED's definition of "release" as "to free from restraint" or even "to liberate from ... an obligation" (not simply "to free from ... captivity"), http://www.oed.com/

view/Entry/161859 (def. 6(a)). And it is consistent with our earlier reading of the word "detain." *Supra,* at 869 – 872. Following the OED's definition of "detain" as "*under restraint,*" we have understood the word "detention" to include the state of being "under" those "restraints" that typically accompany bail. *Supra,* at 869 – 872. That is to say, both the individual on bail and the individual not on bail are "detained"; and the Attorney General, through his Witness Protection Program powers can free the individual from both. To repeat: The provision at issue means that the Attorney General "may release" the detained person from the restraints that accompany detainment—whether that individual has been detained with, or without, bail.

So understood the phrase has nothing to do with the issue before us: whether a confined individual is, or is not, entitled to bail or a bail hearing. It simply means that the Attorney General cannot free that person from all, or most, restraining conditions (including those that accompany bail) unless the alien is placed in the Witness Protection Program. So read, the words "only if" neither favor nor disfavor a reading of the statute consistent with the right to a bail proceeding.

The purpose-related reasons that argue for a bail-favorable reading are also applicable here. Congress did not consider the problem of long-term detention. It wrote the statute with brief detention in mind. See H.R.Rep. No. 104–469, pt. 1, p. 123, and n. 25 (1996) (stating that the "average stay [was] 28 days"). Congress did not know (for apparently the Government did not know in *Demore* ) that the average length of detention for this class would turn out to be about a year. Nor did Congress necessarily know that about 40% of class members eventually obtain the right to remain in the United States.

I should add that reading the statute as denying bail to those whose detention is prolonged is anomalous. Those whose removal is legally or factually questionable could be imprisoned indefinitely while the matter is being decided. Those whose removal is not questionable (for they are under a final removal order) could be further imprisoned for no more than six months. See *supra,* at 860, 868. In fact, even before our decision in *Zadvydas,* the Government gave bail hearings to noncitizens under a final order of removal after six months of detention. See 🚩 533 U.S., at 683, 121 S.Ct. 2491.

C

*Other Applicants for Admission*

The statutory provision that governs the third category of noncitizens seeking admission at the border is § 1225(b)(2)(A). It says that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." See Appendix A–3, *infra*.

The Government tells us that this miscellaneous category consists of persons who are neither (1) clearly eligible for admission, nor (2) clearly ineligible. Pet. **\*875** for Cert. 3–4. A clearly eligible person is, of course, immediately admitted. A clearly ineligible person—someone who lacks the required documents, or provides fraudulent ones—is "removed ... without further hearing or review." § 1225(b)(1)(A)(i); see §§ 1182(a)(6)(C), (a)(7). But where the matter is not clear, *i.e.,* where the immigration officer determines that an alien "is not clearly and beyond a doubt entitled to be admitted," he is detained for a removal proceeding. § 1225(b)(2)(A). Like all respondents, this class has been detained for at least six months. It may include persons returning to the United States who have work permits or other documents seemingly entitling them to entry, but whom an immigration officer suspects are inadmissible for some other reason, such as because they may have incomplete vaccinations or have committed student visa abuse or a crime of "moral turpitude." See § 1182(a) (delineating classes of aliens ineligible for admission). For instance, the Federal Register is replete with examples of offenses that immigration authorities have thought are crimes of moral turpitude but that the courts of appeals later determine are not. See, *e.g.,* *Goldeshtein v. INS,* 8 F.3d 645, 648 (C.A.9 1993) (structuring financial transactions to avoid currency reports); *Nunez v. Holder,* 594 F.3d 1124, 1138 (C.A.9 2010) (indecent exposure). It also may include individuals who claim citizenship by virtue of birth or parentage but who lack documents clearly proving their claim.

The critical statutory words are the same as those I have just discussed in the context of the asylum seekers—"shall be detained." There is no more plausible reason here than there was there to believe those words foreclose bail. See *supra,* at 869 – 872. The constitutional considerations, the statutory language, and the purposes underlying the statute are virtually the same. Thus, the result should be the same: Given the constitutional considerations, we should interpret the statute as permitting bail.

IV

The majority concludes in Part V, *ante,* at 851 – 852, by saying that, before considering bail-related constitutional arguments, the lower courts "should reexamine whether respondents can continue litigating their claims as a class." *Ante,* at 851. Relying on dicta in *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC* ), it then suggests that the respondents may not be able to continue litigating because the Act says that

"no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation [of the statutory provisions here at issue] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

Were the majority's suggestion correct as to this jurisdictional question, it would have shown, at most, that we should decide the constitutional question here and now. We have already asked for and received briefs on that question. But I do not believe the majority is correct. Every member of the classes before us falls within the provision's exception. Every one of them is an "individual alien against whom proceedings under such part have been initiated." *Ibid.* The Court in *AADC* did not consider, and had no reason to consider, the application of § 1252(f)(1) to such a class. Regardless, a court could order declaratory relief. Federal Rule of Civil Procedure 23(b)(2) permits a class action where "final injunctive relief or *corresponding* declaratory relief is appropriate **\*876** respecting the class as a whole." (Emphasis added.) And the Advisory Committee says that declaratory relief can fall within the Rule's term "corresponding" if it "serves as a basis for later injunctive relief." Notes on Rule 23(b)(2)–1966 Amendment, 28 U.S.C.App., p. 812.

Jurisdiction also is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only "[w]ith respect to review of

an order of removal under [ § 1252(a)(1) ]." § 1252(b). Respondents challenge their detention without bail, not an order of removal.

Neither does Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), bar these class actions. Every member of each class seeks the same relief (a bail hearing), every member has been denied that relief, and the differences in situation among members of the class are not relevant to their entitlement to a bail hearing.

At a minimum I can find nothing in the statute or in the cases to which the majority refers that would prevent the respondents from pursuing their action, obtaining a declaratory judgment, and then using that judgment to obtain relief, namely, a bail hearing, in an individual case. Thus, I believe the lower courts are free to consider the constitutionality of the relevant statutory provisions as the majority now interprets them.

### V

#### Conclusion

The relevant constitutional language, purposes, history, traditions, context, and case law, taken together, make it likely that, where confinement of the noncitizens before us is prolonged (presumptively longer than six months), bail proceedings are constitutionally required. Given this serious constitutional problem, I would interpret the statutory provisions before us as authorizing bail. Their language permits that reading, it furthers their basic purposes, and it is consistent with the history, tradition, and constitutional values associated with bail proceedings. I believe that those bail proceedings should take place in accordance with customary rules of procedure and burdens of proof rather than the special rules that the Ninth Circuit imposed.

The bail questions before us are technical but at heart they are simple. We need only recall the words of the Declaration of Independence, in particular its insistence that *all* men and women have "certain unalienable Rights," and that among them is the right to "Liberty." We need merely remember that the Constitution's Due Process Clause protects each person's liberty from arbitrary deprivation. And we need just keep in mind the fact that, since Blackstone's time and long before, liberty has included the right of a confined person to seek

release on bail. It is neither technical nor unusually difficult to read the words of these statutes as consistent with this basic right. I would find it far more difficult, indeed, I would find it alarming, to believe that Congress wrote these statutory words in order to put thousands of individuals at risk of lengthy confinement all within the United States but all without hope of bail. I would read the statutory words as consistent with, indeed as requiring protection of, the basic right to seek bail.

Because the majority does not do so, with respect, I dissent.

**\*883** APPENDIXES

A

1

*Statute Applicable to Asylum Seekers*

8 U.S.C. § 1225. "Inspection by immigration officers; expedited removal of inadmissible **\*877** arriving aliens; referral for hearing

.....

"(b) Inspection of applicants for admission
"(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

"(A) Screening

"(i) In general

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

"(ii) Claims for asylum

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible

under 🚩 section 1182(a)(6)(C) or 🚩 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

.....

"(B) Asylum interviews

"(i) Conduct by asylum officers

"An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) Referral of certain aliens

"If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien *shall be detained for further consideration of the application for asylum.*" (Emphasis added.)

2

*Statute Applicable to Criminal Aliens*

🚩 8 U.S.C. § 1226. "Apprehension and detention of aliens

"(a) Arrest, detention, and release
"On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) *bond* of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole;

.....

"(c) Detention of criminal aliens
"(1) Custody

"The Attorney General *shall take into custody* any alien who—

"(A) is inadmissible by reason of having committed any offense covered in 🚩 section 1182(a)(2) of this title,

"(B) is deportable by reason of having committed any offense covered in 🚩 section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

"(C) is deportable under 🚩 section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

**\*878** "(D) is inadmissible under 🚩 section 1182(a)(3)(B) of this title or deportable under 🚩 section 1227(a)(4)(B) of this title, "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) Release

"The Attorney General *may release* an alien described in paragraph (1) *only if* the Attorney General decides *pursuant to* section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)

3

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 145 of 1021   PageID 7015

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

*Statute Applicable to Miscellaneous*
*Applicants for Admission*

🚩 8 U.S.C. § 1225. "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

.....

"(b) Inspection of applicants for admission

.....

"(2) Inspection of other aliens

"(A) In general

"Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title.

"(B) Exception

"Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(C) Treatment of aliens arriving from contiguous territory

"In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." (Emphasis added.)

B

*State Bail Law*

| State | Key Bail Provisions |
|---|---|
| Alabama | Ala. Const., Art. 1, §16; Ala. Code §§15–13–3, 15–13–108, 15–13–190 (2011); Ala. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Alaska | Alaska Const., Art. 1, §11; Alaska Stat. §§12.30.011, 12.30.040 (2016) |
| Arizona | Ariz. Const., Art. 2, §22; Ariz. Rev. Stat. Ann. §§13–3961 (Cum. Supp. 2017), 13–3961.01 (2010), 13–3962; Ariz. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Arkansas | Ark. Const., Art. 2, §8; Ark. Code §§16–84–110 (2005), 16–91–110 (Supp. 2017); Ark. Rule App. Crim. Proc. 6 (2017) |
| California | Cal. Const., Art. 1, §12; Cal. Penal Code Ann. §1271 (West 2004) |
| Colorado | Colo. Const., Art. 2, §19; Colo. Rev. Stat. §§16–4–101, 16–4–102, 16–4–201, 16–4–201.5 (2017) |
| Connecticut | Conn. Const., Art. 1, §8; Conn. Gen. Stat. §§54–63f, 54–64a (2017) |
| Delaware | Del. Const., Art. 1, §12; Del. Code Ann., Tit. 11, §§2103, 2104, 2112 (2015) |
| Florida | Fla. Const., Art. 1, §14; Fla. Stat. §§903.046, 903.132, 903.133 (2017) |
| Georgia | Ga. Code Ann. §§17–6–1, 17–6–15 (Supp. 2017) |

| State | Key Bail Provisions |
|---|---|
| Hawaii | Haw. Rev. Stat. §§804–3, 804–4 (2014) |
| Idaho | Idaho Const., Art. 1, §6; Idaho Code Ann. §19–2903 (2017) |
| Illinois | Ill. Const., Art. 1, §9; Ill. Comp. Stat., ch. 725, §§5110–4, 5110–6.2 (West 2016) |
| Indiana | Ind. Const., Art. 1, §17; Ann. Ind. Code §§35–33–8.5–6 (West 2012), 35–33–9–1 (West Cum. Supp. 2017) |
| Iowa | Iowa Const., Art. 1, §12; Iowa Code Ann. §§811.1, 811.5 (West 2015) |
| Kansas | Kan. Const., Bill of Rights §9; Kan. Stat. Ann. §§22–2801, 22–2804 (2007), 22–2802 (2016 Cum. Supp.) |
| Kentucky | Ky. Const., §16; Ky. Rev. Stat. Ann. §431.066 (West Cum. Supp. 2017); Ky. Rules Crim. Proc. 4.02, 4.54, 12.78 (West Cum. Supp. 2017) |
| Louisiana | La. Const., Art. 1, §18; La. Code Crim. Proc. Ann., Art. 312, 316 (West 2017) |
| Maine | Me. Const., Art. 1, §10; Me. Rev. Stat. Ann., Tit. 15, §§1003, 1051 (Cum. Supp. 2017), 1026, 1027 (2016) |
| Maryland | Md. Crim. Proc. Code Ann. §§5–101, 5–102 (Supp. 2017), 5–207 (2008); Md. Rules 4–216.1, 4–349 (2018) |
| Massachusetts | Mass. Gen. Laws, ch. 276, §§20D, 42, 42A (2016); Mass. Rule Crim. Proc. 31 (West 2017) |

| State | Key Bail Provisions |
| --- | --- |
| Michigan | Mich. Comp. Laws Ann. §§765.6 (West Supp. 2017), 770.9 (West 2006) |
| Minnesota | Minn. Const., Art. 1, §7; Minn. Stat. §629.16 (2016); Minn. Rules Crim. Proc. 6, 28.02 (2016) |
| Mississippi | Miss. Const., Art. 32, §29; Miss. Code Ann. §§99–5–11, 99–35–3. (2015) |
| Missouri | Mo. Const., Art. 1, §§20, 34; Mo. Ann. Rev. Stat. §§544.455, 544. 671 (Vernon Cum. Supp. 2017), 544.457, 547.170 (Vernon 2002) |
| Montana | Mont. Const., Art. 2, §21; Mont. Code Ann. §§46–9–102, 46–9–107 (2017) |
| Nebraska | Neb. Const., Art. 1, §9; Neb. Rev. Stat. §§29–901 (2017 Supp.), 29–2301 (2016) |
| Nevada | Nev. Const., Art. 1, §7; Nev. Rev. Stat. §§178.484, 178.488 (2015) |
| New Hampshire | N. H. Rev. Stat. Ann. §§597:1 (2001), 597:1–a (Cum. Supp. 2017), 597:1–c, 597:2 |
| New Jersey | N. J. Const., Art. 1, §11; N. J. Stat. Ann. §§2A:162–11 (West 2011), 162–18 (West Cum. Supp. 2017), 2A:162–20; N. J. Rule App. Proc. 2:9–4 (West 2018) |
| New Mexico | N. M. Const., Art. 2, §13; N. M. Dist. Ct. Rules Crim. Proc. 5–401, 5–402 (1992) |

| State | Key Bail Provisions |
| --- | --- |
| New York | N. Y. Crim. Proc. Law Ann. §§510.20, 530.10 (West 2009), 510.30 (West Cum. Supp. 2018) |
| North Carolina | N. C. Gen. Stat. Ann. §§15A–533, 15A–534 (2017) |
| North Dakota | N. D. Const., Art. 1, §11; N. D. Rule Crim. Proc. 46 (2016–2017) |
| Ohio | Ohio Const., Art. I, §9; Ohio Rev. Code Ann. §§2937.222, 2949.02 (Lexis 2014); Ohio Rule Crim. Proc. 46 (Lexis 2017–2018) |
| Oklahoma | Okla. Const., Art. 2, §8; Okla. Stat., Tit. 22, §§1077, 1101, 1102 (2011) |
| Oregon | Ore. Const., Art. 1, §§14, 43; Ore. Rev. Stat. §§135.240, 138.650 (2015) |
| Pennsylvania | Pa. Const., Art. 1, §14; 42 Pa. Cons. Stat. §5701 (2015); Pa. Rule Crim. Proc. 521 (West 2017) |
| Rhode Island | R. I. Const., Art. 1, §9; R. I. Gen. Laws §§12–13–1, 12–22–12 (2002); R. I. Super. Ct. Rule Crim. Proc. 46 (Supp. 2017) |
| South Carolina | S. C. Const., Art. 1, §15; S. C. Code Ann. §§17–15–10, 22–5–510 (Cum. Supp. 2017), 18–1–90 (2014) |
| South Dakota | S. D. Const., Art. 6, §8; S. D. Codified Laws §§23A–43–2, 23A–43–2.1, 23A–43–16 (2016), 23A–43–3, 23A–43–4 (Cum. Supp. 2017) |
| Tennessee | Tenn. Const., Art. 1, §15; Tenn. Code Ann. §§40–11–102, 40–11–105, 40–11–113 (2012) |

| State | Key Bail Provisions |
| --- | --- |
| Texas | Tex. Const., Art. 1, §§11, 11a, 11b, 11c; Tex. Code Crim. Proc. Ann., Art. 17.15, 17.40 (Vernon 2015), 44.04 (Vernon Cum. Supp. 2017) |
| Utah | Utah Const., Art. 1, §8; Utah Code §§77–20–1, 77–20–10 (2017) |
| Vermont | Vt. Const., ch. 2, §40; Vt. Stat. Ann., Tit. 13, §§7553, 7574 (2009), 7553a, 7554 (2017 Cum. Supp.) |
| Virginia | Va. Code Ann. §§19.2–120, 19.2–120.1, 19.2–121, 19.2–319 (2015) |
| Washington | Wash. Const., Art. 1, §20; Wash. Rev. Code §§10.21.020, 10.21.030, 10.21.040, 10.73.040 (2016) |
| West Virginia | W. Va. Code Ann. 62–1C–1 (Lexis 2014) |
| Wisconsin | Wis. Const., Art. 1, §8, cl. 2; Wis. Stat. §§969.01, 969.03, 969.035 (2011–2012) |
| Wyoming | Wyo. Const., Art. 1, §14; Wyo. Stat. Ann. §7–10–101 (2015) |

**All Citations**

138 S.Ct. 830, 200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826, 2018 Daily Journal D.A.R. 1764, 27 Fla. L. Weekly Fed. S 78

## Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\* Justice SOTOMAYOR joins only Part III–C of this opinion.

1 Anyone who believes that he is not covered by § 1226(c) may also ask for what is known as a "*Joseph* hearing." See *Matter of Joseph,* 22 I. & N. Dec. 799 (BIA 1999). At a *Joseph* hearing, that person "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the [Government] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore v. Kim,* 538 U.S. 510, 514, n. 3, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). Whether respondents are entitled to *Joseph* hearings is not before this Court.

2 It is questionable whether this is true for aliens who are detained under 8 U.S.C. § 1225(b)(1)(B)(ii) for consideration of their asylum applications.

3 The concurrence contends that "detention *is* an 'action taken ... to remove' an alien" and that therefore "even the narrowest reading of 'arising from' must cover" the claims raised by respondents. *Post,* at 855. We do not follow this logic. We will assume for the sake of argument that detention is an action taken "to remove an alien," *i.e.,* for the purpose of removing an alien, rather than simply an action aimed at ensuring that the alien does not flee or commit a crime while his proceedings are pending. But even if we proceed on the basis of that assumption, we do not see what it proves. The question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action. And for the reasons explained above, those legal questions are too remote from the actions taken to fall within the scope of § 1252(b)(9).

4 According to the dissent, we could have applied the *expressio unius* canon in *Zadvydas* as well because there was also an "alternative avenue for relief, namely, bail," available for aliens detained under § 1231(a)(6). *Post,* at 872 (opinion of BREYER, J.). But the dissent overlooks the fact that the provision granting bail was precisely the same provision that the Court purported to be interpreting, so the canon was not applicable. See 533 U.S., at 683, 121 S.Ct. 2491.

5 See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (PATRIOT Act), 115 Stat. 272.

6 As the dissent notes, § 1158(d)(2) regulates employment authorization for certain "applicant[s] for asylum." Were all asylum applicants detained, the dissent says, that provision would make no sense, because detained aliens do not need work authorizations. *Post,* at 871 – 872. But § 1158(d)(2) applies not only to aliens seeking asylum status "in accordance with ... section 1225(b)" (and thus aliens who are detained), but also to all aliens already "physically present in the United States." § 1158(a)(1). Many of those aliens will be in the country lawfully, and thus they will not be detained and will be able to work pending the outcome of their asylum application. For example, an alien may apply for asylum after being admitted into the country on a short-term visa. While the application is pending, § 1158 may offer a way for that alien to find employment.

In response, the dissent accuses us of "apply[ing] this provision to some asylum applicants but not the ones before us." *Post,* at 871 – 872. That is not remotely what we are doing. We do not doubt that § 1158(d)(2)

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 148 of 1021   PageID 7018

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

"applies" to all "applicant[s] for asylum" as it says, even if some of those applicants are not as likely to receive an employment authorization (for instance, because they are detained) as others.

7    It should not be surprising by this point that even the aliens in *Waldman* understood "detention" in contradistinction to "bail." See Petition for Rehearing in *Tod v. Waldman,* O.T. 1924, No. 95, pp. 17–18 ("[T]he Court's mandate should authorize relators to give bail, instead of having [them] go to Ellis Island and remain there *in custody* pending an appeal ... which may involve very long *detention* pending hearing of the appeal ..." (capitalization omitted and emphasis added)).

8    The dissent argues that because "the question at issue [in *Zadvydas* ] was release from detention," "the key word was consequently 'may.' " *Post,* at 871. We agree but fail to see the point. If, as the dissent admits, *Zadvydas* was about "release from detention" and not about what qualifies as "detention," then it is unclear why the dissent thinks that dictionaries support its unorthodox interpretation of the word "detention."

1    The named Government officials are the Attorney General of the United States, the Secretary of the Department of Homeland Security, the Director of the Executive Office for Immigration Review, the Director and Assistant Director of the Los Angeles District of Immigration and Customs Enforcement, and several directors of jails and detention facilities.

2    Section 1252 provides a few specific grants of jurisdiction beyond § 1252(a)(1)'s general grant of jurisdiction over final removal orders and all other related questions of law and fact. Section 1252(b)(7), for example, allows an alien to challenge the validity of his removal order during criminal proceedings if he is charged with willfully failing to depart the United States. And § 1252(e)(2) allows an alien who is denied admission to the United States and ordered removed to raise certain claims in habeas corpus proceedings.

3    Respondents also asserted at oral argument that the Government "has said repeatedly" that § 1252(b)(9) does not apply to detention claims. Tr. of Oral Arg. 36. But our "independent obligation" to evaluate jurisdiction, *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), means that we cannot accept the Government's concessions on this point. See *King Bridge Co. v. Otoe County,* 120 U.S. 225, 226, 7 S.Ct. 552, 30 L.Ed. 623 (1887).

4    Contrary to respondents' argument, some of the respondents will get review before "all the detention has already happened." Respondents who successfully petition for review to the Court of Appeals from a final removal order and obtain a remand to the immigration court, like class representative Alejandro Rodriguez did here, will have an opportunity to obtain review of their detention before it is complete. See Third Amended Complaint, at 9–12.

5    See, *e.g.,* Act of Aug. 18, 1884, 28 Stat. 390 ("In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereinafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of Treasury"), upheld in *Lem Moon Sing v. United States,* 158 U.S. 538, 547–550, 15 S.Ct. 967, 39 L.Ed. 1082 (1895); Immigration Act of 1891, § 8, 26 Stat. 1085 ("All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of Treasury"), upheld in *Ekiu v. United States,* 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); 1917 Immigration Act, § 19, 39 Stat. 890 ("In every case where any person is ordered deported

from the United States under the provisions of this Act, or of any law or treaty, the decision of the Secretary of Labor shall be final"), upheld in *Heikkila,* 345 U.S., at 233–235, 237, 73 S.Ct. 603.

6    I take no position on whether some of the respondents will face other jurisdictional hurdles, even on review of their final removal orders. See, *e.g.,* §§ 1252(a)(2)(A), (B). I also continue to agree with Justice O'Connor's concurring opinion in *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), which explained that § 1226(e) "unequivocally deprives federal courts of jurisdiction to set aside 'any action or decision' by the Attorney General" regarding detention. *Id.,* at 533, 123 S.Ct. 1708 (opinion concurring in part and concurring in judgment).

7    This Court has never addressed whether habeas relief can be pursued in a class action. See *Schall v. Martin,* 467 U.S. 253, 261, n. 10, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (reserving this question). I take no position on that issue here, since I conclude that respondents are not seeking habeas relief in the first place.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Unconstitutional by   Restrepo v. McElroy,   2nd Cir.(N.Y.),   Apr. 01, 2004

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 8. Aliens and Nationality (Refs & Annos)
      Chapter 12. Immigration and Nationality (Refs & Annos)
         Subchapter II. Immigration
            Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1182

§ 1182. Inadmissible aliens

Effective: March 7, 2013
Currentness

**(a) Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1) Health-related grounds**

**(A) In general**

Any alien--

**(i)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1]

**(ii)** except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

**(iii)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)--

**(I)** to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

**(II)** to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

**(iv)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

**(B) Waiver authorized**

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

**(C) Exception from immunization requirement for adopted children 10 years of age or younger**

Clause (ii) of subparagraph (A) shall not apply to a child who--

**(i)** is 10 years of age or younger,

**(ii)** is described in subparagraph (F) or (G) of section 1101(b)(1) of this title; [1] and

**(iii)** is seeking an immigrant visa as an immediate relative under section 1151(b) of this title,

if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

**(2) Criminal and related grounds**

**(A) Conviction of certain crimes**

**(i) In general**

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

**(I)** a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

**(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

### (ii) Exception

Clause (i)(I) shall not apply to an alien who committed only one crime if--

**(I)** the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

**(II)** the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

### (B) Multiple criminal convictions

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

### (C) Controlled substance traffickers

Any alien who the consular officer or the Attorney General knows or has reason to believe--

**(i)** is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

**(ii)** is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

**(D) Prostitution and commercialized vice**

Any alien who--

**(i)** is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

**(ii)** directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

**(iii)** is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

  is inadmissible.

**(E) Certain aliens involved in serious criminal activity who have asserted immunity from prosecution**

Any alien--

**(i)** who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

**(ii)** for whom immunity from criminal jurisdiction was exercised with respect to that offense,

**(iii)** who as a consequence of the offense and exercise of immunity has departed from the United States, and

**(iv)** who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

  is inadmissible.

**(F) Waiver authorized**

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

**(G) Foreign government officials who have committed particularly severe violations of religious freedom**

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of Title 22, is inadmissible.

**(H) Significant traffickers in persons**

**(i) In general**

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 7102 of Title 22, is inadmissible.

**(ii) Beneficiaries of trafficking**

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

**(iii) Exception for certain sons and daughters**

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

**(I) Money laundering**

Any alien--

**(i)** who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of Title 18 (relating to laundering of monetary instruments); or

**(ii)** who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

is inadmissible.

**(3) Security and related grounds**

**(A) In general**

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in--

**(i)** any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

**(ii)** any other unlawful activity, or

**(iii)** any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is inadmissible.

**(B) Terrorist activities**

**(i) In general**

Any alien who--

**(I)** has engaged in a terrorist activity;

**(II)** a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

**(III)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

**(IV)** is a representative (as defined in clause (v)) of--

**(aa)** a terrorist organization (as defined in clause (vi)); or

**(bb)** a political, social, or other group that endorses or espouses terrorist activity;

**(V)** is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

**(VI)** is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(VII)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

**(VIII)** has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

**(IX)** is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

**(ii) Exception**

Subclause (IX) of clause (i) does not apply to a spouse or child--

**(I)** who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

**(II)** whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

**(iii) "Terrorist activity" defined**

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

**(I)** The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

**(II)** The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

**(III)** A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

**(IV)** An assassination.

**(V)** The use of any--

(**a**) biological agent, chemical agent, or nuclear weapon or device, or

**(b)** explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

**(VI)** A threat, attempt, or conspiracy to do any of the foregoing.

### (iv) "Engage in terrorist activity" defined

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

**(I)** to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

**(II)** to prepare or plan a terrorist activity;

**(III)** to gather information on potential targets for terrorist activity;

**(IV)** to solicit funds or other things of value for--

  **(aa)** a terrorist activity;

  **(bb)** a terrorist organization described in clause (vi)(I) or (vi)(II); or

  **(cc)** a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(V)** to solicit any individual--

  **(aa)** to engage in conduct otherwise described in this subsection;

  **(bb)** for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

  **(cc)** for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

**(VI)** to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

**(aa)** for the commission of a terrorist activity;

**(bb)** to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

**(cc)** to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

**(dd)** to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

#### (v) "Representative" defined

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

#### (vi) "Terrorist organization" defined

As used in this section, the term "terrorist organization" means an organization--

**(I)** designated under section 1189 of this title;

**(II)** otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

**(III)** that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

### (C) Foreign policy

#### (i) In general

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible.

**(ii) Exception for officials**

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

**(iii) Exception for other aliens**

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

**(iv) Notification of determinations**

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

**(D) Immigrant membership in totalitarian party**

**(i) In general**

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

**(ii) Exception for involuntary membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

**(iii) Exception for past membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that--

**(I)** the membership or affiliation terminated at least--

**(a)** 2 years before the date of such application, or

**(b)** 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

**(II)** the alien is not a threat to the security of the United States.

**(iv) Exception for close family members**

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

**(E) Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

**(i) Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with--

**(I)** the Nazi government of Germany,

**(II)** any government in any area occupied by the military forces of the Nazi government of Germany,

**(III)** any government established with the assistance or cooperation of the Nazi government of Germany, or

**(IV)** any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

**(ii) Participation in genocide**

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of Title 18, is inadmissible.

**(iii) Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of--

**(I)** any act of torture, as defined in section 2340 of Title 18; or

**(II)** under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note),

is inadmissible.

**(F) Association with terrorist organizations**

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

**(G) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18, is inadmissible.

**(4) Public charge**

**(A) In general**

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

**(B) Factors to be taken into account**

**(i)** In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's--

**(I)** age;

**(II)** health;

**(III)** family status;

**(IV)** assets, resources, and financial status; and

**(V)** education and skills.

**(ii)** In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph.

**(C) Family-sponsored immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1151(b)(2) or 1153(a) of this title is inadmissible under this paragraph unless--

**(i)** the alien has obtained--

**(I)** status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 1154(a)(1)(A) of this title;

**(II)** classification pursuant to clause (ii) or (iii) of section 1154(a)(1)(B) of this title; or

**(III)** classification or status as a VAWA self-petitioner; or

**(ii)** the person petitioning for the alien's admission (and any additional sponsor required under section 1183a(f) of this title or any alternative sponsor permitted under paragraph (5)(B) of such section) has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(D) Certain employment-based immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1153(b) of this title by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible under this paragraph unless such relative has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(E) Special rule for qualified alien victims**

Subparagraphs (A), (B), and (C) shall not apply to an alien who--

**(i)** is a VAWA self-petitioner;

**(ii)** is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U) of this title; or

**(iii)** is a qualified alien described in section 1641(c) of this title.

**(5) Labor certification and qualifications for certain immigrants**

**(A) Labor certification**

**(i) In general**

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--

**(I)** there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

**(II)** the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

**(ii) Certain aliens subject to special rule**

For purposes of clause (i)(I), an alien described in this clause is an alien who--

**(I)** is a member of the teaching profession, or

**(II)** has exceptional ability in the sciences or the arts.

**(iii) Professional athletes**

**(I) In general**

A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

**(II) "Professional athlete" defined**

For purposes of subclause (I), the term "professional athlete" means an individual who is employed as an athlete by--

**(aa)** a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

**(bb)** any minor league team that is affiliated with such an association.

**(iv) Long delayed adjustment applicants**

A certification made under clause (i) with respect to an individual whose petition is covered by section 1154(j) of this title shall remain valid with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued.

**(B) Unqualified physicians**

An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession is inadmissible, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C) Uncertified foreign health-care workers**

Subject to subsection (r), any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that--

**(i)** the alien's education, training, license, and experience--

**(I)** meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

**(II)** are comparable with that required for an American health-care worker of the same type; and

**(III)** are authentic and, in the case of a license, unencumbered;

**(ii)** the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the

alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

**(iii)** if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.

### (D) Application of grounds

The grounds for inadmissibility of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph (2) or (3) of section 1153(b) of this title.

## (6) Illegal entrants and immigration violators

### (A) Aliens present without admission or parole

#### (i) In general

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

#### (ii) Exception for certain battered women and children

Clause (i) shall not apply to an alien who demonstrates that--

**(I)** the alien is a VAWA self-petitioner;

**(II)** (a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

**(III)** there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

### (B) Failure to attend removal proceeding

Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.

**(C) Misrepresentation**

**(i) In general**

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

**(ii) Falsely claiming citizenship**

**(I) In general**

Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

**(II) Exception**

In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (i).

**(D) Stowaways**

Any alien who is a stowaway is inadmissible.

**(E) Smugglers**

**(i) In general**

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(11).

**(F) Subject of civil penalty**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is inadmissible.

**(ii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(12).

**(G) Student visa abusers**

An alien who obtains the status of a nonimmigrant under section 1101(a)(15)(F)(i) of this title and who violates a term or condition of such status under section 1184(l) of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.

**(7) Documentation requirements**

**(A) Immigrants**

**(i) In general**

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission--

**(I)** who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

**(II)** whose visa has been issued without compliance with the provisions of section 1153 of this title,

is inadmissible.

**(ii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (k).

**(B) Nonimmigrants**

**(i) In general**

Any nonimmigrant who--

**(I)** is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

**(II)** is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

is inadmissible.

**(ii) General waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(4).

**(iii) Guam and Northern Mariana Islands visa waiver**

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (l).

**(iv) Visa waiver program**

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

**(8) Ineligible for citizenship**

**(A) In general**

Any immigrant who is permanently ineligible to citizenship is inadmissible.

**(B) Draft evaders**

Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency is inadmissible, except that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

**(9) Aliens previously removed**

**(A) Certain aliens previously removed**

**(i) Arriving aliens**

Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(ii) Other aliens**

Any alien not described in clause (i) who--

**(I)** has been ordered removed under section 1229a of this title or any other provision of law, or

**(II)** departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(iii) Exception**

Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

**(B) Aliens unlawfully present**

**(i) In general**

Any alien (other than an alien lawfully admitted for permanent residence) who--

**(I)** was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) [2] of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

**(II)** has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

**(ii) Construction of unlawful presence**

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

**(iii) Exceptions**

**(I) Minors**

No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(II) Asylees**

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

**(III) Family unity**

No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(IV) Battered women and children**

Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if "violation of the terms of the alien's nonimmigrant visa" were substituted for "unlawful entry into the United States" in subclause (III) of that paragraph.

**(V) Victims of a severe form of trafficking in persons**

Clause (i) shall not apply to an alien who demonstrates that the severe form of trafficking (as that term is defined in section 7102 of Title 22) was at least one central reason for the alien's unlawful presence in the United States.

**(iv) Tolling for good cause**

In the case of an alien who--

**(I)** has been lawfully admitted or paroled into the United States,

**(II)** has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

**(III)** has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

**(v) Waiver**

The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

**(C) Aliens unlawfully present after previous immigration violations**

**(i) In general**

Any alien who--

**(I)** has been unlawfully present in the United States for an aggregate period of more than 1 year, or

**(II)** has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

**(ii) Exception**

Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

**(iii) Waiver**

The Secretary of Homeland Security may waive the application of clause (i) in the case of an alien who is a VAWA self-petitioner if there is a connection between--

**(I)** the alien's battering or subjection to extreme cruelty; and

**(II)** the alien's removal, departure from the United States, reentry or reentries into the United States; or attempted reentry into the United States.

**(10) Miscellaneous**

**(A) Practicing polygamists**

Any immigrant who is coming to the United States to practice polygamy is inadmissible.

**(B) Guardian required to accompany helpless alien**

Any alien--

**(i)** who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 1222(c) of this title, and

**(ii)** whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.

**(C) International child abduction**

**(i) In general**

Except as provided in clause (ii), any alien who, after entry of an order by a court in the United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, is inadmissible until the child is surrendered to the person granted custody by that order.

**(ii) Aliens supporting abductors and relatives of abductors**

Any alien who--

**(I)** is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

**(II)** is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

**(III)** is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

**(iii) Exceptions**

Clauses (i) and (ii) shall not apply--

**(I)** to a government official of the United States who is acting within the scope of his or her official duties;

**(II)** to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

**(III)** so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

**(D) Unlawful voters**

**(i) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible.

**(ii) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation

that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such violation.

**(E) Former citizens who renounced citizenship to avoid taxation**

Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is inadmissible.

**(b) Notices of denials**

**(1)** Subject to paragraphs (2) and (3), if an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be inadmissible under subsection (a), the officer shall provide the alien with a timely written notice that--

**(A)** states the determination, and

**(B)** lists the specific provision or provisions of law under which the alien is inadmissible or adjustment [3] of status.

**(2)** The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of inadmissible aliens.

**(3)** Paragraph (1) does not apply to any alien inadmissible under paragraph (2) or (3) of subsection (a).

**(c) Repealed. Pub.L. 104-208, Div. C, Title III, § 304(b), Sept. 30, 1996, 110 Stat. 3009-597**

**(d) Temporary admission of nonimmigrants**

**(1)** The Attorney General shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(S) of this title. The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(S) of this title, if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting removal proceedings against an alien admitted as a nonimmigrant under section 1101(a)(15)(S) of this title for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 1101(a)(15)(S) of this title.

**(2)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(3)(A)** Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3) (A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A) (iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

**(B)(i)** The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II), no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi), and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. Such a determination shall neither prejudice the ability of the United States Government to commence criminal or civil proceedings involving a beneficiary of such a determination or any other person, nor create any substantive or procedural right or benefit for a beneficiary of such a determination or any other person. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D). The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.

**(ii)** Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.

**(4)** Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands and residents thereof having a common nationality with such nationals, or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 1223(c) of this title.

**(5)(A)** The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent

humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**(B)** The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

**(6)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(7)** The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, the Commonwealth of the Northern Mariana Islands, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. [4] Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed in the manner provided by section 1231(c) of this title.

**(8)** Upon a basis of reciprocity accredited officials of foreign governments, their immediate families, attendants, servants, and personal employees may be admitted in immediate and continuous transit through the United States without regard to the provisions of this section except paragraphs (3)(A), (3)(B), (3)(C), and (7)(B) of subsection (a) of this section.

**(9), (10)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(11)** The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of removal, and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title and in the case of an alien seeking admission or adjustment of status as an immediate relative or immigrant under section 1153(a) of this title (other than paragraph (4) thereof), if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of such action was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(12)** The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)--

**(A)** in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title, and

**(B)** in the case of an alien seeking admission or adjustment of status under section 1151(b)(2)(A) of this title or under section 1153(a) of this title,

if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.

**(13)(A)** The Secretary of Homeland Security shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(T) of this title, except that the ground for inadmissibility described in subsection (a)(4) shall not apply with respect to such a nonimmigrant.

**(B)** In addition to any other waiver that may be available under this section, in the case of a nonimmigrant described in section 1101(a)(15)(T) of this title, if the Secretary of Homeland Security considers it to be in the national interest to do so, the Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of--

**(i)** subsection (a)(1); and

**(ii)** any other provision of subsection (a) (excluding paragraphs (3), (4), (10)(C), and (10(E)) [6] if the activities rendering the alien inadmissible under the provision were caused by, or were incident to, the victimization described in section 1101(a)(15)(T)(i)(I) of this title.

**(14)** The Secretary of Homeland Security shall determine whether a ground of inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(U) of this title. The Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(U) of this title, if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

**(e) Educational visitor status; foreign residence requirement; waiver**

No person admitted under section 1101(a)(15)(J) of this title or acquiring such status after admission (i) whose participation in the program for which he came to the United States was financed in whole or in part, directly or indirectly, by an agency of the Government of the United States or by the government of the country of his nationality or his last residence, (ii) who at the time of admission or acquisition of status under section 1101(a)(15)(J) of this title was a national or resident of a country which the Director of the United States Information Agency, pursuant to regulations prescribed by him, had designated as clearly requiring the services of persons engaged in the field of specialized knowledge or skill in which the alien was engaged, or (iii) who came to the United States or acquired such status in order to receive graduate medical education or training, shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa under section 1101(a)(15)(H) or section 1101(a)(15)(L) of this title until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States: *Provided,* That upon the favorable recommendation of the Director, pursuant to the request of an interested United States Government agency (or, in the case of an alien described in clause (iii), pursuant to the request of a State Department of Public Health, or its equivalent), or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), or that the alien cannot return to the country of his nationality or last residence because he would be subject to persecution on account of race, religion, or political opinion, the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest except that in the case of a waiver requested by a State Department of Public Health, or its equivalent, or

in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii), the waiver shall be subject to the requirements of section 1184(l) of this title: *And provided further,* That, except in the case of an alien described in clause (iii), the Attorney General may, upon the favorable recommendation of the Director, waive such two-year foreign residence requirement in any case in which the foreign country of the alien's nationality or last residence has furnished the Director a statement in writing that it has no objection to such waiver in the case of such alien.

**(f) Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**(g) Bond and conditions for admission of alien inadmissible on health-related grounds**

The Attorney General may waive the application of--

**(1)** subsection (a)(1)(A)(i) in the case of any alien who--

**(A)** is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa,

**(B)** has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa; or

**(C)** is a VAWA self-petitioner,

in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

**(2)** subsection (a)(1)(A)(ii) in the case of any alien--

**(A)** who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

**(B)** for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(C)** under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

**(3)** subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.

**(h) Waiver of subsection (a)(2)(A)(i)(I), (II), (B), (D), and (E)**

The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if--

**(1)(A)** in the case of any immigrant it is established to the satisfaction of the Attorney General that--

**(i)** the alien is inadmissible only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is inadmissible occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status,

**(ii)** the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

**(iii)** the alien has been rehabilitated; or

**(B)** in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; or

**(C)** the alien is a VAWA self-petitioner; and

**(2)** the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

No waiver shall be provided under this subsection in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture. No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the

United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.

**(i) Admission of immigrant inadmissible for fraud or willful misrepresentation of material fact**

**(1)** The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6) (C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

**(2)** No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).

**(j) Limitation on immigration of foreign medical graduates**

**(1)** The additional requirements referred to in section 1101(a)(15)(J) of this title for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

**(A)** A school of medicine or of one of the other health professions, which is accredited by a body or bodies approved for the purpose by the Secretary of Education, has agreed in writing to provide the graduate medical education or training under the program for which the alien is coming to the United States or to assume responsibility for arranging for the provision thereof by an appropriate public or nonprofit private institution or agency, except that, in the case of such an agreement by a school of medicine, any one or more of its affiliated hospitals which are to participate in the provision of the graduate medical education or training must join in the agreement.

**(B)** Before making such agreement, the accredited school has been satisfied that the alien (i) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States); or (ii)(I) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services), (II) has competency in oral and written English, (III) will be able to adapt to the educational and cultural environment in which he will be receiving his education or training, and (IV) has adequate prior education and training to participate satisfactorily in the program for which he is coming to the United States. For the purposes of this subparagraph, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners examination if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C)** The alien has made a commitment to return to the country of his nationality or last residence upon completion of the education or training for which he is coming to the United States, and the government of the country of his nationality or last residence has provided a written assurance, satisfactory to the Secretary of Health and Human Services, that there is a need in that country for persons with the skills the alien will acquire in such education or training.

**(D)** The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's admission into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that--

**(i)** such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

**(ii)** the alien may, once and not later than two years after the date the alien is admitted to the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

**(E)** The alien furnishes the Attorney General each year with an affidavit (in such form as the Attorney General shall prescribe) that attests that the alien (i) is in good standing in the program of graduate medical education or training in which the alien is participating, and (ii) will return to the country of his nationality or last residence upon completion of the education or training for which he came to the United States.

**(2)** An alien who is a graduate of a medical school and who is coming to the United States to perform services as a member of the medical profession may not be admitted as a nonimmigrant under section 1101(a)(15)(H)(i)(b) of this title unless--

**(A)** the alien is coming pursuant to an invitation from a public or nonprofit private educational or research institution or agency in the United States to teach or conduct research, or both, at or for such institution or agency, or

**(B)(i)** the alien has passed the Federation licensing examination (administered by the Federation of State Medical Boards of the United States) or an equivalent examination as determined by the Secretary of Health and Human Services, and

**(ii)** (I) has competency in oral and written English or (II) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States).

**(3)** Omitted

**(k) Attorney General's discretion to admit otherwise inadmissible aliens who possess immigrant visas**

Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside

foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

**(l) Guam and Northern Mariana Islands visa waiver program**

**(1) In general**

The requirement of subsection (a)(7)(B)(i) may be waived by the Secretary of Homeland Security, in the case of an alien applying for admission as a nonimmigrant visitor for business or pleasure and solely for entry into and stay in Guam or the Commonwealth of the Northern Mariana Islands for a period not to exceed 45 days, if the Secretary of Homeland Security, after consultation with the Secretary of the Interior, the Secretary of State, the Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands, determines that--

**(A)** an adequate arrival and departure control system has been developed in Guam and the Commonwealth of the Northern Mariana Islands; and

**(B)** such a waiver does not represent a threat to the welfare, safety, or security of the United States or its territories and commonwealths.

**(2) Alien waiver of rights**

An alien may not be provided a waiver under this subsection unless the alien has waived any right--

**(A)** to review or appeal under this chapter an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam or the Commonwealth of the Northern Mariana Islands; or

**(B)** to contest, other than on the basis of an application for withholding of removal under section 1231(b)(3) of this title or under the Convention Against Torture, or an application for asylum if permitted under section 1158 of this title, any action for removal of the alien.

**(3) Regulations**

All necessary regulations to implement this subsection shall be promulgated by the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, on or before the 180th day after May 8, 2008. The promulgation of such regulations shall be considered a foreign affairs function for purposes of section 553(a) of Title 5. At a minimum, such regulations should include, but not necessarily be limited to--

**(A)** a listing of all countries whose nationals may obtain the waiver also provided by this subsection, except that such regulations shall provide for a listing of any country from which the Commonwealth has received a significant economic benefit from the number of visitors for pleasure within the one-year period preceding May 8, 2008, unless the Secretary of Homeland Security determines that such country's inclusion on such list would represent a threat to the welfare, safety, or security of the United States or its territories; and

**(B)** any bonding requirements for nationals of some or all of those countries who may present an increased risk of overstays or other potential problems, if different from such requirements otherwise provided by law for nonimmigrant visitors.

#### (4) Factors

In determining whether to grant or continue providing the waiver under this subsection to nationals of any country, the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, shall consider all factors that the Secretary deems relevant, including electronic travel authorizations, procedures for reporting lost and stolen passports, repatriation of aliens, rates of refusal for nonimmigrant visitor visas, overstays, exit systems, and information exchange.

#### (5) Suspension

The Secretary of Homeland Security shall monitor the admission of nonimmigrant visitors to Guam and the Commonwealth of the Northern Mariana Islands under this subsection. If the Secretary determines that such admissions have resulted in an unacceptable number of visitors from a country remaining unlawfully in Guam or the Commonwealth of the Northern Mariana Islands, unlawfully obtaining entry to other parts of the United States, or seeking withholding of removal or asylum, or that visitors from a country pose a risk to law enforcement or security interests of Guam or the Commonwealth of the Northern Mariana Islands or of the United States (including the interest in the enforcement of the immigration laws of the United States), the Secretary shall suspend the admission of nationals of such country under this subsection. The Secretary of Homeland Security may in the Secretary's discretion suspend the Guam and Northern Mariana Islands visa waiver program at any time, on a country-by-country basis, for other good cause.

#### (6) Addition of countries

The Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands may request the Secretary of the Interior and the Secretary of Homeland Security to add a particular country to the list of countries whose nationals may obtain the waiver provided by this subsection, and the Secretary of Homeland Security may grant such request after consultation with the Secretary of the Interior and the Secretary of State, and may promulgate regulations with respect to the inclusion of that country and any special requirements the Secretary of Homeland Security, in the Secretary's sole discretion, may impose prior to allowing nationals of that country to obtain the waiver provided by this subsection.

### (m) Requirements for admission of nonimmigrant nurses

**(1)** The qualifications referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to an alien who is coming to the United States to perform nursing services for a facility, are that the alien--

**(A)** has obtained a full and unrestricted license to practice professional nursing in the country where the alien obtained nursing education or has received nursing education in the United States;

**(B)** has passed an appropriate examination (recognized in regulations promulgated in consultation with the Secretary of Health and Human Services) or has a full and unrestricted license under State law to practice professional nursing in the State of intended employment; and

**(C)** is fully qualified and eligible under the laws (including such temporary or interim licensing requirements which authorize the nurse to be employed) governing the place of intended employment to engage in the practice of professional nursing as a registered nurse immediately upon admission to the United States and is authorized under such laws to be employed by the facility.

**(2)(A)** The attestation referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to a facility for which an alien will perform services, is an attestation as to the following:

**(i)** The facility meets all the requirements of paragraph (6).

**(ii)** The employment of the alien will not adversely affect the wages and working conditions of registered nurses similarly employed.

**(iii)** The alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.

**(iv)** The facility has taken and is taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants who are authorized to perform nursing services, in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses.

**(v)** There is not a strike or lockout in the course of a labor dispute, the facility did not lay off and will not lay off a registered nurse employed by the facility within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition, and the employment of such an alien is not intended or designed to influence an election for a bargaining representative for registered nurses of the facility.

**(vi)** At the time of the filing of the petition for registered nurses under section 1101(a)(15)(H)(i)(c) of this title, notice of the filing has been provided by the facility to the bargaining representative of the registered nurses at the facility or, where there is no such bargaining representative, notice of the filing has been provided to the registered nurses employed at the facility through posting in conspicuous locations.

**(vii)** The facility will not, at any time, employ a number of aliens issued visas or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title that exceeds 33 percent of the total number of registered nurses employed by the facility.

**(viii)** The facility will not, with respect to any alien issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title--

**(I)** authorize the alien to perform nursing services at any worksite other than a worksite controlled by the facility; or

**(II)** transfer the place of employment of the alien from one worksite to another.

Nothing in clause (iv) shall be construed as requiring a facility to have taken significant steps described in such clause before November 12, 1999. A copy of the attestation shall be provided, within 30 days of the date of filing, to registered nurses employed at the facility on the date of filing.

**(B)** For purposes of subparagraph (A)(iv), each of the following shall be considered a significant step reasonably designed to recruit and retain registered nurses:

**(i)** Operating a training program for registered nurses at the facility or financing (or providing participation in) a training program for registered nurses elsewhere.

**(ii)** Providing career development programs and other methods of facilitating health care workers to become registered nurses.

**(iii)** Paying registered nurses wages at a rate higher than currently being paid to registered nurses similarly employed in the geographic area.

**(iv)** Providing reasonable opportunities for meaningful salary advancement by registered nurses.

The steps described in this subparagraph shall not be considered to be an exclusive list of the significant steps that may be taken to meet the conditions of subparagraph (A)(iv). Nothing in this subparagraph shall require a facility to take more than one step if the facility can demonstrate that taking a second step is not reasonable.

**(C)** Subject to subparagraph (E), an attestation under subparagraph (A)--

**(i)** shall expire on the date that is the later of--

**(I)** the end of the one-year period beginning on the date of its filing with the Secretary of Labor; or

**(II)** the end of the period of admission under section 1101(a)(15)(H)(i)(c) of this title of the last alien with respect to whose admission it was applied (in accordance with clause (ii)); and

**(ii)** shall apply to petitions filed during the one-year period beginning on the date of its filing with the Secretary of Labor if the facility states in each such petition that it continues to comply with the conditions in the attestation.

**(D)** A facility may meet the requirements under this paragraph with respect to more than one registered nurse in a single petition.

**(E)(i)** The Secretary of Labor shall compile and make available for public examination in a timely manner in Washington, D.C., a list identifying facilities which have filed petitions for nonimmigrants under section 1101(a)(15)(H)(i)(c) of this title and, for each such facility, a copy of the facility's attestation under subparagraph (A) (and accompanying documentation) and each such petition filed by the facility.

**(ii)** The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary). The Secretary shall conduct an investigation under this clause if there is reasonable cause to believe that a facility fails to meet conditions attested to. Subject to the time limits established under this clause, this subparagraph shall apply regardless of whether an attestation is expired or unexpired at the time a complaint is filed.

**(iii)** Under such process, the Secretary shall provide, within 180 days after the date such a complaint is filed, for a determination as to whether or not a basis exists to make a finding described in clause (iv). If the Secretary determines that such a basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint within 60 days of the date of the determination.

**(iv)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that a facility (for which an attestation is made) has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per nurse per violation, with the total penalty not to exceed $10,000 per violation) as the Secretary determines to be appropriate. Upon receipt of such notice, the Attorney General shall not approve petitions filed with respect to a facility during a period of at least one year for nurses to be employed by the facility.

**(v)** In addition to the sanctions provided for under clause (iv), if the Secretary of Labor finds, after notice and an opportunity for a hearing, that a facility has violated the condition attested to under subparagraph (A)(iii) (relating to payment of registered nurses at the prevailing wage rate), the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with such condition.

**(F)(i)** The Secretary of Labor shall impose on a facility filing an attestation under subparagraph (A) a filing fee, in an amount prescribed by the Secretary based on the costs of carrying out the Secretary's duties under this subsection, but not exceeding $250.

**(ii)** Fees collected under this subparagraph shall be deposited in a fund established for this purpose in the Treasury of the United States.

**(iii)** The collected fees in the fund shall be available to the Secretary of Labor, to the extent and in such amounts as may be provided in appropriations Acts, to cover the costs described in clause (i), in addition to any other funds that are available to the Secretary to cover such costs.

**(3)** The period of admission of an alien under section 1101(a)(15)(H)(i)(c) of this title shall be 3 years.

**(4)** The total number of nonimmigrant visas issued pursuant to petitions granted under section 1101(a)(15)(H)(i)(c) of this title in each fiscal year shall not exceed 500. The number of such visas issued for employment in each State in each fiscal year shall not exceed the following:

**(A)** For States with populations of less than 9,000,000, based upon the 1990 decennial census of population, 25 visas.

**(B)** For States with populations of 9,000,000 or more, based upon the 1990 decennial census of population, 50 visas.

**(C)** If the total number of visas available under this paragraph for a fiscal year quarter exceeds the number of qualified nonimmigrants who may be issued such visas during those quarters, the visas made available under this paragraph shall be issued without regard to the numerical limitation under subparagraph (A) or (B) of this paragraph during the last fiscal year quarter.

**(5)** A facility that has filed a petition under section 1101(a)(15)(H)(i)(c) of this title to employ a nonimmigrant to perform nursing services for the facility--

**(A)** shall provide the nonimmigrant a wage rate and working conditions commensurate with those of nurses similarly employed by the facility;

**(B)** shall require the nonimmigrant to work hours commensurate with those of nurses similarly employed by the facility; and

**(C)** shall not interfere with the right of the nonimmigrant to join or organize a union.

**(6)** For purposes of this subsection and section 1101(a)(15)(H)(i)(c) of this title, the term "facility" means a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) that meets the following requirements:

**(A)** As of March 31, 1997, the hospital was located in a health professional shortage area (as defined in section 254e of Title 42).

**(B)** Based on its settled cost report filed under title XVIII of the Social Security Act for its cost reporting period beginning during fiscal year 1994--

**(i)** the hospital has not less than 190 licensed acute care beds;

**(ii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of such title is not less than 35 percent of the total number of such hospital's acute care inpatient days for such period; and

**(iii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, is not less than 28 percent of the total number of such hospital's acute care inpatient days for such period.

**(7)** For purposes of paragraph (2)(A)(v), the term "lay off", with respect to a worker--

**(A)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(B)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

Nothing in this paragraph is intended to limit an employee's or an employer's rights under a collective bargaining agreement or other employment contract.

**(n) Labor condition application**

**(1)** No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the application, and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the application--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought, or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H-1B nonimmigrants are sought.

**(D)** The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(E)(i)** In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

**(ii)** An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before [7] by an H-1B-dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after October 21, 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5-year period preceding the filing of the application. An application is not described in this clause if the only H-1B nonimmigrants sought in the application are exempt H-1B nonimmigrants.

**(F)** In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H-1B-dependent employer) where--

**(i)** the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

**(ii)** there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

**(G)(i)** In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application--

**(I)** has taken good faith steps to recruit, in the United States using procedures that meet industry-wide standards and offering compensation that is at least as great as that required to be offered to H-1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

**(II)** has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

**(ii)** The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H-1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 1153(b)(1) of this title.

The employer shall make available for public examination, within one working day after the date on which an application under this paragraph is filed, at the employer's principal place of business or worksite, a copy of each such application (and such accompanying documents as are necessary). The Secretary shall compile, on a current basis, a list (by employer and by occupational classification) of the applications filed under this subsection. Such list shall include the wage rate, number of aliens sought, period of intended employment, and date of need. The Secretary shall make such list available for public examination in Washington, D.C. The Secretary of Labor shall review such an application only for completeness and obvious inaccuracies. Unless the Secretary finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application. The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph. Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.

**(2)(A)** Subject to paragraph (5)(A), the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under such process, the Secretary shall provide, within 30 days after the date such a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1)(E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)--

(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

(II) the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 2 years for aliens to be employed by the employer.

(iii) If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application--

(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

(II) the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 3 years for aliens to be employed by the employer.

(iv) It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

(v) The Secretary of Labor and the Attorney General shall devise a process under which an H-1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

(vi)(I) It is a violation of this clause for an employer who has filed an application under this subsection to require an H-1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

(II) It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 1184(c)(1) of this title, for which a fee is imposed under section 1184(c)(9) of this title, to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

**(III)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a full-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a part-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

**(III)** In the case of an H-1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 1184(c)(1) of this title, with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

**(IV)** This clause does not apply to a failure to pay wages to an H-1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H-1B nonimmigrant an established salary practice of the employer, under which the employer pays to H-1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H-1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility

for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and noncash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** If an H-1B-dependent employer places a nonexempt H-1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer--

**(i)** knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

**(ii)** has been subject to a sanction under this subparagraph based upon a previous placement of an H-1B nonimmigrant with the same other employer.

**(F)** The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after October 21, 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i)(II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H-1B-dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(G)(i)** The Secretary of Labor may initiate an investigation of any employer that employs nonimmigrants described in section 1101(a)(15)(H)(i)(b) of this title if the Secretary of Labor has reasonable cause to believe that the employer is not in compliance with this subsection. In the case of an investigation under this clause, the Secretary of Labor (or the acting Secretary in the case of the absence of[8] disability of the Secretary of Labor) shall personally certify that reasonable cause exists and shall approve commencement of the investigation. The investigation may be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with this subsection.

**(ii)** If the Secretary of Labor receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor may conduct an investigation into the alleged

failure or failures. The Secretary of Labor may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of Title 5.

**(iii)** The Secretary of Labor shall establish a procedure for any person desiring to provide to the Secretary of Labor information described in clause (ii) that may be used, in whole or in part, as the basis for the commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary of Labor and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iv)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

**(iv)** Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that

    **(I)** originates from a source other than an officer or employee of the Department of Labor; or

    **(II)** was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this chapter of [8] any other Act.

**(v)** The receipt by the Secretary of Labor of information submitted by an employer to the Attorney General or the Secretary of Labor for purposes of securing the employment of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title shall not be considered a receipt of information for purposes of clause (ii).

**(vi)** No investigation described in clause (ii) (or hearing described in clause (viii) based on such investigation) may be conducted with respect to information about a failure to meet a condition described in clause (ii), unless the Secretary of Labor receives the information not later than 12 months after the date of the alleged failure.

**(vii)** The Secretary of Labor shall provide notice to an employer with respect to whom there is reasonable cause to initiate an investigation described in clauses [9] (i) or (ii), prior to the commencement of an investigation under such clauses, of the intent to conduct an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary of Labor is not required to comply with this clause if the Secretary of Labor determines that to do so would interfere with an effort by the Secretary of Labor to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary of Labor under this clause.

**(viii)** An investigation under clauses [9] (i) or (ii) may be conducted for a period of up to 60 days. If the Secretary of Labor determines after such an investigation that a reasonable basis exists to make a finding that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing in accordance with section 556 of Title 5 within 120 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 120 days after the date of the hearing.

**(H)(i)** Except as provided in clauses (ii) and (iii), a person or entity is considered to have complied with the requirements of this subsection, notwithstanding a technical or procedural failure to meet such requirements, if there was a good faith attempt to comply with the requirements.

**(ii)** Clause (i) shall not apply if--

    **(I)** the Department of Labor (or another enforcement agency) has explained to the person or entity the basis for the failure;

    **(II)** the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure; and

    **(III)** the person or entity has not corrected the failure voluntarily within such period.

**(iii)** A person or entity that, in the course of an investigation, is found to have violated the prevailing wage requirements set forth in paragraph (1)(A), shall not be assessed fines or other penalties for such violation if the person or entity can establish that the manner in which the prevailing wage was calculated was consistent with recognized industry standards and practices.

**(iv)** Clauses (i) and (iii) shall not apply to a person or entity that has engaged in or is engaging in a pattern or practice of willful violations of this subsection.

**(I)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(3)(A)** For purposes of this subsection, the term "H-1B-dependent employer" means an employer that

    **(i)**(I) has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H-1B nonimmigrants;

    **(ii)**(I) has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H-1B nonimmigrants; or

    **(iii)**(I) has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H-1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

**(B)** For purposes of this subsection

    **(i)** the term "exempt H-1B nonimmigrant" means an H-1B nonimmigrant who--

**(I)** receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

**(II)** has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

**(ii)** the term "nonexempt H-1B nonimmigrant" means an H-1B nonimmigrant who is not an exempt H-1B nonimmigrant.

**(C)** For purposes of subparagraph (A)

**(i)** in computing the number of full-time equivalent employees and the number of H-1B nonimmigrants, exempt H-1B nonimmigrants shall not be taken into account during the longer of--

**(I)** the 6-month period beginning on October 21, 1998; or

**(II)** the period beginning on October 21, 1998, and ending on the date final regulations are issued to carry out this paragraph; and

**(ii)** any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as a single employer.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the H-1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an application with respect to one or more H-1B nonimmigrants by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)** The term "H-1B nonimmigrant" means an alien admitted or provided status as a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title.

**(D)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a

temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(E)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed.

**(5)(A)** This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

**(B)** The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

**(C)** If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

**(D)(i)** The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General.

Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

**(ii)** The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of Title 9.

**(iii)** With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

**(E)** If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)--

**(i)** the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

**(ii)** the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 1154 or 1184(c) of this title--

**(I)** during a period of not more than 1 year; or

**(II)** in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

**(F)** The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.

**(o) Omitted**

**(p) Computation of prevailing wage level**

**(1)** In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) in the case of an employee of--

**(A)** an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity; or

**(B)** a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

**(2)** With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.

**(3)** The prevailing wage required to be paid pursuant to subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections.

**(4)** Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient thus obtained to the first level and subtracting that quotient from the second level.

**(q) Academic honoraria**

Any alien admitted under section 1101(a)(15)(B) of this title may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6-month period.

**(r) Exception for certain alien nurses**

Subsection (a)(5)(C) shall not apply to an alien who seeks to enter the United States for the purpose of performing labor as a nurse who presents to the consular officer (or in the case of an adjustment of status, the Attorney General) a certified statement from the Commission on Graduates of Foreign Nursing Schools (or an equivalent independent credentialing organization approved for the certification of nurses under subsection (a)(5)(C) by the Attorney General in consultation with the Secretary of Health and Human Services) that--

**(1)** the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

**(2)** the alien has passed the National Council Licensure Examination (NCLEX);

**(3)** the alien is a graduate of a nursing program--

**(A)** in which the language of instruction was English;

**(B)** located in a country--

**(i)** designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; or

**(ii)** designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; and

**(C)(i)** which was in operation on or before November 12, 1999; or

**(ii)** has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

**(s) Consideration of benefits received as battered alien in determination of inadmissibility as likely to become public charge**

In determining whether an alien described in subsection (a)(4)(C)(i) is inadmissible under subsection (a)(4) or ineligible to receive an immigrant visa or otherwise to adjust to the status of permanent resident by reason of subsection (a)(4), the consular officer or the Attorney General shall not consider any benefits the alien may have received that were authorized under section 1641(c) of this title.

**(t)** [10] **Nonimmigrant professionals; labor attestations**

**(1)** No alien may be admitted or provided status as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title in an occupational classification unless the employer has filed with the Secretary of Labor an attestation stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question; or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the attestation; and

(ii) will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the attestation--

(i) has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought; or

(ii) if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title are sought.

**(D)** A specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(2)(A)** The employer shall make available for public examination, within one working day after the date on which an attestation under this subsection is filed, at the employer's principal place of business or worksite, a copy of each such attestation (and such accompanying documents as are necessary).

**(B)(i)** The Secretary of Labor shall compile, on a current basis, a list (by employer and by occupational classification) of the attestations filed under this subsection. Such list shall include, with respect to each attestation, the wage rate, number of aliens sought, period of intended employment, and date of need.

**(ii)** The Secretary of Labor shall make such list available for public examination in Washington, D.C.

**(C)** The Secretary of Labor shall review an attestation filed under this subsection only for completeness and obvious inaccuracies. Unless the Secretary of Labor finds that an attestation is incomplete or obviously inaccurate, the Secretary of Labor shall provide the certification described in section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title within 7 days of the date of the filing of the attestation.

**(3)(A)** The Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints respecting the failure of an employer to meet a condition specified in an attestation submitted under this subsection or misrepresentation by the employer of material facts in such an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary of Labor shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under the process described in subparagraph (A), the Secretary of Labor shall provide, within 30 days after the date a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary of Labor determines that such a reasonable basis exists, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary of Labor may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), a substantial failure to meet a condition of paragraph (1)(C) or (1)(D), or a misrepresentation of material fact in an attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an attestation, or a violation of clause (iv)--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an attestation, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition or application supported by the attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary of Labor determines to be appropriate; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an attestation under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Secretary of Homeland Security shall devise a process under which a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an attestation under this subsection to require a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary of Labor shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary of Labor may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a full-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a part-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on the attestation consistent with the rate of pay identified on the attestation.

**(III)** In the case of a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who has not yet entered into employment with an employer who has had approved an attestation under this subsection with

respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States, or 60 days after the date the nonimmigrant becomes eligible to work for the employer in the case of a nonimmigrant who is present in the United States on the date of the approval of the attestation filed with the Secretary of Labor.

**(IV)** This clause does not apply to a failure to pay wages to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title an established salary practice of the employer, under which the employer pays to nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection to fail to offer to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified in the attestation and required under paragraph (1), the Secretary of Labor shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** The Secretary of Labor may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date on which the employer is found by the Secretary of Labor to have committed a willful failure to meet a condition of paragraph (1) or to have made a willful misrepresentation of material fact in an attestation. The authority of the Secretary of Labor under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(F)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an attestation with respect to one or more nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(D)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Secretary of Homeland Security, to be employed.

**(t)** [10] **Foreign residence requirement**

**(1)** Except as provided in paragraph (2), no person admitted under section 1101(a)(15)(Q)(ii)(I) of this title, or acquiring such status after admission, shall be eligible to apply for nonimmigrant status, an immigrant visa, or permanent residence under this chapter until it is established that such person has resided and been physically present in the person's country of nationality or last residence for an aggregate of at least 2 years following departure from the United States.

**(2)** The Secretary of Homeland Security may waive the requirement of such 2-year foreign residence abroad if the Secretary determines that--

**(A)** departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or an alien lawfully admitted for permanent residence); or

**(B)** the admission of the alien is in the public interest or the national interest of the United States.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 212, 66 Stat. 182; July 18, 1956, c. 629, Title III, § 301(a), 70 Stat. 575; Pub.L. 85-508, § 23, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(b), Mar. 18, 1959, 73 Stat. 13; Pub.L. 86-648, § 8, July 14, 1960, 74 Stat. 505; Pub.L. 87-256, § 109(c), Sept. 21, 1961, 75 Stat. 535; Pub.L. 87-301, §§ 11-15, Sept. 26, 1961, 75 Stat. 654, 655; Pub.L. 89-236, §§ 10, 15, Oct. 3, 1965, 79 Stat. 917, 919; Pub.L. 91-225, § 2, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-484, Title VI, § 601(a), (c), (d), Oct. 12, 1976, 90 Stat. 2300, 2301; Pub.L. 94-571, §§ 5, 7(d), Oct. 20, 1976, 90 Stat. 2705, 2706; Pub.L. 95-83, Title III, § 307(q)(1), (2), Aug. 1, 1977, 91 Stat. 394; Pub.L. 95-549, Title I, §§ 101, 102, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 96-70, Title III, § 3201(b), Sept. 27, 1979, 93 Stat. 497; Pub.L. 96-212, Title II, § 203(d), (f), Mar. 17, 1980, 94 Stat. 107; Pub.L. 96-538, Title IV, § 404, Dec. 17, 1980, 94 Stat. 3192; Pub.L. 97-116, §§ 4, 5(a)(1), (2), (b), 18(e), Dec. 29, 1981, 95 Stat. 1611, 1612, 1620; Pub.L. 98-454, Title VI, § 602[(a)], Oct. 5, 1984, 98 Stat. 1737; Pub.L. 98-473, Title II, § 220(a), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-396, § 14(a), Aug. 27, 1986, 100 Stat. 842; Pub.L. 99-570, Title I, § 1751(a), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-639, § 6(a), Nov. 10, 1986, 100 Stat. 3543; Pub.L. 99-653, § 7(a), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-204, Title VIII, § 806(c), Dec. 22, 1987, 101 Stat. 1399; Pub.L. 100-525, §§ 3(1)(A), 7(c)(1), (3), 8(f), 9(i), Oct. 24, 1988, 102 Stat. 2614, 2616, 2617, 2620; Pub.L. 100-690, Title VII, § 7349(a), Nov. 18, 1988, 102 Stat. 4473; Pub.L. 101-238, § 3(b), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(a), (c), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, § 162(e)(1), (f)(2)(B), Title II, §§ 202(b), 205(c)(3), Title V, §§ 511(a), 514(a), Title VI, § 601(a), (b), (d), Nov. 29, 1990, 104 Stat. 5011, 5012, 5014, 5020, 5052, 5053, 5067, 5075 to 5077; Pub.L. 102-232, Title III, §§ 302(e)(6), (9), 303(a)(5)(B), (6), (7) (B), 306(a)(10), (12), 307(a) to (g), 309(b)(7), Dec. 12, 1991, 105 Stat. 1746, 1747, 1751, 1753 to 1755, 1759; Pub.L. 103-43, Title XX, § 2007(a), June 10, 1993, 107 Stat. 210; Pub.L. 103-317, Title V, § 506(a), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(b)(1), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-416, Title II, §§ 203(a), 219(e), (z)(1), (5), 220(a), Oct. 25, 1994, 108 Stat. 4311, 4316, 4318, 4319; Pub.L. 104-132, Title IV, §§ 411, 412, 440(d), Apr. 24, 1996, 110 Stat. 1268, 1269, 1277; Pub.L. 104-208, Div. C, Title I, § 124(b)(1), Title III, §§ 301(b)(1), (c)(1), 304(b), 305(c), 306(d), 308(c)(2) (B), (d)(1), (e)(1)(B), (C), (2)(A), (6), (f)(1)(C) to (F), (3)(A), (g)(1), (4)(B), (10)(A), (H), 322(a)(2)(B), 341(a), (b), 342(a), 343, 344(a), 345(a), 346(a), 347(a), 348(a), 349, 351(a), 352(a), 355, Title V, § 531(a), Title VI, §§ 602(a), 622(b), 624(a), 671(e)(3), Sept. 30, 1996, 110 Stat. 3009-562, 3009-576, 3009-578, 3009-597, 3009-607, 3009-612, 3009-616, 3009-619 to 3009-622, 3009-625, 3009-629, 3009-635 to 3009-641, 3009-644, 3009-674, 3009-689, 3009-695, 3009-698, 3009-723; Pub.L. 105-73, Nov. 12, 1997, 111 Stat. 1459; Pub.L. 105-277, Div. C, Title IV, §§ 412(a) to (c), 413(a) to (e)(1), (f), 415(a), 431(a), Div. G, Title XXII, § 2226(a), Oct. 21, 1998, 112 Stat. 2681-642 to 2681-651, 2681-654, 2681-658, 2681-820; Pub.L. 105-292, Title VI, § 604(a), Oct. 27, 1998, 112 Stat. 2814; Pub.L. 106-95, §§ 2(b), 4(a), Nov. 12, 1999, 113 Stat. 1312, 1317; Pub.L. 106-120, Title VIII, § 809, Dec. 3, 1999, 113 Stat. 1632; Pub.L. 106-313, Title I, §§ 106(c)(2), 107(a), Oct. 17, 2000, 114 Stat. 1254, 1255; Pub.L. 106-386, Div. A, §§ 107(e)(3), 111(d), Div. B, Title V, §§ 1505(a), (c)(1), (d) to (f), 1513(e), Oct. 28, 2000, 114 Stat. 1478, 1485, 1525, 1526, 1536; Pub.L. 106-395, Title II, § 201(b)(1), (2), Oct. 30, 2000, 114 Stat. 1633, 1634; Pub.L. 106-396, Title I, § 101(b)(1), Oct. 30, 2000, 114 Stat. 1638; Pub.L. 107-56, Title IV, § 411(a), Title X, § 1006(a), Oct. 26, 2001, 115 Stat. 345, 394; Pub.L. 107-150, § 2(a)(2), Mar. 13, 2002, 116 Stat. 74; Pub.L. 107-273, Div. C, Title I, § 11018(c), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 108-77, Title IV, § 402(b), (c), Sept. 3, 2003, 117 Stat. 940, 946; Pub.L. 108-193, §§ 4(b)(4), 8(a)(2), Dec. 19, 2003, 117 Stat. 2879; Pub.L. 108-447, Div. J, Title IV, §§ 422(a), 423, 424(a)(1), (b), Dec. 8, 2004, 118 Stat. 3353 to 3355; Pub.L. 108-449, § 1(b)(2), Dec. 10, 2004, 118 Stat. 3470; Pub.L. 108-458, Title V, §§ 5501(a), 5502(a), 5503,

Dec. 17, 2004, 118 Stat. 3740, 3741; Pub.L. 109-13, Div. B, Title I, §§ 103(a) to (c), 104, Title V, § 501(d), May 11, 2005, 119 Stat. 306 to 309, 322; Pub.L. 109-162, Title VIII, § 802, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(b), Aug. 12, 2006, 120 Stat. 762; Pub.L. 110-161, Div. J, Title VI, § 691(a), (c), Dec. 26, 2007, 121 Stat. 2364, 2365; Pub.L. 110-229, Title VII, § 702(b)(2), (3), (d), May 8, 2008, 122 Stat. 860, 862; Pub.L. 110-293, Title III, § 305, July 30, 2008, 122 Stat. 2963; Pub.L. 110-340, § 2(b), Oct. 8, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 222(f)(1), 234, Dec. 23, 2008, 122 Stat. 5071, 5074; Pub.L. 111-122, § 3(b), Dec. 22, 2009, 123 Stat. 3481; Pub.L. 111-287, § 2, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 113-4, Title VIII, § 804, Mar. 7, 2013, 127 Stat. 111.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12324

Ex. Ord. No. 12324, Sept. 29, 1981, 46 F.R. 48109, relating to high seas interdiction of illegal aliens, was revoked by Ex. Ord. No. 12807, May 24, 1992, 57 F.R. 23133, set out as a note under this section.

### EXECUTIVE ORDER NO. 12807

<May 24, 1992, 57 F.R. 23133, as amended Ex. Ord. No. 13286, Sec. 30, Feb. 28, 2003, 68 F.R. 10625>

### Interdiction of Illegal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title] and whereas:

**(1)** The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

**(2)** The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U.S. T.I.A.S. 6577; 19 U.S.T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

**(3)** Proclamation No. 4865 [set out as a note under this section] suspends the entry of all undocumented aliens into the United States by the high seas; and

**(4)** There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

I, GEORGE BUSH, President of the United States of America, hereby order as follows:

**Section 1.** The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.

**Sec. 2. (a)** The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

**(b)** Those instructions shall apply to any of the following defined vessels:

**(1)** Vessels of the United States, meaning any vessel documented or numbered pursuant to the laws of the United States, or owned in whole or in part by the United States, a citizen of the United States, or a corporation incorporated under the laws of the United States or any State, Territory, District, Commonwealth, or possession thereof, unless the vessel has been granted nationality by a foreign nation in accord with Article 5 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(2)** Vessels without nationality or vessels assimilated to vessels without nationality in accordance with paragraph (2) of Article 6 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(3)** Vessels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels.

**(c)** Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

**(1)** To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

**(2)** To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

**(3)** To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Secretary of Homeland Security, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

**(d)** These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

**Sec. 3.** This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act [section 551 et seq. of Title 5, Government Organization and Employees]), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.

**Sec. 4.** Executive Order No. 12324 [formerly set out as a note under this section] is hereby revoked and replaced by this order.

**Sec. 5.** This order shall be effective immediately.

<div align="right">GEORGE BUSH</div>

<div align="center">**EXECUTIVE ORDER NO. 13276**</div>

<Nov. 15, 2002, 67 F.R. 69985, as amended Ex. Ord. No. 13286, Sec. 1, Feb. 28, 2003, 68 F.R. 10619>

**Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsecs. (f) and (a)(1) of this section], and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

**Section 1.** Duties and Authorities of Agency Heads. Consistent with applicable law,

**(a)(i)** The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

**(ii)** The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

**(b)** The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

**(c)(i)** The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

**(ii)** In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out under this section], regarding interdiction of migrants.

**Sec. 2.** Definitions. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

**Sec. 3.** Scope.

**(a)** Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992.

**(b)** Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

**(c)** This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

**(d)** Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

**(e)** This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13769

Ex. Ord. No. 13769, January 27, 2017, 82 F.R. 8977, relating to protecting the Nation from foreign terrorist entry into the United States, was revoked by Ex. Ord. No. 13780, § 13, March 9, 2017, 82 F.R. 13209.

### EXECUTIVE ORDER NO. 13780

Ex. Ord. No. 13780, Mar. 6, 2017, 82 F.R. 13209, which prevented nationals from certain countries from entering the United States, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

### EXECUTIVE ORDER NO. 13815

Ex. Ord. No. 13815, Oct. 24, 2017, 82 F.R. 50055, which related to resuming the Unites States Refugee Admissions Program with enhanced vetting capabilities, was revoked by Ex. Ord. No. 14013, § 2(a), Feb. 4, 2021, 86 F.R. 8840.

### EXECUTIVE ORDER NO. 13940

<August 3, 2020, 85 F.R. 47879>

**Aligning Federal Contracting and Hiring Practices With the Interests of American Workers**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the executive branch to create opportunities for United States workers to compete for jobs, including jobs created through Federal contracts. These opportunities, particularly in regions where the Federal Government remains the largest employer, are especially critical during the economic dislocation caused by the 2019 novel coronavirus (COVID-19) pandemic. When employers trade American jobs for temporary foreign labor, for example, it reduces opportunities

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

for United States workers in a manner inconsistent with the role guest-worker programs are meant to play in the Nation's economy.

**Sec. 2. Review of Contracting and Hiring Practices. (a)** The head of each executive department and agency (agency) that enters into contracts shall review, to the extent practicable, performance of contracts (including subcontracts) awarded by the agency in fiscal years 2018 and 2019 to assess:

**(i)** whether contractors (including subcontractors) used temporary foreign labor for contracts performed in the United States, and, if so, the nature of the work performed by temporary foreign labor on such contracts; whether opportunities for United States workers were affected by such hiring; and any potential effects on the national security caused by such hiring; and

**(ii)** whether contractors (including subcontractors) performed in foreign countries services previously performed in the United States, and, if so, whether opportunities for United States workers were affected by such offshoring; whether affected United States workers were eligible for assistance under the Trade Adjustment Assistance program authorized by the Trade Act of 1974; and any potential effects on the national security caused by such offshoring.

**(b)** The head of each agency that enters into contracts shall assess any negative impact of contractors' and subcontractors' temporary foreign labor hiring practices or offshoring practices on the economy and efficiency of Federal procurement and on the national security, and propose action, if necessary and as appropriate and consistent with applicable law, to improve the economy and efficiency of Federal procurement and protect the national security.

**(c)** The head of each agency shall, in coordination with the Director of the Office of Personnel Management, review the employment policies of the agency to assess the agency's compliance with Executive Order 11935 of September 2, 1976 (Citizenship Requirements for Federal Employment), and section 704 of the Consolidated Appropriations Act, 2020, Public Law 116-93.

**(d)** Within 120 days of the date of this order, the head of each agency shall submit a report to the Director of the Office of Management and Budget summarizing the results of the reviews required by subsections (a) through (c) of this section; recommending, if necessary, corrective actions that may be taken by the agency and timeframes to implement such actions; and proposing any Presidential actions that may be appropriate.y47880

**Sec. 3. Measures to Prevent Adverse Effects on United States Workers.** Within 45 days of the date of this order, the Secretaries of Labor and Homeland Security shall take action, as appropriate and consistent with applicable law, to protect United States workers from any adverse effects on wages and working conditions caused by the employment of H-1B visa holders at job sites (including third-party job sites), including measures to ensure that all employers of H-1B visa holders, including secondary employers, adhere to the requirements of section 212(n)(1) of the Immigration and Nationality Act (8 U.S.C. 1182(n)(1)).

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## PROCLAMATIONS

### Suspending Entry of Certain Aliens

Suspension of entry of certain aliens into the United States were contained in the following Presidential proclamations:

Proc. No. 10309, Nov. 16, 2021, 86 F.R. 64797, relating to immigrants and nonimmigrants responsible for policies or actions that threaten democracy in Nicaragua.

Proc. No. 10052, June 22, 2020, 85 F.R. 38263, as amended by Proc. No. 10054, June 29, 2020, 85 F.R. 40085; Proc. No. 10131, § 2, Dec. 31, 2020, 86 F.R. 418; Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847, relating to immigrants and nonimmigrants who present a risk to the United States labor market following the COVID-19 pandemic, expired Mar. 31, 2021.

Proc. No. 10043, May 29, 2020, 85 F.R. 34353, relating to certain students and researchers from the People's Republic of China.

Proc. No. 10014, Apr. 22, 2020, 85 F.R. 23441, as amended by Proc. No. 10052, § 1, June 22, 2020, 85 F.R. 38264; Proc. No. 10131, § 1, Dec. 31, 2020, 86 F.R. 418, relating to immigrants who present a risk to the United States labor market following the COVID-19 pandemic, was revoked by Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847.

Proc. No. 9945, Oct. 4, 2019, 84 F.R. 53991, relating to immigrants who will financially burden the United States healthcare system, was revoked by Proc. No. 10209, May 14, 2021, 86 F.R. 27015.

Proc. No. 9932, Sept. 25, 2019, 84 F.R. 51935, relating to senior officials of the government of Iran.

Proc. No. 9931, Sept. 25, 2019, 84 F.R. 51931, relating to persons responsible for policies or actions that threaten Venezuela's democratic institutions.

Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, relating to persons who participate in serious human rights and humanitarian law violations and other abuses.

Proc. No. 8693, July 24, 2011, 76 F.R. 44751, relating to aliens subject to United Nations Security Council travel bans and International Emergency Economic Powers Act Sanctions.

Proc. No. 8342, Jan. 16, 2009, 74 F.R. 4093, relating to foreign government officials responsible for failing to combat trafficking in persons.

Proc. No. 7750, Jan. 12, 2004, 69 F.R. 2287, relating to persons engaged in or benefiting from corruption.

### Suspending Entry as Immigrants and Nonimmigrants of Persons
### Who Pose a Risk of Transmitting 2019 Novel Coronavirus:

Proc. No. 10315, Nov. 26, 2021, 86 F.R. 68385, relating to noncitizens who were physically present within the Republic of Botswana, the Kingdom of Eswatini, the Kingdom of Lesotho, the Republic of Malawi, the Republic of Mozambique, the

Republic of Namibia, the Republic of South Africa, and the Republic of Zimbabwe, was revoked by Proc. No. 10329, Dec. 28, 2021, 87 F.R. 149.

Proc. No. 10294, Oct. 25, 2021, 86 F.R. 59603, relating to certain noncitizens who are nonimmigrants and who are not fully vaccinated against COVID-19 arriving by air.

Proc. No. 10199, Apr. 30, 2021, 86 F.R. 24297, relating to noncitizens entering as nonimmigrants who were physically present within the Republic of India, was revoked by Proc. No. 10294, §. 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10143, Jan. 25, 2021, 86 F.R. 7467, relating to noncitizens who were physically present within the Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, and the Federative Republic of Brazil, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10041, May 24, 2020, 85. F.R. 31933, as amended by Proc. No. 10042, May 25, 2020 85 F.R. 32291, relating to aliens present in the Federative Republic of Brazil, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9996, Mar. 14, 2020, 85 F.R. 15341, relating to aliens present in the United Kingdom and Republic of Ireland, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9993, Mar. 11, 2020, 85 F.R. 15045, relating to aliens present in the Schengen Area, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9992, Feb. 29, 2020, 85 F.R. 12855, as amended by Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the Islamic Republic of Iran, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 9984, Jan. 31, 2020, 85 F.R. 6709, as amended by Proc. No. 9992, § 4, Feb. 29, 2020, 85 F.R. 12857; Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the People's Republic of China, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

## PROCLAMATION NO. 4865

<Sept. 29, 1981, 46 F.R. 48107>

### High Seas Interdiction of Illegal Aliens

The ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

As a result of our discussions with the Governments of affected foreign countries and with agencies of the Executive Branch of our Government, I have determined that new and effective measures to curtail these unlawful arrivals are necessary. In this regard, I have determined that international cooperation to intercept vessels trafficking in illegal migrants is a necessary and proper means of insuring the effective enforcement of our laws.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and the statutes of the United States, including Sections 212(f) and 215(a)(1) of the Immigration and Nationality

Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title], in order to protect the sovereignty of the United States, and in accordance with cooperative arrangements with certain foreign governments, and having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States, do proclaim that:

The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of September, in the year of our Lord nineteen hundred and eighty-one, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN

### PROCLAMATION NO. 7359

Proc. No. 7359, Oct. 10, 2000, 65 F.R. 60831, related to the suspension of entry as immigrants and nonimmigrants of persons impeding the peace process in Sierra Leone.

### PROCLAMATION NO. 7750

<Jan. 12, 2004, 69 F.R. 2287>

**To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefitting from Corruption**

**By the President of the United States of America**

**A Proclamation**

In light of the importance of legitimate and transparent public institutions to world stability, peace, and development, and the serious negative effects that corruption of public institutions has on the United States efforts to promote security and to strengthen democratic institutions and free market systems, and in light of the importance to the United States and the international community of fighting corruption, as evidenced by the Third Global Forum on Fighting Corruption and Safeguarding Integrity and other intergovernmental efforts, I have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions where that corruption has serious adverse effects on international activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f) [subsec. (f) of this section], and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Public officials or former public officials whose solicitation or acceptance of any article of monetary value, or other benefit, in exchange for any act or omission in the performance of their public functions has or had serious adverse effects on the national interests of the United States.

**(b)** Persons whose provision of or offer to provide any article of monetary value or other benefit to any public official in exchange for any act or omission in the performance of such official's public functions has or had serious adverse effects on the national interests of the United States.

**(c)** Public officials or former public officials whose misappropriation of public funds or interference with the judicial, electoral, or other public processes has or had serious adverse effects on the national interests of the United States.

**(d)** The spouses, children, and dependent household members of persons described in paragraphs (a), (b), and (c) above, who are beneficiaries of any articles of monetary value or other benefits obtained by such persons.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States.

**Sec. 3.** Persons covered by sections 1 and 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** For purposes of this proclamation, "serious adverse effects on the national interests of the United States" means serious adverse effects on the international economic activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

**Sec. 5.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 6.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary may, in the Secretary's discretion, establish.

**Sec. 7.** This proclamation is effective immediately.

**Sec. 8.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twelfth day of January, in the year of our Lord two thousand four, and of the Independence of the United States of America the two hundred and twenty-eighth.

GEORGE W. BUSH

## PROCLAMATION NO. 9645

Proc. No. 9645, Sept. 24, 2017, 82 F.R. 45161, as amended by Proc. No. 9723, § 1, Apr. 10, 2018, 83 F.R. 15939; Proc. No. 9983, § 3, Jan. 31, 2020, 85 F.R. 6706, which prohibited entry into the United States by nationals of certain countries unless they are approved for a waiver, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9723

Proc. No. 9723, Apr. 10, 2018, 83 F.R. 15937, which maintained enhanced vetting capabilities and processes for detecting attempted entry into the United States by terrorists or other public-safety threats, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9983

Proc. No. 9983, Jan. 31, 2020 85 F.R. 6699, which prohibited entry into the United States by nationals of certain countries, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## MEMORANDA OF PRESIDENT

## DELEGATION OF AUTHORITY UNDER SECTIONS 212(f) AND 215(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT

<Sept. 24, 1999, 64 F.R. 55809>

### Memorandum for the Attorney General

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and in light of Proclamation 4865 of September 29, 1981 [set out as a note under this section], I hereby delegate to the Attorney General the authority to:

**(a)** Maintain custody, at any location she deems appropriate, and conduct any screening she deems appropriate in her unreviewable discretion, of any undocumented person she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas through December 31, 2000; and

**(b)** Undertake any other appropriate actions with respect to such aliens permitted by law.

With respect to the functions delegated by this order, all actions taken after April 16, 1999, for or on behalf of the President that would have been valid if taken pursuant to this memorandum are ratified.

This memorandum is not intended to create, and should not be construed to create, any right or benefit, substantive or procedural, legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person, or to require any procedures to determine whether a person is a refugee.

You are authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

## PRESIDENTIAL MEMORANDUM

Memorandum of President of the United States, Mar. 6, 2017, 82 F.R. 16279, which related to increased enforcement of immigration laws, was revoked by Ex. Ord. No. 14013, § 2(b), Feb. 4, 2021, 86 F.R. 8840.

# PRESIDENTIAL MEMORANDUM

<June 14, 2017, 82 F.R. 27965>

### Effective Date in Executive Order 13780

**Memorandum for the Secretary of State[,] the Attorney General[,] the Secretary of Homeland Security[, and] the Director of National Intelligence**

This memorandum provides guidance for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence in light of two preliminary injunctions that bar enforcement of certain provisions of Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States" (Mar. 6, 2017). The preliminary injunction entered by the United States District Court for the District of Maryland, and affirmed in substantial part by the United States Court of Appeals for the Fourth Circuit, bars enforcement of section 2(c) of the Executive Order. The portions of the preliminary injunction entered by the United States District Court for the District of Hawaii that were affirmed by the recent decision of the United States Court of Appeals for the Ninth Circuit bar enforcement of certain provisions of sections 2 and 6 of the Executive Order.

Various provisions of sections 2 and 6 of the Executive Order (as well as sections 3 and 12(c), which delineate the scope of the suspension contained in section 2(c)), refer to the Order's effective date. Section 14 of the Executive Order provides that the Order was effective at 12:01 a.m., eastern daylight time on March 16, 2017. Sections 2 and 6, however, were enjoined before that effective date, and the courts of appeals have affirmed the injunctions with respect to certain provisions of sections 2 and 6. As a result, under the terms of the Executive Order, the effective date of the enjoined provisions (as well as related provisions of sections 3 and 12(c)) is delayed or tolled until those injunctions are lifted or stayed.

In light of questions in litigation about the effective date of the enjoined provisions and in the interest of clarity, I hereby declare the effective date of each enjoined provision to be the date and time at which the referenced injunctions are lifted or stayed with respect to that provision. To the extent it is necessary, this memorandum should be construed to amend the Executive Order.

Because the injunctions have delayed the effective date of section 12(c), no immigrant or nonimmigrant visa issued before the effective date of section 2(c) shall be revoked pursuant to the Executive Order.

I hereby direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to jointly begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after all applicable injunctions are lifted or stayed with respect to that provision, to ensure an orderly and proper implementation of those provisions. Prior to that time, consular officers may issue valid visas to, and the Secretary of Homeland Security may admit, otherwise eligible aliens without regard to sections 2 and 6. If not otherwise revoked, visas and other travel documents issued during this period remain valid for travel as if they were issued prior to the effective date.

DONALD J. TRUMP

Notes of Decisions (2801)

**Footnotes**

1      So in original. The semicolon probably should be a comma.

2      So in original. Probably should be a reference to section 1229c of this title.

3      So in original. Probably should be preceded by "ineligible for".

4      So in original.

5      So in original. Probably should be "Secretary's".

6      So in original. Probably should be "(10)(E))".

7      So in original.

8      So in original. Probably should be "or".

9      So in original. Probably should be "clause".

10     So in original. Two subsecs. (t) have been enacted.

8 U.S.C.A. § 1182, 8 USCA § 1182
Current through P.L. 117-166. Some statute sections may be more current, see credits for details.

End of Document                               © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid  Flores v. Rosen,   9th Cir.(Cal.),   Dec. 29, 2020

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 212. Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens;
        Parole (Refs & Annos)

8 C.F.R. § 212.5

§ 212.5 Parole of aliens into the United States.

Effective: May 31, 2022

Currentness

<For statute(s) affecting validity of this section, see: 8 USCA § 1225(b)(1)(A)(i); 8 USCA § 1225(b)(1)(B)(iii)(IV).>

(a) The authority of the Secretary to continue an alien in custody or grant parole under section 212(d)(5)(A) of the Act shall be exercised by the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees. The Secretary or his designees may invoke, in the exercise of discretion, the authority under section 212(d)(5)(A) of the Act.

(b) Parole from custody. The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(b) or (c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as minors in § 236.3(b) of this chapter and are in DHS custody. The Executive Assistant Director, Enforcement and Removal Operations; directors of field operations; field office directors, deputy field office directors; or chief patrol agents shall follow the guidelines set forth in § 236.3(j) of this chapter and paragraphs (b)(3)(i) through (ii) of this section in determining under what conditions a minor should be paroled from detention:

(i) Minors may be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention.

(ii) Minors may be released with an accompanying parent or legal guardian who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a non-relative in detention who accompanied him or her on arrival, the question of releasing the minor and the accompanying non-relative adult shall be addressed on a case-by-case basis;

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by those officials identified in paragraph (a) of this section.

(c) In the case of all other arriving aliens, except those detained under § 235.3(b) or (c) of this chapter and paragraph (b) of this section, those officials listed in paragraph (a) of this section may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (d) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (f) of this section shall be denied parole and detained for removal in accordance with the provisions of § 235.3(b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under § 235.3(b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(d) Conditions. In any case where an alien is paroled under paragraph (b) or (c) of this section, those officials listed in paragraph (a) of this section may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. Those officials should apply reasonable discretion. The consideration of all relevant factors includes:

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I–352 in such amount as may be deemed appropriate;

(2) Community ties such as close relatives with known addresses; and

(3) Agreement to reasonable conditions (such as periodic reporting of whereabouts).

(e) Termination of parole—

(1) Automatic. Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.

(2)(i) On notice. In cases not covered by paragraph (e)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of the official listed in paragraph (a) of this section the public interest requires that the alien be continued in custody.

(ii) An alien who is granted parole into the United States after enactment of the Immigration Reform and Control Act of 1986 for other than the specific purpose of applying for adjustment of status under section 245A of the Act shall not be permitted to avail him or herself of the privilege of adjustment thereunder. Failure to abide by this provision through making such an application will subject the alien to termination of parole status and institution of proceedings under sections 235 and 236 of the Act without the written notice of termination required by § 212.5(e)(2)(i) of this chapter.

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in 8 CFR 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an arriving alien, and processed accordingly by the Department of Homeland Security.

(f) Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel.

(g) Parole for certain Cuban nationals. Notwithstanding any other provision respecting parole, the determination whether to release on parole, or to revoke the parole of, a native of Cuba who last came to the United States between April 15, 1980, and October 20, 1980, shall be governed by the terms of § 212.12.

(h) Effect of parole of Cuban and Haitian nationals.

(1) Except as provided in paragraph (h)(2) of this section, any national of Cuba or Haiti who was paroled into the United States on or after October 10, 1980, shall be considered to have been paroled in the special status for nationals of Cuba or Haiti, referred to in section 501(e)(1) of the Refugee Education Assistance Act of 1980, Public Law 96–422, as amended (8 U.S.C. 1522 note).

(2) A national of Cuba or Haiti shall not be considered to have been paroled in the special status for nationals of Cuba or Haiti, referred to in section 501(e)(1) of the Refugee Education Assistance Act of 1980, Public Law 96–422, as amended, if the individual was paroled into the United States:

(i) In the custody of a Federal, State or local law enforcement or prosecutorial authority, for purposes of criminal prosecution in the United States; or

(ii) Solely to testify as a witness in proceedings before a judicial, administrative, or legislative body in the United States.

**Credits**

[40 FR 49767, Oct. 24, 1975; as amended at 46 FR 24929, May 4, 1981; 47 FR 30045, July 9, 1982; 47 FR 46494, Oct. 19, 1982; 52 FR 16194, May 1, 1987; 52 FR 48802, Dec. 28, 1987; 53 FR 17450, May 17, 1988; 61 FR 36611, July 12, 1996; 62 FR 10348, March 6, 1997; 63 FR 31895, June 11, 1998; 65 FR 80294, Dec. 21, 2000; 65 FR 82255, Dec. 28, 2000; 66 FR 7863, March 26, 2001; 67 FR 39257, June 7, 2002; 68 FR 35152, June 12, 2003; 69 FR 69489, Nov. 29, 2004; 76 FR 53787, Aug. 29, 2011; 84 FR 44525, Aug. 23, 2019; 87 FR 18220, March 29, 2022]

SOURCE: 52 FR 16193, May 1, 1987; 52 FR 16372, May 5, 1987; 52 FR 48083, Dec. 18, 1987; 52 FR 48802, Dec. 28, 1987; 53 FR 9282, March 22, 1988; 53 FR 17450, May 17, 1988; 53 FR 24900, June 30, 1988; 53 FR 30017, Aug. 10, 1988; 53 FR 40867, Oct. 19, 1988; ; 55 FR 24859, June 19, 1990; 55 FR 36259, Sept. 5, 1990; 59 FR 13870, March 24, 1994; 60 FR 34090, June 30, 1995; 66 FR 236, Jan. 3, 2001; 67 FR 71447, Dec. 2, 2002; 68 FR 10923, March 6, 2003; 68 FR 35152, June 12, 2003; 68 FR 35275, June 13, 2003; 68 FR 46928, Aug. 7, 2003; 71 FR 68429, Nov. 24, 2006; 73 FR 18415, April 3, 2008; ; 74 FR 2833, Jan. 16, 2009; 74 FR 55738, Oct. 28, 2009; 76 FR 16232, March 23, 2011; 81 FR 72491, Oct. 20, 2016; 81 FR 92304, Dec. 19, 2016; 82 FR 5286, Jan. 17, 2017; 82 FR 41873, Sept. 5, 2017; 85 FR 29311, May 14, 2020; 86 FR 14227, March 15, 2021, unless otherwise noted.

AUTHORITY: 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; section 7209 of Pub.L. 108–458 (8 U.S.C. 1185 note); Title VII of Pub.L. 110–229 (8 U.S.C. 1185 note); 8 CFR part 2; Pub.L. 115–218.; Section 212.1(q) also issued under section 702, Pub.L. 110–229, 122 Stat. 754, 854.

Notes of Decisions (14)

Current through Aug. 25, 2022, 87 FR 52356. Some sections may be more current. See credits for details.

---

   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Unconstitutional as Applied by   Perera v. Jennings,   N.D.Cal.,   Apr. 15, 2022

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated

   Title 8. Aliens and Nationality (Refs & Annos)

      Chapter 12. Immigration and Nationality (Refs & Annos)

         Subchapter II. Immigration

            Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

---

8 U.S.C.A. § 1226

§ 1226. Apprehension and detention of aliens

Currentness

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

  **(1)** may continue to detain the arrested alien; and

  **(2)** may release the alien on--

    **(A)** bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

    **(B)** conditional parole; but

  **(3)** may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

**(b) Revocation of bond or parole**

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

**(c) Detention of criminal aliens**

---

**(1) Custody**

The Attorney General shall take into custody any alien who--

    **(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    **(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    **(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [1] to a term of imprisonment of at least 1 year, or

    **(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

    when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

**(2) Release**

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**(d) Identification of criminal aliens**

    **(1)** The Attorney General shall devise and implement a system--

        **(A)** to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

        **(B)** to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

        **(C)** which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

**(2)** The record under paragraph (1)(C) shall be made available--

**(A)** to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

**(B)** to officials of the Department of State for use in its automated visa lookout system.

**(3)** Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

**(e) Judicial review**

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 4, § 236, 66 Stat. 200; Pub.L. 101-649, Title V, § 504(b), Title VI, § 603(a)(12), Nov. 29, 1990, 104 Stat. 5050, 5083; Pub.L. 102-232, Title III, § 306(a)(5), Dec. 12, 1991, 105 Stat. 1751; Pub.L. 104-208, Div. C, Title III, §§ 303(a), 371(b)(5), Sept. 30, 1996, 110 Stat. 3009-585, 3009-645.)

Notes of Decisions (710)

**Footnotes**

1       So in original. Probably should be "sentenced".

8 U.S.C.A. § 1226, 8 USCA § 1226
Current through P.L. 117-166. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Superseded by Statute as Stated in Department of Homeland Security v. Thuraissigiam, U.S., June 25, 2020

12 S.Ct. 336
Supreme Court of the United States

NISHIMURA EKIU

v.

UNITED STATES et al.

January 18, 1892.

**Synopsis**
Appeal from the circuit court of the United States for the northern district of California. Affirmed.

**336  STATEMENT BY MR. JUSTICE GRAY.

*Habeas corpus*, sued out May 13, 1891, by a female subject of the emperor of Japan, restrained of her liberty and detained at San Francisco upon the ground that she should not be permitted to land in the United States. The case, as appearing by the papers filed, and by the report of a commissioner of the circuit court, to whom the case was referred by that court 'to find the facts and his conclusions of law, and to report a judgment therein,' and by the admissions of counsel at the argument in this court, was as follows:

The petitioner arrived at the port of San Francisco on the steamship Belgic, from Yokohama, Japan, on May 7, 1891. William H. Thornley, commissioner of immigration of the state of California, and claiming to act under instructions from and contract with the secretary of the treasury of the United States, refused to allow her to land; and on May 13, 1891, in a 'report of alien immigrants forbidden to land under the provisions of the act of congress approved August 3, 1882, at the port of San Francisco, being passengers upon the steamer Belgic, Walker, master, which arrived May 7, 1891, from Yokohama,' made these statements as to the petitioner: 'Sex, female; age, 25.' 'Passport states that she comes to San Francisco in company with her husband, which is not a fact. She states that she has been married two years, and that her husband has been in the United States one year, but she does not know his address. She has $22, and is to stop at some hotel until her husband calls for her.'

With this report Thornley sent a letter to the collector, stating that after a careful examination of the alien immigrants on board the Belgic he was satisfied that the petitioner and five others were 'prohibited from landing by the existing immigration laws,' for reasons specifically stated with regard to each; and that, pending the collector's final decision as to their right to land, he had 'placed them temporarily in the Methodist Chinese Mission, as the steamer was not a proper place to detain them, until the date of sailing.' On the same day the collector wrote to Thornley, approving his action.

Thereafter, on the same day, this writ of *habeas corpus* was issued to Thornley, and he made the following return thereon: 'In obedience to the within writ I hereby produce the body of Nishimura Ekiu, as within directed, and return that I hold her in my custody by direction of the customs authorities of the port of San Francisco, Cal., under the provisions of the immigration act; that, by an understanding between the United States attorney and the attorney for petitioner, said party will remain in the custody of the Methodist Episcopal Japanese and Chiness Mission pending a final disposition of the writ.' The petitioner remained at the mission-house until the final order of the circuit court.

Afterwards, and before a hearing, the following proceedings took place: On May 16th the district attorney of the United States intervened in opposition to the writ of *habeas corpus*, insisting that the finding and decision of Thoruley and the collector were final and conclusive, and **337 could not be reviewed by the court. John L. Hatch, having been appointed on May 14, by the secretary of the treasury, inspector of immigration at the port of San Francisco, on May 16th made the inspection and examination required by the act of March 3, 1891, c. 551, entitled 'An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor,' (the material provisions of which are set out in the margin, [1] ) and refused to allow the petitioner to land, and made a report to the collector in the very words of Thornley's report, except in stating the date of the act of congress, under which he acted, as March 3, 1891, instead of August 3, 1882; and, on May 18th, Hatch intervened in opposition to the writ of *habeas corpus*, stating these doings of his, and that upon said examination he found the petitioner to be 'an alien immigrant from Yokohama, empire of Japan,' and 'a person without means of support, without relatives or friends in the United States,' and **338 "a person unable to care for herself, and liable to become a public charge, and therefore inhibited from landing under the provisions of said act of 1891, and previous acts of which said act is amendatory:" and insisting that his finding and decison were reviewable by the superintendent of immigration and the secretary of the treasury only.

At the hearing before the commissioner of the circuit court, the petitioner offered to introduce evidence as to her right to land; and contended that the act of 1891, if construed as vesting in the officers named therein exclusive authority to determine that right, was in so far unconstitutional, as depriving her of her liberty without due process of law; and that by the constitution she had a right to the writ of *habeas corpus*, which carried with it the right to a determination by the court as to the legality of her detention, and therefore, necessarily, the right to inquire into the facts relating thereto.

The commissioner excluded the evidence offered as to the petitioner's right to land; and reported that the question of that right had been tried and determined by a duly-constituted and competent tribunal having jurisdiction in the premises; that the decision of Hatch, as inspector of immigration, was conclusive on the right of the petitioner to land, and could not be reviewed by the court, but only by the commissioner of immigration and the secretary of the treasury; and that the petitioner was not unlawfully restrained of her liberty.

On July 24, 1891, the circuit court confirmed its commissioner's report, and ordered 'that she be remanded by the marshal to the custody from which she has been taken, to-wit, to the custody of J. L. Hatch, immigration inspector for the port of San Francisco, to be dealt with as he may find that the law requires, upon either the present testimony before him, or that and such other as he may deem proper to take.' The petitioner appealed to this court.

West Headnotes (5)

**[1]**   **Aliens, Immigration, and Citizenship** 🔑 Validity

Act March 3, 1891, c. 551, 26 Stat. 1084, which provides for the exclusion from admission into the United States of certain classes of aliens, and that the decision by the inspectors of immigration adverse to the right of any alien to land shall be final and conclusive unless appeal is taken to the superintendent of immigration, whose action is subject to review by the secretary of the treasury, is a constitutional exercise of the power of congress.

48 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and Citizenship** 🔑 Appointment and qualification

**Public Employment** 🔑 Election or appointment

Inspectors of immigration, under Act March 3, 1891, c. 551, 26 Stat. 1084, are to be appointed by the secretary of the treasury, and not by the superintendent of immigration.

3 Cases that cite this headnote

**[3]**   **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

The courts have no power to review the action of an inspector of immigration in refusing to allow an alien to land, as within the class excluded by Act March 3, 1891, c. 551, 26 Stat. 1084. Section 13, which provides that the circuit and district courts of the United States are "invested with full and concurrent jurisdiction of all cases, civil and criminal, arising under any of the provisions of this act," only refers to actions for penalties under sections 3 and 4, and indictments for misdemeanors under sections 6, 8, and 10.

7 Cases that cite this headnote

**[4]**   **Aliens, Immigration, and Citizenship** 🔑 Powers and duties

**Aliens, Immigration, and Citizenship** 🔑 Administrative Procedure

The provision that inspectors of immigration and their assistants "shall have power to administer oaths, and to take and consider testimony touching the rights of" aliens to enter the United States, "all of which shall be entered of record," does not require inspectors to take such testimony. They may decide the question of the right to land upon their own inspection and examination.

34 Cases that cite this headnote

**[5]**   **Aliens, Immigration, and Citizenship** 🔑 Necessity of Entry;  Mode

An alien immigrant detained by the collector of the port of San Francisco on report of the

state commissioner of immigration that she came within the excluded class under Act Aug. 3, 1882, c. 376, 22 Stat. 214, was placed in a mission house as a more suitable place than the steamship pending the decision of the question of her right to land, and was kept there, by agreement between her attorney and the attorney for the United States, until final judgment upon a writ of habeas corpus. Held, that placing her in such mission left her in the same position, as far as regarded her right to land, as if she had never been removed from the steamship.

113 Cases that cite this headnote

**Attorneys and Law Firms**

**\*657** *Lyman I. Mowry*, for appellant.

**\*658** *Asst. Atty. Gen. Parker*, for the United States.

**Opinion**

Mr. Justice GRAY, after stating the case as above, delivered the opinion of the court.

As this case involves the constitutionality of a law of the United States, it is within the appellate jurisdiction of this **\*659** court, notwithstanding the appeal was taken since the act establishing circuit courts of appeals took effect. Act March 3, 1891, c. 517, § 5, (26 St. 827, 828, 1115.)

It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. Vat. Law Nat. lib. 2, §§ 94, 100; 1 Phillim. Int. Law, (3d Ed.) c. 10, § 220. In the United States this power is vested in the national government, to which the constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the president and senate, or through statutes enacted by congress, upon whom the constitution has conferred power to regulate commerce with foreign nations, including the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States; to establish a uniform rule of naturalization; to declare war, and to provide

and maintain armies and navies; and to make all laws which may be necessary and proper for carrying into effect these powers and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof. Const. art. 1, § 8; Head-Money Cases, 112 U. S. 580, 5 Sup. Ct. Rep. 247; Ping v. U. S., 130 U. S. 581, 604–609, 9 Sup. Ct. Rep. 623.

The supervision of the admission of aliens into the United States may be intrusted by congress either to the department of state, having the general management of foreign relations, or to the department of the treasury, charged with the enforcement of the laws regulating foreign commerce; and congress has often passed acts forbidding the immigration of particular classes of foreigners, and has committed the execution of these acts to the secretary of the treasury, to collectors of customs, and to inspectors acting under their authority. See, for instance, acts of March 3, 1875, c. 141, (18 St. 477;) August 3, 1882, c. 376, (22 St. 214;) February 23, 1887, c. **\*660** 220, (24 St. 414;) October 19, 1888, c. 1210, (25 St. 566;) as well as the various acts for the exclusion of the Chinese.

An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful. Chew Heong v. U. S., 112 U. S. 536, 5 Sup. Ct. Rep. 255; U. S. v. Jung Ah Lung, 124 U. S. 621, 8 Sup. Ct. Rep. 663; Wan Shing v. U. S., 140 U. S. 424, 11 Sup. Ct. Rep. 729; Lau Ow Bew, Petitioner, 141 U. S. 583, 12 Sup. Ct. Rep. 43. And congress may, if it sees fit, as in the statutes in question in U. S. v. Jung Ah Lung, just cited, authorize the courts to investigate and ascertain the facts on which the right to land depends. But, on the other hand, the final determination of those facts may be in trusted by congress to executive officers; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to re-examine or controvert the sufficiency of the evidence on which he acted. Martin v. Mott, 12 Wheat. 19, 31; Railroad Co. v. Stimpson, 14 Pet. 448, 458; Benson v. McMahon, 127 U. S. 457, 8 Sup. Ct. Rep. 1240; In re Luis

Oteiza y Cortes, 136 U. S. 330, 10 Sup. Ct. Rep. 1031. It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the **\*\*339** United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law.

Murray v. Hoboken Co., 18 How. 272; Hilton v. Merritt, 110 U. S. 97, 3 Sup. Ct. Rep. 548.

The immigration act of August 3, 1882, c. 376, which was held to be constitutional in the Head-Money Cases, above cited, imposed a duty of 50 cents for each alien passenger coming by vessel into any port of the United States, to be **\*661** paid to the collector of customs, and by him into the treasury, to constitute an immigrant fund; by section 2, the secretary of the treasury was charged with the duty of execution the provisions of the act, and with the supervision of the business of immigration to the United States, and, for these purposes, was empowered to make contracts with any state commission, board, or officers, and it was made their duty to go on board vessels and examine the condition of immigrants, 'and if on such examination there shall be found among such passengers any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge, they shall report the same in writing to the collector of such port, and such persons shall not be permitted to land;' and by section 3, the secretary of the treasury was authorized to establish rules and regulations, and to issue instructions, to carry out this and other immigration laws of the United States. 22 St. 214.

The doings of Thornley, the state commissioner of immigration, in examining and detaining the petitioner, and in reporting to the collector, appear to have been under that act, and would be justified by the second section thereof, unless that section should be taken to have been impliedly repealed by the last paragraph of section 8 of the act of March 3, 1891, c. 551, by which all duties imposed and powers confered by that section upon state commissions, boards, or officers, acting under contract with the secretary of the treasury, 'shall be performed and exercised, as occasion may arise, by the inspection officers of the United States.' 26 St. 1085.

But it is unnecessary to express a definite opinion on the authority of Thornley to inspect and detain the petitioner.

Putting her in the mission-house as a more suitable place than the steam-ship, pending the decision of the question of her right to land, and keeping her there, by agreement between her attorney and the attorney for the United States, until final judgment upon the writ of *habeas corpus*, left her in the same position, so far as regarded her right to land in the United States, as if she never had been removed from the steam-ship.

Before the hearing upon the writ of *habeas corpus*, Hatch **\*662** was appointed by the secretary of the treasury inspector of immigration at the port of San Francisco, and, after making the inspection and examination required by the act of 1891, refused to allow the petitioner to land, and made a report to the collector of customs, stating facts which tended to show, and which the inspector decided did show, that she was a 'person likely to become a public charge,' and so within one of the classes of aliens 'excluded from admission into the United States' by the first section of that act. And Hatch intervened in the proceedings on the writ of *habeas corpus*, setting up his decision in bar of the writ.

A writ of *habeas corpus* is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and, if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment. Ex part Bollman, 4 Cranch, 75, 114, 125; Coleman v. Tennessee, 97 U. S. 509, 519; U. S. v. McBratney, 104 U. S. 621, 624; Kelley v. Thomas, 15 Gray, 192; King v. Marks, 3 East, 157; Shuttleworth's Case, 9 Q. B. 651.

The case must therefore turn on the validity and effect of the action of Hatch as inspector of immigration.

Section 7 of the act of 1891 establishes the office of superintendent of immigration, and enacts that he 'shall be an officer in the treasury department, under the control and supervision of the secretary of the treasury.' By section 8, 'the proper inspection officers' are required to go on board any vessel bringing alien immigrants, and to inspect and examine them, and may for this purpose remove and detain them on shore, without such removal being considered a landing; and 'shall have power to administer oaths, and to take and consider testimony touching the right of any such aliens to enter the United States, all of which shall be entered of record.' 'All decisions made by the inspection officers or their assistants touching the right of any alien to land, when

adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the secretary **\*663** of the treasury;' and the secretary of the treasury may prescribe rules for inspection along the borders of Canada, British Columbia, and Mexico, 'provided that not exceeding one inspector shall be appointed for each customs district.'

It was argued that the appointment of Hatch was illegal, because it was made by the secretary of the treasury, and should have been made by the superintendent of immigration. But the constitution does not allow congress to vest the appointment of inferior officers elsewhere than 'in the president alone, in the courts of law, or in the heads of departments.' The act of 1891 manifestly contemplates and intends that the inspectors of immigration shall be appointed by the secretary of the treasury; and appointments of such officers by the superintendent of immigration could be upheld only by presuming them to be made with the concurrence or approval of the secretary of the treasury, his official head.

Const. art. 2, § 2; U. S. v. Hartwell, 6 Wall. 385; **\*\*340** Stanton v. Wilkeson, 8 Ben. 357; Price v. Abbott, 17 Fed. Rep. 506.

It was also argued that Hatch's proceedings did not conform to section 8 of the act of 1891, because it did not appear that he took testimony on oath, and because there was no record of any testimony or of his decision. But the statute does not require inspectors to take any testimony at all, and allows them to decide on their own inspection and examination the question of the right of any alien immigrant to land. The provision relied on merely empowers inspectors to administer oaths, and to take and consider testimony, and requires only testimony so taken to be entered of record.

The decision of the inspector of immigration being in conformity with the act of 1891, there can be no doubt that it was final and conclusive against the petitioner's right to land in the Unites States. The words of section 8 are clear to that effect, and were manifestly intended to prevent the question of an alien immigrant's right to land, when once decided adversely by an inspector, acting within the jurisdiction conferred upon him, from being impeached or reviewed, in the courts or otherwise, save only by appeal to the inspector's **\*664** official superiors, and in accordance with the provisions of the act. Section 13, by which the circuit and district courts of the United States are 'invested with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of this act,' evidently refers to causes of judicial cognizance, already provided for, whether civil actions in the nature of debt for penalties under sections 3 and 4, or indictments for misdemeanors under section 6, 8, and 10. Its intention was to vest concurrent jurisdiction of such causes in the circuit and district courts, and it is impossible to construe it as giving the courts jurisdiction to determine matters which the act has expressly committed to the final determination of executive officers.

The result is that the act of 1891 is constitutional and valid; the inspector of immigration was duly appointed; his decision against the petitioner's right to land in the United States was within the authority conferred upon him by that act; no appeal having been taken to the superintendent of immigration, that decision was final and conclusive; the petitioner is not unlawfully restrained of her liberty; and the order of the circuit court is affirmed.

Mr. Justice BREWER dissented.

**All Citations**

142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146

# Footnotes

1  'Section 1. The following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude,' etc.

By sections 3 and 4, certain offenses are defined and subjected to the penalties imposed by the act of February 26, 1885, c. 164, § 3, namely, penalties of $1,000, 'which may be sued for and recovered by the United States, or by any person who shall first bring his action therefor,' 'as debts of like amount are now recovered in the circuit courts of the United States, the proceeds to be paid into the treasury of the United States.' 23 St. 333.

'Sec. 6. Any person who shall bring into or land in the United States by vessel or otherwise, or who shall aid to bring into or land in the United States by vessel or otherwise, any alien not lawfully entitled to enter the United States, shall be deemed guilty of a misdemeanor, and shall, on conviction, be punished by a fine not exceeding one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.

'Sec. 7. The office of superintendent of immigration is hereby created and established, and the president, by and with the advice and consent of the senate, is authorized and directed to appoint such officer, whose salary shall be four thousand dollars per annum, payable monthly. The superintendent of immigration shall be an officer in the treasury department, under the control and supervision of the secretary of the treasury, to whom he shall make annual reports in writing of the transactions of his office, together with such special reports in writing as the secretary of the treasury shall require.

'Sec. 8. Upon the arrival by water at any place within the United States of any alien immigrants it shall be the duty of the commanding officer and the agents of the steam or sailing vessel by which they came to report the name, nationality, last residence, and destination of every such alien, before any of them are landed, to the proper inspection officers, who shall thereupon go or send competent assistants on board such vessel, and there inspect all such aliens, or the inspection officers may order a temporary removal of such aliens for examination at a designated time and place, and then and there detain them until a thorough inspection is made. But such removal shall not be considered a landing during the pendency of such examination. The medical examination shall be made by surgeons of the marine hospital service. In cases where the services of a marine hospital surgeon cannot be obtained without causing unreasonable delay, the inspector may cause an alien to be examined by a civil surgeon, and the secretary of the treasury shall fix the compensation for such examination. The inspection officers and their assistants shall have power to administer oaths, and to take and consider testimony touching the right of any such aliens to enter the United States, all of which shall be entered of record. During such inspection, after temporary removal, the superintendent shall cause such aliens to be properly housed, fed, and cared for, and also, in his discretion, such as are delayed in proceeding to their destination after inspection. All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final, unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the secretary of the treasury. It shall be the duty of the aforesaid officers and agents of such vessel to adopt due precautions to prevent the landing of any alien immigrant at any place or time other than that designated by the inspection officers; and any such officer or agent or person in charge of such vessel, who shall either knowingly or negligently land or permit to land any alien immigrant at any place or time other than that designated by the inspection officers, shall be deemed guilty of a misdemeanor, and punished by a fine not exceeding one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.'

'The secretary of the treasury may prescribe rules for inspection along the borders of Canada, British Columbia, and Mexico, so as not to obstruct or unnecessarily delay, impede, or annoy passengers in ordinary travel between said countries: provided, that not exceeding one inspector shall be appointed for each customs district, and whose salary shall not exceed twelve hundred dollars per year.

'All duties imposed and powers conferred by the second section of the act of August third, eighteen hundred and eighty-two, upon state commissioners, boards, or officers acting under contract with the secretary of the

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

treasury, shall be performed and exercised, as occasion may arise, by the inspection officers of the United States.'

'Sec. 10. All aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessel on which such aliens came; and if any master, agent, consignee, or owner of such vessel shall refuse to receive back on board the vessel such aliens, or shall neglect to detain them thereon, or shall refuse or neglect to return them to the port from which they came, or to pay the cost of their maintenance while on land, such master, agent, consignee, or owner shall be deemed guilty of a misdemeanor, and shall be punished by a fine not less than three hundred dollars for each and every offense; and any such vessel shall not have clearance from any port of the United States while any such fine is unpaid.'

Section 11 provides for the return within one year of any alien coming into the United States in violation of law.

Section 12 saves all prosecutions and proceedings, criminal or civil, begun under any act hereby amended.

By section 13 the circuit and district courts of the United States are 'invested with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of this act;' and the act is to go into effect on April 1, 1891. 26 St. 1084–1086.

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Cheneau v. Garland,   9th Cir.,   May 13, 2021

45 S.Ct. 257
Supreme Court of the United States.

KAPLAN

v.

TOD, Commissioner of Immigration.

No. 241.
|
Argued Jan. 26, 1924.
|
Decided March 2, 1925.

**Synopsis**
Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus proceedings by Esther Kaplan against Robert E. Tod, Commissioner of Immigration, Ellis Island, Port of New York. From order dismissing petition, petitioner appeals. Affirmed.

West Headnotes (2)

**[1]** **Aliens, Immigration, and Citizenship** Time Limitations in General

Feeble-minded alien child who had lived with father more than five years pending deportation could be deported; "found in United States"; "entered United States."

93 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** Children of Citizens in General

Feeble-minded alien child did not become citizen on naturalization of father with whom she was living pending deportation; "dwelling in United States."

33 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*257**  **\*228**  Messrs. James Marshall and Elijah N. Zoline, both of New York City, for appellant.

Mr. Asst. Atty. Gen. Donovan, for appellee.

**Opinion**

**\*229**  Mr. Justice HOLMES delivered the opinion of the Court.

This is an appeal from an order dismissing a petition of the appellant for a writ of habeas corpus. The petition alleges that the petitioner is a citizen of the United States, and that she is unlawfully detained by the respondent under a warrant of deportation issued by the Assistant Secretary of Labor, without jurisdiction and without due process of law contrary to the Fifth Amendment of the Constitution of the United States. An appeal was taken directly to this Court on the alleged infringement of the appellant's constitutional rights. Chin Yow v. United States, 208 U. S. 8, 13, 28 S. Ct. 201, 52 L. Ed. 369; Ng Fung Ho v. White, 259 U. S. 276, 284, 42 S. Ct. 492, 66 L. Ed. 938.

The appellant was born in Russia. On July 20, 1914, being then about thirteen years old, she was brought to this country, where her father already was, by her mother. Upon examination she was certified to be feeble minded, and was ordered to be excluded, but before the order could be carried into effect the European war had begun. Deportation necessarily was suspended, and she was kept at Ellis Island until June, 1915. In the latter half of that month she was handed over to the Hebrew Sheltering and Immigrant Aid Society upon its undertaking to accept custody of the child until she could be deported safely, to return her when required, and meanwhile to prevent her becoming a public charge. The Society allowed her to live with her father, which she has done ever since. On December 14, 1920, her father was naturalized, she being then about nineteen. The warrant of deportation was issued on January 19, 1923; the writ of habeas corpus was allowed on April 24, and was dismissed on the following October 9.

[1] [2] It is not questioned that the appellant rightly was denied admission in July, 1914, or that she is feeble minded **\*230** still. Act of March 26, 1910, c. 128; 36 Stat. 263. But it is said that she became a citizen by the naturalization of her father while she was a minor and in this country, Rev. St.

**Kaplan v. Tod, 267 U.S. 228 (1925)**
45 S.Ct. 257, 69 L.Ed. 585

§ 2172 (Comp. St. § 4367) and that she cannot be deported upon a warrant issued more than five years after her entry into the United States. Act of February 5, 1917, c. 29, § 19, 39 Stat. 874, 889 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼ jj); Act of February 20, 1907, c. 1134, § 20; 34 Stat. 898, 904. The answers to both arguments are much the same. Naturalization of parents affects minor children only 'if dwelling in the United States.' Rev. St. § 2172. The appellant could not lawfully have landed in the United States in view of the express prohibition of the Act of 1910 just referred to, and until she legally landed 'could not have dwelt within the United States.' Zartarian v. Billings, 204 U. S. 170, 175, 27 S. Ct. 182, 184 (51 L. Ed. 428). Moreover while she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared. United States v. Ju Toy, 198 U. S. 253, 263, 25 S. Ct. 644, 49 L. Ed. 1040. When her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was still in theory of law at the boundary line and had **\*\*258** gained no foothold in the United States. Nishimura Ekiu v. United States, 142 U. S. 651, 661, 12 S. Ct. 336, 35 L. Ed. 1146. She never has been dwelling in the United States within the meaning of the Act. Still more clearly she never has begun to reside permanently in the United States within the later Act of March 2, 1907, c. 2534, § 5; 34 Stat. 1229 (Comp. St. § 3962). United States ex rel. Patton v. Tod (C. C. A.) 297 F. 385, affirming (D. C.) 292 F. 243; United States ex rel. De Rienzo v. Rodgers, 185 F. 334, 107 C. C. A. 452.

The later of the limitation acts, the Act of February 5, 1917, c. 29, § 19, 39 Stat. 874, 889, applies to 'any alien who at the time of entry was a member of one or more of the classes excluded by law' and to 'any alien who shall have entered or who shall be found in the United **\*231** States in violation of this Act.' For the reasons already stated the appellant never has entered the United States within the meaning of the law, and is not properly described in the warrant as 'found in the United States in violation of the immigrant authorities.' Theoretically she is in custody at the limit of the jurisdiction awaiting the order of the authorities. It would be manifestly absurd to hold that the five years run in favor of one held at Ellis Island for deportation, and as we have said the position of the appellant is the same.

Order affirmed.

**All Citations**

267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Superseded by Statute as Stated in   Fieran v. I.N.S.,   6th Cir.,   October 2, 2001

78 S.Ct. 1072
Supreme Court of the United States

LENG MAY MA, Petitioner,

v.

Bruce G. BARBER, District Director, Immigration
and Naturalization Service, San Francisco District.

No. 105.
|
Argued May 20, 1958.
|
Decided June 16, 1958.

**Synopsis**

Habeas corpus proceeding. The United States District Court
for the Northern District of California, Southern Division,
denied the relief sought, and the petitioner appealed. The
Court of Appeals for the Ninth Circuit, 241 F.2d 85, affirmed,
and certiorari was granted. The Supreme Court, Mr. Justice
Clark, held that temporary parole in United States while
alien's admissibility was being determined did not entitle alien
to benefit of statute giving Attorney General authority to
withhold deportation of any alien 'within the United States' if
alien would thereby be subjected to physical persecution.

Affirmed.

Mr. Justice Douglas, Mr. Chief Justice Warren, Mr. Justice
Black and Mr. Justice Brennan dissented.

West Headnotes (2)

**[1]**   **Aliens, Immigration, and
Citizenship**   Aliens not within United
States

An alien confined pending determination of his
admissibility is not "within the United States"
for purposes of statute giving Attorney General
authority to withhold deportation of an alien
"within the United States." Immigration and

Nationality Act, § 243(h),   8 U.S.C.A. §
1253(h).

151 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and
Citizenship**   Aliens not within United
States

The parole of aliens seeking admission is simply
a device through which needless confinement
is avoided while administrative proceedings are
conducted and was never intended to affect an
alien's status; and temporary parole in United
States while alien's admissibility was being
determined did not entitle alien to benefit
of statute giving Attorney General authority
to withhold deportation of any alien "within
the United States" if alien would thereby be
subjected to physical persecution. Immigration
and Nationality Act, §§ 212(d) (5), 231–240,
236(a), 241–250, 241, 243(h),   8 U.S.C.A.
§§   1182(d)   (5),   1221–1230,   1226(a),
1251–1260,   1251,   1253(h).

194 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1072   \*185**  Mr. Joseph S. Hertogs, San Francisco, Cal.,
for the petitioner.

Mr. Leonard B. Sand, Washington, D.C., for the respondent.

**Opinion**

Mr. Justice CLARK delivered the opinion of the Court.

This is a habeas corpus case involving s 243(h) of the
Immigration and Nationality Act, which authorizes the
Attorney **\*\*1073** General 'to withhold deportation of any
alien within the United States to any country in which in his
opinion the alien would be subject to physical persecution.
**\*186** * * *[1] Claiming to be an alien 'within the United
States' by reason of her parole in this country while her
admissibility was being determined, petitioner contends that
she is eligible to receive the benefactions of s 243(h). The

Attorney General contends that the section is applicable only to aliens who, in contemplation of law, have entered the United States. He argues that petitioner has never enjoyed that status because she eventually was found ineligible for entry and ordered excluded. The District Court denied a writ of habeas corpus, and the Court of Appeals affirmed. 9 Cir., 241 F.2d 85. We granted certiorari. 1957, 353 U.S. 981, 77 S.Ct. 1283, 1 L.Ed.2d 1141. We conclude that petitioner's parole did not alter her status as an excluded alien or otherwise bring her 'within the United States' in the meaning of s 243(h).

Petitioner is a native of China who arrived in this country in May 1951 claiming United States citizenship on the ground that her father was a United States citizen. Pending determination of her claim, she at first was held in custody, but later, in August 1952, was released on parole. Some three months thereafter, having failed to establish her claim of citizenship, she was ordered excluded, and the Board of Immigration Appeals affirmed. She surrendered for deportation in January 1954, and thereafter applied for a stay of deportation under s 243(h) in which she alleged that her pending deportation to China would subject her to physical persecution and probable death at the hands of the existing government. Her petition for writ of habeas corpus followed administrative notification of her ineligibility for relief under that section. Petitioner does not challenge the **\*187** validity of her exclusion order or the proceedings culminating therein. She merely contends that by virtue of her physical presence as a parolee she is 'within the United States,' and hence covered by s 243(h). The question, therefore, is wholly one of statutory construction.

It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.' Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956. See Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576. The distinction was carefully preserved in Title II of the Immigration and Nationality Act. Chapter 4[2] subjects those seeking admission to 'exclusion proceedings' to determine whether they 'shall be allowed to enter or shall be excluded and deported.' 66 Stat. 200, 8 U.S.C. s 1226(a), 8 U.S.C.A. s 1226(a).

On the other hand, Chapter 5[3] concerns itself with aliens who have already entered the United States and are subject to 'expulsion,' as distinguished from 'exclusion,' if they fall within certain 'general classes of deportable aliens.' 66 Stat. 204, 8 U.S.C. s 1251, 8 U.S.C.A. s 1251. Proceedings for expulsion under Chapter 5 are commonly **\*1074** referred to as 'deportation proceedings.' Parenthetically, the word 'deportation' appears also in Chapter 4 to refer to the return of excluded aliens from the country, but its use there reflects none of the technical gloss accompanying its use as a word of art in Chapter 5.

**\*188** [1]   For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 215, 73 S.Ct. 625, 630; United States v. Ju Toy, 1905, 198 U.S. 253, 263, 25 S.Ct. 644, 646, 49 L.Ed. 1040; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 661, 12 S.Ct. 336, 339, 35 L.Ed. 1146. It seems quite clear that an alien so confined would not be 'within the United States' for purposes of s 243(h). This, in fact, was conceded by respondents in the companion case, Rogers v. Quan, 357 U.S. 193 78 S.Ct. 1076. Our question is whether the granting of temporary parole somehow effects a change in the alien's legal status. In s 212(d)(5) of the Act, generally a codification of the administrative practice pursuant to which petitioner was paroled,[4] the Congress specifically provided that parole 'shall not be regarded as an admission of the alien,' and that after the return to custody the alien's case 'shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'[5] (Emphasis added.) Petitioner's concept of the effect of parole certainly finds no support in this statutory language.

**\*189**   This Court previously has had occasion to define the legal status of excluded aliens on parole. In Kaplan v. Tod, 1925, 267 U.S. 228, 45 S.Ct. 257, 258, 69 L.Ed. 585, an excluded alien was paroled to a private Immigrant Aid Society pending deportation. The questions posed were whether the alien was 'dwelling in the United States' within the meaning of a naturalization statute, and whether she had 'entered or (was) found in the United States' for purpose of limitations. Mr. Justice Holmes disposed of the problem by explicitly equating parole with detention:

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 237 of 1021   PageID 7107

'The appellant could not lawfully have landed in the United States * * *, and until she legally landed 'could not have dwelt within the United States.' Zartarian v. Billings, 204 U.S. 170, 175, 27 S.Ct. 182, 183, 51 L.Ed. 428. Moreover while she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared. United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, (646), 49 L.Ed. 1040. When her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was still in theory of law at the boundary line and had gained no foothold in the United  **1075  State.'

267 U.S. at page 230, 45 S.Ct. at page 257.

We find no evidence that the Congress, in enacting s 243(h) in 1952, intended to depart from this interpretation.

The context in which s 243(h) appears in the Act persuasively indicates the scope of its provisions. As we have observed, Title II of the Act preserves the distinction between exclusion proceedings and deportation (expulsion) proceedings, Chapter 4 dealing with the former and Chapter 5 with the latter. Within the two chapters are enumerated separate administrative procedures for  *190  exclusion and expulsion, separate provisions for removal and transportation, and—most significantly—separate provisions for stays of deportation. Section 243(h), under which petitioner claims relief, was inserted by the Congress not among Chapter 4's 'Provisions Relating to Entry and Exclusion,' but squarely within Chapter 5—a strikingly inappropriate place if, as petitioner claims, it was intended to apply to excluded aliens.

 [2]    The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court. Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. See Annual Reports, Immigration and Naturalization Service, 1955, pp. 5—6; 1956, pp. 5—6. Certainly this policy reflects the humane qualities of an enlightened civilization. The acceptance of petitioner's position in this case, however, with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy—an intention we are reluctant to impute to the Congress.

Affirmed.

Mr. Justice DOUGLAS, with whom The CHIEF JUSTICE, Mr. Justice BLACK and Mr. Justice BRENNAN concur, dissenting.

The statutory provision in controversy is contained in s 243(h) of the Immigration and Nationality Act of 1952, 66 Stat. 212, 214, 8 U.S.C. s 1253(h), 8 U.S.C.A. s 1253(h), which reads:

> 'The Attorney General is authorized to withhold deportation of any alien within the United States  *191  to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason.'

The alien who is physically present in this country is about to be sent to Communist China—a country which the Immigration and Naturalization Service itself has told us is inhospitable to refugees. *

 **1076   *192  The question for us is not whether she should or should not be returned to China. It is whether the Attorney General has discretion to withhold her deportation if in his opinion she would be 'subject to physical persecution' were she returned to that country.

This alien is not in custody at our border. She is here on parole. The authority to parole is contained in s 212(d)(5) of the Act—the Attorney General may 'in his discretion' parole an alien 'into the United States.' How an alien can be paroled 'into the United States' and yet not be 'within the United States' remains a mystery.

Of course if we had the problem of Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585, different considerations would come into play. There an alien on parole sought to have her years here used to gain herself citizenship. Alternatively, she argued that the statute had run on her deportation since her parole was an 'entry.'

No such enlargement of the prerogatives of a parolee is sought here. This alien seeks not citizenship, not residence, but only the shelter of a provision of the law designed to protect such refugees from the fate of 'physical persecution.' She only requests that she be eligible to be considered by the Attorney General as a beneficiary of this humane provision of our law. Only a hostile reading can deny her that respite.

I would not read the law narrowly to make it the duty of our officials to send this alien and the others in the companion case to what may be persecution or death. Technicalities need not enmesh us. The spirit of the law provides the true guide. It makes plain, I think, that this case is one of those where the Attorney General is authorized to save a human being from persecution in a Communist land.

**All Citations**

357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246

## Footnotes

1 Section 243(h): 'The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason.' 66 Stat. 214, 8 U.S.C. s 1253(h), 8 U.S.C.A. s 1253(h).

2 66 Stat. 195—204, 8 U.S.C. ss 1221—1230, 8 U.S.C.A. ss 1221—1230.

3 66 Stat. 204—219, 8 U.S.C. ss 1251—1260, 8 U.S.C.A. ss 1251—1260.

4 See Analysis of S. 716, 82d Cong., General Counsel, Immigration and Naturalization Service, pp. 39—42.

5 Section 212(d)(5): 'The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.' 66 Stat. 188, 8 U.S.C. s 1182(d)(5), 8 U.S.C.A. s 1182(d)(5).

* The Immigration and Naturalization Service announced on October 31, 1956, a policy of granting stays of deportation for those headed back to Red China. In that connection it stated:

'Official notice may be taken that the China mainland is under the control of a de facto Communist government. As in other Communist states, this government operates as totalitarian dictatorship, suppressing personal liberties and imposing arbitrary restraints on the people when necessary to maintain its authority or secure its objectives. Its methods for imposing its will include persecution of individuals and groups by way of economic sanctions, corporal punishment, incarceration, and execution.

'While it can be accepted as a general proposition that the Peiping government at times engages in these forms of persecution to further its authoritarian ends, no reliable information has yet been made available to this Service to indicate whether such persecution is directed indiscriminately against the populace as a whole or whether it is employed on a selective basis against particular elements. It is not known to what extent or to what degree such factors as personal political beliefs or religious views, in themselves, are noticed or acted upon by the Communist authorities. Another unknown factor is whether prior presence in the United

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

States has any bearing on the kind of treatment accorded by the Communist authorities to a Chinese national upon his return to the mainland, despite the fact that there is evidence indicating strong and continued efforts on the part of these same authorities to persuade their overseas nationals to re-establish themselves and their residence within Communist China. These and other specific considerations bearing on the question of physical persecution as practiced on the China mainland today are matters which await further inquiry and to which an answer may be provided through the collation of intelligence material being gathered by other agencies of the United States government.' In re Lee Sung, No. A—7921505.

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 240 of 1021   PageID 7110

PL 104–208, September 30, 1996, 110 Stat 3009

UNITED STATES PUBLIC LAWS

104th Congress - Second Session

Convening January 3, 1996

Additions and Deletions are not identified in this document.

PL 104–208 (HR 3610)

September 30, 1996

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997

An Act making omnibus consolidated appropriations for the fiscal year ending September 30, 1997, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

[THIS ACT IS FROM THE HAND ENROLLED BILL.]

## DIVISION A

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1997, and for other purposes, namely:

## TITLE I—OMNIBUS APPROPRIATIONS

SEC. 101. (a) For programs, projects or activities in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Departments of Commerce, Justice, and State, the Judiciary, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

### SALARIES AND EXPENSES

For expenses necessary for the administration of the Department of Justice, $75,773,000 of which not to exceed $3,317,000 is for the Facilities Program 2000, to remain available until expended: Provided, That not to exceed 43 permanent positions and 44 full-time equivalent workyears and $7,477,000 shall be expended for the Department Leadership Program exclusive of augmentation that occurred in these offices in fiscal year 1996: Provided further, That not to exceed 41 permanent positions and 48 full-time equivalent workyears and $4,660,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or non-reimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount, for enhancements for the Office of Intelligence Policy and Review and security measures, $3,600,000; of which $2,170,000 is for security enhancements: Provided, That the entire amount is designated by Congress

as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## COUNTERTERRORISM FUND

For necessary expenses, as determined by the Attorney General, $9,450,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City or any domestic or international terrorist incident, (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities, and (3) the costs of conducting a terrorism threat assessment of Federal agencies and their facilities: Provided, That funds provided under this heading shall be available only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

For an additional amount for necessary expenses, as determined by the Attorney General, $20,000,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of any domestic or international terrorist incident, or (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## ADMINISTRATIVE REVIEW AND APPEALS

For expenses necessary for the administration of pardon and clemency petitions and immigration related activities, $62,000,000.

For an additional amount for security measures for the Executive Office of Immigration Review, $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS, ADMINISTRATIVE REVIEW AND APPEALS

For activities authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $48,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $31,960,000; including not to exceed $10,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and for the acquisition, lease, maintenance, and operation of motor vehicles, without regard to the general purchase price limitation for the current fiscal year.

## UNITED STATES PAROLE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the United States Parole Commission as authorized by law, $4,845,000.

## LEGAL ACTIVITIES

### SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES

For expenses, necessary for the legal activities of the Department of Justice, not otherwise provided for, including not to exceed $20,000 for expenses of collecting evidence, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and rent of private or Government-owned space in the District of Columbia; 420,793,000; of which not to exceed $10,000,000 for litigation support contracts shall remain available until expended: Provided, That of

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 242 of 1021   PageID 7112

the funds available in this appropriation, not to exceed $17,525,000 shall remain available until expended for office automation systems for the legal divisions covered by this appropriation, and for the United States Attorneys, the Antitrust Division, and offices funded through "Salaries and Expenses", General Administration: Provided further, That of the total amount appropriated, not to exceed $1,000 shall be available to the United States National Central Bureau, INTERPOL, for official reception and representation expenses: Provided further, That notwithstanding 31 U.S.C. 1342, the Attorney General may accept on behalf of the United States, and credit to this appropriation, gifts of money, personal property and services, for the purposes of hosting the International Criminal Police Organization's (INTERPOL) American Regional Conference in the United States during fiscal year 1997: Provided further, That not to exceed 8 permanent positions and 10 full-time equivalent workyears and $987,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

  In addition, for reimbursement of expenses of the Department of Justice associated with processing cases under the National Childhood Vaccine Injury Act of 1986 as amended, not to exceed $4,028,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

  For an additional amount for expenses of the Criminal Division relating to terrorism, $1,719,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, GENERAL LEGAL ACTIVITIES

  For the expeditious deportation of denied asylum applicants, as authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $7,750,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### SALARIES AND EXPENSES, ANTITRUST DIVISION

  For expenses necessary for the enforcement of antitrust and kindred laws, $76,447,000: Provided, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $17,542,000: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997, shall remain available until expended, but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, UNITED STATES ATTORNEYS

  For necessary expenses of the Office of the United States Attorneys, including intergovernmental agreements, $923,340,000 of which not to exceed $2,500,000 shall be available until September 30, 1998, for the purposes of (1) providing training of personnel of the Department of Justice in debt collection, (2) providing services to the Department of Justice related to locating debtors and their property, such as title searches, debtor skiptracing, asset searches, credit reports and other investigations, (3) paying the costs of the Department of Justice for the sale of property not covered by the sale proceeds, such as auctioneers' fees and expenses, maintenance and protection of property and businesses, advertising and title search and surveying costs, and (4) paying the costs of processing and tracking debts owed to the United States Government: Provided, That of the total amount appropriated, not to exceed $8,000 shall be available for official reception and representation expenses: Provided further, That not to exceed $10,000,000 of those funds available for automated litigation support contracts shall remain available until expended: Provided further, That $1,900,000 for supervision of the International Brotherhood of Teamsters national election, shall remain available until expended: Provided further, That in addition to reimbursable full-time equivalent workyears available to the Office of the United States Attorneys, not to exceed 8,652 positions and 8,936 full-time equivalent workyears shall be supported from the funds appropriated in this Act for the United States Attorneys.

For an additional amount for expenses relating to terrorism and security needs, $10,900,000: *Provided*, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES ATTORNEYS

For activities authorized by sections 40114, 130005, 190001(b), 190001(d) and 250005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 815 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $43,876,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, of which $28,602,000 shall be available to help meet the increased demands for litigation and related activities, $4,641,000 for Southwest Border Control, $1,000,000 for Federal victim counselors, and $9,633,000 for expeditious deportation of denied asylum applicants.

### UNITED STATES TRUSTEE SYSTEM FUND

For necessary expenses of the United States Trustee Program, as authorized by 28 U.S.C. 589a(a), $107,950,000, to remain available until expended and to be derived from the United States Trustee System Fund: *Provided*, That notwithstanding any other provision of law, deposits to the Fund shall be available in such amounts as may be necessary to pay refunds due depositors: *Provided further*, That notwithstanding any other provision of law, $107,950,000 of offsetting collections derived from fees collected pursuant to 28 U.S.C. 589a(b) shall be retained and used for necessary expenses in this appropriation and remain available until expended: *Provided further*, That the sum herein appropriated from the Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the Fund estimated at $0: *Provided further*, That any such fees collected in excess of $107,950,000 in fiscal year 1997 shall remain available until expended but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, FOREIGN CLAIMS SETTLEMENT COMMISSION

For expenses necessary to carry out the activities of the Foreign Claims Settlement Commission, including services as authorized by 5 U.S.C. 3109, $953,000.

### SALARIES AND EXPENSES, UNITED STATES MARSHALS SERVICE

For necessary expenses of the United States Marshals Service; including the acquisition, lease, maintenance, and operation of vehicles and aircraft, and the purchase of passenger motor vehicles for police-type use, without regard to the general purchase price limitation for the current fiscal year, $457,495,000, as authorized by 28 U.S.C. 561(i); of which not to exceed $6,000 shall be available for official reception and representation expenses; and of which not to exceed $4,000,000 for development, implementation, maintenance and support, and training for an automated prisoner information system, and $2,200,000 to support the Justice Prisoner and Alien Transportation System, shall remain available until expended: *Provided*, That, with respect to the amounts appropriated above, the service of maintaining and transporting State, local, or territorial prisoners shall be considered a specialized or technical service for purposes of 31 U.S.C. 6505, and any prisoners so transported shall be considered persons (transported for other than commercial purposes) whose presence is associated with the performance of a governmental function for purposes of 49 U.S.C. 40102: *Provided further*, That not to exceed 12 permanent positions and 12 full-time equivalent workyears and $700,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: *Provided further*, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES MARSHALS SERVICE

For activities authorized by section 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### FEDERAL PRISONER DETENTION

For expenses, related to United States prisoners in the custody of the United States Marshals Service as authorized in 18 U.S.C. 4013, but not including expenses otherwise provided for in appropriations available to the Attorney General, $405,262,000,

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

as authorized by 28 U.S.C. 561(i), to remain available until expended: Provided, That this appropriation hereafter shall not be available for expenses authorized under 18 U.S.C. 4013(a)(4).

## FEES AND EXPENSES OF WITNESSES

For expenses, mileage, compensation, and per diems of witnesses, for expenses of contracts for the procurement and supervision of expert witnesses, for private counsel expenses, and for per diems in lieu of subsistence, as authorized by law, including advances, $100,702,000, to remain available until expended; of which not to exceed $4,750,000 may be made available for planning, construction, renovations, maintenance, remodeling, and repair of buildings, and the purchase of equipment incident thereto, for protected witness safesites; of which not to exceed $1,000,000 may be made available for the purchase and maintenance of armored vehicles for transportation of protected witnesses; and of which not to exceed $4,000,000 may be made available for the purchase, installation and maintenance of a secure, automated information network to store and retrieve the identities and locations of protected witnesses.

## SALARIES AND EXPENSES, COMMUNITY RELATIONS SERVICE

For necessary expenses of the Community Relations Service, established by title X of the Civil Rights Act of 1964, $5,319,000: Provided, That notwithstanding any other provision of law, upon a determination by the Attorney General that emergent circumstances require additional funding for conflict prevention and resolution activities of the Community Relations Service, the Attorney General may transfer such amounts to the Community Relations Service, from available appropriations for the current fiscal year for the Department of Justice, as may be necessary to respond to such circumstances: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## ASSETS FORFEITURE FUND

For expenses authorized by 28 U.S.C. 524(c)(1)(A)(ii), (B), (C), (F), and (G), as amended, $23,000,000, to be derived from the Department of Justice Assets Forfeiture Fund.

## RADIATION EXPOSURE COMPENSATION

### ADMINISTRATIVE EXPENSES

For necessary administrative expenses in accordance with the Radiation Exposure Compensation Act, $2,000,000.

### PAYMENT TO RADIATION EXPOSURE COMPENSATION TRUST FUND

For payments to the Radiation Exposure Compensation Trust Fund, $13,736,000, not to be available for obligation until September 30, 1997.

## INTERAGENCY LAW ENFORCEMENT

### INTERAGENCY CRIME AND DRUG ENFORCEMENT

For necessary expenses for the detection, investigation, and prosecution of individuals involved in organized crime drug trafficking not otherwise provided for, to include intergovernmental agreements with State and local law enforcement agencies engaged in the investigation and prosecution of individuals involved in organized crime drug trafficking, $359,430,000, of which $50,000,000 shall remain available until expended: Provided, That any amounts obligated from appropriations under this heading may be used under authorities available to the organizations reimbursed from this appropriation: Provided further, That any unobligated balances remaining available at the end of the fiscal year shall revert to the Attorney General for reallocation among participating organizations in succeeding fiscal years, subject to the reprogramming procedures described in section 605 of this Act.

## FEDERAL BUREAU OF INVESTIGATION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Bureau of Investigation for detection, investigation, and prosecution of crimes against the United States; including purchase for police-type use of not to exceed 2,706 passenger motor vehicles, of which 1,945 will be for

replacement only, without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance, and operation of aircraft; and not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; $2,451,361,000, of which not to exceed $50,000,000 for automated data processing and telecommunications and technical investigative equipment and $1,000,000 for undercover operations shall remain available until September 30, 1998; of which not less than $147,081,000 shall be for counterterrorism investigations, foreign counterintelligence, and other activities related to our national security; of which not to exceed $98,400,000 shall remain available until expended; and of which not to exceed $10,000,000 is authorized to be made available for making payments or advances for expenses arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to violent crime, terrorism, organized crime, and drug investigations; and of which $1,500,000 shall be available to maintain an independent program office dedicated solely to the relocation of the Criminal Justice Information Services Division and the automation of fingerprint identification services: Provided, That not to exceed $45,000 shall be available for official reception and representation expenses: Provided further, That not to exceed 81 permanent positions and 85 full-time equivalent workyears and $5,959,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for necessary expenses of the Federal Bureau of Investigation to prevent and investigate terrorism activities and incidents; provide for additional agents and support staff; protect key physical assets; establish a capability for chemical, biological and nuclear research; improve domestic intelligence; and improve security at Federal Bureau of Investigation offices, $115,610,000, as authorized by the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132): Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) as amended ("the 1994 Act"), and the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"), $169,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $76,356,000 shall be for activities authorized by section 190001(c) of the 1994 Act and section 811 of the Antiterrorism Act; $53,404,000 shall be for activities authorized by section 190001(b) of the 1994 Act, of which $20,240,000 shall be for activities authorized by section 103 of the Brady Handgun Violence Prevention Act (Public Law 103–159), as amended; $4,000,000 shall be for training and investigative assistance authorized by section 210501 of the 1994 Act; $9,500,000 shall be for grants to States, as authorized by section 811(b) of the Antiterrorism Act; and $5,500,000 shall be for establishing DNA quality-assurance and proficiency-testing standards, establishing an index to facilitate law enforcement exchange of DNA identification information, and related activities authorized by section 210501 of the 1994 Act.

### TELECOMMUNICATIONS CARRIER COMPLIANCE FUND

For necessary expenses, as determined by the Attorney General, $60,000,000, to remain available until expended, to be deposited in the Telecommunications Carrier Compliance Fund for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 110 of this Act: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $41,639,000, to remain available until expended.

## DRUG ENFORCEMENT ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Drug Enforcement Administration, including not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; expenses for conducting drug education and training programs, including travel and related expenses for participants in such programs and the distribution of items of token value that promote the goals of such programs; purchase of not to exceed 1,158 passenger motor vehicles, of which 1,032 will be for replacement only, for policetype use without regard to the general purchase price limitation for the current fiscal year; and acquisition, lease, maintenance, and operation of aircraft; $745,388,000, of which not to exceed $1,800,000 for research and $15,000,000 for transfer to the Drug Diversion Control Fee Account for operating expenses shall remain available until expended, and of which not to exceed $400,000 for purchase of evidence and payments for information, not to exceed $4,000,000 for contracting for automated data processing and telecommunications equipment, and not to exceed $2,000,000 for laboratory equipment, $4,000,000 for technical equipment, and $2,000,000 for aircraft replacement retrofit and parts, shall remain available until September 30, 1998; and of which not to exceed $50,000 shall be available for official reception and representation expenses: Provided, That not to exceed 25 permanent positions and 25 full-time equivalent workyears and $1,828,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for security measures for domestic and foreign Drug Enforcement Administration offices, $5,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 180104 and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 814 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), and for the purchase of passenger motor vehicles for police-type use, as otherwise authorized in this title, $220,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $30,806,000, to remain available until expended.

## IMMIGRATION AND NATURALIZATION SERVICE

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; purchase for police-type use (not to exceed 2,691, of which 1,711 are for replacement only), without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; and research related to immigration enforcement; $1,590,159,000 of which not to exceed $400,000 for research shall remain available until expended; and of which not to exceed $10,000,000 shall be available for costs associated with the training program for basic officer training, and $5,000,000 is for payments or advances arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to immigration: Provided, That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 1997: Provided

further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $5,000 shall be available for official reception and representation expenses: Provided further, That none of the funds provided in this or any other Act shall be used for the continued operation of the San Clemente and Temecula checkpoints unless the checkpoints are open and traffic is being checked on a continuous 24–hour basis: Provided further, That the Land Border Fee Pilot Project scheduled to end September 30, 1996, is extended to September 30, 1999, for projects on both the northern and southern borders of the United States, except that no pilot program may implement a universal land border crossing toll: Provided further, That obligated and unobligated balances available to "Salaries and Expenses, Community Relations Service" under section 501(c) of the Refugee Education Assistance Act of 1980 are transferred to this account and shall remain available until expended: Provided further, That not to exceed 48 permanent positions and 48 full-time equivalent workyears and $4,628,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount to support the detention and removal of aliens with ties to terrorist organizations and expand the detention and removal of illegal aliens and enhance the intelligence of the Immigration and Naturalization Service, $15,000,000, of which $10,000,000 shall be for detention and removal of aliens: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 130002, 130005, 130006, 130007, and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 813 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $500,000,000, to remain available until expended, which will be derived from the Violent Crime Reduction Trust Fund, of which $66,217,000 shall be for expeditious deportation of denied asylum applicants, $317,256,000 shall be for improving border controls, and $116,527,000 shall be for detention and deportation proceedings: Provided, That amounts not required for asylum processing provided under the expeditious deportation of denied asylum applicants shall also be available for other deportation program activities.

## CONSTRUCTION

For planning, construction, renovation, equipping, and maintenance of buildings and facilities necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, not otherwise provided for, $9,841,000, to remain available until expended.

## FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

<< 42 USCA § 250a >>

<< 18 USCA § 4352 NOTE >>

For expenses necessary for the administration, operation, and maintenance of Federal penal and correctional institutions, including purchase (not to exceed 836, of which 572 are for replacement only) and hire of law enforcement and passenger motor vehicles, and for the provision of technical assistance and advice on corrections related issues to foreign governments; $2,768,316,000: Provided, That the Attorney General may transfer to the Health Resources and Services Administration such amounts as may be necessary for direct expenditures by that Administration for medical relief for inmates of Federal penal and correctional institutions: Provided further, That the Director of the Federal Prison System (FPS), where necessary, may enter into contracts with a fiscal agent/fiscal intermediary claims processor to determine the amounts payable to persons who, on behalf of the FPS, furnish health services to individuals committed to the custody of the FPS: Provided further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $6,000 shall be available for official reception and representation expenses: Provided further, That not to exceed

$90,000,000 for the activation of new facilities shall remain available until September 30, 1998: Provided further, That of the amounts provided for Contract Confinement, not to exceed $20,000,000 shall remain available until expended to make payments in advance for grants, contracts and reimbursable agreements, and other expenses authorized by section 501(c) of the Refugee Education Assistance Act of 1980, as amended, for the care and security in the United States of Cuban and Haitian entrants: Provided further, That notwithstanding section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), FPS may enter into contracts and other agreements with private entities for periods of not to exceed 3 years and 7 additional option years for the confinement of Federal prisoners: Provided further, That the National Institute of Corrections hereafter shall be included in the FPS Salaries and Expenses budget, in the Contract Confinement program and shall continue to perform its current functions under 18 U.S.C. 4351, et seq., with the exception of its grant program and shall collect reimbursement for services whenever possible: Provided further, That any unexpended balances available to the "National Institute of Corrections" account shall be credited to and merged with this appropriation, to remain available until expended.

### VIOLENT CRIME REDUCTION PROGRAMS

For substance abuse treatment in Federal prisons as authorized by section 32001(e) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,224,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### BUILDINGS AND FACILITIES

For planning, acquisition of sites and construction of new facilities; leasing the Oklahoma City Airport Trust Facility; purchase and acquisition of facilities and remodeling, and equipping of such facilities for penal and correctional use, including all necessary expenses incident thereto, by contract or force account; and constructing, remodeling, and equipping necessary buildings and facilities at existing penal and correctional institutions, including all necessary expenses incident thereto, by contract or force account; $395,700,000, to remain available until expended, of which not to exceed $14,074,000 shall be available to construct areas for inmate work programs: Provided, That labor of United States prisoners may be used for work performed under this appropriation: Provided further, That not to exceed 10 percent of the funds appropriated to "Buildings and Facilities" in this Act or any other Act may be transferred to "Salaries and Expenses", Federal Prison System, upon notification by the Attorney General to the Committees on Appropriations of the House of Representatives and the Senate in compliance with provisions set forth in section 605 of this Act: Provided further, That of the total amount appropriated, not to exceed $36,570,000 shall be available for the renovation and construction of United States Marshals Service prisoner-holding facilities.

### FEDERAL PRISON INDUSTRIES, INCORPORATED

The Federal Prison Industries, Incorporated, is hereby authorized to make such expenditures, within the limits of funds and borrowing authority available, and in accord with the law, and to make such contracts and commitments, without regard to fiscal year limitations as provided by section 9104 of title 31, United States Code, as may be necessary in carrying out the program set forth in the budget for the current fiscal year for such corporation, including purchase of (not to exceed five for replacement only) and hire of passenger motor vehicles.

### LIMITATION ON ADMINISTRATIVE EXPENSES, FEDERAL PRISON INDUSTRIES, INCORPORATED

Not to exceed $3,042,000 of the funds of the corporation shall be available for its administrative expenses, and for services as authorized by 5 U.S.C. 3109, to be computed on an accrual basis to be determined in accordance with the corporation's current prescribed accounting system, and such amounts shall be exclusive of depreciation, payment of claims, and expenditures which the said accounting system requires to be capitalized or charged to cost of commodities acquired or produced, including selling and shipping expenses, and expenses in connection with acquisition, construction, operation, maintenance, improvement, protection, or disposition of facilities and other property belonging to the corporation or in which it has an interest.

### OFFICE OF JUSTICE PROGRAMS

### JUSTICE ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and the Missing Children's Assistance Act, as amended, including salaries and expenses in connection therewith, and with the Victims of Crime Act of 1984, as amended, $101,429,000, to remain available until

expended, as authorized by section 1001 of title I of the Omnibus Crime Control and Safe Streets Act, as amended by Public Law 102–534 (106 Stat. 3524).

For an additional amount, $17,000,000, to remain available until expended; of which $5,000,000 shall be for Local Firefighter and Emergency Services Training Grants as authorized by section 819 of the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"); of which $10,000,000 shall be for development of counterterrorism technologies to help State and local law enforcement combat terrorism, as authorized by section 821 of the Antiterrorism Act; of which $2,000,000 shall be for specialized multi-agency response training: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, for State and Local Narcotics Control and Justice Assistance Improvements, notwithstanding the provisions of section 511 of said Act, $361,000,000, to remain available until expended, as authorized by section 1001 of title I of said Act, as amended by Public Law 102–534 (106 Stat. 3524), of which $60,000,000 shall be available to carry out the provisions of chapter A of subpart 2 of part E of title I of said Act, for discretionary grants under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs.

VIOLENT CRIME REDUCTION PROGRAMS, STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

<< 42 USCA § 13703 NOTE >>

For assistance (including amounts for administrative costs for management and administration, which amounts shall be transferred to and merged with the "Justice Assistance" account) authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended ("the 1994 Act"); the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("the 1968 Act"); and the Victims of Child Abuse Act of 1990, as amended ("the 1990 Act"); $2,036,150,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $523,000,000 shall be for Local Law Enforcement Block Grants, pursuant to H.R. 728 as passed by the House of Representatives on February 14, 1995, except that for purposes of this Act, the Commonwealth of Puerto Rico shall be considered a "unit of local government" as well as a "State", for the purposes set forth in paragraphs (A), (B), (D), (F), and (I) of section 101(a)(2) of H.R. 728 and for establishing crime prevention programs involving cooperation between community residents and law enforcement personnel in order to control, detect, or investigate crime or the prosecution of criminals: Provided, That no funds provided under this heading may be used as matching funds for any other Federal grant program: Provided further, That $20,000,000 of this amount shall be for Boys and Girls Clubs in public housing facilities and other areas in cooperation with State and local law enforcement: Provided further, That funds may also be used to defray the costs of indemnification insurance for law enforcement officers; of which $50,000,000 shall be for grants to upgrade criminal records, as authorized by section 106(b) of the Brady Handgun Violence Prevention Act of 1993, as amended, and section 4(b) of the National Child Protection Act of 1993; of which $199,000,000 shall be available as authorized by section 1001 of title I of the 1968 Act, to carry out the provisions of subpart 1, part E of title I of the 1968 Act, notwithstanding section 511 of said Act, for the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs; of which $330,000,000 shall be for the State Criminal Alien Assistance Program, as authorized by section 242(j) of the Immigration and Nationality Act, as amended; of which $670,000,000 shall be for Violent Offender Incarceration and Truth in Sentencing Incentive Grants pursuant to subtitle A of title II of the 1994 Act, of which $170,000,000 shall be available for payments to States for incarceration of criminal aliens, and of which $12,500,000 shall be available for the Cooperative Agreement Program: Provided further, That funds made available for Violent Offender Incarceration and Truth in Sentencing Incentive Grants to the State of California may, at the discretion of the recipient, be used for payments for the incarceration of criminal aliens: Provided further, That beginning in fiscal year 1999, and thereafter, no funds shall be available to make grants to a State pursuant to section 20103 or section 20104 of the Violent Crime Control and Law Enforcement Act of 1994 unless

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

no later than September 1, 1998, such State has implemented a program of controlled substance testing and intervention for appropriate categories of convicted offenders during periods of incarceration and criminal justice supervision, with sanctions including denial or revocation of release for positive controlled substance tests, consistent with guidelines issued by the Attorney General; of which $6,000,000 shall be for the Court Appointed Special Advocate Program, as authorized by section 218 of the 1990 Act; of which $1,000,000 shall be for Child Abuse Training Programs for Judicial Personnel and Practitioners, as authorized by section 224 of the 1990 Act; of which $145,000,000 shall be for Grants to Combat Violence Against Women, to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(18) of the 1968 Act; of which $33,000,000 shall be for Grants to Encourage Arrest Policies to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(19) of the 1968 Act; of which $8,000,000 shall be for Rural Domestic Violence and Child Abuse Enforcement Assistance Grants, as authorized by section 40295 of the 1994 Act; of which $1,000,000 shall be for training programs to assist probation and parole officers who work with released sex offenders, as authorized by section 40152(c) of the 1994 Act; of which $550,000 shall be for grants for televised testimony, as authorized by section 1001(a)(7) of the 1968 Act; of which $1,750,000 shall be for national stalker and domestic violence reduction, as authorized by section 40603 of the 1994 Act; of which $30,000,000 shall be for grants for residential substance abuse treatment for State prisoners as authorized by section 1001(a)(17) of the 1968 Act; of which $3,000,000 shall be for grants to States and units of local government for projects to improve DNA analysis, as authorized by section 1001(a)(22) of the 1968 Act; of which $900,000 shall be for the Missing Alzheimer's Disease Patient Alert Program, as authorized by section 240001(c) of the 1994 Act; of which $750,000 shall be for Motor Vehicle Theft Prevention Programs, as authorized by section 220002(h) of the 1994 Act; of which $200,000 shall be for a National Baseline Study on Campus Sexual Assault, as authorized by section 40506(e) of the 1994 Act; of which $30,000,000 shall be for Drug Courts, as authorized by title V of the 1994 Act; of which $1,000,000 shall be for Law Enforcement Family Support Programs, as authorized by section 1001(a)(21) of the 1968 Act; and of which $2,000,000 shall be for public awareness programs addressing marketing scams aimed at senior citizens, as authorized by section 250005(3) of the 1994 Act: Provided further, That funds made available in fiscal year 1997 under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, may be obligated for programs to assist States in the litigation processing of death penalty Federal habeas corpus petitions and for drug testing initiatives: Provided further, That any 1996 balances for these programs shall be transferred to and merged with this appropriation: Provided further, That if a unit of local government uses any of the funds made available under this title to increase the number of law enforcement officers, the unit of local government will achieve a net gain in the number of law enforcement officers who perform nonadministrative public safety service.

## WEED AND SEED PROGRAM FUND

For necessary expenses, including salaries and related expenses of the Executive Office for Weed and Seed, to implement "Weed and Seed" program activities, $28,500,000, which shall be derived from discretionary grants provided under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, to remain available until expended for intergovernmental agreements, including grants, cooperative agreements, and contracts, with State and local law enforcement agencies engaged in the investigation and prosecution of violent crimes and drug offenses in "Weed and Seed" designated communities, and for either reimbursements or transfers to appropriation accounts of the Department of Justice and other Federal agencies which shall be specified by the Attorney General to execute the "Weed and Seed" program strategy: Provided, That funds designated by Congress through language for other Department of Justice appropriation accounts for "Weed and Seed" program activities shall be managed and executed by the Attorney General through the Executive Office for Weed and Seed: Provided further, That the Attorney General may direct the use of other Department of Justice funds and personnel in support of "Weed and Seed" program activities only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

## COMMUNITY ORIENTED POLICING SERVICES

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322 ("the 1994 Act") (including administrative costs), $1,400,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, for Public Safety and Community Policing Grants pursuant to title I of the 1994 Act:

Provided, That not to exceed 186 permanent positions and 174 full-time equivalent workyears and $19,800,000 shall be expended for program management and administration.

In addition, for programs of Police Corps education, training and service as set forth in sections 200101–200113 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), $20,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

## JUVENILE JUSTICE PROGRAMS

For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, including salaries and expenses in connection therewith to be transferred to and merged with the appropriations for Justice Assistance, $170,000,000, to remain available until expended, as authorized by section 299 of part I of title II and section 506 of title V of the Act, as amended by Public Law 102–586, of which (1) notwithstanding any other provision of law, $5,000,000 shall be available for expenses authorized by part A of title II of the Act, $86,500,000 shall be available for expenses authorized by part B of title II of the Act, and $29,500,000 shall be available for expenses authorized by part C of title II of the Act: Provided, That $16,500,000 of the amounts provided for part B of title II of the Act, as amended, is for the purpose of providing additional formula grants under part B, for innovative local law enforcement and community policing programs, to States that provide assurances to the Administrator that the State has in effect (or will have in effect no later than 1 year after date of application) policies and programs, that ensure that juveniles are subject to accountability-based sanctions for every act for which they are adjudicated delinquent; (2) $12,000,000 shall be available for expenses authorized by sections 281 and 282 of part D of title II of the Act for prevention and treatment programs relating to juvenile gangs; (3) $10,000,000 shall be available for expenses authorized by section 285 of part E of title II of the Act; (4) $7,000,000 shall be available for expenses authorized by part G of title II of the Act for juvenile mentoring programs; and (5) $20,000,000 shall be available for expenses authorized by title V of the Act for incentive grants for local delinquency prevention programs: Provided, That upon the enactment of reauthorization legislation for Juvenile Justice Programs under the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, funding provided in this Act shall from that date be subject to the provisions of that legislation and any provisions in this Act that are inconsistent with that legislation shall no longer have effect.

In addition, for grants, contracts, cooperative agreements, and other assistance authorized by the Victims of Child Abuse Act of 1990, as amended, $4,500,000, to remain available until expended, as authorized by sections 214B of the Act.

## PUBLIC SAFETY OFFICERS BENEFITS

For payments authorized by part L of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796), as amended, such sums as are necessary, to remain available until expended, as authorized by section 6093 of Public Law 100–690 (102 Stat. 4339–4340), and, in addition, $2,200,000, to remain available until expended, for payments as authorized by section 1201(b) of said Act.

## GENERAL PROVISIONS—DEPARTMENT OF JUSTICE

SEC. 101. In addition to amounts otherwise made available in this title for official reception and representation expenses, a total of not to exceed $45,000 from funds appropriated to the Department of Justice in this title shall be available to the Attorney General for official reception and representation expenses in accordance with distributions, procedures, and regulations established by the Attorney General.

SEC. 102. Authorities contained in the Department of Justice Appropriation Authorization Act, Fiscal Year 1980 (Pub.L. 96–132, 93 Stat. 1040 (1979)), as amended, shall remain in effect until the termination date of this Act or until the effective date of a Department of Justice Appropriation Authorization Act, whichever is earlier.

SEC. 103. None of the funds appropriated by this title shall be available to pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape: Provided, That should this prohibition be declared unconstitutional by a court of competent jurisdiction, this section shall be null and void.

SEC. 104. None of the funds appropriated under this title shall be used to require any person to perform, or facilitate in any way the performance of, any abortion.

SEC. 105. Nothing in the preceding section shall remove the obligation of the Director of the Bureau of Prisons to provide escort services necessary for a female inmate to receive such service outside the Federal facility: Provided, That nothing in this

section in any way diminishes the effect of section 104 intended to address the philosophical beliefs of individual employees of the Bureau of Prisons.

<< 18 USCA § 3059 NOTE >>

SEC. 106. Notwithstanding any other provision of law, not to exceed $10,000,000 of the funds made available in this Act may be used to establish and publicize a program under which publicly-advertised, extraordinary rewards may be paid, which shall not be subject to spending limitations contained in sections 3059 and 3072 of title 18, United States Code: Provided, That any reward of $100,000 or more, up to a maximum of $2,000,000, may not be made without the personal approval of the President or the Attorney General and such approval may not be delegated.

SEC. 107. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Justice in this Act, including those derived from the Violent Crime Reduction Trust Fund, may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation except in compliance with the procedures set forth in that section.

<< 28 USCA § 524 >>

SEC. 108. Section 524(c)(8)(E) of title 28, United States Code, is amended by striking the year in the date therein contained and replacing the same with "1996".

<< 28 USCA § 1930 >>

SEC. 109. (a) Section 1930(a) of title 28, United States Code, is amended in paragraph (3), by inserting "$" before "800", and in paragraph (6), by striking everything after "total less than $15,000;" and inserting in lieu thereof: "$500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.".

<< 28 USCA § 589a >>

(b) Section 589a of title 28, United States Code, is amended to read as follows:

"§ 589a. United States Trustee System Fund

"(a) There is hereby established in the Treasury of the United States a special fund to be known as the 'United States Trustee System Fund' (hereinafter in this section referred to as the 'Fund'). Monies in the Fund shall be available to the Attorney General without fiscal year limitation in such amounts as may be specified in appropriations Acts for the following purposes in connection with the operations of United States trustees—

"(1) salaries and related employee benefits;

"(2) travel and transportation;

"(3) rental of space;

"(4) communication, utilities, and miscellaneous computer charges;

"(5) security investigations and audits;

"(6) supplies, books, and other materials for legal research;

"(7) furniture and equipment;

"(8) miscellaneous services, including those obtained by contract; and

"(9) printing.

"(b) For the purpose of recovering the cost of services of the United States Trustee System, there shall be deposited as offsetting collections to the appropriation 'United States Trustee System Fund', to remain available until expended, the following—

"(1) 23.08 percent of the fees collected under section 1930(a)(1) of this title;

"(2) one-half of the fees collected under section 1930(a)(3) of this title;

"(3) one-half of the fees collected under section 1930(a)(4) of this title;

"(4) one-half of the fees collected under section 1930(a)(5) of this title;

"(5) 100 percent of the fees collected under section 1930(a)(6) of this title;

"(6) three-fourths of the fees collected under the last sentence of section 1930(a) of this title;

"(7) the compensation of trustees received under section 330(d) of title 11 by the clerks of the bankruptcy courts; and

"(8) excess fees collected under section 586(e)(2) of this title.

"(c) Amounts in the Fund which are not currently needed for the purposes specified in subsection (a) shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

"(d) The Attorney General shall transmit to the Congress, not later than 120 days after the end of each fiscal year, a detailed report on the amounts deposited in the Fund and a description of expenditures made under this section.

"(e) There are authorized to be appropriated to the Fund for any fiscal year such sums as may be necessary to supplement amounts deposited under subsection (b) for the purposes specified in subsection (a).".

<< 28 USCA § 589a NOTE >>

(c) Notwithstanding any other provision of law or of this Act, the amendments to 28 U.S.C. 589a made by subsection (b) of this section shall take effect upon enactment of this Act.

<< 28 USCA § 1930 NOTE >>

(d) Section 101(a) of Public Law 104–91, as amended by section 211 of Public Law 104–99, is further amended by inserting ": Provided further, That, notwithstanding any other provision of law, the fees under 28 U.S.C. 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans" after "enacted into law".

SEC. 110. Public Law 103–414 (108 Stat. 4279) is amended by inserting at its conclusion a new title IV, as follows:

<< 47 USCA Ch. 9 >>

"TITLE IV—TELECOMMUNICATIONS CARRIER COMPLIANCE PAYMENTS

<< 47 USCA § 1021 >>

"SEC. 401. DEPARTMENT OF JUSTICE TELECOMMUNICATIONS CARRIER COMPLIANCE FUND.

"(a) ESTABLISHMENT OF FUND.—There is hereby established in the United States Treasury a fund to be known as the Department of Justice Telecommunications Carrier Compliance Fund (hereafter referred to as 'the Fund'), which shall be available without fiscal year limitation to the Attorney General for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 109 of this Act.

"(b) DEPOSITS TO THE FUND.—Notwithstanding any other provision of law, any agency of the United States with law enforcement or intelligence responsibilities may deposit as offsetting collections to the Fund any unobligated balances that are available until expended, upon compliance with any Congressional notification requirements for reprogrammings of funds applicable to the appropriation from which the deposit is to be made.

"(c) TERMINATION.—

"(1) The Attorney General may terminate the Fund at such time as the Attorney General determines that the Fund is no longer necessary.

"(2) Any balance in the Fund at the time of its termination shall be deposited in the General Fund of the Treasury.

"(3) A decision of the Attorney General to terminate the Fund shall not be subject to judicial review.

"(d) AVAILABILITY OF FUNDS FOR EXPENDITURE.—Funds shall not be available for obligation unless an implementation plan as set forth in subsection (e) is submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate and the Congress does not by law block or prevent the obligation of such funds. Such funds shall be treated as a reprogramming of funds under section 605 of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section and this section.

"(e) IMPLEMENTATION PLAN.—The implementation plan shall include:

"(1) the law enforcement assistance capability requirements and an explanation of law enforcement's recommended interface;

"(2) the proposed actual and maximum capacity requirements for the number of simultaneous law enforcement communications intercepts, pen registers, and trap and trace devices that authorized law enforcement agencies may seek to conduct, set forth on a county-by-county basis for wireline services and on a market service area basis for wireless services, and the historical baseline of electronic surveillance activity upon which such capacity requirements are based;

"(3) a prioritized list of carrier equipment, facilities, and services deployed on or before January 1, 1995, to be modified by carriers at the request of law enforcement based on its investigative needs;

"(4) a projected reimbursement plan that estimates the cost for the coming fiscal year and for each fiscal year thereafter, based on the prioritization of law enforcement needs as outlined in (3), of modification by carriers of equipment, facilities and services, installed on or before January 1, 1995.

"(f) ANNUAL REPORT TO THE CONGRESS.—The Attorney General shall submit to the Congress each year a report specifically detailing all deposits and expenditures made pursuant to this Act in each fiscal year. This report shall be submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate, and to the Speaker and minority leader of the House of Representatives and to the majority and minority leaders of the Senate, no later than 60 days after the end of each fiscal year.".

SEC. 111. It is the sense of the Congress that the Drug Enforcement Administration, together with other appropriate Federal agencies, should take such actions as may be necessary to end the illegal importation into the United States of Rohypnol (flunitrazepam), a drug frequently distributed with the intent to facilitate sexual assault and rape.

<< 42 USCA § 10601 >>

SEC. 112. Section 1402 of the Victims of Crime Act of 1984, as amended (42 U.S.C. 10601), is amended at subsection (e) by deleting "2" and inserting "3", and at subsection (d) by adding a new paragraph (5) as follows:

"(5) The Director may set aside up to $500,000 of the reserve fund described in paragraph (4) to make supplemental grants to United States Attorneys Offices to provide necessary assistance to victims of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, to facilitate observation of and/or participation by such victims in trial proceedings arising therefrom, including, without limitation, provision of lodging and travel assistance, and to pay such other, related expenses determined to be necessary by the Director.".

<< 18 USCA § 841 NOTE >>

SEC. 113. Section 732 of Public Law 104–132 (110 Stat. 1303; 18 U.S.C. 841 note) is amended—

(1) in subsection (a), by adding at the end the following new paragraph:

"(3) NEW PREVENTION TECHNOLOGIES.—In addition to the study of taggants as provided herein, the Secretary, in consultation with the Attorney General, shall concurrently report to the Congress on the possible use, and exploitation of technologies such as vapor detection devices, computed tomography, nuclear quadropole resonance, thermal neutron analysis, pulsed fast-neutron analysis, and other technologies upon which recommendations to the Congress may be made for further study, funding, and use of the same in preventing and solving acts of terrorism involving explosive devices."; and

(2) by adding at the end the following new subsection:

"(f) SPECIAL STUDY.—

"(1) IN GENERAL.—Notwithstanding subsection (a), the Secretary of the Treasury shall enter into a contract with the National Academy of Sciences (referred to in this section as the 'Academy') to conduct a study of the tagging of smokeless

and black powder by any viable technology for purposes of detection and identification. The study shall be conducted by an independent panel of 5 experts appointed by the Academy.

"(2) STUDY ELEMENTS.—The study conducted under this subsection shall—

"(A) indicate whether the tracer elements, when added to smokeless and black powder—

"(i) will pose a risk to human life or safety;

"(ii) will substantially assist law enforcement officers in their investigative efforts;

"(iii) will impair the quality and performance of the powders (which shall include a broad and comprehensive sampling of all available powders) for their intended lawful use, including, but not limited to the sporting, defense, and handloading uses of the powders, as well as their use in display and lawful consumer pyrotechnics;

"(iv) will have a substantially adverse effect on the environment;

"(v) will incur costs which outweigh the benefits of their inclusion, including an evaluation of the probable production and regulatory cost of compliance to the industry, and the costs and effects on consumers, including the effect on the demand for ammunition; and

"(vi) can be evaded, and with what degree of difficulty, by terrorists or terrorist organizations, including evading tracer elements by the use of precursor chemicals to make black or other powders; and

"(B) provide for consultation on the study with Federal, State, and local officials, non-governmental organizations, including all national police organizations, national sporting organizations, and national industry associations with expertise in this area and such other individuals as shall be deemed necessary.

"(3) REPORT AND COSTS.—The study conducted under this subsection shall be presented to Congress 12 months after the enactment of this subsection and be made available to the public, including any data tapes or data used to form such recommendations. There are authorized to be appropriated such sums as may be necessary to carry out the study.".

<< 28 USCA § 524 >>

Sec. 114. (a) Section 524(c)(1) of title 28, United States Code, is amended in the first sentence following the second subparagraph (I) by deleting "(C),".

(b) Section 524(c)(8)(A) is amended by deleting "(C),".

<< 28 USCA § 509 NOTE >>

Sec. 115. Effective with the enactment of this Act and in any fiscal year hereafter, under policies established by the Attorney General, the Department of Justice may reimburse employees who are paid by an appropriation account within the Department of Justice and are traveling on behalf of the United States in temporary duty status to investigate, prosecute, or litigate (including the provision of support therefor) a criminal or civil matter, or for other similar special circumstances, for Federal, State, and local taxes heretofore and hereafter resulting from any reimbursement of travel expenses from an appropriation account within the Department of Justice: Provided, That such reimbursement may include an amount equal to all income taxes for which the employee would be liable due to such reimbursement.

<< 28 USCA § 524 >>

Sec. 116. Section 524 of title 28, United States Code, is amended by adding a new subsection (d) as follows:

"(d)(1) The Attorney General may accept, hold, administer, and use gifts, devises, and bequests of any property for the purpose of aiding or facilitating the work of the Department of Justice.

"(2) Gifts, devises, and bequests of money, the proceeds of sale or liquidation of any other property accepted hereunder, and any income accruing from any property accepted hereunder—

"(A) shall be deposited in the Treasury in a separate fund and held in trust by the Secretary of the Treasury for the benefit of the Department of Justice; and

"(B) are hereby appropriated, without fiscal year limitation, and shall be disbursed on order of the Attorney General.

"(3) Upon request of the Attorney General, the Secretary of the Treasury may invest and reinvest the fund described herein in public debt securities with maturities suitable for the needs of the fund and bearing interest at rates determined by the Secretary

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   AR02914  16

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 256 of 1021   PageID 7126

of the Treasury, taking into consideration the current average market yield on outstanding marketable obligations of the United States or comparable maturities.

"(4) Evidences of any intangible personal property (other than money) accepted hereunder shall be deposited with the Secretary of the Treasury, who may hold or liquidate them, except that they shall be liquidated upon the request of the Attorney General.

"(5) For purposes of federal income, estate, and gift taxes, property accepted hereunder shall be considered a gift, devise, or bequest to, or for the use of, the United States.".

<< 28 USCA § 524 >>

Sec. 117. Section 524(c)(9), of title 28, United States Code, is amended to read as follows:

"(9)(A) Following the completion of procedures for the forfeiture of property pursuant to any law enforced or administered by the Department, the Attorney General is authorized, in her discretion, to warrant clear title to any subsequent purchaser or transferee of such property.

"(B) For fiscal year 1997, the Attorney General is authorized to transfer, under such terms and conditions as the Attorney General shall specify, real or personal property of limited or marginal value, to a State or local government agency, or its designated contractor or transferee, for use to support drug abuse treatment, drug and crime prevention and education, housing, job skills, and other community-based public health and safety programs. Such transfer shall not create or confer any private right of action in any person against the United States.".

<< 28 USCA § 594 >>

Sec. 118. Section 594(b)(3)(A) of title 28, United States Code, is amended in the second sentence by—

(a) striking "by 6 months" and inserting "for successive 6–month periods"; and

(b) striking the phrase "employee assigned duties under subsection (l)(1)(A)(iii) certifies" and inserting "independent counsel and the division of the court certify";

(c) striking "such employee" and inserting "the independent counsel" and "the division of the court".

<< 29 USCA § 621 NOTE >>

Sec. 119. This section may be cited as the "Age Discrimination in Employment Amendments of 1996".

Subsection 1. AGE DISCRIMINATION AMENDMENT.

<< 29 USCA § 623 NOTE >>

(a) REPEAL OF REPEALER.—Section 3(b) of the Age Discrimination in Employment Amendments of 1986 (29 U.S.C. 623 note) is repealed.

<< 29 USCA § 623 >>

(b) EXEMPTION.—Section 4(j) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 623(j)), as in effect immediately before December 31, 1993—

(1) is reenacted as such section; and

(2) as so reenacted, is amended in paragraph (1) by striking "and the individual has attained the age" and all that follows through "1983, and" and inserting the following: ", the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—

"(A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or

"(B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996; or

"(ii) if applicable State or local law was enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996 and the individual was discharged, the higher of—

"(I) the age of retirement in effect on the date of such discharge under such law; and

"(II) age 55; and".

<< 29 USCA § 623 NOTE >>

(c) CONSTRUCTION.—Nothing in the repeal, reenactment, and amendment made by subsections (a) and (b) shall be construed to make lawful the failure or refusal to hire, or the discharge of, an individual pursuant to a law that—

(1) was enacted after March 3, 1983 and before the date of enactment of the Age Discrimination in Employment Amendments of 1996; and

(2) lowered the age of hiring or retirement, respectively, for firefighters or law enforcement officers that was in effect under applicable State or local law on March 3, 1983.

<< 29 USCA § 623 NOTE >>

Subsection 2. STUDY AND GUIDELINES FOR PERFORMANCE TESTS.

(a) STUDY.—Not later than 3 years after the date of enactment of this Act, the Secretary of Health and Human Services, acting through the Director of the National Institute for Occupational Safety and Health (referred to in this section as the "Secretary"), shall conduct, directly or by contract, a study, and shall submit to the appropriate committees of Congress a report based on the results of the study that shall include—

(1) a list and description of all tests available for the assessment of abilities important for the completion of public safety tasks performed by law enforcement officers and firefighters;

(2) a list of the public safety tasks for which adequate tests described in paragraph (1) do not exist;

(3) a description of the technical characteristics that the tests shall meet to be in compliance with applicable Federal civil rights law and policies;

(4) a description of the alternative methods that are available for determining minimally acceptable performance standards on the tests;

(5) a description of the administrative standards that should be met in the administration, scoring, and score interpretation of the tests; and

(6) an examination of the extent to which the tests are cost-effective, are safe, and comply with the Federal civil rights law and policies.

(b) CONSULTATION REQUIREMENT; OPPORTUNITY FOR PUBLIC COMMENT.—

(1) CONSULTATION.—The Secretary shall, during the conduct of the study required by subsection (a), consult with—

(A) the Deputy Administrator of the United States Fire Administration;

(B) the Director of the Federal Emergency Management Agency;

(C) organizations that represent law enforcement officers, firefighters, and employers of the officers and firefighters; and

(D) organizations that represent older individuals.

(2) PUBLIC COMMENT.—Prior to issuing the advisory guidelines required in subsection (c), the Secretary shall provide an opportunity for public comment on the proposed advisory guidelines.

(c) ADVISORY GUIDELINES.—Not later than 4 years after the date of enactment of this Act, the Secretary shall develop and issue, based on the results of the study required by subsection (a), advisory guidelines for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to perform the requirements of the jobs of the officers and firefighters.

(d) JOB PERFORMANCE TESTS.—

(1) IDENTIFICATION OF TESTS.—After issuance of the advisory guidelines described in subsection (c), the Secretary shall issue regulations identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption described in section 4(j) of the Age Discrimination in Employment Act of 1967 with respect to firefighters or law enforcement officers who have attained an age of retirement described in such section 4(j).

(2) USE OF TESTS.—Effective on the date of issuance of the regulations described in paragraph (1), any employer seeking such exemption with respect to a firefighter or law enforcement officer who has attained such age shall provide to each

firefighter or law enforcement officer who has attained such age an annual opportunity to demonstrate physical and mental fitness by passing a test described in paragraph (1), in order to continue employment.

(e) DEVELOPMENT OF STANDARDS FOR WELLNESS PROGRAMS.—Not later than 2 years after the date of enactment of this Act, the Secretary shall propose advisory standards for wellness programs for law enforcement officers and firefighters.

(f) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $5,000,000 to carry out this section.

<< 29 USCA § 623 NOTE >>

SUBSECTION 3. EFFECTIVE DATES.

(a) GENERAL EFFECTIVE DATE.—Except as provided in subsection (b), this title and the amendments made by this title shall take effect on the date of enactment of this Act.

(b) SPECIAL EFFECTIVE DATE.—The repeal made by section 2(a) and the reenactment made by section 2(b)(1) shall take effect on December 31, 1993.

<< 28 USCA RULES FRE Rule 413 NOTE >>

Sec. 120. Section 320935(e) of the Violent Crime Control and Law Enforcement Act of 1994 is amended by inserting ", including all trials commenced on or after the effective date of such amendments" after "such amendments".

<< 18 USCA § 2251 NOTE >>

Sec. 121. This section may be cited as the "Child Pornography Prevention Act of 1996".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 1. FINDINGS.

Congress finds that—

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer;

(5) new photographic and computer imaging technologies make it possible to produce by electronic, mechanical, or other means, visual depictions of what appear to be children engaging in sexually explicit conduct that are virtually indistinguishable to the unsuspecting viewer from unretouched photographic images of actual children engaging in sexually explicit conduct;

(6) computers and computer imaging technology can be used to—

(A) alter sexually explicit photographs, films, and videos in such a way as to make it virtually impossible for unsuspecting viewers to identify individuals, or to determine if the offending material was produced using children;

(B) produce visual depictions of child sexual activity designed to satisfy the preferences of individual child molesters, pedophiles, and pornography collectors; and

(C) alter innocent pictures of children to create visual depictions of those children engaging in sexual conduct;

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come;

(8) the effect of visual depictions of child sexual activity on a child molester or pedophile using that material to stimulate or whet his own sexual appetites, or on a child where the material is being used as a means of seducing or breaking down the child's inhibitions to sexual abuse or exploitation, is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by electronic, mechanical, or other means, including by computer, which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children;

(9) the danger to children who are seduced and molested with the aid of child sex pictures is just as great when the child pornographer or child molester uses visual depictions of child sexual activity produced wholly or in part by electronic, mechanical, or other means, including by computer, as when the material consists of unretouched photographic images of actual children engaging in sexually explicit conduct;

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

<< 18 USCA § 2256 >>

SUBSECTION 2. DEFINITIONS.

Section 2256 of title 18, United States Code, is amended—

(1) in paragraph (5), by inserting before the semicolon the following: ", and data stored on computer disk or by electronic means which is capable of conversion into a visual image";

(2) in paragraph (6), by striking "and";

(3) in paragraph (7), by striking the period and inserting a semicolon; and

(4) by adding at the end the following new paragraphs:

"(8) 'child pornography' means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

"(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

"(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

"(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

"(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct; and

"(9) 'identifiable minor'—

"(A) means a person—

"(i)(I) who was a minor at the time the visual depiction was created, adapted, or modified; or

"(II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and

"(ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and

"(B) shall not be construed to require proof of the actual identity of the identifiable minor.".

SUBSECTION 3. PROHIBITED ACTIVITIES RELATING TO MATERIAL CONSTITUTING OR CONTAINING CHILD PORNOGRAPHY.

<< 18 USCA § 2252A >>

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by adding after section 2252 the following:

"§ 2252A. Certain activities relating to material constituting or containing child pornography

"(a) Any person who—

"(1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;

"(2) knowingly receives or distributes—

"(A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

"(3) knowingly reproduces any child pornography for distribution through the mails, or in interstate or foreign commerce by any means, including by computer;

"(4) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly sells or possesses with the intent to sell any child pornography; or

"(B) knowingly sells or possesses with the intent to sell any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(5) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography; or

"(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer,

shall be punished as provided in subsection (b).

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), (3), or (4) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, subsection (a)(5) shall be fined under this title or imprisoned not more than 5 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.

"(c) It shall be an affirmative defense to a charge of violating paragraphs (1), (2), (3), or (4) of subsection (a) that—

"(1) the alleged child pornography was produced using an actual person or persons engaging in sexually explicit conduct;

"(2) each such person was an adult at the time the material was produced; and

"(3) the defendant did not advertise, promote, present, describe, or distribute the material in such a manner as to convey the impression that it is or contains a visual depiction of a minor engaging in sexually explicit conduct.".

<< 18 USCA Ch. 110 >>

(b) TECHNICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by adding after the item relating to section 2252 the following:

"2252A. Certain activities relating to material constituting or containing child pornography.".

<< 18 USCA § 2251 >>

SUBSECTION 4. PENALTIES FOR SEXUAL EXPLOITATION OF CHILDREN.

Section 2251(d) of title 18, United States Code, is amended to read as follows:

"(d) Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title or imprisoned not less than 10 years nor more than 20 years, and both, but if such person has one prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned for not less than 15 years nor more than 30 years, but if such person has 2 or more prior convictions under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 30 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for any term of years or for life.".

<< 18 USCA § 2252 >>

SUBSECTION 5. MATERIAL INVOLVING SEXUAL EXPLOITATION OF MINORS.

Section 2252 of title 18, United States Code, is amended—by striking subsection (b) and inserting the following:

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), or (3) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 5 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.".

<< 42 USCA § 2000aa >>

SUBSECTION 6. PRIVACY PROTECTION ACT AMENDMENTS.

Section 101 of the Privacy Protection Act of 1980 (42 U.S.C. 2000aa) is amended—

(1) in subsection (a)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code"; and

(2) in subsection (b)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code".

SUBSECTION 7. AMBER HAGERMAN CHILD PROTECTION ACT OF 1996.

<< 18 USCA § 2241 NOTE >>

(a) SHORT TITLE.—This section may be cited as the "Amber Hagerman Child Protection Act of 1996".

<< 18 USCA § 2241 >>

(b) AGGRAVATED SEXUAL ABUSE OF A MINOR.—Section 2241(c) of title 18, United States Code, is amended to read as follows:

"(c) WITH CHILDREN.—Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than that person), or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both. If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.".

<< 18 USCA § 2243 >>

(c) SEXUAL ABUSE OF A MINOR.—Section 2243(a) of title 18, United States Code, is amended by inserting "crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or" after "Whoever".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 8. SEVERABILITY.

If any provision of this Act, including any provision or section of the definition of the term child pornography, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, including any other provision or section of the definition of the term child pornography, the amendments made by this Act, and the application of such to any other person or circumstance shall not be affected thereby.

This title may be cited as the "Department of Justice Appropriations Act, 1997".

TITLE II—DEPARTMENT OF COMMERCE AND RELATED AGENCIES

TRADE AND INFRASTRUCTURE DEVELOPMENT

RELATED AGENCIES

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

SALARIES AND EXPENSES

For necessary expenses of the Office of the United States Trade Representative, including the hire of passenger motor vehicles and the employment of experts and consultants as authorized by 5 U.S.C. 3109, $21,449,000, of which $2,500,000 shall remain available until expended: Provided, That not to exceed $98,000 shall be available for official reception and representation expenses.

INTERNATIONAL TRADE COMMISSION

SALARIES AND EXPENSES

For necessary expenses of the International Trade Commission, including hire of passenger motor vehicles, and services as authorized by 5 U.S.C. 3109, and not to exceed $2,500 for official reception and representation expenses, $40,850,000, to remain available until expended.

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

## OPERATIONS AND ADMINISTRATION

For necessary expenses for international trade activities of the Department of Commerce provided for by law, and engaging in trade promotional activities abroad, including expenses of grants and cooperative agreements for the purpose of promoting exports of United States firms, without regard to 44 U.S.C. 3702 and 3703; full medical coverage for dependent members of immediate families of employees stationed overseas and employees temporarily posted overseas; travel and transportation of employees of the United States and Foreign Commercial Service between two points abroad, without regard to 49 U.S.C. 1517; employment of Americans and aliens by contract for services; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; purchase or construction of temporary demountable exhibition structures for use abroad; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $327,000 for official representation expenses abroad; purchase of passenger motor vehicles for official use abroad, not to exceed $30,000 per vehicle; obtain insurance on official motor vehicles; and rent tie lines and teletype equipment; $270,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities without regard to section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912); and that for the purpose of this Act, contributions under the provisions of the Mutual Educational and Cultural Exchange Act shall include payment for assessments for services provided as part of these activities.

## EXPORT ADMINISTRATION

### OPERATIONS AND ADMINISTRATION

For necessary expenses for export administration and national security activities of the Department of Commerce, including costs associated with the performance of export administration field activities both domestically and abroad; full medical coverage for dependent members of immediate families of employees stationed overseas; employment of Americans and aliens by contract for services abroad; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $15,000 for official representation expenses abroad; awards of compensation to informers under the Export Administration Act of 1979, and as authorized by 22 U.S.C. 401(b); purchase of passenger motor vehicles for official use and motor vehicles for law enforcement use with special requirement vehicles eligible for purchase without regard to any price limitation otherwise established by law; $36,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities: Provided further, That payments and contributions collected and accepted for materials or services provided as part of such activities may be retained for use in covering the cost of such activities, and for providing information to the public with respect to the export administration and national security activities of the Department of Commerce and other export control programs of the United States and other governments.

For an additional amount for nonproliferation efforts to prevent illegal exports of chemical weapon precursors, biological agents, nuclear weapons and missile development equipment, $3,900,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## ECONOMIC DEVELOPMENT ADMINISTRATION

### ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For grants for economic development assistance as provided by the Public Works and Economic Development Act of 1965, as amended, Public Law 91–304, and such laws that were in effect immediately before September 30, 1982, and for trade adjustment assistance, $328,500,000: Provided, That none of the funds appropriated or otherwise made available under this heading may be used directly or indirectly for attorneys' or consultants' fees in connection with securing grants and contracts made by the Economic Development Administration: Provided further, That, notwithstanding any other provision of law, the Secretary of Commerce may provide financial assistance for projects to be located on military installations closed or scheduled for closure or realignment to grantees eligible for assistance under the Public Works and Economic Development Act of 1965,

as amended, without it being required that the grantee have title or ability to obtain a lease for the property, for the useful life of the project, when in the opinion of the Secretary of Commerce, such financial assistance is necessary for the economic development of the area: Provided further, That the Secretary of Commerce may, as the Secretary considers appropriate, consult with the Secretary of Defense regarding the title to land on military installations closed or scheduled for closure or realignment.

## SALARIES AND EXPENSES

For necessary expenses of administering the economic development assistance programs as provided for by law, $20,036,000: Provided, That these funds may be used to monitor projects approved pursuant to title I of the Public Works Employment Act of 1976, as amended, title II of the Trade Act of 1974, as amended, and the Community Emergency Drought Relief Act of 1977.

## MINORITY BUSINESS DEVELOPMENT AGENCY

## MINORITY BUSINESS DEVELOPMENT

For necessary expenses of the Department of Commerce in fostering, promoting, and developing minority business enterprise, including expenses of grants, contracts, and other agreements with public or private organizations, $28,000,000: Provided, That of the total amount provided, $2,000,000 shall be available for obligation and expenditure only for projects jointly developed, implemented and administered with the Small Business Administration.

## ECONOMIC AND INFORMATION INFRASTRUCTURE

## ECONOMIC AND STATISTICAL ANALYSIS

## SALARIES AND EXPENSES

For necessary expenses, as authorized by law, of economic and statistical analysis programs of the Department of Commerce, $45,900,000, to remain available until September 30, 1998.

## ECONOMICS AND STATISTICS ADMINISTRATION

## REVOLVING FUND

### << 15 USCA § 1527a NOTE >>

The Secretary of Commerce is authorized to disseminate economic and statistical data products as authorized by sections 1, 2, and 4 of Public Law 91–412 (15 U.S.C. 1525–1527) and, notwithstanding section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912), charge fees necessary to recover the full costs incurred in their production. Notwithstanding 31 U.S.C. 3302, receipts received from these data dissemination activities shall be credited to this account, to be available for carrying out these purposes without further appropriation.

## BUREAU OF THE CENSUS

## SALARIES AND EXPENSES

For expenses necessary for collecting, compiling, analyzing, preparing, and publishing statistics, provided for by law, $135,000,000.

## PERIODIC CENSUSES AND PROGRAMS

For expenses necessary to collect and publish statistics for periodic censuses and programs provided for by law, $210,500,000, to remain available until expended.

## NATIONAL TELECOMMUNICATIONS AND INFORMATION

## ADMINISTRATION

## SALARIES AND EXPENSES

<< 47 USCA § 903 NOTE >>

For necessary expenses, as provided for by law, of the National Telecommunications and Information Administration (NTIA), $15,000,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 1535(d), the Secretary of Commerce shall charge Federal agencies for costs incurred in spectrum management, analysis, and operations, and related services and such fees shall be retained and used as offsetting collections for costs of such spectrum services, to remain available until expended: Provided further, That hereafter, notwithstanding any other provision of law, NTIA shall not authorize spectrum use or provide any spectrum functions pursuant to the NTIA Organization Act, 47 U.S.C. §§ 902–903, to any Federal entity without reimbursement as required by NTIA for such spectrum management costs, and Federal entities withholding payment of such cost shall not use spectrum: Provided further, That the Secretary of Commerce is authorized to retain and use as offsetting collections all funds transferred, or previously transferred, from other Government agencies for all costs incurred in telecommunications research, engineering, and related activities by the Institute for Telecommunication Sciences of the NTIA, in furtherance of its assigned functions under this paragraph, and such funds received from other Government agencies shall remain available until expended.

### PUBLIC BROADCASTING FACILITIES, PLANNING AND CONSTRUCTION

For grants authorized by section 392 of the Communications Act of 1934, as amended, $15,250,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $1,500,000 shall be available for program administration as authorized by section 391 of the Act: Provided further, That notwithstanding the provisions of section 391 of the Act, the prior year unobligated balances may be made available for grants for projects for which applications have been submitted and approved during any fiscal year.

### INFORMATION INFRASTRUCTURE GRANTS

For grants authorized by section 392 of the Communications Act of 1934, as amended, $21,490,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $3,000,000 shall be available for program administration and other support activities as authorized by section 391: Provided further, That of the funds appropriated herein, not to exceed 5 percent may be available for telecommunications research activities for projects related directly to the development of a national information infrastructure: Provided further, That notwithstanding the requirements of section 392(a) and 392(c) of the Act, these funds may be used for the planning and construction of telecommunications networks for the provision of educational, cultural, health care, public information, public safety, or other social services.

### PATENT AND TRADEMARK OFFICE

### SALARIES AND EXPENSES

For necessary expenses of the Patent and Trademark Office provided for by law, including defense of suits instituted against the Commissioner of Patents and Trademarks, $61,252,000, to remain available until expended: Provided, That the funds made available under this heading are to be derived from deposits in the Patent and Trademark Office Fee Surcharge Fund as authorized by law: Provided further, That the amounts made available under the Fund shall not exceed amounts deposited; and such fees as shall be collected pursuant to 15 U.S.C. 1113 and 35 U.S.C. 41 and 376, shall remain available until expended.

### TECHNOLOGY ADMINISTRATION

### UNDER SECRETARY FOR TECHNOLOGY/OFFICE OF TECHNOLOGY POLICY

### SALARIES AND EXPENSES

For necessary expenses for the Under Secretary for Technology/Office of Technology Policy, $9,500,000: Provided, That $2,500,000 of the total amount provided under this heading shall be available to support the United States–Israel Science and Technology Commission.

### SCIENCE AND TECHNOLOGY

## NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### SCIENTIFIC AND TECHNICAL RESEARCH AND SERVICES

For necessary expenses of the National Institute of Standards and Technology, $268,000,000, to remain available until expended, of which not to exceed $1,625,000 may be transferred to the "Working Capital Fund".

### INDUSTRIAL TECHNOLOGY SERVICES

#### << 15 USCA § 278k NOTE >>

For necessary expenses of the Manufacturing Extension Partnership of the National Institute of Standards and Technology, $95,000,000, to remain available until expended, of which not to exceed $300,000 may be transferred to the "Working Capital Fund": Provided, That notwithstanding the time limitations imposed by 15 U.S.C. 278k(c)(1) and (5) on the duration of Federal financial assistance that may be awarded by the Secretary of Commerce to Regional Centers for the transfer of Manufacturing Technology ("Centers"), such Federal financial assistance for a Center may continue beyond six years and may be renewed for additional periods, not to exceed one year, at a rate not to exceed one-third of the Center's total annual costs, subject before any such renewal to a positive evaluation of the Center and to a finding by the Secretary of Commerce that continuation of Federal funding to the Center is in the best interest of the Regional Centers for the transfer of Manufacturing Technology Program.

In addition, for necessary expenses of the Advanced Technology Program of the National Institute of Standards and Technology, $225,000,000, to remain available until expended, of which not to exceed $500,000 may be transferred to the "Working Capital Fund."

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES (INCLUDING TRANSFER OF FUNDS)

#### << 33 USCA § 851 NOTE >>

For necessary expenses of activities authorized by law for the National Oceanic and Atmospheric Administration, including acquisition, maintenance, operation, and hire of aircraft; not to exceed 299 commissioned officers on the active list as of September 30, 1997; grants, contracts, or other payments to nonprofit organizations for the purposes of conducting activities pursuant to cooperative agreements; and alteration, modernization, and relocation of facilities as authorized by 33 U.S.C. 883i; $1,854,067,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 3302 but consistent with other existing law, fees shall be assessed, collected, and credited to this appropriation as offsetting collections to be available until expended, to recover the costs of administering aeronautical charting programs: Provided further, That the sum herein appropriated from the general fund shall be reduced as such additional fees are received during fiscal year 1997, so as to result in a final general fund appropriation estimated at not more than $1,851,067,000: Provided further, That any such additional fees received in excess of $3,000,000 in fiscal year 1997 shall not be available for obligation until October 1, 1997: Provided further, That fees and donations received by the National Ocean Service for the management of the national marine sanctuaries may be retained and used for the salaries and expenses associated with those activities, notwithstanding 31 U.S.C. 3302: Provided further, That in addition, $66,000,000 shall be derived by transfer from the fund entitled "Promote and Develop Fishery Products and Research Pertaining to American Fisheries": Provided further, That grants to States pursuant to sections 306 and 306A of the Coastal Zone Management Act of 1972, as amended, shall not exceed $2,000,000: Provided further, That not later than November 15, 1996, the Department of Commerce, in conjunction with the National Oceanic and Atmospheric Administration, shall submit to the appropriate committees of the Congress, a long-term plan and a legislative proposal necessary to implement such plan regarding the continuation of a National Oceanic and Atmospheric Administration commissioned corps.

### COASTAL ZONE MANAGEMENT FUND

Of amounts collected pursuant to section 308 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1456a), not to exceed $7,800,000, for purposes set forth in sections 308(b)(2)(A), 308(b)(2)(B)(v), and 315(e) of such Act.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## CONSTRUCTION

For repair and modification of, and additions to, existing facilities and construction of new facilities, and for facility planning and design and land acquisition not otherwise provided for the National Oceanic and Atmospheric Administration, $58,250,000, to remain available until expended, of which $8,500,000 shall be available only for a grant to the University of New Hampshire for construction and related expenses for an environmental technology facility.

## FLEET MODERNIZATION, SHIPBUILDING AND CONVERSION

For expenses necessary for the repair, acquisition, leasing, or conversion of vessels, including related equipment to maintain and modernize the existing fleet and to continue planning the modernization of the fleet, for the National Oceanic and Atmospheric Administration, $8,000,000, to remain available until expended.

## FISHING VESSEL AND GEAR DAMAGE COMPENSATION FUND

For carrying out the provisions of section 3 of Public Law 95–376, not to exceed $200,000, to be derived from receipts collected pursuant to subsections (b) and (f) of section 10 of the Fishermen's Protective Act of 1967 (22 U.S.C. 1980), to remain available until expended.

## FISHERMEN'S CONTINGENCY FUND

For carrying out the provisions of title IV of Public Law 95–372, not to exceed $1,000,000, to be derived from receipts collected pursuant to that Act, to remain available until expended.

## FOREIGN FISHING OBSERVER FUND

For expenses necessary to carry out the provisions of the Atlantic Tunas Convention Act of 1975, as amended (Public Law 96–339), the Magnuson Fishery Conservation and Management Act of 1976, as amended (Public Law 100–627), and the American Fisheries Promotion Act (Public Law 96–561), to be derived from the fees imposed under the foreign fishery observer program authorized by these Acts, not to exceed $196,000, to remain available until expended.

## FISHING VESSEL OBLIGATIONS GUARANTEES

For the cost of guaranteed loans, $250,000, as authorized by the Merchant Marine Act of 1936, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That none of the funds made available under this heading may be used to guarantee loans for any new fishing vessel that will increase the harvesting capacity in any United States fishery.

## GENERAL ADMINISTRATION

## SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of Commerce provided for by law, including not to exceed $3,000 for official entertainment, $28,490,000.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11 as amended by Public Law 100–504), $20,140,000.

## NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

## CONSTRUCTION OF RESEARCH FACILITIES

## (RESCISSION)

Of the obligated and unobligated balances available under this heading, $16,000,000 are rescinded.

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

## OPERATIONS, RESEARCH, AND FACILITIES

(RESCISSION)

Of the unobligated balances available under this heading, $20,000,000 are rescinded.

GENERAL PROVISIONS—DEPARTMENT OF COMMERCE

SEC. 201. During the current fiscal year, applicable appropriations and funds made available to the Department of Commerce by this Act shall be available for the activities specified in the Act of October 26, 1949 (15 U.S.C. 1514), to the extent and in the manner prescribed by the Act, and, notwithstanding 31 U.S.C. 3324, may be used for advanced payments not otherwise authorized only upon the certification of officials designated by the Secretary that such payments are in the public interest.

SEC. 202. During the current fiscal year, appropriations made available to the Department of Commerce by this Act for salaries and expenses shall be available for hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; services as authorized by 5 U.S.C. 3109; and uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902).

SEC. 203. None of the funds made available by this Act may be used to support the hurricane reconnaissance aircraft and activities that are under the control of the United States Air Force or the United States Air Force Reserve.

<< 13 USCA § 23 NOTE >>

SEC. 204. None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce, shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses paid before October 1, 1992, as authorized by section 8501 of title 5, United States Code, for services performed after April 20, 1990, by individuals appointed to temporary positions within the Bureau of the Census for purposes relating to the 1990 decennial census of population.

SEC. 205. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Commerce in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 206. (a) Should legislation be enacted to dismantle or reorganize the Department of Commerce, the Secretary of Commerce, no later than 90 days thereafter, shall submit to the Committees on Appropriations of the House and the Senate a plan for transferring funds provided in this Act to the appropriate successor organizations: Provided, That the plan shall include a proposal for transferring or rescinding funds appropriated herein for agencies or programs terminated under such legislation: Provided further, That such plan shall be transmitted in accordance with section 605 of this Act.

(b) The Secretary of Commerce or the appropriate head of any successor organization(s) may use any available funds to carry out legislation dismantling or reorganizing the Department of Commerce to cover the costs of actions relating to the abolishment, reorganization, or transfer of functions and any related personnel action, including voluntary separation incentives if authorized by such legislation: Provided, That the authority to transfer funds between appropriations accounts that may be necessary to carry out this section is provided in addition to authorities included under section 205 of this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 207. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 16 USCA § 1851 NOTE >>

SEC. 208. None of the funds appropriated under this Act or any other Act henceforth may be used to develop new fishery management plans, amendments, or regulations which create new individual fishing quota programs (whether such quotas are transferable or not) or to implement any such plans, amendments or regulations approved by a Regional Fishery Management

Council or the Secretary after January 4, 1995, until offsetting fees to pay for the cost of administering such plans, amendments, or regulations are expressly authorized under the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.). This restriction shall also apply to any program relating to the Gulf of Mexico commercial red snapper fishery that authorizes the consolidation of licenses permits or endorsements that result in different trip limits for vessels in the same class. This restriction shall not apply in any way to the North Pacific halibut and sablefish, South Atlantic wreckfish, or the Mid–Atlantic surfclam and ocean (including mahogany) quohog individual fishing quota programs. The term "individual fishing quota" does not include a community development quota.

SEC. 209. The Secretary may award contracts for hydrographic, geodetic, and photogrammetric surveying and mapping services in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).

<< 13 USCA § 11 NOTE >>

SEC. 210. There is hereby established the Bureau of the Census Working Capital Fund, which shall be available without fiscal year limitation, for expenses and equipment necessary for the maintenance and operation of such services and projects as the Director of the Census Bureau determines may be performed more advantageously when centralized: Provided, That such central services shall, to the fullest extent practicable, be used to make unnecessary the maintenance of separate like services in the divisions and offices of the Bureau: Provided further, That a separate schedule of expenditures and reimbursements, and a statement of the current assets and liabilities of the Working Capital Fund as of the close of the last completed fiscal year, shall be prepared each year: Provided further, That notwithstanding 31 U.S.C. 3302, the Working Capital Fund may be credited with advances and reimbursements from applicable appropriations of the Bureau and from funds of other agencies or entities for services furnished pursuant to law: Provided further, That any inventories, equipment, and other assets pertaining to the services to be provided by such funds, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made hereafter for the purpose of providing capital, shall be used to capitalize the Working Capital Fund: Provided further, That the Working Capital Fund shall provide for centralized services at rates which will return in full all expenses of operation, including depreciation of fund plant and equipment, amortization of automated data processing software and hardware systems, and an amount necessary to maintain a reasonable operating reserve as determined by the Director.

<< 16 USCA § 1801 NOTE >>

SEC. 211. (a) Effective 15 days after the enactment of the Sustainable Fisheries Act, section 1 of the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801) shall be amended to read as follows: "That this Act may be cited as the 'Magnuson–Stevens Fishery Conservation and Management Act'."

(b) Effective 15 days after the enactment of the Sustainable Fisheries Act, all references to the Magnuson Fishery Conservation and Management Act shall be redesignated as references to the Magnuson–Stevens Fishery Conservation and Management Act.

This title may be cited as the "Department of Commerce and Related Agencies Appropriations Act, 1997".

TITLE III—THE JUDICIARY

SUPREME COURT OF THE UNITED STATES

SALARIES AND EXPENSES

For expenses necessary for the operation of the Supreme Court, as required by law, excluding care of the building and grounds, including purchase or hire, driving, maintenance, and operation of an automobile for the Chief Justice, not to exceed $10,000 for the purpose of transporting Associate Justices, and hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; not to exceed $10,000 for official reception and representation expenses; and for miscellaneous expenses, to be expended as the Chief Justice may approve; $27,157,000.

CARE OF THE BUILDING AND GROUNDS

For such expenditures as may be necessary to enable the Architect of the Capitol to carry out the duties imposed upon him by the Act approved May 7, 1934 (40 U.S.C. 13a–13b), $2,800,000, of which $260,000 shall remain available until expended.

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 270 of 1021   PageID 7140

SALARIES AND EXPENSES

For salaries of the chief judge, judges, and other officers and employees, and for necessary expenses of the court, as authorized by law, $15,013,000.

UNITED STATES COURT OF INTERNATIONAL TRADE

SALARIES AND EXPENSES

For salaries of the chief judge and eight judges, salaries of the officers and employees of the court, services as authorized by 5 U.S.C. 3109, and necessary expenses of the court, as authorized by law, $11,114,000.

COURTS OF APPEALS, DISTRICT COURTS, AND OTHER JUDICIAL SERVICES

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For the salaries of circuit and district judges (including judges of the territorial courts of the United States), justices and judges retired from office or from regular active service, judges of the United States Court of Federal Claims, bankruptcy judges, magistrate judges, and all other officers and employees of the Federal Judiciary not otherwise specifically provided for, and necessary expenses of the courts, as authorized by law, $2,556,000,000 (including the purchase of firearms and ammunition); of which not to exceed $13,454,000 shall remain available until expended for space alteration projects; of which $500,000 shall be transferred to the Commission on Structural Alternatives for the Federal Courts of Appeals only after legislation is enacted to establish the Commission; of which not to exceed $10,000,000 shall remain available until expended for furniture and furnishings related to new space alteration and construction projects; and of which $500,000 is to remain available until expended for acquisition of books, periodicals, and newspapers, and all other legal reference materials, including subscriptions. In addition, for expenses of the United States Court of Federal Claims associated with processing cases under the National Childhood Vaccine Injury Act of 1986, not to exceed $2,390,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

For an additional amount for expenses relating to additional workload from the Antiterrorism and Effective Death Penalty Act of 1996, and for Court Security needs, $10,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

VIOLENT CRIME REDUCTION PROGRAMS

For activities of the Federal Judiciary as authorized by law, $30,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as authorized by section 190001(a) of Public Law 103–322.

DEFENDER SERVICES

For the operation of Federal Public Defender and Community Defender organizations; the compensation and reimbursement of expenses of attorneys appointed to represent persons under the Criminal Justice Act of 1964, as amended; the compensation and reimbursement of expenses of persons furnishing investigative, expert and other services under the Criminal Justice Act (18 U.S.C. 3006A(e)); the compensation (in accordance with Criminal Justice Act maximums) and reimbursement of expenses of attorneys appointed to assist the court in criminal cases where the defendant has waived representation by counsel; the compensation and reimbursement of travel expenses of guardians ad litem acting on behalf of financially eligible minor or incompetent offenders in connection with transfers from the United States to foreign countries with which the United States has a treaty for the execution of penal sentences; and the compensation of attorneys ap-[sic]

FEES OF JURORS AND COMMISSIONERS

For fees and expenses of jurors as authorized by 28 U.S.C. 1871 and 1876; compensation of jury commissioners as authorized by 28 U.S.C. 1863; and compensation of commissioners appointed in condemnation cases pursuant to rule 71A(h) of the Federal Rules of Civil Procedure (28 U.S.C. Appendix Rule 71A(h)); $67,000,000, to remain available until expended: Provided, That the compensation of land commissioners shall not exceed the daily equivalent of the highest rate payable under section 5332 of title 5, United States Code.

<p style="text-align:center">COURT SECURITY</p>

For necessary expenses, not otherwise provided for, incident to the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms and adjacent areas, including building ingress-egress control, inspection of packages, directed security patrols, and other similar activities as authorized by section 1010 of the Judicial Improvement and Access to Justice Act (Public Law 100–702); $127,000,000, to be expended directly or transferred to the United States Marshals Service which shall be responsible for administering elements of the Judicial Security Program consistent with standards or guidelines agreed to by the Director of the Administrative Office of the United States Courts and the Attorney General.

<p style="text-align:center">ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS</p>

<p style="text-align:center">SALARIES AND EXPENSES</p>

For necessary expenses of the Administrative Office of the United States Courts as authorized by law, including travel as authorized by 31 U.S.C. 1345, hire of a passenger motor vehicle as authorized by 31 U.S.C. 1343(b), advertising and rent in the District of Columbia and elsewhere, $49,450,000, of which not to exceed $7,500 is authorized for official reception and representation expenses.

<p style="text-align:center">FEDERAL JUDICIAL CENTER</p>

<p style="text-align:center">SALARIES AND EXPENSES</p>

For necessary expenses of the Federal Judicial Center, as authorized by Public Law 90–219, $17,495,000; of which $1,800,000 shall remain available through September 30, 1998, to provide education and training to Federal court personnel; and of which not to exceed $1,000 is authorized for official reception and representation expenses.

<p style="text-align:center">JUDICIAL RETIREMENT FUNDS</p>

<p style="text-align:center">PAYMENT TO JUDICIARY TRUST FUNDS</p>

For payment to the Judicial Officers' Retirement Fund, as authorized by 28 U.S.C. 377(o), $21,000,000, to the Judicial Survivors' Annuities Fund, as authorized by 28 U.S.C. 376(c), $7,300,000, and to the United States Court of Federal Claims Judges' Retirement Fund, as authorized by 28 U.S.C. 178(l), $1,900,000.

<p style="text-align:center">UNITED STATES SENTENCING COMMISSION</p>

<p style="text-align:center">SALARIES AND EXPENSES</p>

For the salaries and expenses necessary to carry out the provisions of chapter 58 of title 28, United States Code, $8,490,000, of which not to exceed $1,000 is authorized for official reception and representation expenses.

<p style="text-align:center">GENERAL PROVISIONS—THE JUDICIARY</p>

SEC. 301. Appropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. 3109.

SEC. 302. Appropriations made in this title shall be available for salaries and expenses of the Special Court established under the Regional Rail Reorganization Act of 1973, Public Law 93–236.

SEC. 303. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Judiciary in this Act may be transferred between such appropriations, but no such appropriation, except "Courts of Appeals, District Courts, and other Judicial Services, Defender Services" and "Courts of Appeals, District Courts, and other Judicial Services, Fees of Jurors and Commissioners", shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 272 of 1021   PageID 7142

this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 304. Notwithstanding any other provision of law, the salaries and expenses appropriation for district courts, courts of appeals, and other judicial services shall be available for official reception and representation expenses of the Judicial Conference of the United States: Provided, That such available funds shall not exceed $10,000 and shall be administered by the Director of the Administrative Office of the United States Courts in his capacity as Secretary of the Judicial Conference.

<< 28 USCA § 612 >>

SEC. 305. Section 612(l) of title 28, United States Code, shall be amended as follows: strike "1997", and insert in lieu thereof "1998".

<< 18 USCA § 3626 NOTE >>

SEC. 306. None of the funds available to the Judiciary in fiscal years 1996 and 1997 and hereafter shall be available for expenses authorized pursuant to section 802(a) of title VIII of section 101(a) of title I of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, for costs related to the appointment of Special Masters prior to April 26, 1996.

Sec. 307. The United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be known and designated as the "James A. Redden Federal Courthouse".

Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be deemed to be a reference to the "James A. Redden Federal Courthouse".

This title may be cited as "The Judiciary Appropriations Act, 1997".

TITLE IV—DEPARTMENT OF STATE AND RELATED AGENCIES

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

DIPLOMATIC AND CONSULAR PROGRAMS

<< 8 USCA § 1351 NOTE >>

<< 22 USCA § 2695b >>

For necessary expenses of the Department of State and the Foreign Service not otherwise provided for, including expenses authorized by the State Department Basic Authorities Act of 1956, as amended; representation to certain international organizations in which the United States participates pursuant to treaties, ratified pursuant to the advice and consent of the Senate, or specific Acts of Congress; acquisition by exchange or purchase of passenger motor vehicles as authorized by 31 U.S.C. 1343, 40 U.S.C. 481(c) and 22 U.S.C. 2674; and for expenses of general administration; $1,700,450,000: Provided, That notwithstanding section 140(a)(5), and the second sentence of section 140(a)(3), of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236), not to exceed $150,000,000 of fees may be collected during fiscal year 1997 under the authority of section 140(a)(1) of that Act: Provided further, That all fees collected under the preceding proviso shall be deposited in fiscal year 1997 as an offsetting collection to appropriations made under this heading to recover the costs of providing consular services and shall remain available until expended: Provided further, That in fiscal year 1998, a system shall be in place that allocates to each department and agency the full cost of its presence outside of the United States.

Of the funds provided under this heading, $24,856,000 shall be available only for the Diplomatic Telecommunications Service for operation of existing base services and not to exceed $17,230,000 shall be available only for the enhancement of the Diplomatic Telecommunications Service and shall remain available until expended. Of the latter amount, $2,500,000 shall not be made available until expiration of the 15 day period beginning on the date when the Secretary of State and the Director of the Diplomatic Telecommunications Service submit the pilot program report required by section 507 of Public Law 103–317.

In addition, not to exceed $700,000 in registration fees collected pursuant to section 38 of the Arms Export Control Act, as amended, may be used in accordance with section 45 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2717); and in addition not to exceed $1,223,000 shall be derived from fees collected from other executive agencies for lease or use of facilities located at the International Center in accordance with section 4 of the International Center Act (Public Law 90–553), as amended; and in addition, as authorized by section 5 of such Act, $450,000, to be derived from the reserve authorized by that section, to be used for the purposes set out in that section; and in addition not to exceed $15,000 which shall be derived from reimbursements, surcharges, and fees for use of Blair House facilities in accordance with section 46 of the State of Department Basic Authorities Act of 1956 (22 U.S.C. 2718(a)).

Notwithstanding section 402 of this Act, not to exceed 20 percent of the amounts made available in this Act in the appropriation accounts "Diplomatic and Consular Programs" and "Salaries and Expenses" under the heading "Administration of Foreign Affairs" may be transferred between such appropriation accounts: Provided, That any transfer pursuant to this sentence shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

For an additional amount for counterterrorism requirements overseas, including security guards and equipment, $23,700,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of State and the Foreign Service, provided for by law, including expenses authorized by section 9 of the Act of August 31, 1964, as amended (31 U.S.C. 3721), and the State Department Basic Authorities Act of 1956, as amended, $352,300,000.

## CAPITAL INVESTMENT FUND

For necessary expenses of the Capital Investment Fund, $24,600,000, to remain available until expended, as authorized in Public Law 103–236: Provided, That section 135(e) of Public Law 103–236 shall not apply to funds appropriated under this heading.

## OFFICE OF INSPECTOR GENERAL

<< 5 USCA App. 3 § 11 NOTE >>

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App.), $27,495,000, notwithstanding section 209(a)(1) of the Foreign Service Act of 1980, as amended (Public Law 96–465), as it relates to post inspections: Provided, That notwithstanding any other provision of law, the merger of the Office of Inspector General of the United States Information Agency with the Office of Inspector General of the Department of State provided for in the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1996, contained in Public Law 104–134, is effective hereafter.

## REPRESENTATION ALLOWANCES

For representation allowances as authorized by section 905 of the Foreign Service Act of 1980, as amended (22 U.S.C. 4085), $4,490,000.

## PROTECTION OF FOREIGN MISSIONS AND OFFICIALS

For expenses, not otherwise provided, to enable the Secretary of State to provide for extraordinary protective services in accordance with the provisions of section 214 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4314) and 3 U.S.C. 208, $8,332,000, to remain available until September 30, 1998.

## SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS

For necessary expenses for carrying out the Foreign Service Buildings Act of 1926, as amended (22 U.S.C. 292–300), and the Diplomatic Security Construction Program as authorized by title IV of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4851), $364,495,000, to remain available until expended as authorized by section 24(c) of the State

Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)): Provided, That none of the funds appropriated in this paragraph shall be available for acquisition of furniture and furnishings and generators for other departments and agencies.

For an additional amount for security improvements, necessary relocation expenses, and security equipment for United States diplomatic facilities and missions overseas, $24,825,000, to remain available until expended: Provided, That of this amount $9,400,000 is for security projects on behalf of United States and Foreign Commercial Service missions and $1,125,000 is for security projects on behalf of United States Information Agency missions: Provided further, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For expenses necessary to enable the Secretary of State to meet unforeseen emergencies arising in the Diplomatic and Consular Service pursuant to the requirement of 31 U.S.C. 3526(e), $5,800,000, to remain available until expended as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)), of which not to exceed $1,000,000 may be transferred to and merged with the Repatriation Loans Program Account, subject to the same terms and conditions.

## REPATRIATION LOANS PROGRAM ACCOUNT

For the cost of direct loans, $593,000, as authorized by section 4 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2671): Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974. In addition, for administrative expenses necessary to carry out the direct loan program, $663,000 which may be transferred to and merged with the Salaries and Expenses account under Administration of Foreign Affairs.

## PAYMENT TO THE AMERICAN INSTITUTE IN TAIWAN

For necessary expenses to carry out the Taiwan Relations Act, Public Law 96–8 (93 Stat. 14), $14,490,000.

## PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the Foreign Service Retirement and Disability Fund, as authorized by law, $126,491,000.

## INTERNATIONAL ORGANIZATIONS AND CONFERENCES

## CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS

<< 22 USCA § 269a NOTE >>

For expenses, not otherwise provided for, necessary to meet annual obligations of membership in international multilateral organizations, pursuant to treaties ratified pursuant to the advice and consent of the Senate, conventions or specific Acts of Congress, $892,000,000: Provided, That any payment of arrearages shall be directed toward special activities that are mutually agreed upon by the United States and the respective international organization: Provided further, That 20 percent of the funds appropriated in this paragraph for the assessed contribution of the United States to the United Nations shall be withheld from obligation and expenditure until a certification is made under section 401(b) of Public Law 103–236 for fiscal year 1997: Provided further, That certification under section 401(b) of Public Law 103–236 for fiscal year 1997 may only be made if the Committees on Appropriations and Foreign Relations of the Senate and the Committees on Appropriations and International Relations of the House of Representatives are notified of the steps taken, and anticipated, to meet the requirements of section 401(b) of Public Law 103–236 at least 15 days in advance of the proposed certification: Provided further, That none of the funds appropriated in this paragraph shall be available for a United States contribution to an international organization for the United States share of interest costs made known to the United States Government by such organization for loans incurred on or after October 1, 1984, through external borrowings: Provided further, That of the funds appropriated in this paragraph, $100,000,000 may be made available only pursuant to a certification by the Secretary of State by no later than January 30, 1997,

that the United Nations has taken no action during calendar year 1996 to increase funding for any United Nations program without identifying an offsetting decrease elsewhere in the United Nations budget and cause the United Nations to exceed its no growth budget for the biennium 1996–1997 adopted in December, 1995: Provided further, That if the Secretary of State is unable to make the aforementioned certification, the $100,000,000 is to be applied to paying the current year assessment for other international organizations for which the assessment has not been paid in full or to paying the assessment due in the next fiscal year for such organizations, subject to the reprogramming procedures contained in Section 605 of this Act: Provided further, That notwithstanding section 402 of this Act, not to exceed $10,000,000 may be transferred from the funds made available under this heading to the "International Conferences and Contingencies" account for assessed contributions to new or provisional international organizations or for travel expenses of official delegates to international conferences: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## CONTRIBUTIONS FOR INTERNATIONAL PEACEKEEPING ACTIVITIES

For necessary expenses to pay assessed and other expenses of international peacekeeping activities directed to the maintenance or restoration of international peace and security, $352,400,000, of which $50,000,000 is for payment of arrearages accumulated in 1995, and which shall be available only upon certification by the Secretary of State that at least two of the following have been achieved: (1) savings of at least $100,000,000 will be achieved in the biennial expenses of the following United Nations divisions and activities—the United Nations Conference on Trade and Development, the Regional Economic Commissions, the Department of Public Information, and the Department of Conference Services, travel and overtime; (2) the number of professional and general service staff employed by the United Nations Secretariat at the conclusion of the 1996–1997 biennium will be at least ten percent below the number of such positions on January 1, 1996; and (3) the United Nations has adopted a budget outline for the 1998–1999 biennium that is below $2,608,000,000; as part of a five-year program to achieve major cost-saving reforms in the United Nations and specialized agencies: Provided, That none of the funds made available under this Act shall be obligated or expended for any new or expanded United Nations peacekeeping mission unless, at least fifteen days in advance of voting for the new or expanded mission in the United Nations Security Council (or in an emergency, as far in advance as is practicable), (1) the Committees on Appropriations of the House of Representatives and the Senate and other appropriate Committees of the Congress are notified of the estimated cost and length of the mission, the vital national interest that will be served, and the planned exit strategy; and (2) a reprogramming of funds pursuant to section 605 of this Act is submitted, and the procedures therein followed, setting forth the source of funds that will be used to pay for the cost of the new or expanded mission: Provided further, That funds shall be available for peacekeeping expenses only upon a certification by the Secretary of State to the appropriate committees of the Congress that American manufacturers and suppliers are being given opportunities to provide equipment, services, and material for United Nations peacekeeping activities equal to those being given to foreign manufacturers and suppliers.

## INTERNATIONAL COMMISSIONS

<< 22 USCA § 269a NOTE >>

For necessary expenses, not otherwise provided for, to meet obligations of the United States arising under treaties, or specific Acts of Congress, as follows:

## INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES AND MEXICO

For necessary expenses for the United States Section of the International Boundary and Water Commission, United States and Mexico, and to comply with laws applicable to the United States Section, including not to exceed $6,000 for representation; as follows:

## SALARIES AND EXPENSES

For salaries and expenses, not otherwise provided for, $15,490,000.

## CONSTRUCTION

For detailed plan preparation and construction of authorized projects, $6,463,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

### AMERICAN SECTIONS, INTERNATIONAL COMMISSIONS

For necessary expenses, not otherwise provided for the International Joint Commission and the International Boundary Commission, United States and Canada, as authorized by treaties between the United States and Canada or Great Britain, and for the Border Environment Cooperation Commission as authorized by Public Law 103–182; $5,490,000, of which not to exceed $9,000 shall be available for representation expenses incurred by the International Joint Commission.

### INTERNATIONAL FISHERIES COMMISSIONS

For necessary expenses for international fisheries commissions, not otherwise provided for, as authorized by law, $14,549,000: Provided, That the United States' share of such expenses may be advanced to the respective commissions, pursuant to 31 U.S.C. 3324.

### OTHER

### PAYMENT TO THE ASIA FOUNDATION

For a grant to the Asia Foundation, as authorized by section 501 of Public Law 101–246, $8,000,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

### RELATED AGENCIES

### ARMS CONTROL AND DISARMAMENT AGENCY

### ARMS CONTROL AND DISARMAMENT ACTIVITIES

For necessary expenses not otherwise provided, for arms control, nonproliferation, and disarmament activities, $41,500,000, of which not to exceed $50,000 shall be for official reception and representation expenses as authorized by the Act of September 26, 1961, as amended (22 U.S.C. 2551 et seq.).

### UNITED STATES INFORMATION AGENCY

### SALARIES AND EXPENSES

For expenses, not otherwise provided for, necessary to enable the United States Information Agency, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), to carry out international communication, educational and cultural activities; and to carry out related activities authorized by law, including employment, without regard to civil service and classification laws, of persons on a temporary basis (not to exceed $700,000 of this appropriation), as authorized by section 801 of such Act of 1948 (22 U.S.C. 1471), and entertainment, including official receptions, within the United States, not to exceed $25,000 as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)); $440,000,000: Provided, That not to exceed $1,400,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085): Provided further, That not to exceed $7,615,000, to remain available until expended, may be credited to this appropriation from fees or other payments received from or in connection with English teaching, library, motion pictures, and publication programs as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e) and, notwithstanding any other law, fees from student advising and counseling: Provided further That not to exceed $1,100,000 to remain available until expended may be used to carry out projects involving security construction and related improvements for agency facilities not physically located together with Department of State facilities abroad.

For an additional amount for necessary expenses relating to security, $1,375,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### TECHNOLOGY FUND

For expenses necessary to enable the United States Information Agency to provide for the procurement of information technology improvements, as authorized by the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $5,050,000, to remain available until expended.

### EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS

For expenses of educational and cultural exchange programs, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $185,000,000, to remain available until expended as authorized by section 105 of such Act of 1961 (22 U.S.C. 2455).

### EISENHOWER EXCHANGE FELLOWSHIP PROGRAM TRUST FUND

For necessary expenses of Eisenhower Exchange Fellowships, Incorporated, as authorized by sections 4 and 5 of the Eisenhower Exchange Fellowship Act of 1990 (20 U.S.C. 5204–5205), all interest and earnings accruing to the Eisenhower Exchange Fellowship Program Trust Fund on or before September 30, 1997, to remain available until expended: *Provided*, That none of the funds appropriated herein shall be used to pay any salary or other compensation, or to enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376; or for purposes which are not in accordance with OMB Circulars A–110 (Uniform Administrative Requirements) and A–122 (Cost Principles for Non-profit Organizations), including the restrictions on compensation for personal services.

### ISRAELI ARAB SCHOLARSHIP PROGRAM

For necessary expenses of the Israeli Arab Scholarship Program as authorized by section 214 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452), all interest and earnings accruing to the Israeli Arab Scholarship Fund on or before September 30, 1997, to remain available until expended.

### INTERNATIONAL BROADCASTING OPERATIONS

For expenses necessary to enable the United States Information Agency, as authorized by the United States Information and Educational Exchange Act of 1948, as amended, the United States International Broadcasting Act of 1994, as amended, and Reorganization Plan No. 2 of 1977, to carry out international communication activities; $325,000,000, of which not to exceed $16,000 may be used for official receptions within the United States as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)), not to exceed $35,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085), and not to exceed $39,000 may be used for official reception and representation expenses of Radio Free Europe/Radio Liberty; and in addition, not to exceed $250,000 from fees as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e), to remain available until expended for carrying out authorized purposes; and in addition, notwithstanding any other provision of law, not to exceed $1,000,000 in monies received (including receipts from advertising, if any) by or for the use of the United States Information Agency from or in connection with broadcasting resources owned by or on behalf of the Agency, to be available until expended for carrying out authorized purposes.

### BROADCASTING TO CUBA

For expenses necessary to enable the United States Information Agency to carry out the Radio Broadcasting to Cuba Act, as amended, the Television Broadcasting to Cuba Act, and the International Broadcasting Act of 1994, including the purchase, rent, construction, and improvement of facilities for radio and television transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception, $25,000,000, to remain available until expended.

### RADIO CONSTRUCTION

For the purchase, rent, construction, and improvement of facilities for radio transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception as authorized by section 801 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471), $35,490,000, to remain available until expended, as authorized by section 704(a) of such Act of 1948 (22 U.S.C. 1477b(a)).

### EAST–WEST CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the Center for Cultural and Technical Interchange Between East and West Act of 1960 (22 U.S.C. 2054–2057), by grant to the Center for Cultural and Technical Interchange Between East and West in the State of Hawaii, $10,000,000: Provided, That none of the funds appropriated herein shall be used to pay any salary, or enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376.

## NORTH/SOUTH CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the North/South Center Act of 1991 (22 U.S.C. 2075), by grant to an educational institution in Florida known as the North/South Center, $1,495,000, to remain available until expended.

## NATIONAL ENDOWMENT FOR DEMOCRACY

For grants made by the United States Information Agency to the National Endowment for Democracy as authorized by the National Endowment for Democracy Act, $30,000,000, to remain available until expended.

## GENERAL PROVISIONS—DEPARTMENT OF STATE AND RELATED AGENCIES

SEC. 401. Funds appropriated under this title shall be available, except as otherwise provided, for allowances and differentials as authorized by subchapter 59 of 5 U.S.C.; for services as authorized by 5 U.S.C. 3109; and hire of passenger transportation pursuant to 31 U.S.C. 1343(b).

SEC. 402. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of State in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That not to exceed 5 percent of any appropriation made available for the current fiscal year for the United States Information Agency in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided further, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 22 USCA § 268c >>

SEC. 403. Funds hereafter appropriated or otherwise made available under this Act or any other Act may be expended for compensation of the United States Commissioner of the International Boundary Commission, United States and Canada, only for actual hours worked by such Commissioner.

SEC. 404. Funds appropriated by this Act for the United States Information Agency, the Arms Control and Disarmament Agency, and the Department of State may be obligated and expended notwithstanding section 701 of the United States Information and Educational Exchange Act of 1948 and section 313 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, section 53 of the Arms Control and Disarmament Act, and section 15 of the State Department Basic Authorities Act of 1956.

SEC. 405. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 406. Starting sixty days after enactment of this Act, none of the funds made available by this Act may be made available to support the activities of the Standing Consultative Commission (SCC) unless the President provides to the Congress a report containing a detailed analysis of whether the Memorandum of Understanding on Succession and the Agreed Statement regarding Demarcation agreed to by the Standing Consultative Commission on June 24, 1996, which was reaffirmed by Secretary of State Warren Christopher and Minister of Foreign Affairs Evgeny Primakov on September 23, 1996, represent substantive changes to the Anti–Ballistic Missile Treaty of 1972 and whether these agreements will require the advice and consent of the Senate of the United States.

<< 22 USCA § 214 >>

SEC. 407. Section 1 of the Act of June 4, 1920 (41 Stat. 750; 22 U.S.C. 214) is amended by—

(1) inserting before the period at the end of the first sentence the following: "; except that the Secretary of State may by regulation authorize State officials or the United States Postal Service to collect and retain the execution fee for each application for a passport accepted by such officials or by that Service"; and

(2) striking the second sentence.

This title may be cited as the "Department of State and Related Agencies Appropriations Act, 1997".

## TITLE V—RELATED AGENCIES

### DEPARTMENT OF TRANSPORTATION

### MARITIME ADMINISTRATION

### OPERATING–DIFFERENTIAL SUBSIDIES

#### (LIQUIDATION OF CONTRACT AUTHORITY)

For the payment of obligations incurred for operating-differential subsidies, as authorized by the Merchant Marine Act, 1936, as amended, $148,430,000, to remain available until expended.

### MARITIME SECURITY PROGRAM

For necessary expenses to maintain and preserve a U.S.-flag merchant fleet to serve the national security needs of the United States, $54,000,000, to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this program.

### OPERATIONS AND TRAINING

For necessary expenses of operations and training activities authorized by law, $65,000,000: Provided, That reimbursements may be made to this appropriation from receipts to the "Federal Ship Financing Fund" for administrative expenses in support of that program in addition to any amount heretofore appropriated.

### MARITIME GUARANTEED LOAN (TITLE XI) PROGRAM ACCOUNT

For the cost of guaranteed loans, as authorized by the Merchant Marine Act, 1936, $37,450,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $1,000,000,000.

In addition, for administrative expenses to carry out the guaranteed loan program, not to exceed $3,450,000, which shall be transferred to and merged with the appropriation for Operations and Training.

### ADMINISTRATIVE PROVISIONS—MARITIME ADMINISTRATION

Notwithstanding any other provision of this Act, the Maritime Administration is authorized to furnish utilities and services and make necessary repairs in connection with any lease, contract, or occupancy involving Government property under control of the Maritime Administration, and payments received therefor shall be credited to the appropriation charged with the cost thereof: Provided, That rental payments under any such lease, contract, or occupancy for items other than such utilities, services, or repairs shall be covered into the Treasury as miscellaneous receipts.

No obligations shall be incurred during the current fiscal year from the construction fund established by the Merchant Marine Act, 1936, or otherwise, in excess of the appropriations and limitations contained in this Act or in any prior appropriation Act, and all receipts which otherwise would be deposited to the credit of said fund shall be covered into the Treasury as miscellaneous receipts.

### COMMISSION FOR THE PRESERVATION OF AMERICA'S HERITAGE ABROAD

### SALARIES AND EXPENSES

For expenses for the Commission for the Preservation of America's Heritage Abroad, $206,000, as authorized by Public Law 99–83, section 1303.

### COMMISSION ON CIVIL RIGHTS

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Civil Rights, including hire of passenger motor vehicles, $8,740,000: Provided, That not to exceed $50,000 may be used to employ consultants: Provided further, That none of the funds appropriated in this paragraph shall be used to employ in excess of four full-time individuals under Schedule C of the Excepted Service exclusive of one special assistant for each Commissioner: Provided further, That none of the funds appropriated in this paragraph shall be used to reimburse Commissioners for more than 75 billable days, with the exception of the Chairperson who is permitted 125 billable days.

### COMMISSION ON IMMIGRATION REFORM

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Immigration Reform pursuant to section 141(f) of the Immigration Act of 1990, $2,196,000, to remain available until expended.

### COMMISSION ON SECURITY AND COOPERATION IN EUROPE

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Security and Cooperation in Europe, as authorized by Public Law 94–304, $1,090,000, to remain available until expended as authorized by section 3 of Public Law 99–7.

### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Equal Employment Opportunity Commission as authorized by title VII of the Civil Rights Act of 1964, as amended (29 U.S.C. 206(d) and 621–634), the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991, including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); non-monetary awards to private citizens; not to exceed $27,500,000, for payments to State and local enforcement agencies for services to the Commission pursuant to title VII of the Civil Rights Act of 1964, as amended, sections 6 and 14 of the Age Discrimination in Employment Act, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991; $239,740,000; Provided, That the Commission is authorized to make available for official reception and representation expenses not to exceed $2,500 from available funds.

### FEDERAL COMMUNICATIONS COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Communications Commission, as authorized by law, including uniforms and allowances therefor, as authorized by 5 U.S.C. 5901–02; not to exceed $600,000 for land and structure; not to exceed $500,000 for improvement and care of grounds and repair to buildings; not to exceed $4,000 for official reception and representation expenses; purchase (not to exceed sixteen) and hire of motor vehicles; special counsel fees; and services as authorized by 5 U.S.C. 3109; $189,079,000, of which not to exceed $300,000 shall remain available until September 30, 1998, for research and policy studies: Provided, That $152,523,000 of offsetting collections shall be assessed and collected pursuant to section 9 of title I of the Communications Act of 1934, as amended, and shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated shall be reduced as such offsetting collections are received during fiscal year 1997 so as to result in a final fiscal year 1997 appropriation estimated at $36,556,000:

Provided further, That any offsetting collections received in excess of $152,523,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997.

## FEDERAL MARITIME COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Maritime Commission as authorized by section 201(d) of the Merchant Marine Act of 1936, as amended (46 App. U.S.C. 1111), including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); and uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–02; $14,000,000: Provided, That not to exceed $2,000 shall be available for official reception and representation expenses.

## FEDERAL TRADE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Trade Commission, including uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–5902; services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles; and not to exceed $2,000 for official reception and representation expenses; $85,930,000: Provided, That not to exceed $300,000 shall be available for use to contract with a person or persons for collection services in accordance with the terms of 31 U.S.C. 3718, as amended: Provided further, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $27,025,000, to remain available until expended: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997: Provided further, That none of the funds made available to the Federal Trade Commission shall be available for obligation for expenses authorized by section 151 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (Public Law 102–242, 105 Stat. 2282–2285).

## GAMBLING IMPACT STUDY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Gambling Impact Study Commission, $4,000,000 to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this Commission.

## LEGAL SERVICES CORPORATION

### PAYMENT TO THE LEGAL SERVICES CORPORATION

For payment to the Legal Services Corporation to carry out the purposes of the Legal Services Corporation Act of 1974, as amended, $283,000,000, of which $274,400,000 is for basic field programs and required independent audits; $1,500,000 is for the Office of Inspector General, of which such amounts as may be necessary may be used to conduct additional audits of recipients; and $7,100,000 is for management and administration.

### ADMINISTRATIVE PROVISIONS—LEGAL SERVICES CORPORATION

SEC. 501. (a) CONTINUATION OF COMPETITIVE SELECTION PROCESS.—None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any person or entity except through a competitive selection process conducted in accordance with regulations promulgated by the Corporation in accordance with the criteria set forth in subsections (c), (d), and (e) of section 503 of Public Law 104–134 (110 Stat. 1321–52 et seq.).

(b) INAPPLICABILITY OF NONCOMPETITIVE PROCEDURES.—For purposes of the funding provided in this Act, rights under sections 1007(a)(9) and 1011 of the Legal Services Corporation Act (42 U.S.C. 2996f(a)(9) and 42 U.S.C. 2996j) shall not apply.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 502. (a) CONTINUATION OF REQUIREMENTS AND RESTRICTIONS.—None of the funds appropriated in this Act to the Legal Services Corporation shall be expended for any purpose prohibited or limited by, or contrary to any of the provisions of—

  (1) sections 501, 502, 505, 506, and 507 of Public Law 104–134 (110 Stat. 1321–51 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions as set forth in such sections, except that all references in such sections to 1995 and 1996 shall be deemed to refer instead to 1996 and 1997, respectively; and

  (2) section 504 of Public Law 104–134 (110 Stat. 1321–53 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions set forth in such section, except that—

  (A) subsection (c) of such section 504 shall not apply;

  (B) paragraph (3) of section 508(b) of Public Law 104–134 (110 Stat. 1321–58) shall apply with respect to the requirements of subsection (a)(13) of such section 504, except that all references in such section 508(b) to the date of enactment shall be deemed to refer to April 26, 1996; and

  (C) subsection (a)(11) of such section 504 shall not be construed to prohibit a recipient from using funds derived from a source other than the Corporation to provide related legal assistance to—

  (i) an alien who has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty; or

  (ii) an alien whose child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty.

(b) DEFINITIONS.—For purposes of subsection (a)(2)(C):

  (1) The term "battered or subjected to extreme cruelty" has the meaning given such term under regulations issued pursuant to subtitle G of the Violence Against Women Act of 1994 (Pub.L. 103–322; 108 Stat. 1953).

  (2) The term "related legal assistance" means legal assistance directly related to the prevention of, or obtaining of relief from, the battery or cruelty described in such subsection.

SEC. 503. (a) CONTINUATION OF AUDIT REQUIREMENTS.—The requirements of section 509 of Public Law 104–134 (110 Stat. 1321–58 et seq.), other than subsection (l) of such section, shall apply during fiscal year 1997.

  (b) REQUIREMENT OF ANNUAL AUDIT.—An annual audit of each person or entity receiving financial assistance from the Legal Services Corporation under this Act shall be conducted during fiscal year 1997 in accordance with the requirements referred to in subsection (a).


MARINE MAMMAL COMMISSION


SALARIES AND EXPENSES

  For necessary expenses of the Marine Mammal Commission as authorized by title II of Public Law 92–522, as amended, $1,189,000.


NATIONAL BANKRUPTCY REVIEW COMMISSION


SALARIES AND EXPENSES

  For necessary expenses of the National Bankruptcy Review Commission, as authorized by the Bankruptcy Reform Act of 1994, $494,000.


OUNCE OF PREVENTION COUNCIL

  For activities authorized by sections 30101 and 30102 of Public Law 103–322 (including administrative costs), $1,500,000, to remain available until expended, for the Ounce of Prevention Grant Program: Provided, That the Council may accept and use gifts and donations, both real and personal, for the purpose of aiding or facilitating the authorized activities of the Council, of which not to exceed $5,000 may be used for official reception and representation expenses.


SECURITIES AND EXCHANGE COMMISSION

## SALARIES AND EXPENSES

<< 15 USCA § 77f NOTE, 78ee NOTE >>

For necessary expenses for the Securities and Exchange Commission, including services as authorized by 5 U.S.C. 3109, the rental of space (to include multiple year leases) in the District of Columbia and elsewhere, and not to exceed $3,000 for official reception and representation expenses, $260,400,000, of which not to exceed $10,000 may be used toward funding a permanent secretariat for the International Organization of Securities Commissions, and of which not to exceed $100,000 shall be available for expenses for consultations and meetings hosted by the Commission with foreign governmental and other regulatory officials, members of their delegations, appropriate representatives and staff to exchange views concerning developments relating to securities matters, development and implementation of cooperation agreements concerning securities matters and provision of technical assistance for the development of foreign securities markets, such expenses to include necessary logistic and administrative expenses and the expenses of Commission staff and foreign invitees in attendance at such consultations and meetings including (1) such incidental expenses as meals taken in the course of such attendance, (2) any travel and transportation to or from such meetings, and (3) any other related lodging or subsistence: Provided, That immediately upon enactment of this Act, the rate of fees under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) shall increase from one-fiftieth of one percentum to one-thirty-third of one percentum, and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover costs of services of the securities registration process: Provided further, That effective January 1, 1997, every national securities association shall pay to the Commission a fee at a rate of one-three-hundredth of one percentum of the aggregate dollar amount of sales transacted by or through any member of such association otherwise than on a national securities exchange (other than bonds, debentures, and other evidences of indebtedness) subject to prompt last sale reporting pursuant to the rules of the Commission or a registered national securities association, excluding any sales for which a fee is paid under section 31 of the Securities Exchange Act of 1934 (15 U.S.C. 78ee), and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover the costs to the Government of the supervision and regulation of securities markets and securities professionals: Provided further, That the fee due from every national securities association shall be paid on or before September 30, 1997, with respect to transactions and sales occurring during the period beginning on January 1, 1997, and ending at the close of August 31, 1997: Provided further, That the total amount appropriated for fiscal year 1997 under this heading shall be reduced as all such offsetting fees are deposited to this appropriation so as to result in a final total fiscal year 1997 appropriation from the General Fund estimated at not more than $37,778,000: Provided further, That any such fees collected in excess of $222,622,000 shall remain available until expended but shall not be available for obligation until October 1, 1997.

## SMALL BUSINESS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses, not otherwise provided for, of the Small Business Administration as authorized by Public Law 103–403, including hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344, and not to exceed $3,500 for official reception and representation expenses, $223,547,000, of which $1,000,000 shall only be available for obligation and expenditure for projects jointly developed, implemented and administered with the Minority Business Development Agency of the Department of Commerce: Provided, That the Administrator is authorized to charge fees to cover the cost of publications developed by the Small Business Administration, and certain loan servicing activities: Provided further, That notwithstanding 31 U.S.C. 3302, revenues received from all such activities shall be credited to this account, to be available for carrying out these purposes without further appropriations: Provided further, That $75,500,000 shall be available to fund grants for performance in fiscal year 1997 or fiscal year 1998 as authorized by section 21 of the Small Business Act, as amended. In addition, for expenses not otherwise provided for, of the Small Business Administration, $11,500,000, of which: $3,000,000 shall be available for a grant to continue the WVHTC Foundation outreach program to assist small business development; $7,000,000 shall be available for a grant to the Center for Rural Development in Somerset, Kentucky, for small business and rural technology development assistance; $1,000,000 shall be available for a grant to Indiana State University for the renovation and equipping of a training facility, to assist in creating small business and economic development opportunities; and $500,000 shall be available for a

continuation grant to the Center for Entrepreneurial Opportunity in Greensburg, Pennsylvania, to provide for small business consulting and assistance.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11, as amended by Public Law 100–504), $9,000,000.

## BUSINESS LOANS PROGRAM ACCOUNT

For the cost of direct loans, $1,691,000, and for the cost of guaranteed loans, $182,017,000, as authorized by 15 U.S.C. 631 note, of which $2,317,000, to be available until expended, shall be for the Microloan Guarantee Program, and of which $40,510,000 shall remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That during fiscal year 1997, commitments to guarantee loans under section 503 of the Small Business Investment Act of 1958, as amended, shall not exceed the amount of financings authorized under section 20(n)(2)(B) of the Small Business Act, as amended.

In addition, for administrative expenses to carry out the direct and guaranteed loan programs, $94,000,000, which may be transferred to and merged with the appropriations for Salaries and Expenses.

## DISASTER LOANS PROGRAM ACCOUNT

For the cost of direct loans authorized by section 7(b) of the Small Business Act, as amended, $105,432,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

In addition, for administrative expenses to carry out the direct loan program, $86,500,000, including not to exceed $500,000 for the Office of Inspector General of the Small Business Administration for audits and reviews of disaster loans and the disaster loan program, and said sums may be transferred to and merged with appropriations for Salaries and Expenses and Office of Inspector General.

## SURETY BOND GUARANTEES REVOLVING FUND

For additional capital for the "Surety Bond Guarantees Revolving Fund", authorized by the Small Business Investment Act, as amended, $3,730,000, to remain available without fiscal year limitation as authorized by 15 U.S.C. 631 note.

## ADMINISTRATIVE PROVISION—SMALL BUSINESS ADMINISTRATION

SEC. 504. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Small Business Administration in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## STATE JUSTICE INSTITUTE

## SALARIES AND EXPENSES

For necessary expenses of the State Justice Institute, as authorized by the State Justice Institute Authorization Act of 1992 (Public Law 102–572 (106 Stat. 4515–4516)), $6,000,000, to remain available until expended: Provided, That not to exceed $2,500 shall be available for official reception and representation expenses.

## TITLE VI—GENERAL PROVISIONS

SEC. 601. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

SEC. 602. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 603. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available

for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

SEC. 604. If any provision of this Act or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act and the application of each provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

SEC. 605. (a) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds which (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes any functions, or activities presently performed by Federal employees; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

(b) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for activities, programs, or projects through a reprogramming of funds in excess of $500,000 or 10 percent, whichever is less, that (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or (3) results from any general savings from a reduction in personnel which would result in a change in existing programs, activities, or projects as approved by Congress; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

SEC. 606. None of the funds made available in this Act may be used for the construction, repair (other than emergency repair), overhaul, conversion, or modernization of vessels for the National Oceanic and Atmospheric Administration in shipyards located outside of the United States.

SEC. 607. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 608. None of the funds made available in this Act may be used to implement, administer, or enforce any guidelines of the Equal Employment Opportunity Commission covering harassment based on religion, when it is made known to the Federal entity or official to whom such funds are made available that such guidelines do not differ in any respect from the proposed guidelines published by the Commission on October 1, 1993 (58 Fed.Reg. 51266).

SEC. 609. None of the funds appropriated or otherwise made available by this Act may be obligated or expended to pay for any cost incurred for (1) opening or operating any United States diplomatic or consular post in the Socialist Republic of Vietnam that was not operating on July 11, 1995; (2) expanding any United States diplomatic or consular post in the Socialist Republic of Vietnam that was operating on July 11, 1995; or (3) increasing the total number of personnel assigned to United States diplomatic or consular posts in the Socialist Republic of Vietnam above the levels existing on July 11, 1995, unless the President certifies within 60 days, based upon all information available to the United States Government that the Government of the Socialist Republic of Vietnam is cooperating in full faith with the United States in the following four areas:

(1) Resolving discrepancy cases, live sightings and field activities,

(2) Recovering and repatriating American remains,

(3) Accelerating efforts to provide documents that will help lead to fullest possible accounting of POW/MIA's.

(4) Providing further assistance in implementing trilateral investigations with Laos.

SEC. 610. None of the funds made available by this Act may be used for any United Nations undertaking when it is made known to the Federal official having authority to obligate or expend such funds (1) that the United Nations undertaking is a peacekeeping mission, (2) that such undertaking will involve United States Armed Forces under the command or operational control of a foreign national, and (3) that the President's military advisors have not submitted to the President a recommendation that such involvement is in the national security interests of the United States and the President has not submitted to the Congress such a recommendation.

SEC. 611. None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system—

(1) in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(2) the viewing of R, X, and NC–17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates, or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

Sec. 612. None of the funds made available in title II for the National Oceanic and Atmospheric Administration (NOAA) under the heading "Fleet Modernization, Shipbuilding and Conversion" may be used to implement sections 603, 604, and 605 of Public Law 102–567: Provided, That NOAA may develop a modernization plan for its fisheries research vessels that takes fully into account opportunities for contracting for fisheries surveys.

SEC. 613. Any costs incurred by a Department or agency funded under this Act resulting from personnel actions taken in response to funding reductions included in this Act shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 614. None of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity.

SEC. 615. Of the funds appropriated in this Act under the heading "OFFICE OF JUSTICE PROGRAMS—STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE" and "Community Oriented Policing Services Program", not more than ninety percent of the amount to be awarded to an entity under the Local Law Enforcement Block Grant and part Q of title I of the Omnibus Crime Control and Safe Streets Act of 1968 shall be made available to such an entity when it is made known to the Federal official having authority to obligate or expend such funds that the entity that employs a public safety officer (as such term is defined in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968) does not provide such a public safety officer who retires or is separated from service due to injury suffered as the direct and proximate result of a personal injury sustained in the line of duty while responding to an emergency situation or a hot pursuit (as such terms are defined by State law) with the same or better level of health insurance benefits that are paid by the entity at the time of retirement or separation.

<< 35 USCA § 287 >>

SEC. 616. LIMITATION ON PATENT INFRINGEMENTS RELATING TO A MEDICAL PRACTITIONER'S PERFORMANCE OF A MEDICAL ACTIVITY.

Section 287 of title 35, United States Code, is amended by adding at the end the following new subsection:

(c)(1) With respect to a medical practitioner's performance of a medical activity that constitutes an infringement under section 271(a) or (b) of this title, the provisions of sections 281, 283, 284, and 285 of this title shall not apply against the medical practitioner or against a related health care entity with respect to such medical activity.

(2) For the purposes of this subsection:

(A) the term "medical activity" means the performance of a medical or surgical procedure on a body, but shall not include (i) the use of a patented machine, manufacture, or composition of matter in violation of such patent, (ii) the practice of a patented use of a composition of matter in violation of such patent, or (iii) the practice of a process in violation of a biotechnology patent.

(B) the term "medical practitioner" means any natural person who is licensed by a State to provide the medical activity described in subsection (c)(1) or who is acting under the direction of such person in the performance of the medical activity.

(C) the term "related health care entity" shall mean an entity with which a medical practitioner has a professional affiliation under which the medical practitioner performs the medical activity, including but not limited to a nursing home, hospital, university, medical school, health maintenance organization, group medical practice, or a medical clinic.

(D) the term "professional affiliation" shall mean staff privileges, medical staff membership, employment or contractual relationship, partnership or ownership interest, academic appointment, or other affiliation under which a medical practitioner provides the medical activity on behalf of, or in association with, the health care entity.

(E) the term "body" shall mean a human body, organ or cadaver, or a nonhuman animal used in medical research or instruction directly relating to the treatment of humans.

(F) the term "patented use of a composition of matter" does not include a claim for a method of performing a medical or surgical procedure on a body that recites the use of a composition of matter where the use of that composition of matter does not directly contribute to achievement of the objective of the claimed method.

(G) the term "State" shall mean any state or territory of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

(3) This subsection does not apply to the activities of any person, or employee or agent of such person (regardless of whether such person is a tax exempt organization under section 501(c) of the Internal Revenue Code), who is engaged in the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), where such activities are:

(A) directly related to the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), and

(B) regulated under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, or the Clinical Laboratories Improvement Act.

(4) This subsection shall not apply to any patent issued before the date of enactment of this subsection.

SEC. 617. Effective with the enactment of this Act and in any fiscal year hereafter, section 8 of Public Law 96–132 is hereby repealed.

<< 46 App. USCA § 1273a NOTE >>

SEC. 618. (a) IN GENERAL.—The Secretary may issue a guarantee or a commitment to guarantee obligations under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), upon such terms as the Secretary may prescribe, to assist in the reactivation and modernization of any shipyard in the United States that is closed on the date of the enactment of this Act, if the Secretary finds that—

(1) the closed shipyard historically built military vessels and responsible entities now seek to reopen it as an internationally competitive commercial shipyard;

(2)(A) the closed shipyard has been designated by the President as a public-private partnership project; or

(B) has a reuse plan approved by the Navy in which commercial shipbuilding and repair are primary activities and has a revolving economic conversion fund approved by the Department of Defense; and

(3) the State in which the shipyard is located, and each other involved State, or a State-chartered agency, is making a significant financial investment in the overall cost of reactivation and modernization as its contribution to the reactivation and modernization project, in addition to the funds required by subsection (d)(2) of this section.

(b) WAIVERS.—Notwithstanding any other provision of title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), the Secretary shall not apply the requirements of section 1104A(d) of that Act when issuing a guarantee or a commitment to guarantee an obligation under this section.

(c) CONDITIONS.—The Secretary shall impose such conditions on the issuance of a guarantee or a commitment to guarantee under this section as are necessary to protect the interests of the United States from the risk of a default. The Secretary shall consider the interdependency of such shipyard modernization and reactivation projects and related vessel loan guarantee requests pending under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.) before issuing a guarantee or a commitment to guarantee under this section.

(d) FUNDING PROVISIONS.—

  (1) The Secretary may not guarantee or commit to guarantee obligations under this section that exceed $50,000,000 in the aggregate.

  (2) The amount of appropriated funds required by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) in advance of the Secretary's issuance of a guarantee or a commitment to guarantee under this section shall be provided by the State in which the shipyard is located, and other involved States, or by a State-chartered agency, and deposited by the Secretary in the financing account established under the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) for loan guarantees issued by the Secretary under title XI of the Merchant Marine Act of 1936 (46 App.U.S.C. 1271 et seq.). No federally appropriated funds shall be available for this purpose. The funds deposited into that financing account shall be held and applied by the Secretary in accordance with the provisions of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.), except that, unless the Secretary shall have earlier paid an obligee or been required to pay an obligee pursuant to the terms of a loan guarantee, the funds deposited in that financing account shall be returned, upon the expiration of the Secretary's loan guarantee, to the State, States, or State-chartered agency which originally provided the funds to the Secretary.

  (3) Notwithstanding the provisions of any other law or regulation, the cost (as that term is defined by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.)) of a guarantee or commitment to guarantee issued under this section—

    (A) may only be determined with reference to the merits of the specific closed shipyard reactivation project which is the subject of that guarantee or commitment to guarantee, without reference to any other project, type of project, or averaged risk; and

    (B) may not be used in determining the cost of any other project, type of project, or averaged risk applicable to guarantees or commitments to guarantee issued under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.).

(e) SUNSET.—No commitment to guarantee obligations under this section shall be issued by the Secretary after one year after the date of enactment of this section.

(f) DEFINITION.—As used in this section, the term "Secretary" means the Secretary of Transportation.

TITLE VII—RESCISSIONS

DEPARTMENT OF JUSTICE

GENERAL ADMINISTRATION

WORKING CAPITAL FUND

(RESCISSION)

Of the unobligated balances available under this heading on October 31, 1996, $30,000,000 are rescinded.

IMMIGRATION AND NATURALIZATION SERVICE

IMMIGRATION EMERGENCY FUND

(RESCISSION)

Of the unobligated balances available under this heading $34,779,000 are rescinded.

TITLE VIII—FISCAL YEAR 1996 SUPPLEMENTAL AND RESCISSION

DEPARTMENT OF JUSTICE

FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

In addition to funds made available under this heading, $40,000,000, which shall remain available until September 30, 1997: Provided, That these funds shall be available upon enactment of this Act: Provided further, That these funds shall only be available if enacted by September 30, 1996.

## (RESCISSION)

Of the unobligated balances made available under this heading until September 30, 1996, $40,000,000 are rescinded: Provided, That these funds shall only be available for rescission if enacted by September 30, 1996.

## TITLE IX—SUPPLEMENTAL APPROPRIATIONS

## DEPARTMENT OF COMMERCE

## ECONOMIC DEVELOPMENT ADMINISTRATION

## ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For an additional amount for "Economic Development Assistance Programs" for emergency infrastructure expenses resulting from Hurricane Fran and Hurricane Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## RELATED AGENCY

## SMALL BUSINESS ADMINISTRATION

## DISASTER LOANS PROGRAM ACCOUNT

For an additional amount for "Disaster Loans Program Account" for emergency expenses resulting from Hurricanes Fran and Hortense and other disasters, $113,000,000 for the cost of direct loans, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974; and for administrative expenses to carry out the disaster loan program, $22,000,000, to remain available until expended, which may be transferred to and merged with "Salaries and Expenses": Provided further, That both amounts are hereby designated by Congress as emergency requirements pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This Act may be cited as the "Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997".

(b) For programs, projects or activities in the Department of Defense Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Department of Defense for the fiscal year ending September 30, 1997, and for other purposes

## TITLE I

## MILITARY PERSONNEL

## MILITARY PERSONNEL, ARMY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Army on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $20,633,998,000.

## MILITARY PERSONNEL, NAVY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Navy on active duty (except members of the Reserve provided for elsewhere); midshipmen, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $16,986,976,000.

## MILITARY PERSONNEL, MARINE CORPS

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Marine Corps on active duty (except members of the Reserve provided for elsewhere); and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $6,111,728,000.

## MILITARY PERSONNEL, AIR FORCE

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Air Force on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $17,069,490,000.

## RESERVE PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army Reserve on active duty under sections 10211, 10302, and 3038 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $2,073,479,000.

## RESERVE PERSONNEL, NAVY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Navy Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,405,606,000.

## RESERVE PERSONNEL, MARINE CORPS

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Marine Corps Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Marine Corps platoon leaders class, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $388,643,000.

## RESERVE PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air Force Reserve on active duty under sections 10211, 10305, and 8038 of title 10, United States Code, or while serving on active duty under section

12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Air Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $783,697,000.

## NATIONAL GUARD PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army National Guard while on duty under section 10211, 10302, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $3,266,393,000.

## NATIONAL GUARD PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air National Guard on duty under section 10211, 10305, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,296,490,000.

## TITLE II

## OPERATION AND MAINTENANCE

## OPERATION AND MAINTENANCE, ARMY

## (INCLUDING TRANSFER OF FUNDS)

<< 43 USCA § 1471g >>

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Army, as authorized by law; and not to exceed $11,437,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Army, and payments may be made on his certificate of necessity for confidential military purposes; $17,519,340,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund: Provided, That during the current fiscal year and hereafter, funds appropriated under this paragraph may be made available to the Department of the Interior to support the Memorial Day and Fourth of July ceremonies and activities in the National Capital Region: Provided further, That of the funds appropriated in this paragraph, not less than $300,000,000 shall be made available only for conventional ammunition care and maintenance.

## OPERATION AND MAINTENANCE, NAVY

## (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Navy and the Marine Corps, as authorized by law; and not to exceed $3,995,000, can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Navy, and payments may be made on his certificate of necessity for confidential military purposes; $20,061,961,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

## OPERATION AND MAINTENANCE, MARINE CORPS

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Marine Corps, as authorized by law; $2,254,119,000.

## OPERATION AND MAINTENANCE, AIR FORCE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Air Force, as authorized by law; and not to exceed $8,362,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Air Force, and payments may be made on his certificate of necessity for confidential military purposes; $17,263,193,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

## OPERATION AND MAINTENANCE, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of activities and agencies of the Department of Defense (other than the military departments), as authorized by law; $10,044,200,000, of which not to exceed $25,000,000 may be available for the CINC initiative fund account; and of which not to exceed $28,500,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of Defense, and payments may be made on his certificate of necessity for confidential military purposes: Provided, That of the funds appropriated under this heading, $20,000,000 shall be made available only for use in federally owned education facilities located on military installations for the purpose of transferring title of such facilities to the local education agency: Provided further, That of the funds appropriated under this heading, $1,000,000 is available, by grant or other transfer, to the Harnett County School Board, Lillington, North Carolina, for use by the school board for the education of dependents of members of the Armed Forces and employees of the Department of Defense located at Fort Bragg and Pope Air Force Base, North Carolina.

## OPERATION AND MAINTENANCE, ARMY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Army Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,119,436,000.

## OPERATION AND MAINTENANCE, NAVY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Navy Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $886,027,000.

## OPERATION AND MAINTENANCE, MARINE CORPS RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Marine Corps Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $109,667,000.

## OPERATION AND MAINTENANCE, AIR FORCE RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Air Force Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,496,553,000.

## OPERATION AND MAINTENANCE, ARMY NATIONAL GUARD

For expenses of training, organizing, and administering the Army National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, and repairs to structures and facilities; hire of passenger motor vehicles; personnel services in the National Guard Bureau; travel expenses (other than mileage), as authorized by law

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 293 of 1021   PageID 7163

for Army personnel on active duty, for Army National Guard division, regimental, and battalion commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; supplying and equipping the Army National Guard as authorized by law; and expenses of repair, modification, maintenance, and issue of supplies and equipment (including aircraft); $2,254,477,000.

## OPERATION AND MAINTENANCE, AIR NATIONAL GUARD

For operation and maintenance of the Air National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, repair, and other necessary expenses of facilities for the training and administration of the Air National Guard, including repair of facilities, maintenance, operation, and modification of aircraft; transportation of things, hire of passenger motor vehicles; supplies, materials, and equipment, as authorized by law for the Air National Guard; and expenses incident to the maintenance and use of supplies, materials, and equipment, including such as may be furnished from stocks under the control of agencies of the Department of Defense; travel expenses (other than mileage) on the same basis as authorized by law for Air National Guard personnel on active Federal duty, for Air National Guard commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; $2,716,379,000.

## OVERSEAS CONTINGENCY OPERATIONS TRANSFER FUND

### (INCLUDING TRANSFER OF FUNDS)

For expenses directly relating to Overseas Contingency Operations by United States military forces; $1,140,157,000: Provided, That the Secretary of Defense may transfer these funds only to operation and maintenance accounts within this title: Provided further, That the funds transferred shall be merged with and shall be available for the same purposes and for the same time period, as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any other transfer authority contained elsewhere in this Act.

## UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

For salaries and expenses necessary for the United States Court of Appeals for the Armed Forces; $6,797,000, of which not to exceed $2,500 can be used for official representation purposes.

## ENVIRONMENTAL RESTORATION, ARMY

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Army, $339,109,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Army, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: Provided further, That not more than twenty-five percent of funds provided under this heading may be obligated for environmental remediation by the Corps of Engineers under total environmental remediation contracts.

## ENVIRONMENTAL RESTORATION, NAVY

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Navy, $287,788,000, to remain available until transferred: Provided, That the Secretary of the Navy shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Navy, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Navy, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a

determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, AIR FORCE

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Air Force, $394,010,000, to remain available until transferred: Provided, That the Secretary of the Air Force shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Air Force, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Air Force, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Defense, $36,722,000, to remain available until transferred: Provided, That the Secretary of Defense shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of Defense, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of Defense, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, FORMERLY USED DEFENSE SITES

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Army, $256,387,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris at sites formerly used by the Department of Defense, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID

For expenses relating to the Overseas Humanitarian, Disaster, and Civic Aid programs of the Department of Defense (consisting of the programs provided under sections 401, 402, 404, 2547, and 2551 of title 10, United States Code); $49,000,000, to remain available until September 30, 1998.

## FORMER SOVIET UNION THREAT REDUCTION

For assistance to the republics of the former Soviet Union, including assistance provided by contract or by grants, for facilitating the elimination and the safe and secure transportation and storage of nuclear, chemical and other weapons; for establishing programs to prevent the proliferation of weapons, weapons components, and weapon-related technology and expertise; for programs relating to the training and support of defense and military personnel for demilitarization and protection of weapons, weapons components and weapons technology and expertise; $327,900,000, to remain available until expended.

## QUALITY OF LIFE ENHANCEMENTS, DEFENSE

For expenses, not otherwise provided for, resulting from unfunded shortfalls in the repair and maintenance of real property of the Department of Defense (including military housing and barracks); $600,000,000, for the maintenance of real property

of the Department of Defense (including minor construction and major maintenance and repair), which shall remain available for obligation until September 30, 1998, as follows:

Army, $149,000,000;

Navy, $108,000,000;

Marine Corps, $45,000,000;

Air Force, $108,000,000;

Army Reserve, $18,000,000;

Navy Reserve, $18,000,000;

Marine Corps Reserve, $9,000,000;

Air Force Reserve, $15,000,000;

Army National Guard, $86,000,000; and

Air National Guard, $44,000,000.

## TITLE III

## PROCUREMENT

### AIRCRAFT PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,348,434,000, to remain available for obligation until September 30, 1999.

### MISSILE PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of missiles, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,041,867,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

For construction, procurement, production, and modification of weapons and tracked combat vehicles, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,470,286,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $33,100,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

### PROCUREMENT OF AMMUNITION, ARMY

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment,

appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,127,149,000, to remain available for obligation until September 30, 1999.

## OTHER PROCUREMENT, ARMY

For construction, procurement, production, and modification of vehicles, including tactical, support, and non-tracked combat vehicles; the purchase of not to exceed 14 passenger motor vehicles for replacement only; communications and electronic equipment; other support equipment; spare parts, ordnance, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $3,172,485,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $2,400,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

## AIRCRAFT PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $7,027,010,000, to remain available for obligation until September 30, 1999.

## WEAPONS PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of missiles, torpedoes, other weapons, and related support equipment including spare parts, and accessories therefor; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $1,389,913,000, to remain available for obligation until September 30, 1999: Provided, That in addition to the foregoing purposes, the funds appropriated above under this heading shall be available to liquidate reported deficiencies in appropriations provided under this heading in prior Department of Defense appropriations acts, to the extent such deficiencies cannot otherwise be liquidated pursuant to 31 U.S.C. 1553(b).

## PROCUREMENT OF AMMUNITION, NAVY AND MARINE CORPS

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $289,695,000, to remain available for obligation until September 30, 1999.

## SHIPBUILDING AND CONVERSION, NAVY

For expenses necessary for the construction, acquisition, or conversion of vessels as authorized by law, including armor and armament thereof, plant equipment, appliances, and machine tools and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; procurement of critical, long leadtime components and designs for vessels to be constructed or converted in the future; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title, as follows:

For continuation of the SSN–21 attack submarine program, $649,071,000;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

NSSN–1 (AP), $296,186,000;

NSSN–2 (AP), $501,000,000;

CVN Refuelings, $237,029,000;

DDG–51 destroyer program, $3,609,072,000;

Oceanographic ship program, $54,400,000;

Oceanographic ship SWATH, $45,000,000;

LCAC landing craft air cushion program (AP–CY), $3,000,000; and

For craft, outfitting, post delivery, conversions, and first destination transportation, $218,907,000;

In all: $5,613,665,000, to remain available for obligation until September 30, 2001: Provided, That additional obligations may be incurred after September 30, 2001, for engineering services, tests, evaluations, and other such budgeted work that must be performed in the final stage of ship construction: Provided further, That none of the funds herein provided for the construction or conversion of any naval vessel to be constructed in shipyards in the United States shall be expended in foreign facilities for the construction of major components of such vessel: Provided further, That none of the funds herein provided shall be used for the construction of any naval vessel in foreign shipyards.

## OTHER PROCUREMENT, NAVY

For procurement, production, and modernization of support equipment and materials not otherwise provided for, Navy ordnance (except ordnance for new aircraft, new ships, and ships authorized for conversion); expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $3,067,944,000, to remain available for obligation until September 30, 1999.

## PROCUREMENT, MARINE CORPS

For expenses necessary for the procurement, manufacture, and modification of missiles, armament, military equipment, spare parts, and accessories therefor; plant equipment, appliances, and machine tools, and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; vehicles for the Marine Corps, including the purchase of not to exceed 88 passenger motor vehicles for replacement only; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired and construction prosecuted thereon prior to approval of title; $569,073,000, to remain available for obligation until September 30, 1999.

## AIRCRAFT PROCUREMENT, AIR FORCE

For construction, procurement, and modification of aircraft and equipment, including armor and armament, specialized ground handling equipment, and training devices, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $6,404,980,000, to remain available for obligation until September 30, 1999.

## MISSILE PROCUREMENT, AIR FORCE

For construction, procurement, and modification of missiles, spacecraft, rockets, and related equipment, including spare parts and accessories therefor, ground handling equipment, and training devices; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $2,297,145,000, to remain available for obligation until September 30, 1999.

## PROCUREMENT OF AMMUNITION, AIR FORCE

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $293,153,000, to remain available for obligation until September 30, 1999.

## OTHER PROCUREMENT, AIR FORCE

For procurement and modification of equipment (including ground guidance and electronic control equipment, and ground electronic and communication equipment), and supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 506 passenger motor vehicles for replacement only; the purchase of 1 vehicle required for physical security of personnel, notwithstanding price limitations applicable to passenger vehicles but not to exceed $287,000 per vehicle; and expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon, prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $5,944,680,000, to remain available for obligation until September 30, 1999.

## PROCUREMENT, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments) necessary for procurement, production, and modification of equipment, supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 389 passenger motor vehicles for replacement only; expansion of public and private plants, equipment, and installation thereof in such plants, erection of structures, and acquisition of land for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $1,978,005,000, to remain available for obligation until September 30, 1999.

## NATIONAL GUARD AND RESERVE EQUIPMENT

For procurement of aircraft, missiles, tracked combat vehicles, ammunition, other weapons, and other procurement for the reserve components of the Armed Forces; $780,000,000, to remain available for obligation until September 30, 1999: Provided, That the Chiefs of the Reserve and National Guard components shall, not later than 30 days after the enactment of this Act, individually submit to the congressional defense committees the modernization priority assessment for their respective Reserve or National Guard component.

## TITLE IV

## RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, ARMY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $5,062,763,000, to remain available for obligation until September 30, 1998.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $8,208,946,000, to remain available for obligation until September 30, 1998: Provided, That funds appropriated in this paragraph which are available for the V–22 may be used to meet unique requirements of the Special Operations Forces.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, AIR FORCE

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $14,499,606,000, to remain available for obligation until September 30, 1998: Provided, That not less than $1,000,000 of the funds appropriated in this paragraph shall be made available only to assess the budgetary, cost, technical, operational, training, and safety issues associated with a decision to eliminate development of the F–22B two-seat training variant of the F–22 advanced tactical fighter: Provided further, That the assessment required by the preceding proviso shall be submitted, in classified and unclassified versions, by the Secretary of the Air Force to the congressional defense committees not later than February 15, 1997: Provided further, That of the funds made available in this paragraph, $10,000,000 shall be only for development of reusable launch vehicle technologies.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments), necessary for basic and applied scientific research, development, test and evaluation; advanced research projects as may be designated and determined by the Secretary of Defense, pursuant to law; maintenance, rehabilitation, lease, and operation of facilities and equipment; $9,362,800,000, to remain available for obligation until September 30, 1998: Provided, That not less than $304,171,000 of the funds appropriated in this paragraph shall be made available only for the Sea–Based Wide Area Defense (Navy Upper–Tier) program.

### DEVELOPMENTAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, of independent activities of the Director, Test and Evaluation in the direction and supervision of developmental test and evaluation, including performance and joint developmental testing and evaluation; and administrative expenses in connection therewith; $282,038,000, to remain available for obligation until September 30, 1998.

### OPERATIONAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, necessary for the independent activities of the Director, Operational Test and Evaluation in the direction and supervision of operational test and evaluation, including initial operational test and evaluation which is conducted prior to, and in support of, production decisions; joint operational testing and evaluation; and administrative expenses in connection therewith; $24,968,000, to remain available for obligation until September 30, 1998.

### TITLE V—REVOLVING AND MANAGEMENT FUNDS

### DEFENSE BUSINESS OPERATIONS FUND

For the Defense Business Operations Fund; $947,900,000.

### NATIONAL DEFENSE SEALIFT FUND

For National Defense Sealift Fund programs, projects, and activities, and for expenses of the National Defense Reserve Fleet, as established by section 11 of the Merchant Ship Sales Act of 1946 (50 U.S.C.App. 1744); $1,428,002,000, to remain available until expended: Provided, That none of the funds provided in this paragraph shall be used to award a new contract that provides for the acquisition of any of the following major components unless such components are manufactured in the United States: auxiliary equipment, including pumps, for all ship-board services; propulsion system components (that is; engines, reduction gears, and propellers); shipboard cranes; and spreaders for shipboard cranes: Provided further, That the exercise of an option in a contract awarded through the obligation of previously appropriated funds shall not be considered to be the award of a new contract: Provided further, That the Secretary of the military department responsible for such procurement may waive these restrictions on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

### TITLE VI—OTHER DEPARTMENT OF DEFENSE PROGRAMS

### DEFENSE HEALTH PROGRAM

For expenses, not otherwise provided for, for medical and health care programs of the Department of Defense, as authorized by law; $10,207,308,000, of which $9,937,838,000 shall be for Operation and maintenance, of which not to exceed three percent

shall remain available until September 30, 1998; and of which $269,470,000, to remain available for obligation until September 30, 1999, shall be for Procurement: Provided, That of the funds appropriated under this heading, $14,500,000 shall be made available for obtaining emergency communications services for members of the Armed Forces and their families from the American National Red Cross: Provided further, That notwithstanding any other provision of law, of the funds provided under this heading, the Secretary of Defense is directed to use and obligate, within thirty days of enactment of this Act, not less than $3,400,000 only to permit private sector or non-Federal physicians who have used and will use the antibacterial treatment method based upon the excretion of dead and decaying spherical bacteria to work in conjunction with the Walter Reed Army Medical Center on a treatment protocol and related studies for Desert Storm Syndrome affected veterans.

## CHEMICAL AGENTS AND MUNITIONS DESTRUCTION, DEFENSE

 For expenses, not otherwise provided for, necessary for the destruction of the United States stockpile of lethal chemical agents and munitions in accordance with the provisions of section 1412 of the Department of Defense Authorization Act, 1986 (50 U.S.C. 1521), and for the destruction of other chemical warfare materials that are not in the chemical weapon stockpile, $758,447,000, of which $478,947,000 shall be for Operation and maintenance, $191,200,000 shall be for Procurement to remain available until September 30, 1999, and $88,300,000 shall be for Research, development, test and evaluation to remain available until September 30, 1998: Provided, That of the funds made available under this heading, $1,000,000 shall be available until expended only for a Johnston Atoll off-island leave program: Provided further, That notwithstanding any other provision of law, the Secretaries concerned may, pursuant to uniform regulations prescribe travel and transportation allowances for travel by participants in the off-island leave program.

## DRUG INTERDICTION AND COUNTER–DRUG ACTIVITIES, DEFENSE

### (INCLUDING TRANSFER OF FUNDS)

 For drug interdiction and counter-drug activities of the Department of Defense, for transfer to appropriations available to the Department of Defense for military personnel of the reserve components serving under the provisions of title 10 and title 32, United States Code; for Operation and maintenance; for Procurement; and for Research, development, test and evaluation; $807,800,000: Provided, That the funds appropriated by this paragraph shall be available for obligation for the same time period and for the same purpose as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any transfer authority contained elsewhere in this Act.

## OFFICE OF THE INSPECTOR GENERAL

 For expenses and activities of the Office of the Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended; $139,157,000, of which $137,157,000 shall be for Operation and maintenance, of which not to exceed $500,000 is available for emergencies and extraordinary expenses to be expended on the approval or authority of the Inspector General, and payments may be made on his certificate of necessity for confidential military purposes; and of which $2,000,000, to remain available until September 30, 1999, shall be for Procurement.

## TITLE VII

## RELATED AGENCIES

## CENTRAL INTELLIGENCE AGENCY RETIREMENT AND DISABILITY SYSTEM FUND

 For payment to the Central Intelligence Agency Retirement and Disability System Fund, to maintain proper funding level for continuing the operation of the Central Intelligence Agency Retirement and Disability System; $196,400,000.

## INTELLIGENCE COMMUNITY MANAGEMENT ACCOUNT

 For necessary expenses of the Intelligence Community Management Account; $129,164,000: Provided, That of the funds appropriated under this heading, $27,000,000 shall be transferred to the Department of Justice for the National Drug Intelligence Center to support the Department of Defense's counterdrug monitoring and detection responsibilities.

## PAYMENT TO KAHO'OLAWE ISLAND CONVEYANCE,
## REMEDIATION, AND ENVIRONMENTAL RESTORATION FUND

For payment to Kaho'olawe Island Conveyance, Remediation, and Environmental Restoration Fund, as authorized by law; $10,000,000, to remain available until expended.

## NATIONAL SECURITY EDUCATION TRUST FUND

For the purposes of title VIII of Public Law 102–183, $5,100,000, to be derived from the National Security Education Trust Fund, to remain available until expended.

## TITLE VIII

### GENERAL PROVISIONS

SEC. 8001. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

<< 10 USCA § 1584 NOTE >>

SEC. 8002. During the current fiscal year, provisions of law prohibiting the payment of compensation to, or employment of, any person not a citizen of the United States shall not apply to personnel of the Department of Defense: Provided, That salary increases granted to direct and indirect hire foreign national employees of the Department of Defense funded by this Act shall not be at a rate in excess of the percentage increase authorized by law for civilian employees of the Department of Defense whose pay is computed under the provisions of section 5332 of title 5, United States Code, or at a rate in excess of the percentage increase provided by the appropriate host nation to its own employees, whichever is higher: Provided further, That this section shall not apply to Department of Defense foreign service national employees serving at United States diplomatic missions whose pay is set by the Department of State under the Foreign Service Act of 1980: Provided further, That the limitations of this provision shall not apply to foreign national employees of the Department of Defense in the Republic of Turkey.

SEC. 8003. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year, unless expressly so provided herein.

SEC. 8004. No more than 20 per centum of the appropriations in this Act which are limited for obligation during the current fiscal year shall be obligated during the last two months of the fiscal year: Provided, That this section shall not apply to obligations for support of active duty training of reserve components or summer camp training of the Reserve Officers' Training Corps.

(TRANSFER OF FUNDS)

SEC. 8005. Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $2,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: Provided, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by Congress: Provided further, That the Secretary of Defense shall notify the Congress promptly of all transfers made pursuant to this authority or any other authority in this Act: Provided further, That no part of the funds in this Act shall be available to prepare or present a request to the Committees on Appropriations for reprogramming of funds, unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which reprogramming is requested has been denied by the Congress.

(TRANSFER OF FUNDS)

SEC. 8006. During the current fiscal year, cash balances in working capital funds of the Department of Defense established pursuant to section 2208 of title 10, United States Code, may be maintained in only such amounts as are necessary at any time for cash disbursements to be made from such funds: Provided, That transfers may be made between such funds and the "Foreign Currency Fluctuations, Defense" and "Operation and Maintenance" appropriation accounts in such amounts as may be determined by the Secretary of Defense, with the approval of the Office of Management and Budget, except that such transfers

may not be made unless the Secretary of Defense has notified the Congress of the proposed transfer. Except in amounts equal to the amounts appropriated to working capital funds in this Act, no obligations may be made against a working capital fund to procure or increase the value of war reserve material inventory, unless the Secretary of Defense has notified the Congress prior to any such obligation.

SEC. 8007. Funds appropriated by this Act may not be used to initiate a special access program without prior notification 30 calendar days in session in advance to the congressional defense committees.

SEC. 8008. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services shall be available for payments to physicians and other non-institutional health care providers in excess of the amounts allowed in fiscal year 1996 for similar services, except that: (a) for services for which the Secretary of Defense determines an increase is justified by economic circumstances, the allowable amounts may be increased in accordance with appropriate economic index data similar to that used pursuant to title XVIII of the Social Security Act; and (b) for services the Secretary determines are overpriced based on allowable payments under title XVIII of the Social Security Act, the allowable amounts shall be reduced by not more than 15 percent (except that the reduction may be waived if the Secretary determines that it would impair adequate access to health care services for beneficiaries). The Secretary shall solicit public comment prior to promulgating regulations to implement this section. Such regulations shall include a limitation, similar to that used under title XVIII of the Social Security Act, on the extent to which a provider may bill a beneficiary an actual charge in excess of the allowable amount.

SEC. 8009. None of the funds provided in this Act shall be available to initiate (1) a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year of the contract or that includes an unfunded contingent liability in excess of $20,000,000, or (2) a contract for advance procurement leading to a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year, unless the congressional defense committees have been notified at least thirty days in advance of the proposed contract award: Provided, That no part of any appropriation contained in this Act shall be available to initiate a multiyear contract for which the economic order quantity advance procurement is not funded at least to the limits of the Government's liability: Provided further, That no part of any appropriation contained in this Act shall be available to initiate multiyear procurement contracts for any systems or component thereof if the value of the multiyear contract would exceed $500,000,000 unless specifically provided in this Act: Provided further, That no multiyear procurement contract can be terminated without 10–day prior notification to the congressional defense committees: Provided further, That the execution of multiyear authority shall require the use of a present value analysis to determine lowest cost compared to an annual procurement: Provided further, That notwithstanding Section 8010 of Public Law 104–61, funds appropriated for the DDG–51 destroyer program in Public Law 104–61 may be used to initiate a multiyear contract for the Arleigh Burke class destroyer program.

Funds appropriated in title III of this Act may be used for multiyear procurement contracts as follows:

Javelin missiles;

Army Tactical Missile System (ATACMS);

MK19–3 grenade machine guns;

M16A2 rifles;

M249 Squad Automatic Weapons;

M4 carbine rifles;

M240B machine guns; and

Arleigh Burke (DDG–51) class destroyers.

<< 10 USCA § 401 NOTE >>

SEC. 8010. Within the funds appropriated for the operation and maintenance of the Armed Forces, funds are hereby appropriated pursuant to section 401 of title 10, United States Code, for humanitarian and civic assistance costs under chapter 20 of title 10, United States Code. Such funds may also be obligated for humanitarian and civic assistance costs incidental to authorized operations and pursuant to authority granted in section 401 of chapter 20 of title 10, United States Code, and these obligations shall be reported to Congress on September 30 of each year: Provided, That funds available for operation and maintenance shall be available for providing humanitarian and similar assistance by using Civic Action Teams in the Trust Territories of the Pacific Islands and freely associated states of Micronesia, pursuant to the Compact of Free Association as authorized by Public Law 99–239: Provided further, That upon a determination by the Secretary of the Army that such

action is beneficial for graduate medical education programs conducted at Army medical facilities located in Hawaii, the Secretary of the Army may authorize the provision of medical services at such facilities and transportation to such facilities, on a nonreimbursable basis, for civilian patients from American Samoa, the Commonwealth of the Northern Mariana Islands, the Marshall Islands, the Federated States of Micronesia, Palau, and Guam.

SEC. 8011. (a) During fiscal year 1997, the civilian personnel of the Department of Defense may not be managed on the basis of any end-strength, and the management of such personnel during that fiscal year shall not be subject to any constraint or limitation (known as an end-strength) on the number of such personnel who may be employed on the last day of such fiscal year.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget request shall be prepared and submitted to the Congress as if subsections (a) and (b) of this provision were effective with regard to fiscal year 1998.

(c) Nothing in this section shall be construed to apply to military (civilian) technicians.

SEC. 8012. Notwithstanding any other provision of law, none of the funds made available by this Act shall be used by the Department of Defense to exceed, outside the fifty United States, its territories, and the District of Columbia, 125,000 civilian workyears: Provided, That workyears shall be applied as defined in the Federal Personnel Manual: Provided further, That workyears expended in dependent student hiring programs for disadvantaged youths shall not be included in this workyear limitation.

SEC. 8013. None of the funds made available by this Act shall be used in any way, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before the Congress.

SEC. 8014. (a) None of the funds appropriated by this Act shall be used to make contributions to the Department of Defense Education Benefits Fund pursuant to section 2006(g) of title 10, United States Code, representing the normal cost for future benefits under section 3015(c) of title 38, United States Code, for any member of the armed services who, on or after the date of enactment of this Act—

   (1) enlists in the armed services for a period of active duty of less than three years; or

   (2) receives an enlistment bonus under section 308a or 308f of title 37, United States Code,

nor shall any amounts representing the normal cost of such future benefits be transferred from the Fund by the Secretary of the Treasury to the Secretary of Veterans Affairs pursuant to section 2006(d) of title 10, United States Code; nor shall the Secretary of Veterans Affairs pay such benefits to any such member: Provided, That in the case of a member covered by clause (1), these limitations shall not apply to members in combat arms skills or to members who enlist in the armed services on or after July 1, 1989, under a program continued or established by the Secretary of Defense in fiscal year 1991 to test the cost-effective use of special recruiting incentives involving not more than nineteen noncombat arms skills approved in advance by the Secretary of Defense: Provided further, That this subsection applies only to active components of the Army.

(b) None of the funds appropriated by this Act shall be available for the basic pay and allowances of any member of the Army participating as a full-time student and receiving benefits paid by the Secretary of Veterans Affairs from the Department of Defense Education Benefits Fund when time spent as a full-time student is credited toward completion of a service commitment: Provided, That this subsection shall not apply to those members who have reenlisted with this option prior to October 1, 1987: Provided further, That this subsection applies only to active components of the Army.

SEC. 8015. None of the funds appropriated by this Act shall be available to convert to contractor performance an activity or function of the Department of Defense that, on or after the date of enactment of this Act, is performed by more than ten Department of Defense civilian employees until a most efficient and cost-effective organization analysis is completed on such activity or function and certification of the analysis is made to the Committees on Appropriations of the House of Representatives and the Senate: Provided, That this section shall not apply to a commercial or industrial type function of the Department of Defense that: (1) is included on the procurement list established pursuant to section 2 of the Act of June 25, 1938 (41 U.S.C. 47), popularly referred to as the Javits–Wagner–O'Day Act; (2) is planned to be converted to performance by a qualified nonprofit agency for the blind or by a qualified nonprofit agency for other severely handicapped individuals in accordance with that Act; or (3) is planned to be converted to performance by a qualified firm under 51 percent Native American ownership.

<div align="center">(TRANSFER OF FUNDS)</div>

SEC. 8016. Funds appropriated in title III of this Act for the Department of Defense Pilot Mentor–Protege Program may be transferred to any other appropriation contained in this Act solely for the purpose of implementing a Mentor–Protege Program

developmental assistance agreement pursuant to section 831 of the National Defense Authorization Act for Fiscal Year 1991 (Public Law 101–510; 10 U.S.C. 2301 note), as amended, under the authority of this provision or any other transfer authority contained in this Act.

SEC. 8017. None of the funds in this Act may be available for the purchase by the Department of Defense (and its departments and agencies) of welded shipboard anchor and mooring chain 4 inches in diameter and under unless the anchor and mooring chain are manufactured in the United States from components which are substantially manufactured in the United States: Provided, That for the purpose of this section manufactured will include cutting, heat treating, quality control, testing of chain and welding (including the forging and shot blasting process): Provided further, That for the purpose of this section substantially all of the components of anchor and mooring chain shall be considered to be produced or manufactured in the United States if the aggregate cost of the components produced or manufactured in the United States exceeds the aggregate cost of the components produced or manufactured outside the United States: Provided further, That when adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis, the Secretary of the service responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations that such an acquisition must be made in order to acquire capability for national security purposes.

SEC. 8018. None of the funds appropriated by this Act available for the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be available for the reimbursement of any health care provider for inpatient mental health service for care received when a patient is referred to a provider of inpatient mental health care or residential treatment care by a medical or health care professional having an economic interest in the facility to which the patient is referred: Provided, That this limitation does not apply in the case of inpatient mental health services provided under the program for the handicapped under subsection (d) of section 1079 of title 10, United States Code, provided as partial hospital care, or provided pursuant to a waiver authorized by the Secretary of Defense because of medical or psychological circumstances of the patient that are confirmed by a health professional who is not a Federal employee after a review, pursuant to rules prescribed by the Secretary, which takes into account the appropriate level of care for the patient, the intensity of services required by the patient, and the availability of that care.

SEC. 8019. Funds available in this Act may be used to provide transportation for the next-of-kin of individuals who have been prisoners of war or missing in action from the Vietnam era to an annual meeting in the United States, under such regulations as the Secretary of Defense may prescribe.

<< 10 USCA § 2687 NOTE >>

SEC. 8020. Notwithstanding any other provision of law, during the current fiscal year, the Secretary of Defense may, by Executive Agreement, establish with host nation governments in NATO member states a separate account into which such residual value amounts negotiated in the return of United States military installations in NATO member states may be deposited, in the currency of the host nation, in lieu of direct monetary transfers to the United States Treasury: Provided, That such credits may be utilized only for the construction of facilities to support United States military forces in that host nation, or such real property maintenance and base operating costs that are currently executed through monetary transfers to such host nations: Provided further, That the Department of Defense's budget submission for fiscal year 1998 shall identify such sums anticipated in residual value settlements, and identify such construction, real property maintenance or base operating costs that shall be funded by the host nation through such credits: Provided further, That all military construction projects to be executed from such accounts must be previously approved in a prior Act of Congress: Provided further, That each such Executive Agreement with a NATO member host nation shall be reported to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate thirty days prior to the conclusion and endorsement of any such agreement established under this provision.

SEC. 8021. None of the funds available to the Department of Defense may be used to demilitarize or dispose of M–1 Carbines, M–1 Garand rifles, M–14 rifles, .22 caliber rifles, .30 caliber rifles, or M–1911 pistols.

SEC. 8022. Notwithstanding any other provision of law, none of the funds appropriated by this Act shall be available to pay more than 50 percent of an amount paid to any person under section 308 of title 37, United States Code, in a lump sum.

SEC. 8023. None of the funds appropriated by this Act shall be available for payments under the Department of Defense contract with the Louisiana State University Medical Center involving the use of cats for Brain Missile Wound Research, and the Department of Defense shall not make payments under such contract from funds obligated prior to the date of the enactment

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September.

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 305 of 1021   PageID 7175

of this Act, except as necessary for costs incurred by the contractor prior to the enactment of this Act: Provided, That funds necessary for the care of animals covered by this contract are allowed.

SEC. 8024. Of the funds made available by this Act in title III, Procurement, $8,000,000, drawn pro rata from each appropriations account in title III, shall be available for incentive payments authorized by section 504 of the Indian Financing Act of 1974, 25 U.S.C. 1544. These payments shall be available only to contractors which have submitted subcontracting plans pursuant to 15 U.S.C. 637(d), and according to regulations which shall be promulgated by the Secretary of Defense within 90 days of the passage of this Act.

SEC. 8025. None of the funds provided in this Act or any other Act shall be available to conduct bone trauma research at any Army Research Laboratory until the Secretary of the Army certifies that the synthetic compound to be used in the experiments is of such a type that its use will result in a significant medical finding, the research has military application, the research will be conducted in accordance with the standards set by an animal care and use committee, and the research does not duplicate research already conducted by a manufacturer or any other research organization.

SEC. 8026. During the current fiscal year, none of the funds available to the Department of Defense may be used to procure or acquire (1) defensive handguns unless such handguns are the M9 or M11 9 mm Department of Defense standard handguns, or (2) offensive handguns except for the Special Operations Forces: Provided, That the foregoing shall not apply to handguns and ammunition for marksmanship competitions.

SEC. 8027. No more than $500,000 of the funds appropriated or made available in this Act shall be used for any single relocation of an organization, unit, activity or function of the Department of Defense into or within the National Capital Region: Provided, That the Secretary of Defense may waive this restriction on a case-by-case basis by certifying in writing to the Congressional defense committees that such a relocation is required in the best interest of the Government.

SEC. 8028. During the current fiscal year, funds appropriated or otherwise available for any Federal agency, the Congress, the judicial branch, or the District of Columbia may be used for the pay, allowances, and benefits of an employee as defined by section 2105 of title 5 or an individual employed by the government of the District of Columbia, permanent or temporary indefinite, who—

 (1) is a member of a Reserve component of the Armed Forces, as described in section 261 of title 10, or the National Guard, as described in section 101 of title 32;

 (2) performs, for the purpose of providing military aid to enforce the law or providing assistance to civil authorities in the protection or saving of life or property or prevention of injury—

  (A) Federal service under sections 331, 332, 333, or 12406 of title 10, or other provision of law, as applicable, or

  (B) full-time military service for his or her State, the District of Columbia, the Commonwealth of Puerto Rico, or a territory of the United States; and

 (3) requests and is granted—

  (A) leave under the authority of this section; or

  (B) annual leave, which may be granted without regard to the provisions of sections 5519 and 6323(b) of title 5, if such employee is otherwise entitled to such annual leave:

Provided, That any employee who requests leave under subsection (3)(A) for service described in subsection (2) of this section is entitled to such leave, subject to the provisions of this section and of the last sentence of section 6323(b) of title 5, and such leave shall be considered leave under section 6323(b) of title 5.

SEC. 8029. None of the funds appropriated by this Act shall be available to perform any cost study pursuant to the provisions of OMB Circular A–76 if the study being performed exceeds a period of twenty-four months after initiation of such study with respect to a single function activity or forty-eight months after initiation of such study for a multi-function activity.

SEC. 8030. Funds appropriated by this Act for the American Forces Information Service shall not be used for any national or international political or psychological activities.

SEC. 8031. Notwithstanding any other provision of law or regulation, the Secretary of Defense may adjust wage rates for civilian employees hired for certain health care occupations as authorized for the Secretary of Veterans Affairs by section 7455 of title 38, United States Code.

SEC. 8032. None of the funds appropriated or made available in this Act shall be used to reduce or disestablish the operation of the 53rd Weather Reconnaissance Squadron of the Air Force Reserve, if such action would reduce the WC–130 Weather Reconnaissance mission below the levels funded in this Act.

SEC. 8033. (a) Of the funds for the procurement of supplies or services appropriated by this Act, qualified nonprofit agencies for the blind or other severely handicapped shall be afforded the maximum practicable opportunity to participate as subcontractors and suppliers in the performance of contracts let by the Department of Defense.

(b) During the current fiscal year, a business concern which has negotiated with a military service or defense agency a subcontracting plan for the participation by small business concerns pursuant to section 8(d) of the Small Business Act (15 U.S.C. 637(d)) shall be given credit toward meeting that subcontracting goal for any purchases made from qualified nonprofit agencies for the blind or other severely handicapped.

(c) For the purpose of this section, the phrase "qualified nonprofit agency for the blind or other severely handicapped" means a nonprofit agency for the blind or other severely handicapped that has been approved by the Committee for the Purchase from the Blind and Other Severely Handicapped under the Javits–Wagner–O'Day Act (41 U.S.C. 46–48).

SEC. 8034. During the current fiscal year, net receipts pursuant to collections from third party payers pursuant to section 1095 of title 10, United States Code, shall be made available to the local facility of the uniformed services responsible for the collections and shall be over and above the facility's direct budget amount.

SEC. 8035. During the current fiscal year, the Department of Defense is authorized to incur obligations of not to exceed $350,000,000 for purposes specified in section 2350j(c) of title 10, United States Code, in anticipation of receipt of contributions, only from the Government of Kuwait, under that section: Provided, That, upon receipt, such contributions from the Government of Kuwait shall be credited to the appropriation or fund which incurred such obligations.

SEC. 8036. Of the funds made available in this Act, not less than $23,626,000 shall be available for the Civil Air Patrol, of which $19,926,000 shall be available for Operation and maintenance.

SEC. 8037. (a) None of the funds appropriated in this Act are available to establish a new Department of Defense (department) federally funded research and development center (FFRDC), either as a new entity, or as a separate entity administered by an organization managing another FFRDC, or as a nonprofit membership corporation consisting of a consortium of other FFRDCs and other non-profit entities.

(b) LIMITATION ON COMPENSATION.—No member of a Board of Directors, Trustees, Overseers, Advisory Group, Special Issues Panel, Visiting Committee, or any similar entity of a defense FFRDC, and no paid consultant to any defense FFRDC, may be compensated for his or her services as a member of such entity, or as a paid consultant, except under the same conditions, and to the same extent, as members of the Defense Science Board: Provided, That a member of any such entity referred to previously in this subsection shall be allowed travel expenses and per diem as authorized under the Federal Joint Travel Regulations, when engaged in the performance of membership duties.

(c) Notwithstanding any other provision of law, none of the funds available to the department from any source during fiscal year 1997 may be used by a defense FFRDC, through a fee or other payment mechanism, for construction of new buildings, for payment of cost sharing for projects funded by government grants, or for absorption of contract overruns.

(d) Notwithstanding any other provision of law, of the funds available to the department during fiscal year 1997, not more than 5,975 staff years of technical effort (staff years) may be funded for defense FFRDCs: Provided, That of the specific amount referred to previously in this subsection, not more than 1,088 staff years may be funded for the defense studies and analysis FFRDCs.

(e) Notwithstanding any other provision of law, the Secretary of Defense shall control the total number of staff years to be performed by defense FFRDCs during fiscal year 1997 so as to reduce the total amounts appropriated in titles II, III, and IV of this Act by $52,286,000: Provided, That the total amounts appropriated in titles II, III, and IV of this Act are hereby reduced by $52,286,000 to reflect savings from the use of defense FFRDCs by the department.

(f) Within 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report presenting the specific amounts of staff years of technical effort to be allocated by the department for each defense FFRDC during fiscal year 1997: Provided, That, after the submission of the report required by this subsection, the department may not reallocate more than five percent of an FFRDC's staff years among other defense FFRDCs until 30 days after a detailed justification for any such reallocation is submitted to the Congressional defense committees.

(g) The Secretary of Defense shall, with the submission of the department's fiscal year 1998 budget request, submit a report presenting the specific amounts of staff years of technical effort to be allocated for each defense FFRDC during that fiscal year.

(h) The total amounts appropriated to or for the use of the department in titles II, III, and IV of this Act are hereby further reduced by $102,286,000 to reflect savings from the decreased use of non-FFRDC consulting services by the department.

(i) No part of the reductions contained in subsections (e) and (h) of this section may be applied against any budget activity, activity group, subactivity group, line item, program element, program, project, subproject or activity which does not fund defense FFRDC activities or non-FFRDC consulting services within each appropriation account.

(j) Not later than 90 days after enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (i) above pursuant to this section.

SEC. 8038. None of the funds in this or any other Act shall be available for the preparation of studies on—

(a) the feasibility of removal and transportation of unitary chemical weapons or agents from the eight chemical storage sites within the continental United States to Johnston Atoll: Provided, That this prohibition shall not apply to General Accounting Office studies requested by a Member of Congress or a Congressional Committee; and

(b) the potential future uses of the nine chemical disposal facilities other than for the destruction of stockpile chemical munitions and as limited by section 1412(c)(2), Public Law 99–145: Provided, That this prohibition does not apply to future use studies for the CAMDS facility at Tooele, Utah.

SEC. 8039. None of the funds appropriated or made available in this Act shall be used to procure carbon, alloy or armor steel plate for use in any Government-owned facility or property under the control of the Department of Defense which were not melted and rolled in the United States or Canada: Provided, That these procurement restrictions shall apply to any and all Federal Supply Class 9515, American Society of Testing and Materials (ASTM) or American Iron and Steel Institute (AISI) specifications of carbon, alloy or armor steel plate: Provided further, That the Secretary of the military department responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes: Provided further, That these restrictions shall not apply to contracts which are in being as of the date of enactment of this Act.

SEC. 8040. For the purposes of this Act, the term "congressional defense committees" means the National Security Committee of the House of Representatives, the Armed Services Committee of the Senate, the subcommittee on Defense of the Committee on Appropriations of the Senate, and the subcommittee on National Security of the Committee on Appropriations of the House of Representatives.

SEC. 8041. During the current fiscal year, the Department of Defense may acquire the modification, depot maintenance and repair of aircraft, vehicles and vessels as well as the production of components and other Defense-related articles, through competition between Department of Defense depot maintenance activities and private firms: Provided, That the Senior Acquisition Executive of the military department or defense agency concerned, with power of delegation, shall certify that successful bids include comparable estimates of all direct and indirect costs for both public and private bids: Provided further, That Office of Management and Budget Circular A–76 shall not apply to competitions conducted under this section.

<< 41 USCA § 10b–2 >>

SEC. 8042. (a)(1) If the Secretary of Defense, after consultation with the United States Trade Representative, determines that a foreign country which is party to an agreement described in paragraph (2) has violated the terms of the agreement by discriminating against certain types of products produced in the United States that are covered by the agreement, the Secretary of Defense shall rescind the Secretary's blanket waiver of the Buy American Act with respect to such types of products produced in that foreign country.

(2) An agreement referred to in paragraph (1) is any reciprocal defense procurement memorandum of understanding, between the United States and a foreign country pursuant to which the Secretary of Defense has prospectively waived the Buy American Act for certain products in that country.

(b) The Secretary of Defense shall submit to Congress a report on the amount of Department of Defense purchases from foreign entities in fiscal year 1997. Such report shall separately indicate the dollar value of items for which the Buy American Act was waived pursuant to any agreement described in subsection (a)(2), the Trade Agreement Act of 1979 (19 U.S.C. 2501 et seq.), or any international agreement to which the United States is a party.

(c) For purposes of this section, the term "Buy American Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

SEC. 8043. Appropriations contained in this Act that remain available at the end of the current fiscal year as a result of energy cost savings realized by the Department of Defense shall remain available for obligation for the next fiscal year to the extent, and for the purposes, provided in section 2865 of title 10, United States Code.

<< 10 USCA § 1175 NOTE >>

SEC. 8044. During the current fiscal year and hereafter, voluntary separation incentives payable under 10 U.S.C. 1175 may be paid in such amounts as are necessary from the assets of the Voluntary Separation Incentive Fund established by section 1175(h)(1).

(INCLUDING TRANSFER OF FUNDS)

SEC. 8045. Amounts deposited during the current fiscal year to the special account established under 40 U.S.C. 485(h)(2) and to the special account established under 10 U.S.C. 2667(d)(1) are appropriated and shall be available until transferred by the Secretary of Defense to current applicable appropriations or funds of the Department of Defense under the terms and conditions specified by 40 U.S.C. 485(h)(2) (A) and (B) and 10 U.S.C. 2667(d)(1)(B), to be merged with and to be available for the same time period and the same purposes as the appropriation to which transferred.

SEC. 8046. During the current fiscal year, appropriations available to the Department of Defense may be used to reimburse a member of a reserve component of the Armed Forces who is not otherwise entitled to travel and transportation allowances and who occupies transient government housing while performing active duty for training or inactive duty training: Provided, That such members may be provided lodging in kind if transient government quarters are unavailable as if the member was entitled to such allowances under subsection (a) of section 404 of title 37, United States Code: Provided further, That if lodging in kind is provided, any authorized service charge or cost of such lodging may be paid directly from funds appropriated for operation and maintenance of the reserve component of the member concerned.

<< 10 USCA § 221 NOTE >>

SEC. 8047. The President shall include with each budget for a fiscal year submitted to the Congress under section 1105 of title 31, United States Code, materials that shall identify clearly and separately the amounts requested in the budget for appropriation for that fiscal year for salaries and expenses related to administrative activities of the Department of Defense, the military departments, and the Defense Agencies.

SEC. 8048. Notwithstanding any other provision of law, funds available for "Drug Interdiction and Counter–Drug Activities, Defense" may be obligated for the Young Marines program.

SEC. 8049. During the current fiscal year, amounts contained in the Department of Defense Overseas Military Facility Investment Recovery Account established by section 2921(c)(1) of the National Defense Authorization Act of 1991 (Public Law 101–510; 10 U.S.C. 2687 note) shall be available until expended for the payments specified by section 2921(c)(2) of that Act.

<< 10 USCA § 12681 NOTE >>

SEC. 8050. During the current fiscal year and hereafter, annual payments granted under the provisions of section 4416 of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 106 Stat. 2714) shall be made from appropriations in this Act which are available for the pay of reserve component personnel.

SEC. 8051. Of the funds appropriated or otherwise made available by this Act, not more than $119,200,000 shall be available for payment of the operating costs of NATO Headquarters: Provided, That the Secretary of Defense may waive this section for Department of Defense support provided to NATO forces in and around the former Yugoslavia.

SEC. 8052. During the current fiscal year, appropriations which are available to the Department of Defense for operation and maintenance may be used to purchase items having an investment item unit cost of not more than $100,000.

<< 10 USCA § 1293 NOTE >>

SEC. 8053. During the current fiscal year and hereafter, appropriations available for the pay and allowances of active duty members of the Armed Forces shall be available to pay the retired pay which is payable pursuant to section 4403 of Public Law 102–484 (10 U.S.C. 1293 note) under the terms and conditions provided in section 4403.

SEC. 8054. (a) During the current fiscal year, none of the appropriations or funds available to the Defense Business Operations Fund shall be used for the purchase of an investment item for the purpose of acquiring a new inventory item for sale or anticipated sale during the current fiscal year or a subsequent fiscal year to customers of the Defense Business Operations Fund if such an item would not have been chargeable to the Defense Business Operations Fund during fiscal year 1994 and if the purchase of such an investment item would be chargeable during the current fiscal year to appropriations made to the Department of Defense for procurement.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget shall be prepared and submitted to the Congress on the basis that any equipment which was classified as an end item and funded in a procurement appropriation contained in this Act shall be budgeted for in a proposed fiscal year 1998 procurement appropriation and not in the supply management business area or any other area or category of the Defense Business Operations Fund.

SEC. 8055. None of the funds provided in this Act shall be available for use by a Military Department to modify an aircraft, weapon, ship or other item of equipment, that the Military Department concerned plans to retire or otherwise dispose of within five years after completion of the modification: Provided, That this prohibition shall not apply to safety modifications: Provided further, That this prohibition may be waived by the Secretary of a Military Department if the Secretary determines it is in the best national security interest of the United States to provide such waiver and so notifies the congressional defense committees in writing.

SEC. 8056. None of the funds appropriated by this Act for programs of the Central Intelligence Agency shall remain available for obligation beyond the current fiscal year, except for funds appropriated for the Reserve for Contingencies, which shall remain available until September 30, 1998.

SEC. 8057. Notwithstanding any other provision of law, funds made available in this Act for the Defense Intelligence Agency may be used for the design, development, and deployment of General Defense Intelligence Program intelligence communications and intelligence information systems for the Services, the Unified and Specified Commands, and the component commands.

SEC. 8058. (a) Notwithstanding any other provision of law, funds appropriated in this Act for the High Performance Computing Modernization Program shall be made available only for the acquisition, modernization and sustainment of supercomputing capability and capacity at Department of Defense (DoD) science and technology sites under the cognizance of the Director of Defense Research and Engineering and DoD test and evaluation facilities under the Director of Test and Evaluation, OUSD (A&T): Provided, That these funds shall be awarded based on user-defined requirements.

(b) Of the funds appropriated in this Act under the heading "Procurement, Defense–Wide", $124,735,000 shall be made available for the High Performance Computing Modernization Program. Of the total funds made available for the program pursuant to this subsection, $20,000,000 shall be for the Army High Performance Computing Research Center.

SEC. 8059. Of the funds appropriated by the Department of Defense under the heading "Operation and Maintenance, Defense–Wide", not less than $8,000,000 shall be made available only for the mitigation of environmental impacts, including training and technical assistance to tribes, related administrative support, the gathering of information, documenting of environmental damage, and developing a system for prioritization of mitigation, on Indian lands resulting from Department of Defense activities.

SEC. 8060. Amounts collected for the use of the facilities of the National Science Center for Communications and Electronics during the current fiscal year pursuant to section 1459(g) of the Department of Defense Authorization Act, 1986 and deposited to the special account established under subsection 1459(g)(2) of that Act are appropriated and shall be available until expended for the operation and maintenance of the Center as provided for in subsection 1459(g)(2).

SEC. 8061. None of the funds appropriated in this Act may be used to fill the commander's position at any military medical facility with a health care professional unless the prospective candidate can demonstrate professional administrative skills.

SEC. 8062. (a) None of the funds appropriated in this Act may be expended by an entity of the Department of Defense unless the entity, in expending the funds, complies with Buy American Act. For purposes of this subsection, the term "Buy American

Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

 (b) If the Secretary of Defense determines that a person has been convicted of intentionally affixing a label bearing a "Made in America" inscription to any product sold in or shipped to the United States that is not made in America, the Secretary shall determine, in accordance with section 2410f of title 10, United States Code, whether the person should be debarred from contracting with the Department of Defense.

 (c) In the case of any equipment or products purchased with appropriations provided under this Act, it is the sense of the Congress that any entity of the Department of Defense, in expending the appropriation, purchase only American-made equipment and products, provided that American-made equipment and products are cost-competitive, quality-competitive, and available in a timely fashion.

 SEC. 8063. None of the funds appropriated by this Act shall be available for a contract for studies, analyses, or consulting services entered into without competition on the basis of an unsolicited proposal unless the head of the activity responsible for the procurement determines—

 (1) as a result of thorough technical evaluation, only one source is found fully qualified to perform the proposed work, or

 (2) the purpose of the contract is to explore an unsolicited proposal which offers significant scientific or technological promise, represents the product of original thinking, and was submitted in confidence by one source, or

 (3) the purpose of the contract is to take advantage of unique and significant industrial accomplishment by a specific concern, or to insure that a new product or idea of a specific concern is given financial support:

Provided, That this limitation shall not apply to contracts in an amount of less than $25,000, contracts related to improvements of equipment that is in development or production, or contracts as to which a civilian official of the Department of Defense, who has been confirmed by the Senate, determines that the award of such contract is in the interest of the national defense.

 SEC. 8064. Funds appropriated by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

<< 50 USCA § 1521 NOTE >>

 SEC. 8065. Notwithstanding section 142 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, of the funds provided in title VI of this Act, under the heading "Chemical Agents and Munitions Destruction, Defense", $40,000,000 shall only be available for the conduct of a pilot program to identify and demonstrate not less than two alternatives to the baseline incineration process for the demilitarization of assembled chemical munitions: Provided, That the Under Secretary of Defense for Acquisition and Technology shall, not later than December 1, 1996, designate a program manager who is not, nor has been, in direct or immediate control of the baseline reverse assembly incineration demilitarization program to carry out the pilot program: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall evaluate the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program to demilitarize munitions and assembled chemical munitions while meeting all applicable Federal and State environmental and safety requirements: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall transmit, by December 15 of each year, a report to the congressional defense committees on the activities carried out under the pilot program during the preceding fiscal year in which the report is to be made: Provided further, That section 142(f)(3) of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is repealed: Provided further, That no funds may be obligated for the construction of a baseline incineration facility at the Lexington Blue Grass Army Depot or the Pueblo Depot activity until 180 days after the Secretary of Defense has submitted to the congressional defense committees a report detailing the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program and its ability to meet the applicable safety and environmental requirements: Provided further, That none of the funds in this or any other Act may be obligated for the preparation of studies, assessments, or planning of the removal and transportation of stockpile assembled unitary chemical weapons or neutralized chemical agent to any of the eight chemical weapons storage sites within the continental United States.

 SEC. 8066. (a) None of the funds made available by this Act may be obligated for design, development, acquisition, or operation of more than 47 Titan IV expendable launch vehicles, or for satellite mission-model planning for a Titan IV requirement beyond 47 vehicles.

(b) $59,600,000 made available in this Act for Research, Development, Test and Evaluation, Air Force, may only be obligated for development of a new family of medium-lift and heavy-lift expendable launch vehicles evolved from existing technologies.

SEC. 8067. None of the funds available to the Department of Defense in this Act may be used to establish additional field operating agencies of any element of the Department during fiscal year 1997, except for field operating agencies funded within the National Foreign Intelligence Program: Provided, That the Secretary of Defense may waive this section by certifying to the House and Senate Committees on Appropriations that the creation of such field operating agencies will reduce either the personnel and/or financial requirements of the Department of Defense.

SEC. 8068. Notwithstanding section 303 of Public Law 96–487 or any other provision of law, the Secretary of the Navy is authorized to lease real and personal property at Naval Air Facility, Adak, Alaska, pursuant to 10 U.S.C. 2667(f), for commercial, industrial or other purposes.

<< 10 USCA Ch. 108 >>

SEC. 8069. Notwithstanding any other provision of law, for resident classes entering the war colleges after September 30, 1997, the Department of Defense shall require that not less than 20 percent of the total of United States military students at each war college shall be from military departments other than the hosting military department: Provided, That each military department will recognize the attendance at a sister military department war college as the equivalent of attendance at its own war college for promotion and advancement of personnel.

(RESCISSIONS)

SEC. 8070. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1995/1997", $4,500,000;

"Aircraft Procurement, Navy, 1995/1997", $8,000,000;

"Procurement of Ammunition, Navy and Marine Corps, 1995/1997", $2,000,000;

"Other Procurement, Navy, 1995/1997", $10,000,000;

"Aircraft Procurement, Air Force, 1995/1997", $3,100,000;

"Missile Procurement, Air Force, 1995/1997", $31,900,000;

"Aircraft Procurement, Navy, 1996/1998", $5,400,000;

"Procurement of Ammunition, Navy and Marine Corps, 1996/1998", $12,708,000;

"Aircraft Procurement, Air Force, 1996/1998", $9,000,000;

"Missile Procurement, Air Force, 1996/1998", $20,000,000;

"Other Procurement, Air Force, 1996/1998", $26,000,000;

"Research, Development, Test and Evaluation, Navy 1996/1997", $4,500,000.

SEC. 8071. None of the funds provided in this Act may be obligated for payment on new contracts on which allowable costs charged to the government include payments for individual compensation at a rate in excess of $250,000 per year.

SEC. 8072. Of the funds appropriated in the Department of Defense Appropriations Act, 1996 (Public Law 104–61), under the heading "Other Procurement, Army", the Department of the Army shall grant $477,000 to the Kansas Unified School District 207 for the purpose of integrating schools at Fort Leavenworth into the existing fiber optic network on post.

SEC. 8073. None of the funds available in this Act may be used to reduce the authorized positions for military (civilian) technicians of the Army National Guard, the Air National Guard, Army Reserve and Air Force Reserve for the purpose of applying any administratively imposed civilian personnel ceiling, freeze, or reduction on military (civilian) technicians, unless such reductions are a direct result of a reduction in military force structure.

SEC. 8074. None of the funds appropriated or otherwise made available in this Act may be obligated or expended for assistance to the Democratic People's Republic of North Korea unless specifically appropriated for that purpose.

SEC. 8075. During the current fiscal year, funds appropriated in this Act are available to compensate members of the National Guard for duty performed pursuant to a plan submitted by a Governor of a State and approved by the Secretary of Defense under section 112 of title 32, United States Code: Provided, That during the performance of such duty, the members of the National Guard shall be under State command and control: Provided further, That such duty shall be treated as full-time National Guard duty for purposes of sections 12602(a)(2) and (b)(2) of title 10, United States Code.

SEC. 8076. Funds appropriated in this Act for operation and maintenance of the Military Departments, Unified and Specified Commands and Defense Agencies shall be available for reimbursement of pay, allowances and other expenses which would otherwise be incurred against appropriations for the National Guard and Reserve when members of the National Guard and Reserve provide intelligence support to Unified Commands, Defense Agencies and Joint Intelligence Activities, including the activities and programs included within the General Defense Intelligence Program and the Consolidated Cryptologic Program: Provided, That nothing in this section authorizes deviation from established Reserve and National Guard personnel and training procedures.

SEC. 8077. During the current fiscal year, none of the funds appropriated in this Act may be used to reduce the civilian medical and medical support personnel assigned to military treatment facilities below the September 30, 1996 level: Provided, That the Service Surgeons General may waive this section by certifying to the congressional defense committees that the beneficiary population is declining in some catchment areas and civilian strength reductions may be consistent with responsible resource stewardship and capitation-based budgeting.

SEC. 8078. All refunds or other amounts collected in the administration of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be credited to current year appropriations.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8079. None of the funds appropriated in this Act may be transferred to or obligated from the Pentagon Reservation Maintenance Revolving Fund, unless the Secretary of Defense certifies that the total cost for the planning, design, construction and installation of equipment for the renovation of the Pentagon Reservation will not exceed $1,118,000,000.

<< 10 USCA § 374 NOTE >>

SEC. 8080. (a) None of the funds available to the Department of Defense for any fiscal year for drug interdiction or counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

<< 50 USCA § 403f NOTE >>

(b) None of the funds available to the Central Intelligence Agency for any fiscal year for drug interdiction and counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

(TRANSFER OF FUNDS)

SEC. 8081. Appropriations available in this Act under the heading "Operation and Maintenance, Defense–Wide" for increasing energy and water efficiency in Federal buildings may, during their period of availability, be transferred to other appropriations or funds of the Department of Defense for projects related to increasing energy and water efficiency, to be merged with and to be available for the same general purposes, and for the same time period, as the appropriation or fund to which transferred.

SEC. 8082. None of the funds appropriated by this Act may be used for the procurement of ball and roller bearings other than those produced by a domestic source and of domestic origin: Provided, That the Secretary of the military department responsible for such procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

SEC. 8083. Notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to American Samoa: Provided, That notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to the Indian Health Service when it is in conjunction with a civil-military project.

SEC. 8084. None of the funds in this Act may be used to purchase any supercomputer which is not manufactured in the United States, unless the Secretary of Defense certifies to the congressional defense committees that such an acquisition must be made in order to acquire capability for national security purposes that is not available from United States manufacturers.

SEC. 8085. Notwithstanding any other provision of law, the Naval shipyards of the United States shall be eligible to participate in any manufacturing extension program financed by funds appropriated in this or any other Act.

SEC. 8086. None of the funds appropriated by this Act shall be available to lease or charter a vessel in excess of seventeen months (inclusive of any option periods) to transport fuel or oil for the Department of Defense if the vessel was constructed after October 1, 1995 unless the Secretary of Defense requires that the vessel be constructed in the United States with a double hull under the long-term lease or charter authority provided in section 2401 note of title 10, United States Code: Provided, That this limitation shall not apply to contracts in force on the date of enactment of this Act: Provided further, That by 1997 at least 20 percent of annual leases and charters must be for ships of double hull design constructed after October 1, 1995 if available in numbers sufficient to satisfy this requirement: Provided further, That the Military Sealift Command shall plan to achieve the goal of eliminating single hull ship leases by the year 2015.

(TRANSFER OF FUNDS)

SEC. 8087. In addition to amounts appropriated or otherwise made available by this Act, $300,000,000 is hereby appropriated to the Department of Defense and shall be available only for transfer to the United States Coast Guard.

SEC. 8088. Notwithstanding any other provision in this Act, the total amount appropriated in this Act is hereby reduced by $150,000,000 to reflect savings from reduced carryover of activities funded through the Defense Business Operations Fund, to be distributed as follows: "Operation and Maintenance, Army", $60,000,000; and "Operation and Maintenance, Navy", $90,000,000.

SEC. 8089. Notwithstanding any other provision of law, each contract awarded by the Department of Defense during the current fiscal year for construction or service performed in whole or in part in a State which is not contiguous with another State and has an unemployment rate in excess of the national average rate of unemployment as determined by the Secretary of Labor, shall include a provision requiring the contractor to employ, for the purpose of performing that portion of the contract in such State that is not contiguous with another State, individuals who are residents of such State and who, in the case of any craft or trade, possess or would be able to acquire promptly the necessary skills: Provided, That the Secretary of Defense may waive the requirements of this section, on a case-by-case basis, in the interest of national security.

SEC. 8090. During the current fiscal year, the Army shall use the former George Air Force Base as the airhead for the National Training Center at Fort Irwin: Provided, That none of the funds in this Act shall be obligated or expended to transport Army personnel into Edwards Air Force Base for training rotations at the National Training Center.

SEC. 8091. (a) The Secretary of Defense shall submit, on a quarterly basis, a report to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate setting forth all costs (including incremental costs) incurred by the Department of Defense during the preceding quarter in implementing or supporting resolutions of the United Nations Security Council, including any such resolution calling for international sanctions, international peacekeeping operations, and humanitarian missions undertaken by the Department of Defense. The quarterly report shall include an aggregate of all such Department of Defense costs by operation or mission.

(b) The Secretary of Defense shall detail in the quarterly reports all efforts made to seek credit against past United Nations expenditures and all efforts made to seek compensation from the United Nations for costs incurred by the Department of Defense in implementing and supporting United Nations activities.

SEC. 8092. (a) LIMITATION ON TRANSFER OF DEFENSE ARTICLES AND SERVICES.—Notwithstanding any other provision of law, none of the funds available to the Department of Defense for the current fiscal year may be obligated or expended to transfer to another nation or an international organization any defense articles or services (other than intelligence services) for use in the activities described in subsection (b) unless the congressional defense committees, the Committee on International Relations of the House of Representatives, and the Committee on Foreign Relations of the Senate are notified 15 days in advance of such transfer.

(b) COVERED ACTIVITIES.—(1) This section applies to—

(A) any international peacekeeping or peace-enforcement operation under the authority of chapter VI or chapter VII of the United Nations Charter under the authority of a United Nations Security Council resolution; and

(B) any other international peacekeeping, peace-enforcement, or humanitarian assistance operation.

(c) REQUIRED NOTICE.—A notice under subsection (a) shall include the following:

(1) A description of the equipment, supplies, or services to be transferred.

(2) A statement of the value of the equipment, supplies, or services to be transferred.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) In the case of a proposed transfer of equipment or supplies—

(A) a statement of whether the inventory requirements of all elements of the Armed Forces (including the reserve components) for the type of equipment or supplies to be transferred have been met; and

(B) a statement of whether the items proposed to be transferred will have to be replaced and, if so, how the President proposes to provide funds for such replacement.

SEC. 8093. To the extent authorized by subchapter VI of Chapter 148 of title 10, United States Code, the Secretary of Defense shall issue loan guarantees in support of U.S. defense exports not otherwise provided for: Provided, That the total contingent liability of the United States for guarantees issued under the authority of this section may not exceed $15,000,000,000: Provided further, That the exposure fees charged and collected by the Secretary for each guarantee, shall be paid by the country involved and shall not be financed as part of a loan guaranteed by the United States: Provided further, That the Secretary shall provide quarterly reports to the Committees on Appropriations, Armed Services and Foreign Relations of the Senate and the Committees on Appropriations, National Security and International Relations in the House of Representatives on the implementation of this program: Provided further, That amounts charged for administrative fees and deposited to the special account provided for under section 2540c(d) of title 10, shall be available for paying the costs of administrative expenses of the Department of Defense that are attributable to the loan guarantee program under subchapter VI of Chapter 148 of title 10.

SEC. 8094. None of the funds available to the Department of Defense shall be obligated or expended to make a financial contribution to the United Nations for the cost of an United Nations peacekeeping activity (whether pursuant to assessment or a voluntary contribution) or for payment of any United States arrearage to the United Nations.

SEC. 8095. None of the funds available to the Department of Defense under this Act shall be obligated or expended to pay a contractor under a contract with the Department of Defense for costs of any amount paid by the contractor to an employee when—

(1) such costs are for a bonus or otherwise in excess of the normal salary paid by the contractor to the employee; and

(2) such bonus is part of restructuring costs associated with a business combination.

SEC. 8096. The amount otherwise provided by this Act for "Operation and Maintenance, Air Force" is hereby reduced by $194,500,000, to reflect a reduction in the pass-through to the Air Force business areas of the Defense Business Operations Fund.

SEC. 8097. (a) None of the funds appropriated or otherwise made available in this Act may be used to transport or provide for the transportation of chemical munitions or agents to the Johnston Atoll for the purpose of storing or demilitarizing such munitions or agents.

(b) The prohibition in subsection (a) shall not apply to any obsolete World War II chemical munition or agent of the United States found in the World War II Pacific Theater of Operations.

(c) The President may suspend the application of subsection (a) during a period of war in which the United States is a party.

SEC. 8098. None of the funds provided in title II of this Act for "Former Soviet Union Threat Reduction" may be obligated or expended to finance housing for any individual who was a member of the military forces of the Soviet Union or for any individual who is or was a member of the military forces of the Russian Federation.

SEC. 8099. During the current fiscal year, no more than $15,000,000 of appropriations made in this Act under the heading "Operation and Maintenance, Defense–Wide" may be transferred to appropriations available for the pay of military personnel, to be merged with, and to be available for the same time period as the appropriations to which transferred, to be used in support of such personnel in connection with support and services for eligible organizations and activities outside the Department of Defense pursuant to section 2012 of title 10, United States Code.

<< 18 USCA § 3056 NOTE >>

SEC. 8100. Beginning in fiscal year 1997 and thereafter, and notwithstanding any other provision of law, fixed and mobile telecommunications support shall be provided by the White House Communications Agency (WHCA) to the United States Secret Service (USSS), without reimbursement, in connection with the Secret Service's duties directly related to the protection of the President or the Vice President or other officer immediately next in order of succession to the office of the President at the White House Security Complex in the Washington, D.C. Metropolitan Area and Camp David, Maryland. For these purposes, the White House Security Complex includes the White House, the White House grounds, the Old Executive Office Building, the New Executive Office Building, the Blair House, the Treasury Building, and the Vice President's Residence at the Naval Observatory.

SEC. 8101. None of the funds provided in this Act may be obligated or expended for the sale of zinc in the National Defense Stockpile if zinc commodity prices decline more than five percent below the London Metals Exchange market price reported on the date of enactment of this Act.

SEC. 8102. For purposes of section 1553(b) of title 31, United States Code, any subdivision of appropriations made in this Act under the heading "Shipbuilding and Conversion, Navy" shall be considered to be for the same purpose as any subdivision under the heading "Shipbuilding and Conversion, Navy" appropriations in any prior year, and the one percent limitation shall apply to the total amount of the appropriation.

SEC. 8103. During the current fiscal year, and notwithstanding 31 U.S.C. 1552(a), not more than $107,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 101–511 and not more than $15,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 102–172 which were available and obligated for the B–2 Aircraft Program shall remain available for expenditure and for adjusting obligations for such Program until September 30, 2002.

SEC. 8104. During the current fiscal year, in the case of an appropriation account of the Department of Defense for which the period of availability for obligation has expired or which has closed under the provisions of section 1552 of title 31, United States Code, and which has a negative unliquidated or unexpended balance, an obligation or an adjustment of an obligation may be charged to any current appropriation account for the same purpose as the expired or closed account if—

(1) the obligation would have been properly chargeable (except as to amount) to the expired or closed account before the end of the period of availability or closing of that account;

(2) the obligation is not otherwise properly chargeable to any current appropriation account of the Department of Defense; and

(3) in the case of an expired account, the obligation is not chargeable to a current appropriation of the Department of Defense under the provisions of section 1405(b)(8) of the National Defense Authorization Act for Fiscal Year 1991, Public Law 101–510, as amended (31 U.S.C. 1551 note): Provided, That in the case of an expired account, if subsequent review or investigation discloses that there did not in fact a negative unliquidated or unexpended balance in the account, any charge to a current account under the authority of this section shall be reversed and recorded against the expired account: Provided further, That the total amount charged to a current appropriation under this section may not exceed an amount equal to one percent of the total appropriation for that account.

(TRANSFER OF FUNDS)

SEC. 8105. Upon enactment of this Act, the Secretary of Defense shall make the following transfers of funds: Provided, That the amounts transferred shall be available for the same purposes as the appropriations to which transferred, and for the same time period as the appropriation from which transferred: Provided further, That the amounts shall be transferred between the following appropriations in the amount specified:

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":

CG–47 cruiser program, $4,300,000;

For craft, outfitting, and post delivery, $2,000,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":

DDG–51 destroyer program, $6,300,000;

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":

LHD–1 amphibious assault ship program, $2,154,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":

For craft, outfitting and post delivery, $2,154,000;

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":

T–AO fleet oiler program, $1,095,000;

Oceanographic ship program, $735,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":

For craft, outfitting, and post delivery, $1,830,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":
    T–AO fleet oiler program, $6,571,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":
    SSN–21 attack submarine program, $6,571,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":
    DDG–51 destroyer program, $12,687,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":
    LHD–1 amphibious assault ship program, $9,387,000;
    MHC coastal mine hunter program, $3,300,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":
    For escalation, $1,600,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":
    MHC coastal mine hunter program, $1,600,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    DDG–51 destroyer program, $5,000,000;
    LSD–41 cargo variant ship program, $2,700,000;
    For craft, outfitting, post delivery, and first destination transportation, and inflation adjustments, $1,577,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    AOE combat support ship program, $9,277,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":
    Carrier replacement program, $18,023,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    MHC coastal mine hunter program, $6,700,000;
    AOE combat support ship program, $11,323,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":
    LHD–1 amphibious assault ship program, $4,100,000;
    Mine warfare command and control ship, $1,000,000;
    For craft, outfitting, post delivery, and first destination transportation, $2,000,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":
    Carrier replacement program, $9,477,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1996/2000":
    NSSN–1 (AP), $3,791,000;
    DDG–51 destroyer program, $4,075,000;
    CVN Refuelings, $5,212,000;
    LHD–1 amphibious ship program, $16,800,000;

T–AGS–64 multi-purpose oceanographic survey ship, $375,000;

For craft, outfitting, post delivery, conversions and first destination transportation, $11,770,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":

DDG–51 destroyer program, $41,800,000; and

Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":

For craft, outfitting, post delivery, conversions and first destination transportation, $16,800,000.

<< 10 USCA § 113 NOTE >>

SEC. 8106. (a) The Secretary of Defense shall require not later than June 30, 1997, each disbursement by the Department of Defense in an amount in excess of $3,000,000 be matched to a particular obligation before the disbursement is made.

(b) The Secretary shall ensure that a disbursement in excess of the threshold amount applicable under section (a) is not divided into multiple disbursements of less than that amount for the purpose of avoiding the applicability of such section to that disbursement.

SEC. 8107. Notwithstanding any other provision of law, the Air Force shall not introduce any new supplier for the remaining production units for the AN/ALE–47 Countermeasures Dispenser System without conducting a full and open competition that will include, but not be limited to, small businesses.

SEC. 8108. The Under Secretary of Defense (Comptroller) shall submit to the congressional defense committees a detailed report identifying, by amount and by separate budget activity, activity group, subactivity group, line item, program element, program, project, subproject, and activity, any activity for which the fiscal year 1998 budget request was reduced because Congress appropriated funds above the President's budget request for that specific activity for fiscal year 1997.

<< 10 USCA § 2241 NOTE >>

SEC. 8109. In applying section 9005 of the Department of Defense Appropriations Act, 1993, Public Law 102–396 (10 U.S.C. 2241 note), during the current fiscal year and thereafter—

(1) the term "synthetic fabric and coated synthetic fabric" shall be deemed to include all textile fibers and yarns that are for use in such fabrics; and

(2) such section shall be treated, notwithstanding section 34 of Public Law 93–400 (41 U.S.C. 430), as being applicable to contracts and subcontracts for the procurement of commercial items that are articles or items, specialty metals, or tools covered by that section 9005.

SEC. 8110. Notwithstanding any other provision of law, including Section 2304(j) of title 10, United States Code, of the funds appropriated under the heading "Aircraft Procurement, Navy" in Public Law 104–61, $45,000,000 shall be made available only for acquisition of T–39N aircraft, associated ground-based training system (GBTS), service life extension related components and parts, associated equipment, and data that meet the Undergraduate Flight Officer (UNFO) training requirements by procurement of the T–39N aircraft currently being used by the Navy for UNFO training under a services contract.

SEC. 8111. TRADEOFF STUDY OF CURRENT AND FUTURE DEEP–STRIKE CAPABILITIES.—

(1) The Secretary of Defense shall carry out the deep-strike tradeoff study announced by the President to study tradeoffs between bombers, land and sea-based tactical aircraft, and missiles capable of striking targets in an enemy's rear area.

(2) The Secretary of Defense shall establish an ad hoc review committee under the auspices of the Defense Science Board to establish the methodological approach to the tradeoff study, to establish a broad range of stressing scenarios of interest, and to review assumptions regarding the analyses to be conducted.

(3) The ad hoc review committee to be established under paragraph (2) shall include among its members analysts who have performed or participated in bomber tradeoff analysis, retired military personnel with broad experience in recent conventional warfare operations, and experts on the logistics of both initial deployment and sustaining support. These members shall be selected without regard for current service on the Defense Science Board.

(4) After submitting its recommendations for the conduct of the deep-strike tradeoff study to the Secretary of Defense, the ad hoc review committee shall continue to meet regularly to review preliminary results of the analysis and to recommend additional variations in assumptions that may be required to illuminate particular force tradeoff issues.

SEC. 8112. Notwithstanding 31 U.S.C. 1552(a), of the funds provided in Department of Defense Appropriations Acts, not more than the specified amounts of funds from the following accounts shall remain available for the payment of satellite on-orbit incentive fees until the fees are paid:

"Missile Procurement, Air Force, 1990/1992", $17,800,000;

"Missile Procurement, Air Force, 1991/1993", $19,330,000;

"Missile Procurement, Air Force, 1992/1994", $23,570,000;

"Missile Procurement, Air Force, 1993/1995", $16,780,000;

"Missile Procurement, Air Force, 1994/1996", $16,780,000.

SEC. 8113. TACTICAL AIRCRAFT REQUIREMENT STUDY.—The Secretary of Defense and the Chairman of the Joint Chiefs of Staff shall carry out a joint study under the direct supervision of the Joint Requirements Oversight Council (JROC) assessing future tactical aircraft requirements across service jurisdictions. This study shall determine the best and most affordable mix of weapon systems to carry out different mission areas and shall include recommendations for changes to the planned numbers and types of tactical aircraft to be developed and procured over the next ten years if appropriate. Such report shall be submitted to the congressional defense committees no later than March 30, 1997.

SEC. 8114. None of the funds available to the Department of the Navy may be used to enter into any contract for the overhaul, repair, or maintenance of any naval vessel homeported on the West Coast of the United States which includes charges for interport differential as an evaluation factor for award.

SEC. 8115. (a) None of the funds available to the Department of Defense under this Act may be obligated or expended to reimburse a defense contractor for restructuring costs associated with a business combination of the defense contractor that occurs after the date of enactment of this Act unless:

(1) the auditable savings for the Department of Defense resulting from the restructuring will exceed the costs allowed by a factor of at least two to one, or

(2) the savings for the Department of Defense resulting from the restructuring will exceed the costs allowed and the Secretary of Defense determines that the business combination will result in the preservation of a critical capability that might otherwise be lost to the Department, and

(3) the report required by Section 818(e) of Public Law 103–337 to be submitted to Congress in 1996 is submitted.

(b) Not later than April 1, 1997, the Comptroller General shall, in consultation with the Inspector General of the Department of Defense, the Secretary of Defense, and the Secretary of Labor, submit to Congress a report which shall include the following:

(1) an analysis and breakdown of the restructuring costs paid by or submitted to the Department of Defense to companies involved in business combinations since 1993;

(2) an analysis of the specific costs associated with workforce reductions;

(3) an analysis of the services provided to the workers affected by business combinations;

(4) an analysis of the effectiveness of the restructuring costs used to assist laid off workers in gaining employment;

(5) in accordance with section 818 of Public Law 103–337, an analysis of the savings reached from the business combination relative to the restructuring costs paid by the Department of Defense.

(c) The report should set forth recommendations to make this program more effective for workers affected by business combinations and more efficient in terms of the use of Federal dollars.

SEC. 8116. Notwithstanding any other provision of law, none of the funds appropriated in this Act may be used to purchase, install, replace, or otherwise repair any lock on a safe or security container which protects information critical to national security or any other classified materials and which has not been certified as passing the security lock specifications contained in regulation FF–L–2740 dated October 12, 1989, and has not passed all testing criteria and procedures established through February 28, 1992: Provided, That the Director of Central Intelligence may waive this provision, on a case-by-case basis only, upon certification that the above cited locks are not adequate for the protection of sensitive intelligence information.

SEC. 8117. Section 8110 of Public Law 104–61 (109 Stat. 674) is hereby repealed.

SEC. 8118. The Secretary of Defense, in conjunction with the Secretary of Labor, shall take such steps as required to ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code are

aware of, and in compliance with, the requirements of that section regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans: Provided, That the Secretary of Defense shall ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code which have contracts with the Department of Defense are notified of the potential penalties associated with failure to comply with these annual reporting requirements (including potential suspension or debarment from federal contracting): Provided further, That within 180 days of enactment of this Act the Secretary of Labor and the Secretary of Defense shall submit a report to Congress which—

(1) using the most recent reporting data, details the number of reports received from Department of Defense contractors and the estimated number of Department of Defense contractors which are not in compliance with these annual reporting requirements;

(2) describes the steps taken by the Departments of Labor and Defense in order to ensure compliance with section 4212(d) of title 38, United States Code;

(3) describes any additional measures taken or planned to be taken by the Departments of Labor and Defense to improve compliance with section 4212(d) of title 38, United States Code pursuant to this section; and

(4) any further recommendations regarding additional action (including changes in existing law) which may be necessary to improve compliance with section 4212(d) of title 38, United States Code.

SEC. 8119. Funds appropriated in title II of this Act for supervision and administration costs for facilities maintenance and repair, minor construction, or design projects may be obligated at the time the reimbursable order is accepted by the performing activity: Provided, That for the purpose of this section, supervision and administration costs includes all in-house Government cost.

SEC. 8120. (a) LIMITATION ON ADVANCE BILLING.—During fiscal year 1997, advance billing for services provided or work performed by the Defense Business Operations Fund activities of the Department of the Navy in excess of $1,000,000,000 is prohibited.

(b) REVISED RATES; ADDITIONAL SURCHARGES.—In conjunction with the Under Secretary of Defense (Comptroller), the Secretary of the Navy shall develop a plan to revise fiscal year 1997 customer rates or establish additional surcharges so as to increase revenues to the Defense Business Operations Fund by at least an additional $500,000,000 in executing orders accepted during fiscal year 1997.

(c) TRANSFER AUTHORITY.—To the extent necessary to comply with any rate increase or new surcharge on rates in fiscal year 1997 established under subsection (b), the Secretary of the Navy shall transfer at least $500,000,000, from funds made available under subsection (d), into customer accounts of the Navy used to reimburse the Defense Business Operations Fund so as to provide customers with sufficient resources to pay the increased customer rates and additional surcharges. The transfer authority provided by this subsection is in addition to other transfer authority provided in this Act. The funds transferred shall be merged with and available for the same purposes, and for the same time period, as the appropriation to which transferred.

(d) SOURCE OF FUNDS.—To provide funds for transfer under subsection (c), the amounts appropriated elsewhere in this Act for the following appropriation accounts are reduced by 2.0 percent: Aircraft Procurement, Navy; Weapons Procurement, Navy; Procurement of Ammunition, Navy and Marine Corps; Shipbuilding and Conversion, Navy; Other Procurement, Navy; and Research, Development, Test and Evaluation, Navy. These reductions shall be applied on a pro-rata basis to each line item, program element, program, project, subproject, and activity within each appropriation account.

SEC. 8121. The Secretary of Defense may waive reimbursement of the cost of conferences, seminars, courses of instruction, or similar educational activities of the Asia–Pacific Center for Security Studies for military officers and civilian officials of foreign nations if the Secretary determines that attendance by such personnel, without reimbursement, is in the national security interest of the United States: Provided, That costs for which reimbursement is waived pursuant to this subsection shall be paid from appropriations available for the Asia–Pacific Center.

SEC. 8122. (a) Of the amounts appropriated or otherwise made available by this Act for the Department of the Air Force, $2,000,000 shall be available only for a facility at Lackland Air Force Base, Texas to provide comprehensive care and rehabilitation services to children with disabilities who are dependents of members of the Armed Forces.

(b) Subject to subsection (c), the Secretary of the Air Force shall grant the funds made available under subsection (a) to the Children's Association for Maximum Potential (CAMP) for use by the association to defray the costs of designing and constructing the facility referred to in subsection (a).

(c)(1) The Secretary may not make a grant of funds under subsection (b) until the Secretary and the association enter into an agreement under which the Secretary leases to the association the facility to be constructed using the funds.

(2) The term of the lease under subsection (c)(1) may not be less than 25 years.

(3) The Secretary may require such additional terms and conditions in connection with the lease as the Secretary considers appropriate to protect the interests of the United States.

SEC. 8123. None of the funds appropriated by this Act may be obligated or expended—

(1) to reduce the number of units of special operations forces of the Army National Guard during fiscal year 1997;

(2) to reduce the authorized strength of any such unit below the strength authorized for the unit as of September 30, 1996; or

(3) to apply any administratively imposed limitation on the assigned strength of any such unit at less than the strength authorized for that unit as of September 30, 1996.

SEC. 8124. (a) The Secretary of the Army shall ensure that solicitations for contracts for unrestricted procurement to be entered into using funds appropriated for the Army by this Act include, where appropriate, specific goals for subcontracts with small businesses, small disadvantaged businesses, and women owned small businesses.

(b) The Secretary shall ensure that any subcontract entered into pursuant to a solicitation referred to in subsection (a) that meets a specific goal referred to in that subsection is credited toward the overall goal of the Army for subcontracts with the businesses referred to in that subsection.

SEC. 8125. (a) The Secretary of the Air Force and the Director of the Office of Personnel Management shall submit a joint report describing in detail the benefits, allowances, services, and any other forms of assistance which may or shall be provided to any civilian employee of the Federal Government or to any private citizen, or to the family of such an individual, who is injured or killed while traveling on an aircraft owned, leased, chartered, or operated by the Government of the United States.

(b) The report required by subsection (a) above shall be submitted to the congressional defense committees and to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives not later than December 15, 1996.

SEC. 8126. (a) Not later than March 1, 1997, the Deputy Secretary of Defense shall submit to the congressional defense committees a report on Department of Defense procurements of propellant raw materials.

(b) The report shall include the following:

(1) The projected future requirements of the Department of Defense for propellant raw materials, such as nitrocellulose.

(2) The capacity, ability, and production cost rates of the national technology and industrial base, including Government-owned, contractor-operated facilities, contractor-owned and operated facilities, and Government-owned, Government-operated facilities, for meeting such requirements.

(3) The national security benefits of preserving in the national technology and industrial base contractor-owned and operated facilities for producing propellant raw materials, including nitrocellulose.

(4) The extent to which the cost rates for production of nitrocellulose in Government-owned, contractor-operated facilities is lower because of the relationship of those facilities with the Department of Defense than such rates would be without that relationship.

(5) The advantages and disadvantages of permitting commercial facilities to compete for award of Department of Defense contracts for procurement of propellant raw materials, such as nitrocellulose.

SEC. 8127. Not later than six months after the date of the enactment of this Act, the Secretary of the Air Force shall submit to Congress a cost-benefit analysis of consolidating the ground station infrastructure of the Air Force that supports polar orbiting satellites.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8128. In addition to the amounts appropriated elsewhere in this Act, $100,000,000 is appropriated for defense against weapons of mass destruction: Provided, That the funds appropriated under this section may be transferred to and merged with funds appropriated elsewhere in this Act and that this transfer authority shall be in addition to any other transfer authority provided under this Act: Provided further, That of the funds made available by this section, $10,000,000 shall be transferred to and merged with funds appropriated in this Act for "Procurement, Marine Corps" and shall be available only for the procurement of equipment that enhances the capability of the Chemical–Biological Incident Response Force to respond to incidents of terrorism.

SEC. 8129. The Secretary of Defense, in consultation with the Secretary of Health and Human Services and the Director of the Office of Personnel Management, shall submit a report to the congressional defense committees by February 1, 1997 containing recommendations regarding the establishment of a demonstration program under which covered beneficiaries under chapter 55

of title 10, United States Code, who are entitled to benefits under part A of the medicare program and who do not have access to TRICARE, would be permitted to enroll in a health benefits program offered through the Federal Employee Health Benefits Program under chapter 89 of title 5, United States Code.

SEC. 8130. (a) Section 203 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is hereby amended by repealing section 203(a), section 203(c), and section 203(e).

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 203 of such Act had been enacted as so amended.

<< 10 USCA § 1073 NOTE >>

SEC. 8131. (a) Section 722(c) of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out paragraph (2);

(2) by striking out "(1)"; and

(3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively.

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 722 of such Act had been enacted as so amended.

SEC. 8132. The Secretary of Defense shall complete a cost/benefit analysis on the establishment of a National Missile Defense Joint Program Office: Provided, That the Secretary of Defense shall submit a report on this analysis to the congressional defense committees no later than March 31, 1997: Provided further, That the Department of Defense shall take no action to establish any National Missile Defense Joint Program Office, to reassign service National Missile Defense roles and missions under any National Missile Defense Joint Program Office strategy or to relocate people under such a strategy prior to March 31, 1997.

SEC. 8133. (a) Notwithstanding any other provision of law, the Chief of the National Guard Bureau may permit the use of equipment of the National Guard Distance Learning Project by any person or entity on a space-available, reimbursable basis. The Chief of the National Guard Bureau shall establish the amount of reimbursement for such use on a case-by-case basis.

(b) Amounts collected under subsection (a) shall be credited to funds available for the National Guard Distance Learning Project and be available to defray the costs associated with the use of equipment of the project under that subsection. Such funds shall be available for such purposes without fiscal year limitation.

SEC. 8134. Using funds available by this Act or any other Act, the Secretary of the Air Force, pursuant to a determination under section 2690 of title 10, United States Code, may implement cost-effective agreements for required heating facility modernization in the Kaiserslautern Military Community in the Federal Republic of Germany: Provided, That in the City of Kaiserslautern such agreements will include the use of United States anthracite as the base load energy for municipal district heat to the United States Defense installations: Provided further, That at Landstuhl Army Regional Medical Center and Ramstein Air Base, furnished heat may be obtained from private, regional or municipal services, if provisions are included for the consideration of United States coal as an energy source.

SEC. 8135. (a) Section 2867 of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out "Michael O'Callaghan Military Hospital" both places it appears in the text of such section and inserting in lieu thereof "Mike O'Callaghan Federal Hospital"; and

(2) in the section heading, by striking out "MICHAEL O'CALLAGHAN MILITARY HOSPITAL" and inserting in lieu thereof "MIKE O'CALLAGHAN FEDERAL HOSPITAL".

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 and shall apply as if such amendments had been included in section 2867 of such Act when enacted.

SEC. 8136. (a) In addition to any other reductions required by this Act, the following funds are hereby reduced from the following accounts in title IV of this Act in the specified amounts:

"Research, Development, Test and Evaluation, Army", $101,257,000;

"Research, Development, Test and Evaluation, Navy", $164,179,000;

"Research, Development, Test and Evaluation, Air Force", $289,992,000;

"Research, Development, Test and Evaluation, Defense–Wide", $119,483,000; and

"Developmental Test and Evaluation, Defense", $5,641,000.

(b) The reductions taken pursuant to subsection (a) shall be applied on a pro-rata basis by subproject within each R–1 program element as modified by this Act, except that no reduction may be taken against the funds made available to the Department of Defense for Ballistic Missile Defense.

(c) Unless expressly exempted by subsection (b), each program element, program, project, subproject, and activity funded by title IV of this Act shall be allocated a pro-rata share of any of the reductions made by this section.

(d) Not later than 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (c) above pursuant to this section.

Sec. 8137. In addition to amounts appropriated or otherwise made available in this Act, $230,680,000 is hereby appropriated to the Department of Defense for anti-terrorism, counter-terrorism, and security enhancement programs and activities, as follows:

"Operation and Maintenance, Army", $15,249,000;

"Operation and Maintenance, Navy", $23,956,000;

"Operation and Maintenance, Marine Corps", $600,000;

"Operation and Maintenance, Air Force", $10,750,000;

"Operation and Maintenance, Defense–Wide", $29,534,000;

"Operation and Maintenance, Navy Reserve", $517,000;

"Other Procurement, Army", $5,252,000;

"Other Procurement, Air Force", $101,472,000;

"Procurement, Defense–Wide", $35,350,000;

"Research, Development, Test and Evaluation, Defense–Wide", $8,000,000:

Provided, That such amounts in their entirety are designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended; Provided further, That funds appropriated in this section, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997; Provided further, That funds appropriated in this section or made available by transfer of such funds, to any intelligence agency or activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

Sec. 8138. Of the amounts provided in Titles I through VIII of this Act, $230,680,000 are permanently canceled: Provided, That the Secretary of Defense shall allocate the amount of budgetary resources canceled by this section on a pro-rata basis among each budget activity, activity group and subactivity group and each program, project or activity within each appropriations account.

Titles I through VIII of this Act may be cited as the "Department of Defense Appropriations Act, 1997".

TITLE IX—FISCAL YEAR 1996 SUPPLEMENTAL APPROPRIATIONS AND RESCISSIONS FOR
ANTI–TERRORISM, COUNTER–TERRORISM, AND SECURITY ENHANCEMENT ACTIVITIES

The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to provide emergency supplemental appropriations for the Department of Defense for the fiscal year ending September 30, 1996, namely:

DEPARTMENT OF DEFENSE—MILITARY

MILITARY PERSONNEL

Military Personnel, Army

For an additional amount for "Military Personnel, Army", $4,800,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

Military Personnel, Air Force

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

For an additional amount for "Military Personnel, Air Force", $4,000,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## OPERATION AND MAINTENANCE

### Operation and Maintenance, Army

For an additional amount for "Operation and Maintenance, Army", $21,200,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Operation and Maintenance, Air Force

For an additional amount for "Operation and Maintenance, Air Force", $67,400,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That these funds may be used to liquidate obligations incurred by the Air Force during fiscal year 1996 for costs incurred under the authority of the Feed and Forage Act (41 U.S.C. 11).

## PROCUREMENT

### Other Procurement, Army

For an additional amount for "Other Procurement, Army", $11,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Other Procurement, Air Force

For an additional amount for "Other Procurement, Air Force", $13,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## GENERAL PROVISIONS

### (Rescissions)

Sec. 9001. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded, as of the date of enactment of this Act, from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1994/1996", $1,000,000;

"Other Procurement, Army, 1994/1996", $6,000,000;

"Research, Development, Test and Evaluation, Army, 1995/1996", $2,055,000;

"Aircraft Procurement, Navy, 1994/1996", $10,157,000;

"Weapons Procurement, Navy, 1994/1996", $10,688,000;

"Other Procurement, Navy, 1994/1996", $4,000,000;

"Research, Development, Test and Evaluation, Navy, 1995/1996", $6,909,000;

"Aircraft Procurement, Air Force, 1994/1996", $18,771,000;

"Missile Procurement, Air Force, 1994/1996", $10,156,000;

"Other Procurement, Air Force, 1994/1996", $14,395,000;

"Research, Development, Test and Evaluation, Air Force, 1995/1996", $4,918,000;

"Procurement, Defense–Wide, 1994/1996", $9,954,000;

"Research, Development, Test and Evaluation, Defense–Wide, 1995/1996", $23,597,000.

Sec. 9002. Funds appropriated by this title, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997: Provided, That funds appropriated by this title, or made available by transfer of such funds, to any intelligence agency or intelligence activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

 (c) For programs, projects or activities in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

### AN ACT

 Making appropriations for the foreign operations, export financing, and related programs for the fiscal year ending September 30, 1997, and for other purposes.

### TITLE I—EXPORT AND INVESTMENT ASSISTANCE

### EXPORT–IMPORT BANK OF THE UNITED STATES

 The Export–Import Bank of the United States is authorized to make such expenditures within the limits of funds and borrowing authority available to such corporation, and in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out the program for the current fiscal year for such corporation: Provided, That none of the funds available during the current fiscal year may be used to make expenditures, contracts, or commitments for the export of nuclear equipment, fuel, or technology to any country other than a nuclear-weapon State as defined in Article IX of the Treaty on the Non–Proliferation of Nuclear Weapons eligible to receive economic or military assistance under this Act that has detonated a nuclear explosive after the date of enactment of this Act.

### SUBSIDY APPROPRIATION

 For the cost of direct loans, loan guarantees, insurance, and tied-aid grants as authorized by section 10 of the Export–Import Bank Act of 1945, as amended, $726,000,000 to remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall remain available until 2012 for the disbursement of direct loans, loan guarantees, insurance and tied-aid grants obligated in fiscal years 1997 and 1998: Provided further, That up to $50,000,000 of funds appropriated by this paragraph shall remain available until expended and may be used for tied-aid grant purposes: Provided further, That none of the funds appropriated by this paragraph may be used for tied-aid credits or grants except through the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated by this paragraph are made available notwithstanding section 2(b)(2) of the Export–Import Bank Act of 1945, in connection with the purchase or lease of any product by any East European country, any Baltic State, or any agency or national thereof.

### ADMINISTRATIVE EXPENSES

<< 12 USCA § 635a NOTE >>

 For administrative expenses to carry out the direct and guaranteed loan and insurance programs (to be computed on an accrual basis), including hire of passenger motor vehicles and services as authorized by 5 U.S.C. 3109, and not to exceed $20,000 for official reception and representation expenses for members of the Board of Directors, $46,614,000: Provided, That necessary expenses (including special services performed on a contract or fee basis, but not including other personal services) in connection with the collection of moneys owed the Export–Import Bank, repossession or sale of pledged collateral or other assets acquired by the Export–Import Bank in satisfaction of moneys owed the Export–Import Bank, or the investigation or appraisal of any property, or the evaluation of the legal or technical aspects of any transaction for which an application for a loan, guarantee or insurance commitment has been made, shall be considered nonadministrative expenses for the purposes of this heading: Provided further, That, effective July 21, 1997, notwithstanding any other provision of law, none of the funds made available by this or any other Act may be made available to compensate the incumbent Chairman and President of the Export–Import

Bank Provided further, That, notwithstanding subsection (b) of section 117 of the Export Enhancement Act of 1992, subsection (a) thereof shall remain in effect until October 1, 1997.

## OVERSEAS PRIVATE INVESTMENT CORPORATION

### NONCREDIT ACCOUNT

The Overseas Private Investment Corporation is authorized to make, without regard to fiscal year limitations, as provided by 31 U.S.C. 9104, such expenditures and commitments within the limits of funds available to it and in accordance with law as may be necessary: Provided, That the amount available for administrative expenses to carry out the credit and insurance programs (including an amount for official reception and representation expenses which shall not exceed $35,000) shall not exceed $32,000,000: Provided further, That project-specific transaction costs, including direct and indirect costs incurred in claims settlements, and other direct costs associated with services provided to specific investors or potential investors pursuant to section 234 of the Foreign Assistance Act of 1961, shall not be considered administrative expenses for the purposes of this heading.

### PROGRAM ACCOUNT

<< 22 USCA § 2195 >>

For the cost of direct and guaranteed loans, $72,000,000, as authorized by section 234 of the Foreign Assistance Act of 1961: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall be available for direct loan obligations and loan guaranty commitments incurred or made during fiscal years 1997 and 1998: Provided further, That such sums shall remain available through fiscal year 2005 for the disbursement of direct and guaranteed loans obligated in fiscal year 1997, and through fiscal year 2006 for the disbursement of direct and guaranteed loans obligated in fiscal year 1998: Provided further, That section 235(a)(3) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(3)) is amended by striking out "1996" and inserting in lieu thereof "1997" and, notwithstanding section 235(a)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(1)), the maximum contingent liability of issuing authority for insurance and financing shall not in the aggregate exceed the amounts provided in section 235(a)(1) and (2) of that Act. In addition, such sums as may be necessary for administrative expenses to carry out the credit program may be derived from amounts available for administrative expenses to carry out the credit and insurance programs in the Overseas Private Investment Corporation Noncredit Account and merged with said account.

## FUNDS APPROPRIATED TO THE PRESIDENT

### TRADE AND DEVELOPMENT AGENCY

For necessary expenses to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, $40,000,000: Provided, That the Trade and Development Agency may receive reimbursements from corporations and other entities for the costs of grants for feasibility studies and other project planning services, to be deposited as an offsetting collection to this account and to be available for obligation until September 30, 1998, for necessary expenses under this paragraph: Provided further, That such reimbursements shall not cover, or be allocated against, direct or indirect administrative costs of the agency.

## TITLE II—BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes, to remain available until September 30, 1997, unless otherwise specified herein, as follows:

### AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHILD SURVIVAL AND DISEASE PROGRAMS FUND

For necessary expenses to carry out the provisions of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, for child survival, basic education, assistance to combat tropical and other diseases, and related activities, in addition to funds

otherwise available for such purposes, $600,000,000, to remain available until expended: Provided, That this amount shall be made available for such activities as (1) immunization programs, (2) oral rehydration programs, (3) health and nutrition programs, and related education programs, which address the needs of mothers and children, (4) water and sanitation programs, (5) assistance for displaced and orphaned children, (6) programs for the prevention, treatment, and control of, and research on, tuberculosis, HIV/AIDS, polio, malaria and other diseases, (7) not to exceed $98,000,000 for basic education programs for children, and (8) a contribution on a grant basis to the United Nations Children's Fund (UNICEF) pursuant to section 301 of the Foreign Assistance Act of 1961.

DEVELOPMENT ASSISTANCE

(INCLUDING TRANSFER OF FUNDS)

 For necessary expenses to carry out the provisions of sections 103 through 106 and chapter 10 of part I of the Foreign Assistance Act of 1961, title V of the International Security and Development Cooperation Act of 1980 (Public Law 96–533) and the provisions of section 401 of the Foreign Assistance Act of 1969, $1,181,500,000, to remain available until September 30, 1998: Provided, That of the amount appropriated under this heading, up to $20,000,000 may be made available for the Inter–American Foundation and shall be apportioned directly to that agency: Provided further, That of the amount appropriated under this heading, up to $11,500,000 may be made available for the African Development Foundation and shall be apportioned directly to that agency: Provided further, That of the funds appropriated under title II of this Act that are administered by the Agency for International Development and made available for family planning assistance, not less than 65 percent shall be made available directly to the agency's central Office of Population and shall be programmed by that office for family planning activities: Provided further, That of the funds appropriated under this heading and under the heading "Child Survival and Disease Programs Fund" that are made available by the Agency for International Development for development assistance activities, the amount made available to carry out chapter 10 of part I of the Foreign Assistance Act of 1961 (relating to the Development Fund for Africa) and the amount made available for activities in the Latin America and Caribbean region should be in at least the same proportion as the amount identified in the fiscal year 1997 draft congressional presentation document for development assistance for each such region is to the total amount requested for development assistance for such fiscal year: Provided further, That funds appropriated under this heading may be made available, notwithstanding any other provision of law except section 515 of this Act, to assist Vietnam to reform its trade regime (such as through reform of its commercial and investment legal codes): Provided further, That none of the funds made available in this Act nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization: Provided further, That none of the funds made available under this heading may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions; and that in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects which offer, either directly or through referral to, or information about access to, a broad range of family planning methods and services: Provided further, That in awarding grants for natural family planning under section 104 of the Foreign Assistance Act of 1961 no applicant shall be discriminated against because of such applicant's religious or conscientious commitment to offer only natural family planning; and, additionally, all such applicants shall comply with the requirements of the previous proviso: Provided further, That for purposes of this or any other Act authorizing or appropriating funds for foreign operations, export financing, and related programs, the term "motivate", as it relates to family planning assistance, shall not be construed to prohibit the provision, consistent with local law, of information or counseling about all pregnancy options: Provided further, That nothing in this paragraph shall be construed to alter any existing statutory prohibitions against abortion under section 104 of the Foreign Assistance Act of 1961: Provided further, That, notwithstanding section 109 of the Foreign Assistance Act of 1961, of the funds appropriated under this heading in this Act, and of the unobligated balances of funds previously appropriated under this heading, up to $17,500,000 may be transferred to "International Organizations and Programs" for a contribution to the International Fund for Agricultural Development (IFAD), and that any such transfer of funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That of the funds appropriated under this heading that are made available for assistance programs for displaced and orphaned children and victims of war, not to exceed $25,000, in addition to funds otherwise available for such purposes, may be used to monitor and provide oversight of such programs: Provided further, That not less than $500,000 of the funds made available under this heading shall be available only for support of the United States Telecommunications Training Institute.

## CYPRUS

Of the funds appropriated under the headings "Development Assistance" and "Economic Support Fund", not less than $15,000,000 shall be made available for Cyprus to be used only for scholarships, administrative support of the scholarship program, bicommunal projects, and measures aimed at reunification of the island and designed to reduce tensions and promote peace and cooperation between the two communities on Cyprus.

## BURMA

Of the funds appropriated by this Act to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $2,500,000 shall be made available to support activities in Burma, along the Burma–Thailand border, and for activities of Burmese student groups and other organizations located outside Burma, for the purposes of fostering democracy in Burma, supporting the provision of medical supplies and other humanitarian assistance to Burmese located in Burma or displaced Burmese along the borders, and for other purposes: Provided, That of this amount, not less than $200,000 shall be made available to support newspapers, publications, and other media activities promoting democracy inside Burma: Provided further, That funds made available under this heading may be made available notwithstanding any other provision of law: Provided further, That provision of such funds shall be made available subject to the regular notification procedures of the Committees on Appropriations.

## PRIVATE AND VOLUNTARY ORGANIZATIONS

### << 22 USCA § 2151u NOTE >>

None of the funds appropriated or otherwise made available by this Act for development assistance may be made available to any United States private and voluntary organization, except any cooperative development organization, which obtains less than 20 per centum of its total annual funding for international activities from sources other than the United States Government: Provided, That the requirements of the provisions of section 123(g) of the Foreign Assistance Act of 1961 and the provisions on private and voluntary organizations in title II of the "Foreign Assistance and Related Programs Appropriations Act, 1985" (as enacted in Public Law 98–473) shall be superseded by the provisions of this section, except that the authority contained in the last sentence of section 123(g) may be exercised by the Administrator with regard to the requirements of this paragraph.

Funds appropriated or otherwise made available under title II of this Act should be made available to private and voluntary organizations at a level which is equivalent to the level provided in fiscal year 1995. Such private and voluntary organizations shall include those which operate on a not-for-profit basis, receive contributions from private sources, receive voluntary support from the public and are deemed to be among the most cost-effective and successful providers of development assistance.

## INTERNATIONAL DISASTER ASSISTANCE

For necessary expenses for international disaster relief, rehabilitation, and reconstruction assistance pursuant to section 491 of the Foreign Assistance Act of 1961, as amended, $190,000,000, to remain available until expended.

## DEBT RESTRUCTURING

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of modifying direct loans and loan guarantees, as the President may determine, for which funds have been appropriated or otherwise made available for programs within the International Affairs Budget Function 150, including the cost of selling, reducing, or canceling amounts, through debt buybacks and swaps, owed to the United States as a result of concessional loans made to eligible Latin American and Caribbean countries, pursuant to part IV of the Foreign Assistance Act of 1961, and of modifying concessional loans authorized under title I of the Agricultural Trade Development and Assistance Act of 1954, as amended, as authorized under subsection (a) under the heading "Debt Reduction for Jordan" in title VI of Public Law 103–306; $27,000,000, to remain available until expended: Provided, That none of the funds appropriated under this heading shall be obligated except as provided through the regular notification procedures of the Committees on Appropriations.

## MICRO AND SMALL ENTERPRISE DEVELOPMENT PROGRAM ACCOUNT

For the cost of direct loans and loan guarantees, $1,500,000, as authorized by section 108 of the Foreign Assistance Act of 1961, as amended: Provided, That such costs shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That guarantees of loans made under this heading in support of microenterprise activities may guarantee up to 70 percent of the principal amount of any such loans notwithstanding section 108 of the Foreign Assistance Act of 1961. In addition, for administrative expenses to carry out programs under this heading, $500,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

### HOUSING GUARANTY PROGRAM ACCOUNT

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of guaranteed loans authorized by sections 221 and 222 of the Foreign Assistance Act of 1961, $3,500,000, to remain available until September 30, 1998: Provided, That these funds are available to subsidize loan principal, 100 percent of which shall be guaranteed, pursuant to the authority of such sections. In addition, for administrative expenses to carry out guaranteed loan programs, $6,000,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That commitments to guarantee loans under this heading may be entered into notwithstanding the second and third sentences of section 222(a) and, with regard to programs for Central and Eastern Europe and programs for the benefit of South Africans disadvantaged by apartheid, section 223(j) of the Foreign Assistance Act of 1961.

### PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the "Foreign Service Retirement and Disability Fund", as authorized by the Foreign Service Act of 1980, $43,826,000.

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

For necessary expenses to carry out the provisions of section 667, $470,750,000: Provided, That none of the funds appropriated by this Act for programs administered by the Agency for International Development may be used to finance printing costs of any report or study (except feasibility, design, or evaluation reports or studies) in excess of $25,000 without the approval of the Administrator of the Agency or the Administrator's designee

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT OFFICE OF INSPECTOR GENERAL

For necessary expenses to carry out the provisions of section 667, $30,000,000, to remain available until September 30, 1998, which sum shall be available for the Office of the Inspector General of the Agency for International Development.

### OTHER BILATERAL ECONOMIC ASSISTANCE

### ECONOMIC SUPPORT FUND

For necessary expenses to carry out the provisions of chapter 4 of part II, $2,343,000,000, to remain available until September 30, 1998: Provided, That of the funds appropriated under this heading, not less than $1,200,000,000 shall be available only for Israel, which sum shall be available on a grant basis as a cash transfer and shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: Provided further, That not less than $815,000,000 shall be available only for Egypt, which sum shall be provided on a grant basis, and of which sum cash transfer assistance may be provided, with the understanding that Egypt will undertake significant economic reforms which are additional to those which were undertaken in previous fiscal years, and of which not less than $200,000,000 shall be provided as Commodity Import Program assistance: Provided further, That in exercising the authority to provide cash transfer assistance for Israel and Egypt, the President shall ensure that the level of such assistance does not cause an adverse impact on the total level of nonmilitary exports from the United States to each such country: Provided further, That it is the sense of the Congress that the recommended levels of assistance for Egypt and Israel are based in great measure upon their continued participation in the Camp David Accords and upon the Egyptian–Israeli peace treaty: Provided further, That none of the funds appropriated under this heading shall be made available for Zaire.

### INTERNATIONAL FUND FOR IRELAND

For necessary expenses to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, $19,600,000, which shall be available for the United States contribution to the International Fund for Ireland and shall be made available in accordance with the provisions of the Anglo–Irish Agreement Support Act of 1986 (Public Law 99–415): Provided, That such amount shall be expended at the minimum rate necessary to make timely payment for projects and activities: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

### ASSISTANCE FOR EASTERN EUROPE AND THE BALTIC STATES

 (a) For necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 and the Support for East European Democracy (SEED) Act of 1989, $475,000,000, to remain available until September 30, 1998, which shall be available, notwithstanding any other provision of law, for economic assistance and for related programs for Eastern Europe and the Baltic States.

 (b) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the Fund's disbursement of such funds for program purposes. The Fund may retain for such program purposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

 (c) Funds appropriated under this heading shall be considered to be economic assistance under the Foreign Assistance Act of 1961 for purposes of making available the administrative authorities contained in that Act for the use of economic assistance.

 (d) None of the funds appropriated under this heading may be made available for new housing construction or repair or reconstruction of existing housing in Bosnia and Herzegovina unless directly related to the efforts of United States troops to promote peace in said country.

 (e) With regard to funds appropriated or otherwise made available under this heading for the economic revitalization program in Bosnia and Herzegovina, and local currencies generated by such funds (including the conversion of funds appropriated under this heading into currency used by Bosnia and Herzegovina as local currency and local currency returned or repaid under such program)—

  (1) the Administrator of the Agency for International Development shall provide written approval for grants and loans prior to the obligation and expenditure of funds for such purposes, and prior to the use of funds that have been returned or repaid to any lending facility or grantee; and

  (2) the provisions of section 531 of this Act shall apply.

 (f) With regard to funds appropriated under this heading that are made available for economic revitalization programs in Bosnia and Herzegovina, 50 percent of such funds shall not be available for obligation unless the President determines and certifies to the Committees on Appropriations that the Federation of Bosnia and Herzegovina has complied with article III of annex 1–A of the General Framework Agreement for Peace in Bosnia and Herzegovina concerning the withdrawal of foreign forces, and that intelligence cooperation on training, investigations, and related activities between Iranian officials and Bosnian officials has been terminated.

### ASSISTANCE FOR THE NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

 (a) For necessary expenses to carry out the provisions of chapter 11 of part I of the Foreign Assistance Act of 1961 and the FREEDOM Support Act, for assistance for the new independent states of the former Soviet Union and for related programs, $625,000,000, to remain available until September 30, 1998: Provided, That the provisions of such chapter shall apply to funds appropriated by this paragraph.

 (b) None of the funds appropriated under this heading shall be transferred to the Government of Russia—

  (1) unless that Government is making progress in implementing comprehensive economic reforms based on market principles, private ownership, negotiating repayment of commercial debt, respect for commercial contracts, and equitable treatment of foreign private investment; and

  (2) if that Government applies or transfers United States assistance to any entity for the purpose of expropriating or seizing ownership or control of assets, investments, or ventures.

 (c) Funds may be furnished without regard to subsection (b) if the President determines that to do so is in the national interest.

<< 22 USCA § 5814 NOTE >>

(d) None of the funds appropriated under this heading shall be made available to any government of the new independent states of the former Soviet Union if that government directs any action in violation of the territorial integrity or national sovereignty of any other new independent state, such as those violations included in the Helsinki Final Act: Provided, That such funds may be made available without regard to the restriction in this subsection if the President determines that to do so is in the national security interest of the United States: Provided further, That the restriction of this subsection shall not apply to the use of such funds for the provision of assistance for purposes of humanitarian, disaster and refugee relief.

(e) None of the funds appropriated under this heading for the new independent states of the former Soviet Union shall be made available for any state to enhance its military capability: Provided, That this restriction does not apply to demilitarization or nonproliferation programs.

(f) Funds appropriated under this heading shall be subject to the regular notification procedures of the Committees on Appropriations.

(g) Funds made available in this Act for assistance to the new independent states of the former Soviet Union shall be subject to the provisions of section 117 (relating to environment and natural resources) of the Foreign Assistance Act of 1961.

(h)(1) Of the funds appropriated under title II of this Act, including funds appropriated under this heading, not less than $10,000,000 shall be available only for assistance for Mongolia, of which amount not less than $6,000,000 shall be available only for the Mongolian energy sector.

(2) Funds made available for assistance for Mongolia may be made available in accordance with the purposes and utilizing the authorities provided in chapter 11 of part I of the Foreign Assistance Act of 1961.

(i) Funds made available in this Act for assistance to the New Independent States of the former Soviet Union shall be provided to the maximum extent feasible through the private sector, including small- and medium-size businesses, entrepreneurs, and others with indigenous private enterprises in the region, intermediary development organizations committed to private enterprise, and private voluntary organizations: Provided, That grantees and contractors should, to the maximum extent possible, place in key staff positions specialists with prior on the ground expertise in the region of activity and fluency in one of the local languages.

(j) In issuing new task orders, entering into contracts, or making grants, with funds appropriated under this heading or in prior appropriations Acts, for projects or activities that have as one of their primary purposes the fostering of private sector development, the Coordinator for United States Assistance to the New Independent States and the implementing agency shall encourage the participation of and give significant weight to contractors and grantees who propose investing a significant amount of their own resources (including volunteer services and in-kind contributions) in such projects and activities.

(k) Of the funds made available under this heading, not less than $225,000,000 shall be made available for Ukraine, of which funds not less than $25,000,000 shall be made available to carry out United States decommissioning obligations regarding the Chornobyl plant made in the Memorandum of Understanding between the Government of Ukraine and the G–7 Group: Provided, That not less than $35,000,000 shall be made available for agricultural projects, including those undertaken through the Food Systems Restructuring Program, which leverage private sector resources with United States Government assistance: Provided further, That $5,000,000 shall be available for a small business incubator project: Provided further, That $5,000,000 shall be made available for screening and treatment of childhood mental and physical illnesses related to Chornobyl radiation: Provided further, That $5,000,000 shall be available only for a land and resource management institute to identify nuclear contamination at Chornobyl: Provided further, That $15,000,000 shall be available for the legal restructuring necessary to support a decentralized market-oriented economic system, including enactment of necessary substantive commercial law, implementation of reforms necessary to establish an independent judiciary and bar, legal education for judges, attorneys, and law students, and education of the public designed to promote understanding of a law-based economy.

(l) Of the funds made available for Ukraine, under this Act and Public Law 104–107, not less than $50,000,000 shall be made available to improve safety at nuclear reactors: Provided, That of this amount $20,000,000 shall be provided for the purchase and installation of, and training for, safety parameter display or control systems at all operational nuclear reactors: Provided further, That of this amount, $20,000,000 shall be made available for the purchase, construction, installation and training for Full Scope and Analytical/Engineering simulators: Provided further, That of this amount funds shall be made available to conduct Safety Analysis Reports at all operational nuclear reactors.

(m) Of the funds made available by this Act, not less than $95,000,000 shall be made available for Armenia.

(n) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the disbursement of such funds by the Fund for program purposes. The Fund may retain for such program proposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(o)(1) None of the funds appropriated under this heading may be made available for Russia unless the President determines and certifies in writing to the Committees on Appropriations that the Government of Russia has terminated implementation of arrangements to provide Iran with technical expertise, training, technology, or equipment necessary to develop a nuclear reactor or related nuclear research facilities or programs.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(p) Of the funds made available under this heading, not less than $10,000,000 shall be made available for a United States contribution to the Trans–Caucasus Enterprise Fund: Provided, That to further the development of the private sector in the Trans–Caucasus, such amount and amounts appropriated for purposes of subsection (t) under the heading "Assistance for the New Independent States of the Former Soviet Union" in Public Law 104–107 may be invested in a Trans–Caucasus Enterprise Fund or, notwithstanding the provisions of such subsection, invested in other funds established by public or private organizations, or transferred to the Overseas Private Investment Corporation to be available, subject to the requirements of the Federal Credit Reform Act, to subsidize the costs of direct and guaranteed loans.

(q)(1) Funds appropriated under this heading may not be made available for the Government of Ukraine if the President determines and reports to the Committees on Appropriations that the Government of Ukraine is engaged in military cooperation with the Government of Libya.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(r) Of the funds appropriated under this heading, not less than $15,000,000 should be available only for a family planning program for the New Independent States of the former Soviet Union comparable to the family planning program currently administered by the Agency for International Development in the Central Asian Republics and focusing on population assistance which provides an alternative to abortion.

(s) Funds made available under this Act or any other Act (other than assistance under title V of the FREEDOM Support Act and section 1424 of the "National Defense Authorization Act for Fiscal Year 1997") may not be provided for assistance to the Government of Azerbaijan until the President determines, and so reports to the Congress, that the Government of Azerbaijan is taking demonstrable steps to cease all blockades and other offensive uses of force against Armenia and Nagorno–Karabakh.

(t) Of the funds appropriated under this heading, not less than $2,500,000 shall be made available for the American–Russian Center.

INDEPENDENT AGENCY

PEACE CORPS

For expenses necessary to carry out the provisions of the Peace Corps Act (75 Stat. 612), $208,000,000, including the purchase of not to exceed five passenger motor vehicles for administrative purposes for use outside of the United States: Provided, That none of the funds appropriated under this heading shall be used to pay for abortions: Provided further, That funds appropriated under this heading shall remain available until September 30, 1998.

DEPARTMENT OF STATE

INTERNATIONAL NARCOTICS CONTROL

For necessary expenses to carry out section 481 of the Foreign Assistance Act of 1961, $213,000,000: Provided, That during fiscal year 1997, the Department of State may also use the authority of section 608 of the Foreign Assistance Act of 1961, without regard to its restrictions, to receive non-lethal excess property from an agency of the United States Government for the

purpose of providing it to a foreign country under chapter 8 of part I of that Act subject to the regular notification procedures of the Committees on Appropriations: Provided further, That none of the funds made available under this heading may be provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence to believe such unit has committed gross violations of human rights unless the Secretary determines and reports to the Committees on Appropriations that the government of such country is taking steps to bring the responsible members of the security forces unit to justice.

## MIGRATION AND REFUGEE ASSISTANCE

For expenses, not otherwise provided for, necessary to enable the Secretary of State to provide, as authorized by law, a contribution to the International Committee of the Red Cross, assistance to refugees, including contributions to the International Organization for Migration and the United Nations High Commissioner for Refugees, and other activities to meet refugee and migration needs; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980; allowances as authorized by sections 5921 through 5925 of title 5, United States Code; purchase and hire of passenger motor vehicles; and services as authorized by section 3109 of title 5, United States Code, $650,000,000: Provided, That not more than $12,000,000 shall be available for administrative expenses: Provided further, That not less than $80,000,000 shall be made available for refugees from the former Soviet Union and Eastern Europe and other refugees resettling in Israel.

## REFUGEE RESETTLEMENT ASSISTANCE

For necessary expenses for the targeted assistance program authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 and administered by the Office of Refugee Resettlement of the Department of Health and Human Services, in addition to amounts otherwise available for such purposes, $5,000,000.

## UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For necessary expenses to carry out the provisions of section 2(c) of the Migration and Refugee Assistance Act of 1962, as amended (22 U.S.C. 260(c)), $50,000,000, to remain available until expended: Provided, That the funds made available under this heading are appropriated notwithstanding the provisions contained in section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 which would limit the amount of funds which could be appropriated for this purpose.

## NONPROLIFERATION, ANTI–TERRORISM, DEMINING AND RELATED PROGRAMS

For necessary expenses for nonproliferation, anti-terrorism and related programs and activities, $133,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance, section 504 of the FREEDOM Support Act for the Nonproliferation and Disarmament Fund, section 23 of the Arms Export Control Act for demining activities, notwithstanding any other provision of law, including activities implemented through non-governmental and international organizations, section 301 of the Foreign Assistance Act of 1961 for a voluntary contribution to the International Atomic Energy Agency (IAEA) and a voluntary contribution to the Korean Peninsula Energy Development Organization (KEDO), and for the acquisition and provision of goods and services, or for grants to Israel necessary to support the eradication of terrorism in and around Israel: Provided, That of this amount not to exceed $15,000,000, to remain available until expended, may be made available for the Nonproliferation and Disarmament Fund, notwithstanding any other provision of law, to promote bilateral and multilateral activities relating to nonproliferation and disarmament: Provided further, That such funds may also be used for such countries other than the new independent states of the former Soviet Union and international organizations when it is in the national security interest of the United States to do so: Provided further, That such funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated under this heading may be made available for the International Atomic Energy Agency only if the Secretary of State determines (and so reports to the Congress) that Israel is not being denied its right to participate in the activities of that Agency: Provided further, That not to exceed $25,000,000 may be made available to the Korean Peninsula Energy Development Organization (KEDO) only for the administrative expenses and heavy fuel oil costs associated with the Agreed Framework: Provided further, That such funds may be obligated to KEDO only if, prior to such obligation of funds, the President certifies and so reports to Congress that (1)(A) the United States is taking steps to assure that progress is made on the implementation of the January 1, 1992, Joint Declaration on the Denuclearization of the Korean Peninsula and the implementation of the North–South dialogue, and (B) North Korea is complying with the other provisions of the Agreed Framework between North Korea and the United States and with the Confidential Minute; (2) North Korea is cooperating fully in the canning and safe storage of all spent fuel

from its graphite-moderated nuclear reactors and that such canning and safe storage is scheduled to be completed by the end of fiscal year 1997; and (3) North Korea has not significantly diverted assistance provided by the United States for purposes for which it was not intended: Provided further, That the President may waive the certification requirements of the preceding proviso if the President determines that it is vital to the national security interests of the United States: Provided further, That no funds may be obligated for KEDO until 30 calendar days after submission to Congress of the waiver permitted under the preceding proviso: Provided further, That before obligating any funds for KEDO, the President shall report to Congress on (1) the cooperation of North Korea in the process of returning to the United States the remains of United States military personnel who are listed as missing in action as a result of the Korean conflict (including conducting joint field activities with the United States); (2) violations of the military armistice agreement of 1953; (3) the actions which the United States is taking to assure that North Korea is consistently taking steps to implement the Joint Declaration on Denuclearization of the Korean Peninsula and engage in North–South dialogue; and (4) all instances of non-compliance with the Agreed Framework between North Korea and the United States and the Confidential Minute, including diversion of heavy fuel oil: Provided further, That the obligation of such funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That the Secretary of State shall submit to the appropriate congressional committees an annual report (to be submitted with the annual presentation for appropriations) providing a full and detailed accounting of the fiscal year request for the United States contribution to KEDO, the expected operating budget of the Korean Peninsula Energy Development Organization, to include proposed annual costs associated with heavy fuel oil purchases and other related activities, and the amount of funds pledged by other donor nations and organizations to support KEDO activities on a per country basis.

## TITLE III—MILITARY ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL MILITARY EDUCATION AND TRAINING

For necessary expenses to carry out the provisions of section 541 of the Foreign Assistance Act of 1961, $43,475,000: Provided, That none of the funds appropriated under this heading shall be available for Zaire and Guatemala: Provided further, That funds appropriated under this heading for grant financed military education and training for Indonesia may only be available for expanded international military education and training.

### FOREIGN MILITARY FINANCING PROGRAM

For expenses necessary for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $3,164,000,000: Provided, That of the funds appropriated by this paragraph not less than $1,800,000,000 shall be available for grants only for Israel, and not less than $1,300,000,000 shall be available for grants only for Egypt: Provided further, That the funds appropriated by this paragraph for Israel shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: Provided further, That to the extent that the Government of Israel requests that funds be used for such purposes, grants made available for Israel by this paragraph shall, as agreed by Israel and the United States, be available for advanced weapons systems, of which not less than $475,000,000 shall be available for the procurement in Israel of defense articles and defense services, including research and development: Provided further, That of the funds made available under this paragraph, $30,000,000 shall be available for assistance on a grant basis for Poland, Hungary, and the Czech Republic to carry out title II of Public Law 103–477 and section 585 of Public Law 104–107: Provided further, That funds made available under this paragraph shall be nonrepayable notwithstanding any requirement in section 23 of the Arms Export Control Act: Provided further, That, for the purpose only of providing support for NATO expansion and the Warsaw Initiative Program, of the funds appropriated by this Act under the headings "Assistance for Eastern Europe and the Baltic States" and "Assistance for the New Independent States of the Former Soviet Union", up to a total of $7,000,000 may be transferred, notwithstanding any other provision of law, to the funds appropriated under this paragraph: Provided further, That none of the funds made available under this heading shall be available for any non-NATO country participating in the Partnership for Peace Program except through the regular notification procedures of the Committees on Appropriations.

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of direct loans authorized by section 23 of the Arms Export Control Act as follows: cost of direct loans, $60,000,000: Provided, That these funds are available to subsidize gross obligations for the principal amount of direct loans of not to exceed $540,000,000: Provided further, That the rate of interest charged on such loans shall be not less than the current average market yield on outstanding marketable obligations of the United States of comparable maturities: Provided further, That of the funds appropriated under this paragraph $20,000,000

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September.

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 334 of 1021   PageID 7204

shall be made available to Poland, Hungary, and the Czech Republic: Provided further, That funds appropriated under this heading shall be made available for Greece and Turkey only on a loan basis, and the principal amount of direct loans for each country shall not exceed the following: $122,500,000 only for Greece and $175,000,000 only for Turkey.

None of the funds made available under this heading shall be available to finance the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act unless the foreign country proposing to make such procurements has first signed an agreement with the United States Government specifying the conditions under which such procurements may be financed with such funds: Provided, That all country and funding level increases in allocations shall be submitted through the regular notification procedures of section 515 of this Act: Provided further, That funds made available under this heading shall be obligated upon apportionment in accordance with paragraph (5)(C) of title 31, United States Code, section 1501(a): Provided further, That none of the funds appropriated under this heading shall be available for Zaire, Sudan, Liberia, and Guatemala: Provided further, That funds made available under this heading may be used, notwithstanding any other provision of law, for activities related to the clearance of landmines and unexploded ordnance, and may include activities implemented through nongovernmental and international organizations: Provided further, That only those countries for which assistance was justified for the "Foreign Military Sales Financing Program" in the fiscal year 1989 congressional presentation for security assistance programs may utilize funds made available under this heading for procurement of defense articles, defense services or design and construction services that are not sold by the United States Government under the Arms Export Control Act: Provided further, That, subject to the regular notification procedures of the Committees on Appropriations, funds made available under this heading for the cost of direct loans may also be used to supplement the funds available under this heading for grants, and funds made available under this heading for grants may also be used to supplement the funds available under this heading for the cost of direct loans: Provided further, That funds appropriated under this heading shall be expended at the minimum rate necessary to make timely payment for defense articles and services: Provided further, That not more than $23,250,000 of the funds appropriated under this heading may be obligated for necessary expenses, including the purchase of passenger motor vehicles for replacement only for use outside of the United States, for the general costs of administering military assistance and sales: Provided further, That not more than $355,000,000 of funds realized pursuant to section 21(e)(1)(A) of the Arms Export Control Act may be obligated for expenses incurred by the Department of Defense during fiscal year 1997 pursuant to section 43(b) of the Arms Export Control Act, except that this limitation may be exceeded only through the regular notification procedures of the Committees on Appropriations.

TITLE IV—MULTILATERAL ECONOMIC ASSISTANCE

FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL FINANCIAL INSTITUTIONS
CONTRIBUTION TO THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the International Bank for Reconstruction and Development by the Secretary of the Treasury, for the United States contribution to the Global Environment Facility (GEF), $35,000,000, to remain available until September 30, 1998.

CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

For payment to the International Development Association by the Secretary of the Treasury, $700,000,000, for the United States contribution to the tenth replenishment, to remain available until expended: Provided, That none of the funds may be obligated before March 1, 1997: Provided further, That not less than twenty days before such funds are obligated, the Secretary of the Treasury shall submit a report to the Committees on Appropriations on his efforts to reach agreement with the other IDA–11 donors, including at the February 1997 IDA–11 donors review meeting, that the procurement restrictions in the Interim Trust Fund will be lifted.

CONTRIBUTION TO THE INTERNATIONAL FINANCE CORPORATION

For payment to the International Finance Corporation by the Secretary of the Treasury, $6,656,000, for the United States share of the increase in subscriptions to capital stock, to remain available until expended.

CONTRIBUTION TO THE INTER–AMERICAN DEVELOPMENT BANK

For payment to the Inter–American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in share portion of the increase in capital stock, $25,610,667, and for the United States share of the increase in the resources of the Fund for Special Operations, $10,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Inter–American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $1,503,718,910.

### CONTRIBUTION TO THE ENTERPRISE FOR THE AMERICAS MULTILATERAL INVESTMENT FUND

For payment to the Enterprise for the Americas Multilateral Investment Fund by the Secretary of the Treasury, for the United States contribution to the Fund to be administered by the Inter–American Development Bank, $27,500,000 to remain available until expended.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT BANK

For payment to the Asian Development Bank by the Secretary of the Treasury for the United States share of the paid-in portion of the increase in capital stock, $13,221,596, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Asian Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $647,858,204.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $100,000,000, to remain available until expended.

### CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the European Bank for Reconstruction and Development by the Secretary of the Treasury, $11,916,447, for the United States share of the paid-in share portion of the initial capital subscription, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the European Bank for Reconstruction and Development may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $27,805,043.

### NORTH AMERICAN DEVELOPMENT BANK

For payment to the North American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in portion of the capital stock, $56,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the North American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of the capital stock of the North American Development Bank in an amount not to exceed $318,750,000.

### INTERNATIONAL ORGANIZATIONS AND PROGRAMS

For necessary expenses to carry out the provisions of section 301 of the Foreign Assistance Act of 1961, and of section 2 of the United Nations Environment Program Participation Act of 1973, $169,950,000: Provided, That none of the funds appropriated under this heading shall be made available for the United Nations Fund for Science and Technology: Provided further, That none of the funds appropriated under this heading that are made available to the United Nations Population Fund (UNFPA) shall be made available for activities in the People's Republic of China: Provided further, That not more than $25,000,000 of the funds appropriated under this heading may be made available to the UNFPA: Provided further, That not more than one-half of this amount may be provided to UNFPA before March 1, 1997, and that no later than February 15, 1997, the Secretary of State shall submit a report to the Committees on Appropriations indicating the amount UNFPA is budgeting for the People's Republic of China in 1997: Provided further, That any amount UNFPA plans to spend in the People's Republic of China in 1997 shall be deducted from the amount of funds provided to UNFPA after March 1, 1997, pursuant to the previous provisos: Provided further, That with respect to any funds appropriated under this heading that are made available to UNFPA, UNFPA

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

shall be required to maintain such funds in a separate account and not commingle them with any other funds: Provided further, That none of the funds appropriated under this heading may be made available to the Korean Peninsula Energy Development Organization (KEDO) or the International Atomic Energy Agency (IAEA).

## TITLE V—GENERAL PROVISIONS

### OBLIGATIONS DURING LAST MONTH OF AVAILABILITY

SEC. 501. Except for the appropriations entitled "International Disaster Assistance", and "United States Emergency Refugee and Migration Assistance Fund", not more than 15 per centum of any appropriation item made available by this Act shall be obligated during the last month of availability.

### PROHIBITION OF BILATERAL FUNDING FOR INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 502. None of the funds contained in title II of this Act may be used to carry out the provisions of section 209(d) of the Foreign Assistance Act of 1961.

### LIMITATION ON RESIDENCE EXPENSES

SEC. 503. Of the funds appropriated or made available pursuant to this Act, not to exceed $126,500 shall be for official residence expenses of the Agency for International Development during the current fiscal year: Provided, That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars.

### LIMITATION ON EXPENSES

SEC. 504. Of the funds appropriated or made available pursuant to this Act, not to exceed $5,000 shall be for entertainment expenses of the Agency for International Development during the current fiscal year.

### LIMITATION ON REPRESENTATIONAL ALLOWANCES

SEC. 505. Of the funds appropriated or made available pursuant to this Act, not to exceed $95,000 shall be available for representation allowances for the Agency for International Development during the current fiscal year: Provided, That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars: Provided further, That of the funds made available by this Act for general costs of administering military assistance and sales under the heading "Foreign Military Financing Program", not to exceed $2,000 shall be available for entertainment expenses and not to exceed $50,000 shall be available for representation allowances: Provided further, That of the funds made available by this Act under the heading "International Military Education and Training", not to exceed $50,000 shall be available for entertainment allowances: Provided further, That of the funds made available by this Act for the Inter–American Foundation, not to exceed $2,000 shall be available for entertainment and representation allowances: Provided further, That of the funds made available by this Act for the Peace Corps, not to exceed a total of $4,000 shall be available for entertainment expenses: Provided further, That of the funds made available by this Act under the heading "Trade and Development Agency", not to exceed $2,000 shall be available for representation and entertainment allowances.

### PROHIBITION ON FINANCING NUCLEAR GOODS

SEC. 506. None of the funds appropriated or made available (other than funds for "Nonproliferation, Anti-terrorism, Demining and Related Programs") pursuant to this Act, for carrying out the Foreign Assistance Act of 1961, may be used, except for purposes of nuclear safety, to finance the export of nuclear equipment, fuel, or technology.

### PROHIBITION AGAINST DIRECT FUNDING FOR CERTAIN COUNTRIES

SEC. 507. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance or reparations to Cuba, Iraq, Libya, North Korea, Iran, Sudan, or Syria: Provided, That for purposes of this section, the prohibition on obligations or expenditures shall include direct loans, credits, insurance and guarantees of the Export–Import Bank or its agents.

### MILITARY COUPS

SEC. 508. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance to any country whose duly elected Head of Government is deposed by military coup or decree: Provided, That assistance may be resumed to such country if the President determines and reports to the Committees on Appropriations that subsequent to the termination of assistance a democratically elected government has taken office.

## TRANSFERS BETWEEN ACCOUNTS

SEC. 509. None of the funds made available by this Act may be obligated under an appropriation account to which they were not appropriated, except for transfers specifically provided for in this Act, unless the President, prior to the exercise of any authority contained in the Foreign Assistance Act of 1961 to transfer funds, consults with and provides a written policy justification to the Committees on Appropriations of the House of Representatives and the Senate.

## DEOBLIGATION/REOBLIGATION AUTHORITY

SEC. 510. (a) Amounts certified pursuant to section 1311 of the Supplemental Appropriations Act, 1955, as having been obligated against appropriations heretofore made under the authority of the Foreign Assistance Act of 1961 for the same general purpose as any of the headings under title II of this Act are, if deobligated, hereby continued available for the same period as the respective appropriations under such headings or until September 30, 1997, whichever is later, and for the same general purpose, and for countries within the same region as originally obligated: Provided, That the Appropriations Committees of both Houses of the Congress are notified fifteen days in advance of the reobligation of such funds in accordance with regular notification procedures of the Committees on Appropriations.

(b) Obligated balances of funds appropriated to carry out section 23 of the Arms Export Control Act as of the end of the fiscal year immediately preceding the current fiscal year are, if deobligated, hereby continued available during the current fiscal year for the same purpose under any authority applicable to such appropriations under this Act: Provided, That the authority of this subsection may not be used in fiscal year 1997.

## AVAILABILITY OF FUNDS

SEC. 511. No part of any appropriation contained in this Act shall remain available for obligation after the expiration of the current fiscal year unless expressly so provided in this Act: Provided, That funds appropriated for the purposes of chapters 1, 8, and 11 of part I, section 667, and chapter 4 of part II of the Foreign Assistance Act of 1961, as amended, and funds provided under the heading "Assistance for Eastern Europe and the Baltic States", shall remain available until expended if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act: Provided further, That, notwithstanding any other provision of this Act, any funds made available for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated or obligated for cash disbursements in order to address balance of payments or economic policy reform objectives, shall remain available until expended: Provided further, That the report required by section 653(a) of the Foreign Assistance Act of 1961 shall designate for each country, to the extent known at the time of submission of such report, those funds allocated for cash disbursement for balance of payment and economic policy reform purposes.

## LIMITATION ON ASSISTANCE TO COUNTRIES IN DEFAULT

SEC. 512. No part of any appropriation contained in this Act shall be used to furnish assistance to any country which is in default during a period in excess of one calendar year in payment to the United States of principal or interest on any loan made to such country by the United States pursuant to a program for which funds are appropriated under this Act: Provided, That this section and section 620(q) of the Foreign Assistance Act of 1961 shall not apply to funds made available in this Act or during the current fiscal year for Nicaragua, and for any narcotics-related assistance for Columbia, Bolivia, and Peru authorized by the Foreign Assistance Act of 1961 or the Arms Export Control Act.

## COMMERCE AND TRADE

SEC. 513. (a) None of the funds appropriated or made available pursuant to this Act for direct assistance and none of the funds otherwise made available pursuant to this Act to the Export–Import Bank and the Overseas Private Investment Corporation shall be obligated or expended to finance any loan, any assistance or any other financial commitments for establishing or expanding production of any commodity for export by any country other than the United States, if the commodity is likely to be in surplus on world markets at the time the resulting productive capacity is expected to become operative and if the assistance will cause

substantial injury to United States producers of the same, similar, or competing commodity: Provided, That such prohibition shall not apply to the Export–Import Bank if in the judgment of its Board of Directors the benefits to industry and employment in the United States are likely to outweigh the injury to United States producers of the same, similar, or competing commodity, and the Chairman of the Board so notifies the Committees on Appropriations.

 (b) None of the funds appropriated by this or any other Act to carry out chapter 1 of part I of the Foreign Assistance Act of 1961 shall be available for any testing or breeding feasibility study, variety improvement or introduction, consultancy, publication, conference, or training in connection with the growth or production in a foreign country of an agricultural commodity for export which would compete with a similar commodity grown or produced in the United States: Provided, That this subsection shall not prohibit—

   (1) activities designed to increase food security in developing countries where such activities will not have a significant impact in the export of agricultural commodities of the United States; or

   (2) research activities intended primarily to benefit American producers.

SURPLUS COMMODITIES

<< 22 USCA § 262h NOTE >>

 SEC. 514. The Secretary of the Treasury shall instruct the United States Executive Directors of the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter–American Development Bank, the International Monetary Fund, the Asian Development Bank, the Inter–American Investment Corporation, the North American Development Bank, the European Bank for Reconstruction and Development, the African Development Bank, and the African Development Fund to use the voice and vote of the United States to oppose any assistance by these institutions, using funds appropriated or made available pursuant to this Act, for the production or extraction of any commodity or mineral for export, if it is in surplus on world markets and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity.

NOTIFICATION REQUIREMENTS

 SEC. 515. For the purposes of providing the Executive Branch with the necessary administrative flexibility, none of the funds made available under this Act for "Child Survival and Disease Programs Fund", "Development Assistance", "Debt restructuring", "International organizations and programs", "Trade and Development Agency", "International narcotics control", "Assistance for Eastern Europe and the Baltic States", "Assistance for the New Independent States of the Former Soviet Union", "Economic Support Fund", "Peacekeeping operations", "Operating expenses of the Agency for International Development", "Operating expenses of the Agency for International Development Office of Inspector General", "Nonproliferation, anti-terrorism, demining and related programs", "Foreign Military Financing Program", "International military education and training", "Inter–American Foundation", "African Development Foundation", "Peace Corps", "Migration and refugee assistance", shall be available for obligation for activities, programs, projects, type of materiel assistance, countries, or other operations not justified or in excess of the amount justified to the Appropriations Committees for obligation under any of these specific headings unless the Appropriations Committees of both Houses of Congress are previously notified fifteen days in advance: Provided, That the President shall not enter into any commitment of funds appropriated for the purposes of section 23 of the Arms Export Control Act for the provision of major defense equipment, other than conventional ammunition, or other major defense items defined to be aircraft, ships, missiles, or combat vehicles, not previously justified to Congress or 20 per centum in excess of the quantities justified to Congress unless the Committees on Appropriations are notified fifteen days in advance of such commitment: Provided further, That this section shall not apply to any reprogramming for an activity, program, or project under chapter 1 of part I of the Foreign Assistance Act of 1961 of less than 10 per centum of the amount previously justified to the Congress for obligation for such activity, program, or project for the current fiscal year: Provided further, That the requirements of this section or any similar provision of this Act or any other Act, including any prior Act requiring notification in accordance with the regular notification procedures of the Committees on Appropriations, may be waived if failure to do so would pose a substantial risk to human health or welfare: Provided further, That in case of any such waiver, notification to the Congress, or the appropriate congressional committees, shall be provided as early as practicable, but in no event later than three days after taking the action to which such notification requirement was applicable, in the context of

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

the circumstances necessitating such waiver: Provided further, That any notification provided pursuant to such a waiver shall contain an explanation of the emergency circumstances.

  Drawdowns made pursuant to section 506(a)(2) of the Foreign Assistance Act of 1961 shall be subject to the regular notification procedures of the Committees on Appropriations.

### LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL ORGANIZATIONS AND PROGRAMS

  SEC. 516. Notwithstanding any other provision of law or of this Act, none of the funds provided for "International Organizations and Programs" shall be available for the United States proportionate share, in accordance with section 307(c) of the Foreign Assistance Act of 1961, for any programs identified in section 307, or for Libya, Iran, or, at the discretion of the President, Communist countries listed in section 620(f) of the Foreign Assistance Act of 1961, as amended: Provided, That, subject to the regular notification procedures of the Committees on Appropriations, funds appropriated under this Act or any previously enacted Act making appropriations for foreign operations, export financing, and related programs, which are returned or not made available for organizations and programs because of the implementation of this section or any similar provision of law, shall remain available for obligation through September 30, 1998.

### ECONOMIC SUPPORT FUND ASSISTANCE FOR ISRAEL

  SEC. 517. The Congress finds that progress on the peace process in the Middle East is vitally important to United States security interests in the region. The Congress recognizes that, in fulfilling its obligations under the Treaty of Peace Between the Arab Republic of Egypt and the State of Israel, done at Washington on March 26, 1979, Israel incurred severe economic burdens. Furthermore, the Congress recognizes that an economically and militarily secure Israel serves the security interests of the United States, for a secure Israel is an Israel which has the incentive and confidence to continue pursuing the peace process. Therefore, the Congress declares that, subject to the availability of appropriations, it is the policy and the intention of the United States that the funds provided in annual appropriations for the Economic Support Fund which are allocated to Israel shall not be less than the annual debt repayment (interest and principal) from Israel to the United States Government in recognition that such a principle serves United States interests in the region.

### PROHIBITION ON FUNDING FOR ABORTIONS AND INVOLUNTARY STERILIZATION

  SEC. 518. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for any biomedical research which relates in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be obligated or expended for any country or organization if the President certifies that the use of these funds by any such country or organization would violate any of the above provisions related to abortions and involuntary sterilizations: Provided, That none of the funds made available under this Act may be used to lobby for or against abortion.

### AUTHORIZATION FOR POPULATION PLANNING

  SEC. 518A. (a) None of the funds made available in title II of this Act for population planning activities or other population assistance pursuant to section 104(b) of the Foreign Assistance Act or any other provision of law may be obligated or expended prior to July 1, 1997.

  (b) Not to exceed $385,000,000 of the funds appropriated in title II of this Act may be made available for population planning activities or other population assistance.

  (c) Such funds may be apportioned only on a monthly basis, and such monthly apportionments may not exceed 8 percent of the total available for such activities.

  (d) Not later than February 1, 1997, the President shall submit a finding to the Congress regarding the impact of the limitation on obligations imposed by subsection (a) of this section on the proper functioning of the population planning program. If such Presidential finding indicates that the limitation is having a negative impact on the proper functioning of the population

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

planning program, funds for population planning activities and other population assistance referred to in subsection (a) may be made available beginning March 1, 1997, notwithstanding the July 1, 1997, limitation set forth in subsection (a), if the Congress approves such finding by adoption of a joint resolution of approval not later than February 28, 1997, in accordance with subsection (e).

(e) CONGRESSIONAL REVIEW PROCEDURE.—

(1) This subsection is enacted by Congress—

(A) as an exercise of the rulemaking power of the House of Representatives and the Senate, respectively, and as such it is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraph (2) of this subsection; and it supersedes other rules only to the extent that it is inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as those rules relate to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of such House.

(2) For purposes of this section, the term "resolution" means a joint resolution, the text of which is as follows: "That the House of Representatives and Senate approve the Presidential finding, submitted to the Congress on XXXXX, that the limitation on obligations imposed by section 518A(a) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, is having a negative impact on the proper functioning of the population planning program.". The blank space therein shall be filled with the date on which the President submits his finding to the House of Representatives and the Senate.

(3) On the day on which the President submits a finding under this section to the Congress, a joint resolution described in paragraph (2) shall be introduced (by request) in the House by the majority leader of the House, for himself and the minority leader of the House, or by Members of the House designated by the majority leader and minority leader of the House; and shall be introduced (by request) in the Senate by the majority leader of the Senate, for himself and the minority leader of the Senate, or by Members of the Senate designated by the majority leader and minority leader of the Senate. If either House is not in session on the day on which the President submits such finding, the resolution shall be introduced in that House, as provided in the preceding sentence, on the first day thereafter on which that House is in session. A resolution once introduced in the House with respect to a Presidential finding under this section shall be referred to 1 or more committees (and all resolutions with respect to the same Presidential finding shall be referred to the same committee or committees) by the Speaker of the House of Representatives. A resolution once introduced in the Senate with respect to a Presidential finding under this section shall be referred to the appropriate committee (and all resolutions with respect to the same Presidential finding shall be referred to the same committee) by the President of the Senate.

(4) No amendment to a resolution introduced under this section shall be in order in either the House of Representatives or the Senate; and no motion to suspend the application of this subsection shall be in order in either House, nor shall it be in order in either House for the presiding officer to entertain a request to suspend the application of this subsection by unanimous consent.

(5)(A) If any committee to which a resolution with respect to a Presidential finding under this section has been referred has not reported it at the end of 5 calendar days after its introduction, such committee shall be automatically discharged from further consideration of the resolution and it shall be placed on the appropriate calendar. A vote on final passage of the resolution, shall be taken in each House on or before February 28, 1997. If prior to the passage by 1 House of a resolution of that House under this section, that House receives the same resolution from the other House, then—

(i) the procedure in that House shall be the same as if no resolution had been received from the other House, but

(ii) the vote on final passage shall be on the resolution of the other House.

(6)(A) A motion in the House of Representatives to proceed to the consideration of a resolution under this section shall be highly privileged and not debatable. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the House of Representatives on the resolution described in paragraph (2) of this subsection shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing such resolution. A motion to further limit debate shall not be debatable. It shall not be in order to move to recommit a resolution or to move to reconsider the vote by which such resolution was agreed to or disagreed to.

(C) Appeals from the decision of the Chair relating to the application of the rules of the House of Representatives to the procedures relating to a resolution under this section shall be decided without debate.

(D) Except to the extent specifically provided in preceding provisions of this subsection, consideration in the House of Representatives of a resolution under this subsection shall be governed by the rules of the House of Representatives applicable to other resolutions in similar circumstances.

(7)(A) A motion in the Senate to proceed to the consideration of a resolution under this section shall not be debatable. It shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the Senate on the resolution described in paragraph (2) of this subsection, and all debatable motions and appeals in connection therewith, shall be limited to not more than 2 hours. The time shall be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(C) A motion in the Senate to further limit debate is not debatable. A motion to recommit a resolution is not in order.

## REPORTING REQUIREMENT

SEC. 519. The President shall submit to the Committees on Appropriations the reports required by section 25(a)(1) of the Arms Export Control Act.

## SPECIAL NOTIFICATION REQUIREMENTS

SEC. 520. None of the funds appropriated in this Act shall be obligated or expended for Colombia, Guatemala (except that this provision shall not apply to development assistance for Guatemala), Dominican Republic, Haiti, Liberia, Pakistan, Peru, Serbia, Sudan, or Zaire except as provided through the regular notification procedures of the Committees on Appropriations.

## DEFINITION OF PROGRAM, PROJECT, AND ACTIVITY

SEC. 521. For the purpose of this Act, "program, project, and activity" shall be defined at the Appropriations Act account level and shall include all Appropriations and Authorizations Acts earmarks, ceilings, and limitations with the exception that for the following accounts: Economic Support Fund and Foreign Military Financing Program, "program, project, and activity" shall also be considered to include country, regional, and central program level funding within each such account; for the development assistance accounts of the Agency for International Development "program, project, and activity" shall also be considered to include central program level funding, either as (1) justified to the Congress, or (2) allocated by the executive branch in accordance with a report, to be provided to the Committees on Appropriations within thirty days of enactment of this Act, as required by section 653(a) of the Foreign Assistance Act of 1961.

## CHILD SURVIVAL AND AIDS ACTIVITIES

SEC. 522. Up to $8,000,000 of the funds made available by this Act for assistance for family planning, health, child survival, and AIDS, may be used to reimburse United States Government agencies, agencies of State governments, institutions of higher learning, and private and voluntary organizations for the full cost of individuals (including for the personal services of such individuals) detailed or assigned to, or contracted by, as the case may be, the Agency for International Development for the purpose of carrying out family planning activities, child survival activities and activities relating to research on, and the treatment and control of acquired immune deficiency syndrome in developing countries: Provided, That funds appropriated by this Act that are made available for child survival activities or activities relating to research on, and the treatment and control of, acquired immune deficiency syndrome may be made available notwithstanding any provision of law that restricts assistance to foreign countries: Provided further, That funds appropriated by this Act that are made available for family planning activities may be made available notwithstanding section 512 of this Act and section 620(q) of the Foreign Assistance Act of 1961.

## PROHIBITION AGAINST INDIRECT FUNDING TO CERTAIN COUNTRIES

SEC. 523. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated to finance indirectly any assistance or reparations to Cuba, Iraq, Libya, Iran, Syria, North Korea, or the People's Republic of China, unless the President of the United States certifies that the withholding of these funds is contrary to the national interest of the United States.

## RECIPROCAL LEASING

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 342 of 1021   PageID 7212

<< 22 USCA § 2796 >>

SEC. 524. Section 61(a) of the Arms Export Control Act is amended by striking out "1996" and inserting in lieu thereof "1997".

### NOTIFICATION ON EXCESS DEFENSE EQUIPMENT

SEC. 525. Prior to providing excess Department of Defense articles in accordance with section 516(a) of the Foreign Assistance Act of 1961, the Department of Defense shall notify the Committees on Appropriations to the same extent and under the same conditions as are other committees pursuant to subsection (c) of that section: Provided, That before issuing a letter of offer to sell excess defense articles under the Arms Export Control Act, the Department of Defense shall notify the Committees on Appropriations in accordance with the regular notification procedures of such Committees: Provided further, That such Committees shall also be informed of the original acquisition cost of such defense articles.

### AUTHORIZATION REQUIREMENT

SEC. 526. Funds appropriated by this Act may be obligated and expended notwithstanding section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956.

### PROHIBITION ON BILATERAL ASSISTANCE TO TERRORIST COUNTRIES

SEC. 527. (a) Notwithstanding any other provision of law, funds appropriated for bilateral assistance under any heading of this Act and funds appropriated under any such heading in a provision of law enacted prior to enactment of this Act, shall not be made available to any country which the President determines—

(1) grants sanctuary from prosecution to any individual or group which has committed an act of international terrorism, or

(2) otherwise supports international terrorism.

(b) The President may waive the application of subsection (a) to a country if the President determines that national security or humanitarian reasons justify such waiver. The President shall publish each waiver in the Federal Register and, at least fifteen days before the waiver takes effect, shall notify the Committees on Appropriations of the waiver (including the justification for the waiver) in accordance with the regular notification procedures of the Committees on Appropriations.

### COMMERCIAL LEASING OF DEFENSE ARTICLES

<< 22 USCA § 2763 NOTE >>

SEC. 528. Notwithstanding any other provision of law, and subject to the regular notification procedures of the Committees on Appropriations, the authority of section 23(a) of the Arms Export Control Act may be used to provide financing to Israel, Egypt and NATO and major non-NATO allies for the procurement by leasing (including leasing with an option to purchase) of defense articles from United States commercial suppliers, not including Major Defense Equipment (other than helicopters and other types of aircraft having possible civilian application), if the President determines that there are compelling foreign policy or national security reasons for those defense articles being provided by commercial lease rather than by government-to-government sale under such Act.

### COMPETITIVE INSURANCE

SEC. 528A. All Agency for International Development contracts and solicitations, and subcontracts entered into under such contracts, shall include a clause requiring that United States insurance companies have a fair opportunity to bid for insurance when such insurance is necessary or appropriate.

### STINGERS IN THE PERSIAN GULF REGION

SEC. 529. Except as provided in section 581 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, the United States may not sell or otherwise make available any Stingers to any country bordering the Persian Gulf under the Arms Export Control Act or chapter 2 of part II of the Foreign Assistance Act of 1961.

### DEBT–FOR–DEVELOPMENT

SEC. 530. In order to enhance the continued participation of nongovernmental organizations in economic assistance activities under the Foreign Assistance Act of 1961, including endowments, debt-for-development and debt-for-nature exchanges, a nongovernmental organization which is a grantee or contractor of the Agency for International Development may place in interest bearing accounts funds made available under this Act or prior Acts or local currencies which accrue to that organization as a result of economic assistance provided under title II of this Act and any interest earned on such investment shall be used for the purpose for which the assistance was provided to that organization.

## SEPARATE ACCOUNTS

### << 22 USCA § 2359 NOTE >>

SEC. 531. (a) SEPARATE ACCOUNTS FOR LOCAL CURRENCIES.—(1) If assistance is furnished to the government of a foreign country under chapters 1 and 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961 under agreements which result in the generation of local currencies of that country, the Administrator of the Agency for International Development shall—

  (A) require that local currencies be deposited in a separate account established by that government;

  (B) enter into an agreement with that government which sets forth—

  (i) the amount of the local currencies to be generated, and

  (ii) the terms and conditions under which the currencies so deposited may be utilized, consistent with this section; and

  (C) establish by agreement with that government the responsibilities of the Agency for International Development and that government to monitor and account for deposits into and disbursements from the separate account.

(2) USES OF LOCAL CURRENCIES.—As may be agreed upon with the foreign government, local currencies deposited in a separate account pursuant to subsection (a), or an equivalent amount of local currencies, shall be used only—

  (A) to carry out chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), for such purposes as—

  (i) project and sector assistance activities, or

  (ii) debt and deficit financing; or

  (B) for the administrative requirements of the United States Government.

(3) PROGRAMMING ACCOUNTABILITY.—The Agency for International Development shall take all necessary steps to ensure that the equivalent of the local currencies disbursed pursuant to subsection (a)(2)(A) from the separate account established pursuant to subsection (a)(1) are used for the purposes agreed upon pursuant to subsection (a)(2).

(4) TERMINATION OF ASSISTANCE PROGRAMS.—Upon termination of assistance to a country under chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), any unencumbered balances of funds which remain in a separate account established pursuant to subsection (a) shall be disposed of for such purposes as may be agreed to by the government of that country and the United States Government.

(5) CONFORMING AMENDMENTS.—The provisions of this subsection shall supersede the tenth and eleventh provisos contained under the heading "Sub–Saharan Africa, Development Assistance" as included in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 and sections 531(d) and 609 of the Foreign Assistance Act of 1961.

(6) REPORTING REQUIREMENT.—The Administrator of the Agency for International Development shall report on an annual basis as part of the justification documents submitted to the Committees on Appropriations on the use of local currencies for the administrative requirements of the United States Government as authorized in subsection (a)(2)(B), and such report shall include the amount of local currency (and United States dollar equivalent) used and/or to be used for such purpose in each applicable country.

(b) SEPARATE ACCOUNTS FOR CASH TRANSFERS.—(1) If assistance is made available to the government of a foreign country, under chapters 1 or 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961, as cash transfer assistance or as nonproject sector assistance, that country shall be required to maintain such funds in a separate account and not commingle them with any other funds.

(2) APPLICABILITY OF OTHER PROVISIONS OF LAW.—Such funds may be obligated and expended notwithstanding provisions of law which are inconsistent with the nature of this assistance including provisions which are referenced in the Joint Explanatory Statement of the Committee of Conference accompanying House Joint Resolution 648 (H. Report No. 98–1159).

(3) NOTIFICATION.—At least fifteen days prior to obligating any such cash transfer or nonproject sector assistance, the President shall submit a notification through the regular notification procedures of the Committees on Appropriations, which shall include a detailed description of how the funds proposed to be made available will be used, with a discussion of the United States interests that will be served by the assistance (including, as appropriate, a description of the economic policy reforms that will be promoted by such assistance).

(4) EXEMPTION.—Nonproject sector assistance funds may be exempt from the requirements of subsection (b)(1) only through the notification procedures of the Committees on Appropriations.

## COMPENSATION FOR UNITED STATES EXECUTIVE
## DIRECTORS TO INTERNATIONAL FINANCING INSTITUTIONS

SEC. 532. (a) No funds appropriated by this Act may be made as payment to any international financial institution while the United States Executive Director to such institution is compensated by the institution at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to such institution is compensated by the institution at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

(b) For purposes of this section, "international financial institutions" are: the International Bank for Reconstruction and Development, the Inter–American Development Bank, the Asian Development Bank, the Asian Development Fund, the African Development Bank, the African Development Fund, the International Monetary Fund, the North American Development Bank, and the European Bank for Reconstruction and Development.

## COMPLIANCE WITH UNITED NATIONS SANCTIONS AGAINST IRAQ

<< 50 USCA § 1701 NOTE >>

SEC. 533. (a) DENIAL OF ASSISTANCE.—None of the funds appropriated or otherwise made available pursuant to this Act to carry out the Foreign Assistance Act of 1961 (including title IV of chapter 2 of part I, relating to the Overseas Private Investment Corporation) or the Arms Export Control Act may be used to provide assistance to any country that is not in compliance with the United Nations Security Council sanctions against Iraq, Serbia or Montenegro unless the President determines and so certifies to the Congress that—

(1) such assistance is in the national interest of the United States;

(2) such assistance will directly benefit the needy people in that country; or

(3) the assistance to be provided will be humanitarian assistance for foreign nationals who have fled Iraq and Kuwait.

(b) IMPORT SANCTIONS.—If the President considers that the taking of such action would promote the effectiveness of the economic sanctions of the United Nations and the United States imposed with respect to Iraq, Serbia, or Montenegro, as the case may be, and is consistent with the national interest, the President may prohibit, for such a period of time as he considers appropriate, the importation into the United States of any or all products of any foreign country that has not prohibited—

(1) the importation of products of Iraq, Serbia, or Montenegro into its customs territory, and

(2) the export of its products to Iraq, Serbia, or Montenegro, as the case may be.

## COMPETITIVE PRICING FOR SALES OF DEFENSE ARTICLES

<< 22 USCA § 2762 NOTE >>

SEC. 533A. Direct costs associated with meeting a foreign customer's additional or unique requirements will continue to be allowable under contracts under section 22(d) of the Arms Export Control Act. Loadings applicable to such direct costs shall be permitted at the same rates applicable to procurement of like items purchased by the Department of Defense for its own use.

## POW/MIA MILITARY DRAWDOWN

SEC. 534. (a) Notwithstanding any other provision of law, the President may direct the drawdown, without reimbursement by the recipient, of defense articles from the stocks of the Department of Defense, defense services of the Department of Defense,

and military education and training, of an aggregate value not to exceed $15,000,000 in fiscal year 1997, as may be necessary to carry out subsection (b).

(b) Such defense articles, services and training may be provided to Vietnam, Cambodia and Laos, under subsection (a) as the President determines are necessary to support efforts to locate and repatriate members of the United States Armed Forces and civilians employed directly or indirectly by the United States Government who remain unaccounted for from the Vietnam War, and to ensure the safety of United States Government personnel engaged in such cooperative efforts and to support United States Department of Defense-sponsored humanitarian projects associated with the POW/MIA efforts. Any aircraft shall be provided under this section only to Laos and only on a lease or loan basis, but may be provided at no cost notwithstanding section 61 of the Arms Export Control Act and may be maintained with defense articles, services and training provided under this section.

(c) The President shall, within sixty days of the end of any fiscal year in which the authority of subsection (a) is exercised, submit a report to the Congress which identifies the articles, services, and training drawn down under this section.

### MEDITERRANEAN EXCESS DEFENSE ARTICLES

<< 22 USCA § 2321j NOTE >>

SEC. 535. For the four-year period beginning on October 1, 1996, the President shall ensure that excess defense articles will be made available under section 516 and 519 of the Foreign Assistance Act of 1961 consistent with the manner in which the President made available excess defense articles under those sections during the four-year period that began on October 1, 1992, pursuant to section 573(e) of the Foreign Operations, Export Financing, Related Programs Appropriations Act, 1990.

### CASH FLOW FINANCING

SEC. 536. For each country that has been approved for cash flow financing (as defined in section 25(d) of the Arms Export Control Act, as added by section 112(b) of Public Law 99–83) under the Foreign Military Financing Program, any Letter of Offer and Acceptance or other purchase agreement, or any amendment thereto, for a procurement in excess of $100,000,000 that is to be financed in whole or in part with funds made available under this Act shall be submitted through the regular notification procedures to the Committees on Appropriations.

### AUTHORITIES FOR THE PEACE CORPS, THE INTER–AMERICAN FOUNDATION AND THE AFRICAN DEVELOPMENT FOUNDATION

SEC. 537. Unless expressly provided to the contrary, provisions of this or any other Act, including provisions contained in prior Acts authorizing or making appropriations for foreign operations, export financing, and related programs, shall not be construed to prohibit activities authorized by or conducted under the Peace Corps Act, the Inter–American Foundation Act, or the African Development Foundation Act. The appropriate agency shall promptly report to the Committees on Appropriations whenever it is conducting activities or is proposing to conduct activities in a country for which assistance is prohibited.

### IMPACT ON JOBS IN THE UNITED STATES

SEC. 538. None of the funds appropriated by this Act may be obligated or expended to provide—

(a) any financial incentive to a business enterprise currently located in the United States for the purpose of inducing such an enterprise to relocate outside the United States if such incentive or inducement is likely to reduce the number of employees of such business enterprise in the United States because United States production is being replaced by such enterprise outside the United States;

(b) assistance for the purpose of establishing or developing in a foreign country any export processing zone or designated area in which the tax, tariff, labor, environment, and safety laws of that country do not apply, in part or in whole, to activities carried out within that zone or area, unless the President determines and certifies that such assistance is not likely to cause a loss of jobs within the United States; or

(c) assistance for any project or activity that contributes to the violation of internationally recognized workers rights, as defined in section 502(a)(4) of the Trade Act of 1974, of workers in the recipient country, including any designated zone or area in that country: Provided, That in recognition that the application of this subsection should be commensurate with the level of development of the recipient country and sector, the provisions of this subsection shall not preclude assistance for the informal sector in such country, micro and small-scale enterprise, and smallholder agriculture.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 346 of 1021 PageID 7216

### AUTHORITY TO ASSIST BOSNIA AND HERZEGOVINA

SEC. 539. (a) The President is authorized to direct the transfer, subject to prior notification of the Committees on Appropriations, to the Government of Bosnia and Herzegovina, without reimbursement, of defense articles from the stocks of the Department of Defense and defense services of the Department of Defense of an aggregate value of not to exceed $100,000,000 in fiscal years 1996 and 1997: Provided, That the President certifies in a timely fashion to the Congress that the transfer of such articles would assist that nation in self-defense and thereby promote the security and stability of the region.

(b) Within 60 days of any transfer under the authority provided in subsection (a), and every 60 days thereafter, the President shall report in writing to the Speaker of the House of Representatives and the President pro tempore of the Senate concerning the articles transferred and the disposition thereof.

(c) There are authorized to be appropriated to the President such sums as may be necessary to reimburse the applicable appropriation, fund, or account for defense articles provided under this section.

### RESTRICTIONS ON THE TERMINATION OF SANCTIONS AGAINST SERBIA AND MONTENEGRO

<< 50 USCA § 1701 NOTE >>

SEC. 540. (a) RESTRICTIONS.—Notwithstanding any other provision of law, no sanction, prohibition, or requirement described in section 1511 of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160), with respect to Serbia or Montenegro, may cease to be effective, unless—

(1) the President first submits to the Congress a certification described in subsection (b); and

(2) the requirements of section 1511 of that Act are met.

(b) CERTIFICATION.—A certification described in this subsection is a certification that—

(1) there is substantial progress toward—

(A) the realization of a separate identity for Kosova and the right of the people of Kosova to govern themselves; or

(B) the creation of an international protectorate for Kosova;

(2) there is substantial improvement in the human rights situation in Kosova;

(3) international human rights observers are allowed to return to Kosova; and

(4) the elected government of Kosova is permitted to meet and carry out its legitimate mandate as elected representatives of the people of Kosova.

(c) WAIVER AUTHORITY.—The President may waive the application in whole or in part, of subsection (a) if the President certifies to the Congress that the President has determined that the waiver is necessary to meet emergency humanitarian needs or to achieve a negotiated settlement of the conflict in Bosnia and Herzegovina that is acceptable to the parties.

### SPECIAL AUTHORITIES

SEC. 541. (a) Funds appropriated in title II of this Act that are made available for Afghanistan, Lebanon, and Cambodia, and for victims of war, displaced children, displaced Burmese, humanitarian assistance for Romania, and humanitarian assistance for the peoples of Bosnia and Herzegovina, Croatia, and Kosova, may be made available notwithstanding any other provision of law: Provided, That any such funds that are made available for Cambodia shall be subject to the provisions of section 531(e) of the Foreign Assistance Act of 1961 and section 906 of the International Security and Development Cooperation Act of 1985: Provided further, That none of the funds appropriated by this Act may be made available for assistance for any country or organization that the Secretary of State determines is cooperating, tactically or strategically, with the Khmer Rouge in their military operations, or to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge: Provided further, That the Secretary of State shall submit a report to the Committees on Appropriations by February 1, 1997, on whether there are any countries, organizations, or militaries for which assistance is prohibited under the previous proviso, the basis for such conclusions and, if appropriate, the steps being taken to terminate assistance: Provided further, That the prohibition on assistance to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge may be waived by the President if he determines and reports to the Committees on Appropriations that it is important to the national security interest of the United States to do so.

(b) Funds appropriated by this Act to carry out the provisions of sections 103 through 106 of the Foreign Assistance Act of 1961 may be used, notwithstanding any other provision of law, for the purpose of supporting tropical forestry and energy programs aimed at reducing emissions of greenhouse gases, and for the purpose of supporting biodiversity conservation activities: Provided, That such assistance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(c) During fiscal year 1997, the President may use up to $40,000,000 under the authority of section 451 of the Foreign Assistance Act of 1961, notwithstanding the funding ceiling contained in subsection (a) of that section.

(d) The Agency for International Development may employ personal services contractors, notwithstanding any other provision of law, for the purpose of administering programs for the West Bank and Gaza.

## POLICY ON TERMINATING THE ARAB LEAGUE BOYCOTT OF ISRAEL

SEC. 542. It is the sense of the Congress that—

(1) the Arab League countries should immediately and publicly renounce the primary boycott of Israel and the secondary and tertiary boycott of American firms that have commercial ties with Israel; and

(2) the President should—

(A) take more concrete steps to encourage vigorously Arab League countries to renounce publicly the primary boycotts of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel as a confidence-building measure;

(B) take into consideration the participation of any recipient country in the primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel when determining whether to sell weapons to said county;

(C) report to Congress on the specific steps being taken by the President to bring about a public renunciation of the Arab primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel; and

(D) encourage the allies and trading partners of the United States to enact laws prohibiting businesses from complying with the boycott and penalizing businesses that do comply.

## ANTI–NARCOTICS ACTIVITIES

SEC. 543. (a) Of the funds appropriated or otherwise made available by this Act for "Economic Support Fund", assistance may be provided to strengthen the administration of justice in countries in Latin America and the Caribbean and in other regions consistent with the provisions of section 534(b) of the Foreign Assistance Act of 1961, except that programs to enhance protection of participants in judicial cases may be conducted notwithstanding section 660 of that Act.

(b) Funds made available pursuant to this section may be made available notwithstanding section 534(c) and the second and third sentences of section 534(e) of the Foreign Assistance Act of 1961. Funds made available pursuant to subsection (a) for Bolivia, Colombia and Peru may be made available notwithstanding section 534(c) and the second sentence of section 534(e) of the Foreign Assistance Act of 1961.

## ELIGIBILITY FOR ASSISTANCE

SEC. 544. (a) ASSISTANCE THROUGH NONGOVERNMENTAL ORGANIZATIONS.—Restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance in support of programs of nongovernmental organizations from funds appropriated by this Act to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961: Provided, That the President shall take into consideration, in any case in which a restriction on assistance would be applicable but for this subsection, whether assistance in support of programs of nongovernmental organizations is in the national interest of the United States: Provided further, That before using the authority of this subsection to furnish assistance in support of programs of nongovernmental organizations, the President shall notify the Committees on Appropriations under the regular notification procedures of those committees, including a description of the program to be assisted, the assistance to be provided, and the reasons for furnishing such assistance: Provided further, That nothing in this subsection shall be construed to alter any existing statutory prohibitions against abortion or involuntary sterilizations contained in this or any other Act.

(b) PUBLIC LAW 480.—During fiscal year 1997, restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance under the Agricultural Trade Development and Assistance Act of 1954:

Provided, That none of the funds appropriated to carry out title I of such Act and made available pursuant to this subsection may be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

(c) EXCEPTION.—This section shall not apply—

(1) with respect to section 620A of the Foreign Assistance Act or any comparable provision of law prohibiting assistance to countries that support international terrorism; or

(2) with respect to section 116 of the Foreign Assistance Act of 1961 or any comparable provision of law prohibiting assistance to countries that violate internationally recognized human rights.

## EARMARKS

SEC. 544A. (a) Funds appropriated by this Act which are earmarked may be reprogrammed for other programs within the same account notwithstanding the earmark if compliance with the earmark is made impossible by operation of any provision of this or any other Act or, with respect to a country with which the United States has an agreement providing the United States with base rights or base access in that country, if the President determines that the recipient for which funds are earmarked has significantly reduced its military or economic cooperation with the United States since enactment of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991; however, before exercising the authority of this subsection with regard to a base rights or base access country which has significantly reduced its military or economic cooperation with the United States, the President shall consult with, and shall provide a written policy justification to the Committees on Appropriations: Provided, That any such reprogramming shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That assistance that is reprogrammed pursuant to this subsection shall be made available under the same terms and conditions as originally provided.

(b) In addition to the authority contained in subsection (a), the original period of availability of funds appropriated by this Act and administered by the Agency for International Development that are earmarked for particular programs or activities by this or any other Act shall be extended for an additional fiscal year if the Administrator of such agency determines and reports promptly to the Committees on Appropriations that the termination of assistance to a country or a significant change in circumstances makes it unlikely that such earmarked funds can be obligated during the original period of availability: Provided, That such earmarked funds that are continued available for an additional fiscal year shall be obligated only for the purpose of such earmark.

## CEILINGS AND EARMARKS

SEC. 545. Ceilings and earmarks contained in this Act shall not be applicable to funds or authorities appropriated or otherwise made available by any subsequent Act unless such Act specifically so directs.

## PROHIBITION ON PUBLICITY OR PROPAGANDA

SEC. 546. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not authorized before the date of enactment of this Act by the Congress: Provided, That not to exceed $750,000 may be made available to carry out the provisions of section 316 of Public Law 96–533.

## USE OF AMERICAN RESOURCES

SEC. 547. To the maximum extent possible, assistance provided under this Act should make full use of American resources, including commodities, products, and services.

## PROHIBITION OF PAYMENTS TO UNITED NATIONS MEMBERS

SEC. 548. None of the funds appropriated or made available pursuant to this Act for carrying out the Foreign Assistance Act of 1961, may be used to pay in whole or in part any assessments, arrearages, or dues of any member of the United Nations.

## CONSULTING SERVICES

SEC. 549. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order pursuant to existing law.

## PRIVATE VOLUNTARY ORGANIZATIONS—DOCUMENTATION

SEC. 550. None of the funds appropriated or made available pursuant to this Act shall be available to a private voluntary organization which fails to provide upon timely request any document, file, or record necessary to the auditing requirements of the Agency for International Development.

### PROHIBITION ON ASSISTANCE TO FOREIGN GOVERNMENTS THAT EXPORT LETHAL MILITARY EQUIPMENT TO COUNTRIES SUPPORTING INTERNATIONAL TERRORISM

SEC. 551. (a) None of the funds appropriated or otherwise made available by this Act may be available to any foreign government which provides lethal military equipment to a country the government of which the Secretary of State has determined is a terrorist government for purposes of section 40(d) of the Arms Export Control Act. The prohibition under this section with respect to a foreign government shall terminate 12 months after that government ceases to provide such military equipment. This section applies with respect to lethal military equipment provided under a contract entered into after the date of enactment of this Act.

(b) Assistance restricted by subsection (a) or any other similar provision of law, may be furnished if the President determines that furnishing such assistance is important to the national interests of the United States.

(c) Whenever the waiver of subsection (b) is exercised, the President shall submit to the appropriate congressional committees a report with respect to the furnishing of such assistance. Any such report shall include a detailed explanation of the assistance to be provided, including the estimated dollar amount of such assistance, and an explanation of how the assistance furthers United States national interests.

### WITHHOLDING OF ASSISTANCE FOR PARKING FINES OWED BY FOREIGN COUNTRIES

SEC. 552. (a) IN GENERAL.—Of the funds made available for a foreign country under part I of the Foreign Assistance Act of 1961, an amount equivalent to 110 percent of the total unpaid fully adjudicated parking fines and penalties owed to the District of Columbia by such country as of the date of enactment of this Act shall be withheld from obligation for such country until the Secretary of State certifies and reports in writing to the appropriate congressional committees that such fines and penalties are fully paid to the government of the District of Columbia.

(b) DEFINITION.—For purposes of this section, the term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on Appropriations of the Senate and the Committee on International Relations and the Committee on Appropriations of the House of Representatives.

### LIMITATION ON ASSISTANCE FOR THE PLO FOR THE WEST BANK AND GAZA

SEC. 553. None of the funds appropriated by this Act may be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza unless the President has exercised the authority under section 604(a) of the Middle East Peace Facilitation Act of 1995 (title VI of Public Law 104–107) or any other legislation to suspend or make inapplicable section 307 of the Foreign Assistance Act of 1961 and that suspension is still in effect: Provided, That if the President fails to make the certification under section 604(b)(2) of the Middle East Peace Facilitation Act of 1995 or to suspend the prohibition under other legislation, funds appropriated by this Act may not be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza.

### EXPORT FINANCING TRANSFER AUTHORITIES

SEC. 554. Not to exceed 5 percent of any appropriation other than for administrative expenses made available for fiscal year 1997 for programs under title I of this Act may be transferred between such appropriations for use for any of the purposes, programs and activities for which the funds in such receiving account may be used, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 25 percent by any such transfer: Provided, That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

### WAR CRIMES TRIBUNALS

<< 22 USCA § 2656 NOTE >>

SEC. 555. If the President determines that doing so will contribute to a just resolution of charges regarding genocide or other violations of international humanitarian law, the President may direct a drawdown pursuant to section 552(c) of the Foreign

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 350 of 1021   PageID 7220

Assistance Act of 1961, as amended, of up to $25,000,000 of commodities and services for the United Nations War Crimes Tribunal established with regard to the former Yugoslavia by the United Nations Security Council or such other tribunals or commissions as the Council may establish to deal with such violations, without regard to the ceiling limitation contained in paragraph (2) thereof: Provided, That the determination required under this section shall be in lieu of any determinations otherwise required under section 552(c): Provided further, That 60 days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State shall submit a report to the Committees on Appropriations describing the steps the United States Government is taking to collect information regarding allegations of genocide or other violations of international law in the former Yugoslavia and to furnish that information to the United Nations War Crimes Tribunal for the former Yugoslavia.

LANDMINES

<< 22 USCA § 2778 NOTE >>

SEC. 556. Notwithstanding any other provision of law, demining equipment available to the Agency for International Development and the Department of State and used in support of the clearing of landmines and unexploded ordnance for humanitarian purposes may be disposed of on a grant basis in foreign countries, subject to such terms and conditions as the President may prescribe: Provided, That section 1365(c) of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 22 U.S.C., 2778 note) is amended by striking out "During the five-year period beginning on October 23, 1992" and inserting in lieu thereof "During the eight-year period beginning on October 23, 1992".

RESTRICTIONS CONCERNING THE PALESTINIAN AUTHORITY

SEC. 557. None of the funds appropriated by this Act may be obligated or expended to create in any part of Jerusalem a new office of any department or agency of the United States Government for the purpose of conducting official United States Government business with the Palestinian Authority over Gaza and Jericho or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles: Provided, That this restriction shall not apply to the acquisition of additional space for the existing Consulate General in Jerusalem: Provided further, That meetings between officers and employees of the United States and officials of the Palestinian Authority, or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles, for the purpose of conducting official United States Government business with such authority should continue to take place in locations other than Jerusalem. As has been true in the past, officers and employees of the United States Government may continue to meet in Jerusalem on other subjects with Palestinians (including those who now occupy positions in the Palestinian Authority), have social contacts, and have incidental discussions.

PROHIBITION OF PAYMENT OF CERTAIN EXPENSES

SEC. 558. None of the funds appropriated or otherwise made available by this Act under the heading "INTERNATIONAL MILITARY EDUCATION AND TRAINING" or "FOREIGN MILITARY FINANCING PROGRAM" for Informational Program activities may be obligated or expended to pay for—

(1) alcoholic beverages;

(2) food (other than food provided at a military installation) not provided in conjunction with Informational Program trips where students do not stay at a military installation; or

(3) entertainment expenses for activities that are substantially of a recreational character, including entrance fees at sporting events and amusement parks.

HUMANITARIAN CORRIDORS

<< 22 USCA § 2378–1 >>

SEC. 559. The Foreign Assistance Act of 1961 is amended by adding immediately after section 620H the following new section:

"SEC. 620I. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT RESTRICT UNITED STATES HUMANITARIAN ASSISTANCE.—

"(a) IN GENERAL.—No assistance shall be furnished under this Act or the Arms Export Control Act to any country when it is made known to the President that the government of such country prohibits or otherwise restricts, directly or indirectly, the transport or delivery of United States humanitarian assistance.

"(b) EXCEPTION.—Assistance may be furnished without regard to the restriction in subsection (a) if the President determines that to do so is in the national security interest of the United States.

"(c) NOTICE.—Prior to making any determination under subsection (b), the President shall notify the Committee on International Relations, the Committee on Foreign Relations, and the Committees on Appropriations of the Senate and House of Representatives of his intention to make such a determination, the effective date of the determination, and the reasons for making the determination.".

### EQUITABLE ALLOCATION OF FUNDS

SEC. 560. Not more than 20 percent of the funds appropriated by this Act to carry out the provisions of sections 103 through 106 and chapter 4 of part II of the Foreign Assistance Act of 1961, that are made available for Latin America and the Caribbean region may be made available, through bilateral and Latin America and the Caribbean regional programs, to provide assistance for any country in such region.

### PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS

SEC. 561. (a) SENSE OF CONGRESS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

### LIMITATION OF FUNDS FOR NORTH AMERICAN DEVELOPMENT BANK

SEC. 562. None of the Funds appropriated in this Act under the heading "North American Development Bank" and made available for the Community Adjustment and Investment Program shall be used for purposes other than those set out in the binational agreement establishing the Bank.

### INTERNATIONAL DEVELOPMENT ASSOCIATION

SEC. 563. In order to pay for the United States contribution to the tenth replenishment of the resources of the International Development Association authorized in section 526 of Public Law 103–87, there is authorized to be appropriated, without fiscal year limitation, $700,000,000 for payment by the Secretary of the Treasury.

### SPECIAL DEBT RELIEF FOR THE POOREST

SEC. 564. (a) AUTHORITY TO REDUCE DEBT.—The President may reduce amounts owed to the United States (or any agency of the United States) by an eligible country as a result of—

(1) guarantees issued under sections 221 and 222 of the Foreign Assistance Act of 1961; or

(2) credits extended or guarantees issued under the Arms Export Control Act.

(b) LIMITATIONS.—

(1) The authority provided by subsection (a) may be exercised only to implement multilateral official debt relief and referendum agreements, commonly referred to as "Paris Club Agreed Minutes".

(2) The authority provided by subsection (a) may be exercised only in such amounts or to such extent as is provided in advance by appropriations Acts.

(3) The authority provided by subsection (a) may be exercised only with respect to countries with heavy debt burdens that are eligible to borrow from the International Development Association, but not from the International Bank for Reconstruction and Development, commonly referred to as "IDA-only" countries.

(c) CONDITIONS—The authority provided by subsection (a) may be exercised only with respect to a country whose government—

(1) does not have an excessive level of military expenditures;

(2) has not repeatedly provided support for acts of international terrorism;

(3) is not failing to cooperate on international narcotics control matters;

(4) (including its military or other security forces) does not engage in a consistent pattern of gross violations of internationally recognized human rights; and

(5) is not ineligible for assistance because of the application of section 527 of the Foreign Relations Authorization Act, fiscal years 1994 and 1995.

(d) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

(e) CERTAIN PROHIBITIONS INAPPLICABLE.—A reduction of debt pursuant to subsection (a) shall not be considered assistance for purposes of any provision of law limiting assistance to a country. The authority provided by subsection (a) may be exercised notwithstanding section 620(r) of the Foreign Assistance Act of 1961.

### AUTHORITY TO ENGAGE IN DEBT BUYBACKS OR SALES

SEC. 565. (a) LOANS ELIGIBLE FOR SALE, REDUCTION, OR CANCELLATION.—

(1) AUTHORITY TO SELL, REDUCE, OR CANCEL CERTAIN LOANS.—Notwithstanding any other provision of law, the President may, in accordance with this section, sell to any eligible purchaser any concessional loan or portion thereof made before January 1, 1995, pursuant to the Foreign Assistance Act of 1961, to the government of any eligible country as defined in section 702(6) of that Act or on receipt of payment from an eligible purchaser, reduce or cancel such loan or portion thereof, only for the purpose of facilitating—

(A) debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps; or

(B) a debt buyback by an eligible country of its own qualified debt, only if the eligible country uses an additional amount of the local currency of the eligible country, equal to not less than 40 percent of the price paid for such debt by such eligible country, or the difference between the price paid for such debt and the face value of such debt, to support activities that link conservation and sustainable use of natural resources with local community development, and child survival and other child development, in a manner consistent with sections 707 through 710 of the Foreign Assistance Act of 1961, if the sale, reduction, or cancellation would not contravene any term or condition of any prior agreement relating to such loan.

(2) TERMS AND CONDITIONS.—Notwithstanding any other provision of law, the President shall, in accordance with this section, establish the terms and conditions under which loans may be sold, reduced, or canceled pursuant to this section.

(3) ADMINISTRATION.—The Facility, as defined in section 702(8) of the Foreign Assistance Act of 1961, shall notify the administrator of the agency primarily responsible for administering part I of the Foreign Assistance Act of 1961 of purchasers that the President has determined to be eligible, and shall direct such agency to carry out the sale, reduction, or cancellation of a loan pursuant to this section. Such agency shall make an adjustment in its accounts to reflect the sale, reduction, or cancellation.

(4) LIMITATION.—The authorities of this subsection shall be available only to the extent that appropriations for the cost of the modification, as defined in section 502 of the Congressional Budget Act of 1974, are made in advance.

(b) DEPOSIT OF PROCEEDS.—The proceeds from the sale, reduction, or cancellation of any loan sold, reduced, or canceled pursuant to this section shall be deposited in the United States Government account or accounts established for the repayment of such loan.

(c) ELIGIBLE PURCHASERS.—A loan may be sold pursuant to subsection (a)(1)(A) only to a purchaser who presents plans satisfactory to the President for using the loan for the purpose of engaging in debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(d) DEBTOR CONSULTATIONS.—Before the sale to any eligible purchaser, or any reduction or cancellation pursuant to this section, of any loan made to an eligible country, the President should consult with the country concerning the amount of loans to be sold, reduced, or canceled and their uses for debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(e) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

### LIBERIA

SEC. 566. Funds appropriated by this Act may be made available for assistance for Liberia notwithstanding section 620(q) of the Foreign Assistance Act of 1961 and section 512 of this Act.

### GUATEMALA

SEC. 567. (a) Funds provided in this Act may be made available for the Guatemalan military forces, and the restrictions on Guatemala under the headings "International Military Education and Training" and "Foreign Military Financing Program" shall not apply, only if the President determines and certifies to the Congress that the Guatemalan military is cooperating fully with efforts to resolve human rights abuses which elements of the Guatemalan military forces are alleged to have committed, ordered or attempted to thwart the investigation of, and with efforts to negotiate a peace settlement.

(b) The prohibition contained in subsection (a) shall not apply to funds made available to implement a ceasefire or peace agreement.

(c) Any funds made available pursuant to subsections (a) or (b) shall be subject to the regular notification procedures of the Committees on Appropriations.

(d) Any funds made available pursuant to subsections (a) and (b) for international military education and training may only be for expanded international military education and training.

### SANCTIONS AGAINST COUNTRIES HARBORING WAR CRIMINALS

SEC. 568. (a) BILATERAL ASSISTANCE.—The President is authorized to withhold funds appropriated by this Act under the Foreign Assistance Act of 1961 or the Arms Export Control Act for any country described in subsection (c).

(b) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury should instruct the United States executive directors of the international financial institutions to work in opposition to, and vote against, any extension by such institutions of financing or financial or technical assistance to any country described in subsection (c).

(c) SANCTIONED COUNTRIES.—A country described in this subsection is a country the government of which knowingly grants sanctuary to persons in its territory for the purpose of evading prosecution, where such persons—

(1) have been indicted by the International Criminal Tribunal for the former Yugoslavia, the International Criminal Tribunal for Rwanda, or any other international tribunal with similar standing under international law, or

(2) have been indicted for war crimes or crimes against humanity committed during the period beginning March 23, 1933 and ending on May 8, 1945 under the direction of, or in association with—

(A) the Nazi government of Germany;

(B) any government in any area occupied by the military forces of the Nazi government of Germany;

(C) any government which was established with the assistance or cooperation of the Nazi government; or

(D) any government which was an ally of the Nazi government of Germany.

### LIMITATION ON ASSISTANCE FOR HAITI

SEC. 569. (a) LIMITATION.—None of the funds appropriated or otherwise made available by this Act, may be provided to the Government of Haiti until the President reports to Congress that—

(1) the Government is conducting thorough investigations of extrajudicial and political killings; and

(2) the Government is cooperating with United States authorities in the investigations of political and extrajudicial killings.

(b) Nothing in this section shall be construed to restrict the provision of humanitarian, development, or electoral assistance.

(c) The President may waive the requirements of this section on a semiannual basis if he determines and certifies to the appropriate committees of Congress that it is in the national interest of the United States.

### POLICY TOWARD BURMA

SEC. 570. (a) Until such time as the President determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government, the following sanctions shall be imposed on Burma:

(1) BILATERAL ASSISTANCE.—There shall be no United States assistance to the Government of Burma, other than:

(A) humanitarian assistance,

(B) subject to the regular notification procedures of the Committees on Appropriations, counter-narcotics assistance under chapter 8 of part I of the Foreign Assistance Act of 1961, or crop substitution assistance, if the Secretary of State certifies to the appropriate congressional committees that—

(i) the Government of Burma is fully cooperating with United States counter-narcotics efforts, and

(ii) the programs are fully consistent with United States human rights concerns in Burma and serve the United States national interest, and

(C) assistance promoting human rights and democratic values.

(2) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury shall instruct the United States executive director of each international financial institution to vote against any loan or other utilization of funds of the respective bank to or for Burma.

(3) VISAS.—Except as required by treaty obligations or to staff the Burmese mission to the United States, the United States should not grant entry visas to any Burmese government official.

(b) CONDITIONAL SANCTIONS.—The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma, if the President determines and certifies to Congress that, after the date of enactment of this Act, the Government of Burma has physically harmed, rearrested for political acts, or exiled Daw Aung San Suu Kyi or has committed large-scale repression of or violence against the Democratic opposition.

(c) MULTILATERAL STRATEGY.—The President shall seek to develop, in coordination with members of ASEAN and other countries having major trading and investment interests in Burma, a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma, including the development of a dialogue between the State Law and Order Restoration Council (SLORC) and democratic opposition groups within Burma.

(d) PRESIDENTIAL REPORTS.—Every six months following the enactment of this Act, the President shall report to the Chairmen of the Committee on Foreign Relations, the Committee on International Relations and the House and Senate Appropriations Committees on the following:

(1) progress toward democratization in Burma;

(2) progress on improving the quality of life of the Burmese people, including progress on market reforms, living standards, labor standards, use of forced labor in the tourism industry, and environmental quality; and

(3) progress made in developing the strategy referred to in subsection (c).

(e) WAIVER AUTHORITY.—The President shall have the authority to waive, temporarily or permanently, any sanction referred to in subsection (a) or subsection (b) if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States.

(f) DEFINITIONS.—

(1) The term "international financial institutions" shall include the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Multilateral Investment Guarantee Agency, the Asian Development Bank, and the International Monetary Fund.

(2) The term "new investment" shall mean any of the following activities if such an activity is undertaken pursuant to an agreement, or pursuant to the exercise of rights under such an agreement, that is entered into with the Government of Burma or a nongovernmental entity in Burma, on or after the date of the certification under subsection (b):

(A) the entry into a contract that includes the economical development of resources located in Burma, or the entry into a contract providing for the general supervision and guarantee of another person's performance of such a contract;

(B) the purchase of a share of ownership, including an equity interest, in that development;

(C) the entry into a contract providing for the participation in royalties, earnings, or profits in that development, without regard to the form of the participation:

Provided, That the term "new investment" does not include the entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology.

REPORT REGARDING HONG KONG

<< 22 USCA § 5731 NOTE >>

SEC. 571. In light of the deficiencies in reports submitted to the Congress pursuant to section 301 of the United States–Hong Kong Policy Act (22 U.S.C. 5731), the Congress directs that the additional report required to be submitted during 1997 under such section include detailed information on the status of, and other developments affecting, implementation of the Sino–British Joint Declaration on the Question of Hong Kong, including—

(1) the Basic Law and its consistency with the Joint Declaration;

(2) Beijing's plans to replace the elected legislature with an appointed body;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) the openness and fairness of the election of the chief executive and the executive's accountability to the legislature;

(4) the treatment of political parties;

(5) the independence of the Judiciary and its ability to exercise the power of final judgment over Hong Kong law; and

(6) the Bill of Rights.

### USE OF FUNDS FOR PURCHASE OF PRODUCTS NOT MADE IN AMERICA

SEC. 572. The Administrator of the Agency for International Development shall provide a report to the appropriate committees of the Congress on the ability of the United States Government to implement a provision of law (and on the foreign policy implications of such a provision of law) which would require that United States funds could be made available to the government of a foreign country for the purchase of any equipment or products only if such purchases were to occur in such foreign country or the United States, and substantially similar equipment and products were made in the United States and available for purchase at a price that is not more than 10 percent higher than that in other countries.

### CONFLICT IN CHECHNYA

SEC. 573. The Secretary of State shall provide to the Committees on Appropriations no later than 30 days from the date of enactment of this Act a detailed report on actions undertaken by the United States Government to resolve the conflict in Chechnya.

### EXTENSION OF CERTAIN ADJUDICATION PROVISIONS

SEC. 575. The Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Public Law 101–167) is amended—

<< 8 USCA § 1157 NOTE >>

(1) in section 599D (8 U.S.C. 1157 note)—

 (A) in subsection (b)(3), by striking "and 1996" and inserting "1996, and 1997"; and

 (B) in subsection (e), by striking out "October 1, 1996" each place it appears and inserting "October 1, 1997"; and

<< 8 USCA § 1255 NOTE >>

(2) in section 599E (8 U.S.C. 1255 note) in subsection (b)(2), by striking out "September 30, 1996" and inserting "September 30, 1997".

### TRANSPARENCY OF BUDGETS

<< 22 USCA § 262k–1 >>

SEC. 576. (a) LIMITATION.—Beginning three years after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

 (1) does not have in place a functioning system for a civilian audit of all receipts and expenditures that fund activities of the armed forces and security forces;

 (2) has not provided a summary of a current audit to the institution.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

### GUARANTEES

<< 2 USCA § 901 >>

SEC. 577. Section 251(b)(2)(G) of the Balanced Budget and Emergency Deficit Control Act of 1985 is amended by striking "fiscal year 1994 and 1995" and inserting in lieu thereof "fiscal years 1994, 1995, and 1997" in both places that this appears.

INFORMATION ON COOPERATION WITH UNITED STATES ANTI–
TERRORISM EFFORTS IN ANNUAL COUNTRY REPORTS ON TERRORISM

<< 22 USCA § 2656f >>

SEC. 578. Section 140 of the Foreign Relations Authorization Act, fiscal years 1988 and 1989 (22 U.S.C. 2656f) is amended—

(1) in subsection (a)—

(A) by striking "and" at the end of paragraph (1);

(B) by striking the period at the end of paragraph (2) and inserting a semicolon; and

(C) by adding at the end the following:

"(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on—

"(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and

"(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and

"(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B)."; and

(2) in subsection (c)—

(A) by striking "The report" and inserting "(1) Except as provided in paragraph (2), the report";

(B) by indenting the margin of paragraph (1) as so designated, 2 ems; and

(C) by adding at the end the following:

"(2) If the Secretary of State determines that the transmittal of the information with respect to a foreign country under paragraph (3) or (4) of subsection (a) in classified form would make more likely the cooperation of the government of the foreign country as specified in such paragraph, the Secretary may transmit the information under such paragraph in classified form.".

FEMALE GENITAL MUTILATION

<< 22 USCA § 262k–2 >>

SEC. 579. (a) LIMITATION.—Beginning 1 year after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

(1) has, as a cultural custom, a known history of the practice of female genital mutilation; and

(2) has not taken steps to implement educational programs designed to prevent the practice of female genital mutilation.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

REQUIREMENT FOR DISCLOSURE OF FOREIGN AID IN REPORT OF SECRETARY OF STATE

<< 22 USCA § 2414a NOTE >>

SEC. 580. (a) FOREIGN AID REPORTING REQUIREMENT.—In addition to the voting practices of a foreign country, the report required to be submitted to Congress under section 406(a) of the Foreign Relations Authorization Act, fiscal years 1990 and 1991 (22 U.S.C. 2414a), shall include a side-by-side comparison of individual countries' overall support for the United States at the United Nations and the amount of United States assistance provided to such country in fiscal year 1996.

(b) UNITED STATES ASSISTANCE.—For purposes of this section, the term "United States assistance" has the meaning given the term in section 481(e)(4) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291(e)(4)).

RESTRICTIONS ON VOLUNTARY CONTRIBUTIONS TO UNITED NATIONS AGENCIES

SEC. 581. (a) PROHIBITION ON VOLUNTARY CONTRIBUTIONS FOR THE UNITED NATIONS.—None of the funds appropriated or otherwise made available by this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) if the United Nations implements or imposes any taxation on any United States persons.

(b) CERTIFICATION REQUIRED FOR DISBURSEMENT OF FUNDS.—None of the funds appropriated or otherwise made available under this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) unless the President certifies to the Congress 15 days in advance of such payment that the United Nations is not engaged in any effort to implement or impose any taxation on United States persons in order to raise revenue for the United Nations or any of its specialized agencies.

(c) DEFINITIONS.—As used in this section the term "United States person" refers to—

  (1) a natural person who is a citizen or national of the United States; or

  (2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States.

HAITI

SEC. 582. The Government of Haiti shall be eligible to purchase defense articles and services under the Arms Export Control Act (22 U.S.C. 2751 et seq.), for the civilian-led Haitian National Police and Coast Guard: Provided, That the authority provided by this section shall be subject to the regular notification procedures of the Committees on Appropriations.

REFUGEE STATUS FOR ADULT CHILDREN OF FORMER VIETNAMESE REEDUCATION
CAMP INTERNEES RESETTLED UNDER THE ORDERLY DEPARTURE PROGRAM

SEC. 584. (a) ELIGIBILITY FOR ORDERLY DEPARTURE PROGRAM.—For purposes of eligibility for the Orderly Departure Program for nationals of Vietnam, during fiscal year 1997, an alien described in subsection (b) shall be considered to be a refugee of special humanitarian concern to the United States within the meaning of section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) and shall be admitted to the United States for resettlement if the alien would be admissible as an immigrant under the Immigration and Nationality Act (except as provided in section 207(c)(3) of that Act).

(b) ALIENS COVERED.—An alien described in this subsection is an alien who—

  (1) is the son or daughter of a national of Vietnam who—

  (A) was formerly interned in a reeducation camp in Vietnam by the Government of the Socialist Republic of Vietnam; and

  (B) has been accepted for resettlement as a refugee under the Orderly Departure Program on or after April 1, 1995;

  (2) is 21 years of age or older; and

  (3) was unmarried as of the date of acceptance of the alien's parent for resettlement under the Orderly Departure Program.

(c) SUPERSEDES EXISTING LAW.—This section supersedes any other provision of law.

NORTH KOREA

<< 22 USCA § 2656 NOTE >>

SEC. 585. Ninety days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State, in consultation with the Secretary of Defense, shall provide a report in a classified or unclassified form to the Committee on Appropriations including the following information:

(a) a best estimate on fuel used by the military forces of the Democratic People's Republic of Korea (DPRK);

(b) the deployment position and military training and activities of the DPRK forces and best estimate of the associated costs of these activities;

(c) steps taken to reduce the DPRK level of forces; and

(d) cooperation, training, or exchanges of information, technology or personnel between the DPRK and any other nation supporting the development or deployment of a ballistic missile capability.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

LIMITATION ON ASSISTANCE TO MEXICO

SEC. 587. Not less than $2,500,000 of the funds appropriated or otherwise made available by this Act for the Government of Mexico shall be withheld from obligation until the President has determined and reported to Congress that—

(1) the Government of Mexico is taking actions to reduce the amount of illegal drugs entering the United States from Mexico; and

(2) the Government of Mexico—

(A) is taking effective actions to apply vigorously all law enforcement resources to investigate, track, capture, incarcerate, and prosecute individuals controlling, supervising, or managing international narcotics cartels or other similar entities and the accomplices of such individuals, individuals responsible for, or otherwise involved in, corruption, and individuals involved in money-laundering;

(B) is pursuing international anti-drug trafficking initiatives;

(C) is cooperating fully with international efforts at narcotics interdiction; and

(D) is cooperating fully with requests by the United States for assistance in investigations of money-laundering violations and is making progress toward implementation of effective laws to prohibit money-laundering.

LIMITATION OF ASSISTANCE TO TURKEY

SEC. 588. Not more than $22,000,000 of the funds appropriated in this Act under the heading "Economic Support Fund" may be made available to the Government of Turkey.

<< 28 USCA § 1605 NOTE >>

CIVIL LIABILITY FOR ACTS OF STATE SPONSORED TERRORISM

SEC. 589. (a) an official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. 1605(f) and (g) shall also apply to actions brought under this section.

No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.

Titles I through V of this Act may be cited as the "Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997".

<< 22 USCA § 1928 NOTE >>

TITLE VI—NATO ENLARGEMENT FACILITATION ACT OF 1996

SEC. 601. SHORT TITLE.

This title may be cited as the "NATO Enlargement Facilitation Act of 1996".

SEC. 602. FINDINGS.

The Congress makes the following findings:

(1) Since 1949, the North Atlantic Treaty Organization (NATO) has played an essential role in guaranteeing the security, freedom, and prosperity of the United States and its partners in the Alliance.

(2) The NATO Alliance is, and has been since its inception, purely defensive in character, and it poses no threat to any nation. The enlargement of the NATO Alliance to include as full and equal members emerging democracies in Central and Eastern Europe will serve to reinforce stability and security in Europe by fostering their integration into the structures which have

created and sustained peace in Europe since 1945. Their admission into NATO will not threaten any nation. America's security, freedom, and prosperity remain linked to the security of the countries of Europe.

(3) The sustained commitment of the member countries of NATO to a mutual defense has made possible the democratic transformation of Central and Eastern Europe. Members of the Alliance can and should play a critical role in addressing the security challenges of the post-Cold War era and in creating the stable environment needed for those emerging democracies in Central and Eastern Europe to successfully complete political and economic transformation.

(4) The United States continues to regard the political independence and territorial integrity of all emerging democracies in Central and Eastern Europe as vital to European peace and security.

(5) The active involvement by the countries of Central and Eastern Europe has made the Partnership for Peace program an important forum to foster cooperation between NATO and those countries seeking NATO membership.

(6) NATO has enlarged its membership on 3 different occasions since 1949.

(7) Congress supports the admission of qualified new members to NATO and the European Union at an early date and has sought to facilitate the admission of qualified new members into NATO.

(8) Lasting security and stability in Europe requires not only the military integration of emerging democracies in Central and Eastern Europe into existing European structures, but also the eventual economic and political integration of these countries into existing European structures.

(9) As new members of NATO assume the responsibilities of Alliance membership, the costs of maintaining stability in Europe should be shared more widely. Facilitation of the enlargement process will require current members of NATO, and the United States in particular, to demonstrate the political will needed to build on successful ongoing programs such as the Warsaw Initiative and the Partnership for Peace by making available the resources necessary to supplement efforts prospective new members are themselves undertaking.

(10) New members will be full members of the Alliance, enjoying all rights and assuming all the obligations under the North Atlantic Treaty, signed at Washington on April 4, 1949 (hereafter in this Act referred to as the "Washington Treaty").

(11) In order to assist emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO to be prepared to assume the responsibilities of NATO membership, the United States should encourage and support efforts by such countries to develop force structures and force modernization priorities that will enable such countries to contribute to the full range of NATO missions, including, most importantly, territorial defense of the Alliance.

(12) Cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO, such as the Baltic Peacekeeping Battalion, the Polish–Lithuanian Joint Peacekeeping Force, and the Polish–Ukrainian Peacekeeping Force, can make an important contribution to European peace and security and international peacekeeping efforts, can assist those countries preparing to assume the responsibilities of possible NATO membership, and accordingly should receive appropriate support from the United States.

(13) NATO remains the only multilateral security organization capable of conducting effective military operations and preserving security and stability of the Euro–Atlantic region.

(14) NATO is an important diplomatic forum and has played a positive role in defusing tensions between members of the Alliance and, as a result, no military action has occurred between two Alliance member states since the inception of NATO in 1949.

(15) The admission to NATO of emerging democracies in Central and Eastern Europe which are found to be in a position to further the principles of the Washington Treaty would contribute to international peace and enhance the security of the region. Countries which have become democracies and established market economies, which practice good neighborly relations, and which have established effective democratic civilian control over their defense establishments and attained a degree of interoperability with NATO, should be evaluated for their potential to further the principles of the Washington Treaty.

(16) Democratic civilian control of defense forces is an essential element in the process of preparation for those states interested in possible NATO membership.

(17) Protection and promotion of fundamental freedoms and human rights is an integral aspect of genuine security, and in evaluating requests for membership in NATO, the human rights records of the emerging democracies in Central and Eastern Europe should be evaluated according to their commitments to fulfill in good faith the human rights obligations of the Charter of the United Nations, the principles of the Universal Declaration on Human Rights, and the Helsinki Final Act.

(18) A number of Central and Eastern European countries have expressed interest in NATO membership, and have taken concrete steps to demonstrate this commitment, including their participation in Partnership for Peace activities.

(19) The Caucasus region remains important geographically and politically to the future security of Central Europe. As NATO proceeds with the process of enlargement, the United States and NATO should continue to examine means to strengthen the sovereignty and enhance the security of United Nations recognized countries in that region.

(20) In recognition that not all countries which have requested membership in NATO will necessarily qualify at the same pace, the accession date for each new member will vary.

(21) The provision of additional NATO transition assistance should include those emerging democracies most ready for closer ties with NATO and should be designed to assist other countries meeting specified criteria of eligibility to move forward toward eventual NATO membership.

(22) The Congress of the United States finds in particular that Poland, Hungary, and the Czech Republic have made significant progress toward achieving the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994 and should be eligible for the additional assistance described in this Act.

(23) The evaluation of future membership in NATO for emerging democracies in Central and Eastern Europe should be based on the progress of those nations in meeting criteria for NATO membership, which require enhancement of NATO's security and the approval of all NATO members.

(24) The process of NATO enlargement entails the consensus agreement of the governments of all 16 NATO members and ratification in accordance with their constitutional procedures.

(25) Some NATO members, such as Spain and Norway, do not allow the deployment of nuclear weapons on their territory although they are accorded the full collective security guarantees provided by Article 5 of the Washington Treaty. There is no a priori requirement for the stationing of nuclear weapons on the territory of new NATO members, particularly in the current security climate. However, NATO retains the right to alter its security posture at any time as circumstances warrant.

SEC. 603. UNITED STATES POLICY.

It is the policy of the United States—

(1) to join with the NATO allies of the United States to adapt the role of the NATO Alliance in the post-Cold War world;

(2) to actively assist the emerging democracies in Central and Eastern Europe in their transition so that such countries may eventually qualify for NATO membership;

(3) to support the enlargement of NATO in recognition that enlargement will benefit the interests of the United States and the Alliance and to consider these benefits in any analysis of the costs of NATO enlargement;

(4) to ensure that all countries in Central and Eastern Europe are fully aware of and capable of assuming the costs and responsibilities of NATO membership, including the obligation set forth in Article 10 of the Washington Treaty that new members be able to contribute to the security of the North Atlantic area; and

(5) to work to define a constructive and cooperative political and security relationship between an enlarged NATO and the Russian Federation.

SEC. 604. SENSE OF THE CONGRESS REGARDING FURTHER ENLARGEMENT OF NATO.

It is the sense of the Congress that in order to promote economic stability and security in Slovakia, Estonia, Latvia, Lithuania, Romania, Bulgaria, Albania, Moldova, and Ukraine—

(1) the United States should continue and expand its support for the full and active participation of these countries in activities appropriate for qualifying for NATO membership;

(2) the United States Government should use all diplomatic means available to press the European Union to admit as soon as possible any country which qualifies for membership;

(3) the United States Government and the North Atlantic Treaty Organization should continue and expand their support for military exercises and peacekeeping initiatives between and among these nations, nations of the North Atlantic Treaty Organization, and Russia; and

(4) the process of enlarging NATO to include emerging democracies in Central and Eastern Europe should not be limited to consideration of admitting Poland, Hungary, the Czech Republic, and Slovenia as full members of the NATO Alliance.

SEC. 605. SENSE OF THE CONGRESS REGARDING ESTONIA, LATVIA AND LITHUANIA.

In view of the forcible incorporation of Estonia, Latvia, Lithuania into the Soviet Union in 1940 under the Molotov–Ribbentrop Pact and the refusal of the United States and other countries to recognize that incorporation for over 50 years, it is the sense of the Congress that—

(1) Estonia, Latvia, and Lithuania have valid historical security concerns that must be taken into account by the United States; and

(2) Estonia, Latvia, and Lithuania should not be disadvantaged in seeking to join NATO by virtue of their forcible incorporation into the Soviet Union.

SEC. 606. DESIGNATION OF COUNTRIES ELIGIBLE FOR NATO ENLARGEMENT ASSISTANCE.

(a) IN GENERAL.—The following countries are designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994 and shall be deemed to have been so designated pursuant to section 203(d)(1) of such Act: Poland, Hungary, and the Czech Republic.

(b) DESIGNATION OF SLOVENIA.—Effective 90 days after the date of enactment of this Act, Slovenia is designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994, and shall be deemed to have been so designated pursuant to section 203(d) of such Act, unless the President certifies to Congress prior to such effective date that Slovenia fails to meet the criteria under section 203(d)(3) of such Act.

(c) DESIGNATION OF OTHER COUNTRIES.—The President shall designate other emerging democracies in Central and Eastern Europe as eligible to receive assistance under the program established under section 203(a) of such Act if such countries—

(1) have expressed a clear desire to join NATO;

(2) have begun an individualized dialogue with NATO in preparation for accession;

(3) are strategically significant to an effective NATO defense; and

(4) meet the other criteria outlined in section 203(d)(3) of the NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note).

(d) RULE OF CONSTRUCTION.—Nothing in this section precludes the designation by the President of Estonia, Latvia, Lithuania, Romania, Slovakia, Bulgaria, Albania, Moldova, Ukraine, or any other emerging democracy in Central and Eastern Europe pursuant to section 203(d) of the NATO Participation Act of 1994 as eligible to receive assistance under the program established under section 203(a) of such Act.

SEC. 607. AUTHORIZATION OF APPROPRIATIONS FOR NATO ENLARGEMENT ASSISTANCE.

(a) IN GENERAL.—There are authorized to be appropriated $60,000,000 for fiscal year 1997 for the program established under section 203(a) of the NATO Participation Act of 1994.

(b) AVAILABILITY.—Of the funds authorized to be appropriated by subsection (a)—

(1) not less than $20,000,000 shall be available for the cost, as defined in section 502(5) of the Credit Reform Act of 1990, of direct loans pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program");

(2) not less than $30,000,000 shall be available for assistance on a grant basis pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program"); and

(3) not more than $10,000,000 shall be available for assistance pursuant to the authority of section 203(c)(3) of the NATO Participation Act of 1994 (relating to international military education and training).

(c) RULE OF CONSTRUCTION.—Amounts authorized to be appropriated under this section are authorized to be appropriated in addition to such amounts as otherwise may be available for such purposes.

SEC. 608. REGIONAL AIRSPACE INITIATIVE AND PARTNERSHIP FOR PEACE INFORMATION MANAGEMENT SYSTEM.

(a) IN GENERAL.—To the extent provided in advance in appropriations acts for such purposes, funds described in subsection (b) are authorized to be made available to support the implementation of the Regional Airspace Initiative and the Partnership for Peace Information Management System, including—

  (1) the procurement of items in support of these programs; and

  (2) the transfer of such items to countries participating in these programs.

  (b) FUNDS DESCRIBED.—Funds described in this subsection are funds that are available—

  (1) during any fiscal year under the NATO Participation Act of 1994 with respect to countries eligible for assistance under that Act; or

  (2) during fiscal year 1997 under any Act to carry out the Warsaw Initiative.

SEC. 609. EXCESS DEFENSE ARTICLES.

  (a) PRIORITY DELIVERY.—Notwithstanding any other provision of law, the delivery of excess defense articles under the authority of section 203(c)(1) and (2) of the NATO Participation Act of 1994 and section 516 of the Foreign Assistance Act of 1961 shall be given priority to the maximum extent feasible over the delivery of such excess defense articles to all other countries except those countries referred to in section 541 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1995 (Public Law 103–306; 108 Stat. 1640).

  (b) COOPERATIVE REGIONAL PEACEKEEPING INITIATIVES.—The Congress encourages the President to provide excess defense articles and other appropriate assistance to cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed an interest in joining NATO in order to enhance their ability to contribute to European peace and security and international peacekeeping efforts.

SEC. 610. MODERNIZATION OF DEFENSE CAPABILITY.

  The Congress endorses efforts by the United States to modernize the defense capability of Poland, Hungary, the Czech Republic, Slovenia, and any other countries designated by the President pursuant to section 203(d) of the NATO Participation Act of 1994, by exploring with such countries options for the sale or lease to such countries of weapons systems compatible with those used by NATO members, including air defense systems, advanced fighter aircraft, and telecommunications infrastructure.

SEC. 611. TERMINATION OF ELIGIBILITY.

  (a) TERMINATION OF ELIGIBILITY.—The eligibility of a country designated pursuant to subsection (a) or (b) of section 606 or pursuant to section 203(d) of the NATO Participation Act of 1994 may be terminated upon a determination by the President that such country does not meet the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994.

  (b) NOTIFICATION.—At least 15 days before terminating the eligibility of any country pursuant to subsection (a), the President shall notify the congressional committees specified in section 634A of the Foreign Assistance Act of 1961 in accordance with the procedures applicable to reprogramming notifications under that section.

SEC. 612. CONFORMING AMENDMENTS TO THE NATO PARTICIPATION ACT.

  The NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note) is amended in sections 203(a), 203(d)(1), and 203(d)(2) by striking "countries emerging from communist domination" each place it appears and inserting "emerging democracies in Central and Eastern Europe".

<< 22 USCA Ch. 7 >>

TITLE VII—MIDDLE EAST DEVELOPMENT BANK

<< 22 USCA § 290*o* NOTE >>

SEC. 701. SHORT TITLE.

  This title may be cited as the "Bank for Economic Cooperation and Development in the Middle East and North Africa Act".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z  Document 162-7  Filed 09/02/22  Page 363 of 1021  PageID 7233

<< 22 USCA § 290*o* >>

## SEC. 702. ACCEPTANCE OF MEMBERSHIP.

The President is hereby authorized to accept membership for the United States in the Bank for Economic Cooperation and Development in the Middle East and North Africa (in this title referred to as the "Bank") provided for by the agreement establishing the Bank (in this title referred to as the "Agreement"), signed on May 31, 1996.

<< 22 USCA § 290*o*–1 >>

## SEC. 703. GOVERNOR AND ALTERNATE GOVERNOR.

(a) APPOINTMENT.—At the inaugural meeting of the Board of Governors of the Bank, the Governor and the alternate for the Governor of the International Bank for Reconstruction and Development, appointed pursuant to section 3 of the Bretton Woods Agreements Act, shall serve ex-officio as a Governor and the alternate for the Governor, respectively, of the Bank. The President, by and with the advice and consent of the Senate, shall appoint a Governor of the Bank and an alternate for the Governor.

(b) COMPENSATION.—Any person who serves as a governor of the Bank or as an alternate for the Governor may not receive any salary or other compensation from the United States by reason of such service.

<< 22 USCA § 290*o*–2 >>

## SEC. 704. APPLICABILITY OF CERTAIN PROVISIONS OF THE BRETTON WOODS AGREEMENTS ACT.

Section 4 of the Bretton Woods Agreements Act shall apply to the Bank in the same manner in which such section applies to the International Bank for Reconstruction and Development and the International Monetary Fund.

<< 22 USCA § 290*o*–3 >>

## SEC. 705. FEDERAL RESERVE BANKS AS DEPOSITORIES.

Any Federal Reserve Bank which is requested to do so by the Bank may act as its depository, or as its fiscal agent, and the Board of Governors of the Federal Reserve System shall exercise general supervision over the carrying out of these functions.

<< 22 USCA § 290*o*–4 >>

## SEC. 706. SUBSCRIPTION OF STOCK.

(a) SUBSCRIPTION AUTHORITY.—

(1) IN GENERAL.—The Secretary of the Treasury may subscribe on behalf of the United States to not more than 7,011,270 shares of the capital stock of the Bank.

(2) EFFECTIVENESS OF SUBSCRIPTION COMMITMENT.—Any commitment to make such subscription shall be effective only to such extent or in such amounts as are provided for in advance by appropriations Acts.

(b) LIMITATIONS ON AUTHORIZATION OF APPROPRIATIONS.—For payment by the Secretary of the Treasury of the subscription of the United States for shares described in subsection (a), there are authorized to be appropriated $1,050,007,800 without fiscal year limitation.

(c) LIMITATIONS ON OBLIGATION OF APPROPRIATED AMOUNTS FOR SHARES OF CAPITAL STOCK.—

(1) PAID–IN CAPITAL STOCK.—

(A) IN GENERAL.—Not more than $105,000,000 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of paid-in capital stock.

(B) FISCAL YEAR 1997.—Not more than $52,500,000 of the amounts appropriated pursuant to subsection (b) for fiscal year 1997 may be obligated for subscription to shares of paid-in capital stock.

(2) CALLABLE CAPITAL STOCK.—Not more than $787,505,852 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of callable capital stock.

(d) DISPOSITION OF NET INCOME DISTRIBUTIONS BY THE BANK.—Any payment made to the United States by the Bank as a distribution of net income shall be covered into the Treasury as a miscellaneous receipt.

<< 22 USCA § 290*o*–5 >>

## SEC. 707. JURISDICTION AND VENUE OF CIVIL ACTIONS BY OR AGAINST THE BANK.

(a) JURISDICTION.—The United States district courts shall have original and exclusive jurisdiction of any civil action brought in the United States by or against the Bank.

(b) VENUE.—For purposes of section 1391(b) of title 28, United States Code, the Bank shall be deemed to be a resident of the judicial district in which the principal office of the Bank in the United States, or its agent appointed for the purpose of accepting service or notice of service, is located.

<< 22 USCA § 290*o*–6 >>

## SEC. 708. EFFECTIVENESS OF AGREEMENT.

The Agreement shall have full force and effect in the United States, its territories and possessions, and the Commonwealth of Puerto Rico, upon acceptance of membership by the United States in the Bank and the entry into force of the Agreement.

<< 22 USCA § 290*o*–7 >>

## SEC. 709. EXEMPTION FROM SECURITIES LAWS FOR CERTAIN SECURITIES ISSUED BY THE BANK; REPORTS REQUIRED.

(a) EXEMPTION FROM SECURITIES LAWS; REPORTS TO SECURITIES AND EXCHANGE COMMISSION.—Any securities issued by the Bank (including any guaranty by the Bank, whether or not limited in scope) in connection with borrowing of funds, or the guarantee of securities as to both principal and interest, shall be deemed to be exempted securities within the meaning of section 3(a)(2) of the Securities Act of 1933 and section 3(a)(12) of the Securities Exchange Act of 1934. The Bank shall file with the Securities and Exchange Commission such annual and other reports with regard to such securities as the Commission shall determine to be appropriate in view of the special character of the Bank and its operations and necessary in the public interest or for the protection of investors.

(b) AUTHORITY OF SECURITIES AND EXCHANGE COMMISSION TO SUSPEND EXEMPTION; REPORTS TO THE CONGRESS.—The Securities and Exchange Commission, acting in consultation with such agency or officer as the President shall designate, may suspend the provisions of subsection (a) at any time as to any or all securities issued or guaranteed by the Bank during the period of such suspension. The Commission shall include in its annual reports to the Congress such information as it shall deem advisable with regard to the operations and effect of this section.

## SEC. 710. TECHNICAL AMENDMENTS.

<< 22 USCA § 262r >>

(a) ANNUAL REPORT REQUIRED ON PARTICIPATION OF THE UNITED STATES IN THE BANK.—Section 1701(c)(2) of the International Financial Institutions Act (22 U.S.C. 262r(c)(2)) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "Inter–American Development Bank".

<< 12 USCA § 24 >>

(b) EXEMPTION FROM LIMITATIONS AND RESTRICTIONS ON POWER OF NATIONAL, BANKING ASSOCIATIONS TO DEAL IN AND UNDERWRITE INVESTMENT SECURITIES OF THE BANK.—The seventh sentence

of paragraph 7 of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank".

<< 22 USCA § 276c–2 >>

 (c) BENEFITS FOR UNITED STATES CITIZEN–REPRESENTATIVES TO THE BANK.—Section 51 of Public Law 91–599 (22 U.S.C. 276c–2) is amended by inserting "the Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank,".

 (d) For programs, projects or activities in the Department of the Interior and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

 Making appropriations for the Department of the Interior, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

TITLE I—DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

<< 43 USCA § 1734a >>

 For expenses necessary for protection, use, improvement, development, disposal, cadastral surveying, classification, acquisition of easements and other interests in lands, and performance of other functions, including maintenance of facilities, as authorized by law, in the management of lands and their resources under the jurisdiction of the Bureau of Land Management, including the general administration of the Bureau, and assessment of mineral potential of public lands pursuant to Public Law 96–487 (16 U.S.C. 3150(a)), $572,164,000, to remain available until expended, of which $2,010,000 shall be available for assessment of the mineral potential of public lands in Alaska pursuant to section 1010 of Public Law 96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived from the special receipt account established by the Land and Water Conservation Act of 1965, as amended (16 U.S.C. 460*l*–6a(i)); and of which $1,000,000 shall be available in fiscal year 1997 subject to a match by at least an equal amount by the National Fish and Wildlife Foundation, to such Foundation for challenge cost share projects supporting fish and wildlife conservation affecting Bureau lands; in addition, $27,300,000 for Mining Law Administration program operations, to remain available until expended, to be reduced by amounts collected by the Bureau and credited to this appropriation from annual mining claim fees so as to result in a final appropriation estimated at not more than $572,164,000; and in addition, not to exceed $5,000,000, to remain available until expended, from annual mining claim fees; which shall be credited to this account for the costs of administering the mining claim fee program, and $2,000,000 from communication site rental fees established by the Bureau for the cost of administering communication site activities: Provided, That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors: Provided further, That in fiscal year 1997 and thereafter, all fees, excluding mining claim fees, in excess of the fiscal year 1996 collections established by the Secretary of the Interior under the authority of 43 U.S.C. 1734 for processing, recording, or documenting authorizations to use public lands or public land natural resources (including cultural, historical, and mineral) and for providing specific services to public land users, and which are not presently being covered into any Bureau of Land Management appropriation accounts, and not otherwise dedicated by law for a specific distribution, shall be made immediately available for program operations in this account and remain available until expended.

WILDLAND FIRE MANAGEMENT

 For necessary expenses for fire use and management, fire preparedness, suppression operations, and emergency rehabilitation by the Department of the Interior, $252,042,000, to remain available until expended, of which not to exceed $5,025,000 shall be for the renovation or construction of fire facilities: Provided, That such funds are also available for repayment of advances to other appropriation accounts from which funds were previously transferred for such purposes: Provided further, That persons hired pursuant to 43 U.S.C. 1469 may be furnished subsistence and lodging without costs from funds available from this

appropriation: Provided further, That unobligated balances of amounts previously appropriated to the "Fire Protection" and "Emergency Department of the Interior Firefighting Fund" may be transferred to this appropriation.

## CENTRAL HAZARDOUS MATERIALS FUND

For necessary expenses of the Department of the Interior and any of its component offices and bureaus for the remedial action, including associated activities, of hazardous waste substances, pollutants, or contaminants pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended (42 U.S.C. 9601 et seq.), $12,000,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 3302, sums recovered from or paid by a party in advance of or as reimbursement for remedial action or response activities conducted by the Department pursuant to sections 107 or 113(f) of such Act, shall be credited to this account to be available until expended without further appropriation: Provided further, That such sums recovered from or paid by any party are not limited to monetary payments and may include stocks, bonds or other personal or real property, which may be retained, liquidated, or otherwise disposed of by the Secretary and which shall be credited to this account.

## CONSTRUCTION

For construction of buildings, recreation facilities, roads, trails, and appurtenant facilities, $4,333,000, to remain available until expended.

## PAYMENTS IN LIEU OF TAXES

For expenses necessary to implement the Act of October 20, 1976, as amended (31 U.S.C. 6901–07), $113,500,000, of which not to exceed $400,000 shall be available for administrative expenses.

## LAND ACQUISITION

For expenses necessary to carry out sections 205, 206, and 318(d) of Public Law 94–579 including administrative expenses and acquisition of lands or waters, or interests therein, $10,410,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## OREGON AND CALIFORNIA GRANT LANDS

For expenses necessary for management, protection, and development of resources and for construction, operation, and maintenance of access roads, reforestation, and other improvements on the revested Oregon and California Railroad grant lands, on other Federal lands in the Oregon and California land-grant counties of Oregon, and on adjacent rights-of-way; and acquisition of lands or interests therein including existing connecting roads on or adjacent to such grant lands; $100,515,000, to remain available until expended: Provided, That 25 per centum of the aggregate of all receipts during the current fiscal year from the revested Oregon and California Railroad grant lands is hereby made a charge against the Oregon and California land-grant fund and shall be transferred to the General Fund in the Treasury in accordance with the second paragraph of subsection (b) of title II of the Act of August 28, 1937 (50 Stat. 876).

## RANGE IMPROVEMENTS

For rehabilitation, protection, and acquisition of lands and interests therein, and improvement of Federal rangelands pursuant to section 401 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701), notwithstanding any other Act, sums equal to 50 per centum of all moneys received during the prior fiscal year under sections 3 and 15 of the Taylor Grazing Act (43 U.S.C. 315 et seq.) and the amount designated for range improvements from grazing fees and mineral leasing receipts from Bankhead–Jones lands transferred to the Department of the Interior pursuant to law, but not less than $9,113,000, to remain available until expended: Provided, That not to exceed $600,000 shall be available for administrative expenses.

## SERVICE CHARGES, DEPOSITS, AND FORFEITURES

<< 43 USCA § 1735 NOTE >>

For administrative expenses and other costs related to processing application documents and other authorizations for use and disposal of public lands and resources, for costs of providing copies of official public land documents, for monitoring construction, operation, and termination of facilities in conjunction with use authorizations, and for rehabilitation of damaged

property, such amounts as may be collected under Public Law 94–579, as amended, and Public Law 93–153, to remain available until expended: Provided, That notwithstanding any provision to the contrary of section 305(a) of Public Law 94–579 (43 U.S.C. 1735(a)), any moneys that have been or will be received pursuant to that section, whether as a result of forfeiture, compromise, or settlement, if not appropriate for refund pursuant to section 305(c) of that Act (43 U.S.C. 1735(c)), shall be available and may be expended under the authority of this Act by the Secretary to improve, protect, or rehabilitate any public lands administered through the Bureau of Land Management which have been damaged by the action of a resource developer, purchaser, permittee, or any unauthorized person, without regard to whether all moneys collected from each such action are used on the exact lands damaged which led to the action: Provided further, That any such moneys that are in excess of amounts needed to repair damage to the exact land for which funds were collected may be used to repair other damaged public lands.

## MISCELLANEOUS TRUST FUNDS

In addition to amounts authorized to be expended under existing laws, there is hereby appropriated such amounts as may be contributed under section 307 of the Act of October 21, 1976 (43 U.S.C. 1701), and such amounts as may be advanced for administrative costs, surveys, appraisals, and costs of making conveyances of omitted lands under section 211(b) of that Act, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Land Management shall be available for purchase, erection, and dismantlement of temporary structures, and alteration and maintenance of necessary buildings and appurtenant facilities to which the United States has title; up to $100,000 for payments, at the discretion of the Secretary, for information or evidence concerning violations of laws administered by the Bureau; miscellaneous and emergency expenses of enforcement activities authorized or approved by the Secretary and to be accounted for solely on his certificate, not to exceed $10,000: Provided, That notwithstanding 44 U.S.C. 501, the Bureau may, under cooperative cost-sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share the cost of printing either in cash or in services, and the Bureau determines the cooperator is capable of meeting accepted quality standards.

The Bureau of Land Management's Visitor Center in Rand, Oregon is hereby named the "William B. Smullin Visitor Center".

## UNITED STATES FISH AND WILDLIFE SERVICE

## RESOURCE MANAGEMENT

### << 16 USCA § 742b NOTE >>

For expenses necessary for scientific and economic studies, conservation, management, investigations, protection, and utilization of fishery and wildlife resources, except whales, seals, and sea lions, and for the performance of other authorized functions related to such resources; for the general administration of the United States Fish and Wildlife Service; for maintenance of the herd of long-horned cattle on the Wichita Mountains Wildlife Refuge; and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended, $523,947,000, to remain available until September 30, 1998, of which $11,557,000 shall remain available until expended for operation and maintenance of fishery mitigation facilities constructed by the Corps of Engineers under the Lower Snake River Compensation Plan, authorized by the Water Resources Development Act of 1976, to compensate for loss of fishery resources from water development projects on the Lower Snake River, and of which $2,000,000 shall be provided to local governments in southern California for planning associated with the Natural Communities Conservation Planning (NCCP) program and shall remain available until expended: Provided, That hereafter, pursuant to 31 U.S.C. 9701, the Secretary shall charge reasonable fees for the full costs of providing training by the National Education and Training Center, to be credited to this account, notwithstanding 31 U.S.C. 3302, for the direct costs of providing such training.

## CONSTRUCTION

For construction and acquisition of buildings and other facilities required in the conservation, management, investigation, protection, and utilization of fishery and wildlife resources, and the acquisition of lands and interests therein; $43,365,000, to remain available until expended.

## NATURAL RESOURCE DAMAGE ASSESSMENT FUND

To conduct natural resource damage assessment activities by the Department of the Interior necessary to carry out the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. 9601, et seq.), Federal Water Pollution Control Act, as amended (33 U.S.C. 1251, et seq.), the Oil Pollution Act of 1990 (Public Law 101–380), and Public Law 101–337; $4,000,000, to remain available until expended.

## LAND ACQUISITION

<< 16 USCA § 668dd NOTE >>

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the United States Fish and Wildlife Service, $44,479,000, of which $3,000,000 is authorized to be appropriated and shall be used to establish the Clarks River National Wildlife Refuge in Kentucky, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## COOPERATIVE ENDANGERED SPECIES CONSERVATION FUND

For expenses necessary to carry out the provisions of the Endangered Species Act of 1973 (16 U.S.C. 1531–1543), as amended, $14,085,000, for grants to States, to be derived from the Cooperative Endangered Species Conservation Fund, and to remain available until expended.

## NATIONAL WILDLIFE REFUGE FUND

For expenses necessary to implement the Act of October 17, 1978 (16 U.S.C. 715s), $10,779,000.

## REWARDS AND OPERATIONS

For expenses necessary to carry out the provisions of the African Elephant Conservation Act (16 U.S.C. 4201–4203, 4211–4213, 4221–4225, 4241–4245, and 1538), $1,000,000, to remain available until expended.

## NORTH AMERICAN WETLANDS CONSERVATION FUND

For expenses necessary to carry out the provisions of the North American Wetlands Conservation Act, Public Law 101–233, as amended, $9,750,000, to remain available until expended.

## RHINOCEROS AND TIGER CONSERVATION FUND

For deposit to the Rhinoceros and Tiger Conservation Fund, $400,000, to remain available until expended, to carry out the Rhinoceros and Tiger Conservation Act of 1994 (Public Law 103–391).

## WILDLIFE CONSERVATION AND APPRECIATION FUND

For deposit to the Wildlife Conservation and Appreciation Fund, $800,000, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

<< 16 USCA § 460*l*–6a NOTE >>

Appropriations and funds available to the United States Fish and Wildlife Service shall be available for purchase of not to exceed 83 passenger motor vehicles of which 73 are for replacement only (including 43 for police-type use); not to exceed $400,000 for payment, at the discretion of the Secretary, for information, rewards, or evidence concerning violations of laws administered by the Service, and miscellaneous and emergency expenses of enforcement activities, authorized or approved by the Secretary and to be accounted for solely on his certificate; repair of damage to public roads within and adjacent to reservation areas caused by operations of the Service; options for the purchase of land at not to exceed $1 for each option; facilities incident to such public recreational uses on conservation areas as are consistent with their primary purpose; and the maintenance and improvement of aquaria, buildings, and other facilities under the jurisdiction of the Service and to which the United States has title, and which are utilized pursuant to law in connection with management and investigation of fish

and wildlife resources: Provided, That notwithstanding 44 U.S.C. 501, the Service may, under cooperative cost sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share at least one-half the cost of printing either in cash or services and the Service determines the cooperator is capable of meeting accepted quality standards: Provided further, That the Service may accept donated aircraft as replacements for existing aircraft: Provided further, That notwithstanding any other provision of law, the Secretary of the Interior may not spend any of the funds appropriated in this Act for the purchase of lands or interests in lands to be used in the establishment of any new unit of the National Wildlife Refuge System unless the purchase is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551: Provided further, That section 101(c) of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 is amended in section 315(c)(1)(E) (110 Stat. 1321–201; 16 U.S.C. 460*l*–6a note) by striking "distributed in accordance with section 201(c) of the Emergency Wetlands Resources Act" and inserting "available to the Secretary of the Interior until expended to be used in accordance with clauses (i), (ii), and (iii) of section 201(c)(A) of the Emergency Wetlands Resources Act of 1986 (16 U.S.C. 3911(c)(A))".

## NATIONAL PARK SERVICE

### OPERATION OF THE NATIONAL PARK SYSTEM

For expenses necessary for the management, operation, and maintenance of areas and facilities administered by the National Park Service (including special road maintenance service to trucking permittees on a reimbursable basis), and for the general administration of the National Park Service, including not to exceed $1,593,000 for the Volunteers-in-Parks program, and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by 16 U.S.C. 1706, $1,152,311,000, without regard to 16 U.S.C. 451, of which $8,000,000 for research, planning and interagency coordination in support of land acquisition for Everglades restoration shall remain available until expended, and of which not to exceed $72,000,000, to remain available until expended, is to be derived from the special fee account established pursuant to title V, section 5201, of Public Law 100–203.

### NATIONAL RECREATION AND PRESERVATION

For expenses necessary to carry out recreation programs, natural programs, cultural programs, environmental compliance and review, international park affairs, statutory or contractual aid for other activities, and grant administration, not otherwise provided for, $37,976,000.

### HISTORIC PRESERVATION FUND

For expenses necessary in carrying out the Historic Preservation Act of 1966, as amended (16 U.S.C. 470), $36,612,000, to be derived from the Historic Preservation Fund, to remain available until September 30, 1998.

### CONSTRUCTION

For construction, improvements, repair or replacement of physical facilities including the modifications authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989, $163,444,000, to remain available until expended, of which $270,000 shall be used for appropriate fish restoration projects not related to dam removal including reimbursement to the State of Washington for emergency actions taken to protect the 1996 run of fall chinook salmon on the Elwha River: Provided, That funds previously provided under this heading that had been made available to the City of Hot Springs, Arkansas, to be used for a flood protection feasibility study, are now made available to the City of Hot Springs for the rehabilitation of the Federally-constructed Hot Springs Creek Arch, including the portion within Hot Springs National Park.

### LAND AND WATER CONSERVATION FUND (RESCISSION)

<< 16 USCA § 460*l*–10a NOTE >>

The contract authority provided for fiscal year 1997 by 16 U.S.C. 460*l*–10a is rescinded.

### LAND ACQUISITION AND STATE ASSISTANCE

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 370 of 1021   PageID 7240

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of lands or waters, or interest therein, in accordance with statutory authority applicable to the National Park Service, $53,915,000, to be derived from the Land and Water Conservation Fund, to remain available until expended, of which $1,500,000 is to administer the State assistance program: Provided, That any funds made available for the purpose of acquisition of the Elwha and Glines dams shall be used solely for acquisition, and shall not be expended until the full purchase amount has been appropriated by the Congress: Provided further, That of the funds provided herein, $9,000,000 is available for acquisition of the Sterling Forest, subject to authorization.

## ADMINISTRATIVE PROVISIONS

Appropriations for the National Park Service shall be available for the purchase of not to exceed 404 passenger motor vehicles, of which 287 shall be for replacement only, including not to exceed 320 for police-type use, 13 buses, and 6 ambulances: Provided, That none of the funds appropriated to the National Park Service may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided further, That none of the funds appropriated to the National Park Service may be used to implement an agreement for the redevelopment of the southern end of Ellis Island until such agreement has been submitted to the Congress and shall not be implemented prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full and comprehensive report on the development of the southern end of Ellis Island, including the facts and circumstances relied upon in support of the proposed project.

None of the funds in this Act may be spent by the National Park Service for activities taken in direct response to the United Nations Biodiversity Convention.

<< 16 USCA § 1g >>

The National Park Service may in fiscal year 1997 and thereafter enter into cooperative agreements that involve the transfer of National Park Service appropriated funds to State, local and tribal governments, other public entities, educational institutions, and private nonprofit organizations for the public purpose of carrying out National Park Service programs pursuant to 31 U.S.C. 6305 to carry out public purposes of National Park Service programs.

Notwithstanding any other provision of law, remaining balances, including interest, from funds granted to the National Park Foundation pursuant to the National Park System Visitor Facilities Fund Act of 1983 (Public Law 97–433, 96 Stat. 2277) shall be available to the National Park Foundation for expenditure in units of the National Park System for the purpose of improving visitor facilities.

## UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

<< 43 USCA § 31j >>

<< 43 USCA § 50 >>

For expenses necessary for the United States Geological Survey to perform surveys, investigations, and research covering topography, geology, hydrology, and the mineral and water resources of the United States, its Territories and possessions, and other areas as authorized by 43 U.S.C. 31, 1332 and 1340; classify lands as to their mineral and water resources; give engineering supervision to power permittees and Federal Energy Regulatory Commission licensees; administer the minerals exploration program (30 U.S.C. 641); and publish and disseminate data relative to the foregoing activities; and to conduct inquiries into the economic conditions affecting mining and materials processing industries (30 U.S.C. 3, 21a, and 1603; 50 U.S.C. 98g(1)) and related purposes as authorized by law and to publish and disseminate data; $738,913,000, of which $64,559,000 shall be available only for cooperation with States or municipalities for water resources investigations; and of which $16,000,000 shall remain available until expended for conducting inquiries into the economic conditions affecting mining and materials processing industries; and of which $137,500,000 shall be available until September 30, 1998 for the biological research activity and the

operation of the Cooperative Research Units: Provided, That none of these funds provided for the biological research activity shall be used to conduct new surveys on private property, unless specifically authorized in writing by the property owner: Provided further, That beginning in fiscal year 1998 and once every five years thereafter, the National Academy of Sciences shall review and report on the biological research activity of the Survey: Provided further, That no part of this appropriation shall be used to pay more than one-half the cost of topographic mapping or water resources data collection and investigations carried on in cooperation with States and municipalities.

## ADMINISTRATIVE PROVISIONS

The amount appropriated for the United States Geological Survey shall be available for the purchase of not to exceed 53 passenger motor vehicles, of which 48 are for replacement only; reimbursement to the General Services Administration for security guard services; contracting for the furnishing of topographic maps and for the making of geophysical or other specialized surveys when it is administratively determined that such procedures are in the public interest; construction and maintenance of necessary buildings and appurtenant facilities; acquisition of lands for gauging stations and observation wells; expenses of the United States National Committee on Geology; and payment of compensation and expenses of persons on the rolls of the Survey duly appointed to represent the United States in the negotiation and administration of interstate compacts: Provided, That activities funded by appropriations herein made may be accomplished through the use of contracts, grants, or cooperative agreements as defined in 31 U.S.C. 6302, et seq.

## MINERALS MANAGEMENT SERVICE

## ROYALTY AND OFFSHORE MINERALS MANAGEMENT

For expenses necessary for minerals leasing and environmental studies, regulation of industry operations, and collection of royalties, as authorized by law; for enforcing laws and regulations applicable to oil, gas, and other minerals leases, permits, licenses and operating contracts; and for matching grants or cooperative agreements; including the purchase of not to exceed eight passenger motor vehicles for replacement only; $156,955,000, of which not less than $70,063,000 shall be available for royalty management activities; and an amount not to exceed $41,000,000 for the Technical Information Management System and activities of the Outer Continental Shelf (OCS) Lands Activity, to be credited to this appropriation and to remain available until expended, from additions to receipts resulting from increases to rates in effect on August 5, 1993, from rate increases to fee collections for OCS administrative activities performed by the Minerals Management Service over and above the rates in effect on September 30, 1993, and from additional fees for OCS administrative activities established after September 30, 1993: Provided, That $1,500,000 for computer acquisitions shall remain available until September 30, 1998: Provided further, That funds appropriated under this Act shall be available for the payment of interest in accordance with 30 U.S.C. 1721(b) and (d): Provided further, That not to exceed $3,000 shall be available for reasonable expenses related to promoting volunteer beach and marine cleanup activities: Provided further, That notwithstanding any other provision of law, $15,000 under this head shall be available for refunds of overpayments in connection with certain Indian leases in which the Director of the Minerals Management Service concurred with the claimed refund due, to pay amounts owed to Indian allottees or Tribes, or to correct prior unrecoverable erroneous payments.

## OIL SPILL RESEARCH

For necessary expenses to carry out title I, section 1016, title IV, sections 4202 and 4303, title VII, and title VIII, section 8201 of the Oil Pollution Act of 1990, $6,440,000, which shall be derived from the Oil Spill Liability Trust Fund, to remain available until expended.

## OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT

## REGULATION AND TECHNOLOGY

### << 30 USCA § 1211 NOTE >>

For necessary expenses to carry out the provisions of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not to exceed 10 passenger motor vehicles, for replacement only; $94,172,000,

and notwithstanding 31 U.S.C. 3302, an additional amount shall be credited to this account, to remain available until expended, from performance bond forfeitures in fiscal year 1997: Provided, That the Secretary of the Interior, pursuant to regulations, may utilize directly or through grants to States, moneys collected in fiscal year 1997 for civil penalties assessed under section 518 of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1268), to reclaim lands adversely affected by coal mining practices after August 3, 1977, to remain available until expended: Provided further, That appropriations for the Office of Surface Mining Reclamation and Enforcement may provide for the travel and per diem expenses of State and tribal personnel attending Office of Surface Mining Reclamation and Enforcement sponsored training.

### ABANDONED MINE RECLAMATION FUND

For necessary expenses to carry out title IV of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not more than 10 passenger motor vehicles for replacement only, $177,085,000, to be derived from receipts of the Abandoned Mine Reclamation Fund and to remain available until expended; of which up to $4,000,000 shall be for supplemental grants to States for the reclamation of abandoned sites with acid mine rock drainage from coal mines through the Appalachian Clean Streams Initiative: Provided, That grants to minimum program States will be $1,500,000 per State in fiscal year 1997: Provided further, That of the funds herein provided up to $18,000,000 may be used for the emergency program authorized by section 410 of Public Law 95–87, as amended, of which no more than 25 per centum shall be used for emergency reclamation projects in any one State and funds for federally-administered emergency reclamation projects under this proviso shall not exceed $11,000,000: Provided further, That prior year unobligated funds appropriated for the emergency reclamation program shall not be subject to the 25 per centum limitation per State and may be used without fiscal year limitation for emergency projects: Provided further, That pursuant to Public Law 97–365, the Department of the Interior is authorized to use up to 20 per centum from the recovery of the delinquent debt owed to the United States Government to pay for contracts to collect these debts: Provided further, That funds made available to States under title IV of Public Law 95–87 may be used, at their discretion, for any required non-Federal share of the cost of projects funded by the Federal Government for the purpose of environmental restoration related to treatment or abatement of acid mine drainage from abandoned mines: Provided further, That such projects must be consistent with the purposes and priorities of the Surface Mining Control and Reclamation Act: Provided further, That the State of Maryland may set aside the greater of $1,000,000 or 10 percent of the total of the grants made available to the State under title IV of the Surface Mining Control and Reclamation Act of 1977, as amended (30 U.S.C. 1231 et. seq.), if the amount set aside is deposited in an acid mine drainage abatement and treatment fund established under a State law, pursuant to which law the amount (together with all interest earned on the amount) is expended by the State to undertake acid mine drainage abatement and treatment projects, except that before any amounts greater than 10 percent of its title IV grants are deposited in an acid mine drainage abatement and treatment fund, the State of Maryland must first complete all Surface Mining Control and Reclamation Act priority one projects.

### BUREAU OF INDIAN AFFAIRS

### OPERATION OF INDIAN PROGRAMS

<< 25 USCA § 2012 NOTE >>

For operation of Indian programs by direct expenditure, contracts, cooperative agreements, compacts, and grants including expenses necessary to provide education and welfare services for Indians, either directly or in cooperation with States and other organizations, including payment of care, tuition, assistance, and other expenses of Indians in boarding homes, or institutions, or schools; grants and other assistance to needy Indians; maintenance of law and order; management, development, improvement, and protection of resources and appurtenant facilities under the jurisdiction of the Bureau, including payment of irrigation assessments and charges; acquisition of water rights; advances for Indian industrial and business enterprises; operation of Indian arts and crafts shops and museums; development of Indian arts and crafts, as authorized by law; for the general administration of the Bureau, including such expenses in field offices; maintaining of Indian reservation roads as defined in 23 U.S.C. 101; and construction, repair, and improvement of Indian housing, $1,436,902,000, of which not to exceed $86,520,000 shall be for welfare assistance payments and not to exceed $90,829,000 shall be for payments to tribes and tribal organizations for contract support costs associated with ongoing contracts or grants or compacts entered into with the Bureau prior to fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, as amended, and up to $5,000,000 shall be for the Indian Self–

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Determination Fund, which shall be available for the transitional cost of initial or expanded tribal contracts, grants, compacts, or cooperative agreements with the Bureau under such Act; and of which not to exceed $365,124,000 for school operations costs of Bureau-funded schools and other education programs shall become available on July 1, 1997, and shall remain available until September 30, 1998; and of which not to exceed $53,805,000 for higher education scholarships, adult vocational training, and assistance to public schools under 25 U.S.C. 452 et seq., shall remain available until September 30, 1998; and of which not to exceed $54,973,000 shall remain available until expended for housing improvement, road maintenance, attorney fees, litigation support, self-governance grants, the Indian Self–Determination Fund, and the Navajo–Hopi Settlement Program: Provided, That tribes and tribal contractors may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants or compact agreements and for unmet welfare assistance costs: Provided further, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, or grants authorized by the Indian Education Amendments of 1988 (25 U.S.C. 2001 and 2008A) shall remain available until expended by the contractor or grantee: Provided further, That to provide funding uniformity within a Self–Governance Compact, any funds provided in this Act with availability for more than one year may be reprogrammed to one year availability but shall remain available within the Compact until expended: Provided further, That notwithstanding any other provision of law, Indian tribal governments may, by appropriate changes in eligibility criteria or by other means, change eligibility for general assistance or change the amount of general assistance payments for individuals within the service area of such tribe who are otherwise deemed eligible for general assistance payments so long as such changes are applied in a consistent manner to individuals similarly situated: Provided further, That any savings realized by such changes shall be available for use in meeting other priorities of the tribes: Provided further, That any net increase in costs to the Federal Government which result solely from tribally increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation: Provided further, That any forestry funds allocated to a tribe which remain unobligated as of September 30, 1997, may be transferred during fiscal year 1998 to an Indian forest land assistance account established for the benefit of such tribe within the tribe's trust fund account: Provided further, That any such unobligated balances not so transferred shall expire on September 30, 1998: Provided further, That notwithstanding any other provision of law, no funds available to the Bureau, other than the amounts provided herein for assistance to public schools under 25 U.S.C. 452 et seq., shall be available to support the operation of any elementary or secondary school in the State of Alaska in fiscal year 1997: Provided further, That funds made available in this or any other Act for expenditure through September 30, 1998 for schools funded by the Bureau shall be available only to the schools in the Bureau school system as of September 1, 1995: Provided further, That no funds available to the Bureau shall be used to support expanded grades for any school or dormitory beyond the grade structure in place or approved by the Secretary of the Interior at each school in the Bureau school system as of October 1, 1995: Provided further, That in fiscal year 1997 and thereafter, notwithstanding the provisions of 25 U.S.C. 2012(h)(1)(A) and (B), upon the recommendation of either (i) a local school board and school supervisor for an education position in a Bureau of Indian Affairs operated school, or (ii) an Agency school board and education line officer for an Agency education position, the Secretary shall establish adjustments to the rates of basic compensation or annual salary rates established under 25 U.S.C. 2012(h)(1)(A) and (B) for education positions at the school or the Agency, at a level not less than that for comparable positions in the nearest public school district, and the adjustment shall be deemed to be a change to basic pay and shall not be subject to collective bargaining: Provided further, That any reduction to rates of basic compensation or annual salary rates below the rates established under 25 U.S.C. 2012(h)(1)(A) and (B) shall apply only to educators appointed after June 30, 1997, and shall not affect the right of an individual employed on June 30, 1997, in an education position, to receive the compensation attached to such position under 25 U.S.C. 2012(h)(1)(A) and (B) so long as the individual remains in the same position at the same school: Provided further, That notwithstanding 25 U.S.C. 2012(h)(1)(B), when the rates of basic compensation for teachers and counselors at Bureau-operated schools are established at the rates of basic compensation applicable to comparable positions in overseas schools under the Defense Department Overseas Teachers Pay and Personnel Practices Act, such rates shall become effective with the start of the next academic year following the issuance of the Department of Defense salary schedule and shall not be effected retroactively.

CONSTRUCTION

For construction, major repair, and improvement of irrigation and power systems, buildings, utilities, and other facilities, including architectural and engineering services by contract; acquisition of lands, and interests in lands; and preparation of lands for farming, and for construction of the Navajo Indian Irrigation Project pursuant to Public Law 87–483, $94,531,000, to remain available until expended: Provided, That such amounts as may be available for the construction of the Navajo Indian

Irrigation Project may be transferred to the Bureau of Reclamation: Provided further, That not to exceed 6 per centum of contract authority available to the Bureau of Indian Affairs from the Federal Highway Trust Fund may be used to cover the road program management costs of the Bureau: Provided further, That any funds provided for the Safety of Dams program pursuant to 25 U.S.C. 13 shall be made available on a non-reimbursable basis: Provided further, That for fiscal year 1997, in implementing new construction or facilities improvement and repair project grants in excess of $100,000 that are provided to tribally controlled grant schools under Public Law 100–297, as amended, the Secretary of the Interior shall use the Administrative and Audit Requirements and Cost Principles for Assistance Programs contained in 43 CFR part 12 of the regulatory requirements: Provided further, That such grants shall not be subject to section 12.61 of 43 CFR; the Secretary and the grantee shall negotiate and determine a schedule of payments for the work to be performed: Provided further, That in considering applications, the Secretary shall consider whether the Indian tribe or tribal organization would be deficient in assuring that the construction projects conform to applicable building standards and codes and Federal, tribal, or State health and safety standards as required by 25 U.S.C. 2005(a), with respect to organizational and financial management capabilities: Provided further, That if the Secretary declines an application, the Secretary shall follow the requirements contained in 25 U.S.C. 2505(f): Provided further, That any disputes between the Secretary and any grantee concerning a grant shall be subject to the disputes provision in 25 U.S.C. 2508(e).

### INDIAN LAND AND WATER CLAIM SETTLEMENTS AND MISCELLANEOUS PAYMENTS TO INDIANS

For miscellaneous payments to Indian tribes and individuals and for necessary administrative expenses, $69,241,000, to remain available until expended; of which $68,400,000 shall be available for implementation of enacted Indian land and water claim settlements pursuant to Public Laws 101–618, 102–374, 102–575, and for implementation of other enacted water rights settlements, including not to exceed $8,000,000, which shall be for the Federal share of the Catawba Indian Tribe of South Carolina Claims Settlement, as authorized by section 5(a) of Public Law 103–116; and of which $841,000 shall be available pursuant to Public Laws 98–500, 99–264, and 100–580.

### INDIAN GUARANTEED LOAN PROGRAM ACCOUNT

For the cost of guaranteed loans, $4,500,000, as authorized by the Indian Financing Act of 1974, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $34,615,000.

In addition, for administrative expenses to carry out the guaranteed loan programs, $500,000.

### ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Indian Affairs (except the revolving fund for loans, the Indian loan guarantee and insurance fund, the Technical Assistance of Indian Enterprises account, the Indian Direct Loan Program account, and the Indian Guaranteed Loan Program account) shall be available for expenses of exhibits, and purchase of not to exceed 229 passenger motor vehicles, of which not to exceed 187 shall be for replacement only.

Notwithstanding any other provision of law, no funds available to the Bureau of Indian Affairs for central office operations or pooled overhead general administration shall be available for tribal contracts, grants, compacts, or cooperative agreements with the Bureau of Indian Affairs under the provisions of the Indian Self–Determination Act or the Tribal Self–Governance Act of 1994 (Public Law 103–413).

### DEPARTMENTAL OFFICES

### INSULAR AFFAIRS

### ASSISTANCE TO TERRITORIES

<< 48 USCA § 1469b >>

<< 48 USCA § 1801 NOTE >>

For expenses necessary for assistance to territories under the jurisdiction of the Department of the Interior, $65,188,000, of which (1) $61,339,000 shall be available until expended for technical assistance, including maintenance assistance, disaster

assistance, insular management controls, and brown tree snake control and research; grants to the judiciary in American Samoa for compensation and expenses, as authorized by law (48 U.S.C. 1661(c)); grants to the Government of American Samoa, in addition to current local revenues, for construction and support of governmental functions; grants to the Government of the Virgin Islands as authorized by law; grants to the Government of Guam, as authorized by law; and grants to the Government of the Northern Mariana Islands as authorized by law (Public Law 94–241; 90 Stat. 272); and (2) $3,849,000 shall be available for salaries and expenses of the Office of Insular Affairs: Provided, That all financial transactions of the territorial and local governments herein provided for, including such transactions of all agencies or instrumentalities established or utilized by such governments, may be audited by the General Accounting Office, at its discretion, in accordance with chapter 35 of title 31, United States Code: Provided further, That Northern Mariana Islands Covenant grant funding shall be provided according to those terms of the Agreement of the Special Representatives on Future United States Financial Assistance for the Northern Mariana Islands approved by Public Law 99–396, or any subsequent legislation related to Commonwealth of the Northern Mariana Islands grant funding: Provided further, That section 703(a) of Public Law 94–241, as amended, is hereby amended by striking "of the Government of the Northern Mariana Islands": Provided further, That of the amounts provided for technical assistance, sufficient funding shall be made available for a grant to the Close Up Foundation: Provided further, That the funds for the program of operations and maintenance improvement are appropriated to institutionalize routine operations and maintenance improvement of capital infrastructure in American Samoa, Guam, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia through assessments of long-range operations maintenance needs, improved capability of local operations and maintenance institutions and agencies (including management and vocational education training), and project-specific maintenance (with territorial participation and cost sharing to be determined by the Secretary based on the individual territory's commitment to timely maintenance of its capital assets): Provided further, That any appropriation for disaster assistance under this head in this Act or previous appropriations Acts may be used as non-Federal matching funds for the purpose of hazard mitigation grants provided pursuant to section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170c).

## COMPACT OF FREE ASSOCIATION

For economic assistance and necessary expenses for the Federated States of Micronesia and the Republic of the Marshall Islands as provided for in sections 122, 221, 223, 232, and 233 of the Compacts of Free Association, and for economic assistance and necessary expenses for the Republic of Palau as provided for in sections 122, 221, 223, 232, and 233 of the Compact of Free Association, $23,538,000, to remain available until expended, as authorized by Public Law 99–239 and Public Law 99–658.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

For necessary expenses for management of the Department of the Interior, $58,286,00, [1] of which not to exceed $7,500 may be for official reception and representation expenses, and of which up to $2,000,000 shall be available for workers compensation payments and unemployment compensation payments associated with the orderly closure of the United States Bureau of Mines

---

[1] Remainder of figure missing, complete figure probably should read '$58,286,000".

## OFFICE OF THE SOLICITOR

### SALARIES AND EXPENSES

For necessary expenses of the Office of the Solicitor, $35,443,000.

## OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General, $24,439,000, together with any funds or property transferred to the Office of Inspector General through forfeiture proceedings or from the Department of Justice Assets Forfeiture Fund or the Department of the Treasury Assets Forfeiture Fund, that represent an equitable share from the forfeiture of property

in investigations in which the Office of Inspector General participated, with such transferred funds to remain available until expended.

## NATIONAL INDIAN GAMING COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Indian Gaming Commission, pursuant to Public Law 100–497, $1,000,000.

## OFFICE OF SPECIAL TRUSTEE FOR AMERICAN INDIANS

### FEDERAL TRUST PROGRAMS

For operation of trust programs for Indians by direct expenditure, contracts, cooperative agreements, compacts, and grants, $32,126,000, to remain available until expended for trust funds management: Provided, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975 (25 U.S.C. 450 et seq.), shall remain available until expended by the contractor or grantee: Provided further, That notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss: Provided further, That unobligated balances previously made available (1) to liquidate obligations owed tribal and individual Indian payees of any checks canceled pursuant to section 1003 of the Competitive Equality Banking Act of 1987 (Public Law 100–86; 31 U.S.C. 3334(b)), (2) to restore Individual Indian Monies trust funds, Indian Irrigation Systems, and Indian Power Systems accounts amounts invested in credit unions or defaulted savings and loan associations and which where not Federally insured, including any interest on these amounts that may have been earned, but was not because of the default, and (3) to reimburse Indian trust fund account holders for losses to their respective accounts where the claim for said loss has been reduced to a judgement or settlement agreement approved by the Department of Justice, under the heading "Indian Land and Water Claim Settlements and Miscellaneous Payments to Indians", Bureau of Indian Affairs in fiscal years 1995 and 1996, are hereby transferred to and merged with this appropriation and may only be used for the operation of trust programs, in accordance with this appropriation.

### ADMINISTRATIVE PROVISIONS

There is hereby authorized for acquisition from available resources within the Working Capital Fund, 15 aircraft, 10 of which shall be for replacement and which may be obtained by donation, purchase or through available excess surplus property: Provided, That notwithstanding any other provision of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft: Provided further, That no programs funded with appropriated funds in "Departmental Management", "Office of the Solicitor", and "Office of Inspector General" may be augmented through the Working Capital Fund or the Consolidated Working Fund.

### GENERAL PROVISIONS, DEPARTMENT OF THE INTERIOR

SEC. 101. Appropriations made in this title shall be available for expenditure or transfer (within each bureau or office), with the approval of the Secretary, for the emergency reconstruction, replacement, or repair of aircraft, buildings, utilities, or other facilities or equipment damaged or destroyed by fire, flood, storm, or other unavoidable causes: Provided, That no funds shall be made available under this authority until funds specifically made available to the Department of the Interior for emergencies shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible.

SEC. 102. The Secretary may authorize the expenditure or transfer of any no year appropriation in this title, in addition to the amounts included in the budget programs of the several agencies, for the suppression or emergency prevention of forest or range fires on or threatening lands under the jurisdiction of the Department of the Interior; for the emergency rehabilitation of burned-over lands under its jurisdiction; for emergency actions related to potential or actual earthquakes, floods, volcanoes, storms, or other unavoidable causes; for contingency planning subsequent to actual oilspills; response and natural resource damage assessment activities related to actual oilspills; for the prevention, suppression, and control of actual or potential grasshopper

and Mormon cricket outbreaks on lands under the jurisdiction of the Secretary, pursuant to the authority in section 1773(b) of Public Law 99–198 (99 Stat. 1658); for emergency reclamation projects under section 410 of Public Law 95–87; and shall transfer, from any no year funds available to the Office of Surface Mining Reclamation and Enforcement, such funds as may be necessary to permit assumption of regulatory authority in the event a primacy State is not carrying out the regulatory provisions of the Surface Mining Act: Provided, That appropriations made in this title for fire suppression purposes shall be available for the payment of obligations incurred during the preceding fiscal year, and for reimbursement to other Federal agencies for destruction of vehicles, aircraft, or other equipment in connection with their use for fire suppression purposes, such reimbursement to be credited to appropriations currently available at the time of receipt thereof: Provided further, That for emergency rehabilitation and wildfire suppression activities, no funds shall be made available under this authority until funds appropriated to "Wildland Fire Management" shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible: Provided further, That such replenishment funds shall be used to reimburse, on a pro rata basis, accounts from which emergency funds were transferred.

SEC. 103. Appropriations made in this title shall be available for operation of warehouses, garages, shops, and similar facilities, wherever consolidation of activities will contribute to efficiency or economy, and said appropriations shall be reimbursed for services rendered to any other activity in the same manner as authorized by sections 1535 and 1536 of title 31, United States Code: Provided, That reimbursements for costs and supplies, materials, equipment, and for services rendered may be credited to the appropriation current at the time such reimbursements are received.

SEC. 104. Appropriations made to the Department of the Interior in this title shall be available for services as authorized by 5 U.S.C. 3109, when authorized by the Secretary, in total amount not to exceed $500,000; hire, maintenance, and operation of aircraft; hire of passenger motor vehicles; purchase of reprints; payment for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and the payment of dues, when authorized by the Secretary, for library membership in societies or associations which issue publications to members only or at a price to members lower than to subscribers who are not members.

SEC. 105. Appropriations available to the Department of the Interior for salaries and expenses shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902 and D.C. Code 4–204).

SEC. 106. Appropriations made in this title shall be available for obligation in connection with contracts issued for services or rentals for periods not in excess of twelve months beginning at any time during the fiscal year.

SEC. 107. Prior to the transfer of Presidio properties to the Presidio Trust, when authorized, the Secretary may not obligate in any calendar month more than $^1/_{12}$ of the fiscal year 1997 appropriation for operation of the Presidio: Provided, That prior to the transfer of any Presidio property to the Presidio Trust, the Secretary shall transfer such funds as the Trust deems necessary to initiate leasing and other authorized activities of the Trust: Provided further, That this section shall expire on December 31, 1996.

SEC. 108. No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act.

SEC. 109. No funds provided in this title may be expended by the Department of the Interior for the conduct of offshore leasing and related activities placed under restriction in the President's moratorium statement of June 26, 1990, in the areas of Northern, Central, and Southern California; the North Atlantic; Washington and Oregon; and the Eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude.

SEC. 110. No funds provided in this title may be expended by the Department of the Interior for the conduct of leasing, or the approval or permitting of any drilling or other exploration activity, on lands within the North Aleutian Basin planning area.

SEC. 111. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Eastern Gulf of Mexico for Outer Continental Shelf Lease Sale 151 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

SEC. 112. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Atlantic for Outer Continental Shelf Lease Sale 164 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 501 NOTE >>

SEC. 113. There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for costs of capitalizing and operating administrative services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made prior to the current year for the purpose of providing capital shall be used to capitalize such fund: Provided further, That such fund shall be paid in advance from funds available to the Department and other Federal agencies for which such centralized services are performed, at rates which will return in full all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of automatic data processing (ADP) software and systems (either acquired or donated) and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary: Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed four percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment, and for the improvement and implementation of Department financial management, ADP, and other support systems: Provided further, That no later than thirty days after the end of each fiscal year amounts in excess of this reserve limitation shall be transferred to the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

Sec. 114. Public Law 102–495 is amended by adding the following new section:

"Sec. 10. Washington State Removal Option.

"(a) Upon appropriation of $29,500,000 for the Federal government to acquire the projects in the State of Washington pursuant to this Act, the State of Washington may, upon the submission to Congress of a binding agreement to remove the projects within a reasonable period of time, purchase the projects from the Federal government for $2. Such a binding agreement shall provide for the full restoration of the Elwha River ecosystem and native anadromous fisheries, for protection of the existing quality and availability of water from the Elwha River for municipal and industrial uses from possible adverse impacts of dam removal, and for fulfillment by the State of each of the other obligations of the Secretary under this Act.

"(b) Upon receipt of the payment pursuant to subsection (a), the Federal government shall relinquish ownership and title to the projects to the State of Washington.

"(c) Upon the purchase of the projects by the State of Washington, section 3(a), (c), and (d), and Sections 4, 7, and 9 of this Act are hereby repealed, and the remaining sections renumbered accordingly.".

<< 16 USCA § 461 NOTE >>

SEC. 115. Section 7 of Public Law 99–647 (16 U.S.C. 461 note) is amended to read as follows:

"SEC. 7. TERMINATION OF COMMISSION.

"The Commission shall terminate on November 10, 1997.".

SEC. 116. The Congress of the United States hereby designates and ratifies the assignment to the University of Utah as successor to, and beneficiary of, all the existing assets, revenues, funds and rights granted to the State of Utah under the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and the School of Mines Grant (July 26, 1894, 28 Stat. 110). Further, the Secretary of the Interior is authorized and directed to accept such relinquishment of all remaining and unconveyed entitlement for quantity grants owed the State of Utah for the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and any unconveyed entitlement that may remain for the University of Utah School of Mines Grant (July 26, 1894, 28 Stat. 110).

<< 25 USCA § 458bb >>

SEC. 117. Section 402(b)(1) of The Indian Self–Determination and Education Assistance Act (25 U.S.C. 458bb) is amended to read as follows: "(1) In addition to those Indian tribes participating in self-governance under subsection (a) of this section,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

the Secretary, acting through the Director of the Office of Self–Governance, may select up to 50 new tribes per year from the applicant pool described in subsection (c) of this section to participate in self-governance.".

<< 25 USCA § 305a–1 >>

  SEC. 118. In fiscal year 1997 and thereafter, the Indian Arts and Crafts Board may charge admission fees at its museums; charge rent and/or franchise fees for shops located in its museums; publish and sell publications; sell or rent or license use of photographs or other images in hard copy or other forms; license the use of designs, in whole or in part, by others; charge for consulting services provided to others; and may accept the services of volunteers to carry out its mission: Provided, That all revenue derived from such activities is covered into the special fund established by section 4 of Public Law 74–355 (25 U.S.C. 305c).

SEC. 119. TRANSFER OF CERTAIN BUREAU OF LAND MANAGEMENT FACILITIES.—

  (a) BATTLE MOUNTAIN, NEVADA.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to Lander County, Nevada, without consideration, title to the former Bureau of Land Management administrative site and associated buildings in Battle Mountain, Nevada.
  (b) WINNEMUCCA, NEVADA.—
  (1) TRANSFER.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to the State of Nevada, without consideration, title to the surplus Bureau of Land Management District Office building in Winnemucca, Nevada.
  (2) USE.—The transfer under paragraph (1) is made with the intent that the building shall be available to meet the needs of the Department of Conservation and Natural Resources of the State of Nevada.

SEC. 120. ALASKA AVIATION HERITAGE.—

  (a) FINDINGS.—The Congress finds that—
  (1) the Department of the Interior's Grumman Goose G21–A aircraft number N789 is to be retired from several decades of active service in the State of Alaska in 1996; and
  (2) the aircraft is of significant historic value to the people of the State of Alaska.
  (b) DONATION OF AIRCRAFT.—The Secretary of the Interior shall transfer the Grumman Goose G21–A aircraft number N789 to the Alaska Aviation Heritage Museum in Anchorage, Alaska, at no cost to the museum, for permanent display.
  SEC. 121. The Mesquite Lands Act of 1988 is amended by adding the following at the end of section 3:
  "(d) FOURTH AREA.—(1) No later than ten years after the date of enactment of this Act, the City of Mesquite shall notify the Secretary as to which if any of the public lands identified in paragraph (2) of this subsection the city wishes to purchase.
  "(2) For a period of twelve years after the date of enactment of this Act, the city shall have exclusive right to purchase the following parcels of public lands:
  "Parcel A—East ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 5, T. 13 S., R. 71 E., Mount Diablo Meridian; West ½ Sec. 4, T. 13 S., R. 71 E, Mount Diablo Meridian; East ½, West ½ Sec. 4, T. 13 S., R. 71 E., Mount Diablo Meridian.
  "Parcel B—North ½ Sec. 7, T. 13 S., R. 71 E., Mount Diablo Meridian; South East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, West ½ North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian.
  "Parcel C—West ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 1, T. 13 S., R. 70 E., Mount Diablo Meridian; West ½, West ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; North West ¼ Sec. 13, S., R. 70 E., Mount Diablo Meridian; West ½ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, South East ¼, Sec. 11, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½ North East ¼, Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian.
  "Parcel D—South ½ Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian; South West ¼, Sec. 13, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 23, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 24, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 26, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian."

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 380 of 1021   PageID 7250

SEC. 122. FATHER AULL SITE TRANSFER.—

(a) This section may be cited as the "Father Aull Site Transfer Act of 1996".

(b) FINDINGS.—Congress finds that—

(1) the buildings and grounds developed by Father Roger Aull located on public domain land near Silver City, New Mexico, are historically significant to the citizens of the community;

(2) vandalism at the site has become increasingly destructive and frequent in recent years;

(3) because of the isolated location and the distance from other significant resources and agency facilities, the Bureau of Land Management has been unable to devote sufficient resources to restore and protect the site from further damage; and

(4) St. Vincent DePaul Parish in Silver City, New Mexico, has indicated an interest in, and developed a sound proposal for the restoration of, the site, such that the site could be permanently occupied and used by the community.

(c) CONVEYANCE OF PROPERTY.—Subject to valid existing rights, all right, title and interest of the United States in and to the land (including improvements on the land), consisting of approximately 43.06 acres, located approximately 10 miles east of Silver City, New Mexico, and described as follows: T. 17 S., R. 12 W., Section 30: Lot 13, and Section 31: Lot 27 (as generally depicted on the map dated July 1995) is hereby conveyed by operation of law to St. Vincent DePaul Parish in Silver City, New Mexico, without consideration.

(d) RELEASE.—Upon the conveyance of any land or interest in land identified in this section of St. Vincent DePaul Parish, St. Vincent DePaul Parish shall assume any liability for any claim relating to the land or interest in the land arising after the date of the conveyance.

(e) MAP.—The map referred to in this section shall be on file and available for public inspection in—

(1) the State of New Mexico Office of the Bureau of Land Management, Santa Fe, New Mexico; and

(2) the Las Cruces District Office of the Bureau of Land Management, Las Cruces, New Mexico.

SEC. 123. The second proviso under the heading "Bureau of Mines, Administrative Provisions" of Public Law 104–134 is amended by inserting after the word "authorized" the word "hereafter".

<< 16 USCA § 1011 >>

SEC. 124. Watershed Restoration and Enhancement Agreements.

(a) IN GENERAL.—For fiscal year 1997 and each fiscal year thereafter, appropriations made for the Bureau of Land Management may be used by the Secretary of the Interior for the purpose of entering into cooperative agreements with willing private landowners for restoration and enhancement of fish, wildlife, and other biotic resources on public or private land or both that benefit these resources on public lands within the watershed.

(b) DIRECT AND INDIRECT WATERSHED AGREEMENTS.—The Secretary of the Interior may enter into a watershed restoration and enhancement agreement—

(1) directly with a willing private landowner; or

(2) indirectly through an agreement with a state, local, or tribal government or other public entity, educational institution, or private nonprofit organization.

(c) TERMS AND CONDITIONS.—In order for the Secretary to enter into a watershed restoration and enhancement agreement—

(1) the agreement shall—

(A) include such terms and conditions mutually agreed to by the Secretary and the landowner;

(B) improve the viability of and otherwise benefit the fish, wildlife, and other biotic resources on public land in the watershed;

(C) authorize the provision of technical assistance by the Secretary in the planning of management activities that will further the purposes of the agreement;

(D) provide for the sharing of costs of implementing the agreement among the Federal government, the landowner, and other entities, as mutually agreed on by the affected interests; and

(E) ensure that any expenditure by the Secretary pursuant to the agreement is determined by the Secretary to be in the public interest; and

(2) the Secretary may require such other terms and conditions as are necessary to protect the public investment on private lands, provided such terms and conditions are mutually agreed to by the Secretary and the landowner.

<< 16 USCA § 410ff NOTE >>

SEC. 125. Visitor Center Designation at Channel Islands National Park.

(a) The visitor center at Channel Islands National Park, California, is hereby designated as the "Robert J. Lagomarsino Visitor Center".

(b) Any reference in law, regulation, paper, record, map, or any other document in the United States to the visitor center referred to in subsection (a) shall be deemed to be a reference to the "Robert J. Lagomarsino Visitor Center".

TITLE II—RELATED AGENCIES

DEPARTMENT OF AGRICULTURE

FOREST SERVICE

FOREST AND RANGELAND RESEARCH

For necessary expenses of forest and rangeland research as authorized by law, $179,786,000, to remain available until expended.

STATE AND PRIVATE FORESTRY

For necessary expenses of cooperating with, and providing technical and financial assistance to States, Territories, possessions, and others for forest pest management activities, cooperative forestry and education and land conservation activities, $155,461,000, to remain available until expended, as authorized by law: Provided That of funds available under this heading for Pacific Northwest Assistance in this or prior appropriations Acts. $750,000 shall be provided to the World Forestry Center for purposes of continuing scientific research and other authorized efforts regarding the land exchange efforts in the Umpqua River Basin region.

NATIONAL FOREST SYSTEM

For necessary expenses of the Forest Service, not otherwise provided for, for management, protection, improvement, and utilization of the National Forest System, for ecosystem planning, inventory, and monitoring, and for administrative expenses associated with the management of funds provided under the heads "Forest and Rangeland Research," "State and Private Forestry," "National Forest System," "Wildland Fire Management," "Reconstruction and Construction," and "Land Acquisition," $1,274,781,000, to remain available until expended, and including 50 per centum of all monies received during the prior fiscal year as fees collected under the Land and Water Conservation Fund Act of 1965, as amended, in accordance with section 4 of the Act (16 U.S.C. 460*l*–6a(i)): Provided, That up to $5,000,000 of the funds provided herein for road maintenance shall be available for the planned obliteration of roads which are no longer needed.

WILDLAND FIRE MANAGEMENT

For necessary expenses for forest fire presuppression activities on National Forest System lands, for emergency fire suppression on or adjacent to such lands or other lands under fire protection agreement, and for emergency rehabilitation of burned over National Forest System lands, $530,016,000, to remain available until expended: Provided, That unexpended balances of amounts previously appropriated under any other headings for Forest Service fire activities are transferred to and merged with this appropriation and subject to the same terms and conditions: Provided, further, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes.

RECONSTRUCTION AND CONSTRUCTION

For necessary expenses of the Forest Service, not otherwise provided for, $174,974,000, to remain available until expended for construction, reconstruction and acquisition of buildings and other facilities, and for construction, reconstruction and repair of forest roads and trails by the Forest Service as authorized by 16 U.S.C. 532–538 and 23 U.S.C. 101 and 205: Provided, That not to exceed $50,000,000, to remain available until expended, may be obligated for the construction of forest roads by

timber purchasers: Provided further, That funds appropriated under this head for the construction of the Wayne National Forest Supervisor's Office may be granted to the Ohio State Highway Patrol as the federal share of the cost of construction of a new facility to be occupied jointly by the Forest Service and the Ohio State Highway Patrol: Provided further, That an agreed upon lease of space in the new facility shall be provided to the Forest Service without charge for the life of the building.

## LAND ACQUISITION

  For expenses necessary to carry out the provisions of the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the Forest Service, $40,575,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## ACQUISITION OF LANDS FOR NATIONAL FORESTS SPECIAL ACTS

  For acquisition of lands within the exterior boundaries of the Cache, Uinta, and Wasatch National Forests, Utah; the Toiyabe National Forest, Nevada; and the Angeles, San Bernardino, Sequoia, and Cleveland National Forests, California, as authorized by law, $1,069,000, to be derived from forest receipts.

## ACQUISITION OF LANDS TO COMPLETE LAND EXCHANGES

  For acquisition of lands, such sums, to be derived from funds deposited by State, county, or municipal governments, public school districts, or other public school authorities pursuant to the Act of December 4, 1967, as amended (16 U.S.C. 484a), to remain available until expended.

## RANGE BETTERMENT FUND

  For necessary expenses of range rehabilitation, protection, and improvement, 50 per centum of all moneys received during the prior fiscal year, as fees for grazing domestic livestock on lands in National Forests in the sixteen Western States, pursuant to section 401(b)(1) of Public Law 94–579, as amended, to remain available until expended, of which not to exceed 6 per centum shall be available for administrative expenses associated with on-the-ground range rehabilitation, protection, and improvements.

## GIFTS, DONATIONS AND BEQUESTS FOR FOREST AND RANGELAND RESEARCH

  For expenses authorized by 16 U.S.C. 1643(b), $92,000, to remain available until expended, to be derived from the fund established pursuant to the above Act.

## ADMINISTRATIVE PROVISIONS, FOREST SERVICE

  Appropriations to the Forest Service for the current fiscal year shall be available for: (a) purchase of not to exceed 159 passenger motor vehicles of which 14 will be used primarily for law enforcement purposes and of which 149 shall be for replacement; acquisition of 10 passenger motor vehicles from excess sources, and hire of such vehicles; operation and maintenance of aircraft, the purchase of not to exceed two for replacement only, and acquisition of 20 aircraft from excess sources; notwithstanding other provisions of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft; (b) services pursuant to 7 U.S.C. 2225, and not to exceed $100,000 for employment under 5 U.S.C. 3109; (c) purchase, erection, and alteration of buildings and other public improvements (7 U.S.C. 2250); (d) acquisition of land, waters, and interests therein, pursuant to 7 U.S.C. 428a; (e) for expenses pursuant to the Volunteers in the National Forest Act of 1972 (16 U.S.C. 558a, 558d, 558a note); and (f) for debt collection contracts in accordance with 31 U.S.C. 3718(c).

  None of the funds made available under this Act shall be obligated or expended to change the boundaries of any region, to abolish any region, to move or close any regional office for research, State and private forestry, or National Forest System administration of the Forest Service, Department of Agriculture, or to implement any reorganization, "reinvention" or other type of organizational restructuring of the Forest Service, other than the relocation of the Regional Office for Region 5 of the Forest Service from San Francisco to excess military property at Mare Island, Vallejo, California, without the consent of the House and Senate Committees on Appropriations.

  Any funds available to the Forest Service may be used for retrofitting Mare Island facilities to accommodate the relocation: Provided, That funds for the move must come from funds otherwise available to Region 5: Provided further, That any funds to be provided for such purposes shall only be available upon approval of the House and Senate Committees on Appropriations.

AR03041143

Case 2:21-cv-00067-2  Document 162-7  Filed 09/02/22  Page 383 of 1021  PageID 7253

Any appropriations or funds available to the Forest Service may be advanced to the Wildland Fire Management appropriation and may be used for forest firefighting and the emergency rehabilitation of burned-over lands under its jurisdiction.

Funds appropriated to the Forest Service shall be available for assistance to or through the Agency for International Development and the Foreign Agricultural Service in connection with forest and rangeland research, technical information, and assistance in foreign countries, and shall be available to support forestry and related natural resource activities outside the United States and its territories and possessions, including technical assistance, education and training, and cooperation with United States and international organizations.

None of the funds made available to the Forest Service under this Act shall be subject to transfer under the provisions of section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or 7 U.S.C. 147b unless the proposed transfer is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551.

None of the funds available to the Forest Service may be reprogrammed without the advance approval of the House and Senate Committees on Appropriations in accordance with the procedures contained in House Report 103–551.

No funds appropriated to the Forest Service shall be transferred to the Working Capital Fund of the Department of Agriculture without the approval of the Chief of the Forest Service.

Notwithstanding any other provision of the law, any appropriations or funds available to the Forest Service may be used to disseminate program information to private and public individuals and organizations through the use of nonmonetary items of nominal value and to provide nonmonetary awards of nominal value and to incur necessary expenses for the nonmonetary recognition of private individuals and organizations that make contributions to Forest Service programs.

Notwithstanding any other provision of law, money collected, in advance or otherwise, by the Forest Service under authority of section 101 of Public Law 93–153 (30 U.S.C. 185(1)) as reimbursement of administrative and other costs incurred in processing pipeline right-of-way or permit applications and for costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities, may be used to reimburse the applicable appropriation to which such costs were originally charged.

Funds available to the Forest Service shall be available to conduct a program of not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended by Public Law 93–408.

None of the funds available in this Act shall be used for timber sale preparation using clearcutting in hardwood stands in excess of 25 percent of the fiscal year 1989 harvested volume in the Wayne National Forest, Ohio: Provided, That this limitation shall not apply to hardwood stands damaged by natural disaster: Provided further, That landscape architects shall be used to maintain a visually pleasing forest.

Any money collected from the States for fire suppression assistance rendered by the Forest Service on non-Federal lands not in the vicinity of National Forest System lands shall be used to reimburse the applicable appropriation and shall remain available until expended as the Secretary may direct in conducting activities authorized by 16 U.S.C. 2101 (note), 2101–2110, 1606, and 2111.

Of the funds available to the Forest Service, $1,500 is available to the Chief of the Forest Service for official reception and representation expenses.

Notwithstanding any other provision of law, the Forest Service is authorized to employ or otherwise contract with persons at regular rates of pay, as determined by the Service, to perform work occasioned by emergencies such as fires, storms, floods, earthquakes or any other unavoidable cause without regard to Sundays, Federal holidays, and the regular workweek.

To the greatest extent possible, and in accordance with the Final Amendment to the Shawnee National Forest Plan, none of the funds available in this Act shall be used for preparation of timber sales using clearcutting or other forms of even aged management in hardwood stands in the Shawnee National Forest, Illinois.

Pursuant to sections 405(b) and 410(b) of Public Law 101–593, funds up to $1,000,000 for matching funds shall be available for the National Forest Foundation on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

Pursuant to section 2(b)(2) of Public Law 98–244, up to $1,000,000 of the funds available to the Forest Service shall be available for matching funds, as authorized in 16 U.S.C. 3701–3709, on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

Funds appropriated to the Forest Service shall be available for interactions with and providing technical assistance to rural communities for sustainable rural development purposes.

Notwithstanding any other provision of law, 80 percent of the funds appropriated to the Forest Service in the National Forest System and Construction accounts and planned to be allocated to activities under the "Jobs in the Woods" program for projects on National Forest land in the State of Washington may be granted directly to the Washington State Department of Fish and Wildlife for accomplishment of planned projects. Twenty percent of said funds shall be retained by the Forest Service for planning and administering projects. Project selection and prioritization shall be accomplished by the Forest Service with such consultation with the State of Washington as the Forest Service deems appropriate.

Funds appropriated to the Forest Service shall be available for payments to counties within the Columbia River Gorge National Scenic Area, pursuant to sections 14(c)(1) and (2), and section 16(a)(2) of Public Law 99–663.

The Secretary of Agriculture shall by March 31, 1997 report to the Committees on Appropriations of the House of Representatives and the Senate on the status and disposition of all salvage timber sales started under the authority of Section 2001 of Public Law 104–19 and subsequently withdrawn or delayed and completed under different authorities as a consequence of the July 2, 1996 directive on the implementation of Section 2001 issued by the Secretary.

The Pacific Northwest Research Station Silviculture Laboratory in Bend, Oregon is hereby named the "Robert W. Chandler Building".

For purposes of the Southeast Alaska Economic Disaster Fund as set forth in section 101(c) of Public Law 104–134, the direct grants provided in subsection (c) shall be considered direct payments for purposes of all applicable law except that these direct grants may not be used for lobbying activities.

No employee of the Department of Agriculture may be detailed or assigned from an agency or office funded by this Act to any other agency or office of the Department for more than 30 days unless the individual's employing agency or office is fully reimbursed by the receiving agency or office for the salary and expenses of the employee for the period of assignment.

## DEPARTMENT OF ENERGY

## CLEAN COAL TECHNOLOGY

### (RESCISSION)

Of the funds made available under this heading for obligation in fiscal year 1997 or prior years, $123,000,000 are rescinded: Provided, That funds made available in previous appropriations Acts shall be available for any ongoing project regardless of the separate request for proposal under which the project was selected.

## FOSSIL ENERGY RESEARCH AND DEVELOPMENT

For necessary expenses in carrying out fossil energy research and development activities, under the authority of the Department of Energy Organization Act (Public Law 95–91), including the acquisition of interest, including defeasible and equitable interests in any real property or any facility or for plant or facility acquisition or expansion, and for conducting inquiries, technological investigations and research concerning the extraction, processing, use, and disposal of mineral substances without objectionable social and environmental costs (30 U.S.C. 3, 1602, and 1603), performed under the minerals and materials science programs at the Albany Research Center in Oregon, $364,704,000 to remain available until expended: Provided, That no part of the sum herein made available shall be used for the field testing of nuclear explosives in the recovery of oil and gas.

## ALTERNATIVE FUELS PRODUCTION

### (INCLUDING TRANSFER AND RESCISSION OF FUNDS)

Monies received as investment income on the principal amount in the Great Plains Project Trust at the Norwest Bank of North Dakota, in such sums as are earned as of October 1, 1996, shall be deposited in this account and immediately transferred to the General Fund of the Treasury. Monies received as revenue sharing from the operation of the Great Plains Gasification Plant shall be immediately transferred to the General Fund of the Treasury. Funds are hereby rescinded in the amount of $2,500,000 from unobligated balances under this head.

## NAVAL PETROLEUM AND OIL SHALE RESERVES

<< 10 USCA § 7430 NOTE >>

For necessary expenses in carrying out naval petroleum and oil shale reserve activities, $143,786,000, to remain available until expended: Provided, That the requirements of 10 U.S.C. 7430(b)(2)(B) shall not apply to fiscal year 1997.

## ENERGY CONSERVATION

For necessary expenses in carrying out energy conservation activities, $569,762,000, to remain available until expended, including, notwithstanding any other provision of law, the excess amount for fiscal year 1997 determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided, That $149,845,000 shall be for use in energy conservation programs as defined in section 3008(3) of Public Law 99–509 (15 U.S.C. 4507) and shall not be available until excess amounts are determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided further, That notwithstanding section 3003(d)(2) of Public Law 99–509 such sums shall be allocated to the eligible programs as follows: $120,845,000 for weatherization assistance grants and $29,000,000 for State energy conservation grants.

## ECONOMIC REGULATION

For necessary expenses in carrying out the activities of the Office of Hearing and Appeals, $2,725,000, to remain available until expended.

## STRATEGIC PETROLEUM RESERVE

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses for Strategic Petroleum Reserve facility development and operations and program management activities pursuant to the Energy Policy and Conservation Act of 1975, as amended (42 U.S.C. 6201 et seq.), $220,000,000, to remain available until expended, of which $220,000,000 shall be repaid from the "SPR Operating Fund" from amounts made available from the sale of oil from the Reserve: Provided, That notwithstanding section 161 of the Energy Policy and Conservation Act, the Secretary shall draw down and sell in fiscal year 1997 $220,000,000 worth of oil from the Strategic Petroleum Reserve: Provided further, That the proceeds from the sale shall be deposited into a special account in the Treasury, to be established and known as the "SPR Operating Fund", and shall, upon receipt, be transferred to the Strategic Petroleum Reserve account for operations of the Strategic Petroleum Reserve.

## SPR PETROLEUM ACCOUNT

Notwithstanding 42 U.S.C. 6240(d) the United States share of crude oil in Naval Petroleum Reserve Numbered 1 (Elk Hills) may be sold or otherwise disposed of to other than the Strategic Petroleum Reserve: Provided, That outlays in fiscal year 1997 resulting from the use of funds in this account shall not exceed $5,000,000.

## ENERGY INFORMATION ADMINISTRATION

For necessary expenses in carrying out the activities of the Energy Information Administration, $66,120,000 to remain available until expended.

## ADMINISTRATIVE PROVISIONS, DEPARTMENT OF ENERGY

Appropriations under this Act for the current fiscal year shall be available for hire of passenger motor vehicles; hire, maintenance, and operation of aircraft; purchase, repair, and cleaning of uniforms; and reimbursement to the General Services Administration for security guard services.

From appropriations under this Act, transfers of sums may be made to other agencies of the Government for the performance of work for which the appropriation is made.

None of the funds made available to the Department of Energy under this Act shall be used to implement or finance authorized price support or loan guarantee programs unless specific provision is made for such programs in an appropriations Act.

The Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, private or foreign: Provided, That revenues and other moneys received by or for the account of the Department of Energy or otherwise generated by sale of products in connection with projects of the Department appropriated under this Act may be retained by the Secretary of Energy, to be available until

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

expended, and used only for plant construction, operation, costs, and payments to cost-sharing entities as provided in appropriate cost-sharing contracts or agreements: Provided further, That the remainder of revenues after the making of such payments shall be covered into the Treasury as miscellaneous receipts: Provided further, That any contract, agreement, or provision thereof entered into by the Secretary pursuant to this authority shall not be executed prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full comprehensive report on such project, including the facts and circumstances relied upon in support of the proposed project.

No funds provided in this Act may be expended by the Department of Energy to prepare, issue, or process procurement documents for programs or projects for which appropriations have not been made.

In addition to other authorities set forth in this Act, the Secretary may accept fees and contributions from public and private sources, to be deposited in a contributed funds account, and prosecute projects using such fees and contributions in cooperation with other Federal, State or private agencies or concerns.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## INDIAN HEALTH SERVICE

### INDIAN HEALTH SERVICES

For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self–Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,806,269,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service: Provided, That funds made available to tribes and tribal organizations through contracts, grant agreements, or any other agreements or compacts authorized by the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), shall be deemed to be obligated at the time of the grant or contract award and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That $12,000,000 shall remain available until expended, for the Indian Catastrophic Health Emergency Fund: Provided further, That $356,325,000 for contract medical care shall remain available for obligation until September 30, 1998: Provided further, That of the funds provided, not less than $11,706,000 shall be used to carry out the loan repayment program under section 108 of the Indian Health Care Improvement Act: Provided further, That funds provided in this Act may be used for one-year contracts and grants which are to be performed in two fiscal years, so long as the total obligation is recorded in the year for which the funds are appropriated: Provided further, That the amounts collected by the Secretary of Health and Human Services under the authority of title IV of the Indian Health Care Improvement Act shall remain available until expended for the purpose of achieving compliance with the applicable conditions and requirements of titles XVIII and XIX of the Social Security Act (exclusive of planning, design, or construction of new facilities): Provided further, That of the funds provided, $7,500,000 shall remain available until expended, for the Indian Self–Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, compacts, grants or cooperative agreements with the Indian Health Service under the provisions of the Indian Self–Determination Act: Provided further, That funding contained herein, and in any earlier appropriations Acts for scholarship programs under the Indian Health Care Improvement Act (25 U.S.C. 1613) shall remain available for obligation until September 30, 1998: Provided further, That amounts received by tribes and tribal organizations under title IV of the Indian Health Care Improvement Act shall be reported and accounted for and available to the receiving tribes and tribal organizations until expended.

### INDIAN HEALTH FACILITIES

For construction, repair, maintenance, improvement, and equipment of health and related auxiliary facilities, including quarters for personnel; preparation of plans, specifications, and drawings; acquisition of sites, purchase and erection of modular buildings, and purchases of trailers; and for provision of domestic and community sanitation facilities for Indians, as authorized by section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a), the Indian Self–Determination Act, and the Indian Health Care Improvement Act, and for expenses necessary to carry out such Acts and titles II and III of the Public Health Service Act with respect to environmental health and facilities support activities of the Indian Health Service, $247,731,000, to remain available until expended: Provided, That notwithstanding any other provision of law, funds appropriated for the planning, design,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

construction or renovation of health facilities for the benefit of an Indian tribe or tribes may be used to purchase land for sites to construct, improve, or enlarge health or related facilities.

## ADMINISTRATIVE PROVISIONS, INDIAN HEALTH SERVICE

Appropriations in this Act to the Indian Health Service shall be available for services as authorized by 5 U.S.C. 3109 but at rates not to exceed the per diem rate equivalent to the maximum rate payable for senior-level positions under 5 U.S.C. 5376; hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation and erection of modular buildings and renovation of existing facilities; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and for uniforms or allowances therefore as authorized by 5 U.S.C. 5901–5902; and for expenses of attendance at meetings which are concerned with the functions or activities for which the appropriation is made or which will contribute to improved conduct, supervision, or management of those functions or activities: Provided, That in accordance with the provisions of the Indian Health Care Improvement Act, non-Indian patients may be extended health care at all tribally administered or Indian Health Service facilities, subject to charges, and the proceeds along with funds recovered under the Federal Medical Care Recovery Act (42 U.S.C. 2651–53) shall be credited to the account of the facility providing the service and shall be available without fiscal year limitation: Provided further, That notwithstanding any other law or regulation, funds transferred from the Department of Housing and Urban Development to the Indian Health Service shall be administered under Public Law 86–121 (the Indian Sanitation Facilities Act) and Public Law 93–638, as amended: Provided further, That funds appropriated to the Indian Health Service in this Act, except those used for administrative and program direction purposes, shall not be subject to limitations directed at curtailing Federal travel and transportation: Provided further, That notwithstanding any other provision of law, funds previously or herein made available to a tribe or tribal organization through a contract, grant, or agreement authorized by title I or title III of the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), may be deobligated and reobligated to a self-determination contract under title I, or a self-governance agreement under title III of such Act and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That none of the funds made available to the Indian Health Service in this Act shall be used to implement the final rule published in the Federal Register on September 16, 1987, by the Department of Health and Human Services, relating to the eligibility for the health care services of the Indian Health Service until the Indian Health Service has submitted a budget request reflecting the increased costs associated with the proposed final rule, and such request has been included in an appropriations Act and enacted into law: Provided further, That funds made available in this Act are to be apportioned to the Indian Health Service as appropriated in this Act, and accounted for in the appropriation structure set forth in this Act: Provided further, That funds received from any source, including tribal contractors and compactors for previously transferred functions which tribal contractors and compactors no longer wish to retain, for services, goods, or training and technical assistance, shall be retained by the Indian Health Service and shall remain available until expended by the Indian Health Service: Provided further, That reimbursements for training, technical assistance, or services provided by the Indian Health Service will contain total costs, including direct, administrative, and overhead associated with the provision of goods, services, or technical assistance: Provided further, That the appropriation structure for the Indian Health Service may not be altered without advance approval of the House and Senate Committees on Appropriations.

## DEPARTMENT OF EDUCATION

## OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

## INDIAN EDUCATION

For necessary expenses to carry out, to the extent not otherwise provided, title IX, part A of the Elementary and Secondary Education Act of 1965, as amended, and section 215 of the Department of Education Organization Act, $61,000,000.

## OTHER RELATED AGENCIES

## OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION

## SALARIES AND EXPENSES

For necessary expenses of the Office of Navajo and Hopi Indian Relocation as authorized by Public Law 93–531, $19,345,000, to remain available until expended: Provided, That funds provided in this or any other appropriations Act are to be used to relocate eligible individuals and groups including evictees from District 6, Hopi-partitioned lands residents, those in significantly substandard housing, and all others certified as eligible and not included in the preceding categories: Provided further, That none of the funds contained in this or any other Act may be used by the Office of Navajo and Hopi Indian Relocation to evict any single Navajo or Navajo family who, as of November 30, 1985, was physically domiciled on the lands partitioned to the Hopi Tribe unless a new or replacement home is provided for such household: Provided further, That no relocatee will be provided with more than one new or replacement home: Provided further, That the Office shall relocate any certified eligible relocatees who have selected and received an approved homesite on the Navajo reservation or selected a replacement residence off the Navajo reservation or on the land acquired pursuant to 25 U.S.C. 640d–10.

INSTITUTE OF AMERICAN INDIAN AND ALASKA NATIVE CULTURE AND ARTS DEVELOPMENT

PAYMENT TO THE INSTITUTE

For payment to the Institute of American Indian and Alaska Native Culture and Arts Development, as authorized by title XV of Public Law 99–498, as amended (20 U.S.C. 56, part A), $5,500,000.

SMITHSONIAN INSTITUTION

SALARIES AND EXPENSES

For necessary expenses of the Smithsonian Institution, as authorized by law, including research in the fields of art, science, and history; development, preservation, and documentation of the National Collections; presentation of public exhibits and performances; collection, preparation, dissemination, and exchange of information and publications; conduct of education, training, and museum assistance programs; maintenance, alteration, operation, lease (for terms not to exceed thirty years), and protection of buildings, facilities, and approaches; not to exceed $100,000 for services as authorized by 5 U.S.C. 3109; up to 5 replacement passenger vehicles; purchase, rental, repair, and cleaning of uniforms for employees; $317,557,000, of which not to exceed $30,665,000 for the instrumentation program, collections acquisition, Museum Support Center equipment and move, exhibition reinstallation, the National Museum of the American Indian, the repatriation of skeletal remains program, research equipment, information management, and Latino programming shall remain available until expended, and including such funds as may be necessary to support American overseas research centers and a total of $125,000 for the Council of American Overseas Research Centers: Provided, That funds appropriated herein are available for advance payments to independent contractors performing research services or participating in official Smithsonian presentations.

CONSTRUCTION AND IMPROVEMENTS, NATIONAL ZOOLOGICAL PARK

For necessary expenses of planning, construction, remodeling, and equipping of buildings and facilities at the National Zoological Park, by contract or otherwise, $3,850,000, to remain available until expended.

REPAIR AND RESTORATION OF BUILDINGS

For necessary expenses of repair and restoration of buildings owned or occupied by the Smithsonian Institution, by contract or otherwise, as authorized by section 2 of the Act of August 22, 1949 (63 Stat. 623), including not to exceed $10,000 for services as authorized by 5 U.S.C. 3109, $39,000,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or restoration of buildings of the Smithsonian Institution may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

CONSTRUCTION

For necessary expenses for construction, $10,000,000, to remain available until expended.

NATIONAL GALLERY OF ART

SALARIES AND EXPENSES

For the upkeep and operations of the National Gallery of Art, the protection and care of the works of art therein, and administrative expenses incident thereto, as authorized by the Act of March 24, 1937 (50 Stat. 51), as amended by the public

resolution of April 13, 1939 (Public Resolution 9, Seventy-sixth Congress), including services as authorized by 5 U.S.C. 3109; payment in advance when authorized by the treasurer of the Gallery for membership in library, museum, and art associations or societies whose publications or services are available to members only, or to members at a price lower than to the general public; purchase, repair, and cleaning of uniforms for guards, and uniforms, or allowances therefor, for other employees as authorized by law (5 U.S.C. 5901–5902); purchase or rental of devices and services for protecting buildings and contents thereof, and maintenance, alteration, improvement, and repair of buildings, approaches, and grounds; and purchase of services for restoration and repair of works of art for the National Gallery of Art by contracts made, without advertising, with individuals, firms, or organizations at such rates or prices and under such terms and conditions as the Gallery may deem proper, $53,899,000, of which not to exceed $3,026,000 for the special exhibition program shall remain available until expended.

### REPAIR, RESTORATION AND RENOVATION OF BUILDINGS

For necessary expenses of repair, restoration and renovation of buildings, grounds and facilities owned or occupied by the National Gallery of Art, by contract or otherwise, as authorized, $5,942,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or renovation of buildings of the National Gallery of Art may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

### JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For necessary expenses for the operation, maintenance and security of the John F. Kennedy Center for the Performing Arts, $10,875,000.

### CONSTRUCTION

For necessary expenses of capital repair and rehabilitation of the existing features of the building and site of the John F. Kennedy Center for the Performing Arts, $9,000,000, to remain available until expended.

### WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS

### SALARIES AND EXPENSES

For expenses necessary in carrying out the provisions of the Woodrow Wilson Memorial Act of 1968 (82 Stat. 1356) including hire of passenger vehicles and services as authorized by 5 U.S.C. 3109, $5,840,000.

### NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### NATIONAL ENDOWMENT FOR THE ARTS

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $82,734,000, shall be available to the National Endowment for the Arts for the support of projects and productions in the arts through assistance to organizations and individuals pursuant to section 5(c) of the Act, and for administering the functions of the Act, to remain available until expended.

### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $16,760,000, to remain available until expended, to the National Endowment for the Arts: Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of section 10(a)(2), subsections 11(a)(2)(A) and 11(a)(3)(A) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

### NATIONAL ENDOWMENT FOR THE HUMANITIES

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $96,100,000 shall be available to the National Endowment for the Humanities for support of activities in the humanities, pursuant to section 7(c) of the Act, and for administering the functions of the Act, to remain available until expended.

### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $13,900,000, to remain available until expended, of which $8,000,000 shall be available to the National Endowment for the Humanities for the purposes of section 7(h): Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of subsections 11(a)(2)(B) and 11(a)(3)(B) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

## INSTITUTE OF MUSEUM SERVICES

### GRANTS AND ADMINISTRATION

For carrying out title II of the Arts, Humanities, and Cultural Affairs Act of 1976, as amended, $22,000,000, to remain available until expended.

### ADMINISTRATIVE PROVISIONS

None of the funds appropriated to the National Foundation on the Arts and the Humanities may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided, That none of the funds appropriated to the National Foundation on the Arts and the Humanities may be used for official reception and representation expenses.

## COMMISSION OF FINE ARTS

### SALARIES AND EXPENSES

For expenses made necessary by the Act establishing a Commission of Fine Arts (40 U.S.C. 104), $867,000.

### NATIONAL CAPITAL ARTS AND CULTURAL AFFAIRS

For necessary expenses as authorized by Public Law 99–190 (20 U.S.C. 956(a)), as amended, $6,000,000.

## ADVISORY COUNCIL ON HISTORIC PRESERVATION

### SALARIES AND EXPENSES

For necessary expenses of the Advisory Council on Historic Preservation (Public Law 89–665, as amended), $2,500,000: Provided, That none of these funds shall be available for the compensation of Executive Level V or higher position.

## NATIONAL CAPITAL PLANNING COMMISSION

### SALARIES AND EXPENSES

For necessary expenses, as authorized by the National Capital Planning Act of 1952 (40 U.S.C. 71–71i), including services as authorized by 5 U.S.C. 3109, $5,390,000: Provided, That all appointed members will be compensated at a rate not to exceed the rate for Executive Schedule Level IV.

## FRANKLIN DELANO ROOSEVELT MEMORIAL COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Franklin Delano Roosevelt Memorial Commission, established by the Act of August 11, 1955 (69 Stat. 694), as amended by Public Law 92–332 (86 Stat. 401), $500,000 to remain available until expended.

## UNITED STATES HOLOCAUST MEMORIAL COUNCIL

### HOLOCAUST MEMORIAL COUNCIL

For expenses of the Holocaust Memorial Council, as authorized by Public Law 96–388 (36 U.S.C. 1401), as amended, $30,707,000, of which $1,575,000 for the Museum's repair and rehabilitation program and $1,264,000 for the Museum's exhibitions program shall remain available until expended.

## TITLE III—GENERAL PROVISIONS

SEC. 301. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive Order issued pursuant to existing law.

SEC. 302. No part of any appropriation under this Act shall be available to the Secretary of the Interior or the Secretary of Agriculture for the leasing of oil and natural gas by noncompetitive bidding on publicly owned lands within the boundaries of the Shawnee National Forest, Illinois: Provided, That nothing herein is intended to inhibit or otherwise affect the sale, lease, or right to access to minerals owned by private individuals.

SEC. 303. No part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which congressional action is not complete.

SEC. 304. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 305. None of the funds provided in this Act to any department or agency shall be obligated or expended to provide a personal cook, chauffeur, or other personal servants to any officer or employee of such department or agency except as otherwise provided by law.

SEC. 306. No assessments may be levied against any program, budget activity, subactivity, or project funded by this Act unless advance notice of such assessments and the basis therefor are presented to the Committees on Appropriations and are approved by such Committees.

SEC. 307. (a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c; popularly known as the "Buy American Act").

(b) SENSE OF CONGRESS; REQUIREMENT REGARDING NOTICE.—

(1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

(2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each Federal agency shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA.
—If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 308. None of the funds in this Act may be used to plan, prepare, or offer for sale timber from trees classified as giant sequoia (Sequoiadendron giganteum) which are located on National Forest System or Bureau of Land Management lands in a manner different than such sales were conducted in fiscal year 1995.

SEC. 309. None of the funds made available by this Act may be obligated or expended by the National Park Service to enter into or implement a concession contract which permits or requires the removal of the underground lunchroom at the Carlsbad Caverns National Park.

SEC. 310. Where the actual costs of construction projects under self-determination contracts, compacts, or grants, pursuant to Public Laws 93–638, 103–413, or 100–297, are less than the estimated costs thereof, use of the resulting excess funds shall be determined by the appropriate Secretary after consultation with the tribes.

SEC. 311. Notwithstanding Public Law 103–413, quarterly payments of funds to tribes and tribal organizations under annual funding agreements pursuant to section 108 of Public Law 93–638, as amended, may be made on the first business day following the first day of a fiscal quarter.

SEC. 312. None of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps program, unless the relevant agencies of the Department of the Interior and/or Agriculture follow appropriate reprogramming guidelines: Provided, That if no funds are provided for the AmeriCorps program by the VA–HUD and Independent Agencies fiscal year 1997 appropriations bill, then none of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps programs.

SEC. 313. None of the funds made available in this Act may be used (1) to demolish the bridge between Jersey City, New Jersey, and Ellis Island; or (2) to prevent pedestrian use of such bridge, when it is made known to the Federal official having authority to obligate or expend such funds that such pedestrian use is consistent with generally accepted safety standards.

SEC. 314. (a) None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to accept or process applications for a patent for any mining or mill site claim located under the general mining laws.

(b) The provisions of subsection (a) shall not apply if the Secretary of the Interior determines that, for the claim concerned: (1) a patent application was filed with the Secretary on or before September 30, 1994, and (2) all requirements established under sections 2325 and 2326 of the Revised Statutes (30 U.S.C. 29 and 30) for vein or lode claims and sections 2329, 2330, 2331, and 2333 of the Revised Statutes (30 U.S.C. 35, 36, and 37) for placer claims, and section 2337 of the Revised Statutes (30 U.S.C. 42) for mill site claims, as the case may be, were fully complied with by the applicant by that date.

(c) PROCESSING SCHEDULE.—For those applications for patents pursuant to subsection (b) which were filed with the Secretary of the Interior, prior to September 30, 1994, the Secretary of the Interior shall—

(1) Within three months of the enactment of this Act, file with the House and Senate Committees on Appropriations and the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the United States Senate a plan which details how the Department of the Interior will make a final determination as to whether or not an applicant is entitled to a patent under the general mining laws on at least 90 percent of such applications within five years of the enactment of this Act and file reports annually thereafter with the same committees detailing actions taken by the Department of the Interior to carry out such plan; and

(2) Take such actions as may be necessary to carry out such plan.

(d) MINERAL EXAMINATIONS.—In order to process patent applications in a timely and responsible manner, upon the request of a patent applicant, the Secretary of the Interior shall allow the applicant to fund a qualified third-party contractor to be selected by the Bureau of Land Management to conduct a mineral examination of the mining claims or mill sites contained in a patent application as set forth in subsection (b). The Bureau of Land Management shall have the sole responsibility to choose and pay the third-party contractor in accordance with the standard procedures employed by the Bureau of Land Management in the retention of third-party contractors.

SEC. 315. None of the funds appropriated or otherwise made available by this Act may be used for the purposes of acquiring lands in the counties of Gallia, Lawrence, Monroe, or Washington, Ohio, for the Wayne National Forest.

SEC. 316. Of the funds provided to the National Endowment for the Arts:

(a) The Chairperson shall only award a grant to an individual if such grant is awarded to such individual for a literature fellowship, National Heritage Fellowship, or American Jazz Masters Fellowship.

(b) The Chairperson shall establish procedures to ensure that no funding provided through a grant, except a grant made to a State or local arts agency, or regional group, may be used to make a grant to any other organization or individual to conduct activity independent of the direct grant recipient. Nothing in this subsection shall prohibit payments made in exchange for goods and services.

(c) No grant shall be used for seasonal support to a group, unless the application is specific to the contents of the season, including identified programs and/or projects.

Sec. 317. None of the funds available to the Department of the Interior or the Department of Agriculture by this or any other Act may be used to prepare, promulgate, implement, or enforce any interim or final rule or regulation pursuant to Title VIII of the Alaska National Interest Lands Conservation Act to assert jurisdiction, management, or control over any waters (other than non-navigable waters on Federal lands), non-Federal lands, or lands selected by, but not conveyed to, the State of Alaska

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

pursuant to the Submerged Lands Act of 1953 or the Alaska Statehood Act, or an Alaska Native Corporation pursuant to the Alaska Native Claims Settlement Act.

<< 16 USCA § 620c NOTE >>

SEC. 318. No funds appropriated under this or any other Act shall be used to review or modify sourcing areas previously approved under section 490(c)(3) of the Forest Resources Conservation and Shortage Relief Act of 1990 (Public Law 101–382) or to enforce or implement Federal regulations 36 CFR part 223 promulgated on September 8, 1995. The regulations and interim rules in effect prior to September 8, 1995 (36 CFR 223.48, 36 CFR 223.87, 36 CFR 223 subpart D, 36 CFR 223 subpart F, and 36 CFR 261.6) shall remain in effect. The Secretary of Agriculture or the Secretary of the Interior shall not adopt any policies concerning Public Law 101–382 or existing regulations that would restrain domestic transportation or processing of timber from private lands or impose additional accountability requirements on any timber. The Secretary of Commerce shall extend until September 30, 1997, the order issued under section 491(b)(2)(A) of Public Law 101–382 and shall issue an order under section 491(b)(2)(B) of such law that will be effective October 1, 1997.

<< 16 USCA § 460l–6a NOTE >>

SEC. 319. Section 101(c) of Public Law 104–134 is amended as follows: Under the heading "Title III—General Provisions" amend section 315(b) by striking "50, areas," and inserting in lieu thereof "100, areas," and amend section 315(f) by striking "September 30, 1998" and inserting in lieu thereof "September 30, 1999" and by striking "September 30, 2001" and inserting in lieu thereof "September 30, 2002".

SEC. 320. None of the amounts made available by this Act may be used for design, planning, implementation, engineering, construction, or any other activity in connection with a scenic shoreline drive in Pictured Rocks National Lakeshore.

SEC. 321. LAND TRANSFER, BEND SILVICULTURE LAB, DESCHUTES NATIONAL FOREST, OREGON.—

(a) TRANSFER OF REAL PROPERTY AND ALL IMPROVEMENTS LOCATED THEREON.—Notwithstanding any other provisions of law, there is hereby transferred, without consideration and subject to existing valid rights, all right, title and interest of the United States in and to approximately 5.73 acres of land as described by plat dated July 7, 1977, (which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C.), as well as all improvements, including the Bend Silviculture Lab located thereon, to the Central Oregon Community College, Bend, Oregon; this being a portion of the same tract acquired by donation from the City of Bend on August 10, 1960, through a Bargain and Sale deed to the USDA Forest Service for use as a research lab, and recorded in volume 125, page 508 of the Deschutes County, Oregon, Deed Records.

(b) CONDITIONS OF TRANSFER.—The transfer effected by subsection (a) is made subject to no special terms or conditions.

SEC. 322. No part of any appropriation contained in this Act or any other Act shall be expended or obligated to fund the activities of the Office of Forestry and Economic Assistance, or any successor office after December 31, 1996.

SEC. 323. (a) The Secretary of the Interior is authorized to accept title to approximately 84 acres of land located in Prince Georges County, Maryland, adjacent to Oxon Cove Park, and bordered generally by the Potomac River, Interstate 295 and the Woodrow Wilson Bridge, or any interest therein, and in exchange therefor may convey to the Corrections Corporation of America approximately 50 acres of land located in Oxon Cove Park in the District of Columbia and bordered generally by Oxon Cove, Interstate 295 and the District of Columbia Impound Lot, or any interest therein.

(b) Before proceeding with an exchange, the Secretary shall determine if the federal property is suitable for exchange under the criteria normally used by the National Park Service. The exchange shall comply with applicable regulations and National Park Service policies for land exchanges.

(c)(1) The Secretary shall not acquire any lands under this section if the Secretary determines that the lands or any portion thereof have become contaminated with hazardous substances (as defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960l)).

(2) Notwithstanding any other provision of law, the United States shall have no responsibility or liability with respect to any hazardous wastes or other substances placed on any of the lands covered by this section after their transfer to the ownership of any party, but nothing in this section shall be construed as either diminishing or increasing any responsibility or liability of

the United States based on the condition of such lands on the date of their transfer to the ownership of another party: Provided, That the Corrections Corporation of America shall indemnify the United States for liabilities arising under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960l) and the Resource Conservation Recovery Act (42 U.S.C. 690l, et seq.).

(d) The properties so exchanged either shall be approximately equal in fair market value or if they are not approximately equal, shall be equalized by the payment of cash to the Corporation or to the Secretary as required or in the event the value of the Corporation's lands is greater, the acreage may be reduced so that the fair market value is approximately equal: Provided, That the Secretary shall order appraisals made of the fair market value for improvements thereon: Provided further, That any such cash payment received by the Secretary shall be deposited to "Miscellaneous Trust Funds, National Park Service" and shall be available without further appropriation until expended for the acquisition of land within the National Park System.

(e) Costs of conducting necessary land surveys, preparing the legal descriptions of the lands to be conveyed, performing the appraisals, and administrative costs incurred in completing the exchange shall be borne by the Corporation.

(f) Following any exchange authorized by this provision, the boundaries of Oxon Cove Park shall be expanded to include the land acquired by the United States.

SEC. 324. SECTION 1. LAND EXCHANGE.—

(a) EXCHANGE.—Subject to subsection (c), the Secretary of Agriculture (referred to in this section as the "Secretary") shall convey all right, title, and interest of the United States in and to the National Forest System lands described in subsection (b)(1) to Public Utility District No. 1 of Chelan County, Washington (referred to in this section as the "Public Utility District"), in exchange for the conveyance to the Department of Agriculture by the Public Utility District of all right, title, and interest of the Public Utility District in and to the lands described in subsection (b)(2).

(b) DESCRIPTION OF LANDS.—

(1) NATIONAL FOREST SYSTEM LANDS.—The National Forest System lands referred to in subsection (a) are 122 acres, more or less, that are partially occupied by a wastewater treatment facility referred to in subsection (c)(4)(A) with the following legal description:

(A) The NE¼ of SW¼ of section 27 of township 27 north, range 17 east, Willamette Meridian, Chelan County, Washington.

(B) The N½ of SE¼ of SW¼ of such section 27.

(C) The W½ of NW¼ of SE¼ of such section 27.

(D) The NW¼ of SW¼ of SE¼ of such section 27.

(E) The E½ of NW¼ of the SE¼ of such section 27.

(F) That portion of the S½ of SE¼ of SW¼ lying north of the northerly edge of Highway 209 right-of-way of such section 27.

(2) PUBLIC UTILITY DISTRICT LANDS.—The lands owned by the Public Utility District are 109.15 acres, more or less, with the following legal description:

(A) S½ of SW¼ of section 35 of township 26 north, range 17 east, Willamette Meridian, Chelan County, Washington.

(B) The area specified by Public Utility District No. 1 as Government Lot 5 in such section 35.

(c) REQUIREMENTS FOR EXCHANGE.—

(1) TITLE ACCEPTANCE AND CONVEYANCE.—Upon offer by the Public Utility District of all right, title and interest in and to the lands described in subsection (b)(2), if the title is found acceptable by the Secretary, the Secretary shall accept title to such lands and interests therein and shall convey to the Public Utility District all right, title, and interest of the United States in and to the lands described in subsection (b)(1).

(2) APPRAISALS REQUIRED.—Before making an exchange pursuant to subsection (a), the Secretary shall conduct appraisals of the lands that are subject to the exchange to determine the fair market value of the lands. Such appraisals shall not include the value of the wastewater treatment facility referred to in paragraph (4)(A).

(3) ADDITIONAL CONSIDERATION.—If, on the basis of the appraisals made under paragraph (1), the Secretary determines that the fair market value of the lands to be conveyed by one party under subsection (a) is less than the fair market value of the lands to be conveyed by the other party under subsection (a), then, as a condition of making the exchange under subsection (a), the party conveying the lands with the lesser value shall pay the other party the amount by which the fair market value of the lands of greater value exceeds the fair market value of the lands of lesser value.

(4) CONVEYANCE OF WASTEWATER TREATMENT FACILITY.—(A) As part of an exchange made under subsection (a), the Secretary shall convey to the Public Utility District of Chelan County, Washington, all right, title and interest of the United States in and to the wastewater treatment facility (including the wastewater treatment plant and associated lagoons) located on the lands described in subsection (b)(1) that is in existence on the date of the exchange.

(B) As a condition for the exchange under subsection (a), the Public Utility District shall provide for a credit equal to the fair market value of the wastewater treatment facility conveyed pursuant to subparagraph (A) (determined as of November 4, 1991), that shall be applied to the United States' share of any new wastewater treatment facility constructed by the Public Utility District after such date.

(d) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the exchange under this section as the Secretary determines appropriate to protect the interests of the United States.

SEC. 325. "Snoqualmie National Forest Boundary Adjustment Act of 1996."

(a) IN GENERAL.—The Secretary of Agriculture is hereby directed to modify the boundary of the Snoqualmie National Forest to include and encompass 10,589.47 acres, more or less, as generally depicted on a map entitled "Snoqualmie National Forest Proposed 1996 Boundary Modification" dated July, 1996. Such map, together with a legal description of all lands included in the boundary adjustment, shall be on file and available for public inspection in the Office of the Chief of the Forest Service in Washington, District of Columbia.

(b) RULE FOR LAND AND WATER CONSERVATION FUND.—For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundary of the Snoqualmie National Forest, as modified pursuant to subsection (a), shall be considered to be the boundary of that National Forest as of January 1, 1965.

SEC. 326. Sugarbush Land Exchange Act of 1996.

(a) EXCHANGE OR SALE OF LAND.—

(1) If Sugarbush Resort Holdings, Inc. conveys to the United States land acceptable to the Secretary of Agriculture that is at least equal in value to the value of the land described in subsection (a)(2), makes a payment of cash at least equal to that value, or conveys land and makes a payment of cash that in combination are at least equal to that value, the Secretary, subject to valid existing rights, shall, under such terms and conditions as the Secretary may prescribe, convey all right, title, and interest of the United States in and to the land described in subsection (a)(2).

(2) FEDERAL LAND TO BE EXCHANGED.—The Federal land to be exchanged is approximately 57 acres of federally owned land in the Green Mountain National Forest depicted on the map entitled "Green Mountain National Forest, Sugarbush Exchange," dated December 1995.

(3) Lands acquired from Sugarbush Resort Holdings, Inc.—Any land conveyed to the United States in an exchange under subsection (a)(1) shall be subject to such valid existing rights of record as may be acceptable to the Secretary, and the title to the parcel shall conform with the title approval standards applicable to federal land acquisitions.

(b) ADMINISTRATION OF LAND.—

(1) ADDITION TO GREEN MOUNTAIN NATIONAL FOREST.—On approval and acceptance of title by the Secretary, the land acquired by the United States through an exchange or with proceeds from a sale under subsection (a) shall become part of the Green Mountain National Forest, and the boundaries of the National Forest shall be adjusted to include the land.

(2) ADMINISTRATION.—Land acquired under this Act shall be administered by the Secretary in accordance with the laws (including regulations) pertaining to the National Forest System.

(3) AUTHORITY OF THE SECRETARY.—This section does not limit the authority of the Secretary to adjust the boundaries of the Green Mountain National Forest pursuant to section 11 of the Act of March 1, 1911 (36 Stat. 963, chapter 186; 16 U.S.C. 521) (commonly known as the "Weeks Law").

(4) For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundaries of the Green Mountain National Forest, as adjusted under this Act, shall be considered to be the boundaries of the Green Mountain National Forest as of January 1, 1965.

SEC. 327. Snowbird Wilderness Study Area.

 (a) In General.—Section 6(a)(4) of the North Carolina Wilderness Act of 1984 (Public Law 98–324) is amended—
  (1) by striking "eight thousand four hundred and ninety acres" and inserting "8,390 acres"; and
  (2) by striking "July 1983" and inserting "July 1996".
 (b) Management.—The Secretary of Agriculture shall manage the area removed from wilderness study status by the amendments made by subsection (a) in accordance with the provisions of law applicable to adjacent areas outside the wilderness study area.

<< 16 USCA § 1132 NOTE >>

SEC. 328. Renaming of Wilderness Area.

 (a) The Columbia Wilderness, created by the Oregon Wilderness Act of 1984, Public Law 98–328, located in the Mt. Hood National Forest, Oregon, shall be known and designated as the "Mark O. Hatfield Wilderness".
 (b) Any references in a law, map, regulation, document, paper, or other record of the United States to the Columbia Wilderness shall be deemed to be a reference to the "Mark O. Hatfield Wilderness".
 SEC. 329. Notwithstanding any other provision of law, for fiscal year 1997 the Secretaries of Agriculture and Interior are authorized to limit competition for watershed restoration project contracts as part of the "Jobs in the Woods" component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington, Oregon, and northern California that have been affected by reduced timber harvesting on Federal lands.

<< 25 USCA § 1708 >>

SEC. 330. Section 9 of the Rhode Island Indian Claims Settlement Act (25 U.S.C. 1708) is amended—
  (1) by striking "Sec. 9. Except as"; and inserting the following:
"(a) In General.—Except as";
  (2) by striking the section heading and inserting the following:
"Sec. 9. Applicability of State Law; Treatment of Settlement Lands Under the Indian Gaming Regulatory Act."; and
  (3) by adding at the end the following new subsection:
 "(b) Treatment of Settlement Lands Under the Indian Gaming Regulatory Act.—For purposes of the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.), settlement lands shall not be treated as Indian lands.".

TITLE IV—EMERGENCY APPROPRIATIONS

DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

 For an additional amount for management of lands and resources, $3,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

WILDLAND FIRE MANAGEMENT

 For an additional amount for wildland fire management, $100,000,000, to remain available until expended, for emergency rehabilitation and wildfire suppression activities of the Department of the Interior: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget

request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OREGON AND CALIFORNIA GRANT LANDS

For an additional amount for Oregon and California grant lands, $2,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## United States Fish and Wildlife Service

### RESOURCE MANAGEMENT

For an additional amount for resource management, $2,100,000, to remain available until expended, of which $600,000 is to restore public lands damaged by fire and $1,500,000 is address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $15,891,000, to remain available until expended, to repair damage caused by hurricanes, floods and other acts of nature: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## NATIONAL PARK SERVICE

### OPERATION OF THE NATIONAL PARK SYSTEM

For an additional amount for operation of the National park system, $2,300,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $9,300,000, to remain available until expended, of which $3,000,000 is to repair damage caused by hurricanes and $6,300,000 is to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

For an additional amount for surveys, investigations, and research, $1,138,000, to remain available until expended, to address damage caused by hurricanes and floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## BUREAU OF INDIAN AFFAIRS

### OPERATION OF INDIAN PROGRAMS

For an additional amount for operation of Indian programs, $6,600,000, to remain available until expended, to repair damage caused by floods and to restore Indian lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $6,000,000, to remain available until expended, to repair damage caused by floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## DEPARTMENT OF AGRICULTURE

### FOREST SERVICE

### NATIONAL FOREST SYSTEM

For an additional amount for the National Forest System, $3,395,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### WILDLAND FIRE MANAGEMENT

For an additional amount for wildland fire management, $550,000,000, to remain available until expended, for presuppression due to emergencies for emergency fire suppression on or adjacent to National Forest System lands or other lands under fire protection agreement and for emergency rehabilitation of burned over National Forest System lands: Provided, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes: Provided further, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### RECONSTRUCTION AND CONSTRUCTION

For an additional amount for reconstruction and construction, $5,210,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section

251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OTHER RELATED AGENCIES

## SMITHSONIAN INSTITUTION

### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $935,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b) (2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For an additional amount for operations and maintenance, $1,600,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $3,400,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b) (2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## NATIONAL GALLERY OF ART

### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $382,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b) (2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## UNITED STATES HOLOCAUST MEMORIAL COUNCIL

### HOLOCAUST MEMORIAL COUNCIL

For an additional amount for the Holocaust Memorial Council, $1,000,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes

designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

This Act may be cited as the "Department of the Interior and Related Agencies Appropriations Act, 1997".

(e) For programs, projects or activities in the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

### TITLE I—DEPARTMENT OF LABOR

### EMPLOYMENT AND TRAINING ADMINISTRATION

### TRAINING AND EMPLOYMENT SERVICES

### << 29 USCA § 1732 NOTE >>

For expenses necessary to carry into effect the Job Training Partnership Act, as amended, including the purchase and hire of passenger motor vehicles, the construction, alteration, and repair of buildings and other facilities, and the purchase of real property for training centers as authorized by the Job Training Partnership Act; the Women in Apprenticeship and Nontraditional Occupations Act; the National Skill Standards Act of 1994; and the School-to-Work Opportunities Act; $4,719,703,000 plus reimbursements, of which $3,559,408,000 is available for obligation for the period July 1, 1997 through June 30, 1998; of which $88,685,000 is available for the period July 1, 1997 through June 30, 2000 for necessary expenses of construction, rehabilitation, and acquisition of Job Corps centers; and of which $200,000,000 shall be available from July 1, 1997 through September 30, 1998, for carrying out activities of the School-to-Work Opportunities Act: Provided, That $52,502,000 shall be for carrying out section 401 of the Job Training Partnership Act, $69,285,000 shall be for carrying out section 402 of such Act, $7,300,000 shall be for carrying out section 441 of such Act, $8,000,000 shall be for all activities conducted by and through the National Occupational Information Coordinating Committee under such Act, $895,000,000 shall be for carrying out title II, part A of such Act, and $126,672,000 shall be for carrying out title II, part C of such Act: Provided further, That no funds from any other appropriation shall be used to provide meal services at or for Job Corps centers: Provided further, That funds provided to carry out title III of the Job Training Partnership Act shall not be subject to the limitation contained in subsection (b) of section 315 of such Act; that the waiver allowing a reduction in the cost limitation relating to retraining services described in subsection (a)(2) of such section 315 may be granted with respect to funds from this Act if a substate grantee demonstrates to the Governor that such waiver is appropriate due to the availability of low-cost retraining services, is necessary to facilitate the provision of needs-related payments to accompany long-term training, or is necessary to facilitate the provision of appropriate basic readjustment services; and that funds provided to carry out the Secretary's discretionary grants under part B of such title III may be used to provide needs-related payments to participants who, in lieu of meeting the requirements relating to enrollment in training under section 314(e) of such Act, are enrolled in training by the end of the sixth week after grant funds have been awarded: Provided further, That service delivery areas may transfer funding provided herein under authority of titles II–B and II–C of the Job Training Partnership Act between the programs authorized by those titles of that Act, if such transfer is approved by the Governor: Provided further, That service delivery areas and substate areas may transfer up to 20 percent of the funding provided herein under authority of title II–A and title III of the Job Training Partnership Act between the programs authorized by those titles of the Act, if such transfer is approved by the Governor: Provided further, That, notwithstanding any other provision of law, any proceeds from the sale of Job Corps center facilities shall be retained by the Secretary of Labor to carry out the Job Corps program: Provided further, That notwithstanding any other provision of law, the Secretary of Labor may waive any of the statutory or regulatory requirements of titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, worker rights, participation and protection, grievance procedures and judicial review, nondiscrimination, allocation of funds to local areas, eligibility, review and approval of plans, the establishment and functions of service delivery areas and private industry councils, and the basic purposes of the Act), and any of the statutory or regulatory requirements

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September.....

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 401 of 1021   PageID 7271

of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), only for funds available for expenditure in program year 1997, pursuant to a request submitted by a State which identifies the statutory or regulatory requirements that are requested to be waived and the goals which the State or local service delivery areas intend to achieve, describes the actions that the State or local service delivery areas have undertaken to remove State or local statutory or regulatory barriers, describes the goals of the waiver and the expected programmatic outcomes if the request is granted, describes the individuals impacted by the waiver, and describes the process used to monitor the progress in implementing a waiver, and for which notice and an opportunity to comment on such request has been provided to the organizations identified in section 105(a)(1) of the Job Training Partnership Act, if and only to the extent that the Secretary determines that such requirements impede the ability of the State to implement a plan to improve the workforce development system and the State has executed a Memorandum of Understanding with the Secretary requiring such State to meet agreed upon outcomes and implement other appropriate measures to ensure accountability: Provided further, That the Secretary of Labor shall establish a workforce flexibility (work-flex) partnership demonstration program under which the Secretary shall authorize not more than six States, of which at least three States shall each have populations not in excess of 3,500,000, with a preference given to those States that have been designated Ed–Flex Partnership States under section 311(e) of Public Law 103–227, to waive any statutory or regulatory requirement applicable to service delivery areas or substate areas within the State under titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, grievance procedures and judicial review, nondiscrimination, allotment of funds, and eligibility), and any of the statutory or regulatory requirements of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), for a duration not to exceed the waiver period authorized under section 311(e) of Public Law 103–227, pursuant to a plan submitted by such States and approved by the Secretary for the provision of workforce employment and training activities in the States, which includes a description of the process by which service delivery areas and substate areas may apply for and have waivers approved by the State, the requirements of the Wagner–Peyser Act to be waived, the outcomes to be achieved and other measures to be taken to ensure appropriate accountability for federal funds.

## COMMUNITY SERVICE EMPLOYMENT FOR OLDER AMERICANS

### (TRANSFER OF FUNDS)

To carry out the activities for national grants or contracts with public agencies and public or private nonprofit organizations under paragraph (1)(A) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $361,140,000, including $21,840,000 which shall be available for the period ending June 30, 1997.

To carry out the activities for grants to States under paragraph (3) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $101,860,000, including $6,160,000 which shall be available for the period ending June 30, 1997.

The funds appropriated under this heading shall be transferred to the Department of Health and Human Services, "Aging Services Programs" following the enactment of legislation authorizing the administration of the program by that Department.

### FEDERAL UNEMPLOYMENT BENEFITS AND ALLOWANCES

For payments during the current fiscal year of trade adjustment benefit payments and allowances under part I, and for training, for allowances for job search and relocation, and for related State administrative expenses under part II, subchapters B and D, chapter 2, title II of the Trade Act of 1974, as amended, $324,500,000, together with such amounts as may be necessary to be charged to the subsequent appropriation for payments for any period subsequent to September 15 of the current year.

### STATE UNEMPLOYMENT INSURANCE AND EMPLOYMENT

### SERVICE OPERATIONS

For authorized administrative expenses, $173,452,000, together with not to exceed $3,146,826,000 (including not to exceed $1,653,000 which may be used for amortization payments to States which had independent retirement plans in their State employment service agencies prior to 1980, and including not to exceed $2,000,000 which may be obligated in contracts with

non-State entities for activities such as occupational and test research activities which benefit the Federal–State Employment Service System), which may be expended from the Employment Security Administration account in the Unemployment Trust Fund including the cost of administering section 1201 of the Small Business Job Protection Act of 1996, section 7(d) of the Wagner–Peyser Act, as amended, the Trade Act of 1974, as amended, the Immigration Act of 1990, and the Immigration and Nationality Act, as amended, and of which the sums available in the allocation for activities authorized by title III of the Social Security Act, as amended (42 U.S.C. 502–504), and the sums available in the allocation for necessary administrative expenses for carrying out 5 U.S.C. 8501–8523, shall be available for obligation by the States through December 31, 1997, except that funds used for automation acquisitions shall be available for obligation by States through September 30, 1999; and of which $23,452,000, together with not to exceed $738,283,000 of the amount which may be expended from said trust fund, shall be available for obligation for the period July 1, 1997 through June 30, 1998, to fund activities under the Act of June 6, 1933, as amended, including the cost of penalty mail authorized under 39 U.S.C. 3202(a)(1)(E) made available to States in lieu of allotments for such purpose, and of which $216,333,000 shall be available only to the extent necessary for additional State allocations to administer unemployment compensation laws to finance increases in the number of unemployment insurance claims filed and claims paid or changes in a State law: Provided, That to the extent that the Average Weekly Insured Unemployment (AWIU) for fiscal year 1997 is projected by the Department of Labor to exceed 2,828,000 an additional $28,600,000 shall be available for obligation for every 100,000 increase in the AWIU level (including a pro rata amount for any increment less than 100,000) from the Employment Security Administration Account of the Unemployment Trust Fund: Provided further, That funds appropriated in this Act which are used to establish a national one-stop career center network may be obligated in contracts, grants or agreements with non-State entities: Provided further, That funds appropriated under this Act for activities authorized under the Wagner–Peyser Act, as amended, and title III of the Social Security Act, may be used by the States to fund integrated Employment Service and Unemployment Insurance automation efforts, notwithstanding cost allocation principles prescribed under Office of Management and Budget Circular A–87.

### ADVANCES TO THE UNEMPLOYMENT TRUST FUND AND OTHER FUNDS

For repayable advances to the Unemployment Trust Fund as authorized by sections 905(d) and 1203 of the Social Security Act, as amended, and to the Black Lung Disability Trust Fund as authorized by section 9501(c)(1) of the Internal Revenue Code of 1954, as amended; and for nonrepayable advances to the Unemployment Trust Fund as authorized by section 8509 of title 5, United States Code, section 104(d) of Public Law 102–164, and section 5 of Public Law 103–6, and to the "Federal unemployment benefits and allowances" account, to remain available until September 30, 1998, $373,000,000.

In addition, for making repayable advances to the Black Lung Disability Trust Fund in the current fiscal year after September 15, 1997, for costs incurred by the Black Lung Disability Trust Fund in the current fiscal year, such sums as may be necessary.

### PROGRAM ADMINISTRATION

For expenses of administering employment and training programs and for carrying out section 908 of the Social Security Act, $81,393,000, together with not to exceed $39,977,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

### PENSION AND WELFARE BENEFITS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for Pension and Welfare Benefits Administration, $77,083,000, of which $6,000,000 shall remain available through September 30, 1998 for expenses of revising the processing of employee benefit plan returns.

### PENSION BENEFIT GUARANTY CORPORATION

### PENSION BENEFIT GUARANTY CORPORATION FUND

The Pension Benefit Guaranty Corporation is authorized to make such expenditures, including financial assistance authorized by section 104 of Public Law 96–364, within limits of funds and borrowing authority available to such Corporation, and in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as amended (31 U.S.C. 9104), as may be necessary in carrying out the program through September 30, 1997, for such Corporation: Provided, That not to exceed $10,345,000 shall be available for administrative

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

expenses of the Corporation: Provided further, That expenses of such Corporation in connection with the termination of pension plans, for the acquisition, protection or management, and investment of trust assets, and for benefits administration services shall be considered as non-administrative expenses for the purposes hereof, and excluded from the above limitation.

## EMPLOYMENT STANDARDS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for the Employment Standards Administration, including reimbursement to State, Federal, and local agencies and their employees for inspection services rendered, $290,422,000, together with $983,000 which may be expended from the Special Fund in accordance with sections 39(c) and 44(j) of the Longshore and Harbor Workers' Compensation Act: Provided, That the Secretary of Labor is authorized to accept, retain, and spend, until expended, in the name of the Department of Labor, all sums of money ordered to be paid to the Secretary of Labor, in accordance with the terms of the Consent Judgment in Civil Action No. 91–0027 of the United States District Court for the District of the Northern Mariana Islands (May 21, 1992): Provided further, That the Secretary of Labor is authorized to establish and, in accordance with 31 U.S.C. 3302, collect and deposit in the Treasury fees for processing applications and issuing certificates under sections 11(d) and 14 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 211(d) and 214) and for processing applications and issuing registrations under Title I of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. 1801 et seq.

### SPECIAL BENEFITS

### (INCLUDING TRANSFER OF FUNDS)

For the payment of compensation, benefits, and expenses (except administrative expenses) accruing during the current or any prior fiscal year authorized by title 5, chapter 81 of the United States Code; continuation of benefits as provided for under the head "Civilian War Benefits" in the Federal Security Agency Appropriation Act, 1947; the Employees' Compensation Commission Appropriation Act, 1944; and sections 4(c) and 5(f) of the War Claims Act of 1948 (50 U.S.C.App. 2012); and 50 per centum of the additional compensation and benefits required by section 10(h) of the Longshore and Harbor Workers' Compensation Act, as amended, $213,000,000 together with such amounts as may be necessary to be charged to the subsequent year appropriation for the payment of compensation and other benefits for any period subsequent to August 15 of the current year: Provided, That such sums as are necessary may be used under section 8104 of title 5, United States Code, by the Secretary to reimburse an employer, who is not the employer at the time of injury, for portions of the salary of a reemployed, disabled beneficiary: Provided further, That balances of reimbursements unobligated on September 30, 1996, shall remain available until expended for the payment of compensation, benefits, and expenses: Provided further, That in addition there shall be transferred to this appropriation from the Postal Service and from any other corporation or instrumentality required under section 8147(c) of title 5, United States Code, to pay an amount for its fair share of the cost of administration, such sums as the Secretary of Labor determines to be the cost of administration for employees of such fair share entities through September 30, 1997: Provided further, That of those funds transferred to this account from the fair share entities to pay the cost of administration, $11,390,000 shall be made available to the Secretary of Labor for expenditures relating to capital improvements in support of Federal Employees' Compensation Act administration, and the balance of such funds shall be paid into the Treasury as miscellaneous receipts: Provided further, That the Secretary may require that any person filing a notice of injury or a claim for benefits under Subchapter 5, U.S.C., chapter 81, or under subchapter 33, U.S.C. 901, et seq. (the Longshore and Harbor Workers' Compensation Act, as amended), provide as part of such notice and claim, such identifying information (including Social Security account number) as such regulations may prescribe.

### BLACK LUNG DISABILITY TRUST FUND

### (INCLUDING TRANSFER OF FUNDS)

For payments from the Black Lung Disability Trust Fund, $1,007,644,000, of which $961,665,000 shall be available until September 30, 1998, for payment of all benefits as authorized by section 9501(d)(1), (2), (4), and (7) of the Internal Revenue Code of 1954, as amended, and interest on advances as authorized by section 9501(c)(2) of that Act, and of which $26,071,000 shall be available for transfer to Employment Standards Administration, Salaries and Expenses, $19,621,000 for transfer to Departmental Management, Salaries and Expenses, and $287,000 for transfer to Departmental Management, Office of Inspector

General, for expenses of operation and administration of the Black Lung Benefits program as authorized by section 9501(d)(5)(A) of that Act: Provided, That, in addition, such amounts as may be necessary may be charged to the subsequent year appropriation for the payment of compensation, interest, or other benefits for any period subsequent to August 15 of the current year: Provided further, That in addition such amounts shall be paid from this fund into miscellaneous receipts as the Secretary of the Treasury determines to be the administrative expenses of the Department of the Treasury for administering the fund during the current fiscal year, as authorized by section 9501(d)(5)(B) of that Act.

## OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

<< 29 USCA § 670 NOTE >>

For necessary expenses for the Occupational Safety and Health Administration, $325,734,000, including not to exceed $77,354,000 which shall be the maximum amount available for grants to States under section 23(g) of the Occupational Safety and Health Act, which grants shall be no less than fifty percent of the costs of State occupational safety and health programs required to be incurred under plans approved by the Secretary under section 18 of the Occupational Safety and Health Act of 1970; and, in addition, notwithstanding 31 U.S.C. 3302, the Occupational Safety and Health Administration may retain up to $750,000 per fiscal year of training institute course tuition fees, otherwise authorized by law to be collected, and may utilize such sums for occupational safety and health training and education grants: Provided, That, notwithstanding 31 U.S.C. 3302, the Secretary of Labor is authorized, during the fiscal year ending September 30, 1997, to collect and retain fees for services provided to Nationally Recognized Testing Laboratories, and may utilize such sums, in accordance with the provisions of 29 U.S.C. 9a, to administer national and international laboratory recognition programs that ensure the safety of equipment and products used by workers in the workplace: Provided further, That none of the funds appropriated under this paragraph shall be obligated or expended to prescribe, issue, administer, or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 which is applicable to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees: Provided further, That no funds appropriated under this paragraph shall be obligated or expended to administer or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 with respect to any employer of ten or fewer employees who is included within a category having an occupational injury lost workday case rate, at the most precise Standard Industrial Classification Code for which such data are published, less than the national average rate as such rates are most recently published by the Secretary, acting through the Bureau of Labor Statistics, in accordance with section 24 of that Act (29 U.S.C. 673), except—

(1) to provide, as authorized by such Act, consultation, technical assistance, educational and training services, and to conduct surveys and studies;

(2) to conduct an inspection or investigation in response to an employee complaint, to issue a citation for violations found during such inspection, and to assess a penalty for violations which are not corrected within a reasonable abatement period and for any willful violations found;

(3) to take any action authorized by such Act with respect to imminent dangers;

(4) to take any action authorized by such Act with respect to health hazards;

(5) to take any action authorized by such Act with respect to a report of an employment accident which is fatal to one or more employees or which results in hospitalization of two or more employees, and to take any action pursuant to such investigation authorized by such Act; and

(6) to take any action authorized by such Act with respect to complaints of discrimination against employees for exercising rights under such Act: Provided further, That the foregoing proviso shall not apply to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees.

## MINE SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 30 USCA § 962 >>

For necessary expenses for the Mine Safety and Health Administration, $197,810,000, including purchase and bestowal of certificates and trophies in connection with mine rescue and first-aid work, and the hire of passenger motor vehicles; the Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, or private; the Mine Safety and Health Administration is authorized to promote health and safety education and training in the mining community through cooperative programs with States, industry, and safety associations; and any funds available to the Department may be used, with the approval of the Secretary, to provide for the costs of mine rescue and survival operations in the event of a major disaster: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended to carry out section 115 of the Federal Mine Safety and Health Act of 1977 or to carry out that portion of section 104(g)(1) of such Act relating to the enforcement of any training requirements, with respect to shell dredging, or with respect to any sand, gravel, surface stone, surface clay, colloidal phosphate, or surface limestone mine.

## BUREAU OF LABOR STATISTICS

### SALARIES AND EXPENSES

For necessary expenses for the Bureau of Labor Statistics, including advances or reimbursements to State, Federal, and local agencies and their employees for services rendered, $309,647,000, of which $16,145,000 shall be for expenses of revising the Consumer Price Index and shall remain available until September 30, 1998, together with not to exceed $52,053,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

<< 33 USCA § 921 NOTE >>

For necessary expenses for Departmental Management, including the hire of three sedans, and including up to $4,358,000 for the President's Committee on Employment of People With Disabilities, $144,211,000; together with not to exceed $297,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund: Provided, That no funds made available by this Act may be used by the Solicitor of Labor to participate in a review in any United States court of appeals of any decision made by the Benefits Review Board under section 21 of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 921) where such participation is precluded by the decision of the United States Supreme Court in Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding, 115 S.Ct. 1278 (1995): Provided further, That no funds made available by this Act may be used by the Secretary of Labor to review a decision under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 901 et seq.) that has been appealed and that has been pending before the Benefits Review Board for more than 12 months: Provided further, That any such decision pending a review by the Benefits Review Board for more than one year shall be considered affirmed by the Benefits Review Board on that date, and shall be considered the final order of the Board for purposes of obtaining a review in the United States courts of appeals: Provided further, That these provisions shall not be applicable to the review of any decision issued under the Black Lung Benefits Act (30 U.S.C. 901 et seq.).

### ASSISTANT SECRETARY FOR VETERANS EMPLOYMENT AND TRAINING

Not to exceed $181,949,000 may be derived from the Employment Security Administration account in the Unemployment Trust Fund to carry out the provisions of 38 U.S.C. 4100–4110A and 4321–4327, and Public Law 103–353, and which shall be available for obligation by the States through December 31, 1997.

### OFFICE OF INSPECTOR GENERAL

For salaries and expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $42,938,000, together with not to exceed $3,543,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## GENERAL PROVISIONS

Sec. 101. None of the funds appropriated in this title for the Job Corps shall be used to pay the compensation of an individual, either as direct costs or any proration as an indirect cost, at a rate in excess of $125,000.

### (TRANSFER OF FUNDS)

Sec. 102. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Labor in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

Sec. 103. Funds shall be available for carrying out title IV–B of the Job Training Partnership Act, notwithstanding section 427(c) of that Act, if a Job Corps center fails to meet national performance standards established by the Secretary.

Sec. 104. Effective January 1, 1997, no funds appropriated or otherwise made available to the Department of Labor in this title shall be disbursed without the approval of the Department's Chief Financial Officer or his delegatee.

Sec. 105. Notwithstanding any other provision of law, the Secretary of Labor may waive any of the requirements contained in sections 4, 104, 105, 107, 108, 121, 164, 204, 253, 254, 264, 301, 311, 313, 314, and 315 of the Job Training Partnership Act in order to assist States in improving State workforce development systems, pursuant to a request submitted by a State that has prior to the date of enactment of this Act executed a Memorandum of Understanding with the United States requiring such State to meet agreed upon outcomes.

This title may be cited as the "Department of Labor Appropriations Act, 1997".

## TITLE II—DEPARTMENT OF HEALTH AND HUMAN SERVICES

### HEALTH RESOURCES AND SERVICES ADMINISTRATION

#### HEALTH RESOURCES AND SERVICES

For carrying out titles II, III, VII, VIII, X, XII, XVI, XIX, and XXVI of the Public Health Service Act, section 427(a) of the Federal Coal Mine Health and Safety Act, title V of the Social Security Act, the Health Care Quality Improvement Act of 1986, as amended, and the Native Hawaiian Health Care Act of 1988, as amended, $3,405,019,000, of which $297,000 shall remain available until expended for interest subsidies on loan guarantees made prior to fiscal year 1981 under part B of title VII of the Public Health Service Act: Provided, That the Division of Federal Occupational Health may utilize personal services contracting to employ professional management/administrative and occupational health professionals: Provided further, That of the funds made available under this heading, $828,000 shall be available until expended for facilities renovations at the Gillis W. Long Hansen's Disease Center: Provided further, That in addition to fees authorized by section 427(b) of the Health Care Quality Improvement Act of 1986, fees shall be collected for the full disclosure of information under the Act sufficient to recover the full costs of operating the National Practitioner Data Bank, and shall remain available until expended to carry out that Act: Provided further, That no more than $5,000,000 is available for carrying out the provisions of Public Law 104–73: Provided further, That of the funds made available under this heading, $198,452,000 shall be for the program under title X of the Public Health Service Act to provide for voluntary family planning projects: Provided further, That amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office: Provided further, That $167,000,000 shall be for State AIDS Drug Assistance Programs authorized by section 2616 of the Public Health Service Act and shall be distributed to States as authorized by section 2618(b)(2) of such Act: Provided further, That notwithstanding any other provision of law, funds made available under this heading may be used to continue operating the Council on Graduate Medical Education established by section 301 of Public Law 102–408: Provided further, That, of the funds made available under this heading, not more than $8,000,000 shall be made available and shall remain available until expended for loan guarantees for loans made by non-Federal lenders for the construction, renovation, and modernization of medical facilities that are owned

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

and operated by health centers funded under part A of title XVI of the Public Health Service Act as amended, and, subject to authorization, for loans made to health centers for the costs of developing and operating managed care networks or plans, and that such funds be available to subsidize guarantees of total loan principal in an amount not to exceed $80,000,000: Provided further, That notwithstanding section 502(a)(1) of the Social Security Act, not to exceed $103,609,000 is available for carrying out special projects of regional and national significance pursuant to section 501(a)(2) of such Act.

## MEDICAL FACILITIES GUARANTEE AND LOAN FUND

### FEDERAL INTEREST SUBSIDIES FOR MEDICAL FACILITIES

 For carrying out subsections (d) and (e) of section 1602 of the Public Health Service Act, $7,000,000, together with any amounts received by the Secretary in connection with loans and loan guarantees under title VI of the Public Health Service Act, to be available without fiscal year limitation for the payment of interest subsidies. During the fiscal year, no commitments for direct loans or loan guarantees shall be made.

### HEALTH EDUCATION ASSISTANCE LOANS PROGRAM

 For the cost of guaranteed loans, such sums as may be necessary to carry out the purpose of the program, as authorized by title VII of the Public Health Service Act, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize gross obligations for the total loan principal any part of which is to be guaranteed at not to exceed $140,000,000. In addition, for administrative expenses to carry out the guaranteed loan program, $2,688,000.

### VACCINE INJURY COMPENSATION PROGRAM TRUST FUND

 For payments from the Vaccine Injury Compensation Program Trust Fund, such sums as may be necessary for claims associated with vaccine-related injury or death with respect to vaccines administered after September 30, 1988, pursuant to subtitle 2 of title XXI of the Public Health Service Act, to remain available until expended: Provided, That for necessary administrative expenses, not to exceed $3,000,000 shall be available from the Trust Fund to the Secretary of Health and Human Services.

### VACCINE INJURY COMPENSATION

 For payment of claims resolved by the United States Court of Federal Claims related to the administration of vaccines before October 1, 1988, $110,000,000, to remain available until expended.

## CENTERS FOR DISEASE CONTROL AND PREVENTION

### DISEASE CONTROL, RESEARCH, AND TRAINING

<< 30 USCA § 1 NOTE >>

 To carry out titles II, III, VII, XI, XV, XVII, and XIX of the Public Health Service Act, sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act of 1977, and sections 20, 21 and 22 of the Occupational Safety and Health Act of 1970, title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980; including insurance of official motor vehicles in foreign countries; and hire, maintenance, and operation of aircraft, $2,262,698,000, of which $30,553,000 shall remain available until expended for equipment and construction and renovation of facilities, and of which $32,000,000 shall remain available until September 30, 1998 for mine safety and health activities, and in addition, such sums as may be derived from authorized user fees, which shall be credited to this account: Provided, That in addition to amounts provided herein, up to $48,400,000 shall be available from amounts available under section 241 of the Public Health Service Act, to carry out the National Center for Health Statistics surveys: Provided further, That none of the funds made available for injury prevention and control at the Centers for Disease Control and Prevention may be used to advocate or promote gun control: Provided further, That the Director may redirect the total amount made available under authority of Public Law 101–502, section 3, dated November 3, 1990, to activities the Director may so designate: Provided further, That the Congress is to be notified promptly of any such transfer: Provided further, That the functions described in clause (1) of the first proviso under the subheading "mines and minerals" under the heading "Bureau of Mines" in the text of title I of the Department of the Interior and Related Agencies Appropriations Act, 1996, as enacted by section 101(c) of

the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134), are hereby transferred to, and vested in, the Secretary of Health and Human Services, subject to section 1531 of title 31, United States Code: *Provided further,* That of the amount provided, $23,000,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

 In addition, $41,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40151 and 40261 of Public Law 103–322.

## NATIONAL INSTITUTES OF HEALTH

### NATIONAL CANCER INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cancer, $2,382,532,000.

### NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cardiovascular, lung, and blood diseases, and blood and blood products, $1,433,001,000.

### NATIONAL INSTITUTE OF DENTAL RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to dental disease, $195,997,000.

### NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to diabetes and digestive and kidney disease, $815,982,000.

### NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to neurological disorders and stroke, $726,746,000.

### NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to allergy and infectious diseases, $1,257,234,000.

### NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to general medical sciences, $998,470,000.

### NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT

 For carrying out section 301 and title IV of the Public Health Service Act with respect to child health and human development, $631,703,000.

### NATIONAL EYE INSTITUTE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to eye diseases and visual disorders, $332,735,000.

### NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES

 For carrying out sections 301 and 311 and title IV of the Public Health Service Act with respect to environmental health sciences, $308,819,000.

### NATIONAL INSTITUTE ON AGING

For carrying out section 301 and title IV of the Public Health Service Act with respect to aging, $486,047,000.

### NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to arthritis and musculoskeletal and skin diseases, $257,111,000.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

### NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS

For carrying out section 301 and title IV of the Public Health Service Act with respect to deafness and other communication disorders, $188,422,000.

### NATIONAL INSTITUTE OF NURSING RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to nursing research, $59,743,000.

### NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

For carrying out section 301 and title IV of the Public Health Service Act with respect to alcohol abuse and alcoholism, $212,004,000.

### NATIONAL INSTITUTE ON DRUG ABUSE

For carrying out section 301 and title IV of the Public Health Service Act with respect to drug abuse, $489,375,000.

### NATIONAL INSTITUTE OF MENTAL HEALTH

For carrying out section 301 and title IV of the Public Health Service Act with respect to mental health, $701,585,000.

### NATIONAL CENTER FOR RESEARCH RESOURCES

For carrying out section 301 and title IV of the Public Health Service Act with respect to research resources and general research support grants, $415,145,000: Provided, That none of these funds shall be used to pay recipients of the general research support grants program any amount for indirect expenses in connection with such grants: Provided further, That $20,000,000 shall be for extramural facilities construction grants.

### NATIONAL CENTER FOR HUMAN GENOME RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to human genome research, $189,657,000.

### JOHN E. FOGARTY INTERNATIONAL CENTER

For carrying out the activities at the John E. Fogarty International Center, $26,586,000.

### NATIONAL LIBRARY OF MEDICINE

For carrying out section 301 and title IV of the Public Health Service Act with respect to health information communications, $151,103,000, of which $4,000,000 shall be available until expended for improvement of information systems: Provided, That in fiscal year 1997, the Library may enter into personal services contracts for the provision of services in facilities owned, operated, or constructed under the jurisdiction of the National Institutes of Health.

### OFFICE OF THE DIRECTOR

### (INCLUDING TRANSFER OF FUNDS)

For carrying out the responsibilities of the Office of the Director, National Institutes of Health, $287,206,000, of which $35,589,000 shall be for the Office of AIDS Research: Provided, That funding shall be available for the purchase of not to exceed five passenger motor vehicles for replacement only: Provided further, That the Director may direct up to 1 percent of the total amount made available in this Act to all National Institutes of Health appropriations to activities the Director may so designate: Provided further, That no such appropriation shall be increased or decreased by more than 1 percent by any such transfers and that the Congress is promptly notified of the transfer: Provided further, That NIH is authorized to collect third party payments for the cost of clinical services that are incurred in National Institutes of Health research facilities and that such payments shall be credited to the National Institutes of Health Management Fund: Provided further, That all funds credited to the NIH Management Fund shall remain available for one fiscal year after the fiscal year in which they are deposited: Provided further, That up to $200,000 shall be available to carry out section 499 of the Public Health Service Act.

### BUILDINGS AND FACILITIES

For the study of, construction of, and acquisition of equipment for, facilities of or used by the National Institutes of Health, including the acquisition of real property, $200,000,000, to remain available until expended, of which $90,000,000 shall be for the clinical research center: Provided, That, notwithstanding any other provision of law, a single contract or related contracts for the development and construction of the clinical research center may be employed which collectively include the full scope of the project: Provided further, That the solicitation and contract shall contain the clause "availability of funds" found at 48 CFR 52.232–18.

### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION

### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES

For carrying out titles V and XIX of the Public Health Service Act with respect to substance abuse and mental health services, the Protection and Advocacy for Mentally Ill Individuals Act of 1986, section 30401 of Public Law 103–322 and section 301 of the Public Health Service Act with respect to program management, $2,134,743,000, of which $5,000,000 shall be for grants to rural and Native American projects and $12,800,000 shall be for activities authorized by section 30401 of Public Law 103–322.

### RETIREMENT PAY AND MEDICAL BENEFITS FOR COMMISSIONED OFFICERS

For retirement pay and medical benefits of Public Health Service Commissioned Officers as authorized by law, and for payments under the Retired Serviceman's Family Protection Plan and Survivor Benefit Plan and for medical care of dependents and retired personnel under the Dependents' Medical Care Act (10 U.S.C. ch. 55), and for payments pursuant to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), such amounts as may be required during the current fiscal year.

### AGENCY FOR HEALTH CARE POLICY AND RESEARCH

### HEALTH CARE POLICY AND RESEARCH

For carrying out titles III and IX of the Public Health Service Act, and part A of title XI of the Social Security Act, $96,175,000; in addition, amounts received from Freedom of Information Act fees, reimbursable and interagency agreements, and the sale of data tapes shall be credited to this appropriation and shall remain available until expended: Provided, That the amount made available pursuant to section 926(b) of the Public Health Service Act shall not exceed $47,412,000.

### HEALTH CARE FINANCING ADMINISTRATION

### GRANTS TO STATES FOR MEDICAID

For carrying out, except as otherwise provided, titles XI and XIX of the Social Security Act, $75,056,618,000, to remain available until expended.

For making, after May 31, 1997, payments to States under title XIX of the Social Security Act for the last quarter of fiscal year 1997 for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States under title XIX of the Social Security Act for the first quarter of fiscal year 1998, $27,988,993,000, to remain available until expended.

Payment under title XIX may be made for any quarter with respect to a State plan or plan amendment in effect during such quarter, if submitted in or prior to such quarter and approved in that or any subsequent quarter.

### PAYMENTS TO HEALTH CARE TRUST FUNDS

For payment to the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as provided under sections 217(g) and 1844 of the Social Security Act, sections 103(c) and 111(d) of the Social Security Amendments of 1965, section 278(d) of Public Law 97–248, and for administrative expenses incurred pursuant to section 201(g) of the Social Security Act, $60,079,000,000.

### PROGRAM MANAGEMENT

For carrying out, except as otherwise provided, titles XI, XVIII, and XIX of the Social Security Act, title XIII of the Public Health Service Act, and the Clinical Laboratory Improvement Amendments of 1988, not to exceed $1,735,125,000 to be transferred from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the Public Health

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 411 of 1021   PageID 7281

Service Act, the latter funds to remain available until expended, together with such sums as may be collected from authorized user fees and the sale of data, which shall remain available until expended: Provided, That all funds derived in accordance with 31 U.S.C. 9701 from organizations established under title XIII of the Public Health Service Act are to be credited to and available for carrying out the purposes of this appropriation.

### HEALTH MAINTENANCE ORGANIZATION LOAN AND LOAN GUARANTEE FUND

For carrying out subsections (d) and (e) of section 1308 of the Public Health Service Act, any amounts received by the Secretary in connection with loans and loan guarantees under title XIII of the Public Health Service Act, to be available without fiscal year limitation for the payment of outstanding obligations. During fiscal year 1997, no commitments for direct loans or loan guarantees shall be made.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

### FAMILY SUPPORT PAYMENTS TO STATES

For making payments of such sums as necessary to each State for carrying out the program of Aid to Families with Dependent Children under title IV–A of the Social Security Act in fiscal year 1997 before the effective date of the program of Temporary Assistance to Needy Families (TANF) with respect to such State: Provided, That the sum of the amounts available to a State with respect to expenditures under such title IV–A in fiscal year 1997 under this appropriation and under such title IV–A as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 shall not exceed the limitations under section 116(b) of such Act.

For making payments to States for carrying out title IV–A (other than section 402(g)(6)) of the Social Security Act in calendar quarters prior to October 1, 1996, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9), $2,158,000,000 to remain available until expended.

For making, after May 31 of the current fiscal year, payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act, for the last three months of the current year for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9) for the first quarter of fiscal year 1998, $607,000,000, to remain available until expended.

### JOB OPPORTUNITIES AND BASIC SKILLS

For carrying out aid to families with dependent children work programs, as authorized by part F of title IV of the Social Security Act, $1,000,000,000.

### LOW INCOME HOME ENERGY ASSISTANCE

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000.

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000, to be available for obligation in the period October 1, 1997 through September 30, 1998.

### REFUGEE AND ENTRANT ASSISTANCE

For making payments for refugee and entrant assistance activities authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 (Public Law 96–422), $412,076,000: Provided, That funds appropriated pursuant to section 414(a) of the Immigration and Nationality Act under Public Law 103–333 for fiscal year 1995 shall be available for the costs of assistance provided and other activities conducted in such year and in fiscal years 1996 and 1997.

### CHILD CARE AND DEVELOPMENT BLOCK GRANT

### (INCLUDING TRANSFER OF FUNDS)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 412 of 1021   PageID 7282

For carrying out sections 658A through 658R of the Omnibus Budget Reconciliation Act of 1981 (The Child Care and Development Block Grant Act of 1990), $956,120,000, of which $937,000,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998: Provided, That $19,120,000 shall become available for obligation on October 1, 1996 for child care resource and referral and school-age child care activities, of which $6,120,000 shall be derived from an amount that shall be transferred from the amount appropriated under section 452(j) of the Social Security Act (42 U.S.C. 652(j)) for fiscal year 1996 and remaining available for expenditure.

## SOCIAL SERVICES BLOCK GRANT

For making grants to States pursuant to section 2002 of the Social Security Act, $2,500,000,000: Provided, That notwithstanding section 2003(c) of such Act, as amended, the amount specified for allocation under such section for fiscal year 1997 shall be $2,500,000,000.

## CHILDREN AND FAMILIES SERVICES PROGRAMS

### (INCLUDING RESCISSIONS)

For carrying out, except as otherwise provided, the Runaway and Homeless Youth Act, the Developmental Disabilities Assistance and Bill of Rights Act, the Head Start Act, the Child Abuse Prevention and Treatment Act, the Temporary Child Care for Children with Disabilities and Crisis Nurseries Act of 1986, section 429A, part B of title IV of the Social Security Act, section 413 of the Social Security Act, the Family Violence Prevention and Services Act, the Native American Programs Act of 1974, title II of Public Law 95–266 (adoption opportunities), the Abandoned Infants Assistance Act of 1988, and part B(1) of title IV of the Social Security Act; for making payments under the Community Services Block Grant Act; and for necessary administrative expenses to carry out said Acts and titles I, IV, X, XI, XIV, XVI, and XX of the Social Security Act, the Act of July 5, 1960 (24 U.S.C. ch. 9), the Omnibus Budget Reconciliation Act of 1981, title IV of the Immigration and Nationality Act, section 501 of the Refugee Education Assistance Act of 1980, and section 126 and titles IV and V of Public Law 100–485, $5,363,569,000, of which $536,432,000 shall be for making payments under the Community Services Block Grant Act: Provided, That to the extent Community Services Block Grant funds are distributed as grant funds by a State to an eligible entity as provided under the Act, and have not been expended by such entity, they shall remain with such entity for carryover into the next fiscal year for expenditure by such entity consistent with program purposes: Provided further, That of the amount appropriated for fiscal year 1997 under section 672(a) of the Community Services Block Grant Act, the Secretary shall use up to one percent of the funds available to correct allocation errors that occurred in fiscal year 1995 and fiscal year 1996 to ensure that the minimum allotment to each State for each of fiscal years 1995 and 1996 would be $2,222,460: Provided further, That no more than one-half of one percent of the funds available under section 672(a) shall be used for the purposes of section 674(a) of the Community Services Block Grant Act.

In addition, $20,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40155, 40211 and 40241 of Public Law 103–322.

Funds appropriated for fiscal year 1996 and fiscal year 1997 under section 429A(e), part B of title IV of the Social Security Act shall be reduced by $6,000,000 in each such year.

Funds appropriated for fiscal year 1997 under section 413(h)(1) of the Social Security Act shall be reduced by $15,000,000.

## FAMILY PRESERVATION AND SUPPORT

For carrying out section 430 of the Social Security Act, $240,000,000.

## PAYMENTS TO STATES FOR FOSTER CARE AND ADOPTION ASSISTANCE

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, $4,445,031,000.

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, for the first quarter of fiscal year 1998, $1,111,000,000.

## ADMINISTRATION ON AGING

## AGING SERVICES PROGRAMS

For carrying out, to the extent not otherwise provided, the Older Americans Act of 1965, as amended, $830,168,000: Provided, That notwithstanding section 308(b)(1) of such Act, the amounts available to each State for administration of the State plan under title III of such Act shall be reduced not more than 5 percent below the amount that was available to such State for such purpose for fiscal year 1995: Provided further, That in considering grant applications for nutrition services for elder Indian recipients, the Assistant Secretary shall provide maximum flexibility to applicants who seek to take into account subsistence, local customs and other characteristics that are appropriate to the unique cultural, regional and geographic needs of the American Indian, Alaskan and Hawaiian native communities to be served.

## OFFICE OF THE SECRETARY

### GENERAL DEPARTMENTAL MANAGEMENT

For necessary expenses, not otherwise provided, for general departmental management, including hire of six sedans, and for carrying out titles III, XVII, and XX of the Public Health Service Act, $174,523,000, together with $5,851,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund: Provided, That of the funds made available under this heading for carrying out title XVII of the Public Health Service Act, $11,500,000 shall be available until expended for extramural construction: Provided further, That notwithstanding section 2010(b) and (c) under title XX of the Public Health Service Act, as amended, of the funds made available under this heading, $10,879,000 shall be for activities specified under section 2003(b)(2) of title XX of the Public Health Service Act, as amended, and of which $9,011,000 shall be for prevention grants under section 510(b)(2) of title V of the Social Security Act, as amended: Provided further, That of the amount provided, $5,775,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $32,999,000, together with any funds, to remain available until expended, that represent the equitable share from the forfeiture of property in investigations in which the Office of Inspector General participated, and which are transferred to the Office of Inspector General by the Department of Justice, the Department of the Treasury, or the United States Postal Service.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, $16,216,000, together with not to exceed $3,314,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund.

### POLICY RESEARCH

For carrying out, to the extent not otherwise provided, research studies under section 1110 of the Social Security Act and section 301(l) of Public Law 104–191, $18,500,000: Provided, That $9,500,000, to remain available until September 30, 1998, shall be for carrying out section 301(l) of Public Law 104–191.

### GENERAL PROVISIONS

Sec. 201. Funds appropriated in this title shall be available for not to exceed $37,000 for official reception and representation expenses when specifically approved by the Secretary.

Sec. 202. The Secretary shall make available through assignment not more than 60 employees of the Public Health Service to assist in child survival activities and to work in AIDS programs through and with funds provided by the Agency for International Development, the United Nations International Children's Emergency Fund or the World Health Organization.

Sec. 203. None of the funds appropriated under this Act may be used to implement section 399L(b) of the Public Health Service Act or section 1503 of the National Institutes of Health Revitalization Act of 1993, Public Law 103–43.

Sec. 204. None of the funds made available by this Act may be used to withhold payment to any State under the Child Abuse Prevention and Treatment Act by reason of a determination that the State is not in compliance with section 1340.2(d)(2)(ii) of title 45 of the Code of Federal Regulations. This provision expires upon the date of enactment of the reauthorization of the Child Abuse Prevention and Treatment Act.

Sec. 205. None of the funds appropriated in this Act for the National Institutes of Health and the Substance Abuse and Mental Health Services Administration shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of $125,000 per year.

Sec. 206. None of the funds appropriated in this Act may be expended pursuant to section 241 of the Public Health Service Act, except for funds specifically provided for in this Act, or for other taps and assessments made by any office located in the Department of Health and Human Services, prior to the Secretary's preparation and submission of a report to the Committee on Appropriations of the Senate and of the House detailing the planned uses of such funds.

(TRANSFER OF FUNDS)

Sec. 207. Of the funds appropriated or otherwise made available for the Department of Health and Human Services, General Departmental Management, for fiscal year 1997, the Secretary of Health and Human Services shall transfer to the Office of the Inspector General such sums as may be necessary for any expenses with respect to the provision of security protection for the Secretary of Health and Human Services.

Sec. 208. None of the funds appropriated in this Act may be obligated or expended for the Federal Council on Aging under the Older Americans Act or the Advisory Board on Child Abuse and Neglect under the Child Abuse Prevention and Treatment Act.

(TRANSFER OF FUNDS)

Sec. 209. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Health and Human Services in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

(TRANSFER OF FUNDS)

Sec. 210. The Director of the National Institutes of Health, jointly with the Director of the Office of AIDS Research, may transfer up to 3 percent among institutes, centers, and divisions from the total amounts identified by these two Directors as funding for research pertaining to the human immunodeficiency virus: Provided, That the Congress is promptly notified of the transfer.

(TRANSFER OF FUNDS)

Sec. 211. Of the amounts made available in this Act for the National Institutes of Health, the amount for research related to the human immunodeficiency virus, as jointly determined by the Director of NIH and the Director of the Office of AIDS Research, shall be made available to the "Office of AIDS Research" account. The Director of the Office of AIDS Research shall transfer from such account amounts necessary to carry out section 2353(d)(3) of the Public Health Service Act.

Sec. 212. Not later than January 1, 1997, the Administrator of the Health Care Financing Administration, with the advice and technical assistance of the Agency for Health Care Policy and Research, shall transmit to the appropriate committees of the Congress a report including—

(1) a review of all available studies and research data on the treatment of end-stage emphysema and chronic obstructive pulmonary disease by both unilateral and bilateral lung volume reduction surgery, involving both invasive and noninvasive surgery and supplemental surgical methods, including laser applications; and

(2) a recommendation, based on such review, as to the appropriateness of Medicare coverage of such procedures and the conditions, if necessary, that facilities and physicians should be required to meet, to ensure the efficacy of such procedures, as more detailed clinical studies are conducted.

<< 42 USCA § 10403 >>

Sec. 213. Section 304(a)(1) of the Family Violence Prevention and Services Act (42 U.S.C. 10403(a)(1)) is amended by striking "$200,000" and inserting "$400,000".

Sec. 214. The new clinical research center at the National Institutes of Health is hereby named the Mark O. Hatfield Clinical Research Center.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 42 USCA §§ 652, 653 >>

<< 42 USCA §§ 652 NOTE,653 nt >>

Sec. 215. Section 345 of Public Law 104–193 is amended by replacing "section 457(a)" wherever it appears with "a plan approved under this part". Amounts available under such section shall be calculated as though such section were effective October 1, 1995.

This title may be cited as the "Department of Health and Human Services Appropriations Act, 1997".

## TITLE III—DEPARTMENT OF EDUCATION

### EDUCATION REFORM

For carrying out activities authorized by titles III and IV of the Goals 2000: Educate America Act and the School-to-Work Opportunities Act, $691,000,000, of which $476,000,000 for the Goals 2000: Educate America Act and $200,000,000 for the School-to-Work Opportunities Act shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That none of the funds appropriated under this heading shall be obligated or expended to carry out section 304(a)(2)(A) of the Goals 2000: Educate America Act.

### EDUCATION FOR THE DISADVANTAGED

For carrying out title I of the Elementary and Secondary Education Act of 1965, and section 418A of the Higher Education Act, $7,698,469,000, of which $6,380,114,000 shall become available on July 1, 1997, and shall remain available through September 30, 1998, and of which $1,298,386,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998, for academic year 1997–1998: Provided, That $6,194,850,000 shall be available for basic grants under section 1124: Provided further, That up to $3,500,000 of these funds shall be available to the Secretary on October 1, 1996, to obtain updated local-educational-agency-level census poverty data from the Bureau of the Census: Provided further, That $999,249,000 shall be available for concentration grants under section 1124(A) and $7,000,000 shall be available for evaluations under section 1501.

### IMPACT AID

For carrying out programs of financial assistance to federally affected schools authorized by title VIII of the Elementary and Secondary Education Act of 1965, $730,000,000, of which $615,500,000 shall be for basic support payments under section 8003(b), $40,000,000 shall be for payments for children with disabilities under section 8003(d), $52,000,000, to remain available until expended, shall be for payments under section 8003(f), $5,000,000 shall be for construction under section 8007, and $17,500,000 shall be for Federal property payments under section 8002.

### SCHOOL IMPROVEMENT PROGRAMS

For carrying out school improvement activities authorized by titles II, IV–A–1, V–A and B, VI, IX, X and XIII of the Elementary and Secondary Education Act of 1965; the Stewart B. McKinney Homeless Assistance Act; and the Civil Rights Act of 1964; $1,425,631,000, of which $1,202,478,000 shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That of the amount appropriated, $310,000,000 shall be for Eisenhower professional development State grants under title II–B and $310,000,000 shall be for innovative education program strategies State grants under title VI–A.

### BILINGUAL AND IMMIGRANT EDUCATION

For carrying out, to the extent not otherwise provided, bilingual, foreign language and immigrant education activities authorized by parts A and C and section 7203 of title VII of the Elementary and Secondary Education Act, without regard to section 7103(b), $261,700,000, of which $100,000,000 shall be for immigrant education programs authorized by part C: Provided, That State educational agencies may use all, or any part of, their part C allocation for competitive grants to local educational agencies: Provided further, That the Department of Education should only support instructional programs which ensure that students completely master English in a timely fashion (a period of three to five years) while meeting rigorous achievement standards in the academic content areas.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## SPECIAL EDUCATION

For carrying out parts B, C, D, E, F, G, and H and section 610(j)(2)(C) of the Individuals with Disabilities Education Act, $4,036,000,000, of which $3,783,685,000 shall become available for obligation on July 1, 1997, and shall remain available through September 30, 1998: Provided, That the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall continue to be eligible to receive funds under the Individuals with Disabilities Education Act consistent with the provisions of Public Law 104–134: Provided further, That the entities that received competitive awards for direct services to children under section 611 of the Individuals with Disabilities Education Act in accordance with the competition required in Public Law 104–134 shall continue to be funded, without competition, in the same amounts as under Public Law 104–134.

## REHABILITATION SERVICES AND DISABILITY RESEARCH

For carrying out, to the extent not otherwise provided, the Rehabilitation Act of 1973, the Technology–Related Assistance for Individuals with Disabilities Act, and the Helen Keller National Center Act, as amended, $2,509,447,000.

## SPECIAL INSTITUTIONS FOR PERSONS WITH DISABILITIES

## AMERICAN PRINTING HOUSE FOR THE BLIND

For carrying out the Act of March 3, 1879, as amended (20 U.S.C. 101 et seq.), $6,680,000.

## NATIONAL TECHNICAL INSTITUTE FOR THE DEAF

For the National Technical Institute for the Deaf under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $43,041,000: Provided, That from the amount available, the Institute may at its discretion use funds for the endowment program as authorized under section 207.

## GALLAUDET UNIVERSITY

For the Kendall Demonstration Elementary School, the Model Secondary School for the Deaf, and the partial support of Gallaudet University under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $79,182,000: Provided, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under section 207.

## VOCATIONAL AND ADULT EDUCATION

For carrying out, to the extent not otherwise provided, the Carl D. Perkins Vocational and Applied Technology Education Act, the Adult Education Act, and the National Literacy Act of 1991, $1,486,531,000, of which $4,500,000 shall be for the National Institute for Literacy; and of which $1,483,612,000 shall become available on July 1, 1997 and shall remain available through September 30, 1998: Provided, That, of the amounts made available for title II of the Carl D. Perkins Vocational and Applied Technology Education Act, $4,500,000 shall be used by the Secretary for national programs under title IV, without regard to section 451: Provided further, That, in addition, the Secretary may reserve up to $9,000,000 under section 101(a)(1)(A) of the Carl D. Perkins Vocational and Applied Technology Education Act, without regard to section 451: Provided further, That the Secretary may reserve up to $5,000,000 under section 313(d) of the Adult Education Act for activities carried out under section 383 of that Act: Provided further, That no funds shall be awarded to a State Council under section 112(f) of the Carl D. Perkins Vocational and Applied Technology Education Act, and no State shall be required to operate such a Council.

## STUDENT FINANCIAL ASSISTANCE

For carrying out subparts 1, 3, and 4 of part A, part C and part E of title IV of the Higher Education Act of 1965, as amended, $7,560,407,000, which shall remain available through September 30, 1998.

<< 20 USCA § 1070a NOTE >>

The maximum Pell Grant for which a student shall be eligible during award year 1997–1998 shall be $2,700: Provided, That notwithstanding section 401(g) of the Act, if the Secretary determines, prior to publication of the payment schedule for such award year, that the amount included within this appropriation for Pell Grant awards in such award year, and any funds available

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

from the fiscal year 1996 appropriation for Pell Grant awards, are insufficient to satisfy fully all such awards for which students are eligible, as calculated under section 401(b) of the Act, the amount paid for each such award shall be reduced by either a fixed or variable percentage, or by a fixed dollar amount, as determined in accordance with a schedule of reductions established by the Secretary for this purpose.

## FEDERAL FAMILY EDUCATION LOAN PROGRAM ACCOUNT

For Federal administrative expenses to carry out guaranteed student loans authorized by title IV, part B, of the Higher Education Act, as amended, $46,572,000.

## HIGHER EDUCATION

For carrying out, to the extent not otherwise provided, parts A and B of title III, without regard to section 360(a)(1)(B)(ii), titles IV, V, VI, VII, and IX, part A and subpart 1 of part B of title X, and title XI of the Higher Education Act of 1965, as amended, Public Law 102–423 and the Mutual Educational and Cultural Exchange Act of 1961; $879,054,000, of which $15,673,000 for interest subsidies under title VII of the Higher Education Act, as amended, shall remain available until expended: *Provided*, That funds available for part D of title IX of the Higher Education Act shall be available to fund noncompeting continuation awards for academic year 1997–1998 for fellowships awarded originally under part B of title IX of said Act, under the terms and conditions of part B: *Provided further*, That $5,931,000 of the funds available for part D of title IX of the Higher Education Act shall be available to fund new and noncompeting continuation awards for academic year 1997–1998 for fellowships awarded under part C of title IX of said Act, under the terms and conditions of part C: *Provided further*, That notwithstanding sections 419D, 419E, and 419H of the Higher Education Act, as amended, scholarships made under title IV, part A, subpart 6 shall be prorated to maintain the same number of new scholarships in fiscal year 1997 as in fiscal year 1996: *Provided further*, That $3,000,000, to remain available until expended, shall be for the George H.W. Bush fellowship program, if authorized by April 1, 1997: *Provided further*, That $3,000,000, to remain available until expended, shall be for the Edmund S. Muskie Foundation to establish an endowment fund to provide income to support such foundation on a continuing basis, if authorized by April 1, 1997: *Provided further*, That $3,000,000, to remain available until expended, shall be for the Claiborne Pell Institute for International Relations and Public Policy at Salve Regina University in Newport, Rhode Island, if authorized by April 1, 1997: *Provided further*, That $1,000,000, to remain available until expended, shall be for the Calvin Coolidge Memorial Foundation, if authorized by April 1, 1997: *Provided further*, That, of the amounts made available under title X, part A of the Higher Education Act, $2,000,000 shall be awarded to the Pennsylvania Educational Telecommunications Exchange Network.

## HOWARD UNIVERSITY

For partial support of Howard University (20 U.S.C. 121 et seq.), $196,000,000: *Provided*, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under the Howard University Endowment Act (Public Law 98–480).

## HIGHER EDUCATION FACILITIES LOANS

The Secretary is hereby authorized to make such expenditures, within the limits of funds available under this heading and in accord with law, and to make such contracts and commitments without regard to fiscal year limitation, as provided by section 104 of the Government Corporation Control Act (31 U.S.C. 9104), as may be necessary in carrying out the program for the current fiscal year.

## COLLEGE HOUSING AND ACADEMIC FACILITIES LOANS PROGRAM

For administrative expenses to carry out the existing direct loan program of college housing and academic facilities loans entered into pursuant to title VII, part C, of the Higher Education Act, as amended, $698,000.

## COLLEGE HOUSING LOANS

Pursuant to title VII, part C of the Higher Education Act, as amended, for necessary expenses of the college housing loans program, the Secretary shall make expenditures and enter into contracts without regard to fiscal year limitation using loan repayments and other resources available to this account. Any unobligated balances becoming available from fixed fees paid into this account pursuant to 12 U.S.C. 1749d, relating to payment of costs for inspections and site visits, shall be available for the operating expenses of this account.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

### HISTORICALLY BLACK COLLEGE AND UNIVERSITY

### CAPITAL FINANCING, PROGRAM ACCOUNT

The total amount of bonds insured pursuant to section 724 of title VII, part B of the Higher Education Act shall not exceed $357,000,000, and the cost, as defined in section 502 of the Congressional Budget Act of 1974, of such bonds shall not exceed zero.

For administrative expenses to carry out the Historically Black College and University Capital Financing Program entered into pursuant to title VII, part B of the Higher Education Act, as amended, $104,000.

### EDUCATION RESEARCH, STATISTICS, AND IMPROVEMENT

For carrying out activities authorized by the Educational Research, Development, Dissemination, and Improvement Act of 1994, including part E; the National Education Statistics Act of 1994; section 2102, sections 3132, 3136 and 3141, parts B, C, and D of title III and parts A, B, I, and K and section 10601 of title X, and part C of title XIII of the Elementary and Secondary Education Act of 1965, as amended, and title VI of Public Law 103–227, $598,350,000: Provided, That $200,000,000 shall be for section 3132, $56,965,000 shall be for section 3136 and $10,000,000 shall be for section 3141 of the Elementary and Secondary Education Act: Provided further, That notwithstanding any other provision of law, one-half of one percent of the amount available for section 3132 of the Elementary and Secondary Education Act of 1965, as amended, shall be set aside for the outlying areas to be distributed among the outlying areas on the basis of their relative need as determined by the Secretary in accordance with the purposes of the program: Provided further, That, notwithstanding section 3131(b) of said Act, if any State educational agency does not apply for a grant under section 3132, that State's allotment under section 3131 shall be reserved by the Secretary for grants to local educational agencies in the State that apply directly to the Secretary according to the terms and conditions announced by the Secretary in the Federal Register: Provided further, That, of the amount available for title III, part B of the Elementary and Secondary Education Act of 1965, as amended, funds shall be awarded to continue the Iowa Communication Network statewide fiber optic demonstration and $2,000,000 shall be awarded to the Southeastern Pennsylvania Consortium for Higher Education for the establishment of local and wide area computer networks to provide instructional resources to students and faculty: Provided further, That none of the funds appropriated in this paragraph may be obligated or expended for the Goals 2000 Community Partnerships Program.

### LIBRARIES

Notwithstanding title VII of this Act, for carrying out titles I, II, III, and IV of the Library Services and Construction Act, and title II–B of the Higher Education Act, $136,369,000, of which $16,369,000 shall be used to carry out the provisions of title II of the Library Services and Construction Act and shall remain available until expended; and $2,500,000 shall be for section 222 and $5,000,000 shall be for section 223 of the Higher Education Act: Provided, That $1,000,000 shall be competitively awarded to a nonprofit regional social tolerance resource center, operating tolerance tools and prejudice reduction programs and multimedia tolerance and genocide exhibits: Provided further, That $1,500,000 shall be for the continuation of a demonstration project making information available for public use by connecting Internet to a multistate consortium and a historical society: Provided further, That $1,000,000 shall be for continuation of catalog conversion of research and doctoral institutions and networking of local libraries under the fiber optics demonstration initiated in Public Law 102–394 under section 223 of the Higher Education Act: Provided further, That each State or local recipient of funds under titles I, II, III, and IV of the Library Services and Construction Act may use any such funds to plan for any library program or activity authorized under title VII of this Act and conduct any other activity reasonably necessary to provide for an orderly and effective transition to the operation of library programs or activities under title VII of this Act.

### DEPARTMENTAL MANAGEMENT

### PROGRAM ADMINISTRATION

For carrying out, to the extent not otherwise provided, the Department of Education Organization Act, including rental of conference rooms in the District of Columbia and hire of two passenger motor vehicles, $327,000,000.

### OFFICE FOR CIVIL RIGHTS

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 419 of 1021   PageID 7289

For expenses necessary for the Office for Civil Rights, as authorized by section 203 of the Department of Education Organization Act, $55,000,000.

## OFFICE OF THE INSPECTOR GENERAL

For expenses necessary for the Office of the Inspector General, as authorized by section 212 of the Department of Education Organization Act, $30,000,000.

## GENERAL PROVISIONS

Sec. 301. No funds appropriated in this Act may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of racial desegregation of any school or school system.

Sec. 302. None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, to the school offering such special education, in order to comply with title VI of the Civil Rights Act of 1964. For the purpose of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.

Sec. 303. No funds appropriated under this Act may be used to prevent the implementation of programs of voluntary prayer and meditation in the public schools.

Sec. 304. Notwithstanding any other provision of law, funds available under section 458 of the Higher Education Act shall not exceed $491,000,000 for fiscal year 1997. The Department of Education shall use $80,000,000 of the amounts provided for payment of administrative cost allowances to guaranty agencies for fiscal year 1996. For fiscal year 1997, the Department of Education shall pay administrative costs to guaranty agencies, calculated on the basis of 0.85 percent of the total principal amount of loans upon which insurance was issued on or after October 1, 1996: Provided, That such administrative costs shall be paid only on the first $8,200,000,000 of the principal amount of loans upon which insurance was issued on or after October 1, 1996 by such guaranty agencies, and shall not exceed a total of $70,000,000. Such payments are to be paid quarterly, and receipt of such funds and uses of such funds shall be in accordance with section 428(f) of the Higher Education Act.

<< 20 USCA § 1087h NOTE >>

Notwithstanding section 458 of the Higher Education Act, the Secretary may not use funds available under that section or any other section for subsequent fiscal years for administrative expenses of the William D. Ford Direct Loan Program. The Secretary may not require the return of guaranty agency reserve funds during fiscal year 1997, except after consultation with both the Chairmen and ranking members of the House Economic and Educational Opportunities Committee and the Senate Labor and Human Resources Committee. Any reserve funds recovered by the Secretary shall be returned to the Treasury of the United States for purposes of reducing the Federal deficit.

No funds available to the Secretary may be used for (1) the hiring of advertising agencies or other third parties to provide advertising services for student loan programs prior to January 1, 1997, or (2) payment of administrative fees relating to the William D. Ford Direct Loan Program to institutions of higher education.

Sec. 305. None of the funds appropriated in this Act may be obligated or expended to carry out section 621(b) of Public Law 101–589.

## (TRANSFER OF FUNDS)

Sec. 306. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Education in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

Sec. 307. (a) Section 8003(f)(3)(A)(i) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7703(f)(3)(A)(i)) is amended—

<< 20 USCA § 7703 >>

   (1) in the matter preceding subclause (I), by striking "The Secretary" and all that follows through "greater of—" and inserting the following: "The Secretary, in conjunction with the local educational agency, shall first determine each of the following:";
   (2) in each of subclauses (I) through (III), by striking "the average" each place it appears the first time in each such subclause and inserting "The average";
   (3) in subclause (I), by striking the semicolon and inserting a period;
   (4) in subclause (II), by striking ": or" and inserting a period; and
   (5) by adding at the end the following:
   "The local educational agency shall select one of the amounts determined under subclause (I), (II), or (III) for purposes of the remaining computations under this subparagraph.".

<< 20 USCA § 7703 NOTE >>

   (b) The amendments made by subsection (a) shall apply with respect to fiscal years beginning with fiscal year 1995.

<< 20 USCA § 1092 >>

Sec. 308. Section 485(e)(9) of the Higher Education Act of 1965 is amended by striking out "June 30" in the second sentence of such section and inserting "August 30".
   This title may be cited as the "Department of Education Appropriations Act, 1997".

## TITLE IV–RELATED AGENCIES

### ARMED FORCES RETIREMENT HOME

   For expenses necessary for the Armed Forces Retirement Home to operate and maintain the United States Soldiers' and Airmen's Home and the United States Naval Home, to be paid from funds available in the Armed Forces Retirement Home Trust Fund, $56,204,000, of which $432,000 shall remain available until expended for construction and renovation of the physical plants at the United States Soldiers' and Airmen's Home and the United States Naval Home: Provided, That this appropriation shall not be available for the payment of hospitalization of members of the Soldiers' and Airmen's Home in United States Army hospitals at rates in excess of those prescribed by the Secretary of the Army upon recommendation of the Board of Commissioners and the Surgeon General of the Army.

### CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

### DOMESTIC VOLUNTEER SERVICE PROGRAMS, OPERATING EXPENSES

   For expenses necessary for the Corporation for National and Community Service to carry out the provisions of the Domestic Volunteer Service Act of 1973, as amended, $213,969,000.

### CORPORATION FOR PUBLIC BROADCASTING

   For payment to the Corporation for Public Broadcasting, as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act, for the fiscal year 1999, $250,000,000: Provided, That no funds made available to the Corporation for Public Broadcasting by this Act shall be used to pay for receptions, parties, or similar forms of entertainment for Government officials or employees: Provided further, That none of the funds contained in this paragraph shall be available or used to aid or support any program or activity from which any person is excluded, or is denied benefits, or is discriminated against, on the basis of race, color, national origin, religion, or sex.

### FEDERAL MEDIATION AND CONCILIATION SERVICE

### SALARIES AND EXPENSES

For expenses necessary for the Federal Mediation and Conciliation Service to carry out the functions vested in it by the Labor Management Relations Act, 1947 (29 U.S.C. 171–180, 182–183), including hire of passenger motor vehicles; and for expenses necessary for the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a); and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, Public Law 95–454 (5 U.S.C. chapter 71), $32,579,000 including $1,500,000, to remain available through September 30, 1998, for activities authorized by the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a): Provided, That notwithstanding 31 U.S.C. 3302, fees charged, up to full-cost recovery, for special training activities and for arbitration services shall be credited to and merged with this account, and shall remain available until expended: Provided further, That fees for arbitration services shall be available only for education, training, and professional development of the agency workforce: Provided further, That the Director of the Service is authorized to accept on behalf of the United States gifts of services and real, personal, or other property in the aid of any projects or functions within the Director's jurisdiction.

### FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

#### SALARIES AND EXPENSES

For expenses necessary for the Federal Mine Safety and Health Review Commission (30 U.S.C. 801 et seq.), $6,060,000.

### NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE

#### SALARIES AND EXPENSES

For necessary expenses for the National Commission on Libraries and Information Science, established by the Act of July 20, 1970 (Public Law 91–345, as amended by Public Law 102–95), $897,000.

### NATIONAL COUNCIL ON DISABILITY

#### SALARIES AND EXPENSES

For expenses necessary for the National Council on Disability as authorized by title IV of the Rehabilitation Act of 1973, as amended, $1,793,000.

### NATIONAL EDUCATION GOALS PANEL

For expenses necessary for the National Education Goals Panel, as authorized by title II, part A of the Goals 2000: Educate America Act, $1,500,000.

### NATIONAL LABOR RELATIONS BOARD

#### SALARIES AND EXPENSES

For expenses necessary for the National Labor Relations Board to carry out the functions vested in it by the Labor–Management Relations Act, 1947, as amended (29 U.S.C. 141–167), and other laws, $175,000,000: Provided, That no part of this appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in section 2(3) of the Act of July 5, 1935 (29 U.S.C. 152), and as amended by the Labor–Management Relations Act, 1947, as amended, and as defined in section 3(f) of the Act of June 25, 1938 (29 U.S.C. 203), and including in said definition employees engaged in the maintenance and operation of ditches, canals, reservoirs, and waterways when maintained or operated on a mutual, nonprofit basis and at least 95 per centum of the water stored or supplied thereby is used for farming purposes: Provided further, That none of the funds made available by this Act shall be used in any way to promulgate a final rule (altering 29 CFR part 103) regarding single location bargaining units in representation cases.

### NATIONAL MEDIATION BOARD

#### SALARIES AND EXPENSES

AR03080

For expenses necessary to carry out the provisions of the Railway Labor Act, as amended (45 U.S.C. 151–188), including emergency boards appointed by the President, $8,300,000: Provided, That unobligated balances at the end of fiscal year 1997 not needed for emergency boards shall remain available for other statutory purposes through September 30, 1998.

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Occupational Safety and Health Review Commission (29 U.S.C. 661), $7,753,000.

## PHYSICIAN PAYMENT REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1845(a) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Supplementary Medical Insurance Trust Fund.

## PROSPECTIVE PAYMENT ASSESSMENT COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1886(e) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds.

## SOCIAL SECURITY ADMINISTRATION

### PAYMENTS TO SOCIAL SECURITY TRUST FUNDS

For payment to the Federal Old–Age and Survivors Insurance and the Federal Disability Insurance trust funds, as provided under sections 201(m), 228(g), and 1131(b)(2) of the Social Security Act, $20,923,000.

In addition, to reimburse these trust funds for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986, $10,000,000, to remain available until expended.

### SPECIAL BENEFITS FOR DISABLED COAL MINERS

For carrying out title IV of the Federal Mine Safety and Health Act of 1977, $460,070,000, to remain available until expended.

For making, after July 31 of the current fiscal year, benefit payments to individuals under title IV of the Federal Mine Safety and Health Act of 1977, for costs incurred in the current fiscal year, such amounts as may be necessary.

For making benefit payments under title IV of the Federal Mine Safety and Health Act 1977 for the first quarter of fiscal year 1998, $160,000,000, to remain available until expended.

### SUPPLEMENTAL SECURITY INCOME PROGRAM

For carrying out titles XI and XVI of the Social Security Act, section 401 of Public Law 92–603, section 212 of Public Law 93–66, as amended, and section 405 of Public Law 95–216, including payment to the Social Security trust funds for administrative expenses incurred pursuant to section 201(g)(1) of the Social Security Act, $19,372,010,000, to remain available until expended: Provided, That any portion of the funds provided to a State in the current fiscal year and not obligated by the State during that year shall be returned to the Treasury.

From funds provided under the previous paragraph, not less than $100,000,000 shall be available for payment to the Social Security trust funds for administrative expenses for conducting continuing disability reviews.

In addition, $175,000,000, to remain available until September 30, 1998, for payment to the Social Security trust funds for administrative expenses for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redetermination as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

For making, after June 15 of the current fiscal year, benefit payments to individuals under title XVI of the Social Security Act, for unanticipated costs incurred for the current fiscal year, such sums as may be necessary.

For carrying out title XVI of the Social Security Act for the first quarter of fiscal year 1998, $9,690,000,000, to remain available until expended.

### LIMITATION ON ADMINISTRATIVE EXPENSES

For necessary expenses, including the hire of two passenger motor vehicles, and not to exceed $10,000 for official reception and representation expenses, not more than $5,873,382,000 may be expended, as authorized by section 201(g)(1) of the Social Security Act or as necessary to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 from any one or all of the trust funds referred to therein: Provided, That reimbursement to the trust funds under this heading for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 shall be made, with interest, not later than September 30, 1998: Provided further, That not less than $1,268,000 shall be for the Social Security Advisory Board: Provided further, That unobligated balances at the end of fiscal year 1997 not needed for fiscal year 1997 shall remain available until expended for a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network.

From funds provided under the previous paragraph, not less than $200,000,000 shall be available for conducting continuing disability reviews.

In addition to funding already available under this heading, and subject to the same terms and conditions, $310,000,000, to remain available until September 30, 1998, for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redeterminations as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

In addition to funding already available under this heading, and subject to the same terms and conditions, $234,895,000, which shall remain available until expended, to invest in a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network, for the Social Security Administration and the State Disability Determination Services, may be expended from any or all of the trust funds as authorized by section 201(g)(1) of the Social Security Act.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $6,335,000, together with not to exceed $31,089,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund.

### RAILROAD RETIREMENT BOARD

### DUAL BENEFITS PAYMENTS ACCOUNT

For payment to the Dual Benefits Payments Account, authorized under section 15(d) of the Railroad Retirement Act of 1974, $223,000,000, which shall include amounts becoming available in fiscal year 1997 pursuant to section 224(c)(1)(B) of Public Law 98–76; and in addition, an amount, not to exceed 2 percent of the amount provided herein, shall be available proportional to the amount by which the product of recipients and the average benefit received exceeds $223,000,000: Provided, That the total amount provided herein shall be credited in 12 approximately equal amounts on the first day of each month in the fiscal year.

### FEDERAL PAYMENTS TO THE RAILROAD RETIREMENT ACCOUNTS

For payment to the accounts established in the Treasury for the payment of benefits under the Railroad Retirement Act for interest earned on unnegotiated checks, $300,000, to remain available through September 30, 1998, which shall be the maximum amount available for payment pursuant to section 417 of Public Law 98–76.

### LIMITATION ON ADMINISTRATION

For necessary expenses for the Railroad Retirement Board for administration of the Railroad Retirement Act and the Railroad Unemployment Insurance Act, $87,898,000, to be derived in such amounts as determined by the Board from the railroad retirement accounts and from moneys credited to the railroad unemployment insurance administration fund.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## LIMITATION ON THE OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General for audit, investigatory and review activities, as authorized by the Inspector General Act of 1978, as amended, not more than $5,404,000, to be derived from the railroad retirement accounts and railroad unemployment insurance account: *Provided*, That none of the funds made available in this Act may be transferred to the Office from the Department of Health and Human Services, or used to carry out any such transfer: *Provided further*, That none of the funds made available in this paragraph may be used for any audit, investigation, or review of the Medicare program.

## UNITED STATES INSTITUTE OF PEACE

### OPERATING EXPENSES

For necessary expenses of the United States Institute of Peace as authorized in the United States Institute of Peace Act, $11,160,000.

## TITLE V—GENERAL PROVISIONS

SEC. 501. The Secretaries of Labor, Health and Human Services, and Education are authorized to transfer unexpended balances of prior appropriations to accounts corresponding to current appropriations provided in this Act: *Provided*, That such transferred balances are used for the same purpose, and for the same periods of time, for which they were originally appropriated.

SEC. 502. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 503. (a) No part of any appropriation contained in this Act shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television, or video presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself or any State legislature, except in presentation to the Congress or any State legislative body itself.

(b) No part of any appropriation contained in this Act shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

SEC. 504. The Secretaries of Labor and Education are each authorized to make available not to exceed $15,000 from funds available for salaries and expenses under titles I and III, respectively, for official reception and representation expenses; the Director of the Federal Mediation and Conciliation Service is authorized to make available for official reception and representation expenses not to exceed $2,500 from the funds available for "Salaries and expenses, Federal Mediation and Conciliation Service"; and the Chairman of the National Mediation Board is authorized to make available for official reception and representation expenses not to exceed $2,500 from funds available for "Salaries and expenses, National Mediation Board".

Sec. 505. Notwithstanding any other provision of this Act, no funds appropriated under this Act shall be used to carry out any program of distributing sterile needles for the hypodermic injection of any illegal drug unless the Secretary of Health and Human Services determines that such programs are effective in preventing the spread of HIV and do not encourage the use of illegal drugs.

Sec. 506. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 507. When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds included in this Act, including but not limited to State and local governments and recipients of Federal research grants, shall clearly state (1) the percentage of the total costs of the program or project which will be financed with Federal money, (2) the dollar amount of Federal funds for the project or program, and (3) percentage and dollar amount of the total costs of the project or program that will be financed by nongovernmental sources.

SEC. 508. None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.

<< 5 USCA § 3341 nt >>

<< 31 USCA § 1301 NOTE >>

SEC. 509. Notwithstanding any other provision of law—

(1) no amount may be transferred from an appropriation account for the Departments of Labor, Health and Human Services, and Education except as authorized in this or any subsequent appropriation Act, or in the Act establishing the program or activity for which funds are contained in this Act;

(2) no department, agency, or other entity, other than the one responsible for administering the program or activity for which an appropriation is made in this Act, may exercise authority for the timing of the obligation and expenditure of such appropriation, or for the purpose for which it is obligated and expended, except to the extent and in the manner otherwise provided in sections 1512 and 1513 of title 31, United States Code; and

(3) no funds provided under this Act shall be available for the salary (or any part thereof) of an employee who is reassigned on a temporary detail basis to another position in the employing agency or department or in any other agency or department, unless the detail is independently approved by the head of the employing department or agency.

SEC. 510. None of the funds made available in this Act may be used for the expenses of an electronic benefit transfer (EBT) task force.

SEC. 511. None of the funds made available in this Act may be used to enforce the requirements of section 428(b)(1)(U)(iii) of the Higher Education Act of 1965 with respect to any lender when it is made known to the Federal official having authority to obligate or expend such funds that the lender has a loan portfolio under part B of title IV of such Act that is equal to or less than $5,000,000.

SEC. 512. (a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.208(a)(2) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term "human embryo or embryos" include any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes.

SEC. 513. (a) Limitation on Use of Funds for Promotion of Legalization of Controlled Substances.—None of the funds made available in this Act may be used for any activity when it is made known to the Federal official having authority to obligate or expend such funds that the activity promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act (21 U.S.C. 812).

(b) Exceptions.—The limitation in subsection (a) shall not apply when it is made known to the Federal official having authority to obligate or expend such funds that there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that Federally-sponsored clinical trials are being conducted to determine therapeutic advantage.

<< 10 USCA § 503 NOTE >>

SEC. 514. (a) Denial of Funds for Preventing ROTC Access to Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any

fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) the maintaining, establishing, or operation of a unit of the Senior Reserve Officer Training Corps (in accordance with section 654 of title 10, United States Code, and other applicable Federal laws) at the covered educational entity; or

(2) a student at the covered educational entity from enrolling in a unit of the Senior Reserve Officer Training Corps at another institution of higher education.

(b) Denial of Funds for Preventing Federal Military Recruiting on Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of Federal military recruiting; or

(2) access by military recruiters for purposes of Federal military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at the covered educational entity:

(A) student names, addresses, and telephone listings; and

(B) if known, student ages, levels of education, and majors.

(c) Exceptions.—The limitation established in subsection (a) or (b) shall not apply to a covered educational entity if the Secretary of Defense determines that—

(1) the covered educational entity has ceased the policy or practice described in such subsection;

(2) the institution of higher education involved has a longstanding policy of pacifism based on historical religious affiliation; or

(3) the institution of higher education involved is prohibited by the law of any State, or by the order of any State court, from allowing Senior Reserve Officer Training Corps activities or Federal military recruiting on campus, except that this paragraph shall apply only during the one-year period beginning on the effective date of this section.

(d) Notice of Determinations.—Whenever the Secretary of Defense makes a determination under subsection (a), (b), or (c), the Secretary—

(1) shall transmit a notice of the determination to the Secretary of Education and to the Congress; and

(2) shall publish in the Federal Register a notice of the determination and the effect of the determination on the eligibility of the covered educational entity for contracts and grants.

(e) Semiannual Notice in Federal Register.—The Secretary of Defense shall publish in the Federal Register once every 6 months a list of each covered educational entity that is currently ineligible for contracts and grants by reason of a determination of the Secretary under subsection (a) or (b).

(f) Covered Educational Entity.—For purposes of this section, the term "covered educational entity" means an institution of higher education, or a subelement of an institution of higher education.

(g) Effective Date.—This section shall take effect upon the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations in consultation with the Secretary of Education to carry out this section.

Sec. 515. (a) Technical Amendment to Other ROTC and Military Recruiting Provisions.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, are amended by striking "when it is made known to the Federal official having authority to obligate or expend such funds" each place it appears and inserting "if the Secretary of Defense determines".

(b) Effective Date.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, shall not take effect until the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations to carry out such sections (as amended by subsection (a)).

SEC. 516. None of the funds made available in this Act may be obligated or expended to enter into or renew a contract with an entity when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such entity is otherwise a contractor with the United States and is subject to the requirement in section 4212(d) of title 38, United States Code, regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans; and

(2) such entity has not submitted a report as required by that section for the most recent year for which such requirement was applicable to such entity.

SEC. 517. (a) Notwithstanding any provision of the Carl D. Perkins Vocational and Applied Technology Act (as such Act was in effect on September 24, 1990), a State shall be deemed to have met the requirements of section 503 of such Act with respect to decisions appealed by applications filed on April 30, 1993 and October 29, 1993 under section 452(b) of the General Education Provisions Act.

(b) Subsection (a) shall take effect on October 1, 1996.

SEC. 518. None of the funds appropriated in this Act may be made available to any entity under title X of the Public Health Service Act unless it is made known to the Federal official having authority to obligate or expend such funds that the applicant for the award certifies to the Secretary that it encourages family participation in the decision of the minor to seek family planning services.

Sec. 519. Of the budgetary resources available to agencies in this Act for salaries and expenses during fiscal year 1997, $30,500,000, to be allocated by the Office of Management and Budget, are permanently canceled: Provided, That the foregoing provision shall not apply to the Food and Drug Administration and the Indian Health Service: Provided further, That amounts available in this Act for congressional and legislative affairs, public affairs, and intergovernmental affairs activities are hereby reduced by $2,000,000.

<< 5 USCA § 5597 NOTE >>

SEC. 520. Voluntary Separation Incentives for Employees of Certain Federal Agencies.—(a) Definitions.—For the purposes of this section—

(1) the term "agency" means the Railroad Retirement Board and the Office of Inspector General of the Railroad Retirement Board;

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty-four-month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve-month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) Agency Strategic Plan.—

(1) In general.—The three-member Railroad Retirement Board, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) Contents.—The agency's plan shall include—

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) Authority to Provide Voluntary Separation Incentive Payments.—

(1) In general.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) Amount and treatment of payments.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before September 30, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) Additional Agency Contributions to the Retirement Fund.—

(1) In general.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

2) Definition.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

e) Effect of Subsequent Employment With the Government.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) Reduction of Agency Employment Levels.—

(1) In general.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) Enforcement.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) Effective Date.—This section shall take effect October 1, 1996.

<< 42 USCA § 233 NOTE >>

SEC. 521. Correction of Effective Date.—Effective on the day after the date of enactment of the Health Centers Consolidation Act of 1996, section 5 of that Act is amended by striking "October 1, 1997" and inserting "October 1, 1996".

TITLE VI—REORGANIZATION AND PRIVATIZATION OF SALLIE MAE AND CONNIE LEE

<< 20 USCA § 1001 NOTE >>

SEC. 601. SHORT TITLE.

This title may be cited as the "Student Loan Marketing Association Reorganization Act of 1996".

SEC. 602. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

<< 20 USCA § 1087–3 >>

(a) AMENDMENT.—Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by inserting after section 439 (20 U.S.C. 1087–2) the following new section:

"SEC. 440. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

"(a) ACTIONS BY THE ASSOCIATION'S BOARD OF DIRECTORS.—The Board of Directors of the Association shall take or cause to be taken all such action as the Board of Directors deems necessary or appropriate to effect, upon the shareholder approval described in subsection (b), a restructuring of the common stock ownership of the Association, as set forth in a plan of reorganization adopted by the Board of Directors (the terms of which shall be consistent with this section) so that all of the outstanding common shares of the Association shall be directly owned by a Holding Company. Such actions may include, in the Board of Director's discretion, a merger of a wholly owned subsidiary of the Holding Company with and into the Association, which would have the effect provided in the plan of reorganization and the law of the jurisdiction in which such subsidiary is incorporated. As part of the restructuring, the Board of Directors may cause—

"(1) the common shares of the Association to be converted, on the reorganization effective date, to common shares of the Holding Company on a one for one basis, consistent with applicable State or District of Columbia law; and

"(2) Holding Company common shares to be registered with the Securities and Exchange Commission.

"(b) SHAREHOLDER APPROVAL.—The plan of reorganization adopted by the Board of Directors pursuant to subsection (a) shall be submitted to common shareholders of the Association for their approval. The reorganization shall occur on the reorganization effective date, provided that the plan of reorganization has been approved by the affirmative votes, cast in person or by proxy, of the holders of a majority of the issued and outstanding shares of the Association common stock.

"(c) TRANSITION.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) IN GENERAL.—Except as specifically provided in this section, until the dissolution date the Association shall continue to have all of the rights, privileges and obligations set forth in, and shall be subject to all of the limitations and restrictions of, section 439, and the Association shall continue to carry out the purposes of such section. The Holding Company and any subsidiary of the Holding Company (other than the Association) shall not be entitled to any of the rights, privileges, and obligations, and shall not be subject to the limitations and restrictions, applicable to the Association under section 439, except as specifically provided in this section. The Holding Company and any subsidiary of the Holding Company (other than the Association or a subsidiary of the Association) shall not purchase loans insured under this Act until such time as the Association ceases acquiring such loans, except that the Holding Company may purchase such loans if the Association is merely continuing to acquire loans as a lender of last resort pursuant to section 439(q) or under an agreement with the Secretary described in paragraph (6).

"(2) TRANSFER OF CERTAIN PROPERTY.—

"(A) IN GENERAL.—Except as provided in this section, on the reorganization effective date or as soon as practicable thereafter, the Association shall use the Association's best efforts to transfer to the Holding Company or any subsidiary of the Holding Company (or both), as directed by the Holding Company, all real and personal property of the Association (both tangible and intangible) other than the remaining property. Subject to the preceding sentence, such transferred property shall include all right, title, and interest in—

"(i) direct or indirect subsidiaries of the Association (excluding special purpose funding companies in existence on the date of enactment of this section and any interest in any government-sponsored enterprise);

"(ii) contracts, leases, and other agreements of the Association;

"(iii) licenses and other intellectual property of the Association; and

"(iv) any other property of the Association.

"(B) CONSTRUCTION.—Nothing in this paragraph shall be construed to prohibit the Association from transferring remaining property from time to time to the Holding Company or any subsidiary of the Holding Company, subject to the provisions of paragraph (4).

"(3) TRANSFER OF PERSONNEL.—On the reorganization effective date, employees of the Association shall become employees of the Holding Company (or any subsidiary of the Holding Company), and the Holding Company (or any subsidiary of the Holding Company) shall provide all necessary and appropriate management and operational support (including loan servicing) to the Association, as requested by the Association. The Association, however, may obtain such management and operational support from persons or entities not associated with the Holding Company.

"(4) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards and requirements set forth in section 439(r). If, at any time after the reorganization effective date, the Association fails to comply with such capital standards, the Holding Company shall transfer with due diligence to the Association additional capital in such amounts as are necessary to ensure that the Association again complies with the capital standards.

"(5) CERTIFICATION PRIOR TO DIVIDEND.—Prior to the payment of any dividend under paragraph (4), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (4) and shall provide copies of all calculations needed to make such certification.

"(6) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY ASSOCIATION.—

"(A) IN GENERAL.—After the reorganization effective date, the Association shall not engage in any new business activities or acquire any additional program assets described in section 439(d) other than in connection with—

"(i) student loan purchases through September 30, 2007;

"(ii) contractual commitments for future warehousing advances, or pursuant to letters of credit or standby bond purchase agreements, which are outstanding as of the reorganization effective date;

"(iii) the Association serving as a lender-of-last-resort pursuant to section 439(q); and

"(iv) the Association's purchase of loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(B) AGREEMENT.—The Secretary is authorized to enter into an agreement described in clause (iv) of subparagraph (A) with the Association covering such secondary market activities. Any agreement entered into under such clause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under section 439(h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(7) ISSUANCE OF DEBT OBLIGATIONS DURING THE TRANSITION PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—After the reorganization effective date, the Association shall not issue debt obligations which mature later than September 30, 2008, except in connection with serving as a lender-of-last-resort pursuant to section 439(q) or with purchasing loans under an agreement with the Secretary as described in paragraph (6). Nothing in this section shall modify the attributes accorded the debt obligations of the Association by section 439, regardless of whether such debt obligations are incurred prior to, or at any time following, the reorganization effective date or are transferred to a trust in accordance with subsection (d).

"(8) MONITORING OF SAFETY AND SOUNDNESS.—

"(A) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

"(i) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

"(ii) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

"(B) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of the information described in subparagraph (A) to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the

AR03089

preceding sentence and subparagraph (A), require the Association to make reports concerning the activities of any associated person whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

"(C) SEPARATE OPERATION OF CORPORATIONS.—

"(i) IN GENERAL.—The funds and assets of the Association shall at all times be maintained separately from the funds and assets of the Holding Company or any subsidiary of the Holding Company and may be used by the Association solely to carry out the Association's purposes and to fulfill the Association's obligations.

"(ii) BOOKS AND RECORDS.—The Association shall maintain books and records that clearly reflect the assets and liabilities of the Association, separate from the assets and liabilities of the Holding Company or any subsidiary of the Holding Company.

"(iii) CORPORATE OFFICE.—The Association shall maintain a corporate office that is physically separate from any office of the Holding Company or any subsidiary of the Holding Company.

"(iv) DIRECTOR.—No director of the Association who is appointed by the President pursuant to section 439(c)(1)(A) may serve as a director of the Holding Company.

"(v) ONE OFFICER REQUIREMENT.—At least one officer of the Association shall be an officer solely of the Association.

"(vi) TRANSACTIONS.—Transactions between the Association and the Holding Company or any subsidiary of the Holding Company, including any loan servicing arrangements, shall be on terms no less favorable to the Association than the Association could obtain from an unrelated third party offering comparable services.

"(vii) CREDIT PROHIBITION.—The Association shall not extend credit to the Holding Company or any subsidiary of the Holding Company nor guarantee or provide any credit enhancement to any debt obligations of the Holding Company or any subsidiary of the Holding Company.

"(viii) AMOUNTS COLLECTED.—Any amounts collected on behalf of the Association by the Holding Company or any subsidiary of the Holding Company with respect to the assets of the Association, pursuant to a servicing contract or other arrangement between the Association and the Holding Company or any subsidiary of the Holding Company, shall be collected solely for the benefit of the Association and shall be immediately deposited by the Holding Company or such subsidiary to an account under the sole control of the Association.

"(D) ENCUMBRANCE OF ASSETS.—Notwithstanding any Federal or State law, rule, or regulation, or legal or equitable principle, doctrine, or theory to the contrary, under no circumstances shall the assets of the Association be available or used to pay claims or debts of or incurred by the Holding Company. Nothing in this subparagraph shall be construed to limit the right of the Association to pay dividends not otherwise prohibited under this subparagraph or to limit any liability of the Holding Company explicitly provided for in this section.

"(E) HOLDING COMPANY ACTIVITIES.—After the reorganization effective date and prior to the dissolution date, all business activities of the Holding Company shall be conducted through subsidiaries of the Holding Company.

"(F) CONFIDENTIALITY.—Any information provided by the Association pursuant to this section shall be subject to the same confidentiality obligations contained in section 439(r)(12).

"(G) DEFINITION.—For purposes of this paragraph, the term 'associated person' means any person, other than a natural person, who is directly or indirectly controlling, controlled by, or under common control with, the Association.

"(9) ISSUANCE OF STOCK WARRANTS.—

"(A) IN GENERAL.—On the reorganization effective date, the Holding Company shall issue to the District of Columbia Financial Responsibility and Management Assistance Authority a number of stock warrants that is equal to one percent of the outstanding shares of the Association, determined as of the last day of the fiscal quarter preceding the date of enactment of this section, with each stock warrant entitling the holder of the stock warrant to purchase from the Holding Company one share of the registered common stock of the Holding Company or the Holding Company's successors or assigns, at any time on or before September 30, 2008. The exercise price for such warrants shall be an amount equal to the average closing price of the common stock of the Association for the 20 business days prior to the date of enactment of this section on the exchange or market which is then the primary exchange or market for the common stock of the Association. The number of shares of Holding Company common stock subject to each stock warrant and the exercise price of each stock warrant shall be adjusted as necessary to reflect—

"(i) the conversion of Association common stock into Holding Company common stock as part of the plan of reorganization approved by the Association's shareholders; and

"(ii) any issuance or sale of stock (including issuance or sale of treasury stock), stock split, recapitalization, reorganization, or other corporate event, if agreed to by the Secretary of the Treasury and the Association.

"(B) AUTHORITY TO SELL OR EXERCISE STOCK WARRANTS; DEPOSIT OF PROCEEDS.—The District of Columbia Financial Responsibility and Management Assistance Authority is authorized to sell or exercise the stock warrants described in subparagraph (A). The District of Columbia Financial Responsibility and Management Assistance Authority shall deposit into the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996 amounts collected from the sale and proceeds resulting from the exercise of the stock warrants pursuant to this subparagraph.

"(10) RESTRICTIONS ON TRANSFER OF ASSOCIATION SHARES AND BANKRUPTCY OF ASSOCIATION.—After the reorganization effective date, the Holding Company shall not sell, pledge, or otherwise transfer the outstanding shares of the Association, or agree to or cause the liquidation of the Association or cause the Association to file a petition for bankruptcy under title 11, United States Code, without prior approval of the Secretary of the Treasury and the Secretary of Education.

"(d) TERMINATION OF THE ASSOCIATION.—In the event the shareholders of the Association approve a plan of reorganization under subsection (b), the Association shall dissolve, and the Association's separate existence shall terminate on September 30, 2008, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days after receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to section 439(q) or continues to be needed to purchase loans under an agreement with the Secretary described in subsection (c) (6). On the dissolution date, the Association shall take the following actions:

"(1) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement that is in form and substance satisfactory to the Secretary of the Treasury, the Association and the appointed trustee, irrevocably transfer all remaining obligations of the Association to the trust and irrevocably deposit or cause to be deposited into such trust, to be held as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms. To the extent the Association cannot provide money or qualifying obligations in the amount required, the Holding Company shall be required to transfer money or qualifying obligations to the trust in the amount necessary to prevent any deficiency.

"(2) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust.

"(3) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association not transferred to the trust, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding. Any obligations of the Association which cannot be fully satisfied shall become liabilities of the Holding Company as of the date of dissolution.

"(4) TRANSFER OF REMAINING ASSETS.—After compliance with paragraphs (1) and (3), any remaining assets of the trust shall be transferred to the Holding Company or any subsidiary of the Holding Company, as directed by the Holding Company.

"(e) OPERATION OF THE HOLDING COMPANY.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) HOLDING COMPANY BOARD OF DIRECTORS.—The number of members and composition of the Board of Directors of the Holding Company shall be determined as set forth in the Holding Company's charter or like instrument (as amended from time to time) or bylaws (as amended from time to time) and as permitted under the laws of the jurisdiction of the Holding Company's incorporation.

"(2) HOLDING COMPANY NAME.—The names of the Holding Company and any subsidiary of the Holding Company (other than the Association)—

"(A) may not contain the name 'Student Loan Marketing Association'; and

"(B) may contain, to the extent permitted by applicable State or District of Columbia law, 'Sallie Mae' or variations thereof, or such other names as the Board of Directors of the Association or the Holding Company deems appropriate.

"(3) USE OF SALLIE MAE NAME.—Subject to paragraph (2), the Association may assign to the Holding Company, or any subsidiary of the Holding Company, the 'Sallie Mae' name as a trademark or service mark, except that neither the Holding Company nor any subsidiary of the Holding Company (other than the Association or any subsidiary of the Association) may use the 'Sallie Mae' name on, or to identify the issuer of, any debt obligation or other security offered or sold by the Holding Company or any subsidiary of the Holding Company (other than a debt obligation or other security issued to and held by the Holding Company or any subsidiary of the Holding Company). The Association shall remit to the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996, $5,000,000, within 60 days of the reorganization effective date as compensation for the right to assign the 'Sallie Mae' name as a trademark or service mark.

"(4) DISCLOSURE REQUIRED.—Until 3 years after the dissolution date, the Holding Company, and any subsidiary of the Holding Company (other than the Association), shall prominently display—

"(A) in any document offering the Holding Company's securities, a statement that the obligations of the Holding Company and any subsidiary of the Holding Company are not guaranteed by the full faith and credit of the United States; and

"(B) in any advertisement or promotional materials which use the 'Sallie Mae' name or mark, a statement that neither the Holding Company nor any subsidiary of the Holding Company is a government-sponsored enterprise or instrumentality of the United States.

"(f) STRICT CONSTRUCTION.—Except as specifically set forth in this section, nothing in this section shall be construed to limit the authority of the Association as a federally chartered corporation, or of the Holding Company as a State or District of Columbia chartered corporation.

"(g) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.

"(h) DEADLINE FOR REORGANIZATION EFFECTIVE DATE.—This section shall be of no further force and effect in the event that the reorganization effective date does not occur on or before 18 months after the date of enactment of this section.

"(i) DEFINITIONS.—For purposes of this section:

"(1) ASSOCIATION.—The term 'Association' means the Student Loan Marketing Association.

"(2) DISSOLUTION DATE.—The term 'dissolution date' means September 30, 2008, or such earlier date as the Secretary of Education permits the transfer of remaining obligations in accordance with subsection (d).

"(3) HOLDING COMPANY.—The term 'Holding Company' means the new business corporation established pursuant to this section by the Association under the laws of any State of the United States or the District of Columbia for the purposes of the reorganization and restructuring described in subsection (a).

"(4) REMAINING OBLIGATIONS.—The term 'remaining obligations' means the debt obligations of the Association outstanding as of the dissolution date.

"(5) REMAINING PROPERTY.—The term 'remaining property' means the following assets and liabilities of the Association which are outstanding as of the reorganization effective date:

"(A) Debt obligations issued by the Association.

"(B) Contracts relating to interest rate, currency, or commodity positions or protections.

"(C) Investment securities owned by the Association.

"(D) Any instruments, assets, or agreements described in section 439(d) (including, without limitation, all student loans and agreements relating to the purchase and sale of student loans, forward purchase and lending commitments, warehousing advances, academic facilities obligations, letters of credit, standby bond purchase agreements, liquidity agreements, and student loan revenue bonds or other loans).

"(E) Except as specifically prohibited by this section or section 439, any other nonmaterial assets or liabilities of the Association which the Association's Board of Directors determines to be necessary or appropriate to the Association's operations.

"(6) REORGANIZATION.—The term 'reorganization' means the restructuring event or events (including any merger event) giving effect to the Holding Company structure described in subsection (a).

"(7) REORGANIZATION EFFECTIVE DATE.—The term 'reorganization effective date' means the effective date of the reorganization as determined by the Board of Directors of the Association, which shall not be earlier than the date that shareholder approval is obtained pursuant to subsection (b) and shall not be later than the date that is 18 months after the date of enactment of this section.

"(8) SUBSIDIARY.—The term 'subsidiary' means one or more direct or indirect subsidiaries.".

(b) TECHNICAL AMENDMENTS.—

(1) ELIGIBLE LENDER.—

(A) AMENDMENTS TO THE HIGHER EDUCATION ACT.—

<< 20 USCA § 1085 >>

(i) DEFINITION OF ELIGIBLE LENDER.—Section 435(d)(1)(F) of the Higher Education Act of 1965 (20 U.S.C. 1085(d) (1)(F)) is amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440,".

<< 20 USCA §§ 1078–3, 1085 >>

(ii) DEFINITION OF ELIGIBLE LENDER AND FEDERAL CONSOLIDATION LOANS.—Sections 435(d)(1)(G) and 428C(a)(1)(A) of such Act (20 U.S.C. 1085(d)(1)(G) and 1078–3(a)(1)(A)) are each amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440".

<< 20 USCA § 1078–3 NOTE >>

(B) EFFECTIVE DATE.—The amendments made by this paragraph shall take effect on the reorganization effective date as defined in section 440(h) of the Higher Education Act of 1965 (as added by subsection (a)).

<< 20 USCA § 1087–2 >>

(2) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is amended—

(A) in the first sentence of paragraph (12), by inserting "or the Association's associated persons" after "by the Association";

(B) by redesignating paragraph (13) as paragraph (15); and

(C) by inserting after paragraph (12) the following new paragraph:

"(13) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.".

(3) FINANCIAL SAFETY AND SOUNDNESS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

(A) in paragraph (1)—

(i) by striking "and" at the end of subparagraph (A);

(ii) by striking the period at the end of subparagraph (B) and inserting "; and"; and

(iii) by adding at the end the following new subparagraph:

"(C)(i) financial statements of the Association within 45 days of the end of each fiscal quarter; and

"(ii) reports setting forth the calculation of the capital ratio of the Association within 45 days of the end of each fiscal quarter.";

(B) in paragraph (2)—

(i) by striking clauses (i) and (ii) of subparagraph (A) and inserting the following:

"(i) appoint auditors or examiners to conduct audits of the Association from time to time to determine the condition of the Association for the purpose of assessing the Association's financial safety and soundness and to determine whether the requirements of this section and section 440 are being met; and

"(ii) obtain the services of such experts as the Secretary of the Treasury determines necessary and appropriate, as authorized by section 3109 of title 5, United States Code, to assist in determining the condition of the Association for the purpose of assessing the Association's financial safety and soundness, and to determine whether the requirements of this section and section 440 are being met."; and

 (ii) by adding at the end the following new subparagraph:

"(D) ANNUAL ASSESSMENT.—

 "(i) IN GENERAL.—For each fiscal year beginning on or after October 1, 1996, the Secretary of the Treasury may establish and collect from the Association an assessment (or assessments) in amounts sufficient to provide for reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440 during such fiscal year. In no event may the total amount so assessed exceed, for any fiscal year, $800,000, adjusted for each fiscal year ending after September 30, 1997, by the ratio of the Consumer Price Index for All Urban Consumers (issued by the Bureau of Labor Statistics) for the final month of the fiscal year preceding the fiscal year for which the assessment is made to the Consumer Price Index for All Urban Consumers for September 1997.

 "(ii) DEPOSIT.—Amounts collected from assessments under this subparagraph shall be deposited in an account within the Treasury of the United States as designated by the Secretary of the Treasury for that purpose. The Secretary of the Treasury is authorized and directed to pay out of any funds available in such account the reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440. None of the funds deposited into such account shall be available for any purpose other than making payments for such costs and expenses."; and

(C) by inserting after paragraph (13) (as added by paragraph (2)(C)) the following new paragraph:

"(14) ACTIONS BY SECRETARY.—

"(A) IN GENERAL.—For any fiscal quarter ending after January 1, 2000, the Association shall have a capital ratio of at least 2.25 percent. The Secretary of the Treasury may, whenever such capital ratio is not met, take any one or more of the actions described in paragraph (7), except that—

 "(i) the capital ratio to be restored pursuant to paragraph (7)(D) shall be 2.25 percent; and

 "(ii) if the relevant capital ratio is in excess of or equal to 2 percent for such quarter, the Secretary of the Treasury shall defer taking any of the actions set forth in paragraph (7) until the next succeeding quarter and may then proceed with any such action only if the capital ratio of the Association remains below 2.25 percent.

"(B) APPLICABILITY.—The provisions of paragraphs (4), (5), (6), (8), (9), (10), and (11) shall be of no further application to the Association for any period after January 1, 2000.".

 (4) INFORMATION REQUIRED; DIVIDENDS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

 (A) by adding at the end of paragraph (2) (as amended in paragraph (3)(B)(ii)) the following new subparagraph:

"(E) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—

 "(i) IN GENERAL.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

  "(I) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

  "(II) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

 "(ii) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of such information to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the preceding sentence and clause (i), require the Association to make reports concerning the activities of any associated person, whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) DEFINITION.—For purposes of this subparagraph, the term 'associated person' means any person, other than a natural person, directly or indirectly controlling, controlled by, or under common control with the Association."; and

(B) by adding at the end the following new paragraphs:

"(16) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards set forth in this section.

"(17) CERTIFICATION PRIOR TO PAYMENT OF DIVIDEND.—Prior to the payment of any dividend under paragraph (16), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (16) and shall provide copies of all calculations needed to make such certification.".

(c) SUNSET OF THE ASSOCIATION'S CHARTER IF NO REORGANIZATION PLAN OCCURS.—Section 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) is amended by adding at the end the following new subsection:

"(s) CHARTER SUNSET.—

"(1) APPLICATION OF PROVISIONS.—This subsection applies beginning 18 months and one day after the date of enactment of this subsection if no reorganization of the Association occurs in accordance with the provisions of section 440.

"(2) SUNSET PLAN.—

"(A) PLAN SUBMISSION BY THE ASSOCIATION.—Not later than July 1, 2007, the Association shall submit to the Secretary of the Treasury and to the Chairman and Ranking Member of the Committee on Labor and Human Resources of the Senate and the Chairman and Ranking Member of the Committee on Economic and Educational Opportunities of the House of Representatives, a detailed plan for the orderly winding up, by July 1, 2013, of business activities conducted pursuant to the charter set forth in this section. Such plan shall—

"(i) ensure that the Association will have adequate assets to transfer to a trust, as provided in this subsection, to ensure full payment of remaining obligations of the Association in accordance with the terms of such obligations;

"(ii) provide that all assets not used to pay liabilities shall be distributed to shareholders as provided in this subsection; and

"(iii) provide that the operations of the Association shall remain separate and distinct from that of any entity to which the assets of the Association are transferred.

"(B) AMENDMENT OF THE PLAN BY THE ASSOCIATION.—The Association shall from time to time amend such plan to reflect changed circumstances, and submit such amendments to the Secretary of the Treasury and to the Chairman and Ranking Minority Member of the Committee on Labor and Human Resources of the Senate and Chairman and Ranking Minority Member of the Committee on Economic and Educational Opportunities of the House of Representatives. In no case may any amendment extend the date for full implementation of the plan beyond the dissolution date provided in paragraph (3).

"(C) PLAN MONITORING.—The Secretary of the Treasury shall monitor the Association's compliance with the plan and shall continue to review the plan (including any amendments thereto).

"(D) AMENDMENT OF THE PLAN BY THE SECRETARY OF THE TREASURY.—The Secretary of the Treasury may require the Association to amend the plan (including any amendments to the plan), if the Secretary of the Treasury deems such amendments necessary to ensure full payment of all obligations of the Association.

"(E) IMPLEMENTATION BY THE ASSOCIATION.—The Association shall promptly implement the plan (including any amendments to the plan, whether such amendments are made by the Association or are required to be made by the Secretary of the Treasury).

"(3) DISSOLUTION OF THE ASSOCIATION.—The Association shall dissolve and the Association's separate existence shall terminate on July 1, 2013, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days of receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to subsection (q) or continues to be needed to purchase loans under an agreement with the Secretary described in paragraph (4) (A). On the dissolution date, the Association shall take the following actions:

"(A) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement in form and substance satisfactory to the Secretary of the Treasury, the Association, and the appointed trustee, irrevocably transfer all remaining obligations of the Association to a trust and irrevocably deposit or cause to be deposited into such trust, to be held

AR03095

as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms.

"(B) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust. Upon the fulfillment of the trustee's duties under the trust, any remaining assets of the trust shall be transferred to the persons who, at the time of the dissolution, were the shareholders of the Association, or to the legal successors or assigns of such persons.

"(C) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding.

"(D) TRANSFER OF REMAINING ASSETS.—After compliance with subparagraphs (A) and (C), the Association shall transfer to the shareholders of the Association any remaining assets of the Association.

"(4) RESTRICTIONS RELATING TO WINDING UP.—

"(A) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY THE ASSOCIATION.—

"(i) IN GENERAL.—Beginning on July 1, 2009, the Association shall not engage in any new business activities or acquire any additional program assets (including acquiring assets pursuant to contractual commitments) described in subsection (d) other than in connection with the Association—

"(I) serving as a lender of last resort pursuant to subsection (q); and

"(II) purchasing loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(ii) AGREEMENT.—The Secretary is authorized to enter into an agreement described in subclause (II) of clause (i) with the Association covering such secondary market activities. Any agreement entered into under such subclause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under subsection (h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(B) ISSUANCE OF DEBT OBLIGATIONS DURING THE WIND UP PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—The Association shall not issue debt obligations which mature later than July 1, 2013, except in connection with serving as a lender of last resort pursuant to subsection (q) or with purchasing loans under an agreement with the Secretary as described in subparagraph (A). Nothing in this subsection shall modify the attributes accorded the debt obligations of the Association by this section, regardless of whether such debt obligations are transferred to a trust in accordance with paragraph (3).

"(C) USE OF ASSOCIATION NAME.—The Association may not transfer or permit the use of the name 'Student Loan Marketing Association', 'Sallie Mae', or any variation thereof, to or by any entity other than a subsidiary of the Association.".

(d) REPEALS.—

<< 20 USCA §§ 1087–2, 1087–3 >>

(1) IN GENERAL.—Sections 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) and 440 of such Act (as added by subsection (a) of this section) are repealed.

<< 20 USCA § 1087–2 NOTE >>

(2) EFFECTIVE DATE.—The repeals made by paragraph (1) shall be effective one year after—

(A) the date on which all of the obligations of the trust established under section 440(d)(1) of the Higher Education Act of 1965 (as added by subsection (a)) have been extinguished, if a reorganization occurs in accordance with section 440 of such Act; or

(B) the date on which all of the obligations of the trust established under subsection 439(s)(3)(A) of such Act (as added by subsection (c)) have been extinguished, if a reorganization does not occur in accordance with section 440 of such Act.

(e) ASSOCIATION NAMES.—Upon dissolution in accordance with section 439(s) of the Higher Education Act of 1965 (20 U.S.C. 1087–2), the names "Student Loan Marketing Association", "Sallie Mae", and any variations thereof may not be used by any entity engaged in any business similar to the business conducted pursuant to section 439 of such Act (as such section was in effect on the date of enactment of this Act) without the approval of the Secretary of the Treasury.

(f) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of subsection (e), or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with subsection (e).

<< 20 USCA § 1132f–10 >>

SEC. 603. CONNIE LEE PRIVATIZATION.

(a) STATUS OF THE CORPORATION AND CORPORATE POWERS; OBLIGATIONS NOT FEDERALLY GUARANTEED.—

(1) STATUS OF THE CORPORATION.—The Corporation shall not be an agency, instrumentality, or establishment of the United States Government, nor a Government corporation, nor a Government controlled corporation, as such terms are defined in section 103 of title 5, United States Code. No action under section 1491 of title 28, United States Code (commonly known as the Tucker Act) shall be allowable against the United States based on the actions of the Corporation.

(2) CORPORATE POWERS.—The Corporation shall be subject to the provisions of this section, and, to the extent not inconsistent with this section, to the District of Columbia Business Corporation Act (or the comparable law of another State, if applicable). The Corporation shall have the powers conferred upon a corporation by the District of Columbia Business Corporation Act (or such other applicable State law) as from time to time in effect in order to conduct the Corporation's affairs as a private, for-profit corporation and to carry out the Corporation's purposes and activities incidental thereto. The Corporation shall have the power to enter into contracts, to execute instruments, to incur liabilities, to provide products and services, and to do all things as are necessary or incidental to the proper management of the Corporation's affairs and the efficient operation of a private, for-profit business.

(3) LIMITATION ON OWNERSHIP OF STOCK.—

(A) STUDENT LOAN MARKETING ASSOCIATION.—The Student Loan Marketing Association shall not increase its share of the ownership of the Corporation in excess of 42 percent of the shares of stock of the Corporation outstanding on the date of enactment of this Act. The Student Loan Marketing Association shall not control the operation of the Corporation, except that the Student Loan Marketing Association may participate in the election of directors as a shareholder, and may continue to exercise the Student Loan Marketing Association's right to appoint directors under section 754 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3) as long as that section is in effect.

(B) PROHIBITION.—Until such time as the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association shall not provide financial support or guarantees to the Corporation.

(C) FINANCIAL SUPPORT OR GUARANTEES.—After the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association may provide financial support or guarantees to the Corporation, if such support or guarantees are subject to terms and conditions that are no more advantageous to the Corporation than the terms and conditions the Student Loan Marketing Association provides to other entities, including, where applicable, other monoline financial guaranty corporations in which the Student Loan Marketing Association has no ownership interest.

(4) NO FEDERAL GUARANTEE.—

(A) OBLIGATIONS INSURED BY THE CORPORATION.—

(i) FULL FAITH AND CREDIT OF THE UNITED STATES.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the full faith and credit of the United States.

(ii) STUDENT LOAN MARKETING ASSOCIATION.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the Student Loan Marketing Association.

(iii) SPECIAL RULE.—This paragraph shall not affect the determination of whether such obligation is guaranteed for purposes of Federal income taxes.

(B) SECURITIES OFFERED BY THE CORPORATION.—No debt or equity securities of the Corporation shall be deemed to be guaranteed by the full faith and credit of the United States.

(5) DEFINITION.—The term "Corporation" as used in this section means the College Construction Loan Insurance Association as in existence on the day before the date of enactment of this Act, and any successor corporation.

(b) RELATED PRIVATIZATION REQUIREMENTS.—

(1) NOTICE REQUIREMENTS.—

(A) IN GENERAL.—During the six-year period following the date of enactment this Act, the Corporation shall include, in each of the Corporation's contracts for the insurance, guarantee, or reinsurance of obligations, and in each document offering debt or equity securities of the Corporation, a prominent statement providing notice that—

(i) such obligations or such securities, as the case may be, are not obligations of the United States, nor are such obligations or such securities, as the case may be, guaranteed in any way by the full faith and credit of the United States; and

(ii) the Corporation is not an instrumentality of the United States.

(B) ADDITIONAL NOTICE.—During the five-year period following the sale of stock pursuant to subsection (c)(1), in addition to the notice requirements in subparagraph (A), the Corporation shall include, in each of the contracts and documents referred to in such subparagraph, a prominent statement providing notice that the United States is not an investor in the Corporation.

(2) CORPORATE CHARTER.—The Corporation's charter shall be amended as necessary and without delay to conform to the requirements of this section.

(3) CORPORATE NAME.—The name of the Corporation, or of any direct or indirect subsidiary thereof, may not contain the term "College Construction Loan Insurance Association", or any substantially similar variation thereof.

(4) ARTICLES OF INCORPORATION.—The Corporation shall amend the Corporation's articles of incorporation without delay to reflect that one of the purposes of the Corporation shall be to guarantee, insure, and reinsure bonds, leases, and other evidences of debt of educational institutions, including Historically Black Colleges and Universities and other academic institutions which are ranked in the lower investment grade category using a nationally recognized credit rating system.

(5) REQUIREMENTS UNTIL STOCK SALE.—Notwithstanding subsection (d), the requirements of sections 754 and 760 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3 and 1132f–9), as such sections were in effect on the day before the date of enactment of this Act, shall continue to be effective until the day immediately following the date of closing of the purchase of the Secretary of Education's stock (or the date of closing of the final purchase, in the case of multiple transactions) pursuant to subsection (c)(1) of this Act.

(c) SALE OF FEDERALLY OWNED STOCK.—

(1) PURCHASE BY THE CORPORATION.—The Secretary of the Treasury shall sell and the Corporation shall purchase, within 90 days after the date of enactment of this Act, the stock of the Corporation held by the Secretary of Education at a price determined by the binding, independent appraisal of a nationally recognized financial firm, except that the 90–day period may be extended by mutual agreement of the Secretary of the Treasury and the Corporation to not more than 150 days after the date of enactment of this Act. The appraiser shall be jointly selected by the Secretary of the Treasury and the Corporation. In the event that the Secretary of the Treasury and the Corporation cannot agree on the appraiser, then the Secretary of the Treasury and the Corporation shall name an independent third party to select the appraiser.

(2) REIMBURSEMENT OF COSTS AND EXPENSES OF SALE.—The Secretary of the Treasury shall be reimbursed from the proceeds of the sale of the stock under this subsection for all reasonable costs and expenses related to such sale, except that one-half of all reasonable costs and expenses relating to the independent appraisal under paragraph (1) shall be borne by the Corporation.

(3) DEPOSIT INTO ACCOUNT.—Amounts collected from the sale of stock pursuant to this subsection that are not used to reimburse the Secretary of the Treasury pursuant to paragraph (2) shall be deposited into the account established under subsection (e).

(4) ASSISTANCE BY THE CORPORATION.—The Corporation shall provide such assistance as the Secretary of the Treasury and the Secretary of Education may require to facilitate the sale of the stock under this subsection.

(5) REPORT TO CONGRESS.—Not later than 6 months after the date of enactment of this Act, the Secretary of the Treasury shall report to the appropriate committees of Congress on the completion and terms of the sale of stock of the Corporation pursuant to this subsection.

<< 20 USCA §§ 1132f, 1132f–1, 1132f–2, 1132f–3, 1132f–4, 1132f–5, 1132f–6, 1132f–7, 1132f–8, 1132f–9 >>

<< 20 USCA § 1132f–10 >>

(d) REPEAL OF STATUTORY RESTRICTIONS AND RELATED PROVISIONS.—Part D of title VII of the Higher Education Act of 1965 (20 U.S.C. 1132f et seq.) is repealed.

<< 20 USCA § 1132f–10 >>

(e) ESTABLISHMENT OF ACCOUNT.—
(1) IN GENERAL.—Notwithstanding any other provision of law, the District of Columbia Financial Responsibility and Management Assistance Authority shall establish an account to receive—
(A) amounts collected from the sale and proceeds resulting from the exercise of stock warrants pursuant to section 440(c)(9) of the Higher Education Act of 1965;
(B) amounts and proceeds remitted as compensation for the right to assign the "Sallie Mae" name as a trademark or service mark pursuant to section 440(e)(3) of the Higher Education Act of 1965; and
(C) amounts and proceeds collected from the sale of the stock of the Corporation and deposited pursuant to subsection (c)(3).
(2) AMOUNTS AND PROCEEDS.—
(A) AMOUNTS AND PROCEEDS RELATING TO SALLIE MAE.—The amounts and proceeds described in subparagraphs (A) and (B) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia or to carry out the District of Columbia School Reform Act of 1995.
(B) AMOUNTS AND PROCEEDS RELATING TO CONNIE LEE.—The amounts and proceeds described in subparagraph (C) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia.

<< 20 USCA § 1087–4 >>

SEC. 604. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by adding after section 440 (as added by section 602) the following new section:

"SEC. 440A. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

"The Student Loan Marketing Association (and, if the Association is privatized under section 440, any successor entity functioning as a secondary market for loans under this part, including the Holding Company described in such section) shall not engage directly or indirectly in any pattern or practice that results in a denial of a borrower's access to loans under this part because of the borrower's race, sex, color, religion, national origin, age, disability status, income, attendance at a particular eligible institution, length of the borrower's educational program, or the borrower's academic year at an eligible institution.".

TITLE VII—MUSEUM AND LIBRARY SERVICES ACT OF 1996

<< 20 USCA § 9101 NOTE >>

SECTION 701. SHORT TITLE.

This title may be cited as the "Museum and Library Services Act of 1996".

<< 20 USCA §§ 961, 962, 963, 964, 965, 966, 967, 968, 969 >>

<< 20 USCA § 961 NOTE >>

SEC. 702. MUSEUM AND LIBRARY SERVICES.

 The Museum Services Act (20 U.S.C. 961 et seq.) is amended to read as follows:

"TITLE II—MUSEUM AND LIBRARY SERVICES

<< 20 USCA Ch. 72 >>

"Subtitle A—General Provisions

<< 20 USCA § 9101 NOTE >>

"SEC. 201. SHORT TITLE.

 "This title may be cited as the 'Museum and Library Services Act'.

<< 20 USCA § 9101 >>

"SEC. 202. GENERAL DEFINITIONS.

 "As used in this title:
  "(1) COMMISSION.—The term 'Commission' means the National Commission on Libraries and Information Science established under section 3 of the National Commission on Libraries and Information Sciences Act (20 U.S.C. 1502).
  "(2) DIRECTOR.—The term 'Director' means the Director of the Institute appointed under section 204.
  "(3) INSTITUTE.—The term 'Institute' means the Institute of Museum and Library Services established under section 203.
  "(4) MUSEUM BOARD.—The term 'Museum Board' means the National Museum Services Board established under section 275.

<< 20 USCA § 9102 >>

"SEC. 203. INSTITUTE OF MUSEUM AND LIBRARY SERVICES.

  "(a) ESTABLISHMENT.—There is established, within the National Foundation on the Arts and the Humanities, an Institute of Museum and Library Services.
  "(b) OFFICES.—The Institute shall consist of an Office of Museum Services and an Office of Library Services. There shall be a National Museum Services Board in the Office of Museum Services.

<< 20 USCA § 9103 >>

"SEC. 204. DIRECTOR OF THE INSTITUTE.

 "(a) APPOINTMENT.—
  "(1) IN GENERAL.—The Institute shall be headed by a Director, appointed by the President, by and with the advice and consent of the Senate.
  "(2) TERM.—The Director shall serve for a term of 4 years.
  "(3) QUALIFICATIONS.—Beginning with the first individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to library and information services. Beginning with the second individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to museum services.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 "(b) COMPENSATION.—The Director may be compensated at the rate provided for level III of the Executive Schedule under section 5314 of title 5, United States Code.

 "(c) DUTIES AND POWERS.—The Director shall perform such duties and exercise such powers as may be prescribed by law, including awarding financial assistance for activities described in this title.

 "(d) NONDELEGATION.—The Director shall not delegate any of the functions of the Director to any person who is not an officer or employee of the Institute.

 "(e) COORDINATION.—The Director shall ensure coordination of the policies and activities of the Institute with the policies and activities of other agencies and offices of the Federal Government having interest in and responsibilities for the improvement of museums and libraries and information services.

<< 20 USCA § 9104 >>

"SEC. 205. DEPUTY DIRECTORS.

 "The Office of Library Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have a graduate degree in library science and expertise in library and information services. The Office of Museum Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have expertise in museum services.

<< 20 USCA § 9105 >>

"SEC. 206. PERSONNEL.

 "(a) IN GENERAL.—The Director may, in accordance with applicable provisions of title 5, United States Code, appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute.

 "(b) VOLUNTARY SERVICES.—The Director may accept and utilize the voluntary services of individuals and reimburse the individuals for travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

<< 20 USCA § 9106 >>

"SEC. 207. CONTRIBUTIONS.

 "The Institute is authorized to solicit, accept, receive, and invest in the name of the United States, gifts, bequests, or devises of money and other property or services and to use such property or services in furtherance of the functions of the Institute. Any proceeds from such gifts, bequests, or devises, after acceptance by the Institute, shall be paid by the donor or the representative of the donor to the Director. The Director shall enter the proceeds in a special-interest bearing account to the credit of the Institute for the purposes specified in each case.

<< 20 USCA Ch. 72 >>

"Subtitle B—Library Services and Technology

<< 20 USCA § 9101 NOTE >>

"SEC. 211. SHORT TITLE.

 "This subtitle may be cited as the 'Library Services and Technology Act'.

<< 20 USCA § 9121 >>

"SEC. 212. PURPOSE.

 "It is the purpose of this subtitle—

"(1) to consolidate Federal library service programs;

"(2) to stimulate excellence and promote access to learning and information resources in all types of libraries for individuals of all ages;

"(3) to promote library services that provide all users access to information through State, regional, national and international electronic networks;

"(4) to provide linkages among and between libraries; and

"(5) to promote targeted library services to people of diverse geographic, cultural, and socioeconomic backgrounds, to individuals with disabilities, and to people with limited functional literacy or information skills.

<< 20 USCA § 9122 >>

"SEC. 213. DEFINITIONS.

"As used in this subtitle:

"(1) INDIAN TRIBE.—The term 'Indian tribe' means any tribe, band, nation, or other organized group or community, including any Alaska native village, regional corporation, or village corporation, as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), which is recognized by the Secretary of the Interior as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"(2) LIBRARY.—The term 'library' includes—

"(A) a public library;

"(B) a public elementary school or secondary school library;

"(C) an academic library;

"(D) a research library, which for the purposes of this subtitle means a library that—

"(i) makes publicly available library services and materials suitable for scholarly research and not otherwise available to the public; and

"(ii) is not an integral part of an institution of higher education; and

"(E) a private library, but only if the State in which such private library is located determines that the library should be considered a library for purposes of this subtitle.

"(3) LIBRARY CONSORTIUM.—The term 'library consortium' means any local, statewide, regional, interstate, or international cooperative association of library entities which provides for the systematic and effective coordination of the resources of school, public, academic, and special libraries and information centers, for improved services for the clientele of such library entities.

"(4) STATE.—The term 'State', unless otherwise specified, includes each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(5) STATE LIBRARY ADMINISTRATIVE AGENCY.—The term 'State library administrative agency' means the official agency of a State charged by the law of the State with the extension and development of public library services throughout the State.

"(6) STATE PLAN.—The term 'State plan' means the document which gives assurances that the officially designated State library administrative agency has the fiscal and legal authority and capability to administer all aspects of this subtitle, provides assurances for establishing the State's policies, priorities, criteria, and procedures necessary to the implementation of all programs under this subtitle, submits copies for approval as required by regulations promulgated by the Director, identifies a State's library needs, and sets forth the activities to be taken toward meeting the identified needs supported with the assistance of Federal funds made available under this subtitle.

<< 20 USCA § 9123 >>

"SEC. 214. AUTHORIZATION OF APPROPRIATIONS.

"(a) AUTHORIZATION OF APPROPRIATIONS.—

"(1) IN GENERAL.—There are authorized to be appropriated $150,000,000 for fiscal year 1997 and such sums as may be necessary for each of the fiscal years 1998 through 2002 to carry out this subtitle.

"(2) TRANSFER.—The Secretary of Education shall—

"(A) transfer promptly to the Director any funds appropriated under the authority of paragraph (1), to enable the Director to carry out this subtitle; and

"(B) not exercise any authority concerning the administration of this title other than the transfer described in subparagraph (A).

"(b) FORWARD FUNDING.—

"(1) IN GENERAL.—To the end of affording the responsible Federal, State, and local officers adequate notice of available Federal financial assistance for carrying out ongoing library activities and projects, appropriations for grants, contracts, or other payments under any program under this subtitle are authorized to be included in the appropriations Act for the fiscal year preceding the fiscal year during which such activities and projects shall be carried out.

"(2) ADDITIONAL AUTHORIZATION OF APPROPRIATIONS.—In order to effect a transition to the timing of appropriation action authorized by subsection (a), the application of this section may result in the enactment, in a fiscal year, of separate appropriations for a program under this subtitle (whether in the same appropriations Act or otherwise) for two consecutive fiscal years.

"(c) ADMINISTRATION.—Not more than 3 percent of the funds appropriated under this section for a fiscal year may be used to pay for the Federal administrative costs of carrying out this subtitle.

<< 20 USCA Ch. 72 >>

"CHAPTER 1—BASIC PROGRAM REQUIREMENTS

<< 20 USCA § 9131 >>

"SEC. 221. RESERVATIONS AND ALLOTMENTS.

"(a) RESERVATIONS.—

"(1) IN GENERAL.—From the amount appropriated under the authority of section 214 for any fiscal year, the Director—

"(A) shall reserve 1½ percent to award grants in accordance with section 261; and

"(B) shall reserve 4 percent to award national leadership grants or contracts in accordance with section 262.

"(2) SPECIAL RULE.—If the funds reserved pursuant to paragraph (1)(B) for a fiscal year have not been obligated by the end of such fiscal year, then such funds shall be allotted in accordance with subsection (b) for the fiscal year succeeding the fiscal year for which the funds were so reserved.

"(b) ALLOTMENTS.—

"(1) IN GENERAL.—From the sums appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year, the Director shall award grants from minimum allotments, as determined under paragraph (3), to each State. Any sums remaining after minimum allotments are made for such year shall be allotted in the manner set forth in paragraph (2).

"(2) REMAINDER.—From the remainder of any sums appropriated under the authority of section 214 that are not reserved under subsection (a) and not allotted under paragraph (1) for any fiscal year, the Director shall award grants to each State in an amount that bears the same relation to such remainder as the population of the State bears to the population of all States.

"(3) MINIMUM ALLOTMENT.—

"(A) IN GENERAL.—For the purposes of this subsection, the minimum allotment for each State shall be $340,000, except that the minimum allotment shall be $40,000 in the case of the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(B) RATABLE REDUCTIONS.—If the sum appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year is insufficient to fully satisfy the aggregate of the minimum allotments for all States for that purpose for such year, each of such minimum allotments shall be reduced ratably.

"(C) SPECIAL RULE.—

"(i) IN GENERAL.—Notwithstanding any other provision of this subsection and using funds allotted for the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau under this subsection, the Director shall award grants to Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau to carry out activities described in this subtitle in accordance with the provisions of this subtitle that the Director determines are not inconsistent with this subparagraph.

"(ii) AWARD BASIS.—The Director shall award grants pursuant to clause (i) on a competitive basis and pursuant to recommendations from the Pacific Region Educational Laboratory in Honolulu, Hawaii.

"(iii) TERMINATION OF ELIGIBILITY.—Notwithstanding any other provision of law, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall not receive any funds under this subtitle for any fiscal year that begins after September 30, 2001.

"(iv) ADMINISTRATIVE COSTS.—The Director may provide not more than 5 percent of the funds made available for grants under this subparagraph to pay the administrative costs of the Pacific Region Educational Laboratory regarding activities assisted under this subparagraph.

"(4) DATA.—The population of each State and of all the States shall be determined by the Director on the basis of the most recent data available from the Bureau of the Census.

<< 20 USCA § 9132 >>

"SEC. 222. ADMINISTRATION.

"(a) IN GENERAL.—Not more than 4 percent of the total amount of funds received under this subtitle for any fiscal year by a State may be used for administrative costs.

"(b) CONSTRUCTION.—Nothing in this section shall be construed to limit spending for evaluation costs under section 224(c) from sources other than this subtitle.

<< 20 USCA § 9133 >>

"SEC. 223. PAYMENTS; FEDERAL SHARE; AND MAINTENANCE OF EFFORT REQUIREMENTS.

"(a) PAYMENTS.—Subject to appropriations provided pursuant to section 214, the Director shall pay to each State library administrative agency having a State plan approved under section 224 the Federal share of the cost of the activities described in the State plan.

"(b) FEDERAL SHARE.—

"(1) IN GENERAL.—The Federal share shall be 66 percent.

"(2) NON–FEDERAL SHARE.—The non-Federal share of payments shall be provided from non-Federal, State, or local sources.

"(c) MAINTENANCE OF EFFORT.—

"(1) STATE EXPENDITURES.—

"(A) REQUIREMENT.—

"(i) IN GENERAL.—The amount otherwise payable to a State for a fiscal year pursuant to an allotment under this chapter shall be reduced if the level of State expenditures, as described in paragraph (2), for the previous fiscal year is less than the average of the total of such expenditures for the 3 fiscal years preceding that previous fiscal year. The amount of the reduction in allotment for any fiscal year shall be equal to the amount by which the level of such State expenditures for the fiscal year for which the determination is made is less than the average of the total of such expenditures for the 3 fiscal years preceding the fiscal year for which the determination is made.

"(ii) CALCULATION.—Any decrease in State expenditures resulting from the application of subparagraph (B) shall be excluded from the calculation of the average level of State expenditures for any 3–year period described in clause (i).

"(B) DECREASE IN FEDERAL SUPPORT.—If the amount made available under this subtitle for a fiscal year is less than the amount made available under this subtitle for the preceding fiscal year, then the expenditures required by subparagraph (A) for such preceding fiscal year shall be decreased by the same percentage as the percentage decrease in the amount so made available.

AR03104

"(2) LEVEL OF STATE EXPENDITURES.—The level of State expenditures for the purposes of paragraph (1) shall include all State dollars expended by the State library administrative agency for library programs that are consistent with the purposes of this subtitle. All funds included in the maintenance of effort calculation under this subsection shall be expended during the fiscal year for which the determination is made, and shall not include capital expenditures, special one-time project costs, or similar windfalls.

"(3) WAIVER.—The Director may waive the requirements of paragraph (1) if the Director determines that such a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State.

<< 20 USCA § 9134 >>

"SEC. 224. STATE PLANS.

"(a) STATE PLAN REQUIRED.—

"(1) IN GENERAL.—In order to be eligible to receive a grant under this subtitle, a State library administrative agency shall submit a State plan to the Director not later than April 1, 1997.

"(2) DURATION.—The State plan shall cover a period of 5 fiscal years.

"(3) REVISIONS.—If a State library administrative agency makes a substantive revision to its State plan, then the State library administrative agency shall submit to the Director an amendment to the State plan containing such revision not later than April 1 of the fiscal year preceding the fiscal year for which the amendment will be effective.

"(b) CONTENTS.—The State plan shall—

"(1) establish goals, and specify priorities, for the State consistent with the purposes of this subtitle;

"(2) describe activities that are consistent with the goals and priorities established under paragraph (1), the purposes of this subtitle, and section 231, that the State library administrative agency will carry out during such year using such grant;

"(3) describe the procedures that such agency will use to carry out the activities described in paragraph (2);

"(4) describe the methodology that such agency will use to evaluate the success of the activities established under paragraph (2) in achieving the goals and meeting the priorities described in paragraph (1);

"(5) describe the procedures that such agency will use to involve libraries and library users throughout the State in policy decisions regarding implementation of this subtitle; and

"(6) provide assurances satisfactory to the Director that such agency will make such reports, in such form and containing such information, as the Director may reasonably require to carry out this subtitle and to determine the extent to which funds provided under this subtitle have been effective in carrying out the purposes of this subtitle.

"(c) EVALUATION AND REPORT.—Each State library administrative agency receiving a grant under this subtitle shall independently evaluate, and report to the Director regarding, the activities assisted under this subtitle, prior to the end of the 5–year plan.

"(d) INFORMATION.—Each library receiving assistance under this subtitle shall submit to the State library administrative agency such information as such agency may require to meet the requirements of subsection (c).

"(e) APPROVAL.—

"(1) IN GENERAL.—The Director shall approve any State plan under this subtitle that meets the requirements of this subtitle and provides satisfactory assurances that the provisions of such plan will be carried out.

"(2) PUBLIC AVAILABILITY.—Each State library administrative agency receiving a grant under this subtitle shall make the State plan available to the public.

"(3) ADMINISTRATION.—If the Director determines that the State plan does not meet the requirements of this section, the Director shall—

"(A) immediately notify the State library administrative agency of such determination and the reasons for such determination;

"(B) offer the State library administrative agency the opportunity to revise its State plan;

"(C) provide technical assistance in order to assist the State library administrative agency in meeting the requirements of this section; and

"(D) provide the State library administrative agency the opportunity for a hearing.

<< 20 USCA Ch. 72 >>

"CHAPTER 2—LIBRARY PROGRAMS

<< 20 USCA § 9141 >>

"SEC. 231. GRANTS TO STATES.

"(a) IN GENERAL.—Of the funds provided to a State library administrative agency under section 214, such agency shall expend, either directly or through subgrants or cooperative agreements, at least 96 percent of such funds for—

"(1)(A) establishing or enhancing electronic linkages among or between libraries;

"(B) electronically linking libraries with educational, social, or information services;

"(C) assisting libraries in accessing information through electronic networks;

"(D) encouraging libraries in different areas, and encouraging different types of libraries, to establish consortia and share resources; or

"(E) paying costs for libraries to acquire or share computer systems and telecommunications technologies; and

"(2) targeting library and information services to persons having difficulty using a library and to underserved urban and rural communities, including children (from birth through age 17) from families with incomes below the poverty line (as defined by the Office of Management and Budget and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2)) applicable to a family of the size involved.

"(b) SPECIAL RULE.—Each State library administrative agency receiving funds under this chapter may apportion the funds available for the purposes described in subsection (a) between the two purposes described in paragraphs (1) and (2) of such subsection, as appropriate, to meet the needs of the individual State.

<< 20 USCA Ch. 72 >>

"CHAPTER 3—ADMINISTRATIVE PROVISIONS

"Subchapter A—State Requirements

<< 20 USCA § 9151 >>

"SEC. 251. STATE ADVISORY COUNCILS.

"Each State desiring assistance under this subtitle may establish a State advisory council which is broadly representative of the library entities in the State, including public, school, academic, special, and institutional libraries, and libraries serving individuals with disabilities.

<< 20 USCA Ch. 72 >>

"Subchapter B—Federal Requirements

<< 20 USCA § 9161 >>

"SEC. 261. SERVICES FOR INDIAN TRIBES.

"From amounts reserved under section 221(a)(1)(A) for any fiscal year the Director shall award grants to organizations primarily serving and representing Indian tribes to enable such organizations to carry out the activities described in section 231.

<< 20 USCA § 9162 >>

"SEC. 262. NATIONAL LEADERSHIP GRANTS OR CONTRACTS.

"(a) IN GENERAL.—From the amounts reserved under section 221(a)(1)(B) for any fiscal year the Director shall establish and carry out a program awarding national leadership grants or contracts to enhance the quality of library services nationwide and to provide coordination between libraries and museums. Such grants or contracts shall be used for activities that may include—

   "(1) education and training of persons in library and information science, particularly in areas of new technology and other critical needs, including graduate fellowships, traineeships, institutes, or other programs;

   "(2) research and demonstration projects related to the improvement of libraries, education in library and information science, enhancement of library services through effective and efficient use of new technologies, and dissemination of information derived from such projects;

   "(3) preservation or digitization of library materials and resources, giving priority to projects emphasizing coordination, avoidance of duplication, and access by researchers beyond the institution or library entity undertaking the project; and

   "(4) model programs demonstrating cooperative efforts between libraries and museums.

"(b) GRANTS OR CONTRACTS.—

   "(1) IN GENERAL.—The Director may carry out the activities described in subsection (a) by awarding grants to, or entering into contracts with, libraries, agencies, institutions of higher education, or museums, where appropriate.

   "(2) COMPETITIVE BASIS.—Grants and contracts under this section shall be awarded on a competitive basis.

"(c) SPECIAL RULE.—The Director shall make every effort to ensure that activities assisted under this section are administered by appropriate library and museum professionals or experts.

<< 20 USCA § 9163 >>

"SEC. 263. STATE AND LOCAL INITIATIVES.

   "Nothing in this subtitle shall be construed to interfere with State and local initiatives and responsibility in the conduct of library services. The administration of libraries, the selection of personnel and library books and materials, and insofar as consistent with the purposes of this subtitle, the determination of the best uses of the funds provided under this subtitle, shall be reserved for the States and their local subdivisions.

<< 20 USCA Ch. 72 >>

"Subtitle C—Museum Services

<< 20 USCA § 9171 >>

"SEC. 271. PURPOSE.

   "It is the purpose of this subtitle—

   "(1) to encourage and assist museums in their educational role, in conjunction with formal systems of elementary, secondary, and postsecondary education and with programs of nonformal education for all age groups;

   "(2) to assist museums in modernizing their methods and facilities so that the museums are better able to conserve the cultural, historic, and scientific heritage of the United States; and

   "(3) to ease the financial burden borne by museums as a result of their increasing use by the public.

<< 20 USCA § 9172 >>

"SEC. 272. DEFINITIONS.

   "As used in this subtitle:

   "(1) MUSEUM.—The term 'museum' means a public or private nonprofit agency or institution organized on a permanent basis for essentially educational or aesthetic purposes, that utilizes a professional staff, owns or utilizes tangible objects, cares for the tangible objects, and exhibits the tangible objects to the public on a regular basis.

"(2) STATE.—The term 'State' means each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

<< 20 USCA § 9173 >>

"SEC. 273. MUSEUM SERVICES ACTIVITIES.

"(a) GRANTS.—The Director, subject to the policy direction of the Museum Board, may make grants to museums to pay for the Federal share of the cost of increasing and improving museum services, through such activities as—

  "(1) programs that enable museums to construct or install displays, interpretations, and exhibitions in order to improve museum services provided to the public;

  "(2) assisting museums in developing and maintaining professionally trained or otherwise experienced staff to meet the needs of the museums;

  "(3) assisting museums in meeting the administrative costs of preserving and maintaining the collections of the museums, exhibiting the collections to the public, and providing educational programs to the public through the use of the collections;

  "(4) assisting museums in cooperating with each other in developing traveling exhibitions, meeting transportation costs, and identifying and locating collections available for loan;

  "(5) assisting museums in the conservation of their collections;

  "(6) developing and carrying out specialized programs for specific segments of the public, such as programs for urban neighborhoods, rural areas, Indian reservations, and penal and other State institutions; and

  "(7) model programs demonstrating cooperative efforts between libraries and museums.

"(b) CONTRACTS AND COOPERATIVE AGREEMENTS.—

  "(1) PROJECTS TO STRENGTHEN MUSEUM SERVICES.—The Director, subject to the policy direction of the Museum Board, is authorized to enter into contracts and cooperative agreements with appropriate entities, as determined by the Director, to pay for the Federal share of enabling the entities to undertake projects designed to strengthen museum services, except that any contracts or cooperative agreements entered into pursuant to this subsection shall be effective only to such extent or in such amounts as are provided in appropriations Acts.

  "(2) LIMITATION ON AMOUNT.—The aggregate amount of financial assistance made available under this subsection for a fiscal year shall not exceed 15 percent of the amount appropriated under this subtitle for such fiscal year.

  "(3) OPERATIONAL EXPENSES.—No financial assistance may be provided under this subsection to pay for operational expenses.

"(c) FEDERAL SHARE.—

  "(1) 50 PERCENT.—Except as provided in paragraph (2), the Federal share described in subsections (a) and (b) shall be not more than 50 percent.

  "(2) GREATER THAN 50 PERCENT.—The Director may use not more than 20 percent of the funds made available under this subtitle for a fiscal year to make grants under subsection (a), or enter into contracts or agreements under subsection (b), for which the Federal share may be greater than 50 percent.

"(d) REVIEW AND EVALUATION.—The Director shall establish procedures for reviewing and evaluating grants, contracts, and cooperative agreements made or entered into under this subtitle. Procedures for reviewing grant applications or contracts and cooperative agreements for financial assistance under this subtitle shall not be subject to any review outside of the Institute.

<< 20 USCA § 9174 >>

"SEC. 274. AWARD.

  "The Director, with the advice of the Museum Board, may annually award a National Award for Museum Service to outstanding museums that have made significant contributions in service to their communities.

<< 20 USCA § 9175 >>

"SEC. 275. NATIONAL MUSEUM SERVICES BOARD.

"(a) ESTABLISHMENT.—There is established in the Institute a National Museum Services Board.

"(b) COMPOSITION AND QUALIFICATIONS.—

"(1) COMPOSITION.—The Museum Board shall consist of the Director and 14 members appointed by the President, by and with the advice and consent of the Senate.

"(2) QUALIFICATIONS.—The appointive members of the Museum Board shall be selected from among citizens of the United States—

"(A) who are members of the general public;

"(B) who are or have been affiliated with—

"(i) resources that, collectively, are broadly representative of the curatorial, conservation, educational, and cultural resources of the United States; or

"(ii) museums that, collectively, are broadly representative of various types of museums, including museums relating to science, history, technology, art, zoos, and botanical gardens; and

"(C) who are recognized for their broad knowledge, expertise, or experience in museums or commitment to museums.

"(3) GEOGRAPHIC AND OTHER REPRESENTATION.—Members of the Museum Board shall be appointed to reflect persons from various geographic regions of the United States. The Museum Board may not include, at any time, more than 3 members from a single State. In making such appointments, the President shall give due regard to equitable representation of women, minorities, and persons with disabilities who are involved with museums.

"(c) TERMS.—

"(1) IN GENERAL.—Each appointive member of the Museum Board shall serve for a term of 5 years, except that—

"(A) of the members first appointed, 3 shall serve for terms of 5 years, 3 shall serve for terms of 4 years, 3 shall serve for terms of 3 years, 3 shall serve for terms of 2 years, and 2 shall serve for terms of 1 year, as designated by the President at the time of nomination for appointment; and

"(B) any member appointed to fill a vacancy shall serve for the remainder of the term for which the predecessor of the member was appointed.

"(2) REAPPOINTMENT.—No member of the Museum Board who has been a member for more than 7 consecutive years shall be eligible for reappointment.

"(3) SERVICE UNTIL SUCCESSOR TAKES OFFICE.—Notwithstanding any other provision of this subsection, a member of the Museum Board shall serve after the expiration of the term of the member until the successor to the member takes office.

"(d) DUTIES AND POWERS.—The Museum Board shall have the responsibility to advise the Director on general policies with respect to the duties, powers, and authority of the Institute relating to museum services, including general policies with respect to—

"(1) financial assistance awarded under this subtitle for museum services; and

"(2) projects described in section 262(a)(4).

"(e) CHAIRPERSON.—The President shall designate 1 of the appointive members of the Museum Board as Chairperson of the Museum Board.

"(f) MEETINGS.—

"(1) IN GENERAL.—The Museum Board shall meet—

"(A) not less than 3 times each year, including—

"(i) not less than 2 times each year separately; and

"(ii) not less than 1 time each year in a joint meeting with the Commission, convened for purposes of making general policies with respect to financial assistance for projects described in section 262(a)(4); and

"(B) at the call of the Director.

"(2) VOTE.—All decisions by the Museum Board with respect to the exercise of the duties and powers of the Museum Board shall be made by a majority vote of the members of the Museum Board who are present. All decisions by the Commission and the Museum Board with respect to the policies described in paragraph (1)(A)(ii) shall be made by a $^2/_3$ majority vote of the total number of the members of the Commission and the Museum Board who are present.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(g) QUORUM.—A majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official meetings of the Museum Board, but a lesser number of members may hold hearings. A majority of the members of the Commission and a majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the Museum Board.

"(h) COMPENSATION AND TRAVEL EXPENSES.—

"(1) COMPENSATION.—Each member of the Museum Board who is not an officer or employee of the Federal Government may be compensated at a rate to be fixed by the President, but not to exceed the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel time) during which such member is engaged in the performance of the duties of the Museum Board. All members of the Museum Board who are officers or employees of the Federal Government shall serve without compensation in addition to compensation received for their services as officers or employees of the Federal Government.

"(2) TRAVEL EXPENSES.—The members of the Museum Board may be allowed travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent, as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

"(i) COORDINATION.—The Museum Board, with the advice of the Director, shall take steps to ensure that the policies and activities of the Institute are coordinated with other activities of the Federal Government.

<< 20 USCA § 9176 >>

"SEC. 276. AUTHORIZATION OF APPROPRIATIONS.

"(a) GRANTS.—For the purpose of carrying out this subtitle, there are authorized to be appropriated to the Director $28,700,000 for the fiscal year 1997, and such sums as may be necessary for each of the fiscal years 1998 through 2002.

"(b) ADMINISTRATION.—Not more than 10 percent of the funds appropriated under this section for a fiscal year may be used to pay for the administrative costs of carrying out this subtitle.

"(c) SUMS REMAINING AVAILABLE.—Sums appropriated pursuant to subsection (a) for any fiscal year shall remain available for obligation until expended.".

SEC. 703. NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE.

<< 20 USCA § 1504 >>

(a) FUNCTIONS.—Section 5 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1504) is amended—

(1) by redesignating subsections (b) through (d) as subsections (d) through (f), respectively; and

(2) by inserting after subsection (a) the following:

"(b) The Commission shall have the responsibility to advise the Director of the Institute of Museum and Library Services on general policies with respect to the duties, powers, and authority of the Institute of Museum and Library Services relating to library services, including—

"(1) general policies with respect to—

"(A) financial assistance awarded under the Museum and Library Services Act for library services; and

"(B) projects described in section 262(a)(4) of such Act; and

"(2) measures to ensure that the policies and activities of the Institute of Museum and Library Services are coordinated with other activities of the Federal Government.

"(c)(1) The Commission shall meet not less than 1 time each year in a joint meeting with the National Museum Services Board, convened for purposes of providing advice on general policy with respect to financial assistance for projects described in section 262(a)(4) of such Act.

"(2) All decisions by the Commission and the National Museum Services Board with respect to the advice on general policy described in paragraph (1) shall be made by a $2/3$ majority vote of the total number of the members of the Commission and the National Museum Services Board who are present.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(3) A majority of the members of the Commission and a majority of the members of the National Museum Services Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the National Museum Services Board.".

<< 20 USCA § 1505 >>

(b) MEMBERSHIP.—Section 6 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1505) is amended—

(1) in subsection (a)—

(A) in the first sentence, by striking "Librarian of Congress" and inserting "Librarian of Congress, the Director of the Institute of Museum and Library Services (who shall serve as an ex officio, nonvoting member),";

(B) in the second sentence—

(i) by striking "special competence or interest in" and inserting "special competence in or knowledge of; and

(ii) by inserting before the period the following: "and at least one other of whom shall be knowledgeable with respect to the library and information service and science needs of the elderly";

(C) in the third sentence, by inserting "appointive" before "members"; and

(D) in the last sentence, by striking "term and at least" and all that follows and inserting "term."; and

(2) in subsection (b), by striking "the rate specified" and all that follows through "and while" and inserting "the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel-time) during which the members are engaged in the business of the Commission. While".

<< 20 USCA § 9102 NOTE >>

SEC. 704. TRANSFER OF FUNCTIONS FROM INSTITUTE OF MUSEUM SERVICES.

(a) DEFINITIONS.—For purposes of this section, unless otherwise provided or indicated by the context—

(1) the term "Federal agency" has the meaning given to the term "agency" by section 551(1) of title 5, United States Code;

(2) the term "function" means any duty, obligation, power, authority, responsibility, right, privilege, activity, or program; and

(3) the term "office" includes any office, administration, agency, institute, unit, organizational entity, or component thereof.

(b) TRANSFER OF FUNCTIONS FROM THE INSTITUTE OF MUSEUM SERVICES AND THE LIBRARY PROGRAM OFFICE.—There are transferred to the Director of the Institute of Museum and Library Services established under section 203 of the Museum and Library Services Act—

(1) all functions that the Director of the Institute of Museum Services exercised before the date of enactment of this section (including all related functions of any officer or employee of the Institute of Museum Services); and

(2) all functions that the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education exercised before the date of enactment of this section and any related function of any officer or employee of the Department of Education.

(c) DETERMINATIONS OF CERTAIN FUNCTIONS BY THE OFFICE OF MANAGEMENT AND BUDGET.—If necessary, the Office of Management and Budget shall make any determination of the functions that are transferred under subsection (b).

(d) DELEGATION AND ASSIGNMENT.—Except where otherwise expressly prohibited by law or otherwise provided by this section, the Director of the Institute of Museum and Library Services may delegate any of the functions transferred to the Director of the Institute of Museum and Library Services by this section and any function transferred or granted to such Director of the Institute of Museum and Library Services after the effective date of this section to such officers and employees of the Institute of Museum and Library Services as the Director of the Institute of Museum and Library Services may designate, and may authorize successive redelegations of such functions as may be necessary or appropriate, except that any delegation of any such functions with respect to libraries shall be made to the Deputy Director of the Office of Library Services and with respect to museums shall be made to the Deputy Director of the Office of Museum Services. No delegation of functions by the Director of the Institute of Museum and Library Services under this section or under any other provision of this section shall relieve such Director of the Institute of Museum and Library Services of responsibility for the administration of such functions.

(e) REORGANIZATION.—The Director of the Institute of Museum and Library Services may allocate or reallocate any function transferred under subsection (b) among the officers of the Institute of Museum and Library Services, and may establish, consolidate, alter, or discontinue such organizational entities in the Institute of Museum and Library Services as may be necessary or appropriate.

(f) RULES.—The Director of the Institute of Museum and Library Services may prescribe, in accordance with chapters 5 and 6 of title 5, United States Code, such rules and regulations as the Director of the Institute of Museum and Library Services determines to be necessary or appropriate to administer and manage the functions of the Institute of Museum and Library Services.

(g) TRANSFER AND ALLOCATIONS OF APPROPRIATIONS AND PERSONNEL.—Except as otherwise provided in this section, the personnel employed in connection with, and the assets, liabilities, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds employed, used, held, arising from, available to, or to be made available in connection with the functions transferred by this section, subject to section 1531 of title 31, United States Code, shall be transferred to the Institute of Museum and Library Services. Unexpended funds transferred pursuant to this subsection shall be used only for the purposes for which the funds were originally authorized and appropriated.

(h) INCIDENTAL TRANSFERS.—The Director of the Office of Management and Budget, at such time or times as the Director shall provide, may make such determinations as may be necessary with regard to the functions transferred by this section, and make such additional incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with such functions, as may be necessary to carry out this section. The Director of the Office of Management and Budget shall provide for the termination of the affairs of all entities terminated by this section and for such further measures and dispositions as may be necessary to effectuate the purposes of this section.

(i) EFFECT ON PERSONNEL.—

(1) IN GENERAL.—Except as otherwise provided by this section, the transfer pursuant to this section of full-time personnel (except special Government employees) and part-time personnel holding permanent positions shall not cause any such employee to be separated or reduced in grade or compensation for 1 year after the date of transfer of such employee under this section.

(2) EXECUTIVE SCHEDULE POSITIONS.—Except as otherwise provided in this section, any person who, on the day preceding the effective date of this section, held a position compensated in accordance with the Executive Schedule prescribed in chapter 53 of title 5, United States Code, and who, without a break in service, is appointed in the Institute of Museum and Library Services to a position having duties comparable to the duties performed immediately preceding such appointment shall continue to be compensated in such new position at not less than the rate provided for such previous position, for the duration of the service of such person in such new position.

(j) SAVINGS PROVISIONS.—

(1) CONTINUING EFFECT OF LEGAL DOCUMENTS.—All orders, determinations, rules, regulations, permits, agreements, grants, contracts, certificates, licenses, registrations, privileges, and other administrative actions—

(A) that have been issued, made, granted, or allowed to become effective by the President, any Federal agency or official of a Federal agency, or by a court of competent jurisdiction, in the performance of functions that are transferred under this section; and

(B) that were in effect before the effective date of this section, or were final before the effective date of this section and are to become effective on or after the effective date of this section;

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the President, the Director of the Institute of Museum and Library Services or other authorized official, a court of competent jurisdiction, or by operation of law.

(2) PROCEEDINGS NOT AFFECTED.—This section shall not affect any proceedings, including notices of proposed rulemaking, or any application for any license, permit, certificate, or financial assistance pending before the Institute of Museum Services on the effective date of this section, with respect to functions transferred by this section. Such proceedings and applications shall be continued. Orders shall be issued in such proceedings, appeals shall be taken from the orders, and payments shall be made pursuant to the orders, as if this section had not been enacted, and orders issued in any such proceedings shall continue in effect until modified, terminated, superseded, or revoked by a duly authorized official, by a court of competent

jurisdiction, or by operation of law. Nothing in this paragraph shall be construed to prohibit the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that such proceeding could have been discontinued or modified if this section had not been enacted.

(3) SUITS NOT AFFECTED.—This section shall not affect suits commenced before the effective date of this section, and in all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this section had not been enacted.

(4) NONABATEMENT OF ACTIONS.—No suit, action, or other proceeding commenced by or against the Institute of Museum Services, or by or against any individual in the official capacity of such individual as an officer of the Institute of Museum Services, shall abate by reason of the enactment of this section.

(5) ADMINISTRATIVE ACTIONS RELATING TO PROMULGATION OF REGULATIONS.—Any administrative action relating to the preparation or promulgation of a regulation by the Institute of Museum Services relating to a function transferred under this section may be continued by the Institute of Museum and Library Services with the same effect as if this section had not been enacted.

(k) TRANSITION.—The Director of the Institute of Museum and Library Services may utilize—

(1) the services of such officers, employees, and other personnel of the Institute of Museum Services with respect to functions transferred to the Institute of Museum and Library Services by this section; and

(2) funds appropriated to such functions for such period of time as may reasonably be needed to facilitate the orderly implementation of this section.

(l) REFERENCES.—A reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or relating to—

(1) the Director of the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Director of the Institute of Museum and Library Services; and

(2) the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Institute of Museum and Library Services.

(m) ADDITIONAL CONFORMING AMENDMENTS.—

(1) RECOMMENDED LEGISLATION.—After consultation with the appropriate committees of Congress and the Director of the Office of Management and Budget, the Director of the Institute of Museum and Library Services shall prepare and submit to the appropriate committees of Congress recommended legislation containing technical and conforming amendments to reflect the changes made by this section.

(2) SUBMISSION TO CONGRESS.—Not later than 6 months after the effective date of this section, the Director of the Institute of Museum and Library Services shall submit to the appropriate committees of Congress the recommended legislation referred to under paragraph (1).

<< 20 USCA § 9103 NOTE >>

SEC. 705. SERVICE OF INDIVIDUALS SERVING ON DATE OF ENACTMENT.

Notwithstanding section 204 of the Museum and Library Services Act, the individual who was appointed to the position of Director of the Institute of Museum Services under section 205 of the Museum Services Act (as such section was in effect on the day before the date of enactment of this Act) and who is serving in such position on the day before the date of enactment of this Act shall serve as the first Director of the Institute of Museum and Library Services under section 204 of the Museum and Library Services Act (as added by section 2 of this Act), and shall serve at the pleasure of the President.

<< 20 USCA § 9105 NOTE >>

SEC. 706. CONSIDERATION.

Consistent with title 5, United States Code, in appointing employees of the Office of Library Services, the Director of the Institute of Museum and Library Services shall give strong consideration to individuals with experience in administering State-based and national library and information services programs.

<< 20 USCA § 9102 NOTE >>

SEC. 707. TRANSITION AND TRANSFER OF FUNDS.

 (a) TRANSITION.—The Director of the Office of Management and Budget shall take appropriate measures to ensure an orderly transition from the activities previously administered by the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services under this Act. Such measures may include the transfer of appropriated funds.

 (b) TRANSFER.—From any amounts available to the Secretary of Education for salaries and expenses at the Department of Education, the Secretary of Education shall transfer to the Director the amount of funds necessary to ensure the orderly transition from activities previously administered by the Director of the Office of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services. In no event shall the amount of funds transferred pursuant to the preceding sentence be less than $200,000.

SEC. 708. REPEALS.

<< 20 USCA §§ 351, 351a, 351b, 351c, 351d, 351e, 351f, 351g, 352, 353, 354, 355, 355a, 355b, 355c, 355d, 355e, 355e–1, 355e–2, 355e–3, 355e–4, 361, 362, 363, 364, 365, 366, 371, 375, 381, 385, 385a, 385b, 385c, 385d, 385e, 386, 386a, 386b, 386c, 386d, 386e, 386f, 386g >>

<< 20 USCA § 351 NOTE >>

 (a) LIBRARY SERVICES AND CONSTRUCTION ACT.—The Library Services and Construction Act (20 U.S.C. 351 et seq.) is repealed.

<< 20 USCA §§ 1021, 1022, 1023, 1029, 1031, 1032, 1033, 1034, 1041, 1042, 1047 >>

 (b) TITLE II OF THE HIGHER EDUCATION ACT OF 1965.—Title II of the Higher Education Act of 1965 (20 U.S.C. 1021 et seq.), relating to academic libraries and information services, is repealed.

<< 20 USCA § 1029 NOTE >>

 (c) PART D OF TITLE XIII OF THE HIGHER EDUCATION AMENDMENTS OF 1986.—Part D of title XIII of the Higher Education Amendments of 1986 (20 U.S.C. 1029 note), relating to library resources, is repealed.

<< 20 USCA § 1221i >>

 (d) SECTION 519 OF THE EDUCATION AMENDMENTS OF 1974.—Section 519 of the Education Amendments of 1974 (20 U.S.C. 1221i) is repealed.

<< 20 USCA §§ 7001, 7002, 7003, 7004, 7005 >>

 (e) PART F OF THE TECHNOLOGY FOR EDUCATION ACT OF 1994.—Part F of the Technology for Education Act of 1994 (20 U.S.C. 7001 et seq.), contained in title III of the Elementary and Secondary Education Act of 1965, is repealed.

SEC. 709. CONFORMING AMENDMENTS.

 (a) REFERENCES TO LIBRARY SERVICES AND CONSTRUCTION ACT.—

<< 20 USCA § 6813 >>

(1) TECHNOLOGY FOR EDUCATION ACT OF 1994.—Section 3113(10) of the Technology for Education Act of 1994 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act;" and inserting "section 213 of the Library Services and Technology Act;".

<< 20 USCA § 3489 >>

(2) OMNIBUS EDUCATION RECONCILIATION ACT OF 1981.—Section 528 of the Omnibus Education Reconciliation Act of 1981 (20 U.S.C. 3489) is amended—
  (A) by striking paragraph (12); and
  (B) by redesignating paragraphs (13) through (15) as paragraphs (12) through (14), respectively.

<< 20 USCA § 6813 >>

(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—Section 3113(10) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act" and inserting "section 213 of the Library Services and Technology Act".

<< 40 USCA § 276d–3 >>

(4) COMMUNITY IMPROVEMENT VOLUNTEER ACT OF 1994.—Section 7305 of the Community Improvement Volunteer Act of 1994 (40 U.S.C. 276d–3) is amended—
  (A) by striking paragraph (1); and
  (B) by redesignating paragraphs (2) through (6) as paragraphs (1) through (5), respectively.

<< 40 App. USCA § 214 >>

(5) APPALACHIAN REGIONAL DEVELOPMENT ACT OF 1965.—Section 214(c) of the Appalachian Regional Development Act of 1965 (40 U.S.C. App. 214(c)) is amended by striking "Library Services and Construction Act;".

<< 42 USCA § 3338 >>

(6) DEMONSTRATION CITIES AND METROPOLITAN DEVELOPMENT ACT OF 1966.—Section 208(2) of the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. 3338(2)) is amended by striking "title II of the Library Services and Construction Act;".

<< 48 USCA § 1666 >>

(7) PUBLIC LAW 87–688.—Subsection (c) of the first section of the Act entitled "An Act to extend the application of certain laws to American Samoa", approved September 25, 1962 (48 U.S.C. 1666(c)) is amended by striking "the Library Services Act (70 Stat. 293; 20 U.S.C. 351 et seq.),".

<< 47 USCA § 254 >>

(8) COMMUNICATIONS ACT OF 1934.—Paragraph (4) of section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)(4)) is amended by striking "library not eligible for participation in State-based plans for funds under title III of the Library Services and Construction Act (20 U.S.C. 335c et seq.)" and inserting "library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act".
(b) REFERENCES TO INSTITUTE OF MUSEUM SERVICES.—

<< 5 USCA § 5315 >>

(1) TITLE 5, UNITED STATES CODE.—Section 5315 of title 5, United States Code, is amended by striking the following: "Director of the Institute of Museum Services." and inserting the following:
"Director of the Institute of Museum and Library Services.".

<< 20 USCA § 3441 >>

(2) DEPARTMENT OF EDUCATION ORGANIZATION ACT.—Section 301 of the Department of Education Organization Act (20 U.S.C. 3441) is amended—

(A) in subsection (a)—

(i) by striking paragraph (5); and

(ii) by redesignating paragraphs (6) and (7) as paragraphs (5) and (6), respectively; and

(B) in subsection (b)—

(i) by striking paragraph (4); and

(ii) by redesignating paragraphs (5) through (7) as paragraphs (4) through (6), respectively.

(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—

<< 20 USCA §§ 6621, 6645, 6648, 6649, 8091 >>

(A) Sections 2101(b), 2205(c)(1)(D), 2208(d)(1)(H)(v), and 2209(b)(1)(C)(iv), and subsection (d)(6) and (e)(2) of section 10401 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6621(b), 6645(c)(1)(D), 6648(d)(1)(H)(vi), 6649(b)(1)(C)(vi), and 8091(d)(6) and (e)(2)) are amended by striking "the Institute of Museum Services" and inserting "the Institute of Museum and Library Services".

<< 20 USCA § 8102 >>

(B) Section 10412(b) of such Act (20 U.S.C. 8102(b)) is amended—

(i) in paragraph (2), by striking "the Director of the Institute of Museum Services," and inserting "the Director of the Institute of Museum and Library Services,"; and

(ii) in paragraph (7), by striking "the Director of the Institute of Museum Services," and inserting "the director of the Institute of Museum and Library Services,".

<< 20 USCA § 8104 >>

(C) Section 10414(a)(2)(B) of such Act (20 U.S.C. 8104(a)(2)(B)) is amended by striking clause (iii) and inserting the following new clause:

"(iii) the Institute of Museum and Library Services.".

<< 20 USCA § 3473 >>

(c) REFERENCE TO OFFICE OF LIBRARIES AND LEARNING RESOURCES.—Section 413(b)(1) of the Department of Education Organization Act (20 U.S.C. 3473(b)(1)) is amended—

(1) by striking subparagraph (H); and

(2) by redesignating subparagraphs (I) through (M) as subparagraphs (H) through (L), respectively.

<< 20 USCA § 1069b >>

(d) REFERENCES TO STATE POSTSECONDARY REVIEW ENTITY PROGRAMS.—Section 356(b)(2) of the Higher Education Act of 1965 (20 U.S.C. 10696(b)) is amended by striking "II,".

This Act may be cited as the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997".

(f) For programs, projects or activities in the Treasury, Postal Service, and General Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 1997, and for other purposes.

Case 2:21-cv-00067-Z  Document 162-7  Filed 09/02/22  Page 458 of 1021  PageID 7328

TITLE I—DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

For necessary expenses of the Departmental Offices including operation and maintenance of the Treasury Building and Annex; hire of passenger motor vehicles; maintenance, repairs, and improvements of, and purchase of commercial insurance policies for, real properties leased or owned overseas, when necessary for the performance of official business; not to exceed $2,900,000 for official travel expenses; not to exceed $150,000 for official reception and representation expenses; not to exceed $258,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Secretary of the Treasury and to be accounted for solely on his certificate; $111,760,000.

AUTOMATION ENHANCEMENT

INCLUDING TRANSFER OF FUNDS

For the development and acquisition of automatic data processing equipment, software, and services for the Department of the Treasury, $27,100,000, of which $15,000,000 shall be available to the United States Customs Service for the Automated Commercial Environment project, and of which $5,600,000 shall be available to the United States Customs Service for the International Trade Data System: Provided, That these funds shall remain available until September 30, 1999: Provided further, That these funds shall be transferred to accounts and in amounts as necessary to satisfy the requirements of the Department's offices, bureaus, and other organizations: Provided further, That this transfer authority shall be in addition to any other transfer authority provided in this Act: Provided further, That none of the funds shall be used to support or supplement Internal Revenue Service appropriations for Information Systems and Tax Systems Modernization: Provided further, That of the funds appropriated for the Automated Commercial Environment, $3,475,000 may not be obligated until the Commissioner of Customs consults with the Committees on Appropriations regarding deficiencies identified by the General Accounting Office.

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, not to exceed $2,000,000 for official travel expenses; including hire of passenger motor vehicles; and not to exceed $100,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Inspector General of the Treasury; $29,736,000.

OFFICE OF PROFESSIONAL RESPONSIBILITY

SALARIES AND EXPENSES

For necessary expenses of the Office of Professional Responsibility, including purchase and hire of passenger motor vehicles, $1,500,000.

TREASURY BUILDINGS AND ANNEX REPAIR AND RESTORATION

INCLUDING TRANSFER OF FUNDS

For the repair, alteration, and improvement of the Treasury Building and Annex, $28,213,000, to remain available until expended: Provided, That funds previously made available under this title for the Secret Service Headquarter's building shall be transferred to the Secret Service Acquisition, Construction, Improvement and Related Expenses appropriation.

FINANCIAL CRIMES ENFORCEMENT NETWORK

SALARIES AND EXPENSES

For necessary expenses of the Financial Crimes Enforcement Network, including hire of passenger motor vehicles; travel expenses of non-Federal law enforcement personnel to attend meetings concerned with financial intelligence activities, law

enforcement, and financial regulation; not to exceed $14,000 for official reception and representation expenses; and for assistance to Federal law enforcement agencies, with or without reimbursement; $22,387,000: Provided, That notwithstanding any other provision of law, the Director of the Financial Crimes Enforcement Network may procure up to $500,000 in specialized, unique, or novel automatic data processing equipment, ancillary equipment, software, services, and related resources from commercial vendors without regard to otherwise applicable procurement laws and regulations and without full and open competition, utilizing procedures best suited under the circumstances of the procurement to efficiently fulfill the agency's requirements: Provided further, That funds appropriated in this account may be used to procure personal services contracts.

## DEPARTMENT OF THE TREASURY FORFEITURE FUND

For necessary expenses of the Treasury Forfeiture Fund, as authorized by Public Law 102–393, not to exceed $10,000,000, to be derived from deposits in the fund: Provided, That notwithstanding any other provision of law, not to exceed $7,500,000 shall be made available for the development of a Federal wireless communication system: Provided further, That the Secretary of the Treasury is authorized to receive all unavailable collections transferred from the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. 1509) by the Director of the Office of Drug Control Policy as a deposit into the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## VIOLENT CRIME REDUCTION PROGRAMS

### INCLUDING TRANSFER OF FUNDS

For activities authorized by Public Law 103–322, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as follows:

(a) As authorized by section 190001(e), $89,000,000, of which $36,595,000 shall be available to the Bureau of Alcohol, Tobacco and Firearms, of which $3,000,000 shall be available for administering the Gang Resistance Education and Training program, of which $3,662,000 shall be available for ballistics technologies, including the purchase, maintenance and upgrading of equipment and of which $29,133,000 shall be available to enhance training and purchase equipment and services, and of which $800,000 shall be available for project LEAD; of which $18,300,000 shall be available to the Secretary as authorized by section 732 of Public Law 104–132 as amended by Section 113 of the Fiscal Year 1997 Department of Commerce, Justice and State, and the Judiciary, and Related Agencies Appropriations Act; of which $1,000,000 shall be available to the Financial Crimes Enforcement Network; of which $20,000,000 shall be available to the United States Secret Service, of which no less than $1,400,000 shall be available for a grant for activities related to the investigations of missing and exploited children; and of which $13,105,000 shall be available to the Federal Drug Control Programs, High Intensity Drug Trafficking Areas program.

(b) As authorized by section 32401, $8,000,000, for disbursement through grants, cooperative agreements or contracts, to local governments for Gang Resistance Education and Training: Provided, That notwithstanding sections 32401 and 310001, such funds shall be allocated only to the affected State and local law enforcement and prevention organizations participating in such projects.

## TREASURY FRANCHISE FUND

<< 31 USCA § 501 NOTE >>

There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for expenses and equipment necessary for the maintenance and operation of such financial and administrative support services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made for the purpose of providing capital, shall be used to capitalize such fund: Provided further, That such fund shall be reimbursed or credited with the payments, including advanced payments, from applicable appropriations and funds available to the Department and other Federal agencies for which such administrative and financial services are performed, at rates which will recover all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of Automatic Data Processing (ADP) software and systems, and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary:

Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed 4 percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment and for the improvement and implementation of Treasury financial management, ADP, and other support systems: Provided further, That no later than 30 days after the end of each fiscal year, amounts in excess of this reserve limitation shall be deposited as miscellaneous receipts in the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

  For necessary expenses of the Federal Law Enforcement Training Center, as a bureau of the Department of the Treasury, including materials and support costs of Federal law enforcement basic training; purchase (not to exceed 52 for police-type use, without regard to the general purchase price limitation) and hire of passenger motor vehicles; for expenses for student athletic and related activities; uniforms without regard to the general purchase price limitation for the current fiscal year; the conducting of and participating in firearms matches and presentation of awards; for public awareness and enhancing community support of law enforcement training; not to exceed $9,500 for official reception and representation expenses; room and board for student interns; and services as authorized by 5 U.S.C. 3109; $54,831,000, of which up to $13,034,000 for materials and support costs of Federal law enforcement basic training shall remain available until September 30, 1999: Provided, That the Center is authorized to accept and use gifts of property, both real and personal, and to accept services, for authorized purposes, including funding of a gift of intrinsic value which shall be awarded annually by the Director of the Center to the outstanding student who graduated from a basic training program at the Center during the previous fiscal year, which shall be funded only by gifts received through the Center's gift authority: Provided further, That notwithstanding any other provision of law, students attending training at any Federal Law Enforcement Training Center site shall reside in on-Center or Center-provided housing, insofar as available and in accordance with Center policy: Provided further, That funds appropriated in this account shall be available, at the discretion of the Director, for: training United States Postal Service law enforcement personnel and Postal police officers; State and local government law enforcement training on a space-available basis; training of foreign law enforcement officials on a space-available basis with reimbursement of actual costs to this appropriation; training of private sector security officials on a space-available basis with reimbursement of actual costs to this appropriation; and travel expenses of non-Federal personnel to attend course development meetings and training at the Center: Provided further, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training at the Federal Law Enforcement Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available at the end of the fiscal year: Provided further, That the Federal Law Enforcement Training Center is authorized to provide short term medical services for students undergoing training at the Center.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

  For expansion of the Federal Law Enforcement Training Center, for acquisition of necessary additional real property and facilities, and for ongoing maintenance, facility improvements, and related expenses, $18,884,000, to remain available until expended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

  For necessary expenses of the Financial Management Service, $196,069,000, of which not to exceed $14,277,000 shall remain available until expended for systems modernization initiatives. In addition, $90,000, to be derived from the Oil Spill Liability Trust Fund, to reimburse the Service for administrative and personnel expenses for financial management of the Fund, as authorized by section 1012 of Public Law 101–380: Provided, That none of the funds made available for systems modernization initiatives may not be obligated until the Commissioner of the Financial Management Service has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, including purchase of not to exceed 650 vehicles for police-type use for replacement only and hire of passenger motor vehicles; hire of aircraft; and services of expert witnesses at such rates as may be determined by the Director; for payment of per diem and/or subsistence allowances to employees where an assignment to the National Response Team during the investigation of a bombing or arson incident requires an employee to work 16 hours or more per day or to remain overnight at his or her post of duty; not to exceed $12,500 for official reception and representation expenses; for training of State and local law enforcement agencies with or without reimbursement, including training in connection with the training and acquisition of canines for explosives and fire accelerants detection; provision of laboratory assistance to State and local agencies, with or without reimbursement; $393,971,000, of which $12,011,000, to remain available until expended, shall be available for arson investigations, with priority assigned to any arson, explosion or violence against religious institutions; which not to exceed $1,000,000 shall be available for the payment of attorneys' fees as provided by 18 U.S.C. 924(d)(2); and of which $1,000,000 shall be available for the equipping of any vessel, vehicle, equipment, or aircraft available for official use by a State or local law enforcement agency if the conveyance will be used in drug-related joint law enforcement operations with the Bureau of Alcohol, Tobacco and Firearms and for the payment of overtime salaries, travel, fuel, training, equipment, and other similar costs of State and local law enforcement officers that are incurred in joint operations with the Bureau of Alcohol, Tobacco and Firearms: Provided, That no funds made available by this or any other Act may be used to transfer the functions, missions, or activities of the Bureau of Alcohol, Tobacco and Firearms to other agencies or Departments in the fiscal year ending on September 30, 1997: Provided further, That no funds appropriated herein shall be available for salaries or administrative expenses in connection with consolidating or centralizing, within the Department of the Treasury, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees: Provided further, That no funds appropriated herein shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to implement an amendment or amendments to 27 CFR 178.118 or to change the definition of "Curios or relics" in 27 CFR 178.11 or remove any item from ATF Publication 5300.11 as it existed on January 1, 1994: Provided further, That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That such funds shall be available to investigate and act upon applications filed by corporations for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That no funds in this Act may be used to provide ballistics imaging equipment to any State or local authority who has obtained similar equipment through a Federal grant or subsidy unless the State or local authority agrees to return that equipment or to repay that grant or subsidy to the Federal Government: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That no funds under this Act may be used to electronically retrieve information gathered pursuant to 18 U.S.C. 923(g)(4) by name or any personal identification code.

### LABORATORY FACILITIES

For necessary expenses for design of a new facility or facilities, to house the Bureau of Alcohol, Tobacco and Firearms National Laboratory Center and the Fire Investigation Research and Development Center, not to exceed 185,000 occupiable square feet, $6,978,000, to remain available until expended: Provided, That these funds shall not be available until a prospectus of authorization for the Laboratory Facilities is approved by the House Committee on Transportation and Infrastructure and the Senate Committee on Environment and Public Works.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the United States Customs Service, including purchase of up to 1,000 motor vehicles of which 960 are for replacement only, including 990 for police-type use and commercial operations; hire of motor vehicles; contracting with individuals for personal services abroad; not to exceed $30,000 for official reception and representation expenses; and

awards of compensation to informers, as authorized by any Act enforced by the United States Customs Service; $1,487,250,000; of which $65,000,000 shall be available until expended for Operation Hardline; of which $28,000,000 shall remain available until expended for acquisition of aircraft and related operations and maintenance associated with Operation Gateway; and of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Reconciliation Act of 1985, as amended (19 U.S.C. 58c(f)(3)), shall be derived from that Account; of the total, not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations, and not to exceed $4,000,000 shall be available until expended for research and not to exceed $1,000,000 shall be available until expended for conducting special operations pursuant to 19 U.S.C. 2081 and up to $6,000,000 shall be available until expended for the procurement of automation infrastructure items, including hardware, software, and installation: Provided, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That the United States Custom Service shall implement the General Aviation Telephonic Entry program within 30 days of enactment of this Act: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That the Spirit of St. Louis Airport in St. Louis County, Missouri, shall be designated a port of entry: Provided further, That no funds under this Act may be used to provide less than 30 days public notice for any change in apparel regulations: Provided further, That $750,000 shall be available for additional part-time and temporary positions in the Honolulu Customs District: Provided further, That of the funds appropriated $2,500,000 may be made available for the Western Hemisphere Trade Center authorized by Public Law 103–182.

### OPERATION AND MAINTENANCE, AIR AND MARINE INTERDICTION PROGRAMS

For expenses, not otherwise provided for, necessary for the operation and maintenance of marine vessels, aircraft, and other related equipment of the Air and Marine Programs, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include: the interdiction of narcotics and other goods; the provision of support to Customs and other Federal, State, and local agencies in the enforcement or administration of laws enforced by the Customs Service; and, at the discretion of the Commissioner of Customs, the provision of assistance to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts; $83,363,000, which shall remain available until expended: Provided, That no aircraft or other related equipment, with the exception of aircraft which is one of a kind and has been identified as excess to Customs requirements and aircraft which has been damaged beyond repair, shall be transferred to any other Federal agency, Department, or office outside of the Department of the Treasury, during fiscal year 1997 without the prior approval of the House and Senate Committees on Appropriations.

### CUSTOMS SERVICES AT SMALL AIRPORTS

### (TO BE DERIVED FROM FEES COLLECTED)

Such sums as may be necessary for expenses for the provision of Customs services at certain small airports or other facilities when authorized by law and designated by the Secretary of the Treasury, including expenditures for the salary and expenses of individuals employed to provide such services, to be derived from fees collected by the Secretary pursuant to section 236 of Public Law 98–573 for each of these airports or other facilities when authorized by law and designated by the Secretary, and to remain available until expended.

### HARBOR MAINTENANCE FEE COLLECTION

For administrative expenses related to the collection of the Harbor Maintenance Fee, pursuant to Public Law 103–182, $3,000,000, to be derived from the Harbor Maintenance Trust Fund and to be transferred to and merged with the Customs "Salaries and Expenses" account for such purposes.

### BUREAU OF THE PUBLIC DEBT

### ADMINISTERING THE PUBLIC DEBT

For necessary expenses connected with any public-debt issues of the United States; $169,735,000: Provided, That the sum appropriated herein from the General Fund for fiscal year 1997 shall be reduced by not more than $4,400,000 as definitive

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

security issue fees and Treasury Direct Investor Account Maintenance fees are collected, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at $165,335,000.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE, AND MANAGEMENT

For necessary expenses of the Internal Revenue Service, not otherwise provided for; including processing tax returns; revenue accounting; providing assistance to taxpayers, management services, and inspection; including purchase (not to exceed 150 for replacement only for police-type use) and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner; $1,779,840,000, of which up to $3,700,000 shall be for the Tax Counseling for the Elderly Program, and of which not to exceed $25,000 shall be for official reception and representation expenses.

### TAX LAW ENFORCEMENT

For necessary expenses of the Internal Revenue Service for determining and establishing tax liabilities; tax and enforcement litigation; technical rulings; examining employee plans and exempt organizations; investigation and enforcement activities; securing unfiled tax returns; collecting unpaid accounts; statistics of income and compliance research; the purchase (for police-type use, not to exceed 850), and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner $4,104,211,000, of which not to exceed $1,000,000 shall remain available until September 30, 1999, for research.

### INFORMATION SYSTEMS

For necessary expenses for data processing and telecommunications support for Internal Revenue Service activities, including tax systems modernization and operational information systems; the hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner, $1,323,075,000, of which no less than $130,075,000 shall be available for Tax Systems Modernization (TSM) development and deployment which shall be available until September 30, 1999, and of which no less than $206,200,000 shall be available for TSM Operational Systems: Provided, That none of the funds made available for TSM Operational Systems shall be available after July 31, 1997, unless the Department of the Treasury has prepared a Request for Proposal which could be used as a base for a solicitation of a contract with an alternative or new Prime Contractor to manage, integrate, test and implement the TSM program: Provided further, That all activities associated with the development of a request for proposal, contract solicitation, and contract award for private sector assistance on TSM (both operational systems and development and deployment systems), beyond private sector assistance which is currently under contract, shall be conducted by the Department of the Treasury's Modernization Management Board: Provided further, That if the Internal Revenue Service determines that it is unable to meet deadlines established herein, the Secretary of the Treasury shall notify the Committees on Appropriations of the House and the Senate of the delay Provided further, That the Internal Revenue Service shall submit, by February 1, 1997, a timetable for implementing, by October 1, 1997, recommendations made by the General Accounting Office in its July 1995 report, entitled: "Tax Systems Modernization: Management and Technical Weaknesses Must Be Corrected If Modernization Is To Succeed": Provided further, That the Internal Revenue Service shall submit, by December 1, 1996, a schedule to transfer, not later than July 31, 1997, a majority of Tax Systems Modernization development, deployment, management, integration, and testing, from the Internal Revenue Service to the private sector.

### INFORMATION SYSTEMS

### (RESCISSION)

Of the funds made available under this heading for Information Systems in Public Law 104–52, $115,000,000 are rescinded, in Public Law 103–123, $17,447,000 are rescinded, in Public Law 102–393, $15,000,000 are rescinded, and in Public Law 102–141, $27,000,000 are rescinded.

### ADMINISTRATIVE PROVISIONS—INTERNAL REVENUE SERVICE

SECTION 101. Not to exceed 5 percent of any appropriation made available in this Act to the Internal Revenue Service may be transferred to any other Internal Revenue Service appropriation upon the advance approval of the House and Senate Committees on Appropriations.

<< 26 USCA § 7803 NOTE >>

SEC. 102. The Internal Revenue Service shall maintain a training program to insure that Internal Revenue Service employees are trained in taxpayers' rights, in dealing courteously with the taxpayers, and in cross-cultural relations.

SEC. 103. The funds provided in this Act for the Internal Revenue Service shall be used to provide as a minimum, the fiscal year 1995 level of service, staffing, and funding for Taxpayer Services.

SEC. 104. No funds available in this Act to the Internal Revenue Service for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations.

Sec. 105. The Internal Revenue Service (IRS) may proceed with its field support reorganization in fiscal year 1997 after it submits its report, no earlier than March 1, 1997, to the Committees on Appropriations of the House and Senate only if the IRS maintains, in fiscal year 1997, the current level of taxpayer service employees that work on cases generated through walk in visits and telephone calls to IRS offices.

SEC. 106. Funds made available by this or any other Act to the Internal Revenue Service shall be available for improved facilities and increased manpower to provide sufficient and effective 1–800 help line for taxpayers. The Commissioner shall make the improvement of the IRS 1–800 help line service a priority and allocate resources necessary to increase phone lines and staff to improve the IRS 1–800 help line service.

SEC. 107. No funds made available by this Act, or any other Act, to the Internal Revenue Service may be used to pay for the design and printing of more than two ink colors on the covers of income tax packages, and such ink colors must be the same colors as used to print the balance of the material in each package.

SEC. 108. Notwithstanding any other provision of law, no field support reorganization of the Internal Revenue Service shall be undertaken in Aberdeen, South Dakota until the Internal Revenue Service toll-free help phone line assistance program reaches at least an 80 percent service level. The Commissioner shall submit to Congress a report and the GAO shall certify to Congress that the 80 percent service level has been met.

## UNITED STATES SECRET SERVICE

## SALARIES AND EXPENSES

<< 3 USCA § 203 >>

For necessary expenses of the United States Secret Service, including purchase (not to exceed 702 vehicles for police-type use, of which 665 shall be for replacement only), and hire of passenger motor vehicles; hire of aircraft; training and assistance requested by State and local governments, which may be provided without reimbursement; services of expert witnesses at such rates as may be determined by the Director; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; for payment of per diem and/or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee require an employee to work 16 hours per day or to remain overnight at his or her post of duty; the conducting of and participating in firearms matches; presentation of awards; and for travel of Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act: Provided, That approval is obtained in advance from the House and Senate Committees on Appropriations; for repairs, alterations, and minor construction at the James J. Rowley Secret Service Training Center; for research and development; for making grants to conduct behavioral research in support of protective research and operations; not to exceed $20,000 for official reception and representation expenses; not to exceed $50,000 to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; for payment in advance for commercial accommodations as may be necessary to perform protective functions; and for uniforms without regard to the general purchase price limitation for the current fiscal year: Provided further, That 3 U.S.C. 203(a) is amended by deleting "but not exceeding twelve hundred in number"; $528,262,000,

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 465 of 1021   PageID 7335

of which $1,200,000 shall be available as a grant for activities related to the investigations of missing and exploited children and shall remain available until expended.

SALARIES AND EXPENSES

(RESCISSION)

Of the funds made available under this heading in Public Law 104–52, $7,600,000 are rescinded.

ACQUISITION, CONSTRUCTION, IMPROVEMENT, AND RELATED EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of construction, repair, alteration, and improvement of facilities, $37,365,000, of which $8,200,000 shall be available for the Rowley Secret Service Training Center, to remain available until expended: Provided, That funds previously provided under the title, "Treasury Buildings and Annex Repair and Restoration," for the Secret Service's Headquarters Building, shall be transferred to this account: Provided further, That funds for the Rowley Secret Service Training Center shall not be available until a prospectus authorizing such facilities is approved in accordance with the Public Buildings Act of 1959, as amended, except that funds may be expended for required expenses in connection with the development of a proposed prospectus.

GENERAL PROVISIONS—DEPARTMENT OF THE TREASURY

SECTION 111. Any obligation or expenditure by the Secretary in connection with law enforcement activities of a Federal agency or a Department of the Treasury law enforcement organization in accordance with 31 U.S.C. 9703(g)(4)(B) from unobligated balances remaining in the Fund on September 30, 1997, shall be made in compliance with the reprogramming guidelines contained in the House and Senate reports accompanying this Act.

SEC. 112. Appropriations to the Treasury Department in this Act shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901), including maintenance, repairs, and cleaning; purchase of insurance for official motor vehicles operated in foreign countries; purchase of motor vehicles without regard to the general purchase price limitations for vehicles purchased and used overseas for the current fiscal year; entering into contracts with the Department of State for the furnishing of health and medical services to employees and their dependents serving in foreign countries; and services authorized by 5 U.S.C. 3109.

SEC. 113. None of the funds appropriated by this title shall be used in connection with the collection of any underpayment of any tax imposed by the Internal Revenue Code of 1986 unless the conduct of officers and employees of the Internal Revenue Service in connection with such collection, including any private sector employees under contract to the Internal Revenue Service, complies with subsection (a) of section 805 (relating to communications in connection with debt collection), and section 806 (relating to harassment or abuse), of the Fair Debt Collection Practices Act (15 U.S.C. 1692).

<< 26 USCA § 6103 NOTE >>

SEC. 114. The Internal Revenue Service shall institute policies and procedures which will safeguard the confidentiality of taxpayer information.

SEC. 115. The funds provided to the Bureau of Alcohol Tobacco and Firearms for fiscal year 1997 in this Act for the enforcement of the Federal Alcohol Administration Act shall be expended in a manner so as not to diminish enforcement efforts with respect to section 105 of the Federal Alcohol Administration Act.

<< 31 USCA § 9703 >>

SEC. 116. Paragraph (3)(C) of section 9703(g) of title 31, United States Code, is amended—

(1) by striking in the third sentence "and at the end of each fiscal year thereafter";

(2) by inserting in lieu thereof "1994, 1995, and 1996"; and

(3) by adding at the end the following new sentence: "At the end of fiscal year 1997, and at the end of each fiscal year thereafter, the Secretary shall reserve any amounts that are required to be retained in the Fund to ensure the availability of amounts in the subsequent fiscal year for purposes authorized under subsection (a)."

SEC. 117. Of the funds available to the Internal Revenue Service, $13,000,000 shall be made available to continue the private sector debt collection program which was initiated in fiscal year 1996 and $13,000,000 shall be transferred to the Departmental Offices appropriation to initiate a new private sector debt collection program: Provided, That the transfer provided herein shall be in addition to any other transfer authority contained in this Act.

<< 18 USCA § 923 >>

SEC. 118. Section 923(j) of title 18, United States Code, is amended by striking the period after the last sentence, and inserting the following: ", including the right of a licensee to conduct 'curios or relics' firearms transfers and business away from their business premises with another licensee without regard as to whether the location of where the business is conducted is located in the State specified on the license of either licensee.".

This title may be cited as the "Treasury Department Appropriations Act, 1997".

TITLE II—POSTAL SERVICE

PAYMENTS TO THE POSTAL SERVICE

PAYMENT TO THE POSTAL SERVICE FUND

<< 39 USCA § 403 NOTE >>

For payment to the Postal Service Fund for revenue forgone on free and reduced rate mail, pursuant to subsections (c) and (d) of section 2401 of title 39, United States Code, $85,080,000: Provided, That mail for overseas voting and mail for the blind shall continue to be free: Provided further, That 6–day delivery and rural delivery of mail shall continue at not less than the 1983 level: Provided further, That none of the funds made available to the Postal Service by this Act shall be used to implement any rule, regulation, or policy of charging any officer or employee of any State or local child support enforcement agency, or any individual participating in a State or local program of child support enforcement, a fee for information requested or provided concerning an address of a postal customer: Provided further, That none of the funds provided in this Act shall be used to consolidate or close small rural and other small post offices in the fiscal year ending on September 30, 1997.

PAYMENT TO THE POSTAL SERVICE FUND FOR NONFUNDED LIABILITIES

For payment to the Postal Service Fund for meeting the liabilities of the former Post Office Department to the Employees' Compensation Fund pursuant to 39 United States Code 2004, $35,536,000.

TITLE III—EXECUTIVE OFFICE OF THE PRESIDENT AND FUNDS APPROPRIATED TO THE PRESIDENT

COMPENSATION OF THE PRESIDENT AND THE WHITE HOUSE OFFICE

COMPENSATION OF THE PRESIDENT

<< 3 USCA § 102 NOTE >>

For compensation of the President, including an expense allowance at the rate of $50,000 per annum as authorized by 3 U.S.C. 102, $250,000: Provided, That none of the funds made available for official expenses shall be expended for any other purpose and any unused amount shall revert to the Treasury pursuant to section 1552 of title 31, United States Code: Provided further, That none of the funds made available for official expenses shall be considered as taxable to the President.

SALARIES AND EXPENSES

For necessary expenses for the White House as authorized by law, including not to exceed $3,850,000 for services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 105; including subsistence expenses as authorized by 3 U.S.C. 105, which shall be expended and accounted for as provided in that section; hire of passenger motor vehicles, newspapers, periodicals, teletype news service, and travel (not to exceed $100,000 to be expended and accounted for as provided by 3 U.S.C. 103); not to exceed $19,000 for official entertainment expenses, to be available for allocation within the Executive Office of the President; $40,193,000:

Provided, That $420,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

EXECUTIVE RESIDENCE AT THE WHITE HOUSE

OPERATING EXPENSES

For the care, maintenance, repair and alteration, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the Executive Residence at the White House and official entertainment expenses of the President, $7,827,000, to be expended and accounted for as provided by 3 U.S.C. 105, 109–110, 112–114.

SPECIAL ASSISTANCE TO THE PRESIDENT AND THE OFFICIAL RESIDENCE OF THE VICE PRESIDENT

SALARIES AND EXPENSES

For necessary expenses to enable the Vice President to provide assistance to the President in connection with specially assigned functions, services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 106, including subsistence expenses as authorized by 3 U.S.C. 106, which shall be expended and accounted for as provided in that section; and hire of passenger motor vehicles; $3,280,000: Provided, That $150,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

OPERATING EXPENSES

For the care, operation, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the official residence of the Vice President, the hire of passenger motor vehicles, and not to exceed $90,000 for official entertainment expenses of the Vice President, to be accounted for solely on his certificate; $324,000: Provided, That advances or repayments or transfers from this appropriation may be made to any department or agency for expenses of carrying out such activities: Provided further, That $8,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted for approval to the Committees on Appropriations of the House and Senate a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

COUNCIL OF ECONOMIC ADVISERS

SALARIES AND EXPENSES

For necessary expenses of the Council in carrying out its functions under the Employment Act of 1946 (15 U.S.C. 1021), $3,439,000.

OFFICE OF POLICY DEVELOPMENT

SALARIES AND EXPENSES

For necessary expenses of the Office of Policy Development, including services as authorized by 5 U.S.C. 3109, and 3 U.S.C. 107; $3,867,000: Provided, That $45,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

NATIONAL SECURITY COUNCIL

SALARIES AND EXPENSES

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 468 of 1021   PageID 7338

For necessary expenses of the National Security Council, including services as authorized by 5 U.S.C. 3109, $6,648,000: Provided, That $3,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Office of Administration, $26,100,000, including services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 107, and hire of passenger motor vehicles: Provided, That $340,700 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF MANAGEMENT AND BUDGET

### SALARIES AND EXPENSES

For necessary expenses of the Office of Management and Budget, including hire of passenger motor vehicles, services as authorized by 5 U.S.C. 3109, $55,573,000, of which not to exceed $5,000,000 shall be available to carry out the provisions of 44 U.S.C. chapter 35: Provided, That, as provided in 31 U.S.C. 1301(a), appropriations shall be applied only to the objects for which appropriations were made except as otherwise provided by law: Provided further, That none of the funds appropriated in this Act for the Office of Management and Budget may be used for the purpose of reviewing any agricultural marketing orders or any activities or regulations under the provisions of the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.): Provided further, That none of the funds made available for the Office of Management and Budget by this Act may be expended for the altering of the transcript of actual testimony of witnesses, except for testimony of officials of the Office of Management and Budget, before the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs or their subcommittees: Provided further, That this proviso shall not apply to printed hearings released by the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs.

## OFFICE OF NATIONAL DRUG CONTROL POLICY

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy; for research activities pursuant to title I of Public Law 100–690; not to exceed $8,000 for official reception and representation expenses; and for participation in joint projects or in the provision of services on matters of mutual interest with nonprofit, research, or public organizations or agencies, with or without reimbursement; $35,838,000, of which $19,000,000 shall remain available until expended, consisting of $1,000,000 for policy research and evaluation and $18,000,000 for the Counter–Drug Technology Assessment Center for counternarcotics research and development projects of which $1,000,000 shall be obligated for state conferences on model state drug laws: Provided, That the $17,000,000 for the Counter–Drug Technology Assessment Center shall be available for transfer to other Federal departments or agencies: Provided further, That the Office is authorized to accept, hold, administer, and utilize gifts, both real and personal, for the purpose of aiding or facilitating the work of the Office: Provided further, That not before January 31, 1997, the Director of the Office of National Drug Control Policy shall transfer all balances in the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. § 1509) to the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## FEDERAL DRUG CONTROL PROGRAMS

### HIGH INTENSITY DRUG TRAFFICKING AREAS PROGRAM

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy's High Intensity Drug Trafficking Areas Program, $127,102,000 for drug control activities consistent with the approved strategy for each of the designated High Intensity Drug Trafficking Areas, of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in Lake County, Indiana; of which $6,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area for the Gulf Coast States of Louisiana, Alabama, and Mississippi; of which $8,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area dedicated to combating methamphetamine use, production and trafficking in a five State area including Iowa, Missouri, Nebraska, South Dakota, and Kansas; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the State of Colorado; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the Pacific Northwest; of the total amount appropriated, including transferred funds, no less than $71,000,000 shall be transferred to State and local entities for drug control activities, and up to $69,207,000 may be transferred to Federal agencies and departments at a rate to be determined by the Director: Provided, That the funds made available under this head shall be obligated within 90 days of the date of enactment of this Act.

This title may be cited as the "Executive Office Appropriations Act, 1997".

## TITLE IV—INDEPENDENT AGENCIES

### COMMITTEE FOR PURCHASE FROM PEOPLE WHO ARE BLIND OR SEVERELY DISABLED

#### SALARIES AND EXPENSES

For necessary expenses of the Committee for Purchase From People Who Are Blind or Severely Disabled established by the Act of June 23, 1971, Public Law 92–28; $1,800,000.

### FEDERAL ELECTION COMMISSION

#### SALARIES AND EXPENSES

For necessary expenses to carry out the provisions of the Federal Election Campaign Act of 1971, as amended, $28,165,000, of which no less than $2,500,000 shall be available for internal automated data processing systems, and of which not to exceed $5,000 shall be available for reception and representation expenses.

### FEDERAL LABOR RELATIONS AUTHORITY

#### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Federal Labor Relations Authority, pursuant to Reorganization Plan Numbered 2 of 1978, and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, including hire of experts and consultants, hire of passenger motor vehicles, rental of conference rooms in the District of Columbia and elsewhere; $21,588,000: Provided, That public members of the Federal Service Impasses Panel may be paid travel expenses and per diem in lieu of subsistence as authorized by law (5 U.S.C. 5703) for persons employed intermittently in the Government service, and compensation as authorized by 5 U.S.C. 3109: Provided further, That notwithstanding 31 U.S.C. 3302, funds received from fees charged to non-Federal participants at labor-management relations conferences shall be credited to and merged with this account, to be available without further appropriation for the costs of carrying out these conferences.

### GENERAL SERVICES ADMINISTRATION

### FEDERAL BUILDINGS FUND

### LIMITATIONS ON AVAILABILITY OF REVENUE

(INCLUDING TRANSFER OF FUNDS)

For additional expenses necessary to carry out the purpose of the Fund established pursuant to section 210(f) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)), $400,544,000, to be deposited into said Fund. The revenues and collections deposited into the Fund shall be available for necessary expenses of real property management

and related activities not otherwise provided for, including operation, maintenance, and protection of federally owned and leased buildings; rental of buildings in the District of Columbia; restoration of leased premises; moving governmental agencies (including space adjustments and telecommunications relocation expenses) in connection with the assignment, allocation and transfer of space; contractual services incident to cleaning or servicing buildings, and moving; repair and alteration of federally owned buildings including grounds, approaches and appurtenances; care and safeguarding of sites; maintenance, preservation, demolition, and equipment; acquisition of buildings and sites by purchase, condemnation, or as otherwise authorized by law; acquisition of options to purchase buildings and sites; conversion and extension of federally owned buildings; preliminary planning and design of projects by contract or otherwise; construction of new buildings (including equipment for such buildings); and payment of principal, interest, taxes, and any other obligations for public buildings acquired by installment purchase and purchase contract, in the aggregate amount of $5,555,544,000 of which (1) not to exceed $657,711,000 shall remain available until expended for construction of additional projects and at maximum construction improvement costs (including funds for sites and expenses and associated design and construction services) as follows:

New Construction:
California:
  Fresno, Federal Building and U.S. Courthouse, $6,595,000
Colorado:
  Denver, Rogers Federal Building–U.S. Courthouse, $9,545,000
District of Columbia:
  U.S. Courthouse Annex, $5,703,000
Florida:
  Miami, U.S. Courthouse, $24,990,000
  Orlando, U.S. Courthouse, $9,514,000
Kentucky:
  Covington, U.S. Courthouse, $17,134,000
  London, U.S. Courthouse, $13,732,000
Montana:
  Babb, Piegan Border Station, $333,000
  Sweetgrass, Border Station, $1,059,000
Nevada:
  Las Vegas, U.S. Courthouse, $83,719,000
New York:
  Brooklyn, U.S. Courthouse, $169,000,000
Ohio:
  Cleveland, U.S. Courthouse, $128,559,000
  Youngstown, U.S. Courthouse, $15,813,000
Oregon:
  Portland, Consolidated Law Federal Office Building, $4,750,000
Pennsylvania:
  Erie, U.S. Courthouse Annex, $3,300,000
  Philadelphia, DVA–Federal Complex, Phase II, $13,765,000
South Carolina:
  Columbia, U.S. Courthouse Annex, $43,848,000
Texas:
  Corpus Christi, U.S. Courthouse, $24,161,000
Utah:
  Salt Lake City, Moss U.S. Courthouse Annex and Alteration, $11,474,000
Washington:
  Blaine, U.S. Border Station, $13,978,000
  Oroville, U.S. Border Station, $1,452,000

Seattle, U.S. Courthouse, $16,853,000

Sumas, U.S. Border Station (Claim), $1,177,000

Nationwide:

Non-prospectus construction projects, $10,000,000

Security Enhancements, $27,256,000:

Provided, That each of the immediately foregoing limits of costs on new construction projects may be exceeded to the extent that savings are affected in other such projects, but not to exceed 10 percent unless advance approval is obtained from the House and Senate Committees on Appropriations of a greater amount: Provided further, That the cost of future U.S. Courthouse annex projects shall reflect savings through improving design efficiencies, curtailing planned interior finishes, requiring more efficient use of courtroom and library space, and by otherwise limiting space requirements: Providing further, That from funds available in the Federal Buildings Fund, $20,000,000 shall be available until expended for environmental clean up activities at the Southeast Federal Center in the District of Columbia and $81,000,000 shall be available until expended for design and construction activities at the Consolidated Law Federal Office Building in Portland, Oregon: Provided further, That from funds available for non-prospectus construction projects, $250,000 may be available until expended for the acquisition, lease, construction, and equipping of flexiplace work telecommuting centers in West Virginia: Provided further, That all funds for direct construction projects shall expire on September 30, 1999: (2) not to exceed $639,000,000 shall remain available until expended, for repairs and alterations which includes associated design and construction services: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the amount by project as follows, except each project may be increased by an amount not to exceed 10 per centum unless advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount:

Repairs and alterations:

District of Columbia:

Ariel Rios Building, $62,740,000

Justice Department, Phase 1 of 3, $50,000,000

Lafayette Building, $5,166,000

Hawaii:

Honolulu, Prince Jonah Kuhio Kalanianaole Federal Building and U.S. Courthouse, $4,140,000

Illinois:

Chicago, Everett M. Dirksen Federal Building, $18,844,000

Chicago, John C. Kluczynski, Jr. Federal Building (IRS), $13,414,000

Louisiana:

New Orleans, Customhouse, $3,500,000

Maryland:

Montgomery County, White Oak environmental clean up activities, $10,000,000

Massachusetts:

Andover, IRS Regional Service Center, $812,000

New Hampshire:

Concord, J.C. Cleveland Federal Building, $8,251,000

New Jersey:

Camden, U.S. Post Office–Courthouse $11,096,000

New York:

Albany, James T. Foley Post Office–Courthouse, $3,880,000

Brookhaven, IRS Service Center, $2,272,000

New York, Jacob K. Javits Federal Building, $13,651,000

Pennsylvania:

Scranton, Federal Building–U.S. Courthouse, $10,610,000

Rhode Island:

Providence, Federal Building–U.S. Courthouse, $8,209,000

Texas:

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Fort Worth, Federal Center, $11,259,000

Nationwide:

Chlorofluorocarbons Program, $23,456,000

Elevator Program, $10,000,000

Energy Program, $20,000,000

Security Enhancements, various buildings, $2,700,000

Basic Repairs and Alterations, $345,000,000:

<< 40 USCA § 872 NOTE >>

Provided further, That additional projects for which prospectuses have been fully approved may be funded under this category only if advance approval is obtained from the Committees on Appropriations of the House and Senate: Provided further, That the amounts provided in this or any prior Act for Repairs and Alterations may be used to fund costs associated with implementing security improvements to buildings necessary to meet the minimum standards for security in accordance with current law and in compliance with the reprogramming guidelines of the appropriate Committees of the House and Senate: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the originally authorized amount, except each project may be increased by an amount not to exceed 10 percent when advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount: Provided further, That the difference between the funds appropriated and expended on any projects in this or any prior Act, under the heading "Repairs and Alterations", may be transferred to Basic Repairs and Alterations or used to fund authorized increases in prospectus projects: Provided further, That from funds made available for Basic Repairs and Alterations, $8,000,000 shall be made available for renovation of the Agricultural Research Service Laboratory in Ames, Iowa, which is currently occupied by the Animal and Plant Health Inspection Service: Provided further, That from funds made available for Basic Repairs Alterations, $1,450,000 may be available for the renovation of the Pioneer Courthouse located at 520 SW Morrison, in Portland, Oregon: Provided further, That from funds made available for Basic Repairs and Alterations, $6,000,000 shall be used for necessary expenses associated with ongoing construction of the U.S. Courthouse in Montgomery, Alabama: Provided further, That from funds made available for Basic Repairs and Alterations, $100,000 shall be transferred to the National Park Service "Construction" appropriation for restoration and maintenance of the multi-purpose field at Wallenberg Place in Washington, DC: Provided further, That all funds for repairs and alterations prospectus projects shall expire on September 30, 1999, and remain in the Federal Buildings Fund except funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to such date: Provided further, That the amount provided in this or any prior Act for Basic Repairs and Alterations may be used to pay claims against the Government arising from any projects under the heading "Repairs and Alterations" or used to fund authorized increases in prospectus projects: Provided further, That $5,700,000 of the funds provided under this heading in Public Law 103–329, for the IRS Service Center, Holtsville, New York, shall be available until September 30, 1998; (3) not to exceed $173,075,000 for installment acquisition payments including payments on purchase contracts which shall remain available until expended: Provided further, That up to $1,500,000 shall be available for a design prospectus of the Federal Building and U.S. Courthouse located at 811 Grand Avenue in Kansas City, Missouri; (4) not to exceed $2,343,795,000 for rental of space which shall remain available until expended; and (5) not to exceed $1,552,651,000 for building operations which shall remain available until expended and of which $8,000,000 shall be transferred to the "Policy and Operations" appropriation: Provided further, That funds available to the General Services Administration shall not be available for expenses in connection with any construction, repair, alteration, and acquisition project for which a prospectus, if required by the Public Buildings Act of 1959, as amended, has not been approved, except that necessary funds may be expended for each project for required expenses in connection with the development of a proposed prospectus: Provided further, That the Administrator of General Services shall, at the earliest practicable date, initiate discussions with the Smithsonian Institution on the feasibility of transferring Federal Building 10B located at 600 Independence Avenue SW., Washington, DC to the Smithsonian Institution at such price and under such terms and conditions as determined appropriate by the Administrator and subject to the prior approval of the appropriate authorizing and appropriations committees of the Congress: Provided further, That funds provided in this Act under the heading "Security Enhancements, various buildings" may be used, by project in accordance with an approved prospectus: Provided further, That the Administrator is authorized in fiscal year 1997 and thereafter, to enter into and perform such leases, contracts, or other transactions with any agency or instrumentality of the United States, the several States, or the District of Columbia, or with any

person, firm, association, or corporation, as may be necessary to implement the trade center plan at the Federal Triangle Project and is hereby granted all the rights and authorities of the former Pennsylvania Avenue Development Corporation (PADC) with regard to property transferred from the PADC to the General Services Administration in fiscal year 1996: Provided further, That notwithstanding any other provision of law, the Administrator of General Services is hereby authorized to use all funds transferred from the PADC or income earned on PADC properties for activities associated with carrying out the responsibilities of the PADC transferred to the Administrator of General Services and that any such income earned on or after April 1, 1996, shall be deposited to the Pennsylvania Avenue Activities account and shall remain available until expended: Provided further, That any funds or income as may be deemed by the Administrator as excess to the amount needed to fulfill the PADC responsibilities transferred to the Administrator of General Services, shall be applied to any outstanding debt, with the exception of debt associated with the Ronald Reagan Building and International Trade Center, incurred by the PADC in the course of acquiring real estate: Provided further, That with respect to real property transferred from the PADC to the General Services Administration pursuant to section 313 of Public Law 104–134, Title III, General Provisions, the Administrator of General Services is hereafter authorized and directed to make payments required by section 10(b) of the PADC Act of 1972, Public Law 92–578 in the same manner as previously paid by the PADC: Provided further, That for the purposes of this authorization, buildings constructed pursuant to the purchase contract authority of the Public Buildings Amendments of 1972 (40 U.S.C. 602a), buildings occupied pursuant to installment purchase contracts, and buildings under the control of another department or agency where alterations of such buildings are required in connection with the moving of such other department or agency from buildings then, or thereafter to be, under the control of the General Services Administration shall be considered to be federally owned buildings: Provided further, That funds available in the Federal Buildings Fund may be expended for emergency repairs when advance approval is obtained from the Committees on Appropriations of the House and Senate: Provided further, That amounts necessary to provide reimbursable special services to other agencies under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)(6)) and amounts to provide such reimbursable fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control as may be appropriate to enable the United States Secret Service to perform its protective functions pursuant to 18 U.S.C. 3056, as amended, shall be available from such revenues and collections: Provided further, That revenues and collections and any other sums accruing to this Fund during fiscal year 1997, excluding reimbursements under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490(f)(6)) in excess of $5,555,544,000 shall remain in the Fund and shall not be available for expenditure except as authorized in appropriations Acts.

## POLICY AND OPERATIONS

For expenses authorized by law, not otherwise provided for, for Government-wide policy and oversight activities associated with asset management activities; utilization and donation of surplus personal property; transportation management activities; procurement and supply management activities; Government-wide and internal responsibilities relating to automated data management, telecommunications, information resources management, and related technology activities; utilization survey, deed compliance inspection, appraisal, environmental and cultural analysis, and land use planning functions pertaining to excess and surplus real property; agency-wide policy direction; Board of Contract Appeals; accounting, records management, and other support services incident to adjudication of Indian Tribal Claims by the United States Court of Federal Claims; services as authorized by 5 U.S.C. 3109; and not to exceed $5,000 for official reception and representation expenses; $110,173,000.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General and services authorized by 5 U.S.C. 3109, $33,863,000: Provided, That not to exceed $5,000 shall be available for payment for information and detection of fraud against the Government, including payment for recovery of stolen Government property: Provided further, That not to exceed $2,500 shall be available for awards to employees of other Federal agencies and private citizens in recognition of efforts and initiatives resulting in enhanced Office of Inspector General effectiveness.

## ALLOWANCES AND OFFICE STAFF FOR FORMER PRESIDENTS

For carrying out the provisions of the Act of August 25, 1958, as amended (3 U.S.C. 102 note), and Public Law 95–138, $2,180,000: Provided, That the Administrator of General Services shall transfer to the Secretary of the Treasury such sums as may be necessary to carry out the provisions of such Acts.

EXPENSES, PRESIDENTIAL TRANSITION

For expenses necessary to carry out the Presidential Transition Act of 1963, as amended (3 U.S.C. 102 note), $5,600,000.

GENERAL PROVISIONS—GENERAL SERVICES

ADMINISTRATION

SECTION 401. The appropriate appropriation or fund available to the General Services Administration shall be credited with the cost of operation, protection, maintenance, upkeep, repair, and improvement, included as part of rentals received from Government corporations pursuant to law (40 U.S.C. 129).

SEC. 402. Funds available to the General Services Administration shall be available for the hire of passenger motor vehicles.

SEC. 403. Funds in the Federal Buildings Fund made available for fiscal year 1997 for Federal Buildings Fund activities may be transferred between such activities only to the extent necessary to meet program requirements: Provided, That any proposed transfers shall be approved in advance by the Committees on Appropriations of the House and Senate.

SEC. 404. No funds made available by this Act shall be used to transmit a fiscal year 1998 request for United States Courthouse construction that does not meet the design guide standards for construction as established by the General Services Administration, the Judicial Conference of the United States, and the Office of Management and Budget and does not reflect the priorities of the Judicial Conference of the United States as set out in its approved 5–year construction plan: Provided, That the request must be accompanied by a standardized courtroom utilization study of each facility to be replaced or expanded.

SEC. 405. None of the funds provided in this Act may be used to increase the amount of occupiable square feet, provide cleaning services, security enhancements, or any other service usually provided through the Federal Buildings Fund, to any agency which does not pay the requested rate per square foot assessment for space and services as determined by the General Services Administration in compliance with the Public Buildings Amendments Act of 1972 (Public Law 92–313).

SEC. 406. The Administrator of the General Services is directed to ensure that the materials used for the fascade on the United States Courthouse Annex, Savannah, Georgia project are compatible with the existing Savannah Federal Building–U.S. Courthouse fascade, in order to ensure compatibility of this new facility with the Savannah historic district and to ensure that the Annex will not endanger the National Landmark status of the Savannah historic district.

SEC. 407. (a) Section 210 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490) is amended by adding at the end the following new subsection:

<< 40 USCA § 490 >>

"(l)(1) The Administrator may establish, acquire space for, and equip flexiplace work telecommuting centers (in this subsection referred to as 'telecommuting centers') for use by employees of Federal agencies, State and local governments, and the private sector in accordance with this subsection.

"(2) The Administrator may make any telecommuting center available for use by individuals who are not Federal employees to the extent the center is not being fully utilized by Federal employees. The Administrator shall give Federal employees priority in using the telecommuting centers.

"(3)(A) The Administrator shall charge user fees for the use of any telecommuting center. The amount of the user fee shall approximate commercial charges for comparable space and services except that in no instance shall such fee be less than that necessary to pay the cost of establishing and operating the center, including the reasonable cost of renovation and replacement of furniture, fixtures, and equipment.

"(B) Amounts received by the Administrator after September 30, 1993, as user fees for use of any telecommuting center may be deposited into the Fund established under subsection (f) of this section and may be used by the Administrator to pay costs incurred in the establishment and operation of the center.

"(4) The Administrator may provide guidance, assistance, and oversight to any person regarding establishment and operation of alternative workplace arrangements, such as telecommuting, hoteling, virtual offices, and other distributive work arrangements.

"(5) In considering whether to acquire any space, quarters, buildings, or other facilities for use by employees of any executive agency, the head of that agency shall consider whether the need for the facilities can be met using alternative workplace arrangements referred to in paragraph (4).".

(b) Section 13 of the Public Building Act of 1959, as amended, (107 Stat. 438; 40 U.S.C. 612) is amended—

<< 40 USCA § 612 >>

(1) by striking "(xi)" and inserting in lieu thereof "(xii)"; and

(2) by striking "and (x)" and inserting in lieu thereof "(x) telecommuting centers and (xi)".

SEC. 408. Notwithstanding any other provision of law, the Administrator of General Services is authorized and directed to acquire the land bounded by S.W. First Avenue, S.W. Second Avenue, S.W. Main Street, and S.W. Madison Street, Portland, Oregon, for the purposes of constructing the proposed Law Enforcement Center on the site.

SEC. 409. Section 2815 of Public Law 103–160, relating to the conveyance of real property at the Iowa Army Ammunition Plant, is amended—

(1) in subsection (a), by striking "may convey to" and inserting "shall convey, without reimbursement and if requested by,"; and

(2) by striking subsection (b) and inserting the following new subsection:

"(b) USE OF WATER AND SEWER LINES.—As part of the conveyance under subsection (a), the Secretary shall permit the City to use existing water and sewer lines and sewage system at the Iowa Army Ammunition Plant for a three-year period beginning on the date of the conveyance.".

SEC. 410. (a) CONVEYANCE OF LAND.—

(1) ADMINISTRATOR OF GENERAL SERVICES.—Subject to subsections (b) and (c), the Administrator of General Services (hereinafter in this section referred to as the "Administrator") shall convey, without compensation, to a nonprofit organization known as the "Beaver County Corporation for Economic Development" all right, title, and interest of the United States in and to those pieces or parcels of land in Hopewell Township, Pennsylvania, described in subsection (b), together with all improvements thereon and appurtenances thereto. The purpose of the conveyance is to provide a site for economic development in Hopewell Township.

(2) PROPERTY DESCRIPTION.—The land referred to in paragraph (1) is the parcel of land in the township of Hopewell, county of Beaver, Pennsylvania, bounded and described as follows:

(A) Beginning at the southwest corner at a point common to Lot No. 1, same plan, lands now or formerly of Frank and Catherine Wutter, and the easterly right-of-way line of Pennsylvania Legislative Route No. 60 (Beaver Valley Expressway); thence proceeding by the easterly right-of-way of Pennsylvania Legislative Route No. 60 by the following three courses and distances:

(i) North 17 degrees, 14 minutes, 20 seconds West, 213.10 feet to a point.

(ii) North 72 degrees, 45 minutes, 40 seconds East, 30.00 feet to a point.

(iii) North 17 degrees, 14 minutes, 20 seconds West, 252.91 feet to a point; on a line dividing Lot No. 1 from the other part of Lot No. 1, said part now called Lot No. 5, same plan; thence by last mentioned dividing line, North 78 degrees, 00 minutes, 00 seconds East; 135.58 feet to a point, a cul-de-sac on Industrial Drive; thence by said cul-de-sac and the southerly side of Industrial Drive by the following courses and distances:

(I) By a curve to the right having a radius of 100.00 feet for an arc distance of 243.401 feet to a point.

(II) Thence by a curve to the right having a radius of 100.00 feet for an arc distance of 86.321 feet to a point.

(III) Thence by 78 degrees, 00 minutes, 00 seconds East, 777.78 feet to a point.

(IV) Thence, North 12 degrees, 00 minutes, 00 seconds West, 74.71 feet to a point.

(V) Thence by a curve to the right, having a radius of 50.00 feet for an arc distance of 78.54 feet to a point.

(VI) Thence North 78 degrees, 00 minutes, 00 seconds East, 81.24 feet to a point.

(VII) Thence by a curve to the right, having a radius of 415.00 feet for an arc distance of 140.64 feet to a point.

(VIII) Thence, South 82 degrees, 35 minutes, 01 second East, 125.00 feet to a point.

(IX) Thence, South 7 degrees, 24 minutes, 59 seconds West, 5.00 feet to a point.

(X) Thence by a curve to the right, having a radius of 320.00 feet for an arc distance of 256.85 feet to a point.

(XI) Thence by a curve to the right having a radius of 50.00 feet for an arc distance of 44.18 feet to a point on the northerly side of Airport Road.

(B) Thence by the northerly side thereof by the following:

(i) South 14 degrees, 01 minutes, 54 seconds, West, 56.94 feet to a point.

(ii) Thence by a curve to the right having a radius of 225.00 feet for an arc distance of 207.989 feet to a point.

(iii) Thence South 66 degrees, 59 minutes, 45 seconds West, 192.08 feet to a point on the southern boundary of Lot No. 1, which line is also the line dividing Lot No. 1 from lands now or formerly, of Frank and Catherine Wutter.

(C) Thence by the same, South 75 degrees, 01 minutes, 00 seconds West, 1,351.23 feet to a point at the place of beginning.

(3) DATE OF CONVEYANCE.—The date of the conveyance of property required under paragraph (1) shall be not later than the 90th day following the date of the enactment of this Act.

(4) CONVEYANCE TERMS.—

(A) TERMS AND CONDITIONS.—The conveyance of property required under paragraph (1) shall be subject to such terms and conditions as may be determined by the Administrator to be necessary to safeguard the interests of the United States. Such terms and conditions shall be consistent with the terms and conditions set forth in this section.

(B) QUITCLAIM DEED.—The conveyance of property required under paragraph (1) shall be by quitclaim deed.

(b) LIMITATION ON CONVEYANCE.—No part of any land conveyed under subsection (a) may be used, during the 30–year period beginning on the date of conveyance for any purpose other than economic development.

(c) REVERSIONARY INTEREST.—

(1) IN GENERAL.—The property conveyed under subsection (a) shall revert to the United States on any date in the 30–year period beginning on the date of such conveyance on which the property is used for a purpose other than economic development.

(2) ENFORCING REVERSION.—The Administrator shall perform all acts necessary to enforce any reversion of property to the United States under this subsection.

(3) INVENTORY OF PUBLIC BUILDINGS SERVICE.—Property that reverts to the United States under this subsection shall be under the control of the General Services Administration.

SEC. 411. Notwithstanding any other provision of law, the land contained in block 111 in the Federal District, Denver, Colorado, obtained pursuant to paragraphs (6) and (7) of section 12 of Public Law 94–204 (43 U.S.C. 1611 note) shall not be subject to condemnation by any agency or instrumentality of the Federal Government, without the consent of the owner of that land.

### JOHN F. KENNEDY ASSASSINATION RECORDS REVIEW BOARD

For necessary expenses to carry out the John F. Kennedy Assassination Records Collection Act of 1992, $2,150,000.

### MERIT SYSTEMS PROTECTION BOARD

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses to carry out functions of the Merit Systems Protection Board pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and direct procurement of survey printing, $23,923,000, together with not to exceed $2,430,000 for administrative expenses to adjudicate retirement appeals to be transferred from the Civil Service Retirement and Disability Fund in amounts determined by the Merit Systems Protection Board.

### NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### OPERATING EXPENSES

For necessary expenses in connection with the administration of the National Archives (including the Information Security Oversight Office) and records and related activities, as provided by law, and for expenses necessary for the review and declassification of documents, and for the hire of passenger motor vehicles, $196,963,000: Provided, That the Archivist of the United States is authorized to use any excess funds available from the amount borrowed for construction of the National Archives facility, for expenses necessary to move into the facility.

### ARCHIVES FACILITIES AND PRESIDENTIAL LIBRARIES

### REPAIRS AND RESTORATION

For the repair, alteration, and improvement of archives facilities and presidential libraries, and to provide adequate storage for holdings, $16,229,000 to remain available until expended.

## NATIONAL HISTORICAL PUBLICATIONS AND RECORDS COMMISSION

### GRANTS PROGRAM

For necessary expenses for allocations and grants for historical publications and records as authorized by 44 U.S.C. 2504, as amended, $5,000,000 to remain available until expended.

## OFFICE OF GOVERNMENT ETHICS

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Government Ethics pursuant to the Ethics in Government Act of 1978, as amended by Public Law 100–598, and the Ethics Reform Act of 1989, Public Law 101–194, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and not to exceed $1,500 for official reception and representation expenses; $8,078,000.

## OFFICE OF PERSONNEL MANAGEMENT

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses to carry out functions of the Office of Personnel Management pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109; medical examinations performed for veterans by private physicians on a fee basis; rental of conference rooms in the District of Columbia and elsewhere; hire of passenger motor vehicles; not to exceed $2,500 for official reception and representation expenses; advances for reimbursements to applicable funds of the Office of Personnel Management and the Federal Bureau of Investigation for expenses incurred under Executive Order 10422 of January 9, 1953, as amended; and payment of per diem and/or subsistence allowances to employees where Voting Rights Act activities require an employee to remain overnight at his or her post of duty; $87,076,000, of which not to exceed $1,000,000 shall be available for the establishment of health promotion and disease prevention programs for Federal employees; and in addition $94,736,000 for administrative expenses, to be transferred from the appropriate trust funds of the Office of Personnel Management without regard to other statutes, including direct procurement of printing materials for annuitants, for the retirement and insurance programs, of which $3,500,000 shall be transferred at such times as the Office of Personnel Management deems appropriate, and shall remain available until expended for the costs of automating the retirement recordkeeping systems, together with remaining amounts authorized in previous Acts for the recordkeeping systems: Provided, That the provisions of this appropriation shall not affect the authority to use applicable trust funds as provided by section 8348(a)(1)(B) of title 5, United States Code: Provided further, That, except as may be consistent with 5 U.S.C. 8902a(f)(1) and (i), no payment may be made from the Employees Health Benefits Fund to any physician, hospital, or other provider of health care services or supplies who is, at the time such services or supplies are provided to an individual covered under chapter 89 of title 5, United States Code, excluded, pursuant to section 1128 or 1128A of the Social Security Act (42 U.S.C. 1320a–7–1320a–7a), from participation in any program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.): Provided further, That no part of this appropriation shall be available for salaries and expenses of the Legal Examining Unit of the Office of Personnel Management established pursuant to Executive Order 9358 of July 1, 1943, or any successor unit of like purpose: Provided further, That the President's Commission on White House Fellows, established by Executive Order 11183 of October 3, 1964, may, during the fiscal year ending September 30, 1997, accept donations of money, property, and personal services in connection with the development of a publicity brochure to provide information about the White House Fellows, except that no such donations shall be accepted for travel or reimbursement of travel expenses, or for the salaries of employees of such Commission.

### GENERAL PROVISIONS—OFFICE OF PERSONNEL

### MANAGEMENT

AR03136

<< 5 USCA § 1304 >>

SEC. 421. The first sentence of section 1304(e)(1) of title 5, United States Code, is amended by inserting after "basis" the following ", including personnel management services performed at the request of individual agencies (which would otherwise be the responsibility of such agencies), or at the request of nonappropriated fund instrumentalities".

<< 5 USCA § 8906 >>

SEC. 422. Paragraph (1) of section 8906(e) of title 5, United States Code, is amended—
 (1) by striking the last sentence of that paragraph and redesignating the remainder of that paragraph as (1)(A);
 (2) by adding at the end of paragraph (1)(A) (as so designated) the following:
 "(B) During each pay period in which an enrollment continues under subparagraph (A)—
 "(i) employee and Government contributions required by this section shall be paid on a current basis; and
 "(ii) if necessary, the head of the employing agency shall approve advance payment, recoverable in the same manner as under section 5524a(c), of a portion of basic pay sufficient to pay current employee contributions.
 "(C) Each agency shall establish procedures for accepting direct payments of employee contributions for the purposes of this paragraph.".

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act, as amended, including services as authorized by 5 U.S.C. 3109, hire of passenger motor vehicles, $960,000; and in addition, not to exceed $8,645,000 for administrative expenses to audit the Office of Personnel Management's retirement and insurance programs, to be transferred from the appropriate trust funds of the Office of Personnel Management, as determined by the Inspector General: Provided, That the Inspector General is authorized to rent conference rooms in the District of Columbia and elsewhere.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEES HEALTH BENEFITS

For payment of Government contributions with respect to retired employees, as authorized by chapter 89 of title 5, United States Code, and the Retired Federal Employees Health Benefits Act (74 Stat. 849), as amended, such sums as may be necessary.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEE LIFE INSURANCE

For payment of Government contributions with respect to employees retiring after December 31, 1989, as required by chapter 87 of title 5, United States Code, such sums as may be necessary.

PAYMENT TO CIVIL SERVICE RETIREMENT AND DISABILITY FUND

<< 33 USCA § 776 >>

For financing the unfunded liability of new and increased annuity benefits becoming effective on or after October 20, 1969, as authorized by 5 U.S.C. 8348, and annuities under special Acts to be credited to the Civil Service Retirement and Disability Fund, such sums as may be necessary: Provided, That annuities authorized by the Act of May 29, 1944, as amended, and the Act of August 19, 1950, as amended (33 U.S.C. 771–75), may hereafter be paid out of the Civil Service Retirement and Disability Fund.

OFFICE OF SPECIAL COUNSEL

SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Special Counsel pursuant to Reorganization Plan Numbered 2 of 1978, the Civil Service Reform Act of 1978 (Public Law 95–454), the Whistleblower Protection Act of 1989 (Public Law 101–

12), Public Law 103–424, and the Uniformed Services Employment and Reemployment Act of 1994 (Public Law 103–353), including services as authorized by 5 U.S.C. 3109, payment of fees and expenses for witnesses, rental of conference rooms in the District of Columbia and elsewhere, and hire of passenger motor vehicles; $8,116,000.

## UNITED STATES TAX COURT

### SALARIES AND EXPENSES

<< 26 USCA § 7443 NOTE >>

For necessary expenses, including contract reporting and other services as authorized by 5 U.S.C. 3109, $33,781,000: Provided, That travel expenses of the judges shall be paid upon the written certificate of the judge.

This title may be cited as the "Independent Agencies Appropriations Act, 1997".

## TITLE V—GENERAL PROVISIONS

### THIS ACT

SECTION 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

<< 31 USCA § 5131 >>

SEC. 503. Section 5131 of title 31, United States Code, is amended—

(1) by striking subsection (c); and

(2) by redesignating subsection (d) as subsection (c).

SEC. 504. None of the funds made available by this Act shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would prohibit the enforcement of section 307 of the Tariff Act of 1930.

SEC. 505. None of the funds made available by this Act shall be available for the purpose of transferring control over the Federal Law Enforcement Training Center located at Glynco, Georgia, and Artesia, New Mexico, out of the Treasury Department.

SEC. 506. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

SEC. 507. No part of any appropriation contained in this Act shall be available for the payment of the salary of any officer or employee of the United States Postal Service, who—

(1) prohibits or prevents, or attempts or threatens to prohibit or prevent, any officer or employee of the United States Postal Service from having any direct oral or written communication or contact with any Member or committee of Congress in connection with any matter pertaining to the employment of such officer or employee or pertaining to the United States Postal Service in any way, irrespective of whether such communication or contact is at the initiative of such officer or employee or in response to the request or inquiry of such Member or committee; or

(2) removes, suspends from duty without pay, demotes, reduces in rank, seniority, status, pay, or performance of efficiency rating, denies promotion to, relocates, reassigns, transfers, disciplines, or discriminates in regard to any employment right, entitlement, or benefit, or any term or condition of employment of, any officer or employee of the United States Postal Service, or attempts or threatens to commit any of the foregoing actions with respect to such officer or employee, by reason of any communication or contact of such officer or employee with any Member or committee of Congress as described in paragraph (1).

SEC. 508. The Office of Personnel Management may, during the fiscal year ending September 30, 1997, accept donations of supplies, services, land, and equipment for the Federal Executive Institute and Management Development Centers to assist in enhancing the quality of Federal management.

<< 18 USCA § 3056 NOTE >>

SEC. 509. The United States Secret Service may, during the fiscal year ending September 30, 1997, and hereafter, accept donations of money to off-set costs incurred while protecting former Presidents and spouses of former Presidents when the former President or spouse travels for the purpose of making an appearance or speech for a payment of money or any thing of value.

SEC. 510. No part of any appropriation contained in this Act shall be available to pay the salary for any person filling a position, other than a temporary position, formerly held by an employee who has left to enter the Armed Forces of the United States and has satisfactorily completed his period of active military or naval service and has within 90 days after his release from such service or from hospitalization continuing after discharge for a period of not more than 1 year made application for restoration to his former position and has been certified by the Office of Personnel Management as still qualified to perform the duties of his former position and has not been restored thereto.

SEC. 511. None of the funds made available in this Act may be used to provide any non-public information such as mailing or telephone lists to any person or any organization outside of the Federal Government without the approval of the House and Senate Committees on Appropriations.

SEC. 512. No funds appropriated pursuant to this Act may be expended by an entity unless the entity agrees that in expending the assistance the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c, popularly known as the "Buy American Act").

SEC. 513. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or products that may be authorized to be purchased with financial assistance provided under this Act, it is the sense of the Congress that entities receiving such assistance should, in expending the assistance, purchase only American-made equipment and products.

(b) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance under this Act, the Secretary of the Treasury shall provide to each recipient of the assistance a notice describing the statement made in subsection (a) by the Congress.

SEC. 514. If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, such person shall be ineligible to receive any contract or subcontract made with funds provided pursuant to this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 515. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 1997 from appropriations made available for salaries and expenses for fiscal year 1997 in this Act, shall remain available through September 30, 1998, for each such account for the purposes authorized: Provided, That a request shall be submitted to the House and Senate Committees on Appropriations for approval prior to the expenditure of such funds.

SEC. 516. Where appropriations in this Act are expendable for travel expenses of employees and no specific limitation has been placed thereon, the expenditures for such travel expenses may not exceed the amount set forth in the budget estimates submitted for appropriations without the advance approval of the House and Senate Committees on Appropriations: Provided, That this section shall not apply to travel performed by uncompensated officials of local boards and appeal boards in the Selective Service System; to travel performed directly in connection with care and treatment of medical beneficiaries of the Department of Veterans Affairs; to travel of the Office of Personnel Management in carrying out its observation responsibilities of the Voting Rights Act; or to payments to interagency motor pools separately set forth in the budget schedules: Provided further, That this provision does not apply to accounts that do not contain an object identification for travel.

<< 31 USCA § 5141 NOTE >>

SEC. 517. Notwithstanding any other provision of law or regulation during the fiscal year ending September 30, 1997, and thereafter:

(1) The authority of the special police officers of the Bureau of Engraving and Printing, in the Washington, DC Metropolitan area, extends to buildings and land under the custody and control of the Bureau; to buildings and land acquired by or for the Bureau through lease, unless otherwise provided by the acquisition agency; to the streets, sidewalks and open areas immediately adjacent to the Bureau along Wallenberg Place (15th Street) and 14th Street between Independence and Maine Avenues and C and D Streets between 12th and 14th Streets; to areas which include surrounding parking facilities used by Bureau employees, including the lots at 12th and C Streets, SW, Maine Avenue and Water Streets, SW, Maiden Lane, the Tidal Basin and East Potomac Park; to the protection in transit of United States securities, plates and dies used in the production of United States securities, or other products or implements of the Bureau of Engraving and Printing which the Director of that agency so designates.

<< 31 USCA §§ 5131 nt, 5141 NOTE >>

(2) The authority of the special police officers of the United States Mint extends to the buildings and land under the custody and control of the Mint; to the streets, sidewalks and open areas in the vicinity to such facilities; to surrounding parking facilities used by Mint employees; and to the protection in transit of bullion, coins, dies, and other property and assets of, or in the custody of, the Mint.

(3) The exercise of police authority by Bureau or Mint officers, with the exception of the exercise of authority upon property under the custody and control of the Bureau or the Mint, respectively, shall be deemed supplementary to the Federal police force with primary jurisdictional responsibility. This authority shall be in addition to any other law enforcement authority which has been provided to these officers under other provisions of law or regulations.

SEC. 518. No funds appropriated by this Act shall be available to pay for an abortion, or the administrative expenses in connection with any health plan under the Federal employees health benefit program which provides any benefits or coverage for abortions.

SEC. 519. The provision of section 518 shall not apply where the life of the mother would be endangered if the fetus were carried to term, or the pregnancy is the result of an act of rape or incest.

SEC. 520. No part of any appropriation made available in this Act shall be used to implement Bureau of Alcohol, Tobacco and Firearms Ruling TD ATF–360; Re: Notice Nos. 782, 780, 91F009P.

SEC. 521. Notwithstanding title 5, United States Code, Personal Service Contractors (PSC) employed by the Department of the Treasury shall be considered as Federal Government employees for purposes of making available Federal employee health and life insurance.

<< 31 USCA § 5131 >>

SEC. 522. Section 5131 of title 31, United States Code, is amended by striking subsection (c); and by redesignating subsection (d) as subsection (c).

<< 31 USCA § 5112 >>

<< 31 USCA 5112 NOTE >>

SEC. 523. Section 5112(i)(4) of title 31, United States Code, is amended by adding at the end the following new subparagraph:

"(C) The Secretary may continue to mint and issue coins in accordance with the specifications contained in paragraphs (7), (8), (9), and (10) of subsection (a) and paragraph (1)(A) of this subsection at the same time the Secretary in minting and issuing other bullion and proof gold coins under this subsection in accordance with such program procedures and coin specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That profits generated from the sale of gold to the United States Mint for this program shall be considered as a receipt to be deposited into the General Fund of the Treasury.

<< 31 USCA § 5112 >>

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 482 of 1021   PageID 7352

<< 31 USCA § 5112 NOTE >>

SEC. 524. Section 5112 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(k) The Secretary may mint and issue bullion and proof platinum coins in accordance with such specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That the Secretary is authorized to use Government platinum reserves stockpiled at the United States Mint as working inventory and shall ensure that reserves utilized are replaced by the Mint.

SEC. 526. (a) REIMBURSEMENT OF CERTAIN ATTORNEY FEES AND COSTS.—

(1) IN GENERAL.—The Secretary of the Treasury shall pay from amounts appropriated in title I of this Act under the heading, "Departmental Offices, Salaries and Expenses", up to $500,000 to reimburse former employees of the White House Travel Office whose employment in that Office was terminated on May 19, 1993, for any attorney fees and costs they incurred with respect to that termination.

(2) VERIFICATION REQUIRED.—The Secretary shall pay an individual in full under paragraph (1) upon submission by the individual of documentation verifying the attorney fees and costs.

(3) NO INFERENCE OF LIABILITY.—Liability of the United States shall not be inferred from enactment of or payment under this subsection.

(b) LIMITATION ON FILING OF CLAIMS.—The Secretary of the Treasury shall not pay any claim filed under this section that is filed later than 120 days after the date of the enactment of this Act.

(c) LIMITATION.—Payments under subsection (a) shall not include attorney fees or costs incurred with respect to any Congressional hearing or investigation into the termination of employment of the former employees of the White House Travel Office.

(d) REDUCTION.—The amount paid pursuant to this section to an individual for attorney fees and costs described in subsection (a) shall be reduced by any amount received before the date of the enactment of this Act, without obligation for repayment by the individual, for payment of such attorney fees and costs (including any amount received from the funds appropriated for the individual in the matter relating to the "Office of the General Counsel" under the heading "Office of the Secretary" in title I of the Department of Transportation and Related Agencies Appropriations Act, 1994).

(e) PAYMENT IN FULL SETTLEMENT OF CLAIMS AGAINST THE UNITED STATES.—Payment under this section, when accepted by an individual described in subsection (a), shall be in full satisfaction of all claims of, or on behalf of, the individual against the United States that arose out of the termination of the White House Travel Office employment of that individual on May 19, 1993.

SEC. 527. None of the funds made available in this Act may be used by the Executive Office of the President to request from the Federal Bureau of Investigation any official background investigation report on any individual, except when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such individual has given his or her express written consent for such request not more than 6 months prior to the date of such request and during the same presidential administration; or

(2) such request is required due to extraordinary circumstances involving national security.

SEC. 528. (a) CLOSING OF ALLEY.—The alley bisecting the property on which a facility is being constructed for use by the United States Government at 930 H Street, N.W., Washington, District of Columbia, is closed to the public, without regard to any contingencies.

(b) JURISDICTION.—The Administrator of General Services shall have administrative jurisdiction over, and shall hold title on behalf of the United States in, the alley, property, and facility referred to in subsection (a).

SEC. 529. (a) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—Section 5112 of title 31, United States Code, as amended by sections 524 and 530 of this Act, is amended by adding at the end the following new subsection:

<< 31 USCA § 5112 >>

"(m) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—

"(1) MAXIMUM NUMBER.—Beginning January 1, 1999, the Secretary may mint and issue commemorative coins under this section during any calendar year with respect to not more than 2 commemorative coin programs.

"(2) MINTAGE LEVELS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), in carrying out any commemorative coin program, the Secretary shall mint—

"(i) not more than 750,000 clad half-dollar coins;

"(ii) not more than 500,000 silver one-dollar coins; and

"(iii) not more than 100,000 gold five-dollar or ten-dollar coins.

"(B) EXCEPTION.—If the Secretary determines, based on independent, market-based research conducted by a designated recipient organization of a commemorative coin program, that the mintage levels described in subparagraph (A) are not adequate to meet public demand for that commemorative coin, the Secretary may waive one or more of the requirements of subparagraph (A) with respect to that commemorative coin program.

"(C) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this paragraph, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

(b) RECOVERY OF MINT EXPENSES REQUIRED BEFORE PAYMENT OF SURCHARGES TO ANY RECIPIENT ORGANIZATION.—

<< 31 USCA § 5134 >>

(1) CLARIFICATION OF LAW RELATING TO DEPOSIT OF SURCHARGES IN THE NUMISMATIC PUBLIC ENTERPRISE FUND.—Section 5134(c)(2) of title 31, United States Code, is amended by inserting ", including amounts attributable to any surcharge imposed with respect to the sale of any numismatic item" before the period.

(2) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(f) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—

"(1) PAYMENT OF SURCHARGES.—Notwithstanding any other provision of law, no amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall be paid from the fund to any designated recipient organization unless—

"(A) all numismatic operation and program costs allocable to the program under which such numismatic item is produced and sold have been recovered; and

"(B) the designated recipient organization submits an audited financial statement that demonstrates to the satisfaction of the Secretary of the Treasury that, with respect to all projects or purposes for which the proceeds of such surcharge may be used, the organization has raised funds from private sources for such projects and purposes in an amount that is equal to or greater than the maximum amount the organization may receive from the proceeds of such surcharge.

"(2) ANNUAL AUDITS.—

"(A) ANNUAL AUDITS OF RECIPIENTS REQUIRED.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such amount, for an annual audit, in accordance with generally accepted government auditing standards by an independent public accountant selected by the organization, of all such payments to the organization beginning in the first fiscal year of the organization in which any such amount is received and continuing until all amounts received by such organization from the fund with respect to such surcharges are fully expended or placed in trust.

"(B) MINIMUM REQUIREMENTS FOR ANNUAL AUDITS.—At a minimum, each audit of a designated recipient organization pursuant to subparagraph (A) shall report—

"(i) the amount of payments received by the designated recipient organization from the fund during the fiscal year of the organization for which the audit is conducted that are derived from the proceeds of any surcharge imposed on the sale of any numismatic item;

"(ii) the amount expended by the designated recipient organization from the proceeds of such surcharges during the fiscal year of the organization for which the audit is conducted; and

"(iii) whether all expenditures by the designated recipient organization during the fiscal year of the organization for which the audit is conducted from the proceeds of such surcharges were for authorized purposes.

"(C) RESPONSIBILITY OF ORGANIZATION TO ACCOUNT FOR EXPENDITURES OF SURCHARGES.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall take appropriate steps, as a condition for receiving any such payment, to ensure that the receipt of the payment and the expenditure of the proceeds of such surcharge by the organization in each fiscal year of the organization can be accounted for separately from all other revenues and expenditures of the organization.

"(D) SUBMISSION OF AUDIT REPORT.—Not later than 90 days after the end of any fiscal year of a designated recipient organization for which an audit is required under subparagraph (A), the organization shall—

"(i) submit a copy of the report to the Secretary of the Treasury; and

"(ii) make a copy of the report available to the public.

"(E) USE OF SURCHARGES FOR AUDITS.—Any designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may use the amount received to pay the cost of an audit required under subparagraph (A).

"(F) WAIVER OF PARAGRAPH.—The Secretary of the Treasury may waive the application of any subparagraph of this paragraph to any designated recipient organization for any fiscal year after taking into account the amount of surcharges that such organization received or expended during such year.

"(G) NONAPPLICABILITY TO FEDERAL ENTITIES.—This paragraph shall not apply to any Federal agency or department or any independent establishment in the executive branch that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item.

"(H) AVAILABILITY OF BOOKS AND RECORDS.—An organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such payment, to the Inspector General of the Department of the Treasury or the Comptroller General of the United States, upon the request of such Inspector General or the Comptroller General, all books, records, and work papers belonging to or used by the organization, or by any independent public accountant who audited the organization in accordance with subparagraph (A), which may relate to the receipt or expenditure of any such amount by the organization.

"(3) USE OF AGENTS OR ATTORNEYS TO INFLUENCE COMMEMORATIVE COIN LEGISLATION.—No portion of any payment from the fund to any designated recipient organization of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may be used, directly or indirectly, by the organization to compensate any agent or attorney for services rendered to support or influence in any way legislative action of the Congress relating to such numismatic item.

"(4) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this subsection, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

<< 31 USCA § 5134 NOTE >>

(3) SCOPE OF APPLICATION.—The amendments made by this section shall apply with respect to the proceeds of any surcharge imposed on the sale of any numismatic item that are deposited in the Numismatic Public Enterprise Fund after the date of the enactment of this Act.

<< 31 USCA § 5112 NOTE >>

(4) REPEAL OF EXISTING RECIPIENT REPORT REQUIREMENT.—Section 303 of Public Law 103–186 (31 U.S.C. 5112 note) is repealed.

<< 31 USCA § 5134 >>

(c) QUARTERLY FINANCIAL REPORTS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(g) QUARTERLY FINANCIAL REPORTS.—

"(1) IN GENERAL.—Not later than the 30th day of each month following each calendar quarter through and including the final period of sales with respect to any commemorative coin program authorized on or after the date of enactment of the Treasury, Postal Service, and General Government Appropriations Act, 1997, the Mint shall submit to the Congress a quarterly financial report in accordance with this subsection.

"(2) REQUIREMENTS.—Each report submitted under paragraph (1) shall include, with respect to the calendar quarter at issue—

"(A) a detailed financial statement, prepared in accordance with generally accepted accounting principles, that includes financial information specific to that quarter, as well as cumulative financial information relating to the entire program;

"(B) a detailed accounting of—

"(i) all costs relating to marketing efforts;

"(ii) all funds projected for marketing use;

"(iii) all costs for employee travel relating to the promotion of commemorative coin programs;

"(iv) all numismatic items minted, sold, not sold, and rejected during the production process; and

"(v) the costs of melting down all rejected and unsold products;

"(C) adequate market-based research for all commemorative coin programs; and

"(D) a description of the efforts of the Mint in keeping the sale price of numismatic items as low as practicable.".

<< 31 USCA § 5135 >>

(d) CITIZENS COMMEMORATIVE COIN ADVISORY COMMITTEE.—

(1) FIXED TERMS FOR MEMBERS.—Section 5135(a)(4) of title 31, United States Code, is amended to read as follows:

"(4) TERMS.—Each member appointed under clause (i) or (iii) of paragraph (3)(A) shall be appointed for a term of 4 years.".

(2) CHAIRPERSON.—Section 5135(a) of title 31, United States Code, is amended by adding at the end the following new paragraph:

"(7) CHAIRPERSON.—

"(A) IN GENERAL.—Subject to subparagraph (B), the Chairperson of the Advisory Committee shall be elected by the members of the Advisory Committee from among such members.

"(B) EXCEPTION.—The member appointed pursuant to paragraph (3)(A)(ii) (or the alternate to that member) may not serve as the Chairperson of the Advisory Committee, beginning on June 1, 1999.".

<< 31 USCA §§ 5112 NOTE, 5134 nt, 5135 nt >>

(e) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date of enactment of this Act.

## TITLE VI—GENERAL PROVISIONS

### DEPARTMENTS, AGENCIES, AND CORPORATIONS

SECTION 601. Funds appropriated in this or any other Act may be used to pay travel to the United States for the immediate family of employees serving abroad in cases of death or life threatening illness of said employee.

SEC. 602. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency, or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from the illegal use, possession, or distribution of controlled substances (as defined in the Controlled Substances Act) by the officers and employees of such department, agency, or instrumentality.

SEC. 603. Notwithstanding 31 U.S.C. 1345, any agency, department or instrumentality of the United States which provides or proposes to provide child care services for Federal employees may reimburse any Federal employee or any person employed to provide such services for travel, transportation, and subsistence expenses incurred for training classes, conferences or other meetings in connection with the provision of such services: Provided, That any per diem allowance made pursuant to this section shall not exceed the rate specified in regulations prescribed pursuant to section 5707 of title 5, United States Code.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 1343 NOTE >>

SEC. 604. Unless otherwise specifically provided, the maximum amount allowable during the current fiscal year in accordance with section 16 of the Act of August 2, 1946 (60 Stat. 810), for the purchase of any passenger motor vehicle (exclusive of buses, ambulances, law enforcement, and undercover surveillance vehicles), is hereby fixed at $8,100 except station wagons for which the maximum shall be $9,100: Provided, That these limits may be exceeded by not to exceed $3,700 for police-type vehicles, and by not to exceed $4,000 for special heavy-duty vehicles: Provided further, That the limits set forth in this section may not be exceeded by more than 5 percent for electric or hybrid vehicles purchased for demonstration under the provisions of the Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976: Provided further, That the limits set forth in this section may be exceeded by the incremental cost of clean alternative fuels vehicles acquired pursuant to Public Law 101–549 over the cost of comparable conventionally fueled vehicles.

SEC. 605. Appropriations of the executive departments and independent establishments for the current fiscal year available for expenses of travel or for the expenses of the activity concerned, are hereby made available for quarters allowances and cost-of-living allowances, in accordance with 5 U.S.C. 5922–24.

<< 5 USCA § 3101 NOTE >>

SEC. 606. Unless otherwise specified during the current fiscal year, no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in the continental United States unless such person (1) is a citizen of the United States, (2) is a person in the service of the United States on the date of enactment of this Act who, being eligible for citizenship, has filed a declaration of intention to become a citizen of the United States prior to such date and is actually residing in the United States, (3) is a person who owes allegiance to the United States, (4) is an alien from Cuba, Poland, South Vietnam, the countries of the former Soviet Union, or the Baltic countries lawfully admitted to the United States for permanent residence, (5) is a South Vietnamese, Cambodian, or Laotian refugee paroled in the United States after January 1, 1975, or (6) is a national of the People's Republic of China who qualifys for adjustment of status pursuant to the Chinese Student Protection Act of 1992: Provided, That for the purpose of this section, an affidavit signed by any such person shall be considered prima facie evidence that the requirements of this section with respect to his or her status have been complied with: Provided further, That any person making a false affidavit shall be guilty of a felony, and, upon conviction, shall be fined no more than $4,000 or imprisoned for not more than 1 year, or both: Provided further, That the above penal clause shall be in addition to, and not in substitution for, any other provisions of existing law: Provided further, That any payment made to any officer or employee contrary to the provisions of this section shall be recoverable in action by the Federal Government. This section shall not apply to citizens of Ireland, Israel, or the Republic of the Philippines, or to nationals of those countries allied with the United States in the current defense effort, or to international broadcasters employed by the United States Information Agency, or to temporary employment of translators, or to temporary employment in the field service (not to exceed 60 days) as a result of emergencies.

SEC. 607. Appropriations available to any department or agency during the current fiscal year for necessary expenses, including maintenance or operating expenses, shall also be available for payment to the General Services Administration for charges for space and services and those expenses of renovation and alteration of buildings and facilities which constitute public improvements performed in accordance with the Public Buildings Act of 1959 (73 Stat. 749), the Public Buildings Amendments of 1972 (87 Stat. 216), or other applicable law.

SEC. 608. In addition to funds provided in this or any other Act, all Federal agencies are authorized to receive and use funds resulting from the sale of materials, including Federal records disposed of pursuant to a records schedule recovered through recycling or waste prevention programs. Such funds shall be available until expended for the following purposes:

(1) Acquisition, waste reduction and prevention, and recycling programs as described in Executive Order 12873 (October 20, 1993), including any such programs adopted prior to the effective date of the Executive Order.

(2) Other Federal agency environmental management programs, including, but not limited to, the development and implementation of hazardous waste management and pollution prevention programs.

(3) Other employee programs as authorized by law or as deemed appropriate by the head of the Federal agency.

SEC. 609. Funds made available by this or any other Act for administrative expenses in the current fiscal year of the corporations and agencies subject to chapter 91 of title 31, United States Code, shall be available, in addition to objects for which such funds are otherwise available, for rent in the District of Columbia; services in accordance with 5 U.S.C. 3109; and the objects specified under this head, all the provisions of which shall be applicable to the expenditure of such funds unless otherwise specified in the Act by which they are made available: Provided, That in the event any functions budgeted as administrative expenses are subsequently transferred to or paid from other funds, the limitations on administrative expenses shall be correspondingly reduced.

SEC. 610. No part of any appropriation for the current fiscal year contained in this or any other Act shall be paid to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person.

<< 40 USCA § 486a >>

SEC. 611. For the fiscal year ending September 30, 1997, and thereafter, any department or agency to which the Administrator of General Services has delegated the authority to operate, maintain or repair any building or facility pursuant to section 205(d) of the Federal Property and Administrative Services Act of 1949, as amended, shall retain that portion of the GSA rental payment available for operation, maintenance or repair of the building or facility, as determined by the Administrator, and expend such funds directly for the operation, maintenance or repair of the building or facility. Any funds retained under this section shall remain available until expended for such purposes.

SEC. 612. (a) IN GENERAL.—Section 1306 of title 31, United States Code, is amended to read as follows:

<< 31 USCA § 1306 >>

"§ 1306. Use of foreign credits

"(a) IN GENERAL.—Foreign credits (including currencies) owed to or owned by the United States may be used by any agency for any purpose for which appropriations are made for the agency for the current fiscal year (including the carrying out of Acts requiring or authorizing the use of such credits), but only when reimbursement therefor is made to the Treasury from applicable appropriations of the agency.

"(b) EXCEPTION TO REIMBURSEMENT REQUIREMENT.—Credits described in subsection (a) that are received as exchanged allowances, or as the proceeds of the sale of personal property, may be used in whole or partial payment for the acquisition of similar items, to the extent and in the manner authorized by law, without reimbursement to the Treasury.".

<< 31 USCA § 1306 NOTE >>

(b) APPLICABILITY.—The amendment made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

SEC. 613. No part of any appropriation contained in this or any other Act shall be available for interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities) which do not have a prior and specific statutory approval to receive financial support from more than one agency or instrumentality.

SEC. 614. Funds made available by this or any other Act to the "Postal Service Fund" (39 U.S.C. 2003) shall be available for employment of guards for all buildings and areas owned or occupied by the Postal Service and under the charge and control of the Postal Service, and such guards shall have, with respect to such property, the powers of special policemen provided by the first section of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318), and, as to property owned or occupied by the Postal Service, the Postmaster General may take the same actions as the Administrator of General Services may take under the provisions of sections 2 and 3 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318a, 318b), attaching thereto penal consequences under the authority and within the limits provided in section 4 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318c).

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 488 of 1021   PageID 7358

SEC. 615. None of the funds made available pursuant to the provisions of this Act shall be used to implement, administer, or enforce any regulation which has been disapproved pursuant to a resolution of disapproval duly adopted in accordance with the applicable law of the United States.

<< 5 USCA § 5343 NOTE >>

SEC. 616. (a) Notwithstanding any other provision of law, and except as otherwise provided in this section, no part of any of the funds appropriated for the fiscal year ending on September 30, 1997, by this or any other Act, may be used to pay any prevailing rate employee described in section 5342(a)(2)(A) of title 5, United States Code—

(1) during the period from the date of expiration of the limitation imposed by section 616 of the Treasury, Postal Service and General Government Appropriations Act, 1996, until the normal effective date of the applicable wage survey adjustment that is to take effect in fiscal year 1997, in an amount that exceeds the rate payable for the applicable grade and step of the applicable wage schedule in accordance with such section 616; and

(2) during the period consisting of the remainder of fiscal year 1997, in an amount that exceeds, as a result of a wage survey adjustment, the rate payable under paragraph (1) by more than the sum of—

(A) the percentage adjustment taking effect in fiscal year 1997 under section 5303 of title 5, United States Code, in the rates of pay under the General Schedule; and

(B) the difference between the overall average percentage of the locality-based comparability payments taking effect in fiscal year 1997 under section 5304 of such title (whether by adjustment or otherwise), and the overall average percentage of such payments which was effective in fiscal year 1996 under such section.

(b) Notwithstanding any other provision of law, no prevailing rate employee described in subparagraph (B) or (C) of section 5342(a)(2) of title 5, United States Code, and no employee covered by section 5348 of such title, may be paid during the periods for which subsection (a) is in effect at a rate that exceeds the rates that would be payable under subsection (a) were subsection (a) applicable to such employee.

(c) For the purposes of this section, the rates payable to an employee who is covered by this section and who is paid from a schedule not in existence on September 30, 1996, shall be determined under regulations prescribed by the Office of Personnel Management.

(d) Notwithstanding any other provision of law, rates of premium pay for employees subject to this section may not be changed from the rates in effect on September 30, 1996, except to the extent determined by the Office of Personnel Management to be consistent with the purpose of this section.

(e) This section shall apply with respect to pay for service performed after September 30, 1996.

(f) For the purpose of administering any provision of law (including section 8431 of title 5, United States Code, and any rule or regulation that provides premium pay, retirement, life insurance, or any other employee benefit) that requires any deduction or contribution, or that imposes any requirement or limitation on the basis of a rate of salary or basic pay, the rate of salary or basic pay payable after the application of this section shall be treated as the rate of salary or basic pay.

(g) Nothing in this section shall be considered to permit or require the payment to any employee covered by this section at a rate in excess of the rate that would be payable were this section not in effect.

(h) The Office of Personnel Management may provide for exceptions to the limitations imposed by this section if the Office determines that such exceptions are necessary to ensure the recruitment or retention of qualified employees.

SEC. 617. During the period in which the head of any department or agency, or any other officer or civilian employee of the Government appointed by the President of the United States, holds office, no funds may be obligated or expended in excess of $5,000 to furnish or redecorate the office of such department head, agency head, officer or employee, or to purchase furniture or make improvements for any such office, unless advance notice of such furnishing or redecoration is expressly approved by the Committees on Appropriations of the House and Senate. For the purposes of this section, the word "office" shall include the entire suite of offices assigned to the individual, as well as any other space used primarily by the individual or the use of which is directly controlled by the individual.

SEC. 618. Notwithstanding any other provision of law, no executive branch agency shall purchase, construct, and/or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the House and Senate Committees on Appropriations.

SEC. 619. Notwithstanding section 1346 of title 31, United States Code, or section 613 of this Act, funds made available for fiscal year 1997 by this or any other Act shall be available for the interagency funding of national security and emergency preparedness telecommunications initiatives which benefit multiple Federal departments, agencies, or entities, as provided by Executive Order Numbered 12472 (April 3, 1984).

SEC. 620. (a) None of the funds appropriated by this or any other Act may be obligated or expended by any Federal department, agency, or other instrumentality for the salaries or expenses of any employee appointed to a position of a confidential or policy-determining character excepted from the competitive service pursuant to section 3302 of title 5, United States Code, without a certification to the Office of Personnel Management from the head of the Federal department, agency, or other instrumentality employing the Schedule C appointee that the Schedule C position was not created solely or primarily in order to detail the employee to the White House.

(b) The provisions of this section shall not apply to Federal employees or members of the armed services detailed to or from—

(1) the Central Intelligence Agency;

(2) the National Security Agency;

(3) the Defense Intelligence Agency;

(4) the offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;

(5) the Bureau of Intelligence and Research of the Department of State;

(6) any agency, office, or unit of the Army, Navy, Air Force, and Marine Corps, the Federal Bureau of Investigation and the Drug Enforcement Administration of the Department of Justice, the Department of Transportation, the Department of the Treasury, and the Department of Energy performing intelligence functions; and

(7) the Director of Central Intelligence.

SEC. 621. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from discrimination and sexual harassment and that all of its workplaces are not in violation of title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973.

SEC. 622. No part of any appropriation contained in this Act may be used to pay for the expenses of travel of employees, including employees of the Executive Office of the President, not directly responsible for the discharge of official governmental tasks and duties: *Provided,* That this restriction shall not apply to the family of the President, Members of Congress or their spouses, Heads of State of a foreign country or their designees, persons providing assistance to the President for official purposes, or other individuals so designated by the President.

<< 5 USCA § 7301 NOTE >>

SEC. 623. Notwithstanding any provision of law, the President, or his designee, must certify to Congress, annually, that no person or persons with direct or indirect responsibility for administering the Executive Office of the President's Drug–Free Workplace Plan are themselves subject to a program of individual random drug testing.

SEC. 624. (a) None of the funds made available in this Act or any other Act may be obligated or expended for any employee training when it is made known to the Federal official having authority to obligate or expend such funds that such employee training—

(1) does not meet identified needs for knowledge, skills, and abilities bearing directly upon the performance of official duties;

(2) contains elements likely to induce high levels of emotional response or psychological stress in some participants;

(3) does not require prior employee notification of the content and methods to be used in the training and written end of course evaluation;

(4) contains any methods or content associated with religious or quasi-religious belief systems or "new age" belief systems as defined in Equal Employment Opportunity Commission Notice N–915.022, dated September 2, 1988;

(5) is offensive to, or designed to change, participants' personal values or lifestyle outside the workplace; or

(6) includes content related to human immunodeficiency virus/acquired immune deficiency syndrome (HIV/AIDS) other than that necessary to make employees more aware of the medical ramifications of HIV/AIDS and the workplace rights of HIV-positive employees.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(b) Nothing in this section shall prohibit, restrict, or otherwise preclude an agency from conducting training bearing directly upon the performance of official duties.

SEC. 625. No funds appropriated in this or any other Act for fiscal year 1997 may be used to implement or enforce the agreements in Standard Forms 312 and 4355 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These restrictions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by Executive Order 12356; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents); and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive Order and listed statutes are incorporated into this agreement and are controlling.": *Provided,* That notwithstanding the preceding paragraph, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress or to an authorized official of an executive agency or the Department of Justice that are essential to reporting a substantial violation of law.

SEC. 626. (a) None of the funds appropriated by this or any other Act may be expended by any Federal Agency to procure any product or service subject to section 5124 of Public Law 104–106 and that will be available under the procurement by the Administrator of General Services known as "FTS2000" unless—

(1) such product or service is procured by the Administrator of General Services as part of the procurement known as "FTS2000"; or

(2) that agency establishes to the satisfaction of the Administrator of General Services that—

(A) that agency's requirements for such procurement are unique and cannot be satisfied by property and service procured by the Administrator of General Services as part of the procurement known as "FTS2000"; and

(B) the agency procurement, pursuant to such delegation, would be cost-effective and would not adversely affect the cost-effectiveness of the FTS2000 procurement.

(b) After December 31, 1998, subsection (a) shall apply only if the Administrator of General Services has reported that the FTS2000 procurement is producing prices that allow the Government to satisfy its requirements for such procurement in the most cost-effective manner.

<< 31 USCA § 501 NOTE >>

SEC. 627. Subsection (f) of section 403 of Public Law 103–356 is amended by deleting "October 1, 1999" and inserting "October 1, 2001".

SEC. 628. (a) IN GENERAL.—Notwithstanding any other provision of law, none of the funds made available by this Act for the Department of the Treasury shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would permit the Secretary of the Treasury to make any loan or extension of credit under section 5302 of title 31, United States Code, with respect to a single foreign entity or government of a foreign country (including agencies or other entities of that government)—

(1) with respect to a loan or extension of credit for more than 60 days, unless the President certifies to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Banking and Financial Services of the House of Representatives that—

(A) there is no projected cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the United States from the proposed loan or extension of credit; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) any proposed obligation or expenditure of United States funds to or on behalf of the foreign government is adequately backed by an assured source of repayment to ensure that all United States funds will be repaid; and

(2) other than as provided by an Act of Congress, if that loan or extension of credit would result in expenditures and obligations, including contingent obligations, aggregating more than $1,000,000,000 with respect to that foreign country for more than 180 days during the 12–month period beginning on the date on which the first such action is taken.

(b) WAIVER OF LIMITATIONS.—The President may exceed the dollar and time limitations in subsection (a)(2) if he certifies in writing to the Congress that a financial crisis in that foreign country poses a threat to vital United States economic interests or to the stability of the international financial system.

(c) EXPEDITED PROCEDURES FOR A RESOLUTION OF DISAPPROVAL.—A presidential certification pursuant to subsection (b) shall not take effect, if the Congress, within 30 calendar days after receiving such certification, enacts a joint resolution of disapproval, as described in paragraph (5) of this subsection.

(1) REFERENCE TO COMMITTEES.—All joint resolutions introduced in the Senate to disapprove the certification shall be referred to the Committee on Banking, Housing, and Urban Affairs, and in the House of Representatives, to the appropriate committees.

(2) DISCHARGE OF COMMITTEES.—(A) If the committee of either House to which a resolution has been referred has not reported it at the end of 15 days after its introduction, it is in order to move either to discharge the committee from further consideration of the joint resolution or to discharge the committee from further consideration of any other resolution introduced with respect to the same matter, except no motion to discharge shall be in order after the committee has reported a joint resolution with respect to the same matter.

(B) A motion to discharge may be made only by an individual favoring the resolution, and is privileged in the Senate; and debate thereon shall be limited to not more than 1 hour, the time to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees.

(3) FLOOR CONSIDERATION IN THE SENATE.—(A) A motion in the Senate to proceed to the consideration of a resolution shall be privileged.

(B) Debate in the Senate on a resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 4 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

(C) Debate in the Senate on any debatable motion or appeal in connection with a resolution shall be limited to not more than 20 minutes, to be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto, shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(D) A motion in the Senate to further limit debate on a resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a resolution is in order in the Senate.

(4) In the case of a resolution, if prior to the passage by one House of a resolution of that House, that House receives a resolution with respect to the same matter from the other House, then—

(A) the procedure in that House shall be the same as if no resolution had been received from the other House; but

(B) the vote on final passage shall be on the resolution of the other House.

(5) For purposes of this subsection, the term "joint resolution" means only a joint resolution of the 2 Houses of Congress, the matter after the resolving clause of which is as follows: "That the Congress disapproves the action of the President under section 628(c) of the Treasury, Postal Service, and General Government Appropriations Act, 1997, notice of which was submitted to the Congress on _____.", with the blank space being filled with the appropriate date.

(d) APPLICABILITY.—This section—

(1) shall not apply to any action taken as part of the program of assistance to Mexico announced by the President on January 31, 1995; and

(2) shall remain in effect through fiscal year 1997.

<< 5 USCA § 8401 NOTE >>

Case 2:21-cv-00067-2 Document 162-7 Filed 09/02/22 Page 492 of 1021 PageID 7362

SEC. 629. (a) TECHNICAL AMENDMENT.—Section 640 of Public Law 104–52 (109 Stat. 513) is amended by striking "Service performed" and inserting "Hereafter, service performed".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in Public Law 104–52 on the date of its enactment.

SEC. 630. Notwithstanding any other provision of law, no part of any appropriation contained in this Act for any fiscal year shall be available for paying Sunday premium or differential pay to any employee unless such employee actually performed work during the time corresponding to such premium or differential pay.

SEC. 631. No part of any funds appropriated in this or any other Act shall be used by an agency of the executive branch, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, and for the preparation, distribution or use of any kit, pamphlet, booklet, publication, radio, television or film presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself.

SEC. 632. (a) The United States Courthouse under construction at 1030 Southwest 3d Avenue in Portland, Oregon, shall be known and designated as the "Mark O. Hatfield United States Courthouse".

(b) Any reference in a law, map, regulation, document, paper, or other record of the United States to the courthouse referred to in section 901 shall be deemed to be a reference to the "Mark O. Hatfield United States Courthouse".

(c) This section shall take effect on January 2, 1997.

SEC. 633. SURVIVOR ANNUITY RESUMPTION UPON TERMINATION OF MARRIAGE.—(a) AMENDMENTS.—

<< 5 USCA § 8341 >>

(1) CIVIL SERVICE RETIREMENT SYSTEM.—Section 8341(e) of title 5, United States Code, is amended by adding at the end the following:

"(4) If the annuity of a child under this subchapter terminates under paragraph (3)(E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if—

"(A) any lump sum paid is returned to the Fund; and

"(B) that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8443 >>

(2) FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—Section 8443(b) of such title is amended by adding at the end the following: "If the annuity of a child under this subchapter terminates under subparagraph (E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if any lump sum paid is returned to the Fund, and that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8908 >>

(3) FEDERAL EMPLOYEES HEALTH BENEFITS.—Section 8908 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(d) A surviving child whose survivor annuity under section 8341(e) or 8443(b) was terminated and is later restored under paragraph (4) of section 8341(e) or the last sentence of section 8443(b) may, under regulations prescribed by the Office, enroll in a health benefits plan described by section 8903 or 8903a if such surviving child was covered by any such plan immediately before such annuity was terminated.".

<< 5 USCA § 8341 NOTE >>

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any termination of marriage taking effect before, on, or after the date of enactment of this Act, except that benefits shall be payable only with respect to amounts accruing for periods beginning on the first day of the month beginning after the later of such termination of marriage or such date of enactment.

<< 5 USCA § 6302 >>

SEC. 634. AVAILABILITY OF ANNUAL LEAVE FOR EMPLOYEES AFFECTED BY REDUCTION IN FORCE.—Section 6302 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(g) An employee who is being involuntarily separated from an agency due to a reduction in force or transfer of function under subchapter I of chapter 35 may elect to use annual leave to the employee's credit to remain on the agency's rolls after the date the employee would otherwise have been separated if, and only to the extent that, such additional time in a pay status will enable the employee to qualify for an immediate annuity under section 8336, 8412, 8414, or to qualify to carry health benefits coverage into retirement under section 8905(b).".

<< 18 USCA § 207 >>

SEC. 635. Section 207(e)(6)(B) of title 18, United States Code, is amended by striking "level V of the Executive Schedule" and inserting "level 5 of the Senior Executive Service".

<< 5 USCA Ch. 59 NOTE >>

SEC. 636. REIMBURSEMENTS RELATING TO PROFESSIONAL LIABILITY INSURANCE.—(a) AUTHORITY.—Notwithstanding any other provision of law, amounts appropriated by this Act (or any other Act for fiscal year 1997 or any fiscal year thereafter) for salaries and expenses may be used to reimburse any qualified employee for not to exceed one-half the costs incurred by such employee for professional liability insurance. A payment under this section shall be contingent upon the submission of such information or documentation as the employing agency may require.

(b) QUALIFIED EMPLOYEE.—For purposes of this section, the term "qualified employee" means an agency employee whose position is that of—

  (1) a law enforcement officer; or

  (2) a supervisor or management official.

(c) DEFINITIONS.—For purposes of this section—

  (1) the term "agency" means an Executive agency, as defined by section 105 of title 5, United States Code, and any agency of the Legislative Branch of Government including any office or committee of the Senate or the House of Representatives;

  (2) the term "law enforcement officer" means an employee, the duties of whose position are primarily the investigation, apprehension, prosecution, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including any law enforcement officer under section 8331(20) or 8401(17) of such title 5, or under section 4823 of title 22, United States Code;

  (3) the terms "supervisor" and "management official" have the respective meanings given them by section 7103(a) of such title 5, and

  (4) the term "professional liability insurance" means insurance which provides coverage for—

   (A) legal liability for damages due to injuries to other persons, damage to their property, or other damage or loss to such other persons (including the expenses of litigation and settlement) resulting from or arising out of any tortious act, error, or omission of the covered individual (whether common law, statutory, or constitutional) while in the performance of such individual's official duties as a qualified employee; and

   (B) the cost of legal representation for the covered individual in connection with any administrative or judicial proceeding (including any investigation or disciplinary proceeding) relating to any act, error, or omission of the covered individual while in the performance of such individual's official duties as a qualified employee, and other legal costs and fees relating to any such administrative or judicial proceeding.

(d) APPLICABILITY.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

<< 5 USCA § 5303 NOTE >>

SEC. 637. For purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1997 in the rates of basic pay for the statutory pay systems.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 638. For FY 1997, the Secretary of the Treasury is authorized to use funds made available to the FSLIC Resolution Fund under P.L. 103–327, not to exceed $26.1 million, to reimburse the Department of Justice for the reasonable expenses of litigation that are incurred in the defense of claims against the U.S. arising from FIRREA and its implementation.

SEC. 639. Section 608 of Public Law 104–52 is amended in the first sentence by inserting before the period, ", including Federal records disposed of pursuant to a records schedule".

<< 40 USCA § 1411 NOTE >>

SEC. 640. In reviewing and analyzing the contracting out, outsourcing or privatization of business and administrative functions, and in implementing 40 U.S.C. sections 1413 and 1423, and other provisions, in title LI of the National Defense Authorization Act for fiscal year 1996 (the Information Technology Management Reform Act)—

(1) the Director of the Office of Management and Budget and the heads of the executive agencies may have studies, analyses, reviews and other management assistance performed by the private sector;

(2) the reviews, analyses, and studies called for by 40 U.S.C. section 1413(b)(2)(B) and (C) shall be completed and reported to the Agency Head within 180 days, or less measured from when a study analysis or review is initiated unless the Agency Head determines additional time is needed;

(3) in accordance with principles and rules governing organizational conflicts of interest, persons involved in a particular study may not compete for any work that is to be or is outsourced as a result of that study; and

(4) this section will apply with respect to studies occurring on or after the date of enactment of this subsection and completed before September 1, 1999 and the Comptroller General of the United States shall review and provide an assessment of this program by January 1, 1999.

<< 5 USCA § 5509 NOTE >>

SEC. 641. (a) SECTION 1—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note, Public Law 101–12, April 10, 1989, 103 Stat. 34, as amended Public Law 103–424, Section 1, October 29, 1994, 108 Stat. 4361), is amended by striking the words: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 5 USCA § 5509 NOTE >>

SEC. 642. (a) SECTION 1.—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note; Public Law 103–424; 103 Stat. 34) is amended by striking out: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 26 USCA § 7801 NOTE >>

SEC. 643. MODIFICATIONS OF NATIONAL COMMISSION ON RESTRUCTURING THE INTERNAL REVENUE SERVICE.—(a) QUORUM.—Paragraph (4) of section 637(b) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52, 109 Stat. 510) is amended by striking "Seven" and inserting "Nine".

(b) CO–CHAIRS.—

(1) IN GENERAL.—Paragraph (3) of section 637(b) of such Act is amended—

(A) by striking "a Chairman" and inserting "Co–Chairs", and

(B) by striking "Chairman" in the heading and inserting "Co–Chairs".

(2) CONFORMING AMENDMENTS.—(A) Paragraph (5)(B) of section 637(b) of such Act is amended by striking "a Chairman" and inserting "Co–Chairs".

(B) Subsections (b)(4), (d)(1)(B), (d)(3), and (e)(1) of section 637 of such Act are each amended by striking "Chairman" each place it appears and inserting "Co–Chairs".

(c) GIFTS.—Section 637(d) of such Act is amended by adding at the end the following new paragraph:

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 495 of 1021   PageID 7365

"(6) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property in carrying out its duties under this section."

(d) TRAVEL EXPENSES.—Section 637(f)(2) of such Act is amended by striking "shall" and inserting "may".

(e) TIME FOR FILING REPORT.—

  (1) IN GENERAL.—Paragraph (1) of section 637(g) of such Act is amended by striking "one year" and inserting "15 months".

  (2) CONFORMING AMENDMENT.—Subparagraph (A) of section 637(c)(1) of such Act is amended by striking "one year" and inserting "15 months".

(f) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the Treasury, Postal Service, and General Government Appropriations Act, 1996.

<< 39 USCA § 202 >>

SEC. 644. (a) IN GENERAL.—Section 202(a) of title 39, United States Code, is amended by striking "$10,000 a year" and inserting "$30,000 a year".

<< 39 USCA § 202 NOTE >>

(b) EFFECTIVE DATE.—Subsection (a) shall take effect at the beginning of the next applicable pay period beginning after the date of the enactment of this Act.

SEC. 645. (a) IN GENERAL.—No later than September 30, 1997, the Director of the Office of Management and Budget shall submit to the Congress a report that provides—

  (1) estimates of the total annual costs and benefits of Federal regulatory programs, including quantitative and nonquantitative measures of regulatory costs and benefits;

  (2) estimates of the costs and benefits (including quantitative and nonquantitative measures) of each rule that is likely to have a gross annual effect on the economy of $100,000,000 or more in increased costs;

  (3) an assessment of the direct and indirect impacts of Federal rules on the private sector, State and local government, and the Federal Government; and

  (4) recommendations from the Director and a description of significant public comments to reform or eliminate any Federal regulatory program or program element that is inefficient, ineffective, or is not a sound use of the Nation's resources.

(b) NOTICE.—The Director shall provide public notice and an opportunity to comment on the report under subsection (a) before the report is issued in final form.

<< 31 USCA § 501 NOTE >>

SEC. 646. Subsection (b) of section 404 of Public Law 103–356 is amended by deleting "September 30, 1997" and inserting "December 31, 1999".

SEC. 647. (a) Notwithstanding any other provision of law, the Secretary shall, on behalf of the United States, transfer to the University of Miami, without charge, title to the real property and improvements that as of the date of the enactment of this Act constitute the Federal facility known as the Perrine Primate Center, subject to the condition that, during the 10–year period beginning on the date of the transfer—

  (1) the University will provide for the continued use of the real property and improvements as an animal research facility, including primates, and such use will be the exclusive use of the property (with such incidental exceptions as the Secretary may approve); or

  (2) the real property and improvements will be used for research-related purposes other than the purpose specified in paragraph (1) (or for both of such purposes), if the Secretary and the University enter into an agreement accordingly.

(b) The conveyance under subsection (a) shall not become effective unless the conveyance specifies that, if the University of Miami engages in a material breach of the conditions specified in such subsection, title to the real property and improvements involved reverts to the United States at the election of the Secretary.

(c) The real property referred to in subsections (a) and (b) is located in the county of Dade in the State of Florida, and is a parcel consisting of the northernmost 30 acre-parcel of the area. The exact acreage and legal description used for purposes of the transfer under subsection (a) shall be in accordance with a survey that is satisfactory to the Secretary.

(d) For the purposes of this section—

(1) the term "Secretary" means the Secretary of Health and Human Services; and

(2) the term "University of Miami" means the University of Miami located in the State of Florida.

<< 18 USCA §§ 474, 474A >>

SEC. 648. (a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".

(b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

(1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

"(a) Whoever, with the intent to defraud—

"(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;

"(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or

"(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

"(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).

"(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section."

<< 18 USCA Ch. 25 >>

(2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:

"514. Fictitious obligations.".

<< 18 USCA § 474 NOTE >>

(c) PERIOD OF EFFECT.—This section and the amendments made by this section shall become effective on the date of enactment of this Act and shall remain in effect during each fiscal year following that date of enactment.

SEC. 649. None of the funds appropriated by this Act may be used by an agency to provide a Federal employee's home address to any labor organization except when it is made known to the Federal official having authority to obligate or expend such funds that the employee has authorized such disclosure or that such disclosure has been ordered by a court of competent jurisdiction.

SEC. 650. (a) No later than 45 days after the date of the enactment of this Act, the Inspector General of each Federal department or agency that uses administratively uncontrollable overtime in the pay of any employee shall—

(1) conduct an audit on the use of administratively uncontrollable overtime by employees of such department or agency, which shall include—

(A) an examination of the policies, extent, costs, and other relevant aspects of the use of administratively uncontrollable overtime at the department or agency; and

(B) a determination of whether the eligibility criteria of the department or agency and payment of administratively uncontrollable overtime comply with Federal statutory and regulatory requirements; and

(2) submit a report of the findings and conclusions of such audit to—

(A) the Office of Personnel Management;

(B) the Governmental Affairs Committee of the Senate; and

(C) the Government Reform and Oversight Committee of the House of Representatives.

(b) No later than 30 days after the submission of the report under subsection (a), the Office of Personnel Management shall issue revised guidelines to all Federal departments and agencies that—

(1) limit the use of administratively uncontrollable overtime to employees meeting the statutory intent of section 5545(c)(2) of title 5, United States Code; and

(2) expressly prohibit the use of administratively uncontrollable overtime for—

(A) customary or routine work duties; and

(B) work duties that are primarily administrative in nature, or occur in noncompelling circumstances.

<< 5 USCA § 8133 NOTE >>

SEC. 651. Notwithstanding section 8116 of title 5, United States Code, and in addition to any payment made under 5 U.S.C. 8101 et seq., beginning in fiscal year 1997 and thereafter, the head of any department or agency is authorized to pay from appropriations made available to the department or agency a death gratuity to the personal representative (as that term is defined by applicable law) of a civilian employee of that department or agency whose death resulted from an injury sustained in the line of duty on or after August 2, 1990: Provided, That payments made pursuant to this section, in combination with the payments made pursuant to sections 8133(f) and 8134(a) of such title 5 and section 312 of Public Law 103–332 (108 Stat. 2537), may not exceed a total of $10,000 per employee.

<< 18 USCA § 846 NOTE >>

SEC. 653. (a) AUTHORIZATION.—

The Secretary of the Treasury is authorized to establish scientific certification standards for explosives detection canines, and shall provide, on a reimbursable basis, for the certification of explosives detection canines employed by Federal agencies, or other agencies providing explosives detection services at airports in the United States.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out the purposes of this section.

SEC. 654. NATIONAL REPOSITORY FOR INFORMATION ON EXPLOSIVES INCIDENTS AND ARSON.

<< 18 USCA § 846 >>

(a) Section 846 of title 18, United States Code, is amended by—

(1) designating the existing section as subsection (a); and

(2) by adding the following new subsection (b) to read as follows:

"(b) The Secretary is authorized to establish a national repository of information on incidents involving arson and the suspected criminal misuse of explosives. All Federal agencies having information concerning such incidents shall report the information to the Secretary pursuant to such regulations as deemed necessary to carry out the provisions of this subsection. The repository shall also contain information on incidents voluntarily reported to the Secretary by State and local authorities."

<< 18 USCA § 846 NOTE >>

(b) There is authorized to be appropriated such sums as may be necessary to carry out the provisions of this subsection.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 5603 >>

SEC. 655. Section 5(c)(1) of Public Law 102–259 (20 U.S.C. 5603(c)(1)) is amended—

(1) in subparagraph (A)(iii), by striking "and" after the semicolon;

(2) in subparagraph (B), by striking the period and inserting "; and"; and

(3) by adding after subparagraph (B) the following:

"(C) a Trustee may serve after the expiration of the Trustee's term until a successor has been chosen.".

SEC. 656. Notwithstanding any other provision of law, the Secretary of the Interior, through the Bureau of Indian Affairs, may directly transfer to Indian tribes in North and South Dakota portable housing units at the Grand Forks Air Force base in North Dakota which have been declared excess by the Department of Defense and requested for transfer by the Department of the Interior.

<< 18 USCA § 922 >>

SEC. 657. Section 922(q) of title 18, United States Code, is amended to read as follows:

"(q)(1) The Congress finds and declares that—

"(A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

"(B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

"(C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the House of Representatives and the Committee on the Judiciary of the Senate;

"(D) in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

"(E) while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

"(F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

"(G) this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

"(H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves—even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

"(I) the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

"(2)(A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

"(B) Subparagraph (A) does not apply to the possession of a firearm—

"(i) on private property not part of school grounds;

"(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

"(iii) that is—

"(I) not loaded; and

"(II) in a locked container, or a locked firearms rack that is on a motor vehicle;

"(iv) by an individual for use in a program approved by a school in the school zone;

"(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

"(vi) by a law enforcement officer acting in his or her official capacity; or

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

AR03157

"(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

"(3)(A) Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

"(B) Subparagraph (A) does not apply to the discharge of a firearm—

"(i) on private property not part of school grounds;

"(ii) as part of a program approved by a school in the school zone, by an individual who is participating in the program;

"(iii) by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

"(iv) by a law enforcement officer acting in his or her official capacity.

"(4) Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.".

SEC. 658. GUN BAN FOR INDIVIDUALS CONVICTED OF A MISDEMEANOR CRIME OF DOMESTIC VIOLENCE.

<< 18 USCA § 921 >>

(a) DEFINITION.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following:

"(33)(A) Except as provided in subparagraph (C), the term 'misdemeanor crime of domestic violence' means an offense that—

"(i) is a misdemeanor under Federal or State law; and

"(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim

"(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless—

"(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

"(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

"(aa) the case was tried by a jury, or

"(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

"(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.".

<< 18 USCA § 922 >>

(b) PROHIBITIONS.—

(1) Section 922(d) of such title is amended—

(A) by striking "or" at the end of paragraph (7);

(B) by striking the period at the end of paragraph (8) and inserting "; or"; and

(C) by inserting after paragraph (8) the following:

"(9) has been convicted in any court of a misdemeanor crime of domestic violence.".

(2) Section 922(g) of such title is amended—

(A) by striking "or" at the end of paragraph (7);

(B) by striking the comma at the end of paragraph (8) and inserting "; or"; and

(C) by inserting after paragraph (8) the following:

"(9) who has been convicted in any court of a misdemeanor crime of domestic violence,".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) Section 922(s)(3)(B)(i) of such title is amended by inserting ", and has not been convicted in any court of a misdemeanor crime of domestic violence" before this semicolon.

<< 18 USCA § 925 >>

(c) GOVERNMENT ENTITIES NOT EXCEPTED.—Section 925(a)(1) of such title is amended by inserting "sections 922(d)(9) and 922(g)(9) and" after "except for".

SEC. 659. THRIFT SAVINGS PLAN.

TITLE I—ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

<< 5 USCA § 8401 NOTE >>

SEC. 101. SHORT TITLE

This title may be cited as the "Thrift Savings Investment Funds Act of 1996".

<< 5 USCA § 8438 >>

SEC. 102. ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

Section 8438 of title 5, United States Code, is amended—
(1) in subsection (a)—
(A) by redesignating paragraphs (5) through (8) as paragraphs (6) through (9), respectively;
(B) by inserting after paragraph (4) the following new paragraph:
"(5) the term 'International Stock Index Investment Fund' means the International Stock Index Investment Fund established under subsection (b)(1)(E);";
(C) in paragraph (8) (as redesignated by subparagraph (A) of this paragraph) by striking out "and" at the end thereof;
(D) in paragraph (9) (as redesignated by subparagraph (A) of this paragraph)—
(i) by striking out "paragraph (7)(D)" in each place it appears and inserting in each such place "paragraph (8)(D)"; and
(ii) by striking out the period and inserting in lieu thereof a semicolon and "and"; and
(E) by adding at the end thereof the following new paragraph:
"(10) the term 'Small Capitalization Stock Index Investment Fund' means the Small Capitalization Stock Index Investment Fund established under subsection (b)(1)(D)."; and
(2) in subsection (b)—
(A) in paragraph (1)—
(i) in subparagraph (B) by striking out "and" at the end thereof;
(ii) in subparagraph (C) by striking out the period and inserting in lieu thereof a semicolon; and
(iii) by adding at the end thereof the following new subparagraphs:
"(D) a Small Capitalization Stock Index Investment Fund as provided in paragraph (3); and
"(E) an International Stock Index Investment Fund as provided in paragraph (4)."; and
(B) by adding at the end thereof the following new paragraphs:
"(3)(A) The Board shall select an index which is a commonly recognized index comprised of common stock the aggregate market value of which represents the United States equity markets excluding the common stocks included in the Common Stock Index Investment Fund.
"(B) The Small Capitalization Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the Small Capitalization Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.

"(4)(A) The Board shall select an index which is a commonly recognized index comprised of stock the aggregate market value of which is a reasonably complete representation of the international equity markets excluding the United States equity markets.

"(B) The International Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the International Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.".

<< 5 USCA § 8439 >>

SEC. 103. ACKNOWLEDGEMENT OF INVESTMENT RISK

Section 8439(d) of title 5, United States Code, is amended by striking out "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund or the Fixed Income Investment Fund described in paragraphs (1) and (3)," and inserting in lieu thereof "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund, the Fixed Income Investment Fund, the International Stock Index Investment Fund, or the Small Capitalization Stock Index Investment Fund, defined in paragraphs (1), (3), (5), and (10),".

<< 5 USCA § 8438 NOTE >>

SEC. 104. EFFECTIVE DATE

This title shall take effect on the date of enactment of this Act, and the Funds established under this title shall be offered for investment at the earliest practicable election period (described in section 8432(b) of title 5, United States Code) as determined by the Executive Director in regulations.

TITLE II—THRIFT SAVINGS ACCOUNTS LIQUIDITY

<< 5 USCA § 8401 NOTE >>

SEC. 201. SHORT TITLE

This title may be cited as the "Thrift Savings Plan Act of 1996".

<< 5 USCA § 8351 >>

SEC. 202. NOTICE TO SPOUSES FOR IN–SERVICE WITHDRAWALS; DE MINIMUS ACCOUNTS; CIVIL SERVICE RETIREMENT SYSTEM PARTICIPANTS

Section 8351(b) of title 5, United States Code, is amended—

(1) in paragraph (5)—

(A) in subparagraph (B)—

(i) by striking out "An election, change of election, or modification (relating to the commencement date of a deferred annuity)" and inserting in lieu thereof "An election or change of election";

(ii) by inserting "or withdrawal" after "and a loan";

(iii) by inserting "and (h)" after "8433(g)";

(iv) by striking out "the election, change of election, or modification" and inserting in lieu thereof "the election or change of election"; and

(v) by inserting "or withdrawal" after "for such loan"; and

(B) in subparagraph (D)—

(i) by inserting "or withdrawals" after "of loans"; and

(ii) by inserting "or (h)" after "8433(g)"; and

(2) in paragraph (6)—

  (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

  (B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

## SEC. 203. IN–SERVICE WITHDRAWALS; WITHDRAWAL ELECTIONS, FEDERAL EMPLOYEES RETIREMENT SYSTEM PARTICIPANTS

<< 5 USCA § 8433 >>

(a) IN GENERAL.—Section 8433 of title 5, United States Code, is amended—

(1) by striking out subsections (b) and (c) and inserting in lieu thereof the following:

"(b) Subject to section 8435 of this title, any employee or Member who separates from Government employment is entitled and may elect to withdraw from the Thrift Savings Fund the balance of the employee's or Member's account as—

"(1) an annuity;

"(2) a single payment;

"(3) 2 or more substantially equal payments to be made not less frequently than annually; or

"(4) any combination of payments as provided under paragraphs (1) through (3) as the Executive Director may prescribe by regulation.

"(c)(1) In addition to the right provided under subsection (b) to withdraw the balance of the account, an employee or Member who separates from Government service and who has not made a withdrawal under subsection (h)(1)(A) may make one withdrawal of any amount as a single payment in accordance with subsection (b)(2) from the employee's or Member's account.

"(2) An employee or Member may request that the amount withdrawn from the Thrift Savings Fund in accordance with subsection (b)(2) be transferred to an eligible retirement plan.

"(3) The Executive Director shall make each transfer elected under paragraph (2) directly to an eligible retirement plan or plans (as defined in section 402(c)(8) of the Internal Revenue Code of 1986) identified by the employee, Member, former employee, or former Member for whom the transfer is made.

"(4) A transfer may not be made for an employee, Member, former employee, or former Member under paragraph (2) until the Executive Director receives from that individual the information required by the Executive Director specifically to identify the eligible retirement plan or plans to which the transfer is to be made.";

(2) in subsection (d)—

  (A) in paragraph (1) by striking out "Subject to paragraph (3)(A)" and inserting in lieu thereof "Subject to paragraph (3)";

  (B) by striking out paragraph (2) and redesignating paragraph (3) as paragraph (2); and

  (C) in paragraph (2) (as redesignated under subparagraph (B) of this paragraph)—

    (i) in subparagraph (A) by striking out "(A)"; and

    (ii) by striking out subparagraph (B);

(3) in subsection (f)(1)—

  (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation; and

  (B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b), or" and inserting a comma;

(4) in subsection (f)(2)—

  (A) by striking out "February 1" and inserting in lieu thereof "April 1";

  (B) in subparagraph (A)—

    (i) by striking out "65" and inserting in lieu thereof "70½"; and

    (ii) by inserting "or" after the semi-colon;

  (C) by striking out subparagraph (B); and

  (D) by redesignating subparagraph (C) as subparagraph (B);

(5) in subsection (g)—

(A) in paragraph (1) by striking out "after December 31, 1987, and", and by adding at the end of the paragraph the following sentence: "Before a loan is issued, the Executive Director shall provide in writing the employee or Member with appropriate information concerning the cost of the loan relative to other sources of financing, as well as the lifetime cost of the loan, including the difference in interest rates between the funds offered by the Thrift Savings Fund, and any other effect of such loan on the employee's or Member's final account balance."; and

(B) by striking out paragraph (2) and redesignating paragraphs (3) through (5) as paragraphs (2) through (4), respectively; and

(6) by adding after subsection (g) the following new subsection:

"(h)(1) An employee or Member may apply, before separation, to the Board for permission to withdraw an amount from the employee's or Member's account based upon—

"(A) the employee or Member having attained age 59½; or

"(B) financial hardship.

"(2) A withdrawal under paragraph (1)(A) shall be available to each eligible participant one time only.

"(3) A withdrawal under paragraph (1)(B) shall be available only for an amount not exceeding the value of that portion of such account which is attributable to contributions made by the employee or Member under section 8432(a) of this title.

"(4) Withdrawals under paragraph (1) shall be subject to such other conditions as the Executive Director may prescribe by regulation.

"(5) A withdrawal may not be made under this subsection unless the requirements of section 8435(e) of this title are satisfied.".

<< 5 USCA § 8433 NOTE >>

(b) INVALIDITY OF CERTAIN PRIOR ELECTIONS.—Any election made under section 8433(b)(2) of title 5, United States Code (as in effect before the effective date of this title), with respect to an annuity which has not commenced before the implementation date of this title as provided by regulation by the Executive Director in accordance with section 207 of this title, shall be invalid.

<< 5 USCA § 8435 >>

SEC. 204. SURVIVOR ANNUITIES FOR FORMER SPOUSES; NOTICE TO FEDERAL EMPLOYEES RETIREMENT SYSTEM SPOUSES FOR IN–SERVICE WITHDRAWALS

Section 8435 of title 5, United States Code, is amended—

(1) in subsection (a)(1)(A)—

(A) by striking out "may make an election under subsection (b)(3) or (b)(4) of section 8433 of this title or change an election previously made under subsection (b)(1) or (b)(2) of such section" and inserting in lieu thereof "may withdraw all or part of a Thrift Savings Fund account under subsection (b)(2), (3), or (4) of section 8433 of this title or change a withdrawal election"; and

(B) by adding at the end thereof "A married employee or Member (or former employee or Member) may make a withdrawal from a Thrift Savings Fund account under subsection (c)(1) of section 8433 of this title only if the employee or Member (or former employee or Member) satisfies the requirements of subparagraph (B).";

(2) in subsection (c)—

(A) in paragraph (1)—

(i) by striking out "An election, change of election, or modification of the commencement date of a deferred annuity" and inserting in lieu thereof "An election or change of election"; and

(ii) by striking out "modification, or transfer" and inserting in lieu thereof "or transfer"; and

(B) in paragraph (2) in the matter following subparagraph (B)(ii) by striking out "modification,";

(3) in subsection (e)—

(A) in paragraph (1)—

(i) in subparagraph (A)—

(I) by inserting "or withdrawal" after "A loan";

(II) by inserting "and (h)" after "8433(g)"; and

(III) by inserting "or withdrawal" after "such loan";

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 504 of 1021   PageID 7374

  (ii) in subparagraph (B) by inserting "or withdrawal" after "loan"; and

  (iii) in subparagraph (C)—

   (I) by inserting "or withdrawal" after "to a loan"; and

   (II) by inserting "or withdrawal" after "for such loan"; and

  (B) in paragraph (2)—

   (i) by inserting "or withdrawal" after "loan"; and

   (ii) by inserting "and (h)" after "8344(g)"; and

 (4) in subsection (g)—

  (A) by inserting "or withdrawals" after "loans"; and

  (B) by inserting "and (h)" after "8344(g)".

## SEC. 205. DE MINIMUS ACCOUNTS RELATING TO THE JUDICIARY

<< 5 USCA § 8440a >>

 (a) JUSTICES AND JUDGES.—Section 8440a(b)(7) of title 5, United States Code, is amended—

 (1) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

 (2) by striking out "unless the justice or judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

<< 5 USCA § 8440b >>

 (b) BANKRUPTCY JUDGES AND MAGISTRATES.—Section 8440b(b) of title 5, United States Code, is amended—

 (1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

 (2) in paragraph (8)—

  (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

  (B) by striking out "unless the bankruptcy judge or magistrate elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

<< 5 USCA § 8440c >>

 (c) FEDERAL CLAIMS JUDGES.—Section 8440c(b) of title 5, United States Code, is amended—

 (1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

 (2) in paragraph (8)—

  (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

  (B) by striking out "unless the judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

## SEC. 206. DEFINITION OF BASIC PAY

<< 5 USCA § 8401 >>

 (a) IN GENERAL.—(1) Section 8401(4) of title 5, United States Code, is amended by striking out "except as provided in subchapter III of this chapter,".

<< 5 USCA § 8431 >>

 (2) Section 8431 of title 5, United States Code, is repealed.

<< 5 USCA Ch. 84 >>

(b) TECHNICAL AND CONFORMING AMENDMENTS.—(1) The table of sections for chapter 84 of title 5, United States Code, is amended by striking out the item relating to section 8431.

<< 5 USCA § 5545a >>

(2) Section 5545a(h)(2)(A) of title 5, United States Code, is amended by striking out "8431,".

<< 5 USCA § 5343 NOTE >>

(3) Section 615(f) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52; 109 Stat. 500; 5 U.S.C. 5343 note) is amended by striking out "section 8431 of title 5, United States Code,".

<< 5 USCA § 5545a NOTE >>

SEC. 207. EFFECTIVE DATE

This title shall take effect on the date of the enactment of this Act and withdrawals and elections as provided under the amendments made by this title shall be made at the earliest practicable date as determined by the Executive Director in regulations.

Sec. 660. Notwithstanding Section 613, interagency financing is authorized to carry out the purposes of the National Bioethics Advisory Commission.

SEC. 661. (a) DESIGNATION.—The United States courthouse to be constructed at 111 South 18th Plaza, Omaha, Nebraska, shall be known and designated as the "Roman L. Hruska United States Courthouse".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse referred to in section 1 shall be deemed to be a reference to the "Roman L. Hruska United States Courthouse".

SEC. 662. (a) PROVISIONS RELATING TO TITLE 39, UNITED STATES CODE.—

<< 39 USCA § 202 >>

"(1) APPOINTMENT AND REMOVAL OF INSPECTOR GENERAL.—Section 202 of title 39, United States Code, is amended by adding at the end the following:

"(e)(1) The Governors shall appoint and shall have the power to remove the Inspector General.

"(2) The Inspector General shall be appointed—

"(A) for a term of 7 years;

"(B) without regard to political affiliation; and

"(C) solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.

"(3) The Inspector General may at any time be removed upon the written concurrence of at least 7 Governors, but only for cause. Nothing in this subsection shall be considered to exempt the Governors from the requirements of section 8G(e) of the Inspector General Act of 1978.".

<< 39 USCA § 102 >>

(2) DEFINITION.—Section 102 of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (2);

(B) by striking the period at the end of paragraph (3) and inserting "; and"; and

(C) by adding at the end the following:

"(4) 'Inspector General' means the Inspector General appointed under section 202(e) of this title.".

<< 39 USCA § 2009 NOTE >>

(3) SEPARATE ITEM IN ANNUAL BUDGET.—For purposes of the fifth sentence of section 2009 of title 39, United States Code, the operations of the Office of Inspector General of the United States Postal Service shall be considered a major type of activity.

(b) AMENDMENTS TO THE INSPECTOR GENERAL ACT OF 1978.—

<< 5 USCA App. 3 § 8G >>

(1) GOVERNORS AS HEAD OF THE POSTAL SERVICE.—Section 8G(a)(4) of the Inspector General Act of 1978 (5 U.S.C.App.) is amended by striking "except that" and all that follows through the semicolon and inserting "except that—

"(A) with respect to the National Science Foundation, such term means the National Science Board; and

"(B) with respect to the United States Postal Service, such term means the Governors (within the meaning of section 102(3) of title 39, United States Code);".

(2) SPECIAL RULES RELATING TO THE UNITED STATES POSTAL SERVICE.—Subsection (f) of section 8G of such Act is amended to read as follows:

"(f)(1) For purposes of carrying out subsection (c) with respect to the United States Postal Service, the appointment provisions of section 202(e) of title 39, United States Code, shall be applied.

"(2) In carrying out the duties and responsibilities specified in this Act, the Inspector General of the United States Postal Service (hereinafter in this subsection referred to as the 'Inspector General') shall have oversight responsibility for all activities of the Postal Inspection Service, including any internal investigation performed by the Postal Inspection Service. The Chief Postal Inspector shall promptly report the significant activities being carried out by the Postal Inspection Service to such Inspector General.

"(3)(A)(i) Notwithstanding subsection (d), the Inspector General shall be under the authority, direction, and control of the Governors with respect to audits or investigations, or the issuance of subpoenas, which require access to sensitive information concerning—

"(I) ongoing civil or criminal investigations or proceedings;

"(II) undercover operations;

"(III) the identity of confidential sources, including protected witnesses;

"(IV) intelligence or counterintelligence matters; or

"(V) other matters the disclosure of which would constitute a serious threat to national security.

"(ii) With respect to the information described under clause (i), the Governors may prohibit the Inspector General from carrying out or completing any audit or investigation, or from issuing any subpoena, after such Inspector General has decided to initiate, carry out, or complete such audit or investigation or to issue such subpoena, if the Governors determine that such prohibition is necessary to prevent the disclosure of any information described under clause (i) or to prevent the significant impairment to the national interests of the United States.

"(iii) If the Governors exercise any power under clause (i) or (ii), the Governors shall notify the Inspector General in writing stating the reasons for such exercise. Within 30 days after receipt of any such notice, the Inspector General shall transmit a copy of such notice to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives, and to other appropriate committees or subcommittees of the Congress.

"(B) In carrying out the duties and responsibilities specified in this Act, the Inspector General—

"(i) may initiate, conduct and supervise such audits and investigations in the United States Postal Service as the Inspector General considers appropriate; and

"(ii) shall give particular regard to the activities of the Postal Inspection Service with a view toward avoiding duplication and insuring effective coordination and cooperation.

"(C) Any report required to be transmitted by the Governors to the appropriate committees or subcommittees of the Congress under section 5(d) shall also be transmitted, within the seven-day period specified under such section, to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(3) Nothing in this Act shall restrict, eliminate, or otherwise adversely affect any of the rights, privileges, or benefits of either employees of the United States Postal Service, or labor organizations representing employees of the United States Postal Service, under chapter 12 of title 39, United States Code, the National Labor Relations Act, any handbook or manual affecting employee labor relations with the United States Postal Service, or any collective bargaining agreement.

"(4) As used in this subsection, the term 'Governors' has the meaning given such term by section 102(3) of title 39, United States Code.".

<< 5 USCA App. 3 § 8H >>

(3) TECHNICAL CORRECTION.—The Inspector General Act of 1978 is amended by redesignating the second section which is designated as section 8G as section 8H.

(c) PROVISIONS RELATING TO COMPENSATION.—

(1) INSPECTOR GENERAL.—Section 5315 of title 5, United States Code, is amended by adding at the end the following:

<< 5 USCA § 5315 >>

"Inspector General, United States Postal Service.".

<< 5 USCA § 5315 NOTE >>

The amendment made by the preceding sentence shall apply notwithstanding section 410 or any other provision of title 39, United States Code.

<< 39 USCA § 1003 >>

(2) OFFICERS AND EMPLOYEES OF THE OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE; POSTAL INSPECTORS.—

(A) IN GENERAL.—Section 1003 of title 39, United States Code, is amended—

(i) by redesignating subsection (b) as subsection (d); and

(ii) by inserting after subsection (a) the following:

"(b) Compensation and benefits for all officers and employees serving in or under the Office of Inspector General of the United States Postal Service shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the respective Offices of Inspector General of the various establishments named in section 11(2) of the Inspector General Act of 1978.

"(c) Compensation and benefits for all Postal Inspectors shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the executive branch of the Government outside of the Postal Service. As used in this subsection, the term 'Postal Inspector' included any agent to whom any investigative powers are granted under section 3061 of title 18.".

(B) CONFORMING AMENDMENT.—The first sentence of section 1003(a) of title 39, United States Code, is amended by striking "chapters 2 and 12 of this title" and inserting "chapters 2 and 12 of this title, section 8G of the Inspector General Act of 1978,".

<< 39 USCA § 2802 NOTE >>

(d) STRATEGIC PLANS.—

(1) OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE.—

(A) IN GENERAL.—Strategic plans shall be prepared under this paragraph addressing staffing requirements, general goals and objectives for major functions and operations of the Office of Inspector General of the United States Postal Service, and how goals and objectives of the Office are to be achieved, including a description of operational processes, skills and technology, and the human, capital, information, and other resources required to meet those goals and objectives.

(B) SPECIFIC REQUIREMENTS.—Plans under this paragraph—

(i) shall be prepared by the Inspector General of the United States Postal Service;

(ii) shall each cover a 5–year period (the beginning and ending dates of which shall be specified in each such plan); and

(iii) shall be included, as part of the annual budget required under section 2009 of title 39, United States Code, at least every 3 years.

(C) FIRST SUBMISSION.—The first plan under this paragraph shall be prepared in time to be included with the annual budget under section 2009 of title 39, United States Code, next due to be submitted after the end of the 6–month period beginning on the date of the appointment of the first Inspector General to be appointed pursuant to the amendments made by this section.

(2) POSTAL INSPECTION SERVICE.—The Chief Postal Inspector shall, with respect to the Postal Inspection Service, prepare a strategic plan similar in content to that required under paragraph (1)(A) with respect to the Office of Inspector General of the United States Postal Service. Such plan shall be prepared in time to be included with the annual budget under section 2009 of such title 39 next due to be submitted after the end of the 30–day period beginning on the date of the enactment of this Act.

<< 39 USCA § 201 NOTE >>

(e) FIRST APPOINTMENT; TRANSFERS; TRANSITION PROVISION.—

(1) FIRST APPOINTMENT.—The first Inspector General of the United States Postal Service appointed pursuant to the amendments made by this section shall be appointed before the end of the 90–day period beginning on the date of the enactment of this Act.

(2) TRANSFERS.—

(A) IN GENERAL.—All measures described in section 8G(b) of the Inspector General Act of 1978 necessary to establish an Office of Inspector General within the United States Postal Service pursuant to this section, including all appropriate transfers, shall occur—

(i) no earlier than the date the appointment under paragraph (1) is made; and

(ii) no later than 60 days after the date the appointment under paragraph (1) is made.

(B) PROVISIONS RELATING TO PERSONNEL.—

(i) CONSULTATION.—Decisions concerning which personnel are to be transferred pursuant to subparagraph (A) shall be made by the Governors (within the meaning of section 102(3) of title 39, United States Code) in consultation with the Inspector General appointed under paragraph (1).

(ii) TRANSFERRED PERSONNEL.—Personnel transferred pursuant to subparagraph (A) shall, to the extent not inconsistent with other provisions of this subsection, be transferred in accordance with applicable laws and regulations relating to the transfer of functions within the United States Postal Service, except that, notwithstanding any provision of section 1003(b) of title 39, United States Code, as amended by this section, the classification and compensation of such personnel shall not be reduced, by reason of having been transferred, for 1 year after being so transferred.

(3) TRANSITION PROVISION.—The Chief Postal Inspector may continue to serve as Inspector General of the United States Postal Service until the date on which an Inspector General is appointed under paragraph (1) or, if earlier, the end of the period referred to in such paragraph. Compensation for any service under this paragraph shall be determined as if this section had not been enacted.

(f) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 39 USCA § 410 >>

(1) Section 410(b) of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (9); and

(B) by amending paragraph (10) to read as follows:

"(10) the Inspector General Act of 1978; and".

<< 39 USCA § 204 >>

(2)(A) Section 204 of such title 39 is amended—

(i) by amending the section heading to read as follows:

"§ 204. General Counsel; Judicial Officer; Chief Postal Inspector";

(ii) in the first sentence by striking "and a Judicial Officer." and inserting "a Judicial Officer, and a Chief Postal Inspector.";

(iii) in the second sentence by striking "and the Judicial Officer" and inserting "the Judicial Officer, and the Chief Postal Inspector"; and

(iv) by adding at the end the following: "The Chief Postal Inspector shall report to, and be under the general supervision of, the Postmaster General. The Postmaster General shall promptly notify the Governors and both Houses of Congress in writing if he or she removes the Chief Postal Inspector or transfers the Chief Postal Inspector to another position or location within the Postal Service, and shall include in any such notification the reasons for the removal or transfer.".

<< 39 USCA Ch. 2 >>

(B) The table of sections for chapter 2 of such title 39 is amended by striking the item relating to section 204 and inserting the following:

"204. General Counsel; Judicial Officer; Chief Postal Inspector.".

<< 5 USCA § 5597 NOTE >>

SEC. 663. VOLUNTARY SEPARATION INCENTIVES FOR EMPLOYEES OF CERTAIN FEDERAL AGENCIES.—(a) DEFINITIONS.—For the purposes of this section—

(1) the term "agency" means any Executive agency (as defined in section 105 of title 5, United States Code), other than an Executive agency (except an agency receiving such authority in the Department of Transportation Appropriations Act, 1997) that is authorized by any other provision of this Act or any other Act to provide voluntary separation incentive payments during all, or any part of, fiscal year 1997; and

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty four month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) AGENCY STRATEGIC PLAN.—

(1) IN GENERAL.—The head of each agency, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) CONTENTS.—The agency's plan shall include—

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) AUTHORITY TO PROVIDE VOLUNTARY SEPARATION INCENTIVE PAYMENTS.—

(1) IN GENERAL.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) AMOUNT AND TREATMENT OF PAYMENTS.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before December 31, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) ADDITIONAL AGENCY CONTRIBUTIONS TO THE RETIREMENT FUND.—

(1) IN GENERAL.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

(2) DEFINITION.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

(e) EFFECT OF SUBSEQUENT EMPLOYMENT WITH THE GOVERNMENT.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) REDUCTION OF AGENCY EMPLOYMENT LEVELS.—

(1) IN GENERAL.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) ENFORCEMENT.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) EFFECTIVE DATE.—This section shall take effect October 1, 1996.

<< 31 USCA § 3336 >>

SECTION 664. ELECTRONIC BENEFIT TRANSFER PILOT.

Title 31, United States Code, is amended by inserting after section 3335 the following new section:

"SEC. 3336. Electronic benefit transfer pilot

(a) The Congress finds that:

"(1) Electronic benefit transfer (EBT) is a safe, reliable, and economical way to provide benefit payments to individuals who do not have an account at a financial institution.

"(2) The designation of financial institutions as financial agents of the Federal Government for EBT is an appropriate and reasonable use of the Secretary's authority to designate financial agents.

"(3) A joint federal-state EBT system offers convenience and economies of scale for those states (and their citizens) that wish to deliver state-administered benefits on a single card by entering into a partnership with the federal government.

"(4) The Secretary's designation of a financial agent to deliver EBT is a specialized service not available through ordinary business channels and may be offered to the states pursuant to section 6501 et seq. of this title.

"(b) The Secretary shall continue to carry out the existing EBT pilot to disburse benefit payments electronically to recipients who do not have an account at a financial institution, which shall include the designation of one or more financial institution as a financial agent of the Government, and the offering to the participating states of the opportunity to contract with the financial agent selected by the Secretary, as described in the Invitation for Expressions of Interest to Acquire EBT Services for the Southern Alliance of States dated March 9, 1995, as amended as of June 30, 1995, July 7, 1995, and August 1, 1995.

["(c) The selection and designation of financial agents, the design of the pilot program, and any other matter associated with or related to the EBT pilot described in subsection (b) shall not be subject to judicial review."]

SECTION 2. DESIGNATION OF FINANCIAL AGENTS

<< 12 USCA § 90 >>

1. 12 U.S.C. 90 is amended by adding at the end thereof the following:

"Notwithstanding the Federal Property and Administrative Services Act of 1949, as amended, the Secretary may select associations as financial agents in accordance with any process the Secretary deems appropriate and their reasonable duties may include the provision of electronic benefit transfer services (including State-administered benefits with the consent of the States), as defined by the Secretary.".

2. Make conforming amendments to 12 U.S.C. 265, 266, 391, 1452(d), 1767, 1789a, 2013, 2122 and to 31 U.S.C. 3122 and 3303.

TITLE VII—COUNTER–TERRORISM AND DRUG LAW ENFORCEMENT

DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Foreign Assets Control, $288,000: Provided, That of the amount provided, $288,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Inspector General $34,000, to remain available until expended: Provided, That of the amount provided, $34,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

COUNTERTERRORISM FUND

For necessary expenses, as determined by the Secretary, $15,000,000, to remain available until expended, to reimburse any Department of the Treasury organization for the costs of providing support to counter, investigate, or prosecute terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount of this appropriation shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 512 of 1021   PageID 7382

1985, is transmitted by the President to Congress: Provided further, That the entire amount is designated by Congress as an emergency appropriation pursuant to section 251(b)(2)(D)(i) of such Act.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Federal Law Enforcement Training Center, $1,354,000, to remain available until expended: Provided, That of the amount provided, $1,354,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For an additional amount for the necessary expenses for the acquisition, construction, improvement, and related expenses, $2,700,000, to remain available until expended: Provided, That of the amount provided, $2,700,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Financial Management Service, $449,000, to remain available until expended: Provided, That of the amount provided, $449,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, $66,423,000; of which $3,500,000 shall be available for the construction and expansion of a canine training facility, to remain available until expended; of which $3,000,000 shall be available for conducting a study of car bomb explosives, to remain available until expended; and of which $6,700,000, to remain available until expended, for relocation of the bureau's headquarters building and laboratory facilities; Provided, That of the amount provided, $66,423,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expense of the United States Customs Service, $62,335,000; of which not to exceed $26,400,000 shall be available until expended for funding noncompetitive cooperative agreements with air carriers, airports, or other cargo authorities, which provide for the Customs Service to purchase and assist in installing advanced air cargo inspection equipment for the joint use of such entities and the United States Customs Service: Provided, That of the amount provided, $62,335,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE AND MANAGEMENT

For an additional amount for the necessary expenses for the processing, assistance and management, $10,488,000, to remain available until expended: Provided, That of the amount provided, $10,488,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES SECRET SERVICE

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the United States Secret Service $3,026,000, to remain available until expended: Provided, That of the amount provided, $3,026,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

INDEPENDENT AGENCIES

OFFICE OF PERSONNEL MANAGEMENT

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Personnel Management $210,000, to remain available until expended: Provided, That of the amount provided, $210,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

FUNDS APPROPRIATED TO THE PRESIDENT

FEDERAL DRUG CONTROL PROGRAMS

SPECIAL FORFEITURE FUND

(INCLUDING TRANSFER OF FUNDS)

For activities authorized by Public Law 100–690, as amended, $112,900,000, of which $42,000,000 shall be transferred to the United States Customs Service for the conversion of one P–3AEW aircraft for the air interdiction program; of which $10,000,000 shall be available for transfer to other Federal agencies for methamphetamine reduction efforts; and of which $60,900,000 shall be available to the Director of the Office of National Drug Control Policy for enhancing other drug control activities, including transfer to other Federal agencies: Provided, That of the amount provided, $112,900,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended to become available only upon receipt by the Congress of a supplemental request from the President requesting such designation.

TITLE VIII—FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT

<< 31 USCA § 3512 NOTE >>

SEC. 801. SHORT TITLE

This title may be cited as the "Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

SEC. 802. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds the following:

(1) Much effort has been devoted to strengthening Federal internal accounting controls in the past. Although progress has been made in recent years, Federal accounting standards have not been uniformly implemented in financial management systems for agencies.

(2) Federal financial management continues to be seriously deficient, and Federal financial management and fiscal practices have failed to—

(A) identify costs fully;

(B) reflect the total liabilities of congressional actions; and

(C) accurately report the financial condition of the Federal Government.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) Current Federal accounting practices do not accurately report financial results of the Federal Government or the full costs of programs and activities. The continued use of these practices undermines the Government's ability to provide credible and reliable financial data and encourages already widespread Government waste, and will not assist in achieving a balanced budget.

(4) Waste and inefficiency in the Federal Government undermine the confidence of the American people in the government and reduce the federal Government's ability to address vital public needs adequately.

(5) To rebuild the accountability and credibility of the Federal Government, and restore public confidence in the Federal Government, agencies must incorporate accounting standards and reporting objectives established for the Federal Government into their financial management systems so that all the assets and liabilities, revenues, and expenditures or expenses, and the full costs of programs and activities of the Federal Government can be consistently and accurately recorded, monitored, and uniformly reported throughout the Federal Government.

(6) Since its establishment in October 1990, the Federal Accounting Standards Advisory Board (hereinafter referred to as the "FASAB") has made substantial progress toward developing and recommending a comprehensive set of accounting concepts and standards for the Federal Government. When the accounting concepts and standards developed by FASAB are incorporated into Federal financial management systems, agencies will be able to provide cost and financial information that will assist the Congress and financial managers to evaluate the cost and performance of Federal programs and activities, and will therefore provide important information that has been lacking, but is needed for improved decision making by financial managers and the Congress.

(7) The development of financial management systems with the capacity to support these standards and concepts will, over the long term, improve Federal financial management.

(b) PURPOSE—The purposes of this Act are to—

(1) provide for consistency of accounting by an agency from one fiscal year to the next, and uniform accounting standards throughout the Federal Government;

(2) require Federal financial management systems to support full disclosure of Federal financial data, including the full costs of Federal programs and activities, to the citizens, the Congress, the President, and agency management, so that programs and activities can be considered based on their full costs and merits;

(3) increase the accountability and credibility of federal financial management;

(4) improve performance, productivity and efficiency of Federal Government financial management;

(5) establish financial management systems to support controlling the cost of Federal Government;

(6) build upon and complement the Chief Financial Officers Act of 1990 (Public Law 101–576; 104 Stat 2838), the Government Performance and Results Act of 1993 (Public Law 103–62 107 Stat. 285) and the Government Management Reform Act of 1994 (Public Law 103–356; 108 Stat. 3410); and

(7) increase the capability of agencies to monitor execution of the budget by more readily permitting reports that compare spending of resources to results of activities.

<< 31 USCA § 3512 NOTE >>

SEC. 803 IMPLEMENTATION OF FEDERAL FINANCIAL MANAGEMENT IMPROVEMENTS.

(a) IN GENERAL.—Each agency shall implement and maintain financial management systems that comply substantially with Federal financial management systems requirements, applicable Federal accounting standards, and the United States Government Standard General Ledger at the transaction level.

(b) AUDIT COMPLIANCE FINDING.—

(1) IN GENERAL.—Each audit required by section 3521(e) of title 31, United States Code, shall report whether the agency financial management systems comply with the requirements of subsection (a).

(2) CONTENT OF REPORTS.—When the person performing the audit required by section 3521(e) of title 31, United States Code, reports that the agency financial management systems do not comply with the requirements of subsection (a), the person performing the audit shall include in the report on the audit—

(A) the entity or organization responsible for the financial management systems that have been found not to comply with the requirements of subsection (a);

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) all facts pertaining to the failure to comply with the requirements of subsection (a), including—

  (i) the nature and extent of the noncompliance including areas in which there is substantial but not full compliance;

  (ii) the primary reason or cause of the noncompliance;

  (iii) the entity or organization responsible for the non-compliance[sic]; and

  (iv) any relevant comments from any responsible officer or employee; and

 (C) a statement with respect to the recommended remedial actions and the time frames to implement such actions.

(c) COMPLIANCE IMPLEMENTATION.—

 (1) DETERMINATION.—No later than the date described under paragraph (2), the Head of an agency shall determine whether the financial management systems of the agency comply with the requirements of subsection (a). Such determination shall be based on—

  (A) a review of the report on the applicable agency-wide audited financial statement;

  (B) any other information the Head of the agency considers relevant and appropriate.

 (2) DATE OF DETERMINATION.—The determination under paragraph (1) shall be made no later than 120 days after the earlier of—

  (A) the date of the receipt of an agency-wide audited financial statement; or

  (B) the last day of the fiscal year following the year covered by such statement.

 (3) REMEDIATION PLAN.—

  (A) If the Head of an agency determines that the agency's financial management systems do not comply with the requirements of subsection (a), the head of the agency, in consultation with the Director, shall establish a remediation plan that shall include resources, remedies, and intermediate target dates necessary to bring the agency's financial management systems into substantial compliance.

  (B) If the determination of the head of the agency differs from the audit compliance findings required in subsection (b), the Director shall review such determinations and provide a report on the findings to the appropriate committees of the Congress.

 (4) TIME PERIOD FOR COMPLIANCE.—A remediation plan shall bring the agency's financial management systems into substantial compliance no later than 3 years after the date a determination is made under paragraph (1), unless the agency, with concurrence of the Director—

  (A) determines that the agency's financial management systems cannot comply with the requirements of subsection (a) within 3 years;

  (B) specifies the most feasible date for bringing the agency's financial management systems into compliance with the requirements of subsection (a); and

  (C) designates an official of the agency who shall be responsible for bringing the agency's financial management systems into compliance with the requirements of subsection (a) by the date specified under subparagraph (B).

<< 31 USCA § 3512 NOTE >>

SEC. 804. REPORTING REQUIREMENTS.

 (a) REPORTS BY THE DIRECTOR.—No later than March 31 of each year, the Director shall submit a report to the Congress regarding implementation of this Act. The Director may include the report in the financial management status report and the 5–year financial management plan submitted under section 3512(a)(1) of title 31, United States Code.

 (b) REPORTS BY THE INSPECTOR GENERAL.—Each Inspector General who prepares a report under section 5(a) of the Inspector General Act of 1978 (5 U.S.C.App.) shall report to Congress instances and reasons when an agency has not met the intermediate target dates established in the remediation plan required under section 3(c). Specifically the report shall include—

  (1) the entity or organization responsible for the non-compliance;

  (2) the facts pertaining to the failure to comply with the requirements of subsection (a), including the nature and extent of the non-compliance, the primary reason or cause for the failure to comply, and any extenuating circumstances; and

  (3) a statement of the remedial actions needed to comply.

 (c) REPORTS BY THE COMPTROLLER GENERAL.—No later than October 1, 1997, and October 1, of each year thereafter, the Comptroller General of the United States shall report to the appropriate committees of the Congress concerning—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 516 of 1021   PageID 7386

(1) compliance with the requirements of section 3(a) of this Act, including whether the financial statements of the Federal Government have been prepared in accordance with applicable accounting standards; and

(2) the adequacy of applicable accounting standards for the Federal Government.

<< 31 USCA § 3512 NOTE >>

SEC. 805. CONFORMING AMENDMENTS.

<< 31 USCA § 3521 >>

(a) AUDITS BY AGENCIES.—Section 3521(f)(1) of title 31, United States Code, is amended in the first sentence by inserting "and the Controller of the Office of Federal Financial Management" before the period.

<< 31 USCA § 3512 >>

(b) FINANCIAL MANAGEMENT STATUS REPORT.—Section 3512(a)(2) of title 31, United States Code, is amended by—
(1) in subparagraph (D) by striking "and' after the semicolon;
(2) by redesignating subparagraph (E) as subparagraph (F); and
(3) by inserting after subparagraph (D) the following:
   "(E) a listing of agencies whose financial management systems do not comply substantially with the requirements of Section 3(a) the Federal Financial Management Improvement Act of 1996, and a summary statement of the efforts underway to remedy the noncompliance; and"

<< 5 USCA App. 3 § 5 >>

(c) INSPECTOR GENERAL ACT OF 1978.—Section 5(a) of the Inspector General Act of 1978 is amended—
(1) in paragraph (11) by striking "and" after the semicolon;
(2) in paragraph (12) by striking the period and inserting "; and"; and
(3) by adding at the end the following new paragraph:
"(13) the information described under section 05(b) of the Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

SEC. 806. DEFINITIONS.

For purposes of this title:
(1) AGENCY.—The term "agency" means a department or agency of the United States Government as defined in section 901(b) of title 31, United States Code.
(2) DIRECTOR.—The term "Director" means the Director of the Office of Management and Budget.
(3) FEDERAL ACCOUNTING STANDARDS.—The term "Federal accounting standards" means applicable accounting principles, standards, and requirements consistent with section 902(a)(3)(A) of title 31, United States Code.
(4) FINANCIAL MANAGEMENT SYSTEMS.—The term "financial management systems" includes the financial systems and the financial portions of mixed systems necessary to support financial management, including automated and manual processes, procedures, controls, data, hardware, software, and support personnel dedicated to the operation and maintenance of system functions.
(5) FINANCIAL SYSTEM.—The term "financial system" includes an information system, comprised of one or more applications, that is used for—
   (A) collecting, processing, maintaining, transmitting, or reporting data about financial events;
   (B) supporting financial planning or budgeting activities;
   (C) accumulating and reporting costs information; or
   (D) supporting the preparation of financial statements.

(6) MIXED SYSTEM.—The term "mixed system' means an information system that supports both financial and nonfinancial functions of the Federal Government or components thereof.

<< 31 USCA § 3512 NOTE >>

SEC. 807. EFFECTIVE DATE.

 This title shall take effect for the fiscal year ending September 30, 1997.

SEC. 808. REVISION OF SHORT TITLES.—

<< 31 USCA § 3512 NOTE >>

<< 41 USCA § 251 NOTE >>

 (a) Section 4001 of Public Law 104–106 (110 Stat. 642; 41 U.S.C. 251 note) is amended to read as follows:

"SEC. 4001. SHORT TITLE.

 "This division and division E may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 31 USCA 3512 NOTE >>

<< 41 USCA § 1401 NOTE >>

 (b) Section 5001 of Public Law 104–106 (110 Stat. 679; 40 U.S.C. 1401 note) is amended to read as follows:

"SEC. 5001. SHORT TITLE.

 "This division and division D may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 10 USCA § 113 nt >>

<< 10 USCA § 2315 >>

<< 15 USCA § 278g–3 >>

<< 28 USCA § 612 >>

<< 31 USCA § 3512 NOTE >>

<< 38 USCA § 310 >>

<< 40 USCA §§ 1411 nt, 1441 nt >>

<< 44 USCA §§ 3502, 3504, 3518 >>

 (c) Any reference in any law, regulation, document, record, or other paper of the United States to the Federal Acquisition Reform Act of 1996 or to the Information Technology Management Reform Act of 1996 shall be considered to be a reference to the Clinger–Cohen Act of 1996.
 This Act may be cited as the "Treasury, Postal Service, and General Government Appropriations Act, 1997".

TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

SEC. 2001. SHORT TITLE; TABLE OF CONTENTS; DEFINITIONS

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 518 of 1021   PageID 7388

<< 12 USCA § 226 NOTE >>

(a) SHORT TITLE.—This title may be cited as the "Economic Growth and Regulatory Paperwork Reduction Act of 1996".

(b) TABLE OF CONTENTS.—The table of contents for this title is as follows:

### TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

Sec. 2001. Short title; table of contents; definitions

#### Subtitle A—Streamlining the Home Mortgage Lending Process

Sec. 2101. Simplification and unification of disclosures required under RESPA and TILA for mortgage transactions.

Sec. 2102. General exemption authority for loans.

Sec. 2103. Reductions in Real Estate Settlement Procedures Act of 1974 regulatory burdens.

Sec. 2104. Waiver for certain borrowers.

Sec. 2105. Alternative disclosures for adjustable rate mortgages.

Sec. 2106. Restitution for violations of the Truth in Lending Act.

Sec. 2107. Limitation on liability under the Truth in Lending Act.

#### Subtitle B—Streamlining Government Regulation

##### CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

Sec. 2201. Elimination of redundant approval requirement for Oakar transactions.

Sec. 2202. Elimination of duplicative requirements imposed upon bank holding companies.

Sec. 2203. Elimination of the per branch capital requirement for national banks and State member banks.

Sec. 2204. Elimination of branch application requirements for automatic teller machines.

Sec. 2205. Elimination of requirement for approval of investments in bank premises for well capitalized and well managed banks.

Sec. 2206. Elimination of approval requirement for divestitures.

Sec. 2207. Streamlined nonbanking acquisitions by well capitalized and well managed banking organizations.

Sec. 2208. Elimination of unnecessary filing for officer and director appointments.

Sec. 2209. Amendments to the Depository Institution Management Interlocks Act.

Sec. 2210. Elimination of recordkeeping and reporting requirements for officers.

Sec. 2211. Repayment of Treasury loan.

Sec. 2212. Branch closures.

Sec. 2213. Foreign banks.

Sec. 2214. Disposition of foreclosed assets.

Sec. 2215. Exemption authority for antitying provision.

Sec. 2216. FDIC approval of new State bank powers.

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

Sec. 2221. Small bank examination cycle.

Sec. 2222. Required review of regulations.

Sec. 2223. Repeal of identification of nonbank financial institution customers.

Sec. 2224. Repeal of certain reporting requirements.

Sec. 2225. Increase in home mortgage disclosure exemption threshold.

Sec. 2226. Elimination of stock loan reporting requirement.

Sec. 2227. Credit availability assessment.

CHAPTER 3—REGULATORY MICROMANAGEMENT

Sec. 2241. National bank directors.

Sec. 2242. Paperwork reduction review.

Sec. 2243. State bank representation on Board of Directors of the FDIC.

Sec. 2244. Consultation among examiners.

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

Sec. 2301. Audit costs.

Sec. 2302. Incentives for self-testing.

Sec. 2303. Qualified thrift investment amendments.

Sec. 2304. Limited purpose banks.

Sec. 2305. Amendment to Fair Debt Collection Practices Act.

Sec. 2306. Increase in certain credit union loan ceilings.

Sec. 2307. Bank investments in Edge Act and agreement corporations.

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

Sec. 2401. Short title.

Sec. 2402. Definitions.

Sec. 2403. Furnishing consumer reports; use for employment purposes.

Sec. 2404. Use of consumer reports for prescreening and direct marketing; prohibition on unauthorized or uncertified use of information.

Sec. 2405. Consumer consent required to furnish consumer report containing medical information.

Sec. 2406. Obsolete information and information contained in consumer reports.

Sec. 2407. Compliance procedures.

Sec. 2408. Consumer disclosures.

Sec. 2409. Procedures in case of the disputed accuracy of any information in a consumer's file.

Sec. 2410. Charges for certain disclosures.

Sec. 2411. Duties of users of consumer reports.

Sec. 2412. Civil liability.

Sec. 2413. Responsibilities of persons who furnish information to consumer reporting agencies.

Sec. 2414. Investigative consumer reports.

Sec. 2415. Increased criminal penalties for obtaining information under false pretenses.

Sec. 2416. Administrative enforcement.

Sec. 2417. State enforcement of Fair Credit Reporting Act.

Sec. 2418. Federal Reserve Board authority.

Sec. 2419. Preemption of State law.

Sec. 2420. Effective date.

Sec. 2421. Relationship to other law.

Sec. 2422. Federal Reserve Board study.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

Sec. 2451. Regulation of credit repair organizations.

Sec. 2452. Credit worthiness.

Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

Sec. 2501. Short title.

Sec. 2502. CERCLA lender and fiduciary liability limitations amendments.

Sec. 2503. Conforming amendment.

Sec. 2504. Lender liability rule.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Sec. 2505. Effective date.

Subtitle F—Miscellaneous

Sec. 2601. Federal Reserve Board study.

Sec. 2602. Treatment of claims arising from breach of contracts executed by the receiver or conservator.

Sec. 2603. Criminal sanctions for fictitious financial instruments and counterfeiting.

Sec. 2604. Amendments to the Truth in Savings Act.

Sec. 2605. Consumer Leasing Act amendments.

Sec. 2606. Study of corporate credit unions.

Sec. 2607. Report on the reconciliation of differences between regulatory accounting principles and generally accepted accounting principles.

Sec. 2608. State-by-State and metropolitan area-by-metropolitan area study of bank fees.

Sec. 2609. Prospective application of gold clauses in contracts.

Sec. 2610. Qualified family partnerships.

Sec. 2611. Cooperative efforts between depository institutions and farmers and ranchers in drought-stricken areas.

Sec. 2612. Streamlining process for determining new nonbanking activities.

Sec. 2613. Authorizing bank service companies to organize as limited liability partnerships.

Sec. 2614. Retirement certificates of deposits.

Sec. 2615. Prohibitions on certain depository institution associations with Government-sponsored enterprises.

Subtitle G—Deposit Insurance Funds

Sec. 2701. Short title.

Sec. 2702. Special assessment to capitalize SAIF.

Sec. 2703. Financing corporation funding.

Sec. 2704. Merger of BIF and SAIF.

Sec. 2705. Creation of SAIF special reserve.

Sec. 2706. Refund of amounts in deposit insurance fund in excess of designated reserve amount.

Sec. 2707. Assessment rates for SAIF members may not be less than assessment rates for BIF members.

Sec. 2708. Assessments authorized only if needed to maintain the reserve ratio of a deposit insurance fund.

Sec. 2709. Treasury study of common depository institution charter.

Sec. 2710. Definitions.

Sec. 2711. Deductions for special assessments.

<< 12 USCA § 252 NOTE >>

(c) DEFINITIONS.—Except as otherwise specified in this title, the following definitions shall apply for purposes of this title:

(1) APPRAISAL SUBCOMMITTEE.—The term "Appraisal Subcommittee" means the Appraisal Subcommittee established under section 1011 of the Federal Financial Institutions Examination Council Act of 1978 (as in existence on the day before the date of enactment of this Act).

(2) APPROPRIATE FEDERAL BANKING AGENCY.—The term "appropriate Federal banking agency" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(3) BOARD.—The term "Board" means the Board of Governors of the Federal Reserve System.

(4) CORPORATION.—The term "Corporation" means the Federal Deposit Insurance Corporation.

(5) COUNCIL.—The term "Council" means the Financial Institutions Examination Council established under section 1004 of the Federal Financial Institutions Examination Council Act of 1978.

(6) INSURED CREDIT UNION.—The term "insured credit union" has the same meaning as in section 101 of the Federal Credit Union Act.

(7) INSURED DEPOSITORY INSTITUTION.—The term "insured depository institution" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

Subtitle A—Streamlining the Home Mortgage Lending Process

<< 12 USCA § 2601 NOTE >>

SEC. 2101. SIMPLIFICATION AND UNIFICATION OF DISCLOSURES REQUIRED UNDER RESPA AND TILA FOR MORTGAGE TRANSACTIONS.

(a) IN GENERAL.—With respect to credit transactions which are subject to the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board of Governors of the Federal Reserve System (hereafter in this section referred to as the "Board") and the Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall take such action as may be necessary before the end of the 6–month period beginning on the date of enactment of this Act—

(1) to simplify and improve the disclosures applicable to such transactions under such Acts, including the timing of the disclosures; and

(2) to provide a single format for such disclosures which will satisfy the requirements of each such Act with respect to such transactions.

(b) REGULATIONS.—To the extent that it is necessary to prescribe any regulation in order to effect any changes required to be made under subsection (a), the proposed regulation shall be published in the Federal Register before the end of the 6–month period referred to in subsection (a).

(c) RECOMMENDATIONS FOR LEGISLATION.—If the Board and the Secretary find that legislative action may be necessary or appropriate in order to simplify and unify the disclosure requirements under the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board and the Secretary shall submit a report containing recommendations to the Congress concerning such action.

SEC. 2102. GENERAL EXEMPTION AUTHORITY FOR LOANS.

<< 15 USCA § 1603 >>

(a) REGULATORY FLEXIBILITY.—Section 104 of the Truth in Lending Act (15 U.S.C. 1603) is amended—

(1) by redesignating paragraphs (5) and (6) as paragraphs (6) and (7), respectively; and

(2) by inserting after paragraph (4) the following new paragraph:

"(5) Transactions for which the Board, by rule, determines that coverage under this title is not necessary to carry out the purposes of this title.".

<< 15 USCA § 1604 >>

(b) EXEMPTION AUTHORITY.—Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:

"(f) EXEMPTION AUTHORITY.—

"(1) IN GENERAL.—The Board may exempt, by regulation, from all or part of this title any class of transactions, other than transactions involving any mortgage described in section 103(aa), for which, in the determination of the Board, coverage under all or part of this title does not provide a meaningful benefit to consumers in the form of useful information or protection.

"(2) FACTORS FOR CONSIDERATION.—In determining which classes of transactions to exempt in whole or in part under paragraph (1), the Board shall consider the following factors and publish its rationale at the time a proposed exemption is published for comment:

"(A) The amount of the loan and whether the disclosures, right of rescission, and other provisions provide a benefit to the consumers who are parties to such transactions, as determined by the Board.

"(B) The extent to which the requirements of this title complicate, hinder, or make more expensive the credit process for the class of transactions.

"(C) The status of the borrower, including—

"(i) any related financial arrangements of the borrower, as determined by the Board;

"(ii) the financial sophistication of the borrower relative to the type of transaction; and

"(iii) the importance to the borrower of the credit, related supporting property, and coverage under this title, as determined by the Board;

"(D) whether the loan is secured by the principal residence of the consumer; and

"(E) whether the goal of consumer protection would be undermined by such an exemption.".

SEC. 2103. REDUCTIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT OF 1974 REGULATORY BURDENS.

<< 12 USCA § 2605 >>

(a) UNNECESSARY DISCLOSURE.—Section 6(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2605(a)) is amended to read as follows:

"(a) DISCLOSURE TO APPLICANT RELATING TO ASSIGNMENT, SALE, OR TRANSFER OF LOAN SERVICING.—Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.".

<< 12 USCA § 2606 >>

(b) CONSISTENCY OF REAL ESTATE SETTLEMENT PROCEDURES ACT AND TRUTH IN LENDING ACT EXEMPTION OF BUSINESS LOANS.—Section 7 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2606) is amended—

(1) by striking "This Act" and inserting the following:

"(a) IN GENERAL.—This Act"; and

(2) by adding at the end the following new subsection:

"(b) INTERPRETATION.—In prescribing regulations under section 19(a), the Secretary shall ensure that, with respect to subsection (a) of this section, the exemption for credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, as provided in section 7(1) of the Real Estate Settlement Procedures Act of 1974 shall be the same as the exemption for such credit transactions under section 104(1) of the Truth in Lending Act.".

(c) REDESIGNATION OF CONTROLLED BUSINESS ARRANGEMENTS AS AFFILIATED BUSINESS ARRANGEMENTS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended—

<< 12 USCA § 2602 >>

(1) in section 3(7), by striking "controlled business arrangement" and inserting "affiliated business arrangement"; and

<< 12 USCA § 2607 >>

(2) in subsections (c)(4) and (d)(6) of section 8, by striking "controlled business arrangements" and inserting "affiliated business arrangements".

(d) DISCLOSURES BY TELEPHONE OR ELECTRONIC MEDIA.—Section 8(c)(4) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2607(c)(4)(A)) is amended by striking subparagraph (A) and inserting the following "(A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business); (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone, (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral); or (iii) in the case of a referral by a lender (including a referral by a lender to an affiliated lender), at the time the estimates required under section 5(c) are provided (notwithstanding clause (i) or (ii)); and any required written receipt of such disclosure (without regard to the manner of the disclosure under clause (i), (ii), or (iii)) may be obtained at the closing or settlement (except that a person making a face-to-face referral who provides the written disclosure at or before the time of the referral shall attempt to obtain any required written receipt of such disclosure at such time and if the person being referred chooses not to acknowledge the receipt of the disclosure at that time, that fact shall be noted in the written, electronic, or similar system of records maintained in the regular course of business by the person making the referral),".

<< 12 USCA § 2614 >>

(e) LIMITATION ON CLAIMS ARISING FROM VIOLATIONS OF REQUIREMENTS FOR SERVICING MORTGAGES AND ADMINISTERING ESCROW ACCOUNTS.—Section 16 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2614) is amended—

(1) by striking "section 8 or 9" and inserting "section 6, 8, or 9"; and

(2) by striking "within one year" and inserting "within 3 years in the case of a violation of section 6 and 1 year in the case of a violation of section 8 or 9".

<< 12 USCA § 2617 >>

(f) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —Section 19 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2617) is amended by adding at the end the following new subsection:

"(d) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —

"(1) IN GENERAL.—The amendment to part 3500 of title 24 of the Code of Federal Regulations contained in the final regulation prescribed by the Secretary and published in the Federal Register on June 7, 1996, which will, as of the effective date of such amendment—

"(A) eliminate the exemption for payments by an employer to employees of such employer for referral activities which is currently codified as section 3500.14(g)(1)(vii) of such title 24; and

"(B) replace such exemption with a more limited exemption in new clauses (vii), (viii), and (ix) of section 3500.14 of such title 24,

shall not take effect before July 31, 1997.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 525 of 1021   PageID 7395

"(2) CONTINUATION OF PRIOR RULE.—The regulation codified as section 3500.14(g)(1)(vii) of title 24 of the Code of Federal Regulations, relating to employer-employee payments, as in effect on May 1, 1996, shall remain in effect until the date the amendment referred to in paragraph (1) takes effect in accordance with such paragraph.

"(3) PUBLIC NOTICE OF EFFECTIVE DATE.—The Secretary shall provide public notice of the date on which the amendment referred to in paragraph (1) will take effect in accordance with such paragraph not less than 90 days and not more than 180 days before such effective date.".

(g) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 2603 >>

(1) Section 4(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2603(a)) is amended by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision".

<< 12 USCA § 2609 >>

(2) Section 10(c)(1)(C) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2609(c)(1)(C)) is amended by striking "Not later than the expiration of the 90-day period beginning on the date of the enactment of the Cranston–Gonzalez National Affordable Housing Act, the" and inserting "The".

<< 12 USCA §§ 2611, 2612, 2613 >>

(h) REPEAL OF OBSOLETE PROVISIONS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended by striking sections 13, 14 and 15.

<< 15 USCA § 1604 >>

SEC. 2104. WAIVER FOR CERTAIN BORROWERS.

Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:
"(g) WAIVER FOR CERTAIN BORROWERS.—

"(1) IN GENERAL.—The Board, by regulation, may exempt from the requirements of this title certain credit transactions if—
"(A) the transaction involves a consumer—
"(i) with an annual earned income of more than $200,000; or
"(ii) having net assets in excess of $1,000,000 at the time of the transaction; and
"(B) a waiver that is handwritten, signed, and dated by the consumer is first obtained from the consumer.
"(2) ADJUSTMENTS BY THE BOARD.—The Board, at its discretion, may adjust the annual earned income and net asset requirements of paragraph (1) for inflation.".

<< 15 USCA § 1638 >>

SEC. 2105. ALTERNATIVE DISCLOSURES FOR ADJUSTABLE RATE MORTGAGES.

Section 128(a) of the Truth in Lending Act (15 U.S.C. 1638(a)) is amended by adding at the end the following new paragraph:
"(14) In the case of any variable interest rate residential mortgage transaction, in disclosures provided at application as prescribed by the Board for a variable rate transaction secured by the consumer's principal dwelling, at the option of the creditor, a statement that the periodic payments may increase or decrease substantially, and the maximum interest rate and payment for a $10,000 loan originated at a recent interest rate, as determined by the Board, assuming the maximum periodic increases in rates and payments under the program, or a historical example illustrating the effects of interest rate changes implemented according to the loan program.".

<< 15 USCA § 1607 >>

AR03184

SEC. 2106. RESTITUTION FOR VIOLATIONS OF THE TRUTH IN LENDING ACT.

 Section 108(e)(3) of the Truth in Lending Act (15 U.S.C. 2602(3)) is amended—
  (1) by striking "ordered (A) if" and inserting the following: "ordered—
   "(A) if";
  (2) by striking "may require a partial" and inserting "may—
   "(i) require a partial";
  (3) by striking ", except that with respect" and all that follows through "Act, the agency shall require" and inserting "; or
   "(ii) require";
  (4) by striking "reasonable, (B) the" and inserting the following: "reasonable, if (in the case of an agency referred to in paragraph (1), (2), or (3) of subsection (a)), the agency determines that a partial adjustment or making partial payments over an extended period is necessary to avoid causing the creditor to become undercapitalized pursuant to section 38 of the Federal Deposit Insurance Act;
   "(B) the"; and
  (5) by striking "(C) except" and inserting the following:
   "(C) except".

SEC. 2107. LIMITATION ON LIABILITY UNDER THE TRUTH IN LENDING ACT.

<< 15 USCA § 1649 >>

 (a) IN GENERAL.—Section 139(a) of the Truth in Lending Act (15 U.S.C. 1649(a)) is amended by striking "For any consumer credit transaction subject to this title" and inserting "For any closed end consumer credit transaction that is secured by real property or a dwelling, that is subject to this title, and".

<< 15 USCA § 1649 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as of September 30, 1995.

Subtitle B—Streamlining Government Regulation

CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

SEC. 2201. ELIMINATION OF REDUNDANT APPROVAL REQUIREMENT FOR OAKAR TRANSACTIONS.

<< 12 USCA § 1815 >>

 (a) IN GENERAL.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—
 (1) in subparagraph (A), by striking "with the prior written approval of" and inserting "if the transaction is approved by";
 (2) in subparagraph (E)—
  (A) by striking clauses (i) and (iv);
  (B) by redesignating clauses (ii) and (iii) as clauses (i) and (ii), respectively; and
  (C) by adding at the end the following new clause:
   "(iii) CAPITAL REQUIREMENTS.—A transaction described in this paragraph shall not be approved under section 18(c)(2) unless the acquiring, assuming, or resulting depository institution will meet all applicable capital requirements upon consummation of the transaction.";
 (3) by striking subparagraph (G); and
 (4) by redesignating subparagraphs (H) through (J) as subparagraphs (G) through (I), respectively.
 (b) CONFORMING AMENDMENTS.—

<< 12 USCA § 215c >>

(1) REVISED STATUTES.—Section 5156A(b)(1) of the Revised Statutes of the United States (12 U.S.C. 215c(b)(1)) is amended by striking "by section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

<< 12 USCA § 1467a >>

(2) HOME OWNERS' LOAN ACT.—Section 10(s)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1467a(s)(2)(A)) is amended by striking "under section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

SEC. 2203. ELIMINATION OF DUPLICATIVE REQUIREMENTS IMPOSED UPON BANK HOLDING COMPANIES.

<< 12 USCA § 1467a >>

(a) EXEMPTION FOR BANK HOLDING COMPANIES.—Section 10 of the Home Owners' Loan Act (12 U.S.C. 1467a) is amended by adding at the end the following new subsection:

"(t) EXEMPTION FOR BANK HOLDING COMPANIES.—This section shall not apply to a bank holding company that is subject to the Bank Holding Company Act of 1956, or any company controlled by such bank holding company.".

<< 12 USCA § 1467a >>

(b) DEFINITION.—Section 10(a)(1)(D) of the Home Owners' Loan Act (12 U.S.C. 1467a(a)(1)(D)) is amended to read as follows:

"(D) SAVINGS AND LOAN HOLDING COMPANY.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'savings and loan holding company' means any company that directly or indirectly controls a savings association or that controls any other company that is a savings and loan holding company.

"(ii) EXCLUSION.—The term 'savings and loan holding company' does not include a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or to any company directly or indirectly controlled by such company (other than a savings association).".

(c) ACQUISITIONS.—Section 10(e)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(e)(1)) is amended—

(1) in subparagraph (A)(iii)(VII), by inserting "or" at the end;

(2) in subparagraph (A)(iv), by inserting "and" at the end; and

(3) in subparagraph (B)—

(A) by striking "or (ii)" and inserting "(ii)"; and

(B) by inserting before the first period ", or (iii) acquired by a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or any company controlled by such bank holding company".

<< 12 USCA § 1843 >>

(d) AMENDMENTS TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 4(i) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(i)) is amended by adding at the end the following new paragraphs:

"(4) SOLICITATION OF VIEWS.—

"(A) NOTICE TO DIRECTOR.—Upon receiving any application or notice by a bank holding company to acquire, directly or indirectly, a savings association under subsection (c)(8), the Board shall solicit comments and recommendations from the Director with respect to such acquisition.

"(B) COMMENT PERIOD.—The comments and recommendations of the Director under subparagraph (A) with respect to any acquisition subject to such subparagraph shall be transmitted to the Board not later than 30 days after the receipt by the Director of the notice relating to such acquisition (or such shorter period as the Board may specify if the Board advises the Director that an emergency exists that requires expeditious action).

"(5) EXAMINATION.—

"(A) SCOPE.—The Board shall consult with the Director, as appropriate, in establishing the scope of an examination by the Board of a bank holding company that directly or indirectly controls a savings association.

"(B) ACCESS TO INSPECTION REPORTS.—Upon the request of the Director, the Board shall furnish the Director with a copy of any inspection report, additional examination materials, or supervisory information relating to any bank holding company that directly or indirectly controls a savings association.

"(6) COORDINATION OF ENFORCEMENT EFFORTS.—The Board and the Director shall cooperate in any enforcement action against any bank holding company that controls a savings association, if the relevant conduct involves such association.

"(7) DIRECTOR DEFINED.—For purposes of this section, the term 'Director' means the Director of the Office of Thrift Supervision.".

<< 12 USCA § 36 >>

SEC. 2204. ELIMINATION OF THE PER BRANCH CAPITAL REQUIREMENT FOR NATIONAL BANKS AND STATE MEMBER BANKS.

Section 5155(h) of the Revised Statutes of the United States (12 U.S.C. 36(h)) is amended to read as follows:
"(h) [Repealed]".

SEC. 2205. ELIMINATION OF BRANCH APPLICATION REQUIREMENTS FOR AUTOMATIC TELLER MACHINES.

<< 12 USCA § 36 >>

(a) "BRANCH" UNDER NATIONAL BANK ACT.—Section 5155(j) of the Revised Statutes of the United States (12 U.S.C. 36(j)) is amended by adding at the end the following: "The term 'branch', as used in this section, does not include an automated teller machine or a remote service unit.".

<< 12 USCA § 1813 >>

(b) "DOMESTIC BRANCH" UNDER THE FEDERAL DEPOSIT INSURANCE ACT.—Section 3(o) of the Federal Deposit Insurance Act (12 U.S.C. 1813(o)) is amended by striking "lent; and the" and inserting "lent. The term 'domestic branch' does not include an automated teller machine or a remote service unit. The".

<< 12 USCA § 371d >>

SEC. 2206. ELIMINATION OF REQUIREMENT FOR APPROVAL OF INVESTMENTS IN BANK PREMISES FOR WELL CAPITALIZED AND WELL MANAGED BANKS.

Section 24A of the Federal Reserve Act (12 U.S.C. 371d) is amended to read as follows:

"SEC. 24A. INVESTMENT IN BANK PREMISES OR STOCK OF CORPORATION HOLDING PREMISES.

"(a) CONDITIONS OF INVESTMENT.—No national bank or State member bank shall invest in bank premises, or in the stock, bonds, debentures, or other such obligations of any corporation holding the premises of such bank, or make loans to or upon the security of any such corporation—

"(1) unless the bank receives the prior approval of the Comptroller of the Currency (with respect to a national bank) or the Board (with respect to a State member bank);

"(2) unless the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to the amount of the capital stock of such bank; or

"(3) unless—

"(A) the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to 150 percent of the capital and surplus of the bank; and

"(B) the bank—

"(i) has a CAMEL composite rating of 1 or 2 under the Uniform Financial Institutions Rating System (or an equivalent rating under a comparable rating system) as of the most recent examination of such bank;

"(ii) is well capitalized and will continue to be well capitalized after the investment or loan; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) provides notification to the Comptroller of the Currency (with respect to a national bank) or to the Board (with respect to a State member bank) not later than 30 days after making the investment or loan.

"(b) DEFINITIONS.—For purposes of this section—

"(1) the term 'affiliate' has the same meaning as in section 2 of the Banking Act of 1933; and

"(2) the term 'well capitalized' has the same meaning as in section 38(b) of the Federal Deposit Insurance Act.".

<< 12 USCA § 1841 >>

SEC. 2207. ELIMINATION OF APPROVAL REQUIREMENT FOR DIVESTITURES.

Section 2(g) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(g)) is amended—

(1) in paragraph (1), by adding "and" at the end;

(2) in paragraph (2), by striking "; and" and inserting a period; and

(3) by striking paragraph (3).

SEC. 2208. STREAMLINED NONBANKING ACQUISITIONS BY WELL CAPITALIZED AND WELL MANAGED BANKING ORGANIZATIONS.

<< 12 USCA § 1843 >>

(a) NOTICE REQUIREMENTS.—Section 4(j) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(j)) is amended—

(1) in paragraph (1)(A), by striking "No" and inserting "Except as provided in paragraph (3), no"; and

(2) by adding at the end the following new paragraphs:

"(3) NO NOTICE REQUIRED FOR CERTAIN TRANSACTIONS.—No notice under paragraph (1) of this subsection or under subsection (c)(8) or (a)(2)(B) is required for a proposal by a bank holding company to engage in any activity or acquire the shares or assets of any company, other than an insured depository institution, if the proposal qualifies under paragraph (4).

"(4) CRITERIA FOR STATUTORY APPROVAL.—A proposal qualifies under this paragraph if all of the following criteria are met:

"(A) FINANCIAL CRITERIA.—Both before and immediately after the proposed transaction—

"(i) the acquiring bank holding company is well capitalized;

"(ii) the lead insured depository institution of such holding company is well capitalized;

"(iii) well capitalized insured depository institutions control at least 80 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company; and

"(iv) no insured depository institution controlled by such holding company is undercapitalized.

"(B) MANAGERIAL CRITERIA.—

"(i) WELL MANAGED.—At the time of the transaction, the acquiring bank holding company, its lead insured depository institution, and insured depository institutions that control at least 90 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company are well managed.

"(ii) LIMITATION ON POORLY MANAGED INSTITUTIONS.—Except as provided in paragraph (6), no insured depository institution controlled by the acquiring bank holding company has received 1 of the 2 lowest composite ratings at the later of the institution's most recent examination or subsequent review.

"(C) ACTIVITIES PERMISSIBLE.—Following consummation of the proposal, the bank holding company engages directly or through a subsidiary solely in—

"(i) activities that are permissible under subsection (c)(8), as determined by the Board by regulation or order thereunder, subject to all of the restrictions, terms, and conditions of such subsection and such regulation or order; and

"(ii) such other activities as are otherwise permissible under this section, subject to the restrictions, terms and conditions, including any prior notice or approval requirements, provided in this section.

"(D) SIZE OF ACQUISITION.—

"(i) ASSET SIZE.—The book value of the total assets to be acquired does not exceed 10 percent of the consolidated total risk-weighted assets of the acquiring bank holding company.

"(ii) CONSIDERATION.—The gross consideration to be paid for the securities or assets does not exceed 15 percent of the consolidated Tier 1 capital of the acquiring bank holding company.

"(E) NOTICE NOT OTHERWISE WARRANTED.—For proposals described in paragraph (5)(B), the Board has not, before the conclusion of the period provided in paragraph (5)(B), advised the bank holding company that a notice under paragraph (1) is required.

"(F) COMPLIANCE CRITERION.—During the 12–month period ending on the date on which the bank holding company proposes to commence an activity or acquisition, no administrative enforcement action has been commenced, and no cease and desist order has been issued pursuant to section 8 of the Federal Deposit Insurance Act, against the bank holding company or any depository institution subsidiary of the holding company, and no such enforcement action, order, or other administrative enforcement proceeding is pending as of such date.

"(5) NOTIFICATION.—

"(A) COMMENCEMENT OF ACTIVITIES APPROVED BY RULE.—A bank holding company that qualifies under paragraph (4) and that proposes to engage de novo, directly or through a subsidiary, in any activity that is permissible under subsection (c)(8), as determined by the Board by regulation, may commence that activity without prior notice to the Board and must provide written notification to the Board not later than 10 business days after commencing the activity.

"(B) ACTIVITIES PERMITTED BY ORDER AND ACQUISITIONS.—

"(i) IN GENERAL.—At least 12 business days before commencing any activity pursuant to paragraph (3) (other than an activity described in subparagraph (A) of this paragraph) or acquiring shares or assets of any company pursuant to paragraph (3), the bank holding company shall provide written notice of the proposal to the Board, unless the Board determines that no notice or a shorter notice period is appropriate.

"(ii) DESCRIPTION OF ACTIVITIES AND TERMS.—A notification under this subparagraph shall include a description of the proposed activities and the terms of any proposed acquisition.

"(6) RECENTLY ACQUIRED INSTITUTIONS.—Any insured depository institution which has been acquired by a bank holding company during the 12–month period preceding the date on which the company proposes to commence an activity or acquisition pursuant to paragraph (3) may be excluded for purposes of paragraph (4)(B)(ii) if—

"(A) the bank holding company has developed a plan for the institution to restore the capital and management of the institution which is acceptable to the appropriate Federal banking agency; and

"(B) all such insured depository institutions represent, in the aggregate, less than 10 percent of the aggregate total risk-weighted assets of all insured depository institutions controlled by the bank holding company.

"(7) ADJUSTMENT OF PERCENTAGES.—The Board may, by regulation, adjust the percentages and the manner in which the percentages of insured depository institutions are calculated under paragraph (4)(B)(i), (4)(D), or (6)(B) if the Board determines that any such adjustment is consistent with safety and soundness and the purposes of this Act.".

<< 12 USCA § 1841 >>

(b) DEFINITIONS.—Section 2(o) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(o)) is amended—

(1) by striking paragraph (1) and inserting the following new paragraph:

"(1) CAPITAL TERMS.—

"(A) INSURED DEPOSITORY INSTITUTIONS.—With respect to insured depository institutions, the terms 'well capitalized', 'adequately capitalized', and 'undercapitalized' have the same meanings as in section 38(b) of the Federal Deposit Insurance Act.

"(B) BANK HOLDING COMPANY.—

"(i) ADEQUATELY CAPITALIZED.—With respect to a bank holding company, the term 'adequately capitalized' means a level of capitalization which meets or exceeds all applicable Federal regulatory capital standards.

"(ii) WELL CAPITALIZED.—A bank holding company is 'well capitalized' if it meets the required capital levels for well capitalized bank holding companies established by the Board.

"(C) OTHER CAPITAL TERMS.—The terms 'Tier 1' and 'risk-weighted assets' have the meanings given those terms in the capital guidelines or regulations established by the Board for bank holding companies."; and

(2) by adding at the end the following new paragraphs:

"(8) LEAD INSURED DEPOSITORY INSTITUTIONS.—

"(A) IN GENERAL.—The term 'lead insured depository institution' means the largest insured depository institution controlled by the subject bank holding company at any time, based on a comparison of the average total risk-weighted assets controlled by each insured depository institution during the previous 12–month period.

"(B) BRANCH OR AGENCY.—For purposes of this paragraph and section 4(j)(4), the term 'insured depository institution' includes any branch or agency operated in the United States by a foreign bank.

"(9) WELL MANAGED.—The term 'well managed' means—

"(A) in the case of any company or depository institution which receives examinations, the achievement of—

"(i) a CAMEL composite rating of 1 or 2 (or an equivalent rating under an equivalent rating system) in connection with the most recent examination or subsequent review of such company or institution; and

"(ii) at least a satisfactory rating for management, if such rating is given; or

"(B) in the case of a company or depository institution that has not received an examination rating, the existence and use of managerial resources which the Board determines are satisfactory.".

<< 12 USCA § 1831i >>

SEC. 2209. ELIMINATION OF UNNECESSARY FILING FOR OFFICER AND DIRECTOR APPOINTMENTS.

Section 32 of the Federal Deposit Insurance Act (12 U.S.C. 1831i) is amended—

(1) in subsection (a)—

(A) by inserting "(or such other period, as determined by the appropriate Federal banking agency)" after "30 days";

(B) by striking "if the insured depository institution or depository institution holding company" and inserting "if";

(C) by striking paragraphs (1) and (2);

(D) by redesignating paragraph (3) as paragraph (1);

(E) in paragraph (1), as redesignated—

(i) by inserting "the insured depository institution or depository institution holding company" before "is not in compliance"; and

(ii) by striking the period at the end and inserting "; or"; and

(F) by adding at the end the following new paragraph:

"(2) the agency determines, in connection with the review by the agency of the plan required under section 38 or otherwise, that such prior notice is appropriate."; and

(2) in subsection (b), by striking "30–day period" and inserting "notice period, not to exceed 90 days,".

SEC. 2210. AMENDMENTS TO THE DEPOSITORY INSTITUTION MANAGEMENT INTERLOCKS ACT.

<< 12 USCA § 3203 >>

(a) DUAL SERVICE AMONG LARGER ORGANIZATIONS—Section 204 of the Depository Institution Management Interlocks Act (12 U.S.C. 3203) is amended—

(1) by striking "$1,000,000,000" and inserting "$2,500,000,000";

(2) by striking "$500,000,000" and inserting "$1,500,000,000"; and

(3) by adding at the end the following: "In order to allow for inflation or market changes, the appropriate Federal depository institutions regulatory agencies may, by regulation, adjust, as necessary, the amount of total assets required for depository institutions or depository holding companies under this section.".

<< 12 USCA § 3205 >>

(b) EXTENSION OF GRANDFATHER EXEMPTION.—Section 206 of the Depository Institution Management Interlocks Act (12 U.S.C. 3205) is amended—

(1) in subsection (a), by striking "for a period of, subject to the requirements of subsection (c), 20 years after the date of enactment of this title";

(2) in subsection (b), by striking the second sentence; and

(3) by striking subsection (c).

<< 12 USCA § 3207 >>

(c) REGULATIONS.—Section 209 of the Depository Institution Management Interlocks Act (12 U.S.C. 3207) is amended—

(1) in subsection (a)—

  (A) by striking "(a) IN GENERAL.—Rules and regulations" and inserting "Regulations";

  (B) by inserting ", including regulations that permit service by a management official that would otherwise be prohibited by section 203 or section 204, if such service would not result in a monopoly or substantial lessening of competition," after "title";

  (C) in paragraph (4)—

   (i) by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision"; and

   (ii) by striking "Savings and Loan" and inserting "Deposit"; and

(2) by striking subsections (b) and (c).

<< 12 USCA § 375b >>

SEC. 2211. ELIMINATION OF RECORDKEEPING AND REPORTING REQUIREMENTS FOR OFFICERS.

(a) EMPLOYEE BENEFIT PLANS.—Section 22(h)(2) of the Federal Reserve Act (12 U.S.C. 375b(2)) is amended—

(1) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively, and indenting appropriately;

(2) by striking "(2) PREFERENTIAL TERMS PROHIBITED.—" and inserting the following:

"(2) PREFERENTIAL TERMS PROHIBITED.—

  "(A) IN GENERAL.—"; and

(3) by adding at the end the following new subparagraph:

  "(B) EXCEPTION.—Nothing in this paragraph shall prohibit any extension of credit made pursuant to a benefit or compensation program—

   "(i) that is widely available to employees of the member bank; and

   "(ii) that does not give preference to any officer, director, or principal shareholder of the member bank, or to any related interest of such person, over other employees of the member bank.".

(b) EXCEPTION FOR EXTENSIONS OF CREDIT TO EXECUTIVE OFFICERS AND DIRECTORS OF AFFILIATES.—Section 22(h)(8)(B) of the Federal Reserve Act (12 U.S.C. 375b(8)(B)) is amended to read as follows:

"(B) EXCEPTION.—The Board may, by regulation, make exceptions to subparagraph (A) for any executive officer or director of a subsidiary of a company that controls the member bank if—

  "(i) the executive officer or director does not have authority to participate, and does not participate, in major policymaking functions of the member bank; and

  "(ii) the assets of such subsidiary do not exceed 10 percent of the consolidated assets of a company that controls the member bank and such subsidiary (and is not controlled by any other company).".

<< 12 USCA § 3337 >>

SEC. 2212. REPAYMENT OF TREASURY LOAN.

Section 1108 of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 3337) is amended by adding at the end the following new subsection.—

"(c) REPAYMENT OF TREASURY LOAN.—Not later than September 30, 1998, the Appraisal Subcommittee shall repay to the Secretary of the Treasury the unpaid portion of the $5,000,000 paid to the Appraisal Subcommittee pursuant to this section.".

<< 12 USCA § 1831r–1 >>

SEC. 2213. BRANCH CLOSURES.

Section 42 of the Federal Deposit Insurance Act (12 U.S.C. 1831r–1) is amended by adding at the end the following new subsection:

"(e) SCOPE OF APPLICATION.—This section shall not apply with respect to—

"(1) an automated teller machine;

"(2) the relocation of a branch or consolidation of one or more branches into another branch, if the relocation or consolidation—

"(A) occurs within the immediate neighborhood; and

"(B) does not substantially affect the nature of the business or customers served; or

"(3) a branch that is closed in connection with—

"(A) an emergency acquisition under—

"(i) section 11(n); or

"(ii) subsection (f) or (k) of section 13; or

"(B) any assistance provided by the Corporation under section 13(c).".

<< 12 USCA § 3105 >>

SEC. 2214. FOREIGN BANKS.

(a) EXAMINATION OF BRANCHES AND AGENCIES BY BOARD.—Section 7(c) of the International Banking Act of 1978 (12 U.S.C. 3105(c)) is amended—

(1) by striking "(c)" and inserting the following:

"(c) FOREIGN BANK EXAMINATIONS AND REPORTING.—";

(2) in paragraph (1)(B), by adding at the end the following new clause:

"(iii) AVOIDANCE OF DUPLICATION.—In exercising its authority under this paragraph, the Board shall take all reasonable measures to reduce burden and avoid unnecessary duplication of examinations.";

(3) by striking subparagraph (C) of paragraph (1) and inserting the following:

"(C) ON–SITE EXAMINATION.—Each Federal branch or agency, and each State branch or agency, of a foreign bank shall be subject to on-site examination by an appropriate Federal banking agency or State bank supervisor as frequently as would a national bank or a State bank, respectively, by the appropriate Federal banking agency."; and

(4) in paragraph (1)(D), by inserting before the period at the end the following: ", only to the same extent that fees are collected by the Board for examination of any State member bank".

(b) ESTABLISHMENT OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(d) of the International Banking Act of 1978 (12 U.S.C. 3105(d)) is amended—

(1) in paragraph (2), by striking "The Board" and inserting "Except as provided in paragraph (6), the Board";

(2) in paragraph (5), by striking "Consistent with the standards for approval in paragraph (2), the"; and inserting "The"; and

(3) by adding at the end the following new paragraphs:

"(6) EXCEPTION.—

"(A) IN GENERAL.—If the Board is unable to find, under paragraph (2), that a foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by the appropriate authorities in its home country, the Board may nevertheless approve an application by such foreign bank under paragraph (1) if—

"(i) the appropriate authorities in the home country of the foreign bank are actively working to establish arrangements for the consolidated supervision of such bank; and

"(ii) all other factors are consistent with approval.

"(B) OTHER CONSIDERATIONS.—In deciding whether to use its discretion under subparagraph (A), the Board shall also consider whether the foreign bank has adopted and implements procedures to combat money laundering. The Board may also take into account whether the home country of the foreign bank is developing a legal regime to address money laundering or is participating in multilateral efforts to combat money laundering.

"(C) ADDITIONAL CONDITIONS.—In approving an application under this paragraph, the Board, after requesting and taking into consideration the views of the appropriate State bank supervisor or the Comptroller of the Currency, as the case may be, may impose such conditions or restrictions relating to the activities or business operations of the proposed branch, agency,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

or commercial lending company subsidiary, including restrictions on sources of funding, as are considered appropriate. The Board shall coordinate with the appropriate State bank supervisor or the Comptroller of the Currency, as appropriate, in the implementation of such conditions or restrictions.

"(D) MODIFICATION OF CONDITIONS.—Any condition or restriction imposed by the Board in connection with the approval of an application under authority of this paragraph may be modified or withdrawn.

"(7) TIME PERIOD FOR BOARD ACTION.—

"(A) FINAL ACTION.—The Board shall take final action on any application under paragraph (1) not later than 180 days after receipt of the application, except that the Board may extend for an additional 180 days the period within which to take final action on such application after providing notice of, and the reasons for, the extension to the applicant foreign bank and any appropriate State bank supervisor or the Comptroller of the Currency, as appropriate.

"(B) FAILURE TO SUBMIT INFORMATION.—The Board may deny any application if it does not receive information requested from the applicant foreign bank or appropriate authorities in the home country of the foreign bank in sufficient time to permit the Board to evaluate such information adequately within the time periods for final action set forth in subparagraph (A).

"(C) WAIVER.—A foreign bank may waive the applicability of this paragraph with respect to any application under paragraph (1).".

(c) TERMINATION OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(e)(1)(A) of the International Banking Act of 1978 (12 U.S.C. 3105(e)(1)(A)) is amended—

(1) by inserting "(i)" after "(A)";

(2) by striking "or" at the end and inserting "and"; and

(3) by adding at the end the following new clause:

"(ii) the appropriate authorities in the home country of the foreign bank are not making demonstrable progress in establishing arrangements for the comprehensive supervision or regulation of such foreign bank on a consolidated basis; or".

<< 12 USCA § 1843 >>

SEC. 2215. DISPOSITION OF FORECLOSED ASSETS.

Section 4(c)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(2)) is amended—

(1) by striking "for not more than one year at a time"; and

(2) by striking "but no such extensions shall extend beyond a date five years" and inserting "and, in the case of a bank holding company which has not disposed of such shares within 5 years after the date on which such shares were acquired, the Board may, upon the application of such company, grant additional exemptions if, in the judgment of the Board, such extension would not be detrimental to the public interest and, either the bank holding company has made a good faith attempt to dispose of such shares during such 5–year period, or the disposal of such shares during such 5–year period would have been detrimental to the company, except that the aggregate duration of such extensions shall not extend beyond 10 years".

SEC. 2216. EXEMPTION AUTHORITY FOR ANTITYING PROVISION.

<< 12 USCA § 1972 >>

(a) FEDERAL RESERVE BOARD AUTHORITY.—Section 106(b)(1) of the Bank Holding Company Act Amendments of 1970 (12 U.S.C. 1972(1)) is amended in the last sentence, by inserting "and the prohibitions of section 4(f)(9) and 4(h)(2) of the Bank Holding Company Act of 1956" after "prohibition".

<< 12 USCA § 1464 >>

(b) OTS AUTHORITY.—Section 5(q) of the Home Owners' Loan Act (12 U.S.C. 1464(q)) is amended by adding at the end the following new paragraph:

"(6) EXCEPTIONS.—The Director may, by regulation or order, permit such exceptions to the prohibitions of this subsection as the Director considers will not be contrary to the purposes of this subsection and which conform to exceptions granted

by the Board of Governors of the Federal Reserve System pursuant to section 106(b) of the Bank Holding Company Act Amendments of 1970.".

<< 12 USCA § 1831a >>

SEC. 2217. FDIC APPROVAL OF NEW STATE BANK POWERS.

Section 24 of the Federal Deposit Insurance Act (12 U.S.C. 1831a) is amended—
  (1) in subsection (a)—
  (A) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and indenting appropriately;
  (B) by striking "IN GENERAL.—" and inserting the following: "PERMISSIBLE ACTIVITIES.—
"(1) IN GENERAL.—"; and
  (C) by adding at the end the following new paragraph:
"(2) PROCESSING PERIOD.—
  "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
  "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension."; and
  (2) in subsection (d), by adding at the end the following new paragraph:
"(3) PROCESSING PERIOD.—
  "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
  "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension.".

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

<< 12 USCA § 1820 >>

SEC. 2221. SMALL BANK EXAMINATION CYCLE.

Section 10(d) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)) is amended—
  (1) by redesignating the second paragraph designated as paragraph (8) as paragraph (10), and by inserting that paragraph, as redesignated, immediately after paragraph (9); and
  (2) in paragraph (10), as redesignated, by striking "$175,000,000" and inserting "$250,000,000".

<< 12 USCA § 3311 >>

SEC. 2222. REQUIRED REVIEW OF REGULATIONS.

  (a) IN GENERAL.—Not less frequently than once every 10 years, the Council and each appropriate Federal banking agency represented on the Council shall conduct a review of all regulations prescribed by the Council or by any such appropriate Federal banking agency, respectively, in order to identify outdated or otherwise unnecessary regulatory requirements imposed on insured depository institutions.
  (b) PROCESS.—In conducting the review under subsection (a), the Council or the appropriate Federal banking agency shall—
  (1) categorize the regulations described in subsection (a) by type (such as consumer regulations, safety and soundness regulations, or such other designations as determined by the Council, or the appropriate Federal banking agency); and
  (2) at regular intervals, provide notice and solicit public comment on a particular category or categories of regulations, requesting commentators to identify areas of the regulations that are outdated, unnecessary, or unduly burdensome.
  (c) COMPLETE REVIEW.—The Council or the appropriate Federal banking agency shall ensure that the notice and comment period described in subsection (b)(2) is conducted with respect to all regulations described in subsection (a) not less frequently than once every 10 years.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(d) REGULATORY RESPONSE.—The Council or the appropriate Federal banking agency shall—

 (1) publish in the Federal Register a summary of the comments received under this section, identifying significant issues raised and providing comment on such issues; and

 (2) eliminate unnecessary regulations to the extent that such action is appropriate.

 (e) REPORT TO CONGRESS.—Not later than 30 days after carrying out subsection (d)(1), the Council shall submit to the Congress a report, which shall include—

 (1) a summary of any significant issues raised by public comments received by the Council and the appropriate Federal banking agencies under this section and the relative merits of such issues; and

 (2) an analysis of whether the appropriate Federal banking agency involved is able to address the regulatory burdens associated with such issues by regulation, or whether such burdens must be addressed by legislative action.

SEC. 2223. REPEAL OF IDENTIFICATION OF NONBANK FINANCIAL INSTITUTION CUSTOMERS.

 Subchapter II of chapter 53 of title 31, United States Code, is amended—

<< 31 USCA § 5327 >>

 (1) by striking section 5327;

<< 31 USCA Ch. 53 >>

 (2) in the chapter analysis, by striking the item relating to section 5327; and

<< 31 USCA § 5321 >>

 (3) in section 5321(a), by striking paragraph (7).

SEC. 2224. REPEAL OF CERTAIN REPORTING REQUIREMENTS.

<< 12 USCA § 251 >>

 (a) FDIA.—Section 477 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 251) is repealed.

<< 12 USCA § 1833 >>

 (b) FIRREA.—Section 918 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1833 note) is repealed.

<< 12 USCA § 3912 >>

 (c) ILS.—Section 913 of the International Lending Supervision Act of 1983 (12 U.S.C. 3912) is repealed.

SEC. 2225. INCREASE IN HOME MORTGAGE DISCLOSURE EXEMPTION THRESHOLD.

<< 12 USCA § 2808 >>

 (a) IN GENERAL.—Section 309 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2808) is amended—

 (1) by striking "This title" and inserting "(a) IN GENERAL.—This title";

 (2) in the 3d sentence, by inserting "(as determined without regard to the adjustment made by subsection (b))" before the period; and

 (2) by adding at the end the following new subsection:

 "(b) CPI ADJUSTMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the dollar amount applicable with respect to institutions described in section 303(2)(A) under the 2d sentence of subsection (a) shall be adjusted annually after December 31, 1996, by the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers published by the Bureau of Labor Statistics.

"(2) 1–TIME ADJUSTMENT FOR PRIOR INFLATION.—The first adjustment made under paragraph (1) after the date of the enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996 shall be the percentage by which—

"(A) the Consumer Price Index described in such paragraph for the calendar year 1996, exceeds

"(B) such Consumer Price Index for the calendar year 1975.

"(3) ROUNDING.—The dollar amount applicable under paragraph (1) for any calendar year shall be the amount determined in accordance with subparagraphs (A) and (B) of paragraph (2) and rounded to the nearest multiple of $1,000,000.".

<< 12 USCA § 2803 >>

(b) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—Section 304 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2803) is amended by adding at the end the following new subsection:

"(m) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—

"(1) IN GENERAL.—

"(A) SATISFACTION OF PUBLIC AVAILABILITY REQUIREMENTS.—A depository institution shall be deemed to have satisfied the public availability requirements of subsection (a) if the institution compiles the information required under that subsection at the home office of the institution and provides notice at the branch locations specified in subsection (a) that such information is available from the home office of the institution upon written request.

"(B) PROVISION OF INFORMATION UPON REQUEST.—Not later than 15 days after the receipt of a written request for any information required to be compiled under subsection (a), the home office of the depository institution receiving the request shall provide the information pertinent to the location of the branch in question to the person requesting the information.

"(2) FORM OF INFORMATION.—In complying with paragraph (1), a depository institution shall, in the sole discretion of the institution, provide the person requesting the information with—

"(A) a paper copy of the information requested; or

"(B) if acceptable to the person, the information through a form of electronic medium, such as a computer disk.".

<< 21 USCA § 1817 >>

SEC. 2226. ELIMINATION OF STOCK LOAN REPORTING REQUIREMENT.

Section 7(j) of the Federal Deposit Insurance Act (12 U.S.C. 1817(j)) is amended—

(1) in paragraph (9)(A)—

(A) by striking "financial institution and any affiliate of any financial institution" and inserting "foreign bank, or any affiliate thereof,"; and

(B) by striking "by the financial institution and such institution's affiliates" and inserting "by the foreign bank or any affiliate thereof";

(2) in paragraph (9)(B)—

(A) by striking "paragraph—" and inserting "paragraph, the following definitions shall apply:";

(B) by striking clause (i) and inserting the following:

"(i) FOREIGN BANK.—The terms 'foreign bank' and 'affiliate' have the same meanings as in section 1 of the International Banking Act of 1978."; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof";

(3) in paragraph (9)(C)—

(A) by striking "financial institution or any of its affiliates" and inserting "foreign bank or any affiliate thereof"; and

(B) by striking "financial institution or its affiliates" and inserting "foreign bank or any affiliate thereof";

(4) in paragraph (9)(D)—

(A) in clause (i)—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking "the financial institution and all affiliates of the institution" and inserting "the foreign bank and all affiliates thereof"; and

(ii) by striking "financial institution or any such affiliate" and inserting "foreign bank or affiliate thereof";

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof"; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof"; and

(5) in paragraph (9)(E)—

(A) in clause (i)—

(i) by striking "a financial institution and the affiliates of such institution" and inserting "a foreign bank or any affiliate thereof"; and

(ii) by striking "institution or affiliate" each place such term appears and inserting "foreign bank or any affiliate thereof"; and

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof".

<< 12 USCA § 252 >>

SEC. 2227. CREDIT AVAILABILITY ASSESSMENT.

(a) STUDY.—

(1) IN GENERAL.—Not later than 12 months after the date of enactment of this Act, and once every 60 months thereafter, the Board, in consultation with the Director of the Office of Thrift Supervision, the Comptroller of the Currency, the Board of Directors of the Corporation, the Administrator of the National Credit Union Administration, the Administrator of the Small Business Administration, and the Secretary of Commerce, shall conduct a study and submit a report to the Congress detailing the extent of small business lending by all creditors.

(2) CONTENTS OF STUDY.—The study required under paragraph (1) shall identify, to the extent practicable, those factors which provide policymakers with insights into the small business credit market, including—

(A) the demand for small business credit, including consideration of the impact of economic cycles on the levels of such demand;

(B) the availability of credit to small businesses;

(C) the range of credit options available to small businesses, such as those available from insured depository institutions and other providers of credit;

(D) the types of credit products used to finance small business operations, including the use of traditional loans, leases, lines of credit, home equity loans, credit cards, and other sources of financing;

(E) the credit needs of small businesses, including, if appropriate, the extent to which such needs differ, based upon product type, size of business, cash flow requirements, characteristics of ownership or investors, or other aspects of such business;

(F) the types of risks to creditors in providing credit to small businesses; and

(G) such other factors as the Board deems appropriate.

(b) USE OF EXISTING DATA.—The studies required by this section shall not increase the regulatory or paperwork burden on regulated financial institutions, other sources of small business credit, or small businesses.

CHAPTER 3—REGULATORY MICROMANAGEMENT RELIEF

<< 12 USCA § 72 >>

SEC. 2241. NATIONAL BANK DIRECTORS.

Section 5146 of the Revised Statutes of the United States (12 U.S.C. 72) is amended in the first sentence, by striking "except" and all that follows through the end of the sentence and inserting the following: "except that the Comptroller may, in the discretion of the Comptroller, waive the requirement of residency.".

<< 12 USCA § 4803 >>

SEC. 2242. PAPERWORK REDUCTION REVIEW.

 Section 303(a) of the Riegle Community Development and Regulatory Improvement Act of 1994 (12 U.S.C. 4803(a)) is amended—

   (1) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

   (2) by inserting after paragraph (1) the following new paragraph:

   "(2) review the extent to which existing regulations require insured depository institutions and insured credit unions to produce unnecessary internal written policies and eliminate such requirements, where appropriate;".

<< 12 USCA § 1812 >>

SEC. 2243. STATE BANK REPRESENTATION ON BOARD OF DIRECTORS OF THE FDIC.

 Section 2(a)(1)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1812(a)(1)(C)) is amended by inserting before the period ", 1 of whom shall have State bank supervisory experience".

<< 12 USCA § 1820 >>

SEC. 2244. CONSULTATION AMONG EXAMINERS.

 (a) IN GENERAL.—Section 10 of the Federal Deposit Insurance Act (12 U.S.C. 1820) is amended by adding at the end the following new subsection:

 "(j) CONSULTATION AMONG EXAMINERS.—

 "(1) IN GENERAL.—Each appropriate Federal banking agency shall take such action as may be necessary to ensure that examiners employed by the agency—

   "(A) consult on examination activities with respect to any depository institution; and

   "(B) achieve an agreement and resolve any inconsistencies in the recommendations to be given to such institution as a consequence of any examinations.

   "(2) EXAMINER–IN–CHARGE.—Each appropriate Federal banking agency shall consider appointing an examiner-in-charge with respect to a depository institution to ensure consultation on examination activities among all of the examiners of that agency involved in examinations of the institution.".

 (b) COORDINATED AND UNIFIED EXAMINATION FLEXIBILITY.—Section 10(d)(6)(B) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)(6)(B)) is amended by inserting "or State bank supervisors" after "one of the Federal agencies".

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

<< 12 USCA § 1831m >>

SEC. 2301. AUDIT COSTS.

 (a) AUDITOR ATTESTATIONS.—Section 36 of the Federal Deposit Insurance Act (12 U.S.C. 1831m) is amended by striking subsection (e) and inserting the following:

 "(e) [Repealed]".

 (b) INDEPENDENT AUDIT COMMITTEES.—Section 36(g)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(g)(1)) is amended—

   (1) in subparagraph (A), by inserting ", except as provided in subparagraph (D)" after "management of the institution"; and

   (2) by adding at the end the following new subparagraph:

   "(D) EXEMPTION AUTHORITY.—

     "(i) IN GENERAL.—An appropriate Federal banking agency may, by order or regulation, permit the independent audit committee of an insured depository institution to be made up of less than all, but no fewer than a majority of, outside directors, if the agency determines that the institution has encountered hardships in retaining and recruiting a sufficient number of competent outside directors to serve on the internal audit committee of the institution.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) FACTORS TO BE CONSIDERED.—In determining whether an insured depository institution has encountered hardships referred to in clause (i), the appropriate Federal banking agency shall consider factors such as the size of the institution, and whether the institution has made a good faith effort to elect or name additional competent outside directors to the board of directors of the institution who may serve on the internal audit committee.".

(c) PUBLIC AVAILABILITY.—Section 36(a)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(a)(3)) is amended by adding at the end the following: "Notwithstanding the preceding sentence, the Corporation and the appropriate Federal banking agencies may designate certain information as privileged and confidential and not available to the public.".

SEC. 2302. INCENTIVES FOR SELF–TESTING.

(a) EQUAL CREDIT OPPORTUNITY.—

<< 15 USCA § 1691c–1 >>

(1) IN GENERAL.—The Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) is amended by inserting after section 704 the following new section:

"SEC. 704A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

"(a) PRIVILEGED INFORMATION.—

"(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulations of the Board) shall be considered to be privileged under paragraph (2) if a creditor—

"(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a credit transaction by a creditor, in order to determine the level or effectiveness of compliance with this title by the creditor; and

"(B) has identified any possible violation of this title by the creditor and has taken, or is taking, appropriate corrective action to address any such possible violation.

"(2) PRIVILEGED SELF–TEST.—If a creditor meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

"(A) shall be privileged; and

"(B) may not be obtained or used by any applicant, department, or agency in any—

"(i) proceeding or civil action in which one or more violations of this title are alleged; or

"(ii) examination or investigation relating to compliance with this title.

"(b) RESULTS OF SELF–TESTING.—

"(1) IN GENERAL.—No provision of this section may be construed to prevent an applicant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

"(A) the creditor or any person with lawful access to the report or results—

"(i) voluntarily releases or discloses all, or any part of, the report or results to the applicant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the creditor to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1)(B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An applicant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 15 USCA § 1691c–1 NOTE >>

(2) REGULATIONS.—

(A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Secretary of Housing and Urban Development and the agencies referred to in section 704 of the Equal Credit Opportunity Act, and after providing notice and an opportunity for public comment, the Board shall prescribe final regulations to implement section 704A of the Equal Credit Opportunity Act, as added by this section.

(B) SELF–TEST.—

(i) DEFINITION.—The regulations prescribed under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 704A of the Equal Credit Opportunity Act, as added by this section.

(ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of compliance by a creditor with the Equal Credit Opportunity Act.

(iii) SUBSTANTIAL SIMILARITY TO CERTAIN FAIR HOUSING ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Secretary of Housing and Urban Development to carry out section 814A(d) of the Fair Housing Act, as added by this section.

(3) CLERICAL AMENDMENT.—The table of sections for title VII of the Consumer Credit Protection Act is amended by inserting after the item relating to section 704 the following new item:

"704A. Incentives for self-testing and self-correction.".

(b) FAIR HOUSING.—

<< 42 USCA § 3614–1 >>

(1) IN GENERAL.—The Fair Housing Act (42 U.S.C. 3601 et seq.) is amended by inserting after section 814 the following new section:

"SEC. 814A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

"(a) PRIVILEGED INFORMATION.—

"(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulation of the Secretary) shall be considered to be privileged under paragraph (2) if any person—

"(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a residential real estate related lending transaction of that person, or any part of that transaction, in order to determine the level or effectiveness of compliance with this title by that person; and

"(B) has identified any possible violation of this title by that person and has taken, or is taking, appropriate corrective action to address any such possible violation.

"(2) PRIVILEGED SELF–TEST.—If a person meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

"(A) shall be privileged; and

"(B) may not be obtained or used by any applicant, department, or agency in any—

"(i) proceeding or civil action in which one or more violations of this title are alleged; or

"(ii) examination or investigation relating to compliance with this title.

"(b) RESULTS OF SELF–TESTING.—

"(1) IN GENERAL.—No provision of this section may be construed to prevent an aggrieved person, complainant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

"(A) the person to whom the self-test relates or any person with lawful access to the report or the results—

"(i) voluntarily releases or discloses all, or any part of, the report or results to the aggrieved person, complainant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the person to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1)(B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An aggrieved person, complainant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 42 USCA § 3614–1 NOTE >>

(2) REGULATIONS.—

(A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Board and after providing notice and an opportunity for public comment, the Secretary of Housing and Urban Development shall prescribe final regulations to implement section 814A of the Fair Housing Act, as added by this section.

(B) SELF–TEST.—

(i) DEFINITION.—The regulations prescribed by the Secretary under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 814A of the Fair Housing Act, as added by this section.

(ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed by the Secretary under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of the compliance by a person engaged in residential real estate related lending activities with the Fair Housing Act.

(iii) SUBSTANTIAL SIMILARITY TO CERTAIN EQUAL CREDIT OPPORTUNITY ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Board to carry out section 704A of the Equal Credit Opportunity Act, as added by this section.

<< 15 USCA § 1691c–1 NOTE >>

(c) APPLICABILITY.—

(1) IN GENERAL.—Except as provided in paragraph (2), the privilege provided for in section 704A of the Equal Credit Opportunity Act or section 814A of the Fair Housing Act (as those sections are added by this section) shall apply to a self-test (as that term is defined pursuant to the regulations prescribed under subsection (a)(2) or (b)(2) of this section, as appropriate) conducted before, on, or after the effective date of the regulations prescribed under subsection (a)(2) or (b)(2), as appropriate.

(2) EXCEPTION.—The privilege referred to in paragraph (1) does not apply to such a self-test conducted before the effective date of the regulations prescribed under subsection (a) or (b), as appropriate, if—

(A) before that effective date, a complaint against the creditor or person engaged in residential real estate related lending activities (as the case may be) was—

(i) formally filed in any court of competent jurisdiction; or

(ii) the subject of an ongoing administrative law proceeding;

(B) in the case of section 704A of the Equal Credit Opportunity Act, the creditor has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section; or

(C) in the case of section 814A of the Fair Housing Act, the person engaged in residential real estate related lending activities has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section.

SEC. 2303. QUALIFIED THRIFT INVESTMENT AMENDMENTS.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 543 of 1021   PageID 7413

<< 12 USCA § 1464 >>

(a) CREDIT CARDS.—Section 5(b) of the Home Owners' Loan Act (12 U.S.C. 1464(b)) is amended—

(1) by striking paragraph (4); and

(2) by redesignating paragraph (5) as paragraph (4).

(b) LOANS OR INVESTMENTS WITHOUT PERCENTAGE OF ASSETS LIMITATION.—Section 5(c)(1) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(1)) is amended by adding at the end the following new subparagraphs:

"(T) CREDIT CARD LOANS.—Loans made through credit cards or credit card accounts.

"(U) EDUCATIONAL LOANS.—Loans made for the payment of educational expenses.".

(c) COMMERCIAL AND OTHER LOANS.—Section 5(c)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(2)(A)) is amended to read as follows:

"(A) COMMERCIAL AND OTHER LOANS.—Secured or unsecured loans for commercial, corporate, business, or agricultural purposes. The aggregate amount of loans made under this subparagraph may not exceed 20 percent of the total assets of the Federal savings association, and amounts in excess of 10 percent of such total assets may be used under this subparagraph only for small business loans, as that term is defined by the Director.".

(d) LOANS OR INVESTMENTS LIMITED TO 5 PERCENT OF ASSETS.—Section 5(c)(3) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(3)) is amended—

(1) by striking subparagraph (A); and

(2) by redesignating subparagraphs (B), (C), and (D) as subparagraphs (A), (B), and (C), respectively.

<< 12 USCA § 1467a >>

(e) QUALIFIED THRIFT LENDER TEST.—Section 10(m)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(1)) is amended—

(1) by redesignating subparagraph (B) as clause (ii);

(2) in subparagraph (A), by striking "(A) the savings" and inserting "(B)(i) the savings"; and

(3) by inserting after "if—" the following new subparagraph:

"(A) the savings association qualifies as a domestic building and loan association, as such term is defined in section 7701(a)(19) of the Internal Revenue Code of 1986; or".

<< 12 USCA § 1464 >>

(f) BRANCHING.—Section 5(r) of the Home Owners' Loan Act (12 U.S.C. 1464(r)) is amended—

(1) in paragraph (1)—

 (A) in the first sentence—

  (i) by inserting before the period ", or qualifies as a qualified thrift lender, as determined under section 10(m) of this Act"; and

  (ii) by striking "(c)" and inserting "(C)"; and

 (B) in the second sentence, by inserting before the period "or as a qualified thrift lender, as determined under section 10(m) of this Act, as applicable"; and

(2) in paragraph (2), by striking subparagraph (C) and inserting the following:

 "(C) the law of the State where the branch is located, or is to be located, would permit establishment of the branch if the association was a savings association or savings bank chartered by the State in which its home office is located; or".

<< 12 USCA § 1467a >>

(g) DEFINITION.—Section 10(m)(4) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(4)) is amended—

(1) by striking "subsection—" and inserting "subsection, the following definitions shall apply:";

(2) in subparagraph (C)—

 (A) in clause (ii), by adding at the end the following new subclause:

"(VII) Loans for educational purposes, loans to small businesses, and loans made through credit cards or credit card accounts."; and

(B) in clause (iii), by striking subclause (VI) and inserting the following:

"(VI) Loans for personal, family, or household purposes (other than loans for personal, family, or household purposes described in clause (ii)(VII))."; and

(3) by adding at the end the following new subparagraphs:

"(D) CREDIT CARD.—The Director shall issue such regulations as may be necessary to define the term 'credit card'.

"(E) SMALL BUSINESS.—The Director shall issue such regulations as may be necessary to define the term 'small business'.".

SEC. 2304. LIMITED PURPOSE BANKS.

<< 12 USCA § 1843 >>

(a) GROWTH CAP RELIEF.—Section 4(f)(3)(B) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(f)(3)(B)) is amended—

(1) in clause (ii), by adding "or" at the end;

(2) in clause (iii), by striking "; or" at the end and inserting a period; and

(3) by striking clause (iv).

<< 12 USCA § 1841 >>

(b) LIMITED PURPOSE BANK EXCEPTION.—Section 2(c)(2)(F) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(c)(2)(F)) is amended by inserting ", including an institution that accepts collateral for extensions of credit by holding deposits under $100,000, and by other means" after "An institution".

SEC. 2305. AMENDMENT TO FAIR DEBT COLLECTION PRACTICES ACT.

<< 15 USCA § 1692e >>

(a) IN GENERAL.—Section 807(11) of the Fair Debt Collection Practices Act (15 U.S.C. 1692e(11)) is amended to read as follows:

"(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.".

<< 15 USCA § 1692e NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of enactment of this Act and shall apply to all communications made after that date of enactment.

<< 12 USCA § 1757 >>

SEC. 2306. INCREASE IN CERTAIN CREDIT UNION LOAN CEILINGS.

Section 107(5)(A) of the Federal Credit Union Act (12 U.S.C. 1757(5)(A)) is amended—

(1) in clause (iv), by striking "$10,000" and inserting "$20,000"; and

(2) in clause (v), by striking "$10,000" and inserting "$20,000".

<< 12 USCA § 618 >>

## SEC. 2307. BANK INVESTMENTS IN EDGE ACT AND AGREEMENT CORPORATIONS.

The 10th undesignated paragraph of section 25A of the Federal Reserve Act (12 U.S.C. 618) is amended by striking the last sentence and inserting the following: "Any national bank may invest in the stock of any corporation organized under this section. The aggregate amount of stock held by any national bank in all corporations engaged in business of the kind described in this section or section 25 shall not exceed an amount equal to 10 percent of the capital and surplus of such bank unless the Board determines that the investment of an additional amount by the bank would not be unsafe or unsound and, in any case, shall not exceed an amount equal to 20 percent of the capital and surplus of such bank.".

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

<< 15 USCA § 1601 NOTE >>

## SEC. 2401. SHORT TITLE.

This chapter may be cited as the "Consumer Credit Reporting Reform Act of 1996".

<< 15 USCA § 1681a >>

## SEC. 2402. DEFINITIONS.

(a) ADVERSE ACTION.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(k) ADVERSE ACTION.—

"(1) ACTIONS INCLUDED.—The term 'adverse action'—

"(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act; and

"(B) means—

"(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

"(ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

"(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D); and

"(iv) an action taken or determination that is—

"(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii); and

"(II) adverse to the interests of the consumer.

"(2) APPLICABLE FINDINGS, DECISIONS, COMMENTARY, AND ORDERS.—For purposes of any determination of whether an action is an adverse action under paragraph (1)(A), all appropriate final findings, decisions, commentary, and orders issued under section 701(d)(6) of the Equal Credit Opportunity Act by the Board of Governors of the Federal Reserve System or any court shall apply.".

(b) FIRM OFFER OF CREDIT OR INSURANCE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(*l*) FIRM OFFER OF CREDIT OR INSURANCE.—The term 'firm offer of credit or insurance' means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

"(1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established—

"(A) before selection of the consumer for the offer; and

"(B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.

"(2) Verification—

"(A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

"(B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

"(3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was—

"(A) established before selection of the consumer for the offer of credit or insurance; and

"(B) disclosed to the consumer in the offer of credit or insurance.".

(c) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (b) of this section) is amended by adding at the end the following new subsection:

"(m) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—The term 'credit or insurance transaction that is not initiated by the consumer' does not include the use of a consumer report by a person with which the consumer has an account or insurance policy, for purposes of—

"(1) reviewing the account or insurance policy; or

"(2) collecting the account.".

(d) STATE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (c) of this section) is amended by adding at the end the following new subsection:

"(n) STATE.—The term 'State' means any State, the Commonwealth of Puerto Rico, the District of Columbia, and any territory or possession of the United States.".

(e) DEFINITION OF CONSUMER REPORT.—Section 603(d) of the Fair Credit Reporting Act (15 U.S.C. 1681a(d)) is amended—

(1) by striking "(d) The term" and inserting the following:

"(d) CONSUMER REPORT.—

"(1) IN GENERAL.—The term";

(2) by striking "for (1) credit" and inserting the following: "for—

"(A) credit";

(3) by striking "purposes, or (2)" and all that follows through "section 604." and inserting the following: "purposes;

"(B) employment purposes; or

"(C) any other purpose authorized under section 604.".; and

(4) by striking the second sentence and inserting the following:

"(2) EXCLUSIONS.—The term 'consumer report' does not include—

"(A) any—

"(i) report containing information solely as to transactions or experiences between the consumer and the person making the report;

"(ii) communication of that information among persons related by common ownership or affiliated by corporate control; or

"(iii) any communication of other information among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons;

"(B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device;

"(C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his or her decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under section 615; or

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(D) a communication described in subsection (o).".

(f) EXCLUSION OF CERTAIN COMMUNICATIONS BY EMPLOYMENT AGENCIES FROM DEFINITION OF CONSUMER REPORT.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(o) EXCLUDED COMMUNICATIONS.—A communication is described in this subsection if it is a communication—

"(1) that, but for subsection (d)(2)(E), would be an investigative consumer report;

"(2) that is made to a prospective employer for the purpose of—

"(A) procuring an employee for the employer; or

"(B) procuring an opportunity for a natural person to work for the employer;

"(3) that is made by a person who regularly performs such procurement;

"(4) that is not used by any person for any purpose other than a purpose described in subparagraph (A) or (B) of paragraph (2); or

"(5) with respect to which—

"(A) the consumer who is the subject of the communication—

"(i) consents orally or in writing to the nature and scope of the communication, before the collection of any information for the purpose of making the communication;

"(ii) consents orally or in writing to the making of the communication to a prospective employer, before the making of the communication; and

"(iii) in the case of consent under clause (i) or (ii) given orally, is provided written confirmation of that consent by the person making the communication, not later than 3 business days after the receipt of the consent by that person;

"(B) the person who makes the communication does not, for the purpose of making the communication, make any inquiry that if made by a prospective employer of the consumer who is the subject of the communication would violate any applicable Federal or State equal employment opportunity law or regulation; and

"(C) the person who makes the communication—

"(i) discloses in writing to the consumer who is the subject of the communication, not later than 5 business days after receiving any request from the consumer for such disclosure, the nature and substance of all information in the consumer's file at the time of the request, except that the sources of any information that is acquired solely for use in making the communication and is actually used for no other purpose, need not be disclosed other than under appropriate discovery procedures in any court of competent jurisdiction in which an action is brought; and

"(ii) notifies the consumer who is the subject of the communication, in writing, of the consumer's right to request the information described in clause (i).".

(g) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON A NATIONWIDE BASIS. —Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (f) of this section) is amended by adding at the end the following new subsection:

"(p) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON CONSUMERS ON A NATIONWIDE BASIS.—The term 'consumer reporting agency that compiles and maintains files on consumers on a nationwide basis' means a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:

"(1) Public record information.

"(2) Credit account information from persons who furnish that information regularly and in the ordinary course of business.".

<< 15 USCA § 1681b >>

SEC. 2403. FURNISHING CONSUMER REPORTS; USE FOR EMPLOYMENT PURPOSES.

(a) FURNISHING CONSUMER REPORTS FOR BUSINESS TRANSACTIONS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended—

(1) by inserting "(a) IN GENERAL.—" before "A consumer reporting agency"; and

(2) in subsection (a)(3) (as so designated by paragraph (1) of this subsection), by striking subparagraph (E) and inserting the following:

"(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

"(F) otherwise has a legitimate business need for the information—

"(i) in connection with a business transaction that is initiated by the consumer; or

"(ii) to review an account to determine whether the consumer continues to meet the terms of the account.".

(b) FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(b) CONDITIONS FOR FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—

"(1) CERTIFICATION FROM USER.—A consumer reporting agency may furnish a consumer report for employment purposes only if—

"(A) the person who obtains such report from the agency certifies to the agency that—

"(i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable; and

"(ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and

"(B) the consumer reporting agency provides with the report a summary of the consumer's rights under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

"(2) DISCLOSURE TO CONSUMER.—A person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—

"(A) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

"(B) the consumer has authorized in writing the procurement of the report by that person.

"(3) CONDITIONS ON USE FOR ADVERSE ACTIONS.—In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—

"(A) a copy of the report; and

"(B) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).".

SEC. 2404. USE OF CONSUMER REPORTS FOR PRESCREENING; PROHIBITION ON UNAUTHORIZED OR UNCERTIFIED USE OF INFORMATION.

<< 15 USCA § 1681b >>

(a) IN GENERAL.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by section 2403 of this chapter) is amended—

(1) in subsection (a), by striking "A consumer reporting agency" and inserting "Subject to subsections (c), any consumer reporting agency"; and

(2) by adding at the end the following new subsections:

"(c) FURNISHING REPORTS IN CONNECTION WITH CREDIT OR INSURANCE TRANSACTIONS THAT ARE NOT INITIATED BY THE CONSUMER.—

"(1) IN GENERAL.—A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit or insurance transaction that is not initiated by the consumer only if—

"(A) the consumer authorizes the agency to provide such report to such person; or

"(B)(i) the transaction consists of a firm offer of credit or insurance;

"(ii) the consumer reporting agency has complied with subsection (e); and

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) there is not in effect an election by the consumer, made in accordance with subsection (e), to have the consumer's name and address excluded from lists of names provided by the agency pursuant to this paragraph.

"(2) LIMITS ON INFORMATION RECEIVED UNDER PARAGRAPH (1)(B).—A person may receive pursuant to paragraph (1)(B) only—

"(A) the name and address of a consumer;

"(B) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and

"(C) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity.

"(3) INFORMATION REGARDING INQUIRIES.—Except as provided in section 609(a)(5), a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.

"(d) Reserved

"(e) ELECTION OF CONSUMER TO BE EXCLUDED FROM LISTS.—

"(1) IN GENERAL.—A consumer may elect to have the consumer's name and address excluded from any list provided by a consumer reporting agency under subsection (c)(1)(B) in connection with a credit or insurance transaction that is not initiated by the consumer, by notifying the agency in accordance with paragraph (2) that the consumer does not consent to any use of a consumer report relating to the consumer in connection with any credit or insurance transaction that is not initiated by the consumer.

"(2) MANNER OF NOTIFICATION.—A consumer shall notify a consumer reporting agency under paragraph (1)—

"(A) through the notification system maintained by the agency under paragraph (5); or

"(B) by submitting to the agency a signed notice of election form issued by the agency for purposes of this subparagraph.

"(3) RESPONSE OF AGENCY AFTER NOTIFICATION THROUGH SYSTEM.—Upon receipt of notification of the election of a consumer under paragraph (1) through the notification system maintained by the agency under paragraph (5), a consumer reporting agency shall—

"(A) inform the consumer that the election is effective only for the 2–year period following the election if the consumer does not submit to the agency a signed notice of election form issued by the agency for purposes of paragraph (2)(B); and

"(B) provide to the consumer a notice of election form, if requested by the consumer, not later than 5 business days after receipt of the notification of the election through the system established under paragraph (5), in the case of a request made at the time the consumer provides notification through the system.

"(4) EFFECTIVENESS OF ELECTION.—An election of a consumer under paragraph (1)—

"(A) shall be effective with respect to a consumer reporting agency beginning 5 business days after the date on which the consumer notifies the agency in accordance with paragraph (2);

"(B) shall be effective with respect to a consumer reporting agency—

"(i) subject to subparagraph (C), during the 2–year period beginning 5 business days after the date on which the consumer notifies the agency of the election, in the case of an election for which a consumer notifies the agency only in accordance with paragraph (2)(A); or

"(ii) until the consumer notifies the agency under subparagraph (C), in the case of an election for which a consumer notifies the agency in accordance with paragraph (2)(B);

"(C) shall not be effective after the date on which the consumer notifies the agency, through the notification system established by the agency under paragraph (5), that the election is no longer effective; and

"(D) shall be effective with respect to each affiliate of the agency.

"(5) NOTIFICATION SYSTEM.—

"(A) IN GENERAL.—Each consumer reporting agency that, under subsection (c)(1)(B), furnishes a consumer report in connection with a credit or insurance transaction that is not initiated by a consumer, shall—

"(i) establish and maintain a notification system, including a toll-free telephone number, which permits any consumer whose consumer report is maintained by the agency to notify the agency, with appropriate identification, of the consumer's election to have the consumer's name and address excluded from any such list of names and addresses provided by the agency for such a transaction; and

"(ii) publish by not later than 365 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996, and not less than annually thereafter, in a publication of general circulation in the area served by the agency—

"(I) a notification that information in consumer files maintained by the agency may be used in connection with such transactions; and

"(II) the address and toll-free telephone number for consumers to use to notify the agency of the consumer's election under clause (i).

"(B) ESTABLISHMENT AND MAINTENANCE AS COMPLIANCE.—Establishment and maintenance of a notification system (including a toll-free telephone number) and publication by a consumer reporting agency on the agency's own behalf and on behalf of any of its affiliates in accordance with this paragraph is deemed to be compliance with this paragraph by each of those affiliates.

"(6) NOTIFICATION SYSTEM BY AGENCIES THAT OPERATE NATIONWIDE.—Each consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall establish and maintain a notification system for purposes of paragraph (5) jointly with other such consumer reporting agencies.".

(b) USE OF INFORMATION OBTAINED FROM REPORTS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(f) CERTAIN USE OR OBTAINING OF INFORMATION PROHIBITED.—A person shall not use or obtain a consumer report for any purpose unless—

"(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

"(2) the purpose is certified in accordance with section 607 by a prospective user of the report through a general or specific certification.".

<< 15 USCA § 1681b NOTE >>

(c) FTC GUIDELINES REGARDING PRESCREENING FOR INSURANCE TRANSACTIONS.—The Federal Trade Commission may issue such guidelines as it deems necessary with respect to the use of consumer reports in connection with insurance transactions that are not initiated by the consumer pursuant to section 604(c) of the Fair Credit Reporting Act, as added by subsection (a) of this section.

<< 15 USCA § 1681b >>

## SEC. 2405. CONSUMER CONSENT REQUIRED TO FURNISH CONSUMER REPORT CONTAINING MEDICAL INFORMATION.

Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(g) FURNISHING REPORTS CONTAINING MEDICAL INFORMATION.—A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction or a direct marketing transaction, a consumer report that contains medical information about a consumer, unless the consumer consents to the furnishing of the report.".

## SEC. 2406. OBSOLETE INFORMATION AND INFORMATION CONTAINED IN CONSUMER REPORTS.

<< 15 USCA § 1681c >>

(a) AMENDMENT TO LARGE–DOLLAR EXCEPTION.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended—

(1) by inserting "INFORMATION EXCLUDED FROM CONSUMER REPORTS.—" after "(a)";

(2) in subsection (b)—

(A) in paragraph (1), by striking "$50,000" and inserting "$150,000";

(B) in paragraph (2), by striking "$50,000" and inserting "$150,000"; and

(C) in paragraph (3), by striking "$20,000" and inserting "$75,000".

(b) CLARIFICATION OF REPORTING PERIOD.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(c) RUNNING OF REPORTING PERIOD.—

"(1) IN GENERAL.—The 7–year period referred to in paragraphs (4) and (6) of subsection (a) shall begin, with respect to any delinquent account that is placed for collection (internally or by referral to a third party, whichever is earlier), charged to profit and loss, or subjected to any similar action, upon the expiration of the 180–day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action.

"(2) EFFECTIVE DATE.—Paragraph (1) shall apply only to items of information added to the file of a consumer on or after the date that is 455 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996.".

(c) ADDITIONAL INFORMATION ON BANKRUPTCY FILINGS REQUIRED.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsection:

"(d) INFORMATION REQUIRED TO BE DISCLOSED.—Any consumer reporting agency that furnishes a consumer report that contains information regarding any case involving the consumer that arises under title 11, United States Code, shall include in the report an identification of the chapter of such title 11 under which such case arises if provided by the source of the information. If any case arising or filed under title 11, United States Code, is withdrawn by the consumer before a final judgment, the consumer reporting agency shall include in the report that such case or filing was withdrawn upon receipt of documentation certifying such withdrawal.".

(d) INDICATION OF CLOSURE OF ACCOUNT; INDICATION OF DISPUTE BY CONSUMER.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsections:

"(e) INDICATION OF CLOSURE OF ACCOUNT BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(4) that a credit account of a consumer was voluntarily closed by the consumer, the agency shall indicate that fact in any consumer report that includes information related to the account.

"(f) INDICATION OF DISPUTE BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(3) that information regarding a consumer who was furnished to the agency is disputed by the consumer, the agency shall indicate that fact in each consumer report that includes the disputed information.".

(e) CONFORMING AMENDMENTS.—

(1) Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended in the section heading, by striking "OBSOLETE INFORMATION" and inserting "REQUIREMENTS RELATING TO INFORMATION CONTAINED IN CONSUMER REPORTS".

(2) The table of sections for the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 605 and inserting the following:

"605. Requirements relating to information contained in consumer reports.".

<< 15 USCA § 1681e >>

SEC. 2407. COMPLIANCE PROCEDURES.

(a) DISCLOSURE OF CONSUMER REPORTS BY USERS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding at the end the following new subsection:

"(c) DISCLOSURE OF CONSUMER REPORTS BY USERS ALLOWED.—A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report.".

(b) NOTICE TO USERS AND PROVIDERS OF INFORMATION TO ENSURE COMPLIANCE.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (c) (as added by subsection (a) of this section) the following new subsection:

"(d) NOTICE TO USERS AND FURNISHERS OF INFORMATION.—

"(1) NOTICE REQUIREMENT.—A consumer reporting agency shall provide to any person—

"(A) who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or

"(B) to whom a consumer report is provided by the agency;

a notice of such person's responsibilities under this title.

"(2) CONTENT OF NOTICE.—The Federal Trade Commission shall prescribe the content of notices under paragraph (1), and a consumer reporting agency shall be in compliance with this subsection if it provides a notice under paragraph (1) that is substantially similar to the Federal Trade Commission prescription under this paragraph.".

(c) RECORD OF IDENTITY OF USERS AND PURPOSES CERTIFIED BY USERS OF REPORTS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (d) (as added by subsection (b) of this section) the following new subsection:

"(e) PROCUREMENT OF CONSUMER REPORT FOR RESALE.—

"(1) DISCLOSURE.—A person may not procure a consumer report for purposes of reselling the report (or any information in the report) unless the person discloses to the consumer reporting agency that originally furnishes the report—

"(A) the identity of the end-user of the report (or information); and

"(B) each permissible purpose under section 604 for which the report is furnished to the end-user of the report (or information).

"(2) RESPONSIBILITIES OF PROCURERS FOR RESALE.—A person who procures a consumer report for purposes of reselling the report (or any information in the report) shall—

"(A) establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 604, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person—

"(i) identifies each end user of the resold report (or information);

"(ii) certifies each purpose for which the report (or information) will be used; and

"(iii) certifies that the report (or information) will be used for no other purpose; and

"(B) before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).".

SEC. 2408. CONSUMER DISCLOSURES.

<< 15 USCA § 1681g >>

(a) ALL INFORMATION IN CONSUMER'S FILE REQUIRED TO BE DISCLOSED.—Section 609(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)(1)) is amended to read as follows:

"(1) All information in the consumer's file at the time of the request, except that nothing in this paragraph shall be construed to require a consumer reporting agency to disclose to a consumer any information concerning credit scores or any other risk scores or predictors relating to the consumer.".

(b) MORE INFORMATION CONCERNING RECIPIENTS OF REPORTS REQUIRED.—Section 609(a)(3) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended to read as follows:

"(3)(A) Identification of each person (including each end-user identified under section 607(e)(1)) that procured a consumer report—

"(i) for employment purposes, during the 2–year period preceding the date on which the request is made; or

"(ii) for any other purpose, during the 1–year period preceding the date on which the request is made.

"(B) An identification of a person under subparagraph (A) shall include—

"(i) the name of the person or, if applicable, the trade name (written in full) under which such person conducts business; and

"(ii) upon request of the consumer, the address and telephone number of the person.".

(c) INFORMATION REGARDING INQUIRIES.—Section 609(a) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended by adding at the end the following new paragraph:

"(5) A record of all inquiries received by the agency during the 1–year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer.".

(d) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

(1) IN GENERAL.—Section 609 of the Fair Credit Reporting Act (15 U.S.C. 1681g) is amended by adding at the end the following new subsection:

"(c) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

"(1) SUMMARY OF RIGHTS.—A consumer reporting agency shall provide to a consumer, with each written disclosure by the agency to the consumer under this section—

"(A) a written summary of all of the rights that the consumer has under this title; and

"(B) in the case of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, a toll-free telephone number established by the agency, at which personnel are accessible to consumers during normal business hours.

"(2) SPECIFIC ITEMS REQUIRED TO BE INCLUDED.—The summary of rights required under paragraph (1) shall include—

"(A) a brief description of this title and all rights of consumers under this title;

"(B) an explanation of how the consumer may exercise the rights of the consumer under this title;

"(C) a list of all Federal agencies responsible for enforcing any provision of this title and the address and any appropriate phone number of each such agency, in a form that will assist the consumer in selecting the appropriate agency;

"(D) a statement that the consumer may have additional rights under State law and that the consumer may wish to contact a State or local consumer protection agency or a State attorney general to learn of those rights; and

"(E) a statement that a consumer reporting agency is not required to remove accurate derogatory information from a consumer's file, unless the information is outdated under section 605 or cannot be verified.

"(3) FORM OF SUMMARY OF RIGHTS.—For purposes of this subsection and any disclosure by a consumer reporting agency required under this title with respect to consumers' rights, the Federal Trade Commission (after consultation with each Federal agency referred to in section 621(b)) shall prescribe the form and content of any such disclosure of the rights of consumers required under this title. A consumer reporting agency shall be in compliance with this subsection if it provides disclosures under paragraph (1) that are substantially similar to the Federal Trade Commission prescription under this paragraph.

"(4) EFFECTIVENESS.—No disclosures shall be required under this subsection until the date on which the Federal Trade Commission prescribes the form and content of such disclosures under paragraph (3).".

<< 15 USCA § 1681d >>

(2) TECHNICAL AMENDMENT.—Section 606(a)(1)(B) of the Fair Credit Reporting Act (15 U.S.C. 1681d(a)(1)(B)) is amended by inserting "and the written summary of the rights of the consumer prepared pursuant to section 609(c)" before the semicolon.

(e) FORM OF DISCLOSURES.—

<< 15 USCA § 1681h >>

(1) IN GENERAL.—Subsections (a) and (b) of section 610 of the Fair Credit Reporting Act (15 U.S.C. 1681h) are amended to read as follows:

"(a) IN GENERAL.—

"(1) PROPER IDENTIFICATION.—A consumer reporting agency shall require, as a condition of making the disclosures required under section 609, that the consumer furnish proper identification.

"(2) DISCLOSURE IN WRITING.—Except as provided in subsection (b), the disclosures required to be made under section 609 shall be provided under that section in writing.

"(b) OTHER FORMS OF DISCLOSURE.—

"(1) IN GENERAL.—If authorized by a consumer, a consumer reporting agency may make the disclosures required under 609—

"(A) other than in writing; and

"(B) in such form as may be—

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(i) specified by the consumer in accordance with paragraph (2); and

"(ii) available from the agency.

"(2) FORM.—A consumer may specify pursuant to paragraph (1) that disclosures under section 609 shall be made—

"(A) in person, upon the appearance of the consumer at the place of business of the consumer reporting agency where disclosures are regularly provided, during normal business hours, and on reasonable notice;

"(B) by telephone, if the consumer has made a written request for disclosure by telephone;

"(C) by electronic means, if available from the agency; or

"(D) by any other reasonable means that is available from the agency.".

<< 15 USCA § 1681g NOTE >>

(2) SIMPLIFIED DISCLOSURE.—Not later than 90 days after the date of enactment of this Act, each consumer reporting agency shall develop a form on which such consumer reporting agency shall make the disclosures required under section 609(a) of the Fair Credit Reporting Act, for the purpose of maximizing the comprehensibility and standardization of such disclosures.

(3) GOALS.—The Federal Trade Commission shall take appropriate action to assure that the goals of comprehensibility and standardization are achieved in accordance with paragraph (2).

<< 15 USCA § 1681h >>

(4) DEFAMATION.—Section 610(e) of the Fair Credit Reporting Act (15 U.S.C. 1681h(e)) is amended by inserting "or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report" before "except".

(5) CONFORMING AMENDMENTS.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681g >>

(A) in section 609(a), in the matter preceding paragraph (1), by striking "and proper identification of any consumer" and inserting ", and subject to section 610(a)(1)";

<< 15 USCA § 1681h >>

(B) in section 610, in the section heading, by inserting "AND FORM" after "CONDITIONS"; and

(C) in the table of sections at the beginning of that Act, in the item relating to section 610, by inserting "and form" after "conditions".

<< 15 USCA § 1681i >>

SEC. 2409. PROCEDURES IN CASE OF THE DISPUTED ACCURACY OF ANY INFORMATION IN A CONSUMER'S FILE.

(a) IN GENERAL.—Section 611(a) of the Fair Credit Reporting Act (15 U.S.C. 1681i(a)) is amended to read as follows:

"(a) REINVESTIGATIONS OF DISPUTED INFORMATION.—

"(1) REINVESTIGATION REQUIRED.—

"(A) IN GENERAL.—If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

"(B) EXTENSION OF PERIOD TO REINVESTIGATE.—Except as provided in subparagraph (C), the 30–day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30–day period that is relevant to the reinvestigation.

"(C) LIMITATIONS ON EXTENSION OF PERIOD TO REINVESTIGATE.—Subparagraph (B) shall not apply to any reinvestigation in which, during the 30–day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

"(2) PROMPT NOTICE OF DISPUTE TO FURNISHER OF INFORMATION.—

  "(A) IN GENERAL.—Before the expiration of the 5–business–day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

  "(B) PROVISION OF OTHER INFORMATION FROM CONSUMER.—The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

"(3) DETERMINATION THAT DISPUTE IS FRIVOLOUS OR IRRELEVANT.—

  "(A) IN GENERAL.—Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

  "(B) NOTICE OF DETERMINATION.—Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

  "(C) CONTENTS OF NOTICE.—A notice under subparagraph (B) shall include—

    "(i) the reasons for the determination under subparagraph (A); and

    "(ii) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

"(4) CONSIDERATION OF CONSUMER INFORMATION.—In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

"(5) TREATMENT OF INACCURATE OR UNVERIFIABLE INFORMATION.—

  "(A) IN GENERAL.—If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

  "(B) REQUIREMENTS RELATING TO REINSERTION OF PREVIOUSLY DELETED MATERIAL.—

    "(i) CERTIFICATION OF ACCURACY OF INFORMATION.—If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

    "(ii) NOTICE TO CONSUMER.—If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

    "(iii) ADDITIONAL INFORMATION.—As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—

      "(I) a statement that the disputed information has been reinserted;

      "(II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

"(C) PROCEDURES TO PREVENT REAPPEARANCE.—A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

"(D) AUTOMATED REINVESTIGATION SYSTEM.—Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

"(6) NOTICE OF RESULTS OF REINVESTIGATION.—

"(A) IN GENERAL.—A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

"(B) CONTENTS.—As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5–day period referred to in subparagraph (A)—

"(i) a statement that the reinvestigation is completed;

"(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

"(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

"(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

"(v) a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

"(7) DESCRIPTION OF REINVESTIGATION PROCEDURE.—A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iv) by not later than 15 days after receiving a request from the consumer for that description.

"(8) EXPEDITED DISPUTE RESOLUTION.—If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency—

"(A) provides prompt notice of the deletion to the consumer by telephone;

"(B) includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

"(C) provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.".

(b) CONFORMING AMENDMENT.—Section 611(d) of the Fair Credit Reporting Act (15 U.S.C. 1681i(d)) is amended by striking "The consumer reporting agency shall clearly" and all that follows through the end of the subsection.

<< 15 USCA § 1681j >>

## SEC. 2410. CHARGES FOR CERTAIN DISCLOSURES.

Section 612 of the Fair Credit Reporting Act (15 U.S.C. 1681j) is amended to read as follows:

"SEC. 612. CHARGES FOR CERTAIN DISCLOSURES.

"(a) REASONABLE CHARGES ALLOWED FOR CERTAIN DISCLOSURES.—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(1) IN GENERAL.—Except as provided in subsections (b), (c), and (d), a consumer reporting agency may impose a reasonable charge on a consumer—

  "(A) for making a disclosure to the consumer pursuant to section 609, which charge—

   "(i) shall not exceed $8; and

   "(ii) shall be indicated to the consumer before making the disclosure; and

  "(B) for furnishing, pursuant to section 611(d), following a reinvestigation under section 611(a), a statement, codification, or summary to a person designated by the consumer under that section after the 30–day period beginning on the date of notification of the consumer under paragraph (6) or (8) of section 611(a) with respect to the reinvestigation, which charge—

   "(i) shall not exceed the charge that the agency would impose on each designated recipient for a consumer report; and

   "(ii) shall be indicated to the consumer before furnishing such information.

 "(2) MODIFICATION OF AMOUNT.—The Federal Trade Commission shall increase the amount referred to in paragraph (1)(A)(i) on January 1 of each year, based proportionally on changes in the Consumer Price Index, with fractional changes rounded to the nearest fifty cents.

 "(b) FREE DISCLOSURE AFTER ADVERSE NOTICE TO CONSUMER.—Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 609 without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 615, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 609.

 "(c) FREE DISCLOSURE UNDER CERTAIN OTHER CIRCUMSTANCES.—Upon the request of the consumer, a consumer reporting agency shall make all disclosures pursuant to section 609 once during any 12–month period without charge to that consumer if the consumer certifies in writing that the consumer—

  "(1) is unemployed and intends to apply for employment in the 60–day period beginning on the date on which the certification is made;

  "(2) is a recipient of public welfare assistance; or

  "(3) has reason to believe that the file on the consumer at the agency contains inaccurate information due to fraud.

 "(d) OTHER CHARGES PROHIBITED.—A consumer reporting agency shall not impose any charge on a consumer for providing any notification required by this title or making any disclosure required by this title, except as authorized by subsection (a).".

SEC. 2411. DUTIES OF USERS OF CONSUMER REPORTS.

<< 15 USCA § 1681m >>

 (a) DUTIES OF USERS TAKING ADVERSE ACTIONS.—Section 615(a) of the Fair Credit Reporting Act (15 U.S.C. 1681m(a)) is amended to read as follows:

 "(a) DUTIES OF USERS TAKING ADVERSE ACTIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER REPORTS.—If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—

 "(1) provide oral, written, or electronic notice of the adverse action to the consumer;

 "(2) provide to the consumer orally, in writing, or electronically—

  "(A) the name, address, and telephone number of the consumer reporting agency (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis) that furnished the report to the person; and

  "(B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

 "(3) provide to the consumer an oral, written, or electronic notice of the consumer's right—

  "(A) to obtain, under section 612, a free copy of a consumer report on the consumer from the consumer reporting agency referred to in paragraph (2), which notice shall include an indication of the 60–day period under that section for obtaining such a copy; and

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(B) to dispute, under section 611, with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.".

(b) DUTIES OF USERS MAKING CERTAIN CREDIT SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(d) DUTIES OF USERS MAKING WRITTEN CREDIT OR INSURANCE SOLICITATIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER FILES.—

"(1) IN GENERAL.—Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, that is provided to that person under section 604(c)(1)(B), shall provide with each written solicitation made to the consumer regarding the transaction a clear and conspicuous statement that—

"(A) information contained in the consumer's consumer report was used in connection with the transaction;

"(B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer;

"(C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral;

"(D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and

"(E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 604(e).

"(2) DISCLOSURE OF ADDRESS AND TELEPHONE NUMBER.—A statement under paragraph (1) shall include the address and toll-free telephone number of the appropriate notification system established under section 604(e).

"(3) MAINTAINING CRITERIA ON FILE.—A person who makes an offer of credit or insurance to a consumer under a credit or insurance transaction described in paragraph (1) shall maintain on file the criteria used to select the consumer to receive the offer, all criteria bearing on credit worthiness or insurability, as applicable, that are the basis for determining whether or not to extend credit or insurance pursuant to the offer, and any requirement for the furnishing of collateral as a condition of the extension of credit or insurance, until the expiration of the 3–year period beginning on the date on which the offer is made to the consumer.

"(4) AUTHORITY OF FEDERAL AGENCIES REGARDING UNFAIR OR DECEPTIVE ACTS OR PRACTICES NOT AFFECTED.—This section is not intended to affect the authority of any Federal or State agency to enforce a prohibition against unfair or deceptive acts or practices, including the making of false or misleading statements in connection with a credit or insurance transaction that is not initiated by the consumer.".

(c) DUTIES OF USERS MAKING OTHER SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(e)

(d) CONFORMING AMENDMENT.—Section 615(c) of the Fair Credit Reporting Act (15 U.S.C. 1681m(c)) is amended by striking "subsections (a) and (b)" and inserting "this section".

(e) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—Section 615(b) of the Fair Credit Reporting Act (15 U.S.C. 1681m(b)) is amended—

(1) by striking "(b) Whenever credit" and inserting the following:

"(b) ADVERSE ACTION BASED ON INFORMATION OBTAINED FROM THIRD PARTIES OTHER THAN CONSUMER REPORTING AGENCIES.—

"(1) IN GENERAL.—Whenever credit";

(2) by adding at the end the following new paragraph:

"(2) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—

"(A) DUTIES, GENERALLY.—If a person takes an action described in subparagraph (B) with respect to a consumer, based in whole or in part on information described in subparagraph (C), the person shall—

"(i) notify the consumer of the action, including a statement that the consumer may obtain the information in accordance with clause (ii); and

"(ii) upon a written request from the consumer received within 60 days after transmittal of the notice required by clause (i), disclose to the consumer the nature of the information upon which the action is based by not later than 30 days after receipt of the request.

"(B) ACTION DESCRIBED.—An action referred to in subparagraph (A) is an adverse action described in section 603(k) (1)(A), taken in connection with a transaction initiated by the consumer, or any adverse action described in clause (i) or (ii) of section 603(k)(1)(B).

"(C) INFORMATION DESCRIBED.—Information referred to in subparagraph (A)—

"(i) except as provided in clause (ii), is information that—

"(I) is furnished to the person taking the action by a person related by common ownership or affiliated by common corporate control to the person taking the action; and

"(II) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer; and

"(ii) does not include—

"(I) information solely as to transactions or experiences between the consumer and the person furnishing the information; or

"(II) information in a consumer report.".

SEC. 2412. CIVIL LIABILITY.

<< 15 USCA § 1681n >>

(a) CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL. —Any person who".

(b) MINIMUM CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681n(1)), as so designated by subsection (a) of this section, is amended to read as follows:

"(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

"(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;".

(c) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(b) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.".

<< 15 USCA § 1681*o* >>

(d) CIVIL LIABILITY FOR NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681*o*) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL. —Any person who".

(e) ATTORNEY'S FEES.—

<< 15 USCA § 1681n >>

(1) WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(c) ATTORNEY'S FEES.—Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

<< 15 USCA § 1681*o* >>

(2) NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681*o*) is amended by adding at the end the following new subsection:

"(b) ATTORNEY'S FEES.—On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

SEC. 2413. RESPONSIBILITIES OF PERSONS WHO FURNISH INFORMATION TO CONSUMER REPORTING AGENCIES.

(a) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681t >>

(1) by redesignating section 623 as section 624; and

<< 15 USCA § 1681s–2 >>

(2) by inserting after section 622 the following:

"SEC. 623. RESPONSIBILITIES OF FURNISHERS OF INFORMATION TO CONSUMER REPORTING AGENCIES.

"(a) DUTY OF FURNISHERS OF INFORMATION TO PROVIDE ACCURATE INFORMATION.—

"(1) PROHIBITION.—

"(A) REPORTING INFORMATION WITH ACTUAL KNOWLEDGE OF ERRORS.—A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

"(B) REPORTING INFORMATION AFTER NOTICE AND CONFIRMATION OF ERRORS.—A person shall not furnish information relating to a consumer to any consumer reporting agency if—

"(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and

"(ii) the information is, in fact, inaccurate.

"(C) NO ADDRESS REQUIREMENT.—A person who clearly and conspicuously specifies to the consumer an address for notices referred to in subparagraph (B) shall not be subject to subparagraph (A); however, nothing in subparagraph (B) shall require a person to specify such an address.

"(2) DUTY TO CORRECT AND UPDATE INFORMATION.—A person who—

"(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

"(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

"(3) DUTY TO PROVIDE NOTICE OF DISPUTE.—If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

"(4) DUTY TO PROVIDE NOTICE OF CLOSED ACCOUNTS.—A person who regularly and in the ordinary course of business furnishes information to a consumer reporting agency regarding a consumer who has a credit account with that person

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

shall notify the agency of the voluntary closure of the account by the consumer, in information regularly furnished for the period in which the account is closed.

  "(5) DUTY TO PROVIDE NOTICE OF DELINQUENCY OF ACCOUNTS.—A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the agency of the month and year of the commencement of the delinquency that immediately preceded the action.

"(b) DUTIES OF FURNISHERS OF INFORMATION UPON NOTICE OF DISPUTE.—

  "(1) IN GENERAL.—After receiving notice pursuant to section 611(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

   "(A) conduct an investigation with respect to the disputed information;

   "(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2);

   "(C) report the results of the investigation to the consumer reporting agency; and

   "(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

  "(2) DEADLINE.—A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under section 611(a)(1) within which the consumer reporting agency is required to complete actions required by that section regarding that information.

  "(c) LIMITATION ON LIABILITY.—Sections 616 and 617 do not apply to any failure to comply with subsection (a), except as provided in section 621(c)(1)(B).

  "(d) LIMITATION ON ENFORCEMENT.—Subsection (a) shall be enforced exclusively under section 621 by the Federal agencies and officials and the State officials identified in that section.".

  (b) CONFORMING AMENDMENT.—The table of sections at the beginning of the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 623 and inserting the following:

"623. Responsibilities of furnishers of information to consumer reporting agencies.

"624. Relation to State laws.".

<< 15 USCA § 1681d >>

SEC. 2414. INVESTIGATIVE CONSUMER REPORTS.

  Section 606 of the Fair Credit Reporting Act (15 U.S.C. 1681d) is amended—

  (1) in subsection (a)(1), by striking "or" at the end and inserting "and";

  (2) by striking subsection (a)(2) and inserting the following:

  "(2) the person certifies or has certified to the consumer reporting agency that—

   "(A) the person has made the disclosures to the consumer required by paragraph (1); and

   "(B) the person will comply with subsection (b).";

  (3) in subsection (b), by striking "shall" the second place such term appears; and

  Sec. 2414(4)

  (4) by adding at the end the following new subsection:

"(d) PROHIBITIONS.—

  "(1) CERTIFICATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report unless the agency has received a certification under subsection (a)(2) from the person who requested the report.

  "(2) INQUIRIES.—A consumer reporting agency shall not make an inquiry for the purpose of preparing an investigative consumer report on a consumer for employment purposes if the making of the inquiry by an employer or prospective employer of the consumer would violate any applicable Federal or State equal employment opportunity law or regulation.

  "(3) CERTAIN PUBLIC RECORD INFORMATION.—Except as otherwise provided in section 613, a consumer reporting agency shall not furnish an investigative consumer report that includes information that is a matter of public record and that

relates to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless the agency has verified the accuracy of the information during the 30–day period ending on the date on which the report is furnished.

"(4) CERTAIN ADVERSE INFORMATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report on a consumer that contains information that is adverse to the interest of the consumer and that is obtained through a personal interview with a neighbor, friend, or associate of the consumer or with another person with whom the consumer is acquainted or who has knowledge of such item of information, unless—

"(A) the agency has followed reasonable procedures to obtain confirmation of the information, from an additional source that has independent and direct knowledge of the information; or

"(B) the person interviewed is the best possible source of the information.".

SEC. 2415. INCREASED CRIMINAL PENALTIES FOR OBTAINING INFORMATION UNDER FALSE PRETENSES.

<< 15 USCA § 1681q >>

(a) OBTAINING INFORMATION UNDER FALSE PRETENSES.—Section 619 of the Fair Credit Reporting Act (15 U.S.C. 1681q) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681r >>

(b) UNAUTHORIZED DISCLOSURES BY OFFICERS OR EMPLOYEES.—Section 620 of the Fair Credit Reporting Act (15 U.S.C. 1681r) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681s >>

SEC. 2416. ADMINISTRATIVE ENFORCEMENT.

(a) AVAILABLE ENFORCEMENT POWERS.—Section 621(a) of the Fair Credit Reporting Act (15 U.S.C. 1681s(a)) is amended—

(1) by inserting "(1)" after "(a)";

(2) by adding at the end the following new paragraph:

"(2)(A) In the event of a knowing violation, which constitutes a pattern or practice of violations of this title, the Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person that violates this title. In such action, such person shall be liable for a civil penalty of not more than $2,500 per violation.

"(B) In determining the amount of a civil penalty under subparagraph (A), the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

"(3) Notwithstanding paragraph (2), a court may not impose any civil penalty on a person for a violation of section 623(a) (1) unless the person has been enjoined from committing the violation, or ordered not to commit the violation, in an action or proceeding brought by or on behalf of the Federal Trade Commission, and has violated the injunction or order, and the court may not impose any civil penalty for any violation occurring before the date of the violation of the injunction or order.

"(4) Neither the Commission nor any other agency referred to in subsection (b) may prescribe trade regulation rules or other regulations with respect to this title.".

(b) AGENCIES RESPONSIBLE FOR ENFORCEMENT.—Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—

(1) in subsection (a), by inserting "ENFORCEMENT BY FEDERAL TRADE COMMISSION.—" before "Compliance with the requirements";

(2) in subsection (b), by striking the matter preceding paragraph (1) and inserting the following:

"(b) ENFORCEMENT BY OTHER AGENCIES.—Compliance with the requirements imposed under this title with respect to consumer reporting agencies, persons who use consumer reports from such agencies, persons who furnish information to such agencies, and users of information that are subject to subsection (d) or (e) of section 615 shall be enforced under—"; and

(3) in subsection (c), by adding at the end the following: "Notwithstanding the preceding, no agency referred to in subsection (b) may conduct an examination of a bank, savings association, or credit union regarding compliance with the provisions of this title, except in response to a complaint (or if the agency otherwise has knowledge) that the bank, savings association, or credit union has violated a provision of this title, in which case, the agency may conduct an examination as necessary to investigate the complaint. If an agency determines during an investigation in response to a complaint that a violation of this title has occurred, the agency may, during its next 2 regularly scheduled examinations of the bank, savings association, or credit union, examine for compliance with this title.".

<< 15 USCA § 1681s >>

SEC. 2417. STATE ENFORCEMENT OF FAIR CREDIT REPORTING ACT.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—
(1) by redesignating subsection (c) as subsection (d); and
(2) by inserting after subsection (b) the following new subsection:
"(c) STATE ACTION FOR VIOLATIONS.—
  "(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, if the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—
    "(A) may bring an action to enjoin such violation in any appropriate United States district court or in any other court of competent jurisdiction;
    "(B) subject to paragraph (5), may bring an action on behalf of the residents of the State to recover—
      "(i) damages for which the person is liable to such residents under sections 616 and 617 as a result of the violation;
      "(ii) in the case of a violation of section 623(a), damages for which the person would, but for section 623(c), be liable to such residents as a result of the violation; or
      "(iii) damages of not more than $1,000 for each willful or negligent violation; and
    "(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.
  "(2) RIGHTS OF FEDERAL REGULATORS.—The State shall serve prior written notice of any action under paragraph (1) upon the Federal Trade Commission or the appropriate Federal regulator determined under subsection (b) and provide the Commission or appropriate Federal regulator with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Federal Trade Commission or appropriate Federal regulator shall have the right—
    "(A) to intervene in the action;
    "(B) upon so intervening, to be heard on all matters arising therein;
    "(C) to remove the action to the appropriate United States district court; and
    "(D) to file petitions for appeal.
  "(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.
  "(4) LIMITATION ON STATE ACTION WHILE FEDERAL ACTION PENDING.—If the Federal Trade Commission or the appropriate Federal regulator has instituted a civil action or an administrative action under section 8 of the Federal Deposit Insurance Act for a violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission or the appropriate Federal regulator for any violation of this title that is alleged in that complaint.
  "(5) LIMITATIONS ON STATE ACTIONS FOR VIOLATION OF SECTION 623(a)(1).—

"(A) VIOLATION OF INJUNCTION REQUIRED.—A State may not bring an action against a person under paragraph (1)(B) for a violation of section 623(a)(1), unless—

"(i) the person has been enjoined from committing the violation, in an action brought by the State under paragraph (1)(A); and

"(ii) the person has violated the injunction.

"(B) LIMITATION ON DAMAGES RECOVERABLE.—In an action against a person under paragraph (1)(B) for a violation of section 623(a)(1), a State may not recover any damages incurred before the date of the violation of an injunction on which the action is based.".

<< 15 USCA § 1681s >>

SEC. 2418. FEDERAL RESERVE BOARD AUTHORITY.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended by adding at the end the following new subsection:

"(e) INTERPRETIVE AUTHORITY.—The Board of Governors of the Federal Reserve System may issue interpretations of any provision of this title as such provision may apply to any persons identified under paragraph (1), (2), and (3) of subsection (b), or to the holding companies and affiliates of such persons, in consultation with Federal agencies identified in paragraphs (1), (2), and (3) of subsection (b).".

<< 15 USCA § 1681t >>

SEC. 2419. PREEMPTION OF STATE LAW.

Section 624 of the Fair Credit Reporting Act (as redesignated by section 2413(a) of this chapter) is amended—

(1) by striking "This title" and inserting "(a) IN GENERAL.—Except as provided in subsections (b) and (c), this title"; and

(2) by adding at the end the following new subsection:

"(b) GENERAL EXCEPTIONS.—No requirement or prohibition may be imposed under the laws of any State—

"(1) with respect to any subject matter regulated under—

"(A) subsection (c) or (e) of section 604, relating to the prescreening of consumer reports;

"(B) section 611, relating to the time by which a consumer reporting agency must take any action, including the provision of notification to a consumer or other person, in any procedure related to the disputed accuracy of information in a consumer's file, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996;

"(C) subsections (a) and (b) of section 615, relating to the duties of a person who takes any adverse action with respect to a consumer;

"(D) section 615(d), relating to the duties of persons who use a consumer report of a consumer in connection with any credit or insurance transaction that is not initiated by the consumer and that consists of a firm offer of credit or insurance;

"(E) section 605, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; or

"(F) section 623, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—

"(i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996);

"(2) with respect to the exchange of information among persons affiliated by common ownership or common corporate control, except that this paragraph shall not apply with respect to subsection (a) or (c)(1) of section 2480e of title 9, Vermont Statutes Annotated (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(3) with respect to the form and content of any disclosure required to be made under section 609(c).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(c) DEFINITION OF FIRM OFFER OF CREDIT OR INSURANCE.—Notwithstanding any definition of the term 'firm offer of credit or insurance' (or any equivalent term) under the laws of any State, the definition of that term contained in section 603(l) shall be construed to apply in the enforcement and interpretation of the laws of any State governing consumer reports.

"(d) LIMITATIONS.—Subsections (b) and (c)—

"(1) do not affect any settlement, agreement, or consent judgment between any State Attorney General and any consumer reporting agency in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; and

"(2) do not apply to any provision of State law (including any provision of a State constitution) that—

"(A) is enacted after January 1, 2004;

"(B) states explicitly that the provision is intended to supplement this title; and

"(C) gives greater protection to consumers than is provided under this title.".

<< 15 USCA § 1681a NOTE >>

SEC. 2420. EFFECTIVE DATE.

(a) IN GENERAL.—Except as otherwise specifically provided in this chapter, the amendments made by this chapter shall become effective 365 days after the date of enactment of this Act.

(b) EARLY COMPLIANCE.—Any person or other entity that is subject to the requirements of this chapter may, at its option, comply with any provision of this chapter before the date on which that provision becomes effective under this chapter, in which case, each of the corresponding provisions of this chapter shall be fully applicable to such person or entity.

<< 15 USCA § 1681a NOTE >>

SEC. 2421. RELATIONSHIP TO OTHER LAW.

Nothing in this chapter or the amendments made by this chapter shall be considered to supersede or otherwise affect section 2721 of title 18, United States Code, with respect to motor vehicle records for surveys, marketing, or solicitations.

SEC. 2422. FEDERAL RESERVE BOARD STUDY.

(a) STUDY REQUIRED.—The Board of Governors of the Federal Reserve System, in consultation with the other Federal banking agencies (as defined in section 3 of the Federal Deposit Insurance Act) and the Federal Trade Commission, shall conduct a study of whether organizations which, as of the date of the enactment of this Act, are not subject to the Fair Credit Reporting Act as consumer reporting agencies (as defined in section 603 of such Act) are engaged in the business of making sensitive consumer identification information, including social security numbers, mothers' maiden names, prior addresses, and dates of birth, available to the general public.

(b) DETERMINATION OF POTENTIAL FOR FRAUD.—If the Board of Governors of the Federal Reserve System determines that organizations referred to in subsection (a) are engaged in the business of making sensitive consumer identification information available to the general public, the Board shall determine—

(1) whether such activities create undue potential for fraud and risk of loss to insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(2) if so, whether changes in Federal law are necessary to address such risks of fraud and loss.

(c) REPORT TO CONGRESS.—Before the end of the 6–month period beginning on the date of the enactment of this Act, the Board of Governors of the Federal Reserve System shall submit a report to the Congress containing—

(1) the findings and conclusion of the Board in connection with the study required under subsections (a) and (b); and

(2) recommendations for such legislative or administrative action as the Board determines to be appropriate.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

SEC. 2451. REGULATION OF CREDIT REPAIR ORGANIZATIONS.

Title IV of the Consumer Credit Protection Act (Public Law 90–321, 82 Stat. 164) is amended to read as follows:

<< 15 USCA Ch. 41 >>

"TITLE IV—CREDIT REPAIR ORGANIZATIONS

"Sec.

"401. Short title.

"402. Findings and purposes.

"403. Definitions.

"404. Prohibited practices.

"405. Disclosures.

"406. Credit repair organizations contracts.

"407. Right to cancel contract.

"408. Noncompliance with this title.

"409. Civil liability.

"410. Administrative enforcement.

"411. Statute of limitations.

"412. Relation to State law.

"413. Effective date.

<< 15 USCA § 1601 NOTE >>

"SEC. 401. SHORT TITLE.

  "This title may be cited as the 'Credit Repair Organizations Act'.

<< 15 USCA § 1679 >>

"SEC. 402. FINDINGS AND PURPOSES.

  "(a) FINDINGS.—The Congress makes the following findings:

  "(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

  "(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

  "(b) PURPOSES.—The purposes of this title are—

  "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

  "(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

<< 15 USCA § 1679a >>

"SEC. 403. DEFINITIONS.

"For purposes of this title, the following definitions apply:

"(1) CONSUMER.—The term 'consumer' means an individual.

"(2) CONSUMER CREDIT TRANSACTION.—The term 'consumer credit transaction' means any transaction in which credit is offered or extended to an individual for personal, family, or household purposes.

"(3) CREDIT REPAIR ORGANIZATION.—The term 'credit repair organization'—

"(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

"(i) improving any consumer's credit record, credit history, or credit rating; or

"(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

"(B) does not include—

"(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986;

"(ii) any creditor (as defined in section 103 of the Truth in Lending Act), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

"(iii) any depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act) or any Federal or State credit union (as those terms are defined in section 101 of the Federal Credit Union Act), or any affiliate or subsidiary of such a depository institution or credit union.

"(4) CREDIT.—The term 'credit' has the meaning given to such term in section 103(e) of this Act.

<< 15 USCA § 1679b >>

"SEC. 404. PROHIBITED PRACTICES.

"(a) IN GENERAL.—No person may—

"(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—

"(A) any consumer reporting agency (as defined in section 603(f) of this Act); or

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(2) make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to—

"(A) any consumer reporting agency;

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(3) make or use any untrue or misleading representation of the services of the credit repair organization; or

"(4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

"(b) PAYMENT IN ADVANCE.—No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

<< 15 USCA § 1679c >>

"SEC. 405. DISCLOSURES.

"(a) DISCLOSURE REQUIRED.—Any credit repair organization shall provide any consumer with the following written statement before any contract or agreement between the consumer and the credit repair organization is executed:

" 'Consumer Credit File Rights Under State and Federal Law

" 'You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any "credit repair" company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

" 'You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

" 'You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

" 'You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

" 'Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

" 'You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

" 'If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

" 'The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

" 'The Public Reference Branch

" 'Federal Trade Commission

" 'Washington, D.C. 20580'.

"(b) SEPARATE STATEMENT REQUIREMENT.—The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.

"(c) RETENTION OF COMPLIANCE RECORDS.—

"(1) IN GENERAL.—The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.

"(2) MAINTENANCE FOR 2 YEARS.—The copy of any consumer's statement shall be maintained in the organization's files for 2 years after the date on which the statement is signed by the consumer.

<< 15 USCA § 1679d >>

"SEC. 406. CREDIT REPAIR ORGANIZATIONS CONTRACTS.

"(a) WRITTEN CONTRACTS REQUIRED.—No services may be provided by any credit repair organization for any consumer—

"(1) unless a written and dated contract (for the purchase of such services) which meets the requirements of subsection (b) has been signed by the consumer; or

"(2) before the end of the 3–business–day period beginning on the date the contract is signed.

"(b) TERMS AND CONDITIONS OF CONTRACT.—No contract referred to in subsection (a) meets the requirements of this subsection unless such contract includes (in writing)—

"(1) the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person;

"(2) a full and detailed description of the services to be performed by the credit repair organization for the consumer, including —

"(A) all guarantees of performance; and

"(B) an estimate of—

"(i) the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete; or

"(ii) the length of the period necessary to perform such services;

"(3) the credit repair organization's name and principal business address; and

"(4) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'.

<< 15 USCA § 1679e >>

"SEC. 407. RIGHT TO CANCEL CONTRACT.

"(a) IN GENERAL.—Any consumer may cancel any contract with any credit repair organization without penalty or obligation by notifying the credit repair organization of the consumer's intention to do so at any time before midnight of the 3rd business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed or would, but for this subsection, become enforceable against the parties.

"(b) CANCELLATION FORM AND OTHER INFORMATION.—Each contract shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation' and contains in bold face type the following statement:

" 'You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.

" 'To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]

" 'I hereby cancel this transaction,

[date]

[purchaser's signature].'.

"(c) CONSUMER COPY OF CONTRACT REQUIRED.—Any consumer who enters into any contract with any credit repair organization shall be given, by the organization—

"(1) a copy of the completed contract and the disclosure statement required under section 405; and

"(2) a copy of any other document the credit repair organization requires the consumer to sign, at the time the contract or the other document is signed.

<< 15 USCA § 1679f >>

"SEC. 408. NONCOMPLIANCE WITH THIS TITLE.

"(a) CONSUMER WAIVERS INVALID.—Any waiver by any consumer of any protection provided by or any right of the consumer under this title—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(b) ATTEMPT TO OBTAIN WAIVER.—Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title shall be treated as a violation of this title.

"(c) CONTRACTS NOT IN COMPLIANCE.—Any contract for services which does not comply with the applicable provisions of this title—

  "(1) shall be treated as void; and

  "(2) may not be enforced by any Federal or State court or any other person.

<< 15 USCA § 1679g >>

"SEC. 409. CIVIL LIABILITY.

  "(a) LIABILITY ESTABLISHED.—Any person who fails to comply with any provision of this title with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

  "(1) ACTUAL DAMAGES.—The greater of—

  "(A) the amount of any actual damage sustained by such person as a result of such failure; or

  "(B) any amount paid by the person to the credit repair organization.

  "(2) PUNITIVE DAMAGES.—

  "(A) INDIVIDUAL ACTIONS.—In the case of any action by an individual, such additional amount as the court may allow.

  "(B) CLASS ACTIONS.—In the case of a class action, the sum of—

  "(i) the aggregate of the amount which the court may allow for each named plaintiff; and

  "(ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

  "(3) ATTORNEYS' FEES.—In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

  "(b) FACTORS TO BE CONSIDERED IN AWARDING PUNITIVE DAMAGES.—In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

  "(1) the frequency and persistence of noncompliance by the credit repair organization;

  "(2) the nature of the noncompliance;

  "(3) the extent to which such noncompliance was intentional; and

  "(4) in the case of any class action, the number of consumers adversely affected.

<< 15 USCA § 1679h >>

"SEC. 410. ADMINISTRATIVE ENFORCEMENT.

  "(a) IN GENERAL.—Compliance with the requirements imposed under this title with respect to credit repair organizations shall be enforced under the Federal Trade Commission Act by the Federal Trade Commission.

  "(b) VIOLATIONS OF THIS TITLE TREATED AS VIOLATIONS OF FEDERAL TRADE COMMISSION ACT.—

  "(1) IN GENERAL.—For the purpose of the exercise by the Federal Trade Commission of the Commission's functions and powers under the Federal Trade Commission Act, any violation of any requirement or prohibition imposed under this title with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act.

  "(2) ENFORCEMENT AUTHORITY UNDER OTHER LAW.—All functions and powers of the Federal Trade Commission under the Federal Trade Commission Act shall be available to the Commission to enforce compliance with this title by any person subject to enforcement by the Federal Trade Commission pursuant to this subsection, including the power to enforce the provisions of this title in the same manner as if the violation had been a violation of any Federal Trade Commission trade regulation rule, without regard to whether the credit repair organization—

  "(A) is engaged in commerce; or

  "(B) meets any other jurisdictional tests in the Federal Trade Commission Act.

  "(c) STATE ACTION FOR VIOLATIONS.—

"(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, whenever the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—

  "(A) may bring an action to enjoin such violation;

  "(B) may bring an action on behalf of its residents to recover damages for which the person is liable to such residents under section 409 as a result of the violation; and

  "(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.

  "(2) RIGHTS OF COMMISSION.—

  "(A) NOTICE TO COMMISSION.—The State shall serve prior written notice of any civil action under paragraph (1) upon the Federal Trade Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action.

  "(B) INTERVENTION.—The Commission shall have the right—

  "(i) to intervene in any action referred to in subparagraph (A);

  "(ii) upon so intervening, to be heard on all matters arising in the action; and

  "(iii) to file petitions for appeal.

  "(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

  "(4) LIMITATION.—Whenever the Federal Trade Commission has instituted a civil action for violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission for any violation of this title that is alleged in that complaint.

<< 15 USCA § 1679i >>

"SEC. 411. STATUTE OF LIMITATIONS.

"Any action to enforce any liability under this title may be brought before the later of—

  "(1) the end of the 5–year period beginning on the date of the occurrence of the violation involved; or

  "(2) in any case in which any credit repair organization has materially and willfully misrepresented any information which—

  "(A) the credit repair organization is required, by any provision of this title, to disclose to any consumer; and

  "(B) is material to the establishment of the credit repair organization's liability to the consumer under this title,

the end of the 5–year period beginning on the date of the discovery by the consumer of the misrepresentation.

<< 15 USCA § 1679j >>

"SEC. 412. RELATION TO STATE LAW.

"This title shall not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with any law of any State except to the extent that such law is inconsistent with any provision of this title, and then only to the extent of the inconsistency.

<< 15 USCA §§ 1679 NOTE, 1679a nt, 1679b nt, 1679c nt, 1679d
nt, 1679e nt, 1679f nt, 1679g nt, 1679h nt, 1679i nt, 1679j nt >>

"SEC. 413. EFFECTIVE DATE.

"This title shall apply after the end of the 6–month period beginning on the date of the enactment of the Credit Repair Organizations Act, except with respect to contracts entered into by a credit repair organization before the end of such period.".

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## SEC. 2452. CREDIT WORTHINESS.

It is the sense of the Senate that—

(1) individuals should generally be judged for credit worthiness based on their own credit worthiness and not on the zip code or neighborhood in which they live; and

(2) the Federal Trade Commission, after consultation with the appropriate Federal banking agency, should report to the Committee on Banking, Housing, and Urban Affairs of the Senate as to whether and how the location of the residence of an applicant for unsecured credit is considered by many companies and financial institutions in deciding whether an applicant should be granted credit.

### Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

<< 42 USCA § 9601 NOTE >>

## SEC. 2501. SHORT TITLE.

This subtitle may be cited as the "Asset Conservation, Lender Liability, and Deposit Insurance Protection Act of 1996".

## SEC. 2502. CERCLA LENDER AND FIDUCIARY LIABILITY LIMITATIONS AMENDMENTS.

(a) IN GENERAL.—Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9607) is amended by adding at the end the following:

<< 42 USCA § 9607 >>

"(n) LIABILITY OF FIDUCIARIES.—

"(1) IN GENERAL.—The liability of a fiduciary under any provision of this Act for the release or threatened release of a hazardous substance at, from, or in connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets held in the fiduciary capacity.

"(2) EXCLUSION.—Paragraph (1) does not apply to the extent that a person is liable under this Act independently of the person's ownership of a vessel or facility as a fiduciary or actions taken in a fiduciary capacity.

"(3) LIMITATION.—Paragraphs (1) and (4) do not limit the liability pertaining to a release or threatened release of a hazardous substance if negligence of a fiduciary causes or contributes to the release or threatened release.

"(4) SAFE HARBOR.—A fiduciary shall not be liable in its personal capacity under this Act for—

"(A) undertaking or directing another person to undertake a response action under subsection (d)(1) or under the direction of an on scene coordinator designated under the National Contingency Plan;

"(B) undertaking or directing another person to undertake any other lawful means of addressing a hazardous substance in connection with the vessel or facility;

"(C) terminating the fiduciary relationship;

"(D) including in the terms of the fiduciary agreement a covenant, warranty, or other term or condition that relates to compliance with an environmental law, or monitoring, modifying or enforcing the term or condition;

"(E) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(F) providing financial or other advice or counseling to other parties to the fiduciary relationship, including the settlor or beneficiary;

"(G) restructuring, renegotiating, or otherwise altering the terms and conditions of the fiduciary relationship;

"(H) administering, as a fiduciary, a vessel or facility that was contaminated before the fiduciary relationship began; or

"(I) declining to take any of the actions described in subparagraphs (B) through (H).

"(5) DEFINITIONS.—As used in this Act:

"(A) FIDUCIARY.—The term 'fiduciary'—

"(i) means a person acting for the benefit of another party as a bona fide—

"(I) trustee;

AR03231

"(II) executor;

"(III) administrator;

"(IV) custodian;

"(V) guardian of estates or guardian ad litem;

"(VI) receiver;

"(VII) conservator;

"(VIII) committee of estates of incapacitated persons;

"(IX) personal representative;

"(X) trustee (including a successor to a trustee) under an indenture agreement, trust agreement, lease, or similar financing agreement, for debt securities, certificates of interest or certificates of participation in debt securities, or other forms of indebtedness as to which the trustee is not, in the capacity of trustee, the lender; or

"(XI) representative in any other capacity that the Administrator, after providing public notice, determines to be similar to the capacities described in subclauses (I) through (X); and

"(ii) does not include—

"(I) a person that is acting as a fiduciary with respect to a trust or other fiduciary estate that was organized for the primary purpose of, or is engaged in, actively carrying on a trade or business for profit, unless the trust or other fiduciary estate was created as part of, or to facilitate, 1 or more estate plans or because of the incapacity of a natural person; or

"(II) a person that acquires ownership or control of a vessel or facility with the objective purpose of avoiding liability of the person or of any other person.

"(B) FIDUCIARY CAPACITY.—The term 'fiduciary capacity' means the capacity of a person in holding title to a vessel or facility, or otherwise having control of or an interest in the vessel or facility, pursuant to the exercise of the responsibilities of the person as a fiduciary.

"(6) SAVINGS CLAUSE.—Nothing in this subsection—

"(A) affects the rights or immunities or other defenses that are available under this Act or other law that is applicable to a person subject to this subsection; or

"(B) creates any liability for a person or a private right of action against a fiduciary or any other person.

"(7) NO EFFECT ON CERTAIN PERSONS.—Nothing in this subsection applies to a person if the person—

"(A)(i) acts in a capacity other than that of a fiduciary or in a beneficiary capacity; and

"(ii) in that capacity, directly or indirectly benefits from a trust or fiduciary relationship; or

"(B)(i) is a beneficiary and a fiduciary with respect to the same fiduciary estate; and

"(ii) as a fiduciary, receives benefits that exceed customary or reasonable compensation, and incidental benefits, permitted under other applicable law.

"(8) LIMITATION.—This subsection does not preclude a claim under this Act against—

"(A) the assets of the estate or trust administered by the fiduciary; or

"(B) a nonemployee agent or independent contractor retained by a fiduciary.".

<< 42 USCA § 9601 >>

(b) DEFINITION OF OWNER OR OPERATOR.—Section 101(20) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601(20)) is amended by adding at the end the following:

"(E) EXCLUSION OF LENDERS NOT PARTICIPANTS IN MANAGEMENT.—

"(i) INDICIA OF OWNERSHIP TO PROTECT SECURITY.—The term 'owner or operator' does not include a person that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility.

"(ii) FORECLOSURE.—The term 'owner or operator' does not include a person that is a lender that did not participate in management of a vessel or facility prior to foreclosure, notwithstanding that the person—

"(I) forecloses on the vessel or facility; and

"(II) after foreclosure, sells, re-leases (in the case of a lease finance transaction), or liquidates the vessel or facility, maintains business activities, winds up operations, undertakes a response action under section 107(d)(1) or under the

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-2  Document 162-7  Filed 09/02/22  Page 574 of 1021  PageID 7444

direction of an on-scene coordinator appointed under the National Contingency Plan, with respect to the vessel or facility, or takes any other measure to preserve, protect, or prepare the vessel or facility prior to sale or disposition,

if the person seeks to sell, re-lease (in the case of a lease finance transaction), or otherwise divest the person of the vessel or facility at the earliest practicable, commercially reasonable time, on commercially reasonable terms, taking into account market conditions and legal and regulatory requirements.

"(F) PARTICIPATION IN MANAGEMENT.—For purposes of subparagraph (E)—

"(i) the term 'participate in management'—

"(I) means actually participating in the management or operational affairs of a vessel or facility; and

"(II) does not include merely having the capacity to influence, or the unexercised right to control, vessel or facility operations;

"(ii) a person that is a lender and that holds indicia of ownership primarily to protect a security interest in a vessel or facility shall be considered to participate in management only if, while the borrower is still in possession of the vessel or facility encumbered by the security interest, the person—

"(I) exercises decisionmaking control over the environmental compliance related to the vessel or facility, such that the person has undertaken responsibility for the hazardous substance handling or disposal practices related to the vessel or facility; or

"(II) exercises control at a level comparable to that of a manager of the vessel or facility, such that the person has assumed or manifested responsibility—

"(aa) for the overall management of the vessel or facility encompassing day-to-day decisionmaking with respect to environmental compliance; or

"(bb) over all or substantially all of the operational functions (as distinguished from financial or administrative functions) of the vessel or facility other than the function of environmental compliance;

"(iii) the term 'participate in management' does not include performing an act or failing to act prior to the time at which a security interest is created in a vessel or facility; and

"(iv) the term 'participate in management' does not include—

"(I) holding a security interest or abandoning or releasing a security interest;

"(II) including in the terms of an extension of credit, or in a contract or security agreement relating to the extension, a covenant, warranty, or other term or condition that relates to environmental compliance;

"(III) monitoring or enforcing the terms and conditions of the extension of credit or security interest;

"(IV) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(V) requiring a response action or other lawful means of addressing the release or threatened release of a hazardous substance in connection with the vessel or facility prior to, during, or on the expiration of the term of the extension of credit;

"(VI) providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value of the vessel or facility;

"(VII) restructuring, renegotiating, or otherwise agreeing to alter the terms and conditions of the extension of credit or security interest, exercising forbearance;

"(VIII) exercising other remedies that may be available under applicable law for the breach of a term or condition of the extension of credit or security agreement; or

"(IX) conducting a response action under section 107(d) or under the direction of an on-scene coordinator appointed under the National Contingency Plan,

if the actions do not rise to the level of participating in management (within the meaning of clauses (i) and (ii)).

"(G) OTHER TERMS.—As used in this Act:

"(i) EXTENSION OF CREDIT.—The term 'extension of credit' includes a lease finance transaction—

"(I) in which the lessor does not initially select the leased vessel or facility and does not during the lease term control the daily operations or maintenance of the vessel or facility; or

"(II) that conforms with regulations issued by the appropriate Federal banking agency or the appropriate State bank supervisor (as those terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813) or with regulations issued by the National Credit Union Administration Board, as appropriate.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) FINANCIAL OR ADMINISTRATIVE FUNCTION.—The term 'financial or administrative function' includes a function such as that of a credit manager, accounts payable officer, accounts receivable officer, personnel manager, comptroller, or chief financial officer, or a similar function.

"(iii) FORECLOSURE; FORECLOSE.—The terms 'foreclosure' and 'foreclose' mean, respectively, acquiring, and to acquire, a vessel or facility through—

"(I)(aa) purchase at sale under a judgment or decree, power of sale, or nonjudicial foreclosure sale;

"(bb) a deed in lieu of foreclosure, or similar conveyance from a trustee; or

"(cc) repossession,

if the vessel or facility was security for an extension of credit previously contracted;

"(II) conveyance pursuant to an extension of credit previously contracted, including the termination of a lease agreement; or

"(III) any other formal or informal manner by which the person acquires, for subsequent disposition, title to or possession of a vessel or facility in order to protect the security interest of the person.

"(iv) LENDER.—The term 'lender' means—

"(I) an insured depository institution (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813));

"(II) an insured credit union (as defined in section 101 of the Federal Credit Union Act (12 U.S.C. 1752));

"(III) a bank or association chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.);

"(IV) a leasing or trust company that is an affiliate of an insured depository institution;

"(V) any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person;

"(VI) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Agricultural Mortgage Corporation, or any other entity that in a bona fide manner buys or sells loans or interests in loans;

"(VII) a person that insures or guarantees against a default in the repayment of an extension of credit, or acts as a surety with respect to an extension of credit, to a nonaffiliated person; and

"(VIII) a person that provides title insurance and that acquires a vessel or facility as a result of assignment or conveyance in the course of underwriting claims and claims settlement.

"(v) OPERATIONAL FUNCTION.—The term 'operational function' includes a function such as that of a facility or plant manager, operations manager, chief operating officer, or chief executive officer.

"(vi) SECURITY INTEREST.—The term 'security interest' includes a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person.".

<< 42 USCA § 6991b >>

SEC. 2503. CONFORMING AMENDMENT.

Section 9003(h) of the Solid Waste Disposal Act (42 U.S.C. 6991b(h)) is amended by striking paragraph (9) and inserting the following:

"(9) DEFINITION OF OWNER OR OPERATOR.—

"(A) IN GENERAL.—As used in this subtitle, the terms 'owner' and 'operator' do not include a person that, without participating in the management of an underground storage tank and otherwise not engaged in petroleum production, refining, or marketing, holds indicia of ownership primarily to protect the person's security interest.

"(B) SECURITY INTEREST HOLDERS.—The provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries at section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 shall apply in determining a person's liability as an owner or operator of an underground storage tank for the purposes of this subtitle.

"(C) EFFECT ON RULE.—Nothing in subparagraph (B) shall be construed as modifying or affecting the final rule issued by the Administrator on September 7, 1995 (60 Fed.Reg. 46,692), or as limiting the authority of the Administrator to amend the final rule, in accordance with applicable law. The final rule in effect on the date of enactment of this subparagraph shall

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

prevail over any inconsistent provision regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) or any inconsistent provision regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. Any amendment to the final rule shall be consistent with the provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. This subparagraph does not preclude judicial review of any amendment of the final rule made after the date of enactment of this subparagraph.".

SEC. 2504. LENDER LIABILITY RULE.

 (a) IN GENERAL.—Effective on the date of enactment of this Act, the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, shall be deemed to have been validly issued under authority of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) and to have been effective according to the terms of the final rule. No additional judicial proceedings shall be necessary or may be held with respect to such portion of the final rule. Any reference in that portion of the final rule to section 300.1100 of title 40, Code of Federal Regulations, shall be deemed to be a reference to the amendments made by this subtitle.

 (b) JUDICIAL REVIEW.—Notwithstanding section 113(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9613(a)), no court shall have jurisdiction to review the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344) that prescribed section 300.1105 of title 40, Code of Federal Regulations.

 (c) AMENDMENT.—No provision of this section shall be construed as limiting the authority of the President or a delegee of the President to amend the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, consistent with the amendments made by this subtitle and other applicable law.

 (d) JUDICIAL REVIEW.—No provision of this section shall be construed as precluding judicial review of any amendment of section 300.1105 of title 40, Code of Federal Regulations, made after the date of enactment of this Act.

<< 42 USCA §§ 6991b NOTE, 9601 nt, 9607 nt >>

SEC. 2505. EFFECTIVE DATE.

 The amendments made by this subtitle shall be applicable with respect to any claim that has not been finally adjudicated as of the date of enactment of this Act.

Subtitle F—Miscellaneous

SEC. 2601. FEDERAL RESERVE BOARD STUDY.

 (a) STUDY OF ELECTRONIC STORED VALUE PRODUCTS.—

 (1) STUDY.—The Board shall conduct a study of electronic stored value products which evaluates whether provisions of the Electronic Fund Transfer Act could be applied to such products without adversely impacting the cost, development, and operation of such products.

 (2) CONSIDERATIONS.—In conducting its study under paragraph (1), the Board shall consider whether alternatives to regulation under the Electronic Fund Transfer Act, such as allowing competitive market forces to shape the development and operation of electronic stored value products, could more efficiently achieve the objectives embodied in that Act.

 (b) REPORT.—The Board shall submit a report of its study under subsection (a) to the Congress not later than 6 months after the date of enactment of this Act.

 (c) ACTION TO FINALIZE.—The Board shall take no action to finalize any amendments to regulations under the Electronic Fund Transfer Act that would regulate electronic stored value products until the later of—

 (1) 3 months after the date on which the report is submitted to the Congress under subsection (b); or

 (2) 9 months after the date of enactment of this Act.

<< 12 USCA § 1821 >>

SEC. 2602. TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.

  Section 11(d) of the Federal Deposit Insurance Act (12 U.S.C. 1821(d)) is amended by adding at the end the following new paragraph:

  "(20) TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.—Notwithstanding any other provision of this subsection, any final and unappealable judgment for monetary damages entered against a receiver or conservator for an insured depository institution for the breach of an agreement executed or approved by such receiver or conservator after the date of its appointment shall be paid as an administrative expense of the receiver or conservator. Nothing in this paragraph shall be construed to limit the power of a receiver or conservator to exercise any rights under contract or law, including to terminate, breach, cancel, or otherwise discontinue such agreement.".

SEC. 2603. CRIMINAL SANCTIONS FOR FICTITIOUS FINANCIAL INSTRUMENTS AND COUNTERFEITING.

<< 18 USCA §§ 474, 474A >>

  (a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".
  (b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

  (1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

  "(a) Whoever, with the intent to defraud—
  "(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;
  "(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or
  "(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.
  "(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).
  "(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section.".

<< 18 USCA Ch. 25 >>

  (2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:

"514. Fictitious obligations.".

SEC. 2604. AMENDMENTS TO THE TRUTH IN SAVINGS ACT.

<< 12 USCA § 4310 >>

<< 12 USCA § 4310 NOTE >>

 (a) REPEAL.—Effective as of the end of the 5–year period beginning on the date of the enactment of this Act, section 271 of the Truth in Savings Act (12 U.S.C. 4310) is repealed.

<< 12 USCA § 4302 >>

 (b) ON–PREMISES DISPLAYS.—Section 263(c) of the Truth in Savings Act (12 U.S.C. 4302(c)) is amended—
 (1) by striking paragraph (2);
 (2) by striking "(1) IN GENERAL.—"; and
 (3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively, and indenting appropriately.

<< 12 USCA § 4313 >>

 (c) DEPOSITORY INSTITUTION DEFINITION.—Section 274(6) of the Truth in Savings Act (12 U.S.C. 4313(6)) is amended by inserting before the period ", but does not include any nonautomated credit union that was not required to comply with the requirements of this title as of the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996, pursuant to the determination of the National Credit Union Administration Board".

<< 12 USCA § 4305 >>

 (d) TIME DEPOSITS.—Section 266(a)(3) of the Truth in Savings Act (12 U.S.C. 4305(a)(3)) is amended by inserting "has a maturity of more than 30 days" after "deposit which".

SEC. 2605. CONSUMER LEASING ACT AMENDMENTS.

<< 15 USCA § 1667f NOTE >>

 (a) CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSES.—
 (1) FINDINGS.—The Congress finds that—
  (A) competition among the various financial institutions and other firms engaged in the business of consumer leasing is greatest when there is informed use of leasing;
  (B) the informed use of leasing results from an awareness of the cost of leasing by consumers; and
  (C) there has been a continued trend toward leasing automobiles and other durable goods for consumer use as an alternative to installment credit sales and that leasing product advances have occurred such that lessors have been unable to provide consistent industry-wide disclosures to fully account for the competitive progress that has occurred.
 (2) PURPOSES.—The purposes of this section are—
  (A) to assure a simple, meaningful disclosure of leasing terms so that the consumer will be able to compare more readily the various leasing terms available to the consumer and avoid the uninformed use of leasing, and to protect the consumer against inaccurate and unfair leasing practices;
  (B) to provide for adequate cost disclosures that reflect the marketplace without impairing competition and the development of new leasing products; and
  (C) to provide the Board with the regulatory authority to assure a simplified, meaningful definition and disclosure of the terms of certain leases of personal property for personal, family, or household purposes so as to—
   (i) enable the lessee to compare more readily the various lease terms available to the lessee;
   (ii) enable comparison of lease terms with credit terms, as appropriate; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(iii) assure meaningful and accurate disclosures of lease terms in advertisements.
(b) REGULATIONS.—

<< 15 USCA § 1667f >>

(1) IN GENERAL.—Chapter 5 of the Truth in Lending Act (15 U.S.C. 1667 et seq.) is amended by adding at the end the following new section:

"SEC. 187. REGULATIONS.

"(a) REGULATIONS AUTHORIZED.—

"(1) IN GENERAL.—The Board shall prescribe regulations to update and clarify the requirements and definitions applicable to lease disclosures and contracts, and any other issues specifically related to consumer leasing, to the extent that the Board determines such action to be necessary—

"(A) to carry out this chapter;

"(B) to prevent any circumvention of this chapter; or

"(C) to facilitate compliance with the requirements of the chapter.

"(2) CLASSIFICATIONS, ADJUSTMENTS.—Any regulations prescribed under paragraph (1) may contain classifications and differentiations, and may provide for adjustments and exceptions for any class of transactions, as the Board considers appropriate.

"(b) MODEL DISCLOSURE.—

"(1) PUBLICATION.—The Board shall establish and publish model disclosure forms to facilitate compliance with the disclosure requirements of this chapter and to aid the consumer in understanding the transaction to which the subject disclosure form relates.

"(2) USE OF AUTOMATED EQUIPMENT.—In establishing model forms under this subsection, the Board shall consider the use by lessors of data processing or similar automated equipment.

"(3) USE OPTIONAL.—A lessor may utilize a model disclosure form established by the Board under this subsection for purposes of compliance with this chapter, at the discretion of the lessor.

"(4) EFFECT OF USE.—Any lessor who properly uses the material aspects of any model disclosure form established by the Board under this subsection shall be deemed to be in compliance with the disclosure requirements to which the form relates.".

<< 15 USCA § 1667f NOTE >>

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—Any regulation of the Board, or any amendment or interpretation of any regulation of the Board issued pursuant to section 187 of the Truth in Lending Act (as added by paragraph (1) of this subsection), shall become effective on the first October 1 that follows the date of promulgation of that regulation, amendment, or interpretation by not less than 6 months.

(B) LONGER PERIOD.—The Board may, at the discretion of the Board, extend the time period referred to in subparagraph (A) in accordance with subparagraph (C), to permit lessors to adjust their disclosure forms to accommodate the requirements of section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection).

(C) SHORTER PERIOD.—The Board may shorten the time period referred to in subparagraph (A), if the Board makes a specific finding that such action is necessary to comply with the findings of a court or to prevent an unfair or deceptive practice.

(D) COMPLIANCE BEFORE EFFECTIVE DATE.—Any lessor may comply with any means of disclosure provided for in section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection) before the effective date of such requirement.

(E) DEFINITIONS.—For purposes of this subsection, the term "lessor" has the same meaning as in section 181 of the Truth in Lending Act.

(3) CLERICAL AMENDMENT.—The table of sections for chapter 5 of title I of the Truth in Lending Act (15 U.S.C. 1601 et seq.) is amended by inserting after the item relating to section 186 the following new item:

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 580 of 1021   PageID 7450

"187. Regulations.".

<< 15 USCA § 1667c >>

(c) CONSUMER LEASE ADVERTISING.—Section 184 of the Truth in Lending Act (15 U.S.C. 1667c) is amended—

(1) by striking subsections (a) and (c);

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting before subsection (c), as so redesignated, the following:

"(a) IN GENERAL.—If an advertisement for a consumer lease includes a statement of the amount of any payment or a statement that any or no initial payment is required, the advertisement shall clearly and conspicuously state, as applicable—

"(1) the transaction advertised is a lease;

"(2) the total amount of any initial payments required on or before consummation of the lease or delivery of the property, whichever is later;

"(3) that a security deposit is required;

"(4) the number, amount, and timing of scheduled payments; and

"(5) with respect to a lease in which the liability of the consumer at the end of the lease term is based on the anticipated residual value of the property, that an extra charge may be imposed at the end of the lease term.

"(b) ADVERTISING MEDIUM NOT LIABLE.—No owner or employee of any entity that serves as a medium in which an advertisement appears or through which an advertisement is disseminated, shall be liable under this section.".

<< 12 USCA § 1752a NOTE >>

SEC. 2606. STUDY OF CORPORATE CREDIT UNIONS.

(a) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

(1) ADMINISTRATION.—The term "Administration" means the National Credit Union Administration.

(2) BOARD.—The term "Board" means the National Credit Union Administration Board.

(3) CORPORATE CREDIT UNION.—The term "corporate credit union" has the meaning given such term by rule or regulation of the Board.

(4) FUND.—The term "Fund" means the National Credit Union Share Insurance Fund established under section 203 of the Federal Credit Union Act.

(5) SECRETARY.—The term "Secretary" means the Secretary of the Treasury.

(b) STUDY.—

(1) IN GENERAL.—The Secretary, in consultation with the Board, the Corporation, the Comptroller of the Currency, and the Administration, shall conduct a study and evaluation of—

(A) the oversight and supervisory practices of the Administration concerning the Fund, including the treatment of amounts deposited in the Fund pursuant to section 202(c) of the Federal Credit Union Act, including analysis of—

(i) whether those amounts should be—

(I) refundable; or

(II) treated as expenses; and

(ii) the use of those amounts in determining equity capital ratios;

(B) the potential for, and potential effects of, administration of the Fund by an entity other than the Administration;

(C) the 10 largest corporate credit unions in the United States, conducted in cooperation with appropriate employees of other Federal agencies with expertise in the examination of federally insured financial institutions, including—

(i) the investment practices of those credit unions; and

(ii) the financial stability, financial operations, and financial controls of those credit unions;

(D) the regulations of the Administration; and

(E) the supervision of corporate credit unions by the Administration.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 581 of 1021   PageID 7451

(c) REPORT.—Not later than 12 months after the date of enactment of this Act, the Secretary shall submit to the appropriate committees of the Congress, a report that includes the results of the study and evaluation conducted under subsection (b), together with any recommendations that the Secretary considers to be appropriate.

SEC. 2607. REPORT ON THE RECONCILIATION OF DIFFERENCES BETWEEN REGULATORY ACCOUNTING PRINCIPLES AND GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

Not later than 180 days after the date of enactment of this Act, each appropriate Federal banking agency shall submit to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, a report describing both the actions that have been taken by the agency and the actions that will be taken by the agency to eliminate or conform inconsistent or duplicative accounting and reporting requirements applicable to reports or statements filed with any such agency by insured depository institutions, as required by section 121 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

<< 12 USCA § 1811 NOTE >>

SEC. 2608. STATE–BY–STATE AND METROPOLITAN AREA–BY–METROPOLITAN AREA STUDY OF BANK FEES.

Section 1002(b)(2)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1811 note) is amended to read as follows:

"(A) a description of any discernible trend, in the Nation as a whole, in each of the 50 States, and in each consolidated metropolitan statistical area or primary metropolitan statistical area (as defined by the Director of the Office of Management and Budget), in the cost and availability of retail banking services (including fees imposed for providing such services), that delineates differences between insured depository institutions on the basis of both the size of the institution and any engagement of the institution in multistate activity; and".

<< 31 USCA § 5118 >>

SEC. 2609. PROSPECTIVE APPLICATION OF GOLD CLAUSES IN CONTRACTS.

Section 5118(d)(2) of title 31, United States Code, is amended by adding at the end the following: "This paragraph shall apply to any obligation issued on or before October 27, 1977, notwithstanding any assignment or novation of such obligation after October 27, 1977, unless all parties to the assignment or novation specifically agree to include a gold clause in the new agreement. Nothing in the preceding sentence shall be construed to affect the enforceability of a Gold Clause contained in any obligation issued after October 27, 1977 if the enforceability of that Gold Clause has been finally adjudicated before the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996.".

<< 12 USCA § 1841 >>

SEC. 2610. QUALIFIED FAMILY PARTNERSHIPS.

Section 2 of the Bank Holding Company Act of 1956 (12 U.S.C. 1841) is amended—

(1) in subsection (b), by inserting ", and shall not include a qualified family partnership" after "by any State"; and

(2) in subsection (o), by adding at the end the following:

"(10) QUALIFIED FAMILY PARTNERSHIP.—The term 'qualified family partnership' means a general or limited partnership that the Board determines—

"(A) does not directly control any bank, except through a registered bank holding company;

"(B) does not control more than 1 registered bank holding company;

"(C) does not engage in any business activity, except indirectly through ownership of other business entities;

"(D) has no investments other than those permitted for a bank holding company pursuant to section 4(c);

"(E) is not obligated on any debt, either directly or as a guarantor;

"(F) has partners, all of whom are either—

"(i) individuals related to each other by blood, marriage (including former marriage), or adoption; or

"(ii) trusts for the primary benefit of individuals related as described in clause (i); and

"(G) has filed with the Board a statement that includes—

"(i) the basis for the eligibility of the partnership under subparagraph (F);

"(ii) a list of the existing activities and investments of the partnership;

"(iii) a commitment to comply with this paragraph;

"(iv) a commitment to comply with section 7 of the Federal Deposit Insurance Act with respect to any acquisition of control of an insured depository institution occurring after date of enactment of this paragraph; and

"(v) a commitment to be subject, to the same extent as if the qualified family partnership were a bank holding company—

"(I) to examination by the Board to assure compliance with this paragraph; and

"(II) to section 8 of the Federal Deposit Insurance Act.".

## SEC. 2611. COOPERATIVE EFFORTS BETWEEN DEPOSITORY INSTITUTIONS AND FARMERS AND RANCHERS IN DROUGHT–STRICKEN AREAS.

(a) FINDINGS.—The Congress hereby finds the following:

(1) Severe drought is being experienced in the Plains and the Southwest portions of our country.

(2) Soil erosion is becoming a critical issue as the dry season approaches and summer winds may rob these fields of nutrient-rich topsoil.

(3) Without immediate assistance, ranchers and farmers would be forced to cull their herds bringing tremendous volatility in the beef market.

(4) The American people will feel the impact of this drought in their pocketbooks through higher prices for grain products.

(5) The communities in drought-stricken areas are suffering and borrowers may have difficulty meeting their obligations to financial institutions.

(6) Congress has already passed the Depository Institutions Disaster Relief Act of 1992 which allows financial institutions to make emergency exceptions to the appraisal requirement in times of national disasters.

(b) SENSE OF THE CONGRESS.—It is the sense of the Congress that financial institutions and Federal bank regulators should work cooperatively with farmers and ranchers in communities affected by drought conditions to allow financial obligations to be met without imposing undue burdens.

<< 12 USCA § 1843 >>

## SEC. 2612. STREAMLINING PROCESS FOR DETERMINING NEW NONBANKING ACTIVITIES.

Section 4(c)(8) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(8)) is amended by striking "and opportunity for hearing" and inserting the following: "(and opportunity for hearing in the case of an acquisition of a savings association)".

## SEC. 2613. AUTHORIZING BANK SERVICE COMPANIES TO ORGANIZE AS LIMITED LIABILITY COMPANIES.

<< 12 USCA § 1861 >>

(a) AMENDMENT TO SHORT TITLE.—Section 1 of the Bank Service Corporation Act (12 U.S.C. 1861(a)) is amended by striking subsection (a) and inserting the following new subsection:

"(a) SHORT TITLE.—This Act may be cited as the 'Bank Service Company Act'.";

(b) AMENDMENTS TO DEFINITIONS.—Section 1(b) of the Bank Service Corporation Act (12 U.S.C. 1861(b)) is amended—

(1) by striking paragraph (2) and inserting the following new paragraph:

"(2) the term 'bank service company' means—

"(A) any corporation—

"(i) which is organized to perform services authorized by this Act; and

"(ii) all of the capital stock of which is owned by 1 or more insured banks; and

"(B) any limited liability company—

"(i) which is organized to perform services authorized by this Act; and

"(ii) all of the members of which are 1 or more insured banks.";

(2) in paragraph (6)—

(A) by striking "corporation" and inserting "company"; and

(B) by striking "and" after the semicolon;

(3) by redesignating paragraph (7) as paragraph (8) and inserting after paragraph (6) the following new paragraph:

"(7) the term 'limited liability company' means any company, partnership, trust, or similar business entity organized under the law of a State (as defined in section 3 of the Federal Deposit Insurance Act) which provides that a member or manager of such company is not personally liable for a debt, obligation, or liability of the company solely by reason of being, or acting as, a member or manager of such company; and"; and

(4) in paragraph (8) (as so redesignated)—

(A) by striking "corporation" each place such term appears and inserting "company"; and

(B) by striking "capital stock" and inserting "equity".

<< 12 USCA § 1862 >>

(c) AMENDMENTS TO SECTION 2.—Section 2 of the Bank Service Corporation Act (12 U.S.C. 1862) is amended—

(1) by striking "corporation" and inserting "company";

(2) by striking "corporations" and inserting "companies"; and

(3) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1863 >>

(d) AMENDMENTS TO SECTION 3.—Section 3 of the Bank Service Corporation Act (12 U.S.C. 1863) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1864 >>

(e) AMENDMENTS TO SECTION 4.—Section 4 of the Bank Service Corporation Act (12 U.S.C. 1864) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (b), by inserting "or members" after "shareholders" each place such term appears;

(3) in subsections (c) and (d), by inserting "or member" after "shareholder" each place such term appears;

(4) in subsection (e)—

(A) by inserting "or members" after "national bank and State bank shareholders";

(B) by striking "its national bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a national bank";

(C) by striking "its State bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a State bank";

(D) by striking "such State bank or banks" and inserting "any such State bank"; and

(E) by inserting "or members" after "State bank and national bank shareholders"; and

(5) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1865 >>

(f) AMENDMENTS TO SECTION 5.—Section 5 of the Bank Service Corporation Act (12 U.S.C. 1865) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

<< 12 USCA § 1866 >>

(g) AMENDMENTS TO SECTION 6.—Section 6 of the Bank Service Corporation Act (12 U.S.C. 1866) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) by inserting "or is not a member of" after "does not own stock in";

(3) by striking "the nonstockholding institution" and inserting "such depository institution";

(4) by inserting "or is a member of" after "that owns stock in";

(5) in paragraphs (1) and (2), by inserting "or nonmember" after "nonstockholding"; and

(6) in the heading for such section by inserting "OR NONMEMBERS" after "NONSTOCKHOLDERS".

<< 12 USCA § 1867 >>

(h) AMENDMENTS TO SECTION 7.—Section 7 of the Bank Service Corporation Act (12 U.S.C. 1867) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (a)—

 (A) by inserting "or principal member" after "principal shareholder"; and

 (B) by inserting "or member" after "other shareholder"; and

(3) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

SEC. 2614. RETIREMENT CERTIFICATES OF DEPOSITS.

<< 12 USCA § 1813 >>

(a) IN GENERAL.—Section 3(l)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1813(l)(5) is amended—

(1) in subparagraph (A), by striking "and" at the end;

(2) in subparagraph (B), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

 "(C) any liability of an insured depository institution that arises under an annuity contract, the income of which is tax deferred under section 72 of the Internal Revenue Code of 1986.".

<< 12 USCA § 1813 NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to any liability of an insured depository that arises under an annuity contract issued on or after the date of enactment of this Act.

SEC. 2615. PROHIBITIONS ON CERTAIN DEPOSITORY INSTITUTION ASSOCIATIONS WITH GOVERNMENT–SPONSORED ENTERPRISES.

<< 12 USCA § 1781 >>

 (a) CREDIT UNIONS.—Section 201 of the Federal Credit Union Act (12 U.S.C. 1781) is amended by adding at the end the following new subsection:

"(e) PROHIBITION ON CERTAIN ASSOCIATIONS.—

 "(1) IN GENERAL.—No insured credit union may be sponsored by or accept financial support, directly or indirectly, from any Government-sponsored enterprise, if the credit union includes the customers of the Government-sponsored enterprise in the field of membership of the credit union.

 "(2) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance generally provided by a Government-sponsored enterprise in the ordinary course of business of the enterprise.

 "(3) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

 "(4) EMPLOYEE CREDIT UNION.—No provision of this subsection shall be construed as prohibiting any employee of a Government-sponsored enterprise from becoming a member of a credit union whose field of membership is the employees of such enterprise.".

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 1828 >>

(b) BANKS AND SAVINGS ASSOCIATIONS.—Section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828) is amended by adding at the end the following new subsection:

"(s) PROHIBITION ON CERTAIN AFFILIATIONS.—

"(1) IN GENERAL.—No depository institution may be an affiliate of, be sponsored by, or accept financial support, directly or indirectly, from any Government-sponsored enterprise.

"(2) EXCEPTION FOR MEMBERS OF A FEDERAL HOME LOAN BANK.—Paragraph (1) shall not apply with respect to the membership of a depository institution in a Federal home loan bank.

"(3) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance provided by a Government-sponsored enterprise pursuant to the statutes governing such enterprise.

"(4) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.".

<< 12 USCA § 1781 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply on and after January 1, 1996.

Subtitle G—Deposit Insurance Funds

<< 12 USCA § 1811 NOTE >>

SEC. 2701. SHORT TITLE.

This subtitle may be cited as the "Deposit Insurance Funds Act of 1996".

SEC. 2702. SPECIAL ASSESSMENT TO CAPITALIZE SAIF.

<< 12 USCA § 1817 NOTE >>

(a) IN GENERAL.—Except as provided in subsection (f), the Board of Directors of the Federal Deposit Insurance Corporation shall impose a special assessment on the SAIF-assessable deposits of each insured depository institution in accordance with assessment regulations of the Corporation at a rate applicable to all such institutions that the Board of Directors, in its sole discretion, determines (after taking into account the adjustments described in subsections (g), (h), and (j)) will cause the Savings Association Insurance Fund to achieve the designated reserve ratio on the first business day of the 1st month beginning after the date of the enactment of this Act.

(b) FACTORS TO BE CONSIDERED.—In carrying out subsection (a), the Board of Directors shall base its determination on—

(1) the monthly Savings Association Insurance Fund balance most recently calculated;

(2) data on insured deposits reported in the most recent reports of condition filed not later than 70 days before the date of enactment of this Act by insured depository institutions; and

(3) any other factors that the Board of Directors deems appropriate.

(c) DATE OF DETERMINATION.—For purposes of subsection (a), the amount of the SAIF-assessable deposits of an insured depository institution shall be determined as of March 31, 1995.

(d) DATE PAYMENT DUE.—Except as provided in subsection (g), the special assessment imposed under this section shall be—

(1) due on the first business day of the 1st month beginning after the date of the enactment of this Act; and

(2) paid to the Corporation on the later of—

(A) the first business day of the 1st month beginning after such date of enactment; or

(B) such other date as the Corporation shall prescribe, but not later than 60 days after the date of enactment of this Act.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(e) ASSESSMENT DEPOSITED IN SAIF.—Notwithstanding any other provision of law, the proceeds of the special assessment imposed under this section shall be deposited in the Savings Association Insurance Fund.

(f) EXEMPTIONS FOR CERTAIN INSTITUTIONS.—

(1) EXEMPTION FOR WEAK INSTITUTIONS.—The Board of Directors may, by order, in its sole discretion, exempt any insured depository institution that the Board of Directors determines to be weak, from paying the special assessment imposed under this section if the Board of Directors determines that the exemption would reduce risk to the Savings Association Insurance Fund.

(2) GUIDELINES REQUIRED.—Not later than 30 days after the date of enactment of this Act, the Board of Directors shall prescribe guidelines setting forth the criteria that the Board of Directors will use in exempting institutions under paragraph (1). Such guidelines shall be published in the Federal Register.

(3) EXEMPTION FOR CERTAIN NEWLY CHARTERED AND OTHER DEFINED INSTITUTIONS.—

(A) IN GENERAL.—In addition to the institutions exempted from paying the special assessment under paragraph (1), the Board of Directors shall exempt any insured depository institution from payment of the special assessment if the institution—

(i) was in existence on October 1, 1995, and held no SAIF-assessable deposits before January 1, 1993;

(ii) is a Federal savings bank which—

(I) was established de novo in April 1994 in order to acquire the deposits of a savings association which was in default or in danger of default; and

(II) received minority interim capital assistance from the Resolution Trust Corporation under section 21A(w) of the Federal Home Loan Bank Act in connection with the acquisition of any such savings association; or

(iii) is a savings association, the deposits of which are insured by the Savings Association Insurance Fund, which—

(I) before January 1, 1987, was chartered as a Federal savings bank insured by the Federal Savings and Loan Insurance Corporation for the purpose of acquiring all or substantially all of the assets and assuming all or substantially all of the deposit liabilities of a national bank in a transaction consummated after July 1, 1986; and

(II) as of the date of that transaction, had assets of less than $150,000,000.

(B) DEFINITION.—For purposes of this paragraph, an institution shall be deemed to have held SAIF-assessable deposits before January 1, 1993, if—

(i) it directly held SAIF-assessable deposits before that date; or

(ii) it succeeded to, acquired, purchased, or otherwise holds any SAIF-assessable deposits as of the date of enactment of this Act that were SAIF-assessable deposits before January 1, 1993.

(4) EXEMPT INSTITUTIONS REQUIRED TO PAY ASSESSMENTS AT FORMER RATES.—

(A) PAYMENTS TO SAIF AND DIF.—Any insured depository institution that the Board of Directors exempts under this subsection from paying the special assessment imposed under this section shall pay semiannual assessments—

(i) during calendar years 1996, 1997, and 1998, into the Savings Association Insurance Fund, based on SAIF-assessable deposits of that institution, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; and

(ii) during calendar year 1999—

(I) into the Deposit Insurance Fund, based on SAIF-assessable deposits of that institution as of December 31, 1998, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; or

(II) in accordance with clause (i), if the Bank Insurance Fund and the Savings Association Insurance Fund are not merged into the Deposit Insurance Fund.

(B) OPTIONAL PRO RATA PAYMENT OF SPECIAL ASSESSMENT.—This paragraph shall not apply with respect to any insured depository institution (or successor insured depository institution) that has paid, during any calendar year from 1997 through 1999, upon such terms as the Corporation may announce, an amount equal to the product of—

(i) 16.7 percent of the special assessment that the institution would have been required to pay under subsection (a), if the Board of Directors had not exempted the institution; and

(ii) the number of full semiannual periods remaining between the date of the payment and December 31, 1999.

(g) SPECIAL ELECTION FOR CERTAIN INSTITUTIONS FACING HARDSHIP AS A RESULT OF THE SPECIAL ASSESSMENT.—

(1) ELECTION AUTHORIZED.—If—

  (A) an insured depository institution, or any depository institution holding company which, directly or indirectly, controls such institution, is subject to terms or covenants in any debt obligation or preferred stock outstanding on September 13, 1995; and

  (B) the payment of the special assessment under subsection (a) would pose a significant risk of causing such depository institution or holding company to default or violate any such term or covenant,

the depository institution may elect, with the approval of the Corporation, to pay such special assessment in accordance with paragraphs (2) and (3) in lieu of paying such assessment in the manner required under subsection (a).

  (2) 1ST ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay an assessment in an amount equal to 50 percent of the amount of the special assessment that would otherwise apply under subsection (a), by the date on which such special assessment is payable under subsection (d).

  (3) 2D ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a 2d assessment, by the date established by the Board of Directors in accordance with paragraph (4), in an amount equal to the product of 51 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment and the SAIF-assessable deposits of the institution on March 31, 1996, or such other date in calendar year 1996 as the Board of Directors determines to be appropriate.

  (4) DUE DATE OF 2D ASSESSMENT.—The date established by the Board of Directors for the payment of the assessment under paragraph (3) by a depository institution shall be the earliest practicable date which the Board of Directors determines to be appropriate, which is at least 15 days after the date used by the Board of Directors under paragraph (3).

  (5) SUPPLEMENTAL SPECIAL ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a supplemental special assessment, at the same time the payment under paragraph (3) is made, in an amount equal to the product of—

  (A) 50 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment; and

  (B) 95 percent of the amount by which the SAIF-assessable deposits used by the Board of Directors for determining the amount of the 1st assessment under paragraph (2) exceeds, if any, the SAIF-assessable deposits used by the Board for determining the amount of the 2d assessment under paragraph (3).

(h) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—

  (1) IN GENERAL.—For purposes of computing the special assessment imposed under this section with respect to a Bank Insurance Fund member bank, the amount of any deposits of any insured depository institution which section 5(d)(3) of the Federal Deposit Insurance Act treats as insured by the Savings Association Insurance Fund shall be reduced by 20 percent—

  (A) if the adjusted attributable deposit amount of the Bank Insurance Fund member bank is less than 50 percent of the total domestic deposits of that member bank as of June 30, 1995; or

  (B) if, as of June 30, 1995, the Bank Insurance Fund member—

  (i) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

  (ii) had total assessable deposits greater than $5,000,000,000; and

  (iii) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.

  (2) ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—For purposes of this subsection, the "adjusted attributable deposit amount" shall be determined in accordance with section 5(d)(3)(C) of the Federal Deposit Insurance Act.

<< 12 USCA § 1815 >>

<< 12 USCA § 1817 NOTE >>

  (i) ADJUSTMENT TO THE ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(1) in subparagraph (C), by striking "The adjusted attributable deposit amount" and inserting "Except as provided in subparagraph (K), the adjusted attributable deposit amount"; and

(2) by adding at the end the following new subparagraph:

"(K) ADJUSTMENT OF ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—The amount determined under subparagraph (C)(i) for deposits acquired by March 31, 1995, shall be reduced by 20 percent for purposes of computing the adjusted attributable deposit amount for the payment of any assessment for any semiannual period that begins after the date of the enactment of the Deposit Insurance Funds Act of 1996 (other than the special assessment imposed under section 2702(a) of such Act), for a Bank Insurance Fund member bank that, as of June 30, 1995—

"(i) had an adjusted attributable deposit amount that was less than 50 percent of the total deposits of that member bank; or

"(ii)(I) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

"(II) had total assessable deposits greater than $5,000,000,000; and

"(III) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.".

<< 12 USCA § 1817 NOTE >>

(j) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN SAVINGS ASSOCIATIONS.—

(1) SPECIAL ASSESSMENT REDUCTION.—For purposes of computing the special assessment imposed under this section, in the case of any converted association, the amount of any deposits of such association which were insured by the Savings Association Insurance Fund as of March 31, 1995, shall be reduced by 20 percent.

(2) CONVERTED ASSOCIATION.—For purposes of this subsection, the term "converted association" means—

(A) any Federal savings association—

(i) that is a member of the Savings Association Insurance Fund and that has deposits subject to assessment by that fund which did not exceed $4,000,000,000, as of March 31, 1995; and

(ii) that had been, or is a successor by merger, acquisition, or otherwise to an institution that had been, a State savings bank, the deposits of which were insured by the Federal Deposit Insurance Corporation before August 9, 1989, that converted to a Federal savings association pursuant to section 5(i) of the Home Owners' Loan Act before January 1, 1985;

(B) a State depository institution that is a member of the Savings Association Insurance Fund that had been a State savings bank before October 15, 1982, and was a Federal savings association on August 9, 1989;

(C) an insured bank that—

(i) was established de novo in order to acquire the deposits of a savings association in default or in danger of default;

(ii) did not open for business before acquiring the deposits of such savings association; and

(iii) was a Savings Association Insurance Fund member before the date of enactment of this Act; and

(D) an insured bank that—

(i) resulted from a savings association before December 19, 1991, in accordance with section 5(d)(2)(G) of the Federal Deposit Insurance Act; and

(ii) had an increase in its capital in conjunction with the conversion in an amount equal to more than 75 percent of the capital of the institution on the day before the date of the conversion.

SEC. 2703. FINANCING CORPORATION FUNDING.

<< 12 USCA § 1441 >>

(a) IN GENERAL.—Section 21 of the Federal Home Loan Bank Act (12 U.S.C. 1441) is amended—

(1) in subsection (f)(2)—

(A) in the matter immediately preceding subparagraph (A)—

(i) by striking "To the extent the amounts available pursuant to paragraph (1) are insufficient to cover the amount of interest payments, issuance costs, and custodial fees," and inserting "In addition to the amounts obtained pursuant to paragraph (1),";

(ii) by striking "Savings Association Insurance Fund member" and inserting "insured depository institution"; and

(iii) by striking "members" and inserting "institutions"; and

(B) by striking ", except that—" and all that follows through the end of the paragraph and inserting ", except that—

"(A) the assessments imposed on insured depository institutions with respect to any BIF-assessable deposit shall be assessed at a rate equal to $^1/_5$ of the rate of the assessments imposed on insured depository institutions with respect to any SAIF assessable deposit; and

"(B) no limitation under clause (i) or (iii) of section 7(b)(2)(A) of the Federal Deposit Insurance Act shall apply for purposes of this paragraph."; and

(2) in subsection (k)—

(A) by striking "section—" and inserting "section, the following definitions shall apply:";

(B) by striking paragraph (1);

(C) by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively; and

(D) by adding at the end the following new paragraphs:

"(3) INSURED DEPOSITORY INSTITUTION.—The term 'insured depository institution' has the same meaning as in section 3 of the Federal Deposit Insurance Act

"(4) DEPOSIT TERMS.—

"(A) BIF–ASSESSABLE DEPOSITS.—The term 'BIF-assessable deposit' means a deposit that is subject to assessment for purposes of the Bank Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as a deposit insured by the Bank Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act).

"(B) SAIF–ASSESSABLE DEPOSIT.—The term 'SAIF-assessable deposit' has the meaning given to such term in section 2710 of the Deposit Insurance Funds Act of 1996.".

<< 12 USCA § 1817 >>

(b) CONFORMING AMENDMENT.—Section 7(b)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)) is amended by striking subparagraph (D).

<< 12 USCA 1441 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subsections (a) and (c) and the amendments made by such subsections shall apply with respect to semiannual periods which begin after December 31, 1996.

(2) TERMINATION OF CERTAIN ASSESSMENT RATES.—Subparagraph (A) of section 21(f)(2) of the Federal Home Loan Bank Act (as amended by subsection (a)) shall not apply after the earlier of—

(A) December 31, 1999; or

(B) the date as of which the last savings association ceases to exist.

(d) PROHIBITION ON DEPOSIT SHIFTING.—

(1) IN GENERAL.—Effective as of the date of the enactment of this Act and ending on the date provided in subsection (c)(2) of this section, the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Director of the Office of Thrift Supervision shall take appropriate actions, including enforcement actions, denial of applications, or imposition of entrance and exit fees as if such transactions qualified as conversion transactions pursuant to section 5(d) of the Federal Deposit Insurance Act, to prevent insured depository institutions and depository institution holding companies from facilitating or encouraging the shifting of deposits from SAIF-assessable deposits to BIF-assessable deposits (as defined in section 21(k) of the Federal Home Loan Bank Act) for the purpose of evading the assessments imposed on insured depository institutions with respect to SAIF-assessable deposits under section 7(b) of the Federal Deposit Insurance Act and section 21(f)(2) of the Federal Home Loan Bank Act.

(2) REGULATIONS.—The Board of Directors of the Federal Deposit Insurance Corporation may issue regulations, including regulations defining terms used in paragraph (1), to prevent the shifting of deposits described in such paragraph.

(3) RULE OF CONSTRUCTION.—No provision of this subsection shall be construed as prohibiting conduct or activity of any insured depository institution which—

(A) is undertaken in the ordinary course of business of such depository institution; and

(B) is not directed towards the depositors of an insured depository institution affiliate (as defined in section 2(k) of the Bank Holding Company Act of 1956) of such depository institution.

SEC. 2704. MERGER OF BIF AND SAIF.

<< 12 USCA § 1821 NOTE >>

(a) IN GENERAL.—

  (1) MERGER.—The Bank Insurance Fund and the Savings Association Insurance Fund shall be merged into the Deposit Insurance Fund established by section 11(a)(4) of the Federal Deposit Insurance Act, as amended by this section.

  (2) DISPOSITION OF ASSETS AND LIABILITIES.—All assets and liabilities of the Bank Insurance Fund and the Savings Association Insurance Fund shall be transferred to the Deposit Insurance Fund.

  (3) NO SEPARATE EXISTENCE.—The separate existence of the Bank Insurance Fund and the Savings Association Insurance Fund shall cease.

(b) SPECIAL RESERVE OF THE DEPOSIT INSURANCE FUND.—

  (1) IN GENERAL.—Immediately before the merger of the Bank Insurance Fund and the Savings Association Insurance Fund, if the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which that reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Deposit Insurance Fund, established under section 11(a)(5) of the Federal Deposit Insurance Act, as amended by this section.

  (2) DEFINITION.—For purposes of this subsection, the term "reserve ratio" means the ratio of the net worth of the Savings Association Insurance Fund to the aggregate estimated amount of deposits insured by the Savings Association Insurance Fund.

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on January 1, 1999, if no insured depository institution is a savings association on that date.

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 1821 >>

  (1) DEPOSIT INSURANCE FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended—

  (A) by redesignating subparagraph (B) as subparagraph (C);

  (B) by striking subparagraph (A) and inserting the following:

  "(A) ESTABLISHMENT.—There is established the Deposit Insurance Fund, which the Corporation shall—

  "(i) maintain and administer;

  "(ii) use to carry out its insurance purposes in the manner provided by this subsection; and

  "(iii) invest in accordance with section 13(a).

  "(B) USES.—The Deposit Insurance Fund shall be available to the Corporation for use with respect to Deposit Insurance Fund members."; and

  (C) by striking "(4) GENERAL PROVISIONS RELATING TO FUNDS.—" and inserting the following:

  "(4) ESTABLISHMENT OF THE DEPOSIT INSURANCE FUND.—".

  (2) OTHER REFERENCES.—Section 11(a)(4)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)(C), as redesignated by paragraph (1) of this subsection) is amended by striking "Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

  (3) DEPOSITS INTO FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended by adding at the end the following new subparagraph:

  "(D) DEPOSITS.—All amounts assessed against insured depository institutions by the Corporation shall be deposited in the Deposit Insurance Fund.".

  (4) SPECIAL RESERVE OF DEPOSITS.—Section 11(a)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(5)) is amended to read as follows:

  "(5) SPECIAL RESERVE OF DEPOSIT INSURANCE FUND.—

  "(A) ESTABLISHMENT.—

"(i) IN GENERAL.—There is established a Special Reserve of the Deposit Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve.

"(B) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding subparagraph (A)(ii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve to the Deposit Insurance Fund, for the purposes set forth in paragraph (4), only if—

"(i) the reserve ratio of the Deposit Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(ii) the Corporation expects the reserve ratio of the Deposit Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(C) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve shall be excluded in calculating the reserve ratio of the Deposit Insurance Fund under section 7.".

<< 12 USCA § 1441b >>

(5) FEDERAL HOME LOAN BANK ACT.—Section 21B(f)(2)(C)(ii) of the Federal Home Loan Bank Act (12 U.S.C. 1441b(f)(2)(C)(ii)) is amended—

(A) in subclause (I), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995"; and

(B) in subclause (II), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995".

(6) REPEALS.—

<< 12 USCA § 1813 >>

(A) SECTION 3.—Section 3(y) of the Federal Deposit Insurance Act (12 U.S.C. 1813(y)) is amended to read as follows:

"(y) DEFINITIONS RELATING TO THE DEPOSIT INSURANCE FUND.—

"(1) DEPOSIT INSURANCE FUND.—The term 'Deposit Insurance Fund' means the fund established under section 11(a)(4).

"(2) RESERVE RATIO.—The term 'reserve ratio' means the ratio of the net worth of the Deposit Insurance Fund to aggregate estimated insured deposits held in all insured depository institutions.

"(3) DESIGNATED RESERVE RATIO.—The designated reserve ratio of the Deposit Insurance Fund for each year shall be—

"(A) 1.25 percent of estimated insured deposits; or

"(B) a higher percentage of estimated insured deposits that the Board of Directors determines to be justified for that year by circumstances raising a significant risk of substantial future losses to the fund.

<< 12 USCA § 1817 >>

(B) SECTION 7.—Section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817) is amended—

(i) by striking subsection (l);

(ii) by redesignating subsections (m) and (n) as subsections (l) and (m), respectively;

(iii) in subsection (b)(2), by striking subparagraphs (B) and (F), and by redesignating subparagraphs (C), (E), (G), and (H) as subparagraphs (B) through (E), respectively.

<< 12 USCA § 1821 >>

(C) SECTION 11.—Section 11(a) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)) is amended—

(i) by striking paragraphs (6) and (7); and

(ii) by redesignating paragraph (8) as paragraph (6).

<< 12 USCA § 24 >>

(7) SECTION 5136 OF THE REVISED STATUTES.—The paragraph designated the "Eleventh" of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended in the 5th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 338a >>

(8) INVESTMENTS PROMOTING PUBLIC WELFARE; LIMITATIONS ON AGGREGATE INVESTMENTS.—The 23d undesignated paragraph of section 9 of the Federal Reserve Act (12 U.S.C. 338a) is amended in the 4th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 347b >>

(9) ADVANCES TO CRITICALLY UNDERCAPITALIZED DEPOSITORY INSTITUTIONS.—Section 10B(b)(3)(A)(ii) of the Federal Reserve Act (12 U.S.C. 347b(b)(3)(A)(ii)) is amended by striking "any deposit insurance fund in" and inserting "the Deposit Insurance Fund of".

<< 2 USCA § 905 >>

(10) AMENDMENTS TO THE BALANCED BUDGET AND EMERGENCY DEFICIT CONTROL ACT OF 1985.—Section 255(g)(1)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 905(g)(1)(A)) is amended—

(A) by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and
(B) by striking "Federal Deposit Insurance Corporation, Savings Association Insurance Fund;".

(11) FURTHER AMENDMENTS TO THE FEDERAL HOME LOAN BANK ACT.—The Federal Home Loan Bank Act (12 U.S.C. 1421 et seq.) is amended—

<< 12 USCA § 1431 >>

(A) in section 11(k) (12 U.S.C. 1431(k))—
(i) in the subsection heading, by striking "SAIF" and inserting "THE DEPOSIT INSURANCE FUND"; and
(ii) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441a >>

(B) in section 21A(b)(4)(B) (12 U.S.C. 1441a(b)(4)(B)), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";
(C) in section 21A(b)(6)(B) (12 U.S.C. 1441a(b)(6)(B))—
(i) in the subparagraph heading, by striking "SAIF–INSURED BANKS" and inserting "CHARTER CONVERSIONS"; and
(ii) by striking "Savings Association Insurance Fund member" and inserting "savings association";
(D) in section 21A(b)(10)(A)(iv)(II) (12 U.S.C. 1441a(b)(10)(A)(iv)(II)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441b >>

(E) in section 21B(e) (12 U.S.C. 1441b(e))—
(i) in paragraph (5), by inserting "as of the date of funding" after "Savings Association Insurance Fund members" each place such term appears;
(ii) by striking paragraph (7); and
(iii) by redesignating paragraph (8) as paragraph (7); and
(F) in section 21B(k) (12 U.S.C. 1441b(k))—

(i) by striking paragraph (8); and

(ii) by redesignating paragraphs (9) and (10) as paragraphs (8) and (9), respectively.

(12) AMENDMENTS TO THE HOME OWNERS' LOAN ACT.—The Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended—

<< 12 USCA § 1464 >>

(A) in section 5—

(i) in subsection (c)(5)(A), by striking "that is a member of the Bank Insurance Fund";

(ii) in subsection (c)(6), by striking "As used in this subsection—" and inserting "For purposes of this subsection, the following definitions shall apply:";

(iii) in subsection (o)(1), by striking "that is a Bank Insurance Fund member";

(iv) in subsection (o)(2)(A), by striking "a Bank Insurance Fund member until such time as it changes its status to a Savings Association Insurance Fund member" and inserting "insured by the Deposit Insurance Fund";

(v) in subsection (t)(5)(D)(iii)(II), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (t)(7)(C)(i)(I), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (v)(2)(A)(i), by striking ", the Savings Association Insurance Fund" and inserting "or the Deposit Insurance Fund"; and

<< 12 USCA § 1467a >>

(B) in section 10—

(i) in subsection (e)(1)(A)(iii)(VII), by adding "or" at the end;

(ii) in subsection (e)(1)(A)(iv), by adding "and" at the end;

(iii) in subsection (e)(1)(B), by striking "Savings Association Insurance Fund or Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(iv) in subsection (e)(2), by striking "Savings Association Insurance Fund or the Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and

(v) in subsection (m)(3), by striking subparagraph (E), and by redesignating subparagraphs (F), (G), and (H) as subparagraphs (E), (F), and (G), respectively.

(13) AMENDMENTS TO THE NATIONAL HOUSING ACT.—The National Housing Act (12 U.S.C. 1701 et seq.) is amended—

<< 12 USCA § 1723i >>

(A) in section 317(b)(1)(B) (12 U.S.C. 1723i(b)(1)(B)), by striking "Bank Insurance Fund for banks or through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 1735f–14 >>

(B) in section 526(b)(1)(B)(ii) (12 U.S.C. 1735f–14(b)(1)(B)(ii)), by striking "Bank Insurance Fund for banks and through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund".

(14) FURTHER AMENDMENTS TO THE FEDERAL DEPOSIT INSURANCE ACT.—The Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.) is amended—

<< 12 USCA § 1813 >>

(A) in section 3(a)(1) (12 U.S.C. 1813(a)(1)), by striking subparagraph (B) and inserting the following:

"(B) includes any former savings association.";

<< 12 USCA § 1815 >>

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) in section 5(b)(5) (12 U.S.C. 1815(b)(5)), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund;" and inserting "Deposit Insurance Fund,";

(C) in section 5(d) (12 U.S.C. 1815(d)), by striking paragraphs (2) and (3);

(D) in section 5(d)(1) (12 U.S.C. 1815(d)(1))—

(i) in subparagraph (A), by striking "reserve ratios in the Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "the reserve ratio of the Deposit Insurance Fund";

(ii) by striking subparagraph (B) and inserting the following:

"(2) FEE CREDITED TO THE DEPOSIT INSURANCE FUND.—The fee paid by the depository institution under paragraph (1) shall be credited to the Deposit Insurance Fund.";

(iii) by striking "(1) UNINSURED INSTITUTIONS.—"; and

(iv) by redesignating subparagraphs (A) and (C) as paragraphs (1) and (3), respectively, and moving the margins 2 ems to the left;

(E) in section 5(e) (12 U.S.C. 1815(e))—

(i) in paragraph (5)(A), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(ii) by striking paragraph (6); and

(iii) by redesignating paragraphs (7), (8), and (9) as paragraphs (6), (7), and (8), respectively;

<< 12 USCA § 1816 >>

(F) in section 6(5) (12 U.S.C. 1816(5)), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1817 >>

(G) in section 7(b) (12 U.S.C. 1817(b))—

(i) in paragraph (1)(D), by striking "each deposit insurance fund" and inserting "the Deposit Insurance Fund";

(ii) in clauses (i)(I) and (iv) of paragraph (2)(A), by striking "each deposit insurance fund" each place such term appears and inserting "the Deposit Insurance Fund";

(iii) in paragraph (2)(A)(iii), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(iv) by striking clause (iv) of paragraph (2)(A);

(v) in paragraph (2)(C) (as redesignated by paragraph (6)(B) of this subsection)—

(I) by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(II) by striking "that fund" each place such term appears and inserting "the Deposit Insurance Fund";

(vi) in paragraph (2)(D) (as redesignated by paragraph (6)(B) of this subsection)—

(I) in the subparagraph heading, by striking "FUNDS ACHIEVE" and inserting "FUND ACHIEVES"; and

(II) by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(vii) in paragraph (3)—

(I) in the paragraph heading, by striking "FUNDS" and inserting "FUND";

(II) by striking "members of that fund" where such term appears in the portion of subparagraph (A) which precedes clause (i) of such subparagraph and inserting "insured depository institutions";

(III) by striking "that fund" each place such term appears (other than in connection with term amended in subclause (II) of this clause) and inserting "the Deposit Insurance Fund";

(IV) in subparagraph (A), by striking "Except as provided in paragraph (2)(F), if" and inserting "If";

(V) in subparagraph (A), by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(VI) by striking subparagraphs (C) and (D) and inserting the following:

"(C) AMENDING SCHEDULE.—The Corporation may, by regulation, amend a schedule prescribed under subparagraph (B)."; and

(viii) in paragraph (6)—

(I) by striking "any such assessment" and inserting "any such assessment is necessary";

(II) by striking "(A) is necessary—";

(III) by striking subparagraph (B);

(IV) by redesignating clauses (i), (ii), and (iii) as subparagraphs (A), (B), and (C), respectively, and moving the margins 2 ems to the left; and

(V) in subparagraph (C) (as redesignated), by striking "; and" and inserting a period;

<< 12 USCA § 1821 >>

(H) in section 11(f)(1) (12 U.S.C. 1821(f)(1)), by striking ", except that—" and all that follows through the end of the paragraph and inserting a period;

(I) in section 11(i)(3) (12 U.S.C. 1821(i)(3))—

(i) by striking subparagraph (B);

(ii) by redesignating subparagraph (C) as subparagraph (B); and

(iii) in subparagraph (B) (as redesignated), by striking "subparagraphs (A) and (B)" and inserting "subparagraph (A)";

<< 12 USCA § 1821a >>

(J) in section 11A(a) (12 U.S.C. 1821a(a))—

(i) in paragraph (2), by striking "LIABILITIES.—" and all that follows through "Except" and inserting "LIABILITIES.—Except";

(ii) by striking paragraph (2)(B); and

(iii) in paragraph (3), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "the Deposit Insurance Fund";

(K) in section 11A(b) (12 U.S.C. 1821a(b)), by striking paragraph (4);

(L) in section 11A(f) (12 U.S.C. 1821a(f)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1823 >>

(M) in section 13 (12 U.S.C. 1823)—

(i) in subsection (a)(1), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund, the Special Reserve of the Deposit Insurance Fund,";

(ii) in subsection (c)(4)(E)—

(I) in the subparagraph heading, by striking "FUNDS" and inserting "FUND"; and

(II) in clause (i), by striking "any insurance fund" and inserting "the Deposit Insurance Fund";

(iii) in subsection (c)(4)(G)(ii)—

(I) by striking "appropriate insurance fund" and inserting "Deposit Insurance Fund";

(II) by striking "the members of the insurance fund (of which such institution is a member)" and inserting "insured depository institutions";

(III) by striking "each member's" and inserting "each insured depository institution's"; and

(IV) by striking "the member's" each place such term appears and inserting "the institution's";

(iv) in subsection (c), by striking paragraph (11);

(v) in subsection (h), by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (k)(4)(B)(i), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (k)(5)(A), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1824 >>

(N) in section 14(a) (12 U.S.C. 1824(a)) in the 5th sentence—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(ii) by striking "each such fund" and inserting "the Deposit Insurance Fund";

(O) in section 14(b) (12 U.S.C. 1824(b)), by striking "Bank Insurance Fund or Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(P) in section 14(c) (12 U.S.C. 1824(c)), by striking paragraph (3);

(Q) in section 14(d) (12 U.S.C. 1824(d))—

(i) by striking "BIF" each place such term appears and inserting "DIF"; and

(ii) by striking "Bank Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1825 >>

(R) in section 15(c)(5) (12 U.S.C. 1825(c)(5))—

(i) by striking "the Bank Insurance Fund or Savings Association Insurance Fund, respectively" each place such term appears and inserting "the Deposit Insurance Fund"; and

(ii) in subparagraph (B), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund, respectively" and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1827 >>

(S) in section 17(a) (12 U.S.C. 1827(a))—

(i) in the subsection heading, by striking "BIF, SAIF," and inserting "THE DEPOSIT INSURANCE FUND"; and

(ii) in paragraph (1), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

(T) in section 17(d) (12 U.S.C. 1827(d)), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1828 >>

(U) in section 18(m)(3) (12 U.S.C. 1828(m)(3))—

(i) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund"; and

(ii) in subparagraph (C), by striking "or the Bank Insurance Fund";

(V) in section 18(p) (12 U.S.C. 1828(p)), by striking "deposit insurance funds" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831a >>

(W) in section 24 (12 U.S.C. 1831a) in subsections (a)(1) and (d)(1)(A), by striking "appropriate deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831e >>

(X) in section 28 (12 U.S.C. 1831e), by striking "affected deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831h >>

(Y) by striking section 31 (12 U.S.C. 1831h);

<< 12 USCA § 1831m >>

(Z) in section 36(i)(3) (12 U.S.C. 1831m(i)(3)) by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 1831*o* >>

(AA) in section 38(a) (12 U.S.C. 1831*o*(a)) in the subsection heading, by striking "FUNDS" and inserting "FUND";

(BB) in section 38(k) (12 U.S.C. 1831*o*(k))—

(i) in paragraph (1), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(ii) in paragraph (2)(A)—

(I) by striking "A deposit insurance fund" and inserting "The Deposit Insurance Fund"; and

(II) by striking "the deposit insurance fund's outlays" and inserting "the outlays of the Deposit Insurance Fund"; and

(CC) in section 38(o) (12 U.S.C. 1831*o*(o))—

(i) by striking "ASSOCIATIONS.—" and all that follows through "Subsections (e)(2)" and inserting "ASSOCIATIONS.—Subsections (e)(2)";

(ii) by redesignating subparagraphs (A), (B), and (C) as paragraphs (1), (2), and (3), respectively, and moving the margins 2 ems to the left; and

(iii) in paragraph (1) (as redesignated), by redesignating clauses (i) and (ii) as subparagraphs (A) and (B), respectively, and moving the margins 2 ems to the left.

(15) AMENDMENTS TO THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT OF 1989.—The Financial Institutions Reform, Recovery, and Enforcement Act is amended—

<< 12 USCA § 1833a >>

(A) in section 951(b)(3)(B) (12 U.S.C. 1833a(b)(3)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 3341 >>

(B) in section 1112(c)(1)(B) (12 U.S.C. 3341(c)(1)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund".

<< 12 USCA § 1834 >>

(16) AMENDMENT TO THE BANK ENTERPRISE ACT OF 1991.—Section 232(a)(1) of the Bank Enterprise Act of 1991 (12 U.S.C. 1834(a)(1)) is amended by striking "section 7(b)(2)(H)" and inserting "section 7(b)(2)(G)".

<< 12 USCA § 1841 >>

(17) AMENDMENT TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 2(j)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(j)(2)) is amended by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 1821 >>

SEC. 2705. CREATION OF SAIF SPECIAL RESERVE.

Section 11(a)(6) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(6)) is amended by adding at the end the following new subparagraph:

"(L) ESTABLISHMENT OF SAIF SPECIAL RESERVE.—

"(i) ESTABLISHMENT.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, there is established a Special Reserve of the Savings Association Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) AMOUNTS IN SPECIAL RESERVE.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which the reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Savings Association Insurance Fund established by clause (i).

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 598 of 1021   PageID 7468

"(iii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve of the Savings Association Insurance Fund.

"(iv) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding clause (iii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve of the Savings Association Insurance Fund to the Savings Association Insurance Fund for the purposes set forth in paragraph (4), only if—

"(I) the reserve ratio of the Savings Association Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(II) the Corporation expects the reserve ratio of the Savings Association Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(v) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve of the Savings Association Insurance Fund shall be excluded in calculating the reserve ratio of the Savings Association Insurance Fund.".

<< 12 USCA § 1817 >>

## SEC. 2706. REFUND OF AMOUNTS IN DEPOSIT INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE AMOUNT.

Subsection (e) of section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817(e)) is amended to read as follows:

"(e) REFUNDS.—

"(1) OVERPAYMENTS.—In the case of any payment of an assessment by an insured depository institution in excess of the amount due to the Corporation, the Corporation may—

"(A) refund the amount of the excess payment to the insured depository institution; or

"(B) credit such excess amount toward the payment of subsequent semiannual assessments until such credit is exhausted.

"(2) BALANCE IN INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE.—

"(A) IN GENERAL.—Subject to subparagraphs (B) and (C), if, as of the end of any semiannual assessment period beginning after the date of the enactment of the Deposit Insurance Funds Act of 1996, the amount of the actual reserves in—

"(i) the Bank Insurance Fund (until the merger of such fund into the Deposit Insurance Fund pursuant to section 2704 of the Deposit Insurance Funds Act of 1996); or

"(ii) the Deposit Insurance Fund (after the establishment of such fund),

exceeds the balance required to meet the designated reserve ratio applicable with respect to such fund, such excess amount shall be refunded to insured depository institutions by the Corporation on such basis as the Board of Directors determines to be appropriate, taking into account the factors considered under the risk-based assessment system.

"(B) REFUND NOT TO EXCEED PREVIOUS SEMIANNUAL ASSESSMENT.—The amount of any refund under this paragraph to any member of a deposit insurance fund for any semiannual assessment period may not exceed the total amount of assessments paid by such member to the insurance fund with respect to such period.

"(C) REFUND LIMITATION FOR CERTAIN INSTITUTIONS.—No refund may be made under this paragraph with respect to the amount of any assessment paid for any semiannual assessment period by any insured depository institution described in clause (v) of subsection (b)(2)(A).".

<< 12 USCA § 1817 >>

## SEC. 2707. ASSESSMENT RATES FOR SAIF MEMBERS MAY NOT BE LESS THAN ASSESSMENT RATES FOR BIF MEMBERS.

Section 7(b)(2)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(E), as redesignated by section 2704(d)(6) of this subtitle) is amended—

(1) by striking "and" at the end of clause (i);

(2) by striking the period at the end of clause (ii) and inserting "; and"; and

(3) by adding at the end the following new clause:

AR03257

"(iii) notwithstanding any other provision of this subsection, during the period beginning on the date of enactment of the Deposit Insurance Funds Act of 1996, and ending on December 31, 1998, the assessment rate for a Savings Association Insurance Fund member may not be less than the assessment rate for a Bank Insurance Fund member that poses a comparable risk to the deposit insurance fund.".

<< 12 USCA § 1817 >>

SEC. 2708. ASSESSMENTS AUTHORIZED ONLY IF NEEDED TO MAINTAIN THE RESERVE RATIO OF A DEPOSIT INSURANCE FUND.

(a) IN GENERAL.—Section 7(b)(2)(A)(i) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)(i)) is amended in the matter preceding subclause (I) by inserting "when necessary, and only to the extent necessary" after "insured depository institutions".

(b) LIMITATION ON ASSESSMENT.—Section 7(b)(2)(A)(iii) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)(iii)) is amended to read as follows:

"(iii) LIMITATION ON ASSESSMENT.—Except as provided in clause (v), the Board of Directors shall not set semiannual assessments with respect to a deposit insurance fund in excess of the amount needed—

"(I) to maintain the reserve ratio of the fund at the designated reserve ratio; or

"(II) if the reserve ratio is less than the designated reserve ratio, to increase the reserve ratio to the designated reserve ratio.".

(c) EXCEPTION TO LIMITATION ON ASSESSMENTS.—Section 7(b)(2)(A) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)) is amended by adding at the end the following new clause:

"(v) EXCEPTION TO LIMITATION ON ASSESSMENTS.—The Board of Directors may set semiannual assessments in excess of the amount permitted under clauses (i) and (iii) with respect to insured depository institutions that exhibit financial, operational, or compliance weaknesses ranging from moderately severe to unsatisfactory, or are not well capitalized, as that term is defined in section 38.".

SEC. 2709. TREASURY STUDY OF COMMON DEPOSITORY INSTITUTION CHARTER.

(a) STUDY REQUIRED.—The Secretary of the Treasury shall conduct a study of all issues which the Secretary considers to be relevant with respect to the development of a common charter for all insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) and the abolition of separate and distinct charters between banks and savings associations.

(b) REPORT TO THE CONGRESS.—

(1) IN GENERAL.—The Secretary of the Treasury shall submit a report to the Congress on or before March 31, 1997, containing the findings and conclusions of the Secretary in connection with the study conducted pursuant to subsection (a).

(2) DETAILED ANALYSIS AND RECOMMENDATIONS.—The report under paragraph (1) shall include—

(A) a detailed analysis of each issue the Secretary considered relevant to the subject of the study;

(B) recommendations of the Secretary with regard to the establishment of a common charter for insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(C) such recommendations for legislative and administrative action as the Secretary determines to be appropriate to implement the recommendations of the Secretary under subparagraph (B).

<< 12 USCA § 1821 NOTE >>

SEC. 2710. DEFINITIONS.

For purposes of this subtitle, the following definitions shall apply:

(1) BANK INSURANCE FUND.—The term "Bank Insurance Fund" means the fund established pursuant to section (11)(a)(5)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(2) BIF MEMBER, SAIF MEMBER.—The terms "Bank Insurance Fund member" and "Savings Association Insurance Fund member" have the same meanings as in section 7(l) of the Federal Deposit Insurance Act.

(3) VARIOUS BANKING TERMS.—The terms "bank", "Board of Directors", "Corporation", "deposit", "insured depository institution", "Federal savings association", "savings association", "State savings bank", and "State depository institution" have the same meanings as in section 3 of the Federal Deposit Insurance Act.

(4) DEPOSIT INSURANCE FUND.—The term "Deposit Insurance Fund" means the fund established under section 11(a)(4) of the Federal Deposit Insurance Act (as amended by section 2704(d) of this subtitle).

(5) DEPOSITORY INSTITUTION HOLDING COMPANY.—The term "depository institution holding company" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(6) DESIGNATED RESERVE RATIO.—The term "designated reserve ratio" has the same meaning as in section 7(b)(2)(A)(iv) of the Federal Deposit Insurance Act.

(7) SAIF.—The term "Savings Association Insurance Fund" means the fund established pursuant to section 11(a)(6)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(8) SAIF–ASSESSABLE DEPOSIT.—The term "SAIF-assessable deposit"—

 (A) means a deposit that is subject to assessment for purposes of the Savings Association Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as insured by the Savings Association Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act); and

 (B) includes any deposit described in subparagraph (A) which is assumed after March 31, 1995, if the insured depository institution, the deposits of which are assumed, is not an insured depository institution when the special assessment is imposed under section 2702(a).

<< 26 USCA § 162 NOTE >>

SEC. 2711. DEDUCTION FOR SPECIAL ASSESSMENTS.

For purposes of subtitle A of the Internal Revenue Code of 1986—

 (1) the amount allowed as a deduction under section 162 of such Code for a taxable year shall include any amount paid during such year by reason of an assessment under section 2702 of this subtitle, and

 (2) section 172(f) of such Code shall not apply to any deduction described in paragraph (1).

TITLE III—SPECTRUM ALLOCATION PROVISIONS

SEC. 3001. COMPETITIVE BIDDING FOR SPECTRUM.

 (a) COMMISSION OBLIGATION TO MAKE ADDITIONAL SPECTRUM AVAILABLE.—The Federal Communications Commission shall—

 (1) reallocate the use of frequencies at 2305–2320 megahertz and 2345–2360 megahertz to wireless services that are consistent with international agreements concerning spectrum allocations; and

 (2) assign the use of such frequencies by competitive bidding pursuant to section 309(j) of the Communications Act of 1934 (47 U.S.C. 309(j)).

 (b) ADDITIONAL REQUIREMENTS.—In making the bands of frequencies described in subsection (a) available for competitive bidding, the Commission shall—

 (1) seek to promote the most efficient use of the spectrum; and

 (2) take into account the needs of public safety radio services.

 (c) EXPEDITED PROCEDURES.—The Commission shall commence the competitive bidding for the assignment of the frequencies described in subsection (a)(1) no later than April 15, 1997. The rules governing such frequencies shall be effective immediately upon publication in the Federal Register notwithstanding section 553(d), 801(a)(3), and 806(a) of title 5, United States Code. Chapter 6 of such title, and sections 3507 and 3512 of title 44, United States Code, shall not apply to the rules and competitive bidding procedures governing such frequencies. Notwithstanding section 309(b) of the Communications Act of 1934 (47 U.S.C. 309(b)), no application for an instrument of authorization for such frequencies shall be granted by the Commission earlier than 7 days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereto. Notwithstanding section 309(d)(1) of such Act (47 U.S.C. 309(d)(1)), the

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 601 of 1021   PageID 7471

Commission may specify a period (no less than 5 days following issuance of such public notice) for the filing of petitions to deny any application for an instrument of authorization for such frequencies.

 (d) DEADLINE FOR COLLECTION.—The Commission shall conduct the competitive bidding under subsection (a)(2) in a manner that ensures that all proceeds of the bidding are deposited in accordance with section 309(j)(8) of the Communications Act of 1934 not later September 30, 1997.

## TITLE IV—ADJUSTMENT OF PAYGO BALANCES

### SEC. 4001. ADJUSTMENT OF PAYGO BALANCES.

 For purposes of section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985, on the calendar day after the Director of the Office of Management and Budget issues the final sequestration report for fiscal year 1997, the Director and the Director of the Congressional Budget Office shall change the balances (as computed pursuant to section 252(b) of that Act) of direct spending and receipts legislation—

 (1) for fiscal year 1997 to zero if such balance for the fiscal year is not an increase in the deficit.

## TITLE V—ADDITIONAL APPROPRIATIONS

### CHAPTER 1

## DEPARTMENT OF AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES

### DEPARTMENT OF AGRICULTURE

#### Cooperative State Research, Education, and Extension Service

##### Extension Activities

 For an additional amount for payments for cooperative extension work by the colleges receiving the benefits of the second Morrill Act (7 U.S.C. 321–326, 328) and Tuskegee University, $753,000.

#### Natural Resources Conservation Service

##### Watershed and Flood Prevention Operations

 For an additional amount to repair damages to the waterways and watersheds resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $63,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### Farm Service Agency

##### Emergency Conservation Program

 For an additional amount for emergency expenses resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### CHAPTER 2

### DISTRICT OF COLUMBIA

### EDUCATION FACILITIES IMPROVEMENT IN THE DISTRICT OF COLUMBIA

#### (BY TRANSFER)

SEC. 5201. The District of Columbia Financial Responsibility and Management Assistance Authority (referred to in this section as the "Authority") shall have the authority to contract with a private entity (or entities) to carry out a program of school facility repair of public schools and public charter schools located in public school facilities in the District of Columbia, in consultation with the General Services Administration: Provided, That an amount estimated to be $40,700,000 is hereby transferred and otherwise made available to the Authority until expended for contracting as provided under this section, to be derived from transfers and reallocations as follows: (1) funds made available under the heading "PUBLIC EDUCATION SYSTEM" in Public Law 104–194 for school repairs in a restricted line item; (2) all capital financing authority made available for public school capital improvements in Public Law 104–194; and (3) all capital financing authority made available for public school capital improvements which are or remain available from Public Law 104–134 or any previous appropriations Act for the District of Columbia: Provided further, That the General Services Administration, in consultation with the District of Columbia Public Schools and the District of Columbia Council and subject to the approval of the Authority and the Committees on Appropriations of the Senate and the House of Representatives, shall provide program management services to assist in the short-term management of the repairs and capital improvements: Provided further, That contracting authorized under this section shall be conducted in accordance with Federal procurement rules and regulations and guidelines or such guidelines as prescribed by the Authority.

SPECIAL RULES REGARDING GENERAL OBLIGATION BOND ACT

SEC. 5202. WAIVER OF CONGRESSIONAL REVIEW.—Notwithstanding section 602(c)(1) of the District of Columbia Self–Government and Governmental Reorganization Act (sec. 1–233(c)(1), D.C.Code), the General Obligation Bond Act of 1996 (D.C.Bill 11–840), if enacted by the Council of the District of Columbia, shall take effect on the date of the enactment of such Act or the date of the enactment of this Act, whichever is later.

AMENDMENTS TO FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE ACT

SEC. 5203. (a) CALCULATION OF 7–DAY REVIEW PERIOD FOR COUNCIL ACTS.—Section 203(a)(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 (sec. 47–392.3(a)(5), D.C.Code) is amended—

(1) by inserting "(excluding Saturdays, Sundays, and legal holidays)" after "7–day period" the first place it appears; and

(2) by striking "the date the Council submits the Act to the Authority" and inserting "the first day (excluding Saturdays, Sundays, and legal holidays) after the Authority receives the Act from the Council".

(b) SPECIFICATION OF PENALTY FOR PROHIBITED ACTS.—Section 103(i)(1) of such Act (sec. 47–391.3(i)(1), D.C.Code) is amended by striking the period at the end and inserting the following: ", and shall be fined not more than $1,000, imprisoned for not more than 1 year, or both.".

(c) WAIVER OF PRIVACY ACT REQUIREMENTS FOR OBTAINING OFFICIAL DATA.—Section 103(c)(1) of such Act (sec. 47–391.3(c)(1), D.C.Code) is amended by striking "Act) and 552b" and inserting "Act), 552a (the Privacy Act of 1974), and 552b".

(d) PERMITTING AUTHORITY REVIEW OF RULEMAKING.—Section 203(b) of such Act (sec. 47–392.3(b), D.C.Code) is amended by adding at the end the following new paragraph:

"(5) APPLICATION TO RULES AND REGULATIONS.—The provisions of this subsection shall apply with respect to a rule or regulation issued or proposed to be issued by the Mayor (or the head of any department or agency of the District government) in the same manner as such provisions apply to a contract or lease.".

(e) DEPOSIT OF ALL DISTRICT BORROWING WITH AUTHORITY.—

(1) IN GENERAL.—Section 204 of such Act (sec. 47–392.4, D.C.Code) is amended—

(A) by redesignating subsections (d) and (e) as subsections (e) and (f); and

(B) by inserting after subsection (c) the following new subsection:

"(d) DEPOSIT OF BORROWED FUNDS WITH AUTHORITY.—If the District government borrows funds during a control year, the funds shall be deposited into an escrow account held by the Authority, to be allocated by the Authority to the Mayor at such intervals and in accordance with such terms and conditions as it considers appropriate, consistent with the financial plan and budget for the year and with any other withholding of funds by the Authority pursuant to this Act.".

(2) CONFORMING AMENDMENTS.—(A) Section 204(e) of such Act, as redesignated by paragraph (1)(A), is amended by inserting after "(b)(1)" the following: "or the escrow account described in subsection (d)".

(B) Section 206(d)(1) of such Act is amended by striking "204(b)" and inserting "204(b), section 204(d),".

(f) GRANTING AUTHORITY POWER TO ISSUE GENERAL ORDERS.—Section 207 of such Act (sec. 47–392.7, D.C.Code) is amended by adding at the end the following new subsection:

"(d) ADDITIONAL POWER TO ISSUE ORDERS, RULES, AND REGULATIONS.—

"(1) IN GENERAL.—In addition to the authority described in subsection (c), the Authority may at any time issue such orders, rules, or regulations as it considers appropriate to carry out the purposes of this Act and the amendments made by this Act, to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

"(2) NOTIFICATION.—Upon issuing an order, rule, or regulation pursuant to this subsection, the Authority shall notify the Mayor, the Council, the President, and Congress.

"(3) NO JUDICIAL REVIEW OF DECISION TO ISSUE ORDER.—The decision by the Authority to issue an order, rule, or regulation pursuant to this subsection shall be final and shall not be subject to judicial review.".

PROHIBITING FUNDING FOR TERMINATED EMPLOYEES OR CONTRACTORS

SEC. 5204. (a) IN GENERAL.—Except as provided in subsection (b), none of the funds made available to the District of Columbia during any fiscal year (beginning with fiscal year 1996) may be used to pay the salary or wages of any individual whose employment by the District government is no longer required as determined by the District of Columbia Financial Responsibility and Management Assistance Authority, or to pay any expenses associated with a contractor or consultant of the District government whose contract or arrangement with the District government is no longer required as determined by the Authority.

(b) EXCEPTION FOR PAYMENTS FOR SERVICES ALREADY PROVIDED.—Funds made available to the District of Columbia may be used to pay an individual for employment already performed at the time of the Authority's determination, or to pay a contractor or consultant for services already provided at the time of the Authority's determination, to the extent permitted by the District of Columbia Financial Responsibility and Management Assistance Authority.

(c) DISTRICT GOVERNMENT DEFINED.—In this section, the term "District government" has the meaning given such term in section 305(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995.

AMENDMENTS TO DISTRICT OF COLUMBIA SCHOOL REFORM ACT OF 1995.

Sec. 5205. (a) PROCESS FOR FILING CHARTER PETITIONS.—Section 2201 of the District of Columbia School Reform Act of 1995 (Public Law 104–134; 110 Stat. 1321–115) is amended by adding at the end the following:

"(d) LIMITATIONS ON FILING.—

"(1) MULTIPLE CHARTERING AUTHORITIES.—An eligible applicant may not file the same petition to establish a public charter school with more than 1 eligible chartering authority during a calendar year.

"(2) MULTIPLE PETITIONS.—An eligible applicant may not file more than 1 petition to establish a public charter school during a calendar year.".

(b) CONTENTS OF PETITION.—Section 2202(6)(B) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–116) is amended to read as follows:

"(B) either—

"(i)(I) an identification of a facility for the school, including a description of the site where the school will be located, any buildings on the site, and any buildings proposed to be constructed on the site, and (II) information demonstrating that the eligible applicant has acquired title to, or otherwise secured the use of, the facility; or

"(ii) a timetable by which an identification described in clause (i)(I) will be made, and the information described in clause (i)(II) will be submitted, to the eligible chartering authority;".

(c) PROCESS FOR APPROVING OR DENYING PUBLIC CHARTER SCHOOL PETITIONS.—Section 2203 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–118) is amended—

(1) by amending subsection (d) to read as follows:

"(d) APPROVAL.—

"(1) IN GENERAL.—Subject to subsection (i) and paragraph (2), an eligible chartering authority shall approve a petition to establish a public charter school, if—

"(A) the eligible chartering authority determines that the petition satisfies the requirements of this subtitle;

"(B) the eligible applicant who filed the petition agrees to satisfy any condition or requirement, consistent with this subtitle and other applicable law, that is set forth in writing by the eligible chartering authority as an amendment to the petition;

"(C) the eligible chartering authority determines that the public charter school has the ability to meet the educational objectives outlined in the petition; and

"(D) the approval will not cause the eligible chartering authority to exceed a limit under subsection (i).

"(2) CONDITIONAL APPROVAL.—

"(A) IN GENERAL.—In the case of a petition that does not contain the identification and information required under section 2202(6)(B)(i), but does contain the timetable required under section 2202(6)(B)(ii), an eligible chartering authority may only approve the petition on a conditional basis, subject to the eligible applicant's submitting the identification and information described in section 2202(6)(B)(i) in accordance with such timetable, or any other timetable specified in writing by the eligible chartering authority in an amendment to the petition.

"(B) EFFECT OF CONDITIONAL APPROVAL.—For purposes of subsections (e), (h), (i), and (j), a petition conditionally approved under this paragraph shall be treated the same as a petition approved under paragraph (1), except that on the date that such a conditionally approved petition ceases to be conditionally approved because the eligible applicant has not timely submitted the identification and information described in section 2202(6)(B)(i), the approval of the petition shall cease to be counted for purposes of subsection (i).";

(2) in subsection (h), by striking "(d)(2)," each place such term appears and inserting "(d),";

(3) by amending subsection (i) to read as follows:

"(i) NUMBER OF PETITIONS.—

"(1) FIRST YEAR.—During calendar year 1996, not more than 10 petitions to establish public charter schools may be approved under this subtitle.

"(2) SUBSEQUENT YEARS.—

"(A) IN GENERAL.—Subject to subparagraph (B), during calendar year 1997, and during each subsequent calendar year, each eligible chartering authority shall not approve more than 10 petitions to establish a public charter school under this subtitle. Any such petition shall be approved during the period that begins on January 1 and ends on April 1.

"(B) EXCEPTION.—If, by April 1 of any calendar year after 1996, an eligible chartering authority has approved fewer than 10 petitions during such calendar year, any other eligible chartering authority may approve more than 10 petitions during such calendar year, but only if—

"(i) the eligible chartering authority completes the approval of any such additional petition before June 1 of the year; and

"(ii) the approval of any such additional petition will not cause the total number of petitions approved by all eligible chartering authorities during the calendar year to exceed 20."; and

(4) by amending subsection (j) to read as follows:

"(j) AUTHORITY OF ELIGIBLE CHARTERING AUTHORITY.—

"(1) IN GENERAL.—Except as provided in paragraph (2), and except for officers or employees of the eligible chartering authority with which a petition to establish a public charter school is filed, no governmental entity, elected official, or employee of the District of Columbia shall make, participate in making, or intervene in the making of, the decision to approve or deny such a petition.

"(2) AVAILABILITY OF REVIEW.—A decision by an eligible chartering authority to deny a petition to establish a public charter school shall be subject to judicial review by an appropriate court of the District of Columbia.".

(d) DISTRICT OF COLUMBIA PUBLIC SCHOOL SERVICES TO PUBLIC CHARTER SCHOOLS.—Section 2209 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–125) is amended—

(1) by inserting "(a) IN GENERAL.—" before "The Superintendent"; and

(2) by adding at the end the following:

"(b) PREFERENCE IN LEASING OR PURCHASING PUBLIC SCHOOL FACILITIES.—

"(1) FORMER PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, with respect to the purchase or lease of a facility or property described in subparagraph (B), provided

that doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, or real property—

"(i) that formerly was under the jurisdiction of the Board of Education;

"(ii) that the Board of Education has determined is no longer needed for purposes of operating a District of Columbia public school; and

"(iii) with respect to which the Board of Education has transferred jurisdiction to the Mayor.

"(2) CURRENT PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, in leasing, or otherwise contracting for the use of, a facility or property described in subparagraph (B).

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, real property, or a designated area of a facility or real property, that—

"(i) is under the jurisdiction of the Board of Education; and

"(ii) is available for use because the Board of Education is not using, for educational, administrative, or other purposes, the facility, real property, or designated area.".

(e) CHARTER RENEWAL.—Section 2212 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–129) is amended—

(1) by amending subsection (a) to read as follows:

"(a) TERMS.—

"(1) INITIAL TERM.—A charter granted to a public charter school shall remain in force for a 15–year period.

"(2) RENEWALS.—A charter may be renewed for an unlimited number of times, each time for a 15–year period.

"(3) REVIEW.—An eligible chartering authority that grants or renews a charter pursuant to paragraph (1) or (2) shall review the charter—

"(A) at least once every 5 years to determine whether the charter should be revoked for the reasons described in subsection (a)(1)(A) or (b) of section 2213 in accordance with the procedures for such revocation established under section 2213(c); and

"(B) once every 5 years, beginning on the date that is 5 years after the date on which the charter is granted or renewed, to determine whether the charter should be revoked for the reasons described in section 2213(a)(1)(B) in accordance with the procedures for such revocation established under section 2213(c)."; and

(2) by amending subsection (d)(6) to read as follows:

"(6) JUDICIAL REVIEW.—A decision by an eligible chartering authority to deny an application to renew a charter shall be subject to judicial review by an appropriate court of the District of Columbia.".

(f) CHARTER REVOCATION.—Section 2213(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–130) is amended to read as follows:

"(a) CHARTER OR LAW VIOLATIONS; FAILURE TO MEET GOALS.—

"(1) IN GENERAL.—Subject to paragraph (2), an eligible chartering authority that has granted a charter to a public charter school may revoke the charter if the eligible chartering authority determines that the school—

"(A) committed a violation of applicable laws or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities; or

"(B) failed to meet the goals and student academic achievement expectations set forth in the charter.

"(2) SPECIAL RULE.—An eligible chartering authority may not revoke a charter under paragraph (1)(B), except pursuant to a determination made through a review conducted under section 2212(a)(3)(B).".

(g) PUBLIC CHARTER SCHOOL BOARD.—Paragraphs (3) and (4) of section 2214(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–132) are amended to read as follows:

"(3) VACANCIES.—

"(A) OTHER THAN FROM EXPIRATION OF TERM.—Where a vacancy occurs in the membership of the Board for reasons other than the expiration of the term of a member of the Board, the Secretary of Education, not later than 30 days after the vacancy occurs, shall present to the Mayor a list of 3 people the Secretary determines are qualified to serve on the

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 606 of 1021   PageID 7476

Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from the list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, such member of the Board taking into consideration the criteria described in paragraph (2). Any member appointed to fill a vacancy occurring prior to the expiration of the term of a predecessor shall be appointed only for the remainder of the term.

  "(B) EXPIRATION OF TERM.—Not later than the date that is 60 days before the expiration of the term of a member of the Board, the Secretary of Education shall present to the Mayor, with respect to each such impending vacancy, a list of 3 people the Secretary determines are qualified to serve on the Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from each such list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, any member of the Board taking into consideration the criteria described in paragraph (2).

  "(4) TIME LIMIT FOR APPOINTMENTS.—If, at any time, the Mayor does not appoint members to the Board sufficient to bring the Board's membership to 7 within 30 days after receiving a recommendation from the Secretary of Education under paragraph (2) or (3), the Secretary, not later than 10 days after the final date for such mayoral appointment, shall make such appointments as are necessary to bring the membership of the Board to 7.".

  (h) TECHNICAL AMENDMENT.—Section 2561(b) of the District of Columbia School Reform Act of 1995 (Public Law 104–134), as amended by section 148 of the District of Columbia Appropriations Act, 1997 (Public Law 104–194), is amended to read as follows:

  "(b) LIMITATION.—A waiver under subsection (a) shall not apply to the Davis–Bacon Act (40 U.S.C. 276a et seq.) or Executive Order 11246 or other civil rights standards.".

<center>DISPOSITION OF CERTAIN SCHOOL PROPERTY BY AUTHORITY</center>

  SEC. 5206. (a) IN GENERAL.—Subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new section:

"SEC. 225. DISPOSITION OF CERTAIN SCHOOL PROPERTY.

  "(a) POWER TO DISPOSE.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subsection (d), the Authority may dispose (by sale, lease, or otherwise) of any facility or property described in subsection (d).

  "(b) PREFERENCE FOR PUBLIC CHARTER SCHOOLS.—In disposing of a facility or property under this section, the Authority shall give preference to an eligible applicant (as defined in section 2002 of the District of Columbia School Reform Act of 1995) whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2) of such Act, or a Board of Trustees (as defined in section 2002 of such Act) of such a public charter school, if doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

  "(c) USE OF PROCEEDS FROM DISPOSITION FOR SCHOOL REPAIR AND MAINTENANCE.—

  "(1) IN GENERAL.—The Authority shall deposit any proceeds of the disposition of a facility or property under this section in the Board of Education Real Property Maintenance and Improvement Fund (as established by the Real Property Disposal Act of 1990), to be used for the construction, maintenance, improvement, rehabilitation, or repair of buildings and grounds which are used for educational purposes for public and public charter school students in the District of Columbia.

  "(2) CONSULTATION.—In disposing of a facility or property under this section, the Authority shall consult with the Superintendent of Schools of the District of Columbia, the Mayor, the Council, the Administrator of General Services, and education and community leaders involved in planning for an agency or authority that will design and administer a comprehensive long-term program for repair and improvement of District of Columbia public school facilities (as described in section 2552(a) of the District of Columbia School Reform Act of 1995).

  "(3) LEGAL EFFECT OF SALE.—The Authority may dispose of a facility or property under this section by executing a proper deed and any other legal instrument for conveyance of title to the facility or property, and such deed shall convey good and valid title to the purchaser of the facility or property.

  "(d) FACILITY OR PROPERTY DESCRIBED.—A facility or property described in this subsection is a facility or property which is described in section 2209(b)(1)(B) of the District of Columbia School Reform Act of 1995 and with respect to which the Authority has made the following determinations:

"(1) The property is no longer needed for purposes of operating a District of Columbia public school (as defined in section 2002 of the District of Columbia School Reform Act of 1995).

"(2) The disposition of the property is in the best interests of education in the District of Columbia.

"(3) The Mayor (or any other department or agency of the District government) has failed to make substantial progress toward disposing the property during the 90–day period which begins on the date the Board of Education transfers jurisdiction over the property to the Mayor (or, in the case of property which is described in section 2209(b)(1)(B) of such Act as of the date of the enactment of this section, during the 90–day period which begins on the date of the enactment of this section).".

(b) CONTROL OVER BOARD OF EDUCATION REAL PROPERTY MAINTENANCE AND IMPROVEMENT FUND.—

(1) IN GENERAL.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) by amending the second sentence to read as follows: "Subject to paragraph (6), the District of Columbia Financial Responsibility and Management Assistance Authority shall administer the Fund and receive all payments into the Fund that are required by law."; and

(B) by adding at the end the following new paragraph:

"(6) Upon the establishment of an agency or authority within the District of Columbia government to administer a public schools facilities revitalization plan pursuant to section 2552(a)(2) of the District of Columbia School Reform Act of 1995, such agency or authority shall administer the Fund and receive all payments into the Fund that are required by law.".

(2) CONFORMING AMENDMENTS.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) in the third sentence of paragraph (1), by striking "; provided that the Board" and all that follows and inserting a period; and

(B) by striking paragraph (5).

(c) CLERICAL AMENDMENT.—The table of contents of subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new item:

**"Sec. 225. Disposition of certain school property.".**

## CHAPTER 3

## ENERGY AND WATER DEVELOPMENT

## DEPARTMENT OF DEFENSE—CIVIL

## DEPARTMENT OF THE ARMY

### Corps of Engineers—Civil

### Operation and Maintenance, General

For an additional amount for "Operation and Maintenance, General" for emergency expenses resulting from Hurricane Fran and other natural disasters of 1996, $19,000,000, to remain available until expended: Provided: That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISION

SEC. 5301. None of the funds appropriated in the Energy and Water Development Appropriations Act, 1997 may be made available to the Tennessee Valley Authority if the Tennessee Valley Authority is imposing a performance deposit in connection with residential shoreline alteration permits.

## CHAPTER 4

## LEGISLATIVE BRANCH

## HOUSE OF REPRESENTATIVES

## SALARIES AND EXPENSES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated in the Legislative Branch Appropriations Act, 1996, for the House of Representatives under the heading "SALARIES AND EXPENSES", there is rescinded $500,000, specified for the following heading and account:

(1) "ALLOWANCES AND EXPENSES", $500,000, as follows: (A) "Government contributions to employees' life insurance fund, retirement funds, Social Security fund, Medicare fund, health benefits fund, and worker's and unemployment compensation."

## JOINT ITEMS

## CAPITOL POLICE BOARD

## CAPITOL POLICE

## SALARIES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated under this heading in Public Law 104–53, $3,000,000 are rescinded.

## GENERAL EXPENSES

For an additional amount for the Capitol Police Board for necessary expenses for the design and installation of security systems for the Capitol buildings and grounds, $3,250,000, which shall remain available until expended.

## ARCHITECT OF THE CAPITOL

## CAPITOL BUILDINGS AND GROUNDS

## CAPITOL BUILDINGS

For an additional amount for "Capitol Buildings and Grounds, Capitol Buildings", $250,000, to remain available until expended, for architectural and engineering services related to the design and installation of security systems for Capitol buildings and grounds.

## SENATE OFFICE BUILDINGS

Of the funds appropriated under the heading, "ARCHITECT OF THE CAPITOL, Capitol Buildings and Grounds, Senate office buildings" in Public Law 104–53, $650,000 shall remain available until September 30, 1997 for furniture, furnishings, and equipment for the Senate employees' child care center.

## GENERAL PROVISIONS

## CONGRESSIONAL AWARD ACT AMENDMENTS OF 1996

<< 2 USCA § 804 >>

SEC. 5401. (a) EXTENSION OF REQUIREMENTS REGARDING FINANCIAL OPERATIONS OF CONGRESSIONAL AWARD PROGRAM; NONCOMPLIANCE WITH REQUIREMENTS.—Section 5(c)(2)(A) of the Congressional Award Act (2 U.S.C. 804(c)(2)(A)) is amended by striking "and 1994" and inserting "1994, 1995, 1996, 1997, and 1998".

<< 2 USCA § 808 >>

(b) TERMINATION.—Section 9 of the Congressional Award Act (2 U.S.C. 808) is amended by striking "October 1, 1995" and inserting "October 1, 1999".

<< 2 USCA § 808 NOTE >>

(c) SAVINGS PROVISIONS.—During the period of October 1, 1995, through the date of the enactment of this section, all actions and functions of the Congressional Award Board under the Congressional Award Act shall have the same effect as though no lapse or termination of the Congressional Award Board ever occurred.

BILL EMERSON HALL IN THE HOUSE OF REPRESENTATIVES PAGE SCHOOL

<< 2 USCA § 141 NOTE >>

SEC. 5402. The Founders Hall instructional area in the House of Representatives Page School, located in the Thomas Jefferson Building of the Library of Congress, shall be known and designated as "Bill Emerson Hall".

CHAPTER 5

DEPARTMENT OF TRANSPORTATION

FEDERAL AVIATION ADMINISTRATION

OPERATIONS

(Airport and Airway Trust Fund)

For additional operating expenses of the Federal Aviation Administration for airport security activities, $57,900,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1998: Provided, That of the funds provided, $8,900,000 shall be for establishment of additional explosive detection K–9 teams at airports; $5,500,000 shall be for airport vulnerability assessments; $18,000,000 shall be for the hire of additional aviation security personnel: and $25,500,000 shall be for the hire of additional aviation safety inspectors and contract weather observers, air traffic controller training, and implementation of recommendations of the Federal Aviation Administration's "Ninety Day Safety Review", dated September 16, 1996: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

FACILITIES AND EQUIPMENT

(Airport and Airway Trust Fund)

For additional necessary expenses for "Facilities and Equipment", $147,700,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That of the funds provided, $144,200,000 shall only be for non-competitive contracts or cooperative agreements with air carriers and airport authorities, which provide for the Federal Aviation Administration to purchase and assist in installation of advanced security equipment for the use of such entities and $3,500,000 shall be for accelerated development and deployment of the Online Aviation Safety Information System: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

RESEARCH, ENGINEERING, AND DEVELOPMENT

(Airport and Airway Trust Fund)

For an additional amount for "Research, Engineering, and Development", $21,000,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That the funds provided shall only be for aviation security research and operational testing of document trace scanners and explosive detection portals for airport passengers: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 610 of 1021   PageID 7480

GRANTS–IN–AID FOR AIRPORTS

(Airport and Airway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $50,000,000 are rescinded.

FEDERAL HIGHWAY ADMINISTRATION

HIGHWAY–RELATED SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $9,100,000 are rescinded.

FEDERAL–AID HIGHWAYS

(Highway Trust Fund)

For an additional amount for "Emergency Relief Program" for emergency expenses resulting from Hurricanes Fran and Hortense and for other disasters, as authorized by 23 U.S.C. 125, $82,000,000, to be derived from the Highway Trust Fund and to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

MOTOR CARRIER SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $12,300,000 are rescinded.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

HIGHWAY TRAFFIC SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $11,800,000 are rescinded.

FEDERAL RAILROAD ADMINISTRATION

Northeast Corridor Improvement Program

For additional necessary expenses related to Northeast Corridor improvements authorized by title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, as amended (45 U.S.C. 851 et seq.) and 49 U.S.C. 24909, $60,000,000, to remain available until September 30, 1999.

DIRECT LOAN FINANCING PROGRAM

Notwithstanding any other provision of law, $58,680,000, for direct loans not to exceed $400,000,000 consistent with the purposes of section 505 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825) as in effect on September 30, 1988, to the Alameda Corridor Transportation Authority to continue the Alameda Corridor Project, including replacement of at-grade rail lines with a below-grade corridor and widening of the adjacent major highway: Provided, That loans not to exceed the following amounts shall be made on or after the first day of the fiscal year indicated:

Fiscal year 1997 $140,000,000

Fiscal year 1998 $140,000,000

Fiscal year 1999 $120,000,000

Provided further, That any loan authorized under this section shall be structured with a maximum 30–year repayment after completion of construction at an annual interest rate of not to exceed the 30–year United States Treasury rate and on such terms and conditions as deemed appropriate by the Secretary of Transportation: Provided further, That specific provisions of section 505(a), (b) and (d) through (h) shall not apply: Provided further, That the Alameda Corridor Transportation Authority shall be deemed to be a financially responsible person for purposes of section 505 of the Act.

### GRANTS TO THE NATIONAL RAILROAD PASSENGER CORPORATION

For additional expenses necessary for "Grants to the National Railroad Passenger Corporation", $22,500,000 for operating losses, to remain available until September 30, 1997: Provided, That amounts made available shall only be used to continue service on routes the National Railroad Passenger Corporation currently plans to terminate.

### RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

### RESEARCH AND SPECIAL PROGRAMS

For additional expenses necessary for "Research and Special Programs" to conduct vulnerability and threat assessments of the nation's transportation system, $3,000,000, to remain available until September 30, 1999: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### NATIONAL TRANSPORTATION SAFETY BOARD

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $6,000,000, to reimburse other federal agencies for previously incurred costs of recovering wreckage from TWA flight 800, and for other costs related to the TWA 800 accident investigation: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### EMERGENCY FUND

For necessary expenses of the National Transportation Safety Board for accident investigations, including hire of passenger motor vehicles and aircraft; services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for a GS–18; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902), $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISIONS

Sec. 5501. In fiscal year 1997, the Administrator of the Federal Aviation Administration may establish at individual airports such consortia of government and aviation industry representatives as the Administrator may designate to provide advice on matters related to aviation security and safety: Provided, That such consortia shall not be considered Federal advisory committees.

Sec. 5502. In cases where an emergency ocean condition causes erosion of a bank protecting a scenic highway or byway, fiscal year 1996 or fiscal year 1997 Federal Highway Administration Emergency Relief funds can be used to halt the erosion and stabilize the bank if such action is necessary to protect the highway from imminent failure and is less expensive than highway relocation.

Sec. 5503. Of the funds deducted under 23 U.S.C. subsection 104(a) for fiscal year 1997, $30,000,000 shall be available for allocation to States authorized by section 1069(y) of Public Law 102–240.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## SEC. 5504. CONVEYANCE OF PROPERTY IN TRAVERSE CITY, MICHIGAN.

 (a) AUTHORITY TO CONVEY.—The Secretary of Transportation (or any other official having control over the property described in subsection (b)) shall expeditiously convey to the Traverse City Area Public School District in Traverse City, Michigan, without consideration, all right, title, and interest of the United States in and to the property identified, described, and determined by the Secretary under subsection (b), subject to all easements and other interests in the property held by any other person.

 (b) IDENTIFICATION OF PROPERTY.—The Secretary shall identify, describe, and determine the property to be conveyed pursuant to this section.

 (c) REVERSIONARY INTEREST.—In addition to any term or condition established pursuant to subsection (a) or (d), any conveyance of property described in subsection (b) shall be subject to the condition that all right, title, and interest in and to the property so conveyed shall immediately revert to the United States if the property, or any part thereof, ceases to be used by the Traverse City Area Public School District.

 (d) TERMS OF CONVEYANCE.—The conveyance of property under this section shall be subject to such conditions as the Secretary considers to be necessary to assure that—

  (1) the pump room located on the property shall continue to be operated and maintained by the United States for as long as it is needed for this purpose;

  (2) the United States shall have an easement of access to the property for the purpose of operating and maintaining the pump room; and

  (3) the United States shall have the right, at any time, to enter the property without notice for the purpose of operating and maintaining the pump room.

## SEC. 5505. AUTHORITY TO CONVEY WHITEFISH POINT LIGHT STATION LAND.

 (a) AUTHORITY TO CONVEY.—

  (1) IN GENERAL.—Except as otherwise provided in this section, the Secretary of the Interior (in this section referred to as the "Secretary") may convey, by an appropriate means of conveyance, all right, title, and interest of the United States in 1 of the 3 parcels comprising the land on which the United States Coast Guard Whitefish Point Light Station is situated (in this section referred to as the "Property"), to each of the Great Lakes Shipwreck Historical Society, located in Sault Ste. Marie, Michigan, the United States Fish and Wildlife Service, and the Michigan Audubon Society (each of which is referred to in this section as a "recipient"), subject to all easements, conditions, reservations, exceptions, and restrictions contained in prior conveyances of record.

  (2) LIMITATION.—Notwithstanding paragraph (1), the Secretary shall retain for the United States all right, title, and interest in—

   (A) any historical artifact, including any lens or lantern, and

   (B) the light, antennas, sound signal, towers, associated lighthouse equipment, and any electronic navigation equipment, which are active aids to navigation,

which is located on the Property, or which relates to the Property.

  (3) IDENTIFICATION OF THE PROPERTY.—The Secretary may identify, describe, and determine the parcels to be conveyed pursuant to this section.

  (4) RIGHTS OF ACCESS.—If necessary to ensure access to a public roadway for a parcel conveyed under this section, the Secretary shall convey with the parcel an appropriate appurtenant easement over another parcel conveyed under this section.

  (5) EASEMENT FOR PUBLIC ALONG SHORELINE.—In each conveyance under this section of property located on the shoreline of Lake Superior, the Secretary shall retain for the public, for public walkway purposes, a right-of-way along the shoreline that extends 30 feet inland from the mean high water line.

 (b) TERMS AND CONDITIONS.—

  (1) IN GENERAL.—Any conveyance pursuant to subsection (a) shall be made—

   (A) without payment of consideration; and

   (B) subject to such terms and conditions as the Secretary considers appropriate.

(2) MAINTENANCE OF NAVIGATION FUNCTONS.—The Secretary shall ensure that any conveyance pursuant to this section is subject to such conditions as the Secretary considers to be necessary to assure that—

(A) the light, antennas, sound signal, towers, and associated lighthouse equipment, and any electronic navigation equipment, which are located on the Property and which are active aids to navigation shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

(B) the recipients may not interfere or allow interference in any manner with such aids to navigation without express written permission from the United States;

(C) there is reserved to the United States the right to relocate, replace, or add any aids to navigation, or make any changes on any portion of the Property as may be necessary for navigation purposes;

(D) the United States shall have the right, at any time, to enter the Property without notice for the purpose of maintaining aids to navigation;

(E) the United States shall have—

(i) an easement of access to and across the Property for the purpose of maintaining the aids to navigation and associated equipment in use on the Property; and

(ii) an easement for an arc of visibility; and

(F) the United States shall not be responsible for the cost and expense of maintenance, repair, and upkeep of the Property.

(3) MAINTENANCE OBLIGATION.—The recipients shall not have any obligation to maintain any active aid to navigation equipment on any parcel conveyed pursuant to this section.

(c) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a) in accordance with the provisions of the National Historic Preservation Act (16 U.S.C. 470 et seq.), and other applicable laws.

(d) MAINTENANCE STANDARD.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a), at its own cost and expense, in a proper, substantial, and workmanlike manner, including the easements of access, the easement for an arc of visibility, the nuisance easement, and the underground easement.

(e) SHARED USE AND OCCUPANCY AGREEMENT.—The Secretary shall require, as a condition of each conveyance of property under this section, that all of the recipients have entered into the same agreement governing the shared use and occupancy of the existing Whitefish Point Light Station facilities. The agreement shall be drafted by the recipients and shall include—

(1) terms governing building occupancy and access of recipient staff and public visitors to public restrooms, the auditorium, and the parking lot; and

(2) terms requiring that each recipient shall be responsible for paying a pro rata share of the costs of operating and maintaining the existing Whitefish Point Light Station facilities, that is based on the level of use and occupancy of the facilities by the recipient.

(f) LIMITATIONS ON DEVELOPMENT AND IMPAIRING USES.—It shall be a term of each conveyance under this section that—

(1) no development of new facilities or expansion of existing facilities or infrastructure on property conveyed under this section may occur, except for purposes of implementing the Whitefish Point Comprehensive Plan of October 1992 or for a gift shop, unless—

(A) each of the recipients consents to the development or expansion in writing;

(B) there has been a reasonable opportunity for public comment on the development or expansion, and full consideration has been given to such public comment as is provided; and

(C) the development or expansion is consistent with preservation of the Property in its predominantly natural, scenic, historic, and forested condition; and

(2) any use of the Property or any structure located on the property which may impair or interfere with the conservation values of the Property is expressly prohibited.

(g) REVISIONARY INTEREST.—

(1) IN GENERAL.—All right, title, and interests in and to property and interests conveyed under this section shall revert to the United States and thereafter be administered by the Secretary of Interior acting through the Director of the United States Fish and Wildlife Service, if—

AR03272

(A) in the case of such property and interests conveyed to the Great Lakes Shipwreck Historical Society, the property or interests cease to be used for the purpose of historical interpretation;

(B) in the case of such property and interests conveyed to the Michigan Audubon Society, the property or interests cease to be used for the purpose of environmental protection, research, and interpretation; or

(C) in the case any property and interests conveyed to a recipient referred to in subparagraph (A) or (B)—

(i) there is any violation of any term or condition of the conveyance to that recipient; or

(ii) the recipient has ceased to exist.

(2) AUTHORITY TO ENFORCE REVERSIONARY INTEREST.—The Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall have the authority—

(A) to determine for the United States Government whether any act or omission of a recipient results in a reversion of property and interests under paragraph (1); and

(B) to initiate a civil action to enforce that reversion, after notifying the recipient of the intent of the Secretary of the Interior to initiate that action.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—In the event of a reversion of property under this subsection, the Secretary of the Interior shall administer the property subject to any conditions the Secretary of Transportation considers to be necessary to maintain the navigation functions.

SEC. 5506. CONVEYANCE OF LIGHTHOUSES.

(a) AUTHORITY TO CONVEY.—

(1) IN GENERAL.—The Secretary of Transportation or the Secretary of the Interior, as appropriate, shall convey, by an appropriate means of conveyance, all right, title, and interest of the United States in and to each of the following properties:

(A) Saint Helena Island Light Station, located in MacKinac County, Moran Township, Michigan, to the Great Lakes Lighthouse Keepers Association.

(B) Presque Isle Light Station, located in Presque Isle Township, Michigan, to Presque Isle Township, Presque Isle County, Michigan.

(2) IDENTIFICATION OF PROPERTY.—The Secretary may identify, describe, and determine the property to be conveyed under this subsection.

(3) EXCEPTION.—The Secretary may not convey any historical artifact, including any lens or lantern, located on the property at or before the time of the conveyance.

(b) TERMS OF CONVEYANCE.—

(1) IN GENERAL.—The conveyance of property under this section shall be made—

(A) without payment of consideration; and

(B) subject to the conditions required by this section and other terms and conditions the Secretary may consider appropriate.

(2) REVERSIONARY INTEREST.—In addition to any term or condition established under this section, the conveyance of property under this subsection shall be subject to the condition that all right, title, and interest in the property shall immediately revert to the United States if—

(A) the property, or any part of the property—

(i) ceases to be used as a nonprofit center for the interpretation and preservation of maritime history;

(ii) ceases to be maintained in a manner that ensures its present or future use as a Coast Guard aid to navigation; or

(iii) ceases to be maintained in a manner consistent with the provisions of the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); or

(B) at least 30 days before that reversion, the Secretary of Transportation provides written notice to the owner that the property is needed for national security purposes.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—A conveyance of property under this section shall be made subject to the conditions that the Secretary of Transportation considers to be necessary to assure that—

(A) the lights, antennas, sound signal, electronic navigation equipment, and associated lighthouse equipment located on the property conveyed, which are active aids to navigation, shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) the owner of the property may not interfere or allow interference in any manner with aids to navigation without express written permission from the Secretary of Transportation;

(C) there is reserved to the United States the right to relocate, replace or add any aid to navigation or make any changes to the property as may be necessary for navigational purposes;

(D) the United States shall have the right, at any time, to enter the property without notice for the purpose of maintaining aids to navigation; and

(E) the United States shall have an easement of access to and across the property for the purpose of maintaining the aids to navigation in use on the property.

(4) OBLIGATION LIMITATION.—The owner of property conveyed under this section is not required to maintain any active aid to navigation equipment on the property.

(5) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—The owner of property conveyed under this section shall maintain the property in accordance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.) and other applicable laws.

(c) MAINTENANCE STANDARD.—The owner of any property conveyed under this section, at its own cost and expense, shall maintain the property in a proper, substantial, and workmanlike manner.

(d) DEFINITIONS.—For purposes of this section:

(1) the term "owner" means the person identified in subsection a(1)(A) and (B), and includes any successor of assign of that person.

(2) The term "Presque Isle Light Station" includes the light tower, attached dwelling, detached dwelling, 3–car garage, and any other improvements on that parcel of land.

## CHAPTER 6

## DEPARTMENT OF THE TREASURY

### COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS

#### COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND PROGRAM ACCOUNT

For an additional amount for "Community Development Financial Institutions Fund Program Account" for grants, loans, and technical assistance to qualifying community development lenders, $5,000,000, to remain available until September 30, 1998, of which $850,000 may be used for the cost of direct loans: Provided, That the cost of direct loans, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

### ENVIRONMENTAL PROTECTION AGENCY

#### SCIENCE AND TECHNOLOGY

For an additional amount for "Science and Technology", $10,000,000, to remain available until September 30, 1998, to conduct health effects research to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182.

#### ENVIRONMENTAL PROGRAMS AND MANAGEMENT

For an additional amount for "Environmental Programs and Management", $42,221,000, to remain available until September 30, 1998, of which $30,000,000 is to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182, and the purposes of the Food Quality Protection Act of 1996, Public Law 104–170, and of which $10,221,000 is for pesticide residue data collection for use in risk assessment activities.

#### STATE AND TRIBAL ASSISTANCE GRANTS

For an additional amount for "State and Tribal Assistance Grants", $35,000,000, to remain available until expended, for a grant to the City of Boston, Massachusetts, subject to an appropriate cost share as determined by the Administrator, for the construction of wastewater treatment facilities.

### FEDERAL EMERGENCY MANAGEMENT AGENCY

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $3,000,000.

### EMERGENCY MANAGEMENT PLANNING AND ASSISTANCE

For an additional amount for "Emergency Management Planning and Assistance" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $12,000,000.

### NATIONAL FLOOD INSURANCE FUND

<< 42 USCA § 4016 >>

Section 1309(a)(2) of the National Flood Insurance Act (42 U.S.C. 4016(a)(2)), is amended by striking "$1,000,000,000" and inserting in lieu thereof "$1,500,000,000 through September 30, 1997, and $1,000,000,000 thereafter".

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

### OFFICE OF CONSUMER AFFAIRS

For necessary expenses of the Office of Consumer Affairs, including expenses authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for GS–18, $1,500,000: Provided, That none of the funds provided under this heading may be made available for any other activities within the Department of Health and Human Services.

### NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

### SCIENCE, AERONAUTICS AND TECHNOLOGY

For an additional amount for "Science, Aeronautics and Technology", $5,000,000, to remain available until September 30, 1998.

### CHAPTER 7

### INTERNATIONAL SECURITY ASSISTANCE

### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for nonproliferation, anti-terrorism and related programs and activities, $18,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance.

### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $60,000,000.

### PEACEKEEPING OPERATIONS

For necessary expenses to carry out the provisions of section 551 of the Foreign Assistance Act of 1961, $65,000,000: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

### CHAPTER 8

### GENERAL PROVISIONS

SEC. 5801. Of the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $56,232,000 shall be made available only for the Corps Surface-to-Air Missile (CORPS SAM) program.

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 617 of 1021   PageID 7487

<< 10 USCA § 2012 NOTE >>

SEC. 5802. There is hereby established on the books of the Treasury an account, "Support for International Sporting Competitions, Defense" (hereinafter referred to in this section as the "Account") to be available until expended for logistical and security support for international sporting competitions (other than pay and non-travel-related allowances of members of the Armed Forces of the United States, except for members of the reserve components thereof called or ordered to active duty in connection with providing such support): Provided, That there shall be credited to the Account: (a) unobligated balances of the funds appropriated in Public Laws 103–335 and 104–61 under the headings "Summer Olympics"; (b) any reimbursements received by the Department of Defense in connection with support to the 1993 World University Games; the 1994 World Cup Games; and the 1996 Games of the XXVI Olympiad held in Atlanta, Georgia; (c) any reimbursements received by the Department of Defense after the date of enactment of this Act for logistical and security support provided to international sporting competitions; and (d) amounts specifically appropriated to the Account, all to remain available until expended: Provided further, That none of the funds made available to the Account may be obligated until 45 days after the congressional defense committees have been notified in writing by the Secretary of Defense as to the purpose for which these funds will be obligated.

SEC. 5803. In addition to the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $100,000,000 is hereby appropriated and made available only for the Dual–Use Applications Program.

## DIVISION B—OREGON RESOURCE CONSERVATION ACT OF 1996

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Oregon Resource Conservation Act of 1996".

## TITLE I—OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA

<< 16 USCA § 545b NOTE >>

### SEC. 101. SHORT TITLE.

This title may be cited as the "Opal Creek Wilderness and Opal Creek Scenic Recreation Area Act of 1996".

<< 16 USCA § 545b NOTE >>

### SEC. 102. DEFINITIONS.

In this title:

(1) BULL OF THE WOODS WILDERNESS.—The term "Bull of the Woods Wilderness" means the land designated as wilderness by section 3(4) of the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132 note).

(2) OPAL CREEK WILDERNESS.—The term "Opal Creek Wilderness" means certain land in the Willamette National Forest in the State of Oregon comprising approximately 12,800 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996.

(3) SCENIC RECREATION AREA.—The term "Scenic Recreation Area" means the Opal Creek Scenic Recreation Area, comprising approximately 13,000 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996 and established under section 104(a)(3) of this title.

(4) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

<< 16 USCA § 545b NOTE >>

### SEC. 103. PURPOSES.

The purposes of this title are:

(1) to establish a wilderness and scenic recreation area to protect and provide for the enhancement of the natural, scenic, recreational, historic, and cultural resources of the area in the vicinity of Opal Creek;

(2) to protect and support the economy of the communities in the Santiam Canyon; and

(3) to provide increased protection for an important drinking water source for communities served by the north Santiam River.

<< 16 USCA § 545b NOTE >>

<< 16 USCA § 1132 NOTE >>

SEC. 104. ESTABLISHMENT OF OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA.

(a) ESTABLISHMENT.—On a determination by the Secretary under subsection (b)—

(1) the Opal Creek Wilderness, as depicted on the map described in section 102(2), is hereby designated as wilderness, subject to the provisions of the Wilderness Act of 1964, shall become a component of the National Wilderness System, and shall be known as the Opal Creek Wilderness;

(2) the part of the Bull of the Woods Wilderness that is located in the Willamette National Forest shall be incorporated into the Opal Creek Wilderness; and

(3) the Secretary shall establish the Opal Creek Scenic Recreation Area in the Willamette National Forest in the State of Oregon, comprising approximately 13,000 acres, as generally depicted on the map described in section 102(3).

(b) CONDITIONS.—The designations in subsection (a) shall not take effect unless the Secretary makes a determination, not later than 2 years after the date of enactment of this title, that the following conditions have been met:

(1) the following have been donated to the United States in an acceptable condition and without encumbrances—

(A) all right, title, and interest in the following patented parcels of land—

(i) Santiam number 1, mineral survey number 992, as described in patent number 39–92–0002, dated December 11, 1991;

(ii) Ruth Quartz Mine number 2, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991;

(iii) Morning Star Lode, mineral survey number 993, as described in patent number 36–91–0011, dated February 12, 1991;

(B) all right, title, and interest held by any entity other than the Times Mirror Land and Timber Company, its successors and assigns, in and to lands located in section 18, township 8 south, range 5 east, Marion County, Oregon, Eureka numbers 6, 7, 8, and 13 mining claims; and

(C) an easement across the Hewitt, Starvation, and Poor Boy Mill Sites, mineral survey number 990, as described in patent number 36–91–0017, dated May 9, 1991. In the sole discretion of the Secretary, such easement may be limited to administrative use if an alternative access route, adequate and appropriate for public use, is provided.

(2) a binding agreement has been executed by the Secretary and the owners of record as of March 29, 1996, of the following interests, specifying the terms and conditions for the disposition of such interests to the United States Government—

(A) the lode mining claims known as Princess Lode, Black Prince Lode, and King number 4 Lode, embracing portions of sections 29 and 32, township 8 south, range 5 east, Willamette Meridian, Marion County, Oregon, the claims being more particularly described in the field notes and depicted on the plat of mineral survey number 887, Oregon; and

(B) Ruth Quartz Mine number 1, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991.

(c) ADDITIONS TO THE WILDERNESS AND SCENIC RECREATION AREAS.—

(1) Lands or interests in lands conveyed to the United States under this section shall be included in and become part of, as appropriate, Opal Creek Wilderness or the Opal Creek Scenic Recreation Area.

(2) On acquiring all or substantially all of the land located in section 36, township 8 south, range 4 east, of the Willamette Meridian, Marion County, Oregon, commonly known as the Rosboro section, by exchange, purchase from a willing seller, or by donation, the Secretary shall expand the boundary of the Scenic Recreation Area to include such land.

(3) On acquiring all or substantially all of the land located in section 18, township 8 south, range 5 east, Marion County, Oregon, commonly known as the Times Mirror property, by exchange, purchase from a willing seller, or by donation, such land shall be included in and become a part of the Opal Creek Wilderness.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 619 of 1021   PageID 7489

<< 16 USCA § 545b NOTE >>

SEC. 105. ADMINISTRATION OF THE SCENIC RECREATION AREA.

 (a) IN GENERAL.—The Secretary shall administer the Scenic Recreation Area in accordance with this title and the laws (including regulations) applicable to the National Forest System.

 (b) OPAL CREEK MANAGEMENT PLAN.—

   (1) IN GENERAL.—Not later than 2 years after the date of establishment of the Scenic Recreation Area, the Secretary, in consultation with the advisory committee established under section 106(a), shall prepare a comprehensive Opal Creek Management Plan (Management Plan) for the Scenic Recreation Area.

   (2) INCORPORATION IN LAND AND RESOURCE MANAGEMENT PLAN.—Upon its completion, the Opal Creek Management Plan shall become part of the land and resource management plan for the Willamette National Forest and supersede any conflicting provision in such land and resource management plan. Nothing in this paragraph shall be construed to supersede the requirements of the Endangered Species Act or the National Forest Management Act or regulations promulgated under those Acts, or any other law.

   (3) REQUIREMENTS.—The Opal Creek Management Plan shall provide for a broad range of land uses, including—

     (A) recreation;

     (B) harvesting of nontraditional forest products, such as gathering mushrooms and material to make baskets; and

     (C) educational and research opportunities.

   (4) PLAN AMENDMENTS.—The Secretary may amend the Opal Creek Management Plan as the Secretary may determine to be necessary, consistent with the procedures and purposes of this title.

 (c) RECREATION.—

   (1) RECOGNITION.—Congress recognizes recreation as an appropriate use of the Scenic Recreation Area.

   (2) MINIMUM LEVELS.—The management plan shall permit recreation activities at not less than the levels in existence on the date of enactment of this title.

   (3) HIGHER LEVELS.—The management plan may provide for levels of recreation use higher than the levels in existence on the date of enactment of this title if such uses are consistent with the protection of the resource values of Scenic Recreation Area.

   (4) The management plan may include public trail access through section 28, township 8 south, range 5 east, Willamette Meridian, to Battle Axe Creek, Opal Pool and other areas in the Opal Creek Wilderness and the Opal Creek Scenic Recreation Area.

 (d) TRANSPORTATION PLANNING.—

   (1) IN GENERAL.—Except as provided in this subparagraph, motorized vehicles shall not be permitted in the Scenic Recreation Area. To maintain reasonable motorized and other access to recreation sites and facilities in existence on the date of enactment of this title, the Secretary shall prepare a transportation plan for the Scenic Recreation Area that:

     (A) evaluates the road network within the Scenic Recreation Area to determine which roads should be retained and which roads should be closed;

     (B) provides guidelines for transportation and access consistent with this title;

     (C) considers the access needs of persons with disabilities in preparing the transportation plan for the Scenic Recreation Area;

     (D) allows forest road 2209 beyond the gate to the Scenic Recreation Area, as depicted on the map described in 102(2), to be used by motorized vehicles only for administrative purposes and for access by private inholders, subject to such terms and conditions as the Secretary may determine to be necessary; and

     (E) restricts construction on or improvements to forest road 2209 beyond the gate to the Scenic Recreation Area to maintaining the character of the road as it existed upon the date of enactment of this title, which shall not include paving or widening. In order to comply with subsection 107(b) of this title, the Secretary may make improvements to forest road 2209 and its bridge structures consistent with the character of the road as it existed on the date of enactment of this title.

 (e) HUNTING AND FISHING.—

   (1) IN GENERAL.—Subject to applicable Federal and State law, the Secretary shall permit hunting and fishing in the Scenic Recreation Area.

---

(2) LIMITATION.—The Secretary may designate zones in which, and establish periods when, no hunting or fishing shall be permitted for reasons of public safety, administration, or public use and enjoyment of the Scenic Recreation Area.

(3) CONSULTATION.—Except during an emergency, as determined by the Secretary, the Secretary shall consult with the Oregon State Department of Fish and Wildlife before issuing any regulation under this subsection.

(f) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall prohibit the cutting and/or selling of trees in the Scenic Recreation Area.

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary may allow the cutting of trees in the Scenic Recreation Area only—

(i) for public safety, such as to control the continued spread of a forest fire in the Scenic Recreation Area or on land adjacent to the Scenic Recreation Area;

(ii) for activities related to administration of the Scenic Recreation Area, consistent with the Opal Creek Management Plan; or

(iii) for removal of hazard trees along trails and roadways.

(B) SALVAGE SALES.—The Secretary may not allow a salvage sale in the Scenic Recreation Area.

(g) WITHDRAWAL.—

(1) Subject to valid existing rights, all lands in the Scenic Recreation Area are withdrawn from—

(i) any form of entry, appropriation, or disposal under the public land laws;

(ii) location, entry, and patent under the mining laws; and

(iii) disposition under the mineral and geothermal leasing laws.

(h) BORNITE PROJECT.—

(1) Nothing in this title shall be construed to interfere with or approve any exploration, mining, or mining-related activity in the Bornite Project Area, depicted on the map described in subsection 102(3), conducted in accordance with applicable laws.

(2) Nothing in this title shall be construed to interfere with the ability of the Secretary to approve and issue, or deny, special use permits in connection with exploration, mining, and mining-related activities in the Bornite Project Area.

(3) Motorized vehicles, roads, structures, and utilities (including but not limited to power lines and water lines) may be allowed inside the Scenic Recreation Area to serve the activities conducted on land within the Bornite Project.

(4) After the date of enactment of this title, no patent or claim shall be issued for any mining claim under the general mining laws located within the Bornite Project Area.

(i) WATER IMPOUNDMENTS.—Notwithstanding the Federal Power Act (16 U.S.C. 791a et seq.), the Federal Energy Regulatory Commission may not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project work in the Scenic Recreation Area, except as may be necessary to comply with the provisions of subsection 105(h) with regard to the Bornite Project.

(j) CULTURAL AND HISTORIC RESOURCE INVENTORY.—

(1) IN GENERAL.—Not later than 1 year after the date of establishment of the Scenic Recreation Area, the Secretary shall review and revise the inventory of the cultural and historic resources on the public land in the Scenic Recreation Area developed pursuant to the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132).

(2) INTERPRETATION.—Interpretive activities shall be developed under the management plan in consultation with State and local historic preservation organizations and shall include a balanced and factual interpretation of the cultural, ecological, and industrial history of forestry and mining in the Scenic Recreation Area.

(k) PARTICIPATION.—So that the knowledge, expertise, and views of all agencies and groups may contribute affirmatively to the most sensitive present and future use of the Scenic Recreation Area and its various subareas for the benefit of the public:

(1) ADVISORY COUNCIL.—The Secretary shall consult on a periodic and regular basis with the advisory council established under section 106 with respect to matters relating to management of the Scenic Recreation Area.

(2) PUBLIC PARTICIPATION.—The Secretary shall seek the views of private groups, individuals, and the public concerning the Scenic Recreation Area.

(3) OTHER AGENCIES.—The Secretary shall seek the views and assistance of, and cooperate with, any other Federal, State, or local agency with any responsibility for the zoning, planning, or natural resources of the Scenic Recreation Area.

(4) NONPROFIT AGENCIES AND ORGANIZATIONS.—The Secretary shall seek the views of any nonprofit agency or organization that may contribute information or expertise about the resources and the management of the Scenic Recreation Area.

<< 16 USCA § 545b NOTE >>

SEC. 106. ADVISORY COUNCIL.

  (a) ESTABLISHMENT.—Not later than 90 days after the establishment of the Scenic Recreation Area, the Secretary shall establish an advisory council for the Scenic Recreation Area.

  (b) MEMBERSHIP.—The advisory council shall consist of not more than 13 members, of whom—

   (1) 1 member shall represent Marion County, Oregon, and shall be designated by the governing body of the county;

   (2) 1 member shall represent the State of Oregon and shall be designated by the Governor of Oregon; and

   (3) 1 member shall represent the city of Salem, and shall be designated by the mayor of Salem, Oregon;

   (4) 1 member from a city within a 25–mile radius of the Opal Creek Scenic Recreation Area, to be designated by the Governor of the State of Oregon from a list of candidates provided by the mayors of the cities located within a 25–mile radius of the Opal Creek Scenic Recreation Area; and

   (5) not more than 9 members shall be appointed by the Secretary from among persons who, individually or through association with a national or local organization, have an interest in the administration of the Scenic Recreation Area, including, but not limited to, representatives of the timber industry, environmental organizations, the mining industry, inholders in the Opal Creek Wilderness and Scenic Recreation Area, economic development interests and Indian Tribes.

  (c) STAGGERED TERMS.—Members of the advisory council shall serve for staggered terms of three years.

  (d) CHAIRMAN.—The Secretary shall designate one member of the advisory council as chairman.

  (e) VACANCIES.—The Secretary shall fill a vacancy on the advisory council in the same manner as the original appointment.

  (f) COMPENSATION.—Members of the advisory council shall receive no compensation for service on the advisory council.

<< 16 USCA § 545b NOTE >>

SEC. 107. GENERAL PROVISIONS.

  (a) LAND ACQUISITION.—

  (1) IN GENERAL.—Subject to the other provisions of this title the Secretary may acquire any lands or interests in land in the Scenic Recreation Area or the Opal Creek Wilderness that the Secretary determines are needed to carry out this title.

  (2) PUBLIC LAND.—Any lands or interests in land owned by a State or a political subdivision of a State may be acquired only by donation or exchange.

  (3) CONDEMNATION.—Within the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area, the Secretary may not acquire any privately owned land or interest in land without the consent of the owner unless the Secretary finds that—

   (A) the nature of land use has changed significantly, or the landowner has demonstrated intent to change the land use significantly, from the use that existed on the date of the enactment of this title; and

   (B) acquisition by the Secretary of the land or interest in land is essential to ensure use of the land or interest in land in accordance with the purposes of this title or the management plan prepared under section 105(b).

  (4) Nothing in this title shall be construed to enhance or diminish the condemnation authority available to the Secretary outside the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area.

  (b) ENVIRONMENTAL RESPONSE ACTIONS AND COST RECOVERY.—

  (1) RESPONSE ACTIONS.—Nothing in this title shall limit the authority of the Secretary or a responsible party to conduct an environmental response action in the Scenic Recreation Area in connection with the release, threatened release, or cleanup of a hazardous substance, pollutant, or contaminant, including a response action conducted under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.).

  (2) LIABILITY.—Nothing in this title shall limit the authority of the Secretary or a responsible party to recover costs related to the release, threatened release, or cleanup of any hazardous substance or pollutant or contaminant in the Scenic Recreation Area.

(c) MAPS AND DESCRIPTION.—

 (1) IN GENERAL.—As soon as practicable after the date of enactment of this title, the Secretary shall file a map and a boundary description for the Opal Creek Wilderness and for the Scenic Recreation Area with the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

 (2) FORCE AND EFFECT.—The boundary description and map shall have the same force and effect as if the description and map were included in this title, except that the Secretary may correct clerical and typographical errors in the boundary description and map.

 (3) AVAILABILITY.—The map and boundary description shall be on file and available for public inspection in the Office of the Chief of the Forest Service, Department of Agriculture.

 (d) Nothing in this title shall interfere with any activity for which a special use permit has been issued, has not been revoked, and has not expired, before the date of enactment of this title, subject to the terms of the permit.

<< 16 USCA § 545b NOTE >>

SEC. 108. ROSBORO LAND EXCHANGE.

 (a) AUTHORIZATION.—Notwithstanding any other law, if the Rosboro Lumber Company (referred to in this section as "Rosboro") offers and conveys marketable title to the United States to the land described in subsection (b), the Secretary of Agriculture shall convey all right, title and interest held by the United States to sufficient lands described in subsection (c) to Rosboro, in the order in which they appear in subsection (c), as necessary to satisfy the equal value requirements of subsection (d).

 (b) LAND TO BE OFFERED BY ROSBORO.—The land referred to in subsection (a) as the land to be offered by Rosboro shall comprise Section 36, Township 8 South, range 4 east, Willamette Meridian.

 (c) LAND TO BE CONVEYED BY THE UNITED STATES.—The land referred to in subsection (a) as the land to be conveyed by the United States shall comprise sufficient land from the following prioritized list to be of equal value under subparagraph (d):

  (1) Section 5, Township 17 South, Range 4 East, Lot 7 (37.63 acres).

  (2) Section 2, Township 17 South, Range 4 East, Lot 3 (29.28 acres).

  (3) Section 13, Township 17 South, Range 4 East, S 1/2 SE 1/4 (80 acres).

  (4) Section 2, Township 17 South, Range 4 East, SW 1/4 SW 1/4 (40 acres).

  (5) Section 2, Township 17 South, Range 4 East, NW 1/4 SE 1/4 (40 acres).

  (6) Section 8, Township 17 South, Range 4 East, SE 1/4 SW 1/4 (40 acres).

  (7) Section 11, Township 17 South, Range 4 East, W 1/2 NW 1/4 (80 acres).

 (d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law. The appraisal shall consider access costs for the parcels involved.

 (e) TIMETABLE.—

  (1) The exchange directed by this section shall be consummated not later than 120 days after the date Rosboro offers and conveys the property described in subsection (b) to the United States.

  (2) The authority provided by this section shall lapse if Rosboro fails to offer the land described in subsection (b) within two years after the date of enactment of this title.

 (f) Rosboro shall have the right to challenge in United States District Court for the District of Oregon a determination of marketability under subsection (a) and a determination of value for the lands described in subsections (b) and (c) by the Secretary of Agriculture. The Court shall have the authority to order the Secretary to complete the transaction contemplated in this Section.

 (g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 16 USCA § 545b NOTE >>

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 1274 >>

SEC. 109. DESIGNATION OF ELKHORN CREEK AS A WILD AND SCENIC RIVER.

  Section 3(a) of the Wild and Scenic Rivers Act (16 U.S.C. 1274(a)) is amended by adding at the end the following:

"( )(A) ELKHORN CREEK.—The 6.4 mile segment traversing federally administered lands from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, in the following classes:

  "(i) a 5.8–mile wild river area, extending from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to its confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered as agreed on by the Secretaries of Agriculture and the Interior, or as directed by the President; and

  "(ii) a 0.6–mile scenic river area, extending from the confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered by the Secretary of Interior, or as directed by the President.

  "(B) Notwithstanding section 3(b) of this Act, the lateral boundaries of both the wild river area and the scenic river area along Elkhorn Creek shall include an average of not more than 640 acres per mile measured from the ordinary high water mark on both sides of the river."

<< 16 USCA § 545b NOTE >>

SEC. 110. ECONOMIC DEVELOPMENT.

  (a) ECONOMIC DEVELOPMENT PLAN.—As a condition for receiving funding under subsection (b) of this section, the State of Oregon, in consultation with Marion County and the Secretary of Agriculture, shall develop a plan for economic development projects for which grants under this section may be used in a manner consistent with this title and to benefit local communities in the vicinity of the Opal Creek area. Such plan shall be based on an economic opportunity study and other appropriate information.

  (b) FUNDS PROVIDED TO THE STATES FOR GRANTS.—Upon completion of the Opal Creek Management Plan, and receipt of the plan referred to in subsection (a) of this section, the Secretary shall provide, subject to appropriations, $15,000,000, to the State of Oregon. Such funds shall be used to make grants or loans for economic development projects that further the purposes of this title and benefit the local communities in the vicinity of Opal Creek.

  (c) REPORT.—The State of Oregon shall—

  (1) prepare and provide the Secretary and Congress with an annual report on the use of the funds made available under this section;

  (2) make available to the Secretary and to Congress, upon request, all accounts, financial records, and other information related to grants and loans made available pursuant to this section; and

  (3) as loans are repaid, make additional grants and loans with the money made available for obligation by such repayments.

TITLE II—UPPER KLAMATH BASIN

SEC. 201. UPPER KLAMATH BASIN ECOLOGICAL RESTORATION PROJECTS.

  (a) DEFINITIONS.—In this section:

  (1) ECOSYSTEM RESTORATION OFFICE.—The term "Ecosystem Restoration Office" means the Klamath Basin Ecosystem Restoration Office operated cooperatively by the United States Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, and Forest Service.

  (2) WORKING GROUP.—The term "Working Group" means the Upper Klamath Basin Working Group, established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

(A) 3 tribal members;

(B) 1 representative of the city of Klamath Falls, Oregon;

(C) 1 representative of Klamath County, Oregon;

(D) 1 representative of institutions of higher education in the Upper Klamath Basin;

(E) 4 representatives of the environmental community, including at least one such representative from the State of California with interests in the Klamath Basin National Wildlife Refuge Complex;

(F) 4 representatives of local businesses and industries, including at least one representative of the wood products industry and one representative of the ocean commercial fishing industry and/or the recreational fishing industry based in either Oregon or California;

(G) 4 representatives of the ranching and farming community, including representatives of Federal lease-land farmers and ranchers and of private land farmers and ranchers in the Upper Klamath Basin;

(H) 2 representatives from State of Oregon agencies with authority and responsibility in the Klamath River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department;

(I) 4 representatives from the local community;

(J) 1 representative each from the following Federal resource management agencies in the Upper Klamath Basin: Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, Bureau of Indian Affairs, Forest Service, Natural Resources Conservation Service, National Marine Fisheries Service and Ecosystem Restoration Office; and

(K) 1 representative of the Klamath County Soil and Water Conservation District.

(3) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(4) TASK FORCE.—The term "Task Force" means the Klamath River Basin Fisheries Task Force as established by the Klamath River Basin Fishery Resource Restoration Act (Public Law 99–552, 16 U.S.C. 460ss–3, et. seq.).

(5) COMPACT COMMISSION.—The term "Compact Commission" means the Klamath River Basin Compact Commission created pursuant to the Klamath River Compact Act of 1954.

(6) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and consisting of at least a quorum at a regularly scheduled business meeting.

(7) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(8) TRINITY TASK FORCE.—The term "Trinity Task Force" means the Trinity River Restoration Task Force created by Public Law 98–541, as amended by Public Law 104–143.

(b) IN GENERAL.—

(1) The Working Group through the Ecosystem Restoration Office, with technical assistance from the Secretary, will propose ecological restoration projects, economic development and stability projects, and projects designed to reduce the impacts of drought conditions to be undertaken in the Upper Klamath Basin based on a consensus of the Working Group membership.

(2) The Secretary shall pay, to the greatest extent feasible, up to 50 percent of the cost of performing any project approved by the Secretary or his designee, up to a total amount of $1,000,000 during each of fiscal years 1997 through 2001.

(3) Funds made available under this title through the Department of the Interior or the Department of Agriculture shall be distributed through the Ecosystem Restoration Office.

(4) The Ecosystem Restoration Office may utilize not more than 15 percent of all Federal funds administered under this section for administrative costs relating to the implementation of this title.

(5) All funding recommendations developed by the Working Group shall be based on a consensus of Working Group members.

(c) COORDINATION.—

(1) The Secretary shall formulate a cooperative agreement among the Working Group, the Task Force, the Trinity Task Force and the Compact Commission for the purposes of ensuring that projects proposed and funded through the Working Group are consistent with other basin-wide fish and wildlife restoration and conservation plans, including but not limited to plans developed by the Task Force and the Compact Commission.

(2) To the greatest extent practicable, the Working Group shall provide notice to, and accept input from, two members each of the Task Force, the Trinity Task Force, and the Compact Commission, so appointed by those entities, for the express purpose of facilitating better communication and coordination regarding additional basin-wide fish and wildlife and ecosystem restoration and planning efforts. The roles and relationships of the entities involved shall be clarified in the cooperative agreement.

(d) PUBLIC MEETINGS.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(e) TERMS AND VACANCIES.—Working Group members shall serve for 3–year terms, beginning on the date of enactment of this title. Vacancies which occur for any reason after the date of enactment of this title shall be filled by direct appointment of the governor of the State of Oregon, in consultation with the Secretary of the Interior and the Secretary of Agriculture, in accordance with nominations from the appropriate groups, interests, and government agencies outlined in subsection (a)(2).

(f) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Klamath Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

(g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2002.

TITLE III—DESCHUTES BASIN

SEC. 301. DESCHUTES BASIN ECOSYSTEM RESTORATION PROJECTS.

(a) DEFINITIONS.—In this section:

(1) WORKING GROUP.—The term "Working Group" means the Deschutes River Basin Working Group established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

(A) 5 representatives of private interests including one each from hydroelectric production, livestock grazing, timber, land development, and recreation/tourism;

(B) 4 representatives of private interests including two each from irrigated agriculture and the environmental community;

(C) 2 representatives from the Confederated Tribes of the Warm Springs Reservation of Oregon;

(D) 2 representatives from Federal agencies with authority and responsibility in the Deschutes River Basin, including one from the Department of the Interior and one from the Agriculture Department;

(E) 2 representatives from the State of Oregon agencies with authority and responsibility in the Deschutes River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department; and

(F) 4 representatives from county or city governments within the Deschutes River Basin county and/or city governments.

(2) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(3) FEDERAL AGENCIES.—The term "Federal agencies" means agencies and departments of the United States, including, but not limited to, the Bureau of Reclamation, Bureau of Indian Affairs, Bureau of Land Management, Fish and Wildlife Service, Forest Service, Natural Resources Conservation Service, Farm Services Agency, the National Marine Fisheries Service, and the Bonneville Power Administration.

(4) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and constituting at least a quorum at a regularly scheduled business meeting.

(5) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(b) IN GENERAL.—

(1) The Working Group will propose ecological restoration projects on both Federal and non-Federal lands and waters to be undertaken in the Deschutes River Basin based on a consensus of the Working Group, provided that such projects, when involving Federal land or funds, shall be proposed to the Bureau of Reclamation in the Department of the Interior and any other Federal agency with affected land or funds.

(2) The Working Group will accept donations, grants or other funds and place such funds received into a trust fund, to be expended on ecological restoration projects which, when involving Federal land or funds, are approved by the affected Federal agency.

(3) The Bureau of Reclamation shall pay from funds authorized under subsection (h) of this title up to 50 percent of the cost of performing any project proposed by the Working Group and approved by the Secretary, up to a total amount of $1,000,000 during each of the fiscal years 1997 through 2001.

(4) Non–Federal contributions to project costs for purposes of computing the Federal matching share under paragraph (3) of this subsection may include in-kind contributions.

(5) Funds authorized in subsection (h) of this title shall be maintained in and distributed by the Bureau of Reclamation in the Department of the Interior. The Bureau of Reclamation shall not expend more than 5 percent of amounts appropriated pursuant to subsection (h) for Federal administration of such appropriations pursuant to this title.

(6) The Bureau of Reclamation is authorized to provide by grant to the Working Group not more than 5 percent of funds appropriated pursuant to subsection (h) of this title for not more than 50 percent of administrative costs relating to the implementation of this title.

(7) The Federal agencies with authority and responsibility in the Deschutes River Basin shall provide technical assistance to the Working Group and shall designate representatives to serve as members of the Working Group.

(8) All funding recommendations developed by the Working Group shall be based on a consensus of the Working Group members.

(c) PUBLIC NOTICE AND PARTICIPATION.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(d) PRIORITIES.—The Working Group shall give priority to voluntary market-based economic incentives for ecosystem restoration including, but not limited to, water leases and purchases; land leases and purchases; tradable discharge permits; and acquisition of timber, grazing, and land development rights to implement plans, programs, measures, and projects.

(e) TERMS AND VACANCIES.—Members of the Working Group representing governmental agencies or entities shall be named by the represented government agency. Members of the Working Group representing private interests shall be named in accordance with the articles of incorporation and bylaws of the Working Group. Representatives from Federal agencies will serve for terms of 3 years. Vacancies which occur for any reason after the date of enactment of this title shall be filled in accordance with this title.

(f) ADDITIONAL PROJECTS.—Where existing authority and appropriations permit, Federal agencies may contribute to the implementation of projects recommended by the Working Group and approved by the Secretary.

(g) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Deschutes Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

(h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2001.

TITLE IV—MOUNT HOOD CORRIDOR

SEC. 401. LAND EXCHANGE.

(a) AUTHORIZATION.—Notwithstanding any other law, if Longview Fibre Company (referred to in this section as "Longview") offers and conveys title that is acceptable to the United States to some or all of the land described in subsection (b), the Secretary of the Interior (referred to in this section as the "Secretary") shall convey to Longview title to some or all of the land described in subsection (c), as necessary to satisfy the requirements of subsection (d).

(b) LAND TO BE OFFERED BY LONGVIEW.—The land referred to in subsection (a) as the land to be offered by Longview are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(c) LAND TO BE CONVEYED BY THE SECRETARY.—The land referred to in subsection (a) as the land to be conveyed by the Secretary are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law.

(e) REDESIGNATION OF LAND TO MAINTAIN REVENUE FLOW.—So as to maintain the current flow of revenue from land subject to the Act entitled "An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon", approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary may redesignate public domain land located in and west of Range 9 East, Willamette Meridian, Oregon, as land subject to that Act.

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 627 of 1021   PageID 7497

(f) TIMETABLE.—The exchange directed by this section shall be consummated not later than 1 year after the date of enactment of this title.

(g) WITHDRAWAL OF LANDS.—All lands managed by the Department of the Interior, Bureau of Land Management, located in Townships 2 and 3 South, Ranges 6 and 7 East, Willamette Meridian, which can be seen from the right-of-way of U.S. Highway 26 (in this section, such lands are referred to as the "Mt. Hood Corridor Lands"), shall be managed primarily for the protection or enhancement of scenic qualities. Management prescriptions for other resource values associated with these lands shall be planned and conducted for purposes other than timber harvest, so as not to impair the scenic qualities of the area.

(h) TIMBER CUTTING.—Timber cutting may be conducted on Mt. Hood Corridor Lands following a resource-damaging catastrophic event. Such cutting may only be conducted to achieve the following resource management objectives, in compliance with the current land use plans—

(1) to maintain safe conditions for the visiting public;

(2) to control the continued spread of forest fire;

(3) for activities related to administration of the Mt. Hood Corridor Lands; or

(4) for removal of hazard trees along trails and roadways.

(i) ROAD CLOSURE.—The forest road gate located on Forest Service Road 2503, located in T. 2 S., R. 6 E., sec. 14, shall remain closed and locked to protect resources and prevent illegal dumping and vandalism. Access to this road shall be limited to—

(1) Federal and State officers and employees acting in an official capacity;

(2) employees and contractors conducting authorized activities associated with the telecommunication sites located in T. 2 S., R. 6 E., sec. 14; and

(3) the general public for recreational purposes, except that all motorized vehicles will be prohibited.

(j) NEPA EXEMPTION.—The National Environmental Policy Act of 1969 (P.L. 91–190) shall not apply to this section for one year after the date of enactment of this title.

(k) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 25 USCA § 715c >>

TITLE V—COQUILLE TRIBAL FOREST

SEC. 501. CREATION OF THE COQUILLE FOREST.

(a) The Coquille Restoration Act (P.L. 101–42) is amended by inserting at the end of section 5 the following:

"(d) CREATION OF THE COQUILLE FOREST.—

"(1) DEFINITIONS.—In this subsection:

"(A) the term 'Coquille Forest' means certain lands in Coos County, Oregon, comprising approximately 5,400 acres, as generally depicted on the map entitled 'Coquille Forest Proposal', dated July 8, 1996.

"(B) the term 'Secretary' means the Secretary of the Interior.

"(C) the term 'the Tribe' means the Coquille Tribe of Coos County, Oregon.

"(2) MAP.—The map described in subparagraph (d)(1)(A), and such additional legal descriptions which are applicable, shall be placed on file at the local District Office of the Bureau of Land Management, the Agency Office of the Bureau of Indian Affairs, and with the Senate Committee on Energy and Natural Resources and the House Committee on Resources.

"(3) INTERIM PERIOD.—From the date of enactment of this subsection until two years after the date of enactment of this subsection, the Bureau of Land Management shall:

"(A) retain Federal jurisdiction for the management of lands designated under this subsection as the Coquille Forest and continue to distribute revenues from such lands in a manner consistent with existing law; and,

"(B) prior to advertising, offering or awarding any timber sale contract on lands designated under this subsection as the Coquille Forest, obtain the approval of the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe.

"(4) TRANSITION PLANNING AND DESIGNATION.—

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 628 of 1021   PageID 7498

"(A) During the two year interim period provided for in paragraph (3), the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe, is authorized to initiate development of a forest management plan for the Coquille Forest. The Secretary, acting through the Director of the Bureau of Land Management, shall cooperate and assist in the development of such plan and in the transition of forestry management operations for the Coquille Forest to the Assistant Secretary for Indian Affairs.

"(B) Two years after the date of enactment of this subsection, the Secretary shall take the lands identified under subparagraph (d)(1)(A) into trust, and shall hold such lands in trust, in perpetuity, for the Coquille Tribe. Such lands shall be thereafter designated as the Coquille Forest.

"(C) So as to maintain the current flow of revenue from land subject to the Act entitled 'An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon' (the O & C Act), approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary shall redesignate, from public domain lands within the tribe's service area, as defined in this Act, certain lands to be subject to the O & C Act. Lands redesignated under this subparagraph shall not exceed lands sufficient to constitute equivalent timber value as compared to lands constituting the Coquille Forest.

"(5) MANAGEMENT.—The Secretary of Interior, acting through the Assistant Secretary for Indian Affairs, shall manage the Coquille Forest under applicable State and Federal forestry and environmental protection laws, and subject to critical habitat designations under the Endangered Species Act, and subject to the standards and guidelines of Federal forest plans on adjacent or nearby Federal lands, now and in the future. The Secretary shall otherwise manage the Coquille Forest in accordance with the laws pertaining to the management of Indian Trust lands and shall distribute revenues in accord with Public Law 101–630, 25 U.S.C. 3107.

"(A) Unprocessed logs harvested from the Coquille Forest shall be subject to the same Federal statutory restrictions on export to foreign Nations that apply to unprocessed logs harvested from Federal lands.

"(B) Notwithstanding any other provision of law, all sales of timber from land subject to this subsection shall be advertised, offered and awarded according to competitive bidding practices, with sales being awarded to the highest responsible bidder.

"(6) INDIAN SELF DETERMINATION ACT AGREEMENT.—No sooner than two years after the date of enactment of this subsection, the Secretary may, upon a satisfactory showing of management competence and pursuant to the Indian Self–Determination Act (25 U.S.C. 450 et seq.), enter into a binding Indian self-determination agreement (agreement) with the Coquille Indian Tribe. Such agreement may provide for the tribe to carry out all or a portion of the forest management for the Coquille Forest.

"(A) Prior to entering such an agreement, and as a condition of maintaining such an agreement, the Secretary must find that the Coquille Tribe has entered into a binding memorandum of agreement (MOA) with the State of Oregon, as required under paragraph 7.

"(B) The authority of the Secretary to rescind the Indian self-determination agreement shall not be encumbered.

"(i) The Secretary shall rescind the agreement upon a demonstration that the tribe and the State of Oregon are no longer engaged in a memorandum of agreement as required under paragraph 7.

"(ii) The Secretary may rescind the agreement on a showing that the Tribe has managed the Coquille Forest in a manner inconsistent with this subsection, or the Tribe is no longer managing, or capable of managing, the Coquille Forest in a manner consistent with this subsection.

"(7) MEMORANDUM OF AGREEMENT.—The Coquille Tribe shall enter into a memorandum of agreement (MOA) with the State of Oregon relating to the establishment and management of the Coquille Forest. The MOA shall include, but not be limited to, the terms and conditions for managing the Coquille Forest in a manner consistent with paragraph (5) of this subsection, preserving public access, advancing jointly-held resource management goals, achieving tribal restoration objectives and establishing a coordinated management framework. Further, provisions set forth in the MOA shall be consistent with federal trust responsibility requirements applicable to Indian trust lands and paragraph (5) of this subsection.

"(8) PUBLIC ACCESS.—The Coquille Forest shall remain open to public access for purposes of hunting, fishing, recreation and transportation, except when closure is required by state or federal law, or when the Coquille Indian Tribe and the State of Oregon agree in writing that restrictions on access are necessary or appropriate to prevent harm to natural resources, cultural resources or environmental quality; *Provided,* That the State of Oregon's agreement shall not be required when immediate action is necessary to protect archeological resources.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(9) JURISDICTION.—

"(A) The United States District Court for the District of Oregon shall have jurisdiction over actions against the Secretary arising out of claims that this subsection has been violated. Consistent with existing precedents on standing to sue, any affected citizen may bring suit against the Secretary for violations of this subsection, except that suit may not be brought against the Secretary for claims that the MOA has been violated. The Court has the authority to hold unlawful and set aside actions pursuant to this subsection that are arbitrary and capricious, an abuse of discretion, or otherwise an abuse of law.

"(B) The United States District Court for the District of Oregon shall have jurisdiction over actions between the State of Oregon and the Tribe arising out of claims of breach of the MOA.

"(C) Unless otherwise provided for by law, remedies available under this subsection shall be limited to equitable relief and shall not include damages.

"(10) STATE REGULATORY AND CIVIL JURISDICTION.—In addition to the jurisdiction described in paragraph 7 of this subsection, the State of Oregon may exercise exclusive regulatory civil jurisdiction, including but not limited to adoption and enforcement of administrative rules and orders, over the following subjects:

"(A) management, allocation and administration of fish and wildlife resources, including but not limited to establishment and enforcement of hunting and fishing seasons, bag limits, limits on equipment and methods, issuance of permits and licenses, and approval or disapproval of hatcheries, game farms, and other breeding facilities; Provided, That nothing herein shall be construed to permit the State of Oregon to manage fish or wildlife habitat on Coquille Forest lands;

"(B) allocation and administration of water rights, appropriation of water and use of water;

"(C) regulation of boating activities, including equipment and registration requirements, and protection of the public's right to use the waterways for purposes of boating or other navigation;

"(D) fills and removals from waters of the State, as defined in Oregon law;

"(E) protection and management of the State's proprietary interests in the beds and banks of navigable waterways;

"(F) regulation of mining, mine reclamation activities, and exploration and drilling for oil and gas deposits;

"(G) regulation of water quality, air quality (including smoke management), solid and hazardous waste, and remediation of releases of hazardous substances;

"(H) regulation of the use of herbicides and pesticides; and

"(I) enforcement of public health and safety standards, including standards for the protection of workers, well construction and codes governing the construction of bridges, buildings, and other structures.

"(11) SAVINGS CLAUSE, STATE AUTHORITY.—

"(A) Nothing in this subsection shall be construed to grant tribal authority over private or State-owned lands.

"(B) To the extend that the State of Oregon is regulating the foregoing areas pursuant to a delegated Federal authority or a Federal program, nothing in this subsection shall be construed to enlarge or diminish the State's authority under such law.

"(C) Where both the State of Oregon and the United States are regulating, nothing herein shall be construed to alter their respective authorities.

"(D) To the extent that Federal law authorizes the Coquille Indian Tribe to assume regulatory authority over an area, nothing herein shall be construed to enlarge or diminish the tribe's authority to do so under such law.

"(E) Unless and except to the extent that the tribe has assumed jurisdiction over the Coquille Forest pursuant to Federal law, or otherwise with the consent of the State, the State of Oregon shall have jurisdiction and authority to enforce its laws addressing the subjects listed in subparagraph 10 of this subsection on the Coquille Forest against the Coquille Indian Tribe, its members and all other persons and entities, in the same manner and with the same remedies and protections and appeal rights as otherwise provided by general Oregon law. Where the State of Oregon and Coquille Indian Tribe agree regarding the exercise of tribal civil regulatory jurisdiction over activities on the Coquille Forest lands, the tribe may exercise such jurisdiction as is agreed upon.

"(12) In the event of a conflict between Federal and State law under this subsection, Federal law shall control."

## TITLE VI—BULL RUN WATERSHED PROTECTION

<< 16 USCA § 482b NOTE >>

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 601. The first sentence of section 2(a) of Public Law 95–200 is amended after "referred to in this subsection (a)" by striking "2(b)" and inserting in lieu thereof "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 602. The first sentence of section 2(b) of Public Law 95–200 is amended after "the policy set forth in subsection (a)" by inserting "and (b)".

<< 16 USCA § 482b NOTE >>

SEC. 603. Section 2(b) of Public Law 95–200 is redesignated as "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 604(a) Public Law 95–200 is amended by adding a new subsection 2(b) immediately after subsection 2(a), as follows: "(b) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary of Agriculture shall prohibit the cutting of trees in that part of the unit consisting of the hydrographic boundary of the Bull Run River Drainage, including certain lands within the unit and located below the headworks of the city of Portland, Oregon's water storage and delivery project, and as depicted in a map dated July 22, 1996 and entitled "Bull Run River Drainage".

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary of Agriculture shall prohibit the cutting of trees in the area described in paragraph (1).

(B) PERMITTED CUTTING.—Subject to subparagraph (C), the Secretary may only allow the cutting of trees in the area described in paragraph (1)—

(i) for the protection or enhancement of water quality in the area described in paragraph (1); or

(ii) for the protection, enhancement, or maintenance of water quantity available from the area described in paragraph (1); or

(iii) for the construction, expansion, protection or maintenance of municipal water supply facilities; or

(iv) for the construction, expansion, protection or maintenance of facilities for the transmission of energy through and over the unit or previously authorized hydroelectric facilities or hydroelectric projects associated with municipal water supply facilities.

(C) SALVAGE SALES.—The Secretary of Agriculture may not authorize a salvage sale in the area described in paragraph (1)."

(b) Redesignate subsequent subsections of Public Law 95–200 accordingly.

SEC. 605. REPORT TO CONGRESS.

(a) The Secretary of Agriculture shall, in consultation with the city of Portland and other affected parties, undertake a study of that part of the Little Sandy Watershed that is within the unit (hereinafter referred to as the "study area"), as depicted on the map described in section 604 of this title.

(b) The study referred to in (a) shall determine—

(1) the impact of management activities within the study area on the quality of drinking water provided to the Portland Metropolitan area;

(2) the identity and location of certain ecological features within the study area, including late successional forest characteristics, aquatic and terrestrial wildlife habitat, significant hydrological values, or other outstanding natural features; and

(3) the location and extent of any significant cultural or other values within the study area.

(c) The study referred to in subsection (a) shall include both legislative and regulatory recommendations to Congress on the future management of the study area. In formulating such recommendations, the Secretary shall consult with the city of Portland and other affected parties.

(d) To the greatest extent possible, the Secretary shall use existing data and processes to carry out this study and report.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

(e) The study referred to in subsection (a) shall be submitted to the Senate Committees on Energy and Natural Resources and Agriculture and the House Committees on Resources and Agriculture not later than one year from the date of enactment of this section.

(f) The Secretary is prohibited from advertising, offering or awarding any timber sale within the study area for a period of two years after the date of enactment of this section.

(g) Nothing in this section shall in any way affect any State or Federal law governing appropriation, use of or Federal right to water on or flowing through National Forest System lands. Nothing in this section is intended to influence the relative strength of competing claims to the waters of the Little Sandy River. Nothing in this section shall be construed to expand or diminish Federal, State, or local jurisdiction, responsibility, interests, or rights in water resources development or control, including rights in and current uses of water resources in the road.

SEC. 606. Lands within the Bull Run Management Unit, as defined in Public Law 95–200, but not contained within the Bull Run River Drainage, as defined by this title and as depicted on the map dated July 1996 described in Section 604 of this title, shall continue to be managed in accordance with Public Law 95–200.

<< 16 USCA § 1132 NOTE >>

## TITLE VII—OREGON ISLANDS WILDERNESS, ADDITIONS

SEC. 701. OREGON ISLANDS WILDERNESS, ADDITIONS.

(a) In furtherance of the purposes of the Wilderness Act of 1964, certain lands within the boundaries of the Oregon Islands National Wildlife Refuge, Oregon, comprising approximately ninety-five acres and as generally depicted on a map entitled "Oregon Island Wilderness Additions—Proposed" dated August 1996, are hereby designated as wilderness. The map shall be on file and available for public inspection in the offices of the Fish and Wildlife Service, Department of the Interior.

(b) All other federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, not currently designated as wilderness and also within the Oregon Islands National Wildlife Refuge boundaries under the administration of the United States Fish and Wildlife Service, Department of the Interior, as designated by Executive Order 7035, Proclamation 2416, Public Land Orders 4395, 4475 and 6287, and Public Laws 91–504 and 95–450, are hereby designated as wilderness.

(c) All federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, and presently under the jurisdiction of the Bureau of Land Management, except Chiefs Island, are hereby designated as wilderness, shall become part of the Oregon Islands National Wildlife Refuge and the Oregon Islands Wilderness and shall be under the jurisdiction of the United States Fish and Wildlife Service, Department of the Interior.

(d) As soon as practicable after this title takes effect, a map of the wilderness area and a description of its boundaries shall be filed with the Senate Committee on Energy and Natural Resources and the House Committee on Resources, and such map shall have the same force and effect as if included in this title: Provided, however, That correcting clerical and typographical errors in the map and land descriptions may be made.

(e) Public Land Order 6287 of June 16, 1982, which withdrew certain rocks, reefs, islets and islands lying within three geographical miles off the coast of Oregon and above mean high tide, including the ninety-five acres described in subsection (a), as an addition to the Oregon Islands National Wildlife Refuge is hereby made permanent.

## TITLE VIII—UMPQUA RIVER LAND EXCHANGE STUDY

SEC. 801. UMPQUA RIVER LAND EXCHANGE STUDY: POLICY AND DIRECTION.

(a) IN GENERAL.—The Secretaries of the Interior and Agriculture (Secretaries) are hereby authorized and directed to consult, coordinate, and cooperate with the Umpqua Land Exchange Project (ULEP), affected units and agencies of State and local government, and, as appropriate, the World Forestry Center and National Fish and Wildlife Foundation, to assist ULEP's ongoing efforts in studying and analyzing land exchange opportunities in the Umpqua River basin and to provide scientific, technical,

research, mapping and other assistance and information to such entities. Such consultation, coordination, and cooperation shall at a minimum include, but not be limited to:

(1) working with ULEP to develop or assemble comprehensive scientific and other information (including comprehensive and integrated mapping) concerning the Umpqua River Basin's resources of forest, plants, wildlife, fisheries (anadromous and other), recreational opportunities, wetlands, riparian habitat, and other physical or natural resources;

(2) working with ULEP to identify general or specific areas within the basin where land exchanges could promote consolidation of forestland ownership for long-term, sustained timber production; protection and restoration of habitat for plants, fish, and wildlife (including any federally listed threatened or endangered species); protection of drinking water supplies; recovery of threatened and endangered species; protection and restoration of wetlands, riparian lands, and other environmentally sensitive areas; consolidation of land ownership for improved public access and a broad array of recreational uses; and consolidation of land ownership to achieve management efficiency and reduced costs of administration; and

(3) developing a joint report for submission to the Congress which discusses land exchange opportunities in the basin and outlines either a specific land exchange proposal or proposals which may merit consideration by the Secretaries or the Congress, or ideas and recommendations for new authorizations, direction, or changes in existing law or policy to expedite and facilitate the consummation of beneficial land exchanges in the basin via administrative means.

(b) MATTERS FOR SPECIFIC STUDY.—In analyzing land exchange opportunities with ULEP, the Secretaries shall give priority to assisting ULEP's ongoing efforts in:

(1) studying, identifying, and mapping areas where the consolidation of land ownership via land exchanges could promote the goals of long term species and watershed protection and utilization, including but not limited to the goals of the Endangered Species Act of 1973 more effectively than current land ownership patterns and whether any changes in law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(2) studying, identifying and mapping areas where land exchanges might be utilized to better satisfy the goals of sustainable timber harvest, including studying whether changes in existing law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(3) identifying issues and studying options and alternatives, including possible changes in existing law or policy, to insure that combined post-exchange revenues to units of local government from State and local property, severance, and other taxes or levies and shared Federal land receipts will approximate pre-exchange revenues;

(4) identifying issues and studying whether possible changes in law, special appraisal instruction, or changes in certain Federal appraisal procedures might be advisable or necessary to facilitate the appraisal of potential exchange lands which may have special characteristics or restrictions affecting land values;

(5) identifying issues and studying options and alternatives, including changes in existing laws or policy, for achieving land exchanges without reducing the net supply of timber available to small businesses;

(6) identifying, mapping, and recommending potential changes in land use plans, land classifications, or other actions which might be advisable or necessary to expedite, facilitate or consummate land exchanges in certain areas;

(7) analyzing potential sources for new or enhanced Federal, State, or other funding to promote improved resource protection, species recovery, and management in the basin; and

(8) identifying and analyzing whether increased efficiency and better land and resource management could occur through either consolidation of Federal forest management under one agency or exchange lands between the Forest Service and the Bureau of Land Management.

## SEC. 802. REPORT TO CONGRESS.

No later than February 1, 1998, ULEP and the Secretaries shall submit a joint report to the Committee on Resources of the United States House of Representatives and to the Committee on Energy and Natural Resources of the United States Senate concerning their studies, findings, recommendations, mapping and other activities conducted pursuant to this title.

## SEC. 803. AUTHORIZATION OF APPROPRIATIONS.

In furtherance of the purposes of this title, there is hereby authorized to be appropriated the sum of $2 million, to remain available until expended.

DIVISION C—ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

SEC. 1. SHORT TITLE OF DIVISION; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS OF DIVISION; SEVERABILITY.

<< 8 USCA § 1101 NOTE >>

(a) SHORT TITLE.—This division may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this division an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and

(2) amendments to a section or other provision are to such section or other provision before any amendment made to such section or other provision elsewhere in this division.

(c) APPLICATION OF CERTAIN DEFINITIONS.—Except as otherwise specifically provided in this division, for purposes of titles I and VI of this division, the terms "alien", "Attorney General", "border crossing identification card", "entry", "immigrant", "immigrant visa", "lawfully admitted for permanent residence", "national", "naturalization", "refugee", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act.

(d) TABLE OF CONTENTS OF DIVISION.—The table of contents of this division is as follows:

Sec. 1. Short title of division; amendments to Immigration and Nationality Act; application of definitions of such Act; table of contents of division; severability.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Hiring and training standards.
Sec. 107. Report on border strategy.
Sec. 108. Criminal penalties for high speed flights from immigration checkpoints.
Sec. 109. Joint study of automated data collection.
Sec. 110. Automated entry-exit control system.
Sec. 111. Submission of final plan on realignment of border patrol positions from interior stations.
Sec. 112. Nationwide fingerprinting of apprehended aliens.

Subtitle B—Facilitation of Legal Entry

Sec. 121. Land border inspectors.
Sec. 122. Land border inspection and automated permit pilot projects.
Sec. 123. Preinspection at foreign airports.
Sec. 124. Training of airline personnel in detection of fraudulent documents.
Sec. 125. Preclearance authority.

Subtitle C—Interior Enforcement

Sec. 131. Authorization of appropriations for increase in number of certain investigators.
Sec. 132. Authorization of appropriations for increase in number of investigators of visa overstayers.
Sec. 133. Acceptance of State services to carry out immigration enforcement.

Sec. 134. Minimum State INS presence.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

Sec. 201. Wiretap authority for investigations of alien smuggling or document fraud.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New document fraud offenses; new civil penalties for document fraud.
Sec. 213. New criminal penalty for failure to disclose role as preparer of false application for immigration benefits.
Sec. 214. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 215. Criminal penalty for false claim to citizenship.
Sec. 216. Criminal penalty for voting by aliens in Federal election.
Sec. 217. Criminal forfeiture for passport and visa related offenses.
Sec. 218. Penalties for involuntary servitude.
Sec. 219. Admissibility of videotaped witness testimony.
Sec. 220. Subpoena authority in document fraud enforcement.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

Subtitle B—Criminal Alien Provisions

Sec. 321. Amended definition of aggravated felony.
Sec. 322. Definition of conviction and term of imprisonment.
Sec. 323. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 324. Penalty for reentry of deported aliens.
Sec. 325. Change in filing requirement.
Sec. 326. Criminal alien identification system.
Sec. 327. Appropriations for criminal alien tracking center.
Sec. 328. Provisions relating to State criminal alien assistance program.
Sec. 329. Demonstration project for identification of illegal aliens in incarceration facility of Anaheim, California.
Sec. 330. Prisoner transfer treaties.
Sec. 331. Prisoner transfer treaties study.
Sec. 332. Annual report on criminal aliens.

Sec. 333. Penalties for conspiring with or assisting an alien to commit an offense under the Controlled Substances Import and Export Act.

Sec. 334. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.

Subtitle C—Revision of Grounds for Exclusion and Deportation

Sec. 341. Proof of vaccination requirement for immigrants.

Sec. 342. Incitement of terrorist activity and provision of false documentation to terrorists as a basis for exclusion from the United States.

Sec. 343. Certification requirements for foreign health-care workers.

Sec. 344. Removal of aliens falsely claiming United States citizenship.

Sec. 345. Waiver of exclusion and deportation ground for certain section 274C violators.

Sec. 346. Inadmissibility of certain student visa abusers.

Sec. 347. Removal of aliens who have unlawfully voted.

Sec. 348. Waivers for immigrants convicted of crimes.

Sec. 349. Waiver of misrepresentation ground of inadmissibility for certain alien.

Sec. 350. Offenses of domestic violence and stalking as ground for deportation.

Sec. 351. Clarification of date as of which relationship required for waiver from exclusion or deportation for smuggling.

Sec. 352. Exclusion of former citizens who renounced citizenship to avoid United States taxation.

Sec. 353. References to changes elsewhere in division.

Subtitle D—Changes in Removal of Alien Terrorist Provisions

Sec. 354. Treatment of classified information.

Sec. 355. Exclusion of representatives of terrorist organizations.

Sec. 356. Standard for judicial review of terrorist organization designations.

Sec. 357. Removal of ancillary relief for voluntary departure.

Sec. 358. Effective date.

Subtitle E—Transportation of Aliens

Sec. 361. Definition of stowaway.

Sec. 362. Transportation contracts.

Subtitle F—Additional Provisions

Sec. 371. Immigration judges and compensation.

Sec. 372. Delegation of immigration enforcement authority.

Sec. 373. Powers and duties of the Attorney General and the Commissioner.

Sec. 374. Judicial deportation.

Sec. 375. Limitation on adjustment of status.

Sec. 376. Treatment of certain fees.

Sec. 377. Limitation on legalization litigation.

Sec. 378. Rescission of lawful permanent resident status.

Sec. 379. Administrative review of orders.

Sec. 380. Civil penalties for failure to depart.

Sec. 381. Clarification of district court jurisdiction.

Sec. 382. Application of additional civil penalties to enforcement.

Sec. 383. Exclusion of certain aliens from family unity program.

Sec. 384. Penalties for disclosure of information.

Sec. 385. Authorization of additional funds for removal of aliens.

Sec. 386. Increase in INS detention facilities; report on detention space.

Sec. 387. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.

Sec. 388. Report on interior repatriation program.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Subtitle A—Pilot Programs for Employment Eligibility Confirmation

Sec. 401. Establishment of programs.
Sec. 402. Voluntary election to participate in a pilot program.
Sec. 403. Procedures for participants in pilot programs.
Sec. 404. Employment eligibility confirmation system.
Sec. 405. Reports.

Subtitle B—Other Provisions Relating to Employer Sanctions

Sec. 411. Limiting liability for certain technical violations of paperwork requirements.
Sec. 412. Paperwork and other changes in the employer sanctions program.
Sec. 413. Report on additional authority or resources needed for enforcement of employer sanctions provisions.
Sec. 414. Reports on earnings of aliens not authorized to work.
Sec. 415. Authorizing maintenance of certain information on aliens.
Sec. 416. Subpoena authority.

Subtitle C—Unfair Immigration–Related Employment Practices

Sec. 421. Treatment of certain documentary practices as unfair immigration-related employment practices.

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

Sec. 501. Exception to ineligibility for public benefits for certain battered aliens.
Sec. 502. Pilot programs on limiting issuance of driver's licenses to illegal aliens.
Sec. 503. Ineligibility of aliens not lawfully present for Social Security benefits.
Sec. 504. Procedures for requiring proof of citizenship for Federal public benefits.
Sec. 505. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits.
Sec. 506. Study and report on alien student eligibility for postsecondary Federal student financial assistance.
Sec. 507. Verification of immigration status for purposes of Social Security and higher educational assistance.
Sec. 508. No verification requirement for nonprofit charitable organizations.
Sec. 509. GAO study of provision of means-tested public benefits to aliens who are not qualified aliens on behalf of eligible individuals.
Sec. 510. Transition for aliens currently receiving benefits under the Food Stamp program.

Subtitle B—Public Charge Exclusion

Sec. 531. Ground for exclusion.

Subtitle C—Affidavits of Support

Sec. 551. Requirements for sponsor's affidavit of support.
Sec. 552. Indigence and battered spouse and child exceptions to Federal attribution of income rule.
Sec. 553. Authority of States and political subdivisions of States to limit assistance to aliens and to distinguish among classes of aliens in providing general cash public assistance.

Subtitle D—Miscellaneous Provisions

Sec. 561. Increased maximum criminal penalties for forging or counterfeiting seal of a Federal department or agency to facilitate benefit fraud by an unlawful alien.
Sec. 562. Treatment of expenses subject to emergency medical services exception.
Sec. 563. Reimbursement of States and localities for emergency ambulance services.
Sec. 564. Pilot programs to require bonding.

Sec. 565. Reports.

### Subtitle E—Housing Assistance

Sec. 571. Short title.
Sec. 572. Prorating of financial assistance.
Sec. 573. Actions in cases of termination of financial assistance.
Sec. 574. Verification of immigration status and eligibility for financial assistance.
Sec. 575. Prohibition of sanctions against entities making financial assistance eligibility determinations.
Sec. 576. Eligibility for public and assisted housing.
Sec. 577. Regulations.

### Subtitle F—General Provisions

Sec. 591. Effective dates.
Sec. 592. Not applicable to foreign assistance.
Sec. 593. Notification.
Sec. 594. Definitions.

### TITLE VI—MISCELLANEOUS PROVISIONS

### Subtitle A—Refugees, Parole, and Asylum

Sec. 601. Persecution for resistance to coercive population control methods.
Sec. 602. Limitation on use of parole.
Sec. 603. Treatment of long-term parolees in applying worldwide numerical limitations.
Sec. 604. Asylum reform.
Sec. 605. Increase in asylum officers.
Sec. 606. Conditional repeal of Cuban Adjustment Act.

### Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

Sec. 621. Alien witness cooperation.
Sec. 622. Waiver of foreign country residence requirement with respect to international medical graduates.
Sec. 623. Use of legalization and special agricultural worker information.
Sec. 624. Continued validity of labor certifications and classification petitions for professional athletes.
Sec. 625. Foreign students.
Sec. 626. Services to family members of certain officers and agents killed in the line of duty.

### Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

Sec. 631. Validity of period of visas.
Sec. 632. Elimination of consulate shopping for visa overstays.
Sec. 633. Authority to determine visa processing procedures.
Sec. 634. Changes regarding visa application process.
Sec. 635. Visa waiver program.
Sec. 636. Fee for diversity immigrant lottery.
Sec. 637. Eligibility for visas for certain Polish applicants for the 1995 diversity immigrant program.

### Subtitle D—Other Provisions

Sec. 641. Program to collect information relating to nonimmigrant foreign students.
Sec. 642. Communication between government agencies and the Immigration and Naturalization Service.
Sec. 643. Regulations regarding habitual residence.
Sec. 644. Information regarding female genital mutilation.
Sec. 645. Criminalization of female genital mutilation.
Sec. 646. Adjustment of status for certain Polish and Hungarian parolees.

Sec. 647. Support of demonstration projects.

Sec. 648. Sense of Congress regarding American-made products; requirements regarding notice.

Sec. 649. Vessel movement controls during immigration emergency.

Sec. 650. Review of practices of testing entities.

Sec. 651. Designation of a United States customs administrative building.

Sec. 652. Mail-order bride business.

Sec. 653. Review and report on H–2A nonimmigrant workers program.

Sec. 654. Report on allegations of harassment by Canadian customs agents.

Sec. 655. Sense of Congress on discriminatory application of New Brunswick provincial sales tax.

Sec. 656. Improvements in identification-related documents.

Sec. 657. Development of prototype of counterfeit-resistant Social Security card.

Sec. 658. Border Patrol Museum.

Sec. 659. Sense of the Congress regarding the mission of the Immigration and Naturalization Service.

Sec. 660. Authority for National Guard to assist in transportation of certain aliens.

Subtitle E—Technical Corrections

Sec. 671. Miscellaneous technical corrections.

<< 7 USCA § 2015 nt >>

<< 8 USCA §§ 1101 NOTE, 1102 nt, 1103 nt, 1105a nt, 1151 nt, 1152 nt, 1154 nt, 1155 nt, 1156 nt, 1157 nt, 1158 nt, 1159 nt, 1160 nt, 1182 nt, 1183 nt, 1183a nt, 1184 nt, 1186a nt, 1186b nt, 1187 nt, 1189 nt, 1201 nt, 1202 nt, 1206 nt, 1221 nt, 1222 nt, 1223 nt, 1224 nt, 1225 nt, 1226 nt, 1227 nt, 1228 nt, 1230 nt, 1251 nt, 1252 nt, 1252a nt, 1252b nt, 1253 nt, 1254 nt, 1254a nt, 1255 nt, 1255a nt, 1256 nt, 1257 nt, 1258 nt, 1259 nt, 1282 nt, 1284 nt, 1288 nt, 1303 nt, 1304 nt, 1306 nt, 1321 nt, 1322 nt, 1323 nt, 1324 nt, 1324a nt, 1324b nt, 1324c nt, 1325 nt, 1326 nt, 1327 nt, 1329 nt, 1330 nt, 1356 nt, 1357 nt, 1360 nt, 1361 nt, 1362 nt, 1364 nt, 1427 nt, 1429 nt, 1483 nt, 1503 nt, 1522 nt, 1531 nt, 1532 nt, 1534 nt, 1535 nt, 1537 nt, 1612 nt, 1631 nt, 1632 nt, 1641 nt, 1642 nt >>

<< 8 USCA §§ 1225a nt, 1229 nt, 1229a nt, 1229b nt, 1229c nt, 1231 nt, 1324d nt, 1363a nt, 1363b nt, 1366 nt, 1367 nt, 1368 nt, 1369 nt, 1370 nt, 1371 nt, 1372 nt, 1373 nt, 1374 nt, 1375 nt, 1623 nt, 1624 nt >>

<< 18 USCA §§ 506 nt, 982 nt, 1015 nt, 1028 nt, 1425 nt, 1426 nt, 1427 nt, 1541 nt, 1542 nt, 1543 nt, 1544 nt, 1546 nt, 1581 nt, 1583 nt, 1584 nt, 1588 nt, 1961 nt, 2424 nt, 2516 nt, 3563 nt, 4113 nt >>

<< 18 USCA §§ 116 nt, 611 nt, 758 nt >>

<< 20 USCA § 1091 nt >>

<< 22 USCA §§ 618 nt, 2508 nt >>

<< 28 USCA § 1821 nt >>

<< 32 USCA § 112 nt >>

<< 42 USCA §§ 402 nt, 1320b–7, 1436a >>

<< 50 USCA §§ 47c, 191, 503h, 855 >>

(e) SEVERABILITY.—If any provision of this division or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this division and the application of the provisions of this division to any person or circumstance shall not be affected thereby.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION
OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.

(a) INCREASED NUMBER OF BORDER PATROL AGENTS.—The Attorney General in each of fiscal years 1997, 1998, 1999, 2000, and 2001 shall increase by not less than 1,000 the number of positions for full-time, active-duty border patrol agents within the Immigration and Naturalization Service above the number of such positions for which funds were allotted for the preceding fiscal year.

(b) INCREASE IN BORDER PATROL SUPPORT PERSONNEL.—The Attorney General, in each of fiscal years 1997, 1998, 1999, 2000, and 2001, may increase by 300 the number of positions for personnel in support of border patrol agents above the number of such positions for which funds were allotted for the preceding fiscal year.

(c) DEPLOYMENT OF BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that additional border patrol agents shall be deployed among Immigration and Naturalization Service sectors along the border in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis. The previous sentence shall not apply to border patrol agents located at checkpoints.

(2) PRESERVATION OF LAW ENFORCEMENT FUNCTIONS AND CAPABILITIES IN INTERIOR STATES.—The Attorney General shall, when deploying border patrol personnel from interior stations to border stations, coordinate with, and act in conjunction with, State and local law enforcement agencies to ensure that such deployment does not degrade or compromise the law enforcement capabilities and functions currently performed at interior border patrol stations.

(3) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on—

(A) the progress and effectiveness of the forward deployment under paragraph (1); and

(B) the measures taken to comply with paragraph (2).

SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.

<< 8 USCA § 1103 NOTE >>

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

<< 8 USCA § 1103 >>

(d) LAND ACQUISITION AUTHORITY.—

(1) IN GENERAL.—Section 103 (8 U.S.C. 1103) is amended—

(A) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

(B) by inserting after subsection (a) the following:

"(b)(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

"(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

"(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).".

(2) CONFORMING AMENDMENT.—Section 103(e) (as so redesignated by paragraph (1)(A)) is amended by striking "subsection (c)" and inserting "subsection (d)".

<< 8 USCA § 1103 NOTE >>

SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATES.—

(1) CLAUSE A.—Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 18 months after the date of the enactment of this Act.

(2) CLAUSE B.—Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

## SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.

<< 8 USCA § 1325 >>

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

(2) by inserting after subsection (a) the following:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry); or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

<< 8 USCA § 1325 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

<< 8 USCA § 1103 NOTE >>

## SEC. 106. HIRING AND TRAINING STANDARDS.

(a) REVIEW OF HIRING STANDARDS.—Not later than 60 days after the date of the enactment of this Act, the Attorney General shall complete a review of all prescreening and hiring standards used by the Commissioner of Immigration and Naturalization, and, where necessary, revise such standards to ensure that they are consistent with relevant standards of professionalism.

(b) CERTIFICATION.—At the conclusion of each of fiscal years 1997, 1998, 1999, 2000, and 2001, the Attorney General shall certify in writing to the Committees on the Judiciary of the House of Representatives and of the Senate that all personnel hired by the Commissioner of Immigration and Naturalization for such fiscal year were hired pursuant to the appropriate standards, as revised under subsection (a).

(c) REVIEW OF TRAINING STANDARDS.—

(1) REVIEW.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall complete a review of the sufficiency of all training standards used by the Commissioner of Immigration and Naturalization.

(2) REPORT.—

(A) IN GENERAL.—Not later than 90 days after the completion of the review under paragraph (1), the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the review, including—

(i) a description of the status of efforts to update and improve training throughout the Immigration and Naturalization Service; and

(ii) an estimate of when such efforts are expected to be completed.

(B) AREAS REQUIRING FUTURE REVIEW.—The report shall disclose those areas of training that the Attorney General determines require further review in the future.

<< 8 USCA § 1103 NOTE >>

## SEC. 107. REPORT ON BORDER STRATEGY.

AR03300

(a) EVALUATION OF STRATEGY.—The Comptroller General of the United States shall track, monitor, and evaluate the Attorney General's strategy to deter illegal entry in the United States to determine the efficacy of such strategy.

(b) COOPERATION.—The Attorney General, the Secretary of State, and the Secretary of Defense shall cooperate with the Comptroller General of the United States in carrying out subsection (a).

(c) REPORT.—Not later than one year after the date of the enactment of this Act, and every year thereafter for the succeeding 5 years, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the activities undertaken under subsection (a) during the previous year. Each such report shall include an analysis of the degree to which the Attorney General's strategy has been effective in reducing illegal entry. Each such report shall include a collection and systematic analysis of data, including workload indicators, related to activities to deter illegal entry and recommendations to improve and increase border security at the border and ports of entry.

SEC. 108. CRIMINAL PENALTIES FOR HIGH SPEED FLIGHTS FROM IMMIGRATION CHECKPOINTS.

<< 18 USCA § 758 NOTE >>

(a) FINDINGS.—The Congress finds as follows:

(1) Immigration checkpoints are an important component of the national strategy to prevent illegal immigration.

(2) Individuals fleeing immigration checkpoints and leading law enforcement officials on high speed vehicle chases endanger law enforcement officers, innocent bystanders, and the fleeing individuals themselves.

(3) The pursuit of suspects fleeing immigration checkpoints is complicated by overlapping jurisdiction among Federal, State, and local law enforcement officers.

(b) HIGH SPEED FLIGHT FROM IMMIGRATION CHECKPOINTS.—

<< 18 USCA § 758 >>

(1) IN GENERAL.—Chapter 35 of title 18, United States Code, is amended by adding at the end the following:

"§ 758. High speed flight from immigration checkpoint

"Whoever flees or evades a checkpoint operated by the Immigration and Naturalization Service, or any other Federal law enforcement agency, in a motor vehicle and flees Federal, State, or local law enforcement agents in excess of the legal speed limit shall be fined under this title, imprisoned not more than five years, or both.".

<< 18 USCA Ch. 35 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 757 the following:

"758. High speed flight from immigration checkpoint.".

<< 8 USCA § 1251 >>

(c) GROUNDS FOR DEPORTATION.—Section 241(a)(2)(A) (8 U.S.C. 1251(a)(2)(A)) is amended—

(1) by redesignating clause (iv) as clause (v);

(2) by inserting after clause (iii) the following:

"(iv) HIGH SPEED FLIGHT.—Any alien who is convicted of a violation of section 758 of title 18, United States Code, (relating to high speed flight from an immigration checkpoint) is deportable."; and

(3) in clause (v) (as so redesignated by paragraph (1)), by striking "and (iii)" and inserting "(iii), and (iv)".

SEC. 109. JOINT STUDY OF AUTOMATED DATA COLLECTION.

(a) STUDY.—The Attorney General, together with the Secretary of State, the Secretary of Agriculture, the Secretary of the Treasury, and appropriate representatives of the air transport industry, shall jointly undertake a study to develop a plan for making the transition to automated data collection at ports of entry.

(b) REPORT.—Nine months after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives on the outcome of the joint initiative under subsection (a), noting specific areas of agreement and disagreement, and recommending further steps to be taken, including any suggestions for legislation.

<< 8 USCA § 1221 NOTE >>

## SEC. 110. AUTOMATED ENTRY–EXIT CONTROL SYSTEM.

(a) SYSTEM.—Not later than 2 years after the date of the enactment of this Act, the Attorney General shall develop an automated entry and exit control system that will—

  (1) collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States; and

  (2) enable the Attorney General to identify, through on-line searching procedures, lawfully admitted nonimmigrants who remain in the United States beyond the period authorized by the Attorney General.

(b) REPORT.—

  (1) DEADLINE.—Not later than December 31 of each year following the development of the system under subsection (a), the Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and of the Senate on such system.

  (2) INFORMATION.—The report shall include the following information:

   (A) The number of departure records collected, with an accounting by country of nationality of the departing alien.

   (B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.

   (C) The number of aliens who arrived as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the system or through other means as of the end of the alien's authorized period of stay, with an accounting by the alien's country of nationality and date of arrival in the United States.

(c) USE OF INFORMATION ON OVERSTAYS.—Information regarding aliens who have remained in the United States beyond their authorized period of stay identified through the system shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.

## SEC. 111. SUBMISSION OF FINAL PLAN ON REALIGNMENT OF BORDER PATROL POSITIONS FROM INTERIOR STATIONS.

Not later than November 30, 1996, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a final plan regarding the redeployment of border patrol personnel from interior locations to the front lines of the border. The final plan shall be consistent with the following:

  (1) The preliminary plan regarding such redeployment submitted by the Attorney General on May 17, 1996, to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate.

  (2) The direction regarding such redeployment provided in the joint explanatory statement of the committee of conference in the conference report to accompany the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134).

## SEC. 112. NATIONWIDE FINGERPRINTING OF APPREHENDED ALIENS.

There are authorized to be appropriated such additional sums as may be necessary to ensure that the "IDENT" program (operated by the Immigration and Naturalization Service) is expanded to apply to illegal or criminal aliens apprehended nationwide.

Subtitle B—Facilitation of Legal Entry

SEC. 121. LAND BORDER INSPECTORS.

In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and the Secretary of the Treasury each shall increase, by approximately equal numbers in each of fiscal years 1997 and 1998, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes currently in use, under construction, or whose construction has been authorized by the Congress, except such low-use lanes as the Attorney General may designate.

SEC. 122. LAND BORDER INSPECTION AND AUTOMATED PERMIT PILOT PROJECTS.

<< 8 USCA § 1356 >>

(a) EXTENSION OF LAND BORDER INSPECTION PROJECT AUTHORITY; ESTABLISHMENT OF AUTOMATED PERMIT PILOT PROJECTS.—Section 286(q) is amended—

(1) by striking the matter preceding paragraph (2) and inserting the following:

"(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1)(A)(i) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, not more than 6 projects under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. Such projects may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.

"(ii) The program authorized in this subparagraph shall terminate on September 30, 2000, unless further authorized by an Act of Congress.

"(iii) This subparagraph shall take effect, with respect to any project described in clause (1) that was not authorized to be commenced before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 30 days after submission of a written plan by the Attorney General detailing the proposed implementation of such project.

"(iv) The Attorney General shall prepare and submit on a quarterly basis, until September 30, 2000, a status report on each land border inspection project implemented under this subparagraph.

"(B) The Attorney General, in consultation with the Secretary of the Treasury, may conduct pilot projects to demonstrate the use of designated ports of entry after working hours through the use of card reading machines or other appropriate technology."; and

(2) by striking paragraph (5).

<< 8 USCA § 1356 NOTE >>

(b) CONFORMING AMENDMENT.—The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1994 (Public Law 103–121, 107 Stat. 1161) is amended by striking the fourth proviso under the heading "Immigration and Naturalization Service, Salaries and Expenses".

SEC. 123. PREINSPECTION AT FOREIGN AIRPORTS.

<< 8 USCA § 1225a >>

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 235 the following:

"PREINSPECTION AT FOREIGN AIRPORTS

"SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.—

"(1) NEW STATIONS.—Subject to paragraph (5), not later than October 31, 1998, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of inadmissible alien passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of such Act.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(2) REPORT.—Not later than October 31, 1998, the Attorney General shall report to the Committees on the Judiciary of the House of Representatives and of the Senate on the implementation of paragraph (1).

"(3) DATA COLLECTION.—Not later than November 1, 1997, and each subsequent November 1, the Attorney General shall compile data identifying—

  "(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years;

  "(B) the number and nationality of such aliens arriving from each such foreign airport; and

  "(C) the primary routes such aliens followed from their country of origin to the United States.

"(4) ADDITIONAL STATIONS.—Subject to paragraph (5), not later than October 31, 2000, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines, based on the data compiled under paragraph (3) and such other information as may be available, would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States who are inadmissible to the United States. Such preinspection stations shall be in addition to those established prior to the date of the enactment of such Act or pursuant to paragraph (1).

"(5) CONDITIONS.—Prior to the establishment of a preinspection station, the Attorney General, in consultation with the Secretary of State, shall ensure that—

  "(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection;

  "(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety; and

  "(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967), or that an alien in the country otherwise has recourse to avenues of protection from return to persecution.

"(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(3), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.".

  (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 235 the following:

"Sec. 235A. Preinspection at foreign airports.".

SEC. 124. TRAINING OF AIRLINE PERSONNEL IN DETECTION OF FRAUDULENT DOCUMENTS.

  (a) USE OF FUNDS.—

<< 8 USCA § 1356 >>

  (1) IN GENERAL.—Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

  (A) in clause (iv), by inserting ", including training of, and technical assistance to, commercial airline personnel regarding such detection" after "United States"; and

  (B) by adding at the end the following:

"The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.".

<< 8 USCA § 1356 NOTE >>

  (2) APPLICABILITY.—The amendments made by paragraph (1) shall apply to expenses incurred during or after fiscal year 1997.

  (b) COMPLIANCE WITH DETECTION REGULATIONS.—

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(f) (8 U.S.C. 1182(f)) is amended by adding at the end the following: "Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.".

<< 8 USCA § 1182 NOTE >>

(2) DEADLINE.—The Attorney General shall first issue, in proposed form, regulations referred to in the second sentence of section 212(f) of the Immigration and Nationality Act, as added by the amendment made by paragraph (1), not later than 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

SEC. 125. PRECLEARANCE AUTHORITY.

Section 103(a) of the Immigration and Nationality Act (8 U.S.C. 1103(a)) is amended by adding at the end the following: "After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws. Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.".

Subtitle C—Interior Enforcement

SEC. 131. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF CERTAIN INVESTIGATORS.

(a) AUTHORIZATION.—There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate potential violations of sections 274 and 274A of the Immigration and Nationality Act by a number equivalent to 300 full-time active-duty investigators in each of fiscal years 1997, 1998, and 1999.

(b) ALLOCATION OF INVESTIGATORS.—At least one-half of the investigators hired with funds made available under subsection (a) shall be assigned to investigate potential violations of section 274A of the Immigration and Nationality Act.

(c) LIMITATION ON OVERTIME.—None of the funds made available under subsection (a) shall be available for administrative expenses to pay any employee overtime pay in an amount in excess of $25,000 for any fiscal year.

SEC. 132. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF INVESTIGATORS OF VISA OVERSTAYERS.

There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate visa overstayers by a number equivalent to 300 full-time active-duty investigators in fiscal year 1997.

<< 8 USCA § 1357 >>

SEC. 133. ACCEPTANCE OF STATE SERVICES TO CARRY OUT IMMIGRATION ENFORCEMENT.

Section 287 (8 U.S.C. 1357) is amended by adding at the end the following:

AR03305

"(g)(1) Notwithstanding section 1342 of title 31, United States Code, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

"(2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

"(3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

"(4) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

"(5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

"(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

"(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of title 5, United States Code, (relating to compensation for injury) and sections 2671 through 2680 of title 28, United States Code (relating to tort claims).

"(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

"(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

"(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

"(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

"(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.".

SEC. 134. MINIMUM STATE INS PRESENCE.

<< 8 USCA § 1103 >>

(a) IN GENERAL.—Section 103 (8 U.S.C. 1103), as amended by section 102(e) of this division, is further amended by adding at the end the following:

"(f) The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this Act.".

<< 8 USCA § 1103 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of the enactment of this Act.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

<< 18 USCA § 2516 >>

## SEC. 201. WIRETAP AUTHORITY FOR INVESTIGATIONS OF ALIEN SMUGGLING OR DOCUMENT FRAUD.

Section 2516(1) of title 18, United States Code, is amended—

(1) in paragraph (c), by striking "or section 1992 (relating to wrecking trains)" and inserting "section 1992 (relating to wrecking trains), a felony violation of section 1028 (relating to production of false identification documentation), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passports), section 1544 (relating to misuse of passports), or section 1546 (relating to fraud and misuse of visas, permits, and other documents)";

(2) by striking "or" at the end of paragraph (l);

(3) by redesignating paragraphs (m), (n), and (o) as paragraphs (n), (o), and (p), respectively; and

(4) by inserting after paragraph (l) the following new paragraph:

"(m) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (8 U.S.C. 1324, 1327, or 1328) (relating to the smuggling of aliens);".

<< 18 USCA § 1961 >>

## SEC. 202. RACKETEERING OFFENSES RELATING TO ALIEN SMUGGLING.

Section 1961(1) of title 18, United States Code, as amended by section 433 of Public Law 104–132, is amended—

(1) by striking "if the act indictable under section 1028 was committed for the purpose of financial gain";

(2) by inserting "section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers)," after "section 1344 (relating to financial institution fraud),";

(3) by striking "if the act indictable under section 1542 was committed for the purpose of financial gain";

(4) by striking "if the act indictable under section 1543 was committed for the purpose of financial gain";

(5) by striking "if the act indictable under section 1544 was committed for the purpose of financial gain"; and

(6) by striking "if the act indictable under section 1546 was committed for the purpose of financial gain".

## SEC. 203. INCREASED CRIMINAL PENALTIES FOR ALIEN SMUGGLING.

<< 8 USCA § 1324 >>

(a) COMMERCIAL ADVANTAGE.—Section 274(a)(1)(B)(i) (8 U.S.C. 1324(a)(1)(B)(i)) is amended by inserting "or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain" after "subparagraph (A)(i)".

(b) ADDITIONAL OFFENSES.—Section 274(a) (8 U.S.C. 1324(a)) is amended—

(1) in paragraph (1)(A)—

(A) by striking "or" at the end of clause (iii);

(B) by striking the comma at the end of clause (iv) and inserting "; or"; and

(C) by adding at the end the following new clause:

"(v)(I) engages in any conspiracy to commit any of the preceding acts, or

"(II) aids or abets the commission of any of the preceding acts,";

(2) in paragraph (1)(B)—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(A) in clause (i), by inserting "or (v)(I)" after "(A)(i)";

(B) in clause (ii), by striking "or (iv)" and inserting "(iv), or (v)(II)";

(C) in clause (iii), by striking "or (iv)" and inserting "(iv), or (v)"; and

(D) in clause (iv), by striking "or (iv)" and inserting "(iv), or (v)";

(3) in paragraph (2)(B), by striking "be fined" and all that follows and inserting the following: "be fined under title 18, United States Code, and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years."; and

(4) by adding at the end the following new paragraph:

"(3)(A) Any person who, during any 12–month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18, United States Code, or imprisoned for not more than 5 years, or both.

"(B) An alien described in this subparagraph is an alien who—

"(i) is an unauthorized alien (as defined in section 274A(h)(3)), and

"(ii) has been brought into the United States in violation of this subsection.".

(c) SMUGGLING OF ALIENS WHO WILL COMMIT CRIMES.—Clause (i) of section 274(a)(2)(B) (8 U.S.C. 1324(a)(2)(B)) is amended to read as follows:

"(i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,".

(d) APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended by striking "for each transaction constituting a violation of this paragraph, regardless of the number of aliens involved" and inserting "for each alien in respect to whom a violation of this paragraph occurs".

<< 28 USCA § 994 NOTE >>

(e) SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of offenses related to smuggling, transporting, harboring, or inducing aliens in violation of section 274(a) (1)(A) or (2) of the Immigration and Nationality Act (8 U.S.C. 1324(a)(1)(A), (2)(B)) in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses described in paragraph (1)—

(A) increase the base offense level for such offenses at least 3 offense levels above the applicable level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for the number of aliens involved (U.S.S.G. 2L1.1(b)(2)), and increase the sentencing enhancement by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underling conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(E) impose an appropriate sentencing enhancement on a defendant who, in the course of committing an offense described in this subsection—

(i) murders or otherwise causes death, bodily injury, or serious bodily injury to an individual;

(ii) uses or brandishes a firearm or other dangerous weapon; or

(iii) engages in conduct that consciously or recklessly places another in serious danger of death or serious bodily injury;

(F) consider whether a downward adjustment is appropriate if the offense is a first offense and involves the smuggling only of the alien's spouse or child; and

(G) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 8 USCA § 1324 NOTE >>

(f) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 204. INCREASED NUMBER OF ASSISTANT UNITED STATES ATTORNEYS.

(a) IN GENERAL.—The number of Assistant United States Attorneys employed by the Department of Justice for the fiscal year 1997 shall be increased by at least 25 above the number of Assistant United States Attorneys that were authorized to be employed as of September 30, 1996.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall prosecute persons who bring into the United States or harbor illegal aliens or violate other criminal statutes involving illegal aliens.

SEC. 205. UNDERCOVER INVESTIGATION AUTHORITY.

<< 8 USCA § 1363a >>

(a) IN GENERAL.—Title II is amended by adding at the end the following new section:

"UNDERCOVER INVESTIGATION AUTHORITY

"SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

"(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

"(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

"(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

"(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

"(D) the third undesignated paragraph under the heading 'Miscellaneous' of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

"(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

"(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

"(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254(a) and (c));

"(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

"(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

"(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

"(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

"(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

"(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.".

(b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 293 the following:

"Sec. 294. Undercover investigation authority.".

Subtitle B—Deterrence of Document Fraud

SEC. 211. INCREASED CRIMINAL PENALTIES FOR FRAUDULENT USE OF GOVERNMENT–ISSUED DOCUMENTS.

(a) FRAUD AND MISUSE OF GOVERNMENT–ISSUED IDENTIFICATION DOCUMENTS.—(1) Section 1028(b) of title 18, United States Code, is amended—

<< 18 USCA § 1028 >>

(A) in paragraph (1), by inserting "except as provided in paragraphs (3) and (4)," after "(1)" and by striking "five years" and inserting "15 years";

(B) in paragraph (2), by inserting "except as provided in paragraphs (3) and (4)," after "(2)" and by striking "and" at the end;

(C) by redesignating paragraph (3) as paragraph (5); and

(D) by inserting after paragraph (2) the following new paragraphs:

"(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);

"(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and".

<< 18 USCA §§ 1425, 1426, 1427, 1541, 1542, 1543, 1544, 1546 >>

(2) Sections 1425 through 1427, sections 1541 through 1544, and section 1546(a) of title 18, United States Code, are each amended by striking "imprisoned not more" and all that follows through "years" each place it appears and inserting the following: "imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facility such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense)".

<< 28 USCA § 994 NOTE >>

(b) CHANGES TO THE SENTENCING LEVELS.—

(1) IN GENERAL.—Pursuant to the Commission's authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of violating, or conspiring to violate, sections 1028(b)(1), 1425 through 1427, 1541 through 1544, and 1546(a) of title 18, United States Code, in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses referred to in paragraph (1)—

(A) increase the base offense level for such offenses at least 2 offense levels above the level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for number of documents or passports involved (U.S.S.G. 2L2.1(b)(2)), and increase the upward adjustment by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category; and

(E) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1028 NOTE >>

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 212. NEW DOCUMENT FRAUD OFFENSES; NEW CIVIL PENALTIES FOR DOCUMENT FRAUD.

<< 8 USCA § 1324c >>

(a) ACTIVITIES PROHIBITED.—Section 274C(a) (8 U.S.C. 1324c(a)) is amended—

(1) in paragraph (1), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(2) in paragraph (2), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(3) in paragraph (3)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the comma at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking "or" at the end;

(4) in paragraph (4)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the period at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking the period at the end and inserting ", or"; and

(5) by adding at the end the following new paragraphs:

"(5) to prepare, file, or assist another in preparing or filing, any application for benefits under this Act, or any document required under this Act, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted, or

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(6)(A) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States, and (B) to fail to present such document to an immigration officer upon arrival at a United States port of entry.".

(b) DEFINITION OF FALSELY MAKE.—Section 274C (8 U.S.C. 1324c), as amended by section 213 of this division, is further amended by adding at the end the following new subsection:

"(f) FALSELY MAKE.—For purposes of this section, the term 'falsely make' means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.".

(c) CONFORMING AMENDMENT.—Section 274C(d)(3) (8 U.S.C. 1324c(d)(3)) is amended by striking "each document used, accepted, or created and each instance of use, acceptance, or creation" each place it appears and inserting "each document that is the subject of a violation under subsection (a)".

(d) WAIVER BY ATTORNEY GENERAL.—Section 274C(d) (8 U.S.C. 1324c(d)) is amended by adding at the end the following new paragraph:

"(7) WAIVER BY ATTORNEY GENERAL.—The Attorney General may waive the penalties imposed by this section with respect to an alien who knowingly violates subsection (a)(6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).".

<< 8 USCA § 1324c NOTE >>

(e) EFFECTIVE DATE.—Section 274C(f) of the Immigration and Nationality Act, as added by subsection (b), applies to the preparation of applications before, on, or after the date of the enactment of this Act.

<< 8 USCA § 1324c >>

SEC. 213. NEW CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS PREPARER OF FALSE APPLICATION FOR IMMIGRATION BENEFITS.

Section 274C (8 U.S.C. 1324c) is amended by adding at the end the following new subsection:

"(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS DOCUMENT PREPARER.—(1) Whoever, in any matter within the jurisdiction of the Service, knowingly and willfully fails to disclose, conceals, or covers up the fact that they have, on behalf of any person and for a fee or other remuneration, prepared or assisted in preparing an application which was falsely made (as defined in subsection (f)) for immigration benefits, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both, and prohibited from preparing or assisting in preparing, whether or not for a fee or other remuneration, any other such application.

"(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for immigration benefits pursuant to this Act, or the regulations promulgated thereunder, whether or not for a fee or other remuneration and regardless of whether in any matter within the jurisdiction of the Service, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 15 years, or both, and prohibited from preparing or assisting in preparing any other such application.".

<< 18 USCA § 1546 >>

SEC. 214. CRIMINAL PENALTY FOR KNOWINGLY PRESENTING DOCUMENT WHICH FAILS TO CONTAIN REASONABLE BASIS IN LAW OR FACT.

The fourth paragraph of section 1546(a) of title 18, United States Code, is amended by striking "containing any such false statement" and inserting "which contains any such false statement or which fails to contain any reasonable basis in law or fact".

<< 18 USCA § 1015 >>

## SEC. 215. CRIMINAL PENALTY FOR FALSE CLAIM TO CITIZENSHIP.

Section 1015 of title 18, United States Code, is amended—

(1) by striking the dash at the end of paragraph (d) and inserting "; or", and

(2) by inserting after paragraph (d) the following:

"(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal or State benefit or service, or to engage unlawfully in employment in the United States; or

"(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—".

## SEC. 216. CRIMINAL PENALTY FOR VOTING BY ALIENS IN FEDERAL ELECTION.

<< 18 USCA § 611 >>

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after section 610 the following:

"§ 611. Voting by aliens

"(a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—

"(1) the election is held partly for some other purpose;

"(2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and

"(3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

"(b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.".

<< 18 USCA Ch. 29 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 29 of title 18, United States Code, is amended by inserting after the item relating to section 610 the following new item:

"611. Voting by aliens.".

<< 18 USCA § 982 >>

## SEC. 217. CRIMINAL FORFEITURE FOR PASSPORT AND VISA RELATED OFFENSES.

Section 982(a) of title 18, United States Code, is amended by inserting after paragraph (5) the following new paragraph:

"(6)(A) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law—

"(i) any conveyance, including any vessel, vehicle, or aircraft used in the commission of a violation of, or a conspiracy to violate, subsection (a); and

"(ii) any property real or personal—

"(I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title; or

"(II) that is used to facilitate, or is intended to be used to facilitate, the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title.

The court, in imposing sentence on such person, shall order that the person forfeit to the United States all property described in this subparagraph.

"(B) The criminal forfeiture of property under subparagraph (A), including any seizure and disposition of the property and any related administrative or judicial proceeding, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), other than subsections (a) and (d) of such section 413.".

## SEC. 218. CRIMINAL PENALTIES FOR INVOLUNTARY SERVITUDE.

<< 18 USCA §§ 1581, 1583, 1584, 1588 >>

(a) AMENDMENTS TO TITLE 18.—Sections 1581, 1583, 1584, and 1588 of title 18, United States Code, are amended by striking "five" each place it appears and inserting "10".

<< 28 USCA § 994 NOTE >>

(b) REVIEW OF SENTENCING GUIDELINES.—The United States Sentencing Commission shall ascertain whether there exists an unwarranted disparity—

(1) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses in effect on the date of the enactment of this Act; and

(2) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for alien smuggling offenses in effect on the date of the enactment of this Act and after the amendment made by subsection (a).

(c) AMENDMENT OF SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall review its guidelines on sentencing for peonage, involuntary servitude, and slave trade offenses under sections 1581 through 1588 of title 18, United States Code, and shall amend such guidelines as necessary to—

(A) reduce or eliminate any unwarranted disparity found under subsection (b) that exists between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses and alien smuggling offenses;

(B) ensure that the applicable guidelines for defendants convicted of peonage, involuntary servitude, and slave trade offenses are sufficiently stringent to deter such offenses and adequately reflect the heinous nature of such offenses; and

(C) ensure that the guidelines reflect the general appropriateness of enhanced sentences for defendants whose peonage, involuntary servitude, or slave trade offenses involve—

(i) a large number of victims;

(ii) the use or threatened use of a dangerous weapon; or

(iii) a prolonged period of peonage or involuntary servitude.

(2) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1581 NOTE >>

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

<< 8 USCA § 1324 >>

## SEC. 219. ADMISSIBILITY OF VIDEOTAPED WITNESS TESTIMONY.

Section 274 (8 U.S.C. 1324) is amended by adding at the end thereof the following new subsection:

"(d) Notwithstanding any provision of the Federal Rules of Evidence, the videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation if the witness was available for cross examination and the deposition otherwise complies with the Federal Rules of Evidence.".

<< 8 USCA § 1324c >>

SEC. 220. SUBPOENA AUTHORITY IN DOCUMENT FRAUD ENFORCEMENT.

Section 274C(d)(1) (8 U.S.C. 1324c(d)(1)) is amended—
(1) by striking "and" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
(3) by inserting after subparagraph (B) the following:
"(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

SEC. 301. TREATING PERSONS PRESENT IN THE UNITED STATES WITHOUT AUTHORIZATION AS NOT ADMITTED.

<< 8 USCA § 1101 >>

(a) "ADMISSION" DEFINED.—Paragraph (13) of section 101(a) (8 U.S.C. 1101(a)) is amended to read as follows:
"(13)(A) The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.
"(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.
"(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—
"(i) has abandoned or relinquished that status,
"(ii) has been absent from the United States for a continuous period in excess of 180 days,
"(iii) has engaged in illegal activity after having departed the United States,
"(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,
"(v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a), or
"(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.".
(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(a) (8 U.S.C. 1182(a)) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following new paragraph:
"(9) ALIENS PREVIOUSLY REMOVED.—
"(A) CERTAIN ALIENS PREVIOUSLY REMOVED.—
"(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(ii) OTHER ALIENS.—Any alien not described in clause (i) who—

"(I) has been ordered removed under section 240 or any other provision of law, or

"(II) departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

"(B) ALIENS UNLAWFULLY PRESENT.—

"(i) IN GENERAL.—Any alien (other than an alien lawfully admitted for permanent residence) who—

"(I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 244(e)) prior to the commencement of proceedings under section 235(b)(1) or section 240, and again seeks admission within 3 years of the date of such alien's departure or removal, or

"(II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

"(ii) CONSTRUCTION OF UNLAWFUL PRESENCE.—For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

"(iii) EXCEPTIONS.—

"(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

"(III) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(IV) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if 'violation of the terms of the alien's nonimmigrant visa' were substituted for 'unlawful entry into the United States' in subclause (III) of that paragraph.

"(iv) TOLLING FOR GOOD CAUSE.—In the case of an alien who—

"(I) has been lawfully admitted or paroled into the United States,

"(II) has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

"(III) has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

"(v) WAIVER.—The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

"(C) ALIENS UNLAWFULLY PRESENT AFTER PREVIOUS IMMIGRATION VIOLATIONS.—

"(i) IN GENERAL.—Any alien who—

"(I) has been unlawfully present in the United States for an aggregate period of more than 1 year, or

"(II) has been ordered removed under section 235(b)(1), section 240, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

"(ii) EXCEPTION.—Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.".

<< 8 USCA § 1258 >>

(2) LIMITATION ON CHANGE OF STATUS.—Section 248 (8 U.S.C. 1258) is amended by inserting "and who is not inadmissible under section 212(a)(9)(B)(i) (or whose inadmissibility under such section is waived under section 212(a)(9)(B)(v))" after "maintain that status".

<< 8 USCA § 1182 NOTE >>

(3) TREATMENT OF UNLAWFUL PRESENCE BEFORE EFFECTIVE DATE.—In applying section 212(a)(9)(B) of the Immigration and Nationality Act, as inserted by paragraph (1), no period before the title III–A effective date shall be included in a period of unlawful presence in the United States.

(c) REVISION TO GROUND OF INADMISSIBILITY FOR ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Subparagraphs (A) and (B) of section 212(a)(6) (8 U.S.C. 1182(a)(6)) are amended to read as follows:

"(A) ALIENS PRESENT WITHOUT ADMISSION OR PAROLE.—

"(i) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

"(ii) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who demonstrates that—

"(I) the alien qualifies for immigrant status under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),

"(II)(a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented to or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

"(III) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

"(B) FAILURE TO ATTEND REMOVAL PROCEEDING.—Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.".

<< 8 USCA § 1182 NOTE >>

(2) TRANSITION FOR BATTERED SPOUSE OR CHILD PROVISION.—The requirements of subclauses (II) and (III) of section 212(a)(6)(A)(ii) of the Immigration and Nationality Act, as inserted by paragraph (1), shall not apply to an alien who demonstrates that the alien first arrived in the United States before the title III–A effective date (described in section 309(a) of this division).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1251 >>

(d) ADJUSTMENT IN GROUNDS FOR DEPORTATION.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

(1) in the matter before paragraph (1) of subsection (a), by striking "in the United States" and inserting "in and admitted to the United States";

(2) in subsection (a)(1), by striking "EXCLUDABLE" each place it appears and inserting "INADMISSIBLE";

(3) in subsection (a)(1)(A), by striking "excludable" and inserting "inadmissible"; and

(4) by amending subparagraph (B) of subsection (a)(1) to read as follows:

"(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.

SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING (REVISED SECTION 235).

<< 8 USCA § 1225 >>

(a) IN GENERAL.—Section 235 (8 U.S.C. 1225) is amended to read as follows:

"INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING

"SEC. 235. (a) INSPECTION.—

"(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this Act an applicant for admission.

"(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.

"(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

"(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

"(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

"(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

"(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES AND CERTAIN OTHER ALIENS WHO HAVE NOT BEEN ADMITTED OR PAROLED.—

"(A) SCREENING.—

"(i) IN GENERAL.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7), the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution.

"(ii) CLAIMS FOR ASYLUM.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)

(C) or 212(a)(7) and the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

"(iii) APPLICATION TO CERTAIN OTHER ALIENS.—

"(I) IN GENERAL.—The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

"(II) ALIENS DESCRIBED.—An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2–year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

"(B) ASYLUM INTERVIEWS.—

"(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

"(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

"(I) IN GENERAL.—Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

"(II) RECORD OF DETERMINATION.—The officer shall prepare a written record of a determination under subclause (I). Such record shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. A copy of the officer's interview notes shall be attached to the written summary.

"(III) REVIEW OF DETERMINATION.—The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I).

"(IV) MANDATORY DETENTION.—Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

"(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.

"(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE REVIEW.—Except as provided in subparagraph (B)(iii)(III), a removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 207, or to have been granted asylum under section 208.

"(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

  "(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and

  "(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

  "(F) EXCEPTION.—Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry.

"(2) INSPECTION OF OTHER ALIENS.—

  "(A) IN GENERAL.—Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 240.

  "(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

  "(i) who is a crewman,

  "(ii) to whom paragraph (1) applies, or

  "(iii) who is a stowaway.

  "(C) TREATMENT OF ALIENS ARRIVING FROM CONTIGUOUS TERRITORY.—In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 240.

"(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 240.

"(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

  "(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

  "(A) order the alien removed, subject to review under paragraph (2);

  "(B) report the order of removal to the Attorney General; and

  "(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

  "(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

  "(B) If the Attorney General—

  "(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

  "(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

  "(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

  "(3) SUBMISSION OF STATEMENT AND INFORMATION.—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

"(d) AUTHORITY RELATING TO INSPECTIONS.—

  "(1) AUTHORITY TO SEARCH CONVEYANCES.—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

  "(2) AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

  "(A) to detain the alien on the vessel or at the airport of arrival, and

  "(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

"(3) ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

"(4) SUBPOENA AUTHORITY.—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

"(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.".

<< 8 USCA § 1225 NOTE >>

(b) GAO STUDY ON OPERATION OF EXPEDITED REMOVAL PROCEDURES.—

(1) STUDY.—The Comptroller General shall conduct a study on the implementation of the expedited removal procedures under section 235(b)(1) of the Immigration and Nationality Act, as amended by subsection (a). The study shall examine—

(A) the effectiveness of such procedures in deterring illegal entry,

(B) the detention and adjudication resources saved as a result of the procedures,

(C) the administrative and other costs expended to comply with the provision,

(D) the effectiveness of such procedures in processing asylum claims by undocumented aliens who assert a fear of persecution, including the accuracy of credible fear determinations, and

(E) the cooperation of other countries and air carriers in accepting and returning aliens removed under such procedures.

(2) REPORT.—By not later than 18 months after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on the study conducted under paragraph (1).

SEC. 303. APPREHENSION AND DETENTION OF ALIENS (REVISED SECTION 236).

<< 8 USCA § 1226 >>

(a) IN GENERAL.—Section 236 (8 U.S.C. 1226) is amended to read as follows:

"APPREHENSION AND DETENTION OF ALIENS

"SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

"(b) REVOCATION OF BOND OR PAROLE.—The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

"(c) DETENTION OF CRIMINAL ALIENS.—

"(1) CUSTODY.—The Attorney General shall take into custody any alien who—

  "(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

  "(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

  "(C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

  "(D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

  "(2) RELEASE.—The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

  "(d) IDENTIFICATION OF CRIMINAL ALIENS.—(1) The Attorney General shall devise and implement a system—

  "(A) to make available, daily (on a 24–hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

  "(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

  "(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

  "(2) The record under paragraph (1)(C) shall be made available—

  "(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

  "(B) to officials of the Department of State for use in its automated visa lookout system.

  "(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

  "(e) JUDICIAL REVIEW.—The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.".

<< 8 USCA § 1226 NOTE >>

(b) EFFECTIVE DATE.—

  (1) IN GENERAL.—The amendment made by subsection (a) shall become effective on the title III–A effective date.

<< 8 USCA § 1226 NOTE, 1252 nt >>

  (2) NOTIFICATION REGARDING CUSTODY.—If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104–132, the provisions in paragraph (3) shall be in effect for a 1–year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1–year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1–year period. After the end of such 1–year or 2–year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

<< 8 USCA § 1226 NOTE >>

(3) TRANSITION PERIOD CUSTODY RULES.—

(A) IN GENERAL.—During the period in which this paragraph is in effect pursuant to paragraph (2), the Attorney General shall take into custody any alien who—

(i) has been convicted of an aggravated felony (as defined under section 101(a)(43) of the Immigration and Nationality Act, as amended by section 321 of this division),

(ii) is inadmissible by reason of having committed any offense covered in section 212(a)(2) of such Act,

(iii) is deportable by reason of having committed any offense covered in section 241(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of such Act (before redesignation under this subtitle), or

(iv) is inadmissible under section 212(a)(3)(B) of such Act or deportable under section 241(a)(4)(B) of such Act (before redesignation under this subtitle),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(B) RELEASE.—The Attorney General may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii) and—

(i) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or

(ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

SEC. 304. REMOVAL PROCEEDINGS; CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS; VOLUNTARY DEPARTURE (REVISED AND NEW SECTIONS 239 TO 240C).

(a) IN GENERAL.—Chapter 4 of title II is amended—

<< 1 USCA § 1229 >>

<< 1 USCA § 1224 >>

(1) by redesignating section 239 (8 U.S.C. 1229) as section 234 and by moving such section to immediately follow section 233;

<< 8 USCA § 1230 >>

(2) by redesignating section 240 (8 U.S.C. 1230) as section 240C; and

(3) by inserting after section 238 the following new sections:

<< 8 USCA § 1229 >>

"INITIATION OF REMOVAL PROCEEDINGS

"SEC. 239. (a) NOTICE TO APPEAR.—

"(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

"(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

"(G)(i) The time and place at which the proceedings will be held.

"(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

"(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

"(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

"(i) the new time or place of the proceedings, and

"(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

"(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

"(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

"(b) SECURING OF COUNSEL.—

"(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

"(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

"(3) RULE OF CONSTRUCTION.—Nothing in this subsection may be construed to prevent the Attorney General from proceeding against an alien pursuant to section 240 if the time period described in paragraph (1) has elapsed and the alien has failed to secure counsel.

"(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

"(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

"(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

<< 8 USCA § 1229a >>

"REMOVAL PROCEEDINGS

"SEC. 240. (a) PROCEEDING.—

"(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

"(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).

"(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.

"(b) CONDUCT OF PROCEEDING.—

AR03324
426

"(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this Act.

"(2) FORM OF PROCEEDING.—

"(A) IN GENERAL.—The proceeding may take place—

"(i) in person,

"(ii) where agreed to by the parties, in the absence of the alien,

"(iii) through video conference, or

"(iv) subject to subparagraph (B), through telephone conference.

"(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

"(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

"(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

"(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

"(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this Act, and

"(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

"(5) CONSEQUENCES OF FAILURE TO APPEAR.—

"(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

"(B) NO NOTICE OF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

"(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

"(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

"(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 239(a) or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

"(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

"(E) ADDITIONAL APPLICATION TO CERTAIN ALIENS IN CONTIGUOUS TERRITORY.—The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 235(b)(2)(C).

"(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

"(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

AR03325

"(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

"(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

"(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

"(c) DECISION AND BURDEN OF PROOF.—

"(1) DECISION.—

"(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

"(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

"(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

"(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

"(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

"(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—

"(A) IN GENERAL.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"(B) PROOF OF CONVICTIONS.—In any proceeding under this Act, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

"(i) An official record of judgment and conviction.

"(ii) An official record of plea, verdict, and sentence.

"(iii) A docket entry from court records that indicates the existence of the conviction.

"(iv) Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

"(v) An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

"(vi) Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

"(vii) Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

"(C) ELECTRONIC RECORDS.—In any proceeding under this Act, any record of conviction or abstract that has been submitted by electronic means to the Service from a State or court shall be admissible as evidence to prove a criminal conviction if it is—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(i) certified by a State official associated with the State's repository of criminal justice records as an official record from its repository or by a court official from the court in which the conviction was entered as an official record from its repository, and

"(ii) certified in writing by a Service official as having been received electronically from the State's record repository or the court's record repository.

A certification under clause (i) may be by means of a computer-generated signature and statement of authenticity.

"(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

"(5) MOTIONS TO RECONSIDER.—

"(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

"(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

"(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

"(6) MOTIONS TO REOPEN.—

"(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

"(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

"(C) DEADLINE.—

"(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

"(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

"(iii) FAILURE TO APPEAR.—The filing of a motion to reopen an order entered pursuant to subsection (b)(5) is subject to the deadline specified in subparagraph (C) of such subsection.

"(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

"(e) DEFINITIONS.—In this section and section 240A:

"(1) EXCEPTIONAL CIRCUMSTANCES.—The term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

"(2) REMOVABLE.—The term 'removable' means—

"(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or

"(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.

<< 8 USCA § 1229b >>

"CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS

"SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

"(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

"(3) has not been convicted of any aggravated felony.

"(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—

"(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

"(B) has been a person of good moral character during such period;

"(C) has not been convicted of an offense under section 212(a)(2), 237(a)(2), or 237(a)(3); and

"(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

"(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien demonstrates that—

"(A) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

"(B) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

"(C) the alien has been a person of good moral character during such period;

"(D) the alien is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

"(E) the removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

"(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

"(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

"(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

"(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

"(3) An alien who—

"(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

"(B) is subject to the two-year foreign residence requirement of section 212(e), and

"(C) has not fulfilled that requirement or received a waiver thereof.

"(4) An alien who is inadmissible under section 212(a)(3) or deportable under section 237(a)(4).

"(5) An alien who is described in section 241(b)(3)(B)(i).

"(6) An alien whose removal has previously been cancelled under this section or whose deportation was suspended under section 244(a) or who has been granted relief under section 212(c), as such sections were in effect before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

"(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

"(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under

section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

"(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

"(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

"(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

"(B) at the time of the alien's enlistment or induction was in the United States.

"(e) ANNUAL LIMITATION.—The Attorney General may not cancel the removal and adjust the status under this section, nor suspend the deportation and adjust the status under section 244(a) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), of a total of more than 4,000 aliens in any fiscal year. The previous sentence shall apply regardless of when an alien applied for such cancellation and adjustment and whether such an alien had previously applied for suspension of deportation under such section 244(a).

<< 8 USCA § 1229c >>

"VOLUNTARY DEPARTURE

"SEC. 240B. (a) CERTAIN CONDITIONS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

"(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

"(b) AT CONCLUSION OF PROCEEDINGS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the immigration judge enters an order granting voluntary departure in lieu of removal and finds that—

"(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);

"(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

"(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and

"(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.

"(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(6)(A).

"(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249. The order permitting the alien to depart voluntarily shall inform the alien of the penalties under this subsection.

"(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens. No court may review any regulation issued under this subsection.

"(f) JUDICIAL REVIEW.—No court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure under subsection (b), nor shall any court order a stay of an alien's removal pending consideration of any claim with respect to voluntary departure.".

<< 8 USCA § 1182 >>

(b) REPEAL OF SECTION 212(c).—Section 212(c) (8 U.S.C. 1182(c)) is repealed.

(c) STREAMLINING REMOVAL OF CRIMINAL ALIENS.—

<< 8 USCA § 1252a >>

(1) IN GENERAL.—Section 242A(b)(4) (8 U.S.C. 1252a(b)(4)), as amended by section 442(a) of Public Law 104–132 and before redesignation by section 308(b)(5) of this division, is amended—

(A) by striking subparagraph (D);

(B) by amending subparagraph (E) to read as follows:

"(D) a determination is made for the record that the individual upon whom the notice for the proceeding under this section is served (either in person or by mail) is, in fact, the alien named in such notice;"; and

(C) by redesignating subparagraphs (F) and (G) as subparagraph (E) and (F), respectively.

<< 8 USCA § 1252a NOTE >>

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall be effective as if included in the enactment of section 442(a) of Public Law 104–132.

SEC. 305. DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED (NEW SECTION 241).

(a) IN GENERAL.—Title II is further amended—

<< 8 USCA § 1227 >>

(1) by striking section 237 (8 U.S.C. 1227),

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 >>

(2) by redesignating section 241 (8 U.S.C. 1251) as section 237 and by moving such section to immediately follow section 236, and

<< 8 USCA § 1231 >>

(3) by inserting after section 240C (as redesignated by section 304(a)(2)) of this division the following new section:

"DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED

"SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS ORDERED REMOVED.—

"(1) REMOVAL PERIOD.—

"(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').

"(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

"(i) The date the order of removal becomes administratively final.

"(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

"(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

"(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"(2) DETENTION.—During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B) or deportable under section 237(a)(2) or 237(a)(4)(B).

"(3) SUPERVISION AFTER 90–DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

"(A) to appear before an immigration officer periodically for identification;

"(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

"(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

"(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

"(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—

"(A) IN GENERAL.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)) and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

"(B) EXCEPTION FOR REMOVAL OF NONVIOLENT OFFENDERS PRIOR TO COMPLETION OF SENTENCE OF IMPRISONMENT.—The Attorney General is authorized to remove an alien in accordance with applicable procedures under this Act before the alien has completed a sentence of imprisonment—

"(i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 101(a)(43)(B), (C), (E), (I), or (L) and (II) the removal of the alien is appropriate and in the best interest of the United States; or

"(ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 101(a)(43)(C) or (E)), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

"(C) NOTICE.—Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

"(D) NO PRIVATE RIGHT.—No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

"(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS ILLEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this Act, and the alien shall be removed under the prior order at any time after the reentry.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(6) INADMISSIBLE OR CRIMINAL ALIENS.—An alien ordered removed who is inadmissible under section 212, removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

"(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

"(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

"(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

"(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—

"(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—

"(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

"(3) RESTRICTION ON REMOVAL TO A COUNTRY WHERE ALIEN'S LIFE OR FREEDOM WOULD BE THREATENED.—

"(A) IN GENERAL.—Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

"(B) EXCEPTION.—Subparagraph (A) does not apply to an alien deportable under section 237(a)(4)(D) or if the Attorney General decides that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

"(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

"(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 237(a)(4)(B) shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

"(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—

"(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(b)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

"(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

"(B) the alien is a stowaway—

"(i) who has been ordered removed in accordance with section 235(a)(1),

"(ii) who has requested asylum, and

"(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

"(2) STAY OF REMOVAL.—

"(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

"(i) immediate removal is not practicable or proper; or

"(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

"(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'—

"(i) the cost of maintenance of the alien; and

"(ii) a witness fee of $1 a day.

"(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

"(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

"(ii) condition that the alien appear when required as a witness and for removal; and

"(iii) other conditions the Attorney General may prescribe.

"(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

"(i) while the alien is detained under subsection (d)(1), and

"(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

"(I) subsection (d)(2)(A) or (d)(2)(B)(i),

"(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

"(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

"(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

"(i) the alien is a crewmember;

"(ii) the alien has an immigrant visa;

"(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

"(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

"(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

"(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

"(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

"(vi) the individual claims to be a national of the United States and has a United States passport.

"(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

"(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

"(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

"(B) take the alien to the foreign country to which the alien is ordered removed.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

"(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

"(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

"(i) for medical treatment,

"(ii) for detention of the stowaway by the Attorney General, or

"(iii) for departure or removal of the stowaway; and

"(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if the requester has obtained any travel documents necessary for departure or repatriation of the stowaway and removal of the stowaway will not be unreasonably delayed.

"(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

"(e) PAYMENT OF EXPENSES OF REMOVAL.—

"(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

"(A) pay the cost from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'; and

"(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

"(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

"(A) THROUGH APPROPRIATION.—Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(B) THROUGH OWNER.—

"(i) IN GENERAL.—In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

"(ii) ALIENS DESCRIBED.—An alien described in this clause is an alien who—

"(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

"(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.

"(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

"(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

"(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

"(g) PLACES OF DETENTION.—

"(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses', without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

"(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

"(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1326 >>

(b) REENTRY OF ALIEN REMOVED PRIOR TO COMPLETION OF TERM OF IMPRISONMENT.—Section 276(b) (8 U.S.C. 1326(b)), as amended by section 321(b) of this division, is amended—

(1) by striking "or" at the end of paragraph (2),

(2) by adding "or" at the end of paragraph (3), and

(3) by inserting after paragraph (3) the following new paragraph:

"(4) who was removed from the United States pursuant to section 241(a)(4)(B) who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under title 18, United States Code, imprisoned for not more than 10 years, or both.

<< 8 USCA § 1182 >>

(c) MISCELLANEOUS CONFORMING AMENDMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a) of this division, is amended by striking "241(a)(5)(B)" each place it appears and inserting "237(a)(5)(B)".

SEC. 306. APPEALS FROM ORDERS OF REMOVAL (NEW SECTION 242).

(a) IN GENERAL.—Section 242 (8 U.S.C. 1252) is amended—

<< 8 USCA § 1252 >>

<< 8 USCA § 1231 >>

(1) by redesignating subsection (j) as subsection (i) and by moving such subsection and adding it at the end of section 241, as inserted by section 305(a)(3) of this division; and

<< 8 USCA § 1252 >>

(2) by amending the remainder of section 242 to read as follows:

"JUDICIAL REVIEW OF ORDERS OF REMOVAL

"SEC. 242. (a) APPLICABLE PROVISIONS.—

"(1) GENERAL ORDERS OF REMOVAL.—Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

"(2) MATTERS NOT SUBJECT TO JUDICIAL REVIEW.—

"(A) REVIEW RELATING TO SECTION 235(b)(1).—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

"(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

"(iii) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

"(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

"(B) DENIALS OF DISCRETIONARY RELIEF.—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) any judgment regarding the granting of relief under section 212(h), 212(i), 240A, 240B, or 245, or

"(ii) any other decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General, other than the granting of relief under section 208(a).

"(C) ORDERS AGAINST CRIMINAL ALIENS.—Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 212(a)(2) or 237(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 237(a)(2)(A) (ii) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 237(a) (2)(A)(i).

"(3) TREATMENT OF CERTAIN DECISIONS.—No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).

"(b) REQUIREMENTS FOR REVIEW OF ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

"(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

"(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

"(3) SERVICE.—

"(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 240 was entered.

"(B) STAY OF ORDER.—Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

"(C) ALIEN'S BRIEF.—The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

"(4) SCOPE AND STANDARD FOR REVIEW.—Except as provided in paragraph (5)(B)—

"(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

"(B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

"(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

"(D) the Attorney General's discretionary judgment whether to grant relief under section 208(a) shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

"(5) TREATMENT OF NATIONALITY CLAIMS.—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

"(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

"(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

"(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

"(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

"(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

"(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

"(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

"(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

"(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

"(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

"(8) CONSTRUCTION.—This subsection—

"(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

"(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

"(C) does not require the Attorney General to defer removal of the alien.

"(9) CONSOLIDATION OF QUESTIONS FOR JUDICIAL REVIEW.—Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section.

"(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal—

"(1) shall attach a copy of such order, and

"(2) shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

"(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

"(1) the alien has exhausted all administrative remedies available to the alien as of right, and

"(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

"(e) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

"(1) LIMITATIONS ON RELIEF.—Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

"(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 235(b)(1) except as specifically authorized in a subsequent paragraph of this subsection, or

"(B) certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

"(2) HABEAS CORPUS PROCEEDINGS.—Judicial review of any determination made under section 235(b)(1) is available in habeas corpus proceedings, but shall be limited to determinations of—

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

"(3) CHALLENGES ON VALIDITY OF THE SYSTEM.—

"(A) IN GENERAL.—Judicial review of determinations under section 235(b) and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

"(i) whether such section, or any regulation issued to implement such section, is constitutional; or

"(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this title or is otherwise in violation of law.

"(B) DEADLINES FOR BRINGING ACTIONS.—Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

"(C) NOTICE OF APPEAL.—A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

"(D) EXPEDITIOUS CONSIDERATION OF CASES.—It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

"(4) DECISION.—In any case where the court determines that the petitioner—

"(A) is an alien who was not ordered removed under section 235(b)(1), or

"(B) has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

"(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

"(f) LIMIT ON INJUNCTIVE RELIEF.—

"(1) IN GENERAL.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

"(2) PARTICULAR CASES.—Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

"(g) EXCLUSIVE JURISDICTION.—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.".

<< 8 USCA § 1105a >>

(b) REPEAL OF SECTION 106.—Section 106 (8 U.S.C. 1105a) is repealed.

<< 8 USCA § 1252 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subject to paragraph (2), the amendments made by subsections (a) and (b) shall apply to all final orders of deportation or removal and motions to reopen filed on or after the date of the enactment of this Act and subsection (g) of section 242 of the Immigration and Nationality Act (as added by subsection (a)), shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act.

(2) LIMITATION.—Paragraph (1) shall not be considered to invalidate or to require the reconsideration of any judgment or order entered under section 106 of the Immigration and Nationality Act, as amended by section 440 of Public Law 104–132.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

<< 8 USCA § 1182 NOTE >>

(d) TECHNICAL AMENDMENT.—Effective as if included in the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), subsections (a), (c), (d), (g), and (h) of section 440 of such Act are amended by striking "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i)" and inserting "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i)".

<< 8 USCA § 1253 >>

SEC. 307. PENALTIES RELATING TO REMOVAL (REVISED SECTION 243).

(a) IN GENERAL.—Section 243 (8 U.S.C. 1253) is amended to read as follows:

"PENALTIES RELATED TO REMOVAL

"SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

"(1) IN GENERAL.—Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—

"(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

"(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

"(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

"(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

"(2) EXCEPTION.—It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 682 of 1021   PageID 7552

"(3) SUSPENSION.—The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—

"(A) the age, health, and period of detention of the alien;

"(B) the effect of the alien's release upon the national security and public peace or safety;

"(C) the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

"(D) the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

"(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

"(F) the eligibility of the alien for discretionary relief under the immigration laws.

"(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

"(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

"(1) CIVIL PENALTIES.—

"(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

"(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

"(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

"(2) CLEARING VESSELS AND AIRCRAFT.—

"(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

"(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

"(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.".

SEC. 308. REDESIGNATION AND REORGANIZATION OF OTHER PROVISIONS; ADDITIONAL CONFORMING AMENDMENTS.

(a) CONFORMING AMENDMENT TO TABLE OF CONTENTS; OVERVIEW OF REORGANIZED CHAPTERS.—The table of contents, as amended by sections 123(b) and 671(e)(1) of this division, is amended—

(1) by striking the item relating to section 106, and

(2) by striking the item relating to chapter 4 of title II and all that follows through the item relating to section 244A and inserting the following:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL

"Sec. 231. Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.

"Sec. 232. Detention of aliens for physical and mental examination.

"Sec. 233. Entry through or from foreign territory and adjacent islands; landing stations.

"Sec. 234. Designation of ports of entry for aliens arriving by civil aircraft.

"Sec. 235. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.

"Sec. 235A. Preinspection at foreign airports.

"Sec. 236. Apprehension and detention of aliens not lawfully in the United States.

"Sec. 237. General classes of deportable aliens.

"Sec. 238. Expedited removal of aliens convicted of committing aggravated felonies.

"Sec. 239. Initiation of removal proceedings.

"Sec. 240. Removal proceedings.

"Sec. 240A. Cancellation of removal; adjustment of status.

"Sec. 240B. Voluntary departure.

"Sec. 240C. Records of admission.

"Sec. 241. Detention and removal of aliens ordered removed.

"Sec. 242. Judicial review of orders of removal.

"Sec. 243. Penalties relating to removal.

"Sec. 244. Temporary protected status.

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".
  (b) REORGANIZATION OF OTHER PROVISIONS.—Chapters 4 and 5 of title II are amended as follows:

<< 8 USCA Ch. 12 >>

  (1) AMENDING CHAPTER HEADING.—Amend the heading for chapter 4 of title II to read as follows:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL".

<< 8 USCA § 1222 >>

  (2) REDESIGNATING SECTION 232 AS SECTION 232(a).—Amend section 232 (8 U.S.C. 1222)—
  (A) by inserting "(a) DETENTION OF ALIENS.—" after "SEC. 232.", and
  (B) by amending the section heading to read as follows:

"DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION".
  (3) REDESIGNATING SECTION 234 AS SECTION 232(b).—Amend section 234 (8 U.S.C. 1224)—

<< 8 USCA § 1224 >>

  (A) by striking the heading,
  (B) by striking "SEC. 234." and inserting the following: "(b) PHYSICAL AND MENTAL EXAMINATION.—", and

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 684 of 1021   PageID 7554

<< 8 USCA §§ 1222, 1224 >>

(C) by moving such provision to the end of section 232.

<< 8 USCA § 1228 >>

<< 8 USCA § 1223 >>

(4) REDESIGNATING SECTION 238 AS SECTION 233.—Redesignate section 238 (8 U.S.C. 1228) as section 233 and move the section to immediately follow section 232.

<< 8 USCA § 1252a >>

<< 8 USCA § 1228 >>

(5) REDESIGNATING SECTION 242A AS SECTION 238.—Redesignate section 242A as section 238, strike "DEPORTATION" in its heading and insert "REMOVAL", and move the section to immediately follow section 237 (as redesignated by section 305(a)(2)).

<< 8 USCA § 1252b >>

(6) STRIKING SECTION 242B.—Strike section 242B (8 U.S.C. 1252b).

<< 8 USCA § 1254 >>

<< 8 USCA § 1254a >>

(7) STRIKING SECTION 244 AND REDESIGNATING SECTION 244A AS SECTION 244.—Strike section 244 (8 U.S.C. 1254) and redesignate section 244A as section 244.

<< 8 USCA Ch. 12 >>

(8) AMENDING CHAPTER HEADING.—Amend the heading for chapter 5 of title II to read as follows:

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".

(c) ADDITIONAL CONFORMING AMENDMENTS.—

(1) EXPEDITED PROCEDURES FOR AGGRAVATED FELONS (FORMER SECTION 242A).—Section 238 (which, previous to redesignation under section 308(b)(5) of this division, was section 242A) is amended—

<< 8 USCA § 1228 >>

(A) in subsection (a)(1), by striking "section 242" and inserting "section 240";

(B) in subsection (a)(2), by striking "section 242(a)(2)" and inserting "section 236(c)"; and

(C) in subsection (b)(1), by striking "section 241(a)(2)(A)(iii)" and inserting "section 237(a)(2)(A)(iii)".

(2) TREATMENT OF CERTAIN HELPLESS ALIENS.—

<< 8 USCA § 1222 >>

(A) CERTIFICATION OF HELPLESS ALIENS.—Section 232 (8 U.S.C. 1222), as amended by section 308(b)(2) of this division, is further amended by adding at the end the following new subsection:

"(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.".

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 685 of 1021   PageID 7555

<< 8 USCA § 1182 >>

(B) GROUND OF INADMISSIBILITY FOR PROTECTION AND GUARDIANSHIP OF ALIENS DENIED ADMISSION FOR HEALTH OR INFANCY.—Subparagraph (B) of section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(a)(1) of this division, is amended to read as follows:

"(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—

"(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and

"(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.".

<< 8 USCA § 1323 >>

(3) CONTINGENT CONSIDERATION IN RELATION TO REMOVAL OF ALIENS.—Section 273(a) (8 U.S.C. 1323(a)) is amended—

(A) by inserting "(1)" after "(a)", and

(B) by adding at the end the following new paragraph:

"(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.".

<< 8 USCA § 1228 >>

(4) CLARIFICATION.—(A) Section 238(a)(1), which, previous to redesignation under section 308(b)(5) of this division, was section 242A(a)(1), is amended by adding at the end the following: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1101 NOTE >>

(B) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) is amended by striking "and nothing in" and all that follows up to "shall".

(d) ADDITIONAL CONFORMING AMENDMENTS RELATING TO EXCLUSION AND INADMISSIBILITY.—

(1) SECTION 212.—Section 212 (8 U.S.C. 1182(a)) is amended—

<< 8 USCA § 1182 >>

(A) in the heading, by striking "EXCLUDED FROM" and inserting "INELIGIBLE FOR";

(B) in the matter in subsection (a) before paragraph (1), by striking all that follows "(a)" and inserting the following: "CLASSES OF ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States;";

(C) in subsection (a), by striking "is excludable" and inserting "is inadmissible" each place it appears;

(D) in subsections (a)(5)(C) (before redesignation by section 343(c)(1) of this division), (d)(1), and (k), by striking "exclusion" and inserting "inadmissibility";

(E) In subsections (b), (d)(3), (h)(1)(A)(i), and (k), by striking "excludable" each place it appears and inserting "inadmissible";

(F) in subsection (b)(2), by striking "or ineligible for entry";

(G) in subsection (d)(7), by striking "excluded from" and inserting "denied"; and

(H) in subsection (h)(1)(B), by striking "exclusion" and inserting "denial of admission".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(2) SECTION 241.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

<< 8 USCA § 1251 >>

(A) in subsection (a)(1)(H), by striking "excludable" and inserting "inadmissible";
(B) in subsection (a)(4)(C)(ii), by striking "excludability" and inserting "inadmissibility";
(C) in subsection (c), by striking "exclusion" and inserting "inadmissibility"; and

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 NOTE >>

(D) effective upon enactment of this Act, by striking subsection (d), as added by section 414(a) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132).
(3) OTHER GENERAL REFERENCES.—The following provisions are amended by striking "excludability" and "excludable" each place each appears and inserting "inadmissibility" and "inadmissible", respectively:

<< 8 USCA §§ 1101, 1183, 1224, 1251, 1322, 1327, 1356 >>

<< 8 USCA § 1182 NOTE >>

(A) Sections 101(f)(3), 213, 234 (before redesignation by section 308(b) of this division), 241(a)(1) (before redesignation by section 305(a)(2) of this division), 272(a), 277, 286(h)(2)(A)(v), and 286(h)(2)(A)(vi).

<< 8 USCA § 1182 NOTE >>

(B) Section 601(c) of the Immigration Act of 1990.

<< 8 USCA § 1182 NOTE >>

(C) Section 128 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).
(D) Section 1073 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337).

<< 8 USCA § 1182 NOTE >>

(E) Section 221 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).
(4) RELATED TERMS.—

<< 8 USCA § 1101 >>

(A) Section 101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal".

<< 8 USCA § 1102 >>

(B) Section 102 (8 U.S.C. 1102) is amended by striking "exclusion or deportation" and inserting "removal".

<< 8 USCA § 1103 >>

(C) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "been excluded or deported" and inserting "not been admitted or have been removed".

<< 8 USCA § 1156 >>

(D) Section 206 (8 U.S.C. 1156) is amended by striking "excluded from admission to the United States and deported" and inserting "denied admission to the United States and removed".

<< 8 USCA § 1186a >>

(E) Section 216(f) (8 U.S.C. 1186a) is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1187 >>

(F) Section 217 (8 U.S.C. 1187) is amended by striking "excluded from admission" and inserting "denied admission at the time of arrival" each place it appears.

<< 8 USCA § 1201 >>

(G) Section 221(f) (8 U.S.C. 1201) is amended by striking "exclude" and inserting "deny admission to".

<< 8 USCA § 1222 >>

(H) Section 232(a) (8 U.S.C. 1222(a)), as redesignated by subsection (b)(2), is amended by striking "excluded by" and "the excluded classes" and inserting "inadmissible under" and "inadmissible classes", respectively.

<< 8 USCA § 1322 >>

(I)(i) Section 272 (8 U.S.C. 1322) is amended—
  (I) by striking "EXCLUSION" in the heading and inserting "DENIAL OF ADMISSION",
  (II) in subsection (a), by striking "excluding condition" and inserting "condition causing inadmissibility", and
  (III) in subsection (c), by striking "excluding".
 (ii) The item in the table of contents relating to such section is amended by striking "exclusion" and inserting "denial of admission".

<< 8 USCA § 1326 >>

(J) Section 276(a) (8 U.S.C. 1326(a)) is amended—
  (i) in paragraph (1), as amended by section 324(a) of this division—
   (I) by striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed," and
   (II) by striking "exclusion or deportation" and inserting "exclusion, deportation, or removal"; and
  (ii) in paragraph (2)(B), by striking "excluded and deported" and inserting "denied admission and removed".

<< 8 USCA § 1356 >>

(K) Section 286(h)(2)(A)(vi) (8 U.S.C. 1356(h)(2)(A)(vi)) is amended by striking "exclusion" each place it appears and inserting "removal".

<< 8 USCA § 1357 >>

(L) Section 287 (8 U.S.C. 1357) is amended—
  (i) in subsection (a), by striking "or expulsion" each place it appears and inserting "expulsion, or removal", and
  (ii) in subsection (c), by striking "exclusion from" and inserting "denial of admission to".

<< 8 USCA § 1360 >>

(M) Section 290(a) (8 U.S.C. 1360(a)) is amended by striking "admitted to the United States, or excluded therefrom" each place it appears and inserting "admitted or denied admission to the United States".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 688 of 1021   PageID 7558

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361) is amended by striking "subject to exclusion" and inserting "inadmissible" each place it appears.

<< 8 USCA § 1362 >>

(O) Section 292 (8 U.S.C. 1362) is amended by striking "exclusion or deportation" each place it appears and inserting "removal".

<< 8 USCA § 1503 >>

(P) Section 360 (8 U.S.C. 1503) is amended—
  (i) in subsection (a), by striking "exclusion" each place it appears and inserting "removal", and
  (ii) in subsection (c), by striking "excluded from" and inserting "denied".

<< 8 USCA § 1537 >>

(Q) Section 507(b)(2)(D) (8 U.S.C. 1537(b)(2)(D)) is amended by striking "exclusion because such alien is excludable" and inserting "removal because such alien is inadmissible".

<< 8 USCA § 1255a NOTE >>

(R) Section 301(a)(1) of the Immigration Act of 1990 is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1522 NOTE >>

(S) Section 401(c) of the Refugee Act of 1980 is amended by striking "deportation or exclusion" and inserting "removal".

<< 8 USCA § 1522 NOTE >>

(T) Section 501(e)(2) of the Refugee Education Assistance Act of 1980 (Public Law 96–422) is amended—
  (i) by striking "exclusion or deportation" each place it appears and inserting "removal", and
  (ii) by striking "deportation or exclusion" each place it appears and inserting "removal".

<< 18 USCA § 4113 >>

(U) Section 4113(c) of title 18, United States Code, is amended by striking "exclusion and deportation" and inserting "removal".

<< 8 USCA §§ 1225, 1227 >>

<< 8 USCA § 1225 NOTE >>

(5) REPEAL OF SUPERSEDED PROVISION.—Effective as of the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, section 422 of such Act is repealed and the Immigration and Nationality Act shall be applied as if such section had not been enacted.
(e) REVISION OF TERMINOLOGY RELATING TO DEPORTATION.—
  (1) Each of the following is amended by striking "deportation" each place it appears and inserting "removal":

<< 8 USCA § 1154 >>

(A) Subparagraphs (A)(iii)(II), (A)(iv)(II), and (B)(iii)(II) of section 204(a)(1) (8 U.S.C. 1154(a)(1)).

<< 8 USCA § 1182 >>

(B) Section 212(d)(1) (8 U.S.C. 1182(d)(1)).

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)).

<< 8 USCA § 1184 >>

(D) Section 214(k)(4)(C) (8 U.S.C. 1184(k)(4)(C)), as redesignated by section 671(a)(3)(A) of this division.

<< 8 USCA § 1251 >>

(E) Section 241(a)(1)(H) (8 U.S.C. 1251(a)(1)(H)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(F) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1254a >>

(G) Subsections (a)(3) and (b)(5)(B) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by subsection (b)(7).

<< 8 USCA § 1256 >>

(H) Section 246(a) (8 U.S.C. 1256(a)).

<< 8 USCA § 1284 >>

(I) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1303 >>

(J) Section 263(a)(4) (8 U.S.C. 1303(a)(4)).

<< 8 USCA § 1326 >>

(K) Section 276(b) (8 U.S.C. 1326(b)).

<< 8 USCA § 1356 >>

(L) Section 286(h)(2)(A)(v) (8 U.S.C. 1356(h)(2)(A)(v)).

<< 8 USCA § 1357 >>

(M) Section 287(g) (8 U.S.C. 1357(g)) (as added by section 122 of this division).

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361).

<< 8 USCA § 1429 >>

(O) Section 318 (8 U.S.C. 1429).

<< 8 USCA § 1158 >>

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 690 of 1021   PageID 7560

<< 8 USCA § 1158 NOTE >>

(P) Section 130005(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

<< 18 USCA § 4113 >>

(Q) Section 4113(b) of title 18, United States Code.

(2) Each of the following is amended by striking "deported" each place it appears and inserting "removed":

<< 8 USCA § 1182 >>

(A) Section 212(d)(7) (8 U.S.C. 1182(d)(7)).

<< 8 USCA § 1184 >>

(B) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1251 >>

(C) Section 241(a) (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(D) Section 242A(c)(2)(D)(iv) (8 U.S.C. 1252a(c)(2)(D)(iv)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1282 >>

(E) Section 252(b) (8 U.S.C. 1282(b)).

<< 8 USCA § 1284 >>

(F) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1306 >>

(G) Subsections (b) and (c) of section 266 (8 U.S.C. 1306).

<< 8 USCA § 1255a NOTE >>

(H) Section 301(a)(1) of the Immigration Act of 1990.

<< 18 USCA § 4113 >>

(I) Section 4113 of title 18, United States Code.

<< 8 USCA § 1101 >>

(3) Section 101(g) (8 U.S.C. 1101(g)) is amended by inserting "or removed" after "deported" each place it appears.

<< 8 USCA § 1103 >>

(4) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "suspension of deportation" and inserting "cancellation of removal".

<< 8 USCA § 1151 >>

(5) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) is amended by striking "deportation is suspended" and inserting "removal is canceled".

<< 8 USCA § 1182 >>

(6) Section 212(l)(2)(B) (8 U.S.C. 1182(l)(2)(B)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1186a >>

(7) Subsections (b)(2), (c)(2)(B), (c)(3)(D), (c)(4)(A), and (d)(2)(C) of section 216 (8 U.S.C. 1186a) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" each place each appears and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1186b >>

(8) Subsections (b)(2), (c)(2)(B), (c)(3)(D), and (d)(2)(C) of section 216A (8 U.S.C. 1186b) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1187 >>

(9) Section 217(b)(2) (8 U.S.C. 1187(b)(2)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1252a >>

(10) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(6), is amended, in the headings to various subdivisions, by striking "DEPORTATION" and "DEPORTATION" and inserting "REMOVAL" and "REMOVAL", respectively.

(11) Section 244A(a)(1)(A) (8 U.S.C. 1254a(a)(1)(A)), before redesignation as section 244 by subsection (b)(8), is amended—

<< 8 USCA § 1254a >>

(A) in subsection (a)(1)(A), by striking "deport" and inserting "remove", and
(B) in subsection (e), by striking "SUSPENSION OF DEPORTATION" and inserting "CANCELLATION OF REMOVAL".

<< 8 USCA § 1284 >>

(12) Section 254 (8 U.S.C. 1284) is amended by striking "deport" each place it appears and inserting "remove".

<< 8 USCA § 1323 >>

(13) Section 273(d) (8 U.S.C. 1323(d)) is repealed.

<< 8 USCA § 1326 >>

(14)(A) Section 276 (8 U.S.C. 1326) is amended by striking "DEPORTED" and inserting "REMOVED".
(B) The item in the table of contents relating to such section is amended by striking "deported" and inserting "removed".

<< 8 USCA § 1429 >>

(15) Section 318 (8 U.S.C. 1429) is amended by striking "suspending" and inserting "canceling".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1255a NOTE >>

(16) Section 301(a) of the Immigration Act of 1990 is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 8 USCA § 1158 NOTE >>

(17) The heading of section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 22 USCA § 2508 >>

(18) Section 9 of the Peace Corps Act (22 U.S.C. 2508) is amended by striking "deported" and all that follows through "Deportation" and inserting "removed pursuant to chapter 4 of title II of the Immigration and Nationality Act".

<< 22 USCA § 618 >>

(19) Section 8(c) of the Foreign Agents Registration Act (22 U.S.C. 618(c)) is amended by striking "deportation" and all that follows and inserting "removal pursuant to chapter 4 of title II of the Immigration and Nationality Act".

(f) REVISION OF REFERENCES TO ENTRY.—

(1) The following provisions are amended by striking "entry" and inserting "admission" each place it appears:

<< 8 USCA § 1101 >>

(A) Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)).
(B) Section 101(a)(30) (8 U.S.C. 1101(a)(30)).

<< 8 USCA § 1182 >>

(C) Section 212(a)(2)(D) (8 U.S.C. 1182(a)(2)(D)).
(D) Section 212(a)(6)(C)(i) (8 U.S.C. 1182(a)(6)(C)(i)).
(E) Section 212(h)(1)(A)(i) (8 U.S.C. 1182(h)(1)(A)(i)).
(F) Section 212(j)(1)(D) (8 U.S.C. 1182(j)(1)(D)).

<< 8 USCA § 1184 >>

(G) Section 214(c)(2)(A) (8 U.S.C. 1184(c)(2)(A)).
(H) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1186a >>

(I) Section 216(b)(1)(A)(i) (8 U.S.C. 1186a(b)(1)(A)(i)).
(J) Section 216(d)(1)(A)(i)(III) (8 U.S.C. 1186a(d)(1)(A)(i)(III)).

<< 8 USCA § 1230 >>

(K) Subsection (b) of section 240 (8 U.S.C. 1230), before redesignation as section 240C by section 304(a)(2) of this division.

<< 8 USCA § 1251 >>

(L) Subsection (a)(1)(G) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.
(M) Subsection (a)(1)(H) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, other than the last time it appears.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 693 of 1021   PageID 7563

(N) Paragraphs (2) and (4) of subsection (a) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1255 >>

(O) Section 245(e)(3) (8 U.S.C. 1255(e)(3)).

<< 8 USCA § 1257 >>

(P) Section 247(a) (8 U.S.C. 1257(a)).

<< 8 USCA § 1182 NOTE >>

(Q) Section 601(c)(2) of the Immigration Act of 1990.

(2) The following provisions are amended by striking "enter" and inserting "be admitted":

<< 8 USCA § 1154 >>

(A) Section 204(e) (8 U.S.C. 1154(e)).

<< 8 USCA § 1201 >>

(B) Section 221(h) (8 U.S.C. 1201(h)).

<< 8 USCA § 1255 >>

(C) Section 245(e)(2) (8 U.S.C. 1255(e)(2)).

(3) The following provisions are amended by striking "enters" and inserting "is admitted to":

<< 8 USCA § 1182 >>

(A) Section 212(j)(1)(D)(ii) (8 U.S.C. 1154(e)).

<< 8 USCA § 1184 >>

(B) Section 214(c)(5)(B) (8 U.S.C. 1184(c)(5)(B)).

<< 8 USCA § 1228 >>

(4) Subsection (a) of section 238 (8 U.S.C. 1228), before redesignation as section 233 by section 308(b)(4) of this division, is amended by striking "entry and inspection" and inserting "inspection and admission".

<< 8 USCA § 1251 >>

(5) Subsection (a)(1)(H)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended by striking "at entry".

<< 50 USCA § 403h >>

(6) Section 7 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 403h) is amended by striking "that the entry", "given entry into", and "entering" and inserting "that the admission", "admitted to", and "admitted to".

<< 50 USCA § 47c >>

(7) Section 4 of the Atomic Weapons and Special Nuclear Materials Rewards Act (50 U.S.C. 47c) is amended by striking "entry" and inserting "admission".

(g) CONFORMING REFERENCES TO REORGANIZED SECTIONS.—

<< 8 USCA §§ 1182, 1221, 1252a, 1321, 1356, 1364, 1531 >>

<< 8 USCA §§ 1224 NOTE, 1254a NOTE, 1255a NOTE >>

<< 42 USCA § 402 >>

(1) REFERENCES TO SECTIONS 232, 234, 238, 239, 240, 241, 242A, AND 244A.—Any reference in law in effect on the day before the date of the enactment of this Act to section 232, 234, 238, 239, 240, 241, 242A, or 244A of the Immigration and Nationality Act (or a subdivision of such section) is deemed, as of the title III–A effective date, to refer to section 232(a), 232(b), 233, 234, 234A, 237, 238, or 244 of such Act (or the corresponding subdivision of such section), as redesignated by this subtitle. Any reference in law to section 241 (or a subdivision of such section) of the Immigration and Nationality Act in an amendment made by a subsequent subtitle of this title is deemed a reference (as of the title III–A effective date) to section 237 (or the corresponding subdivision of such section), as redesignated by this subtitle.

(2) REFERENCES TO SECTION 106.—

<< 8 USCA § 1252a >>

(A) Sections 242A(b)(3) and 242A(c)(3)(A)(ii) (8 U.S.C. 1252a(b)(3), 1252a(c)(3)(A)(ii), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "106" and inserting "242".

<< 8 USCA § 1160 >>

(B) Sections 210(e)(3)(A) and 245A(f)(4)(A) (8 U.S.C. 1160(e)(3)(A), 1255a(f)(4)(A)) are amended by inserting "(as in effect before October 1, 1996)" after "106".

<< 8 USCA § 1252a >>

(C) Section 242A(c)(3)(A)(iii) (8 U.S.C. 1252a(c)(3)(A)(iii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "106(a)(1)" and inserting "242(b)(1)".

(3) REFERENCES TO SECTION 236.—

<< 8 USCA §§ 1155, 1159 >>

(A) Sections 205 and 209(a)(1) (8 U.S.C. 1155, 1159(a)(1)) are each amended by striking "236" and inserting "240".

<< 18 USCA § 4113 >>

(B) Section 4113(c) of title 18, United States Code, is amended by striking "1226 of title 8, United States Code" and inserting "240 of the Immigration and Nationality Act".

(4) REFERENCES TO SECTION 237.—

<< 8 USCA § 1159 >>

(A) Section 209(a)(1) (8 U.S.C. 1159(a)(1)) is amended by striking "237" and inserting "241".

<< 8 USCA § 1182 >>

(B) Section 212(d)(7) (8 U.S.C. 1182(d)(7)) is amended by striking "237(a)" and inserting "241(c)".

<< 8 USCA § 1330 >>

(C) Section 280(a) (8 U.S.C. 1330(a)) is amended by striking "237, 239, 243" and inserting "234, 243(c)(2)".

(5) REFERENCES TO SECTION 242.—

<< 8 USCA §§ 1184, 1282, 1357 >>

(A)(i) Sections 214(d), 252(b), and 287(f)(1) (8 U.S.C. 1184(d), 1282(b), 1357(f)(1)) are each amended by striking "242" and inserting "240".

<< 8 USCA § 1252a >>

(ii) Subsection (c)(4) of section 242A (8 U.S.C. 1252a), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "242" and inserting "240".

<< 8 USCA § 1255a >>

(iii) Section 245A(a)(1)(B) (8 U.S.C. 1255a(a)(1)(B)) is amended by inserting "(as in effect before October 1, 1996)" after "242".

(iv) Section 4113 of title 18, United States Code, is amended—

<< 18 USCA § 4113 >>

(I) in subsection (a), by striking "section 1252(b) or section 1254(e) of title 8, United States Code," and inserting "section 240B of the Immigration and Nationality Act"; and

(II) in subsection (b), by striking "section 1252 of title 8, United States Code," and inserting "section 240 of the Immigration and Nationality Act".

<< 8 USCA § 1252 NOTE >>

(B) Section 130002(a) of Public Law 103–322, as amended by section 345 of this division, is amended by striking "242(a)(3)(A)" and inserting "236(d)".

<< 8 USCA § 1252a >>

(C) Section 242A(b)(1) (8 U.S.C. 1252a(b)(1)), before redesignation as section 238 by section 308(b)(5) of this division, is amended by striking "242(b)" and inserting "240".

(D) Section 242A(c)(2)(D)(ii) (8 U.S.C. 1252a(c)(2)(D)(ii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "242(b)" and inserting "240".

<< 28 USCA § 1821 >>

(E) Section 1821(e) of title 28, United States Code, is amended by striking "242(b)" and inserting "240".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of Public Law 103–322 is amended by striking "242(i)" and inserting "239(d)".

(G) Section 20301(c) of Public Law 103–322 is amended by striking "242(j)(5)" and "242(j)" and inserting "241(h)(5)" and "241(h)", respectively.

(6) REFERENCES TO SECTION 242B.—

<< 8 USCA § 1254a NOTE >>

(A) Section 303(d)(2) of the Immigration Act of 1990 is amended by striking "242B" and inserting "240(b)(5)".

<< 8 USCA § 1252b NOTE >>

(B) Section 545(g)(1)(B) of the Immigration Act of 1990 is amended by striking "242B(a)(4)" and inserting "239(a)(4)".

(7) REFERENCES TO SECTION 243.—

<< 8 USCA § 1184 >>

(A) Section 214(d) (8 U.S.C. 1184(d)) is amended by striking "243" and inserting "241".

<< 8 USCA § 1534 >>

(B) Section 504(k)(2) (8 U.S.C. 1534(k)(2)) is amended by striking "withholding of deportation under section 243(h)" and inserting "by withholding of removal under section 241(b)(3)".

<< 8 USCA § 1253 NOTE >>

(C)(i) Section 315(c) of the Immigration Reform and Control Act of 1986 is amended by striking "243(g)" and "1253(g)" and inserting "243(d)" and "1253(d)" respectively.

<< 8 USCA § 1201 NOTE >>

(ii) Section 702(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 is amended by striking "243(g)" and inserting "243(d)".

(iii) Section 903(b) of Public Law 100–204 is amended by striking "243(g)" and inserting "243(d)".

<< 7 USCA § 2015 >>

(D)(i) Section 6(f)(2)(F) of the Food Stamp Act of 1977 (7 U.S.C. 2015(f)(2)(F)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 42 USCA § 1436a >>

(ii) Section 214(a)(5) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(a)(5)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 8 USCA § 1254a >>

(E)(i) Subsection (c)(2)(B)(ii) of section 244A (8 U.S.C. 1254a), before redesignated as section 244 by section 308(b)(7), is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1255a NOTE >>

(ii) Section 301(e)(2) of the Immigration Act of 1990 is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1427 >>

(F) Section 316(f) (8 U.S.C. 1427(f)) is amended by striking "subparagraphs (A) through (D) of paragraph 243(h)(2)" and inserting "clauses (i) through (v) of section 208(b)(2)(A)".

(8) REFERENCES TO SECTION 244.—

<< 8 USCA § 1151 >>

(A)(i) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) and subsection (e) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by section 308(b)(7) of this division, are each amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1254a NOTE >>

(ii) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1534 >>

(B) Section 504(k)(3) (8 U.S.C. 1534(k)(3)) is amended by striking "suspension of deportation under subsection (a) or (e) of section 244" and inserting "cancellation of removal under section 240A".

<< 8 USCA § 1254a NOTE >>

(C) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(b)(2)" and inserting "240A(b)(2)".

<< 8 USCA § 1367 >>

(D) Section 364(a)(2) of this division is amended by striking "244(a)(3)" and inserting "240A(a)(3)".

<< 8 USCA § 1641 >>

(E) Section 431(c)(1)(B)(iii) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as added by section 501 of this division, is amended by striking "suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act" and inserting "cancellation of removal under section 240A of such Act".
(9) REFERENCES TO CHAPTER 5.—

<< 8 USCA § 1206 >>

(A) Sections 266(b), 266(c), and 291 (8 U.S.C. 1306(b), 1306(c), 1361) are each amended by striking "chapter 5" and inserting "chapter 4".

<< 50 USCA § 855 >>

(B) Section 6(b) of the Act of August 1, 1956 (50 U.S.C. 855(b)) is amended by striking "chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)" and inserting "chapter 4 of title II of the Immigration and Nationality Act".
(10) MISCELLANEOUS CROSS–REFERENCE CORRECTIONS FOR NEWLY ADDED PROVISIONS.—

<< 8 USCA § 1182 >>

(A) Section 212(h), as amended by section 301(h) of this division, is amended by striking "section 212(c)" and inserting "paragraphs (1) and (2) of section 240A(a)".

<< 8 USCA § 1255 >>

(B) Section 245(c)(6), as amended by section 332(d) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1259 >>

(C) Section 249(d), as amended by section 332(e) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1324c >>

(D) Section 274C(d)(7), as added by section 212(d) of this division, is amended by striking "withholding of deportation under section 243(h)" and inserting "withholding of removal under section 241(b)(3)".

<< 18 USCA § 3563 >>

(E) Section 3563(b)(21) of title 18, United States Code, as inserted by section 374(b) of this division, is amended by striking "242A(d)(5)" and inserting "238(d)(5)".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 671(a)(6) of this division, is amended by striking "242A(a)(3)" and inserting "238(a)(3)".

<< 8 USCA § 1368 >>

(G) Section 386(b) of this division is amended by striking "excludable" and "EXCLUDABLE" and inserting "inadmissible" and "INADMISSIBLE", respectively, each place each appears.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

(H) Subsections (a), (c), (d), (g), and (h) of section 440 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), as amended by section 306(d) of this division, are amended by striking "241(a)(2)(A)(ii)" and "241(a)(2)(A)(i)" and inserting "237(a)(2)(A)(ii)" and "237(a)(2)(A)(i)", respectively.

<< 8 USCA § 1101 NOTE >>

SEC. 309. EFFECTIVE DATES; TRANSITION.

(a) IN GENERAL.—Except as provided in this section and sections 303(b)(2), 306(c), 308(d)(2)(D), or 308(d)(5) of this division, this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").

(b) PROMULGATION OF REGULATIONS.—The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III–A effective date.

(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(2) ATTORNEY GENERAL OPTION TO ELECT TO APPLY NEW PROCEDURES.—In a case described in paragraph (1) in which an evidentiary hearing under section 236 or 242 and 242B of the Immigration and Nationality Act has not commenced as of the title III–A effective date, the Attorney General may elect to proceed under chapter 4 of title II of such Act (as amended by this subtitle). The Attorney General shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. If the Attorney General makes such election, the notice of hearing provided to the alien under section 235 or 242(a) of such Act shall be valid as if provided under section 239 of such Act (as amended by this subtitle) to confer jurisdiction on the immigration judge.

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under chapter 4 of title II the Immigration and Nationality Act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

(4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the case described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104-208, September...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 699 of 1021   PageID 7569

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation;

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed;

(E) there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act);

(F) service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise; and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

(5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

(6) TRANSITION FOR CERTAIN FAMILY UNITY ALIENS.—The Attorney General may waive the application of section 212(a)(9) of the Immigration and Nationality Act, as inserted by section 301(b)(1) of this division, in the case of an alien who is provided benefits under the provisions of section 301 of the Immigration Act of 1990 (relating to family unity).

(7) LIMITATION ON SUSPENSION OF DEPORTATION.—The Attorney General may not suspend the deportation and adjust the status under section 244 of the Immigration and Nationality Act of more than 4,000 aliens in any fiscal year (beginning after the date of the enactment of this Act). The previous sentence shall apply regardless of when an alien applied for such suspension and adjustment.

(d) TRANSITIONAL REFERENCES.—For purposes of carrying out the Immigration and Nationality Act, as amended by this subtitle—

(1) any reference in section 212(a)(1)(A) of such Act to the term "inadmissible" is deemed to include a reference to the term "excludable", and

(2) any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation.

(e) TRANSITION.—No period of time before the date of the enactment of this Act shall be included in the period of 1 year described in section 212(a)(6)(B)(i) of the Immigration and Nationality Act (as amended by section 301(c) of this division).

Subtitle B—Criminal Alien Provisions

SEC. 321. AMENDED DEFINITION OF AGGRAVATED FELONY.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 441(e) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132), is amended—

(1) in subparagraph (A), by inserting ", rape, or sexual abuse of a minor" after "murder";

(2) in subparagraph (D), by striking "$100,000" and inserting "$10,000";

(3) in subparagraphs (F), (G), (N), and (P), by striking "is at least 5 years" each place it appears and inserting "at least one year";

(4) in subparagraph (J), by striking "sentence of 5 years' imprisonment" and inserting "sentence of one year imprisonment";

(5) in subparagraph (K)(ii), by inserting "if committed" before "for commercial advantage";

(6) in subparagraph (L)—

  (A) by striking "or" at the end of clause (i),

  (B) by inserting "or" at the end of clause (ii), and

  (C) by adding at the end the following new clause:

   "(iii) section 601 of the National Security Act of 1947 (relating to protecting the identity of undercover agents);";

 (7) in subparagraph (M), by striking "$200,000" each place it appears and inserting "$10,000";

 (8) in subparagraph (N), by striking "for which the term" and all that follows and inserting the following: ", except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

 (9) in subparagraph (P), by striking "18 months" and inserting "12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

 (10) in subparagraph (R), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year"; and

 (11) in subparagraph (S), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year".

 (b) EFFECTIVE DATE OF DEFINITION.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by adding at the end the following new sentence: "Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.".

<< 8 USCA § 1101 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred, and shall apply under section 276(b) of the Immigration and Nationality Act only to violations of section 276(a) of such Act occurring on or after such date.

SEC. 322. DEFINITION OF CONVICTION AND TERM OF IMPRISONMENT.

 (a) DEFINITION.—

<< 8 USCA § 1101 >>

 (1) IN GENERAL.—Section 101(a) (8 U.S.C. 1101(a)) is amended by adding at the end the following new paragraph:

"(48)(A) The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

 "(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

 "(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

"(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.".

 (2) CONFORMING AMENDMENTS.—

<< 8 USCA § 1101 >>

 (A) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by striking "imposed (regardless of any suspension of imprisonment)" each place it appears in subparagraphs (F), (G), (N), and (P).

<< 8 USCA § 1182 >>

 (B) Section 212(a)(2)(B) (8 U.S.C. 1182(a)(2)(B)) is amended by striking "actually imposed".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 (b) REFERENCE TO PROOF PROVISIONS.—For provisions relating to proof of convictions, see subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division.

<< 8 USCA § 1101 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act. Subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division, shall apply to proving such convictions.

<< 8 USCA § 1303 >>

SEC. 323. AUTHORIZING REGISTRATION OF ALIENS ON CRIMINAL PROBATION OR CRIMINAL PAROLE.

 Section 263(a) (8 U.S.C. 1303(a)) is amended by striking "and (5)" and inserting "(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)".

SEC. 324. PENALTY FOR REENTRY OF DEPORTED ALIENS.

<< 8 USCA § 1326 >>

 (a) IN GENERAL.—Section 276(a)(1) (8 U.S.C. 1326(a)(1)) is amended to read as follows:
 "(1) has been arrested and deported, has been excluded and deported, or has departed the United States while an order of exclusion or deportation is outstanding, and thereafter".
 (b) TREATMENT OF STIPULATIONS.—The last sentence of section 276(b) (8 U.S.C. 1326(b)) is amended by inserting "(or not during)" after "during".

<< 8 USCA § 1326 NOTE >>

 (c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to departures that occurred before, on, or after the date of the enactment of this Act, but only with respect to entries (and attempted entries) occurring on or after such date.

<< 18 USCA § 2424 >>

SEC. 325. CHANGE IN FILING REQUIREMENT.

 Section 2424 of title 18, United States Code, is amended—
 (1) in the first undesignated paragraph of subsection (a)—
  (A) by striking "alien" each place it appears;
  (B) by inserting after "individual" the first place it appears the following: ", knowing or in reckless disregard of the fact that the individual is an alien"; and
  (C) by striking "within three years after that individual has entered the United States from any country, party to the arrangement adopted July 25, 1902, for the suppression of the white-slave traffic";
 (2) in the second undesignated paragraph of subsection (a)—
  (A) by striking "thirty" and inserting "five business"; and
  (B) by striking "within three years after that individual has entered the United States from any country, party to the said arrangement for the suppression of the white-slave traffic,"; and
 (3) in the text following the third undesignated paragraph of subsection (a), by striking "two" and inserting "10".

<< 8 USCA § 1252 NOTE >>

SEC. 326. CRIMINAL ALIEN IDENTIFICATION SYSTEM.

 Subsection (a) of section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 432 of Public Law 104–132, is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.".

<< 8 USCA § 1252 NOTE >>

## SEC. 327. APPROPRIATIONS FOR CRIMINAL ALIEN TRACKING CENTER.

Section 130002(b) of the Violent Crime Control and Law Enforcement Act of 1994 (8 U.S.C. 1252 note) is amended—
(1) by inserting "and" after "1996;", and
(2) by striking paragraph (2) and all that follows through the period at the end and inserting the following:
"(2) $5,000,000 for each of fiscal years 1997 through 2001.".

## SEC. 328. PROVISIONS RELATING TO STATE CRIMINAL ALIEN ASSISTANCE PROGRAM.

(a) MODIFICATION OF AUTHORITY.—

<< 8 USCA § 1231 >>

(1) IN GENERAL.—Section 241(i), as redesignated by section 306(a)(1) of this division, is amended—
  (A) in paragraph (3)(A), by striking "felony and sentenced to a term of imprisonment" and inserting "felony or two or more misdemeanors", and
  (B) by adding at the end the following new paragraph:
"(6) To the extent of available appropriations, funds otherwise made available under this section with respect to a State (or political subdivision, including a municipality) for incarceration of an undocumented criminal alien may, at the discretion of the recipient of the funds, be used for the costs of imprisonment of such alien in a State, local, or municipal prison or jail.".

<< 8 USCA § 1231 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply beginning with fiscal year 1997.
(b) SENSE OF THE CONGRESS WITH RESPECT TO PROGRAM.—
(1) FINDINGS.—The Congress finds as follows:
  (A) Of the $130,000,000 appropriated in fiscal year 1995 for the State Criminal Alien Assistance Program, the Department of Justice disbursed the first $43,000,000 to States on October 6, 1994, 32 days before the 1994 general election, and then failed to disburse the remaining $87,000,000 until January 31, 1996, 123 days after the end of fiscal year 1995.
  (B) While H.R. 2880, the continuing appropriation measure funding certain operations of the Federal Government from January 26, 1996 to March 15, 1996, included $66,000,000 to reimburse States for the cost of incarcerating documented illegal immigrant felons, the Department of Justice failed to disburse any of the funds to the States during the period of the continuing appropriation.
(2) SENSE OF THE CONGRESS.—It is the sense of the Congress that—
  (A) the Department of Justice was disturbingly slow in disbursing fiscal year 1995 funds under the State Criminal Alien Assistance Program to States after the initial grants were released just prior to the 1994 election; and
  (B) the Attorney General should make it a high priority to expedite the disbursement of Federal funds intended to reimburse States for the cost of incarcerating illegal immigrants, aiming for all State Criminal Alien Assistance Program funds to be disbursed during the fiscal year for which they are appropriated.

SEC. 329. DEMONSTRATION PROJECT FOR IDENTIFICATION OF ILLEGAL ALIENS IN INCARCERATION FACILITY OF ANAHEIM, CALIFORNIA.

(a) AUTHORITY.—The Attorney General shall conduct a project demonstrating the feasibility of identifying, from among the individuals who are incarcerated in local governmental prison facilities prior to arraignment on criminal charges, those individuals who are aliens unlawfully present in the United States.

(b) DESCRIPTION OF PROJECT.—The project authorized by subsection (a) shall include—

(1) the detail to incarceration facilities within the city of Anaheim, California and the county of Ventura, California, of an employee of the Immigration and Naturalization Service who has expertise in the identification of aliens unlawfully in the United States, and

(2) provision of funds sufficient to provide for—

(A) access for such employee to records of the Service necessary to identify such aliens, and

(B) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.

(c) TERMINATION.—The authority under this section shall cease to be effective 6 months after the date of the enactment of this Act.

<< 18 USCA § 4100 NOTE >>

SEC. 330. PRISONER TRANSFER TREATIES.

(a) NEGOTIATIONS WITH OTHER COUNTRIES.—(1) Congress advises the President to begin to negotiate and renegotiate, not later than 90 days after the date of enactment of this Act, bilateral prisoner transfer treaties, providing for the incarceration, in the country of the alien's nationality, of any alien who—

(A) is a national of a country that is party to such a treaty; and

(B) has been convicted of a criminal offense under Federal or State law and who—

(i) is not in lawful immigration status in the United States, or

(ii) on the basis of conviction for a criminal offense under Federal or State law, or on any other basis, is subject to deportation or removal under the Immigration and Nationality Act,

for the duration of the prison term to which the alien was sentenced for the offense referred to in subparagraph (B). Any such agreement may provide for the release of such alien pursuant to parole procedures of that country.

(2) In entering into negotiations under paragraph (1), the President may consider providing for appropriate compensation, subject to the availability of appropriations, in cases where the United States is able to independently verify the adequacy of the sites where aliens will be imprisoned and the length of time the alien is actually incarcerated in the foreign country under such a treaty.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

(1) the focus of negotiations for such agreements should be—

(A) to expedite the transfer of aliens unlawfully in the United States who are (or are about to be) incarcerated in United States prisons,

(B) to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States courts,

(C) to eliminate any requirement of prisoner consent to such a transfer, and

(D) to allow the Federal Government or the States to keep their original prison sentences in force so that transferred prisoners who return to the United States prior to the completion of their original United States sentences can be returned to custody for the balance of their prison sentences;

(2) the Secretary of State should give priority to concluding an agreement with any country for which the President determines that the number of aliens described in subsection (a) who are nationals of that country in the United States represents a significant percentage of all such aliens in the United States; and

(3) no new treaty providing for the transfer of aliens from Federal, State, or local incarceration facilities to a foreign incarceration facility should permit the alien to refuse the transfer.

(c) PRISONER CONSENT.—Notwithstanding any other provision of law, except as required by treaty, the transfer of an alien from a Federal, State, or local incarceration facility under an agreement of the type referred to in subsection (a) shall not require consent of the alien.

(d) ANNUAL REPORT.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate stating whether each prisoner transfer treaty to which the United States is a party has been effective in the preceding 12 months in bringing about the return of deportable incarcerated aliens to the country of which they are nationals and in ensuring that they serve the balance of their sentences.

(e) TRAINING FOREIGN LAW ENFORCEMENT PERSONNEL.—(1) Subject to paragraph (2), the President shall direct the Border Patrol Academy and the Customs Service Academy to enroll for training an appropriate number of foreign law enforcement personnel, and shall make appointments of foreign law enforcement personnel to such academies, as necessary to further the following United States law enforcement goals:

  (A) Preventing of drug smuggling and other cross-border criminal activity.

  (B) Preventing illegal immigration.

  (C) Preventing the illegal entry of goods into the United States (including goods the sale of which is illegal in the United States, the entry of which would cause a quota to be exceeded, or the appropriate duty or tariff for which has not been paid).

(2) The appointments described in paragraph (1) shall be made only to the extent there is capacity in such academies beyond what is required to train United States citizens needed in the Border Patrol and Customs Service, and only of personnel from a country with which the prisoner transfer treaty has been stated to be effective in the most recent report referred to in subsection (d).

(f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

SEC. 331. PRISONER TRANSFER TREATIES STUDY.

(a) REPORT TO CONGRESS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State and the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report that describes the use and effectiveness of the prisoner transfer treaties with the three countries with the greatest number of their nationals incarcerated in the United States in removing from the United States such incarcerated nationals.

(b) USE OF TREATY.—The report under subsection (a) shall include—

  (1) the number of aliens convicted of a criminal offense in the United States since November 30, 1977, who would have been or are eligible for transfer pursuant to the treaties;

  (2) the number of aliens described in paragraph (1) who have been transferred pursuant to the treaties;

  (3) the number of aliens described in paragraph (2) who have been incarcerated in full compliance with the treaties;

  (4) the number of aliens who are incarcerated in a penal institution in the United States who are eligible for transfer pursuant to the treaties; and

  (5) the number of aliens described in paragraph (4) who are incarcerated in Federal, State, and local penal institutions in the United States.

(c) RECOMMENDATIONS.—The report under subsection (a) shall include the recommendations of the Secretary of State and the Attorney General to increase the effectiveness and use of, and full compliance with, the treaties. In considering the recommendations under this subsection, the Secretary and the Attorney General shall consult with such State and local officials in areas disproportionately impacted by aliens convicted of criminal offenses as the Secretary and the Attorney General consider appropriate. Such recommendations shall address—

  (1) changes in Federal laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed criminal offenses in the United States;

  (2) changes in State and local laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed a criminal offense in the United States;

  (3) changes in the treaties that may be necessary to increase the number of aliens convicted of criminal offenses who may be transferred pursuant to the treaties;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(4) methods for preventing the unlawful reentry into the United States of aliens who have been convicted of criminal offenses in the United States and transferred pursuant to the treaties;

(5) any recommendations by appropriate officials of the appropriate government agencies of such countries regarding programs to achieve the goals of, and ensure full compliance with, the treaties;

(6) whether the recommendations under this subsection require the renegotiation of the treaties; and

(7) the additional funds required to implement each recommendation under this subsection.

<< 8 USCA § 1366 >>

SEC. 332. ANNUAL REPORT ON CRIMINAL ALIENS.

Not later than 12 months after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

(1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

(2) the number of illegal aliens convicted of felonies in any Federal or State court, but not sentenced to incarceration, in the year before the report was submitted, stating the number convicted for each type of offense;

(3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal; and

(4) methods for identifying and preventing the unlawful reentry of aliens who have been convicted of criminal offenses in the United States and removed from the United States.

<< 28 USCA § 994 NOTE >>

SEC. 333. PENALTIES FOR CONSPIRING WITH OR ASSISTING AN ALIEN TO COMMIT AN OFFENSE UNDER THE CONTROLLED SUBSTANCES IMPORT AND EXPORT ACT.

(a) REVIEW OF GUIDELINES.—Not later than 6 months after the date of the enactment of this Act, the United States Sentencing Commission shall conduct a review of the guidelines applicable to an offender who conspires with, or aids or abets, a person who is not a citizen or national of the United States in committing any offense under section 1010 of the Controlled Substance Import and Export Act (21 U.S.C. 960).

(b) REVISION OF GUIDELINES.—Following such review, pursuant to section 994(p) of title 28, United States Code, the Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines to ensure an appropriately stringent sentence for such offenders.

<< 28 USCA § 994 NOTE >>

SEC. 334. ENHANCED PENALTIES FOR FAILURE TO DEPART, ILLEGAL REENTRY, AND PASSPORT AND VISA FRAUD.

(a) FAILING TO DEPART.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under section 242(e) and 276(b) of the Immigration and Nationality Act (8 U.S.C. 1252(e) and 1326(b)) to reflect the amendments made by section 130001 of the Violent Crime Control and Law Enforcement Act of 1994.

(b) PASSPORT AND VISA OFFENSES.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under chapter 75 of title 18, United States Code to reflect the amendments made by section 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

Subtitle C—Revision of Grounds for Exclusion and Deportation

SEC. 341. PROOF OF VACCINATION REQUIREMENT FOR IMMIGRANTS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(1)(A) (8 U.S.C. 1182(a)(1)(A)) is amended—

(1) by redesignating clauses (ii) and (iii) as clauses (iii) and (iv), respectively, and

(2) by inserting after clause (i) the following new clause:

"(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,".

(b) WAIVER.—Section 212(g) (8 U.S.C. 1182(g)) is amended by striking ", or" at the end of paragraph (1) and all that follows and inserting a semicolon and the following:

"in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

"(2) subsection (a)(1)(A)(ii) in the case of any alien—

"(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

"(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

"(C) under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

"(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to applications for immigrant visas or for adjustment of status filed after September 30, 1996.

SEC. 342. INCITEMENT OF TERRORIST ACTIVITY AND PROVISION OF FALSE DOCUMENTATION TO TERRORISTS AS A BASIS FOR EXCLUSION FROM THE UNITED STATES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(3)(B) (8 U.S.C. 1182(a)(3)(B)) is amended—

(1) by redesignating subclauses (III) and (IV) of clause (i) as subclauses (IV) and (V), respectively;

(2) by inserting after subclause (II) of clause (i) the following new subclause:

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity,"; and

(3) in clause (iii)(III), by inserting "documentation or" before "identification";

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the enactment of this Act and shall apply to incitement regardless of when it occurs.

<< 8 USCA § 1182 >>

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 343. CERTIFICATION REQUIREMENTS FOR FOREIGN HEALTH–CARE WORKERS.

Section 212(a)(5) (8 U.S.C. 1182(a)(5)) is amended—
(1) by redesignating subparagraph (C) as subparagraph (D), and
(2) by inserting after subparagraph (B) the following new subparagraph:
 "(C) UNCERTIFIED FOREIGN HEALTH–CARE WORKERS.—Any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is excludable unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that—
   "(i) the alien's education, training, license, and experience—
    "(I) meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;
    "(II) are comparable with that required for an American health-care worker of the same type; and
    "(III) are authentic and, in the case of a license, unencumbered;
   "(ii) the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and
   "(iii) if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.".

SEC. 344. REMOVAL OF ALIENS FALSELY CLAIMING UNITED STATES CITIZENSHIP.

<< 8 USCA § 1182 >>

 (a) EXCLUSION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 212(a)(6) (C) (8 U.S.C. 1182(a)(6)(C)) is amended—
 (1) by redesignating clause (ii) as clause (iii), and
 (2) by inserting after clause (i) the following new clause:
  "(ii) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any other Federal or State law is excludable.".

<< 8 USCA § 1251 >>

 (b) DEPORTATION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 241(a) (3) (8 U.S.C. 1251(a)(3)) is amended by adding at the end the following new subparagraph:
  "(D) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any Federal or State law is deportable.".

<< 8 USCA §§ 1182 NOTE, 1251 nt >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to representations made on or after the date of the enactment of this Act.

SEC. 345. WAIVER OF EXCLUSION AND DEPORTATION GROUND FOR CERTAIN SECTION 274C VIOLATORS.

<< 8 USCA § 1182 >>

(a) EXCLUSION GROUNDS.—Section 212 (8 U.S.C. 1182) is amended—

(1) by amending subparagraph (F) of subsection (a)(6) to read as follows:

"(F) SUBJECT OF CIVIL PENALTY.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.

"(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12)."; and

(2) by adding at the end of subsection (d) the following new paragraph:

"(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)—

"(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 211(b), and

"(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),

if no previous civil money penalty was imposed against the alien under section 274C and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.".

<< 8 USCA § 1251 >>

(b) GROUND OF DEPORTATION.—Subparagraph (C) of section 241(a)(3) (8 U.S.C. 1251(a)(3)), before redesignation by section 305(a)(2) of this division, is amended to read as follows:

"(C) DOCUMENT FRAUD.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.

"(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 274C and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.".

SEC. 346. INADMISSIBILITY OF CERTAIN STUDENT VISA ABUSERS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(6) (8 U.S.C. 1182(a)(6)) is amended by adding at the end the following new subparagraph:

"(G) STUDENT VISA ABUSERS.—An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) and who violates a term or condition of such status under section 214(l) is excludable until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to aliens who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 347. REMOVAL OF ALIENS WHO HAVE UNLAWFULLY VOTED.

<< 8 USCA § 1182 >>

(a) EXCLUSION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division, is amended by adding at the end the following new subparagraph:

"(D) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is excludable.".

<< 8 USCA § 1251 >>

(b) DEPORTATION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 241(a) (8 U.S.C. 1251(a)), before redesignation by section 305(a)(2) of this division, is amended by adding at the end the following new paragraph:

"(6) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to voting occurring before, on, or after the date of the enactment of this Act.

SEC. 348. WAIVERS FOR IMMIGRANTS CONVICTED OF CRIMES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(h) (8 U.S.C. 1182(h)) is amended by adding at the end the following: "No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective on the date of the enactment of this Act and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date.

<< 8 USCA § 1182 >>

SEC. 349. WAIVER OF MISREPRESENTATION GROUND OF INADMISSIBILITY FOR CERTAIN ALIEN.

Subsection (i) of section 212 (8 U.S.C. 1182) is amended to read as follows:

"(i)(1) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien.

"(2) No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).".

SEC. 350. OFFENSES OF DOMESTIC VIOLENCE AND STALKING AS GROUND FOR DEPORTATION.

<< 8 USCA § 1251 >>

(a) IN GENERAL.—Section 241(a)(2) (8 U.S.C. 1251(a)(2)) is amended by adding at the end the following:

"(E) CRIMES OF DOMESTIC VIOLENCE, STALKING, OR VIOLATION OF PROTECTION ORDER, CRIMES AGAINST CHILDREN AND.—

"(i) DOMESTIC VIOLENCE, STALKING, AND CHILD ABUSE.—Any alien who at any time after entry is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term 'crime of domestic violence' means any crime of violence (as defined in section 16 of title 18, United States Code) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

"(ii) VIOLATORS OF PROTECTION ORDERS.—Any alien who at any time after entry is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term 'protection order' means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.".

<< 8 USCA § 1227 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to convictions, or violations of court orders, occurring after the date of the enactment of this Act.

SEC. 351. CLARIFICATION OF DATE AS OF WHICH RELATIONSHIP REQUIRED FOR WAIVER FROM EXCLUSION OR DEPORTATION FOR SMUGGLING.

<< 8 USCA § 1182 >>

(a) EXCLUSION.—Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting "an individual who at the time of such action was" after "aided only".

<< 8 USCA § 1251 >>

(b) DEPORTATION.—Section 241(a)(1)(E)(iii) (8 U.S.C. 1251(a)(1)(E)(iii) is amended by inserting "an individual who at the time of the offense was" after "aided only".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications for waivers filed before, on, or after the date of the enactment of this Act, but shall not apply to such an application for which a final determination has been made as of the date of the enactment of this Act.

SEC. 352. EXCLUSION OF FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID UNITED STATES TAXATION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division and as amended by section 347(a) of this division, is amended by adding at the end the following:

"(E) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.".

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals who renounce United States citizenship on and after the date of the enactment of this Act.

SEC. 353. REFERENCES TO CHANGES ELSEWHERE IN DIVISION.

(a) DEPORTATION FOR HIGH SPEED FLIGHT.—For provision making high speed flight from an immigration checkpoint subject to deportation, see section 108(c) of this division.

(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—For provision making aliens previously removed and unlawfully present in the United States inadmissible, see section 301(b) of this division.

(c) INADMISSIBILITY OF ILLEGAL ENTRANTS.—For provision revising the ground of inadmissibility for illegal entrants and immigration violators, see section 301(c) of this division.

(d) DEPORTATION FOR VISA VIOLATORS.—For provision revising the ground of deportation for illegal entrants, see section 301(d) of this division.

(e) LABOR CERTIFICATIONS FOR PROFESSIONAL ATHLETES.—For provision providing for continued validity of labor certifications and classification petitions for professional athletes, see section 624 of this division.

Subtitle D—Changes in Removal of Alien Terrorist Provisions

SEC. 354. TREATMENT OF CLASSIFIED INFORMATION.

(a) LIMITATION ON PROVISION OF SUMMARIES; USE OF SPECIAL ATTORNEYS IN CHALLENGES TO CLASSIFIED INFORMATION.—

<< 8 USCA § 1534 >>

(1) NO PROVISION OF SUMMARY IN CERTAIN CASES.—Section 504(e)(3)(D) (8 U.S.C. 1534(e)(3)(D)) is amended—

(A) in clause (ii), by inserting before the period at the end the following: "unless the judge makes the findings under clause (iii)", and

(B) by adding at the end the following new clause:

"(iii) FINDINGS.—The findings described in this clause are, with respect to an alien, that—

"(I) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

"(II) the provision of the summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.".

(2) SPECIAL CHALLENGE PROCEDURES.—Section 504(e)(3) (8 U.S.C. 1534(e)(3)) is amended by adding at the end the following new subparagraphs:

"(E) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in subparagraph (D)(iii)—

"(i) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subparagraph (F) shall apply; and

"(ii) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to this paragraph.

"(F) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

"(i) IN GENERAL.—The procedures described in this subparagraph are that the judge (under rules of the removal court) shall designate a special attorney to assist the alien—

"(I) by reviewing in camera the classified information on behalf of the alien, and

"(II) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

"(ii) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under clause (i)—

"(I) shall not disclose the information to the alien or to any other attorney representing the alien, and

"(II) who discloses such information in violation of subclause (I) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.".

<< 8 USCA § 1535 >>

(3) APPEALS.—Section 505(c) (8 U.S.C. 1535(c)) is amended—

(A) in paragraph (1), by striking "The decision" and inserting "Subject to paragraph (2), the decision";

(B) in paragraph (3)(D), by inserting before the period at the end the following: ", except that in the case of a review under paragraph (2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 504(c)(3), the Court of Appeals shall review questions of fact de novo";

(C) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

(D) by inserting after paragraph (1) the following new paragraph:

"(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

"(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 504(e) (3) and with respect to which the procedures described in section 504(e)(3)(F) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

"(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 504(e)(3)(F)(i) on behalf of the alien.".

<< 8 USCA § 1532 >>

(4) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—Section 502 (8 U.S.C. 1532) is amended by adding at the end the following new subsection:

"(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The removal court shall provide for the designation of a panel of attorneys each of whom—

"(1) has a security clearance which affords the attorney access to classified information, and

"(2) has agreed to represent permanent resident aliens with respect to classified information under section 504(e)(3) in accordance with (and subject to the penalties under) this title.".

<< 8 USCA § 1531 >>

(5) DEFINITION OF SPECIAL ATTORNEY.—Section 501 (8 U.S.C. 1531) is amended—

(A) by striking "and" at the end of paragraph (5),

(B) by striking the period at the end of paragraph (6) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(7) the term 'special attorney' means an attorney who is on the panel established under section 502(e).".

<< 8 USCA § 1534 >>

(b) OTHER PROVISIONS RELATING TO CLASSIFIED INFORMATION.—

(1) INTRODUCTION OF CLASSIFIED INFORMATION.—Section 504(e) (8 U.S.C. 1534(e)) is amended—

(A) in paragraph (1)—

(i) by inserting after "(A)" the following: "the Government is authorized to use in a removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act and", and

(ii) by striking "the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.)" and inserting "such Act"; and

(B) by striking the period at the end of paragraph (3)(A) and inserting the following: "and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to this paragraph. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.".

(2) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ARGUMENTS.—Section 504(f) (8 U.S.C. 1534(f)) is amended by adding at the end the following: "The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.".

(3) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ORDERS.—Section 504(j) (8 U.S.C. 1534(j)) is amended by adding at the end the following: "Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.".

<< 8 USCA § 1182 >>

## SEC. 355. EXCLUSION OF REPRESENTATIVES OF TERRORISTS ORGANIZATIONS.

Section 212(a)(3)(B)(i)(IV) (8 U.S.C. 1182(a)(3)(B)(i)(VI)), as inserted by section 411(1)(C) of Public Law 104–132, is amended by inserting "which the alien knows or should have known is a terrorist organization" after "219,".

<< 8 USCA § 1189 >>

## SEC. 356. STANDARD FOR JUDICIAL REVIEW OF TERRORIST ORGANIZATION DESIGNATIONS.

Section 219(b)(3) (8 U.S.C. 1189(b)(3)), as added by section 302(a) of Public Law 104–132, is amended—

(1) by striking "or" at the end of subparagraph (B),

(2) by striking the period at the end of subparagraph (C) and inserting a semicolon, and

(3) by adding at the end the following:

"(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2), or

"(E) not in accord with the procedures required by law.".

<< 8 USCA § 1534 >>

## SEC. 357. REMOVAL OF ANCILLARY RELIEF FOR VOLUNTARY DEPARTURE.

Section 504(k) (8 U.S.C. 1534(k)) is amended—

(1) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), and

(2) by inserting after paragraph (3) the following new paragraph:

"(4) voluntary departure under section 244(e);".

<< 8 USCA § 1182 NOTE >>

## SEC. 358. EFFECTIVE DATE.

The amendments made by this subtitle shall be effective as if included in the enactment of subtitle A of title IV of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

### SUBTITLE E—Transportation of Aliens

## SEC. 361. DEFINITION OF STOWAWAY.

<< 8 USCA § 1101 >>

(a) STOWAWAY DEFINED.—Section 101(a) (8 U.S.C. 1101(a)), as amended by section 322(a)(1) of this division, is amended by adding at the end the following new paragraph:

"(49) The term 'stowaway' means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1228 >>

SEC. 362. TRANSPORTATION CONTRACTS.

(a) COVERAGE OF NONCONTIGUOUS TERRITORY.—Section 238 (8 U.S.C. 1228), before redesignation as section 233 under section 308(b)(4) of this division, is amended—

(1) in the heading, by striking "CONTIGUOUS", and

(2) by striking "contiguous" each place it appears in subsections (a), (b), and (d).

(b) COVERAGE OF RAILROAD TRAIN.—Subsection (d) of such section is further amended by inserting "or railroad train" after "aircraft".

SUBTITLE F—Additional Provisions

SEC. 371. IMMIGRATION JUDGES AND COMPENSATION.

<< 8 USCA § 1101 >>

(a) DEFINITION OF TERM.—Paragraph (4) of section 101(b) (8 U.S.C. 1101(b)) is amended to read as follows:

"(4) The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.".

(b) SUBSTITUTION FOR TERM "SPECIAL INQUIRY OFFICER".—The Immigration and Nationality Act is amended by striking "a special inquiry officer", "A special inquiry officer", "special inquiry officer", and "special inquiry officers" and inserting "an immigration judge", "An immigration judge", "immigration judge", and "immigration judges", respectively, each place it appears in the following sections:

<< 8 USCA § 1105a >>

(1) Section 106(a)(2) (8 U.S.C. 1105a(a)(2)), before its repeal by section 306(c) of this division.

<< 8 USCA § 1159 >>

(2) Section 209(a)(2) (8 U.S.C. 1159(a)(2)).

<< 8 USCA § 1224 >>

(3) Section 234 (8 U.S.C. 1224), before redesignation by section 308(b) of this division.

<< 8 USCA § 1225 >>

(4) Section 235 (8 U.S.C. 1225), before amendment by section 302(a) of this division.

<< 8 USCA § 1226 >>

(5) Section 236 (8 U.S.C. 1226), before amendment by section 303 of this division.

<< 8 USCA § 1252 >>

(6) Section 242(b) (8 U.S.C. 1252(b)), before amendment by section 306(a)(2) of this division.

<< 8 USCA § 1252b >>

(7) Section 242B(d)(1) (8 U.S.C. 1252b(d)(1)), before repeal by section 306(b)(6) of this division.

<< 8 USCA § 1323 >>

(8) Section 273(d) (8 U.S.C. 1323(d)), before its repeal by section 308(e)(13) of this division.

<< 8 USCA § 1362 >>

(9) Section 292 (8 U.S.C. 1362).

<< 8 USCA § 1103 NOTE >>

(c) COMPENSATION FOR IMMIGRATION JUDGES.—
 (1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3, and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.
 (2) RATES OF PAY.—
   (A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

IJ-1 .......... 70% of the next to highest rate of basic pay for the Senior Executive Service

IJ-2 .......... 80% of the next to highest rate of basic pay for the Senior Executive Service

IJ-3 .......... 90% of the next to highest rate of basic pay for the Senior Executive Service

IJ-4 .......... 92% of the next to highest rate of basic pay for the Senior Executive Service.

 (B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.
 (3) APPOINTMENT.—
   (A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.
   (B) Notwithstanding subparagraph (A), the Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.
 (4) TRANSITION.—Immigration judges serving as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge, and in no case shall be paid less after the effective date than the rate of pay prior to the effective date.
(d) EFFECTIVE DATES.—

<< 8 USCA § 1101 NOTE >>

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 716 of 1021   PageID 7586

<< 8 USCA § 1103 NOTE >>

(2) Subsection (c) shall take effect 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

SEC. 372. DELEGATION OF IMMIGRATION ENFORCEMENT AUTHORITY.

Section 103(a) (8 U.S.C. 1103(a)) is amended—

(1) inserting "(1)" after "(a)",

(2) By designating each sentence (after the first sentence) as a separate paragraph with appropriate consecutive numbering and initial indentation,

(3) by adding at the end the following new paragraph:

"(8) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this Act or regulations issued thereunder upon officers or employees of the Service.".

<< 8 USCA § 1103 >>

SEC. 373. POWERS AND DUTIES OF THE ATTORNEY GENERAL AND THE COMMISSIONER.

Section 103 (8 U.S.C. 1103) is amended—

(1) by adding at the end of subsection (a) the following new paragraph:

"(9) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

"(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

"(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service."; and

(2) by adding at the end of subsection (c), as redesignated by section 102(d)(1) of this division, the following: "The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.".

SEC. 374. JUDICIAL DEPORTATION.

<< 8 USCA § 1252a >>

(a) IN GENERAL.—Section 242A(d) (8 U.S.C. 1252a(d)), as added by section 224(a) of Immigration and Nationality Technical Corrections Act of 1994 and before redesignation by section 308(b)(5) of this division, is amended—

(1) in paragraph (1), by striking "whose criminal conviction causes such alien to be deportable under section 241(a)(2)(A)" and inserting "who is deportable";

(2) in paragraph (4), by striking "without a decision on the merits"; and

(3) by adding at the end the following new paragraph:

"(5) STIPULATED JUDICIAL ORDER OF DEPORTATION.—The United States Attorney, with the concurrence of the Commissioner, may, pursuant to Federal Rule of Criminal Procedure 11, enter into a plea agreement which calls for the alien, who is deportable under this Act, to waive the right to notice and a hearing under this section, and stipulate to the entry of

a judicial order of deportation from the United States as a condition of the plea agreement or as a condition of probation or supervised release, or both. The United States district court, in both felony and misdemeanor cases, and a United States magistrate judge in misdemeanor cases, may accept such a stipulation and shall have jurisdiction to enter a judicial order of deportation pursuant to the terms of such stipulation.".

<< 18 USCA § 3563 >>

(b) DEPORTATION AS A CONDITION OF PROBATION.—Section 3563(b) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (20);

(2) by redesignating paragraph (21) as paragraph (22); and

(3) by inserting after paragraph (20) the following new paragraph:

"(21) be ordered deported by a United States district court, or United States magistrate judge, pursuant to a stipulation entered into by the defendant and the United States under section 242A(d)(5) of the Immigration and Nationality Act, except that, in the absence of a stipulation, the United States district court or a United States magistrate judge, may order deportation as a condition of probation, if, after notice and hearing pursuant to such section, the Attorney General demonstrates by clear and convincing evidence that the alien is deportable; or".

<< 18 USCA § 1228 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a)(2) shall be effective as if included in the enactment of section 224(a) of the Immigration and Nationality Technical Corrections Act of 1994.

<< 8 USCA § 1255 >>

SEC. 375. LIMITATION ON ADJUSTMENT OF STATUS.

Section 245(c) (8 U.S.C. 1255(c)) is amended—

(1) by striking "or (6)" and inserting "(6)"; and

(2) by inserting before the period at the end the following: "; (7) any alien who seeks adjustment of status to that of an immigrant under section 203(b) and is not in a lawful nonimmigrant status; or (8) any alien who was employed while the alien was an unauthorized alien, as defined in section 274A(h)(3), or who has otherwise violated the terms of a nonimmigrant visa".

SEC. 376. TREATMENT OF CERTAIN FEES.

<< 8 USCA § 1255 >>

(a) INCREASE IN FEE.—Section 245(i) (8 U.S.C. 1255(i)), as added by section 506(b) of Public Law 103–317, is amended—

(1) in paragraph (1), by striking "five times the fee required for the processing of applications under this section" and inserting "$1,000"; and

(2) by amending paragraph (3) to read as follows:

"(3)(A) The portion of each application fee (not to exceed $200) that the Attorney General determines is required to process an application under this section and is remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in subsections (m), (n), and (o) of section 286.

"(B) Any remaining portion of such fees remitted under such paragraphs shall be deposited by the Attorney General into the Immigration Detention Account established under section 286(s).".

<< 8 USCA § 1256 >>

(b) IMMIGRATION DETENTION ACCOUNT.—Section 286 (8 U.S.C. 1356) is amended by adding at the end the following new subsection:

"(s) IMMIGRATION DETENTION ACCOUNT.—(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Detention Account'. Notwithstanding any other section of this title, there

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

shall be deposited as offsetting receipts into the Immigration Detention Account amounts described in section 245(i)(3)(B) to remain available until expended.

  "(2)(A) The Secretary of the Treasury shall refund out of the Immigration Detention Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for the detention of aliens under sections 236(c) and 241(a).

  "(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

  "(C) The amounts required to be refunded from the Immigration Detention Account for fiscal year 1997 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

  "(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Detention Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1255 NOTE >>

  (c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications made on or after the end of the 90–day period beginning on the date of the enactment of this Act.

SEC. 377. LIMITATION ON LEGALIZATION LITIGATION.

<< 8 USCA § 1255a >>

  (a) LIMITATION ON COURT JURISDICTION.—Section 245A(f)(4) (8 U.S.C. 1255a(f)(4)) is amended by adding at the end the following new subparagraph:

  "(C) JURISDICTION OF COURTS.—Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section within the period specified by subsection (a)(1), or attempted to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer.".

<< 8 USCA § 1255a NOTE >>

  (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as if included in the enactment of the Immigration Reform and Control Act of 1986.

SEC. 378. RESCISSION OF LAWFUL PERMANENT RESIDENT STATUS.

<< 8 USCA § 1256 >>

  (a) IN GENERAL.—Section 246(a) (8 U.S.C. 1256(a)) is amended by adding at the end the following sentence: "Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.".

<< 8 USCA § 1256 NOTE >>

  (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the title III–A effective date (as defined in section 309(a) of this division).

AR03377

SEC. 379. ADMINISTRATIVE REVIEW OF ORDERS.

<< 8 USCA §§ 1324a, 1324c >>

  (a) IN GENERAL.—Sections 274A(e)(7) and 274C(d)(4) (8 U.S.C. 1324a(e)(7), 1324c(d)(4)) are each amended—
  (1) by striking "unless, within 30 days, the Attorney General modifies or vacates the decision and order" and inserting "unless either (A) within 30 days, an official delegated by regulation to exercise review authority over the decision and order modifies or vacates the decision and order, or (B) within 30 days of the date of such a modification or vacation (or within 60 days of the date of decision and order of an administrative law judge if not so modified or vacated) the decision and order is referred to the Attorney General pursuant to regulations"; and
  (2) by striking "a final order" and inserting "the final agency decision and order".

<< 8 USCA § 1324a NOTE >>

  (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to orders issued on or after the date of the enactment of this Act.

SEC. 380. CIVIL PENALTIES FOR FAILURE TO DEPART.

<< 8 USCA § 1324d >>

  (a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 274C the following new section:

"CIVIL PENALTIES FOR FAILURE TO DEPART

  "SEC. 274D. (a) IN GENERAL.—Any alien subject to a final order of removal who—
  "(1) willfully fails or refuses to—
  "(A) depart from the United States pursuant to the order,
  "(B) make timely application in good faith for travel or other documents necessary for departure, or
  "(C) present for removal at the time and place required by the Attorney General; or
  "(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,

shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.
  "(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.".
  (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 274C the following new item:

"Sec. 274D. Civil penalties for failure to depart.".

<< 8 USCA § 1324d NOTE >>

  (c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to actions occurring on or after the title III–A effective date (as defined in section 309(a) of this division).

SEC. 381. CLARIFICATION OF DISTRICT COURT JURISDICTION.

<< 8 USCA § 1329 >>

  (a) IN GENERAL.—Section 279 (8 U.S.C. 1329) is amended—
  (1) by amending the first sentence to read as follows: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this title.", and

480

(2) by adding at the end the following new sentence: "Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.".

<< 8 USCA § 1329 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions filed after the date of the enactment of this Act.

SEC. 382. APPLICATION OF ADDITIONAL CIVIL PENALTIES TO ENFORCEMENT.

<< 8 USCA § 1330 >>

(a) IN GENERAL.—Subsection (b) of section 280 (8 U.S.C. 1330) is amended to read as follows:

"(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Enforcement Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.

"(2) The amounts described in this paragraph are the following:

"(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.

"(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

"(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title. Such activities include—

"(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

"(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

"(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

"(C) The amounts required to be refunded from the Immigration Enforcement Account for fiscal year 1996 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

"(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Enforcement Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1356 >>

(b) IMMIGRATION USER FEE ACCOUNT.—Section 286(h)(1)(B) (8 U.S.C. 1356(h)(1)(B)) is amended by striking "271" and inserting "243(c), 271,".

<< 8 USCA § 1330 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to fines and penalties collected on or after the date of the enactment of this Act.

<< 8 USCA § 1255a NOTE >>

SEC. 383. EXCLUSION OF CERTAIN ALIENS FROM FAMILY UNITY PROGRAM.

(a) IN GENERAL.—Section 301(e) of the Immigration Act of 1990 (8 U.S.C. 1255a note) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting ", or", and

(3) by adding at the end the following new paragraph:

"(3) has committed an act of juvenile delinquency which if committed by an adult would be classified as—

"(A) a felony crime of violence that has an element the use or attempted use of physical force against another individual, or

"(B) a felony offense that by its nature involves a substantial risk that physical force against another individual may be used in the course of committing the offense.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to benefits granted or extended after the date of the enactment of this Act.

<< 8 USCA § 1367 >>

SEC. 384. PENALTIES FOR DISCLOSURE OF INFORMATION.

(a) IN GENERAL.—Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice (including any bureau or agency of such Department)—

(1) make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act using information furnished solely by—

(A) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

(B) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

(C) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty), or

(D) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

unless the alien has been convicted of a crime or crimes listed in section 241(a)(2) of the Immigration and Nationality Act; or

(2) permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under clause (iii) or (iv) of section 204(a)(1)(A), clause (ii) or (iii) of section 204(a)(1)(B), section 216(c)(4)(C), or section 244(a)(3) of such Act as an alien (or the parent of a child) who has been battered or subjected to extreme cruelty.

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

(b) EXCEPTIONS.—

(1) The Attorney General may provide, in the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

(2) The Attorney General may provide in the discretion of the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.

(3) Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

(4) Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

(c) PENALTIES FOR VIOLATIONS.—Anyone who willfully uses, publishes, or permits information to be disclosed in violation of this section shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation.

(d) CONFORMING AMENDMENTS TO OTHER DISCLOSURE RESTRICTIONS.—

<< 8 USCA §§ 1160, 1255a >>

<< 8 USCA § 1367 >>

(1) IN GENERAL.—The last sentence of section 210(b)(6) and the second sentence of section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) are each amended to read as follows: "Anyone who uses, publishes, or permits information to be examined in violation of this paragraph shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each violation.".

<< 8 USCA § 1367 >>

<< 8 USCA § 1160 NOTE >>

(2) EFFECTIVE DATE.—The amendments made by this subsection shall apply to offenses occurring on or after the date of the enactment of this Act.

SEC. 385. AUTHORIZATION OF ADDITIONAL FUNDS FOR REMOVAL OF ALIENS.

In addition to the amounts otherwise authorized to be appropriated for each fiscal year beginning with fiscal year 1996, there are authorized to be appropriated to the Attorney General $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal, the hiring of more investigators, and the hiring of more detention and deportation officers.

<< 8 USCA § 1368 >>

SEC. 386. INCREASE IN INS DETENTION FACILITIES; REPORT ON DETENTION SPACE.

(a) INCREASE IN DETENTION FACILITIES.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the detention facilities of the Immigration and Naturalization Service to at least 9,000 beds before the end of fiscal year 1997.

(b) REPORT ON DETENTION SPACE.—

(1) IN GENERAL.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate estimating the amount of detention space that will be required, during the fiscal year in which the report is submitted and the succeeding fiscal year, to detain—

(A) all aliens subject to detention under section 236(c) of the Immigration and Nationality Act (as amended by section 303 of this title) and section 241(a) of the Immigration and Nationality Act (as inserted by section 305(a)(3) of this title);

(B) all excludable or deportable aliens subject to proceedings under section 238 of the Immigration and Nationality Act (as redesignated by section 308(b)(5) of this title) or section 235(b)(2)(A) or 240 of the Immigration and Nationality Act; and

(C) other excludable or deportable aliens in accordance with the priorities established by the Attorney General.

(2) ESTIMATE OF NUMBER OF ALIENS RELEASED INTO THE COMMUNITY.—

(A) CRIMINAL ALIENS.—

(i) IN GENERAL.—The first report submitted under paragraph (1) shall include an estimate of the number of criminal aliens who, in each of the 3 fiscal years concluded prior to the date of the report—

(I) were released from detention facilities of the Immigration and Naturalization Service (whether operated directly by the Service or through contract with other persons or agencies); or

(II) were not taken into custody or detention by the Service upon completion of their incarceration.

(ii) ALIENS CONVICTED OF AGGRAVATED FELONIES.—The estimate under clause (i) shall estimate separately, with respect to each year described in such clause, the number of criminal aliens described in such clause who were convicted of an aggravated felony.

(B) ALL EXCLUDABLE OR DEPORTABLE ALIENS.—The first report submitted under paragraph (1) shall also estimate the number of excludable or deportable aliens who were released into the community due to a lack of detention facilities in each of the 3 fiscal years concluded prior to the date of the report notwithstanding circumstances that the Attorney General believed justified detention (for example, a significant probability that the released alien would not appear, as agreed, at subsequent exclusion or deportation proceedings).

(C) SUBSEQUENT REPORTS.—Each report under paragraph (1) following the first such report shall include the estimates under subparagraphs (A) and (B), made with respect to the 6–month period immediately preceding the date of the submission of the report.

<< 8 USCA § 1231 NOTE >>

SEC. 387. PILOT PROGRAM ON USE OF CLOSED MILITARY BASES FOR THE DETENTION OF INADMISSIBLE OR DEPORTABLE ALIENS.

(a) ESTABLISHMENT.—The Attorney General and the Secretary of Defense shall establish one or more pilot programs for up to 2 years each to determine the feasibility of the use of military bases, available because of actions under a base closure law, as detention centers by the Immigration and Naturalization Service. In selecting real property at a military base for use as a detention center under the pilot program, the Attorney General and the Secretary shall consult with the redevelopment authority established for the military base and give substantial deference to the redevelopment plan prepared for the military base.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of Defense, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, and the Committees on Armed Services of the House of Representatives and of the Senate, on the feasibility of using military bases closed under a base closure law as detention centers by the Immigration and Naturalization Service.

(c) DEFINITION.—For purposes of this section, the term "base closure law" means each of the following:

(1) The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

(2) Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

(3) Section 2687 of title 10, United States Code.

(4) Any other similar law enacted after the date of the enactment of this Act.

<< 8 USCA § 1231 NOTE >>

SEC. 388. REPORT ON INTERIOR REPATRIATION PROGRAM.

Not later than 30 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of the program of interior repatriation developed under section 437 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Subtitle A—Pilot Programs for Employment Eligibility Confirmation

<< 8 USCA § 1324a NOTE >>

SEC. 401. ESTABLISHMENT OF PROGRAMS.

(a) IN GENERAL.—The Attorney General shall conduct 3 pilot programs of employment eligibility confirmation under this subtitle.

(b) IMPLEMENTATION DEADLINE; TERMINATION.—The Attorney General shall implement the pilot programs in a manner that permits persons and other entities to have elections under section 402 of this division made and in effect no later than 1 year after the date of the enactment of this Act. Unless the Congress otherwise provides, the Attorney General shall terminate a pilot program at the end of the 4–year period beginning on the first day the pilot program is in effect.

(c) SCOPE OF OPERATION OF PILOT PROGRAMS.—The Attorney General shall provide for the operation—

  (1) of the basic pilot program (described in section 403(a) of this division) in, at a minimum, 5 of the 7 States with the highest estimated population of aliens who are not lawfully present in the United States;

  (2) of the citizen attestation pilot program (described in section 403(b) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(b)(2)(A) of this division; and

  (3) of the machine-readable-document pilot program (described in section 403(c) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(c)(2) of this division.

(d) REFERENCES IN SUBTITLE.—In this subtitle—

  (1) PILOT PROGRAM REFERENCES.—The terms "program" or "pilot program" refer to any of the 3 pilot programs provided for under this subtitle.

  (2) CONFIRMATION SYSTEM.—The term "confirmation system" means the confirmation system established under section 404 of this division.

  (3) REFERENCES TO SECTION 274A.—Any reference in this subtitle to section 274A (or a subdivision of such section) is deemed a reference to such section (or subdivision thereof) of the Immigration and Nationality Act.

  (4) I–9 OR SIMILAR FORM.—The term "I–9 or similar form" means the form used for purposes of section 274A(b)(1)(A) or such other form as the Attorney General determines to be appropriate.

  (5) LIMITED APPLICATION TO RECRUITERS AND REFERRERS.—Any reference to recruitment or referral (or a recruiter or referrer) in relation to employment is deemed a reference only to such recruitment or referral (or recruiter or referrer) that is subject to section 274A(a)(1)(B)(ii).

  (6) UNITED STATES CITIZENSHIP.—The term "United States citizenship" includes United States nationality.

  (7) STATE.—The term "State" has the meaning given such term in section 101(a)(36) of the Immigration and Nationality Act.

<< 8 USCA § 1324a note >>

SEC. 402. VOLUNTARY ELECTION TO PARTICIPATE IN A PILOT PROGRAM.

(a) VOLUNTARY ELECTION.—Subject to subsection (c)(3)(B), any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program. Except as specifically provided in subsection (e), the Attorney General may not require any person or other entity to participate in a pilot program.

(b) BENEFIT OF REBUTTABLE PRESUMPTION.—

  (1) IN GENERAL.—If a person or other entity is participating in a pilot program and obtains confirmation of identity and employment eligibility in compliance with the terms and conditions of the program with respect to the hiring (or recruitment or referral) of an individual for employment in the United States, the person or entity has established a rebuttable presumption that the person or entity has not violated section 274A(a)(1)(A) with respect to such hiring (or such recruitment or referral).

  (2) CONSTRUCTION.—Paragraph (1) shall not be construed as preventing a person or other entity that has an election in effect under subsection (a) from establishing an affirmative defense under section 274A(a)(3) if the person or entity complies with the requirements of section 274A(a)(1)(B) but fails to obtain confirmation under paragraph (1).

(c) GENERAL TERMS OF ELECTIONS.—

  (1) IN GENERAL.—An election under subsection (a) shall be in such form and manner, under such terms and conditions, and shall take effect, as the Attorney General shall specify. The Attorney General may not impose any fee as a condition of making an election or participating in a pilot program.

  (2) SCOPE OF ELECTION.—

(A) IN GENERAL.—Subject to paragraph (3), any electing person or other entity may provide that the election under subsection (a) shall apply (during the period in which the election is in effect)—

  (i) to all its hiring (and all recruitment or referral) in the State (or States) in which the pilot program is operating, or

  (ii) to its hiring (or recruitment or referral) in one or more pilot program States or one or more places of hiring (or recruitment or referral, as the case may be) in the pilot program States.

  (B) APPLICATION OF PROGRAMS IN NON–PILOT PROGRAM STATES.—In addition, the Attorney General may permit a person or entity electing—

  (i) the basic pilot program (described in section 403(a) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating, or

  (ii) the citizen attestation pilot program (described in 403(b) of this division) or the machine-readable-document pilot program (described in section 403(c) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating but only if such States meet the requirements of 403(b)(2)(A) and 403(c)(2) of this division, respectively.

(3) ACCEPTANCE AND REJECTION OF ELECTIONS.—

  (A) IN GENERAL.—Except as provided in subparagraph (B), the Attorney General shall accept all elections made under subsection (a).

  (B) REJECTION OF ELECTIONS.—The Attorney General may reject an election by a person or other entity under this section or limit its applicability to certain States or places of hiring (or recruitment or referral) if the Attorney General has determined that there are insufficient resources to provide appropriate services under a pilot program for the person's or entity's hiring (or recruitment or referral) in any or all States or places of hiring.

(4) TERMINATION OF ELECTIONS.—The Attorney General may terminate an election by a person or other entity under this section because the person or entity has substantially failed to comply with its obligations under the pilot program. A person or other entity may terminate an election in such form and manner as the Attorney General shall specify.

(d) CONSULTATION, EDUCATION, AND PUBLICITY.—

  (1) CONSULTATION.—The Attorney General shall closely consult with representatives of employers (and recruiters and referrers) in the development and implementation of the pilot programs, including the education of employers (and recruiters and referrers) about such programs.

  (2) PUBLICITY.—The Attorney General shall widely publicize the election process and pilot programs, including the voluntary nature of the pilot programs and the advantages to employers (and recruiters and referrers) of making an election under this section.

  (3) ASSISTANCE THROUGH DISTRICT OFFICES.—The Attorney General shall designate one or more individuals in each District office of the Immigration and Naturalization Service for a Service District in which a pilot program is being implemented—

  (A) to inform persons and other entities that seek information about pilot programs of the voluntary nature of such programs, and

  (B) to assist persons and other entities in electing and participating in any pilot programs in effect in the District, in complying with the requirements of section 274A, and in facilitating confirmation of the identity and employment eligibility of individuals consistent with such section.

(e) SELECT ENTITIES REQUIRED TO PARTICIPATE IN A PILOT PROGRAM.—

  (1) FEDERAL GOVERNMENT.—

  (A) EXECUTIVE DEPARTMENTS.—

  (i) IN GENERAL.—Each Department of the Federal Government shall elect to participate in a pilot program and shall comply with the terms and conditions of such an election.

  (ii) ELECTION.—Subject to clause (iii), the Secretary of each such Department—

  (I) shall elect the pilot program (or programs) in which the Department shall participate, and

  (II) may limit the election to hiring occurring in certain States (or geographic areas) covered by the program (or programs) and in specified divisions within the Department, so long as all hiring by such divisions and in such locations is covered.

AR03384

(iii) ROLE OF ATTORNEY GENERAL.—The Attorney General shall assist and coordinate elections under this subparagraph in such manner as assures that—

(I) a significant portion of the total hiring within each Department within States covered by a pilot program is covered under such a program, and

(II) there is significant participation by the Federal Executive branch in each of the pilot programs.

(B) LEGISLATIVE BRANCH.—Each Member of Congress, each officer of Congress, and the head of each agency of the legislative branch, that conducts hiring in a State in which a pilot program is operating shall elect to participate in a pilot program, may specify which pilot program or programs (if there is more than one) in which the Member, officer, or agency will participate, and shall comply with the terms and conditions of such an election.

(2) APPLICATION TO CERTAIN VIOLATORS.—An order under section 274A(e)(4) or section 274B(g) of the Immigration and Nationality Act may require the subject of the order to participate in, and comply with the terms of, a pilot program with respect to the subject's hiring (or recruitment or referral) of individuals in a State covered by such a program.

(3) CONSEQUENCE OF FAILURE TO PARTICIPATE.—If a person or other entity is required under this subsection to participate in a pilot program and fails to comply with the requirements of such program with respect to an individual—

(A) such failure shall be treated as a violation of section 274A(a)(1)(B) with respect to that individual, and

(B) a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A).

Subparagraph (B) shall not apply in any prosecution under section 274A(f)(1).

(f) CONSTRUCTION.—This subtitle shall not affect the authority of the Attorney General under any other law (including section 274A(d)(4)) to conduct demonstration projects in relation to section 274A.

<< 8 USCA § 1324a note >>

SEC. 403. PROCEDURES FOR PARTICIPANTS IN PILOT PROGRAMS.

(a) BASIC PILOT PROGRAM.—A person or other entity that elects to participate in the basic pilot program described in this subsection agrees to conform to the following procedures in the case of the hiring (or recruitment or referral) for employment in the United States of each individual covered by the election:

(1) PROVISION OF ADDITIONAL INFORMATION.—The person or entity shall obtain from the individual (and the individual shall provide) and shall record on the I–9 or similar form—

(A) the individual's social security account number, if the individual has been issued such a number, and

(B) if the individual does not attest to United States citizenship under section 274A(b)(2), such identification or authorization number established by the Immigration and Naturalization Service for the alien as the Attorney General shall specify,

and shall retain the original form and make it available for inspection for the period and in the manner required of I–9 forms under section 274A(b)(3).

(2) PRESENTATION OF DOCUMENTATION.—

(A) IN GENERAL.—The person or other entity, and the individual whose identity and employment eligibility are being confirmed, shall, subject to subparagraph (B), fulfill the requirements of section 274A(b) with the following modifications:

(i) A document referred to in section 274A(b)(1)(B)(ii) (as redesignated by section 412(a) of this division) must be designated by the Attorney General as suitable for the purpose of identification in a pilot program.

(ii) A document referred to in section 274A(b)(1)(D) must contain a photograph of the individual.

(iii) The person or other entity has complied with the requirements of section 274A(b)(1) with respect to examination of a document if the document reasonably appears on its face to be genuine and it reasonably appears to pertain to the individual whose identity and work eligibility is being confirmed.

(B) LIMITATION OF REQUIREMENT TO EXAMINE DOCUMENTATION.—If the Attorney General finds that a pilot program would reliably determine with respect to an individual whether—

(i) the person with the identity claimed by the individual is authorized to work in the United States, and

(ii) the individual is claiming the identity of another person,

if a person or entity could fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b)(1) by examining a document specified in either subparagraph (B) or (D) of such section, the Attorney General may provide that, for purposes of such requirement, only such a document need be examined. In such case, any reference in section 274A(b)(1)(A) to a verification that an individual is not an unauthorized alien shall be deemed to be a verification of the individual's identity.

(3) SEEKING CONFIRMATION.—

  (A) IN GENERAL.—The person or other entity shall make an inquiry, as provided in section 404(a)(1) of this division, using the confirmation system to seek confirmation of the identity and employment eligibility of an individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring (or recruitment or referral, as the case may be).

  (B) EXTENSION OF TIME PERIOD.—If the person or other entity in good faith attempts to make an inquiry during such 3 working days and the confirmation system has registered that not all inquiries were received during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation system registers that it has received all inquiries. If the confirmation system cannot receive inquiries at all times during a day, the person or entity merely has to assert that the entity attempted to make the inquiry on that day for the previous sentence to apply to such an inquiry, and does not have to provide any additional proof concerning such inquiry.

(4) CONFIRMATION OR NONCONFIRMATION.—

  (A) CONFIRMATION UPON INITIAL INQUIRY.—If the person or other entity receives an appropriate confirmation of an individual's identity and work eligibility under the confirmation system within the time period specified under section 404(b) of this division, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a final confirmation of such identity and work eligibility of the individual.

  (B) NONCONFIRMATION UPON INITIAL INQUIRY AND SECONDARY VERIFICATION.—

  (i) NONCONFIRMATION.—If the person or other entity receives a tentative nonconfirmation of an individual's identity or work eligibility under the confirmation system within the time period specified under 404(b) of this division, the person or entity shall so inform the individual for whom the confirmation is sought.

  (ii) NO CONTEST.—If the individual does not contest the nonconfirmation within the time period specified in section 404(c) of this division, the nonconfirmation shall be considered final. The person or entity shall then record on the I–9 or similar form an appropriate code which has been provided under the system to indicate a tentative nonconfirmation.

  (iii) CONTEST.—If the individual does contest the nonconfirmation, the individual shall utilize the process for secondary verification provided under section 404(c) of this division. The nonconfirmation will remain tentative until a final confirmation or nonconfirmation is provided by the confirmation system within the time period specified in such section. In no case shall an employer terminate employment of an individual because of a failure of the individual to have identity and work eligibility confirmed under this section until a nonconfirmation becomes final. Nothing in this clause shall apply to a termination of employment for any reason other than because of such a failure.

  (iv) RECORDING OF CONCLUSION ON FORM.—If a final confirmation or nonconfirmation is provided by the confirmation system under section 404(c) of this division regarding an individual, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a confirmation or nonconfirmation of identity and work eligibility of the individual.

  (C) CONSEQUENCES OF NONCONFIRMATION.—

  (i) TERMINATION OR NOTIFICATION OF CONTINUED EMPLOYMENT.—If the person or other entity has received a final nonconfirmation regarding an individual under subparagraph (B), the person or entity may terminate employment (or recruitment or referral) of the individual. If the person or entity does not terminate employment (or recruitment or referral) of the individual, the person or entity shall notify the Attorney General of such fact through the confirmation system or in such other manner as the Attorney General may specify.

  (ii) FAILURE TO NOTIFY.—If the person or entity fails to provide notice with respect to an individual as required under clause (i), the failure is deemed to constitute a violation of section 274A(a)(1)(B) with respect to that individual and the applicable civil monetary penalty under section 274A(e)(5) shall be (notwithstanding the amounts specified in such section) no less than $500 and no more than $1,000 for each individual with respect to whom such violation occurred.

(iii) CONTINUED EMPLOYMENT AFTER FINAL NONCONFIRMATION.—If the person or other entity continues to employ (or to recruit or refer) an individual after receiving final nonconfirmation, a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A). The previous sentence shall not apply in any prosecution under section 274A(f)(1).

(b) CITIZEN ATTESTATION PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraphs (3) through (5), the procedures applicable under the citizen attestation pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) RESTRICTIONS.—

(A) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the citizen attestation pilot program in a State unless each driver's license or similar identification document described in section 274A(b)(1)(D)(i) issued by the State—

(i) contains a photograph of the individual involved, and

(ii) has been determined by the Attorney General to have security features, and to have been issued through application and issuance procedures, which make such document sufficiently resistant to counterfeiting, tampering, and fraudulent use that it is a reliable means of identification for purposes of this section.

(B) AUTHORIZATION TO LIMIT EMPLOYER PARTICIPATION.—The Attorney General may restrict the number of persons or other entities that may elect to participate in the citizen attestation pilot program under this subsection as the Attorney General determines to be necessary to produce a representative sample of employers and to reduce the potential impact of fraud.

(3) NO CONFIRMATION REQUIRED FOR CERTAIN INDIVIDUALS ATTESTING TO U.S. CITIZENSHIP.—In the case of a person or other entity hiring (or recruiting or referring) an individual under the citizen attestation pilot program, if the individual attests to United States citizenship (under penalty of perjury on an I–9 or similar form which form states on its face the criminal and other penalties provided under law for a false representation of United States citizenship)—

(A) the person or entity may fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b)(1) by examining a document specified in either subparagraph (B)(i) or (D) of such section; and

(B) the person or other entity is not required to comply with respect to such individual with the procedures described in paragraphs (3) and (4) of subsection (a), but only if the person or entity retains the form and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3).

(4) WAIVER OF DOCUMENT PRESENTATION REQUIREMENT IN CERTAIN CASES.—

(A) IN GENERAL.—In the case of a person or entity that elects, in a manner specified by the Attorney General consistent with subparagraph (B), to participate in the pilot program under this paragraph, if an individual being hired (or recruited or referred) attests (in the manner described in paragraph (3)) to United States citizenship and the person or entity retains the form on which the attestation is made and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3), the person or entity is not required to comply with the procedures described in section 274A(b).

(B) RESTRICTION.—The Attorney General shall restrict the election under this paragraph to no more than 1,000 employers and, to the extent practicable, shall select among employers seeking to make such election in a manner that provides for such an election by a representative sample of employers.

(5) NONREVIEWABLE DETERMINATIONS.—The determinations of the Attorney General under paragraphs (2) and (4) are within the discretion of the Attorney General and are not subject to judicial or administrative review.

(c) MACHINE–READABLE–DOCUMENT PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraph (3), the procedures applicable under the machine-readable-document pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the machine-readable-document pilot program in a State unless driver's licenses and similar identification documents described in section 274A(b)(1)(D)(i) issued by the State include a machine-readable social security account number.

(3) USE OF MACHINE–READABLE DOCUMENTS.—If the individual whose identity and employment eligibility must be confirmed presents to the person or entity hiring (or recruiting or referring) the individual a license or other document described in paragraph (2) that includes a machine-readable social security account number, the person or entity must make

an inquiry through the confirmation system by using a machine-readable feature of such document. If the individual does not attest to United States citizenship under section 274A(b)(2), the individual's identification or authorization number described in subsection (a)(1)(B) shall be provided as part of the inquiry.

(d) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE CONFIRMATION SYSTEM.—No person or entity participating in a pilot program shall be civilly or criminally liable under any law for any action taken in good faith reliance on information provided through the confirmation system.

<< 8 USCA § 1324a note >>

SEC. 404. EMPLOYMENT ELIGIBILITY CONFIRMATION SYSTEM.

(a) IN GENERAL.—The Attorney General shall establish a pilot program confirmation system through which the Attorney General (or a designee of the Attorney General, which may be a nongovernmental entity)—

(1) responds to inquiries made by electing persons and other entities (including those made by the transmittal of data from machine-readable documents under the machine-readable pilot program) at any time through a toll-free telephone line or other toll-free electronic media concerning an individual's identity and whether the individual is authorized to be employed, and

(2) maintains records of the inquiries that were made, of confirmations provided (or not provided), and of the codes provided to inquirers as evidence of their compliance with their obligations under the pilot programs.

To the extent practicable, the Attorney General shall seek to establish such a system using one or more nongovernmental entities.

(b) INITIAL RESPONSE.—The confirmation system shall provide confirmation or a tentative nonconfirmation of an individual's identity and employment eligibility within 3 working days of the initial inquiry. If providing confirmation or tentative nonconfirmation, the confirmation system shall provide an appropriate code indicating such confirmation or such nonconfirmation.

(c) SECONDARY VERIFICATION PROCESS IN CASE OF TENTATIVE NONCONFIRMATION.—In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Immigration and Naturalization Service, an available secondary verification process to confirm the validity of information provided and to provide a final confirmation or nonconfirmation within 10 working days after the date of the tentative nonconfirmation. When final confirmation or nonconfirmation is provided, the confirmation system shall provide an appropriate code indicating such confirmation or nonconfirmation.

(d) DESIGN AND OPERATION OF SYSTEM.—The confirmation system shall be designed and operated—

(1) to maximize its reliability and ease of use by persons and other entities making elections under section 402(a) of this division consistent with insulating and protecting the privacy and security of the underlying information;

(2) to respond to all inquiries made by such persons and entities on whether individuals are authorized to be employed and to register all times when such inquiries are not received;

(3) with appropriate administrative, technical, and physical safeguards to prevent unauthorized disclosure of personal information; and

(4) to have reasonable safeguards against the system's resulting in unlawful discriminatory practices based on national origin or citizenship status, including—

(A) the selective or unauthorized use of the system to verify eligibility;

(B) the use of the system prior to an offer of employment; or

(C) the exclusion of certain individuals from consideration for employment as a result of a perceived likelihood that additional verification will be required, beyond what is required for most job applicants.

(e) RESPONSIBILITIES OF THE COMMISSIONER OF SOCIAL SECURITY.—As part of the confirmation system, the Commissioner of Social Security, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and social security account number provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided regarding an individual whose identity and employment eligibility must be confirmed, the correspondence of the name and number, and whether the individual has presented a social security

account number that is not valid for employment. The Commissioner shall not disclose or release social security information (other than such confirmation or nonconfirmation).

(f) RESPONSIBILITIES OF THE COMMISSIONER OF THE IMMIGRATION AND NATURALIZATION SERVICE.— As part of the confirmation system, the Commissioner of the Immigration and Naturalization Service, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and alien identification or authorization number described in section 403(a)(1)(B) of this division which are provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided, the correspondence of the name and number, and whether the alien is authorized to be employed in the United States.

(g) UPDATING INFORMATION.—The Commissioners of Social Security and the Immigration and Naturalization Service shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information, including instances in which it is brought to their attention in the secondary verification process described in subsection (c).

(h) LIMITATION ON USE OF THE CONFIRMATION SYSTEM AND ANY RELATED SYSTEMS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, nothing in this subtitle shall be construed to permit or allow any department, bureau, or other agency of the United States Government to utilize any information, data base, or other records assembled under this subtitle for any other purpose other than as provided for under a pilot program.

(2) NO NATIONAL IDENTIFICATION CARD.—Nothing in this subtitle shall be construed to authorize, directly or indirectly, the issuance or use of national identification cards or the establishment of a national identification card.

<< 8 USCA § 1324a note >>

SEC. 405. REPORTS.

The Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate reports on the pilot programs within 3 months after the end of the third and fourth years in which the programs are in effect. Such reports shall—

(1) assess the degree of fraudulent attesting of United States citizenship,

(2) include recommendations on whether or not the pilot programs should be continued or modified, and

(3) assess the benefits of the pilot programs to employers and the degree to which they assist in the enforcement of section 274A.

Subtitle B—Other Provisions Relating to Employer Sanctions

SEC. 411. LIMITING LIABILITY FOR CERTAIN TECHNICAL VIOLATIONS OF PAPERWORK REQUIREMENTS.

<< 8 USCA § 1324a >>

(a) IN GENERAL.—Section 274A(b) (8 U.S.C. 1324a(b)) is amended by adding at the end the following new paragraph:

"(6) GOOD FAITH COMPLIANCE.—

"(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), a person or entity is considered to have complied with a requirement of this subsection notwithstanding a technical or procedural failure to meet such requirement if there was a good faith attempt to comply with the requirement.

"(B) EXCEPTION IF FAILURE TO CORRECT AFTER NOTICE.—Subparagraph (A) shall not apply if—

"(i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure,

"(ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and

"(iii) the person or entity has not corrected the failure voluntarily within such period.

"(C) EXCEPTION FOR PATTERN OR PRACTICE VIOLATORS.—Subparagraph (A) shall not apply to a person or entity that has or is engaging in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).".

<< 8 USCA § 1324a NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to failures occurring on or after the date of the enactment of this Act.

SEC. 412. PAPERWORK AND OTHER CHANGES IN THE EMPLOYER SANCTIONS PROGRAM.

<< 8 USCA § 1324a >>

 (a) REDUCING THE NUMBER OF DOCUMENTS ACCEPTED FOR EMPLOYMENT VERIFICATION.—Section 274A(b)(1) (8 U.S.C. 1324a(b)(1)) is amended—

 (1) in subparagraph (B)—

 (A) by striking clauses (ii) through (iv),

 (B) in clause (v), by striking "or other alien registration card, if the card" and inserting ", alien registration card, or other document designated by the Attorney General, if the document" and redesignating such clause as clause (ii), and

 (C) in clause (ii), as so redesignated—

 (i) in subclause (I), by striking "or" before "such other personal identifying information" and inserting "and",

 (ii) by striking "and" at the end of subclause (I),

 (iii) by striking the period at the end of subclause (II) and inserting ", and", and

 (iv) by adding at the end the following new subclause:

  "(III) contains security features to make it resistant to tampering, counterfeiting, and fraudulent use.";

 (2) in subparagraph (C)—

 (A) by adding "or" at the end of clause (i),

 (B) by striking clause (ii), and

 (C) by redesignating clause (iii) as clause (ii); and

 (3) by adding at the end the following new subparagraph:

 "(E) AUTHORITY TO PROHIBIT USE OF CERTAIN DOCUMENTS.—If the Attorney General finds, by regulation, that any document described in subparagraph (B), (C), or (D) as establishing employment authorization or identity does not reliably establish such authorization or identity or is being used fraudulently to an unacceptable degree, the Attorney General may prohibit or place conditions on its use for purposes of this subsection.".

 (b) REDUCTION OF PAPERWORK FOR CERTAIN EMPLOYEES.—Section 274A(a) (8 U.S.C. 1324a(a)) is amended by adding at the end the following new paragraph:

 "(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

 "(A) IN GENERAL.—For purposes of this section, if—

 "(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

 "(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

 "(B) PERIOD.—The period described in this subparagraph is 3 years, or, if less, the period of time that the individual is authorized to be employed in the United States.

 "(C) LIABILITY.—

 "(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an alien not authorized to work in the United States, then for the purposes of paragraph (1)(A), subject to clause

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an alien not authorized to work in the United States.

"(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and could not reasonably have known) that the individual at the time of hiring or afterward was an alien not authorized to work in the United States.

"(iii) EXCEPTION.—Clause (i) shall not apply in any prosecution under subsection (f)(1).".

(c) ELIMINATION OF DATED PROVISIONS.—Section 274A (8 U.S.C. 1324a) is amended by striking subsections (i) through (n).

(d) CLARIFICATION OF APPLICATION TO FEDERAL GOVERNMENT.—Section 274A(a) (8 U.S.C. 1324a(a)), as amended by subsection (b), is amended by adding at the end the following new paragraph:

"(7) APPLICATION TO FEDERAL GOVERNMENT.—For purposes of this section, the term 'entity' includes an entity in any branch of the Federal Government.".

<< 8 USCA § 1324a NOTE >>

(e) EFFECTIVE DATES.—

(1) The amendments made by subsection (a) shall apply with respect to hiring (or recruitment or referral) occurring on or after such date (not later than 12 months after the date of the enactment of this Act) as the Attorney General shall designate.

(2) The amendment made by subsection (b) shall apply to individuals hired on or after 60 days after the date of the enactment of this Act.

(3) The amendment made by subsection (c) shall take effect on the date of the enactment of this Act.

(4) The amendment made by subsection (d) applies to hiring occurring before, on, or after the date of the enactment of this Act, but no penalty shall be imposed under subsection (e) or (f) of section 274A of the Immigration and Nationality Act for such hiring occurring before such date.

SEC. 413. REPORT ON ADDITIONAL AUTHORITY OR RESOURCES NEEDED FOR ENFORCEMENT OF EMPLOYER SANCTIONS PROVISIONS.

<< 8 USCA § 1324a NOTE >>

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on any additional authority or resources needed—

(1) by the Immigration and Naturalization Service in order to enforce section 274A of the Immigration and Nationality Act, or

(2) by Federal agencies in order to carry out the Executive Order of February 13, 1996 (entitled "Economy and Efficiency in Government Procurement Through Compliance with Certain Immigration and Naturalization Act Provisions") and to expand the restrictions in such order to cover agricultural subsidies, grants, job training programs, and other Federally subsidized assistance programs.

(b) REFERENCE TO INCREASED AUTHORIZATION OF APPROPRIATIONS.—For provision increasing the authorization of appropriations for investigators for violations of sections 274 and 274A of the Immigration and Nationality Act, see section 131 of this division.

SEC. 414. REPORTS ON EARNINGS OF ALIENS NOT AUTHORIZED TO WORK.

<< 8 USCA § 1360 >>

(a) IN GENERAL.—Subsection (c) of section 290 (8 U.S.C. 1360) is amended to read as follows:

"(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1996), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate quantity of social security account numbers issued to aliens not authorized to be employed, with respect to which, in such fiscal year, earnings were reported to the Social Security Administration.

"(2) If earnings are reported on or after January 1, 1997, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.".

<< 8 USCA § 1360 NOTE >>

(b) REPORT ON FRAUDULENT USE OF SOCIAL SECURITY ACCOUNT NUMBERS.—The Commissioner of Social Security shall transmit to the Attorney General, by not later than 1 year after the date of the enactment of this Act, a report on the extent to which social security account numbers and cards are used by aliens for fraudulent purposes.

<< 8 USCA § 1304 >>

SEC. 415. AUTHORIZING MAINTENANCE OF CERTAIN INFORMATION ON ALIENS.

Section 264 (8 U.S.C. 1304) is amended by adding at the end the following new subsection:
"(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.".

<< 8 USCA § 1324a >>

SEC. 416. SUBPOENA AUTHORITY.

Section 274A(e)(2) (8 U.S.C. 1324a(e)(2)) is amended—
(1) by striking "and" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
(3) by inserting after subparagraph (B) the following:
"(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

Subtitle C—Unfair Immigration–Related Employment Practices

SEC. 421. TREATMENT OF CERTAIN DOCUMENTARY PRACTICES AS UNFAIR IMMIGRATION–RELATED EMPLOYMENT PRACTICES.

<< 8 USCA § 1324b >>

(a) IN GENERAL.—Section 274B(a)(6) (8 U.S.C. 1324b(a)(6)) is amended—
(1) by striking "For purposes of paragraph (1), a" and inserting "A"; and
(2) by striking "relating to the hiring of individuals" and inserting the following: "if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1)".

<< 8 USCA § 1324b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to requests made on or after the date of the enactment of this Act.

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

<< 8 USCA § 1641 >>

SEC. 501. EXCEPTION TO INELIGIBILITY FOR PUBLIC BENEFITS FOR CERTAIN BATTERED ALIENS.

  Section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641) is amended by adding at the end the following new subsection:

  "(c) TREATMENT OF CERTAIN BATTERED ALIENS AS QUALIFIED ALIENS.—For purposes of this title, the term 'qualified alien' includes—

  "(1) an alien who—

    "(A) has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to, or acquiesced in, such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

    "(B) has been approved or has a petition pending which sets forth a prima facie case for—

      "(i) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act,

      "(ii) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B) of the Act,

      "(iii) suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act, or

      "(iv) status as a spouse or child of a United States citizen pursuant to clause (i) of section 204(a)(1)(A) of such Act, or classification pursuant to clause (i) of section 204(a)(1)(B) of such Act; or

  "(2) an alien—

    "(A) whose child has been battered or subjected to extreme cruelty in the United States by a spouse or a parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

    "(B) who meets the requirement of clause (ii) of subparagraph (A).

This subsection shall not apply to an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual subjected to such battery or cruelty.".

<< 8 USCA § 1621 NOTE >>

SEC. 502. PILOT PROGRAMS ON LIMITING ISSUANCE OF DRIVER'S LICENSES TO ILLEGAL ALIENS.

  (a) IN GENERAL.—Pursuant to guidelines prescribed by the Attorney General not later than 6 months after the date of the enactment of this Act, all States may conduct pilot programs within their State to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are not lawfully present in the United States. Under a pilot program a State may deny a driver's license to aliens who are not lawfully present in the United States. Such program shall be conducted in cooperation with relevant State and local authorities.

  (b) REPORT.—Not later than 3 years after the date of the enactment of this Act, the Attorney General shall submit a report to the Judiciary Committees of the House of Representatives and of the Senate on the results of the pilot programs conducted under subsection (a).

<< 42 USCA § 402 >>

SEC. 503. INELIGIBILITY OF ALIENS NOT LAWFULLY PRESENT FOR SOCIAL SECURITY BENEFITS.

  (a) IN GENERAL.—Section 202 of the Social Security Act (42 U.S.C. 402) is amended by adding at the end the following new subsection:

"Limitation on Payments to Aliens

"(y) Notwithstanding any other provision of law, no monthly benefit under this title shall be payable to any alien in the United States for any month during which such alien is not lawfully present in the United States as determined by the Attorney General.".

<< 42 USCA § 402 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to benefits for which applications are filed on or after the first day of the first month that begins at least 60 days after the date of the enactment of this Act.

<< 8 USCA § 1642 >>

SEC. 504. PROCEDURES FOR REQUIRING PROOF OF CITIZENSHIP FOR FEDERAL PUBLIC BENEFITS.

Section 432(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended—
(1) by inserting "(1)" after the dash, and
(2) by adding at the end the following:
"(2) Not later than 18 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of Health and Human Services, shall also establish procedures for a person applying for a Federal public benefit (as defined in section 401(c)) to provide proof of citizenship in a fair and nondiscriminatory manner.".

<< 8 USCA § 1623 >>

SEC. 505. LIMITATION ON ELIGIBILITY FOR PREFERENTIAL TREATMENT OF ALIENS NOT LAWFULLY PRESENT ON BASIS OF RESIDENCE FOR HIGHER EDUCATION BENEFITS.

(a) IN GENERAL.—Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.
(b) EFFECTIVE DATE.—This section shall apply to benefits provided on or after July 1, 1998.

<< 8 USCA § 1611 NOTE >>

SEC. 506. STUDY AND REPORT ON ALIEN STUDENT ELIGIBILITY FOR POSTSECONDARY FEDERAL STUDENT FINANCIAL ASSISTANCE.

(a) GAO STUDY AND REPORT.—
(1) STUDY.—The Comptroller General shall conduct a study to determine the extent to which aliens who are not lawfully admitted for permanent residence are receiving postsecondary Federal student financial assistance.
(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Comptroller General shall submit a report to the appropriate committees of the Congress on the study conducted under paragraph (1).
(b) REPORT ON COMPUTER MATCHING PROGRAM.—
(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Education and the Commissioner of Social Security shall jointly submit to the appropriate committees of the Congress a report on the computer matching program of the Department of Education under section 484(p) of the Higher Education Act of 1965.
(2) REPORT ELEMENTS.—The report under paragraph (1) shall include the following:
(A) An assessment by the Secretary and the Commissioner of the effectiveness of the computer matching program, and a justification for such assessment.
(B) The ratio of successful matches under the program to inaccurate matches.
(C) Such other information as the Secretary and the Commissioner jointly consider appropriate.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(c) APPROPRIATE COMMITTEES OF THE CONGRESS.—For purposes of this section the term "appropriate committees of the Congress" means the Committee on Economic and Educational Opportunities and the Committee on the Judiciary of the House of Representatives and the Committee on Labor and Human Resources and the Committee on the Judiciary of the Senate.

SEC. 507. VERIFICATION OF IMMIGRATION STATUS FOR PURPOSES OF SOCIAL SECURITY AND HIGHER EDUCATIONAL ASSISTANCE.

<< 42 USCA § 1320b–7 >>

(a) SOCIAL SECURITY ACT STATE INCOME AND ELIGIBILITY VERIFICATION SYSTEMS.—Section 1137(d)(4)(B)(i)) of the Social Security Act (42 U.S.C. 1320b–7(d)(4)(B)(i)) is amended to read as follows:

"(i) the State shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 20 USCA § 1091 >>

(b) ELIGIBILITY FOR ASSISTANCE UNDER HIGHER EDUCATION ACT OF 1965.—Section 484(g)(4)(B)(i) of the Higher Education Act of 1965 (20 U.S.C. 1091(g)(4)(B)(i)) is amended to read as follows:

"(i) the institution shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 8 USCA § 1642 >>

SEC. 508. NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.

Section 432 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended by adding at the end the following new subsection:

"(d) NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.—Subject to subsection (a), a nonprofit charitable organization, in providing any Federal public benefit (as defined in section 401(c)) or any State or local public benefit (as defined in section 411(c)), is not required under this title to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits.".

SEC. 509. GAO STUDY OF PROVISION OF MEANS–TESTED PUBLIC BENEFITS TO ALIENS WHO ARE NOT QUALIFIED ALIENS ON BEHALF OF ELIGIBLE INDIVIDUALS.

Not later than 180 days after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate and to the Inspector General of the Department of Justice a report on the extent to which means-tested public benefits are being paid or provided to aliens who are not qualified aliens (as defined in section 431(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) in order to provide such benefits to individuals who are United States citizens or qualified aliens (as so defined). Such report shall address the locations in which such benefits are provided and the incidence of fraud or misrepresentation in connection with the provision of such benefits.

SEC. 510. TRANSITION FOR ALIENS CURRENTLY RECEIVING BENEFITS UNDER THE FOOD STAMP PROGRAM.

<< 8 USCA § 1612 NOTE >>

Effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, subclause (I) of section 402(a)(2)(D)(ii) (8 U.S.C. 1612(a)(2)(D)(ii)) is amended to read as follows:

<< 8 USCA § 1612 >>

"(I) IN GENERAL.—With respect to the specified Federal program described in paragraph (3)(B), ineligibility under paragraph (1) shall not apply until April 1, 1997, to an alien who received benefits under such program on the date of enactment of this Act, unless such alien is determined to be ineligible to receive such benefits under the Food Stamp Act of 1977. The State agency shall recertify the eligibility of all such aliens during the period beginning April 1, 1997, and ending August 22, 1997.".

Subtitle B—Public Charge Exclusion

SEC. 531. GROUND FOR EXCLUSION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Paragraph (4) of section 212(a) (8 U.S.C. 1182(a)) is amended to read as follows:

"(4) PUBLIC CHARGE.—

"(A) IN GENERAL.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.

"(B) FACTORS TO BE TAKEN INTO ACCOUNT.—(i) In determining whether an alien is excludable under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's—

"(I) age;

"(II) health;

"(III) family status;

"(IV) assets, resources, and financial status; and

"(V) education and skills.

"(ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 213A for purposes of exclusion under this paragraph.

"(C) FAMILY–SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 201(b)(2) or 203(a) is excludable under this paragraph unless—

"(i) the alien has obtained—

"(I) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A), or

"(II) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B); or

"(ii) the person petitioning for the alien's admission (including any additional sponsor required under section 213A(f)) has executed an affidavit of support described in section 213A with respect to such alien.

"(D) CERTAIN EMPLOYMENT–BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is excludable under this paragraph unless such relative has executed an affidavit of support described in section 213A with respect to such alien.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications submitted on or after such date, not earlier than 30 days and not later than 60 days after the date the Attorney General promulgates under section 551(c)(2) of this division a standard form for an affidavit of support, as the Attorney General shall specify, but subparagraphs (C) and (D) of section 212(a)(4) of the Immigration and Nationality Act, as so amended, shall not apply to applications with respect to which an official interview with an immigration officer was conducted before such effective date.

Subtitle C—Affidavits of Support

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 738 of 1021   PageID 7608

SEC. 551. REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT.

<< 8 USCA § 1183a >>

(a) IN GENERAL.—Section 213A (8 U.S.C. 1183a), as inserted by section 423(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, is amended to read as follows:

"REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT

"SEC. 213A. (a) ENFORCEABILITY.—

"(1) TERMS OF AFFIDAVIT.—No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not excludable as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

"(A) in which the sponsor agrees to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable;

"(B) that is legally enforceable against the sponsor by the sponsored alien, the Federal Government, any State (or any political subdivision of such State), or by any other entity that provides any means-tested public benefit (as defined in subsection (e)), consistent with the provisions of this section; and

"(C) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

"(2) PERIOD OF ENFORCEABILITY.—An affidavit of support shall be enforceable with respect to benefits provided for an alien before the date the alien is naturalized as a citizen of the United States, or, if earlier, the termination date provided under paragraph (3).

"(3) TERMINATION OF PERIOD OF ENFORCEABILITY UPON COMPLETION OF REQUIRED PERIOD OF EMPLOYMENT, ETC.—

"(A) IN GENERAL.—An affidavit of support is not enforceable after such time as the alien (i) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under subparagraph (B), and (ii) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during any such period.

"(B) QUALIFYING QUARTERS.—For purposes of this section, in determining the number of qualifying quarters of coverage under title II of the Social Security Act an alien shall be credited with—

"(i) all of the qualifying quarters of coverage as defined under title II of the Social Security Act worked by a parent of such alien while the alien was under age 18, and

"(ii) all of the qualifying quarters worked by a spouse of such alien during their marriage and the alien remains married to such spouse or such spouse is deceased.

No such qualifying quarter of coverage that is creditable under title II of the Social Security Act for any period beginning after December 31, 1996, may be credited to an alien under clause (i) or (ii) if the parent or spouse (as the case may be) of such alien received any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during the period for which such qualifying quarter of coverage is so credited.

"(C) PROVISION OF INFORMATION TO SAVE SYSTEM.—The Attorney General shall ensure that appropriate information regarding the application of this paragraph is provided to the system for alien verification of eligibility (SAVE) described in section 1137(d)(3) of the Social Security Act.

"(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—

"(1) REQUEST FOR REIMBURSEMENT.—

"(A) REQUIREMENT.—Upon notification that a sponsored alien has received any means-tested public benefit, the appropriate nongovernmental entity which provided such benefit or the appropriate entity of the Federal Government, a State, or any political subdivision of a State shall request reimbursement by the sponsor in an amount which is equal to the unreimbursed costs of such benefit.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(B) REGULATIONS.—The Attorney General, in consultation with the heads of other appropriate Federal agencies, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

"(2) ACTIONS TO COMPEL REIMBURSEMENT.—

"(A) IN CASE OF NONRESPONSE.—If within 45 days after a request for reimbursement under paragraph (1)(A), the appropriate entity has not received a response from the sponsor indicating a willingness to commence payment an action may be brought against the sponsor pursuant to the affidavit of support.

"(B) IN CASE OF FAILURE TO PAY.—If the sponsor fails to abide by the repayment terms established by the appropriate entity, the entity may bring an action against the sponsor pursuant to the affidavit of support.

"(C) LIMITATION ON ACTIONS.—No cause of action may be brought under this paragraph later than 10 years after the date on which the sponsored alien last received any means-tested public benefit to which the affidavit of support applies.

"(3) USE OF COLLECTION AGENCIES.—If the appropriate entity under paragraph (1)(A) requests reimbursement from the sponsor or brings an action against the sponsor pursuant to the affidavit of support, the appropriate entity may appoint or hire an individual or other person to act on behalf of such entity acting under the authority of law for purposes of collecting any amounts owed.

"(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

"(d) NOTIFICATION OF CHANGE OF ADDRESS.—

"(1) GENERAL REQUIREMENT.—The sponsor shall notify the Attorney General and the State in which the sponsored alien is currently a resident within 30 days of any change of address of the sponsor during the period in which an affidavit of support is enforceable.

"(2) PENALTY.—Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall, after notice and opportunity to be heard, be subject to a civil penalty of—

"(A) not less than $250 or more than $2,000, or

"(B) if such failure occurs with knowledge that the sponsored alien has received any means-tested public benefits (other than benefits described in section 401(b), 403(c)(2), or 411(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) not less than $2,000 or more than $5,000.

The Attorney General shall enforce this paragraph under appropriate regulations.

"(e) JURISDICTION.—An action to enforce an affidavit of support executed under subsection (a) may be brought against the sponsor in any appropriate court—

"(1) by a sponsored alien, with respect to financial support; or

"(2) by the appropriate entity of the Federal Government, a State or any political subdivision of a State, or by any other nongovernmental entity under subsection (b)(2), with respect to reimbursement.

"(f) SPONSOR DEFINED.—

"(1) IN GENERAL.—For purposes of this section the term 'sponsor' in relation to a sponsored alien means an individual who executes an affidavit of support with respect to the sponsored alien and who—

"(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

"(B) is at least 18 years of age;

"(C) is domiciled in any of the several States of the United States, the District of Columbia, or any territory or possession of the United States;

"(D) is petitioning for the admission of the alien under section 204; and

"(E) demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(2) INCOME REQUIREMENT CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

AR03398

"(3) ACTIVE DUTY ARMED SERVICES CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but is on active duty (other than active duty for training) in the Armed Forces of the United States, is petitioning for the admission of the alien under section 204 as the spouse or child of the individual, and demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 100 percent of the Federal poverty line.

"(4) CERTAIN EMPLOYMENT–BASED IMMIGRANTS CASE.—Such term also includes an individual—

"(A) who does not meet the requirement of paragraph (1)(D), but is the relative of the sponsored alien who filed a classification petition for the sponsored alien as an employment-based immigrant under section 203(b) or who has a significant ownership interest in the entity that filed such a petition; and

"(B)(i) who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line, or

"(ii) does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

"(5) NON–PETITIONING CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(D) but who accepts joint and several liability with a petitioning sponsor under paragraph (2) or relative of an employment-based immigrant under paragraph (4) and who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(6) DEMONSTRATION OF MEANS TO MAINTAIN INCOME.—

"(A) IN GENERAL.—

"(i) METHOD OF DEMONSTRATION.—For purposes of this section, a demonstration of the means to maintain income shall include provision of a certified copy of the individual's Federal income tax return for the individual's 3 most recent taxable years and a written statement, executed under oath or as permitted under penalty of perjury under section 1746 of title 28, United States Code, that the copies are certified copies of such returns.

"(ii) FLEXIBILITY.—For purposes of this section, aliens may demonstrate the means to maintain income through demonstration of significant assets of the sponsored alien or of the sponsor, if such assets are available for the support of the sponsored alien.

"(iii) PERCENT OF POVERTY.—For purposes of this section, a reference to an annual income equal to at least a particular percentage of the Federal poverty line means an annual income equal to at least such percentage of the Federal poverty line for a family unit of a size equal to the number of members of the sponsor's household (including family and non-family dependents) plus the total number of other dependents and aliens sponsored by that sponsor.

"(B) LIMITATION.—The Secretary of State, or the Attorney General in the case of adjustment of status, may provide that the demonstration under subparagraph (A) applies only to the most recent taxable year.

"(h) FEDERAL POVERTY LINE DEFINED.—For purposes of this section, the term 'Federal poverty line' means the level of income equal to the official poverty line (as defined by the Director of the Office of Management and Budget, as revised annually by the Secretary of Health and Human Services, in accordance with section 673(2) of the Omnibus Budget Reconciliation Act of 1981 (42 U.S.C. 9902)) that is applicable to a family of the size involved.

"(i) SPONSOR'S SOCIAL SECURITY ACCOUNT NUMBER REQUIRED TO BE PROVIDED.—(1) An affidavit of support shall include the social security account number of each sponsor.

"(2) The Attorney General shall develop an automated system to maintain the social security account number data provided under paragraph (1).

"(3) The Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and the Senate setting forth—

"(A) for the most recent fiscal year for which data are available the number of sponsors under this section and the number of sponsors in compliance with the financial obligations of this section; and

"(B) a comparison of such numbers with the numbers of such sponsors for the preceding fiscal year.".

(b) CONFORMING AMENDMENTS.—

<< 8 USCA §§ 1631, 1632 >>

(1) Section 421(a)(1) and section 422(a)(1) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631(a)(1), 1632(a)(1)) are each amended by inserting "and as amended by section 551(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996" after "section 423".

<< 8 USCA § 1183a NOTE >>

(2) Section 423 of such Act (8 U.S.C. 1138a note) is amended by striking subsection (c).

<< 8 USCA § 1183a NOTE >>

(c) EFFECTIVE DATE; PROMULGATION OF FORM.—

  (1) IN GENERAL.—The amendments made by this section shall apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under paragraph (2).

  (2) PROMULGATION OF FORM.—Not later than 90 days after the date of the enactment of this Act, the Attorney General, in consultation with the heads of other appropriate agencies, shall promulgate a standard form for an affidavit of support consistent with the provisions of section 213A of the Immigration and Nationality Act, as amended by subsection (a).

<< 8 USCA § 1631 >>

SEC. 552. INDIGENCE AND BATTERED SPOUSE AND CHILD EXCEPTIONS TO FEDERAL ATTRIBUTION OF INCOME RULE.

  Section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631) is amended by adding at the end the following new subsection:

  "(e) INDIGENCE EXCEPTION.—

  "(1) IN GENERAL.—For an alien for whom an affidavit of support under section 213A of the Immigration and Nationality Act has been executed, if a determination described in paragraph (2) is made, the amount of income and resources of the sponsor or the sponsor's spouse which shall be attributed to the sponsored alien shall not exceed the amount actually provided for a period beginning on the date of such determination and ending 12 months after such date.

  "(2) DETERMINATION DESCRIBED.—A determination described in this paragraph is a determination by an agency that a sponsored alien would, in the absence of the assistance provided by the agency, be unable to obtain food and shelter, taking into account the alien's own income, plus any cash, food, housing, or other assistance provided by other individuals, including the sponsor. The agency shall notify the Attorney General of each such determination, including the names of the sponsor and the sponsored alien involved.

  "(f) SPECIAL RULE FOR BATTERED SPOUSE AND CHILD.—

  "(1) IN GENERAL.—Subject to paragraph (2) and notwithstanding any other provision of this section, subsection (a) shall not apply to benefits—

  "(A) during a 12 month period if the alien demonstrates that (i) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to or acquiesced to such battery or cruelty, or (ii) the alien's child has been battered or subjected to extreme cruelty in the United States by the spouse or parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the battery or cruelty described in clause (i) or (ii) (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the public benefits applied for; and

  "(B) after a 12 month period (regarding the batterer's income and resources only) if the alien demonstrates that such battery or cruelty under subparagraph (A) has been recognized in an order of a judge or administrative law judge or a prior determination of the Immigration and Naturalization Service, and that such battery or cruelty (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the benefits.

"(2) LIMITATION.—The exception under paragraph (1) shall not apply to benefits for an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual who was subjected to such battery or cruelty.".

<< 8 USCA § 1624 >>

## SEC. 553. AUTHORITY OF STATES AND POLITICAL SUBDIVISIONS OF STATES TO LIMIT ASSISTANCE TO ALIENS AND TO DISTINGUISH AMONG CLASSES OF ALIENS IN PROVIDING GENERAL CASH PUBLIC ASSISTANCE.

(a) IN GENERAL.—Subject to subsection (b) and notwithstanding any other provision of law, a State or political subdivision of a State is authorized to prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State or a political subdivision of a State.

(b) LIMITATION.—The authority provided for under subsection (a) may be exercised only to the extent that any prohibitions, limitations, or restrictions imposed by a State or political subdivision of a State are not more restrictive than the prohibitions, limitations, or restrictions imposed under comparable Federal programs. For purposes of this section, attribution to an alien of a sponsor's income and resources (as described in section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631)) for purposes of determining eligibility for, and the amount of, benefits shall be considered less restrictive than a prohibition of eligibility for such benefits.

Subtitle D—Miscellaneous Provisions

<< 18 USCA § 506 >>

## SEC. 561. INCREASED MAXIMUM CRIMINAL PENALTIES FOR FORGING OR COUNTERFEITING SEAL OF A FEDERAL DEPARTMENT OR AGENCY TO FACILITATE BENEFIT FRAUD BY AN UNLAWFUL ALIEN.

Section 506 of title 18, United States Code, is amended to read as follows:

"§ 506. Seals of departments or agencies

"(a) Whoever—

"(1) falsely makes, forges, counterfeits, mutilates, or alters the seal of any department or agency of the United States, or any facsimile thereof;

"(2) knowingly uses, affixes, or impresses any such fraudulently made, forged, counterfeited, mutilated, or altered seal or facsimile thereof to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possesses, sells, offers for sale, furnishes, offers to furnish, gives away, offers to give away, transports, offers to transport, imports, or offers to import any such seal or facsimile thereof, knowing the same to have been so falsely made, forged, counterfeited, mutilated, or altered,

shall be fined under this title, or imprisoned not more than 5 years, or both.

"(b) Notwithstanding subsection (a) or any other provision of law, if a forged, counterfeited, mutilated, or altered seal of a department or agency of the United States, or any facsimile thereof, is—

"(1) so forged, counterfeited, mutilated, or altered;

"(2) used, affixed, or impressed to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possessed, sold, offered for sale, furnished, offered to furnish, given away, offered to give away, transported, offered to transport, imported, or offered to import,

with the intent or effect of facilitating an alien's application for, or receipt of, a Federal benefit to which the alien is not entitled, the penalties which may be imposed for each offense under subsection (a) shall be two times the maximum fine, and 3 times the maximum term of imprisonment, or both, that would otherwise be imposed for an offense under subsection (a).

"(c) For purposes of this section—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(1) the term 'Federal benefit' means—

"(A) the issuance of any grant, contract, loan, professional license, or commercial license provided by any agency of the United States or by appropriated funds of the United States; and

"(B) any retirement, welfare, Social Security, health (including treatment of an emergency medical condition in accordance with section 1903(v) of the Social Security Act (19 U.S.C. 1396b(v))), disability, veterans, public housing, education, food stamps, or unemployment benefit, or any similar benefit for which payments or assistance are provided by an agency of the United States or by appropriated funds of the United States; and

"(2) each instance of forgery, counterfeiting, mutilation, or alteration shall constitute a separate offense under this section.".

<< 8 USCA § 1369 >>

## SEC. 562. TREATMENT OF EXPENSES SUBJECT TO EMERGENCY MEDICAL SERVICES EXCEPTION.

(a) IN GENERAL.—Subject to such amounts as are provided in advance in appropriation Acts, each State or political subdivision of a State that provides medical assistance for care and treatment of an emergency medical condition (as defined in subsection (d)) through a public hospital or other public facility (including a nonprofit hospital that is eligible for an additional payment adjustment under section 1886 of the Social Security Act) or through contract with another hospital or facility to an individual who is an alien not lawfully present in the United States is eligible for payment from the Federal Government of its costs of providing such services, but only to the extent that such costs are not otherwise reimbursed through any other Federal program and cannot be recovered from the alien or another person.

(b) CONFIRMATION OF IMMIGRATION STATUS REQUIRED.—No payment shall be made under this section with respect to services furnished to an individual unless the immigration status of the individual has been verified through appropriate procedures established by the Secretary of Health and Human Services and the Attorney General.

(c) ADMINISTRATION.—This section shall be administered by the Attorney General, in consultation with the Secretary of Health and Human Services.

(d) EMERGENCY MEDICAL CONDITION DEFINED.—For purposes of this section, the term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(1) placing the patient's health in serious jeopardy,

(2) serious impairment to bodily functions, or

(3) serious dysfunction of any bodily organ or part.

(e) EFFECTIVE DATE.—Subsection (a) shall apply to medical assistance for care and treatment of an emergency medical condition furnished on or after January 1, 1997.

<< 8 USCA § 1370 >>

## SEC. 563. REIMBURSEMENT OF STATES AND LOCALITIES FOR EMERGENCY AMBULANCE SERVICES.

Subject to the availability of appropriations, the Attorney General shall fully reimburse States and political subdivisions of States for costs incurred by such a State or subdivision for emergency ambulance services provided to any alien who—

(1) is injured while crossing a land or sea border of the United States without inspection or at any time or place other than as designated by the Attorney General; and

(2) is under the custody of the State or subdivision pursuant to a transfer, request, or other action by a Federal authority.

## SEC. 564. PILOT PROGRAMS TO REQUIRE BONDING.

<< 8 USCA § 1183a NOTE >>

(a) IN GENERAL.—

(1) The Attorney General of the United States shall establish a pilot program in 5 district offices of the Immigration and Naturalization Service to require aliens to post a bond in addition to the affidavit requirements under section 213A of the

Immigration and Nationality Act and the deeming requirements under section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631). Any pilot program established pursuant to this subsection shall require an alien to post a bond in an amount sufficient to cover the cost of benefits described in section 213A(d)(2)(B) of the Immigration and Nationality Act (as amended by section 551(a) of this division) for the alien and the alien's dependents and shall remain in effect until the departure, naturalization, or death of the alien.

(2) Suit on any such bonds may be brought under the terms and conditions set forth in section 213A of the Immigration and Nationality Act.

(b) REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations for establishing the pilot programs, including—

(1) criteria and procedures for—

(A) certifying bonding companies for participation in the program, and

(B) debarment of any such company that fails to pay a bond, and

(2) criteria for setting the amount of the bond to assure that the bond is in an amount that is not less than the cost of providing benefits under the programs described in subsection (a)(1) for the alien and the alien's dependents for 6 months.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

(d) ANNUAL REPORTING REQUIREMENT.—Beginning 9 months after the date of implementation of the pilot program, the Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and the Senate a report on the effectiveness of the program. The Attorney General shall submit a final evaluation of the program not later than 1 year after termination.

(e) SUNSET.—The pilot program under this section shall terminate after 3 years of operation.

<< 8 USCA § 1183 >>

<< 8 USCA § 1183a NOTE >>

(f) BONDS IN ADDITION TO SPONSORSHIP AND DEEMING REQUIREMENTS.—Section 213 (8 U.S.C. 1183) is amended by inserting "(subject to the affidavit of support requirement and attribution of sponsor's income and resources under section 213A)" after "in the discretion of the Attorney General".

<< 8 USCA § 1371 >>

SEC. 565. REPORTS.

Not later than 180 days after the end of each fiscal year, the Attorney General shall submit a report to the Inspector General of the Department of Justice and the Committees on the Judiciary of the House of Representatives and of the Senate describing the following:

(1) PUBLIC CHARGE DEPORTATIONS.—The number of aliens deported on public charge grounds under section 241(a)(5) of the Immigration and Nationality Act during the previous fiscal year.

(2) INDIGENT SPONSORS.—The number of determinations made under section 421(e) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (as added by section 552 of this division) during the previous fiscal year.

(3) REIMBURSEMENT ACTIONS.—The number of actions brought, and the amount of each action, for reimbursement under section 213A of the Immigration and Nationality Act (including private collections) for the costs of providing public benefits.

Subtitle E—Housing Assistance

<< 42 USCA § 1436a NOTE >>

SEC. 571. SHORT TITLE.

This subtitle may be cited as the "Use of Assisted Housing by Aliens Act of 1996".

<< 42 USCA § 1436a >>

## SEC. 572. PRORATING OF FINANCIAL ASSISTANCE.

Section 214(b) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(b)) is amended—

(1) by inserting "(1)" after "(b)"; and

(2) by adding at the end the following new paragraph:

"(2) If the eligibility for financial assistance of at least one member of a family has been affirmatively established under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the Secretary of Housing and Urban Development shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.".

<< 42 USCA § 1436a >>

## SEC. 573. ACTIONS IN CASES OF TERMINATION OF FINANCIAL ASSISTANCE.

Section 214(c)(1) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(c)(1)) is amended—

(1) in the matter preceding subparagraph (A), by striking "may, in its discretion," and inserting "shall";

(2) in subparagraph (A), by adding at the end the following: "Financial assistance continued under this subparagraph for a family may be provided only on a prorated basis, under which the amount of financial assistance is based on the percentage of the total number of members of the family that are eligible for that assistance under the program of financial assistance and under this section."; and

(3) in subparagraph (B)—

(A) by striking "3 years" and inserting "18-months";

(B) by inserting "(i)" after "(B)";

(C) by striking "Any deferral" and inserting the following:

"(ii) Except as provided in clause (iii), any deferral"; and

(D) by adding at the end the following new clauses:

"(iii) The time period described in clause (ii) shall not apply in the case of a refugee under section 207 of the Immigration and Nationality Act or an individual seeking asylum under section 208 of that Act.".

<< 42 USCA § 1436a >>

## SEC. 574. VERIFICATION OF IMMIGRATION STATUS AND ELIGIBILITY FOR FINANCIAL ASSISTANCE.

Section 214(d) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(d)) is amended—

(1) in the matter preceding paragraph (1), by inserting "or to be" after "being";

(2) in paragraph (1)(A), by adding at the end the following: "If the declaration states that the individual is not a citizen or national of the United States and that the individual is younger than 62 years of age, the declaration shall be verified by the Immigration and Naturalization Service. If the declaration states that the individual is a citizen or national of the United States, the Secretary of Housing and Urban Development, or the agency administering assistance covered by this section, may request verification of the declaration by requiring presentation of documentation that the Secretary considers appropriate, including a United States passport, resident alien card, alien registration card, social security card, or other documentation.";

(3) in paragraph (2)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date"; and

(B) by adding at the end the following:

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"In the case of an individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, the Secretary may not provide any such assistance for the benefit of that individual before documentation is presented and verified under paragraph (3) or (4).";

(4) in paragraph (4)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date";

(B) in subparagraph (A)—

(i) in clause (i)—

(I) by inserting ", not to exceed 30 days," after "reasonable opportunity"; and

(II) by striking "and" at the end; and

(ii) by striking clause (ii) and inserting the following:

"(ii) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and

"(iii) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not deny the application for such assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and"; and

(C) in subparagraph (B), by striking clause (ii) and inserting the following:

"(ii) pending such verification or appeal, the Secretary may not—

"(I) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual; and

"(II) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, deny the application for such assistance on the basis of the immigration status of that individual; and";

(5) in paragraph (5), by striking "status—" and all that follows through the end of the paragraph and inserting the following: "status, the Secretary shall—

"(A) deny the application of that individual for financial assistance or terminate the eligibility of that individual for financial assistance, as applicable;

"(B) provide that the individual may request a fair hearing during the 30–day period beginning upon receipt of the notice under subparagraph (C); and

"(C) provide to the individual written notice of the determination under this paragraph, the right to a fair hearing process, and the time limitation for requesting a hearing under subparagraph (C)."; and

(6) by striking paragraph (6) and inserting the following:

"(6) The Secretary shall terminate the eligibility for financial assistance of an individual and the members of the household of the individual, for a period of not less than 24 months, upon determining that such individual has knowingly permitted another individual who is not eligible for such assistance to reside in the public or assisted housing unit of the individual. This provision shall not apply to a family if the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family.".

<< 42 USCA § 1436a >>

SEC. 575. PROHIBITION OF SANCTIONS AGAINST ENTITIES MAKING FINANCIAL ASSISTANCE ELIGIBILITY DETERMINATIONS.

Section 214(e) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(e)) is amended—

(1) in paragraph (2), by adding "or" at the end;

(2) in paragraph (3), by adding at the end the following: "the response from the Immigration and Naturalization Service to the appeal of that individual."; and

(3) by striking paragraph (4).

<< 42 USCA § 1436a >>

SEC. 576. ELIGIBILITY FOR PUBLIC AND ASSISTED HOUSING.

Section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a) is amended by adding at the end the following new subsection:

"(h) VERIFICATION OF ELIGIBILITY.—

"(1) IN GENERAL.—Except in the case of an election under paragraph (2)(A), no individual or family applying for financial assistance may receive such financial assistance prior to the affirmative establishment and verification of eligibility of at least the individual or one family member under this section by the Secretary or other appropriate entity.

"(2) RULES APPLICABLE TO PUBLIC HOUSING AGENCIES.—A public housing agency (as that term is defined in section 3 of the United States Housing Act of 1937)—

"(A) may elect not to comply with this section; and

"(B) in complying with this section—

"(i) may initiate procedures to affirmatively establish or verify the eligibility of an individual or family under this section at any time at which the public housing agency determines that such eligibility is in question, regardless of whether or not that individual or family is at or near the top of the waiting list of the public housing agency;

"(ii) may affirmatively establish or verify the eligibility of an individual or family under this section in accordance with the procedures set forth in section 274A(b)(1) of the Immigration and Nationality Act; and

"(iii) shall have access to any relevant information contained in the SAVE system (or any successor thereto) that relates to any individual or family applying for financial assistance.

"(3) ELIGIBILITY OF FAMILIES.—For purposes of this subsection, with respect to a family, the term 'eligibility' means the eligibility of each family member.".

<< 42 USCA § 1436a NOTE >>

SEC. 577. REGULATIONS.

(a) ISSUANCE.—Not later than the 60 days after the date of enactment of this Act, the Secretary of Housing and Urban Development shall issue any regulations necessary to implement the amendments made by this part. Such regulations shall be issued in the form of an interim final rule, which shall take effect upon issuance and shall not be subject to the provisions of section 533 of title 5, United States Code, regarding notice or opportunity for comment.

(b) FAILURE TO ISSUE.—If the Secretary fails to issue the regulations required under subsection (a) before the date specified in that subsection, the regulations relating to restrictions on assistance to noncitizens, contained in the final rule issued by the Secretary of Housing and Urban Development in RIN–2501–AA63 (Docket No. R–95–1409; FR–2383–F–050), published in the Federal Register on March 20, 1995 (Vol. 60, No. 53; pp. 14824–14861), shall not apply after that date.

Subtitle F—General Provisions

<< 8 USCA § 1101 NOTE >>

SEC. 591. EFFECTIVE DATES.

Except as provided in this title, this title and the amendments made by this title shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1101 NOTE >>

## SEC. 592. NOT APPLICABLE TO FOREIGN ASSISTANCE.

This title does not apply to any Federal, State, or local governmental program, assistance, or benefits provided to an alien under any program of foreign assistance as determined by the Secretary of State in consultation with the Attorney General.

<< 8 USCA § 1101 NOTE >>

## SEC. 593. NOTIFICATION.

(a) IN GENERAL.—Each agency of the Federal Government or a State or political subdivision that administers a program affected by the provisions of this title, shall, directly or through the States, provide general notification to the public and to program recipients of the changes regarding eligibility for any such program pursuant to this title.

(b) FAILURE TO GIVE NOTICE.—Nothing in this section shall be construed to require or authorize continuation of eligibility if the notice under this section is not provided.

<< 8 USCA § 1101 NOTE >>

## SEC. 594. DEFINITIONS.

Except as otherwise provided in this title, for purposes of this title—

(1) the terms "alien", "Attorney General", "national", "naturalization", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act; and

(2) the term "child" shall have the meaning given such term in section 101(c) of the Immigration and Nationality Act.

### TITLE VI—MISCELLANEOUS PROVISIONS

#### Subtitle A—Refugees, Parole, and Asylum

## SEC. 601. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.

(a) DEFINITION OF REFUGEE.—

<< 8 USCA § 1101 >>

(1) Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

<< 8 USCA § 1101 NOTE >>

(2) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and countries of origin of aliens granted refugee status or asylum under determinations pursuant to the amendment made by paragraph (1). Each such report shall also contain projections regarding the number and countries of origin of aliens that are likely to be granted refugee status or asylum for the subsequent 2 fiscal years.

<< 8 USCA § 1157 >>

(b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)) is amended by adding at the end the following new paragraph:

"(5) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the third sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

## SEC. 602. LIMITATION ON USE OF PAROLE

<< 8 USCA § 1182 >>

(a) PAROLE AUTHORITY.—Section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)) is amended by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit".

<< 8 USCA § 1182 NOTE >>

(b) REPORT TO CONGRESS.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and categories of aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act. Each such report shall provide the total number of aliens paroled into and residing in the United States and shall contain information and data for each country of origin concerning the number and categories of aliens paroled, the duration of parole, the current status of aliens paroled, and the number and categories of aliens returned to the custody from which they were paroled during the preceding fiscal year.

<< 8 USCA § 1151 >>

## SEC. 603. TREATMENT OF LONG–TERM PAROLEES IN APPLYING WORLDWIDE NUMERICAL LIMITATIONS.

Section 201(c) (8 U.S.C. 1151(c)) is amended—

(1) by amending paragraph (1)(A)(ii) to read as follows:

"(ii) the sum of the number computed under paragraph (2) and the number computed under paragraph (4), plus"; and

(2) by adding at the end the following new paragraphs:

"(4) The number computed under this paragraph for a fiscal year (beginning with fiscal year 1999) is the number of aliens who were paroled into the United States under section 212(d)(5) in the second preceding fiscal year—

"(A) who did not depart from the United States (without advance parole) within 365 days; and

"(B) who (i) did not acquire the status of aliens lawfully admitted to the United States for permanent residence in the two preceding fiscal years, or (ii) acquired such status in such years under a provision of law (other than section 201(b)) which exempts such adjustment from the numerical limitation on the worldwide level of immigration under this section.

"(5) If any alien described in paragraph (4) (other than an alien described in paragraph (4)(B)(ii)) is subsequently admitted as an alien lawfully admitted for permanent residence, such alien shall not again be considered for purposes of paragraph (1).".

## SEC. 604. ASYLUM REFORM.

<< 8 USCA § 1158 >>

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).

"(2) EXCEPTIONS.—

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

"(B) TIME LIMIT.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

"(C) PREVIOUS ASYLUM APPLICATIONS.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

"(D) CHANGED CIRCUMSTANCES.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

"(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).

"(b) CONDITIONS FOR GRANTING ASYLUM.—

"(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(2) EXCEPTIONS.—

"(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

"(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

"(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

"(vi) the alien was firmly resettled in another country prior to arriving in the United States.

"(B) SPECIAL RULES.—

"(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

"(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

"(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

"(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

"(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

"(c) ASYLUM STATUS.—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

"(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

"(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

"(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

"(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

"(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

"(B) the alien meets a condition described in subsection (b)(2);

"(C) the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

"(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

"(E) the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

"(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

"(d) ASYLUM PROCEDURE.—

"(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). The Attorney General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General.

"(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

"(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

"(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

"(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

"(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

"(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

"(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

"(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

"(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

"(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

"(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and

"(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

"(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.

"(6) FRIVOLOUS APPLICATIONS.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.

"(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) The item in the table of contents relating to section 208 is amended to read as follows:

"Sec. 208. Asylum.".

<< 8 USCA § 1159 NOTE >>

(2) Section 104(d)(1)(A) of the Immigration Act of 1990 (Public Law 101–649) is amended by striking "208(b)" and inserting "208".

<< 8 USCA § 1158 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

## SEC. 605. INCREASE IN ASYLUM OFFICERS.

Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of asylum officers to at least 600 asylum officers by fiscal year 1997.

<< 8 USCA § 1255 NOTE >>

## SEC. 606. CONDITIONAL REPEAL OF CUBAN ADJUSTMENT ACT.

(a) IN GENERAL.—Public Law 89–732 is repealed effective only upon a determination by the President under section 203(c)(3) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Public Law 104–114) that a democratically elected government in Cuba is in power.

(b) LIMITATION.—Subsection (a) shall not apply to aliens for whom an application for adjustment of status is pending on such effective date.

Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

<< 8 USCA § 1184 >>

## SEC. 621. ALIEN WITNESS COOPERATION.

Section 214(j)(1) (8 U.S.C. 1184(j)(1)) (as added by section 130003(b)(2) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 2025)) (relating to numerical limitations on the number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S) of the Immigration and Nationality Act) is amended—

(1) by striking "100." and inserting "200."; and

(2) by striking "25." and inserting "50.".

SEC. 622. WAIVER OF FOREIGN COUNTRY RESIDENCE REQUIREMENT WITH RESPECT TO INTERNATIONAL MEDICAL GRADUATES.

<< 8 USCA § 1182 NOTE >>

(a) EXTENSION OF WAIVER PROGRAM.—Section 220(c) of the Immigration and Nationality Technical Corrections Act of 1994 (8 U.S.C. 1182 note) is amended by striking "1996." and inserting "2002.".

<< 8 USCA § 1182 >>

(b) CONDITIONS ON FEDERALLY REQUESTED WAIVERS.—Section 212(e) (8 U.S.C. 1182(e)) is amended by inserting after "except that in the case of a waiver requested by a State Department of Public Health, or its equivalent" the following: ", or in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii),".

<< 8 USCA § 1184 >>

(c) RESTRICTIONS ON FEDERALLY REQUESTED WAIVERS.—Section 214(k) (8 U.S.C. 1184(k)) (as added by section 220(b) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416; 108 Stat. 4319)) is amended to read as follows:

"(k)(1) In the case of a request by an interested State agency, or by an interested Federal agency, for a waiver of the 2–year foreign residence requirement under section 212(e) on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless—

"(A) in the case of an alien who is otherwise contractually obligated to return to a foreign country, the government of such country furnishes the Director of the United States Information Agency with a statement in writing that it has no objection to such waiver;

"(B) in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 20;

"(C) in the case of a request by an interested Federal agency or by an interested State agency—

"(i) the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

"(ii) the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3–year period); and

"(D) in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency, the alien agrees to practice medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals.

"(2)(A) Notwithstanding section 248(2), the Attorney General may change the status of an alien who qualifies under this subsection and section 212(e) to that of an alien described in section 101(a)(15)(H)(i)(b).

"(B) No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(3) Notwithstanding any other provision of this subsection, the 2–year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 101(a)(27)(H), if—

"(A) at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

"(B) the alien's employment ceases to benefit the public interest at any time during the 3–year period described in paragraph (1)(C).".

SEC. 623. USE OF LEGALIZATION AND SPECIAL AGRICULTURAL WORKER INFORMATION.

<< 8 USCA § 1255a >>

(a) CONFIDENTIALITY OF INFORMATION.—Section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) is amended to read as follows:
"(5) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, for enforcement of paragraph (6), or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986;

"(ii) make any publication whereby the information furnished by any particular applicant can be identified; or

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide the information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) AUTHORIZED DISCLOSURES.—The Attorney General may provide, in the Attorney General's discretion, for the furnishing of information furnished under this section in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

"(D) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(E) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

<< 8 USCA § 1160 >>

(b) SPECIAL AGRICULTURAL WORKERS.—Section 210(b)(6) (8 U.S.C. 1160(b)(6)) is amended to read as follows:
"(6) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, including a determination under subsection (a)(3)(B), or for enforcement of paragraph (7);

"(ii) make any publication whereby the information furnished by any particular individual can be identified; or

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(D) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

SEC. 624. CONTINUED VALIDITY OF LABOR CERTIFICATIONS AND CLASSIFICATION PETITIONS FOR PROFESSIONAL ATHLETES.

<< 8 USCA § 1182 >>

(a) LABOR CERTIFICATION.—Section 212(a)(5)(A) (8 U.S.C. 1182(a)(5)(A)) is amended by adding at the end the following:

"(iii) PROFESSIONAL ATHLETES.—

"(I) IN GENERAL.—A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

"(II) DEFINITION.—For purposes of subclause (I), the term 'professional athlete' means an individual who is employed as an athlete by—

"(aa) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(bb) any minor league team that is affiliated with such an association.".

<< 8 USCA § 1154 >>

(b) CLASSIFICATION PETITIONS.—Section 204 (8 U.S.C. 1154) is amended by adding at the end the following:

"(i) PROFESSIONAL ATHLETES.—

"(1) IN GENERAL.—A petition under subsection (a)(4)(D) for classification of a professional athlete shall remain valid for the athlete after the athlete changes employers, if the new employer is a team in the same sport as the team which was the employer who filed the petition.

"(2) DEFINITION.—For purposes of paragraph (1), the term 'professional athlete' means an individual who is employed as an athlete by—

"(A) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(B) any minor league team that is affiliated with such an association.".

SEC. 625. FOREIGN STUDENTS.

(a) LIMITATIONS.—

*<< 8 USCA § 1184 >>*

(1) IN GENERAL.—Section 214 (8 U.S.C. 1184) is amended by adding at the end the following new subsection:

"(l)(1) An alien may not be accorded status as a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study—

"(A) at a public elementary school or in a publicly funded adult education program; or

"(B) at a public secondary school unless—

"(i) the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and (ii) the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

"(2) An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 101(a)(15)(F) shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).".

*<< 8 USCA § 1101 >>*

(2) CONFORMING AMENDMENT.—Section 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)) is amended by inserting "consistent with section 214(l)" after "such a course of study".

(b) REFERENCE TO NEW GROUND OF EXCLUSION FOR STUDENT VISA ABUSERS.—For addition of ground of inadmissibility for certain nonimmigrant student abusers, see section 347 of this division.

*<< 8 USCA §§ 1101 NOTE, 1184 nt >>*

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to individuals who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 626. SERVICES TO FAMILY MEMBERS OF CERTAIN OFFICERS AND AGENTS KILLED IN THE LINE OF DUTY.

*<< 8 USCA § 1363b >>*

(a) IN GENERAL.—Title II, as amended by section 205(a) of this division, is amended by adding at the end the following new section:

"TRANSPORTATION OF REMAINS OF IMMIGRATION OFFICERS
AND BORDER PATROL AGENTS KILLED IN THE LINE OF DUTY

"SEC. 295. (a) IN GENERAL.—To the extent provided in appropriation Acts, when an immigration officer or border patrol agent is killed in the line of duty, the Attorney General may pay from appropriations available for the activity in which the officer or agent was engaged—

"(1) the actual and necessary expenses of transportation of the remains of the officer or agent to a place of burial located in any State, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau;

"(2) travel expenses, including per diem in lieu of subsistence, of the decedent's spouse and minor children to and from such site at rates not greater than those established for official government travel under subchapter I of chapter 57 of title 5, United States Code; and

"(3) any other memorial service authorized by the Attorney General.

"(b) PREPAYMENT.—The Attorney General may prepay any expense authorized to be paid under this section.".

(b) CLERICAL AMENDMENT.—The table of contents, as amended by section 205(b) of this division, is amended by inserting after the item relating to section 294 the following new item:

"Sec. 295. Transportation of remains of immigration officers and border patrol agents killed in the line of duty.".

Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

<< 8 USCA § 1201 >>

SEC. 631. VALIDITY OF PERIOD OF VISAS.

(a) EXTENSION OF VALIDITY OF IMMIGRANT VISAS TO 6 MONTHS.—Section 221(c) (8 U.S.C. 1201(c)) is amended by striking "four months" and inserting "six months".

(b) AUTHORIZING APPLICATION OF RECIPROCITY RULE FOR NONIMMIGRANT VISA IN CASE OF REFUGEES AND PERMANENT RESIDENTS.—Such section is further amended by inserting before the period at the end of the third sentence the following: "; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States".

SEC. 632. ELIMINATION OF CONSULATE SHOPPING FOR VISA OVERSTAYS.

<< 8 USCA § 1202 >>

(a) IN GENERAL.—Section 222 (8 U.S.C. 1202) is amended by adding at the end the following:

"(g)(1) In the case of an alien who has been admitted on the basis of a nonimmigrant visa and remained in the United States beyond the period of stay authorized by the Attorney General, such visa shall be void beginning after the conclusion of such period of stay.

"(2) An alien described in paragraph (1) shall be ineligible to be readmitted to the United States as a nonimmigrant, except—

"(A) on the basis of a visa (other than the visa described in paragraph (1)) issued in a consular office located in the country of the alien's nationality (or, if there is no office in such country, in such other consular office as the Secretary of State shall specify); or

"(B) where extraordinary circumstances are found by the Secretary of State to exist.".

<< 8 USCA § 1202 NOTE >>

(b) APPLICABILITY.—

(1) VISAS.—Section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a), shall apply to a visa issued before, on, or after the date of the enactment of this Act.

(2) ALIENS SEEKING READMISSION.—Section 222(g)(2) of the Immigration and Nationality Act, as added by subsection (a), shall apply to any alien applying for readmission to the United States after the date of the enactment of this Act, except an alien applying for readmission on the basis of a visa that—

(A) was issued before such date; and

(B) is not void through the application of section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a).

<< 8 USCA § 1152 >>

SEC. 633. AUTHORITY TO DETERMINE VISA PROCESSING PROCEDURES.

Section 202(a)(1) (8 U.S.C. 1152(a)(1)) is amended—

(1) by inserting "(A)" after "NONDISCRIMINATION.—"; and

(2) by adding at the end the following:

"(B) Nothing in this paragraph shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.".

<< 8 USCA § 1202 >>

SEC. 634. CHANGES REGARDING VISA APPLICATION PROCESS.

(a) NONIMMIGRANT APPLICATIONS.—Section 222(c) (8 U.S.C. 1202(c)) is amended—

(1) by striking "personal description" through "marks of identification);";

(2) by striking "applicant" and inserting "applicant, the determination of his eligibility for a nonimmigrant visa,"; and

(3) by adding at the end the following: "At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 101(a)(15) may vary according to the class of visa being requested.".

(b) DISPOSITION OF APPLICATIONS.—Section 222(e) (8 U.S.C. 1202(e)) is amended—

(1) in the first sentence, by striking "required by this section" and inserting "for an immigrant visa"; and

(2) in the fourth sentence—

  (A) by striking "stamp" and inserting "stamp, or other"

  (B) by striking "by the consular officer".

SEC. 635. VISA WAIVER PROGRAM.

<< 8 USCA § 1187 >>

(a) ELIMINATION OF JOINT ACTION REQUIREMENT.—Section 217 (8 U.S.C. 1187) is amended—

(1) in subsection (a), by striking "Attorney General and the Secretary of State, acting jointly" and inserting "Attorney General, in consultation with the Secretary of State";

(2) in subsection (c)(1), by striking "Attorney General and the Secretary of State acting jointly" and inserting "Attorney General, in consultation with the Secretary of State,"; and

(3) in subsection (d), by striking "Attorney General and the Secretary of State, acting jointly," and inserting "Attorney General, in consultation with the Secretary of State,".

(b) EXTENSION OF PROGRAM.—Section 217(f) (8 U.S.C. 1187(f)) is amended by striking "1996" and inserting "1997.".

(c) DURATION AND TERMINATION OF DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1) IN GENERAL.—Section 217(g) (8 U.S.C. 1187(g)) is amended to read as follows:

"(g) DURATION AND TERMINATION OF DESIGNATION.—

"(1) IN GENERAL.—

  "(A) DETERMINATION AND NOTIFICATION OF DISQUALIFICATION RATE.—Upon determination by the Attorney General that a pilot program country's disqualification rate is 2 percent or more, the Attorney General shall notify the Secretary of State.

  "(B) PROBATIONARY STATUS.—If the program country's disqualification rate is greater than 2 percent but less than 3.5 percent, the Attorney General shall place the program country in probationary status for a period not to exceed 2 full fiscal years following the year in which the determination under subparagraph (A) is made.

  "(C) TERMINATION OF DESIGNATION.—Subject to paragraph (3), if the program country's disqualification rate is 3.5 percent or more, the Attorney General shall terminate the country's designation as a pilot program country effective at the beginning of the second fiscal year following the fiscal year in which the determination under subparagraph (A) is made.

"(2) TERMINATION OF PROBATIONARY STATUS.—

  "(A) IN GENERAL.—If the Attorney General determines at the end of the probationary period described in paragraph (1) (B) that the program country placed in probationary status under such paragraph has failed to develop a machine-readable passport program as required by section (c)(2)(C), or has a disqualification rate of 2 percent or more, the Attorney General shall terminate the designation of the country as a pilot program country. If the Attorney General determines that the program country has developed a machine-readable passport program and has a disqualification rate of less than 2 percent, the Attorney General shall redesignate the country as a pilot program country.

"(B) EFFECTIVE DATE.—A termination of the designation of a country under subparagraph (A) shall take effect on the first day of the first fiscal year following the fiscal year in which the determination under such subparagraph is made. Until such date, nationals of the country shall remain eligible for a waiver under subsection (a).

"(3) NONAPPLICABILITY OF CERTAIN PROVISIONS.—Paragraph (1)(C) shall not apply unless the total number of nationals of a pilot program country described in paragraph (4)(A) exceeds 100.

"(4) DEFINITION.—For purposes of this subsection, the term 'disqualification rate' means the percentage which—

"(A) the total number of nationals of the pilot program country who were—

"(i) excluded from admission or withdrew their application for admission during the most recent fiscal year for which data are available; and

"(ii) admitted as nonimmigrant visitors during such fiscal year and who violated the terms of such admission; bears to

"(B) the total number of nationals of such country who applied for admission as nonimmigrant visitors during such fiscal year.".

<< 8 USCA § 1187 NOTE >>

(2) TRANSITION.—A country designated as a pilot program country with probationary status under section 217(g) of the Immigration and Nationality Act (as in effect on the day before the date of the enactment of this Act) shall be considered to be designated as a pilot program country on and after such date, subject to placement in probationary status or termination of such designation under such section (as amended by paragraph (1)).

<< 8 USCA § 1187 >>

(3) CONFORMING AMENDMENT.—Section 217(a)(2)(B) (8 U.S.C. 1187(a)(2)(B)) is amended by striking "or is" through "subsection (g)." and inserting a period.

<< 8 USCA § 1153 NOTE >>

SEC. 636. FEE FOR DIVERSITY IMMIGRANT LOTTERY.

 The Secretary of State may establish a fee to be paid by each applicant for an immigrant visa described in section 203(c) of the Immigration and Nationality Act. Such fee may be set at a level that will ensure recovery of the cost to the Department of State of allocating visas under such section, including the cost of processing all applications thereunder. All fees collected under this section shall be used for providing consular services. All fees collected under this section shall be deposited as an offsetting collection to any Department of State appropriation and shall remain available for obligations until expended. The provisions of the Act of August 18, 1856 (11 Stat. 58; 22 U.S.C. 4212–4214), concerning accounting for consular fees, shall not apply to fees collected under this section.

<< 8 USCA § 1153 NOTE >>

SEC. 637. ELIGIBILITY FOR VISAS FOR CERTAIN POLISH APPLICANTS FOR THE 1995 DIVERSITY IMMIGRANT PROGRAM.

 (a) IN GENERAL.—The Attorney General, in consultation with the Secretary of State, shall include among the aliens selected for diversity immigrant visas for fiscal year 1997 pursuant to section 203(c) of the Immigration and Nationality Act any alien who, on or before September 30, 1995—

 (1) was selected as a diversity immigrant under such section for fiscal year 1995;

 (2) applied for adjustment of status to that of an alien lawfully admitted for permanent residence pursuant to section 245 of such Act during fiscal year 1995, and whose application, and any associated fees, were accepted by the Attorney General, in accordance with applicable regulations;

 (3) was not determined by the Attorney General to be excludable under section 212 of such Act or ineligible under section 203(c)(2) of such Act; and

 (4) did not become an alien lawfully admitted for permanent residence during fiscal year 1995.

(b) PRIORITY.—The aliens selected under subsection (a) shall be considered to have been selected for diversity immigrant visas for fiscal year 1997 prior to any alien selected under any other provision of law.

(c) REDUCTION OF IMMIGRANT VISA NUMBER.—For purposes of applying the numerical limitations in sections 201 and 203(c) of the Immigration and Nationality Act, aliens selected under subsection (a) who are granted an immigrant visa shall be treated as aliens granted a visa under section 203(c) of such Act.

Subtitle D—Other Provisions

<< 8 USCA § 1372 >>

SEC. 641. PROGRAM TO COLLECT INFORMATION RELATING TO NONIMMIGRANT FOREIGN STUDENTS AND OTHER EXCHANGE PROGRAM PARTICIPANTS.

(a) IN GENERAL.—

(1) PROGRAM.—The Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall develop and conduct a program to collect from approved institutions of higher education and designated exchange visitor programs in the United States the information described in subsection (c) with respect to aliens who—

(A) have the status, or are applying for the status, of nonimmigrants under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act; and

(B) are nationals of the countries designated under subsection (b).

(2) DEADLINE.—The program shall commence not later than January 1, 1998.

(b) COVERED COUNTRIES.—The Attorney General, in consultation with the Secretary of State, shall designate countries for purposes of subsection (a)(1)(B). The Attorney General shall initially designate not less than 5 countries and may designate additional countries at any time while the program is being conducted.

(c) INFORMATION TO BE COLLECTED.—

(1) IN GENERAL.—The information for collection under subsection (a) with respect to an alien consists of—

(A) the identity and current address in the United States of the alien;

(B) the nonimmigrant classification of the alien and the date on which a visa under the classification was issued or extended or the date on which a change to such classification was approved by the Attorney General;

(C) in the case of a student at an approved institution of higher education, the current academic status of the alien, including whether the alien is maintaining status as a full-time student or, in the case of a participant in a designated exchange visitor program, whether the alien is satisfying the terms and conditions of such program; and

(D) in the case of a student at an approved institution of higher education, any disciplinary action taken by the institution against the alien as a result of the alien's being convicted of a crime or, in the case of a participant in a designated exchange visitor program, any change in the alien's participation as a result of the alien's being convicted of a crime.

(2) FERPA.—The Family Educational Rights and Privacy Act of 1974 shall not apply to aliens described in subsection (a) to the extent that the Attorney General determines necessary to carry out the program under subsection (a).

(3) ELECTRONIC COLLECTION.—The information described in paragraph (1) shall be collected electronically, where practicable.

(4) COMPUTER SOFTWARE.—

(A) COLLECTING INSTITUTIONS.—To the extent practicable, the Attorney General shall design the program in a manner that permits approved institutions of higher education and designated exchange visitor programs to use existing software for the collection, storage, and data processing of information described in paragraph (1).

(B) ATTORNEY GENERAL.—To the extent practicable, the Attorney General shall use or enhance existing software for the collection, storage, and data processing of information described in paragraph (1).

(d) PARTICIPATION BY INSTITUTIONS OF HIGHER EDUCATION AND EXCHANGE VISITOR PROGRAMS.—

(1) CONDITION.—The information described in subsection (c) shall be provided by as a condition of—

(A) in the case of an approved institution of higher education, the continued approval of the institution under subparagraph (F) or (M) of section 101(a)(15) of the Immigration and Nationality Act; and

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(B) in the case of an approved institution of higher education or a designated exchange visitor program, the granting of authority to issue documents to an alien demonstrating the alien's eligibility for a visa under subparagraph (F), (J), or (M) of section 101(a)(15) of such Act.

(2) EFFECT OF FAILURE TO PROVIDE INFORMATION.—If an approved institution of higher education or a designated exchange visitor program fails to provide the specified information, such approvals and such issuance of visas shall be revoked or denied.

(e) FUNDING.—

(1) IN GENERAL.—Beginning on April 1, 1997, an approved institution of higher education and a designated exchange visitor program shall impose on, and collect from, each alien described in paragraph (3), with respect to whom the institution or program is required by subsection (a) to collect information, a fee established by the Attorney General under paragraph (4) at the time—

(A) when the alien first registers with the institution or program after entering the United States; or

(B) in a case where a registration under subparagraph (A) does not exist, when the alien first commences activities in the United States with the institution or program.

(2) REMITTANCE.—An approved institution of higher education and a designated exchange visitor program shall remit the fees collected under paragraph (1) to the Attorney General pursuant to a schedule established by the Attorney General.

(3) ALIENS DESCRIBED.—An alien referred to in paragraph (1) is an alien who has nonimmigrant status under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act (other than a nonimmigrant under section 101(a)(15)(J) of such Act who has come to the United States as a participant in a program sponsored by the Federal Government).

(4) AMOUNT AND USE OF FEES.—

(A) ESTABLISHMENT OF AMOUNT.—The Attorney General shall establish the amount of the fee to be imposed on, and collected from, an alien under paragraph (1). Except as provided in subsection (g)(2), the fee imposed on any individual may not exceed $100. The amount of the fee shall be based on the Attorney General's estimate of the cost per alien of conducting the information collection program described in this section.

(B) USE.—Fees collected under paragraph (1) shall be deposited as offsetting receipts into the Immigration Examinations Fee Account (established under section 286(m) of the Immigration and Nationality Act) and shall remain available until expended for the Attorney General to reimburse any appropriation the amount paid out of which is for expenses in carrying out this section.

(f) JOINT REPORT.—Not later than 4 years after the commencement of the program established under subsection (a), the Attorney General, the Secretary of State, and the Secretary of Education shall jointly submit to the Committees on the Judiciary of the Senate and the House of Representatives a report on the operations of the program and the feasibility of expanding the program to cover the nationals of all countries.

(g) WORLDWIDE APPLICABILITY OF THE PROGRAM.—

(1) EXPANSION OF PROGRAM.—

(A) IN GENERAL.—Not later than 6 months after the submission of the report required by subsection (f), the Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall commence expansion of the program to cover the nationals of all countries.

(B) DEADLINE.—Such expansion shall be completed not later than 1 year after the date of the submission of the report referred to in subsection (f).

(2) REVISION OF FEE.—After the program has been expanded, as provided in paragraph (1), the Attorney General may, on a periodic basis, revise the amount of the fee imposed and collected under subsection (e) in order to take into account changes in the cost of carrying out the program.

(h) DEFINITIONS.—As used in this section:

(1) APPROVED INSTITUTION OF HIGHER EDUCATION.—The term "approved institution of higher education" means a college or university approved by the Attorney General, in consultation with the Secretary of Education, under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act.

(2) DESIGNATED EXCHANGE VISITOR PROGRAM.—The term "designated exchange visitor program" means a program that has been—

(A) designated by the Director of the United States Information Agency for purposes of section 101(a)(15)(J) of the Immigration and Nationality Act; and

(B) selected by the Attorney General for purposes of the program under this section.

<< 8 USCA § 1373 >>

SEC. 642. COMMUNICATION BETWEEN GOVERNMENT AGENCIES AND THE IMMIGRATION AND NATURALIZATION SERVICE.

(a) IN GENERAL.—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES.—Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) OBLIGATION TO RESPOND TO INQUIRIES.—The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

<< 48 USCA § 1901 NOTE >>

SEC. 643. REGULATIONS REGARDING HABITUAL RESIDENCE.

Not later than 6 months after the date of the enactment of this Act, the Commissioner of Immigration and Naturalization shall issue regulations governing rights of "habitual residence" in the United States under the terms of the following:

(1) The Compact of Free Association between the Government of the United States and the Governments of the Marshall Islands and the Federated States of Micronesia (48 U.S.C. 1901 note).

(2) The Compact of Free Association between the Government of the United States and the Government of Palau (48 U.S.C. 1931 note).

<< 8 USCA § 1374 >>

SEC. 644. INFORMATION REGARDING FEMALE GENITAL MUTILATION.

(a) PROVISION OF INFORMATION REGARDING FEMALE GENITAL MUTILATION.—The Immigration and Naturalization Service (in cooperation with the Department of State) shall make available for all aliens who are issued immigrant or nonimmigrant visas, prior to or at the time of entry into the United States, the following information:

(1) Information on the severe harm to physical and psychological health caused by female genital mutilation which is compiled and presented in a manner which is limited to the practice itself and respectful to the cultural values of the societies in which such practice takes place.

(2) Information concerning potential legal consequences in the United States for (A) performing female genital mutilation, or (B) allowing a child under his or her care to be subjected to female genital mutilation, under criminal or child protection statutes or as a form of child abuse.

(b) LIMITATION.—In consultation with the Secretary of State, the Commissioner of Immigration and Naturalization shall identify those countries in which female genital mutilation is commonly practiced and, to the extent practicable, limit the provision of information under subsection (a) to aliens from such countries.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(c) DEFINITION.—For purposes of this section, the term "female genital mutilation" means the removal or infibulation (or both) of the whole or part of the clitoris, the labia minora, or labia majora.

SEC. 645. CRIMINALIZATION OF FEMALE GENITAL MUTILATION.

<< 18 USCA § 116 NOTE >>

(a) FINDINGS.—The Congress finds that—

(1) the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States;

(2) the practice of female genital mutilation often results in the occurrence of physical and psychological health effects that harm the women involved;

(3) such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional;

(4) the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control;

(5) the practice of female genital mutilation can be prohibited without abridging the exercise of any rights guaranteed under the first amendment to the Constitution or under any other law; and

(6) Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth Amendment, as well as under the treaty clause, to the Constitution to enact such legislation.

(b) CRIME.—

<< 18 USCA § 116 >>

(1) IN GENERAL.—Chapter 7 of title 18, United States Code, is amended by adding at the end the following:

"§ 116. Female genital mutilation

"(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

"(b) A surgical operation is not a violation of this section if the operation is—

"(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

"(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

"(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.".

<< 18 USCA Ch. 7 >>

(2) CONFORMING AMENDMENT.—The table of sections at the beginning of chapter 7 of title 18, United States Code, is amended by adding at the end the following new item:

"116. Female genital mutilation.".

<< 18 USCA § 116 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (b) shall take effect on the date that is 180 days after the date of the enactment of this Act.

<< 8 USCA § 1255 NOTE >>

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 764 of 1021   PageID 7634

SEC. 646. ADJUSTMENT OF STATUS FOR CERTAIN POLISH AND HUNGARIAN PAROLEES.

 (a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien—

  (1) applies for such adjustment;

  (2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed;

  (3) is admissible to the United States as an immigrant, except as provided in subsection (c); and

  (4) pays a fee (determined by the Attorney General) for the processing of such application.

 (b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

  (1) was a national of Poland or Hungary; and

  (2) was inspected and granted parole into the United States during the period beginning on November 1, 1989, and ending on December 31, 1991, after being denied refugee status.

 (c) WAIVER OF CERTAIN GROUNDS FOR INADMISSIBILITY.—The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) and subparagraphs (A), (B), (C), or (E) of paragraph (3)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

 (d) DATE OF APPROVAL.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as an alien lawfully admitted for permanent residence as of the date of the alien's inspection and parole described in subsection (b)(2).

 (e) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

<< 8 USCA § 1448 NOTE >>

SEC. 647. SUPPORT OF DEMONSTRATION PROJECTS.

 (a) IN GENERAL.—The Attorney General shall make available funds under this section, in each of fiscal years 1997 through 2001, to the Commissioner of Immigration and Naturalization or to other public or private nonprofit entities to support demonstration projects under this section at 10 sites throughout the United States. Each such project shall be designed to provide for the administration of the oath of allegiance under section 337(a) of the Immigration and Nationality Act on a business day around Independence Day to approximately 500 people whose application for naturalization has been approved. Each project shall provide for appropriate outreach and ceremonial and celebratory activities.

 (b) SELECTION OF SITES.—The Attorney General shall, in the Attorney General's discretion, select diverse locations for sites on the basis of the number of naturalization applicants living in proximity to each site and the degree of local community participation and support in the project to be held at the site. No more than 2 sites may be located in the same State. The Attorney General shall consider changing the sites selected from year to year.

 (c) AMOUNTS AVAILABLE; USE OF FUNDS.—

  (1) AMOUNT.—The amount made available under this section with respect to any single site for a year shall not exceed $5,000.

  (2) USE.—Funds made available under this section may be used only to cover expenses incurred in carrying out oath administration ceremonies at the demonstration sites under subsection (a), including expenses for—

   (A) cost of personnel of the Immigration and Naturalization Service (including travel and overtime expenses);

   (B) rental of space; and

   (C) costs of printing appropriate brochures and other information about the ceremonies.

  (3) AVAILABILITY OF FUNDS.—Funds that are otherwise available to the Immigration and Naturalization Service to carry out naturalization activities shall be available, to the extent provided in appropriation Acts, to carry out this section.

(d) APPLICATION.—In the case of an entity other than the Immigration and Naturalization Service seeking to conduct a demonstration project under this section, no amounts may be made available to the entity under this section unless an appropriate application has been made to, and approved by, the Attorney General, in a form and manner specified by the Attorney General.

<< 8 USCA § 1101 NOTE >>

SEC. 648. SENSE OF CONGRESS REGARDING AMERICAN–MADE PRODUCTS; REQUIREMENTS REGARDING NOTICE.

(a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this division should be American-made.

(b) NOTICE TO RECIPIENTS OF GRANTS.—In providing grants under this division, the Attorney General, to the greatest extent practicable, shall provide to each recipient of a grant a notice describing the statement made in subsection (a) by the Congress.

<< 50 USCA § 191 >>

SEC. 649. VESSEL MOVEMENT CONTROLS DURING IMMIGRATION EMERGENCY.

Section 1 of the Act of June 15, 1917 (50 U.S.C. 191) is amended in the first sentence by inserting "or whenever the Attorney General determines that an actual or anticipated mass migration of aliens en route to, or arriving off the coast of, the United States presents urgent circumstances requiring an immediate Federal response," after "United States," the first place such term appears.

SEC. 650. REVIEW OF PRACTICES OF TESTING ENTITIES.

(a) IN GENERAL.—The Attorney General shall investigate, and submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding, the practices of entities authorized to administer standardized citizenship tests pursuant to section 312.3(a) of title 8, Code of Federal Regulations. The report shall include any findings of fraudulent practices by such entities.

(b) PRELIMINARY AND FINAL REPORTS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a preliminary report on the investigation conducted under subsection (a). The Attorney General shall submit to such Committees a final report on such investigation not later than 275 days after the submission of the preliminary report.

SEC. 651. DESIGNATION OF A UNITED STATES CUSTOMS ADMINISTRATIVE BUILDING.

(a) DESIGNATION.—The United States Customs Administrative Building at the Ysleta/Zaragoza Port of Entry located at 797 South Zaragosa Road in El Paso, Texas, is designated as the "Timothy C. McCaghren Customs Administrative Building".

(b) LEGAL REFERENCES.—Any reference in any law, regulation, document, record, map, or other paper of the United States to the building referred to in subsection (a) is deemed to be a reference to the "Timothy C. McCaghren Customs Administrative Building".

<< 8 USCA § 1375 >>

SEC. 652. MAIL–ORDER BRIDE BUSINESS.

(a) FINDINGS.—The Congress finds as follows:

(1) There is a substantial "mail-order bride" business in the United States. With approximately 200 companies in the United States, an estimated 2,000 to 3,500 men in the United States find wives through mail-order bride catalogs each year. However, there are no official statistics available on the number of mail-order brides entering the United States each year.

(2) The companies engaged in the mail-order bride business earn substantial profits.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) Although many of these mail-order marriages work out, in many other cases, anecdotal evidence suggests that mail-order brides find themselves in abusive relationships. There is also evidence to suggest that a substantial number of mail-order marriages are fraudulent under United States law.

(4) Many mail-order brides come to the United States unaware or ignorant of United States immigration law. Mail-order brides who are battered often think that if they flee an abusive marriage, they will be deported. Often the citizen spouse threatens to have them deported if they report the abuse.

(5) The Immigration and Naturalization Service estimates that the rate of marriage fraud between foreign nationals and United States citizens or aliens lawfully admitted for permanent residence is 8 percent. It is unclear what percentage of these marriage fraud cases originate as mail-order marriages.

(b) INFORMATION DISSEMINATION.—

(1) REQUIREMENT.—Each international matchmaking organization doing business in the United States shall disseminate to recruits, upon recruitment, such immigration and naturalization information as the Immigration and Naturalization Service deems appropriate, in the recruit's native language, including information regarding conditional permanent residence status and the battered spouse waiver under such status, permanent resident status, marriage fraud penalties, the unregulated nature of the business engaged in by such organizations, and the study required under subsection (c).

(2) CIVIL PENALTY.—

(A) VIOLATION.—Any international matchmaking organization that the Attorney General determines has violated subsection (b) shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $20,000 for each such violation.

(B) PROCEDURES FOR IMPOSITION OF PENALTY.—Any penalty under subparagraph (A) may be imposed only after notice and opportunity for an agency hearing on the record in accordance with sections 554 through 557 of title 5, United States Code.

(c) STUDY.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization and the Director of the Violence Against Women Initiative of the Department of Justice, shall conduct a study of mail-order marriages to determine, among other things—

(1) the number of such marriages;

(2) the extent of marriage fraud in such marriages, including an estimate of the extent of marriage fraud arising from the services provided by international matchmaking organizations;

(3) the extent to which mail-order spouses utilize section 244(a)(3) of the Immigration and Nationality Act (providing for suspension of deportation in certain cases involving abuse), or section 204(a)(1)(A)(iii) of such Act (providing for certain aliens who have been abused to file a classification petition on their own behalf);

(4) the extent of domestic abuse in mail-order marriages; and

(5) the need for continued or expanded regulation and education to implement the objectives of the Violence Against Women Act of 1994 and the Immigration Marriage Fraud Amendments of 1986 with respect to mail-order marriages.

(d) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate setting forth the results of the study conducted under subsection (c).

(e) DEFINITIONS.—As used in this section:

(1) INTERNATIONAL MATCHMAKING ORGANIZATION.—

(A) IN GENERAL.—The term "international matchmaking organization" means a corporation, partnership, business, or other legal entity, whether or not organized under the laws of the United States or any State, that does business in the United States and for profit offers to United States citizens or aliens lawfully admitted for permanent residence, dating, matrimonial, or social referral services to nonresident noncitizens, by—

(i) an exchange of names, telephone numbers, addresses, or statistics;

(ii) selection of photographs; or

(iii) a social environment provided by the organization in a country other than the United States.

(B) EXCEPTION.—Such term does not include a traditional matchmaking organization of a religious nature that otherwise operates in compliance with the laws of the countries of the recruits of such organization and the laws of the United States.

(2) RECRUIT.—The term "recruit" means a noncitizen, nonresident person, recruited by the international matchmaking organization for the purpose of providing dating, matrimonial, or social referral services to United States citizens or aliens lawfully admitted for permanent residence.

## SEC. 653. REVIEW AND REPORT ON H–2A NONIMMIGRANT WORKERS PROGRAM.

(a) SENSE OF THE CONGRESS.—It is the sense of the Congress that the H2–A nonimmigrant worker program should be reviewed and may need improvement in order to meet the need of producers of labor-intensive agricultural commodities and livestock in the United States for an adequate workforce.

(b) REVIEW.—The Comptroller General shall review the effectiveness of the H–2A nonimmigrant worker program to ensure that the program provides a sufficient supply of agricultural labor in the event of future shortages of domestic workers after the enactment of this Act. Among other things, the Comptroller General shall review the H–2A nonimmigrant worker program to determine—

(1) whether the program ensures that an adequate supply of qualified United States workers is available at the time and place needed for employers seeking such workers after the date of enactment of this Act;

(2) whether the program ensures that there is timely approval of applications for temporary foreign workers under the program in the event of shortages of United States workers after the date of the enactment of this Act;

(3) whether the program ensures that implementation of the program is not displacing United States agricultural workers or diminishing the terms and conditions of employment of United States agricultural workers;

(4) if, and to what extent, the program is contributing to the problem of illegal immigration; and

(5) that the program adequately meets the needs of agricultural employers for all types of temporary foreign agricultural workers, including higher-skilled workers in occupations which require a level of specific vocational preparation of 4 or higher (as described in the 4th edition of the Dictionary of Occupational Title, published by the Department of Labor).

(c) REPORT.—Not later than December 31, 1996, or 3 months after the date of the enactment of this Act, whichever occurs earlier, the Comptroller General shall submit a report to the appropriate committees of the Congress setting forth the conclusions of the Comptroller General from the review conducted under subsection (b).

(d) DEFINITIONS.—As used in this section:

(1) The term "Comptroller General" means the Comptroller General of the United States.

(2) The term "H–2A nonimmigrant worker program" means the program for the admission of nonimmigrant aliens described in section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act.

## SEC. 654. REPORT ON ALLEGATIONS OF HARASSMENT BY CANADIAN CUSTOMS AGENTS.

(a) STUDY AND REVIEW.—

(1) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall initiate a study of harassment by Canadian customs agents allegedly undertaken for the purpose of deterring cross-border commercial activity along the United States–New Brunswick border. Such study shall include a review of the possible connection between any incidents of harassment and the discriminatory imposition of the New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, and with any other actions taken by the Canadian provincial governments to deter cross-border commercial activities.

(2) CONSULTATION.—In conducting the study under paragraph (1), the Commissioner of the United States Customs Service shall consult with representatives of the State of Maine, local governments, local businesses, and any other knowledgeable persons who the Commissioner considers to be important to the completion of the study.

(b) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on the study and review conducted under subsection (a). The report shall include recommendations for steps that the United States Government can take to help end any harassment by Canadian customs agents that is found to have occurred.

## SEC. 655. SENSE OF CONGRESS ON DISCRIMINATORY APPLICATION OF NEW BRUNSWICK PROVINCIAL SALES TAX.

(a) FINDINGS.—The Congress finds as follows:

 (1) In July 1993, Canadian customs officers began collecting an 11 percent New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, an action that has caused severe economic harm to United States businesses located in proximity to the border with New Brunswick.

 (2) This impediment to cross-border trade compounds the damage already done from the Canadian Government's imposition of a 7 percent tax on all goods bought by Canadians in the United States.

 (3) Collection of the New Brunswick provincial sales tax on goods purchased outside of New Brunswick is effected only along the United States–Canadian border, not along New Brunswick's borders with other Canadian provinces; the tax is thus being administered by Canadian authorities in a manner uniquely discriminatory to Canadians shopping in the United States.

 (4) In February 1994, the United States Trade Representative publicly stated an intention to seek redress from the discriminatory application of the New Brunswick provincial sales tax under the dispute resolution process in chapter 20 of the North American Free Trade Agreement (NAFTA), but the United States Government has still not made such a claim under NAFTA procedures.

 (5) Initially, the United States Trade Representative argued that filing a New Brunswick provincial sales tax claim was delayed only because the dispute mechanism under NAFTA had not yet been finalized, but more than a year after such mechanism has been put in place, the claim has still not been put forward by the United States Trade Representative.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

 (1) the provincial sales tax levied by the Canadian province of New Brunswick on Canadian citizens of that province who purchase goods in the United States—

  (A) raises questions about a possible violation of the North American Free Trade Agreement in the discriminatory application of the tax to cross-border trade with the United States; and

  (B) damages good relations between the United States and Canada; and

 (2) the United States Trade Representative should move forward without further delay in seeking redress under the dispute resolution process in chapter 20 of the North American Free Trade Agreement for the violation.

<< 5 USCA § 301 NOTE >>

SEC. 656. IMPROVEMENTS IN IDENTIFICATION–RELATED DOCUMENTS.

 (a) BIRTH CERTIFICATES.—

 (1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

  (A) IN GENERAL.—

   (i) GENERAL RULE.—Subject to clause (ii), a Federal agency may not accept for any official purpose a certificate of birth, unless the certificate—

    (I) is a birth certificate (as defined in paragraph (3)); and

    (II) conforms to the standards set forth in the regulation promulgated under subparagraph (B).

   (ii) APPLICABILITY.—Clause (i) shall apply only to a certificate of birth issued after the day that is 3 years after the date of the promulgation of a final regulation under subparagraph (B). Clause (i) shall not be construed to prevent a Federal agency from accepting for official purposes any certificate of birth issued on or before such day.

  (B) REGULATION.—

   (i) CONSULTATION WITH GOVERNMENT AGENCIES.—The President shall select 1 or more Federal agencies to consult with State vital statistics offices, and with other appropriate Federal agencies designated by the President, for the purpose of developing appropriate standards for birth certificates that may be accepted for official purposes by Federal agencies, as provided in subparagraph (A).

   (ii) SELECTION OF LEAD AGENCY.—Of the Federal agencies selected under clause (i), the President shall select 1 agency to promulgate, upon the conclusion of the consultation conducted under such clause, a regulation establishing standards of the type described in such clause.

   (iii) DEADLINE.—The agency selected under clause (ii) shall promulgate a final regulation under such clause not later than the date that is 1 year after the date of the enactment of this Act.

   (iv) MINIMUM REQUIREMENTS.—The standards established under this subparagraph—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(I) at a minimum, shall require certification of the birth certificate by the State or local custodian of record that issued the certificate, and shall require the use of safety paper, the seal of the issuing custodian of record, and other features designed to limit tampering, counterfeiting, and photocopying, or otherwise duplicating, the birth certificate for fraudulent purposes;

(II) may not require a single design to which birth certificates issued by all States must conform; and

(III) shall accommodate the differences between the States in the manner and form in which birth records are stored and birth certificates are produced from such records.

(2) GRANTS TO STATES.—

(A) ASSISTANCE IN MEETING FEDERAL STANDARDS.—

(i) IN GENERAL.—Beginning on the date a final regulation is promulgated under paragraph (1)(B), the Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in issuing birth certificates that conform to the standards set forth in the regulation.

(ii) ALLOCATION OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to issue birth certificates that conform to the standards described in clause (i).

(B) ASSISTANCE IN MATCHING BIRTH AND DEATH RECORDS.—

(i) IN GENERAL.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in developing the capability to match birth and death records, within each State and among the States, and to note the fact of death on the birth certificates of deceased persons. In developing the capability described in the preceding sentence, a State that receives a grant under this subparagraph shall focus first on individuals born after 1950.

(ii) ALLOCATION AND AMOUNT OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to develop the capability described in clause (i).

(C) DEMONSTRATION PROJECTS.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics, shall make grants to States for a project in each of 5 States to demonstrate the feasibility of a system under which persons otherwise required to report the death of individuals to a State would be required to provide to the State's office of vital statistics sufficient information to establish the fact of death of every individual dying in the State within 24 hours of acquiring the information.

(3) BIRTH CERTIFICATE.—As used in this subsection, the term "birth certificate" means a certificate of birth—

(A) of

(i) an individual born in the United States; or

(ii) an individual born abroad—

(I) who is a citizen or national of the United States at birth; and

(II) whose birth is registered in the United States; and

(B) that—

(i) is a copy, issued by a State or local authorized custodian of record, of an original certificate of birth issued by such custodian of record; or

(ii) was issued by a State or local authorized custodian of record and was produced from birth records maintained by such custodian of record.

(b) STATE–ISSUED DRIVERS LICENSES AND COMPARABLE IDENTIFICATION DOCUMENTS.—

(1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

(A) IN GENERAL.—A Federal agency may not accept for any identification-related purpose a driver's license, or other comparable identification document, issued by a State, unless the license or document satisfies the following requirements:

(i) APPLICATION PROCESS.—The application process for the license or document shall include the presentation of such evidence of identity as is required by regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators.

(ii) SOCIAL SECURITY NUMBER.—Except as provided in subparagraph (B), the license or document shall contain a social security account number that can be read visually or by electronic means.

(iii) FORM.—The license or document otherwise shall be in a form consistent with requirements set forth in regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators. The form shall contain security features designed to limit tampering, counterfeiting, photocopying, or otherwise duplicating, the license or document for fraudulent purposes and to limit use of the license or document by impostors.

(B) EXCEPTION.—The requirement in subparagraph (A)(ii) shall not apply with respect to a driver's license or other comparable identification document issued by a State, if the State—

(i) does not require the license or document to contain a social security account number; and

(ii) requires—

(I) every applicant for a driver's license, or other comparable identification document, to submit the applicant's social security account number; and

(II) an agency of the State to verify with the Social Security Administration that such account number is valid.

(C) DEADLINE.—The Secretary of Transportation shall promulgate the regulations referred to in clauses (i) and (iii) of subparagraph (A) not later than 1 year after the date of the enactment of this Act.

(2) GRANTS TO STATES.—Beginning on the date final regulations are promulgated under paragraph (1), the Secretary of Transportation shall make grants to States to assist them in issuing driver's licenses and other comparable identification documents that satisfy the requirements under such paragraph.

(3) EFFECTIVE DATES.—

(A) IN GENERAL.—Except as otherwise provided in this paragraph, this subsection shall take effect on the date of the enactment of this Act.

(B) PROHIBITION ON FEDERAL AGENCIES.—Subparagraphs (A) and (B) of paragraph (1) shall take effect beginning on October 1, 2000, but shall apply only to licenses or documents issued to an individual for the first time and to replacement or renewal licenses or documents issued according to State law.

(c) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary of Health and Human Services shall submit a report to the Congress on ways to reduce the fraudulent obtaining and the fraudulent use of birth certificates, including any such use to obtain a social security account number or a State or Federal document related to identification or immigration.

(d) FEDERAL AGENCY DEFINED.—For purposes of this section, the term "Federal agency" means any of the following:

(1) An Executive agency (as defined in section 105 of title 5, United States Code).

(2) A military department (as defined in section 102 of such title).

(3) An agency in the legislative branch of the Government of the United States.

(4) An agency in the judicial branch of the Government of the United States.

<< 42 USCA § 405 NOTE >>

SEC. 657. DEVELOPMENT OF PROTOTYPE OF COUNTERFEIT–RESISTANT SOCIAL SECURITY CARD.

(a) DEVELOPMENT.—

(1) IN GENERAL.—The Commissioner of Social Security (in this section referred to as the "Commissioner") shall, in accordance with the provisions of this section, develop a prototype of a counterfeit-resistant social security card. Such prototype card—

(A) shall be made of a durable, tamper-resistant material such as plastic or polyester;

(B) shall employ technologies that provide security features, such as magnetic stripes, holograms, and integrated circuits; and

(C) shall be developed so as to provide individuals with reliable proof of citizenship or legal resident alien status.

(2) ASSISTANCE BY ATTORNEY GENERAL.—The Attorney General shall provide such information and assistance as the Commissioner deems necessary to achieve the purposes of this section.

(b) STUDIES AND REPORTS.—

(1) IN GENERAL.—The Comptroller General and the Commissioner of Social Security shall each conduct a study, and issue a report to the Congress, that examines different methods of improving the social security card application process.

(2) ELEMENTS OF STUDIES.—The studies shall include evaluations of the cost and work load implications of issuing a counterfeit-resistant social security card for all individuals over a 3, 5, and 10 year period. The studies shall also evaluate the feasibility and cost implications of imposing a user fee for replacement cards and cards issued to individuals who apply for such a card prior to the scheduled 3, 5, and 10 year phase-in options.

(3) DISTRIBUTION OF REPORTS.—Copies of the reports described in this subsection, along with facsimiles of the prototype cards as described in subsection (a), shall be submitted to the Committees on Ways and Means and Judiciary of the House of Representatives and the Committees on Finance and Judiciary of the Senate not later than 1 year after the date of the enactment of this Act.

SEC. 658. BORDER PATROL MUSEUM.

(a) AUTHORITY.—Notwithstanding section 203 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 484) or any other provision of law, the Attorney General is authorized to transfer and convey to the Border Patrol Museum and Memorial Library Foundation, incorporated in the State of Texas, such equipment, artifacts, and memorabilia held by the Immigration and Naturalization Service as the Attorney General may determine is necessary to further the purposes of the Museum and Foundation.

(b) TECHNICAL ASSISTANCE.—The Attorney General is authorized to provide technical assistance, through the detail of personnel of the Immigration and Naturalization Service, to the Border Patrol Museum and Memorial Library Foundation for the purpose of demonstrating the use of the items transferred under subsection (a).

SEC. 659. SENSE OF THE CONGRESS REGARDING THE MISSION OF THE IMMIGRATION AND NATURALIZATION SERVICE.

It is the sense of the Congress that the mission statement of the Immigration and Naturalization Service should include a statement that it is the responsibility of the Service to detect, apprehend, and remove those aliens unlawfully present in the United States, particularly those aliens involved in drug trafficking or other criminal activity.

<< 32 USCA § 112 >>

SEC. 660. AUTHORITY FOR NATIONAL GUARD TO ASSIST IN TRANSPORTATION OF CERTAIN ALIENS.

Section 112(d)(1) of title 32, United States Code, is amended by adding at the end the following new sentence: "The plan as approved by the Secretary may provide for the use of personnel and equipment of the National Guard of that State to assist the Immigration and Naturalization Service in the transportation of aliens who have violated a Federal or State law prohibiting or regulating the possession, use, or distribution of a controlled substance.".

Subtitle E—Technical Corrections

SEC. 671. MISCELLANEOUS TECHNICAL CORRECTIONS.

(a) AMENDMENTS RELATING TO PUBLIC LAW 103–322 (VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994).—

<< 8 USCA § 1324 >>

(1) Section 60024(1)(F) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) (in this subsection referred to as "VCCLEA") is amended by inserting "United States Code," after "title 18,".

<< 8 USCA § 1258 >>

(2) Section 130003(b)(3) of VCCLEA is amended by striking "Naturalization" and inserting "Nationality".

<< 8 USCA § 1184 >>

(3)(A) Section 214 (8 U.S.C. 1184) is amended by redesignating the subsection (j), added by section 130003(b)(2) of VCCLEA (108 Stat. 2025), and the subsection (k), as amended by section 622(c) of this division, as subsections (k) and (l), respectively.

<< 8 USCA § 1101 >>

(B) Section 101(a)(15)(S) (8 U.S.C. 1101(a)(15)(S)) is amended by striking "214(j)" and inserting "214(k)".

<< 8 USCA § 1255 >>

(4)(A) Section 245 (8 U.S.C. 1255) is amended by redesignating the subsection (i) added by section 130003(c)(1) of VCCLEA as subsection (j).

<< 8 USCA § 1251 >>

(B) Section 241(a)(2)(A)(i)(I) (8 U.S.C. 1251(a)(2)(A)(i)(I)), as amended by section 130003(d) of VCCLEA and before redesignation by section 305(a)(2) of this division, is amended by striking "245(i)" and inserting "245(j)".

<< 8 USCA § 1255 >>

(5) Section 245(j)(3), as added by section 130003(c)(1) of VCCLEA and as redesignated by paragraph (4)(A), is amended by striking "paragraphs (1) or (2)" and inserting "paragraph (1) or (2)".

<< 8 USCA § 1252 NOTE >>

(6) Section 130007(a) of VCCLEA is amended by striking "242A(d)" and inserting "242A(a)(3)".

<< 8 USCA § 1101 NOTE >>

(7) The amendments made by this subsection shall be effective as if included in the enactment of the VCCLEA.

(b) AMENDMENTS RELATING TO IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994.—

<< 8 USCA § 1401 NOTE >>

(1) Section 101(d) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) (in this subsection referred to as "INTCA") is amended—

(A) by striking "APPLICATION" and all that follows through "This" and inserting "APPLICABILITY OF TRANSMISSION REQUIREMENTS. This";

(B) by striking "any residency or other retention requirements for" and inserting "the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States"; and

(C) by striking "as in effect" and all that follows through the end and inserting "to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.".

<< 8 USCA § 1433 NOTE >>

(2) Section 102 of INTCA is amended by adding at the end the following:

"(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to 'five years, at least two of which' is deemed a reference to '10 years, at least 5 of which'.".

<< 8 USCA § 1483 >>

(3) Section 351(a) (8 U.S.C. 1483(a)), as amended by section 105(a)(2)(A) of INTCA, is amended by striking the comma after "nationality".

<< 8 USCA § 1255b >>

(4) Section 207(2) of INTCA is amended by inserting a comma after "specified".

<< 8 USCA § 1101 >>

(5) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended in subparagraph (K)(ii), by striking the comma after "1588".

<< 8 USCA § 1323 >>

(6) Section 273(b) (8 U.S.C. 1323(b)), as amended by section 209(a) of INTCA, is amended by striking "remain" and inserting "remains".

(7) Section 209(a)(1) of INTCA is amended by striking "$3000" and inserting "$3,000".

<< 8 USCA § 1323 NOTE >>

(8) Section 209(b) of INTCA is amended by striking "subsection" and inserting "section".

<< 8 USCA § 1255a NOTE >>

(9) Section 219(cc) of INTCA is amended by striking " 'year 1993 the first place it appears' " and inserting " 'year 1993' the first place it appears".

<< 8 USCA § 1161 NOTE >>

(10) Section 219(ee) of INTCA is amended by adding at the end the following:

"(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.".

<< 8 USCA § 1356 >>

(11) Paragraphs (4) and (6) of section 286(r) (8 U.S.C. 1356(r)) are amended by inserting "the" before "Fund" each place it appears.

<< 8 USCA § 1101 NOTE >>

(12) Section 221 of INTCA is amended—

  (A) by striking each semicolon and inserting a comma;

  (B) by striking "disasters." and inserting "disasters,"; and

  (C) by striking "The official" and inserting "the official".

<< 8 USCA § 1252a >>

(13) Section 242A (8 U.S.C. 1252a), as added by section 224(a) of INTCA and before redesignation as section 238 by section 308(b)(5) of this division, is amended by redesignating subsection (d) as subsection (c).

<< 8 USCA § 1101 NOTE >>

(14) Except as otherwise provided in this subsection, the amendments made by this subsection shall take effect as if included in the enactment of INTCA.

(c) AMENDMENTS RELATING TO PUBLIC LAW 104–132 (ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996).—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   AR03432

<< 8 USCA § 1189 >>

(1) Section 219 (8 U.S.C. 1189), as added by section 302(a) of Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132) (in this subsection referred to as "AEDPA"), is amended by striking the heading and all that follows through "(a)" and inserting the following:

"DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS

"SEC. 219. (a)".

(2) Section 302(b) of AEDPA is amended by striking ", relating to terrorism,".

<< 8 USCA § 1105a >>

(3) Section 106(a) (8 U.S.C. 1105a(a)), as amended by sections 401(e) and 440(a) of AEDPA, is amended—

  (A) by striking "and" at the end of paragraph (8);

  (B) by striking the period at the end of paragraph (9) and inserting "; and"; and

  (C) in paragraph (10), by striking "Any" and inserting "any".

(4) Section 440(a) of the AEDPA is amended by striking "Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a(a)(10)) is amended to read as follows:" and inserting "Section 106(a) of the Immigration and Nationality Act (8 U.S.C. 1105a(a)) is amended by adding at the end the following:".

<< 8 USCA § 1252a >>

(5) Section 440(g)(1)(A) of AEDPA is amended—

  (A) by striking "of this title"; and

  (B) by striking the period after "241(a)(2)(A)(i)".

(6) Section 440(g) of AEDPA is amended by striking paragraph (2).

<< 8 USCA § 1189 NOTE >>

(7) The amendments made by this subsection shall take effect as if included in the enactment of subtitle A of title IV of AEPDA.

(d) STRIKING REFERENCES TO SECTION 210A.—

<< 8 USCA § 1151 >>

(1)(A) Section 201(b)(1)(C) (8 U.S.C. 1151(b)(1)(C)) is amended by striking ", 210A,".

<< 8 USCA § 1324b >>

(B) Section 274B(a)(3)(B) (8 U.S.C. 1324b(a)(3)(B)) is amended by striking ", 210A(a),".

<< 8 USCA § 1251 >>

(C) Section 241(a)(1) (8 U.S.C. 1251(a)(1)), before redesignation by section 305(a)(2) of this division, is amended by striking subparagraph (F).

<< 8 USCA § 1255a NOTE >>

(2) Sections 204(c)(1)(D)(i) and 204(j)(4) of Immigration Reform and Control Act of 1986 are each amended by striking ", 210A,".

(e) MISCELLANEOUS CHANGES IN THE IMMIGRATION AND NATIONALITY ACT.—

(1) Before being amended by section 308(a)(2) of this division, the item in the table of contents relating to section 242A is amended to read as follows:

"Sec. 242A. Expedited deportation of aliens convicted of committing aggravated felonies.".

<< 8 USCA § 1101 >>

(2) Section 101(c)(1) (8 U.S.C. 1101(c)(1)) is amended by striking ", 321, and 322" and inserting "and 321".

<< 8 USCA § 1182 >>

(3) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting a comma after "(4) thereof)".

(4) Pursuant to section 6(b) of Public Law 103–272 (108 Stat. 1378)—

<< 8 USCA § 1184 >>

(A) section 214(f)(1) (8 U.S.C. 1184(f)(1)) is amended by striking "section 101(3) of the Federal Aviation Act of 1958" and inserting "section 40102(a)(2) of title 49, United States Code"; and

<< 8 USCA § 1288 >>

(B) section 258(b)(2) (8 U.S.C. 1288(b)(2)) is amended by striking "section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)" and inserting "section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code".

<< 8 USCA § 1356 >>

(5) Section 286(h)(1)(A) (8 U.S.C. 1356(h)(1)(A)) is amended by inserting a period after "expended".

(6) Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(A) by striking "and" at the end of clause (iv);

(B) by moving clauses (v) and (vi) 2 ems to the left;

(C) by striking "; and" in clauses (v) and (vi) and inserting "and for";

(D) by striking the colons in clauses (v) and (vi); and

(E) by striking the period at the end of clause (v) and inserting "; and".

<< 8 USCA § 1522 >>

(7) Section 412(b) (8 U.S.C. 1522(b)) is amended by striking the comma after "is authorized" in paragraph (3) and after "The Secretary" in paragraph (4).

<< 8 USCA § 1101 NOTE >>

(f) MISCELLANEOUS CHANGE IN THE IMMIGRATION ACT OF 1990.—Section 161(c)(3) of the Immigration Act of 1990 is amended by striking "an an" and inserting "of an".

(g) MISCELLANEOUS CHANGES IN OTHER ACTS.—

<< 8 USCA § 1430 NOTE >>

(1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

<< 8 USCA § 1182 NOTE >>

(2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—

(A) by moving the indentation of subsections (f) and (g) 2 ems to the left; and

(B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 776 of 1021 PageID 7646

DIVISION D

SMALL BUSINESS PROGRAMS IMPROVEMENT ACT

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 15 USCA §§ 6313 NOTE, 634 nt, 636 nt, 638 nt, 644 nt, 648 nt, 687*l* nt, 695 nt, 696 nt, 697 nt, 697b nt >>

(a) SHORT TITLE.—This division may be cited as the "Small Business Programs Improvement Act of 1996".
(b) TABLE OF CONTENTS.—

Sec. 1. Short title; table of contents.

Sec. 2. Administrator defined.

Sec. 3. Effective date.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

Sec. 101. References.

Sec. 102. Risk management database.

Sec. 103. Section 7(a) loan program.

Sec. 104. Disaster loans.

Sec. 105. Microloan demonstration program.

Sec. 106. Small business development center program.

Sec. 107. Miscellaneous authorities to provide loans and other financial assistance.

Sec. 108. Small business competitiveness demonstration program.

Sec. 109. Amendment to Small Business Guaranteed Credit Enhancement Act of 1993.

Sec. 110. STTR program extension.

Sec. 111. Level of participation for export working capital loans.

TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

Sec. 201. References.

Sec. 202. Modifications to development company debenture program.

Sec. 203. Required actions upon default.

Sec. 204. Loan liquidation pilot program.

Sec. 205. Registration of certificates.

Sec. 206. Preferred surety bond guarantee program.

Sec. 207. Sense of the Congress.

Sec. 208. Small business investment company improvements.

<< 15 USCA § 631 NOTE >>

SEC. 2. ADMINISTRATOR DEFINED.

For purposes of this Act, the term "Administrator" means the Administrator of the Small Business Administration.

<< 15 USCA § 633 NOTE >>

SEC. 3. EFFECTIVE DATE.

Except as otherwise expressly provided, this Act and the amendments made by this Act shall take effect on October 1, 1996.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

SEC. 101. REFERENCES.

Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Act (15 U.S.C. 631 et seq.).

<< 15 USCA § 633 >>

SEC. 102. RISK MANAGEMENT DATABASE.

Section 4(b) (15 U.S.C. 633) is amended by inserting after paragraph (2) the following:

"(3) RISK MANAGEMENT DATABASE.—

"(A) ESTABLISHMENT.—The Administration shall establish, within the management system for the loan programs authorized by subsections (a) and (b) of section 7 of this Act and title V of the Small Business Investment Act of 1958, a management information system that will generate a database capable of providing timely and accurate information in order to identify loan underwriting, collections, recovery, and liquidation problems.

"(B) INFORMATION TO BE MAINTAINED.—In addition to such other information as the Administration considers appropriate, the database established under subparagraph (A) shall, with respect to each loan program described in subparagraph (A), include information relating to—

"(i) the identity of the institution making the guaranteed loan or issuing the debenture;

"(ii) the identity of the borrower;

"(iii) the total dollar amount of the loan or debenture;

"(iv) the total dollar amount of government exposure in each loan;

"(v) the district of the Administration in which the borrower has its principal office;

"(vi) the principal line of business of the borrower, as identified by Standard Industrial Classification Code (or any successor to that system);

"(vii) the delinquency rate for each program (including number of instances and days overdue);

"(viii) the number and amount of repurchases, losses, and recoveries in each program;

"(ix) the number of deferrals or forbearances in each program (including days and number of instances);

"(x) comparisons on the basis of loan program, lender, Administration district and region, for all the data elements maintained; and

"(xi) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan.

"(C) DEADLINE FOR OPERATIONAL CAPABILITY.—The database established under subparagraph (A) shall—

"(i) be operational not later than June 30, 1997; and

"(ii) capture data beginning on the first day of the second quarter of fiscal year 1997 beginning after such date and thereafter.".

SEC. 103. SECTION 7(a) LOAN PROGRAM.

<< 15 USCA § 636 >>

(a) SERVICING AND LIQUIDATION OF LOANS BY PREFERRED LENDERS.—Section 7(a)(2)(C)(ii)(II) (15 U.S.C. 636(a)(2)(C)(ii)(II)) is amended to read as follows:

"(II) complete authority to service and liquidate such loans without obtaining the prior specific approval of the Administration for routine servicing and liquidation activities, but shall not take any actions creating an actual or apparent conflict of interest.".

(b) CERTIFIED LENDERS PROGRAM.—Section 7(a)(19) (15 U.S.C. 636(a)(19)) is amended by adding at the end the following new subparagraph:

"(C) AUTHORITY TO LIQUIDATE LOANS.—

"(i) IN GENERAL.—The Administrator may permit lenders participating in the Certified Lenders Program to liquidate loans made with a guarantee from the Administration pursuant to a liquidation plan approved by the Administrator.

"(ii) AUTOMATIC APPROVAL.—If the Administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.".

(c) LIMITATION ON CONDUCTING PILOT PROJECTS.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(25) LIMITATION ON CONDUCTING PILOT PROJECTS.—

"(A) IN GENERAL.—Not more than 10 percent of the total number of loans guaranteed in any fiscal year under this subsection may be awarded as part of a pilot program which is commenced by the Administrator on or after October 1, 1996.

"(B) PILOT PROGRAM DEFINED.—In this paragraph, the term 'pilot program' means any lending program initiative, project, innovation, or other activity not specifically authorized by law.

"(C) LOW DOCUMENTATION LOAN PROGRAM.—The Administrator may carry out the low documentation loan program for loans of $100,000 or less only through lenders with significant experience in making small business loans. Not later than 90 days after the date of enactment of this subsection, the Administrator shall promulgate regulations defining the experience necessary for participation as a lender in the low documentation loan program.".

(d) CALCULATION OF SUBSIDY RATE.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(26) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this subsection shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing loans under this Act.".

<< 15 USCA § 634 >>

(e) SALE OF UNGUARANTEED PORTIONS OF SBA LOANS.—Section 5(f)(3) (15 U.S.C. 634(f)(3)) is amended by adding at the end the following: "Beginning on March 31, 1997, the sale of the unguaranteed portion of any loan made under section 7(a) shall not be permitted until a final regulation that applies uniformly to both depository institutions and other lenders is promulgated by the Administration setting forth the terms and conditions under which such sales can be permitted, including maintenance of appropriate reserve requirements and other safeguards to protect the safety and soundness of the program."

<< 15 USCA § 636 >>

(f) CONDITIONS ON PURCHASE OF LOANS.—Section 7(a)(4) (15 U.S.C. 636(a)(4)) is amended—

(1) by striking "(4) Notwithstanding" and inserting the following:

"(4) INTEREST RATES AND FEES.—

"(A) INTEREST RATES.—Notwithstanding"; and

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(2) by adding at the end the following new subparagraph:

"(B) PAYMENT OF ACCRUED INTEREST.—

"(i) IN GENERAL.—Any bank or other lending institution making a claim for payment on the guaranteed portion of a loan made under this subsection shall be paid the accrued interest due on the loan from the earliest date of default to the date of payment of the claim at a rate not to exceed the rate of interest on the loan on the date of default, minus one percent.

"(ii) LOANS SOLD ON SECONDARY MARKET.—If a loan described in clause (i) is sold on the secondary market, the amount of interest paid to a bank or other lending institution described in that clause from the earliest date of default to the date of payment of the claim shall be no more than the agreed upon rate, minus one percent.".

(g) PLAN FOR TRANSFER OF LOAN SERVICING FUNCTIONS TO CENTRALIZED CENTERS.—

(1) IMPLEMENTATION PLAN REQUIRED.—The Administrator shall submit a detailed plan for completing the consolidation, in one or more centralized centers, of the performance of the various functions relating to the servicing of loans directly made or guaranteed by the Administration pursuant to the Small Business Act, addressing the matters described in paragraph (2) by the deadline specified in paragraph (3).

(2) CONTENTS OF PLAN.—In addition to such other matters as the Administrator may deem appropriate, the plan required by paragraph (1) shall include—

(A) the proposed number and location of such centralized loan servicing centers;

(B) the proposed workload (identified by type and numbers of loans and their geographic origin by the Small Business Administration district office) and staffing of each such center;

(C) a detailed, time-phased plan for the transfer of the identified loan servicing functions to each proposed center; and

(D) any identified impediments to the timely execution of the proposed plan (including adequacy of available financial resources, availability of needed personnel, facilities, and related equipment) and the recommendations of the Administrator for addressing such impediments.

(3) DEADLINE FOR SUBMISSION.—Not later than February 28, 1997, the plan required by paragraph (1) shall be submitted to the Committees on Small Business of the House of Representatives and Senate.

<< 15 USCA § 634 NOTE >>

(h) PREFERRED LENDER STANDARD REVIEW PROGRAM.—Not later than 90 days after the date of enactment of this Act, the Administrator shall commence a standard review program for the Preferred Lender Program established by section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)), which shall include annual or more frequent assessments of the participation of the lender in the program, including defaults, loans, and recoveries of loans made by that lender under the authority of this section. The Administrator shall require such standard review for each new entrant to the Preferred Lender Program.

(i) INDEPENDENT STUDY OF LOAN PROGRAMS.—

(1) STUDY REQUIRED.—The Administrator shall contract with one or more private sector parties to conduct a comprehensive assessment of the performance of the loan programs authorized by section 7(a) of the Small Business Act (15 U.S.C. 636(a)) and title V of the Small Business Investment Act of 1958 (15 U.S.C. 661) addressing the matters described in paragraph (2) and resulting in a report to the Congress pursuant to paragraph (5).

(2) MATTERS TO BE ASSESSED.—In addition to such other matters as the Administrator considers appropriate, the assessment required by paragraph (1) shall address, with respect to each loan program described in paragraph (1) for each of the fiscal years described in paragraph (3)—

(A) the number and frequency of deferrals and defaults;

(B) default rates;

(C) comparative loss rates, by—

(i) type of lender (separately addressing preferred lenders, certified lenders, and general participation lenders);

(ii) term of the loan;

(iii) dollar value of the loan at disbursement; and

(iv) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan; and

(D) the economic models used by the Office of Management and Budget to calculate the credit subsidy rate applicable to the loan programs.

AR03438

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 780 of 1021   PageID 7650

(3) PERIOD OF ASSESSMENT.—The assessments undertaken pursuant to paragraph (2) shall address data for the period beginning with fiscal year 1986 of each loan program described in paragraph (1).

(4) ACCESS TO INFORMATION.—The Administrator shall provide to the contractor access to any information collected by or available to the Administration with regard to the loan programs being assessed. The contractor shall preserve the confidentiality of any information for which confidentiality is protected by law or properly asserted by the person submitting such information.

(5) CONTRACT FUNDING.—The Administrator shall fund the cost of the contract from the amounts appropriated for the salaries and expenses of the Administration for fiscal year 1997.

(6) REPORT TO THE CONGRESS.—

(A) CONTENTS.—The contractor shall prepare a report of—

(i) its analyses of the matters to be assessed pursuant to paragraph (2); and

(ii) its independent recommendations for improving program performance with respect to each loan program, regarding—

(I) improving the timely collection and subsequent management by the Administration of data to measure the performance of each loan program described in paragraph (1); and

(II) reducing loss rates for and improving the performance of each such loan program.

(B) SUBMISSION TO THE CONGRESS.—Not later than June 30, 1997, the Administrator shall submit the report prepared under subparagraph (A) to the Committees on Small Business of the House of Representatives and the Senate. The Administrator shall append his comments, and those of the Office of Management and Budget, if any, to the report.

SEC. 104. DISASTER LOANS.

<< 15 USCA § 636 NOTE >>

(a) PRIVATE SECTOR LOAN SERVICING DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—

(A) DEMONSTRATION PROGRAM REQUIRED.—Notwithstanding any other provision of law, the Administration shall conduct a demonstration program, within the parameters described in paragraph (2), to evaluate the comparative costs and benefits of having the Administration's portfolio of disaster loans serviced under contract rather than directly by employees of the Administration. All costs of the demonstration program shall be paid from amounts made available for the Salaries and Expenses Account of the Administration.

(B) INITIATION DATE.—Not later than 90 days after the date of enactment of this Act, the Administration shall issue a request for proposals for the program parameters described in paragraph (2).

(2) DEMONSTRATION PROGRAM PARAMETERS.—

(A) LOAN SAMPLE.—The sample of loans for the demonstration program shall be randomly drawn from the Administration's portfolio of loans made pursuant to section 7(b) of the Small Business Act and shall include a representative group of not less than 30 percent of all loans for residential properties, including 30 percent of all loans made during the demonstration program after the date of enactment of this Act, which loans shall be selected by the Administration on the basis of geographic distribution and such other factors as the Administration determines to be appropriate.

(B) CONTRACT AND OPTIONS.—The Administration shall solicit and competitively award one or more contracts to service the loans included in the sample of loans described in subparagraph (A) for a term of not less than one year, with 3 one-year contract renewal options, each of which shall be exercised by the Administration unless the Administration terminates the contractor or contractors for good cause.

(3) TERM OF DEMONSTRATION PROGRAM.—The demonstration program shall commence not later than October 1, 1997.

(4) REPORTS.—

(A) INTERIM REPORTS.—Not later than 120 days before the expiration of the initial 4–year contract performance period, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate an interim report on the conduct of the demonstration program. The contractor shall be afforded a reasonable opportunity to attach comments to each such report.

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 781 of 1021   PageID 7651

(B) FINAL REPORT.—Not later than 120 days after the termination of the demonstration program, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate a final report on the performance of the demonstration program, together with the recommendations of the Administrator for continuation, termination, or modification of the demonstration program.

(b) DEFINITION OF DISASTER.—

<< 15 USCA § 632 >>

(1) IN GENERAL.—Section 3(k) (15 U.S.C. 632(k)) is amended by inserting "commercial fishery failures or fishery resource disasters (as determined by the Secretary of Commerce under section 308(b) of the Interjurisdictional Fisheries Act of 1986)," after "tidal waves,".

<< 15 USCA § 632 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall be effective with respect to any disaster occurring on or after March 1, 1994.

<< 15 USCA § 636 >>

SEC. 105. MICROLOAN DEMONSTRATION PROGRAM.

Section 7(m)(7)(B) (15 U.S.C. 636(m)(4)) is amended by adding at the end the following: "If, however, at the beginning of the fourth quarter of a fiscal year the Administration determines that a portion of appropriated microloan funds are unlikely to be awarded during that year, the Administration may make additional funds available to a State in excess of 125 percent of the pro rata share of that State.".

<< 15 USCA § 648 >>

SEC. 106. SMALL BUSINESS DEVELOPMENT CENTER PROGRAM.

(a) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

(1) DUTIES.—Section 21(h) (15 U.S.C. 648(h)) is amended to read as follows:

"(h) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

"(1) APPOINTMENT AND COMPENSATION.—The Administrator shall appoint an Associate Administrator for Small Business Development Centers who shall report to an official who is not more than one level below the Office of the Administrator and who shall serve without regard to the provisions of title 5 governing appointments in the competitive service, and without regard to chapter 51, and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at a rate not less than the rate of GS–17 of the General Schedule.

"(2) DUTIES.—

"(A) IN GENERAL.—The sole responsibility of the Associate Administrator for Small Business Development Centers shall be to administer the small business development center program. Duties of the position shall include recommending the annual program budget, reviewing the annual budgets submitted by each applicant, establishing appropriate funding levels therefore, selecting applicants to participate in this program, implementing the provisions of this section, maintaining a clearinghouse to provide for the dissemination and exchange of information between small business development centers and conducting audits of recipients of grants under this section.

"(B) CONSULTATION REQUIREMENTS.—In carrying out the duties described in this subsection, the Associate Administrator shall confer with and seek the advice of the Board established by subsection (i) and Administration officials in areas served by the small business development centers; however, the Associate Administrator shall be responsible for the management and administration of the program and shall not be subject to the approval or concurrence of such Administration officials.".

(2) REFERENCES TO ASSOCIATE ADMINISTRATOR.—Section 21 (15 U.S.C. 648) is amended—

(A) in subsection (c)(7), by striking "Deputy Associate Administrator of the Small Business Development Center program" and inserting "Associate Administrator for Small Business Development Centers"; and

(B) in subsection (i)(2), by striking "Deputy Associate Administrator for Management Assistance" and inserting "Associate Administrator for Small Business Development Centers".

(b) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—Section 21(k)(3) (15 U.S.C. 648(k)(3)) is amended to read as follows:

"(3) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—

"(A) IN GENERAL.—In extending or renewing a cooperative agreement of a small business development center, the Administration shall consider the results of the examination and certification program conducted pursuant to paragraphs (1) and (2).

"(B) CERTIFICATION REQUIREMENT.—After September 30, 2000, the Administration may not renew or extend any cooperative agreement with a small business development center unless the center has been approved under the certification program conducted pursuant to this subsection, except that the Associate Administrator for Small Business Development Centers may waive such certification requirement, in the discretion of the Associate Administrator, upon a showing that the center is making a good faith effort to obtain certification.".

(c) TECHNICAL CORRECTION.—Section 21(l) (15 U.S.C. 648(l)) is amended to read as follows:

"(l) CONTRACT AUTHORITY.—The authority to enter into contracts shall be in effect for each fiscal year only to the extent and in the amounts as are provided in advance in appropriations Acts. After the administration has entered a contract, either as a grant or a cooperative agreement, with any applicant under this section, it shall not suspend, terminate, or fail to renew or extend any such contract unless the Administration provides the applicant with written notification setting forth the reasons therefore and affording the applicant an opportunity for a hearing, appeal, or other administrative proceeding under the provisions of chapter 5 of title 5, United States Code.".

<< 15 USCA § 636 >>

SEC. 107. MISCELLANEOUS AUTHORITIES TO PROVIDE LOANS AND OTHER FINANCIAL ASSISTANCE.

(a) FUNDING LIMITATION; SEMINARS.—Section 7(d) (15 U.S.C. 636(d)) is amended—

(1) by striking "(d)(1)" and inserting "(d)"; and

(2) by striking paragraph (2).

(b) TRADE ADJUSTMENT LOANS.—Section 7(e) (15 U.S.C. 636(e)) is amended to read as follows:

"(e) [RESERVED].".

(c) WAIVER OF CREDIT ELSEWHERE TEST FOR COLLEGES AND UNIVERSITIES.—Section 7(f) (15 U.S.C. 636(f)) is amended to read as follows:

"(f) [RESERVED].".

(d) LOANS TO SMALL BUSINESS CONCERNS FOR SOLAR ENERGY AND ENERGY CONSERVATION MEASURES.—Section 7(l) (15 U.S.C. 636(l)) is amended to read as follows:

"(l) [RESERVED].".

SEC. 108. SMALL BUSINESS COMPETITIVENESS DEMONSTRATION PROGRAM.

<< 15 USCA § 644 NOTE >>

(a) EXTENSION OF DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—Section 711(c) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3890) is amended by striking "September 30, 1996" and inserting "September 30, 1997".

(2) REPEAL.—Section 717(f) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note) is repealed.

(b) REPORTING OF SUBCONTRACT PARTICIPATION IN CONTRACTS FOR ARCHITECTURAL AND ENGINEERING SERVICES.—Section 714(b)(5) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3892) is amended to read as follows:

"(5) DURATION.—The system described in subsection (a) shall be established not later than October 1, 1996 (or as soon as practicable thereafter on the first day of a subsequent quarter of fiscal year 1997), and shall terminate on September 30, 1997.".

(c) REPORTS TO THE CONGRESS.—

(1) IN GENERAL.—Section 716 of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893 is amended—

(A) in subsection (a), by striking "fiscal year 1991 and 1995" and inserting "each of fiscal years 1991 through 1996";

(B) in subsection (b), by striking "results" and inserting "cumulative results"; and

(C) in subsection (c), by striking "1996" and inserting "1997".

(2) CUMULATIVE REPORT THROUGH FISCAL YEAR 1995.—A cumulative report of the results of the Small Business Competitiveness Demonstration Program for fiscal years 1991 through 1995 shall be submitted not later than February 28, 1997 pursuant to section 716(a) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893), as amended by paragraph (1) of this subsection.

SEC. 109. AMENDMENT TO SMALL BUSINESS GUARANTEED CREDIT ENHANCEMENT ACT OF 1993.

<< 15 USCA §§ 634 NOTE, 636 nt >>

(a) IN GENERAL.—Section 7 of the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 634 note) is repealed effective September 29, 1996.

(b) CLERICAL AMENDMENT.—The table of contents for the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 631 note) is amended by striking the item relating to section 7.

<< 15 USCA § 638 >>

SEC. 110. STTR PROGRAM EXTENSION.

Section 9(n)(1)(C) (15 U.S.C. 638(n)(1)(C)) is amended by striking "fiscal year 1996" and inserting "fiscal years 1996 and 1997".

<< 15 USCA § 636 >>

SEC. 111. LEVEL OF PARTICIPATION FOR EXPORT WORKING CAPITAL LOANS.

Section 7(a)(2) (15 U.S.C. 636(a)(2)) is amended by adding at the end the following:

"(D) PARTICIPATION UNDER EXPORT WORKING CAPITAL PROGRAM.—Notwithstanding subparagraph (A), in an agreement to participate in a loan on a deferred basis under the Export Working Capital Program established pursuant to paragraph (14)(A), such participation by the Administration shall not exceed 90 percent.".

TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

SEC. 201. REFERENCES.

Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.).

SEC. 202. MODIFICATIONS TO DEVELOPMENT COMPANY DEBENTURE PROGRAM.

<< 15 USCA § 696 >>

(a) DECREASED LOAN TO VALUE RATIOS.—Section 502(3) (15 U.S.C. 696(3)) is amended to read as follows:

"(3) CRITERIA FOR ASSISTANCE.—

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

"(A) IN GENERAL.—Any development company assisted under this section or section 503 of this title must meet the criteria established by the Administration, including the extent of participation to be required or amount of paid-in capital to be used in each instance as is determined to be reasonable by the Administration.

"(B) COMMUNITY INJECTION FUNDS.—

"(i) SOURCES OF FUNDS.—Community injection funds may be derived, in whole or in part, from—

"(I) State or local governments;

"(II) banks or other financial institutions;

"(III) foundations or other not-for-profit institutions; or

"(IV) the small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title.

"(ii) FUNDING FROM INSTITUTIONS.—Not less than 50 percent of the total cost of any project financed pursuant to clauses (i), (ii), or (iii) of subparagraph (C) shall come from the institutions described in subclauses (I), (II), and (III) of clause (i).

"(C) FUNDING FROM A SMALL BUSINESS CONCERN.—The small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title shall provide—

"(i) at least 15 percent of the total cost of the project financed, if the small business concern has been in operation for a period of 2 years or less;

"(ii) at least 15 percent of the total cost of the project financed if the project involves the construction of a limited or single purpose building or structure;

"(iii) at least 20 percent of the total cost of the project financed if the project involves both of the conditions set forth in clauses (i) and (ii); or

"(iv) at least 10 percent of the total cost of the project financed, in all other circumstances, at the discretion of the development company.".

<< 15 USCA § 697 >>

(b) GUARANTEE FEE FOR DEVELOPMENT COMPANY DEBENTURES.—Section 503(b)(7)(A) (15 U.S.C. 697(b)(7)(A)) is amended by striking "equal to 0.125 percent" and all that follows before the semicolon and inserting the following: "equal to the lesser of—

"(i) 0.9375 percent per year of the outstanding balance of the loan; or

"(ii) such percentage per year of the outstanding balance of the loan as the Administrator may determine to be necessary to reduce the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act to an amount that, taking into consideration any available appropriated funds, would permit the Administration to purchase or guarantee $2,000,000,000 of debentures in fiscal year 1997".

(c) FEES TO OFFSET SUBSIDY COST.—Section 503(d) (15 U.S.C. 697(d)) is amended to read as follows:

"(d) CHARGES FOR ADMINISTRATION EXPENSES.—

"(1) LEVEL OF CHARGES.—The Administration may impose an additional charge for administrative expenses with respect to each debenture for which payment of principal and interest is guaranteed under subsection (a).

"(2) PARTICIPATION FEE.—The Administration shall collect a one-time fee in an amount equal to 50 basis points on the total participation in any project of any institution described in subclause (I), (II), or (III) of section 502(3)(B)(i). Such fee shall be imposed only when the participation of the institution will occupy a senior credit position to that of the development company. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).

"(3) DEVELOPMENT COMPANY FEE.—The Administration shall collect annually from each development company a fee of 0.125 percent of the outstanding principal balance of any guaranteed debenture authorized by the Administration after September 30, 1996. Such fee shall be derived from the servicing fees collected by the development company pursuant to regulation, and shall not be derived from any additional fees imposed on small business concerns. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).".

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 785 of 1021   PageID 7655

(d) EFFECTIVE DATE.—Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(f) EFFECTIVE DATE.—The fees authorized by subsections (b) and (c) shall apply to financings approved by the Administration on or after October 1, 1996, but shall not apply to financings approved by the Administration on or after October 1, 1997.".

(e) CALCULATION OF SUBSIDY RATE.—Section 503 (15 U.S.C. 697(a) is amended by adding at the end of the following new subsection:

"(g) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act.".

<< 15 USCA § 697 >>

SEC. 203. REQUIRED ACTIONS UPON DEFAULT.

Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(h) REQUIRED ACTIONS UPON DEFAULT.—

"(1) INITIAL ACTIONS.—Not later than the 45th day after the date on which a payment on a loan funded through a debenture guaranteed under this section is due and not received, the Administration shall—

"(A) take all necessary steps to bring such a loan current; or

"(B) implement a formal written deferral agreement.

"(2) PURCHASE OR ACCELERATION OF DEBENTURE.—Not later than the 65th day after the date on which a payment on a loan described in paragraph (1) is due and not received, and absent a formal written deferral agreement, the administration shall take all necessary steps to purchase or accelerate the debenture.

"(3) PREPAYMENT PENALTIES.—With respect to the portion of any project derived from funds set forth in section 502(3), the Administration—

"(A) shall negotiate the elimination of any prepayment penalties or late fees on defaulted loans made prior to September 30, 1996;

"(B) shall not pay any prepayment penalty or late fee on the default based purchase of loans issued after September 30, 1996; and

"(C) for any project financed after September 30, 1996, shall not pay any default interest rate higher than the interest rate on the note prior to the date of default.".

<< 15 USCA § 695 NOTE >>

SEC. 204. LOAN LIQUIDATION PILOT PROGRAM.

(a) IN GENERAL.—The Administrator shall carry out a loan liquidation pilot program (in this section referred to as the "pilot program") in accordance with the requirements of this section.

(b) SELECTION OF DEVELOPMENT COMPANIES.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Administrator shall establish a pilot program under which certain development companies authorized to make loans and issue debentures under title V of the Small Business Investment Act of 1958 are selected by the Administrator in accordance with this subsection to carry out loan liquidations.

(2) CONFLICTS OF INTEREST.—The development companies selected under paragraph (1) shall agree not to take any action that would create a potential conflict of interest involving the development company, the third party lender, or an associate of the third party lender.

(3) QUALIFICATIONS.—In order to qualify to participate in the pilot program under this section, each development company shall—

(A) have not less than 6 years of experience in the program established by title V of the Small Business Investment Act of 1958;

(B) have made, during the 6 most recent fiscal years, an average of not less than 10 loans per year through the program established by such title V of the Small Business Investment Act of 1958;

(C) have not less than 2 years of experience in liquidating loans under the authority of a Federal, State, or other lending program; and

(D) meet such other requirements as the Administration may establish.

(c) AUTHORITY OF DEVELOPMENT COMPANIES.—The development companies selected under subsection (b) shall, for loans in their portfolio of loans made through debentures guaranteed under title V of the Small Business Investment Act of 1958 that are in default after the date of enactment of this Act, be authorized to—

(1) perform all liquidation and foreclosure functions, including the acceleration or purchase of community injection funds, subject to such company obtaining prior written approval from the Administrator before committing the agency to purchase any other indebtedness secured by the property: Provided, That the Administrator shall approve or deny a request for such purchase within a period of 10 business days; and

(2) liquidate such loans in a reasonable and sound manner and according to commercially accepted practices pursuant to a liquidation plan approved by the administrator in advance of its implementation. If the administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.

(d) AUTHORITY OF THE ADMINISTRATOR.—In carrying out the pilot program, the Administrator shall—

(1) have full authority to rescind the authority granted any development company under this section upon a 10–day written notice stating the reasons for the rescission; and

(2) not later than 90 days after the admission of the development companies specified in subsection (b), implement the pilot program.

(e) REPORT.—

(1) IN GENERAL.—The Administrator shall issue a report on the results of the pilot program to the Committees on Small Business of the House of Representatives and the Senate. The report shall include information relating to—

(A) the total dollar amount of each loan and project liquidated;

(B) the total dollar amount guaranteed by the Administration;

(C) total dollar losses;

(D) total recoveries both as percentage of the amount guaranteed and the total cost of the project; and

(E) a comparison of the pilot program information with the same information for liquidation conducted outside the pilot program over the period of time.

(2) REPORTING PERIOD.—The report shall be based on data from, and issued not later than 90 days after the close of, the first eight 8 fiscal quarters of the pilot program's operation after the date of implementation.

SEC. 205. REGISTRATION OF CERTIFICATES.

<< 15 USCA § 634 >>

(a) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS ACT.—Section 5(h) of the Small Business Act (15 U.S.C. 634(h)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(h)" and inserting "(h)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all loans and trust certificates sold pursuant to subsections (f) and (g) of this section;"; and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates. The Administration may, with the consent of the Secretary of the Treasury, use the book-entry system of the Federal Reserve System.".

<< 15 USCA § 687*l* >>

(b) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS INVESTMENT COMPANY PROGRAM.—Section 321(f) (15 U.S.C. 687*l*(f)) is amended—

(1) in paragraph (1), by striking "Such central registration shall include" and all that follows through the period at the end of the paragraph; and

(2) by adding at the end the following:

"(5) Nothing in this subsection shall prohibit the use of a book-entry or other electronic form of registration for trust certificates.".

<< 15 USCA § 697b >>

(c) CERTIFICATES SOLD PURSUANT TO DEVELOPMENT COMPANY PROGRAM.—Section 505(f) (15 U.S.C. 697b(f)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(f)" and inserting "(f)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all trust certificates sold pursuant to this section;" and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates.".

SEC. 206. PREFERRED SURETY BOND GUARANTEE PROGRAM.

<< 15 USCA § 694b >>

(a) ADMISSIONS OF ADDITIONAL PROGRAM PARTICIPANTS.—Section 411(a) (15 U.S.C. 694(a)) is amended by adding a new paragraph (5), as follows:

"(5)(A) The Administration shall promptly act upon an application from a surety to participate in the Preferred Surety Bond Guarantee Program, authorized by paragraph (3), in accordance with criteria and procedures established in regulations pursuant to subsection (d).

"(B) The Administration is authorized to reduce the allotment of bond guarantee authority or terminate the participation of a surety in the Preferred Surety Bond Guarantee Program based on the rate of participation of such surety during the 4 most recent fiscal year quarters compared to the median rate of participation by the other sureties in the program.".

<< 15 USCA § 694b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply with respect to applications received (or pending substantive evaluation) on or after October 1, 1995.

SEC. 207. SENSE OF THE CONGRESS.

(a) IN GENERAL.—It is the sense of the Congress that the subsidy models prepared by the Office of Management and Budget relative to loan programs sponsored by the United States Small Business Administration have a tendency to—

(1) overestimate potential risks of loss; and

(2) overemphasize historical losses that may be anomalous and do not truly reflect the success of the programs as a whole.

(b) INDEPENDENT STUDY.—Consequently, the Congress mandates the independent study in section 103(h) in an attempt to improve the ability of the Office of Management and Budget to reflect more accurately the budgetary implications of such programs.

SEC. 208. SMALL BUSINESS INVESTMENT COMPANY IMPROVEMENTS.

<< 15 USCA § 662 >>

(a) DEFINITIONS.—

Case 2:21-cv-00067-2   Document 162-7   Filed 09/02/22   Page 788 of 1021   PageID 7658

(1) SMALL BUSINESS CONCERN.—Section 103(5) (15 U.S.C. 662(5)) is amended by inserting before the semicolon the following: ", except that, for purposes of this Act, an investment by a venture capital firm, investment company (including a small business investment company) employee welfare benefit plan or pension plan, or trust, foundation, or endowment that is exempt from Federal income taxation—

"(A) shall not cause a business concern to be deemed not independently owned and operated;

"(B) shall be disregarded in determining whether a business concern satisfies size standards established pursuant to section 3(a)(2) of the Small Business Act; and

"(C) shall be disregarded in determining whether a small business concern is a smaller enterprise".

(2) PRIVATE CAPITAL.—Section 103(9) (15 U.S.C. 662(9)) is amended to read as follows:

"(9) the term 'private capital'—

"(A) means the sum of—

"(i) the paid-in capital and paid-in surplus of a corporate licensee, the contributed capital of the partners of a partnership licensee, or the equity investment of the members of a limited liability company licensee; and

"(ii) unfunded binding commitments, from investors that meet criteria established by the Administrator, to contribute capital to the licensee: Provided, That such unfunded commitments may be counted as private capital for purposes of approval by the Administrator of any request for leverage, but leverage shall not be funded based on such commitments; and

"(B) does not include any—

"(i) funds borrowed by a licensee from any source;

"(ii) funds obtained through the issuance of leverage; or

"(iii) funds obtained directly or indirectly from any Federal, State, or local government, or any government agency or instrumentality, except for—

"(I) funds invested by an employee welfare benefit plan or pension plan; and

"(II) any qualified nonprivate funds (if the investors of the qualified nonprivate funds do not control, directly or indirectly, the management, board of directors, general partners, or members of the licensee);".

(3) NEW DEFINITIONS.—Section 103 (15 U.S.C. 662) is amended by striking paragraph (10) and inserting the following:

"(10) the term 'leverage' includes—

"(A) debentures purchased or guaranteed by the Administration;

"(B) participating securities purchased or guaranteed by the Administration; and

"(C) preferred securities outstanding as of October 1, 1995;

"(11) the term 'third party debt' means any indebtedness for borrowed money, other than indebtedness owed to the Administration;

"(12) the term 'smaller enterprise' means any small business concern that, together with its affiliates—

"(A) has—

"(i) a net financial worth of not more than $6,000,000, as of the date on which assistance is provided under this Act to that business concern; and

"(ii) an average net income for the 2–year period preceding the date on which assistance is provided under this Act to that business concern, of not more than $2,000,000, after Federal income taxes (excluding any carryover losses); or

"(B) satisfies the standard industrial classification size standards established by the Administration for the industry in which the small business concern is primarily engaged;

"(13) the term 'qualified nonprivate funds' means any—

"(A) funds directly or indirectly invested in any applicant or licensee on or before August 16, 1982, by any Federal agency, other than the Administration, under a provision of law explicitly mandating the inclusion of those funds in the definition of the term 'private capital';

"(B) funds directly or indirectly invested in any applicant or licensee by any Federal agency under a provision of law enacted after September 4, 1992, explicitly mandating the inclusion of those funds in the definition of the term 'private capital'; and

"(C) funds invested in any applicant or licensee by one or more State or local government entities (including any guarantee extended by those entities) in an aggregate amount that does not exceed 33 percent of the private capital of the applicant or licensee;

"(14) the terms 'employee welfare benefit plan' and 'pension plan' have the same meanings as in section 3 of the Employee Retirement Income Security Act of 1974, and are intended to include—

"(A) public and private pension or retirement plans subject to such Act; and

"(B) similar plans not covered by such Act that have been established and that are maintained by the Federal Government or any State or political subdivision, or any agency or instrumentality thereof, for the benefit of employees;

"(15) the term 'member' means, with respect to a licensee that is a limited liability company, a holder of an ownership interest or a person otherwise admitted to membership in the limited liability company; and

"(16) the term 'limited liability company' means a business entity that is organized and operating in accordance with a State limited liability company statute approved by the Administration.".

(b) ORGANIZATION OF SMALL BUSINESS INVESTMENT COMPANIES.—

<< 15 USCA § 681 >>

(1) LIMITED LIABILITY COMPANIES.—Section 301(a) (15 U.S.C. 681(a)) is amended in the first sentence, by striking "body or" and inserting "body, a limited liability company, or".

(2) ISSUANCE OF LICENSE.—Section 301(c) (15 U.S.C. 681(c)) is amended to read as follows:

"(c) ISSUANCE OF LICENSE.—

"(1) SUBMISSION OF APPLICATION.—Each applicant for a license to operate as a small business investment company under this Act shall submit to the Administrator an application, in a form and including such documentation as may be prescribed by the Administrator.

"(2) PROCEDURES.—

"(A) STATUS.—Not later than 90 days after the initial receipt by the Administrator of an application under this subsection, the Administrator shall provide the applicant with a written report detailing the status of the application and any requirements remaining for completion of the application.

"(B) APPROVAL OR DISAPPROVAL.—Within a reasonable time after receiving a completed application submitted in accordance with this subsection and in accordance with such requirements as the Administrator may prescribe by regulation, the Administrator shall—

"(i) approve the application and issue a license for such operation to the applicant if the requirements of this section are satisfied; or

"(ii) disapprove the application and notify the applicant in writing of the disapproval.

"(3) MATTERS CONSIDERED.—In reviewing and processing any application under this subsection, the Administrator—

"(A) shall determine whether—

"(i) the applicant meets the requirements of subsections (a) and (c) of section 302; and

"(ii) the management of the applicant is qualified and has the knowledge, experience, and capability necessary to comply with this Act;

"(B) shall take into consideration—

"(i) the need for and availability of financing for small business concerns in the geographic area in which the applicant is to commence business;

"(ii) the general business reputation of the owners and management of the applicant; and

"(iii) the probability of successful operations of the applicant, including adequate profitability and financial soundness; and

"(C) shall not take into consideration any projected shortage or unavailability of leverage.

"(4) EXCEPTION.—

"(A) IN GENERAL.—Notwithstanding any other provision of this Act, the Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, approve an application and issue a license under this subsection with respect to any applicant that—

"(i) has private capital of not less than $3,000,000;

"(ii) would otherwise be issued a license under this subsection, except that the applicant does not satisfy the requirements of section 302(a); and

"(iii) has a viable business plan reasonably projecting profitable operations and a reasonable timetable for achieving a level of private capital that satisfies the requirements of section 302(a).

"(B) LEVERAGE.—An applicant licensed pursuant to the exception provided in this paragraph shall not be eligible to receive leverage as a licensee until the applicant satisfies the requirements of section 302(a).".

(3) SPECIALIZED SMALL BUSINESS INVESTMENT COMPANIES.—

(A) REPEAL.—Section 301(d) (15 U.S.C. 681(d)) is repealed.

<< 15 USCA § 681 NOTE >>

(B) EFFECT ON EXISTING LICENSES.—The repeal under subparagraph (A) shall not be construed to require the Administrator to cancel, revoke, withdraw, or modify any license issued under section 301(d) of the Small Business Investment Act of 1958 before the date of enactment of this Act.

<< 15 USCA § 682 >>

(c) CAPITAL REQUIREMENTS.—

(1) INCREASED MINIMUM CAPITAL REQUIREMENTS.—Section 302(a) (15 U.S.C. 682(a)) is amended by striking "(a)" and all that follows through "The Administration shall also determine the ability of the company," and inserting the following:

"(a) AMOUNT.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the private capital of each licensee shall be not less than—

"(A) $5,000,000, or

"(B) $10,000,000, with respect to each licensee authorized or seeking authority to issue participating securities to be purchased or guaranteed by the Administration under this Act.

"(2) EXCEPTION.—The Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, permit the private capital of a licensee authorized or seeking authorization to issue participating securities to be purchased or guaranteed by the Administration to be less than $10,000,000, but not less than $5,000,000, if the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.

"(3) ADEQUACY.—In addition to the requirements of paragraph (1), the Administrator shall—

"(A) determine whether the private capital of each licensee is adequate to assure a reasonable prospect that the licensee will be operated soundly and profitably, and managed actively and prudently in accordance with its articles; and

"(B) determine that the licensee will be able".

(2) EXEMPTION FOR CERTAIN LICENSEES.—Section 302(a) (15 U.S.C. 682(a)) is amended by adding at the end the following new paragraph:

"(4) EXEMPTION FROM CAPITAL REQUIREMENTS.—The Administrator may, in the discretion of the Administrator, approve leverage for any licensee licensed under subsection (c) or (d) of section 301 before the date of enactment of the Small Business Program Improvement Act of 1996 that does not meet the capital requirements of paragraph (1), if—

"(A) the licensee certifies in writing that not less than 50 percent of the aggregate dollar amount of its financings after the date of enactment of the Small Business Program Improvement Act of 1996 will be provided to smaller enterprises; and

"(B) the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the United States Government.".

(3) DIVERSIFICATION OF OWNERSHIP.—Section 302(c) (15 U.S.C. 682(c)) is amended to read as follows:

"(c) DIVERSIFICATION OF OWNERSHIP.—The Administrator shall ensure that the management of each licensee licensed after the date of enactment of the Small Business Program Improvement Act of 1996 is sufficiently diversified from and unaffiliated with the ownership of the licensee in a manner that ensures independence and objectivity in the financial management and oversight of the investments and operations of the licensee.".

(d) BORROWING.—

<< 15 USCA § 683 >>

(1) DEBENTURES.—Section 303(b) (15 U.S.C. 683(b)) is amended in the first sentence, by striking "(but only" and all that follows through "terms)".

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   **AR03449**   51

(2) THIRD PARTY DEBT.—Section 303(c) (15 U.S.C. 683(c)) is amended to read as follows:

"(c) THIRD PARTY DEBT.—The Administrator—

"(1) shall not permit a licensee having outstanding leverage to incur third party debt that would create or contribute to an unreasonable risk of default or loss to the Federal Government; and

"(2) shall permit such licensees to incur third party debt only on such terms and subject to such conditions as may be established by the Administrator, by regulation or otherwise.".

(3) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—Section 303(d) (15 U.S.C. 683(d)) is amended to read as follows:

"(d) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—The Administrator shall require each licensee, as a condition of approval of an application for leverage, to certify in writing that not less than 20 percent of the aggregate dollar amount of the financings of the licensee will be provided to smaller enterprises.".

(4) CAPITAL IMPAIRMENT REQUIREMENTS.—

(A) IN GENERAL.—Section 303(e) (15 U.S.C. 683(e)) is amended to read as follows:

"(e) CAPITAL IMPAIRMENT.—Before approving any application for leverage submitted by a licensee under this Act, the Administrator—

"(1) shall determine that the private capital of the licensee meets the requirements of section 302(a); and

"(2) shall determine, taking into account the nature of the assets of the licensee, the amount and terms of any third party debt owed by such licensee, and any other factors determined to be relevant by the Administrator, that the private capital of the licensee has not been impaired to such an extent that the issuance of additional leverage would create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.".

<< 15 USCA § 683 NOTE >>

(B) REGULATIONS.—

(i) UNIFORM APPLICABILITY.—Any regulation issued by the Administration to implement section 303(e) of the Small Business Investment Act of 1958 that applies to any licensee with outstanding leverage obtained before the effective date of that regulation, shall apply uniformly to all licensees with outstanding leverage obtained before that effective date.

(ii) DEFINITIONS.—For purposes of this subparagraph, the terms "Administration", "leverage" and "licensee" have the same meanings as in section 103 of the Small Business Investment Act of 1958.

<< 15 USCA § 683 >>

(5) EQUITY INVESTMENT REQUIREMENT.—Section 303(g)(4) (15 U.S.C. 683(g)(4)) is amended by striking "and maintain".

(6) FEES.—Section 303 (15 U.S.C. 683) is amended—

(A) in subsection (b), in the fifth sentence, by striking "1 per centum", and all that follows before the period at the end of the sentence and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration";

(B) in subsection (g)(2), by striking "1 per centum," and all that follows before the period at the end of the paragraph and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration"; and

(C) by adding at the end the following new subsections:

"(i) LEVERAGE FEE.—With respect to leverage granted by the Administration to a licensee, the Administration shall collect from the licensee a nonrefundable fee in an amount equal to 3 percent of the face amount of leverage granted to the licensee, payable upon the earlier of the date of entry into any commitment for such leverage or the date on which the leverage is drawn by the licensee.

"(j) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures and participating securities under this Act.".

<< 15 USCA § 687 >>

(e) LIABILITY OF THE UNITED STATES.—Section 308(e) (15 U.S.C. 687(e)) is amended by striking "Nothing" and inserting "Except as expressly provided otherwise in this Act, nothing".

<< 15 USCA § 687b >>

(f) EXAMINATIONS; VALUATIONS.—

(1) EXAMINATIONS.—Section 310(b) (15 U.S.C. 687b(b)) is amended in the first sentence by inserting "which may be conducted with the assistance of a private sector entity that has both the qualifications to conduct and expertise in conducting such examinations," after "Investment Division of the Administration,".

(2) VALUATIONS.—Section 310(d) (15 U.S.C. 687b(d)) is amended to read as follows:

"(d) VALUATIONS.—

"(1) FREQUENCY OF VALUATIONS.—

"(A) IN GENERAL.—Each licensee shall submit to the Administrator a written valuation of the loans and investments of the licensee not less often than semiannually or otherwise upon the request of the Administrator, except that any licensee with no leverage outstanding shall submit such valuations annually, unless the Administrator determines otherwise.

"(B) MATERIAL ADVERSE CHANGES.—Not later than 30 days after the end of a fiscal quarter of a licensee during which a material adverse change in the aggregate valuation of the loans and investments or operations of the licensee occurs, the licensee shall notify the Administrator in writing of the nature and extent of that change.

"(C) INDEPENDENT CERTIFICATION.—

"(i) IN GENERAL.—Not less than once during each fiscal year, each licensee shall submit to the Administrator the financial statements of the licensee, audited by an independent certified public accountant approved by the Administrator.

"(ii) AUDIT REQUIREMENTS.—Each audit conducted under clause (i) shall include—

"(I) a review of the procedures and documentation used by the licensee in preparing the valuations required by this section; and

"(II) a statement by the independent certified public accountant that such valuations were prepared in conformity with the valuation criteria applicable to the licensee established in accordance with paragraph (2).

"(2) VALUATION CRITERIA.—Each valuation submitted under this subsection shall be prepared by the licensee in accordance with valuation criteria, which shall—

"(A) be established or approved by the Administrator; and

"(B) include appropriate safeguards to ensure that the noncash assets of a licensee are not overvalued.".

(g) TRUSTEE OR RECEIVERSHIP OVER LICENSEES.—

(1) FINDING.—It is the finding of the Congress that increased recoveries on assets in liquidation under the Small Business Investment Act of 1958 are in the best interests of the Federal Government.

(2) DEFINITIONS.—For purposes of this subsection—

(A) the term "Administrator" means the Administrator of the Small Business Administration;

(B) the term "Administration" means the Small Business Administration; and

(C) the term "licensee" has the same meaning as in section 103.

(3) LIQUIDATION PLAN.—

(A) IN GENERAL.—Not later than October 15, 1996, the Administrator shall submit to the Committees on Small Business of the Senate and the House of Representatives a detailed plan to expedite the orderly liquidation of all licensee assets in liquidation, including assets of licensees in receivership or in trust held by or under the control of the Administration or its agents.

(B) CONTENTS.—The plan submitted under paragraph (1) shall include a timetable for liquidating the liquidation portfolio of small business investment company assets owned by the Administration, and shall contain the findings and recommendations of the Administrator on various options providing for the fair and expeditious liquidation of such assets within a reasonable period of time, giving due consideration to the option of entering into one or more contracts with private sector entities having the capability to carry out the orderly liquidation of similar assets.

(h) TECHNICAL AND CONFORMING AMENDMENTS.—

 (1) SMALL BUSINESS INVESTMENT ACT OF 1958.—The Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.) is amended—

<< 15 USCA § 683 >>

 (A) in section 303—

 (i) in subsection (a), by striking "debenture bonds," and inserting "securities,";

 (ii) by striking subsection (f) and inserting the following:

"(f) REDEMPTION OR REPURCHASE OF PREFERRED STOCK.—Notwithstanding any other provision of law—

 "(1) the Administrator may allow the issuer of any preferred stock sold to the Administration before November 1, 1989 to redeem or repurchase such stock, upon the payment to the Administration of an amount less than the par value of such stock, for a repurchase price determined by the Administrator after consideration of all relevant factors, including—

 "(A) the market value of the stock;

 "(B) the value of benefits provided and anticipated to accrue to the issuer;

 "(C) the amount of dividends paid, accrued, and anticipated; and

 "(D) the estimate of the Administrator of any anticipated redemption; and

 "(2) any moneys received by the Administration from the repurchase of preferred stock shall be available solely to provide debenture leverage to licensees having 50 percent or more in aggregate dollar amount of their financings invested in smaller enterprises."; and

 (iii) in subsection (g)(8)—

 (I) by striking "partners or shareholders" and inserting "partners, shareholders, or members";

 (II) by striking "partner's or shareholder's" and inserting "partner's, shareholder's, or member's"; and

 (III) by striking "partner or shareholder" and inserting "partner, shareholder, or member";

<< 15 USCA § 687 >>

 (B) in section 308(h), by striking "subsection (c) or (d) of section 301" each place that term appears and inserting "section 301";

<< 15 USCA § 687b >>

 (C) in section 310(c)(4), by striking "not less than four years in the case of section 301(d) licensees and in all other cases,";

<< 15 USCA § 687d >>

 (D) in section 312—

(i) by striking "shareholders or partners" and inserting "shareholders, partners, or members"; and

(ii) by striking "shareholder, or partner" each place that term appears and inserting "shareholder, partner, or member";

<< 15 USCA §§ 687i, 687j >>

<< 15 USCA §§ 687k, 687*l*, 687m, 80a–18 >>

 (E) by striking sections 317 and 318, and redesignating sections 319 through 322 as sections 317 through 320, respectively;

<< 15 USCA § 687*l* >>

 (F) in section 319, as redesignated—

(i) in subsection (a), by striking ", including companies operating under the authority of section 301(d),"; and

(ii) in subsection (f)(2), by inserting "or investments in obligations of the United States" after "accounts";

<< 15 USCA § 687m >>

(G) in section 320, as redesignated, by striking "section 321" and inserting "section 319"; and

<< 15 USCA § 697f >>

(H) in section 509—
(i) in subsection (a)(1), by striking the second sentence; and
(ii) in subsection (e)(1)(B), by striking "subsection (c) or (d) of section 301" and inserting "section 301".

<< 12 USCA § 1431 >>

(2) AMENDMENT IN OTHER LAW.—Section 11(h) of the Federal Home Loan Bank Act (12 U.S.C. 1431(h)) is amended by striking "301(d)" and inserting "301".
(i) AMENDMENTS TO THE SMALL BUSINESS ACT.—

<< 15 USCA § 634 >>

(1) POWERS OF THE ADMINISTRATOR.—Section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)) is amended by striking the colon and all that follows before the semicolon at the end of the paragraph and inserting the following: ": Provided, That with respect to deferred participation loans, the Administrator may, in the discretion of and pursuant to regulations promulgated by the Administrator, authorize participating lending institutions to take actions relating to loan servicing on behalf of the Administrator, including determining eligibility and creditworthiness and loan monitoring, collection, and liquidation".

<< 15 USCA § 631 NOTE >>

(2) AUTHORIZATION OF APPROPRIATIONS.—Section 20(p)(3) of the Small Business Act (15 U.S.C. 631 note) is amended by striking subparagraph (B) and inserting the following:
"(B) $300,000,000 in guarantees of debentures; and".

<< 15 USCA §§ 80a–18 nt, 631 nt, 634 NOTE, 662 nt, 681 nt, 683 nt, 687 nt, 687b nt, 687c nt, 687d nt, 687i nt, 687j nt, 687k nt, 687*l* nt, 687m nt, 697 nt >>

(j) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on the date of enactment of this Act.

DIVISION E

TITLE I—CALIFORNIA BAY–DELTA ENVIRONMENTAL ENHANCEMENT AND WATER SECURITY ACT

Sec. 101. Short Title.
This title may be cited as the "California Bay–Delta Environmental Enhancement and Water Security Act."
Sec. 102. Program Funding.
(a) Authorization of Appropriations.—For each of the fiscal years 1998, 1999 and 2000, there are authorized to be appropriated an additional $143,300,000 for both (1) the initial Federal share of the cost of developing and implementing that portion of an ecosystem protection plan for the Bay–Delta, referred to as "the Category III program" emanating out of the document entitled "Principles for Agreement on Bay–Delta Standards Between the State of California and the Federal Government," dated December 15, 1994, and, (2) the initial Federal share of the cost of developing and implementing the ecosystem restoration elements of the long-term CALFED Bay–Delta Program, pursuant to the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Funds appropriated pursuant to this section shall remain available until expended and shall be administered in accordance with procedures established by CALFED Bay–Delta Program until Congress authorizes another entity that is recommended by CALFED Bay–Delta Program to carry out this section.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(b) Funds authorized to be appropriated pursuant to this section to those agencies that are currently or subsequently become participants in the CALFED Bay–Delta Program shall be in addition to the baseline funding levels established pursuant to section 103 of this title, for currently authorized projects and programs under the Central Valley Project Improvement Act, Title 34 of Public Law 102–575 and other currently authorized Federal programs for the purpose of Bay–Delta ecosystem protection and restoration.

(c) Nothing in this title shall be deemed to diminish the Federal interest in and responsibility for working with the State of California through the CALFED Bay–Delta Program in developing, funding and implementing a balanced, long-term solution to the problems of ecosystem quality, water quality, water supply and reliability, and system vulnerability affecting the San Francisco Bay/Sacramento–San Joaquin Delta Watershed in California. Participation in such long-term solution shall only be undertaken pursuant to authorization provided by law other than this title, and shall be based on the equitable allocation of program costs among beneficiary groups that the CALFED Bay–Delta programs shall develop.

(d) To the extent not otherwise authorized, those agencies and departments that are currently or subsequently become participants in the CALFED Bay–Delta Program are hereby authorized to undertake the activities and programs for which Federal cost sharing is provided by this section. The United States shall immediately initiate coordinated consultations and negotiations with the State of California to expeditiously execute the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Such activities shall include, but not be limited to, planning, design, technical assistance and construction for ecosystem restoration programs and projects.

SEC. 103. BUDGET CROSSCUT.—The Office of Management and Budget is directed to submit to the House and Senate Committees on Appropriations, as part of the President's Fiscal Year 1998 Budget, an interagency budget crosscut that displays Federal spending for fiscal years 1993 through 1998 on ecosystem restoration and other purposes in the Bay–Delta region, separately showing funding provided previously or requested under both preexisting authorities and new authorities granted by this title.

SEC. 104. EFFECTIVE DATE.—Section 102 of this title shall take effect on the date of passage of California State Proposition 204.

This Act may be cited as the "Omnibus Consolidated Appropriations Act, 1997".

Approved September 30, 1996.

PL 104–208, 1996 HR 3610

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. AR03454 56

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter I. General Provisions (Refs & Annos)

8 U.S.C.A. § 1103

§ 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

Effective: December 22, 2009

Currentness

<For Memorandum of the President, "Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)", see Presidential Memorandum, January 20, 2021, 86 F.R. 7051.>

**(a) Secretary of Homeland Security**

**(1)** The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

**(2)** He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

**(3)** He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

**(4)** He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

**(5)** He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

**(6)** He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 797 of 1021   PageID 7667

**(7)** He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

**(8)** After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

**(9)** Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

**(10)** In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

**(11)** The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized--

**(A)** to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

**(B)** to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

**(1)** The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

**(2)** The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 798 of 1021   PageID 7668

**(3)** When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of Title 40.

**(4)** The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

**(1)** The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

**(2)** Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

**(3)** Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

**(1)** The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

**(2)** Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

## CREDIT(S)

(June 27, 1952, c. 477, Title I, § 103, 66 Stat. 173; Pub.L. 100-525, § 9(c), Oct. 24, 1988, 102 Stat. 2619; Pub.L. 101-649, Title I, § 142, Nov. 29, 1990, 104 Stat. 5004; Pub.L 104-208, Div. C, Title I, §§ 102(d), 125, 134(a), Title III, §§ 308(d)(4)(C), (e)(4), 372, 373, Sept. 30, 1996, 110 Stat. 3009-555, 3009-562, 3009-564, 3009-618, 3009-620, 3009-646, 3009-647; Pub.L. 107-296, Title XI, § 1102, Nov. 25, 2002, 116 Stat. 2273; Pub.L. 108-7, Div. L, § 105(a)(1), (2), Feb. 20, 2003, 117 Stat. 531; Pub.L. 108-458, Title V, § 5505(a), Dec. 17, 2004, 118 Stat. 3741; Pub.L. 111-122, § 2(a), Dec. 22, 2009, 123 Stat. 3480.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12656

Attorney General to develop national security emergency plans for regulation of immigration, regulation of nationals of enemy countries,and plans to implement laws for control of persons entering or leaving the United States, see section 1101(4) of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under 42 U.S.C.A. § 5195.

### EXECUTIVE ORDER NO. 13404

<June 7, 2006, 71 F.R. 33593>

### Task Force on New Americans

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to strengthen the efforts of the Department of Homeland Security and Federal, State, and local agencies to help legal immigrants embrace the common core of American civic culture, learn our common language, and fully become Americans, it is hereby ordered as follows:

**Section 1. Establishment.** The Secretary of Homeland Security (Secretary) shall immediately establish within the Department of Homeland Security (Department) a Task Force on New Americans (Task Force).

**Sec. 2. Membership and Operation. (a)** The Task Force shall be limited to the following members or employees designated by them at no lower than the Assistant Secretary level or its equivalent:

**(i)** the Secretary of Homeland Security, who shall serve as Chair;

**(ii)** the Secretary of State;

**(iii)** the Secretary of the Treasury;

**(iv)** the Secretary of Defense;

**(v)** the Attorney General;

**(vi)** the Secretary of Agriculture;

**(vii)** the Secretary of Commerce;

**(viii)** the Secretary of Labor;

**(ix)** the Secretary of Health and Human Services;

**(x)** the Secretary of Housing and Urban Development;

**(xi)** the Secretary of Education;

**(xii)** such other officers or employees of the Department of Homeland Security as the Secretary may from time to time designate; and

**(xiii)** such other officers of the United States as the Secretary may designate from time to time, with the concurrence of the respective heads of departments and agencies concerned.

**(b)** The Secretary shall convene and preside at meetings of the Task Force, direct its work, and as appropriate, establish and direct subgroups of the Task Force that shall consist exclusively of Task Force members. The Secretary shall designate an official of the Department to serve as the Executive Secretary of the Task Force, and the Executive Secretary shall head the staff assigned to the Task Force.

**Sec. 3. Functions.** Consistent with applicable law, the Task Force shall:

**(a)** provide direction to executive departments and agencies (agencies) concerning the integration into American society of America's legal immigrants, particularly through instruction in English, civics, and history;

**(b)** promote public-private partnerships that will encourage businesses to offer English and civics education to workers;

**(c)** identify ways to expand English and civics instruction for legal immigrants, including through faith-based, community, and other groups, and ways to promote volunteer community service; and

**(d)** make recommendations to the President, through the Secretary, from time to time regarding:

**(i)** actions to enhance cooperation among agencies on the integration of legal immigrants into American society;

**(ii)** actions to enhance cooperation among Federal, State, and local authorities responsible for the integration of legal immigrants;

**(iii)** changes in rules, regulations, or policy to improve the effective integration of legal immigrants into American society; and

**(iv)** proposed legislation relating to the integration of legal immigrants into American society.

**Sec. 4. Administration. (a)** To the extent permitted by law, the Department shall provide the funding and administrative support the Task Force needs to implement this order, as determined by the Secretary.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** authority granted by law to an agency or the head thereof; or

**(ii)** functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is intended to improve the internal management of the Federal Government. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity against the United States, its departments, agencies, entities, instrumentalities, officers, employees, agents, or any other person.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13767

Ex. Ord. No. 13767, Jan. 25, 2017, 82 F.R. 8793, which related to increased security on the southern border and removal of immigrants, was revoked by Ex. Ord. No. 14010, § 4(a)(ii)(F)(1), Feb 2, 2021, 86 F.R. 8270.

### EXECUTIVE ORDER NO. 13768

Ex. Ord. No. 13768, Jan. 25, 2017, 82 F.R. 8799, relating to enhancing public safety in the interior of the United States, was revoked by Ex. Ord. No. 13993, Jan. 20, 2021, 86 F.R. 7051.

### EXECUTIVE ORDER NO. 13841

Ex. Ord. No. 13841, June 20, 2018, 83 F.R. 29345, which related to detention and separation of immigrant families, was revoked by Ex. Ord. No. 14011, §6, Feb. 2, 2021, 86 F.R. 8274.

### EXECUTIVE ORDER NO. 13993

<January 20, 2021, 86 F.R. 7051>

**Revision of Civil Immigration Enforcement Policies and Priorities**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** Immigrants have helped strengthen America's families, communities, businesses and workforce, and economy, infusing the United States with creativity, energy, and ingenuity. The task of enforcing the immigration laws is complex and requires setting priorities to best serve the national interest. The policy of my Administration is to protect national and border security, address the humanitarian challenges at the southern border, and ensure public health and safety. We must also adhere to due process of law as we safeguard the dignity and well-being of all families and communities. My Administration will reset the policies and practices for enforcing civil immigration laws to align enforcement with these values and priorities.

**Sec. 2. Revocation.** Executive Order 13768 of January 25, 2017 (Enhancing Public Safety in the Interior of the United States), is hereby revoked. The Secretary of State, the Attorney General, the Secretary of Homeland Security, the Director of the Office of Management and Budget, the Director of the Office of Personnel Management, and the heads of any other relevant executive departments and agencies (agencies) shall review any agency actions developed pursuant to Executive Order 13768 and take action, including issuing revised guidance, as appropriate and consistent with applicable law, that advances the policy set forth in section 1 of this order.

**Sec. 3. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">J.R. BIDEN JR.</div>

### EXECUTIVE ORDER NO. 14010

<div align="center"><February 2, 2021, 86 F.R. 8267></div>

**Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., it is hereby ordered as follows:

**Section 1. Policy.** For generations, immigrants have come to the United States with little more than the clothes on their backs, hope in their hearts, and a desire to claim their own piece of the American Dream. These mothers, fathers, sons, and daughters have made our Nation better and stronger.

The United States is also a country with borders and with laws that must be enforced. Securing our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is true. We cannot solve the humanitarian crisis at our

AR03461   7

border without addressing the violence, instability, and lack of opportunity that compel so many people to flee their homes. Nor is the United States safer when resources that should be invested in policies targeting actual threats, such as drug cartels and human traffickers, are squandered on efforts to stymie legitimate asylum seekers.

Consistent with these principles, my Administration will implement a multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values. We will work closely with civil society, international organizations, and the governments in the region to: establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. At the same time, the United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.

**Sec. 2. United States Strategies for Addressing the Root Causes of Irregular Migration and for Collaboratively Managing Migration in the Region. (a)** The Assistant to the President for National Security Affairs (APNSA), in coordination with the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of any other relevant executive departments and agencies, shall as soon as possible prepare:

**(i)** the United States Strategy for Addressing the Root Causes of Migration (the "Root Causes Strategy"); and

**(ii)** the United States Strategy for Collaboratively Managing Migration in the Region (the "Collaborative Management Strategy").

**(b)** The Root Causes Strategy shall identify and prioritize actions to address the underlying factors leading to migration in the region and ensure coherence of United States Government positions. The Root Causes Strategy shall take into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society, and it shall include proposals to:

**(i)** coordinate place-based efforts in El Salvador, Guatemala, and Honduras (the "Northern Triangle") to address the root causes of migration, including by:

**(A)** combating corruption, strengthening democratic governance, and advancing the rule of law;

**(B)** promoting respect for human rights, labor rights, and a free press;

**(C)** countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations;

**(D)** combating sexual, gender-based, and domestic violence; and

**(E)** addressing economic insecurity and inequality;

**(ii)** consult and collaborate with the Office of the United States Trade Representative, the Secretary of Commerce, and the Secretary of Labor to evaluate compliance with the Dominican Republic-Central America Free Trade Agreement to ensure that unfair labor practices do not disadvantage competition; and

**(iii)** encourage the deployment of Northern Triangle domestic resources and the development of Northern Triangle domestic capacity to replicate and scale efforts to foster sustainable societies across the region.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 804 of 1021   PageID 7674

**(c)** The Collaborative Management Strategy shall identify and prioritize actions to strengthen cooperative efforts to address migration flows, including by expanding and improving upon previous efforts to resettle throughout the region those migrants who qualify for humanitarian protection. The Collaborative Management Strategy should focus on programs and infrastructure that facilitate access to protection and other lawful immigration avenues, in both the United States and partner countries, as close to migrants' homes as possible. Priorities should include support for expanding pathways through which individuals facing difficult or dangerous conditions in their home countries can find stability and safety in receiving countries throughout the region, not only through asylum and refugee resettlement, but also through labor and other non-protection-related programs. To support the development of the Collaborative Management Strategy, the United States Government shall promptly begin consultations with civil society, the private sector, international organizations, and governments in the region, including the Government of Mexico. These consultations should address:

**(i)** the continued development of asylum systems and resettlement capacities of receiving countries in the region, including through the provision of funding, training, and other support;

**(ii)** the development of internal relocation and integration programs for internally displaced persons, as well as return and reintegration programs for returnees in relevant countries of the region; and

**(iii)** humanitarian assistance, including through expansion of shelter networks, to address the immediate needs of individuals who have fled their homes to seek protection elsewhere in the region.

**Sec. 3. Expansion of Lawful Pathways for Protection and Opportunity in the United States. (a)** The Secretary of State and the Secretary of Homeland Security shall promptly review mechanisms for better identifying and processing individuals from the Northern Triangle who are eligible for refugee resettlement to the United States. Consideration shall be given to increasing access and processing efficiency. As part of this review, the Secretary of State and the Secretary of Homeland Security shall also identify and implement all legally available and appropriate forms of relief to complement the protection afforded through the United States Refugee Admissions Program. The Secretary of State and Secretary of Homeland Security shall submit a report to the President with the results of the review.

**(b)** As part of the review conducted pursuant to section 3(a) of this order, the Secretary of Homeland Security shall:

**(i)** consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program, see "Termination of the Central American Minors Parole Program," 82 FR 38,926 (August 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program; and

**(ii)** consider promoting family unity by exercising the Secretary's discretionary parole authority to permit certain nationals of the Northern Triangle who are the beneficiaries of approved family-sponsored immigrant visa petitions to join their family members in the United States, on a case-by-case basis.

**(c)** The Secretary of State and the Secretary of Homeland Security shall promptly evaluate and implement measures to enhance access for individuals from the Northern Triangle to visa programs, as appropriate and consistent with applicable law.

**Sec. 4. Restoring and Enhancing Asylum Processing at the Border. (a)** Resuming the Safe and Orderly Processing of Asylum Claims at United States Land Borders.

**(i)** The Secretary of Homeland Security and the Director of the Centers for Disease Control and Prevention (CDC), in coordination with the Secretary of State, shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders, consistent with public health and safety and capacity constraints.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 805 of 1021   PageID 7675

**(ii)** The Secretary of Homeland Security, in consultation with the Attorney General, the Secretary of Health and Human Services (HHS), and the Director of CDC, shall promptly begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints. Additionally, in furtherance of this goal, as appropriate and consistent with applicable law:

**(A)** The Secretary of HHS and the Director of CDC, in consultation with the Secretary of Homeland Security, shall promptly review and determine whether termination, rescission, or modification of the following actions is necessary and appropriate: "Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists," 85 FR 65,806 (October 13, 2020); and "Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes," 85 FR 56,424 (September 11, 2020) (codified at 42 CFR 71.40).

**(B)** The Secretary of Homeland Security shall promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols (MPP), including by considering whether to rescind the Memorandum of the Secretary of Homeland Security titled "Policy Guidance for Implementation of the Migrant Protection Protocols" (January 25, 2019), and any implementing guidance. In coordination with the Secretary of State, the Attorney General, and the Director of CDC, the Secretary of Homeland Security shall promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.

**(C)** The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims," 83 FR 55,934 (November 9,2018), and the final rule titled "Asylum Eligibility and Procedural Modifications," 85 FR 82,260 (December 17, 2020), as well as any agency memoranda or guidance that were issued in reliance on those rules.

**(D)** The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act," 84 FR 63,994 (November 19, 2019), as well as any agency memoranda or guidance issued in reliance on that rule. In the interim, the Secretary of State shall promptly consider whether to notify the governments of the Northern Triangle that, as efforts to establish a cooperative, mutually respectful approach to managing migration across the region begin, the United States intends to suspend and terminate the following agreements:

**(1)** "Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims," 84 FR 64,095 (July 26, 2019).

**(2)** "Agreement Between the Government of the United States of America and the Government of the Republic of El Salvador for Cooperation in the Examination of Protection Claims," 85 FR 83,597 (September 20, 2019).

**(3)** "Agreement Between the Government of the United States of America and the Government of the Republic of Honduras for Cooperation in the Examination of Protection Claims," 85 FR 25,462 (September 25, 2019).

**(E)** The Secretary of Homeland Security shall promptly cease implementing the "Prompt Asylum Case Review" program and the "Humanitarian Asylum Review Program" and consider rescinding any orders, rules, regulations, guidelines or policies implementing those programs.

**(F)** The following Presidential documents are revoked:

**(1)** Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements).

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 806 of 1021   PageID 7676

**(2)** Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States).

**(3)** Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System).

**(4)** Presidential Memorandum of April 6, 2018 (Ending "Catch and Release" at the Border of the United States and Directing Other Enhancements to Immigration Enforcement).

**(5)** Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States).

**(G)** The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take steps to rescind any agency memoranda or guidance issued in reliance on or in furtherance of any directive revoked by section 4(a)(ii)(F) of this order.

**(b)** Ensuring a Timely and Fair Expedited Removal Process.

**(i)** The Secretary of Homeland Security, with support from the United States Digital Service within the Office of Management and Budget, shall promptly begin a review of procedures for individuals placed in expedited removal proceedings at the United States border. Within 120 days of the date of this order, the Secretary of Homeland Security shall submit a report to the President with the results of this review and recommendations for creating a more efficient and orderly process that facilitates timely adjudications and adherence to standards of fairness and due process.

**(ii)** The Secretary of Homeland Security shall promptly review and consider whether to modify, revoke, or rescind the designation titled "Designating Aliens for Expedited Removal," 84 FR 35,409 (July 23, 2019), regarding the geographic scope of expedited removal pursuant to INA section 235(b)(1), 8 U.S.C. 1225(b)(1), consistent with applicable law. The review shall consider our legal and humanitarian obligations, constitutional principles of due process and other applicable law, enforcement resources, the public interest, and any other factors consistent with this order that the Secretary deems appropriate. If the Secretary determines that modifying, revoking, or rescinding the designation is appropriate, the Secretary shall do so through publication in the Federal Register.

**(c)** Asylum Eligibility. The Attorney General and the Secretary of Homeland Security shall:

**(i)** within 180 days of the date of this order, conduct a comprehensive examination of current rules, regulations, precedential decisions, and internal guidelines governing the adjudication of asylum claims and determinations of refugee status to evaluate whether the United States provides protection for those fleeing domestic or gang violence in a manner consistent with international standards; and

**(ii)** within 270 days of the date of this order, promulgate joint regulations, consistent with applicable law, addressing the circumstances in which a person should be considered a member of a "particular social group," as that term is used in 8 U.S.C. 1101(a)(42)(A), as derived from the 1951 Convention relating to the Status of Refugees and its 1967 Protocol.

**Sec. 5. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 807 of 1021   PageID 7677

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">J.R. BIDEN JR.</div>

### EXECUTIVE ORDER NO. 14011

<div align="center">&lt;February 2, 2021, 86 F.R. 8273&gt;</div>

<div align="center">

**Establishment of Interagency Task Force on the Reunification of Families**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to reunite children separated from their families at the United States-Mexico border, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States. My Administration condemns the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians (families), including through the use of the Zero-Tolerance Policy. My Administration will protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law.

**Sec. 2. Establishment.** There is hereby established an Interagency Task Force on the Reunification of Families (Task Force).

**Sec. 3. Membership. (a)** The Task Force shall include the following members or their designees:

**(i)** the Secretary of Homeland Security, who shall serve as Chair;

**(ii)** the Secretary of State, who shall serve as a Vice Chair;

**(iii)** the Secretary of Health and Human Services, who shall serve as a Vice Chair;

**(iv)** the Attorney General;

**(v)** such other officers or employees of the Departments of State, Justice, Health and Human Services, and Homeland Security, as the head of each respective department may designate; and

**(vi)** such other officers or employees of executive departments and agencies (agencies) as the Chair or Vice Chairs may invite to participate, with the concurrence of the head of the agency concerned.

**(b)** The Chair shall convene and preside at meetings of the Task Force. The Chair, in consultation with the Vice Chairs, shall direct its work and, as appropriate, establish and direct subgroups of the Task Force.

**Sec. 4. Functions.** The Task Force shall, consistent with applicable law, perform the following functions:

**(a)** Identifying all children who were separated from their families at the United States-Mexico border between January 20, 2017, and January 20, 2021, in connection with the operation of the Zero-Tolerance Policy;

**(b)** To the greatest extent possible, facilitating and enabling the reunification of each of the identified children with their families by:

**(i)** providing recommendations to heads of agencies concerning the exercise of any agency authorities necessary to reunite the children with their families, including:

**(A)** recommendations regarding the possible exercise of parole under section 212(d)(5)(A) of the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1182(d)(5)(A)), or the issuance of visas or other immigration benefits, as appropriate and consistent with applicable law;

**(B)** recommendations regarding the provision of additional services and support to the children and their families, including trauma and mental health services; and

**(C)** recommendations regarding reunification of any additional family members of the children who were separated, such as siblings, where there is a compelling humanitarian interest in doing so;

**(ii)** providing recommendations to the President concerning the exercise of any Presidential authorities necessary to reunite the children with their families, as appropriate and consistent with applicable law; and

**(iii)** for purposes of developing the recommendations described in this subsection, and in particular with respect to recommendations regarding the manner and location of reunification, consulting with the children, their families, representatives of the children and their families, and other stakeholders, and considering the families' preferences and parental rights as well as the children's well-being; and

**(c)** Providing regular reports to the President, including:

**(i)** an initial progress report no later than 120 days after the date of this order;

**(ii)** interim progress reports every 60 days thereafter;

**(iii)** a report containing recommendations to ensure that the Federal Government will not repeat the policies and practices leading to the separation of families at the border, no later than 1 year after the date of this order; and

**(iv)** a final report when the Task Force has completed its mission.

**Sec. 5. Task Force Administration. (a)** To the extent permitted by law, and subject to the availability of appropriations, the Department of Homeland Security shall provide the funding and administrative support the Task Force needs to implement this order, as determined by the Secretary of Homeland Security.

**(b)** To the extent permitted by law, including the Economy Act (31 U.S.C. 1535), and subject to the availability of appropriations, additional agencies represented on the Task Force may detail staff to the Task Force, or otherwise provide administrative support, as necessary to implement this order, as determined by the respective heads of agencies.

**(c)** The Task Force shall coordinate, as appropriate and consistent with applicable law, with relevant stakeholders, including domestic and international non-governmental organizations, and representatives of the children and their families.

**(d)** The Task Force, at the direction of the Chair, may hold public meetings and engagement sessions as necessary to carry out its mission.

**(e)** The Task Force shall terminate 30 days after it provides its final report to the President under section 4(c)(iv) of this order.

**Sec. 6. Revocation of Executive Order 13841.** Executive Order 13841 of June 20, 2018 (Affording Congress an Opportunity To Address Family Separation), is hereby revoked.

**Sec. 7. Definitions.** For purposes of this order:

**(a)** The term "children" includes all persons who were under the age of 18 at the time they were separated from their families at the border.

**(b)** The term "Zero-Tolerance Policy" means the policy discussed in the Attorney General's memorandum of April 6, 2018, entitled, "Zero-Tolerance for Offenses Under 8 U.S.C. 1325(a)," and any other related policy, program, practice, or initiative resulting in the separation of children from their families at the United States-Mexico border.

**Sec. 8. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">J.R. BIDEN JR.</div>

## EXECUTIVE ORDER NO. 14012

<div align="center">&lt;February 2, 2021, 86 F.R. 8277&gt;</div>

### Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** Over 40 million foreign-born individuals live in the United States today. Millions more Americans have immigrants in their families or ancestry. New Americans and their children fuel our economy, working in every industry, including healthcare, construction, caregiving, manufacturing, service, and agriculture. They open and successfully run businesses at high rates, creating jobs for millions, and they contribute to our arts, culture, and government, providing new traditions, customs, and viewpoints. They are essential workers helping to keep our economy afloat and providing important services to Americans during a global pandemic. They have helped the United States lead the world in science, technology, and innovation. And they are on the frontlines of research to develop coronavirus disease 2019 (COVID-19) vaccines and treatments for those afflicted with the deadly disease.

Consistent with our character as a Nation of opportunity and of welcome, it is essential to ensure that our laws and policies encourage full participation by immigrants, including refugees, in our civic life; that immigration processes and other benefits are delivered effectively and efficiently; and that the Federal Government eliminates sources of fear and other barriers that prevent immigrants from accessing government services available to them. Our Nation is enriched socially and economically by the presence of immigrants, and we celebrate with them as they take the important step of becoming United States citizens. The Federal Government should develop welcoming strategies that promote integration, inclusion, and citizenship, and it should embrace the full participation of the newest Americans in our democracy.

**Sec. 2. Role of the Domestic Policy Council.** The role of the White House Domestic Policy Council (DPC) is to convene executive departments and agencies (agencies) to coordinate the formulation and implementation of my Administration's domestic policy objectives. Consistent with that role, the DPC shall coordinate the Federal Government's efforts to welcome and support immigrants, including refugees, and to catalyze State and local integration and inclusion efforts. In furtherance of these goals, the DPC shall convene a Task Force on New Americans, which shall include members of agencies that implement policies that impact immigrant communities.

**Sec. 3. Restoring Trust in our Legal Immigration System.** The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall review existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that may be inconsistent with the policy set forth in section 1 of this order.

**(a)** In conducting this review, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall:

**(i)** identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law; and

**(ii)** identify any agency actions that fail to promote access to the legal immigration system_such as the final rule entitled, ""U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements," 85 Fed. Reg. 46788 (Aug. 3, 2020), in light of the Emergency Stopgap USCIS Stabilization Act (title I of division D of Public Law 116-159)_and recommend steps, as appropriate and consistent with applicable law, to revise or rescind those agency actions.

**(b)** Within 90 days of the date of this order, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a plan to the President describing the steps their respective agencies will take to advance the policy set forth in section 1 of this order.

**(c)** Within 180 days of submitting the plan described in subsection (b) of this section, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing the progress of their respective agencies towards implementing the plan developed pursuant to subsection (b) of this section and recognizing any areas of concern or barriers to implementing the plan.

**Sec. 4. Immediate Review of Agency Actions on Public Charge Inadmissibility.** The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of other relevant agencies, as appropriate, shall review all agency actions related to implementation of the public charge ground of inadmissibility in section 212(a)(4) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a)(4), and the related ground of deportability in section 237(a)(5) of the INA, 8 U.S.C. 1227(a)(5). They shall, in considering the effects and implications of public charge policies, consult with the heads of relevant agencies, including the Secretary of Agriculture, the Secretary of Health and Human Services, and the Secretary of Housing and Urban Development.

**(a)** This review should:

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 811 of 1021   PageID 7681

**(i)** consider and evaluate the current effects of these agency actions and the implications of their continued implementation in light of the policy set forth in section 1 of this order;

**(ii)** identify appropriate agency actions, if any, to address concerns about the current public charge policies' effect on the integrity of the Nation's immigration system and public health; and

**(iii)** recommend steps that relevant agencies should take to clearly communicate current public charge policies and proposed changes, if any, to reduce fear and confusion among impacted communities.

**(b)** Within 60 days of the date of this order, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing any agency actions identified pursuant to subsection (a)(ii) of this section and any steps their agencies intend to take or have taken, consistent with subsection (a)(iii) of this section.

**Sec. 5. Promoting Naturalization.**

**(a)** Improving the naturalization process. The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall, within 60 days of the date of this order, develop a plan describing any agency actions, in furtherance of the policy set forth in section 1 of this order, that they will take to:

**(i)** eliminate barriers in and otherwise improve the existing naturalization process, including by conducting a comprehensive review of that process with particular emphasis on the N-400 application, fingerprinting, background and security checks, interviews, civics and English language tests, and the oath of allegiance;

**(ii)** substantially reduce current naturalization processing times;

**(iii)** make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee and restoration of the fee waiver process;

**(iv)** facilitate naturalization for eligible candidates born abroad and members of the military, in consultation with the Department of Defense; and

**(v)** review policies and practices regarding denaturalization and passport revocation to ensure that these authorities are not used excessively or inappropriately.

**(b)** **Implementing improvements to the naturalization process.** Within 180 days of the issuance of the plan developed pursuant to subsection (a) of this section, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing the progress in implementing the plan, any barriers to implementing the plan, and any additional areas of concern that should be addressed to ensure that eligible individuals are able to apply for naturalization in a fair and efficient manner.

**(c)** Strategy to promote naturalization. There is established an Interagency Working Group on Promoting Naturalization (Naturalization Working Group) to develop a national strategy to promote naturalization. The Naturalization Working Group shall be chaired by the Secretary of Homeland Security, or the Secretary's designee, and it shall include the heads of the following agencies, or senior-level officials designated by the head of each agency:

**(i)** the Secretary of Labor;

**(ii)** the Secretary of Health and Human Services;

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 812 of 1021   PageID 7682

**(iii)** the Secretary of Housing and Urban Development;

**(iv)** the Secretary of Education;

**(v)** the Secretary of Homeland Security;

**(vi)** the Commissioner of Social Security; and

**(vii)** the heads of other agencies invited to participate by the Working Group chair.

**(d)** Within 90 days of the date of this order, the Naturalization Working Group shall submit a strategy to the President outlining steps the Federal Government should take to promote naturalization, including the potential development of a public awareness campaign.

**Sec. 6. Revocation.** The Presidential Memorandum of May 23, 2019 (Enforcing the Legal Responsibilities of Sponsors of Aliens), is revoked. The heads of relevant agencies shall review any investigations or compliance actions initiated pursuant to that memorandum and shall determine whether to suspend, as appropriate, any investigations or compliance actions inconsistent with the policy set forth in section 1 of this order. The heads of relevant agencies shall review any agency actions developed pursuant to that memorandum and, as appropriate, issue revised guidance consistent with the policy set forth in section 1 of this order.

**Sec. 7. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN JR.

<div align="center">

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

&lt;November 21, 2014, 79 F.R. 70765&gt;

</div>

<div align="center">

**Creating Welcoming Communities and Fully Integrating Immigrants and Refugees**

</div>

Memorandum for the Heads of Executive Departments and Agencies

Our country has long been a beacon of hope and opportunity for people from around the world. Nearly 40 million foreign-born residents nationwide contribute to their communities every day, including 3 million refugees who have resettled here since 1975. These new Americans significantly improve our economy. They make up 13 percent of the population, but are over 16

percent of the labor force and start 28 percent of all new businesses. Moreover, immigrants or their children have founded more than 40 percent of Fortune 500 companies, which collectively employ over 10 million people worldwide and generate annual revenues of $4.2 trillion.

By focusing on the civic, economic, and linguistic integration of new Americans, we can help immigrants and refugees in the United States contribute fully to our economy and their communities. Civic integration provides new Americans with security in their rights and liberties. Economic integration empowers immigrants to be self-sufficient and allows them to give back to their communities and contribute to economic growth. English language acquisition allows new Americans to attain employment or career advancement and be more active civic participants.

Our success as a Nation of immigrants is rooted in our ongoing commitment to welcoming and integrating newcomers into the fabric of our country. It is important that we develop a Federal immigrant integration strategy that is innovative and competitive with those of other industrialized nations and supports mechanisms to ensure that our Nation's diverse people are contributing to society to their fullest potential.

Therefore, I am establishing a White House Task Force on New Americans, an interagency effort to identify and support State and local efforts at integration that are working and to consider how to expand and replicate successful models. The Task Force, which will engage with community, business, and faith leaders, as well as State and local elected officials, will help determine additional steps the Federal Government can take to ensure its programs and policies are serving diverse communities that include new Americans.

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order as follows:

**Section 1. White House Task Force on New Americans. (a)** There is established a White House Task Force on New Americans (Task Force) to develop a coordinated Federal strategy to better integrate new Americans into communities and support State and local efforts to do the same. It shall be co-chaired by the Director of the Domestic Policy Council and Secretary of Homeland Security, or their designees. In addition to the Co-Chairs, the Task Force shall consist of the following members:

**(i)** the Secretary of State;

**(ii)** the Attorney General;

**(iii)** the Secretary of Agriculture;

**(iv)** the Secretary of Commerce;

**(v)** the Secretary of Labor;

**(vi)** the Secretary of Health and Human Services;

**(vii)** the Secretary of Housing and Urban Development;

**(viii)** the Secretary of Transportation;

**(ix)** the Secretary of Education;

**(x)** the Chief Executive Officer of the Corporation for National and Community Service;

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 814 of 1021   PageID 7684

**(xi)** the Director of the Office of Management and Budget;

**(xii)** the Administrator of the Small Business Administration;

**(xiii)** the Senior Advisor and Assistant to the President for Intergovernmental Affairs and Public Engagement;

**(xiv)** the Director of the National Economic Council;

**(xv)** the Assistant to the President for Homeland Security and Counterterrorism; and

**(xvi)** the Director of the Office of Science and Technology Policy.

**(b)** A member of the Task Force may designate a senior-level official who is from the member's department, agency, or office, and is a full-time officer or employee of the Federal Government, to perform day-to-day Task Force functions of the member. At the direction of the Co-Chairs, the Task Force may establish subgroups consisting exclusively of Task Force members or their designees under this subsection, as appropriate.

**(c)** The Secretary of Homeland Security shall appoint an Executive Director who will determine the Task Force's agenda, convene regular meetings of the Task Force, and supervise work under the direction of the Co-Chairs. The Department of Homeland Security shall provide funding and administrative support for the Task Force to the extent permitted by law and subject to the availability of appropriations. Each executive department or agency shall bear its own expenses for participating in the Task Force.

**Sec. 2. Mission and Function of the Task Force. (a)** The Task Force shall, consistent with applicable law, work across executive departments and agencies to:

**(i)** review the policies and programs of all relevant executive departments and agencies to ensure they are responsive to the needs of new Americans and the receiving communities in which they reside, and identify ways in which such programs can be used to increase meaningful engagement between new Americans and the receiving community;

**(ii)** identify and disseminate best practices at the State and local level;

**(iii)** provide technical assistance, training, or other support to existing Federal grantees to increase their coordination and capacity to improve long-term integration and foster welcoming community climates;

**(iv)** collect and disseminate immigrant integration data, policies, and programs that affect numerous executive departments and agencies, as well as State and local governments and nongovernmental actors;

**(v)** conduct outreach to representatives of nonprofit organizations, State and local government agencies, elected officials, and other interested persons that can assist with the Task Force's development of recommendations;

**(vi)** work with Federal, State, and local entities to measure and strengthen equitable access to services and programs for new Americans, consistent with applicable law; and

**(vii)** share information with and communicate to the American public regarding the benefits that result from integrating new Americans into communities.

**(b)** Within 120 days of the date of this memorandum, the Task Force shall develop and submit to the President an Integration Plan with recommendations for agency actions to further the integration of new Americans. The Integration Plan shall include:

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 815 of 1021   PageID 7685

**(i)** an assessment by each Task Force member of the status and scope of the efforts by the member's department, agency, or office to further the civic, economic, and linguistic integration of new Americans, including a report on the status of any offices or programs that have been created to develop, implement, or monitor targeted initiatives concerning immigrant integration; and

**(ii)** recommendations for issues, programs, or initiatives that should be further evaluated, studied, and implemented, as appropriate.

**(c)** The Task Force shall provide, within 1 year of the date of this memorandum, a status report to the President regarding the implementation of this memorandum. The Task Force shall review and update the Integration Plan periodically, as appropriate, and shall present to the President any updated recommendations or findings.

**Sec. 3. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** The Secretary of Homeland Security is hereby authorized and directed to publish this memorandum in the *Federal Register*.

BARACK OBAMA

## PRESIDENTIAL MEMORANDUM

<April 22, 2019, 84 F.R. 19853>

### Combating High Nonimmigrant Overstay Rates

Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy. (a)** My Administration is committed to securing the borders of the United States and fostering respect for the laws of our country, both of which are cornerstones of our Republic. Nonimmigrant visa (visa) overstay rates are unacceptably high for nationals of certain countries. Aliens must abide by the terms and conditions of their visas for our immigration system to function as intended. Although the United States benefits from legitimate nonimmigrant entry, individuals who abuse the visa process and decline to abide by the terms and conditions of their visas, including their visa departure dates, undermine the integrity of our immigration system and harm the national interest.

**(b)** The large numbers of aliens who overstay their period of lawful admission, failing to comply with the terms of a visa or the Visa Waiver Program, place significant strain on Department of Justice and Department of Homeland Security resources, which are currently needed to address the national emergency on our southern border.

**Sec. 2. Addressing High Visa Overstay Rates. (a)** The Secretary of State shall engage with the governments of countries with a total overstay rate greater than 10 percent in the combined B-1 and B-2 nonimmigrant visa category based on the Department of Homeland Security Fiscal Year 2018 Entry/Exit Overstay Report. This engagement should identify conditions contributing to high overstay rates among nationals of those countries and methods to address those conditions.

**(b)** Within 120 days of the date of this memorandum, the Secretary of State, in consultation with the Attorney General and the Secretary of Homeland Security, shall provide to the President recommendations to reduce B-1 and B-2 nonimmigrant visa overstay rates from the identified countries. With respect to any of the identified countries, the recommendations may include, as appropriate and to the extent consistent with applicable law, a proclamation, relying on authorities such as sections 212(f) and 215 of the INA (8 U.S.C. 1182(f) and 1185(a)), suspending or limiting entry of nationals of those countries who hold B-1 or B-2 visas; targeted suspension of visa issuance for certain nationals; limits to duration of admission, to be implemented by the Department of Homeland Security; and additional documentary requirements.

**(c)** The Secretary of State and the Secretary of Homeland Security shall immediately begin taking all appropriate actions that are within the scope of their respective authorities to reduce overstay rates for all classes of nonimmigrant visas.

**(d)** Within 180 days of the date of this memorandum, the Secretary of Homeland Security shall provide to the President a summary of the Department of Homeland Security's ongoing efforts to reduce overstays from countries participating in the Visa Waiver Program, to include any recommendations for additional action necessary and appropriate to ensure the integrity and security of that Program.

**Sec. 3. Admission Bonds.** The Secretary of State and the Secretary of Homeland Security shall take steps to develop measures required for imposing admission bonds as a means for improving compliance with the terms and conditions of nonimmigrant visas. The Secretaries shall provide a status report to the President within 120 days of the date of this memorandum.

**Sec. 4. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof;

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals; or

**(iii)** existing rights or obligations under international agreements.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 5.** The Secretary of State is hereby authorized and directed to publish this memorandum in the Federal Register.

DONALD J. TRUMP

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 817 of 1021   PageID 7687

Notes of Decisions (192)

8 U.S.C.A. § 1103, 8 USCA § 1103
Current through P.L. 117-166. Some statute sections may be more current, see credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds   Count My Vote, Inc. v. Cox,   Utah,
October 10, 2019

104 S.Ct. 2778
Supreme Court of the United States

CHEVRON, U.S.A., INC., Petitioner,

v.

NATURAL RESOURCES

DEFENSE COUNCIL, INC., et al.

AMERICAN IRON AND STEEL

INSTITUTE, et al., Petitioners,

v.

NATURAL RESOURCES

DEFENSE COUNCIL, INC., et al.

William D. RUCKELSHAUS, Administrator,

Environmental Protection Agency, Petitioner,

v.

NATURAL RESOURCES

DEFENSE COUNCIL, INC., et al. *

Nos. 82-1005, 82-1247 and 82-1591.
|
Argued Feb. 29, 1984.
|
Decided June 25, 1984.

**Synopsis**
Rehearing Denied Aug. 16, 1984.

See 468 U.S. 1227, 105 S.Ct. 28, 29.

Petition was filed for review of order of the Environmental Protection Agency. The Court of Appeals, 🚩 685 F.2d 718, vacated regulations, and certiorari was granted. The Supreme Court, Justice Stevens, held that Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments.

Reversed.

**West Headnotes (7)**

**[1]**   **Federal Courts** 🖙   Decisions Reviewable

Supreme Court reviews judgments, not opinions.

106 Cases that cite this headnote

**[2]**   **Administrative Law and Procedure** 🖙   Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** 🖙   Permissible or reasonable construction

When court reviews agency's construction of statute which it administers, court is confronted with two questions: whether Congress has directly spoken on precise question at issue; if statute is silent or ambiguous with respect to specific issue, question for court is whether agency's answer is based on permissible construction of statute.

7485 Cases that cite this headnote

**[3]**   **Administrative Law and Procedure** 🖙   Erroneous or unreasonable construction; conflict with statute

Judiciary is final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

1877 Cases that cite this headnote

**[4]**   **Administrative Law and Procedure** 🖙   Permissible or reasonable construction

Court need not conclude that agency's construction of statute which it administered was only one it permissibly could have adopted to uphold construction, or even reading the court would have reached if question initially had arisen in judicial proceeding.

2864 Cases that cite this headnote

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 819 of 1021   PageID 7689

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**[5]** **Administrative Law and Procedure** 👉 Permissible or reasonable construction

Where legislative delegation to agency on particular question is implicit rather than explicit, court may not substitute its own construction of statutory provision for reasonable interpretation made by administrator of agency.

6420 Cases that cite this headnote

**[6]** **Administrative Law and Procedure** 👉 Relationship of agency with statute in general

Considerable weight should be accorded to executive department's construction of statutory scheme it is entrusted to administer.

654 Cases that cite this headnote

**[7]** **Environmental Law** 👉 Stationary sources in general

Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments. Clean Air Act, §§ 111(a)(3), 172(b)(6), 302(j), as amended, 🚩42 U.S.C.A. §§ 7411(a)(3), 7502(b)(6), 7602(j).

307 Cases that cite this headnote

*Syllabus* [a1]

The Clean Air Act Amendments of 1977 impose certain requirements on States **2779 that have not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation, including the requirement that such "nonattainment" States establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for such sources unless

stringent conditions are met. EPA regulations promulgated in 1981 to implement the permit requirement allow a State to adopt a plantwide definition of the term "stationary source," under which an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant, thus allowing a State to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble." Respondents filed a petition for review in the Court of Appeals, which set aside the regulations embodying the "bubble concept" as contrary to law. Although recognizing that the amended Clean Air Act does not explicitly define what Congress envisioned as a "stationary source" to which the permit program should apply, and that the issue was not squarely addressed in the legislative history, the court concluded that, in view of the purpose of the nonattainment program to improve rather than merely maintain air quality, a plantwide definition was "inappropriate," while stating it was mandatory in programs designed to maintain existing air quality.

Held: The EPA's plantwide definition is a permissible construction of the statutory term "stationary source." Pp. 2781–2793.

(a) With regard to judicial review of an agency's construction of the statute which it administers, if Congress has not directly spoken to the precise question at issue, the question for the court is whether the **838 agency's answer is based on a permissible construction of the statute. Pp. 2781–2783.

(b) Examination of the legislation and its history supports the Court of Appeals' conclusion that Congress did not have a specific intention as to the applicability of the "bubble concept" in these cases. Pp. 2783–2786.

(c) The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas plainly discloses that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Pp. 2786–2787.

(d) Prior to the 1977 Amendments, the EPA had used a plantwide definition of the term "source," but in 1980 the EPA ultimately adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals here,

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 820 of 1021   PageID 7690

precluding use of the "bubble concept" in nonattainment States' programs designed to enhance air quality. However, when a new administration took office 1981, the EPA, in promulgating the regulations involved here, reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the plantwide definition in nonattainment areas. Pp. 2787–2790.

(e) Parsing the general terms in the text of the amended Clean Air Act—particularly the provisions of §§ 302(j) and 111(a)(3) pertaining to the definition of "source"—does not reveal any actual intent of Congress as to the issue in these cases. To the extent any congressional "intent" can be discerned from the statutory language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the EPA's power to regulate particular sources in order to effectuate the policies of the Clean Air Act. Similarly, the legislative history is consistent with the **2780 view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments. The plantwide definition is fully consistent with the policy of allowing reasonable economic growth, and the EPA has advanced a reasonable explanation for its conclusion that the regulations serve environmental objectives as well. The fact that the EPA has from time to time changed its interpretation of the term "source" does not lead to the conclusion that no deference should be accorded the EPA's interpretation of the statute. An agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. Policy arguments concerning the "bubble concept" should be addressed to legislators or administrators, not to judges. The EPA's interpretation of the statute here represents a reasonable accommodation of manifestly competing interests and is entitled to deference. Pp. 2790–2793.

🚩 222 U.S.App.D.C. 268, 685 F.2d 718 (1982), reversed.

## Attorneys and Law Firms

*Deputy Solicitor General Bator* argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 82-1591 were *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Assistant Attorney General Walker, Mark I. Levy, Anne S. Almy, William F. Pedersen,* and *Charles S. Carter. Michael H. Salinsky* and *Kevin M. Fong* filed briefs for petitioner in No. 82-1005.

*Robert A. Emmett, David Ferber, Stark Ritchie, Theodore L. Garrett, Patricia A. Barald, Louis E. Tosi, William L. Patberg, Charles F. Lettow,* and *Barton C. Green* filed briefs for petitioners in No. 82-1247.

**\*839** *David D. Doniger* argued the cause and filed a brief for respondents.†>>>

† Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *John A. Myler;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann P. Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Thomas Y. Au, Duane Woodard,* Attorney General of Colorado, *Richard L. Griffith,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert A. Whitehead, Jr.,* Assistant Attorney General, *James S. Tierney,* Attorney General of Maine, *Robert Abrams,* Attorney General of New York, *Marcia J. Cleveland* and *Mary L. Lyndon,* Assistant Attorneys General, *Irwin I. Kimmelman,* Attorney General of New Jersey, *John J. Easton, Jr.,* Attorney General of Vermont, *Merideth Wright,* Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Maryann Sumi,* Assistant Attorney General.

*James D. English, Mary-Win O'Brien,* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL-CIO-CLC, as *amicus curiae.*

## Opinion

Justice STEVENS delivered the opinion of the Court.

In the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685, Congress enacted certain requirements applicable **\*840** to States that had not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met. [1] The EPA regulation promulgated to implement this permit requirement allows a State to adopt a plantwide definition of the term "stationary source." [2] Under this definition, an existing plant that contains several pollution-emitting devices may install

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 821 of 1021   PageID 7691

or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant. The question presented by these cases is whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble" is based on a reasonable construction of the statutory term "stationary source."

## I

The EPA regulations containing the plantwide definition of the term stationary source were promulgated on October **\*841** 14, 1981. 46 Fed.Reg. 50766. Respondents [3] filed a timely petition for review in the United States Court of Appeals for the District of Columbia Circuit pursuant to 42 U.S.C. § 7607(b)(1). [4] The Court of Appeals **\*\*2781** set aside the regulations. Natural Resources Defense Council, Inc. v. Gorsuch, 222 U.S.App.D.C. 268, 685 F.2d 718 (1982).

The court observed that the relevant part of the amended Clean Air Act "does not explicitly define what Congress envisioned as a 'stationary source, to which the permit program ... should apply," and further stated that the precise issue was not "squarely addressed in the legislative history." Id., at 273, 685 F.2d, at 723. In light of its conclusion that the legislative history bearing on the question was "at best contradictory," it reasoned that "the purposes of the nonattainment program should guide our decision here." Id., at 276, n. 39, 685 F.2d, at 726, n. 39.[5] Based on two of its precedents concerning the applicability of the bubble concept to certain Clean Air Act programs,[6] the court stated that the bubble concept was "mandatory" in programs designed merely to maintain existing air quality, but held that it was "inappropriate" in programs enacted to improve air quality. Id., at 276, 685 F.2d, at 726. Since the purpose of the permit **\*842** program—its "raison d'être," in the court's view—was to improve air quality, the court held that the bubble concept was inapplicable in these cases under its prior precedents. Ibid. It therefore set aside the regulations embodying the bubble concept as contrary to law. We granted certiorari to review that judgment, 461 U.S. 956, 103 S.Ct. 2427, 77 L.Ed.2d 1314 (1983), and we now reverse.

[1] The basic legal error of the Court of Appeals was to adopt a static judicial definition of the term "stationary source" when it had decided that Congress itself had not commanded that definition. Respondents do not defend the

legal reasoning of the Court of Appeals.[7] Nevertheless, since this Court reviews judgments, not opinions,[8] we must determine whether the Court of Appeals' legal error resulted in an erroneous judgment on the validity of the regulations.

## II

[2] [3] [4] When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, **\*843** as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, **\*\*2782** the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute,[10] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[11]

[5] "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation **\*844** of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.[12] Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.[13]

[6] We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer,[14] and the principle of deference to administrative interpretations.

"has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full **\*\*2783** understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, e.g., National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; Labor Board v. Hearst Publications, Inc., 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; \*845 Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; Securities & Exchange Comm'n v. Chenery Corp., [332] 322 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]; Labor Board v. Seven–Up Bottling Co., 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

"... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).

Accord Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984).

In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make.

III

In the 1950's and the 1960's Congress enacted a series of statutes designed to encourage and to assist the States in curtailing air pollution. See generally Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 63–64, 95 S.Ct. 1470, 1474–1475, 43 L.Ed.2d 731 (1975). The Clean Air Amendments of 1970, Pub.L. 91–604, 84 Stat. 1676, "sharply increased federal authority and responsibility **\*846** in the continuing effort to combat air pollution," 421 U.S., at 64, 95 S.Ct., at 1474, but continued to assign "primary responsibility for assuring air quality" to the several States, 84 Stat. 1678. Section 109 of the 1970 Amendments directed the EPA to promulgate National Ambient Air Quality Standards (NAAQS's) [15] and § 110 directed the States to develop plans (SIP's) to implement the standards within specified deadlines. In addition, § 111 provided that major new sources of pollution would be required to conform to technology-based performance standards; the EPA was directed to publish a list of categories of sources of pollution and to establish new source performance standards (NSPS) for each. Section 111(e) prohibited the operation of any new source in violation of a performance standard.

Section 111(a) defined the terms that are to be used in setting and enforcing standards of performance for new stationary sources. It provided:

"For purposes of this section:

.....

"(3) The term 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." 84 Stat. 1683.

**\*\*2784** In the 1970 Amendments that definition was not only applicable to the NSPS program required by § 111, but also was made applicable to a requirement of § 110 that each state implementation plan contain a procedure for reviewing the location of any proposed new source and preventing its construction if it would preclude the attainment or maintenance of national air quality standards. [16]

In due course, the EPA promulgated NAAQS's, approved SIP's, and adopted detailed regulations governing NSPS's **\*847** for various categories of equipment. In one of its programs, the EPA used a plantwide definition of the term "stationary source." In 1974, it issued NSPS's for the nonferrous smelting industry that provided that the standards

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 823 of 1021   PageID 7693

would not apply to the modification of major smelting units if their increased emissions were offset by reductions in other portions of the same plant. [17]

*Nonattainment*

The 1970 legislation provided for the attainment of primary NAAQS's by 1975. In many areas of the country, particularly the most industrialized States, the statutory goals were not attained. [18]   In 1976, the 94th Congress was confronted with this fundamental problem, as well as many others respecting pollution control. As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs. The 94th Congress, confronting these competing interests, was unable to agree on what response was in the public interest: legislative proposals to deal with nonattainment failed to command the necessary consensus. [19]

In light of this situation, the EPA published an Emissions Offset Interpretative Ruling in December 1976, see 41 Fed.Reg. 55524, to "fill the gap," as respondents put it, until Congress acted. The Ruling stated that it was intended to  **\*848**  address "the issue of whether and to what extent national air quality standards established under the Clean Air Act may restrict or prohibit growth of major new or expanded stationary air pollution sources." Id., at 55524– 55525. In general, the Ruling provided that "a major new source may locate in an area with air quality worse than a national standard only if stringent conditions can be met." Id., at 55525. The Ruling gave primary emphasis to the rapid attainment of the statute's environmental goals. [20]  Consistent with that emphasis, the construction of every new source in nonattainment areas had to meet the "lowest achievable emission rate" under the current state of the art for that type of facility. See Ibid. The 1976 Ruling did not, however, explicitly adopt or reject the "bubble concept." [21]

**\*2785**  IV

The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue. A small portion of the statute—91 Stat.

 **\*849**  745–751 (Part D of Title I of the amended Act, 42 U.S.C. §§ 7501–7508)—expressly deals with nonattainment

areas. The focal point of this controversy is one phrase in that portion of the Amendments. [22]

Basically, the statute required each State in a nonattainment area to prepare and obtain approval of a new SIP by July 1, 1979. In the interim those States were required to comply with the EPA's interpretative Ruling of December 21, 1976. 91 Stat. 745. The deadline for attainment of the primary NAAQS's was extended until December 31, 1982, and in some cases until December 31, 1987, but the SIP's were required to contain a number of provisions designed to achieve the goals as expeditiously as possible. [23]

 **\*850**  Most significantly for our purposes, the statute provided that each plan shall
"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173...." Id., 747.

Before issuing a permit, § 173 requires (1) the state agency to determine that there will be sufficient emissions reductions in the region to offset the emissions from the new source and also to allow for reasonable further progress toward attainment, or that the increased emissions will not exceed an allowance for growth established pursuant to § 172(b)(5); (2) the applicant to certify that his other sources in the State are in compliance with the SIP, (3) the agency to determine that the applicable SIP is otherwise being implemented, and (4) the proposed source to comply with the lowest achievable emission rate (LAER). [24]

**\*\*2786**  **\*851**  The 1977 Amendments contain no specific reference to the "bubble concept." Nor do they contain a specific definition of the term "stationary source," though they did not disturb the definition of "stationary source" contained in § 111(a)(3), applicable by the terms of the Act to the NSPS program. Section 302(j), however, defines the term "major stationary source" as follows:
"(j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." 91 Stat. 770.

V

The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas does not contain any specific comment on the "bubble concept" or the question whether a plantwide definition of a stationary source is permissible under the permit program. It does, however, plainly disclose that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Indeed, the House Committee Report identified the economic interest as one of the "two main purposes" of this section of the bill. It stated:

"Section 117 of the bill, adopted during full committee markup establishes a new section 127 of the Clean Air Act. The section has two main purposes: (1) to allow reasonable economic growth to continue in an area while making reasonable further progress to assure attainment of the standards by a fixed date; and (2) to allow **852** States greater flexibility for the former purpose than EPA's present interpretative regulations afford.

"The new provision allows States with nonattainment areas to pursue one of two options. First, the State may proceed under EPA's present 'tradeoff' or 'offset' ruling. The Administrator is authorized, moreover, to modify or amend that ruling in accordance with the intent and purposes of this section.

"The State's second option would be to revise its implementation plan in accordance with this new provision." H.R.Rep. No. 95–294, p. 211 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1290. [25]

The portion of the Senate Committee Report dealing with nonattainment areas states generally that it was intended to "supersede the EPA administrative approach," and that expansion should be permitted if a State could "demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." **2787** S.Rep. No. 95–127, p. 55 (1977). The Senate Report notes the value of "case-by-case review of each new or modified major source of pollution that seeks to locate in a region exceeding an ambient standard," explaining that such a review "requires matching reductions from existing sources against **853** emissions expected from the new source in order to assure that introduction of the new source will not

prevent attainment of the applicable standard by the statutory deadline." Ibid. This description of a case-by-case approach to plant additions, which emphasizes the net consequences of the construction or modification of a new source, as well as its impact on the overall achievement of the national standards, was not, however, addressed to the precise issue raised by these cases.

Senator Muskie made the following remarks:

"I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation [the Offset Ruling]—and to the permit requirements of the revised implementation plans under the conference bill—is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for that pollutant—or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.

"A source—including an existing facility ordered to convert to coal—is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are exceeded." 123 Cong.Rec. 26847 (1977).

VI

As previously noted, prior to the 1977 Amendments, the EPA had adhered to a plantwide definition of the term "source" under a NSPS program. After adoption of the 1977 Amendments, proposals for a plantwide definition were considered in at least three formal proceedings.

In January 1979, the EPA considered the question whether the same restriction on new construction in nonattainment areas that had been included in its December 1976 Ruling **854** should be required in the revised SIP's that were scheduled to go into effect in July 1979. After noting that the 1976 Ruling was ambiguous on the question "whether a plant with a number of different processes and emission points would be considered a single source," 44 Fed.Reg. 3276 (1979), the EPA, in effect, provided a bifurcated answer to that question. In those areas that did not have a revised SIP in effect by July 1979, the EPA rejected the plantwide definition; on the other hand, it expressly concluded that the plantwide approach would be permissible in certain circumstances if authorized by an approved SIP. It stated:

"Where a state implementation plan is revised and implemented to satisfy the requirements of Part D, including the reasonable further progress requirement, the plan requirements for major modifications may exempt modifications of existing facilities that are accompanied by intrasource offsets so that there is no net increase in emissions. The agency endorses such exemptions, which would provide greater flexibility to sources to effectively manage their air emissions at least cost." Ibid. [26]

**2788 *855 In April, and again in September 1979, the EPA published additional comments in which it indicated that revised SIP's could adopt the plantwide definition of source in nonattainment areas in certain circumstances. See id., at 20372, 20379, 51924, 51951, 51958. On the latter occasion, the EPA made a formal rulemaking proposal that would have permitted the use of the "bubble concept" for new installations within a plant as well as for modifications of existing units. It explained:

" 'Bubble' Exemption: The use of offsets inside the same source is called the 'bubble.' EPA proposes use of the definition of 'source' (see above) to limit the use of the bubble under nonattainment requirements in the following respects:

"i. Part D SIPs that include all requirements needed to assure reasonable further progress and attainment by the deadline under section 172 and that are being carried out need not restrict the use of a plantwide bubble, the same as under the PSD proposal.

"ii. Part D SIPs that do not meet the requirements specified must limit use of the bubble by including a definition of 'installation' as an identifiable piece of process equipment." [27]

*856 Significantly, the EPA expressly noted that the word "source" might be given a plantwide definition for some purposes and a narrower definition for other purposes. It wrote:

"Source means any building structure, facility, or installation which emits or may emit any regulated pollutant. 'Building, structure, facility or installation' means plant in PSD areas and in nonattainment areas except where the growth prohibitions would apply or where no adequate SIP exists or is being carried out." Id., at 51925. [28]

The EPA's summary of its proposed Ruling discloses a flexible rather than rigid definition of the term "source" to implement various policies and programs:

"In summary, EPA is proposing two different ways to define source for different kinds of NSR programs:

"(1) For PSD and complete Part D SIPs, review would apply only to plants, with an unrestricted plant-wide bubble.

"(2) For the offset ruling, restrictions on construction, and incomplete Part D SIPs, review would apply to both plants and individual pieces of process equipment, causing the plant-wide bubble not to apply for new and modified major pieces of equipment.

"In addition, for the restrictions on construction, EPA is proposing to define 'major modification' so as to prohibit the bubble entirely. Finally, an alternative discussed but not favored is to have only pieces of process equipment reviewed, resulting in no plant-wide bubble and allowing minor pieces of equipment to escape **2789 NSR *857 regardless of whether they are within a major plant." Id., at 51934.

In August 1980, however, the EPA adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals in these cases. The EPA took particular note of the two then-recent Court of Appeals decisions, which had created the bright-line rule that the "bubble concept" should be employed in a program designed to maintain air quality but not in one designed to enhance air quality. Relying heavily on those cases, [29] EPA adopted a dual definition of "source" for nonattainment areas that required a permit whenever a change in either the entire plant, or one of its components, would result in a significant increase in emissions even if the increase was completely offset by reductions elsewhere in the plant. The EPA expressed the opinion that this interpretation was "more consistent with congressional intent" than the plantwide definition because it "would bring in more sources or modifications for review," 45 Fed.Reg. 52697 (1980), but its primary legal analysis was predicated on the two Court of Appeals decisions.

In 1981 a new administration took office and initiated a "Government-wide reexamination of regulatory burdens and complexities." 46 Fed.Reg. 16281. In the context of *858 review, the EPA reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 826 of 1021   PageID 7696

given the same definition in both nonattainment areas and PSD areas.

In explaining its conclusion, the EPA first noted that the definitional issue was not squarely addressed in either the statute or its legislative history and therefore that the issue involved an agency "judgment as how to best carry out the Act." Ibid. It then set forth several reasons for concluding that the plantwide definition was more appropriate. It pointed out that the dual definition "can act as a disincentive to new investment and modernization by discouraging modifications to existing facilities" and "can actually retard progress in air pollution control by discouraging replacement of older, dirtier processes or pieces of equipment with new, cleaner ones." Ibid. Moreover, the new definition "would simplify EPA's rules by using the same definition of 'source' for PSD, nonattainment new source review and the construction moratorium. This reduces confusion and inconsistency." Ibid. Finally, the agency explained that additional requirements that remained in place would accomplish the fundamental purposes of achieving attainment with NAAQS's as expeditiously as possible. [30] These conclusions were **2790 expressed *859 in a proposed rulemaking in August 1981 that was formally promulgated in October. See id., at 50766.

### VII

[7]   In this Court respondents expressly reject the basic rationale of the Court of Appeals' decision. That court viewed the statutory definition of the term "source" as sufficiently flexible to cover either a plantwide definition, a narrower definition covering each unit within a plant, or a dual definition that could apply to both the entire "bubble" and its components. It interpreted the policies of the statute, however, to mandate the plantwide definition in programs designed to maintain clean air and to forbid it in programs designed to improve air quality. Respondents place a fundamentally different construction on the statute. They contend that the text of the Act requires the EPA to use a dual definition—if either a component of a plant, or the plant as a whole, emits over 100 tons of pollutant, it is a major stationary source. They thus contend that the EPA rules adopted in 1980, insofar as they apply to the maintenance of the quality of clean air, as well as the 1981 rules which apply to nonattainment areas, violate the statute. [31]

### Statutory Language

The definition of the term "stationary source" in § 111(a)(3) refers to "any building, structure, facility, or installation" which emits air pollution. See supra, at 2784. This definition is applicable only to the NSPS program by the express terms of the statute; the text of the statute does not make this definition *860 applicable to the permit program. Petitioners therefore maintain that there is no statutory language even relevant to ascertaining the meaning of stationary source in the permit program aside from § 302(j), which defines the term "major stationary source." See supra, at 2786. We disagree with petitioners on this point.

The definition in § 302(j) tells us what the word "major" means—a source must emit at least 100 tons of pollution to qualify—but it sheds virtually no light on the meaning of the term "stationary source." It does equate a source with a facility—a "major emitting facility" and a "major stationary source" are synonymous under § 302(j). The ordinary meaning of the term "facility" is some collection of integrated elements which has been designed and constructed to achieve some purpose. Moreover, it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts. Basically, however, the language of § 302(j) simply does not compel any given interpretation of the term "source."

Respondents recognize that, and hence point to § 111(a)(3). Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word "source" as anything in the statute. [32] As respondents point out, use of the words "building, structure, facility, or installation," as the definition of source, could be read to impose the permit conditions on an individual building that is a part of a plant. [33] A "word may have a character of its own not to be submerged by its association." ⚑ *861 Russell Motor Car Co. v. United States, 261 U.S. 514, 519, 43 S.Ct. 428, 429, 67 L.Ed. 778 (1923). On the other hand, the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may **2791 indicate that the true meaning of the series is to convey a common idea. The language may reasonably be interpreted to impose the requirement on any discrete, but integrated, operation which pollutes. This gives meaning to all of the terms—a single building, not part of a larger operation, would be covered if it emits more than 100 tons

of pollution, as would any facility, structure, or installation. Indeed, the language itself implies a "bubble concept" of sorts: each enumerated item would seem to be treated as if it were encased in a bubble. While respondents insist that each of these terms must be given a discrete meaning, they also argue that § 111(a)(3) defines "source" as that term is used in § 302(j). The latter section, however, equates a source with a facility, whereas the former defines "source" as a facility, among other items.

We are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress.[34] **\*862** We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.

### Legislative History

In addition, respondents argue that the legislative history and policies of the Act foreclose the plantwide definition, and that the EPA's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the Act.

Based on our examination of the legislative history, we agree with the Court of Appeals that it is unilluminating. The general remarks pointed to by respondents "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire...." Jewell Ridge Coal Corp. v. Mine Workers, 325 U.S. 161, 168–169, 65 S.Ct. 1063, 1067–1068, 89 L.Ed. 1534 (1945). Respondents' argument based on the legislative history relies heavily on Senator Muskie's observation that a new source is subject to the LAER requirement.[35] But the full statement is ambiguous and like the text of § 173 itself, this comment does not tell us what a new source is, much less that it is to have an inflexible definition. We find that the legislative history as a whole is silent on the precise issue before us. It is, however, consistent with the view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments.

**\*863** More importantly, that history plainly identifies the policy concerns that motivated the enactment; the plantwide definition is fully consistent with one of those concerns **\*\*2792** —the allowance of reasonable economic growth— and, whether or not we believe it most effectively implements the other, we must recognize that the EPA has advanced a reasonable explanation for its conclusion that the regulations serve the environmental objectives as well. See supra, at 2789–2790, and n. 29; see also supra, at 2788, n. 27. Indeed, its reasoning is supported by the public record developed in the rulemaking process,[36] as well as by certain private studies.[37]

Our review of the EPA's varying interpretations of the word "source"—both before and after the 1977 Amendments —convinces us that the agency primarily responsible for administering this important legislation has consistently interpreted it flexibly—not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena. The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations **\*864** and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

Significantly, it was not the agency in 1980, but rather the Court of Appeals that read the statute inflexibly to command a plantwide definition for programs designed to maintain clean air and to forbid such a definition for programs designed to improve air quality. The distinction the court drew may well be a sensible one, but our labored review of the problem has surely disclosed that it is not a distinction that Congress ever articulated itself, or one that the EPA found in the statute before the courts began to review the legislative work product. We conclude that it was the Court of Appeals, rather than Congress or any of the decisionmakers who are authorized by Congress to administer this legislation, that was primarily responsible for the 1980 position taken by the agency.

### Policy

The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 828 of 1021   PageID 7698

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges. [38]

**\*865** In these cases, the Administrator's interpretation represents a reasonable accommodation of manifestly competing in **\*\*2793** terests and is entitled to deference: the regulatory scheme is technical and complex, [39] the agency considered the matter in a detailed and reasoned fashion, [40] and the decision involves reconciling conflicting policies. [41] Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases. Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred.

Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the

**\*866** agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency —have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

We hold that the EPA's definition of the term "source" is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. "The Regulations which the Administrator has adopted provide what the agency could allowably view as ... [an] effective reconciliation of these twofold ends...." United States v. Shimer, 367 U.S., at 383, 81 S.Ct., at 1560.

The judgment of the Court of Appeals is reversed.

It is so ordered.

Justice MARSHALL and Justice REHNQUIST took no part in the consideration or decision of these cases.

Justice O'CONNOR took no part in the decision of these cases.

**All Citations**

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, 21 ERC 1049, 14 Envtl. L. Rep. 20,507

---

### Footnotes

\*    US Reports Title: Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.

a1    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Section 172(b)(6), 42 U.S.C. § 7502(b)(6), provides:

"The plan provisions required by subsection (a) shall—

.....

"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 (relating to permit requirements)." 91 Stat. 747.

2    "(i) 'Stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.

"(ii) 'Building, structure, facility, or installation' means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 CFR §§ 51.18(j)(1)(i) and (ii) (1983).

3    National Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and North Western Ohio Lung Association, Inc.

4    Petitioners, Chevron U.S.A. Inc., American Iron and Steel Institute, American Petroleum Institute, Chemical Manufacturers Association, Inc., General Motors Corp., and Rubber Manufacturers Association were granted leave to intervene and argue in support of the regulation.

5    The court remarked in this regard:

"We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory directive would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will." 222 U.S.App.D.C., at 276, n. 39, 685 F.2d, at 726, n. 39.

6    Alabama Power Co. v. Costle, 204 U.S.App.D.C. 51, 636 F.2d 323 (1979); ASARCO Inc. v. EPA, 188 U.S.App.D.C. 77, 578 F.2d 319 (1978).

7    Respondents argued below that EPA's plantwide definition of "stationary source" is contrary to the terms, legislative history, and purposes of the amended Clean Air Act. The court below rejected respondents' arguments based on the language and legislative history of the Act. It did agree with respondents contention that the regulations were inconsistent with the purposes of the Act, but did not adopt the construction of the statute advanced by respondents here. Respondents rely on the arguments rejected by the Court of Appeals in support of the judgment, and may rely on any ground that finds support in the record. See Ryerson v. United States, 312 U.S. 405, 408, 61 S.Ct. 656, 658, 85 L.Ed. 917 (1941); LeTulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 316, 84 L.Ed. 355 (1940); Langnes v. Green, 282 U.S. 531, 533–539, 51 S.Ct. 243, 244–246, 75 L.Ed. 520 (1931).

8    E.g., Black v. Cutter Laboratories, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956); J.E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); Williams v. Norris, 12 Wheat. 117, 120, 6 L.Ed. 571 (1827); McClung v. Silliman, 6 Wheat. 598, 603, 5 L.Ed. 340 (1821).

9    The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. See, e.g., FEC v. Democratic Senatorial

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 830 of 1021   PageID 7700

Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); ⚑SEC v. Sloan, 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); ⚑FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1784–1785, 36 L.Ed.2d 620 (1973); ⚑Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); ⚑NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); ⚑FTC v. Colgate–Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); ⚑Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); ⚑Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); ⚑Webster v. Luther, 163 U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896). If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

10  See generally, R. Pound, The Spirit of the Common Law 174–175 (1921).

11  The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. ⚑FEC v. Democratic Senatorial Campaign Committee, 454 U.S., at 39, 102 S.Ct., at 46; Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); ⚑Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); ⚑Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); ⚑Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); ⚑McLaren v. Fleischer, 256 U.S. 477, 480–481, 41 S.Ct. 577, 577–578, 65 L.Ed. 1052 (1921).

12  See, e.g., ⚑United States v. Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) ⚑Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); ⚑Batterton v. Francis, 432 U.S. 416, 424–426, 97 S.Ct. 2399, 2404–2406, 53 L.Ed.2d 448 (1977); ⚑American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 235–237, 57 S.Ct. 170, 172–173, 81 L.Ed. 142 (1936).

13  E.g., ⚑INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); ⚑Train v. Natural Resources Defense Council, Inc., 421 U.S., at 87, 95 S.Ct., at 1485.

14  ⚑Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479–2480, 81 L.Ed.2d 301 (1984); ⚑Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); ⚑Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); ⚑Investment Company Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); ⚑Unemployment Compensation Comm'n v. Aragon, 329 U.S., at 153–154, 67 S.Ct., at 250–251; ⚑NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); ⚑McLaren v. Fleischer, 256 U.S., at 480–481, 41 S.Ct., at 577–578; ⚑Webster v. Luther, 163 U.S., at 342, 16 S.Ct., at 967; Brown v. United States, 113 U.S. 568, 570–571, 5 S.Ct. 648, 649–650, 28 L.Ed. 1079 (1885); United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588 (1878); Edwards' Lessee v. Darby, 12 Wheat. 206, 210, 6 L.Ed. 603 (1827).

15 Primary standards were defined as those whose attainment and maintenance were necessary to protect the public health, and secondary standards were intended to specify a level of air quality that would protect the public welfare.

16 See §§ 110(a)(2)(D) and 110(a)(4).

17 The Court of Appeals ultimately held that this plantwide approach was prohibited by the 1970 Act, see ASARCO Inc., 188 U.S.App.D.C., at 83–84, 578 F.2d, at 325–327. This decision was rendered after enactment of the 1977 Amendments, and hence the standard was in effect when Congress enacted the 1977 Amendments.

18 See Report of the National Commission on Air Quality, To Breathe Clean Air, 3.3–20 through 3.3–33 (1981).

19 Comprehensive bills did pass both Chambers of Congress; the Conference Report was rejected in the Senate. 122 Cong.Rec. 34375–34403, 34405–34418 (1976).

20 For example, it stated:

"Particularly with regard to the primary NAAQS's, Congress and the Courts have made clear that economic considerations must be subordinated to NAAQS achievement and maintenance. While the ruling allows for some growth in areas violating a NAAQS if the net effect is to insure further progress toward NAAQS achievement, the Act does not allow economic growth to be accommodated at the expense of the public health." 41 Fed.Reg. 55527 (1976).

21 In January 1979, the EPA noted that the 1976 Ruling was ambiguous concerning this issue:

"A number of commenters indicated the need for a more explicit definition of 'source.' Some readers found that it was unclear under the 1976 Ruling whether a plant with a number of different processes and emission points would be considered a single source. The changes set forth below define a source as 'any structure, building, facility, equipment, installation, or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control.' This definition precludes a large plant from being separated into individual production lines for purposes of determining applicability of the offset requirements." 44 Fed.Reg. 3276.

22 Specifically, the controversy in these cases involves the meaning of the term "major stationary sources" in § 172(b)(6) of the Act, 42 U.S.C. § 7502(b)(6). The meaning of the term "proposed source" in § 173(2) of the Act, 42 U.S.C. § 7503(2), is not at issue.

23 Thus, among other requirements, § 172(b) provided that the SIP's shall—

"(3) require, in the interim, reasonable further progress (as defined in section 171(1)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;

"(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under paragraph (1);

"(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area; ...

.....

"(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section." 91 Stat. 747.

Section 171(1) provided:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 110(a)(2)(I) and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 172(a)." Id., at 746.

24      Section 171(3) provides:

"(3) The term 'lowest achievable emission rate' means for any source, that rate of emissions which reflects—

"(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

"(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent. "In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance."

The LAER requirement is defined in terms that make it even more stringent than the applicable new source performance standard developed under § 111 of the Act, as amended by the 1970 statute.

25      During the floor debates Congressman Waxman remarked that the legislation struck

"a proper balance between environmental controls and economic growth in the dirty air areas of America.... There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised....

"This is a fair and balanced approach, which will not undermine our economic vitality, or impede achievement of our ultimate environmental objectives." 123 Cong.Rec. 27076 (1977).

The second "main purpose" of the provision—allowing the States "greater flexibility" than the EPA's interpretative Ruling—as well as the reference to the EPA's authority to amend its Ruling in accordance with the intent of the section, is entirely consistent with the view that Congress did not intend to freeze the definition of "source" contained in the existing regulation into a rigid statutory requirement.

26      In the same Ruling, the EPA added:

"The above exemption is permitted under the SIP because, to be approved under Part D, plan revisions due by January 1979 must contain adopted measures assuring that reasonable further progress will be made. Furthermore, in most circumstances, the measures adopted by January 1979 must be sufficient to actually provide for attainment of the standards by the dates required under the Act, and in all circumstances measures adopted by 1982 must provide for attainment. See Section 172 of the Act and 43 FR 21673–21677 (May 19, 1978). Also, Congress intended under Section 173 of the Act that States would have some latitude to depart from the strict requirements of this Ruling when the State plan is revised and is being carried out in accordance with Part D. Under a Part D plan, therefore, there is less need to subject a modification of an

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 833 of 1021   PageID 7703

existing facility to LAER and other stringent requirements if the modification is accompanied by sufficient intrasource offsets so that there is no net increase in emissions." 44 Fed.Reg. 3277 (1979).

27   Id., at 51926. Later in that Ruling, the EPA added:

"However, EPA believes that complete Part D SIPs, which contain adopted and enforceable requirements sufficient to assure attainment, may apply the approach proposed above for PSD, with plant-wide review but no review of individual pieces of equipment. Use of only a plant-wide definition of source will permit plant-wide offsets for avoiding NSR of new or modified pieces of equipment. However, this is only appropriate once a SIP is adopted that will assure the reductions in existing emissions necessary for attainment. See 44 FR 3276 col. 3 (January 16, 1979). If the level of emissions allowed in the SIP is low enough to assure reasonable further progress and attainment, new construction or modifications with enough offset credit to prevent an emission increase should not jeopardize attainment." Id., at 51933.

28   In its explanation of why the use of the "bubble concept" was especially appropriate in preventing significant deterioration (PSD) in clean air areas, the EPA stated: "In addition, application of the bubble on a plant-wide basis encourages voluntary upgrading of equipment, and growth in productive capacity." Id., at 51932.

29   "The dual definition also is consistent with Alabama Power and ASARCO. Alabama Power held that EPA had broad discretion to define the constituent terms of 'source' so as best to effectuate the purposes of the statute. Different definitions of 'source' can therefore be used for different sections of the statute....

"Moreover, Alabama Power and ASARCO taken together suggest that there is a distinction between Clean Air Act programs designed to enhance air quality and those designed only to maintain air quality....

.....

"Promulgation of the dual definition follows the mandate of Alabama Power, which held that, while EPA could not define 'source' as a combination of sources, EPA had broad discretion to define 'building,' 'structure,' 'facility,' and 'installation' so as to best accomplish the purposes of the Act." 45 Fed.Reg. 52697 (1980).

30   It stated:

"5. States will remain subject to the requirement that for all nonattainment areas they demonstrate attainment of NAAQS as expeditiously as practicable and show reasonable further progress toward such attainment. Thus, the proposed change in the mandatory scope of nonattainment new source review should not interfere with the fundamental purpose of Part D of the Act.

"6. New Source Performance Standards (NSPS) will continue to apply to many new or modified facilities and will assure use of the most up-to-date pollution control techniques regardless of the applicability of nonattainment area new source review.

"7. In order to avoid nonattainment area new source review, a major plant undergoing modification must show that it will not experience a significant net increase in emissions. Where overall emissions increase significantly, review will continue to be required." 46 Fed.Reg. 16281 (1981).

31   "What EPA may not do, however, is define all four terms to mean only plants. In the 1980 PSD rules, EPA did just that. EPA compounded the mistake in the 1981 rules here under review, in which it abandoned the dual definition." Brief for Respondents 29, n. 56.

32   We note that the EPA in fact adopted the language of that definition in its regulations under the permit program. 40 CFR §§ 51.18(j)(1)(i), (ii) (1983).

33    Since the regulations give the States the option to define an individual unit as a source, see 40 CFR § 51.18(j) (1) (1983), petitioners do not dispute that the terms can be read as respondents suggest.

34    The argument based on the text of § 173, which defines the permit requirements for nonattainment areas, is a classic example of circular reasoning. One of the permit requirements is that "the proposed source is required to comply with the lowest achievable emission rate" (LAER). Although a State may submit a revised SIP that provides for the waiver of another requirement—the "offset condition"—the SIP may not provide for a waiver of the LAER condition for any proposed source. Respondents argue that the plantwide definition of the term "source" makes it unnecessary for newly constructed units within the plant to satisfy the LAER requirement if their emissions are offset by the reductions achieved by the retirement of older equipment. Thus, according to respondents, the plantwide definition allows what the statute explicitly prohibits—the waiver of the LAER requirement for the newly constructed units. But this argument proves nothing because the statute does not prohibit the waiver unless the proposed new unit is indeed subject to the permit program. If it is not, the statute does not impose the LAER requirement at all and there is no need to reach any waiver question. In other words, § 173 of the statute merely deals with the consequences of the definition of the term "source" and does not define the term.

35    See supra, at 2787. We note that Senator Muskie was not critical of the EPA's use of the "bubble concept" in one NSPS program prior to the 1977 amendments. See ibid.

36    See, for example, the statement of the New York State Department of Environmental Conservation, pointing out that denying a source owner flexibility in selecting options made it "simpler and cheaper to operate old, more polluting sources than to trade up...." App. 128–129.

37    "Economists have proposed that economic incentives be substituted for the cumbersome administrative-legal framework. The objective is to make the profit and cost incentives that work so well in the marketplace work for pollution control.... [The 'bubble' or 'netting' concept] is a first attempt in this direction. By giving a plant manager flexibility to find the places and processes within a plant that control emissions most cheaply, pollution control can be achieved more quickly and cheaply." L. Lave & G. Omenn, Cleaning Air: Reforming the Clean Air Act 28 (1981) (footnote omitted).

38    Respondents point out if a brand new factory that will emit over 100 tons of pollutants is constructed in a nonattainment area, that plant must obtain a permit pursuant to § 172(b)(6) and in order to do so, it must satisfy the § 173 conditions, including the LAER requirement. Respondents argue if an old plant containing several large emitting units is to be modernized by the replacement of one or more units emitting over 100 tons of pollutant with a new unit emitting less—but still more than 100 tons—the result should be no different simply because "it happens to be built not at a new site, but within a pre-existing plant." Brief for Respondents 4.

39    See e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S., at 390, 104 S.Ct., at 2480 (1984).

40    See SEC v. Sloan, 436 U.S., at 117, 98 S.Ct., at 1711; Adamo Wrecking Co. v. United States, 434 U.S. 275, 287, n. 5, 98 S.Ct. 566, 574, n. 5, 54 L.Ed.2d 538 (1978); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

41    See Capital Cities Cable, Inc. v. Crisp, 467 U.S. at 699–700, 104 S.Ct. at 2700–2701; United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

---

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Duarte v. Mayorkas,  5th Cir.(Tex.),   March 3, 2022

476 F.3d 125
United States Court of Appeals,
Second Circuit.

David IBRAGIMOV, Petitioner,

v.

Alberto R. GONZALES, Attorney General, Respondent.

Docket No. 05–4771–ag.
|
Argued: Oct. 6, 2006.
|
Decided: Jan. 25, 2007.

**Synopsis**

**Background:** Alien who over-stayed his visa, and then left and returned to the United States pursuant to government's grant of advance parole while his adjustment-of-status application was pending, filed petition for review of decision of the Board of Immigration Appeals (BIA) affirming an order of an immigration judge denying his motion to terminate removal proceedings, which had been commenced after his adjustment-of-status application was denied, and ordering him removed from the United States.

**Holdings:** The Court of Appeals, Jose A. Cabranes, Circuit Judge, held that:

[1] alien was properly treated as an "arriving alien" and an "applicant for admission" subject to a charge of inadmissibility once his adjustment-of-status application was denied, rather than as an "admitted" visa overstay subject to a charge of deportability;

[2] the Court of Appeals did not have jurisdiction to review BIA's decision to issue a "streamlined" decision rather than refer case to three-member panel; and

[3] single member of the BIA did not need to issue written opinion when affirming immigration judge's decision.

Petition denied in part and dismissed in part.

West Headnotes (16)

**[1]    Aliens, Immigration, and Citizenship**  ⬤  Presumptions and burden of proof

Whether an alien's presence in the United States is pursuant to a prior "admission" is the decisive factor in determining whether the alien or the government bears the burden of proof in removal proceedings. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 240(c)(2), (c)(3)(A), 8 U.S.C.A. § 1229a(c)(2), (c)(3)(A).

1 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship**  ⬤  Parole or Temporary Admission

"Parole" is an administrative practice whereby the government allows an arriving alien who has come to a port-of-entry without a valid entry document to be temporarily released from detention and to remain in the United States pending review of the his immigration status; however, such parole does not constitute an admission of the alien. Immigration and Nationality Act, § 212(d)(5)(A), 8 U.S.C.A. § 1182(d)(5)(A).

7 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship**  ⬤  Parole or Temporary Admission

"Advance parole" is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry. Immigration and Nationality Act, § 212(d)(5)(A), 8 U.S.C.A. § 1182(d)(5)(A); 8 C.F.R. § 212.5(f).

4 Cases that cite this headnote

**[4]**   **Aliens, Immigration, and Citizenship** 🔑 Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) affirms the decision of the immigration judge without opinion, the Court of Appeals reviews the immigration judge's decision as the final agency determination.

**[5]**   **Aliens, Immigration, and Citizenship** 🔑 Law questions

Court of Appeals reviews an immigration judge's legal conclusions de novo.

1 Cases that cite this headnote

**[6]**   **Aliens, Immigration, and Citizenship** 🔑 Distinction Between Denial of Admission or Exclusion and Removal or Deportation

**Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Alien who over-stayed his visa, and then left and returned to the United States pursuant to government's grant of advance parole while his adjustment-of-status application was pending, was properly treated as an "arriving alien" and an "applicant for admission" subject to a charge of inadmissibility in removal proceedings once his adjustment-of-status application was denied, rather than as an "admitted" visa overstay subject to a charge of deportability; government's grant of advance parole did not constitute agreement that alien would remain a visa overstay once he voluntarily departed the country, and government's parole of alien back into the country was not an "admission" or "entry." Immigration and Nationality Act, §§ 101(a)(13)(A), 212(d)(5)(A), 🔖 8 U.S.C.A. §§ 1101(a)(13)(A), 🔖 1182(d)(5)(A); 8 C.F.R. §§ 1.1(q), 🚩 212.5(e)(2)(i), 245.2(a)(4)(B).

15 Cases that cite this headnote

**[7]**   **Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Congress did not intend for parole of an alien to constitute an alien's legal entry or admission to the United States; instead, parole is a means by which the government allows aliens who have arrived at a port-of-entry to temporarily remain in the United States pending the review and adjudication of their immigration status. Immigration and Nationality Act, §§ 101(a)(13)(A), 212(d)(5)(A), 🔖 8 U.S.C.A. §§ 1101(a)(13)(A), 🔖 1182(d)(5)(A).

11 Cases that cite this headnote

**[8]**   **Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Although paroled aliens physically enter the United States for a temporary period, they nevertheless remain constructively detained at the border, i.e. legally unadmitted, while their status is being resolved by immigration officials. Immigration and Nationality Act, §§ 101(a)(13)(A), 212(d)(5)(A), 🔖 8 U.S.C.A. §§ 1101(a)(13)(A), 🔖 1182(d)(5)(A).

7 Cases that cite this headnote

**[9]**   **Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

An arriving alien who has been granted advance parole by the government while his or her adjustment-of-status application is pending is exempt from being put in expedited removal proceedings, but is not exempt from being put in regular, non-expedited removal proceedings after the adjustment-of-status application is denied. Immigration and Nationality Act, § 235(b)(1)(A)(i), 🔖 8 U.S.C.A. § 1225(b)(1)(A)(i); 8 C.F.R. § 1.1(q).

2 Cases that cite this headnote

**[10]** **Aliens, Immigration, and Citizenship** 🔑 Revocation or expiration

The "time of parole," for purposes of regulation stating that, upon termination of an alien's parole, the alien shall be restored to the status that he had at time of parole, is not the time when the government provides advance authorization for the alien to be paroled upon his return to the United States, but rather occurs when the alien is actually paroled into the country by immigration officials at a port-of-entry. 🚩8 C.F.R. § 212.5(e)(2)(i).

7 Cases that cite this headnote

**[11]** **Aliens, Immigration, and Citizenship** 🔑 Visa Proceedings

Immigration and Naturalization Service (INS) regulations manifest the agency's intent to treat "visa overstays" who return to the United States pursuant to a grant of advance parole, and who are subsequently denied an adjustment of status, as "arriving aliens," i.e., "applicants for admission." 8 C.F.R. §§ 1.1(q), 🚩212.5(e)(2)(i), 245.2(a)(4)(B).

2 Cases that cite this headnote

**[12]** **Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Immigration and Naturalization Service (INS) regulations, under which advance parolees remain arriving aliens even after they have re-entered the United States, reflect a permissible interpretation of the parole statute; parole statute is silent on the question of what status should be accorded to advance parolees who have previously overstayed their visas, and the INS regulations are consistent with the parole statute's command that parole does not afford an alien legal admission to the country. Immigration and Nationality Act, § 212(d)(5)(A), 🚩8 U.S.C.A. § 1182(d)(5)(A); 8 C.F.R. §§ 1.1(q), 🚩212.5(e)(2)(i), 245.2(a)(4)(B).

2 Cases that cite this headnote

**[13]** **Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

Under *Chevron*, if a statute is clear on its face, the court must give effect to the unambiguously expressed intent of Congress; if, however, the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

**[14]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

The Court of Appeals did not have jurisdiction to review the decision of the Board of Immigration Appeals (BIA), in removal proceeding, to issue a "streamlined" decision on the alien's claims, i.e., a decision by a single board member and without consideration by a three-member panel. 🚩8 C.F.R. § 1003.1(e).

1 Cases that cite this headnote

**[15]** **Aliens, Immigration, and Citizenship** 🔑 Summary affirmance; single or multiple member review

Single member of the Board of Immigration Appeals (BIA) did not need to issue a written opinion when affirming immigration judge's denial of alien's motion to terminate removal proceedings, where regulations clearly and unambiguously supported immigration judge's conclusion that alien was an "arriving alien" who was properly subject to a determination of admissibility, as opposed to deportability. 8 C.F.R. §§ 1.1(q), 🚩212.5(e)(2)(i), 245.2(a)(4)(B), 🚩1003.1(e)(4)—(e)(5).

1 Cases that cite this headnote

[16]  **Aliens, Immigration, and Citizenship** 🔑 Summary affirmance; single or multiple member review

**Constitutional Law** 🔑 Admission and exclusion; deportation

Board of Immigration Appeals (BIA) did not violate alien's due process or equal protection rights when it issued a "streamlined" decision, i.e., an unpublished decision by a single board member, that affirmed immigration judge's removal order. U.S.C.A. Const.Amend. 5; 8 C.F.R. § 1003.1(e).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*127** Michael P. Diraimondo, Diraimondo & Masi, LLP, Melville, NY, for Petitioner.

Debra Prillaman, Assistant United States Attorney (Chuck Rosenberg, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of Virginia, Richmond, VA, for Respondent.

Before FEINBERG, CABRANES, and SACK, Circuit Judges.

**Opinion**

JOSÉ A. CABRANES, Circuit Judge.

We consider here the claims of a petitioner who all but concedes that he has no legal right to remain in the United States, but who argues that his removal proceedings were invalid because the charges **\*128** brought against him did not reflect his proper status, which he claims was *merely* that of an *illegal* "visa overstay."[1] In particular, we consider whether petitioner, who remained in the United States after the expiration of his B–2 visa,[2] and subsequently left and returned to the country pursuant to the government's grant of "advance parole"[3] while his adjustment-of-status application[4] was pending, was improperly charged with removal as an "arriving alien"[5] and an "applicant for admission"[6] once his adjustment-of-status application was denied. Petitioner argues that because he traveled abroad

with the government's express authorization, he should have retained his prior status as a visa overstay and been subject to a charge of deportability (rather than inadmissibility).[7] He therefore contends that the IJ erred in denying his motion to terminate his removal proceedings and in failing to afford him the enhanced protections that apply to visa overstays, as opposed to arriving aliens.

We hold that the government did not err in treating petitioner as an arriving alien and an applicant for admission, or in denying his motion to terminate his removal proceedings.

We further hold, pursuant to *Kambolli v. Gonzales, 449 F.3d 454 (2d Cir.2006),* that we lack jurisdiction to consider petitioner's additional claim that the Board of Immigration Appeals ("BIA") erred by having his appeal decided by a single-member panel rather than referring it to a three-member panel for decision. Finally, assuming without deciding that we have jurisdiction to review the propriety of the one-judge panel's issuance of a summary affirmance instead of a written opinion, we conclude that it was not error to do so here under the governing BIA regulations.

**I. Background**

Petitioner David Ibragimov, a native of Uzbekiztan and citizen of Israel, entered **\*129** the United States on a valid six-month B–2 visa on September 20, 1992. Petitioner over-stayed his visa—*i.e.,* he remained in the United States after the expiration of the visa that permitted him to enter the United States in the first place; that visa expired on March 19, 1993. On November 8, 1995, while still residing in the United States, he married a United States citizen. Petitioner's wife subsequently filed a Petition for Alien Relative (Form I–130) on his behalf. In conjunction with the Petition for Alien Relative, petitioner filed an Application for Adjustment of Status ("Form I–485").

While these applications were pending before the Immigration and Naturalization Service ("INS")[8], petitioner applied for "advance parole," *i.e.,* permission to leave and return to the United States with the government's prior authorization pending resolution of his immigration status. The INS granted advance parole on July 29, 1996 by issuing a "Form I–512." The Form I–512 contained a warning which stated: "WARNING: pursuant to 8 C.F.R. § 245.2(a)(4) if your application for adjustment of status is denied, you will be subject to exclusion proceedings."[9] Pursuant to this

advance parole authorization, and while his adjustment of status application was pending, petitioner left the United States and was "paroled back" into the country several times.

Petitioner's most recent return to the United States pursuant to the government's grant of advance parole occurred on or about July 24, 1998. Thereafter, on October 19, 1999, the INS denied petitioner's visa petition and his Application for Adjustment of Status. On July 23, 2001, the INS revoked petitioner's parole on the ground that its purpose "ha[d] been accomplished, and there [was] no emergent, humanitarian, or public interest reasons which warrant[ed]" his continued presence in the United States.

On October 1, 2001, the INS issued a Notice to Appear ("NTA") for removal proceedings before an immigration judge. The NTA charged that petitioner was inadmissible pursuant to Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 🚩 8 U.S.C. § 1182(a)(7)(A) (i)(I). [10] In particular, the NTA alleged that petitioner was a non-citizen who (1) "applied for admission to enter the United States ... on or about ... July 24, 1998 [the date he last returned to the United States]"; (2) applied for admission as an intending immigrant; and (3) was "not in possession of a valid, unexpired immigrant visa, reentry permit, border crossing card, or other valid entry **\*130** document required by the Immigration and Nationality Act."

Removal proceedings were held before Immigration Judge ("IJ") Patricia J. Rohan between February 2002 and February 2004. On or about May 12, 2003, petitioner filed a motion to terminate his removal proceedings. In his brief in support of his motion to terminate, petitioner argued, *inter alia*, that he was not an arriving alien (*i.e.*, an applicant for admission) as alleged in the NTA because he had left and been "paroled back" into the country with the government's advance authorization. The INS opposed the motion, arguing that under applicable INS regulations petitioner was an "arriving alien."

On February 26, 2004, the IJ denied petitioner's motion to terminate the removal proceedings. The IJ stated that petitioner had not "established as a matter of law that the definition of an arriving alien does not apply to him." The IJ concluded that "[the definition of an arriving alien] clearly does apply to [the petitioner] who most recently returned to the United States and was paroled into the United States for the purpose of completing his application for adjustment of his status." Pursuant to this determination, the IJ ordered

petitioner removed from the United States on the grounds that he had not shown he was eligible for admission to the country.

Petitioner timely appealed the IJ's decision to the Board of Immigration Appeals. On August 3, 2005, the BIA affirmed without opinion the IJ's removal order. *See In re David Ibragimov,* No A 74 836 729 (BIA Aug. 3, 2005), *aff'g* No A 74 836 729 (Immig. Ct. N.Y. City Feb. 26, 2004). Petitioner timely seeks review of the BIA's decision.

On appeal, petitioner raises substantially the same argument that he raised in support of his motion to terminate before the IJ—namely, that he was not an "arriving alien" subject to a determination as to admissibility, but was, rather, a "visa overstay" subject to a determination as to deportability. He therefore urges this Court to hold that the IJ's denial of his motion to terminate was error.

Petitioner also argues on appeal that the BIA violated his constitutional rights to due process of law and to equal protection of the laws when it affirmed the IJ's decision by the action of one member of the BIA and without the issuance of a published opinion.

## II. Governing Law

### A. Burden of Proof in Removal Proceedings

Following Congress's passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009, ("IIRIRA"), there is a single category of immigration proceedings for adjudicating whether an alien is legally present in the United States— namely, "removal proceedings." [11] The **\*131** burden of proof in removal proceedings differs, however, depending on an alien's immigration status at the time his proceedings are commenced. In particular, an individual who is an "applicant for admission" to the United States at the time of his removal proceeding is deemed to be legally at the border and bears the burden of establishing that he "is clearly and beyond doubt entitled to be admitted and is not inadmissible ... or ... by clear and convincing evidence, that [he] is lawfully present in the United States pursuant to a prior admission." 🚩 8 U.S.C. § 1229a(c)(2).

By contrast, in a removal proceeding commenced after an alien has been formally "admitted" to the country, "the Service [*i.e.,* the government] has the burden of establishing

by clear, convincing evidence that ... the alien is deportable,"

8 U.S.C. § 1229a(c)(3)(A).

**[1]** Accordingly, whether an alien's presence in the United States is pursuant to a prior "admission" is the decisive factor in determining whether the alien or the government bears the burden of proof in removal proceedings.

## B. Charges in Removal Proceedings

An alien's prior "admission" *vel non* is also dispositive in determining which particular "charge" of removability is appropriate to his removal proceedings. An alien who is "in and admitted to the United States," is considered potentially *deportable* and is therefore subject to a charge of deportability. 8 U.S.C. § 1227(a); *id.* § 1229a(a). By contrast, an alien who is not in the United States pursuant to a prior admission is considered potentially *inadmissible* and is therefore subject to a charge of "inadmissibility," *See* 8 U.S.C. § 1229a(e)(2) (explaining distinction between aliens removable on the basis of inadmissibility and aliens removable on a basis of deportability).

## C. Admission, Entry, and Arriving Aliens

The INA defines the "admission" of an alien as follows: "The terms 'admission' and 'admitted' mean, with respect to an alien, *the lawful entry* of the alien into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A) (emphasis added). Accordingly, an alien will not be considered admitted under the immigration laws (and therefore will bear the burden of proving his admissibility) unless his presence in the country is pursuant to an "entry" that was both "lawful" and "authorized" by an immigration officer. *Id.*

Aliens who appear at a port-of-entry seeking to enter the United States but who have not been formally "admitted" are considered "arriving aliens" and "applicants for admission." *See* 8 C.F.R. § 1.1(q) ("[A]rriving alien means an applicant for admission coming or attempting to come to the United States at a port-of-entry....").

## D. Parole

**[2]** "Parole" is an administrative practice whereby the government allows an arriving alien who has come to a port-of-entry without a valid entry document to be temporarily

released from detention and to remain in the United States pending review of the his immigration status. The statute governing parole states:

> **\*132** The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States....

8 U.S.C. § 1182(d)(5)(A). Such parole does not constitute an admission, however. *See id.*

**[3]** "Advance parole" is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry. *See, e.g., Succar v. Ashcroft,* 394 F.3d 8, 15 n. 7 (1st Cir.2005). Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f), which provides: "Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued form I–512." 8 C.F.R. § 212.5(f). Advance parole is often granted to aliens residing in the United States who have a need to travel abroad, but whose immigration status would not afford them a right to legal admission upon their return. *See, e.g., Succar,* 394 F.3d at 15, n. 7 (explaining the common use of advance parole to allow the return to the country of a resident alien "who has an unexpected need to travel abroad and whose conditions of stay do not otherwise allow for readmission ...."); *see also* 71 Fed.Reg. 27,585, 27,586 n. 1 (May 12, 2006) ("One long-standing use of advance parole has been to provide a means for applicants for adjustment of status to be able to leave the country briefly and return without abandoning their applicants for adjustment."). After the purpose of the parole has been served, the alien's status reverts to that which he had at the time he was inspected and paroled into the country, and "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); *see* Eligibility of Arriving Aliens in

Removal Proceedings To Apply for Adjustment of Status, 8 C.F.R. § 212.5(e)(1)-(2). [12]

### III. Standard of Review

**[4]** **[5]** Where, as here, the BIA affirms the decision of the IJ without opinion, we review the IJ's decision as the final agency determination. *See Twum v. INS,* 411 F.3d 54, 58 (2d Cir.2005). We review the IJ's legal conclusions *de novo. Zhang Jian Xie v. INS,* 434 F.3d 136, 139 (2d Cir.2006).

### IV. Discussion

#### A. Whether the IJ Erred in Denying Petitioner's Motion To Terminate Removal Proceedings Based on The Conclusion That Petitioner Was an Arriving Alien

**[6]** We conclude here that under valid and unambiguous INS regulations governing the grant of advance parole, petitioner was properly treated as an "arriving alien" and an "applicant for admission" in removal proceedings once his adjustment-of-status application was denied. As explained below, INS regulations manifest the agency's clear intent to treat parolees, including advance parolees, as "arriving aliens" subject to a determination of inadmissibility. Once he departed from the United States, petitioner would have had no right to return to the United States absent the **\*133** government's grant of advance parole. Therefore, when petitioner returned and was paroled into the United States in July 1998, he was entitled only to the rights of an advance parolee (namely, the right to physically enter the country and complete his adjustment-of-status application as an "arriving alien") and was not entitled to the enhanced protections that would have been available to a visa overstay who never left the country.

The gravamen of petitioner's challenge to the IJ's denial of his motion to terminate his removal proceedings is that he was not an "arriving alien" at the time his removal proceedings were commenced because he had already "arrived" when the government issued its Notice to Appear. In particular, petitioner argues that (1) his most recent return to the United States pursuant to the government's grant of advance parole was an "entry" or "re-entry" to the country, (2) the government's advance parole authorization form was a valid entry document, and (3) the subsequent denial of his adjustment-of-status application did not revoke, *nunc pro tunc,* the government's "admission" of petitioner pursuant to

its grant of advance parole. Petitioner therefore urges this Court to hold that he retained the status of a visa overstay that he held before leaving the United States.

Although petitioner's argument has some intuitive appeal, it is legally without merit for several reasons.

First, petitioner's argument that the IJ and the agency erred in treating him as an applicant for admission, rather than an admitted alien, directly contravenes the plain language of 8 C.F.R. § 245.2(a)(4)(B). [13] That regulation deals specifically with aliens who, like petitioner, apply for adjustment of status and subsequently travel outside the United States pursuant to the government's grant of advance parole. It provides, in relevant part:

> The travel outside the United States by an applicant for adjustment [of status] who is not under exclusion, deportation, or removal proceedings shall not be deemed an abandonment of the application if he or she was previously granted advance parole for such absences, and was inspected and paroled upon returning to the United States. *If the adjustment of status of such individual is subsequently denied, he or she will be treated as an applicant for admission, and subject to the provisions of Section 212 and 235 of the [Immigration and Naturalization Act,* 8 U.S.C. §§ 1182, 1225].

8 C.F.R. § 245.2(a)(4)(B) (emphasis added). Petitioner does not dispute that before his most recent trip abroad, he was "an applicant for adjustment [of status] who [was] not under exclusion, deportation, or removal proceedings." *Id.* Nor does he dispute that he (1) traveled outside the United States having been "previously granted advance parole," (2) "was inspected and paroled upon returning" to the country, and (3) was "subsequently denied" his adjustment of status application. It therefore directly follows from the plain language of the regulation that petitioner should "be treated as an applicant for admission" to the United States. *Id.*

Second, petitioner's argument that he was not an "applicant for admission" because (1) his parole back into the United States constituted an "entry" or "admission," and because (2) the government's **\*134** parole authorization form was a valid entry document, is undermined by the statute governing the grant of parole by immigration officials. Section 212(d)(5) (A) of the INA provides the Attorney General with discretion to parole into the United States certain aliens who apply

for admission. 8 U.S.C. § 1182(d)(5)(A). The statute specifically states that "parole of [an] alien *shall not* be regarded as an admission of the alien" and that "when the purposes of such parole shall ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other *applicant for admission* to the United States." *Id.* (emphasis added); *see also* 8 U.S.C. § 1101(a)(13)(A) ( "An alien who is paroled under section 212(d)(5) ... shall not be considered to have been admitted).

[7]  [8]  The terms of this statute reflect the well-settled principle that Congress did not intend for parole of an alien to constitute an alien's legal entry or admission to the United States. *See Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *United States ex rel. Kordic v. Esperdy,* 386 F.2d 232, 235 (2d Cir.1967) ("A 'parolee,' even though physically in the country, is not regarded as having 'entered' [the country].... If he is required to leave the United States, he is being excluded, not expelled."). Instead, parole is a means by which the government allows aliens who have arrived at a port-of-entry to temporarily remain in the United States pending the review and adjudication of their immigration status. Although paroled aliens physically enter the United States for a temporary period, they nevertheless remain constructively detained at the border, *i.e.* legally unadmitted, while their status is being resolved by immigration officials. *See Leng May Ma,* 357 U.S. at 191, 78 S.Ct. 1072 ("The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court."); *Fernandez–Roque v. Smith,* 734 F.2d 576, 578–79 & n. 2 (11th Cir.1984) (paroled aliens are considered detained at the border); *see also Wong Hing Fun v. Esperdy,* 335 F.2d 656, 657 (2d Cir.1964) (Marshall, *J.*) (same).

Petitioner argues that his case is distinguishable from those cases cited above because he was not seeking admission for the first time but was, rather, a "visa overstay" returning to the United States with the government's express permission. Petitioner's Br. at 10–11. He thus argues that the BIA exceeded its authority and contravened the purpose of the statute in treating him as an "applicant for admission." *Id.* This argument is unavailing. Neither the governing statute nor the INS's regulations provide any basis for the conclusion that a grant of advance parole warrants an exception to the well-settled principle that parole does not effect a legal entry or admission to the United States. Petitioner was paroled pursuant to 8 U.S.C. § 1182(d)(5)(A) and presents no argument that he was entitled to enter the United States on any other basis. We therefore find no reason why the statute's provision stating that "parole of [an] alien shall not be regarded as an admission," *id.,* should not be read to apply here.

Moreover, to interpret the statute otherwise and deem petitioner an "admitted" visa overstay would ignore the fact that the government's grant of advance parole merely constituted an agreement to allow **\*135** for petitioner's temporary *return* to the United States and to prevent the abandonment of his adjustment-of-status application. It did not constitute a promise to overlook all of the legal consequences of his *departure.* In particular, the government did not agree that petitioner would remain a visa overstay once he voluntarily departed the country. Because visa overstays sacrifice their status as overstays when they leave the country and are not admissible on the basis of their expired visas should they subsequently appear at a port-of-entry, *see* 8 U.S.C. § 1181(a)(7)(A)(i) (requiring "a valid *unexpired* visa" or other entry document for admission) (emphasis added), we reject petitioner's argument that he was entitled to treatment either as an "admitted" alien or as a "visa overstay" when he returned to the country pursuant to his advance parole.

Accordingly, the government's parole of petitioner back into the United States in July 1998 did not constitute a "re-admission," much less an "admission," that reversed the legal effects of his previous departure, nor did his parole document afford him "entry" to the United States. Petitioner left the United States with the government's assurance merely that he would be granted a temporary, *physical* presence in the country upon his return (for the sole purpose of completing his Adjustment of Status Application). Having been paroled into the country and denied an adjustment of status, petitioner cannot now bootstrap his latest parole into a formal, *legal* re-entry. *See Zheng Zheng v. Gonzales,* 422 F.3d 98, 111 (3d Cir.2005) (holding that "because [the petitioner] re-entered with no legal status greater than that of a parolee, he is simply a paroled arriving alien").

Although petitioner additionally relies on 8 C.F.R. § 1.1(q) to suggest that the definition of an "arriving alien" does not apply to him, this reliance is misplaced. 8 C.F.R. § 1.1(q) defines an arriving alien as follows:

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry.... An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act, except that an alien who was paroled before April 1, 1997, or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States shall not be considered an arriving alien for purposes of [INA] section 235(b)(1)(A)(i).

8 C.F.R. § 1.1(q). Petitioner does not appear to dispute that at the time he returned to the United States in July 1998, and *before he was paroled back into the country,* he was an "applicant for admission coming or attempting to come into the United States at a port-of-entry," *id.,* and that the definition of an "arriving alien" therefore applied to him. [14] *Id.; see Matter of Oseiwusu,* 22 I & N Dec. 19, 19–20 (BIA 1998) (holding that aliens returning pursuant to a grant of advance parole are "arriving aliens"). Instead, petitioner argues that "[a]t the time the *Notice to Appear issued,*" he had been paroled back **\*136** into the country and was therefore no longer "seeking inspection to the United States" but, rather, had "already arrived" within the meaning of the regulation. Petitioner's Br. at 12–13 (emphasis added). He thus contends that "the termination of his advance parole status cannot undue [sic] the grant of advance parole *nunc pro tunc* and make [him] an arriving alien." *Id.* at 13. This argument is unavailing for two reasons.

 **[9]**     First, petitioner's argument that he was no longer an "arriving alien" when the Notice to Appear issued ignores the regulation's command that "an arriving alien *remains such*

*even if paroled* pursuant to [INA] section 212(d)(5)." 8 C.F.R. § 1.1(q) (emphasis added). The regulation carves out only two limited exceptions to this general principle, neither of which applies here. The first exception, for "aliens paroled before April 1, 1997," *id.,* does not apply because petitioner was most recently paroled in July of 1998—more than a full year after the latest date covered by the exception. The second exception, for "aliens who are granted advance parole," is rendered inapplicable to this particular petitioner by the exception's narrow specification that such aliens shall not be regarded as arriving aliens "*for purposes of* section 235(b)(1)(A)(i)." *Id.* Section 235(b)(1)(A)(i) of the INA is a statute that deals specifically with *expedited* removal proceedings.

🚩 8 U.S.C. § 1225(b)(1)(A)(i). As the government correctly asserts, the regulation thus "exempts an 'arriving alien' who has been given advance parole from being put in expedited removal [proceedings]." Respondent's Br. at 28. Petitioner in the instant case was not "put in expedited removal [proceedings]"—he was afforded a regular, non-expedited hearing by immigration officials. Therefore, neither the expedited removal statute, nor the above-cited exception set forth in 8 C.F.R. § 1.1(q), applies to him.

 **[10]**     Second, petitioner's argument that he was not an "arriving alien" at the time his Notice to Appear issued is further undermined by the terms of 🚩 8 C.F.R. § 212.5(e)(2)(i), which provides that upon termination of an alien's parole, the alien "shall be restored to the status that he or she had *at the time of parole.*" 🚩 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). Contrary to petitioner's assertion in his brief, Petitioner's Br. at 12, the "time of parole" of an alien is not the time when the government provides advance authorization for the alien to be paroled upon his return to the United States. Rather, the "time of parole" occurs when the alien is actually paroled into the country by immigration officials at a port-of-entry. *See* 🟨 *Barney v. Rogers,* 83 F.3d 318, 321 (9th Cir.1996) ("Although Petitioner received advance parole—a promise of parole upon her return—while she was an illegal overstay, she was not 'paroled' until she returned to the United States from [abroad]."). [15] Accordingly, even if we accepted *arguendo* petitioner's argument that he had "arrived" **\*137** in the United States on the date he returned from his most recent sojourn abroad, [16] upon denial of his adjustment of status application, his status reverted to that which he held at the time he was paroled into the United States in July 1998—namely, that of an "arriving alien" seeking admission at our

borders. *See id.* (holding that "[a]t the time of parole, as distinguished from the time of advance parole, [a petitioner] was an excludable alien like all aliens who seek admission to the United States at designated ports of entry.").

**[11]   [12]   [13]**   Thus, the statutory and regulatory framework governing administrative parole supports the IJ's and the BIA's conclusion that petitioner was an "arriving alien" properly subjected to a charge of inadmissibility. INS regulations manifest the agency's intent to treat "visa overstays" who return to the United States pursuant to a grant of advance parole, and who are subsequently denied an adjustment of status, as "arriving aliens," *i.e.,* "applicants for admission." [17]

We note that the Court of Appeals for the Ninth Circuit has similarly concluded, in a case with facts substantially similar to those at bar, that advance parolees are not legally within the United States for immigration purposes (albeit under the pre-IIRIRA statutory scheme). In *Barney,* 83 F.3d at 318, a petitioner over-stayed her visa, and then left and returned to the United States pursuant to the government's grant of advance parole while her adjustment of status application was pending. *Id.* at 319–20. The government placed petitioner in *exclusion,* rather than *deportation,* proceedings once her application was denied. *Id.* at 320–21. Petitioner argued on appeal that she should retain the "visa overstay" immigration status she held prior to leaving the country. *Id.* The Ninth Circuit disagreed, holding that "advance parole gave petitioner the right to return for the purpose of completing her Adjustment Application; it did not 'freeze' her status as an illegal overstay." **\*138** *Id.* at 321. [18]

More recently, the Court of Appeals for the Third Circuit has similarly held, under the post-IIRIRA statutory scheme, that advance parolees are not "admitted" aliens for the purposes of their removal proceedings. In considering the legality of a regulation precluding parolees from applying for adjustment of status, the Court held that an alien who returned to the United States as an advance parolee was an "arriving alien" under the applicable statutes and regulations. *See Zheng,* 422 F.3d at 110–11. Likewise, the Court of Appeals for the Fifth Circuit has recently held, in an unpublished decision, that an alien who left and returned to the United States pursuant to a grant of advance parole was "by definition an arriving alien." *Diarra v. Gonzales,* 137 Fed.Appx. 627, 630 (5th Cir.2005).

We agree with our sister Circuits, and, for the reasons stated above, we hold that the IJ and the BIA did not err in treating petitioner as an "arriving alien" and an "applicant for admission" for the purposes of his removal proceedings. In particular, we hold that, by overstaying his visa, and then leaving the United States without a document entitling him to legal admission, petitioner sacrificed the status he would have retained had he remained inside the country. His most recent trip abroad rendered him legally outside the borders of the United States and, upon his return, neither his parole back into the country nor the subsequent denial of his adjustment of status compelled the BIA to treat him as an "admitted" visa overstay. Accordingly, the IJ's denial of petitioner's motion to terminate removal proceedings was not erroneous. [19]

## B. Whether the BIA Violated Petitioner's Due Process and Equal Protection rights by Issuing a "Streamlined" Decision

Petitioner's remaining claim is that the BIA erred by issuing a "streamlined" decision *(i.e.,* an unpublished decision by a single board member) when it rejected the merits of his appeal. In particular, he argues that the agency violated his right to due process of law and to equal protection of the laws under the Fifth Amendment.

**[14]**   In *Kambolli v. Gonzales,* 449 F.3d 454 (2d Cir.2006), we held that we lack jurisdiction to review a single Board member's decision unilaterally to affirm a decision pursuant to the "streamlining" regulations adopted by the Department of Justice, 8 C.F.R. § 1003.1(e), rather than **\*139** refer the case to a three-member panel of the BIA. Accordingly, pursuant to our holding in *Kambolli,* we do not have jurisdiction to review the BIA's decision to resolve petitioner's claims without consideration by a three-member panel. *See id.* at 458–65.

**[15]**   As for petitioner's related argument that the single Board member's decision to issue a summary affirmance (rather than a written opinion) was error under governing BIA regulations, *see* Petitioner's Br. at 25, we find the argument to be unavailing. In *Kambolli,* we explicitly left open the question of whether we have jurisdiction to review a petitioner's claim that a single BIA member erred in ... affirming an IJ *without opinion."  See Kambolli,* 449 F.3d at 462 n. 11 (emphasis added). We do not address that question here because, assuming, without deciding, that

we have jurisdiction to consider petitioner's argument, we conclude that the argument is without merit. BIA regulations squarely and unambiguously support the IJ's conclusion that petitioner was an "arriving alien" who was properly subject to a determination of admissibility, as opposed to deportability. Therefore, it was not error for the BIA, when considering the circumstances under which a Board member may affirm an IJ's decision without opinion set forth in 8 C.F.R. § 1003.1(e)(4)-(e)(5), to conclude that no written opinion was warranted in the instant case.

[16]   Finally, in reviewing petitioner's constitutional arguments, we conclude that these arguments are without merit. We have previously upheld the BIA's stream-lining regulations in the face of constitutional challenges brought by petitioners, and the instant petitioner presents no arguments that cause us to reconsider the constitutionality of such regulations. *See, e.g., Yu Sheng Zhang v. U.S. Dep't of Justice,* 362 F.3d 155, 156–59 (2d Cir.2004) (holding that the issuance of a "streamlined" decision did not violate an alien's Due Process rights); *cf. Furman v. United States,* 720 F.2d 263, 264 (2d Cir.1983) (noting that "[t]here is no requirement in the law that a federal appellate court's decision be accompanied by a written opinion.").

## CONCLUSION

We have considered all of petitioner's remaining arguments and find each of them to be without merit.[20]

To summarize, we hold that:

(1) The applicable INS regulations manifest the agency's unambiguous intent to treat aliens who return to the United States pursuant to a grant of advance parole,

and are subsequently denied a pending adjustment-of-status application, as "arriving aliens" and "applicants for admission";

**\*140**  (2) these applicable regulations are supported by the governing statute, which manifests Congress's view that parole does not constitute an alien's "entry" or "admission" to the United States;

(3) the IJ did not err in treating petitioner as an "arriving alien" and an "applicant for admission," or in denying petitioner's motion to terminate his removal proceedings;

(4) we lack jurisdiction to consider petitioner's argument that the BIA erred in issuing a decision by a single-member panel of the Board;

(5) assuming *arguendo* that we have jurisdiction to review petitioner's related argument that the BIA erred by affirming the decision of the IJ without a written opinion, the argument is without merit;

(6) petitioner's constitutional claims arising from the BIA's affirmance without opinion of the IJ's decision are without merit.

* * * *

Accordingly, we **DENY** the petition for review insofar as it relates to (1) the IJ's denial of petitioner's motion to terminate his removal proceedings and (2) the BIA's affirmance of the IJ's decision without a written opinion, and we **DISMISS** the petition insofar as it relates to the single Board member's decision not to refer petitioner's case to a three-member panel.

### All Citations

476 F.3d 125

## Footnotes

1   "Visa overstay" is a term used in the immigration statutes to refer to an alien who has entered the country on a lawful visa but remained in the United States beyond the period authorized by the government. *See, e.g.,* 8 U.S.C. § 1202(g) (providing with respect to "visa overstays," *i.e.,* "alien[s] who ha[ve] been admitted ... and remained in the United States beyond the period of stay authorized by the Attorney General," that their "[nonimmigrant] visa shall be void beginning after the conclusion of such period of stay.").

2    A B–2 visa, often referred to as a "tourist" visa, may be issued to a "visitor for pleasure" so that such a person may remain legally in the United States for a temporary period. The initial period of authorization of a B–2 visa may not exceed one year, but may be extended in increments of six months. *See* 🚩 8 C.F.R. § 214.2(b)(1).

3    Advance parole is a practice whereby the government agrees, before an alien arrives at a port of entry, to allow the alien's physical entry to the United States once he arrives (and while his immigration status is being resolved by immigration officials). *See* pp. 131–32, *post.*

4    A temporary visitor to the United States, *i.e.,* a "nonimmigrant," may apply for an "adjustment of status" to that of a permanent legal resident pursuant to the specific procedures and conditions outlined in the immigration statutes. *See, e.g.,* 🚩 8 U.S.C. § 1255.

5    "Arriving alien" is a term used in the immigration laws to described aliens who are considered, for legal purposes, to be arriving at a port of entry and who have not been formally admitted to the United States. *See* p. 131, *post.*

6    *See* p. 131, *post.*

7    An alien present in the United States pursuant to a prior "admission" is subject to a charge of "deportability." *See* pp. 130–31, *post.* An alien present in the United States who has not been formally "admitted" is subject to a charge of "inadmissibility." *See id.*

8    In 2002, responsibility for enforcing the immigration laws was transferred to the newly-created Bureau of Immigration and Customs Enforcement ("ICE") within the new Department of Homeland Security ("DHS").

*See* 🚩 *Thapa v. Gonzales,* 460 F.3d 323, 325 n. 1(2d Cir.2006). To avoid confusion, we refer to the Government's immigration enforcement authority as the INS throughout this opinion.

9    "Exclusion" is a term previously used in the immigration statutes to refer to proceedings held for aliens who were not in the United States pursuant to a previous legal "entry." Such aliens are now placed in "removal" proceedings and are subject to a charge of "inadmissability," as opposed to "excludability." *See* pp. 133–34, *post;* 🚩 8 U.S.C. § 1229a(a)(2).

10    🚩 8 U.S.C. § 1182(a)(7)(A)(i) provides, in pertinent part:

   "Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission—

   (I) who is not in possession of a valid unexpired visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document ... is inadmissible."

11    Prior to 1996, the INA maintained two separate types of proceedings to adjudicate the legal status of aliens —"deportation" proceedings and "exclusion" proceedings. *See* 🚩 *Henderson v. INS,* 157 F.3d 106, 111 n. 5 (2d Cir.1998). "Deportation" proceedings were provided to aliens who had formally "entered" the United States, while "exclusion" proceedings were provided to aliens who were seeking entry to the United States and therefore were constructively deemed to be at the border. *Id.; see also Landon v. Plasencia,* 459 U.S. 21, 25, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Patel v. McElroy,* 143 F.3d 56, 60 (2d Cir.1998). The IIRIRA combined immigration proceedings into a single category called "removal proceedings" and replaced the definition of an "entry" with that of an "admission." *See Henderson,* 157 F.3d at 111 n. 5. *Compare* 8

U.S.C. § 1101(a)(13) (1994), *with* 🚩 8 U.S.C. § 1101(a)(13)(2006). As explained, *post*, p. 131, "deportability" and "deportation" remain terms under the immigration laws, but now refer to a particular charge that the government may bring against certain aliens who are placed in removal proceedings after having been formally admitted to the country.

12 The regulations governing grant of advance parole are discussed at pp. 132–33, *post.*

13 Petitioner curiously does not challenge, much less address or acknowledge, this regulation in his brief on appeal.

14 We note that the parole statute only provides the Department of Homeland Security Secretary with discretion to parole into the country "alien[s] *applying for admission* to the United States." 🚩 8 U.S.C. § 1182(d)(5)(A). Accordingly, insofar as petitioner implicitly concedes that the government's grant of his parole was a valid exercise of agency authority under 🚩 8 U.S.C. § 1182(d)(5)(A), he also necessarily concedes that he was an alien "applying for admission to the United States" at the time he was paroled in July 1998. *Id.*

15 The Secretary of Homeland Security and the Attorney General have recently emphasized, in an explanatory note to interim rules published in the Federal Register, that a grant of advance parole is not synonymous with the (subsequent) parole of the alien:

'Advance parole' is the determination of an appropriate DHS officer that DHS should agree to the exercise of the parole authority under Section 212(d)(5)(A) of the Act before the alien's actual arrival at a port-of-entry. *The actual decision to parole, however, is made at the port-of-entry.* Since any grant of parole may be revoked, 🚩 8 C.F.R. § 212.5(e), a decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry, should DHS determine that parole is no longer warranted.

Eligibility of Arriving Aliens in Removal Proceedings, 71 Fed.Reg. at 27,586 (May 12, 2006) (emphasis added).

16 We reject this argument for the reasons explained above.

17 Petitioner does not explicitly argue that the pertinent INS regulations reflect an impermissible interpretation of the parole statute under the well-known principles of 🚩 *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Nevertheless, to the extent he implicitly raises such an argument by urging an interpretation of the statute that conflicts with the INS regulations discussed above, *see* Petitioner's Br. at 10–11, his argument is without merit.

Under *Chevron,* if a statute is clear on its face, we "must give effect to the unambiguously expressed intent of Congress." *Fulani v. FCC,* 49 F.3d 904, 910 (2d Cir.1995) (quoting 🚩 *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting 🚩 *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778); *see also* 🚩 *Nolan v. Holmes,* 334 F.3d 189, 198 (2d Cir.2003) (applying *Chevron* to review of INS regulation).

Applying the first step of *Chevron* analysis, we conclude (and petitioner concedes, *see* Petitioner's Br at 10), that the parole statute is silent on the question of what status should be accorded to *advance* parolees who have previously overstayed their visas. Applying the second step of our analysis, we conclude that the relevant INS regulations are "reasonable" and not "arbitrary, capricious, or manifestly contrary" to the intent of Congress, and therefore are entitled to the deference of the courts, 🚩 *Chevron,* 467 U.S. 837 at 845,

104 S.Ct. 2778, 81 L.Ed.2d 694. In particular, the interpretation embraced by the INS's regulations—*i.e.,* that advance parolees remain arriving aliens even after they have re-entered the United States—fully accords with the statute's general command that parole does not afford an alien legal admission to the country. *See* 🚩 8 U.S.C. § 1182(d)(5)(A).

18    Although petitioner relies on two other cases, 🚩 *Patel v. Landon,* 739 F.2d 1455 (9th Cir.1984) (holding that an advance parolee should have been subject to deportation proceedings, rather than exclusion proceedings) and 🚩 *Joshi v. INS,* 720 F.2d 799 (4th Cir.1983) (same), to support his claim that his trips abroad pursuant to the grant of advance parole did not alter his immigration status, this reliance is misplaced. *Patel* and *Joshi* were decided before 1986, when the Attorney General amended 8 C.F.R. § 245.2 to explicitly provide that advance parolees would be subject to exclusion, rather than deportation, proceedings upon their return to the United States. *See* Adjustment of Status to that of Persons Admitted for Permanent Residence, Advance Parole, 51 Fed.Reg. 7431, 7432 (March 4, 1986) (codified as amended at 8 C.F.R. § 245.2(a)(4)). In promulgating these amendments, the Attorney General specifically included commentary in the Federal Register disapproving of the holdings in *Patel* and *Joshi* and noting the agency's intent to "remove the underpinning of those decisions." *Id.* at 7431.

19    Insofar as petitioner also claims that the IJ's order of removal was in error because "the DHS failed to sustain the charges of removability by clear, convincing, and unequivocal evidence," Petitioner's Br. at 7, this argument is also without merit for the reasons stated above.

20    In particular, we reject those of petitioner's arguments—raised for the first time on appeal—that are predicated on a theory of equitable estoppel, *see, e.g.,* Petitioner's Br. at 15, because, *inter alia,* they ignore the warning on petitioner's parole form that he would be subjected to "exclusion" proceedings if his adjustment-of-status application was denied. *See* Joint Appendix ("JA") at 110. We also reject petitioner's arguments which rely on the BIA's unpublished decision by a single member of the Board in *In re Vargas–Reyes* A 74 891 947 (BIA March 6, 2000), JA at 154, because the decision is not binding BIA precedent, *see* 🚩 8 C.F.R. § 1003.1(g) (granting BIA authority to select opinions for publication) (2005). Moreover, it appears likely—based on the limited facts available from the BIA's opinion—that the decision in *Vargas–Reyes* misinterprets the exception to the definition of an "arriving alien" set forth in 8 C.F.R. § 1.1(q) for aliens who would otherwise be subject to expedited removal proceedings.

---

**End of Document**           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

204 F.Supp.2d 1366
United States District Court,
S.D. Florida.

Hedwiche JEANTY, Brunot Colas, Junior Prospere,
and Laurence St. Pierre, on behalf of themselves
and all others similarly situated, Petitioners,
v.
John M. BULGER, Acting Director for District 6,
Immigration and Naturalization Service; James Ziglar,
Commissioner, Immigration and Naturalization
Service; John Ashcroft, Attorney General of the United
States; Immigration and Naturalization Service; and
United States Department of Justice, Respondents.

No. 02–20822–CIV.
|
May 17, 2002.

**Synopsis**
Haitian boat refugees brought action for injunctive and
declaratory relief against Immigration and Naturalization
Service (INS), seeking parole from detention while their
asylum applications were pending. On plaintiffs' motions
for temporary restraining order, preliminary injunction, and
class writ of habeas corpus, the District Court, Lenard, J.,
held that: (1) refugees possessed no constitutional rights
with regard to their parole applications; (2) INS advanced
facially legitimate reasons for detention; (3) INS officials
properly implemented parole policy; and (4) INS actions did
not violate Administrative Procedure Act (APA).

Motions denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (14)

**[1]   Habeas Corpus  ⚷  Aliens**

Court would have habeas corpus jurisdiction to
hear claims of Haitian boat refugees challenging
Attorney General's statutory and constitutional
authority to refuse them parole, allegedly
without making case-by-case determinations.
Immigration and Nationality Act, § 242(a)(2)

(B)(ii), 🚩 8 U.S.C.A. § 1252(a)(2)(B)(ii); 🚩 28
U.S.C.A. § 2241(c)(3).

1 Cases that cite this headnote

**[2]   Habeas Corpus  ⚷  Determination and
Disposition;  Relief**

Court granting writ of habeas corpus may issue
injunction in aid of writ. 28 U.S.C.A. § 2243.

2 Cases that cite this headnote

**[3]   Habeas Corpus  ⚷  Determination and
Disposition;  Relief**

Where court has only habeas jurisdiction and
determines that no writ shall issue, no separate
basis exists for issuance of injunctive relief.

**[4]   Aliens, Immigration, and
Citizenship  ⚷  Mode and Effect of Entry or
Reentry**

"Excludable aliens" are those who seek
admission but who have not been granted entry
into United States; even if physically present
in United States, they are legally considered
detained at border.

**[5]   Aliens, Immigration, and
Citizenship  ⚷  Mode and Effect of Entry or
Reentry**

"Deportable aliens" are those who have
succeeded in either legally or illegally entering
United States.

**[6]   Aliens, Immigration, and
Citizenship  ⚷  Parole or Temporary
Admission**

Excludable aliens possess no constitutional
rights with regard to their parole applications;
rather, they possess only statutory rights and
privileges granted by Congress.

**[7]    Aliens, Immigration, and Citizenship** 🔑 **Proceedings for Adoption and Review**

Acting deputy commissioner of Immigration and Naturalization Service (INS), as statutory delegate of Attorney General, had discretionary authority to promulgate detention and parole policy pertaining specifically to Haitian refugees. Immigration and Nationality Act, § 212(d)(5)(A), 🟡 8 U.S.C.A. § 1182(d)(5)(A); 🚩 8 C.F.R. § 212.5.

**[8]    Aliens, Immigration, and Citizenship** 🔑 **Standard and Scope of Review**

Federal court's scope of review applicable to immigration decisions is limited to determining whether government has advanced facially legitimate and bona fide reason for its decision.

1 Cases that cite this headnote

**[9]    Constitutional Law** 🔑 **Encroachment on Executive**

When analyzing executive official's exercise of discretion, court must avoid overriding policy determination of attorney general's designee; court need not agree with policymaker's choice nor approve of policy reasons underlying it, but must only ascertain whether government has advanced facially legitimate and bona fide reason supporting decision.

1 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🔑 **Grounds for Parole or Denial; Determination**

Preventing loss of life, avoiding mass migration from Haiti and ensuring presence of inadmissible aliens at court hearings were facially legitimate and bona fide reasons for detaining Haitian nationals who arrived by boat in south Florida, and thus policy of Immigration and Naturalization Service (INS) of granting parole to Haitians only in cases of unique hardship was proper.

1 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 🔑 **Grounds for Parole or Denial; Determination**

Immigration and Naturalization Service (INS) officers charged with detaining Haitian boat refugees implemented detention policy as established by high-level INS officials, and thus refugees were properly denied parole; officers continued to review Haitians' parole requests on individual, case-by-case basis, and approximately fifteen Haitians with cases of unusual hardship were approved for parole.

**[12]    Aliens, Immigration, and Citizenship** 🔑 **Judicial Review or Intervention**

Administrative Procedure Act (APA) did not provide basis for Haitian boat refugees to challenge Attorney General's exercise of discretion in denying their parole requests, since Immigration and Nationality Act (INA) precluded judicial review of any specified discretionary decision or action of Attorney General. 🟡 5 U.S.C.A. § 701(a)(1); Immigration and Nationality Act, § 242(a)(2)(B)(ii), 🚩 8 U.S.C.A. § 1252(a)(2)(B)(ii).

**[13]    Habeas Corpus** 🔑 **Aliens**

Court would have habeas corpus jurisdiction to hear claims of Haitian boat refugees alleging that adjustment of detention policy by Immigration and Naturalization Service (INS) violated statutory requirements of Administrative Procedure Act (APA). 🚩 28 U.S.C.A. § 2241(c)(3).

1 Cases that cite this headnote

[14]   **Aliens, Immigration, and Citizenship**  ⬌ Proceedings for Adoption and Review

Policy adjustment by Immigration and Naturalization Service (INS), establishing detention and parole procedures for Haitian refugees, did not establish binding norm, and thus was not subject to notice and comment rulemaking requirements of Administrative Procedure Act (APA), since it did not finally dispose of any individual Haitian's parole application; adjusted policy did not negate discretionary nature of parole determination, and did not prevent INS officials from granting parole. ⬌ 5 U.S.C.A. §§ 551(4), ⬌ 553(b)(A).

**Attorneys and Law Firms**

**\*1367**  Jonell Newman, Florida Justice Institute, Inc., Miami, FL, Rebecca A. Sharpless, Florida Immigration Advocacy Center, Miami, FL, Ira J. Kurzban, Kurzban, Kurzban, Winger & Tetzeli, Miami, FL, Robert L. Parks, Haggard & Parks, P.A., **\*1368** Coral Gables, FL, Charles F. Elsesser, Jr., Miami, FL, for Petitioners.

Dexter Lee, Asst. U.S. Attorney, United States Attorney's Office, Miami, FL, Robert D. McCallum, Jr., M. Jocelyn Lopez Wright, Office of Immigration Litigation, Civ. Div., U.S. Department of Justice, Washington, DC, Mary Jane Candaux, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for Respondents.

*ORDER DENYING PETITIONERS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION OR CLASS WRIT OF HABEAS CORPUS AND FOR IMMEDIATE HEARING, DENYING MOTION TO CERTIFY CLASS, AND DISMISSING CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

LENARD, District Judge.

Petitioners journeyed the high seas to flee Haiti, with hopes of obtaining political asylum and discovering freedom in America. Rather than liberation, they find themselves confined in Miami detention facilities while their asylum applications remain pending. Understandably, Petitioners express confusion about their present circumstances, and they implore the Court to grant them freedom.

Yet, "[n]o judge writes on a wholly clean slate". [1] A district court must apply the body of law found in statutes enacted by Congress, regulations and policies promulgated by the Executive, and the precedents handed down by the Supreme Court and appellate courts.

> Courts are the mere instruments of the law, and can will nothing.... Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.

⬌ *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 866, 6 L.Ed. 204 (1824) (Marshall, C.J.).

Particularly in the area of immigration, which strikes at the heart of a nation's sovereignty, courts generally must defer to the laws established by Congress and administered by the Executive branch of government. Given the narrow scope of judicial review permitted in this area, Petitioners' cry for freedom needs to be directed to those representatives of the political branches responsible for enacting immigration laws and policies. Mindful of the limits on judicial power, the Court proceeds to wade through the complicated issues presented by the instant case.

**I. Factual and Procedural Background**

On December 3, 2001, U.S. Coast Guard officials sighted a rickety and overloaded sailboat, the *Simapvivetzi,* off the coast of South Florida, near Biscayne National Park. The Coast Guard rescued approximately 167 Haitian nationals from the boat. Eighteen others swam to shore, and two more individuals reportedly drowned while attempting to swim to shore. [2]  The Coast Guard turned over the 167 rescued Haitians to the custody of the Immigration and Naturalization Service ("INS"). The **\*1369** INS placed male detainees at Krome Detention Center, female detainees at Turner Guilford Knight Detention Center, and families at a local motel.

As none of the aliens arrived with proper entry documentation, they were legally "inadmissible" under the

Immigration and Naturalization Act ("INA") and, therefore, were placed into expedited removal procedures. Each of the adults was referred for an interview with an INS Asylum Officer to determine whether he or she had a "credible fear" of persecution if returned to Haiti. Each individual that passed the credible fear interview received a Form I–862 "Notice to Appear" for full non-expedited removal proceedings, including the opportunity to apply for asylum before an immigration judge. [3] At this point in the process, the INS typically releases aliens on parole pending the final adjudication of their asylum petitions.

Beginning in mid-December, 2001, the INS reversed its general presumption of release for undocumented Haitians arriving in South Florida. According to INS Acting Deputy Commissioner Peter Michael Becraft, officials from several Executive agencies had observed a sharp increase in dangerous maritime departures from Haiti and grew concerned over the potential for more loss of life and the threat of mass migration. (Becraft Decl. ¶ 8.) Based on consultations with other Executive officials, Becraft instructed the Miami INS office that no undocumented Haitian should be released without the approval of INS Headquarters. (*Id.*) Miami officials learned of the policy adjustment on or about December 14, 2001. (Lee Decl. ¶ 11.) Miami officials continued to review the cases of arriving Haitians and recommended to Headquarters the release of approximately fifteen Haitians, including pregnant women and unaccompanied minors, who arrived after December 3, 2001 (*Id.* ¶ 12.) On February 2, 2002, Miami officials received permission to release pregnant women and unaccompanied minors without obtaining Headquarters' approval. (2/15/02 e-mail of David J. Venturalla.) On March 8, 2002, the Miami office was authorized to release, without Headquarters approval, Haitians granted asylum where the INS decided not to appeal. (Becraft Suppl. Decl. ¶ 7.) On April 5, 2002, Executive Associate Commissioner for the Office of Field Operations Johnny N. Williams and Regional Director J. Scott Blackman authorized Miami officials to release Haitians who arrived for "regular means at a designated port of entry" (e.g. by airplane), pursuant to enhanced procedures for assuring the alien's likelihood of appearing at immigration proceedings. (*Id.* ¶ 9.)

Petitioners are four Haitian nationals who were rescued from the *Simapvivetzi* on December 3, 2001. [4] All four have passed their credible fear interviews yet **\*1370** remain in detention. Petitioners Jeanty, Colas, and Prospere applied for and were denied parole in late January, 2002. Petitioner St. Pierre

submitted a letter requesting parole on February 7, 2002 On April 9, 2002, she submitted a parole request form and identified a sponsor. As of April 12, 2002, the sponsor had not submitted an affidavit of support, and Petitioner St. Pierre's parole request remained pending. (Lee Suppl. Decl. ¶ 2.)

On March 15, 2002, Plaintiffs/Petitioners filed a Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief (D.E.1), an Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Emergency Hearing (D.E.2), and a Motion to Certify Class (D.E.5). The Government filed an Opposition to Petitioners' Motion to Certify Class (D.E.13) and an Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus (D.E.14) on March 18, 2002. Petitioners filed Replies on March 21, 2002. (D.E.20, 21.)

Upon consideration of the briefs, the Court requested further information from both sides on April 5, 2002 (D.E.30.) Pursuant to the April 5th Order, Petitioners submitted copies of the named Petitioners' parole requests (D.E.34); the Government submitted copies of Petitioners' immigration files (D.E.37); and Becraft and Lee submitted supplemental declarations (D.E.38). The Government also submitted a copy of the INS's "Detention Use Policy," copies of electronic communications between INS officials regarding the policies toward Haitians arriving in South Florida, and copies of two memoranda, dated April 5, 2002, entitled "Procedures for Paroling Haitians Arriving by Regular Means at a Designated Port of Entry in South Florida." (D.E.39.)

Once the issues were fully briefed, the parties continued to file additional pleadings. Petitioners submitted a Notice of Filing of Supplemental Exhibits, including an advisory opinion issued by the United Nations High Commissioner for Refugees on April 15, 2002, and statements by social workers and legal personnel regarding the conditions at the detention facilities. (D.E.40.) The Government moved to strike the supplemental argument as untimely, or, alternatively, to respond. (D.E.46.) The Government also requested leave to file supplemental exhibits, including statements by Miami INS officials with respect to policies at the detention facilities. (D.E.47.) Petitioners filed an Opposition to the Motion to Strike, maintaining that the international law issues raised in the advisory opinion are relevant, although conceding that they have not alleged international law claims. [5] (D.E.58)

**\*1371** On May 7, 2002, Petitioners filed an Emergency Motion for Leave to Take Depositions of Respondents and to Otherwise Begin Discovery and also to Shorten Time for Response to Petitioners' First Request to Produce. (D.E.50.) On May 8, 2002, Petitioners filed a Motion to Compel, seeking to compel Respondents to produce the redacted portions of the documents submitted in response to the Court's April 5, 2002 Order. (D.E.54.)

On May 9, 2002, the Lawyers' Committee for Human Rights ("LCHR") filed an Amicus Curiae Brief (D.E.55). [6]

On May 14, 2002, the Government filed a Motion to Dismiss in Part and for Summary Judgment in Part, seeking dismissal of the Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, or, alternatively, dismissal of claims 2 and 3 for lack of jurisdiction, and summary judgment on all other claims. [7] (D.E.60.)

Upon consideration of the entire record in this matter, the Court finds that the issues were fully briefed in the Petitioners' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Emergency Hearing (D.E.2), Motion to Certify Class (D.E.5), Government's Responses (D.E.13, 14), Petitioners' Replies (D.E.20, 21), and the parties' submissions in response to the Court's April 5th Order Directing to Submit Additional Documentation (D.E.34, 37, 38, 39.) Accordingly, the Court finds as follows.

### II. Parties' Arguments

Petitioners seek a writ of habeas corpus on behalf of themselves and a class of:

> All detained Haitian aliens in the Southern District of Florida who arrived on or after December 3, 2001, who are applying for admission into the United States, have passed their "credible fear" interviews with the Asylum Office of the INS, and are in detention pending removal **\*1372** proceedings, for whom a final order of removal has not been entered.

(Pets.' Mot. to Certify Class.)

Petitioners argue that the Government has violated their rights pursuant to: (1) the parole statute and regulations, in that parole decisions were not made on a case-by-case basis; (2) the due process clause of the Fifth Amendment, as Petitioners have a right to be free from unlawful detention; (3) the equal protection component of the Fifth Amendment, because the Government has discriminated against them on the basis of race and/or national origin; (4) section 555(e) of the Administrative Procedures Act ("APA"), by not providing an accurate statement for the grounds of denial of parole requests; (5) APA § 553, in that the Government's new policy is a substantive rule that must be adopted through notice-and-comment rulemaking procedures; and (6) APA § 701, in that the Government has unlawfully withheld agency action to which Petitioners are entitled and has not acted in accordance with applicable statutes, regulations, and constitutional provisions.

Petitioners request this Court to issue a temporary restraining order, injunctive relief, or, in the alternative, a class writ of habeas corpus, to compel the Government to: (a) immediately release Petitioners and class members; (b) cease using race and/or nationality as a factor in adjudicating requests filed by Haitian asylum seekers who have passed their credible fear interviews or who are otherwise eligible to be considered for release; (c) evaluate all pending and future requests on a case-by-case basis; (d) reevaluate all denied requests for release filed by Haitian asylum seekers since December 3, 2001, in accordance with the statute, the regulations, and the Constitution; (e) provide accurate notice of the reasons for the denial of the release request; and (f) complete the above within ten days.

The Government opposes class action status on grounds that INA § 242(f)(1) prohibits the Court from granting class-wide relief or, alternatively, due to the fact-sensitive nature of Petitioner's parole applications. Further, the Government argues that the Court lacks jurisdiction, under INA § 242(a)(2)(B)(ii), over Petitioners challenge to the Attorney General's discretionary decision to deny parole. With respect to habeas and injunctive relief, the Government contends that Petitioners has not shown a substantial likelihood of success on the merits, in that: (1) the Fifth Amendment provides Petitioners no relief; (2) the statute presumes the denial of parole, and the Government continues to make case-by-case decisions regarding Petitioners' parole requests; (3)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 854 of 1021   PageID 7724

the APA does not apply; (4) the Government has provided a "facially legitimate and bona fide" reason for denying Petitioners parole applications; and (5) Petitioners have not shown that they will suffer irreparable harm in the absence of an injunction, or that the balance of hardships tips in their favor.

With its Response, the Government submitted declarations by Peter Michael Becraft, Acting Deputy Commissioner of the INS, and Wesley Lee, Officer in Charge of INS Krome Service Processing Center in Miami, Florida Becraft stated that after the arrival of 167 Haitians by boat on December 3, 2001, the Government feared a mass migration and sought to deter more Haitians from making the dangerous voyage. (Becraft Decl. ¶ 8.) Becraft asserted that after consulting with various INS officials, he directed the INS Office of Field Operations to adjust its parole criteria with respect to inadmissible Haitians arriving in South Florida, and he instructed that no such Haitians should be paroled without the approval of INS Headquarters. (*Id.*)

 **\*1373**  In their Reply, Petitioners argue that Becraft lacks sufficient authority to establish a policy that discriminates against Haitians. According to Petitioners, "Only Congress, the President, or possibly the Attorney General has such authority." (Pets. Reply at 2.) They contend, and submit statistics purported to demonstrate, that there is no current Haitian migration crisis. The crux of Petitioners' argument is that the Supreme Court's decision in *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), requires the INS to make parole determinations in a non-discriminatory manner without treating Haitians different than other nationalities.

### III. Analysis
Initially, the Court must determine whether it has jurisdiction in view of the limits on judicial review of immigration matters imposed by Congress in 996. The Court concludes that the statute precludes full-scale judicial review of Petitioner's parole applications, but habeas jurisdiction exists to determine the legality of Petitioners' detention.

Limited to habeas jurisdiction, the Court then examines the scope of legal protection available to Petitioners. The law makes clear that Petitioners, as arriving aliens, have no constitutional rights with respect to their immigration applications but, rather, only the rights granted by Congress and the Executive by statute or administrative regulation.

By statute. Congress has delegated the authority over parole determinations to the Attorney General, who has further delegated the power to certain high-level INS officials, including the Deputy Commissioner. Third, the Court finds that the Supreme Court's holding in *Jean v. Nelson* does not preclude the Government from adopting a parole policy that differentiates between nationalities. Fourth, the Court must determine whether Acting Deputy Commissioner Becraft has the authority to adjust parole policy. The Court concludes that the Attorney General has conferred all of his parole-related authority upon the Deputy Commissioner, and the Court thus analyzes the policy as if the Attorney General himself had promulgated it.

The case law establishes that the Court's scope of review is limited to determining whether the Government has advanced a "facially legitimate and bona fide reason" for its parole policies and decisions. Applying this extremely deferential standard, the Court next finds that saving lives, deterring mass migration, and ensuring the presence of inadmissible aliens at their immigration hearings are facially legitimate and bona fide reasons supporting the policy of granting parole to Haitians only in cases of unique hardship. Since Petitioners have not alleged that Miami officials have misapplied the policy in any individual case, the Court concludes that Petitioners' detention is legal.

Finally, the Court examines Petitioners' APA claims. First, the Court finds that it lacks jurisdiction to review Petitioners' individual challenges to their parole denials. The Court also rejects Petitioners' claim that formal notice-and-comment rulemaking is required, finding that the INS merely adjusted its general parole policy with regard to Haitians arriving in South Florida.

### A. Jurisdiction
Congress imposed several limitations on the scope of judicial review in the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"). One such limitation provides:

> Notwithstanding any other provision of law, no court shall have jurisdiction to review—(ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter **\*1374** to be in the discretion of the Attorney General,

other than the granting of relief under section 1158(a) of this title.

INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). As the authority to grant parole is specified under INA § 212(b)(5)(A) to be within the discretion of the Attorney General, the Government contends that the Court has no jurisdiction over this matter.

The Supreme Court examined similar post-IIRIRA provisions of the INA in *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and concluded that the statute precludes federal courts from engaging in full-scale "judicial review" of the Attorney General's decisions, but does not strip them of habeas jurisdiction under 28 U.S.C. § 2241 to review the legality of executive actions. 121 S.Ct. at 2285–86. The *St. Cyr* Court noted that in the immigration context, "judicial review" and "habeas corpus" have historically distinct meanings. *Id.* at 2285 (citing *Heikkila v. Barber,* 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953)). The crucial difference is the limited scope of habeas review. *Id.* Given the historic use of section 2241 habeas jurisdiction as a means of reviewing deportation and exclusion orders, the Supreme Court found Congress' failure to refer specifically to section 2241 to be particularly significant *Id.* at 2286 n. 36.

[1] [2] [3] Apparently, the Tenth Circuit is the only appellate court that has addressed the issue of whether INA § 242(a)(2)(B)(ii) strips federal courts of habeas jurisdiction over challenges to INS parole determinations. *See Sierra v. INS,* 258 F.3d 1213 (10th Cir.2001). Applying the reasoning of *St. Cyr,* the *Sierra* court held that federal courts retain jurisdiction over habeas challenges to parole determinations. [8] *Id.* at 1217–18. The Court agrees with the Tenth Circuit for a number of reasons. First, the Supreme Court in *St. Cyr* concluded that the phrase "jurisdiction to review" as used in INA § 242(a)(2)(C), does not preclude habeas review. The Court sees no reason why the same phrase, as used in INA § 242(a)(2)(B)(ii) should have a broader meaning. Both provisions were enacted simultaneously in section 306 of IIRIRA, and Congress did not explicitly mention section 2241 habeas review in either subsection. Thus, neither provision "speaks with sufficient clarity to bar jurisdiction pursuant to the general habeas statute." *St. Cyr,*

121 S.Ct. at 2286. To the extent that Petitioners challenge the Attorney General's statutory and constitutional authority to refuse them parole allegedly without making case-by-case determinations, habeas jurisdiction exists to determine whether Petitioners are held in custody "in violation of the Constitution or the laws or treaties of the United States." [9] 28 U.S.C. § 2241(c)(3); *see Sierra,* 258 F.3d at 1217; *cf. Zavdylas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 2497–98, 150 L.Ed.2d 653 (2001) (holding that section 2241 habeas proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention). The Court limits the scope of its review accordingly. [10]

**\*1375  B. Constitutional Rights of Excludable Aliens**

"For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Courts " 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). " 'Over no conceivable subject is the legislative power of Congress more complete.' " *Id.* (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)). Thus, "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " *Id.* (quoting *Mathews,* 426 U.S. at 79–80, 96 S.Ct. 1883).

[4] [5] Particularly with regard to aliens seeking initial admission to this country, the role of federal courts is limited. The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Excludable aliens are "those who seek admission but who have not been granted entry into the

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 856 of 1021   PageID 7726

United States. Even if physically present in this country, they are legally considered detained at the border". *Garcia–Mir v. Smith,* 766 F.2d 1478, 1483–84 (11th Cir.1985). This is known as the "entry fiction." *Id.* Deportable aliens, by contrast, "have succeeded in either legally or illegally entering the country." *Id.* "Excludable aliens have fewer rights than do deportable aliens, and those seeking initial admission to this country have the fewest of all." *Id.* (citing *Landon,* 459 U.S. 21, 103 S.Ct. 321).

[6]   Despite Petitioners' physical presence in this country, neither detention nor parole affects their legal status as excludable aliens. *See* INA § 212(d)(5)(A) ("[P]arole of such alien shall not be regarded as an admission of the alien...."). As excludable aliens, Petitioners "have no constitutional rights with regard to their [parole] applications." *Garcia–Mir,* 766 F.2d at 1484 (citing *Jean v. Nelson,* 727 F.2d 957, 968 (11th Cir.1984)). Rather, they possess only the statutory rights and privileges granted by Congress *See id.* Because the contours of such rights are "to be largely left to the discretion of the political branches," courts "should ordinarily abstain where excludable aliens are concerned." [11] *Id.* Thus, recognizing its narrow  **\*1376**  role, the Court looks to the statutes and regulations promulgated by the political branches to determine whether Government officials have acted within the scope of their statutory and delegated authority.

### C. Statutory and Regulatory Framework

(1) *Statutory Authority for Detention of Arriving Aliens*
An alien who arrives without the proper documentation required by the INA is inadmissible pursuant to INA § 212(a)(7), and subject to expedited removal procedures under INA § 235. Under INA § 235, an immigration officer shall order the removal of an arriving alien unless the alien indicates an intention to apply for asylum or a fear of persecution, in which case the officer shall refer the alien for an interview by an asylum officer under INA § 208(b)(1)(B). *See* INA § 235(b)(1)(A), 8 U.S.C. § 125(b)(1)(A). If the asylum officer conducting the interview determines that the alien has a "credible fear" of persecution, the statute provides that "the alien shall be detained for further consideration of the application for asylum." INA § 235(b)(1)(B)(ii), 8 U.S.C § 125(b)(1)(B)(ii). Thus, by statute, Congress has plainly indicated its intent and approval of the detention of an undocumented alien who has passed the credible fear interview, until adjudication of the asylum application.

(2) *Parole of "Credible Fear" Aliens*
Notwithstanding the broad statutory authority for detention of "credible fear" aliens, the Attorney General's regulations authorize the INS to consider parole for such aliens. The regulations provide that an alien who has passed the credible fear interview shall receive a Form I–862, Notice to Appear, for full consideration of the asylum and/or withholding of removal claim in regular removal proceedings under INA § 240. [12] 8 C.F.R. § 208.30(f). In addition, the regulations provide that "parole of the alien may be considered only in accordance with [INA] § 212(d)(5) and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f).

**\*1377**  By statute, Congress has delegated to the Attorney General the authority to make parole determinations, as follows:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

[7]   Pursuant to this statutory authority, the Attorney General has promulgated 8 C.F.R. § 212.5 to govern parole determinations. By regulation, the Attorney General has delegated his parole authority, as follows:

The authority of the Commissioner to continue an alien in custody or grant parole under [INA] § 212(d)(5)(A) shall be exercised by the district director or chief patrol agent, subject to the parole and detention authority of the Commissioner or her designees, which include the Deputy Commissioner, the Executive Associate Commissioner for Field Operations, and the regional director, any of whom in the exercise of discretion may invoke this authority under [INA] § 212(d)(5)(A).

8 C.F.R. § 212.5(a). [13]

With respect to aliens who have passed the credible fear interview, the regulations establish the following standard for parole determinations: [14]

"[T]he district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with [INA] § 212(d)(5)(A), any alien applicant for admission under such terms and conditions, including those set forth in paragraph (d) of this section, as he or she may deem appropriate."

8 C.F.R. § 212.5(c).

In furtherance of the regulations, in October, 1998, the INS issued a "Detention Use Policy" establishing the INS's priorities for the use of limited detention space. (Becraft Suppl. Decl. ¶ 5.) The Detention Use Policy defines four categories of aliens: (1) required detention (with limited exceptions); (2) high priority; (3) medium priority; and (4) low priority. With respect to "credible fear" aliens, the Detention Use Policy provides, "Although parole is discretionary in all cases where it is available, it is INS policy to favor release of aliens found to have a credible fear of persecution, provided that they do not pose a risk of flight or danger to the community." Such aliens fall within Category 4, or "low priority." The Government concedes that:

In practice, the application of INS Detention Use Policy in the Miami District, because of limited detention space in **1378** that district, resulted in the parole of most arriving aliens found to have credible fear unless they were identified as posing a danger to the community because of a criminal record or other factors.

(Becraft Suppl. Decl. ¶ 6.)

*Haitian Policy Adjustment*

Becraft states that on or about December 14, 2001, he adjusted the criteria of the Detention Use Policy for arriving Haitian nationals, pursuant to his delegated authority under 8 C.F.R. § 212.5(a). (Becraft Suppl. Decl. ¶¶ 2, 7.) As a result of this adjustment, arriving Haitian nationals would no longer be considered "Category 4" or "low priority" aliens under the Detention Use Policy. (*Id.* ¶ 8.) Specifically, Becraft instructed the INS Office of Field Operations that "no Haitian should be paroled without the approval of INS Headquarters." (*Id.* ¶ 7.) His instructions were conveyed to the Miami District both orally and electronic mail. (*Id.*) After the issuance of Becraft's instruction, the Miami District continued to review the files of arriving Haitians and advised INS Headquarters of cases of "unusual hardship," including pregnant women and unaccompanied minors. (*Id.*) INS Headquarters approved parole releases for the cases of unusual hardship. (*Id.*) Beginning on February 15, 2002, the Miami office was allowed to release juveniles with approved sponsors and pregnant females, without requesting approval from Headquarters. (2/15/02 e-mail of David J. Venturalla.) The Miami office also informed Headquarters of individuals who had been granted asylum by an immigration judge where INS counsel had decided not to appeal the grant of asylum, and Headquarters approved the release of the asylees on March 18, 2002. (Becraft Suppl. Decl. ¶ 7.)

**D. Lawfulness of the Haitian Policy Adjustment**

(1) *Jean v. Nelson*

According to Petitioners, the Supreme Court held in *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664

(1985), that the parole statute and regulations require the INS to make individualized parole determinations without regard to race or nationality. Upon closer examination, however, *Jean* establishes no such broad rule. The *Jean* majority expressly refused to address the constitutional issue and confined its ruling to the unique factual and procedural history of the case, as follows.

Until 1981, the INS followed a policy of general parole for undocumented aliens. *Id.* at 849, 105 S.Ct. 2992. In the late 1970's and early 1980's, large numbers of undocumented aliens arrived in South Florida, mostly from Haiti and Cuba. *Id.* Concerned about the large influx of undocumented aliens, the Attorney General ordered the INS to detain without parole any alien who could not present a prima facie case for admission. *Id.* The petitioners, Haitian detainees who had been denied parole, filed a class action lawsuit. The district court held that the new policy of detention without parole must be promulgated in accordance with APA rulemaking procedures and ordered parole of the detained class, with certain exceptions. *Louis v. Nelson,* 544 F.Supp. 973 (S.D.Fla.1982). The INS promptly promulgated 8 C.F.R. § 212.5.

On appeal, the Eleventh Circuit affirmed the district court's ruling on the APA claim. *Jean v. Nelson,* 711 F.2d 1455, 1483 (11th Cir.1983) (hereinafter "*Jean I* "). In addition, the panel held that the Fifth Amendment's equal protection guarantee applied to the parole of unadmitted aliens, and found that the district court's finding of no invidious discrimination was clearly erroneous. *Id.* at 1483–1503. Subsequently, **\*1379** the Eleventh Circuit granted rehearing en banc, thereby vacating the panel opinion. *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (hereinafter "*Jean II* "). By then, the remaining petitioners were being held under the new regulations; thus, the en banc court held that the APA claim was moot. *Id.* at 962. The en banc court also reversed the panel on the constitutional issue, holding that the Fifth Amendment's equal protection guarantee does not apply to the parole of undocumented aliens. *Id.* at 968–75. Notwithstanding its constitutional holding, the en banc court concluded that an INS official's decision to deny parole may be subject to limited judicial review for abuse of discretion, and remanded to the district court for a determination of whether low-level INS officials had exercised their discretion in an individualized and non-discriminatory manner. *Id.* at 975–79.

The Supreme Court held that the Eleventh Circuit should not have addressed the constitutional issue, since the petitioners only sought to have the statutes and regulations applied in a non-discriminatory manner.[15] *Jean,* 472 U.S. at 854–55, 105 S.Ct. 2992. In the Supreme Court, the government argued that it would be constitutionally permissible for the government to adopt different parole criteria for different nationalities, but also *conceded* that both the statute and the newly issued regulations, on their face, required INS officials in the field to make race- and nationality-neutral parole determinations. *Id.* at 855–56, 105 S.Ct. 2992. The Supreme Court adopted the petitioners' statement of the issue:

> This case does not implicate the authority of Congress, the President, or the Attorney General. Rather, it challenges the power of low-level politically unresponsive government officials to act in a manner which is contrary to federal statutes ... and the directions of the President and the Attorney General, both of whom provided for a policy of non-discriminatory enforcement.

*Id.* at 853, 105 S.Ct. 2992. With this narrow statement of the issue, the Supreme Court affirmed the Eleventh Circuit's remand for a determination of whether INS officials made parole determinations without regard to race or national origin, as the government conceded was required in that case. *Id.* at 857, 105 S.Ct. 2992. The Supreme Court held neither that excludable aliens have any constitutional rights with regard to their parole applications, nor that the Executive must maintain nationality-neutral parole criteria as a policy matter.

The crucial difference between *Jean* and the instant case is that, here, the Acting Deputy Commissioner of the INS has authorized a policy of denying parole to inadmissible Haitian nationals based on specific policy concerns, including the goals of preventing a mass migration from Haiti and ensuring the presence of Haitian asylum seekers at their removal hearings. Accordingly, the Court must determine whether Becraft, as Acting Deputy Commissioner, has the authority to promulgate such a policy.

## (2) *Authority of Deputy Commissioner to Promulgate Policy*

By statute, Congress has delegated to the Attorney General the authority to make parole determinations. *See* INA **\*1380** § 212(d)(5)(A), 8 U.S.C. § 182(d)(5)(A). Congress has also

authorized the Attorney General to establish regulations and "perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA] § 103(a)(3)", 🚩 8 U.S.C. § 103(a)(3). In addition, the statute provides that, "[the Attorney General] may require or authorize any employee of the [INS] or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the [INS]." 🚩 § 103(a)(4), 8 U.S.C. § 1104(a)(4).

Pursuant to statutory authority, the Attorney General has promulgated 🚩 8 C.F.R. § 212.5 to govern parole determinations. By regulation, the Attorney General has delegated the discretionary power to invoke the parole authority of INA § 212(d)(5)(A) to the INS Commissioner and certain designees, namely, the Deputy Commissioner, the Executive Associate Commissioner for Field Operations, and the regional director. 🚩 8 C.F.R. § 212.5(a). This provision was added to the regulations, effective January 29, 2001, in order to clarify that the parole authority vested in the Attorney General by INA § 212(d)(5) is delegated to the Commissioner, and that the parole power flows from the Commissioner to his designated subordinates without divesting the Commissioner or his subordinates of the delegated authority. *See* 65 Fed.Reg. 82254, 82254–55 (Dec. 28, 2000). Because the regulation explicitly delegates the Attorney General's parole authority to the Deputy Commissioner, the Court analyzes the Haitian adjustment policy established by Acting Deputy Commissioner Becraft in the same manner as if the Attorney General himself had promulgated the policy.

*"Facially Legitimate and Bona Fide Reason"*
Having determined that Acting Deputy Commissioner Becraft possesses sufficient authority to speak for the Executive branch, the Court reaches the heart of this dispute, namely, whether the Government is justified in adjusting its policy so as to result in the differential treatment of one national group. Here, the law makes clear that courts generally should defer to the Executive prerogative:

'[T]here is little question that the Executive has the power to draw distinctions among aliens based on nationality.' .... Aliens may be excluded on grounds that might be 'suspect in the context of domestic legislation,' because 'there are apparently no limitations on the power of the federal government to determine what classes of aliens will be permitted to enter the United States or what procedures will be used to determine their admissibility.'

*Cuban Am. Bar Ass'n,* 43 F.3d at 1427–28 (quoting 🚩 *Jean II,* 727 F.2d at 978 n. 30, 965 n. 5).

**[8]**   to the political nature of decisions made by Congress and the he Executive in the immigration area, the standard of review applicable to immigration decisions is extremely deferential. A federal court's scope of review is limited to ascertaining whether the Government has advanced "a facially legitimate and bona fide reason" for its decision. 🚩 *Garcia–Mir,* 766 F.2d at 1484–85 (citing 🚩 *Jean II,* 727 F.2d at 977); *see also Cuban Am. Bar Ass'n,* 43 F.3d at 1427–28. Because the political branches share concurrent authority over immigration matters, the same narrow standard of review applies to actions taken by Congress or the Executive. 🚩 *Jean II,* 727 F.2d at 976. With respect to parole determinations, the same standard applies to general policy decisions of high-level Executive officials and to individual determinations **\*1381** made by INS field officers. *See* 🚩 *Garcia–Mir,* 766 F.2d at 1485.

(a) *The Policy Adjustment*
Acting Deputy Commissioner Becraft advances a number of justifications for the adjusted policy with respect to undocumented Haitians. First, he notes a sharp increase in maritime departures from Haiti beginning in November, 2001, when the Coast Guard reported interdicting vessels carrying a total of 350 Haitian nationals, in contrast to a total of 96 interdictions in the preceding three months. (Becraft Decl. ¶ 6.) After the Coast Guard rescued 187 Haitian nationals from the *Simapvivetzi* in early December, and the reported drowning of two others, Becraft explains:

In the wake of this sharp increase in dangerous maritime departures from Haiti, consultations occurred among officials from several executive agencies and INS officials, including myself. In these consultations, the following concerns were discussed: (1) the possibility that the numbers of Haitians embarking in U.S.-bound boats would continue to increase and turn into a mass migration;

(2) that the U.S. should take steps to discourage Haitians from contemplating dangerous voyages to the United States; (3) that paroling the migrants from the December 3 vessel might cause others to attempt dangerous maritime departures, placing themselves at risk, or trigger a mass migration from Haiti to the United States; (4) that adjusting the INS' parole criteria with respect to Haitians arriving by boat in South Florida, so that the parole criteria would be applied in a more restrictive manner, would be a reasonable step to take to address concerns (1) to (3) above; and (5) that the Haitians from the December 3 vessel, and other Haitians who might arrive in a similar fashion in South Florida, are less likely to appear for their immigration proceedings or for removal, if they ultimately received final orders of removal, given their demonstrated desperation to depart Haiti.

(Becraft Decl. ¶ 8.) Based on these considerations, Becraft states that he exercised his authority under INA § 212(d)(5) and 🚩 8 C.F.R. § 212.5(a), and instructed the Office of Field Operations to adjust its parole criteria with regard to inadmissible Haitians arriving in South Florida so that no Haitian would be released without INS Headquarters approval. (Id.) After Becraft's instructions were communicated to the Miami office, local officials continued to review the parole applications of arriving Haitians and released individuals with unusual hardships, such as pregnant women and unaccompanied minors. (Lee Decl. ¶ 2.)

**[9]   [10]** When analyzing an Executive official's exercise of discretion, a court must avoid overriding the policy determination of the Attorney General's designee. *See* 🚩 *Garcia–Mir,* 766 F.2d at 1485. The Court need not agree with the policymaker's choice nor approve of the policy reasons underlying it; rather, the Court must only ascertain whether the Government has advanced a facially legitimate and bona fide reason supporting the decision. *See id.* (citing 🚩 *Jean II,* 727 F.2d at 977). Here, the Court finds

that preventing loss of life and avoiding a mass migration from Haiti are facially legitimate and bona fide reasons for detaining Haitian nationals who arrive by boat in South Florida. This conclusion is supported by the declaration of U.S. Coast Guard Lieutenant Bryan E. Clampitt, indicating that at least eighteen Haitian migrants died attempting to reach the shores of South Florida in the past year, in addition to the two who reportedly drowned attempting to swim ashore from the *Simapvivetzi.* [16] (Clampitt Decl. ¶¶ 4– **\*1382** 5.) Lieutenant Clampitt also states that the Coast Guard interdicted approximately thirty vessels containing Haitian migrants between March 15, 2001 and March 15, 2002, and that almost all such vessels must be destroyed by the Coast Guard after interdiction, due to their unseaworthy condition. (*Id.* ¶ 3.) In light of such credible evidence from Executive officials of recurring loss of life and the potential for future danger and large-scale loss of life, the Court may not further scrutinize the policy choices made by the properly delegated Executive officials.

In addition, parole determinations normally take account of the possibility that an excludable alien may abscond to avoid being returned to his or her home country. *See, e.g.* 🚩 *Garcia–Mir,* 766 F.2d at 1485; 🚩 *Bertrand,* 684 F.2d at 214–18. Here, Acting Deputy Commissioner Becraft concluded that Haitians arriving by boat would be less likely to appear for immigration proceedings, given their demonstrated desperation to leave Haiti. (Becraft Decl. ¶ 8.) The Court finds that this is a facially legitimate and bona fide reason to deny parole, and, therefore, the Court will not speculate as to whether the same goal could be achieved through alternative means.

*(b) Individualized Determinations*

Having determined that the Haitian adjustment policy is supported by a facially legitimate and bona fide reason, the only remaining question is whether low-level Miami officials implemented the policy as intended by the policymakers. The Officer in Charge of INS Krome Service Processing Center indicates that after receiving Becraft's instructions on December 14, 2001, the deportation officers in Miami continued to review Haitians' parole requests on an individual, case-by-case basis. (Lee Decl. ¶ 12.) Lee himself recommended to Headquarters the release of approximately fifteen Haitians with cases of unusual hardship, and Headquarters approved of parole in those cases. (*Id.*)

**[11]** Petitioners do not allege that they are entitled to release under the adjusted policy. In addition, none of the named Petitioners' parole applications indicates any unusual hardship that would qualify for consideration by Headquarters. Based on the record, the Court finds that Miami officials have implemented the policy as established by high-level INS officials. Because the policy is supported by a facially legitimate and bona fide reason, the Court concludes that the named Petitioners were properly denied parole.

### E. APA Challenges

**[12]** The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 702. However, judicial review is not available under the APA where otherwise precluded by statute. 5 U.S.C. § 701(a)(1). In the instant case, the INA precludes judicial review of any decision or action of the Attorney General "the authority for which is specified under [title II of the INA] to be in the discretion of the Attorney General." INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). Thus, the APA does not provide a basis for Petitioners to challenge the Attorney General's exercise of discretion in denying their parole requests *See, e.g.,* St. Cyr, 121 S.Ct. at 2285–86.

**[13]** Petitioners also argue that the INS's policy toward Haitians is subject to **\*1383** the APA's "notice and comment" rulemaking requirements, 5 U.S.C. § 533 *et seq.* Here, Petitioners claim that the Government's adjustment of policy violated the APA's statutory requirements, not that it constituted an abuse of discretion. Thus, INA § 242(a)(2)(B)(ii) does not preclude jurisdiction. The Court may address this claim under habeas jurisdiction because if the APA required notice-and-comment rulemaking for the policy pursuant to which Petitioners were held, their detention could be "in violation of ... the laws ... of the United States." 28 U.S.C. § 2241(c)(3). The Government contends that the current policy toward Haitians is "merely an adjustment to the INS's Detention Use Guidelines, limited to one district." (Resp. at 3.) The Government maintains that its actions toward Haitians are exempt from the APA's rulemaking requirements under the "general policy statement" and "foreign affairs" exceptions.

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). As the definition of "rule" is quite broad, the APA provides a number of exceptions that permit promulgation of certain rules without recourse to the rulemaking procedures. One exception is for "general statements of policy," a term not defined by statute. 5 U.S.C. § 553(b)(3)(A). "A critical test of whether a rule is a general statement of policy is its practical effect in a subsequent administrative proceeding: A general statement of policy ... does not establish a 'binding norm.' It is not finally determinative of the issues or rights to which it is addressed." *Guardian Fed. Sav. & Loan Assoc. v. Fed. Sav. & Loan Ins. Corp.,* 589 F.2d 658, 666 (D.C.Cir.1978), *cited with approval in Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983); *Jean I,* 711 F.2d at 1480–83 (vacated as moot).

**[14]** Here, the policy adjustment does not establish a binding norm because it does not finally dispose of an individual Haitian's parole application. The Detention Use Policy, which was not promulgated as a rule, specifically states, "Although parole is discretionary in all cases where it is available, it is INS policy to favor release of aliens found to have a credible fear of persecution." The adjusted policy does not negate the discretionary nature of the parole determination, and it does not prevent INS officials from granting parole. Instead, the adjustment only requires that Miami officials obtain Headquarters' approval before granting parole to a Haitian who did not arrive by regular means at a designated port of entry. The policy allows Miami officials to release pregnant women and juveniles with approved sponsors on parole without obtaining Headquarters approval, and it allows them to forward any other case of unusual hardship to Headquarters for approval. Even under the adjusted policy, each case receives individual consideration. Therefore, the adjustment does not establish a "binding norm," and it need not be promulgated as a rule under the APA. [17]

### IV. Conclusion

When Petitioners boarded the *Simapvivetzi,* they risked their lives in search of freedom and democracy in the United States. Paramount within our democratic **\*1384** values is the separation of powers among the three co-equal branches of government. The law teaches us that the power to control a nation's borders is so fundamental to its sovereignty that we must abide by the lawfully enacted policy decisions made

by the Legislative and Executive branches, or seek change at the ballot box. In immigration matters, neither individuals nor the Court can substitute their policy perspectives for the judgments made by Executive officials, based upon facially legitimate and bona fide reasons, pursuant to statutory and delegated authority.

As the Court has determined that a writ of habeas corpus shall not issue, no basis exists for the issuance of a preliminary injunction or temporary restraining order, or any further action in this matter. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Petitioners' Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Hearing (D.E.2), filed March 15, 2002, is **DENIED.**

2. The Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief (D.E.1), filed March 15, 2001, is **DISMISSED.**

3. This case is **CLOSED.**

4. All motions not otherwise ruled upon by separate order are **DENIED AS MOOT.**

**All Citations**

204 F.Supp.2d 1366, 15 Fla. L. Weekly Fed. D 303

## Footnotes

1   Justice Felix Frankfurter, *The Commerce Clause* 12 (1937).

2   The eighteen Haitian migrants who swam to shore were considered by the INS to be "present without inspection," rather than "arriving aliens," as were the aliens brought to shore by the Coast Guard. (Gov't Opp. to Pets.' Mot. for TRO/PI/Writ at 5 n.3.) As such, the eighteen who swam to shore were released from detention and are not parties to this action.

3   The Government indicates that 165 of the 167 Haitian nationals rescued from the *Simapvivetzi* passed their "credible fear" interviews. (Gov't Opp. to Pets.' Mot. for TRO/PI/Writ at 5 n.3.) The other two were placed into expedited removal proceedings and are not parties to the instant action.

4   Originally, six named Plaintiffs/Petitioners filed this action. Subsequently, two of the original six were released from custody. The original lead Plaintiff/Petitioner, Ernest Moise, arrived aboard the *Simapvivetzi*. He and his family were granted asylum and released from detention on March 19, 2002. The Government filed a Motion to Dismiss Moise (D.E.16) on March 20, 2002. Petitioners conceded that his claims are moot. (D.E.29.) The Court granted the Motion to Dismiss Moise on May 10, 2002. (D.E.57.) The other original named Petitioner, Peterson Belizaire, arrived by plane at Miami International Airport on December 17, 2001. He applied for parole on February 27, 2002, and his application was denied on April 4, 2002. After the INS changed its policy with regard to Haitians arriving by plane, Belizaire completed a new parole request form. Upon his sponsor's completion of an affidavit of support, Belizaire was released on parole on April 18, 2002. The Government filed a Motion to Dismiss Belizaire (D.E.45) on April 26, 2002. Petitioners conceded that his claims are moot. (D.E.53.) The Court granted the Motion to Dismiss Belizaire on May 10, 2002. (D.E.57.)

5   The opinion, issued by the UNHCR at the request of Petitioners' counsel, concludes that under international refugee law (including the 1967 Protocol relating to the Status of Refugees, to which the United States is a party), detention should not be used as a means of deterring asylum seekers from seeking protection in a given country, and that detention is arbitrary, and therefore illegal, when asylum seekers of a particular national origin are subject to more restrictive criteria for release from detention than those of other nationalities. (UNHCR Advisory Opinion at 7.) Petitioners state that the advisory opinion is "relevant to the

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

present case" without addressing the issue of whether it constitutes binding authority in this Court. (Pets.' Not. of Filing Supp'l Exs. at 1.) Appellate courts, including the Eleventh Circuit, have held that the 1967 Protocol provides no enforceable rights in U.S. courts because it is not a self-executing treaty. *See Haitian Refugee Ctr., Inc. v. Baker,* 949 F.2d 1109, 1110 (11th Cir.1991); *Bertrand v. Sava,* 684 F.2d 204, 218 (2d Cir.1982). As Petitioners concede that they have not alleged any cause of action under international law, the Court need not further address the conclusions of the advisory opinion.

6    The amicus brief argues that Petitioners' detention violates international law, including the 1967 Protocol and the International Covenant on Civil and Political Rights ("ICCPR"), and alleges that continued detention will have an adverse impact on Petitioners' mental and physical well-being and their ability to present their asylum claims. The brief does not address whether the treaties are enforceable in U.S. courts. The law makes clear that neither the Protocol nor the ICCPR is a self-executing treaty, and, thus, neither provides enforceable rights in U.S. courts. *See supra* note 5; *United States v. Duarte–Acero,* 208 F.3d 1282, 1284 n. 8 (11th Cir.2000) (ICCPR not self-executing); *Buell v. Mitchell,* 274 F.3d 337, 372 (6th Cir.2001) (holding that ICCPR is not enforceable in U.S. courts). Moreover, the Complaint states no cause of action under international law, and the brief alleges no specific facts directed toward the current detention of Petitioners or any other Haitians in Miami. Therefore, the Court need not further address the amicus curiae brief.

7    The Government previously filed an Opposition to Petitioners' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, responding in full to the Emergency Motion. (D.E.14.) Petitioners seek the same relief in the Complaint (D.E.1) and the Emergency Motion (D.E.2). Therefore, the Court finds it unnecessary to consider the Government's Motion to Dismiss and for Summary Judgment, and rules upon the basis of the Emergency Motion and related pleadings.

8    *Sierra* involved the withdrawal of parole of a Mariel Cuban, which is covered by separate immigration regulations, yet the Tenth Circuit found no material difference between the situation in *Sierra* and a previous case involving a non-Mariel Cuban challenging the initial denial of parole, 258 F.3d at 1219 n. 4. Likewise, this Court finds no material difference between *Sierra* and the present case. The same jurisdiction-stripping provision, INA § 242(a)(2)(B)(ii), is at issue here.

9    By contrast, the Court lacks jurisdiction over Petitioners' attempts to obtain full APA-style judicial review of the Attorney General's discretionary parole decisions. *See infra* section III.E.

10   In the instant Emergency Motion, Petitioners seek a temporary restraining order, preliminary injunction, or, in the alternative, a class writ of habeas corpus. For the reasons set forth in this Order, the Court finds that it lacks independent jurisdiction over Petitioners' constitutional and APA claims apart from habeas jurisdiction under 28 U.S.C. § 2241. Habeas jurisdiction allows a court to equitably "dispose of the matter as law and justice require." 28 U.S.C. § 2243. Thus, a court granting a writ of habeas corpus may issue an injunction in aid of the writ. *See Pierre v. United States,* 525 F.2d 933, 936 (5th Cir.1976) ("injunctive relief may be necessary to enforce the petitioners' right of liberty"); *United States v. Doherty,* 786 F.2d 491, 499 n. 11 (2d Cir.1986) (citing *Louis v. Nelson,* 544 F.Supp. 1004 (S.D.Fla.1982)); *Moore v. DeYoung,* 515 F.2d 437, 447 (3d Cir.1975). However, where a court has only habeas jurisdiction and determines that no writ shall issue, no separate basis exists for the issuance of injunctive relief.

11   *Garcia–Mir* was part of lengthy litigation following the Mariel Boatlift of 1980, in which 125,00 Cubans participated in a mass exodus from Cuba to the United States. 766 F.2d at 1480. In *Garcia–Mir,* the Eleventh Circuit emphasized the importance of judicial deference to the political branches' decisions with

respect to such a crisis: "In overriding the government's decisions about how best to handle the sudden influx of Mariel Cubans, the district court has failed to take account of those significant countervailing national concerns that have led our immigration law to place primary decisionmaking authority about such a problem squarely into the hands of the political branches." *Id.* at 1484. In the instant action, the Government asserts that the Haitian adjustment policy was adopted, in part, to avoid a mass migration from Haiti. (Becraft Decl. ¶ 8.) Petitioners contend and submit statistics to show that, unlike the Mariel Boatlift, there is no current Haitian migration crisis. (Pets.' Reply at 7–10.) Petitioners' argument, however, disregards the importance of the separation of powers concerns that mandate judicial deference. The same "significant countervailing national concerns" that prevented the *Garcia–Mir* court from second-guessing the Attorney General's decisions in response to the Mariel Boatlift also guide this Court. Executive officials have considerable knowledge and experience with respect to both the history and the current situation in Haiti and South Florida. Thus, the Court must allow them to make policy determinations at the outset in an attempt to avoid what they perceive as a potential threat of another mass migration.

12  At this point, the alien moves out of "expedited removal proceedings" under INA § 235, and into regular removal proceedings under INA § 240. A "credible fear" alien's petition for asylum is then adjudicated before an immigration judge at a removal hearing. Currently, Petitioners are in regular section 240 proceedings, awaiting their removal hearings.

13  Acting Deputy Commissioner Peter Michael Becraft acted pursuant to this authority when he instructed Miami officials to adjust the parole criteria for Haitians arriving in South Florida. (Becraft Decl. ¶ 2; Becraft Suppl. Decl. ¶ 7.)

14  8 C.F.R. § 212.5(b) governs parole for aliens in expedited removal proceedings. Once an alien moves into regular removal proceedings, *see supra* note 12, 8 C.F.R. § 212.5(c) applies.

15  Although the Supreme Court held that the appellate court in *Jean II* should not have reached the constitutional issue, the en banc holding regarding the constitutional issue remains viable as the Supreme Court did not vacate the opinion but affirmed and remanded on alternative grounds. *See Cuban Am. Bar Ass'n, Inc. v. Christopher,* 43 F.3d 1412, 1428 n. 20 (11th Cir.1995) (internal cites omitted).

16  In addition, the Coast Guard recently rescued 73 Haitian survivors from a 35–foot sailboat that capsized near the Bahamas. When the Coast Guard suspended its search for survivors on May 11, 2002, thirteen Haitians were reported dead, and another fourteen remained missing. *See* Anabelle de Gale, *One Body Recovered, but Search Suspended for Haitians at Sea,* Miami Herald, May 12, 2002.

17  Because the Court finds that the Haitian policy qualifies for the "general statement of policy" exception to the APA rulemaking requirements, the Court need not decide whether the politically sensitive "foreign affairs" exception applies.

**End of Document**　　© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Lorillard v. Pons, 434 U.S. 575 (1978)

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 865 of 1021   PageID 7735

98 S.Ct. 866, 16 Fair Empl.Prac.Cas. (BNA) 885, 16 Empl. Prac. Dec. P 8134...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Henderson v. Shinseki,   Fed.Cir.,   December 17, 2009

98 S.Ct. 866
Supreme Court of the United States

LORILLARD, a Division of
Loew's Theatres, Inc., Petitioner,

v.

Frances P. PONS.

No. 76–1346.
|
Argued Dec. 6, 1977.
|
Decided Feb. 22, 1978.

## Synopsis

Action was brought under the Age Discrimination in Employment Act of 1967 seeking reinstatement, lost wages, liquidated damages, attorney fees and costs. The United States District Court for the Middle District of North Carolina, 69 F.R.D. 576, granted defendant's motion to strike plaintiff's demand for jury trial, and plaintiff took an interlocutory appeal. The Court of Appeals, 549 F.2d 950, allowed appeal and vacated the trial court's order, and certiorari was granted. The Supreme Court, Mr. Justice Marshall, held that Congress intended that in a private action under the ADEA a trial by jury would be available where sought by one of the parties.

Judgment of Court of Appeals affirmed.

West Headnotes (4)

**[1]**    **Administrative Law and Procedure**    Reenactment of construed statute; incorporation of construction

**Statutes**    Reenactment or incorporation of prior statute

Congress is presumed to be aware of administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change.

364 Cases that cite this headnote

**[2]**    **Statutes**    Reenactment or incorporation of prior statute

Congress in adopting a new law incorporating sections of a prior law normally can be presumed to have had knowledge of interpretation given to incorporated law, at least insofar as it affects the new statute.

374 Cases that cite this headnote

**[3]**    **Jury**    Legal or Equitable Actions or Issues

In cases in which "legal" relief is available and "legal" rights are determined, the Seventh Amendment provides a right to jury trial. U.S.C.A.Const. Amend. 7.

171 Cases that cite this headnote

**[4]**    **Jury**    Civil rights actions

In face of its extensive knowledge of operation of Fair Labor Standards Act, illustrated by its selective incorporation and amendment of FLSA provisions for the Age Discrimination in Employment Act, Congress could not be assumed to have been unaware that courts had uniformly afforded jury trial under the FLSA nor was Congress, in specifically providing for "legal" relief in the ADEA, oblivious to its long-established meaning or significance and thus, in light of congressional intent, a trial by jury is available in private civil actions for lost wages under the ADEA where sought by one of the parties. Fair Labor Standards Act of 1938, §§ 1 et seq., 16 et seq., 29 U.S.C.A. §§ 201 et seq., 216 et seq.; Age Discrimination in Employment Act of 1967, §§ 2 et seq., 7(b, c), 29 U.S.C.A. §§ 621 et seq., 626(b, c); U.S.C.A.Const. Amend. 7.

579 Cases that cite this headnote

Lorillard v. Pons, 434 U.S. 575 (1978)
98 S.Ct. 866, 16 Fair Empl.Prac.Cas. (BNA) 885, 16 Empl. Prac. Dec. P 8134...

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 866 of 1021   PageID 7736

**\*\*867  \*575** *Syllabus* [*]

In a private civil action for lost wages under the Age Discrimination in Employment Act of 1967 (ADEA), a trial by jury is available where sought by one of the parties, since, although the ADEA contains no provision expressly granting a right to jury trial in such cases, the ADEA's structure demonstrates a congressional intent to grant such a right. Pp. 868–872.

(a) The directive of § 7(b) of the ADEA that the Act be enforced in accordance with the "powers, remedies, and *procedures* " of the Fair Labor Standards Act (FLSA) is a significant indication of Congress' intent. Long before the ADEA was enacted, courts had uniformly interpreted the FLSA to afford a right to jury trial in private actions pursuant to that Act. Congress can be presumed to have been aware of that interpretation and by incorporating certain remedial and procedural provisions of the FLSA into the ADEA, Congress demonstrated its intention to afford a right to jury trial. Pp. 870–871.

(b) By directing in § 7(b) of the ADEA that actions for lost wages be treated as actions for unpaid minimum wages or overtime compensation under the FLSA, Congress dictated that the jury trial right then available to enforce that FLSA liability would also be available in private actions under the ADEA. This conclusion is supported by the language of § 7(b) empowering a court to grant "*legal* or equitable relief" and of § 7(c) authorizing individuals to bring actions for "*legal* or equitable relief." It can be inferred that Congress knew the significance of the term "legal" and that by providing specifically for "legal" relief, it intended that there would be a jury trial on demand to enforce liability for amounts deemed to be unpaid minimum wages or overtime compensation. Pp. 871–872.

(c) A contrary congressional intent cannot be found by comparing the ADEA with Title VII of the Civil Rights Act of 1964. Assuming, *arguendo,* that Congress did not intend that there be jury trials in private actions under Title VII, there is a material difference between the ADEA and Title VII. In contrast to the ADEA, Title VII does not, in so many words, authorize "legal" relief, and the availability of **\*576** backpay is a matter of equitable discretion. It appears, moreover, that Congress rejected the course of adopting Title VII procedures **\*\*868**  for ADEA actions in favor of incorporating the FLSA procedures. Pp. 871–872.

549 F.2d 950, affirmed.

**Attorneys and Law Firms**

Thornton H. Brooks, Greensboro, N. C., for petitioner.

Norman B. Smith, Greensboro, N. C., for respondent.

**Opinion**

Mr. Justice MARSHALL delivered the opinion of the Court.

This case presents the question whether there is a right to a jury trial in private civil actions for lost wages under the Age Discrimination in Employment Act of 1967 (ADEA or Act), 81 Stat. 602, as amended, 88 Stat. 74, 29 U.S.C. § 621 *et seq.* (1970 ed. and Supp. V). Respondent commenced this action against petitioner, her former employer, alleging that she had been discharged because of her age in violation of the ADEA. She sought reinstatement, lost wages, liquidated damages, attorney's fees, and costs. Respondent demanded a jury trial on all issues of fact; petitioner moved to strike the demand. The District Court granted the motion to strike but certified the issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The United States Court of Appeals for the Fourth Circuit allowed the appeal and vacated the trial court's order, ruling that the ADEA and the Seventh Amendment [1]  **\*577** afford respondent the right to a jury trial on her claim for lost wages, 549 F.2d 950, 952–953 (1977). [2]  We granted certiorari, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1090 (1977), to resolve the conflict in the Circuits [3]  on this important issue in the administration of the ADEA. We now affirm.

I

The ADEA broadly prohibits arbitrary discrimination in the workplace based on age. § 4(a), 29 U.S.C. § 623(a). Although the ADEA contains no provision expressly granting a right to jury trial, respondent nonetheless contends that the structure of the Act demonstrates a congressional intent to grant such a right. Alternatively, she argues that the Seventh Amendment requires that in a private action for lost wages under the ADEA, the parties must be given the option of having the case heard by a jury. We turn first to the statutory question since " 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is

fairly possible by which the [constitutional] question may be avoided.' " *United States v. Thirty-seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971), quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). Accord, *Pernell v. Southall Realty,* 416 U.S. 363, 365, 94 S.Ct. 1723, 1724, 40 L.Ed.2d 198 (1974). Because we find the statutory issue dispositive, we need not address the constitutional issue.

The enforcement scheme for the statute is complex—the product of considerable attention during the legislative debates **\*578** preceding passage of the Act. Several alternative proposals were considered by Congress. The Administration submitted a bill, modeled after §§ 10(c), (e) of the National Labor Relations Act, 29 U.S.C. §§ 160(c), (e), which would have granted power to the Secretary of Labor to issue cease-and-desist orders enforceable in the courts of appeals, **\*\*869** but would not have granted a private right of action to aggrieved individuals, S. 830, H.R. 4221, 90th Cong., 1st Sess. (1967). Senator Javits introduced an alternative proposal to make discrimination based on age unlawful under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.;* the normal enforcement provisions of the FLSA, 29 U.S.C. § 216 *et seq.,* (1970 ed. and Supp. V), then would have been applicable, permitting suits by either the Secretary of Labor or the injured individual, S. 788, 90th Cong., 1st Sess. (1967). A third alternative that was considered would have adopted the statutory pattern of Title VII of the Civil Rights Act of 1964 and utilized the Equal Employment Opportunity Commission. 42 U.S.C. §§ 2000e–4, 2000e–5 (1970 ed. and Supp. V).

The bill that was ultimately enacted is something of a hybrid, reflecting, on the one hand, Congress' desire to use an existing statutory scheme and a bureaucracy with which employers and employees would be familiar and, on the other hand, its dissatisfaction with some elements of each of the pre-existing schemes. [4] Pursuant to § 7(b) of the Act, 29 U.S.C. § 626(b), violations of the ADEA are to be treated as violations of the FLSA. "Amounts owing . . . as a result of a violation" of the ADEA are to be treated as "unpaid minimum **\*579** wages or unpaid overtime compensation" under the FLSA and the rights created by the ADEA are to be "enforced in accordance with the powers, remedies and procedures" of specified sections of the FLSA. 29 U.S.C. § 626(b). [5]

Following the model of the FLSA, the ADEA establishes two primary enforcement mechanisms. Under the FLSA provisions incorporated in § 7(b) of the ADEA, 29 U.S.C. § 626(b), the Secretary of Labor may bring suit on behalf of an aggrieved individual for injunctive and monetary relief. 29 U.S.C. §§ 216(c), 217 (1970 ed. and Supp. V). The incorporated FLSA provisions together with § 7(c) of the ADEA, 29 U.S.C. § 626(c), in addition, authorize private civil actions for "such legal or equitable relief as will effectuate the purposes of" the ADEA. [6] Although not required by the **\*580** FLSA, prior to the initiation of any ADEA action, an individual must give notice to the **\*\*870** Secretary of Labor of his intention to sue in order that the Secretary can attempt to eliminate the alleged unlawful practice through informal methods. § 7(d), 29 U.S.C. § 626(d). After allowing the Secretary 60 days to conciliate the alleged unlawful practice, the individual may file suit. The right of the individual to sue on his own terminates, however, if the Secretary commences an action on his behalf. § 7(c), 29 U.S.C. § 626(c).

## II

[1]  [2]  Looking first to the procedural provisions of the statute, we find a significant indication of Congress' intent in its directive that the ADEA be enforced in accordance with the "powers, remedies, and *procedures* " of the FLSA. § 7(b), 29 U.S.C. § 626(b) (emphasis added). Long before Congress enacted the ADEA, it was well established that there was a right to a jury trial in private actions pursuant to the FLSA. Indeed, every court to consider the issue had so held. [7] Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change, see *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975); **\*581** *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 366, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951); *National Lead Co. v. United States,* 252 U.S. 140, 147, 40 S.Ct. 237, 239, 64 L.Ed. 496 (1920); 2A C. Sands, Sutherland on Statutory Construction § 49.09 and cases cited (4th ed. 1973). So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed

to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

That presumption is particularly appropriate here since, in enacting the ADEA, Congress exhibited both a detailed knowledge of the FLSA provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation. For example, in construing the enforcement sections of the FLSA, the courts had consistently declared that injunctive relief was not available in suits by private individuals but only in suits by the Secretary. *Powell v. Washington Post Co.*, 105 U.S.App.D.C. 374, 267 F.2d 651 (1959); 🚩*Roberg v. Henry Phipps Estate*, 156 F.2d 958, 963 (CA2 1946); 🚩*Bowe v. Judson C. Burns, Inc.*, 137 F.2d 37 (CA3 1943). Congress made plain its decision to follow a different course in the ADEA by expressly permitting "such . . . equitable relief as may be appropriate to effectuate the purposes of [the ADEA] including without limitation judgments compelling employment, reinstatement or promotion" "in *any* action brought to enforce" the Act. § 7(b), 🚩29 U.S.C. § 626(b) (emphasis added). Similarly, while incorporating into the ADEA the FLSA provisions authorizing awards of liquidated damages, Congress altered the circumstances under which such awards would be available in ADEA actions by mandating that such damages be awarded only where the violation of the ADEA is willful. [8] Finally, **\*582  \*\*871** Congress expressly declined to incorporate into the ADEA the criminal penalties established for violations of the FLSA. [9]

This selectivity that Congress exhibited in incorporating provisions and in modifying certain FLSA practices strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA. Senator Javits, one of the floor managers of the bill, so indicated in describing the enforcement section which became part of the Act: "The enforcement techniques provided by [the ADEA] are directly analogous to those available under the Fair Labor Standards Act; in fact [the ADEA] incorporates by reference, to the greatest extent possible, the provisions of the [FLSA]." 113 Cong.Rec. 31254 (1967). [10] And by directing that actions for lost wages under the ADEA be treated as actions for unpaid minimum wages or overtime compensation under the FLSA, § 7(b), 🚩29 U.S.C. § 626(b), Congress dictated that the jury trial right then

available to **\*583** enforce that FLSA liability would also be available in private actions under the ADEA.

**[3]** This inference is buttressed by an examination of the language Congress chose to describe the available remedies under the ADEA. Section 7(b), 🚩29 U.S.C. § 626(b), empowers a court to grant "*legal* or equitable relief" and § 7(c), 🚩29 U.S.C. § 626(c), authorizes individuals to bring actions for "*legal* or equitable relief" (emphases added). The word "legal" is a term of art: In cases in which legal relief is available and legal rights are determined, the Seventh Amendment provides a right to jury trial. See 🚩*Curtis v. Loether*, 415 U.S. 189, 195–196, 94 S.Ct. 1005, 1008–1009, 39 L.Ed.2d 260 (1974). "[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." 🚩*Standard Oil v. United States*, 221 U.S. 1, 59, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). See 🚩*Gilbert v. United States*, 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750 (1962); *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 394, 27 L.Ed. 431 (1883). We can infer, therefore, that by providing specifically for "legal" relief, Congress knew the significance of the term "legal," and intended that there would be a jury trial on demand to "enforc[e] . . . liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation." § 7(b), 🚩29 U.S.C. § 626(b). [11]

Petitioner strives to find a contrary congressional intent by comparing the ADEA with Title VII of the Civil Rights Act of **\*\*872** 1964, 🚩42 U.S.C. § 2000e *et seq.* (1970 ed. and Supp. V), which petitioner maintains does not provide for jury trials. We, of course, intimate no view as to whether a jury trial is **\*584** available under Title VII as a matter of either statutory or constitutional right. See 🚩*Curtis v. Loether, supra*, 415 U.S., at 197, 94 S.Ct., at 1009. However, after examining the provisions of Title VII, we find petitioner's argument by analogy to Title VII unavailing. There are important similarities between the two statutes, to be sure, both in their aims—the elimination of discrimination from the workplace—and in their substantive prohibitions. In fact, the prohibitions of the ADEA were derived *in haec verba* from Title VII. [12] But in deciding whether a statutory right to jury trial exists, it is the remedial and procedural provisions of the two laws that are crucial and there we find significant differences.

Looking first to the statutory language defining the relief available, we note that Congress specifically provided for both "legal or equitable relief" in the ADEA, but did not authorize "legal" relief in so many words under Title VII. Compare § 7(b), 29 U.S.C. § 626(b), with 42 U.S.C. § 2000e–5(g) (1970 ed., Supp. V). Similarly, the ADEA incorporates the FLSA provision that employers "shall be liable" for amounts deemed unpaid minimum wages or overtime compensation, while under Title VII, the availability of backpay is a matter of equitable discretion, see *Albemarle Paper Co. v. Moody,* 422 U.S., at 421, 95 S.Ct., at 2373. [13] Finally, rather than adopting the procedures of Title VII for ADEA actions, Congress rejected that course **\*585** in favor of incorporating the FLSA procedures even while adopting Title VII's substantive prohibitions. Thus, even if petitioner is correct that Congress did not intend there to be jury trials under Title VII, that fact sheds no light on congressional intent under the ADEA. Petitioner's reliance on Title VII, therefore, is misplaced. [14]

**[4]** We are not unmindful of the difficulty of discerning congressional intent where the statute provides no express

answer. However, we cannot assume, in the face of Congress' extensive knowledge of the operation of the FLSA, illustrated by its selective incorporation and amendment of the FLSA provisions for the ADEA, that Congress was unaware that courts had uniformly afforded jury trials under the FLSA. Nor can we believe that in using the word "legal," Congress was oblivious to its long-established meaning or its significance. We are therefore persuaded that Congress intended that in a private action under the ADEA a trial by jury would be available where sought by one of the parties. The judgment of the Court of Appeals is, accordingly,

*Affirmed.*

Mr. Justice BLACKMUN took no part in the consideration or decision of this case.

## All Citations

434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40, 16 Fair Empl.Prac.Cas. (BNA) 885, 16 Empl. Prac. Dec. P 8134, 24 Fed.R.Serv.2d 1005

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Judge Butzner filed an opinion concurring specially. Since he agreed with the court that the statute entitled respondent to a jury trial, he found no occasion to address the constitutional issue. 549 F.2d 950, 954 (1977).

2    The Court of Appeals did not decide whether respondent was entitled to a jury trial on her claim for liquidated damages because according to the District Court opinion, respondent had "conceded that the liquidated damages issue would not be triable to a jury." 69 F.R.D. 576 n. 2 (1976). We express no view on the issue of the right to jury trial on a liquidated damages claim.

3    *Morelock v. NCR Corp.,* 546 F.2d 682 (CA6 1976) (no right to jury trial), cert. pending, No. 77–172; *Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834 (CA3 1977) (right to jury trial), cert. denied, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770.

4    Hearings on S. 830, S. 788 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess., 24 (1967) (remarks of Sen. Javits); *id.,* at 29 (remarks of Sen. Smathers); *id.,* at 396 (statement of National Retail Merchants Assn.). Hearings on H.R. 3651, H.R. 3768, and H.R. 4221

before the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Cong., 1st Sess., 12–13 (1967) (remarks of Secretary of Labor); *id.*, at 413 (statement of Legislative Representative, AFL–CIO).

5    Section 7(b), as set forth in 29 U.S.C. § 626(b), provides:

"The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of this title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided*, That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion."

6    Section 7(c), as set forth in 29 U.S.C. § 626(c), provides:

"Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: *Provided*, That the right of any person to bring such action shall terminate upon the commencement of an action by the Secretary to enforce the right of such employee under this chapter."

7    See, *e. g., Wirtz v. Jones*, 340 F.2d 901, 904 (CA5 1965); *Lewis v. Times Publishing Co.*, 185 F.2d 457 (CA5 1950); *Olearchick v. American Steel Foundries*, 73 F.Supp. 273, 279 (WD Pa.1947). See also Note, The Right to Jury Trial Under the Age Discrimination in Employment and Fair Labor Standards Acts, 44 U.Chi.L.Rev. 365, 376 (1977); Note, Fair Labor Standards Act and Trial by Jury, 65 Colum.L.Rev. 514 (1965). However, no right to jury trial was recognized in actions brought by the Secretary of Labor enjoining violations of the FLSA and compelling employers to pay unlawfully withheld minimum wages or overtime compensation pursuant to 29 U.S.C. § 217. See, *e. g., Sullivan v. Wirtz*, 359 F.2d 426 (CA5 1966); *Wirtz v. Jones, supra.*

8    By its terms, 29 U.S.C. § 216(b) requires that liquidated damages be awarded as a matter of right for violations of the FLSA. However, in response to its dissatisfaction with that judicial interpretation of the provision, Congress enacted the Portal-to-Portal Pay Act of 1947, 61 Stat. 84, which, *inter alia*, grants courts authority to deny or limit liquidated damages where the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of" the FLSA, § 11, 29 U.S.C. § 260 (1970 ed., Supp. V). Although § 7(e) of the ADEA, 29 U.S.C. § 626(e), expressly incorporates §§ 6 and 10 of the Portal-to-Portal Pay Act, 29 U.S.C. §§ 255 and 259 (1970 ed. and Supp. V), the ADEA does not make any reference to § 11, 29 U.S.C. § 260 (1970 ed., Supp. V).

9      Section 10 of the ADEA, 29 U.S.C. § 629, establishes criminal penalties for interference with the performance of an authorized representative of the Secretary when he is engaged in the performance of his duties under the Act. Cf. 🚩29 U.S.C. § 216(a).

10     Senator Javits made the only specific reference in the legislative history to a jury trial. He said:

       "The whole test is somewhat like the test in an accident case—did the person use reasonable care. A jury will answer yes or no. The question here is: Was the individual discriminated against solely because of his age? The alleged discrimination must be proved and the burden of proof is upon the one who would assert that that was actually the case." 113 Cong.Rec. 31255 (1967).

       It is difficult to tell whether Senator Javits was referring to the issue in ADEA cases or in accident cases when he said the jury will say yes or no.

11     Section 7(b), 🚩29 U.S.C. § 626(b), does not specify which of the listed categories of relief are legal and which are equitable. However, since it is clear that judgments compelling "employment, reinstatement or promotion" are equitable, see 5 J. Moore, Federal Practice ¶ 38.21 (1977), Congress must have meant the phrase "legal relief" to refer to judgments "enforcing . . . liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation."

12     Title VII with respect to race, color, religion, sex, or national origin, and the ADEA with respect to age make it unlawful for an employer "to fail or refuse to hire or to discharge any individual," or otherwise to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," on any of those bases. 🚩42 U.S.C. § 2000e–2(a)(1); 🚩29 U.S.C. § 623(a)(1). Compare 🚩42 U.S.C. § 2000e–2(a)(2) (1970 ed., Supp. V) with 🚩29 U.S.C. § 623(a)(2).

13     Although we have held that the discretionary power to deny backpay should be used only where to do so "would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination," 🚩*Albemarle Paper Co. v. Moody,* 422 U.S, at 421, 95 S.Ct., at 2373, we nonetheless have recognized that under Title VII some discretion exists.

14     Indeed, to the extent petitioner correctly interprets congressional intent with respect to jury trials under Title VII, the very different remedial and procedural provisions under the ADEA suggest that Congress had a very different intent in mind in drafting the later law.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 214 and 274a**

[CIS No. 2689–21]

RIN 1615–AC72

# DEPARTMENT OF LABOR

**Employment and Training Administration**

**20 CFR Part 655**

[DOL Docket No. ETA–2021–0005]

RIN 1205–AC07

**Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS) and Employment and Training Administration and Wage and Hour Division, U.S. Department of Labor (DOL).

**ACTION:** Temporary rule.

**SUMMARY:** The Secretary of Homeland Security, in consultation with the Secretary of Labor, is exercising his time-limited Fiscal Year (FY) 2021 authority and increasing the numerical limitation on H–2B nonimmigrant visas to authorize the issuance of no more than 22,000 additional visas through the end of the second half of FY 2021 to those businesses likely to suffer irreparable harm, as attested by the employer on a new attestation form. In addition to making additional visas available under the FY 2021 time-limited authority, DHS is exercising its general H–2B regulatory authority to temporarily provide portability flexibility by allowing H–2B workers who are already in the United States to begin work immediately after an H–2B petition (supported by a valid temporary labor certification) is received by USCIS, and before it is approved.

**DATES:** The amendments to title 8 of the Code of Federal Regulations in this rule are effective from May 25, 2021 through May 28, 2024, although DHS will not approve any H–2B petition under the provisions related to the supplemental numerical allocation after September 30, 2021, and the provisions related to portability are only available to petitioners and H–2B nonimmigrant workers initiating employment through the end of November 22, 2021. The amendments to title 20 of the Code of Federal Regulations in this rule are effective from May 25, 2021 through September 30, 2021, except for 20 CFR 655.68 which is effective from May 25, 2021 through September 30, 2024.

The Office of Foreign Labor Certification within the U.S. Department of Labor will be accepting comments in connection with the new information collection Form ETA–9142B–CAA–4 associated with this rule until July 26, 2021.

**ADDRESSES:** You may submit written comments on the new information collection Form ETA–9142B–CAA–4, identified by Regulatory Information Number (RIN) 1205–AC07 electronically by the following method:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions on the website for submitting comments.

*Instructions:* Include the agency's name and the RIN 1205–AC07 in your submission. All comments received will become a matter of public record and will be posted without change to *http:// www.regulations.gov.* Please do not include any personally identifiable information or confidential business information you do not want publicly disclosed.

**FOR FURTHER INFORMATION CONTACT:** Regarding 8 CFR parts 214 and 274a: Charles L. Nimick, Chief, Business and Foreign Workers Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

Regarding 20 CFR part 655 and Form ETA–9142B–CAA–4: Brian D. Pasternak, Administrator, Office of Foreign Labor Certification, Employment and Training Administration, Department of Labor, 200 Constitution Ave NW, Room N–5311, Washington, DC 20210, telephone (202) 693–8200 (this is not a toll-free number).

Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. Legal Framework
  B. H–2B Numerical Limitations Under the INA
  C. FY 2021 Omnibus
  D. Joint Issuance of the Final Rule
III. Discussion
  A. Statutory Determination
  B. Numerical Increase and Allocation of up to 22,000 Visas
  C. Returning Workers
  D. Returning Worker Exemption for up to 6,000 Visas for Nationals of Guatemala, El Salvador, and Honduras (Northern Triangle Countries)
  E. Business Need Standard—Irreparable Harm and FY 2021 Attestation
  F. Portability
  G. COVID–19 Worker Protections
  H. DHS Petition Procedures
  I. DOL Procedures
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  B. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Small Business Regulatory Enforcement Fairness Act of 1996
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Congressional Review Act
  I. National Environmental Policy Act
  J. Paperwork Reduction Act

## I. Executive Summary

*FY 2021 H–2B Supplemental Cap*

With this temporary final rule (TFR), the Secretary of Homeland Security, following consultation with the Secretary of Labor, is authorizing the immediate release of an additional 22,000 H–2B visas through the end of FY 2021, subject to certain conditions. The 22,000 visas are divided into two allocations, as follows:

• 16,000 visas limited to returning workers, regardless of country of nationality, in other words, those workers who were issued H–2B visas or held H–2B status in fiscal years 2018, 2019, or 2020; and

• 6,000 visas initially reserved for nationals of the Northern Triangle countries as attested by the petitioner (regardless of whether such nationals are returning workers). However, if all 6,000 visas reserved for nationals of the Northern Triangle countries are not allocated by July 8, 2021, USCIS will announce by July 23, 2021, on its website, that such unused Northern Triangle country visas will be made available to employers regardless of the beneficiary's country of nationality, subject to the returning worker limitation.

To qualify for the FY 2021 supplemental cap, eligible petitioners must:

• Meet all existing H–2B eligibility requirements, including obtaining an approved temporary labor certification

**AR03531**

(TLC) from DOL before filing the Form I–129, Petition for Nonimmigrant Worker, with USCIS;

• Submit an attestation affirming, under penalty of perjury, that the employer will likely suffer irreparable harm if it cannot employ the requested H–2B workers, and that it is seeking to employ returning workers only, unless the H–2B worker is a Northern Triangle national and counted towards the 6,000 cap (during such time as when the Northern Triangle cap reservation allocation is applicable); and

• Agree to comply with all applicable labor and employment laws, including health and safety laws pertaining to COVID–19, as well as any rights to time off or paid time off to obtain COVID–19 vaccinations, and notify the workers in a language understood by the worker, as necessary or reasonable, of equal access of nonimmigrants to COVID–19 vaccines and vaccination distribution sites.

Employers filing an H–2B petition 45 or more days after the certified start date on the TLC, must attest to engaging in the following additional steps to recruit U.S. workers:

• No later than 1 business day after filing the petition, place a new job order with the relevant State Workforce Agency (SWA) for at least 15 calendar days;

• Contact the nearest American Job Center serving the geographic area where work will commence and request staff assistance in recruiting qualified U.S. workers;

• Contact the employer's former U.S. workers, including those the employer furloughed or laid off beginning on January 1, 2019, and until the date the H–2B petition is filed, disclose the terms of the job order and solicit their return to the job;

• Provide written notification of the job opportunity to the bargaining representative for the employer's employees in the occupation and area of employment, or post notice of the job opportunity at the anticipated worksite if there is no bargaining representative; and

• Hire any qualified U.S. worker who applies or is referred for the job opportunity until the later of either (1) the date on which the last H–2B worker departs for the place of employment, or (2) 30 days after the last date of the SWA job order posting.

Petitioners filing H–2B petitions under the FY 2021 supplemental cap must retain documentation of compliance with the attestation requirements for 3 years from the date the TLC was approved, and must provide the documents and records upon the request of DHS or DOL, as well as fully cooperate with any compliance reviews such as audits. Both DHS and DOL intend to conduct a significant number of post-adjudication audits to ascertain compliance with the attestation requirements of this TFR.

Falsifying information in attestation(s) can result not only in penalties relating to perjury, but can also result in, among other things, a finding of fraud or willful misrepresentation; denial or revocation of the H–2B petition requesting supplemental workers; debarment by DOL and DHS from the H–2 program; and may subject petitioner/employer to other criminal penalties.

The authority to approve H–2B petitions under the FY 2021 supplemental cap expires on September 30, 2021.

*H–2B Portability*

In addition to exercising time limited authority to make additional H–2B visas available in FY 2021, DHS is providing additional flexibilities to H–2B petitioners under its general programmatic authority by allowing nonimmigrant workers in the United States in valid H–2B status to begin work with a new employer after an H–2B petition (supported by a valid TLC) is filed and before the petition is approved generally for a period of up to 60 days. However, such employment authorization would end 15 days after USCIS denies the H–2B petition or such petition is withdrawn. This H–2B portability ends 180 days after the effective date of this rule, in other words, after the date this rule is published in the **Federal Register**.

**II. Background**

*A. Legal Framework*

The Immigration and Nationality Act (INA), as amended, establishes the H–2B nonimmigrant classification for a nonagricultural temporary worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform . . . temporary [non-agricultural] service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b). Employers must petition the Department of Homeland Security (DHS) for classification of prospective temporary workers as H–2B nonimmigrants. INA section 214(c)(1), 8 U.S.C. 1184(c)(1). Generally, DHS must approve this petition before the beneficiary can be considered eligible for an H–2B visa. In addition, the INA requires that "[t]he question of importing any alien as [an H–2B] nonimmigrant . . . in any specific case or specific cases shall be determined by [DHS],[1] after consultation with appropriate agencies of the Government." INA section 214(c)(1), 8 U.S.C. 1184(c)(1). The INA generally charges the Secretary of Homeland Security with the administration and enforcement of the immigration laws, and provides that the Secretary "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority" under the INA. *See* INA section 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also* 6 U.S.C. 202(4) (charging the Secretary with "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission . . . to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States"). With respect to nonimmigrants in particular, the INA provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe." INA section 214(a)(1), 8 U.S.C. 1184(a)(1); *see also* INA section 274A(h)(1) and (3), 8 U.S.C. 1324a(h)(1) and (3) (prohibiting employment of noncitizen[2] not authorized for employment). The Secretary may designate officers or employees to take and consider evidence concerning any matter which is material or relevant to the enforcement of the INA. INA sections 287(a)(1), (b), 8 U.S.C. 1357(a)(1), (b) and INA section 235(d)(3), 8 U.S.C. 1225(d)(3).

Finally, under section 101 of HSA, 6 U.S.C. 111(b)(1)(F), a primary mission of DHS is to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

DHS regulations provide that an H–2B petition for temporary employment in the United States must be accompanied by an approved TLC from the U.S.

---

[1] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, Title XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[2] For purposes of this discussion, the Departments use the term "noncitizen" colloquially to be synonymous with the term "alien" as it is used in the Immigration and Nationality Act.

Department of Labor (DOL), issued pursuant to regulations established at 20 CFR part 655, or from the Guam Department of Labor if the worker will be employed on Guam. 8 CFR 214.2(h)(6)(iii)(C) through (E), (h)(6)(iv)(A); *see also* INA section 103(a)(6), 8 U.S.C. 1103(a)(6). The TLC serves as DHS's consultation with DOL with respect to whether a qualified U.S. worker is available to fill the petitioning H–2B employer's job opportunity and whether a foreign worker's employment in the job opportunity will adversely affect the wages and working conditions of similarly-employed U.S. workers. *See* INA section 214(c)(1), 8 U.S.C. 1184(c)(1); 8 CFR 214.2(h)(6)(iii)(A) and (D).

In order to determine whether to issue a TLC, the Departments have established regulatory procedures under which DOL certifies whether a qualified U.S. worker is available to fill the job opportunity described in the employer's petition for a temporary nonagricultural worker, and whether a foreign worker's employment in the job opportunity will adversely affect the wages or working conditions of similarly employed U.S. workers. *See* 20 CFR part 655, subpart A. The regulations establish the process by which employers obtain a TLC and the rights and obligations of workers and employers.

Once the petition is approved, under the INA and current DHS regulations, H–2B workers do not have employment authorization outside of the validity period listed on the approved petition unless otherwise authorized, and the workers are limited to employment with the H–2B petitioner. *See* 8 U.S.C. 1184(c)(1), 8 CFR 274a.12(b)(9). An employer or U.S. agent generally may submit a new H–2B petition, with a new, approved TLC, to USCIS to request an extension of H–2B nonimmigrant status for the validity of the TLC or for a period of up to 1 year. 8 CFR 214.2(h)(15)(ii)(C). Except as provided for in this rule, and except for certain professional athletes being traded among organizations,[3] H–2B workers seeking to extend their status with a new employer may not begin employment with the new employer until the new H–2B petition is approved.

The INA also authorizes DHS to impose appropriate remedies against an employer for a substantial failure to meet the terms and conditions of employing an H–2B nonimmigrant worker, or for a willful misrepresentation of a material fact in a petition for an H–2B nonimmigrant worker. INA section 214(c)(14)(A), 8 U.S.C. 1184(c)(14)(A). The INA expressly authorizes DHS to delegate certain enforcement authority to DOL. INA section 214(c)(14)(B), 8 U.S.C. 1184(c)(14)(B); *see also* INA section 103(a)(6), 8 U.S.C. 1103(a)(6). DHS has delegated its authority under INA section 214(c)(14)(A)(i), 8 U.S.C. 1184(c)(14)(A)(i) to DOL. *See* DHS, Delegation of Authority to DOL under Section 214(c)(14)(A) of the INA (Jan. 16, 2009); *see also* 8 CFR 214.2(h)(6)(ix) (stating that DOL may investigate employers to enforce compliance with the conditions of, among other things, an H–2B petition and a DOL-approved TLC). This enforcement authority has been delegated within DOL to the Wage and Hour Division (WHD), and is governed by regulations at 29 CFR part 503.

*B. H–2B Numerical Limitations Under the INA*

The INA sets the annual number of noncitizens who may be issued H–2B visas or otherwise provided H–2B nonimmigrant status to perform temporary nonagricultural work at 66,000, to be distributed semi-annually beginning in October and April. *See* INA sections 214(g)(1)(B) and (g)(10), 8 U.S.C. 1184(g)(1)(B) and (g)(10). With certain exceptions, described below, up to 33,000 noncitizens may be issued H–2B visas or provided H–2B nonimmigrant status in the first half of a fiscal year, and the remaining annual allocation, including any unused nonimmigrant H–2B visas from the first half of a fiscal year, will be available for employers seeking to hire H–2B workers during the second half of the fiscal year.[4] If insufficient petitions are approved to use all H–2B numbers in a given fiscal year, the unused numbers cannot be carried over for petition approvals for employment start dates beginning on or after the start of the next fiscal year.

In FYs 2005, 2006, 2007, and 2016, Congress exempted H–2B workers identified as returning workers from the annual H–2B cap of 66,000.[5] A returning worker is defined by statute as an H–2B worker who was previously counted against the annual H–2B cap during a designated period of time. For example, Congress designated that returning workers for FY 2016 needed to have been counted against the cap during FY 2013, 2014, or 2015.[6] DHS and the Department of State (DOS) worked together to confirm that all workers requested under the returning worker provision in fact were eligible for exemption from the annual cap (in other words, were issued an H–2B visa or provided H–2B status during one of the prior 3 fiscal years) and were otherwise eligible for H–2B classification.

Because of the strong demand for H–2B visas in recent years, the statutorily-limited semi-annual visa allocation, the DOL regulatory requirement that employers apply for a TLC 75 to 90 days before the start date of work,[7] and the DHS regulatory requirement that all H–2B petitions be accompanied by an approved TLC,[8] employers that wish to obtain visas for their workers under the semi-annual allotment must act early to receive a TLC and file a petition with U.S. Citizenship and Immigration Services (USCIS). As a result, DOL typically sees a significant spike in TLC applications from employers seeking to hire H–2B temporary or seasonal workers prior to the United States' warm weather months. For example, in FY 2021, based on TLC applications filed during the 3-day filing window of January 1 through 3, 2021, DOL's Office of Foreign Labor Certification (OFLC) received requests to certify 96,641 worker positions for start dates of work on April 1, 2021.[9] USCIS, in turn, received sufficient H–2B petitions to reach the second half of the fiscal year

---

[3] *See* 8 CFR 214.2(h)(6)(vii) and 8 CFR 274a.12(b)(9).

[4] The Federal Government's fiscal year runs from October 1 of the prior year through September 30 of the year being described. For example, fiscal year 2021 is from October 1, 2020, through September 30, 2021.

[5] INA section 214(g)(9)(A), 8 U.S.C. 1184(g)(9)(A), *see also* Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565; John Warner National Defense Authorization Act for Fiscal Year 2007, Public Law 109–364, div. A, tit. X, sec. 1074, (2006); Save Our Small and Seasonal Businesses Act of 2005, Public Law 109–13, div. B, tit. IV, sec. 402.

[6] *See* Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565.

[7] 20 CFR 655.15(b).

[8] *See* 8 CFR 214.2(h)(5)(i)(A).

[9] DOL announcement on January 7, 2021. *See https://www.foreignlaborcert.doleta.gov/* (last accessed on April 9, 2021). For historical context, with the FY 2020 statutory cap, DOL announced on January 6, 2020 that it received requests to certify 99,362 worker positions for start dates of work on April 1, 2020. On February 26, 2020, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for FY 2020. On February 18, 2020, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B cap for the second half of FY 2020. In accordance with regulations, USCIS determined it was necessary to use a computer generated process, commonly known as a lottery, to ensure the fair and orderly allocation of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2020 cap. 8 CFR 214.2(h)(8)(vii). On February 20, 2020, USCIS conducted a lottery to randomly select petitions from those received on February 18, 2020. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 20, 2020.

statutory cap by February 12, 2021.[10] This early date continues to reflect an ongoing trend of higher H–2B demand in the second half of the fiscal year compared to the statutorily authorized level. Congress, in recognition of this increased demand: (1) Allowed for additional H–2B workers through the FY 2016 reauthorization of the returning worker cap exemption;[11] and (2) for the last five fiscal years authorized supplemental caps under section 543 of Division F of the Consolidated Appropriations Act, 2017, Public Law 115–31 (FY 2017 Omnibus); section 205 of Division M of the Consolidated Appropriations Act, 2018, Public Law 115–141 (FY 2018 Omnibus); section 105 of Division H of the Consolidated Appropriations Act, 2019, Public Law 116–6 (FY 2019 Omnibus); section 105 of Division I of the Further Consolidated Appropriations Act, 2020, Public Law 116–94 (FY 2020 Omnibus);[12] and section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260 (FY 2021 Omnibus), which is discussed below.

*C. FY 2021 Omnibus*

On December 27, 2020, then-President Donald Trump signed the FY 2021 Omnibus which contains a provision, section 105 of Division O (section 105), permitting the Secretary of Homeland Security, under certain circumstances and after consultation with the Secretary of Labor, to increase the number of H–2B visas available to U.S. employers, notwithstanding the otherwise-established statutory numerical limitation set forth in the INA. Specifically, section 105 provides

that "the Secretary of Homeland Security, after consultation with the Secretary of Labor, and upon the determination that the needs of American businesses cannot be satisfied in [FY] 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor,'' may increase the total number of noncitizens who may receive an H–2B visa in FY 2021 by not more than the highest number of H–2B nonimmigrants who participated in the H–2B returning worker program in any fiscal year in which returning workers were exempt from the H–2B numerical limitation.[13] The Secretary of Homeland Security has consulted with the Secretary of Labor, and this rule implements the authority contained in section 105.

As noted above, since FY 2017, Congress has enacted a series of public laws providing the Secretary of Homeland Security with the discretionary authority to increase the H–2B cap beyond that set forth in section 214 of the INA. The previous four statutory provisions are materially identical to section 105 of the FY 2021 Omnibus. During each fiscal year from FY 2017 through FY 2019, the Secretary of Homeland Security, after consulting with the Secretary of Labor, determined that the needs of some American businesses could not be satisfied in such year with U.S. workers who were willing, qualified, and able to perform temporary nonagricultural labor. On the basis of these determinations, on July 19, 2017, and May 31, 2018, DHS and DOL jointly published temporary final rules for FY 2017 and FY 2018, respectively, each of which allowed an increase of up to 15,000 additional H–2B visas for those businesses that attested that if they did not receive all of the workers requested on the Petition for a Nonimmigrant Worker (Form I–129), they were likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss.[14] A total of 12,294 H–2B workers were approved for H–2B classification under petitions filed

pursuant to the FY 2017 supplemental cap increase.[15] In FY 2018, USCIS received petitions for more than 15,000 beneficiaries during the first 5 business days of filing for the supplemental cap, and held a lottery on June 7, 2018. The total number of H–2B workers approved toward the FY 2018 supplemental cap increase was 15,788.[16] The vast majority of the H–2B petitions received under the FY 2017 and FY 2018 supplemental caps requested premium processing [17] and were adjudicated within 15 calendar days.

On May 8, 2019, DHS and DOL jointly published a temporary final rule authorizing an increase of up to 30,000 additional H–2B visas for the remainder of FY 2019. The additional visas were limited to returning workers who had been counted against the H–2B cap or were otherwise granted H–2B status in the previous 3 fiscal years, and for those businesses that attested to a level of need such that, if they did not receive all of the workers requested on the Form I–129, they were likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss.[18] The Secretary determined that limiting returning workers to those who were issued an H–2B visa or granted H–2B status in the past 3 fiscal years was appropriate, as it mirrored the standard that Congress designated in previous returning worker provisions. On June 5, 2019, approximately 30 days after the supplemental visas became available, USCIS announced that it received sufficient petitions filed pursuant to the FY 2019 supplemental cap increase. USCIS did not conduct a lottery for the FY 2019 supplemental cap increase. The total number of H–2B workers approved towards the FY 2019 supplemental cap increase was 32,666.[19] The vast majority

---

[10] On February 24, 2021, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for the second half of FY 2021. *See https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy-2021* (Feb. 24, 2021). On February 12, 2021, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B statutory cap for the second half of FY 2021. In accordance with regulations, USCIS determined it was necessary to use a computer-generated process, commonly known as a lottery, to ensure the fair and orderly distribution of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2021 cap. 8 CFR 214.2(h)(8)(vii). On February 17, 2021, USCIS conducted a lottery to randomly select petitions from those received on February 12, 2021. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 17, 2021.

[11] INA section 214(g)(9)(a), 8 U.S.C. 1184(g)(9)(a), as revised by the Consolidated Appropriations Act of 2016 (Pub. L. 114–113). This program expired on September 30, 2016.

[12] DHS, after consulting with DOL, did not publish a temporary final rule supplementing the H–2B cap for FY 2020 pursuant to the Further Consolidated Appropriations Act, 2020, Public Law 116–94.

[13] The highest number of returning workers in any such fiscal year was 64,716, which represents the number of beneficiaries covered by H–2B returning worker petitions that were approved for FY 2007. DHS also considered using an alternative approach, under which DHS measured the number of H–2B returning workers admitted at the ports of entry (66,792 for FY 2007).

[14] Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2017 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program,* 82 FR 32987, 32998 (July 19, 2017); Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2018 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program,* 83 FR 24905, 24917 (May 31, 2018).

[15] USCIS data pulled from the Computer Linked Application Information Management System (CLAIMS3) database, available at *https://www.dhs.gov/publication/dhsuscispia-016-computer-linked-application-information-management-system-claims-3-and,* on Mar. 15, 2021.

[16] The number of approved workers exceeded the number of additional visas authorized for FY 2018 to allow for the possibility that some approved workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States. USCIS data pulled from CLAIMS3 on Mar. 15, 2021.

[17] Premium processing allows for expedited processing for an additional fee. *See* INA 286(u), 8 U.S.C. 1356(u).

[18] Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2019 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program,* 84 FR 20005, 20021 (May 8, 2019).

[19] The number of approved workers exceeded the number of additional visas authorized for FY 2019 to allow for the possibility that some approved

Continued

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 876 of 1021 PageID 7746

of these petitions requested premium processing and were adjudicated within 15 calendar days.

Although Congress provided the Secretary of Homeland Security with the discretionary authority to increase the H–2B cap in FY 2020, the Secretary did not exercise that authority. DHS initially intended to exercise its authority and, on March 4, 2020, announced that it would make available 35,000 supplemental H–2B visas for the second half of fiscal year.[20] On March 13, 2020, then-President Trump declared a National Emergency concerning COVID–19, a communicable disease caused by the coronavirus SARS–CoV–2.[21] On April 2, 2020, DHS announced that the rule to increase the H–2B cap was on hold due to economic circumstances, and no additional H–2B visas would be released until further notice.[22] DHS also noted that the Department of State had suspended routine visa services.[23] As explained in further detail below, although the COVID–19 public health emergency is still in effect, DHS believes that it is appropriate to increase the H–2B cap coupled with additional protections (for example, post-adjudication audits, investigations, and compliance checks), for FY 2021 based on the demand for H–2B workers in the second half of FY 2021, recent and continuing economic growth, the improving job market and increased visa processing by the Department of State.

*D. Joint Issuance of This Final Rule*

As they did in FY 2017, FY 2018, and FY 2019, the Departments have determined that it is appropriate to jointly issue this temporary rule.[24] The determination to issue the temporary rule jointly follows conflicting court decisions concerning DOL's authority to independently issue legislative rules to carry out its consultative and delegated functions pertaining to the H–2B program under the INA.[25] Although

DHS and DOL each have authority to independently issue rules implementing their respective duties under the H–2B program,[26] the Departments are implementing section 105 in this manner to ensure there can be no question about the authority underlying the administration and enforcement of the temporary cap increase. This approach is consistent with rules implementing DOL's general consultative role under INA section 214(c)(1), 8 U.S.C. 1184(c)(1), and delegated functions under INA sections 103(a)(6) and 214(c)(14)(B), 8 U.S.C. 1103(a)(6), 1184(c)(14)(B).[27]

**III. Discussion**

*A. Statutory Determination*

Following consultation with the Secretary of Labor, the Secretary of Homeland Security has determined that the needs of some U.S. employers cannot be satisfied in FY 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor. In accordance with section 105 of the FY 2021 Omnibus, the Secretary of Homeland Security has determined that it is appropriate, for the reasons stated below, to raise the numerical limitation on H–2B nonimmigrant visas up to 22,000 additional visas for those American businesses that attest to a level of need such that, if they do not receive the workers under the cap increase, they are likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss. These businesses must retain documentation, as described below, supporting this attestation.

DHS and DOL intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. If an employer's documentation does not establish the likelihood of irreparable harm, or if the employer fails to provide evidence demonstrating irreparable harm or comply with the audit process, this may be considered a substantial violation resulting in an adverse agency action on the employer, including revocation of the petition and/or TLC or program debarment.

The Secretary of Homeland Security has also determined that for certain employers, additional recruitment steps are necessary to confirm that there are no qualified U.S. workers available for the positions. In addition, the Secretary of Homeland Security has determined that the supplemental visas will be limited to returning workers, with the exception that up to 6,000 of the 22,000 visas will be exempt from the returning worker requirement and will be reserved for H–2B workers who are nationals of Guatemala, Honduras, or El Salvador (the Northern Triangle countries).[28] The 6,000 H–2B visas are reserved for nationals of the Northern Triangle countries to further the objectives of E.O. 14010, which among other initiatives, instructs the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access to visa programs for individuals from the Northern Triangle.[29] This decision supports the President's vision of expanding lawful pathways for protection and opportunity for individuals from the Northern Triangle.[30]

Similar to the temporary final rule for the FY 2019 supplemental cap, the Secretary of Homeland Security has also determined to limit the supplemental visas to H–2B returning workers, in other words, workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020,[31] unless the employer indicates on the new attestation form that it is requesting workers who are nationals of the Northern Triangle countries and who are therefore counted towards the 6,000 allotment regardless of whether they are new or returning workers. If the 6,000 returning worker exemption cap for Northern Triangle nationals has been

workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States. USCIS data pulled from CLAIMS3 on Mar. 15, 2021.

[20] DHS to Improve Integrity of Visa Program for Foreign Workers, March 5, 2020, *https:// www.dhs.gov/news/2020/03/05/dhs-improve-integrity-visa-program-foreign-workers*.

[21] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak*, 85 FR 15337 (Mar. 18, 2020).

[22] *https://twitter.com/DHSgov/status/ 1245745115458568192?s=20*.

[23] *Id.*

[24] 82 FR 32987 (Jul. 19, 2017); 83 FR 24905 (May 31, 2018); 84 FR 20005 (May 8, 2019).

[25] *See Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671 (4th Cir. 2020); *see also Temporary Non-Agricultural Employment of*

*H–2B Aliens in the United States*, 80 FR 24042, 24045 (Apr. 29, 2015).

[26] *See Outdoor Amusement Bus. Ass'n*, 983 F.3d at 684–89.

[27] *See* 8 CFR 214.2(h)(6)(iii)(A) and (C), (h)(6)(iv)(A).

[28] These conditions and limitations are not inconsistent with sections 214(g)(3) ("first in, first out" H–2B processing) and (g)(10) (fiscal year H–2B allocations) because noncitizens covered by the special allocation under section 105 of the FY 2021 Omnibus are not "subject to the numerical limitations of [section 214(g)(1)]." *See, e.g.,* INA section 214(g)(3); INA section 214(g)(10); FY 2021 Omnibus div. O, sec. 105 ("Notwithstanding the numerical limitation set forth in section 214(g)(1)(B) of the [INA]. . . .").

[29] *See* Section 3(c) of E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, signed February 2, 2021. *https://www.govinfo.gov/content/ pkg/FR-2021-02-05/pdf/2021-02561.pdf*.

[30] *Id.*

[31] For purposes of this rule, these returning workers could have been H–2B cap exempt or extended H–2B status in FY 2018, 2019, or 2020. Additionally they may have been previously counted against the annual H–2B cap of 66,000 visas during FY 2018, 2019, or 2020, or the supplemental caps in FY 2018 or FY 2019.

AR03535

reached and visas remain available under the returning worker cap, the petition would be rejected and any fees submitted returned to the petitioner. In such a case, a petitioner may continue to request workers who are nationals of one of the Northern Triangle countries, but the petitioner must file a new Form I–129 petition, with fee, and attest that these noncitizens will be returning workers, in other words, workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020. If the 6,000 returning worker exemption cap for nationals of the Northern Triangle countries remains unfilled by July 8, 2021, USCIS will announce on its website that the remaining visas will be made available to the general public, but the petitioner must file a new Form I–129 petition and attest that these noncitizens will be returning workers.

The Secretary of Homeland Security's determination to increase the numerical limitation is based, in part, on the conclusion that some businesses are likely to suffer irreparable harm in the absence of a cap increase. Congress has expressed concern with the unavailability of H–2B visas for employers that need workers to start late in the fiscal year.[32] In addition, members of Congress have sent numerous letters to the Secretaries of Homeland Security and Labor about the needs of some U.S. businesses for H–2B workers (after the statutory cap for the second half of the fiscal year has been reached) and about the potentially negative impact on state and local economies if the cap is not increased.[33] U.S. businesses, chambers of commerce, employer organizations, and state and local elected officials have also written to the DHS and Labor Secretaries to express their concerns with the unavailability of H–2B visas after the statutory cap has been reached.[34] DHS held a stakeholder listening session on April 8, 2021, during and after which numerous small and seasonal business owners described the challenges they face absent the ability to secure H–2B

workers because the statutory cap has been reached.[35]

The Secretary of Homeland Security and the Secretary of Labor heard from many trade unions and worker advocates who opposed raising the cap. They argued that the unemployment rate remains high. In particular, they provided evidence that the unemployment rate for summer-related occupations, such as landscaping workers, restaurant workers, construction workers and others, for which businesses were pressing for an increase in visas, exceeds the national average in unemployment.[36] They also pointed to what they consider weaknesses in the labor market test, and stated that some H–2B employers have violated labor laws, including requirements in the H–2B program.

After considering the full range of evidence and diverse points of view, the Secretary of Homeland Security has deemed it appropriate to take action to avoid irreparable harm to businesses that were unable to obtain H–2B workers under the statutory cap, including potential wage and job losses by their U.S. workers, as well as other adverse downstream economic effects.[37] At the same time, the Secretary of Homeland Security believes it is appropriate to condition receipt of supplemental visas on adherence to additional worker protections, particularly because of current national unemployment rates, as discussed below.

The decision to afford the benefits of this temporary cap increase to U.S. businesses that need workers to avoid irreparable harm and that will comply with additional worker protections, rather than applying the cap increase to any and all businesses seeking temporary workers, is consistent with section 105 of the FY 2021 Omnibus, as explained below. The Secretary of Homeland Security, in implementing section 105 and determining the scope

of any such increase, has broad discretion, following consultation with the Secretary of Labor, to identify the business needs that are most relevant, while bearing in mind the need to protect U.S. workers. Within that context, for the below reasons, the Secretary of Homeland Security has determined to allow an overall increase of 22,000 additional visas solely for the businesses facing permanent, severe potential losses.

First, DHS interprets section 105's reference to "the needs of American businesses" as describing a need different from the need ordinarily required of employers in petitioning for an H–2B worker. Under the generally applicable H–2B program, each individual H–2B employer must demonstrate that it has a temporary need for the services or labor for which it seeks to hire H–2B workers. *See* 8 CFR 214.2(h)(6)(ii), 20 CFR 655.6. The use the phrase "needs of American businesses," which is not found in INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b), or the regulations governing the standard H–2B cap, authorizes the Secretary of Homeland Security in allocating additional H–2B visas under section 105 to require that employers establish a need above and beyond the normal standard under the H–2B program, that is, an inability to find sufficient qualified U.S. workers willing and available to perform services or labor and that the employment of the H–2B worker will not adversely affect the wages and working conditions of U.S. workers, *see* 8 CFR 214.2(h)(6)(i)(A). DOL concurs with this interpretation.

Second, the approach set forth in this rule limits the increase in a way that is similar to the implementation of the supplemental caps in fiscal years 2017, 2018, and 2019, and provides protections against adverse effects on U.S. workers that may result from a cap increase. Although there is not enough time to conduct a more full and formal quantitative analysis of such adverse effects, the Secretary has determined that in the particular circumstances presented here, it is appropriate, within the limits discussed below, to tailor the availability of this temporary cap increase to those businesses likely to suffer irreparable harm, in other words, those facing permanent and severe financial loss.

As noted above, to address the increased, and, in some cases, imminent need for H–2B workers, for FY 2021, the Secretary of Homeland Security has determined that employers may petition for supplemental visas on behalf of up to 16,000 workers who were issued an

---

[32] In the Joint Explanatory Statement for the FY 2018 DHS Consolidated Appropriations Act (Public Law 115–141), for example, Congress directed DHS, in consultation with DOL, to report on options to improve the accessibility of H–2B visas for employers that need workers to start late in the season. DHS submitted the report to Congress on June 7, 2019. Congress made a similar request in the Joint Explanatory Statement for the FY 2020 DHS Further Consolidated Appropriations Act (Public Law 116–94).

[33] See the docket for this rulemaking for access to these letters.

[34] *Id.*

[35] USCIS expects to post a recording of the stakeholder listening engagement on its Electronic Reading Room, at *https://www.uscis.gov/records/electronic-reading-room.*

[36] See: Department of Labor, Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, Table A–30, available at *https://www.bls.gov/web/empsit/cpseea30.htm.* According to the March 2021 Current Population Survey, the unemployment rate for construction and landscaping workers was 9.5 percent and 9.9 percent, respectively, whereas the national unemployment rate was 6.2 percent.

[37] *See, e.g.,* Impacts of the H–2B Visa Program for Seasonal Workers on Maryland's Seafood Industry and Economy, Maryland Department of Agriculture Seafood Marketing Program and Chesapeake Bay Seafood Industry Association (March 2, 2020), available at *https://mda.maryland.gov/documents/2020-H2B-Impact-Study.pdf* (last visited May 7, 2021).

AR03536

H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020.[38] The last 3 fiscal years' temporal limitation in the returning worker definition in this temporary rule mirrors the temporal limitation Congress imposed in previous returning worker statutes.[39] Such workers (in other words, those who recently participated in the H–2B program) have previously obtained H–2B visas and therefore have been vetted by DOS, would have departed the United States after their authorized period of stay as generally required by the terms of their nonimmigrant admission, and therefore may obtain their new visas through DOS and begin work more expeditiously.[40] DOS has informed DHS that, in general, H–2B visa applicants who are able to demonstrate clearly that they have previously abided by the terms of their status granted by DHS have a higher success rate when applying to renew their H–2B visas, as compared with the overall visa applicant pool from a given country. For that reason, some consular sections waive the in-person interview requirement for H–2B applicants whose visa expired within a specific timeframe and who otherwise meet the strict limitations set out under INA section 222(h), 8 U.S.C. 1202(h). We note that DOS has, in response to the COVID–19 pandemic, expanded interview waivers to some first-time H–2 applicants[41] potentially allowing some such applicants to be processed with increased efficiency. However, there is no indication that this temporary, short-term measure will necessarily affect the overall success rates of applicants, which DOS has indicated is higher for returning workers who can demonstrate prior compliance with the program.

Limiting the supplemental cap to returning workers is beneficial because these workers have generally followed immigration law in good faith and demonstrated their willingness to return home after they have completed their temporary labor or services or their period of authorized stay, which is a condition of H–2B status. The returning worker condition therefore provides a basis to believe that H–2B workers under this cap increase will again abide by the terms and conditions of their visa. The returning worker condition also benefits employers that seek to re-hire known and trusted workers who have a proven positive employment track record while previously employed as workers in this country. While the Departments recognize that the returning worker requirement may limit to an extent the flexibility of employers that might wish to hire non-returning workers, the requirement provides an important safeguard against H–2B abuse, which DHS considers to be a significant consideration.

In allocating up to 6,000 H–2B visas to nationals of the Northern Triangle countries while making the remaining up to 16,000 H–2B initially available visas available to qualified returning workers, irrespective of their country of nationality, this rule strikes a balance between furthering the U.S. foreign policy interests of creating a comprehensive framework—of which this allocation is one piece—to address and manage migration from the Northern Triangle and addressing the needs of certain H–2B employers at risk of suffering from irreparable harm. The United States has strong foreign policy interests in initially allocating up to 6,000 supplemental visas only to nationals of the Northern Triangle countries and exempting such persons from the returning worker requirement. The Secretary of Homeland Security has determined that both the 6,000 limitation and the exemption from the returning worker requirement for nationals of the Northern Triangle countries is beneficial in light of President Biden's February 2, 2021 E.O. 14010, which instructed the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access for individuals of the Northern Triangle countries to visa programs, as appropriate and consistent with applicable law. In response to this executive order, DHS seeks to promote and improve safety, security, and economic stability throughout the region, and work with these countries to stem the flow of irregular migration in the region and enhance access to visa programs.

The exemption from the returning worker requirement recognizes the relatively small numbers of individuals from the three Northern Triangle countries who were previously granted H–2B visas in recent years.[42] Absent this exemption, there may be insufficient workers from these countries, which means that the rule might thereby fail to achieve its intended policy objective, in other words, to provide additional temporary foreign workers for U.S. employers that may suffer irreparable harm absent these workers, while also enhancing access to the H–2B visa classification for individuals from the Northern Triangle countries.

Finally, this rule provides that employers seeking H–2B visas for nationals of the Northern Triangle countries exempt from the returning worker requirement must file their petitions with USCIS no later than July 8, 2021. If fewer petitions are received than needed to reach the 6,000 allocation by July 8, 2021, the remaining visas will be made available to returning workers, irrespective of their country of origin. USCIS will announce the availability and filing period for such remaining visas on its website, uscis.gov, no later than July 23, 2021. DHS believes that making any remaining visas available to returning workers after July 8, 2021 will provide sufficient opportunity for their use by nationals of Northern Triangle countries and also help ensure that supplemental H–2B visas do not go unused if there is insufficient demand from employers seeking or able to employ nationals of Northern Triangle countries.

For all petitions filed under this rule and the H–2B program, generally, employers must establish, among other requirements, that insufficient qualified U.S. workers are available to fill the petitioning H–2B employer's job opportunity and that the foreign worker's employment in the job opportunity will not adversely affect the wages or working conditions of similarly-employed U.S. workers. INA section 214(c)(1), 8 U.S.C. 1184(c)(1); 8 CFR 214.2(h)(6)(iii)(A) and (D); 20 CFR 655.1. To meet this standard of protection for U.S. workers and, in order to be eligible for additional visas under this rule, employers must have applied for and received a valid TLC in accordance with 8 CFR 214.2(h)(6)(iv)(A) and (D) and 20 CFR

---

[38] DHS believes that this temporal limitation is appropriate even though H–2B visa issuances and admissions were lower in FY 2020 than in previous years, likely due to the impacts of COVID–19 as DHS believes that there will still be a sufficient number of returning workers available to U.S. employers to use the 16,000 additional visas authorized by this rule.

[39] Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565; John Warner National Defense Authorization Act for Fiscal Year 2007, Public Law 109–364, div. A, tit. X, sec. 1074, (2006); Save Our Small and Seasonal Businesses Act of 2005, Public Law. 109–13, div. B, tit. IV, sec. 402.

[40] Non-returning workers cannot meet the statutory criteria under INA section 222(h)(1)(B) for an interview waiver. The previous review of an applicant's qualifications and current evidence of lawful travel to the United States will generally lead to a shorter processing time of a renewal application.

[41] DOS, *Important Announcement on H2 Visas, https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (last updated Mar. 26, 2020).

[42] DOS issued a combined total of approximately 26,600 H–2B visas to nationals of the Northern Triangle countries from FY 2015 through FY 2020, combined, approximately 4,400 per year. DOS Monthly NIV Issuances by Nationality and Visa Class; *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited April 11, 2021).

part 655, subpart A. Under DOL's H–2B regulations, TLCs are valid only for the period of employment certified by DOL and expire on the last day of authorized employment. 20 CFR 655.55(a).

In order to have a valid TLC, therefore, the employment start date on the employer's H–2B petition must not be different from the employment start date certified by DOL on the TLC. *See* 8 CFR 214.2(h)(6)(iv)(D). Under generally applicable DHS regulations, the only exception to this requirement applies when an employer files an amended visa petition, accompanied by a copy of the previously approved TLC and a copy of the initial visa petition approval notice, at a later date to substitute workers as set forth under 8 CFR 214.2(h)(6)(viii)(B). This rule also requires additional recruitment for certain petitioners, as discussed below.

In sum, this rule increases the FY 2021 numerical limitation by up to 22,000 visas, but also restricts the availability of those additional visas by prioritizing only the most significant business needs, and limiting eligibility to H–2B returning workers, unless the worker is a national of one of the Northern Triangle countries counted towards the 6,000 allocation that are exempt from the returning worker limitation. These provisions are each described in turn below.

*B. Numerical Increase and Allocation of up to 22,000 Visas*

The increase of up to 22,000 visas will help address the urgent needs of eligible employers for additional H–2B workers for the remainder of FY 2021.[43] The determination to allow up to 22,000 additional H–2B visas reflects a balancing of a number of factors including the demand for H–2B visas for the second half of FY 2021; current

economic conditions; the increased demand for supplemental visas from FY 2017 to FY 2019; H–2B returning worker data; the amount of time remaining for employers to hire and obtain H–2B workers in the fiscal year; congressional concerns such as the one demonstrated by the FY 2018 and FY 2020 Joint Explanatory Statements where Congress directed DHS, in consultation with DOL, to consider options that would help address the unavailability of H–2B visas for late-season employers; and the objectives of E.O. 14010. DHS believes the numerical increase both addresses the needs of U.S. businesses and, as explained in more detail below, furthers the foreign policy interests of the United States. Additional provisions address the need to protect workers, such as informing them of access to COVID–19 vaccines and requiring additional recruitment efforts.

Section 105 of the FY 2021 Omnibus sets the highest number of H–2B returning workers who were exempt from the cap in certain previous years as the maximum limit for any increase in the H–2B numerical limitation for FY 2021.[44] Consistent with the statute's reference to H–2B returning workers, in determining the appropriate number by which to increase the H–2B numerical limitation, the Secretary of Homeland Security focused on the number of visas allocated to such workers in years in which Congress enacted returning worker exemptions from the H–2B numerical limitation. During each of the years the returning worker provision was in force, U.S. employers' standard business needs for H–2B workers exceeded the statutory 66,000 cap. The highest number of H–2B returning workers approved was 64,716 in FY 2007. In setting the number of additional H–2B visas to be made available during FY 2021, DHS considered this number, overall indications of increased need, the availability of U.S. workers during this period of high unemployment, as discussed below, Congress's prior direction that DHS review options for addressing the problem of unavailability of H–2B visas for businesses that need workers to start work late in a semiannual period of availability, and

the time remaining in FY 2021. On the basis of these considerations, DHS determined that it would be appropriate to make additional visas available and to limit the supplemental cap to up to 22,000. The Secretary further considered the objectives of E.O. 14010, which among other initiatives, instructs the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access to visa programs for individuals from the Northern Triangle, and determined that reserving up to 6,000 of the up to 22,000 additional visas and exempting this number from the returning worker requirement would be appropriate.

In past years, the number of beneficiaries covered by H–2B petitions filed exceeded the number of additional visas allocated under the two most recent supplemental caps. In FY 2018, USCIS received petitions for approximately 29,000 beneficiaries during the first 5 business days of filing for the 15,000 supplemental cap. USCIS therefore conducted a lottery on June 7, 2018, to randomly select petitions that would be accepted under the supplemental cap. Of the petitions that were selected, USCIS issued approvals for 15,672 beneficiaries.[45] In FY 2019, USCIS received sufficient petitions for the 30,000 supplemental cap on June 5, 2019, but did not conduct a lottery to randomly select petitions that would be accepted under the supplemental cap. Of the petitions received, USCIS issued approvals for 32,717 beneficiaries.[46]

Available data clearly indicate a need for supplemental H–2B visas in FY 2021. As noted above, in FY 2021, based on TLC applications filed during the 3-day filing window of January 1 through 3, 2021, DOL's Office of Foreign Labor Certification (OFLC) received requests to certify 96,641 worker positions, from 5,377 H–2B applications, for start dates

---

[43] In contrast with section 214(g)(1) of the INA, 8 U.S.C. 1184(g)(1), which establishes a cap on the number of individuals who may be issued visas *or otherwise provided [H–2B] status,* and section 214(g)(10) of the INA, 8 U.S.C. 1184(g)(10) (emphasis added), which imposes a first half of the fiscal year cap on H–2B issuance with respect to the number of individuals who may be issued visas *or are accorded [H–2B] status"* (emphasis added), section 105 only authorizes DHS to increase the number of available H–2B *visas.* Accordingly, DHS will not permit individuals authorized for H–2B status pursuant to an H–2B petition approved under section 105 to change to H–2B status from another nonimmigrant status. *See* INA section 248, 8 U.S.C. 1258; *see also* 8 CFR part 248. If a petitioner files a petition seeking H–2B workers in accordance with this rule and requests a change of status on behalf of someone in the United States, the change of status request will be denied, but the petition will be adjudicated in accordance with applicable DHS regulations. Any noncitizen authorized for H–2B status under the approved petition would need to obtain the necessary H–2B visa at a consular post abroad and then seek admission to the United States in H–2B status at a port of entry.

[44] During fiscal years 2005 to 2007, and 2016, Congress enacted "returning worker" exemptions to the H–2B visa cap, allowing workers who were counted against the H–2B cap in one of the three preceding fiscal years not to be counted against the upcoming fiscal year cap. Save Our Small and Seasonal Businesses Act of 2005, Public Law 109–13, Sec. 402 (May 11, 2005); John Warner National Defense Authorization Act, Public Law 109–364, Sec. 1074 (Oct. 17, 2006); Consolidated Appropriations Act of 2016, Public Law 114–113, Sec. 565 (Dec. 18, 2015).

[45] USCIS recognizes it may have received petitions for more than 29,000 supplemental H–2B workers if the cap had not been exceeded within the first 5 days of opening. However, DHS estimates that not all of the 29,000 workers requested under the FY 2018 supplemental cap would have been approved and/or issued visas. For instance, although DHS approved petitions for 15,672 beneficiaries under the FY 2018 cap increase, the Department of State data shows that as of January 15, 2019, it issued only 12,243 visas under that cap increase. Similarly, DHS approved petitions for 12,294 beneficiaries under the FY 2017 cap increase, but the Department of State data shows that it issued only 9,160 visas.

[46] The number of approved workers exceeded the number of additional visas authorized for FY 2018 and FY 2019 to allow for the possibility that some approved workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States.

Case 2:21-cv-00067-Z Document 162-7 Filed 09/02/22 Page 880 of 1021 PageID 7750

of work on April 1, 2021.[47] USCIS, in turn, received sufficient H–2B petitions to reach the second half of the fiscal year statutory cap by February 12, 2021.[48] This is similar to the level of demand in FY 2020, when OFLC received requests to certify 99,362 worker positions for start dates of work on April 1, 2020,[49] and USCIS received sufficient H–2B petitions to reach the second half of the fiscal year statutory cap by February 18, 2020.[50] On March 4, 2020, DHS announced that it would make available 35,000 supplemental H–2B visas for the second half of fiscal year.[51] However, on March 13, 2020, then-President Trump declared a National Emergency concerning the COVID–19 outbreak to control the spread of the virus in the United States.[52] On April 2, 2020, DHS announced that the rule to increase the H–2B cap was on hold due to economic circumstances, and no additional H–2B visas would be released until further notice.[53] DHS also noted that DOS had suspended routine visa services.[54]

Although the public health emergency due to COVID–19 still exists,[55] DHS believes that it is appropriate to issue additional H–2B visas for the remainder of FY 2021. While the economic impacts of COVID–19 continue to be felt, real gross domestic product (GDP) grew significantly in the third and fourth quarters of 2020.[56] Economists project that this economic growth will continue throughout FY 2021 and beyond.[57] Similarly, the unemployment rate, while still not at pre-pandemic levels, improved from 14.7 percent in April 2020 [58] to 6.0 percent in March 2021. (Note, however, that higher unemployment in the top H–2B occupations remains.[59])

In March 2020, the U.S. labor market was severely affected by the onset of the COVID–19 pandemic, pushing the national unemployment rate to near record levels and resulting in millions of U.S. workers being displaced from work. At the beginning of March 2020, the national unemployment rate was 3.5 percent with an estimated 5.8 million people categorized as unemployed.[60] This continued a 6-month trend of the unemployment rate sitting at or below 3.5 percent. However, by the end of April 2020, the unemployment rate increased from 4.4 percent to a peak of 14.7 percent. The 10.3 percent increase in the unemployment rate is the largest recorded month-to-month increase in the rate and coincided with total employment declining 20.5 million in April 2020.[61] As of April 2021, the U.S. unemployment rate sat at 6.0 percent. While this is a considerable decline from the prior year's rate, it remains 2.5 percent above the pre-pandemic unemployment rate, and the number of unemployed persons is currently 9.7 million people which is 4 million people higher than it was at the beginning of March 2020. A February 2021 Congressional Budget Office outlook of the labor market projects that a full recovery to pre-pandemic levels of employment could take in excess of 3 years.[62]

Typically H–2B occupations are cyclical jobs, and U.S. workers in these occupations are more susceptible to job instability and labor market variability. Amongst the occupations most commonly associated with the H–2B program, the unemployment rate has displayed a wide degree of variance. Whereas the pre-pandemic unemployment rate for the U.S. was 3.5 percent, the unemployment rate across the top 25 occupations most commonly associated with the H–2B program sat at 6.82 percent.[63] Currently the average unemployment rate across these occupations is 8.93 percent. The current unemployment rate for Landscaping and Groundskeeping Workers (the single largest occupation that uses the H–2B program) is 7.8 percent, followed by Amusement and Recreation Attendants at 9.3 percent, and 7.1 percent for Meat, Poultry, and Fish Cutters.[64]

From March 2020 through March 2021, approximately 1 million U.S. workers have been displaced across occupations that are predominantly used in the H–2B program.[65] Because of the higher unemployment rate of these occupations for U.S. workers, there is an increased likelihood that more U.S. workers could be available to work in H–2B jobs. The Departments acknowledge that it is challenging to extrapolate, from national unemployment rates in occupations, precise estimates regarding the availability of U.S. workers for any particular job opportunity and in any particular geographic area. The additional procedures contained in this rule, including the attestation requirements and DOL procedures, provide appropriate protections for U.S. workers within the context of that uncertainty.

Finally, while DOS temporarily suspended routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020, it subsequently announced a phased resumption of visa services [66] and indicated it would continue

[47] DOL announcement on January 7, 2021. *See https://www.foreignlaborcert.doleta.gov/* (last accessed on February 24, 2021).

[48] On February 24, 2021, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for the second half of FY 2021. *See https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy-2021* (Feb. 24, 2021). On February 12, 2021, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B statutory cap for the second half of FY 2021. In accordance with regulations, USCIS determined it was necessary to use a computer-generated process, commonly known as a lottery, to ensure the fair and orderly allocation of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2021 cap. 8 CFR 214.2(h)(8)(vii). On February 17, 2021, USCIS conducted a lottery to randomly select petitions from those received on February 12, 2021. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 17, 2021.

[49] DOL announcement on January 6, 2020. *OFLC Conducts Randomization Process on H–2B Applications Requesting an April 1, 2020, Work Start Date, https://flag.dol.gov/announcements/01-06-2020.*

[50] *H–2B Cap Reached for Second Half of FY2020,* Feb. 26, 2020, *https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy2020.*

[51] DHS to Improve Integrity of Visa Program for Foreign Workers, March 5, 2020, *https://www.dhs.gov/news/2020/03/05/dhs-improve-integrity-visa-program-foreign-workers.*

[52] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak,* 85 FR 15337 (Mar. 18, 2020).

[53] *https://twitter.com/DHSgov/status/1245745115458568192?s=20.*

[54] *Id.*

[55] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15April2021.aspx* (Apr. 15, 2021).

[56] *https://www.bea.gov/news/glance.*

[57] *https://www.bloomberg.com/news/articles/2021-02-12/charting-the-global-economy-u-s-growth-forecasts-upgraded.*

[58] *https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm*

[59] Department of Labor, Bureau of Labor Statistics, The Employment Situation, March 2021. Available at *https://www.bls.gov/news.release/archives/empsit_04022021.htm.*

[60] *https://www.bls.gov/news.release/archives/empsit_03062020.pdf.*

[61] *https://www.bls.gov/news.release/archives/empsit_05082020.pdf.*

[62] *https://www.cbo.gov/system/files/2021-02/56965-Economic-Outlook.pdf.*

[63] *See https://www.bls.gov/web/empsit/cpseea30.htm. The unemployment rates for the top 25 H–2B occupations were obtained by identifying the top occupations based on OFLC performance data.*

[64] *See* 2021 Q2 OFLC Performance data: *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Disclosure_Data_FY2021_Q2.xlsx* and OFLC 2021 Q2 Selected statistics *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Selected_Statistics_FY2021_Q2.pdf*

[65] *See https://www.bls.gov/web/empsit/cpseea30.htm. The number of displaced workers within the most commonly held H–2B occupations were obtained by identifying the top occupations based on OFLC performance data and comparing those occupations to unemployment data from BLS.*

[66] DOS, *Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated July 22, 2020).

processing H–2 cases as much as possible, as permitted by post resources and local government restrictions, and expanded the categories of H–2 visa applicants whose applications can be adjudicated without an in-person interview.[67] In addition, Presidential Proclamation 10052, which temporarily suspended the entry of certain nonimmigrants, including certain H–2B nonimmigrants, expired on March 31, 2021.[68] Given the level of demand for H–2B workers, the continued and projected economic recovery, the continued and projected job growth, and the resumption of visa processing services and the expiration of the suspension of entry of H–2B nonimmigrants, DHS believes it is appropriate to release additional visas at this time. Further, DHS believes that 22,000 is an appropriate number of visas for the reasons discussed above.

Finally, recognizing the high demand for H–2B visas, it is plausible that the additional H–2B allocations provided in this rule will be reached prior to the end of the fiscal year. Specifically, the following scenarios may still occur:

• The 16,000 supplemental cap visas limited to returning workers that will be immediately available for employers will be reached before September 15, 2021.

• The 6,000 supplemental cap visas limited to nationals of the Northern Triangle countries will be reached before July 8, 2021.

• The cap for any remaining visas from the Northern Triangle allotment made available to returning workers after July 8, 2021,regardless of the country of nationality, will be reached before September 15, 2021.

DHS regulation, 8 CFR 214.2(h)(6)(x)(E), reaffirms the use of the processes that are in place when H–2B numerical limitations under INA section 214(g)(1)(B) or (g)(10), 8 U.S.C. 1184(g)(1)(B) or (g)(10), are reached, as applicable to each of the scenarios described above that involve numerical limitations of the supplemental cap. Specifically, for each of the scenarios mentioned above, DHS will monitor petitions received, and make projections of the number of petitions necessary to achieve the projected numerical limit of approvals. USCIS will also notify the public of the dates that USCIS has received the necessary number of petitions (the ''final receipt dates'') for each of these scenarios. The day the public is notified will not control the final receipt dates. Moreover, USCIS may randomly select, via computer-generated selection, from among the petitions received on the final receipt date the remaining number of petitions deemed necessary to generate the numerical limit of approvals for each of the scenarios involving numerical limitations to the supplemental cap. USCIS may, but will not necessarily, conduct a lottery if: The 16,000 supplemental cap visas for returning workers is reached before September 15, 2021; the 6,000 visas limited to nationals of the Northern Triangle countries is reached before July 8, 2021; or the cap for any remaining visas from the Northern Triangle allotment made available to returning workers regardless of the country of nationality, is reached before September 15, 2021. Finally, similar to the processes applicable to the H–2B statutory cap, if the final receipt date is any of the first 5 business days on which petitions subject to the applicable numerical limit may be received (in other words, if the numerical limit is reached on any one of the first 5 business days that filings can be made), USCIS will randomly apply all of the numbers among the petitions received on any of those 5 business days.

*C. Returning Workers*

Similar to the temporary increase in FY 2019, the Secretary of Homeland Security has determined that the supplemental visas should be granted to returning workers from the past 3 fiscal years, in order to meet the immediate need for H–2B workers, unless the H–2B worker is a national of one of the Northern Triangle countries and is counted towards the separate 6,000 cap for such workers. The Secretary has determined that, for purposes of this program, H–2B returning workers include those individuals who were issued an H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020. As discussed above, the Secretary determined that limiting returning workers to those who were issued an H–2B visa or granted H–2B status in the past three fiscal years is appropriate as it mirrors the standard that Congress designated in previous returning worker provisions. DHS acknowledges that H–2B visa issuances and admissions were lower in the second half of FY 2021 than in recent fiscal years, likely as a result of COVID–19. However, DHS believes that there will be sufficient numbers of returning workers to meet the needs of employers and fully utilize the additional 16,000 visas, and thus the temporal limitation remains appropriate. Returning workers have previously obtained H–2B visas and therefore been vetted by DOS, would have departed the United States after their authorized period of stay as generally required by the terms of their nonimmigrant admission, and therefore may have a higher likelihood of success in obtaining their new visas through DOS, possibly without a required interview, and begin work more expeditiously.

To ensure compliance with the requirement that additional visas only be made available to returning workers, petitioners seeking H–2B workers under the supplemental cap will be required to attest that each employee requested or instructed to apply for a visa under the FY 2021 supplemental cap was issued an H–2B visa or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of one of the Northern Triangle countries and is counted towards the 6,000 cap. This attestation will serve as prima facie initial evidence to DHS that each worker, unless a national of one of the Northern Triangle countries who is counted against the 6,000 cap, meets the returning worker requirement. DHS and DOS retain the right to review and verify that each beneficiary is in fact a returning worker any time before and after approval of the petition or visa. DHS has authority to review and verify this attestation during the course of an audit or investigation.

*D. Returning Worker Exemption for up to 6,000 Visas for Nationals of Guatemala, El Salvador, and Honduras (Northern Triangle Countries)*

As described above, the Secretary of Homeland Security has determined that up to 6,000 additional H–2B visas will be limited to workers who are nationals of one of the Northern Triangle countries. These 6,000 visas will be exempt from the returning worker requirement. If the 6,000 visa limit has been reached and the 16,000 cap has not, petitioners may continue to request workers who are nationals of one of the Northern Triangle countries, but these noncitizens must be specifically requested as returning workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020. Alternatively, if the returning worker exemption cap initially reserved for nationals from the Northern Triangle remains unfilled on July 8, 2021, the remaining H–2B visas will be made available to workers

[67] DOS, *Expansion of Interview Waiver Eligibility,* *https://travel.state.gov/content/travel/en/News/ visas-news/expansion-of-interview-waiver- eligibility.html* (last updated Mar. 11, 2021); DOS, *Important Announcement on H2 Visas, https:// travel.state.gov/content/travel/en/News/visas-news/ important-announcement-on-h2-visas.html* (last updated Mar. 26, 2020).

[68] *https://travel.state.gov/content/travel/en/News/ visas-news/update-on-presidential-proclamation- 10052.html*

irrespective of their home country, but these noncitizens must be returning workers. USCIS will announce the availability of the remainder of the allocation on the USCIS website at uscis.gov no later than July 23, 2021.

DHS has determined that reserving 6,000 supplemental H–2B visas for nationals of the Northern Triangle countries—a number significantly higher than the average annual number of visas issued to such persons in the past 6 fiscal years—will encourage U.S. employers who face a likelihood of irreparable harm to seek out workers from such countries, while, at the same time, increase interest among nationals of the Northern Triangle countries seeking temporary employment in the United States. DOS issued a combined total of approximately 26,600 H–2B visas to nationals of the Northern Triangle countries from FY 2015 through FY 2020, an average of approximately 4,400 per year.[69] As previously stated, DHS has determined that the additional increase will not only provide U.S. businesses who have been unable to find qualified and available U.S. workers with potential workers, but also promote lawful immigration and lawful employment authorization for Northern Triangle nationals.

While DHS reiterates the importance of limiting the general supplemental cap exclusively to returning workers, for the reasons stated previously, the Secretary has determined that the exemption from the returning worker requirement for nationals of the Northern Triangle countries is beneficial for the following reasons. It strikes a balance between furthering the U.S. foreign policy interests of expanding access to lawful pathways in the United States for Northern Triangle nationals and addressing the needs of certain H–2B employers at risk of suffering from irreparable harm. This policy initiative would also support the strategies for the region described in E.O. 14010, which directs DHS to implement efforts to expand access to lawful immigration to the United States, including visa programs, as appropriate and consistent with the law through both protection-related and non-protection related programs. The availability of workers from the Northern Triangle countries may help provide U.S. employers with additional labor from neighboring countries who are committed to working with the United States and also promote safe and lawful immigration to the United States.

Similar to the discussion above regarding returning workers, DOS will work with the relevant countries to facilitate consular interviews, as required,[70] and channels for reporting incidents of fraud and abuse within the H–2 programs. Further, each country's own consular networks will maintain contact with the workers while in the United States and ensure the workers know their rights and responsibilities under the U.S. immigration laws, which are all valuable protections to the immigration system, U.S. employers, U.S. workers, and workers entering the country on H–2 visas.

Nothing in this rule will limit the authority of DHS or DOS to deny, revoke, or take any other lawful action with respect to an H–2B petition or visa application at any time before or after approval of the H–2B petition or visa application.

*E. Business Need Standard—Irreparable Harm and FY 2021 Attestation*

To file any H–2B petition under this rule during the remainder of FY 2021, petitioners must meet all existing H–2B eligibility requirements, including having an approved, valid, and unexpired TLC. *See* 8 CFR 214.2(h)(6) and 20 CFR part 655, subpart A. In addition, the petitioner must submit an attestation to USCIS in which the petitioner affirms, under penalty of perjury, that it meets the business need standard. Under that standard, the petitioner must be able to establish that, if it does not receive all of the workers requested under the cap increase,[71] it is likely to suffer irreparable harm, that is, permanent and severe financial loss. The TLC process focuses on establishing whether a petitioner has a temporary need for workers and whether there are U.S. workers who are able, willing, qualified, and available to perform the temporary service or labor, and does not address the harm a petitioner may face in the absence of such workers; the attestation addresses this question. The attestation must be submitted directly to USCIS, together with Form I–129, the approved and valid TLC, and any other necessary documentation. As in the rules implementing the FY 2017, FY 2018, and FY 2019 temporary cap increases, employers will be required to complete the new attestation form which can be found at: *https:// www.foreignlaborcert.doleta.gov/ form.cfm.*[72]

The attestation form will serve as prima facie initial evidence to DHS that the petitioner's business is likely to suffer irreparable harm. Any petition requesting H–2B workers under the FY 2021 supplemental cap that is received lacking the requisite attestation form may be, as applicable, rejected in accordance with 8 CFR 103.2(a)(7)(ii) or denied in accordance with 8 CFR 103.2(b)(8)(ii). Although this regulation does not require submission of evidence at the time of filing of the petition, other than an attestation, the employer must have such evidence on hand and ready to present to DHS or DOL at any time starting with the date of filing the I–129 petition, through the prescribed document retention period discussed below. In fact, the Departments intend to select a significant number of petitions approved for audit examination to verify compliance with program requirements, including the irreparable harm standard and recruitment provisions implemented through this rule. Failure to provide evidence demonstrating irreparable harm or to comply with the audit process may be considered a substantial violation resulting in an adverse agency action on the employer, including revocation of the petition and/or TLC or program debarment. Similarly, failure to cooperate with any compliance review, evaluation, verification, or inspection conducted by DHS or DOL as required by 8 CFR 214.2(h)(6)(x)(B)(2)(*vi*) and (*vii*), respectively, may constitute a violation of the terms and conditions of an approved petition and lead to petition revocation under 8 CFR 214.2(h)(11)(iii)(A)(*3*).

In addition to the statement regarding the irreparable harm standard, the

---

[69] DOS Monthly NIV Issuances by Nationality and Visa Class; *https://travel.state.gov/content/travel/ en/legal/visa-law0/visa-statistics/nonimmigrant- visa-statistics.html* (last visited April 11, 2021).

[70] As noted previously, some consular sections waive the in-person interview requirement for H–2B applicants whose prior visa expired within a specific timeframe and who otherwise meet the strict limitations set out under INA section 222(h), 8 U.S.C. 1202(h) and, as an effort to reduce the risk of COVID–19 transmission, DOS recently expanded the ability of consular officers to waive the in-person interview requirement for individuals applying for a nonimmigrant visa in the same classification. DOS, *Expansion of Interview Waiver Eligibility, https://travel.state.gov/content/travel/en/ News/visas-news/expansion-of-interview-waiver- eligibility.html* (last updated Mar. 11, 2021).

[71] An employer may request fewer workers on the H–2B petition than the number of workers listed on the TLC. *See* Instructions for Petition for Nonimmigrant Worker, providing that "the total number of workers you request on the petition must not exceed the number of workers approved by the Department of Labor or Guam Department of Labor, if required, on the temporary labor certification."

[72] This portion of the temporary rule does not apply to workers who have already been counted under the fiscal year 2021 H–2B statutory cap (66,000). Further, this portion of the rule does not apply to noncitizens who are exempt from the fiscal year 2021 H–2B statutory cap, including those who are extending their stay in H–2B status. Accordingly, petitioners who are filing on behalf of such workers are not subject to the attestation requirement.

attestation submitted to USCIS will also state that the employer meets all other eligibility criteria for the available visas, including the returning worker requirement, unless exempt because the H–2B worker is a national of one of the Northern Triangle countries who is counted against the 6,000 visas reserved for such workers; will comply with all assurances, obligations, and conditions of employment set forth in the *Application for Temporary Employment Certification* (Form ETA 9142B and appendices) certified by DOL for the job opportunity (which serves as the TLC); will conduct additional recruitment of U.S. workers in accordance with the requirements of this rule and discussed further below; and will document and retain evidence of such compliance. Because the attestation will be submitted to USCIS as initial evidence with Form I–129, DHS considers the attestation to be evidence that is incorporated into and a part of the petition consistent with 8 CFR 103.2(b)(1). Accordingly, a petition may be denied or revoked, as applicable, based on or related to statements made in the attestation, including but not limited to the following grounds: (1) Because the employer failed to demonstrate employment of all of the requested workers as required under the irreparable harm standard; and (2) the employer failed to demonstrate that it requested and/or instructed that each worker petitioned for was a returning worker, or a national of one of the Northern Triangle countries, as required by this rule. Any denial or revocation on such basis, however, would be appealable under 8 CFR part 103, consistent with DHS regulations and existing USCIS procedures.

It is the view of the Secretaries of Homeland Security and Labor that requiring a post-TLC attestation to USCIS is the most practical approach, given the time remaining in FY 2021 and the need to assemble the necessary documentation. In addition, the employer is required to retain documentation, which must be provided upon request by DHS or DOL, supporting the new attestations regarding (1) the irreparable harm standard, (2) the returning worker requirement, or, alternatively, documentation supporting that the H–2B worker(s) requested is a national of one of the Northern Triangle countries who is counted against the 6,000 cap (which may be satisfied by the separate Form I–129 that employers are required to file for such workers in accordance with this rule) and (3) a recruitment report for any additional

recruitment required under this rule for a period of 3 years. *See* new 20 CFR 655.68. Although the employer must have such documentation on hand at the time it files the petition, the Departments have determined that, if employers were required to submit the attestation form to DOL before filing a petition with DHS, the attendant delays would render any visas unlikely to satisfy the needs of American businesses given processing timeframes and the time remaining in this fiscal year. However, as noted above, the Departments will be conducting audits, investigations and/or post-adjudication compliance reviews on a significant number of H–2B petitions. As part of that process, USCIS may issue a request for additional evidence, a notice of intent to revoke, or a revocation notice, based on the review of such documentation, and DOL's OFLC and WHD will be able to review this documentation and enforce the attestations during the course of an audit examination or investigation. *See* 8 CFR 103.2(b) or 8 CFR 214.2(h)(11).

In accordance with the attestation requirements, under which petitioners attest that they meet the irreparable harm standard, that they are seeking to employ only returning workers (unless exempt as described above), and they meet the document retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records fulfilling their responsibility to demonstrate compliance with this rule for 3 years from the date of the attestation, and must provide the documents and records upon the request of DHS or DOL. Supporting evidence may include, but is not limited to, the following types of documentation:

(1) Evidence that the business has suffered or will suffer permanent and severe financial loss due to the inability to meet financial or existing contractual obligations without all of the H–2B workers, including evidence of contracts, reservations, orders, or other business arrangements that have been or would be cancelled absent the requested H–2B workers, and evidence demonstrating an inability to pay debts/bills;

(2) Evidence that the business has suffered or will suffer permanent and severe financial loss during the period of need, as compared to the period of need in prior years, such as financial statements (including profit/loss statements) comparing the present period of need to prior years; bank statements, tax returns, or other documents showing evidence of current and past financial condition; and

relevant tax records, employment records, or other similar documents showing hours worked and payroll comparisons from prior years to current year;

(3) Evidence showing the number of workers needed in the previous three seasons (FY 2018, 2019 and 2020) to meet the employer's need as compared to those currently employed. Such evidence must indicate the dates of their employment, and their hours worked (for example, payroll records) and evidence showing the number of H–2B workers requested under this rule, the number of workers it claims are needed, the workers' actual dates of employment and hours worked;

(4) Evidence that the petitioner is reliant on obtaining a certain number of workers to operate, based on the nature and size of the business, such as documentation showing the number of workers it has needed to maintain its operations in the past, or will need prospectively, including but not limited to; a detailed business plan, copies of purchase orders or other requests for good and services, or other reliable forecast of its need for workers; and/or

(5) With respect to satisfying the returning worker requirement, evidence that the employer requested and/or instructed that each of the workers petitioned by the employer in connection with this temporary rule were issued H–2B visas or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of one of the Northern Triangle countries counted towards the 6,000 cap. Such evidence would include, but is not limited to, a date-stamped written communication from the employer to its agent(s) and/or recruiter(s) that instructs the agent(s) and/or recruiter(s) to only recruit and provide instruction regarding an application for an H–2B visa to those foreign workers who were previously issued an H–2B visa or granted H–2B status in FY 2018, 2019, or 2020.

These examples are not exhaustive, nor will they necessarily establish that the business meets the irreparable harm or returning worker standards; petitioners may retain other types of evidence they believe will satisfy these standards. When an approved petition is selected for audit examination or investigation, DHS or DOL will review all evidence available to it to confirm that the petitioner properly attested to DHS that their business would likely suffer irreparable harm and that they petitioned for and employed only returning workers, unless the H–2B worker is a national of one of the Northern Triangle countries counted

towards the 6,000 cap. If DHS subsequently finds that the evidence does not support the employer's attestations, DHS may deny or, if the petition has already been approved, revoke the petition at any time consistent with existing regulatory authorities. DHS may also, or alternatively, notify DOL. In addition, DOL may independently take enforcement action, including by, among other things, debarring the petitioner from the H–2B program for not less than 1 year or more than 5 years from the date of the final agency decision, which also disqualifies the debarred party from filing any labor certification applications or labor condition applications with DOL for the same period set forth in the final debarment decision. *See, e.g.,* 20 CFR 655.73; 29 CFR 503.20, 503.24.[73]

To the extent that evidence reflects a preference for hiring H–2B workers over U.S. workers, an investigation by other agencies enforcing employment and labor laws, such as the Immigrant and Employee Rights Section (IER) of the Department of Justice's Civil Rights Division, may be warranted. *See* INA section 274B, 8 U.S.C. 1324b (prohibiting certain types of employment discrimination based on citizenship status or national origin). Moreover, DHS and DOL may refer potential discrimination to IER pursuant to applicable interagency agreements. *See* IER, Partnerships, *https:// www.justice.gov/crt/partnerships* (last visited Apr. 9, 2021). In addition, if members of the public have information that a participating employer may be abusing this program, DHS invites them to notify USCIS by completing the online fraud tip form, *https:// www.uscis.gov/report-fraud/uscis-tip-form* (last visited Apr. 9, 2021).[74]

DHS, in exercising its statutory authority under INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b), and section 105 of the FY 2021 Omnibus, is responsible for adjudicating eligibility for H–2B

classification. As in all cases, the burden rests with the petitioner to establish eligibility by a preponderance of the evidence. INA section 291, 8 U.S.C. 1361. *Matter of Chawathe,* 25 I&N Dec. 369, 375–76 (AAO 2010). Accordingly, as noted above, where the petition lacks initial evidence, such as a properly completed attestation, DHS may, as applicable, reject the petition in accordance with 8 CFR 103.2(a)(7)(ii) or deny the petition in accordance with 8 CFR 103.2(b)(8)(ii). Further, where the initial evidence submitted with the petition contains inconsistencies or is inconsistent with other evidence in the petition and the underlying TLC, DHS may issue a Request for Evidence, Notice of Intent to Deny, or Denial in accordance with 8 CFR 103.2(b)(8). In addition, where it is determined that an H–2B petition filed pursuant to the FY 2021 Omnibus was granted erroneously, the H–2B petition approval may be revoked. *See* 8 CFR 214.2(h)(11).

Because of the particular circumstances of this regulation, and because the attestation and other requirements of this rule play a vital role in achieving the purposes of this rule, DHS and DOL intend that the attestation requirement, DOL procedures, and other aspects of this rule be non-severable from the remainder of the rule, including the increase in the numerical allocations.[75] Thus, in the event the attestation requirement or any other part of this rule is enjoined or held invalid, the remainder of the rule, with the exception of the retention requirements being codified in 20 CFR 655.68, is also intended to cease operation in the relevant jurisdiction, without prejudice to workers already present in the United States under this regulation, as consistent with law.

## G. Portability

As an additional option for employers that cannot find U.S. workers this rule allows petitioners to hire immediately certain H–2B workers that are already present in the United States in H–2B status without waiting for approval of a new H–2B petition. Specifically, the rule allows H–2B nonimmigrant workers to begin new employment with a new H–2B employer or agent upon USCIS' receipt of a timely, non-frivolous H–2B petition. The H–2B nonimmigrant worker must have been lawfully admitted to the United States, must not have worked without authorization

subsequent to such lawful admission, and must currently hold valid H–2B status. Since every H–2B petition must be accompanied by an approved TLC, all H–2B petitioners must have completed a test of the U.S. labor market, as a result of which DOL determined that there were no qualified U.S. workers available to fill these temporary positions.

This provision mirrors temporary flexibilities that DHS has used previously to improve employer access to noncitizen workers during the COVID–19 pandemic.[76] In the context of this rule, DHS believes this flexibility will help some U.S. employers address the challenges related to the limitations imposed by the cap, as well as due to the ongoing disruptions caused by the COVID–19 pandemic. The pandemic has resulted in a variety of travel restrictions and visa processing limitations to mitigate the spread of COVID–19.

In addition to resulting in a devastating loss of life, the worldwide pandemic of COVID–19 has impacted the United States in myriad ways, disrupting daily life, travel, and the operation of individual businesses and the economy at large. On January 31, 2020, the Secretary of the U.S. Department of Health and Human Services (HHS) declared a public health emergency dating back to January 27, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d).[77] This determination that a public health emergency exists due to COVID–19 has subsequently been renewed five times: On April 21, 2020, on July 23, 2020, on October 2, 2020, on January 7, 2021, and most recently on April 15, 2021, effective April 21, 2021.[78] On March 13, 2020, then-President Trump declared a National Emergency concerning the

---

[73] Pursuant to the statutory provisions governing enforcement of the H–2B program, INA section 214(c)(14), 8 U.S.C. 1184(c)(14), a violation exists under the H–2B program where there has been a willful misrepresentation of a material fact in the petition or a substantial failure to meet any of the terms and conditions of the petition. A substantial failure is a willful failure to comply that constitutes a significant deviation from the terms and conditions. *See, e.g.,* 29 CFR 503.19.

[74] DHS may publicly disclose information regarding the H–2B program consistent with applicable law and regulations. For information about DHS disclosure of information contained in a system of records, *see https://www.dhs.gov/ system-records-notices-sorns.* Additional general information about DHS privacy policy generally can be accessed at *https://www.dhs.gov/policy.*

[75] The Departments' intentions with respect to non-severability extend to all features of this rule other than the portability provision, which is described in the section below.

[76] On May 14, 2020, DHS published a temporary final rule in the **Federal Register** to amend certain H–2B requirements to help H–2B petitioners seeking workers to perform temporary nonagricultural services or labor essential to the U.S. food supply chain. 85 FR 28843 (May 14, 2020). In addition, on April 20, 2020, DHS issued a temporary final rule which, among other flexibilities, allowed H–2A workers to change employers and begin work before USCIS approved the new H–2A petition for the new employer. 85 FR 21739. DHS has subsequently extended that portability provision for H–2A workers through two additional temporary final rules, on August 20, 2020, and December 18, 2020, which have been effective for H–2A petitions that were received on or after August 19, 2020 through December 17, 2020, and on or after December 18, 2020 through June 16, 2021, respectively. 85 FR 51304 and 85 FR 82291.

[77] HHS, *Determination of Public Health Emergency,* 85 FR 7316 (Feb. 7, 2020).

[78] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https:// www.phe.gov/emergency/news/healthactions/phe/ Pages/COVID-15April2021.aspx* (Apr. 15, 2021).

COVID–19 outbreak to control the spread of the virus in the United States.[79] The proclamation declared that the emergency began on March 1, 2020. DOS temporarily suspended routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020, and subsequently announced a phased resumption of visa services in which it would continue to provide emergency and mission critical visa services and resume routine visa services as local conditions and resources allowed.[80] Based on the importance of the H–2A temporary agricultural worker and H–2B temporary nonagricultural worker programs, DOS indicated it would continue processing H–2A and H–2B cases to the extent possible, as permitted by post resources and local government restrictions, and expanded the categories of H–2 visa applicants whose applications can be adjudicated without an in-person interview.[81] As recently as April 6, 2021, however, DOS noted the COVID–19 pandemic continues to have a severe adverse impact on routine visa services for embassies and consulates around the world.[82]

Further, due to the possibility that some H–2B workers may be unavailable due to visa processing delays or may become unavailable due to COVID–19 related illness or a legitimate fear of contracting COVID–19 under current conditions, U.S. employers that have approved H–2B petitions or who will be filing H–2B petitions in accordance with this rule might not receive all of the workers requested to fill the temporary positions.

DHS is strongly committed not only to protecting U.S. workers and helping U.S. businesses receive the documented and work-authorized workers to perform temporary nonagricultural services or labor that they need, but also to protecting the rights and interests of H–2B workers (consistent with Executive Order 13563 and in particular its reference to ''equity,'' ''fairness,'' and ''human dignity''). In the FY 2020 DHS

Further Consolidated Appropriations Act (Public Law 116–94), Congress directed DHS to provide options to improve the H–2A and H–2B visa programs, to include options that would protect worker rights.[83] DHS has determined that providing H–2B nonimmigrant workers with the flexibility of being able to begin work with a new H–2B petitioner immediately and avoid a potential job loss or loss of income while the new H–2B petition is pending, provides some certainty to H–2B workers who have maintained their status but may have found themselves in situations that warrant a change in employers.[84] Providing that flexibility is also equitable and fair.

Portability for H–2B workers provides these noncitizens with the option of not having to worry about job loss or loss of income between the time they leave a current employer and while they await approved employment with a new U.S. employer or agent. DHS believes this flexibility and job portability not only protects H–2B workers but also provides an alternative to H–2B petitioners who have not been able to find U.S. workers and who have not been able to obtain H–2B workers subject to the statutory or supplemental caps who have the skills to perform the job duties. In that sense as well, it is equitable and fair.

DHS is making this flexibility available for a 180-day period in order to provide stability for H–2B employers amidst uncertainties surrounding the COVID–19 pandemic. This period is justified especially given the possible

future impacts of COVID–19 variants, continuing limited vaccine access for certain groups (including in H–2B workers' home countries), and uncertainty regarding the duration of vaccine-gained immunity and how effective currently approved vaccines are in responding to COVID–19 variants.[85] DHS will continue to monitor the evolving health crisis caused by COVID–19 and may address it in future rules.

*H. COVID–19 Worker Protections*

It is the policy of DHS and its Federal partners to support equal access to the COVID–19 vaccines and vaccine distribution sites, irrespective of an individuals' immigration status.[86] This policy promotes fairness and equity (see Executive Order 13563). Accordingly, DHS and DOL encourage all individuals, regardless of their immigration status, to receive the COVID–19 vaccine. U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection do not conduct enforcement operations at or near vaccine distribution sites or clinics. Consistent with ICE's long-standing sensitive locations policy, ICE does not and will not carry out enforcement operations at or near health care facilities, such as hospitals, doctors' offices, accredited health clinics, and emergent or urgent care facilities, except in the most extraordinary of circumstances.

This TFR reflects that policy by providing as follows:

*Supplemental H–2B Visas:* With respect to petitioners who wish to qualify to receive supplemental H–2B visas pursuant to the FY 2021 Omnibus, the Departments are using the DOL Form ETA–9142–B–CAA–4 to support equal access to vaccines in two ways. First, the Departments are requiring such petitioners to attest on the DOL Form ETA–9142–B–CAA–4 that, consistent with such petitioners' obligations under generally applicable H–2B regulations, they will comply with all Federal, State, and local employment-related laws and

[79] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak,* 85 FR 15337 (Mar. 18, 2020).

[80] DOS, *Suspension of Routine Visa Services,* *https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated July 22, 2020).

[81] DOS, *Important Announcement on H2 Visas,* *https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (last updated Mar. 26, 2020).

[82] DOS, *Visa Services Operating Status Update,* *https://travel.state.gov/content/travel/en/News/visas-news/visa-services-operating-status-update.html* (last updated, Apr. 6, 2021).

[83] The Joint Explanatory Statement accompanying the *Fiscal Year* (FY) *2020 Department of Homeland Security* (DHS) *Further Consolidated Appropriations Act* (Public Law 116–94) states, ''H–2A and H–2B Visa Program Processes.—Not later than 120 days after the date of enactment of this Act, DHS, the Department of Labor, the Department of State, and the United States Digital Service are directed to report on options to improve the execution of the H–2A and H–2B visa programs, including: processing efficiencies; combatting human trafficking; protecting worker rights; and reducing employer burden, to include the disadvantages imposed on such employers due to the current semiannual distribution of H–2B visas on October 1 and April 1 of each fiscal year. USCIS is encouraged to leverage prior year materials relating to the issuance of additional H–2B visas, to include previous temporary final rules, to improve processing efficiencies.''

[84] The National Action Plan to Combat Human Trafficking, Priority Action 1.6.3, at p. 20–21 (2020) (Stating that ''[w]orkers sometimes find themselves in abusive work situations, but because their immigration status is dependent on continued employment with the employer in whose name the visa has been issued, workers may be left with few options to leave that situation.'' By providing the option of changing employers without risking job loss or a loss of income through the publication of this rule, DHS believes that H–2B workers may be more likely to leave abusive work situations, and thereby are afforded greater worker protections.)

[85] *See,* About Variants of the Virus that Causes COVID–19, Centers for Disease Control and Prevention, last updated April 2, 2021. *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html,* Key Things to Know About COVID–19 Vaccines, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html?s_cid=10499:what%20is%20the%20covid%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY21* (Last visited April 14, 2021).

[86] *See* DHS Statement on Equal Access to COVID–19 Vaccines and Vaccine Distribution Sites, *https://www.dhs.gov/news/2021/02/01/dhs-statement-equal-access-covid-19-vaccines-and-vaccine-distribution-sites* (Feb. 1, 2021), (accessed Apr. 28, 2021).

regulations, including health and safety laws and laws related to COVID–19 worker protections and any right to time off or paid time off for COVID–19 vaccination. *See* new 8 CFR 214.2(h)(6)(x)(B)(*2*)(*iii*) and 20 CFR 655.64(a)(4). Second, the Departments are requiring such petitioners to also attest that they will notify any H–2B workers approved under the supplemental cap, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites. Because the attestation will be submitted to USCIS as initial evidence with Form I–129, DHS considers the attestation to be evidence that is incorporated into and a part of the petition consistent with 8 CFR 103.2(b)(1). Accordingly, a petition may be denied or revoked, as applicable, based on or related to statements made in the attestation, including, but not limited to, because the employer violated an applicable employment-related law or regulation, or failed to notify workers regarding equal access to COVID–19 vaccines and vaccine distribution sites.

*Other H–2B Employers:* While there is no additional attestation with respect to H–2B petitioners that do not avail themselves of the supplemental H–2B visas made available under this rule, the Departments remind all H–2B employers that they must comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections and any right to time off or paid time off for COVID–19 vaccination. Failure to comply with such laws may be a basis for DHS to revoke the petition under 8 CFR 214.2(h)(11). This obligation is also reflected as a condition of H–2B portability under this rule. See new 8 CFR 214.2(h)(26)(iii)(C).

Ensuring that the Departments encourage employers to provide access to COVID–19 vaccines is consistent with the policies of the Biden Administration. President Biden, in his speech to Joint Session of Congress, made the following statement: ''[T]oday, I'm announcing a program to address [the issue of COVID vaccinations] . . . nationwide. I'm calling on every employer, large and small, in every state, to give employees the time off they need, with pay, to get vaccinated and any time they need, with pay, to recover if they are feeling under the weather after the shot.'' [87] Consistent with the President's statement, the Departments strongly urge, but do not require, that all employers seeking H–2B workers under either the Supplemental Cap or portability sections of the TFR, make every effort to ensure that all their workers, including nonimmigrant workers, be afforded an opportunity to take the time off needed to get receive their COVID–19 vaccinations, as well as time off, with pay, to recover from any temporary side effect.

As noted, Executive Order 13563 refers to fairness, equity, and human dignity, and such efforts, on the part of employers, would be consistent with those commitments.

Petitioners otherwise are strongly encouraged to facilitate and provide flexibilities, to the greatest extent possible, to all workers who wish to receive COVID–19 vaccinations.

*I. DHS Petition Procedures*

To petition for H–2B workers under this rule, the petitioner must file a Form I–129 in accordance with applicable regulations and form instructions, an unexpired TLC, and the attestation form described above. All H–2B petitions must state the nationality of all the requested H–2B workers, whether named or unnamed, even if there are beneficiaries from more than one country. *See* 8 CFR 214.2(h)(2)(iii). If filing multiple Forms I–129 based on the same TLC (for instance, one requesting returning workers and another requesting workers who are nationals of one of the Northern Triangle countries), each H–2B petition must include a copy of the TLC and reference all previously-filed or concurrently filed petitions associated with the same TLC. The total number of requested workers may not exceed the total number of workers indicated on the approved TLC. Petitioners seeking H–2B classification for Northern Triangle country nationals under the 6,000 visas that are exempt from the returning worker provision must file a separate Form I–129 for those Northern Triangle country nationals only. *See* new 8 CFR 214.2(h)(6)(x). Requiring the filing of separate petitions to request returning workers and to request workers who are Northern Triangle country nationals is necessary to ensure the operational capability to properly calculate and manage the respective additional cap allocations and to ensure that all corresponding visa issuances are limited to qualifying applicants, particularly when such petitions request unnamed beneficiaries or are relied upon for subsequent requests to substitute beneficiaries in accordance with 8 CFR 214.2(h)(6)(viii). The attestations must be filed on Form ETA–9142–B–CAA–4, Attestation for Employers Seeking to Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Further Consolidated Appropriations Act, 2021 Public Law 116–260. *See* 20 CFR 655.64. A petitioner is required to retain a copy of such attestations and all supporting evidence for 3 years from the date the associated TLC was approved, consistent with 20 CFR 655.56 and 29 CFR 503.17. *See* new 20 CFR 655.68. Petitions submitted to DHS pursuant to the FY 2021 Omnibus will be processed in the order in which they were received. Petitioners may also choose to request premium processing of their petitions under 8 CFR 103.7(e), which allows for expedited processing for an additional fee.

To encourage timely filing of any petition seeking a visa under the FY 2021 Omnibus, DHS is notifying the public that the petition may not be approved by USCIS on or after October 1, 2021. *See* new 8 CFR 214.2(h)(6)(x). Petitions pending with USCIS that are not approved before October 1, 2021 will be denied and any fees will not be refunded. *See* new 8 CFR 214.2(h)(6)(x).

USCIS's current processing goal for H–2B petitions filed via premium processing that can be adjudicated without the need for further evidence (in other words, without a Request for Evidence or Notice of Intent to Deny) is 15 days. USCIS intends to adjudicate petitions filed for standard processing within a reasonable period of time.[88] Given USCIS' processing goals for premium processing, DHS believes that 15 days from the end of the fiscal year is the minimum time needed for petitions to be adjudicated, although USCIS cannot guarantee the time period will be sufficient in all cases. Therefore, if the increase in the H–2B numerical limitation to 22,000 visas has not yet been reached, USCIS will stop accepting petitions received after September 15, 2021. *See* new 8 CFR 214.2(h)(6)(x)(C). Such petitions will be rejected and the filing fees will be returned.

As with other Form I–129 filings, DHS encourages petitioners to provide a duplicate copy of Form I–129 and all supporting documentation at the time of filing if the beneficiary is seeking a

---

[87] *See https://www.whitehouse.gov/briefing-room/ speeches-remarks/2021/04/21/remarks-by- president-biden-on-the-covid-19-response-and-the- state-of-vaccinations-2/.*

[88] These processing goals are not binding on USCIS; depending on the evidence presented, actual processing times may vary.

nonimmigrant visa abroad. Failure to submit a duplicate copy may cause a delay in the issuance of a visa to an otherwise eligible applicant.[89]

*J. DOL Procedures*

As noted above, all employers are required to have an approved and valid TLC from DOL in order to file a Form I–129 petition with DHS. *See* 8 CFR 214.2(h)(6)(iv)(A) and (D). The standards and procedures governing the submission and processing of *Applications for Temporary Employment Certification* for employers seeking to hire H–2B workers are set forth in 20 CFR part 655, subpart A. Employers with an approved TLC have conducted recruitment, as set forth in 20 CFR 655.40 through 655.48, to determine whether U.S. workers are qualified and available to perform the work for which H–2B workers are sought.

In addition to the recruitment already conducted in connection with a valid TLC, in order to ensure the recruitment has not become stale, employers that wish to obtain visas for their workers under 8 CFR 214.2(h)(6)(x), and who file an I–129 petition 45 or more days after the certified start date of work on the TLC must conduct additional recruitment for U.S. workers. This is particularly important this year as U.S. workers have begun to, and will continue to, reenter the workforce as they become vaccinated and the COVID–19 emergency subsides.

As noted in the 2015 H–2B Interim Final Rule, U.S. workers seeking employment in temporary or seasonal nonagricultural jobs typically do not search for work months in advance, and cannot make commitments about their availability for employment far in advance of the work start date. *See* 80 FR 24041, 24061, 24071. Given that the temporary labor certification process generally begins 75 to 90 days in advance of the employer's start date of work, employer recruitment efforts typically occur between 40 and 60 days before that date with an obligation to provide employment to any qualified U.S. worker who applies until 21 days before the date of need. Therefore, employers with TLCs containing a start date of work on April 1, 2021, likely conducted their positive recruitment beginning around late-January and ending around mid-February 2021, and continued to consider U.S. worker

applicants and referrals only until March 11, 2021.

In order to provide U.S. workers a realistic opportunity to pursue jobs for which employers will be seeking foreign workers under this rule, the Departments have determined that if employers file an I–129 petition 45 or more days after their date of need, they have not conducted recruitment recently enough for the Departments to reasonably conclude that there are currently an insufficient number of U.S. workers who are qualified, willing, and available to perform the work absent taking additional, positive recruitment steps. The 45-day threshold for additional recruitment identified in this rule reflects a timeframe between the end of the employer's recruitment and filing of the petition similar to that provided under the FY 2018 and FY 2019 H–2B supplemental cap rules.

An employer who files an I–129 petition under 8 CFR 214.2(h)(6)(x) less than 45 after the certified start date of work on the TLC must submit the TLC and a completed Form ETA–9142B–CAA–4, but is not required to conduct recruitment for U.S. workers beyond the recruitment already conducted as a condition of certification. Only those employers with still-valid TLCs with a start date of work that is 45 or more days before the date they file a petition will be required to conduct recruitment in addition to that conducted prior to being granted labor certification and attest that the recruitment will be conducted, as follows.

The employer must place a new job order for the job opportunity with the State Workforce Agency (SWA) serving the area of intended employment no later than the next business day after submitting an I–129 petition for H–2B workers to USCIS. The job order must contain the job assurances and contents set forth in 20 CFR 655.18 for recruitment of U.S. workers at the place of employment, and remain posted for at least 15 calendar days. The employer must also follow all applicable SWA instructions for posting job orders and receive applications in all forms allowed by the SWA, including online applications. The Departments have concluded that keeping the job order posted for a period of 15 calendar days, during the period the employer is conducting the additional recruitment steps explained below, will effectively ensure U.S. workers are apprised of the job opportunity and are referred for employment, if they are willing, qualified, and available to perform the work. The 15 calendar day period also is consistent with the employer-

conducted recruitment activity period applicable under 20 CFR 655.40(b).

The employer also must conduct additional recruitment steps during the period of time the SWA is actively circulating the job order for intrastate clearance. First, the employer must contact, by email or other electronic means, the nearest American Job Center(s) (AJC) offering business services and serving the area of intended employment where work will commence to request staff assistance to advertise and recruit U.S. workers for the job opportunity. AJCs bring together a variety of programs providing a wide range of employment and training services for U.S. workers, including job search services and assistance for prospective workers and recruitment services for employers through the Wagner-Peyser Program. Therefore, AJCs can offer assistance to employers with recruitment of U.S. workers, and contact with local AJCs will facilitate contemporaneous and effective recruitment activities that can broaden dissemination of the employer's job opportunity through connections with other partner programs within the One-Stop System to locate qualified U.S. workers to fill the employer's labor need. For example, the local AJC may contact community-based organizations in the geographic area that serve potentially qualified workers or, when a job opportunity is in an occupation or industry that is traditionally or customarily unionized, the local AJC is well-positioned to identify and circulate the job order to appropriate union offices, consistent with 20 CFR 655.33(b)(5). In addition, as a partner program in the One-Stop System, AJCs are connected with the state's unemployment insurance program, thus an employer's connection with the AJC will help facilitate knowledge of the job opportunity to U.S. workers actively seeking employment. When contacting the AJC(s), the employer must provide staff with the job order number or, if the job order number is unavailable, a copy of the job order.

To increase navigability and to make the process as convenient as possible, DOL offers an online service for employers to locate the nearest local AJC at *https://www.careeronestop.org/* and by selecting the ''Find Local Help'' feature on the main homepage. This feature will navigate the employer to a search function called ''Find an American Job Center'' where the city, state or zip code covering the geographic area where work will commence can be entered. Once entered and the search function is executed, the online service will return a listing of the

---

name(s) of the AJC(s) serving that geographic area as well as contact option(s) and an indication as to whether the AJC is a "comprehensive" or "affiliate" center. Employers must contact an AJC that is labeled "comprehensive center" as those offer the full range of employment and business services. As explained on the locator website, many AJCs continue to offer virtual or remote services due to the pandemic with physical office locations temporarily closed for in-person and mail processing services. Therefore, this rule requires that employers utilize available electronic methods for the nearest AJC to meet the contact and disclosure requirements in this rule.

Second, during the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) for intrastate clearance, the employer must make reasonable efforts to contact (by mail or other effective means) its former U.S. workers that it employed in the occupation at the place of employment (except those who were dismissed for cause or who abandoned the worksite) during the period beginning January 1, 2019, until the date the I–129 petition required under 8 CFR 214.2(h)(6)(x) is submitted. Among the employees the employer must contact are those who have been furloughed or laid off during this period. The employer must disclose to its former employees the terms of the job order, and solicit their return to the job. The contact and disclosures required by this paragraph must be provided in a language understood by the worker, as necessary or reasonable.

Furloughed employees are employees the employer laid off (as the term is defined in 20 CFR 655.5 and 29 CFR 503.4), but the layoff is intended to last for a temporary period of time. This recruitment step will help ensure notice of the job opportunity is disseminated broadly to U.S. workers who were laid off or furloughed during the COVID–19 outbreak and who may be seeking employment as the economy begins to recover in 2021. While this requirement goes beyond the requirement at 20 CFR 655.43, the Departments believes it is appropriate given the evolving conditions of the U.S. labor market, as described above, and the increased likelihood that qualified U.S. workers will make themselves available for these job opportunities.

Third, as the employer was required to do when initially applying for its labor certification, the employer must provide a copy of the job order to the bargaining representative for employees in the occupation and area of intended employment, consistent with 20 CFR

655.45(a), or if there is no bargaining representative, post the job order in the places and manner described in 20 CFR 655.45(b).

The requirements to contact former U.S. workers and provide notice to the bargaining representative or post the job order must be conducted in a language understood by the workers, as necessary or reasonable. This requirement would apply, for example, in situations where an employer has one or more employees who do not speak English as their primary language and who have a limited ability to read, write, speak, or understand English. This requirement would allow those workers to make informed decisions regarding the job opportunity, and is a reasonable interpretation of the recruitment requirements in 20 CFR part 655, subpart A, in light of the need to ensure that the test of the U.S. labor market is as comprehensive as possible. Consistent with existing language requirements in the H–2B program under 20 CFR 655.20(l), DOL intends to broadly interpret the necessary or reasonable qualification, and apply an exemption only in those situations where having the job order translated into a particular language would both place an undue burden on an employer and not significantly disadvantage the employee.

The employer must hire any qualified U.S. worker who applies or is referred for the job opportunity until either (1) the date on which the last H–2B worker departs for the place of employment, or (2) 30 days after the last date on which the SWA job order is posted, whichever is later. Additionally, consistent with 20 CFR 655.40(a), applicants may be rejected only for lawful job-related reasons. Given that the employer, SWA, and AJC(s) will be actively engaged in conducting recruitment and broader dissemination of the job opportunity during the period of time the job order is active, this requirement provides an adequate period of time for U.S. workers to contact the employer or SWA for referral to the employer and completion of the additional recruitment steps described above. As explained above, the Departments have determined that if employers file a petition 45 or more days after their dates of need, they have not conducted recruitment recently enough for the Departments to reasonably conclude that there are currently an insufficient number of U.S. workers qualified, willing, and available to perform the work absent additional recruitment.

Because of the abbreviated timeline for the additional recruitment required for employers whose initial recruitment

has gone stale, the Departments have determined that a longer hiring period is necessary to approximate the hiring period under normal recruitment procedures and ensure that domestic workers have access to these job opportunities, consistent with the Departments' mandate. Additionally, given the relatively brief period during which additional recruitment will occur, additional time may be necessary for U.S. workers to have a meaningful opportunity to learn about the job opportunities and submit applications.

Although the hiring period may require some employers to hire U.S. workers after the start of the contract period, this is not unprecedented. For example, in the H–2A program, employers have been required to hire U.S. workers through 50 percent of the contract period since at least 2010,[90] which "enhance[s] protections for U.S. workers, to the maximum extent possible, while balancing the potential costs to employers," and is consistent with the Departments' responsibility to ensure that these job opportunities are available to U.S. workers.[91] The Department acknowledges that hiring workers after the start of the contract period imposes an additional cost on employers, but that cost can be lessened, in part, by the ability to discharge the H–2B worker upon hiring a U.S. worker. Additionally, this rule permits employers to immediately hire H–2B workers who are already present in the United States without waiting for approval of an H–2B petition, which will reduce the potential for harm to H–2B workers as a result of displacement by U.S. workers. *See* new 8 CFR 214.2(h)(26). Most importantly, a longer hiring period will ensure that available U.S. workers have a viable opportunity to apply for H–2B job opportunities. Accordingly, the Departments have determined that in affording the benefits of this temporary cap increase to businesses that need workers to avoid irreparable harm, it is necessary to ensure U.S. workers who may be seeking employment as the economy begins to recover in 2021 have sufficient time to apply for these jobs.

Finally, as in the temporary rules implementing the supplemental cap increases in prior years, employers must retain documentation demonstrating compliance with the recruitment requirements described above, including placement of a new job order

---

[90] Final Rule, *Temporary Agricultural Employment of H–2A Aliens in the United States,* 75 FR 6884, 6921 (Feb. 12, 2010).

[91] NPRM, *Temporary Agricultural Employment of H–2A Aliens in the United States,* 74 FR 45906, 45917 (Sept. 4, 2009); 75 FR at 6922.

with the SWA, contact with AJCs, contact with former U.S. workers, and compliance with § 655.45(a) or (b). Employers must prepare and retain a recruitment report that describes these efforts and meets the requirements set forth in 20 CFR 655.48, including the requirement to update the recruitment report throughout the recruitment and hiring period set forth in paragraph (a)(5)(v) of new 20 CFR 655.64. Employers must maintain copies of the recruitment report, attestation, and supporting documentation, as described above, for a period of 3 years from the date that the TLC was approved, consistent with the document retention requirements under 20 CFR 655.56. These requirements are similar to those that apply to certain seafood employers who stagger the entry of H–2B workers under 20 CFR 655.15(f).

DOL's WHD has the authority to investigate the employer's attestations, as the attestations are a required part of the H–2B petition process under this rule and the attestations rely on the employer's existing, approved TLC. Where a WHD investigation determines that there has been a willful misrepresentation of a material fact or a substantial failure to meet the required terms and conditions of the attestations, WHD may institute administrative proceedings to impose sanctions and remedies, including (but not limited to) assessment of civil money penalties; recovery of wages due; make-whole relief for any U.S. worker who has been improperly rejected for employment, laid off, or displaced; and/or debarment for 1 to 5 years. *See* 29 CFR 503.19, 503.20. This regulatory authority is consistent with WHD's existing enforcement authority and is not limited by the expiration date of this rule. Therefore, in accordance with the documentation retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records evidencing compliance with this rule, and must provide the documents and records upon request by DHS or DOL.

DHS has the authority to verify any information submitted to establish H–2B eligibility at any time before or after the petition has been adjudicated by USCIS. *See, e.g.,* INA sections 103 and 214 (8 U.S.C. 1103, 1184); *see also* 8 CFR part 103 and 8 CFR 214.2(h). DHS' verification methods may include, but are not limited to, review of public records and information, contact via written correspondence or telephone, unannounced physical site inspections, and interviews. USCIS will use information obtained through verification to determine H–2B eligibility and assess compliance with

the requirements of the H–2B program. Subject to the exceptions described in 8 CFR 103.2(b)(16), USCIS will provide petitioners with an opportunity to address any adverse information that may result from a USCIS compliance review, verification, or site visit after a formal decision is made on a petition or after the agency has initiated an adverse action that may result in revocation or termination of an approval.

As previously noted, the Departments have agreed to select a significant number of approved petitions for audit examination to verify compliance with the irreparable harm standard and additional employer conducted recruitment implemented through this rule. DOL's OFLC already has the authority under 20 CFR 655.70 to conduct audit examinations on adjudicated *Applications for Temporary Employment Certification,* including all appropriate appendices, and verify any information supporting the employer's attestations. OFLC uses audits of adjudicated *Applications for Temporary Employment Certification,* as authorized by 20 CFR 655.70, to ensure employer compliance with attestations made in its *Application for Temporary Employment Certification* and to ensure the employer has met all statutory and regulatory criteria and satisfied all program requirements. The OFLC certifying officer (CO) has sole discretion to choose which *Applications for Temporary Employment Certification* will be audited. *See* 20 CFR 655.70(a). Post adjudication audits can be used to establish a record of employer compliance or non-compliance with program requirements and the information gathered during the audit assists DOL in determining whether it needs to further investigate or debar an employer or its agent or attorney from future labor certifications.

Under this rule, an employer may submit a petition to USCIS, including a valid TLC and Form ETA–9142B–CAA–4, in which the employer attests to compliance with requirements for access to the supplemental H–2B visas allocated through 8 CFR 214.2(h)(6)(x), including that its business is likely to suffer irreparable harm and that it will conduct additional recruitment, if necessary to refresh the TLC's labor market test. DHS and DOL consider Form ETA–9142B–CAA–4 to be an appendix to the *Application for Temporary Employment Certification* and the attestations contained on the Form ETA–9142B–CAA–4 and documentation supporting the attestations to be evidence that is incorporated into and a part of the approved TLC. Therefore, DOL's audit

authority includes the authority to audit the veracity of any attestations made on Form ETA–9142B–CAA–4 and documentation supporting the attestations. However, DOL's audit authority is independently authorized, and is not limited by the expiration date of this rule. In order to make certain that the supplemental visa allocation is not subject to fraud or abuse, DHS will share information regarding Forms ETA–9142B–CAA–4 with DOL, consistent with existing authorities. This information sharing will support DOL's identification of TLCs used to access the supplemental visa allocation for closer examination of TLCs through the audit process.

In accordance with the documentation retention requirements in this rule, the petitioner must retain documents and records proving compliance with this rule, and must provide the documents and records upon request by DHS or DOL. Under this rule, DOL will audit a significant number of TLCs used to access the supplemental visa allocation to ensure employer compliance with attestations, including those regarding the irreparable harm standard and additional employer conducted recruitment, required under this rule. In the event of an audit, the OFLC CO will send a letter to the employer and, if appropriate, a copy of the letter to the employer's attorney or agent, listing the documentation the employer must submit and the date by which the documentation must be sent to the CO. During audits under this rule, the CO will request documentation necessary to demonstrate the employer conducted all e recruitment steps required under this rule and truthfully attested to the irreparable harm the employer would suffer if it does not receive all requested workers under the cap increase, including documentation the employer is required to retain under this rule. If necessary to complete the audit, the CO may request supplemental information and/or documentation from the employer during the course of the audit process. 20 CFR 655.70(c).

Failure to comply in the audit process may result in the revocation of the employer's certification or in debarment, under 20 CFR 655.72 and 655.73, respectively, or require the employer to undergo assisted recruitment in future filings of an *Application for Temporary Employment Certification,* under 20 CFR 655.71. Where an audit examination or review of information from DHS or other appropriate agencies determines that there has been fraud or willful misrepresentation of a material fact or a

AR03548

substantial failure to meet the required terms and conditions of the attestations or failure to comply with the audit examination process, OFLC may institute appropriate administrative proceedings to impose sanctions on the employer. Those sanctions may result in revocation of an approved TLC, the requirement that the employer undergo assisted recruitment in future filings of an *Application for Temporary Employment Certification* for a period of up to 2 years, and/or debarment from the H–2B program and any other foreign labor certification program administered by DOL for 1 to 5 years. *See* 29 CFR 655.71, 655.72, 655.73. Additionally, OFLC has the authority to provide any finding made or documents received during the course of conducting an audit examination to DHS, WHD, IER, or other enforcement agencies. OFLC's existing audit authority is independently authorized, and is not limited by the expiration date of this rule. Therefore, in accordance with the documentation retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records proving compliance with this rule, and must provide the documents and records upon request by DHS or DOL.

Petitioners must also comply with any other applicable laws, such as avoiding unlawful discrimination against U.S. workers based on their citizenship status or national origin. Specifically, the failure to recruit and hire qualified and available U.S. workers on account of such individuals' national origin or citizenship status may violate INA section 274B, 8 U.S.C. 1324b.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

This rule is issued without prior notice and opportunity to comment and with an immediate effective date pursuant to the Administrative Procedure Act (APA). 5 U.S.C. 553(b) and (d).

#### 1. Good Cause To Forgo Notice and Comment Rulemaking

The APA, 5 U.S.C. 553(b)(B), authorizes an agency to issue a rule without prior notice and opportunity to comment when the agency, for good cause, finds that those procedures are ''impracticable, unnecessary, or contrary to the public interest.'' Among other things, the good cause exception for forgoing notice and comment rulemaking ''excuses notice and comment in emergency situations, or where delay could result in serious harm.'' *Jifry* v. *FAA,* 370 F.3d 1174,

1179 (D.C. Cir. 2004). Although the good-cause exception is ''narrowly construed and only reluctantly countenanced,'' *Tenn. Gas Pipeline Co.* v. *FERC,* 969 F.2d 1141, 1144 (D.C. Cir. 1992), the Departments have appropriately invoked the exception in this case, for the reasons set forth below.

With respect to the supplemental allocations provisions in 8 CFR 214.2 and 20 CFR part 655, subpart A, the Departments are bypassing advance notice and comment because of the exigency created by section 105 of Div. O of the FY 2021 Omnibus, which went into effect on December 27, 2020, and expires on September 30, 2021, as well as rapidly evolving economic conditions and labor demand, as described above. USCIS received more than enough petitions to meet the H–2B visa statutory cap for the second half of FY 2021 on February 12, 2021, which is 6 days earlier than when the statutory cap for the second half of FY 2020 was reached. USCIS conducted a lottery on February 17, 2021, to randomly select a sufficient number of petitions to meet the remainder of the statutory cap. USCIS rejected and returned the petitions and associated filing fees to petitioners that were not selected, as well as all cap-subject petitions received after February 12, 2021. Given high demand by American businesses for H–2B workers, rapidly evolving economic conditions and labor demand, and the short time remaining in the fiscal year for U.S. employers to avoid the economic harm described above, a decision to undertake notice and comment rulemaking would likely delay final action on this matter by weeks or months, and would, therefore, greatly complicate and indeed likely preclude the Departments from successfully exercising the authority created by section 105.

The temporary portability and change of employer provisions in 8 CFR 214.2 and 274a.12 are further supported by conditions created by the COVID–19 pandemic. On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency under section 319 of the Public Health Service Act in response to COVID–19 retroactive to January 27, 2020.[92] This determination that a public health emergency exists due to COVID–19 has subsequently been renewed five times: On April 21, 2020, on July 23, 2020, on October 2, 2020, January 7, 2021, and

most recently on April 15, 2021 effective on April 21, 2021.[93] On March 13, 2020, then-President Trump declared a National Emergency concerning the COVID–19 outbreak, retroactive to March 1, 2020, to control the spread of the virus in the United States.[94] In response to the Mexican government's call to increase social distancing in that country, DOS announced the temporary suspension of routine immigrant and nonimmigrant visa services processed at the U.S. Embassy in Mexico City and all U.S. consulates in Mexico beginning on March 18, 2020.[95] DOS expanded the temporary suspension of routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020.[96] On July 22, 2020, DOS indicated that embassies and consulates should continue to provide emergency and mission critical visa services to the extent possible and could begin a phased resumption of routine visa services as local conditions and resources allow.[97] On March 26, 2020 DOS designated the H–2 programs as essential to the economy and food security of the United States and a national security priority; DOS indicated that U.S. Embassies and Consulates will continue to process H–2 cases to the extent possible and implemented a change in its procedures, to include interview waivers.[98] On January 25, 2021, President Biden issued a *Proclamation on the Suspension of Entry as Immigrants and Non-Immigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease.*[99] The proclamation restricted entry into the United States from European Schengen treaty countries, the United Kingdom (including territories outside of Europe), Ireland, Brazil, and South

---

[92] HHS, Determination that a Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited Apr. 20, 2021). See also HHS, Determination of Public Health Emergency, 85 FR 7316 (Feb. 7, 2020).

[93] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15April2021.aspx.* (Apr. 15, 2021).

[94] President of the United States, Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak, 85 FR 15337 (Mar. 18, 2020).

[95] DOS, Suspension of Routine Visa Services, *https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated Mar. 20, 2020).

[96] *https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html*

[97] *https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (Last visited on Apr. 21, 2021).

[98] Proclamation 10143 of January 25, 2021, 86 FR 7467 (Jan. 28, 2021). *https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/25/proclamation-on-the-suspension-of-entry-as-immigrants-and-non-immigrants-of-certain-additional-persons-who-pose-a-risk-of-transmitting-coronavirus-disease/.*

Africa—countries where COVID–19 variants originated or were identified as present.[100] On January 28, 2021, DOS reaffirmed the importance of the H–2 programs by making a national interest designation for certain H–2 travelers from South Africa.[101] On April 19, 2021, Customs and Border Protection announced an extension of certain land border restrictions between U.S. and Canada, and U.S. and Mexico to May 21, 2021.[102]

In addition to travel restrictions and impacts of the pandemic on visa services, as discussed elsewhere in this rule, current efforts to curb the pandemic in the United States and worldwide have been partially successful, however, with the emergence of COVID–19 variants; different rates of vaccination in some countries and regions; and other uncertainties associated with the evolving pandemic situation, DHS anticipates that H–2B employers may need additional flexibilities, beyond supplemental visa numbers, to meet all of their labor needs, particularly if some U.S. and H–2B workers become unavailable due to illness or other restrictions related to the spread of COVID–19. Therefore, DHS is acting expeditiously to put in place rules that will facilitate the continued employment of the H–2B workers already present in the United States. This action will help employers fill these critically necessary nonagricultural job openings and protect U.S. businesses' economic investments in their operations.

Courts have found ''good cause'' under the APA when an agency is moving expeditiously to avoid significant economic harm to a program, program users, or an industry. Courts have held that an agency may use the good cause exception to address ''a serious threat to the financial stability of [a government] benefit program,'' *Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 611 (D.C. Cir. 1982), or to avoid ''economic harm and disruption'' to a given industry, which would likely result in higher consumer prices, *Am. Fed'n of Gov't Emps.* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981).

Consistent with the above authorities, the Departments are bypassing notice

and comment to prevent ''serious economic harm to the H–2B community,'' including U.S. employers, associated U.S. workers, and related professional associations, that could result from ongoing uncertainty over the status of the numerical limitation, in other words, the effective termination of the program through the remainder of FY 2021. *See Bayou Lawn & Landscape Servs.* v. *Johnson,* 173 F. Supp. 3d 1271, 1285 & n.12 (N.D. Fla. 2016). The Departments note that this action is temporary in nature, *see id.,*[103] and includes appropriate conditions to ensure that it affects only those businesses most in need, and also protects H–2B and U.S. workers.

### 2. Good Cause To Proceed With an Immediate Effective Date

The APA also authorizes agencies to make a rule effective immediately, upon a showing of good cause, instead of imposing a 30-day delay. 5 U.S.C. 553(d)(3). The good cause exception to the 30-day effective date requirement is easier to meet than the good cause exception for foregoing notice and comment rulemaking. *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992); *Am. Fed'n of Gov't Emps., AFL–CIO* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981); *U.S. Steel Corp.* v. *EPA,* 605 F.2d 283, 289–90 (7th Cir. 1979). An agency can show good cause for eliminating the 30-day delayed effective date when it demonstrates urgent conditions the rule seeks to correct or unavoidable time limitations. *U.S. Steel Corp.,* 605 F.2d at 290; *United States* v. *Gavrilovic,* 511 F.2d 1099, 1104 (8th Cir. 1977). For the same reasons set forth above expressing the need for immediate action, we also conclude that the Departments have good cause to dispense with the 30-day effective date requirement.

### B. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to proceed (to the extent permitted by law) only if the benefits justify the costs and to select (again to the extent permitted by law) the regulatory approach that maximizes net

benefits. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits; reducing costs; simplifying and harmonizing rules; and promoting flexibility through approaches that preserve freedom of choice (including through ''provision of information in a form that is clear and intelligible''). It also allows consideration of equity, fairness, distributive impacts, and human dignity, even if some or all of these are difficult or impossible to quantify.

This rule is a ''significant regulatory action,'' although not an economically significant regulatory action since it does not meet the threshold of $100 million in annual economic effects, under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation.

### Summary

With this temporary final rule (TFR), DHS is authorizing the immediate release of an additional 22,000 H–2B visas. By the authority given under the Further Consolidated Appropriations Act, 2021, Public Law 116–260 (FY 2021 Omnibus), DHS is raising the H–2B cap by an additional 22,000 visas for the remainder of FY 2021 to businesses that: (1) Show that there are an insufficient number of U.S. workers to meet their needs in FY 2021; (2) attest that their businesses are likely to suffer irreparable harm without the ability to employ the H–2B workers that are the subject of their petition, among other commitments; and (3) petition for returning workers who were issued an H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of Guatemala, Honduras, and El Salvador (the Northern Triangle countries). Additionally, up to 6,000 of the 22,000 visas may be granted to workers from the Northern Triangle countries who are exempt from the returning worker requirement. This TFR aims to prevent irreparable harm to certain U.S. businesses by allowing them to hire additional H–2B workers within FY 2021.

The estimated total costs to petitioners ranges from $10,192,963 to $26,063,006. The estimated total cost to the Federal Government is $467,820. DHS estimates that the total cost of this rule ranges from $10,660,783 to $26,530,826. The benefits of this rule are diverse, though some of them are difficult to quantify. They include:

(1) Employers benefit from this rule significantly through increased access to H–2B workers;

---

[100] *Id.*

[101] *See* https://travel.state.gov/content/travel/en/News/visas-news/national-interest-exception-for-certain-h-2-travelers-from-south-africa.html (Jan. 28, 2021).

[102] *See Temporary Restriction of Travelers Crossing US-Canada and Mexico Land Borders for Non-Essential Purposes, https://help.cbp.gov/s/article/Article-1596?language=en_US#:~:text=On%20March%2021%2C%202020%2C%20the,EDT%20on%20April%2021%2C%202021* (last visited on April 20, 2021).

[103] Because the Departments have issued this rule as a temporary final rule, this rule—with the sole exception of the document retention requirements—will be of no effect after September 30, 2021, even if Congress includes an authority similar to section 105 in a subsequent act of Congress.

(2) Customers and others benefit directly or indirectly from that increased access;

(3) H–2B workers benefit from this rule significantly through obtaining jobs and earning wages, potential ability to port and earn additional wages, and increased information on COVID–19 and vaccination distribution. DHS recognizes that some of the effects of these provisions may occur beyond the borders of the United States;[104]

(4) Some American workers may benefit to the extent that they do not lose jobs through the reduced or closed business activity that might occur if fewer H–2B workers were available;

(5) The existence of a lawful pathway, for the 6,000 visas set aside for new workers from Guatemala, Honduras, and El Salvador, is likely to provide multiple benefits in terms of U.S. policy with respect to the Northern Triangle; and

(6) The Federal Government benefits from increased evidence regarding attestations. Table 1 provides a summary of the provisions in this rule and some of their impacts.

TABLE 1—SUMMARY OF THE TFR'S PROVISIONS AND ECONOMIC IMPACT

| Current provision | Changes resulting from the provisions of the TFR | Expected costs of the provisions of the TFR | Expected benefits of the provisions of the TFR |
|---|---|---|---|
| —The current statutory cap limits H–2B visa allocations to 66,000 workers a year. | —The amended provisions will allow for an additional 22,000 H–2B temporary workers. Up to 6,000 of the 22,000 additional visas will be reserved for workers who are nationals of Guatemala, Honduras, and El Salvador and will be exempt from the returning worker requirement. | —The total estimated cost to file Form I–129 by human resource specialists is approximately $1,344,810. The total estimated cost to file Form I–129 and Form G–28 will range from approximately $1,545,882 if filed by in-house lawyers to approximately $2,148,647 if filed by outsourced lawyers. The total estimated cost associated with filing additional petitions ranges from $2,890,692 to $3,493,457 depending on the filer. | —Form I–129 petitioners would be able to hire temporary workers needed to prevent their businesses from suffering irreparable harm.<br>—Businesses that are dependent on the success of other businesses that are dependent on H–2B workers would be protected from the repercussions of local business failures.<br>—Some American workers may benefit to the extent that they do not lose jobs through the reduced or closed business activity that might occur if fewer H–2B workers were available. |
|  |  | —The total estimated costs associated with filing Form I–907 if it is filed with Form I–129 is $2,863,603 if filed by human resource specialists. The total estimated costs associated with filing Form I–907 would range from approximately $2,259,184 if filed by an in-house lawyer to approximately $2,322,317 if filed by an outsourced lawyer. The total estimated costs associated with requesting premium processing ranges from approximately $5,122,787 to approximately $5,185,920.<br>—DHS may incur additional adjudication costs as more applicants file Form I–129. However, these additional costs to USCIS are expected to be covered by the fees paid for filing the form, which have been accounted for in costs to petitioners. |  |
|  | —Petitioners will be required to fill out the newly created Form ETA–9142–B–CAA–4, Attestation for Employers Seeking to Employ H–2B Nonimmigrant Workers Under Section 105 of Div. O of the Consolidated Appropriations Act, 2021. | —The total estimated cost to petitioners to complete and file Form ETA–9142–B–CAA–4 is approximately $1,370,719. | —Form ETA–9142–B–CAA–4 will serve as initial evidence to DHS that the petitioner meets the irreparable harm standard and returning worker requirements. |
|  | —Petitioners would be required to conduct an additional round of recruitment. | —The total estimated cost to petitioners to conduct an additional round of recruitment is approximately $516,622. | —The additional round of recruitment will ensure that a U.S. worker that is willing and able to fill the position is not replaced by a non-immigrant worker. |

---

[104] *See, e.g.,* Arnold Brodbeck et al., Seasonal Migrant Labor in the Forest Industry of the Southeastern United States: The Impact of H–2B Employment on Guatemalan Livelihoods, 31 Society and Natural Resources 1012 (2018).

TABLE 1—SUMMARY OF THE TFR'S PROVISIONS AND ECONOMIC IMPACT—Continued

| Current provision | Changes resulting from the provisions of the TFR | Expected costs of the provisions of the TFR | Expected benefits of the provisions of the TFR |
|---|---|---|---|
| | —Employers of H–2B workers would be required to provide information about equal access to COVID–19 vaccines and vaccination distribution sites.<br>—An H–2B nonimmigrant with a valid visa who is physically present in the United States may port to another employer. | —The total estimated cost to petitioners to provide COVID–19 vaccines and vaccination distribution site information is approximately $1,743.<br><br>—The total estimated cost to file Form I–129 if filed by human resource specialists will range from $0 to approximately $2,081,206. The total estimated costs to file Form I–129 and Form G–28 ranges from $0 to approximately $2,393,077 if filed by in-house lawyers and from $0 to approximately $5,095,792 if filed by outsourced lawyers. | —Workers would be given information about equal access to vaccines and vaccination distribution.<br><br>—H–2B workers with a valid visa present in the United States will be able to port to another employer and potentially extend their stay and, therefore, earn additional wages.<br>—An H–2B worker with an employer that is not complying with H–2B program requirements would have additional flexibility in porting to another employer's certified position.<br>—This provision would ensure employers will be able to hire the H–2B workers they need. |
| | | —The total estimated cost associated with filing Form I–907 if filed by human resource specialists ranges from $0 to approximately $4,431,409. The total estimated cost to file Form I–907 ranges from $0 to approximately $3,497,990 if filed by in-house lawyers and from $0 to approximately $3,595,738 if filed by outsourced lawyers. The total estimated costs associated with this provision ranges from $0 to approximately $15,204,145.<br>—DHS may incur some additional adjudication costs as more petitioners file Form I–129. However, these additional costs to USCIS are expected to be covered by the fees paid for filing the form, which have been accounted for in costs to petitioners. | |
| | —DHS and DOL intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. | —Employers will have to comply with audits for an estimated total opportunity cost of time of $290,400.<br>—It is expected both DHS and DOL will be able to shift resources to be able to conduct these audits without incurring additional costs. However, the Departments will incur opportunity costs of time. The audits are expected to take a total of approximately 6,000 hours and cost approximately $467,820. | —DOL and DHS audits will yield evidence of the efficacy of attestations in enforcing compliance with H–2B supplemental cap requirements.<br>—Conducting a significant number of audits will discourage uncorroborated attestations. |

Source: USCIS and DOL analysis.

## Background and Purpose of the Proposed Rule

The H–2B visa classification program was designed to serve U.S. businesses that are unable to find a sufficient number of U.S. workers to perform nonagricultural work of a temporary or seasonal nature. For a nonimmigrant worker to be admitted into the United States under this visa classification, the hiring employer is required to: (1) Receive a temporary labor certification (TLC) from the Department of Labor

(DOL); and (2) file Form I–129 with DHS. The temporary nature of the services or labor described on the approved TLC is subject to DHS review during adjudication of Form I–129.[105] The current INA statute sets the annual number of H–2B visas for workers performing temporary nonagricultural work at 66,000 to be distributed semi-annually beginning in October (33,000)

and in April (33,000).[106] Any unused H–2B visas from the first half of the fiscal year will be available for employers seeking to hire H–2B workers during the second half of the fiscal year. However, any unused H–2B visas from one fiscal year do not carry over into the next and will therefore not be made

---

[105] Revised effective 1/18/2009; 73 FR 78104.

[106] See 8 U.S.C. 1184(g)(1)(B), INA 214(g)(1)(B) and 8 U.S.C. 1184(g)(4), INA 214(g)(4).

AR03552

available.[107] Once the statutory H–2B visa cap limit has been reached, petitioners must wait until the next half of the fiscal year, or the beginning of the next fiscal year, for additional visas to become available.

On Dec 27, 2020, the President signed the FY 2021 Omnibus that contains a provision (Sec. 105 of Div. O) permitting the Secretary of Homeland Security, under certain circumstances, to increase the number of H–2B visas available to U.S. employers, notwithstanding the established statutory numerical limitation. After consulting with the Secretary of Labor, the Secretary of the Homeland Security has determined it is appropriate to exercise his discretion and raise the H–2B cap by up to an additional 22,000 visas for the remainder of FY 2021 for those businesses who would qualify under certain circumstances.

These businesses must attest that they will likely suffer irreparable harm if the requested H–2B visas are not granted. The Secretary has determined that initially up to 16,000 of the 22,000 these supplemental visas will be limited to specified H–2B returning workers for nationals of any country. Specifically, these individuals must be workers who were issued H–2B visas or were otherwise granted H–2B status in fiscal years 2018, 2019, or 2020. The Secretary has also determined that up to 6,000 of the 22,000 additional visas will be reserved for workers who are nationals of Guatemala, Honduras, and El Salvador, and that these 6,000 workers will be exempt from the returning worker requirement. Once the 6,000-visa limit has been reached, a petitioner may continue to request H–2B visas for workers who are nationals of Guatemala, Honduras, and El Salvador, but these workers must be returning workers. If the 6,000 exemption cap for nationals of the Northern Triangle countries remains unfilled by July 8, 2021, USCIS will announce that the remaining visas will be made available to employers with TLCs that comply with the provisions of this rule but the petitioner must file a new Form I–129 petition and attest that these noncitizens will be returning workers.

Population

This rule would affect those employers that file Form I–129 on behalf of nonimmigrant workers they seek to hire under the H–2B visa program. More specifically, this rule would affect those employers that can establish that their business is likely to suffer irreparable harm because they cannot employ the H–2B returning workers requested on their petition in this fiscal year, without the exercise of authority that is the subject of this rule. Due to the temporary nature of this rule and the limited time left for these additional visas to become available, DHS believes that it is reasonable to assume that eligible petitioners for these additional 22,000 visas will generally be those employers that have already completed the steps to receive an approved TLC prior to the issuance of this rule.

This rule would also have additional impacts on the population of H–2B employers and workers presently in the United States by permitting some H–2B workers to port to another certified employer. These H–2B workers would continue to earn wages and gaining employers would continue to obtain necessary workers.

Population That Will File a Form I–129, Petition for a Nonimmigrant Worker

According to DOL OFLC's certification data for FY 2021, as of April 15, 2021, about 6,172 TLCs for 107,654 H–2B positions were received with expected work start dates between April 1 and September 30, 2021. DOL OFLC has approved 5,507 certifications for 97,627 H–2B positions and is still reviewing the remaining 155 TLC requests for 2,227 H–2B positions. DOL OFLC has denied, withdrawn, rejected, or returned 510 certifications for 7,800 H–2B positions.[108] However, many of these certified worker positions have already been filled under the semi-annual cap of 33,000 and, for approximately 10 percent of the worker positions certified and still under review by DOL, employers indicated on the Form ETA-9142B their intention to employ some or all of the H–2B workers under the application who will be exempt from the statutory visa cap. The number of approved and pending certifications is 5,662 for 99,854 H–2B positions.[109]

Of the 5,507 certified Applications for Temporary Employment Certification DOL issued, USCIS data shows that 2,104 H–2B petitions for 36,792 positions with approved certifications were already filed toward the second semi-annual cap of 33,000 visas.[110] Therefore, we estimate that approximately 3,558 *Applications for Temporary Employment Certification* may be filed towards the FY 2021 supplemental cap. This number is based on 5,507 (total certified) − 2,104 (certified and already submitted under the second semi-annual cap) and 155 (*Applications for Temporary Employment Certification* that are still being processed by DOL), and therefore represents a reasonable estimate of the pool of potential petitions that may request additional H–2B workers under this rule, in other words, under the FY 2021 supplemental cap. USCIS recognizes that some employers would have to submit two Forms I–129 if they choose to request H–2B workers under both the returning worker and Northern Triangle Countries cap. At this time, USCIS cannot predict how many employers will choose to take advantage of this set-aside, and therefore recognize that the number of petitions may be underestimated. Additionally, due to the timing of the availability of these additional 22,000 visas, USCIS assumes there will not be additional TLCs filed with the DOL.

Population That Files Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative

If an attorney or accredited representative submits Form I–129 on behalf of the petitioner, Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, must accompany the Form I–129 submission.[111] Using data from FY 2016 to FY 2020, we estimate that approximately 43.59 percent of Form I–129 petitions will be filed by a lawyer or accredited representative (Table 2). Table 2 shows the percentage of Form I–129 H–2B petitions that were accompanied by a Form G–28. We estimate that 1,551 Form I–129 and Form G–28 will be filed by in-house or outsourced lawyers, and that 2,007 Form I–129 will be filed by human resources (HR) specialists.[112]

---

[107] A Temporary Labor Certification (TLC) approved by the Department of Labor must accompany an H–2B petition. The employment start date stated on the petition must match the start date listed on the TLC. *See* 8 CFR 214.2(h)(6)(iv)(A) and (D).

[108] As of April 15, 2021, DOL OFLC had denied 163 applications for 2,161 positions and rejected 28 applications for 360 positions. Employers had withdrawn 312 applications for 5,161 positions and returned 7 applications for 118 positions. This totals 510 applications for 7,800 positions either denied, rejected, withdrawn, or returned.

[109] Calculation: 5,507 approved certifications + 155 pending certifications = 5,662 approved and pending certifications.

Calculation: 97,627 positions associated with approved certification + 2,227 positions associated with pending certifications = 99,854 positions associated with approved and pending certifications.

[110] USCIS, Office of Performance and Quality, Data pulled on April 21, 2021.

[111] USCIS, *Filing Your Form G–28, https://www.uscis.gov/forms/filing-your-form-g-28.*

[112] Calculation: 3,558 estimated additional petitions * 43.59 percent of petitions filed by a lawyer = 1551 petitions (rounded) filed by a lawyer.

TABLE 2—FORM I–129 H–2B PETITION RECEIPTS THAT WERE ACCOMPANIED BY A FORM G–28, FY 2016–2020

| Fiscal year | Number of Form I–129 H–2B petitions accompanied by a Form G–28 | Total Number of Form I–129 H–2B petitions received | Percent of Form I–129 H–2B petitions accompanied by a Form G–28 |
|---|---|---|---|
| 2016 | 2,795 | 6,527 | 42.82 |
| 2017 | 2,615 | 6,112 | 42.78 |
| 2018 | 2,626 | 6,148 | 42.71 |
| 2019 | 3,335 | 7,461 | 44.70 |
| 2020 | 2,434 | 5,422 | 44.89 |
| 2016–2020 Total | 13,805 | 31,670 | 43.59 |

Source: USCIS Claims3 database, queried using the SMART utility by the USCIS Office of Policy and Strategy on April 8, 2021.

Population That Files Form I–907, Request for Premium Processing Service

Employers may use Form I–907, Request for Premium Processing Service, to request faster processing of their Form I–129 petitions for H–2B visas. Table 3 shows the percentage of Form I–129 H–2B petitions that were filed with a Form I–907. USCIS estimates that approximately 93.37 percent of Form I–129 H–2B petitioners will also file a Form I–907 requesting premium processing, though this could be higher because of the timing of this rule. Based on this historical data, USCIS estimates that 3,322 Forms I–907 will be filed with the Forms I–129 as a result of this rule.[113] We estimate that 1,448 Forms I–907 will be filed by in-house or outsourced lawyers and 1,874 will be filed by HR specialists.[114]

TABLE 3—FORM I–129 H–2B PETITION RECEIPTS THAT WERE ACCOMPANIED BY A FORM I–907, FY 2016–2020

| Fiscal year | Number of Form I–129 H–2B petitions accompanied by Form I–907 | Total Number of Form I–129 H–2B petitions received | Percent of Form I–129 H–2B petitions accompanied by Form I–907 |
|---|---|---|---|
| 2016 | 6,084 | 6,527 | 93.21 |
| 2017 | 5,932 | 6,112 | 97.05 |
| 2018 | 5,986 | 6,148 | 97.36 |
| 2019 | 7,227 | 7,461 | 96.86 |
| 2020 | 4,341 | 5,422 | 80.06 |
| 2016–2020 Total | 29,570 | 31,670 | 93.37 |

Source: USCIS Claims3 database, queried using the SMART utility by the USCIS Office of Policy and Strategy on April 8, 2021.

Population That Files Form ETA–9142–B–CAA–4, Attestation for Employers Seeking To Employ H–2B Nonimmigrant Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260

Petitioners seeking to take advantage of the FY 2021 H–2B supplemental visa cap will need to file a Form ETA–9142–B–CAA–4 attesting their business will suffer irreparable harm without the ability to hire temporary nonimmigrant workers, comply with third party notification, and maintain required records, among other requirements. DOL estimates that each of the 3,558 petitioners will need to file a Form ETA–9142–B–CAA–4 and comply with its provisions.

Population Affected by the Portability Provision

The population affected by this provision are nonimmigrants in H–2B status who are present in the United States and the employers with valid TLCs seeking to hire H–2B workers. We use the population of 66,000 H–2B workers authorized by statute and 22,000 additional H–2B workers authorized by this supplemental cap regulation as a proxy for the H–2B population that could be currently present in the United States.[115] We use the number of approved TLCs (5,507) to estimate the potential number of Form I–129 H–2B petitions that incur impacts associated with this porting provision. USCIS is not able to predict an estimate of what percentage of these approved

Calculation: 3,558 estimated additional petitions − 1,551 petitions filed by a lawyer = 2,007 petitions filed by an HR specialist.

[113] Calculation: 3,558 estimated additional petitions * 93.37 percent premium processing filing rate = 3,322 (rounded) additional Form I–907.

[114] Calculation: 3,322 additional Form I–907 * 43.59 percent of petitioners represented by a lawyer = 1,448 (rounded) additional Form I–907 filed by a lawyer.

Calculation: 3,322 additional Form I–907 − 1448 additional Form I–907 filed by a lawyer = 1,874 additional Form I–907 filed by an HR specialist.

[115] H–2B workers may have varying lengths in time approved on their H–2B visas. This number may overestimate H–2B workers who have already completed employment and departed and may underestimate H–2B workers not reflected in the current cap and long-term H–2B workers. In FY2020, 346 requests for change of status to H–2B were approved by USCIS and 3,505 crossings of visa-exempt H–2B workers were processed by Customs and Border Protection (CBP). *See Characteristics of H–2B Nonagricultural Temporary Workers FY2020 Report to Congress at https://www.uscis.gov/sites/default/files/document/reports/H-2B-FY20-Characteristics-Report.pdf.* USCIS assumes some of these workers, along with current workers with a valid H–2B visa under the cap, could be eligible to port under this new provision. USCIS does not know the exact number of H–2B workers who would be eligible to port at this time but uses the cap and supplemental cap allocations as a possible proxy for this population.

TLCs will file petitions for H–2B workers who would port under this provision. Therefore, USCIS presents a sensitivity analysis in Table 4 based on the percentage of employers with approved TLCs that could file a Form I–129 H–2B petition in order to obtain an H–2B worker under the porting provision.

TABLE 4—SENSITIVITY ANALYSIS OF FORM I–129 H–2B PETITIONS FILED ON BEHALF OF H–2B WORKERS WHO MAY BE ELIGIBLE TO PORT

| Percent of Form I–129 H–2B petitions that may be filed on behalf of workers eligible to port | Estimated number of approved Form I–129 H–2B petitions that may be filed on behalf of workers eligible to port |
|---|---|
| 0 | 0 |
| 5 | 275 |
| 25 | 1,377 |
| 50 | 2,754 |
| 75 | 4,130 |
| 95 | 5,232 |
| 100 | 5,507 |

Source: USCIS Analysis.

Population Affected by the Audits

DHS and DOL each intend to conduct 250 audits of employers hiring H–2B workers under this FY2021 H–2B supplemental cap rule. The determination of which employers are audited will be mostly random, though the agencies will coordinate so that no employer is audited by both DOL and DHS. Therefore, a total of 500 audits on employers who petition for H–2B workers under this TFR will be conducted by the Federal Government.

Cost-Benefit Analysis

The provisions of this rule require the submission of a Form I–129 H–2B petition. The costs for this form include filing costs and the opportunity cost of time to complete and submit the form. The current filing fee for Form I–129 is $460 and the estimated time to complete and file Form I–129 for H–2B classification is 4.34 hours.[116] The application must be filed by a U.S. employer, a U.S. agent, or a foreign employer filing through the U.S. agent. DHS estimates that 43.59 percent of Form I–129 H–2B petitions will be filed by an in-house or outsourced lawyer,

and the remainder (56.41 percent) will be filed by an HR specialist or equivalent occupation. DHS presents estimated costs for HR specialists filing Form I–129 petitions and an estimated range of costs for in-house lawyers or outsourced lawyers filing Form I–129 petitions.

To estimate the total opportunity cost of time to HR specialists who complete and file Form I–129, DHS uses the mean hourly wage rate of HR specialists of $33.38 as the base wage rate.[117] If petitioners hire an in-house or outsourced lawyer to file Form I–129 on their behalf, DHS uses the mean hourly wage rate of $71.59 as the base wage rate.[118] Using the most recent Bureau of Labor Statistics (BLS) data, DHS calculated a benefits-to-wage multiplier of 1.45 to estimate the full wages to include benefits such as paid leave, insurance, and retirement.[119] DHS multiplied the average hourly U.S. wage rate for HR specialists and for in-house lawyers by the benefits-to-wage multiplier of 1.45 to estimate the full cost of employee wages. The total compensation for an HR specialist is $48.40 per hour, and the total compensation for an in-house lawyer is $103.81 per hour.[120] In addition, DHS recognizes that an entity may not have in-house lawyers and seek outside counsel to complete and file Form I–129 on behalf of the petitioner. Therefore, DHS presents a second wage rate for lawyers labeled as outsourced lawyers. DHS recognizes that the wages for outsourced attorneys may be much higher than in-house attorneys and therefore uses a higher compensation-to-wage multiplier of 2.5 for outsourced attorneys.[121] DHS estimates the total

compensation for an outsourced lawyer is $178.98 per hour.[122] If a lawyer submits Form I–129 on behalf of the petitioner, Form G–28 must accompany the Form I–129 petition.[123] DHS estimates the time burden to complete and submit Form G–28 for a lawyer is 50 minutes (0.83 hour, rounded).[124] For this analysis, DHS adds the time to complete Form G–28 to the opportunity cost of time to lawyers for filing Form I–129 on behalf of a petitioner. This results in a time burden of 5.17 hours for in-house lawyers and outsourced lawyers to complete Form G–28 and Form I–129.[125] Therefore, the total opportunity cost of time per petition for an HR specialist to complete and file Form I–129 is approximately $210.06, for an in-house lawyer to complete and file Forms I–129 and G–28 is about $536.70, and for an outsourced lawyer to complete and file is approximately $925.33.[126] The total cost, including filing fee and opportunity costs of time, per petitioner to file Form I–129 is approximately $670.06 if HR specialists file, $996.70 if an in-house lawyer files, and $1,385.33 if an outsourced lawyer files the form.[127]

Cost to Petitioners

As mentioned in *Section 3,* the estimated population impacted by this rule is 3,558 eligible petitioners who are projected to apply for the additional 22,000 H–2B visas for the remainder of FY 2021, with 6,000 of the additional visas reserved for employers that will petition for workers who are nationals

---

[116] The public reporting burden for this form is 2.34 hours for Form I–129 and an additional 2.00 hours for H Classification Supplement, totaling 4.34 hours. See Form I–129 instructions at *https://www.uscis.gov/i-129.*

[117] U.S. Department of Labor, Bureau of Labor Statistics, "May 2020 National Occupational Employment and Wage Statistics" Human Resources Specialist (13–1071), Mean Hourly Wage, available at *https://www.bls.gov/oes/2020/may/oes_nat.htm#13-0000* (accessed April 9, 2021).

[118] U.S. Department of Labor, Bureau of Labor Statistics, "May 2020 National Occupational Employment and Wage Estimates" Lawyers (23–1011), Mean Hourly Wage, available at *https://www.bls.gov/oes/2020/may/oes_nat.htm#23-0000* (accessed April 9, 2021).

[119] Calculation: $38.60 mean Total Employee Compensation per hour for civilian workers/$26.53 mean Wages and Salaries per hour for civilian workers = 1.45 benefits-to-wage multiplier. *See* Economic News Release, Bureau of Labor Statistics, U.S. Department of Labor, Table 1. Employer Costs for Employee Compensation by ownership, Civilian workers, available at *https://www.bls.gov/news.release/pdf/ecec.pdf* (accessed April 9, 2021).

[120] Calculation for the total wage of an HR specialist: $33.38 × 1.45 = $48.40 (rounded).

Calculation for the total wage of an in-house lawyer: $71.59 × 1.45 = $103.81 (rounded).

[121] The DHS ICE "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney based on

information received in public comment to that rule. We believe the explanation and methodology used in the Final Small Entity Impact Analysis remains sound for using 2.5 as a multiplier for outsourced labor wages in this rule, see page G–4 [September 1, 2015] [*https://www.regulations.gov/document/ICEB-2006-0004-0921*].

[122] *Calculation:* Average hourly wage rate of lawyers × benefits-to-wage multiplier for outsourced lawyer = $71.59 × 2.5 = $178.98.

[123] USCIS, *Filing Your Form G–28, https://www.uscis.gov/forms/filing-your-form-g-28.*

[124] Id.

[125] Calculation: 0.83 hours to file Form G–28 + 4.34 hours to file Form I–129 = 5.17 hours to file both forms.

[126] Calculation if an HR specialist files Form I–129: $48.40 × 4.34 hours = $210.06 (rounded).

Calculation if an in-house lawyer files Forms I–129 and G–28: $103.81 × 5.17 hours = $536.70 (rounded).

Calculation if an outsourced lawyer files Forms I–129 and G–28: $178.98 × 5.17 hours = $925.33 (rounded).

[127] Calculation if an HR specialist files Form I–129 and filing fee: $210.06 opportunity cost of time + $460 filing fee = $670.06.

Calculation if an in-house lawyer files Forms I–129, G–28, and filing fee: $536.70 opportunity cost of time + $460 filing fee = $996.70.

Calculation if outsourced lawyer files Forms I–129, G–28 and filing fee: $925.33 opportunity cost of time + $460 filing fee = $1,385.33.

of the Northern Triangle countries who are exempt from the returning worker requirement.

Costs to Petitioners To File Form I–129 and Form G–28

As discussed above, DHS estimates that an additional 2,007 petitions will be filed by HR specialists using Form I–129 and an additional 1,551 petitions will be filed by lawyers using Form I–129 and Form G–28. DHS estimates the total cost to file Form I–129 petitions if filed by HR specialists is $1,344,810 (rounded).[128] DHS estimates total cost to file Form I–129 petitions and Form G–28 if filed by lawyers will range from $1,545,882 (rounded) if only in-house lawyers file these forms to $2,148,647 (rounded) if only outsourced lawyers file them.[129] Therefore, the estimated total cost to file Form I–129 and Form G–28 range from $2,890,692 and $3,493,457.[130]

Costs To File Form I–907

Employers may use Form I–907 to request premium processing of Form I–129 petitions for H–2B visas. The filing fee for Form I–907 for H–2B petitions is $1,500 and the time burden for completing the form is 35 minutes (0.58 hour).[131] Using the wage rates established previously, the opportunity cost of time to file Form I–907 is approximately $28.07 for an HR specialist, $60.21 for an in-house lawyer, and $103.81 for an outsourced lawyer.[132] Therefore, the total filing cost

to complete and submit Form I–907 per petitioner is approximately $1,528.07 for HR specialists, $1,560.21 for in-house lawyers, and $1,603.81 for outsourced lawyers.[133]

As discussed above, DHS estimates that an additional 1,874 Form I–907 will be filed by HR specialists and an additional 1,448 Form I–907 will be filed lawyers. DHS estimates the total cost of Form I–907 filed by HR specialists is about $2,863,603 (rounded).[134] DHS estimates total cost to file Form I–907 filed by lawyers range from about $2,259,184 (rounded) for only in-house lawyers to $2,322,317 (rounded) for only outsourced lawyers.[135] The estimated total cost to file Form I–907 range from $5,122,787 and $5,185,920.[136]

Cost To File Form ETA–9142–B–CAA–4

Form ETA–9142–B–CAA–4 is an attestation form that includes recruiting requirements, the irreparable harm standard, and document retention obligations. DOL estimates the time burden for completing and signing the form is 0.25 hour, 0.25 hours for retaining records, and 0.5 hours to comply with the returning workers' requirements, for a total time burden of 1 hour. Using the total wage per hour for an HR specialist ($48.40), the opportunity cost of time for an HR specialist to complete the attestation form, and notify third parties, and retain records relating to the returning worker requirements, is approximately $48.40.[137]

Additionally, the form requires that petitioners assess and document supporting evidence for meeting the irreparable harm standard, and retain those documents and records, which we assume will require the resources of a financial analyst (or another equivalent occupation). Using the same methodology previously described for wages, the total wage per hour for a financial analyst is $67.37.[138] DOL estimates the time burden for these tasks is at least 4 hours, and 1 hour for gathering and retaining documents and records. Therefore, the total opportunity cost of time for a financial analyst to assess, document, and retain supporting evidence is approximately $336.85.[139]

As discussed previously, DHS believes that the estimated 3,558 remaining certifications for the latter half of FY 2021 would include potential employers that might request to employ H–2B workers under this rule. This number of certifications is a reasonable proxy for the number of employers that may need to review and sign the attestation. Using this estimate for the total number of certifications, we estimate the opportunity cost of time for completing the attestation for HR specialists is approximately $172,207 and for financial analysts is about $1,198,512.[140] The total cost is estimated to be approximately $1,370,719.[141]

Cost to Conduct Recruitment

An employer that files Form ETA–9142B–CAA–4 and the I–129 petition 45 or more days after the certified start date of work must conduct additional

---

[128] Calculation: $670.06 opportunity costs for HR specialist plus filing fees * 2,007 Form I–129 filed by HR specialists = $1,344,810(rounded) total cost of Form I–129 filed by HR specialists.

[129] Calculation: $996.70 opportunity costs for in-house lawyers plus filing fees * 1,551 Form I–129 and Form G–28 filed by in-house lawyers = $1,545,882(rounded) total cost of Form I–129 and Form G–28 filed by in-house lawyers.

Calculation: $1,385.33 opportunity costs for outsourced lawyers plus filing fees * 1,551 Form I–129 and Form G–28 filed by outsourced lawyers = $2,148,647(rounded) total cost of Form I–129 and Form G–28 filed by outsourced lawyers.

[130] Calculation: $1,344,810 total cost of Form I–129 filed by HR specialists + $1,545,882 total cost of Form I–129 and Form G–28 filed by in-house lawyers = $2,890,692 estimated total costs to file Form I–129 and Form G–28

Calculation: $1,344,810 total cost of Form I–129 filed by HR specialists + $2,148,647 total cost of Form I–129 and Form G–28 filed by outsourced lawyers = $3,493,457 estimated total costs to file Form I–129 and Form G–28

[131] See Form I–907 instructions at *https://www.uscis.gov/i-907*.

[132] Calculation for opportunity cost of time if an HR specialist files Form I–907: $48.40 × 0.58 hours = $28.07(rounded).

Calculation for opportunity cost of time if an in-house lawyer files Form I–907: $103.81 × 0.58 hours= $60.21(rounded).

Calculation for opportunity cost of time if an outsourced lawyer files Form I–907: $178.98 × 0.58 hours = $103.81(rounded).

[133] Calculation if an HR specialist files: $28.07 + $1,500 = $1,528.07.

Calculation if an in-house lawyer files: $60.21 + $1,500 = $1,560.21.

Calculation if outsourced lawyer files: $103.81 + $1,500 = $1,603.81.

[134] Calculation: $1,528.07 opportunity costs for HR specialist plus filing fees * 1,874 Form I–907 filed by HR specialists = $2,863,603 (rounded) total cost of Form I–907 filed by HR specialists.

[135] Calculation: $1,560.21 opportunity costs for in-house lawyers plus filing fees * 1,448 Form I–907 filed by in-house lawyers = $2,259,184 (rounded) total cost of Form I–907 filed by in-house lawyers.

Calculation: $1,603.81 opportunity costs for outsourced lawyers plus filing fees * 1,448 Form I–907 filed by outsourced lawyers = $2,322,317 (rounded) total cost of Form I–907 filed by outsourced lawyers.

[136] Calculation: $2,863,603 total cost of Form I–907 filed by HR specialists + $2,259,184 total cost of Form I–907 filed by in-house lawyers = $5,122,787 estimated total costs to file Form I–907.

Calculation: $2,863,603 total cost of Form I–129 filed by HR specialists + $2,322,317 total cost of Form I–907 filed by outsourced lawyers = $5,185,920 estimated total costs to file Form I–907.

[137] Calculation: $48.40 opportunity cost of time for HR specialist × 1-hour time burden for the new attestation form and notifying third parties and retaining records related to the returning worker requirements = $48.40.

[138] Calculation: $46.46 (average per hour wage for a financial analyst, based on BLS wages) × 1.45 (benefits-to-wage multiplier) = $67.37. U.S. Department of Labor, Bureau of Labor Statistics, ''May 2020 National Occupational Employment and Wage Statistics'' Financial and Investment Analysts, Financial Risk Specialists, and Financial Specialists, All Other (13–2098): *https://www.bls.gov/oes/2020/may/oes_nat.htm#13-0000* (accessed April 9, 2021).

[139] Calculation: $67.37 (fully loaded hourly wage for a financial analyst) × 5 hours (time burden for assessing, documenting and retention of supporting evidence demonstrating the employer is likely to suffer irreparable harm) = $336.85.

[140] Calculation: Cost for HR Specialists: $48.40 opportunity cost of time for an HR specialist to comply with attestation requirements * 3,558 estimated additional requirements = $172,207(rounded) total cost for HR specialists to comply with attestation requirements.

Calculation: $336.85 opportunity cost of time for a financial analyst to comply with attestation requirements * 3,558 estimated additional petitions = $1,198,512(rounded) for financial analysts to comply with attestation requirements.

[141] Calculation: $172,207 total cost for HR specialist to comply with attestation requirement + $1,198,512 total cost for financial analysts to comply with attestation requirements = $1,370,719 total cost to comply with attestation requirements.

recruitment of U.S. workers. This consists of placing a new job order with the State Workforce Agency, contacting the American Job Center, and contacting laid-off workers. Employers must place a new job order for the job opportunity with the State Workforce Agency (SWA). DOL estimates that it would take up to one hour to satisfy this requirement.

Employers are required to make reasonable efforts to contact, by mail or other effective means, their former U.S. workers, including those workers who were furloughed and laid off, beginning January 1, 2019. Employers must also disclose the terms of the job order to these workers as required by the rule. DOL estimates that it would take up to one hour to contact and provide the disclosure to displaced U.S. workers.

During the period of time the SWA is actively circulating the job order, employers must contact, by email or other available electronic means, the nearest local American Job Center (AJC) in order to request staff assistance advertising and recruiting qualified U.S. workers for the job opportunity, and to provide to the AJC the unique identification number associated with the job order placed with the SWA. DOL estimates that it would take up to one hour to satisfy this requirement.

DOL estimates the total time burden for activities related to conducting recruitment is 3 hours. Assuming this work will be done by an HR specialist or an equivalent occupation, the estimated cost to each petitioner is approximately $145.20.[142] Using the 3,558 as the estimated number of petitioners, the estimated total cost of this provision is approximately $516,622.[143] It is possible that if U.S. employees apply for these positions, H–2B employers may incur some costs associated with reviewing applications, interviewing, testing, and hiring applicants who are referred to H–2B employers by the recruiting activities required by this rule. However, DOL is unable to quantify the impact.

Cost of the COVID Protection Provision

Employers must notify employees, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites. We assume that employers will provide a printed notification to inform their employees that printing and posting the notification can be done during the normal course of business. Given that the regulatory text associated with this provision is less than 150 words, we expect that an employer would only need to post a one-page notification, even if the notification is in multiple languages. The printing cost associated with posting the notification (assuming that the notification is written) is $0.49 per posting.[144] The estimated total cost to petitioners to print copies is approximately $1,743 (rounded).[145]

Cost of the Portability Provision

Petitioners seeking to hire H–2B nonimmigrants who are currently present in the United States with a valid H–2B visa would need to file a Form I–129 which includes paying the associated fee as discussed above. Also previously discussed, we assume that all employers with an approved TLC—5,507—would be able to file a petition under this provision. As discussed previously, if a petitioner is represented by a lawyer, the lawyer must file Form G–28; if premium processing is desired, a petitioner must file Form I–907 and pay the associated fee. We expect these actions to be performed by an HR specialist, in-house lawyer, or an outsourced lawyer. Moreover, as previously estimated, we expect that about 43.59 percent of these Form I–129 petitions will be filed by an in-house or outsourced lawyer. We do not have an estimate of the percentage of H–2B workers that may choose to port under this provision and therefore we do not know the numbers of petitions that may be filed with USCIS. Therefore, Table 5 presents a sensitivity analysis of the number of Forms I–129 H–2B petitions that may be filed under this provision by an HR specialist and the number of Forms I–129 H–2B petitions and accompanying Forms G–28 that may be filed by an in-house or outsourced lawyer.

TABLE 5—NUMBERS OF FORM I–129 H–2B PETITIONS THAT MAY BE FILED ON BEHALF OF H–2B WORKERS THAT CHOOSE TO PORT BY HR SPECIALISTS AND LAWYERS

| Percent of approved TLCs | Numbers of Form I–129 H–2B petitions filed by HR specialists | Numbers of Form I–129 H–2B petitions and Form G–28 filed by lawyers |
|---|---|---|
| 0 ............... | 0 | 0 |
| 5 ............... | 155 | 120 |
| 25 ............. | 777 | 600 |
| 50 ............. | 1,554 | 1,200 |
| 75 ............. | 2,330 | 1,800 |
| 95 ............. | 2,951 | 2,281 |
| 100 ........... | 3,106 | 2,401 |

Source: USCIS Analysis.

Previously, we estimated that about 93.37 percent of Form I–129 H–2B petitions are filed with Form I–907 for premium processing. For this provision, we estimate that 5,142 Form I–129 H–2B petitions will be filed with premium processing Forms I–907.[146] Table 6 presents a sensitivity analysis of the numbers of Forms I–907 that may be filed by HR specialists and lawyers under this portability provision.

TABLE 6—NUMBERS OF FORM I–907 FILED WITH FORM I–129 H–2B PETITIONS ON BEHALF OF H–2B WORKERS THAT CHOOSE TO PORT BY HR SPECIALISTS AND LAWYERS

| Percent of approved TLCs | Numbers of Form I–907 filed by HR specialists | Numbers of Form I–907 filed by lawyers |
|---|---|---|
| 0 ............... | 0 | 0 |
| 5 ............... | 145 | 112 |
| 25 ............. | 725 | 560 |
| 50 ............. | 1,451 | 1,120 |
| 75 ............. | 2,176 | 1,681 |
| 95 ............. | 2,755 | 2,130 |
| 100 ........... | 2,900 | 2,242 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an HR specialist to file a Form I–129 is approximately $670.06 and the estimated cost for an HR specialist to file a Form I–907 is about $1,528.07. Table 7 presents a sensitivity analysis of costs resulting from HR specialists filing Form I–129, Form I–907, and the estimated total cost. The "Cost for HR Specialist Filing Form I–129" column multiplies the values in the "Form I–129 Petitions Filed by HR Specialists" column from

[142] Calculation: $48.40 hourly opportunity cost of time for an HR specialist * 3-hour time burden = $145.20 per petitioner to conduct additional recruitment.

[143] Calculation: 3,558 estimated number of petitioners * $145.20 per petitioner cost to conduct additional recruitment = $516,622 (rounded) total cost to conduct additional recruitment.

[144] Cost to make copies $0.49. See https://www.fedex.com/en-us/office/copy-and-print-services.html (accessed April 21, 2021).

[145] Calculation: $0.49 per posting * 3,558 petitioners = $1,743 cost of notifications copies.

[146] Calculation: 5,507 estimated number of approved petitioners * 93.37 percent premium processing filing rate = 5,142 (rounded) additional Forms I–907.

Table 5 by $670.06, the estimated cost for an HR specialist to file a Form I–129. The "Costs for HR Specialist Filing Form I–907" column multiplies the values in the "Form I–907 Filed by HR Specialists" from Table 6 by $1,528.07, the estimated cost for an HR specialist for an HR specialist to file a Form I–907.

TABLE 7—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY HR SPECIALISTS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Total costs for HR specialists filing Form I–129 | Total costs for HR specialists filing Form I–907 | Total estimated costs for HR specialists |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 5 | 103,859 | 221,570 | 325,429 |
| 25 | 520,637 | 1,107,852 | 1,628,489 |
| 50 | 1,041,273 | 2,217,232 | 3,258,505 |
| 75 | 1,561,240 | 3,325,085 | 4,886,325 |
| 95 | 1,977,347 | 4,209,838 | 6,187,185 |
| 100 | 2,081,206 | 4,431,409 | 6,512,615 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an in-house lawyer to file a Form I–129 petition and the accompanying Form G–28 is approximately 996.70 and the estimated cost for an in-house lawyer to file a Form I–907 is about 1,560.21. Table 8 presents a sensitivity analysis of costs resulting from in-house lawyers filing Form I–129, Form G–28, Form I–907, and the estimated total cost. The "Cost for In-house Lawyer Filing Form I–129 and Form G–28" column multiplies the values in the "Form I–129 Petitions and Form G–28 Filed by Lawyers" column from Table 5 by 996.70, the estimated cost for an in-house lawyer to file a Form I–129 and Form G–28. The "Costs for In-house Lawyer Filing Form I–907" column multiplies the values in the "Form I–907 by Lawyers" from Table 6 by 1,560.21, the estimated cost for an HR specialist for an HR specialist to file a Form I–907.

TABLE 8—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY IN-HOUSE LAWYERS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Costs for In-house lawyer filing Form I–129 and Form G–28 | Costs for In-house lawyer filing Form I–907 | Total estimated costs resulting from in-house lawyer |
|---|---|---|---|
| 0 | $0 | $0 | $0 |
| 5 | 119,604 | 174,743 | 294,347 |
| 25 | 598,020 | 873,717 | 1,471,737 |
| 50 | 1,196,040 | 1,747,435 | 2,943,475 |
| 75 | 1,794,060 | 2,622,713 | 4,416,773 |
| 95 | 2,273,473 | 3,323,247 | 5,596,720 |
| 100 | 2,393,077 | 3,497,990 | 5,891,067 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an outsourced lawyer to file a Form I–129 and the accompanying Form G–28 is approximately 1,385.33 and the estimated cost for an outsourced lawyer to file a Form I–907 is about 1,603.81. Table 9 presents a sensitivity analysis of costs resulting from outsourced lawyers filing Form I–129, Form G–28, Form I–907, and the estimated total cost. The "Costs for Outsourced Lawyer Filing Form I–129 and Form G–28" column multiplies the values in the "Form I–129 Petitions and Form G–28 Filed by Lawyers" column from Table 5 by 1,385.33, the estimated cost for an outsourced lawyer to file a Form I–129 and Form G–28. The "Costs for Outsourced Lawyer Filing Form I–907" column multiplies the values in the "Form I–907 by Lawyers" from Table 6 by 1,603.81, the estimated cost for an outsourced lawyer to file a Form I–907.

TABLE 9—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY OUTSOURCED LAWYERS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Costs for outsourced lawyer filing Form I–129 and Form G–28 | Costs for outsourced lawyer filing Form I–907 | Total estimated costs resulting from outsourced lawyer |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 5 | 254,466 | 179,627 | 434,093 |
| 25 | 1,274,179 | 898,133 | 2,172,312 |
| 50 | 2,548,359 | 1,796,265 | 4,344,624 |
| 75 | 3,821,613 | 2,696,002 | 6,517,615 |
| 95 | 4,841,327 | 3,416,112 | 8,257,439 |
| 100 | 5,095,792 | 3,595,738 | 8,691,530 |

Source: USCIS Analysis.

The total quantified costs for this provision range from 0 to 15,204,145 and are presented in Table 10 below. Though we present the sensitivity analysis as if no one will choose to port to another employer, DHS expects that at least one worker will take advantage of this porting provision and therefore, does not expect a 0 cost from this provision. DHS recognizes that if an employer that loses workers as a result of this provision chooses to replace those lost workers, that employer may incur some additional search and replacement costs associated with this provision.

TABLE 10—SENSITIVITY ANALYSIS OF TOTAL COSTS OF FORM I–129 H–2B PETITIONS TO HIRE H–2B WORKERS WHO CHOOSE TO PORT

| Percent of Approved TLCs | Range in costs from HR specialists and in-house lawyers to hire H–2B workers who choose to port (addition of totals from Table 7 and Table 8) | Range in costs from HR specialists and outsourced lawyers to hire H–2B workers who choose to port (addition of totals from Table 7 and Table 9) |
|---|---|---|
| 0 | 0 | 0 |
| 5 | 619,776 | 759,522 |
| 25 | 3,100,226 | 3,800,801 |
| 50 | 6,201,980 | 7,603,129 |
| 75 | 9,303,098 | 11,403,940 |
| 95 | 11,783,905 | 14,444,624 |
| 100 | 12,403,682 | 15,204,145 |

Source: USCIS Analysis.

Cost of Audits to Petitioners

DHS and DOL will each conduct audits on 250 separate employers of H–2B workers hired under this supplemental cap, for a total of 500 employers. Employers will need to provide requested information to comply with the audit. The expected time burden to comply with audits is estimated to be 12 hours.[147] We expect that providing these documents will be accomplished by an HR specialist or equivalent occupation. Given an hourly opportunity cost of time of 48.40, the estimated cost of complying with audits is 580.80 per audited employer.[148] Therefore, the total estimated cost to employers to comply with audits is 290,400.[149]

Estimated Total Costs to Petitioners

The monetized costs of this rule come from filing and complying with Form I–129, Form G–28, Form I–907, and Form ETA–9142–B–CAA–4, as well as contacting refreshing recruitment efforts, posting notifications, filings to obtain a porting worker, and complying with audits. The estimated total cost to file Form I–129 and an accompanying Form G–28 ranges from $2,890,692 to $3,493,457, depending on the filer. The estimated total cost of filing Form I–907 ranges from $5,122,787 to $5,185,920, depending on the filer. The estimated total cost of filing and complying with Form ETA–9142–B–CAA–4 is about $1,370,719. The estimated total cost of conducting additional recruitment is about $516,662. The estimated total cost of the COVID–19 protection provision is approximately $1,743. The estimated cost of the portability provision ranges

[147] The number in hours for audits was provided by the USCIS, Service Center Operations.

[148] Calculation: 48.40 hourly opportunity cost of time for an HR specialist * 12 hours to comply with an audit = 580.80 per audited employer.

[149] Calculation: 500 audited employers * 580.80 opportunity cost of time to comply with an audit = 290,400.

from $0 to $15,204,145.[150] The estimated total cost for employers to comply with audits is $290,400. The total estimated cost to petitioners ranges from $10,192,963 to $26,063,006.[151]

Cost to the Federal Government

The INA provides USCIS with the authority for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including administrative costs, and services provided without charge to certain applicants and petitioners.[152] DHS notes USCIS establishes its fees by assigning costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs such as clerical, officers, and managerial salaries and benefits, plus an amount to recover unassigned overhead (for example, facility rent, IT equipment and systems among other expenses) and immigration benefits provided without a fee charge. Consequently, since USCIS immigration fees are based on resource expenditures related to the benefit in question, USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS. DHS anticipates some additional costs in adjudicating the additional petitions submitted because of the increase in cap limitation for H–2B visas. However, DHS expects these costs to be fully recovered by the fees associated with the forms, which have been accounted for under costs to petitioners and serve as proxy of the costs to the agency to adjudicate these forms.

Both DOL and DHS intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. While most USCIS activities are funded through fees and DOL is funded through

appropriations, it is expected that both agencies will be able to shift resources to be able to conduct these audits without incurring additional costs. As previously mentioned, the agencies will conduct a total of 500 audits and each audit is expected to take 12 hours. This results in a total time burden of 6,000 hours.[153] USCIS anticipates that a Federal employee at a GS–13 Step 5 salary will conduct these audits for each agency. The base pay for a GS–13 Step 5 in the Washington, DC locality area is $117,516.[154] The hourly wage for this salary is approximately $56.50.[155] To estimate the total hourly compensation for these positions, we multiply the hourly wage ($56.50) by the Federal benefits to wage multiplier of 1.38.[156] This results in an hourly opportunity cost of time of $77.97 for GS 13–5 Federal employees in the Washington, DC locality pay area.[157] The total opportunity costs of time for Federal workers to conduct audits is estimated to be $467,820.[158]

Benefits to Petitioners

The inability to access H–2B workers for some entities may cause their businesses to suffer irreparable harm. Temporarily increasing the number of available H–2B visas for this fiscal year may result in a cost savings, because it will allow some businesses to hire the additional labor resources necessary to avoid such harm. Preventing such harm may ultimately preserve the jobs of other employees (including U.S. workers) at that establishment. Additionally, returning workers are likely to be very familiar with the H–2B process and requirements, and may be

positioned to begin work more expeditiously with these employers. Moreover, employers may already be familiar with returning workers as they have trained, vetted, and worked with some of these returning workers in past years. As such, limiting the supplemental visas to returning workers would assist employers that are facing irreparable harm.

Benefits to Workers

The existence of this rule will benefit the workers who receive H–2B visas. See Arnold Brodbeck et al., Seasonal Migrant Labor in the Forest Industry of the United States: The Impact of H–2B Employment on Guatemalan Livelihoods, 31 Society & Natural Resources 1012 (2018), and in particular this finding: ''Participation in the H–2B guest worker program has become a vital part of the livelihood strategies of rural Guatemalan families and has had a positive impact on the quality of life in the communities where they live. Migrant workers who were landless, lived in isolated rural areas, had few economic opportunities, and who had limited access to education or adequate health care, now are investing in small trucks, building roads, schools, and homes, and providing employment for others in their home communities. . . . The impact has been transformative and positive.''

Some provisions of this rule will benefit such workers in particular ways. The portability provision of this rule will allow nonimmigrants with valid H–2B visas who are present in the United States to transfer to a new employer more quickly and potentially extend their stay in the United States and, therefore, earn additional wages. Importantly, the rule will also increase information employees have about equal access to COVID–19 vaccinations and vaccine distribution sites. DHS recognizes that some of the effects of these provisions may occur beyond the borders of the United States.

Note as well that U.S. workers will benefit in multiple ways. For example, the additional round of recruitment and U.S. worker referrals required by the provisions of this rule will ensure that a U.S. worker who is willing and able to fill the position is not displaced by a nonimmigrant worker. As noted, the avoidance of irreparable harm that would be suffered by employers unable to secure sufficient workers, made possible by this rule, could ensure that U.S. workers do not lose their jobs, which might otherwise be vulnerable if H–2B workers were not given visas.

---

[150] The lower bound cost of $0 is only if none of the eligible workers choose to port under this provision, while the upper bound cost of $15,204,145 is if every eligible worker chooses to port and every petitioner uses the more expensive filing option of an outsourced lawyer. As shown in Table 10, the range in costs if 50 percent of eligible workers choose to port with their petitioners using an HR specialist or an outsourced lawyer to file would be from $6,201,980 to $7,603,129.

[151] Calculation of lower range: $2,890,692 + $5,122,787 + $1,370,719 + $516,622 + $1,743 + $0 + $290,400 = $10,192,963.

Calculation of upper range: $3,493,457 + $5,185,920 + $1,370,719 + $516,622 + $1,743 + $15,204,145 + $290,400 = $26,063,006.

[152] See INA section 286(m), 8 U.S.C. 1356(m).

[153] Calculation: 12 hours to conduct an audit * 500 audits = 6,000 total hours to conduct audits.

[154] U.S. Office of Personnel Management, Pay and Leave, Salaries and Wages, For the Locality Pay area of Washington-Baltimore-Arlington, DC–MD–VA–WV–PA, 2021. *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/21Tables/html/DCB.aspx* (last accessed May 6, 2021).

[155] Calculation: $117,516 GS 13–5 Washington, DC locality annual salary/2080 annual hours = $56.50 (rounded).

[156] Calculation: $1,717,321 Full-time Permanent Salaries + $656,748 Civilian Personnel Benefits = $2,374,069 Compensation.

$2,374,069 Compensation/$1,717,321 Full-time Permanent Salaries = 1.38 (rounded) Federal employee benefits to wage ratio.

*https://www.uscis.gov/sites/default/files/document/reports/USCIS_FY_2021_Budget_Overview.pdf* (last accessed May 6, 2021).

[157] Calculation: $56.50 hourly wage for a GS 13–5 in the Washington, DC locality area * 1.38 Federal employee benefits to wage = $77.97 hourly opportunity cost of time for a GS 13–5 federal employee in the Washington, DC locality area.

[158] Calculation: 6,000 hours to conduct audits * $77.97 hourly opportunity cost of time = $467,820 total opportunity costs of time for Federal employees to conduct audits.

AR03560

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* (RFA), imposes certain requirements on Federal agency rules that are subject to the notice and comment requirements of the APA. See 5 U.S.C. 603(a), 604(a). This temporary final rule is exempt from notice and comment requirements for the reasons stated above. Therefore, the requirements of the RFA applicable to final rules, 5 U.S.C. 604, do not apply to this temporary final rule. Accordingly, the Departments are not required to either certify that the temporary final rule would not have a significant economic impact on a substantial number of small entities nor conduct a regulatory flexibility analysis.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. This rule is exempt from the written statement requirement because DHS did not publish a notice of proposed rulemaking for this rule.

In addition, this rule does not exceed the $100 million expenditure in any 1 year when adjusted for inflation ($169.8 million in 2020 dollars),[159] and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and the

[159] *See* U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf* (last visited May 5, 2021).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2020 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383]/152.383] * 100 = (106.428/152.383) *100 = 0.6984 * 100 = 69.84 percent = 69.8 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

Departments have not prepared a statement under the Act.

## E. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, 61 FR 4729 (Feb. 5, 1996).

## G. National Environmental Policy Act

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act (NEPA) applies to them and, if so, what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. The Instruction Manual, Appendix A, Table 1 lists Categorical Exclusions that DHS has found to have no such effect. Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Instruction Manual, section V.B.2(a–c).

This rule temporarily amends the regulations implementing the H–2B

nonimmigrant visa program to increase the numerical limitation on H–2B nonimmigrant visas for the remainder of FY 2021 based on the Secretary of Homeland Security's determination, in consultation with the Secretary of Labor, consistent with the FY 2021 Omnibus. It also allows H–2B beneficiaries who are in the United States to change employers upon the filing of a new H–2B petition and begin to work for the new employer for a period generally not to exceed 60 days before the H–2B petition is approved by USCIS.

DHS has determined that this rule clearly fits within categorical exclusion A3(d) because it interprets or amends a regulation without changing its environmental effect. The amendments to 8 CFR part 214 would authorize up to an additional 22,000 visas for aliens who may receive H–2B nonimmigrant visas, of which 16,000 are for returning workers (persons issued H–2B visas or were otherwise granted H–2B status in Fiscal Years 2018, 2019, or 2020). The proposed amendments would also facilitate H–2B nonimmigrants to move to new employment faster than they could if they had to wait for a petition to be approved. The amendment's operative provisions approving H–2B petitions under the supplemental allocation would effectively terminate after September 30, 2021 for the cap increase, and 180 days from the rule's effective date for the portability provision. DHS believes amending applicable regulations to authorize up to an additional 22,000 H–2B nonimmigrant visas will not result in any meaningful, calculable change in environmental effect with respect to the current H–2B limit or in the context of a current U.S. population exceeding 331,000,000 (maximum temporary increase of 0.0066%).

The amendment to applicable regulations is a stand-alone temporary authorization and not a part of any larger action, and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this action is categorically excluded and no further NEPA analysis is required.

## H. Congressional Review Act

This temporary final rule is not a "major rule" as defined by the Congressional Review Act, 5 U.S.C. 804(2), and thus is not subject to a 60-day delay in the rule becoming effective. DHS will send this temporary final rule to Congress and to the Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq.*

## I. Paperwork Reduction Act

Attestation for Employers Seeking To Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260, Form ETA–9142–B–CAA–4

The Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.,* provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. DOL has submitted the Information Collection Request (ICR) contained in this rule to OMB and obtained approval of a new form, Form ETA–9142B–CAA–4, using emergency clearance procedures outlined at 5 CFR 1320.13. The Departments note that while DOL submitted the ICR, both DHS and DOL will use the information.

Petitioners will use the new Form ETA–9142B–CAA–4 to make attestations regarding, for example, irreparable harm and returning worker (unless exempt because the H–2B worker is a national of one of the Northern Triangle countries who is counted against the 6,000 returning worker exemption cap) described above. Petitioners will need to file the attestation with DHS until it announces that the supplemental H–2B cap has been reached. In addition, the petitioner will need to retain all documentation demonstrating compliance with this implementing rule, and must provide it to DHS or DOL in the event of an audit or investigation.

In addition to obtaining immediate emergency approval, DOL is seeking comments on this information collection pursuant to 5 CFR 1320.13. Comments on the information collection must be received by July 26, 2021. This process of engaging the public and other Federal agencies helps ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed. The PRA provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally

not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. *See* 44 U.S.C. 3501 *et seq.* In addition, notwithstanding any other provisions of law, no person must generally be subject to a penalty for failing to comply with a collection of information that does not display a valid OMB Control Number. *See* 5 CFR 1320.5(a) and 1320.6.

In accordance with the PRA, DOL is affording the public with notice and an opportunity to comment on the new information collection, which is necessary to implement the requirements of this rule. The information collection activities covered under a newly granted OMB Control Number 1205–NEW are required under Section 105 of Division O of the FY 2021 Omnibus, which provides that "the Secretary of Homeland Security, after consultation with the Secretary of Labor, and upon the determination that the needs of American businesses cannot be satisfied in [FY] 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor," may increase the total number of noncitizens who may receive an H–2B visa in FY 2021 by not more than the highest number of H–2B nonimmigrants who participated in the H–2B returning worker program in any fiscal year in which returning workers were exempt from the H–2B numerical limitation. As previously discussed in the preamble of this rule, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has decided to increase the numerical limitation on H–2B nonimmigrant visas to authorize the issuance of up to, but not more than, an additional 22,000 visas through the end of FY 2021 for certain H–2B workers for U.S. businesses who attest that they will likely suffer irreparable harm. As with the previous supplemental rules, the Secretary has determined that the additional visas will only be available for returning workers, that is workers who were issued H–2B visas or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the worker is one of the 6,000 nationals of one of the Northern Triangle countries who are exempt from the returning worker requirement.

Commenters are encouraged to discuss the following:
- Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;
- the accuracy of the agency's estimate of the burden of the proposed

collection of information, including the validity of the methodology and assumptions used;
- the quality, utility, and clarity of the information to be collected; and
- the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

The aforementioned information collection requirements are summarized as follows:

*Agency:* DOL–ETA.

*Type of Information Collection:* Extension of an existing information collection.

*Title of the Collection:* Attestation for Employers Seeking to Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260.

*Agency Form Number:* Form ETA–9142–B–CAA–4.

*Affected Public:* Private Sector—businesses or other for-profits.

*Total Estimated Number of Respondents:* 3,558.

*Average Responses per Year per Respondent:* 1.

*Total Estimated Number of Responses:* 3,558.

*Average Time per Response:* 9 hours per application.

*Total Estimated Annual Time Burden:* 32,023 hours.

*Total Estimated Other Costs Burden:* $0.

Application for Premium Processing Service, Form I–907

The Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.,* provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. Form I–907, Application for Premium Processing Service, has been approved by OMB and assigned OMB control number 1615–0048. DHS is making no changes to the Form I–907 in connection with this temporary rule implementing the time-limited authority pursuant to section

105 of Division O, FY 2021 Omnibus (which expires on September 30, 2021). However, USCIS estimates that this temporary rule may result in approximately 3,332 additional filings of Form I–907 in fiscal year 2021. The current OMB-approved estimate of the number of annual respondents filing a Form I–907 is 319,301. USCIS has determined that the OMB-approved estimate is sufficient to fully encompass the additional respondents who will be filing Form I–907 in connection with this temporary rule, which represents a small fraction of the overall Form I–907 population. Therefore, DHS is not changing the collection instrument or increasing its burden estimates in connection with this temporary rule, and is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0048.

## List of Subjects

### 8 CFR Part 214

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

### 20 CFR Part 655

Administrative practice and procedure, Employment, Employment and training, Enforcement, Foreign workers, Forest and forest products, Fraud, Health professions, Immigration, Labor, Longshore and harbor work, Migrant workers, Nonimmigrant workers, Passports and visas, Penalties, Reporting and recordkeeping requirements, Unemployment, Wages, Working conditions.

## Department of Homeland Security

### 8 CFR Chapter I

For the reasons discussed in the joint preamble, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 214—NONIMMIGRANT CLASSES

■ 1. Effective May 25, 2021 through May 28, 2024, the authority citation for part 214 is revised to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–

1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 2. Effective May 25, 2021 through May 28, 2024, amend § 214.2 by:
■ a. Adding paragraph (h)(6)(x);
■ b. Adding reserved paragraph (h)(25); and
■ c. Adding paragraph (h)(26).

The additions read as follows:

**§ 214.2 Special requirements for admission, extension, and maintenance of status.**

\* \* \* \* \*

(h) \* \* \*

(6) \* \* \*

(x) *Special requirements for additional cap allocations under the Consolidated Appropriations Act, 2021, Public Law 116–260—(A) Public Law 116–260—(1) Supplemental allocation for returning workers.* Notwithstanding the numerical limitations set forth in paragraph (h)(8)(i)(C) of this section, for fiscal year 2021 only, the Secretary has authorized up to an additional 16,000 visas for aliens who may receive H–2B nonimmigrant visas pursuant to section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260. An alien may be eligible to receive an H–2B nonimmigrant visa under this paragraph (h)(6)(x)(A)(*1*) if she or he is a returning worker. The term ''returning worker'' under this paragraph (h)(6)(x)(A)(*1*) means a person who was issued an H–2B visa or was otherwise granted H–2B status in fiscal year 2018, 2019, or 2020. Notwithstanding § 248.2 of this chapter, an alien may not change status to H–2B nonimmigrant under this paragraph (h)(6)(x)(A)(*1*).

(*2*) *Supplemental allocation for nationals of Guatemala, El Salvador, and Honduras (Northern Triangle countries).* Notwithstanding the numerical limitations set forth in paragraph (h)(8)(i)(C) of this section, for fiscal year 2021 only, and in addition to the allocation described in paragraph (h)(6)(x)(A)(*1*) of this section, the Secretary has authorized up to an additional 6,000 aliens who are nationals of Guatemala, El Salvador, or Honduras (Northern Triangle countries) who may receive H–2B nonimmigrant visas pursuant to section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260. Such workers are not subject to the returning worker requirement in paragraph (h)(6)(x)(A)(*1*). Petitioners must request

such workers in an H–2B petition that is separate from H–2B petitions that request returning workers under paragraph (h)(6)(x)(A)(*1*) and must declare that they are requesting these workers in the attestation required under 20 CFR 655.68(a)(1). Notwithstanding § 248.2 of this chapter, an alien may not change status to H–2B nonimmigrant under this paragraph (h)(6)(x)(A)(*2*).

(*i*) Petitions submitted under this paragraph (h)(6)(x)(A)(*2*) must be received by July 8, 2021. H–2B petitions under the supplemental allocation for nationals of Northern Triangle countries received after that date will be rejected.

(*ii*) If USCIS determines that it has received fewer petitions by July 8, 2021 than needed to reach the USCIS projections for the Northern Triangle countries supplemental allocation in this paragraph (h)(6)(x)(A)(*2*), it will make the remainder of the allocation available as a separate allocation described in paragraph (h)(6)(x)(A)(*3*) of this section.

(*3*) *Availability of remainder of supplemental allocation.* If USCIS determines that fewer petitions have been received by July 8, 2021 than needed to meet the additional allocation described in paragraph (h)(6)(x)(A)(*2*) of this section, USCIS will make the remainder of the allocation available as a separate allocation to returning workers as described in paragraph (h)(6)(x)(A)(*1*) of this section and will announce the availability of the remainder of the allocation on the USCIS website at *uscis.gov* no later than July 23, 2021. Such announcement, if made, will specify the date on which petitioners may begin to file H–2B petitions under this paragraph (h)(6)(x)(A)(*3*).

(B) *Eligibility.* In order to file a petition with USCIS under this paragraph (h)(6)(x), the petitioner must:

(*1*) Comply with all other statutory and regulatory requirements for H–2B classification, including, but not limited to, requirements in this section, under part 103 of this chapter, and under 20 CFR part 655 and 29 CFR part 503; and

(*2*) Submit to USCIS, at the time the employer files its petition, a U.S. Department of Labor attestation, in compliance with this section and 20 CFR 655.64, evidencing that:

(*i*) Without the ability to employ all of the H–2B workers requested on the petition filed pursuant to this paragraph (h)(6)(x), its business is likely to suffer irreparable harm (that is, permanent and severe financial loss);

(*ii*) All workers requested and/or instructed to apply for a visa have been issued an H–2B visa or otherwise

granted H–2B status in fiscal year 2018, 2019, or 2020, unless the H–2B worker is a national of Guatemala, El Salvador, or Honduras and is counted towards the 6,000 cap described in paragraph (h)(6)(x)(A)(2) of this section;

(iii) The employer will comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections, any right to time off or paid time off for COVID–19 vaccination, and that the employer will notify any H–2B workers approved under the supplemental cap in paragraph (h)(6)(x)(A)(2) of this section, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites;

(iv) The employer will comply with obligations and additional recruitment requirements outlined in 20 CFR 655.64(a)(3) through (5);

(v) The employer will provide documentary evidence of the facts in paragraphs (h)(6)(x)(B)(2)(i) through (iv) of this section to DHS or DOL upon request; and

(vi) The employer will agree to fully cooperate with any compliance review, evaluation, verification, or inspection conducted by DHS, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other individuals possessing pertinent information, and review of the employer's records related to the compliance with immigration laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in paragraph (h)(6)(x)(B) of this section, as a condition for the approval of the petition.

(vii) The employer must attest on Form ETA–9142–B–CAA–4 that it will fully cooperate with any audit, investigation, compliance review, evaluation, verification or inspection conducted by DOL, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other individuals possessing pertinent information, and review of the employer's records related to the compliance with applicable laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in 20 CFR 655.64(a) and 655.68(a), as a condition for the approval of the H–2B petition. The employer must further attest on Form ETA–9142–B–CAA–4

that it will not impede, interfere, or refuse to cooperate with an employee of the Secretary of the U.S. Department of Labor who is exercising or attempting to exercise DOL's audit or investigative authority pursuant to 20 CFR part 655, subpart A, and 29 CFR 503.25.

(C) *Processing.* USCIS will reject petitions filed pursuant to paragraph (h)(6)(x)(A)(1) or (3) of this section that are received after the applicable numerical limitation has been reached or after September 15, 2021, whichever is sooner. USCIS will reject petitions filed pursuant to paragraph (h)(6)(x)(A)(2) of this section that are received after the applicable numerical limitation has been reached or after July 8, 2021, whichever is sooner. USCIS will not approve a petition filed pursuant to this paragraph (h)(6)(x) on or after October 1, 2021.

(D) *Numerical limitations under paragraphs (h)(6)(x)(A)(1), (2), and (3) of this section.* When calculating the numerical limitations under paragraphs (h)(6)(x)(A)(1), (2), and (3) of this section as authorized under Public Law 116–260, USCIS will make numbers for each allocation available to petitions in the order in which the petitions subject to the respective limitation are received. USCIS will make projections of the number of petitions necessary to achieve the numerical limit of approvals, taking into account historical data related to approvals, denials, revocations, and other relevant factors. USCIS will monitor the number of petitions (including the number of workers requested when necessary) received and will notify the public of the dates that USCIS has received the necessary number of petitions (the "final receipt dates") under paragraph (h)(6)(x)(A)(1) or paragraphs (h)(6)(x)(A)(2) and (3). The day the public is notified will not control the final receipt dates. When necessary to ensure the fair and orderly allocation of numbers subject to the numerical limitations in paragraphs (h)(6)(x)(A)(1), (2), and (3), USCIS may randomly select from among the petitions received on the final receipt dates the remaining number of petitions deemed necessary to generate the numerical limit of approvals. This random selection will be made via computer-generated selection. Petitions subject to a numerical limitation not randomly selected or that were received after the final receipt dates that may be applicable under paragraph (h)(6)(x)(A)(1), (2), or (3) will be rejected. If the final receipt date is any of the first 5 business days on which petitions subject to the applicable numerical limits described in paragraph

(h)(6)(x)(A)(1), (2), or (3) may be received (in other words, if any of the numerical limits described in paragraph (h)(6)(x)(A)(1), (2), or (3) is reached on any one of the first 5 business days that filings can be made), USCIS will randomly apply all of the numbers among the petitions received on any of those 5 business days.

(E) *Sunset.* This paragraph (h)(6)(x) expires on October 1, 2021.

(F) *Non-severability.* The requirement to file an attestation under paragraph (h)(6)(x)(B)(2) of this section is intended to be non-severable from the remainder of this paragraph (h)(6)(x), including, but not limited to, the numerical allocation provisions at paragraphs (h)(6)(x)(A)(1), (2), and (3) of this section in their entirety. In the event that any part of this paragraph (h)(6)(x) is enjoined or held to be invalid by any court of competent jurisdiction, the remainder of this paragraph (h)(6)(x) is also intended to be enjoined or held to be invalid in such jurisdiction, without prejudice to workers already present in the United States under this paragraph (h)(6)(x), as consistent with law.

\* \* \* \* \*

(26) *Change of employers and portability for H–2B workers.* (i) This paragraph (h)(26) relates to H–2B workers seeking to change employers during the time period specified in paragraph (h)(26)(iv) of this section. Notwithstanding paragraph (h)(2)(i)(D) of this section, an alien in valid H–2B nonimmigrant status:

(A) Whose new petitioner files a non-frivolous H–2B petition requesting an extension of the alien's stay on or after May 25, 2021, is authorized to begin employment with the new petitioner after the petition described in this paragraph (h)(26) is received by USCIS and before the new H–2B petition is approved, but no earlier than the start date indicated in the new H–2B petition; or

(B) Whose new petitioner filed a non-frivolous H–2B petition requesting an extension of the alien's stay before May 25, 2021 that remains pending on May 25, 2021, is authorized to begin employment with the new petitioner before the new H–2B petition is approved, but no earlier than the start date of employment indicated on the new H–2B petition.

(ii)(A) With respect to a new petition described in paragraph (h)(26)(i)(A) of this section, and subject to the requirements of 8 CFR 274a.12(b)(30), the new period of employment described in paragraph (h)(26)(i) of this section may last for up to 60 days beginning on the Received Date on Form

I–797 (Notice of Action) or, if the start date of employment occurs after the I–797 Received Date, for a period of up to 60 days beginning on the start date of employment indicated in the H–2B petition.

(B) With respect to a new petition described in paragraph (h)(26)(i)(B) of this section, the new period of employment described in paragraph (h)(26)(i) of this section may last for up to 60 days beginning on the later of either May 25, 2021 or the start date of employment indicated in the H–2B petition.

(C) With respect to either type of new petition, if USCIS adjudicates the new petition before the expiration of this 60-day period and denies the petition, or if the new petition is withdrawn by the petitioner before the expiration of the 60-day period, the employment authorization associated with the filing of that petition under 8 CFR 274a.12(b)(30) will automatically terminate 15 days after the date of the denial decision or 15 days after the date on which the new petition is withdrawn. Nothing in this paragraph (h)(26) is intended to alter the availability of employment authorization related to professional H–2B athletes who are traded between organizations pursuant to paragraph (h)(6)(vii) of this section and 8 CFR 274a.12(b)(9).

(iii) In addition to meeting all other requirements in paragraph (h)(6) of this section for the H–2B classification, to commence employment and be approved under this paragraph (h)(26):

(A) The alien must have been in valid H–2B nonimmigrant status on or after May 25, 2021;

(B) The new H–2B petition must have been—

(1) Pending as of May 25, 2021; or

(2) Received on or after May 25, 2021, but no later than November 22, 2021;

(C) The petitioner must comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws, laws related to COVID–19 worker protections, and any right to time off or paid time off for COVID–19 vaccination; and

(D) The petitioner may not impede, interfere, or refuse to cooperate with an employee of the Secretary of the U.S. Department of Labor who is exercising or attempting to exercise DOL's audit or investigative authority under 20 CFR part 655, subpart A, and 29 CFR 503.25.

(iv) Authorization to initiate employment changes pursuant to this paragraph (h)(26) begins at 12 a.m. on May 25, 2021, and ends at the end of November 22, 2021.

\*　\*　\*　\*　\*

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 3. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 4. Effective May 25, 2021 through May 28, 2024, amend § 274a.12 by adding paragraph (b)(30) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*　\*　\*　\*　\*

(b) \* \* \*

(30)(i) Pursuant to 8 CFR 214.2(h)(26) and notwithstanding 8 CFR 214.2(h)(2)(i)(D), an alien is authorized to be employed no earlier than the start date of employment indicated in the H–2B petition and no earlier than May 25, 2021, by a new employer that has filed an H–2B petition naming the alien as a beneficiary and requesting an extension of stay for the alien, for a period not to exceed 60 days beginning on:

(A) The later of the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition, or the start date of employment indicated on the new H–2B petition, for petitions filed on or after May 25, 2021; or

(B) The later of May 25, 2021 or the start date of employment indicated on the new H–2B petition, for petitions that are pending as of May 25, 2021.

(ii) If USCIS adjudicates the new petition prior to the expiration of the 60-day period in paragraph (b)(30)(i) of this section and denies the new petition for extension of stay, or if the petitioner withdraws the new petition before the expiration of the 60-day period, the employment authorization under this paragraph (b)(30) will automatically terminate upon 15 days after the date of the denial decision or the date on which the new petition is withdrawn. Nothing in this section is intended to alter the availability of employment authorization related to professional H–2B athletes who are traded between organizations pursuant to paragraph (b)(9) of this section and 8 CFR 214.2(h)(6)(vii).

(iii) Authorization to initiate employment changes pursuant to 8 CFR 214.2(h)(26) and paragraph (b)(30)(i) of this section begins at 12 a.m. on May 25, 2021, and ends at the end of November 22, 2021.

\*　\*　\*　\*　\*

## Department of Labor

## Employment and Training Administration

### 20 CFR Chapter V

Accordingly, for the reasons stated in the joint preamble, 20 CFR part 655 is amended as follows:

## PART 655—TEMPORARY EMPLOYMENT OF FOREIGN WORKERS IN THE UNITED STATES

■ 5. The authority citation for part 655 continues to read as follows:

**Authority:** Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), (p), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Pub. L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub. L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; sec. 412(e), Pub. L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub. L. 107–296, 116 Stat. 2135, as amended; Pub. L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

Subpart A issued under 8 CFR 214.2(h).

Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).

Subpart E issued under 48 U.S.C. 1806.

Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), (p), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub. L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub. L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

■ 6. Effective May 25, 2021 through September 30, 2021, add § 655.64 to read as follows:

### § 655.64   Special application filing and eligibility provisions for Fiscal Year 2021 under the Consolidated Appropriations Act, 2021.

(a) An employer filing a petition with USCIS under 8 CFR 214.2(h)(6)(x) to request H–2B workers who will begin employment on or after May 25, 2021, through September 30, 2021, must meet the following requirements:

(1) The employer must attest on Form ETA–9142–B–CAA–4 that without the ability to employ all of the H–2B

workers requested on the petition filed pursuant to 8 CFR 214.2(h)(6)(x), its business is likely to suffer irreparable harm (that is, permanent and severe financial loss), and that the employer will provide documentary evidence of this fact to DHS or DOL upon request.

(2) The employer must attest on Form ETA–9142–B–CAA–4 that each of the workers requested and/or instructed to apply for a visa, whether named or unnamed, on a petition filed pursuant to 8 CFR 214.2(h)(6)(x), have been issued an H–2B visa or otherwise granted H–2B status during one of the last three (3) fiscal years (fiscal year 2018, 2019, or 2020), unless the H–2B worker is a national of Guatemala, El Salvador, or Honduras and is counted towards the 6,000 cap described in 8 CFR 214.2(h)(6)(x)(A)(*2*).

(3) The employer must attest on Form ETA–9142–B–CAA–4 that the employer will comply with all the assurances, obligations, and conditions of employment set forth on its approved *Application for Temporary Employment Certification.*

(4) The employer must attest on Form ETA–9142–B–CAA–4 that it will comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections, any right to time off or paid time off for COVID–19 vaccination, and that the employer will notify any H–2B workers approved under the supplemental cap in 8 CFR 214.2(h)(6)(x)(A)(*1*) and (*2*), in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites.

(5) An employer that submits Form ETA–9142B–CAA–4 and the I–129 petition 45 or more days after the certified start date of work, as shown on its approved *Application for Temporary Employment,* must conduct additional recruitment of U.S. workers as follows:

(i) Not later than the next business day after submitting the I–129 petition for H–2B worker(s), the employer must place a new job order for the job opportunity with the State Workforce Agency (SWA), serving the area of intended employment. The employer must follow all applicable SWA instructions for posting job orders and receive applications in all forms allowed by the SWA, including online applications (sometimes known as ''self-referrals''). The job order must contain the job assurances and contents set forth in § 655.18 for recruitment of U.S. workers at the place of employment,

and remain posted for at least 15 calendar days;

(ii) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must contact, by email or other available electronic means, the nearest comprehensive American Job Center offering business services and serving the area of intended employment where work will commence, request staff assistance advertising and recruiting qualified U.S. workers for the job opportunity, and provide the unique identification number associated with the job order placed with the SWA or, if unavailable, a copy of the job order;

(iii) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must contact (by mail or other effective means) its former U.S. workers, including those who have been furloughed or laid off, during the period beginning January 1, 2019, until the date the I–129 petition required under 8 CFR 214.2(h)(6)(x) is submitted, who were employed by the employer in the occupation at the place of employment (except those who were dismissed for cause or who abandoned the worksite), disclose the terms of the job order, and solicit their return to the job. The contact and disclosures required by this paragraph (a)(5)(iii) must be provided in a language understood by the worker, as necessary or reasonable;

(iv) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must engage in the recruitment of U.S. workers as provided in § 655.45(a) and (b). The contact and disclosures required by this paragraph (a)(5)(iv) must be provided in a language understood by the worker, as necessary or reasonable; and

(v) The employer must hire any qualified U.S. worker who applies or is referred for the job opportunity until the date on which the last H–2B worker departs for the place of employment, or 30 days after the last date on which the SWA job order is posted, whichever is later. Consistent with § 655.40(a), applicants can be rejected only for lawful job-related reasons.

(6) The employer must attest on Form ETA–9142–B–CAA–4 that it will fully cooperate with any audit, investigation, compliance review, evaluation, verification, or inspection conducted by DOL, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other

individuals possessing pertinent information, and review of the employer's records related to the compliance with applicable laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in this paragraph (a) and § 655.68(a), as a condition for the approval of the H–2B petition. Pursuant to this subpart and 29 CFR 503.25, the employer will not impede, interfere, or refuse to cooperate with an employee of the Secretary who is exercising or attempting to exercise DOL's audit or investigative authority.

(b) This section expires on October 1, 2021.

(c) The requirements under paragraph (a) of this section are intended to be non-severable from the remainder of this section; in the event that paragraph (a)(1), (2), (3), (4), or (5) of this section is enjoined or held to be invalid by any court of competent jurisdiction, the remainder of this section is also intended to be enjoined or held to be invalid in such jurisdiction, without prejudice to workers already present in the United States under this part, as consistent with law.

■ 7. Effective May 25, 2021 through September 30, 2024, add § 655.68 to read as follows:

### § 655.68 Special document retention provisions for Fiscal Years 2021 through 2024 under the Consolidated Appropriations Act, 2021.

(a) An employer who files a petition with USCIS to employ H–2B workers in fiscal year 2021 under authority of the temporary increase in the numerical limitation under section 105 of Division O, Public Law 116–260 must maintain for a period of three (3) years from the date of certification, consistent with 20 CFR 655.56 and 29 CFR 503.17, the following:

(1) A copy of the attestation filed pursuant to the regulations in 8 CFR 214.2 governing that temporary increase;

(2) Evidence establishing, at the time of filing the I–129 petition, that employer's business is likely to suffer irreparable harm (that is, permanent and severe financial loss), if it cannot employ H–2B nonimmigrant workers in fiscal year 2021;

(3) Documentary evidence establishing that each of the workers the employer requested and/or instructed to apply for a visa, whether named or unnamed on a petition filed pursuant to 8 CFR 214.2(h)(6)(x), have been issued an H–2B visa or otherwise granted H–2B status during one of the last three (3) fiscal years (fiscal year 2018, 2019,

or 2020), unless the H–2B worker(s) is a national of El Salvador, Guatemala, or Honduras and is counted towards the 6,000 cap described in 8 CFR 214.2(h)(6)(x)(A)(*2*). Alternatively, if applicable, employers must maintain documentary evidence that the workers the employer requested and/or instructed to apply for visas are eligible nationals of El Salvador, Guatemala, or Honduras, as defined in 8 CFR 214.2(h)(6)(x)(A)(*2*); and

(4) If applicable, proof of recruitment efforts set forth in § 655.64(a)(5)(i) through (iv) and a recruitment report that meets the requirements set forth in § 655.48(a)(1) through (4) and (7), and maintained throughout the recruitment period set forth in § 655.64(a)(5)(v).

(b) DOL or DHS may inspect the documents in paragraphs (a)(1) through (4) of this section upon request.

(c) This section expires on October 1, 2024.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Martin J. Walsh,**
*Secretary, U.S. Department of Labor.*

[FR Doc. 2021–11048 Filed 5–21–21; 11:15 am]

**BILLING CODE 9111–97–P; 4510–FP–P**

AR03567

 An official website of the United States government
Here's how you know

 **The .gov means it's official.**
Federal government websites often end in .gov or .mil. Before
sharing sensitive information, make sure you're on a federal
government site.

**The site is secure.**
The **https://** ensures that you are connecting to the official
website and that any information you provide is encrypted and
transmitted securely.

View the latest ICE guidance on COVID-19

# ICE Check-in

Get information about how to check in with your local ICE Office here.

Reportándose con ICE: Obtenga información sobre cómo reportarse a su oficina local de ICE aquí.

🌐 View in other languages

 **U.S. Immigration and Customs Enforcement**

Call **1-866-DHS-2-ICE**
Report Crime

ICE    DETAIN



## Detention Management

The U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO)
manages and oversees the nation's civil immigration detention system. ICE detainees placed in ERO custody
represent virtually every country in the world, various security classifications, both genders and medical
conditions ranging from healthy to terminally ill.

Non-U.S. citizens who are apprehended and determined to need custodial supervision are placed in
detention facilities. Those who are released from secure custody constitute ERO's "nondetained" docket.
Every case, whether "detained" or "non-detained," remains part of ERO's caseload and is actively managed
until it is formally closed. ERO processes and monitors detained and non-detained cases as they move
through immigration court proceedings to conclusion. At that point, ERO executes the judge's order.

**AR03568**

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 910 of 1021   PageID 7780

Through an aggressive inspections program, ICE ensures its facilities follow ICE's National Detention Standards (NDS). ERO's Detention Oversight Unit ensures that detainees in ICE custody reside in safe, secure and humane environments and under appropriate conditions of confinement.

The NDS were originally issued in September 2000 to facilitate consistent conditions of confinement, access to legal representation and safe and secure operations across the detention system. The standards established consistency of program operations and management expectations, accountability for compliance and a culture of professionalism.

ICE now uses Performance-Based National Detention Standards (PBNDS) that focus on results or outcomes. Each detention center must meet specified standards.

As part of the restructuring of the former INS, the Homeland Security Act of 2002 transferred the responsibilities related to the care and custody of unaccompanied undocumented children to the Department of Health and Human Services, Office of Refugee Resettlement. To that end, ERO developed policy and procedures regarding the appropriate case management of unaccompanied undocumented children in Federal custody while they wait for immigration proceedings. ERO coordinates closely with DHS partners to ensure the timely and safe transfer of unaccompanied noncitizen children to the Office of Refugee Resettlement in accordance with both the Homeland Security Act of 2002 and the Trafficking Victims Protection Reauthorization Act of 2008.

# Family Staging Centers



Detention Management - Family Residential Centers

Family Staging Centers maintain family unity as families go through immigration proceedings or await return to their home countries. ICE ensures that these residential centers operate in an open environment, including access to medical care, social workers, educational services, legal counsel and recreational

AR03569

Case 2:21-cv-00067-Z   Document 162-7   Filed 09/02/22   Page 911 of 1021   PageID 7781

opportunities. To improve meaningful access to services within the centers, a language services program provides indigenous language interpretation for residents in family residential centers.

To be eligible to stay at a staging center, the family cannot have a criminal history and must include a non-U.S. citizen child or children under the age of eighteen accompanied by his/her/their non-U.S. citizen parent(s) or legal guardian(s). With limited exceptions stays at residential centers are generally limited to 20 days.

Families are medically screened upon arrival by a licensed nursing staff that is on-site 24 hours a day, seven days a week. The facilities provide ongoing medical, dental and mental health care as needed.

Depending on the length of stay, school-aged children receive educational services by state certified teachers. The centers include communal activity rooms, social library, law library, televisions, recreation areas and toddler play areas. Residents have access to cafeterias with child-friendly and cultural food choices offered three times a day. Refrigerators in common areas are stocked with fresh fruit, milk, juice and water 24 hours a day. Families have access to an on-site commissary to purchase additional food, snacks and drinks.

Social and legal visitation opportunities are available to residents seven days a week.

ICE headquarters has a designated unit that oversees compliance with Family Residential Standards and manages an independent compliance inspection program through a contracted team of juvenile and family subject matter experts.

As detailed in the June 2017 DHS Inspector General's report, the family staging centers are "clean, well-organized, and efficiently run" and the agency was found to be "addressing the inherent challenges of providing medical care and language services and ensuring the safety of families in detention."

As part of a set of nimble operational changes to address an influx of migrants along the Southwest Border, in FY 2021 ICE shifted its operations away from the detention of families while adapting new and existing detention capacity to address an influx along the Southwest Border. Most notably, ICE no longer supports long-term detention of families at its facilities, while adapting existing facilities (Karnes, Berks, and South Texas Residential Centers) for single adult detention purposes.

# Detention Statistics

ICE ERO manages and oversees the nation's civil immigration detention system, detaining individuals in furtherance of their removal proceedings or to effect their departure from the United States after a final order of removal from a federal immigration judge. ICE detainees are housed in a variety of facilities across the United States, including but not limited to ICE-owned-and-operated facilities; local, county or state facilities contracted through Intergovernmental Service Agreements, and contractor-owned-and-operated facilities.

**AR03570**

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 912 of 1021    PageID 7782

ICE is committed to ensuring that those in our custody reside in safe, secure and humane environments and under appropriate conditions of confinement. ICE makes custody determinations on a case-by-case basis, in accordance with United States law and Department of Homeland Security policy, considering the merits and factors of each case while adhering to current agency priorities, guidelines and legal mandates. In making such determinations, ERO officers weigh a variety of factors, including the person's criminal record, immigration history, ties to the community, risk of flight, and whether he or she poses a potential threat to public safety.

Congressional requirements described in the Department of Homeland Security Appropriations Bill (2020) require ICE to make the following data publicly accessible.

ICE provides the following detention, Alternatives to Detention (ATD) and facility information below. The data tables are searchable and sortable, and worksheets are protected to ensure their accuracy and reliability. ICE confirms the integrity of the data as published on this site, but cannot attest to subsequent transmissions. Data fluctuate until "locked" at the conclusion of the fiscal year.

## ⊖ FY 2022 ICE Statistics

🗎 <u>Detention FY 2022 YTD, Alternatives to Detention FY 2022 YTD and Facilities FY 2022 YTD, Footnotes</u> (164 K

## ⊖ Previous Year-End Reports

🗎 <u>FY 2021 Detention Statistics</u>

🗎 <u>FY 2020 Detention Statistics</u>

🗎 <u>FY 2019 Detention Statistics</u>

# Alternatives to Detention Program

ICE's ATD program uses technology and other tools to manage undocumented individual's compliance with release conditions while they are on the non-detained docket. It is not a substitute for detention, but allows ICE to exercise increased supervision over a portion of those who are not detained.

AR03571

Case 2:21-cv-00067-Z    Document 162-7    Filed 09/02/22    Page 913 of 1021    PageID 7783

The ATD program began in 2004 through the agency's Intensive Supervision Appearance Program (ISAP) I contract. Currently, ATD-ISAP III utilizes modern technology and case management with the goal of more closely monitoring a small segment of cases assigned to the non-detained docket. As of August 2020, there are over 3.3 million individuals assigned to the non-detained docket, many with pending cases before the immigration courts. Of these, ICE has resources to monitor approximately 5 percent of the total non-detained population, or approximately 100,000 undocumented individuals.

**FACTSHEET**

ATD Infographic

There are varying degrees of supervision and monitoring options available in the ATD -ISAP III program. On a case by case basis, local ICE ERO Deportation Officers determine the type and manner of monitoring that is appropriate for each participant, including the specific type of technology – global positioning system (GPS) tracking devices, telephonic reporting (TR), or a smartphone application (SmartLINK) – and case management levels, which include frequency of office or home visits. ICE may adjust the level of supervision required as the level of compliance either increases or decreases. There are several factors considered when reviewing a case to determine if they will be enrolled in the ATD program. Some examples are an individual's criminal and immigration history; supervision history; family and/or community ties; status as a caregiver or provider; and other humanitarian or medical considerations.

Additionally, as instructed by Congress, ICE recently incorporated many of the Family Case Management Program (FCMP) principles into its traditional ATD program. These principles were incorporated into the current ATD ISAP III through a contract modification and are known as Extended Case Management Services (ECMS). These same services are available through the ECMS modification as they were available under FCMP with two distinct differences: ECMS is available in a higher number of locations and available at a fraction of the cost. While ECMS is a new program, ICE continues to identify and enroll eligible participants.

Updated: 08/19/2022

RELATED INFORMATION                                                                —

Detention Facility Locator

Detention Policies

Facility Inspections

National Detainee Handbook

Detainee Death Reporting

RELATED DOCUMENTS                                                                 —

 Detainee Health Care Overview

 Detention Facility Termination of Agreement

- Visitor Code of Conduct
- Tour/Visit Notification Flyer
- Procedures for Congressional Facility Visits
- Procedures for Touring/Visiting a Facility
- Language Access Program Infographic
- Legal Access in Detention: At a Glance
- Over-72-hour ICE Detention Facilities
- Vulnerable Populations: Transgender Care Program

## DETENTION STANDARDS                                                    —

Family Residential Standards

2019 NDS

2011 PBNDS

2008 PBNDS

2000 National Detention Standards for Non-Dedicated Facilities

## CONNECT WITH #ICE                                                      —

 Facebook

 Twitter

 YouTube

 Instagram

 Flickr

 LinkedIn

 RSS

## INFORMATION LIBRARY                                                    —

Detention Policies

Facility Inspections

Fact Sheets

Federal Register Notices

Forms

**AR03573**

Freedom of Information Act

Legal Notices

Metrics

Speeches & Testimonies

Statements

Statistics

## PARTNERS                                                                      —

DHS

USCIS

TSA

FEMA

USSS

CISA

CBP

USCG

FLETC

Accessibility
Accountability
Archive
Data
Intellectual Property Policy
No Fear Act
OIG
Privacy Policies
Site Map
Site Policies & Plugins
Web Content Inventory

**AR03574**

**U.S. Immigration and Customs Enforcement**

These statistics are made available to the public pursuant to the Fiscal Year 2020
Department of Homeland Security Appropriations Bill.

## ICE DETENTION DATA, EOFY2020

**ICE Currently Detained by Processing Disposition and Detention Facility Type:**

| Processing Disposition | FRC | Adult | Total |
|---|---|---|---|
| Total | 319 | 18,749 | 19,068 |
| Expedited Removal (I-860) | 307 | 4,086 | 4,393 |
| Notice to Appear (I-862) | 2 | 11,146 | 11,148 |
| Reinstatement of Deport Order (I-871) | 1 | 2,415 | 2,416 |
| Other | 9 | 1,102 | 1,111 |

**Average Time from USCIS Fear Decision Service Date to ICE Release (In Days)**

| ICE Release Fiscal Year | FRC | Adult | Total |
|---|---|---|---|
| FY2020 | 19.2 | 137.2 | 133.7 |

**Aliens with USCIS-Established Fear Decisions in an ICE Detention Facility by Facility Type**

| Detention Facility Type | Total Detained |
|---|---|
| Total | 2,387 |
| FRC | - |
| Adult | 2,387 |

**ICE Currently Detained by Criminality and Arresting Agency**

| Criminality | ICE | Percent ICE | CBP | Percent CBP | Total |
|---|---|---|---|---|---|
| Total | 12,853 | 67% | 6,215 | 33% | 19,068 |
| Convicted Criminal | 9,250 | 90% | 971 | 10% | 10,221 |
| Pending Criminal Charges | 2,919 | 92% | 268 | 8% | 3,187 |
| Other Immigration Violator | 684 | 12% | 4,976 | 88% | 5,660 |

**ICE Initial Book-Ins by Arresting Agency and Month: EOFY2020**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 24,728 | 22,369 | 23,907 | 22,780 | 22,687 | 19,386 | 8,517 | 7,277 | 6,688 | 7,540 | 8,274 | 8,716 | 182,869 |
| CBP | 13,303 | 12,643 | 14,007 | 10,868 | 11,197 | 9,211 | 2,904 | 1,883 | 1,585 | 1,685 | 1,740 | 2,069 | 83,095 |
| ICE | 11,425 | 9,726 | 9,900 | 11,912 | 11,490 | 10,175 | 5,613 | 5,394 | 5,103 | 5,855 | 6,534 | 6,647 | 99,774 |

**ICE Initial Book-Ins by Facility Type and Criminality: EOFY2020**

| Facility Type | Convicted Criminal | Pending Criminal Charges | Other Immigration Violator | Total |
|---|---|---|---|---|
| Total | 98,375 | 23,500 | 60,994 | 182,869 |
| FRC | 15 | 6 | 1,809 | 1,830 |
| Adult | 98,360 | 23,494 | 59,185 | 181,039 |

**ICE Final Releases by Facility Type: EOFY2020**

| Facility Type | Total |
|---|---|
| Total | 61,886 |
| FRC | 5,307 |
| Adult | 56,579 |

**ICE Removals: EOFY2020**

| | Removals |
|---|---|
| Total | 185,884 |
| Removals with an FRC Detention | 3,310 |

**ICE Final Releases by Release Reason and Criminality: EOFY2020**

| Release Reason | Convicted Criminal | Pending Criminal Charges | Other Immigration Violator | Total |
|---|---|---|---|---|
| Total | 11,989 | 9,245 | 40,652 | 61,886 |
| Bonded Out | 6,892 | 6,585 | 16,259 | 29,736 |
| Bond Set by ICE | 1,145 | 1,622 | 2,019 | 4,786 |
| Bond Set by IJ | 5,747 | 4,963 | 14,240 | 24,950 |
| Order of Recognizance | 1,937 | 1,995 | 10,321 | 14,253 |
| Order of supervision | 2,897 | 518 | 3,205 | 6,620 |
| Paroled | 261 | 146 | 10,866 | 11,273 |
| Prosecutorial Discretion | 2 | 1 | 1 | 4 |

**ICE Average Daily Population by Arresting Agency, Month and Criminality: EOFY2020**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP Average | 31,144 | 27,524 | 24,438 | 22,594 | 20,332 | 18,514 | 15,025 | 12,085 | 10,176 | 8,956 | 7,582 | 6,731 | 17,098 |
| Convicted Criminal | 4,741 | 3,981 | 3,503 | 3,308 | 2,981 | 2,868 | 2,677 | 2,352 | 2,132 | 1,826 | 1,489 | 1,124 | 2,750 |
| Pending Criminal Charges | 877 | 748 | 664 | 616 | 537 | 469 | 397 | 362 | 319 | 280 | 286 | | 519 |
| Other Immigration Violator | 25,526 | 22,795 | 20,270 | 18,610 | 16,735 | 15,109 | 11,879 | 9,336 | 7,681 | 6,811 | 5,813 | 5,321 | 13,829 |
| ICE Average | 19,074 | 18,648 | 18,313 | 18,521 | 18,981 | 19,174 | 16,798 | 15,104 | 14,028 | 13,594 | 13,815 | 13,496 | 16,626 |
| Convicted Criminal | 13,267 | 12,851 | 12,623 | 12,684 | 12,827 | 12,947 | 11,996 | 11,157 | 10,430 | 10,145 | 10,179 | 9,714 | 11,734 |
| Pending Criminal Charges | 3,812 | 3,782 | 3,765 | 3,921 | 4,054 | 4,105 | 3,321 | 2,802 | 2,623 | 2,597 | 2,847 | 3,044 | 3,388 |
| Other Immigration Violator | 1,996 | 2,015 | 1,924 | 1,917 | 2,101 | 2,122 | 1,481 | 1,145 | 975 | 852 | 789 | 738 | 1,503 |
| Average | 50,218 | 46,171 | 42,751 | 41,115 | 39,313 | 37,688 | 31,823 | 27,189 | 24,204 | 22,549 | 21,397 | 20,227 | 33,724 |
| Convicted Criminal | 18,007 | 16,832 | 16,127 | 15,992 | 15,808 | 15,815 | 14,673 | 13,509 | 12,562 | 11,971 | 11,668 | 10,838 | 14,485 |
| Pending Criminal Charges | 4,689 | 4,530 | 4,429 | 4,597 | 4,670 | 4,641 | 3,790 | 3,200 | 2,985 | 2,916 | 3,127 | 3,330 | 3,907 |
| Other Immigration Violator | 27,522 | 24,809 | 22,195 | 20,526 | 18,836 | 17,232 | 13,360 | 10,481 | 8,657 | 7,662 | 6,602 | 6,059 | 15,332 |

AR03575

**ICE Average Length of Stay by Arresting Agency, Month and Criminality: EOFY2020**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP Average | 57.7 | 56.6 | 52.3 | 61.0 | 59.1 | 54.1 | 85.9 | 109.6 | 134.9 | 122.2 | 123.7 | 131.0 | 67.6 |
| Convicted Criminal | 37.8 | 37.8 | 33.2 | 33.9 | 28.7 | 24.8 | 31.4 | 43.9 | 66.5 | 76.6 | 83.0 | 78.3 | 38.2 |
| Pending Criminal Charges | 65.0 | 61.2 | 60.6 | 60.7 | 58.0 | 51.9 | 86.8 | 117.1 | 147.7 | 131.8 | 130.7 | 152.3 | 73.1 |
| Other Immigration Violator | 65.3 | 63.3 | 58.7 | 73.3 | 74.2 | 70.2 | 122.0 | 149.7 | 167.2 | 148.1 | 146.7 | 157.0 | 80.6 |
| ICE Average | 51.3 | 54.2 | 58.5 | 52.5 | 52.6 | 47.9 | 64.5 | 64.8 | 68.0 | 72.5 | 74.1 | 77.9 | 59.4 |
| Convicted Criminal | 52.7 | 55.6 | 61.2 | 52.6 | 52.9 | 49.0 | 64.3 | 61.9 | 66.8 | 70.6 | 72.4 | 80.5 | 60.1 |
| Pending Criminal Charges | 49.5 | 52.0 | 53.9 | 51.0 | 52.7 | 47.9 | 61.6 | 64.6 | 65.1 | 67.4 | 71.2 | 67.4 | 56.7 |
| Other Immigration Violator | 45.4 | 49.7 | 50.2 | 54.7 | 50.5 | 42.2 | 72.7 | 102.2 | 91.9 | 114.6 | 102.3 | 87.8 | 60.0 |
| Average | 55.2 | 55.7 | 54.7 | 57.1 | 56.1 | 51.0 | 73.8 | 80.9 | 91.0 | 88.8 | 88.7 | 91.5 | 63.5 |
| Convicted Criminal | 47.1 | 49.0 | 50.9 | 46.3 | 44.1 | 40.6 | 54.6 | 58.0 | 66.8 | 71.7 | 74.1 | 80.2 | 53.4 |
| Pending Criminal Charges | 52.0 | 53.8 | 55.0 | 52.5 | 53.6 | 48.4 | 64.0 | 68.4 | 71.8 | 72.4 | 75.2 | 72.2 | 58.8 |
| Other Immigration Violator | 63.5 | 62.1 | 57.9 | 70.9 | 70.9 | 65.6 | 113.8 | 142.5 | 156.2 | 142.8 | 137.8 | 141.8 | 78.1 |

**ICE Average Daily Population by Facility Type and Month: EOFY2020**

| Facility Type | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 50,218 | 46,171 | 42,751 | 41,115 | 39,313 | 37,688 | 31,823 | 27,189 | 24,204 | 22,549 | 21,397 | 20,227 | 33,724 |
| FRC | 1,590 | 1,836 | 1,545 | 1,436 | 1,437 | 1,591 | 767 | 367 | 269 | 347 | 263 | 238 | 973 |
| Adult | 48,628 | 44,335 | 41,206 | 39,679 | 37,876 | 36,097 | 31,056 | 26,822 | 23,935 | 22,203 | 21,135 | 19,989 | 32,751 |

**ICE Average Length of Stay by Facility Type and Month: EOFY2020**

| Facility Type | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 55.2 | 55.7 | 54.7 | 57.1 | 56.1 | 51.0 | 73.8 | 80.9 | 91.0 | 88.8 | 88.7 | 91.5 | 63.5 |
| FRC | 24.8 | 39.4 | 32.3 | 54.7 | 56.1 | 64.2 | 61.3 | 78.1 | 42.9 | 100.5 | 71.2 | 167.6 | 50.1 |

**AR03576**

# ICE Detention Statistics



These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.

ICE provides the following Detention and Alternatives to Detention (ATD) statistics, which may be downloaded by clicking below. The data tables are searchable and sortable, and worksheets are protected to ensure their accuracy and reliability.

Records related to credible fear are USCIS records, and are provided to ICE by USCIS.

ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions.  Data fluctuate until "locked" at the conclusion of the fiscal year.

AR03577

# U.S. Immigration and Customs Enforcement

**These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.**

## ICE ALTERNATIVES TO DETENTION DATA, FY20 YTD

**ATD Active Population by Status, Extended Case Management Service, Count and ALIP, EOFY2020**

| FAMU Status | Count | ALIP |
|---|---|---|
| FAMU | | |
| ECMS-FAMU | | |
| Single Adult | | |
| ECMS-Single Adult | | |
| **Total** | | |

Data from BI Inc. Participants Report, 9.30.2019

Data from OBP Report, 9.30.2019

**Active ATD Participants and Average Length in Program, FY20 YTD, as of 1/31/2020, by AOR and Technology**

| AOR/Technology | Count | Average Length in Program |
|---|---|---|
| **Total** | **91,793** | **628.9** |
| **Atlanta** | **3,145** | **685.4** |
| GPS | 991 | 335.0 |
| SmartLINK | 260 | 461.7 |
| TR | 1,894 | 899.4 |
| **Baltimore** | **2,913** | **434.4** |
| GPS | 1,955 | 307.6 |
| SmartLINK | 71 | 549.2 |
| TR | 887 | 704.8 |
| **Boston** | **1,747** | **248.2** |
| GPS | 1,470 | 188.3 |
| SmartLINK | 104 | 451.3 |
| TR | 173 | 635.0 |
| **Buffalo** | **406** | **1,159.3** |
| GPS | 61 | 304.6 |
| SmartLINK | 6 | 838.8 |

AR03578

| | | |
|---|---:|---:|
| TR | 339 | 1,318.8 |
| **Chicago** | **7,086** | **705.0** |
| GPS | 2,886 | 341.7 |
| SmartLINK | 1,283 | 647.4 |
| TR | 2,917 | 1,089.7 |
| **Dallas** | **992** | **492.8** |
| GPS | 728 | 331.8 |
| SmartLINK | 101 | 673.7 |
| TR | 163 | 1,099.9 |
| **Denver** | **1,604** | **1,147.6** |
| GPS | 275 | 361.0 |
| SmartLINK | 213 | 852.7 |
| TR | 1,116 | 1,397.7 |
| **Detroit** | **7,913** | **676.7** |
| GPS | 760 | 346.7 |
| SmartLINK | 4,031 | 446.8 |
| TR | 3,122 | 1,053.8 |
| **El Paso** | **1,072** | **638.1** |
| GPS | 320 | 75.7 |
| SmartLINK | 115 | 581.8 |
| TR | 637 | 930.7 |
| **Houston** | **2,561** | **526.0** |
| GPS | 2,053 | 365.0 |
| SmartLINK | 184 | 838.8 |
| TR | 324 | 1,368.7 |
| **Los Angeles** | **10,482** | **688.4** |
| GPS | 3,658 | 408.6 |
| SmartLINK | 623 | 721.7 |
| TR | 6,201 | 850.1 |
| **Miami** | **4,669** | **376.9** |
| GPS | 3,301 | 242.6 |
| SmartLINK | 704 | 375.4 |
| TR | 664 | 1,046.3 |
| **New Orleans** | **3,123** | **457.7** |
| GPS | 2,196 | 337.9 |
| SmartLINK | 563 | 660.7 |
| TR | 364 | 866.1 |
| **New York** | **4,563** | **609.1** |
| GPS | 1,773 | 270.6 |
| SmartLINK | 87 | 458.0 |
| TR | 2,703 | 835.9 |
| **Newark** | **7,583** | **703.3** |
| GPS | 1,400 | 258.6 |
| SmartLINK | 3,642 | 547.7 |
| TR | 2,541 | 1,171.3 |

AR03579

| | | |
|---|---:|---:|
| **Philadelphia** | **2,130** | **403.0** |
| GPS | 623 | 234.0 |
| SmartLINK | 1,085 | 441.8 |
| TR | 422 | 552.8 |
| **Phoenix** | **671** | **273.6** |
| GPS | 439 | 176.6 |
| SmartLINK | 158 | 396.0 |
| TR | 74 | 587.8 |
| **Salt Lake City** | **3,085** | **724.9** |
| GPS | 645 | 366.7 |
| SmartLINK | 1,513 | 701.1 |
| TR | 927 | 1,013.1 |
| **San Antonio** | **1,229** | **468.8** |
| GPS | 651 | 249.3 |
| SmartLINK | 158 | 600.4 |
| TR | 420 | 759.6 |
| **San Diego** | **2,687** | **663.6** |
| GPS | 1,088 | 350.3 |
| SmartLINK | 573 | 645.0 |
| TR | 1,026 | 1,006.2 |
| **San Francisco** | **13,050** | **689.6** |
| GPS | 6,187 | 322.8 |
| SmartLINK | 791 | 781.4 |
| TR | 6,072 | 1,051.4 |
| **Seattle** | **3,686** | **674.4** |
| GPS | 1,013 | 312.9 |
| SmartLINK | 982 | 578.6 |
| TR | 1,691 | 946.5 |
| **St Paul** | **2,381** | **861.4** |
| GPS | 462 | 381.3 |
| SmartLINK | 808 | 674.9 |
| TR | 1,111 | 1,196.7 |
| **Washington DC** | **3,015** | **331.0** |
| GPS | 1,712 | 260.1 |
| SmartLINK | 860 | 371.2 |
| TR | 443 | 526.7 |

AR03580

# U.S. Immigration and Customs Enforcement

**These statistics are made available to the public pursuant to the Fiscal Year 2020 I**

## ICE FACILITIES DATA, FY20 YTD

### Facility Information

Source: ICE Integrated Decision Support (IIDS), 02/24/2020

| Name |
| --- |
| ADELANTO ICE PROCESSING CENTER |
| STEWART DETENTION CENTER |
| SOUTH TEXAS ICE PROCESSING CENTER |
| SOUTH TEXAS FAMILY RESIDENTIAL CENTER |
| WINN CORRECTIONAL CENTER |
| LA PALMA CORRECTIONAL CENTER |
| LASALLE ICE PROCESSING CENTER (JENA) |
| ELOY FEDERAL CONTRACT FACILITY |
| ADAMS COUNTY DET CENTER |
| OTAY MESA DETENTION CENTER (SAN DIEGO CDF) |
| TACOMA ICE PROCESSING CENTER (NORTHWEST DET CTR) |
| PORT ISABEL |
| OTERO COUNTY PROCESSING CENTER |
| MONTGOMERY ICE PROCESSING CENTER |
| RICHWOOD CORRECTIONAL CENTER |
| JACKSON PARISH CORRECTIONAL CENTER |
| EL VALLE DETENTION FACILITY |
| IRWIN COUNTY DETENTION CENTER |
| EL PASO SERVICE PROCESSING CENTER |
| HOUSTON CONTRACT DETENTION FACILITY |
| PINE PRAIRIE ICE PROCESSING CENTER |
| SOUTH LOUISIANA DETENTION CENTER |
| IMPERIAL REGIONAL DETENTION FACILITY |
| PRAIRIELAND DETENTION FACILITY |
| ESSEX COUNTY CORRECTIONAL FACILITY |
| IMMIGRATION CENTERS OF AMERICA FARMVILLE |

| |
|---|
| KROME NORTH SERVICE PROCESSING CENTER |
| DENVER CONTRACT DETENTION FACILITY |
| MAIN - FOLKSTON IPC (D RAY JAMES) |
| BROWARD TRANSITIONAL CENTER |
| CATAHOULA CORRECTIONAL CENTER |
| YORK COUNTY PRISON |
| T DON HUTTO RESIDENTIAL CENTER |
| LA PALMA CORRECTION CENTER - APSO |
| JOE CORLEY ICE PROCESSING CENTER |
| LASALLE CORR CTR OLLA |
| BUFFALO (BATAVIA) SERVICE PROCESSING CENTER |
| GLADES COUNTY DETENTION CENTER |
| RIO GRANDE DETENTION CENTER |
| RIVER CORRECTIONAL CENTER |
| IAH SECURE ADULT DETENTION FACILITY (POLK) |
| EDEN DETENTION CENTER |
| FLORENCE SERVICE PROCESSING CENTER |
| MESA VERDE ICE PROCESSING CENTER |
| LIMESTONE COUNTY DETENTION CENTER |
| PLYMOUTH COUNTY CORRECTIONAL FACILITY |
| SHERBURNE COUNTY JAIL |
| HUDSON COUNTY CORRECTIONAL CENTER |
| TORRANCE COUNTY DETENTION FACILITY |
| ALEXANDRIA STAGING FACILITY |
| CAROLINE DETENTION FACILITY |
| BAKER COUNTY SHERIFF'S OFFICE |
| MCHENRY COUNTY CORRECTIONAL FACILITY |
| ANNEX - FOLKSTON IPC |
| LAREDO PROCESSING CENTER |
| ETOWAH COUNTY JAIL (ALABAMA) |
| ELIZABETH CONTRACT DETENTION FACILITY |
| OKMULGEE COUNTY JAIL |
| DENVER CONTRACT DETENTION FACILITY (CDF) II |
| BERGEN COUNTY JAIL |
| FLORENCE STAGING FACILITY |
| HENDERSON DETENTION CENTER |
| PIKE COUNTY CORRECTIONAL FACILITY |
| NEVADA SOUTHERN DETENTION CENTER |
| KARNES COUNTY RESIDENTIAL CENTER |
| YUBA COUNTY JAIL |
| JOHNSON COUNTY CORRECTIONS CENTER |
| BRISTOL COUNTY DETENTION CENTER |
| NORTHEAST OHIO CORRECTIONAL CTR (YOUNGSTOWN CDF) |
| PULASKI COUNTY JAIL |
| KENOSHA COUNTY DETENTION CENTER |

AR03582

| |
|---|
| CALHOUN COUNTY CORRECTIONAL CENTER |
| WORCESTER COUNTY JAIL |
| BLUEBONNET DETENTION FACILITY |
| KANKAKEE COUNTY JAIL (JEROME COMBS DET CTR) |
| BOONE COUNTY JAIL |
| BUTLER COUNTY JAIL |
| DODGE COUNTY JAIL |
| ORANGE COUNTY JAIL |
| ALLEN PARISH PUBLIC SAFETY COMPLEX |
| CIBOLA COUNTY CORRECTIONAL CENTER |
| WYATT DETENTION CENTER |
| WEBB COUNTY DETENTION CENTER (CCA) |
| KAY COUNTY JUSTICE FACILITY |
| WAKULLA COUNTY JAIL |
| ROLLING PLAINS DETENTION CENTER |
| STRAFFORD COUNTY CORRECTIONS |
| MONROE COUNTY DETENTION CENTER |
| NYE COUNTY DETENTION CENTER, SOUTHERN (PAHRUMP) |
| HALL COUNTY DEPARTMENT OF CORRECTIONS |
| MONROE COUNTY DETENTION-DORM |
| CHASE COUNTY DETENTION FACILITY |
| CLINTON COUNTY CORRECTIONAL FACILITY |
| TULSA COUNTY JAIL (DAVID L. MOSS JUSTICE CTR) |
| HOWARD COUNTY DETENTION CENTER |
| HARDIN COUNTY JAIL |
| SAINT CLAIR COUNTY JAIL |
| BERKS COUNTY FAMILY SHELTER |
| SENECA COUNTY JAIL |
| SAN LUIS REGIONAL DETENTION CENTER |
| KANDIYOHI COUNTY JAIL |
| MORGAN COUNTY ADULT DETENTION CENTER |
| FREEBORN COUNTY ADULT DETENTION CENTER |
| CLAY COUNTY JAIL |
| GEAUGA COUNTY JAIL |
| ALAMANCE COUNTY DETENTION FACILITY |
| CAMBRIA COUNTY JAIL |
| HONOLULU FEDERAL DETENTION CENTER |
| POLK COUNTY JAIL |
| MORROW COUNTY CORRECTIONAL FACILITY |
| CHIPPEWA COUNTY SSM |
| COASTAL BEND DETENTION FACILITY |
| MONTGOMERY COUNTY JAIL |
| ROBERT A. DEYTON DETENTION FACILITY |
| CBP SAN YSIDRO POE |
| FRANKLIN COUNTY HOUSE OF CORRECTION |

AR03583

TELLER COUNTY JAIL
CACHE COUNTY JAIL
FREDERICK COUNTY DETENTION CENTER
CASS COUNTY JAIL
CARVER COUNTY JAIL
WASHOE COUNTY JAIL
CHARLESTON COUNTY DETENTION CENTER
CHRISTIAN COUNTY JAIL
NORTHERN OREGON CORRECTIONAL FACILITY
DOUGLAS COUNTY DEPARTMENT OF CORRECTIONS
DEKALB COUNTY DETENTION CENTER
CBP CHULA VISTA BPS
PLATTE COUNTY DETENTION CENTER
SAINT TAMMANY PARISH JAIL
COLLIER COUNTY NAPLES JAIL CENTER
DALLAS COUNTY JAIL - LEW STERRETT JUSTICE CENTER
PINELLAS COUNTY JAIL
WASHINGTON COUNTY JAIL (PURGATORY CORRECTIONAL FAC
GUAYNABO MDC (SAN JUAN)
SAIPAN DEPARTMENT OF CORRECTIONS (SUSUPE)
GRAND FORKS COUNTY CORRECTIONAL FACILITY
LINCOLN COUNTY DETENTION CENTER
DEPARTMENT OF CORRECTIONS HAGATNA
PHELPS COUNTY JAIL
LINN COUNTY JAIL
SOUTH CENTRAL REGIONAL JAIL
BALDWIN COUNTY CORRECTIONAL CENTER
MINICASSIA DETENTION CENTER
JEFFERSON COUNTY JAIL
MADISON COUNTY JAIL
POTTAWATTAMIE COUNTY JAIL
COWLITZ COUNTY JUVENILE
KNOX COUNTY DETENTION FACILITY
OLDHAM COUNTY JAIL
DELAWARE CO JAIL (GEORGE W. HILL)
ORANGE COUNTY JAIL
LA PAZ COUNTY ADULT DETENTION FACILITY
RENSSELAER COUNTY CORRECTIONAL FACILITY
WESTERN TENNESSEE DETENTION FACILITY
WASHINGTON COUNTY DETENTION CENTER
EAST HIDALGO DETENTION CENTER
FAYETTE COUNTY DETENTION CENTER
LEXINGTON COUNTY JAIL
DAKOTA COUNTY JAIL
WHITFIELD COUNTY JAIL

| |
|---|
| BEAVER COUNTY JAIL |
| NEW HANOVER COUNTY JAIL |
| CHAUTAUQUA COUNTY JAIL |
| LONOKE POLICE DEPARTMENT |
| BUTLER COUNTY JAIL |
| SALT LAKE COUNTY METRO JAIL |
| MONROE COUNTY DETENTION MAIN |
| YAKIMA COUNTY DEPARTMENT OF CORRECTIONS |
| PLATTE COUNTY JAIL |
| SEBASTIAN COUNTY DETENTION CENTER |
| NORTHERN OREGON JUVENILE DETENTION |
| SALEM COUNTY CORRECTIONAL FACILITY |
| STORY COUNTY JAIL |
| FLOYD COUNTY JAIL |
| VAL VERDE CORRECTIONAL FACILITY |
| UNION COUNTY JAIL |
| MIDLAND COUNTY DETENTION CENTER |
| MILLER COUNTY JAIL |
| ERIE COUNTY JAIL |
| HENDERSON COUNTY JAIL |
| YORK COUNTY DETENTION CENTER |
| KARNES COUNTY CORRECTIONAL CENTER |
| TITUS COUNTY JAIL |

AR03585

**Department of Homeland Security Appropriations Bill.**

| Address | City | State | Zip |
|---|---|---|---|
| 10250 RANCHO ROAD | ADELANTO | CA | 92301 |
| 146 CCA ROAD | LUMPKIN | GA | 31815 |
| 566 VETERANS DRIVE | PEARSALL | TX | 78061 |
| 1925 WEST HIGHWAY 85 | DILLEY | TX | 78017 |
| 560 GUM SPRING ROAD | WINNFIELD | LA | 71483 |
| 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 |
| 830 PINEHILL ROAD | JENA | LA | 71342 |
| 1705 EAST HANNA RD. | ELOY | AZ | 85131 |
| 20 HOBO FORK RD. | NATCHEZ | MS | 39120 |
| 7488 CALZADA DE LA FUENTE | SAN DIEGO | CA | 92154 |
| 1623 E. J STREET | TACOMA | WA | 98421 |
| 27991 BUENA VISTA BOULEVARD | LOS FRESNOS | TX | 78566 |
| 26 MCGREGOR RANGE ROAD | CHAPARRAL | NM | 88081 |
| 806 HILBIG RD | CONROE | TX | 77301 |
| 180 PINE BAYOU CIRCLE | RICHWOOD | LA | 71202 |
| 327 INDUSTRIAL DRIVE | JONESBORO | LA | 71251 |
| 1800 INDUSTRIAL DRIVE | RAYMONDVILLE | TX | 78580 |
| 132 COTTON DRIVE | OCILLA | GA | 31772 |
| 8915 MONTANA AVE. | EL PASO | TX | 79925 |
| 15850 EXPORT PLAZA DRIVE | HOUSTON | TX | 77032 |
| 1133 HAMPTON DUPRE ROAD | PINE PRAIRIE | LA | 70576 |
| 3843 STAGG AVENUE | BASILE | LA | 70515 |
| 1572 GATEWAY | CALEXICO | CA | 92231 |
| 1209 SUNFLOWER LN | ALVARADO | TX | 76009 |
| 354 DOREMUS AVENUE | NEWARK | NJ | 07105 |
| 508 WATERWORKS ROAD | FARMVILLE | VA | 23901 |

AR03586

| | | | |
|---|---|---|---|
| 18201 SOUTHWEST 12TH STREET | MIAMI | FL | 33194 |
| 3130 N. OAKLAND ST. | AURORA | CO | 80010 |
| 3026 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 |
| 3900 NORTH POWERLINE ROAD | POMPANO BEACH | FL | 33073 |
| 499 OLD COLUMBIA ROAD | HARRISONBURG | LA | 71430 |
| 3400 CONCORD ROAD | YORK | PA | 17402 |
| 1001 WELCH STREET | TAYLOR | TX | 76574 |
| 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 |
| 500 HILBIG RD. | CONROE | TX | 77301 |
| 15976 HWY 165 | OLLA | LA | 71465 |
| 4250 FEDERAL DRIVE | BATAVIA | NY | 14020 |
| 1297 EAST SR 78 | MOORE HAVEN | FL | 33471 |
| 1001 SAN RIO BOULEVARD | LAREDO | TX | 78046 |
| 26362 HIGHWAY 15 | FERRIDAY | LA | 71334 |
| 3400 FM 350 SOUTH | LIVINGSTON | TX | 77351 |
| 702 E BROADWAY ST | EDEN | TX | 76837 |
| 3250 NORTH PINAL PARKWAY | FLORENCE | AZ | 85132 |
| 425 GOLDEN STATE AVE | BAKERSFIELD | CA | 93301 |
| 910 NORTH TYUS STREET | GROESBECK | TX | 76642 |
| 26 LONG POND ROAD | PLYMOUTH | MA | 02360 |
| 13880 BUSINESS CENTER DRIVE | ELK RIVER | MN | 55330 |
| 30-35 HACKENSACK AVE. | KEARNY | NJ | 07032 |
| 209 COUNTY ROAD 49 | ESTANCIA | NM | 87016 |
| 96 GEORGE THOMPSON DRIVE | ALEXANDRIA | LA | 71303 |
| 11093 S.W. LEWIS MEMORIAL DRIVE | BOWLING GREEN | VA | 22427 |
| 1 SHERIFF OFFICE DRIVE | MACCLENNY | FL | 32063 |
| 2200 NORTH SEMINARY AVENUE | WOODSTOCK | IL | 60098 |
| 3424 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 |
| 4702 EAST SAUNDERS STREET | LAREDO | TX | 78041 |
| 827 FORREST AVENUE | GADSDEN | AL | 35901 |
| 625 EVANS STREET | ELIZABETH | NJ | 07201 |
| 314 W. 7TH STREET | OKMULGEE | OK | 74447 |
| 11901 E. 30th AVE | AURORA | CO | 80010 |
| 160 SOUTH RIVER STREET | HACKENSACK | NJ | 07601 |
| 3250 NORTH PINAL PARKWAY | FLORENCE | AZ | 85232 |
| 18 E BASIC ROAD | HENDERSON | NV | 89015 |
| 175 PIKE COUNTY BOULEVARD | LORDS VALLEY | PA | 18428 |
| 2190 EAST MESQUITE AVENUE | PAHRUMP | NV | 89060 |
| FM 1144 AT US HIGHWAY 181 | KARNES CITY | TX | 78118 |
| 215 5TH STREET | MARYSVILLE | CA | 95901 |
| 1800 RIDGEMAR DRIVE | CLEBURNE | TX | 76031 |
| 400 FAUNCE CORNER ROAD | NORTH DARTMOUTH | MA | 02747 |
| 2240 HUBBARD ROAD | YOUNGSTOWN | OH | 44505 |
| 1026 SHAWNEE COLLEGE ROAD | ULLIN | IL | 62992 |
| 4777 88TH AVENUE | KENOSHA | WI | 53144 |

AR03587

| | | | |
|---|---|---|---|
| 185 EAST MICHIGAN AVENUE | BATTLE CREEK | MI | 49014 |
| 5022 JOYNER ROAD | SNOW HILL | MD | 21863 |
| 400 2ND STREET | ANSON | TX | 79501 |
| 3050 JUSTICE WAY | KANKAKEE | IL | 60901 |
| 3020 CONRAD LANE | BURLINGTON | KY | 41005 |
| 705 HANOVER STREET | HAMILTON | OH | 45011 |
| 215 WEST CENTRAL STREET | JUNEAU | WI | 53039 |
| 110 WELLS FARM ROAD | GOSHEN | NY | 10924 |
| 7340 HIGHWAY 26 WEST | OBERLIN | LA | 70655 |
| 2000 CIBOLA LOOP | MILAN | NM | 87021 |
| 950 HIGH STREET | CENTRAL FALLS | RI | 02863 |
| 9998 SOUTH HIGHWAY 83 | LAREDO | TX | 78046 |
| 1101 WEST DRY ROAD | NEWKIRK | OK | 74647 |
| 15 OAK STREET | CRAWFORDVILLE | FL | 32327 |
| 118 COUNTY ROAD 206 | HASKELL | TX | 79521 |
| 266 COUNTY FARM ROAD | DOVER | NH | 03820 |
| 5501 COLLEGE ROAD | KEY WEST | FL | 33040 |
| 1520 E. BASIN ROAD | PAHRUMP | NV | 89060 |
| 110 PUBLIC SAFETY DRIVE | GRAND ISLAND | NE | 68801 |
| 7000 EAST DUNBAR ROAD | MONROE | MI | 48161 |
| 301 SOUTH WALNUT STREET | COTTONWOOD FALLS | KS | 66845 |
| 419 SHOEMAKER ROAD | LOCK HAVEN | PA | 17745 |
| 300 NORTH DENVER AVENUE | TULSA | OK | 74103 |
| 7301 WATERLOO ROAD | JESSUP | MD | 20794 |
| 1116 14TH AVENUE | ELDORA | IA | 50627 |
| 1170 MICHIGAN ROAD | PORT HURON | MI | 48060 |
| 1040 BERKS ROAD | LEESPORT | PA | 19533 |
| 3040 SOUTH STATE HIGHWAY 100 | TIFFIN | OH | 44883 |
| 406 NORTH AVENUE D | SAN LUIS | AZ | 85349 |
| 2201 23RD ST NE | WILLMAR | MN | 56201 |
| 211 EAST NEWTON STREET | VERSAILLES | MO | 65084 |
| 411 SOUTH BROADWAY AVENUE | ALBERT LEA | MN | 56007 |
| 611 EAST JACKSON STREET | BRAZIL | IN | 47834 |
| 12450 MERRITT RD | CHARDON | OH | 44024 |
| 109 SOUTH MAPLE STREET | GRAHAM | NC | 27253 |
| 425 MANOR DRIVE | EBENSBURG | PA | 15931 |
| 351 ELLIOTT ST. | HONOLULU | HI | 96819 |
| 1985 NE 51ST PLACE | DES MOINES | IA | 50313 |
| 101 HOME ROAD | MOUNT GILEAD | OH | 43338 |
| 325 COURT STREET | SAULT SAINTE MARIE | MI | 49783 |
| 4909 FM (FARM TO MARKET) 2826 | ROBSTOWN | TX | 78380 |
| 211 EAST THIRD STREET | MONTGOMERY CITY | MO | 63361 |
| 11866 HASTINGS BRIDGE RD | LOVEJOY | GA | 30250 |
| 720 E SAN YSIDRO BLVD | SAN YSIDRO | CA | 92173 |
| 160 ELM STREET | GREENFIELD | MA | 01301 |

| | | | |
|---|---|---|---|
| 288 WEAVERVILLE ROAD | DIVIDE | CO | 80814 |
| 50 WEST 200 NORTH | LOGAN | UT | 84321 |
| 7300 MARCIE'S CHOICE LANE | FREDERICK | MD | 21704 |
| 336 MAIN STREET | PLATTSMOUTH | NE | 68048 |
| 600 EAST FOURTH ST. | CHASKA | MN | 55318 |
| 911 PARR BOULEVARD | RENO | NV | 89512 |
| 3841 LEEDS AVENUE | NORTH CHARLESTON | SC | 29405 |
| 110 WEST ELM | OZARK | MO | 65721 |
| 211 WEBBER ROAD | THE DALLES | OR | 97058 |
| 710 SOUTH 17TH ST | OMAHA | NE | 68102 |
| 2801 JORDAN ROAD | FORT PAYNE | AL | 35968 |
| 311 ATHEY AVE | SAN DIEGO | CA | 92154 |
| 415 THIRD STREET | PLATTE CITY | MO | 64079 |
| 701 NORTH COLUMBIA STREET | COVINGTON | LA | 70433 |
| 3301 TAMIAMI TRAIL EAST | NAPLES | FL | 34112 |
| 111 WEST COMMERCE STREET | DALLAS | TX | 75202 |
| 14400 49TH STREET NORTH | CLEARWATER | FL | 33762 |
| 750 SOUTH 5400 WEST | HURRICANE | UT | 84737 |
| HWY 28 INTSECT OF ROAD 165 | SAN JUAN | PR | 00939 |
| TEKKEN ST., SUSUPE VILLAGE | SAIPAN | MP | 96950 |
| 1701 NORTH WASHINGTON ST | GRAND FORKS | ND | 58206 |
| 65 BUSINESS PARK DRIVE | TROY | MO | 63379 |
| 203 ASPINALL AVENUE | HAGATNA | GU | 96910 |
| 715 5TH AVENUE | HOLDREGE | NE | 68949 |
| 53 3RD AVENUE BRIDGE | CEDAR RAPIDS | IA | 52401 |
| 1001 CENTRE WAY | CHARLESTON | WV | 25309 |
| 200 HAND AVE. | BAY MINETTE | AL | 36507 |
| 1415 ALBION AVENUE | BURLEY | ID | 83318 |
| 200 COURTHOUSE WAY | RIGBY | ID | 83442 |
| 2935 HIGHWAY 51 | CANTON | MS | 39046 |
| 1400 BIG LAKE ROAD | COUNCIL BLUFFS | IA | 51501 |
| 1725 1ST AVE. | LONGVIEW | WA | 98632 |
| 5001 Maloneyville Rd | Knoxville | TN | 37918 |
| 100 W MAIN STREET | LA GRANGE | KY | 40031 |
| 500 CHAYNEY ROAD | THORNTON | PA | 19373 |
| 110 WELLS FARM ROAD | GOSHEN | NY | 10924 |
| 1109 ARIZONA AVE. | PARKER | AZ | 85344 |
| 4000 MAIN STREET | TROY | NY | 12180 |
| 6299 FINDE NAIFEH DRIVE | MASON | TN | 38049 |
| 1155 WEST CLYDESDALE DRIVE | FAYETTEVILLE | AR | 72701 |
| 1330 HIGHWAY 107 | LA VILLA | TX | 78562 |
| 600 OLD FRANKFORD CR | LEXINGTON | KY | 40510 |
| 521 GIBSON ROAD | LEXINGTON | SC | 29072 |
| 1601 BROADWAY | DAKOTA CITY | NE | 68731 |
| 805 PROFESSIONAL BLVD | DALTON | GA | 30720 |

AR03589

| | | | |
|---|---|---|---|
| 6000 WOODLAWN BOULEVARD | ALIQUIPPA | PA | 15001 |
| 3950 JUVENILE RD | CASTLE HAYNE | NC | 28429 |
| 15 E. CHAUTAUQUA STREET | MAYVILLE | NY | 14757 |
| 203 W. FRONT STREET | LONOKE | AR | 72086 |
| 705 HANOVER STREET | HAMILTON | OH | 45011 |
| 3415 SOUTH 900 WEST | SALT LAKE CITY | UT | 84119 |
| 100 EAST 2ND STREET | MONROE | MI | 48161 |
| 111 NORTH FRONT STREET | YAKIMA | WA | 98901 |
| 850 MAPLE STREET | WHEATLAND | WY | 82201 |
| 801 SOUTH A STREET | FORT SMITH | AR | 72901 |
| 211 WEBBER STREET | THE DALLES | OR | 97058 |
| 125 CEMETERY ROAD | WOODSTOWN | NJ | 08098 |
| 1315 SOUTH B AVENUE | NEVADA | IA | 50201 |
| 2526 NEW CALHOUN HWY | ROME | GA | 30161 |
| 253 FARM TO MARKET 2523 | DEL RIO | TX | 78840 |
| BOX 117 | ELK POINT | SD | 57025 |
| 400 S MAIN STREET | MIDLAND | TX | 79701 |
| 2300 EAST STREET | TEXARKANA | AR | 71854 |
| 1618 ASH STREET | ERIE | PA | 16503 |
| 206-A N MURCHISON STREET | ATHENS | TX | 75751 |
| 1675-3A YORK HWY | YORK | SC | 29745 |
| 810 COMMERCE STREET | KARNES CITY | TX | 78118 |
| 304 SOUTH VAN BUREN AVENUE | MT. PLEASANT | TX | 75455 |

AR03590

### ICE Enforcement and Removal Operations Data, EOFY2020

| | | | Facility Average Length of Stay | FY20 ADP: Deta |
|---|---|---|---|---|
| AOR | Type Detailed | Male/Female | FY20 ALOS | Level A |
| LOS | DIGSA | Female/Male | 65 | 743 |
| ATL | DIGSA | Male | 47 | 807 |
| SNA | CDF | Female/Male | 60 | 991 |
| SNA | FAMILY | Female/Male | 40 | 1,323 |
| NOL | IGSA | Male | 113 | 1,092 |
| PHO | IGSA | Male | 71 | 1,006 |
| NOL | DIGSA | Female/Male | 42 | 436 |
| PHO | DIGSA | Female/Male | 71 | 975 |
| NOL | IGSA | Female/Male | 73 | 915 |
| SND | USMS CDF | Female/Male | 79 | 784 |
| SEA | CDF | Female/Male | 91 | 420 |
| SNA | SPC | Female/Male | 12 | 844 |
| ELP | DIGSA | Male | 51 | 604 |
| HOU | CDF | Female/Male | 23 | 291 |
| NOL | IGSA | Male | 144 | 708 |
| NOL | IGSA | Female/Male | 136 | 733 |
| SNA | IGSA | Female/Male | 22 | 781 |
| ATL | USMS IGA | Female/Male | 36 | 395 |
| ELP | SPC | Female/Male | 12 | 461 |
| HOU | CDF | Female/Male | 32 | 349 |
| NOL | DIGSA | Male | 85 | 520 |
| NOL | IGSA | Female/Male | 95 | 637 |
| SND | CDF | Female/Male | 74 | 585 |
| DAL | DIGSA | Female/Male | 22 | 320 |
| NEW | IGSA | Male | 96 | 16 |
| WAS | DIGSA | Male | 66 | 149 |

| MIA | SPC | Male | 24 | 150 |
|-----|-----|------|-----|-----|
| DEN | CDF | Female/Male | 87 | 298 |
| ATL | DIGSA | Male | 70 | 392 |
| MIA | CDF | Female/Male | 36 | 477 |
| NOL | IGSA | Male | 21 | 336 |
| PHI | IGSA | Female/Male | 56 | 148 |
| SNA | FAMILY | Female | 84 | 484 |
| PHO | IGSA | Male | 73 | 346 |
| HOU | IGSA | Female/Male | 70 | 383 |
| NOL | IGSA | Female/Male | 13 | 319 |
| BUF | SPC | Female/Male | 90 | 167 |
| MIA | IGSA | Female/Male | 56 | 2 |
| SNA | USMS CDF | Male | 29 | 379 |
| NOL | IGSA | Male | 106 | 380 |
| HOU | IGSA | Male | 79 | 370 |
| DAL | USMS IGA | Male | 65 | 326 |
| PHO | SPC | Male | 10 | 291 |
| SFR | CDF | Female/Male | 29 | 83 |
| SNA | USMS IGA | Male | 101 | 295 |
| BOS | IGSA | Male | 78 | 147 |
| SPM | IGSA | Female/Male | 48 | 31 |
| NYC | IGSA | Female/Male | 54 | 88 |
| ELP | IGSA | Male | 27 | 178 |
| NOL | STAGING | Male | 3 | 135 |
| WAS | DIGSA | Female/Male | 63 | 71 |
| MIA | IGSA | Female/Male | 39 | 50 |
| CHI | USMS IGA | Female/Male | 25 | 109 |
| ATL | DIGSA | Male | 38 | 33 |
| SNA | DIGSA | Female/Male | 28 | 227 |
| NOL | USMS IGA | Male | 23 | 96 |
| NEW | CDF | Female/Male | 42 | 178 |
| DAL | IGSA | Male | 46 | 126 |
| DEN | CDF | Female/Male | 93 | 181 |
| NYC | USMS IGA | Female/Male | 60 | 80 |
| PHO | STAGING | Male | 2 | 115 |
| SLC | USMS IGA | Female/Male | 36 | 54 |
| PHI | IGSA | Male | 52 | 77 |
| SLC | USMS IGA | Female/Male | 70 | 88 |
| SNA | FAMILY | Male | 27 | 176 |
| SFR | IGSA | Female/Male | 60 | 15 |
| DAL | IGSA | Male | 29 | 85 |
| BOS | IGSA | Female/Male | 90 | 24 |
| DET | CDF | Male | 104 | 113 |
| CHI | IGSA | Female/Male | 20 | 56 |
| CHI | USMS IGA | Female/Male | 22 | 74 |

| DET | IGSA | Female/Male | 48 | 41 |
|-----|------|-------------|----|----|
| BAL | IGSA | Female/Male | 71 | 36 |
| DAL | IGSA | Male | 26 | 72 |
| CHI | USMS IGA | Male | 10 | 48 |
| CHI | USMS IGA | Female/Male | 40 | 29 |
| DET | IGSA | Female/Male | 43 | 40 |
| CHI | USMS IGA | Female/Male | 29 | 20 |
| NYC | IGSA | Female/Male | 74 | 29 |
| NOL | IGSA | Male | 63 | 70 |
| ELP | IGSA | Male | 36 | 76 |
| BOS | USMS IGA | Male | 69 | 51 |
| SNA | DIGSA | Female/Male | 49 | 44 |
| DAL | IGSA | Female | 87 | 77 |
| MIA | IGSA | Male | 30 | 17 |
| DAL | USMS IGA | Female/Male | 85 | 77 |
| BOS | IGSA | Female/Male | 14 | 38 |
| MIA | IGSA | Male | 45 | 0 |
| SLC | IGSA | Female/Male | 40 | 19 |
| SPM | IGSA | Female/Male | 47 | 12 |
| DET | IGSA | Male | 17 | 27 |
| CHI | IGSA | Female/Male | 43 | 3 |
| PHI | USMS IGA | Male | 27 | 3 |
| DAL | IGSA | Female/Male | 49 | 32 |
| BAL | IGSA | Male | 50 | 6 |
| SPM | IGSA | Female/Male | 33 | 13 |
| DET | IGSA | Male | 33 | 26 |
| PHI | FAMILY | Female/Male | 24 | 48 |
| DET | IGSA | Female/Male | 34 | 41 |
| SND | IGSA | Female/Male | 4 | 42 |
| SPM | IGSA | Female/Male | 72 | 11 |
| CHI | IGSA | Male | 41 | 10 |
| SPM | IGSA | Male | 49 | 7 |
| CHI | USMS IGA | Male | 7 | 18 |
| DET | USMS IGA | Female/Male | 38 | 19 |
| ATL | IGSA | Female/Male | 8 | 23 |
| PHI | USMS IGA | Male | 30 | 8 |
| SFR | BOP | Female/Male | 58 | 4 |
| SPM | USMS IGA | Female/Male | 19 | 10 |
| DET | IGSA | Female/Male | 10 | 11 |
| DET | IGSA | Female/Male | 54 | 14 |
| HOU | USMS IGA | Male | 2 | 2 |
| CHI | IGSA | Female/Male | 32 | 10 |
| ATL | USMS CDF | Female/Male | 7 | 9 |
| SND | Other | Female/Male | 3 | 23 |
| BOS | USMS IGA | Male | 39 | 0 |

AR03593

| DEN | IGSA | Female/Male | 52 | 11 |
|-----|------|-------------|-----|-----|
| SLC | USMS IGA | Female/Male | 7 | 3 |
| BAL | IGSA | Male | 26 | 17 |
| SPM | USMS IGA | Female/Male | 28 | 4 |
| SPM | IGSA | Female/Male | 35 | 1 |
| SLC | USMS IGA | Female/Male | 15 | 2 |
| ATL | USMS IGA | Male | 2 | 5 |
| CHI | IGSA | Male | 27 | 3 |
| SEA | IGSA | Male | 42 | 0 |
| SPM | IGSA | Female/Male | 8 | 1 |
| NOL | USMS IGA | Female/Male | 5 | 6 |
| SND | Other | Female/Male | 2 | 10 |
| CHI | IGSA | Female/Male | 19 | 5 |
| NOL | IGSA | Female/Male | 3 | 1 |
| MIA | IGSA | Female/Male | 2 | 4 |
| DAL | USMS IGA | Female/Male | 1 | 7 |
| MIA | USMS IGA | Female/Male | 2 | 1 |
| SLC | USMS IGA | Female/Male | 7 | 1 |
| MIA | BOP | Female/Male | 9 | 0 |
| SFR | USMS IGA | Female/Male | 9 | 0 |
| SPM | IGSA | Female/Male | 4 | 0 |
| CHI | IGSA | Female/Male | 35 | 1 |
| SFR | USMS IGA | Female/Male | 48 | 0 |
| SPM | USMS IGA | Female/Male | 34 | 2 |
| SPM | USMS IGA | Female/Male | 7 | 1 |
| PHI | USMS IGA | Female/Male | 9 | 1 |
| NOL | IGSA | Female/Male | 2 | 0 |
| SLC | IGSA | Female/Male | 5 | 1 |
| SLC | IGSA | Female/Male | 6 | 1 |
| NOL | USMS IGA | Female/Male | 3 | 0 |
| SPM | USMS IGA | Female/Male | 26 | 0 |
| SEA | JUVENILE | Female/Male | 112 | 1 |
| NOL | USMS IGA | Female/Male | 2 | 1 |
| CHI | IGSA | Female/Male | 2 | 1 |
| PHI | USMS IGA | Female/Male | 1 | 1 |
| NYC | IGSA | Female/Male | 74 | 29 |
| PHO | USMS IGA | Female/Male | 2 | 0 |
| BUF | USMS IGA | Female/Male | 4 | 1 |
| NOL | USMS IGA | Female/Male | 2 | 1 |
| NOL | USMS IGA | Female/Male | 2 | 1 |
| SNA | USMS IGA | Female/Male | 3 | 2 |
| CHI | USMS IGA | Female/Male | 2 | 0 |
| ATL | USMS IGA | Female/Male | 1 | 0 |
| SPM | USMS IGA | Female/Male | 3 | 0 |
| ATL | IGSA | Female/Male | 2 | 1 |

| PHI | USMS IGA | Female/Male | 5 | 0 |
|-----|----------|-------------|---|---|
| ATL | IGSA | Female/Male | 2 | 0 |
| BUF | IGSA | Female/Male | 40 | 1 |
| NOL | IGSA | Female/Male | 2 | 0 |
| DET | IGSA | Female/Male | 43 | 40 |
| SLC | USMS IGA | Female/Male | 2 | 0 |
| DET | IGSA | Female/Male | 2 | 0 |
| SEA | USMS IGA | Female/Male | 0 | 1 |
| DEN | USMS IGA | Female/Male | 1 | 0 |
| NOL | USMS IGA | Female/Male | 3 | 0 |
| SEA | JUVENILE | Female/Male | 238 | 0 |
| NEW | USMS IGA | Female/Male | 2 | 0 |
| SPM | USMS IGA | Female/Male | 4 | 0 |
| ATL | USMS IGA | Female/Male | 2 | 0 |
| SNA | USMS IGA | Female/Male | 2 | 0 |
| SPM | USMS IGA | Female/Male | 3 | 0 |
| ELP | USMS IGA | Female/Male | 2 | 0 |
| NOL | USMS IGA | Female/Male | 2 | 0 |
| PHI | USMS IGA | Female/Male | 3 | 0 |
| DAL | IGSA | Female/Male | 1 | 0 |
| ATL | USMS IGA | Female/Male | 2 | 0 |
| SNA | USMS IGA | Female/Male | 0 | 0 |
| DAL | USMS IGA | Female/Male | 1 | 0 |

AR03595

| inee Classification Level | | | FY20 ADP: Criminality | | |
|---|---|---|---|---|---|
| **Level B** | **Level C** | **Level D** | **Male Crim** | **Male Non-Crim** | **Female Crim** |
| 110 | 305 | 441 | 768 | 555 | 75 |
| 275 | 239 | 206 | 733 | 794 | 0 |
| 198 | 159 | 99 | 471 | 768 | 45 |
| 0 | 0 | 0 | 0 | 345 | 5 |
| 111 | 69 | 36 | 171 | 1,136 | 0 |
| 140 | 86 | 47 | 272 | 1,007 | 0 |
| 364 | 340 | 85 | 457 | 524 | 100 |
| 77 | 96 | 69 | 158 | 346 | 88 |
| 29 | 49 | 57 | 134 | 462 | 4 |
| 131 | 45 | 67 | 197 | 694 | 21 |
| 142 | 177 | 201 | 429 | 348 | 42 |
| 48 | 10 | 38 | 174 | 763 | 0 |
| 240 | 44 | 29 | 367 | 550 | 0 |
| 325 | 100 | 159 | 470 | 273 | 49 |
| 88 | 9 | 0 | 62 | 742 | 0 |
| 62 | 4 | 0 | 53 | 593 | 13 |
| 6 | 2 | 0 | 39 | 451 | 24 |
| 178 | 114 | 101 | 252 | 225 | 101 |
| 184 | 75 | 40 | 207 | 240 | 80 |
| 276 | 78 | 57 | 302 | 352 | 24 |
| 110 | 60 | 12 | 131 | 570 | 0 |
| 40 | 8 | 2 | 0 | 0 | 59 |
| 8 | 9 | 35 | 69 | 504 | 2 |
| 103 | 116 | 85 | 292 | 273 | 28 |
| 21 | 357 | 222 | 357 | 258 | 1 |
| 206 | 125 | 127 | 360 | 246 | 1 |

AR03596

| | | | | | |
|---|---|---|---|---|---|
| 76 | 192 | 187 | 373 | 232 | 0 |
| 65 | 144 | 86 | 260 | 303 | 6 |
| 126 | 19 | 7 | 164 | 379 | 0 |
| 41 | 0 | 0 | 83 | 348 | 6 |
| 101 | 56 | 18 | 166 | 345 | 0 |
| 130 | 116 | 95 | 299 | 155 | 17 |
| 4 | 0 | 0 | 0 | 1 | 13 |
| 71 | 36 | 25 | 123 | 355 | 0 |
| 53 | 13 | 15 | 56 | 232 | 20 |
| 55 | 57 | 25 | 125 | 329 | 0 |
| 100 | 73 | 97 | 248 | 135 | 20 |
| 56 | 191 | 178 | 285 | 76 | 39 |
| 19 | 5 | 9 | 63 | 349 | 0 |
| 26 | 2 | 2 | 29 | 381 | 0 |
| 26 | 7 | 6 | 33 | 376 | 0 |
| 52 | 15 | 12 | 98 | 307 | 0 |
| 73 | 3 | 2 | 101 | 267 | 0 |
| 108 | 65 | 89 | 237 | 29 | 15 |
| 33 | 0 | 0 | 50 | 279 | 0 |
| 41 | 59 | 63 | 136 | 174 | 0 |
| 39 | 208 | 26 | 185 | 105 | 9 |
| 55 | 85 | 62 | 172 | 89 | 21 |
| 68 | 20 | 18 | 118 | 167 | 0 |
| 52 | 53 | 39 | 137 | 143 | 0 |
| 92 | 47 | 58 | 145 | 85 | 8 |
| 82 | 79 | 42 | 146 | 88 | 16 |
| 30 | 62 | 51 | 131 | 93 | 6 |
| 22 | 119 | 70 | 189 | 54 | 0 |
| 4 | 3 | 7 | 0 | 0 | 20 |
| 46 | 49 | 44 | 118 | 117 | 0 |
| 55 | 1 | 0 | 62 | 143 | 3 |
| 46 | 26 | 25 | 106 | 116 | 0 |
| 6 | 12 | 11 | 14 | 152 | 14 |
| 34 | 55 | 37 | 115 | 68 | 10 |
| 53 | 21 | 12 | 86 | 96 | 7 |
| 42 | 53 | 45 | 100 | 69 | 18 |
| 24 | 53 | 37 | 111 | 80 | 0 |
| 22 | 49 | 31 | 85 | 34 | 12 |
| 5 | 1 | 0 | 7 | 174 | 0 |
| 23 | 48 | 91 | 142 | 22 | 10 |
| 33 | 33 | 23 | 102 | 72 | 0 |
| 17 | 54 | 73 | 96 | 59 | 9 |
| 15 | 21 | 16 | 51 | 115 | 0 |
| 24 | 36 | 35 | 93 | 48 | 3 |
| 18 | 28 | 28 | 71 | 62 | 6 |

AR03597

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 46 | 29 | 18 | 69 | 38 | 12 |
| 11 | 34 | 52 | 85 | 41 | 4 |
| 30 | 18 | 13 | 62 | 42 | 2 |
| 18 | 22 | 40 | 87 | 41 | 0 |
| 21 | 39 | 34 | 88 | 30 | 2 |
| 33 | 30 | 11 | 67 | 39 | 2 |
| 13 | 46 | 34 | 81 | 25 | 7 |
| 22 | 43 | 18 | 75 | 35 | 1 |
| 38 | 1 | 0 | 13 | 97 | 0 |
| 26 | 4 | 4 | 36 | 73 | 1 |
| 10 | 14 | 25 | 40 | 61 | 0 |
| 2 | 15 | 35 | 29 | 59 | 4 |
| 13 | 1 | 1 | 2 | 2 | 10 |
| 17 | 23 | 32 | 66 | 24 | 0 |
| 7 | 3 | 2 | 1 | 0 | 12 |
| 12 | 14 | 17 | 34 | 37 | 5 |
| 15 | 32 | 34 | 63 | 18 | 0 |
| 7 | 25 | 26 | 55 | 23 | 0 |
| 15 | 31 | 17 | 61 | 10 | 4 |
| 32 | 12 | 2 | 34 | 40 | 0 |
| 40 | 23 | 2 | 43 | 23 | 2 |
| 13 | 34 | 16 | 64 | 2 | 0 |
| 8 | 14 | 8 | 40 | 21 | 0 |
| 8 | 17 | 29 | 50 | 11 | 0 |
| 17 | 12 | 16 | 49 | 8 | 0 |
| 22 | 8 | 2 | 27 | 31 | 0 |
| 7 | 0 | 0 | 0 | 29 | 0 |
| 7 | 4 | 2 | 13 | 35 | 1 |
| 11 | 1 | 1 | 10 | 23 | 1 |
| 6 | 25 | 11 | 26 | 12 | 13 |
| 15 | 17 | 11 | 34 | 19 | 0 |
| 8 | 22 | 15 | 37 | 14 | 0 |
| 7 | 17 | 10 | 31 | 19 | 1 |
| 14 | 9 | 5 | 24 | 18 | 1 |
| 7 | 4 | 7 | 19 | 22 | 0 |
| 15 | 15 | 2 | 21 | 18 | 0 |
| 19 | 9 | 6 | 21 | 11 | 2 |
| 7 | 7 | 7 | 24 | 5 | 2 |
| 8 | 7 | 3 | 18 | 9 | 0 |
| 5 | 6 | 3 | 11 | 13 | 2 |
| 23 | 2 | 0 | 19 | 8 | 0 |
| 4 | 6 | 6 | 11 | 14 | 0 |
| 6 | 6 | 4 | 14 | 11 | 0 |
| 0 | 0 | 0 | 1 | 12 | 0 |
| 0 | 6 | 16 | 18 | 4 | 0 |

AR03598

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 2 | 4 | 5 | 9 | 9 | 1 |
| 4 | 7 | 7 | 17 | 2 | 2 |
| 3 | 0 | 0 | 5 | 15 | 0 |
| 4 | 9 | 2 | 12 | 3 | 2 |
| 3 | 9 | 3 | 10 | 3 | 1 |
| 3 | 6 | 3 | 11 | 2 | 0 |
| 5 | 3 | 2 | 9 | 5 | 0 |
| 4 | 4 | 2 | 7 | 6 | 0 |
| 3 | 5 | 5 | 12 | 1 | 0 |
| 3 | 5 | 3 | 9 | 2 | 1 |
| 3 | 3 | 0 | 0 | 0 | 5 |
| 1 | 0 | 0 | 1 | 8 | 0 |
| 2 | 2 | 1 | 4 | 3 | 2 |
| 4 | 4 | 1 | 2 | 6 | 0 |
| 1 | 2 | 1 | 5 | 3 | 0 |
| 0 | 0 | 0 | 4 | 3 | 0 |
| 3 | 3 | 1 | 4 | 2 | 0 |
| 5 | 1 | 0 | 4 | 2 | 0 |
| 2 | 2 | 2 | 5 | 1 | 0 |
| 6 | 0 | 0 | 3 | 2 | 1 |
| 0 | 6 | 0 | 2 | 3 | 0 |
| 1 | 1 | 4 | 5 | 1 | 1 |
| 4 | 0 | 1 | 4 | 2 | 0 |
| 0 | 3 | 1 | 3 | 2 | 0 |
| 2 | 1 | 1 | 4 | 1 | 0 |
| 2 | 2 | 0 | 3 | 2 | 0 |
| 4 | 1 | 0 | 2 | 3 | 0 |
| 1 | 1 | 1 | 3 | 0 | 0 |
| 1 | 1 | 1 | 2 | 1 | 0 |
| 1 | 2 | 1 | 1 | 2 | 0 |
| 1 | 2 | 0 | 3 | 1 | 0 |
| 1 | 1 | 1 | 0 | 2 | 1 |
| 1 | 0 | 0 | 2 | 1 | 0 |
| 2 | 1 | 0 | 2 | 2 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 22 | 43 | 18 | 75 | 35 | 1 |
| 2 | 0 | 0 | 2 | 0 | 0 |
| 2 | 0 | 0 | 1 | 1 | 0 |
| 1 | 0 | 0 | 2 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 0 | 0 | 2 | 0 | 0 |
| 0 | 1 | 1 | 2 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 1 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 1 | 1 | 0 |

AR03599

| | | | | | |
|---|---|---|---|---|---|
| 1 | 1 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 1 | 1 | 0 |
| 0 | 0 | 1 | 0 | 0 | 1 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 33 | 30 | 11 | 67 | 39 | 2 |
| 0 | 1 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 0 | 1 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |

AR03600

| | FY20 ADP: ICE Threat Level | | | | FY20 ADP: Mandatory |
|---|---|---|---|---|---|
| Female Non-Crim | ICE Threat Level 1 | ICE Threat Level 2 | ICE Threat Level 3 | No ICE Threat Level | Mandatory |
| 201 | 458 | 226 | 152 | 763 | 938 |
| 0 | 308 | 188 | 238 | 794 | 921 |
| 163 | 116 | 118 | 285 | 927 | 687 |
| 973 | 0 | 0 | 5 | 1,318 | 1,251 |
| 0 | 45 | 32 | 95 | 1,136 | 479 |
| 0 | 51 | 44 | 177 | 1,007 | 457 |
| 145 | 204 | 139 | 214 | 669 | 519 |
| 626 | 74 | 49 | 123 | 972 | 461 |
| 450 | 84 | 25 | 29 | 911 | 636 |
| 115 | 114 | 44 | 57 | 813 | 635 |
| 120 | 273 | 100 | 95 | 472 | 620 |
| 2 | 47 | 44 | 84 | 765 | 633 |
| 0 | 46 | 62 | 272 | 537 | 421 |
| 82 | 241 | 129 | 152 | 352 | 504 |
| 1 | 2 | 4 | 56 | 743 | 478 |
| 140 | 2 | 5 | 60 | 733 | 457 |
| 275 | 11 | 12 | 41 | 725 | 593 |
| 209 | 165 | 84 | 106 | 433 | 474 |
| 234 | 69 | 55 | 162 | 474 | 398 |
| 82 | 75 | 101 | 153 | 430 | 508 |
| 0 | 28 | 20 | 83 | 570 | 349 |
| 628 | 6 | 8 | 46 | 628 | 295 |
| 61 | 50 | 8 | 14 | 565 | 478 |
| 29 | 132 | 74 | 114 | 303 | 307 |
| 0 | 203 | 74 | 84 | 255 | 323 |
| 0 | 150 | 103 | 108 | 246 | 300 |

AR03601

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 0 | 185 | 93 | 95 | 232 | 419 |
| 25 | 126 | 86 | 53 | 328 | 344 |
| 0 | 27 | 44 | 94 | 378 | 251 |
| 82 | 2 | 22 | 66 | 429 | 263 |
| 0 | 33 | 29 | 104 | 346 | 502 |
| 20 | 152 | 84 | 78 | 177 | 346 |
| 474 | 0 | 0 | 13 | 475 | 269 |
| 0 | 28 | 18 | 78 | 355 | 238 |
| 155 | 18 | 8 | 53 | 384 | 316 |
| 0 | 52 | 26 | 47 | 329 | 451 |
| 34 | 161 | 39 | 67 | 168 | 313 |
| 26 | 180 | 77 | 67 | 102 | 268 |
| 0 | 7 | 9 | 47 | 349 | 335 |
| 0 | 2 | 1 | 26 | 381 | 286 |
| 0 | 7 | 5 | 22 | 376 | 197 |
| 0 | 31 | 13 | 54 | 308 | 157 |
| 0 | 6 | 9 | 86 | 267 | 256 |
| 64 | 178 | 43 | 27 | 97 | 254 |
| 0 | 1 | 1 | 48 | 279 | 185 |
| 0 | 69 | 28 | 39 | 174 | 166 |
| 6 | 81 | 57 | 55 | 112 | 200 |
| 8 | 85 | 42 | 66 | 97 | 171 |
| 0 | 21 | 27 | 71 | 166 | 254 |
| 0 | 55 | 30 | 52 | 143 | 277 |
| 30 | 61 | 44 | 47 | 115 | 138 |
| 4 | 72 | 38 | 53 | 91 | 122 |
| 23 | 60 | 39 | 39 | 115 | 161 |
| 0 | 115 | 48 | 26 | 54 | 140 |
| 220 | 5 | 2 | 14 | 220 | 119 |
| 0 | 65 | 27 | 27 | 116 | 196 |
| 26 | 8 | 15 | 42 | 169 | 139 |
| 0 | 42 | 27 | 37 | 116 | 108 |
| 30 | 16 | 5 | 6 | 182 | 134 |
| 14 | 43 | 31 | 50 | 82 | 128 |
| 11 | 19 | 16 | 57 | 107 | 173 |
| 7 | 43 | 36 | 39 | 77 | 109 |
| 0 | 52 | 21 | 35 | 82 | 109 |
| 60 | 47 | 23 | 26 | 94 | 108 |
| 2 | 0 | 1 | 6 | 176 | 174 |
| 3 | 98 | 28 | 26 | 25 | 123 |
| 0 | 36 | 27 | 39 | 71 | 87 |
| 4 | 70 | 11 | 24 | 63 | 99 |
| 0 | 22 | 16 | 12 | 115 | 129 |
| 8 | 39 | 25 | 32 | 56 | 92 |
| 11 | 35 | 19 | 23 | 72 | 88 |

AR03602

| | | | | | |
|---|---|---|---|---|---|
| 14 | 30 | 22 | 30 | 52 | 70 |
| 3 | 47 | 22 | 21 | 44 | 88 |
| 26 | 25 | 17 | 22 | 68 | 65 |
| 0 | 47 | 24 | 16 | 41 | 91 |
| 1 | 36 | 35 | 20 | 31 | 62 |
| 6 | 14 | 24 | 31 | 45 | 35 |
| 1 | 26 | 36 | 23 | 29 | 57 |
| 2 | 29 | 13 | 34 | 36 | 47 |
| 0 | 1 | 1 | 11 | 97 | 55 |
| 0 | 6 | 3 | 29 | 72 | 88 |
| 0 | 21 | 7 | 12 | 61 | 50 |
| 5 | 12 | 7 | 14 | 63 | 59 |
| 78 | 1 | 2 | 9 | 80 | 31 |
| 0 | 39 | 15 | 12 | 23 | 79 |
| 75 | 3 | 3 | 7 | 76 | 40 |
| 6 | 20 | 8 | 11 | 43 | 53 |
| 0 | 31 | 21 | 12 | 18 | 49 |
| 0 | 28 | 16 | 10 | 24 | 53 |
| 1 | 19 | 29 | 16 | 11 | 44 |
| 0 | 10 | 10 | 13 | 40 | 41 |
| 0 | 19 | 10 | 16 | 24 | 43 |
| 0 | 46 | 17 | 1 | 2 | 62 |
| 0 | 17 | 9 | 14 | 22 | 27 |
| 0 | 23 | 10 | 14 | 12 | 40 |
| 1 | 18 | 16 | 16 | 8 | 32 |
| 0 | 10 | 7 | 10 | 31 | 27 |
| 25 | 0 | 0 | 0 | 55 | 48 |
| 5 | 3 | 3 | 7 | 40 | 22 |
| 19 | 2 | 2 | 8 | 42 | 51 |
| 2 | 26 | 4 | 8 | 14 | 44 |
| 0 | 16 | 7 | 11 | 19 | 29 |
| 0 | 16 | 13 | 8 | 15 | 37 |
| 1 | 10 | 9 | 12 | 20 | 26 |
| 4 | 4 | 8 | 12 | 22 | 20 |
| 0 | 9 | 4 | 7 | 22 | 31 |
| 0 | 13 | 4 | 4 | 18 | 16 |
| 3 | 13 | 7 | 3 | 15 | 32 |
| 0 | 7 | 7 | 12 | 5 | 17 |
| 1 | 5 | 6 | 7 | 10 | 26 |
| 2 | 9 | 2 | 3 | 15 | 13 |
| 0 | 2 | 8 | 10 | 7 | 25 |
| 1 | 5 | 3 | 3 | 15 | 15 |
| 0 | 8 | 3 | 3 | 11 | 21 |
| 10 | 0 | 0 | 0 | 22 | 23 |
| 0 | 13 | 2 | 3 | 4 | 21 |

AR03603

| | | | | | |
|---|---|---|---|---|---|
| 4 | 6 | 3 | 1 | 12 | 21 |
| 0 | 12 | 5 | 2 | 2 | 17 |
| 0 | 0 | 1 | 4 | 15 | 14 |
| 1 | 2 | 6 | 6 | 4 | 9 |
| 1 | 7 | 2 | 2 | 4 | 12 |
| 0 | 6 | 3 | 2 | 4 | 10 |
| 0 | 2 | 4 | 3 | 5 | 8 |
| 0 | 1 | 3 | 3 | 6 | 5 |
| 0 | 7 | 4 | 1 | 1 | 11 |
| 0 | 4 | 3 | 3 | 2 | 7 |
| 6 | 3 | 1 | 2 | 6 | 10 |
| 1 | 1 | 0 | 1 | 9 | 6 |
| 1 | 3 | 1 | 3 | 4 | 5 |
| 1 | 1 | 1 | 1 | 7 | 4 |
| 0 | 1 | 2 | 3 | 3 | 4 |
| 0 | 1 | 1 | 2 | 3 | 3 |
| 0 | 1 | 1 | 1 | 3 | 3 |
| 0 | 2 | 2 | 1 | 2 | 4 |
| 0 | 2 | 2 | 0 | 1 | 5 |
| 0 | 2 | 2 | 0 | 2 | 5 |
| 0 | 1 | 1 | 1 | 4 | 3 |
| 0 | 2 | 3 | 1 | 1 | 5 |
| 0 | 3 | 1 | 0 | 2 | 4 |
| 0 | 1 | 1 | 1 | 2 | 3 |
| 0 | 2 | 1 | 1 | 1 | 4 |
| 0 | 2 | 2 | 0 | 2 | 4 |
| 0 | 0 | 0 | 1 | 3 | 2 |
| 0 | 1 | 1 | 1 | 0 | 3 |
| 0 | 1 | 1 | 1 | 1 | 3 |
| 0 | 0 | 1 | 1 | 2 | 1 |
| 0 | 0 | 1 | 1 | 1 | 2 |
| 0 | 1 | 0 | 0 | 2 | 1 |
| 0 | 0 | 0 | 1 | 2 | 1 |
| 0 | 0 | 0 | 1 | 2 | 2 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 2 | 29 | 13 | 34 | 36 | 47 |
| 0 | 0 | 1 | 2 | 0 | 2 |
| 0 | 0 | 0 | 1 | 1 | 2 |
| 0 | 0 | 0 | 1 | 1 | 2 |
| 0 | 0 | 0 | 1 | 1 | 1 |
| 0 | 1 | 1 | 0 | 0 | 2 |
| 0 | 1 | 1 | 0 | 1 | 1 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 0 | 0 | 1 | 1 | 0 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |

AR03604

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 1 | 1 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 6 | 14 | 24 | 31 | 45 | 35 |
| 0 | 1 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |

AR03605

## Contract Facility Inspections Information

| Guaranteed Minimum | Last Inspection Type | Last Inspection Standard | Last Inspection Rating - Final | Last Inspection Date |
|---|---|---|---|---|
| 1,455 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
| 1,600 | Regular | PBNDS 2011 | Meets Standard | 5/9/2019 |
| 1,350 | Regular | PBNDS 2011 | Meets Standard | 2/28/2019 |
| 2,400 | Regular | JFRMU Family | Pending | 1/9/2020 |
| 1,100 | Regular | PBNDS 2011 | Meets Standard | 10/10/2019 |
| 650 | Regular | PBNDS 2011 | Meets Standard | 6/27/2019 |
| 1,170 | Regular | PBNDS 2011 | Meets Standard | 9/26/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 2/6/2020 |
| 1,100 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 1/24/2020 |
| 1,181 | Regular | PBNDS 2011 | Meets Standard | 5/16/2019 |
| 800 | Regular | PBNDS 2011 | Meets Standard | 1/30/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 1/30/2020 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 12/19/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 10/3/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 11/7/2019 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 10/24/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 6/13/2019 |
| 600 | Regular | PBNDS 2011 | Meets Standard | 12/12/2019 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 1/9/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 4/25/2019 |
| 700 | Regular | PBNDS 2011 | Meets Standard | 11/7/2019 |
| 640 | Regular | PBNDS 2011 | Meets Standard | 1/16/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 2/13/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 9/26/2019 |
| 500 | Regular | PBNDS 2011 | Meets Standard | 2/28/2019 |

AR03606

| | | | | |
|---|---|---|---|---|
| 450 | Regular | PBNDS 2011 | Pending | 2/13/2020 |
| 525 | Regular | PBNDS 2011 | Meets Standard | 11/27/2019 |
| 544 | Regular | PBNDS 2011 | Meets Standard | 6/6/2019 |
| 700 | Regular | PBNDS 2011 | Meets Standard | 10/31/2019 |
| 625 | Regular | PBNDS 2011 | Meets Standard | 8/22/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/18/2019 |
| | Regular | JFRMU Family | Pending | 8/29/2019 |
| 650 | N/A | | | New Facility |
| | Regular | PBNDS 2011 | Meets Standard | 11/15/2019 |
| 550 | Regular | PBNDS 2011 | Meets Standard | 11/15/2019 |
| 400 | Regular | PBNDS 2011 | Meets Standard | 4/4/2019 |
| | Regular | NDS | Acceptable | 3/14/2019 |
| 275 | Regular | PBNDS 2008 | Meets Standard | 3/14/2019 |
| | Regular | NDS | Acceptable | 10/24/2019 |
| | Regular | NDS | Acceptable | 1/9/2020 |
| | Regular | NDS | Acceptable | 12/19/2019 |
| 374 | Regular | PBNDS 2011 | Meets Standard | 4/11/2019 |
| 320 | Regular | PBNDS 2011 | Meets Standard | 6/27/2019 |
| | Regular | NDS | Acceptable | 10/24/2019 |
| | Regular | NDS | Acceptable | 6/13/2019 |
| 300 | Regular | NDS | Acceptable | 11/15/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 5/9/2019 |
| 714 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
| 1,170 | N/A | | | |
| 224 | Regular | PBNDS 2011 | Meets Standard | 5/2/2019 |
| | Regular | NDS | Acceptable | 5/31/2019 |
| | Regular | NDS | Acceptable | 6/13/2019 |
| 338 | Regular | PBNDS 2011 | Meets Standard | 6/6/2019 |
| | Regular | NDS | Acceptable | 6/4/2019 |
| | Regular | NDS | Acceptable | 7/18/2019 |
| 285 | Regular | PBNDS 2011 | Meets Standard | 10/3/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 9/19/2019 |
| 432 | Regular | PBNDS 2011 | Meets Standard | 11/27/2019 |
| | Regular | NDS | Acceptable | 2/28/2019 |
| 374 | N/A | | | |
| | Regular | NDS | Acceptable | 7/18/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 4/25/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 7/25/2019 |
| 830 | Regular | JFRMU Family | Pending | 1/23/2020 |
| | Regular | NDS | Acceptable | 11/15/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 8/22/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 5/16/2019 |
| 300 | Regular | PBNDS 2011 | Meets Standard | 3/21/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 3/14/2019 |
| | Regular | NDS | Acceptable | 6/6/2019 |

| | | | | |
|---|---|---|---|---|
| 75 | Regular | NDS | Acceptable | 3/7/2019 |
| | Regular | NDS | Acceptable | 8/15/2019 |
| 750 | Regular | PBNDS 2011 | Special Review - Pre-Occu | 12/19/2019 |
| | Regular | NDS | Acceptable | 4/11/2019 |
| | Regular | NDS | Acceptable | 3/7/2019 |
| | Regular | NDS | Acceptable | 5/2/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 12/5/2019 |
| 150 | Regular | PBNDS 2011 | Meets Standard | 5/9/2019 |
| | Regular | NDS | Acceptable | 4/11/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 2/6/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 10/24/2019 |
| | Regular | NDS | Acceptable | 10/18/2019 |
| | Regular | NDS | Acceptable | 8/8/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 12/12/2019 |
| 50 | Regular | PBNDS 2008 | Meets Standard | 8/1/2019 |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 8/15/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 9/26/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 1/25/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 8/29/2019 |
| | Regular | NDS | Acceptable | 9/12/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/31/2019 |
| 96 | Regular | JFRMU Family | Pending | 12/19/2019 |
| | Regular | NDS | Deficient | 10/3/2019 |
| 250 | Regular | NDS | Acceptable | 5/2/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 2/22/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 5/31/2019 |
| | Regular | NDS | Acceptable | 10/10/2019 |
| | Regular | NDS | Acceptable | 11/7/2019 |
| | Regular | NDS | Acceptable | 11/7/2019 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 8/1/2019 |
| | Regular | NDS | Acceptable | 3/8/2018 |
| | Regular | NDS | Acceptable | 3/28/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 1/9/2020 |
| | Regular | NDS | Acceptable | 11/7/2019 |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 5/2/2019 |

| | Regular | NDS | Deficient | 8/22/2019 |
|---|---|---|---|---|
| | Regular | NDS | Acceptable | 11/8/2018 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 9/19/2019 |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | Regular | NDS | Acceptable | 8/30/2018 |
| | Regular | NDS | Acceptable | 12/19/2019 |
| | Regular | NDS | Acceptable | 5/24/2018 |
| | Regular | NDS | Acceptable | 10/31/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/24/2019 |
| | Regular | NDS | Pending | 1/30/2020 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 12/12/2019 |
| | ORSA | NDS | Acceptable | 10/5/2018 |
| | Regular | NDS | Special Review - Pre-Occu | 2/7/2019 |
| | ORSA | NDS | Acceptable | 10/20/2017 |
| | ORSA | NDS | Acceptable | 9/21/2018 |
| | ORSA | NDS | Acceptable | 9/15/2018 |
| | Regular | NDS | Superior | 5/8/2008 |
| | N/A | | | |
| | Regular | NDS | Deficient | 5/17/2018 |
| | ORSA | NDS | Acceptable | 9/19/2018 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 7/18/2019 |
| | Regular | NDS | Acceptable | 6/20/2019 |
| | ORSA | NDS | Acceptable | 8/23/2018 |
| | ORSA | NDS | Acceptable | 9/11/2018 |
| | ORSA | NDS | Acceptable | 9/17/2018 |
| | ORSA | NDS | Acceptable | 9/17/2018 |
| | ORSA | NDS | Acceptable | 9/27/2018 |
| | Regular | NDS | Acceptable | 4/12/2018 |
| | Regular | JFRMU Juvenile | Pending | 8/1/2019 |
| | ORSA | NDS | Acceptable | 9/11/2018 |
| | ORSA | NDS | Acceptable | 8/16/2018 |
| | ORSA | NDS | Acceptable | 8/10/2018 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | ORSA | NDS | Acceptable | 9/27/2018 |
| | N/A | | | |
| | Regular | PBNDS 2008 | Meets Standard | 1/16/2020 |
| | ORSA | NDS | Acceptable | 9/18/2018 |
| | Regular | NDS | Acceptable | 9/6/2019 |
| | ORSA | NDS | Acceptable | 8/14/2018 |
| | ORSA | NDS | Acceptable | 9/15/2017 |
| | ORSA | NDS | Acceptable | 9/24/2018 |
| | ORSA | NDS | Acceptable | 10/16/2018 |

| | ORSA | NDS | Acceptable | 9/18/2017 |
|---|---|---|---|---|
| | ORSA | NDS | Acceptable | 9/15/2017 |
| | ORSA | NDS | Acceptable | 9/25/2018 |
| | ORSA | NDS | Acceptable | 9/18/2018 |
| | Regular | NDS | Acceptable | 5/2/2019 |
| | ORSA | NDS | Acceptable | 9/15/2018 |
| | Regular | NDS | Acceptable | 2/23/2011 |
| | ORSA | NDS | Acceptable | 10/2/2017 |
| | ORSA | NDS | Acceptable | 9/18/2018 |
| | ORSA | NDS | Acceptable | 10/1/2018 |
| | Regular | JFRMU Juvenile | Pending | 7/18/2019 |
| | Regular | NDS | Acceptable | 2/24/2016 |
| | ORSA | NDS | Acceptable | 9/25/2018 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 9/19/2019 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 9/4/2013 |
| | ORSA | NDS | Acceptable | 9/11/2018 |
| | ORSA | NDS | Acceptable | 9/20/2018 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 8/11/2016 |
| | Regular | NDS | Acceptable | 3/16/2017 |
| | ORSA | NDS | Acceptable | 8/8/2016 |

| Second to Last Inspection Type | Second to Last Inspection Standard | Second to Last Inspection Rating | Second to Last Inspection Date |
|---|---|---|---|
| Regular | PBNDS 2011 | Pending | 11/20/2019 |
| Regular | PBNDS 2011 | Meets Standard | 5/3/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | JFRMU Family | Pending | 11/13/2019 |
| N/A | | | |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 9/27/2018 |
| Regular | PBNDS 2011 | Meets Standard | 2/7/2019 |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 1/25/2019 |
| Regular | PBNDS 2011 | Meets Standard | 4/19/2018 |
| Regular | PBNDS 2011 | Meets Standard | 1/31/2019 |
| Regular | PBNDS 2011 | Meets Standard | 1/31/2019 |
| Regular | PBNDS 2011 | Meets Standard | 12/20/2018 |
| N/A | | | |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 12/6/2018 |
| Regular | PBNDS 2008 | Meets Standard | 6/14/2018 |
| Regular | PBNDS 2011 | Meets Standard | 12/13/2018 |
| Regular | PBNDS 2011 | Meets Standard | 1/10/2019 |
| Regular | PBNDS 2011 | Meets Standard | 4/26/2018 |
| Regular | PBNDS 2008 | Meets Standard | 2/12/2015 |
| Regular | PBNDS 2011 | Meets Standard | 1/17/2019 |
| Regular | PBNDS 2011 | Meets Standard | 2/14/2019 |
| Regular | PBNDS 2011 | Meets Standard | 9/27/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/8/2018 |

| Regular | PBNDS 2011 | Meets Standard | 2/14/2019 |
|---|---|---|---|
| Regular | PBNDS 2011 | Meets Standard | 10/4/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/23/2017 |
| Regular | PBNDS 2011 | Meets Standard | 11/1/2018 |
| Regular | NDS | Superior | 4/18/2007 |
| Regular | PBNDS 2008 | Meets Standard | 10/18/2018 |
| N/A | | | |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 11/16/2018 |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | NDS | Acceptable | 3/15/2018 |
| Regular | PBNDS 2008 | Meets Standard | 3/15/2018 |
| Regular | NDS | TAR Assigned | 3/14/2019 |
| Regular | NDS | Acceptable | 1/10/2019 |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 4/12/2018 |
| Regular | PBNDS 2011 | Meets Standard | 6/28/2018 |
| Regular | NDS | Special Review - I | 4/25/2013 |
| Regular | NDS | Acceptable | 6/14/2018 |
| Regular | NDS | Acceptable | 11/16/2018 |
| Regular | PBNDS 2008 | Meets Standard | 8/16/2018 |
| Regular | PBNDS 2011 | Special Review - I | 7/25/2019 |
| N/A | | | |
| Regular | PBNDS 2011 | Special Review - I | 12/20/2018 |
| Regular | NDS | Acceptable | 6/1/2018 |
| Regular | NDS | Acceptable | 6/14/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 6/7/2018 |
| Regular | NDS | Acceptable | 7/19/2018 |
| Regular | PBNDS 2011 | Meets Standard | 10/12/2018 |
| Regular | PBNDS 2011 | Meets Standard | 10/4/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 2/23/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 7/19/2018 |
| Regular | PBNDS 2008 | Meets Standard | 2/15/2018 |
| Regular | PBNDS 2008 | Meets Standard | 7/26/2018 |
| Regular | JFRMU Family | Pending | 12/5/2019 |
| Regular | NDS | Acceptable | 11/16/2018 |
| Regular | PBNDS 2011 | Meets Standard | 8/23/2018 |
| Regular | PBNDS 2008 | Meets Standard | 5/10/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/15/2018 |
| Regular | NDS | Acceptable | 6/7/2018 |

AR03612

| Regular | NDS | Acceptable | 3/8/2018 |
|---------|-----|------------|----------|
| Regular | NDS | Acceptable | 8/16/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 4/12/2018 |
| Regular | NDS | Acceptable | 3/8/2018 |
| Regular | NDS | Acceptable | 2/23/2018 |
| Regular | NDS | Acceptable | 4/19/2018 |
| Regular | NDS | Acceptable | 4/19/2018 |
| Regular | PBNDS 2011 | TAR Assigned | 2/14/2019 |
| Regular | PBNDS 2011 | Meets Standard | 5/10/2018 |
| Regular | NDS | Special Review - I | 10/27/2016 |
| Regular | PBNDS 2011 | Meets Standard | 2/7/2019 |
| N/A | | | |
| Regular | NDS | Acceptable | 12/13/2018 |
| Regular | PBNDS 2011 | Meets Standard | 2/9/2017 |
| Regular | PBNDS 2008 | Meets Standard | 12/13/2018 |
| Regular | PBNDS 2008 | Meets Standard | 8/23/2018 |
| Regular | NDS | Special Review - I | 5/31/2019 |
| Regular | NDS | Acceptable | 7/12/2018 |
| Regular | NDS | Acceptable | 8/16/2018 |
| Regular | NDS | Acceptable | 7/12/2018 |
| Regular | NDS | Acceptable | 11/8/2018 |
| Regular | PBNDS 2011 | Meets Standard | 6/1/2018 |
| Regular | PBNDS 2011 | Does Not Meet St. | 11/29/2018 |
| Regular | NDS | Acceptable | 9/13/2018 |
| Regular | PBNDS 2008 | Meets Standard | 6/20/2019 |
| Regular | JFRMU Family | Pending | 11/14/2019 |
| Regular | NDS | Acceptable | 10/4/2018 |
| Regular | NDS | Acceptable | 5/3/2018 |
| Regular | NDS | Acceptable | 12/6/2018 |
| Regular | NDS | Acceptable | 12/6/2018 |
| Regular | NDS | Acceptable | 4/12/2018 |
| Regular | PBNDS 2008 | Meets Standard | 6/1/2018 |
| Regular | NDS | Deficient | 11/29/2018 |
| Regular | NDS | Special Review - I | 12/20/2018 |
| Regular | NDS | Acceptable | 11/8/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 8/2/2018 |
| Regular | NDS | Acceptable | 2/11/2016 |
| Regular | NDS | Acceptable | 3/9/2017 |
| Regular | PBNDS 2008 | Meets Standard | 1/10/2019 |
| Regular | NDS | Acceptable | 8/10/2017 |
| N/A | | | |
| N/A | | | |
| Regular | NDS | Acceptable | 4/19/2018 |

AR03613

| | | | |
|---|---|---|---|
| ORSA | NDS | Acceptable | 9/28/2018 |
| Regular | NDS | Deficient | 3/16/2017 |
| Regular | NDS | Acceptable | 7/13/2017 |
| Regular | NDS | Acceptable | 9/13/2018 |
| Regular | NDS | Acceptable | 11/16/2017 |
| Regular | NDS | Acceptable | 8/18/2016 |
| Regular | NDS | Acceptable | 11/29/2018 |
| Regular | NDS | Acceptable | 3/1/2018 |
| Regular | NDS | Acceptable | 12/13/2018 |
| Regular | PBNDS 2008 | Meets Standard | 10/25/2018 |
| Regular | NDS | Acceptable | 1/6/2017 |
| N/A | | | |
| Regular | NDS | Acceptable | 11/16/2017 |
| ORSA | NDS | Acceptable | 10/2/2017 |
| ORSA | NDS | Acceptable | 9/21/2018 |
| N/A | | | |
| ORSA | NDS | Acceptable | 10/11/2017 |
| ORSA | NDS | Acceptable | 8/31/2017 |
| Regular | NDS | Superior | 6/8/2007 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/28/2018 |
| Regular | NDS | Acceptable | 11/2/2017 |
| ORSA | NDS | Acceptable | 9/18/2017 |
| ORSA | NDS | Acceptable | 8/29/2017 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| Regular | NDS | Good | 5/23/2008 |
| Regular | NDS | Acceptable | 4/13/2017 |
| N/A | | | |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 8/17/2017 |
| Regular | NDS | Acceptable | 4/19/2018 |
| ORSA | NDS | Acceptable | 9/8/2017 |
| N/A | | | |
| Regular | PBNDS 2008 | Meets Standard | 1/17/2019 |
| Regular | NDS | Superior | 8/18/2009 |
| Regular | NDS | Acceptable | 7/26/2018 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 9/16/2016 |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 9/15/2017 |

AR03614

| | | | |
|---|---|---|---|
| N/A | | | |
| ORSA | NDS | Acceptable | 9/16/2016 |
| ORSA | NDS | Acceptable | 8/10/2017 |
| ORSA | NDS | Acceptable | 8/29/2017 |
| Regular | NDS | Acceptable | 2/23/2018 |
| ORSA | NDS | Acceptable | 11/2/2017 |
| Regular | NDS | Superior | 3/10/2010 |
| ORSA | NDS | Acceptable | 7/20/2016 |
| ORSA | NDS | Acceptable | 9/8/2017 |
| ORSA | NDS | Acceptable | 8/29/2017 |
| N/A | | | |
| Regular | NDS | Special Review - I | 5/7/2015 |
| N/A | | | |
| N/A | | | |
| ORSA | NDS | Acceptable | 10/1/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 6/9/2011 |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 8/14/2017 |
| N/A | | | |
| Regular | NDS | Acceptable | 8/14/2014 |
| Regular | NDS | Acceptable | 3/17/2016 |
| ORSA | NDS | Acceptable | 8/12/2015 |

AR03615

**U.S. Immigration and Customs Enforcement**

These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.

## ICE FOOTNOTES

| Term | Definition |
|---|---|
| ADP | Average daily population |
| ALIP | Average length in program |
| ALOS | Average length of stay |
| AOR | Area of Responsibility |
| ATD | Alternatives to Detention |
| Bonded Out-FO | An alien is bonded out due to decision by the Field Office |
| Bonded Out-IJ | An alien is bonded out due to decision by the Immigration Judge |
| CBP | Customs and Border Protection |
| Classification Level (ADP) | Upon admission and periodically thereafter, detainees are categorized into a security level based on a variety of public safety factors, and are housed accordingly. Factors include prior convictions, threat risk, disciplinary record, special vulnerabilities, and special management concerns. Detainees are categorized into one of four classes of security risk: A/low, B/medium low, C/medium high, and D/high. |
| Credible Fear | A finding by USCIS or an Immigration Judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the interviewing USCIS officer or Immigration Judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(B)(3), or protection from removal under the convention against torture. |
| FCMP | Family Case Management Program |
| Facilities Adhering to ICE Performance Based National Detention Standards (PBNDS2011, PBNDS 2008, and NDS 2019) | Meets Standards: The facility's detention functions are being adequately performed. Although deficiencies may be found, they do not detract from the acceptable accomplishment of vital functions or from the delivery of care and well-being for ICE detainees. Internal controls are in place and appropriate corrective actions to resolve deficiencies can be implemented. |
| | Does Not Meet Standards: The facility's detention functions are not being performed at a "meets standards" level. Internal controls are weak, thus resulting in serious deficiencies in one or more program areas. Detention operations may be impaired to the point that the facility is not presently accomplishing vital functions. Internal controls are insufficient to reasonably assure acceptable performance can be expected in the near future. |
| Facilities Adhering to ICE National Detention Standards (NDS) 2000: | Acceptable: The facility's detention functions are being adequately performed. Although deficiencies may be found, they do not detract from the acceptable accomplishment of vital functions or from the delivery of care and well-being for ICE detainees. Internal controls are in place and appropriate corrective actions to resolve deficiencies can be implemented. |
| | Deficient: The facility's detention functions are not being performed at a "meets standards" level. Internal controls are weak, thus resulting in serious deficiencies in one or more program areas. Detention operations may be impaired to the point that the facility is not presently accomplishing vital functions. Internal controls are insufficient to reasonably assure acceptable performance can be expected in the near future. |
| Family Unit | Non-U.S. citizen child or children under the age of 18, accompanied by his/her/their parent(s) or legal guardian(s) |
| GPS | Global positioning system tracking device |
| Head of Household | Parent or legal guardian of a non-U.S. citizen child or children under the age of 18. |
| ICE | Immigration and Customs Enforcement |
| ICE Threat Level (ADP) | The average daily population by ICE Threat Level. Threat level is determined by the criminality of a detainee, including the recency of the criminal behavior and its severity. A detainee can be graded on a scale of one to three with one being the highest severity. If a detainee has no criminal convictions, he/she will be classified as "No ICE Threat Level." |
| Inspection Ratings | ICE detention facilities are inspected and rated using a Pass/Fail grading system. Annual or biennial inspections, which measure a facility's program performance and compliance to ICE detention standards over time, will result in ratings. |
| Last Inspection Date | The date the facility was last inspected |
| Last Inspection Rating-Final | The most recent finalized inspection rating the facility received |
| Last Inspection Standard | The inspection standard the facility was last inspected against. |
| Male/Female | This indicates the gender(s) of detainees at a facility. M indicates male population, and F indicates female population. Where limited data is available, the default value is M, F. |
| Mandatory (ADP) | The average daily population of detainees who are subject to mandatory detention |
| Order of Recognizance | A pre-final order alien is released because he/she is not a detention priority |
| Order of Supervision-No SLRFF | A final order alien is released because the Field Office is unable to obtain a travel document. |
| Order of Supervision | A final order alien is released because the field office is unable to obtain a travel document |
| Second to Last Inspection Standard | The inspection standard the facility was inspected against during the second to the last inspection. |
| Second to Last Rating | The final inspection rating a facility received after the second to last inspection |
| Second to Last Inspection Date | The second to last date the facility was inspected. |
| SmartLink | Online tracking device using smart phone or tablet |
| TR | Telephonic reporting |
| Type--Detailed | ICE holds detainees in several different types of facilities, listed below: |
| | BOP (Federal Bureau of Prisons): A facility operated by the Federal Bureau of Prisons |
| | DIGSA (Dedicated Intergovernmental Service Agreement): A publicly-owned facility operated by state/local government(s), or private contractors, in which ICE contracts to use all bed space via a Dedicated Intergovernmental Service Agreement; or facilities used by ICE pursuant to Inter-governmental Service Agreements, which house only ICE detainees – typically these are operated by private contractors pursuant to their agreements with local governments. |
| | FRC (Family Residential Center): A facility that accommodates and cares for family units who remain together while awaiting their proceedings |
| | IGSA (Intergovernmental Service Agreement): A publicly-owned facility operated by state/local government(s), or private contractors, in which ICE contracts for bed space via an Intergovernmental Service Agreement; or local jails used by ICE pursuant to Inter-governmental Service Agreements, which house both ICE and non-ICE detainees, typically county prisoners awaiting trial or serving short sentences, but sometimes also USMS prisoners. |
| | SPC (Service Processing Center): A facility owned by the government and staffed by a combination of federal and contract employees |
| | USMS (United States Marshals Service): A facility primarily contracted with the USMS for housing of USMS detainees, in which ICE contracts with the USMS for bed space. |
| | USMS IGA (USMS Intergovernmental Agreement): A USMS Intergovernmental Agreement in which ICE agrees to utilize an already established US Marshal Service contract. |
| USCIS | U.S. Citizenship and Immigration Services |
| FY2019 ICE Alternatives to Detention | Family Unit (FAMU) subject apprehensions represent all OPB apprehensions of adults (18 years old and over) with a FAMU classification who were subsequently enrolled in ATD. |
| | Average Length in Program is calculated for active participants only |
| | Length of Program = 1/31/2020 ATD Original Start Date +1 |
| FY2020 ICE Average Daily Population and ICE Average Length of Stay | EOFY2020 ICE Detention data are historic and static. Data are filtered through 9/30/2020 (IIDS v.1.34 run date 10/04/2020; EID as of 10/02/2020). |
| | ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service Prisoners |
| | The Average Daily Population (ADP) is based on MANDAY Count. A MANDAY is based on whether a SUBJECT is in an ERO detention facility for the midnight count. For every SUBJECT in a facility for the midnight count, that corresponds to one MANDAY. The ADP is the number of MANDAYS for a given time period, divided by the number of days in that time period. |
| | ADP by Arresting Agency, Month and Criminality: EOFY2020 criminality is defined in the following manner:<br>o Convicted Criminal: Immigration Violators with a criminal conviction entered into ICE systems of record at the time of ICE custody.<br>o Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of ICE custody.<br>o Other Immigration Violators: Immigration Violators without any known or a criminal conviction, or pending charges entered into ICE system of record at the time of ICE custody. |
| | Starting in FY2018, ICE defines immigration violators' criminality for Average Length of Stay in the following manner:<br>Convicted Criminal: Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.<br>Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.<br>Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action. |
| | All stats are pulled based on Current Program which attributes all cases back to the Program of the processing officer of the event. However, if Current Program = OPL, XXX, ZZZ, or null, then Event Program is used. |
| | The ICE Arresting Agency includes the following ERO and HSI Arresting Agency Programs: 287g Program, Alternatives to Detention, ERO Criminal Alien Program, Detained Docket Control, Detention and Deportation, Law Enforcement Area Response Unit, Mobile Criminal Alien Team, Non-Detained Docket Control, Juvenile, Fugitive Operations, Violent Criminal Alien Section, Joint Criminal Alien Response Team, Probation and Parole, Quick Response Team, User Fee Investigations, Joint Terrorism Task Force, Non-User Fee Investigations, HSI Criminal Arrest Only, and Intelligence. This also includes the Default program area for interface records, and PICS Default value--for user initialization only where the users programs were not updated at the time of the data run. |
| | The CBP Arresting Agency includes the following programs: Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea |
| | FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| FY2020 ICE Final Releases | EOFY2020 ICE Final Releases data are historic and static. Data are filtered through 9/30/2020 (IIDS v 1.34 run date 10/04/2020; EID as of 10/02/2020) |
| | An ICE Final Release is defined as a Final Bookout that reflects one of the following release reasons: Bonded Out, Order of Recognizance, Order of Supervision, Paroled, or Prosecutorial Discretion. All Case Statuses are included. |
| | ICE Detention data exclude ORR transfers/facilities, and U.S. Marshals Service prisoners |
| | An alien may have multiple releases; only the most recent release is included in this report |
| | Starting in FY2018, ICE defines immigration violators' criminality in the following manner:<br>Convicted Criminal: Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.<br>Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.<br>Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action. |
| | FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| FY2020 ICE Removals | EOFY2020 ICE Removals data are historic and static. Data are filtered through 9/30/2020. (IIDS v 1.34 run date 10/06/2020; EID as of 10/02/2020) |
| | ICE Removal Data Include Returns. Returns include Voluntary Returns, Voluntary Departures and Withdrawals Under Docket Control |
| | ICE Removals include aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ERO for detention. Aliens processed for ER and not detained by ERO or VR after June 1st, 2013 and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics. |
| | Starting in FY2009, ICE began to "lock" removal statistics on October 5th at the end of each fiscal year and counted only the aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5th were excluded from the locked data and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will include the removals and returns confirmed after October 5th into the next fiscal year. |
| | FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| ICE Currently Detained | EOFY2020 ICE National Docket data are a snapshot as of 10/02/2020 (IIDS v 1.34 run as of 10/04/2020; EID as of 10/02/2020). |
| | ICE Detention data excludes ORR transfers/facilities, as well as U.S. Marshals Service Prisoners |
| | Starting in FY2018, ICE defines immigration violators' criminality in the following manner:<br>Convicted Criminal: Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.<br>Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.<br>Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action. |
| | The ICE Arresting Agency includes the following ERO and HSI Arresting Agency Programs: 287g Program, Alternatives to Detention, ERO Criminal Alien Program, Detained Docket Control, Detention and Deportation, Law Enforcement Area Response Unit, Mobile Criminal Alien Team, Non-Detained Docket Control, Juvenile, Fugitive Operations, Violent Criminal Alien Section, Joint Criminal Alien Response Team, Probation and Parole, Quick Response Team, User Fee Investigations, Joint Terrorism Task Force, Non-User Fee Investigations, HSI Criminal Arrest Only, and Intelligence. This also includes the Default program area for interface records, and PICS Default value--for user initialization only where the users programs were not updated at the time of the data run. |
| | The CBP Arresting Agency includes the following programs: Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea. |
| | Processing dispositions of Other may include, but are not limited to, aliens processed under Administrative Removal, Visa Waiver Program Removal, Stowaway or Crewmember. |
| | FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| FY2020 ICE Initial Book-Ins | EOFY2020 ICE Detention data are historic and static. Data are filtered through 9/30/2020 (IIDS v 1.34 run date 10/04/2020; EID as of 10/02/2020) |
| | ICE Detention data excludes ORR transfers/facilities, as well as U.S. Marshals Service Prisoners |
| | All stats are pulled based on Current Program which attributes all cases back to the Program of the processing officer of the event. However, if Current Program = OPL, XXX, ZZZ, or null, then Event Program is used. |
| | The "ICE" Arresting Agency includes ERO, HSI, and Other programs. |
| | ERO Programs include CAP Programs (ERO Criminal Alien Program, Joint Criminal Alien Response Team, Law Enforcement Area Response Units, and Violent Criminal Alien Section, and Other Programs), Fugitive Operations, 287G Program, Detained Docket Control, Non-Detained Docket Control, Mobile Criminal Alien Team, Alternatives to Detention, Detention and Deportation, and Juvenile. |
| | HSI Programs include HSI Criminal Arrest Only, Intelligence, Joint Terrorism Task Force, Non-User Fee Investigations, Quick Response Team, and User Fee Investigations. |
| | Other Programs include Adjudications, Asylum, and PICS Default Value - for user initialization only; these are included in the CAP Program Counts |
| | The CBP Arresting Agency includes the following programs: Border Patrol, Inspections, Inspections-Air, Inspections-Land, and Inspections-Sea. |
| | Starting in FY2018, ICE defines immigration violators' criminality in the following manner:<br>Convicted Criminal: Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.<br>Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.<br>Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action. |
| | FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| USCIS Average Time from USCIS Fear Decision Service Date to ICE Release (In Days) & Aliens with USCIS-Established Fear Decisions in an ICE Detention Facility | Aliens Currently in ICE Detention Facilities data are a snapshot as of 10/02/2020 (IIDS v1.34 run date 10/04/2020; EID as of 10/02/2020) |
| | EOFY2020 ICE Releases data are historic and static. Data are filtered through 9/30/2020 (IIDS v1.34 run date 10/04/2020; EID as of 10/02/2020) |
| | ICE Detention data excludes ORR transfers/facilities, as well as U.S. Marshals Service Prisoners |
| | USCIS provided data containing APSO (Asylum Pre Screening Officer) cases clocked during FY2018 - FY2020. Data were received on 09/28/2020 |
| | Aliens Currently in ICE Detention Facilities and the Average Time from USCIS Fear Decision Service Date to ICE Release are determined by matching the Alien File Numbers in the data provided by USCIS to ICE Detention data. Data only include Alien File Numbers from the USCIS data that have USCIS Fear Determinations of Persecution Claim Established or Torture Claim Established. Data only include ICE Detention Stays for which the USCIS Decision Service Date falls on or after the initial book in date of the current detention stay. ICE Detention Stays for which the Decision Service Date falls before the initial book in or after release are not included. |
| | An Alien's Fear Screening Determination cannot be confirmed as directly related to an ICE Detention Stay, even if the USCIS Decision Service Date falls within the ICE Detention Stay. |
| | Of the 267,600 records in the USCIS provided data the breakdown of the fear screening determinations is as follows; 168,968 positive fear screening determinations, 53,144 negative fear screening determinations and 45,488 without an identified determination. Of the 168,968 with positive fear screening determinations; 116,682 have Persecution Claim Established and 52,286 have Torture Claim Established. |
| | Aliens Currently in ICE Detention Facilities and the Average Time from USCIS Fear Decision Service Date to ICE Release include detentions not associated with a removal case. |
| | The data provided by USCIS contains multiple records for some Alien File Numbers. There are 266,515 unique fear determinations and 2,459 of those have multiple records in the data provided by USCIS. The Alien File Numbers with multiple USCIS records are treated as follows:<br>• If an Alien File Number is associated with both positive and negative fear screening determinations, only positive fear screening determinations are included.<br>• If an Alien File Number is associated with multiple positive fear determinations and only one ICE Detention Stay, only the determinations for which the USCIS Decision Service Date falls within the detention stay are included.<br>• If an Alien File Number is associated with multiple positive fear determinations and multiple ICE Detention Stays, all determinations for which the USCIS Decision Service Date falls within an ICE Detention Stay are included.<br>• If an Alien File Number has multiple positive fear determinations for which the USCIS Decision Service Dates fall within a single ICE Detention Stay, this is counted as a single detention. |
| | Average Time from USCIS Fear Decision Service Date to ICE Release is calculated from the relevant ICE Detention Stays described above, where the USCIS Decision Service Date for a USCIS Fear Determination of Persecution Claim Established or Torture Claim Established falls within an ICE Detention Stay. The average time for a fiscal year is the average number of days between the USCIS Decision Service Date and the final release from ICE Custody for that fiscal year. The fiscal year for an ICE Detention Stay in this metric is the fiscal year in which the alien was released from ICE Custody. |

**U.S. Immigration and Customs Enforcement**

These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.

## ICE DETENTION DATA, FY19

**ICE Currently Detained by Processing Disposition and Facility Type**

| Processing Disposition | FRC | Adult | Total |
|---|---|---|---|
| Total | 973 | 49,949 | 50,922 |
| Expedited Removal (I-860) | 892 | 26,060 | 26,952 |
| Notice to Appear (I-862) | 51 | 18,478 | 18,529 |
| Reinstatement of Deport Order (I-871) | 28 | 4,211 | 4,239 |
| Other | 2 | 1,200 | 1,202 |

**ICE Currently Detained by Criminality and Arresting Agency**

| Criminality | ICE | Percent ICE | CBP | Percent CBP | Total |
|---|---|---|---|---|---|
| Total | 18,881 | 37% | 32,041 | 63% | 50,922 |
| Convicted Criminal | 12,543 | 78% | 3,577 | 22% | 16,120 |
| Pending Criminal Charges | 4,412 | 82% | 947 | 18% | 5,359 |
| Other Immigration Violator | 1,926 | 7% | 27,517 | 93% | 29,443 |

**ICE Initial Book-Ins by Arresting Agency and Month: FY2019**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 40,551 | 44,313 | 44,418 | 41,027 | 47,103 | 55,149 | 54,961 | 56,826 | 40,367 | 33,769 | 27,803 | 24,567 | 510,854 |
| ICE | 11,892 | 11,224 | 10,818 | 12,013 | 11,539 | 11,722 | 11,527 | 11,898 | 10,650 | 11,653 | 11,420 | 10,728 | 137,084 |
| CBP | 28,659 | 33,089 | 33,600 | 29,014 | 35,564 | 43,427 | 43,434 | 44,928 | 29,717 | 22,116 | 16,383 | 13,839 | 373,770 |

**ICE Initial Book-Ins by Facility Type and Criminality: FY2019**

| Facility Type | Convicted Criminal | Pending Criminal Charges | Other Immigration Violator | Total |
|---|---|---|---|---|
| Total | 155,891 | 38,635 | 316,328 | 510,854 |
| FRC | 213 | 92 | 37,601 | 37,906 |
| Adult | 155,678 | 38,543 | 278,727 | 472,948 |

**ICE Final Releases by Facility Type: FY2019**

| Facility Type | Total |
|---|---|
| Total | 263,263 |
| FRC | 39,796 |
| Adult | 223,467 |

**ICE Removals: FY2019**

| | Removals |
|---|---|
| Total | 267,258 |
| Removals with an FRC Detention | 1,069 |

**ICE Final Releases by Release Reason and Criminality: FY2019**

| Release Reason | Convicted Criminal | Pending Criminal Charges | Other Immigration Violator | Total |
|---|---|---|---|---|
| Total | 21,383 | 13,032 | 228,848 | 263,263 |
| Bonded Out | 12,299 | 9,978 | 31,825 | 54,102 |
| *Bond Set by ICE* | 3,766 | 3,233 | 12,767 | 19,766 |
| *Bond Set by IJ* | 8,533 | 6,745 | 19,058 | 34,336 |
| Order of Recognizance | 3,118 | 1,489 | 172,295 | 176,902 |
| Order of supervision | 5,269 | 993 | 7,504 | 13,766 |
| Paroled | 420 | 291 | 17,087 | 17,798 |
| Prosecutorial Discretion | 277 | 281 | 137 | 695 |

**ICE Average Daily Population by Arresting Agency, Month and Criminality: FY2019**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP Average | 24,216 | 25,492 | 28,301 | 26,348 | 27,604 | 27,722 | 28,754 | 32,261 | 34,764 | 35,088 | 36,447 | 33,439 | 30,050 |
| Convicted Criminal | 5,608 | 5,616 | 5,999 | 6,002 | 6,191 | 6,172 | 6,034 | 5,841 | 5,666 | 5,241 | 4,753 | 4,084 | 5,598 |
| Non-Criminal | 18,609 | 19,876 | 22,302 | 20,346 | 21,413 | 21,550 | 22,719 | 26,421 | 29,098 | 29,847 | 31,694 | 29,355 | 24,452 |
| ICE Average | 21,368 | 20,710 | 20,482 | 20,599 | 20,989 | 21,237 | 20,419 | 19,561 | 19,490 | 19,132 | 18,792 | 18,652 | 20,115 |
| Convicted Criminal | 15,238 | 14,712 | 14,456 | 14,407 | 14,609 | 14,898 | 14,312 | 13,665 | 13,572 | 13,313 | 12,774 | 12,370 | 14,025 |
| Non-Criminal | 6,130 | 5,999 | 6,026 | 6,192 | 6,380 | 6,338 | 6,106 | 5,896 | 5,918 | 5,820 | 6,018 | 6,282 | 6,090 |
| Average | 45,584 | 46,202 | 48,783 | 46,947 | 48,593 | 48,958 | 49,173 | 51,823 | 54,254 | 54,220 | 55,238 | 52,091 | 50,165 |
| Convicted Criminal | 20,846 | 20,328 | 20,455 | 20,409 | 20,800 | 21,070 | 20,347 | 19,506 | 19,238 | 18,554 | 17,526 | 16,454 | 19,624 |
| Non-Criminal | 24,738 | 25,875 | 28,328 | 26,538 | 27,793 | 27,888 | 28,826 | 32,317 | 35,016 | 35,667 | 37,712 | 35,637 | 30,542 |

**ICE Average Length of Stay by Arresting Agency, Month and Criminality: FY2019**

| Agency | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP Average | 25.3 | 23.3 | 22.8 | 26.3 | 21.1 | 19.1 | 19.6 | 20.6 | 29.8 | 44.1 | 48.6 | 54.9 | 26.6 |
| Convicted Criminal | 27.4 | 29.0 | 28.4 | 30.2 | 29.1 | 28.7 | 29.8 | 31.2 | 33.1 | 37.2 | 37.9 | 37.4 | 31.2 |
| Pending Criminal Charges | 37.6 | 38.0 | 31.0 | 34.7 | 34.2 | 29.2 | 30.8 | 32.8 | 37.7 | 41.4 | 44.4 | 46.1 | 36.4 |
| Other Immigration Violator | 24.4 | 21.4 | 21.4 | 25.2 | 19.3 | 17.3 | 17.6 | 18.4 | 28.8 | 46.4 | 52.4 | 60.9 | 25.3 |
| ICE Average | 53.5 | 58.0 | 59.2 | 55.2 | 53.8 | 52.3 | 54.9 | 52.8 | 52.5 | 52.7 | 55.9 | 53.6 | 54.5 |
| Convicted Criminal | 54.9 | 59.9 | 62.7 | 57.2 | 55.8 | 53.8 | 57.4 | 55.1 | 53.0 | 52.5 | 57.0 | 55.9 | 56.2 |
| Pending Criminal Charges | 50.3 | 52.0 | 51.1 | 51.4 | 50.9 | 51.9 | 54.1 | 51.1 | 50.2 | 52.1 | 55.1 | 50.1 | 51.7 |
| Other Immigration Violator | 50.3 | 57.9 | 51.3 | 49.9 | 46.4 | 43.5 | 41.1 | 42.8 | 54.1 | 55.4 | 50.2 | 46.6 | 48.7 |
| Average | 34.0 | 32.9 | 32.3 | 34.5 | 28.7 | 26.6 | 27.8 | 28.0 | 36.0 | 47.3 | 51.4 | 54.4 | 34.3 |
| Convicted Criminal | 43.7 | 46.5 | 48.7 | 46.1 | 44.3 | 43.3 | 46.0 | 44.9 | 44.7 | 47.1 | 50.1 | 49.5 | 46.1 |
| Pending Criminal Charges | 48.1 | 49.3 | 47.0 | 48.1 | 47.1 | 46.8 | 48.1 | 46.4 | 47.0 | 49.6 | 52.8 | 49.1 | 48.3 |
| Other Immigration Violator | 25.8 | 23.0 | 22.6 | 26.4 | 20.3 | 18.2 | 18.5 | 19.4 | 30.0 | 47.0 | 52.2 | 59.6 | 26.4 |

**ICE Average Daily Population by Facility Type and Month: FY2019**

| Facility Type | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 45,584 | 46,202 | 48,783 | 46,947 | 48,593 | 48,958 | 49,173 | 51,823 | 54,254 | 54,220 | 55,238 | 52,091 | 50,165 |
| FRC | 2,082 | 1,563 | 1,978 | 1,339 | 2,240 | 1,665 | 910 | 1,012 | 1,186 | 447 | 928 | 487 | 1,315 |
| Adult | 43,502 | 44,639 | 46,805 | 45,608 | 46,353 | 47,293 | 48,263 | 50,810 | 53,068 | 53,773 | 54,310 | 51,604 | 48,850 |

**ICE Average Length of Stay by Facility Type and Month: FY2019**

| Facility Type | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | FY Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 34.0 | 32.9 | 32.3 | 34.5 | 28.7 | 26.6 | 27.8 | 28.0 | 36.0 | 47.3 | 51.4 | 54.4 | 34.3 |
| FRC | 13.5 | 7.5 | 12.9 | 11.2 | 12.4 | 10.4 | 10.0 | 13.0 | 13.8 | 15.0 | 11.9 | 18.8 | 11.7 |
| Adult | 36.3 | 35.7 | 34.6 | 36.8 | 30.7 | 28.3 | 28.8 | 28.9 | 37.4 | 48.6 | 54.7 | 55.0 | 36.2 |

# ICE Detention Statistics



These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.

ICE  provides the following Detention, Alternatives to Detention, and Dacilities information.  The data tables are searchable and sortable, and worksheets are protected to ensure their accuracy and reliability.

Records related to credible fear are USCIS records, and are provided to ICE by USCIS.

ICE confirms the integrity of the data as published on this site and cannot attest to subsequent transmissions.  Data fluctuate until "locked" at the conclusion of the fiscal year.

# U.S. Immigration and Customs Enforcement

**These statistics are made available to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations Bill.**

## ICE ALTERNATIVES TO DETENTION DATA, FY19

**ATD Active Population by Status, Extended Case Management Service, Count and ALIP, FY2019**

| FAMU Status | Count | ALIP |
|---|---|---|
| FAMU | 58,608 | 292.2 |
| ECMS-FAMU | 44 | 276.9 |
| Single Adult | 24,484 | 362.4 |
| ECMS-Single Adult | 50 | 273.4 |
| **Total** | **83,186** | **352.2** |

Data from BI Inc. Participants Report, 9.30.2019

Data from OBP Report, 9.30.2019

**Active ATD Participants and Average Length in Program, FY19**

| AOR/Technology | Count | Average Length in Program |
|---|---|---|
| **Total** | **83,186** | **352.2** |
| **Atlanta** | **6,835** | **150.1** |
| GPS | 5,749 | 70.6 |
| SmartLINK | 93 | 301.9 |
| VoiceID | 993 | 596.2 |
| **Baltimore** | **2,675** | **463.7** |
| GPS | 1,728 | 239.5 |
| SmartLINK | 75 | 441.3 |
| VoiceID | 872 | 909.9 |
| **Boston** | **4,478** | **316.8** |
| GPS | 3,222 | 178.6 |
| SmartLINK | 200 | 479.1 |
| VoiceID | 1,056 | 707.8 |
| **Buffalo** | **174** | **589.9** |
| GPS | 97 | 306.4 |

AR03619

| | | |
|---|---:|---:|
| SmartLINK | 0 | 0.0 |
| VoiceID | 77 | 947.2 |
| **Chicago** | **2,921** | **377.0** |
| GPS | 2,031 | 195.8 |
| SmartLINK | 253 | 518.2 |
| VoiceID | 637 | 898.6 |
| **Dallas** | **3,058** | **176.8** |
| GPS | 2,822 | 113.1 |
| SmartLINK | 12 | 344.0 |
| VoiceID | 224 | 971.4 |
| **Denver** | **993** | **897.2** |
| GPS | 352 | 240.7 |
| SmartLINK | 55 | 623.7 |
| VoiceID | 586 | 1,317.1 |
| **Detroit** | **1,261** | **533.1** |
| GPS | 436 | 267.7 |
| SmartLINK | 226 | 353.5 |
| VoiceID | 599 | 794.0 |
| **El Paso** | **3,876** | **76.0** |
| GPS | 3,605 | 35.9 |
| SmartLINK | 41 | 199.4 |
| VoiceID | 230 | 682.9 |
| **Houston** | **5,262** | **344.0** |
| GPS | 4,252 | 231.5 |
| SmartLINK | 203 | 354.4 |
| VoiceID | 807 | 934.3 |
| **Los Angeles** | **5,330** | **760.0** |
| GPS | 1,209 | 420.6 |
| SmartLINK | 102 | 642.7 |
| VoiceID | 4,019 | 865.1 |
| **Miami** | **13,173** | **359.2** |
| GPS | 9,178 | 217.9 |
| SmartLINK | 1,180 | 306.2 |
| VoiceID | 2,815 | 841.9 |
| **New Orleans** | **7,463** | **210.2** |
| GPS | 6,961 | 182.6 |
| SmartLINK | 166 | 441.0 |
| VoiceID | 336 | 668.0 |
| **New York** | **4,464** | **580.6** |
| GPS | 957 | 202.4 |
| SmartLINK | 125 | 275.7 |
| VoiceID | 3,382 | 698.9 |
| **Newark** | **1,608** | **506.6** |
| GPS | 669 | 226.3 |
| SmartLINK | 474 | 438.8 |

AR03620

| | | |
|---|---:|---:|
| VoiceID | 465 | 979.1 |
| **Philadelphia** | **1,530** | **261.4** |
| GPS | 614 | 167.5 |
| SmartLINK | 638 | 247.5 |
| VoiceID | 278 | 500.7 |
| **Phoenix** | **1,880** | **117.3** |
| GPS | 1,592 | 56.7 |
| SmartLINK | 45 | 309.9 |
| VoiceID | 243 | 478.3 |
| **Salt Lake City** | **749** | **626.7** |
| GPS | 309 | 360.6 |
| SmartLINK | 156 | 697.7 |
| VoiceID | 284 | 877.4 |
| **San Antonio** | **3,020** | **143.4** |
| GPS | 2,647 | 66.1 |
| SmartLINK | 73 | 525.1 |
| VoiceID | 300 | 731.8 |
| **San Diego** | **1,826** | **153.7** |
| GPS | 1,707 | 112.0 |
| SmartLINK | 22 | 526.0 |
| VoiceID | 97 | 802.1 |
| **San Francisco** | **3,672** | **464.9** |
| GPS | 2,269 | 286.6 |
| SmartLINK | 182 | 483.9 |
| VoiceID | 1,221 | 793.3 |
| **Seattle** | **733** | **607.6** |
| GPS | 241 | 284.9 |
| SmartLINK | 82 | 463.1 |
| VoiceID | 410 | 826.1 |
| **St Paul** | **1,609** | **427.2** |
| GPS | 1,080 | 223.3 |
| SmartLINK | 206 | 806.0 |
| VoiceID | 323 | 867.2 |
| **WashingtonDC** | **4,596** | **391.0** |
| GPS | 2,191 | 264.6 |
| SmartLINK | 1,097 | 405.4 |
| VoiceID | 1,308 | 590.5 |

AR03621

# U.S. Immigration and Customs Enforcement

These statistics are made available to the public pursuant to the Fiscal Year

## ICE FACILITIES DATA, FY19

### Facility Information

Source: ICE Integrated Decision Support (IIDS), 10/07/2019

| Name |
| --- |
| STEWART DETENTION CENTER |
| SOUTH TEXAS ICE PROCESSING CENTER |
| ADELANTO ICE PROCESSING CENTER |
| ELOY FEDERAL CONTRACT FACILITY |
| TACOMA ICE PROCESSING CENTER (NORTHWEST DET CTR) |
| PORT ISABEL |
| LA PALMA CORRECTIONAL CENTER |
| LASALLE ICE PROCESSING CENTER (JENA) |
| TALLAHATCHIE CO CORR FACILITY |
| SOUTH TEXAS FAMILY RESIDENTIAL CENTER |
| OTAY MESA DETENTION CENTER (SAN DIEGO CDF) |
| OTERO COUNTY PROCESSING CENTER |
| MONTGOMERY ICE PROCESSING CENTER |
| IAH SECURE ADULT DETENTION FACILITY (POLK) |
| HOUSTON CONTRACT DETENTION FACILITY |
| DENVER CONTRACT DETENTION FACILITY |
| PINE PRAIRIE ICE PROCESSING CENTER |
| IRWIN COUNTY DETENTION CENTER |
| JOE CORLEY ICE PROCESSING CENTER |
| EL PASO SERVICE PROCESSING CENTER |
| ESSEX COUNTY CORRECTIONAL FACILITY |
| KROME NORTH SERVICE PROCESSING CENTER |
| MAIN - FOLKSTON IPC (D RAY JAMES) |
| YORK COUNTY PRISON |
| EL VALLE DETENTION FACILITY |
| IMMIGRATION CENTERS OF AMERICA FARMVILLE |

AR03622

| |
|---|
| PRAIRIELAND DETENTION FACILITY |
| IMPERIAL REGIONAL DETENTION FACILITY |
| BROWARD TRANSITIONAL CENTER |
| RIO GRANDE DETENTION CENTER |
| BUFFALO (BATAVIA) SERVICE PROCESSING CENTER |
| WEST TEXAS DETENTION FACILITY |
| TORNILLO-GUADALUPE POE |
| JACKSON PARISH CORRECTIONAL CENTER |
| T DON HUTTO RESIDENTIAL CENTER |
| LA PALMA CORRECTION CENTER - APSO |
| HUDSON COUNTY CORRECTIONAL CENTER |
| WINN CORRECTIONAL CENTER |
| KARNES COUNTY CIVIL DETENTION CENTER |
| GLADES COUNTY DETENTION CENTER |
| FLORENCE SERVICE PROCESSING CENTER |
| BERGEN COUNTY JAIL |
| WEBB COUNTY DETENTION CENTER (CCA) |
| RICHWOOD CORRECTIONAL CENTER |
| MESA VERDE ICE PROCESSING CENTER |
| CIBOLA COUNTY CORRECTIONAL CENTER |
| LAREDO PROCESSING CENTER |
| CCA, FLORENCE CORRECTIONAL CENTER |
| JOHNSON COUNTY CORRECTIONS CENTER |
| THEO LACY FACILITY |
| RIVER CORRECTIONAL CENTER |
| SHERBURNE COUNTY JAIL |
| PLYMOUTH COUNTY CORRECTIONAL FACILITY |
| ELIZABETH CONTRACT DETENTION FACILITY |
| NORTHEAST OHIO CORRECTIONAL CTR (YOUNGSTOWN CDF) |
| ETOWAH COUNTY JAIL (ALABAMA) |
| MCHENRY COUNTY CORRECTIONAL FACILITY |
| ANNEX - FOLKSTON IPC |
| CAROLINE DETENTION FACILITY |
| BAKER COUNTY SHERIFF'S OFFICE |
| SAN LUIS REGIONAL DETENTION CENTER |
| ALEXANDRIA STAGING FACILITY |
| BOSSIER PARISH COR. CENTER |
| DENVER CONTRACT DETENTION FACILITY (CDF) II |
| NEVADA SOUTHERN DETENTION CENTER |
| FLORENCE STAGING FACILITY |
| HENDERSON DETENTION CENTER |
| KARNES COUNTY RESIDENTIAL CENTER |
| COASTAL BEND DETENTION FACILITY |
| OKMULGEE COUNTY JAIL |
| ROLLING PLAINS DETENTION CENTER |

| |
|---|
| PIKE COUNTY CORRECTIONAL FACILITY |
| SOUTH LOUISIANA DETENTION CENTER |
| BRISTOL COUNTY DETENTION CENTER |
| CALHOUN COUNTY CORRECTIONAL CENTER |
| YUBA COUNTY JAIL |
| KENOSHA COUNTY DETENTION CENTER |
| PULASKI COUNTY JAIL |
| ORANGE COUNTY JAIL |
| WORCESTER COUNTY JAIL |
| KANKAKEE COUNTY JAIL (JEROME COMBS DET CTR) |
| SUFFOLK COUNTY HOUSE OF CORRECTIONS |
| JAMES A. MUSICK FACILITY |
| LIMESTONE COUNTY DETENTION CENTER |
| BOONE COUNTY JAIL |
| DODGE COUNTY JAIL |
| TULSA COUNTY JAIL (DAVID L. MOSS JUSTICE CTR) |
| BUTLER COUNTY JAIL |
| LA SALLE COUNTY REGIONAL DETENTION CENTER |
| ADAMS COUNTY DET CENTER |
| STRAFFORD COUNTY CORRECTIONS |
| WAKULLA COUNTY JAIL |
| VAL VERDE CORRECTIONAL FACILITY |
| CHARLESTON COUNTY DETENTION CENTER |
| HALL COUNTY DEPARTMENT OF CORRECTIONS |
| MONROE COUNTY DETENTION CENTER |
| CATAHOULA CORRECTIONAL CENTER |
| HOWARD COUNTY DETENTION CENTER |
| EAST HIDALGO DETENTION CENTER |
| CHASE COUNTY DETENTION FACILITY |
| ROBERT A. DEYTON DETENTION FACILITY |
| FREEBORN COUNTY ADULT DETENTION CENTER |
| SAINT CLAIR COUNTY JAIL |
| MONROE COUNTY DETENTION-DORM |
| WYATT DETENTION CENTER |
| ALLEN PARISH PUBLIC SAFETY COMPLEX |
| EDEN DETENTION CENTER |
| GEAUGA COUNTY JAIL |
| CLINTON COUNTY CORRECTIONAL FACILITY |
| HARDIN COUNTY JAIL |
| MORGAN COUNTY ADULT DETENTION CENTER |
| SENECA COUNTY JAIL |
| KANDIYOHI COUNTY JAIL |
| VIRGINIA PENINSULA REGIONAL JAIL |
| CLAY COUNTY JAIL |
| MARSHALL COUNTY JAIL |

AR03624

CAMBRIA COUNTY JAIL
FREDERICK COUNTY DETENTION CENTER
ANNE ARUNDEL COUNTY ORDNANCE ROAD CORRECTIONAL CTR
CACHE COUNTY JAIL
ALBANY COUNTY JAIL
BROOKS COUNTY DETENTION CENTER
MORROW COUNTY CORRECTIONAL FACILITY
ALAMANCE COUNTY DETENTION FACILITY
NATCHITOCHES PARISH DET. CENTER
FRANKLIN COUNTY HOUSE OF CORRECTION
TELLER COUNTY JAIL
POLK COUNTY JAIL
CHIPPEWA COUNTY SSM
TORRANCE COUNTY DETENTION FACILITY
DOUGLAS COUNTY DEPARTMENT OF CORRECTIONS
HONOLULU FEDERAL DETENTION CENTER
DEKALB COUNTY DETENTION CENTER
BERKS COUNTY FAMILY SHELTER
LASALLE CORR CTR OLLA
NORTHERN OREGON CORRECTIONAL FACILITY
CALDWELL COUNTY DETENTION CENTER
KAY COUNTY JUSTICE FACILITY
MONTGOMERY COUNTY JAIL
CARVER COUNTY JAIL
CASS COUNTY JAIL
CHRISTIAN COUNTY JAIL
WASHOE COUNTY JAIL
PLATTE COUNTY DETENTION CENTER
BURNET COUNTY JAIL
CBP SAN YSIDRO POE
COLLIER COUNTY NAPLES JAIL CENTER
LINN COUNTY JAIL
DEPARTMENT OF CORRECTIONS HAGATNA
NYE COUNTY DETENTION CENTER, SOUTHERN (PAHRUMP)
PHELPS COUNTY JAIL
SAINT TAMMANY PARISH JAIL
POTTAWATTAMIE COUNTY JAIL
BEDFORD MUNICIPAL DETENTION CENTER
DALLAS COUNTY JAIL - LEW STERRETT JUSTICE CENTER
EULESS CITY JAIL
SHAWNEE COUNTY DEPARTMENT OF CORRECTIONS
BUTLER COUNTY JAIL
CLINTON COUNTY JAIL
DAVIDSON COUNTY SHERIFF
ELMORE COUNTY JAIL

| |
|---|
| JEFFERSON COUNTY JAIL |
| LINCOLN COUNTY DETENTION CENTER |
| GRAND FORKS COUNTY CORRECTIONAL FACILITY |
| SOUTH CENTRAL REGIONAL JAIL |
| PINELLAS COUNTY JAIL |
| MADISON COUNTY JAIL |
| LA PAZ COUNTY ADULT DETENTION FACILITY |
| YAKIMA COUNTY DEPARTMENT OF CORRECTIONS |
| BALDWIN COUNTY CORRECTIONAL CENTER |
| BEAVER COUNTY JAIL |
| CIBOLA COUNTY DETENTION CENTER |
| CHAUTAUQUA COUNTY JAIL |
| COWLITZ COUNTY JUVENILE |
| DAKOTA COUNTY JAIL |
| GUAYNABO MDC (SAN JUAN) |
| KNOX COUNTY DETENTION FACILITY |
| MINICASSIA DETENTION CENTER |
| LEHIGH COUNTY JAIL (PENNSYLVANIA) |
| LEXINGTON COUNTY JAIL |
| DELAWARE CO JAIL (GEORGE W. HILL) |
| WASHINGTON COUNTY JAIL (PURGATORY CORRECTIONAL FAC |
| WESTERN TENNESSEE DETENTION FACILITY |
| FAYETTE COUNTY DETENTION CENTER |
| ORANGE COUNTY JAIL |
| RENSSELAER COUNTY CORRECTIONAL FACILITY |
| COBB COUNTY JAIL |
| WASHINGTON COUNTY DETENTION CENTER |
| SAN JUAN STAGING |
| OLDHAM COUNTY JAIL |
| NOBLES COUNTY JAIL |
| MONTGOMERY CITY JAIL |
| RANDALL COUNTY JAIL |
| CASCADE COUNTY JAIL (MONTANA) |
| GARVIN COUNTY DETENTION CENTER |
| ROANOKE CITY JAIL |
| NORTHERN OREGON JUVENILE DETENTION |
| LONOKE POLICE DEPARTMENT |
| STORY COUNTY JAIL |
| WHITFIELD COUNTY JAIL |
| KITTITAS COUNTY JAIL |
| WAKE COUNTY SHERIFF DEPARTMENT |
| CBP CHULA VISTA BPS |
| NEW HANOVER COUNTY JAIL |
| RED ROOF INN |
| ABRAXAS ACADEMY DETENTION CENTER |

AR03626

| |
|---|
| FORSYTH COUNTY JAIL |
| YANKTON COUNTY JAIL |
| JACK HARWELL DETENTION CENTER |
| CUMBERLAND COUNTY JAIL |
| CENTRAL TEXAS DETENTION FACILITY |
| CHAVEZ DETENTION CENTER |
| SAIPAN DEPARTMENT OF CORRECTIONS (SUSUPE) |

AR03627

**r 2020 Department of Homeland Security Appropriations Bill.**

| Address | City | State | Zip |
|---|---|---|---|
| 146 CCA ROAD | LUMPKIN | GA | 31815 |
| 566 VETERANS DRIVE | PEARSALL | TX | 78061 |
| 10250 RANCHO ROAD | ADELANTO | CA | 92301 |
| 1705 EAST HANNA RD. | ELOY | AZ | 85131 |
| 1623 E. J STREET | TACOMA | WA | 98421 |
| 27991 BUENA VISTA BOULEVARD | LOS FRESNOS | TX | 78566 |
| 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 |
| 830 PINEHILL ROAD | JENA | LA | 71342 |
| 415 U.S. HIGHWAY 49 North | TUTWILER | MS | 38963 |
| 1925 WEST HIGHWAY 85 | DILLEY | TX | 78017 |
| 7488 CALZADA DE LA FUENTE | SAN DIEGO | CA | 92154 |
| 26 MCGREGOR RANGE ROAD | CHAPARRAL | NM | 88081 |
| 806 HILBIG RD | CONROE | TX | 77301 |
| 3400 FM 350 SOUTH | LIVINGSTON | TX | 77351 |
| 15850 EXPORT PLAZA DRIVE | HOUSTON | TX | 77032 |
| 3130 N. OAKLAND ST. | AURORA | CO | 80010 |
| 1133 HAMPTON DUPRE ROAD | PINE PRAIRIE | LA | 70576 |
| 132 COTTON DRIVE | OCILLA | GA | 31772 |
| 500 HILBIG RD. | CONROE | TX | 77301 |
| 8915 MONTANA AVE. | EL PASO | TX | 79925 |
| 354 DOREMUS AVENUE | NEWARK | NJ | 07105 |
| 18201 SOUTHWEST 12TH STREET | MIAMI | FL | 33194 |
| 3026 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 |
| 3400 CONCORD ROAD | YORK | PA | 17402 |
| 1800 INDUSTRIAL DRIVE | RAYMONDVILLE | TX | 78580 |
| 508 WATERWORKS ROAD | FARMVILLE | VA | 23901 |

AR03628

| 1209 SUNFLOWER LN | ALVARADO | TX | 76009 |
| 1572 GATEWAY | CALEXICO | CA | 92231 |
| 3900 NORTH POWERLINE ROAD | POMPANO BEACH | FL | 33073 |
| 1001 SAN RIO BOULEVARD | LAREDO | TX | 78046 |
| 4250 FEDERAL DRIVE | BATAVIA | NY | 14020 |
| 401 S. VAQUERO AVE. | SIERRA BLANCA | TX | 79851 |
| 1400 LOWER ISLAND RD | TORNILLO | TX | 79853 |
| 327 INDUSTRIAL DRIVE | JONESBORO | LA | 71251 |
| 1001 WELCH STREET | TAYLOR | TX | 76574 |
| 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 |
| 30-35 HACKENSACK AVE. | KEARNY | NJ | 07032 |
| 560 GUM SPRING ROAD | WINNFIELD | LA | 71483 |
| FM 1144 AT US HIGHWAY 181 | KARNES CITY | TX | 78118 |
| 1297 EAST SR 78 | MOORE HAVEN | FL | 33471 |
| 3250 NORTH PINAL PARKWAY | FLORENCE | AZ | 85132 |
| 160 SOUTH RIVER STREET | HACKENSACK | NJ | 07601 |
| 9998 SOUTH HIGHWAY 83 | LAREDO | TX | 78046 |
| 180 PINE BAYOU CIRCLE | RICHWOOD | LA | 71202 |
| 425 GOLDEN STATE AVE | BAKERSFIELD | CA | 93301 |
| 2000 CIBOLA LOOP | MILAN | NM | 87021 |
| 4702 EAST SAUNDERS STREET | LAREDO | TX | 78041 |
| 1100 BOWLING ROAD | FLORENCE | AZ | 85132 |
| 1800 RIDGEMAR DRIVE | CLEBURNE | TX | 76031 |
| 501 THE CITY DRIVE SOUTH | ORANGE | CA | 92868 |
| 26362 HIGHWAY 15 | FERRIDAY | LA | 71334 |
| 13880 BUSINESS CENTER DRIVE | ELK RIVER | MN | 55330 |
| 26 LONG POND ROAD | PLYMOUTH | MA | 02360 |
| 625 EVANS STREET | ELIZABETH | NJ | 07201 |
| 2240 HUBBARD ROAD | YOUNGSTOWN | OH | 44505 |
| 827 FORREST AVENUE | GADSDEN | AL | 35901 |
| 2200 NORTH SEMINARY AVENUE | WOODSTOCK | IL | 60098 |
| 3424 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 |
| 11093 S.W. LEWIS MEMORIAL DRIVE | BOWLING GREEN | VA | 22427 |
| 1 SHERIFF OFFICE DRIVE | MACCLENNY | FL | 32063 |
| 406 NORTH AVENUE D | SAN LUIS | AZ | 85349 |
| 96 GEORGE THOMPSON DRIVE | ALEXANDRIA | LA | 71303 |
| 2984 OLD PLAIN DEALING HIGHWAY | PLAIN DEALING | LA | 71064 |
| 11901 E. 30th AVE | AURORA | CO | 80010 |
| 2190 EAST MESQUITE AVENUE | PAHRUMP | NV | 89060 |
| 3250 NORTH PINAL PARKWAY | FLORENCE | AZ | 85232 |
| 18 E BASIC ROAD | HENDERSON | NV | 89015 |
| FM 1144 AT US HIGHWAY 181 | KARNES CITY | TX | 78118 |
| 4909 FM (FARM TO MARKET) 2826 | ROBSTOWN | TX | 78380 |
| 314 W. 7TH STREET | OKMULGEE | OK | 74447 |
| 118 COUNTY ROAD 206 | HASKELL | TX | 79521 |

AR03629

| 175 PIKE COUNTY BOULEVARD | LORDS VALLEY | PA | 18428 |
| 3843 STAGG AVENUE | BASILE | LA | 70515 |
| 400 FAUNCE CORNER ROAD | NORTH DARTMOUTH | MA | 02747 |
| 185 EAST MICHIGAN AVENUE | BATTLE CREEK | MI | 49014 |
| 215 5TH STREET | MARYSVILLE | CA | 95901 |
| 4777 88TH AVENUE | KENOSHA | WI | 53144 |
| 1026 SHAWNEE COLLEGE ROAD | ULLIN | IL | 62992 |
| 110 WELLS FARM ROAD | GOSHEN | NY | 10924 |
| 5022 JOYNER ROAD | SNOW HILL | MD | 21863 |
| 3050 JUSTICE WAY | KANKAKEE | IL | 60901 |
| 20 BRADSTON STREET | BOSTON | MA | 02118 |
| 13502 MUSICK ROAD | IRVINE | CA | 92618 |
| 910 NORTH TYUS STREET | GROESBECK | TX | 76642 |
| 3020 CONRAD LANE | BURLINGTON | KY | 41005 |
| 215 WEST CENTRAL STREET | JUNEAU | WI | 53039 |
| 300 NORTH DENVER AVENUE | TULSA | OK | 74103 |
| 705 HANOVER STREET | HAMILTON | OH | 45011 |
| 832 EAST TEXAS STATE HIGHWAY 44 | ENCINAL | TX | 78019 |
| 20 HOBO FORK RD. | NATCHEZ | MS | 39120 |
| 266 COUNTY FARM ROAD | DOVER | NH | 03820 |
| 15 OAK STREET | CRAWFORDVILLE | FL | 32327 |
| 253 FARM TO MARKET 2523 | DEL RIO | TX | 78840 |
| 3841 LEEDS AVENUE | NORTH CHARLESTON | SC | 29405 |
| 110 PUBLIC SAFETY DRIVE | GRAND ISLAND | NE | 68801 |
| 5501 COLLEGE ROAD | KEY WEST | FL | 33040 |
| 499 OLD COLUMBIA ROAD | HARRISONBURG | LA | 71430 |
| 7301 WATERLOO ROAD | JESSUP | MD | 20794 |
| 1330 HIGHWAY 107 | LA VILLA | TX | 78562 |
| 301 SOUTH WALNUT STREET | COTTONWOOD FALLS | KS | 66845 |
| 11866 HASTINGS BRIDGE RD | LOVEJOY | GA | 30250 |
| 411 SOUTH BROADWAY AVENUE | ALBERT LEA | MN | 56007 |
| 1170 MICHIGAN ROAD | PORT HURON | MI | 48060 |
| 7000 EAST DUNBAR ROAD | MONROE | MI | 48161 |
| 950 HIGH STREET | CENTRAL FALLS | RI | 02863 |
| 7340 HIGHWAY 26 WEST | OBERLIN | LA | 70655 |
| 702 E BROADWAY ST | EDEN | TX | 76837 |
| 12450 MERRITT DR | CHARDON | OH | 44024 |
| 419 SHOEMAKER ROAD | LOCK HAVEN | PA | 17745 |
| 1116 14TH AVENUE | ELDORA | IA | 50627 |
| 211 EAST NEWTON STREET | VERSAILLES | MO | 65084 |
| 3040 SOUTH STATE HIGHWAY 100 | TIFFIN | OH | 44883 |
| 2201 23RD ST NE | WILLMAR | MN | 56201 |
| 9320 MERRIMAC TRAIL | WILLIAMSBURG | VA | 23185 |
| 611 EAST JACKSON STREET | BRAZIL | IN | 47834 |
| 2369 JESSUP AVENUE | MARSHALLTOWN | IA | 50158 |

AR03630

| | | | |
|---|---|---|---|
| 425 MANOR DRIVE | EBENSBURG | PA | 15931 |
| 7300 MARCIE'S CHOICE LANE | FREDERICK | MD | 21704 |
| 600 E. ORDNANCE ROAD | GLEN BURNIE | MD | 21060 |
| 50 WEST 200 NORTH | LOGAN | UT | 84321 |
| 840 ALBANY SHAKER ROAD | ALBANY | NY | 12211 |
| 901 COUNTY ROAD 201 | FALFURRIAS | TX | 78355 |
| 101 HOME ROAD | MOUNT GILEAD | OH | 43338 |
| 109 SOUTH MAPLE STREET | GRAHAM | NC | 27253 |
| 299 EDWINA DR. | NATCHITOCHES | LA | 71457 |
| 160 ELM STREET | GREENFIELD | MA | 01301 |
| 288 WEAVERVILLE ROAD | DIVIDE | CO | 80814 |
| 1985 NE 51ST PLACE | DES MOINES | IA | 50313 |
| 325 COURT STREET | SAULT SAINTE MARIE | MI | 49783 |
| 209 COUNTY ROAD 49 | ESTANCIA | NM | 87016 |
| 710 SOUTH 17TH ST | OMAHA | NE | 68102 |
| 351 ELLIOTT ST. | HONOLULU | HI | 96819 |
| 2801 JORDAN ROAD | FORT PAYNE | AL | 35968 |
| 1040 BERKS ROAD | LEESPORT | PA | 19533 |
| 15976 HWY 165 | OLLA | LA | 71465 |
| 211 WEBBER ROAD | THE DALLES | OR | 97058 |
| 280 WEST MAIN STREET | KINGSTON | MO | 64650 |
| 1101 WEST DRY ROAD | NEWKIRK | OK | 74647 |
| 211 EAST THIRD STREET | MONTGOMERY CITY | MO | 63361 |
| 600 EAST FOURTH ST. | CHASKA | MN | 55318 |
| 336 MAIN STREET | PLATTSMOUTH | NE | 68048 |
| 110 WEST ELM | OZARK | MO | 65721 |
| 911 PARR BOULEVARD | RENO | NV | 89512 |
| 415 THIRD STREET | PLATTE CITY | MO | 64079 |
| JAIL ADMINISTRATOR | BURNET | TX | 78611 |
| 720 E SAN YSIDRO BLVD | SAN YSIDRO | CA | 92173 |
| 3301 TAMIAMI TRAIL EAST | NAPLES | FL | 34112 |
| 53 3RD AVENUE BRIDGE | CEDAR RAPIDS | IA | 52401 |
| 203 ASPINALL AVENUE | HAGATNA | GU | 96910 |
| 1520 E. BASIN ROAD | PAHRUMP | NV | 89060 |
| 715 5TH AVENUE | HOLDREGE | NE | 68949 |
| 701 NORTH COLUMBIA STREET | COVINGTON | LA | 70433 |
| 1400 BIG LAKE ROAD | COUNCIL BLUFFS | IA | 51501 |
| 2121 L DON DODSON DRIVE | BEDFORD | TX | 76021 |
| 111 WEST COMMERCE STREET | DALLAS | TX | 75202 |
| 1102 W. EULESS BLVD. | EULESS | TX | 76040 |
| 501 SOUTHEAST 8TH AVENUE | TOPEKA | KS | 66607 |
| 701 SE STONE ROAD | EL DORADO | KS | 67042 |
| 25 MCCARTHY DRIVE | PLATTSBURGH | NY | 12901 |
| 448 2ND AVENUE NORTH | NASHVILLE | TN | 37210 |
| 2255 E. 8TH NORTH | MOUNTAIN HOME | ID | 83647 |

AR03631

| | | | |
|---|---|---|---|
| 200 COURTHOUSE WAY | RIGBY | ID | 83442 |
| 65 BUSINESS PARK DRIVE | TROY | MO | 63379 |
| 1701 NORTH WASHINGTON ST | GRAND FORKS | ND | 58206 |
| 1001 CENTRE WAY | CHARLESTON | WV | 25309 |
| 14400 49TH STREET NORTH | CLEARWATER | FL | 33762 |
| 2935 HIGHWAY 51 | CANTON | MS | 39046 |
| 1109 ARIZONA AVE. | PARKER | AZ | 85344 |
| 111 NORTH FRONT STREET | YAKIMA | WA | 98901 |
| 200 HAND AVE. | BAY MINETTE | AL | 36507 |
| 6000 WOODLAWN BOULEVARD | ALIQUIPPA | PA | 15001 |
| P.O. BOX 3540 | GRANTS | NM | 87020 |
| 15 E. CHAUTAUQUA STREET | MAYVILLE | NY | 14757 |
| 1725 1ST AVE. | LONGVIEW | WA | 98632 |
| 1601 BROADWAY | DAKOTA CITY | NE | 68731 |
| HWY 28 INTSECT OF ROAD 165 | SAN JUAN | PR | 00939 |
| 5001 Maloneyville Rd | Knoxville | TN | 37918 |
| 1415 ALBION AVENUE | BURLEY | ID | 83318 |
| 38 N 4TH ST | ALLENTOWN | PA | 18102 |
| 521 GIBSON ROAD | LEXINGTON | SC | 29072 |
| 500 CHAYNEY ROAD | THORNTON | PA | 19373 |
| 750 SOUTH 5400 WEST | HURRICANE | UT | 84737 |
| 6299 FINDE NAIFEH DRIVE | MASON | TN | 38049 |
| 600 OLD FRANKFORD CR | LEXINGTON | KY | 40510 |
| 3855 SOUTH JOHN YOUNG PARKWAY | ORLANDO | FL | 32839 |
| 4000 MAIN STREET | TROY | NY | 12180 |
| 1825 COUNTY SERVICES PARKWAY | MARIETTA | GA | 30060 |
| 1155 WEST CLYDESDALE DRIVE | FAYETTEVILLE | AR | 72701 |
| 651 FEDERAL DRIVE, SUITE 104 | GUAYNABO | PR | 00965 |
| 100 W MAIN STREET | LA GRANGE | KY | 40031 |
| 1530 AIRPORT ROAD | WORTHINGTON | MN | 56187 |
| 320 NORTH RIPLEY STREET | MONTGOMERY | AL | 36104 |
| 9100 SOUTH GEORGIA STREET | AMARILLO | TX | 79118 |
| 3800 ULM NORTH FRONTAGE ROAD | GREAT FALLS | MT | 59404 |
| 201 WEST GRANT AVENUE | PAULS VALLEY | OK | 73075 |
| 340 CAMPBELL AVENUE SOUTHWEST | ROANOKE | VA | 24016 |
| 211 WEBBER STREET | THE DALLES | OR | 97058 |
| 203 W. FRONT STREET | LONOKE | AR | 72086 |
| 1315 SOUTH B AVENUE | NEVADA | IA | 50201 |
| 805 PROFESSIONAL BLVD | DALTON | GA | 30720 |
| 205 WEST 5TH AVENUE | ELLENSBURG | WA | 98926 |
| 330 SOUTH SALISBURY STREET | RALEIGH | NC | 27601 |
| 311 ATHEY AVE | SAN DIEGO | CA | 92154 |
| 3950 JUVENILE RD | CASTLE HAYNE | NC | 28429 |
| 16838 INTERNATIONAL BLVD | SEATAC | WA | 98188 |
| 1000 ACADEMY DRIVE | MORGANTOWN | PA | 19543 |

AR03632

| | | | |
|---|---|---|---|
| 201 NORTH CHURCH STREET | WINSTON-SALEM | NC | 27101 |
| 410 WALNUT STREET | YANKTON | SD | 57078 |
| 3101 MARLIN HWY | WACO | TX | 76705 |
| 50 COUNTY WAY | PORTLAND | ME | 04102 |
| 218 S. LAREDO ST | SAN ANTONIO | TX | 78207 |
| 3701 S. ATKINSON | ROSWELL | NM | 88201 |
| TEKKEN ST., SUSUPE VILLAGE | SAIPAN | MP | 96950 |

AR03633

| AOR | Type Detailed | Male/Female | Facility Average Length of Stay FY19 ALOS | FY19 ADP: Detai Level A |
|-----|---------------|-------------|-------------------------------------------|-------------------------|
| ATL | DIGSA | Male | 45 | 1,150 |
| SNA | CDF | Female/Male | 30 | 1,223 |
| LOS | DIGSA | Female/Male | 54 | 979 |
| PHO | DIGSA | Female/Male | 40 | 1,149 |
| SEA | CDF | Female/Male | 74 | 666 |
| SNA | SPC | Female/Male | 7 | 1,163 |
| PHO | IGSA | Male | 51 | 966 |
| NOL | DIGSA | Female/Male | 37 | 348 |
| NOL | USMS IGA | Male | 31 | 1,044 |
| SNA | FAMILY | Female/Male | 12 | 1,071 |
| SND | USMS CDF | Female/Male | 87 | 643 |
| ELP | DIGSA | Male | 52 | 575 |
| HOU | CDF | Female/Male | 19 | 351 |
| HOU | IGSA | Male | 55 | 670 |
| HOU | CDF | Female/Male | 35 | 447 |
| DEN | CDF | Female/Male | 62 | 435 |
| NOL | DIGSA | Male | 63 | 509 |
| ATL | USMS IGA | Female/Male | 42 | 410 |
| HOU | IGSA | Female/Male | 34 | 595 |
| ELP | SPC | Female/Male | 10 | 428 |
| NEW | IGSA | Male | 95 | 114 |
| MIA | SPC | Male | 24 | 290 |
| ATL | DIGSA | Male | 60 | #N/A |
| PHI | IGSA | Female/Male | 55 | 276 |
| SNA | IGSA | Female/Male | 26 | 693 |
| WAS | DIGSA | Male | 61 | 237 |

AR03634

| DAL | DIGSA | Female/Male | 21 | 336 |
|-----|-------|-------------|-----|-----|
| SND | CDF | Female/Male | 37 | 615 |
| MIA | CDF | Female/Male | 57 | 616 |
| SNA | USMS CDF | Male | 25 | 587 |
| BUF | SPC | Female/Male | 73 | 290 |
| ELP | USMS IGA | Female/Male | 34 | 236 |
| ELP | Other | Female/Male | 46 | 529 |
| NOL | IGSA | Female/Male | 70 | 462 |
| SNA | FAMILY | Female | 28 | 480 |
| PHO | IGSA | Male | 33 | 391 |
| NYC | IGSA | Female/Male | 68 | 140 |
| NOL | IGSA | Male | 56 | 407 |
| SNA | FAMILY | Female/Male | 36 | 422 |
| MIA | IGSA | Female/Male | 51 | 2 |
| PHO | SPC | Male | 9 | 313 |
| NYC | USMS IGA | Female/Male | 50 | 140 |
| SNA | DIGSA | Female/Male | 26 | 254 |
| NOL | IGSA | Male | 80 | 355 |
| SFR | CDF | Female/Male | 25 | 110 |
| ELP | IGSA | Male | 29 | 253 |
| SNA | DIGSA | Female/Male | 15 | 353 |
| PHO | USMS IGA | Male | 38 | 129 |
| DAL | IGSA | Male | 37 | 161 |
| LOS | IGSA | Male | 22 | 107 |
| NOL | IGSA | Male | 71 | 308 |
| SPM | IGSA | Female/Male | 50 | 54 |
| BOS | IGSA | Male | 82 | 150 |
| NEW | CDF | Female/Male | 56 | 228 |
| DET | CDF | Male | 74 | 212 |
| NOL | USMS IGA | Male | 36 | 111 |
| CHI | USMS IGA | Female/Male | 20 | 129 |
| ATL | DIGSA | Male | 35 | #N/A |
| WAS | DIGSA | Female/Male | 32 | 113 |
| MIA | IGSA | Female/Male | 45 | 38 |
| SND | IGSA | Female/Male | 7 | 243 |
| NOL | STAGING | Male | 3 | 112 |
| NOL | USMS IGA | Male | 81 | 221 |
| DEN | CDF | Female/Male | 65 | 227 |
| SLC | USMS IGA | Female/Male | 49 | 66 |
| PHO | STAGING | Male | 2 | 130 |
| SLC | USMS IGA | Female/Male | 41 | 28 |
| SNA | FAMILY | Male | 12 | 204 |
| HOU | USMS IGA | Male | 7 | 171 |
| DAL | IGSA | Male | 45 | 140 |
| DAL | USMS IGA | Female/Male | 55 | 163 |

AR03635

| PHI | IGSA | Male | 71 | 67 |
|-----|------|------|-----|-----|
| NOL | IGSA | Female/Male | 42 | 182 |
| BOS | IGSA | Female/Male | 68 | 31 |
| DET | IGSA | Female/Male | 47 | 86 |
| SFR | IGSA | Female/Male | 51 | 13 |
| CHI | USMS IGA | Female/Male | 21 | 104 |
| CHI | IGSA | Female/Male | 19 | 69 |
| NYC | IGSA | Female/Male | 73 | 62 |
| BAL | IGSA | Female/Male | 80 | 23 |
| CHI | USMS IGA | Male | 10 | 63 |
| BOS | IGSA | Female/Male | 50 | 62 |
| LOS | IGSA | Female/Male | 21 | 90 |
| SNA | USMS IGA | Male | 26 | 127 |
| CHI | USMS IGA | Female/Male | 33 | 26 |
| CHI | USMS IGA | Female/Male | 27 | 36 |
| DAL | IGSA | Female/Male | 36 | 72 |
| DET | IGSA | Female/Male | 35 | 43 |
| SNA | USMS IGA | Male | 20 | 100 |
| NOL | IGSA | Female/Male | 20 | 78 |
| BOS | IGSA | Female/Male | 18 | 39 |
| MIA | IGSA | Male | 34 | 15 |
| SNA | USMS IGA | Female/Male | 4 | 88 |
| ATL | USMS IGA | Male | 14 | 73 |
| SPM | IGSA | Female/Male | 42 | 14 |
| MIA | IGSA | Male | 42 | 0 |
| NOL | IGSA | Male | 17 | 48 |
| BAL | IGSA | Male | 61 | 11 |
| SNA | USMS IGA | Female/Male | 15 | 72 |
| CHI | IGSA | Female/Male | 35 | 11 |
| ATL | USMS CDF | Female/Male | 10 | 24 |
| SPM | IGSA | Male | 59 | 11 |
| DET | IGSA | Male | 31 | 43 |
| DET | IGSA | Male | 16 | 36 |
| BOS | USMS IGA | Male | 41 | 61 |
| NOL | IGSA | Male | 59 | 42 |
| DAL | USMS IGA | Male | 29 | 58 |
| DET | USMS IGA | Female/Male | 43 | 26 |
| PHI | USMS IGA | Male | 21 | 4 |
| SPM | IGSA | Female/Male | 47 | 9 |
| CHI | IGSA | Male | 36 | 11 |
| DET | IGSA | Female/Male | 34 | 36 |
| SPM | IGSA | Female/Male | 61 | 16 |
| WAS | USMS IGA | Male | 51 | 8 |
| CHI | USMS IGA | Male | 7 | 14 |
| SPM | USMS IGA | Female/Male | 58 | 10 |

AR03636

| PHI | USMS IGA | Male | 20 | 7 |
|-----|----------|------|----|---|
| BAL | IGSA | Male | 52 | 30 |
| BAL | IGSA | Female/Male | 81 | 32 |
| SLC | USMS IGA | Female/Male | 9 | 2 |
| BUF | USMS IGA | Female/Male | 68 | 32 |
| SNA | USMS IGA | Female/Male | 4 | 35 |
| DET | IGSA | Female/Male | 12 | 14 |
| ATL | IGSA | Female/Male | 11 | 22 |
| NOL | USMS IGA | Female/Male | 4 | 16 |
| BOS | USMS IGA | Male | 41 | 0 |
| DEN | IGSA | Female/Male | 36 | 20 |
| SPM | USMS IGA | Female/Male | 23 | 7 |
| DET | IGSA | Female/Male | 57 | 13 |
| ELP | IGSA | Male | 16 | 25 |
| SPM | IGSA | Female/Male | 43 | 2 |
| SFR | BOP | Female/Male | 60 | 7 |
| NOL | USMS IGA | Female/Male | 4 | 4 |
| PHI | FAMILY | Female/Male | 16 | 22 |
| NOL | IGSA | Female/Male | 8 | 12 |
| SEA | IGSA | Male | 38 | 2 |
| CHI | IGSA | Female/Male | 43 | 10 |
| DAL | IGSA | Female | 56 | 21 |
| CHI | IGSA | Female/Male | 33 | 8 |
| SPM | IGSA | Female/Male | 26 | 2 |
| SPM | USMS IGA | Female/Male | 36 | 3 |
| CHI | IGSA | Male | 29 | 5 |
| SLC | USMS IGA | Female/Male | 13 | 1 |
| CHI | IGSA | Female/Male | 35 | 5 |
| SNA | USMS IGA | Male | 2 | 9 |
| SND | Other | Female/Male | 5 | 11 |
| MIA | IGSA | Female/Male | 3 | 5 |
| SPM | USMS IGA | Female/Male | 14 | 2 |
| SFR | USMS IGA | Female/Male | 43 | 0 |
| SLC | IGSA | Female/Male | 20 | 1 |
| SPM | USMS IGA | Female/Male | 30 | 2 |
| NOL | IGSA | Female/Male | 3 | 0 |
| SPM | USMS IGA | Female/Male | 30 | 0 |
| DAL | IGSA | Female/Male | 1 | 8 |
| DAL | USMS IGA | Female/Male | 1 | 8 |
| DAL | IGSA | Female/Male | 1 | 8 |
| CHI | IGSA | Female/Male | 26 | 2 |
| CHI | USMS IGA | Female/Male | 27 | 43 |
| BUF | USMS IGA | Female/Male | 6 | 2 |
| NOL | IGSA | Female/Male | 3 | 0 |
| SLC | USMS IGA | Female/Male | 3 | 1 |

AR03637

| SLC | IGSA | Female/Male | 9 | 1 |
|-----|------|-------------|---|---|
| CHI | IGSA | Female/Male | 29 | 0 |
| SPM | IGSA | Female/Male | 4 | 0 |
| PHI | USMS IGA | Female/Male | 8 | 0 |
| MIA | USMS IGA | Female/Male | 2 | 1 |
| NOL | USMS IGA | Female/Male | 3 | 1 |
| PHO | USMS IGA | Female/Male | 2 | 0 |
| SEA | USMS IGA | Female/Male | 1 | 1 |
| NOL | IGSA | Female/Male | 2 | 0 |
| PHI | USMS IGA | Female/Male | 6 | 0 |
| ELP | IGSA | Female/Male | 9 | 3 |
| BUF | IGSA | Female/Male | 37 | 0 |
| SEA | JUVENILE | Female/Male | 112 | 0 |
| SPM | USMS IGA | Female/Male | 5 | 0 |
| MIA | BOP | Female/Male | 8 | 0 |
| NOL | USMS IGA | Female/Male | 2 | 1 |
| SLC | IGSA | Female/Male | 4 | 1 |
| PHI | USMS IGA | Female/Male | 6 | 0 |
| ATL | USMS IGA | Female/Male | 2 | 0 |
| PHI | USMS IGA | Female/Male | 1 | 1 |
| SLC | USMS IGA | Female/Male | 7 | 0 |
| NOL | USMS IGA | Female/Male | 2 | 1 |
| CHI | USMS IGA | Female/Male | 1 | 0 |
| MIA | USMS IGA | Female/Male | 2 | 62 |
| BUF | USMS IGA | Female/Male | 4 | 1 |
| ATL | IGSA | Female/Male | 2 | 1 |
| NOL | USMS IGA | Female/Male | 2 | 0 |
| MIA | STAGING | Female/Male | 1 | 2 |
| CHI | IGSA | Female/Male | 2 | 0 |
| SPM | IGSA | Female/Male | 4 | 0 |
| NOL | IGSA | Female/Male | 2 | 1 |
| DAL | USMS IGA | Female/Male | 2 | 1 |
| SLC | USMS IGA | Female/Male | 6 | 0 |
| DAL | IGSA | Female/Male | 2 | 1 |
| WAS | USMS IGA | Female/Male | 2 | 0 |
| SEA | JUVENILE | Female/Male | 133 | 1 |
| NOL | IGSA | Female/Male | 2 | 0 |
| SPM | USMS IGA | Female/Male | 3 | 1 |
| ATL | IGSA | Female/Male | 2 | 1 |
| SEA | IGSA | Female/Male | 2 | 0 |
| ATL | IGSA | Female/Male | 2 | 1 |
| SND | Other | Female/Male | 2 | 1 |
| ATL | IGSA | Female/Male | 2 | 0 |
| SEA | Other | Female/Male | 1 | 1 |
| PHI | JUVENILE | Female/Male | 237 | 0 |

AR03638

| ATL | USMS IGA | Female/Male | 2 | 0 |
|-----|----------|-------------|---|---|
| SPM | USMS IGA | Female/Male | 3 | 0 |
| SNA | USMS IGA | Female/Male | 2 | 0 |
| BOS | USMS IGA | Female/Male | 5 | 0 |
| SNA | USMS IGA | Female/Male | 1 | 0 |
| ELP | IGSA | Female/Male | 2 | 0 |
| SFR | USMS IGA | Female/Male | 5 | 0 |

AR03639

| hee Classification Level | | | | FY19 ADP: Criminality | |
| Level B | Level C | Level D | Male Crim | Male Non-Crim | Female Crim |
|---|---|---|---|---|---|
| 315 | 238 | 208 | 883 | 1,027 | 0 |
| 272 | 189 | 104 | 790 | 798 | 74 |
| 96 | 259 | 377 | 642 | 811 | 89 |
| 121 | 105 | 77 | 223 | 517 | 109 |
| 196 | 248 | 232 | 582 | 531 | 55 |
| 44 | 10 | 15 | 200 | 852 | 23 |
| 133 | 80 | 43 | 283 | 939 | 0 |
| 304 | 420 | 107 | 570 | 410 | 80 |
| 61 | 5 | 1 | 141 | 969 | 0 |
| 4 | 0 | 0 | 0 | 266 | 3 |
| 174 | 69 | 80 | 261 | 547 | 26 |
| 323 | 39 | 20 | 421 | 537 | 0 |
| 260 | 152 | 188 | 500 | 328 | 46 |
| 123 | 68 | 48 | 222 | 687 | 0 |
| 225 | 139 | 97 | 348 | 378 | 47 |
| 122 | 215 | 116 | 393 | 435 | 20 |
| 203 | 124 | 33 | 253 | 615 | 0 |
| 243 | 105 | 93 | 310 | 271 | 108 |
| 116 | 65 | 68 | 215 | 301 | 32 |
| 277 | 59 | 49 | 272 | 277 | 124 |
| 56 | 371 | 240 | 455 | 326 | 0 |
| 87 | 174 | 177 | 398 | 330 | 0 |
| #N/A | #N/A | #N/A | #N/A | #N/A | #N/A |
| 162 | 152 | 123 | 385 | 265 | 21 |
| 3 | 0 | 0 | 53 | 594 | 6 |
| 147 | 141 | 169 | 439 | 254 | 0 |

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 114 | 133 | 103 | 368 | 255 | 32 |
| 7 | 7 | 38 | 84 | 519 | 3 |
| 35 | 0 | 0 | 113 | 443 | 7 |
| 26 | 0 | 0 | 116 | 497 | 0 |
| 103 | 81 | 137 | 323 | 216 | 26 |
| 322 | 24 | 8 | 264 | 132 | 110 |
| 8 | 0 | 0 | 0 | 426 | 0 |
| 33 | 3 | 0 | 54 | 389 | 1 |
| 2 | 0 | 0 | 0 | 1 | 50 |
| 90 | 1 | 0 | 81 | 400 | 0 |
| 71 | 170 | 92 | 292 | 137 | 29 |
| 34 | 7 | 2 | 33 | 416 | 0 |
| 9 | 1 | 0 | 0 | 0 | 14 |
| 71 | 173 | 177 | 287 | 76 | 36 |
| 96 | 4 | 3 | 128 | 287 | 0 |
| 54 | 116 | 84 | 240 | 118 | 14 |
| 12 | 40 | 78 | 96 | 230 | 18 |
| 22 | 2 | 0 | 29 | 350 | 0 |
| 111 | 65 | 91 | 248 | 39 | 8 |
| 107 | 8 | 6 | 123 | 250 | 0 |
| 10 | 2 | 3 | 3 | 40 | 53 |
| 37 | 103 | 89 | 214 | 144 | 0 |
| 62 | 61 | 49 | 211 | 122 | 0 |
| 20 | 69 | 130 | 211 | 114 | 0 |
| 11 | 1 | 0 | 40 | 280 | 0 |
| 30 | 188 | 35 | 175 | 118 | 10 |
| 25 | 52 | 68 | 126 | 170 | 0 |
| 63 | 2 | 0 | 82 | 182 | 6 |
| 34 | 21 | 20 | 99 | 189 | 0 |
| 40 | 61 | 75 | 164 | 123 | 0 |
| 33 | 57 | 61 | 144 | 101 | 12 |
| #N/A | #N/A | #N/A | #N/A | #N/A | #N/A |
| 77 | 37 | 46 | 134 | 96 | 8 |
| 78 | 76 | 69 | 165 | 76 | 16 |
| 12 | 2 | 1 | 17 | 168 | 2 |
| 51 | 58 | 38 | 146 | 113 | 0 |
| 28 | 2 | 0 | 42 | 210 | 0 |
| 15 | 4 | 2 | 24 | 145 | 8 |
| 42 | 80 | 44 | 125 | 42 | 22 |
| 61 | 25 | 14 | 105 | 116 | 3 |
| 73 | 69 | 45 | 131 | 58 | 16 |
| 10 | 0 | 0 | 10 | 192 | 0 |
| 36 | 2 | 1 | 44 | 165 | 0 |
| 41 | 17 | 11 | 81 | 127 | 0 |
| 24 | 8 | 5 | 12 | 4 | 36 |

AR03641

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 37 | 56 | 38 | 129 | 69 | 0 |
| 14 | 1 | 0 | 1 | 9 | 14 |
| 19 | 59 | 77 | 104 | 68 | 9 |
| 44 | 35 | 19 | 82 | 44 | 18 |
| 27 | 52 | 90 | 150 | 18 | 10 |
| 22 | 20 | 32 | 78 | 88 | 5 |
| 23 | 46 | 41 | 110 | 50 | 6 |
| 41 | 43 | 20 | 90 | 65 | 5 |
| 7 | 53 | 72 | 98 | 46 | 4 |
| 16 | 26 | 45 | 95 | 55 | 0 |
| 22 | 28 | 32 | 48 | 79 | 4 |
| 13 | 29 | 12 | 50 | 64 | 5 |
| 12 | 0 | 0 | 17 | 123 | 0 |
| 33 | 47 | 31 | 100 | 30 | 5 |
| 18 | 35 | 40 | 90 | 32 | 5 |
| 18 | 19 | 17 | 67 | 51 | 3 |
| 38 | 23 | 16 | 72 | 39 | 4 |
| 14 | 1 | 0 | 29 | 86 | 0 |
| 16 | 10 | 5 | 19 | 78 | 0 |
| 15 | 26 | 29 | 52 | 45 | 4 |
| 17 | 28 | 46 | 85 | 21 | 0 |
| 13 | 0 | 0 | 72 | 23 | 5 |
| 11 | 4 | 3 | 25 | 65 | 1 |
| 18 | 31 | 18 | 61 | 14 | 5 |
| 14 | 33 | 34 | 63 | 17 | 0 |
| 18 | 11 | 3 | 27 | 53 | 0 |
| 13 | 24 | 32 | 54 | 25 | 0 |
| 4 | 2 | 1 | 18 | 50 | 1 |
| 42 | 22 | 3 | 39 | 34 | 2 |
| 17 | 15 | 18 | 44 | 26 | 2 |
| 7 | 28 | 23 | 51 | 20 | 0 |
| 13 | 8 | 5 | 32 | 38 | 0 |
| 15 | 13 | 3 | 28 | 38 | 0 |
| 5 | 0 | 0 | 7 | 59 | 0 |
| 18 | 2 | 0 | 8 | 55 | 0 |
| 4 | 0 | 0 | 7 | 55 | 0 |
| 19 | 8 | 5 | 27 | 25 | 2 |
| 13 | 18 | 22 | 54 | 3 | 1 |
| 14 | 18 | 16 | 48 | 7 | 2 |
| 18 | 15 | 12 | 36 | 20 | 0 |
| 14 | 3 | 2 | 13 | 36 | 1 |
| 2 | 17 | 11 | 23 | 18 | 4 |
| 12 | 12 | 13 | 33 | 12 | 0 |
| 6 | 13 | 10 | 30 | 12 | 1 |
| 9 | 12 | 12 | 34 | 7 | 1 |

AR03642

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 17 | 13 | 3 | 19 | 21 | 0 |
| 9 | 0 | 0 | 12 | 28 | 0 |
| 8 | 0 | 0 | 15 | 25 | 0 |
| 9 | 19 | 8 | 30 | 5 | 2 |
| 4 | 1 | 0 | 8 | 23 | 2 |
| 0 | 0 | 0 | 5 | 30 | 0 |
| 12 | 5 | 4 | 20 | 12 | 1 |
| 3 | 6 | 4 | 14 | 21 | 0 |
| 7 | 6 | 5 | 18 | 15 | 0 |
| 0 | 15 | 18 | 26 | 7 | 0 |
| 2 | 3 | 7 | 10 | 13 | 2 |
| 8 | 11 | 5 | 23 | 5 | 2 |
| 4 | 4 | 10 | 17 | 12 | 1 |
| 5 | 0 | 0 | 5 | 25 | 0 |
| 6 | 17 | 3 | 24 | 3 | 2 |
| 11 | 6 | 5 | 18 | 5 | 3 |
| 8 | 12 | 2 | 12 | 8 | 4 |
| 4 | 0 | 0 | 0 | 14 | 0 |
| 4 | 7 | 2 | 12 | 14 | 0 |
| 5 | 7 | 11 | 24 | 0 | 0 |
| 9 | 5 | 1 | 10 | 12 | 2 |
| 3 | 0 | 0 | 0 | 0 | 3 |
| 3 | 6 | 5 | 12 | 8 | 1 |
| 2 | 13 | 3 | 11 | 5 | 3 |
| 4 | 7 | 2 | 12 | 3 | 1 |
| 3 | 4 | 3 | 8 | 7 | 0 |
| 4 | 6 | 4 | 12 | 2 | 0 |
| 5 | 2 | 1 | 4 | 5 | 1 |
| 0 | 0 | 1 | 5 | 7 | 0 |
| 0 | 0 | 0 | 0 | 8 | 0 |
| 2 | 3 | 1 | 8 | 3 | 0 |
| 4 | 2 | 2 | 8 | 1 | 1 |
| 4 | 5 | 0 | 8 | 2 | 0 |
| 1 | 4 | 4 | 8 | 2 | 0 |
| 2 | 4 | 2 | 8 | 2 | 0 |
| 5 | 4 | 0 | 3 | 6 | 0 |
| 3 | 5 | 1 | 7 | 2 | 0 |
| 0 | 0 | 0 | 4 | 3 | 0 |
| 0 | 0 | 0 | 5 | 3 | 0 |
| 0 | 0 | 0 | 4 | 3 | 0 |
| 2 | 2 | 1 | 4 | 3 | 1 |
| 38 | 23 | 16 | 72 | 39 | 4 |
| 4 | 0 | 1 | 4 | 2 | 1 |
| 3 | 3 | 1 | 5 | 2 | 0 |
| 1 | 3 | 1 | 5 | 1 | 0 |

AR03643

| | | | | | |
|---|---|---|---|---|---|
| 1 | 3 | 1 | 4 | 1 | 0 |
| 0 | 1 | 4 | 5 | 0 | 1 |
| 0 | 5 | 0 | 2 | 3 | 0 |
| 2 | 2 | 1 | 3 | 2 | 0 |
| 2 | 2 | 0 | 3 | 2 | 0 |
| 1 | 2 | 1 | 3 | 2 | 0 |
| 4 | 0 | 0 | 4 | 0 | 0 |
| 1 | 2 | 1 | 3 | 1 | 0 |
| 3 | 1 | 0 | 2 | 2 | 0 |
| 2 | 1 | 0 | 2 | 2 | 0 |
| 0 | 0 | 0 | 1 | 3 | 0 |
| 1 | 1 | 1 | 0 | 0 | 3 |
| 0 | 1 | 2 | 1 | 2 | 0 |
| 1 | 2 | 0 | 2 | 1 | 0 |
| 1 | 1 | 1 | 3 | 1 | 0 |
| 2 | 1 | 0 | 2 | 1 | 0 |
| 1 | 1 | 1 | 3 | 1 | 0 |
| 2 | 1 | 0 | 2 | 1 | 0 |
| 1 | 2 | 0 | 2 | 1 | 0 |
| 0 | 1 | 1 | 1 | 1 | 0 |
| 1 | 1 | 0 | 2 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 1 | 1 | 2 | 1 | 0 |
| 41 | 43 | 20 | 90 | 65 | 5 |
| 1 | 0 | 0 | 1 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 0 | 2 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 1 | 0 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 1 | 1 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 1 | 1 | 0 |
| 0 | 1 | 1 | 1 | 0 | 0 |
| 0 | 0 | 1 | 0 | 2 | 0 |
| 1 | 0 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 1 | 1 | 0 |
| 0 | 1 | 0 | 1 | 1 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 1 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 1 | 0 | 1 | 0 |

AR03644

| | | | | | |
|---|---|---|---|---|---|
| 0 | 0 | 0 | 1 | 0 | 0 |
| 0 | 1 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 |
| 1 | 0 | 0 | 0 | 1 | 0 |
| 1 | 0 | 0 | 0 | 1 | 0 |

AR03645

| | FY19 ADP: ICE Threat Level | | | | FY19 ADP: Mandatory |
|---|---|---|---|---|---|
| Female Non-Crim | ICE Threat Level 1 | ICE Threat Level 2 | ICE Threat Level 3 | No ICE Threat Level | Mandatory |
| 0 | 316 | 202 | 369 | 1,023 | 1,507 |
| 125 | 136 | 157 | 583 | 913 | 1,268 |
| 168 | 394 | 181 | 153 | 983 | 1,344 |
| 602 | 81 | 63 | 190 | 1,117 | 965 |
| 174 | 316 | 154 | 165 | 706 | 951 |
| 157 | 43 | 45 | 135 | 1,008 | 1,062 |
| 0 | 48 | 42 | 196 | 936 | 798 |
| 119 | 274 | 164 | 211 | 530 | 653 |
| 0 | 2 | 6 | 135 | 968 | 1,061 |
| 806 | 0 | 0 | 3 | 1,072 | 731 |
| 131 | 152 | 54 | 79 | 680 | 775 |
| 0 | 39 | 48 | 344 | 528 | 735 |
| 77 | 231 | 138 | 192 | 391 | 549 |
| 0 | 55 | 46 | 132 | 677 | 671 |
| 136 | 98 | 99 | 216 | 496 | 699 |
| 41 | 172 | 131 | 111 | 474 | 657 |
| 0 | 54 | 57 | 145 | 612 | 621 |
| 162 | 172 | 111 | 142 | 425 | 534 |
| 296 | 76 | 44 | 139 | 585 | 699 |
| 140 | 64 | 61 | 273 | 414 | 641 |
| 0 | 251 | 100 | 110 | 320 | 435 |
| 0 | 178 | 107 | 116 | 328 | 495 |
| #N/A | #N/A | #N/A | #N/A | #N/A | #N/A |
| 42 | 210 | 87 | 111 | 306 | 570 |
| 44 | 5 | 10 | 44 | 637 | 664 |
| 0 | 196 | 117 | 127 | 252 | 433 |

AR03646

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 31 | 167 | 95 | 140 | 285 | 421 |
| 62 | 56 | 13 | 18 | 580 | 633 |
| 87 | 2 | 23 | 98 | 528 | 425 |
| 0 | 3 | 11 | 102 | 497 | 584 |
| 46 | 209 | 44 | 99 | 260 | 495 |
| 84 | 19 | 57 | 298 | 216 | 511 |
| 112 | 0 | 0 | 0 | 538 | 1 |
| 53 | 1 | 3 | 53 | 442 | 445 |
| 432 | 0 | 0 | 50 | 432 | 438 |
| 0 | 4 | 5 | 72 | 400 | 327 |
| 15 | 121 | 76 | 125 | 150 | 246 |
| 0 | 3 | 4 | 25 | 417 | 308 |
| 417 | 0 | 2 | 12 | 417 | 346 |
| 24 | 176 | 83 | 65 | 99 | 260 |
| 0 | 5 | 7 | 116 | 287 | 337 |
| 22 | 90 | 64 | 103 | 137 | 203 |
| 40 | 23 | 19 | 74 | 268 | 360 |
| 0 | 1 | 2 | 26 | 350 | 353 |
| 82 | 172 | 43 | 32 | 131 | 274 |
| 0 | 12 | 16 | 97 | 249 | 358 |
| 272 | 2 | 4 | 51 | 312 | 303 |
| 0 | 77 | 54 | 82 | 144 | 238 |
| 0 | 75 | 52 | 85 | 122 | 172 |
| 0 | 123 | 56 | 32 | 114 | 215 |
| 0 | 0 | 1 | 39 | 280 | 311 |
| 5 | 88 | 49 | 47 | 123 | 207 |
| 0 | 65 | 19 | 41 | 170 | 201 |
| 23 | 17 | 18 | 54 | 204 | 197 |
| 0 | 28 | 18 | 52 | 190 | 245 |
| 0 | 97 | 36 | 32 | 123 | 250 |
| 23 | 71 | 43 | 41 | 125 | 163 |
| #N/A | #N/A | #N/A | #N/A | #N/A | #N/A |
| 35 | 52 | 44 | 47 | 130 | 176 |
| 4 | 95 | 39 | 47 | 79 | 147 |
| 72 | 3 | 3 | 13 | 240 | 252 |
| 0 | 60 | 29 | 56 | 114 | 256 |
| 0 | 1 | 2 | 39 | 210 | 244 |
| 71 | 3 | 1 | 29 | 215 | 228 |
| 44 | 58 | 40 | 48 | 86 | 125 |
| 7 | 21 | 19 | 67 | 123 | 181 |
| 9 | 50 | 44 | 52 | 68 | 91 |
| 11 | 0 | 1 | 9 | 203 | 157 |
| 0 | 3 | 6 | 37 | 164 | 203 |
| 0 | 25 | 16 | 41 | 126 | 145 |
| 148 | 9 | 6 | 34 | 152 | 174 |

AR03647

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 0 | 65 | 28 | 34 | 71 | 126 |
| 173 | 1 | 0 | 14 | 181 | 175 |
| 4 | 75 | 15 | 23 | 72 | 114 |
| 41 | 34 | 26 | 41 | 84 | 124 |
| 3 | 109 | 33 | 19 | 22 | 117 |
| 9 | 38 | 16 | 29 | 96 | 96 |
| 13 | 46 | 35 | 36 | 62 | 107 |
| 6 | 33 | 19 | 45 | 68 | 64 |
| 6 | 63 | 22 | 17 | 52 | 100 |
| 0 | 52 | 20 | 23 | 56 | 94 |
| 13 | 33 | 7 | 12 | 92 | 100 |
| 26 | 14 | 21 | 20 | 90 | 109 |
| 0 | 1 | 0 | 16 | 123 | 125 |
| 2 | 39 | 43 | 23 | 31 | 61 |
| 2 | 36 | 28 | 27 | 37 | 70 |
| 4 | 29 | 16 | 25 | 55 | 86 |
| 5 | 22 | 22 | 32 | 43 | 49 |
| 0 | 1 | 1 | 27 | 86 | 114 |
| 11 | 10 | 3 | 7 | 90 | 88 |
| 8 | 30 | 12 | 15 | 52 | 78 |
| 0 | 56 | 18 | 11 | 21 | 87 |
| 2 | 1 | 3 | 72 | 25 | 94 |
| 1 | 4 | 4 | 18 | 65 | 83 |
| 2 | 25 | 21 | 21 | 15 | 52 |
| 0 | 33 | 19 | 12 | 17 | 49 |
| 0 | 5 | 5 | 16 | 53 | 80 |
| 0 | 25 | 13 | 16 | 25 | 48 |
| 8 | 7 | 4 | 9 | 59 | 71 |
| 3 | 15 | 11 | 15 | 37 | 49 |
| 3 | 25 | 11 | 12 | 27 | 53 |
| 0 | 30 | 11 | 10 | 20 | 53 |
| 0 | 11 | 8 | 13 | 37 | 29 |
| 0 | 4 | 10 | 14 | 38 | 40 |
| 0 | 0 | 0 | 7 | 58 | 41 |
| 0 | 0 | 0 | 7 | 55 | 43 |
| 0 | 0 | 0 | 7 | 55 | 50 |
| 4 | 8 | 9 | 12 | 28 | 28 |
| 0 | 42 | 10 | 2 | 3 | 54 |
| 0 | 23 | 15 | 12 | 7 | 36 |
| 0 | 19 | 7 | 10 | 20 | 32 |
| 4 | 3 | 4 | 7 | 41 | 24 |
| 1 | 18 | 4 | 5 | 19 | 42 |
| 0 | 14 | 13 | 6 | 12 | 24 |
| 0 | 10 | 9 | 12 | 12 | 22 |
| 1 | 11 | 9 | 15 | 7 | 27 |

AR03648

| | | | | | |
|---:|---:|---:|---:|---:|---:|
| 0 | 11 | 4 | 4 | 21 | 15 |
| 0 | 1 | 3 | 8 | 28 | 33 |
| 0 | 1 | 4 | 9 | 25 | 31 |
| 1 | 18 | 9 | 4 | 6 | 27 |
| 4 | 1 | 1 | 8 | 27 | 31 |
| 0 | 0 | 1 | 4 | 30 | 35 |
| 1 | 7 | 7 | 8 | 13 | 33 |
| 0 | 7 | 3 | 3 | 21 | 31 |
| 0 | 8 | 4 | 7 | 15 | 33 |
| 0 | 18 | 5 | 3 | 7 | 23 |
| 7 | 7 | 4 | 1 | 20 | 30 |
| 2 | 7 | 7 | 11 | 6 | 17 |
| 1 | 11 | 4 | 3 | 12 | 19 |
| 0 | 0 | 1 | 4 | 25 | 28 |
| 0 | 5 | 11 | 10 | 2 | 12 |
| 2 | 11 | 6 | 4 | 7 | 23 |
| 2 | 6 | 5 | 5 | 10 | 13 |
| 12 | 0 | 0 | 0 | 26 | 24 |
| 0 | 5 | 3 | 4 | 14 | 26 |
| 0 | 14 | 7 | 4 | 0 | 23 |
| 2 | 3 | 3 | 6 | 13 | 15 |
| 21 | 0 | 0 | 3 | 21 | 18 |
| 0 | 6 | 5 | 3 | 8 | 13 |
| 2 | 6 | 3 | 5 | 7 | 16 |
| 1 | 5 | 5 | 4 | 3 | 10 |
| 0 | 3 | 3 | 2 | 7 | 7 |
| 0 | 7 | 3 | 3 | 2 | 11 |
| 3 | 2 | 1 | 3 | 8 | 8 |
| 0 | 0 | 1 | 4 | 7 | 10 |
| 3 | 0 | 0 | 0 | 11 | 11 |
| 0 | 2 | 3 | 3 | 3 | 5 |
| 0 | 6 | 3 | 1 | 1 | 8 |
| 0 | 5 | 1 | 2 | 2 | 8 |
| 0 | 4 | 2 | 2 | 2 | 6 |
| 0 | 2 | 3 | 2 | 2 | 4 |
| 1 | 1 | 1 | 1 | 6 | 4 |
| 0 | 1 | 3 | 3 | 2 | 5 |
| 1 | 1 | 1 | 2 | 4 | 3 |
| 0 | 1 | 2 | 2 | 3 | 3 |
| 1 | 1 | 1 | 2 | 4 | 2 |
| 0 | 2 | 1 | 2 | 3 | 5 |
| 5 | 22 | 22 | 32 | 43 | 49 |
| 0 | 1 | 0 | 4 | 2 | 5 |
| 0 | 2 | 1 | 2 | 2 | 3 |
| 0 | 2 | 2 | 1 | 1 | 4 |

AR03649

| | | | | | |
|---|---|---|---|---|---|
| 0 | 2 | 2 | 1 | 1 | 5 |
| 0 | 3 | 1 | 0 | 1 | 4 |
| 0 | 1 | 1 | 1 | 3 | 2 |
| 0 | 2 | 2 | 1 | 1 | 4 |
| 0 | 1 | 1 | 1 | 2 | 2 |
| 0 | 0 | 1 | 1 | 2 | 2 |
| 0 | 0 | 1 | 3 | 0 | 4 |
| 0 | 1 | 1 | 1 | 1 | 2 |
| 0 | 0 | 1 | 1 | 2 | 1 |
| 0 | 1 | 1 | 0 | 2 | 2 |
| 0 | 0 | 0 | 1 | 3 | 4 |
| 0 | 2 | 0 | 1 | 0 | 2 |
| 0 | 1 | 0 | 0 | 2 | 1 |
| 0 | 0 | 1 | 1 | 1 | 2 |
| 0 | 2 | 1 | 0 | 1 | 3 |
| 0 | 0 | 1 | 1 | 1 | 1 |
| 0 | 1 | 1 | 1 | 0 | 2 |
| 0 | 1 | 0 | 1 | 1 | 2 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 0 | 1 | 1 | 1 | 1 | 1 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 0 | 1 | 1 | 0 | 1 | 1 |
| 6 | 33 | 19 | 45 | 68 | 64 |
| 0 | 0 | 0 | 1 | 1 | 2 |
| 0 | 1 | 0 | 1 | 1 | 1 |
| 0 | 1 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 2 | 2 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 1 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 1 | 1 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 1 | 0 | 0 | 1 | 1 |
| 0 | 1 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 2 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 1 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 1 | 0 |

AR03650

| | | | | | |
|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 1 | 1 |
| 0 | 0 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 1 | 0 |
| 0 | 0 | 0 | 0 | 1 | 1 |

AR03651

## Contract Facility Inspections Information

| Guaranteed Minimum | Last Inspection Type | Last Inspection Standard | Last Inspection Rating - Final | Last Inspection Date |
|---:|---|---|---|---:|
| 1,600 | Regular | PBNDS 2011 | Meets Standard | 5/9/2019 |
| 1,350 | Regular | PBNDS 2011 | Meets Standard | 2/28/2019 |
| 1,455 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
|  | Regular | PBNDS 2011 | Meets Standard | 2/6/2020 |
| 1,181 | Regular | PBNDS 2011 | Meets Standard | 5/16/2019 |
| 800 | Regular | PBNDS 2011 | Meets Standard | 1/30/2020 |
| 650 | Regular | PBNDS 2011 | Meets Standard | 6/27/2019 |
| 1,170 | Regular | PBNDS 2011 | Meets Standard | 9/26/2019 |
|  | Regular | NDS | Acceptable | 8/15/2019 |
| 2,400 | Regular | JFRMU Family | Pending | 1/9/2020 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 1/24/2020 |
|  | Regular | PBNDS 2011 | Meets Standard | 1/30/2020 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 12/19/2019 |
|  | Regular | NDS | Acceptable | 1/9/2020 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 1/9/2020 |
| 525 | Regular | PBNDS 2011 | Meets Standard | 11/27/2019 |
|  | Regular | PBNDS 2011 | Meets Standard | 4/25/2019 |
|  | Regular | PBNDS 2008 | Meets Standard | 6/13/2019 |
|  | Regular | PBNDS 2011 | Meets Standard | 11/15/2019 |
| 600 | Regular | PBNDS 2011 | Meets Standard | 12/12/2019 |
|  | Regular | PBNDS 2011 | Meets Standard | 9/26/2019 |
| 450 | Regular | PBNDS 2011 | Pending | 2/13/2020 |
| 544 | Regular | PBNDS 2011 | Meets Standard | 6/6/2019 |
|  | Regular | PBNDS 2008 | Meets Standard | 10/18/2019 |
| 750 | Regular | PBNDS 2011 | Meets Standard | 10/24/2019 |
| 500 | Regular | PBNDS 2011 | Meets Standard | 2/28/2019 |

| | | | | |
|---|---|---|---|---|
| | Regular | PBNDS 2011 | Meets Standard | 2/13/2020 |
| 640 | Regular | PBNDS 2011 | Meets Standard | 1/16/2020 |
| 700 | Regular | PBNDS 2011 | Meets Standard | 10/31/2019 |
| 275 | Regular | PBNDS 2008 | Meets Standard | 3/14/2019 |
| 400 | Regular | PBNDS 2011 | Meets Standard | 4/4/2019 |
| | Regular | NDS | Acceptable | 8/8/2019 |
| | N/A | | | |
| | Regular | PBNDS 2011 | Meets Standard | 11/7/2019 |
| | Regular | JFRMU Family | Pending | 8/29/2019 |
| 650 | N/A | | | New Facility |
| | Regular | PBNDS 2008 | Meets Standard | 5/9/2019 |
| 1,100 | Regular | PBNDS 2011 | Meets Standard | 10/10/2019 |
| 830 | Regular | PBNDS 2011 | Meets Standard | 6/26/2014 |
| | Regular | NDS | Acceptable | 3/14/2019 |
| 374 | Regular | PBNDS 2011 | Meets Standard | 4/11/2019 |
| | Regular | NDS | Acceptable | 2/28/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 2/6/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 10/3/2019 |
| 320 | Regular | PBNDS 2011 | Meets Standard | 6/27/2019 |
| 150 | Regular | PBNDS 2011 | Meets Standard | 5/9/2019 |
| | Regular | NDS | Acceptable | 6/4/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 8/29/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 8/22/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 11/8/2018 |
| | Regular | NDS | Acceptable | 10/24/2019 |
| 300 | Regular | NDS | Acceptable | 11/15/2019 |
| | Regular | NDS | Acceptable | 6/13/2019 |
| 285 | Regular | PBNDS 2011 | Meets Standard | 10/3/2019 |
| 300 | Regular | PBNDS 2011 | Meets Standard | 3/21/2019 |
| | Regular | NDS | Acceptable | 7/18/2019 |
| | Regular | NDS | Acceptable | 6/13/2019 |
| 338 | Regular | PBNDS 2011 | Meets Standard | 6/6/2019 |
| 224 | Regular | PBNDS 2011 | Meets Standard | 5/2/2019 |
| | Regular | NDS | Acceptable | 5/31/2019 |
| 250 | Regular | NDS | Acceptable | 5/2/2019 |
| 1,170 | N/A | | | |
| | Regular | NDS | Acceptable | 12/5/2019 |
| 432 | Regular | PBNDS 2011 | Meets Standard | 11/27/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 7/25/2019 |
| 374 | N/A | | | |
| | Regular | NDS | Acceptable | 7/18/2019 |
| 830 | Regular | JFRMU Family | Pending | 1/23/2020 |
| | Regular | PBNDS 2008 | Meets Standard | 1/9/2020 |
| | Regular | PBNDS 2011 | Meets Standard | 9/19/2019 |
| | Regular | NDS | Acceptable | 8/8/2019 |

AR03653

| | | | | |
|---|---|---|---|---|
| | Regular | PBNDS 2008 | Meets Standard | 4/25/2019 |
| 700 | Regular | PBNDS 2011 | Meets Standard | 11/7/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 5/16/2019 |
| 75 | Regular | NDS | Acceptable | 3/7/2019 |
| | Regular | NDS | Acceptable | 11/15/2019 |
| | Regular | NDS | Acceptable | 6/6/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 3/14/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | NDS | Acceptable | 8/15/2019 |
| | Regular | NDS | Acceptable | 4/11/2019 |
| | Regular | NDS | Acceptable | 5/16/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/18/2018 |
| | Regular | NDS | Acceptable | 10/24/2019 |
| | Regular | NDS | Acceptable | 3/7/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 1/25/2019 |
| | Regular | NDS | Acceptable | 5/2/2019 |
| | Regular | NDS | Acceptable | 9/19/2019 |
| 1,100 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 12/12/2019 |
| | Regular | NDS | Acceptable | 10/18/2019 |
| | Regular | NDS | Acceptable | 9/19/2019 |
| | Regular | NDS | Acceptable | 12/19/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| 50 | Regular | PBNDS 2008 | Meets Standard | 8/1/2019 |
| 625 | Regular | PBNDS 2011 | Meets Standard | 8/22/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 8/29/2019 |
| | Regular | NDS | Acceptable | 9/6/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/31/2019 |
| | Regular | NDS | Acceptable | 8/15/2019 |
| | Regular | NDS | Acceptable | 4/11/2019 |
| | Regular | PBNDS 2011 | Meets Standard | 12/5/2019 |
| | Regular | NDS | Acceptable | 12/19/2019 |
| | Regular | NDS | Acceptable | 10/10/2019 |
| | Regular | NDS | Acceptable | 9/26/2019 |
| | Regular | NDS | Acceptable | 9/12/2019 |
| | Regular | NDS | Acceptable | 2/22/2019 |
| | Regular | NDS | Deficient | 10/3/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| | Regular | NDS | Acceptable | 5/17/2018 |
| | Regular | PBNDS 2008 | Meets Standard | 5/31/2019 |
| | Regular | NDS | Deficient | 10/25/2018 |

AR03654

| | | | | |
|---|---|---|---|---|
| | Regular | NDS | Acceptable | 11/7/2019 |
| | Regular | NDS | Acceptable | 7/11/2019 |
| 40 | Regular | PBNDS 2011 | Meets Standard | 2/1/2018 |
| | Regular | NDS | Acceptable | 11/8/2018 |
| | Regular | NDS | Acceptable | 9/27/2018 |
| | Regular | NDS | Acceptable | 2/22/2019 |
| | Regular | NDS | Acceptable | 3/8/2018 |
| | Regular | NDS | Acceptable | 11/7/2019 |
| | Regular | NDS | Deficient | 7/3/2019 |
| | Regular | NDS | Acceptable | 5/2/2019 |
| | Regular | NDS | Deficient | 8/22/2019 |
| | Regular | NDS | Acceptable | 8/1/2019 |
| | Regular | NDS | Acceptable | 3/28/2019 |
| 714 | Regular | PBNDS 2011 | Meets Standard | 11/21/2019 |
| | Regular | PBNDS 2008 | Meets Standard | 10/24/2019 |
| | N/A | | | |
| | Regular | NDS | Pending | 1/30/2020 |
| 96 | Regular | JFRMU Family | Pending | 12/19/2019 |
| 550 | Regular | PBNDS 2011 | Meets Standard | 11/15/2019 |
| | Regular | NDS | Acceptable | 10/31/2019 |
| | Regular | NDS | Acceptable | 5/24/2018 |
| | Regular | PBNDS 2011 | Meets Standard | 10/24/2019 |
| | Regular | NDS | Acceptable | 11/7/2019 |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | Regular | NDS | Acceptable | 9/19/2019 |
| | Regular | NDS | Acceptable | 5/24/2018 |
| | Regular | NDS | Acceptable | 8/30/2018 |
| | Regular | NDS | Acceptable | 12/12/2019 |
| | ORSA | NDS | Acceptable | 10/1/2018 |
| | N/A | | | |
| | Regular | NDS | Special Review - Pre-Occu | 2/7/2019 |
| | Regular | NDS | Acceptable | 6/20/2019 |
| | N/A | | | |
| | Regular | NDS | Acceptable | 12/5/2019 |
| | Regular | NDS | Acceptable | 7/18/2019 |
| | ORSA | NDS | Acceptable | 10/5/2018 |
| | Regular | NDS | Acceptable | 4/12/2018 |
| | ORSA | NDS | Acceptable | 10/11/2017 |
| | ORSA | NDS | Acceptable | 10/20/2017 |
| | ORSA | NDS | Acceptable | 10/11/2017 |
| | Regular | NDS | Overcome by Events | 9/6/2019 |
| | Regular | NDS | Acceptable | 5/2/2019 |
| | Regular | NDS | Acceptable | 10/25/2018 |
| | ORSA | NDS | Acceptable | 9/24/2018 |
| | ORSA | NDS | Acceptable | 9/17/2018 |

| | | | | |
|---|---|---|---|---|
| | ORSA | NDS | Acceptable | 9/17/2018 |
| | ORSA | NDS | Acceptable | 9/19/2018 |
| | Regular | NDS | Deficient | 5/17/2018 |
| | ORSA | NDS | Acceptable | 8/23/2018 |
| | ORSA | NDS | Acceptable | 9/21/2018 |
| | ORSA | NDS | Acceptable | 9/27/2018 |
| | ORSA | NDS | Acceptable | 9/27/2018 |
| | ORSA | NDS | Acceptable | 10/2/2017 |
| | ORSA | NDS | Acceptable | 9/11/2018 |
| | ORSA | NDS | Acceptable | 9/18/2017 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 9/25/2018 |
| | Regular | JFRMU Juvenile | Pending | 8/1/2019 |
| | ORSA | NDS | Acceptable | 9/24/2018 |
| | Regular | NDS | Superior | 5/8/2008 |
| | ORSA | NDS | Acceptable | 9/11/2018 |
| | ORSA | NDS | Acceptable | 9/17/2018 |
| | Regular | NDS | Superior | 2/7/2007 |
| | ORSA | NDS | Acceptable | 9/15/2017 |
| | ORSA | NDS | Acceptable | 8/10/2018 |
| | ORSA | NDS | Acceptable | 9/15/2018 |
| | Regular | PBNDS 2008 | Meets Standard | 1/16/2020 |
| | ORSA | NDS | Acceptable | 8/14/2018 |
| | Regular | NDS | Acceptable | 4/18/2019 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 10/16/2018 |
| | ORSA | NDS | Acceptable | 9/18/2018 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 8/16/2018 |
| | Regular | NDS | Acceptable | 5/24/2018 |
| | ORSA | NDS | Acceptable | 9/27/2018 |
| | ORSA | NDS | Acceptable | 10/11/2017 |
| | ORSA | NDS | Acceptable | 9/17/2018 |
| | ORSA | NDS | Acceptable | 10/11/2017 |
| | ORSA | NDS | Acceptable | 9/27/2017 |
| | Regular | JFRMU Juvenile | Pending | 7/18/2019 |
| | ORSA | NDS | Acceptable | 9/18/2018 |
| | ORSA | NDS | Acceptable | 9/25/2018 |
| | ORSA | NDS | Acceptable | 10/16/2018 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 10/15/2018 |
| | N/A | | | |
| | ORSA | NDS | Acceptable | 9/15/2017 |
| | N/A | | | |
| | Regular | JFRMU Juvenile | Pending | 7/18/2019 |

AR03656

| | ORSA | NDS | Acceptable | 9/15/2017 |
|---|---|---|---|---|
| | ORSA | NDS | Acceptable | 9/24/2018 |
| | ORSA | NDS | Acceptable | 10/1/2018 |
| | ORSA | NDS | Acceptable | 9/5/2018 |
| | ORSA | NDS | Acceptable | 10/1/2018 |
| | Regular | NDS | Superior | 6/12/2007 |
| | N/A | | | |

AR03657

| Second to Last Inspection Type | Second to Last Inspection Standard | Second to Last Inspection Rating | Second to Last Inspection Date |
|---|---|---|---|
| Regular | PBNDS 2011 | Meets Standard | 5/3/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | PBNDS 2011 | Pending | 11/20/2019 |
| Regular | PBNDS 2011 | Meets Standard | 2/7/2019 |
| Regular | PBNDS 2011 | Meets Standard | 4/19/2018 |
| Regular | PBNDS 2011 | Meets Standard | 1/31/2019 |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 9/27/2018 |
| N/A | | | |
| Regular | JFRMU Family | Pending | 11/13/2019 |
| Regular | PBNDS 2011 | Meets Standard | 1/25/2019 |
| Regular | PBNDS 2011 | Meets Standard | 1/31/2019 |
| Regular | PBNDS 2011 | Meets Standard | 12/20/2018 |
| Regular | NDS | Acceptable | 1/10/2019 |
| Regular | PBNDS 2011 | Meets Standard | 1/10/2019 |
| Regular | PBNDS 2011 | Meets Standard | 10/4/2018 |
| Regular | PBNDS 2011 | Meets Standard | 4/26/2018 |
| Regular | PBNDS 2008 | Meets Standard | 6/14/2018 |
| Regular | PBNDS 2011 | Meets Standard | 11/16/2018 |
| Regular | PBNDS 2011 | Meets Standard | 12/13/2018 |
| Regular | PBNDS 2011 | Meets Standard | 9/27/2018 |
| Regular | PBNDS 2011 | Meets Standard | 2/14/2019 |
| Regular | PBNDS 2011 | Meets Standard | 3/23/2017 |
| Regular | PBNDS 2008 | Meets Standard | 10/18/2018 |
| Regular | PBNDS 2011 | Meets Standard | 12/6/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/8/2018 |

| | | | |
|---|---|---|---|
| Regular | PBNDS 2011 | Meets Standard | 2/14/2019 |
| Regular | PBNDS 2011 | Meets Standard | 1/17/2019 |
| Regular | PBNDS 2011 | Meets Standard | 11/1/2018 |
| Regular | PBNDS 2008 | Meets Standard | 3/15/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | NDS | Acceptable | 8/9/2018 |
| N/A | | | |
| N/A | | | |
| N/A | | | |
| N/A | | | |
| Regular | PBNDS 2008 | Meets Standard | 8/16/2018 |
| N/A | | | |
| Regular | PBNDS 2008 | Meets Standard | 6/27/2013 |
| Regular | NDS | Acceptable | 3/15/2018 |
| Regular | PBNDS 2011 | Meets Standard | 4/12/2018 |
| Regular | NDS | Acceptable | 2/23/2018 |
| Regular | PBNDS 2011 | Meets Standard | 2/7/2019 |
| N/A | | | |
| Regular | PBNDS 2011 | Meets Standard | 6/28/2018 |
| Regular | PBNDS 2011 | Meets Standard | 5/10/2018 |
| Regular | NDS | Acceptable | 6/7/2018 |
| Regular | PBNDS 2008 | Meets Standard | 8/30/2018 |
| Regular | PBNDS 2011 | Meets Standard | 8/23/2018 |
| Regular | PBNDS 2008 | Meets Standard | 10/26/2017 |
| Regular | NDS | TAR Assigned | 3/14/2019 |
| Regular | NDS | Acceptable | 11/16/2018 |
| Regular | NDS | Acceptable | 6/14/2018 |
| Regular | PBNDS 2011 | Meets Standard | 10/12/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/22/2018 |
| Regular | NDS | Acceptable | 7/19/2018 |
| Regular | NDS | Acceptable | 6/14/2018 |
| N/A | | | |
| Regular | PBNDS 2011 | v - Pre-Occupancy | 12/20/2018 |
| Regular | NDS | Acceptable | 6/1/2018 |
| Regular | NDS | Acceptable | 5/3/2018 |
| N/A | | | |
| Regular | NDS | Deficient | 1/31/2019 |
| N/A | | | |
| Regular | PBNDS 2008 | Meets Standard | 7/26/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 7/19/2018 |
| Regular | JFRMU Family | Pending | 12/5/2019 |
| Regular | PBNDS 2008 | Meets Standard | 1/10/2019 |
| Regular | PBNDS 2011 | Meets Standard | 10/4/2018 |
| Regular | PBNDS 2011 | Meets Standard | 2/9/2017 |

| Regular | PBNDS 2008 | Meets Standard | 2/15/2018 |
|---------|-----------|----------------|-----------|
| Regular | PBNDS 2008 | Meets Standard | 2/12/2015 |
| Regular | PBNDS 2008 | Meets Standard | 5/10/2018 |
| Regular | NDS | Acceptable | 3/8/2018 |
| Regular | NDS | Acceptable | 11/16/2018 |
| Regular | NDS | Acceptable | 6/7/2018 |
| Regular | PBNDS 2011 | Meets Standard | 3/15/2018 |
| Regular | NDS | Acceptable | 4/19/2018 |
| Regular | NDS | Acceptable | 8/16/2018 |
| Regular | NDS | Acceptable | 4/12/2018 |
| Regular | NDS | Acceptable | 5/3/2018 |
| Regular | PBNDS 2008 | Meets Standard | 10/19/2017 |
| Regular | NDS | v - Pre-Occupancy | 4/25/2013 |
| Regular | NDS | Acceptable | 3/8/2018 |
| Regular | NDS | Acceptable | 4/19/2018 |
| Regular | PBNDS 2011 | Meets Standard | 6/1/2018 |
| Regular | NDS | Acceptable | 2/23/2018 |
| Regular | NDS | Acceptable | 9/21/2017 |
| N/A | | | |
| Regular | PBNDS 2008 | Meets Standard | 12/13/2018 |
| Regular | NDS | Acceptable | 12/13/2018 |
| ORSA | NDS | Acceptable | 10/1/2018 |
| Regular | NDS | Acceptable | 11/29/2018 |
| Regular | NDS | Acceptable | 7/12/2018 |
| Regular | PBNDS 2008 | Meets Standard | 8/23/2018 |
| Regular | NDS | Superior | 4/18/2007 |
| Regular | PBNDS 2011 | ot Meet Standards | 11/29/2018 |
| Regular | NDS | Acceptable | 7/26/2018 |
| Regular | NDS | Acceptable | 7/12/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 4/12/2018 |
| Regular | PBNDS 2008 | Meets Standard | 6/20/2019 |
| Regular | NDS | Acceptable | 8/16/2018 |
| Regular | NDS | v - Pre-Occupancy | 10/27/2016 |
| Regular | PBNDS 2011 | TAR Assigned | 2/14/2019 |
| N/A | | | |
| Regular | NDS | Deficient | 11/29/2018 |
| Regular | NDS | Acceptable | 11/8/2018 |
| Regular | NDS | Acceptable | 9/13/2018 |
| Regular | NDS | Acceptable | 12/6/2018 |
| Regular | NDS | Acceptable | 10/4/2018 |
| Regular | NDS | Acceptable | 12/6/2018 |
| Regular | NDS | Acceptable | 4/6/2017 |
| Regular | PBNDS 2008 | Meets Standard | 6/1/2018 |
| Regular | NDS | Acceptable | 10/19/2017 |

AR03660

| Regular | NDS | Acceptable | 11/8/2018 |
|---------|-----|------------|-----------|
| Regular | NDS | Acceptable | 7/13/2017 |
| Regular | PBNDS 2011 | v - Pre-Occupancy | 8/4/2016 |
| Regular | NDS | Deficient | 3/16/2017 |
| Regular | NDS | Acceptable | 9/28/2017 |
| Regular | NDS | Acceptable | 4/26/2018 |
| Regular | NDS | Acceptable | 2/11/2016 |
| Regular | NDS | v - Pre-Occupancy | 12/20/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 4/19/2018 |
| ORSA | NDS | Acceptable | 9/28/2018 |
| Regular | NDS | Acceptable | 8/2/2018 |
| Regular | NDS | Acceptable | 3/9/2017 |
| Regular | PBNDS 2011 | v - Pre-Occupancy | 7/25/2019 |
| Regular | PBNDS 2008 | Meets Standard | 10/25/2018 |
| N/A | | | |
| Regular | NDS | Acceptable | 1/6/2017 |
| Regular | JFRMU Family | Pending | 11/14/2019 |
| N/A | | | |
| Regular | NDS | Acceptable | 12/13/2018 |
| Regular | NDS | Acceptable | 5/19/2016 |
| N/A | | | |
| Regular | NDS | Acceptable | 8/10/2017 |
| Regular | NDS | Acceptable | 11/16/2017 |
| Regular | NDS | Acceptable | 9/13/2018 |
| Regular | NDS | Acceptable | 3/1/2018 |
| Regular | NDS | Acceptable | 8/18/2016 |
| Regular | NDS | Acceptable | 11/16/2017 |
| ORSA | NDS | Acceptable | 9/13/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/21/2018 |
| Regular | NDS | Acceptable | 11/2/2017 |
| N/A | | | |
| Regular | NDS | Special Review - I | 5/31/2019 |
| ORSA | NDS | Acceptable | 9/28/2018 |
| ORSA | NDS | Acceptable | 10/2/2017 |
| Regular | NDS | Acceptable | 4/13/2017 |
| ORSA | NDS | Acceptable | 7/29/2016 |
| N/A | | | |
| ORSA | NDS | Acceptable | 8/31/2016 |
| ORSA | NDS | Acceptable | 8/21/2018 |
| Regular | NDS | Acceptable | 2/23/2018 |
| Regular | NDS | Acceptable | 2/8/2018 |
| ORSA | NDS | Acceptable | 8/29/2017 |
| ORSA | NDS | Acceptable | 9/5/2017 |

AR03661

| | | | |
|---|---|---|---|
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 9/18/2017 |
| ORSA | NDS | Acceptable | 10/11/2017 |
| Regular | NDS | Good | 5/23/2008 |
| ORSA | NDS | Acceptable | 9/8/2017 |
| ORSA | NDS | Acceptable | 7/20/2016 |
| ORSA | NDS | Acceptable | 8/29/2017 |
| N/A | | | |
| N/A | | | |
| ORSA | NDS | Acceptable | 8/10/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/21/2017 |
| Regular | NDS | Superior | 6/8/2007 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/5/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/16/2016 |
| ORSA | NDS | Acceptable | 8/17/2017 |
| ORSA | NDS | Acceptable | 8/31/2017 |
| Regular | PBNDS 2008 | Meets Standard | 1/17/2019 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| Regular | NDS | Acceptable | 4/19/2018 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/15/2017 |
| Regular | NDS | Superior | 8/18/2009 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 9/13/2017 |
| ORSA | NDS | Acceptable | 7/1/2016 |
| ORSA | NDS | Acceptable | 9/5/2017 |
| ORSA | NDS | Acceptable | 7/15/2016 |
| ORSA | NDS | Acceptable | 9/9/2016 |
| N/A | | | |
| ORSA | NDS | Acceptable | 8/29/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/15/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/15/2017 |
| N/A | | | |
| ORSA | NDS | Acceptable | 9/16/2016 |
| N/A | | | |
| N/A | | | |

AR03662

| | | | |
|---|---|---|---|
| ORSA | NDS | Acceptable | 9/16/2016 |
| ORSA | NDS | Acceptable | 9/21/2017 |
| ORSA | NDS | Acceptable | 9/13/2017 |
| ORSA | NDS | Acceptable | 8/22/2017 |
| ORSA | NDS | Acceptable | 9/15/2017 |
| Regular | NDS | Superior | 4/27/2006 |
| N/A | | | |

AR03663

# U.S. Immigration a

**These statistics are made avai**

## ICE FOOTNOTES

| Term |
|------|
| ADP |
| ALIP |
| ALOS |
| AOR |
| ATD |
| Bonded Out-FO |
| Bonded Out-IJ |
| CBP |
| Classification Level (ADP) |
| Credible Fear |
| FCMP |
| Facilities Adhering to ICE Performance Based National Detention Standards (PBNDS2011, PBNDS 2008, and NDS 2019) |
| Facilities Adhering to ICE National Detention Standards (NDS) 2000: |
| Family Unit |
| GPS |
| Head of Household |
| ICE |

AR03664

| |
|---|
| ICE Threat Level (ADP) |
| Inspection Ratings |
| Last Inspection Date |
| Last Inspection Rating-Final |
| Last Inspection Standard |
| Male/Female |
| Mandatory (ADP) |
| Order of Recognizance |
| Order of Supervision-No SLRFF |
| Order of Supervision |
| Second to Last Inspection Standard |
| Second to Last Rating |
| Second to Last Inspection Date |
| SmartLink |
| TR |
| Type--Detailed |
| USCIS |
| FY2019 ICE Alternatives to Detention |

FY2019 ICE Average Daily
Population and ICE Average

AR03665

Length of Stay

FY2019 ICE Final Releases

FY2019 ICE Removals

AR03666

ICE Currently Detained
Population

FY2019 ICE Initial Book-Ins

AR03667

# and Customs Enforcement

**lable to the public pursuant to the Fiscal Year 2020 Department of Homeland Security Appropriations**

|  |
| --- |
| **Definition** |
| Average daily population |
| Average length in program |
| Average length of stay |
| Area of Responsibility |
| Alternatives to Detention |
| An alien is bonded out due to decision by the Field Office |
| An alien is bonded out due to decision by the Immigration Judge |
| Customs and Border Protection |
| Upon admission and periodically thereafter, detainees are categorized into a security level based on a variety of public safety factors, and are housed accordingly.  Factors include prior convictions, threat risk, disciplinary record, special vulnerabilities, and special management concerns.  Detainees are categorized |
| A finding by USCIS or an Immigration Judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the interviewing USCIS officer or Immigration Judge, there is a significant possibility that alien could establish eligibility |
| Family Case Management Program |
| Meets Standards: The facility's detention functions are being adequately performed. Although deficiencies may be found, they do not detract from the acceptable accomplishment of vital functions or from the delivery of care and well-being for ICE detainees. Internal controls are in place and appropriate |
| Does Not Meet Standards: The facility's detention functions are not being performed at a "meets standards" level. Internal controls are weak, thus resulting in serious deficiencies in one or more program areas. Detention operations may be impaired to the point that the facility is not presently accomplishing |
| Acceptable: The facility's detention functions are being adequately performed. Although deficiencies may be found, they do not detract from the acceptable accomplishment of vital functions or from the delivery of care and well-being for ICE detainees. Internal controls are in place and appropriate corrective |
| Deficient: The facility's detention functions are not being performed at a "meets standards" level. Internal controls are weak, thus resulting in serious deficiencies in one or more program areas. Detention operations may be impaired to the point that the facility is not presently accomplishing vital functions. |
| Non-U.S. citizen child or children under the age of 18, accompanied by his/her/their parent(s) or legal |
| Global positioning system tracking device |
| Parent or legal guardian of a non-U.S. citizen child or children under the age of 18. |
| Immigration and Customs Enforcement |

| |
|---|
| The average daily population by ICE Threat Level. Threat level is determined by the criminality of a detainee, including the recency of the criminal behavior and its severity. A detainee can be graded on a scale of one to three with one being the highest severity. If a detainee has no criminal convictions, he/she |
| ICE detention facilities are inspected and rated using a Pass/Fail grading system. Annual or biennial inspections, which measure a facility's program performance and compliance to ICE detention standards |
| The date the facility was last inspected. |
| The most recent finalized inspection rating the facility received. |
| The inspection standard the facility was last inspected against. |
| This indicates the gender(s) of detainees at a facility. M indicates male population, and F indicates female population. Where limited data is available, the default value is M, F. |
| The average daily population of detainees who are subject to mandatory detention. |
| A pre-final order alien is released because he/she is not a detention priority. |
| A final order alien is released because the Field Office is unable to obtain a travel document. |
| A final order alien is released because the field office is unable to obtain a travel document. |
| The inspection standard the facility was inspected against during the second to the last inspection. |
| The final inspection rating a facility received after the second to last inspection. |
| The second to last date the facility was inspected. |
| Online tracking device using smart phone or tablet |
| Telephonic reporting |
| ICE holds detainees in several different types of facilities, listed below: |
| BOP (Federal Bureau of Prisons): A facility operated by the Federal Bureau of Prisons |
| DIGSA (Dedicated Intergovernmental Service Agreement): A publicly-owned facility operated by state/local government(s), or private contractors, in which ICE contracts to use all bed space via a Dedicated Intergovernmental Service Agreement; or facilities used by ICE pursuant to Inter- |
| FRC (Family Residential Center):  A facility that accommodates and cares for family units who remain |
| IGSA (Intergovernmental Service Agreement): A publicly-owned facility operated by state/local government(s), or private contractors, in which ICE contracts for bed space via an Intergovernmental Service Agreement; or local jails used by ICE pursuant to Inter-governmental Service Agreements, which |
| SPC (Service Processing Center): A facility owned by the government and staffed by a combination of |
| USMS (United States Marshals Service): A facility primarily contracted with the USMS for housing of USMS detainees, in which ICE contracts with the USMS for bed space. |
| USMS IGA (USMS Intergovernmental Agreement): A USMS Intergovernmental Agreement in which ICE agrees to utilize an already established US Marshal Service contract. |
| U.S. Citizenship and Immigration Services |
| Family Unit (FAMU) subject apprehensions represent all OPB apprehensions of adults (18 years old and over) with a FAMU classification who were subsequently enrolled in ATD. |
| Average Length in Program is calculated for active participants only. |
| Length of Program = 1/31/2020 ATD Original Start Date +1 |
| EOFY2019 ICE Detention data is filtered through 09/30/2019 (IIDS v.1.34 run date 10/06/2019; EID as |
| ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service Prisoners. |

The Average Daily Population (ADP) is based on MANDAY Count.  A MANDAY is based on whether a SUBJECT is in an ERO detention facility for the midnight count.  For every SUBJECT in a facility for the midnight count, that corresponds to one MANDAY.  The ADP is the number of MANDAYS for a

For FY2019 Average Daily Population, immigration violators' criminality is defined in the following manner:
Convicted criminal : The individual has a criminal conviction in the system of record on or prior to the

Starting in FY2018, ICE defines immigration violators' criminality for Average Length of Stay in the following manner:
Convicted Criminal:  Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.
Pending Criminal Charges:  Immigration Violators with pending criminal charges entered into ICE

All stats are pulled based on Current Program which attributes all cases back to the Program of the processing officer of the event.  However, if Current Program = OPL, XXX, ZZZ, or null, then Event

The ICE Arresting Agency includes the following ERO and HSI Arresting Agency Programs:  287g Program, Alternatives to Detention, ERO Criminal Alien Program, Detained Docket Control, Detention and Deportation, Law Enforcement Area Response Unit, Mobile Criminal Alien Team, Non-Detained Docket Control, Juvenile, Fugitive Operations, Violent Criminal Alien Section, Joint Criminal Alien Response Team, Probation and Parole, Quick Response Team, User Fee Investigations, Joint Terrorism

The CBP Arresting Agency includes the following programs:  Border Patrol, Inspections, Inspections-

FRCs are Family Residential Centers and include the following ICE facilities:  Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center.

EOFY2019 ICE Final Releases data is filtered through 09/30/2019 (IIDS v.1.34 run date 10/06/2019;

An ICE Final Release is defined as a Final Bookout that reflects  one of the following release reasons:  Bonded Out, Order of Recognizance, Order of Supervision, Paroled, or Prosecutorial Discretion.  All

ICE Detention data exclude ORR transfers/facilities, and U.S. Marshals Service prisoners.

An alien may have multiple releases; only the most recent release is included in this report.

Starting in FY2018, ICE defines immigration violators' criminality in the following manner:
Convicted Criminal:  Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action.
Pending Criminal Charges:  Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action.

FRCs are Family Residential Centers and include the following ICE facilities:  Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center.

EOFY2019 ICE Removals data is filtered through 09/30/2019 (IIDS v.1.34 run date 10/06/2019; EID as

ICE Removal Data Include Returns.  Returns include Voluntary Returns, Voluntary Departures and

ICE Removals include aliens processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ERO for detention.  Aliens processed for ER and not detained by ERO or VR after June 1st, 2013 and not detained by ERO are primarily processed by Border Patrol, CBP should be contacted

Starting in FY2009, ICE began to "lock" removal statistics on October 5th at the end of each fiscal year and counted only the aliens whose removal or return was already confirmed.  Aliens removed or returned in that fiscal year but not confirmed until after October 5th were excluded from the locked data and thus from ICE statistics.  To ensure an accurate and complete representation of all removals and returns, ICE

| |
|---|
| FRCs are Family Residential Centers and include the following ICE facilities:  Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| ICE National Docket data are a snapshot as of 10/04/2019 (IIDS v.1.34 run date 10/06/2019; EID as of |
| ICE Detention data excludes ORR transfers/facilities, as well as U.S. Marshals Service Prisoners. |
| Starting in FY2018, ICE defines immigration violators' criminality in the following manner: <br> Convicted Criminal:  Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action. <br> Pending Criminal Charges:  Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action. |
| The ICE Arresting Agency includes the following ERO and HSI Arresting Agency Programs:  287g Program, Alternatives to Detention, ERO Criminal Alien Program, Detained Docket Control, Detention and Deportation, Law Enforcement Area Response Unit, Mobile Criminal Alien Team, Non-Detained Docket Control, Juvenile, Fugitive Operations, Violent Criminal Alien Section, Joint Criminal Alien Response Team, Probation and Parole, Quick Response Team, User Fee Investigations, Joint Terrorism |
| The CBP Arresting Agency includes the following programs:  Border Patrol, Inspections, Inspections-Processing dispositions of Other may include, but are not limited to, aliens processed under |
| FRCs are Family Residential Centers and include the following ICE facilities: Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |
| EOFY2019 ICE Detention data is filtered through 09/30/2019 (IIDS v.1.34 run date 10/06/2019; EID as |
| ICE Detention data excludes ORR transfers/facilities, as well as U.S. Marshals Service Prisoners. |
| All stats are pulled based on Current Program which attributes all cases back to the Program of the processing officer of the event.  However, if Current Program = OPL, XXX, ZZZ, or null, then Event |
| The "ICE" Arresting Agency includes ERO, HSI, and Other programs. |
| ERO Programs include CAP Programs (ERO Criminal Alien Program, Joint Criminal Alien Response Team, Law Enforcement Area Response Units, and Violent Criminal Alien Section, and Other Programs), Fugitive Operations, 287G Program, Detained Docket Control, Non-Detained Docket |
| HSI Programs include HSI Criminal Arrest Only, Intelligence, Joint Terrorism Task Force, Non-User |
| Other Programs include Adjudications, Asylum, and PICS Default Value - for user initialization only; |
| The "CBP" Arresting Agency includes the following programs:  Border Patrol, Inspections, Inspections- |
| Starting in FY2018, ICE defines immigration violators' criminality in the following manner: <br> Convicted Criminal:  Immigration violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action. <br> Pending Criminal Charges:  Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action. |
| FRCs are Family Residential Centers and include the following ICE facilities:  Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center. |

CBP provides critical law enforcement and investigative assistance to State and local agencies that are often manpower- and resource-constrained. This support is often seen in **warrant service assistance**, but CBP has also successfully interdicted Amber alert children who were being kidnapped and transported to Mexico. In FY21 the U.S. Border Patrol assisted state and local law enforcement with the service of approximately 45 warrant services.

**Operation Stonegarden** (OPSG) is a $90 million grant within the Homeland Security Grant Program with 80.3% of those funds being focused on the SWB, primarily south Texas, in FY21. The mission of the grant is to augment border security by providing State, Local, Territorial, and Tribal law enforcement partners funding for overtime hours in support of border security.  Multiple and significant narcotics seizures have resulted from this initiative. For example, on March 29, 2021, New York State Police OPSG partners conducted a vehicle stop which led to the seizure of 120 lbs. of marijuana and on February 15, 2021, Ramey Sector agents, along with Puerto Rico Police Department OPSG partners seized 1011 kg of cocaine and arrested three subjects.

The HSI **Border Enforcement Security Task Force (BEST)** aims to combat emerging and existing Transnational Criminal Organizations (TCO) by employing the full range of federal, state, local, tribal and international law enforcement authorities and resources in the fight to identify, investigate, disrupt and dismantle these organizations at every level of operation. BESTs eliminate the barriers between federal and local investigations (access to both federal and state prosecutors) and close the gap with international partners in multinational criminal investigations. HSI leads 79 BEST task forces nationwide (with representation from over 700 State and Local Task Force Officers). Operational successes in FY20 resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957.

The ICE **Criminal Apprehension Program (CAP)** provides agency-wide direction and support in the biometric and biographic identification, arrest, and removal of priority noncitizens who have violated or been convicted of crimes in the U.S and are incarcerated within federal, state, and local prisons and jails. ICE partners with state and local law enforcement agencies to ensure that all efforts are made to investigate, arrest, and remove individuals. In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.

**Operation Sentinel** is a multifaceted counter-network operation focused on identifying and taking law enforcement actions against TCOs involved in the facilitation of mass migration to the Southwest Border (SWB) of the United States. Operation Sentinel has identified over 2,200+ targets associated with TCOs and operational efforts have resulted in multiple revoked visas, revoked Trusted Traveler memberships, blocked bank accounts, and trade entity suspension and debarments.

The **Missing Migrant Program** (MMP) is a CBP humanitarian effort, led by the USBP, that focuses on border safety, locating migrants reported missing, the rescue of migrants in distress, the mitigation of migrant deaths, and the identification and reunification of decedents in the border region. Guided by the Missing Persons and Unidentified Remains Act of 2019, MMP institutionalizes procedures for third party missing migrant reports, providing a focal point for collaboration and integration with internal and external stakeholders such as medical examiners and coroners, non-governmental organizations (NGO), academia, and federal, state, and local other law enforcement partners. In FY21, USBP rescued 12,857 migrants (high water mark).

The **CBP Office of Air and Marine Operations operates flight and float hours** in support of State and Local law enforcement along the SWB. The below chart showcases the amount of flight hours and operational successes in FY21.

**CBP/AMO Southwest Region - Operational Outcomes with State & Local Law Enforcement Partners in FY21**

| Branch | Flight Hours | Float Hours | Total Events | Cocaine Seized (lbs.) | Marijuana Seized (lbs.) | Fentanyl Seized (lbs) | Heroin Seized (lbs.) | Meth Seized (lbs.) | Currency Seized | Weapons Seized | Arrests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| El Paso | 22 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | $ - | 0 | 0 |
| Laredo | 18 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | $ - | 0 | 0 |
| McAllen | 21 | 28 | 1 | 0 | 0 | 0 | 0 | 0 | $ - | 0 | 0 |
| San Diego | 77 | 12 | 21 | 961 | 2,881 | 0 | 13 | 2,233 | $ 218,401 | 0 | 5 |
| Tucson | 23 | 0 | 5 | 0 | 0 | 0 | 0 | 102 | $ - | 0 | 0 |
| Uvalde | 26 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | $ - | 0 | 0 |
| Yuma | 14 | 0 | 6 | 36 | 0 | 14 | 0 | 568 | $ - | 0 | 1 |
| **Total** | **201** | **40** | **42** | **997** | **2,881** | **14** | **13** | **2,903** | **$ 218,401** | **0** | **6** |

AR03673

# U.S. Customs and Border Protection
# Migration Crisis Action Team

## October 27, 2021

WARNING:  This document is designated UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
(U//LES).  It may contain information that is exempt from public release under the Freedom of
Information Act (5USC552).  This document is to be controlled, handled, transmitted, distributed, and
disposed of in accordance with DHS policy relating to FOUO information, and is not to be released to
the public or to personnel who do not have a valid need to know without prior approval from CBP.





U.S. Customs and Border Protection Southwest Border
Office of Field Operations / U.S. Border Patrol
Migration Crisis Action Team



Data is through: 10/26/2021     Preliminary Data and Subject to Change     Report Run Date: 10/27/2021 5:58:11 AM

| Total | Demographic | Encounters (Previous Day) | Title 42 | T8 Apprehensions/ Inadmissibles | 21-Day Average (Encounters) | Currently in Custody | Average TIC (HRS) | CBP Processed Complete | UC Transfers/ TOT ERO (Previous Day) | All Other TOT's/ REPATS (Previous Day) | USBP NTA (OR) Released (Previous Day) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP Southwest Border | UC | 355 | 0 | 355 | 402 | 481 | 23 | 251 | 278 | 17 | 0 |
| | AM (OFO only) | 12 | 11 | 1 | 7 | 2 | 7 | 0 | 0 | 42 | NA |
| | FMUA | 1,182 | 106 | 1,076 | 1,324 | 2,824 | 49 | 971 | 148 | 2 | 444 |
| | Single Adults | 3,637 | 2,470 | 1,167 | 3,511 | 4,185 | 65 | 1,856 | 552 | 298 | 399 |
| | Total Apps | 5,186 | 2,587 | 2,599 | 5,244 | 7,492 | 56 | 3,078 | 978 | 359 | 843 |

| Total | Demographic | Encounters (Previous Day) | Title 42 | T8 Apprehensions | 21-Day Average (Encounters) | Currently in Custody | Average TIC (HRS) | USBP Processed Complete | UC Transfers/ TOT ERO (Previous Day) | All Other TOT's/ REPATS (Previous Day) | USBP NTA (OR) Released (Previous Day) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USBP Southwest Border | UC | 350 | 0 | 350 | 397 | 475 | 23 | 249 | 277 | 0 | 0 |
| | FMUA | 1,151 | 106 | 1,045 | 1,282 | 2,796 | 49 | 971 | 121 | 0 | 444 |
| | Single Adults | 3,516 | 2,425 | 1,091 | 3,374 | 4,096 | 65 | 1,856 | 518 | 0 | 399 |
| | Total Apps | 5,017 | 2,531 | 2,486 | 5,053 | 7,367 | 56 | 3,076 | 916 | 0 | 843 |

| Total | Demographic | Encounters (Previous Day) | Title 42 | T8 Inadmissibles | 21-Day Average (Encounters) | Currently in Custody | Average TIC (HRS) | OFO Processed Complete | TOT ERO (Previous Day) | All Other TOT's/ REPATS (Previous Day) | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OFO Southwest Border | UAC | 5 | 0 | 5 | 5 | 6 | 17 | 2 | 1 | 17 | |
| | AM | 12 | 11 | 1 | 7 | 2 | 7 | 0 | 0 | 42 | |
| | FMUA | 31 | 0 | 31 | 42 | 28 | 23 | 0 | 27 | 2 | |
| | Single Adults | 121 | 45 | 76 | 137 | 89 | 54 | 0 | 34 | 298 | |
| | Total Subjects | 169 | 56 | 113 | 191 | 125 | 45 | 2 | 62 | 359 | |

AR03675




**U.S. Customs and Border Protection - Southwest Border**
**Migration Crisis Action Team**
**October 27, 2021**
Preliminary Data and Subject to Change

| Sector | Capacity | Covid Capacity | In Custody | % Capacity |
|--------|----------|----------------|------------|------------|
| BBT | 1,072 | 268 | 23 | 9% |
| DRT | 1,360 | 465 | 1,029 | 221% |
| ELC | 512 | 128 | 224 | 175% |
| EPT | 2,392 | 858 | 738 | 86% |
| LRT | 1,672 | 543 | 782 | 144% |
| RGV | 3,485 | 1,278 | 1,928 | 151% |
| SDC | 2,176 | 570 | 671 | 118% |
| TCA | 1,468 | 492 | 373 | 76% |
| YUM | 916 | 354 | 1,599 | 452% |
| Total | 15,053 | 4,956 | 7,367 | 149% |

| Central Processing | Capacity | Covid Capacity | In Custody | % Capacity |
|--------------------|----------|----------------|------------|------------|
| TCA/TCC | 100 | 25 | 120 | 480% |

*RGV sector capacity and in-custody numbers include the CPC figures
**Tucson sector capacity and in-custody numbers include the TCC figures*

| Soft Sided Facility | Capacity | Covid Capacity | In Custody | % Capacity |
|---------------------|----------|----------------|------------|------------|
| DRT/SSF | 500 | 250 | 397 | 159% |
| LRT/LPC | 500 | 250 | 501 | 200% |
| RGV/DNT | 1,625 | 813 | 1,355 | 167% |
| TCA/TSS | 500 | 250 | 157 | 63% |
| YUM/YSS | 500 | 250 | 855 | 342% |

| Modulars | Capacity | Covid Capacity | In Custody | % Capacity |
|----------|----------|----------------|------------|------------|
| EPT/MCPC | 1,040 | 520 | 603 | 116% |

*All Soft Sided/Modulars facilities are also reflected within their Sector capacity above*

| Field Office | Capacity | Covid Capacity | In Custody | % Capacity |
|--------------|----------|----------------|------------|------------|
| EL PASO | 137 | 45 | 6 | 13% |
| LAREDO | 283 | 75 | 7 | 9% |
| SAN DIEGO | 386 | 106 | 109 | 103% |
| TUCSON | 96 | 43 | 3 | 7% |
| Total | 902 | 269 | 125 | 46% |

| Port of Entry | Capacity | Covid Capacity | In Custody | % Capacity |
|---------------|----------|----------------|------------|------------|
| BROWNSVILLE, TX (2301) | 85 | 21 | 4 | 19% |
| EL PASO, TX (2402) | 76 | 24 | 6 | 25% |
| LAREDO, TX (2304) | 66 | 17 | 3 | 18% |
| LUKEVILLE, AZ (2602) | 4 | 4 | 1 | 25% |
| NOGALES, AZ (2604) | 30 | 14 | 2 | 14% |
| OTAY MESA (2506) | 7 | 7 | 6 | 86% |
| SAN YSIDRO (2504) | 310 | 77 | 103 | 134% |



**U.S. Customs and Border Protection - Southwest Border**
**Office of Field Operations / U.S. Border Patrol**
**Migration Crisis Action Team**
**Total CBP Southwest Border Encounters  (UAC/AM/FMUA/Singles)**
Preliminary Data and Subject to Change







Singles breakdown last 21 days

FMUA breakdown last 21 days

UAC breakdown last 21 days

AM breakdown last 21 days


**U.S. Customs and Border Protection - Southwest Border**
Case 2:21-cv-00067-Z Document 162-7 Filed 08/02/22    Page 1019 of      PageID 7889
Office of Operations / U.S. Border Patrol
**Migration Crisis Action Team**
**Time in Custody over 72 hours**


| UAC | | | UAC | | | UAC | | |
|---|---|---|---|---|---|---|---|---|
| **OFO** | | | **USBP** | | | **CBP** | | |
| In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs |
| 10/21/21 | 0 | 0 | 0 | 4 | 2 | 1 | 4 | 2 | 1 |
| 10/22/21 | 0 | 0 | 0 | 5 | 1 | 1 | 5 | 1 | 1 |
| 10/23/21 | 0 | 0 | 0 | 2 | 1 | 0 | 2 | 1 | 0 |
| 10/24/21 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 | 0 |
| 10/25/21 | 0 | 0 | 0 | 7 | 0 | 0 | 7 | 0 | 0 |
| 10/26/21 | 0 | 0 | 0 | 6 | 4 | 0 | 6 | 4 | 0 |
| 10/27/21 | 0 | 0 | 0 | 10 | 1 | 0 | 10 | 1 | 0 |
| **Total** | **0** | **0** | **0** | **37** | **9** | **2** | **37** | **9** | **2** |

| FMUA | | | FMUA | | | FMUA | | |
|---|---|---|---|---|---|---|---|---|
| **OFO** | | | **USBP** | | | **CBP** | | |
| In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs |
| 10/21/21 | 0 | 0 | 0 | 521 | 255 | 6 | 521 | 255 | 6 |
| 10/22/21 | 1 | 0 | 0 | 594 | 224 | 6 | 595 | 224 | 6 |
| 10/23/21 | 0 | 0 | 0 | 330 | 25 | 2 | 330 | 25 | 2 |
| 10/24/21 | 0 | 0 | 0 | 459 | 30 | 2 | 459 | 30 | 2 |
| 10/25/21 | 0 | 0 | 0 | 1,118 | 180 | 2 | 1,118 | 180 | 2 |
| 10/26/21 | 0 | 0 | 0 | 680 | 94 | 0 | 680 | 94 | 0 |
| 10/27/21 | 1 | 0 | 0 | 625 | 223 | 2 | 626 | 223 | 2 |
| **Total** | **2** | **0** | **0** | **4,327** | **1,031** | **20** | **4,329** | **1,031** | **20** |

| SINGLE ADULTS | | | SINGLE ADULTS | | | SINGLE ADULTS | | |
|---|---|---|---|---|---|---|---|---|
| **OFO** | | | **USBP** | | | **CBP** | | |
| In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs |
| 10/21/21 | 25 | 20 | 3 | 1,396 | 651 | 294 | 1,421 | 671 | 297 |
| 10/22/21 | 27 | 16 | 1 | 1,294 | 545 | 262 | 1,321 | 561 | 263 |
| 10/23/21 | 17 | 12 | 2 | 1,452 | 558 | 200 | 1,469 | 570 | 202 |
| 10/24/21 | 16 | 15 | 3 | 1,521 | 700 | 178 | 1,537 | 715 | 181 |
| 10/25/21 | 16 | 15 | 7 | 1,808 | 812 | 166 | 1,824 | 827 | 173 |
| 10/26/21 | 15 | 14 | 7 | 1,618 | 538 | 115 | 1,633 | 552 | 122 |
| 10/27/21 | 14 | 13 | 6 | 1,477 | 575 | 119 | 1,491 | 588 | 125 |
| **Total** | **130** | **105** | **29** | **10,566** | **4,379** | **1,334** | **10,696** | **4,484** | **1,363** |

| AM | | | AM | | |
|---|---|---|---|---|---|
| **OFO** | | | **CBP** | | |
| In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs | In Custody > 72 hrs | In Custody > 120 hrs | In Custody > 240 hrs |
| 10/21/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/22/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/23/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/24/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/25/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/26/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/27/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** | **0** | **0** |

AR03678



**U.S. Customs and Border Protection - Southwest Border**
U.S. Border Patrol / Office of Field Operations
**Migration Crisis Action Team**
**Time in Custody by Sector/Field Office**

| Sector | USBP Encounters (Previous Day) | | | | | | Time in Custody | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 21-Day Average | UAC | AM (OFO only) | FMUA | SA | Total | % Capacity | Average TIC (HRS) | > 72 hours | 72-120 hours | > 120 hours |
| BBT | 84 | 118 | 5 | | 0 | 79 | 23 | 9% | 14 | 1 | 1 | 0 |
| DRT | 830 | 922 | 21 | | 176 | 633 | 1,029 | 221% | 46 | 172 | 138 | 34 |
| ELC | 143 | 158 | 2 | | 10 | 131 | 224 | 175% | 70 | 66 | 44 | 22 |
| EPT | 569 | 451 | 47 | | 36 | 486 | 738 | 86% | 90 | 415 | 103 | 312 |
| LRT | 238 | 248 | 10 | | 6 | 222 | 782 | 144% | 81 | 355 | 257 | 98 |
| RGV | 1,266 | 1,422 | 174 | | 420 | 672 | 1,928 | 151% | 48 | 465 | 281 | 184 |
| SDC | 548 | 476 | 20 | | 159 | 369 | 671 | 118% | 53 | 150 | 97 | 53 |
| TCA | 716 | 611 | 61 | | 36 | 619 | 373 | 76% | 48 | 93 | 89 | 4 |
| YUM | 623 | 646 | 10 | | 308 | 305 | 1,599 | 452% | 52 | 374 | 287 | 87 |
| **USBP Total** | **5,017** | **5,053** | **350** | | **1,151** | **3,516** | **7,367** | **149%** | **56** | **2,091** | **1,297** | **794** |

| Field Office | OFO Encounters (Previous Day) | | | | | | Time in Custody | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 21-Day Average | UAC | AM (OFO only) | FMUA | SA | Total | % Capacity | Average TIC (HRS) | > 72 hours | 72-120 hours | > 120 hours |
| EL PASO | 15 | 13 | 0 | 2 | 0 | 13 | 6 | 13% | 9 | 0 | 0 | 0 |
| LAREDO | 41 | 40 | 1 | 4 | 3 | 33 | 7 | 9% | 12 | 0 | 0 | 0 |
| SAN DIEGO | 104 | 125 | 3 | 6 | 26 | 69 | 109 | 103% | 50 | 15 | 2 | 13 |
| TUCSON | 9 | 12 | 1 | 0 | 2 | 6 | 3 | 7% | 9 | 0 | 0 | 0 |
| **OFO Total** | **169** | **191** | **5** | **12** | **31** | **121** | **125** | **46%** | **45** | **15** | **2** | **13** |
| **CBP Total** | **5,186** | **5,244** | **355** | **12** | **1,182** | **3,637** | **7,492** | **0** | **56** | **2,106** | **1,299** | **807** |

AR03679

| FY2019 MPP Funding | | |
|---|---|---|
| **COST ($K)** | **CONTRACT** | **PERIOD OF PERFORMANCE** |
| $    55,276 | CBP IAA | 05 JULY 2019 - 17 DEC 2019 |
| $     5,605 | ICE ADMIN BALIFF | 05 JULY 2019 - 17 DEC 2019 |
| $         - | ICE TRP | 05 JULY 2019 - 17 DEC 2019 |
| **$    60,881** | **FY2019 MPP: 05 JULY 2019 - 17 DEC 2019** | |

| FY2020 MPP Funding | | |
|---|---|---|
| **COST ($K)** | **CONTRACT** | **PERIOD OF PERFORMANCE** |
| $    93,527 | CBP IAA | 18 DEC 2019 - 17 JAN 2021 |
| $    11,653 | ICE ADMIN BALIFF | 18 DEC 2019 - 17 JAN 2021 |
| $     2,099 | ICE TRP **ESTIMATE** | 18 DEC 2019 - 17 JAN 2021 |
| **$   107,279** | **FY2020 MPP: 18 DEC 2019 - 17 JAN 2021** | |

| FY2021 MPP Funding | | |
|---|---|---|
| **COST ($K)** | **CONTRACT** | **PERIOD OF PERFORMANCE** |
| $    19,630 | CBP IAA | 18 JAN 2021 - 17 APRIL 2021 |
| $     2,889 | ICE ADMIN BALIFF | 18 JAN 2021 - 17 APRIL 2021 |
| $       210 | ICE TRP **ESTIMATE** | (6) MONTH ESTIMATE |
| **$    22,729** | **FY2021 MPP: 18 JAN 2021 - 17 APRIL 2021** | |

| FY2022 MPP Funding | | |
|---|---|---|
| **COST ($K)** | **CONTRACT** | **PERIOD OF PERFORMANCE** |
| $    14,175 | CBP IAA | 15 OCT 2021 - 14 NOV 2021 |
| $     1,050 | ICE ADMIN BALIFF | 15 OCT 2021 - 14 NOV 2021 |
| $         - | ICE TRP **ESTIMATE** | 15 OCT 2021 - 14 NOV 2021 |
| **$    15,225** | **FY2020 MPP: 15 OCT 2021 - 14 NOV 2021** | |
| $     6,233 | CBP IAA **ESTIMATE** | 15 NOV 2021 - 14 DEC 2021 |
| $     1,050 | ICE ADMIN BALIFF **ESTIMATE** | 15 NOV 2021 - 14 DEC 2021 |
| $         - | ICE TRP **ESTIMATE** | 15 NOV 2021 - 14 DEC 2021 |
| **$     7,283** | **FY2020 MPP: 15 NOV 2021 - 14 DEC 2021** | |

AR03680