# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ..............................................................................................................2

ARGUMENT ...................................................................................................................5

I.      Plaintiffs' stay request is not justiciable.................................................................6

        A.      Section 1252(f)(1) bars jurisdiction to stay an agency action directing how DHS will implement Section 1225(b)(2)(C)................................................6

        B.      The Court cannot stay agency action that has already gone into effect. ........14

        C.      Plaintiffs lack standing to challenge the October 29 memorandum. .............17

        D.      Plaintiffs' APA claim is not reviewable. ........................................................21

II.     Plaintiffs are not likely to succeed on the merits of their APA claim.......................23

III.    The remaining preliminary injunction factors weigh strongly against a stay. .........40

CONCLUSION ...............................................................................................................45

# TABLE OF AUTHORITIES

## CASE LAW

*Aberdeen & Rockfish R. Co. v. Students Challenging Regul. Agency Procs.*,
    422 U.S. 289 (1975)........................................................................................... 11

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ........................................................................... 42

*Alabi v. DHS-ICE*,
    No. 3:19-CV-2717, 2020 WL 2529379 (N.D. Tex. Apr. 29, 2020)....................... 33

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022)............................................................................... 42

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................... 18, 20, 38, 42

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014)...................................................................... 19

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ....................................................................... 18, 19

*Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000).......................................................................... 21

*Azar v. Allina Health Services*,
    139 S. Ct. 1804 (2019)....................................................................................... 33

*Becerra v. U.S. Dep't of Interior*,
    276 F. Supp. 3d 953 (N.D. Cal. 2017) ................................................................ 15

*Biden v. Texas*,
    142 S. Ct. 2528 (2022)................................................................................. passim

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974)........................................................................................... 39

*Brown v. Gilmore*,
    533 U.S. 1301 (2001)......................................................................................... 11

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................. 40

*California v. Texas,*
    141 S. Ct. 2104 (2021) ................................................................................. 18

*California v. U.S. Bureau of Land Mgmt.,*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) .................................................. 14, 15

*Chevron, USA, Inc. v. NRDC,*
    467 U.S. 837 (1984) .................................................................................... 25

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2014) ............................................................................... 17, 18

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) ................................................................. 19, 20

*Cronin v. USDA,*
    919 F.2d 439 (7th Cir. 1990) ........................................................................ 8

*Cruz-Miguel v. Holder,*
    650 F.3d 189 (2d Cir. 2011) ........................................................................ 33

*Ctr. for Biological Diversity v. Regan,*
    No. CV 21-119 (RDM), 2022 WL 971067 (D.D.C. Mar. 30, 2022)....................... 14

*D&G Holdings v. Burwell,*
    156 F. Supp. 3d 798 (W.D. La. 2016) ................................................... 7, 8, 16

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .............................................................................. passim

*DHS v. New York,*
    140 S. Ct. 599 (2020) .................................................................................. 40

*DHS v. Thuraissigiam,*
    140 S. Ct. 1959 (2020) ................................................................................. 2

*Direct Marketing Assn. v. Brohl,*
    575 U.S. 1 (2015) .................................................................................. 12, 23

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) .................................................................................... 13

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ................................................................................ 37

*F.C.C. v. Fox Television Stations,*
  556 U.S. 502 (2009)................................................................39

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021)......................................................21, 34

*Fed'n for Am. Immigration Reform v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996)....................................................21

*Garland v. Aleman Gonzalez,*
  596 U.S. ___ (2022)...................................................................7

*Georgia v. President of the United States,*
  --- F.4th ----, 2022 WL 3703822 (11th Cir. Aug. 26, 2022)................42

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018)..............................................................40

*Gonzalez v. ICE,*
  975 F.3d 788 (9th Cir. 2020).....................................................17

*Green v. Dep't of Commerce,*
  618 F.2d 836 (D.C. Cir. 1980)...................................................17

*Heckler v. Chaney,*
  470 U.S. 821 (1985)..................................................................20

*Hines v. Davidowitz,*
  312 U.S. 52 (1941)..............................................................18, 33

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
  335 F.3d 357 (5th Cir. 2003).................................................6, 39

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013)..................................................................42

*Knauff v. Shaughnessy,*
  338 U.S. 537 (1950)....................................................................2

*Lewis v. Casey,*
  518 U.S. 343 (1996)..................................................................17

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)..................................................................20

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)..................................................................................... 19

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000).................................................................. 21, 33

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021).......................................................................... 40

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................... 18

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)..................................................................................... 40

*Maldanado v. Macias*,
    150 F. Supp. 3d 788 (W.D. Tex. 2015).......................................................... 33

*Matter of E-R-M- & L-R-M-*,
    25 I. & N. Dec. 520 (BIA 2011)....................................................................... 2

*Monumental Task Comm., Inc. v. Foxx*,
    157 F. Supp. 3d 573 (E.D. La. 2016)........................................................... 6, 8

*Moore v. Tangipahoa Par. Sch. Bd.*,
    507 F. App'x 389 (5th Cir. 2013)................................................................... 39

*Morice v. Hosp. Serv. Dist. #3*, No.,
    CV 18-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) .................................. 40

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)............................................................................... passim

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018)................................................................................. 18

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974).............................................................................. 36, 37

*Native Angels Home Health*,
    2015 WL 12910710 ..................................................................................... 16

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ............................................................ 14

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell,*
    467 F.3d 999 (6th Cir. 2006) ............................................................. 15

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................... 18

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................... 10, 11, 42

*Nutrition Distrib., LLC v. Enhanced Athlete, Inc.,*
    2017 WL 5467252 (E.D. Cal. Nov. 14, 2017) ................................... 40

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO,*
    473 U.S. 1301 (1985) ......................................................................... 15

*Patel v. Garland,*
    142 S. Ct. 1614 (2022) ....................................................................... 22

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ........................................................................... 19

*Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.,*
    658 F.2d 1182 (7th Cir. 1981) .............................................................. 9

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ............................................................................. 37

*Raines v. Byrd,*
    521 U.S. 811 (1997) ........................................................................... 18

*Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020) ................................................................. 21, 37

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ........................................................................... 20

*Safety-Kleen Corp. v. EPA,*
    1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ..................... 13

*Sambrano v. United Airlines, Inc.,*
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ................. 16

*Sampson v. Murray,*
    415 U.S. 61 (1974) .............................................................. 9, 10, 20, 39

*Scripps-Howard Radio v. Fed. Commc'ns Comm'n,*
    316 U.S. 4 (1942) ................................................................................. 8, 9

*Sierra Club v. Jackson,*
    833 F. Supp. 2d 11 (D.D.C. 2012) .................................................... 8, 16

*Sorenson v. Sec'y of Treasury,*
    475 U.S. 851 (1986) ........................................................................ 14, 15

*State of Fla. v. Mellon,*
    273 U.S. 12 (1927) ........................................................................... passim

*State of Texas v. United States,*
    106 F.3d 661 (5th Cir. 1997) ....................................................18, 19, 20

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984) ........................................................................ 19, 21

*Tesfamichael v. Gonzales,*
    411 F.3d 169 (5th Cir. 2005) .................................................................. 10

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ............................................................ passim

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ............................................................... 6, 8

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ................................................................. 12

*Texas v. United States,*
    95 F. Supp. 3d 965 (N.D. Tex. 2015) ..................................................... 8

*Texas v. United States,*
    809 F.3d 134 ........................................................................................... 20

*Thompson v. N. Am. Stainless,*
    562 U.S. 170 (2011) ............................................................................... 21

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005) ............................................................................... 20

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ........................................................................... 42

*United States v. Fausto,*
    484 U.S. 439 (1988) ..................................................................... 20

*United States v. Penn. Indus. Chem. Corp.,*
    411 U.S. 655 (1973) ............................................................. 37, 38

*United States v. Texas,*
    No. 22A17 (22-58), 2022 WL 2841804 (July 21, 2022) ..................... 12

*Valley v. Rapides Parish Sch. Bd.,*
    118 F.3d 1047 (5th Cir. 1997) ...................................................... 41

*VeroBlue Farms USA, Inc. v. Wulf,*
    465 F. Supp. 3d 633 (N.D. Tex. 2020) ........................................... 17

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ...................................................................... 9

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................... 18

*Wenner v. Tex. Lottery Comm'n,*
    123 F.3d 321 (5th Cir. 1997) ........................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................................... 6

*Wooten v. BNSF Ry. Co.,*
    2017 WL 1089546 (D. Mont. Mar. 21, 2017) ................................. 40

*Wyoming v. U.S. Dep't of Interior,*
    2018 WL 2727031 (10th Cir. June 4, 2018) ................................... 11

## FEDERAL STATUTES

5 U.S.C. § 701(a)(1) ......................................................................... 20

5 U.S.C. § 702(1) ............................................................................. 41

5 U.S.C. § 705 .......................................................................... passim

5 U.S.C. § 706 ................................................................................. 12

5 U.S.C. § 706(2)(A) ........................................................................ 13

8 U.S.C. § 1182(d)(5)(A) ................................................................................ 2, 25

8 U.S.C. § 1225 ................................................................................................. 2

8 U.S.C. § 1225(b)(1) ...................................................................................... 2

8 U.S.C. § 1225(b)(2)(C) .............................................................................. 1, 2

8 U.S.C. § 1226(e) .......................................................................................... 20

8 U.S.C. § 1229a ............................................................................................... 2

8 U.S.C. § 1252(f) ................................................................................... 1, 4, 12

8 U.S.C. § 1252(f)(1) .............................................................................. 6, 7, 12

8 U.S.C. § 1252(f)(2) ..................................................................................... 10

8 U.S.C. § 2401 .............................................................................................. 34

28 U.S.C. § 1253 ............................................................................................ 11

# FEDERAL REGULATIONS

8 C.F.R. § 212.5(b)(5) ................................................................................... 34

# FEDERAL REGISTER

84 Fed. Reg. 6811 ............................................................................................ 3

85 Fed. Reg. 17060 .......................................................................................... 3

86 Fed. Reg. 8267 ............................................................................................ 3

# LEGISLATIVE HISTORY

H.R. Rep. No. 79-1980 ............................................................................. 10, 43

