**FILED**

**September 7, 2022**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **2:21-CV-067-Z** |
| | § | |
| **JOSEPH R. BIDEN, JR.,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

***AMICI CURIAE'S* MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION**

## <u>TABLE OF CONTENTS</u>

**ARGUMENT** ..................................................................................................................3

    I.    The Public Interest Strongly Favor
Denying Plaintiffs' Requested Stay .................................................................4

        1.    Remain in Mexico Harms Children
and Separates Families.............................................................................5

        2.    Remain in Mexico Enables Human Trafficking ........................................8

        3.    Remain in Mexico Heightens Risks
to the Most Vulnerable Migrants ............................................................11

        4.    Remain in Mexico Endangers Black Migrants .........................................13

        5.    Remain in Mexico Disadvantages
Indigenous Language Speakers................................................................13

        6.    Remain in Mexico Impedes Fair Hearings ...............................................15

        7.    MPP 2.0 Continued to Return Vulnerable Individuals
Who Should be Exempted from the Program ...........................................17

        8.    Barriers to Access to Counsel and Language
Access Persist Under MPP 2.0................................................................19

        9.    Migrants Continue to Face Serious Danger in Mexico.............................21

    **CONCLUSION**....................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Affinity Healthcare Servs., Inc. v. Sebelius*,
   720 F. Supp. 2d 12 (D.D.C. 2010) ...................................................................3

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985) ........................................................................3

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
   760 F.2d 618 (5th Cir. 1985) ...........................................................................4

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) ...........................................................................3

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) .........................................................................................4

*Winter v. Na'l. Res. Def. Council, Inc.*,
   555 U.S. 7, 24 (2008) .......................................................................................4

### <u>Statutes</u>

8 U.S.C. § 1182(d)(11) .............................................................................................5

Pub. L. No. 106-386 § 1513(a)(2)(A), 114 Stat. 1533................................................9

*Amici* are 23 nonprofit organizations that serve noncitizens and defend their rights. *Amici* include both national advocacy organizations and local direct service providers who aid and advocate for migrant families. *Amici* have a strong interest in the rights and welfare of noncitizens arriving at the southwest border, including those who have been and may be subject to "Migrant Protection Protocols" ("MPP" or "Remain in Mexico"). *Amici* supplement Defendant's brief by presenting information within their expertise demonstrating the harms that Remain in Mexico has caused and the public interest in denying Plaintiffs' requested stay.

Justice Action Center ("JAC") is a nonprofit organization dedicated to advancing the civil and human rights of immigrants through a combination of impact litigation and storytelling. It provides support to select nonprofit organizations that have immigrant members or provide direct legal services to immigrant communities. As an organization litigating on behalf of immigrant communities in numerous jurisdictions nationwide, with active litigation on Remain in Mexico, JAC has a strong interest in the ability of noncitizens to access legal process in safety.

Refugee and Immigrant Center for Education and Legal Services (RAICES) is a nonprofit organization headquartered in San Antonio, Texas. RAICES's mission is to promote justice by providing robust legal services, social programs, bond assistance, and advocacy to support underserved migrant children, families, and refugees in Texas. In 2020, RAICES closed approximately 51,000 cases at no cost to the client. RAICES's Legal Department provides affirmative, defensive, and litigation services. As part of these programs and services, RAICES actively represents migrants subjected to Remain in Mexico.

In addition to JAC and RAICES, the following join as *amici*:

ADL (Anti-Defamation League)
Asylum Seeker Advocacy Project (ASAP)
Central American Resource Center of Northern CA - CARECEN SF
DMRS

Espacio Migrante
Florence Immigrant & Refugee Rights Project
HIAS
International Refugee Assistance Project
Justice For Our Neighbors North Central Texas
Justice in Motion
Kids in Need of Defense (KIND)
Las Americas Immigrant Advocacy Center
National Council of Jewish Women
National Justice For Our Neighbors
Quixote Center
Save the Children
Tahirih Justice Center
Unitarian Universalists for Social Justice
Witness at the Border
Women's Refugee Commission
Worldwide Documentaries, Inc.

This Court has not yet had the opportunity to consider the Department of Homeland Security's October 29, 2021 Memoranda, including its conclusions that Remain in Mexico was rife with "endemic flaws," "imposed unjustifiable human costs," and "fail[ed] to provide the fair process and humanitarian protections that individuals deserve under the law."[1] Indeed, it is undeniable that Remain in Mexico perpetuated a humanitarian crisis at the southwest border. *Amici* bear witness to those human costs, which must not be discounted in Plaintiffs' quest to expedite an imposition of their preferred immigration policy on the asserted basis of a stale record and vacated judgment. The consequences of those errors could be devastating. As shown below, the stories of those suffering under the reinstated policy compel the conclusion that Remain in Mexico is not only unwarranted, it is also inhumane. For the reasons *amici* explain, Plaintiffs' request for a stay should be denied.

---

[1] https://www.dhs.gov/news/2021/10/29/dhs-issues-new-memo-terminate-mpp, accessed Sept. 1, 2022.

## ARGUMENT

Plaintiffs ask this Court to issue a "stay" of the October 29 Memoranda that terminated Remain in Mexico. Plaintiffs have made no showing that would justify this extraordinary relief. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) ("[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.") (citation omitted); *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) ("Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief.") (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)).

Defendants thoroughly explain why Plaintiffs are unlikely to prevail on the merits and how Plaintiffs have entirely failed to substantiate any threat of injury absent a stay; *amici* will not repeat those arguments here. ECF No. 163 at 40-41. *Amici* instead address the final factor the Court must consider in determining whether to grant Plaintiffs' request for a stay, relating to the public interest. This factor is particularly significant to *amici* because of the harm the requested stay could have on the vulnerable immigrant communities whom *amici* serve.

