# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity | § | |
| as President of the United States of | § | |
| America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION
## TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION

TABLE OF CONTENTS

Table of Contents ........................................................................................................................ ii

Table of Authorities...........................................................................**Error! Bookmark not defined.**

    I.    Defendants fail to show that the October 29 Memoranda reasonably considered all the relevant factors. ........................................................................ 1

    II.   No procedural issue precludes this Court's review.......................................... 8

        A.    Plaintiffs have standing to bring this claim......................................... 8

        B.    The October 29 Memoranda are subject to judicial review. ................ 10

            1.    A stay of the agency action here does not violate the restrictions on injunctive relief in 8 U.S.C. § 1252(f)(1). ..................................... 10

            2.    Judicial review of the agency action here is not otherwise precluded. ...... 13

    III.  Texas and Missouri will suffer irreparable harm if a stay is not granted and the equities overwhelmingly favor a stay.......................................................... 14

    IV.  The stay should not be geographically limited.................................................. 15

Conclusion ............................................................................................................................... 15

Certificate of Service................................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barber v. Bryant*,
    833 F.3d 510 (5th Cir. 2016)................................................................................................14

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ...................................................................................................1, 7

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*,
    17 F.4th 604 (5th Cir. 2021) ...........................................................................................10

*Ctr. for Biological Diversity v. Regan*,
    No. CV 21-119 (RDM), 2022 WL 971067 (D.D.C. Mar. 30, 2022) ...........................11, 12

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
    45 F.4 .............................................................................................................................8, 14

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .....................................................................................................3, 6

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    --- F.4th ---, No. 17-20545, 2022 WL 3723116 (5th Cir. Aug. 30, 2022)...........................9

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ....................................................................................................1, 4

*Fisher v. Univ. of Texas at Austin*,
    758 F.3d 633 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) .................................................8, 9

*Free v. Abbott Labs., Inc.*,
    164 F.3d 270 (5th Cir. 1999)................................................................................................8

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ...........................................................................................15

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
    502 U.S. 183 (1991).......................................................................................................11, 12

*Jennings v. Rodriquez*,
    138 S. Ct. 830 (2018)............................................................................................................1

*Judulang v. Holder*,
    565 U.S. 42 (2011)................................................................................................................7

*Liesegang v. Sec'y of Veterans Affairs,*
    312 F.3d 1368 (Fed. Cir. 2002)...........................................................................................11

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013)...........................................................................................................11

*Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).............................................................................................................1

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
    142 S. Ct. 661 (2022).......................................................................................................11

*Natural Resources Defense Council v. Abraham,*
    355 F.3d 179 (2d Cir. 2004)............................................................................................11

*New York v. U.S. Dep't of Commerce,*
    351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part*, 139 S. Ct. 2551
    (2019) ...............................................................................................................................15

*Nken v. Holder,*
    556 U.S. 418 (2009)...................................................................................................11, 13

*Ramaprakash v. FAA,*
    346 F.3d 1121 (D.C. Cir. 2003).........................................................................................7

*Reno* v. *Am-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999).........................................................................................................12

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)...........................................................................................................3

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) (per curiam)............................................................1, 4, 8, 14

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ............................................................................................15

*Texas v. United States EPA,*
    829 F.3d 405 (5th Cir. 2016)............................................................................................10

*United States v. Castillo,*
    179 F.3d 321 (5th Cir. 1999).............................................................................................9

*United States v. Lee,*
    358 F.3d 315 (5th Cir. 2004).............................................................................................9

*United States v. Matthews,*
    312 F.3d 652 (5th Cir. 2002).............................................................................................9

iv

*Wages & White Lion Invs., LLC v. United States FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................................. 10, 11, 14

*West Virginia v. EPA,*
    577 U.S. 1126 (2016).................................................................................... 10

**Statutes**

5 U.S.C. § 551(13) ........................................................................................... 10

5 U.S.C. § 701(a)(2) ........................................................................................ 13

5 U.S.C. § 705 ....................................................................................10, 11, 13, 15

8 U.S.C. §1225(b)(2)(A)...................................................................................1, 2

8 U.S.C. § 1252(f)(1) ................................................................................ 10, 12, 13

**Other Authorities**

Wright & Miller, *11A Fed. Prac. & Proc. Civ.* § 2948 (3d ed.).......................... 11

