IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS, *et al.*,          §
                                    §
         Plaintiffs,                §
                                    §
v.                                  §          2:21-CV-067-Z
                                    §
JOSEPH R. BIDEN, JR., *et al.*,     §
                                    §
         Defendants.                §

## OPINION AND ORDER

This case began as a challenge to the termination of the Migrant Protection Protocols ("MPP") program in January 2021. Although the legal instruments governing the termination evolved over time by issuance of new memoranda, this case continued. Most recently, the Supreme Court remanded the case for this Court to consider Plaintiff States of Texas and Missouri's ("Plaintiffs") claims against the most recent memoranda. The Court now considers Plaintiffs' Motion to Postpone the Effective Date of Agency Action ("Motion") (ECF No. 149), filed on August 8, 2022. Plaintiffs carry their burden to show — among other things — they will likely prevail on the merits. Accordingly, the Court **GRANTS** the Motion and **STAYS** the most recent memoranda, issued on October 29, 2021, and corresponding decision to terminate MPP until the Court can resolve the merits of Plaintiffs' claims.

### BACKGROUND

This action has a complex procedural history, having gone from this Court to the Fifth Circuit, to the Supreme Court, and back to this Court on remand. Or, "there and back again." *See* J.R.R. TOLKIEN, THE HOBBIT, OR THERE AND BACK AGAIN (1937). The Court first addresses that procedural history before more thoroughly detailing the facts relevant on remand.

## A. Procedural Background

On December 20, 2019, the Department of Homeland Security ("DHS") announced MPP. DHS created the program in response to an immigration surge at the southern border of the United States and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering about 2,000 inadmissible aliens each day. ECF No. 94 at 7. MPP required DHS to return certain non-Mexican nationals arriving by land from Mexico back to Mexico to await the results of their removal proceedings under 8 U.S.C. § 1229a. The Government of Mexico agreed to temporarily cooperate in administering MPP. *Id.* at 8.

Congress authorized MPP in the Immigration and Nationality Act ("INA"). The INA provides: "In the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title."[1] 8 U.S.C. § 1225(b)(2)(C). A separate provision of the same INA section states: If "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." *Id.* § 1225(b)(2)(A).

DHS began implementing MPP in January 2019. ECF No. 94 at 8. President Trump's administration implemented MPP because DHS lacks the resources to detain every alien seeking admission to the United States. *Id.* at 43. MPP ensured "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear

---

[1] Although this provision refers to the Attorney General, the authority it confers has been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. § 251(2) (transferring authority over "[t]he detention and removal program" to DHS); *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

before an immigration judge can determine the merits of any claim." *Id.* at 8. By December 31, 2020, DHS had enrolled 68,039 aliens in the program. *Id.* at 12.

On January 20, 2021, the Acting Secretary of DHS wrote: "Effective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Id.* at 15 ("January Suspension"). President Biden's administration later issued Executive Order No. 14010, which directed DHS Secretary Alejandro Mayorkas to "promptly review and determine whether to terminate or modify [MPP]." 86 Fed. Reg. 8269 (2021).

On June 1, 2021, Secretary Mayorkas issued a memorandum officially ending MPP. *See* Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) ("June 1 Memorandum"). In doing so, Secretary Mayorkas "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." ECF No. 54-2 at 172.

On April 13, 2021, Plaintiffs initiated this litigation challenging President Biden's administration's termination of MPP. *See generally* ECF No. 1. Plaintiffs' initial Complaint challenged the January Suspension that paused new enrollments in MPP. Following the June 1 Memorandum, Plaintiffs amended their Complaint to challenge the termination of the entire program. *See generally* ECF No. 48. Plaintiffs' First Amended Complaint asserted the June 1 Memorandum violated the INA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the termination under the APA. *See id.*

3

After a consolidated hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), the Court vacated the June 1 Memorandum and enjoined Defendants to continue to implement MPP "in good faith until such a time as it has been lawfully rescinded in compliance with the APA *and* until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 without releasing any aliens *because of* a lack of detention resources." ECF No. 94 at 52–53. Defendants sought a stay of that order, which the Fifth Circuit denied. *State v. Biden*, 10 F.4th 538, 543–61 (2021) (per curiam). The Supreme Court also denied Defendants' stay request because Defendants "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." *Biden v. Texas*, 142 S. Ct. 926, 926 (2021) (mem. op.).

On the cusp of oral argument in the Fifth Circuit, DHS issued two memoranda ("October 29 Memoranda") declaring that it had made a new decision terminating MPP. *See* ECF No. 162 at 19–61, Termination of the Migrant Protection Protocols ("Termination Memorandum") and Explanation of the Decision to Terminate the Migrant Protection Protocols ("Explanation Memorandum"). At the same time, Defendants asked the Fifth Circuit to hold the case moot, to vacate this Court's judgment and permanent injunction, and to remand the case for further proceedings. *Texas v. Biden*, 20 F.4th 928, 946 (5th Cir. 2021) ("*Biden II*"). The Fifth Circuit declined. It instead held that the October 29 Memoranda did not moot or have any legal effect on the appeal. *Id.* at 956–66, 998–1000. The Fifth Circuit then affirmed this Court on the merits. *See generally id.*

On June 30, 2022, the Supreme Court reversed the Fifth Circuit. *See generally Biden v. Texas*, 142 S. Ct. 2528 (2022) ("*Biden III*"). First, the Supreme Court determined 8 U.S.C. § 1252(f)(1) barred this Court's injunction, though that provision does not deprive this Court of

subject-matter jurisdiction over this action. *See id.* at 2538–39. The Supreme Court also held the termination of MPP did not itself violate the mandatory-detention requirement of Section 1225(b)(2)(A), although the Supreme Court "assume[d] *arguendo* . . . that the dissent's interpretation of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. *Biden III* did not disturb any of the holdings of this Court or the Fifth Circuit on issues of standing or reviewability to challenge a termination of MPP, the limits on parole authority, or the mandatory nature of the detention requirements of Section 1225.

Although the Supreme Court determined the October 29 Memoranda constitute final agency action that suspended the June 1 Memorandum, the Supreme Court did not answer whether the October 29 Memoranda are arbitrary and capricious under the APA. That task, the Supreme Court stated, is for this Court. *See id.* at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57 (1983))), 2549 (Kavanaugh, J., concurring) ("The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time. The Court today therefore properly leaves the *State Farm* issue for consideration on remand."), 2559 (Alito, J., dissenting) ("I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with § 706 of the APA."). Plaintiffs now challenge the October 29 Memoranda.

