# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS AND THE STATE OF MISSOURI,<br><br>        Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*,<br><br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:21-cv-00067-Z |

# PLAINTIFF STATES' SUPPLEMENTAL BRIEF

## TABLE OF CONTENTS

Table of Contents ................................................................................................ ii

Table of Authorities ........................................................................................... iii

Introduction ......................................................................................................... 1

Argument ............................................................................................................. 2

    I.    Plaintiff States have standing. ................................................................... 2

        A.    Standing is determined by facts in existence when the suit was commenced. .. 2

        B.    Plaintiff States have demonstrated a legally cognizable injury in fact ................ 3

        C.    The Plaintiff States's injuries are traceable to the termination of MPP and redressable by the relief sought. .............................................................................. 12

    II.    The October 29 Memoranda should be vacated. ................................... 15

        A.    The remedy of vacatur is authorized by the APA ............................. 15

        B.    Vacatur is not barred by 8 U.S.C. § 1252(f)(1). ................................ 19

        C.    The October 29 Memoranda should be vacated. ............................... 22

Conclusion ......................................................................................................... 23

Certificate of Service ........................................................................................ 25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
  No. 2:22-CV-223-Z, 2023 WL 2825871 (N.D. Tex. Apr. 7, 2023), *aff'd in part,
  vacated in part,* 78 F.4th 210 (5th Cir. 2023) .......................................................... 14

*Alli v. Decker*,
  650 F.3d 1007 (3d Cir. 2011) ....................................................................................... 21

*Almendarez-Torres v. United States*,
  523 U.S. 224 (1998) ....................................................................................................... 20

*Arevalo v. Ashcroft*,
  344 F.3d 1 (1st Cir. 2003) ............................................................................................ 21

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ............................................................................................ 11, 12

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ........................................................................................ 9, 10, 20

*Biden v. Texas*,
  142 S. Ct. 926 (2021) .................................................................................................... 23

*California v. Arizona*,
  452 U.S. 431 (1981) ...................................................................................................... 20

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) (en banc) .................................................................... 15

*Carr v. Alta Verde Indus., Inc.*,
  931 F.2d 1055 (5th Cir. 1991) ...................................................................................... 2

*Cochran v. SEC*,
  20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v.
  FTC*, 142 S. Ct. 890 (2023) ..................................................................................... 8, 13

*In re Core Comm'n, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ....................................... 22

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*,
  187 F.2d 789 (3d Cir. 1951) ........................................................................................ 17

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) ........................................................ 16, 21

*Davis v. FEC*,
    554 U.S. 724 (2008) .............................................................................2

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)........................................................................7, 8

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020).......................................................................9, 16

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ............................................................................21

*EME Homer City Generation, L.P. v. E.P.A.*,
    795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.) ..................................... 22

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) (en banc)...............................................18

*Fisher v. Univ. of Texas at Austin*,
    758 F.3d 633 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) .......................4

*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ...............................................................15

*Free v. Abbott Labs., Inc.*,
    164 F.3d 270 (5th Cir. 1999)..................................................................3

*GLO v. Biden*,
    71 F.4th 264 (5th Cir. 2023)...................................................................2

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ......................................................... 16, 21

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ........................................................................ 20

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) .............................................................................9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................2, 17

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ....................................................................... 17, 18

*Lynch v. Leis,*
    382 F.3d 642 (6th Cir. 2004) ........................................................................................2

*Missouri v. Biden,*
    —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4,
    2023) (Doughty, J.) ................................................................................................13

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ..............................................................................................21

*Nat. Res. Def. Council v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) .................................. 22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998)............................................................................17

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019) ......................................................................17

*Pederson v. Louisiana State Univ.,*
    213 F.3d 858 (5th Cir. 2000) ..................................................................................2

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
    No. 6:20-cv-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (Barker, J.) ...................... 16

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ..............................................................................................19

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ................................................................................................3

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. 2010) ..............................................................................21

*S. Utah Wilderness All. v. Palma,*
    707 F.3d 1143 (10th Cir. 2013) ..............................................................................3

*Scenic Am., Inc. v. United States Dep't of Transportation,*
    836 F.3d 42 (D.C. Cir. 2016) ................................................................................12

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,*
    No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.)..........................16

*Texas v. Biden,*
    554 F. Supp. 3d 818 (N.D. Tex. 2021) (Kacsmaryk, J.) ........................................10

*Texas v. Biden (MPP)*,
    20 F.4th 928 (5th Cir. 2021) ................................................................. *passim*

*Texas v. Biden*,
    No. 2:21-cv-67, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) ............ 1, 2, 18

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ..............................................................................2

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ................................................................15, 18, 19

*Texas v. United States*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.) ..................................................10

*Texas v. United States* (*DACA*),
    50 F.4th 498 (5th Cir. 2022) ................................................................10, 13, 19, 22

*Texas v. United States* (*DAPA*),
    809 F.3d 134 (5th Cir. 2015) ................................................................ 9, 11, 18, 19

*United States v. Castillo*,
    179 F.3d 321 (5th Cir. 1999) ..............................................................................4

*United States v. Lee*,
    358 F.3d 315 (5th Cir. 2004) ..............................................................................4

*United States v. Texas* (*Enforcement Priorities*),
    143 S. Ct. 1964 (2023) ................................................................................. *passim*

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ..........................................................................14

*V.I. Tel. Corp. v. FCC*,
    444 F.3d 666 (D.C. Cir. 2006) ............................................................................16

**Statutes**

5 U.S.C. § 705 ......................................................................................................1, 17

5 U.S.C. § 706 ........................................................................................................17

5 U.S.C. § 706(2) ..............................................................................................14, 16, 17

5 U.S.C. § 706(2)(A) ................................................................................................16

8 U.S.C. § 1252(f) ................................................................................................20, 21

8 U.S.C. § 1252(f)(1) ................................................................................................ 19, 20, 21

**Other Authorities**

8 C.F.R. § 1.3(a)(4)(vi) ..............................................................................................9

8 C.F.R. § 274a.12(c)(14) (2022) ...............................................................................9

42 C.F.R. § 417.422(h) ..............................................................................................9

*Black's Law Dictionary* 550 (7th ed. 1999) ............................................................ 20

*Black's Law Dictionary* 937 (11th ed. 2019) .......................................................... 20

*Black's Law Dictionary* 1612 (3d ed. 1933) ............................................................16

*Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011) .................................... 20

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012
      (2018) ................................................................................................................ 21

Pursuant to this Court's order, ECF No. 201, Plaintiffs the State of Texas and the State of Missouri submit this brief to supplement their previously filed briefs (ECF Nos. 149, 168, and 175), which are adopted by reference here for purposes of summary judgment.

## INTRODUCTION

On August 8, 2022—after the Supreme Court remanded for this Court to evaluate the reasoned decisionmaking of Defendants' second attempt to terminate the Migrant Protection Protocols (MPP) via two memoranda issued on October 29, 2021—Plaintiff States filed an amended complaint and a motion to stay the October 29 Memoranda under Section 705 of the APA ECF No. 149.

Plaintiff States asked the Court to issue a stay of the October 29 Memoranda pending a final merits determination as to whether they adequately considered: (1) "how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate"; (2) "MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims"; (3) "the justification of changed factual determinations regarding *in absentia* removal orders"; (4) "whether DHS's rescission of MPP is causing [DHS] to violate the limits on its parole authority"; and (5) "costs to States and their reliance interests." ECF No. 149 at 6. This Court granted a stay of the October 29 Memoranda, finding they were likely arbitrary and capricious on all these grounds. *Texas v. Biden*, No. 2:21-cv-67, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.).

1

ARGUMENT

## I.   Plaintiff States have standing.

Defendants argue that this Court cannot rely on its previous standing determinations made in the prior termination of MPP. ECF No. 203 at 11–13. But the Court already rejected these arguments. *Biden*, 2022 WL 17718634, *4–5. Nothing new justifies reversing this determination.

### A.   Standing is determined by facts in existence when the suit was commenced.

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted); *see also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

This suit was filed on April 13, 2021. ECF No. 1. In evaluating standing, the relevant facts are those existing when the complaint initiating the suit was filed. *See Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004). No facts subsequent to that date can serve to retroactively defeat standing. *See GLO v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021,

2

developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing).

That the Plaintiff States filed an amended complaint on August 8, 2022, does not change the relevant time period for evaluating standing. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). Although courts "look to the amended complaint to determine jurisdiction," *id*. at 474, "subject-matter jurisdiction depends on the state of things at the time of the action brought," *i.e.*, at the time the plaintiff *commenced suit*, *id*. at 473 (citation and internal quotation marks omitted). "The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (cleaned up); *see also id.* ("Thus, although we examine the allegations in SUWA's Amended Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007.").

This means that Defendants' attempts to undermine Plaintiff States' standing by pointing to actions by the Government of Mexico or numbers of migrant flows, ECF No. 203 at 9–10, 14, 28–29, cannot succeed. [1]

**B. Plaintiff States have demonstrated a legally cognizable injury in fact.**

The law-of-the-case doctrine applies to determinations of subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to

---

[1] Defendants even cite facts that post-date the August 8, 2022, filing of the Second Amended Complaint. ECF No. 203 at 9–10, 14, 28–29.

recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required) (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)). And "[i]n implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. S. Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin,* 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) (emphasis added; citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else.").

This Court is therefore bound by the Fifth Circuit's legal determinations on standing in this case, as well as the Supreme Court having "impliedly" found standing to challenge the termination of MPP when it reached the merits and remanded to this Court to evaluate the merits of whether the termination was arbitrary and capricious. *See* ECF No. 168 at 8–10. Defendants may assert that the Supreme Court's decision in *United States v. Texas* (*Enforcement Priorities*), 143 S. Ct. 1964 (2023), is an intervening authority sufficient to justify a refusal to follow this rule. But that ruling explicitly does not apply to cases like this one.

**1.** ***Enforcement Priorities* does not apply to this challenge to the termination of MPP.**

*Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens

4

whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect

order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because Plaintiff States' injuries are not based on a mere failure to arrest particular aliens on the border—they are based on Defendants' release of already-detained aliens into the States via parole, making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts,

for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id*. (cleaned up; citations omitted). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id*. at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id*. at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id*. at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment)

(noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

### 2. Even were the general rule in *Enforcement Priorities* to apply to this case, its exceptions would grant the Plaintiff States standing.

The Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, two closely related exceptions articulated by the Court would apply even if it did.

The *Enforcement Priorities* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional

enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *Texas v. United States* (*DAPA*), 809 F.3d 134, 154 (5th Cir. 2015) (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")). DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This exception applies to this case due to Defendants' policy of paroling—rather than detaining— the vast majority of aliens arriving at the border. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues). Parole makes recipients eligible for various federal and state benefits. "When the Department of Homeland Security lacks sufficient capacity to detain noncitizens at the southern border pending their immigration proceedings (often asylum proceedings), the immigration laws afford DHS two primary options": returning to Mexico (MPP) or parole. *Biden*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). "Due to the huge numbers of aliens who attempt to enter illegally from Mexico, DHS does not have the capacity to detain all

inadmissible aliens encountered at the border," *Biden*, 142 S. Ct. at 2550 (Alito, J., dissenting). That means aliens arriving at the border are being granted parole, at a rate that would be reduced by using MPP.

> As this Court has explained:
>
> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (Kacsmaryk, J.) (emphases in original). Because this Court has already found "that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri," due to a lack of detention capacity, *Texas v. Biden (MPP)*, 20 F.4th 928, 966 (5th Cir. 2021), that meant that more aliens were being released into the States to use healthcare services and public education—and parole made them eligible for subsidized driver's licenses. *Id*. at 968. This was sufficient for Article III standing and remains the case.

Plaintiff States' injuries on this basis are not indirect—courts in the DACA litigation described these same injuries as *direct* costs to the States. *See Texas v. United States* (*DACA*), 50 F.4th 498, 517 (5th Cir. 2022) ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id*. at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). The termination of MPP increases the flow of aliens paroled into the Plaintiff States, and the combination of the lack of capacity to detain all of them and the exercise of parole makes them eligible for benefits, imposing *direct* costs on the Plaintiff States.

The Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) reinforces that the costs to the Plaintiff States in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id*. at 2365, and it interacted with the federal government to service student loans and received administrative fees for these services, *id*. The loss of those fees was "an injury in fact *directly* traceable to the" loan forgiveness program, *id*. (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself," *id*. at 2366 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the Plaintiff States here. Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d at 155 n.58, and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and

without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156).

Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, the financial injuries imposed on the Plaintiff States here are direct rather than indirect.

### C.  The Plaintiff States's injuries are traceable to the termination of MPP and redressable by the relief sought.

The *Enforcement Priorities* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *Enforcement Priorities*, 143 S. Ct. at 1970–71; *id.* at 1995 (Alito, J., dissenting). That decision therefore has no effect on those two prongs of the standing analysis, leaving the holdings of this Court and the Fifth Circuit the law of the case.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[2] *Enforcement Priorities*, 143 S. Ct. at 1976 (Gorsuch, J., concurring in the judgment). But that opinion has no legal effect—the majority had five different Justices supporting its holding and did not address traceability or redressability—and cannot somehow allow this Court to ignore binding Fifth Circuit precedent in this area, including the law-of-the-case determination by the Fifth Circuit in this case.

---

[2] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

The Plaintiff States here are entitled to special solicitude, as this Court and the Fifth Circuit have already held. The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Missouri v. Biden*, —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270, at *64 (W.D. La. July 4, 2023) (Doughty, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*).

Defendants still argue that *Enforcement Priorities* somehow overturns the special solicitude doctrine. ECF No. 203 at 24–27. But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11. This Court should follow the law-of-the-case determinations of the Fifth Circuit and find that the Plaintiff States are entitled to special solicitude.

Defendants argue that the lack of the subsequent cooperation of Mexico with MPP means that vacatur of the termination of MPP will not redress Plaintiff States' injuries. Of course, these facts are subsequent to even the August 8, 2022, amended complaint and cannot affect Article III standing, including redressability.

Further, when special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Mexico has as recently as last year cooperated with the United States in implementing MPP, and there is at least "some possibility" that it will do so again.

13

This Court has recently explained the standard for redressability (even without special solicitude):

> In this case, a favorable decision would likely relieve Plaintiffs of at least some of the injuries allegedly caused by FDA. *See Larson v. Valente*, 456 U.S. 228, 243 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury").

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2023 WL 2825871, at *8 (N.D. Tex. Apr. 7, 2023), *aff'd in part, vacated in part,* 78 F.4th 210 (5th Cir. 2023).

Directly relevant to the argument that Mexico having to cooperate with implementation of MPP affects the redressability analysis, this Court further explained in that case that:

> redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2565–66, 204 L.Ed.2d 978 (2019) ("[T]hird parties will likely react in predictable ways."); *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (defendants' actions need not be "the very last step in the chain of causation"); *Larson*, 456 U.S. at 242–44, 102 S.Ct. 1673; *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015). Therefore, Plaintiffs' alleged injuries are fairly traceable to Defendants and redressable by a favorable decision.

*Id.* This is *contra* Defendants' arguments that there is no redressability due to the necessity of Mexico's cooperation, and that line DHS officers would still have authority to not place aliens into MPP. ECF No. 203 at 27–28. There is some possibility that Mexico will again cooperate, as it has in the recent past, and DHS line officers have placed aliens into MPP during that time.

## II.   The October 29 Memoranda should be vacated.

Under the APA, an agency action that a court holds unlawful is "set aside," *i.e.*, vacated. 5 U.S.C. § 706(2). "The ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

The Fifth Circuit explained that "[r]emand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *MPP*, 20 F.4th at 1000 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). "But by default, remand *with* vacatur is the appropriate remedy." *Id.* (emphasis in original). The test focuses on "'(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" *Id.* (quoting *United Steel*, 925 F.3d at 1287).

The Fifth Circuit recently "reject[ed] DHS's contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *DAPA*, 809 F.3d at 188).

### A.  The remedy of vacatur is authorized by the APA.

Federal Defendants continue to push their radical claim that vacatur is not a legitimate remedy under the Administrative Procedure Act ("APA"). ECF No. 203 at 34–35. But the Fifth Circuit just recently affirmed such a remedy, finding it "was well within its discretion to order vacatur" of the DACA Memorandum. *DACA*, 50 F.4th at 530. And when reviewing the prior

15

termination of MPP, that court did the same, *MPP*, 20 F.4th at 1000–01, making the availability of this remedy the law of the case.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

Defendants contend that section 706(2) is merely a rule of decision and does not authorize vacatur. ECF No. 203 at 34–34. But "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). If accepted, Federal Defendants' interpretation would upend decades of APA decisions. For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1901 & 1916 n.7 (2020).

Even if it weren't precluded by binding precedent, Federal Defendants' arguments fail even writing on a blank slate. The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have long relied on the "set aside" authority to vacate unlawful agency actions.

A court "set[s] aside agency action" by vacating it. 5 U.S.C. § 706(2). When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.

Defendants maintain that if agency actions are vacated, vacatur should apply only to the parties. ECF No. 203 at 33. This atextual argument raises unanswerable questions. "[H]ow could this Court vacate the Rule with respect to the … plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Defendants' argument clashes with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the

17

scope of relief to be awarded). *Lujan*'s five-Justice majority observed that an "entire" agency program is "affected" by a successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation, "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting). Against this authority, however, Defendants have cited no case adopting their interpretation.

Defendants also argue that *nationwide* vacatur would be improper. ECF No. 203 at 35–36. But relief applying to Texas alone would not provide even Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [alien] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188; *see also Biden*, 2022 WL 17718634, at *18 ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted). This principle applies equally to vacatur.

18

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)), meaning that "[p]artial implementation of [the challenged immigration policy] would "detract[ ] from the 'integrated scheme of regulation' created by Congress," *id.*(quoting *Arizona*, 567 U.S. at 401).

Thus, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

**B.  Vacatur is not barred by 8 U.S.C. § 1252(f)(1).**

Defendants argue that the remedy of vacatur is akin to an injunction and barred by the limit on injunctive relief in 8 U.S.C. §1252(f)(1). ECF No. 203 at 31–33. Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (rejecting DHS argument that "vacatur

'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)."

This provision further confines itself to injunctions through its reference to remedies that "enjoin or restrain." 8 U.S.C. § 1252(f)(1). As "common doublets in legal writing" "restrain and enjoin" are often used as "coupled synonyms." *Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011).

Indeed, dictionaries contemporaneous to the passage of section 1252(f)(1) defined "enjoin" as "restrain by injunction." *Black's Law Dictionary* 550 (7th ed. 1999). "Enjoin" and "restrain," independently and as a doublet, refer to injunctive relief. Indeed, the Supreme Court has entered injunctions against parties in its original-jurisdiction docket by holding that they are "enjoined and restrained." *E.g., California v. Arizona*, 452 U.S. 431, 432 (1981).

Of course, at times, "enjoin" and "restrain" refer to injunctions and restraining orders as distinct from one another. For example, Federal Rule of Civil Procedure 65(c) describes the subject of a "preliminary injunction" or "temporary restraining order" as a party "enjoined or restrained." Whether treated as synonyms or references to two types of injunctive relief, "enjoin or restrain" as used in section 1252(f)(1) specifies injunctive relief. Subsection 1252(f)'s title, "Limit on injunctive relief," confirms this interpretation. 8 U.S.C. § 1252(f). "[T]he heading of a section" is a "tool available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (cleaned up). Here, section 1252(f)'s "title—'Limit on injunctive relief'—makes clear the narrowness of [the statute's] scope." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). It "prohibits ... injunctive relief." *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018).

Contrary to Federal Defendants' contention, vacatur is not "like an injunction." ECF No. 203 at 31. "[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." *Black's Law Dictionary* 937 (11th ed. 2019) (quoting 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2-3 (1909)). Vacatur does not operate *in personam*, and it does not involve coercion.

Instead, vacatur operates against a challenged action, is self-executing, and is accomplished through the court's order. It operates "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018). Nor does vacatur compel officials to do or refrain from anything. Like the revocation of a court order, judicial annulment of administrative action may alter a party's conduct, but it does not order anyone to do anything.

The two remedies differ in additional ways. "An injunction is a[n] … extraordinary remedy," *Monsanto*, 561 U.S. at 165, while vacatur is "the ordinary result," *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Injunctions "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but vacatur is the "default," *Data Mktg. P'ship, LP*, 45 F.4th at 859. Injunctions require showing "an irreparable injury," and both "the public interest" and "the balance of hardships between the plaintiff and defendant" must favor injunctive relief. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Vacatur's "less drastic remedy," *Monsanto*, 561 U.S. at 165, requires none of those showings.

Defendants also maintain that the term "restrain" in Section 1252(f)(1) sweeps beyond injunctive relief. ECF No. 203 at 31. But the word "'restrain' in Section 1252(f) is best read to

refer to temporary injunctive relief." *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010); *Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011) ("'[R]estrain' refers to one or more forms of temporary injunctive relief, such as a temporary restraining order or preliminary injunction"); *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) ("The most sensible way to give operative effect to both words in this statutory scheme is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief....").

### C. The October 29 Memoranda should be vacated.

In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *DACA*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

The October 29 Memoranda have serious deficiencies as they perpetuate the same unlawful action on one of the same bases that this Court previously held as unlawful—arbitrary and capricious decisionmaking. As the Fifth Circuit previously said in this case:

> DHS was on notice about the problems with its decision well before it terminated MPP. And it still failed to correct them. It therefore makes sense that the district court didn't take seriously DHS's claim that it could easily fix those errors on remand without vacatur.

*MPP*, 20 F.4th at 1000–01. Further, there would be no disruptive consequences, as the October 29 Memoranda have been stayed since this Court's prior ruling on December 15, 2022.

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J.,

concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such.").

DHS has had opportunities to solve this problem within the bounds of reasoned decisionmaking. It failed when it tried to terminate MPP the first time. *See Biden v. Texas*, 142 S. Ct. 926 (2021) (mem.) (denying stay because Defendants "had failed to show a likelihood of success on the claim that the [original MPP termination memorandum] was not arbitrary and capricious." And given a second chance, DHS has failed to terminate MPP according to the requirements of reasoned decisionmaking again in the October 29 Memoranda.  There should be no third chance. Accordingly, this Court should vacate the October 29 Memoranda.

CONCLUSION

The Court should grant summary judgment on Plaintiff States' claim that the October 29 Memoranda are arbitrary and capricious; issue declaratory relief to that effect; and set aside, *i.e.*, vacate the October 29 Memoranda.

Dated: September 15, 2023

Respectfully submitted.

ANDREW BAILEY
Attorney General of Missouri

ANGELA COLMENERO
Provisional Attorney General of Texas

JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

*/s/ Maria Lanahan*
MARIA LANAHAN, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Maria.Lanahan@ago.mo.gov

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Deputy Chief, Special Litigation Division
*Attorney-in-Charge*
Texas Bar No. 24105085

**Counsel for Plaintiff State of Missouri**

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
ryan.walters@oag.texas.gov
munera.al-fuhaid@oag.texas.gov

**Counsel for Plaintiff State of Texas**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on September 15, 2023.

/s/ Ryan D. Walters
RYAN D. WALTERS

25