**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, <br> STATE OF MISSOURI, <br><br> *Plaintiffs,* <br><br> v. <br><br> JOSEPH R. BIDEN, JR., <br> in his official capacity as <br> President of the United States, *et al.*, <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 2:21-cv-00067-Z

<u>**DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 3

    A. Factual and Procedural History ................................................................... 3

    B. Subsequent Events ..................................................................................... 8

STATEMENT OF UNDISPUTED FACTS RELEVANT  TO SUPPLEMENTAL BRIEFING .. 9

ARGUMENT ....................................................................................................... 10

    I.   Plaintiffs lack standing. ......................................................................... 10

        A.   Prior rulings in this case do not establish, pursuant to the relevant
preponderance standard, that Plaintiffs have standing to challenge the October
29 memorandum. ................................................................................ 11

        B.   Even were the prior rulings law of the case, an intervening precedential
decision and new evidence bring this case outside the scope of that doctrine. ........ 14

        C.   Plaintiffs lack a cognizable injury from the federal government's decisions
whether to return noncitizens to Mexico under MPP. ............................................. 15

        D.   Plaintiffs' claim for standing fails regardless because the injury is too
attenuated from the challenged action and they do not warrant special
solicitude. .................................................................................................... 20

        E.   Plaintiffs alleged injuries are not redressable. ......................................... 27

    II.   The Court lacks authority to issue injunctive-like relief, including vacatur of the
October 29 memorandum. ................................................................................ 31

    A. Section 1252(f)(1) bars jurisdiction to vacate the October 29 memorandum. .......... 31

    B. Universal vacatur of the October 29 memorandum is not available under the
APA. ........................................................................................................... 33

CONCLUSION ................................................................................................... 36

i

Case 2:21-cv-00067-Z    Document 203    Filed 09/15/23    Page 3 of 46    PageID 8261

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Arizona v. Biden,*
 40 F.4th 375 (6th Cir. 2022) ........................................................................... 26, 35

*Arizona v. United States,*
 567 U.S. 387 (2012) ............................................................................................. 26

*Arpaio v. Obama,*
 27 F. Supp. 3d 185 (D.D.C. 2014) ....................................................................... 27

*Arpaio v. Obama,*
 797 F.3d 11 (D.C. Cir. 2015) ......................................................................... 21, 27

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,*
 976 F.3d 585 (5th Cir. 2020) ........................................................................... 9, 10

*Boelens v. Redman Homes, Inc.,*
 759 F.2d 504 (5th Cir. 1985) ................................................................................ 13

*Califano v. Yamasaki,*
 442 U.S. 682 (1979) ............................................................................................. 33

*California v. Texas,*
 141 S. Ct. 2104 (2021) .............................................................................. 21, 25, 27

*Campaign Legal Ctr. v. Scott,*
 49 F.4th 931 (5th Cir. 2022) ................................................................................ 10

*Cannon v. Principal Health Care of Louisiana,*
 87 F.3d 1311 (5th Cir. 1996) ................................................................................ 14

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2014) ....................................................................................... 21, 24

*DaimlerChrysler Corp. v. Cuno,*
 547 U.S. 332 (2006) .............................................................................. 11, 12, 21

*Davis v. F.E.C.,*
 554 U.S. 724 (2008) ............................................................................................. 11

*Delta Constr. Co. v. EPA,*
 783 F.3d 1291 (D.C. Cir. 2015) ........................................................................... 28

*Department of Commerce v. New York,*

Case 2:21-cv-00067-Z    Document 203    Filed 09/15/23    Page 4 of 46    PageID 8262

*139 S. Ct. 2551 (2019)* .................................................................................................. 25

*DHS v. New York*,
    140 S. Ct. 599 (2020) ........................................................................................ 34

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959, 1965 n.3 (2020) .................................................................... 3

*Direct Mktg. Ass'n v. Brohl*,
    575 U.S. 1 (2015) .............................................................................................. 31

*Fisher v. Univ. of Tex. at Austin*,
    758 F.3d 633 (5th Cir. 2014) ........................................................................... 13

*Garland v. Aleman Gonzalez*,
    142 S.Ct. 2057 (2022) ...................................................................................... 30

*Gen. Land Off. v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ..................................................................... 22, 29

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ..................................................................................... 33

*Gonzalez v. ICE*,
    975 F.3d 788 (9th Cir. 2020) ........................................................................... 11

*Green v. Dep't of Commerce*,
    618 F.2d 836 (D.C. Cir. 1980) ........................................................................ 11

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ......................................................................................... 33

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ......................................................................................... 35

*Henderson v. Stalder*,
    287 F.3d (5th Cir.2002) ................................................................................... 23

*Immigrant Defenders Law Center v. DHS*,
    No. 2:21-cv-00395 (C.D. Cal., trial held Aug. 14, 2023) ............................. 34

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ...................................................................................... 18

*Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................................... 3

*Kucana v. Holder*,
    558 U.S. 233 (2010) ......................................................................................... 30

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................. 11, 33

*Linda R. S. v. Richard D.*,
    410 U. S. 614 (1973) .................................................................................. 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................... passim

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................ 24, 25, 26

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ................................................................................... 34

*Matter of E-R-M- & L-R-M-*,
    25 I. & N. Dec. 520 (BIA 2011) ................................................................ 3

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................................... 32

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) .............................................................................. 20

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................... 20

*Newman–Green, Inc. v. Alfonzo–Larrain*,
    490 U.S. 826 (1989) ................................................................................... 13

*Patel v. Garland*,
    142 S. Ct. 1614 (2022) .............................................................................. 30

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ................................................................................... 21

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................... 15

*Renal Physicians Ass'n v. U.S. HHS*,
    489 F.3d 1267 (D.C. Cir. 2007) ............................................................... 28

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................................... 16

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007) ................................................................................... 13

*Sprint Communications Co. v. APCC Services, Inc.*,

554 U.S. 269 (2008) ................................................................................................. 15, 16

*State of Fla. v. Mellon*,
    273 U.S. 12 (1927) ................................................................................................. 20, 25

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ...................................................................................................... 24

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ............................................................................................... 16, 18

*Texas v. Biden (MPP),*
    20 F.4th 928 (5th Cir. 2021) ............................................................................... passim

*Texas v. Biden (MPP),*
    142 S. Ct. 2528 (2022) ......................................................................................... passim

*Texas v. Biden (MPP)*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ................................................................... 6, 29

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ...................................................................................... 32

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ......................................................................... 22, 25, 29

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997) ...................................................................................... 21

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ......................................................................... 22, 23, 27, 29

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................................................ 33

*Trump v. New York*,
    141 S. Ct. 530 (2020) .................................................................................................. 25

*United States v. Matthews*,
    312 F.3d 652 (5th Cir. 2002) ...................................................................................... 14

*United States v. Texas (Priorities)*,
    143 S. Ct. 1964 (2023) ......................................................................................... passim

*VeroBlue Farms USA, Inc. v. Wulf*,
    465 F. Supp. 3d 633 (N.D. Tex. 2020) ...................................................................... 11

## STATUTES

5 U.S.C. § 703 ............................................................................................................ 34

5 U.S.C. § 706(2) .................................................................................................. 34, 35

8 U.S.C. § 1103 ............................................................................................................ 4

8 U.S.C. § 1182(d)(5)(A) ............................................................................................. 4

8 U.S.C. § 1225(b)(1)(A)(i) ......................................................................................... 4

8 U.S.C. § 1225(b)(2)(A) ............................................................................................. 4

8 U.S.C. § 1225(b)(2)(C) ................................................................................. 4, 18, 19

8 U.S.C. § 1226(c) ..................................................................................................... 19

8 U.S.C. § 1231(a)(2) ................................................................................................. 19

8 U.S.C. § 1252(a)(2)(B)(ii) ...................................................................................... 30

8 U.S.C. § 1252(f)(1) ........................................................................................... 29, 31

42 U.S.C. § 7607(b)(1) .............................................................................................. 26

Tex. Transp. Code § 521.142(a) ................................................................................ 22

## RULES

Fed. R. Evid. 201(b) ..................................................................................................... 9

## REGULATIONS

*Notice of Order Under Sections 362 and 365 of the Public Health Service Act*,
    85 Fed. Reg. 17060-02, 2020 WL 1445906 (March 26, 2020) ................................... 5

## OTHER AUTHORITIES

Aditya     Bamzai,     The     Path     of     Administrative     Law     Remedies,
    98 Notre Dame L. Rev. 2037 (2023) ...................................................................... 35

Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L. Rev. 387 (1995) .................. 5

Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes
    of Migration*, 86 Fed. Reg. 8267 (Feb 2, 2021) .......................................................... 5

John Harrison, Section 706 of the Administrative Procedure Act Does Not Call for Universal
    Injunctions or Other Universal Remedies, 37 Yale J. on Reg. Bull. 37, 42 (2019-2020). ....... 34

Case 2:21-cv-00067-Z   Document 203   Filed 09/15/23   Page 8 of 46   PageID 8266

Press Release 33, Secretarie de Relaciones Exteriores, "Foreign Ministry rejects having migrants stay in Mexico under reimplementation of US Immigration and Nationality Act Section 235(b)(2)(C)," Feb. 6, 2023, https://www.gob.mx/sre/prensa/foreign-ministry-rejects-having-migrants-stay-in-mexico-under-reimplementation-of-us-immigration-and-nationality-act-section-235-b-2-c ................................................................................................................... 9

Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417 (2017) ............................................................................................. 33, 35

U.S. Citizenship and Immigration Services, Humanitarian or Significant Public Benefit Parole for Individuals Outside of the United States, May 2, 2023, https://www.uscis.gov/humanitarian/humanitarian_parole. ..................................................... 10

U.S. Customs and Border Protection, Southwest Land Border Encounters, August 18, 2023, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ........................... 9, 12

## INTRODUCTION

Pursuant to the Court's Scheduling Order of July 17, 2023, ECF No. 201, Defendants submit this Supplemental Brief addressing additional arguments relevant to the parties' briefing on Plaintiffs' Motion to Postpone the Effective Date of Agency Action, ECF Nos. 149, 163, 168, 173, 175, which the Court converted to summary judgment briefing. This supplemental brief addresses four additional reasons the Court should enter summary judgment in Defendants' favor and reject Plaintiffs' challenge to the October 29, 2021 memorandum terminating the Migrant Protection Protocols (MPP). First, Plaintiffs fail to offer evidence sufficient to carry their burden to establish standing on summary judgment. Second, an intervening ruling by the U.S. Supreme Court indicates that Plaintiffs lack a cognizable injury, traceability or redressability to support standing in this case. Third, they cannot show redressability given that Mexico has stated it will no longer allow MPP returns. Fourth, 8 U.S.C. § 1252(f)(1) and traditional Administrative Procedure Act (APA) principles bar injunctive or vacatur relief in this case. Further, Defendants are entitled to summary judgment for all the reasons Defendants previously provided in briefing, ECF Nos. 163, 173, reincorporated here.[1]

First, there is insufficient evidence of injury. Plaintiffs have failed to point to any evidence connecting the October 29, 2021 termination memorandum—as opposed to the June 2021 memorandum that was the subject of their initial claims—to an increase in noncitizens in or costs to their State, much less by the requisite preponderance of the evidence needed to succeed at this stage.

Second, Plaintiffs lack Article III standing in light of the Supreme Court's recent decision

---

[1] These include including that Plaintiffs cannot obtain APA review of their challenge to the October 29 memorandum and that, even if they could, that memorandum satisfies APA arbitrary-and-capricious review because is reasonably explained and addresses all necessary factors.

in *United States v. Texas*, 143 S. Ct. 1964 (2023) ("*Texas (Priorities)"*), which rejected the same theory of state standing Plaintiffs advance here: injury based on the indirect effects of federal immigration policies on the States' social service expenditures. *Texas (Priorities)* makes clear that states do not have a cognizable Article III interest in obtaining enforcement (or nonenforcement) of federal immigration laws by the federal government, and that the kinds of indirect, downstream effects of federal enforcement that Plaintiffs invoke here are insufficient. This Supreme Court decision represents an intervening change in law that supersedes this Court's and the Fifth Circuit's previous determinations that Plaintiffs have standing here, and precludes their claims of Article III injury traceability, and redressability.

Third, Plaintiffs cannot show that a favorable ruling would redress their claimed financial injuries. Mexico has announced it will no longer accept returns under section 1225(b)(2)(C) pursuant to MPP, effectively preventing the Government from returning noncitizens under such a program even if Plaintiffs were to succeed here. Further, statistics indicate that the number of border encounters was not affected by the operation of MPP (and in fact increased while it was in effect), refuting any contention that reinstating MPP would necessarily cause a decrease in noncitizens coming to Plaintiff States. Additionally, MPP does not dictate that line DHS officers return amenable noncitizens to Mexico, and reinstating MPP would not deprive those officers' discretion or render it likely they would return noncitizen in individual cases. Finally, the Court additionally cannot provide redress given the statutory bars on the type of relief Plaintiffs seek.

Fourth, the Court cannot enjoin the October 29 memorandum or enter injunctive-like relief due to section 1252(f)(1)'s bar on relief restraining the Government in its implementation of section 1225(b)(2)(C). The Supreme Court held that this Court lacks jurisdiction to enjoin a Department of Homeland Security (DHS) memorandum ending MPP, an entirely discretionary

program implementing the agency's discretionary enforcement authority under 8 U.S.C. § 1225(b)(2)(C) to return certain noncitizens to Mexico pending their removal proceedings. The same principles apply to Plaintiffs' new request to evade this holding by seeking universal vacatur; vacatur, too, would restrain the agency's enforcement of the immigration laws, and is thus likewise barred by Section 1225(b)(2)(C) under the Supreme Court's reasoning. And even were vacatur not precluded by section 1252(f)(1), it is not an available APA remedy because the APA does not in fact authorize it and nationwide vacatur violates the traditional equitable principle that relief must be limited to the parties before the Court.

Accordingly, the Court should enter summary judgment in Defendants' favor and reject Plaintiffs' challenge to the October 29 memorandum.

## **BACKGROUND**

### A. Factual and Procedural History

The Executive Branch has broad constitutional and statutory power to determine who may enter the country, and on what terms. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). The Executive Branch also has authority and prosecutorial discretion to prioritize which noncitizens to remove, and through what type of enforcement proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011). In 8 U.S.C. § 1225, Congress delegated to the Executive Branch the authority and discretion to inspect and process for immigration proceedings noncitizens arriving in the United States.[2] First, Congress has authorized DHS to initiate expedited removal proceedings in 8 U.S.C. § 1225(b)(1). Under that provision, an "applicant for admission" to the United States who lacks valid entry documentation or misrepresents his identity shall be "removed from the United States without further hearing or review unless" he "indicates either an intention

---

[2] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

3

to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Alternatively, Congress has provided that DHS can place an applicant who is seeking admission into removal proceedings before an immigration judge under 8 U.S.C. § 1229a, and shall detain the noncitizen pending such proceedings if he is not "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). Congress also provided DHS with various alternatives to detention. Among other things, (1) DHS may release applicants for admission on parole "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), or (2) "[i]n the case of an alien described in [§ 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary of Homeland Security] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C); *see also* 8 U.S.C.§ 1103.

In December 2018, the Secretary of Homeland Security announced DHS would begin, via MPP, the first programmatic use of the previously *ad hoc* contiguous-territory-return authority in § 1225(b)(2)(C), 84 Fed. Reg. 6811 (Feb. 28, 2019), one of many discretionary enforcement authorities available to DHS in prioritizing enforcement of the immigration laws. Under MPP, it was DHS policy that certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to" § 1225(b)(2)(C) "for the duration of their Section [1229a] removal proceedings." *Id*. If an immigration officer determined that a noncitizen should be returned to Mexico pursuant to MPP, the noncitizen was issued a Notice to Appear ("NTA") and placed into § 1229a removal proceedings, and then transferred to Mexico to await those proceedings. *Id*.

In March 2020, the Centers for Disease Control and Prevention ("CDC") issued an order temporarily suspending entry of certain individuals traveling from Canada or Mexico in response

4

to the COVID-19 pandemic.  The government then sharply declined its enrolling of noncitizens in MPP. *See Notice of Order Under Sections 362 and 365 of the Public Health Service Act*, 85 Fed. Reg. 17060-02, 2020 WL 1445906 (March 26, 2020); AR0010-11.[3]  While that CDC order was in effect, the government acted to "expel" certain noncitizens from the United States to their home countries, under the public health authority of 42 U.S.C. § 265, rather than placing them in removal proceedings under Title 8. 2020 WL 1445906 at 17067.

On January 20, 2021, the new Acting Secretary announced DHS would "suspend new enrollments in [MPP], pending further review of the program." AR1175. The President subsequently issued an Executive Order directing DHS to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as [MPP]." *See* Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes of Migration*, 86 Fed. Reg. 8267 (Feb 2, 2021); AR0914. On June 1, 2021, the DHS Secretary issued a memorandum setting out his decision to terminate MPP and rescind the January 25, 2019 memorandum creating the program. AR0063.

Missouri and Texas filed this suit in April 2021, initially challenging the suspension of new enrollments in MPP and later amending their complaint to seek injunctive relief against the Secretary's June 1 decision. On August 13, 2021, following a one-day bench trial, the Court "permanently enjoined and restrained" DHS "from implementing or enforcing the June 1 Memorandum," which it "vacated in its entirety and remanded to DHS for further consideration."

---

[3] "AR" references are to the Administrative Record for the October 29, 2021 Memoranda, ECF No. 162.

ECF No. 94; *Texas v. Biden*, 554 F. Supp. 3d 818, 857 (N.D. Tex. 2021) ("*Texas (MPP)*"). Further, the Court issued a nationwide, permanent injunction requiring DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens *because of* a lack of detention resources." *Id.* The Court found that Plaintiffs had established injury, causation, and redressability sufficient to establish standing. It concluded that "the termination of MPP will increase the cost of providing driver's licenses to aliens released and paroled into the United States," as that termination would "necessarily" increase the number of noncitizens entering Plaintiff States and they will predictably seek to obtain driver's licenses, and that "injunctive relief authorizing DHS officers to return aliens to Mexico via the MPP program" would provide redress by reducing the number of noncitizens in the States, thus reducing their fiscal injury. *Texas (MPP)*, 554 F. Supp. 3d at 840-41. The Court further noted that, "although unnecessary to [its] finding of standing, the Court finds Texas and Missouri are entitled to special solicitude in its standing analysis." *Id.* at 842.

Defendants appealed. On October 29, 2021, while that appeal was pending and following extensive additional review of the program, the Secretary issued a new memorandum terminating MPP and immediately rescinded all prior MPP memoranda. Based on that superseding decision the government moved in the Fifth Circuit for a remand to this Court for further proceedings. In December 2021, the Fifth Circuit denied that motion and affirmed the injunction. *Texas (MPP)*, 20 F.4th 928 (5th Cir. 2021). The Court of Appeals held that the States had standing. *Id.* at 969. It upheld the district court's factual findings that the termination of MPP, coupled with DHS's limited detention capacity, had led to an increase in noncitizens released into the country on parole,

and that the increase in parolees cost the States financially in the form of drivers' license application costs and subsidies for healthcare. *Id.* at 966-69. The Court also held that the States' standing bid was assisted by their entitlement to "special solicitude." *Id.* at 970.

The Fifth Circuit also held that (a) section 1225(b)(2)(C), which authorizes contiguous-territory return as an alternative to detention under section 1225(b)(2)(A), becomes mandatory if the government lacks sufficient detention capacity, (b) the October 29 memorandum did not constitute a new and separately reviewable agency action, and (c) the limits on jurisdiction in 8 U.S.C. § 1252(f)—which generally bars courts from enjoining or restraining the operation of relevant sections of the INA—did not apply because the district court's injunction "restored" the operation of section 1225(b)(2)(C) rather than enjoined it.  *Id*. at 951, 996, 1004.

On June 30, 2022, the Supreme Court held that this Court lacked authority to enjoin the MPP policy under section 1252(f)(1), reversed the Fifth Circuit's rulings as to the interpretation of section 1225(b)(2)(C) and whether the October 29 constituted a separate agency action,[4] and remanded the case. *Texas (MPP)*, 142 S. Ct. 2528, 2548 (2022). The Supreme Court ordered that "[o]n remand, the District Court should consider in the first instance whether the October 29 memoranda" comply with the APA. *Id*. On August 3, 2022, the Fifth Circuit remanded the case to this Court "for further proceedings consistent with the Supreme Court's decision," Order, *Texas (MPP)*, No. 21-10806 (5th Cir Aug. 3, 2022), and issued the mandate on August 6, 2022, *see* Order, *Texas (MPP)*, No. 21-10806 (5th Cir. Aug. 6, 2022). On August 8, 2022, this Court vacated the permanent injunction preventing DHS from ending MPP. ECF No. 147.

Plaintiffs moved to postpone the effective date of the October 29, 2021 memorandum,

---

[4] Standing was not an issue presented to the Supreme Court in this case. Pet. for Writ of Cert., *Biden v. Texas*, 2021 WL 6206109 (U.S.) at *I.

which the Court granted, holding that Plaintiffs had standing based on the prior rulings in this case. ECF No. 178. Plaintiffs filed a second amended complaint, replacing their prior claims with a new APA claim challenging the October 29 memorandum as arbitrary and capricious, ECF No. 153, which Defendants answered, ECF No. 196. Pursuant to the parties' request, the Court agreed to consider the briefing on the stay motion on the merits as well and convert the motion to one for summary judgment, and provided the parties opportunity for supplemental briefing. ECF No. 201.

### B. Subsequent Events

On June 23, 2023, the Supreme Court issued its decision in *Texas (Priorities)*. 143 S. Ct. 1964. In that case, Texas and Louisiana challenged DHS guidelines that established priorities for immigration enforcement, arguing that the guidelines contravened 8 U.S.C. §§ 1226(c) and 1231(a)(2), which the States asserted required DHS to arrest certain noncitizens. *Id.* at 1969. The States alleged indirect fiscal harms from the enforcement guidelines, claiming that "they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* The Supreme Court rejected that argument. Noting that a State's bid for standing is already more attenuated when it challenges a federal policy that generates only "indirect effects on state revenues or state spending," the Court held that the States lacked standing to maintain such a suit because States do not have a cognizable Article III interest in government's decision to enforce (or not) immigration statutes against noncitizens through arrest and/or prosecution. *Id.* at 1970-73 & n.3. Three justices concurred in the judgment but focused on the absence of redressability. They would have held that 8 U.S.C. § 1252(f)(1)'s bar on injunctive relief prevented the court from ordering the government to take those enforcement actions, and lesser relief would not remedy the alleged injury. *Id.* at 1978-79.

### STATEMENT OF UNDISPUTED FACTS RELEVANT
### TO SUPPLEMENTAL BRIEFING

1. Beginning in March 2020, in response to the COVID-19 pandemic, the Executive Office for Immigration Review paused court hearings for noncitizens enrolled in MPP, and DHS significantly reduced enrollments in the program until new enrollments were suspended in January 2021. AR0010-11.

2. No noncitizens were enrolled in MPP from the Acting Homeland Secretary's suspension of enrollments effective January 21, 2021 until December 6, 2021, when Mexico agreed to accept returns again following this Court's injunction requiring the re-implementation of MPP. AR0014-15, ECF No. 117-1.

3. No noncitizens have been enrolled in MPP since the Court vacated its injunction on August 8, 2022. AR0004; ECF No. 147.

4. On February 6, 2023, the Government of Mexico declared that, were MPP to be attempted by the United States a third time, Mexico would entirely reject returns. Press Release 33, Secretarie de Relaciones Exteriores, "Foreign Ministry rejects having migrants stay in Mexico under reimplementation of US Immigration and Nationality Act Section 235(b)(2)(C)," Feb. 6, 2023,   https://www.gob.mx/sre/prensa/foreign-ministry-rejects-having-migrants-stay-in-mexico-under-reimplementation-of-us-immigration-and-nationality-act-section-235-b-2-c.[5]

5. The Court enjoined DHS to reimplement MPP in August 2021. The number of Southwest border encounters for FY2021, which ended the following month, was 1,734,686. U.S. CBP, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Sept. 14, 2023).

---

[5] The Court may take judicial notice of the publicly available documents and webpages produced by the United States and Mexican governments cited herein. *See* Fed. R. Evid. 201(b); *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020).

6. Following the Court's order, in FY2022, the number of Southwest border encounters rose to 2,378,944. Thus far in FY2023, with two months of data still unreported, the number of encounters has been 1,973,092. *Id.*

7. DHS offers humanitarian parole under 8 U.S.C. § 1182(d)(5)(A) via several different processes for noncitizens. USCIS, Humanitarian or Significant Public Benefit Parole for Individuals Outside of the United States, https://www.uscis.gov/humanitarian/humanitarian_parole (last visited Sep. 11, 2023).

## ARGUMENT

## I.    Plaintiffs lack standing.

Plaintiffs lack standing to challenge DHS's discretionary decision to terminate MPP: they lack a cognizable Article III injury based on the federal government's decision not to implement section 1225(b)(2)(C) in a programmatic fashion; they challenge only indirect effects of governmental regulation of others; they lack the support of special solicitude in the standing analysis; and in any event, their injuries are not redressable, as the government previously explained. ECF Nos. 163, 173. The prior standing rulings in this litigation no longer apply:  First, the Supreme Court has ruled since that time that injuries like those alleged by Texas are not cognizable (and which three justices would have held are not redressable).  In addition, Texas's prior submissions on injury are not sufficient to carry their burden of persuasion on summary judgment with respect to the October 29 memoranda.

To have standing, a plaintiff must suffer an injury-in-fact caused by the challenged action, traceable to the challenged action, and redressable by a court order. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992). Now that this case has reached the summary judgment stage, Plaintiffs must "prove standing by a preponderance of the evidence." *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *see also Lujan*, 504 U.S. at 561 (noting the "burden of proof" increases

10

with "successive stages of litigation"). This burden includes the requirement to identify a concrete injury that is traceable directly to the challenged action, and thus redressable by a favorable decision. *Lujan*, 504 U.S. at 561.

"[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). *See also Davis v. F.E.C.*, 554 U.S. 724, 733 (2008). Regardless of any prior conclusions the Court may have reached, in light of *Texas (Priorities)*, Plaintiffs cannot meet this burden here to demonstrate standing to challenge the October 29 memorandum.

### A. Prior rulings in this case do not establish, pursuant to the relevant preponderance standard, that Plaintiffs have standing to challenge the October 29 memorandum.

At the threshold, prior rulings on standing in this case do not establish as law of the case that Plaintiffs have standing for their challenges to the October 29 memorandum in the Second Amended Complaint under the preponderance standard on which this motion will be adjudicated.

Plaintiffs' new claims in their Second Amended Complaint at issue on summary judgment challenge the October 29 termination memorandum, a new agency action not addressed by either this Court's or the Fifth Circuit's prior rulings on standing in this case. Those prior decisions challenging a different agency action (the June 2021 termination memorandum) do not, and cannot, resolve the standing question with respect to Plaintiffs' new claims challenging the October 29 memorandum. *See, e.g.*, *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 649 (N.D. Tex. 2020) (explaining that "Plaintiffs' Amended Complaint" "wipe[s] the slate clean"); *see also Green v. Dep't of Commerce*, 618 F.2d 836, 839 n.9 (D.C. Cir. 1980) ("[T]he doctrine of 'law of the case' does not apply to the fundamental question of subject matter jurisdiction."); *Gonzalez v. ICE*, 975 F.3d 788, 805 (9th Cir. 2020) (same). Moreover, the Court's prior standing decisions

11

were based on data of border encounters that is now stale. *See supra* 9-10; AR664, 669 (showing border encounters increased in the months after MPP was announced); Southwest Land Border Encounters, *supra 9-10,* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (showing southwest border encounters increased after Court-ordered reimplementation of MPP).

Plaintiffs cannot rely on that stale evidence to establish standing for their new claims challenging the October 29 memorandum. "[A] plaintiff must demonstrate standing for each claim he seeks to press," and "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Here, however, Plaintiffs do not claim any specific harm from the October 29 memorandum, nor do they proffer any new evidence to show standing for the new claims raised in the Second Amended Complaint, arguing only "the evidence already in the record in this case amply supports Plaintiffs' standing." *Id.* But the more recent evidence undermines their speculation that state costs are attributable to noncitizens who would otherwise have been returned under MPP, because border encounters increased both after MPP was announced and after the Court ordered reimplementation of MPP. *Supra* 9-10. Plaintiffs therefore cannot show any connection between MPP (whether its enforcement or nonenforcement) and any influx of migrants into their States along with any attendant costs.[6]

Although the Court did conclude, in granting Plaintiffs' stay motion, that Plaintiffs had standing to challenge the October 29 memorandum, it erroneously relied on its prior ruling on the June 2021 memorandum, concluding that, because the Supreme Court did not overturn the Court's or the Fifth Circuit's prior standing rulings, to revisit standing would exceed the scope of the mandate on remand. But the October 29 memorandum is a distinct agency action, Plaintiffs have

---

[6] Indeed, as explained further below, Plaintiffs here rely on almost identical evidence to that rejected as sufficient to show standing in *Texas (Priorities)*.

filed a Second Amended Complaint, and new facts have come to light that did not exist when the Court ruled on the June 2021 memorandum. "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Lujan*, 504 U.S. at 571 n.4 (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)). However, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). Thus, the earlier standing rulings cannot govern standing for the new claims in the Second Amended Complaint.

Further, the Court's rationale that the Supreme Court tacitly found standing assumes the Court passed on the issue. *See* ECF No. 178 at 9 ("The Supreme Court did not address the issue of standing, although it was squarely presented to it." (quoting *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 640 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016)). However, this is incorrect. Standing was not a question raised or briefed in Defendants' petition for a writ of certiorari or in merits argument before the Supreme Court. Pet. for Writ of Cert., *Biden v. Texas*, 2021 WL 6206109 (U.S.); Pet'rs Br., *id.*, 2022 WL 815341 (U.S.). Even if standing were part of the Fifth Circuit's mandate on remand, again, that decision did not consider standing separately for the October 29 memorandum, incorrectly holding that it did not represent a separate agency action. *Texas (MPP)*, 20 F.4th at 950.

In sum, Plaintiffs cannot rely on rulings finding standing for their claims challenging the June 2021 memorandum, and their failure to produce or point to any evidence establishing standing based on an injury from the October 29 memorandum dooms their ability to establish standing for the claims in their Second Amended Complaint.

13

**B.   Even were the prior rulings law of the case, an intervening precedential decision and new evidence bring this case outside the scope of that doctrine.**

Even assuming that the Fifth Circuit's prior decision on Article III injury in this case is law of the case, it would not be controlling here. Law-of-the-case doctrine has an exception where "there has been an intervening change of law by a controlling Authority." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). The Supreme Court's decision in *Texas (Priorities)*, issued after the Fifth Circuit's decision in this case, represents just such an intervening change of law by a controlling authority, and is irreconcilable with the theory of standing presented by Plaintiffs and previously accepted by the Fifth Circuit in the prior appeal in this case.

In addition, "the availability of new evidence" constitutes another exception to law-of-the-case doctrine that applies here. *Cannon v. Principal Health Care of Louisiana*, 87 F.3d 1311 (5th Cir. 1996). The Court's prior finding of standing related to the June 2021 memorandum was based on increased border encounters from January 2021 to June 2021, and all of its findings with respect to increased state costs were linked to its resulting conclusion that there would be more noncitizens entering the States to incur those costs. ECF No. 94 at 21-23; *see Texas (MPP)*, 20 F.4th at 972 (explaining the court's traceability finding that "MPP's termination has already increased the rate of illegal entries and the number of parolees"). However, newer, undisputed evidence shows that encounters did not decrease when MPP was reimplemented following the court's injunction. *Supra* 9-10. This newly available evidence undermines Plaintiff's contention that MPP would reduce the number of noncitizens in the Plaintiff States and forecloses their theory of harm, which depends on tracing nonenforcement of MPP to an increase in the numbers of border encounters and the number of noncitizens entering their States who may use State services. That evidence defeats Plaintiffs' current bid for standing even if law of the case doctrine applied here.

14

**C. Plaintiffs lack a cognizable injury from the federal government's decisions whether to return noncitizens to Mexico under MPP.**

The logic of *Texas (Priorities)* dictates that Plaintiffs have no cognizable Article III injury from the federal government's decision to terminate MPP, which represents a discretionary Executive Branch decision not to exercise authority under section 1225(b)(2)(C) in the broad-scale fashion than Plaintiffs would prefer.

*Texas (Priorities)* rejected State standing premised on exactly the same type of financial harms from noncitizen use of public services alleged by Texas here. In that case, the Supreme Court began its inquiry into whether the States had standing to challenge DHS's immigration enforcement guidelines based on the alleged indirect financial harm from noncitizens using state services by looking to see whether this was the type of injury cognizable under Article III. While the Court recognized that "monetary costs" can be an injury in certain circumstances, it stressed such costs are not always sufficient to establish standing, especially when a State alleges that such costs arise as an indirect effect of changes in federal policy. 143 S. Ct. at 1970 & n.3. To satisfy Article III standing, an injury must also be "'legally and judicially cognizable,'" meaning, "'among other things,' that the 'dispute is traditionally thought to be capable of resolution through the judicial process'—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). In conducting this inquiry, the Supreme Court emphasized that courts must examine "'history and tradition,' among other things, as 'a meaningful guide to the types of cases that Article III empowers federal courts to consider.'" *Id.* at 1970 (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008)).

Applying that rule to the case before it, the Court concluded that there was no "precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution

15

policies so that the Executive Branch makes more arrests or initiates more prosecutions." *Id.* at 1970–71. To the contrary, precedent indicates that plaintiffs have "no judicially cognizable interest in procuring enforcement of the immigration laws" by the Executive Branch. *Id.* (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) and citing *Linda R. S. v. Richard D.*, 410 U.S. 614 (1973)). Such challenges fall particularly far from traditionally cognizable Article III injuries because immigration enforcement discretion "implicates not only 'normal domestic law Texas (Priorities)' but also 'foreign-policy objectives.'" *Id.* at 1971-72 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–491 (1999). In sum, the Court explained, the States' challenge to DHS's Texas (Priorities) memorandum "is not the kind redressable by a federal court." *Id.* at 1971.

This conclusion applies equally here. Texas and Missouri challenge the October 29 memorandum terminating MPP, which represents the Executive Branch's decision not to exercise its discretionary authority under 8 U.S.C. § 1225(b)(2)(C) in a broad-scale fashion to return certain noncitizens to a contiguous country while they await their removal proceedings. The States allege that noncitizens who are not returned under 1225(b)(2)(C) and who instead settled in their states will use publicly subsidized services such as driver's licenses and health care. *See Texas*, 20 F.4th at 966-69. However, *Texas (Priorities)* makes clear that such an indirect financial injury is not sufficient. As the Court stressed, standing turns on whether an alleged injury is "legally and judicially cognizable" such that it is traditionally of the type redressable by a federal court. 143 S. Ct. at 1970.

Plaintiffs have not and cannot make this showing. Plaintiffs have not identified any history or tradition of courts finding that indirect costs resulting from the Executive's discretionary decision not to enforce immigration laws to the maximum degree are sufficient to satisfy Article

16

III. Rather, history and precedent do not support Plaintiffs' standing to challenge DHS's October 29 memorandum for the reasons articulated in *Texas (Priorities)*. Implementing MPP requires the agreement and participation of Mexico, and thus requires careful balancing of foreign policy objectives and costs to maintain diplomatic relationships and other international priorities. MPP has "played an outsized role in its policy and operational engagement with [Mexico], thus distracting from other diplomatic initiatives and programs concerning migration flows." AR0030. "These engagements … require enormous amounts of time to prepare for and execute, and involve the same individuals … who would otherwise be working on advancing other key bilateral priorities." *Id.* The Supreme Court's decisions in both this case and *Texas (Priorities)* make clear that these factors point strongly against concluding that the States' theories here are sufficient for standing.  And it is indisputable that MPP involves the sort of "foreign-policy objectives" (143 S. Ct. at 1971-72) that the Court said weigh strongly against finding standing.  *See Texas (MPP)*, 142 S. Ct. at 2543 (explaining "the foreign affairs consequences of mandating the exercise of contiguous-territory return" and thus the need to avoid "unwarranted judicial interference" in this matter of foreign policy); *see also id.* at 2549 (Kavanaugh, J., concurring) ("To be clear, when … [the President] determines that returning noncitizens to Mexico is not feasible for foreign-policy reasons, a court applying *State Farm* must be deferential to the President's Article II foreign-policy judgment.")

Further, if—as the Supreme Court has held—a state lacks a cognizable Article III interest in the federal government's decision whether to seek removal of a criminal noncitizen under section 1226(c), *see* 143 S. Ct. at 1969-71, then a state also lacks such an interest in the federal government's decision whether to return noncitizens to Mexico under MPP during the pendency of removal proceedings.  The government's decision where to locate noncitizens during removal

17

Case 2:21-cv-00067-Z    Document 203    Filed 09/15/23    Page 26 of 46    PageID 8284

proceedings is intertwined with and dependent upon the decision to seek their removal in the first instance. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018). The Secretary may only return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a." 8 U.S.C. § 1225(b)(2)(C). The Supreme Court's admonition applies thus equally to both intertwined immigration enforcement decisions: the States there and here "have 'no judicially cognizable interest in procuring enforcement of the immigration laws' by the Executive Branch." *Texas (Priorities),* 143 S. Ct. at 1970 (quoting *Sure-Tan*, 467 U.S. at 897)).

Similarly, "courts generally lack meaningful standards for assessing the propriety of enforcement choices" regarding the contiguous return authority just as they do with arrest and prosecution authority. 143 S. Ct. at 1972. Here, the Court lacks manageable standards for determining and executing "foreign policy objectives," a necessary task for providing Plaintiffs relief given the necessity of obtaining the Government of Mexico's agreement to permit MPP generally and resolve its concerns with individual parameters of the program. AR0033-34; *Texas (Priorities)*, 143 S. Ct. at 1971-72. As illustrated by the history of MPP, *supra* 4-8, foreign-relations decisions involve a "complicated balancing process" that "in turn leaves courts without meaningful standards for assessing those policies." *Texas (Priorities)*, 143 S. Ct. at 1972. And "[n]othing in the relevant immigration statutes at issue [with MPP] suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations." *Texas (MPP)*, 142 S. Ct. at 2549 (Kavanaugh, J., concurring).

*Texas (Priorities)* suggested that "policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies." 143 S. Ct. at 1974 (citing *Texas (MPP)*, 142 S. Ct. at 2528)).

However, the Court expressly declined to address whether states would have standing in those circumstances because the enforcement guidelines did not deal with continued detention. *Id.*

The same is true here: the October 29 memorandum is not a "polic[y] governing the continued detention of noncitizens." *Id.* The memorandum instead addresses DHS's decision not to exercise its discretion to return certain noncitizens to Mexico under its contiguous-return authority. AR0001-0004. It provides no directive or guidance about whether the noncitizens not returned should be detained or released pending their removal proceedings. *See id.* And even if the October 29 memorandum did affect the detention or release of noncitizens, Plaintiffs still would lack standing to challenge the termination of MPP, because they still have failed to show, under a preponderance standard, current evidence of injury traceable to the October 29 memorandum that the Court can likely redress.

Indeed, the conclusion that States lack standing to challenge the October 29 memorandum follows *a fortiori* from the Supreme Court's decision in *Texas (Priorities)*. The DHS memorandum challenged in that case concerned enforcement actions that the relevant statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Court explained that the States' challenge nevertheless was not cognizable because it interfered with the Executive's inherent Article II discretion. *Texas (Priorities)*, 143 S. Ct. at 1973. This case, however, concerns a statute in which Congress expressly granted the Executive *discretion* to exercise contiguous-return authority by using the term "may." *See* 8 U.S.C. § 1225(b)(2)(C); *Texas (MPP)*, 142 S. Ct. at 2544. Thus, a judicial order that would force the Executive to exercise its discretion in a particular way would interfere not only with the Executive's inherent Article II discretion but also with the express discretion conferred by Congress. This demonstrates that, under the logic of *Texas (Priorities)*, Plaintiffs' challenge to termination of MPP is not a matter fit for judicial resolution.

19

**D. Plaintiffs' claim for standing fails regardless because the injury is too attenuated from the challenged action and they do not warrant special solicitude.**

Other aspects of the *Texas (Priorities)* decision further undermine the States' standing here: their alleged indirect financial injury is too attenuated from the challenged action to be "fairly traceable" to the termination of MPP, *Lujan*, 504 U.S. at 561, and they do not benefit from relaxed imminence and redressability requirements because they do not benefit from special solicitude in the standing analysis.

First, *Texas (Priorities)* emphasized that, in the system of dual federal and state sovereignty created by the Constitution, "federal policies frequently generate indirect effects on state revenues or state spending," and that when a State's bid for standing is based "only those kinds of indirect effects" from federal regulation, "the State's claim for standing can become more attenuated." *Id.* The Court rejected such harms as an independently sufficient basis to support standing as well. *See id.* ("In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit."). Indeed, in rejecting such indirect costs as sufficient to show standing, *Texas (Priorities)* implicitly rejected some of the very same evidence that Plaintiffs rely on here: declarations from state officials addressing the same subject matter for the same time period. *Compare* ECF No. 54-2 at 164-66 *with Texas (Priorities)*, No. 6:21-cv-00016 (S.D. Tex.), ECF No. 19-6; *compare* ECF No. 54-2 at 143-158 *with Texas (Priorities)*, No. 6:21-cv-00016, ECF Nos. 19-7, 19-8.

Other Supreme Court and lower-court cases decisions held that States generally may sue the Federal Government only if they have suffered a direct injury from federal action. *State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927). The Framers intentionally established a national government with the power to act directly on individuals, replacing a system where the government had to act through the States. *New York v. United States*, 505 U.S. 144, 162-66 (1992); *Murphy v. NCAA*,

20

138 S. Ct. 1461, 1476 (2018). While regulation of those individuals can lead indirectly to effects on the States where they reside, these effects are based on the independent decisions of those individuals and states, and thus are too "attenuated" from the federal action challenged to support standing. *See Texas (Priorities)*, 143 S. Ct. at 1972 n.3.

Another problem with indirect costs is that they often depend, such as here and in *Texas (Priorities)*, on the independent actions of the directly regulated noncitizens. However, courts routinely reject theories of standing that depend on the independent actions of non-party individuals. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 (2014); *see also Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015); *DaimlerChrysler Corp.*, 547 U.S. at 344; *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing … is ordinarily 'substantially more difficult' to establish.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992))). The States' bid for standing here requires predictions about the actions of noncitizens, including that they are more likely to migrate to the U.S. if MPP is not enforced, if they are not returned they will settle in Texas and Missouri, if they do they will try to obtain state subsidized services, etc.

Relatedly, Plaintiffs' claimed injuries are not connected to the October 29 memorandum because their costs are most directly a result of their own lawmakers' choices. State expenditures as a result of immigration are typically caused by the State's own laws, or the State's decision to opt into federal programs like Medicaid to obtain a benefit—but they are not dictated by federal policy. *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997). Such state expenditures on services for noncitizens are not cognizable harms for Article III purposes because they are self-inflicted injuries and not traceable to the Government's actions. *Pennsylvania v. New Jersey*, 426

21

U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures").

This case is no different. The financial injuries identified by the Fifth Circuit – drivers' license and health care costs – are attributable not to DHS's decision regarding MPP, but rather to decisions by state lawmakers to provide benefits to noncitizens for state welfare purposes and to take advantage of federal programs. *See id.*; *see also, e.g.*, Tex. Transp. Code § 521.142(a). Further, whether such costs are incurred by Plaintiffs depends not only upon their lawmakers' choices but also upon the independent actions of noncitizens not returned under MPP to settle in particular states and utilize public services.

Fifth Circuit rulings recognizing standing for states challenging other immigration policies either were based on different, lower burdens of proof or were based on a flawed theory of drivers-license costs that did not establish that Texas had actually suffered net costs from that service. In *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) ("the Border Wall case"), the court's determination that the state had alleged an injury sufficient to support standing was based solely off the allegations in the complaint, not evidence *establishing* that injury under the preponderance standard that applies here. In the cases addressing Deferred Action for Childhood Arrivals ("DACA") and Deferred Action for Parents of Childhood Arrivals ("DAPA"), *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (DAPA); *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (DACA), as well as the appeal in this case, *Texas (MPP)*, 20 F.4th at 970-72, the court relied on the same theory of drivers-license-cost standing advanced here. The evidence in this case now shows, however, that Texas does not in fact incur costs from drivers' licenses. Texas speculates that if the demand for driver's licenses increases by tens of thousands of individuals, it will have to build new facilities and hire more staff. ECF No. 54-2 ¶¶ 8-9.  But Texas has not put forth any

22

actual evidence that it has built any new facilities or hired any additional staff, or that any increased expenditures have actually occurred. *See Texas*, 809 F.3d at 162 (noting standing based on licensing fees "was based largely on the need to hire employees, purchase equipment, and obtain office space," steps that "would be unnecessary" without a showing of some significant increase in population, making "causation" a "substantial obstacle" to finding standing on this theory in most cases).

Putting aside the unsubstantiated costs for building and staffing additional facilities, the actual costs for verification of lawful-presence status, social security and eligibility are a total of $0.35 for one limited-term driver's license for most applicants, and an absolute maximum of less than $0.88 for a small percentage of applicants. *See* ECF No. 54-2 ¶¶ 6-7. The actual costs for card production for one limited term driver's license is $1.35. *Id.* ¶ 8 ($27,000 annually for card production divided by 20,000 (10,000 biennial applicants multiplied by twice per year)). Combining the costs for verification and production of limited term driver's licenses, each license costs Texas about $2, far less than the $33 Texas charges for each limited term driver's license. *See* https://www.dps.texas.gov/section/driver-license/driver-license-fees. The Fifth Circuit has held that these types of offsets must be considered. *See Texas*, 809 F.3d 134, 156 (citing *Henderson*, 287 F.3d at 379-81, and noting that the Fifth Circuit had held that licensing fees were an offset that must be considered in the standing analysis). Texas has a revenue gain, not loss, from providing drivers' licenses to noncitizens.

In sum, in *Texas (Priorities)*, the States' financial harms from providing services to noncitizens they contended should have been arrested and prosecuted were both dependent on the independent actions of those noncitizens and choices by state lawmakers on how to serve noncitizens in their state, and thus only indirectly connected to the DHS priorities guidance and

too attenuated to independently satisfy Article III. *See* 143 S. Ct. at 1972 n.3. Likewise here, Plaintiffs' financial injuries depend on the independent choices of noncitizens they think should be returned under MPP, and their own lawmakers' choices, and are similarly too indirectly related to and attenuated from DHS's decision to terminate MPP to satisfy Article III. *See id.*

Article III also requires "a fairly traceable connection between the plaintiff's injury and *the complained-of conduct* of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (emphasis added). Here, Plaintiffs cannot satisfy that traceability requirement because they cannot establish that any noncitizens to whom they provide services reside in their States as a result of the termination of MPP rather than a host of other possible reasons. There are a multitude of reasons that noncitizens, who may be present in the United States based on parole or a host of other immigration statuses for which they would be eligible regardless of whether MPP is in operation, may travel to various states, such as for family reunification or employment, wholly unrelated to any effects of the October 29 memorandum. *See supra* 9-10. Plaintiffs offer no evidence showing parolees Texas and Missouri may be serving would be in those states but for the termination of MPP in the October 29 memorandum. Absent evidence tying such residence to the termination of MPP, it would be impermissible speculation to find standing based on such indirect, attenuated costs. *See Clapper*, 568 U.S. at 409, 414.

Plaintiffs cannot remedy these defects by relying on the "special solicitude" for States in the standing analysis recognized in *Massachusetts v. EPA*, 549 U.S. 497 (2007). Notably, the Supreme Court's *Texas (Priorities)* recognized no such special solicitude for the States, or even discuss it—even though the States argued in their brief that they were entitled to it. [7] *See* Br. for

---

[7] Without referencing special solicitude, the majority cited *Massachusetts v. EPA* in a footnote, but only to distinguish it, holding that case "involved a challenge to the denial of a statutorily

Pet'rs, *United States v. Texas*, 2022 WL 12591050 (U.S.) at 16. Justice Gorsuch's concurrence, on behalf of three Justices, highlights the significance of this omission.

> Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules "ha[d] no basis in our jurisprudence." … Nor has "special solicitude" played a meaningful role in this Court's decisions in the years since. Even so, it's hard not to wonder why the Court says nothing about "special solicitude" in this case. And it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones.

*Texas (Priorities)*, 143 S. Ct. at 1977 (internal citations omitted) (Gorsuch, Thomas, Barrett, JJ, concurring).[8]

And even in the rare circumstances where the States have been accorded such special solicitude, the courts have not relieved States of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury in fact traceable to the challenged agency action. *Massachusetts*, 549 U.S. at 522. At most, special solicitude might relax certain requirements for establishing imminence and redressability. *See Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022). But that cannot help a plaintiff who has not established a concrete harm in the first place.  It is thus of no use to these plaintiff States, who raise the type of indirect, unsubstantiated costs that are insufficient to satisfy "bedrock Article III constraints," *Texas*, 143 S. Ct. at 1964 n.3; *see State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927) (States may sue the United States only if they have suffered a "direct injury," not where the alleged harm is "only remote and indirect").

---

authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Texas (Priorities)*, 143 S. Ct. at 1975 n.6.

[8] The Supreme Court has never afforded States "special solicitude" in any other case since *Massachusetts*. To the contrary, the Court's decisions since then have consistently analyzed state standing without granting States favorable treatment simply because they are States. *See, e.g., California v. Texas*, 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

25

*Massachusetts* by contrast involved a *direct* harm to a state, namely the threatened loss of territory owned by and subject to the sovereignty of the State. *Massachusetts*, 549 U.S. at 521. The Supreme Court has long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L. Rev. 387, 415-16 (1995) (discussing 19th-century cases). Plaintiffs' challenge to the October 29 memorandum involves only alleged "indirect fiscal burdens"—a "humdrum feature" of many federal policies, including many policies with respect to immigration. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.). "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id*. at 386-87 (citing *Arizona v. United States*, 567 U.S. 387, 394-97 (2012)). "The States have distinctly less, not more, solicitude in this area." 40 F.4th at 387.

Even where appropriate, special solicitude requires a particular procedural right and quasi-sovereign interests, neither of which are present here.  Section 1225(b)(2)(C) does not give Plaintiffs any specific procedural right, and Plaintiffs are not claiming any deprivation of their land or sovereign authority. *See Massachusetts*, 549 U.S. at 520. *Massachusetts* attached "critical importance" to the State's "procedural right" provided by the Clean Air Act to submit a petition for rulemaking and challenge the denial of such a petition related to emissions standards. *Massachusetts*, 549 U.S. at 516, 518; *see also id*. at 527 (noting case dealt with the denial of a petition "for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file"); 42 U.S.C. § 7607(b)(1); *Texas*, 143 S. Ct. at 1975 n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to an exercise of the Executive's discretion). Because a State seeking to invoke special solicitude "must" among other things "be

26

exercising a procedural right created by Congress" and show that it is under substantial pressure to change State law with respect to some quasi-sovereign interest of the State, the Fifth Circuit has held that the "factors" necessary to invoke special solicitude "will seldom exist." *Texas*, 809 F. 3d at 162.

In sum, a "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015). *Texas (Priorities)* reaffirms that such indirect harms as Plaintiffs allege are insufficient alone to satisfy the basic requirements of Article III, and special solicitude, to the extent it still exists at all, does not relieve a plaintiff of the burden to meet those bedrock constitutional requirements for standing.

### E. Plaintiffs alleged injuries are not redressable.

Finally, Plaintiffs lack standing because the Court cannot redress Plaintiffs' alleged injuries. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Here, judicial redress is not likely—indeed, not possible—because Mexico has indicated it will not accept returns under section 1225(b)(2)(C). And even if the Court reinstated MPP, DHS officers would still retain discretion to not return noncitizens; the reinstatement of MPP would not necessarily reduce border encounters and thus reduce the numbers of noncitizen in the Plaintiff States; and section 1252(f)(1) deprives the Court of effective means of relief.

The Court cannot provide likely redress because it cannot ensure that noncitizens are returned to Mexico. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (finding no

redressability where any relief the court could grant would have no practical effect). As the Supreme Court explained, "MPP applies exclusively to non-Mexican nationals who have arrived at ports of entry that are located in the United States" and DHS "therefore cannot unilaterally return these migrants to Mexico." *Texas (MPP)*, 142 S. Ct. at 2543 (quotation marks and citation omitted). Defendants must obtain agreement from Mexico to take returns under MPP generally, and also on the specific conditions and the extent to which returns can be made. AR0033-34. Mexico has made clear that it will not accept returns under MPP even if the program is again reinstated. *Supra* 9. Given this refusal by Mexico, an order by this Court vacating the October 29 termination memorandum would have no practical effect and cannot redress Plaintiffs' claimed injuries. Where, as here, "the undoing of the [challenged] governmental action will not undo the harm" because the alleged harm is caused "by other forces," the claims are not redressable. *Renal Physicians Ass'n v. U.S. HHS*, 489 F.3d 1267, 1276 (D.C. Cir. 2007); *see Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015).

Redressability is lacking for a second reason. Even were the Court to vacate the October 29 memorandum, thereby reinstating as operative the January 25, 2019 DHS memorandum creating MPP, AR389-392, MPP has never *required* the return of amenable noncitizens, but rather, even when operative, left it in the discretion of line DHS officers to decide whether to exercise the section 1225(b)(2)(C) return authority in particular cases. *Id.* Like the DHS guidelines at issue in *Texas (Priorities)*, MPP guidelines "merely advise federal officials about how to exercise their prosecutorial discretion when it comes to deciding which aliens to prioritize for" return to Mexico. 143 S. Ct. at 1978 (Gorsuch, J., concurring). "A judicial decree rendering the [October 29 memorandum] a nullity does nothing to change the fact that federal officials possess the same underlying … discretion." *Id.* "Nor does such a decree require federal officials to change how they

exercise that [section 1225(b)(2)(C)] discretion" regardless of whether MPP is in operation. *Id.* at 1978-79. Thus, even if MPP were reinstated, it would be entirely speculative whether any particular noncitizens who might otherwise relocate to Texas or Missouri would be returned to Mexico pending their proceedings. Other Fifth Circuit cases addressing state standing to challenge other programmatic exercises of discretionary immigration authority do not foreclose this argument because they did not address this independent, underlying discretion issue that eliminates redressability. *See Texas*, 809 F.3d at 161 (DAPA); *Texas*, 50 F.4th at 520 (DACA); *Gen. Land Off.*, 71 F.4th at 273-74.

Moreover, the undisputed facts indicate that the number of border encounters continued to increase when MPP was in use. *Supra* 9-10. If Plaintiffs' standing depends on the conclusion that the absence of MPP will lead to larger encounter numbers and hence more noncitizens in Texas and Missouri, as the Court held, *Texas (MPP)*, 554 F. Supp. 3d at 840 (holding "the termination of MPP necessarily increases the number of aliens released and paroled into the United States and the Plaintiff States specifically"), then the fact that reinstating MPP (an option not currently available) did not reduce encounter numbers indicates that the Court cannot provide judicial relief that will redress the States' injury.

Third, the Supreme Court has made clear that this Court cannot enjoin Defendants to reinstate MPP or make any returns under section 1225(b)(2)(C) generally because of 8 U.S.C. § 1252(f)(1). That statute provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," including 8 U.S.C. § 1225, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) "generally prohibits lower courts from entering

injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Enjoining the Government to reinstate and implement MPP, as the Court's injunction previously did, requires Defendants to "tak[e] actions to … implement" section 1252(b)(2)(C), and therefore violates section 1252(f)(1), as the Supreme Court has explained. *Texas (MPP)*, 142 S. Ct. at 2538 ("The District Court's injunction in this case violated that provision."). While the Supreme Court could grant relief otherwise barred by section 1252(f)(1), it has rejected that opportunity in this case. *See id.*

Finally, as Defendants previously argued, ECF No. 163 at 21-22, the Supreme Court's recent decision interpreting 8 U.S.C. § 1252(a)(2)(B)(i) sheds light on its sister provision, section 1252(a)(2)(B)(ii), indicating that the Court is barred from providing relief based on this statute as well. Section 1252(a)(2)(B)(ii) provides that "no court shall have jurisdiction to review ... any other decision or action … the authority for which is specified … to be in the discretion of the ... Secretary." Section 1225(b)(2)(C) is such a discretionary statute. *See Texas (MPP)*, 142 S. Ct. at 2544. In *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022), a decision post-dating the Fifth Circuit's decision in this case, the Supreme Court held that section 1252(a)(2)(B)(i), which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions bars review of "judgments of whatever kind" covered by the statute, and "not just discretionary judgments or the last-in-time judgment," and so this provision "encompasses not just the granting of relief but also any judgment relating to the granting of relief." Given that the Court has explained that the two provisions, 8 U.S.C. §§ 1252(a)(2)(B)(i) and (ii), cover decisions "of a like kind," *Kucana v. Holder,* 558 U.S. 233, 247 (2010), this indicates that the termination of MPP, a "judgment relating to" the discretionary decision to return under section 1225(b)(2)(C), is shielded from jurisdiction

30

by section 1252(a)(2)(B)(ii). If the Court cannot review the decision to terminate MPP under this provision, *a fortiori* it lacks authority to negate or alter this determination to afford Plaintiffs relief.

In short, the Court has no way to provide *likely*, as opposed to merely speculative, redress of Plaintiffs' alleged injuries even if it finds them cognizable and traceable to the October 29 memorandum. Nothing the Court can do can force Mexico to accept returns or DHS officers to use their statutory return authority, such that the States' alleged injuries will remain with or without MPP.

**II.    The Court lacks authority to issue injunctive-like relief, including vacatur of the October 29 memorandum.**

**A. Section 1252(f)(1) bars jurisdiction to vacate the October 29 memorandum.**

The court lacks authority under the INA to vacate the October 29 memorandum because such vacatur would have the effect of enjoining or restraining the manner in which the government is implementing Section 1225. For that reason, vacatur is prohibited by 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." This provision bars any form of relief that restrains the Government's implementation of the covered provisions, including section 1225(b)(2)(C). Vacatur, no less than an injunction, "restrain[s]" the Government from implementing the covered immigration laws.

The Supreme Court in this case held that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas (MPP)*, 142 S. Ct. at 2538. Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on

the agency action under review. Vacatur is, to be sure, a "less drastic remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), than an injunction prohibiting the agency from re-adopting the challenged policy in the future. But a vacatur is practically equivalent to an injunction in that it deprives the agency of authority to implement the challenged action. Here, vacatur of the October 29 memorandum would render that memorandum terminating MPP unenforceable. It would effectively stop DHS from taking action under the October 29 memorandum to end MPP, and would restrain DHS in its decision of how to exercise its authority under section 1225(b)(2)(C), Accordingly, vacatur of the October 29 memorandum would possess the hallmark of the relief barred by section 1252(f)(1) and such interference with DHS's implementation of section 1225(b)(2)(C) would thus be barred by that section.

Defendants recognize that the Fifth Circuit held in the *Texas (Priorities)* case that vacatur under the APA following a determination that a rule is arbitrary and capricious under 5 U.S.C. § 706 does not "enjoin or restrain" the rule because "a vacatur does nothing but re-establish the status quo absent the unlawful agency action" and so "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220-221 (5th Cir. 2022). This determination was not overruled by the Supreme Court in that case, but Defendants submit that Justice Gorsuch's explanation of the coercive effect of vacatur calls the reasoning that it "neither compels nor restrains" agency action into question. National vacatur "render[s] the[ agency's guidance] inoperable with respect to any person anywhere" and "nullif[ies]" them "with respect to anyone anywhere." 143 S. Ct. at 1981 (Gorsuch, J., concurring). "[A]n extraordinary remedy like vacatur would demand truly extraordinary circumstances to justify it." *Id.* at 1985. Such dramatic and coercive effects are inconsistent with the notion that vacatur merely preserves the status quo and does not impermissibly restrain an agency's implementation of a covered statute in violation

32

of section 1252(f)(1). Accordingly, that section bars vacatur of the October 29 memorandum.

### B. Universal vacatur of the October 29 memorandum is not available under the APA.

Even if section 1252(f)(1) permits relief in these circumstances, the APA does not authorize universal vacatur of the October 29 memorandum.

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (brackets and citation omitted). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 319 (1999); *see id.* at 318-319. Such relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Hawaii*, 138 S. Ct. at 2427 (Thomas, J., concurring); *Texas (Priorities)*, 143 S. Ct. at 1980 (Gorsuch, J., concurring in the judgment).

Universal relief is irreconcilable with those constitutional and equitable limitations. By definition, it extends to parties who were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996). And when a court awards relief to nonparties, it exceeds the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano*, 527 U.S. at 319; *see* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 424-445 (2017) (Bray).

Universal relief also creates other constitutional, legal, and practical problems. It "strains our separation of powers" by "allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Texas (Priorities)*, 143 S. Ct. at 1985

(Gorsuch, J., concurring). It circumvents the procedural rules governing joinder and class actions. *See id.* at 1981. It encourages forum shopping by empowering a single district judge to nullify the decisions of other courts upholding the challenged agency action. *See id.* at 1986. And it operates asymmetrically: The government must prevail in every suit to keep its policy in force, but plaintiffs can derail a federal regulation or policy nationwide with a single district court victory. *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay). This case vividly illustrates those problems, as at least one other federal court is currently grappling with the validity of MPP, and universal vacatur of the October 29 memorandum threatens to conflict with orders potentially being issued by that court. *Immigrant Defenders Law Center v. DHS*, No. 2:21-cv-00395 (C.D. Cal., trial scheduled for Nov. 7, 2023).

While 5 U.S.C. § 706(2) provides that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions," this does not provide a basis for nationwide vacatur. At the outset, Section 706(2) "does not say anything about 'vacating' agency action ('wholesale' or otherwise)," *Texas (Priorities)*, 143 S. Ct. at 1982 (Gorsuch, J., concurring in the judgment); indeed, it does not pertain to remedies at all. Instead, it directs a court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it. 5 U.S.C. § 706(2); *see* John Harrison, Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies, 37 Yale J. on Reg. Bull. 37, 42 (2019-2020).

That understanding is consistent with the standard account of judicial review of statutes, which holds that judicial review is merely "the negative power to disregard an unconstitutional enactment" in deciding a case. *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Of course, when a court declines to give effect to an agency action in the case before it on the ground that the action is unlawful, it may issue appropriate relief. But 5 U.S.C. § 703 points outside the APA for

the available remedies, specifying that "[t]he form of proceeding" is a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." There is no reason to think that, after "nodd[ing] to traditional standing rules and remedial principles" in Section 703, "Congress proceeded just a few paragraphs later to plow right through those rules and empower a single judge to award a novel form of relief affecting parties and nonparties alike." *Texas (Priorities)*, 143 S. Ct. at 1983 (Gorsuch, J., concurring in the judgment). To the contrary, the contemporaneous understanding of the term "set aside" further confirms that it "does not depart from, but rather incorporates, background rules of equity and judgments." Aditya Bamzai, The Path of Administrative Law Remedies, 98 Notre Dame L. Rev. 2037, 2041 (2023) (Bamzai).

Even if Section 706 did speak to remedies, it would not suggest that courts should "set aside," 5 U.S.C. § 706(2), a rule on a universal basis. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see Bray* 438 n.121. There is nothing to suggest that the APA "upset the bedrock practice of case-by-case judgments with respect to the parties in each case" by allowing every district judge to nullify agency action nationwide. *Arizona v. Biden*, 40 F.4th at 396 (Sutton, C.J., concurring).

And even if the Court concluded that nationwide vacatur was authorized in some extreme circumstances, this case does not present the appropriate circumstances. "[A] district court should 'think twice—and perhaps twice again—before granting' such sweeping relief." *Texas (Priorities)*, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment) (citation omitted). At a minimum, the Court should "carefully consider" the grave systemic and separation-of-powers issues raised by universal vacatur. *Id.* at 1986. The concurrent consideration of MPP in other courts

and the potential international ramifications of vacatur for U.S.-Mexico relations indicate that more narrowly tailored relief, if relief is deemed appropriate at all, should be provided instead.

<u>**CONCLUSION**</u>

For these reasons, and those described in Defendants' prior briefing, the Court should enter summary judgment in Defendants' favor and dismiss Plaintiffs' challenges to the October 29 memorandum.

36

Dated: September 15, 2023       Respectfully submitted,

CHAD E. MEACHAM        BRIAN M. BOYNTON
*Acting United States Attorney*    *Principal Deputy Assistant Attorney General*

BRIAN W. STOLZ          WILLIAM C. PEACHEY
*Assistant United States Attorney*   *Director*
                         Office of Immigration Litigation
                         District Court Section

                         EREZ REUVENI
                         *Assistant Director*

                         BRIAN C. WARD
                         *Senior Litigation Counsel*

                         /s/ *Joseph A. Darrow*
                         JOSEPH A. DARROW
                         *Trial Attorney*
                         U.S. Department of Justice
                         Civil Division
                         Office of Immigration Litigation
                         District Court Section
                         P.O. Box 868, Ben Franklin Station
                         Washington, DC 20044
                         Tel.: (202) 598-7537
                         Joseph.a.darrow@usdoj.gov

                         *Counsel for Defendants*

37

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice