# Exhibit A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity | § | |
| as President of the United States of | § | |
| America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION
## TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................iii

Introduction...............................................................................................................................1

Statement of Facts.....................................................................................................................5

Summary of the Argument......................................................................................................6

Argument....................................................................................................................................6

    I.     Plaintiffs are likely to succeed on the merits...............................................................7

        A.   The October 29 Memoranda constitute arbitrary and capricious agency action under the APA.......................................................................................................7

            1.   Defendants failed to adequately consider how using its contiguous-territory return authority would allow them to avoid violations of the INA's clear detention mandate. ........................................................................8

            2.   Defendants failed to adequately account for MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims. ...............................................10

            3.   Defendants failed to adequately justify their changed factual determinations regarding *in absentia* removal orders. ...............................12

            4.   Defendants failed to adequately examine whether DHS's rescission of MPP is causing it to violate the limits on its parole authority. .................12

            5.   Defendants failed to adequately consider costs to States and their reliance interests......................................................................................................19

         B.   No procedural issue precludes this Court's review. ...............................................21

            1.   Plaintiffs have standing to bring this claim. ..................................................21

            2.   Plaintiffs have a cause of action.....................................................................22

            3.   The October 29 Memoranda are subject to judicial review.......................22

            4.   The October 29 Memoranda are final agency action..................................24

    II.    Texas and Missouri will suffer irreparable harm if a stay is not granted.........................24

    III.   The equities overwhelmingly favor a stay...............................................................25

Conclusion................................................................................................................................25

Certificate of Conference.......................................................................................................27

Certificate of Service...............................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Healthcare Servs., Inc. v. Sebelius,*
　720 F. Supp. 2d 12 (D.D.C. 2010) .................................................................................7, 23

*Amanullah v. Nelson,*
　811 F.2d 1 (1st Cir. 1987) ..........................................................................................17

*Arizona v. United States,*
　567 U.S. 387 (2012) ...................................................................................................21

*Bechtel v. FCC,*
　957 F.2d 873 (D.C. Cir. 1992) ...................................................................................18

*Bennett v. Spear,*
　520 U.S. 154 (1997) ...................................................................................................24

*Biden v. Texas,*
　142 S. Ct. 2528 (2022) (*Biden III*) .................................................................*passim*

*Catawba Cnty. v. EPA,*
　571 F.3d 20 (D.C. Cir. 2009) .....................................................................................18

*Chevron U.S.A. Inc. v. NRDC,*
　467 U.S. 837 (1984) ...................................................................................................16

*Cruz-Miguel v. Holder,*
　650 F.3d 189 (2d Cir. 2011) .......................................................................................13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
　140 S. Ct. 1891 (2020) .................................................................................... 8, 19, 20

*FBI v. Abramson,*
　456 U.S. 615 (1982) ...................................................................................................14

*FCC v. Fox Television Stations, Inc.,*
　556 U.S. 502 (2009) ...................................................................................................12

*FCC v. Prometheus Radio Project,*
　141 S. Ct. 1150 (2021) ................................................................................................7

*Gen. Chem. Corp. v. United States,*
　817 F.2d 844 (D.C. Cir. 1987) ...................................................................................11

iii

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ..........................................................................................14

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
    804 F.2d 1390 (5th Cir. 1986) ........................................................................24

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018).................................................................................9, 18

*Judulang v. Holder*,
    565 U.S. 42 (2011)............................................................................................8

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ...................................................................................14

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................25

*Lopez v. Davis*,
    531 U.S. 230 (2001) ........................................................................................16

*Medellin v. Texas*,
    552 U.S. 491 (2008) ........................................................................................15

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................4, 7, 8, 11

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................23, 25

*Office of Commc'n of the United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983) ..............................................................9, 13, 18

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ................................................................9, 13, 18

*Richardson v. Joslin*,
    501 F.3d 415 (5th Cir. 2007)..........................................................................14

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019).............................................................................7

*Texas v. Biden*,
    10 F.4th 538 (2021) (*per curiam*) ...............................................................3, 22

iv

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) (*Biden II*) ..............................................................*passim*

*Texas v. U.S. EPA,*
  829 F.3d 405 (5th Cir. 2016) ..............................................................................7

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) (per curiam) ................................................ 19, 21

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
  985 F.3d 472 (5th Cir. 2021) ..............................................................................7

*Valley v. Rapides Parish School Bd.,*
  118 F.3d 1047 (5th Cir. 1997) ............................................................................7

**Statutes**

5 U.S.C. § 701(a)(2) ...........................................................................................24

5 U.S.C. §705 ............................................................................................ 6, 7, 23

5 U.S.C.§ 706 ..............................................................................4, 5, 7, 22, 23

8 U.S.C. § 1182(d)(5) .............................................................................. 13, 15, 16

8 U.S.C. § 1225 .................................................................................................*passim*

8 U.S.C. § 1229a ...................................................................................................1

8 U.S.C. § 1252(a)(2)(B)(ii) ...............................................................................24

8 U.S.C. § 1252(f)(1) .............................................................................. 4, 22, 23

8 U.S.C. §§ 1252(g), 1252(b)(9), 1252(a)(2)(B)(ii) .........................................24

8 U.S.C. § 1226(a) ...............................................................................................18

**Other Authorities**

8 C.F.R. § 212.5(a) ...............................................................................................13

86 Fed. Reg. 8269 (2021) ....................................................................................2

Executive Order No. 14010 .................................................................................2

Federal Rule of Civil Procedure 65(a)(2) ............................................................3

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950–51, 1016
  (2018) ................................................................................................................23

## Introduction

On December 20, 2018, the Department of Homeland Security (DHS) announced a new program: the Migrant Protection Protocols (MPP). MPP was created in response to an immigration surge at the southern border, and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering approximately 2,000 inadmissible aliens each day. ECF 94 at 7. MPP provided that certain non-Mexican nationals arriving by land from Mexico would be returned to Mexico to await the results of their removal proceedings under 8 U.S.C. § 1229a. On the same day that DHS announced the program, the Government of Mexico agreed that it would cooperate in administering it, on a temporary basis. ECF 94 at 8.

MPP was implemented pursuant to express congressional authorization in the Immigration and Nationality Act (INA), which provides that "[i]n the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

A separate provision of the same section of the INA states that if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). DHS lacks the resources to detain every alien seeking admission to the United States. ECF 94 at 43. Ameliorating that problem was one reason the Trump administration chose to implement MPP; the program ensured that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." ECF 94 at 8.

In January 2019, DHS began implementing MPP, initially in San Diego, California, then in El Paso, Texas, and Calexico, California, and then nationwide. ECF 94 at 8. By December 31, 2020, DHS

had enrolled 68,039 aliens in the program. ECF 94 at 12.

Following the 2020 election, however, the newly inaugurated Biden Administration sought to terminate the program. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." ECF 94 at 15 (the "January Suspension"). President Biden also issued Executive Order No. 14010, which directed the new Secretary of Homeland Security, Alejandro N. Mayorkas, to "promptly review and determine whether to terminate or modify the [MPP] program." 86 Fed. Reg. 8269 (2021). The effects on the border were immediate—according to Defendants' own data, border "encounters jump[ed] from 75,000 in January 2021," when MPP was first suspended, to about "173,000 in April 2021." ECF 94 at 17.

On June 1, 2021, Secretary Mayorkas issued a memorandum officially terminating MPP (the "June 1 Memorandum"). In that memorandum, the Secretary noted his determination "that MPP [d]oes not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." ECF 94 at 16. For this and other reasons, the Secretary announced that he was "by this memorandum terminating the MPP program," and "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." ECF 54-2, App.467.

On April 13, 2021, Plaintiffs, the States of Texas and Missouri, initiated this lawsuit challenging this Administration's shutdown of MPP. ECF 1. Plaintiffs' initial complaint challenged the January Suspension that paused new enrollments in MPP, but following the June 1 Memorandum, they amended their complaint to challenge the termination of the entire program. The First Amended Complaint asserted that the June 1 Memorandum violated the INA and the Administrative Procedure

Act (APA), 5 U.S.C. § 701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the termination pursuant to the APA. ECF 48.

After a consolidated preliminary injunction hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), this Court vacated Defendants' decision to terminate MPP as arbitrary and capricious, ECF 94 at 34–42, and as contrary to law for causing Defendants to exacerbate their violation of the mandatory detention requirements of section 1225(b)(1)(B)(iii)(IV), ECF 94 at 42–44. The Court then enjoined Defendants to continue to implement MPP "in good faith until such a time as it has been lawfully rescinded in compliance with the APA *and* until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources." ECF 94 at 52 (*Biden I*). Defendants sought a stay of that order, which the Fifth Circuit denied. *Texas v. Biden*, 10 F.4th 538, 543–561 (2021) (*per curiam*). Defendants then sought a stay in the Supreme Court, but their application there was also denied as they "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." 594 U. S. ——, 142 S.Ct. 926 (2021).

Two business days before oral argument on the merits in the Fifth Circuit, DHS issued two memoranda (the "October 29 Memoranda") declaring that it had made a new decision terminating MPP. *See* Termination of the Migrant Protection Protocols (the "Termination Memorandum"), Supp.App.001–004; Explanation of the Decision to Terminate the Migrant Protection Protocols (the "Explanation Memorandum"), Supp.App.005–043. At the same time, Defendants asked the Fifth Circuit to hold that the case was moot, to vacate this Court's judgment and permanent injunction, and to remand the case for further proceedings. *Texas v. Biden*, 20 F.4th 928, 946 (5th Cir. 2021) (*Biden II*). The Fifth Circuit declined, holding that the October 29 Memoranda did not moot—or have any legal effect on—the appeal. *Id.* at 956–966, 998–1000. The Fifth Circuit then affirmed this Court on the merits.

The Supreme Court granted certiorari, 595 U. S. ——, 142 S.Ct. 1098, 212 (2022), and expedited consideration of the appeal at Defendants' request. On June 30, the Supreme Court reversed the Fifth Circuit. *Biden v. Texas*, 142 S. Ct. 2528 (2022) (*Biden III*). First, it found that this Court's permanent injunction was barred by 8 U.S.C. § 1252(f)(1),[1] *id.* at 2538, though that provision "does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 2539. The Court also held that the termination of MPP did not itself violate the mandatory detention requirements of section 1225(b)(2)(A), *id.* at 2541–43, although the majority "assume[d] *arguendo* … that the dissent's interpretation [advanced by Justice Alito] of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. *Biden III* did not disturb any of the holdings of this Court or the Fifth Circuit on issues of standing or reviewability to challenge a termination of MPP, the limits on parole authority, or the mandatory nature of the detention requirements of section 1225.

The Supreme Court expressly left open a challenge in this Court to the October 29 Memoranda as arbitrary and capricious under the APA. *Biden III*, 142 S. Ct. at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA.") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57 (1983)); *id.* at 2549 (Kavanaugh, J., concurring) ("The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time. The Court today therefore properly leaves the *State Farm* issue for consideration on remand."); *id.* at 2559 (Alito, J., dissenting) ("I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with § 706 of the APA.").

---

[1] "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated."

Indeed, the Court determined that the October 29 Memoranda constituted final agency action that superseded the June 1 Memorandum. *Id.* at 2544. Plaintiffs now challenge the October 29 Memoranda, which—like its predecessor—suffers from arbitrary and capricious decisionmaking.

STATEMENT OF FACTS

On October 29, the Secretary released the Termination Memorandum, consisting of four pages that again announced the termination of MPP, along with the 39-page Explanation Memorandum explaining his reasons for doing so. As the Secretary explained it, these October 29 Memoranda "examined considerations that the District Court determined were insufficiently addressed in the June 1 Memorandum, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its [detention] obligations under 8 U.S.C. § 1225." Supp.App.016.

The Secretary acknowledged what he called "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." Supp.App.003. But he nonetheless concluded that the program's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Id.* Finally, the Secretary noted that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id.*

In light of those conclusions, the Secretary announced that he was once again "hereby terminating MPP." *Id.* at 4. He explained that DHS would "continue complying with the [this Court's]

5

injunction requiring good-faith implementation and enforcement of MPP," but that "the termination of MPP" would be "implemented as soon as practicable after a final judicial decision to vacate" that injunction. *Id.*

This Court vacated the permanent injunction on August 8, 2022. ECF 147.

## SUMMARY OF THE ARGUMENT

Plaintiffs are entitled to a stay of the October 29 Memoranda pending a final merits determination as to whether they satisfy the requirements of reasoned decisionmaking under the APA. The termination of MPP failed to adequately consider (1) how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate; (2) MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims; (3) the justification of changed factual determinations regarding *in absentia* removal orders; (4) whether DHS's rescission of MPP is causing it to violate the limits on its parole authority; and (5) costs to States and their reliance interests.

## ARGUMENT

The stay provision of the APA provides that:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process *to postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. §705 (emphasis added).[2]

This provision "authorizes reviewing courts to stay agency action pending judicial

---

[2] This Court should consider this motion for interim relief without waiting for Defendants to produce an administrative record for the October 29 Memoranda. *See, e.g.*, *Franciscan All., Inc. v. Burwell*, 7:16-cv-108-O, 2016 WL 9281524, at *3 (N.D. Tex. Nov. 1, 2016) (O'Connor, J.) (setting a briefing schedule "to consider the pending motion for preliminary injunction" despite "no administrative record" and deferring consideration of summary judgment so that the court could consider the "administrative record in the normal course of this litigation"); *Doe v. Trump*, 3:19-cv-1743, 2020 WL 1853657, at *3 (D. Or. Apr. 13, 2020) (noting that the court relied on a "partial record produced before the preliminary injunction" and then set a later deadline "to supplement the administrative record" after the preliminary injunction decision).

review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. U.S. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and that (4) an injunction is in the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). Plaintiffs easily satisfy these standards.

**I.  Plaintiffs are likely to succeed on the merits.**

**A.    The October 29 Memoranda constitute arbitrary and capricious agency action under the APA.**

Courts have the duty to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *post hoc. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

The agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. The agency must consider the reliance interests of those affected by a contemplated decision, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020), and must consider less-disruptive policies in light of those interests. *Id.*

 "[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system," *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up), and an agency rule is "arbitrary and capricious if it the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

### 1. Defendants failed to adequately consider how using its contiguous-territory return authority would allow them to avoid violations of the INA's clear detention mandate.

Though the October 29 Memoranda purport to address compliance with section 1225's detention mandate, Supp.App.030–033, they rely on incorrect legal conclusions, including that "[s]ection 1225 does not impose a near-universal detention mandate," and that section 1182(d)(5)(A)'s parole authority permits DHS to parole nearly all aliens subject to section 1225's mandatory-detention obligation. Supp.App.031–033.

This Court has already determined that the detention requirements of section 1225 are mandatory. ECF 94 at 42–44. The Fifth Circuit reinforced this determination. *Biden II*, 20 F.4th at 992–96; *see also id.* at 978 ("Section 1225(b)(2)(A) provides that, under certain circumstances, 'the alien shall be detained' during her removal proceeding. That's obviously a mandatory statutory command— not a commitment to agency discretion.").

Nothing by the Supreme Court in *Biden III* upsets those prior determinations. The majority rejected the insinuation that its "opinion authorizes the Government to release aliens subject to

detention under section 1225(b)(2)(A)," clarifying that it "need[s] not and d[id] not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision." *Biden III*, 142 S. Ct. at 2542 n.4. Instead, the majority "assume[d] *arguendo* for purposes of this opinion that the dissent's interpretation of section 1225(b)(2)(A) [as mandating detention] is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2540.

"[T]he dissent's interpretation" that the majority assumed was correct is in harmony with this Court's previous determination of the mandatory nature of the detention requirements in 8 U.S.C. § 1225(b)(2)(A). The dissent pointed to the Court's conclusion in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), that "[r]ead most naturally, §§ 1225(b)(1) and (b)(2) ... mandate detention of applicants for admission until certain proceedings have concluded." *Biden III*, 142 S. Ct. at 2553–54 (Alito, J. dissenting) (quoting *Jennings*, 138 S. Ct. at 842).

The termination of MPP reduces Defendants' ability to detain all of the arriving aliens that Congress has mandated them to do, and DHS failed to adequately consider this effect on that related statutory requirement. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Comm'c'n of the United Church of Christ v. FCC*, 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

By denying that section 1225 creates a detention mandate in the October 29 Memoranda—despite this Court's earlier determination to the contrary, ECF 94 at 42–44—Defendants have based the renewed termination of MPP on arbitrary and capricious grounds. Their erroneous legal root

9

prevented Defendants from properly analyzing the strength of using MPP to reduce their noncompliance with their detention mandates.

### 2. Defendants failed to adequately account for MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims.

The October 29 Memoranda failed to consider key benefits of MPP. For example, they extensively discussed conditions for migrants in Mexico, Supp.App.016–022, but omitted the hardships befalling aliens who make the dangerous journey to the southern border—even though the Secretary similarly acknowledged that MPP "is likely … to contribute[] to a decrease in migrant flows." Supp.App.027. The October 29 Memoranda also had no analysis of the harms avoided by deterring migrants without meritorious asylum claims from traveling to the United States. Explanation Supp.App.022–025.

This Court previously faulted the June 1 Memorandum for failing to "address the problems created by false claims of asylum or how MPP addressed those problems." ECF 94 at 36. The October 29 Memoranda suffer from the same defect.

"[W]hen MPP was first announced the Department observed that 'approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious." Supp.App.024–025. Though the October 29 Memoranda acknowledge that Defendants "do[] not have a record of the methodology used to generate this … statistic," they nonetheless disagree with it and change policy because, in their view, MPP resulted in too few asylum grants. Supp.App.025. Defendants cite the lower rates for granting asylum claims for those enrolled in MPP, Supp.App.024–025, but they articulate no reason to think that the higher rates outside MPP they cite are more accurate determinations than the lower rates for aliens enrolled in the program. They concluded that "[t]hese discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims," Supp.App.025, but "[s]uch intuitional

forms of decisionmaking, completely opaque to judicial review, fall somewhere on the distant side of arbitrary." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (quoting *Central Florida Enterprises, Inc. v. FCC*, 598 F.2d 37, 50 (D.C. Cir. 1978)). The October 29 Memoranda do not evidence "a rational connection between the facts found and the choice made" to terminate MPP. *State Farm*, 463 U.S. at 43.

A substantial harm resulting from migrant flows includes human trafficking. ECF 94 at 20. Defendants dismiss the concern that terminating MPP contributed to an increase in these crimes by looking at the data for seizures of narcotics, which indicates a decline, including while MPP was moribund. Supp.App.029–030.

But Defendants themselves note that "[t]hese declines have been driven by a substantial decrease in marijuana smuggling," and the numbers for "hard narcotics … are historically smuggled through ports of entry and this have very little connection to MPP's implementation." Supp.App.029. Indeed, Defendants concede up front that "[s]eizures of narcotics [are not] necessarily indicative of trafficking activity," but use this data to determine that there is no evidence of effects on human trafficking due to implementation of MPP. Supp.App.029. This use of admittedly irrelevant data is a hallmark of a lack of rational decisionmaking, as agencies "must examine the relevant data" and are required to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Biden II*, 20 F.4th at 992 ("We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion."). By failing to adequately consider the effects of the implementation of MPP on deterring illegal border crossings and unmeritorious asylum claims, and in reducing the opportunities for human trafficking, Defendants did not consider the relevant costs and benefits to make a rational decision when it terminated MPP.

**3. Defendants failed to adequately justify their changed factual determinations regarding *in absentia* removal orders.**

The October 29 Memoranda also purport to "rest[] upon factual findings that contradict those which underlay [DHS's] prior policy," but fail to provide the "more detailed justification" required under those circumstances. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516–17 (2009). For example, the October 29 Memoranda contain completely different numbers regarding *in absentia* removal orders than those contained in the June 1 Memorandum's administrative record to show MPP resulted in a high rate of *in absentia* removals. Supp.App.022–025. But Defendants did not explain the discrepancy or contest the Fifth Circuit's conclusion "that *in absentia* removal rates were similar prior to MPP." *Biden II*, 20 F. 4th at 991–92; *see also* ECF 94 at 40.

Defendants also never provided a rational explanation why the increased *in absentia* removal rates for aliens enrolled in MPP is not an indicator of MPP working; this Court has noted that "[a] higher rate of *in absentia* removal is consistent with DHS's [previous] findings that MPP reduced the 'perverse incentives' to pursue meritless asylum applications." ECF 94 at 40–41. This failure to appreciate the relevant costs and benefits of MPP precluded DHS from making a reasoned determination that considered all relevant factors.

**4. Defendants failed to adequately examine whether DHS's rescission of MPP is causing it to violate the limits on its parole authority.**

The Supreme Court majority in *Biden III* noted that "the INA expressly authorizes DHS to process applicants for admission under a third option: parole." *Biden III*, 142 S. Ct. at 2543 (citing 8 U.S.C. § 1182(d)(5)(A)). But it also emphasized that this "the authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). "And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* (citing *State Farm*, 463 U.S. 29). The October 29 Memoranda failed to consider how

terminating MPP—combined with Defendants' inability to detain all arriving aliens—leads to increased violations of the limits on their parole authority as they release aliens into the United States. *Cf. Portland Cement Ass'n*, 665 F.3d at 187 ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ*, 707 F.2d at 1441–42 (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

By passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress cabined the Executive's parole authority precisely because it believed the Executive used that authority to evade congressionally mandated detention. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Defendants point to a history of broad discretion in exercising parole, Supp.App.031–032., but Congress's decision to restrict that discretion renders that irrelevant.

Unable to detain and unwilling to return aliens eligible for MPP, Defendants propose that two sources of parole authority, subparagraph 1182(d)(5)(A) and subsection 1226(a), permit DHS to release tens of thousands of detention-mandated aliens into the United States. Subparagraph 1182(d)(5)(A) authorizes individual parole on a case-by-case basis for narrow reasons; subsection 1226(a) does not apply to individuals eligible for MPP. Neither justifies Defendants' dogged refusal to employ its contiguous-return authority to avoid violating its mandatory-detention obligation.

Defendants challenge the Fifth Circuit's conclusion that they cannot parole aliens *en masse* under subparagraph 1182(d)(5)(A). Subparagraph 1182(d)(5)(A) provides only limited humanitarian-parole authority, authorizing "parole … only on a case-by-case basis for urgent humanitarian reasons or a significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Subparagraph 1182(d)(5)(A)'s implementing regulations reiterate that parole may only be granted on a case-by-case basis. 8 C.F.R. § 212.5(a). No deference is due Defendants' interpretation of the regulation implementing their parole authority

because, after "exhaust[ing] all the traditional tools of construction[,]" the regulation is not "genuinely ambiguous," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984))—the requirement that a power must be exercised on a case-by-case basis generally precludes the exercise of that power on a categorical basis, *see, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985); *FBI v. Abramson*, 456 U.S. 615, 631 (1982). Justice Alito noted that "the Solicitor General argued that the case-by-case determination requirement can be met simply by going through a brief checklist for each alien," that "[e]ven the rudimentary step of verifying that an alien does not have a criminal record is not performed in every case," and concluded that "[s]uch procedures are inconsistent with the ordinary meaning of 'case-by-case' review." *Biden III*, 142 S. Ct. at 2555 (Alito, J., dissenting).

"The *Accardi* doctrine stands for the unremarkable proposition that an agency must abide by its own regulations." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (referring to *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)) (internal quotation marks and citation omitted). The October 29 Memoranda make no attempt to evaluate the limitations on parole in the statute and in DHS's own regulations—as properly understood—and how they are undermined by the refusal to use MPP to relieve the pressure to categorically releaser aliens *en masse* into the United States.

This Court found that MPP's termination forced Defendants "to release and parole aliens into the United States because [they] simply do not have the resources to detain aliens as mandated by statute." ECF 94 at 17. And Defendants have long been on notice that Plaintiffs believed their decision to rescind MPP would necessarily cause the Executive to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings. Plaintiffs argued as much when they first sought a preliminary injunction on May 14, 2020, claiming that "[i]nstead of detaining … aliens or returning them to Mexico, Defendants are paroling them into the United States. But parole is available 'only on a case-by-case basis for urgent humanitarian reasons or a significant public benefit,' not on a

class-wide basis." ECF 30 at 20.

Defendants continue paroling aliens *en masse* into the United States. Defendants' most recent status report filed pursuant to this Court's injunction indicates that in June alone, DHS paroled 11,424 applicants for admission under section 1225 into the United States and—"whether paroled or otherwise"—released 72,611 applicants for admission under section 1225. ECF 143-1 at 4-5. Although Defendants reason that "the [parole] statute does not set any limit on the number of individuals DHS can decide to release on parole," Supp.App.031, it is impossible to believe that DHS has paroled or released these aliens based on case-by-case determinations of urgent humanitarian reasons or significant public benefit. *See Biden III*, 142 S. Ct. at 2554 (Alito, J. Dissenting) ("the number of aliens paroled each month under [under § 1182(d)(5)(A)]—more than 27,000 in April of this year—gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis.").

Defendants reason that the parole statute "does [not] provide that the agency cannot rely on limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225." Supp.App.031. But the Fifth Circuit has rejected "the Government's proposal to parole every alien it cannot detain [as] the opposite of the 'case-by-case basis' determinations required by law." *Biden II*, 20 F.4th at 997. Defendants require such a power to resolve their conundrum: if they may systemically grant parole instead of either detaining or returning MPP-eligible aliens, then they need not detain or return those aliens as the law requires. Defendants implicitly recognize that subparagraph 1182(d)(5)(A)'s "case-by-case basis" requirement forecloses the sweeping, thousands-by-thousands parole authority they want. They therefore instead rely on past DHS practice, asserting that DHS has "long interpreted" its parole authority to enable it to simply parole aliens when it lacks sufficient capacity to detain them. Supp.App.032. But such a practice "does not, by itself, create power," *Medellin v. Texas*, 552 U.S. 491, 532 (2008), and DHS's claim to such a power is contradicted

15

by subparagraph 1182(d)(5)(A)'s text, IIRIRA's historical context, and Congress's history of circumscribing DHS's parole authority.

Subparagraph 1182(d)(5)(A)'s text is unusually clear: it permits DHS to parole aliens only based on individualized determinations, and only for urgent humanitarian reasons or significant public benefit. As the Fifth Circuit observed, "[d]eciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking." *Biden II*, 20 F. 4th at 942.

The Explanation Memorandum claims its interpretation of its parole authority is entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Supp.App.031–032. "Even under this deferential [*Chevron*] standard, however, agencies must operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 576 U.S. 743, 751 (2015) (cleaned up). And while an agency ordinarily "has the authority to rely on rulemaking" to categorically resolve "certain issues of general applicability," Congress can withhold that authority. *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001).

Congress did so here, passing IIRIRA specifically to curtail the Executive's improper exercise of parole authority to release classes of aliens rather than individual aliens. After "the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants, … Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Biden II*, 20 F.4th at 947 (citing Pub. L. No. 96-212, 94 Stat. 102, 108 (adding 8 U.S.C. § 1182(d)(5)(B)); Pub. L. No. 104-208, 110 Stat. 3009, 3009-689 (adding subparagraph 1182(d)(5)(A)). "By enacting [IIRIRA], Congress 'specifically narrowed the executive's discretion' to grant parole due to 'concern that parole … was being used by the executive to circumvent congressionally established immigration policy.'" ECF 94 at 43 n.11 (quoting *Cruz-Miguel*, 650 F.3d at 199 & n.15).

Additional historical context confirms that DHS cannot exercise its parole authority under subparagraph 1182(d)(5)(A) to grant relief to categories of aliens instead of individuals. Before

IIRIRA, federal immigration authorities enjoyed a parole power "under such conditions as [the Attorney General] may prescribe for emergent reasons or for reasons deemed strictly in the public interest." Pub. L. No. 414 c. 477, Title II, c. 2, § 212, 66 Stat. 182. As the First Circuit summarized, that pre-IIRIRA parole authority was understood to be "close to plenary," even though "[t]he legislative history of the parole statute demonstrate[d] clearly that Congress intended such largesse to be extended infrequently, where exigent circumstances obtained." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987) (citing H.R. Rep. No. 1365, 82d Cong., 2d Sess., 1952, reprinted in 1952 U.S.C.C.A.N. 1653, 1706). Congress made clear as early as 1965 that the parole authority should be used narrowly. *See* H.R. 2580, 89th Cong., 1st sess., H. Rept. 945, Aug. 6, 1965, p. 15-16; H.R. 2580, 89th Cong., 1st sess., S. Rept. 748, Sept. 15, 1965, p. 17. These "parole provisions" were "designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law." *Id.*

The Executive nonetheless continued to abuse its parole authority to release classes of aliens into the United States, and Congress remained concerned that "parole ha[d] been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, Mar. 4, 1996, at 140. Congress therefore determined that "further, specific limitations on [the Executive's] discretion . . . [were] necessary," *id.*, and it amended subparagraph 1182(d)(5)(A) to make clear that parole "should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories." *Id.* at 141.

In other words, after long experience with Executive Branch intransigence, Congress expressly foreclosed DHS from exercising its parole authority under subparagraph 1182(d)(5)(A) on a categorical basis. To describe Defendants' reasoning in the Explanation Memorandum—that DHS's

historical disregard of legislative restrictions on its historical parole power justifies a present disregard of legislative restrictions on its present parole power—is to refute it.

In a footnote, the Explanation Memorandum claims an alternative source to parole aliens into the United States: 8 U.S.C. § 1226(a)'s bond-and-condition parole provisions. Supp.App.031. But as the Supreme Court has explained, subsection 1226(a) governs the arrest, detention, and release of aliens who are already "present in the country." *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018). "Section 1226 generally governs the process of arresting and detaining that group of aliens," *i.e.*, those already "inside the United States." *Id.* For arriving aliens, section 1225 applies instead. Neither side disputes that only aliens apprehended at the border are eligible for MPP—so whatever the scope of DHS's subsection 1226(a) authorities, they cannot be used to parole MPP-eligible aliens in lieu of either detention or contiguous return.

Since agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion," *Catawba Cnty. v. EPA,* 571 F.3d 20, 45 (D.C. Cir. 2009), or to "reexamine" their approaches "if a significant factual predicate" changes, *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C. Cir. 1992), "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates." *Portland Cement Ass'n,* 665 F.3d at 187; *see also Office of Commc'n of the United Church of Christ,* 707 F.2d at 1441–42. Despite their purported implementation of MPP in good faith, DHS is presently releasing into the country tens of thousands of individuals per month through parole and otherwise. The continued violation of the limits on Defendants' parole authority—even after the re-institution of MPP—should have led Defendants to consider how terminating MPP would only exacerbate that problem.

The loss of MPP as a tool to reduce the numbers paroled without the required individualized assessment was not adequately considered in the October 29 Memoranda. The consideration of the relevant costs and benefits of MPP thus did not adequately consider the relevant factors.

**5. Defendants failed to adequately consider costs to States and their reliance interests.**

The Fifth Circuit recently evaluated a DHS memorandum under the APA, finding that federal agencies, many of whom are Defendants here, failed to consider both States' costs and their reliance interests in federal immigration policies. *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) (per curiam). There, DHS had "a multi-page section … analyzing the 'Impact on States'" but the court found its analysis "dismissive," merely "dot[ting] 'i's' and cross[ing] 't's' without actually saying anything." *Id.* at 228. The failure to actually "quantify or at least reasonably describe the costs of this policy to the States …[and] the agency['s] audacious[] conclu[sion] that 'any effects from implementation of priorities guidance are unlikely to be significant'" did not satisfy the requirement that agencies consider the costs to the States. *Id.*

So too here. DHS devoted just a single paragraph purporting to consider this factor. Supp.App.030. It was dismissive towards to costs of the States on the ground that "[f]ederal immigration policy virtually always affects the number of people living within the States," and describes these as "marginal costs" that are "outweighed by the other considerations and policy concerns." Supp.App.030. But no such calculation can be rationally made without attempting to quantify these costs—such as the sorts of expenses the States set forth earlier in this case—in order to perform such a cost-benefit analysis.

Plaintiffs also faulted the June 1 Memorandum for the Secretary's failure to consider their legitimate reliance interests in MPP's continued operation or to provide for alternative means of meeting the Executive's § 1225 detention obligations. Yet the October 29 Memoranda airily dismiss the notion that Plaintiffs retain any legitimate reliance interests in MPP's operation and presume the Executive may broadly release aliens notwithstanding § 1225's mandate. Supp.App.030.

While *Regents* requires DHS to actually consider Plaintiffs' financial injuries and other reliance interests, 140 S. Ct. at 1913, the October 29 Memoranda did the opposite. Without explaining what

inquiry they made, Defendants breezily assert that "the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation … of MPP." Supp.App.030. The Explanation Memorandum also asserts that "any claimed reliance interest is undermined by the fact that [MPP] is itself discretionary." Supp.App.030. But in *Regents*, "the Supreme Court acknowledged that DACA was a discretionary program [but still] faulted DHS for not considering reliance interests … [t]hat included the States' reliance interests" including financial injuries from termination of the program. *Biden II*, 20 F.4th at 990 (5th Cir. 2021). "So if DHS must consider states' reliance interests before terminating DACA—a discretionary immigration program—then it must do so before terminating MPP." *Id.*

The October 29 Memoranda also maintain that "[t]he short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the [southwest border] who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States." Supp.App.030. But DACA was a program that had only existed for five years before the challenged termination, *Regents*, 140 S. Ct. at 1901, and this statement is contradicted by Secretary Mayorkas's repeated concessions that the benefits of MPP included deterring aliens from arriving— that is, the reduction of the number of aliens present in the States included the aliens *deterred from arriving* by MPP, not just those actually enrolled in MPP.

The Fifth Circuit's recent decision as to evaluating costs to the States also addressed the issue of adequately considering reliance:

> As to the States' reliance interests, the Considerations Memo flatly concludes that "no such reasonable reliance interests exist." In a single paragraph citing no evidence, DHS concluded that the States, including Texas as a 900-mile border state, has *no reliance interests* in the enforcement of federal criminal immigration law according to the governing statutes. This omission is more inexcusable since the States have consistently asserted their reliance interests in the context of this litigation, which has been ongoing simultaneously with DHS's promulgation of the Final Memo and the Considerations Memo. "Stating that a factor was considered … is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Rather, courts "must make a searching and careful inquiry to determine if [the

20

agency] actually *did* consider it." *Id.* (internal quotation marks omitted). At this point,
DHS has not shown a likelihood that it adequately considered the relevant costs to the
States or their reliance interests in the pre-existing enforcement policy.

*Texas*, 40 F.4th at 228. The October 29 Memoranda demonstrate this same failure to evaluate reliance

interests here: by terminating MPP without adequately considering the reliance interests of States in

the control of the flow of aliens—as assisted by MPP—Defendants failed to shape their "approach

[to be] tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of

the immigration system." *Judulang*, 565 U.S. at 55. The States "bear[] many of the consequences of

unlawful immigration," which "must not be underestimated." *Arizona v. United States*, 567 U.S. 387,

397 (2012). The failure of the October 29 Memoranda to seriously evaluate these consequences was

arbitrary and capricious.

### B. No procedural issue precludes this Court's review.

Defendants cannot avoid judicial review by raising non-merits arguments that this Court has

already rejected.

#### 1. Plaintiffs have standing to bring this claim.

Plaintiffs have standing to challenge Defendants' termination of MPP for the same reasons

that they had standing to challenge the previous termination of the program. This Court's previous

determinations on standing constitute the law of the case because the challenged agency action here

is identical to the previous one: whereas under MPP large numbers of aliens who would have otherwise

been imposing costs on the States were instead required to wait in Mexico pending the determination

of their asylum proceedings, the termination of the program led to the imposition of those costs. ECF

94 at 17–26; *see also Biden II*, 20 F.4th at 966–76 (finding States had standing to challenge agency action

terminating MPP, including for claim of arbitrary-and-capricious decisionmaking under the APA).

And regardless of whether it is law of the case, the evidence already in the record in this case amply

supports Plaintiffs' standing. *See* ECF 54.

21

**2. Plaintiffs have a cause of action.**

This Court has already determined that the States' claims challenging the termination of MPP fall within the zone of interests of the INA. ECF 94 at 33–34; *see also Biden II*, 20 F.4th at 975–76. Nothing could justify a different result here as the subsequent October 29 Memoranda purports to do the same thing: terminate MPP.

**3. The October 29 Memoranda are subject to judicial review.**

Section 1252(f)(1) does not bar a stay of the effective date of the October 29 Memoranda. The Supreme Court noted "the narrowness of [Section 1252(f)(1)'s] scope" as indicated by its tile: "Limit on injunctive relief.*" Biden III*, 142 S. Ct. at 2539. Section 1252(f)(1) only "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." *Id.* The opinion of the Court distinguished its own previous cases that considered challenges under §§ 1221–1232, reasoning that they included claims for declaratory relief that would not be barred by § 1252(f)(1). *Id.* at 2540. The majority also emphasized that it "express[ed] no view" on "whether that limitation [in § 1252(f)(1)] extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA [*i.e.*, vacatur of agency action]." *Id.* at 2540 n.4; *see also id.* at 2552 (Alito, J., dissenting) (noting Defendants' "far-reaching position that § 1252(f)(1)" bars vacatur under the APA); *id.* at 2562 (Barrett, J., dissenting) (noting that the Court "reserves the question whether § 1252(f)(1) bars declaratory relief" and "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act") (internal citations omitted).

In a post-*Biden III* opinion, the Fifth Circuit construed § 1252(f)(1) as not precluding vacatur of agency actions under section 706 of the APA for claims relating to INA §§ 1221–1232. *Texas,* 40 F.4th at 219–20. There, the court noted the "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Id.* at 219 (quoting

22

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). These fundamental distinctions make "[e]xtending [the Supreme Court's construction of section 1252(f)(1)] to vacatur … particularly dubious in light of the Court's caveats." *Id.* at 219–220. As "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action," and "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.* at 220. Thus, section 1252(f)(1) does not "strip[] federal court jurisdiction to vacate unlawful agency action." *Id.* Delaying the effective date of MPP's termination is no different; if anything, it is less drastic than vacatur. If vacatur—*a.k.a.*, "set[ting] aside" unlawful agency action after a merits determination, 5 U.S.C.§ 706—is not precluded by § 1252(f)(1), then neither is postponing the effective date.

Underscoring that fact is that is that § 705 authorizes is a stay of agency action. *See, e,g., Affinity Healthcare Servs., Inc.*, 720 F. Supp. 2d at 15 n.4. Stays are not injunctions. "An injunction and a stay have typically been understood to serve different purposes." *Nken v. Holder*, 556 U.S. 418, 428 (2009). An injunction "is a means by which a court tells someone what to do or not to do," *id.*, but stays are a limit upon the actions of the agency itself, not its officers as would be in the case of an injunction, *cf. id.* (noting stays "operate[] upon the judicial proceeding itself … either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability."); Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950–51, 1016 (2018) (noting that both sections 705 and 706 nullify the agency action itself, rather than (as in an injunction) acting on officials who enforce an unlawful provision). Stays of agency action under § 705 are therefore not within the ambit of the injunctive relief precluded by section 1252(f)(1). *See Nken*, 556 U.S. at 430 (noting that "the language of [1252](f) says nothing about stays, but is instead titled 'Limit on injunctive relief'").

As to Defendants' earlier arguments involving other statutory bars of judicial review of the termination of MPP, the analyses of those provisions can be no different for the termination ordered

by the October 29 Memoranda, as it was for that ordered by the June 1 Memorandum. This Court's rulings are therefore the law of the case; there are no statutory bars of judicial review of this action. *See* ECF 94 at 28–30 (finding no bar to judicial review of agency action terminating MPP in 8 U.S.C. §§ 1252(g), 1252(b)(9), 1252(a)(2)(B)(ii)); *see also Biden II*, 20 F.4th at 977 (finding that 8 U.S.C. § 1252(a)(2)(B)(ii) did not bar review of agency action terminating MPP).

This Court has also rejected the argument that agency action terminating MPP is "agency action … committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review. ECF 94 at 31–32; *see also Biden II*, 20 F.4th at 978–88 (same). This determination remains the law of the case.

### 4. The October 29 Memoranda are final agency action.

Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). The Supreme Court has already determined that the October 29 Memoranda satisfy these conditions and "were therefore final agency action for the same reasons that the June 1 Memorandum was final agency action." *Biden III*, 142 S. Ct. at 2544–45.

## II. Texas and Missouri will suffer irreparable harm if a stay is not granted.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

The Court's analysis of this factor in granting a permanent injunction is equally applicable to

challenges this new attempt to terminate MPP. ECF 94 at 50. It is sufficient, for this factor, that MPP will impose unrecoverable costs on Plaintiffs. *See id.*; *see also Biden II*, 20 F.4th at 1002 (factual findings regarding injury made in standing context show increased costs to States from termination of MPP, and inability to recover from federal government supports determination that States have suffered an irreparable injury for which remedies available at law are precluded due to sovereign immunity).

### III. The equities overwhelmingly favor a stay.

The two final prongs of the inquiry for a stay of agency action "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Defendants have no legitimate interest in the implementation of an unlawful agency action. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The analysis of the public interest and the balance of the equities is the same regarding the new attempt to terminate MPP as it was the last time the Court addressed the issue. ECF 94 at 50. Indeed, because MPP is currently operational, Defendants lack their primary arguments they made regarding this prong in the previous challenge to the termination of MPP.

When Defendants terminated MPP in the June 1 Memorandum, the program had been effectively shuttered, and injunctive relief required them to restart the program from scratch—requiring them to negotiate with Mexico, to rebuild facilities and to find resources. *Biden II*, 20 F.4th at 1002–03. None of those arguments are now available to Defendants—they have been complying with the Court's permanent injunction and MPP has been operational since December. *See* ECF 117 (Defendants' notice that MPP was restarted on December 2, 2021, after agreement with Mexico); ECF 143-1 at 2 (most recent status report showing 1,382 returns to Mexico via MPP for month of June 2022).

### CONCLUSION

Plaintiffs respectfully request that the Court postpone the effective date of the October 29 Memoranda that terminate MPP.

Dated: August 8, 2022

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

MICHAEL E. TALENT, #73339MO *
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff*
*State of Missouri*

/s/ Ryan D. Walters
RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

*Admitted pro hac vice

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

26

## CERTIFICATE OF CONFERENCE

I certify that on August 8, 2022, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

/s/ Ryan D. Walters
RYAN D. WALTERS

## CERTIFICATE OF SERVICE

I certify that on August 8, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Ryan D. Walters
RYAN D. WALTERS

# Exhibit B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity | § | |
| as President of the United States of | § | |
| America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# PLAINTIFFS' MOTION
# TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Table of Authorities................................................**Error! Bookmark not defined.**

I.    Defendants fail to show that the October 29 Memoranda reasonably
considered all the relevant factors. .......................................................... 1

II.    No procedural issue precludes this Court's review........................................ 8

     A.    Plaintiffs have standing to bring this claim................................ 8

     B.    The October 29 Memoranda are subject to judicial review. .............. 10

         1.    A stay of the agency action here does not violate the restrictions on
injunctive relief in 8 U.S.C. § 1252(f)(1). ..................................... 10

         2.    Judicial review of the agency action here is not otherwise precluded. ..... 13

III.    Texas and Missouri will suffer irreparable harm if a stay is not granted and the
equities overwhelmingly favor a stay................................................. 14

IV.    The stay should not be geographically limited.................................. 15

Conclusion ................................................................................................ 15

Certificate of Service................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. Bryant,*
   833 F.3d 510 (5th Cir. 2016)................................................................................................................14

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ....................................................................................................................1, 7

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.,*
   17 F.4th 604 (5th Cir. 2021) ..............................................................................................................10

*Ctr. for Biological Diversity v. Regan,*
   No. CV 21-119 (RDM), 2022 WL 971067 (D.D.C. Mar. 30, 2022) ..........................................11, 12

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
   45 F.4 ...............................................................................................................................................8, 14

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ....................................................................................................................3, 6

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,*
   --- F.4th ---, No. 17-20545, 2022 WL 3723116 (5th Cir. Aug. 30, 2022) ..........................................9

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ....................................................................................................................1, 4

*Fisher v. Univ. of Texas at Austin,*
   758 F.3d 633 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) ...............................................................8, 9

*Free v. Abbott Labs., Inc.,*
   164 F.3d 270 (5th Cir. 1999)................................................................................................................8

*Harmon v. Thornburgh,*
   878 F.2d 484 (D.C. Cir. 1989) ...........................................................................................................15

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,*
   502 U.S. 183 (1991)......................................................................................................................11, 12

*Jennings v. Rodriquez,*
   138 S. Ct. 830 (2018)............................................................................................................................1

*Judulang v. Holder,*
   565 U.S. 42 (2011)................................................................................................................................7

*Liesegang v. Sec'y of Veterans Affairs*,
312 F.3d 1368 (Fed. Cir. 2002) ............................................................................11

*McQuiggin v. Perkins*,
569 U.S. 383 (2013) ............................................................................................11

*Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................1

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
142 S. Ct. 661 (2022) ..........................................................................................11

*Natural Resources Defense Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ................................................................................11

*New York v. U.S. Dep't of Commerce*,
351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part*, 139 S. Ct. 2551
(2019) ...................................................................................................................15

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................................11, 13

*Ramaprakash v. FAA*,
346 F.3d 1121 (D.C. Cir. 2003) .............................................................................7

*Reno v. Am-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ............................................................................................12

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..............................................................................................3

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) (per curiam) ...............................................1, 4, 8, 14

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ................................................................................15

*Texas v. United States EPA*,
829 F.3d 405 (5th Cir. 2016) ...............................................................................10

*United States v. Castillo*,
179 F.3d 321 (5th Cir. 1999) .................................................................................9

*United States v. Lee*,
358 F.3d 315 (5th Cir. 2004) .................................................................................9

*United States v. Matthews*,
312 F.3d 652 (5th Cir. 2002) .................................................................................9

iv

*Wages & White Lion Invs., LLC v. United States FDA,*
    16 F.4th 1130 (5th Cir. 2021) ..................................................................... 10, 11, 14

*West Virginia v. EPA,*
    577 U.S. 1126 (2016)..................................................................................... 10

## Statutes

5 U.S.C. § 551(13) ............................................................................................... 10

5 U.S.C. § 701(a)(2) ............................................................................................. 13

5 U.S.C. § 705 .......................................................................................10, 11, 13, 15

8 U.S.C. §1225(b)(2)(A).........................................................................................1, 2

8 U.S.C. § 1252(f)(1) ................................................................................... 10, 12, 13

## Other Authorities

Wright & Miller, *11A Fed. Prac. & Proc. Civ.* § 2948 (3d ed.).................................11

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221 ...............12

Fed. R. Civ. P. 65(b) ..............................................................................................12

Federal Register. 5 U.S.C. 553(c) ...........................................................................11

*Federal Register Document Drafting Handbook* (Oct. 10, 1998), available at
    https://open.defense.gov/Portals/23/Documents/Regulatory/ddh.pdf......................12

## I. Defendants fail to show that the October 29 Memoranda reasonably considered all the relevant factors.

Defendants' arguments that the October 29 Memoranda "reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), starts with two pages of assertions that DHS considered certain items and then concluded that it should terminate MPP. *See* Opp'n 23–24. But saying something "was considered is not enough to show reasoned analysis." *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam). Instead, what is noteworthy about Defendants' argument is what it concedes—that MPP does prevent at least some illegal migration. *See* Opp'n 24 (noting "the Secretary concluded that MPP had mixed effectiveness").

*First* is the States' claim that the October 29 Memoranda ignore DHS's mandatory detention obligations. Per 8 U.S.C. §1225(b)(2)(A), an alien "seeking admission [who] is not clearly and beyond doubt entitled to be admitted ... *shall be detained* for a proceeding under section 1229a of this title." "Read most naturally, [the statute] mandate[s] detention ... ." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). There are two exceptions to detention that DHS may, in its discretion, use—parole and, for aliens arriving from a contiguous territory like Mexico, return to that territory (*e.g.*, MPP). *See Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022) (noting those two options); *id.* at 2548 (Kavanaugh, J., concurring). The States' argument is straightforward: Before deciding to terminate MPP—*i.e.*, the first discretionary option—the Government had to consider the effect of the termination on its ability to meet its mandatory detention duties. *See* Stay Motion 9–10. Given the statutory mandate to detain, it blinks reality to believe that is not "an important aspect of the problem" that DHS had to consider. *Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants argue that the States "theory is simply the same argument the Supreme Court already rejected": that DHS must either detain all arriving aliens or require them to remain in Mexico. Opp'n 25–26. Not so. However DHS exercises its discretion, the exercise of that discretion must "be reasonable and reasonably explained." *Biden III*, 142 S. Ct. at 2548–49 (Kavanaugh, J., concurring); *see*

1

*also id.* at 2543 ("DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."). So that DHS *may* release some aliens instead of detaining them or returning them to Mexico—which is the sum total of Defendants' argument—does not mean it sufficiently explained *why* it has done so here.

Defendants thus overstate their case when they say that "the Secretary did consider Section 1225(b)(2)(A)." Opp'n 26. He did, but only to conclude that he did not need to detain all inadmissible aliens. *See id.* (discussing how the October Memoranda "discuss[] how reading Section 1225 to impose a near-universal mandate is inconstant" with the Secretary's interpretation of the law). That logic only *permits* him to terminate MPP; it does not mean he reasonably did so in the October Memoranda. In short, a reasonable termination would address the fact that terminating MPP affects DHS's ability to comply with its mandatory detention requirements in §1225. The October Memoranda do not.

*Second* is the Secretary's weighing of the benefits and harms of rescinding MPP. *See* Opp'n 27–30. Defendants claim, first, that the States' argument is that the Secretary failed to consider points he actually considered, *see, e.g.,* Opp'n at 28–29 ("There is thus no basis for Plaintiffs' claim that the Secretary *did not consider* harms that might be avoided by deterring individuals from making the journey to the southern border.") (emphasis added); *id.* at 29 ("The Secretary also addressed this issue."), second, that the States ignore alternative methods to deter illegal border crossings, *see id.* at 28, ignore hardships the program imposes on migrants, *see id.* at 30, or fail to provide alternative data, *see id.* at 29–30.

But the States' argument is not that the Secretary categorically failed to consider factors or that there are no alternative policies. The States' argument is that the Secretary failed "to *adequately account for*" the program's benefits. Stay Motion 10 (emphasis added).[1] That is, the failure is an analytical

---

[1] Defendants appear to claim that the States are pressing claims to third parties by bringing up the benefit MPP provided in deterring migrants from making the dangerous journey to the United States. *See* Opp'n 28 n.6. Not so. The States point that out as a benefit the Secretary failed to consider,

one—the Secretary failed to balance in any rational way the benefits of MPP as compared to eliminating the program. Defendants do not address that argument. Indeed, Defendants' acknowledgment that "the Secretary *presumed* ... that MPP contributed to decreased migration flows" establishes that the States are correct. Opp'n 27 (emphasis added) (quoting AR27). Absent some quantification, presumptions are empty—and the Secretary certainly never quantified the benefit he presumed MPP provided. Indeed, he says such quantification is impossible. *See* AR27.

The incentive to stack the deck in favor of termination—by expressly presuming a benefit while implicitly presuming that the benefit is small, or always outweighed by countervailing factors— is plain. Thus, Defendants arguments here either ignores the actual issue before the agency—for example, that "DHS has other avenues for quickly process, and thereby deterring" individuals without meritorious asylum claims, Opp'n 28, says nothing about the deterrent effect of those avenues versus MPP—or constitute mere assertion—for example, saying MPP "led to individuals with meritorious asylum claims abandoning them and imposed additional costs that far outweighed whatever effects MPP had on non-meritorious claims," Opp'n 29, is a conclusion, not a reason. That the Secretary admittedly used data that "are not necessarily indicative" of the harms of human trafficking—and, thus, a benefit that MPP provided by deterring such trafficking—highlights that what the Secretary engaged in was motivated reasoning, not reasonable decision-making. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574–75 (2019) (requiring reasoned decision-making even for decisions driven by "policy preferences").

Regardless, the Fifth Circuit has already rejected that DHS considering alternatives "outside the ambit of the existing policy," such as the "Dedicated Docket" program, satisfies the requirements of reasoned decisionmaking; also "neither the June 1 Memorandum nor the Government in its stay

---

and they have standing to raise that procedural injury since it affects the States' concrete interests, *see supra*. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

motion explains why MPP and the 'Dedicated Docket' are mutually exclusive." *See Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam) (denying stay on August 19—before the October 29 Memoranda). The October 29 Memoranda exhibit the same errors.

In short, the Secretary's presumption that MPP had some benefit is no different from "stating that an alternative was considered," and neither is "enough to show reasoned analysis." *Texas v. Biden*, 10 F.4th at 555.

*Third*, Defendants attempt to justify using a new, higher rate of *in absentia* removals fails. Indeed, it undermines Defendants' argument. As the Secretary acknowledges, MPP deters non-meritorious asylum claims. *See* AR25 (saying the program was "deterring non-meritorious claims"). That is, the States and this Court are correct that "the increased *in absentia* removal rates for aliens" indicates that MPP is working. Stay Motion 12; ECF 94 at 40–41; *see also* AR23 ("The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP."); *cf.* AR25 n.89 (noting that "implicit" in the claim that MPP deterred aliens from asserting asylum claims, "many of which may be meritless" is that "some such claims do have merit") (emphasis omitted).

DHS never addresses that fact except to say that "that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims." AR25. And in its opposition, Defendants just reiterate that claim. *See* Opp'n 32. But nowhere has any federal actor quantified, estimated, or made any attempt to show how many deterred meritorious asylum claims there are. DHS, to be sure, did not need "to conduct or commission [its] own empirical or statistical studies" as a general matter. *Prometheus Radio Project*, 141 S. Ct. at 1160. But if it does not, then it should not do what the Secretary did here: Compare anecdotes (here, that MPP deterred meritorious claims, *see* AR 24 & nn.84–85) with hard numbers (here, the rate of *in absentia* orders) especially where the

4

hard numbers and the anecdotes are not clearly comparable. That is so because the anecdotes--while showing that some aliens abandoned or lost their claims due to conditions in Mexico—do not establish that those claims were meritorious. So, too, for that matter, is the raw rate of *in absentia* orders; those contains some unknown mix of meritorious and non-meritorious claims. To conclude from them that the rate of deterrence of meritorious claims is high relative to non-meritorious claims given what those data points say is the opposite of reasoned decisionmaking. *See Biden II*, 20 F.4th at 992 ("We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion.").

If more proof is necessary that the Secretary's analysis is motivated reasoning and not rational decisionmaking, consider the claim that "a 'remarkably low 1.1 percent' of individuals placed in MPP were granted relief or protection, a substantially lower rate of relief—'26 times' lower—than expected when compared to similar individuals not placed in MPP, lend[s] further support to the conclusion that MPP caused individuals with potentially meritorious claims to abandon them." Opp'n 31 (quoting AR24–25). That claim is flawed. For one, the Secretary's analysis fails to account for the possibility that individuals in MPP and those not in MPP are likely different.

Moreover, the Secretary inflates the difference in that rate, for the "26 times" statement is misleading. As the Secretary acknowledges in footnote 87, relief grant rates for both groups are "low," AR24 n.79, so what constitutes a 26-times difference in the rate of relief as a percent translates into a difference of 16 individuals in every 1,000—that is, something that is much more likely explainable by group differences and not the fact that MPP deterred meritorious asylum claims. Indeed, that difference may be fully explainable by the fact the Secretary's analysis looked at "relief and protection from removal," which encompasses more than just grants of asylum. AR24 & n.87. Thus, the 16-person difference in relief between MPP and non-MPP participants is just as likely the result of non-MPP participants receiving non-asylum relief at a higher rate as it is anything else. In all events, the

numbers the Secretary used in no way suggests that MPP resulted in higher rates of aliens abandoning or losing meritorious asylum claims.

In short, the Secretary failed to link the high *in absentia* removal rate for aliens enrolled in MPP and his claim that the program deterred too many meritorious asylum claims compared to non-meritorious ones. All that this shows is that the program deterred non-meritorious asylum claims, even if it deterred some unspecified number of meritorious ones.[2] As a result, the Secretary failed "to appreciate the relevant costs and benefits of MPP" and so failed to make "a reasoned determination." Stay Motion 12.

*Fourth*, Defendants avoid the fact that the Secretary ignored the limits on DHS's parole authority in terminating MPP. Defendants do not contest that "DHS is presently releasing into the country tens of thousands of individuals per month through parole and otherwise." Stay Motion 18. Defendants claim that the States failed to provide evidence "that DHS is not making parole decisions on a case-by-case basis." Opp'n 34. The proof is in the numbers—to believe that DHS is actually engaging in a case-by-case evaluation for parole requires "a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 139 S. Ct. at 2575 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

Indeed, that *Defendants do not say that DHS is processing parolees on a case-by-case basis* speaks volumes. Defendants are the ones who can show DHS is making parole decisions case-by-case, and their failure to make that claim and support it with evidence is damning. What is arbitrary and

---

[2] Defendants' focus on defending the methodology of calculating *in absentia* orders, *see* Opp'n 31–32, or comparing those orders to prior years, *see id.* at 32, do not address the underlying logic of the Secretary's analysis. Furthermore, that the Secretary's method for calculating 2015 and 2017 *in absentia* case rates lowers the percentages may well be suspect. The Secretary says that the recalculation compares *in absentia* orders to "total cases referred to EOIR in those years … ." AR23 n.82. "Total" cases include cases that are "completed" and "ongoing." *Id.* (emphasis omitted). Logically, some cases that were referred to the EOIR in 2015 and 2017 were completed in a later year; the Secretary, however, does not say what year those cases were counted, or how that would affect the analysis. So, the recalculation adds little to the analysis.

capricious is the failure to address how the termination of MPP affects Defendants' ability to make case-by-case determinations for parole.

With that, Defendants' arguments on this point fall apart. Whatever the scope of DHS's discretion to parole aliens and whatever role detention capacity can play in that decision, "the authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Biden*, 142 S. Ct. at 2543 (quoting 8 U.S.C. §1182(d)(5)(A)). Choosing to terminate MPP when DHS admittedly lacks the capacity to detain all alien migrants is an implicit choice to parole those migrants—that is, to make a *categorical* parole decision. That, the agency cannot do; that the agency did not consider that fact in terminating MPP renders its decision arbitrary and capricious.

Defendants claim a "consistent interpretation" that empowers them to parole aliens due to lack of detention capacity. Opp'n 34. Even if there were such consistency, "[a]rbitrary agency action becomes no less so by simple dint of repetition." *Judulang v. Holder*, 565 U.S. 42, 61 (2011); *see also id.* ("[L]ongstanding capriciousness receives no special exemption from the APA."). But the October Memoranda never address Defendants' prior determinations that lack of detention space is not an appropriate reason to parole an alien. *See* AR159, 161, 163. "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decisionmaking." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

*Finally*, Defendants defend their perfunctory evaluation of costs to the States and their reliance interests. Opp'n 35–40. They argue that Plaintiffs cite no authority that they were required to quantify the costs to the States. Opp'n 36. But Plaintiffs did so, citing *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (failure to actually "quantify or at least reasonably describe the costs of this policy to the States" did not satisfy requirement to consider them). And far from Defendants lacking data on

7

this issue, Opp'n 36, they had that data readily available to them from the record in this case. *See* ECF 54; *see also* ECF 94 at 17–21.

As for reliance interests, the Fifth Circuit has already held that Plaintiffs had a reliance interest in MPP's continuation. "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam) (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)).

## II. No procedural issue precludes this Court's review.

### A. Plaintiffs have standing to bring this claim.

Defendants argue that the Court cannot rely on its previous determination that Plaintiffs had standing to challenge the termination of MPP. Opp'n at 17. But the determinations by this Court and the Fifth Circuit were not overruled by the Supreme Court. *See Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th ---, No. 20-11179, 2022 WL 3440652, *5 n.2 (5th Cir. Aug. 17, 2022).

The Fifth Circuit has held that the law of the case does apply to subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required).

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) (citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing

else.") (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)); *United States v. Matthews,* 312 F.3d 652, 657 (5th Cir. 2002) (on remand the district court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court.") (quoting *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)). "In implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. Southern Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

As the Fifth Circuit's determinations on standing were not disturbed by the Supreme Court—which itself "impliedly" determined that standing was satisfied—and its remand was limited to determining whether the October 29 memoranda were arbitrary and capricious, this Court would exceed the mandate and violate the law of the case by reexamining standing. *See Fisher,* 758 F.3d at 640 ("The Supreme Court did not address the issue of standing, although it was squarely presented to it. Rather, it remanded the case for a decision on the merits …The parties have identified no changes in jurisdictional facts occurring since briefing in the Supreme Court.").

Even though the impact of the termination of MPP by the October 29 Memoranda can be no different from the previous termination due to new reasons given, Defendants argue that because it is not the identical action, the standing inquiry must start over. Opp'n 17. But "because injury must only be *fairly* traceable to the challenged conduct, plaintiffs need not connect the exact time of their injuries with the exact time of an alleged violation." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,* --- F.4th ---, No. 17-20545, 2022 WL 3723116, at *4 (5th Cir. Aug. 30, 2022) (cleaned up). "Article III is satisfied if [the challenged action] were "of a type that 'causes or contributes to the kinds of injuries alleged by the plaintiffs.'" *Id.* (emphasis added) (rejecting the view that "Article III requires plaintiffs to show that each challenged [action] is a but-for cause of their injuries.").

Defendants' remaining arguments on this issue are just a regurgitation of their disagreement

with this Court's prior determinations, and that of the Fifth Circuit. Opp'n 18–20. There is no justification to ignore the binding determinations in this case finding that Plaintiffs have standing to challenge the termination of MPP.

**B.    The October 29 Memoranda are subject to judicial review.**

**1.    A stay of the agency action here does not violate the restrictions on injunctive relief in 8 U.S.C. § 1252(f)(1).**

Defendants argue that, even under Section 705 is not precluded by 8 U.S.C. § 1252(f)(1), there are problems with Plaintiffs obtaining relief here.

They argue that such stays are limited to being granted against agency adjudications (orders) rather than "policies" (rules), Opp'n 11, and that relief may not be granted here because the termination of MPP has already gone into effect. Opp'n 14–16. But courts routinely grant stays under Section 705 of agency rules, and after the effective date of the action. *See, e.g., West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.) (stay issued under Section 705 on Feb. 9, 2016, against agency rule with effective date of December 22, 2015. 80 Fed. Reg. 64,662); *Wages & White Lion Invs., LLC v. United States FDA*, 16 F.4th 1130 (5th Cir. 2021) (stay issued under Section 705 on October 26, 2021, against agency action effective on September 14, 2021); *Texas v. United States EPA*, 829 F.3d 405 (5th Cir. 2016) (stay issued under Section 705 on July 15, 2016, against agency rule with effective date of February 4, 2016, 81 Fed. Reg. 296-01); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021) (stay issued under Section 705 on November 12, 2021, against agency rule with effective date of November 5, 2021, 86 Fed. Reg. 61,402).

Section 705 may be applied to "rules" because any "agency action" is subject to it, 5 U.S.C. § 705, and "agency action" is defined as including a "rule." 5 U.S.C. § 551(13). And the cases Defendants cite as restricting relief under Section 705 before the effective date of the action involve agencies postponing their own rules. Opp'n 14–16. But the authorities they cite point out that this limitation

does not apply to courts because "Section 705 confers a broader authority on reviewing courts, permitting the court 'to postpone the effective date … *or to preserve* status or *rights* pending conclusion of the review proceedings.'" *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at \*21 (D.D.C. Mar. 30, 2022). This limitation on agencies lies because "[a]dministrative agencies are creatures of statute [and] accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). Courts, however, have inherent authority to stay agency action to facilitate judicial review. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Courts should "not construe a statute to displace courts' traditional equitable authority absent the clearest command.'" *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010)).

Defendants also maintain that staying the October 29 Memoranda cannot be said to "preserve status or rights" because it would upset the status quo. Opp'n 16. But the "status quo" is "the last peaceable uncontested status existing between the parties before the dispute developed." Wright & Miller, *11A Fed. Prac. & Proc. Civ.* § 2948 (3d ed.) (cleaned up). The Fifth Circuit has held that staying an agency action—even after the effective date—preserves the *status quo ante* and is properly imposed via Section 705. *Wages & White Lion Invs., LLC v. United States FDA*, 16 F.4th 1130, 1143–44 (5th Cir. 2021).

Regardless, the effective date of the October 29 Memoranda has yet to arrive. It has yet to be published in the Federal Register. 5 U.S.C. 553(c) provides, with some exceptions, that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date." The date when a regulation may "take effect" is not the same as the "effective date." See *See Liesegang v. Sec'y of Veterans Affairs,* 312 F.3d 1368, 1374-75 (Fed. Cir. 2002); *Natural Resources Defense Council v. Abraham,* 355 F.3d 179, 202 (2d Cir. 2004); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at \*18 (D.D.C. Mar. 30, 2022).

11

The Office of the Federal Register (OFR) uses the term "effective date" to describe the date that amendments in a rulemaking document affect the current Code of Federal Regulations. *See Federal Register Document Drafting Handbook,* at p. 2-10 (Oct. 10, 1998), available at https://open.defense.gov/Portals/23/Documents/Regulatory/ddh.pdf. However, OFR draws a contrast between such a date and the compliance or applicability date of a rule, which is described as "the date that the affected person must start following the rule." Id. at 2-11. Thus, the "effective date" of a regulation is commonly used to describe the date by which a provision in the Code of Federal Regulations is enacted as law, but it is not necessarily the same as the time when provision enacted in the Code of Federal Regulations is operative on the regulated activity or entity. The latter may be described as the "compliance," "applicability," or "takes effect" date—this is what Defendants are confusing for the "effective date" of agency action.

An order staying administrative action does not "enjoin or restrain" the INA's operation because a stay alone does not enjoin anything at all. Defendants maintain that even if it does not "enjoin," vacatur falls within the term "restrain." Opp'n 12–13. But "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 189 (1991); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221 (discussing the "Title-and-Headings Canon"). And the Supreme Court has found the title of Section 1252(f)(1) relevant to its meaning: "By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief." *Reno* v. *Am-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 481 (1999). The title of that section is: "Limit on *Injunctive* Relief: In General." 8 U.S.C. § 1252(f)(1) (emphasis added) And the term "restrain," read in context, most naturally applies to temporary restraining orders under Fed. R. Civ. P. 65(b), which section 1252(b)(1) would prohibit as it does preliminary or permanent injunctive relief by the lower courts.

While "[a] stay [of an agency action] pending appeal certainly has some functional overlap with

an injunction, particularly a preliminary one … [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined," *Nken*, 556 U.S. at 428, "a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29. Stays of agency action under section 705 are therefore not coercive, and thus not within the ambit of the injunctive relief precluded by section 1252(f)(1). *See id.* at 430 (noting that "the language of [1252](f) says nothing about stays, but is instead titled 'Limit on injunctive relief'").

It is true that "'[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*.'" *Nken,* 556 U.S. at 428. "This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct." *Id.* But "instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself[,] … either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Id.*

Defendants reject the applicability of the Fifth Circuit's holding that vacatur under Section 706 is not precluded by Section 1252(f)(1). Opp'n 13. But a stay under Section 705 is just an interim vacatur. It does not have a coercive effect because it nullifies (temporarily) an agency action but has no coercive effect *in personam*—unlike with an injunction, when a stay is issued under Section 705, the agencies are free to undertake the identical action anew, just as when an agency action is vacated.

### 2. Judicial review of the agency action here is not otherwise precluded.

Defendants renew two other arguments against judicial review of the decision to terminate MPP, Opp'n 21–22: (1) that agency action terminating MPP is "agency action … committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review; and (2) that the States' claims challenging the termination of MPP do not fall within the zone of interests of the INA.

13

But this Court has already rejected these arguments. ECF 94 at 31–34. The Fifth Circuit has done the same, *Biden*, 20 F.4th at 978–88; *id.* at 975–76, and that portion of that opinion remains good law. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th ---, No. 20-11179, 2022 WL 3440652, *5 n.2 (5th Cir. Aug. 17, 2022).[3]

### III. Texas and Missouri will suffer irreparable harm if a stay is not granted and the equities overwhelmingly favor a stay.

Defendants repeat their attach on this Court's previous determinations relating to injury. Opp'n 40–41, but this attempt should be rejected as it should be for the standing inquiry.

"[T]he maintenance of the *status quo* is an important consideration in granting a stay." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quotation omitted). The "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Biden*, 10 F.4th at 559 (quotation omitted). "And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* at 560 (alteration omitted) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). If Defendants failed to satisfy the requirements of reasoned decisionmaking, the public interest lies in staying their action.

Defendants assert that the public interest lies with them because they have found MPP ineffective. Opp'n 43. "But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Wages & White Lion Invs., LLC,* 16 F.4th at 1143 (citation omitted). And the interest

---

[3] Defendants make a convoluted argument that a recent decision of the Supreme Court construing one provision of the INA (8 U.S.C. § 1252(a)(2)(B)(i)) applies to another (8 U.S.C. § 1252(a)(2)(B)(i)) that would preclude review here. Opp'n at 22 & n.4 (citing *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022)). But that decision (1) involved a provision only applicable to individual determinations of relief, *id.*, which the Fifth Circuit has determined that "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens," *Biden*, 20 F.4th at 977 (which remains binding law in the Fifth Circuit today, *see Data Mktg. P'ship, LP*, 2022 WL 3440652, *5 n.2; and (3) came out prior to the Supreme Court's ruling in *Biden III*, which proceeded to not only review the prior agency action terminating MPP, but explicitly ordered the lower courts to consider whether the new termination violated the APA; it would be strange for the Supreme Court to do so if such decisions were barred from judicial review by one of its own decisions from a month earlier, with no mention of it.

of the Executive in foreign affairs, Opp'n 44–45, is related to every immigration policy; Congress has an equal interest in seeing that its limits on agency action are upheld.

## IV. The stay should not be geographically limited.

Defendants maintain that any remedy must be limited to the Plaintiff States, Opp'n 41–43, but—as explained above—a stay under Section 705 is just an interim vacatur. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 672 (S.D.N.Y. 2019) ("[T]he 'normal remedy' is to set aside the agency action wholesale, not merely as it applies to the particular plaintiff or plaintiffs who brought the agency action before the court."), *aff'd in part, rev'd in part*, 139 S. Ct. 2551 (2019).

The Fifth Circuit recently "reject[ed] DHSs contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022). Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *Texas v. United States (DAPA)*, 809 F.3d 134, 188 (5th Cir. 2015)).

### CONCLUSION

Plaintiffs respectfully request that the Court stay the October 29 Memoranda that terminate MPP pending a determination on the merits.

15

Dated: September 9, 2022

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

MICHAEL E. TALENT, #73339MO *
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff*
*State of Missouri*

/s/ Ryan D. Walters
RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

*Admitted pro hac vice

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on September 9, 2022, a true and accurate copy of the foregoing document was

filed electronically (via CM/ECF) and served on all counsel of record.

/s/ *Ryan D. Walters*
RYAN D. WALTERS

17

# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS and | § |
| | § |
| THE STATE OF MISSOURI, | § |
| | § |
| Plaintiffs, | § Case No. 2:21-cv-00067-Z |
| | § |
| v. | § |
| | § |
| JOSEPH R. BIDEN, JR., in his official capacity | § |
| as President of the United States of | § |
| America, *et al.*, | § |
| | § |
| Defendants. | § |

**PLAINTIFFS' SUR-SURREPLY IN SUPPORT OF
THEIR MOTION TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION**

Plaintiffs the State of Texas and the State of Missouri respond to the arguments made in Defendants' Surreply in Opposition to Plaintiffs' Motion to Postpone the Effective Date of Agency Action, ECF 169-1 (the "Surreply").

**Timeliness of a Stay of Agency Action.** Defendants dispute it, Surreply at 3–4, but the effective date of the October 29 Memoranda has yet to happen because the "effective date" of an agency action is a term of art tied to publication in the Federal Register. Defendants assume that only agency actions that are required to undergo notice-and-comment rulemaking are required to be published in the Federal Register, Surreply at 3–4, but this is incorrect.

Plaintiffs had cited the publication requirements of 5 U.S.C. § 553—relating to rules subject to notice-and-comment—in their Reply, ECF 168 at 11, because Defendants had cited cases precluding *agencies* from postponing the effective date of agency actions after the effective date had arrived, ECF 163 at 14–16. Those cases reasoned that allowing agencies to do so would permit them to evade their notice-and-comment requirements. *See, e.g., Ctr. for Biological Diversity v. Regan*, No. CV

1

21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022).

One reason the APA was adopted was "to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To further advance that interest, Congress has required that "substantive rules of general applicability adopted as authorized by law" be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). But it goes further than agency actions required to undergo notice-and-comment rulemaking, making "statements of general policy or interpretations of general applicability formulated and adopted by the agency," and "each amendment, revision, or repeal" of such agency actions also subject to the publication requirement. *Id.* As the October 29 Memoranda have yet to be published in the Federal Register, their effective date remains in the future.[1]

As courts have repeatedly held, the relevant date for a rule's issuance is therefore the date of publication in the Federal Register. *See, e.g., Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 196 (2d Cir. 2004) ("[P]ublication in the Federal Register ... is the culminating event in the rulemaking process.").[2] The plain language of the statute authorizes postponement of the "effective date," 5 U.S.C. § 705, not "compliance dates" such as when the October 29 Memoranda began to have legal effect once the permanent injunction was lifted—"effective" and "compliance" dates have distinct meanings. *See Silverman v. Eastrich Multiple Inv'r Fund, L.P.*, 51 F.3d 28, 31 (3d Cir. 1995) ("The mandatory compliance date should not be misconstrued as the effective date of the revisions."); *Nat.*

---

[1] The memoranda implementing MPP were themselves published in the Federal Register. *See Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols*, 84 Fed. Reg. 6811 (issued January 25, 2019, but with a publication date of February 25, 2019).

[2] Defendants argue that *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368 (Fed. Cir. 2002) supports their argument that the date the October 29 Memoranda were "issued" is equivalent to the "effective date" of the agency action. Surreply at 4 n.2. But that case held that "the effective date of the regulation is the date of publication in the Federal Register," *Liesegang*, 312 F.3d at 1370, and rejected the argument that the "effective date" was when the agency action became operational. *Id.* at 1375; *see also id.* at 1376 (distinguishing between "the operative date of the regulation" and "its effective date").

*Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 683 F.2d 752, 762 (3d Cir. 1982) (stating an effective date is "an essential part of any rule: without an effective date, the agency statement could have no future effect, and could not serve to implement, interpret, or prescribe law or policy") (internal quotation marks omitted); *California v. U.S. Bureau of Land Mgmt.,* 277 F.Supp.3d 1106, 1117–20 (N.D. Cal. 2017) (rejecting conflation of "compliance date" and "effective date" of agency action); *Becerra v. U.S. Dep't of Interior*, 276 F.Supp.3d 953, 963–65 (N.D. Cal. 2017) (same).

The Surreply argues that the "effective date" of the October 29 Memoranda was when it was "issued"—that is, October 29, 2021. Surreply at 4 n.2. But the caselaw does not support classifying an agency action as "issued" when it is signed, but when it is published in the Federal Register. *See Pub. Citizen Inc. v. Mineta*, 343 F.3d 1159, 1161 (9th Cir. 2003) ("We hold that an order has not been 'issued' until it has been filed with the Office of the Federal Register and thus made available for public inspection."); *Fla. Manuf. Housing Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1573 (11th Cir. 1995) (rejecting argument "that the rule was issued when the rulemaking decision was dated, not when it was published"); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151–52 (S.D.N.Y. 2019) (rejecting argument that agency action was "issued" on date of its signature line).

Regardless, Defendants do not address the aspect of cases where courts issued stays under Section 705 of agency action *after* the effective date of that action, as cited by Plaintiffs in their Reply. ECF 168 at 10.[3] "Section 705 confers a broader authority on reviewing courts [than on agencies],

---

[3] Defendants also maintain that *BST Holdings, LLC v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021) did not involve a stay under Section 705 but was "injunctive relief." Surreply at 1. The opinion refers repeatedly to staying agency action pending a merits determination. *See BST Holdings, LLC*, 17 F.4th at 609 ("An array of petitioners seeks a stay barring OSHA from enforcing the Mandate during the pendency of judicial review. On November 6, 2021, we agreed to stay the Mandate pending briefing and expedited judicial review. Having conducted that expedited review, we reaffirm our initial stay."); *id.* at 610 ("The petitioners seek a stay—and ultimately a permanent injunction—of the Mandate's enforcement pending full judicial review of the Mandate. We address their request for a stay today."). The briefing in that case also relied explicitly on Section 705. *See* Motion for Stay Pending Disposition of Petitioners' Petition for Review, *Texas Trucking Ass'n v. Occupational Safety & Health Admin., United States Dep't of Lab.*, Case No. 21-60845, Doc. No. 00516088649 at 4, 6, 21, 22 (5th Cir.) (repeatedly referencing Section 705 in requesting a stay of agency action).

3

permitting the court 'to postpone the effective date ... *or to preserve* status or *rights* pending conclusion of the review proceedings,'" *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (emphases in original). ECF 168 at 10–11. Even if the effective date of the October 29 Memoranda had passed, this Court has the authority to stay them pending review on the merits, to preserve the *status quo*.

Defendants also argue that a stay of the October 29 Memoranda would not *preserve* the *status quo* but *alter* it. Surreply at 2. But the Fifth Circuit has recently explained that vacating an agency action "does nothing but re-establish the status quo absent the unlawful agency action," and "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *see also Wages & White Lion Invs., LLC v. United States Food & Drug Admin.*, 16 F.4th 1130, 1144 (5th Cir. 2021) ("the *status quo* [is] the state of affairs before the" challenged agency action). As a stay under Section 705 of the APA is just the interim equivalent of a vacatur under Section 706, this analysis holds here.

The Supreme Court also articulated this understanding of the *status quo* and stays of agency action:

> An alien seeking a stay of removal pending adjudication of a petition for review does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove. Although such a stay acts to "ba[r] Executive Branch officials from removing [the applicant] from the country," *post,* at 1767 (ALITO, J., dissenting), it does so by returning to the status quo—the state of affairs before the removal order was entered.

*Nken v. Holder*, 556 U.S. 418, 429 (2009).

Staying the October 29 Memoranda would therefore preserve the *status quo ante* and allow review on the merits of the lawfulness of the agency action.

**Authority of District Courts to Stay Agency Action.** Defendants maintain that district courts lack the authority to stay agency action—that only appellate courts have this power. Surreply

4

at 1. But district courts have the same authority as appellate courts in issuing stays under Section 705 because of the nature of judicial review of agency action.

The APA allows for judicial review in any court "of competent jurisdiction," absent a "special statutory review proceeding." 5 U.S.C. § 703. Unless there is a special statutory provision, agency actions may not be directly reviewed in the courts of appeals. *In re Sch. Bd. of Broward Cnty.*, 475 F.2d 1117, 1119 (5th Cir. 1973). "Unless a statute provides otherwise, persons seeking review of agency action go first to district court rather than to a court of appeals." *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481 (D.C. Cir. 1994) (citing 5 U.S.C. § 703); *see also id.* (referring to initial review of agency action in district court as "the normal default rule"). So, "appeals of federal agency decisions are generally heard by federal district courts." Joseph W. Mead & Nicholas A. Fromherz, *Choosing A Court to Review the Executive*, 67 Admin. L. Rev. 1, 28 (2015); *id.* at 15–16 (noting that despite many specific provisions provide for initial review in the courts of appeals, "an untold number of agency decisions are left to the default route of initial district court review.").

"Modern administrative law is built on the appellate review model of the relationship between reviewing courts and agencies [and] the reviewing court conceives of its role vis-à-vis the administrative agency in terms of the conventions that govern the appeals court–trial court relationship." Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 940–41 (2011). Therefore, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001).

All federal courts have "inherent" authority "to hold an order in abeyance while [they] assess[] the legality of the order." *Nken*, 556 U.S. at 426. This authority is "preserved" in the provisions of the All Writs Act, 28 U.S.C. § 1651(a), *Nken*, 556 U.S. at 426, which provides that "[t]he Supreme Court *and all courts established by Act of Congress* may issue all writs necessary or appropriate in aid of their

5

respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §1651(a) (emphasis added). And the APA's stay provision is not limited to appellate courts: "*the reviewing court* … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added).

The "historic pedigree and importance of the power" to stay agency action pending judicial review means that even if Section 705 or some other provision did not explicitly authorize it, that "should not be taken as an implicit denial of that power." *Nken*, 556 U.S. at 426 (citing *Scripps–Howard Radio, Inc. v. FCC,* 316 U.S. 4 (1942)). Here, both the All Writs Act and the APA reaffirm that power in district courts—this Court therefore has the same remedial authority as an appellate court when reviewing an agency action under the APA.

**Section 1252(f)(1) and Stays of Agency Action.** Defendants argue that Section 1252(f)(1) bars all equitable relief. Surreply at 2 (arguing that "to the extent Section 705 is read to preserve a district court's authority to grant equitable relief, Section 1252(f)(1) expressly removes that authority here"). This broad interpretation of Section 1252(f)(1) is wrong.

For example, even though "the vacatur inquiry is an equitable one," *Texas v. Biden*, 20 F.4th 928, 998 (5th Cir. 2021) (cleaned up), that remedy is not precluded by Section 1252(f)(1). *Texas*, 40 F.4th at 219. Defendants argue that because "a stay would prevent the agency from relying on the October 29 [Memoranda]" such a remedy would be "practically equivalent to an injunction compelling the agency to rescind or stop implementing the [Memoranda]." Surreply at 3. But the Fifth Circuit has rejected this same argument relating to vacatur. *See Texas*, 40 F.4th at 219 (rejecting DHS argument that Section 1252(f)(1) applied because "vacatur 'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions.").

Defendants also maintain that the term "restrain" in Section 1252(f)(1) sweeps beyond

injunctive relief. Surreply at 2. But the word "'restrain' in Section 1252(f) is best read to refer to temporary injunctive relief." *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010); *Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011) ("'restrain' refers to one or more forms of temporary injunctive relief, such as a temporary restraining order or preliminary injunction"); *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) ("The most sensible way to give operative effect to both words in this statutory scheme is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief....").

Statutory context also leads to the conclusion that Section 1252(f)(1) does not preclude stays of agency action under Section 705 because it does not specifically refer to that relief:

> The Clean Air Act does not displace Section 705, the general APA provision governing stays pending judicial review. The Clean Air Act expressly provides that several provisions of the APA—5 U.S.C. §§ 553–557 and 706—"shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies." 42 U.S.C. § 7607(d)(1). Section 705 is not on that list. By contrast, Congress has displaced Section 705 in other statutory regimes. *Cf.* 16 U.S.C. § 1855(f)(1) (fishery management regulations subject to judicial review in accordance with Administrative Procedure Act, but not with Section 705); *id.* § 3636(c) (Pacific salmon fishing regulations subject to judicial review in accordance with Administrative Procedure Act, but not with Section 705). Had Congress wanted to prevent courts in Clean Air Act cases from issuing stays under Section 705, Congress could have done so.

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 n.1 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part). This same principle precludes interpreting Section 1252(f)(1) as forbidding all equitable relief:

> We therefore turn to the statutory context of § 1252(f)(1). A closely adjacent provision, § 1252(e)(1)(A), precludes courts from entering "declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien...." This provision is compelling evidence that Congress knew how to preclude declaratory relief, but chose not to in § 1252(f)(1). *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 432 (1987) ("'[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983))). In *Nken v. Holder,* the Supreme Court followed this presumption in interpreting § 1252(f)(2), immediately adjacent to the provision at issue here, and noted that the presumption was "particularly true ... where [the] subsections ... were enacted as part of a unified overhaul of judicial review procedures." *See Nken v. Holder,* 556 U.S. 418 (2009).

7

*Alli*, 650 F.3d at 1012–13 (citations truncated). Similarly, if Congress had wanted to preclude stays or other equitable relief in Section 1252(f)(1), it knew how do so.

Any construction to the contrary in the face of any ambiguity would violate "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)). That presumption means that, "when a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (quoting *Kucana*, 558 U.S. at 251). That "well-settled" and "strong presumption" in favor of judicial review applies even when determining the scope of statutory provisions specifically designed to limit judicial review. *See Guerrero-Lasprilla*, 140 S. Ct. at 1068; *see also Kucana*, 558 U.S. at 251–252; *El Paso Natural Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011) ("Th[e] presumption applies even where, as here, the statute expressly prohibits judicial review—in other words, the presumption dictates that such provisions must be read narrowly."). That "well-settled" presumption can be overcome only by "clear and convincing evidence" of congressional intent to preclude judicial review. *See, e.g.*, *Kucana*, 558 U.S. at 252. Defendants fail to meet that standard.

This Court should reject Defendants' "far-reaching position that §1252(f)(1) does indeed bar APA review." *Biden v. Texas*, 142 S.Ct. 2528, 2552 (2022) (Alito, J., dissenting). Because damages are not available in an APA action, Defendants' construction of Section 1252(f)(1) as precluding not only injunctive relief, but also declaratory relief, vacatur, and stays, would make agency actions implementing the relevant provisions of the INA completely immune from judicial review.

8

Dated: September 19, 2022

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

MICHAEL E. TALENT, #73339MO *
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff*
*State of Missouri*

/s/ Ryan D. Walters
RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

*Admitted pro hac vice

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

9

### CERTIFICATE OF SERVICE

I certify that on September 19, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

10

# Exhibit D

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

THE STATE OF TEXAS AND　　　　　§
THE STATE OF MISSOURI,　　　　　§
　　　　　　　　　　　　　　　　§
　　　　Plaintiffs,　　　　　　　 §
　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　 §　　　　Case No. 2:21-cv-00067-Z
　　　　　　　　　　　　　　　　§
JOSEPH R. BIDEN, JR., in his official　§
capacity as President of the United　　§
States of America, *et al.*,　　　　　 §
　　　　　　　　　　　　　　　　§
　　　　Defendants.　　　　　　　 §

## PLAINTIFF STATES' SUPPLEMENTAL BRIEF

# TABLE OF CONTENTS

Table of Contents ............................................................................................. ii

Table of Authorities ........................................................................................ iii

Introduction ......................................................................................................1

Argument ......................................................................................................... 2

    I.    Plaintiff States have standing. ................................................................ 2

        A.    Standing is determined by facts in existence when the suit was commenced. .. 2

        B.    Plaintiff States have demonstrated a legally cognizable injury in fact.................3

        C.    The Plaintiff States's injuries are traceable to the termination of MPP and redressable by the relief sought. ....................................................................12

    II.    The October 29 Memoranda should be vacated. ...................................15

        A.    The remedy of vacatur is authorized by the APA...........................15

        B.    Vacatur is not barred by 8 U.S.C. § 1252(f)(1). ...........................19

        C.    The October 29 Memoranda should be vacated............................ 22

Conclusion ......................................................................................................23

Certificate of Service......................................................................................25

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
No. 2:22-CV-223-Z, 2023 WL 2825871 (N.D. Tex. Apr. 7, 2023), *aff'd in part, vacated in part*, 78 F.4th 210 (5th Cir. 2023) ..................................................... 14

*Alli v. Decker*,
650 F.3d 1007 (3d Cir. 2011) ................................................................. 21

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) .............................................................................. 20

*Arevalo v. Ashcroft*,
344 F.3d 1 (1st Cir. 2003) ..................................................................... 21

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ..................................................................... 11, 12

*Biden v. Texas*,
142 S. Ct. 2528 (2022) ................................................................ 9, 10, 20

*Biden v. Texas*,
142 S. Ct. 926 (2021) ........................................................................... 23

*California v. Arizona*,
452 U.S. 431 (1981) .............................................................................. 20

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) (en banc) ................................................. 15

*Carr v. Alta Verde Indus., Inc.*,
931 F.2d 1055 (5th Cir. 1991) ................................................................. 2

*Cochran v. SEC*,
20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023) ............................................................... 8, 13

*In re Core Comm'n, Inc.*,
531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ....................... 22

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*,
187 F.2d 789 (3d Cir. 1951) ................................................................. 17

iii

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) .................................................................................. 16, 21

*Davis v. FEC*,
    554 U.S. 724 (2008) ...................................................................................................... 2

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................................... 7, 8

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .............................................................................................. 9, 16

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) .................................................................................................... 21

*EME Homer City Generation, L.P. v. E.P.A.*,
    795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.) ....................................................... 22

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) (en banc) ...................................................................... 18

*Fisher v. Univ. of Texas at Austin*,
    758 F.3d 633 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) ......................................... 4

*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ...................................................................................... 15

*Free v. Abbott Labs., Inc.*,
    164 F.3d 270 (5th Cir. 1999)......................................................................................... 3

*GLO v. Biden*,
    71 F.4th 264 (5th Cir. 2023)......................................................................................... 2

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) .............................................................................. 16, 21

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) .................................................................................................. 20

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ...................................................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................................. 2, 17

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) .............................................................................................. 17, 18

iv

*Lynch v. Leis*,
    382 F.3d 642 (6th Cir. 2004) ..................................................................................... 2

*Missouri v. Biden*,
    —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4,
    2023) (Doughty, J.) ................................................................................................ 13

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................................... 21

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) ................................. 22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................................. 17

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................................... 17

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ................................................................................... 2

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
    No. 6:20-cv-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (Barker, J.) ...... 16

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ............................................................................................... 19

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007) ................................................................................................. 3

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ............................................................................... 21

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ............................................................................... 3

*Scenic Am., Inc. v. United States Dep't of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) ................................................................................. 12

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) .......... 16

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) (Kacsmaryk, J.) ........................................ 10

v

*Texas v. Biden (MPP)*,
  20 F.4th 928 (5th Cir. 2021) ..................................................................................... *passim*

*Texas v. Biden*,
  No. 2:21-cv-67, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) ............ 1, 2, 18

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ................................................................................................. 2

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ..................................................................................... 15, 18, 19

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.) ................................................................ 10

*Texas v. United States (DACA)*,
  50 F.4th 498 (5th Cir. 2022) ....................................................................... 10, 13, 19, 22

*Texas v. United States (DAPA)*,
  809 F.3d 134 (5th Cir. 2015) ............................................................................. 9, 11, 18, 19

*United States v. Castillo*,
  179 F.3d 321 (5th Cir. 1999) .................................................................................................. 4

*United States v. Lee*,
  358 F.3d 315 (5th Cir. 2004) .................................................................................................. 4

*United States v. Texas (Enforcement Priorities)*,
  143 S. Ct. 1964 (2023) ............................................................................................... *passim*

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ............................................................................................ 14

*V.I. Tel. Corp. v. FCC*,
  444 F.3d 666 (D.C. Cir. 2006) .............................................................................................. 16

**Statutes**

5 U.S.C. § 705 ............................................................................................................... 1, 17

5 U.S.C. § 706 ..................................................................................................................... 17

5 U.S.C. § 706(2) ..................................................................................................... 14, 16, 17

5 U.S.C. § 706(2)(A) ............................................................................................................ 16

8 U.S.C. § 1252(f) ......................................................................................................... 20, 21

8 U.S.C. § 1252(f)(1) ............................................................................................ 19, 20, 21

**Other Authorities**

8 C.F.R. § 1.3(a)(4)(vi) ...................................................................................................9

8 C.F.R. § 274a.12(c)(14) (2022) ...................................................................................9

42 C.F.R. § 417.422(h) ....................................................................................................9

*Black's Law Dictionary* 550 (7th ed. 1999) ................................................................ 20

*Black's Law Dictionary* 937 (11th ed. 2019) .............................................................. 20

*Black's Law Dictionary* 1612 (3d ed. 1933) ................................................................16

*Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011) ....................................... 20

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012
(2018) ........................................................................................................................ 21

Pursuant to this Court's order, ECF No. 201, Plaintiffs the State of Texas and the State of Missouri submit this brief to supplement their previously filed briefs (ECF Nos. 149, 168, and 175), which are adopted by reference here for purposes of summary judgment.

## INTRODUCTION

On August 8, 2022—after the Supreme Court remanded for this Court to evaluate the reasoned decisionmaking of Defendants' second attempt to terminate the Migrant Protection Protocols (MPP) via two memoranda issued on October 29, 2021—Plaintiff States filed an amended complaint and a motion to stay the October 29 Memoranda under Section 705 of the APA ECF No. 149.

Plaintiff States asked the Court to issue a stay of the October 29 Memoranda pending a final merits determination as to whether they adequately considered: (1) "how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate"; (2) "MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims"; (3) "the justification of changed factual determinations regarding *in absentia* removal orders"; (4) "whether DHS's rescission of MPP is causing [DHS] to violate the limits on its parole authority"; and (5) "costs to States and their reliance interests." ECF No. 149 at 6. This Court granted a stay of the October 29 Memoranda, finding they were likely arbitrary and capricious on all these grounds. *Texas v. Biden*, No. 2:21-cv-67, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.).

1

## ARGUMENT

## I.    Plaintiff States have standing.

Defendants argue that this Court cannot rely on its previous standing determinations made in the prior termination of MPP. ECF No. 203 at 11–13. But the Court already rejected these arguments. *Biden*, 2022 WL 17718634, *4–5. Nothing new justifies reversing this determination.

### A.    Standing is determined by facts in existence when the suit was commenced.

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted); *see also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

This suit was filed on April 13, 2021. ECF No. 1. In evaluating standing, the relevant facts are those existing when the complaint initiating the suit was filed. *See Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004). No facts subsequent to that date can serve to retroactively defeat standing. *See GLO v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021,

2

developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing).

That the Plaintiff States filed an amended complaint on August 8, 2022, does not change the relevant time period for evaluating standing. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). Although courts "look to the amended complaint to determine jurisdiction," *id*. at 474, "subject-matter jurisdiction depends on the state of things at the time of the action brought," *i.e.*, at the time the plaintiff *commenced suit*, *id*. at 473 (citation and internal quotation marks omitted). "The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (cleaned up); *see also id.* ("Thus, although we examine the allegations in SUWA's Amended Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007.").

This means that Defendants' attempts to undermine Plaintiff States' standing by pointing to actions by the Government of Mexico or numbers of migrant flows, ECF No. 203 at 9–10, 14, 28–29, cannot succeed. [1]

**B. Plaintiff States have demonstrated a legally cognizable injury in fact.**

The law-of-the-case doctrine applies to determinations of subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to

---

[1] Defendants even cite facts that post-date the August 8, 2022, filing of the Second Amended Complaint. ECF No. 203 at 9–10, 14, 28–29.

recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required) (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)). And "[i]n implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. S. Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin,* 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) (emphasis added; citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else.").

This Court is therefore bound by the Fifth Circuit's legal determinations on standing in this case, as well as the Supreme Court having "impliedly" found standing to challenge the termination of MPP when it reached the merits and remanded to this Court to evaluate the merits of whether the termination was arbitrary and capricious. *See* ECF No. 168 at 8–10. Defendants may assert that the Supreme Court's decision in *United States v. Texas* (*Enforcement Priorities*), 143 S. Ct. 1964 (2023), is an intervening authority sufficient to justify a refusal to follow this rule. But that ruling explicitly does not apply to cases like this one.

### 1. *Enforcement Priorities* does not apply to this challenge to the termination of MPP.

*Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens

whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect

5

order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because Plaintiff States' injuries are not based on a mere failure to arrest particular aliens on the border—they are based on Defendants' release of already-detained aliens into the States via parole, making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts,

6

for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id*. (cleaned up; citations omitted). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id*. at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id*. at 1969. But *those* indirect injuries were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id*. at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id*. at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment)

(noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

### 2. Even were the general rule in *Enforcement Priorities* to apply to this case, its exceptions would grant the Plaintiff States standing.

The Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, two closely related exceptions articulated by the Court would apply even if it did.

The *Enforcement Priorities* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional

8

enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *Texas v. United States* (*DAPA*), 809 F.3d 134, 154 (5th Cir. 2015) (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")). DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This exception applies to this case due to Defendants' policy of paroling—rather than detaining— the vast majority of aliens arriving at the border. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues). Parole makes recipients eligible for various federal and state benefits. "When the Department of Homeland Security lacks sufficient capacity to detain noncitizens at the southern border pending their immigration proceedings (often asylum proceedings), the immigration laws afford DHS two primary options": returning to Mexico (MPP) or parole. *Biden*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). "Due to the huge numbers of aliens who attempt to enter illegally from Mexico, DHS does not have the capacity to detain all

9

inadmissible aliens encountered at the border," *Biden*, 142 S. Ct. at 2550 (Alito, J., dissenting). That means aliens arriving at the border are being granted parole, at a rate that would be reduced by using MPP.

> As this Court has explained:
>
> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (Kacsmaryk, J.) (emphases in original). Because this Court has already found "that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri," due to a lack of detention capacity, *Texas v. Biden (MPP)*, 20 F.4th 928, 966 (5th Cir. 2021), that meant that more aliens were being released into the States to use healthcare services and public education—and parole made them eligible for subsidized driver's licenses. *Id*. at 968. This was sufficient for Article III standing and remains the case.

Plaintiff States' injuries on this basis are not indirect—courts in the DACA litigation described these same injuries as *direct* costs to the States. *See Texas v. United States* (*DACA*), 50 F.4th 498, 517 (5th Cir. 2022) ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id*. at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). The termination of MPP increases the flow of aliens paroled into the Plaintiff States, and the combination of the lack of capacity to detain all of them and the exercise of parole makes them eligible for benefits, imposing *direct* costs on the Plaintiff States.

The Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) reinforces that the costs to the Plaintiff States in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id*. at 2365, and it interacted with the federal government to service student loans and received administrative fees for these services, *id*. The loss of those fees was "an injury in fact *directly* traceable to the" loan forgiveness program, *id*. (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself," *id*. at 2366 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the Plaintiff States here. Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d at 155 n.58, and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and

11

without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156).

Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, the financial injuries imposed on the Plaintiff States here are direct rather than indirect.

### C. The Plaintiff States's injuries are traceable to the termination of MPP and redressable by the relief sought.

The *Enforcement Priorities* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *Enforcement Priorities*, 143 S. Ct. at 1970–71; *id.* at 1995 (Alito, J., dissenting). That decision therefore has no effect on those two prongs of the standing analysis, leaving the holdings of this Court and the Fifth Circuit the law of the case.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[2] *Enforcement Priorities*, 143 S. Ct. at 1976 (Gorsuch, J., concurring in the judgment). But that opinion has no legal effect—the majority had five different Justices supporting its holding and did not address traceability or redressability—and cannot somehow allow this Court to ignore binding Fifth Circuit precedent in this area, including the law-of-the-case determination by the Fifth Circuit in this case.

---

[2] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

12

The Plaintiff States here are entitled to special solicitude, as this Court and the Fifth Circuit have already held. The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Missouri v. Biden*, —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270, at *64 (W.D. La. July 4, 2023) (Doughty, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*).

Defendants still argue that *Enforcement Priorities* somehow overturns the special solicitude doctrine. ECF No. 203 at 24–27. But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11. This Court should follow the law-of-the-case determinations of the Fifth Circuit and find that the Plaintiff States are entitled to special solicitude.

Defendants argue that the lack of the subsequent cooperation of Mexico with MPP means that vacatur of the termination of MPP will not redress Plaintiff States' injuries. Of course, these facts are subsequent to even the August 8, 2022, amended complaint and cannot affect Article III standing, including redressability.

Further, when special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Mexico has as recently as last year cooperated with the United States in implementing MPP, and there is at least "some possibility" that it will do so again.

This Court has recently explained the standard for redressability (even without special solicitude):

> In this case, a favorable decision would likely relieve Plaintiffs of at least some of the injuries allegedly caused by FDA. *See Larson v. Valente*, 456 U.S. 228, 243 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury").

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2023 WL 2825871, at *8 (N.D. Tex. Apr. 7, 2023), *aff'd in part, vacated in part,* 78 F.4th 210 (5th Cir. 2023).

Directly relevant to the argument that Mexico having to cooperate with implementation of MPP affects the redressability analysis, this Court further explained in that case that:

> redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2565–66, 204 L.Ed.2d 978 (2019) ("[T]hird parties will likely react in predictable ways."); *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (defendants' actions need not be "the very last step in the chain of causation"); *Larson*, 456 U.S. at 242–44, 102 S.Ct. 1673; *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015). Therefore, Plaintiffs' alleged injuries are fairly traceable to Defendants and redressable by a favorable decision.

*Id.* This is *contra* Defendants' arguments that there is no redressability due to the necessity of Mexico's cooperation, and that line DHS officers would still have authority to not place aliens into MPP. ECF No. 203 at 27–28. There is some possibility that Mexico will again cooperate, as it has in the recent past, and DHS line officers have placed aliens into MPP during that time.

## II.    The October 29 Memoranda should be vacated.

Under the APA, an agency action that a court holds unlawful is "set aside," *i.e.*, vacated. 5 U.S.C. § 706(2). "The ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

The Fifth Circuit explained that "[r]emand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *MPP*, 20 F.4th at 1000 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). "But by default, remand *with* vacatur is the appropriate remedy." *Id.* (emphasis in original). The test focuses on "'(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" *Id.* (quoting *United Steel*, 925 F.3d at 1287).

The Fifth Circuit recently "reject[ed] DHS's contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *DAPA*, 809 F.3d at 188).

### A.  The remedy of vacatur is authorized by the APA.

Federal Defendants continue to push their radical claim that vacatur is not a legitimate remedy under the Administrative Procedure Act ("APA"). ECF No. 203 at 34–35. But the Fifth Circuit just recently affirmed such a remedy, finding it "was well within its discretion to order vacatur" of the DACA Memorandum. *DACA*, 50 F.4th at 530. And when reviewing the prior

termination of MPP, that court did the same, *MPP*, 20 F.4th at 1000–01, making the availability of this remedy the law of the case.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

Defendants contend that section 706(2) is merely a rule of decision and does not authorize vacatur. ECF No. 203 at 34–34. But "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). If accepted, Federal Defendants' interpretation would upend decades of APA decisions. For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1901 & 1916 n.7 (2020).

Even if it weren't precluded by binding precedent, Federal Defendants' arguments fail even writing on a blank slate. The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have long relied on the "set aside" authority to vacate unlawful agency actions.

A court "set[s] aside agency action" by vacating it. 5 U.S.C. § 706(2). When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.

Defendants maintain that if agency actions are vacated, vacatur should apply only to the parties. ECF No. 203 at 33. This atextual argument raises unanswerable questions. "[H]ow could this Court vacate the Rule with respect to the … plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Defendants' argument clashes with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the

17

scope of relief to be awarded). *Lujan*'s five-Justice majority observed that an "entire" agency program is "affected" by a successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation, "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting). Against this authority, however, Defendants have cited no case adopting their interpretation.

Defendants also argue that *nationwide* vacatur would be improper. ECF No. 203 at 35–36. But relief applying to Texas alone would not provide even Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [alien] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188; *see also Biden*, 2022 WL 17718634, at *18 ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted). This principle applies equally to vacatur.

18

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)), meaning that "[p]artial implementation of [the challenged immigration policy] would "detract[ ] from the 'integrated scheme of regulation' created by Congress," *id.*(quoting *Arizona*, 567 U.S. at 401).

Thus, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

### B. Vacatur is not barred by 8 U.S.C. § 1252(f)(1).

Defendants argue that the remedy of vacatur is akin to an injunction and barred by the limit on injunctive relief in 8 U.S.C. §1252(f)(1). ECF No. 203 at 31–33. Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (rejecting DHS argument that "vacatur

'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)).

This provision further confines itself to injunctions through its reference to remedies that "enjoin or restrain." 8 U.S.C. § 1252(f)(1). As "common doublets in legal writing" "restrain and enjoin" are often used as "coupled synonyms." *Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011).

Indeed, dictionaries contemporaneous to the passage of section 1252(f)(1) defined "enjoin" as "restrain by injunction." *Black's Law Dictionary* 550 (7th ed. 1999). "Enjoin" and "restrain," independently and as a doublet, refer to injunctive relief. Indeed, the Supreme Court has entered injunctions against parties in its original-jurisdiction docket by holding that they are "enjoined and restrained." *E.g., California v. Arizona*, 452 U.S. 431, 432 (1981).

Of course, at times, "enjoin" and "restrain" refer to injunctions and restraining orders as distinct from one another. For example, Federal Rule of Civil Procedure 65(c) describes the subject of a "preliminary injunction" or "temporary restraining order" as a party "enjoined or restrained." Whether treated as synonyms or references to two types of injunctive relief, "enjoin or restrain" as used in section 1252(f)(1) specifies injunctive relief. Subsection 1252(f)'s title, "Limit on injunctive relief," confirms this interpretation. 8 U.S.C. § 1252(f). "[T]he heading of a section" is a "tool available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (cleaned up). Here, section 1252(f)'s "title—'Limit on injunctive relief'—makes clear the narrowness of [the statute's] scope." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). It "prohibits … injunctive relief." *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018).

Contrary to Federal Defendants' contention, vacatur is not "like an injunction." ECF No. 203 at 31. "[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." *Black's Law Dictionary* 937 (11th ed. 2019) (quoting 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2-3 (1909)). Vacatur does not operate *in personam*, and it does not involve coercion.

Instead, vacatur operates against a challenged action, is self-executing, and is accomplished through the court's order. It operates "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018). Nor does vacatur compel officials to do or refrain from anything. Like the revocation of a court order, judicial annulment of administrative action may alter a party's conduct, but it does not order anyone to do anything.

The two remedies differ in additional ways. "An injunction is a[n] … extraordinary remedy," *Monsanto*, 561 U.S. at 165, while vacatur is "the ordinary result," *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Injunctions "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but vacatur is the "default," *Data Mktg. P'ship, LP*, 45 F.4th at 859. Injunctions require showing "an irreparable injury," and both "the public interest" and "the balance of hardships between the plaintiff and defendant" must favor injunctive relief. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Vacatur's "less drastic remedy," *Monsanto*, 561 U.S. at 165, requires none of those showings.

Defendants also maintain that the term "restrain" in Section 1252(f)(1) sweeps beyond injunctive relief. ECF No. 203 at 31. But the word "'restrain' in Section 1252(f) is best read to

refer to temporary injunctive relief." *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010); *Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011) ("'[R]estrain' refers to one or more forms of temporary injunctive relief, such as a temporary restraining order or preliminary injunction"); *Arevalo v. Ashcroft,* 344 F.3d 1, 7 (1st Cir. 2003) ("The most sensible way to give operative effect to both words in this statutory scheme is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief....").

## C. The October 29 Memoranda should be vacated.

In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *DACA*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

The October 29 Memoranda have serious deficiencies as they perpetuate the same unlawful action on one of the same bases that this Court previously held as unlawful—arbitrary and capricious decisionmaking. As the Fifth Circuit previously said in this case:

> DHS was on notice about the problems with its decision well before it terminated MPP. And it still failed to correct them. It therefore makes sense that the district court didn't take seriously DHS's claim that it could easily fix those errors on remand without vacatur.

*MPP*, 20 F.4th at 1000–01. Further, there would be no disruptive consequences, as the October 29 Memoranda have been stayed since this Court's prior ruling on December 15, 2022.

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J.,

concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such.").

DHS has had opportunities to solve this problem within the bounds of reasoned decisionmaking. It failed when it tried to terminate MPP the first time. *See Biden v. Texas*, 142 S. Ct. 926 (2021) (mem.) (denying stay because Defendants "had failed to show a likelihood of success on the claim that the [original MPP termination memorandum] was not arbitrary and capricious." And given a second chance, DHS has failed to terminate MPP according to the requirements of reasoned decisionmaking again in the October 29 Memoranda. There should be no third chance. Accordingly, this Court should vacate the October 29 Memoranda.

CONCLUSION

The Court should grant summary judgment on Plaintiff States' claim that the October 29 Memoranda are arbitrary and capricious; issue declaratory relief to that effect; and set aside, *i.e.*, vacate the October 29 Memoranda.

23

Dated: September 15, 2023

Respectfully submitted.

ANDREW BAILEY
Attorney General of Missouri

ANGELA COLMENERO
Provisional Attorney General of Texas

JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

*/s/ Maria Lanahan*
MARIA LANAHAN, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Maria.Lanahan@ago.mo.gov

**Counsel for Plaintiff State of Missouri**

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Deputy Chief, Special Litigation Division
*Attorney-in-Charge*
Texas Bar No. 24105085

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
ryan.walters@oag.texas.gov
munera.al-fuhaid@oag.texas.gov

**Counsel for Plaintiff State of Texas**

24

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on September 15, 2023.

/s/ Ryan D. Walters
RYAN D. WALTERS

# Exhibit E

**United States District Court**
**Northern District of Texas**
**Amarillo Division**

| | |
|---|---|
| THE STATE OF TEXAS AND THE STATE OF MISSOURI | |
| *Plaintiffs,* | |
| v. | Case No. 2:21-cv-00067-Z |
| JOSEPH R. BIDEN, JR., In his official capacity as President of the United States of America, *et al.*, | |
| *Defendants.* | |

# PLAINTIFF STATES' SUPPLEMENTAL RESPONSE BRIEF

# TABLE OF CONTENTS

Table of Contents ......................................................................................................... ii

Argument ...................................................................................................................... 1

    I.     Plaintiff States have standing. ............................................................. 1

    II.    Review is not foreclosed by statute. ..................................................... 7

    III.   The October 29 Memoranda should be vacated. ................................. 8

Conclusion .................................................................................................................... 9

Certificate of Service.................................................................................................... 11

ii

Pursuant to this Court's order, ECF No. 201, Plaintiffs the State of Texas and the State of Missouri submit this response brief to supplement their previously filed briefs (ECF Nos. 149, 168, and 175), which are adopted by reference here for purposes of summary judgment, as well as their initial supplemental brief (ECF No. 204).

## ARGUMENT

### I.   Plaintiff States have standing.

Defendants continue to press their argument that the prior determinations that Plaintiff States have standing to challenge the termination of the Migrant Protection Protocols (MPP) by this Court and the Fifth Circuit (explicitly) and the Supreme Court (implicitly) do not constitute law of the case. ECF No. 203 at 11–13; ECF No. 205 at 1–6. But this Court already rejected these arguments when it granted preliminary relief in this case. *Texas v. Biden*, No. 2:21-cv-67, 2022 WL 17718634, *4–5 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.). "In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under Section 705 of the Administrative Procedure Act (APA)] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). For the same reasons that Plaintiff States were entitled to a stay of the October 29 Memoranda terminating MPP, they are entitled to vacatur of that action.

Defendants maintain that the Supreme Court in its MPP ruling did not have the issue of standing presented to it. But by reaching the merits, the Court necessarily determined that Plaintiff States had standing to challenge the termination of MPP. *Biden v. Texas*, 142 S. Ct. 2528 (2022). Further, by remanding back to this Court to consider whether the termination of MPP by the October 29 Memoranda was arbitrary and capricious, the Supreme Court "impliedly" determined that this Court Article III had standing to make such a determination. ECF No. 168 at 8–10; *see*

1

*Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) ("the 'mandate rule,' a corollary of the law of the case doctrine, compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court") (cleaned up).

In evaluating a new agency action that reimplemented the DACA program after remand from the Fifth Circuit that had previously found standing to challenge the prior iteration of the program, Judge Hanen recently explained why considering standing anew would violate the Fifth Circuit's mandate and the law of the case:

> The Fifth Circuit specifically mandated this Court to determine if there are material differences between the Final Rule and the 2012 DACA Memorandum, and, if so, whether the already established rulings concerning the 2012 DACA Memorandum apply to the Final Rule. While this limited remand does not prohibit the Court from proceeding on the currently filed motions, it clearly does not permit the parties to relitigate previously established issues.

> * * *

> Despite the Fifth Circuit's instructions, the Federal Defendants and the Defendant-Intervenors are attempting to relitigate a different set of issues than the one remanded to the Court, perhaps because it is abundantly clear from the administrative record that the Final Rule is merely a more formal enactment of the 2012 DACA Memorandum and thus subject to the same deficiencies. For example, the Defendant-Intervenors and the Federal Defendants have asked this Court to reconsider whether the Plaintiff States (and, specifically, Texas, the lead Plaintiff) have standing.

> This Court has addressed the topic of standing in great detail and has found that standing exists, and that finding has been affirmed by the Fifth Circuit. Thus, unless ultimately set aside by the Fifth Circuit *en banc* or by the Supreme Court, the Plaintiff States have established standing. Accordingly, the topic of standing is not before this Court.

*Texas v. United States*, No. 1:18-cv-00068, 2023 WL 5951196, at *8 (S.D. Tex. Sept. 13, 2023).

This Court's understanding of the proper role of a trial court after remand is not an outlier. The effect of the October 29 Memoranda is analytically identical to the previous termination action

2

because they do the same thing: terminate MPP. That the particular reasons given for performing each action differ does not change the effect of the action on the Plaintiff States.

But Defendants are even wrong that the Supreme Court has not faced the issue of standing in this case. They carefully state that "[s]tanding was not a question raised or briefed in Defendants' petition for a writ of certiorari or in merits argument before the Supreme Court." ECF No. 203 at 13. But when the Defendants *sought a stay* of this Court's ruling, they argued in the Supreme Court that Plaintiff States did not have standing to challenge the termination of MPP. *See Application for a Stay of the Injunction Issued by the United States District Court for the Northern District of Texas and for an Administrative Stay* 15–17, available at https://www.scotusblog.com/wp-content/uploads/2021/08/21A21.pdf.

The Court was not convinced—it rejected the application because Defendants "had failed to show a likelihood of success on the claim that the [original MPP termination memorandum] was not arbitrary and capricious." *Biden v. Texas*, 142 S. Ct. 926 (2021) (mem.). So, the Supreme Court rejected the application on the basis that the Plaintiff States had likely succeeded *on the merits* of the same claim of the functionally identical agency action here—that the termination of MPP was arbitrary and capricious.

And the Supreme Court's recent decision that Defendants heavily rely on—*United States v. Texas (Enforcement Priorities)*, 143 S. Ct. 1964 (2023)—carves out the challenge to the termination of MPP from its rule against standing. *See id.* at 1974 (citing *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues).

On this, Defendants maintain that the termination of MPP is not a "policy governing the continued detention of noncitizens." ECF No. 203 at 19 (cleaned up). But *Enforcement Priorities*

3

cited the MPP case as concerning that very issue. *Enforcement Priorities*, 143 S. Ct. at 1974. And the law of the case is that the termination of MPP concerns that issue. *See Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) ("Moreover, the MPP program is not about enforcement proceedings *at all*. Any alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a. The only question MPP answers is *where* the alien will *be* while the federal government pursues removal—in the United States or in Mexico.") (emphases in original); *see also Texas v. Biden (MPP)*, 20 F.4th 928, 987 (5th Cir. 2021) (endorsing this point).

Defendants press their argument that the existence of an amended complaint changes everything. ECF No. 205 at 2–3. But Plaintiff States have explained that where the same parties have standing at the time of the original complaint, Article III is satisfied even where the complaint is amended. ECF No. 204 at 2–3; *see also Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (rejecting the argument that the time of the most recent amended complaint is the relevant time period); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005) ("We do not think, however, that the actual use of checkpoints in 1997, 1998, and 1999 is relevant on the issue of standing because all of these events occurred after [the plaintiff] filed her original complaint") (quoting *Park v. Forest Serv. of the United States,* 205 F.3d 1034, 1037 (8th Cir. 2000)).

Defendants further argue that the Plaintiff States' injuries are self-inflicted because "they are the result of their own lawmakers' choices" to provide certain benefits. ECF No. 203 at 21–22. But, again, it is the law of the case here that has already rejected that argument:

> Finally, the Government says Texas's injuries are self-inflicted and therefore entirely irrelevant to the standing inquiry. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). Our court addressed and rejected precisely this argument in *DAPA. See* 809 F.3d at 157–60 (citing *Wyoming v. Oklahoma*, 502 U.S. 437 (1992)). The Government does not acknowledge that exhaustive, precedent-based treatment of the issue, and it offers no reason at all for holding that Texas's

injury is self-inflicted in this case when it was not in *DAPA*. Here, as there, Texas is injured by the "Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.* at 163.

*MPP*, 20 F.4th at 972 (citations truncated).

Defendants also attempt to relitigate whether Texas has shown injury due to its subsidized driver's licenses. ECF No. 203 at 22–23. But this is subject to a now-familiar response: the law of the case prevents a new evaluation of this evidence. The Fifth Circuit has held that "each additional customer seeking a Texas driver's license imposes a cost on Texas," *MPP*, 20 F. 4th at 968; that "the record" in this case shows "that Texas incurs a cost for each driver's license application it reviews," *id.*; and "the record shows the State incurs a cost for actually granting licenses." *Id.* at 969.

Defendants point to the Fifth Circuit's ruling in *Texas v. United States (DAPA)*, 809 F.3d 134, 162 (5th Cir. 2015), as limiting standing based on the driver's license rationale to large influxes of eligible aliens. ECF No. 203 at 23. But the Fifth Circuit *in this case* has explained that that limitation is no longer good law:

> The Government also seeks to differentiate this case from *DAPA* on grounds of magnitude—it seems to suggest there's no standing here because the damages may not total to millions of dollars. Our court noted that Texas's injuries in that case largely depended on its "need to hire employees, purchase equipment, and obtain office space"—"steps that would be unnecessary" with smaller numbers of new applicants. *DAPA*, 809 F.3d at 162. Regardless of what *DAPA* had to say on the magnitude of injury required for standing, the Supreme Court has since clarified that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, ––– U.S. ––––, 137 S. Ct. 973, 983 (2017) (quotation omitted); *see also Uzuegbunam v. Preczewski*, ––– U.S. ––––, 141 S. Ct. 792, 801–02 (2021) (nominal damages sufficient for standing's redressability prong).

*MPP*, 20 F.4th at 974–75 (citations truncated).

5

Defendants also challenge traceability because, they say, Plaintiff States "cannot establish that any noncitizens to whom they provide services reside in their States as a result of the termination of MPP rather than a host of other possible reasons," including "on parole or a host of other immigration statutes for which they would be eligible regardless of whether MPP is in operation." ECF No. 203 at 24. Again, the law of the case here has already rejected this reasoning:

> The Government says [showing that the challenged agency action would increase the number of aliens paroled into Texas is] not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971. "To the contrary, given both MPP's effect of increasing the number of parolees and the fact that many of those parolees will apply for Texas licenses, it's impossible to imagine how the Government could terminate MPP *without* costing Texas any money." *Id.*

Defendants also contend that because the Government of Mexico is an obstacle to reimplementing MPP, there is no redressability. ECF No. 205 at 12–13. But Plaintiff States have explained why this is not so. ECF No. 204 at 13–14.

Defendants further maintain that this Court cannot rely on special solicitude. ECF No. 205 at 12. Of course, that the Plaintiff States are entitled to such solicitude is the law of the case. And *Enforcement Priorities* did not overrule that doctrine; it merely held it had no application where the States sought to interfere with executive discretion to arrest aliens. *Enforcement Priorities,* 143 S. Ct 1975 n.6.

6

Finally, Defendants argue this case is moot. ECF No. 205 at 3–4. But "the burden of proving mootness is higher than simply showing a lack of standing." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 n.40 (5th Cir. 2022). A case is moot if "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, (2012) (quotation omitted). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984). Defendants do not meet their heavy burden of showing the impossibility of Mexico cooperating with MPP.

## II.    Review is not foreclosed by statute.

Defendants press the idea that review of the decision to terminate MPP is barred by 8 U.S.C. § 1252(a)(2)(B)(ii). ECF No. 203 at 30–31. But the law of the case has already rejected this. "To the contrary, the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *MPP*, 20 F.4th at 977 (rejecting argument that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii)") (emphasis in original); *see also Roe v. Mayorkas*, No. 22-cv-10808, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023) ("the Court agrees with Plaintiffs that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action taken under § 1182(d)(5)(A)" and collecting cases holding the same thing); *id.* at *9 (DHS parole policies at issue in the case were reviewable under the APA, because "the guidelines in § 1182(d)(5)(A) provide sufficient guidance such that the [Federal] Defendants' actions are not unreviewable under the narrow exception articulated in § 701(a)(2).").

7

Plaintiff States have also addressed Defendants' argument, ECF No. 203 at 30, that the Supreme Court's decision in *Patel v. Garland*, 142 S. Ct. 1614 (2022), has any relevance here. *See* ECF No. 168 at 14 n.3.

## III. The October 29 Memoranda should be vacated.

Defendants rely heavily on the three-Justice concurrence in *Enforcement Priorities* in support of their argument that the APA does not authorize the remedy of vacatur. ECF No. 205 at 14–17. As explained by the Plaintiff States, binding Fifth Circuit precedent—including in this very case—rejects this argument. ECF No. 204 at 15–19. And even Justice Gorsuch's concurrence in *Enforcement Priorities* takes no position on whether vacatur is an available remedy under the APA. *See Enforcement Priorities*, 143 S. Ct. at 1985 ("courts can at least arguably trace their authority to order vacatur to language in a statute and practice in some lower courts. But the questions here are serious ones. And given the volume of litigation under the APA, this Court will have to address them sooner or later. Until then, we would greatly benefit from the considered views of our lower court colleagues."). Defendants can cite no judicial authority in support of their radical argument.

Vacatur is proper based on consideration of "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the action." *Texas v. United States (DACA)*, 50 F.4th 498, 529 (5th Cir. 2022) (citation omitted).

As Plaintiff States have explained, the agency has already had two opportunities to justify a termination of MPP. ECF No. 204 at 23. And the Supreme Court has held that an agency action "must be vacated" even where the sole infirmity is arbitrary-and-capricious decisionmaking. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020).

8

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council*, 955 F.3d at 85 (rejecting agency's disruption argument). And no foreign policy concerns can serve to preclude vacatur. "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). While "[t]he [G]overnment's interest in efficient administration of the immigration laws at the border is ... weighty," "control over matters of immigration is a sovereign prerogative, largely within the control of the executive *and the legislature*." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (emphasis added). By making agencies such as DHS subject to judicial review under the APA, Congress has asserted its foreign policy prerogatives over that of the agencies, including requiring reasoned decisionmaking in this area.

## CONCLUSION

The Court should grant summary judgment on Plaintiff States' claim that the October 29 Memoranda are arbitrary and capricious; issue declaratory relief to that effect; and set aside, *i.e.*, vacate the October 29 Memoranda.

9

Dated: October 6, 2023

Respectfully submitted.

ANDREW BAILEY
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

*/s/ Maria Lanahan*
MARIA LANAHAN, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Maria.Lanahan@ago.mo.gov

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
*Attorney-in-Charge*
Texas Bar No. 24105085

**Counsel for Plaintiff State of Missouri**

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
ryan.walters@oag.texas.gov
munera.al-fuhaid@oag.texas.gov

**Counsel for Plaintiff State of Texas**

10

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served

electronically (via CM/ECF) on October 6, 2023.

/s/ Ryan D. Walters
RYAN D. WALTERS

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

THE STATE OF TEXAS AND
THE STATE OF MISSOURI,
        *PLAINTIFFS,*
V.

DONALD J. TRUMP, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED
STATES OF AMERICA, *ET AL.*,

        *DEFENDANTS.*

CASE NO. 2:21-CV-00067-Z

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING DEVELOPMENTS SINCE 2023**

On December 5, 2025, the Court stated in its Order (ECF No. 235) that the parties "may file supplemental briefing limited to legal and factual developments since October 2023 on or before December 19, 2025". Plaintiffs accordingly file this Supplemental Brief.

The District Court in this case ordered a stay of the October 29 Memoranda[1] and the termination of MPP on December 15, 2022 (ECF No. 178). *Texas v. Biden*, 646 F. Supp. 3d 753 (N. D. Tex. 2022). This Court in its 35-page Opinion and Order recounted the complex procedural history of this case. (*Id.* pp. 1-5). 646 F. Supp. 3d at 761-64. The Court then concluded at that stage of this case that:

A. Plaintiffs have standing (pages 8-10), 646 F. Supp. 3d at 765-66;

B. Plaintiffs Asserted a Valid Cause of Action (pages 10-11), 646 F. Supp. 3d at 766;

C. 8 U. S. C. Section 1252(f)(1) Does not Bar Jurisdiction (pages 11-15), 646 F. Supp. 3d at 766-69; and

D. Plaintiffs Are Likely to Prevail on the Merits (pages 19-33) 646 F. Supp. 3d at 771-80.

---

[1] The Court defined the "October 29 Memoranda" at page 4 as "two memoranda declaring that [DHS] had made a new decision terminating MPP. See ECF No. 162 at 19-61, Termination of the Migrant Protection Protocols ("Termination Memorandum") and Explanation of the Decision to Terminate the Migration Protection Protocols ("Explanation Memorandum").

1

E.  The Balance of Equities are in the Plaintiff States' Favor and Relief is in the Public Interest (p. 34), 646 F. Supp. 3d at 780-81;

F.  The Remedy Need Not be Geographically Limited (p34) 646 F. Supp. 3d at 781..

Thereafter, the parties completed briefing of motions for summary judgment in September and October 2023 (ECF Nos. 203, 204, 205, and 206).

## I.  STANDING

This Court had determined before December 15, 2022, that Plaintiff Texas had standing to bring the claims in this action as to the previous termination of MPP. See ECF No. 94 at 21-26. The Court stated in its Opinion and Order at page 8 that "Plaintiffs have standing to challenge the October 29 Memoranda for the same reasons that they had standing to challenge the previous termination of MPP. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 416 (5th Cir. 2022)".

The Court also noted that its previous standing determination is the "law of the case because the agency action at issue is identical to the previously challenged action." *Id.* The Court also noted that the Fifth Circuit had also previously confirmed the standing of Plaintiffs in *Texas v. Biden*, 20 F.4th 928, 966-76 (5th Cir. 2022).. Thus, Plaintiffs' standing is not subject to re-examination here.

Moreover, "standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction." *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991). Since 2023, this Court reiterated this principle in *Texas v. EEOC*, 785 F. Supp. 3d 170, 185 (N. D. Tex. 2025):

> Nor does the recent administration changes in the Executive Order or any subsequent DOJ policy affect the Court's determination that Texas established an injury in fact. As the Court has already noted, standing is established at the time the lawsuit is filed. Newman Green, Inc. 490 U. S. at 830. And "subsequent events do not deprive the court of jurisdiction."

2

The Court's reasoning in determining that Texas has standing in this case has been strongly bolstered since 2023 by the Fifth Circuit's decision in the *DACA* case, *Texas v. United States*, 126 F.4th 392, 407-12 (5th Cir. 2025). There, the Fifth Circuit noted that it had previously ruled in *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ("*Texas II*") that injuries like those shown by Texas were sufficient to establish standing. The Fifth Circuit then held that the law of the case doctrine applied to that holding in *Texas II* unless the Supreme Court had made a contrary decision since *Texas II*. See 126 F.4th at 405-06 & n.12.

The Fifth Circuit in the DACA Case affirmed the District Court's conclusion that Texas had standing because it had shown "pocketbook injury" from the increased presence of illegal aliens in Texas caused by the challenged immigration policies of Defendants. The Court rejected Defendants' argument that the Supreme Court's decision in *United States v. Texas*, 599 U. S. 670 (2023) ("*Immigration Priorities*") had undermined Fifth Circuit law establishing standing in cases in which standing is based on injuries to Texas like increased social-services spending. *Id.* at 411.

Thus, as here, the law of the case applied in the DACA Case so as to confirm that Texas had established standing. But even apart from the law of the case doctrine, the DACA Case confirms that the injuries Texas has shown in this case are legally sufficient to establish its standing in *MPP*. The Court was and is on very solid ground in so concluding.

Finally, the "mandate rule" compels the same conclusion that Plaintiffs have standing here for yet another reason. This case was remanded by the Supreme Court with the direction that the Court should consider "whether the October 29 Memoranda comply with Section 706 of the APA." *Texas v. Biden*, 597 U. S. 785, 814, 142 S. Ct. 2528, 2548 (2022). The Fifth Circuit remanded to this Court "for further proceedings consistent with the Supreme Court's decision". *Texas v. Biden*, 43 F.4th 446, 447 (5th Cir. 2022).

The mandate rule "requires a district court on remand to effect [the] mandate and do nothing else." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). The Fifth Circuit reiterated and applied the mandate rule several times since 2023. *See First Baptist Church of Iowa v.*

3

*Church Mut. Ins. Co.*, 2025 U. S. App. LEXIS 14824, 2025 WL 1683537 (5th Cir. 2025): *Franklin v. Regions Bank*, 125 F.4th 613, 629 (5th Cir. 2025); *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 257 (5th Cir. 2024). As stated in *First Baptist Church*:

> The law of the case doctrine dictates that a decision of a legal issue or issues by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case in the trial court, or on a later appeal in the appellate court. This doctrine requires that the district court abstain from reexamining an issue of fact or law that has already been decided on appeal. The proscription applies regardless of whether the issue was decided explicitly or by necessary implication. Relatedly, the mandate rule requires the district court on remand to affect our mandate and to do nothing else. Under the mandate rule, a district court on remand must implement both the letter and spirit of the appellate court's mandate and may not disregard the explicit directions of that court.

2025 U. S. App. LEXIS at **6-7 (punctuation omitted). Because neither the Supreme Court nor the Fifth Circuit upset this Court's ruling that Texas has standing nor remanded this case with directions to reconsider Plaintiffs' standing, the Court's holding on that issue remains solid.

## II.      VALID CAUSE OF ACTION

This Court previously rejected two stock arguments of Defendants: that its actions as to MPP were "committed to agency discretion" and that Plaintiffs' claims challenging the termination of MPP were "outside the zone of interests" of the INA. The Fifth Circuit affirmed this Court's rejection of those arguments. *Texas v. Biden*, 20 F.4th 928, 975-76, 978-88 (5th Cir. 2022). Thus, the law of the case doctrine and the mandate rule both bar relitigating them now.

Decisions since briefing was completed in this case in October 2023 confirm the correctness of the Court's rulings on these issues. The Southern District of Texas in *Gen. Land Office of Texas v. Biden*, 722 F. Supp. 3d 700 (S. D. Tex. 2024), stated:

> The APA establishes a basic presumption of judicial review for one suffering a legal wrong because of agency action. This presumption can be rebutted by a showing that the agency action is committed to agency discretion by law. However, to honor the presumption of review, this exception to Section

> 701(a)(2) is to be construed quite narrowly, and applies only in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.

*Id.* at 730 (citations omitted.) The Court contrasted agency decisions like the allocation of funds from a lump-sum appropriation, which provide no meaningful standard for judicial review, with the defendants' decision to spend funds for purposes not authorized by the relevant statute. Such decisions – there, to spend funds allocated for border wall construction for other purposes -- are not committed to agency discretion and were found to be contrary to law. *Id.*

The Court in *State v. United States Dep't of Homeland Security*, 736 F. Supp. 3d 310, 337(E. D. Tex. 2024), also rejected an argument by DHS that its challenged "parole in place" Rule was a matter "committed to agency discretion". Judge Barker described that the "committed to agency discretion" exception was "very narrow" and that the "narrow exception does not apply here" to the challenged parole statute.

The Fifth Circuit in the DACA Case, 126 F.4th 392 (5th Cir. 2025), rejected Defendants' "zone of interests" argument. It stated that the zone of interests test was "not intended to be especially demanding" and that "Texas need only show that it has an interest in the INA's enforcement and that its interest is arguably within the zone of interests the INS aims to advance. 126 F.4th at 415-16. The Court relied on its previous holding that the "interests the states seek to protect fall within the zone of the INA" because "Congress had "explicitly allowed states to deny public benefits to illegal aliens", 809 F.3d at 163. The Fifth Circuit concluded: "The interests the states seek to protect fall within the zone of interests of the INA. 126 F.4th at 416.

In *Texas v. Dept. of Homeland Security*, 2023 U. S. Dist. LEXIS 212676, 2023 WL 8285223 (W. D. Tex. Nov. 29, 2023), Chief Judge Moses stated that the harm asserted by Texas in that case "satisfies the additional "zone of interests" standing requirement, citing *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022). *Id.* at **18-19. The Court denied a preliminary injunction in that case based on its conclusion that the APA had not waived sovereign immunity of defendants as to Texas's common law claims. However, the Fifth Circuit later reversed that conclusion and issued

5

a preliminary injunction in favor of Texas. *State v. United States Dep't of Homeland Security,* 123 F.4th 186 (5th Cir. 2024). The Fifth Circuit thus implicitly affirmed the District Court's conclusion that Texas was within the "zone of interests" and had standing to sue DHS.

Texas and other States in 2024 also challenged the DHS "parole in place" Rule. *State v. United States Dep't of Homeland Security*, 756 F. Supp. 3d 310 (E. D. Tex. 2024). Defendants alleged that the Plaintiff States were not within the "zone of interests" of the APA and the INA, but the District Corut disagreed. It stated: "The plaintiff States' interest in border control is also within the zone of interests pf the INA". *Id.* at 336-37.

This Court in 2024 also found that a claim by Texas against DHS was within the zone of interests of the INA. In *Texas v. Mayorkas,* 2024 U. S. Dist. LEXIS 21947 (N. D. Tex. 2024), the Court denied a motion to dismiss a challenge by Texas to an Interim Final Rule known as the "Asylum Officer Rule". The court found that Texas's claims "easily satisfy the [zone of interests] test." Id. At *10-11.

### III.      8 U. S. C. SECTION 1252(f)(1)

Defendants argued that this Court lacked jurisdiction to grant relief under Section 705 of the Administrative Procedure Act. The argument pertained to this Court's authority to issue a stay of the October 29 Memoranda.  The Court concluded that Section 1252(f)(1) does not prohibit vacatur under Section 706, as the Fifth Circuit decided in *Texas v. United States*, 40 F.4th 205, 219-20 and *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022).  That is the principal final relief that Plaintiffs now seek.

Since 2023, the Fifth Circuit reiterated its 2022 holding that Section 1252(f)(1) does not bar vacatur. In January 2025, the Fifth Circuit made short work of Defendants' argument:

> The government attempts to evade review entirely by theorizing that 8 U.S.C. § 1252(f)(1) strips the district court of jurisdiction to enjoin and vacate the Rule.40 But we rejected that theory in *Texas II, see* 50 F.4th at 529, and that holding controls.

*Texas v. United States,* 123 F.4th 392, 419 (5th Cir. 2025).

6

## IV.    PLAINTIFFS SHOULD PREVAIL ON THE MERITS.

Plaintiffs are unaware of any developments since 2023 that cast any doubt on the conclusions the Court reached in its careful consideration of the merits of this case. See 646 F. Supp. 3d at 771-80. Time has only made more apparent the flaws in Defendants' decision making with respect to the October 29 Memoranda. 2023 and 2024 saw illegal immigration surge to unprecedented level along the Texas Border and elsewhere. "Catch and release" policies necessitated in part by the termination of MPP allowed millions of illegal aliens to enter the United States without detention or even any supervision. This surge overwhelmed Defendants' capacity to detain such aliens as required by the INA.

The defects the Court found in Defendants' decision making in the October 29 Memoranda have cost America – and Texas and its citizens – dearly:

a. *Defendants failed to adequately consider how using contiguous-territory return authority would allow them to avoid violations of the INA's detention mandate.*

b. *Defendants failed to adequately examine whether DHS's rescission of MPP causes it to violate the limits on it parole authority.*

c. *Defendants failed to adequately account for several key benefits of MPP.*

d. *Defendants failed to adequately justify factual determinations regarding in absentia removal orders.*

e. *Defendants failed to adequately consider costs to States and their reliance interests.*

Since 2023, the Court in *State v. United States Dep't of Homeland Security*, 756 F. Supp. 2d 310 (E. D. Tex. 2024), found that Defendants did violate their parole authority when they adopted the "parole-in-place" Rule in 024. In November 2024, American voters elected a new President

7

who campaigned on promises to strongly enforce United States laws against illegal immigration. When the new President took office in January 2025, once of his first actions was to sign Executive Orders restricting abuse of Defendants' parole authority. Another was his reinstatement of MPP.

On February 11, 2025, the Immigration Defenders Law Center filed an ex parte application in the Central District of California seeking a nationwide stay of the reimplementation of MPP. I*mm. Def, L. Ctr. v. Noem*, 2025 U. S. Dist. LEXIS 90171 (C. D. Cal. 2025) at **11-12. The District Court granted that application on April 18, 2025. The Government promptly appealed that ruling and moved to stay the District Court's Order pending appeal. The District Court denied the motion to stay. *Id.*

In a 2-1 opinion, the Ninth Circuit Court of Appeals on July 18, 2025, granted a partial stay by limiting the District Court's stay of reimplementation of MPP to the plaintiff and its clients. *Imm. Def. L. Ctr. v. Noem*, 145 F.4[th] 972 (9th Cir. 2025). However, the panel majority stated that the Plaintiff "has shown a likelihood of success on the merits of its APA claims" *Id*. at 994. It stated further:

> At this stage, we find that the substantial and concrete harm that ImmDef will suffer upon reimplementation of MPP likely outweighs the harm to the government and public's interest in the Executive Branch exercising its contiguous-territory return authority without restriction in the form of the Remain in Mexico policy.

145 F.4[th] at 995.

A petition for rehearing *en banc* was filed by the Government and is pending. In addition, the appeal was briefed and oral argument took place in the Ninth Circuit on August 21, 2025. No decision on the appeal has yet been announced.

8

Plaintiffs conclude that the proceedings in the Central District of California and the Ninth Circuit in the I*mmDef* case do not impede in any way the ability of this Court to rule on the pending summary judgment motions in this case. Moreover, the Court's conclusions in its Opinion and Order, 646 F. Supp. 3d 763 (N. D. Tex.), have only been strengthened and confirmed by relevant factual and legal developments since October 2023.

## V.     NATIONWIDE VACATUR IS APPROPRIATE.

Vacatur is a longstanding remedy under Section 706 of the APA and is recognized as distinct from injunctive relief in both its effect and its history. The Supreme Court in *Trump v. CASA, Inc.*, 606 U. S. 831 (2025), was careful to make clear that the geographical limits on injunctive relief discussed in that case did not affect remedies available under the APA. As stated in *Asylum Seeker Advoc. Project v. United Staes Citizenship & Imm. Servs.*, 2025 U. S. Dist. LEXIS 213791, 2025 WL 3029552 (D. Md. 2025) at *28:

> [I]n its recent decision limiting universal injunctions, the Supreme Court explicitly stated that its decision did not concern "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." Trump v. CASA, Inc., 606 U. S. 831, 847 n.10 (2025). This Court concludes, consistent with other recent cases addressing this issue, that the decision in CASA does not apply to relief under the APA.

Accordingly, Plaintiffs respectfully request that the Court grants summary judgment in their favor and vacate the October 29 Memoranda.

Date: December 19, 2025

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**CATHERINE L. HANAWAY**.
Attorney General of Missouri

**BRENT WEBSTER**
First Assistant Attorney General

**LOUIS J. CAPOZZI III**
Solicitor General
Bar #327251 (Pa)

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy

*/s/ Maria Lanahan*

**MARIA LANAHAN**
Deputy Solicitor General
MO Bar No. 65956

**RYAN G. KERCHER**
Chief, Special Litigation Division

*/s/ David Bryant*

**DAVID BRYANT**
*Attorney-in-Charge*
Senior Special Counsel
Texas Bar No. 03281500

**MISSOURI ATTORNEY GENERAL'S OFFICE**
815 Olive St, Suite 200
St. Louis, MO 63101
Phone: (314) 340-7366
Maria.lanahan@ago.mo.gov

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**COUNSEL FOR THE STATE OF MISSOURI**

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
David.bryant@oag.texas.gov
Munera.al-fuhaid@oag.texas.gov

**COUNSEL FOR THE STATE OF TEXAS**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 19, 2025 and that all counsel of record were served by CM/ECF.

*/s/ David Bryant*

**DAVID BRYANT**