H.R. Rep. No. 104-469 .................................................................................. 14

H.R. Rep. No. 469 .......................................................................................... 34

H.R. Rep. No. 828 .......................................................................................... 34

S. Rep. No. 79-752 ................................................................................................................... 10

**MISCELLANEOUS**

U.S. Customs and Border Protection*, Southwest Land Border Encounters (By Component), ,*
Available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited
Apr. 22, 2021) ....................................................................................................................... 18

U.S. Dep't of Homeland Sec. *DHS Statement on U.S. District Court's Decision Regarding MPP*,
    available at https://www.dhs.gov/news/2022/08/08/dhs-statement-us-district-courts-decision-
    regarding-mpp (last visited Sep. 2, 2022)........................................................................ 5, 16

U.S. Dep't of Justice, *Administrative Procedure Act: Legislative History, 1944-46, at 230* (1946),
    available at www.justice.gov/sites/default/files/jmd/legacy/2014/03/20/senaterept-752-
    1945.pdf (last visited Sep. 2, 2022) ...................................................................................... 10

**<u>INTRODUCTION</u>**

This Court should deny Plaintiffs' motion to postpone the effective date of an October 29, 2021 memorandum ending the Migrant Protection Protocols ("MPP") that has already gone into effect. Just two months ago, the Supreme Court held that lower courts lack jurisdiction to enjoin a Department of Homeland Security ("DHS") memorandum ending MPP, an entirely discretionary program implementing the agency's discretionary enforcement authority under 8 U.S.C. § 1225(b)(2)(C) to return certain noncitizens to Mexico pending their removal proceedings. For the following reasons, the Court should reject Plaintiffs' renewed attempt to restrain DHS's discretion to implement Section 1225(b)(2)(C) by effectively seeking under a different name the same relief the Supreme Court already said was barred.

First, Plaintiffs' claim is in substance no different than a request for a preliminary injunction. They in effect seek to restrain DHS decisions on how to implement 8 U.S.C. § 1225(b)(2)(C), and so their claim is barred by 8 U.S.C. § 1252(f)(1), as the Supreme Court explained in this case. Second, while 5 U.S.C. § 705 authorizes courts in some circumstances to delay the effective date of an agency action, Section 705 cannot be used where, as here, the agency action has already taken effect. Third, Plaintiffs lack standing, and their claim under the Administrative Procedure Act ("APA") is not reviewable. Fourth, even if the Court had jurisdiction and the claim was reviewable, Plaintiffs cannot show a likelihood of success on their claim. Fifth, even if the States could satisfy the requirements for a stay, which are the same as for a preliminary injunction, the remaining preliminary injunction factors all weigh strongly in Defendants' favor and against granting a stay. Finally, even if the Court grants a stay, it must be limited to the Plaintiff States.

Accordingly, the Court should deny Plaintiffs' motion.

1

## **BACKGROUND**

The Executive Branch has broad constitutional and statutory power to determine who may enter the country, and on what terms. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). The Executive Branch also has authority and discretion to prioritize which noncitizens to remove, and through what type of proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011). In 8 U.S.C. § 1225, Congress delegated to the Executive Branch the authority and discretion to inspect and process for immigration proceedings noncitizens arriving in the United States.[1] First, Congress has authorized DHS to initiate expedited removal proceedings in 8 U.S.C. § 1225(b)(1). Under that provision, an "applicant for admission" to the United States who lacks valid entry documentation or misrepresents a material fact shall be "removed from the United States without further hearing or review unless" he "indicates either an intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Alternatively, Congress has provided that DHS can place an applicant who is seeking admission into removal proceedings before an immigration judge under 8 U.S.C. § 1229a, and shall detain the noncitizen pending such proceedings if he is not "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). Congress also provided DHS with various alternatives to detention. Among other things, (1) DHS may release applicants for admission on parole on a case-by-case basis "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), or (2) "[i]n the case of an alien described in [§ 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary of Homeland Security] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

---

[1] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

In December 2018, then-Secretary Nielsen announced DHS would "begin implementation of" the contiguous-territory-return authority in § 1225(b)(2)(C), 84 Fed. Reg. 6811 (Feb. 28, 2019), one of many discretionary enforcement authorities available to DHS in prioritizing enforcement of the immigration laws. Under MPP, it was DHS policy that certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico— illegally or without proper documentation—may be returned to Mexico pursuant to" § 1225(b)(2)(C) "for the duration of their Section [1229a] removal proceedings." *Id.* If an immigration officer determined that a noncitizen was eligible for return to Mexico and should be placed in MPP, the noncitizen was issued a Notice to Appear ("NTA") and placed into § 1229a removal proceedings, and then returned to Mexico to await those proceedings. *Id.*

In March 2020, after the Centers for Disease Control and Prevention issued an order temporarily suspending entry of certain individuals traveling from Canada or Mexico in response to the COVID-19 pandemic, MPP enrollments began to decline. *See Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 17060 (Mar. 26, 2020).

Upon President Biden taking office on January 20, 2021, the Acting Secretary directed that DHS would "suspend new enrollments in [MPP], pending further review of the program." Administrative Record ("AR") at 1175. President Biden subsequently issued an Executive Order directing DHS to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as [MPP]." *See* Executive Order No. 14010, 86 Fed. Reg. 8267, Creating a Comprehensive Regional

3

Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (Feb 2, 2021); AR914. On June 1, 2021, the Secretary issued a memorandum setting out his decision to terminate MPP and rescind the January 25, 2019 memorandum creating the program. AR63.

Missouri and Texas filed this suit in April 2021, initially challenging the suspension of new enrollments in MPP and later amending their complaint to seek injunctive relief against the Secretary's June 1 decision. On August 13, 2021, following a one-day bench trial, the Court "permanently enjoined and restrained" DHS "from implementing or enforcing the June 1 Memorandum," which it "vacated in its entirety and remanded to DHS for further consideration." ECF No. 94. Further, the Court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens *because of* a lack of detention resources." *Id*. Defendants appealed.

On October 29, 2021, while that appeal was pending and following extensive additional review of the program, the Secretary issued a new memorandum terminating MPP and immediately rescinding all prior MPP memoranda. AR1-43. Based on that superseding decision, the government moved the Fifth Circuit to remand to this Court for further proceedings. In December 2021, the Fifth Circuit denied that motion and upheld the injunction. *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021). It held that the limits on jurisdiction in 8 U.S.C. § 1252(f) did not apply because the district court's injunction "restored" the operation of Section 1225(b)(2)(C) rather than enjoined it, that Section 1225(b)(2)(C), which authorizes contiguous-territory return as an

alternative to detention under Section 1225(b)(2)(A), becomes mandatory if the government lacks sufficient detention capacity, and that the October 29 memorandum did not constitute a new and separately reviewable agency action. *Id*. at 951, 996, 1004.

On June 30, 2022, the Supreme Court reversed each of those rulings and "the judgment of the Court of Appeals and remand[ed] the case for further proceedings." *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022). The Supreme Court ordered that "[o]n remand, the District Court should consider in the first instance whether the October 29 memoranda" comply with the APA. *Id*. On August 3, 2022, the Fifth Circuit remanded the case to this Court "for further proceedings consistent with the Supreme Court's decision," Order, *Texas v. Biden*, No. 21-10806 (5th Cir Aug. 3, 2022), and issued the mandate on August 6, 2022, *see* Order, *Texas v. Biden*, No. 21-10806 (5th Cir. Aug. 6, 2022). On August 8, 2022, this Court vacated the permanent injunction, *see* ECF No. 147, and DHS ended the use of MPP as directed by the October 29 memorandum. *See* DHS Statement on U.S. District Court's Decision Regarding MPP, *available at* https://www.dhs.gov/news/2022/08/08/dhs-statement-us-district-courts-decision-regarding-mpp.

Plaintiffs then moved to postpone the effective date of the October 29, 2021 memorandum.

## ARGUMENT

Section 1252(f)(1) divests this Court of jurisdiction and authority to grant Plaintiffs' request to postpone under 5 U.S.C. § 705 or otherwise restrain agency actions related to implementation of Section 1225(b)(2)(C) for the same reasons the Supreme Court held injunctive relief is unavailable with respect to that section. In addition, Section 705 does not grant this Court authority to postpone the effective date of a memorandum that has already taken effect. Even if the Court had such authority, the Court should still deny the stay because Plaintiffs cannot show a likelihood of success on the merits of their claim, and the equities and public interest tip strongly in Defendants' favor.

Section 705 provides that where a rule has not yet become effective, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The standard for a Section 705 stay "is the same as the standard for issuance of a preliminary injunction." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff 'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017); *see Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016). The preliminary injunction standard requires Plaintiffs to show: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). It is "an extraordinary remedy which should only be granted if" Plaintiffs have "clearly carried the burden of persuasion on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). Plaintiffs cannot meet this standard.

## I.      Plaintiffs' stay request is not justiciable.

### A. Section 1252(f)(1) bars jurisdiction to stay an agency action directing how DHS will implement Section 1225(b)(2)(C).

The relief Plaintiffs seek would have the effect of enjoining or restraining DHS's implementation of Section 1225 and is thus barred by 8 U.S.C. § 1252(f)(1).

Invoking 5 U.S.C. § 705, Plaintiffs ask this Court to "[p]ostpone the effective date of Defendants' termination of MPP effected by the October 29 Memoranda," Second Amended Complaint, ECF No. 148-1, Prayer For Relief, ¶ a; *see* Mot. at 6-7. Section 705 provides that where a rule has not yet become effective, and "an agency finds that justice so requires," it may postpone the effective date of action taken by it, pending judicial review," and that:

> [o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

However, "Section 705 of the APA is not an independent grant of subject matter jurisdiction," and the "Supreme Court has stated that the APA does not provide a mechanism to override the jurisdictional requirements of" more specific statutes that govern review of a particular agency's actions. *D&G Holdings v. Burwell*, 156 F. Supp. 3d 798, 811 (W.D. La. 2016) (explaining that jurisdictional limits in Medicare Act foreclose relief under Section 705).

Section 1252(f)(1) is such a provision. Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). The Supreme Court held that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas*, 142 S. Ct. at 2538 (quoting *Garland v. Aleman Gonzalez*, 596 U.S. ___ (2022)). Section 1225(b)(2)(C) is one of the statutory provisions covered by Section 1252(f)(1), and so "[t]he District Court's [previous] injunction in this case violated that provision." *Id*. Section 1252(f)(1) thus eliminates the Court's authority—and the authority of any court other than the Supreme Court—to issue coercive orders restraining implementation of Section 1225.

A court order postponing agency action under Section 705 is such a coercive order. Such an order would restrain the agency's actions with respect to how it will implement Section

1225(b)(2)(C), and is thus analogous to a preliminary injunction in that an order under Section 705 purports to maintain the status quo pending resolution of the merits. 5 U.S.C. § 705 (referencing "preserv[ation of] status or rights"); *see, e.g.*, *D&G Holdings*, 156 F. Supp. 3d at 811 (movant seeks "a status quo injunction under 5 U.S.C. § 705"). Courts, including the Fifth Circuit, thus routinely note that the standard for a Section 705 stay "is the same as the standard for issuance of a preliminary injunction." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017); *see, e.g.*, *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 424 (5th Cir. 2016); *Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990); *D&G Holdings*, 156 F. Supp. 3d at 811; *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 19 (D.D.C. 2012). Moreover, an order under Section 705 postponing the effective date of the October 29 Memorandum "order[s] federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas*, 142 S. Ct. at 2538 (emphasis added); *see* Black's Law Dictionary (10th ed. 2014) (defining injunction as "[a] court order commanding or preventing an action").

Plaintiffs' sole rejoinder is that stays are different from injunctions, Mot. at 23, but that argument depends on the incorrect assumption that Section 705 creates a new form of remedy—a district court stay of agency action that is distinct from an injunction. Section 705 does not, however, create any new remedies beyond the traditional equitable relief that existed at the time of the APA's passage. Even assuming that Plaintiffs could show a pre-APA tradition of courts of appeals staying agency *orders* challenged in special statutory review proceedings, *see Scripps-*

*Howard Radio v. Fed. Commc'ns Comm'n*, 316 U.S. 4, 16-17 (1942), Plaintiffs have not identified any pre-APA historical tradition of *district* courts issuing stays of agency *policies*.

When Congress adopted Section 705, there is no evidence that it intended to greatly expand preexisting authority by allowing district courts to enjoin agency policies. Instead, Congress simply codified existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary and appropriate." And the Supreme Court long ago concluded that "[t]he relevant legislative history of that section ... indicates that it was primarily intended to reflect existing law" permitting courts of appeals to stay certain agency actions pending direct review authorized by statute in the same manner that appellate courts can in certain circumstances stay a district court decision pending appeal. *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974); *see Scripps-Howard Radio*, 316 U.S. at 9-10 ("It has always been held, therefore, that, as part of its traditional equipment for the administration of justice, a federal court can stay the *enforcement of a judgment pending the outcome of an appeal*") (emphasis added). Section 705 was not intended "to fashion new rules of intervention for District Courts." *Sampson*, 415 U.S. at 68 n.15; *see also Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1191 (7th Cir. 1981) (noting that the APA "has been widely interpreted as being merely declaratory of the common law of reviewability and standing existing at the time of [its] enactment" and collecting cases on that point). Section 705 thus does not create any new remedies distinct from traditional equitable relief.

The Senate Report prepared in advance of the APA's enactment explains that the "first sentence" of Section 705—relating to an agency's authority to postpone the effective date of a rule—simply "states existing law," while the "second sentence"—the one at issue here—"may be said to change existing law *only* to the extent that the language of the opinion in *Scripps-Howard* ... may be interpreted to deny to reviewing courts the power to permit an applicant for a renewal

9

of a license to continue to operate as if the original license had not expired, pending conclusion of the judicial review proceedings." S. Rep. No. 79-752, at 44 (1945), *reprinted in* GPO, Administrative Procedure Act: Legislative History, 1944-46, at 230 (1946), *available at* www.justice.gov/sites/default/files/jmd/legacy/2014/03/20/senaterept-752-1945.pdf (attached in Addendum) (emphasis added). The House Report separately noted that relief under Section 705 requires a "proper showing" of the traditional prerequisites for relief. H.R. Rep. No. 79-1980, at 43-44 (1946), *reprinted in* GPO, Administrative Procedure Act: Legislative History, 1944-46, at 277-78 (1946).

The Attorney General's Manual on the APA further supports the conclusion that Section 705 does not create any new remedies. The Supreme Court has accorded deference to this manual because it was issued contemporaneously with passage of the APA and because of the "role played by the Department of Justice in drafting the legislation," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978). The Manual explains that "[t]he provisions of section 10 [the APA's judicial review provisions] constitute a general restatement of the principles of judicial review embodied in many statutes and judicial decisions," and "generally leave[] the mechanics of judicial review to be governed by other statutes and by judicial rules." U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 93 (1946). Referring to Section 705, the Manual emphasizes that the "general procedural provisions governing the issuance of preliminary injunctions . . . appear to be applicable to the exercise of the power conferred by that subsection." *Id.* at 107. Thus, the text, context, legislative history, sources contemporary to the APA's passage, and relevant case law all show that Section 705 does nothing more than preserve traditional equitable relief—relief that is barred here by Section 1252(f)(1).

Plaintiffs nonetheless contend that "[s]tays are not injunctions" because "'[a]n injunction and a stay have typically been understood to serve different purposes.'" Mot. at 23 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). *Nken*, however, has no application here. In *Nken*, the Court addressed a different statutory provision of the INA, 8 U.S.C. § 1252(f)(2)—which only prohibited "enjoin[ing] the removal of any alien"—and held that it did not preclude individual stays of the order of removal pending review. *Nken*, 556 U.S. at 428. The stay of the removal order, the Court reasoned, "operate[d] upon the [administrative or] judicial proceeding itself." *Id.* at 428; *see Tesfamichael v. Gonzales*, 411 F.3d 169, 174 (5th Cir. 2005) (explaining that a "stay" is distinct from an "injunction" when it operates on an *adjudication* originating in a lower court or an administrative agency); *see also* Black's Law Dictionary 1413 (6th ed.1990) (defining a "stay" as: "[a] stopping; the act of arresting a *judicial proceeding* by the order of a court") (emphasis added).[2]

Plaintiffs do not ask this Court for an order that would operate on the individual removal proceedings or some other *agency adjudication* pending judicial review of that adjudication. They ask this Court to "prevent" the government from implementing its chosen "course of action" with respect to Section 1225(b)(2)(C). *See Aleman Gonzalez*, 142 S. Ct. at 2063, 2065 (orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by a covered provisions are barred by Section 1252(f)). Such an order, even if labeled a stay, is

---

[2] Further distinguishing *Nken*, the INA specifically contemplates stays of removal orders pending judicial review. *See* 8 U.S.C. § 1231(a)(1)(B)(ii). Moreover, Section 1252(f)(1) explicitly exempts cases involving individual noncitizens from its coverage, meaning it would not bar an individual stay of removal. But no provision of the INA explicitly contemplates a similar carve-out for parties seeking on a programmatic basis to delay the operation of other agency actions implementing covered statutory provisions. Put differently, no provision authorizes courts to "coerc[e]," *Nken*, 556 U.S. at 429, the federal government to not implement the covered provisions as it chooses through an order that operates on a federal regulation or policy, rather than "upon [a] judicial [or administrative] proceeding itself," a hallmark of a stay, *Nken*, 556 U.S. at 428. And *Aleman Gonzalez* eliminates any doubt that an order purporting to stay the operation of a federal regulation or policy implementing a covered provision of the INA is prohibited by Section 1252(f)(1).

11

injunctive in effect and thus prohibited by Section 1252(f)(1). *See id.*; *accord Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *Wyoming v. U.S. Dep't of Interior*, Nos. 18-8027, 18-8029, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (explaining that "[t]he district court's 'stay' effectively enjoins enforcement of the Rule" and is thus immediately appealable as an injunctive order). Indeed, *Nken* itself recognized this distinction, explaining that "[a] stay 'simply suspends *judicial alteration of the status quo*, while injunctive relief *grants judicial intervention*" in the first instance. *Nken*, 556 U.S. at 429.

In addition, the Supreme Court has repeatedly accorded a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from an "*injunction* in any civil action ... required ... to be heard and determined by a district court of three judges," 28 U.S.C. § 1253 (emphasis added), to apply to orders with a "coercive ... effect." *Aberdeen & Rockfish R. Co. v. Students Challenging Regul. Agency Procs.*, 422 U.S. 289, 307 (1975). In reaching that conclusion, the Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders ... not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11.

Regardless, even if the Court were to otherwise conclude that a stay here does not "enjoin" operation of the covered provisions under *Nken*, Section 1252(f)(1) is far broader than Section 1252(f)(2), given that it strips courts of jurisdiction to "enjoin *or restrain* the operation" of the covered provisions, rather than just prohibiting enjoining removal orders. 8 U.S.C. § 1252(f)(1) (emphasis added). As the Supreme Court held in *Aleman*, to "restrain" means to "check, hold back,

or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 142 S. Ct. at 2063 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989); Webster's Third New International Dictionary, at 1936; *Direct Marketing Ass'n. v. Brohl*, 575 U.S. 1, 12–13 (2015)). An order preventing the memorandum from remaining in effect prevents or stops its operation, and so constitutes an order "restraining" federal officials "from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2065.

Finally, Plaintiffs' reliance on *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) is misplaced. There, the Fifth Circuit held that vacatur under the APA as part of a final judgment following a determination that a rule is arbitrary and capricious under 5 U.S.C. § 706 likely does not "enjoin or restrain" the rule because "a vacatur does nothing but re-establish the status quo absent the unlawful agency action" and so "neither compels nor restrains further agency decision-making." *Id.* at 220-21. At the outset, that decision was issued in a preliminary stay posture and thus did not definitively resolve the meaning of Section 1252(f)(1), *id.* at 220, and the Supreme Court has granted certiorari to consider the issue, *see United States v. Texas*, No. 22A17 (22-58), 2022 WL 2841804 (July 21, 2022). Moreover, while the government disagrees with the Fifth Circuit's conclusion with respect to Section 1252(f) and vacatur relief, *see* Supplemental brief of petitioners at 14-19, *Biden v. Texas*, No. 21-954, the fact remains that what Plaintiffs seek here is not vacatur. Plaintiffs do not ask the Court to set aside the memorandum following a final decision on the merits with respect to their APA claim, which merely requires a showing that the agency action at issue is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). They seek a remedy that requires the far more demanding showing on the four factors required for preliminary injunctive relief, including "irreparable injury," 5 U.S.C.

13

§ 705, and the other factors, and an order that has the effect of preventing DHS from implementing the memorandum. As explained above, that would enjoin or at least restrain the government's chosen operation of Section 1225(b)(2)(C), and so is barred by Section 1252(f)(1).

Indeed, a contrary reading is at odds with Congress's clear intent that the government's chosen means of implementing the covered "procedures will remain in force while [any] lawsuits are pending" and that "single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S." H.R. Rep. No. 104-469, pt 1, at 161 (Conference Report). A postponement under Section 705 would improperly prevent implementation of the memorandum "while [] lawsuits are pending," before final judgment affirmed by the Supreme Court. *Id*. And even if Section 1252(f)(1) did not bar such a restraint unless ordered by the Supreme Court, vacatur is a remedy that can only be granted upon final judgment. *Cf. Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction").

### B.  The Court cannot stay agency action that has already gone into effect.

Even if Section 1252(f) does not apply, Section 705 by its own terms does not authorize a postponement of the memorandum. Courts construing Section 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review," but not suspension of a rule that is already in effect. *See, e.g.*, *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (same, collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) (same); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same).

While these cases address an agency decision to "postpone the effective date," Section 705 uses identical language when referring to "the reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences of Section 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). Given its plain meaning, the language in Section 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *See* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/postpone (last visited Mar. 17, 2021); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/effective (last visited Mar. 17, 2021); *see also* BLACK'S LAW DICTIONARY ONLINE (2d. Ed.) (defining "postpone" as "to put off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus, it would be unreasonable to interpret the statute as permitting the issuance of a stay after the operative date of the challenged rule has already passed.

Here, the October 29 decision became "effective immediately." AR4 ("I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP."). And although the October 29 memorandum delayed "implement[ation]" of the Secretary's termination until the injunction was "vacated," *id.*, that is irrelevant to whether the memorandum was in effect earlier. Courts distinguish between the effective date and implementation or compliance date for purposes of Section 705. *See, e.g.*, *Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 963 (N.D. Cal. 2017); *U.S. Bureau of Land*

*Mgmt.*, 277 F. Supp. 3d at 1118. In any event, even the implementation date has now come to pass. This Court vacated its permanent injunction shortly after 4:00 PM CST on August 8, 2022. ECF No. 147. That same day, DHS announced that new enrollments in MPP would cease immediately and that no individuals physically present in the United States for an MPP hearing would be returned to Mexico. *See* DHS Statement on U.S. District Court's Decision Regarding MPP, *available at* https://www.dhs.gov/news/2022/08/08/dhs-statement-us-district-courts-decision-regarding-mpp. Thus, there is no plausible basis for Plaintiffs to argue that the October 29 decision is "not yet effective." *Safety-Kleen Corp.*, 1996 U.S. App. LEXIS 2324, at *2-3.

Finally, the fact that Section 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or* to *preserve status or rights* pending conclusion of the review proceedings" (emphasis added), cannot change this result. That second clause is subject to the same temporal limitation as the first clause for the simple reason that the status quo, once a rule goes into effect, is that the rule is in effect. An order staying a rule or policy after it goes into effect thus does not preserve, but alters, the status quo. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (explaining that had the district court issued an order stopping rule from taking effect that would alter the "status quo"). The status quo presently is that the October 29 memorandum is operative and DHS has ceased new enrollments in MPP and stopped returning individuals to Mexico under the program.

Moreover, even were the status quo something other than the circumstances created by the October 29 memorandum taking effect, an order seeking to preserve the status quo prior to an

agency action is in effect no different than an injunction. *See, e.g.*, *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022) ("purpose of a preliminary injunction is to preserve the status quo); *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) ("prohibitory injunction freezes the status quo, and is intended to preserve the relative positions of the parties until a trial on the merits can be held"); *accord D&G Holdings*, 156 F. Supp. 3d at 811 (movant seeks "a status quo injunction under 5 U.S.C. § 705"); *Native Angels Home Health*, 2015 WL 12910710, at *1 (similar); *Sierra Club*, 833 F. Supp. 2d at 19 (similar). And so any order to "preserve status or rights," 5 U.S.C. § 705, is also an order "enjoin[ing]" or "restrain[ing]" "the operation" of Section 1225 that is barred by Section 1252(f).

## C. Plaintiffs lack standing to challenge the October 29 memorandum.

Plaintiffs argue they have standing based on costs they speculate they may incur without MPP. Mot. 21. But they do not raise any specific argument for harm based on the October 29 memorandum, arguing instead that the Court's prior, vacated ruling with respect to their standing to challenge the June 1 memorandum is the law of the case. *Id.* Plaintiffs' amended complaint, however, raises a new claim challenging a new agency action, and they have the burden to establish standing for this new claim and the new form of relief they now seek. "[A] plaintiff must demonstrate standing for each claim he seeks to press," and "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

The now-reversed prior decisions addressing Plaintiffs' standing with respect to different claims challenging a different agency action do not resolve the standing question for Plaintiffs' new claims. *See, e.g.*, *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 649 (N.D. Tex. 2020) (explaining that "Plaintiffs' Amended Complaint" "wipe[s] the slate clean"); *Green v. Dep't of Commerce*, 618 F.2d 836, 839 n.9 (D.C. Cir. 1980) ("[T]he doctrine of 'law of the case' does not apply to the fundamental question of subject matter jurisdiction."); *Gonzalez v. ICE*, 975 F.3d

17

788, 805 (9th Cir. 2020) (same). This is especially true where the prior findings were based on data on encounters that is now stale and has been superseded by more recent events. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The actual-injury requirement would hardly serve [its] purpose … if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.").

Plaintiffs' prior evidence submitted with their challenge to the June 1 memorandum was based entirely on speculation about additional individuals residing in Texas and Missouri, and further speculation that those individuals would use State services and increase costs. But this speculation on speculation was not based on any actual evidence that terminating MPP had led to *any* increase in the use of State services or costs. Indeed, Plaintiffs have never submitted evidence showing any increase in the number of noncitizens in these two States, and, in any event, nothing they previously submitted addressed current circumstances or the effect of the October 29 memorandum. Moreover, their speculative theory of causation—that MPP would decrease border encounters—has since been proven false. *See, e.g.*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (showing border encounters increased after reimplementation of MPP). Unsupported speculation about some "*possible* future injury" is not sufficient to establish standing, and in particular, the Supreme Court has "rejected theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 (2014); *see also Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015); *DaimlerChrysler Corp.*, 547 U.S. at 344; *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing … is ordinarily 'substantially more difficult' to establish.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992))).

Even if Plaintiffs could establish some downstream costs traceable to the October 29 memorandum, finding standing wherever a policy might arguably have some incidental costs to a State would allow States to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process. Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner. *Clapper*, 568 U.S. at 408; *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Framers established a national government with the power to act directly on individuals, replacing a system where the government had to act through the States, *New York v. United States*, 505 U.S. 144, 162-66 (1992); *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018), and immigration is inherently a subject of national concern, *see Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941). The absence of suits like this one during the vast majority of our Nation's history is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *see State of Texas v. United States*, 106 F.3d 661, 665 (5th Cir. 1997) (noting the political branches' general authority over immigration and the court's "difficulty conceiving of any judicially discoverable standards for determining whether immigration control efforts by Congress are constitutionally adequate").

A "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir.

2015). And generalized information showing "*illegal immigration* is costing the state money" is insufficient to confer standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015); *see also Arpaio*, 797 F.3d at 20. In addition, a party generally lacks "standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Applying that principle here, States have "no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). And, to the extent the States incorrectly allege that ending MPP confers a benefit on any noncitizen, the States lack standing to challenge the provision of benefits to a third party. *See DaimlerChrysler Corp*, 547 U.S. at 342-46.

The States' alleged injuries also are not cognizable harms for Article III purposes because they are self-inflicted and not traceable to the government's actions. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"); *State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927) (States may sue the United States only if they have suffered a "*direct* injury"). As the Fifth Circuit explained, State expenditures as a result of immigration are caused by the State's own laws, or the State's decision to opt into federal programs like Medicaid in order to obtain a benefit—but they are not dictated by federal policy. *State of Texas*, 106 F.3d at 666. While this conclusion was part of that court's Tenth Amendment analysis, *id.*, the causal reasoning is equally true in the standing context and applicable to any injuries alleged on the basis of compliance with the State's own laws, such as provision of driver's licenses to immigrants under Texas law. *See* Tex. Transp. Code § 521.142(a).

Accordingly, Plaintiffs lack standing to challenge, or stay, the October 29 memorandum.

### D.  Plaintiffs' APA claim is not reviewable.

Even if Plaintiffs had standing, they still cannot raise a challenge to the October 29 memorandum.[3] First, the Supreme Court confirmed that Secretary's exercise of his authority under Section 1225(b)(2)(C)—the basis for MPP—is entirely discretionary. *Texas*, 142 S. Ct. at 2541-42. The APA precludes review of "administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas v. United States*, 809 F.3d 134, 165 (5th Cir. 2015) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2); *Arizona*, 567 U.S. at 396; *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005); *Crane*, 783 F.3d at 247.

Second, Plaintiffs lack a cause of action under the APA. Congress has made clear that only noncitizens may challenge immigration enforcement actions, precluding States from raising claims based on Section 1225(b). The APA does not provide a cause of action when another "statute[] preclude[s] judicial review," 5 U.S.C. § 701(a)(1), and a detailed review scheme that allows only particular parties to challenge certain executive actions is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988). Congress has enacted many provisions "aimed at protecting the Executive's discretion from the courts" and limiting review to claims brought by individual noncitizens. *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 486–87 (1999); *see id.* at 82-85; 8 U.S.C. §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A), (B), (C), (b)(4)(D), (b)(9), (d), (f), (g); *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359–60 (D.C. Cir. 2000). For example, under Section 1252(a)(2)(B)(ii) Congress provided that "no court shall have jurisdiction to review ... any other decision or action … the authority for which is specified … to be in the discretion of

---

[3] To the extent the Court finds the Fifth Circuit's earlier ruling on these grounds controlling, Defendants still wish to preserve these arguments for appeal.

the ... Secretary." "[T]he contiguous-territory return authority in section 1225(b)(2)(C) is discretionary," *Texas*, 142 S. Ct. at 2544, and nothing in the October 29 memorandum bars line officers from using the return authority where appropriate, it simply ends programmatic use through MPP. Moreover, if a decision is discretionary, neither the "discretionary judgment," nor "the manner in which that discretionary judgment is exercised," is "subject to review." *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 & n.12 (5th Cir. 2000); *see id. at* 991 & n.12 (explaining the agency's use of parole is thus not subject to review); *cf. Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (holding that section 1252(a)(2)(B)(i), which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment," and so "encompasses not just the granting of relief but also any judgment relating to the granting of relief").[4]

For these reasons, States are not within the zone of interests of Section 1225(b). *See, e.g.*, *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011); *Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996); *cf. Sure-Tan*, 467 U.S. at 897 (finding "no judicially cognizable interest in procuring enforcement of the immigration laws").

---

[4] Although *Patel* addressed section 1252(a)(2)(B)(i), its reasoning is relevant to section 1252(a)(2)(B)(ii). As the Supreme Court explained in *Kucana v. Holder*, 558 U.S. 233, 247 (2010), "[o]ther decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind" to those covered by section 1252(a)(2)(B)(i). Accordingly, section 1252(a)(2)(B)(ii) also extends not just to final decisions or actions, but "any [decision or action] relating to the granting of relief." *Patel*, 142 S. Ct. at 1622. Moreover, *Patel* post-dates the Fifth Circuit's decision in this case, and thus renders any aspect of that case construing section 1252 inconsistent with *Patel* no longer binding. *See, e.g.*, *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) (explaining panel decision binding until "the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc").

## II.      Plaintiffs are not likely to succeed on the merits of their APA claim.

Even if the States could raise challenges to the October 29 memorandum, their APA claim would nonetheless fail on the merits. Plaintiffs argue the memorandum is arbitrary and capricious because, in their view, it did not adequately consider certain factors, *see* Mot. 7-21, but there is no merit to any of their arguments. Review under the APA's arbitrary and capricious standard is "deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). A court's role is limited to evaluating whether the agency "reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1933 (2020); *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The October 29 memorandum easily meets this standard.

Following this Court's remand order, the Secretary "once more assessed whether MPP should be maintained, terminated or modified in a variety of ways." AR2. In doing so, the Secretary reviewed "multiple court decisions, filings, and declarations related to MPP," "data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings," "previous Departmental assessments of MPP," and "news reports and publicly available sources of information pertaining to conditions in Mexico." *Id.* He "met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border." *Id.* He also "examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers," and

"predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the [INA], impose undue costs on states, and put a strain on U.S.-Mexico relations." *Id.* And the Secretary considered perspectives from "those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form." *Id.*

After this thorough review, the Secretary concluded that MPP had mixed effectiveness at achieving its goals and that it "impos[ed] substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico." AR2. He also concluded that the agency could pursue alternatives that will more effectively "disincentivize irregular migration while incentivizing safe, orderly, and humane pathways." *Id.* The Secretary noted that "[s]ignificant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities," and that there is little that can be done to remedy this fundamental problem with the program because "the United States has limited ability to ensure the safety and security of those returned to Mexico." *Id.* at 3. In addition "[e]fforts to implement MPP" diverted "attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration," and the "the concentration of resources, personnel, and aid efforts on the northern border of Mexico" necessary to implement MPP prevented DHS from carrying out "broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border." *Id.* Ultimately, the Secretary concluded "the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives," *id.*, and "there are inherent

24

problems with the program that no amount of resources can sufficiently fix," *id*. at 4. Plaintiffs' arguments that the Secretary failed to "examine the relevant data and articulate a satisfactory explanation," Mot. 8, lack merit.

*First*, Plaintiffs argue that the Secretary failed to adequately consider how using MPP would avoid alleged "violations of the INA's clear detention mandate." Mot. 8-10. Plaintiffs contend the Fifth Circuit already held that "Section 1225(b)(2)(A) provides that, under certain circumstances, 'the alien shall be detained'" creating "a mandatory statutory command," and argue nothing in the Supreme Court's decision upset that determination. Mot. at 8-9. The Supreme Court has held, however, that "the INA expressly authorizes DHS to process applicants for admission under a third option: parole." *Texas*, 142 S. Ct. at 2543. The Fifth Circuit's ruling that Section 1225(b)(2)(A) contains a detention mandate for any noncitizens not returned under MPP depended on that court's conclusion that parole was not a permissible alternative to detention or return. *See Texas*, 20 F.4th at 996-67. Moreover, the Supreme Court has also held that even if Section 1225(b)(2)(A) does mandate detention, the Secretary is not obligated to return noncitizens to Mexico under "section 1225(b)(2)(C)" or to use that provision as a "mandatory cure of any compliance with the Government's detention obligations." 142 S. Ct. at 2541. The Court explained that "Congress conferred contiguous-territory return authority in expressly discretionary terms" and the "statutory grant of discretion" to use MPP—or not use MPP—is not limited by whether the government can otherwise "comply with its detention obligations." *Id*. at 2541-42. Because "the contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any violation of section 1225(b)(2)(A)," *id*. at 2544, there is no merit to Plaintiffs' argument that the Secretary was required to give controlling weight to the possibility of "using MPP to reduce [ ] noncompliance with" Section 1225(b)(2)(A), Mot. at 10. Plaintiffs'

present theory is simply the same argument the Supreme Court already rejected, in the guise of an arbitrary-and-capricious challenge.

In any event, the Secretary did consider Section 1225(b)(2)(A). The Secretary did consider it but disagreed that Section 1225 imposes "a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory." AR31. In fact, the memorandum contains a lengthy section entitled "Relationship between Implementation of MPP and Statutory Mandates" that specifically discusses how reading Section 1225 to impose such a near-universal mandate is inconsistent with the statutory text, the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities. AR30-33; *see also* AR158-70, 448, 990, 1240, 1399, 1471, 1580, 1590, 1819, 3568.

In particular, the memorandum notes that "[p]ursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power," which "has been exercised for as long as the federal government has been regulating immigration." *Id.* at 31; *see also infra* at 32-34 (further discussing the agency's consideration of its parole authority). And although Congress would need to appropriate substantial additional funds to allow DHS to detain everyone potentially subject to detention under Section 1225, it has never done so since enacting Section 1225(b)(2)(C), nor has it ever amended Section 1225 to mandate contiguous-territory return for individuals the agency lacks the resources to detain. AR33 n.124. The Supreme Court thus noted "the INA expressly authorizes DHS to process applicants for admission under a third option: parole" under "8 U.S.C. § 1182(d)(5)(A)," and "[e]very administration, including the Trump and Biden administrations, has utilized this authority to some extent." 142 S. Ct. at 2543.

The "available of the parole option additionally makes clear that the Court of Appeals erred in holding the INA required the Government to continue implementing MPP." *Id.* at 2544.

DHS's interpretation of the statutes it is charged with implementing is entitled to *Chevron* deference, as the Fifth Circuit acknowledged: "DHS's new Memoranda invoke deference under *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837 (1984) … [s]o *Chevron* deference, which wasn't at play before, is relevant now." *Texas*, 20 F.4th at 960.[5] Plaintiffs thus cannot succeed on their claim that DHS must use "MPP to reduce [ ] noncompliance with their detention mandates," Mot. at 10, or a claim that the Secretary did not address this issue when he considered the issue at length and concluded that the "decision to terminate MPP creates no conflict with the detention authorities in Section 1225." AR33.

*Second*, Plaintiffs argue that the Secretary failed to adequately consider "MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims." Mot. 10-11. In fact, however, the Secretary "presumed … that MPP contributed to decreased migration flows," AR27, when making his decision, but "concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants …, and the way in which MPP detracts from other regional and domestic goals and policy initiatives … to manage migratory flows." *Id*. at 27. The agency explained, "MPP is not the only, and certainly not the preferred, means of tackling irregular migration" and DHS "is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration," "addressing root causes and building regional solutions," and "channeling migration through safe and orderly pathways." *Id*. at 34-35.

---

[5] The Fifth Circuit faulted the government for not raising *Chevron* deference with respect to the June 1 memorandum in its briefs filed prior to the October 29 memorandum, but that has no bearing on whether such deference is due to the October 29 memorandum.

Plaintiffs acknowledge the agency "extensively discussed conditions for migrants in Mexico," but nonetheless argue the Secretary did not adequately address "hardships befalling aliens who make the dangerous journey to the southern border." Mot. 10.[6] To the extent Plaintiffs assert that MPP deterred certain individuals without meritorious asylum claims from making the journey to the border in the first place, DHS has other avenues for quickly processing, and thereby deterring, such individuals, such as "employing expedited removal to rapidly, but humanely, return certain individuals" "[a]t the border" or "encountered unlawfully crossing between [ports of entry]," in some cases leading to these individuals being "returned to their countries within a few days of being encountered." AR35. DHS's efforts are also aimed at "providing alternative" pathways to seek protection without making what the Secretary acknowledged was an "often-dangerous journey" to the border. *Id.* at 36; *see also id.* at 37.

The memorandum also details how DHS is working with regional partners to "manage migratory flows" throughout the region and obtain agreements with other countries to "combat[ ] human smuggling and trafficking, and expanding humane enforcement efforts." AR36. This includes "working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows." *Id.* "The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups," which will "reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully." *Id.* There is thus no basis for Plaintiffs' claim that the Secretary did not consider

---

[6] Plaintiffs lack standing to assert a claim based on alleged injuries to third parties or to seek relief on this basis. *DaimlerChrysler Corp.*, 547 U.S. at 352; *see also supra* at 19-20.

harms that might be avoided by deterring individuals from making the journey to the southern border. Mot. at 10.

Plaintiffs also argue that the Secretary did not adequately address problems created by false asylum claims or how MPP addressed these problems. Mot. at 10. Plaintiffs argue that when MPP was first announced "approximately 9 out of 10 asylum claims from the Northern Triangle countries" were "non-meritorious." Mot. at 10. The Secretary also addressed this issue, noting that DHS could not identify any basis for this statistic, that the evidence in the record showed that a much higher rate of such claims were meritorious, and (as explained further below) that using MPP to discourage asylum seekers led to individuals with *meritorious* claims abandoning them and imposed additional costs that far outweighed whatever effects MPP had on non-meritorious claims. AR24-25.

Plaintiffs next explain that the "harm" they believe the Secretary should have further considered was human trafficking related to migrant flows. Mot. at 11. Plaintiffs acknowledge the Secretary did address whether "terminating MPP contributed to an increase in these crimes by looking at the data for seizures of narcotics" and noted that this data showed a decline in trafficking even while MPP was not in effect. *Id.* Plaintiffs argue that statistics related to narcotics smuggling are not necessarily indicative of trafficking activity, and that the Secretary thus failed to adequately assess whether "the implementation of MPP" reduced "the opportunities for human trafficking." Mot. at 11. The Secretary acknowledged that seizures of narcotics are not necessarily indicative of trafficking activity, but explained that it nonetheless constitutes "the best available data," and does not indicate that MPP had any effect on trafficking. AR29. Plaintiffs do not point to any other data that the Secretary should have considered on this point or that contradicts the agency's statement that the "Department also has carefully reviewed the available information and has not seen any

29

evidence that MPP had any effect on human trafficking and crime." *Id.*; *see also id.* at 28 n.102 (explaining that the Secretary reviewed the specific allegations Plaintiffs made as part of this case with respect to human trafficking).

The Secretary also considered the extensive evidence in the record of kidnappings and other crimes perpetrated on individuals waiting in Mexico as a result of MPP. AR16-17. The Secretary reviewed various news stories and reports, court documents and decisions, and prior agency assessments of MPP that detailed the substantial risk of kidnapping migrants faced while waiting for their hearings as a part of MPP, and weighed these negative consequences of continuing the program. *Id.*; *see* AR81-137, 171, 710-29, 745-828, 834, 892, 1210, 1303, 1311-79, 1431-34, 1671, 1799-1805, 1897-1916, 2609-13. The Secretary is not required to ignore these serious hardships and dangers, especially after explaining that the United States has limited ability to address this fundamental problem with MPP.

*Third*, Plaintiffs argue that the Secretary failed to adequately justify factual determinations regarding *in absentia* removal orders. Mot. 12. Here, Plaintiffs contend that the October 29 memorandum contains "completely different numbers regarding *in absentia* removal orders than those contained in the June 1 Memorandum's administrative record" but do "not explain the discrepancy." Mot. at 12. They also fault the Secretary for not addressing the Fifth Circuit's conclusion that *in absentia* removal rates were also high at certain times prior to MPP, or adequately explaining why high *in absentia* rates "is not an indicator of MPP working." *Id.* There is no merit to any of these arguments.

The memorandum expressly addresses each of these issues. The agency explained that "noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period." AR22.

30

Overall 32 percent of individuals enrolled in MPP received *in absentia* orders, while only 13 percent of comparable noncitizens outside of MPP received *in absentia* orders during the same time period—"about two-fifths of the rate of the MPP group." AR22-23. The agency also explained in detail how it had "updated its methodology" to arrive at these numbers and generate more accurate statistics, noting that it had previously omitted cases that involved an *in absentia* order if there was a subsequent motion to reopen, "thus undercounting the total number of *in absentia* orders," and had only included numbers for MPP cases that reached a final disposition, rather than *all* MPP cases, including those still pending. AR22 n.78. Plaintiffs are thus incorrect that the agency did not explain the basis for these updated numbers.

The agency also explained why the high *in absentia* rate was relevant, noting the "considerably higher" rate for MPP cases versus "comparable non-MPP cases might not, by itself, indicate a problem with MPP," but there is also substantial evidence that individuals in MPP abandoned their claims, not because they did not have valid claims, but rather because of dangerous conditions in Mexico, "including the threat of violence and kidnapping." AR24 & n. 84-85. The record contains evidence that noncitizens often abandoned their claims because of "serious threats to their personal safety," "inadequate and unreliable access to food and shelter," and because of lack of adequate notice of their hearings. *Id.*; *see* AR81-137, 171, 710-29, 745-828, 834, 892, 1210, 1303, 1311-79, 1431-34, 1671, 1799-1805, 1897-1916, 2609-13; *see also* AR44-57. And only a "remarkably low 1.1 percent" of individuals placed in MPP were granted relief or protection, a substantially lower rate of relief—"26 times" lower—than expected when compared to similar individuals not placed in MPP, lending further support to the conclusion that MPP caused individuals with potentially meritorious claims to abandon them. AR24-25.

Plaintiffs' argument that the Secretary failed to "contest the Fifth Circuit's conclusion 'that

31

*in absentia* removal rates were similar prior to MPP,'" Mot. at 12 (quoting *Texas*, 20 F.4th at 991-92), is similarly meritless. The agency specifically addressed data showing "*in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47%"—but explained "there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in [the October 29] memorandum." AR23 n.82. The *in absentia* rates discussed in the memorandum show *in absentia* orders "as a share of the *total* number of cases" while the statistics from past years addressing removal proceedings measure "*in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such orders." *Id.*; *see also* AR951-74. Recalculating those numbers as a share of total cases sent to the immigration courts in those years "yields rates of 21 percent and 20 percent … one-half the *in absentia* and termination rate found in MPP cases." AR23 n.82.

The MPP *in absentia* rate is thus substantially higher than the rates cited by the Fifth Circuit and this Court in its prior decision. That rate, combined with the evidence discussed above, further supports the conclusion that MPP led to abandonment of potentially meritorious claims. Based on this evidence, the other evidence in the record and "the Department's experience with MPP," the Secretary reasonably "determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings." AR23. "Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico … led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims." *Id*. "[T]he return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many

individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute." *Id*.

*Fourth*, Plaintiffs argue that the Secretary failed to adequately examine whether ending MPP would lead to violations of limits on parole authority. Mot. 12-18. Plaintiffs claim the "October 29 Memoranda failed to consider how terminating MPP—combined with Defendants' inability to detain all arriving aliens—leads to increased violations on parole authority." Mot. 11-12. Again, this theory simply repackages Plaintiffs' argument that a lack of detention space makes contiguous-territory return mandatory. The Supreme Court has already unambiguously rejected that reading of the statute. *Texas*, 142 S. Ct. at 2541 (rejecting contention that Congress "intended section 1225(b)(2)(C) to operate as a mandatory cure of any noncompliance with the Government's detention obligations"). Among other things, the Court recognized that, whatever the statutory limits on parole may be, "the availability of the parole option" as an alternative to MPP makes clear that lack of detention space does not require the Secretary to use MPP for individuals DHS lacks the resources to detain. *Id.* at 2543-44.

Even setting that aside, Plaintiffs' theory fails on its own terms. Plaintiffs argue that Congress has "cabined the Executive's parole authority" and that it must be used only on a "case-by-case basis," Mot. at 13, but they point to nothing showing that DHS is not doing so, and there is certainly nothing in the October 29 memorandum that says DHS plans to categorically parole individuals as an alternative to MPP. The memorandum notes that "the statute does not set any limit on the number of individuals DHS can decide to release on parole," "[n]or does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225." AR31. Instead "Congress simply required that parole decisions be made on a case-by-case basis and that they be based on 'urgent humanitarian

reasons' or 'significant public benefit.'" *Id*. Plaintiffs do not contest the statement that the statute does not define these ambiguous terms, leaving it to the agency to define them, or point to anything that contradicts that agency's explanation that it "has long interpreted the phrase "significant public benefit' to permit it to parole noncitizens 'whose continued detention is not in the public interest as determined by' specific agency officials." *Id*. at 32 (citing 8 C.F.R. § 212.5(b)(5)). The agency's consistent interpretation over multiple decades that detention is not in the public interest where, "in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community," AR32, is entitled to deference. *See also* AR158-70, 448, 990, 1240, 1399, 1471, 1580, 1590, 1819, 3568.[7]

The remainder of Plaintiffs' arguments are based on the unsupported assumption that DHS is not making parole decisions on a case-by-case basis. Plaintiffs argue, for example, that the memorandum does not adequately explain or justify DHS making categorical parole decisions or paroling *en masse*. Mot. at 13-14. But the October 29 memorandum does not say DHS will exercise

---

[7] Plaintiffs repeatedly appeal to legislative history to argue that Congress has limited DHS's authority to use parole. Mot. at 16-17. But that history cannot justify imposing limitations on parole beyond those in the statutory text. *See Azar v. Allina Health Services*, 139 S. Ct. 1804, 1814 (2019). In any event, Plaintiffs' account is misleading. They rely on the IIRIRA House Report, which objected that parole "ha[d] been used increasingly to admit entire categories of [noncitizens]"— for example, "Cuban nationals"—"with the intent that they will remain *permanently* in the United States." H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 140 (1996) (emphasis added) (cited in *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011)). Parole for that purpose is not at issue here: Inadmissible applicants for admission in removal proceedings are paroled to complete those proceedings. Moreover, the House Report is a dubious guide to interpreting Section 1182(d)(5)(A) because Congress did not enact the House's proposed constraints on parole authority, which would have tightly limited the substantive grounds for release. *See id.* at 77-78. The House largely receded to the Senate's amendment to Section 1182(d)(5)(A), which proposed essentially the current standard more broadly authorizing release to advance a significant public benefit. *See* H.R. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996) (Conference Report).

its parole authority on a categorical basis, and Plaintiffs cite no evidence that DHS is not making case-by-case determinations. They simply point to the number of individuals paroled, not evidence of how those individual decisions were made. Mot. 15. But Plaintiffs cannot dispute that "the [parole] statute does not set any limit on the number of individuals DHS can decide to release on parole." AR31.[8]

*Finally*, Plaintiffs argue that the Secretary failed to adequately consider costs to States and their reliance interests. Mot. 19-21. Plaintiffs argue "DHS devoted just a single paragraph" to "this factor," Mot. at 19, but the memorandum includes a lengthy section titled "Addressing the Concerns of States and Border Communities," AR28-30. The memorandum specifically discusses Plaintiffs' allegations that "the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs," as well as allegations it would lead to "an increase in organized crime, human trafficking, and drug cartel activity." AR28. The "Secretary takes these concerns seriously," and "sought to understand and address impacts … on communities," including "consult[ing] with numerous state and local officials across the [southwest border] about the Department's border management strategy." AR28. Plaintiffs do not cite any specific evidence

---

[8] Plaintiffs do not directly challenge DHS's use of the parole authority. But even if they had, the Fifth Circuit has held that "[t]he Attorney General's discretionary judgment regarding … parole" and "the manner in which that discretionary judgment is exercised," including "whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are "not ... subject to review." *Loa-Herrera*, 231 F.3d at 991 & n.12 (quotation marks and citation omitted); *see also Alabi v. DHS-ICE*, No. 3:19-CV-2717, 2020 WL 2529379, at *3 (N.D. Tex. Apr. 29, 2020), *report and recommendation adopted*, No. 3:19-CV-02717, 2020 WL 2527198 (N.D. Tex. May 15, 2020); *Maldanado v. Macias*, 150 F. Supp. 3d 788, 794-95 (W.D. Tex. 2015) (collecting cases). To the extent Plaintiffs' actual complaint is that neither the parole statute nor the regulation contains any numerical cap on paroles, such a claim would also be untimely, *see* 8 U.S.C. § 2401, and is an issue Plaintiffs should take up with Congress rather than this Court.

of State costs the Secretary failed to consider, arguing only generally that the Secretary should have to done more "to quantify these costs … in order to perform such a cost-benefit analysis." Mot. 19. But they cite no authority requiring the agency to quantify costs Plaintiffs cannot even specifically identify, and the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus Radio Project*, 141 S. Ct. at 1160 (noting it "is not unusual in day-to-day agency decisionmaking" for an agency to lack "empirical or statistical data").

The Secretary was clear that the agency has taken, and "will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states." AR28; *see also id*. at 28-29 (describing various steps the agency is taking to eliminate costs to border states). Among other things, DHS explained that it was pursuing "policies and practices that will more effectively and more humanely" help to "stem[] migration flows." *Id*. at 34; *see id*. at 35 ("To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach."). And the Secretary considered the potential costs the States might nonetheless incur, and determined, when weighed against the various other policy concerns and costs, that the potential costs to the States of terminating MPP and any potential benefits of continuing MPP did not outweigh the program's costs:

> [T]he fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States— many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns.

AR30. Plaintiffs may disagree with the Secretary's ultimate conclusion, but they cannot succeed

36

on a claim that the Secretary did not consider potential costs to States. The Secretary examined the relevant available evidence and his decision reflects a "rational connection between the facts found and the choice made."' *State Farm*, 463 U.S. at 43. Nothing more is required.

The same is true with respect to Plaintiffs' arguments on reliance interests. Plaintiffs argue the Secretary should have given more consideration to their reliance interests, but they do not, and never have, actually articulated what actions they took in reliance on MPP that they think must be considered. The Secretary noted that "even after his many consultations" with State and local officials, at no point was he ever made aware "of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP," and he correctly noted that "State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP." AR30. Plaintiffs do not meaningfully respond to this statement, nor have they taken the opportunity in their amended complaint or their motion to clarify what exactly it is they believe the Secretary was supposed to consider. The closest Plaintiffs come to identifying their purported reliance interests is one phrase in their motion asserting that he did not consider "the reliance interests of States in the control of the flow of aliens—as assisted by MPP." Mot. at 21. But this is merely a policy preference, not some action they took in reliance on MPP. And, in any event, the Secretary *did* consider MPP's impact on the flow of migrants. *See, e.g.* AR27 (addressing "Impact of MPP and its Termination on SWB Migration flows").

Plaintiffs also argue that "*Regents* requires DHS to actually consider Plaintiffs' … reliance interests" and that the fact that MPP was a discretionary program does not bar them from establishing reliance interests because the DACA program at issue in *Regents* was also discretionary. Mot. at 20. But cases requiring an agency to consider reliance interests have traditionally limited this requirement to new policies that would lead to some unexpected civil or

criminal liability for the regulated industry or individuals—not potential incidental effects on third parties or States. *See, e.g.*, *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974) (noting that industry reliance on past agency decisions did not limit subsequent agency action where there were no "fines or damages involved" and no "new liability sought to be imposed on individuals for past actions which were taken in good-faith reliance" on prior agency pronouncements). Plaintiffs have never argued that they were regulated by MPP, or that they have incurred some additional legal liability as a result of any actions they took in reliance on MPP.

*Regents* did not alter this rule in holding that the decision to terminate DACA did not adequately address "reliance interests of DACA recipients"—the individuals regulated by DACA and directly impacted by its rescission. 140 S. Ct. at 1914-15. There the Supreme Court identified reliance interests that are far different than the mere policy preference for MPP that Plaintiffs raise here. *See id.* (noting "need for DACA recipients to reorder their affairs" because these individuals had made decisions and commitments based on the "reliance interests engendered by DACA," and were potentially "caught in the middle of a time-bounded commitment" such as needing additional time to "graduate from their course of study, complete their military service, or finish a medical treatment regimen"). The cases on which *Regents* is based are similarly limited to regulated entities taking actions in reasonable reliance on a longstanding policy. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (addressing regulatory change that would upset "decades of industry reliance" and potentially result in "substantial" and potentially "retroactive" legal "liability"); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973) (addressing whether regulated corporation could assert reliance on longstanding agency interpretation of statute as defense to criminal liability under a new agency interpretation); *see also, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015) (describing this "constraint[ ] on agency

decisionmaking" as applying in the context of "regulated entities" with "settled reliance interests" based on "previous agency interpretations" who may now face "liability" under the agency's new interpretation or approach). The States can claim no similar reliance on MPP, which was a novel program that was only briefly in effect, not the type of long-standing agency practice that can lead to reliance interests. *See Regents*, 140 S. Ct. at 1913 (discussing "longstanding policies"); *Encino Motorcars*, 136 S. Ct. at 2126 ("decades of industry reliance"); *Bell Aerospace*, 416 U.S. at 275, 289; *Penn. Indus. Chem. Corp.*, 411 U.S. at 675.

As the Secretary noted, any claimed reliance interest is further undermined by the fact that "[*n*]*o* administration has ever done what State-plaintiffs in the litigation argue is required here— detain or return to Mexico everyone that the Department encounters along the border," and "States cannot have a reliance interest based on something that has never previously been implemented." AR30. Even while MPP was in place, it applied to only a very small percentage of noncitizens arriving at the southwest border, undermining any claimed reliance interest or allegation of costs traceable to MPP's termination, *id.*, and individuals who were discouraged from pursuing their claims because of MPP may have had meritorious claims for relief. Plaintiffs cannot claim injury from allowing individuals to seek types of relief from persecution that Congress has specifically provided them by statute, or any reliance on a program that was only briefly in place and put up significant barriers to individuals pursuing statutory rights Congress gave them. *See Arizona*, 567 U.S. at 396-97, 401-02; *cf. Penn.*, 411 U.S. at 675 ("reliance" must be "reasonable under the circumstances").

In sum, the Secretary rationally determined that there were serious questions about the effectiveness of MPP and that its intended benefits did not outweigh its many costs. The Secretary also determined that limited agency and diplomatic resources could instead be devoted to various

alternatives that will more effectively achieve the agency's goals and better align with ongoing diplomatic efforts to manage regional migration. The Supreme Court acknowledged the "significant burden upon the Executive's ability to conduct diplomatic relations with Mexico" that was created by requiring it to continue MPP. *Texas*, 142 S. Ct. at 2543 (noting the need for courts to take care to avoid "unwarranted judicial interference in the conduct of foreign policy" absent an "affirmative intention of the Congress clearly expressed" and which the Court found lacking in the context of MPP). Such diplomatic and foreign-policy considerations are inextricably interwoven with immigration policy. *See Arizona*, 567 U.S. at 396-97 ("[T]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy."); s*ee also id.* at 396 (noting agency's "broad discretion" is "[a] principal feature of the removal system"). The 43-page memorandum, supported by a 3,680-page record, provides more than adequate explanation for the decision and easily satisfies the APA's requirements for reasoned analysis. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009) (agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute [and] that there are good reasons for it").

## III.     The remaining preliminary injunction factors weigh strongly against a stay.

Plaintiffs have not shown an irreparable injury that will result absent a stay. Plaintiffs argue only generally that "MPP will impose unrecoverable costs on Plaintiffs," but do not identify any specific costs. Mot. 24. Instead they simply cite this Court's prior findings when it enjoined the June 1 memorandum. *Id*. But the burden is on Plaintiffs to show irreparable harm absent a stay and they cannot meet this burden simply by relying on a now-vacated decision addressing a separate agency action. And even if they could, the speculative, minor, wholly financial and self-inflicted

costs Plaintiffs previously identified cannot establish irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Moore v. Tangipahoa Par. Sch. Bd*., 507 F. App'x 389, 397-98 (5th Cir. 2013) ("general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" insufficient to establish irreparable harm). Notably, even though this case went to trial, Plaintiffs put forth no concrete evidence of harm or increased costs from ending MPP, nor have they done so now with respect to the October 29 memorandum. Plaintiffs have not "clearly carried their burden" to show irreparable harm absent a stay. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

Even if the Court found Plaintiffs' assertion of harm persuasive, it would still be insufficient to stay the October 29 memorandum nationwide. Plaintiffs do not assert harm beyond the Plaintiff States, nor could they. *Cf. Morice v. Hosp. Serv. Dist. #3*, No. CV 18-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (plaintiff "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit"); *Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017) (refusing to "consider irreparable harm to third parties"); *Wooten v. BNSF Ry. Co.*, 2017 WL 1089546, at *1 (D. Mont. Mar. 21, 2017) ("harms alleged against third parties are not relevant to the irreparable harm prong"). Article III demands that a remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018); *see also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). A stay, like an injunction, thus must be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Since MPP was only implemented at the border, even if Plaintiffs did establish irreparable harm, any relief should be limited to the Texas border. *See* 5 U.S.C. § 705 (authorizing a stay only "to

the extent necessary to prevent [the] irreparable injury"); *cf. California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" and narrowing relief "to the plaintiff states").

"Principles of judicial restraint" also require limiting relief to the Plaintiff States where, as here, "[o]ther courts are considering these same issues," and "many states that have not brought suit may well have accepted and even endorsed the" agency's action. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021); *see West Virginia v. DHS*, No. 2:21-cv-22 (D. W.Va.) (challenging ending of MPP); *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz.) (same); *MCIR v. DHS*, No. 1:20-cv-3438 (D.D.C.) (same). "[I]n cases challenging federal administrative actions, similarly situated parties may well have extremely *dissimilar* views on whether they are helped or harmed by a federal policy." *Georgia v. President of the United States*, --- F.4th ----, 2022 WL 3703822, at *16 (11th Cir. Aug. 26, 2022). And these dissimilar views "'encourage[] multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids this Court's own decisionmaking process.'" *Louisiana*, 20 F.4th at 264 (quoting *New York*, 140 S. Ct. at 600 (Gorsuch, J, concurring)); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) (explaining that nationwide relief "prevent[s] legal questions from percolating through the federal courts, encourage[es] forum shopping, and mak[es] every case a national emergency for the courts and for the Executive Branch"); *see, e.g., Georgia*, 2022 WL 3703822, at *16 ("When, as here, a regulatory challenge involves important and difficult questions of law, it is especially vital that various courts be allowed to weigh in so that the issues can percolate among the courts") Thus, "nonuniformity is a deliberate feature of our federal court system, and Congress—not one of the 94 federal district courts or 12 regional circuit courts—is best positioned to choose when to depart from that norm." *Id.*; *see also Arizona v. Biden*, 40 F.4th

375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

Moreover, even if Section 1252(f) does not bar relief under Section 705 outright, Section 705 does not authorize a nationwide stay except to the extent necessary to redress Plaintiffs' injury. Section 705 permits relief only "to the extent necessary to prevent irreparable injury" to the *parties*, and, as explained, the APA reinforces remedial limitations like those in Section 1252(f)(1) by providing that "[n]othing" in the APA right of review "affects other limitations on judicial review," the "duty of the court to … deny relief on any other appropriate legal or equitable ground," or "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702(1), (2). Thus, even if the Court reads an order under Section 705 to function as a stay rather than an injunction, Section 1252(f) would still bar an order issuing such a stay nationwide, rather than just to the parties before the Court. The House Report prepared in advance of the APA's enactment further makes clear that "[t]he authority granted is equitable" and "[s]uch relief would normally … *be limited to the parties complainant*." H.R. Rep. No. 79-1980, at 44 (1946) (emphasis added).

The balance of equities also weighs strongly against granting a stay. Plaintiffs' asserted injury cannot outweigh the harm to Defendants or the public interest from continuing a program that the Secretary has found ineffectual and counterproductive. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As with their argument on irreparable harm, Plaintiffs argue the balance of equities and public interest favor them simply by reference to this Court's prior findings when entering a permanent injunction, and argue the government's interests are lessened here because the government does not now have to rebuild infrastructure or negotiate with Mexico to restart MPP. Mot. 24-25. But implementation of MPP required constant and ongoing coordination and negotiation with Mexico that detracted from other diplomatic initiatives

43

to manage the flow of migrants, "diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." AR3.

The Supreme Court has now emphasized, once again, that courts should give great weight to potential foreign affairs consequences and take great care to avoid "the danger of unwarranted judicial interference in the conduct of foreign policy." *Texas*, 142 S. Ct. at 2543 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013)). This is equally true in the immigration context where the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Texas*, 142 S. Ct. at 2543 (quoting *Arizona*, 567 U.S. at 397). As the Supreme Court explained, requiring the agency to continue using MPP "imposed a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico," in part because "MPP applies exclusively to non-Mexican nationals who have arrived at ports of entry that are located in the United States" and DHS "therefore cannot unilaterally return these migrants to Mexico." *Id.* (quotation marks and citation omitted). Further weighing in Defendants' favor and against a stay is the now even greater record of evidence showing the harm that was caused by MPP, including how it prevented migrants from pursuing relief that Congress specifically authorized by statute, and subjected migrants to crime, violence, and kidnapping while waiting in Mexico to attend their hearings. *See supra* at 29; AR81-137, 171, 710-29, 745-828, 834, 892, 1210, 1303, 1311-79, 1431-34, 1671, 1799-1805, 1897-1916, 2609-13.

Challenges to DHS's discretion on how best to enforce immigration law "invade a special province of the Executive." *AADC*, 525 U.S. at 489. A stay preventing DHS from ending a discretionary program would thus interfere with a core constitutional power conferred on the Executive, which itself establishes irreparable harm. *See, e.g., Adams v. Vance*, 570 F.2d 950, 954

44

(D.C. Cir. 1978). Accordingly, a stay preventing DHS from ending MPP would cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken*, 556 U.S. at 435. The balance of equities clearly favors Defendants.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion to postpone the effective date of the October 29 memorandum.

Dated: September 2, 2022                Respectfully submitted,

CHAD E. MEACHAM                    BRIAN M. BOYNTON
*United States Attorney*              *Principal Deputy Assistant Attorney General*

BRIAN W. STOLTZ                    WILLIAM C. PEACHEY
*Assistant United States Attorney*        *Director*
                              Office of Immigration Litigation
                              District Court Section

                              BRIAN C. WARD
                              *Senior Litigation Counsel*

                              JOSEPH A. DARROW
                              *Trial Attorney*

                              /s/ *Erez Reuveni*
                              EREZ REUVENI
                              Assistant Director
                              U.S. Department of Justice
                              Civil Division
                              Office of Immigration Litigation
                              District Court Section
                              P.O. Box 868, Ben Franklin Station
                              Washington, DC 20044
                              Tel.: (202) 307-4293
                              Email: erez.r.reuveni@usdoj.gov

                              *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 2, 2022, I electronically filed this response with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Erez Reuveni
U.S. Department of Justice