Plaintiffs' sole argument relating to the public interest rests on two deficient assertions. First, Plaintiffs point to what is now a vacated judgment that assessed a different administrative action, different legal challenge, and different set of facts. ECF No. 149 at 25, citing ECF No. 94 at 50. Second, Plaintiffs erroneously assert that "MPP is currently operational[.]" But this is simply not true. ECF No. 163 at 16.

Plaintiffs fail to address that Remain in Mexico undermines due process, enables human trafficking, separates families, heightens threats faced by particularly vulnerable groups, and

subjects thousands of people to unjustifiable risk of danger and death. These flaws have proven to be unavoidable despite changes made to the program following this Court's now-vacated injunction. ECF No. 147. Ultimately, the inescapable features of this program undermine the United States' powerful interest in the rule of law and human rights. Any effort to "postpone" the ongoing winddown of this grotesque program would gravely damage the public interest.

## I. THE PUBLIC INTEREST STRONGLY FAVORS DENYING PLAINTIFFS' REQUESTED STAY

The public interest strongly favors denying Plaintiffs' request for extraordinary relief given the unjustifiable human cost it would impose. When evaluating whether to grant relief such as a stay or an injunction, both the Supreme Court and the Fifth Circuit have emphasized the importance of considering the broader consequences on nonparties when weighing the public interest. *See Winter v. Na'l. Res. Def. Council*, Inc., 555 U.S. 7, 24 (2008) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (*citing Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625–26 (5th Cir. 1985) (noting "judicial concern about the impact of legal decisions on society as a whole" and looking "beyond the immediate interests of the named litigants" when considering the public interest).

As discussed in depth below, not only is Remain in Mexico a failure on its own terms, but it also severely undermines the public interest in safety, family unity, and fair legal process. From the start of Remain in Mexico in 2019 through February 19, 2021, "there were at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against asylum seekers and migrants forced to return to Mexico" under this program that purports to provide "[p]rotection." *Forced Returns to Mexico: At Least 1,544 Publicly Reported Cases of Murder, Rape, Torture, Kidnapping & Other Violent Assaults*, Human Rights First (Feb. 19,

2021).[2] Moreover, because so many asylum seekers already have family here, this brutality reverberates through communities throughout the United States as well. Given these enormous human costs, the public interest weighs heavily in denying Plaintiffs' request for a stay.

### 1. Remain in Mexico Harms Children and Separates Families

Remain in Mexico has delivered thousands of children into danger and has separated families. *"Like I'm Drowning" Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Human Rights Watch (Jan. 6, 2021).[3] Undoubtedly, the separation of families undermines the public interest. *See*, *e.g.*, 8 U.S.C. § 1182(d)(11) (Immigration and Nationality Act "family unity" provision for the waiver of inadmissibility recognizing that "assur[ing] family unity" is in the public interest). "Vast scientific evidence suggests separation from parents is among the most impactful traumatic experiences that a child can have."[4]

For example, **Jonathan**,[5] a young man escaping violence in El Salvador entered the United States with his wife **Daya**, who was seven months pregnant. Separating them, DHS admitted Daya

---

[2] https://www.humanrightsfirst.org/campaign/remain-mexico, accessed Sept. 1, 2022.

[3] https://www.hrw.org/report/2021/01/06/im-drowning/children-and-families-sent-harm-us-remain-mexico-program, accessed Sept., 1, 2022.

[4] Cristina Muñiz de la Peña et al., Working with Parents and Children Separated at the Border: Examining the Impact of the Zero Tolerance Policy and beyond, 12 J. of Child & Adolescent Trauma 153-64 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7163859/, accessed Sept. 1, 2022.

[5] *Amici* have used pseudonyms for all individuals whose stories are shared in this brief. *Amici* extend their gratitude to the many organizations that provided information and client stories for this brief: Cara Pro Bono Project; Catholic Legal Immigration Network, which provided the stories of Jonathan and Daya; Civil Rights Education and Enforcement Center; Detention & Deportation Project at Hofstra University; Diocesan Migrant & Refugee Services; HIAS, which provided the stories of Iris, Rosa, Edwin, Daniel, Victor, and Benjamin; Human Rights First, which provided the stories of Gisela, Gloria, Teresa; Immigrant Defenders Law Center, which provided the stories of Isabel, Chepo, and Raquel; Jewish Family Services of San Diego; Kids in Need of Defense (KIND); Las Americas Immigrant Advocacy Center, which provided the story of Gabriel; The Legal Aid Society in NYC; RAICES's Detained Unaccompanied Children Services Unit and Pre-Removal Unit, which provided the stories of Mario, Roberto, Ian, Hugo, Marvin, and Angel;

but returned Jonathan to Ciudad Juarez alone. In shock, Jonathan could not stop crying following the separation. "How could they do this to me? Why would they separate us? I promised to always take care of her... that I would always be there for her. We are going to have a girl," he said.

Remain in Mexico also separates children from family members—often as a direct result of the violence inherent in being forced to wait in dangerous border cities. Kids in Need of Defense ("KIND"), *Forced Apart: How the "Remain in Mexico" Policy Places Children in Danger and Separates Families* (Feb. 24, 2020).[6] In some cases, when their parent or guardian is kidnapped, harmed, or otherwise disappears, these children are left in Mexico without anyone to care for them. *Id*. In search of safety, they return to the U.S. border as unaccompanied children. *Id*. Not only do family separations cause untold trauma for children and their parents, but they impair the children's ability to present effective claims for immigration relief in their proceedings. *Id*.

**Mario** is a Honduran minor who was forced to flee his country. Following an arduous journey, Mario and his father **Roberto** attempted to seek safety in the United States. Customs and Border Protection ("CBP") detained them and—without explanation of the program or what was happening to them—enrolled them in Remain in Mexico and returned them to Nuevo Laredo.

Only about four days after being sent back to Mexico, a truck full of cartel members attempted to capture Mario and Roberto. Mario ran, but when he looked back, the gang members and his father were gone. This was the last time Mario saw or heard from his father.

Alone and fearing for his life if he stayed in Nuevo Laredo, Mario fled further into Mexico's interior. He had none of the documentation that CBP had given his father about MPP,

---

Taylor Levy Law; Texas Civil Rights Project, which provided the story of Gloria; UnLocal, Inc., which provided the stories of Carlos and Oscar; and The Young Center for Immigrant Children's Rights, which provided the stories of Juan and Johanna.

[6]     https://supportkind.org/wp-content/uploads/2020/02/MPP-KIND-2.24updated-003.pdf, accessed Sept. 1, 2022.

nor had he been provided any information about any hearing dates. So, after working for months to save enough money for another journey, Mario entered the U.S. by himself in September 2020. CBP detained him and designated him an unaccompanied minor. This was the first time Mario learned that—having never received any knowledge of proceedings—he had an *in absentia* removal order because he missed his MPP hearing.

In other cases, the violence inherent in Remain in Mexico forces some parents to make the gut-wrenching decision to separate from their children as the only way to save their lives. **Juan**, a five-year-old Honduran boy who became sick and was kidnapped in the Matamoros encampment, exemplifies this danger characteristic of Remain in Mexico.

Juan's mother **Johanna** was sold to and raped by a human trafficker as a child. She escaped after four years and gave birth to Juan, her joy. Johanna's sole mission became protecting Juan from the abuse she experienced as a child. So, in October 2019, they fled violence in Honduras for the U.S.—but, under Remain in Mexico, they were instead returned to wait in Matamoros.

The camp where they sought refuge was in an area controlled by a Mexican cartel. One day when Juan and Johanna neared the camp after going to a local store, a group of men attempted to kidnap Johanna. In narrowly escaping, Juan was injured, scarring his face. Over time, Juan grew sick and lost his appetite, but medical treatment was unavailable to him in Matamoros. Then, Juan and Johanna were kidnapped and held for two months. After being released, with no other option to save her child, Johanna made the agonizing choice to send Juan to the U.S. border alone to seek protection as an unaccompanied minor. Following the pain of their separation and the trauma he had survived, Juan constantly cried, called for his mother to return, and wet the bed at night.

These stories are common and inevitable because Remain in Mexico compels vulnerable people to remain in indisputably dangerous locations—many of which are on the State

Department's Do Not Travel list due to crime and kidnapping.[7] "[K]idnappings and attacks are frequently perpetrated by cartels that exercise control over territory in Mexico and target asylum seekers and migrants for kidnappings, extortion, and other attacks, often with the complicity of Mexican police and immigration officers." *Any Version of "Remain in Mexico" Would be Unlawful, Inhumane, and Deadly*, Human Rights First, at 2 (Sept. 2021).[8] Migrants in particular are obvious and vulnerable targets for abuse and violence at the border. *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, Human Rights Watch (July 2, 2019).[9]

## 2.    Remain in Mexico Enables Human Trafficking

Remain in Mexico originally promised to reduce human trafficking and protect vulnerable populations. DHS, *Migrant Protection Protocols* (Jan. 24, 2019) ("MPP will help . . . decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations . . . ").[10] In practice, Remain in Mexico has the opposite effect, exposing people to unconscionable risk of kidnapping, trafficking, and rape. Remain in Mexico exacerbates the trafficking of migrants at the southern border. "Human Rights First tracked over 1,500 public reports of rape, kidnapping, torture, trafficking, and other crimes carried out against asylum seekers and migrants sent back to Mexico under RMX."[11]

---

[7] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html, accessed Sept. 1, 2022.

[8] https://www.humanrightsfirst.org/sites/default/files/MPPUnlawfulInhumaneandDeadly.pdf, accessed Sept. 1, 2022.

[9] https://www.hrw.org/sites/default/files/report_pdf/us_mexico0719_web2.pdf, accessed Sept. 1, 2022.

[10] https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols, accessed Sept. 1, 2022.

[11] https://www.humanrightsfirst.org/sites/default/files/ShamefulRecord.pdf, accessed Sept. 1, 2022.

The public interest is undermined by such a program. Indeed, Congress has recognized that "offering protection to victims" of "trafficking of [noncitizens]" is "in keeping with the humanitarian interests of the United States." Pub. L. No. 106-386 § 1513(a)(2)(A), 114 Stat. 1533.

When CBP officials returned **Gisela**, a 28-year-old-asylum seeker from Honduras, to Ciudad Juárez from the El Paso port of entry, a trafficker kidnapped her as she left a Mexican migration office. For three unbearable months, she was raped and forced into sexual slavery. Gisela managed to escape, but only when one of her captors offered to assist her to leave in exchange for sex. She hid at a Juárez church shelter after her brave escape, but even then men continued to stalk the church in search of her.

**Carlos** and his toddler **Oscar** fled political persecution in Venezuela and were placed in MPP in September 2019. While forced to wait in Mexico, Carlos accepted a job from a man who turned out to belong to a drug cartel. The cartel trafficked Carlos, threatening to sell Oscar on the black market if Carlos didn't work 17-hour days without pay fixing cars for the cartel. Terrified of the fate awaiting Oscar, Carlos did as he was told. Doing his best to keep Oscar safe while working grueling hours for dangerous people, Carlos put Oscar to sleep in dirty cars while he worked, until he was able to escape with his son.

At his first MPP court appearance and following a non-refoulement interview (to address potential persecution), the government still sent Carlos and his son back to Mexico despite clear evidence of trafficking. Terrified, Carlos and Oscar went into hiding. Both Carlos and Oscar are deeply affected by the trauma they survived and continue to suffer from Remain in Mexico.

Unfortunately, Carlos and Oscar are not alone in having experienced this kind of terror. In July 2019, **Iris** and her 11-year-old daughter **Rosa** entered the U.S. through El Paso, Texas and presented themselves to CBP. Having experienced violence in both their home country of

9

Honduras and traveling through Mexico, Iris told CBP she feared returning to both places. CBP nonetheless returned Iris and her daughter to Mexico under MPP.

In Mexico, there was no food, shelter, or humanitarian relief available for them. Iris and Rosa did their best to survive, but—as they were recognizable as migrants and easy targets—locals began harassing and threatening them at gunpoint. Months of stalking forced Iris and Rosa into hiding until their MPP court date. At her next MPP hearing, Iris again stated she was afraid to return to Mexico, but still was not given a fear interview and was again returned. Just days later, Iris and Rosa were abducted. While in captivity, Iris was violently raped in the same room as her young daughter. Trying to minimize Rosa's trauma, Iris told Rosa to hide and cover her ears.

After four days, Iris saw an unlocked door and escaped with Rosa, immediately fleeing to the United States to present themselves to CBP and seek safety. Iris again disclosed her fear of returning to Mexico—and both Iris and Rosa recounted their kidnapping to the asylum officer. Iris's request to be removed from MPP was denied, and again CBP returned them to Mexico.

Less than a week later, Iris was recaptured by her previous abductors. This time, she was able to save Rosa by helping her hide before the attackers broke into their home at gunpoint. The kidnappers abducted Iris, but not Rosa, taking her to a warehouse where she was sex trafficked and gang raped. After another courageous escape, Iris's agony and worry were tempered when she learned that Rosa had managed to flee to the United States as an unaccompanied minor.

Between the trauma they suffer and the horror they witness, the true scale of violence inflicted upon those subjected to Remain in Mexico is unknown—but it is surely greater than the unconscionable volumes of harm that have already been documented.

### 3.      Remain in Mexico Heightens Risks to the Most Vulnerable Migrants

Despite offering to exclude "individuals from vulnerable populations,"[12] Remain in Mexico routinely endangers the most vulnerable individuals among us—including pregnant women, mothers with infants, individuals with disabilities or health conditions, and LGBTQ individuals. See, *e.g.*, *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, Human Rights Watch at 30–33 (July 2, 2019) (describing vulnerable populations as "likely to face greater challenges" at the border and in the asylum process).[13] Indeed, the U.S. State Department has documented pervasive violence against women, LGBTQ individuals, and people with disabilities. U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Mexico*.[14]

For instance, DHS returned **Gloria**, an asylum seeker from Honduras, to Matamoros under Remain in Mexico. In retelling her experience, she shared stories of the abuse she suffered in Mexico because she is a lesbian. For example, a few blocks from the makeshift tent camp in Matamoros where she stayed, passers-by who discovered she was a lesbian hit her in the face, busting her lip. On another occasion, men at the camp threatened to rape her, saying they would "teach us [lesbians] to like men."

Additionally, the "Guiding Principles" implementing Remain in Mexico assured that noncitizens with known physical or mental health issues were "not amenable" to being returned under the program.[15] Despite this express policy purporting to exempt individuals with health

---

[12] https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols, accessed Sept. 1, 2022.
[13] https://www.hrw.org/sites/default/files/report_pdf/us_mexico0719_web2.pdf, accessed Sept. 1, 2022.
[14] https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/mexico/, accessed Sept. 1, 202.
[15] https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf, accessed Sept. 1, 2022.

issues, members of this vulnerable group frequently have been returned to Mexico, exacerbating the danger they already face.

**Teresa**, a 27-year-old asylum seeker, survived beatings and torture by members of a Nicaraguan paramilitary force. In addition to post-traumatic panic attacks, Teresa sustained severe back injuries. The lasting damage was so serious that, while in CBP custody after fleeing to the United States, Teresa required a wheelchair and treatment by a CBP physician. Although this obvious physical health issue, known to CBP, should have led to her exemption from Remain in Mexico, she was nonetheless returned to Mexico under the program.

As these and other stories demonstrate, Remain in Mexico not only fails to exempt or protect vulnerable populations—it exposes them to even greater harm. *See also Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process*, at 9–10 (Aug. 2019)[16]; Jessica Eller et al., *Migrant Protection Protocols: Implementation and Consequences for Asylum Seekers in Mexico*, 218 U. Tex. Austin Strauss Ctr. Int'l Sec. & l. 26 (May 2020);[17] Adam Gabbatt, *'Like a child': the disabled migrant stranded and alone in Mexico*, The Guardian (Jul. 28, 2019).[18]

### 4.    Remain in Mexico Endangers Black Migrants

Black migrants are especially vulnerable to violence, targeted abuse, and racism while forced to Remain in Mexico. *See*, *e.g.*, S. Priya Morley et al., *"There is a Target on Us"* – *The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021) at 46

---

[16] https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019%20.pdf, accessed Sept. 1, 2022.

[17] https://repositories.lib.utexas.edu/handle/2152/81991, accessed Sept. 1, 2022.

[18]https://www.theguardian.com/us-news/2019/jul/27/mexico-disabled-migrant-stranded-trump?CMP=Share_iOSApp_Other, accessed Sept. 1, 2022.

(explaining that "the racism, as well as xenophobia and gender-based discrimination, in Mexico continues to impact African and other Black migrants in the country").[19]

**Isabel**, an Afro-Cuban woman with epilepsy, is a survivor whose story illustrates the well-documented experience of anti-Black racism migrants often experience in Mexico. Having been persecuted by authorities in Cuba because she is a lesbian, Isabel fled for safety in the United States. In December of 2020, she was placed in MPP and returned to Mexico. Isabel confronted regular racist intimidation, homophobic slurs, and violent threats during her time in Mexico. For nearly a year and a half, Isabel was stuck and in danger from routine threats and discrimination in Mexico because she is Black and LGBTQ. *See also* Jonathan Blitzer, *How the U.S. Asylum System is Keeping Migrants at Risk in Mexico*, The New Yorker (Oct. 1, 2019) (telling the story of Tania, a Black indigenous migrant who experienced regular public abuse under Remain in Mexico).[20]

### 5.    Remain in Mexico Disadvantages Indigenous Language Speakers

Indigenous language speakers in particular suffer compounded harm under Remain in Mexico. While MPP focuses most of its language access resources on Spanish-speaking migrants, at least 40 languages are spoken among Remain in Mexico enrollees. TRAC, *40 Languages Spoken Among Asylum Seekers with Pending MPP Cases* (Apr. 26, 2021).[21] For indigenous language speakers who are not fluent in Spanish, an additional layer of vulnerability is created because of language barriers, cultural differences, and discrimination. *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *2020 Country Reports on Human Rights Practices: Mexico* (2021) ("[I]ndigenous women were among the most vulnerable groups in society. They often experienced

---

[19] https://imumi.org/attachments/2020/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf, accessed Sept. 1, 2022.

[20] https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico, accessed Sept. 1, 2022.

[21] https://trac.syr.edu/whatsnew/email.210426.html, accessed Sept. 1, 2022.

racism and discrimination and were frequently victims of violence").[22] This creates additional hardship for indigenous language speakers' safety and survival in Mexico.

**Ian** fled Guatemala with his five-year-old son **Hugo**. After Ian and Hugo entered the United States, CBP took them into custody and interviewed Ian. Ian told them he spoke Quiche and asked for an interpreter, but they refused and proceeded in Spanish, which Ian does not understand fluently. As Ian described: "The CBP officer asked me if I had fear of returning to Guatemala. Since they did not provide me with a Quiche interpreter, . . . I did not understand how they used the word 'fear'. [] They also did not ask if I had fear to return to Mexico. [] I told them there was danger in my country, that we were running for our life from political threats [and] I would die if I returned. They did not explain anything to me."

CBP took them to Tijuana by bus and left them there without any resources or shelter. There, Ian and Hugo were stopped and held in a car by Mexican police officers who extorted them, beat Ian, then threw him out of the car and threw Hugo on top of him. Ian reported the police brutality to his Immigration Judge at his next hearing and said that he was afraid to return to Mexico. Nonetheless they were both returned to Mexico.

### 6.    Remain in Mexico Impedes Fair Hearings

Ultimately, the dangers inherent in being forced to wait in unsafe Mexican border towns directly undermines immigrants' ability to fairly and effectively pursue their claims for immigration relief. Human Rights First, *Fully End the Migrant Protection Protocols: Ensure Safety for All Subjected to Horrific Policy*, at 1-5 (Apr. 2021).[23] Being in Mexico often causes

---

[22] https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/mexico/, accessed Sept. 1, 2022.
[23] https://www.humanrightsfirst.org/sites/default/files/FactsheetFullyEndMPP.pdf, accessed Sept. 1, 2022.

migrants to miss MPP hearings, and therefore, receive *in absentia* removal orders, as they are victimized and kidnapped. *Id*. As a former asylum officer who participated directly in Remain in Mexico stated, "the implementation is calculated to prevent individuals from receiving any type of protection or immigration benefits in the future." *Email from Asylum Officer to USCIS Management, After August 8, 2019 Meeting with Management Concerning the Officer's Refusal to Participate in the Migrant Protection Protocols (Remain in Mexico) Program* at 3 (Nov. 12, 2019).[24] Remain in Mexico creates cruel circumstances that often result in severe miscarriages of justice. Alyssa Isidoridy, et al., *Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process*, Human Rights First (Aug. 2019).[25]

For example, fleeing violence and political and religious persecution in Honduras, **Marvin** crossed the border with his five-year-old son **Angel** through the river in Piedras Negras. After being detained for six days in the United States, they were enrolled in Remain in Mexico and released in Nuevo Laredo with a MPP hearing notice. The same day they were returned to Mexico, cartel members kidnapped Marvin and Angel. For four days, the kidnappers tortured Marvin until he gave them his sister's phone number. After a few more days and his sister's ransom payment, Marvin and Angel were finally released only to be kidnapped again while awaiting their hearing. This time, they were held for six days before escaping. Compounding the trauma, they missed their MPP hearing because they were abducted and thus were ordered removed *in absentia*.

Similarly, **Chepo** and his minor daughter **Raquel** fled El Salvador, where Chepo faces continuing threats, to seek asylum in the United States. They presented themselves at the U.S.-

---

[24] https://www.washingtonpost.com/context/read-the-email-former-asylum-officer-blasts-trump-s-remain-in-mexico-policy/bd0e07ea-2b91-4d5b-9bc1-4fb01500359a/?itid=lk_inline_manual_7, accessed Sept. 2, 2022.
[25] https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019%20.pdf, accessed Sept. 2, 2022.

Mexico border on February 26, 2019 and were detained for about two days before CBP returned them to Mexico. They were not provided any resources or support for their survival, safety, or welfare. In Mexico, Raquel became gravely ill. A doctor at a local pharmacy advised that Raquel needed a CT scan or an ultrasound, which were only available at the local hospital. However, the hospital refused to provide them service because they were not Mexican citizens or residents. Raquel's condition worsened. Her stomach pain was so severe that she cried for two or three days straight and began vomiting. They returned to the hospital but were again refused services.

Faced with a Hobson's choice, Chepo made the agonizing decision to bring Raquel back to El Salvador to get her the care that would save her life. The doctors in El Salvador who performed emergency surgery on Raquel told Chepo that she had nearly died from necrotizing pancreatitis. As a result, they missed their MPP hearing and received an *in absentia* removal order.

These and thousands of other accounts of violence under Remain in Mexico "are not isolated events, but amount to systematic trends." Tom K. Wong, *Seeking Asylum: Part 2*, U.S. Immigration Policy Center, at 9 (Oct. 29, 2019).[26] They illustrate the "significant and unjustified human cost" of MPP articulated in the October 29 Memoranda that this Court has yet to consider.

### 7. MPP 2.0 Continued to Return Vulnerable Individuals Who Should be Exempted from the Program

Acknowledging that the original MPP exemption categories were too narrowly constructed and applied, DHS added classes of particularly vulnerable migrants that officers are instructed to exempt from MPP 2.0. Memorandum from U.S. Dep't of Homeland Security on Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols, at 4-5 (Dec.

---

[26] https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf, accessed Sept. 2, 2022.

2, 2021)("Policy Guidance").[27] Migrants exempted from MPP 2.0 are those "with a known mental or physical health issue, including a disability or a medical condition related to pregnancy"; those with "particular vulnerabilities given their advanced age"; and those "at increased risk of harm in Mexico due to their sexual orientation or gender identity." *Id*. In practice, however, these MPP 2.0 exemptions were narrowly and inconsistently applied. As a result, migrants who should be exempted from MPP 2.0 because of a particular vulnerability are returned to danger in Mexico.

**Edwin**, a young man from Nicaragua born with cognitive disabilities that make speech and comprehension difficult, is one example. At 22-years-old, Edwin was detained while trying to reach his mother, who was in the U.S. In the ten days he was detained, he was denied access to personal hygiene items and a shower. He was also not allowed to call his mother or a lawyer.

Edwin was put into MPP 2.0 and returned to Matamoros. Because of his disability, he did not understand the information provided to him regarding his upcoming court hearings, but managed to figure out his first hearing date. On his way to court in early March 2022, he and three other men in MPP 2.0 were kidnapped. The kidnappers tortured the men for about seven days. Having missed their hearings, all men were ordered removed *in absentia*.

Upon escape, Edwin and the other men found themselves in Monclova, Coahuila—over three hundred miles from Matamoros—and were too afraid to report their kidnapping to the police because of the threats the kidnappers had made. They were, however, able to find contact information for a nonprofit organization, which they called and told what had happened to them. Edwin explained he had not been able to find a lawyer, and he expressed that he was desperate and

---

[27] https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf, accessed Sept. 2, 2022.

terrified. Since that call, the nonprofit staff has searched persistently but has not been able to locate Edwin or any of the other men. They fear the men have once again been kidnapped.

**Daniel** is another disabled migrant who was returned to danger in Mexico. Daniel is a 34-year-old Colombian man with a hearing disability who has been diagnosed with depression and anxiety. Upon being returned to Tijuana, Mexican police extorted and violently attacked him, breaking his hearing device. As a result, he suffers from incessant dizziness, intense headaches, communication difficulties, and a lack of stability. Daniel cannot afford even basic medications that would mitigate his symptoms while he seeks a way to access and afford comprehensive care.

**Victor**, a 43-year-old asylum-seeker, was also returned to Tijuana despite a serious health issue. Victor was a taxi driver in Caracas, Venezuela, and was hit by a stray bullet one day while driving. The gunshot wound damaged his kidneys, requiring long-term medical treatment and nutritional adjustments. Despite explaining to officials the nature of his condition and the pain he experiences without proper treatment, Victor was returned to a shelter in Tijuana, where the food and medical assistance were inadequate to keep him healthy.

### 8.     Barriers to Access to Counsel and Language Access Persist Under MPP 2.0

In an attempt to cure the procedural problems inherent in Remain in Mexico, DHS instructed its officials to "ensure that those processed into MPP have reasonable and meaningful opportunities to access legal information in a language they understand and to access counsel or legal representation for *non-refoulement* interviews and removal proceedings." Policy Guidance at 6. But MPP's procedural problems have proven to be incurable.

First, it is difficult for lawyers to identify and contact individuals in Mexico who need representation, and asylum-seekers routinely lack essential information on their rights and available resources. See *Human Rights Fiasco: The Trump Administration's Dangerous Asylum*

18

*Returns Continue*, Human Rights First, at 25-27 (Dec. 2019).[28] Many asylum-seekers report not knowing they could seek an attorney until well into their cases, and those who did know to seek an attorney were not able to. On the first day of MPP 2.0 hearings in San Diego, legal observers interviewed men and women being put into MPP and sent back to Tijuana, who did not know they could contact an attorney to help stop them from being sent to Mexico. Migrants in MPP rarely successfully retain counsel: At its first wind-down, nine percent of migrants in the original implementation of MPP had a lawyer, and high barriers to access to counsel persisted in MPP 2.0. Muzaffar Chishti & Jessica Bolter, *Court-Ordered Relaunch of Remain in Mexico Policy Tweaks Predecessor Program, but Faces Similar Challenges*, Migration Policy Institute (Dec. 2, 2021).[29]

Second, even if lawyers and asylum-seekers manage to connect, the barriers to providing effective representation are often insurmountable. Lawyers often cannot safely travel to the Mexican border towns where their clients are living, and migrants often lack a sufficiently private space and reliable connection to call their lawyer when in-person meetings are not possible. Migrants may risk forfeiting their spot at a shelter or being the victim of a violent attack each time they go to an internet cafe to send their lawyer important documents. These factors prevent lawyers from gathering crucial client information and developing a trusting relationship with their client, which in turn prejudices migrants' cases.

Third, legal services providers are concerned that there is a lack of expeditious and comprehensive *non-refoulement* interviews under MPP 2.0. For example, the port of entry in Laredo has only two office spaces available for migrants to use for consultations and *non-*

---

[28]   https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDec19.pdf,   accessed Sept. 2, 2022.

[29] https://www.migrationpolicy.org/article/court-order-relaunch-remain-in-mexico,   accessed Sept. 2, 2022.

*refoulement* interviews, which means only two migrants can have confidential phone access at a time. The result is migrants must either wait for long periods of time at the port of entry just to speak with counsel or complete a *non-refoulement* interview, or else be rushed through the process, perhaps without speaking with counsel or fully understanding the process.

Such was the case of **Pedro**, a migrant subjected to MPP 2.0 who told the immigration judge that he feared returning to Mexico.[30] DHS guidance instructs that asylum-seekers should be given at least 24 hours to prepare for a *non-refoulement* interview and contact attorneys. DHS, however, scheduled his *non-refoulement* interview for later that day. Since the hearing was in the afternoon, that gave the asylum-seeker only a few hours to prepare for his *non-refoulement* interview—far short of the 24 hours to which he was entitled.

Fourth, although DHS instructed asylum officers to confirm migrants understand the *non-refoulement* interview process and ensure appropriate language and disability access, Policy Guidance at 8, migrants were still denied access to information and interpreters in their language. The result is that migrants—who are usually unrepresented—are kept in the dark throughout their proceedings, or unfairly prejudiced because they could not fully understand or communicate.

On the first day of MPP 2.0 hearings in San Diego, for example, one asylum-seeker was alone in the back of the courtroom, holding the documents she had been given by the court. She blurted out in her native language: "I don't understand anything. It's all in English." Other asylum-seekers have reported being ordered to sign documents that were not in their native language and that they did not understand.

---

[30] Pedro's story was recounted in a news article. John Washington, Catastrophic Asylum Program "Remain in Mexico" Could Get Even Worse, Depending on the Supreme Court, The Intercept (Mar. 2, 2022) https://theintercept.com/2022/03/02/remain-in-mexico-asylum-biden-mpp-supreme-court/, accessed Sept. 2, 2022.

These and countless other examples illustrate that there is no way to operate the Remain in Mexico program without subjecting migrants to needless violence, suffering, and unfair process.

### 9.    Migrants Continue to Face Serious Danger in Mexico

Border towns in Mexico continue to be dangerous places where attacks on migrants are brutal and relentless. According to the U.S. State Department, Ciudad Juárez is often the site of turf battles between criminal organizations — and Tamaulipas, the state in which Matamoros and Nuevo Laredo are located, remains on the State Department's "Do Not Travel" list. Mexico Travel Advisory, U.S. Dep't of State (Aug. 17, 2022).[31] Mexican security forces are often helpless to stop the kidnapping, extortion, and murder of migrants by cartels, and continue to collaborate with the cartels in such crimes. See June S. Beittel, Cong. Rsch. Serv., R41576, *Mexico: Organized Crime and Drug Trafficking Organizations* at 14 (June 7, 2020) (describing how "[p]olice corruption has been so through… that law enforcement officials reportedly carry out violent assignments from [drug trafficking organizations]" but arrests of corrupt police rarely lead to convictions and purges of police have not solved the problem)[32]; Alfredo Peña & Mark Stevenson, *History of Abuse for Mexican Police Unit in Migrant Massacre*, AP News (Feb. 10, 2021).[33]

Migrants stand out from the local population, and their vulnerability makes them common targets for kidnapping and extortion by cartels in Mexico. See Parker Asmann, *With U.S. Policy, Mexico Crime Groups See Double the Opportunity in Northbound Migrants*, InSight Crime (Jan. 17, 2022).[34] As of January 13, 2022, a human rights organization tracked 8,705 cases of rape,

---

[31] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html, accessed Sept. 2, 2022.
[32] https://sgp.fas.org/crs/row/R41576.pdf, accessed Sept. 2, 2022.
[33] https://apnews.com/article/police-mexico-victoria-massacres-texas-ea8622410ccdc3fc9b0eb11dd974b8a8, accessed Sept. 2, 2022.
[34] https://insightcrime.org/news/us-policy-mexico-crime-groups-opportunity-migrants/,  accessed Sept. 2, 2022.

kidnapping, or violent assault against asylum-seekers forced to wait in Mexico under MPP and another policy, "Title 42." Julia Neusner, Kennji Kizuka, & Ana Ortega, *A Shameful Record: Biden Administration's Use of Trump Policies Endangers People Seeking Asylum*, Human Rights First (Jan. 2022).[35] This number grows every day as immigrants' rights organizations like *amici* hear new stories from migrants who have endured unimaginable violence in Mexico.

In recognition of the dangers migrants face in Mexico, DHS has instructed its officers to proactively ask questions regarding fear of return to Mexico to all individuals encountered, and not to return any individual who demonstrates a reasonable possibility of persecution on account of a protected ground or torture in Mexico. Policy Guidance at 2. Immigrants' rights organizations, however, have documented cases of migrants who feared return to Mexico based on past violence but were nonetheless returned to Mexico. In fact, every migrant returned to Mexico interviewed by a human rights organization in December 2021 had been the victim of violence or criminal targeting by police or other Mexican government officials. Julia Neusner & Ana Ortega Villegas, *"Nothing Humane About This Process": Biden Administration Launches "Remain in Mexico" Revamp at El Paso Port of Entry*, Human Rights First (Dec. 16, 2021).[36]

Stories from migrants enrolled in MPP 2.0 reveal that the changes intended to prevent the return to Mexico of migrants at particular risk of violence there were not effective. **Gabriel's** experience is one such story. Fleeing his native Nicaragua, he crossed into Mexico over its southern border and almost immediately was stopped by Mexican police, who robbed him of his

---

[35] https://www.humanrightsfirst.org/sites/default/files/ShamefulRecord.pdf, accessed Sept. 2, 2022.
[36] https://www.humanrightsfirst.org/blog/nothing-humane-about-process-biden-administration-launches-remain-mexico-revamp-el-paso-port, accessed Sept. 2, 2022.

belongings, including his Nicaraguan identification card and his money. The police officers threatened him, telling him they would find him if he ever reported the robbery.

Shortly after, two men kidnapped Gabriel, drove him to a house, and trapped him in a confined space for over a month. The kidnappers told him he would be released if he paid them 500,000 Mexican pesos—about 24,000 U.S. dollars. Gabriel's brother in Nicaragua attempted to obtain the money, but could not successfully gather such a large amount. In the many weeks while Gabriel was kidnapped, the kidnappers kept him blindfolded and regularly beat him. He lived in squalid conditions with little food and was forced to sleep on the floor. The kidnappers regularly insulted him and subjected him to humiliating treatment, such as forcing him to use the bathroom in front of them. They threatened him with death on multiple occasions.

Finally, after nearly 40 days, the kidnappers drove Gabriel to Chiapas and abandoned him on a street corner. A generous stranger took him in for a short period of time, giving him some money to continue his travel north. Because he had been robbed and threatened by Mexican police before, Gabriel did not file a police report about his kidnapping. He eventually traveled to the U.S.-Mexico border, and was given a *non-refoulement* interview. Yet despite his fear of violence in Mexico, he was put into MPP and was sent to Ciudad Juarez.

Another example is **Benjamin**, a 25-year-old man from the Indigenous Miskitu community of Nicaragua, which is plagued by violent land conflict. Because of his high school education and Indigenous identity, he was perceived as a resistance organizer challenging the seizure of his community's land. He was thus persistently threatened and forced to flee the country. Upon arriving in Mexico, Benjamin witnessed and experience violence—he was robbed, but too afraid of the Mexican police to file a report. He discussed his fear of Mexico in his *non-refoulement* interview, but the officers did not listen: he was put into MPP 2.0 and returned to Ciudad Juárez.

23

Kidnapping, police brutality, robbery, extortion, violence, and discrimination are among the extraordinary risks migrants face in public spaces in Mexico—but migrant shelters, too, are often a site of danger and deprivation. Shelters are often migrants' only options for refuge in Mexico, yet many of them are unsanitary and unsafe. The Leona Vicario shelter is one such example. Located in Ciudad Juárez, it was opened by the Mexican government in 2019 during the first iteration of MPP, and it became the largest federally-operated migrant center in Mexico.

After being put into MPP 2.0 in December 2021, **Mateo** was at Leona Vicario for over two months.[37] In his *non-refoulement* interview, Mateo told the officer he had been robbed several times in Mexico, including by Mexican police. Nonetheless, he failed the interview and was returned to the shelter until his next court date. He described squalid conditions including insufficient food supplies, freezing temperatures, unsanitary bathrooms, and broad disregard of COVID-19 precautions, such as quarantining those who are infected and ensuring staff wear masks. He reported that a guards repeatedly berates the migrants, while another guard told a migrant at the shelter that if he didn't follow the shelter's rules the guard would "disappear" him.

**Gabriel**—the asylum-seeker who was kidnapped for over a month in Mexico—faced routine discrimination and harassment from the shelter employees. The employees confiscated his Bible, as well as his phone, because he had an electronic copy of the Bible. Gabriel's inability to practice his religion has only compounded his trauma.

---

[37] Mateo's story was recounted in a news article. John Washington, *Catastrophic Asylum Program "Remain in Mexico" Could Get Even Worse, Depending on the Supreme Court*, The Intercept, Mar. 2, 2022,), https://theintercept.com/2022/03/02/remain-in-mexico-asylum-biden-mpp-supreme-court/, accessed Sept. 2, 2022.

Whether in a public or private space, migrants forced to wait in Mexico cannot escape harm.  As fundamental programmatic feature, remaining in Mexico denies them the ability to live in safety and meet their basic needs while they await their court proceedings.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Stay would undermine the public interest and therefore should be denied.

Respectfully submitted,

*/s/ Robert S. Velevis*

Robert S. Velevis
Texas State Bar No. 24047032
Amanda Crawford-Steger
Texas State Bar No. 24105756
SIDLEY AUSTIN LLP
2021 McKinney Ave., Suite 2000
Dallas, TX 75201
(214) 969-3501
(214) 981-3496
Fax: (214) 981-3400
rvelevis@sidley.com
asteger@sidley.com

Kelly J. Huggins
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-3206
khuggins@sidley.com

Jeffrey T. Green
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8291
jgreen@sidley.com

Naomi A. Igra
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94101
(415) 772-7495
naomi.igra@sidley.com

*Counsel for Refugee and Immigrant
Center for Education and Legal Services*

Jane Petersen Bentrott
Karen C. Tumplin
Esther H. Sung
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027

26

(323) 450-7271
jane.bentrott@justiceactioncenter.org

Tamara F. Goodlette
Yvette Changuin
Vanessa Rivas-Bernardy
REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES
802 Kentucky Avenue
San Antonio, Texas 27201
(210) 960-3206
tami.goodlette@raicestexas.org

## CERTIFICATE OF SERVICE

I certify that on September 6, 2022, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing to all

counsel of record.

*/s/ Robert S. Velevis*
Robert S. Velevis