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221 ................... 12

Fed. R. Civ. P. 65(b) ....................................................................................... 12

Federal Register. 5 U.S.C. 553(c) .................................................................... 11

*Federal Register Document Drafting Handbook* (Oct. 10, 1998), available at
    https://open.defense.gov/Portals/23/Documents/Regulatory/ddh.pdf....................... 12

## I.  Defendants fail to show that the October 29 Memoranda reasonably considered all the relevant factors.

Defendants' arguments that the October 29 Memoranda "reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), starts with two pages of assertions that DHS considered certain items and then concluded that it should terminate MPP. *See* Opp'n 23–24. But saying something "was considered is not enough to show reasoned analysis." *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam). Instead, what is noteworthy about Defendants' argument is what it concedes—that MPP does prevent at least some illegal migration. *See* Opp'n 24 (noting "the Secretary concluded that MPP had mixed effectiveness").

*First* is the States' claim that the October 29 Memoranda ignore DHS's mandatory detention obligations. Per 8 U.S.C. §1225(b)(2)(A), an alien "seeking admission [who] is not clearly and beyond doubt entitled to be admitted ... *shall be detained* for a proceeding under section 1229a of this title." "Read most naturally, [the statute] mandate[s] detention ... ." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). There are two exceptions to detention that DHS may, in its discretion, use—parole and, for aliens arriving from a contiguous territory like Mexico, return to that territory (*e.g.*, MPP). *See Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022) (noting those two options); *id.* at 2548 (Kavanaugh, J., concurring). The States' argument is straightforward: Before deciding to terminate MPP—*i.e.*, the first discretionary option—the Government had to consider the effect of the termination on its ability to meet its mandatory detention duties. *See* Stay Motion 9–10. Given the statutory mandate to detain, it blinks reality to believe that is not "an important aspect of the problem" that DHS had to consider. *Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants argue that the States "theory is simply the same argument the Supreme Court already rejected": that DHS must either detain all arriving aliens or require them to remain in Mexico. Opp'n 25–26.  Not so. However DHS exercises its discretion, the exercise of that discretion must "be reasonable and reasonably explained." *Biden III*, 142 S. Ct. at 2548–49 (Kavanaugh, J., concurring); *see*

1

*also id.* at 2543 ("DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."). So that DHS *may* release some aliens instead of detaining them or returning them to Mexico—which is the sum total of Defendants' argument—does not mean it sufficiently explained *why* it has done so here.

Defendants thus overstate their case when they say that "the Secretary did consider Section 1225(b)(2)(A)." Opp'n 26. He did, but only to conclude that he did not need to detain all inadmissible aliens. *See id.* (discussing how the October Memoranda "discuss[] how reading Section 1225 to impose a near-universal mandate is inconstant" with the Secretary's interpretation of the law). That logic only *permits* him to terminate MPP; it does not mean he reasonably did so in the October Memoranda. In short, a reasonable termination would address the fact that terminating MPP affects DHS's ability to comply with its mandatory detention requirements in §1225. The October Memoranda do not.

*Second* is the Secretary's weighing of the benefits and harms of rescinding MPP. *See* Opp'n 27–30. Defendants claim, first, that the States' argument is that the Secretary failed to consider points he actually considered, *see, e.g.,* Opp'n at 28–29 ("There is thus no basis for Plaintiffs' claim that the Secretary *did not consider* harms that might be avoided by deterring individuals from making the journey to the southern border.") (emphasis added); *id.* at 29 ("The Secretary also addressed this issue."), second, that the States ignore alternative methods to deter illegal border crossings, *see id.* at 28, ignore hardships the program imposes on migrants, *see id.* at 30, or fail to provide alternative data, *see id.* at 29–30.

But the States' argument is not that the Secretary categorically failed to consider factors or that there are no alternative policies. The States' argument is that the Secretary failed "to *adequately account* for" the program's benefits. Stay Motion 10 (emphasis added).[1] That is, the failure is an analytical

---

[1] Defendants appear to claim that the States are pressing claims to third parties by bringing up the benefit MPP provided in deterring migrants from making the dangerous journey to the United States. *See* Opp'n 28 n.6. Not so. The States point that out as a benefit the Secretary failed to consider,

one—the Secretary failed to balance in any rational way the benefits of MPP as compared to eliminating the program. Defendants do not address that argument. Indeed, Defendants' acknowledgment that "the Secretary '*presumed* ... that MPP contributed to decreased migration flows" establishes that the States are correct. Opp'n 27 (emphasis added) (quoting AR27). Absent some quantification, presumptions are empty—and the Secretary certainly never quantified the benefit he presumed MPP provided. Indeed, he says such quantification is impossible. *See* AR27.

The incentive to stack the deck in favor of termination—by expressly presuming a benefit while implicitly presuming that the benefit is small, or always outweighed by countervailing factors— is plain. Thus, Defendants arguments here either ignores the actual issue before the agency—for example, that "DHS has other avenues for quickly process, and thereby deterring" individuals without meritorious asylum claims, Opp'n 28, says nothing about the deterrent effect of those avenues versus MPP—or constitute mere assertion—for example, saying MPP "led to individuals with meritorious asylum claims abandoning them and imposed additional costs that far outweighed whatever effects MPP had on non-meritorious claims," Opp'n 29, is a conclusion, not a reason. That the Secretary admittedly used data that "are not necessarily indicative" of the harms of human trafficking—and, thus, a benefit that MPP provided by deterring such trafficking—highlights that what the Secretary engaged in was motivated reasoning, not reasonable decision-making. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574–75 (2019) (requiring reasoned decision-making even for decisions driven by "policy preferences").

Regardless, the Fifth Circuit has already rejected that DHS considering alternatives "outside the ambit of the existing policy," such as the "Dedicated Docket" program, satisfies the requirements of reasoned decisionmaking; also "neither the June 1 Memorandum nor the Government in its stay

---

and they have standing to raise that procedural injury since it affects the States' concrete interests, *see supra*. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

motion explains why MPP and the 'Dedicated Docket' are mutually exclusive." *See Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam) (denying stay on August 19—before the October 29 Memoranda). The October 29 Memoranda exhibit the same errors.

In short, the Secretary's presumption that MPP had some benefit is no different from "stating that an alternative was considered," and neither is "enough to show reasoned analysis." *Texas v. Biden*, 10 F.4th at 555.

*Third*, Defendants attempt to justify using a new, higher rate of *in absentia* removals fails. Indeed, it undermines Defendants' argument. As the Secretary acknowledges, MPP deters non-meritorious asylum claims. *See* AR25 (saying the program was "deterring non-meritorious claims"). That is, the States and this Court are correct that "the increased *in absentia* removal rates for aliens" indicates that MPP is working. Stay Motion 12; ECF 94 at 40–41; *see also* AR23 ("The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP."); *cf.* AR25 n.89 (noting that "implicit" in the claim that MPP deterred aliens from asserting asylum claims, "many of which may be meritless" is that "some such claims do have merit") (emphasis omitted).

DHS never addresses that fact except to say that "that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims." AR25. And in its opposition, Defendants just reiterate that claim. *See* Opp'n 32. But nowhere has any federal actor quantified, estimated, or made any attempt to show how many deterred meritorious asylum claims there are. DHS, to be sure, did not need "to conduct or commission [its] own empirical or statistical studies" as a general matter. *Prometheus Radio Project*, 141 S. Ct. at 1160. But if it does not, then it should not do what the Secretary did here: Compare anecdotes (here, that MPP deterred meritorious claims, *see* AR 24 & nn.84–85) with hard numbers (here, the rate of *in absentia* orders) especially where the

4

hard numbers and the anecdotes are not clearly comparable. That is so because the anecdotes--while showing that some aliens abandoned or lost their claims due to conditions in Mexico—do not establish that those claims were meritorious. So, too, for that matter, is the raw rate of *in absentia* orders; those contains some unknown mix of meritorious and non-meritorious claims. To conclude from them that the rate of deterrence of meritorious claims is high relative to non-meritorious claims given what those data points say is the opposite of reasoned decisionmaking. *See Biden II*, 20F.4th at 992 ("We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion.").

If more proof is necessary that the Secretary's analysis is motivated reasoning and not rational decisionmaking, consider the claim that "a 'remarkably low 1.1 percent' of individuals placed in MPP were granted relief or protection, a substantially lower rate of relief—'26 times' lower—than expected when compared to similar individuals not placed in MPP, lend[s] further support to the conclusion that MPP caused individuals with potentially meritorious claims to abandon them." Opp'n 31 (quoting AR24–25). That claim is flawed. For one, the Secretary's analysis fails to account for the possibility that individuals in MPP and those not in MPP are likely different.

Moreover, the Secretary inflates the difference in that rate, for the "26 times" statement is misleading. As the Secretary acknowledges in footnote 87, relief grant rates for both groups are "low," AR24 n.79, so what constitutes a 26-times difference in the rate of relief as a percent translates into a difference of 16 individuals in every 1,000—that is, something that is much more likely explainable by group differences and not the fact that MPP deterred meritorious asylum claims. Indeed, that difference may be fully explainable by the fact the Secretary's analysis looked at "relief and protection from removal," which encompasses more than just grants of asylum.  AR24 & n.87. Thus, the 16-person difference in relief between MPP and non-MPP participants is just as likely the result of non-MPP participants receiving non-asylum relief at a higher rate as it is anything else. In all events, the

5

numbers the Secretary used in no way suggests that MPP resulted in higher rates of aliens abandoning or losing meritorious asylum claims.

In short, the Secretary failed to link the high *in absentia* removal rate for aliens enrolled in MPP and his claim that the program deterred too many meritorious asylum claims compared to non-meritorious ones. All that this shows is that the program deterred non-meritorious asylum claims, even if it deterred some unspecified number of meritorious ones.[2] As a result, the Secretary failed "to appreciate the relevant costs and benefits of MPP" and so failed to make "a reasoned determination." Stay Motion 12.

*Fourth*, Defendants avoid the fact that the Secretary ignored the limits on DHS's parole authority in terminating MPP. Defendants do not contest that "DHS is presently releasing into the country tens of thousands of individuals per month through parole and otherwise." Stay Motion 18. Defendants claim that the States failed to provide evidence "that DHS is not making parole decisions on a case-by-case basis." Opp'n 34. The proof is in the numbers—to believe that DHS is actually engaging in a case-by-case evaluation for parole requires "a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 139 S. Ct. at 2575 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

Indeed, that *Defendants do not say that DHS is processing parolees on a case-by-case basis* speaks volumes. Defendants are the ones who can show DHS is making parole decisions case-by-case, and their failure to make that claim and support it with evidence is damning. What is arbitrary and

---

[2] Defendants' focus on defending the methodology of calculating *in absentia* orders, *see* Opp'n 31–32, or comparing those orders to prior years, *see id.* at 32, do not address the underlying logic of the Secretary's analysis. Furthermore, that the Secretary's method for calculating 2015 and 2017 *in absentia* case rates lowers the percentages may well be suspect. The Secretary says that the recalculation compares *in absentia* orders to "total cases referred to EOIR in those years ... ." AR23 n.82. "'Total' cases include cases that are 'completed' and 'ongoing.' *Id.* (emphasis omitted). Logically, some cases that were referred to the EOIR in 2015 and 2017 were completed in a later year; the Secretary, however, does not say what year those cases were counted, or how that would affect the analysis. So, the recalculation adds little to the analysis.

capricious is the failure to address how the termination of MPP affects Defendants' ability to make case-by-case determinations for parole.

With that, Defendants' arguments on this point fall apart. Whatever the scope of DHS's discretion to parole aliens and whatever role detention capacity can play in that decision, "the authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Biden*, 142 S. Ct. at 2543 (quoting 8 U.S.C. §1182(d)(5)(A)). Choosing to terminate MPP when DHS admittedly lacks the capacity to detain all alien migrants is an implicit choice to parole those migrants—that is, to make a *categorical* parole decision. That, the agency cannot do; that the agency did not consider that fact in terminating MPP renders its decision arbitrary and capricious.

Defendants claim a "consistent interpretation" that empowers them to parole aliens due to lack of detention capacity. Opp'n 34. Even if there were such consistency, "[a]rbitrary agency action becomes no less so by simple dint of repetition." *Judulang v. Holder*, 565 U.S. 42, 61 (2011); *see also id.* ("[L]ongstanding capriciousness receives no special exemption from the APA."). But the October Memoranda never address Defendants' prior determinations that lack of detention space is not an appropriate reason to parole an alien. *See* AR159, 161, 163. "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decisionmaking." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

*Finally*, Defendants defend their perfunctory evaluation of costs to the States and their reliance interests. Opp'n 35–40. They argue that Plaintiffs cite no authority that they were required to quantify the costs to the States. Opp'n 36. But Plaintiffs did so, citing *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (failure to actually "quantify or at least reasonably describe the costs of this policy to the States" did not satisfy requirement to consider them). And far from Defendants lacking data on

this issue, Opp'n 36, they had that data readily available to them from the record in this case. *See* ECF 54; *see also* ECF 94 at 17–21.

As for reliance interests, the Fifth Circuit has already held that Plaintiffs had a reliance interest in MPP's continuation. "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam) (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)).

## II.  No procedural issue precludes this Court's review.

### A.      Plaintiffs have standing to bring this claim.

Defendants argue that the Court cannot rely on its previous determination that Plaintiffs had standing to challenge the termination of MPP. Opp'n at 17. But the determinations by this Court and the Fifth Circuit were not overruled by the Supreme Court. *See Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th ---, No. 20-11179, 2022 WL 3440652, *5 n.2 (5th Cir. Aug. 17, 2022).

The Fifth Circuit has held that the law of the case does apply to subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required).

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) (citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing

else.") (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)); *United States v. Matthews,* 312 F.3d 652, 657 (5th Cir. 2002) (on remand the district court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court.") (quoting *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)). "In implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. Southern Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

As the Fifth Circuit's determinations on standing were not disturbed by the Supreme Court—which itself "impliedly" determined that standing was satisfied—and its remand was limited to determining whether the October 29 memoranda were arbitrary and capricious, this Court would exceed the mandate and violate the law of the case by reexamining standing. *See Fisher,* 758 F.3d at 640 ("The Supreme Court did not address the issue of standing, although it was squarely presented to it. Rather, it remanded the case for a decision on the merits …The parties have identified no changes in jurisdictional facts occurring since briefing in the Supreme Court.").

Even though the impact of the termination of MPP by the October 29 Memoranda can be no different from the previous termination due to new reasons given, Defendants argue that because it is not the identical action, the standing inquiry must start over. Opp'n 17. But "because injury must only be *fairly* traceable to the challenged conduct, plaintiffs need not connect the exact time of their injuries with the exact time of an alleged violation." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,* --- F.4th ---, No. 17-20545, 2022 WL 3723116, at *4 (5th Cir. Aug. 30, 2022) (cleaned up). "Article III is satisfied if [the challenged action] were "of a type that 'causes or contributes to the kinds of injuries alleged by the plaintiffs.'" *Id.* (emphasis added) (rejecting the view that "Article III requires plaintiffs to show that each challenged [action] is a but-for cause of their injuries.").

Defendants' remaining arguments on this issue are just a regurgitation of their disagreement

with this Court's prior determinations, and that of the Fifth Circuit. Opp'n 18–20. There is no justification to ignore the binding determinations in this case finding that Plaintiffs have standing to challenge the termination of MPP.

**B.   The October 29 Memoranda are subject to judicial review.**

**1.   A stay of the agency action here does not violate the restrictions on injunctive relief in 8 U.S.C. § 1252(f)(1).**

Defendants argue that, even under Section 705 is not precluded by 8 U.S.C. § 1252(f)(1), there are problems with Plaintiffs obtaining relief here.

They argue that such stays are limited to being granted against agency adjudications (orders) rather than "policies" (rules), Opp'n 11, and that relief may not be granted here because the termination of MPP has already gone into effect. Opp'n 14–16. But courts routinely grant stays under Section 705 of agency rules, and after the effective date of the action. *See, e.g., West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.) (stay issued under Section 705 on Feb. 9, 2016, against agency rule with effective date of December 22, 2015. 80 Fed. Reg. 64,662); *Wages & White Lion Invs., LLC v. United States FDA*, 16 F.4th 1130 (5th Cir. 2021) (stay issued under Section 705 on October 26, 2021, against agency action effective on September 14, 2021); *Texas v. United States EPA*, 829 F.3d 405 (5th Cir. 2016) (stay issued under Section 705 on July 15, 2016, against agency rule with effective date of February 4, 2016, 81 Fed. Reg. 296-01); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021) (stay issued under Section 705 on November 12, 2021, against agency rule with effective date of November 5, 2021, 86 Fed. Reg. 61,402).

Section 705 may be applied to "rules" because any "agency action" is subject to it, 5 U.S.C. § 705, and "agency action" is defined as including a "rule." 5 U.S.C. § 551(13). And the cases Defendants cite as restricting relief under Section 705 before the effective date of the action involve agencies postponing their own rules. Opp'n 14–16. But the authorities they cite point out that this limitation

does not apply to courts because "Section 705 confers a broader authority on reviewing courts, permitting the court 'to postpone the effective date ... *or to preserve* status or *rights* pending conclusion of the review proceedings.'" *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022). This limitation on agencies lies because "[a]dministrative agencies are creatures of statute [and] accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). Courts, however, have inherent authority to stay agency action to facilitate judicial review. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Courts should "not construe a statute to displace courts' traditional equitable authority absent the clearest command.'" *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010)).

Defendants also maintain that staying the October 29 Memoranda cannot be said to "preserve status or rights" because it would upset the status quo. Opp'n 16. But the "status quo" is "the last peaceable uncontested status existing between the parties before the dispute developed." Wright & Miller, *11A Fed. Prac. & Proc. Civ.* § 2948 (3d ed.) (cleaned up). The Fifth Circuit has held that staying an agency action—even after the effective date—preserves the *status quo ante* and is properly imposed via Section 705. *Wages & White Lion Invs., LLC v. United States FDA*, 16 F.4th 1130, 1143–44 (5th Cir. 2021).

Regardless, the effective date of the October 29 Memoranda has yet to arrive. It has yet to be published in the Federal Register. 5 U.S.C. 553(c) provides, with some exceptions, that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date." The date when a regulation may "take effect" is not the same as the "effective date." See *See Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1374-75 (Fed. Cir. 2002); *Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *18 (D.D.C. Mar. 30, 2022).

The Office of the Federal Register (OFR) uses the term "effective date" to describe the date that amendments in a rulemaking document affect the current Code of Federal Regulations. *See Federal Register Document Drafting Handbook,* at p. 2-10 (Oct. 10, 1998), available at https://open.defense.gov/Portals/23/Documents/Regulatory/ddh.pdf. However, OFR draws a contrast between such a date and the compliance or applicability date of a rule, which is described as "the date that the affected person must start following the rule." Id. at 2-11. Thus, the "effective date" of a regulation is commonly used to describe the date by which a provision in the Code of Federal Regulations is enacted as law, but it is not necessarily the same as the time when provision enacted in the Code of Federal Regulations is operative on the regulated activity or entity. The latter may be described as the "compliance," "applicability," or "takes effect" date—this is what Defendants are confusing for the "effective date" of agency action.

An order staying administrative action does not "enjoin or restrain" the INA's operation because a stay alone does not enjoin anything at all. Defendants maintain that even if it does not "enjoin," vacatur falls within the term "restrain." Opp'n 12–13. But "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221 (discussing the "Title-and-Headings Canon"). And the Supreme Court has found the title of Section 1252(f)(1) relevant to its meaning: "By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief." *Reno* v. *Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). The title of that section is: "Limit on *Injunctive* Relief: In General." 8 U.S.C. § 1252(f)(1) (emphasis added) And the term "restrain," read in context, most naturally applies to temporary restraining orders under Fed. R. Civ. P. 65(b), which section 1252(b)(1) would prohibit as it does preliminary or permanent injunctive relief by the lower courts.

While "[a] stay [of an agency action] pending appeal certainly has some functional overlap with

12

an injunction, particularly a preliminary one … [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined," *Nken*, 556 U.S. at 428, "a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29. Stays of agency action under section 705 are therefore not coercive, and thus not within the ambit of the injunctive relief precluded by section 1252(f)(1). *See id.* at 430 (noting that "the language of [1252](f) says nothing about stays, but is instead titled 'Limit on injunctive relief'").

It is true that "'[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam.*'" *Nken,* 556 U.S. at 428. "This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct." *Id.* But "instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself[,] … either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Id.*

Defendants reject the applicability of the Fifth Circuit's holding that vacatur under Section 706 is not precluded by Section 1252(f)(1). Opp'n 13. But a stay under Section 705 is just an interim vacatur. It does not have a coercive effect because it nullifies (temporarily) an agency action but has no coercive effect *in personam*—unlike with an injunction, when a stay is issued under Section 705, the agencies are free to undertake the identical action anew, just as when an agency action is vacated.

### 2.  Judicial review of the agency action here is not otherwise precluded.

Defendants renew two other arguments against judicial review of the decision to terminate MPP, Opp'n 21–22: (1) that agency action terminating MPP is "agency action … committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review; and (2) that the States' claims challenging the termination of MPP do not fall within the zone of interests of the INA.

13

But this Court has already rejected these arguments. ECF 94 at 31–34. The Fifth Circuit has done the same, *Biden*, 20 F.4th at 978–88; *id.* at 975–76, and that portion of that opinion remains good law. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th ---, No. 20-11179, 2022 WL 3440652, *5 n.2 (5th Cir. Aug. 17, 2022).[3]

### III. Texas and Missouri will suffer irreparable harm if a stay is not granted and the equities overwhelmingly favor a stay.

Defendants repeat their attach on this Court's previous determinations relating to injury. Opp'n 40–41, but this attempt should be rejected as it should be for the standing inquiry.

"[T]he maintenance of the *status quo* is an important consideration in granting a stay." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quotation omitted). The "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Biden*, 10 F.4th at 559 (quotation omitted). "And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* at 560 (alteration omitted) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). If Defendants failed to satisfy the requirements of reasoned decisionmaking, the public interest lies in staying their action.

Defendants assert that the public interest lies with them because they have found MPP ineffective. Opp'n 43. "But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Wages & White Lion Invs., LLC,* 16 F.4th at 1143 (citation omitted). And the interest

---

[3] Defendants make a convoluted argument that a recent decision of the Supreme Court construing one provision of the INA (8 U.S.C. § 1252(a)(2)(B)(i)) applies to another (8 U.S.C. § 1252(a)(2)(B)(i)) that would preclude review here. Opp'n at 22 & n.4 (citing *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022)). But that decision (1) involved a provision only applicable to individual determinations of relief, *id.*, which the Fifth Circuit has determined that "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens," *Biden*, 20 F.4th at 977 (which remains binding law in the Fifth Circuit today, *see Data Mktg. P'ship, LP*, 2022 WL 3440652, *5 n.2; and (3) came out prior to the Supreme Court's ruling in *Biden III*, which proceeded to not only review the prior agency action terminating MPP, but explicitly ordered the lower courts to consider whether the new termination violated the APA; it would be strange for the Supreme Court to do so if such decisions were barred from judicial review by one of its own decisions from a month earlier, with no mention of it.

of the Executive in foreign affairs, Opp'n 44–45, is related to every immigration policy; Congress has an equal interest in seeing that its limits on agency action are upheld.

## IV. The stay should not be geographically limited.

Defendants maintain that any remedy must be limited to the Plaintiff States, Opp'n 41–43, but—as explained above—a stay under Section 705 is just an interim vacatur.  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 672 (S.D.N.Y. 2019) ("[T]he 'normal remedy' is to set aside the agency action wholesale, not merely as it applies to the particular plaintiff or plaintiffs who brought the agency action before the court."), *aff'd in part, rev'd in part*, 139 S. Ct. 2551 (2019).

The Fifth Circuit recently "reject[ed] DHSs contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022). Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *Texas v. United States (DAPA)*, 809 F.3d 134, 188 (5th Cir. 2015)).

### CONCLUSION

Plaintiffs respectfully request that the Court stay the October 29 Memoranda that terminate MPP pending a determination on the merits.

Dated: September 9, 2022

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

MICHAEL E. TALENT, #73339MO *
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff*
*State of Missouri*

/s/ Ryan D. Walters
RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

*Admitted pro hac vice

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on September 9, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

17