### B. Background Relevant to the October 29 Memoranda

On October 29, 2021, the Secretary issued the two memoranda, which the Court collectively calls the "October 29 Memoranda." The October 29 Memoranda consist of

the "Termination Memorandum" (four pages again announcing the termination of MPP) and the "Explanation Memorandum" (thirty-nine pages explaining the reasons for doing so). *See generally* ECF No. 162 at 19–61. The October 29 Memoranda claim the Secretary "examined the considerations that th[is] District Court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its [detention] obligations under 8 U.S.C. § 1225." *Id.* at 34.

In the October 29 Memoranda, the Secretary identified what he believed to be "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." *Id.* at 21. The Secretary nonetheless concluded MPP's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Id.* Finally, the Secretary noted that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id.*

Considering these conclusions, the Secretary announced he would once again terminate MPP. *Id.* at 22. The Secretary explained DHS would "continue complying with [this Court's] injunction requiring good-faith implementation and enforcement of MPP," but that "the termination of MPP" would be "implemented as soon as practicable after a final judicial

decision to vacate" that injunction. *Id.* This Court vacated its injunction on August 8, 2022. *See* ECF No. 147.

### C. The Pending Motion

On August 8, 2022, Plaintiffs filed the instant Motion. *See* ECF No. 149. Plaintiffs ask the Court to issue "a stay of the October 29 Memoranda pending a final merits determination as to whether they satisfy the requirements of reasoned decisionmaking under the APA." *Id.* at 11. Plaintiffs allege the Secretary failed to adequately consider: (1) "how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate"; (2) "MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims"; (3) "the justification of changed factual determinations regarding *in absentia* removal orders"; (4) "whether DHS's rescission of MPP is causing [DHS] to violate the limits on its parole authority"; and (5) "costs to States and their reliance interests." *Id.*

Defendants dispute these assertions. *See* ECF No. 163 at 34–51. But before addressing the substance of Plaintiffs' APA claims, Defendants argue this Court lacks jurisdiction and the request for stay is not justiciable. *See id.* at 17–25. Specifically, Defendants argue: (1) 8 U.S.C. § 1252(f)(1) "bars jurisdiction to stay an agency action directing how DHS will implement [8 U.S.C. §] 1225(b)(2)(C)"; (2) a court may not "stay agency action that has already gone into effect"; (3) "Plaintiffs lack standing to challenge the October 29 memorandum"; and (4) "Plaintiffs' APA claim is not reviewable." *See id.* at 25–51.

7

ANALYSIS

The Court separates Parties' arguments into two categories: justiciability arguments and merits arguments. The Court will reorder and consider Defendants' justiciability arguments before turning to Plaintiffs' APA claims.

### A. Plaintiffs Possess Standing

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement requires a plaintiff to establish standing to sue. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims.").

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To possess standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) his injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) his injury is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560–61 (internal marks omitted).

Plaintiffs have standing to challenge the October 29 Memoranda for the same reasons that they had standing to challenge the previous termination of MPP. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 416 (5th Cir. 2022); ECF No. 94 at 21–26. Additionally, the Court's previous determinations on standing constitute the law of the case because the agency action at issue is identical to the previously challenged action. *See Free v. Abbott Lab'ys, Inc.*, 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize jurisdiction exception to law-of-the-case doctrine and explaining that although a federal

court must examine each case to determine basis for jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required). That is, under MPP, large numbers of aliens who would otherwise impose costs on the States were instead required to remain in Mexico pending determinations of their asylum proceedings, and the termination of the program led to the imposition of those costs. *See* ECF No. 94 at 17–26; *Biden II*, 20 F.4th at 966–76 (finding States had standing to challenge agency action terminating MPP, including for claim of arbitrary-and-capricious decisionmaking under the APA).

Although Defendants argue the Court cannot rely on its previous standing determination, the Supreme Court did not overturn the standing determinations of this Court or the Fifth Circuit. *See* ECF No. 163 at 28–29; *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022); *Texas v. United States*, 40 F.4th 205, 222 n.9 (5th Cir. 2022) (per curiam) (considering *Biden II* binding on all grounds not reversed), *cert. granted*, No. 22A17 (22-58), 2022 WL 4841804 (July 21, 2022); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001) (concluding circuit opinions in which judgment reversed on only some grounds are still precedential with respect to portions not reversed). The Supreme Court implied standing is satisfied — as it remanded this action for the limited consideration of whether the October 29 Memoranda were arbitrary and capricious. *See Biden III*, 142 S. Ct. at 2548; *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 640 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) ("The Supreme Court did not address the issue of standing, although it was squarely presented to it."). The Supreme Court would not have remanded this case to this Court if Plaintiffs lacked standing to challenge the October 29 Memoranda.

Moreover, "the mandate rule, a corollary of the law of the case doctrine, compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues

expressly or impliedly decided by the appellate court." *Fisher*, 758 F.3d at 639–40 (internal marks omitted); *see also United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else."); *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (A court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." (quoting *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998))).

This Court will not exceed the Supreme Court or Fifth Circuit's mandates. *See Biden III*, 142 S. Ct. at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA."); *Texas v. Biden*, 43 F.4th 446, 447 (5th Cir. 2022) (per curiam) (mem. op.) ("We remand for further proceedings consistent with the Supreme Court's decision." (emphasis removed)). Accordingly, the Court finds no reason to dismiss this case for an alleged absence of standing.

### B.  Plaintiffs Assert a Valid Cause of Action

Defendants renew two arguments against judicial review of the Secretary's decision to terminate MPP. First, Defendants argue agency action terminating MPP is "committed to agency discretion" by law and, therefore, not subject to judicial review. ECF No. 163 at 32; *see also* 5 U.S.C. § 701(a)(2). Second, Defendants argue Plaintiffs' claims challenging the termination of MPP fall outside the zone of interests of the INA. ECF No. 163 at 32–33. The Court has rejected both arguments. *See* ECF No. 94 at 31–34. The Fifth Circuit has done the same. *See Biden II*, 20 F.4th at 975–76, 978–88. The portion of the Fifth Circuit's opinion rejecting these arguments remains good law. *See Data Mktg. P'ship*, 45 F.4th 846, 856 n.2. And again, the Supreme Court expressly remanded this case to this Court to "consider in the first instance whether the October

29 Memoranda comply with section 706 of the APA." *Biden III*, 142 S. Ct. at 2548. The Court

therefore finds Defendants' arguments unpersuasive.

### C.  Section 1252(f)(1) Does Not Bar Jurisdiction

Parties dispute whether the Court has "jurisdiction or authority" to "issue all necessary and

appropriate process to postpone the effective date of an agency action or to preserve status or rights

pending conclusion of the review proceedings" under Section 705 of the APA. The Court

determines it does.

Section 705 of the APA provides:

> When an agency finds that justice so requires, it may postpone the effective date of
> action taken by it, pending judicial review. On such conditions as may be required
> and to the extent necessary to prevent irreparable injury, the reviewing court,
> including the court to which a case may be taken on appeal from or on application
> for certiorari or other writ to a reviewing court, may issue all necessary and
> appropriate process to postpone the effective date of an agency action or to preserve
> status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. Section 1252(f)(1) of the INA states:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of
> part IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1). The Supreme Court recently held Section 1252(f)(1) "prohibits lower courts

from entering injunctions that order federal officials to take or to refrain from taking actions to

enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman

Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

Neither the Supreme Court nor the Fifth Circuit have answered whether Section 1252(f)(1)

prohibits relief under Section 705. In fact, the Supreme Court has expressly reserved whether

Section 1252(f)(1) prohibits various types of non-injunctive relief. *See Biden III*, 142 S. Ct. at 2548

(directing this Court to consider whether October 29 Memoranda comply with Section 706 of the APA), 2552 (Alito, J., dissenting) (noting whether Section 1252(f)(1) bars review under Section 706 "is an important question" that remains), 2562 (Barrett, J., dissenting) (noting the Supreme Court "reserves the question whether § 1252(f)(1) bars declaratory relief" and "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the [APA]" (internal marks omitted)); *Aleman Gonzalez*, 142 S. Ct. at 2077 n.9 (Sotomayor, J., concurring) ("Section 1252(f)(1) limits lower courts' authority to 'enjoin or restrain,' whereas a declaratory judgment (unlike an injunction) 'is not ultimately coercive.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 471 (1974)) (collecting cases)).

Because neither the Supreme Court nor the Fifth Circuit have answered whether Section 1252(f)(1) prohibits relief under Section 705, this Court will decide the issue. The Court begins with the text of Section 705. The Court construes statutory text to give effect to the ordinary public meaning conveyed when Congress enacted the statute. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 536 (2019); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–92 (2012) ("Reading Law"). When doing so, the Court "read[s] the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006). And the Court must abide by judicially accepted principles of linguistics in reading the whole — including compositionality. *See generally* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript); *Bostock v. Clayton County*, 140 S. Ct. 1731, 1769 n.22 (2020) (Alito, J., dissenting) (same). Although courts start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the

[statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). Context includes the *corpus juris* of which a statute is a part. *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes.").

The Fifth Circuit recently determined a district court may hold unlawful and set aside an agency action under Section 706 despite Section 1252(f)(1). *See Texas*, 40 F.4th at 219–20; *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) (Section 1252(f)(1) "does not apply to vacatur."). Section 706 grants a court reviewing agency action remedial options, including: (1) compelling agency action; and (2) holding unlawful and setting aside agency action. The latter of these options is often called "vacatur." The Fifth Circuit has acknowledged "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *See Texas*, 40 F.4th at 219 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Whereas an injunction "tells someone what to do or not to do," a vacatur only reinstates "the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making." *Aleman Gonzalez*, 142 S. Ct. at 2064 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)); *Texas*, 40 F.4th at 219. Accordingly, the Fifth Circuit has not extended Section 1252(f)(1)'s limitations on injunctive relief to vacatur,[2] "especially when doing so would be contrary to the 'strong presumption favoring judicial review of administrative action.'" *Texas*, 40 F.4th at 220 (quoting *Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021)).

---

[2] In fact, the title of Section 1252(f) is "Limit on injunctive relief." *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991); SCALIA & GARNER, READING LAW 221 ("Title-and-Headings Canon"). "By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief." *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

Just as Section 1252(f)(1) does not prohibit "vacatur" under Section 706, Section 1252(f)(1) does not prohibit issuance of a "stay" under Section 705. Although Section 705 does not use the term "stay," courts characterize the provision as allowing for such relief. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power *to stay* the agency's action 'to the extent necessary to prevent irreparable injury[.]'" (quoting 5 U.S.C. § 705) (emphasis added) (alteration in original)); *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (Section 705 "authorizes reviewing courts *to stay* agency action pending judicial review." (emphasis added)).

Revisit Section 706. That provision states a court shall "hold unlawful and set aside agency action" under certain circumstances. 5 U.S.C. § 706(2). Neither "vacate" nor "vacatur" appear in the statute. Still, courts understand Section 706 to permit vacatur — *i.e.*, "[t]he act of annulling or setting aside." *Vacatur*, BLACK'S LAW DICTIONARY (11th ed. 2019). Just as Section 706 does not employ the term "vacatur," Section 705 does not use the term "stay." But the same logic applies: Section 705 should be understood to permit the issuance of a stay, rather than injunctive relief. *Compare* 5 U.S.C. § 705 (A court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."), *with Stay*, BLACK'S LAW DICTIONARY ("The postponement or halting of a proceeding, judgment, or the like.").

Unlike an injunction, a stay would not "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions" at issue. *Aleman Gonzalez*, 142 S. Ct. at 2065; *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950–51, 1016 (2018) ("Preliminary relief under section 705 differs from a preliminary injunction, which blocks the executive from *enforcing* a law but does not

14

postpone the effective date of the law itself. Section 705, by contrast, empowers courts to delay the effective date of the challenged agency action.").[3] A Section 705 stay can instead be seen as an interim or lesser form of vacatur under Section 706. Just as a preliminary injunction is often a precursor to a permanent injunction, a stay under Section 705 can be viewed as a precursor to vacatur under Section 706. *Compare Stay*, BLACK'S LAW DICTIONARY ("The postponement or halting of a proceeding, judgment, or the like."), *and Vacatur* ("The act of annulling or setting aside."), *with Injunction* ("A court order commanding or preventing an action.").

It would be "particularly dubious in light of the [Supreme] Court's caveats" to extend *Aleman Gonzalez* or Section 1252(f)(1) to stays under Section 705. *Texas*, 40 F.4th at 219, 220 ("The Supreme Court has indicated that § 1252(f) is to be interpreted relatively narrowly. Indeed, the Court described § 1252(f) as 'nothing more or less than a limit on injunctive relief.'" (quoting *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481)). Accordingly, the Court finds it has authority to "issue all necessary and appropriate process to postpone the effective date of an agency action" in light of Section 1252(f)(1). 5 U.S.C. § 705.

### D. The Court May Stay the October 29 Memoranda under Section 705

Defendants argue Section 705 may only remedy an agency action that has yet to take effect. ECF No. 163 at 25. In support of their argument, Defendants cite cases[4] interpreting an agency's ability to "postpone the effective date of action taken by it." *Id.* Although these cases do not

---

[3] To be sure, stays and injunctions share similarities. *See Nken*, 556 U.S. at 428–29 ("A stay [of an agency action] pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one . . . . [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act — the order or judgment in question — not by directing an actor's conduct."). Indeed, "[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*." *Id.* at 428.

[4] These cases include: *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996); *Ctr. for Biological Diversity v. Regan*, No. CV-21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 263 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017).

interpret what it means for "the reviewing court . . . to postpon[e] the effective date of an agency action," Defendants argue "[t]he use of an identical phrase in . . . Section 705 must be presumed to be intentional." *Id.* at 26 (quoting 5 U.S.C. § 705). And therefore, the Court cannot issue interim relief to stay the effect of an already-effective agency action.[5]

Whether the effective date of the October 29 Memoranda has passed is irrelevant to this Court's ability to issue a Section 705 stay.[6] Courts — including the Supreme Court — routinely stay already-effective agency action under Section 705. *See, e.g.*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016). Defendants attempt to distinguish a federal appellate court's power to stay agency action under Section 705 from a district court's power to do same. *See* ECF No. 173 at 2–3. But district courts have the same authority as appellate courts in issuing Section 705 stays because of the nature of judicial review of agency action.[7]

---

[5] It is of no issue to Defendants that Section 705 also allows a court to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." Defendants argue this "clause is subject to the same temporal limitation as the first clause for the simple reason that the status quo, once a rule goes into effect, is that the rule is in effect." ECF No. 163 at 27.

[6] Although Supreme Court has held the October 29 Memoranda constitute "final" and "operative agency action[]," thereby qualifying the Memoranda as a rule, it did not detail the effective date of the action. *Biden III*, 142 S. Ct. at 2545; *see also* 5 U.S.C. § 551(4). The APA does not define "effective date" as used in Section 705. "In general, an effective date is part of an agency statement of general or particular applicability and of future effect." *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 761–62 (3d Cir. 1982) (internal marks omitted); *see also Effective Date*, BLACK'S LAW DICTIONARY ("The date on which a statute, contract, or insurance policy, or other such instrument becomes enforceable or otherwise takes effect. This date sometimes differs from the date on which the instrument was enacted or signed."). Because this case does not turn on the effective date of the October 29 Memoranda, the Court need not divine that date.

[7] The APA allows for judicial review in a court "of competent jurisdiction" absent a "special statutory review proceeding." 5 U.S.C. § 703. Without a special statutory provision, courts of appeals may not directly review agency actions. *In re Sch. Bd. of Broward Cnty.*, 475 F.2d 1117, 1119 (5th Cir. 1973); *see also Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481 (D.C. Cir. 1994) ("Unless a statute provides otherwise, persons seeking review of agency action go first to district court rather than to a court of appeals."). The APA's stay provision is not limited to exclusive application by appellate courts. Instead, the "reviewing court[] may issue all necessary and appropriate process to

Whereas an agency may only "postpone the effective date of action taken by it, pending judicial review," a federal court has broader power to "issue all necessary and appropriate process to postpone the effective date of an agency action *or to preserve status or rights pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphasis added). The greater limitation on agencies exists because "agencies are creatures of statute" and, thus, "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022).

The cases Defendants cite preclude agencies — not courts — from staying the effective date of agency actions after the effective date. Authorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements. *See, e.g., Ctr. for Biological Diversity*, 2022 WL 971067, at *21 ("[I]t is one thing to permit an agency to stay an administrative decision pending judicial review in order to maintain the status quo, but something altogether different to alter the status quo without providing an opportunity for notice and comment."). An agency's "order delaying [a] rule's effective date . . . [is] tantamount to amending or revoking a rule." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). This includes the general requirement that rules be subject to notice-and-comment procedures.[8]

The limitation on agencies contrasts with courts' inherent authority to stay agency action to facilitate judicial review. *See Nken*, 556 U.S. at 426; *see also McQuiggin v. Perkins*, 569 U.S.

---

postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Here, this Court is the relevant reviewing court.

[8] The memoranda implementing MPP were published in the Federal Register. *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 Fed. Reg. 6811 (issued January 25, 2019, with publication date of February 25, 2019). By contrast, the October 29 Memoranda were not published in the Federal Register.

383, 397 (2013) (Courts should "not construe a statute to displace courts' traditional equitable authority absent the clearest command." (quoting *Holland v. Florida*, 560 U.S. 631, 636 (2010))). The All Writs Act "preserves" courts' authority to issue such stays. *See* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

Just as vacating an agency action "does nothing but re-establish the status quo absent the unlawful agency action," staying an agency action under Section 705 (even after the effective date) restores the same status quo *ex ante*. *Texas*, 40 F.4th at 220; *see also Wages & White Lion Invs.*, 16 F.4th at 1144. The "status quo" to be restored is "the last peaceable uncontested status existing between the parties before the dispute developed." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 11A FEDERAL PRACTICE & PROCEDURE § 2948 (3d ed. 2013) (cleaned up); *see also Texas*, 40 F.4th at 219 (stating relevant status quo is "status quo absent the unlawful agency action" (quoting *Nken*, 556 U.S. at 428)); *Wages & White Line Invs.*, 16 F.4th at 1144 ("[T]he status quo [is] the state of affairs before the" challenged agency action.). The "status quo" is thus the administration of MPP, the status before the Secretary issued the October 29 Memoranda. "In other words, 'the relief sought here would simply suspend *administrative* alteration of the *status quo*.'" *Wages & White Lion Invs.*, 16 F.4th at 1144 (quoting *Nken*, 556 U.S. at 430 n.1).

### E.  A Stay Is Appropriate

"Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs.*, 720 F. Supp. 2d at 15 n.4; *see also Texas*, 829 F.3d at 435 (applying preliminary injunction factors). These factors require the movant to show: (1) a likelihood of success on the merits;

(2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). Plaintiffs satisfy all four factors.

    1.  <u>Plaintiffs are likely to succeed on the merits.</u>

A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Although a reviewing "court may not substitute its own policy judgment for that of the agency" and must apply this standard deferentially, the agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency "action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *ex post*. *State Farm*, 463 U.S. at 50. Agency "action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment'" must be set aside. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Judicial review of agency action "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The agency must also consider reliance interests of those affected by a contemplated decision and consider less-disruptive policies given those interests. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020). In the immigration context, the agency's "approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011).

Merely saying something "was considered is not enough to show reasoned analysis." *Biden*, 10

F.4th at 555.

> a. *Defendants fail to adequately consider how using contiguous-territory return authority would allow them to avoid violations of the INA's detention mandate.*

The October 29 Memoranda rely on incorrect legal conclusions, including that

"Section 1225 does not impose a near-universal detention mandate," and that

Section 1182(d)(5)(A)'s parole authority permits DHS to parole nearly all aliens subject to

Section 1225's mandatory-detention obligation. ECF No. 162 at 49–51. Under 8 U.S.C.

§ 1225(b)(2)(A), an alien "seeking admission [who] is not clearly and beyond a doubt entitled to

be admitted . . . shall be detained for a proceeding under section 1229a of this title." *See also*

*Jennings v. Rodriquez*, 138 S. Ct. 830, 842 (2018) ("Read most naturally, [the statute] mandate[s]

detention . . . ."). This Court has already determined Section 1225's detention requirements

are mandatory. *See* ECF No. 94 at 42–44. Likewise, the Fifth Circuit determined

Section 1225(b)(2)(A)'s "shall be detained" language is "obviously a mandatory statutory

command — not a commitment to agency discretion." *Biden II*, 20 F.4th at 978, 992–96. *Biden III*

does not upset this Court and the Fifth Circuit's determinations stating as much.[9]

Before terminating MPP, Defendants had to thoroughly consider the effect of the

termination on mandatory-detention duties. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187

---

[9] In *Biden III*, the Supreme Court rejected the insinuation that its "opinion authorizes the Government to release aliens subject to detention under section 1225(b)(2)(A)," and clarified that it "need not and d[id] not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion . . . or whether the Government's current practices simply violate that provision." *Biden III*, 142 S. Ct. at 2542 n.4. Instead, the Court only "assum[d] *arguendo* for purposes of [its] opinion that the dissent's interpretation of section 1225(b)(2)(A) [as mandating detention] is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. Justice Alito's dissent interpreted Section 1225(b)(2)(A) in harmony with this Court's interpretation. Justice Alito's dissent pointed to the conclusion in *Jennings v. Rodriguez* that "[r]ead most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." *Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting) (quoting 138 S. Ct. at 842). That Section 1225(b)(2)(C) confers discretionary authority does not nullify Section 1225(b)(2)(A)'s mandatory-detention requirement. The Secretary can violate his mandatory-detention duty under Section 1225(b)(2)(A) while exercising discretion not to return certain aliens under Section 1225(b)(2)(C).

(D.C. Cir. 2011) (stating "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates — especially when the change impacts a contemporaneous and closely related rulemaking"); *Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process). Defendants failed to do so.

Terminating MPP lessened Defendants' ability to detain all arriving aliens, as mandated by Congress. Although DHS may exercise its discretion and parole certain aliens on a "case-by-case basis," the exercise of that discretion must "be reasonable and reasonably explained." *Biden III*, 142 S. Ct. at 2548–49 (Kavanaugh, J., concurring); *see also Biden III*, 142 S. Ct. at 2543 ("DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."). That DHS may, on a "case-by-case basis," parole some aliens rather than detaining them or returning them to Mexico, does not mean the October 29 Memoranda sufficiently explained why those aliens were paroled. 8 U.S.C. § 1182(d)(5)(A).

An assertion that "the Secretary did consider Section 1225(b)(2)(A)" does not adequately address the issue. ECF No. 163 at 37. The Secretary did consider Section 1225(b)(2)(A) — though only to conclude that he did not need to detain all inadmissible aliens as mandated by statute. ECF No. 162 at 49. In full, the Secretary stated:

> Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory. Section 1225 'does not mean' that every noncitizen 'must be detained from the moment of apprehension until the completion of removal proceedings.' The INA provides DHS with latitude for processing noncitizens beyond returns or detention. DHS 'may . . . in [its] discretion' release a noncitizen placed in Section 1229a proceedings through 'parole,' pursuant to 8 U.S.C. § 1182(d)(5) 'for urgent humanitarian reasons or significant public benefit.'

*Id.* (citing *Matter of M-S-*, 27 I&N Dec. 509, 516–17 (A.G. 2019), *and Rodriguez*, 138 S. Ct. at 837). Defendants highlight other portions of the Explanation Memorandum, contending the Secretary determined "reading Section 1225 to impose such a near-universal mandate is inconsistent with the statutory text, the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities." ECF No. 163 at 37. But those portions push aside the undisturbed holdings of the Fifth Circuit and this Court, impermissibly replacing caselaw with agency-made "law." *See* ECF No. 162 at 30–33.

The Secretary's consideration does not — in and of itself — mean he *adequately* considered obligations imposed by Section 1225(b)(2)(A). *See Biden III*, 142 S. Ct. at 2543 (requiring a reasonable explanation). Reasonable consideration would address that terminating MPP affects DHS's ability to comply with mandatory-detention requirements. The October 29 Memoranda do not reflect necessary reasonable consideration. Instead, they merely make an assertion contrary to this Court's prior conclusion — a conclusion vindicated by the Fifth Circuit and relied upon by the Supreme Court. *See* ECF No. 94 at 42–44; *Biden III*, 142 S. Ct. at 2541–42; *Biden III*, 142 S. Ct. at 2553–54 (Alito, J., dissenting); *Biden II*, 20 F.4th at 978, 992–96.

Defendants appear to base the renewed termination of MPP on arbitrary and capricious grounds by denying that Section 1225 creates a detention mandate, despite this Court's earlier conclusion to the contrary. *See* ECF No. 94 at 42–44. Accordingly, Defendants likely could not — and did not — properly analyze the strength of using MPP to reduce their noncompliance with their detention mandates.

   b. *Defendants fail to adequately examine whether DHS's rescission of MPP causes it to violate the limits on its parole authority.*

In the Explanation Memorandum, the Secretary relies on DHS's "parole" authority under Section 1182(d)(5) of the INA to support his conclusion that "Section 1225 does not impose a

near-universal detention mandate for all inadmissible applicants for admission." ECF No. 162 at 49. The INA grants DHS the express authority to "parole" applicants for admission "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also Biden III*, 142 S. Ct. at 2543 (noting "the INA expressly authorizes DHS to process applicants for admission under a third option: parole" (citing 8 U.S.C. § 1182(d)(5)(A)).

DHS's parole authority "is not unbounded." *Biden III*, 142 S. Ct. at 2543. "DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). "And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* The October 29 Memoranda fail to consider how terminating MPP — combined with Defendants' inability to detain all arriving aliens — leads to increased violations of limits on their parole authority as they release aliens into the United States. *Cf. Portland Cement Ass'n*, 665 F.3d at 187; *Office of Comm'n of United Church of Christ*, 707 F.2d at 1141–42.

"Throughout the mid-twentieth century, the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants," so, "[i]n response, Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Biden II*, 20 F.4th at 947 (internal marks omitted); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Limiting the scope of Section 1182(d)(5) did not completely remove Defendants' discretion to parole aliens. But parole cannot be granted on a categorical basis by a broad, programmatic decision. *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985); *FBI v. Abramson*, 456 U.S. 615, 631 (1982). Section 1182(d)(5) explicitly limits DHS's parole

authority to "case-by-case" consideration: "The power *must* be exercised on a case-by-case basis." *Biden II*, 20 F.4th at 947 (emphasis added).

The Court previously found MPP's termination forced Defendants "to release and parole aliens into the United States because [Defendants] simply do not have the resources to detain aliens as mandated by statute." ECF No. 94 at 17. And Defendants continue to do so. *See* ECF No. 143-1 at 4–5 (noting Defendants released 11,424 applicants for admission and released 72,611 applicants for admission, "whether paroled or otherwise," in June 2022). The October 29 Memoranda attempt to justify Defendants' actions by stating "the [parole] statute does not set any limit on the number of individuals DHS can decide to release on parole." ECF No. 162 at 49. That may be true. But "the number of aliens paroled each month . . . gives rise to a strong inference that the Government is not really making these [parole] decisions on a case-by-case basis." *Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting); *see also Biden II*, 20 F.4th at 997 (stating "the Government's proposal to parole every alien it cannot detain is the opposite of the 'case-by-case basis' determinations required by law"). The October 29 Memoranda also attempt to justify Defendants' actions by relying on past DHS practice, claiming DHS has "long interpreted" its parole authority to enable it to simply parole aliens when it lacks sufficient detention capacity.[10] ECF No. 162 at 50. Yet practice "does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1982)); *see also Judulang*, 565 U.S. at 61 ("Arbitrary agency action becomes no less so by simple dint of repetition," and "longstanding capriciousness receives no special exemption from the APA.").

---

[10] The Court notes, however, the October 29 Memoranda fail to address Defendants' prior determinations that lack of detention space is not an appropriate reason to parole an alien. *See* ECF No. 162 at 177, 179, 181. "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decisionmaking." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (internal marks omitted).

Section 1182(d)(5)(A)'s text and historical context contradict any claim to such power. Section 1182(d)(5)(A)'s text is clear: "Deciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking." *Biden II*, 20 F.4th at 942; *see also Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting) ("[T]he number of aliens paroled each month under that provision — more than 27,000 in April of [2022] — gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis."). Applying *Chevron* deference does not change Section 1182(d)(5)(A)'s requirements. *See generally Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). Defendants "must operate within the bounds of reasonable interpretation," even when applying *Chevron. Michigan v. EPA*, 576 U.S. 743, 751 (2015).

While an agency generally "has the authority to rely on rulemaking" to resolve "certain issues of general applicability," Congress can withhold that authority. *Lopez v. Davis*, 531 U.S. 230, 243–44 (2001) (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991)). Congress did so when it passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to cabin the executive branch's parole authority, believing the executive used that authority to evade congressionally mandated detention. *Cruz-Miguel*, 650 F.3d at 199 & n.15; *see also Biden II*, 20 F.4th at 947 (After "the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants, . . . Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." (internal marks omitted)). "By enacting [IIRIRA], Congress 'specifically narrowed the executive's discretion to grant' parole due to 'concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy.'" ECF No. 94 at 43 n.11 (quoting *Cruz-Miguel*, 650 F.3d at 199 & n.15).

Likewise, Section 1182(d)(5)(A)'s historical context confirms DHS cannot exercise its parole authority to parole categories of aliens, rather than individuals. Before IIRIRA, federal immigration authorities enjoyed a parole power "under such conditions as [the Attorney General] may prescribe for emergent reasons or for reasons deemed strictly in the public interest." Pub. L. No. 414 ch. 477, Title II, ch. 2, § 212, 66 Stat. 182. This parole authority was "close to plenary." *Amanullab v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987). But again, Congress curtailed the parole authority by amending Section 1182(d)(5)(A), thereby expressly limiting the parole authority to require case-by-case determinations.

As for Section 1226(a), that provision does not apply to individuals eligible for MPP. Section 1226(a) governs the arrest, detention, and release of aliens who are already "present in the country." *Rodriguez*, 138 S. Ct. at 837. By contrast, Section 1225 applies to aliens arriving to the United States. Because neither side disputes only aliens apprehended at the border are eligible for MPP, Defendants cannot use Section 1226(a) to parole MPP-eligible aliens in lieu of detention or contiguous return. ECF No. 149 at 23; ECF No. 162 at 49.

Considering the above, the Court finds the October 29 Memoranda likely fail to adequately consider the relevant costs and benefits of MPP. Therefore, the Court finds the October 29 Memoranda are likely arbitrary and capricious in this fashion.

   c. *Defendants fail to adequately account for several key benefits of MPP.*

The October 29 Memoranda fail to consider MPP's deterrent effect on illegal border crossings and the reduction of unmeritorious asylum claims. For example, the October 29 Memoranda extensively discuss conditions migrants face while they remain in Mexico. ECF No. 162 at 34–40. Yet the Memoranda do not mention the hardships aliens face

when making the dangerous journey to the southern border in the first instance,[11] despite acknowledging MPP "likely . . . contributed to a decrease in migration flows." *Id.* at 45. The October 29 Memoranda further fail to analyze how MPP deterred migrants with unmeritorious asylum claims from traveling to the southern border, just as the June 1 Memoranda failed to do. *Id.* at 40–43; *see also* ECF No. 94 at 36 (stating June 1 Memoranda failed to "address the problems created by false claims of asylum or how MPP addressed those problems").

Defendants abandoned statistic-based decisionmaking for intuitional decisionmaking. *See, e.g.*, ECF No. 162 at 45 ("In making his determination decision, the Secretary has *presumed* — as is *likely* — that MPP contributed to a decrease in migrant flows." (emphasis added)). When MPP was first announced, DHS "observed that 'approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges.'" *Id.* at 42–43. But when terminating MPP, the October 29 Memoranda acknowledge Defendants "do[] not have a record of the methodology used to generate this '9 out of 10' statistic." *Id.* at 43. Defendants implemented a policy change because, in their view, MPP led to too few asylum grants. *Id.* To support their conclusion, Defendants cite lower rates for granting asylum claims for those enrolled in MPP. *Id.* But Defendants fail to articulate why higher rates outside MPP are more accurate determinations than the lower rates for aliens enrolled in the program. Instead, Defendants conclude "[t]hese discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims." *Id.*

The October 29 Memoranda do not appear to demonstrate "a rational connection between the facts found and the choice made" to terminate MPP. *State Farm*, 463 U.S. at 43 (internal marks

---

[11] Plaintiffs do not press claims on behalf of third parties. Instead, Plaintiffs highlight the reduction in journeys to the southern border "as a benefit the Secretary failed to consider, and [Plaintiffs] have standing to raise that procedural injury since it affects the States' concrete interests." ECF No. 168 at 7–8 n.1; *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009).

omitted). Absent some qualification, presumptions and speculations do little — if anything — to justify agency action. The Court finds "[s]uch intuitional . . . decisionmaking, completely opaque to judicial review," likely "fall[s] somewhere on the distant side of arbitrary." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (quoting *Cent. Fla. Enters., Inc. v. FCC*, 598 F.2d 37, 50 (D.C. Cir. 1978)). Decisionmaking based on "policy preferences" cannot replace required reasoned decisionmaking. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574–75 (2019).

Defendants also fail to consider MPP's impact on human trafficking. *Cf.* ECF 94 at 20. They instead focus on other crimes, including narcotics smuggling. ECF No. 162 at 47–48. Although the data Defendants cite for these crimes suggests a decline, several problems with the data exist. First, Defendants note "[t]hese declines have been driven by a substantial decrease in marijuana smuggling," as "hard narcotics . . . are historically smuggled through ports of entry and thus have very little connection to MPP's implementation." *Id.* at 47. Second, although Defendants state "[s]eizures of narcotics [are not] necessarily indicative of [human] trafficking activity," they use this data to conclude there is no evidence of MPP's effect on human trafficking. *Id.*

By using irrelevant data, Defendants again fail to articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Biden II*, 20 F.4th at 992 ("We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion."). The use of admittedly irrelevant data strongly evidences a lack of rational decisionmaking, as agencies "must examine the *relevant* data" — not just *any* data. *State Farm*, 463 U.S. at 43 (emphasis added).

28

   d. *Defendants fail to adequately justify factual determinations regarding* in absentia
      *removal orders.*

The October 29 Memoranda provide no rational explanation why the increased rates of *in absentia* removals for aliens enrolled in MPP are not an indicator of MPP working. *See* ECF No. 162 at 22–23 (noting 32 percent of aliens enrolled in MPP were subject to *in absentia* orders of removal at some point during removal proceedings, whereas the rate was only 13 percent for aliens not processed through MPP during the same time period), 43 (stating MPP was "deterring non-meritorious claims"). The Court previously noted that "[a] higher rate of *in absentia* removal is consistent with DHS's [previous] findings that MPP reduced the 'perverse incentives' to pursue meritless asylum applications." ECF No. 94 at 40–41; *see also* ECF No. 162 at 41 ("The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP."); *cf.* ECF No. 162 at 43 n.89 (noting "implicit" in claim that MPP deterred aliens from asserting asylum claims, "many of which may be meritless" is that "some such claims do have merit" (emphasis removed)).

In the administrative record, DHS only addresses that fact by asserting MPP "deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims." ECF No. 162 at 43. And Defendants simply reiterate this claim in briefing. *See id.* The Court is unaware of any attempt by a federal actor to quantify, estimate, or show how many deterred meritorious asylum claims there are. DHS was under no obligation "to conduct or commission [its] own empirical or statistical studies" as a general matter. *Prometheus Radio Project*, 141 S. Ct. at 1160. But the failure to do so does not permit one to compare anecdotes that MPP deterred meritorious claims with hard numbers regarding the rate of *in absentia* orders, especially where the anecdotes and hard numbers are not clearly comparable. The anecdotes (while showing that some aliens

abandoned or lost their claims due to conditions in Mexico) do not establish that those claims were meritorious.[12] Likewise, the raw rate of *in absentia* orders contain a mixture of meritorious and non-meritorious claims. So, one cannot conclude that the rate of deterrence of meritorious claims is high relative to non-meritorious claims based on the raw rate of *in absentia* orders.

Accordingly, the Secretary fails to link the high *in absentia* removal rate for aliens enrolled in MPP with his claim that MPP deterred too many meritorious asylum claims compared to non-meritorious claims. So again, the failure to appreciate the relevant costs and benefits of MPP indicates Defendants failed to make a reasoned determination by considering all relevant factors.

e.   *Defendants fail to adequately consider costs to States and their reliance interests.*

The October 29 Memoranda devote little consideration of the costs to States and their reliance interests. *See* ECF No. 162 at 46–48. Defendants noted aliens "received COVID-19 tests before crossing the border and entering the United States," the Secretary "worked with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports," and the Secretary has taken actions to combat "criminal activity." *Id.* at 46–47. Notably missing — however — are considerations of the greater short-term and long-term impacts on the States and any level of detail regarding the softening of those impacts. *See id.* at 46–48.

The Explanation Memorandum acknowledges "the termination of MPP could lead to an increased number of noncitizens without proper documentation in [Texas and Missouri], which

---

[12] The Explanation Memorandum notes "only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal — a grant rate of just 1.1 [percent]." ECF No. 162 at 42. But the grant rate of a "comparable set of non-MPP cases from the same time period" was "2.7 percent." *Id.* According to Defendants, this discrepancy suggests "at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access." *Id.* at 43. It is doubtful a difference of 1.6 percent in meritorious claims from the comparable datasets is largely attributable to conditions in Mexico but not MPP's effectiveness. In any event, such a conclusion fails to account for the possibility that aliens enrolled in MPP differ from those not enrolled in the program.

might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs." *Id.* at 46; *see also* ECF No. 94 at 17–21 (discussing harms to Plaintiffs caused by termination of MPP). Yet the Secretary concludes "[f]ederal immigration policy virtually always affects the number of people living within the States." ECF No. 162 at 48. To Defendants, these are "marginal costs" that are "outweighed by the other considerations and policy concerns." *Id.* Defendants did not attempt to quantify these burdens to perform a cost-benefit analysis — despite possessing data readily available to do so. *See* ECF No. 94 at 17–21.

This case resembles *Texas v. United States*, where the Fifth Circuit determined the defendants overlooked both States' costs and their reliance interests in federal immigration policies. *See generally* 40 F.4th 205 (5th Cir. 2022) (per curiam). Although the DHS memorandum at issue contained "a multi-page section . . . analyzing the 'Impact on States,'" the Fifth Circuit found the analysis "dismissive," as it merely "dots 'i's and crosses 't's' without actually saying anything." *Id.* at 228. By failing to "quantify or at least reasonably describe the costs of th[e] policy to the States" and making the "audacious[] conclu[sion] that 'any effects from implementation of priorities guidance are unlikely to be significant,'" the defendants did not satisfy the requirement that agencies consider the costs to the States. *Id.* (internal marks omitted).

Defendants also gloss over the States' reliance interests. The October 29 Memoranda assert "the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation . . . of MPP" and state "any claimed reliance interest is undermined by the fact that [MPP] is itself discretionary." ECF No. 162 at 48. In *Department of Homeland Security v. Regents of the University of California*, "the Supreme Court acknowledged that DACA was a discretionary program . . . . [but still] faulted DHS for not considering reliance

31

interests . . . [t]hat included the States' reliance interests." *Biden II*, 20 F.4th at 990 (citing 140 S. Ct. at 1910, 1913–14). Just as DHS was required to consider States' reliance interests before terminating DACA, Defendants must consider States' reliance interests before terminating MPP. *Id.* at 990. The October 29 Memoranda also discount Plaintiffs' reliance interests, stating: "The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the [southwest border] who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States." ECF No. 162 at 48. Like MPP, DACA had only existed for a short time. *See Regents*, 140 S. Ct. at 1901. This statement is further contradicted by the Secretary's statements that the benefits of MPP include *deterring* aliens from arriving. So, the Court must look beyond *enrollment* numbers when considering Plaintiffs' reliance interests.

Plaintiffs, particularly the State of Texas, shoulder much of the burden of unlawful immigration, which "must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397–98 (2012). Texas is "a 900-mile border state." *Texas*, 40 F.4th at 228. It cannot be that Texas "has *no reliance interests* in the enforcement of federal criminal immigration law." *Id.* Giving short shrift to a relevant consideration "is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). In fact, the Fifth Circuit has recognized Plaintiffs' reliance interests in MPP's continuation: "The Supreme Court has recognized that border states 'bear[] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Biden*, 10 F.4th at 553 (quoting *Arizona*, 567 U.S. at 397) (alteration in original).

By terminating MPP without adequately considering the reliance interests of States in control of the flow of aliens (as assisted by MPP), Defendants do not appear to have tied their

approach, "even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55; *see also Texas*, 40 F.4th at 228 ("At this point, DHS has not shown a likelihood that it adequately considered the relevant costs to the States or their reliance interests in the pre-existing enforcement policy."). Failure to adequately consider the costs imposed on States and their reliance interests likely constitutes arbitrary and capricious decisionmaking.

2. Plaintiffs will likely suffer irreparable harm without preliminary relief.

"To show irreparable injury" in lieu of a stay, "it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* As the Court previously determined, "Plaintiffs have shown that they are suffering ongoing and future injuries as a result of the termination of MPP." ECF No. 94 at 49. The same injuries giving rise to standing are relevant to the irreparable injury analysis. *See Biden II*, 20 F.4th at 1002 (factual findings regarding injury made in standing context show increased costs to States from termination of MPP, and inability to recover from federal government supports determination that States have suffered an irreparable injury for which remedies available at law are precluded due to sovereign immunity). Accordingly, Plaintiffs satisfy this factor.

3. The balance of equities tips in Plaintiffs' favor and relief under Section 705 is in the public interest.

When considering the propriety of a Section 705 stay, the two final prongs "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. The analysis of the public interest and the balance of the equities is the same regarding the new attempt to terminate MPP as it was when the Court last addressed these factors. *See* ECF No. 94 at 50. Defendants lack a legitimate

interest in implementing an unlawful agency action. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, there is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). This remains true "even in pursuit of desirable ends." *Wages & White Lion Invs.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021)). And the public interest favors Plaintiffs because the public has an "interest in stemming the flow of illegal immigration" through the enforcement of immigration laws, including Section 1225. *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620, at *2 (S.D. Tex. Nov. 28, 2017); *see also* ECF No. 94 at 50.

### F. A Section 705 Remedy Need Not Be Geographically Limited

"In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Here, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective," as aliens would simply enter the United States through a non-party State. *Id.*

In any event, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). The text of Section 705 confirms this interpretation when applied to a stay. By "postpon[ing] the effective date of an agency action," the Court would stop the agency action in total. 5 U.S.C. § 705. The postponement clause does not merely speak to *part* of an agency action or indicate courts should take a piecemeal approach. And under the postponement clause's sister provision — allowing the Court "to preserve status or rights" — the relevant status quo was that MPP was administered along the southern border as a whole. *Id.*

34

CONCLUSION

Based on the above, the Court **GRANTS** the Motion. The Court **STAYS** the October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of this action. The Court **DENIES** all relief not expressly granted herein.

**SO ORDERED**.

December *15*, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE